No. 25-5197

# In the United States Court of Appeals for The Ninth Circuit

GOUYEN BROWN LOPEZ, ET AL.,
*Plaintiffs-Appellants*,

v.

UNITED STATES OF AMERICA, ET AL.,
*Defendants-Appellees*,

and

RESOLUTION COPPER MINING, LLC,
*Intervenor-Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Arizona
No. 2:25-cv-02758-DWL
Hon. Dominic W. Lanza

**EMERGENCY MOTION FOR AN INJUNCTION
PENDING APPEAL UNDER CIRCUIT RULE 27-3
RELIEF REQUESTED BY 11:59 P.M. AUGUST 18, 2025**

Miles E. Coleman
NELSON MULLINS RILEY & SCARBOROUGH LLP
2 W. Washington St., Ste. 400
Greenville, SC 29601
(864) 373-2352
miles.coleman@nelsonmullins.com

Jeffrey A. Wald*
NELSON MULLINS RILEY & SCARBOROUGH LLP
380 Knollwood Street, Suite 530
Winston-Salem, NC 27103
(336) 774-3335
jeffrey.wald@nelsonmullins.com

Madeline C. Bergstrom*
NELSON MULLINS RILEY & SCARBOROUGH LLP
101 Constitution Ave. NW, Suite 900
Washington, DC 20001
(202) 689-2807
madeline.bergstrom@nelsonmullins.com

*application for admission forthcoming

*Counsel for Plaintiffs-Appellants*

## CIRCUIT RULE 27-3 CERTIFICATE

The undersigned counsel certifies the following:

**(i) Attorneys' names and contact information**

Plaintiffs-Appellants are represented by:

Miles E. Coleman
Madeline C. Bergstrom
Jeffrey A. Wald
NELSON MULLINS RILEY & SCARBOROUGH LLP
2 W. Washington St., Ste. 400
Greenville, SC 29601
(864) 373-2352
*miles.coleman@nelsonmullins.com*

Defendants-Appellees United States of America, et al., are represented by:

Erika Danielle Norman
Angela Ellis
Gregory Martin Cumming
ENVIRONMENT AND NATURAL RESOURCES DIVISION
U.S. DEPARTMENT OF JUSTICE
4 Constitution Square
Washington, D.C. 20002
(202) 305-0475
Erika.Norman@usdoj.gov
Angela.Ellis@usdoj.gov
Gregory.Cumming@usdoj.gov

Intervenor-Defendant Resolution Copper Mining, LLC, is represented by:

Andrea J. Driggs
Benjamin Longbottom
Janet Marie Howe
Christopher David Thomas

i

HOLLAND & HART LLP
3110 N. Central Ave., Ste. D-160
Phoenix, AZ 85012
(602) 884-2003
ajdriggs@hollandhart.com
balongbottom@hollandhart.com
jmhowe@hollandhart.com
cdthomas@hollandhart.com

Michael R. Huston
Addison W. Bennett
Diane M. Johnsen
Samantha Jones Burke
PERKINS COIE LLP
2525 E. Camelback Rd., Ste. 500
Phoenix, AZ 85016
(602) 351-8062
mhuston@perkinscoie.com
abennett@perkinscoie.com
djohnsen@perkinscoie.com
sburke@perkinscoie.com

**(ii) Facts showing the nature and existence of the emergency**

For centuries, Western Apaches and other tribes have worshiped at a sacred site called Chí'chil Biłdagoteel ("a broad flat of Emory oak trees") or Oak Flat. Oak Flat is the Apaches' direct corridor to the Creator and the site of sacred rituals that are uniquely tied to that place and cannot be replicated elsewhere.

Yet on Tuesday, August 19, 2025, the federal government plans to transfer Oak Flat to a foreign-owned copper-mining company for the sole purpose of constructing a mine that will physically destroy the sacred

ii

site, swallowing it in a nearly two-mile-wide, 1,100-foot-deep crater and ending the religious practices of Apaches like Plaintiffs forever. The government admits that the mine will destroy Oak Flat: the destruction will be "immediate, permanent, and large in scale"; "public access" to the site will be "lost"; and nothing can "replace or replicate the tribal resources and [traditional cultural properties] that would be destroyed." USDA, 3 *Final Environmental Impact Statement: Resolution Copper Project & Land Exchange* 892 (June 2025) (i.e., 3-EIS-892), https://www.resolutionmineeis.us/documents/final-eis; 1-EIS-153, 327. The government also admits that the copper could be mined using "alternative underground mining methods" that would not crater Oak Flat's surface; but the government declined to require these alternatives, or even consider them, on the ground that using them would "reduce the amount of ore that could be profitably mined." 4-EIS-F-3, F-4. In other words, the government has authorized the complete physical destruction of an irreplaceable Native American sacred site solely to increase the profits of a foreign-owned mining company.

This irreversible destruction of Oak Flat violates, at minimum, the National Environmental Policy Act (NEPA), and the National Historic Preservation Act (NHPA). Thus, Plaintiffs seek an emergency injunction pending appeal to preserve the status quo while this appeal proceeds.

The lower court in this case concluded that Plaintiffs will begin suffering irreparable harm immediately "once the land exchange is completed"

on August 19—both because the exchange will limit their "access" to Oak Flat, and because "it is undisputed" that the mining company "will begin changing Oak Flat in irreversible ways," such as by constructing "subterranean data-gathering tunnels" and disturbing Oak Flat's surface. *San Carlos Apache Tribe v. U.S. Forest Serv.*, No. 2:21-cv-68, Dkt. 124 at 89–91 (D. Ariz. Aug. 15, 2025) ("*San Carlos*"); *accord* ER.19 (noting that the analysis of irreparable harm in *San Carlos* "is incorporated by reference here" and that "Plaintiffs will suffer irreparable harm in the absence of a preliminary injunction"). The court also noted that "this is an important case of an unusual magnitude," that Plaintiffs have shown "compelling equities," and that the "Ninth Circuit" should have "at least some period of time … to consider these issues." ER.19–20.

Accordingly, Plaintiffs request, at minimum, that the Court enter an order by 11:59 p.m. on August 18, 2025, enjoining the land exchange for fourteen (14) days—until September 2, 2025—to allow this Court to consider Plaintiffs' request for an injunction pending appeal.

