No. 25-5197

# In the United States Court of Appeals for The Ninth Circuit

GOUYEN BROWN LOPEZ, ET AL.,
*Plaintiffs-Appellants*,

v.

UNITED STATES OF AMERICA, ET AL.,
*Defendants-Appellees*,

and

RESOLUTION COPPER MINING, LLC,
*Intervenor-Defendant-Appellee*.

On Appeal from the United States District Court
for the District of Arizona
No. 2:25-cv-02758-DWL
Hon. Dominic W. Lanza

## REPLY IN SUPPORT OF EMERGENCY MOTION FOR AN INJUNCTION PENDING APPEAL UNDER CIRCUIT RULE 27-3

Miles E. Coleman
NELSON MULLINS RILEY & SCARBOROUGH LLP
2 W. Washington St., Suite 400
Greenville, SC 29601
(864) 373-2352
miles.coleman@nelsonmullins.com

Jeffrey A. Wald
NELSON MULLINS RILEY & SCARBOROUGH LLP
380 Knollwood Street, Suite 530
Winston-Salem, NC 27103
(336) 774-3335
jeffrey.wald@nelsonmullins.com

Madeline C. Bergstrom*
NELSON MULLINS RILEY & SCARBOROUGH LLP
101 Constitution Ave. NW, Suite 900
Washington, DC 20001
(202) 689-2807
madeline.bergstrom@nelsonmullins.com

*application for admission forthcoming

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ii

TABLE OF ACRONYMS AND ABBREVIATIONS ................................. v

INTRODUCTION ........................................................................... 1

ARGUMENT .................................................................................. 3

I.    Defendants' "threshold" issues are meritless. ................................. 3

II.   The harm is imminent and irreparable. ........................................ 8

III.  The equities and public interest heavily favor Plaintiffs. ............... 10

IV.  Plaintiffs are likely to succeed on the merits................................ 12

    A. The Government's actions violate NEPA. ................................. 12

        1. Excessive length ....................................................... 12

        2. Failure to consider alternatives ................................... 14

    B. The Government's actions violate the NHPA............................. 17

CONCLUSION .............................................................................. 18

CERTIFICATE OF COMPLIANCE...................................................... 20

CERTIFICATE OF SERVICE............................................................. 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apache Stronghold v. United States,*
   101 F.4th 1036 (9th Cir. 2024) ........................................................... 2

*Apache Stronghold v. United States,*
   No. 21-cv-50, 2025 WL 1360694
   (D. Ariz. May 9, 2025) ............................................................. 9, 11, 12

*Bowen v. Mich. Acad. of Family Physicians,*
   476 U.S. 667 (1986) ............................................................................ 5

*Cal. Wilderness Coal. v. U.S. Dep't of Energy,*
   631 F.3d 1072 (9th Cir. 2011) ..................................................... 13, 14

*Ctr. for Biological Diversity v. BLM,*
   141 F.4th 976 (9th Cir. 2025) .................................................. 8, 16, 17

*Desert Citizens Against Pollution v. Bisson,*
   231 F.3d 1172 (9th Cir. 2000) ............................................................ 3

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.,*
   82 F.4th 664, 684 (9th Cir. 2023) ..................................................... 12

*Friends of the Atglen-Susquehanna Trail, Inc. v.*
   *Surface Transp. Bd.,*
   252 F.3d 246 (3d Cir. 2001) .............................................................. 17

*Friends of the Inyo v. U.S. Forest Serv.,*
   103 F.4th 543 (9th Cir. 2024) ........................................................... 13

*High Country Conserv. Advocates v. U.S. Forest Serv.,*
   951 F.3d 1217 (10th Cir. 2020) ......................................................... 15

*Idaho Conservation League v. Mumma,*
   956 F.2d 1508 (9th Cir. 1992) ............................................................ 7

*League of Wilderness Defs. v. Connaughton,*
752 F.3d 755 (9th Cir. 2014)........................................................ 8, 12

*Montana Wildlife Fed v. Haaland,*
127 F.4th 1 (9th Cir. 2025) ............................................................... 14

