No. 25-5197

# In the United States Court of Appeals for the Ninth Circuit

GOUYEN BROWN LOPEZ, ET AL.,
Plaintiffs-Appellants,

v.

UNITED STATES OF AMERICA, ET AL.,
Defendants-Appellees

and

RESOLUTION COPPER MINING LLC,
Intervenor-Defendant-Appellee

Appeal from the United States District Court
for the District of Arizona
Honorable Dominic W. Lanza
(2:25-cv-2758-PHX-DWL)

## OPENING BRIEF OF PLAINTIFFS-APPELLANTS

Madeline C. Bergstrom*
NELSON MULLINS RILEY &
    SCARBOROUGH LLP
101 Constitution Ave. NW,
    Suite 900
Washington, DC 20001
(202) 689-2807
madeline.bergstrom@nelsonmul-
lins.com

*application for admission forthcoming

Miles E. Coleman
NELSON MULLINS RILEY &
    SCARBOROUGH LLP
2 W. Washington St., Ste. 400
Greenville, SC 29601
(864) 373-2352
miles.coleman@nelsonmullins.com

Jeffrey A. Wald
NELSON MULLINS RILEY &
    SCARBOROUGH LLP
380 Knollwood Street, Suite 530
Winston-Salem, NC 27103
(336) 774-3335
jeffrey.wald@nelsonmullins.com

Counsel for Plaintiffs-Appellants

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES....................................................................iv

TABLE OF ACRONYMS........................................................................xi

INTRODUCTION.................................................................................1

JURISDICTIONAL STATEMENT ...........................................................6

STATEMENT OF ISSUES.....................................................................6

STATEMENT OF THE CASE .................................................................7

    A. Oak Flat..................................................................................7

    B. Plaintiffs' religious practices..........................................................14

    C. The taking of Oak Flat.................................................................16

    D. Protections for Oak Flat...............................................................19

    E. The land transfer .......................................................................19

    F. The mine..................................................................................22

    G. Initial lawsuits ..........................................................................25

    H. The decision below ....................................................................26

STANDARD OF REVIEW.....................................................................28

SUMMARY OF ARGUMENT ................................................................28

ARGUMENT .....................................................................................30

    I. The government's actions violate RFRA.........................................30

        A. The transfer and destruction of Oak Flat imposes a
           substantial burden on Plaintiffs' religious exercise..................31

        B. The government's actions fail strict scrutiny............................41

II. The government's actions violate the Free Exercise Clause......... 46

    A. The government's actions burden Plaintiffs' First
    Amendment right to direct the religious upbringing of
    their children. ............................................................................ 47

    B. The government's actions are not neutral and
    generally applicable................................................................. 51

III. The government's actions violate NEPA...................................... 52

    A. The EIS fails to consider reasonable alternatives.................. 53

    B. The EIS violates NEPA's length requirement. ....................... 56

IV. The government's actions violate the NHPA. .............................. 57

V. The other injunction factors are met. ........................................... 61

CONCLUSION ......................................................................................... 65

STATEMENT OF RELATED CASES ..................................................... 67

CERTIFICATE OF COMPLIANCE......................................................... 68

CERTIFICATE OF SERVICE ................................................................. 69

ADDENDUM 1: Constitutional Provisions, Statutes, Regulations....... 71

ADDENDUM 2: Excerpts from 2025 EIS ............................................... 99

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*All. for Wild Rockies v. Cottrell,*
632 F.3d 1127 (9th Cir. 2011) .......................................... 30, 61, 62, 64

*Apache Stronghold v. United States,*
101 F.4th 1036 (9th Cir. 2024) ........................... 26, 33, 34, 35, 37, 38,
39, 40, 41, 51–52, 62

*Apache Stronghold v. United States,*
145 S. Ct. 1480 (2025) .......................................... 2, 17, 26, 34, 35, 36,
37, 39, 50, 61, 64

*Apache Stronghold v. United States,*
782 F. Supp. 3d 756 (D. Ariz. 2025) ...................................... 62, 63, 65

*Apache Stronghold v. United States,*
95 F.4th 608 (9th Cir. 2024) ............................................................ 63

*Apache Stronghold v. United States,*
No. 2:21-cv-50, 2021 WL 689906 (D. Ariz. Feb. 22, 2021) ................. 26

*Apache Stronghold v. United States,*
No. 21-15295, 2021 WL 12295173 (9th Cir. 2021) ............................ 33

*Bates v. Pakseresht,*
146 F.4th 772 (9th Cir. 2025) .......................................................... 44

*Bostock v. Clayton County,*
590 U.S. 644 (2020) ........................................................................ 30

*Buono v. Norton,*
371 F.3d 543 (9th Cir. 2004) ............................................................ 41

*Burwell v. Hobby Lobby Stores, Inc.,*
573 U.S. 682 (2014) ............................................... 30, 35–36, 41, 44, 46

*Cal. Wilderness Coal. v. U.S. Dep't of Energy,*
631 F.3d 1072 (9th Cir. 2011) .......................................................... 57

iv

*Concerned Citizens All., Inc. v. Slater*,
   176 F.3d 686 (3d Cir. 1999) ............................................................... 60

*CTIA - The Wireless Ass'n v. City of Berkeley*,
   928 F.3d 832 (9th Cir. 2019) ............................................................. 61

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
   141 F.4th 976 (9th Cir. 2025) ..................................................... 53, 56

*Doe #1 v. Trump*,
   984 F.3d 848 (9th Cir. 2020) ............................................................. 28

*Emp. Div. v. Smith*,
   494 U.S. 872 (1990) ........................................................................... 51

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
   36 F.4th 850 (9th Cir. 2022) ............................................................. 56

*Fellowship of Christian Athletes v. San Jose
   Unified Sch. Dist. Bd. of Educ.*,
   82 F.4th 664 (9th Cir. 2023) ................................................. 42, 51, 61

*Fraternal Ord. of Police Newark Lodge No. 12
   v. City of Newark*,
   170 F.3d 359 (3d Cir. 1999) ......................................................... 51, 52

*Friends of the Atglen-Susquehanna Trail,
   Inc. v. Surface Transp. Bd.*,
   252 F.3d 246 (3d Cir. 2001) ......................................................... 58, 61

*Friends of the Inyo v. U.S. Forest Serv.*,
   103 F.4th 543 (9th Cir. 2024) ........................................................... 57

*Fulton v. City of Philadelphia*,
   593 U.S. 522 (2021) ..................................................................... 36, 46

*Haight v. Thompson*,
   763 F.3d 554 (6th Cir. 2014) ............................................................. 32

*Holt v. Hobbs*,
   574 U.S. 352 (2015) ..................................................................... 31, 36

*Int'l Church of Foursquare Gospel v. City of San Leandro*,
  673 F.3d 1059 (9th Cir. 2011) ....................................................... 32, 51

*Johnson v. Baker*,
  23 F.4th 1209 (9th Cir. 2022) ............................................................. 31

*Kettle Range Conservation Grp. v. U.S. Bureau of Land Mgmt.*,
  150 F.3d 1083 (9th Cir. 1998) ............................................................. 63

*Langere v. Verizon Wireless Servs., LLC*,
  983 F.3d 1115 (9th Cir. 2020) ............................................................. 39

*League of Wilderness Defs. v. Connaughton*,
  752 F.3d 755 (9th Cir. 2014) ............................................................... 65

*Lopez v. United States*,
  No. 1:25-cv-2408 (D.D.C., filed July 24, 2025) .................................... 27

*Lyng v. Nw. Indian Cemetery Protective Ass'n*,
  485 U.S. 439 (1988) .......................................................... 36–37, 41, 49

*Mahmoud v. McKnight*,
  102 F.4th 191 (4th Cir. 2024) ............................................................. 38

*Mahmoud v. Taylor*,
  145 S. Ct. 2332 (2025) ......................................... 2, 3, 37, 38, 39, 40, 47,
                                                                                48, 49, 50, 52

*Miller v. Gammie*,
  335 F.3d 889 (9th Cir. 2003) .................................................. 37, 38, 52

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
  177 F.3d 800 (9th Cir. 1999) ............................................................... 58

*Nken v. Holder*,
  556 U.S. 418 (2009) ............................................................................ 63

*Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Air Force*,
  128 F.4th 1089 (9th Cir. 2025) ........................................................... 54

*Robertson v. Methow Valley Citizens Council,*
490 U.S. 332 (1989).............................................................. 52

*San Jose Christian Coll. v. City of Morgan Hill,*
360 F.3d 1024 (9th Cir. 2004)...................................... 31, 33

*Se. Alaska Conservation Council v. Fed. Highway Admin.,*
649 F.3d 1050 (9th Cir. 2011)............................................. 56

*Seven Cnty. Infrastructure Coal. v. Eagle County,*
145 S. Ct. 1497 (2025)................................................... 52, 57

*Singh v. Berger,*
56 F.4th 88 (D.C. Cir. 2022) ......................................... 44, 61

*Tanzin v. Tanvir,*
592 U.S. 43 (2020)......................................... 31, 32, 35, 61

*Thai Meditation Ass'n of Ala. v. City of Mobile,*
980 F.3d 821 (11th Cir. 2020)............................................. 32

*TikTok Inc. v. Garland,*
604 U.S. 56 (2025).............................................................. 43

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
582 U.S. 449 (2017).............................................................. 36

*United States v. Grace,*
461 U.S. 171 (1983).............................................................. 40

*W. Watersheds Project v. Abbey,*
719 F.3d 1035 (9th Cir. 2013)............................................. 55

*Wisconsin v. Yoder,*
406 U.S. 205 (1972).............................................................. 47

*Yellowbear v. Lampert,*
741 F.3d 48 (10th Cir. 2014)............................................... 32

**Statutes**

5 U.S.C. § 706 ................................................................... 57, 61

16 U.S.C. § 539p ........................................................ 21, 22, 52, 54, 55, 57

28 U.S.C. § 1292 ................................................................................... 6

28 U.S.C. § 1331 ................................................................................... 6

28 U.S.C. § 1343 ................................................................................... 6

28 U.S.C. § 1361 ................................................................................... 6

28 U.S.C. § 2201 ................................................................................... 6

28 U.S.C. § 2202 ................................................................................... 6

42 U.S.C. § 2000bb ....................................................................... 30, 35

42 U.S.C. § 2000bb-1 .......................................................... 30, 35, 41, 44

42 U.S.C. § 2000bb-3 .......................................................... 30, 34, 35

42 U.S.C. § 4332 ................................................................................. 53

42 U.S.C. § 4336a .............................................................................. 57

54 U.S.C. § 306108 ............................................................................. 58

Treaty with the Apaches (July 1, 1852), 10 Stat. 979 ........................... 17

## Regulations

36 C.F.R. § 800.1 ............................................................................... 58

36 C.F.R. § 800.7 ............................................................................... 59

36 C.F.R. § 800.14 ............................................................................. 58

20 Fed. Reg. 7,319 (Oct. 1, 1955) ...................................................... 19

36 Fed. Reg. 18,997 (Sep. 25, 1971) .................................................. 19

90 Fed. Reg. 26,287 (June 20, 2025) .................................................. 23

## Other Authorities

9th Cir. R. 28-2.7 ........................................................................ 7

*About Chinalco, Overview*, Aluminum Corp. of China ........................... 20

David Wallace Adams, *Education for Extinction: American
   Indians and the Boarding School Experience, 1875-1928*
   (1st ed. 1995) ...................................................................... 18

Martin Creamer, *Anglo planning to go underground in Chile
   as glacier-protective step*, Creamer Media's Mining Weekly
   (Oct. 22, 2019) .................................................................... 45

*Final Determination for Pebble Deposit Area*, United States
   Environmental Protection Agency (Apr. 4, 2025) ............................. 44

Dana Hedgpeth, *This land is sacred to the Apache, and they
   are fighting to save it*, Washington Post (Apr. 12, 2021) .................. 18

Neil Hume, *Rio faces rebellion from biggest shareholder*,
   Financial Times (Apr. 10, 2019) ............................................... 20

Lewis Jackson & Amy Lv, *Where does the US get its copper?*,
   Reuters (July 9, 2025)........................................................... 42

Dan Kraker, *Biden administration cancels Twin Metals'
   leases to mine near BWCA*, Minnesota Public Radio
   (Jan. 26, 2022).................................................................... 45

Letter from Rick Gonzalez, ACHP Vice Chairman, to Hon.
   Tom Vilsack, Sec'y of Agric. (Mar. 29, 2021)............................ 58–59

Katherine E. Lovett, *Not All Land Exchanges Are Created
   Equal: A Case Study of the Oak Flat Land Exchange*, 28
   Colo. Nat. Res., Energy & Envtl. L. Rev. 353 (2017) ....................... 20

Lydia Millet, *Selling Off Apache Holy Land*,
   N.Y. Times (May 29, 2015) ............................................... 19, 21

Parliament of Australia, Joint Standing Committee on
   Northern Australia, *Never Again* (Dec. 2020)................................ 20

Hiram Price, *Rules Governing the Court of Indian Offenses*,
Department of the Interior, Office of Indian Affairs
(Mar. 30, 1883) ...................................................................................... 18

Bruno Venditti, *The State of Copper Recycling in the U.S.*,
Visual Capitalist (Dec. 12, 2023) ......................................................... 45

Bruno Venditti, *Visualizing the U.S. Copper Gap*,
Visual Capitalist (July 11, 2025) .......................................................... 43

John R. Welch, *Earth, Wind, and Fire: Pinal Apaches,
Miners, and Genocide in Central Arizona,
1859-1874*, 7 SAGE Open, Oct.-Dec. 2017 ............................. 16–17, 18

Tisa Wenger, *Fighting for Oak Flat: Western Apaches and
American Religious Freedom*,
39 J.L. & Religion 247 (2024) ...................................................... 8, 9, 13

Zheng Xin, *Rio Tinto Banks on Nation's Energy Shift*
(Mar. 26, 2025) ..................................................................................... 44

# TABLE OF ACRONYMS

ACHP    Advisory Council on Historic Preservation

EIS    Environmental Impact Statement

ER    Excerpts of Record

NDAA    National Defense Authorization Act

NEPA    National Environmental Policy Act

NHPA    National Historic Preservation Act

RFRA    Religious Freedom Restoration Act

RLUIPA    Religious Land Use and Institutionalized Persons Act

ROD    Record of Decision

## INTRODUCTION

For centuries, Western Apaches have centered their worship at an ancient sacred site called *Chí'chil Biłdagoteel*, or Oak Flat. Oak Flat is the Apaches' direct corridor to the Creator and the site of sacred rituals uniquely tied to that place that cannot be replicated elsewhere. The federal government has long recognized the significance of Oak Flat and protected Apache rituals there—reserving Oak Flat from mining and placing it in the National Register of Historic Places. Yet the government now seeks to transfer Oak Flat to a foreign-owned copper-mining company for the sole purpose of creating a mine that will destroy the site, swallowing it in a massive crater and ending Apache rituals forever.

The government's own Environmental Impact Statement (EIS) admits that the mine will destroy Oak Flat: the destruction will be "immediate, permanent, and large in scale"; "public access" to the site will be "lost"; and nothing can "replace or replicate the tribal resources and [traditional cultural properties] that would be destroyed." 3-EIS-892; 1-EIS-153, 327. The EIS also admits that the copper could be mined using "alternative underground mining methods" that would not destroy Oak Flat; but the government declined to require these alternatives, or even analyze them, because the mining company said they would "reduce the amount of ore that could be profitably mined." 4-EIS-F-3. Thus, the government has authorized the complete physical destruction of an irreplaceable sacred site solely to increase the profits of a foreign-owned mining company.

1

This wanton, intentional, and needless destruction of Oak Flat violates federal law in multiple respects.

First, it violates the Religious Freedom Restoration Act. RFRA states that the federal government shall not "substantially burden" a person's religious exercise unless the government demonstrates that imposing that burden is "the least restrictive means of furthering" a "compelling governmental interest." RFRA applies to "all Federal law," including laws disposing of federal real property, and it expressly defines the "exercise of religion" to include "[t]he use … of real property for the purpose of religious exercise." Thus, six judges on this Court and two Supreme Court Justices have already opined that destroying Oak Flat would substantially burden Apache religious exercise.

This Court's prior contrary ruling—by a bare en banc majority in *Apache*—is irreconcilable with the Supreme Court's intervening decision in *Mahmoud v. Taylor*, 145 S. Ct. 2332 (2025), and is therefore ripe for reexamination. It was also wrong to begin with. As Justices Gorsuch and Thomas noted, it is supported by "exactly nothing" in "RFRA's text," represents an "outlier" among circuits, and adopts reasoning the Supreme Court has "emphatically rejected" as "absurd." *Apache Stronghold v. United States*, 145 S. Ct. 1480, 1486, 1488 (2025) (Gorsuch, J., dissenting from denial of certiorari) ("Gorsuch & Thomas"). Particularly given intervening Supreme Court precedent, this Court should correct its "grievous mistake" in *Apache*. *Id.* at 1489.

2

Second, the destruction of Oak Flat violates the free-exercise right of Apache parents to direct their children's religious upbringing. In *Mahmoud*, the Supreme Court held that this right "would be an empty promise if it did not follow" children onto government property. 145 S. Ct. at 2351. Accordingly, the Court held that reading LGBTQ-inclusive storybooks to children in public schools, without notifying parents or allowing children to opt out, posed a "'very real threat of undermining' the religious beliefs that the parents wish to instill in their children," even though the government's actions were "subtle." *Id.* at 2355. Here, the government's actions are anything but "subtle": they will physically destroy an irreplaceable sacred site, without which Apache parents can never initiate their children in Apache religious ways. This is nothing less than "the destruction of [a religious] community"—which every Justice in *Mahmoud* agreed was unconstitutional. *Id.* at 2392 & n.8 (Sotomayor, J., dissenting).

