No. 25-5197

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

GOUYEN BROWN LOPEZ, ET AL.,
Plaintiffs-Appellants,

v.

UNITED STATES OF AMERICA, ET AL.,
Defendants-Appellees

and

RESOLUTION COPPER MINING LLC,
Intervenor-Defendant-Appellee.

Appeal from the United States District Court
for the District of Arizona
Honorable Dominic W. Lanza
(2:25-cv-2758-PHX-DWL)

**BRIEF OF AMICI CURIAE NATIONAL NATIVE AMERICAN LAW
STUDENTS ASSOCIATION, YALE NATIVE AMERICAN LAW
STUDENTS ASSOCIATION, UNIVERSITY OF ARIZONA NATIVE AND
INDIGENOUS LAW STUDENTS ASSOCIATION, AND OTHERS IN
SUPPORT OF PLAINTIFFS-APPELLANTS AND REVERSAL**

Heather D. Whiteman Runs Him
*Counsel of Record*
Dana L. Chavis
Tribal Justice Clinic
Rogers College of Law
University of Arizona
1145 N. Mountain Avenue
P.O. Box 210176
Tucson, AZ 85721
(520) 626-9762
whitemanrunshim@arizona.edu

Gerald Torres
Yale Law School
127 Wall Street
New Haven, CT 06511
(203) 432-4958
gerald.torres@yale.edu

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................. i

TABLE OF AUTHORITIES ......................................................... iii

CORPORATE DISCLOSURE STATEMENT ........................................... viii

INTEREST OF AMICI CURIAE ...................................................... 1

SUMMARY OF ARGUMENT ........................................................ 2

ARGUMENT ......................................................................... 3

I.    This court should grant Plaintiff-Appellants a Preliminary Injunction because they have established all necessary factors for a preliminary injunction ................................................................. 3

    A.    Read in light of *Mahmoud*, the *Apache Stronghold* en banc majority erred in applying *Lyng* ................................................. 6

        1.    Contrary to the majority's interpretation, *Lyng* does not articulate a special test for free exercise claims in real property cases ..................................................... 6

        2.    Even so, RFRA extends beyond any outer boundaries which *Lyng* may have established ................................... 7

        3.    Even so, the instant case is distinguishable from *Lyng* for multiple reasons .......................................... 10

            a)    The instant case involves the permanent actual physical destruction of sacred sites and the government has failed to show mitigating efforts, thus imposing a greater burden than in *Lyng* ....................................... 10

            b)    Upholding the land transfer of Oak Flat would discriminate against Plaintiff-Appellants,

imposing a greater burden than in *Lyng* .............. 13

    c)     Enforcing the transfer of Oak Flat fails to recognize the coerciveness of governmental control of land-based Native American religious practices, imposing a greater burden than *Lyng* ................................................ 15

    d)     When deciding this case, the Court must consider the obligations of the government under the trust responsibility and the unique government-to-government relationship between Tribal Nations and the federal government ........................................................... 19

    e)     Like the imposition of storytime discussions in *Mahmoud*, the disposition of Oak Flat is not an internal affair .................................................................. 23

II.     The most relevant precedent, as shown in Mahmoud, is Yoder .......... 23

    A.     By discriminatorily withholding protections for Plaintiff-Appellants' and other Native American sacred sites, this Court's standard violates the spirit of the free exercise clause, the establishment clause, and the equal protection clause .......................................................... 25

III.     Recognizing that Plaintiff-Appellants in this case face a substantial burden to religious exercise does not foreclose government action related to its lands ............................................................ 28

    A.     RFRA conditions Congressional power to manage its real property ........................................................... 29

CONCLUSION ........................................................... 32

CERTIFICATE OF COMPLIANCE

STATEMENT OF THE PARTIES' CONSENT

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

*Apache Stronghold v. United States*,
38 F.4th 742 (9th Cir. 2022) ..................................................... 17

*Apache Stronghold v. United States*,
95 F.4th 608 (9th Cir. 2024) ........................................... 7, passim

*Apache Stronghold v. United States*,
101 F.4th 1036 (9th Cir. 2024) ........................................... 6, 32

*Apache Stronghold v. United States*,
605 U.S. __, 145 S. Ct. 1480 (2025) .................................. 6, 10, 14, 25, 29

*Buono v. Norton*,
371 F.3d 543 (9th Cir. 2004) ..................................................... 23

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014) ..................................................... 8

*Carson as next friend of O. C. v. Makin*,
596 U.S. 767 (2022) ..................................................... 27

*Cholla Ready Mix, Inc. v. Civish*,
382 F.3d 969 (9th Cir. 2004) ..................................................... 22

*Comanche v. United States*,
2008 WL 4426621 (W.D. Okla. Sept. 23, 2008) ....................................... 16

*Cnty. of Allegheny v. ACLU Greater Pittsburgh Chapter*,
492 U.S. 573 (1989) ..................................................... 26

*Employment Division, Department of Human Resources of Oregon v. Smith*,
494 U.S. 872 (1990) ........................................................

*Fulton v. City of Philadelphia*,
593 U.S. 522 (2021) ..................................................... 8, passim

*Haaland v. Brackeen*,
599 U.S. 255 (2023) ............................................................ 18, 19

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022) ..................................................................... 27

*Lone Wolf v. Hitchcock*,
187 U.S. 553 (1903) ..................................................................... 22

*Lyng v. Northwest Indian Cemetery Protective Ass'n*,
485 U.S. 439 (1988) ......................................................... 1, passim

*Mahmoud v. Taylor*,
606 U.S. ___, 145 S. Ct. 2332 (2025) ............................... 1, passim

*McClanahan v. Arizona State Tax Comm'n*,
411 U.S. 164 (1973) ..................................................................... 19

*Peyote Way Church of God, Inc. v. Thornburgh*,
922 F.2d 1210, 1217 (5th Cir. 1991) ........................................... 22

*Prince v. Massachusetts*,
321 U.S. 158 (1944) ..................................................................... 28

*Seminole Nation v. United States*,
316 U.S. 286 (1942) ..................................................................... 19

*Sherbert v. Verner*,
374 U.S. 398 (1963) ................................................................. 9, 16

*Texas Monthly, Inc. v. Bullock*,
489 U.S. 1 (1989) ........................................................................... 8

*United States v. Grace*,
461 U.S. 171 (1983) ..................................................................... 23

*United States v. Mitchell*,
463 U.S. 206 (1983) ..................................................................... 19

*United States v. Sioux Nation of Indians*,
  448 U.S. 371 (1980) ................................................................ 19

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7, 20 (2008) ................................................................ 3

