No. 25-5197

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

GOUYEN BROWN LOPEZ, ET AL.,
*Plaintiffs-Appellants*,

v.

UNITED STATES OF AMERICA, ET AL.,
*Defendants-Appellees*,

and

RESOLUTION COPPER MINING, LLC,
*Intervenor-Defendant-Appellee*.

On Appeal from the United States District Court
For the District of Arizona
No. 2:25-cv-02758-DWL
Hon. Dominic W. Lanza

**BRIEF OF THE LIPAN NATIVE AMERICAN CHURCH
AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLANTS**

Steven T. Collis
*Counsel of Record*
John Greil
Law & Religion Clinic
University of Texas School of Law
727 E. Dean Keeton St.
Austin, TX 78705
512-475-9090
Steven.Collis@law.utexas.edu
John.Greil@law.utexas.edu

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

*Amicus* certifies under Rule 26.1 of the Federal Rules of Appellate Procedure that it is not a subsidiary or affiliate of any publicly owned corporation, and that it does not issue shares of stock.

Dated: September 15, 2025

_____/s/ Steven T. Collis_____
Steven T. Collis
Attorney for *Amicus Curiae*
Lipan Native American Church

**TABLE OF CONTENTS**

RULE 26.1 CORPORATE DISCLOSURE STATEMENT........................................i

TABLE OF AUTHORITIES ................................................................... iii

INTEREST OF AMICUS CURIAE..........................................................1

SUMMARY OF ARGUMENT ................................................................2

ARGUMENT ......................................................................................4

    I. Circuit precedent compels government agencies to "actually consider" and then use workable alternatives under NEPA. ........................................4

        A. Forcing the government to investigate alternatives ensures that the government will consider and use the best alternatives. ..................................4

        B. Post hoc justifications undermine the statutory duties to investigate and explain. ................................................................................6

    II. The government failed to rigorously explore and objectively evaluate all reasonable alternatives before adopting the Land Transfer Act and thus failed to comply with NEPA. ........................................................................7

    III. The Free Exercise Clause and RFRA require the government to prove that no less religiously restrictive means exists to further a compelling government interest.................................................................................12

        A. Both the Free Exercise Clause and RFRA place the duty on the government to show that it is using the least religiously restrictive means to accomplish a compelling government interest. ...............................................12

        B. Under the Free Exercise Clause and RFRA, if "the government can achieve its interest in a manner that does not burden religion, it must do so." 13

CONCLUSION ...................................................................................14

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Apache Stronghold v. United States*,
  519 F. Supp. 3d 591 (D. Ariz. 2021)....................................................................7

*Apache Stronghold v. United States*,
  101 F.4th 1036 (9th Cir. 2024) (en banc) .........................................................7

*Burlington Truck Lines, Inc. v. United States*,
  371 U.S. 156 (1962) ............................................................................................2

*Burwell v. Hobby Lobby Stores, Inc.*,
  573 U.S. 682 (2014)..........................................................................................14

*Center for Biological Diversity v. BLM*,
  141 F.4th 976 (9th Cir. 2025) ...........................................................................6

*Citizens to Preserve Overton Park v. Volpe*,
  401 U.S. 402 (1971) ...........................................................................................5

*City of Carmel–by–the–Sea v. U.S. Dep't of Transp.*,
  123 F.3d 1142 (9th Cir. 1997).........................................................................11

*Friends of Yosemite Valley v. Kempthorne*,
  520 F. 3d 1024 (9th Cir. 2008).........................................................................6

*Fulton v. City of Philadelphia*,
  593 U.S. 522 (2021) ......................................................................................3, 13

*Holt v. Hobbs*,
  574 U.S. 352 (2015) .....................................................................................12, 13

*Kennedy v. Bremerton Sch. Dist.*,
  597 U.S. 507 (2022) .....................................................................................12, 14

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut.*
  *Auto. Ins. Co.*, 463 U.S. 29 (1983) ..................................................................5

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
  177 F.3d 800 (9th Cir. 1999)..........................................................................3, 9

*Ramirez v. Collier*,
  595 U.S. 411 (2022) .........................................................................................12

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) ...........................................................................................6

*Sec. & Exch. Comm'n v. Chenery Corp.*,
  318 U.S. 80 (1943) .............................................................................................5

*Warsoldier v. Woodford*,
  418 F.3d 989 (9th Cir. 2005) ...........................................................................13

iii

*Watson v. City of Memphis*,
    373 U.S. 526 (1963) ...................................................................................14

