Case No. 25-5189

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

SAN CARLOS APACHE TRIBE,

*Appellant,*

v.

UNITED STATES FOREST SERVICE *et al.*,

*Appellees,*

and

RESOLUTION COPPER MINING, LLC,

*Intervenor-Appellee.*

On Appeal from the United States District Court
for the District of Arizona
Hon. Dominic W. Lanza | Case No. 2:21-cv-00068-DWL

## BRIEF OF *AMICI CURIAE* NATIONAL CONGRESS OF AMERICAN INDIANS AND NATIONAL ASSOCIATION OF TRIBAL HISTORIC PRESERVATION OFFICERS IN SUPPORT OF APPELLANT SAN CARLOS APACHE TRIBE

Wesley James Furlong
   *Counsel of Record*
NATIVE AMERICAN RIGHTS FUND
745 West 4th Avenue, Suite 502
Anchorage, AK 99501
Tel. (907) 276-0680
wfurlong@narf.org

Geoffrey C. Blackwell
NATIONAL CONGRESS OF
   AMERICAN INDIANS
1516 P Street Northwest
Washington, DC 20005
Tel. (202) 253-4846
gblackwell@ncai.org

*Counsel for* Amici Curiae *NCAI and NATHPO*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a) and 29(a)(4)(A), undersigned counsel certifies that *Amici Curiae* National Congress of American Indians and National Association of Tribal Historic Preservation Officers are non-profit corporations with no parent corporations and do not issue stock.

/s/ *Wesley James Furlong*
Wesley James Furlong
NATIVE AMERICAN RIGHTS FUND

*Counsel for* Amici Curiae *NCAI and NATHPO*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................ii

TABLE OF CONTENTS .................................................................iii

TABLE OF AUTHORITIES...............................................................iv

INTEREST OF *AMICI CURIAE*......................................................1

SUMMARY OF ARGUMENT ................................................3

ARGUMENT ........................................................................5

I.  Native American religions and cultures are land based. ................5

II. Colonial era and post-Colonial era policies dispossessing Natives Americans of their homelands have left the United States as gatekeeper to their sacred places.....................................................8

III. The history of land dispossession and loss of access to sacred places emphasizes the importance of meaningful Tribal consultation. ......................................................14

CONCLUSION ........................................................................23

CERTIFICATE OF SERVICE.................................................24

CERTIFICATE OF COMPLIANCE........................................25

# TABLE OF AUTHORITIES

**Cases**

*Apache Stronghold v. United States,*
    145 S. Ct. 1480 (2025)............................................................... 3

*Johnson v. M'Intosh,*
    21 U.S. 543 (1832).................................................................. 9

*Lyng v. Northwest Indian Cemetery Protective Association,*
    485 U.S. 439 (1988)................................................................ 8

*Peyote Way Church of God, Inc. v. Thornburgh,*
    992 F.2d 1210 (5th Cir. 1991)............................................... 20

*Pit River Tribe v. United States Forest Service,*
    469 F.3d 768 (9th Cir. 2006)................................................. 20

*Quechan Indian Tribe v. United States,*
    535 F. Supp. 2d 1072 (S.D. Cal. 2008)................................. 20

*Quechan Tribe of Fort Yuma Indian Reservation v. United States*
    *Department of Interior,*
    755 F. Supp. 2d 1104 (S.D. Cal. 2010)................................. 18

*Seminole Nation v. United States,*
    316 U.S. 286 (1942).............................................................. 15

*Solenex LLC v. Bernhardt,*
    962 F.3d 520, 522 (D.C. Cir. 2020) ..................................... 10

*Standing Rock Sioux Tribe v. United States Army Corps of Engineers,*
    985 F.3d 1032 (D.C. Cir. 2021) ........................................... 21

*United States v. Sioux Nation of Indians,*
    448 U.S. 371 (1980).............................................................. 11

iv

*Wahington v. Washington State Commercial Passenger Fishing Vessel Association*,
  443 U.S. 658 (1979) ................................................................. 9

*Washington State Department of Licensing v. Cougar Den, Inc.*,
  586 U.S. 347 (2019) ................................................................. 9

*Wyoming v. United States Department of Interior*,
  136 F. Supp. 3d 1317 (D. Wyo. 2015), *vac'd as moot sub nom.*
  *Wyoming v. Sierra Club*, No. 15-8126, 2016 WL 3853806 (10th Cir.
  July 13, 2016) ....................................................................... 21


**Treaties and Agreements**

Agreement with the Indians of the Blackfeet Indian Reservation in
  Montana, Act of June 10, 1896, 29 Stat. 353 ..................................... 10

Fort Laramie Treaty of April 29, 1868, 15 Stat. 636 .............................. 11

