**No. 25-5189**

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

---

San Carlos Apache Tribe

*Plaintiff-Appellant,*

v.

United States Forest Service, et al.,

*Defendants-Appellees,*

and

Resolution Copper Mining LLC,

*Intervenor-Appellee.*

---

Appeal from the United States District Court for the District of Arizona, Case No. 2:25-cv-00068-PHX-DWL, Honorable Dominic Lanza, District Judge

---

**BRIEF OF AMICUS CURIAE COALITION OF LARGE TRIBES IN SUPPORT OF APPELLANT**

---

Jennifer Weddle
Greenberg Traurig, LLP
1144 15th Street, Suite 3300
Denver, CO 80202
(509) 969-4436
Weddlej@gtlaw.com
*Counsel for Amicus Curiae Coalition of Large Tribes*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), the Coalition of Large Tribes is an intertribal Section 17 federally-chartered corporation (a manner in which tribes may organize themselves under the Indian Reorganization Act of 1934, 25 U.S.C. § 5124), with no parent corporation and in which no person or entity owns stock.

# TABLE OF CONTENTS

STATEMENT OF IDENTITY, INTERESTS AND AUTHORITY TO FILE OF *AMICUS CURIAE* ...................................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................... 3

ARGUMENT ........................................................................................................ 7

I.    Title to tribal water rights is held by the United States in trust for the tribes, and it is blackletter law that the beneficiaries of a trust are entitled to an accounting of their property.  The FEIS must provide more detail about the impacts of Resoluion's project to San Carlos Apache water rights. .................................................................................. 7

II.    The executive branch has historically played a complex role in the formalization, quantification and protection of tribal water rights, both as a litigant and, more often, by negotiating water settlements that are ultimately adopted by congressional enactments, and then as a trustee protecting those rights. ................................................................. 10

        A.    Indian water rights settlements. ......................................... 11
        B.    The Blackfeet Water Rights Settlement ............................ 12
        C.    The Crow Water Rights Settlement .................................... 14
        D.    The Big Horn General Stream Adjudication ....................... 16

III.    To fulfill its trust responsibilities, the United States must assess and quantify Resolution's impacts on the San Carlos Apache Tribe's water resources. .......................................................................................... 17

IV.    The omissions and conclusory statements in the FEIS with respect to tribal rights necessitate further administrative process as the Forest Service has failed to meet the *Seven County* standard. ................................ 18

CONCLUSION ................................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona v. California*,
460 U.S. 605 (1983).................................................................8

*Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*,
462 U. S. 87 (1983)................................................................19

*Department of Transportation v. Public Citizen*,
541 U. S. 752 (2004)..............................................................19

*Jones v. Meehan*,
175 U.S. 1 (1899)...................................................................18

*Kleppe v. Sierra Club*,
427 U. S. 390 (1976)..............................................................19

*Marsh v. Oregon Natural Resources Council*,
490 U. S. 360 (1989)..............................................................19

*Nez Perce Tribe v. U.S. Forest Serv.*,
No. 3:13-CV-348-BLW, 2013 WL 5212317 (D. Idaho Sept. 12, 2013).....................20

*Quechan Tribe v. Dept. of the Interior*,
755 F.Supp.2d 1104 (C.D. Cal. 2010) ........................................22

*Robertson v. Methow Valley Citizens Council*,
490 U. S. 332 (1989)..............................................................19

*Seven County Infrastructure Coalition v. Eagle County*,
145 S. Ct. 1497 (2025)............................................................7

*Strycker's Bay Neighborhood Council, Inc. v. Karlen*,
444 U. S. 223 (1980)..............................................................19

*United States v. Michigan*,
508 F. Supp. 480 (W.D. Mich. 1980), *aff'd*, 712 F.2d 242 (6th Cir. 1983) ................19

*United States v. Mitchell*,
    463 U.S. 206 (1983)..................................................................8

*United States v. Powers*,
    305 U.S. 527 (1939)................................................................16

*United States v. Washington*,
    864 F.3d 1017 (9th Cir. 2017) ................................................20

*United States v. Winans*,
    198 U.S. 371 (1905)................................................................18

*Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense
    Council, Inc.*,
    435 U. S. 519 (1978)...............................................................19

*Winters v. United States*,
    207 U.S. 564 (1908).............................................................3, 18

*Worcester v. Georgia*,
    31 U.S. 515 (1832).................................................................18

*Wyoming v. Dep't of the Interior*,
    136 F.Supp.3d 1317 (D. Wyo. 2015)...................................20, 21

**Statutes**

16 U.S.C. § 539p(c)(3), (9) .........................................................7

Blackfeet Water Rights Settlement Act, WIIN Act of 2016, Pub. L. No. 114-
    322, subtit. G, § 3715, 130 Stat. 1628, 1832 (2016)...............*passim*

Confederated Tribes of the Warm Springs Reservation Water Rights
    Settlement Agreement, 1997, art. V, § B, approved by Pub. L. No. 107-
    102, § 2(a), 115 Stat. 974 ........................................................8

Crow Water Rights Settlement Act of 2010, Title IV of the Claims
    Resolution Act of 2010 (Pub. L. 111-291) .............................14

Gila River Indian Cmty. Water Rights Settlement Act of 2004, Pub. L. No.
    108-451, tit. H, § 204(a)(2), 118 Stat. 3478, 3502 ...................8

