Nos. 25-5185, 25-5189, 25-5197

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

ARIZONA MINING REFORM COALITION, et al.,
*Plaintiffs–Appellants*,
v.
UNITED STATES FOREST SERVICE, et al.
*Defendants–Appellees*.
and
RESOLUTION COPPER MINING, LLC,
*Intervenor-Defendant–Appellee*

(caption continued on following page)

Appeal from the United States District Court for the
District of Arizona
Nos. 2:21-cv-68, 2:21-cv-122, 2:25-cv-2758 (Hon. Dominic W. Lanza)

## APPELLEES' ANSWERING BRIEF

ADAM R.F. GUSTAFSON
*Acting Assistant Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*

THEKLA HANSEN-YOUNG
ERIKA NORMAN
ANGELA ELLIS
EZEKIEL A. PETERSON
*Attorneys*
Environment & Natural Resources Div.
U.S. Department of Justice
999 18th St., Suite 370
Denver, CO 80202
(202) 598-6399
ezekiel.a.peterson@usdoj.gov

(caption continued from previous page)

———————————————

SAN CARLOS APACHE TRIBE, et al.,
*Plaintiffs–Appellants*,

v.

UNITED STATES FOREST SERVICE, et al.
*Defendants–Appellees*.

and

RESOLUTION COPPER MINING, LLC,
*Intervenor-Defendant–Appellee*

———————————————

GOUYEN BROWN LOPEZ, et al.,
*Plaintiffs–Appellants*,

v.

UNITED STATES OF AMERICA, et al.
*Defendants–Appellees*.

and

RESOLUTION COPPER MINING, LLC,
*Intervenor-Defendant–Appellee*

———————————————

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ v

INTRODUCTION ................................................................................... 1

STATEMENT OF JURISDICTION.......................................................... 3

STATEMENT OF THE ISSUES............................................................... 3

STATEMENT OF THE CASE .................................................................. 4

    A.    Statutory and regulatory background .................................... 4

        1.    Oak Flat and Resolution Copper's mineral rights............................................................................ 4

        2.    The Southeast Arizona Land Exchange and Conservation Act............................................... 5

        3.    The National Environmental Policy Act ...................... 9

        4.    The National Historic Preservation Act...................... 10

    B.    Procedural background................................................ 11

        1.    Cases challenging the land exchange and the *Apache Stronghold* litigation.................................. 11

        2.    The Final EIS, the appraisal report, and the Draft ROD ................................................... 13

        3.    Tribal and ACHP consultation ................................... 20

        4.    District court proceedings ......................................... 22

SUMMARY OF ARGUMENT .................................................................. 25

STANDARD OF REVIEW......................................................................... 28

ARGUMENT ............................................................. 30

I.   Plaintiffs have not shown serious questions on the
     merits of their claims, much less likelihood of success. ............. 31

     A.   AMRC is unlikely to succeed on its claim
          challenging the appraisal. ...................................... 31

          1.   The appraisal correctly excluded the value
               of Resolution's unpatented mining claims. ................ 31

          2.   The Forest Service correctly based its
               appraisal on the current sellable value of
               the land. ................................................. 34

          3.   AMRC lacks an APA right of action to
               challenge the land exchange under the Act's
               appraisal provisions. ..................................... 40

     B.   Plaintiffs are unlikely to succeed on their NEPA
          claims. ........................................................ 44

          1.   The Final EIS is not a final agency action
               under the APA. ............................................ 44

          2.   Plaintiffs cannot challenge the land
               exchange itself under NEPA because NEPA
               does not apply to the nondiscretionary land
               exchange. ................................................. 48

          3.   Plaintiffs' NEPA claims and claims about
               the Final EIS also fail on the merits. .................... 49

               a.   The Forest Service drew reasonable
                    lines in analyzing the proposed mine's
                    impacts on groundwater. ............................. 50

b. The Forest Service reasonably responded to other agencies' comments. ........................... 54

c. The Forest Service reasonably analyzed mitigation measures. ........................ 57

d. The Tribe's extra-record declarations do not show that the Forest Service failed to comply with NEPA. ........................ 58

e. The Forest Service reasonably analyzed alternative mining techniques. ........................ 61

f. The district court properly rejected Lopez's argument that she is entitled to a preliminary injunction because the Forest Service did too much NEPA analysis. ........................ 63

C. Plaintiffs are unlikely to succeed on their claims challenging the Forest Service's consultation. ...................... 65

1. The Forest Service satisfied its consultation obligations under the Land Exchange Act. ................. 65

2. The Forest Service complied with the NHPA by accounting for the ACHP's comments. ................... 69

D. Lopez is unlikely to succeed on her claims challenging the land exchange under RFRA and the First Amendment. ........................ 72

1. The en banc decision in *Apache Stronghold* bars Lopez's religious-liberty claims. ........................ 72

2. The Supreme Court's decision in *Mahmoud* is inapplicable. ........................ 74

iii

E.    Plaintiffs lack standing to challenge the land exchange because their injury is not redressable. ................ 77

II.  Plaintiffs have not shown irreparable harm from the land exchange, and the balance of equities tips sharply in the government's favor. ............................................................ 82

CONCLUSION ........................................................................ 86

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*All. for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ................................................................ 29

*Envt'l Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
  *36 F.*4th 850 (9th Cir. 2022) ................................................................ 44

*Apache Stronghold v. United States*,
  2021 WL 689906 (D. Ariz. Feb. 22, 2021) ............................................ 12

*Apache Stronghold v. United States*,
  38 F.4th 742 (9th Cir. 2022) ................................................................ 12

*Apache Stronghold v. United States*,
  101 F.4th 1036 (9th Cir. 2024) ...................................................... passim

*Apache Stronghold v. United States*,
  145 S. Ct. 1480 (2025) ........................................................................ 13

*ASARCO Inc. v. Kadish*,
  490 U.S. 605 (1989) ............................................................................ 81

*Bank of Am. Corp. v. City of Miami*,
  581 U.S. 189 (2017) ............................................................................ 41

*Bennett v. Spear*,
  520 U.S. 154 (1997) .................................................................... 41, 45

*Benson Mining & Smelting Co. v. Alta Mining & Smelting Co.*,
  145 U.S. 428 (1892) ............................................................................ 32

*Bowen v. Roy*,
  476 U.S. 693 ........................................................................................ 76

*Cascadia Wildlands v. United States Bureau of Land Mgmt.*,
  ___ F.4th ___, 2025 WL 2460946 (9th Cir. Aug. 27, 2025) ................. 56

*Concerned Citizens & Retired Miners Coalition v. U.S. Forest Serv.*,
  279 F. Supp. 3d 898 (D. Ariz. 2017) ...................................................... 66

*Concerned Citizens All., Inc. v. Slater*,
  176 F.3d 686 (3d Cir. 1999) ................................................... 70

*Coos Cty. of Oregon v. Bernhardt*, No. 6:19-CV-00576-MC, 2019 WL
  5748368 (D. Or. Nov. 5, 2019) ............................................... 42

*CTIA – The Wireless Ass'n v. FCC*,
  466 F.3d 105 (D.C. Cir. 2006) ........................................... 11, 69

*Davis v. Fed. Election Comm'n*,
  554 U.S. 724 (2008) ............................................................. 77

*Davis v. PBGC*,
  571 F.3d 1288 (D.C. Cir. 2009) ............................................ 29

*Dep't of Transp. v. Pub. Citizen*,
  541 U.S. 752 (2004) ............................................................. 48

*Desert Citizens Against Pollution v. Bisson*,
  231 F.3d 1172 (9th Cir. 2000) .................................... 42, 43, 80

*Earth Island Inst. v. Muldoon*,
  82 F.4th 624 (9th Cir. 2023) ............................................... 54

*Earth Island Inst. v. U.S. Forest Serv.*,
  351 F.3d 1291 (9th Cir. 2003) .............................................. 60

*Earth Island Inst. v. U.S. Forest Serv.*,
  697 F.3d 1010 (9th Cir. 2012) ........................................ 54, 57

*Friends of the Inyo v. U.S. Forest Serv.*,
  103 F.4th 543 (9th Cir. 2024) .............................................. 64

*Fund for Animals, Inc. v. Lujan,*
  962 F.2d 1391 (9th Cir. 1992) ................................................ 63

*Greater Yellowstone Coal. v. Lewis,*
  628 F.3d 1143 (9th Cir. 2010) ................................................ 55

*Havasupai Tribe v. Provencio,*
  906 F.3d 1155 (9th Cir. 2018) ................................................ 43

*Lands Council v. McNair,*
  537 F.3d 981 (9th Cir. 2008) ................................................ 29

*Lexmark Intern., Inc. v. Static Control Components, Inc.,*
  572 U.S. 118 (2014) ........................................................ 40, 41

*Lopez v. United States,*
  2025 WL 2193001 (D.D.C. Aug. 1, 2025) ................................ 24

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ........................................................ 78

*Lujan v. National Wildlife Fed'n,*
  497 U.S. 871 (1990) ........................................................ 40

*Lyng v. Northwest Indian Cemetery Protective Ass'n,*
  485 U.S. 439 (1988) .................................................. 13, 73, 76

*M.S. v. Brown,*
  902 F.3d 1076 (9th Cir. 2018) ................................................ 78

*Mahmoud v. Taylor,*
  145 S. Ct. 2332 (2025) .............................................. passim

*Massachusetts v. EPA,*
  549 U.S. 497 (2007) ........................................................ 78

*Muckleshoot Indian Tribe v. U.S. Forest Serv.,*
  177 F.3d 800 (9th Cir. 1999) ................................................ 69

vii

*National Wildlife Federation v. Burford,*
    871 F.2d 849 (9th Cir. 1989) ................................................................. 43

*Nken v. Holder,*
    556 U.S. 418 (2009) ........................................................................... 84

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.,*
    475 F.3d 1136 (9th Cir. 2007) .............................................................. 30

*Nw. Requirements Utilities v. FERC,*
    798 F.3d 796 (9th Cir. 2015) ............................................................... 42

*Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.,*
    625 F.3d 1092 (9th Cir. 2010) ............................................................. 46

*Pres. Coal. Inc. v. Pierce,*
    667 F.2d 851 (9th Cir. 1982) ............................................................... 11

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dept. of Agric.,*
    415 F.3d 1078 (9th Cir. 2005) ............................................................. 42

*Salmon Spawning & Recovery Alliance v. Gutierrez,*
    545 F.3d 1220 (9th Cir. 2008) ................................................... 78, 79, 82

*San Carlos Apache Tribe v. United States,*
    417 F.3d 1091 (9th Cir. 2005) ............................................................. 11

*Saravia for A.H. v. Sessions,*
    905 F.3d 1137 (9th Cir. 2018) ............................................................. 30

*Seven County Infrastructure Coalition v. Eagle County,*
    145 S. Ct. 1497 (2025) ................................................................. passim

*Shoshone-Bannock Tribes of Fort Hall Reservation v. U.S. Department of the Interior,*
    ___ F.4th ___, 2025 WL 2424422 (9th Cir., Aug. 22, 2025) ................ 37

*Sierra Club v. Babbitt,*
65 F.3d 1502 (9th Cir. 1995) ............................................................. 48

*Summers v. Earth Island Inst.,*
555 U.S. 488 (2009) ................................................................. 63, 80

*Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior,*
608 F.3d 592 (9th Cir. 2010) ............................................................ 10

*TransUnion LLC v. Ramirez,*
594 U.S. 413 (2021) ........................................................................ 77

*United States v. Locke,*
471 U.S. 84 (1985) .......................................................................... 32

*United States v. Oakland Cannabis Buyer's Co-op,*
532 U.S. 483 (2001) ........................................................................ 85

*United States v. Shumway,*
199 F.3d 1093 (9th Cir. 1999) ..................................................... 32, 34

*Vartelas v. Holder,*
566 U.S. 257 (2012) ........................................................................ 63

*W. Land Exch. Project v. U.S. Bureau of Land Mgmt.,*
315 F. Supp. 2d 1068 (D. Nev. 2004) ................................................. 81

*Westlands Water Dist. v. U.S. Dep't of the Interior,*
376 F.3d 853 (9th Cir. 2004) ............................................................ 30

*Wilbur v. United States ex rel. Krushnic,*
280 U.S. 306 (1930) ........................................................................ 32

*Winter v. Nat. Res. Def. Council, Inc.,*
555 U.S. 7 (2008) ................................................................. 29, 84, 85

## Statutes

5 U.S.C. § 551 ........................................................................ 45

5 U.S.C. § 702 ........................................................................ 40

5 U.S.C. § 704 ........................................................................ 45

5 U.S.C. § 706(2)(A) .............................................................. 30

16 U.S.C. § 539p(a) ................................................ 5, 80, 84, 85

16 U.S.C. § 539p(c) .......................................................... passim

16 U.S.C. § 539p(e)(2) ........................................................... 39

16 U.S.C. § 539p(g) ............................................................ 7, 8

16 U.S.C. § 539p(*i*) ............................................ 8, 35, 40, 83

30 U.S.C. § 26 .......................................................... 19, 32, 34

30 U.S.C. § 181 ...................................................................... 19

30 U.S.C. § 611 ...................................................................... 19

30 U.S.C. § 612 ........................................................ 19, 32, 34

42 U.S.C. § 4336(b)(1) ........................................................... 10

42 U.S.C. § 4336a(e)(1)(A) .................................................... 63

42 U.S.C. § 4336e(10)(B)(vii) ............................................... 48

54 U.S.C. § 300320 ................................................................ 11

54 U.S.C. § 306108 ......................................................... 11, 69

Pub. L. No. 114-94 ................................................................ 86

## Regulations

36 C.F.R. pt. 218 ................................................................ 18

36 C.F.R. § 218.11(b) ........................................................ 46

36 C.F.R. § 254.2 .............................................................. 38

36 C.F.R. § 254.9(b) ...................................................... 37, 38

36 C.F.R. § 254.9(c)(4) ...................................................... 33

36 C.F.R. § 800.7(a) .......................................................... 69

36 C.F.R. § 800.7(c)(4) .................................................. 70, 71

## Other Authorities

Exec. Order No. 14241 ...................................................... 85

*Hearing on H.R. 1063 et al., before the H. Subcommittee on Energy and Mineral Resources, H. Comm. on Natural Resources*, 113th Cong. 93, 101 (2013) ...................................................................... 6

*Legislative Hearing on H.R. 1904 et al., H. Comm. on Natural Resources, Subcommittee on National Parks, Forests and Public Lands*, 112th Cong. 68 (2011) ................................................ 7

*Hearing on H.R. 3301, H. Comm. on Natural Resources, Subcommittee on National Parks, Forests and Public Lands*, 110th Cong. 19 (2007) ............................................................ 6

# INTRODUCTION

More than a decade ago, Congress mandated a land exchange between the U.S. Forest Service and Resolution Copper LLC for the purpose of mining one of the largest copper deposits in the world, which Resolution Copper discovered in the Tonto National Forest. The statute embodies a compromise: certain lands would be used for mining, other lands would be reserved for tribal use, and other lands would be added to national conservation areas. Congress made that policy decision after years of hearings and debate.