Before filing this motion, Plaintiffs conferred with counsel for the Defendants (the federal government and Resolution Copper) and asked if they would agree to a 14-day stay of the land transfer so that this Court could consider the request for relief on a less compressed schedule. The government and Resolution refused.

To facilitate prompt consideration of Plaintiffs' request for an injunction pending appeal, Plaintiffs propose the following briefing schedule:

- August 17: Plaintiffs' motion
- August 24: Defendants' response
- August 28: Plaintiffs' reply
- September 2: Court's decision

### (iii) Why the motion could not have been filed earlier

Plaintiffs filed a motion for preliminary injunction in the district court on July 25, 2025, requesting relief by August 12, 2025. On August 15, when the district court had not yet ruled on their preliminary-injunction motion, Plaintiffs filed a conditional motion for injunction pending appeal—requesting that, if the district court denied their preliminary-injunction motion, the court enter an injunction pending appeal.

The district court denied Plaintiffs' preliminary-injunction motion, and their request for injunction pending appeal, at 2:22 p.m. Pacific time on Sunday, August 17, 2025.

Plaintiffs filed this appeal and emergency motion the same day.

### (iv) Notice and service on the opposing parties' counsel

In compliance with FRAP 8(a)(2), Plaintiffs' notice of appeal and motion for an injunction pending appeal in the district court gave Defendants and Intervenor advance notice of this motion. Plaintiffs also notified Defendants' and Intervenor's counsel by email on August 15, 2025, of its intent to file this motion. Plaintiffs' counsel will email a PDF copy of this motion to Defendants' and Intervenor's counsel immediately after it is filed.

**(v) Whether relief was first sought in the district court**

Plaintiffs filed a motion for injunction pending appeal in the district court on August 15, 2025, and that motion was denied on August 17, 2025.

# TABLE OF CONTENTS

CIRCUIT RULE 27-3 CERTIFICATE ........................................................ i

TABLE OF AUTHORITIES ............................................................... viii

INTRODUCTION ............................................................................. 1

BACKGROUND ............................................................................... 3

    A. The Apaches and Oak Flat ................................................. 3

    B. Plaintiffs' religious practices ........................................... 6

    C. Prior protections for Oak Flat .......................................... 7

    D. The land transfer............................................................... 8

    E. The mine ........................................................................... 10

    F. Procedural history ............................................................ 12

ARGUMENT ................................................................................... 13

I.  The harm is undeniably irreparable. ................................... 14

II. The equities and public interest weigh heavily in
    Plaintiffs' favor. ................................................................. 16

III.  Plaintiffs are likely to succeed on the merits. .................. 18

    A. The Government's actions violate NEPA. ...................... 18

        1. The EIS violates NEPA's length requirement. ......... 19

        2. The EIS fails to consider reasonable alternatives. ..... 20

    B. The Government's actions violate the NHPA. ............... 24

CONCLUSION ................................................................................ 26

CERTIFICATE OF COMPLIANCE ...................................................... 28

STATEMENT OF RELATED CASES ................................................... 29

CERTIFICATE OF SERVICE ............................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All. for the Wild Rockies v. Cottrell,*
   632 F.3d 1127 (9th Cir. 2011) .......................................................15, 17

*Apache Stronghold v. United States,*
   101 F.4th 1036 (9th Cir. 2024) ........................................................1, 13

*Apache Stronghold v. United States,*
   145 S. Ct. 1480 (2025) ................................................................1, 8, 16

*Apache Stronghold v. United States,*
   2021 WL 12295173 (9th Cir. 2021) .................................................1, 15

*Apache Stronghold v. United States,*
   No. 21-cv-50, 2025 WL 1360694 (D. Ariz. May 9, 2025) .............14, 18

*Concerned Citizens All., Inc. v. Slater,*
   176 F.3d 686 (3d Cir. 1999) ...............................................................26

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.,*
   141 F.4th 976 (9th Cir. 2025) .......................................................21, 23

*Fellowship of Christian Athletes v. San Jose Unified Sch.*
*Dist. Bd. of Educ.,*
   82 F.4th 664 (9th Cir. 2023) ........................................................14, 18

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana,*
   98 F.4th 1180 (9th Cir. 2024) ............................................................14

*Friends of the Atglen-Susquehanna Trail, Inc. v. Surface*
*Transp. Bd.,*
   252 F.3d 246 (3d Cir. 2001) .......................................................24, 26

*Friends of the Inyo v. U.S. Forest Serv.,*
   103 F.4th 543 (9th Cir. 2024) ............................................................19

viii

*Kettle Range Conservation Grp. v. U.S. Bureau of Land Mgmt.*,
150 F.3d 1083 (9th Cir. 1998) ........................................................ 17–18

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
177 F.3d 800 (9th Cir. 1999) ............................................................ 24

*Nken v. Holder*,
556 U.S. 418 (2009) ......................................................................... 16

*Prutehi Litekyan: Save Ritidan v. U.S. Dep't of Air Force*,
128 F.4th 1089 (9th Cir. 2025) ......................................................... 22

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989) ......................................................................... 18

*Scott v. Boos*,
215 F.3d 940 (9th Cir. 2000) ............................................................ 20

*Seven County Infra. Coal. v. Eagle County*,
145 S. Ct. 1497 (2025) ............................................................... 19, 20

*W. Watersheds Project v. Abbey*,
719 F.3d 1035 (9th Cir. 2013) .......................................................... 22

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ............................................................................. 14

## Statutes

5 U.S.C. § 706 .............................................................................. 19, 26

16 U.S.C. § 539p ................................................................................ 22

42 U.S.C. § 4336a .......................................................................... 19, 20

54 U.S.C. § 306108 ............................................................................. 23

National Defense Authorization Act for Fiscal Year 2015,
§ 3003, 128 Stat. 3292, 3293 ..................................................... *passim*

## Other Authorities

36 C.F.R. § 800.1 ................................................................. 23–24

20 Fed. Reg. 7,319 (Oct. 1, 1955) ............................................. 7

36 Fed. Reg. 18,997 (Sep. 25, 1971) ......................................... 7

*About Chinalco, Overview*, Aluminum Corp. of China ............................ 8