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,*
886 F.3d 803 (9th Cir. 2018) ............................................................... 8

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.,*
465 F.3d 977 (9th Cir. 2006) ............................................................... 6

*Pollinator Stewardship Council v. EPA,*
806 F.3d 520 (9th Cir. 2015) ............................................................... 7

*Porretti v. Dzurenda,*
11 F.4th 1037 (9th Cir. 2021) ........................................................... 11

*Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Air Force,*
128 F.4th 1089 (9th Cir. 2025) ....................................................... 4, 6

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
592 U.S. 14 (2020).............................................................................. 8

*Salmon River Concerned Citizens v. Robertson,*
32 F.3d 1346 (9th Cir. 1994).............................................................. 6

*Salmon Spawning & Recovery All. v. Gutierrez,*
545 F.3d 1220 (9th Cir. 2008) ............................................................ 4

*Seattle Audubon Soc'y v. Espy,*
998 F.2d 699 (9th Cir. 1993)............................................................... 4

*Seven County Infra. Coal. v. Eagle County,*
145 S. Ct. 1497 (2025)...................................................................... 13

*Summers v. Earth Island Inst.,*
555 U.S. 488 (2009).......................................................................... 13

*United States v. Oakland Cannabis Buyers' Coop.,*
532 U.S. 483 (2001) .......................................................................... 10

*W. Watersheds Project v. Grimm*,
 921 F.3d 1141 (9th Cir. 2019) ................................................................. 4

*Wisconsin Right to Life, Inc. v. FEC*,
 542 U.S. 1305 (2004) ............................................................................. 2

**Statutes**

Carl Levin and Howard P. "Buck" McKeon National
 Defense Authorization Act for Fiscal Year 2015,
 § 3003, 128 Stat. 3292 ................................................................. *passim*

# TABLE OF ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| ACHP | Advisory Council on Historic Preservation |
| DEIS | Draft Environmental Impact Statement |
| EIS | Environmental Impact Statement |
| ER | Excerpts of Record |
| NEPA | National Environmental Policy Act |
| NHPA | National Historic Preservation Act |
| ROD | Record of Decision |
| Gov. | Government's Opposition to Emergency Motion, Dkt. 7.1 |
| Res. | Resolution Copper's Opposition to Emergency Motion, Dkt. 10.1 |

# INTRODUCTION

Defendants don't dispute that transferring and destroying Oak Flat will subject the Apache Plaintiffs to devastating, irreparable harm. As the district court found: "Even the government has acknowledged that the destruction of Oak Flat will inflict indescribable hardship on the Apaches." *San Carlos*, No. 2:21-cv-68, Dkt. 124 at 2–3.

Nor is there any serious dispute about the balance of harms. If this Court enjoins the transfer now but reverses course later, the government loses nothing: it can still proceed with the project—which the government itself has voluntarily delayed for years—and still recover every ounce of copper. But if this Court denies relief now and reverses course later, the Apaches lose everything: Oak Flat will be destroyed, and they can never practice their religion again.

Unable to dispute this wildly disproportionate balance of harms, Defendants offer a dog's breakfast of "threshold" issues, which they say prevent consideration of Plaintiffs' claims. But the district court rightly rejected these issues; all are meritless.

When Defendants finally address the merits, they fail to justify the government's clear NEPA and NHPA violations. It is undisputed that the EIS "eliminated" "alternative mining techniques" "from detailed analysis," despite admitting that "other under-ground … techniques" are "technically" and "physically feasible" and would eliminate the "subsid-

1

ence area overhead on Oak Flat." 1-EIS-50; 4-EIS-F-3–5. That is a text-book NEPA violation. And given the ACHP's express recommendation to consider alternative mining techniques—which the government never responded to—the government violated the NHPA, too.