Third, the destruction of Oak Flat violates the Free Exercise Clause because the government's actions are neither neutral toward religion nor generally applicable. Rather, the government has made a discretionary, individualized decision to favor copper mining over Apache religious practices on a particular piece of land. That sort of decision to favor secular over religious conduct triggers strict scrutiny, which the government has not tried to satisfy.

3

Fourth, the government's EIS violates the National Environmental Policy Act. NEPA requires federal agencies to analyze a reasonable range of alternatives to a proposed agency action that are technically and economically feasible. Here, however, the Forest Service expressly declined to conduct any detailed analysis of alternative underground mining methods, despite admitting that those methods are "technically" and "physically feasible," would allow billions of pounds of copper to be "profitably mined," and would preserve Oak Flat's surface. The EIS also violates NEPA's mandatory page limit.

Fifth, the transfer of Oak Flat violates the National Historic Preservation Act. The NHPA requires the government to identify historic sites that may be harmed by federal projects and seek to avoid or mitigate that harm. Here, it is undisputed that Oak Flat is historically significant. Yet the government failed to follow the processes set out in the NHPA. It pushed the project forward over the opposition of the NHPA-created Advisory Council on Historical Preservation. And it ignored the Council's recommendation to assess and incentivize the use of alternative mining techniques that would enable mining without harming Oak Flat. This disregard of the Council violated the NHPA.

Finally, given these serious questions on the merits and the balance of harms, a preliminary injunction is warranted. The district court correctly found that "Plaintiffs will suffer irreparable harm in the absence" of an injunction. ER-22. Indeed, "the government has acknowledged that

the destruction of Oak Flat will inflict indescribable hardship on the Apaches." ER-25–26. And there is no serious dispute about the balance of harms. If this Court enjoins the transfer now but reverses course later, the government loses nothing: it can still proceed with the project—which it has voluntarily delayed for years—and still recover every ounce of copper. But if this Court denies relief now and reverses course later, the Apaches lose everything: Oak Flat will be destroyed and they can never again practice their religion.

*　　*　　*

The consequences of this case are profound. This nation has a tragic history of destroying Apache lives and land for the sake of mining interests. And today, in 2025, the government is planning to do it again: destroying one of the last vestiges of Apache religious heritage, violating the First Amendment and multiple federal statutes, and "effectively end[ing] Apache religious existence as we know it." ER-25. Before such a tragedy occurs, the Court should at the very least enter a preliminary injunction so that the Apaches' serious legal claims can be fully heard.

## JURISDICTIONAL STATEMENT

The district court has jurisdiction under 28 U.S.C. §§ 1331, 1343, 1361, 2201, and 2202. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1) because this is an appeal from an interlocutory order denying a preliminary injunction on August 17, 2025. The notice of appeal was filed that same day.

## STATEMENT OF ISSUES

**I. RFRA:** Whether transferring and destroying Oak Flat "substantially burdens" Plaintiffs' religious exercise and likely violates RFRA when it makes their religious practices impossible.

**II. Free Exercise:** Whether transferring and destroying Oak Flat triggers heightened review and likely violates the Free Exercise Clause, when the government's actions (a) substantially interfere with the religious upbringing of Plaintiffs' children, and (b) involve a discretionary decision to favor secular over religious use of a single parcel of land.

**III. NEPA:** Whether the government likely violates NEPA when its EIS (a) fails to consider admittedly "feasible" alternative mining methods that would preserve Oak Flat, and (b) exceeds NEPA's length limit.

**IV. NHPA:** Whether the government likely violates the NHPA when it fails to address an ACHP recommendation that the government assess and incentivize alternative mining methods that would preserve Oak Flat.

**V. Injunction Factors:** Whether the remaining injunction factors favor injunctive relief when Plaintiffs face the permanent loss of an irreplaceable sacred site, while the government faces only temporary, marginal delay of a project the government itself has delayed for years.

A statutory addendum is included at the end of this brief. 9th Cir. R. 28-2.7.

## STATEMENT OF THE CASE

### A. Oak Flat

For centuries, Western Apaches have worshipped at a sacred site called *Chí'chil Biłdagoteel* or Oak Flat. *See generally* ER-227, 231, 237–45, 248–55.

Oak Flat lies within the Tonto National Forest about three miles east of Superior, Arizona, between Apache Leap on the west and Ga'an Canyon on the east. ER-265. Its terrain is characterized by old-growth oak groves, grassy basins, boulder fields, jagged cliffs, and perennial waters used by abundant wildlife. ER-228.

Oak Flat "is particularly rich in traditional Apache resources, providing everything necessary for Apache survival." ER-251. This includes abundant acorns ("the single most important traditional food today"), "traditional Apache plants," "rare holy medicines," and animals and minerals "that are crucial to Apache religion and culture." *Id.* In part because of this natural abundance, Oak Flat also features a singular concentra-

7

tion of "Apache [archaeological] sites located in one small area"—demonstrating that Oak Flat "has been persistently utilized and occupied for the past 1,500 years." ER-237–39.

As part of Western Apaches' ancestral homeland, Oak Flat figures prominently in Apache history and cosmology. ER-231. It is often described as "the birthplace" of Apache religion or the Apaches' "spiritual" or "religious home." ER-205–06, 208, 210–12, 214, 218. It is a dwelling place of powerful spiritual beings called Ga'an, who are holy spirits or messengers between the Creator and humans (ER-210–11)—sometimes compared to angels in the Judeo-Christian tradition, but "bound up with a specific place" and unable "to exist without it." Tisa Wenger, *Fighting for Oak Flat: Western Apaches and American Religious Freedom*, 39 J.L. & Religion 247, 248, 267 (2024) ("Wenger"); ER-248.

As the dwelling place of the Ga'an, Oak Flat is a unique "source of supernatural power" (or *diyih*) and "the direct corridor to the Creator." ER-216, 231, 250-51; *see also* ER-199, 205, 206, 208, 218. As such, Oak Flat is the site of essential religious ceremonies that cannot be replicated elsewhere. ER-205, 211, 215, 218; *see* Wenger at 248 (Oak Flat is "the only place where certain prayers, offerings, and ceremonies can be conducted").

One ceremony is called the Holy Ground Ceremony. This is a blessing ceremony conducted by a medicine man for protection from sickness and perils. *Id.* at 259–60. It has been performed in its current form at Oak

8

Flat for at least 100 years, and it reflects and builds on much older practices. *Id.* at 257–58. The current version dates back to the Apache prophet Silas John. *Id.* In the 1920s, the federal government attempted to suppress Silas John's Holy Ground movement by forbidding his dances and jailing him. *Id.* at 259. But Apache families continued to hold Holy Ground Ceremonies at Oak Flat in the late 1940s or early 1950s, and still do today. *Id.* The ceremony takes place at Oak Flat because the Ga'an's presence "makes the plants, herbs, and medicines gathered at Chi'chil Biłdagoteel more potent for both medicinal and ceremonial use." *Id.* at 261; *see also* ER-212 (healing from blessings and prayers at Oak Flat); ER-210 (healing from sacred spring waters at Oak Flat).

Another ceremony is the Sunrise Ceremony, a religious rite of passage for Apache girls. ER-199. This coming-of-age ceremony takes months of planning, entails several days of celebration, and often unites families from all four Western Apache reservations. ER-199, 255.

To prepare for her Sunrise Ceremony, the girl uses materials from Oak Flat to build a traditional Apache house, called a wickiup, where she lives for the ceremony's duration. ER-200, 212. She gathers the necessary elements from the holy ground at Oak Flat, thanking Mother Earth for her resources. ER-205. A medicine man gives the girl traditional buckskin clothing and a cane, and tribal members surround her with singing, dancing, and prayer. ER-201–03.

9



ER-214

On the second night of the ceremony, the Ga'an arrive. ER-203–04. Five girls dance behind the Ga'an dancers, representing how the Ga'an guide them through life. ER-203–04. On the last day, the girl is painted with white paint made from the ground at Oak Flat; as she dances, she embodies the White Painted Woman, the Apache matriarch who came from the ground at Oak Flat. ER-204. At the ceremony's end, when the girl's godmother wipes the paint from her eyes, she is a new Apache woman, forever connected with the spirit of Oak Flat. ER-205, 213, 215, 216.



Gorsuch & Thomas, 145 S. Ct. at 1481

Oak Flat is also the site of several natural springs, which are rare in the arid region and a source of spiritual power for Apaches. 1-EIS-ES-29; ER-205, 209; Wenger at 16–17. One example is *Tú Nahikaadi* (Dripping Spring), which plays a unique role in Apache tradition. ER-255; Wenger at 250–51. According to that tradition, a great flood scoured the world, and the Apache matriarch, White Painted Woman or Changing Woman, survived the flood and took refuge in a cave with a dripping spring. Wenger at 250–51; ER-204–05. She emerged alone into this world, and her children, conceived with the Sun, received guidance from the Ga'an on how to live. Wenger at 250–51. Apaches still visit Dripping Spring for sacred rituals today, *id.* at 262–63, and the Apache girl in a Sunrise Dance embodies this first matriarch as she dances her way to womanhood, ER-204–05.

Oak Flat is also the site of *Tséyaa Gogeschin* (Written or Painted under the Rocks), a large rock overhang with ancient pictographs and petroglyphs—rock art that holds profound meaning for Apaches and provides an irreplaceable connection to Apache ancestors. ER-255; ER-209. The San Carlos Apache Tribe's Chairman has described this artwork as "the footprints and the very spirit of our ancestors, hallmarks akin to the art found in gothic cathedrals and temples, like the Western Wall in Jerusalem [or] St. Peter's Basilica in Vatican City … . This is why I call Oak Flat the Sistine Chapel of Apache religion." 6-EIS-U-9.

The shaded portion of the following map shows the area where the critical sites described above are located—including the sacred ceremonial grounds, oak groves, sacred springs, medicine-gathering areas, and ancient petroglyphs (ER-207–08):



## B. Plaintiffs' religious practices

Plaintiffs are Apache women and girls whose religious practices center on Oak Flat and who would be unable to practice their religion if Oak Flat is destroyed.

Plaintiff Gouyen Brown had her Sunrise Ceremony at Oak Flat. ER-199, 200–05. There, she experienced a profound spiritual connection with Mother Earth and with her ancestors. ER-205. It is where she became a new woman. ER-205. She continues to return to Oak Flat to pray, gather

14

medicine, and participate in religious ceremonies. ER-205–06. She hopes and intends that her own daughters will be able to connect with the Creator at Oak Flat and have their Sunrise Ceremonies there. ER-205–06. If Oak Flat is destroyed, she would be devastated. She would be unable to continue core religious practices or to bring up her children in Apache religious ways. ER-205, 206.

Plaintiff Sinetta Lopez is an Apache woman and Gouyen's mother. She grew up coming to Oak Flat with her mother and grandmother, collecting berries, praying, and worshipping there. ER-207, 208. Oak Flat is central to her religious practices and essential to how she brings up her daughters in the Apache way. ER-209–11.

Sinetta also has a minor daughter, L.B., who has grown up visiting Oak Flat, has had dreams and encounters with spirits at Oak Flat, and was healed of an illness by drinking water from a sacred spring at Oak Flat. ER-210. She is planning her Sunrise Ceremony at Oak Flat for October 2025 and wants to remain connected with the Creator and her ancestors through sacred ceremonies there. ER-210.

Plaintiff Nomie Brown is an Apache woman who had her Sunrise Ceremony at Oak Flat. ER-212. That ceremony fundamentally changed her life, and she continues to return to Oak Flat to engage in prayer and religious ceremonies today. ER-213, 214. Oak Flat is essential to her ongoing religious exercise and identity as an Apache woman.

Plaintiff Angela Kinsey is an Apache woman and mother who worships at Oak Flat. ER-217, 218. She grew up coming to Oak Flat with her grandmother and has participated in many religious ceremonies at Oak Flat, including serving as a godmother in a Sunrise Ceremony. ER-217, 218. She has two minor daughters whom she continues to take to Oak Flat to pass on Apache religious ways. ER-218–20. Oak Flat is the place where she is uniquely able to connect with the Creator. ER-220.

Angela's minor daughter, V.K., had her coming-of-age ceremony at Oak Flat. ER-218. She has participated in many ceremonies at Oak Flat, and doing so is an essential part of her religion and identity as an Apache woman. ER-218.

Angela's younger minor daughter, M.K., is four years old. ER-218. Angela hopes and intends that M.K. will be able to have her coming-of-age ceremony at Oak Flat. ER-220.

For Plaintiffs, Oak Flat in its entirety is a sacred and holy site. Its protection is essential for the continued practice of Apache religious ways, and Plaintiffs oppose the government's plan to violate the integrity of Oak Flat through mining—which would cut off Plaintiffs' access to Oak Flat and make it impossible for them to practice their religion.

### C. The taking of Oak Flat

Before the United States existed, Oak Flat was Apache land. John R. Welch, *Earth, Wind, and Fire: Pinal Apaches, Miners, and Genocide in*

*Central Arizona, 1859-1874*, 7 SAGE Open, Oct.-Dec. 2017, https://journals.sagepub.com/doi/epub/10.1177/2158244017747016 ("Welch"); ER-231, 237–39. Beginning in the 1500s, other nations made claims to the land, including Spain and, later, Mexico. *See* Gorsuch & Thomas, 145 S. Ct. at 1482. The United States first gained an interest in the area in 1848, when Mexico—defeated in the Mexican-American War—ceded its claim to the area in the Treaty of Guadalupe Hidalgo. *Id.* at 1482; 2-EIS-822.

In 1852, the United States entered the Treaty of Santa Fe with several Apache chiefs. Treaty with the Apaches art. 8 (July 1, 1852), 10 Stat. 979, 980, https://www.govinfo.gov/content/pkg/STATUTE-10/pdf/STATUTE-10-Pg979.pdf#page=2. To secure peace with the Apaches, the United States promised to "designate, settle, and adjust their territorial boundaries" and "pass and execute" laws conducive to their "prosperity and happiness." *Id.*, art. 9. The earliest known map of the area, prepared by the Smithsonian Institution in 1899, shows Oak Flat as Apache territory, not belonging to the United States. Welch at 6. However, the formal designation of territorial boundaries never occurred.

The promised peace didn't occur either. Shortly after the 1852 Treaty, settlers and miners entered the area over Apache opposition, and U.S. soldiers and civilians repeatedly massacred Apaches. Welch at 7–8. In 1862, U.S. Army General James Carleton ordered Apache men to be killed wherever found. When miners discovered gold and silver nearby,

17

General Carleton ordered the Apaches' "removal to a Reservation" or "utter extermination" to protect "all those who go to the country in search of precious metals." Welch at 8. By 1874, the government had forced 4,000 Apaches onto the San Carlos Reservation—nicknamed "Hell's 40 Acres" because it was a barren wasteland. Dana Hedgpeth, *This land is sacred to the Apache, and they are fighting to save it*, Washington Post (Apr. 12, 2021), https://archive.ph/SBYtV.

In 1883, the Code of Indian Offenses prohibited traditional Native American religious practices on pain of imprisonment. Hiram Price, *Rules Governing the Court of Indian Offenses*, Department of the Interior, Office of Indian Affairs (Mar. 30, 1883), https://commons.und.edu/indigenous-gov-docs/131/. The government also forcibly removed hundreds of Apache children from their families, sending them to boarding schools aimed at rooting out their "savagism" and converting them to Christianity. David Wallace Adams, *Education for Extinction: American Indians and the Boarding School Experience, 1875-1928* 6 (1st ed. 1995); Welch at 14.

The United States doesn't dispute this history. The EIS acknowledges that Oak Flat is "part of the traditional territories of the Western Apache," who "lived on and used the resources of these lands," that the government took Oak Flat "by force 150 years ago," and that because of the government's actions, Western Apaches "lost large portions of their

18

homelands, including Oak Flat, and today live on lands that do not encompass places sacred to their cultures." 3-EIS-873–75.

## D. Protections for Oak Flat

Beginning in the 1900s, the government took steps to protect Oak Flat. In 1905, the government created the Tonto National Forest, which includes Oak Flat. 2-EIS-823. In 1955, President Eisenhower reserved portions of Oak Flat to protect it from mining. 20 Fed. Reg. 7,319, 7,336–37 (Oct. 1, 1955). In 1971, President Nixon renewed the protection. 36 Fed. Reg. 18,997, 19,029 (Sep. 25, 1971). And in 2016, the National Park Service placed Oak Flat in the National Register of Historic Places, recognizing "that *Chí'chil Biłdagoteel* is an important feature of the Western Apache landscape as a sacred site, as a source of supernatural power, and as a staple in their traditional lifeway." ER-231.

## E. The land transfer

These protections came under pressure starting in 1995, when a large copper deposit was discovered beneath Oak Flat. 1-EIS-ES-1. In 2004, two of the world's largest mining companies, Rio Tinto and BHP, formed a joint venture called Resolution Copper and began lobbying Congress to transfer Oak Flat to Resolution. *Id.*; Lydia Millet, *Selling Off Apache Holy Land*, N.Y. Times (May 29, 2015), https://archive.ph/ojJDL ("Millet"). Rio's largest shareholder is Aluminum Corporation of China, a

19

"state-owned enterprise" of the Chinese government.[1] And Rio has been widely condemned internationally for destroying indigenous sacred sites—including 46,000-year-old caves constituting one of Australia's most significant cultural sites.[2] Australia's Parliament found that "Rio knew the value of what they were destroying but blew it up anyway … despite having options which would have preserved [the site]." *Never Again*, *supra* n.2.

Between 2005 and 2013, Congress considered at least twelve standalone bills to transfer Oak Flat to Resolution. Katherine E. Lovett, *Not All Land Exchanges Are Created Equal: A Case Study of the Oak Flat Land Exchange*, 28 Colo. Nat. Res., Energy & Envtl. L. Rev. 353, 366–67 (2017). Each failed. *Id.*

Lacking congressional support for a standalone bill, Resolution and its allies tried a different tack: a last-minute rider to must-pass legislation. Each year, Congress passes the National Defense Authorization Act, which is essential to fund the military. *Id.* at 368. In 2014, the NDAA was 698 pages long and authorized hundreds of billions in defense spending.