*Wisconsin v. Yoder*,
  406 U.S. 205 (1972) .......................................................... passim

*Yellowbear v. Atty. Gen. of Wyoming*,
  380 Fed. Appx. 740 (10th Cir. 2010) ................................ 17, 28

**STATUTES**

Military Construction Authorization Act of 1978,
  Pub. L. 95-82, 91 Stat. 358 (1977) (codified at 10 U.S.C. § 2687) .......... 30

Land Exchange Act,
  16 U.S.C. § 539p(c)(3)(A)–(B) ................................................ 22, 32

National Historic Preservation Act,
  54 U.S.C. § 302706(a) (formerly 16 U.S.C. § 470a(d)(6)(A) ................... 22

Religious Freedom Restoration Act of 1993 (RFRA),
  42 U.S.C. § 2000bb *et seq.* .......................................... 1, passim

42 U.S.C. § 2000bb(a)(3) ................................................................ 7

42 U.S.C. § 2000bb(b)(1), (2) ...................................................... 8, 9

42 U.S.C. § 2000bb-1(a), (b) .......................................................... 9

American Indian Religious Freedom Act,
  42 U.S.C. § 1996 ................................................................... 20

Federal Assets Sale and Transfer Act of 2016,
  Pub. L. No. 114-287, 130 Stat. 1463 (2016) ....................... 31, 32

v

**TREATIES**

Treaty with the Apache,
  July 1, 1852, 10 Stat. 979 ............................................................ 20

**OTHER AUTHORITIES**

Stephanie Hall Barclay & Michalyn Steele, *Rethinking Protections for Indigenous Sacred Sites*,
  134 Harv. L. Rev. 1294 (2021) ............................................ 2, 13, 16, 17, 28

Russel Lawrence Barsh, *The Illusion of Religious Freedom for Indigenous Americans*,
  65 Or. L. Rev. 363 (1986) ............................................................ 14

Kristen A. Carpenter, *A Property Rights Approach to Sacred Sites Cases Asserting a Place for Indians as Nonowners*,
  52 UCLA L. Rev. 1061 (2005) ...................................................... 7

Kristen A. Carpenter, *Old Ground and New Directions at Sacred Sites on the Western Landscape*,
  83 Denv. U. L. Rev. 981 (2006) .................................................. 15

Vine Deloria, Jr., *God Is Red: A Native View of Religion*,
  (4th ed. Fulcrum Publ'g 2016) .................................................. 4

William A. Fletcher, *Protection for Indian Sacred Sites*,
  97 Wash. L. Rev. 703 (2022) ...................................................... 25

Gabrielle M. Girgis, *What Is A "Substantial Burden" on Religion Under RFRA and the First Amendment?*,
  97 Wash. U.L. Rev. 1755 (2020) ................................................ 8

Garrett Hatch, Cong. Rsch. Serv., R47308, *The Federal Assets Sale and Transfer Act: Background and Implementation* (Nov. 16, 2022) ............................ 31

Arlene Hirschfelder & Paulette Molin, *The Encyclopedia of Native American Religions* (Facts On File 1992) .................................................. 14

Bernadette Meyler, *The Equal Protection of Free Exercise: Two Approaches and Their History*,
47 B.C. L. Rev 275 (2006) ........................................................................ 26

Bryan Newland, Assistant Sec'y – Indian Affairs,
U.S. Dep't of the Interior, *Federal Indian Boarding School Initiative Investigative Report* (May 2022) ............................................................. 17

Andrew Tilghman, Cong. Rsch. Serv., R48547, *Excess Military Infrastructure and the Base Realignment and Closure (BRAC) Process* (May 27, 2025) ............................................................................... 30

U.N. Declaration on the Rights of Indigenous Peoples,
G.A. Res. 61/295 (Sept. 13, 2007) ........................................................... 21

Exec. Order No. 13007 (1996) ...................................................................... 21

Memorandum Opinion, *Permissible Accommodation of Sacred Sites*,
20 Op. O.L.C. 337 (1996) ......................................................................... 21

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 29.1(a)(4)(A), amici have no parent corporation

and no stock.


September 15, 2025

/s/ *Heather Whiteman Runs Him*
Heather Whiteman Runs Him
*Counsel of Record for Amici Curiae*

# INTEREST OF AMICI CURIAE[1]

*Amicus Curiae*, The National Native American Law Students Association ("NALSA") was founded in 1970 to support law students interested in the study of Federal Indian Law and Tribal law and policy.

*Amici* Yale NALSA, University of Arizona Native and Indigenous Law Students Association (NILSA), University of Michigan NALSA, and Arizona State University NALSA support Native American and Indigenous law students at their respective institutions, foster community among all law students interested in Native American and Indigenous Peoples' legal issues and promote awareness of federal Indian law and Tribal law.

*Amici* state that no party's counsel authored this brief in whole or in part; no party's counsel, and no person other than the amici, their members, and their counsel, contributed money that was intended to fund preparing or submitting the brief.[2]

---

[1] Pursuant to Fed. R. App. P. 29(a)(2), all parties consent to the filing of this amicus brief.

[2] The preparation of this brief was ably assisted by law students from Yale NALSA: Naji Thompson and Danna Castro Galindo; and Arizona NILSA: Aouli Ross, Dana Chavis, and Jessica Frappier.

1

## SUMMARY OF ARGUMENT

This Court should grant Plaintiff-Appellants' requests for a preliminary injunction. By doing so, this Court has an opportunity to rectify the Ninth Circuit's en banc panel's flawed holding in *Apache Stronghold v. United States*, which ignored both the text and purpose of the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb, *et seq.*, in rejecting Apache Stronghold's RFRA claim and incorrectly applying the holding of *Lyng v. Northwest Indian Cemetery Protective Association*, 485 U.S. 439 (1988). Granting Plaintiff-Appellants' request for injunctive relief and applying intervening Supreme Court precedent, *Mahmoud v. Taylor*, 606 U.S. ___, 145 S. Ct. 2332 (2025), will resolve uncertainty surrounding substantial and undue burdens on faiths with land-based religious practices after the *Apache Stronghold* en banc panel's flawed holding. This uncertainty must be resolved to prevent discrimination against Native American religions representing a majority of faiths with such land-based religious practices in the United States, *Lyng*, 485 U.S. at 460-461 (Brennan, dissenting) and Stephanie Hall Barclay & Michalyn Steele, *Rethinking Protections for Indigenous Sacred Sites*, 134 Harv. L. Rev. 1294, 1341–42 (2021). Religious freedom of Native American citizens practicing land-based religions remains imperiled as long as the legal precedent established by the en banc's erroneous decision remains the law.