**Statutes**

42 U.S.C. § 4332(2)(C) ....................................................................4, 5, 6, 7, 11
Pub. L. No. 113-291, § 3003, 128 Stat. 3732, 3741 ...................................8

**Regulations**

40 C.F.R. § 1502.14.................................................................................6, 7

**Other**

Robert L. Glicksman & Jarryd Page, *Adaptive Management and NEPA: How to
    Reconcile Predictive Assessment in the Face of Uncertainty with Natural
    Resource Management Flexibility and Success*, 46 Harv. Envtl. L. Rev. 121
    (2022) ...................................................................................................4
Letter from Rich Gonzales (Vice Chairman of the Advisory Council on Historic
    Preservation) to Secretary of Agriculture Tom Vilsack (March 29, 2021)...........11

## INTEREST OF AMICUS CURIAE[1]

The Lipan Native American Church teaches Christianity and traditional indigenous beliefs, with membership largely based in the American southwest. It is committed to religious freedom for all, but has a particular interest in the protection of indigenous sacred sites and the proper development of the law regarding governmental duties to investigate alternatives to destructive actions.

---

[1] Fed. R. App. P. 29 Statement: No counsel for either party authored this brief in whole or in part. No person or entity other than *amici* made a monetary contribution to its preparation or submission. Pursuant to Ninth Circuit Local Rule 29-2(a), and Fed. R. App. P. 29(a)(2) and 29(a)(4)(E), all parties have consented to the filing of this brief.

## SUMMARY OF ARGUMENT

Plaintiffs-Appellants ably explain why permanently destroying Oak Flat is in clear violation of the National Environmental Policy Act (NEPA) and the National Historic Preservation Act (NHPA) because the government failed to consider less destructive alternatives. Amicus writes to emphasize three points: first, NEPA requires a genuine search for less destructive alternatives, framed with precision; second, the Forest Service failed that duty by rejecting feasible, less harmful methods on cost grounds; third, the Forest Service *a fortiori* failed to satisfy the significantly more stringent strict scrutiny test under the Free Exercise Clause and the Religious Freedom Restoration Act (RFRA).

**I.** One of the most fundamental principles of administrative law is that "courts may not accept appellate counsel's *post hoc* rationalizations for agency action." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). A corollary of that principle is that government at the agency stage must frame its interest with precision. Together, those requirements ensure that agencies clearly define what they seek to accomplish, weigh the full range of reasonable options, and give courts and the public confidence that decisions rest on evidence and principle rather than litigation convenience.

**II.** The present case illustrates the necessity for actual investigation prior to litigation of less-restrictive alternatives. The Forest Service's 2021 Environmental

Impact Statement (EIS) identified multiple means of extracting copper in a less environmentally destructive way. This shows that government investigations can *identify* less destructive alternatives. But the final EIS rejected those alternatives merely because they involved "higher operational costs." In short, the government failed to investigate less restrictive means with the goal of minimizing adverse effects to the environment; it was looking only to maximize industrial convenience. That type of misguided investigation does not meet the demands of NEPA. *See Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 808 (9th Cir. 1999) (Forest Service did not minimize adverse effects where it dismissed alternative as "too expensive and impractical").

**III.** The Free Exercise Clause and RFRA impose an even higher burden: the government must prove that its policy is the least restrictive means of furthering a compelling interest. Under that test, "so long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton v. City of Philadelphia*, 593 U.S. 522, 541 (2021). This too requires that the government rigorously explore alternative means of achieving its interests prior to litigation. And so under RFRA and the Free Exercise Clause, the government cannot meet its burden.

## ARGUMENT

**I. Circuit precedent compels government agencies to "actually consider" and then use workable alternatives under NEPA.**

    **A. Forcing the government to investigate alternatives ensures that the government will consider and use the best alternatives.**

NEPA requires agencies to produce "a detailed statement by the responsible official" that lists "a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impact of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal." 42 U.S.C. § 4332(C)(iii). The statute front-loads the alternatives requirement, "forc[ing] agencies to predict (and consider ways to avoid) the adverse environmental impacts of actions *before committing to them*." Robert L. Glicksman & Jarryd Page, *Adaptive Management and NEPA: How to Reconcile Predictive Assessment in the Face of Uncertainty with Natural Resource Management Flexibility and Success*, 46 Harv. Envtl. L. Rev. 121, 121 (2022).