Treaty with the Navajo, June 1, 1868, 15 Stat. 667 ............................... 10


**Statutes**

16 U.S.C. § 539p ..................................................................... 4

25 U.S.C. § 71 ....................................................................... 9

42 U.S.C. § 1996 .................................................................... 15

54 U.S.C. § 302706 ............................................................ 4, 17, 18

54 U.S.C. § 304108 .................................................................. 15

54 U.S.C. § 306108 .............................................................. 4, 15

4 Stat. 411 (1830) .................................................................. 11

24 Stat. 388 (1887) ................................................................. 11

Pub. L. No. 83-587, 68 Stat. 718 (1954) ................................................. 12

Pub. L. No. 99-398, 100 Stat. 849 (1986) ............................................... 13

Pub. L. No. 102-575, 106 Stat. 4600 (1992) ........................................... 16

**Regulations**

36 C.F.R. § 800.1 ....................................................................................... 19

36 C.F.R. § 800.2 ........................................................................... 18, 19, 20

36 C.F.R. § 800.6 ....................................................................................... 19

**Executive Materials**

Executive Order No. 13,175, 65 Fed. Reg. 57,249 (Nov. 9, 2000)
............................................................................................... 4, 20, 21

Tribal Consultation: Memorandum for the Heads of Executive
Departments and Agencies, 74 Fed. Reg. 57,881 (Nov. 6, 2009) ....... 21

**Additional Authorities**

Brief 52 Tribal Nations and Organizations as *Amici Curiae*, *Apache
Stronghold v. United States*, 145 S. Ct. 1480 (2025) (No. 24-291),
2024 WL 5399334 ................................................................................... 7

Brief of *Amici Curiae* San Carlos Apache Tribe *et al. Apache Stronghold
v. United States*, 145 S. Ct. 1480 (2025) (No. 24-291), https://sct.narf.
org/documents/apache_stronghold_v_us/amicus_san_carlos_apache_t
ribe.pdf ................................................................................................... 3

*Bureau of Indian Affairs Records: Termination,* NAT'L ARCHIVES,
https://www.archives.gov/research/native-americans/bia/
termination ........................................................................................... 12

Carol Hardy Vincent & Laura A. Hanson, *Congressional Research Service Report No. R42346: Federal Land Ownership: Overview and Data* (Feb. 21, 2020)............................................................................ 14

Carole Goldberg, *Acknowledging the Repatriation Claims of Unacknowledged California Tribes*, 21 AM. INDIAN CULTURE & RES. J. 183 (1997)................................................................................. 9, 10

COHEN'S HANDBOOK OF FEDERAL INDIAN LAW (Nell Jessup Newton & Kevin K. Washburn, eds. 2024)................................................... 12, 19

Emma Blake, *Tribal Co-Management: A Monumental Undertaking?*, 48 ECOLOGY L.Q 249 (2021) .................................................................. 10

HILLARY HOFFMAN & MONTE MILLS, A THIRD WAY: DECOLONIZING THE LAWS OF INDIGENOUS CULTURAL PRACTICE (2020) .............................. 16

Joel West Williams & Emily deLisle, *An "Unfulfilled, Hollow Promise":* Lyng, Navajo Nation*, and the Substantial Burden on Native American Religious Practice*, 48 ECOLOGY L.Q. 809 (2021) ................. 5

Kristen A. Carpenter, *A Property Rights Approach to Sacred Sites Cases: Asserting A Place for Indians as Nonowners*, 52 UCLA L. REV. 1061 (2005)........................................................................................ 6

Kristen A. Carpenter, *Living the Sacred: Indigenous Peoples and Religious Freedom*, 134 HARV. L. REV. 2103 (2021) ....................... 6, 14

Kristen A. Carpenter et al., *In Defense of Property*, 118 YALE L.J. 1022 (2009)............................................................................................... 13

Michael D. McNally, *The Sacred and the Profaned Protection of Native American Sacred Places that have been Desecrated*, 111 CALIF. L. REV. 395 (2023) ................................................................................. 13

Monte Mills & Martin Nie, *Bridges to a New Era: A Report on the Past, Present, and Potential Future of Tribal Co-Management on Federal Public Lands*, 44 PUB. LAND & RESOURCES L. REV. 49 (2021)............ 12

NATIONAL PARK SERVICE, KEEPERS OF THE TREASURES: PROTECTING HISTORIC PROPERTIES AND CULTURAL TRADITIONS ON INDIAN LANDS (1990) ................................................................................ 13, 14, 17