National Environmental Policy Act of 1969, 42 U.S.C. § 4321 *et seq.* ....................*passim*

iv

Snake River Water Rights Act of 2004, Pub. L. No. 108-447, tit. X, § 7(a)(1)(A), 118 Stat. 2809, 3434 ....................................................................8

**Other Authorities**

36 C.F.R. § 800.2(c)(2)(ii)(C) ........................................................................22

55 Fed. Reg. 9223 (March 12, 1990) ............................................................12

88 Fed. Reg. 2112 (Jan. 12, 2023) ................................................................12

*Blackfeet Water Rights Settlement Act of 2013, Hearing Before the Comm. on Indian Affairs* ..........................................................................................13

Charles Wilkinson, *Introduction to* Big Horn *General Stream Adjudication Symposium*, 15 WYO. L. REV. 233, 240 (2015) ............................................16

Christopher Flavelle, *As the Colorado River Shrinks, Washington Prepares to Spread the Pain*, N.Y. TIMES, Jan. 27, 2023 .............................................5

*Indian Water Rights Settlements*, CRS Report R44148 (April 16, 2019) ........12

Jason A. Robison, *Wyoming's Big Horn General Stream Adjudication*, 15 WYO. L. REV 243, 244 (2015) ..............................................................16, 17

Judith Royster, *Indian Water and the Federal Trust: Some Proposals for Federal Action*, 46 NAT. RESOURCES J. 375, 375-378 (2006) ........................8

Restatement (First) of Trusts § 172 cmt. a (1935) ..........................................9

Restatement (Second) of Trusts § 172 (1959) .................................................9

Restatement (Third) of Trusts § 84 (2012) ...........................................3, 8, 9

Tarah Bailey, Note, *Consultation with American Indian Tribes: Resolving Ambiguity and Inconsistency in Government-to-Government Relations*, 29 Colo. Nat. Res. Energy & Envtl. L. Rev. 195, 205 (2018) ......................24

Timothy Q. Purdon, Katherine S. Barrett Wiik, Dr. Aryn Conrad, *DAPL: Storm Clouds on the Horizon in Indian Country*, 65 Federal Lawyer (June 2017) ..............................................................................................24

Troy A. Eid, *Beyond Dakota Access Pipeline: Energy Development and the Imperative for Meaningful Tribal Consultation*, 95 Univ. of Denv. L. Rev. 593, 604 (2018)................................................................................24

U.S. CONST. art. VI, cl. 2 ...............................................................................17

U.S. Dep't of Interior, Press Release, Crow Tribe, United States and State of Montana Sign Historic Water Compact (April 27, 2012), https://www.doi.gov/news/pressreleases/Crow-Tribe-United-States-and-State-of-Montana-Sign-Historic-Water-Compact ........................................15

vi

**STATEMENT OF IDENTITY, INTERESTS AND AUTHORITY TO FILE OF**
***AMICUS CURIAE*[1]**

The Coalition of Large Tribes ("COLT") represents the interests of the more than 50 tribal nations whose land base each exceeds 100,000 acres, encompassing more than 95% of tribal lands and approximately half the Native American population in the country, and who are parties to numerous binding treaties with the United States, including the Navajo Nation, Crow Tribe, Blackfeet Tribe, Shoshone-Bannock Tribes, Spokane Tribe, Northern Cheyenne Tribe, Confederated Tribes of the Warm Springs Reservation, Confederated Tribes of the Colville Reservation, Rosebud Sioux Tribe, Sisseton Wahpeton Oyate, and others.

Many of these tribal nations are within the Ninth Circuit. This includes over 75 percent of the nation's 574 federally-recognized Indian tribes and encompasses more than 71 million reservation acres, roughly 80 percent of the country's total reservation lands, and also includes the San Carlos Apache Tribe.

COLT tribes have reserved *Winters* water rights which they have struggled to quantify and develop, often with only limited help, and no small amount of hindrance, from the United States. COLT member tribes govern vast swaths of the West, but do so largely

---

[1] All parties have consented to the filing of this brief. *Amicus curiae* files this brief in accordance with Federal Rule of Appellate Procedure 29(a)(2). No party's counsel authored this brief in whole or in part; no party's counsel contributed money to fund preparing or submitting this brief; and no person other than *Amicus curiae* contributed money that was intended to fund preparing or submitting this brief. *See* Fed. R. App. P. 29(a)(4)(e).

with at least one hand veritably tied behind their back because of their uncertain water rights and the United States' persistent failure to protect tribal water rights. And, again like the San Carlos Apache Tribe, many COLT member tribes have unextinguished Indian title claims to off-reservation sacred sites like Oak Flat.

Since its creation in 2011, COLT has provided a unified advocacy base for tribes that govern large land bases—some as large as states such as Delaware and West Virginia—and provide full service in the governing of their citizens and reservations. COLT's member tribes routinely engage with project proponents like Resolution Copper Mining, LLC and federal agencies when large and small-scale projects are considered throughout the West. Such federal permitting processes are time-consuming and complex, often addressing matters, as here, of overlapping regulatory jurisdiction, geographically broad-based interconnected ecosystems and regional water consumption in the over-appropriated arid West. This is a case that cries out for more process—namely leadership-level negotiations for amicable resolution between Resolution, the federal government and the San Carlos Apache Tribe. That is something that should happen on a political level and cannot be accommodated in the EIS process.