Plaintiffs in these consolidated cases now ask this Court to block Congress's decision. The district court declined that invitation, concluding after thorough review that Plaintiffs had not shown even serious questions on the merits, and that Congress had already balanced the equities when it mandated the land exchange by statute.

Plaintiffs' bid for a preliminary injunction has not improved on appeal. They bring a smorgasbord of claims under the statute mandating the land exchange, the National Environmental Policy Act (NEPA), the National Historic Preservation Act (NHPA), the Religious Freedom Restoration Act (RFRA), and the First Amendment. The claims all suffer from fatal threshold deficiencies, including a lack of standing and failure to identify final agency action subject to judicial review under the Administrative Procedure Act (APA).

On the merits, the claims are exceptionally weak. Plaintiffs' challenge to the real-estate appraisal is legally baseless and defies common sense. Plaintiffs still have "never directly address[ed] the absurd consequences" of their position, which would require Resolution Copper to pay for mining rights it already owns. 1-AMRCER-24.

Plaintiffs' litany of NEPA complaints is foreclosed by the Forest Service's exhaustive environmental analysis and by the Supreme Court's recent "course correction" in *Seven County Infrastructure Coalition v. Eagle County*, 145 S. Ct. 1497, 1511 (2025), which held that "the central principle of judicial review in NEPA cases is deference." Plaintiffs' tribal and historic consultation claims are foreclosed by overwhelming evidence, including "434 documented consultations with the San Carlos Apache Tribe" spanning two decades. 1-AMRCER-68. And Plaintiffs' religious freedom claims are foreclosed by this Court's *en banc* decision in *Apache Stronghold* just last year. Plaintiffs have not shown serious questions on the merits, much less likelihood of success.

Nor, despite their rhetoric, have Plaintiffs shown they would suffer irreparable harm from the land exchange itself, rather than mining operations, which Plaintiffs concede are many years in the future. As for the balancing of equities, Congress already determined by statute that the exchange advances the public interest by facilitating critical copper mining and expanding the national system of

2

conservation lands. The equities tip sharply in favor of Congress's decision to mandate the land exchange.

The district court correctly denied Plaintiffs' motions for a preliminary injunction, and this Court should affirm.

## STATEMENT OF JURISDICTION

The Forest Service adopts Plaintiffs' statement of jurisdiction.

## STATEMENT OF THE ISSUES

1. Whether the district court abused its discretion when it denied Plaintiffs' request for a preliminary injunction. That question includes consideration of whether Plaintiffs are likely to succeed on the merits of their claims, which involve the following issues:

A. Whether an appraiser must attribute the value of minerals to the United States in an appraisal of federal land where a private party possesses the exclusive right to mine those minerals.

B. Whether the Forest Service's analysis in its Environmental Impact Statement was appropriate under the deferential NEPA standard that the Supreme Court laid out in *Seven County Infrastructure Coalition v. Eagle County*, 145 S. Ct. 1497 (2025) and whether the Forest Service's Environmental Impact Statement is a final agency action challengeable under the Administrative Procedure Act.

3

C. Whether the Forest Service complied with its obligations to consult with Tribes and the Advisory Council on Historic Preservation under the Land Exchange Act and the NHPA.

D. Whether, under this Court's en banc decision in *Apache Stronghold*, the Forest Service substantially burdens religious practice when it executes a congressionally mandated land exchange.

E. Whether Plaintiffs have standing to challenge a congressionally mandated land exchange.

2.    Whether Plaintiffs have shown that they would suffer irreparable harm because of the land exchange, rather than future mining operations, and that the equities tip sharply in their favor.

## STATEMENT OF THE CASE

### A.    Statutory and regulatory background

#### 1.    Oak Flat and Resolution Copper's mineral rights

One of the largest undeveloped copper deposits in the world is in Southeast Arizona, lying under the Tonto National Forest. 2-AMRCER-176. The deposit is estimated to include 1.8 billion metric tons of copper resources, as well as strategic and critical minerals such as rhenium, tellurium, indium, arsenic, and bismuth. SER-006. The land surface overlying the copper deposit is located in an area that, Plaintiffs allege,

4

has a long history of use by Native Tribes, including an Apache ceremonial ground known in English as "Oak Flat." SER-007.

Resolution Copper, LLC owns land surrounding the deposit, as well as mining claims that grant it the exclusive right to extract valuable minerals from a portion of the federal land in the area. 1-AMRCER-21–22. In that portion of the federal land, the United States holds fee-simple interest in the land, but that interest is "subject to valid and existing rights including all unpatented mining claims held by Resolution Copper." 4-AMRCER-539. Resolution's mining claims "confer all right to locatable minerals" on the land "and the right to use the surface for mining purposes." 4-AMRCER-539.

### 2. The Southeast Arizona Land Exchange and Conservation Act

In 2014, as part of the National Defense Authorization Act, Congress passed the Southeast Arizona Land Exchange and Conservation Act (the Land Exchange Act, or Act). 16 U.S.C. § 539p. The express purpose of the Act is to "authorize, direct, facilitate, and expedite the exchange of land between Resolution Copper and the United States." *Id.* § 539p(a). Specifically, the Act directed the Forest Service to convey 2,422 acres of land in Arizona—including Oak Flat— for at least 5,344 acres of equally appraised land owned by Resolution. *Id.* § 539p(b)(2), (4).

5

The Act culminated from many years of legislative and public debate. When Congress initially debated the Land Exchange Act, several members of the San Carlos Apache Tribe testified for and against the exchange. A prior version of the bill included Apache Leap as land to be transferred to Resolution as part of the exchange. *See Hearing on H.R. 3301, H. Comm. on Natural Resources, Subcommittee on National Parks, Forests and Public Lands*, 110th Cong. 19 (2007). At a 2007 hearing on the prior version of the bill, Wendsler Nosie, then-Chairman of the San Carlos Apache Tribe, testified in opposition, explaining that Apache Leap was sacred because "seventy-five of our People sacrificed their lives at Apache Leap during the winter of 1870 to protect their land, their principles, and their freedom." *Hearing on H.R. 3301, H. Comm. on Natural Resources, Subcommittee on National Parks, Forest and Public Lands*, 110th Cong. 19 (2007); *see also Hearing on H.R. 1063 et al., before the H. Subcommittee on Energy and Mineral Resources, H. Comm. on Natural Resources*, 113th Cong. 93, 101 (2013).

On the other hand, former San Carlos Apache Tribal Chairman Harrison Talgo testified in 2011 in support of the project:

> [W]e are in such desperate need of jobs and industry. We are one of the poorest Indian tribes in the Nation. Seven of ten eligible workers in the tribe are unemployed. . . . Without jobs our children are forced to move to neighboring communities, or into cities to find work. Not many of them return, and with each passing generation a piece of [A]pache identity and culture is lost.

*Legislative Hearing on H.R. 1904 et al., H. Comm. on Natural Resources, Subcommittee on National Parks, Forests and Public Lands*, 112th Cong. 68 (2011). Former Chairman Talgo stated that he believed that "Oak Flat is a long way from us" and that it "it is possible for our traditional values to coexist with economic progress." *Id.* He further clarified: "In fact, I don't believe that one can survive without the other." *Id.* Other Tribe members, including Dale Miles, the first historian of the San Carlos Apache Tribe, have also voiced support for the land exchange. See Dale Miles, *Oak Flat is a sacred site? It never was before*, https://www.azcentral.com/story/opinion/op-ed/2015/07/23/oak-flat-sacred/30587803/ (July 23, 2015) ("It wasn't until recent years that the site of Oak Flat was called sacred in any kind of way. All one has to do is examine the records to see if the word sacred was ever used for the site."); *see also* Oversight Hearing before the Subcommittee for Indigenous Peoples of the United States of the Committee on Natural Resources, U.S. House of Representatives, 116th Cong. 129-30 (Mar. 12, 2020) (submitting Miles op-ed for the record).

Ultimately, Congress considered both sides and determined that the public interest favored allowing mining on Oak Flat, but not on Apache Leap. As a condition of the land exchange, Resolution was required to surrender "all rights held under the mining laws and any other law to commercially extract minerals under Apache Leap," without compensation, 16 U.S.C. § 539p(g)(3), and the Forest Service

was directed to preserve Apache Leap's natural character, to allow for traditional Tribal uses, and to protect and conserve cultural and archaeological resources there, *Id.* § 539p(g)(4).

At the same time, Congress acknowledged and preserved Resolution's pre-existing mining rights in Oak Flat. "Nothing in this section shall interfere with, limit, or otherwise impair, the unpatented mining claims or rights currently held by Resolution Copper on the Federal land." *Id.* § 539p(*i*)(C); *see also id.* § 539p(b)(2) (defining the exchanged "Federal Land").

The Land Exchange Act sets out several procedural requirements alongside its core command to execute the land exchange. The Act requires the Forest Service to "engage in government-to-government consultation with affected Indian tribes concerning issues of concern to the affected Indian tribes related to the land exchange." *Id.* § 539p(c)(3)(A). After consultation, the agency must consult with Resolution "and seek to find mutually acceptable measures" to address tribal concerns and to minimize adverse effects on Indian tribes from mining. *Id.* § 539p(c)(3)(B). The Act also requires appraisals of the federal land and non-federal land to ensure that the value of the federal land and non-federal land to be exchanged are equal. *Id.* § 539p(c)(4)–(5). The appraisals must be conducted "in accordance with nationally recognized appraisal standards." *Id.* § 539p(c)(4)(B)(i).

8

The Land Exchange Act also includes a provision outlining the Forest Service's obligations to conduct environmental analysis. *Id.* § 539p(c)(9). Specifically, prior to conveying any land, the Forest Service must "prepare a single environmental impact statement under [NEPA], . . . which shall be used as the basis for all decisions under Federal law related to the proposed mine and the Resolution mine plan of operations and any related major Federal actions significantly affecting the quality of the human environment." *Id.* § 539p(c)(9)(B). Such "related major Federal actions" include "granting of any permits, rights-of-way, or approvals" for the construction of, among other things, ancillary facilities. *Id.* Once the Forest Service has published its Final EIS, it must convey title to the federal land within 60 days of publication. *Id.* § 539p(c)(10).

In exchange for conveying the federal land, the Act provides that Resolution will simultaneously convey at least 5,459 acres of land to the Forest Service and the Department of the Interior. *Id.* § 539p(d)(1). That land will be incorporated into either the National Forest System or several conservation areas administered by the Department of the Interior. *Id.* § 539p(d)(2).

### 3. The National Environmental Policy Act

NEPA is a "purely procedural" statute that "ensures that the agency and the public are aware of the environmental consequences of proposed projects." *Seven Cty.*, 145 S. Ct. at 1510. As a "procedural

9

cross-check," NEPA does not mandate any particular substantive outcome, and it is not meant to be a "substantive roadblock" to agency action. *Id.* at 1507, 1511. "The goal of the law is to inform agency decisionmaking, not to paralyze it." *Id.* at 1507. When an agency determines that a proposed federal action will have significant environmental effects, it prepares an EIS analyzing the action's environmental effects. 42 U.S.C. § 4336(b)(1).

In NEPA cases, "the central principle of judicial review . . . is deference." *Seven Cty.*, 145 S. Ct. at 1511. Therefore, "[c]ourts should afford substantial deference and should not micromanage" agency choices that "fall within a broad zone of reasonableness." *Id.* at 1513. Because judicial review proceeds under the APA rather than directly under NEPA, courts ask only "whether the agency's final decision"—not merely its NEPA document—"was reasonable and reasonably explained." *Id.* at 1511, 1514. A NEPA analysis "invariably make[s] a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry," and courts must give those agency choices "substantial deference." *Id.* at 1513.

### 4. The National Historic Preservation Act

The NHPA is a procedural statute that requires federal agencies to "stop, look and listen" by considering the effects of their undertakings on historic properties. *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 607 (9th Cir. 2010) (quotation omitted).

10

Section 106 of the NHPA requires federal agencies to "take into account the effect of [any] undertaking on any historic property." 54 U.S.C. § 306108.[1] Section 106 does not prohibit harm to historic properties, which are defined in the statute as properties eligible for or included on the National Register of Historic Places. *Id.* § 300308. Like NEPA, the NHPA creates obligations that are "chiefly procedural in nature." *San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1097 (9th Cir. 2005) (quoting *Pres. Coal. Inc. v. Pierce*, 667 F.2d 851, 859 (9th Cir. 1982)). For instance, the NHPA requires agencies to give the Advisory Council on Historic Preservation (ACHP) "a reasonable opportunity to comment with regard to the undertaking." 54 U.S.C. § 306108. But an agency need not receive approval from the ACHP before it proceeds with the undertaking; rather, the NHPA only requires that an agency consult with the ACHP and consider the impacts of its undertaking. *CTIA – The Wireless Ass'n v. FCC*, 466 F.3d 105, 107 (D.C. Cir. 2006).

## B. Procedural background

### 1. Cases challenging the land exchange and the *Apache Stronghold* litigation

The Forest Service first published a Final EIS analyzing the land exchange on January 15, 2021. 2-AMRCER-178. Shortly thereafter,

---

[1] An "undertaking" is a "project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency." 54 U.S.C. § 300320.

three Plaintiff groups challenged the land exchange and moved for preliminary injunctions seeking to halt the exchange. The Arizona Mining Reform Coalition (AMRC) and the San Carlos Apache Tribe plaintiffs primarily challenged the sufficiency of the Final EIS and are also plaintiffs in this appeal. The third case, *Apache Stronghold v. United States*, challenged the land exchange under the Religious Freedom Restoration Act (RFRA) and the Free Exercise Clause, arguing that the land exchange substantially burdened the Apache religion. No. 21-00050, 2021 WL 689906 (D. Ariz. Feb. 22, 2021).

In March 2021, the Forest Service withdrew the Final EIS in order to reinitiate consultation with the Tribes and ensure impacts have been fully analyzed. 6-AMRCER-1027. Because AMRC and the Tribe's suits focused on the adequacy of the Final EIS, those cases were stayed while the government reinitiated consultation.

But the *Apache Stronghold* case continued. This Court affirmed the district court's denial of a preliminary injunction, and plaintiffs sought rehearing en banc, which this Court granted. *See Apache Stronghold v. United States*, 38 F.4th 742 (9th Cir. 2022), *vacated, Apache Stronghold v. United States*, 56 F.4th 636 (9th Cir. 2022) (granting petition for rehearing en banc).

The en banc panel also affirmed the district court's denial of a preliminary injunction. *Apache Stronghold v. United States*, 101 F.4th 1036, 1044 (9th Cir. 2024). The en banc Court held that "a disposition of

12

government real property does not impose a substantial burden on religious exercise when it has 'no tendency to coerce individuals into acting contrary to their religious beliefs,' does not 'discriminate' against religious adherents, does not 'penalize' them, and does not deny them 'an equal share of the rights, benefits, and privileges enjoyed by other citizens.'" *Id.* at 1044 (quoting *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 449–50 (1988)). The en banc Court held that Apache Stronghold's claims under RFRA and the Free Exercise Clause both failed because the land exchange was a disposition of real property that did not substantially burden religious exercise. *Id.* at 1044, 1051–52, 1063.