Neil Hume, *Rio faces rebellion from biggest shareholder*,
   Financial Times (Apr. 10, 2019) ............................................. 8

Parliament of the Commonwealth of Australia, Joint Stand-
   ing Committee on Northern Australia, *Never Again* (Dec.
   2020) ........................................................................ 8

Response Letter from Brooke L. Rollins, USDA Sec'y, to Reid
   Nelson, ACHP Exec. Dir. (Apr. 17, 2025) ................................... 25

Tisa Wenger, *Fighting for Oak Flat: Western Apaches and
   American Religious Freedom*, 39 J.L. & Religion 247
   (2024). ................................................................... 3–4

USDA, *Final Environmental Impact Statement: Resolution
   Copper Project & Land Exchange* (June 2025) .............................. 10

x

## INTRODUCTION

In 24 hours, the core sacred site of the Western Apache people is set to be transferred to a private copper-mining company for the construction of a mine that will destroy the site, turning it into a nearly two-mile-wide, 1,100-foot-deep crater. The government's own environmental impact statement admits that the destruction will be "immediate, permanent, and large in scale"; that "public access" to the site will be "lost"; and that nothing can "replace or replicate the tribal resources and [traditional cultural properties] that would be destroyed." Thus, as two Justices and six judges of this Court have recognized, permitting this project to proceed will have "consequences that threaten to reverberate for generations," *Apache Stronghold v. United States*, 145 S. Ct. 1480, 1489 (2025) (Gorsuch, J., joined by Thomas, J., dissenting from denial of certiorari), "tragically" and "categorically preventing … Western Apaches" like Plaintiffs here "from ever again communing with *Usen* and the *Ga'an*, the very foundation of the Apache religion," *Apache Stronghold v. United States*, 101 F.4th 1036, 1157 (9th Cir. 2024) (en banc) (Murguia, C.J., dissenting); *accord Apache Stronghold v. United States*, 2021 WL 12295173, at *1–2 (9th Cir. 2021) (Bumatay, J., dissenting).

But that tragedy should not come to pass, because the government has not complied with the statutory prerequisites necessary to accomplish the transfer. The land transfer was purportedly authorized by Congress—but Congress *also* required the Forest Service to "carry [it] out in

accordance with the requirements of the National Environmental Policy Act of 1969 [(NEPA)]." Here, the government has not satisfied NEPA, in part because it failed to consider obvious alternatives: commonly used mining techniques that the government admitted were "technically" and "physically feasible" here and that would *not* turn Oak Flat into a crater. And the government's intransigent refusal to consider less destructive alternatives likewise violates the National Historic Preservation Act (NHPA), since the Forest Service flatly ignored a request by a peer federal agency (the Advisory Council on Historic Preservation) to assess those alternatives in detail and "employ all measures at its disposal to incentivize" them.

These claims weren't at issue in *Apache Stronghold*, so that case does not resolve them. And scenarios like this one are precisely why NEPA's and NHPA's procedural requirements exist—preventing projects from blithely destroying important environmental and cultural resources without the public's ability to make an informed assessment of the tradeoffs. The Court should enter an injunction pending appeal preventing the transfer and destruction of Oak Flat while Plaintiffs' appeal proceeds.

## BACKGROUND

### A. The Apaches and Oak Flat

For centuries, Western Apaches and other tribes have worshipped at *Chí'chil Biłdagoteel* or Oak Flat. *See generally* ER.201, 205, 211–19, 222–29.

Oak Flat is within the Tonto National Forest near Superior, Arizona. ER.239. Its terrain is characterized by old-growth oak groves, grassy basins, boulder fields, jagged cliffs, and rare perennial waters used by abundant wildlife. ER.202. It also features a singular concentration of "Apache [archaeological] sites located in one small area"—demonstrating it "has been persistently utilized and occupied for the past 1,500 years." ER.211–13.

Oak Flat is "the birthplace of [Western Apache] religion." ER.182; *accord* ER.184–87, 179–80, 192. It is a dwelling place of powerful spiritual beings called *Ga'an*, who are holy spirits or messengers between the Creator (*Usen*) and humans. ER.184–85, 222. As the dwelling place of the *Ga'an*, Oak Flat is a unique "source of supernatural power" (or *diyih*) and "the direct corridor to the Creator." ER.190, 205, 224; *see also* ER.173, 179–80, 182, 192. As such, Oak Flat is the site of essential religious ceremonies that are tied to that place and cannot be replicated elsewhere.

One example is the Holy Ground Ceremony—a blessing ceremony conducted by a medicine man for protection from sickness and perils. Tisa Wenger, *Fighting for Oak Flat: Western Apaches and American Religious*

3

*Freedom*, 39 J.L. & Religion 247, 259–60 (2024). The ceremony occurs at Oak Flat because "[t]he presence of the Gáán … makes the plants, herbs, and medicines gathered at Chi'chil Biłdagoteel more potent." *Id.* at 261; *see also* ER.184, 186.

Another is the Sunrise Ceremony, a rite of passage for Apache girls. ER.173. This ceremony takes months of planning, entails several days of celebration, and often unites clans from all four Western Apache reservations. ER.173, 229. To prepare for her Sunrise Ceremony, a girl moves onto Oak Flat and uses materials from Oak Flat to build a house—a *wickiup*—where she lives for the ceremony's duration. ER.174, 186. At the end of the ceremony, when the girl's godmother wipes the clay from her eyes, she is an Apache woman, forever connected with the spirit of Oak Flat. ER.179, 187, 189–90.

Oak Flat is also the site of several rare springs, which are sources of spiritual power for Apaches. ER.202, 224; 1-EIS-16. One example is *Tú Nahikaadi* (Dripping Spring), which has a unique role in Apache tradition as the site where the White Painted Woman—the matriarch of the Apache—took refuge following a great flood that scoured the world. ER.184–85, 229.