Defendants' final redoubt is to claim that the land transfer must take place, no matter how procedurally flawed, because Congress mandated it. But Congress *also* mandated that the transfer comply with NEPA and other federal laws. Thus, Plaintiffs aren't asking for an injunction "barring the enforcement of an Act of Congress," Res.6 (quoting *Wisconsin Right to Life, Inc. v. FEC*, 542 U.S. 1305, 1305–06 (2004)), but *requiring compliance* with an Act of Congress.

*  *  *

The consequences of this case are profound. The government and Resolution are planning to rip the heart out of the Apache people, "effectively end[ing] Apache religious existence as we know it." *San Carlos*, No. 2:21-cv-68, Dkt. 124 at 2. This shouldn't happen. *See Apache Stronghold v. United States*, 101 F.4th 1036, 1157 (9th Cir. 2024) (en banc) (Murguia, C.J., dissenting). But if the government is determined to destroy yet more Apache lives and lands for the sake of mining interests, it should at least be held to strict compliance with every substantive and procedural safeguard the law requires.

## ARGUMENT

## I. Defendants' "threshold" issues are meritless.

Anxious to dodge the merits, Defendants first offer a handful of so-called "threshold deficiencies." Each is unavailing.

*First*, Defendants say Plaintiffs' claims are "not redressable" because "no additional" NEPA analysis can change their "nondiscretionary" duty to "transfer title." Gov.7–11; Res.22. But this Court has already rejected a similar argument in a land-exchange case, reversing a district court that denied standing to bring procedural claims on the ground that "the public lands would nevertheless be traded away," and holding instead that "those who use and enjoy the land … are certainly entitled under the APA to file suit to assure that no exchange takes place unless the governing federal statutes and regulations are followed." *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1177–78 (9th Cir. 2000). Just so here. Indeed, Plaintiffs' claims are redressable in two distinct ways.

For one, if a court vacates the EIS, then the transfer cannot occur until there is a new EIS—permitting Plaintiffs to continue freely worshiping at Oak Flat in the interim. As the district court explained, "every day that Oak Flat remains intact is another day that" Apaches "can use the land in its current, unspoiled form for religious purposes and ceremonies." *San Carlos*, No. 2:21-cv-68, Dkt. 124 at 31. "Thus, even a temporary delay may, for example, allow another Sunrise Ceremony to take place," *id.*—like L.B.'s ceremony now planned for October, ER.184. That would

3

redress Plaintiffs' injuries at least in part—which is all that's necessary. *See, e.g.*, *W. Watersheds Project v. Grimm*, 921 F.3d 1141, 1148 (9th Cir. 2019) (possible "short term" cessation of harmful activities sufficed to make NEPA claim redressable); *cf. Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1226 (9th Cir. 2008) (no standing where, unlike here, court could not even temporarily "set aside … the United States' entrance into" an international treaty).

For another, the government *admits* it has "a certain amount of discretion over the contours" of the mine. Gov.14. Thus, if the government were compelled to take a hard look at alternative mining methods less destructive of Oak Flat, then its decisions on those contours "could be influenced" by more thorough consideration of those methods. *Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Air Force*, 128 F.4th 1089, 1106 (9th Cir. 2025). Indeed, that's at least partly why Section 3003 requires an EIS in the first place—so the EIS's alternatives analysis can be "used as the basis for all decisions under Federal law related to the proposed mine," including "minimiz[ing] the adverse effects on the affected Indian tribes." National Defense Authorization Act for Fiscal Year 2015, §§ 3003(c)(3)(B)(2), (9)(B), 128 Stat. 3733, 3735–36. Plaintiffs are under no obligation to show that "redrafting the EIS" certainly *would* change the government's decisions; "the 'asserted injury is that environmental consequences might be overlooked.'" *Seattle Audubon Soc'y v. Espy*, 998 F.2d 699, 703 (9th Cir. 1993).