---

[1] *About Chinalco, Overview*, Aluminum Corp. of China, https://www.chinalco.com.cn/en/en_gywm/en_qyjj/; *see* Neil Hume, *Rio faces rebellion from biggest shareholder*, Financial Times (Apr. 10, 2019), https://archive.ph/MOCv6.

[2] Parliament of Australia, Joint Standing Committee on Northern Australia, *Never Again*, at vi (Dec. 2020), https://culturalheritage.org.au/wp-content/uploads/2024/01/Never-Again.pdf.

*See* Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015, 128 Stat. 3292. At the last minute, Arizona Senators McCain and Flake attached to the NDAA a land-exchange rider—called the "Southeast Arizona Land Exchange and Conservation Act"—without a separate vote or debate. Millet, *supra* p.19. The land-exchange rider then passed as Section 3003 of the NDAA. 16 U.S.C. § 539p.

Subject to various conditions, the rider authorizes the Secretary of Agriculture to transfer title to 2,422 acres of Forest Service lands, including Oak Flat, to Resolution, in exchange for other parcels owned by Resolution scattered elsewhere in Arizona. *Id.* § 539p(b)(2), (b)(4), (c)(1), (d)(1). The land to be transferred to Resolution is shown here (*cf.* 1-EIS-65):



The land-exchange rider revokes the orders by Presidents Eisenhower and Nixon protecting Oak Flat. 16 U.S.C. § 539p(i)(1)(A). It instructs that, before conveying the federal land, the Secretary must "prepare a single environmental impact statement under [NEPA] which shall be used as the basis for all decisions under Federal law related to the proposed mine." *Id.* § 539p(c)(9)(B). The rider also requires the Secretary to "engage in government-to-government consultation with affected Indian tribes concerning issues of concern." *Id.* § 539p(c)(3)(A). Following that consultation, the Secretary must consult with Resolution "and seek to find mutually acceptable measures to (i) address the concerns of the affected Indian tribes; and (ii) minimize the adverse effects on the affected Indian tribes resulting from mining and related activities." *Id.* § 539p(c)(3)(B).

Once the Secretary publishes a NEPA-compliant EIS, the rider provides that "the Secretary shall convey" all federal interest in Oak Flat "to Resolution Copper" within "60 days." *Id.* § 539p(c)(10).

## F. The mine

The government originally published an EIS on January 15, 2021. 1-EIS-ES-3. On March 1, 2021, the government withdrew that EIS—stating that it needed additional "time" to "fully understand concerns raised by Tribes." *Id.* The government eventually republished the EIS on June 16, 2025, with the Notice of Availability appearing in the Federal Regis-

22

ter on June 20. USDA, *Final Environmental Impact Statement: Resolution Copper Project & Land Exchange* (June 2025), https://www.resolutionmineeis.us/documents/final-eis; *see* 90 Fed. Reg. 26,287 (June 20, 2025).

The EIS confirms that the mine will destroy Oak Flat. *See generally* Addendum 2, *infra* p.99 (EIS excerpts). The copper is located 4,500 to 7,000 feet below Oak Flat. 1-EIS-ES-1. To mine it, Resolution plans to use a technique called panel caving, which involves tunneling beneath the ore, fracturing it with explosives, and removing it from below. 1-EIS-13. Once the ore is removed, approximately 1.37 billion tons of toxic waste ("tailings") will need to be stored above ground forever. 1-EIS-62. This method will permanently bury or otherwise destroy many prehistoric and historic cultural artifacts, including human burials. 1-EIS-44. Oak Flat itself will collapse ("subside") into a crater almost 2 miles across and 800 to 1,115 feet deep. 1-EIS-ES-4. The following map shows the crater in relation to the ceremonial sites described above (*cf.* 1-EIS-65):



The EIS admits that "there are other underground … techniques that could physically be applied to" the deposit to preserve Oak Flat's surface. 4-EIS-F-3–F-5. These techniques, such as cut-and-fill or sublevel stoping, involve "backfilling tailings underground"—*i.e.*, filling the underground voids created by a mine with waste materials left over from the mining process. *Id.* These techniques, the EIS admits, would eliminate the need to store toxic tailings on the surface and would eliminate the "subsidence area" swallowing Oak Flat. 4-EIS-F-5; 1-EIS-50. The EIS also admits that these methods are "technically" and "physically feasible." 4-EIS-F-5. But the government rejected any detailed consideration of these alternatives on the ground that they "would result in higher per-ton mining

costs" and thus "reduce the amount of ore that could be profitably mined." 1-EIS-50–51; 4-EIS-F-3–4.

The EIS admits that the impacts of the mine will be "immediate, permanent, and large in scale" and that "public access" to the site will be "lost." 3-EIS-892; 1-EIS-327. Among other things, the mine will destroy the places used for Sunrise, Holy Grounds, and other sacred ceremonies; old-growth oak groves and sacred medicinal plants; sacred springs, including Changing Woman Spring; burial grounds; and ancient religious, historical, and cultural artifacts, including the ancient petroglyphs of *Tséyaa Gogeschin*. 1-EIS-ES-29, 1-EIS-44, 160; 6-EIS-U-2–U-3, U-9–U-10. This will make it physically impossible for the Apaches to ever engage in their core religious practices again. 1-EIS-160; 3-EIS-867–71; ER-206, 211, 216, 220.

## G. Initial lawsuits

When the government first published an EIS in 2021, three lawsuits were filed. Compl., *Apache Stronghold v. United States*, No. 2:21-cv-50 (D. Ariz. Jan. 12, 2021), ECF No. 1; Compl., *San Carlos Apache Tribe v. U.S. Forest Serv.*, No. 2:21-cv-68 (D. Ariz. Jan. 14, 2021), ECF No. 1; Compl., *Ariz. Mining Reform Coal. v. U.S. Forest Serv.*, No. 2:21-cv-122 (D. Ariz. Jan. 22, 2021), ECF No. 1. Two of those lawsuits focused on the 2021 EIS's adequacy and were stayed when the EIS was withdrawn on March 1, 2021. Order, *San Carlos Apache Tribe v. U.S. Forest Serv.*, No.

2:21-cv-68 (D. Ariz. Mar. 23, 2021), ECF No. 47; Order, *Ariz. Mining Reform Coal. v. U.S. Forest Serv.*, No. 2:21-cv-122 (D. Ariz. Mar. 16, 2021), ECF No. 35.

One of the lawsuits challenged the land transfer's legality under RFRA and the First Amendment and sought a preliminary injunction. The district court declined to enjoin the transfer. *Apache Stronghold v. United States*, No. 2:21-cv-50, 2021 WL 689906 (D. Ariz. Feb. 22, 2021). This Court affirmed by a 6-5 en banc vote. *Apache Stronghold v. United States*, 101 F.4th 1036 (9th Cir. 2024). The Supreme Court declined to grant certiorari on May 27, 2025, over a dissent from Justice Gorsuch, joined by Justice Thomas. Gorsuch & Thomas, 145 S. Ct. 1480. Justices Gorsuch and Thomas explained that this Court's decision was "extraordinary," "highly doubtful as a matter of law," and turned on a rule that "[n]ot a single other Court of Appeals has" adopted. *Id.* at 1480, 1488. The Plaintiff in *Apache* has asked the Supreme Court to reconsider its denial of certiorari in light of the Court's subsequent decision in *Mahmoud*, and that request remains pending.

### H. The decision below

A few weeks after the Supreme Court denied certiorari in *Apache*, the government on June 20, 2025, gave notice that it had republished the EIS and would transfer Oak Flat to Resolution on August 19, 2025.

Shortly after the EIS was republished, Plaintiffs filed this suit in federal district court in D.C. and sought a preliminary injunction, alleging

that the government's actions violate RFRA, the Free Exercise Clause, NEPA, and the NHPA. *Lopez v. United States*, No. 1:25-cv-2408 (D.D.C., filed July 24, 2025). The District of D.C., at the government's and Resolution's behest, transferred this case to the District of Arizona.

On August 17, 2025, the district court in Arizona denied Appellants' motion for a preliminary injunction (ER-4–23)—as it had in the *San Carlos* and *Arizona Mining* cases two days earlier (ER-117).

The court agreed that "Plaintiffs will suffer irreparable harm in the absence of a preliminary injunction." ER-22. However, it held that "[w]hatever force" Plaintiffs' RFRA and First Amendment claims have, they are "foreclosed" "by a slim margin" under *Apache*. ER-11. As for NEPA, the court held that "the Forest Service was not required to provide … any analysis of alternative mining methods" because "the Forest Service lacks authority to regulate the mining operations that will occur on private land following the land exchange." ER-18. It also held that the Forest Service's violation of NEPA's page limits was harmless. ER-14–15. Finally, the court held that, under the NHPA, the government adequately responded to the ACHP's recommendation to consider alternative mining methods because the "final paragraph" of the government's response, when "[r]ead in proper context," indicates that the Forest Service lacks authority to regulate mining methods on private land. ER-21.

This appeal followed.

## STANDARD OF REVIEW

This Court reviews the denial of a preliminary injunction for abuse of discretion. *Doe #1 v. Trump*, 984 F.3d 848, 861 (9th Cir. 2020). The district court's legal conclusions are "subject to de novo review," and "a district court abuses its discretion when it makes an error of law." *Id.*

## SUMMARY OF ARGUMENT

Plaintiffs have shown a likelihood of success on the merits, and the remaining injunction factors overwhelmingly favor relief.

**I.** Under RFRA, the government may not "substantially burden" religious exercise unless doing so is the least restrictive means of advancing a compelling governmental interest. Here, the government substantially burdens Plaintiffs' religious exercise by destroying Oak Flat—which makes their religious practices impossible. This Court's contrary conclusion in *Apache* is both wrong and clearly irreconcilable with intervening Supreme Court precedent—and should therefore be corrected. And the government has not even attempted to satisfy strict scrutiny.

**II.** The Free Exercise Clause prohibits the government from substantially interfering with parents' ability to direct their children's religious upbringing. That prohibition is triggered here by the government's decision to destroy Oak Flat—which makes it impossible for Apache parents to initiate their children in their religious ways.

The Free Exercise Clause also requires strict scrutiny of laws that burden religion and are not generally applicable. Here, the land-exchange

rider is not generally applicable because it represents a discretionary decision to favor secular over religious use of a single parcel of land. That sort of individualized value judgment triggers strict scrutiny.

**III.** NEPA requires federal agencies to study, develop, and describe all technically and economically feasible alternatives to a proposed agency action. Here, the Forest Service violated this requirement by excluding any detailed analysis of alternative mining methods that the EIS concedes are feasible, profitable, and would preserve Oak Flat. The Forest Service also violated NEPA by exceeding NEPA's page limit.

**IV.** The NHPA requires federal agencies to consider the ACHP's comments and demonstrate that they were taken seriously. Here, the government violated that requirement by ignoring the ACHP's recommendation to consider and incentivize alternative mining techniques that would prevent subsidence at Oak Flat. That violates the NHPA.

**V.** In addition to Plaintiffs' likelihood of success on the merits, the remaining injunction factors favor relief. The district court correctly found that "Plaintiffs will suffer irreparable harm in the absence" of an injunction. ER-22. And the balance of hardships strongly favors relief, given that Plaintiffs face the permanent loss of an irreplaceable sacred site, while the government faces only temporary, marginal delay of a project it has long voluntarily delayed.

## ARGUMENT

A preliminary injunction is appropriate when the plaintiff shows (1) likelihood of success on the merits, (2) likelihood of irreparable harm absent relief, (3) the equities favor relief, and (4) relief is in the public interest. *All. for Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011). If "the balance of hardships tips sharply in the plaintiff's favor," as here, the plaintiff need show only "serious questions going to the merits." *Id.* at 1134–35. Here, all four factors favor relief.

## I. The government's actions violate RFRA.

Congress enacted RFRA "to provide very broad protection for religious liberty." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014). Under RFRA, the "Government shall not substantially burden a person's exercise of religion" unless it satisfies strict scrutiny. 42 U.S.C. § 2000bb-1(a)–(b). RFRA sidesteps the rule developed in *Employment Division v. Smith*—which permits laws that are neutral and generally applicable to burden religious exercise—and applies even if government action is "'neutral' toward religion" and "of general applicability." *Id.* §§ 2000bb(a)(2), 2000bb-1(a). And RFRA is a "super statute," *Bostock v. Clayton County*, 590 U.S. 644, 682 (2020), applying "to all Federal law, and the implementation of that law, whether statutory or otherwise." 42 U.S.C. § 2000bb-3(a).

RFRA claims proceed in two steps. First, the plaintiff must show his "exercise of religion" has been "substantially burdened." *Gonzales v. O*

*Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 431 (2006). Second, "the burden is placed squarely on the Government" to prove that substantially burdening the plaintiff is "the least restrictive means" of furthering a "compelling governmental interest." *Id.* at 428, 429.

Here, the government's actions substantially burden Plaintiffs' religious exercise by barring access to and physically destroying the irreplaceable site where Plaintiffs' religious practices must take place. Although this Court wrongly held otherwise in *Apache*, that case's reasoning has been repudiated by the Supreme Court's intervening decision in *Mahmoud*. And the government has not even attempted to satisfy strict scrutiny. Thus, Plaintiffs are likely to prevail on their RFRA claim.

## A. The transfer and destruction of Oak Flat imposes a substantial burden on Plaintiffs' religious exercise.

**1.** RFRA doesn't define what it means to "substantially burden" an exercise of religion—so courts "turn to the phrase's plain meaning." *Tanzin v. Tanvir*, 592 U.S. 43, 48 (2020). Interpreting that plain meaning, this Court has defined a substantial burden as "a 'significantly great' restriction or onus on 'any exercise of religion.'" *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034–35 (9th Cir. 2004). And while *San Jose* arose under RFRA's "sister statute," RLUIPA, both statutes apply the "same standard." *Holt v. Hobbs*, 574 U.S. 352, 356, 358 (2015).

This Court's "precedent shows that we do not take a narrow view of what constitutes a 'substantial burden.'" *Johnson v. Baker*, 23 F.4th

31

1209, 1215 (9th Cir. 2022). Even a "lesser restriction[]" can suffice—for example, one that "causes 'substantial delay, uncertainty, and expense' to worship." *Id.* at 1215–16 (quoting *Int'l Church of Foursquare Gospel v. City of San Leandro*, 673 F.3d 1059, 1068 (9th Cir. 2011)). Accordingly, government action that outright "prevents" worship—for example, by depriving the practitioner of "access" to a resource needed to perform it—is an *a fortiori* case. *Id.* at 1214–16. As another court has put it: "The greater restriction (barring access to the practice) includes the lesser one (substantially burdening the practice)." *Haight v. Thompson*, 763 F.3d 554, 565 (6th Cir. 2014); *see also, e.g.*, *Thai Meditation Ass'n of Ala. v. City of Mobile*, 980 F.3d 821, 830–31 (11th Cir. 2020) ("complet[e] prevent[ion]" is a "clear[]" case); *Yellowbear v. Lampert*, 741 F.3d 48, 55–56 (10th Cir. 2014) (Gorsuch, J.) (government "easily" imposes a substantial burden when it "prevents the plaintiff from participating in a[ religious] activity").

It's therefore little surprise that the Supreme Court has already recognized that preventing religious exercise through physical acts—such as "destruction of religious property"—can constitute a "RFRA violation[]." *Tanzin*, 592 U.S. at 51. And courts have already applied this principle to the precise context at issue here: Native American sacred sites on federal land. In *Comanche Nation v. United States*, for example, the Army planned to build a warehouse on federal land near Medicine Bluffs, a sacred site. No. 08-cv-849, 2008 WL 4426621, at *17 (W.D. Okla. Sep.

23, 2008). But the warehouse would have occupied "the precise location" where Native Americans stood for worship near the Bluffs—making their traditional religious practices impossible. *Id.* at \*7, \*17. The court held that this physical interference with plaintiffs' religious exercise "amply demonstrate[d]" a "substantial burden." *Id.*

This plain-language reading of RFRA resolves the "substantial burden" question here. The government's actions will not just place an "onus" on Plaintiffs' religious exercise, *San Jose Christian Coll.*, 360 F.3d at 1034–35—they will terminate it altogether. Plaintiffs, like their Apache forebears, practice their faith at Oak Flat, performing specific religious rituals there that are uniquely tied to that site and cannot be replicated elsewhere. ER-205, 211, 216, 220. But the transfer and mine will render that longstanding religious exercise physically impossible. Plaintiffs' "access" to the land now constituting Oak Flat "w[ill] be eliminated." 1-EIS-153; *see also, e.g.*, 1-EIS-ES-29, 1-EIS-327. And the site itself will be swallowed by a massive crater. 1-EIS-ES-4. If that burden isn't substantial, it's difficult to imagine what is.

**2.** In *Apache*, a razor-thin majority of the en banc Court rejected a RFRA challenge to the transfer and mine at issue here. 101 F.4th at 1043–44 (per curiam). But while six judges found no substantial burden, six others concluded the opposite—that "the complete destruction" of Oak Flat was "an obvious substantial burden on [Apache] religious exercise." *Apache Stronghold v. United States*, No. 21-15295, 2021 WL 12295173,

33

at *2–4 (9th Cir. 2021) (Bumatay, J., dissenting); *Apache*, 101 F.4th at 1145–46 (Murguia, C.J., dissenting). And two Supreme Court Justices have likewise criticized the *Apache* majority's "extraordinary" conclusion as being supported by "[e]xactly nothing" in "RFRA's text," representing an "outlier" among circuits, and resting on reasoning the Supreme Court has "emphatically rejected" as "absurd." Gorsuch & Thomas, 145 S. Ct. at 1486, 1488.