# ARGUMENT

I. **This court should grant Plaintiff-Appellants a Preliminary Injunction because they have established all necessary factors for a preliminary injunction.**

In determining whether to grant a preliminary injunction, courts consider four factors: likelihood of success on the merits; likelihood that the party will suffer irreparable harm in the absence of preliminary relief; the balance of equities between both parties; and whether the injunction is in the public's best interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Turning first to the balance of equities, granting preliminary relief for Plaintiff-Appellants clearly strikes this balance; the Court would stay the impending and irreversible destruction of Oak Flat, allowing Plaintiff-Appellants to continue practicing their religion while the courts weigh the merits of this case. In the absence of preliminary relief, the balance of equities would tilt sharply to Defendants, at the expense of the destruction of Plaintiff-Appellants' religious freedom, way of life, and Apache identity. By granting preliminary relief to Plaintiff-Appellants to prevent grave and irreversible harms while the merits of the case are weighed, the Court would reaffirm the integrity of the judicial process and promote the public's interest by protecting the integrity of the legal system.

3

Next, integral to Plaintiff-Appellants' request, no party in this case disputes that, if the government transfers Oak Flat to Resolution Copper, the Plaintiffs will suffer irreparable harm. Despite failing to enjoin the transfer, the court below found that without the injunction the Plaintiffs will suffer irreparable harm. Order Denying Motion for Preliminary Injunction, Doc. 45, at 19, *Lopez v. United States*, No. 2:25-cv-02758-DWL (D. Ariz. 2025 Aug. 17, 2025).

The government concedes that mining Oak Flat will destroy irreplaceable "tribal resources" and permanently end the Apache's ability to perform religious practices at their sacred site that has otherwise stood since time immemorial. Uniting this Indigenous community is a shared conviction that transfer and destruction of Oak Flat will permanently end current and future generations of Apache women and girls' ability to practice their religion. This affected group most pressingly includes Plaintiff-Appellants currently before the Court.

Many Western Apache origin stories, spiritual beings, and religious rites, like the Sunrise Ceremony, are situated at Oak Flat. *See* Compl., Doc. 1, *Lopez v. United States*, No. 2:25-cv-02758-DWL (D. Ariz. 2025 July 24, 2025). In many Native American religions, "sacred places are the foundation of all other beliefs and practices," and their loss entails not only spiritual harm but cultural collapse. Vine Deloria, Jr., *God Is Red: A Native View of Religion* 267–68 (4th ed. Fulcrum Publ'g 2016). The destruction or desecration of such places is therefore not just a

4

continuation the physical deprivation Native communities suffered at the hands of the United States government but also a rupture in communal identity and continuity. The destruction of land severs cultural and spiritual ties between current and past tribal members, devastating the Tribal Nation and community that relies upon it. Accordingly, the Land Transfer Act will prevent the perpetuation of religious practice, rendering future Apache generations' religious continuity impossible. Such "policies pose a very real threat of undermining the religious beliefs and practices that [Apache] parents wish to instill in their children." *Mahmoud*, 145 S. Ct. at 2361 (cleaned up).

Thus, in this case, the transfer and subsequent destruction of Oak Flat will mean the irreversible loss of the Apache way of life. For Apache girls, this loss means they are unable to enter the Apache community as women and Apache women lose their identity as Apache women. *Lopez* Compl. at 10. For the mothers bringing this case, the transfer of this sacred site would forever impede their ability to pass their religious beliefs to their daughters and raise them in the Apache religion.

Finally, Plaintiff-Appellants are likely to succeed on the merits. Under RFRA and Free Exercise jurisprudence, particularly following the Supreme Court's holding in *Mahmoud*, the Apache women and girls are likely to succeed on their

claims that the transfer and destruction of Oak Flat would substantially burden their religious practices, violating RFRA and the Free Exercise Clause.

**A.  Read in light of *Mahmoud*, the *Apache Stronghold* en banc majority erred in applying *Lyng*.**

1. <u>Contrary to the majority's interpretation, *Lyng* does not articulate a special test for free exercise claims in real property cases.</u>

The *Apache Stronghold* majority erred by interpreting *Lyng* as holding that "'disposition' of the government's real property," mandates a greater standard to assess the "substantial burden" requirement of free exercise claims beyond the mere consideration of whether government action "prevent[s] access to religious exercise. . . ." *Apache Stronghold v. United States*, 101 F.4th 1036, 1055 (9th Cir. 2024). On its face, *Lyng* cannot be read to create a special test governing when government "disposition" of land becomes a "substantial burden." As noted by Justice Gorsuch in dissent, the words "substantial burden" do not appear in *Lyng*. *Apache Stronghold v. United States*, 605 U.S.__, 145 S. Ct. 1480, 1487 (2025) (Gorsuch, J., dissenting from denial of certiorari). Moreover, no other circuit has read a similar standard out of the case's holding. *Id*. at 1488. In fact, current Supreme Court precedent demonstrates that *Lyng* does not establish a "substantial burden" test limiting plaintiffs' access to protections from threats to their religious

exercise. In *Mahmoud*, the Court clarified that the *Lyng* majority only mentioned the government's lack of religious discrimination to "emphasize[]" why their conclusion was correct. 145 S. Ct. at 2357. It follows that the Ninth Circuit cannot base its test on *Lyng's* discussion of discrimination because the Court applies the reasoning to bolster its holding, not set out further factors needed to establish a substantial burden claim.

> 2.  Even so, RFRA extends beyond any outer boundaries which
>     *Lyng* may have established.

An en banc majority for this court has suggested that RFRA, which was enacted to prevent government from "substantially burden[ing] religious exercise *without compelling justification*," 42 U.S.C. § 2000bb(a)(3) (emphasis added), allows for the destruction of sacred sites, "without which many tribal religions cannot exist," even in the absence of any showing of a compelling justification. Kristen A. Carpenter, *A Property Rights Approach to Sacred Sites Cases Asserting a Place for Indians as Nonowners*, 52 UCLA L. Rev. 1061, 1068–69 (2005). The en banc majority reached this determination based on two erroneous holdings. First, it determined that RFRA incorporated *Lyng* concerning "what counts as a governmental imposition of a substantial burden on religious exercise." *Apache Stronghold v. United States*, 95 F.4th 608, 614 (9th Cir. 2024). Second, it

determined that under *Lyng*, the destruction of a sacred site on federal government property does not constitute a "substantial burden on religious exercise." *Id*.