The alternatives requirement must precede litigation. Once litigation ensues, government actors' motivations shift. Even if the burden is placed upon them to show that less restrictive measures do not exist, their goal—or, more accurately, the goal of their attorneys—is no longer to explore alternatives. Their goal becomes to show why any conceivable alternative will not work. The regulators and experts who

have knowledge about what is possible shift their attention from imagining how something *can* work to helping their lawyers argue why it *cannot*.

This is the basic human psychology that underlies numerous administrative law doctrines. Under *Chenery I*, agency action "cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its actions can be sustained." *Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 95 (1943). "Hard look" review ensures agencies adequately consider and publicly disclose the environmental effects of their actions. *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971). And agency action is "arbitrary and capricious if the agency … entirely failed to consider an important aspect of the problem." *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Together, these doctrines force *ex ante* deliberation by requiring contemporaneous, transparent reasoning and by foreclosing *post hoc*, litigation-driven rationalizations.

Placing the burden on the government to hunt for "a reasonable range of alternatives" prior to implementing the agency action helps avoid serious hazards. 42 U.S.C. § 4332(C)(iii). At the agency stage, government actors are incentivized to avoid litigation, not to win it. They will spend their time and resources talking over the interest the government is trying to achieve, discussing concerns with affected parties, and then working with experts (if necessary) to find and use plausible

alternatives. That is exactly what NEPA envisions: without a reasonably complete discussion of possible mitigation, "neither the agency nor other interested groups and individuals can properly evaluate the severity of the adverse effects." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989).

### B. Post hoc justifications undermine the statutory duties to investigate and explain.

NEPA places the duty on *agencies* to produce "a detailed statement…[with] a reasonable range of alternatives." 42 U.S.C. § 4332(C)(iii). But when government never adequately investigates alternatives, then waits until litigation to argue that no alternatives exist, it shifts that statutory burden to challengers of the agency action.

That approach undermines the plain text and logic of the statute. It also contradicts this Court's rulings in *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024 (9th Cir. 2008) and *Center for Biological Diversity v. BLM*, 141 F.4th 976 (9th Cir. 2025).

In *Kempthorne*, this Court reiterated that the "existence of a viable but unexamined alternative renders an environmental impact statement inadequate." *Kempthorne*, 520 F.3d at 1038 (quoting *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison,* 67 F.3d 723, 729 (9th Cir. 1995)). Indeed, completion of a reasonable-alternative analysis is the "'heart' of the EIS." *Ctr. for Biological Diversity*, 141 F.4th at 990 (9th Cir. 2025) (citing 40 C.F.R. § 1502.14).

6

**II. The government failed to rigorously explore and objectively evaluate all reasonable alternatives before adopting the Land Transfer Act and thus failed to comply with NEPA.**

This case shows exactly why NEPA requires "rigorous" exploration and "objective[]" evaluation of alternatives. *See* 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.14.

Under its current proposal, Resolution Copper intends to use "panel caving" to extract copper ore from beneath Oak Flat, which will cause the land to be "all but destroyed." *See Apache Stronghold v. United States*, 519 F. Supp. 3d 591, 606 (D. Ariz. 2021). Panel caving involves the fracturing of ore using explosives, followed by removal of the ore from beneath. U.S. Forest Serv., Resolution Copper Project and Land Exchange Environmental Impact Statement: Draft Alternatives Evaluation Report 4 (2017) [hereinafter 2017 Draft]. In the case of Oak Flat, use of this technique is expected to cause land subsidence (collapse) to a depth of up to 1,100 feet over approximately 1,750 acres. *Id*. Oak Flat will no longer exist; "[i]t is undisputed that this subsidence will destroy the Apaches' historical place of worship, preventing them from ever again engaging in religious exercise at their sacred site." *Apache Stronghold v. United States*, 101 F.4th 1036, 1129 (9th Cir. 2024) (en banc) (Murguia, C.J., dissenting), *cert. denied*, 145 S. Ct. 1480 (2025).

However, surface-destructive panel caving is far from the only option available to Resolution Copper. The statute authorizing the land transfer was passed

in 2014. Pub. L. No. 113-291, § 3003, 128 Stat. 3732, 3741. The Forest Service's own environmental impact statements, from multiple years, present several other mining techniques that Resolution Copper could use to extract copper—techniques the Forest Service acknowledged "could substantially reduce impacts on surface resources." EIS at F-4.