NED BLACKHAWK, THE REDISCOVERY OF AMERICA (2023) .......... 8, 9, 11, 12

Stephanie Hall Barclay & Michalyn Steele, *Rethinking Protections for Indigenous Sacred Sites*, 134 HARV. L. REV. 1294 (2021) ............... 5, 8

VINE DELORIA, GOD IS RED: A NATIVE VIEW OF RELIGION (4th ed. 2023) .................................................................................... 6, 7, 8

WALTER R. ECHO-HAWK, IN THE COURTS OF THE CONQUEROR: THE 10 WORST INDIAN LAW CASES EVER DECIDED (2010) ................................. 7

Wesley James Furlong, *"Subsistence is Cultural Survival": Subsistence is Cultural Survival": Examining the Legal Framework for the Recognition and Incorporation of Traditional Cultural Landscapes within the National Historic Preservation Act*, 22 TRIBAL L.J. 51 (2023), https://digitalrepository.unm.edu/tlj/vol22/iss/4/ ............. 16, 19

## INTEREST OF *AMICI CURIAE*[1]

*Amicus Curiae* National Congress of American Indians ("NCAI"), founded in 1944 and based in Washington, D.C., is the oldest and largest national organization comprised of American Indian and Alaska Native governments and their citizens. NCAI advises and educates the public, state governments, and the federal government on a broad range of issues involving Tribal sovereignty, self-government, treaty rights, and policies affecting Tribal Nations. NCAI's primary focus is protecting the inherent sovereign legal rights of Tribal Nations through positions directed by consensus-based resolutions. These resolutions are promulgated at NCAI national conventions by the organization's entire membership. NCAI's membership is comprised of approximately 300 Tribal Nations and is renewed annually.

NCAI also serves the broad policy interests of Tribal governments by working daily to promote strong Tribal and federal Nation-to-Nation

---

[1] This brief is filed without leave of the Court because the Parties in all three consolidated appeals have consented to its filing. Fed. R. App. P. 29(a)(2). None of the Parties' counsel authored this brief in whole or in part, and no other person, including the Parties' counsel—other than *Amici Curiae*, their members, and their counsel—contributed money that was intended to fund the preparation of this brief. Fed. R. App. P. 29(a)(4)(E).

policies. This includes advancing religious and cultural rights and protecting Tribal cultural resources and sacred places.

*Amicus Curiae* National Association of Tribal Historic Preservation Officers ("NATHPO") is a national, non-profit membership organization founded in 1998. Its membership is comprised of Tribal governmental officials—primarily Tribal Historic Preservation Officers ("THPO")—who implement federal and Tribal cultural resource and historic preservation laws. NATHPO's overarching purpose is to support the preservation, maintenance, and revitalization of the cultures and traditions of Native peoples in the United States.

NATHPO monitors congressional, administrative, and state cultural resource and historic preservation and management issues that affect its members, Tribal Nations, and THPOs generally, as well as the effectiveness and implementation of federal cultural resources and historic preservation laws and policies. NATHPO advises and works with federal agencies on the management and protection and cultural and historic resources, and on their compliance with federal laws and policies. NATHPO also advises Congress on the development and

implementation of federal cultural resources and historic preservation legislation.

*Amici Curiae* NCAI and NATHPO submit this brief in solidarity with and support of the San Carlos Apache Tribe and its efforts to protect Chi'chil Biłdagoteel (Oak Flat) from total destruction.

## SUMMARY OF ARGUMENT

Chi'chil Biłdagoteel is "a sacred place of creation where the spirit world becomes physically manifest." Br. of *Amici Curiae* San Carlos Apache Tribe *et al.* at 5, *Apache Stronghold v. United States*, 145 S. Ct. 1480 (2025) (No. 24-291), https://sct.narf.org/documents/apache_stronghold_v_us/amicus_san_carlos_apache_tribe.pdf. The United States intends on transferring Chi'chil Biłdagoteel to Intervenor-Appellee Resolution Copper Mining, LLC, to construct an open-pit copper mine. "'It is undisputed' that the government's plan [to transfer Chi'chil Biłdagoteel to Resolution Copper] will permanently 'destroy the Apaches' historical place of worship, preventing them from ever again engaging in religious exercise.'" *Apache Stronghold v. United States*, 145 S. Ct. 1480, 1480 (2025) (Gorsuch, J., dissenting) (citation omitted). The transfer will also significantly impair the San Carlos Apache

Tribe's use and occupancy rights to Chi'chil Biłdagoteel, as well as its water rights.