But of course political process cannot be mandated by the judicial branch and the Court is left with the United States' short shrift afforded to discussion of Indian title, usufructuary rights and water rights impacts in the Final Environmental Impact Statement ("FEIS") challenged by Appellant, which is regrettably typical. The National Environmental Policy Act of 1969, 42 U.S.C. § 4321 *et seq.*, while not exacting, requires

more than conclusory statements like those the FEIS provides with respect to Indian title to Oak Flat and the impacts to the Tribe's water rights. The FEIS is arbitrary and capricious for these reasons, and the outcome of this case—advising on the parameters of the work the United States must show in an FEIS on these subject-matters—will have an immediate and direct impact on the ability of many COLT member tribes to manage their tribal citizens' access to sacred sites and to protect their water resources.

COLT respectfully submits this brief to provide background to the Court on the challenges its member tribes face. COLT and its member tribes in the Ninth Circuit and elsewhere have profound interests in protecting tribes' ability to manage and conserve their limited and precious water resources and conserving their Indian title to sacred places.

## INTRODUCTION AND SUMMARY OF ARGUMENT

When the United States set aside lands to be reserved as homelands for Indian tribes, it also reserved the water needed to make those lands livable and productive. *Winters v. United States*, 207 U.S. 564, 576 (1908). These reserved water rights are property of the United States, held in trust for the Tribes. *See*, *e.g.*, San Carlos Apache Tribe Water Rights Settlement Agreement (Mar. 30, 1999) at ¶ 4.0. (7-ER-1368-69, 1397-99; 8-ER-1761-62); *see also* Blackfeet Water Rights Settlement Act, WIIN Act of 2016, Pub. L. No. 114-322, subtit. G, § 3715, 130 Stat. 1628, 1832 (2016) ("Blackfeet Settlement").

It is blackletter law that a trustee has an obligation to identify the property held in trust, segregate that property from the trustee's own property to the extent possible, and to refrain from conflicts of interest and self-dealing with regard to that property. Restatement

(Third) of Trusts § 84 cmt. d (2012). In the context of Indian reserved water rights, this requires the United States as trustee to identify which waters it believes have been reserved for the San Carlos Apache Tribe, as well as for other parties, and how uses proposed by other parties may impact those rights, such as Resolution's proposed use discussed in the FEIS. This information is absolutely critical for the federal government to evaluate its own reserved water rights and identify waters which are otherwise within its control and available for federal purposes. Only then can the federal government meet its obligations as trustee to manage water from these different sources in a manner that avoids unnecessarily comingling these assets or engaging in self-dealing and conflicts of interest.

The United States plays an essential role in this process as a litigant, a regulator, and by assessing, negotiating and preparing the groundwork for water rights settlements that are ultimately adopted by enactments of Congress. As the experience of COLT members attests, efforts to quantify and formalize Native American water rights are protracted matters, often involving decades of litigation and compromise. In many cases the key issue is not how much water is available, but how much money Congress is prepared to appropriate to enable that water to reach the people who need it and how long tribes have to wait to receive those funds. This same process continues after tribal water rights settlements are enacted, with the United States continuing as trustee in seeking to protect this trust assets in other federal processes.

Yet, in the FEIS, the Forest Service offers only a few scant paragraphs at pages 437, 438 and 441 to conclude that the at least 6.5 billion gallons of water per year Resolution

will use for 40 years of its operations at Oak Flat can be mitigated from some potential resources, without ever analyzing the interconnectedness of those mitigation water resources to the San Carlos Apache Tribe's resources, or the big picture of what such large scale dewatering of southern Arizona will mean for all stakeholders, which could not possibly be mitigated from distant water wells associated with Resolution's historic mining rights elsewhere in Arizona, as envisioned by the FEIS.

The relief sought here—an injunction requiring the United States to properly evaluate the water rights that are held in trust by the United States on behalf of the San Carlos Apache Tribe, and how they might be impacted by Resolution in the FEIS—subject to the ultimate plenary power of Congress—is a necessary step toward fulfilling its most basic responsibilities to the San Carlos Apache Tribe as the Tribe's trustee.

This is both timely and urgent, because rapid growth and drought conditions have placed Western river systems under increasing pressure. *See generally* Christopher Flavelle, *As the Colorado River Shrinks, Washington Prepares to Spread the Pain*, N.Y. TIMES, Jan. 27, 2023. The United States Department of Interior and Bureau of Reclamation have threatened to impose deep cuts to California and Arizona's water use in an effort to maintain minimum water levels in Lake Powell and Lake Mead; those states and water users have made it clear that they will not make such reductions without a legal battle. *Id*. Tribal water rights will be caught up in this battle, which will likely involve protracted litigation that the tribes can ill afford and intense political pressure on the federal government to prioritize some users over others. *Id*.

The federal government cannot exercise its trust responsibilities to the San Carlos Apache Tribe and other Native American tribes without first evaluating their *Winters* rights and how the rights may be impacted by Resolution's admittedly massive use of water. Such an assessment is the necessary first step to understanding the scope of the property that the United States government has a duty to protect as the tribes' trustee, and the scope of potential impacts to that property. Only then can the other potentially competing interests in those same water resources be weighed in the NEPA process. A trustee that does not even know the scope of the property with which it has been entrusted to preserve and manage, or the scope of potential impacts to that property, or take the necessary steps to figure it out, is no trustee at all.

USDA's unsupported conclusions in the FEIS with respect to the San Carlos Apache's Tribe's water rights evokes images of Obi-Wan Kenobi waving his hand and pronouncing to weak-minded stormtroopers that these are not the droids they are looking for, as if merely stating it makes it so. In *Star Wars*, such declaratory subterfuge worked, but it should not here.