Apache Stronghold petitioned for certiorari, which the Supreme Court denied in May 2025. *Apache Stronghold v. United States*, 145 S. Ct. 1480 (2025). Justices Gorsuch and Thomas dissented from the denial of certiorari. *Id.* at 1480–89 (Gorsuch, J., dissenting from the denial of certiorari). On June 23, 2025, Apache Stronghold filed a petition for rehearing, asking the Court to reconsider its denial of certiorari in light of its decision in *Mahmoud v. Taylor*, 145 S. Ct. 2332 (2025). That petition is still pending.

### 2. The Final EIS, the appraisal report, and the Draft ROD

a. *Environmental Impact Statement.* The Forest Service published its Final EIS on June 20, 2025. The EIS consists of six volumes,

13

including a nine-chapter, 1,000-page body and twenty-one appendices. In total, the EIS spans nearly 2,200 pages examining the environmental impacts of the land exchange and any Forest Service approvals for mine-related infrastructure on Forest land (including Forest land not at issue in the land exchange or this lawsuit). 2-AMRCER-181.

The Forest Service's EIS took an in-depth look at six different alternatives for potential federal approvals related to the mine. 2-AMRCER-186–97. This included a no-action alternative and five alternatives looking at various ways the mine would store and process tailings. 2-AMRCER-186–97. The EIS noted the public's interest in an analysis of alternative mining techniques, but explained that, "all industry mining guidance indicates alternative mining techniques are not appropriate for a deposit" like the Resolution deposit. SER-16–17. Moreover, the "use of any of these alternative underground mining techniques would result in higher per-ton mining costs" and could result in "remov[ing] an estimated 80 percent of the tonnage of the Resolution Copper deposit from consideration for development." SER-16–17. The Forest Service concluded that "forgoing 80 percent of the ore deposit to accommodate an alternative mining technique is an unreasonable outcome" and thus excluded alternative mining techniques from more-detailed analysis.

The Forest Service conducted an extensive analysis of the land exchange's environmental impacts. The EIS looked at how the land

14

exchange and potential federal actions would impact a plethora of resources including, local geology, soils and vegetation, noise and vibration, transportation and access, air quality, water resources, wildlife, recreation, public health and safety, scenic resources, cultural resources, socioeconomics, tribal values, and livestock. 2-AMRCER-198–204.

The EIS took a particularly close look at the proposed mine's impact on water resources and groundwater. *See* SER-028–72. Specifically, the EIS analyzed impacts on "local water supplies from dewatering and block caving, the amount of water that would be used by each alternative, the impacts from pumping of the mine water from the Desert Wellfield, and the potential for ground subsidence to occur because of groundwater pumping." SER-029. For each alternative, the Forest Service quantitatively modeled the physical impact caused by groundwater withdrawals, modeling groundwater up to 200 years in the future. SER-029–44. The EIS also analyzed direct impacts on groundwater pumping for each alternative, including analysis of groundwater drawdown (the reduction in water level from pumping) at different locations in the Desert Wellfield. SER-056–60.

In its analysis of groundwater impacts, the Forest Service considered and responded to comments from other government agencies, including the Bureau of Land Management and the Arizona State Land Department. And the Forest Service made several additions

15

to the EIS based on input from the Bureau of Land Management. *See, e.g.*, SER-126–35.

Not only did the EIS look at the mine's direct effects on groundwater, it also looked at potential cumulative effects when combined with potential nearby developments. Specifically, the EIS analyzed regional water supplies when taking into account the planned Superstition Vistas development. SER-126–38. The Forest Service added a qualitative analysis of a proposed Superstition Vistas residential development project in part to respond to concerns raised by the State of Arizona. 2-AMRCER-217; 4-SCATER-787–88 (responding to the State's comments).

The EIS also considered the risks associated with tailings storage and pipelines, devoting over fifty pages to tailings and pipeline safety. SER-073–124. The Forest Service conducted a full "failure modes and effects analysis," which evaluated different scenarios in which the proposed tailings storage could fail in order to prevent or mitigate such possibilities. SER-077. That analysis considered a range of possible breach scenarios, used a worst-case assumption to analyze potential outcomes, and assessed the potential downstream impacts in areas where tailings would travel. SER-077.

Finally, the EIS includes a detailed framework for how the Forest Service and Resolution will mitigate and monitor environmental impacts. SER-008–15. Appendix J of the EIS includes an in-depth

16

discussion of mitigation and monitoring measures. SER-150–99. The Forest Service also considered the measures suggested by commenters, including those related to groundwater impacts. The agency further explained that it lacks authority to impose certain commenter-suggested methods. 4-SCATER-732–46.

Although the Forest Service analyzed the environmental impacts of the land exchange and associated federal actions that may follow the land exchange and that are required for mine development to proceed, the EIS makes abundantly clear that the Forest Service does not have discretion to determine whether to approve the land exchange, which is mandated by Congress. 2-AMRCER-184. Rather, the EIS is meant to inform federal agency decisionmaking related to decisions under federal law related to the proposed mine. 2-AMRCER-184; 16 U.S.C. § 539p(c)(9)(B) (directing the Forest Service to prepare an EIS "which shall be used as the basis for all decisions under Federal law related to the proposed mine").

The Final EIS explains that the agency should use the analysis in the EIS to make decisions about project-related activities on federal lands, such as special-use authorizations that would authorize construction of power lines that support the mine. The EIS was accompanied by a draft record of decision (ROD) that proposes these decisions. SER-010. But the Draft ROD is not the last word on the matter—the Draft is subject to the Forest Service's administrative-

objection process, which is currently ongoing. SER-010 (citing 36 C.F.R. pt. 218). Once the Forest Service responds to objections to the Draft ROD, it will issue a final ROD that will constitute the agency's final action as to the proposed decisions in the Draft ROD.[2] SER-010.

b. *Appraisal Reports.* Pursuant to the Land Exchange Act, the Forest Service prepared appraisal reports for the federal land that is to be conveyed to Resolution. Notably, Resolution holds unpatented mining claims on a portion of that federal land. 4-AMRCER-539. Thus, one appraisal report summarized the value of the "Mining Claim Zone," or the portion of the federal land on which Resolution holds unpatented mining claims. 4-AMRCER-539; *see also* 16 U.S.C. § 539p(c)(4). Another summarized the value of the "Mineral Withdrawal Area," or the portion of the federal land on which Resolution holds no mining claims and thus holds no possessory interest in the minerals found there. 4-AMRCER-552–79.

The Mining Claim Zone appraisal report explains that it applies to the fee-simple interest in the land, "subject to valid and existing rights including all unpatented mining claims held by Resolution Copper." 4-AMRCER-539. The report notes that those mining claims "confer all right to locatable minerals" on the land "and the right to use the surface

---

[2] The Draft ROD recognized that, because the statute mandates that the land exchange occur within 60 days of the publication of the Final EIS, it was likely that the Final ROD would be issued after the land exchange has already occurred. 2-AMRCER-276–67.

for mining purposes." 4-AMRCER-539. The report appraised the property as if it was in private ownership and sold on the free market, noting that the land "is encumbered by mining claims held by a party other than the United States." 4-AMRCER-540. The report explained that Resolution's mining claims create "a conditional, possessory interest in real property ownership of a mineral estate in accordance with the Mining Law." 4-AMRCER-545. Thus, the value of the locatable minerals on the land "are not part of the estate owned by the United States." 4-AMRCER-545 (citing 30 U.S.C. §§ 26, 181, 611). Because the estate owned by the United States does not include the right to mine copper, the appraiser found that the "highest and best use of the property" for a buyer on the free market was to use the surface land in support of a mining operation. 4-AMRCER-545.

In contrast, the appraisal report for the Mineral Withdrawal Area notes that the minerals on that parcel "are owned by the United States" and that the highest and best use of that portion of the land would be "the exploration and development of a mineral resource as a portion of the Resolution Copper deposit." 4-AMRCER-559, 561. Thus, the appraisal of the Mineral Withdrawal Area included the copper deposits in its assessment of the property's value. 4-AMRCER-563–68.

Concurrent with the publication of the Final EIS, the Forest Service published a 92-page Draft ROD that proposes authorizing special-use authorizations for pipelines, transmission lines, and roads,

and forest-plan amendments related to the Resolution Copper project. 2-AMRCER-268. In other words, the Draft ROD only proposes decisions for portions of the project for which the Forest Service has discretionary authority, such as power lines crossing National Forest land.

### 3. Tribal and ACHP consultation

Pursuant to its obligations in the Land Exchange Act and the NHPA, the Forest Service consulted with Tribes and the ACHP about the land exchange's effects on cultural and historic resources. The Final EIS describes the extensive consultation process including "formal and informal meetings, correspondence, sharing information, site visits, and documentation of Tribal comments and concerns by the Forest Service." SER-148.

Tribal consultation was extensive. As the district court outlined, discussions between the federal government and members of the Tribe regarding the land exchange began in 2003, and continued through 2015, even before Congress passed the Land Exchange Act. 1-AMRCER-68. The district court also provided a detailed overview of the numerous consultation sessions between the Forest Service and the Tribes after 2015. In all, "the Forest Service conducted . . . 434 documented consultations with the San Carlos Apache Tribe." 1-AMRCER-68, 69–72.

The consultation process with the ACHP began in 2017, but in February 2021 the ACHP notified the Forest Service that it was

20

terminating consultation because it believed that further consultation would be unproductive. SER-200–01. The ACHP concluded that the land exchange would destroy significant historic properties and the mitigation measures contemplated by the Forest Service were not sufficient to adequately resolve those adverse effects. SER-200.

In March 2021, the Forest Service withdrew its previously published EIS and reinitiated Tribal consultation. SER-148. As part of the reinitiated consultation, the Forest Service held Tribal listening sessions, as well as formal and informal consultation meetings with Tribes. SER-148. Between 2021 and 2023, the Forest Service engaged directly with Plaintiff San Carlos Apache's Tribal Council. 1-AMRCER-70–71. That process continued through 2024, when the Forest Service conducted two more formal consultation meetings with the Tribe to discuss its concerns and to attempt to develop a memorandum of understanding. 1-AMRCER-70–72. The extensive Tribal consultation is documented in Appendix S of the Final EIS, which runs more than 100 pages. 5-SCATER-899–1008.

In 2025, the Secretary of Agriculture responded by letter to the ACHP's final comments on the project. LopezER-191–92. The letter explained that, even after further consultation with the Tribes, no other potential mitigation or alternatives had been discovered that would allow the Forest Service to both comply with the Land Exchange Act and avoid adverse impacts to Tribal interests. LopezER-193. Thus, the

letter finalized the NHPA consultation process and documented how the Forest Service considered the ACHP's comments in publishing the Final EIS. LopezER-192.

### 4. District court proceedings

AMRC and the Tribe moved for preliminary injunctions in early 2025 after the Forest Service gave notice that it planned to publish a Final EIS no later than June 16, 2025. The district court denied those motions on June 6, 2025, but the court nonetheless entered an order, with the consent of the government, enjoining the government from conveying title to the federal lands until August 19, 2025, to allow for a second round of preliminary-injunction briefing. After that briefing, the district court denied Plaintiffs' renewed motions on August 15, 2025, four days before the statutorily mandated deadline to complete the land exchange. 1-AMRCER-95.

In a 94-page order, the district court found that Plaintiffs were not entitled to a preliminary injunction because they neither established serious questions going to the merits of any of their claims, nor showed that the balance of hardships tips sharply in their favor. 1-AMRCER-93–94. The district court methodically walked through each of Plaintiffs' many merits claims and explained why they did not raise serious questions.

First, the court found that AMRC's appraisal claims did not raise serious questions because the appraisers' approach was correct and

AMRC's criticisms flowed from a misunderstanding of how unpatented mining claims worked. 1-AMRCER-21–28. Second, the court found that neither AMRC nor the Tribe had raised serious questions as to the adequacy of the EIS and the Forest Service's NEPA analysis. 1-AMRCER-45–61. Third, the court held that the Tribe had not raised serious questions as to the adequacy of the Forest Service's consultation, providing a detailed history of how the agency sought and considered the Tribe's views on the project. 1-AMRCER-66–79. Finally, the court found that even if Plaintiffs had established a likelihood of success on the merits, it would still deny the motions because the equities did not tip sharply in Plaintiffs' favor. 1-AMRCER-91–93. The court concluded that even if there were important public-interest considerations that favored Plaintiffs, they were balanced by considerations that favored the government, primarily because the Land Exchange Act represents a considered choice by Congress. 1-AMRCER-92.

While the AMRC and Tribe's cases were proceeding in the District of Arizona, the Plaintiffs in *Lopez* filed suit in the District for the District of Columbia. Lopez sued on July 24, 2025—four years after AMRC, the Tribe, and Apache Stronghold filed suit, and more than 90 days after the Government provided sixty days' notice of intent to publish the Final EIS. *Lopez v. United States*, No. 1:25-cv-02408 (D.D.C., July 24, 2025). The district court granted the government's

motion to transfer venue to the District of Arizona on August 1, 2025. In the transfer memorandum, the court explained that the Lopez Plaintiffs' conduct "raise[d] the specter of forum-shopping," because the Ninth Circuit's decision in *Apache Stronghold* "would appear to doom many of their First Amendment and RFRA claims." *Lopez v. United States*, 2025 WL 2193001, *3–4 (D.D.C. Aug. 1, 2025).

On August 17, 2025, the district court for the District of Arizona denied Lopez's motion for a preliminary injunction. LopezER-23. The court first explained that *Apache Stronghold* doomed the Lopez's RFRA and Free Exercise claims now that the case was in the Ninth Circuit because *Apache Stronghold* represents the binding law of the Circuit. LopezER-11. The court also held that the Supreme Court's decision in *Mahmoud* was not clearly irreconcilable with *Apache Stronghold*. LopezER-5.

Turning to the Lopez's NEPA claims, the court rejected the claim that the Final EIS was too long and in violation of NEPA's EIS length limitations because, even assuming that the EIS did violate NEPA's length requirements, Lopez did not demonstrate "how the publishing of a shorter FEIS would have made a difference in the agency decisionmaking or otherwise impede NEPA's goals." LopezER-15. And the court found that the Lopez's substantive NEPA claims were not likely to succeed because the Forest Service assessed the environmental consequences of alternative mining methods. LopezER-16–19. Finally,

24

the court found that the Forest Service complied with its NHPA consultation duties and that the public interest did not tip sharply in Lopez's favor. LopezER-20–21.

All three Plaintiff groups appealed to this Court and filed motions for injunctions pending appeal. On August 18, 2025, a motions panel of this Court entered an order referring the emergency motions for injunctive relief to the merits panel. ECF 19 at 2. The motions panel took no position on the merits of the motions but nevertheless granted "a temporary administrative injunction to preserve the status quo while the motions are pending." ECF 19 at 2. Those motions remain pending, and the temporary administrative injunction blocking the congressionally mandated land exchange remains in place.