Oak Flat is also the site of *Tséyaa Gogeschin* (Written or Painted Under the Rocks), a large rock overhang with ancient pictographs and petroglyphs—rock art that holds profound meaning for Apaches and provides an irreplaceable connection to Apache ancestors. ER.183, 229. The

Chairman of the San Carlos Apache Tribe has described this artwork as "the very spirit of our ancestors, hallmarks akin to the art found in gothic cathedrals and temples … . This is why I call Oak Flat the Sistine Chapel of Apache religion." 6-EIS-U-9.

While marking off specific boundaries of a sacred place is in tension with Apache ways (ER.208), the following map identifies the area where the critical sites described above are located—including the sacred ceremonial grounds, oak groves, sacred springs, medicine-gathering areas, and ancient petroglyphs (*see* ER.181):



### B. Plaintiffs' religious practices

Plaintiffs in this case are Apache women and girls whose religious practices center on Oak Flat and who would be unable to practice their religion if Oak Flat is destroyed.

Plaintiff Gouyen Brown had her Sunrise Ceremony at Oak Flat. ER.173–79. She continues to return to Oak Flat to pray, gather medicine, and participate in religious ceremonies. ER.179–80.

Plaintiff Sinetta Lopez is Gouyen's mother. She grew up coming to Oak Flat with her own mother and grandmother, ER.181–82, and Oak Flat is central to her religious practices.

Sinetta has a minor daughter, L.B, who has grown up at Oak Flat, had dreams and encounters with spirits there, and was healed of an illness by drinking water from one of Oak Flat's sacred springs. ER.184. She is planning her Sunrise Ceremony at Oak Flat for October. ER.184.

Plaintiff Nomie Brown is an Apache woman who had her coming-of-age Sunrise Ceremony at Oak Flat. ER.186. That ceremony fundamentally changed her life, and she continues to return to Oak Flat to engage in prayer and religious ceremonies there today. ER.187–88.

Plaintiff Angela Kinsey is an Apache woman and mother who engages in religious practices at Oak Flat. ER.191–92. She has two minor daughters whom she continues to take to Oak Flat to pass on Apache traditions and religious ways. ER.192–94.

Angela's older minor daughter, V.K., had her coming-of-age ceremony at Oak Flat. ER.192. She has attended many ceremonies at Oak Flat, and attending and participating in those ceremonies is an essential part of her religious practices and identity as an Apache woman. ER.192.

Angela's younger minor daughter, M.K., is four years old. ER.192. Angela hopes and intends that M.K. will be able to have her coming-of-age ceremony at Oak Flat. ER.194.

### C. Prior protections for Oak Flat

Before the United States existed, Oak Flat was Apache land. As the government here admits, Oak Flat is "part of the traditional territories of the Western Apache," who "lived on and used the resources of these lands" until the government took Oak Flat "by force 150 years ago." 3-EIS-873–75. Because of the government's actions, Western Apaches "lost large portions of their homelands, including Oak Flat, and today live on lands that do not encompass places sacred to their cultures." 3-EIS-873–75.

Beginning in the 20th century, the government took steps to protect Oak Flat. In 1905, the government created the Tonto National Forest, encompassing Oak Flat. 2-EIS-823. In 1955, President Eisenhower reserved crucial portions of Oak Flat to protect it from mining. 20 Fed. Reg. 7,319, 7,336–37 (Oct. 1, 1955). In 1971, President Nixon renewed the protection. 36 Fed. Reg. 18,997, 19,029 (Sep. 25, 1971). And in 2016, the National Park Service placed Oak Flat in the National Register of Historic

Places, recognizing "that *Chí'chil Biłdagoteel* is an important feature of the Western Apache landscape as a sacred site, as a source of supernatural power, and as a staple in their traditional lifeway." ER.205.

### D. The land transfer

These protections came under pressure starting in 1995, when a large copper deposit was discovered thousands of feet beneath Oak Flat. 1-EIS-ES-1. In 2004, two multinational mining companies, Rio Tinto and BHP, formed a joint venture called Resolution Copper and began lobbying Congress to transfer Oak Flat so Resolution could mine the deposit. Rio Tinto's largest shareholder is Aluminum Corporation of China, a "state-owned enterprise" of the Chinese government.[1] And Rio has been widely condemned internationally for destroying indigenous sacred sites—including intentionally destroying 46,000-year-old caves constituting one of Australia's most significant cultural sites.[2]

Between 2005 and 2013, Congress considered at least twelve standalone bills to transfer Oak Flat to Resolution Copper. *Apache Stronghold*, 145 S. Ct. at 1482 (Gorsuch, J.). Each failed. *Id.* Lacking congressional support for a standalone bill, Resolution and its allies tried a

---

[1]  *About Chinalco, Overview*, Aluminum Corp. of China, https://www.chinalco.com.cn/en/en_gywm/en_qyjj/; *see* Neil Hume, *Rio faces rebellion from biggest shareholder*, Financial Times (Apr. 10, 2019), https://archive.ph/MOCv6.

[2]  Parliament of the Commonwealth of Australia, Joint Standing Committee on Northern Australia, *Never Again*, at vi (Dec. 2020), https://culturalheritage.org.au/wp-content/uploads/2024/01/Never-Again.pdf.

8

different tack: a last-minute rider to must-pass legislation. In 2014, the land-transfer provision passed as Section 3003 of a military-funding bill, the National Defense Authorization Act for Fiscal Year 2015, § 3003, 128 Stat. 3292, 3293.

Section 3003 authorizes the Secretary of Agriculture to transfer title to approximately 2,422 acres of Forest Service lands, including Oak Flat, to Resolution, in exchange for other parcels of land owned by Resolution scattered elsewhere in Arizona. § 3003(b)(2), (b)(4), (c)(1), (d)(1), 128 Stat. 3732–37. The land to be transferred to Resolution is shown here:



Section 3003 instructs that, "[p]rior to conveying" the federal land, "the Secretary shall prepare a single environmental impact statement under [NEPA], which shall be used as the basis for all decisions under

Federal law related to the proposed mine." § 3003(c)(9)(B), 128 Stat. 3735–36. Section 3003 also requires the Secretary to "engage in government-to-government consultation with affected Indian tribes." § 3003(c)(3)(A), 128 Stat. 3733. Following that consultation, the Secretary must consult with Resolution "and seek to find mutually acceptable measures to (i) address the concerns of the affected Indian tribes; and (ii) minimize the adverse effects on the affected Indian tribes resulting from mining and related activities." § 3003(c)(3)(B), 128 Stat. 3733.