4

*Second*, the government (but not Resolution) argues it doesn't have to comply with NEPA at all because "that procedural statute does not apply in the absence of agency discretion." Gov.11–12. But this argument simply defies Section 3003, which (1) requires that "the Secretary shall carry out the land exchange in accordance with the requirements of [NEPA]"; and (2) directs the preparation of an EIS "under [NEPA]." §§ 3003(c)(9)(A)–(B), 128 Stat. 3735–36. That NEPA's definition of "major federal action" excludes "non-discretionary" decisions is beside the point, Gov.11; even if NEPA wouldn't apply *of its own force* to the government's actions under Section 3003, it nonetheless applies *because Section 3003 itself* says so. The government's argument never mentions (much less grapples with) the key statutory language. *Cf.* Gov.11–12.

*Third*, Resolution (but not the government) offers an even more extreme argument: that because Section 3003 doesn't expressly "condition the land exchange on completed judicial review of any challenges to the FEIS," courts can't engage in such review. Res.21–22. But as the district court recognized, there is a "strong presumption that Congress intends judicial review of administrative action," which only "clear and convincing evidence" can overcome. *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670–72 (1986); *San Carlos*, No. 2:21-cv-68, Dkt. 124 at 15–16, 33. The fact that Congress here didn't add an additional "condition" saying the land exchange can proceed only if a court doesn't enjoin it as unlawful (or issue an injunction pending appeal), *cf.* Res.21–22, comes

5

nowhere close to qualifying as such evidence; indeed it fails to distinguish Section 3003 from virtually any other statute of which Plaintiffs are aware.

*Fourth*, Defendants say certain of Plaintiffs' claims (they can't agree on which ones)[1] fail because the EIS isn't "final agency action." Gov.12–15; Res.20–21. But Plaintiffs already explained how the EIS meets the *Bennett* test, and Defendants offer no response to those arguments. Pls.' Emergency Mot. 22 n.3. Even if *the ROD* is "a draft," Gov.13, the EIS is not—and the EIS is both the agency's "last word" on the environmental impacts of the mine and unambiguously triggers "legal consequences." *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 984, 986 (9th Cir. 2006). The fact that the ROD will *also* trigger *other* legal consequences doesn't change this conclusion. *See Prutehi Litekyan*, 128 F.4th at 1110 ("a federal agency's assessment … qualifies as final agency action even if the ultimate impact of that action rests on some other occurrence"); *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1355 (9th Cir. 1994) ("plaintiffs need not wait to challenge a specific project when their grievance is with an overall plan").

Indeed, Defendants' gesture toward the ROD as the real final agency action is a shell game. *Cf.* Res.20. Defendants intend to effectuate the transfer *before* the final ROD is published—so if Defendants were right

---

[1] *Compare* Gov.12 ("Plaintiffs' NEPA claims") *with* Res.20 (all claims except page limits).

that Plaintiffs can't sue until the final ROD, then Section 3003's requirement that a NEPA-compliant FEIS be issued "[*p*]*rior to* conveying Federal land," § 3003(c)(9)(B), 128 Stat. 3735–36 (emphasis added), would be unenforceable. Final agency action requires no such result. *See Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1516 (9th Cir. 1992).

*Finally*, Defendants argue that even if the EIS were unlawful, the "proper remedy would be to remand" rather than vacate it. Res.22. But this Court remands without vacatur "only in 'limited circumstances'" and "when equity demands" it—which is not this case. *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532–33 (9th Cir. 2015). Resolution says remand without vacatur is appropriate because the agency could not "disapprove" the transfer even if it had to rework the EIS. Res.22–23; *see* Gov.18. But that misses this case's unique statutory context—absent a NEPA-compliant EIS, Section 3003 *itself* disapproves the transfer: issuance of an EIS "under [NEPA]" and "in accordance with [NEPA's] requirements" is an express statutory prerequisite to the transfer's occurring. §§ 3003(c)(9)(A)–(B), 128 Stat. 3735–36. So enjoining the transfer pending an EIS's reissuance doesn't "thwart" Section 3003; it effectuates it. *Cf.* Res.23.