Justices Gorsuch and Thomas are correct. The *Apache* majority agreed that "preventing access to religious exercise" is a "substantial burden" under that phrase's ordinary meaning. 101 F.4th at 1043 (per curiam). But it held that this ordinary meaning doesn't apply in cases involving "a disposition of government real property." *Id.* at 1055. In that supposedly unique context, *Apache* says, government imposes a substantial burden only if it "coerce[s] individuals into acting contrary to their religious beliefs" or "discriminate[s]" amongst or against religious adherents. *Id.* at 1051.

This theory defies RFRA's plain text. "Exactly nothing in the phrase 'substantial burden'—or anything else in RFRA's text—hints that a different and more demanding standard applies when (and only when) the 'disposition' of the government's property is at issue." Gorsuch & Thomas, 145 S. Ct. at 1486. To the contrary, RFRA expressly applies to "all Federal law, and the implementation of that law, whether statutory or otherwise." 42 U.S.C. § 2000bb-3(a). It defines the "exercise of religion" to

34

include "[t]he use … of real property for the purpose of religious exercise." *Id.* §§ 2000bb-2(4), 2000cc-5(7)(B). And it provides that "[n]othing" in its provisions "shall be construed to authorize any government to burden any religious belief." *Id.* § 2000bb-3(c). "In each of these ways, RFRA's terms suggest that a law disposing of federal real property is to be treated like any other." Gorsuch & Thomas, 145 S. Ct. at 1486.

Moreover, not only does the *Apache* majority's "property" exception contradict RFRA's express terms—its exceptions to the exception do, too. Under those exceptions, disposing of government property *does* substantially burden religious exercise if the government "discriminate[s]" against religion or denies religious adherents "equal" treatment relative to "other citizens." 101 F.4th at 1051–52. But RFRA explicitly applies regardless of whether government action is "'neutral' toward religion" or stems from a "rule of general applicability." 42 U.S.C. §§ 2000bb(a)(2), 2000bb-1(a). Indeed, Congress's core purpose in enacting RFRA was to "counter" *Smith* on this score. *Tanzin*, 592 U.S. at 45.

The *Apache* majority's theory also defies Supreme Court precedent. The majority purported to locate its special "property" rule in the Supreme Court's pre-RFRA decision in *Lyng v. Northwest Indian Cemetery Protective Association*, which it said was "subsume[d]" by RFRA. *Apache*, 101 F.4th at 1043–44 (per curiam). But for one thing, the Supreme Court has repeatedly rejected as "absurd" the notion that "RFRA merely restored this Court's pre-*Smith* decisions in ossified form." *Hobby Lobby*,

573 U.S. at 714–16; *accord Holt*, 574 U.S. at 361 (lower court "improperly imported a strand of reasoning" from First Amendment into RFRA). Far from "t[ying] RFRA coverage tightly to the specific holdings of our pre-*Smith* free-exercise cases," "[b]y enacting RFRA, Congress went far beyond what this Court has held is constitutionally required." *Hobby Lobby*, 573 U.S. at 706, 714.

For another, "even taken on its own terms, it is hard to see how *Lyng* can be read as setting forth a special test for determining when a government's 'disposition' of land represents a 'substantial burden' on religion." Gorsuch & Thomas, 145 S. Ct. at 1487. Indeed, the phrase "substantial burden" doesn't even appear in the Court's opinion. To the contrary, *Lyng* described the effect on religious exercise as "incidental," and contrasted the government's actions with laws that "discriminate against religions." *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445–50, 453 (1988). This is the classic language of neutrality and general applicability later adopted in *Smith*—then rejected in RFRA. *See Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 460 (2017) (citing *Lyng* as "example[]" of a case "reject[ing a] free exercise challenge[]" where the "law[] in question [was] neutral and generally applicable"); *Fulton v. City of Philadelphia*, 593 U.S. 522, 536 (2021) (*Smith* "drew support for the neutral and generally applicable standard from … *Lyng*").

In any event, *Lyng* is distinguishable on its facts. *Lyng* involved the government's plan to build a road that was "removed as far as possible

36

from [religious] sites," such that "[n]o sites where specific rituals take place were to be disturbed." *Lyng*, 485 U.S. at 443, 454. It did not "involve a challenge to a governmental plan that seeks to destroy a religious site, as the government's plan for Oak Flat would." Gorsuch & Thomas, 145 S. Ct. at 1487. The *Lyng* plaintiffs' challenge was thus based solely on "subjective spiritual harm," which civil courts cannot weigh. *Apache*, 101 F.4th at 1147 (Murguia, C.J., dissenting). Like the plaintiff in *Bowen v. Roy*—who claimed the government's use of a Social Security number for his daughter would "rob[ her] spirit," 476 U.S. 693, 696 (1986)—the *Lyng* plaintiffs didn't assert an "objective" impediment to their performing any act that constituted their religious exercise. *Mahmoud*, 145 S. Ct. at 2350–51, 55 (emphasizing "objective danger" in burden inquiry). The *Apache* majority disregarded these distinguishing facts—facts the *Lyng* Court itself "took pains to stress." Gorsuch & Thomas, 145 S. Ct. at 1487.

**3.** Of course, this Court would ordinarily be bound by *Apache* despite its wrongness. But panels of this Court are "free to reexamine" "prior circuit authority" where that authority's "reasoning or theory … is clearly irreconcilable with the reasoning or theory of intervening higher authority." *Miller v. Gammie*, 335 F.3d 889, 892–93, 899 (9th Cir. 2003) (en banc). Here, soon after a shorthanded Supreme Court denied certiorari in *Apache*, *see* 145 S. Ct. at 1480 (noting Justice Alito's recusal), the Court in *Mahmoud* issued a landmark decision on the meaning of a religious

"burden"—which unambiguously "undercut[s] the theory or reasoning underlying" *Apache. Miller*, 335 F.3d at 900.

In *Mahmoud*, the Court considered whether a public school district "burden[ed]" parents' religious exercise when it included "'LGBTQ+-inclusive' storybooks" in the curriculum without letting parents opt their children out of the readings. 145 S. Ct. at 2341–42. The Court answered yes—and neither its "'mode of analysis'" nor its result can be reconciled with *Apache. Miller*, 335 F.3d at 900.

First, the Fourth Circuit in *Mahmoud*, like the *Apache* majority here, insisted that a burden is "cognizable" only if the government "coerces" religious practitioners "to *believe* or *act* contrary to their religious views." *Mahmoud v. McKnight*, 102 F.4th 191, 208–14 (4th Cir. 2024); *compare Apache,* 101 F.4th at 1061. But *Mahmoud* squarely rejected this theory. The Court declined to adopt any line between "cognizable" and "non-cognizable" burdens. And it rejected as "alarmingly narrow" the idea that a burden must involve "compulsion or coercion to renounce or abandon one's religion." 145 S. Ct. at 2357–58. Indeed, it denounced that notion as "chilling" and contrary to "the fundamental values of the American people." *Id.* at 2358.

Instead, *Mahmoud* asked whether, looking to "the specific religious beliefs and practices asserted," the challenged government actions pose an "objective danger," or "very real threat" to the claimant's religious exercise, thus "substantially interfer[ing]" with it. *Id.* at 2353, 2355–56. But

this "objective" inquiry is precisely the one that the *Apache* majority rejected, claiming it could not draw a line between objective and "subjective" burdens. 101 F.4th at 1052. Indeed, the *Apache* majority *conceded* that the government's actions "would 'interfere significantly'" with Apache religious exercise at Oak Flat. *Id.* at 1051. That is a burden under *Mahmoud*. And these analyses—one focused on the objective degree of the interference and forswearing the necessity of coercion (*Mahmoud*); the other focused on coercion and holding the objective degree of the interference off-limits (*Apache*)—"cannot both be true at the same time." *Langere v. Verizon Wireless Servs., LLC*, 983 F.3d 1115, 1122 (9th Cir. 2020) (applying *Miller*).

*Mahmoud*'s *result* also can't be reconciled with the no-substantial-burden holding in *Apache*. In *Mahmoud*, the Court held even the ostensibly "subtle" message of certain storybooks imposed a burden, rejecting the salience of the parents' supposed "alternatives" for exercising their religion—like private school or teaching religious beliefs at home. 145 S. Ct. at 2353–54, 2359. But there is nothing "subtle" about the government's plan to blast Oak Flat to oblivion. And Apaches have no alternatives— Oak Flat is the location of "religious ceremonies that cannot take place anywhere else." Gorsuch & Thomas, 145 S. Ct. at 1481, 1488.

The district court below resisted *Mahmoud*, noting that "*Mahmoud* did not purport to overrule" *Lyng* but instead said *Lyng* has "'no application here.'" ER-12 (citing *Mahmoud*, 145 S. Ct. at 2357). But that's the

point: *Mahmoud*'s analysis demonstrates that *Lyng* has no application *here* either. For one thing, contrary to *Apache*'s reading of *Lyng* as a general gloss on the meaning of "substantial burden," 101 F.4th at 1061, *Mahmoud* described *Lyng* as setting forth a rule of "[t]he Free Exercise Clause," 145 S. Ct. at 2356–57—which therefore must yield to RFRA's text in adjudicating RFRA claims.

For another, *Mahmoud* held that any free-exercise exception for the government's management of "its own internal affairs" under *Lyng* and *Bowen* was inapplicable there, since "[t]he government's operation of the public schools is not … akin to the administration of Social Security or the selection of 'filing cabinets.'" *Id.* Neither is the government's plan to destroy Oak Flat.

Indeed, while the panel here asserted that the "internal affairs" doctrine encompassed *any* "disposition of government real property," 101 F.4th at 1053–55, *Mahmoud* forecloses this conclusion. *Mahmoud* explained that public schools could *not* be "purely a matter of internal affairs" since "other First Amendment protections—such as the right to free speech [and] … to be free from established religion"—"plainly" apply in that "context." 145 S. Ct. at 2357. But the same is true of federal land— the right to free speech and to be free of established religion plainly apply in that context, too. *See United States v. Grace*, 461 U.S. 171 (1983) (Free Speech Clause); *Buono v. Norton*, 371 F.3d 543 (9th Cir. 2004) (Establishment Clause).

Given *Mahmoud*, then, *Lyng* at most stands for a narrower proposition not at issue here—one applying to land-use decisions that do not objectively hinder citizens' religious exercises but instead trigger only "spiritual" objections. 485 U.S. at 450. As even the *Apache* majority conceded, that is not this case. 101 F.4th at 1052 ("the Government's actions will physically destroy the site and thereby literally prevent its future use for religious purposes").

### B. The government's actions fail strict scrutiny.

With a substantial burden shown, RFRA permits the transfer and mine to proceed "only if" the "Government" "demonstrates that application of the burden" advances a "compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b). But the government has made no effort to satisfy that standard here. And while Resolution made a passing strict-scrutiny argument below, statutory text and precedent alike are clear that the burden is on the "*Government*" to show a "compelling *governmental* interest." *Id.* (emphasis added). Such a burden can't be carried by private parties seeking to vindicate their financial interests in the government's stead. *See O Centro*, 546 U.S. at 429 ("the burden is placed squarely on the Government"); *see also Hobby Lobby*, 573 U.S. at 721 (refusing to "entertain" strict-scrutiny arguments raised by third parties; "we do not even know what the Government's position might be with respect to" this "intensely empirical argument"). So the Court need proceed

41

no farther to resolve this preliminary-injunction appeal; should the government decide to try to carry its burden, it can try to do so on the merits. *See Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 694 (9th Cir. 2023).

In any event, assuming Resolution tries to reprise its strict-scrutiny argument on appeal, Plaintiffs briefly explain why that argument would fail even on its own terms.

***Compelling interest.*** On compelling interest, Resolution says the U.S. "now produces only half of the copper it needs." ECF 38 at 12, No. 2:25-cv-2758 (D. Ariz. Aug. 5, 2025). But that's not the same as saying there's a shortfall of copper—because there's not. The U.S. imports the rest of its copper from a diverse set of reliable, longstanding allies: Chile, Canada, Mexico, and Peru. ER-134 (97% of U.S. refined copper imports from these four countries); *accord* Lewis Jackson & Amy Lv, *Where does the US get its copper?*, Reuters (July 9, 2025), https://www.reuters.com/markets/commodities/where-does-us-get-its-copper-2025-07-08/.

Moreover, the fact that Resolution wants to *mine* copper in the U.S. doesn't mean it will be *refined* here. To the contrary, American copper mining already vastly outstrips American copper refining capacity, meaning that even without the Resolution mine, the U.S. already "sends nearly half its copper abroad," "only to import" it again later as "refined

42

copper." Bruno Venditti, *Visualizing the U.S. Copper Gap*, Visual Capitalist (July 11, 2025), https://elements.visualcapitalist.com/visualizing-the-u-s-copper-gap/; *see also* ER-134–35 ("World Mine and Refinery Production and Reserves"). So even assuming it's important to import less copper, the mine here won't address that interest.

Similarly, while Resolution emphasizes the size of this deposit, it omits that the U.S. has "ample copper reserves" even outside the Resolution deposit. ER-137. Indeed, the Resolution deposit is—according to Resolution itself—not even "the largest porphyry copper deposit in the region." ER-144 (citing "Morenci" deposit "~175 km to the east").

More importantly, Resolution's insistence on "domestic" copper is ironic, since Resolution is wholly owned by foreign corporations (Rio and BHP), and Rio's largest shareholder is controlled by the Chinese government. *Supra* n.1. Congress and the President have recognized the threat posed by such "foreign adversary controlled" companies. *TikTok Inc. v. Garland*, 604 U.S. 56, 65-66, 74 (2025) (per curiam). And specifically, courts and administration officials have expressed worries about "our reliance upon hostile foreign powers[]" for production of minerals like "copper," ER-164.

And while America currently can't refine even half the copper it mines, the world's dominant copper-refining power, "control[ling] over 50% of global smelting" is China, ER-174—which is also Rio's largest customer, accounting for "a commanding 57 percent of [its] total revenue." Zheng

43

Xin, *Rio Tinto Banks on Nation's Energy Shift*, Chinadaily.com.cn (Mar. 26, 2025), www.chinadaily.com.cn/a/202503/26/WS67e35f10a3101d4e4dc 2ae65.html. So the most likely result of the project is that American copper will be sent to China to be refined there, and (if it returns at all) reimported at a premium—benefitting the Nation's leading mineral competitor. This project is therefore "orthogonal" to the interests Resolution says it's meant to advance. *Singh v. Berger*, 56 F.4th 88, 105 (D.C. Cir. 2022).

***Least restrictive means.*** Even assuming a compelling interest, however, "a more fundamental problem remains," *Bates v. Pakseresht*, 146 F.4th 772, 798–99 (9th Cir. 2025)—the government can't show that this mine, much less Resolution's preferred mining method, is the "least restrictive means" of advancing it. 42 U.S.C. § 2000bb-1(b)(2). This "least-restrictive-means standard is exceptionally demanding." *Hobby Lobby*, 573 U.S. at 728. And here, abundant evidence—including the government's own EIS—demonstrates it isn't met.

At the outset, this mine of course isn't the only way to increase domestic copper supply. Larger copper and copper-nickel deposits are located in Alaska and Minnesota, but the federal government has blocked mines there to protect salmon populations and a wilderness area, respectively. *See Final Determination for Pebble Deposit Area*, U.S. EPA (Apr. 4, 2025), https://www.epa.gov/bristolbay/final-determination-pebble-deposit-area; Dan Kraker, *Biden administration cancels Twin Metals' leases to mine*

*near BWCA*, Minnesota Public Radio (Jan. 26, 2022), https://www.mprnews.org/story/2022/01/26/biden-administration-cancels-twin-metals-leases. Copper is also readily recyclable, and recycled copper contributes over one third of U.S. copper supply, ER-134; but "the U.S. predominantly exports its copper scrap" rather than recycling it at home, Bruno Venditti, *The State of Copper Recycling in the U.S.*, Visual Capitalist (Dec. 12, 2023), https://elements.visualcapitalist.com/the-state-of-copper-recycling-in-the-u-s/.

Even focusing on *this* deposit, however, as the EIS concedes, "there are other underground … techniques that could physically be applied to" the deposit that "could substantially reduce impacts on surface resources." 4-EIS-F-3–4. These methods are "technically" and "physically feasible," and the government "agree[d]" about their benefits: namely, "the lack of a subsidence area overhead on Oak Flat, and the ability to backfill tailings underground." 4-EIS-F-5; 1-EIS-50. Indeed, one of the world's largest copper mines recently opted to use one of these methods to protect glaciers. *See* Martin Creamer, *Anglo planning to go underground in Chile as glacier-protective step*, Creamer Media's Mining Weekly (Oct. 22, 2019), https://www.miningweekly.com/article/anglo-planning-to-go-underground-in-chile-as-glacier-protective-step-2019-10-22. But the government rejected any detailed consideration of these alternatives on the ground that they "would result in higher per-ton mining costs" and thus

45

"reduce the amount of ore that could be profitably mined." 1-EIS-50–51; 4-EIS-F-3–4.

This analysis turns RFRA's least-restrictive-means requirement on its head. That requirement means that if "the government can achieve its interests in a manner that does not burden religion, it must do so," *Fulton*, 593 U.S. at 541—not that doing so is optional if it might marginally affect the government's interests (or a foreign mining company's profits). *See also Hobby Lobby*, 573 U.S. at 730 (RFRA may "require the Government to expend additional funds to accommodate citizens' religious beliefs").

Indeed, the government's claim that the alternative mining methods here wouldn't "typically" be used on similar deposits misses the point. 4-EIS-F-5. This deposit isn't "typical" precisely because it lies beneath an irreplaceable sacred site. The whole point of RFRA is to treat government actions that burden religious exercise differently from those that don't, giving religious exercise "very broad protection." *Hobby Lobby*, 573 U.S. at 685. The government is doing the opposite here—rejecting less restrictive alternatives in favor of a more destructive one. Its actions violate RFRA.

## II. The government's actions violate the Free Exercise Clause.

The destruction of Oak Flat also violates the Free Exercise Clause in two independent respects. First, it violates Plaintiffs' right to direct the

religious upbringing of their children. Second, it is not generally applicable and fails strict scrutiny.