This reasoning is flawed; RFRA's protections extend *beyond* the Supreme Court's pre-*Smith* free exercise jurisprudence, including any potential "outer limits" established by the Supreme Court in *Lyng*. *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 706 (2014). Before *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), the Supreme Court held "that the Free Exercise Clause of the First Amendment *required* religious beliefs to be accommodated by granting religion-specific exemptions from otherwise applicable laws." *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 38 (1989) (Scalia, J., dissenting) (emphasis in original); *see also* Gabrielle M. Girgis, *What Is A "Substantial Burden" on Religion Under RFRA and the First Amendment?*, 97 Wash. U.L. Rev. 1755, 1758 (2020) (Before *Smith*, "any neutral and generally applicable law that imposed on someone's exercise of religion was constitutionally suspect.") In *Smith*, the Supreme Court changed course, declaring that it had "never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate." *Smith*, 494 U.S. at 878-79. Congress enacted RFRA post-*Smith* to reinstate the default principle that the government is required to accommodate religious exercise. *See* 42 U.S.C. § 2000bb(b)(1). RFRA declares that the United States "shall not

substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless it can show a compelling interest. 42 U.S.C. § 2000bb-1(a), (b).

RFRA did far more than "merely restore[] [the Supreme] Court's pre-*Smith* decisions in ossified form." *Hobby Lobby*, 573 U.S. at 684-85. RFRA instead established a "very broad protection for religious liberty," which is "far beyond what [the Supreme] Court has held is constitutionally required" by the First Amendment's free exercise clause. *Id.* at 706. While one of Congress's purposes in enacting RFRA was "to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972)," *see* 42 U.S.C. § 2000bb(b)(1), RFRA claims are not "restricted . . . to plaintiffs who fell within a category of plaintiffs whose claims the Court had recognized before *Smith*." *Hobby Lobby*, 573 U.S. at 684-85.

The *Apache Stronghold* en banc majority's holding that "RFRA subsumes, rather than overrides, the outer limits that [*Lyng*] places on what counts as a governmental imposition of a substantial burden on religious exercise. . . ." *Apache Stronghold*, 95 F.4th at 614, is incompatible with both the Congressional purpose and the Supreme Court's understanding of RFRA. Congress enacted RFRA to expand protection for religious exercise, *see* 42 U.S.C. § 2000bb(b)(2). In contrast, the en banc majority's interpretation of the term "substantial burden" functionally

9

restricts religious exercise protections for members of faiths with land-based religious practices compared to the accommodations allowed under the Supreme Court's pre-*Smith* decisions. This inversion of RFRA permits the government to burden Plaintiff-Appellants' land-based religious practices substantially and creates a carveout that effectively excludes them from RFRA's protection.

      3.     <u>Even so, the instant case is distinguishable from *Lyng* for multiple reasons.</u>

          a)     *The instant case involves the permanent actual physical destruction of sacred sites and the government has failed to show mitigating efforts, thus imposing a greater burden than in* Lyng.

Notwithstanding the question of whether RFRA incorporated *Lyng* as interpreted by the *Apache Stronghold* majority, this case is distinguishable from *Lyng* because it involves an objective inquiry into whether government can functionally prohibit Plaintiff-Appellants' religious free exercise by enabling the physical destruction of the site of their religious  practice; this is a much greater burden to Plaintiff-Appellants' free exercise of religion than the burden in *Lyng*, which only arose from the government's "plan to build a road near religious sites that promised to generate noise and considerable disruption, but that also promised to leave those sites standing." *Apache Stronghold*, 605 U.S. __, 145 S. Ct. at 1487

(Gorsuch, J., dissenting from denial of certiorari). *Lopez* concerns complete and permanent destruction of Plaintiff-Appellants' religious site, making future worship *impossible* instead of *impractical*; this is a functional prohibition of their ability to freely practice their religion, which was not the case in *Lyng*, 485 U.S. at 453 ("[A] law prohibiting the Indian respondents from visiting the Chimney Rock area would raise a different set of constitutional questions.").

Moreover, the Court in *Lyng* emphasized the numerous steps taken to minimize the impact the road construction would have on the petitioners' religious activities. 485 U. S. at 454. Particularly impactful in the Court's decision not to find a "substantial burden" in the case was the government's requirement that "no sites where specific rituals take place [be] disturbed" and that the route chosen for construction by the Regional Forester was "the farthest removed from contemporary spiritual sites" with the goal of minimizing adverse audible intrusions associated with the road. *Id.* Due to the government's intentional pursuit of less harmful alternatives, many *Lyng* plaintiffs were concerned with the diminishment, rather than the destruction, of the area's sacredness. *Lyng*, 485 U.S. at 451.

In direct contrast to the government's cautiously tailored actions in *Lyng*, the government's current plans to transfer Oak Flat to Resolution Copper fully accept and anticipate permanent physical destruction of a site where specific rituals take

11

place, and this plan takes no steps to minimize impacts on Plaintiff-Appellants' religious activities. The government's failure to seek less destructive alternatives comes even after its Environmental Impact Statement (EIS) confirmed that destruction of Oak Flat would be "immediate, permanent, and large in scale." 3-EIS-892; l-EIS-153. If allowed to continue, the transfer of Oak Flat to Resolution Copper will "swall[ow] [Oak Flat] in a massive crater and en[d] Apache rituals forever." Compl. at 12. Thus, unlike in *Lyng*, the government here took no action to minimize the damaging effect of its action on Plaintiff-Appellants' ability to continue their religious practices.

Finally, unlike *Lyng*'s finding that the proposed road's effects would be felt only among future worshippers, the destruction of Oak Flat would impact all future Apache women and girls and have *retrospective effects* on all Apache women, "past and present," who held Sunrise Ceremonies at Oak Flat and whose connection with the spirit of *Chi'chil Bildagoteel* would be permanently severed. (App. to Pet. for Cert. 977a.). Understanding the importance of Native American religions' ancestral connections, the Court in *Lyng* took special note that "the Regional Forester selected a route that avoided archeological sites and was removed as far as possible from the sites used by contemporary Indians for specific spiritual activities." *Id.* at 443. If Oak Flat is destroyed, all Apache girls who have reached womanhood at Oak Flat from *time immemorial* will be permanently

12

divested of their spiritual connection, a harm extending far beyond that experienced by petitioners in *Lyng*. Due to the starkly different circumstances between the petitioners in *Lyng* and the Plaintiff-Appellants in *Lopez*, the instant case must be treated as distinguishable from *Lyng*.

> b) *Upholding the land transfer of Oak Flat would discriminate against Plaintiff-Appellants, imposing a greater burden than in* Lyng.