Specifically, the EIS details various "stoping," or underground mining techniques, of which Resolution Copper (a sophisticated mining operation) could avail itself and preserve the sacred religious site *while* profitably extracting the copper. Stoping involves tunneling underground to carve out "stopes" (underground excavations or rooms) and extract ore. 2017 Draft at 10. The EIS discusses naturally supported stoping methods such as "open stoping," where the excavation is naturally supported, and "open stoping with pillars," where the excavation leaves pillars of ore in place to prevent collapse. EIS at F-3; see 2017 Draft at 10–11 (providing descriptions of alternative mining techniques). Other stoping options discussed include artificially supported stoping methods such as "cut-and-fill stoping" (where tailings of waste rock are used to support the excavation) and "shrinkage stoping" (where fractured ore is left in the stope during the mining process to provide support). EIS at F-3; 2017 Draft at 10–11.

In each case, the stopes would be backfilled with waste tailings once the copper ore is extracted. 2017 Draft at 11. Naturally supported stopes and artificially

supported stopes "do not generally cause subsidence," especially if they are backfilled. *See id*. And the EIS concedes that "several underground stoping techniques could physically and technically be applied to the deposit." EIS at F-5. In short, the government could ensure preservation of a crucial and sacred religious site by directing Resolution Copper to proceed with an alternative mining technique.

However, the government failed to rigorously investigate these alternatives; it rejected them because of the costs involved in implementing them. Although the EIS claims the government is not prioritizing "profitability over environmental protection," the EIS's analysis rests on an economic feasibility assessment of economic conditions like price, administrative costs, and taxes. *Id.* at 47. The EIS states that "[w]hile there are other underground stoping techniques that could physically be applied to the Resolution copper deposit, each of the alternative underground mining methods assessed was found to have higher operational costs than panel caving." *Id.* at F-3 (emphasis added). It says that while other techniques "could substantially reduce impacts on surface resources," a more surface protective method would reduce the amount of "ore that could be profitably mined." *Id.* at F-3–F-4 (emphasis added). Rejecting these alternatives on the sole basis of cost without more rigorous investigation fails to satisfy NEPA's obligations. *See Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 809 (9th Cir. 1999)

9

(holding that documenting a historic trail was inadequate mitigation where the Forest Service rejected an alternative as "too expensive and impractical to monitor").

The EIS's "not economically feasible" conclusion rests on an admitted unknown. The 2017 Draft EIS conceded that "It cannot easily be known what COG [*i.e.* cutoff grade] would be required to break even on mining a ton of ore if the cut-and-fill technique were hypothetically mandated for the Resolution Copper Project." 2017 Draft at 16. The final EIS never cured this defect—the final EIS still *does not know* what the COG for the deposit actually is. Except now, the agency relies on Resolution Copper's say-so. June 2025 Final EIS at F-3 ("The current cutoff grade *as proposed by Resolution Copper* is a greater-than-1-percent copper shell, which would result in the greatest potential volume of ore from within the deposit that can be profitably mined.") (emphasis added). Without identifying the mine's *actual* COG or the alternatives' COG (or modeling it against price, recoveries, backfilling costs, sequencing, and hybrid designs), the agency lacked the predicates needed to deem the alternatives "not economically feasible."

The EIS also improperly equates "economic feasibility" with Resolution Copper's preferred plan to maximize extraction and profit. But NEPA requires agencies to study a "reasonable range of alternatives…that are technically and economically *feasible*" not maximally profitable. 42 U.S.C. § 4332(C)(iii) (emphasis added). A "reasonableness" inquiry does not ask whether an alternative preserves

10

the proponent's best-case financial forecast; it asks whether the alternative meets the project's purpose and need while reducing harm. An alternative can be "reasonable" and "economically feasible" even if it yields fewer tons or higher costs, especially where (as the EIS admits) it could substantially reduce subsidence and enable underground backfilling. By treating any material reduction in ore recovery as "not economically feasible," the agency improperly rewrote the statutory text. *See City of Carmel–by–the–Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997) (agency may not "define its objectives in unreasonably narrow terms").

Finally, to underscore those flaws, a separate and independent federal agency even acknowledged that the government here failed to adequately investigate and use less-destructive alternatives. The Advisory Council on Historic Preservation, in a letter to the Secretary of Agriculture, advised that the government needed to "reassess[] alternative and more sustainable mining techniques in an effort to prevent subsistence at Oak Flat." Letter from Rich Gonzales (Vice Chairman of the Advisory Council on Historic Preservation) to Secretary of Agriculture 17 Tom Vilsack (March 29, 2021), at 7. This included revisiting the alternatives the government failed to properly investigate in the first instance. *Id.* But the Final EIS does not remedy these deficiencies, just as it fails to identify necessary variables concerning economic feasibility.