While Congress has directed Appellee United States Forest Service ("USFS") to transfer Chi'chil Biłdagoteel, it placed conditions on the transfer. Among these conditions are requirements that the USFS "engage in government-to-government consultation with affected Indian tribes concerning issues of concern . . . related to the land exchange[,]" 16 U.S.C. § 539p(c)(3)(A); "assess the effects of the mining and related activities . . . on the cultural and archaeological resources that may be located" at Chi'chil Biłdagoteel, *id.* § 539p(c)(9)(C)(i); and "identify measures that may be taken, to the extent practicable, to minimize potential adverse impacts on those resources[.]" *Id.* § 539p(c)(9)(C)(ii). These provisions incorporate Section 106 and the Tribal consultation requirements of the National Historic Preservation Act ("NHPA"), 54 U.S.C. §§ 302706(b), 306108, as well as Executive Order No. 13,175, 65 Fed. Reg. 57,249 (Nov. 9, 2000) ("EO 13175").

Many Native American religions and cultural practices, like those of the Western Apache, are land based. Chi'chil Biłdagoteel, like so many of Native American sacred places, is located on federal lands

4

today only because of federal policies designed to systematically dispossess Tribal Nations of their homelands and territories. As a result, Tribal sacred places and religious and cultural practices are disproportionately and uniquely threatened by federal land management decisions. It is therefore imperative that these federal agencies engage in genuinely meaningful consultation with Tribal Nations when land management, planning, and permitting decisions have the potential to affect Tribal Nations' traditional territories and sacred places.

## ARGUMENT

## I.  Native American religions and cultures are land based.

Tribal Nations and Indigenous communities across the United States have their "own unique history, culture, and religious traditions." Joel West Williams & Emily deLisle, *An "Unfulfilled, Hollow Promise":* Lyng*, Navajo Nation*, and the Substantial Burden on *Native American Religious Practice*, 48 ECOLOGY L.Q. 809, 814 (2021) (footnote omitted). While it is inappropriate to generalize across all Native religions, practices, and beliefs, common elements exist. *See* Stephanie Hall Barclay & Michalyn Steele, *Rethinking Protections for*

*Indigenous Sacred Sites*, 134 HARV. L. REV. 1294, 1304 (2021). One such element is the central importance of an actual physical place to Native religions. *See* VINE DELORIA, GOD IS RED: A NATIVE VIEW OF RELIGION 110 (4th ed. 2023) ("Sacred places are the foundation of all other beliefs and practices because they represent the presence of the sacred in our lives.").

In his seminal work on Native religion, *God Is Red*, Vine Deloria, Jr., observed that Tribal Nations' traditional homelands are associated with "a multitude of stories that recount migrations, revelations, and particular historical incidences that cumulatively produced the tribe in its current condition." *Id.* For many Tribal Nations, these places form a "sacred geography" within which their religions are practiced. *Id.*; *see* Kristen A. Carpenter, *Living the Sacred: Indigenous Peoples and Religious Freedom*, 134 HARV. L. REV. 2103, 2113 (2021) [hereinafter Carpenter, *Living the Sacred*]. These places are holy and irreplaceable, and without them, "many tribal religions cannot exist." Kristen A. Carpenter, *A Property Rights Approach to Sacred Sites Cases: Asserting A Place for Indians as Nonowners*, 52 UCLA L. REV. 1061, 1068–69 (2005).

6

Sacred places may be specific sites associated with teachings and creation stories; pilgrimage routes; locations for gathering medicines, sacraments, and other plants; shrines, alters, and ruins; burial grounds and massacre sites; vision questing sites and places of prayer, meditation, and communication with the spirit world; as well as "the great American sacred centers where many spirits and divine beings live. . . . These are special places of profound power that combine many of the qualities that form the other categories all in one." WALTER R. ECHO-HAWK, IN THE COURTS OF THE CONQUEROR: THE 10 WORST INDIAN LAW CASES EVER DECIDED (2010). These places, and the plants and animals in them, are imbued with spiritual power. *See* DELORIA, *supra* at 139.

The sacredness and centrality of place is not unique to Native religions. ECHO-HAWK, *supra* at 849–50 ("[A]ll world religions have holy places."). Many of the predominate religions practices in the United States all recognize sacred, or holy, lands. *See* Br. 52 Tribal Nations and Orgs. as *Amici Curiae* at 5–6, *Apache Stronghold v. United States*, 145 S. Ct. 1480 (2025) (No. 24-291), 2024 WL 5399334, at *5–6. Yet, for many Native religions and cultures, certain religious and cultural

7

practices can only be performed as specific places and cannot be performed or observed elsewhere. *See* Barclay & Steele, *supra* at 1305; DELORIA, *supra* at 141. As Justice Brennan observed in *Lyng v. Northwest Indian Cemetery Protective Association*, "[t]he site-specific nature of Indian religious practices derives from the Native American perception that land is itself a sacred, living being." 485 U.S. 439, 461 (1988) (Brennan, J., dissenting).