Similarly, there is no discussion of Indian title at all in the FEIS despite the fact that the San Carlos Apache Tribe submitted significant material on that matter to USDA in this NEPA process. *See, e.g.*, SCATER-0379-95; SCATER-0373-78.

The Court should evaluate the FEIS' conclusory announcements with respect to water and its omission of any discussion of Indian title against the backdrop of the panoply of federal laws and policies that enshrine the government-to-government relationship

between the United States government and Native American tribes and nations. It cannot be that tribal rights to petition one's federal government are limited—as the FEIS' dismissive approach to the Tribe's information and analysis suggests—to little more than a veritable right to shake one's angry fist at the sky.

The Tribe provided in-depth scientific data and reasoned arguments about the impacts of Resolution's project and likewise detailed the highly controversial nature of the project's effects in the region. *See, e.g.* SCATER-0434-52; SCATER 0396-401; SCATER-0434-52; SCATER-1707-58; SCATER-0402-20. In response, the Forest Service effectively whistled past and offered only summary or cursory analysis in the FEIS responding to the Tribe's analysis.

The Forest Service's short shrift does not pass NEPA muster. 16 U.S.C. § 539p(c)(3), (9); *see Seven County Infrastructure Coalition v. Eagle County*, 145 S. Ct. 1497, 1511 (2025).

## ARGUMENT

The FEIS is very limited in its discussion of water impacts, and especially impacts to the San Carlos Apache Tribe's water. *See* FEIS pp. 437, 483, and 441.

**I.     Title to tribal water rights is held by the United States in trust for the tribes, and it is blackletter law that the beneficiaries of a trust are entitled to an accounting of their property. The FEIS must provide more detail about the impacts of Resolution's project to San Carlos Apache water rights.**

The San Carlos Apache Tribe's reserved water rights are held in trust by the United States for its benefit, along with the Tribe's land and minerals. "All of the necessary elements of a common-law trust are present: a trustee (the United States), a beneficiary (the

[Nation]), and a trust corpus (Indian [water]).” *United States v. Mitchell*, 463 U.S. 206, 225 (1983).

Congress has repeatedly acknowledged the trust status of Native American water rights when enacting water rights settlement acts, as discussed in greater detail below. *See, e.g.,* Blackfeet Settlement at § 3715; Gila River Indian Cmty. Water Rights Settlement Act of 2004, Pub. L. No. 108-451, tit. H, § 204(a)(2), 118 Stat. 3478, 3502; Snake River Water Rights Act of 2004, Pub. L. No. 108-447, tit. X, § 7(a)(1)(A), 118 Stat. 2809, 3434; Confederated Tribes of the Warm Springs Reservation Water Rights Settlement Agreement, 1997, art. V, § B, approved by Pub. L. No. 107-102, § 2(a), 115 Stat. 974.[2]

The United States has also demonstrated that it has accepted and assumed this trust responsibility by repeatedly participating as trustee of the tribes in general stream adjudications and other legal proceedings involving water, including proceedings specific to the Colorado River. *See, e.g.*, *Arizona v. California*, 460 U.S. 605, 608-09 (1983).

When a trust has been established, it is governed by standard common law principles. *Id.* The injunctive relief sought by Appellant is in keeping with these basic principles of trust law, which impose on the trustee an obligation to identify the trust corpus, record and segregate it as feasible, and maintain accounts. Restatement (Third) of Trusts § 84 (“The trustee has a duty to see that trust property is designated or identifiable as property of the trust, and also a duty to keep the trust property separate from the trustee’s

---

[2] *See* Judith Royster, *Indian Water and the Federal Trust: Some Proposals for Federal Action*, 46 NAT. RESOURCES J. 375, 375-378 (2006)(collecting references to the trust status of Indian water rights).

8

own property and, so far as practical, separate from other property not subject to the trust"); *see also* Restatement (First) of Trusts § 172 cmt. a (1935) ("The trustee is under a duty to keep accounts showing in detail the nature and amount of the trust property and the administration thereof."); Restatement (Second) of Trusts § 172 (1959) (same).

"It is ordinarily the duty of a trustee to have trust property designated or made externally identifiable as trust property." Restatement (Third) of Trusts § 84 cmt. d (2012). "[T]itle to land acquired by a trustee as such should be taken and recorded in the name of the trustee as trustee[,]" and when this is not feasible "the trustee must maintain records clearly reflecting that the property belongs to the trust and must keep that trust property separate from property belonging to the trustee personally." *Id*. When the terms of the trust make it infeasible to the mingling of trust property with assets of the trustee or other trusts (such as the reserved water rights of other Native American tribes and nations to the same water system), "this does not relieve the trustee of the duty to earmark if and as feasible." *Id*. at cmt. e. These responsibilities are especially crucial when, as with tribal water, the trust assets are inevitably comingled with the assets of the trustee and other trusts and potentially available for appropriation by other users as well.

The federal government chose to become the trustee for the San Carlos Apache Tribe, and other Native American tribes and nations, in accordance with its own federal policy, on its own terms. Since *Winters* was decided in 1908, it is beyond doubt that this trust responsibility includes reserved water rights.

Inexplicably, the Forest Service provides no FEIS analysis of impacts to the trust

water assets it holds for the San Carlos Apache Tribe, and offers only unsupported conclusions that unspecific future mitigation will address those impacts, really through several vague charts like this one:



Figure 3.7.1-4. Location of Phoenix AMA, groundwater basins/subbasins, and the Cutter Basin with respect to the preferred alternative

In the arid West, these conclusions seem fanciful at best.