## SUMMARY OF ARGUMENT

This Court should affirm the district court's denial of Plaintiffs' motions for a preliminary injunction. Plaintiffs have not raised serious questions as to the merits of their claims, let alone shown that they are likely to succeed on the merits. Nor have they shown that the equities tip in their favor.

1. First, the district court correctly concluded that AMRC was unlikely to succeed on the merits of its claim challenging the appraisal of the federal property. Resolution already possessed the right to the minerals on a portion of the federal land, so the appraiser appropriately excluded the value of the copper from that parcel. The United States'

appraised estate did not include the right to mine copper on that parcel; it would be nonsensical to make Resolution pay for the value of a mineral deposit to which Resolution already held a property right and that the United States could not convey, via sale or otherwise. AMRC's claim boils down to an argument that the appraiser should have included the value of the mineral estate because the appraiser should value the land in its post-exchange condition. But there is no support for that counter-intuitive definition of market value in either the statute or in federal appraisal standards. Rather, the standards support exactly the approach the appraiser took here.

2.     Second, Plaintiffs are not likely to succeed on their NEPA claims. All three Plaintiff groups bring claims challenging the sufficiency of the Forest Service's EIS under NEPA. These claims fail at the threshold. Because the EIS was meant to inform future federal agency decisionmaking, the EIS itself is not a challengeable "final agency action" under the APA. As far as Plaintiffs challenge the EIS's analysis of the land exchange directly, NEPA does not apply to the land exchange because it is a nondiscretionary action. Even if Plaintiffs could overcome these threshold deficiencies, their NEPA claims fail on the merits. In *Seven County*, the Supreme Court recently instructed that courts must give agencies' NEPA analysis substantial deference. Here, the Forest Service's analysis was more than enough under this deferential standard. The EIS looks at impacts on groundwater,

26

responds to other agencies' comments, examines mitigation measures, considers safety and risk, and analyzes alternative mining techniques. Plaintiffs flyspeck the details of those analyses, but they have not shown that any analysis was insufficient—much less a basis for enjoining the underlying land exchange—under *Seven County's* deferential standard.

3.    Third, the Tribe and the Lopez Plaintiffs are unlikely to succeed on their claims challenging the sufficiency of the Forest Service's consultation. The Forest Service exhaustively consulted with stakeholders under both the NHPA and the Land Exchange Act. It detailed that extensive consultation history in the EIS, it responded to the ACHP's comments, and it attempted to resolve adverse effects to Tribal interests. Although the Forest Service ultimately determined that there were unmitigable adverse effects to historic properties, neither statute requires the agency to completely nullify adverse effects. The Forest Service fully complied with its procedural consultation duties.

4.    Fourth, the Lopez Plaintiffs are unlikely to succeed on their religious-freedom claims. Those claims are clearly barred by this Court's en banc decision in *Apache Stronghold*, which rejected nearly identical claims. The Lopez Plaintiffs have not shown why that case is not binding here. They argue that *Apache Stronghold* is clearly irreconcilable with the Supreme Court's recent decision in *Mahmoud*,

27

but *Mahmoud* addressed a school's decision rescinding a policy permitting parents to excuse their elementary-age children from instruction related to LGBTQ+-inclusive storybooks. *Mahmoud* is inapposite here.

5. Fifth, none of the Plaintiffs are likely to succeed on the merits of their challenges to the land exchange, as all three Plaintiff groups lack standing to challenge the exchange directly. As stated in their complaints, Plaintiffs' injuries all flow directly from the land exchange. But the Forest Service has a nondiscretionary, congressionally mandated obligation to execute the land exchange and transfer title, and no additional analysis under NEPA, additional appraisal, or consultation can change that duty. Thus, Plaintiffs' injuries that flow from the land exchange would not be redressed by a favorable court decision.

6. Finally, the district court correctly found that Plaintiffs had not shown that the equities and the public-interest factors tipped in their favor. Congress made the decision that this land exchange should go forward, and this Court must credit Congress's judgment.

The district court correctly denied Plaintiffs' motions for a preliminary injunction. This Court should affirm.

## STANDARD OF REVIEW

A preliminary injunction is an "extraordinary remedy," granted only "upon a clear showing that the plaintiff is entitled to such relief."

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Plaintiffs must establish that (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [their] favor"; and (4) "an injunction is in the public interest." *Id.* at 20. This Court has permitted injunctive relief if the movant shows "serious questions" on the merits, but only if it carries its burden on the other injunction factors and if the balance of hardships "tips sharply" in its favor. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011).[3]

The district court's decision to deny Plaintiffs' motion for preliminary injunction is reviewed for abuse of discretion. *Lands Council v. McNair*, 537 F.3d 981, 986 (9th Cir. 2008) (en banc), *overruled on other grounds by Winter*, 555 U.S. at 7. Under this standard, this Court does "not determine the ultimate merits, but rather determine[s] only whether the district court correctly distilled the applicable rules of law and exercised permissible discretion in

---

[3] The government hereby preserves for review by the en banc Court or the Supreme Court the conclusion that "the 'serious questions' version of the sliding scale test for preliminary injunctions remains viable after the Supreme Court's decision in *Winter*." *Cottrell*, 632 F.3d at 1134. *Winter* "made clear that a likelihood of success is an independent, free-standing requirement for a preliminary injunction," meaning that "a strong showing of irreparable harm . . . cannot make up for a failure to demonstrate a likelihood of success on the merits." *Davis v. PBGC*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring).

applying those rules to the facts at hand." *Saravia for A.H. v. Sessions*, 905 F.3d 1137, 1141–42 (9th Cir. 2018) (cleaned up).

In a challenge to agency action, the Court reviews the merits of Plaintiffs' legal challenges under the deferential standard of the Administrative Procedure Act. *Westlands Water Dist. v. U.S. Dep't of the Interior*, 376 F.3d 853, 865 (9th Cir. 2004) (quoting 5 U.S.C. § 706(2)(A)). Under the APA, an agency action may be set aside only if plaintiffs prove the decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The standard of review is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (citation omitted).

## ARGUMENT

This case is not a close call. Plaintiffs do not show serious questions on the merits, as the district court demonstrated in its thorough opinion. Nor do they show irreparable harm from the land exchange, rather than from future mining operations. And, because Congress has already made the policy decision, the equities tip sharply in favor of the land exchange that Congress mandated. This Court should thus affirm the district court's orders denying the motions for a preliminary injunction.

## I. Plaintiffs have not shown serious questions on the merits of their claims, much less likelihood of success.

Plaintiffs' claims fall into four buckets: (a) an appraisal claim, (b) NEPA claims, (c) consultation claims, and (d) religious freedom claims. All fail for lack of standing, as we explain in Section I.E. The claims cannot overcome numerous other threshold barriers, and they woefully fail on the merits regardless.

### A. AMRC is unlikely to succeed on its claim challenging the appraisal.

AMRC's appraisal claim fails on the merits because it lacks support in law or common sense. AMRC is also outside the zone of interest of the appraisal requirement and thus lacks prudential standing.

#### 1. The appraisal correctly excluded the value of Resolution's unpatented mining claims.

Fundamentally, AMRC argues that the appraisal was incorrect to exclude the value of Resolution's unpatented mining claims from its valuation of the land. But the appraisal correctly valued the land because the right to mine the copper was not a right that the United States possessed or could convey in the land exchange.

Under the General Mining Law of 1872, a party that discovers a valuable mineral deposit on lands open to mining obtains a property right to extract those minerals, and to reasonable use of the land for

those purposes, without payment to the United States. 30 U.S.C. §§ 26, 612. "Patenting . . . is not required, and an unpatented mining claim remains a fully recognized possessory interest." *United States v. Locke,* 471 U.S. 84, 86 (1985); *see also Wilbur v. United States ex rel. Krushnic*, 280 U.S. 306, 316–17 (1930) (an unpatented mining claim carries a right of "present and exclusive possession [and] is property in the fullest sense of that term.").

An unpatented mining claim "represents a federally recognized right in real property." *United States v. Shumway*, 199 F.3d 1093, 1099-1100 (9th Cir. 1999). It "is a property interest, which is itself real property in every sense, and not merely an assertion of a right to property." *Id.* (citing *Benson Mining & Smelting Co. v. Alta Mining & Smelting Co.*, 145 U.S. 428 (1892)). Resolution's mining claim is just that: a real-property right to extract the copper under the federal land.

Thus, while the United States owns the land on the Mining Claim Zone in fee simple, "Resolution Copper already effectively owns the exclusive right to mine the copper" underlying the land. 1-AMRCER-23. Accordingly, the United States can neither mine the minerals nor transfer the right to do so to anyone else—at least not without paying just compensation for a taking. *Shumway*, 199 F.3d at 1100 (discussing Supreme Court precedent where "a company holding a mining claim … was entitled to compensation for [a] taking").

The value of Resolution's mineral rights was therefore properly excluded from the United States' estate in the appraisal. This makes sense, because even if Congress had never enacted the Land Exchange Act, Resolution would have retained the exclusive rights to extract the copper without payment to the United States, and those rights would remain an encumbrance on the federal land. *See* 4-AMRCER-544–45. Therefore, the appraisal properly excluded the value of those minerals from the United States' estate. 36 C.F.R. § 254.9(c)(4) (requiring statement of encumbrances for land appraisals).

AMRC asserts that Resolution's mining claims are a "red herring" because even if Resolution has a property right to extract minerals, the United States nonetheless owns title to the mineral estate. AMRC Br. 35–36. AMRC contends that that right only extends to the "ability to propose mining, subject to government regulation." AMRC Br. 36. But Resolution indisputably possesses the exclusive right to extract the minerals. As the district court explained, the nature of a mining claim means that "Resolution Copper already effectively owns the exclusive right to mine the copper underlying" the parcel. 1-AMRCER-23. To the extent that AMRC argues that Resolution's mining claims are not valid because Resolution has not complied with certain procedural requirements, that argument is both forfeited and incorrect. 1-AMRCER-23–24 n.8 (finding that any argument was improperly raised in a reply brief and thus forfeited and that it was not arbitrary and

capricious "for the appraiser to operate from the premise that the copper deposits underlying the MCZ parcel are valuable enough to validate Resolution Copper's mining claims" given that AMRC itself recognizes that the parcel sits atop the world's third-largest known copper deposit).

The land is encumbered by Resolution's property right to extract the copper, and the appraiser correctly excluded the value of that right (i.e., the copper) from the land's value. That is not a right that the United States can convey through sale. *See* 30 U.S.C. §§ 26, 612; *Shumway*, 199 F.3d at 1100.

### 2. The Forest Service correctly based its appraisal on the current sellable value of the land.

Seeking to nullify Resolution's mining rights, AMRC contends that the appraised value of the land must be based on its future value after Resolution takes fee title rather than its pre-sale value on the open market. AMRC Br. 24–35. In other words, AMRC would have the appraiser assess the value of the United States' land by considering how much it is worth *after* one specific buyer (which already owns the right to extract the copper) purchases the land.

That is nonsensical. The point of an appraisal is to estimate the fair value of a property sold to a hypothetical purchaser on the open market. That is what the appraiser did here. A hypothetical buyer on

34

the open market would not pay for the mineral rights because Resolution already owns them.

AMRC's argument directly conflicts with the Land Exchange Act, which specifies that "[n]othing in this section shall interfere with, limit, or otherwise impair, the unpatented mining claims or rights currently held by Resolution Copper on the Federal land." 16 U.S.C. § 539p(*i*)(C). On AMRC's view, however the land exchange strips Resolution of its unpatented mining claims and forces Resolution pay the federal government for those rights. That is obviously incorrect.

AMRC's argument also contradicts professional and regulatory appraisal standards. The Land Exchange Act directs the appraisal to occur "in accordance with nationally recognized appraisal standards" including the Uniform Appraisal Standards for Federal Land Acquisitions (also known as the Yellow Book) and the Uniform Standards of Professional Appraisal Practice. 16 U.S.C. § 539p(c)(4)(B)(i)(I)–(II). The Yellow Book explains that the definition of "market value" is:

> the amount in cash . . . for which in all probability the property would have sold on the effective date of value, after a reasonable exposure time on the open competitive market, from a willing and reasonably knowledgeable seller to a willing and reasonably knowledgeable buyer, with neither compelled to buy or sell, giving due consideration to all available economic uses of the property.

Interagency Land Acquisition Conference, *Yellow Book* 93 (2016).[4]

According to these appraisal standards, market value is defined as the *current* sellable value of the land ("on the effective date of value"), assuming that it is owned by a hypothetical seller and sold on the open market. A hypothetical seller would only own what the United States currently owns which, as explained above, does not include the right to extract the copper. So the market value of the land in the hands of a hypothetical private seller would still be subject to Resolution's mining rights.

Instead of using this straightforward formula for assessing the fair market value of property, AMRC invents a new one. According to AMRC, the appraiser must ignore the mining claims and instead value the parcel in a "future" world where Resolution is the seller and owns both the United States' property *and* Resolution's mining claims. AMRC Br. 24. Unsurprisingly, AMRC cites nothing that supports this strained argument. The word "future" that AMRC sprinkles through its argument is conspicuously missing from the authorities AMRC cites, which all confirm that a property should be appraised under its current market value.

---

[4] Available at
https://www.justice.gov/d9/enrd/legacy/2015/04/13/uniform-appraisal-standards.pdf

First, AMRC points to the Yellow Book, which says lands should be appraised "as if in private ownership and available for sale in the open market." AMRC Br. 24 (citing *Yellow Book* 53); *see also* 36 C.F.R. § 254.9(b)(ii). But of course, that is exactly what the appraiser did. The appraiser valued the federal land as if it was owned by a hypothetical private party, who of course would not own the right to mine the copper deposits, because Resolution already owns those deposits. The function of this regulation is to value the land as if freely alienable and usable as private land. It says nothing about appraising a "future" value, and certainly does not require an appraiser to value the land as if the surface and mineral estates were merged because the land was owned by one specific private party: Resolution.

Second, AMRC cites a dissent from this Court's decision in *Shoshone-Bannock Tribes of Fort Hall Reservation v. U.S. Department of the Interior*, arguing that the dissent supports AMRC's argument that the fair market value of land should be based on the future, post-exchange condition. AMRC Br. 26–28 (citing *Shoshone-Bannock*, ___ F.4th ___, 2025 WL 2424422 (9th Cir., Aug. 22, 2025) (Bumatay, J., dissenting)). But the dissent says nothing about "future" value, and instead says an appraisal should be based on a land's "market value" in "a competitive and open market." *Id* at *25 (internal citation omitted). And, as explained above, the Yellow Book makes clear that market value is defined as the current sellable value of the land, assuming that

it is owned by a hypothetical seller and sold on the open market—not the future value of a property after the property is acquired by one specific party to the land exchange. *Yellow Book* at 93.

AMRC makes two other arguments as to how the appraiser erred, neither of which is correct. First, it argues that the appraisal should have determined that the "highest and best use" of the land is mining rather than surface use in support of mining operations. AMRC Br. 28–31. But in determining the highest and best use of the parcel, the appraiser properly considered the fact that the land is encumbered by Resolution's unpatented mining claims. Because the United States does not possess the right to mine the copper on the parcel, the appraiser correctly determined that the highest and best use of the federal estate—i.e., the land without the right to mine the copper—would be for support facilities for the development of a mine. It would be absurd to conclude that the highest and best use was to mine a piece of property that does not include the right to mine.