Following this process, after the Secretary publishes a NEPA-compliant EIS, Section 3003 provides that "the Secretary shall convey all right, title, and interest of the United States" in Oak Flat "to Resolution Copper" within "60 days." § 3003(c)(10), 128 Stat. 3736.

### E. The mine

The government originally published an EIS on January 15, 2021. 1-EIS-ES-3. Weeks later, the government withdrew that EIS—stating that it needed additional "time" to "fully understand concerns raised by Tribes." *Id.* The government eventually republished the EIS on June 20, 2025. USDA, *Final Environmental Impact Statement: Resolution Copper Project & Land Exchange* (June 2025).

The EIS confirms that the mine will destroy Oak Flat. The copper is located between 4,500 and 7,000 feet below Oak Flat's surface. 1-EIS-ES-1. To mine it, Resolution will use a technique called panel caving, which

involves tunneling beneath the ore, fracturing it with explosives, and removing it from below. 1-EIS-13. Once the ore is removed, approximately 1.37 billion tons of toxic waste ("tailings") will need to be stored forever. 1-EIS-62. This will permanently bury or otherwise destroy many prehistoric and historic cultural artifacts. 1-EIS-44. Oak Flat itself will collapse ("subside") into a crater almost 2 miles across and 800 to 1,115 feet deep. 1-EIS-ES-4. The following map shows the crater in relation to the ceremonial sites described above (*cf.* 1-EIS-65):



The EIS admits that the mine's impacts will be "immediate, permanent, and large in scale" and that "public access" to the site will be "lost." 3-EIS-892; 1-EIS-327. Among other things, the mine will destroy the places used for Sunrise, Holy Grounds, and other sacred ceremonies; old-

growth oak groves and sacred medicinal plants; sacred springs, including Changing Woman Spring; burial grounds; and religious and cultural artifacts, including the ancient petroglyphs of *Tséyaa Gogeschin*. 1-EIS-ES-29, 1-EIS-44, 1-EIS-160; 6-EIS-U-3, 6-EIS-U-9–10. The cratering of Oak Flat will terminate Western Apaches' access to the site, destroy the foods, medicines, springs, artifacts and locations that are essential to their religious practices, and make it physically impossible for Apaches like Plaintiffs to ever engage in their core religious practices again. 1-EIS-160; 3-EIS-867–71; ER.180, 185, 190, 194.

### F. Procedural history

When the government initially published an EIS in 2021, three lawsuits challenged the EIS's adequacy and the land transfer's legality. *Apache Stronghold v. United States*, No. 2:21-cv-50 (D. Ariz. Jan. 12, 2021); *San Carlos Apache Tribe v. U.S. Forest Serv.*, No. 2:21-cv-68 (D. Ariz. Jan. 14, 2021); *Ariz. Mining Reform Coal. v. U.S. Forest Serv.*, No. 2:21-cv-122 (D. Ariz. Jan. 22, 2021). Two of those lawsuits (*San Carlos Apache* and *Arizona Mining Reform*) focused on the EIS itself and were stayed when the EIS was withdrawn on March 1, 2021. One of the lawsuits challenged the legality of the land transfer under the Religious Freedom Restoration Act and First Amendment and sought an emergency injunction. Following a divided panel decision, this Court, sitting en banc, affirmed the denial of an injunction by a splintered, 6-5 vote.

*Apache Stronghold*, 101 F.4th 1036. The Supreme Court denied certiorari, over the dissent of Justices Gorsuch and Thomas.

A few weeks after the certiorari denial, the government on June 20, 2025, republished the EIS. It intends to transfer Oak Flat to Resolution on August 19, 2025.

Plaintiffs filed this suit in the District of D.C. soon after republication of the EIS and sought a preliminary injunction. *Lopez v. United States*, No. 1:25-cv-2408 (D.D.C., filed July 25, 2025). Plaintiffs in the *San Carlos Apache* and *Arizona Mining Reform* cases amended their complaints and likewise sought preliminary relief. The D.C. district court, at Resolution's and the government's behest, transferred this case to the District of Arizona. The District of Arizona then denied a preliminary injunction in all three cases, despite acknowledging that "it is difficult to overstate just how profoundly the land exchange will undermine the ability of members of the San Carlos Apache Tribe ('the Tribe') to practice their religion." *San Carlos*, No. 2:21-cv-68, Dkt. 124 at 2; *see also* ER.19 ("[T]his is an important case of an unusual magnitude, involves sympathetic Plaintiffs, and raises some compelling equities[.]").

## ARGUMENT

An injunction pending appeal is warranted when the moving party demonstrates (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in

the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). These factors are evaluated "on a sliding scale, such 'that a stronger showing of one element may offset a weaker showing of another.'" *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 684 (9th Cir. 2023) (en banc) (citations and internal quotation marks omitted). Where "the balance of equities 'tips sharply in the plaintiff's favor, the plaintiff must raise only 'serious questions' on the merits—a lesser showing than likelihood of success." *Id.* Serious questions need only indicate "a fair chance of success on the merits," they "need not promise a certainty of success, nor even present a probability of success." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1192 (9th Cir. 2024).

## I. The harm is undeniably irreparable.

The court below found that "Plaintiffs will suffer irreparable harm in the absence" of an injunction. ECF No. 45 at 19. Indeed, it's "undisputed" that Plaintiffs will be irreparably harmed "if the transfer goes forward and Resolution Copper's mining plans are effectuated." *Apache Stronghold v. United States*, No. 21-cv-50, 2025 WL 1360694, at *6 (D. Ariz. May 9, 2025). Plaintiffs, like other Apaches, exercise their religion at Oak Flat. ER.179, 185, 190, 194. But on Tuesday, the government is planning to transfer Oak Flat to a copper-mining company that intends to obliterate the site, ending Plaintiffs' religious exercise and destroying priceless historical artifacts forever. In the government's own words, the

14

project will cause "permanent[]," "irreversible," and "irretrievable" harm. 2-EIS-837. Its impact on tribal resources will be "immediate, permanent, and large in scale." 3-EIS-892.