In any event, there is nothing "disruptive" about the remedy Plaintiffs seek, *cf.* Res.23—Plaintiffs seek to preserve the status quo (Oak Flat as federally managed and protected land) that has prevailed for over a cen-

7

tury. And the government's errors here are "serious," *cf.* Res.23: for example, the EIS is the government's sole opportunity to explore the availability of less destructive methods to obtain copper from underneath Oak Flat while it still has the leverage to incentivize Resolution to consider those methods. This case isn't about the delta between "94%" and "full field development," *Ctr. for Biological Diversity v. BLM*, 141 F.4th 976, 1015 (9th Cir. 2025); it's about (among other things) a mining method that will obliterate Oak Flat versus methods that would not result in "a subsidence area overhead on Oak Flat" at all. 4-EIS-F-5; 1-EIS-50.

## II. The harm is imminent and irreparable.

The district court not only correctly rejected Defendants' threshold issues, it also correctly found that "Plaintiffs will suffer irreparable harm in the absence" of an injunction. ER.19. The government doesn't dispute that finding. *See* Gov.21 (no briefing on irreparable harm).

Irreparable harm is straightforward when, as here, the government's unlawful conduct will harm the environment, *League of Wilderness Defs. v. Connaughton*, 752 F.3d 755, 764 (9th Cir. 2014), interfere with Plaintiffs' use and enjoyment of land, *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 822 (9th Cir. 2018) (collecting cases), and prevent religious exercise, *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020). Here, it is "undisputed" that those harms will occur "if the transfer goes forward and Resolution Copper's mining plans are effectuated." *Apache Stronghold v. United States*, No. 21-cv-50, 2025

WL 1360694, at *6 (D. Ariz. May 9, 2025); *see also* 3-EIS-892 (impact on tribal resources from the project will be "immediate, permanent, and large in scale"); 2-EIS-837 (harm will be "permanent[]," "irreversible," and "irretrievable").[2]

Defendants' nod (Gov.22 n.5; Res.25–26) towards temporary access to the Oak Flat *campground* (not all of Oak Flat) solves nothing. The "Oak Flat campground ... represents only a small portion of Oak Flat and [maintaining access] would not reduce the impact on Tribal cultural heritage caused by the destruction of the broader landscape due to the subsidence area." 3-EIS-890. And even access to the campground is "only temporary," not "legally enforceable," and "may be rescinded" at the discretion of "Resolution Copper." *San Carlos*, No. 2:21-cv-68, Dkt. 124 at 89.

Nor does it matter that the mine will be constructed over the course of several years (Res.26–27). As the district court found, and Defendants cannot refute, the irreparable harm begins immediately upon transfer: Oak Flat instantly becomes "private property," 3-EIS-871, with only "limited access," and Resolution will quickly begin changing it in "irreversible

---

[2] Plaintiffs don't "abandon" their "religion claims." Res.8. While Plaintiffs aren't pressing those claims as a basis for emergency relief in this motion, they intend to continue pressing those claims as a basis for a preliminary injunction before the panel and (if necessary) en banc Court.

ways." *San Carlos*, No. 2:21-cv-68, Dkt. 124 at 90. Oak Flat "will immediately start being laced with subterranean data-gathering tunnels," followed by further "surface disturbances." *Id.* That is irreparable harm, and it is imminent—even if additional irreparable harms will continue accruing into the future.

## III. The equities and public interest heavily favor Plaintiffs.

Defendants claim the balance of equities and public interest favor them because "Congress determined that facilitating copper mining" via this land transfer "is in the public interest." Gov.22; *see* Res.28. But Congress *also* determined that it is in the public interest to *condition* the land exchange on compliance with various procedural obligations—including a NEPA-compliant EIS. Allowing the transfer to go forward in breach of those conditions ignores rather than honors the "considered choice by the political branches." *San Carlos*, No. 2:21-cv-68, Dkt. 124 at 91.

Defendants' argument also proves too much. If a statute's mere existence determined the balance of equities and public interest, Gov.22–23, no challenge to the defective implementation of a statute would merit an injunction. But contrary to Defendants' assertions (*id.*), Plaintiffs aren't seeking to "reject the balance that Congress has struck in a statute," *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001), but to *vindicate* the balance Congress struck in the land-transfer statute, NEPA, and the NHPA.