### A. The government's actions burden Plaintiffs' First Amendment right to direct the religious upbringing of their children.

In addition to freeing this Court to examine Plaintiffs' RFRA claim afresh, *supra* Part I.A.3, *Mahmoud* independently requires strict scrutiny under the Free Exercise Clause.

In *Mahmoud*, the Supreme Court held that "regardless" of *Smith*, government actions are subject to strict scrutiny when they "substantially interfer[e] with the religious development" of children. 145 S. Ct. at 2361 (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 218 (1972)). As explained above, *Mahmoud* involved parents of public-elementary-school children who sought to opt their children out of lessons involving "'LGBTQ+-inclusive' storybooks.'" *Id.* at 2341–42. Applying *Yoder*, the Court held that, where the burden the government has placed on religious exercise involves "the religious beliefs and practices that the parents wish to instill in their children," the usual free-exercise question of whether the burden is applied pursuant to a neutral and generally applicable law "d[oes] not apply." *Id.* at 2361. Because the government's actions imposed an "objective danger" to, or a "very real threat of undermining," the parents' exercise of instilling their religious beliefs in their children, the denial of opt-outs burdened the parents' religious exercise and triggered strict scrutiny. *Id.* at 2349, 2355.

47

That same right is implicated here. The destruction of Oak Flat burdens Plaintiff parents' ability to raise their children in accordance with their Apache religious beliefs, which includes worship, prayer, and religious ceremonies at Oak Flat, and instructing their children on their spiritual connection to Oak Flat. *See supra* pp.7–16. Particularly important to their exercise is the parents' desire for their daughters to have a Sunrise Ceremony at Oak Flat, allowing them to transition to womanhood in accordance with their ancestral faith. The government's action here—transferring Oak Flat to a private copper-mining company for the purpose of turning it into a crater—plainly poses an "objective danger" to this exercise. *Mahmoud*, 145 S. Ct. at 2351. Indeed, the government's action will not only "undermin[e]" Plaintiffs' religious exercise but render it physically impossible forever. *Id.* at 2349, 2355.

Doing so will put a full stop to Plaintiffs' ability to raise their children according to their Apache religious beliefs. The government's actions will *eliminate* Plaintiffs' ability to provide their children with the unique spiritual connection and religious practices available only at Oak Flat. *See, e.g.*, ER-210, 220. Their daughters will not be able to hold religious ceremonies signifying their transition to Apache women. They will forever lose the special connection to the White Painted Woman. ER-204, 205, 210–11; *see also* ER-219. They will lose access to the Ga'an that reside there and the special connection to the Creator, Usen, that exists only there. *See* ER-206, 210–11, 218. For Gouyen and V.K., coming of age at

Oak Flat is when their Apache faith came alive. ER-219; *see also* ER-204 ("When I opened my eyes after I was painted, I saw the world differently. My ceremony was a transformational moment in my life."). Angela and Sinetta fear their younger daughters will not have that opportunity. Without that experience, they will be unable to pass their faith and religious practices on to their children. This undoubtedly poses "a very real threat of undermining the religious beliefs and practices the parent wishes to instill in the child." *Mahmoud*, 145 S. Ct. at 2356 (cleaned up).

The district court found no likelihood of success on Plaintiffs' *Mahmoud* claim because *Apache* (in addition to rejecting RFRA) also rejected a claim under the Free Exercise Clause. ER-11–12. But there were no parental-rights or *Mahmoud*-based claims at issue in *Apache*; indeed, *Mahmoud* had not been decided yet. As *Mahmoud* itself explains, when parents' rights to direct the religious upbringing of their children are at issue, courts must "proceed differently." 145 S. Ct. at 2361.

Nor, as explained above (*supra* pp.40–41), does this case fit into the narrow exception the Court articulated in *Mahmoud*. The *Mahmoud* Court rejected the argument that the operation of public schools constituted governmental "internal affairs" that can cause only "incidental interference" in religious exercise. *Id.* at 2356–57 (quoting *Bowen*, 476 U.S. at 699 (1986), and *Lyng*, 485 U.S. at 450). It described "internal affairs" as actions "akin to the administration of Social Security or the selection of 'filing cabinets.'" *Id.* at 2357 (quoting *Bowen*, 476 U.S. at 700). The

action at issue here—a land exchange with a multinational corporation for the purpose of building a mine that will implode Oak Flat into a crater—is not akin to those actions.

Instead, this case "implicates direct, coercive interactions between the State and its young residents," a situation that *Mahmoud* expressly distinguished from the wholly "internal" actions in *Lyng*, *id.* which did not deny Indian respondents' access to the land or prevent their religious practices. Indeed, the government here is seeking to *alienate* the land to an *external* entity—terminating Plaintiffs' access to Oak Flat and turning their children into trespassers should they attempt to pass on their ancestral faith by initiating their children into ceremonies there. *Supra* pp.14–16.

Finally, even the *Mahmoud* dissent agreed that a burden would exist if the government's actions "would 'result in the destruction of [a religious] community as it exist[s] in the United States.'" 145 S. Ct. at 2392 (Sotomayor, J., dissenting). That is this case: as the district court and two Justices have recognized, the government's actions will "effectively end Apache religious existence as we know it." ER-25 (quoting Gorsuch & Thomas). If the "subtle" message of books in public school burdens religious exercise, *Mahmoud*, 145 S. Ct. at 2354, then surely swallowing the birthplace of Western Apache religion in a crater and stopping Apaches like Plaintiffs from ever worshiping there again does, too.

50

*Mahmoud* requires strict scrutiny under the Free Exercise Clause. The land transfer fails this review. *Supra* Part I.B.

## B. The government's actions are not neutral and generally applicable.

*Mahmoud* aside, under the Free Exercise Clause, any government action that burdens religion must survive strict scrutiny unless it qualifies as a "neutral law of general applicability." *Emp. Div. v. Smith*, 494 U.S. 872, 879 (1990). That is, the law must be religion-blind, apply "generally," and have only an "incidental effect" on religious activity. *Id.* at 878.

The land-exchange rider is not such a law. Far from regulating "generally" and burdening religion only "incidentally," the rider constitutes an individualized, discretionary, and intentional decision to favor copper mining over Apache religious practices on a particular piece of land. This sort of "individualized" decision about the "use[]" of particular "property" is not "generally applicable." *Int'l Church of Foursquare Gospel*, 673 F.3d at 1066. It is especially not generally applicable (or neutral) when, as here, it reflects "a value judgment in favor of secular motivations, but not religious motivations." *Fraternal Ord. of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 366 (3d Cir. 1999) (Alito, J.); *accord FCA*, 82 F.4th at 686–90.

In *Apache*, this Court agreed that such "parcel-specific rigging of the statutory framework … manifestly would *not* fit the Court's current understanding of a case involving a neutral and generally applicable law."

51

101 F.4th at 1054–55. It nevertheless declined to apply strict scrutiny because, it said, the decision to destroy Oak Flat lacks "the central ingredient of a Free Exercise Claim—some 'tendency to coerce individuals into acting contrary to their religious beliefs.'" *Id.*

But again, *Mahmoud* squarely rejects this "tendency to coerce" requirement as an "alarmingly narrow rule" that is "chilling" and contrary to "the fundamental values of the American people." 145 S. Ct. at 2357–58. *Apache*'s reasoning, then, is "clearly irreconcilable" with that of *Mahmoud* and should be revisited. *Miller*, 335 F.3d at 892–93.

### III. The government's actions violate NEPA.

The government's EIS also violates NEPA. NEPA imposes "a set of 'action-forcing' procedures that require that agencies take a '"hard look" at environmental consequences'" before engaging in certain projects. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348, 350 (1989); *accord Seven Cnty. Infrastructure Coal. v. Eagle County*, 145 S. Ct. 1497, 1521 (2025) (Sotomayor, J., concurring in the judgment). The mine here is such a project. Indeed, the land-exchange rider expressly requires the Forest Service to "carry out the land exchange in accordance with the requirements of [NEPA]." 16 U.S.C. § 539p(c)(9)(A)–(B). But the Forest Service violated NEPA in at least two ways: (a) failing to consider reasonable alternatives; and (b) exceeding NEPA's express page limits.

**A. The EIS fails to consider reasonable alternatives.**

To start, the EIS is deficient because it fails to analyze "technically and economically feasible" alternative mining methods that would recover copper without destroying Oak Flat. 42 U.S.C. § 4332(C)(iii), (F). These include techniques like cut-and-fill or sublevel stoping, which involve backfilling tailings underground, which would reduce surface waste and avoid cratering Oak Flat. *See supra*, p.24.

Strikingly, the government recognized these techniques "could physically be applied to" the deposit, are "technically" and "physically feasible," and would allow billions of pounds of copper to be "profitably mined." 4-EIS-F-3–5; 1-EIS-50. It also recognized these methods "could substantially reduce impacts on surface resources," including by eliminating the "subsidence area overhead on Oak Flat." 4-EIS-F-4; 1-EIS-50. But the government nonetheless "eliminated" "alternative mining techniques" "from detailed analysis." 4-EIS-F-5. This violates NEPA, which requires an EIS to "'study, develop, and describe appropriate alternatives' to the proposed agency action, thus informing policymakers and the public of options 'that would avoid or minimize adverse effects' on the environment." *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 141 F.4th 976, 990 (9th Cir. 2025) (internal citation omitted).

The district court rejected this argument, claiming that "the Forest Service was not required to provide … any analysis of alternative mining

methods" because "the Forest Service lacks authority to regulate the mining operations that will occur on private land following the land exchange." ER-18. But this is doubly wrong. First, the land-exchange rider itself requires the Forest Service to consider "measures" to "minimize the adverse effects on the affected Indian tribes resulting from mining and related activities"—which would include alternative mining measures. 16 U.S.C. § 539p(c)(3)(B). Second, the chosen mining measures necessarily influence all future "decisions under Federal law related to the proposed mine"—such as pipeline routing and permitting decisions—which is precisely what the EIS serves "as the basis for." *Id.* § 539p(c)(9)(B). Thus, it is impossible to produce a legally compliant EIS without considering these most basic alternatives.[3]

The government's responses fare no better. First, the EIS says the government declined to consider alternative methods because they would "result in higher per-ton mining costs," which would remove an "estimated 80 percent of the tonnage of the deposit from consideration"—relying on figures pulled without scrutiny from Resolution data. 4-EIS-F-5. But a "reasonable" alternative is one that advances a project's purpose,

---

[3] Nor does the EIS's relevance to future decisions present a "final agency action" problem. *Cf.* ER-18. A "single" EIS is the sole environmental analysis the land-exchange rider contemplates, 16 U.S.C. § 539p(c)(9)(B), and the EIS (not any future document) triggers the relevant legal consequence—the transfer. *See Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Air Force*, 128 F.4th 1089, 1108–13 (9th Cir. 2025).

*W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1046 (9th Cir. 2013), and here, alternative mining methods would still allow billions of pounds of copper to be "profitably mined." 4-EIS-F-3–5. Indeed, the project's purpose is not to maximize Resolution's profits but "to authorize … the exchange of land" to make it "available" for "mining," 16 U.S.C. § 539p(a), (c)(8)—and to do so in a way that minimizes harm to Indian tribes, *see id.* § 539p(c)(3), (g)(5). Thus, alternative mining methods *better* advance the purpose of the project. *Cf. W. Watersheds*, 719 F.3d at 1053 (agency violated NEPA by ruling out alternatives "that would have reduced grazing levels").

Second, the EIS refused to analyze alternative mining methods on the grounds that "*almost no* alternative techniques … were identified as reasonable for an ore deposit with the characteristics of the Resolution deposit," 6-EIS-R-175, 180 (emphasis added), and "*very few* of these underground stoping methods have characteristics that are well suited to the Resolution copper deposit," 4-EIS-F-3 (emphasis added). But this simply concedes that *some* alternative techniques *are* "reasonable" and "well suited" to the deposit. The government's refusal to consider these alternatives violates NEPA.

Third, the EIS claims alternative mining methods are unreasonable because the proposed panel caving is a "standard mining method" "commonly used" to mine similar deposits and is thus the "appropriate method

to be applied" here. 4-EIS-F-5. But this is merely an affirmative statement in support of the government's preferred, destructive method; it offers no reason for disqualifying the proposed alternatives. Simply being "standard" or "common" doesn't make an option the only reasonable one. To the contrary, this case's facts suggest this deposit is a uniquely *non*-standard site with uncommon conditions—namely an exceptionally deep deposit beneath an irreplaceable sacred site. 1-EIS-3–4; *cf. supra* p.45 (large copper mine chose sublevel stoping over block caving to protect surface glaciers).

The EIS's failure to complete a reasonable-alternatives analysis—"the 'heart' of the EIS," *Ctr. for Biological Diversity*, 141 F.4th at 990—violates NEPA and requires vacatur and injunctive relief. *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 882 (9th Cir. 2022) ("We vacate the inadequate EA, which is the presumptive remedy for agency action that violates the NEPA as reviewed through the APA."); *Se. Alaska Conservation Council v. Fed. Highway Admin.*, 649 F.3d 1050, 1056, 1059 (9th Cir. 2011) (affirming injunction against "any activities dependent on the issuance of a valid EIS").

## B. The EIS violates NEPA's length requirement.

Perhaps seeking to paper over these and other deficiencies, the EIS also includes reams of unnecessary information, clocking in at over 2,400 pages of text and appendices. This far exceeds NEPA's page limit—which

is 150 pages for a typical EIS, or up to 300 pages in "extraordinary" circumstances. 42 U.S.C. § 4336a(e)(1)(A)–(B). The district court deemed this violation harmless. ER.11–12. But that was error.

This Court has advised "great caution in applying the harmless error rule" in NEPA cases. *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1090 (9th Cir. 2011). The question is whether the violation "materially impeded NEPA's goals." *Friends of the Inyo v. U.S. Forest Serv.*, 103 F.4th 543, 557 (9th Cir. 2024).

Here, the page limit "strongly reinforces [NEPA's] basic principles," *Seven Cnty.*, 145 S. Ct. at 1512 n.3, fostering the public's ability to understand an EIS's contents and thus to hold the agency "publicly accountable for environmental harms it decides to tolerate"—a core purpose of NEPA, *id.* at 1521 (Sotomayor, J., concurring in judgment). The overlength EIS here not only impedes that goal but also specifically prejudiced Plaintiffs, forcing them to digest thousands of pages of material and litigate their claims in a matter of days, without an easily comprehensible administrative record. This clear NEPA violation is "agency action[] … not in accordance with law." 5 U.S.C. § 706(2)(A). Thus, the EIS must be "set aside," *id.*, and the transfer that Congress conditioned on that EIS must be enjoined until an EIS is reissued. 16 U.S.C. § 539p(c)(9)(A)–(B).

## IV. The government's actions violate the NHPA.

The NHPA requires that the federal government "take into account the effect of" any government "undertaking on any historic property" and

"afford the [Advisory Council on Historic Preservation (ACHP)] a reasonable opportunity to comment." 54 U.S.C. § 306108. This process, called the Section 106 process, seeks to "identify historic properties potentially affected by the undertaking, assess its effects and seek ways to avoid, minimize or mitigate any adverse effects." 36 C.F.R. § 800.1(a). If adverse effects are identified, "the agency must continue consulting with the parties," *Friends of the Atglen-Susquehanna Trail, Inc. v. Surface Transp. Bd.*, 252 F.3d 246, 253 (3d Cir. 2001), and "avoid or mitigate any adverse effect," *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999). And if the ACHP and responsible agencies cannot reach agreement on a mitigation plan, the government "must make clear in the record that the ACHP's comments were taken seriously." *Friends*, 252 F.3d at 265.

The government commonly complies with Section 106 by negotiating a "programmatic agreement" with the ACHP, outlining steps to avoid or mitigate a project's adverse effects on historic properties. 36 C.F.R. § 800.14(b)(2)(iii). Here, however, the Forest Service failed to reach an agreement with the ACHP. Rather, the ACHP deemed the government's proposed mitigation measures "wholly inadequate" considering "the enormity of the adverse effects that would result to" Oak Flat, and it terminated the Section 106 consultation process on February 11, 2021. *See* Letter from Rick Gonzalez, ACHP Vice Chairman, to Hon. Tom Vilsack,

Sec'y of Agric., at 5 (Mar. 29, 2021), https://www.achp.gov/sites/de-
fault/files/2021-03/VilsackResolutionCopperLTR20210329.pdf (ACHP
Comments); ER-197–98. That termination triggered two duties under the
NHPA: (1) for the ACHP to provide the Secretary of Agriculture with fi-
nal comments and recommendations on the project, and (2) for the Sec-
retary to respond to those comments in writing, showing they were taken
seriously in reaching a decision. *See* 36 C.F.R. § 800.7(a)(4), (c)(4).

The ACHP's final comments emphasized that "[t]he historic signifi-
cance of Oak Flat cannot be overstated and neither can the enormity of
the adverse effects" of the mine—with "numerous historic properties that
would be physically destroyed," and Oak Flat "directly and permanently
damaged" and "destroyed through subsidence." ACHP Comments at 4–5.
The ACHP specifically recommended that the government "develop and
evaluate alternatives" that "might avoid adverse effects" of the mine—
namely, (1) the government should conduct "a reassessment of alterna-
tive and more sustainable mining techniques" that would "prevent sub-
sidence at Oak Flat," including "those techniques that were previously
considered and rejected" from detailed analysis in the first EIS; and (2)
the government "should employ all measures at its disposal to incentivize
the consideration of such alternatives." *Id.* at 7.

The Secretary of Agriculture responded by letter on April 17, 2025.
ER-191. However, the response entirely ignored the recommendations to
assess alternative mining techniques that were excluded from analysis

in the EIS or to incentivize the consideration of those alternatives. Indeed, the response makes no mention of alternative mining techniques at all. ER-191–96.