Enforcing the *Apache Stronghold* en banc majority's adoption of a federal "real property" exception to the "substantial burden" rule would serve to unfairly discriminate against Native Americans and other land-based religious practitioners. Native Americans constitute the vast majority of land-based religious practitioners in the United States whose sacred sites are on federal public land. Barclay & Steele, supra, at 1341–42. For many Native Americans, their "faith is inextricably bound to the use of land." *Lyng*, 485 U.S. at 460-61 (Brennan, J., dissenting). As with the Apache Tribes and their sacred site at Oak Flat, *Chí'chil Biłdagoteel*, many tribes across the country have worshiped at their sacred sites since "time immemorial." *Apache Stronghold*, 95 F.4th at 699 (Murguia, C.J., dissenting). Additionally, with respect to this case, the lower court's decision would have disproportionate effects on Native Americans' religious freedom because the "[Ninth Circuit] encompasses approximately 74% of all federal land and almost a

13

third of the nation's Native American population." *Apache Stronghold*, 605 U. S. __, 145 S. Ct. at 1488 (Gorsuch, J., dissenting from denial of certiorari). Consequently, the en banc majority's real property exception will devastate and disproportionately impact Indian Country.

Sacred sites are not fungible. Once destroyed, there is no alternate place of worship. Arlene Hirschfelder & Paulette Molin, *The Encyclopedia of Native American Religions*, 251 (Facts On File 1992). Many religions, including those outside of Native American faiths, have land-based sacred sites: among them, Mt. Sinai for Abrahamic faiths, the Western Wall for Jews, the Church of the Nativity for Christians, the Ganges River for Hindus, and the Bodhi tree and its descendants for Buddhists.

In addition, subordinating individuals' right to free exercise of religion because such exercise occurs on federal lands exacerbates the discriminatory effect of the *Apache Stronghold* majority's carveout. While Native American sacred sites are unique in many respects, foremost to the en banc majority is their frequent location on federally owned public land. *Apache Stronghold*, 95 F.4th at 622. Through treaty-making, forced removal, discriminatory allotment policies, and confinement to reservations, the United States historically dispossessed tribes of sacred sites. Russel Lawrence Barsh, *The Illusion of Religious Freedom for Indigenous Americans*, 65 Or. L. Rev. 363, 396 (1986). Today, many Native

14

American religious sites are currently situated on federal land. Kristen A. Carpenter, *Old Ground and New Directions at Sacred Sites on the Western Landscape*, 83 Denv. U. L. Rev. 981, 983 (2006). A standard foreclosing any free exercise claims implicating religious practices on federally owned lands will disproportionately harm Native American religious freedom. Under this decision, Native American sacred sites can be destroyed without a legally cognizable "substantial burden" to Native religions per se; the en banc majority determined that sacred sites on federally owned public land receive no protections under the Constitution or RFRA, even though "the burden here is categorical. . . ." *Apache Stronghold*, 95 F.4th at 720 (Murguia, C.J., dissenting). Consequently, through the en banc decision, the government could arbitrarily pursue "utter erasure of a [land-based] religious practice" if located on federally owned public land. *Id.*

      c)      *Enforcing the transfer of Oak Flat fails to recognize the coerciveness of governmental control of land-based Native American religious practices, imposing a greater burden than* Lyng.

The *Apache Stronghold* en banc majority's "real property" exception fails to recognize the coercive control exercised by the government over land-based Native American religious practitioners who are often uniquely dependent on the federal government. This "exert[ion] of decisive control" creates a clear baseline of

15

governmental coercion that must be taken into account by the Court as it evaluates the applications of the "substantial burden" test in *Yoder* and *Sherbert* to land-based religious practices on federal land. Barclay & Steele, supra, at 1301. Ignoring this coercive control effectively "penaliz[es] [land-based] religious activity by denying . . . the rights, benefits, and privileges enjoyed by other" non-land-based religions that find comparatively greater sanctuary under Free Exercise jurisprudence. *Lyng*, 485 U.S. at 449.

Because the government often controls access to and regulates use of sacred sites, Native Americans' land-based religious practices are subject to a "baseline of omnipresent government interference. . . ." Barclay & Steele, supra, at 1301; *see also Comanche v. United States*, 2008 WL 4426621, at *17 (W.D. Okla. Sept. 23, 2008) (the federal government's physical interference on federal land with religious exercise "amply demonstrate[d]" a "substantial burden on the traditional religious practices of Plaintiffs."). In *Comanche*, the court followed RFRA precedent holding that government action substantially burdens religious exercise where it "significantly inhibit[s] or constrain[s] conduct or expression" or "den[ies] reasonable opportunities to engage in religious activities." *Id.* at *3 (cleaned up). As the dissent in the Ninth Circuit panel decision identified, this kind of coercive control is most analogous to government responsibilities in prisons and military contexts, where the government exercises such control over religion that courts

16

recognize the government's constitutional and statutory obligation to provide accommodations ensuring free exercise. *Apache Stronghold v. United States*, 38 F.4th 742, 774 (9th Cir. 2022) (Berzon, J., dissenting); *see generally Yellowbear v. Atty. Gen. of Wyoming*, 380 Fed. Appx. 740 (10th Cir. 2010).

While Native religions constitute a vast majority of land-based religions subject to federal land use decisions, they are not alone. An estimated seventy churches are in national parks, including Catholic churches in Grand Canyon and Yellowstone National Parks; Ebenezer Baptist Church where Martin Luther King Jr. preached; and the Southwest's Catholic mission churches. Barclay & Steele, supra, at 1341-42. A test that fails to recognize the coercion implicit in government control of religious sites offers no protection for the exercise of religion in these spaces. The *Apache Stronghold* en banc panel failed to recognize this coercion, which should be considered in interpreting RFRA and Free Exercise jurisprudence.

Furthermore, the en banc panel's holding in *Apache Stronghold* fails to recognize the federal government's historic attacks on Native American parental rights. Native American families, including Apache families, directly faced the invasion of parental relationships through federal Indian boarding school policies. Bryan Newland, Assistant Sec'y – Indian Affairs, U.S. Dep't of the Interior, *Federal Indian Boarding School Initiative Investigative Report* (May 2022) (BIA Report). Throughout the boarding school era, the federal government forcibly

removed Native children from the care of their parents under brutal assimilation policies intended to "kill the Indian . . . and save the man." *Haaland v. Brackeen*, 599 U.S. 255, 299 (2023) (Gorsuch, J. concurring) (quoting The Advantages of Mingling Indians With Whites, in Proceedings of the National Conference of Charities and Correction 46 (I. Barrows ed. 1892)). To that end, the federal government directly attacked Indian families, attempting to end "the warm reciprocal affection existing between parents and children." *Brackeen*, 599 U.S. at 299 (Gorsuch, J. concurring) (citing Annual Report of the Commissioner of Indian Affairs to the Secretary of the Interior 392 (1904)). Unlike the schools at issue in *Yoder* and *Mahmoud*, Indian boarding schools exercised complete control over Indian children, forcefully exposing them to other belief systems but also actively requiring Indian children to "abandon [Indigenous] religious beliefs." BIA Report at 71. Boarding schools used education to create a coercive religious environment for Native American children.