11

**III. The Free Exercise Clause and RFRA require the government to prove that no less religiously restrictive means exists to further a compelling government interest.**

  **A. Both the Free Exercise Clause and RFRA place the duty on the government to show that it is using the least religiously restrictive means to accomplish a compelling government interest.**

Just as NEPA requires the government to investigate alternatives and forbids the government from relying on *post hoc* litigation justifications, so too do the Free Exercise Clause and RFRA. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 n.8 (2022) (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)) ("Government 'justification[s]' for interfering with First Amendment rights 'must be genuine, not hypothesized or invented post hoc in response to litigation.'").

Under the compelling interest test, once the plaintiffs have demonstrated a burden on their religious exercise, "the burden flips and the government must 'demonstrate[] that imposition of the burden on that person' is the least restrictive means of furthering a compelling governmental interest." *Ramirez v. Collier*, 595 U.S. 411, 425 (2022). And unlike some administrative law frameworks, courts applying strict scrutiny are forbidden from granting "unquestioning deference" to the government agency. *Holt v. Hobbs*, 574 U.S. 352, 364 (2015). Strict scrutiny "requires [an agency] not merely to explain why it [chose its method] but to prove that [the method] is the least restrictive means of furthering a compelling government interest." *Id.*

Similarly, this Court has recognized that the government's burden to prove it used the least restrictive means logically entails a requirement that the government investigate those other potential means. As this Court has described the test, to satisfy the least restrictive means requirement, the government must have "*actually considered* and rejected the efficacy of less restrictive measures before adopting the challenged practice." *Warsoldier v. Woodford*, 418 F.3d 989, 999 (9th Cir. 2005) (emphasis added).

### B. Under the Free Exercise Clause and RFRA, if "the government can achieve its interest in a manner that does not burden religion, it must do so."

The Forest Service does not plausibly demonstrate that the alternative mining methods are not "economically feasible" under NEPA. *See* Section II, *supra*. For the same reasons, it does not even come close to satisfying the much higher bar for strict scrutiny under the Free Exercise Clause and RFRA.

Once strict scrutiny applies, "so long as the government can achieve its interests in a manner that does not burden religion, it *must do so*." *Fulton v. City of Philadelphia*, 593 U.S. 522, 541 (2021) (emphasis added). "[I]f a less restrictive means is available for the Government to achieve its goals, the Government *must use it*." *Holt*, 574 U.S. at 365 (emphasis added). This is not a judgment of policy

13

preferences, or judicial balancing, but a bright-line rule repeatedly laid down by the Supreme Court.

Moreover, the reasons the agency rejected the alternative at the time must be the reasons it stands on in court. *See Kennedy*, 597 U.S. at 543 n.8. But increased operating costs and reduced profitability are hardly compelling interests. "[C]onstitutional rights cannot be made dependent upon any theory that it is less expensive to deny than to afford them." *Watson v. City of Memphis*, 373 U.S. 526, 537 (1963). And the Supreme Court has specifically noted that RFRA "may require the Government to expend additional funds to accommodate citizens' religious beliefs." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 730 (2014).

Whether under the compelling-interest prong, the least-restrictive-means requirement, or both, the Forest Service's permanent destruction of Oak Flat fails strict scrutiny.

## CONCLUSION

For the foregoing reasons, as well as those presented by Plaintiffs-Appellants, this Court should enjoin the transfer and destruction of Oak Flat and grant the injunction pending appeal.

Dated: September 15, 2025        Respectfully submitted,

/s/ Steven T. Collis
Steven T. Collis
   *Counsel of Record*
John Greil
Law & Religion Clinic
University of Texas
   School of Law
727 E. Dean Keeton St.
Austin, TX 78705
512-475-9090
Steven.Collis@law.utexas.edu
John.Greil@law.utexas.edu
*Attorneys for Amicus Curiae*
*Lipan Native American Church*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this *amicus* brief complies with Federal Rule of Appellate Procedure 29(a)(5) and 9th Circuit Rule 32-3(2) as it contains 2,994 words, excluding the portions exempted by Federal Rule of Appellate Procedure 32(f).

The brief's type size and type face comply with Federal Rule of Appellate Procedure 32(a)(5) and (6) because it was prepared in 14-point Times New Roman, a proportionally spaced font.

Dated: September 15, 2025                    /s/ Steven T. Collis
                                            Steven T. Collis

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system on September 15, 2025. I further certify that service was accomplished on all parties via the Court's ACMS system.

Dated: September 15, 2025                    /s/ Steven T. Collis
                                             Steven T. Collis