## II. Colonial era and post-Colonial era policies dispossessing Natives Americans of their homelands have left the United States as gatekeeper to their sacred places.

From the earliest days of the Nation, the United States has dispossessed Tribal Nations of their homelands in numerous ways. This has included violence and forced removal, claiming land in treaties, and seizing land through executive orders and legislations. While the means to effectuate land dispossession evolved, the results remained the same: the United States's control over Tribal Nations' lands and sacred places.

The United States's early acquisitions of Tribal lands were typically effectuated through war and cessions contained in treaties. *See* NED BLACKHAWK, THE REDISCOVERY OF AMERICA 230 (2023). To justify these takings, the United States relied on the doctrine of discovery. *See*

8

*Johnson v. M'Intosh*, 21 U.S. 543 (1832). From its founding until 1924, the United States "seized hundreds of millions of acres of land from Native nations in more than three hundred treaties." BLACKHAWK, *supra* at 2–3. While treaties between Tribal Nations and the United States are considered essentially contracts between two sovereigns Nations, *see Wahington v. Wash. State Comm. Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 675 (1979), the United States often exercised unequal and coercive bargaining power in their negotiation and drafting. *See Wash. State Dep't of Licensing v. Cougar Den, Inc.*, 586 U.S. 347, 368 (2019) (Gorsuch, J. concurring).

For example, during the Treaty Era,[2] Tribal Nations in California signed eighteen treaties with the United States that removed them from their traditional homelands. Carole Goldberg, *Acknowledging the Repatriation Claims of Unacknowledged California Tribes*, 21 AM. INDIAN CULTURE & RES. J. 183, 184 (1997). By the terms of these treaties, the Tribal Nations believed they would be moved onto eight million acres of reservation lands in exchange for ceding their

---

[2] The Treaty Era began before the formation of the Union and ended in 1871 when Congress prohibited the negotiation of new treaties. *See* 25 U.S.C. § 71.

9

homelands to the United States. *Id*. at 184. But these treaties were a bait-and-switch; Congress refused to ratify the treaties, took the ceded lands, and failed to provide the Tribal Nations with their bargained-for reservations. *Id*. at 184–85.

Recognizing the threat of removal posed to their traditions, some Tribal Nations bargained in their treaties to ensure access to their most sacred places. For example, the Navajo Nation negotiated for the inclusion of Canyon de Chelly, a place of immense religious importance, to be included within its reservation. *See* Treaty with the Navajo, June 1, 1868, 15 Stat. 667; Emma Blake, *Tribal Co-Management: A Monumental Undertaking?*, 48 ECOLOGY L.Q 249, 249 (2021) (Canyon de Chelly features in Navajo creation stories, which maintain that spiritual figures and deities like Spider Woman still reside there). Likewise, the Blackfeet Nation retained the right to access the Badger-Two Medicine, the place of creation and vison questing, in an agreement ceding a portion of its reservation. *See* Agreement with the Indians of the Blackfeet Indian Reservation in Montana, Act of June 10, 1896, 29 Stat. 353; *Solenex LLC v. Bernhardt*, 962 F.3d 520, 522 (D.C. Cir. 2020)

("The [Badger-]Two Medicine Area has long held a special place in the cultural history and religious life of the Blackfeet Tribe.").

Too often, however, the United States failed to honor the promises it made in treaties. In the 1861 Fort Laramie Treaty, the Sioux Nation reserved the Black Hills for its exclusive use. Fort Laramie Treaty of April 29, 1868, 15 Stat. 636. Bowing to pressure to exploit gold discovered in this territory, the United States reneged on its promises and took the Black Hills from the Sioux Nation, breaching the treaty. *See United States v. Sioux Nation of Indians*, 448 U.S. 371 (1980).

The United States also used legislation to dispossess Tribal Nations of their land. The Indian Removal Act of 1830, for example, authorized the forced removal of Tribal Nations from the east coast to west of the Mississippi River. *See* 4 Stat. 411 (1830). The United States also adopted the allotment policy to strip Tribal Nations of the little land the retained. *See* 24 Stat. 388 (1887) ("Allotment Act"). Under the Allotment Act, reservations were broken up and "surplus lands" were conveyed to non-Indians. BLACKHAWK, *supra* at 334. This resulted in the reduction of Tribal landholdings "from 138 million acres of lands in 1887" to just "48 million acres in 1934." *Id*. Allotment, one part of the

11

United States's broader assimilation policies, sought to change Tribal Nations' relationship to their lands by shifting land from collective to private ownership. *Id.*; *see also* COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 1.08, at 77–103 (Nell Jessup Newton & Kevin K. Washburn, eds. 2024).