**II.   The executive branch has historically played a complex role in the formalization, quantification and protection of tribal water rights, both as a litigant and, more often, by negotiating water settlements that are ultimately adopted by congressional enactments, and then as a trustee protecting those rights.**

More fulsome discussion of the San Carlos Apache Tribe's water rights and impacts thereto is necessary to prevent the federal government from actively supporting the diversion of tribal water to other uses without disclosing that to the trust beneficiary.

The experience of COLT members shows that it takes decades of litigation and negotiation to obtain a quantification of tribal water rights. Indeed, ultimately, the biggest factor in obtaining "wet water" for tribes has proven not to be the retained jurisdiction of any court, but the willingness of Congress to put money on the table to build water infrastructure, as the San Carlos Apache Tribe has experienced.

Even under the best circumstances, the resolution of disputes over tribal water rights is often a protracted and expensive process. Many of the COLT members have been enmeshed in decades of litigation and negotiation and protection efforts over their water rights. This makes it all the more critical for the federal government to evaluate the impacts to the Tribe's water rights in the first instance, consistent with foundational common law trust principles.

## A.    Indian water rights settlements.

Assessing tribes' reserved water rights is an essential precondition for informed federal decision-making in an era of increasingly scarce water resources and rapid population growth, especially in the desert Southwest. Indeed, it is hard to imagine how the federal government can persist in not doing so, given that "Indian water rights are vested property rights for which the United States has a trust responsibility, with the United States holding legal title to such water in trust for the benefit of the Indians." Working

Group in Indian Water Settlements; Criteria and Procedures for the Participation of the Federal Government In Negotiations for the Settlement of Indian Water Rights Claims, 55 Fed. Reg. 9223 (March 12, 1990); Congressional Research Service, *Indian Water Rights Settlements*, CRS Report R44148 (April 16, 2019) at 2. Between 1978 and 2019, the United States entered into 36 water rights settlements with 40 tribes. Congressional Research Service, *supra*, at 1. Nonetheless, there are 574 federally recognized Indian tribes (Indian Entities Recognized by and Eligible to Received Services From the United States Bureau of Indian Affairs, 88 Fed. Reg. 2112 (Jan. 12, 2023)). The negotiation, resolution and funding of these settlements is often fraught with challenges, including the final implementation stage where Congress often fails to appropriate money to build the projects required by the settlements, leaving tribes and other stakeholders scrambling for the same and diminishing water resources. *Id*. at 9-15.

**B.     The Blackfeet Water Rights Settlement**

To provide just one recent example, the Blackfeet Nation has recently quantified its water rights through a compact that was adopted by Congress in the Blackfeet Water Rights Settlement Act of 2016. Blackfeet Settlement § 3702. The Blackfeet Settlement formally "ratified, confirmed, and declared to be valid" the Blackfeet Nation's water rights and specified that these rights "(1) shall be held in trust by the United States for the use and benefit of the Tribe and the allottees in accordance with this subtitle; and (2) shall not be subject to forfeiture or abandonment." Blackfeet Settlement § 3715(a)-(c).

This language makes abundantly clear that it is the understanding of Congress that this Act acknowledges an existing, recognized trust responsibility and does not create a new obligation. This existing trust responsibility also came up repeatedly in the legislative history of the Act. *See generally The Blackfeet Water Rights Settlement Act of 2013, Hearing Before the Comm. on Indian Affairs*, S. Hrg. 113-113, 113th Cong. (hereinafter "Blackfeet Settlement Hearing"). Senator Max Baucus of Montana opened his remarks by stating that "[t]he creation of the Blackfeet Reservation implied a commitment on the part of the United States to reserve sufficient water to satisfy both present and future needs of the tribe[,][and] [a] settlement ratified by Congress is far preferable to any litigation over an acknowledged breach of trust." *Id*. (statement of Sen. Baucus).

The Blackfeet Settlement was the culmination of more than a century of disputes regarding the water rights of the Blackfeet Nation. *Id*. (statement of John Bezdek, Counselor to the Deputy Secretary United States Department of the Interior) ("The Tribe's water rights have been fought over for more than 100 years, as reflected in approximately 14 court cases and congressional proceedings addressing directly or indirectly the use and control of the Reservation's water resources."). During that time, several major diversions were built, moving water off-reservation to other appropriators without tribal permission.

The negotiations that finally resulted in the 2016 settlement began in 1979 with a suit filed by the State of Montana in state court and a parallel proceeding filed by the United States in federal court. *Id*. (statement of Hon. Hay Weiner, Assistant Attorney General, State of Montana). After several years of litigation over which court would have

13

jurisdiction, the Blackfeet Nation entered into formal negotiations with the Montana Compact Commission in 1989, and the federal government appointed its own negotiation team the following year. *Id*. (statement of Hon. Kevin K. Washburn, Assistant Sec'y for Indian Affairs, U.S. Department of the Interior).

Efforts to settle the Blackfeet Nation's water rights were complicated both by competing interests and by the sheer technical complexity of the problem, with the reservation spanning six different drainages and involving not only domestic interests but also an international treaty. *Id*. (statement of Hon. Shannon Augare, Councilman, Blackfeet Nation). The final legislation is lengthy, allocating acre feet from several different creeks, dealing with multiple dams and irrigation projects, as well as the minutia of erosion control, hydroelectric power, and the allocation of maintenance costs. Understanding these structures is important to any federal decision-making in northern Montana.