Second, AMRC argues that federal rules and the Land Exchange Act require appraisers to include mineral values in their appraisals. AMRC Br. 31–35. AMRC points to regulatory language that directs appraisers to consider how mineral interests in land may contribute to assessing a property's free market value. AMRC Br. 31 (citing 36 C.F.R. §§ 254.2, 254.9(b)). But the appraiser here did evaluate the mineral interests; it just did not allocate them to the federal government

because Resolution already owns them. 4-AMRCER-544–45. Nothing in the federal appraisal regulations requires an appraiser to consider the value of interests that do not belong to the current estate owner.

AMRC also argues that, unless the value of the copper is included in the appraisal of the Mining Claim Zone (the portion of the federal land where Resolution holds mining claims), then subsection (e) of the Land Exchange Act, which requires Resolution to equalize value if the mine produces more mineral value than originally calculated, would be meaningless. AMRC Br. 32 (citing 16 U.S.C. § 539p(e)(2)). But AMRC misses the point of subsection (e). That subsection instructs Resolution to equalize the value if the minerals from the Federal Land —where Resolution did not already own the right to extract copper—exceed the appraised value. This makes sense when it comes to the Mineral Withdrawal Area, where Resolution did not already own the right to extract copper. But applying it to the Mining Claim Zone would mean that Resolution would pay the United States for minerals it already possessed under the Mining Law—a result that Congress surely did not intend.

As a last resort, AMRC points to legislative history. AMRC Br. 32–35. But nothing in the legislative history supports AMRC's argument because, as the district court explained, the legislative history did not discuss how to appraise the value of the land where Resolution already has mining claims. 1-AMRCER-26 ("[T]he isolated

39

statements that AMRC has been able to pull from the extensive legislative record . . . shed little light on how to construe the statutory text that Congress ultimately chose to adopt.") What Congress did say, in the statute itself, is that "[n]othing in this section shall interfere with, limit, or otherwise impair, the unpatented mining claims or rights currently held by Resolution Copper on the Federal land." 16 U.S.C. § 539p(*i*)(1)(C). AMRC's argument makes a mockery of the Exchange Act, property law, appraisal standards, and common sense.

### 3. AMRC lacks an APA right of action to challenge the land exchange under the Act's appraisal provisions.

The appraisal claim not only fails on the merits, but AMRC has no basis asserting it either. The APA provides a cause of action to a person who is "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. To "be adversely affected or aggrieved" "within the meaning of a statute, the plaintiff must establish that the injury he complains of (his aggrievement, or the adverse effect upon him) falls within the zone of interests sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 883 (1990) (cleaned up); *see also Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014). The Court determines a statutory provision's zone of interests using traditional tools of

40

statutory interpretation. *See Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 197–200 (2017).

To be sure, the zone-of-interests test is not meant to be especially demanding. *Lexmark*, 572 U.S. at 130. But still, the APA does not authorize suit if AMRC's interests are so marginally related to or inconsistent with the purpose of the appraisal provisions that it cannot be reasonably assumed that Congress intended AMRC to sue to enforce that provision. *Id.*

A party's ability to bring its claim is determined "by reference to the particular provision of law upon which the plaintiff relies." *Bennett v. Spear*, 520 U.S. 154, 1175–76 (1997). AMRC challenges the Forest Service's compliance with the Land Exchange Act appraisal provisions. Those provisions require the Forest Service to appraise the Federal land and non-Federal land in accordance with nationally recognized appraisal standards and mandate that the value of the Federal and non-Federal land be equal (or equalized). *See* 16 U.S.C. § 539p(c)(4)–(5). These provisions contain no reference to environmental protection. They are instead designed to protect the economic interests of the parties to the exchange. *See id.* § 539p(c)(4)(B) (establishing appraisal standards), (5)(B) (setting forth a process if the initial exchange turns out to lack the requisite equal value).

AMRC alleges only environmental, recreational, and aesthetic harm from the land exchange and from future mining activities. But the

41

appraisal provisions of the Land Exchange Act do not protect those interests. *Cf. Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dept. of Agric.*, 415 F.3d 1078, 1103 (9th Cir. 2005) (plaintiffs could not bring a NEPA claim because their economic interests were outside of NEPA's zone of interests). And while the provision in the Land Exchange Act requiring the Forest Service to prepare an EIS undoubtably protects environmental interests that could be impacted by discretionary Forest Service decisions, 16 U.S.C. § 539p(c)(9)(B), that provision does not form the basis of AMRC's claim. Moreover, nothing in statute indicates Congress's intent to protect environmental interests with respect to the mandatory land exchange (as opposed to post-exchange discretionary decisions). *Cf. Coos Cty. of Oregon v. Bernhardt*, No. 6:19-CV-00576-MC, 2019 WL 5748368, at *1 (D. Or. Nov. 5, 2019) (holding that plaintiffs asserting financial injury had statutory standing to bring an APA claim under the Coos Bay Wagon Roads Act, which governs federal lands and requires appraisals of such lands to provide payments to counties in which the lands are located in lieu of taxes); *Nw. Requirements Utilities v. FERC*, 798 F.3d 796, 809 (9th Cir. 2015) (finding plaintiffs fell outside of a statute's zone of interests when their stated goals were diametrically opposed to the statute's purpose).

In deciding that AMRC likely could state a cause of action under the APA, the district court primarily relied on *Desert Citizens*, see 1-

42

AMRCER-11–12, but that case is inapposite. *See Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172 (9th Cir. 2000). In *Desert Citizens*, this Court found that the plaintiffs asserting recreational and aesthetic interests had statutory standing to challenge a discretionary land exchange under the Federal Land Policy and Management Act (FLPMA). *Desert Citizens*, 231 F.3d at 1179. This Court reasoned that FLPMA requires public lands to be managed to protect environmental values and sets forth a "goal of providing 'judicial review of public land adjudication decisions.'". *Desert Citizens*, 231 F.3d at 1179 (citing 43 U.S.C. § 1701(a)(6), (a)(8)). Here, by contrast, the appraisal provisions (and the Land Exchange Act more broadly) include no indication of Congress's intent to create broad opportunities for judicial review or to protect environmental interests with respect to the appraisal or the land exchange itself.

Likewise, in *National Wildlife Federation v. Burford*, this Court found that an environmental group had prudential standing to challenge a coal lease under the Coal Leasing Act because the Act's "underlying substantive policy concern was to develop the coal resources in an environmentally sound manner." 871 F.2d 849, 853 (9th Cir. 1989); *see also Havasupai Tribe v. Provencio*, 906 F.3d 1155, 1167 (9th Cir. 2018) (concluding that environmental plaintiffs lacked an APA right of action under the Mining Law, but could bring such a claim under FLPMA). No such substantive policy concern is present in the

43

Land Exchange Act. Instead, the appraisal provisions are designed to protect the U.S. Treasury and the public fisc; they ensure that the United States is fairly compensated for the land.

The inquiry of whether a plaintiff has an APA cause of action to file suit under a specific statute is statute- and context-dependent, and here nothing in the appraisal provisions of the Land Exchange Act indicates that Congress intended to permit suits by groups seeking to redress environmental issues.

## B. Plaintiffs are unlikely to succeed on their NEPA claims.

"The bedrock principle of judicial review in NEPA cases can be stated in a word: Deference." *Seven Cty.*, 145 S. Ct. at 1515. Plaintiffs repeatedly ask this Court to ignore that principle, even bringing in post-hoc expert declarations and asking this Court to don a lab-coat and flyspeck the Forest Service's technical environmental analysis. Plaintiffs' NEPA claims fail both on threshold issues and on the merits.

### 1. The Final EIS is not a final agency action under the APA.

As a threshold matter, Plaintiffs' NEPA claims challenging the Final EIS and draft ROD are unlikely to succeed on the merits because neither of those documents is a final agency action subject to judicial review under the APA. *See Envt'l Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 867 (9th Cir. 2022). The APA authorizes judicial

44

review only of "final agency action." 5 U.S.C. § 704. The APA thus only allows review of agency action, which it defines as "an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* § 551(13). For an action to be "final," it must (1) "mark the 'consummation' of the agency's decisionmaking process" and (2) "be one by which 'rights or obligations have been determined', or from which 'legal consequences will flow.'" *Bennett*, 520 U.S. at 177–78. The EIS, which was issued alongside a draft ROD that is still subject to an administrative objections process, is neither "agency action," nor final.

The EIS is obviously not a rule. It is not a license or a sanction, because it does not grant permission or prohibit any activity. 5 U.S.C. § 551(8), (10). It is not relief, because it does not recognize a claim or act on the application of a person. *Id.* § 551(11)(B). Nor is it an order, *Id.* § 551(6), because it is not the "final disposition" of the agency in any matter.

For the same reason it is not an order, the EIS is also not "final" under the APA. It is a procedural document that informs the agency's decisionmaking. *Seven Cty.*, 145 S. Ct. at 1514 ("[Courts] must keep in mind that review of an agency's EIS is not the same thing as review of the agency's final decision concerning the project."). Indeed, the Land Exchange Act makes clear that the EIS is not a decision document for the land exchange itself, but instead must be used to inform all future

45

decisions "under Federal law related to the proposed mine," such as "granting of any permits, rights-of-way, or approvals" for the mine. 16 U.S.C. § 539p(c)(9)(B).

This is not to say that the contents of the EIS are (or will always be) unreviewable. But any challenges to the adequacy of the EIS at this stage are premature. *Cf.* AMRC Br. 43 ("The Government argued below that the FEIS is completely unreviewable."). Such challenges may instead be brought once an agency makes the final decision the EIS was meant to inform. *See, e.g.*, *Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1118 (9th Cir. 2010) ("Once an EIS's analysis has been solidified in a ROD, an agency has taken final agency action, reviewable under [the APA].").

That decision has not yet been made. Here, the EIS was published concurrently with a draft—not final—ROD. The draft ROD is subject to a 45-day predecisional objection process and, before issuing a final ROD, the Forest Service must consider and provide written responses to objections. 2-AMRCER-277; 36 C.F.R. § 218.11(b). The draft ROD also explains, "[t]he FEIS includes analysis of both the Resolution Copper Mine project, which is the development of a mine on the land, and the congressionally mandated land exchange," but the draft ROD "addresses decisions only related to the Resolution Copper Mine project." 2-AMRCER-277. That is because, while the Forest Service has discretion over the contours of any components of a future mining

46

project to the extent it occurs on Forest lands, the Forest Service has "no discretion or decision to be made with respect to the land exchange." *Id.*

The Tribe nevertheless asserts that its EIS challenges are presently reviewable to the extent the Land Exchange Act makes completion of the EIS a prerequisite to conveying Federal land. Tribe Br. 25–26, 31 ("[T]he question is not whether publication of the EIS constitutes a 'final agency action' under NEPA, but whether it does so under [the Land Exchange Act]."). But the APA—not the Land Exchange Act—supplies the Court with jurisdiction and limits review to final agency action. And the EIS does not constitute separate reviewable final agency action under the APA. Nothing in the Land Exchange Act suggests that Congress intended freestanding judicial review of the EIS. Instead, though the statute makes the EIS a predicate to conveying the land, the statute also makes clear that the EIS is to be used as the basis for all future decisions "under Federal law related to the proposed mine and the Resolution mine plan of operations and any related major Federal actions." The EIS was not meant to serve as a basis to inform the Forest Service on whether to undertake the land exchange itself—that decision was already made by Congress. 16 U.S.C. § 539p(c)(9)(B). In sum, the EIS is not final agency action reviewable under the APA.

47

2. **Plaintiffs cannot challenge the land exchange itself under NEPA because NEPA does not apply to the nondiscretionary land exchange.**

Insofar as Plaintiffs attempt to challenge the EIS's analysis of the land exchange, rather than its analysis of the Forest Service's future, discretionary decisions, those claims are also likely to fail at the outset. Plaintiffs cannot challenge the EIS's analysis of the environmental impacts of the land exchange because NEPA does not apply in the absence of agency discretion. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 769 (2004) ("NEPA's 'rule of reason' [does not] require an agency to prepare a full EIS due to the environmental impact of an action it could not refuse to perform."); *Sierra Club v. Babbitt*, 65 F.3d 1502, 1512–13 (9th Cir. 1995) (NEPA did not apply where BLM lacked authority to modify a road project).

The 2023 amendments to NEPA codified this rule by exempting "activities or decisions that are non-discretionary" from NEPA's definition of a "major Federal action." 42 U.S.C. § 4336e(10)(B)(vii). And the Supreme Court just confirmed it in *Seven County*, explaining that a court cannot enjoin agency action based on a NEPA violation "absent reason to believe that the agency might disapprove the project if it added more to the EIS." 145 S. Ct. at 1514. In other words, if there is no discretionary agency action to "disapprove," NEPA cannot support an injunction.

48

A mandatory transfer of title is not a major federal action subject to NEPA. To be sure, the Land Exchange Act requires the EIS to "assess the effects of the mining and related activities . . . on the cultural and archeological resources located on the Federal land," but the statute also makes clear that the EIS "shall be used as the basis for all decisions under Federal law." 16 U.S.C. § 539p(c)(9)(B), (C). The fact that Congress required the Forest Service to prepare an EIS specifically to "be used as the basis" for its future *discretionary* decisions does not create a cognizable NEPA claim against the predicate nondiscretionary land exchange. *Id.* § 539p(c)(9)(B). To the extent that Plaintiffs challenge the adequacy of the EIS with respect to its analysis of the environmental effects of the land exchange itself, those claims are not cognizable under NEPA.

### 3. Plaintiffs' NEPA claims and claims about the Final EIS also fail on the merits.

Plaintiffs' six NEPA claims also fail on the merits. NEPA is a "procedural cross-check, not a substantive roadblock." *Seven Cty.*, 145 S. Ct. at 1507. "NEPA imposes no substantive environmental obligations or restrictions." *Id.* It merely requires federal agencies to prepare an environmental report. *Id.*

This Court must defer to the Forest Service's judgment as to the scope and contents of the EIS so long as the agency's choices were reasonable. *Id.* at 1507. The "substantial deference" owed to the Forest

49

Service extends to "whether [the] report is detailed enough," "the usefulness of any new potential information," whether there are "feasible alternatives," and all "predictive and scientific judgments." *Id.* at 1512, 1515. When reviewing these judgments, "a reviewing court must be at its most deferential." *Id.* at 1512 (quotation marks omitted).

**a.  The Forest Service drew reasonable lines in analyzing the proposed mine's impacts on groundwater.**

AMRC argues that the Forest Service violated NEPA because the EIS failed to properly analyze the proposed mine's impacts on groundwater in the region. AMRC Br. 46–52. But the EIS includes an exhaustive analysis of the mine's effect on groundwater. Really, AMRC takes issue with the scope of the agency's draft analysis. But AMRC's argument that the Forest Service should have considered impacts from a separate project outside of the agency's authority is barred by *Seven County*. 145 S. Ct. at 1515–16. And, even if the Court considers the Forest Service's analysis in the EIS, it was within the agency's purview to delineate the proper scope, and the Court owes substantial deference under *Seven County* to the Forest Service's exercise of its expertise. *Id.* at 1513. The Forest Service's analysis of groundwater impacts was more than sufficient.