Nor is the irreparable harm limited to completion of the mine. Rather, "even if the site won't be entirely cratered immediately after conveyance," "[o]nce the land is transferred, the Western Apaches will suffer immediate, irreparable harm." *Apache Stronghold*, 2021 WL 12295173, at *5 (Bumatay, J., dissenting).

The transfer will immediately make Oak Flat "private property" that is "no longer … subject to [federal law] or Forest Service management that provides for tribal access." 3-EIS-871. Resolution will immediately have the power to exclude Plaintiffs from the site. As the district court found, they will have only "limited access to the post-land exchange version of Oak Flat," which "is no substitute for, and thus does not remediate the irreparable injury flowing the lack of unlimited access to, Oak Flat in its current form." *San Carlos*, No. 2:21-cv-68, Dkt. 124 at 90. This "will prevent the use and enjoyment by" Plaintiffs, which "satisfies the 'likelihood of irreparable injury' requirement articulated in Winter." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

Moreover, upon transfer, Resolution can immediately begin activities that will degrade Oak Flat. 1-EIS-61, Fig. 2.2.2-3. This includes constructing "new shafts," "new roads," a "water treatment plant," an "admin building," and "substations." *Id.* As the district court found, this

15

means the land "will immediately start being laced with subterranean data-gathering tunnels and," soon after, "undergoing surface disturbances." *San Carlos*, No. 2:21-cv-68, Dkt. 124 at 90.

Finally, transfer immediately deprives the government of any further opportunity to consider alternative mining techniques that would "minimize the adverse effects … resulting from mining," § 3003(c)(3)(B), 128 Stat. 3733—alternatives that must be considered under NEPA and the NHPA. *Infra* Sections III.A.2, III.B. Before transfer, the government is statutorily required to consider such measures. But once transfer occurs, "the Forest Service does not have authority to regulate mining operations on private land." ECF No. 33 at 13.

All of these irreparable harms are imminent: set to occur, absent this Court's intervention, on August 19.

## II. The equities and public interest weigh heavily in Plaintiffs' favor.

The balance of hardships and public interest also decisively favor relief. When the government is the defendant, these two factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Here the equities overwhelmingly favor Plaintiffs. Denial of preliminary relief "could result in the permanent loss of Apaches' legal rights to access their ancestral sacred site." These consequences "threaten to reverberate for generations." *Apache Stronghold*, 145 S. Ct. 1480, 1489 (2025) (Gorsuch, J., dissenting from denial of certiorari). There is also a

16

public interest in "'preserving nature and avoiding irreparable environmental injury.'" *Cottrell*, 632 F.3d at 1138. And this Court has recognized "the public interest in careful consideration of environmental impacts before major federal projects go forward," holding "that suspending such projects until that consideration occurs comports with the public interest." *Id.*

Meanwhile, delaying transfer causes no harm to the government. The government plainly faces no urgency with a transfer that was proposed almost two decades ago and authorized by statute eleven years ago. *Supra* pp.8–9. Indeed, in 2021, the government voluntarily rescinded the original EIS, *supra* pp.10–11, declining to republish it for four more years. And of course, all the copper the government seeks to have mined will still be there by the time this appeal is litigated.

This is precisely the kind of case in which this court has found that the balance of the hardships tips sharply in favor of an injunction. *See, e.g.*, *Cottrell*, 632 F.3d at 1137 (balance of the hardships tipped sharply for organization opposing logging because "[o]nce those acres are logged, the work and recreational opportunities … are irreparably lost," while government's lost revenue was not significant).

In fact, if the government effectuates the transfer and Resolution "under[takes] significant modification" of the land, the court may lose the ability to enforce the environmental protections at issue here altogether. *Kettle Range Conservation Grp. v. U.S. Bureau of Land Mgmt.*, 150 F.3d

1083, 1087–88 (9th Cir. 1998) (refusing to rescind transfer). As Judge Logan recently noted in *Apache Stronghold*, given the "'error costs on each side,'" "the balance of equities indeed 'tip[] sharply" in Plaintiff[s'] favor." 2025 WL 1360694, at *8. "In the most harmful scenario to Plaintiff[s], if this Court denies the injunction … and Plaintiff[s] ultimately win[] on the merits, Plaintiff[s] will have already suffered some or all of [their] enumerated immediate harms, even despite winning the day in this litigation. Yet in the riskiest scenario for Defendants, where the injunction is granted, … the only harm will have been a delay of the land transfer for a number of months or (at most) a couple years." *Id.*

## III. Plaintiffs are likely to succeed on the merits.

When, as here, the "balance of equities 'tips sharply in the plaintiff's favor,' the plaintiff must raise only 'serious questions' on the merits." *FCA*, 82 F.4th at 684. Given Plaintiffs are likely to succeed on the merits of their NEPA and NHPA claims, they easily satisfy this "lesser" serious-questions standard. *Id.*

### A. The Government's actions violate NEPA.

NEPA imposes "a set of 'action-forcing' procedures that require that agencies take a "'hard look" at environmental consequences'" before engaging in certain projects. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348, 50 (1989). The mine here is such a project. Indeed, the land-transfer statute expressly requires the Forest Service to "carry out the land exchange in accordance with the requirements of the National

Environmental Policy Act." § 3003(c)(9)(A)–(B), 128 Stat. 3735. The Forest Service violated NEPA in at least two ways.