Resolution, for its part, continues to conflate its private economic interest with the public interest. Res.29. The public interest, however, "mostly concerns the injunction's impact on nonparties rather than parties." *Porretti v. Dzurenda*, 11 F.4th 1037, 1050 (9th Cir. 2021) (internal quotation marks omitted). In any event, the "costs" that Resolution invokes (Res.29)—which it began incurring "a full decade before Congress passed the Land Exchange Act," and "long before it had any real expectancy interest in the nearby Oak Flat land it now hopes to mine"—are the result of its own "voluntary choice," and fall far short of showing "the balance of equities tips in its favor." *Apache Stronghold*, 2025 WL 1360694, at *7. And its complaints about a decade of delays should be made to the government, which withdrew the original EIS in 2021, only to issue a new EIS that still failed to comply with its NEPA and NHPA obligations.[3]

Regardless, granting an injunction would only delay mining until Plaintiffs have had a fair chance to litigate their claims. If the transfer is upheld, Resolution would still be able to mine every ounce of copper it

---

[3]  The government's claim that Plaintiffs lacked "diligence" in seeking "timely injunctive relief" is mistaken. Gov.23 n.6. The 2021 EIS was published when five of the seven Plaintiffs were still minors and was withdrawn just six weeks later (1-EIS-ES-3)—meaning Plaintiffs *couldn't* have filed this challenge from March 1, 2021, to June 20, 2025, because there was no EIS to challenge. They promptly filed this suit within five weeks of the 2,400-page EIS's publication. *Lopez v. United States*, No. 1:25-cv-2408 (D.D.C., filed July 24, 2025).

desires. But if preliminary relief is not granted, it "could result in the permanent loss of Apaches' legal rights to access their ancestral sacred site." *Apache Stronghold*, 2025 WL 1360694, at *8. Thus, at this stage, "[t]here is no close question in this matter. It is abundantly clear that the balance of equities 'tips sharply' in Plaintiff's favor," *id.* at *9, "because the harms they face are permanent, while the intervenors face temporary delay." *League of Wilderness Defs.*, 752 F.3d at 765.

## IV. Plaintiffs are likely to succeed on the merits.

### A. The Government's actions violate NEPA.

#### 1. Excessive length

There is no dispute that the EIS exceeds NEPA's page limit. The only questions are whether the page limit applies, and if so, whether the violation matters. The answer to both is yes.

*First*, the page limit applies to this EIS just like any other EIS governed by NEPA. *See* § 3003(c)(9)(A)–(B), 128 Stat. 3735. Congress expressly required compliance with *all* of NEPA, "[e]xcept as otherwise provided in this section." § 3003(c)(9)(A), 128 Stat. 3735. And nowhere does the land-transfer statute displace NEPA's page limit.[4] Resolution appears to claim that USDA regulations exempted this EIS from the limit,

---

[4] The fact that "no case" has yet enforced NEPA's page limit, Gov.16, simply reflects that Congress enacted the page limit only recently (2023)—meaning this is an issue of first impression that raises "'serious questions' on the merits." *FCA v. San Jose Unified Sch. Dist.*, 82 F.4th 664, 684 (9th Cir. 2023) (en banc).

12

Res.10, but those regulations were promulgated *after* the EIS and in any event cannot change the statute's black-letter requirement. *See* 90 Fed. Red. 29,632, 29,632 (July 3, 2025) (confirming that if the regulations conflict with the statute or *Seven County*, "the statute governs").

*Second*, the government's violation of the page limit is harmful. This Court has advised "great caution in applying the harmless error rule" in NEPA cases. *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1090 (9th Cir. 2011). The key question is whether the violation "materially impeded NEPA's goals" of "precluding informed decisionmaking and public participation." *Friends of the Inyo v. U.S. Forest Serv.*, 103 F.4th 543, 557 (9th Cir. 2024).