This is a straightforward violation of the NHPA, which requires the government to give "genuine attention" to the ACHP's recommendations and "make clear in the record that the ACHP's comments were taken seriously." *Concerned Citizens All., Inc. v. Slater*, 176 F.3d 686, 696 (3d Cir. 1999).

The district court didn't identify any mention of alternative mining methods in the government's response. Instead, the court tried to infer a response from the statement that "the project will be almost entirely on private land"—which the court reinterpreted as an assertion that "the Forest Service lacks authority to compel Resolution Copper to utilize a particular mining method." ER-21. But that's a non sequitur. The ACHP didn't recommend that the agency *compel* Resolution to utilize a particular mining method. It recommended that the agency *assess* and *incentivize* consideration of alternative methods. That is well within the government's authority. Indeed, much of the woefully inadequate mitigation measures the Forest Service *did* propose—like having Resolution fund tribal scholarships or plant oak groves elsewhere—consist of measures the Forest Service cannot compel Resolution to adopt. 2021 EIS at 5-EIS-98–99.

60

Thus, the government's failure to address the ACHP's recommendation violates the NHPA, and its actions must be held unlawful and "set aside." *Friends*, 252 F.3d at 262; 5 U.S.C. § 706(2).

## V. The other injunction factors are met.

Besides likelihood of success or a serious question on the merits, the Court must also consider the likelihood of irreparable harm absent relief, the balance of equities, and the public interest. *All. For Wild Rockies*, 632 F.3d at 1135. Each element strongly favors Plaintiffs.

***Irreparable harm.*** "Irreparable harm is relatively easy to establish in a First Amendment case." *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 851 (9th Cir. 2019). That's because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *FCA*, 82 F.4th at 694. The same principle applies to RFRA, which "secures Congress' view of the right to free exercise under the First Amendment." *Tanzin*, 592 U.S. at 45; *Singh*, 56 F.4th at 109 (applying RFRA).

Here, "'[i]t is undisputed' that the government's plan will permanently 'destroy the Apaches' historical place of worship, preventing them from ever again engaging in religious exercise' at Oak Flat." Gorsuch & Thomas at 1480. Indeed, the EIS admits that the harm to tribal resources will be "immediate, permanent, and large in scale," 3-EIS-892, causing "permanent[]," "irreversible," and "irretrievable" harm, 2-EIS-837. Not surprisingly, then, the court below—like every other judge to consider

61

this question—found that, absent an injunction, "Plaintiffs will suffer irreparable harm." ER-22; *accord* ER-113 ("irreparable injury"); *Apache Stronghold v. United States*, 782 F. Supp. 3d 756, 766 (D. Ariz. 2025) ("undisputed" that "Plaintiff will suffer irreparable harm"); *Apache*, 2021 WL 12295173, at *5 (Bumatay, J., dissenting) ("Western Apaches will suffer immediate, irreparable harm.").

That harm begins immediately upon transfer, when Oak Flat becomes "private property" that is "no longer … subject to [federal law] or Forest Service management that provides for tribal access." 3-EIS-871. As the district court found, Plaintiffs will have only "limited access to the post-land exchange version of Oak Flat," which "is no substitute for, and thus does not remediate the irreparable injury" from "the lack of unlimited access" to "Oak Flat in its current form." ER-113. This "will prevent the use and enjoyment by" Plaintiffs, which is "irreparable injury." *All. for Wild Rockies*, 632 F.3d at 1135; *see also Apache*, 2021 WL 12295173, at *5 (Bumatay, J., dissenting) ("Western Apaches will suffer immediate, irreparable harm" "[o]nce the land is transferred.").

After transfer, the harm compounds. The government admits that "the min[ing activity planned by Resolution] would cause '*immediate*, permanent, and large in scale' destruction of 'archaeological sites, tribal sacred sites, [and] cultural landscapes.'" *Apache*, 101 F.4th at 1131 (Murguia, J., dissenting) (emphasis added) (quoting 2021 EIS at 2-EIS-789). Oak Flat "will immediately start being laced with subterranean data-gathering

62

tunnels," followed by further "surface disturbances." ER-113. These include activities like "constructing 'new shafts,' 'new roads,' a 'water treatment plant,' an 'admin building,' and 'substations'" that "are likely to degrade the Oak Flat environment" and "cause irreparable damage." *Apache*, 2021 WL 12295173, at \*5 (Bumatay, J., dissenting) (quoting 2021 EIS at 1-EIS-57, Fig. 2.2.2-3).

And the farther the project proceeds, the harder it becomes for courts to unwind later, even if the government's actions are unlawful. For example, once Oak Flat becomes private property, it is arguably "no longer subject to RFRA and other federal protections." *Apache Stronghold v. United States*, 95 F.4th 608, 717 (9th Cir. 2024) (Murguia, C.J., dissenting); *see also Apache*, 2021 WL 12295173, at \*6 (Bumatay, J., dissenting) (same). And once Oak Flat is irreparably damaged, "reversal of the transfer" may be "futile." *Id.* (citing *Kettle Range Conservation Grp. v. U.S. Bureau of Land Mgmt.*, 150 F.3d 1083, 1087 (9th Cir. 1998) (declining to rescind land transfer where the land had already been "denuded" and it would "be impractical to attempt to unscramble the eggs")).

**Balance of equities and public interest.** The balance of equities and public interest also "'tip sharply'" in Plaintiffs' favor. *Apache*, 2021 WL 12295173, at \*7 (Bumatay, J., dissenting); *accord Apache*, 782 F. Supp. 3d at 768–69 ("obvious" that "the balance of equities indeed 'tips sharply' in Plaintiff's favor"). When the government is a defendant, these factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

63

Here, the equities overwhelmingly favor Plaintiffs. Absent preliminary relief, Plaintiffs face the permanent loss of an irreplaceable sacred site—which threatens to "end Apache religious existence as we know it." Gorsuch & Thomas at 1488. "Even the government has acknowledged that the destruction of Oak Flat will inflict 'indescribable hardship' on the Apaches." *Id.*

By contrast, a temporary injunction causes the government no harm. The government has already voluntarily delayed the transfer for over a decade—waiting seven years to publish the first EIS, only to withdraw it voluntarily a few weeks later, and then waiting another four years to publish it again. During this decade plus, neither the government nor Resolution ever claimed that this self-imposed delay caused any harm. The copper isn't going anywhere. And if the transfer and mine are eventually upheld, the government and Resolution can still recover every ounce of copper. That makes this precisely the kind of case in which this Court has found that the equities tip sharply in favor of an injunction. *See, e.g.*, *All. for Wild Rockies*, 632 F.3d at 1137 (balance of the hardships tipped sharply for organization opposing logging because "[o]nce those acres are logged, the work and recreational opportunities … are irreparably lost," while government's lost revenue was not significant).

The district court didn't dispute any of this. It also expressed "no doubt that an array of equities and public-interest considerations favor Plaintiffs." ER-114. Instead, it suggested the equities don't tip "sharply" in

64

Plaintiffs' favor because Congress determined that "there is a public interest in allowing the land exchange to proceed." ER-115. But Congress *also* determined that it is in the public interest to *condition* the land exchange on compliance with other statutes—such as RFRA, NEPA, and the NHPA (not to mention the First Amendment). Allowing the transfer to proceed in breach of those laws ignores rather than honors the "considered choice by the political branches." ER-114.

Regardless, granting an injunction would only delay mining until Plaintiffs have had a fair chance to litigate their claims. If the transfer is upheld, Resolution would still be able to mine all the copper it desires, and any public interest in the transfer would be fully realized. But if preliminary relief is not granted, it "could result in the permanent loss of Apaches' legal rights to access their ancestral sacred site." *Apache*, 782 F. Supp. 3d at 768. Thus, at this stage, "[t]here is no close question in this matter. It is abundantly clear that the balance of equities 'tips sharply' in Plaintiff's favor," *id.* at *9, because "while the intervenors face temporary delay," "the harms [Plaintiffs] face are permanent," *League of Wilderness Defs. v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014).

## CONCLUSION

The Court should reverse and remand for entry of a preliminary injunction.

Respectfully submitted,

/s/ *Miles E. Coleman*
Miles E. Coleman
NELSON MULLINS RILEY & SCARBOROUGH LLP
2 W. Washington St., Ste. 400
Greenville, SC 29601
(864) 373-2352
miles.coleman@nelsonmullins.com

Jeffrey A. Wald
NELSON MULLINS RILEY & SCARBOROUGH LLP
380 Knollwood Street, Suite 530
Winston-Salem, NC 27103
(336) 774-3335
jeffrey.wald@nelsonmullins.com

Madeline C. Bergstrom*
NELSON MULLINS RILEY & SCARBOROUGH LLP
101 Constitution Ave. NW, Suite 900
Washington, DC 20001
(202) 689-2807
madeline.bergstrom@nelsonmullins.com

*application for admission forthcoming*

*Counsel for Plaintiffs-Appellants*

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, the following cases are related to this case as they involve the same transaction or event:

- *Apache Stronghold v. United States*, No. 21-15295;

- *Arizona Mining Reform Coalition v. United States Forest Service*, No. 25-5158;

- *San Carlos Apache Tribe v. United States Forest Service*, No. 25-5189.

/s/ *Miles E. Coleman*
Miles E. Coleman
*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE PURSUANT TO
## NINTH CIRCUIT RULE 32-1

I certify that this brief complies with the length limits permitted by Ninth Circuit Rule 32-1. The brief is 13,958 words, excluding the portions exempted by Fed. R. App. P. 32(f). The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

/s/ *Miles E. Coleman*
Miles E. Coleman
*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on September 8, 2025. All participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ *Miles E. Coleman*
Miles E. Coleman
*Counsel for Plaintiffs-Appellants*

# ADDENDA

## Table of Contents

**Page**

**Addendum 1:**

First Amendment to the United States Constitution ............................ 71

Religious Freedom Restoration Act,
42 U.S.C. § 2000bb *et seq.* ....................................................................... 72

National Environmental Policy Act,
42 U.S.C. §§ 4332, 4336a ......................................................................... 76

National Historic Preservation Act,
54 U.S.C. § 306108, 36 C.F.R. §§ 800.1, 800.7, 800.14 ........................... 79

Administrative Procedure Act,
5 U.S.C. § 706 .......................................................................................... 87

Southeast Arizona Land Exchange and Conservation,
16 U.S.C. § 539p ...................................................................................... 88

**Addendum 2:**

Table of Excerpts from the 2025 Final
Environmental Impact Statement ...................................................... 99

## First Amendment to the United States Constitution

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

**Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.***

**§ 2000bb. Congressional findings and declaration of purposes**

**(a) Findings**

The Congress finds that–

**(1)** the framers of the Constitution, recognizing free exercise of religion as an unalienable right, secured its protection in the First Amendment to the Constitution;

**(2)** laws "neutral" toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise;

**(3)** governments should not substantially burden religious exercise without compelling justification;

**(4)** in *Employment Division v. Smith*, 494 U.S. 872 (1990) the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion; and

**(5)** the compelling interest test as set forth in prior Federal court rulings is a workable test for striking sensible balances between religious liberty and competing prior governmental interests.

**(b) Purposes**

The purposes of this chapter are–

**(1)** to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205

(1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened; and

**(2)** to provide a claim or defense to persons whose religious exercise is substantially burdened by government.

## § 2000bb-1. Free exercise of religion protected

### (a) In general

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

### (b) Exception

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person–

**(1)** is in furtherance of a compelling governmental interest; and

**(2)** is the least restrictive means of furthering that compelling governmental interest.

### (c) Judicial relief

A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government. Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution.

## § 2000bb-2. Definitions

As used in this chapter–

**(1)** the term "government" includes a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, or of a covered entity;

**(2)** the term "covered entity" means the District of Columbia, the Commonwealth of Puerto Rico, and each territory and possession of the United States;

**(3)** the term "demonstrates" means meets the burdens of going forward with the evidence and of persuasion; and

**(4)** the term "exercise of religion" means religious exercise, as defined in section 2000cc-5 of this title.

### § 2000bb-3. Applicability

#### (a) In general

This chapter applies to all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after November 16, 1993.

#### (b) Rule of construction

Federal statutory law adopted after November 16, 1993, is subject to this chapter unless such law explicitly excludes such application by reference to this chapter.

#### (c) Religious belief unaffected

Nothing in this chapter shall be construed to authorize any government to burden any religious belief.

## § 2000bb–4. Establishment clause unaffected

Nothing in this chapter shall be construed to affect, interpret, or in any way address that portion of the First Amendment prohibiting laws respecting the establishment of religion (referred to in this section as the "Establishment Clause"). Granting government funding, benefits, or exemptions, to the extent permissible under the Establishment Clause, shall not constitute a violation of this chapter. As used in this section, the term "granting", used with respect to government funding, benefits, or exemptions, does not include the denial of government funding, benefits, or exemptions.

**National Environmental Policy Act, 42 U.S.C. §§ 4332, 4336a**

**§ 4332. Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts**

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

\* \* \*

**(C)** consistent with the provisions of this chapter and except where compliance would be inconsistent with other statutory requirements, include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on–

**(i)** reasonably foreseeable environmental effects of the proposed agency action;

**(ii)** any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented;

**(iii)** a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal;

**(iv)** the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and

**(v)** any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented.

Prior to making any detailed statement, the head of the lead agency shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

\* \* \*

**(F)** consistent with the provisions of this chapter, study, develop, and describe technically and economically feasible alternatives;

\* \* \*

## § 4336a. Timely and unified Federal reviews

\* \* \*

**(e) Page limits**

**(1) Environmental impact statements**

**(A) In general**

Except as provided in subparagraph (B), an environmental impact statement shall not exceed 150 pages, not including any citations or appendices.

**(B) Extraordinary complexity**

An environmental impact statement for a proposed agency action of extraordinary complexity shall not exceed 300 pages, not including any citations or appendices.

\* \* \*

**National Historic Preservation Act, 54 U.S.C. § 306108, 36 C.F.R. §§ 800.1, 800.7, 800.14**

**§ 306108. Effect of undertaking on historic property**

The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, shall take into account the effect of the undertaking on any historic property. The head of the Federal agency shall afford the Council a reasonable opportunity to comment with regard to the undertaking.

\* \* \*

**36 C.F.R. § 800.1 Purposes.**

(a) Purposes of the section 106 process. Section 106 of the National Historic Preservation Act requires Federal agencies to take into account the effects of their undertakings on historic properties and afford the Council a reasonable opportunity to comment on such undertakings. The procedures in this part define how Federal agencies meet these statutory responsibilities. The section 106 process seeks to accommodate historic preservation concerns with the needs of Federal undertakings through consultation among the agency official and other parties with an interest in the effects of the undertaking on historic properties, commencing at the early stages of project planning. The goal of consultation is to identify

historic properties potentially affected by the undertaking, assess its effects and seek ways to avoid, minimize or mitigate any adverse effects on historic properties.

\* \* \*

(c) Timing. The agency official must complete the section 106 process "prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license." This does not prohibit agency official from conducting or authorizing nondestructive project planning activities before completing compliance with section 106, provided that such actions do not restrict the subsequent consideration of alternatives to avoid, minimize or mitigate the undertaking's adverse effects on historic properties. The agency official shall ensure that the section 106 process is initiated early in the undertaking's planning, so that a broad range of alternatives may be considered during the planning process for the undertaking.

\* \* \*

## 36 C.F.R. § 800.7 Failure to resolve adverse effects.

(a) Termination of consultation. After consulting to resolve adverse effects pursuant to § 800.6(b)(2), the agency official, the SHPO/THPO, or the Council may determine that further consultation will not be productive and terminate consultation. Any party that terminates consultation shall notify the other consulting parties and provide them the reasons for terminating in writing.

80

\* \* \*

(4) If the Council terminates consultation, the Council shall notify the agency official, the agency's Federal preservation officer and all consulting parties of the termination and comment under paragraph (c) of this section. The Council may consult with the agency's Federal preservation officer prior to terminating consultation to seek to resolve issues concerning the undertaking and its effects on historic properties.

(b) Comments without termination. The Council may determine that it is appropriate to provide additional advisory comments upon an undertaking for which a memorandum of agreement will be executed. The Council shall provide them to the agency official when it executes the memorandum of agreement.

(c) Comments by the Council—

(1) Preparation. The Council shall provide an opportunity for the agency official, all consulting parties, and the public to provide their views within the time frame for developing its comments. Upon request of the Council, the agency official shall provide additional existing information concerning the undertaking and assist the Council in arranging an onsite inspection and an opportunity for public participation.

(2) Timing. The Council shall transmit its comments within 45 days of receipt of a request under paragraph (a)(1) or (a)(3) of this section

81

or § 800.8(c)(3), or termination by the Council under § 800.6(b)(1)(v) or paragraph (a)(4) of this section, unless otherwise agreed to by the agency official.

(3) Transmittal. The Council shall provide its comments to the head of the agency requesting comment with copies to the agency official, the agency's Federal preservation officer, all consulting parties, and others as appropriate.

(4) Response to Council comment. The head of the agency shall take into account the Council's comments in reaching a final decision on the undertaking. Section 110(l) of the act directs that the head of the agency shall document this decision and may not delegate his or her responsibilities pursuant to section 106. Documenting the agency head's decision shall include:

(i) Preparing a summary of the decision that contains the rationale for the decision and evidence of consideration of the Council's comments and providing it to the Council prior to approval of the undertaking;

(ii) Providing a copy of the summary to all consulting parties; and

(iii) Notifying the public and making the record available for public inspection.

\* \* \*

## 36 C.F.R. § 800.14 Federal agency program alternatives.

(a) Alternate procedures. An agency official may develop procedures to implement section 106 and substitute them for all or part of subpart B of

this part if they are consistent with the Council's regulations pursuant to section 110(a)(2)(E) of the act.

\* \* \*

(b) Programmatic agreements. The Council and the agency official may negotiate a programmatic agreement to govern the implementation of a particular program or the resolution of adverse effects from certain complex project situations or multiple undertakings.