Supreme Court precedent recognizes parents' rights to impart their chosen religious beliefs to their children. In these cases, the Supreme Court has linked the protection of religious and parental rights to the survival of communities, holding that mere exposure to contrary belief systems may itself infringe on parental rights. *See Wisconsin v. Yoder*, 406 U.S. 205 (1972); *Mahmoud* 606 U.S. ___, 145 S. Ct. at 2353. Apache mothers and daughters deserve no less protection. Additionally, a

18

decision excluding Apache families' belief systems from the courts' protection also risks compounding the history of racial and religious discrimination imposed on Native American parents by the federal government.

> d)      *When deciding this case, the Court must consider the obligations of the government under the trust responsibility and the unique government-to-government relationship between Tribal Nations and the federal government.*

RFRA must be interpreted against treaties, the trust duty, and the unique government-to-government relationship between Tribal Nations and the federal government. *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164 (1973). Treating federal public lands as a "purely internal" matter in free exercise clause jurisprudence functionally ignores widely recognized federal treaty obligations and trust responsibilities to Native Americans and, as such, runs counter to accepted federal Indian law canons. *See generally Seminole Nation v. United States*, 316 U.S. 286 (1942). This trust relationship "informs the exercise of legislative power" and is recognized by the Supreme Court to impose a "distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people." *Brackeen*, 599 U.S. at 274-75 (citing *United States v. Mitchell*, 463 U.S. 206, 225-26 (1983)); s*ee also United States v. Sioux Nation of*

19

*Indians*, 448 U.S. 371 (1980) (invalidating Congressional action that violated treaty obligations).

In this case, RFRA must be read in conjunction with treaties and trust obligations because Plaintiff-Appellants are Apache citizens, whose ancestral lands included Oak Flat before the United States' existence. The Apache and the United States entered the Treaty with the Apache, signed at Santa Fe on July 1, 1852 (commonly referred to as the "Treaty of Santa Fe"), where the government promised to, among other things, "pass and execute laws conducive to [the Apaches'] prosperity and happiness." Compl. at 10; Treaty with the Apache, 10 Stat. 979 (1852). All three branches of the United States government recognize a trust duty encompassing protection of Native American religious and cultural sites and limiting the federal government's "use and alienation of its own land. . . ." *Apache Stronghold*, 95 F.4th at 663 (Nelson, J., concurring). The trust duty undergirds the treaty language. Both Congress and the Executive Branch have established clear standards for government action when federal land policies burden land-based religions.

The American Indian Religious Freedom Act (AIRFA) acknowledges the federal trust duty "protect[s] and preserv[es] for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian . . . including, but not limited to access to sites, use and

20

possession of sacred objects, and the freedom to worship through ceremonials and traditional rites." 42 U.S.C. § 1996. Article 25 of the United Nations Declaration on the Rights of Indigenous Peoples, endorsed by the United States in 2010, explicitly recognizes the rights of Indigenous peoples to "maintain and strengthen their distinctive spiritual relationship with their traditionally owned or otherwise occupied and used lands. . . ." G.A. Res. 61/295 (Sep. 13, 2007).

Executive Orders, including Exec. Order No. 13007 (promulgated in May 1996), clarify the federal government's responsibilities in managing its resources, including facilitating Native Americans' access and ceremonial use of sacred spaces. The Secretary of the Interior's Memorandum Opinion, *Permissible Accommodation of Sacred Sites*, 20 Op. O.L.C. 337 (1996), clarified that (1) either the trust relationship rather than the Establishment Clause applies to sacred site protection, or (2) if traditional Establishment Clause principles apply, "they must be applied in a manner that takes account of the special considerations that underlie the [trust doctrine]."

The trust relationship is not predicated on "reparations," nor does it run afoul of the Establishment Clause. *Apache Stronghold*, 95 F.4th at 699 (Van Dyke, J., concurring). Other Circuits have recognized the trust principles as necessarily prevailing over "conventional separatist understandings of the Establishment Clause," given the federal government's "constitutional role as protector of tribal

21

Native Americans." *Peyote Way Church of God, Inc. v. Thornburgh*, 922 F.2d 1210, 1217 (5th Cir. 1991) (upholding the trust duty, the Fifth Circuit noted that the federal government "cannot at once fulfill its constitutional role as protector of tribal Native Americans and apply conventional separatist understandings of the Establishment Clause to that same relationship"); *See also Cholla Ready Mix, Inc v. Civish*, 382 F. 3d 969, 975 (9th Cir. 2004) (finding no establishment clause violation because of "the secular purpose of carrying out state construction projects in a manner that does not harm a site of religious, historical, and cultural importance to several Native American groups and the nation as a whole"). The National Historic Preservation Act similarly recognizes "properties of traditional religious and cultural significance to an Indian Tribe" as eligible for listing on the National Register of Historic Places. 54 U.S.C. § 302706(a) (formerly codified at 16 U.S.C. § 470a(d)(6)(A)). Oak Flat is designated as a National Historic Place.

The trust relationship and federal Indian law's constructive canons must be considered in interpreting RFRA, evaluating the Land Transfer Act's constitutionality, and any purported abrogation of treaty rights. Contrary to the holding in *Apache Stronghold*, the trust duty and treaty rights are generally not abrogated implicitly. *Lone Wolf v. Hitchcock*, 187 U.S. 553 (1903). While the trust duty and interpretive canons do not prescribe an outcome in the case, they guide

22

the government in responsibly regulating federal public land where government action implicates rights and interests of tribes.

> e) *Like the imposition of storytime discussions in* Mahmoud*, the disposition of Oak Flat is not an internal affair*.