In the 1950s, termination policies further reduced Tribal landholdings. Termination rescinded federal recognition of Tribal Nations and ended federal trusteeship over Tribal lands. *Bureau of Indian Affairs Records: Termination,* NAT'L ARCHIVES, https://www.archives.gov/research/native-americans/bia/termination. As a result, "[t]ermination laws resulted in the loss of 1.3 million acres of Indian land." COHEN'S, *supra* § 1.10[5], at 123. For instance, after the United States allotted the Klamath Tribes' reservation, Congress passed the Klamath Termination Act. Pub. L. No. 83-587, 68 Stat. 718 (1954). Under that act, "70% of the former reservation land ended up in federal ownership." Monte Mills & Martin Nie, *Bridges to a New Era: A Report on the Past, Present, and Potential Future of Tribal Co-Management on*

*Federal Public Lands*, 44 PUB. LAND & RESOURCES L. REV. 49, 73 (2021).[3]

For Tribal Nations across the Country, removal from their traditional lands and scared places has directly impacted Tribal identity; religious, cultural, and spiritual practices; and subsistence. *See* Michael D. McNally, *The Sacred and the Profaned Protection of Native American Sacred Places that have been Desecrated*, 111 CALIF. L. REV. 395, 406 (2023). For example, in litigation involving a sacred place, Cherokee claimants explained that "'[w]hen this place is destroyed, the Cherokee people cease to exist as a people.' They may not have meant that each individual tribal member would literally die, but rather that the loss of such sacred sites would make it difficult or impossible to maintain Cherokee worldviews and lifeways." Kristen A. Carpenter et al., *In Defense of Property*, 118 YALE L.J. 1022, 1051–52 (2009).

"American Indian cultures are not expressed only on reservations . . . . The ancestral homelands of the Indian tribes cover the entire nation." NAT'L PARK SERV., KEEPERS OF THE TREASURES: PROTECTING

---

[3] The Klamath Tribes' federal recognition was restored in 1986. *See* Pub. L. No. 99-398, 100 Stat. 849 (1986).

HISTORIC PROPERTIES AND CULTURAL TRADITIONS ON INDIAN LANDS 1 (1990). Due to the federal policies of systematic dispossession, today, "[s]acred and historic places critical to the continuation of cultural traditions are often not under tribal control, but rather are owned or managed by Federal, State, [and] local governments, and other non-Indians." *Id.* In the western United States, and particularly within this Circuit,[4] much of the land taken from Tribal Nations is now managed by the federal government "as 'public lands,' including National Parks and Forests." Carpenter, *Living the Sacred*, *supra* at 2116. Despite this history of dispossession, Tribal Nations remain committed to "preserving ancestral sites and traditional use areas on lands that they no longer control[.]" NAT'L PARK SERV., *supra* at 67.

## III. The history of land dispossession and loss of access to sacred places emphasizes the importance of meaningful Tribal consultation.

Due to the federal policies of systemic dispossession discussed above, Tribal Nations and their sacred and culturally significant places

---

[4] Of the nearly 640 million acres of federal public lands, nearly 458 million acres are located within the nine states that make up this Circuit. *See* Carol Hardy Vincent & Laura A. Hanson, *Congressional Research Service Report No. R42346: Federal Land Ownership: Overview and Data* 7–8, at Table 1 (Fed. 21, 2020).

are uniquely and disproportionately threatened by the actions of land management agencies, such as the Bureau of Land Management and the USFS. As such, it is imperative that these agencies meaningfully consult with Tribal Nations when engaging in land management, planning, or permitting processes that will affect Tribal Nations' traditional territories and sacred places. This obligation not only arises from the federal government's trust responsibility[5] to Tribal Nations but is required by federal law.

The NHPA is the single most important piece of federal legislation mandating consultation with Tribal Nations about effects to their places of traditional religious and cultural significance. Section 106 of the NHPA requires federal agencies to "take into account the effects of the[ir] undertaking[s] on any historic property." 54 U.S.C. § 306108. The Advisory Council on Historic Preservation has promulgated regulations that implement Section 106. *Id.* § 304108(a). These

---

[5] The United States "has charged itself with moral obligations of the highest responsibility and trust[]" to Tribal Nations. *Seminole Nation v. United States*, 316 U.S. 286, 297 (1942). This includes a specific trust duty to protect Tribal religions. *See* 42 U.S.C. § 1996.

regulations, promulgated at 36 C.F.R. Part 800, set forth a four-step process all federal agencies must follow to comply with Section 106.[6]

When the NHPA was enacted in 1966, it largely excluded and ignored Tribal Nations and their historic and cultural values and places. HILLARY HOFFMAN & MONTE MILLS, A THIRD WAY: DECOLONIZING THE LAWS OF INDIGENOUS CULTURAL PRACTICE 89 (2020) ("As initially adopted in 1966, the NHPA was silent as to the concerns or cultural values relating to historic properties and their protection."). It was not until 1992 that Congress amended the NHPA to require federal agencies to consult with Tribal Nations. *See* Pub. L. No. 102-575, § 4006, 106 Stat. 4600, 4755–57 (1992).