### C.    The Crow Water Rights Settlement

The Crow Tribe, a founding member of COLT, also resolved its longstanding water rights disputes through a settlement act, the Crow Water Rights Settlement Act of 2010, enacted as Title IV of the Claims Resolution Act of 2010 (Pub. L. 111-291) ("Crow Settlement"). Like the Blackfeet Settlement, the Crow Settlement included language confirming the trust status of the tribal water rights at issue: "The tribal water rights are ratified, confirmed, and declared to be valid[,] [and] [t]he tribal water rights—(1) shall be held in trust by the United States for the use and benefit of the Tribe and the allottees in

14

accordance with this section; and (2) shall not be subject to forfeiture or abandonment." *Id*. at § 407.

In this settlement, the tribe secured an allocation of 300,000 acre-feet per year of water stored in Bighorn Lake, under a water right held by the United States and managed by the Bureau of Reclamation, *id*. § 408, of which 50,000 acre feet could be marketed to off-reservation users. The federal government undertook to design and build a Municipal, Rural and Industrial Water System for the Crow Tribe, at an expense not to exceed $246,381,000 and to repair and upgrade the Crow Irrigation Project for an amount not to exceed $131,843,000. *Id*.

This is in keeping with the general pattern of water settlements, which exchange unquantified paper water rights for smaller, quantified rights and money for construction projects to bring that water to where it can be put to beneficial use. As the Department of Interior explained, "[t]he existing drinking water system on the reservation has significant deficiencies in terms of both capacity and water quality, and many tribal members at times must haul water[,] [and] [t]he Crow Irrigation Project is in a state of significant disrepair and currently cannot support the Reservation's mainstay of farming and ranching." U.S. Dep't of Interior, Press Release, Crow Tribe, United States and State of Montana Sign Historic Water Compact (April 27, 2012), https://www.doi.gov/news/pressreleases/Crow-Tribe-United-States-and-State-of-Montana-Sign-Historic-Water-Compact (hereinafter "DOI Press Release").

The Crow Reservation was established by the Treaty of May 7, 1868, 15 Stat. 649, but in 1891 the reservation was diminished in exchange for funds to build an irrigation project for a portion of the remaining lands (the same irrigation project that has since fallen into disrepair). *United States v. Powers*, 305 U.S. 527, 530 (1939). Much of that water was then lost when the irrigated lands were allotted and sold out of tribal ownership. *Id.* (upholding this transfer). The parties had been in litigation and negotiation over the Crow Tribe's remaining water rights since 1975. DOI Press Release, *supra*.

### D. The Big Horn General Stream Adjudication

When tribal water rights are handled through a general stream adjudication, reaching resolution is even slower and more expensive, and the results are uncertain, especially if the result the tribe wishes to obtain is actual drinking water. The *Big Horn* general stream adjudication, for example, was described by Wyoming's own state engineer as "a poster child for how not to quantify reserved water rights." Charles Wilkinson, *Introduction to* Big Horn *General Stream Adjudication Symposium*, 15 Wyo. L. Rev. 233, 240 (2015).

This adjudication opened with a sixteen-month trial and ultimately took four decades to reach final resolution. Jason A. Robison, *Wyoming's* Big Horn *General Stream Adjudication*, 15 Wyo. L. Rev 243, 244 (2015). The basin is set in a mountainous region of the Northern Rockies with a complex hydrology and five sub-basins. The federal government owns 64 percent of the land, not counting Indian lands. *Id.* at 247-49. The basin also includes the Wind River Reservation, home to the Eastern Shoshone and the Northern Arapaho Tribes. *Id.* at 251. The litigation began in 1976, when the Tribes

objected to plans of the municipality of Riverton to drill groundwater wells to support an airport and industrial park. *Id.* at 268. Years of jurisdictional disputes and multiple trials on different issues ensued. *Id.*

Even after the water rights were quantified, the litigation continued to expand, with the Wyoming Supreme Court rejecting the Tribes' claim that their water could be used for non-consumptive purposes. *Id.* at 290-93. Sixteen years of litigation alone ensued over whether non-Indian successors to allottees had water rights and the nature and priority of those rights. *Id.* at 294-97.

## III.   To fulfill its trust responsibilities, the United States must assess and quantify Resolution's impacts on the San Carlos Apache Tribe's water resources.

As we move into an era in which all available water will be fully appropriated or reserved for environmental or other uses, it will become physically impossible for the United States to fulfil its obligations as a trustee to tribes if it does not have at least a working estimate of how much water each tribe, including the San Carlos Apache Tribe, is actually entitled to and how much water is therefore available for the many other competing interests. Such an assessment will enable the various executive agencies to plan and regulate in compliance with the federal government's trust obligations.

The United States entered into solemn Treaty obligations with the San Carlos Apache Tribe, and other COLT member tribes. These treaties, as well as statutes and statutorily codified executive orders, are the "supreme Law of the Land." U.S. CONST. art. VI, cl. 2. The U.S. Supreme Court has likewise made it clear that water rights were

reserved, by Treaty, as a necessary condition without which the other Treaty rights "would be valueless." *Winters*, 207 U.S. at 576.