AMRC's claim boils down to one argument: that "the Forest Service refused to analyze the Mine's cumulative pumping impacts on

50

the aquifer or existing wells alongside the groundwater impacts of the 275-squre mile 'Superstition Vistas'" development. AMRC Br. 48. But the Superstition Vistas development is a potential future housing development over which the Forest Service has no authority. In other words, Superstition Vistas is a "future or geographically separate project[]," and NEPA "does not require the agency to evaluate the effects of that separate project." *Seven Cty.*, 145 S. Ct. at 1515.

Under *Seven County*, the Forest Service is not required to analyze environmental effects from separate projects, or for projects over which it has no regulatory authority. *Id.* at 1515–16. For example, if an agency authorizes construction of a highway, and "a housing development . . . might someday be built near [the] highway—the agency need not consider the environmental effects *of that separate project.*" *Id.* at 1515–16 (emphasis in original). "The effects from a separate project may be factually foreseeable, but that does not mean that those effects are relevant to the agency's decisionmaking process." *Id.*

Here, the Superstition Vistas development is both a separate future project and is outside the regulatory authority of the Forest Service. Thus, the Forest Service was not required to "consider the environmental effects *of that separate project.*" *Id.* That resolves this claim as a matter of law. No more is needed.

But even if the Forest Service was required to look at the effects on regional groundwater from the Superstition Vistas, the Forest

Service did so. The agency quantitatively modeled the anticipated drawdown of groundwater levels up to 200 years into the future under each alternative. SER-032, SER-043–44. The agency also considered the cumulative effects on groundwater from both the mine and the Superstition Vistas development and drew a reasonable line in analyzing reasonably foreseeable future activities. SER-126–38. Under *Seven County*, none of this was required. It is all belt-and-suspenders.

The Forest Service's analysis of cumulative effects on groundwater proceeded in two steps. First, to determine whether it should include some separate activity in its cumulative impacts analysis, the agency conducted a screening process for spatial overlap, temporal overlap, and to determine whether there is sufficient information to analyze for impacts. SER-126.

Second, as appropriate, the agency performed cumulative effects analyses for different resources where the proposed mine and the activity overlap. SER-027, 125. While the Forest Service determined that the Superstition Vistas development as a whole did not pass that initial screening, SER-126, the agency nevertheless analyzed portions of the development quantitatively and, in response to concerns about cumulative impacts to regional water supplies, Chapter 4 of the FEIS contains a qualitative or holistic discussion of regional water impacts including from Superstition Vistas. SER-126–138.

52

The Forest Service's analysis of Superstition Vistas obviously satisfies NEPA, both because courts must be at their "most deferential" when agencies make "predictive and scientific judgments," and because an agency need not analyze projects separate in time or geography, or outside the agency's regulatory authority. *Seven Cty.*, 145 S. Ct. at 1512, 1516. Here, the Forest Service quantitatively analyzed the portions of the project for which it had sufficient information— specifically, the portion that has a demonstrated source of water and that could accordingly be included in the regional cumulative effects groundwater model. SER-136. The other portions "without demonstrated water supplies" were "too speculative to include in the quantitative modeling," *id.*, but the agency nevertheless analyzed those portions qualitatively in Chapter 4. SER-126, 133, 136, 138.

AMRC repeatedly argues that the Forest Service should have quantitatively analyzed the remaining portions of the development and claims that the agency ignored "readily available technical information about the development's full water demands." AMRC Br. 50. But it never explains how this evidence contradicts the Forest Service's explanation that "the details of [the] development . . . do not yet exist," SER-136–37. Nor does AMRC show how the Forest Service's qualitative analysis was faulty, which recognizes that with "potential new future residential demand from Superstition Vistas the cumulative effects modeling suggests that regional water supplies would become more

53

limited and would need to be carefully assessed for sufficiency based on actual development plans for the area." SER-136; 1-AMRCER-46 ("The bottom line is that the FEIS contains extensive analysis regarding water-use issues, including various forms of modeling related to the anticipated water use associated with Desert Wellfield and Superstition Vistas.").

The Forest Service's assessment of the cumulative effects of Superstition Vistas and the mine was more than reasonable, and this Court must defer to the agency's expertise as to the proper scope of its analysis. *Seven Cty.* 145 S. Ct. at 1513; *see also Earth Island Inst. v. Muldoon*, 82 F.4th 624, 637 (9th Cir. 2023) ("It is always possible to quibble with an agency's explanation; a motivated litigant will be able to identify parts of any agency explanation that could have been more precise or thorough. But the arbitrary and capricious standard does not demand perfection.").

### b. The Forest Service reasonably responded to other agencies' comments.

Next, AMRC contends that the Forest Service violated NEPA by failing to respond to comments from the Bureau of Land Management (BLM) and the Arizona State Land Department. AMRC Br. 52–55. An agency "need not respond to every single scientific study or comment." *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1021 (9th Cir.

2012). It need only "acknowledge and respond" to relevant comments. *Greater Yellowstone Coal. v. Lewis*, 628 F.3d 1143, 1151 (9th Cir. 2010), *as amended* (Jan. 25, 2011). The record shows that the Forest Service more than satisfied this standard.  AMRC's argument that the Forest Service failed to respond to BLM's comments is based entirely on a 26-page BLM report providing comments on the prior draft of the EIS. AMRC Br. 52–54. As BLM explains, its report is "high-level" and only involved a relatively quick review by the agency evaluating a "substantial number of supplemental studies," so the value of that report is limited. 2-AMRCER-147. Nonetheless, the Forest Service scrutinized BLM's comments in its report and made several substantive changes to the EIS that respond directly to the issues BLM raised.

The additional cumulative effects analysis in Chapter 4 of the EIS covers the very issues AMRC asserts that BLM said was missing from the draft: more technical analysis of regional groundwater. In response to BLM's report, the Forest Service added discussions concerning Colorado River shortages, SER-129–30; the drought contingency plan and Central Arizona Project, SER-127–29; and assured water supplies, future development, and competing uses for groundwater, SER-130–35. Other responsive changes include additional analyses of Cutter Basin impacts, SER-049–53; additional analyses of impacts to private wells from Desert Wellfield pumping under each alternative, SER-056–60; additional discussion of existing water laws and two new sections on the

55

topic, SER-044–47; and sections on future meteorological trends, SER-141–45.

That analysis is entitled to deference and was more than sufficient to address the comments that BLM raised. *See Cascadia Wildlands v. United States Bureau of Land Mgmt.*, ___ F.4th ___, 2025 WL 2460946, at *22–26 (9th Cir. Aug. 27, 2025) (explaining that courts deferentially review agency's decisions about the appropriate the level of detail in a NEPA document).

The Forest Service also considered the economic concerns raised by the State. *Cf.* AMRC Br. 54–55 (pointing to the State's comments about the impacts on the Superstition Vistas from groundwater use). Again, the Forest Service expanded its analysis of impacts to regional water supplies in response to comments, such as those from the State, that raised concerns about groundwater availability. The Forest Service added a holistic qualitative discussion in its discussion of cumulative effects about water sufficiency in addition to the quantitative model it had already conducted. SER-133; 4-SCATER-787; 5-SCATER-842. The Forest Service concluded that "[g]roundwater modeling, using the best available estimates of all regional groundwater users over the next 100 years, indicates that regional groundwater supplies generally are sufficient to satisfy committed demands," SER-135, but that with "potential new future residential demand from Superstition Vistas the cumulative effects modeling suggests that regional water supplies

would become more limited and would need to be carefully assessed for sufficiency based on actual development plans for the area," SER-136. That discussion is sufficient to demonstrate the Forest Service considered the State's comments. *See Earth Island Inst.*, 697 F.3d at 1021.

### c. The Forest Service reasonably analyzed mitigation measures.

AMRC's final NEPA argument is that the Forest Service failed to consider sufficient mitigation measures. AMRC Br. 55–56. The district court's opinion puts this to rest: "The FEIS includes hundreds of pages of detailed analysis regarding water usage, including analysis regarding mitigation measures." 1-AMRCER-51.

And the record indeed shows that the Forest Service fully considered mitigation measures for water resources and their effectiveness, proposed measures that it has the authority to implement, and disclosed other mitigation measures that will be implemented under contractual, financial, or other agreements. SER-018–26 (providing the overall framework for mitigation); SER-043–65, 66–69, 71–72 (assessing the effectiveness of mitigation measures); SER-048, 70 (discussing applicant-committed environmental protection measures for water); *see also* 2-AMRCER-300 (setting forth proposed required mitigation measures related to water).

57

Appendix J to the EIS addresses the mitigation and monitoring measures that the Forest Service considered and the design features and applicant-committed mitigation measures to be implemented. SER-150–51, 160–99. The Forest Service considered the mitigation and monitoring measures suggested by commenters, including those related to groundwater impacts. But as the agency explained in its response to comments, the Forest Service lacks authority to impose some commenter-suggested measures. 4-SCATER-732, 735, 738, 743, 755, 756, 787; 5-SCATER-842, 848; *see also* SER-151 (explaining the Forest Service's limitations on its authority). For example, the Forest Service lacks authority to require Resolution Copper to "work with any impacted stakeholder to mitigate effects of water level declines caused by the project[,]" because Resolution Copper's recovery wells will not be located on federal land and will be subject to the jurisdiction of the Arizona Department of Water Resources. 4-SCATER-735). The EIS reasonably analyzed potential mitigation measure, noting limitations on the Forest Service's authority when relevant.

### d. The Tribe's extra-record declarations do not show that the Forest Service failed to comply with NEPA.

The Tribe's NEPA claim boils down to a dispute over how the Forest Service analyzed risk and safety in the EIS. Tribe Br. 33–50. Specifically, the Tribe cites two extra-record declarations to argue that

the Forest Service improperly analyzed the direct effects of the mine
when it comes to tailings storage facilities and pipelines. The district
court correctly found that the Tribe was unlikely to succeed on these
claims. 1-AMRCER-52–56.

The EIS exhaustively considered issues of risk and safety with
respect to tailings storage and pipelines. As to tailings, the EIS
analyzes in detail the risks associated with tailings storage facilities
and pipelines, dedicating over fifty pages to tailings and pipeline safety.
SER-073–124. The EIS incorporates a full Failures Modes and Effects
Analysis, building on the analysis in the draft EIS. SER-077. The
Forest Service considered a range of possible breach scenarios and used
a worst-case assumption to analyze potential outcomes. *Id*. The FEIS
also incorporated a breach analysis to "assess the potential downstream
impacts of where the tailings would travel, how far, and how fast." *Id*

The Tribe relies on a declaration that includes a list of fourteen
purported deficiencies with the tailings analysis. *See* Tribe Br. 42. But
that list of criticisms invites precisely the kind of second-guessing about
the Forest Service's scientific analysis that the Supreme Court
specifically rejected in *Seven County*. *See* 145 S. Ct. at 1511.

Indeed, most of the criticisms in the list merely disagree with the
weight the Forest Service gave to various concerns or the modeling it
chose to employ. Those criticisms ignore "[b]lack-letter administrative
law" that requires courts to be at their "most deferential" when

59

assessing an agency's "speculative assessments or predictive or scientific judgments." *Id.* at 1512 (citation omitted). The Tribe's arguments fail under this deferential standard of review. The Tribe has not rebutted the "wide discretion" that this Court affords the Forest Service "in assessing the scientific evidence." *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1301 (9th Cir. 2003).

In attempting to avoid this conclusion, the Tribe argues that the deferential standard in *Seven County* applies to the agency's analysis of a project's indirect and cumulative effects, but not to an agency's analysis of a project's direct effects. Tribe Br. 39–40. That rule appears nowhere in *Seven County* and has no support in the opinion's text. Quite the opposite: the Court repeatedly states that "the *central principle* of judicial review in NEPA cases is deference" and that "[b]lack-letter administrative law" instructs that a reviewing court must be at its "most deferential" when reviewing an agency's predictive or scientific judgments when the agency is assessing "significant environmental effects." *Seven Cty.*, 145 S. Ct. at 1511–13 (emphasis added) (citation omitted). Nowhere does the opinion state that this deference only applies when an agency is assessing indirect, rather than direct environmental effects, nor would such a rule make any sense. The district court correctly deferred to the agency's scientific judgment in its technical analysis of the risks from tailings storage and pipelines.

60

At bottom, the Tribe is wrong when it argues that the EIS "does not consider several material factors." Tribe Br. 50. Although the Tribe (and its experts) think that the Forest Service should have analyzed those factors differently, the agency nonetheless took a hard look at the factors and its technical analysis is entitled to substantial deference. The Tribe is unlikely to succeed on its NEPA claim.

### e. The Forest Service reasonably analyzed alternative mining techniques.

Lopez raises two NEPA claims. First, she argues that the Forest Service failed to consider reasonable mining alternatives. Lopez Br. 53–56. But the Forest Service was not required to analyze alternative mining techniques in detail. "[A]gencies are not required to analyze the effects of projects over which they do not exercise regulatory authority." *Seven Cty.*, 145 S. Ct. at 1516. Along these lines, the Land Exchange Act specified that the EIS would serve to inform future *Forest Service* decisions. 16 U.S.C. § 539p(c)(9)(B). The Forest Service lacks authority to regulate mining operations on land that will be conveyed to Resolution. 2-AMRCER-282 ("Mining operations within the area conveyed by the Forest Service in the exchange are not subject to regulation by the Forest Service, since Forest Service regulation of mining operations pertains only to mining operations conducted on

[National Forest Service] land . . . ."); SER-016–17. NEPA accordingly does not require analysis of alternative techniques.

Regardless, the Forest Service *did* assess alternative mining techniques "due to the interest in this topic" expressed via the public's comments. SER-016. Ultimately, however, the agency dismissed those alternatives from detailed analysis because "[a]lmost all industry mining guidance indicates alternative mining techniques are not appropriate for a deposit like the Resolution Copper deposit, and the trade-offs are unreasonable." SER-016. The EIS explains that "use of any of these alternative underground mining techniques would result in higher per-ton mining costs" and could result in "remov[ing] an estimated 80 percent of the tonnage of the Resolution Copper deposit from consideration for development." SER-016–17. The Forest Service concluded that "forgoing 80 percent of the ore deposit to accommodate an alternative mining technique is an unreasonable outcome" and thus excluded alternative mining techniques from more-detailed analysis. *Id.* The decision to exclude such alternatives from further analysis fell within NEPA's "broad zone of reasonableness" and is entitled to deference. *See Seven Cty.*, 145 S. Ct. at 1513 (courts defer to an agency's choice of feasible alternatives).