### 1. The EIS violates NEPA's length requirement.

First, the district court and Defendants agree that the 2,400-page EIS here far exceeds NEPA's page limit: 150 pages generally or 300 pages in "extraordinary" circumstances. 42 U.S.C. § 4336a(e)(1)(A)–(B). Though the district court deemed this error harmless, ER.11–12, as the Supreme Court has recently emphasized, this limit serves important purposes, "strongly reinforc[ing]" NEPA's "basic principles," *Seven County Infra. Coal. v. Eagle County*, 145 S. Ct. 1497, 1512 n.3 (2025), including "rendering the agency publicly accountable for environmental harms it decides to tolerate," *id.* at 1521 (Sotomayor, J., concurring in judgment). So according to Congress and the Supreme Court, thousands-of-pages-long EISs do indeed "materially impede[] NEPA's goals." *Friends of the Inyo v. U.S. Forest Serv.*, 103 F.4th 543, (9th Cir. 2024). Indeed, here, the noncompliant EIS forced Plaintiffs to digest thousands of pages of material and litigate their cases on an extremely compressed schedule without an easily comprehensible administrative record. Because this clear NEPA violation is "agency action[] … not in accordance with law, the EIS must be "set aside," 5 U.S.C. § 706(2)(A), and the transfer that Congress expressly conditioned on that EIS must be enjoined until an EIS is reissued. § 3003(c)(9)(A)–(B), 128 Stat. 3735.

In response, Defendants' primary argument below was that to apply NEPA's page limit would be impermissibly "retroactive," since the page limit was enacted in 2023 while the "NEPA review" here began beforehand. Dkt.33 at 13. But the page limit regulates "environmental impact statement[s]," 42 U.S.C. § 4336a(e)(1), not "NEPA reviews," and the EIS here was issued in 2025—two years after the page limit was enacted. There is nothing "retroactive" about applying a statute to conduct occurring years later. *See, e.g.*, *Scott v. Boos*, 215 F.3d 940, 943 (9th Cir. 2000) (retroactivity when party lacked "opportunity to know what the law is and conform [its] conduct accordingly"). In fact, *Seven County* itself supports application of the page limit here: Although the Court recounted the page limit and its important purposes, it did not hold the agency to the limit there because the limit was enacted "two years after" the agency "*issued* its final EIS"—not after it (as here) merely started *preparing* to issue one. 145 S. Ct. at 1512 n.3 (emphasis added).

### 2. The EIS fails to consider reasonable alternatives.

Second, the EIS is deficient because it fails to analyze feasible alternative mining methods that would allow recovery of copper without destroying Oak Flat's surface.

Strikingly, the government recognized that such methods exist, conceding "there are other underground … techniques that could physically be applied to" the deposit and that are "technically" and "physically feasible." 4-FEIS-F-3–5; 1-EIS-50. And it recognized these methods "could

substantially reduce impacts on surface resources," leading to "the lack of a subsidence area overhead on Oak Flat." 4-FEIS-F-5; 1-EIS-50. But the government nonetheless "eliminated" "alternative mining techniques" "from detailed analysis." 4-EIS-F-5. This violates NEPA, which requires an EIS to "'study, develop, and describe appropriate alternatives' to the proposed agency action, thus informing policymakers and the public of options 'that would avoid or minimize adverse effects' on the environment." *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 141 F.4th 976, 990 (9th Cir. 2025).

The district court rejected this argument, claiming that "the Forest Service was not required to provide … any analysis of alternative mining methods" because "the Forest Service lacks authority to regulate the mining operations that will occur on private land following the land exchange." ER.15. But this is doubly wrong. First, Section 3003 itself requires the Forest Service to consider "measures" to "minimize the adverse effects on the affected Indian tribes resulting from mining and related activities"—which would include alternative mining measures. § 3003(c)(3)(B), 128 Stat. 3733. Second, the mining measures ultimately chosen necessarily influence all future "decisions under Federal law related to the proposed mine"—such as pipeline routing and permitting decisions—which is precisely what the "environmental impact statement under [NEPA]" serves "as the basis for." § 3003(c)(9)(B), 128 Stat.

21

3735–36. Thus, it is impossible to produce a SALECA- and NEPA-compliant EIS without considering these most basic alternatives.[3]

The government's responses fare no better. *First*, the government said it declined to consider alternative methods because they would "result in higher per-ton mining costs" and remove an "estimated 80 percent of the tonnage of the deposit from consideration"—relying on figures pulled without scrutiny from Resolution data. 4-EIS-F-5. But a "reasonable" alternative is one that advances the purpose of a government project, *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1046 (9th Cir. 2013), which in this case, as Congress explained, is "to authorize … the exchange of land" to make it "available" for "mining." 16 U.S.C. § 539p(a), (c)(8). Congress said nothing about *how much* copper the project should produce. Nor was the intent to maximize Resolution's bottom line. In fact, Congress's express concern was not about Resolution, but the Indian tribes, whose harm the government is required to seek to minimize. *See id.* § 539p(c)(3), (g)(5).

*Second*, the government rejected the viability of alternative mining methods on the grounds that "*almost no* alternative techniques … were

---

[3]  Nor does the EIS's relevance to future decisions present a "final agency action" problem. *Cf.* ER.15. A "single" EIS is the sole environmental analysis the land-transfer statute contemplates, § 3003(c)(9)(B), 128 Stat. 3735–36, and the EIS (not any other future document) triggers the relevant legal consequences—the transfer. *See Prutehi Litekyan: Save Ritidan v. U.S. Dep't of Air Force*, 128 F.4th 1089, 1108–13 (9th Cir. 2025).

identified as reasonable for an ore deposit with the characteristics of the Resolution deposit," 6-EIS-R-175, 180 (emphasis added), and "*very few* of these underground stoping methods have characteristics that are well suited to the Resolution copper deposit," 4-EIS-F-3 (emphasis added). But this simply concedes that at least *some* alternative techniques *are* "reasonable" and "well suited" to the deposit. The government's refusal to consider these alternatives cannot be squared with NEPA.

*Third*, the EIS claims the alternative mining alternatives are unreasonable because the proposed panel caving is a "standard mining method" "commonly used" to mine similar deposits and is thus the "appropriate method to be applied" to this mine. 4-EIS-F-5. But this is merely an affirmative statement in support of the government's preferred, destructive method; it offers no reason for disqualifying the proposed alternative mining methods. Simply being "standard" or "common" does not make an option the only reasonable one. To the contrary, the facts of the case suggest that this deposit is a uniquely non-standard site with uncommon conditions—namely an exceptionally deep deposit beneath an irreplaceable sacred site. 1-EIS-3–4.