Here, the grossly overlength EIS undermines the public's ability to understand its contents and thus to hold the agency "publicly accountable for environmental harms it decides to tolerate"—one of the key goals of the page limit. *Seven County Infra. Coal. v. Eagle County*, 145 S. Ct. 1497, 1521 (2025) (Sotomayor, J., concurring in judgment). The overlength EIS also specifically prejudiced Plaintiffs, giving them only 60 days to digest its content and challenge its deficiencies. Publishing a flood-the-zone EIS shortly before the land transfer—and then arguing Plaintiffs took too long to sue (Gov.23 & n.6)—is far more than a "procedural error *in vacuo*." Gov.16. *Contra Summers v. Earth Island Institute*, 555 U.S. 488, 494–97 (2009) (no standing where plaintiff's "concrete interest" had been remedied through prior settlement); *see also Montana*

13

*Wildlife Fed'n v. Haaland*, 127 F.4th 1, 41–42 (9th Cir. 2025) (rejecting similar harmless error argument).

Defendants' argument would also render the page limits nugatory. If nobody is "injured by receiving more information than they were otherwise entitled to," Res.10, then NEPA's page limit is a dead letter; every violation would be harmless. But Congress made a different judgment—that the public's ability to understand the environmental consequences of government projects can be just as impeded by an overload of information as by a deprivation. And when, as here, a statutory "requirement was directed at process and not merely a final result," courts "are not free to depart from our consistent case law holding that a finding of 'harmless error' requires a determination that the error 'had no bearing *on the procedure used.*'" *Cal. Wilderness*, 631 F.3d at 1092 (cleaned up) (emphasis in original).

## 2. Failure to consider alternatives

Defendants assert that "the Court must defer to the Forest Service's judgment as to the scope and contents of the FEIS so long as the agency's choices were reasonable." Gov.15; *accord* Res.13. The problem is that the agency's choices weren't reasonable. The agency declined to consider alternative mining techniques that all agree would reduce impacts on a millennia-old sacred site on the ground that those techniques would be less "profitabl[e]" for Resolution. 4-EIS-F-3–4. The government thus explicitly elevated a goal that Congress did not mention in Section 3003—

14

maximizing Resolution's profits—over a goal Congress prioritized in Section 3003—"minimiz[ing] the adverse effects on the affected Indian tribes." § 3003(c)(3)(B), 128 Stat. 3733; *see* Pls.' Mot.20–23.

Defendants now assert that the Forest Service "assess[ed] alternative mining techniques." Gov.17; *accord* Res.12. But the EIS is clear: it "eliminated" them "from detailed analysis," 4-EIS-F-5. Eliminating those alternatives, despite ample evidence that they were "not remote, speculative, or impractical or ineffective as judged against the Forest Service's statutory mandate and the project goals," was "arbitrary and capricious." *High Country Conserv. Advocates v. U.S. Forest Serv.*, 951 F.3d 1217, 1227 (10th Cir. 2020) (cleaned up).

Evidence on the feasibility of alternative mining methods included comments like those submitted by Dr. David Chambers, an expert with 40 years' experience in mineral exploration and development. ER.162–172. As he explained, a "backfill-compatible underground mining method"—like sub-level stoping, where tailings are backfilled underground, and which similar mines currently use—would prevent destruction "due to subsidence," "would mine the ore body more efficiently, and would provide more jobs over a longer term to the local economy." ER.162; *see* 6-EIS-R-73. He also noted that the DEIS excluded these methods from consideration based on incomplete data (since it was withheld by Resolution) and mistaken assumptions about the cost and copper grade. ER.163–64.

15

Resolution claims the agency deemed these comments "incorrect," and "explained in detail why block caving is *the* only feasible way" to mine this deposit. Res.15, 12. Far from it: the agency *admitted* "there are other underground … techniques that could physically be applied to" the deposit, that these methods "could substantially reduce impacts on surface resources," and that these methods are both "technically" and "physically feasible." 4-FEIS-F-3–5; 1-EIS-50. That admission is more than enough to trigger the duty under NEPA to "'study, develop, and describe [those] alternatives' … 'that would avoid or minimize adverse effects' on the environment." *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 141 F.4th 976, 990 (9th Cir. 2025).