(1) Use of programmatic agreements. A programmatic agreement may be used:

(i) When effects on historic properties are similar and repetitive or are multi–State or regional in scope;

(ii) When effects on historic properties cannot be fully determined prior to approval of an undertaking;

(iii) When nonfederal parties are delegated major decisionmaking responsibilities;

(iv) Where routine management activities are undertaken at Federal installations, facilities, or other land-management units; or

(v) Where other circumstances warrant a departure from the normal section 106 process.

(2) Developing programmatic agreements for agency programs.

(i) The consultation shall involve, as appropriate, SHPO/THPOs, the National Conference of State Historic Preservation Officers (NCSHPO), Indian tribes and Native Hawaiian organizations, other

83

Federal agencies, and members of the public. If the programmatic agreement has the potential to affect historic properties on tribal lands or historic properties of religious and cultural significance to an Indian tribe or Native Hawaiian organization, the agency official shall also follow paragraph (f) of this section.

(ii) Public participation. The agency official shall arrange for public participation appropriate to the subject matter and the scope of the program and in accordance with subpart A of this part. The agency official shall consider the nature of the program and its likely effects on historic properties and take steps to involve the individuals, organizations and entities likely to be interested.

(iii) Effect. The programmatic agreement shall take effect when executed by the Council, the agency official and the appropriate SHPOs/THPOs when the programmatic agreement concerns a specific region or the president of NCSHPO when NCSHPO has participated in the consultation. A programmatic agreement shall take effect on tribal lands only when the THPO, Indian tribe, or a designated representative of the tribe is a signatory to the agreement. Compliance with the procedures established by an approved programmatic agreement satisfies the agency's section 106 responsibilities for all individual undertakings of the program covered by the agreement until it expires or is terminated by the agency, the president of NCSHPO when a signatory, or the Council. Termination by an individual SHPO/THPO shall

only terminate the application of a regional programmatic agreement within the jurisdiction of the SHPO/THPO. If a THPO assumes the responsibilities of a SHPO pursuant to section 101(d)(2) of the act and the SHPO is signatory to programmatic agreement, the THPO assumes the role of a signatory, including the right to terminate a regional programmatic agreement on lands under the jurisdiction of the tribe.

(iv) Notice. The agency official shall notify the parties with which it has consulted that a programmatic agreement has been executed under paragraph (b) of this section, provide appropriate public notice before it takes effect, and make any internal agency procedures implementing the agreement readily available to the Council, SHPO/THPOs, and the public.

(v) If the Council determines that the terms of a programmatic agreement are not being carried out, or if such an agreement is terminated, the agency official shall comply with subpart B of this part with regard to individual undertakings of the program covered by the agreement.

(3) Developing programmatic agreements for complex or multiple undertakings. Consultation to develop a programmatic agreement for dealing with the potential adverse effects of complex projects or multiple undertakings shall follow § 800.6. If consultation pertains to an activity involving multiple undertakings and the parties fail to reach

agreement, then the agency official shall comply with the provisions of subpart B of this part for each individual undertaking.

(4) Prototype programmatic agreements. The Council may designate an agreement document as a prototype programmatic agreement that may be used for the same type of program or undertaking in more than one case or area. When an agency official uses such a prototype programmatic agreement, the agency official may develop and execute the agreement with the appropriate SHPO/THPO and the agreement shall become final without need for Council participation in consultation or Council signature.

\* \* \*

## Administrative Procedure Act, 5 U.S.C. § 706

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall–

**(1)** compel agency action unlawfully withheld or unreasonably delayed; and

**(2)** hold unlawful and set aside agency action, findings, and conclusions found to be–

    **(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

    **(B)** contrary to constitutional right, power, privilege, or immunity;

    **(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

    **(D)** without observance of procedure required by law;

    **(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

    **(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

## Southeast Arizona Land Exchange and Conservation, 16 U.S.C. § 539p

(a) PURPOSE.—The purpose of this section is to authorize, direct, facilitate, and expedite the exchange of land between Resolution Copper and the United States.

(b) DEFINITIONS.—In this section:

(1) APACHE LEAP.—The term "Apache Leap" means the approximately 807 acres of land depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011-Apache Leap" and dated March 2011.

(2) FEDERAL LAND.—The term "Federal land" means the approximately 2,422 acres of land located in Pinal County, Arizona, depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011-Federal Parcel-Oak Flat" and dated March 2011.

(3) INDIAN TRIBE.—The term "Indian tribe" has the meaning given the term in section 4 of the Indian Self-Determination and Education Assistance Act(25 U.S.C. 450b).

(4) NON-FEDERAL LAND.—The term "non-Federal land" means the parcels of land owned by Resolution Copper that are described in subsection(d)(1) and, if necessary to equalize the land exchange under subsection(c), subsection(c)(5)(B)(i)(I).

(5) OAK FLAT CAMPGROUND.—The term "Oak Flat Campground" means the approximately 50 acres of land comprising approximately

16 developed campsites depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011-Oak Flat Campground" and dated March 2011.

(6) OAK FLAT WITHDRAWAL AREA.–The term "Oak Flat Withdrawal Area" means the approximately 760 acres of land depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011-Oak Flat Withdrawal Area" and dated March 2011.

(7) RESOLUTION COPPER.–The term "Resolution Copper" means Resolution Copper Mining, LLC, a Delaware limited liability company, including any successor, assign, affiliate, member, or joint venturer of Resolution Copper Mining, LLC.

(8) SECRETARY.–The term "Secretary" means the Secretary of Agriculture.

(9) STATE.–The term "State" means the State of Arizona.

(10) TOWN.–The term "Town" means the incorporated town of Superior, Arizona.

(11) RESOLUTION MINE PLAN OF OPERATIONS.–The term "Resolution mine plan of operations" means the mine plan of operations submitted to the Secretary by Resolution Copper in November, 2013, including any amendments or supplements.

(c) LAND EXCHANGE.–

(1) IN GENERAL.–Subject to the provisions of this section, if Resolution Copper offers to convey to the United States all right, title, and

interest of Resolution Copper in and to the non-Federal land, the Secretary is authorized and directed to convey to Resolution Copper, all right, title, and interest of the United States in and to the Federal land.

\* \* \*

(8) USE OF FEDERAL LAND.—The Federal land to be conveyed to Resolution Copper under this section shall be available to Resolution Copper for mining and related activities subject to and in accordance with applicable Federal, State, and local laws pertaining to mining and related activities on land in private ownership.

(9) ENVIRONMENTAL COMPLIANCE.—

(A) IN GENERAL.—Except as otherwise provided in this section, the Secretary shall carry out the land exchange in accordance with the requirements of the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.).

(B) ENVIRONMENTAL ANALYSIS.—Prior to conveying Federal land under this section, the Secretary shall prepare a single environmental impact statement under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.), which shall be used as the basis for all decisions under Federal law related to the proposed mine and the Resolution mine plan of operations and any related major Federal actions significantly affecting the quality of the human environment, including the granting of any permits, rights-of-way, or

approvals for the construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities.

(C) IMPACTS ON CULTURAL AND ARCHEOLOGICAL RESOURCES.—The environmental impact statement prepared under subparagraph (B) shall—

(i) assess the effects of the mining and related activities on the Federal land conveyed to Resolution Copper under this section on the cultural and archeological resources that may be located on the Federal land; and

(ii) identify measures that may be taken, to the extent practicable, to minimize potential adverse impacts on those resources, if any.

(D) EFFECT.—Nothing in this paragraph precludes the Secretary from using separate environmental review documents prepared in accordance with the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) or other applicable laws for exploration or other activities not involving—

(i) the land exchange; or

(ii) the extraction of minerals in commercial quantities by Resolution Copper on or under the Federal land.

(10) TITLE TRANSFER.–Not later than 60 days after the date of publication of the final environmental impact statement, the Secretary shall convey all right, title, and interest of the United States in and to the Federal land to Resolution Copper.

(d) Conveyance and Management of Non-Federal Land.–

(1) CONVEYANCE.–On receipt of title to the Federal land, Resolution Copper shall simultaneously convey–

(A) to the Secretary, all right, title, and interest that the Secretary determines to be acceptable in and to–

(i) the approximately 147 acres of land located in Gila County, Arizona, depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011-Non-Federal Parcel-Turkey Creek" and dated March 2011;

(ii) the approximately 148 acres of land located in Yavapai County, Arizona, depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011-Non-Federal Parcel- Tangle Creek" and dated March 2011;

(iii) the approximately 149 acres of land located in Maricopa County, Arizona, depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011-Non-Federal Parcel-Cave Creek" and dated March 2011;

(iv) the approximately 640 acres of land located in Coconino County, Arizona, depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011-Non-Federal Parcel-East Clear Creek" and dated March 2011; and

(v) the approximately 110 acres of land located in Pinal County, Arizona, depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011-Non-Federal Parcel-Apache Leap South End" and dated March 2011; and

(B) to the Secretary of the Interior, all right, title, and interest that the Secretary of the Interior determines to be acceptable in and to—

(i) the approximately 3,050 acres of land located in Pinal County, Arizona, identified as "Lands to DOI" as generally depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011-Non-Federal Parcel-Lower San Pedro River" and dated July 6, 2011;

(ii) the approximately 160 acres of land located in Gila and Pinal Counties, Arizona, identified as "Lands to DOI" as generally depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011-Non- Federal Parcel-Dripping Springs" and dated July 6, 2011; and

(iii) the approximately 940 acres of land located in Santa Cruz County, Arizona, identified as "Lands to DOI" as generally depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011-Non-Federal Parcel- Appleton Ranch" and dated July 6, 2011.

(2) MANAGEMENT OF ACQUIRED LAND.—

(A) LAND ACQUIRED BY THE SECRETARY.—

(i) IN GENERAL.—Land acquired by the Secretary under this section shall—

(I) become part of the national forest in which the land is located; and

(II) be administered in accordance with the laws applicable to the National Forest System.

(ii) BOUNDARY REVISION.—On the acquisition of land by the Secretary under this section, the boundaries of the national forest shall be modified to reflect the inclusion of the acquired land.

(iii) LAND AND WATER CONSERVATION FUND.—For purposes of section 7 of the Land and Water Conservation Fund Act of 1965 (16 U.S.C. 4601-9), the boundaries of a national forest in which land acquired by the Secretary is located shall be deemed to be the boundaries of that forest as in existence on January 1, 1965.

(B) LAND ACQUIRED BY THE SECRETARY OF THE INTERIOR.—

(i) SAN PEDRO NATIONAL CONSERVATION AREA.—

(I) IN GENERAL.–The land acquired by the Secretary of the Interior under paragraph (1)(B)(i) shall be added to, and administered as part of, the San Pedro National Conservation Area in accordance with the laws (including regulations) applicable to the Conservation Area.

(II) MANAGEMENT PLAN.–Not later than 2 years after the date on which the land is acquired, the Secretary of the Interior shall update the management plan for the San Pedro National Conservation Area to reflect the management requirements of the acquired land.

(ii) DRIPPING SPRINGS.–Land acquired by the Secretary of the Interior under paragraph (1)(B)(ii) shall be managed in accordance with the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1701 et seq.) and applicable land use plans.

(iii) LAS CIENEGAS NATIONAL CONSERVATION AREA.–Land acquired by the Secretary of the Interior under paragraph (1)(B)(iii) shall be added to, and administered as part of, the Las Cienegas National Conservation Area in accordance with the laws (including regulations) applicable to the Conservation Area.

\* \* \*

(g) APACHE LEAP SPECIAL MANAGEMENT AREA.–

(1) DESIGNATION.–To further the purpose of this section, the Secretary shall establish a special management area consisting of Apache

Leap, which shall be known as the "Apache Leap Special Management Area" (referred to in this subsection as the "special management area").

(2) PURPOSE.—The purposes of the special management area are—

(A) to preserve the natural character of Apache Leap;

(B) to allow for traditional uses of the area by Native American people; and

(C) to protect and conserve the cultural and archeological resources of the area.

(3) SURRENDER OF MINING AND EXTRACTION RIGHTS.—As a condition of the land exchange under subsection (c), Resolution Copper shall surrender to the United States, without compensation, all rights held under the mining laws and any other law to commercially extract minerals under Apache Leap.

(4) MANAGEMENT.—

(A) IN GENERAL.—The Secretary shall manage the special management area in a manner that furthers the purposes described in paragraph (2).

(B) AUTHORIZED ACTIVITIES.—The activities that are authorized in the special management area are—

(i) installation of seismic monitoring equipment on the surface and subsurface to protect the resources located within the special management area;

96

(ii) installation of fences, signs, or other measures necessary to protect the health and safety of the public; and

(iii) operation of an underground tunnel and associated workings, as described in the Resolution mine plan of operations, subject to any terms and conditions the Secretary may reasonably require.

(5) PLAN.—

(A) IN GENERAL.—Not later than 3 years after the date of enactment of this Act, the Secretary, in consultation with affected Indian tribes, the Town, Resolution Copper, and other interested members of the public, shall prepare a management plan for the Apache Leap Special Management Area.

(B) CONSIDERATIONS.—In preparing the plan under subparagraph (A), the Secretary shall consider whether additional measures are necessary to—

(i) protect the cultural, archaeological, or historical resources of Apache Leap, including permanent or seasonal closures of all or a portion of Apache Leap; and

(ii) provide access for recreation.

(6) MINING ACTIVITIES.—The provisions of this subsection shall not impose additional restrictions on mining activities carried out by Resolution Copper adjacent to, or outside of, the Apache Leap area beyond

those otherwise applicable to mining activities on privately owned land under Federal, State, and local laws, rules and regulations.

\* \* \*

(i) MISCELLANEOUS PROVISIONS.–

(1) REVOCATION OF ORDERS; WITHDRAWAL.–

(A) REVOCATION OF ORDERS.–Any public land order that withdraws the Federal land from appropriation or disposal under a public land law shall be revoked to the extent necessary to permit disposal of the land.

\* \* \*

(3) PUBLIC ACCESS IN AND AROUND OAK FLAT CAMPGROUND.–As a condition of conveyance of the Federal land, Resolution Copper shall agree to provide access to the surface of the Oak Flat Campground to members of the public, including Indian tribes, to the maximum extent practicable, consistent with health and safety requirements, until such time as the operation of the mine precludes continued public access for safety reasons, as determined by Resolution Copper.

## Table of Excerpts from the
## 2025 Final Environmental Impact Statement

| EIS Cite | Excerpt |
|---|---|
| **VOLUME 1** | |
| 1-EIS-ES-28 | "The NRHP-listed *Chí'chil Biłdagoteel* Historic District TCP would be directly and permanently damaged by the subsidence area at the Oak Flat Federal Parcel." |
| 1-EIS-ES-29 | "Under all action alternatives, the Oak Flat Federal Parcel will be adversely impacted by the proposed mining operation. Extraction of the ore via block caving will eventually lead to the subsidence of the parcel; access to Oak Flat and the subsidence zone will be curtailed once it is no longer safe for visitors. Several springs located on the Oak Flat Federal Parcel will be lost due to the development of the subsidence area. The subsidence has a high potential to directly and permanently adversely affect numerous cultural resources sites, including the following: archaeological resources; areas with sacred values such as springs, seeps, and prayer locations; resource gathering sites; ancestor burial sites; traditional ceremonial and dance locations; and other places of spiritual and cultural significance to members of federally recognized Tribes." |
| 1-EIS-12 | "The land surface overlying the copper deposit is located in an area that has a long history of use by Native Americans, including the Apache, O'odham, Puebloan, and Yavapai people . . . ." |
| 1-EIS-13 | "As the ore moves downward and is removed, the land surface above the ore body also moves downward or 'subsides.' Analysts expect a 'subsidence' zone to develop near the East Plant Site; there is potential for downward movement |

| | |
|---|---|
| | to a depth between 800 and 1,115 feet. Resolution Copper projects the subsidence area to be up to 1.8 miles wide at the surface." |
| 1-EIS-34 | "[T]ailings storage facilities are permanent and remain part of the landscape in perpetuity." |
| 1-EIS-44 | "Construction and operation of the mine would profoundly and permanently alter the NRHP-listed *Chí'chil Biłda-goteel* (Oak Flat) . . . . In addition, development of the proposed tailings storage facility at any of the four proposed or alternative locations would permanently bury or otherwise destroy many prehistoric and historic cultural artifacts, potentially including human burials." |
| 1-EIS-46 | "Construction and operation of the Resolution Copper Mine would, as a result of anticipated geological subsidence at the East Plant Site, permanently alter the topography and scenic character of the Oak Flat area." |
| 1-EIS-60 | "Development of the Resolution Copper Mine would directly and permanently damage the NRHP-listed *Chí'chil Biłdagoteel* Historic District TCP. . . . Dewatering or direct disturbance would impact between 18 and 20 GDEs, mostly sacred springs. . . . Burials are likely to be impacted; the numbers and locations of burials would not be known until such sites are detected as a result of mine-related activities. Under this or any action alternative, one or more Emory oak groves at Oak Flat, used by Tribal members for acorn collecting, would likely be lost." |
| 1-EIS-62 | "Approximately 1.37 billion tons of tailings would be created during the mining process and would be permanently stored at the tailings storage facility." |