The Court declined to extend *Lyng* to *Mahmoud*; it distinguished the two cases by concluding that the Government's operation of public schools could not be a matter of internal affairs because "other First Amendment protections—such as the right to free speech [and] . . . to be free from established religion"— "plainly" apply in that "context," 145 S. Ct. at 2357. The same applies to the Government's disposition of Oak Flat in this case; the right to free speech and to be free of established religion plainly apply to federal lands as well. *See United States v. Grace*, 461 U.S. 171 (1983) (Free Speech Clause); *Buono v. Norton*, 371 F.3d 543 (9th Cir. 2004) (Establishment Clause). Especially considering that the Government in this case is transferring Oak Flat to a private corporation, its disposition in this case is not an "internal affair" consistent with *Lyng*.

## II. The most relevant precedent, as shown in *Mahmoud*, is *Yoder*.

Following the Supreme Court in *Mahmoud*, this court should be guided by *Yoder*. Both *Yoder* and this case involve the destruction of a group's capacity to follow its religious beliefs. *Yoder* required the state to meet an exacting standard upon showing a substantial burden on religious exercise. *Yoder*, 406 U.S. at 215.

23

Even ignoring Congressional intent for RFRA to expand protections for religious liberty, *Hobby Lobby*, 573 U.S. at 684, this Court must engage in deep analysis regarding the state interests at issue.

In *Yoder*, Wisconsin sanctioned the Amish for not complying with a state regulation that would "gravely endanger if not destroy the free exercise of [their] religious beliefs." *Yoder*, 406 U.S. at 219. Wisconsin made public school attendance compulsory, but the Amish believed that sending their children to public schools past eighth grade would "endanger their own salvation and that of their children." *Id.* at 209. The Supreme Court determined that the $5 fine imposed upon Amish families for violating the compulsory-attendance law constituted an undue burden on their free exercise of religion. *Id.* at 220, 235-36. The religious stakes are just as high in the instant case as in *Yoder*. The transfer and cratering of *Chí'chil Biłdagoteel* will completely prohibit Plaintiff-Appellants' religious practices. Furthermore, as mentioned above, the stakes in the instant case span past and present generations, with the religious connection binding Plaintiff-Appellants to *Chí'chil Biłdagoteel*, and generations of other Apache women at risk of being permanently lost.

In *Apache Stronghold* the en banc majority reached the opposite conclusion, determining that Apache Stronghold's members do not receive the same protections the Supreme Court afforded the Amish in *Yoder*. *Apache Stronghold*,

24

95 F.4th at 639 (Bea, J., concurring in part). According to the en banc majority, the destruction of *Chi'chil Bildagoteel* and the functional prohibition of religious practices tied to Oak Flat's physical location do not constitute an undue burden on their free exercise of religion. *Id.* at 622. They reached that conclusion without confronting the requirement in *Yoder*. The reduction of Oak Flat to a 1,100-foot deep open pit copper mine will destroy the free exercise of Plaintiff-Appellant's religious practices. *See Id.* at 618. Under the en banc majority's interpretation of precedent, Apache women and girls cannot receive RFRA protections because their sacred site, following a legacy of State-sponsored oppression, now sits on federal land. Justice Gorsuch, in his dissent in *Apache Stronghold*, 605 U. S.__, 145 S. Ct. 1480, detailed the sordid history of displacement and the retreat from promises of protection to processes of removal.

A.    **By discriminatorily withholding protections for Plaintiff-Appellants' and other Native American sacred sites, this Court's standard violates the spirit of the free exercise clause, the establishment clause, and the equal protection clause.**

The history of the United States government's treatment of American Indian religions is "to use a word that dramatically understates the proposition, fraught." William A. Fletcher, *Protection for Indian Sacred Sites,* 97 Wash. L. Rev. 703, 704 (2022). By failing to acknowledge any legally cognizable claims related to federal

25

land use, even in the context of the trust relationship, the test developed by the en banc majority continues to discriminately withhold protections for Native American sacred sites. This standard contravenes the spirit of the Free Exercise Clause, the Establishment Clause, and the Equal Protection Clause. *See* Bernadette Meyler, *The Equal Protection of Free Exercise: Two Approaches and Their History*, 47 B.C. L. Rev 275 (2006). Underscoring the relationship of equal protection to the free exercise clause, Justice O'Connor recognized equal protection of diverse religions as a fundamental Constitutional protection: "Precisely because of the religious diversity that is our national heritage, the Founders added to the Constitution a Bill of Rights, the very first words of which declare: 'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.'" These words today "are recognized as guaranteeing religious liberty and equality to 'the infidel, the atheist, or the adherent of a non-Christian faith'. . . ." *Cnty. of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 589-90 (1989). A standard that disproportionately harms Native American religious practices does not provide equal protection to religious exercise.

The discriminatory nature of this standard for religious protection as applied to Native Americans is further underscored by the increasing signals from the Supreme Court that RFRA and the Free Exercise Clause must be broadly

26

interpreted to provide expansive protections against substantial burdens on majority religious groups. *See, e.g.*, *Hobby Lobby*; *Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. 522 (2021); *Carson as next friend of O. C. v. Makin*, 596 U.S. 767 (2022); *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022); *Mahmoud*. The en banc majority's test would permit practitioners of certain religions to meet the substantial burden threshold and categorically foreclose others – no matter how substantial the burden, including the complete and irrevocable destruction of their most sacred site. "Whatever may be the exact line between unconstitutional prohibitions on the free exercise of religion and the legitimate conduct by government of its own affairs," the destruction of Oak Flat will prohibit the free exercise of religion for Plaintiff-Appellants. *Lyng*, 485 U.S. at 451. The government is not permitted to prefer one religion over others; the Free Exercise Clause, the Establishment Clause, and RFRA cannot allow this.

This prohibition, coupled with the Supreme Court's recent extension of free exercise protections to parents from religious majorities objecting to schoolbooks, means that the effect of a decision foreclosing any relief to Plaintiff-Appellants, no matter how great the burden or how uncompelling the governmental interest, would do precisely that: subordinate Native American religious exercise. Protecting the religious exercise in *Mahmoud* while simultaneously denying these

same protections to Native Americans would discriminate against Native American religious practitioners and further violate the equal protection of religious exercise.

III. **Recognizing that Plaintiff-Appellants in this case face a substantial burden to religious exercise does not foreclose government action related to its lands.**

Granting the plaintiffs relief so that Native American religious sites receive equal protection under the law would not endlessly encumber the federal government or prevent government regulation of its own lands. Contrary to concerns, recognizing that federal land use can sometimes substantially burden religious practices will not provide the equivalent of an individual veto over government action or "religious servitude." *Apache Stronghold*, 95 F.4th at 622. This is a false cognate. There is no need for a "federal private property" exception because a showing of substantial burden is merely a threshold question. Barclay & Steele, supra, at 1349. The federal government can overcome this burden by justifying its actions with a compelling government interest and a narrowly tailored approach. *Prince v. Massachusetts*, 321 U.S. 158 (1944), (upholding the state's right to force inoculation over parents' religious objections because of the state's overriding interest in health and safety.) Clearly, "[t]he compelling interest test has not proven fatal to the government." *Apache Stronghold*, 95 F.4th at fn.16 (Murguia, C.J., dissenting) (referencing *Yellowbear*, 741 F.3d at 62 (Gorsuch, J)).