Two years earlier, the National Park Service ("NPS") submitted its report, *Keepers of the Treasures*, to Congress. In it, the NPS reported that "[w]hile tribes are certainly concerned about preserving historic properties and other cultural resources on reservation lands, they are

---

[6] For a detailed discussion of the Section 106 process, *see* Wesley James Furlong, *"Subsistence is Cultural Survival": Subsistence is Cultural Survival": Examining the Legal Framework for the Recognition and Incorporation of Traditional Cultural Landscapes within the National Historic Preservation Act*, 22 TRIBAL L.J. 51, 72–84 (2023), https://digitalrepository.unm.edu/tlj/vol22/iss/4/.

often equally or even more concerned about preserving ancestral sites and traditional use areas on lands that they no longer control[.]" NAT'L PARK SERV., *supra* at 67. Importantly, the NPS observed that "[t]his concern indicates a need for tribes to be more involved in the management and planning activities of Federal agencies and State and local governments." *Id*. The NPS recommended "Federal policy should require Federal agencies . . . to ensure that Indian tribes are involved to the maximum extent feasible in decisions that affect properties of cultural importance to them." *Id*. at iv. The NPS noted that "much could be gained through more systematic tribal participation in Federal agency planning under Section[] 106[.]" *Id*. at iii.

The 1992 amendments codified these recommendations. Among other things, the 1992 amendments recognized that historic "[p]ropert[ies] of traditional religious and cultural importance to an Indian tribe or Native Hawaiian organization may be determined to be eligible for inclusion on the National Register." 54 U.S.C. § 302706(a). And, most important, the amendments required that "[i]n carrying out [their] responsibilities under section [106 of the NHPA], Federal agencies shall consult with any Indian tribe or Native Hawaiian

17

organization that attaches religious and cultural significance to propert[ies]" potentially affected by an undertaking. *Id.* § 302706(b).

The ACHP's revised regulations implementing these amendments further reflect the NPS's initial findings and attempt to address Tribal Nations' historical loss of land and access of sacred places. The regulations remind federal agencies "that frequently historic properties of religious and cultural significance are located on ancestral, aboriginal or ceded lands of Indian tribes and Native Hawaiian organizations[.]" 36 C.F.R. § 800.2(c)(2)(ii)(D). The regulations further remind agencies that the requirement to consult with Tribal Nations "applies regardless of the location of the historic property." *Id.* § 800.2(c)(2)(ii).

The NHPA's Tribal "consultation requirement is not an empty formality[.]" *Quechan Tribe of Fort Yuma Indian Res. v. U.S. Dep't of Interior*, 755 F. Supp. 2d 1104, 1108 (S.D. Cal. 2010). Instead, "Indian tribes are entitled to *special consideration* in the course of an agency's fulfillment of its consultation obligations." *Id.* at 1109 (emphasis in original). Federal agencies must provide Tribal Nations with "a reasonable opportunity to identify [their] concerns about historic properties, advise on the identification and evaluation of historic

18

properties, . . . articulate [their] views on the undertaking's effects on such properties, and participate in the resolution of adverse effects." 36 C.F.R. § 800.2(c)(2)(ii)(A).

This consultation must be initiated early in the planning process "so that a broad range of alternatives may be considered[.]" *Id.* § 800.1(c); *see also id.* § 800.6(a) (directing federal agencies "to develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects"). Over the past three decades, the NHPA's Tribal consultation requirement has empowered Tribal Nations to engage in and influence federal land management, planning, and permitting decision, and provided them with powerful tools to protect their sacred places. *See* Furlong, *supra* at 66–68.

The "special consideration" the NHPA affords Tribal Nations arises from the federal government's trust responsibility to Tribal Nations. *See generally* COHEN'S, *supra* § 6.01[4], at 353–55. The ACHP's regulations remind federal agencies that Tribal consultation in the Section 106 process must be conducted in a manner consistent with the trust responsibility, Tribal Nations' sovereignty, and the Nation-to-

19

Nation relationships between the United States and Tribal Nations. S*ee* 36 C.F.R. § 800.2(c)(2)(ii)(B)–(C).