The Supreme Court has long insisted that Treaty obligations with Native American tribes and nations should be construed in favor of the tribes. "The language used in treaties with the Indians should never be construed to their prejudice." *Worcester v. Georgia*, 31 U.S. 515, 582 (1832). "If words be made use of which are susceptible of a more extended meaning than their plain import, as connected with the tenor of the treaty, they should be considered as used only in the latter sense." *Id.* "They must be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians." *Jones v. Meehan*, 175 U.S. 1, 11 (1899). "[W]e will construe a treaty with the Indians as [they] understood it, and as justice and reason demand, in all cases where power is exerted by the strong over those to whom they owe care and protection, and counterpoise the inequality by the superior justice which looks only to the substance of the right, without regard to technical rules." *United States v. Winans*, 198 U.S. 371, 380 (1905) (internal quotation omitted). "[A]mbiguities occurring will be resolved from the standpoint of the Indians." *Winters, id.* at 575.

The United States cannot honor its Treaty and trust obligations if it does not know what they are. It has an obligation as the tribes' trustee to understand those rights so that they can be properly managed and accurately inform agency decision-making.

**IV. The omissions and conclusory statements in the FEIS with respect to tribal rights necessitate further administrative process as the Forest Service has failed to meet the *Seven County* standard.**

The Supreme Court's recent decision in Seven County focuses on commonsense and efficiency under the procedural statute: "NEPA requires agencies to focus on the environmental effects of the project at issue." Slip Op. at 3. The arguments on water and Indian title submitted by the San Carlos Apache Tribe are neither "speculative" nor attenuated from the project at hand. *Department of Transportation v. Public Citizen*, 541 U. S. 752, 767–768, 770 (2004). They are direct, but the Forest Service has failed to show its work with respect to either subject.

In ultimately deciding whether to build, fund, or approve a project, an "agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Robertson v. Methow Valley Citizens Council*, 490 U. S. 332, 350 (1989). Otherwise stated, NEPA "does not mandate particular results, but simply prescribes the necessary process" for an agency's environmental review of a project. *Ibid*.; *see Department of Transportation v. Public Citizen*, 541 U. S. 752, 756–757 (2004); *Marsh v. Oregon Natural Resources Council*, 490 U. S. 360, 370–372 (1989); *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U. S. 87, 97–98 (1983); *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U. S. 223, 227– 228 (1980); *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc*., 435 U. S. 519, 558 (1978); *Kleppe v. Sierra Club*, 427 U. S. 390, 410, n. 21 (1976). Here, the FEIS misses the mark. Several courts have concluded, in like circumstances, that Tribal treaty rights warrant unique protection in the preliminary injunction context because harm to them is presumed to be irreparable. *See United States v. Michigan*, 508 F. Supp. 480, 492 (W.D. Mich. 1980), *aff'd*, 712 F.2d 242

(6th Cir. 1983); *Nez Perce Tribe v. U.S. Forest Serv.*, No. 3:13-CV-348-BLW, 2013 WL 5212317, at *7 (D. Idaho Sept. 12, 2013) ("The plaintiffs are not seeking damages; they are seeking to preserve their Treaty rights along with cultural and intrinsic values that have no price tag"). Such is the case here.

The monetary significance of the Resolution project and the national security interests potentially served by the project do not excuse the United States' foundational duty to address the San Carlos Apache Tribe water and Indian title arguments. *See, e.g., United States v. Washington*, 864 F.3d 1017 (9th Cir. 2017) (denying *en banc* review where state projected $1.88 billion cost to remediate infrastructure installed in violation of tribal Treaty rights). The solution is clear and simple: give Treaty rights due consideration and analysis in advance in the FEIS and develop mitigation measures where necessary. Engage in Tribal consultation and negotiation, so that there is a clear understanding of Tribal rights, interests, and concerns. Looked at in this light, "stop, look, and listen" statutes, such as NEPA, implemented with appropriate consultation procedures, protect the interests of *all* parties.

Underlying the shortcomings of the FEIS here is that Tribes' rights to consultation with federal departments and agencies are not merely superficial, as the United States treats them. In *Wyoming v. Dep't of the Interior* for instance, the court issued a nationwide injunction preventing the BLM from implementing its proposed rules regulating hydraulic fracturing on BLM and tribal lands after determining that federal officials had failed to engage in meaningful consultation with affected tribes. *Wyoming v. Dep't of the Interior*,

136 F.Supp.3d 1317, 1344-46 (D. Wyo. 2015). In its reasoning that the BLM had failed to participate in adequate tribal consultation, the Wyoming court cited to the Department of Interior's Policy on Consultation with Indian Tribes that: "Consultation is a process that aims to create effective collaboration with Indian tribes and to inform Federal decision-makers. Consultation is built upon government-to-government exchange of information and promotes enhanced communication that emphasizes trust, respect, and shared responsibility…" *Id*. at 1344. The court repeatedly noted the lack of meaningful tribal consultation: "The consultation process should include the incorporation of tribal views in the decision-making process, respect for tribal sovereignty, and meaningful dialogue where the viewpoints of tribes and the DOI are shared, discussed, and analyzed." *Id*. at 1345. The court reasoned that the "DOI's policies and procedures reflect the unique relationship between Indian tribes and the federal government and recognize Indian tribes' right to self-governance and tribal sovereignty." *Id*. at 1345. Accordingly, Judge Skavdahl held that the BLM's efforts to hold four regional tribal consultation meetings, distributing copies of a draft rule to affected tribes for comment, and offering to meet individually with tribes following the regional meetings did not satisfy the BLM's tribal consultation requirements because such conduct "reflect[ed] little more than that offered to the public in general." *Id*. at 1345-46.