**f. The district court properly rejected Lopez's argument that she is entitled to a preliminary injunction because the Forest Service did too much NEPA analysis.**

Finally, Lopez argues that the Forest Service violated NEPA because its EIS is too long. Lopez Br. 56–57. Lopez points to recent NEPA amendments that state that the typical EIS should run no more than 150 pages, or 300 pages in extraordinary circumstances. 42 U.S.C. § 4336a(e)(1)(A)–(B). It is unclear whether the page-limit provisions of NEPA apply here because they were enacted in 2023, well after the NEPA process had already begun. *Vartelas v. Holder*, 566 U.S. 257, 266 (2012) (statutes are presumed to apply only prospectively "unless Congress has unambiguously instructed retroactivity"). Regardless, those limitations do not provide a basis to enjoin the exchange.

Lopez points to no case in which a court has held that an agency violated NEPA by producing an EIS that was too long—much less a case in which a court vacated an underlying project on that basis. As the district court explained, Lopez has not shown that she was injured by receiving more information than she was otherwise entitled to. LopezER-14. At most, any such error would be no more than a procedural error *in vacuo*, *Summers v. Earth Island Inst.*, 555 U.S. 488, 496–97 (2009), that cannot serve as a basis for a preliminary injunction. *See, e.g., Fund for Animals, Inc. v. Lujan*, 962 F.2d 1391, 1400 (9th Cir.

63

1992) ("[A] procedural violation of NEPA does not compel the issuance of a preliminary injunction."); *Seven Cty.*, 145 S. Ct. at 1514 ("Even a deficient EIS does not necessarily require vacating an agency's project approval, absent reason to believe that the agency might disapprove the project if it added more to the EIS."). It would be perverse for this court to enjoin the land exchange on the basis that the Forest Service did *too much* environmental analysis.

Lopez's only argument as to how this extra environmental analysis harmed her is that it "forc[ed] [her] to digest thousands of pages of material and litigate their claims in a matter of days, without an easily comprehensible administrative record." Lopez Br. 57. But nothing forced Lopez to wait until July 24, 2025, to bring suit—four years after the plaintiffs in the related cases sued and more than 90 days after the Government provided sixty days' notice of intent to publish the Final EIS. Ultimately, Lopez has not shown how a shorter EIS would have made a difference in the Forest Service's decisionmaking or would have otherwise impeded NEPA's goals of informing public participation. *Cf. Friends of the Inyo v. U.S. Forest Serv.*, 103 F.4th 543, 557 (9th Cir. 2024) (in determining whether a NEPA violation was harmless the question is whether the violation materially impeded NEPA's goals).

### C. Plaintiffs are unlikely to succeed on their claims challenging the Forest Service's consultation.

The Tribe and Lopez challenge the adequacy of the Forest Service's consultation under both the Land Exchange Act and the NHPA. Even if such claims could undo an act of Congress, the Forest Service engaged in an extensive consultation with Tribes and the ACHP about how to minimize the effects of the mine on historic properties. Neither the Tribe nor the Lopez Plaintiffs are likely to succeed on the merits of their consultation claim.

### 1. The Forest Service satisfied its consultation obligations under the Land Exchange Act.

The Tribe argues that the Forest Service failed to satisfy its consultation duties under the Land Exchange Act. Tribe Br. 50–53. The Land Exchange Act requires that the Forest Service "engage in government-to-government consultation with affected Indian tribes," and that the agency consult with Resolution to "seek to find mutually acceptable measures" to address Tribal concerns and to minimize the adverse effects of the mine on Tribes. 16 U.S.C. § 539p(c)(3). The record shows that the Forest Service easily complied with these requirements.

The district court provides an exhaustive overview of the extensive consultation between the Forest Service and the Tribe. 1-AMRCER-68–73. This consultation included "at least eight different versions of the [programmatic agreement], with the Forest Service

65

soliciting comments and input from the Tribe . . . concerning the successive drafts." 1-AMRCER-70. It included an ethnographic and ethnohistoric study with a literature review, oral interviews, and field visits with Tribal members to collect oral history and knowledge." 1-AMRCER-69. And it included "434 documented consultations with the San Carlos Apache Tribe," complete with formal meetings with the Tribal Council and additional formal meetings with individual members of the Tribal Council. 1-AMRCER-67–72. And the district court noted that the Tribe previously challenged the adequacy of the Forest Service's consultation requirements, only for those claims to be rejected, in part because "the Tribe refused to engage in good faith." 1-AMRCER-73 (citing *Concerned Citizens & Retired Miners Coalition v. U.S. Forest Serv.*, 279 F. Supp. 3d 898, 941–42 (D. Ariz. 2017)). As the district court correctly concluded, this exhaustive consultation more than satisfied the Forest Service's consultation requirements under the Land Exchange Act. 1-AMRCER-72–78.

The core of the Tribe's argument on appeal is that the Forest Service violated its consultation requirements by failing to substantively consult with the Tribe between when the agency withdrew its EIS in 2021 and when it issued a new EIS in 2024. Tribe Br. 51–52. But the record shows otherwise.

In March 2021, Forest Service withdrew its EIS and reinitiated Tribal consultation. SER-148. But the Forest Service never said that

66

the pre-2021 consultation was "inadequate." *Cf.* Tribe Br. 51. It simply agreed that further consultation would be appropriate. SER-148. The pre-2021 consultation history, outlined in the EIS, shows the agency's extensive efforts to consult with Tribes and to address Tribal concerns. *See* 1-AMRCER-68–71. Even setting the pre-2021 consultation aside, the post-2021 consultation shows that the Forest Service met its procedural consultation requirements under the Land Exchange Act.

After reinitiating consultation, the Forest Service held Tribal listening sessions, as well as formal and informal consultation meetings with Tribes that could be impacted by the land exchange. SER-148. The Forest Service held a listening session in October 2021 with eight Tribes, including the Plaintiff Tribe. 1-AMRCER-71.[5] Between 2021 and 2023, the Forest Service engaged directly with Plaintiff's Tribal Council. 1-AMRCER-71–72. That process continued through 2024, when the Forest Service conducted two more formal consultation meetings with the Tribe to discuss its concerns as well as efforts to develop a Memorandum of Understanding. 1-AMRCER-72. The extensive Tribal consultation undertaken by the Forest Service is detailed in more than

---

[5] The Tribe brushes this consultation away on the basis that "neither party considered these exchanges to constitute the government-to-government consultation" required by the Land Exchange Act. Tribe Br. 11. But the Tribe does not dispute that the communication that followed the listening sessions was formal consultation.

100 pages of the FEIS. 5-SCATER-899–1008. The consultation was more than sufficient.

To be sure, the consultation did not end in the consummation of a memorandum of understanding, which the Tribe seems to imply invalidates the entire consultation process. Tribe Br. 52–53. But the Land Exchange Act does not require the parties to execute a memorandum of understanding. And the Forest Service explained why the consultation ended without one: "all consulting parties" recognized there would be "adverse direct effects on historic properties" resulting from mining after the nondiscretionary land exchange occurred. LopezER-194, 196. The extensive consultation process did "not uncover[] other potential mitigation or alternatives that would allow USDA to comply with [the Land Exchange Act] while avoiding adverse impacts to Tribal interests." LopezER-196.

In sum, the Land Exchange Act did not require the imposition of impracticable mitigation measures or require the Forest Service to resolve all potential impacts. 16 U.S.C. § 539p(c)(3). And the inability of the consulting parties to identify minimization measures was not due to a lack of meaningful consultation, SER-147–49) (summarizing consultation); 5-SCATER-899–1008 (consultation history), but rather to an irreconcilable conflict between land uses. The consultation was more than sufficient.

68

### 2. The Forest Service complied with the NHPA by accounting for the ACHP's comments.

Lopez argues that the Forest Service violated its NHPA consultation obligations by failing to take into account the ACHP's comments. Lopez Br. 57–61. The record shows, and the district court concluded, that the Forest Service complied with the NHPA by consulting with the ACHP and fully considering and responding to the ACHP's comments, including comments about alternative mining techniques. 1-AMRCER-79–82.

NHPA Section 106 requires federal agencies to "take into account the effect of [an] undertaking on any historic property," 54 U.S.C. § 306108, but it is a procedural statute that does not require substantive outcomes. *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999). Thus, while the Forest Service must "seek" approval from ACHP, it need not receive that approval to comply with Section 106. Nor must it refrain from undertakings that harm historic properties. *CTIA - The Wireless Ass'n*, 466 F.3d at 107. Consulting parties "may determine that further consultation will not be productive and terminate consultation." 36 C.F.R. § 800.7(a). Termination of consultation by ACHP triggers an obligation by the agency to "take into account [ACHP's] comments in reaching a final decision on the undertaking[,]" and to "document this decision." *Id.*

69

§ 800.7(c)(4); *see Concerned Citizens All., Inc. v. Slater*, 176 F.3d 686, 696 (3d Cir. 1999).

Consistent with Section 106 of the NHPA, the Forest Service initiated consultation with the ACHP and other NHPA consulting parties in 2017. 1-AMRCER-80. By January 2021, all parties to the agreement except for the ACHP had signed the programmatic agreement. In February 2021, the ACHP notified the Forest Service that it was terminating consultation because it "believe[d] that further consultation in this case would be unproductive." SER-200.

The ACHP decided to terminate consultation because it disagreed with the land exchange entirely, not for lack of meaningful consultation. *See* SER-147–49 (consultation summary); 5-SCATER-899–1008 (consultation history). Central to the ACHP's decision to terminate was its conclusion that the land exchange "would destroy significant historic properties, including the highly significant Oak Flat," and that the measures contemplated by the programmatic agreement were "not sufficient to adequately resolve those adverse effects." SER-200.

The Secretary of Agriculture sent a letter responding to ACHP's decision terminating consultation and documenting its consideration of the ACHP's comments. LopezER-191–96. The letter explained that "all consulting parties" recognized there would be "adverse direct effects on historic properties." LopezER-191. The letter further noted that extensive consultation process did "not uncover[] other potential

70

mitigation or alternatives that would allow USDA to comply with [the Land Exchange Act] while avoiding adverse impacts to Tribal interests." LopezER-193. This letter further explained how the agency took each one of the Council's comments into account, in compliance with 36 C.F.R. § 800.7(c)(4). LopezER-192. As the district court found, "[n]othing in this [letter] is arbitrary and capricious . . . the tribal consultation process was quite complicated due to the Tribe's vehement, if understandable, opposition to the very concept of the land exchange." 1-AMRCER-82.

Lopez's only specific criticism of this process is her argument that the Forest Service failed to respond to the ACHP's suggestion that the agency consider alternative mining techniques. Lopez Br. 59–60. But, as outlined above, the Forest Service both explained why it did not have the authority to mandate alternative mining techniques, 2-AMRCER-282; SER-16–17, and also assessed alternative mining techniques due to the interest expressed in public comment, SER-16. *See supra* 61–62. Just because that discussion was not specifically included in the Forest Service's response to the ACHP, it does not mean that the Forest Service ignored those comments. The discussion of alternative mining techniques in the EIS demonstrates exactly the opposite. Thus, the Forest Service complied with its NHPA consultation obligations, and Lopez is not likely to succeed on the merits of her claims.

71

### D. Lopez is unlikely to succeed on her claims challenging the land exchange under RFRA and the First Amendment.

Lopez also argues that the land exchange violated her religious liberty under both RFRA, Lopez Br. 30–46, and the Free Exercise Clause of the First Amendment, Lopez Br. 46–52. These arguments are unlikely to succeed on the merits because they are untimely and barred by laches, as explained in Resolution's answering brief. They are also plainly barred by this Court's en banc decision in *Apache Stronghold*. Lopez's attempts to evade this binding precedent fail.

#### 1. The en banc decision in *Apache Stronghold* bars Lopez's religious-liberty claims.

Lopez's RFRA and Free Exercise claims are identical to the claims that this Court rejected in its en banc *Apache Stronghold* decision. With respect to her RFRA claim, she argues that the land transfer, the denial of access to Oak Flat, and the destruction of Oak Flat substantially burdens her religious exercise and that the land transfer does not meet strict scrutiny. SER-214–15. As to the Free Exercise claim, she argues that the land transfer is neither neutral nor generally applicable, burdens her religious exercise, and burdens her right to direct the religious upbringing of her children. SER-215–16.

In *Apache Stronghold*, a majority of the en banc Court rejected these two claims.[6] The Court held that, under *Lyng*,

> a disposition of government real property does not impose a substantial burden on religious exercise when it has "no tendency to coerce individuals into acting contrary to their religious beliefs," does not "discriminate" against religious adherents, does not "penalize" them, and does not deny them "an equal share of the rights, benefits, and privileges enjoyed by other citizens."

*Apache Stronghold*, 101 F.4th at 1044 (quoting *Lyng*, 485 U.S. at 449–50).[7] The en banc court held that Apache Stronghold's claims under RFRA and the Free Exercise Clause both failed under that test. *Id.* at 1044, 1051–52, 1063. Apache Stronghold disagreed and petitioned for

---

[6] Lopez states that "six judges found no substantial burden" and "six others concluded the opposite," but she arrives at this number by adding the five dissenters on the en banc panel to one judge's separate dissent from a 2021 denial of a motion for an injunction pending appeal. Lopez Br. 33–34. The en banc decision is obviously binding, even if a separate judge—who was not part of the en banc panel—dissented as part of a separate motions panel addressing a separate legal question. Insofar as Lopez suggests that some active-service judges on this Court who were not on the en banc panel disagree with that decision, it bears noting that this Court denied Apache Stronghold's petition for en banc rehearing before the full court. *Apache Stronghold*, 101 F.4th at 1043.

[7] In *Lyng*, the Supreme Court held that a statute that exempted a strip of land from a wilderness designation so that a road could be built on that land did not violate the Plaintiff's First Amendment rights, even though the road would "virtually destroy the [Plaintiffs'] ability to practice their religion." 485 U.S. at 451.

certiorari, but the Supreme Court denied review just months ago. *Supra* 13.

After Apache Stronghold lost in this Court and the Supreme Court, Lopez tried raising religious liberty claims in the D.C. Circuit. *Supra* 23–24. But the district court transferred Lopez's case to Arizona, which means Lopez is now bringing RFRA and Free Exercise claims in this Court that are materially identical to the claims this Court rejected en banc in *Apache Stronghold.*

Needless to say, Lopez is not likely to succeed on her religious-freedom claims. Lopez bravely contends that *Apache Stronghold* was wrongly decided, Lopez Br. 34–37, but this Court is bound by its en banc precedent.

### 2. The Supreme Court's decision in *Mahmoud* is inapplicable.

Lopez implausibly contends that the Supreme Court's recent decision in *Mahmoud* is "clearly irreconcilable" with and thus abrogated *Apache Stronghold.* Lopez Br. 37. Simply stating the facts of *Mahmoud* refutes this argument.

A public school district mandated that elementary school children aged 5–11 read "'LGBTQ+ inclusive' storybooks" and receive "associated educational instructions" "designed to 'disrupt' children's thinking about sexuality and gender." 145 S. Ct. at 2341–42. The curriculum "explicitly contradict[ed] their parents' religious views," and if children

"express[ed] a degree of religious confusion,' teachers were encouraged to "correct" or "reprimand" them. *Id.* at 2355–56. Attendance was "mandatory," with no opt-out or even "notice" to parents. *Id.* at 2342. When hundreds of parents objected, one school board member stated they "were comparable to 'white supremacists'" and "xenophobes." *Id.* at 2347.