The EIS's failure to complete a reasonable-alternatives analysis— "the 'heart' of the EIS," *Ctr. for Biological Diversity*, 141 F.4th at 990— violates NEPA and independently requires vacatur and injunctive relief.

**B. The Government's actions violate the NHPA.**

When government projects impact "historic property," the NHPA requires that it "take into account the effect of" any "undertaking" on that property and "afford the [Advisory Council on Historic Preservation (ACHP)] a reasonable opportunity to comment." 54 U.S.C. § 306108. This process, called the Section 106 process, seeks to "identify historic properties potentially affected by the undertaking, assess its effects and seek ways to avoid, minimize or mitigate any adverse effects." 36 C.F.R. § 800.1(a). If adverse effects on historic sites are identified, "the agency must continue consulting with the parties," *Friends of the Atglen-Susquehanna Trail, Inc. v. Surface Transp. Bd.*, 252 F.3d 246, 253 (3d Cir. 2001), seeking to "avoid or mitigate any adverse effect," *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999). And if an agreement between the ACHP and responsible agencies cannot be reached as to a plan for mitigation, the agency "must make clear in the record that the ACHP's comments were taken seriously." *Friends of the Atglen-Susquehanna Trail*, 252 F.3d at 265.

Here, the ACHP identified 43 sites eligible for the National Register that would be transferred to Resolution Copper and "permanently damaged by proposed mining operations." ACHP Comments at 3 (Mar. 29, 2021), https://www.achp.gov/sites/default/files/2021-03/VilsackResolutionCopperLTR20210329.pdf.  The comments specifically focused on the *Chi'chil Biłdagoteel* Historic District and emphasized that "[t]he historic

24

significance of Oak Flat cannot be overstated." *Id.* at 5. The comments further concluded that the mitigation measures proposed by the programmatic agreement were "wholly inadequate in light of the magnitude of adverse effects to this and other historic properties of such significance to numerous Indian tribes." *Id.* To "minimize adverse effects," it recommended (among other things) assessment of "more sustainable mining techniques in an effort to prevent subsidence at Oak Flat," and suggested that "USDA should employ all measures at its disposal to incentivize the consideration of such alternatives." *Id.* at 7.

Instead of adopting these measures, the Secretary of Agriculture decided to end the Section 106 process, publish the EIS, and initiate the 60-day deadline for transferring Oak Flat. On April 17, 2025, the USDA Secretary responded to the ACHP in a letter, declining to adopt the ACHP's recommended measures. Response Letter from Brooke L. Rollins, USDA Sec'y, to Reid Nelson, ACHP Exec. Dir. (Apr. 17, 2025), https://www.achp.gov/sites/default/files/2025-04/ResolutionCopperLetter417.pdf. The response provided no substantive discussion of the ACHP's suggested mitigation efforts, adopted none of them, and entirely failed to mention the specific suggestion of incentivizing alternate mining techniques that would prevent the crater from destroying Oak Flat. *Id.* The EIS then confirmed that the government did *not* conduct the suggested reassessment—since the only purported alternatives analysis it included was from 2020, *before* the ACHP's 2021 comments. 4-EIS-F-3–

25

F-4. The district court inferred a response in the government's claim that "the project will be almost entirely on private land." ER.18. But the land was not private when the government responded to the ACHP's comments, and it is not private now. The government still can and should incentivize the consideration of alternatives.

Section 106 requires the government to give "genuine attention" to the ACHP's conclusions and "make clear in the record that the ACHP's comments were taken seriously." *Concerned Citizens All., Inc. v. Slater*, 176 F.3d 686, 696 (3d Cir. 1999). The Forest Service did the opposite. By refusing to conduct studies of alternative mining methods that would have mitigated adverse effects on the historic and culturally significant land, the Forest Service violated the NHPA. Until the government "seriously" considers the ACHP's suggestions of alternative mining techniques by conducting a complete study of non-caving mining methods, the government's actions here—the promulgation of the EIS and the transfer of the land—should be held unlawful and "set aside." *Friends of the Atglen-Susquehanna Trail*, 252 F.3d at 265; 5 U.S.C. § 706(2).

## CONCLUSION

The Court should enjoin the transfer and destruction of Oak Flat pending appeal.

Respectfully submitted,

26

Dated: August 17, 2025          /s/Miles E. Coleman
                                Miles E. Coleman
                                NELSON MULLINS RILEY & SCARBOROUGH LLP
                                2 W Washington St., Ste. 400
                                Greenville, SC 29601
                                (864) 373-2352
                                miles.coleman@nelsonmullins.com


                                Jeffrey A. Wald*
                                NELSON MULLINS RILEY & SCARBOROUGH LLP
                                380 Knollwood Street, Suite 530
                                Winston-Salem, NC 27103
                                (336) 774-3335
                                jeffrey.wald@nelsonmullins.com

                                Madeline C. Bergstrom*
                                NELSON MULLINS RILEY & SCARBOROUGH LLP
                                101 Constitution Ave. NW, Suite 900
                                Washington, DC 20001
                                (202) 689-2807
                                madeline.bergstrom@nelsonmullins.com

                                *application for admission forthcoming

                                Counsel for Plaintiffs-Appellants

27

## CERTIFICATE OF COMPLIANCE

This motion complies with the requirements of Fed. R. App. P. 27(d) and Circuit Rules 27-1(1)(d) and 32-3(2) because it has 5,593 words.

This motion also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this motion has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ Miles E. Coleman*

Miles E. Coleman

## STATEMENT OF RELATED CASES

This case is related to two other appeals, in which this Court is currently considering similar emergency motions for injunctions pending appeal:

- *San Carlos Apache Tribe v. United States Forest Service*, No. 25-5189

- *Arizona Mining Reform Coalition v. United States Forest Service*, No. 25-5185

It is also related to *Apache Stronghold v. U.S.*, 101 F. 4th 1036 (9th Cir. 2024).

**CERTIFICATE OF SERVICE**

I hereby certify that on August 17, 2025, the foregoing emergency motion for an injunction pending appeal was filed electronically with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit through the Court's CM/ECF system. I certify that all participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system and that a PDF copy of this motion will be emailed to opposing counsel immediately after it is filed.

*/s/ Miles Coleman*
Miles Coleman