Alternatively, Defendants attempt to excuse the failure to consider these alternatives by claiming "the Forest Service does not have authority to regulate mining operations on private land." Gov.16. Their only support for this claim is their own draft ROD and the EIS itself. *Id.* The statute, on the other hand, obligates the agency to consider methods to "minimize the adverse effects on the affected Indian tribes," and says the EIS "shall be used as the basis for *all* decisions under Federal law related to the proposed mine," §§ 3003(c)(3)(B), 3003(c)(9)(B), 128 Stat. 3733–36 (emphasis added)—including other agencies' decisions regarding pipeline routing, permitting, etc. The EIS not only can—but must—put these future agency decisions on solid ground by addressing all reasonable, less-

destructive alternative mining methods. *See Ctr. for Biological Diversity*, 141 F.4th at 994–95.

## B. The Government's actions violate the NHPA.

Under the NHPA, at a minimum, the government must "consider" the comments of the Advisory Council on Historic Preservation and demonstrate that those comments were "taken seriously." *Friends of the Atglen-Susquehanna Trail, Inc. v. Surface Transp. Bd.*, 252 F.3d 246, 265 (3d Cir. 2001). But the government's response to the ACHP here does not meet even that basic procedural requirement.

Nowhere in the government's or Resolution's description of the Section 106 consultation process does either address the only point at issue here: the government's failure to address the ACHP's specific suggestion to "avoid adverse effects" by considering "alternative and more sustainable mining techniques in an effort to prevent subsidence at Oak Flat, including, if feasible, those techniques that were previously considered and rejected" and by "employ[ing] all measures at its disposal to incentivize the consideration of such alternatives." ACHP Comments at 7; Gov.18–20; Res.17–19.

Nor did disclaiming the ability to regulate activity on private land satisfy the government's obligation. ER.18. "Consider[ing]" and "incentiviz[ing]" different mining techniques does not require the government to regulate private parties or insist on a certain mine. ACHP Comments at 7. Those are duties the government could and should have undertaken

17

before the EIS was published—and its failure to do so has devastating consequences. Even after the land transfer, the EIS is the document that will influence permits for the mine, which will have a direct effect on the mine's fallout. § 3003(c)(9)(B), 128 Stat. 3735–36 (The EIS "shall be used as the basis for all decisions under Federal law related to the proposed mine."). Before the government destroys a millennia-old sacred site the importance of which "cannot be overstated," ACHP Comments at 5, it should have to take seriously the ACHP's suggestion to further consider alternate mining techniques that would not result in cratering Oak Flat. The government's failure to do so violates the NHPA.

## CONCLUSION

An injunction pending appeal should be granted.

Respectfully submitted,

Dated: August 19, 2025          */s/Miles E. Coleman*
Miles E. Coleman
NELSON MULLINS RILEY & SCARBOROUGH LLP
2 W Washington St., Ste. 400
Greenville, SC 29601
(864) 373-2352
miles.coleman@nelsonmullins.com

Jeffrey A. Wald
NELSON MULLINS RILEY & SCARBOROUGH LLP
380 Knollwood Street, Suite 530
Winston-Salem, NC 27103
(336) 774-3335
jeffrey.wald@nelsonmullins.com

Madeline C. Bergstrom*
NELSON MULLINS RILEY & SCARBOROUGH LLP
101 Constitution Ave. NW, Suite 900
Washington, DC 20001
(202) 689-2807
madeline.bergstrom@nelsonmullins.com

*application for admission forthcoming

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

This motion complies with the requirements of Fed. R. App. P. 27(d) and Circuit Rules 27-1(1)(d) and 32-3(2) because it has 4,154 words, consistent with the Plaintiffs-Appellants' unopposed motion to permit a 15-page reply brief.

This motion also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this motion has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ Miles E. Coleman*
Miles E. Coleman

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2025, the foregoing document was filed electronically with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit through the Court's CM/ECF system. I certify that all participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

*/s/ Miles Coleman*
Miles Coleman