| 1-EIS-89 | "Reclamation activities would not occur within the subsidence area. There would be a berm and/or fence constructed around the perimeter of the continuous subsidence area." |
|---|---|
| 1-EIS-153 | "All public access . . . would be eliminated on 8,423 acres." |
| 1-EIS-158 | "The NRHP-listed *Chí'chil Biłdagoteel* Historic District TCP would be directly and permanently damaged." |
| 1-EIS-160 | "Development of the Resolution Copper Mine would directly and permanently damage the NRHP-listed *Chí'chil Biłdagoteel* Historic District TCP. . . . Dewatering or direct disturbance would impact between 18 and 20 GDEs, mostly sacred springs. . . . Burials are likely to be impacted; the numbers and locations of burials would not be known until such sites are detected as a result of mine-related activities. Under this or any action alternative, one or more Emory oak groves at Oak Flat, used by Tribal members for acorn collecting, would likely be lost. Other unspecified mineral- and/or plant-collecting locations would also likely be affected; historically, medicinal and other plants are frequently gathered near springs and seeps, so drawdown of water at these locations may also adversely affect plant availability." |
| 1-EIS-191–92 | "The removal of the Oak Flat Federal Parcel from Forest Service jurisdiction negates the ability of the Tonto National Forest to regulate effects on these resources from the proposed mine and block caving. . . . If the land exchange does not occur, not only would mineral exploration not take place within the 760-acre Oak Flat Withdrawal Area, but subsidence caused by block caving would not be allowed to impact the Withdrawal Area." |
| 1-EIS-255 | "The primary impacts on vegetation communities during construction of the action alternatives would be associated |

| | |
|---|---|
| | with removal and/or crushing of natural, native species; increased potential for noxious and invasive weed establishment and spread; decreased plant productivity from fugitive dust; plant community fragmentation; and changes in plant growth and seasonal phenology from artificial lighting." |
| 1-EIS-327 | "The land exchange would have significant effects on transportation and access. . . . [P]ublic access would be lost to the parcel itself, as well as passage through the parcel to other destinations, including Apache Leap and Devil's Canyon." |
| **VOLUME 2** | |
| 2-EIS-454 | "Mine dewatering at the East Plant Site under all action alternatives would result in the same irretrievable commitment of 160,000 acre-feet of water from the combined deep groundwater system and Apache Leap Tuff aquifer over the life of the mine. . . . [E]ven if the water sources are replaced, the impact on the sense of nature and place for these natural riparian systems would be irreversible. In addition, the GDEs directly disturbed by the subsidence area or tailings alternatives represent irreversible impacts." |
| 2-EIS-564 | "Seepage from the tailings storage facilities has several unavoidable adverse effects. In all cases, the tailings seepage adds a pollutant load to the downstream environment. . . . The potential impacts on water quality from tailings seepage would cause an irretrievable commitment of water resources downstream of the tailings storage facility, lasting as long as seepage continued." |

| 2-EIS-598 | "With respect to surface water flows from the project area, all action alternatives would result in both irreversible and irretrievable commitment of surface water resources." |
| --- | --- |
| 2-EIS-617 | "The entire subsidence area would be fenced for public safety." |
| 2-EIS-643 | "The direct loss of productivity of thousands of acres of various habitat from the project components would result in both irreversible and irretrievable commitment of the resources." |
| 2-EIS-663 | "The land exchange would have significant effects on recreation. . . . Additional recreational activities that would be lost include camping at the Oak Flat campground, picnicking, and nature viewing. The campground currently provides approximately 20 campsites and a large stand of native oak trees." |
| 2-EIS-759 | "[O]nce the land exchange occurs, Resolution Copper could use hazardous materials on this land without approval." |
| 2-EIS-812–13 | "For all action alternatives, there would be an irretrievable loss of scenic quality from increased activity and traffic during the construction and operation phases of the mine. . . . There would be an irretrievable, regional, long-term loss of night-sky viewing during project construction and operations because night-sky brightening, light pollution, and sky glow caused by mine lighting would diminish nighttime viewing conditions in the direction of the mine." |
| 2-EIS-820 | "In consultation with SHPO, ACHP, Tribes, and other consulting parties, the Forest Service determined that the project will have an adverse effect on historic properties. Resolution of adverse effects (36 CFR 800.6) involves the |

| | agency consulting with SHPO, Tribes, and other consulting parties to develop strategies to avoid, minimize, or mitigate adverse effects on historic properties." |
|---|---|
| 2-EIS-822 | "The project area is within the traditional territories of the Western Apache, the Yavapai, and the Akimel O'odham or Upper Pima. The histories of the Western Apache—a group that includes ancestors of the White Mountain, San Carlos, Cibecue, and Tonto Apache—tell of migrations into Arizona where they encountered the last inhabitants of villages along the Gila and San Pedro Rivers. The Western Apache practiced a mixed subsistence strategy of farming in the summer in the north, and hunting and gathering in the winter in the south. In the 1870s, the Apache were forced onto reservations, which curtailed much of their seasonal round. However, not all Apache stayed on the reservations, and some continued to use the vicinity of the project area into the twentieth century." |
| 2-EIS-826 | "The removal of the Oak Flat Federal Parcel from Forest Service jurisdiction negates the ability of the Tonto National Forest to regulate effects on these resources. If the land exchange occurs, 41 NRHP-eligible archaeological sites and one TCP within the selected lands would be adversely affected. . . . [H]istoric properties leaving Federal management is considered an adverse effect, regardless of the plans for the land, meaning that, under NEPA, the land exchange would have an adverse effect on cultural resources." |
| 2-EIS-834 | "[E]ven if recorded and documented, loss of these cultural sites contributes to the overall impact to the cultural heritage of the areas. . . . While the footprint of these projects is used as a proxy for impacts to cultural resources, effects |

| | |
|---|---|
| | on cultural resources extend beyond destruction by physical disturbance." |
| 2-EIS-836 | "Cultural resources and historic properties would be directly and permanently impacted. These impacts cannot be avoided within the areas of surface disturbance, nor can they be fully mitigated." |
| **VOLUME 3** | |
| 3-EIS-867 | "No Tribe supports the desecration/destruction of ancestral sites. Places where ancestors have lived are considered alive and sacred. It is a Tribal cultural imperative that these places should not be disturbed or destroyed for resource extraction or for financial gain. Continued access to the land and all its resources is necessary and should be accommodated for present and future generations. . . . The Resolution Copper Mine and Southeast Arizona Land Exchange has a high potential to directly and permanently adversely affect numerous cultural resources sites, including archaeological resources, areas with sacred values, and other places of spiritual and cultural significance to members of federally recognized Tribes." |
| 3-EIS-868 | "We received numerous comments from Tribal members about the sacredness and importance of Oak Flat to them, their lives, their culture, and their children. Many expressed their sadness and anger that their sacred place would be destroyed and that they would lose access to their oak groves and ceremonial grounds." |
| 3-EIS-871 | "***Direct impacts*** on resources of traditional cultural significance (archaeological sites; burial locations; spiritual areas, landforms, viewsheds, and named locations in the cultural landscape; water sources; food, materials, min- |

| | |
|---|---|
| | eral, and medicinal plant gathering localities; or other significant traditionally important places) would consist of damage, loss, or disturbance . . . . [T]he land exchange will have an adverse impact on resources significant to the Tribes." |
| 3-EIS-873 | "In 2015, the Tonto National Forest, in partnership with the San Carlos Apache Tribe, composed a nomination for Oak Flat, the area originally known as *Chí'chil Biłdagoteel*, to be listed in the NRHP as a TCP (Nez 2016). . . . Places like springs, ancestral (archaeological) sites, plants, animals, and mineral resource locations are sacred and should not be disturbed or disrupted. The Oak Flat Federal Parcel slated to be transferred to Resolution Copper was once part of the traditional territories of the Western Apache, the Yavapai, the O'odham, and the Puebloan Tribes of Hopi and Zuni. They lived on and used the resources of these lands until the lands were taken by force 150 years ago." |
| 3-EIS-874–75 | "After the signing of the Treaty of Guadalupe in 1848 . . . Euro-American settlers began arriving in Western Apache lands in search of mineral wealth and ranching lands. . . . Several massacres of Apache by soldiers and civilians occurred from the 1850s through the 1870s, including the reported events at Apache Leap. In the 1870s, the Apache were forced off their lands and onto reservations. . . . All these communities lost large portions of their homelands, including Oak Flat, and today live on lands that do not encompass places sacred to their cultures. . . . Knowing these places is vital to understanding Apache history and, therefore, identity. For the Western Apache, 'the people's sense of place, their sense of the tribal past, and their vibrant sense of themselves are inseparably intertwined' (Basso |

| | |
|---|---|
| | 1996). The Apache landscape is imbued with diyah, or power (Basso 1996). Diyah resides in natural phenomenon like lightning, in things like water or plants, and in places like mountains. Gáán, or holy beings, live in important natural places and protect and guide the Apache people (Hilpert 1996). They come to ceremonies to impart well-being to Apache, to heal, and to help the people stay on the correct path." |
| 3-EIS-879 | "[T]he Tribal Monitors recorded 594 special interest areas in the direct analysis area. Of the 594, 523 are described as cultural resources, 66 as natural resources, and five as both cultural and natural resources. The cultural resources generally correspond to prehistoric archaeological sites and were categorized by the Tribal Monitors as cultural areas, settlement areas, resource gathering areas, resource processing areas, agricultural areas, and other." |
| 3-EIS-885 | "Distinctive features of the TCP include an Emory oak stand that the Apache and Yavapai use to harvest acorns, plus a nearby campground, constructed by the Civilian Conservation Corps, that provides a convenient place for family gatherings. Four of the places of traditional and cultural importance identified in the ethnographic report are found within the Oak Flat Federal Parcel; they are all part of the TCP. Two additional places of traditional and cultural importance are found within the East Plant Site of the GPO. All of these resources would be adversely affected by leaving Federal management, which would result in a high potential to directly and permanently adversely affect numerous cultural resources sites, including the following: archaeological resources; areas with sacred values such as springs, seeps, and prayer locations; resource gathering sites; ancestor burial sites; traditional ceremonial and |

| | |
|---|---|
| | dance locations; and other places of spiritual and cultural significance to members of federally recognized Tribes." |
| 3-EIS-890–92 | "Maintaining access to Oak Flat campground . . . . represents only a small portion of Oak Flat and would not reduce the impact on Tribal cultural heritage caused by the destruction of the broader landscape due to the subsidence area. . . . Significant Tribal properties and uses would be directly and permanently impacted. These impacts cannot be avoided within the areas of direct impact, nor can they be fully mitigated." |
| 3-EIS-892 | "Physical and visual impacts on TCPs, special interest areas, and plant and mineral resources caused by construction of the mine would be immediate, permanent, and large in scale. Mitigation measures cannot replace or replicate the Tribal resources and TCPs that would be destroyed by project construction and operation. The landscape, which is imbued with specific cultural attributions by each of the consulting Tribes, would also be permanently affected. . . . The direct impacts on the TCP and special interest areas from construction of the mine and associated facilities constitute an irreversible commitment of resources. TCPs cannot be reconstructed once disturbed, nor can they be fully mitigated. Sacred springs would be eradicated by subsidence or construction of the tailings storage facility, and affected by groundwater drawdown. Changes that permanently affect the ability of Tribal members to access the TCP and special interest areas for cultural and religious purposes also consist of an irreversible loss of resources. For uses such as gathering traditional materials from areas that would be within the subsidence area or the tailings storage facility, the project would constitute an irreversible loss of resources." |

| VOLUME 4 | |
|---|---|
| 4-EIS-F-3 | "While there are other underground stoping techniques that could physically be applied to the Resolution copper deposit, each of the alternative underground mining methods assessed was found to have higher operational costs than panel caving." |
| 4-EIS-F-4 | "The Forest Service recognizes and acknowledges scoping comments that suggest that the use of mining techniques other than panel caving could substantially reduce impacts on surface resources, both by reducing or eliminating subsidence and by allowing the potential for backfilling tailings underground." |
| **VOLUME 6** | |
| 6-EIS-U-1 | "This appendix contains the testimony of Tribal members describing the spiritual significance of Oak Flat and what its loss would mean to their culture, especially Apache culture, in their own words." |
| 6-EIS-U-1 | "For as long as may be recalled, our People have come together here. We gather the acorns and plants that these lands provide, which we use for ceremonies, medicinal purposes, and for other cultural reasons. . . . These are holy, sacred, and consecrated lands which remain central to our identity as Apache People." |
| 6-EIS-U-2–3 | "*Chi'chil Biłdagoteel* (also known as Oak Flat) is a Holy and Sacred site . . . where we pray, collect water and medicinal plants for ceremonies, gather acorns and other foods, and honor those that are buried here. . . . Emory oak groves at Oak Flat used by tribal members for acorn collecting are among the many living resources that will be lost along with more than a dozen other traditional plant medicine and food sources. . . . The impacts that will occur |

| | |
|---|---|
| | to Oak Flat will undeniably prohibit the Apache people from practicing our ceremonies at our Holy site. . . . Our connections to the Oak Flat area are central to who we are as Apache people. Numerous people speak of buried family members. . . . The destruction to our lands and our sacred sites has occurred consistently over the past century in direct violation of treaty promises and the trust obligation owed to Indian tribes. . . . [T]he United States incurred obligations to protect our lands from harm, and to respect our religion and way of life. Despite these obligations, the U.S. Government has consistently failed to uphold these promises or too often fails to act to protect our rights associated with such places like *Chí'chil Biłdagoteel*." |
| 6-EIS-U-3 | "Throughout our history, Oak Flat continues as a vital part of the Apache religion, traditions, and culture. In Apache, our word for the area of Oak Flat is *Chí'chil Biłdagoteel* (a 'Flat with Acorn Trees'). Oak Flat is a holy and sacred site, and a traditional cultural property with deep religious, cultural, archaeological, historical and environmental significance to Apaches, Yavapais, and other tribes. At least eight Apache Clans and two Western Apache Bands have documented history in the area. . . . A number of Apache religious ceremonies will be held at Oak Flat this Spring, just as similar ceremonies and other religions and traditional practices have been held for a long as long as Apaches can recall. We do so because Oak Flat is a place filled with power, a place Apaches go: for prayer and ceremony, for healing and ceremonial items, or for peace and personal cleansing. . . . In the Oak Flat area, there are hundreds of traditional Apache species of plants, birds, insects, and many other living things in the Oak Flat area that are crucial to Apache religion and culture. . . . Only the species |

| | |
|---|---|
| | within the Oak Flat area are imbued with the unique power of this area." |
| 6-EIS-U-4 | "In the late 1800s, the U.S. Army forcibly removed Apaches from our lands, including the Oak Flat area, to the San Carlos Apache Reservation. We were made prisoners of war there until the early 1900s. Our people lived, prayed, and died in the Oak Flat area. . . . Since time immemorial, Apache religious ceremonies and traditional practices have been held at Oak Flat. Article 11 of the Apache Treaty of 1852, requires the United States to 'so legislate and act to secure the permanent prosperity and happiness' of the Apache people. Clearly, H.R. 687 fails to live up to this promise." |
| 6-EIS-U-6 | "How can we practice our ceremonies at Oak Flat when it is destroyed? How will the future Apache girls and boys know what it is to be Apache, to know our home when it is gone?" |
| 6-EIS-U-6 | "*Chí'chil Biłdagoteel* . . . is a place where we pray, collect water and medicinal plants for ceremonies, gather acorns and other foods, and honor those that are buried here. We have never lost our relationship to *Chí'chil Biłdagoteel*." |
| 6-EIS-U-7 | "My nine year old daughter dreams about having her Apache Sunrise dance ceremony at Oak Flat. The Apaches see Oak Flat differently—it is a church, a place for worship and the practice of our traditional religion. It is the center of our most sincerely held, religious beliefs, where diy1' (sacred power) can be called upon via prayers. . . . At least eight Apache clans have direct ties to this location. Tribal members continue to visit Oak Flat for prayer and a wide range of traditional needs and practices." |

| 6-EIS-U-7 | "I pray my son will have the opportunity to sweat at Oak Flat for the first time, when he becomes a young man. We have gone to many Apache spiritual ceremonies (Sunrise dances and Holy ground ceremonies) at Oak Flat." |
|---|---|
| 6-EIS-U-8 | "My family, my ancestors come from Oak Flat. I grew up there, praying, picking the medicine, picking the acorn, going to the springs, gaining the teachings of my role as an Apache woman so I can pass it down to my daughters. . . . My daughter, Nizhoni, held her Ceremony at Oak Flat in October 2014. . . . All the elements of the wind, fire, water, and land go into the Ceremony for my daughter. Everything Usen (Creator, God) has created has a significant role in the Ceremony got the 4 days that she prays, dances, connects with all the elements, connected to our ancestors, connected to the Holy Spirit. On the 3rd day of the Ceremony she is painted white with the white clay that is provided from Mother Earth, and that paint blesses all living beings, followed by the next day, the last day of the ceremony, she has to wash the paint off and give it back to the earth. . . . The exact springs she went to wash her paint off is being affected by Resolution Copper Mine already by dewatering the springs. You are already tampering with her life." |
| 6-EIS-U-9 | "For at least a half millennium through to the present day, members of our Tribe have utilized the Oak Flat area for traditional religious ceremonies, such as the Sunrise Dance . . . . It is a place where Apache Holy Ground rituals occur, where we commune with and sing to our Creator God, and celebrate our holy spirits, including our mountain spirits, the Ga'an. It is a place filled with rock paintings and petroglyphs, what some may describe as the footprints and the very spirit of our ancestors, hallmarks akin to the |

|  | art found in gothic cathedrals and temples, like the Western Wall in Jerusalem, St. Peter's Basilica in Vatican City, or Angor Wat in Cambodia. This is why I call Oak Flat the Sistine Chapel of Apache religion." |
|---|---|
| 6-EIS-U-9 | "I just recently had my coming of age ceremony at Oak Flat and being there meant a lot to me to have my ceremony in a place where all my ancestors used to be. If the Resolution Copper mine continues with destroying Oak Flat, then I will never have a sacred place to come back to or to show my kids where our ancestors gathered." |
| 6-EIS-U-10 | "Oak Flat is so important to me is because I have a very strong connection with the land. Oak Flat gives me connection with my family and my past ancestors." |
| 6-EIS-U-10 | "Oak Flat is also a place where our members still conduct traditional harvesting of plants important to our diet, such as acorns from Emory oaks, and healing plant-based medicines for a wide range of ailments." |
| 6-EIS-U-10 | "The numerous natural elements, that come from these Holy Sites, are used as tools to conduct Religious Ceremonies, spiritual sweats, and Sunrise Ceremonies." |