28

RFRA permits the government to act even when its action may impact religious exercise, so long as it can articulate a compelling interest in doing so.

**A.    RFRA conditions Congressional power to manage its real property.**

The en banc majority's "real property" exception in *Apache Stronghold* ignores precedent and wrongfully curtails Congress's ability to restrict the government's disposal of its real property. As Justice Gorsuch notes in his dissent, Congress has a long history of exercising control over the government's use of its real property. Congressional control over the government's real property is multifaceted, encompassing the government's ability to both develop and sell said property. Congressional control over the government's real property is also wide-reaching and functions independently of the government's financial interests. To ensure compliance with the Endangered Species Act, for example, Congress ordered construction halted on a virtually completed federal dam, regardless of the federal government's investment equivalent to nearly half a billion dollars into the dam's construction. *Apache Stronghold*, 605 U. S.__, 145 S. Ct. at 1487 (Gorsuch, J., dissenting from denial of certiorari). As with Congress's enforcement of the Endangered Species Act, any potential monetary gain realized from the transfer of Oak Flat to Resolution Copper must come second to enforcement of federal law, including RFRA.

29

Congressional power to restrict the government's sale of its real property is also evident in its establishment of the Base Realignment and Closure (BRAC) process. Since 1977, Congress has exercised its power to limit the executive branch from closing or realigning major military installations. Andrew Tilghman, Cong. Rsch. Serv., R48547, *Excess Military Infrastructure and the Base Realignment and Closure (BRAC) Process* 1 (May 27, 2025). The statute, later codified at 10 U.S.C. § 2687 (Section 612 of the Military Construction Authorization Act of 1978, Pub. L. 95-82, 91 Stat. 358 (1977)), generally required the Department of Defensive (DOD) to conduct comprehensive and lengthy assessments of major basing decisions as part of a congressional report-and-wait process." *Id.* Through BRAC, Congress granted temporary authority to an independent commission for the review and approval of basing changes recommended by the Secretary of Defense. Even when the independent commission's recommendations were accepted and forwarded to Congress by the President, Congress retained the ability to entirely reject recommendations for the government to divest itself of this property, and to prevent the closure or realignment of military installations. Just as Congress has the power to prevent the government from divesting itself of its real property through BRAC, Congress also retains the power to prevent the government's transfer of Oak Flat to Resolution

30

Copper when a transfer would result in a permanent and irreparable violation of RFRA.

This power of Congress is further evidenced by the Federal Assets Sale and Transfer Act of 2016 (FASTA), Pub. L. No. 114-287, 130 Stat. 1463 (2016). Congress sought to address long-standing obstacles to the timely disposal of unneeded federal buildings, land, and structures. Garrett Hatch, Cong. Rsch. Serv., R47308, *The Federal Assets Sale and Transfer Act: Background and Implementation* 1 (Nov. 16, 2022). Through FASTA, Congress formed a Public Buildings Reform Board (PBRB) tasked with recommending unneeded real property for disposal. Members of the PBRB are nominated by the President and approved by the Senate. Furthermore, while FASTA applies to all federal executive branch agencies and wholly owned government corporations, Section 3 of FASTA excludes several categories of properties, including properties controlled by American Indian and Native Alaskan tribes. *Id.* at 1-2. FASTA provides yet another example of 1) Congress' history of restricting the government's power to dispose of its real property and 2) Congress' history of acknowledging that lands used by American Indian and Native Alaskan tribes require additional protections, particularly when the government seeks to divest itself of property integral to preserving American Indians' and Native Alaskan's cultural heritage, such as Oak Flat.

In his concurring majority opinion in *Apache Stronghold,* Judge VanDyke emphasized that "characterizing something as a 'burden' under RFRA that has never before been considered a cognizable burden . . . [is] a job for Congress, not the courts." 101 F.4th at 1119. We agree. While outside of the specific RFRA context, Congress' actions in BRAC and FASTA showcase how Congress has already taken steps to constrain the government's usage of its real property when said usage collides with an interest Congress has characterized as superior. RFRA and the Land Exchange Act require the Secretary of Agriculture to "engage in government-to-government consultation with affected Indian tribes" to address concerns "related to the land exchange" and mitigate any possible "adverse effects on the affected Indian tribes," Congress has thus demonstrated its acknowledgement of potential "cognizable burdens" faced by vulnerable Native American religious practitioners and its desire to prevent such burdens. 16 U.S.C. § 539p(c)(3)(A)-(B). Congress has repeatedly recognized the potential for unconstitutional burdens on Native American land-based religious practice, and its acts intended to mitigate those burdens should be accorded full import and effect.

## Conclusion

For the foregoing reasons, amici respectfully urge this court to reverse the district court's denial of Plaintiff-Appellants' motion for preliminary injunction.

September 15, 2025

Respectfully submitted,

Heather D. Whiteman Runs Him
*Counsel of Record*
Tribal Justice Clinic
Rogers College of Law
University of Arizona
1145 N. Mountain Avenue
P.O. Box 210176
Tucson, AZ 85721
(520) 626-9762
whitemanrunshim@arizona.edu

/s/ Gerald Torres
Gerald Torres (D.C. Bar No. 965590)
Yale Law School
127 Wall Street
New Haven, CT 06511
(203) 432-4958
gerald.torres@yale.edu

*Counsel for Amici Curiae*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 25-5197

I am the attorney or self-represented party.

**This brief contains** 6,998 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Heather D. Whiteman Runs Him **Date** 9/15/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*

## STATEMENT OF THE PARTIES' CONSENT

In accordance with Fed. R. App. P. 29(a)(2), counsel reports that all parties

have given consent to the filing of this amicus brief.


/s/ *Heather Whiteman Runs Him*
Heather Whiteman Runs Him

Dated:  September 15, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2025, the foregoing amicus brief was filed electronically with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit through the Court's ACMS system. I certify that all participants in the case who are registered ACMS users will be served by the appellate ACMS system and that a PDF copy of this brief will be emailed to all parties' counsel immediately after it is filed.

/s/ *Heather Whiteman Runs Him*
Heather Whiteman Runs Him

Dated:  September 15, 2025