This Court has previously held that by violating the NHPA, federal agencies "violate[] their minimum fiduciary duty to" Tribal Nations. *Pit River Tribe v. U.S. Forest Service*, 469 F.3d 768, 788 (9th Cir. 2006). More broadly, the NHPA and other "federal statutes aimed at protecting Indian cultural resources, located both on Indian land and public land, demonstrate the government's comprehensive responsibility to protect those resources[.]" *Quechan Indian Tribe v. United States*, 535 F. Supp. 2d 1072, 1109 (S.D. Cal. 2008). Indeed, the Fifth Circuit has held that the preservation of Native American culture[] . . . is fundamental to the federal government's trust relationship with tribal Native Americans." *Peyote Way Church of God, Inc. v. Thornburgh*, 992 F.2d 1210, 1216 (5th Cir. 1991).

In addition to the NHPA, EO 13175 requires federal agencies to engage in "regular and meaningful consultation and collaboration with tribal officials in the development of Federal policies that have tribal implications." Exec. Order No. 13,175, 65 Fed. Reg. at 57,249. EO 13175 is firmly rooted in the United States's trust responsibility to and

Nation-to-Nation relationships with Tribal Nations. *Id.* § 2(a), 65 Fed. Red. at 57,249. Federal agencies were later directed to develop their own Tribal consultation policies to implement EO 13175. *See* Tribal Consultation: Memorandum for the Heads of Executive Departments and Agencies, 74 Fed. Reg. 57,881 (Nov. 6, 2009). In carrying out their responsibilities under EO 13175, federal agencies' Tribal consultation "policies and procedures require, extra *meaningful* efforts to involve tribes in the decision-making process." *Wyoming v. U.S. Dep't of Interior*, 136 F. Supp. 3d 1317, 1346 (D. Wyo. 2015), *vac'd as moot sub nom. Wyoming v. Sierra Club*, No. 15-8126, 2016 WL 3853806 (10th Cir. July 13, 2016). This is consistent with the observation by the D.C. Circuit that Tribal Nations' "unique role and their government-to-government relationship with the United States demand that their criticisms be treated with appropriate solicitude." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1044 (D.C. Cir. 2021).

The proposed transfer of Chi'chil Biłdagoteel demonstrates acutely the importance of federal agencies engaging in meaningful Tribal consultation over proposals that would affect sacred places on federal

lands. Nowhere are the consequences of the United States's colonial policies of land dispossession put into such stark relief as here. These dispossession policies were, and can be, disastrously carried forward, far into the post-Colonial era. Not only did the United States acquire Chi'chil Biłdagoteel through treatymaking and conflict, but it now plans on transferring it out of federal ownership and into private control to facilitate its wholesale destruction—over the objections of and without meaningful consultation with the San Carlos Apache Tribe.

The importance of the USFS engaging in meaningful Tribal consultation with the San Carlos Apache Tribe under the NHPA and EO 13175 could not be more clearly demonstrated than here. The San Carlos Apache Tribe retains use and occupancy rights to Chi'chil Biłdagoteel, which have not been extinguished by Congress, as well as water rights, which are held in trust by the United States. Doc. 40.1, at 63–65. The transfer of Chi'chil Biłdagoteel to Resolution Copper and the construction of the proposed copper mine would significantly impair these rights. Despite the documented impact the transfer would have on the San Carlos Apache Tribe's rights and resources, the USFS has failed to meet the most basic, minimum legal and fiduciary obligations

to meaningfully consult with the Tribe about those impacts and take measures to minimize them. *See* Doc. 40.1, at 58–62.

## CONCLUSION

For the foregoing reasons, the District Court should be reversed, and the Court should enter an injunction prohibiting the transfer of Chi'chil Biłdagoteel during the pendency of the underlying action.

RESPECTFULLY SUBMITTED this 15th day of September 2025.

> */s/ Wesley James Furlong*
> Wesley James Furlong
> NATIVE AMERICAN RIGHTS FUND
>
> *Counsel for* Amici Curiae *NCAI and NATHPO*
>
> Geoffrey C. Blackwell
> NATIONAL CONGRESS OF
>    AMERICAN INDIANS
>
> *Counsel for* Amicus Curiae *NCAI*

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of September 2025, I electronically filed this document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF. I certify that all participants in the case are registered CM/ECF users.

*/s/ Wesley James Furlong*
Wesley James Furlong
NATIVE AMERICAN RIGHTS FUND

*Counsel for* Amici Curiae *NCAI and NATHPO*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 25-5189

I am the attorney or self-represented party.

**This brief contains** | 4,205 | **words,** including | | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated | | .

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Wesley James Furlong | **Date** | 09/15/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**          *Rev. 12/01/22*