Per *Wyoming*, "meaningful" consultation is not achieved by inviting tribal leaders to talk with the Forest Service about thousands of pages of scientific reports or failing to make any changes in response to tribal feedback about the project. Listening sessions are not

21

meaningful consultation. Meaningful consultation starts at the beginning of an agency effort, not after litigation. It means getting tribal views before putting pen to paper. It means making changes to the proposed permit in response to tribal feedback.

Similarly, in *Quechan Tribe*, the court issued a preliminary injunction enjoining a BLM solar energy project where the BLM had not adequately consulted with the affected tribe: "the consultation requirement is not an empty formality; rather, it 'must recognize the government-to-government relationship between the Federal Government and Indian tribes' and is to be 'conducted in a manner sensitive to the concerns and needs of the Indian tribe.'" *Quechan Tribe v. Dept. of the Interior*, 755 F.Supp.2d 1104, 1108-09 (C.D. Cal. 2010)(citing 36 C.F.R. § 800.2(c)(2)(ii)(C)). The court reasoned that, although BLM had sent numerous letters and communications to the Quechan Tribe, that the sheer volume of documents was not meaningful because the BLM's communications were "replete with recitals of law (including Section 106), professions of good intent, and solicitations to consult with the Tribe" and "documentation that might support a finding that true government-to-government consultation occurred [was] painfully thin." *Quechan Tribe*, 755 F.Supp.2d at 1118. Mere pro forma recitals did not, by themselves, show BLM complied with the law. *Id*. Notably, *Quechan Tribe* reasoned that even though the BLM "did a lot of consulting in general" that "didn't show that its consultation with the [T]ribe was adequate under the regulations." *Id*. at 1112.

What flows from these cases is that tribal consultation is not exacting; it does not have a single mold or method that applies across all government agencies under all

circumstances.  Tribal consultation may vary depending on the circumstances of the federal action and implication of tribal interests.  The approaches to consultation with federal agencies likewise vary from tribe to tribe.

Yet some basic parameters for tribal consultation are discernible from the cases, regulations, and administrative guidance.  Consultation must represent a government-to-government robust dialogue that allows for a substantive exchange of information.  Such exchange should actively involve tribes in the decision-making process early and often and in a thorough manner such that the agency and tribes significantly engage on the issues.  As a government-to-government exchange, tribal sovereignty must be respected by federal agencies demonstrating active listening as opposed to mere passive receipt of tribal views.  Consultation should gather and incorporate tribal views and opinions to avoid any adverse effects on tribal interests and concerns.  Tribal consultation is a cooperative discourse that continues as the parties share their viewpoints.  The result of a tribal consultation's effective collaboration and exchange of ideas should be that the agency and the tribes have listened to, discussed, and addressed each other's expressed concerns.  An agency's tribal consultation efforts need to provide more back and forth than what is generally offered to the public—an agency needs to generally commit to extra, meaningful efforts to engage tribes.  Sheer volume of consultation is insufficient; consultation must create a platform that permits good-faith, constructive dialogue that seeks agreement on the issues. Tribal consultation cannot be cursory and inadequate, and cannot consist mostly of informational meetings or general correspondence.  Consultation needs to be more than a procedural

23

speed bump; it must be an opportunity to reflect on the effect that federal projects and policies have on tribal concerns and sovereignty.

As a critical component of tribal sovereignty, tribal consultation is intended to protect tribal needs, interests, rights, and resources. Through meaningful tribal consultation, the government should maintain open and constant communications with tribes. These communications should center around a respectful relationship using a dialogue that prioritizes identifying and considering tribal interests. Ultimately, this dialogue should develop tailored solutions to address specific and unique needs of tribal communities. *See* Troy A. Eid, *Beyond Dakota Access Pipeline: Energy Development and the Imperative for Meaningful Tribal Consultation*, 95 Univ. of Denv. L. Rev. 593, 604 (2018); *see also* Tarah Bailey, Note, *Consultation with American Indian Tribes: Resolving Ambiguity and Inconsistency in Government-to-Government Relations*, 29 Colo. Nat. Res. Energy & Envtl. L. Rev. 195, 205 (2018); Timothy Q. Purdon, Katherine S. Barrett Wiik, Dr. Aryn Conrad, *DAPL: Storm Clouds on the Horizon in Indian Country*, 65 Federal Lawyer (June 2017).

The FEIS shows no such work.

## CONCLUSION

The FEIS is an echo-chamber of its deficient engagement with the San Carlos Apache Tribe. Because it fails to meet NEPA standards by offering only conclusory statements about the potential impacts to the Tribe's water rights and omits any discussion of Indian title at Oak Flat, the District Court's decision should be reversed. This case cries

out for a negotiated solution with the federal government bringing Resolution and the Tribe to the table.  The interests of all stakeholders are best served by ensuring adequate process, and allowing time for political engagement to be effective.

Respectfully submitted this 15th day of September 2025,

GREENBERG TRAURIG, LLP

S/Jennifer Weddle
Counsel for *Amicus Curiae*

## CERTIFICATE OF SERVICE

The foregoing was filed with the Clerk of Court using the Court's electronic filing system, with notice provided to all parties.

*S/Jennifer Weddle*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s) <u>25-5189</u>**

I am the attorney or self-represented party.

**This brief contains 6473 words,** including **109 words** manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ x ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _____S/Jennifer H. Weddle_____ **Date** _____09/15/2025_____
*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*