The parents in *Mahmoud* asserted that the mandatory instruction burdened their free exercise of religion because it "imposed a set of values and beliefs . . . 'hostile' to their . . . religious beliefs." *Id.* at 2355. The Court agreed, holding that "[a] government burdens the religious exercise of parents when it requires them to submit their children to instruction that poses 'a very real threat of undermining' the religious beliefs and practices that the parents wish to instill." *Id.*

*Mahmoud*, which "implicates direct, coercive interactions between the State and its young residents," *id.* at 2357, is inapplicable here, where the federal government is simply disposing of its own land. *Mahmoud* would be relevant if the federal government required tribal children to attend public school on federal land, forced those children to receive instruction "designed to disrupt" their tribal religious values, and "correct[ed] or "reprimand[ed]" any children who expressed "religious confusion," all with no opt-out and no notice to parents. *Id.* at 2543, 2555–56.

75

If more were needed, *Mahmoud* expressly distinguished *Lyng* as having "no application." 145 S. Ct. 2356–57. *Lyng* has "no application" to *Mahmoud* because *Mahmoud* is a case about compulsory school instruction. But *Lyng* is directly applicable here, as the en banc Court held in *Apache Stronghold*, because *Lyng* is a case about the federal government disposing of its own land. *Apache Stronghold*, 101 F.4th 1043–44.

As the en banc Court held in *Apache Stronghold*, this case is instead controlled by *Bowen v. Roy*, 476 U.S. 693, and *Lyng v. Northwest Indian Cemetery Protective Assn.*, 485 U.S. 439 (1988). In *Bowen*, an Indian religious adherent asserted that the government's use of a social security number associated with his daughter would rob his daughter of her spirit. 476 U.S. at 695–698. In *Lyng*, Native Americans sought to prevent the construction of a paved road on federal land. 485 U.S. at 442–443. As the Supreme Court explained in those cases, "[t]he Free Exercise Clause simply cannot be understood to require the Government to conduct its own internal affairs"—including decisions about use of federal land—"in ways that comport with the religious beliefs of particular citizens," *Bowen*, 476 U.S. at 699, even if it might incidentally interfere "with an individual's spiritual activities," *Lyng*, 485 U.S. at 450. That applies here and disposes of Lopez's claims. Like the plaintiffs in *Lyng*, Lopez lacks a "religious servitude" across federal land. *Id.* at 452.

### E. Plaintiffs lack standing to challenge the land exchange because their injury is not redressable.

Finally, even if any of the merits arguments above had any substance, Plaintiffs would fail because they cannot show redressability for Article III standing. Specifically, insofar as Plaintiffs challenge the land exchange directly, they lack standing because their alleged injuries traceable to the land exchange are not redressable.

This is because the Forest Service has a nondiscretionary, congressionally mandated obligation to execute the land exchange and transfer title, and no additional analysis under NEPA, additional appraisal, or further consultation can change that duty and thus redress Plaintiffs' injuries that flow from the land exchange.[8]

**1.** To have Article III standing, a plaintiff must (1) show a concrete and particularized injury that is (2) caused by the defendant and (3) that is likely to be redressed by judicial relief. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). "The party invoking federal

---

[8] The government does not dispute that Plaintiffs have standing to challenge the Forest Service's decisionmaking for discretionary decisions attendant to the mine, such as whether to grant special-use authorizations. But any such challenge is not ripe. Nor does the government dispute that Lopez has standing to bring her RFRA and Free Exercise claims. Even if this Court determines that Plaintiffs have established standing for some of their claims, Plaintiffs must establish standing for "each claim [they] seek[] to press." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (internal quotation omitted).

jurisdiction bears the burden of establishing these elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

To establish redressability, plaintiffs must show that the requested relief is both (1) substantially likely to redress their injuries and (2) within the district court's power to award. *M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018). The redressability requirement is relaxed when plaintiffs allege procedural violations—plaintiffs need only show that, were an agency to have followed the correct procedure, the agency's decision might have been different. *Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1226–27 (9th Cir. 2008). But even under this relaxed standard, there must be "some possibility that the requested relief [would] prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts v. EPA*, 549 U.S. 497, 517–18, 525–26 (2007) (citing *Lujan*, 504 U.S. at 572 n.7).

**2.** Plaintiffs fail to meet that standard. All three Plaintiff groups allege injuries flowing directly from the congressionally mandated land exchange that cannot be redressed with a favorable decision on their appraisal, NEPA, or consultation claims. AMRC alleges that their use of the area "will be immediately and irreparably diminished or eliminated altogether by the [land] Exchange and Project operations." SER-205. The Tribe alleges that it will be injured by "Oak Flat's physical destruction[, which] will be irreversibly set in motion by its transfer to

Resolution." 7-SCATER-1388. And Lopez alleges that Oak Flat is essential to her religious practices and that the land exchange and mine will destroy the area. SER-209–10, 211–12. These injuries flow from the land exchange, but the exchange is nondiscretionary and congressionally mandated. *See* 16 U.S.C. § 539p(c)(1). This Court cannot change that outcome even if Plaintiffs succeeded on the merits of those claims.

In that way, this case is analogous to *Salmon Spawning*. There, the plaintiffs alleged that federal agencies failed to follow proper procedures in consulting under the Endangered Species Act and sought to invalidate a Biological Opinion for a fishing treaty between the United States and Canada. 545 F.3d at 1226–27. The Ninth Circuit held that the plaintiffs did not meet the redressability element of standing because the court could not "undo the Treaty," and setting aside the Biological Opinion would not "remedy the harm asserted." *Id.* at 1227. The court rejected the plaintiffs' arguments that the agencies might take discretionary actions that would alleviate their injuries as "too uncertain." *Id.* at 1228–29.

Like *Salmon Spawning*, any decision by this Court that the FEIS or appraisal is inadequate would not remedy the harms alleged by Plaintiffs from the privatization of the federal lands and their eventual mining because, even if the Forest Service is required to conduct additional analysis, it cannot refuse to transfer the federal lands to

79

Resolution Copper. *Cf. Desert Citizens*, 231 F.3d at 1178–79 (finding that plaintiffs had established a redressable procedural injury when a federal agency had discretion to disapprove or alter a land exchange after a proper valuation). Congress "authorize[d], direct[ed], facilitate[d], and expedite[d] the exchange." 16 U.S.C. § 539p(a); *accord id.* § 539p(c)(10). The Forest Service lacks discretion over whether to transfer title, and a judicial order compelling additional NEPA analysis cannot alter that fact. Plaintiffs thus lack standing to challenge the land exchange.

Insofar as Plaintiffs allege bare procedural injury based the NEPA or NHPA process itself—as opposed to concrete injury from the substantive decision to transfer the land—that fails as well. *See* 7-SCATER-1390 (alleging that the Tribe did not receive an opportunity to review and comment on new issues presented in the EIS). Bare procedural injuries alone cannot satisfy Article III standing requirements. Plaintiffs must also show that the "deprivation" of the procedural right harmed "some concrete interest" that could be redressed by the Court. *Summers*, 555 U.S. at 496–97. Plaintiffs cannot make such a showing.

The district court erred when it found that AMRC was likely to have standing to challenge the appraisal of the parcel. 1-AMRCER-12. The district court determined that if it agreed with the merits of those claims and ordered a reappraisal that ultimately determined that the

80

land is worth billions of dollars, then those developments "might very well derail the land exchange." 1-AMRCER-13. But the district court acknowledged that, under the Land Exchange Act, the Forest Service would still be required to attempt to convey title to Resolution and that the exchange would only be derailed if Resolution then declined to accept title. 1-AMRCER-13. And plaintiffs lack standing if redressability "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989).[9] Because the Forest Service would be required to attempt the land exchange even if the court ordered a reappraisal, such a remedy would not redress AMRC's injuries, even under this speculative hypothetical.

AMRC points to only one case in which a court found that plaintiffs had established redressability to challenge a congressionally mandated land exchange. AMRC Br. 39 (citing *W. Land Exch. Project v. U.S. Bureau of Land Mgmt.*, 315 F. Supp. 2d 1068 (D. Nev. 2004)). The district court there found that the plaintiffs had established redressability because plaintiffs normally do not need to show that a new NEPA process will result in a different outcome. 315 F. Supp. 2d at

---

[9] To be sure, Resolution is before the Court as an Intervenor. But the Court has no control over Resolution's decision whether or not to enter the land exchange under various economic scenarios.

1080. Certainly, plaintiffs alleging a procedural injury need not show that a favorable decision *would* cause an agency to change its decision, but plaintiffs must show that a favorable decision *could* do so. *Salmon Spawning*, 545 F.3d at 1226–27. To the extent that the court in *Western Land Exchange Project* missed that distinction, the case was wrongly decided. And, of course, *Western Land Exchange* is a district court case that is not binding on this Court. Here, a reappraisal, more NEPA analysis, or further consultation could not result in the Forest Service deciding not to conduct the nondiscretionary land exchange. Thus, Plaintiffs lack standing to pursue their appraisal, NEPA, and consultation claims challenging the land exchange.

## II. Plaintiffs have not shown irreparable harm from the land exchange, and the balance of equities tips sharply in the government's favor.

No Plaintiff has shown that they are likely to succeed on appeal or has even raised serious questions going to the merits, so this Court should affirm without further analysis. But if this Court considers the other injunction factors, it should nonetheless affirm.

Plaintiffs have not pointed to irreparable harm that would flow from the land exchange itself, as opposed to the mine. To be sure, Plaintiffs have submitted declarations that explain how they would be irreparably harmed by the mine and the resulting destruction of the land. But those are harms are not imminent and irreparable because

82

they flow from the mine—not the land exchange. Plaintiffs purported harms to not rise to the level of imminent and irreparable for three reasons.

First, any harm from the mine is not imminent, it is years away. As Plaintiffs themselves recognize, the mine will not be constructed for years after the land exchange. *See* AMRC Br. 58–59 ("[A]ny mine at this site, if it occurs, is years away with or without a temporary injunction."). So Plaintiffs will not suffer any irreparable harm during the pendency of this litigation if the land exchange goes forward.

To the extent that Plaintiffs argue that the lack of access to Oak Flat is itself an irreparable harm, the Land Exchange Act includes a provision explicitly mandating that Resolution Copper maintain access to Oak Flat even after the land exchange occurs until it is no longer safe to do so. 16 U.S.C. § 539p(*i*)(3) ("As a condition of conveyance . . . Resolution Copper shall agree to provide access to the surface of the Oak Flat Campground to members of the public, including Indian tribes, to the maximum extent practicable . . . until such time as the operation of the mine precludes continued public access for safety reasons . . . ."). Thus, even after the land exchange occurs, public access to Oak Flat will not immediately change. Again, any harm would be tied to the destruction of the land and the operation of the mine, not the land exchange.

Third, the land exchange itself will not result in any imminent irreparable harm to the formerly federal land. As Resolution explains in its brief, most of the immediate construction will occur on land that is already in private ownership, and the small amount of federal land that will experience construction in the near term is already traversed by longstanding mining infrastructure. Resolution Br. 82–83. Any near-term construction will not impact Oak Flat or any area known to host tribal ceremonies. Resolution Br. 82–83.

Simply put, Plaintiffs' alleged harms are tied to the destruction of the land, not the land exchange itself. They have not shown that they would suffer imminent irreparable harm without a preliminary injunction.

As to the third and fourth *Winter* factors, the district court correctly found that the balance of equities and harms, as well as the public interest, weigh against an injunction. The third and fourth *Winter* factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Here, the district court correctly found that the equities weigh against an injunction, and that was not an abuse of discretion. In the Land Exchange Act, Congress determined that facilitating copper mining in Arizona and expanding the National Forest System is in the public interest. *See* 16 U.S.C. § 539p(a). When Congress has spoken directly on a matter, a court sitting in equity "cannot 'ignore the

judgment of Congress, deliberately expressed in legislation.'" *United States v. Oakland Cannabis Buyer's Co-op*, 532 U.S. 483, 497 (2001) (quotation omitted). The Tribe is simply wrong when it argues that, in considering the third and fourth *Winter* factors, "courts do not consider policy issues that may have motivated Congress to pass legislation." Tribe Br. 54. "Courts of equity cannot, in their discretion, reject the balance that Congress has struck in a statute." *Oakland Cannabis Buyer's*, 532 U.S. at 497. Here, Congress struck a balance by determining the land exchange was in the public interest because it would facilitate copper mining and expand the national system of conservation lands. *See* 16 U.S.C. § 539p(a), (d). This Court should not override Congress's judgment.

The land exchange is also in the public interest because it will facilitate the domestic production of copper, a critical mineral. 1-AMRCER-93. On March 20, 2025, the President issued an Executive Order, Immediate Measures to Increase American Mineral Production, finding that the national and economic security of the country are threatened by the United States' reliance on foreign mineral production, and it is "imperative for our national security that the United States take immediate action to facilitate domestic mineral production to the maximum possible extent." Exec. Order No. 14241, § 1, 90 Fed. Reg. 13673 (Mar. 20, 2025). Under the Executive Order, the Resolution Copper Project was added as a "priority" mineral project on the

Permitting Dashboard established under section 41003 of title 41 of the Fixing America's Surface Transportation (FAST) Act, Pub. L. No. 114-94, 129 Stat. 1312, 1748 (2015). *See FAST-41 Transparency Projects*, Permitting Council, https://www.permits.performance.gov/projects/transparency-projects (last visited July 25, 2025).

After conducting a hearing and undertaking a thorough review of the record, the district court concluded that there are "weighty equities and public-interest considerations on the [Government's] side of the ledger" that would prevent the equities from tipping sharply in Plaintiffs' favor. 1-AMRCER-92–93. The court did not abuse its discretion.

Executing the land exchange is an action in the public interest as determined by Congress and supported by the President's recent actions to increase domestic production of critical minerals. Plaintiffs have not shown that the balance of the equities tips in their favor.

## CONCLUSION

For these reasons, this Court should affirm the district court's denial of Plaintiffs' motions for a preliminary injunction.

Respectfully submitted,

/s/ *Ezekiel A. Peterson*

86

ADAM R.F. GUSTAFSON
*Acting Assistant Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*

THEKLA HANSEN-YOUNG
ERIKA NORMAN
ANGELA ELLIS
EZEKIEL A. PETERSON
*Attorneys*
Environment & Natural Resources Div.
U.S. Department of Justice
999 18th St., North Terrace, Suite 600
Denver, CO 80202
(202) 598-6399
ezekiel.a.peterson@usdoj.gov

September 29, 2025
90-1-4-16263
90-2-4-16252
90-1-4-16516

87

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** 24-6402

I am the attorney or self-represented party.

**This brief contains 19,562 words,** including 0 words manually counted in any visual images, and excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[X] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**       /s/ Ezekiel A. Peterson

**Date**            September 29, 2025