Nos. 25-5185, 25-5189, 25-5197

---

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

ARIZONA MINING REFORM COALITION, et al.,
*Plaintiffs–Appellants*,
v.
UNITED STATES FOREST SERVICE, et al.
*Defendant–Appellee.*
and
RESOLUTION COPPER MINING, LLC,
*Intervenor-Defendant–Appellee*

(caption continued on following page)

---

Appeal from the United States District Court for the
District of Arizona
Nos. 2:21-cv-68, 2:21-cv-122, 2:25-cv-2758 (Hon. Dominic W. Lanza)

---

**SUPPLEMENTAL EXCERPTS OF RECORD**

---

ADAM R.F. GUSTAFSON
*Acting Assistant Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*

THEKLA HANSEN-YOUNG
ERIKA NORMAN
ANGELA ELLIS
EZEKIEL A. PETERSON
*Attorneys*
Environment & Natural Resources Div.
U.S. Department of Justice
999 18th St., Suite 370
Denver, CO 80202
(202) 598-6399
ezekiel.a.peterson@usdoj.gov

(caption continued from previous page)

---

SAN CARLOS APACHE TRIBE, et al.,
*Plaintiffs–Appellants*,

v.

UNITED STATES FOREST SERVICE, et al.
*Defendant–Appellee.*

and

RESOLUTION COPPER MINING, LLC,
*Intervenor-Defendant–Appellee*

---

GOUYEN BROWN LOPEZ, et al.,
*Plaintiffs–Appellants*,

v.

UNITED STATES OF AMERICA, et al.
*Defendant–Appellee.*

and

RESOLUTION COPPER MINING, LLC,
*Intervenor-Defendant–Appellee*

---

## __Table of Contents for Supplemental Excerpts of Record__

*Arizona Mining Reform Coalition, et al. v. U.S. Forest Service, et al.,*
Nos. 25-5185, 25-5189, 25-5197

| Document | SER Page No. | ECF No. |
|---|---|---|
| U.S. Forest Service, Final Environmental Impact Statement (excerpts) | 004 | 93-1 |
| Advisory Counsel on Historic Preservation, Letter to Forest Service terminating consultation | 200 | 82-2 |
| Arizona Mining Reform Coalition, First Amended Complaint (excerpts) | 202 | 86 |
| Gouyen Brown Lopez, Complaint (excerpts) | 207 | 1 (Lopez) |



## Forest Service
U.S. DEPARTMENT OF AGRICULTURE

**Tonto National Forest**  **MB-R3-12-10**  **June 2025**

# **FINAL** Environmental Impact Statement
## Resolution Copper Project and Land Exchange
Coconino, Gila, Maricopa, Pinal, Santa Cruz, and Yavapai Counties, Arizona



### 1.1.3.6 Status of CEQ Regulations

In January 2025, Executive Order 14154 was issued, directing the CEQ to propose rescinding CEQ's NEPA regulations found at 40 CFR 1500 et. seq. In February 2025, CEQ published an interim final rule removing CEQ regulations from the Code of Federal Regulations. The Forest Service NEPA implementing regulations are found at 36 CFR Part 220 and remain in effect.

### 1.1.3.7 Updated Consistency Review for Amendment of New Forest Plan

The Resolution Copper Project DEIS and January 2021 Rescinded FEIS indicated that Alternatives 2, 3, and 4 would require amendment of the 1985 "Tonto National Forest Land and Resource Management Plan" (U.S. Forest Service 1985b). The forest plan consistency review was revised after the 2023 "Tonto National Forest Land Management Plan" (forest plan) was implemented in December 2023 (SWCA Environmental Consultants 2025). The revised consistency review indicated that a multi-component project-specific amendment of the 2023 forest plan would be needed with each of the action alternatives presented in the FEIS, Alternatives 2 through 6. Details of the amendment and exception of plan components are included in chapter 2, each resource section of chapter 3, and appendix T (for the preferred alternative) and are summarized in table 1.4.3-1.

## 1.2 Background

The area around Superior, Arizona, has a long mining history, starting with sporadic production of silver and gold from claims in the 1870s. The Silver King Mine, a few miles north of Superior, was the richest silver mine in Arizona, producing over 6 million dollars' worth of silver between 1877 and 1886. In 1902, George Lobb, Sr., a former level boss at the Silver King Mine, sold his group of claims to the Lake Superior and Arizona Mining Company and laid out the townsite, which was named Superior. Later, William Boyce Thompson acquired the former Silver Queen mining property and organized the Magma Copper Company in 1910. The merger of Lobb's Golden Eagle claims with Thompson's Silver Queen claims allowed development of the Magma Copper Company mine. The original concentrator was built in 1914, and in 1915, the Magma Arizona Railroad went into operation to transport high-grade ore and concentrates to connect with the Phoenix & Eastern Railroad near Webster (later Magma Junction) and on to a smelter in Hayden. By 1920, the mine had increased in size and production to support construction of a smelter in Superior. The smelter began operating in 1924, including a roaster plant and a 300-foot stack. The highway through Queen Creek Gorge, providing direct travel between Superior and Globe, was completed by the Arizona Highways Department at about the same time.

The Magma Mine boomed in the late 1920s, producing more than 40 million pounds of copper in 1929. The Magma Mine survived the Great Depression on reduced workers' hours but returned to full production during World War II. Dewatering of the mine workings was required to allow access and production from the deeper underground shafts. Superior became one corner of Arizona's "Copper Triangle"—which stretched between the towns of Superior and Globe/Miami to the north and Hayden/Winkelman to the southeast—and which is the general location of more than 30 historical and active copper mines (figure 1.2-1). Mines and smelters in the area included ASARCO's Ray Mine, the Hayden Smelter, the Christmas Mine north of Winkelman, and a number of large open-pit mines in the Globe/Miami area (see figure 1.2-1).

The Magma Mine operated consistently until copper prices fell in the 1980s but reopened in the late 1980s before closing for good in 1996. In addition to substantial surface facilities in Superior, the Magma Mine left approximately 220,000 feet (42 miles) of underground workings.

Exploration from those underground workings led to the discovery of the Resolution deposit—deeper than the historic Magma Mine and a few miles south. The Resolution deposit is not exposed at the surface

but lies between 4,500 and 7,000 feet below the surface. Existing workings from the Magma Mine have been repurposed to allow exploration of and access to the copper deposit.

According to the available geological data, the ore body is one of the largest undeveloped copper deposits in the world with an estimated copper resource of 1.787 billion metric tonnes at an average grade of 1.54 percent copper. Additional strategic and critical materials such as rhenium, tellurium, indium, arsenic, and bismuth could also be recovered economically (Strauss 2022).

The portion of the copper deposit explored to date is located primarily on NFS lands. The ore body likely extends underneath a 760-acre area of NFS land identified in PL 113-291 as the "Oak Flat Withdrawal Area." The Oak Flat Withdrawal Area was withdrawn from mineral entry in 1955 by Public Land Order 1229; consequently, the GPO does not propose to extract minerals from or conduct mining operations on these lands.

However, for more than 10 years, Resolution Copper pursued a land exchange to acquire adjacent lands northeast of the copper deposit. In December 2014, Congress authorized a land exchange pending completion of the EIS; the exchange parcel to be conveyed to Resolution Copper includes not only the Oak Flat Withdrawal Area but also the NFS lands above which the copper deposit is located. This collective 2,422-acre area of land is known as the "Oak Flat Federal Parcel."

The land ownership of the project area includes surface land administered by the Forest Service or BLM with Resolution Copper–controlled unpatented mining and/or mill site claims; Resolution Copper–owned private land; lands where Resolution Copper controls the patented mining claims; as well as lands with unpatented lode claims not controlled by Resolution Copper. Additional information on claims can be found in section 3.2.3.2.

The land surface overlying the copper deposit is located in an area that has a long history of use by Native Americans, including the Apache, O'odham, Puebloan, and Yavapai people currently represented by the following federally recognized Tribes: Fort McDowell Yavapai Nation, Gila River Indian Community, Hopi Tribe, Mescalero Apache Tribe, Pueblo of Zuni, Salt River Pima-Maricopa Indian Community, San Carlos Apache Tribe, Tonto Apache Tribe, White Mountain Apache Tribe, Yavapai-Apache Nation, and Yavapai-Prescott Indian Tribe. The Forest Service maintains formal and informal consultations with these Tribes and other interested and affected parties to better understand the historical, cultural, and religious importance of the area.

## 1.3    Purpose of and Need for Action

The purpose of and need for this project is twofold:

1.  To consider approval of a proposed mine plan governing surface disturbance on NFS lands outside of the exchange parcels from mining operations that are reasonably incident to extraction, transportation, and processing of copper and molybdenum.

2.  To disclose the effects of the exchange of lands between Resolution Copper and the United States as directed by Section 3003 of PL 113-291.

The role of the Forest Service under its primary authorities in the Organic Administration Act, Locatable Minerals Regulations (36 CFR 228 Subpart A), and the Multiple-Use Mining Act is to ensure that mining activities minimize adverse environmental effects on NFS surface resources and comply with all applicable environmental laws. The Forest Service may also impose reasonable conditions to protect surface resources. Through the Mining and Mineral Policy Act, Congress has stated that it is the continuing policy of the Federal Government, in the national interest, to foster and encourage private enterprise in

- the development of economically sound and stable domestic mining, minerals, and metal and mineral reclamation industries; and

- the orderly and economic development of domestic mineral resources, reserves, and reclamation of metals and minerals to help ensure satisfaction of industrial, security, and environmental needs.

The Southeast Arizona Land Exchange and Conservation Act was included in a large public lands package containing 68 bills which was amended to the NDAA during the 113th Congress. The NDAA was signed into law by President Obama on December 19, 2014. Under the Southeast Arizona Land Exchange and Conservation Act, Resolution Copper would receive Federal land at the site of the future underground copper mine in exchange for privately owned conservation and recreation lands throughout Arizona after the completion of a FEIS. While the mine itself would be located on private land after the exchange is completed, ancillary mining operations would need to occur on NFS land, and possibly other Federal and non-Federal land, outside the exchange parcel.

## 1.4    Proposed Action

The proposed action consists of (1) approval of a mining plan of operations on NFS land associated with a proposed large-scale mine, which would be on private land after the land exchange, (2) the land exchange between Resolution Copper and the United States as directed under PL 113-291, (3) a project-specific amendment of the forest plan, if needed, and (4) mitigations to offset impacts from the proposed project.

It should be noted that the proposed action is one of several alternatives considered in the EIS. The proposed action should not be confused with the preferred alternative. The preferred alternative is identified in the executive summary and chapter 2 and is the agency's preference for implementation

specific amendment would differ by alternative, as described in chapters 2 and 3 and summarized in table 1.4.3-1.

The proposed amendment would be limited to apply only to this project. Only the selected alternative for the Resolution Copper Project would be excepted from the specific current plan desired conditions and guidelines included in the amendment, which would allow the project to be consistent with the amended forest plan. All other desired conditions, objectives, standards and guidelines would remain unexcepted and applicable to all other projects and activities across the Tonto National Forest. The selected alternative for the Resolution Copper Project would be excepted from complying with the desired conditions and guidelines contained in the amendment on the area of the Tonto National Forest where impacts would occur. Refer to appendix T of this FEIS for more detailed information on the proposed project-specific amendment for the preferred alternative.

**Table 1.4.3-1. Multiple-component project-specific amendment to the 2023 "Tonto National Forest Land Management Plan" for the Resolution Copper Project**

| Forest Plan Component* | Alternatives Not Consistent[†] | | | |
|---|---|---|---|---|
| | 2/3 | 4 | 5 | 6 |
| Recreation Guideline 10 (REC-G-10) (forest plan, p. 31) | X | X | X | X |
| Wildlife Related Recreation Guideline 03 (REC-WR-G-03) (forest plan, p. 44) | X | X | X | X |
| Cultural and Historic Resources Desired Condition 01 (CUH-DC-01) (forest plan, p. 55) | X | X | X | X |
| Cultural and Historic Resources Desired Condition 02 (CUH-DC-02) (forest plan, p. 55) | X | X | X | X |
| Cultural and Historic Resources Desired Condition 07 (CUH-DC-07) (forest plan, p. 55) | X | X | X | X |
| Scenery Desired Condition 03 (SC-DC-03) (forest plan, p. 67) | X | X | X | X |
| Scenery Guideline 01 (SC-G-01) (forest plan, p. 67) | X | X | X | X |
| Scenery Guideline 03 (SC-G-03) (forest plan, p. 67) | X | X | X | X |
| Riparian Areas, Seeps, Spring, Wetlands, and Riparian Management Zones Desired Condition 01 (RMZ-DC-01) (forest plan, p. 135) | X | X | | |
| Riparian Areas, Seeps, Spring, Wetlands, and Riparian Management Zones Desired Condition 02 (RMZ-DC-02) (forest plan, p. 135) | X | X | | |
| Riparian Areas, Seeps, Spring, Wetlands, and Riparian Management Zones Desired Condition 03 (RMZ-DC-03) (forest plan, p. 135) | X | X | | |
| Riparian Areas, Seeps, Spring, Wetlands, and Riparian Management Zones Desired Condition 06 (RMZ-DC-06) (forest plan, p. 135) | X | X | | |
| Riparian Areas, Seeps, Spring, Wetlands, and Riparian Management Zones Desired Condition 07 (RMZ-DC-07) (forest plan, p. 135) | X | X | | |
| Riparian Areas, Seeps, Spring, Wetlands, and Riparian Management Zones Desired Condition 08 (RMZ-DC-08) (forest plan, p. 135) | X | X | | |
| Riparian Areas, Seeps, Spring, Wetlands, and Riparian Management Zones Desired Condition 09 (RMZ-DC-09) (forest plan, p. 135) | X | X | | |
| Riparian Areas, Seeps, Spring, Wetlands, and Riparian Management Zones Guideline 05 (RMZ-G-05) (forest plan, p. 136) | X | X | | |
| Wildlife, Fish, and Plants Guideline 06 (WFP-G-06) (forest plan, p. 142) | X | X | X | X |
| Wildlife, Fish, and Plants Guideline 07 (WFP-G-07) (forest plan, p. 142) | X | X | X | X |
| Soils Guideline 02 (SL-G-02) (forest plan, p. 147) | X | X | X | X |
| National Trails Management Area Desired Condition 03 (NTMA-DC-03) (forest plan, p. 182) | X | X | X | X |
| National Trails Management Area Desired Condition 06 (NTMA-DC-06) (forest plan, p. 182) | X | X | X | X |
| National Trails Management Area Desired Condition 07 (NTMA-DC-07) (forest plan, p. 182) | X | X | X | X |

| Forest Plan Component* | Alternatives Not Consistent† | | | |
|---|---|---|---|---|
| | 2/3 | 4 | 5 | 6 |
| National Trails Management Area Guideline 01 (NTMA-G-01) (forest plan, p. 182) | X | X | X | X |
| National Trails Management Area Guideline 02 (NTMA-G-02) (forest plan, p. 183) | | X | | |
| National Trails Management Area Guideline 08 (NTMA-G-08) (forest plan, p. 183) | X | X | X | X |

\* The wording is abridged from the full wording in the forest plan.

† Alternatives that are not consistent with a forest plan component are marked with an X and shaded. Alternatives without shading and an X are consistent with the forest plan component.

## 1.5    Decision Framework

Given the purpose and need, the deciding official(s) reviews the proposed action, the other alternatives, and the environmental consequences in order to make the following decisions.

### 1.5.1    Forest Service

As the lead agency tasked with completion of a single EIS, the Forest Service has management responsibility for the following:

- The NFS lands that would be affected by the proposed GPO or special use authorization
- Executing the land exchange that was mandated by Congress
- Approve necessary amendments to the forest plan (see section 1.4.3).

#### 1.5.1.1    General Plan of Operations or Special Use Authorization

The Forest Supervisor, Tonto National Forest, is the deciding official and has discretion to determine whether changes in the proposed GPO would be required prior to approval, or would decide to authorize a special use for the project.

For the action alternatives in the Resolution Copper Project FEIS, determination of appropriate regulations under which actions can be permitted on Federal lands depends on a number of specific details of the alternative in question. These include consideration of whether the mine itself (mineral extraction facilities) is located wholly or partially on Federal land or non-Federal land. The land exchange directed in Section 3003 of PL 113-291 is a factor as well. Section 1.5.5. summarizes the agencies or authorities that would regulate the various aspects of the mine, under different alternatives and scenarios.

If the land exchange is completed as specified in Section 3003 of PL 113-291, the entire Resolution mine (mineral extraction facilities) would be located on private land. Forest Service mining regulations at 36 CFR 228 Subpart A apply to operations conducted under the Mining Law (36 CFR 228.2). Mining operations that take place entirely on non-Federal lands are private mining operations, not operations under the Mining Law. Therefore, any associated uses of NFS land such as roads, pipelines, and utilities are managed as special uses and regulated under 36 CFR 251.50.

If the land exchange does not occur, most of the mineral extraction facilities (East Plant Site) would be located on private land; however, much of the ore body being mined would be under NFS lands, and an access road to the East Plant Site and the subsidence area (surrounded by a fence to prevent people from entering) also would be on NFS land. Where mineral extraction occurs on NFS land (or on both non-Federal and NFS lands in one integrated operation), these mining operations on NFS land are conducted under the Mining Law. Regulations at 36 CFR 228 Subpart A apply.

Another factor that could influence the appropriate regulations under which actions would be permitted on Federal lands is whether Resolution Copper holds mill site claims. The Mining Law allows for location of mill sites, which can be used for tailings and waste disposal on NFS land under certain circumstances. Mill sites do not necessarily have to be associated with mineral extraction on NFS lands or any Federal land. Operations on qualifying mill sites on NFS land are operations under the Mining Law and are covered by regulations at 36 CFR 228 Subpart A.

It is unknown whether the land exchange will occur as described in Section 3003 of PL 113-291 until the appraisal is complete, reviewed, and accepted, and Resolution Copper has accepted or rejected the exchange. It is unknown whether Resolution Copper plans to convert any of its mineral claims to mill site claims for the purpose of placing tailings on NFS or other Federal lands. These factors must be known before the Forest Service and other Federal land management agencies can determine what regulations are appropriate to use for permitting actions on their lands. These factors also must be known before we issue a final ROD. The final ROD will describe the regulations used to permit actions on Federal lands that are contained in the selected alternative.

### Forest Service Process under Mining Law

Regulations that govern the use of surface resources in conjunction with mining operations on NFS lands are set forth under 36 CFR 228 Subpart A. These regulations require that the Forest Service respond to parties who submit proposed plans to conduct mining operations on or otherwise use NFS lands in conjunction with mining. Compliance with other laws and regulations, such as State of Arizona water and air regulations, the ESA, CWA, and NHPA, also frames the proposed mining activities.

After considering the state of land exchange at the time the final ROD is issued, and the alternative tailings location selected by the Forest Supervisor, if either the mine or tailings were located on NFS lands, then the Forest Supervisor would proceed according to Mining Law.

The Forest Supervisor would use analysis in this EIS along with supporting documentation to make the following decisions regarding the proposed GPO:

1. Approve the proposed GPO submitted by Resolution Copper or require changes or additions to the proposed GPO to meet the requirements for environmental protection and reclamation set forth at 36 CFR 228 Subpart A before approving a final GPO. The Forest Service decision may be to authorize use of the surface of NFS lands in connection with mining operations under the GPO composed of elements from one or more of the alternatives considered. The alternative(s) that is/are selected for approval in the final ROD must minimize adverse impacts on NFS surface resources to the extent feasible.

2. Whether to approve project-specific amendments to the forest plan, which may be required to approve the final GPO.

3. Whether to approve a special use permit for SRP to authorize construction and operation of power lines on NFS lands.

The Forest Supervisor would then release a draft ROD that would address these three decisions. The draft ROD would be subject to 36 CFR 218, "Project-Level Pre-decisional Administrative Review Process."

Once objections to the draft ROD are resolved, the Forest Supervisor would issue a final ROD. Resolution Copper may have an opportunity to appeal the decisions as set forth at 36 CFR 214, "Post-decisional Administrative Review Process for Occupancy and Use of National Forest System Lands and Resources."

The remaining step would be approval of a final GPO, which may require Resolution Copper to modify the proposed GPO to align it with (1) the description of the selected alternative in the final ROD, and (2) changed conditions mandated by Section 3003 of PL 113-291. Additionally, the Forest Supervisor, Tonto National Forest, would require Resolution Copper to submit a reclamation bond or other financial assurance to ensure that NFS lands and resources involved with the mining operation are reclaimed in accordance with the approved GPO and Forest Service requirements for environmental protection (36 CFR 228.8 and 228.13). After the Forest Service has determined that the GPO conforms to the ROD and that the reclamation bond is acceptable, it would approve the GPO. Implementation of mining operations that affect NFS lands and resources may not commence until a plan of operations is approved and the reclamation bond or other financial assurance is in place.

### Forest Service Process under Special Use Regulations

As described in chapter 2, the Forest Supervisor has identified Alternative 6 – Skunk Camp as the preferred alternative. This alternative is unique in that the tailings storage facility would be located on private lands (after eventual acquisition of Arizona State Trust land). If the land exchange occurs, then the mine, all processing facilities, and the tailings storage facility would be located off of NFS lands. The remaining portions of the project on NFS land would be roads, pipelines, and utilities. Any associated uses of NFS land such as roads, pipelines, and utilities are considered special uses and regulated under 36 CFR 251.50.

Rather than submittal of a GPO, authorization for a special use or occupancy of NFS lands requires submittal of a special use application (SF-299). This application process is designed to ensure that authorizations to use and occupy NFS lands are in the public interest (36 CFR 251, Subpart B). Once submitted, this application is subject to initial screening, in accordance with Forest Service Handbook (FSH) 2709.11.12.21 (U.S. Forest Service 2020b), to determine consistency with law, regulation, and policy, consistency with the forest plan, and consistency with other policies for use of NFS land. After completion of the initial screening, a secondary screening is undertaken, as detailed in FSH 2709.11.12.32 (U.S. Forest Service 2020b), to determine appropriateness of the special use and financial and technical capability. After processing and ensuring that appropriate processes are met, such as NEPA compliance, the Forest Supervisor would proceed to either approve or deny the application. The special use authorization would include terms and conditions (36 CFR 251.56), including minimizing damage to the environment, protecting the public interest, and requiring compliance with water and air quality standards.

Under the likelihood that the land exchange would occur and Alternative 6 would be selected, Resolution Copper submitted an SF-299 special use permit application for the tailings pipeline uses on September 7, 2020. Tonto National Forest staff carried out initial and secondary screenings and accepted the application on September 28, 2020 (U.S. Forest Service 2020d). Similarly, SRP submitted an SF-299 special use permit application for the transmission line uses on November 11, 2020. Tonto National Forest staff carried out initial and secondary screenings and accepted the application on November 18, 2020 (U.S. Forest Service 2020c). These applications are included as appendix Q of the FEIS.

## 1.5.1.2    Land Exchange

There are two types of land exchanges the Forest Service may undertake: administrative and legislative. The Forest Service is authorized to conduct land exchanges under the General Exchange Act of 1922, the Federal Land Exchange Facilitation Act of 1988, and the Federal Land Policy and Management Act (FLPMA) of 1976. These laws govern how these land exchanges—known as administrative exchanges—will occur. An administrative exchange is a discretionary decision on the part of the Forest Supervisor and would occur only after appropriate NEPA analysis and issuance of a final ROD.

Congress also can direct the Forest Service to exchange lands, which is known as a legislative land exchange. Section 3003 of PL 113-291 directs the Forest Service to undertake a legislative land exchange. With regard to the legislative land exchange, the Tonto National Forest Supervisor has no decision authority due to the constraints imposed by PL 113-291. The Forest Supervisor does have a responsibility to (1) address concerns of affected Indian Tribes and see mutually acceptable resolution of concerns with Resolution Copper; (2) ensure that title to the non-Federal lands offered in the exchange is acceptable in accordance with Section 3003(c)(2)(A) of PL 113-291; and (3) accept additional non-Federal land or a cash payment from Resolution Copper to the United States in the event that the final appraised value of the Federal land exceeds the value of the non-Federal land in accordance with Section 3003(c)(5)(B)(i) of PL 113-291.

Environmental effects resulting from the land exchange on private, State, and NFS lands are analyzed in the EIS. Although the Forest Service no longer would have regulatory jurisdiction for those lands, Resolution Copper would still be required to comply with applicable Federal and State environmental laws, which address air quality, hazardous waste management, mine safety, mine reclamation, and other aspects of the proposed mine.

In passing Section 3003 of PL 113-291, Congress specified the timing of the land exchange, tying it to the publication of the FEIS: "Not later than 60 days after the date of publication of the final environmental impact statement, the Secretary shall convey all right, title, and interest of the United States in and to the Federal land to Resolution Copper" (Section 3003(c)(10)). The ROD for this project does not include any decision related to the land exchange—it only includes decisions related to authorizing mine components located on NFS land. The land exchange itself is not subject to the objection process, objection resolution process, or the ROD.

### 1.5.1.3    Forest Plan Amendment

Plan amendments are guided by Federal regulations at 36 CFR 219 (NFMA implementing regulations, 2012 Planning Rule, or Planning Rule). An analysis of compliance of the proposed project-specific forest plan amendment for the preferred alternative was conducted, which concluded that the amendment would comply with the Planning Rule. See appendix T of this FEIS for details.

## 1.5.2    Bureau of Land Management

The land exchange directed by PL 113-291 would transfer ownership of approximately 4,236 acres of Resolution Copper private lands to the BLM. As with the Forest Service, the BLM has no decision authority with respect to the land exchange.

The BLM would incorporate and administer the land acquired for the Lower San Pedro River Parcels into the San Pedro National Conservation Area no later than 2 years after the date on which the land is acquired. The San Pedro Riparian National Conservation Area Resource Management Plan (Bureau of Land Management 2019c) would be updated to reflect the acquired land.

The BLM would incorporate and administer the land acquired for the Appleton Ranch Parcel into the Las Cienegas National Conservation Area in accordance with the FLPMA, laws (including regulations) applicable to the Las Cienegas National Conservation Area, and applicable land use plans.

For purposes of this analysis, the Forest Service has identified an alternative that includes siting mine facilities on BLM-administered land, rather than on NFS lands as proposed by Resolution Copper (see section 2.2.7 for a description of Alternative 5 – Peg Leg). If the Forest Service were to select Alternative 5 – Peg Leg, the Forest Service's selection of that alternative would not authorize surface use of any BLM-managed public lands. In order to use the public lands identified in Alternative 5 – Peg Leg, Resolution Copper would be required to obtain surface use authorization under the applicable BLM

regulations. BLM would require the submittal of a separate mining plan of operations to determine whether unnecessary or undue degradation would occur (43 CFR 3809.11(a)). BLM would then issue a separate ROD from the Forest Service to approve mine-related actions on BLM-administered lands and would need to conduct any administrative review processes required under BLM regulations; this would include review of conformance with any current management plans. The BLM ROD would not necessarily be issued at the same time as the Forest Service ROD. Additional Tribal and public involvement might also be required to satisfy BLM regulations if Alternative 5 – Peg Leg were selected. To date, Resolution Copper does not have any pending requests for surface use authorization before BLM.

## 1.5.3    U.S. Army Corps of Engineers

Selection of some, but not all, of the alternatives would require the USACE to issue a permit under Section 404 of the CWA, which regulates discharge of dredged and fill within waters of the U.S. The USACE previously evaluated drainages and wetlands in portions of the Upper Queen Creek watershed[10] associated with this project and found these aquatic features were not subject to the USACE's jurisdiction under current rules in effect at that time. Under those rules, for drainages to be under the jurisdiction of the USACE, they must have a "significant nexus" to a traditionally navigable water. In 2012, the USACE determined that the drainages within the Upper Queen Creek watershed do not have a significant nexus to the closest traditionally navigable water, which is the Gila River between Powers Butte and Gillespie Dam. Ultimately, this determination means that a tailings storage facility sited within these areas in the Upper Queen Creek watershed (Alternatives 2, 3, or 4; see section 2.2) would not need a Section 404 permit, whereas other alternatives would require one (Alternatives 5 or 6). The following issuances contain the determinations of which drainages are under the jurisdiction of the USACE, which were then renewed in 2025 (U.S. Army Corps of Engineers 2025):

- USACE 2012a and 2015. These documents are Approved Jurisdictional Determinations that indicate an absence of jurisdiction within the Upper Queen Creek watershed above Whitlow Ranch Dam (U.S. Army Corps of Engineers 2012a, 2015).

- USACE 2020a. This document is an Approved Jurisdictional Determination that indicates absence of jurisdiction for portions of the Alternative 6 pipeline corridor that are within the Upper Queen Creek watershed above Whitlow Ranch Dam (U.S. Army Corps of Engineers 2020a).

- USACE 2020b. This document is a Preliminary Jurisdictional Determination for portions of the Alternative 6 pipeline corridor and tailings storage facility that are within the Dripping Spring Wash-Gila River watershed[11] (U.S. Army Corps of Engineers 2020b). Under a Preliminary Jurisdictional Determination, geographic jurisdiction is presumed based solely on the presence of ordinary high water mark indicators.

Because Congress directed that the EIS serves to support all Federal decisions related to the proposed mine, if Alternative 5 or 6 were ultimately selected, the USACE would rely on this EIS to support issuance of a Section 404 permit. In accordance with the CWA, Section 404(b)(1) guidelines (40 CFR 230), the USACE may only permit the least environmentally damaging practicable alternative in light of cost, logistics, and technology. An alternatives analysis has been prepared for the range of alternatives originally considered for this project using the criteria in the Section 404(b)(1) guidelines and has been included with this FEIS as appendix C; this document identifies Alternative 6 – Skunk Camp as the least environmentally damaging practicable alternative.

---

[10] For the purposes of the EIS, a "watershed" is understood to be the area defined by the 10-digit Hydrologic Unit Code (HUC) established by the U.S. Geological Survey (USGS). The 10-digit HUC for the Upper Queen Creek watershed is 1505010004.

[11] The 10-digit HUC for the Dripping Spring Wash-Gila River watershed is 1505010001.

A permittee is also required to compensate for the loss of waters of the U.S. in accordance with 33 CFR 332. Appendix D of this EIS contains Resolution Copper's conceptual mitigation plan. This plan has been approved by the USACE and determined to contain adequate mitigation to compensate for the loss of waters of the U.S.

Based on the analysis in this EIS and supporting documentation, the USACE's public interest review, and the determination of the least environmentally damaging practicable alternative in the Section 404(b)(1) alternatives analysis, the USACE would determine whether to do one of the following:

1. Issue Resolution Copper a CWA Section 404 individual permit for the discharge of dredged and/or fill material into waters of the U.S.; or

2. Issue Resolution Copper a CWA Section 404 individual permit with modifications or special conditions; or

3. Deny the CWA Section 404 individual permit.

The USACE issued a public notice during the DEIS comment period and has considered all comments received in response to the public notice, the DEIS, and public hearings (if applicable) as part of the public interest review. Following issuance of the FEIS, the USACE would prepare a ROD, separate from the Forest Service, regarding the Section 404 permit. The USACE's administrative appeals process allows the applicant to appeal a denied permit or a proffered permit that the applicant has declined. Details on this process are contained in 33 CFR 331, "Administrative Appeals Process."

### 1.5.3.1    Clarification of Least Environmentally Damaging Practicable Alternative

With respect to the least environmentally damaging practicable alternative, there are differences between the Forest Service and USACE regulatory frameworks.

Under 40 CFR 230.10(a), "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." In practice, this determination is contained in the 404(b)1 Alternatives Analysis, as described above. As noted above, the complete and approved 404(b)1 Alternatives Analysis is included as appendix C of the FEIS and identifies Alternative 6 – Skunk Camp as the least environmentally damaging practicable alternative.

Forest Service NEPA regulations contain a similar definition of the "environmentally preferable alternative" (36 CFR 220.3), but there is no requirement that the environmentally preferable alternative be selected.

## 1.5.4    Bureau of Reclamation Withdrawal Lands

The U.S. Department of the Interior commented on the DEIS and identified an area within the Tonto National Forest that previously was withdrawn from mineral entry for use by the SRP for water storage and diversion and/or power generation, transmission, and distribution. This area is shown in figure 1.5-1; the MARRCO corridor and the tailings storage facility footprints for Alternatives 2 and 3 lie partially within this withdrawal area.

In December 2019, the Tonto National Forest held a subsequent meeting with the Bureau of Reclamation to discuss the ramifications of the withdrawal. The lands are managed through a Tri-party Agreement between the Tonto National Forest, SRP, and Bureau of Reclamation dating to 1979. The withdrawal remains in force as long as the purpose for withdrawal still exists. As such, these lands are generally unavailable for mineral entry, including the staking of mill site claims that would be required for a tailings

storage facility. The mine-related activities to take place within the MARRCO corridor are allowable as part of the existing right-of-way already in place.

With respect to the NEPA process, the presence of the withdrawn lands does not invalidate consideration of Alternatives 2 and 3. CEQ guidance is that "an alternative that is outside the legal jurisdiction of the lead agency must still be analyzed in the EIS if it is reasonable. A potential conflict with local or federal law does not necessarily render an alternative unreasonable, although such conflicts must be considered" (NEPA 40 Most Asked Questions #2b) (U.S. Fish and Wildlife Service 2020b).

There is a similar Bureau of Reclamation withdrawal area along the Gila River, through which the pipeline and power line corridor for Alternative 5 would be required to cross. It has not been determined whether the presence of a pipeline or power line would be incompatible with the purpose of the withdrawal in the same manner as a tailings storage facility; however, as with Alternatives 2 and 3, the presence of the withdrawal area does not invalidate the alternative from consideration under NEPA.

## 1.5.5    Regulatory Jurisdiction by Mine Component and Alternative

As discussed above, jurisdiction over the mine project will differ based on whether the land exchange occurs or not, and which alternative is selected. Not only would the Forest Service authorizing regulations differ, but other Federal agencies (USACE and BLM) would only have regulatory roles under certain alternatives. Table 1.5.5-1 describes the agencies with jurisdiction over each project component, focusing on Federal agencies and State agencies with key permitting roles.

## 2.1.1    Changes from DEIS

The primary change in chapter 2 is the action alternatives themselves. For the DEIS, Alternatives 5 and 6 each had two alternative pipeline routes to carry tailings slurry from the West Plant Site to the respective tailings storage facility. We dropped the Alternative 5 – West pipeline option and the Alternative 6 – South pipeline option from further consideration, and now include a single pipeline option for each alternative. The location of the Alternative 6 – North pipeline option was revised to lessen impacts to resources. We describe all of these changes in detail in chapter 2. We also added additional discussion of power and water use to provide updated information and to respond to concerns raised by the public.

### 2.1.1.1    NPAG/PAG Terminology

We received public comments suggesting that our terminology in the DEIS to describe the tailings was misleading. As described in this chapter, there are two separate tailings streams that leave the West Plant Site processing facility. Early analyses and the GPO titled these "scavenger" and "cleaner" tailings, which refers to specific processes at the flotation plant. However, we deliberately chose to change these names for the DEIS, particularly because "cleaner" has connotations of better water quality when, in fact, "cleaner" tailings contain concentrated pyrite minerals and are actually more problematic for water quality. To avoid these misunderstandings, we used the terms non-potentially acid generating (NPAG) tailings and potentially acid generating (PAG) tailings in the DEIS.

Public comments were concerned that NPAG tailings still have the potential for acid generation and therefore use of this term is misleading. The discussion of the actual acid-generation potential of the tailings, based on laboratory testing, is found in Section 3.7.2, Groundwater and Surface Water Quality. As disclosed there, samples of the tailings we call NPAG in reality are classified roughly as 15 percent acid generating, 41 percent non-acid generating, and 44 percent PAG. By contrast, samples of the tailings we call PAG are classified 100 percent as acid generating.

We accept the validity of this concern, but in order to avoid confusion we have chosen to maintain consistent terminology between the DEIS and FEIS. A substantial number of documents in the project record also use NPAG/PAG terminology. We also added further discussion of this topic to section 3.7.2.

### 2.1.1.2    Alternative Mining Techniques

We received detailed comments on our assessment of alternative mining techniques other than block caving; the most commonly noted was cut-and-fill mining. As noted above, this assessment is described in detail in appendix F. Ultimately, we confirmed our decision to dismiss alternative mining techniques from detailed analysis. Almost all industry mining guidance indicates alternative mining techniques are not appropriate for a deposit like the Resolution Copper deposit, and the trade-offs are unreasonable. However, we added further description here due to the interest in this topic.

Comments note the benefits that would ensue from using cut-and-fill mining or other underground mining techniques, including the lack of a subsidence area overhead on Oak Flat, and the ability to backfill tailings underground. We agree with commenters that these are valid benefits if such a technique were reasonable to mine the Resolution Copper deposit.

However, our analysis found that it is an unreasonable technique. Based on review of industry guidance for selection of mining methods, block caving is the standard mining method used in the industry for ore bodies with the grade, size, depth, and geological characteristics of the Resolution Copper deposit. The ore and host rock characteristics that are favorable to other underground techniques differ from the Resolution Copper deposit. While physically almost any technique could be undertaken, it is unlikely that any of these other underground techniques would be chosen as a reasonable technique for a similar deposit.

Aside from appropriateness when compared to industry standards, use of any of these alternative underground mining techniques would result in higher per-ton mining costs, and as a result the cutoff grade for the deposit would need to be higher to be economically feasible. An increase in the cutoff grade from 1 percent to 2 percent removes an estimated 80 percent of the tonnage of the Resolution Copper deposit from consideration for development. The tonnage is likely to be even lower at a 2 percent cutoff grade, as many of these areas of high-grade ore are not contiguous or continuous. We found that accepting this level of reduction to accommodate an alternative mining technique is not economically feasible and would be unreasonable.

Based on public comments, the primary misunderstanding is that the decision not to analyze alternative mining techniques is based on profit, and that we are prioritizing profitability over environmental protection. This is not the case. Analysis of profitability of the mine was not conducted, and does not factor into the NEPA analysis or the determination of alternatives. Rather, our decision is based on what is reasonable under regulations and policy. We found that forgoing 80 percent of the ore deposit to accommodate an alternative mining technique is an unreasonable outcome. More discussion is included in appendix F.

## 2.1.2    Changes from the January 2021 Rescinded FEIS

Since January 2021, minor changes have been made to chapter 2 to reflect updates to electrical usage and reclamation and closure plans and to clarify aspects of the water balance and water supply. In addition, the Resolution Copper Project DEIS and January 2021 Rescinded FEIS indicated that Alternatives 2, 3, and 4 would require amendment of the 1985 "Tonto National Forest Land and Resource Management Plan." The forest plan consistency review was revisited after the revised forest plan was implemented in December 2023 (SWCA Environmental Consultants 2025). The revised consistency review indicated that a project-specific amendment of the 2023 forest plan would be needed with each of the action alternatives presented in the FEIS, Alternatives 2 through 6. Details of the project-specific amendment and exception of plan components are included in chapter 2, in each resource section of chapter 3, and in appendix T (for the preferred alternative) and are summarized in table 1.4.3-1.

## 2.2    Alternatives Considered in Detail

The FEIS presents five action alternatives and the no action alternative. Alternative 2 is the proposed action and consists of the GPO that was submitted to the Forest Service by the proponent. The remaining action alternatives were developed to meet the purpose and need, and sharply define the issues. The specific reasons for the development of each action alternative are described in the introduction to each alternative in this chapter.

- Alternative 1 – No Action Alternative. The land exchange would not occur, and the GPO would not be approved. Existing activities occurring on private land would continue as permitted (see section 2.2.3).

- Alternative 2 – Near West Proposed Action. This alternative is a variation of the proposed action described in the May 9, 2016, version of the GPO. Alternative 2 would include a split-stream tailings processing method with two tailings types deposited at a facility at the "Near West" location with a modified-centerline embankment (see section 2.2.4).

## 2.3 Mitigation Common to All Action Alternatives

Mitigation measures include the following:

- Avoiding the impact altogether by not taking a certain action or parts of an action;

- Minimizing impacts by limiting the degree or magnitude of the action and its implementation;

- Rectifying the impact by repairing, rehabilitating, or restoring the affected environment;

- Reducing or eliminating an impact over time, through preservation and maintenance operations during the life of the action; and

- Compensating for an impact by replacing or providing substitute resources or environments.

- Mitigation measures and monitoring developed for this project become part of the actions that are proposed in the proposed action or respective alternative. As part of the actions being proposed, the impacts and effectiveness of mitigation measures and monitoring actions are analyzed in tandem with other project actions in chapter 3..

The Forest Service has developed mitigation measures and monitoring actions to be included as project design features in the proposed action and action alternatives. The effectiveness of the mitigation measures and monitoring actions has been evaluated as part of the projected impacts analyses for the proposed action and action alternatives. Refer to the impacts analyses in chapter 3 for further detail.

### 2.3.1 Mitigation and Monitoring

The framework for the project mitigation and monitoring plan is contained in appendix J of this FEIS. Note that the full suite of mitigation measures and monitoring actions would not be known until many or most of the required permits have been issued, which often contain required measures intended to avoid or reduce environmental effects. Mitigation required by the Forest Service ultimately would be included in the ROD, and in the final authorization for the project, which would be either a final GPO or a special use permit.

#### 2.3.1.1 Authority

The framework mitigation and monitoring plan is designed to clearly disclose which mitigation and monitoring items are within the authority of the Forest Service, or other regulatory and permitting agencies, such as the USACE, ADEQ, and Arizona Department of Water Resources (ADWR).

#### Forest Service

The role of the Forest Service under its primary authorities in the Organic Administration Act, Locatable Regulations (36 CFR 228 Subpart A), and Multiple-Use Mining Act is to ensure that mining activities minimize adverse environmental effects on NFS surface resources. The role of the Forest Service under special use authorizations (36 CFR 251 Subpart B) would include terms and conditions to minimize damage to the environment, protect the public interest, and require compliance with water and air quality standards.

Forest Service mitigation measures and monitoring are items that would help to minimize impacts on Forest Service surface resources; or are required to mitigate effects on affected species as described in the FWS Biological Opinion for the project. The Forest Service is responsible for determining whether the implementation of mitigation and the results of monitoring comply with the decision that would be documented in the ROD and in the final authorization for the project (a final GPO or a special use permit).

The Forest Service has no authority, obligation, or expertise to determine or enforce compliance with other agencies' laws or regulations. The Forest Service seeks to coordinate with other agencies to authorize a legally compliant project; however, it is the operator's responsibility to ensure that its actions comply with applicable laws.

### Other Regulatory and Permitting Agencies

Mitigation and monitoring items under this heading are within the authority of other regulatory permitting agencies, including the ADEQ, ADWR, ASLD, BLM, Pinal County Air Quality Control District (PCAQCD), and USACE. Mitigation and monitoring measures under this authority include permit requirements and stipulations from legally binding permits and authorizations, such as the air quality permit, APP, and groundwater withdrawal permit. These other regulatory and permitting agencies would share with the Forest Service monitoring results and any instances of applicant non-compliance. The Forest Service would use the information provided by the regulatory and permitting agencies to determine compliance with the decision that would be documented in the ROD and the final project authorization (a final GPO or special use permit).

### Resolution Copper

Resolution Copper has agreed to implement additional mitigation and monitoring measures in the mitigation and monitoring plan that are outside the scope of the authorities listed here. As these were considered as required in the resource analyses, the final ROD would require these mitigations be enforced. These include contractual, financial, and other agreements over which the Forest Service and other regulatory agencies have no jurisdiction. The Forest Service and regulatory agencies have no authority, obligation, or expertise to determine or enforce compliance of these measures. Since the Forest Service and regulatory permitting agencies cannot require implementation of the mitigation and monitoring measures in this authority, their implementation is not guaranteed until required by a signed final ROD with the mitigations included. The effectiveness of these mitigation measures is included in chapter 3 impact analyses.

## 2.3.1.2    Post-DEIS Mitigation Development Process

Public comments received on the DEIS suggested many potential mitigation measures. Some of these suggestions were specific and detailed, while others were conceptual. The Forest Service evaluated all of these suggestions for inclusion in the FEIS (Garrett 2020g).

The Forest Service identified roughly 280 public comments related to mitigation. These were consolidated into several mitigation lists that were provided to Resolution Copper for consideration and collaboratively discussed with the Forest Service (Garrett 2020f, 2020m; Morey 2020b). More than 140 individual mitigation suggestions were brought forward for consideration as a result of public comments on the DEIS.

Resolution Copper subsequently submitted a suite of mitigation measures they committed to undertake. These measures are included in appendix J. Examples include the following:

- Updated wildlife management plan containing changes made in collaboration with Arizona Game and Fish Department (AGFD) (Resolution Copper 2020i).

- Recreation-related mitigations, including the establishment and management of the new Castleberry campground and commitment to develop access to the Inconceivables climbing area (Graham 2020).

- Water-related mitigations including water quality management and monitoring along Dripping Spring Wash for the Alternative 6 tailings storage facility (Montgomery and Associates Inc.

2020f), an updated mitigation and monitoring plan related to groundwater-dependent ecosystems around the mine site (Montgomery and Associates Inc. 2020b), and replacement of water to Queen Creek to offset losses in runoff due to the subsidence area (Peacey 2020b).

- An updated subsidence monitoring plan, revised in collaboration with the Forest Service (Davies 2020a).

- An item-by-item review of the suggested mitigation lists resulted in adding over 40 new or revised mitigation measures in appendix J. This included agreement to fund a mitigation plan to offset impacts to motorized and non-motorized recreation from the loss of NFS roads on Oak Flat. This measure originated with a plan developed by a multi-faceted recreation user group (RUG) in Superior, and was included in concept in the DEIS (mitigation measure RC-214). After publication of the DEIS, the Forest Service internally evaluated the recreation plan and developed a revised suite of motorized routes, non-motorized routes, and trailheads consistent with Forest Service management priorities (Rausch and Rasmussen 2020). Resolution Copper has agreed to fund this revised plan. The surface disturbance associated with these mitigations is included in the acreage calculations in the FEIS, as detailed in the next section.

Other mitigation measures were developed after the DEIS as part of other specific regulatory processes. These are described in appendix J and include the following:

- Development of mitigations related to impacts to Tribes and cultural resources as part of the PA. The PA was never executed, but all of these measures remain in place, although under different authorities. This is described in appendix J.

- Development and approval by the USACE of compensatory mitigation related to permitting under Section 404 of the CWA (included with the FEIS as appendix D). Surface disturbance associated with these mitigations is included in the acreage calculations in the FEIS, as detailed in the next section.

- Conservation measures developed during consultation with the FWS in compliance with Section 7 of the Endangered Species Act (ESA). These are codified in the approved Biological Opinion (included with the FEIS as appendix P).

### 2.3.1.3    Additional Mitigation-Related Disturbance included in EIS Calculations

#### *Recreation Mitigations*

In 2020, land managers and resource specialists from the Tonto National Forest evaluated several proposed measures intended to mitigate recreation impacts on the Tonto National Forest resulting from actions associated with the proposed project. The mitigation measures evaluated include the "Superior, Arizona Recreation Project Conceptual Plan" (WestLand Resources Inc. 2019), along with other relevant project mitigation suggestions gleaned from the public between March 2016 and November 2019. This review resulted in a set of measures found to be legitimate, practicable, and effective, and were recommended for inclusion in the FEIS (Rausch and Rasmussen 2020).

The recommendations included 9.3 miles of motorized trail and 11.5 miles of non-motorized trail that would be located on and managed by Tonto National Forest. These routes encompass about 42 acres of additional disturbance that were incorporated into the project acreage calculations.

The potential disturbance associated with additional mitigation recommendation—the Castleberry campground located alongside Queen Creek—has also been incorporated into the project acreage calculations. This encompasses approximately 50 acres, of which 2 acres are NFS lands and 48 acres are privately owned by Resolution Copper.

These 92 acres are included as part of project action under each action alternative, as they will offset recreation impacts from the loss of Oak Flat. The recreation mitigation areas are shown in figure 2.3-1.

### Compensatory Mitigation Lands

The three compensatory mitigation parcels approved under the Section 404 permitting process were incorporated into the project acreage calculations (figure 2.3-2). Full details are included in appendix D.

- MAR-5 Wetland/Olberg Road. The conceptual mitigation strategy consists of exotic tree species (principally tamarisk) removal and control, combined with native plant species reseeding, to allow for the establishment and maintenance of a riparian habitat dominated by native tree species. The MAR-5 Wetland site was established in 2015. Proposed continuing mitigation activities for the MAR-5 site include continued scheduled CAP water discharges, limited tamarisk removal and control, and seeding of native plant species. The Olberg Road site would represent new mitigation activities, and is located adjacent to the existing MAR-5 Wetland site. Mitigation activities at the Olberg Road site consist of tamarisk removal and control within the entire 23-acre site, followed by seeding of native plant species. The entire area encompasses 146 acres of lands; only the 23-acre Olberg Road mitigation parcel is part of the compensatory mitigation package.

- Queen Creek. This site is located downstream of the town of Superior, along Queen Creek. Resolution Copper would establish a conservation easement covering approximately 79 acres along 1.8 miles of Queen Creek to restrict future development of the site and provide protected riparian and wildlife habitat. Within a 33-acre area being considered as part of the compensatory mitigation package, conceptual mitigation elements include the removal of tamarisk to allow riparian vegetation to return to its historic composition and structure and promote more natural stream functions.

- H&E Farm. The H&E Farm is a 500-acre property owned by The Nature Conservancy. Mitigation activities proposed include earthwork to reconnect historic tributaries. The earthwork is proposed to reestablish the San Pedro River's access to its floodplain and terrace and enhance the wetland features present in the area. The soils across the site on the terraces are compacted and causing earth fissures and sinkholes on the parcel, which will continue if no intervention occurs. Grading in some areas would reestablish the natural alluvial fan and floodplain terrace structure. Planting and seeding native species is planned to restore a more native vegetation community along the bank of the river. It is intended to mirror previous mitigation strategies implemented by The Nature Conservancy as well as ongoing mitigation at the AGFD Lower San Pedro Wildlife Area that is contiguous to the western and northern boundaries of the H&E Farm parcel. The terrace area to be reestablished encompasses 300 acres, and the wetland area to be reestablished encompasses 15 acres. The remainder of the property would be conserved in the current condition.

These 725 acres described above are included as part of project action solely under Alternative 6 – Skunk Camp. This is because the compensatory mitigation is required for issuance of the Section 404 permit, and the 404 permit application as submitted to the USACE is specific to this location only.



**Figure 2.3-1. Location of recreation-related mitigation areas**

Resolution Copper Project and Land Exchange



**Figure 2.3-2. Location of compensatory mitigation lands required by Section 404 permitting**

#### 2.3.1.4    Applicant-Committed Environmental Protection Measures

Applicant-committed environmental protection measures are features incorporated into the design of the project by Resolution Copper to reduce potential impacts on resources. These measures would be non-discretionary as they are included in the project design, and their effects are accounted for in the analysis of environmental consequences disclosed in each resource section of chapter 3. Three specific applicant-committed environmental protection measures also are discussed as mitigation measures. Their inclusion in the mitigation section reflects specific changes that were made directly in response to public comments, or as a result of the impacts disclosed during the EIS analysis. These include the road use plan, wildlife management plan, and subsidence management plan.

#### 2.3.1.5    Monitoring and Evaluation

Monitoring is fundamental for ensuring the implementation and effectiveness of mitigation commitments, meeting legal and permitting requirements, and identifying trends and possible means for improvement (Council on Environmental Quality 2011) Forest Service NEPA regulations indicate that any adaptive management approaches or alternatives "must also describe the monitoring that would take place to inform the responsible official whether the action is having its intended effect" (36 CFR 220.5(e)). Detailed monitoring plans would be incorporated by reference into the agency's decision document to ensure that they are legally binding. The following monitoring plans would identify the monitoring area, the monitoring systems, and future actions if thresholds are triggered:

- Subsidence management plan. This plan originally was included as an appendix to the GPO. Partially in response to public comments on the DEIS, the Forest Service collaborated with Resolution Copper to produce a revised subsidence monitoring plan (Davies 2020a). After review of the revised plan, we also developed additional stipulations that would be required as part of the subsidence monitoring. The revised plan and added stipulations are detailed in appendix J and discussed in section 3.2.

- Groundwater mitigation and monitoring plan. This plan was brought forward by Resolution Copper as a mitigation measure that was included in the DEIS, and addresses potential impacts to groundwater-dependent ecosystems near the mine site. As part of the reconvened Water Resources Workgroup, the Forest Service collaboratively reviewed the comments on the groundwater mitigation and monitoring plan, and Resolution Copper subsequently submitted a revised plan (Montgomery and Associates Inc. 2020b). The revised plan is detailed in appendix J and discussed in section 3.7.1. Also in response to public comments, Resolution Copper submitted a monitoring plan specific to water resources near the Alternative 6 tailings storage facility, in Dripping Spring Wash (Montgomery and Associates Inc. 2020f).

- Road use plan. This plan originally was included as an appendix to the GPO. Partially in response to public comments on the DEIS and further review by the Forest Service, Resolution Copper submitted a revised road use plan (Resolution Copper 2020b).

- Environmental emergency and response and contingency plan (appendix to GPO)

- Fire prevention and response plan (appendix to GPO)

- Preliminary spill prevention, control, and countermeasures plan (SPCC) (appendix to GPO)

- Explosives management plan (appendix to GPO)

- Acid rock drainage management plan (appendix to GPO)

- Hydrocarbon management plan (appendix to GPO)

- Environmental materials management plan (appendix to GPO)

- Preliminary SWPPP (appendix to GPO)

- Wildlife management plan. This plan originally was included as an appendix to the GPO. After collaborative discussions with AGFD, Resolution Copper submitted a revised wildlife management plan (Resolution Copper 2020i).

- Noxious weed and invasive species plan (Resolution Copper 2019)

- Historic properties treatment plan (HPTP) for Oak Flat land exchange parcel (Deaver and O'Mack 2019)

- Research design for GPO historic properties treatment (in process)

- Tailings pipeline management plans (AMEC Foster Wheeler Americas Limited 2019) and Skunk Camp pipeline protection and integrity plan (Golder Associates Inc. 2020)

- Concentrate pipeline management plan (M3 Engineering and Technology Corporation 2019)

Monitoring and evaluation activities would be prescribed, conducted, and/or reviewed by Resolution Copper, the Forest Service, and other agencies with regulatory or permitting authority. Resolution Copper would fund monitoring as set forth in the ROD, and an approved final GPO or special use permit. Other monitoring activities may be associated with the regulatory authority of other Federal and State agencies and would be funded by permit fees or the agencies themselves as part of their normal activities.

### Evaluation and Reporting

Resolution Copper would submit an annual report to the Forest Service that contains a description of all activities conducted on NFS lands during the previous year and a summary of the amount of acreage disturbed, status of reclamation, spills or releases of chemicals or fuel, and results of all monitoring plans in a format approved by the Forest Service, including a complete data summary and any data trends, status of mining plan (tons of ore and waste mined and any changes to methods or equipment), and plans for the coming year. In addition to annual reporting, individual monitoring measures would also specify reporting requirements, which could include short-term emergency notification (for example, reporting spills within 72 hours) and interim reports (such as quarterly reports). The Forest Service would review reporting to ensure that mitigation commitments were implemented on NFS lands and the effectiveness of the mitigation. Significant changes from the proposed action to incorporate requirements contained in the ROD would be required to be incorporated into the approved final GPO or special use permit and reflected in financial assurance. Past, ongoing, or projected impacts on the environment may also require revision of the approved final GPO or special use permit, ROD, and/or financial assurance held for the project.

## 2.3.1.6    Financial Assurances

As part of the approval of a final GPO, the Forest Service would require Resolution Copper to post financial assurance, or reclamation bond, that would provide adequate funding to allow the Forest Service to complete reclamation and post-closure operation, maintenance activities, and necessary monitoring on NFS land for as long as required to return the site to a stable and acceptable condition. The amount of financial assurance would be determined by the Forest Service and would "address all Forest Service costs that would be incurred in taking over operations because of operator default" (U.S. Forest Service 2004). The financial assurance would be required in a readily available bond instrument payable to the Forest Service and would be subject to 36 CFR 228.13. In order to ensure that the bond can be adjusted as needed to reflect actual costs and inflation, there would be provisions allowing for periodic adjustment on bonds in the final GPO or special use permit prior to approval.

Further discussion of financial assurance is included in section 1.5.5, and in certain sections of chapter 3, including section 3.3 (Soils, Vegetation, and Reclamation), 3.7.2 (Groundwater and Surface Water Quality), and 3.10.1 (Tailings and Pipeline Safety).

## 2.4    Effects of the Land Exchange

As described in section 2.2.3.1, a completed land exchange is considered for all resource analyses in chapter 3.

Physically, the panel caving proposed to take place under Oak Flat is independent of the land exchange. The deposit would be mined with fundamentally the same techniques and require fundamentally the same infrastructure, and result in the same surface subsidence, regardless of whether the surface is under Forest Service jurisdiction or is private. The two primary differences are (1) the regulatory framework under which mining would occur "with" or "without" Federal oversight, and (2) without the land exchange, minerals underneath the withdrawal boundary could not be extracted.

With respect to regulatory framework, if a land exchange does not occur, Resolution Copper would mine and reclaim the mined land under Federal, State, and local permits and an approved GPO under 36 CFR 228 Subpart A. With respect to regulatory framework, if the land exchange does occur and the Oak Flat area becomes private lands, Resolution Copper would be required to conduct its activities in accordance with all applicable Federal, State, and local permits but may not be subject to the requirement of obtaining an approved GPO under 36 CFR 228 Subpart A.

With respect to mining under the 760 Oak Flat Withdrawal Area, if the land exchange did not occur, the 760-acre Oak Flat Withdrawal Area would remain closed to mineral entry. While under the proposed action no mining panels are located below the Oak Flat Withdrawal Area, the proposed action might require modification to limit subsidence into that area. Regardless, mining without a land exchange would still be a possibility.

Public comments on the DEIS noted various surface uses of Oak Flat. Foremost among these are uses by Tribal members. Other uses include recreation, grazing, and reported use by educational institutions. The land exchange would not necessarily prohibit these uses, but they would take place only with the permission of the private landowner, Resolution Copper. Most of these surface uses would be in conflict with mining operations and likely would cease or be greatly curtailed.

Mine operations are governed by several Federal, State, and local regulatory frameworks. Each of the regulatory frameworks is founded in statute and implemented through regulations and policies of the responsible agency. Agency regulations or rules provide guidance to the agency so it can implement the laws and provide guidance to mine operators so they can follow the laws. Each agency requires certain types of information (filing requirements) before it can process and issue permits under its regulations. Many of the filing requirements for permits from the various agencies are duplicative, even though each agency has its own regulatory authority and responsibilities. Performance standards specify the norm governing how operations would occur and describe the level of compliance expected by the agency.

Performance standards required by the Forest Service for mining on Federal land are contained in 36 CFR 228.8: "All operations shall be conducted so as, where feasible, to minimize adverse environmental impacts on National Forest surface resources." These include specific requirements for air quality, water quality, solid waste, scenery values, fishery and wildlife habitat, roads, and reclamation.

State agencies have similar performance standards. For example, the goal of the State's APP program is to ensure no degradation of the state's groundwater. ADEQ ensures this goal by implementing the performance standards outlined by the best available demonstrated control technology (Arizona

The "Environmental Consequences" section describes the impacts of the proposed action or alternatives on the environment. Impacts include both the direct effects and indirect effects of the proposed action or alternatives. Direct effects are caused by the action and occur at the same time and in the same place. Indirect effects are caused by the action and are later in time and/or farther removed in distance but are still reasonably foreseeable. Where alternatives have similar (though not necessarily identical) impacts, all alternatives may be discussed together, to be followed if needed by a discussion of the impacts that differ substantially between the alternatives.

The "Environmental Consequences" section also describes the cumulative impacts of the proposed action or alternatives. A cumulative impact is one that results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions, which are those Federal or non-Federal activities not yet undertaken for which there are existing decisions, funding, or identified proposals (36 CFR 220.3). Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

As noted above, cumulative impacts are the combination of impacts from the proposed action or alternatives with other past, present, and reasonably foreseeable future actions. Past and present actions contribute to the existing condition of the affected environment in the project area and are included under the "Affected Environment" heading. The additional effects of the proposed action or alternatives are discussed under the "Environmental Consequences" heading. To assess cumulative impacts, those effects must then be considered in conjunction with the effects of "reasonably foreseeable" future actions, as long as they overlap in both space and time.

A "reasonably foreseeable" action is one that is likely to occur in the future and does not include those that are speculative. The Forest Service compiled a list of future actions to form the basis for the cumulative effects analysis and applied specific criteria to determine whether they were reasonably foreseeable or speculative (Newell et al. 2020); the list of reasonably foreseeable actions was updated twice more, in 2023 and 2024 (Debauche 2023; SWCA Environmental Consultants 2024). Only the effects of those actions determined to be reasonably foreseeable—and determined to overlap spatially and temporally with effects from the proposed action or alternatives—are included in the "Cumulative Effects" section of each resource (Debauche 2023; SWCA Environmental Consultants 2020b).

Chapter 4 describes the process undertaken for the cumulative effects analysis and the resulting outcome. This changed since the DEIS, with the intention of developing a more quantitative and specific cumulative effects analysis. Chapter 4 also includes additional, expansive discussions, including the effects of future meteorological trends and regional water supplies. The cumulative effects analyzed in chapter 4 are summarized in each resource section in chapter 3.

As described in chapter 2, the Forest Service developed a comprehensive set of mitigation measures that, where practical and technically feasible to implement, would serve to avoid, minimize, rectify, reduce, or compensate for resource impacts identified during effects analyses conducted for this EIS. Concurrent with these mitigation measures, monitoring plans have been developed that would be used to gauge the effectiveness over time of each mitigation measure. If prior experience or analysis shows that a given mitigation measure is likely to reduce but is unlikely to eliminate an impact, an assessment was made to characterize the nature and scale of the anticipated residual impact. Thus, each chapter 3 resource section includes discussions of applicable mitigation measures, monitoring plans, and unavoidable adverse impacts.

## 3.7    Water Resources

### 3.7.1    Groundwater Quantity and Groundwater-Dependent Ecosystems

#### 3.7.1.1    Introduction

This section describes the analysis and predicted effects on the groundwater-dependent ecosystems (GDEs), public and private water supply wells, and subsidence from dewatering.

Resolution Copper has monitored the quantity and quality of water in streams, springs, and riparian areas as far back as 2003. Dozens of wells were installed for the sole purpose of understanding the local and regional hydrogeology, not just below Oak Flat but throughout the region. To assess impacts on groundwater resources, the long history of baseline data collection was considered holistically alongside

- the large geographic area involved;

- the complex geology and multiple aquifers, including the incorporation of the block caving itself, which would fundamentally alter the geological structure of these aquifers over time;

- the long time frames involved for mining (decades) as well as the time for the hydrology to adjust to these changes (hundreds of years); and

- the fact that even relatively small changes in water levels can have large effects on natural systems.

> **Overview**
>
> Natural water features are scarce and important to Tribes, wildlife, residents, and recreationists. The Resolution Copper Project could affect both water availability and quality in several ways. In order to construct mine infrastructure, dewatering of the deep groundwater system below Oak Flat began in 2009, and would continue through mining. As the block caving and subsidence progress, eventually the effects of dewatering would extend to overlying aquifers. Changes in these aquifers, as well as capture of runoff by mine facilities and the subsidence area, could in turn affect springs, flowing streams, and riparian areas. In addition to loss of water, water quality changes could result from stormwater runoff, tailings seepage, or exposure of rock in the block-cave zone.

A numerical groundwater flow model is the best available tool to assess groundwater impacts. Like all modeling, the Resolution Copper Mine groundwater model requires great care to construct, calibrate, and properly interpret. The Forest Service collaborated with a broad spectrum of agencies and professionals over several years to assess the groundwater modeling. This diverse group (see section 3.7.1.2) vetted the construction, calibration, and use of the groundwater model, and focused on understanding any sensitive areas with the potential to be negatively affected, including Devil's Canyon, Oak Flat, Mineral Creek, Queen Creek, Telegraph Canyon, Arnett Creek, and springs located across the landscape. The Forest Service refers to such areas as GDEs, which are "communities of plants, animals, and other organisms whose extent and life processes are dependent on access to or discharge of groundwater" (U.S. Forest Service 2012b).

Just as much care was taken to understand the limitations of the groundwater model. Specific model limitations are described in section 3.7.1.2 and reflect a careful assessment of how the results of a groundwater model can reasonably be used, given the uncertainties involved.

The Forest Service undertook a two-part strategy to manage uncertainty. First, all GDEs were assumed to be connected with the regional aquifers (and therefore potentially affected by the mine) unless direct

evidence existed to indicate otherwise. Second, regardless of what the model might predict, a monitoring plan would be implemented to ensure that actual real-world impacts are fully observed and understood.

This section analyzes impacts on GDEs and local water supplies from dewatering and block caving, the amount of water that would be used by each alternative, the impacts from pumping of the mine water supply from the Desert Wellfield, and the potential for ground subsidence to occur because of groundwater pumping. Some aspects of the analysis are briefly summarized in this section. Additional details not included here are in the project record (Newell and Garrett 2018d).

### Changes from the DEIS

We received a number of technical comments on the groundwater modeling effort used in the DEIS. We assessed these comments with the assistance of the reconvened Water Resources Workgroup. Many of the comments represented alternative modeling choices but not errors in the modeling process (Garrett 2020e). A review of these comments resulted in several clarifications and additions to this section, including details of baseline conditions and model calibration.

This section incorporates updated information with respect to springs and hydrologic conditions at the Skunk Camp location. We added further discussion of the development of the Desert Wellfield model in the East Salt River valley, and a refined analysis of potential subsidence impacts in that area.

The cumulative effects analysis was revised for the FEIS to better quantify impacts. It is described in detail in chapter 4 and summarized in this section. We received numerous comments concerned with water use by the mine and potential water scarcity due to drought, future meteorological trends, and competing water uses. The cumulative effects analysis now includes an expanded discussion of these issues. Mitigations developed between the DEIS and FEIS are summarized in appendix J and, if applicable to water quantity, are analyzed for effectiveness in this section.

### Changes from the January 2021 Rescinded FEIS

A number of changes have been made since January 2021 in response to comments. These include additional assessment of subsidence impacts, an analysis of the potential for indirect impacts affecting the San Carlos Apache Reservation and the Cutter Basin, and an expanded analysis of the number of wells that could be impacted by drawdown associated with the mine and the Desert Wellfield. The discussion of Arizona water law, and other pertinent laws, has also been expanded.

Changes to mitigation plans since January 2021 have been incorporated and assessed, revisions have been made to the cumulative effects analysis based on updates to the list of potentially reasonably foreseeable actions, and the section has been updated to reflect analysis of consistency with the new "Tonto National Forest Land Management Plan," implemented in December 2023.

## 3.7.1.2 Analysis Methodology, Assumptions, and Uncertain and Unknown Information

### Analysis Area

The analysis area for assessing impacts on groundwater quantity and GDEs comprises the groundwater model boundary for the mine site (figure 3.7.1-1) as well as the groundwater model boundary for the East Salt River valley model (figure 3.7.1-2). Models were run up to 1,000 years in the future, but as described below, quantitative results were reasonably applied up to 200 years in the future.

Some public comments expressed concern that the southern boundary of the East Salt River valley model, which corresponds to the boundary between the Phoenix AMA and the Pinal AMA, is inappropriate

because some level of drawdown from the Desert Wellfield is still anticipated at this location. The Phoenix AMA/Pinal AMA boundary is based on a hydrogeologic divide between two distinct groundwater basins. This is the reason that boundary was selected as the domain of the groundwater model and the limit of the groundwater resource analysis area. However, note that the potential for project drawdown to overlap with other drawdown and projects farther south in the Pinal AMA is considered in the cumulative effects analysis in chapter 4.

### Modeling Process

In September 2017, the Tonto National Forest convened a multidisciplinary team of professionals, referred to as the Groundwater Modeling Workgroup. The Groundwater Modeling Workgroup included Tonto National Forest and Washington-level Forest Service hydrologists, the groundwater modeling experts on the project NEPA team, representatives from ADWR, AGFD, the EPA, the San Carlos Apache Tribe, and Resolution Copper and its contractors. This group included not only hydrologists working on the groundwater model itself, but also the biologists and hydrologists who have conducted monitoring in the field and are knowledgeable about the springs, streams, and riparian systems in the project vicinity. The Groundwater Modeling Workgroup tackled three major tasks: defining sensitive areas, evaluating the model and assisting the Tonto National Forest in making key decisions on model construction and methodology, and assisting the Tonto National Forest in making key decisions on how to use and present model results.

A new Water Resources Workgroup convened in January 2020, following receipt of public comments on the DEIS. The reconvened Workgroup assisted the Tonto National Forest in assessing public comments related to water resources, including groundwater modeling, water quality and water quality modeling, and monitoring and mitigation. The Workgroup's efforts led to numerous requests for additional data, clarification, and analysis from the modelers, in order to inform the responses to the comments and the use of the model. Workgroup members disagreed with the approaches taken by the Tonto National Forest on some issues. These disagreements, as well as the results and proceedings of the reconvened Water Resources Workgroup, are documented in several summary memos (BGC Engineering USA Inc. 2020b; Garrett 2020j).

Resolution Copper Project and Land Exchange



**Figure 3.7.1-1. Overview of groundwater modeling analysis area**

384



**Figure 3.7.1-2. Desert Wellfield modeling analysis area and maximum (Alternative 2, left) and minimum (Alternative 4, right) modeled pumping impacts**

Left side of figure: Drawdown for scenario with the most pumping (Alternative 2). Upper left shows drawdown at end of mining; lower left shows maximum geographic extent of drawdown (124 years after end of mining). Right side of figure: Drawdown for scenario with the least pumping (Alternative 4). Upper right shows drawdown at end of mining; lower right shows maximum geographic extent of drawdown (11 years after end of mining).

SELECTED MODEL APPROACH

The groundwater model selected for the project is the MODFLOW-SURFACT program, selected in part because of the ability to change aquifer properties over time because of the effects of the block caving. This computer program code specifically was selected for use on this project for several reasons: "MODFLOW-SURFACT has the advantages of being more numerically stable when solving for groundwater flow in systems with steep hydraulic gradients and large differences in hydraulic conductivity across short distances, and in systems where drying and rewetting of model cells occurs. MODFLOW-SURFACT has been used on numerous large, complex mining projects, and is the most appropriate code for this project" (WSP USA 2019).

The assessment of the model by the Groundwater Modeling Workgroup, as well as the assessment of the conceptual hydrologic model upon which the numerical model is based, can be found in the technical memorandum summarizing the workgroup process and conclusions (BGC Engineering USA Inc. 2018d, 2020b). A description of the model construction can be found in WSP USA (2019). Predictive and sensitivity results can be found in Meza-Cuadra et al. (2018b) and Meza-Cuadra et al. (2018c).

Comments were received on the appropriateness of the groundwater model boundaries for the mine site. As seen in figure 3.7.1-1, the model boundaries were based roughly on watershed boundaries—a common practice for modeling as this often defines groundwater divides. However, the boundaries also represent important hydrologic conditions and geologic divides as well.

- The northeastern model boundary roughly represents the edge of the Apache Leap Tuff and Whitetail Conglomerate against the Pinal Schist and other less permeable igneous and metamorphic rocks (see "Indirect Effects to Cutter Basin" later in section 3.7.1 for a regional geographic map and cross section).

- The model boundaries on the western part of the model largely represent the relatively permeable units of the Superior Basin (Gila Conglomerate), which are surrounded by less permeable igneous and metamorphic rocks.

- The eastern and southeastern model boundary lie along Lyons Fork and Mineral Creek. These model boundaries were selected because they represent reasonable groundwater flow divides.

Part of the vetting of the groundwater model by the Groundwater Modeling Workgroup was to assess whether the selection of these boundaries might affect the groundwater modeling results. The boundaries were found to be reasonable with very little influence on the model outcomes (BGC Engineering USA Inc. 2018d, 2020b). These conclusions are based on two separate assessments. The first assessment considered those boundaries known as "general-head boundaries". These boundaries are important to assess because they allow water to flow in or out of the groundwater model, depending on the groundwater levels. If drawdown encroaches on a general-head boundary, more water will be added into the model, potentially resulting in the model underestimating drawdown impacts. The assessment concluded that the flow across the model boundaries was not substantial, up to 27 gallons per minute combined across all boundaries, compared to a dewatering pumping of 1,065 gallons per minute (Meza-Cuadra and Oliver 2018; Resolution Copper 2018a).

The second assessment converted all of the boundaries to no-flow boundaries, allowing no water in or out of the model. While not necessarily realistic, this ensures that boundaries are not allowing inflows that might reduce drawdown. This primarily increased drawdown in the northeast part of the model, for instance increasing anticipated drawdown in proxy well HRES-06 from about 10 feet to about 14 feet (Meza-Cuadra et al. 2018c). This sensitivity run is incorporated into the range of results described in this section.

IDENTIFYING AND DEFINING GROUNDWATER-DEPENDENT ECOSYSTEMS

The Groundwater Modeling Workgroup developed the list of GDEs based on multiple sources of information; it ultimately evaluated in detail 67 different locations (Garrett 2018e). Any riparian vegetation or aquatic habitat around the GDEs is considered an integral part of the GDE.

It is important to understand that the list of GDEs assessed in detail was derived from a much wider list of potential spring locations. Potential spring locations were originally evaluated from eight separate available data sources (Rietz 2017), resulting in a list of over 1,000 possible springs within 20 miles of the project site. However, most of these spring locations are not perennial and cannot actually be located on the landscape. Spring locations based on available maps and databases may be artifacts of historic water conditions, may be incorrectly mapped, or may represent seasonal or ephemeral water sources.

By contrast, the types of springs that stand to be impacted by mine drawdown are those that have persistent water because they are connected to a regional aquifer system. For this reason, while historical maps and available databases were useful starting points, field surveys were required to verify which springs persistently exist on the landscape (WestLand Resources Inc. and Montgomery and Associates Inc. 2018, 2020). These field-verified springs represent the type of persistent GDEs with the potential for connections to regional aquifers and were then carried forward as part of the 67 GDEs assessed in detail.

The source of water for each GDE is important. Most of the 67 GDE locations the Groundwater Modeling Workgroup assessed were identified because of the persistent presence of water, year-to-year and season-to-season. In most cases this persistent water suggests a groundwater connection; however, the specific type of groundwater is important for predicting impacts on GDEs. There are generally two regional aquifers in the area: the Apache Leap Tuff, and the deep groundwater system. Any GDEs tied to these two aquifers have the potential to be impacted by mining. The deep groundwater system is being and would continue to be actively dewatered, and once block caving begins the Apache Leap Tuff would begin to dewater as well.

In addition to the regional groundwater systems, another type of groundwater results from precipitation that is temporarily stored in near-surface fractures or alluvial sediments. While temporary, this water still may persist over many months or even years as it slowly percolates back to springs or streams or is lost to evapotranspiration. These near-surface features are perched well above and are hydraulically disconnected from both the Apache Leap Tuff aquifer and the deep groundwater system; therefore, this groundwater source does not have the potential to be impacted by mine dewatering. However, changes in the surface watershed could still affect these shallow, perched groundwater sources. Predictions of reductions in runoff caused by changes in the watershed are discussed in section 3.7.3; these changes are also incorporated into this section (3.7.1) in order to clearly identify all the combined effects that could reduce water available for a GDE.

Identifying whether a GDE derives flow from the deep groundwater system, the Apache Leap Tuff, or shallow, perched aquifers was a key part of the Groundwater Modeling Workgroup's efforts. Several lines of evidence helped determine the most likely groundwater source for a number of GDEs: hydrologic and geological framework, inorganic water quality, isotopes, riparian vegetation, and the flow rate or presence of water. However, many more GDEs had little or no evidence to consider, or the evidence was contradictory. In these cases the Forest Service policy is to assume that a GDE has the potential to be impacted (Garrett 2018e; Newell and Garrett 2018a). In addition to identifying GDEs, the Groundwater Modeling Workgroup identified three key public water supply areas to assess for potential impacts from the mine.

After completion of the DEIS, additional field inventories were undertaken to identify other GDEs in the vicinity of the Skunk Camp tailings storage facility. Several additional springs were identified; however, no impacts to these springs by the facility footprint or changes in groundwater quantity are anticipated

(WestLand Resources Inc. and Montgomery and Associates Inc. 2020). Potential changes in groundwater and surface water quality as a result of tailings seepage is assessed in section 3.7.2.

EVALUATING THE MODEL AND MODELING APPROACH

The Groundwater Modeling Workgroup reviewed the work done by WSP (a contractor of Resolution Copper) and assisted the Tonto National Forest in determining the appropriate methodologies and approaches that should be used. In practice, this consisted of an open, iterative process by which the Groundwater Modeling Workgroup requested data, the data were prepared and presented, and the results and meaning were discussed in Groundwater Modeling Workgroup meetings. All fundamental parts of developing a numerical groundwater flow model were discussed: developing a conceptual model, numerical model construction, model calibration, model sensitivity, model predictive runs, and model documentation. The results and conclusions of the Groundwater Modeling Workgroup's effort are documented in a final Groundwater Modeling Workgroup report (BGC Engineering USA Inc. 2018d). Results and conclusions of the post-DEIS reconvened Water Resources Workgroup are documented as well (BGC Engineering USA Inc. 2020b; Garrett 2020j).

The conceptual understanding of the hydrogeology and the geological framework of the area is fundamental to developing a valid groundwater flow model. A separate but related workgroup focused specifically on the geological data collection and interpretation, and the subsidence modeling. The results of this workgroup are discussed in Section 3.2, Geology, Minerals, and Subsidence, and documented in a final workgroup report (BGC Engineering USA Inc. 2018a). Several team members collaborated in both workgroups and facilitated sharing of information.

After receiving input from the Groundwater Modeling Workgroup, the Forest Service and its contractors ultimately determined that WSP's groundwater model, as amended and clarified over the course of the workgroup meetings, is a reasonable and appropriate tool for assessing hydrologic changes.

MODEL CALIBRATION

One specific topic raised in public comments is the calibration of the groundwater model. The selected approach for predicting project impacts requires three different steps: a steady-state model run to provide starting water levels representative of 1910; a transient model run between 1910 and 2016 used to calibrate the model; and predictive transient model runs.[63] The predictive transient models are described in more detail in the section below titled "Summary of Models Used for Mine Site Dewatering/Block Caving Effects."

Few details exist for groundwater levels in 1910, so the calibration target for the steady-state model was to attempt to replicate what was known about the general hydrology of the area, particularly where groundwater discharge was present in Queen Creek above Superior. The resulting steady-state water levels, calibrated in this way, form the starting point for the transient calibration run from 1910 to 2016. Ultimately, given the long time frame (over 100 years), the initial steady-state water levels in 1910 have relatively little effect on the transient modeling results.

Multiple calibration targets were used for the 1910–2016 transient calibration runs. These included:

- Groundwater levels. Groundwater levels formed the primary means of calibration for the transient model, with a strong focus on the time period from 1998 to 2016, which was a period of intensive monitoring of groundwater levels. Ultimately this calibration data set consisted of over

---

[63] A "transient" model run occurs over a specified period of time, with each time step using the model results from the previous time step as a starting point. A "steady-state" model has no time component, and the model simply runs until all the inflows and outflows specified in the model reach a balance.

5,900 measurements at 93 different locations. These calibration targets were assessed statistically and visually (scatter plots and hydrographs comparing field-measured versus modeled water levels).

- Groundwater contours. Groundwater levels also were qualitatively assessed by comparing the modeled contours to real-world conditions, to identify how well gradients and flow directions match.

- Aquifer tests. Numerous aquifer tests were conducted by Resolution Copper as part of hydrogeologic characterization efforts. Two of these tests were particularly long: HRES-20 (90 days) and HRES-09 (23 days). These aquifer tests were replicated using the groundwater model, which is largely useful for calibrating storage parameters.

- Water budget. Groundwater models are built on a conceptual model, which is an understanding of the general characteristics of inflows to, and outflows from, an aquifer. A large part of the conceptual model is the water budget. Water budget components are estimated in a variety of ways, including field measurements. Part of the calibration approach is to compare the water budget from the calibrated model to the original conceptual model to identify what components have changed, and whether they still conform to field observations.

- Model fluxes. A primary purpose of the groundwater model at the mine site is to predict potential impacts to sensitive GDEs that have ties to the regional aquifers, including springs and perennial streams like Devil's Canyon and Mineral Creek. There are multiple ways to model groundwater/surface water interactions. Regardless of the methods used, the resulting model should qualitatively replicate the location and extent of surface water flows dependent on groundwater. This comparison was done in several ways, including comparing modeled flow through drains along Devil's Canyon to baseflow rates measured in the field, and comparing the model-predicted groundwater discharge to the field observations of continuously saturated stream reaches.

Ultimately, the transient calibration was successful. One common measurement used to assess calibration success is the scaled root mean squared (RMS) error, which is in the form of a percentage. Generally, scaled RMS error values less than 10 percent are considered acceptable, provided other qualitative calibration targets also are reasonable. The scaled RMS error for the entire calibration data set was 3 percent, and specifically for the Apache Leap Tuff calibration data set—which represents the aquifer of most importance to perennial waters in springs and in Devil's Canyon—the scaled RMS error was 3.3 percent (WSP USA 2019).

Other comments received focused on the large residuals in the deep groundwater system, compared with the residuals in the Apache Leap Tuff. "Residuals" are the difference between real-world measured groundwater levels and modeled groundwater levels. Reviewing the residuals is an important part of evaluating a model and forms the basis for the scaled RMS error, and are disclosed as part of the modeling results along with other calibration statistics (WSP USA 2019). In this case:

- The overall model, which includes the deep groundwater system and the Apache Leap Tuff, has a residual range from −387 to +681 feet, with an absolute mean residual of 91 feet. This results in the above stated 3.0 percent scaled RMS error.

- The Apache Leap Tuff alone, which is the regional aquifer of most interest because it supplies sensitive GDEs, has a residual range from −133 to +54 feet, with an absolute mean residual of 32 feet. This results in the above stated 3.3 percent scaled RMS error.

The most extreme residuals occur in the deep groundwater system, not the Apache Leap Tuff. However, the range of measured water levels in the deep groundwater system is also much greater than that in the

389

Apache Leap Tuff (see table 3.7.1-1 for the drawdowns observed in the deep groundwater system). The scaled RMS error takes these differences in magnitude into account when assessing the reasonableness of a groundwater model.

The size of the absolute mean residuals informs the precision of the groundwater model results, or the level to which they can be relied upon. These data were reviewed carefully by the Groundwater Modeling Workgroup when making decisions on reliability (see the "Key Decision on Use of Model Results – Level of Precision" section below).

GEOTHERMAL GRADIENTS

Geothermal water is present at the mine site. Temperatures over 150 degrees Fahrenheit (°F) were documented in the deep groundwater system during sampling by Resolution Copper. The groundwater modeling does not incorporate geothermal effects and public comments raised the issue of whether geothermal gradients would have an effect on model results. This is a legitimate concern about a documented site-specific condition, as geothermal gradients can result in circulation within the aquifer.[64] Upon close examination, we determined that the geothermal conditions would not affect the results of the groundwater model as specifically used in the EIS.

- Impacts to GDEs result from water availability and are predicted solely through drawdown. Geothermal gradients have no effect on the amount or presence of water, only on circulation patterns within the aquifer.

- The huge stresses imposed by pumping to dewater the mine and the block caving itself render geothermal effects negligible. The system is anticipated to operate under extreme hydraulic gradients during operations.

- Geothermal gradients could be important for mixing within the block caving zone after operations cease. We evaluated the potential for this to occur in section 3.7.2. Ultimately, the analysis in that section shows that there are no outlets for groundwater within the block caving zone through mine infrastructure or tunnels, natural caves, or lake formation in the subsidence crater.

KEY DECISION ON USE OF MODEL RESULTS – BASELINE CONDITIONS

The Groundwater Modeling Workgroup made four specific key decisions about how the groundwater modeling results would be used:

1. Define appropriate baseline conditions,

2. Select an appropriate time frame for model output,

3. Select an appropriate precision for model output, and

4. Develop a strategy to deal with uncertainties.

The first key decision is how potential impacts from the mine operations are to be defined. With many resources, this is a simple task: predicted conditions during or after mine operations are compared with the affected environment, and the difference is considered the "impact" caused by the mine. In this case, renewed dewatering of the deep groundwater system has taken place since 2009 to allow construction and maintenance of mine infrastructure; this is described further in "Current and Ongoing Pumping and Water Level Trends" later in this section. This dewatering pumping is legal and has been properly permitted by the ADWR (see the "Current and Ongoing Pumping and Water Level Trends" section). Resolution

---

[64] Technically speaking, changes in temperature can also affect the material properties of water which ultimately can change properties like hydraulic conductivity, which incorporates aspects of both the aquifer materials and the fluid flowing through them. These effects are negligible when considering the range of uncertainty in the groundwater model.

Copper is continuing this dewatering and would continue dewatering throughout the mine life. Further, even if the mine is not operated, Resolution Copper will continue legally dewatering to preserve its infrastructure investment.

The Tonto National Forest made the decision to handle this situation in two ways. First, continued dewatering of the mine would be included as part of the no action alternative. Second, the Tonto National Forest is ensuring that any effects of the past dewatering are disclosed as ongoing trends as part of the affected environment (Garrett 2019f).

As such, two separate models were prepared: a No Action model (with continued dewatering, but no block caving), and a Proposed Action model (with continued dewatering and block caving as proposed).

- For the no action alternative, the potential impact from the mine is defined as the drawdown as predicted in the no action groundwater flow model, up to 200 years after the start of mining (see next section for discussion on time frames).

- For the action alternatives, the potential impact from the mine is defined as the drawdown predicted in the proposed action groundwater flow model, up to 200 years after the start of mining (see next section for discussion on time frames). However, some of the GDEs impacted by proposed action drawdown would have been impacted by the no action alternative as well. The GDEs anticipated to be impacted by both models are disclosed for comparison, to clearly identify which impacts result from ongoing dewatering alone and which impacts result from the block caving.

The selection of baseline conditions was a specific point of disagreement in the Groundwater Modeling Workgroup. This same difference of opinion was expressed in public comments on the DEIS as well, noting that hydrologic conditions prior to the onset of Resolution Copper dewatering were not discussed in the DEIS, and that these pre-Resolution water levels should have been the appropriate baseline from which to measure impacts.

Large-scale dewatering activity began at Magma Mine in 1910 and continued until 1998, with the exception being the period between 1986 and 1989, when no significant pumping occurred. Active mining ceased in the Magma Mine in 1996, and the underground dewatering system continued operation until May 1998. Pumping averaged between 500 and 700 gallons per minute and resulted in over 3,000 feet of dewatering (WSP USA 2019).

The best estimate of water levels in 1910 before any dewatering is that they were at an elevation of 3,150 feet amsl (Short et al. 1943). While water levels recovered following the shutdown of dewatering in 1998, the 2009 water levels only rose to about 2,100 feet amsl, still well below the pre-1910 water levels (WSP USA 2019).

We confirmed our choice to use the current groundwater conditions at the site as the baseline to which project-related impacts are compared (Garrett 2018d). Aside from being the appropriate approach under NEPA, groundwater was documented to be substantially affected by mining in the Superior area for over a century. Selecting a past point in time as a baseline does not reflect the environment as it exists today. However, regardless of the baseline selected to disclose project-related impacts, the drawdown caused by past pumping by Resolution Copper is clearly disclosed in table 3.7.1-1.

Resolution Copper Project and Land Exchange

**Table 3.7.1-1. Changes in groundwater head in the deep groundwater system due to dewatering**

| Deep Groundwater System Wells* | Earliest Groundwater Head Elevation, in feet amsl (date shown in parentheses) | Groundwater Head Elevation in 2019 (in feet amsl) | Overall Change (feet) |
|---|---|---|---|
| **Deep groundwater system wells: east of the Concentrator Fault within the Resolution Graben** | | | |
| DHRES-01 (water level in Kvs) | 2,090 (2009) | −300 | −2,390 |
| DHRES-02 (water level in Kvs) | 2,100 (2008) | −580 | −2,680 |
| DHRES-08 (DHRES-08_-231 in Kvs) | 1,920 (2010) | 90 | −1,830 |
| **Deep groundwater system wells: east of the Concentrator Fault outside of the Resolution Graben** | | | |
| DHRES-06 (water level in Pz [Pnaco, Me, Dm, Cb, pCdiab]) | 3,250 (2010) | 3,240 | −10 |
| DHRES-07 (DHRES-07_-108 in Pz [Cb]) | 3,000 (2010) | 2,880 | −120 |
| DHRES-09 (water level in pCdsq and pCdiab) | 2,990 (2011) | 2,940 | −50 |
| DHRES-10 | N/A | N/A | N/A |
| DHRES-11 (water level in Pz and pCy) | 3,300 (2011) | 2,780 | −520 |
| DHRES-13 (water level in pCy and pCpi) | 2,790 (2011) | 2,670 | −120 |
| DHRES-14 (water level in Tw and pCpi) | 3,510 (2012) | 3,480 | −30 |
| DHRES-15 (water level in Dm and Cb) | 3,210 (2015) | 3,240 | +30 |
| **Deep groundwater system wells: west of the Concentrator Fault** | | | |
| DHRES-03 (DHRES-03_335 in Tvs) | 2,530 (2009) | 2,500[†] | −30 |
| DHRES-04 (water level in Tvs) | 2,570 (2009) | 2,620 | +50 |
| DHRES-05B (water level in Tal) | 2,620 (2010) | 2,560 | −60 |
| DHRES-16 (DHRES-16_-387 in Tal) | 2,320 (2014) | 2,190 | −130 |

Source: All data taken from Montgomery and Associates Inc. and Resolution Copper (2016).

Notes: Some elevations approximated to nearest 10 feet for clarity. N/A = Data not available; amsl = above mean sea level.

Tal = Apache Leap Tuff; Tw = Whitetail conglomerate; Tvs = Tertiary sedimentary and volcanic rocks; Kvs = Cretaceous sedimentary and volcanic rocks; Pz = Paleozoic sedimentary rocks (Pnaco = Naco formation; Me = Escabrosa limestone; Dm = Martin formation; Cb = Bolsa quartzite); pCy = Precambrian Apache Group; pCdiab = Precambrian diabase; pCdsq = Precambrian Dripping Springs quartzite; pCpi = Precambrian Pinal schist

\* For wells with multiple monitoring depths, specific monitoring location is shown in parentheses.

† 2016 water level shown

KEY DECISION ON USE OF MODEL RESULTS – TIME FRAME

Groundwater models are generally run until they reach a point where the aquifer has sufficient time to react to an induced stress (in this case, the effects of block caving) and reach a new point of equilibrium.

In some systems this can take hundreds or even thousands of years. The groundwater flow model for the Resolution Copper project was run for 1,000 years, or roughly 950 years after closure of the mine, to approach equilibrium conditions. The Groundwater Modeling Workgroup recognized that a fundamental limitation of the model—of any model—is the unreliability of predictions far in the future, and the workgroup was tasked with determining a time frame that would be reasonable to assess. Based on combined professional judgment, the Groundwater Modeling Workgroup determined that results could be reasonably assessed up to 200 years into the future. All quantitative results disclosed in the EIS are restricted to this time frame.

The Groundwater Modeling Workgroup also recognized that while quantitative predictions over long time frames were not reliable, looking at the general trends of groundwater levels beyond the 200-year time frame still provides valuable context for the analysis. In most cases, the point of maximum groundwater drawdown or impact for any given GDE does not occur at the end of mining. Rather, it takes time for the full impacts to be observed—decades or even centuries. Even if quantitative results are unreliable at long time frames, the general trends in modeled groundwater levels can indicate whether the drawdown or impact reported at 200 years represents a maximum impact, or whether conditions might still worsen at that location. These trends are qualitatively explored, regardless of time frame. Specifically, see the discussions titled "Longer Term Modeled Impacts" in section 3.7.1.4. These qualitative discussions include impacts beyond the 200-year time frame for springs, Devil's Canyon, Queen Creek, Telegraph Canyon, Arnett Creek, and water supplies.

Time frames are only pertinent for transient models. Some public comments suggest that alternative approaches could have been used for the EIS analysis, either using a steady-state model to predict post-mine conditions or simply assuming that post-mine conditions would eventually (many centuries in the future) return to pre-mining conditions. Neither of these approaches is supportable for predicting impacts from the mine.

Steady-state modeling requires aquifer conditions and boundary conditions that are unchanging and in equilibrium. Regarding the mine, the use of block caving will incrementally change the aquifer characteristics over time during operations. Additionally, the amount of pumping is anticipated to change during operations. A transient model that allows for these changes is the only approach that can predict the groundwater levels as conditions change during operations. A steady-state model conceivably could have been used after operations cease to predict post-closure conditions. However, the modeling suggests equilibrium in the aquifer likely will not be achieved for over 1,000 years. Any results from a steady-state model would take place beyond 1,000 years. Thus, we considered such results to be remote and speculative.

Modeling could be avoided entirely if the assumption could be supported that post-mine conditions would eventually return to pre-mining conditions. This will never occur. Block caving is anticipated to fundamentally alter the hydrogeologic framework of the aquifer system, effectively eliminating the Whitetail Conglomerate unit that to date has separated the deep groundwater system from the Apache Leap Tuff aquifer. There is no expectation that the post-mine aquifer system eventually will look the same as it does today. Modeling is the most appropriate tool to predict how an altered aquifer system, fundamentally different from current conditions, would function.

KEY DECISION ON USE OF MODEL RESULTS – LEVEL OF PRECISION

Numerical groundwater models produce highly precise results (i.e., many digits beyond the decimal point). Even in a well-calibrated model, professional hydrologists and modelers recognize that there is a realistic limit to this precision, beyond which results are meaningless. The Groundwater Modeling Workgroup was tasked with determining the appropriate level of precision to use for groundwater modeling results.

Based on combined professional judgment, the Groundwater Modeling Workgroup determined that to properly reflect the level of uncertainty inherent in the modeling effort, results less than 10 feet should not be disclosed or relied upon, as these results are beyond the ability of the model to predict. For values greater than 10 feet, the Groundwater Modeling Workgroup decided to use a series of ranges to further reflect the uncertainty: 10 to 30 feet, 30 to 50 feet, and greater than 50 feet. Regardless of these ranges, the quantitative modeled results for each GDE are still provided in the form of hydrographs (see appendix L). Several strategies were developed to help address the uncertainties associated with the groundwater modeling results, as described in the remainder of this section.

The precision of the results (10 feet) also reflects the inability of a regional groundwater model to fully model the interaction of groundwater with perennial or intermittent streams (see BGC Engineering USA Inc. (2018d) for a full discussion). This limitation means that impacts on surface waters are based on predicted groundwater drawdown, rather than modeled changes in streamflow. Note that while we are not relying quantitatively on modeled water levels less than 10 feet, the hydrographs included in appendix L of the EIS still qualitatively show all modeled drawdown, including drawdowns less than 10 feet.

KEY DECISION ON USE OF MODEL RESULTS – STRATEGIES TO ADDRESS UNCERTAINTY

Two key strategies were selected to deal with the uncertainty inherent in the groundwater model: the use of sensitivity model runs and the use of monitoring. The model runs used to predict impacts are based on the best-calibrated version of the model; however, there are many other variations of the model and model parameters that may also be reasonable. Sensitivity model runs are used to understand how other ways of constructing the model change the results. In these sensitivity runs, various model parameters are increased or decreased within reasonable ranges to see how the model outcomes change. In total, 87 model sensitivity runs were conducted, in addition to the best-calibrated version of the model.

Because of the uncertainty and limitations of the model, the Groundwater Modeling Workgroup decided that it would be most appropriate to disclose not only impacts greater than 10 feet based on the best-calibrated model, but also impacts greater than 10 feet based on any of the sensitivity runs. The predicted model results disclosed in this section represent a range of results from the best-calibrated model as well as the full suite of sensitivity runs. These are considered to encompass a reasonable range of impacts that could occur as a result of the project.

As can be seen in figure 3.7.1-3, which shows the 10-foot drawdown contour that encompasses all sensitivity runs (yellow area), some of the sensitivity runs show drawdown abutting the eastern edges of the model domain, which is an undesirable situation for a groundwater model. This result is driven by a single sensitivity run that looked at an increased hydraulic conductivity in the Apache Leap Tuff aquifer. This has been taken into consideration when interpreting the model results. For some GDEs, this particular sensitivity run represents the sole outcome where impact is anticipated; for these, impacts are considered possible but unlikely, given that the base case and all other model sensitivity runs show consistent results.



**Figure 3.7.1-3. Modeled groundwater drawdown—proposed action, 200 years after start of mine**

The Groundwater Modeling Workgroup recognized that while the model may not be reliable for results less than 10 feet in magnitude, changes in aquifer water level much less than 10 feet still could have meaningful effects on GDEs, even leading to complete drying. The Groundwater Modeling Workgroup explored several other modeling techniques, including explicitly modeling the interaction between groundwater and surface water to predict small changes in streamflow, but found that these techniques had similar limitations. To address this problem, monitoring of GDEs would be implemented during mine operations, closure, and potentially beyond. For many of these GDEs, this monitoring effort simply continues monitoring that has been in place from as early as 2003. Details of monitoring conducted to date are available in the project record for springs and surface waters (Montgomery and Associates Inc. 2017d), water quality sampling (Montgomery and Associates Inc. 2016), and well construction and groundwater levels (Montgomery and Associates Inc. and Resolution Copper 2016). If monitoring identifies real-world impacts that were not predicted by the modeling, mitigation would be implemented. Mitigation is not restricted to unanticipated impacts; mitigation may also be undertaken for those GDEs where impacts are expected to occur.[65]

### Summary of Models Used for Mine Site Dewatering/Block Caving Effects

The following groundwater flow models provide the necessary impact predictions. Each of the models included best-calibrated, base-case modeling runs as well as sensitivity runs:

- **No Action Model, Life of Mine.** This model assumes that no mining occurs and that therefore no block caving occurs that connects the Apache Leap Tuff aquifer to the deep groundwater system. While dewatering of the deep groundwater system is assumed to continue, for the most part those dewatering effects are confined to the deep groundwater system, and the Apache Leap Tuff aquifer does not dewater. This model was run for 51 years, until closure of the mine.

- **No Action Model, Post-closure.** This model continues after 51 years, with dewatering being curtailed at the end of the Life of Mine model. This model was run to 1,000 years, but quantitative results are only used out to 200 years after start of the model, which is 149 years after closure of the mine. Model results beyond 200 years are still used but are discussed qualitatively.

- **Proposed Action Model, Life of Mine.** This model assumes that mining and block caving occur as proposed, along with the dewatering necessary to maintain project infrastructure. Under these conditions, the Apache Leap Tuff aquifer becomes hydraulically connected to and partially drains downward into the deep groundwater system. This model was run for 51 years, until closure of the mine. The proposed action model is applicable to all action alternatives.

- **Proposed Action Model, Post-closure.** This model continues after 51 years, with dewatering being curtailed at the end of the Life of Mine model. This model was run to 1,000 years, but quantitative results are only used out to 200 years after start of the model, which is 149 years after closure of the mine. Model results beyond 200 years are still used but are discussed qualitatively. The proposed action model is applicable to all action alternatives.

### Model Used for Mine Water Supply Pumping Effects

One additional model was part of the analysis process. Resolution Copper also ran a model to predict pumping impacts from the water supply wellfield located along the MARRCO corridor in the East Salt River valley. This groundwater flow model was built from an existing, calibrated, regulatory model prepared by ADWR. In some form, this model has been used widely for basin-wide planning purposes since the 1990s, as well as to estimate project-specific water supply impacts. This model was evaluated

---

[65] In appendix J of the DEIS, this mitigation was found in measure RC-211. In appendix J of the FEIS, this mitigation can be found in measure FS-WR-01.

for applicability to the Desert Wellfield modeling and found to be acceptable for assessing drawdown caused by mine water supply pumping under different alternatives (Walser 2020a).

### 3.7.1.3   Affected Environment

**_Relevant Laws, Regulation, Policies, and Plans_**

The State of Arizona has jurisdiction over groundwater use; however, the Forest Service also has pertinent guidance on analyzing groundwater impacts, disclosing these impacts appropriately during NEPA analysis, and managing GDEs on NFS land.

---

**Primary Legal Authorities and Technical Guidance Relevant to the Groundwater Analysis**

- Arizona Groundwater Management Act of 1980, along with implementing regulations that govern groundwater use within Active Management Areas

- Forest Service Manual 2520 (management of riparian areas, wetlands, and floodplains), 2530 (collecting water resource data), and 2880 (inventory and analysis of GDEs)

---

ARIZONA LEGAL FRAMEWORK CONCERNING WATER USE

The use of water in Arizona—from whatever source—takes place under a complex regulatory framework designed to prioritize and manage limited water resources. There is no single author of this framework; rather, it represents the combined outcome of four decades of intensive water management in Arizona and in the Colorado River drainage basin.

The use of surface water and groundwater are largely separated in Arizona law. Groundwater is governed by the authorities and restrictions put in place by the State of Arizona with the 1980 Groundwater Management Act and furthered by subsequent legislation. These laws are administered by the ADWR and largely govern the use of groundwater within AMAs. Within AMAs, the pumping of groundwater can only take place in conjunction with an appropriate groundwater right or withdrawal permit. Resolution Copper's groundwater pumping at the mine site (dewatering) and at the Desert Wellfield both take place within the boundaries of the Phoenix AMA and therefore must adhere to this regulatory framework. In the Resolution Copper Project analysis area, groundwater use in groundwater basins outside of AMAs is largely not regulated, except for the requirement that it be put to beneficial use.

The boundaries of the Phoenix AMA, Pinal AMA, and other groundwater basins are shown in figure 3.7.1-4. A cross section of the hydrogeology of the Phoenix AMA and Pinal AMA can be seen in figure 3.7.1-5. Note that the aquifers in the Phoenix AMA and Pinal AMA are hydrogeologically similar and connected. At the southern boundary of the Phoenix AMA, groundwater flows northward out of the Pinal AMA and into the Phoenix AMA.

Surface water use throughout the state is governed by a system of surface water rights based on the doctrine of prior appropriation. In practice, most water sources in the state are overallocated, with many more water rights filed than physical water exists in the system. Theoretically this is not problematic, since in times of shortage the senior water right holders would take precedence over junior water right holders. In practice, though, this requires that the priority dates and amounts of all surface water rights are decided upon. For the area encompassing the Resolution Copper Project, this is a massive legal undertaking known as the General Stream Adjudication of the Gila River. Goals of the adjudication include clarifying the validity and priority of surface water rights and providing a clear legal framework

for when groundwater withdrawals would impinge on surface water rights. The adjudication has been underway for several decades, and while progress has been made, many issues remain unresolved, including any prioritization or validation of water rights in the analysis area.

Water use in Arizona is further governed by the body of laws, treaties, and agreements known generally as the Law of the River. This governs the contracting and use of Colorado River water delivered through the Central Arizona Project, which is administered by the Central Arizona Water Conservation District and the Bureau of Reclamation. At present, the availability of CAP supplies is uncertain and in flux as Arizona and the other Colorado River basin states respond to extreme shortages on the Colorado River and in reservoirs like Lake Mead. Note that overall regional water supplies and shortages—and the cumulative impact of Resolution Copper's water use—are assessed in Chapter 4, Cumulative Effects.

Several public comments expressed confusion about aspects of the Resolution Copper Project with respect to Arizona water law and water use. The following questions and answers are provided for clarification.

- **How is Resolution Copper allowed to dewater the mine workings?** Resolution Copper has been pumping groundwater at the East Plant Site since 2009 to allow construction of underground infrastructure. This pumping is located within the Phoenix AMA and therefore requires a groundwater right or withdrawal permit. The current groundwater pumping for dewatering is being conducted under a dewatering permit for mining that was issued to Resolution Copper by ADWR (59-524492).

- **How will Resolution Copper be allowed to dewater mine workings in the future?** Future pumping of groundwater at the East Plant Site will require a similar dewatering permit or may be conducted using some other appropriate groundwater rights. For example, Resolution Copper currently holds multiple Type 2 non-irrigation grandfathered rights that potentially could be used in lieu of a dewatering permit (Rietz 2016b).

- **How will Resolution Copper be allowed to pump the large amount of water needed from the Desert Wellfield?** Because the Desert Wellfield is located within the Phoenix AMA, pumping from the wellfield requires a groundwater right or withdrawal permit. About 60 percent of the groundwater pumped will be associated with long-term storage credits already obtained by Resolution Copper or are under agreement to obtain. Use of these long-term storage credits legally would be considered recovered water. The remaining water would require some other appropriate right or permit from ADWR. Resolution Copper could rely on existing Type 2 non-irrigation grandfathered rights (Rietz 2016b), could obtain additional long-term storage credits, or could obtain a new withdrawal permit. One possible withdrawal permit would be a mineral extraction and metallurgical processing permit (ARS 45-514). This is a "shall issue" permit, provided that certain conditions dictated by statute are met, and typically has a term of 50 years. Any of these avenues are allowable under Arizona water law, but would require appropriate application to and authorization by ADWR.

- **How is Resolution Copper allowed to pump water from the Desert Wellfield for use remotely at the mine site?** The water supply for the Resolution Copper Project will come from the Desert Wellfield, located in the East Salt River valley. The groundwater will then be transported to the West Plant Site via the MARRCO corridor. There are legal restrictions in Arizona on the transfer of groundwater between groundwater basins and subbasins. In this case, both the Desert Wellfield and the West Plant Site are located within the same groundwater basin (the Phoenix AMA) and the same subbasin (East Salt River valley), as shown in figure 3.7.1-4. There is no restriction on transporting Desert Wellfield water within the same groundwater basin and subbasin.

- **How can Resolution Copper transport the dewatering water currently being pumped away from the Superior Basin?** Water removed from the mine workings by Resolution Copper is currently sent to the New Magma Irrigation and Drainage District, via the MARRCO corridor. As noted in the previous bullet, while there are legal restrictions in Arizona on the transfer of groundwater between groundwater basins and subbasins, both the current mine workings and the New Magma Irrigation and Drainage District are located within the same groundwater basin and the same subbasin.

- **How can Resolution Copper rely on its Central Arizona Project allocation, in the face of ongoing shortages on the Colorado River?** On September 20, 2021, Resolution Copper entered into a subcontract with the United States and the Central Arizona Water Conservation District for an annual allocation of 2,238 acre-feet of Non-Indian Agriculture Central Arizona Project water. Previously, it was envisioned that the Resolution Copper CAP allotment could be directly used. This remains a possibility. In 2022, Resolution Copper's allocation was delivered to the New Magma Irrigation and Drainage District's Groundwater Savings Facility, for conversion into new long-term storage credits. Availability of the CAP allotment water in future years will be subject to both physical availability and the terms of whatever drought contingency plans are in effect at that time. Given the variability in supply and the need for infrastructure to access the water directly, it appears most likely at this time that any available CAP allotment would be converted to long-term storage credits rather than accessed directly.

- **How would Resolution Copper be allowed to move water associated with tailings between groundwater basins under the preferred alternative?** The preferred alternative (Alternative 6) involves a tailings storage facility located in a different groundwater basin than the West Plant Site, and therefore would involve the movement of tailings as a slurry to a different groundwater basin. The Forest Service's understanding is that there is no legal restriction on the movement of tailings slurry. The existing restrictions on the movement of groundwater across basin boundaries apply to pumped groundwater, not to the products of industrial processing like tailings. Further, the source of water for the tailings is not directly groundwater. It is from the mine processing water circuit, which is a combination of multiple sources of water, including output from multiple recycling loops. Similarly, process water recovered at the tailings storage facility and recycled back to the West Plant Site is not groundwater and there is no legal restriction on the movement of this process water.

## LAWS CONCERNING FOREST SERVICE MANAGEMENT OF SPRINGS AND WATER RESOURCES

The Forest Service received comments suggesting that disclosure would be improved by discussing laws related to spring impacts. We do not believe it would be useful to summarize the entirety of the laws and regulations governing the administration of Forest Service lands. However, a brief discussion is included below discussing key laws related to governing water resources that are often raised in comments.

**Organic Act of 1897.** The Organic Act of 1897 authorized establishment of National Forest Reserves. The Organic Act specifies the reasons for which lands may be reserved:

> No public forest reservation shall be established, except to improve and protect the forest within the reservation, or for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber for the use and necessities of citizens of the United States . . . .

The Organic Act further specifies that waters within these areas are for use:

> All waters on such reservations may be used for domestic, mining, milling, or irrigation purposes, under the laws of the State wherein such forest reservations are situated, or under the laws of the United States and the rules and regulations established thereunder.

The Organic Act also specifies that mining is an allowable use within these areas:

> Nor shall anything herein prohibit any person from entering upon such forest reservations for all proper and lawful purposes, including that of prospecting, locating, and developing the mineral resources thereof: Provided, That such persons comply with the rules and regulations covering such forest reservations.

The Organic Act effectively provided the authority for designating National Forest lands and contained the broad outlines of what uses Congress intended for these lands, but contained little guidance on how to manage those lands. Guidance on management of NFS lands would continue to be developed through other legislation.

**Multiple-Use Sustained Yield Act of 1960 (Public Law 86-517).** The Multiple-Use Sustained Yield Act of 1960 established the guiding principle that National Forests should be managed for multiple uses, with discretion given to the agency to consider the value of various resources:

> . . . it is the policy of the Congress that the national forests are established and shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes.

> The Secretary of Agriculture is authorized and directed to develop and administer the renewable surface resources of the national forests for multiple use and sustained yield of the several products and services obtained therefrom. In the administration of the national forests due consideration shall be given to the relative values of the various resources in particular areas.

The Multiple-Use Sustained Yield Act is silent on water resources, but as with the Organic Act, does specify that mining within these areas is an allowable use:

> Nothing herein shall be construed so as to affect the use or administration of the mineral resources of national forest lands . . . .

**Forest and Rangeland Renewable Resources Planning Act of 1974 (Public Law 93-378) and National Forest Management Act of 1976 (Public Law 94-588).** These laws establish the framework for long-range planning by the Forest Service to ensure the future supply of forest resources while maintaining a quality environment. These laws are silent on administration of water resources but do "recognize the fundamental need to protect and, where appropriate, improve the quality of soil, water, and air."

Overall, these laws identify water as one resource to be managed on national forests but do not dictate to the Forest Service how waters are to be managed. Rather, they establish an expectation that the Forest Service will manage for multiple uses, and establish an expectation that sustainability and protection of environmental quality must be considered. The regulations promulgated for NFS lands stem from these statutes and adhere to the same principles. Priority is given to protecting water resources without dictating how those resources are managed with other uses.

SUMMARY OF APPLICANT-COMMITTED ENVIRONMENTAL PROTECTION MEASURES

A number of environmental protection measures are incorporated into the design of the project that would act to reduce potential impacts on groundwater quantity and GDEs. These are non-discretionary measures and their effects are accounted for in the analysis of environmental consequences.

From the GPO (2016c), Resolution Copper has committed to various measures to reduce impacts on groundwater quantity and GDEs:

- Groundwater levels will be monitored at designated compliance monitoring wells located downstream of the tailings storage facility seepage recovery embankments in accordance with the requirements of the APP program;

- All potentially impacted water will be contained on-site during operations and will be put to beneficial use, thereby reducing the need to import makeup water;

- Approximately 60 percent of Resolution Copper's water needs will be sourced from long-term storage credits (surface stored underground[69]). In addition, in September 2021, the allocation of a Non-Indian Agriculture CAP allotment was finalized. In 2022, this water was delivered to NMIDD and may be used similarly in the future for continued aquifer recharge;

- As much water as possible will be recycled for reuse; and

- The water supply will also include the beneficial reuse of existing low-quality water sources such as impacted underground mine dewatering water.

HYDROLOGIC CHANGES ANTICIPATED FROM MINING ACTIVITIES

The block caving conducted to remove the ore body would unavoidably result in fracturing and subsidence of overlying rocks. These effects would propagate upward until reaching the ground surface approximately 6 years after block caving begins (Garza-Cruz and Pierce 2017). It is estimated that the subsidence area that would develop at the surface would be approximately 800 to 1,100 feet deep (see Section 3.2, Geology, Minerals, and Subsidence).

Fracturing and subsidence of rock units would extend from the ore body to the surface. This includes fracturing of the Whitetail Conglomerate that forms a barrier between the deep groundwater system and the Apache Leap Tuff aquifer. When the Whitetail Conglomerate fractures and subsides, a hydraulic connection is created between all aquifers. Effects of dewatering from the deep groundwater system would extend to the Apache Leap Tuff aquifer at this time.

CHANGES IN BASIN WATER BALANCE – MINE DEWATERING

Mine dewatering is estimated to remove approximately 87,000 acre-feet of water from the combined deep groundwater system and Apache Leap Tuff aquifer over the life of the mine, or about 1,700 acre-feet per year (Meza-Cuadra et al. 2018a).

ANTICIPATED IMPACTS FOR GROUNDWATER-DEPENDENT ECOSYSTEMS (UP TO 200 YEARS AFTER START OF MINING)

As assessed in this EIS, GDEs can be impacted in several ways:

- Ongoing dewatering (described in the no action alternative section)

---

[69] More discussion about Resolution Copper's accumulation of long-term storage credits, or agreements for obtaining long-term storage credits, is included in Chapter 4, Cumulative Effects.

groundwater drawdown beyond historic lows is not anticipated to occur more than 2 miles from the Desert Wellfield; this is different from the basin-wide declines contributing to earlier subsidence.

There are numerous societal costs associated with land subsidence caused by basin-wide pumping, but specific impacts are unpredictable. Gradual widespread regional subsidence may have no effect at all on infrastructure, whereas the opening of earth fissures due to subsidence can directly destroy infrastructure. Earth fissures generally occur at specific places in the basin driven by underlying geologic geometry, often near the margins of groundwater basins. Specifically mapped fissures have been identified near Apache Junction and along the San Tan Mountains, but not in the immediate vicinity of the Desert Wellfield.

Some of the more common damage associated with earth fissures includes:

- Cracked or collapsing roads
- Broken pipes and utility lines
- Damaged or breached canals
- Cracked foundation/separated walls
- Damaged well casing or wellhead
- Disrupted drainage

INDIRECT EFFECTS ON CUTTER BASIN

During the re-initiation of Tribal consultation in 2021–2022, concerns were raised by the San Carlos Apache Tribe about indirect impacts to Tribal water resources in the Cutter Basin caused by Resolution Copper dewatering around the East Plant Site, as well as long-term changes in regional groundwater from block-caving. The concern raised was not that drawdown from the Resolution Copper Project would directly impact the Cutter Basin, but that drawdown from the Resolution Copper Project would impact regional water supplies, which might then result in water users replacing lost water resources with additional pumping in the Cutter Basin. In response to these comments, the Forest Service conducted an analysis of these potential indirect effects (Garrett 2023b), summarized below.

The Cutter Basin is not an officially recognized groundwater basin, but is a common term used to describe an area roughly encompassed by the Gilson Wash watershed (10-digit HUC 1504000703). This area is part of the wider Safford Groundwater Basin, a basin officially designated by the ADWR (see figure 3.7.1-4). The Cutter Basin is highly similar to other basins in the area (including Dripping Springs Wash). Deep basin-fill sediments—primarily the Quaternary/Tertiary Gila Conglomerate—are underlain by Precambrian igneous and sedimentary bedrock. Most of the Cutter Basin is within the boundaries of the San Carlos Apache Reservation. However, a portion of the Cutter Basin extends west of the reservation boundary. A number of water supply wells have been installed in this area of the Cutter Basin immediately adjacent to the reservation, often referred to as the Cutter Wellfield, as shown on figure 3.7.1-4. These wells have been installed by the City of Globe and several mining companies.

Detailed well logs in the vicinity of these water supply wells indicate that the wells clearly draw water from the Gila Conglomerate. Long-term water level monitoring in the immediate vicinity of the wellfield shows that, between 1990 and 2020, groundwater levels have exhibited long-term decline of around 140 feet. This long-term drawdown very likely extends into the portion of the aquifer that lies below the San Carlos Apache Reservation.

Regional geology extending to the Cutter Basin is shown in figure 3.7.1-12, and a geologic cross section extending from the Resolution Copper mine site to the Cutter Basin is shown in figure 3.7.1-13.

Groundwater modeling of potential impacts indicates that drawdown from the Resolution Copper Project would not extend to this area (see figure 3.7.1-3). In addition, the Resolution Copper dewatering is far removed from the Cutter Basin, in a different groundwater basin, and separated by the relatively impermeable bedrock of the Pinal Mountains (see figure 3.7.1-13). However, direct impacts are not the issue of concern, but rather whether the Resolution Copper Project could affect closer water supplies and thus trigger cascading effects that ultimately could cause more pumping from the Cutter Basin.

The impact of the Resolution Copper Project's dewatering drawdown on water supply wells is analyzed in the EIS (see table 3.7.1.4). The nearest water supply to the Resolution Copper Project—Top of the World—is anticipated to be impacted. While the base case modeling does not indicate drawdown greater than 10 feet, about 20 percent of the sensitivity modeling runs indicate impact could occur, leading the analysis to conclude that: "Additional drawdown due to block caving is anticipated for water supply wells in this area, except for those completed solely in alluvium or shallow fracture systems. Impacts could include loss of well capacity, the need to deepen wells, the need to modify pump equipment, or increased pumping costs."

This is the type of impact to a regional water supply that potentially could cascade to indirectly cause greater pumping from the Cutter Basin. However, the analysis continues to note that this potential impact to these regional water users is addressed by mitigation. Specifically, measure FW-WR-01 in appendix R is a Forest Service–required mitigation related to groundwater-dependent ecosystems and public supply wells. If drawdown related to the mine affects the Top-of-the-World supply wells, the Forest Service requires and Resolution Copper has committed to deepen or replace the wells, or if that proves ineffective, provide an alternative water supply. Since these potential impacts from Resolution Copper's drawdown are mitigated, there would be no motive for Top-of-the-World residents to obtain water from the Cutter Basin, or another nearby source.

The next closest regional water user to the Resolution Copper Project is the Town of Superior, west of the East Plant Site. Potable water is supplied to the Town of Superior by Arizona Water Company and is imported into the area via pipeline from the East Salt River valley. Other production wells in the Superior Basin that are not tied to the Arizona Water Company system could be impacted by mine drawdown. The analysis estimates 10 to 30 feet of drawdown could occur in these wells. However, in a similar manner to Top-of-the-World, Resolution Copper would mitigate any potential impacts via measure FS-WR-01, and there would be no motive for Superior Basin water users to obtain water from the Cutter Basin, or another nearby source.

Aside from Top-of-the-World and the Town of Superior/Superior Basin water users, the next closest regional water user is the Pinto Valley Mine. The mine is located approximately 2 to 3 miles east from Top-of-the-World, and lies beyond the analysis area for Resolution Copper groundwater drawdown impacts (see figure 3.7.1-3). In addition, Pinto Valley obtains most of its water supply from the Gila Conglomerate, a completely different hydrogeologic unit than those impacted by the block-caving and dewatering in the vicinity of the mine site (the Apache Leap Tuff and the Whitetail Conglomerate) (U.S. Forest Service 2021d). It would be unlikely that Resolution Copper pumping would impact Pinto Valley Mine water supplies or cause Pinto Valley Mine to seek water supplies elsewhere.



Figure 3.7.1-12. Regional geology extending to the Cutter Basin

Resolution Copper Project and Land Exchange



**Figure 3.7.1-13. Regional geologic cross section (C–C') extending from the Resolution Copper Project site to the Cutter Basin**

440

In addition to groundwater drawdown, the potential for groundwater quality changes to drive changes in groundwater supply was also assessed (Garrett 2023b), drawing upon the analysis in section 3.7.2 of the FEIS. Groundwater quality changes in the block-caving area were not found to be likely to impact regional water supplies.

Arizona state law also restricts any movement of groundwater from the Cutter Basin into the adjacent groundwater basins, including the Pinal AMA or Phoenix AMA, and these areas are neither adjacent nor readily accessible. For instance, there are three other groundwater basins interposed between the Pinal AMA and the Cutter Basin/Safford Groundwater Basin: the Donnelly Wash Groundwater Basin, the Lower San Pedro Groundwater Basin, and the Dripping Springs Wash Groundwater Basin. Water users in Pinal County would not legally be able to pull water from the Cutter Basin/Safford Groundwater Basin, and transporting water that distance (at least 50 miles) would be physically unlikely as well.

To summarize the conclusions of the analysis conducted in response to these concerns:

- The City of Globe and other water supply wells located adjacent to the San Carlos Apache Reservation appear to be physically impacting water resources in the area known as the Cutter Basin.

- If groundwater impacts from the Resolution Copper Project were to impact regional suppliers, it is conceivable that pumping in the Cutter Basin could increase and further affect groundwater resources of the San Carlos Apache Tribe.

- However, the analysis finds that there are no reasonable cascading effects by which Resolution Copper's actions would increase pumping adjacent to the San Carlos Apache Tribe.

- With respect to drawdown, potential impacts from the block caving to regional water users would be mitigated if they occurred. With respect to water quality, acknowledging the uncertainties, the best available analysis suggests water quality in the block-cave zone would not exceed water quality standards, and the potential for movement of that water away from the block-cave zone (and thus the ability to impact regional water supplies) is remote.

- Further, there are substantial legal restrictions on the ability for any regional water users to move groundwater away from adjacent groundwater basins like the Cutter Basin/Safford Groundwater Basin.

### *Alternative 2 – Near West Proposed Action*

GROUNDWATER-DEPENDENT ECOSYSTEMS IMPACTED

Three GDEs would be directly disturbed by a tailings facility at the Near West site: Bear Tank Canyon Spring, Benson Spring, and Perlite Spring. All three of these GDEs are believed to be disconnected from the regional aquifers, relying on precipitation stored in shallow alluvium or fracture networks. Benson Spring is located near the front of the facility, potentially under the tailings embankment. Bear Tank Canyon Spring is located in the middle of the facility under the NPAG tailings, and Perlite Spring is located at the northern edge of the facility, near the PAG tailings cell.

Alternative 2 likely will impact 20 GDEs (see figure 3.7.1-11):

- Six springs are anticipated to be impacted from continued dewatering under the no action alternative.

- Two additional springs are anticipated to be impacted under the proposed action, because of the block-cave mining.

- Three springs and three ponds are directly disturbed by the subsidence area.

- Three springs are directly disturbed by the Alternative 2 tailings storage facility.

- One perennial stream (Devil's Canyon) is impacted by reduced runoff from the subsidence area.

- Two perennial stream reaches on Queen Creek are impacted by reduced runoff from both the subsidence area and the tailings.

CHANGES IN TAILINGS WATER BALANCE

The substantial differences in water balance between alternatives are directly related to the location and design of the tailings storage facility. There are five major differences, as shown in table 3.7.1-7:

- **Entrainment**. The tailings deposition method affects the amount of water that gets deposited and retained with the tailings. Alternative 2 entrains about the same amount of water as the other slurry tailings alternatives (Alternatives 3, 5, and 6), but substantially more than Alternative 4.

- **Evaporation**. The tailings deposition method also affects the amount of water lost through evaporation, even among slurry tailings. Alternative 2 evaporates a similar amount of water as Alternatives 5 and 6, but substantially more than Alternatives 3 and 4.

- **Watershed losses**. Watershed losses from the capture of precipitation depend primarily on the location of the tailings storage facility and where it sits in the watershed. Surface runoff losses are summarized in table 3.7.1-5, and are analyzed in greater detail in Section 3.7.3, Surface Water Quantity.

- **Seepage.** Differences in seepage losses are substantial between alternatives. Three estimates of seepage are shown in table 3.7.1-7. The amount of seepage based on the initial tailings designs using only the most basic level of seepage controls is shown, and primarily reflects the type of tailings deposition and geology (WestLand Resources Inc. 2018b). After these initial designs, the engineered seepage controls were refined as part of efforts to reduce impacts on water quality from the seepage (Klohn Crippen Berger Ltd. 2019d). The estimated reduced seepage rates with all engineered seepage controls in place, both during operations and post-closure, are also shown in table 3.7.1-7. Alternative 2 loses more seepage than Alternatives 3 and 4, but less seepage than Alternatives 5 and 6. The effects of seepage on groundwater and surface water quality are analyzed in greater detail in Section 3.7.2, Groundwater and Surface Water Quality.

**Table 3.7.1-7. Primary differences between alternative water balances**

| Alternative | Water Entrained with Tailings (acre-feet, life of mine) | Precipitation or Runoff Intercepted (acre-feet, life of mine)* | Percentage Loss to Downstream Waters† | Water Lost to Evaporation from Tailings Storage Facility (acre-feet, life of mine)* | Water Lost as Seepage from Tailings Storage Facility without Engineered Seepage Controls (acre-feet, life of mine) | Water Lost as Seepage to Aquifer after Engineered Seepage Controls during Operations (acre-feet, life of mine) | Water Lost as Seepage to Aquifer, Post-Closure (acre-feet per year) | Makeup Water Pumped from Desert Wellfield (acre-feet, life of mine) |
|---|---|---|---|---|---|---|---|---|
| 2 | 271,839 | 68,780 | 6.5 | 307,903 | 5,741 | 849 | 20.7 | 586,508 |
| 3 | 305,443 | 60,531 | 6.5 | 174,742 | 2,891 | 111 | 2.7 | 494,286 |
| 4 | 71,017 | 110,854 | 8.9 | 135,102 | 3,148 | 369–680 | 15.2–31.9 | 175,800 |
| 5 | 308,404 | 278,639 | 0.2 | 384,702 | 53,184 | 10,701 | 261 | 544,778 |
| 6 | 277,710 | 205,297 | 0.3 | 384,427 | 17,940 | 2,665–7,298 | 202–258 | 544,858 |

Source: Ritter (2018). For seepage losses after engineered seepage controls, during operations and post-closure, see Klohn Crippen Berger Ltd. (2019d) and Gregory and Bayley (2019).

Note that entrainment for Alternative 3 is based on an assumption of 100% saturation used in the global water balance and is known to be overestimated, compared with more detailed seepage modeling conducted for each alternative. See Garrett (2020d) for further details.

* Alternatives 5 and 6 include total precipitation on and evaporation from the tailings beach. However, precipitation onto the tailings beach that evaporates before contributing to the mine water balance is not included in the estimated precipitation and evaporation volumes for Alternatives 2, 3, and 4. These different accounting methods for evaporation and precipitation do not impact the total makeup water demand estimates for the Desert Wellfield

† Alternatives 2, 3, and 4 reflect change in percentage of annual flow in Queen Creek at Whitlow Ranch Dam. Alternatives 5 and 6 reflect change in percentage of annual flow in the Gila River at Donnelly Wash. These numbers only account for precipitation captured by tailings facilities or subsidence area. Water rerouted around the facilities or seepage reappearing downstream is not incorporated.

CHANGES IN DESERT WELLFIELD PUMPING

The water balances for the alternatives are very complex, with multiple water sources and many recycling loops. However, ultimately a certain amount of makeup water is needed, which must be pumped from Desert Wellfield in the East Salt River valley. Alternative 2 requires the most makeup water, roughly 600,000 acre-feet over the life of the mine. The amount of groundwater in storage in the East Salt River valley subbasin (above a depth of 1,000 feet) is estimated to be about 8.1 million acre-feet.[71] Pumping under Alternative 2 represents about 7.3 percent of the available groundwater in the East Salt River valley subbasin.

Projected drawdown would be greatest in the center of the Desert Wellfield, reaching a maximum drawdown of 228 feet, as shown in figure 3.7.1-2. These groundwater levels recover after mining ceases, eventually recovering to less than 20 feet. Drawdown decreases with distance from the wellfield. At the north and south ends of the wellfield, maximum drawdown ranges from 109 to 132 feet, and farther south within NMIDD, maximum drawdown is roughly 49 feet (Bates et al. 2018; Garrett 2018a).

A total of 611 registered wells is located within the 10-foot modeled drawdown contour for Alternative 2 (304 exempt wells and 307 non-exempt wells). Impacts resulting from drawdown could include loss of well capacity, the need to deepen wells, the need to modify pump equipment, or increased pumping costs. According to one estimate, an additional 1.02 to 2.56 kilowatt-hours of energy, depending on pump efficiency, is required to lift 1 acre-foot of water an additional foot (Peacock n.d. [1996]).

### *Alternative 3 – Near West – Ultrathickened*

GROUNDWATER-DEPENDENT ECOSYSTEMS IMPACTED

Alternative 3 likely will impact the same GDEs as those under Alternative 2.

CHANGES IN TAILINGS WATER BALANCE

The following water balance components for Alternative 3 are summarized in table 3.7.1-7:

- **Entrainment.** Alternative 3 entrains about the same amount of water as the other slurry tailings alternatives (Alternatives 3, 5, and 6), but substantially more than Alternative 4.

- **Evaporation.** Alternative 3 evaporates less water than Alternatives 2, 5, and 6, and almost matches the filtered tailings alternative (Alternative 4) for reductions in evaporation.

- **Watershed losses.** Watershed losses are the same as Alternative 2.

- **Seepage.** With engineered seepage controls in place, Alternative 3 loses the least amount of seepage of any alternative, including the filtered tailings alternative (Alternative 4).

---

[71] The amount of groundwater in storage was calculated based on the volume of aquifer located between the 2017 simulated water table (using the Desert Wellfield model) and a depth of 1,000 feet below ground surface, multiplied by a specific yield value of 8 percent (Garrett 2018a). The use of the 1,000-foot depth is based on substantive policy guidance from the ADWR for determining physical availability of groundwater within an AMA when supporting an application for an Assured Water Supply (Arizona Department of Water Resources 2007). The specific yield value was ultimately derived from the ADWR Salt River Valley model upon which the Desert Wellfield model is based. Specific yield in the ADWR model ranges from about 6 to 12 percent in the East Salt River valley, depending on geographic area and hydrologic unit (Freihoefer et al. 2009); see figures 3.8 through 3.10 in that report.

CHANGES IN DESERT WELLFIELD PUMPING

Alternative 3 requires less makeup water than Alternative 2, roughly 500,000 acre-feet over the life of the mine. Pumping under Alternative 3 represents about 6.1 percent of the estimated 8.1 million acre-feet of available groundwater in the East Salt River valley subbasin (Garrett 2018a).

Maximum drawdown for Alternative 3 reaches about 177 feet, eventually recovering to less than 20 feet. At the north and south ends of the wellfield, maximum drawdown ranges from 87 to 105 feet, and farther south within NMIDD maximum drawdown is roughly 42 feet (Bates et al. 2018; Garrett 2018a).

Water use for Alternative 3 is bracketed between that of Alternative 2 with the greatest groundwater use and Alternative 4 with the least groundwater use (see figure 3.7.1-2). A total of 611 registered wells are located within the 10-foot modeled drawdown contour for Alternative 2 (304 exempt wells and 307 non-exempt wells), and a total of 345 registered wells are located within the 10-foot modeled drawdown contour for Alternative 4 (180 exempt wells and 165 non-exempt wells). The number of wells potentially impacted by Alternative 3 falls within this range. Impacts to wells from drawdown are similar to those described for Alternative 2.

### Alternative 4 – Silver King

GROUNDWATER-DEPENDENT ECOSYSTEMS IMPACTED

Two GDEs would be directly disturbed by a tailings facility at the Silver King site: Iberri Spring and McGinnel Spring. Both of these springs are assumed to be at least partially connected to the regional aquifers; both are located under the NPAG tailings facility.

Alternative 4 likely will impact 18 GDEs (see figure 3.7.1-11):

- Six springs are anticipated to be impacted from continued dewatering under the no action alternative.

- Two additional springs are anticipated to be impacted under the proposed action, because of the block-cave mining.

- Three springs and three ponds are directly disturbed by the subsidence area.

- Two springs are directly disturbed by the Alternative 4 tailings storage facility; however, one of these was already impacted under the no action alternative.

- One perennial stream (Devil's Canyon) is impacted by reduced runoff from the subsidence area.

- Two perennial stream reaches on Queen Creek are impacted by reduced runoff from both the subsidence area and the tailings.

For the other action alternatives, there was an anticipated 7 to 15 percent loss in flow in Queen Creek below Superior to Boyce Thompson Arboretum. Because of the location of Alternative 4 at the head of the watershed, these flow losses are more substantial, ranging from 7 percent in Superior, to 20 percent at Boyce Thompson Arboretum, to 9 percent at Whitlow Ranch Dam. Reduction in runoff volume could reduce the amount of water temporarily stored in shallow alluvium or fracture networks.

Impacts at Boyce Thompson Arboretum could include a reduction or loss of spring/stream flow, increased mortality or reduction in extent or health of riparian vegetation, and reduction in the quality or quantity of aquatic habitat from loss of flowing water, adjacent vegetation, or standing pools. Substantial impacts on the riparian vegetation at Whitlow Ranch Dam are still unlikely due to the geological controls, although the reductions in runoff are greater under Alternative 4 than other alternatives.

CHANGES IN TAILINGS WATER BALANCE

The following water balance components for Alternative 4 are summarized in table 3.7.1-7:

- **Entrainment.** Because water is filtered from the tailings before placement, Alternative 4 entrains the least amount of water of all alternatives, approximately only one-quarter of that entrained under Alternative 2.

- **Evaporation.** Because Alternative 4 does not have a standing recycled water pond, Alternative 4 also evaporates the least amount of water of all alternatives, approximately only one-half of that of Alternative 2.

- **Watershed losses.** Watershed losses are higher than Alternatives 2 and 3, due to the position of Alternative 4 higher in the Upper Queen Creek watershed, and the need for stringent stormwater control to avoid contact of water with exposed PAG tailings.

- **Seepage.** Alternative 4 loses the least amount of seepage of all alternatives, except for Alternative 3 (ultrathickened).

CHANGES IN DESERT WELLFIELD PUMPING

Alternative 4 requires the least amount of makeup water of all alternatives, roughly 180,000 acre-feet over the life of the mine, or roughly 30 percent of the makeup water required for the slurry tailings alternatives (Alternatives 2, 3, 5, and 6). Pumping under Alternative 4 represents about 2.2 percent of the estimated 8.1 million acre-feet of available groundwater in the East Salt River valley subbasin (Garrett 2018a).

Alternative 4 also results in the least amount of drawdown, as shown in figure 3.7.1-2. Maximum drawdown for Alternative 4 reaches about 53 feet, eventually recovering to roughly 5 feet. At the north and south ends of the wellfield, maximum drawdown ranges from 30 to 35 feet, and farther south within NMIDD maximum drawdown is roughly 17 feet (Bates et al. 2018; Garrett 2018a).

A total of 345 registered wells are located within the 10-foot modeled drawdown contour for Alternative 4 (180 exempt wells and 165 non-exempt wells). Impacts to wells from drawdown are similar to those described for Alternative 2.

### *Alternative 5 – Peg Leg*

GROUNDWATER-DEPENDENT ECOSYSTEMS IMPACTED

No GDEs have been identified within the vicinity of the Peg Leg site or are expected to be directly disturbed. In total, 14 GDEs are anticipated to be impacted under Alternative 5 (see figure 3.7.1-11):

- Six springs are anticipated to be impacted from continued dewatering under the no action alternative.

- Two additional springs are anticipated to be impacted under the proposed action because of the block-cave mining.

- Two springs are directly disturbed by the subsidence area.

- Three perennial stream reaches in Devil's Canyon and Queen Creek are impacted by reduced runoff from the subsidence area.

- One perennial stream reach of the Gila River is impacted by reduced runoff from the tailings facility.

CHANGES IN TAILINGS WATER BALANCE

The following water balance components for Alternative 5 are summarized in table 3.7.1-7:

- **Entrainment.** Alternative 5 entrains about the same amount of water as the other slurry tailings alternatives (Alternatives 2, 5, and 6), but substantially more than Alternative 4.

- **Evaporation.** Alternative 5 loses the most amount of water to evaporation of all alternatives, about 25 percent more than Alternative 2.

- **Watershed losses.** Watershed losses (as a percentage change in perennial flow) are relatively low for Alternative 5, largely due to the large contributing drainage area and flow of the Gila River.

- **Seepage.** Because of the location over a deep alluvial basin, Alternative 5 loses substantially more seepage than all other alternatives.

CHANGES IN DESERT WELLFIELD PUMPING

Alternative 5 requires more water to move the tailings slurry over long distances, and to make up for seepage losses. Alternative 5 uses only slightly less water than Alternative 2, about 550,000 acre-feet over the life of the mine. Pumping under Alternative 5 represents about 6.7 percent of the estimated 8.1 million acre-feet of available groundwater in the East Salt River valley subbasin (Garrett 2018a).

Maximum drawdown for Alternative 5 reaches about 199 feet, eventually recovering to less than 20 feet. At the north and south ends of the wellfield, maximum drawdown ranges from 96 to 115 feet, and farther south within NMIDD maximum drawdown is roughly 46 feet (Bates et al. 2018; Garrett 2018a).

Water use for Alternative 5 is bracketed between that of Alternative 2 with the greatest groundwater use, and Alternative 4 with the least groundwater use (see figure 3.7.1-2). A total of 611 registered wells are located within the 10-foot modeled drawdown contour for Alternative 2 (304 exempt wells and 307 non-exempt wells), and a total of 345 registered wells are located within the 10-foot modeled drawdown contour for Alternative 4 (180 exempt wells and 165 non-exempt wells). The number of wells potentially impacted by Alternative 5 falls within this range. Impacts to wells from drawdown are similar to those described for Alternative 2.

### *Alternative 6 – Skunk Camp*

GROUNDWATER-DEPENDENT ECOSYSTEMS IMPACTED

No GDEs have been identified within the vicinity of the Skunk Camp site based on site-specific information. Alternative 6 likely will impact 18 GDEs, the same as under Alternative 5 (see figure 3.7.1-11):

- Six springs are anticipated to be impacted from continued dewatering under the no action alternative.

- Two additional springs are anticipated to be impacted under the proposed action, because of the block-cave mining.

- Three springs and three ponds are directly disturbed by the subsidence area.

- Three perennial stream reaches in Devil's Canyon and Queen Creek are impacted by reduced runoff from the subsidence area.

- One perennial stream reach of the Gila River is impacted by reduced runoff from the tailings facility.

CHANGES IN TAILINGS WATER BALANCE

The following water balance components for Alternative 6 are summarized in table 3.7.1-7:

- **Entrainment.** Alternative 6 entrains about the same amount of water as the other slurry tailings alternatives (Alternatives 2, 5, and 6), but substantially more than Alternative 4.

- **Evaporation.** Alternative 6 loses almost as much water to evaporation as the alternative with the greatest evaporative losses (Alternative 5), about 25 percent more than Alternative 2.

- **Watershed losses.** Watershed losses (as a percentage change in perennial flow) are relatively low for Alternative 6, largely due to the large contributing drainage area and flow of the Gila River.

- **Seepage.** Because of the location over an alluvial basin, Alternative 6 loses substantially more than Alternatives 2, 3, and 4, but still less than Alternative 5.

CHANGES IN DESERT WELLFIELD PUMPING

Alternative 6 requires more water to move the tailings slurry over long distances, and to make up for seepage losses. Alternative 6 uses only slightly less water than Alternative 2, about 550,000 acre-feet over the life of the mine, and about the same as Alternative 5. Pumping under Alternative 6 represents about 6.7 percent of the estimated 8.1 million acre-feet of available groundwater in the East Salt River valley subbasin (Garrett 2018a).

Drawdown from Alternative 6 is nearly identical to that of Alternative 5.

Water use for Alternative 6 is bracketed between that of Alternative 2 with the greatest groundwater use, and Alternative 4 with the least groundwater use (see figure 3.7.1-2). A total of 611 registered wells are located within the 10-foot modeled drawdown contour for Alternative 2 (304 exempt wells and 307 non-exempt wells), and a total of 345 registered wells are located within the 10-foot modeled drawdown contour for Alternative 4 (180 exempt wells and 165 non-exempt wells). The number of wells potentially impacted by Alternative 6 falls within this range. Impacts to wells from drawdown are similar to those described for Alternative 2.

### Cumulative Effects

Full details of the cumulative effects analysis can be found in chapter 4. The following represents a summary of the cumulative impacts resulting from the project-related impacts described in Section 3.7.1.5, Environmental Consequences, that are associated with groundwater quantity or GDEs, when combined with other reasonably foreseeable future actions.

The following actions were determined through the cumulative effects analysis process to be reasonably foreseeable, and have impacts that likely overlap in space and time with impacts from the Resolution Copper Project:

- Merrill Ranch Master Planned Community Project

- Ray Land Exchange and Proposed Plan Amendment

The cumulative effects analysis area encompasses two separate modeling areas used to assess direct and indirect impacts to groundwater resources and GDEs: a large model area centered on the block-cave zone and encompassing much of the Upper Queen Creek watershed, the Superior basin, and Oak Flat (where dewatering would occur), and the East Salt River valley (where the mine water supply would be pumped). Both model areas are sufficiently large to encompass other water users that could combine with the project effects and impact groundwater resources. The metrics used to quantify the cumulative impacts to groundwater quantity and GDEs are (1) the amount of water pumped within the same groundwater basin

or aquifer (acre-feet); (2) drawdown caused by pumping within the same groundwater basin or aquifer (feet); (3) drawdown in the East Salt River valley around the Desert Wellfield will be based on cumulative modeling results (model results); and (4) GDEs lost or impacted (number).

The Ray Land Exchange parcels were the only reasonably foreseeable future actions that passed screening and potentially affect the same aquifer as the Resolution Copper Project mine area (different from the Desert Wellfield). As no mine plans have been prepared to date, it is unknown how much water future activities associated with the Ray Land Exchange might use. If groundwater is extracted and used on these parcels, there could be impacts to some of the same regional aquifers impacted by the Resolution Copper Project, though the distance suggests that overlap of drawdown is unlikely to occur (or if it does, is unlikely to be substantial). In general, Ray Mine obtains much of its water supply from sources to the south, including the Hayden well field. Continued reliance on these sources is not anticipated to have any cumulative effect with drawdown or groundwater use associated with the Resolution Copper Project.

Most of Merrill Ranch lies outside of the cumulative effects analysis area, and the source of water is unknown at this time, making it difficult to analyze. However, the potential water use is similar to other actions screened out of the cumulative effects analysis, but still of public concern. Given the overall high level of concern associated with water supply, the number of reasonably foreseeable future actions associated with the cumulative effects analysis and listed above seems remarkably small. Indeed, there are a number of other reasonably foreseeable future actions that were identified that would directly overlap with the Desert Wellfield that would contribute to overall impacts to regional water supplies in the East Salt River valley. These include the following:

- Arizona's drought contingency plan,
- Town of Florence housing developments,
- population change,
- recent modeling reports projecting water shortages in Pinal County,
- Assured Water Supplies in the East Salt River valley, and
- future Superstition Vistas development area on Arizona State Trust land, including the first parcel to auctioned off (2,783 acres) in 2020.

The overall cumulative effects of the Resolution Copper Project with these and similar projects on these regional water supplies, in light of competing water uses, ongoing climatic trends, and drought, are discussed in detail in the "Cumulative Effects on Regional Water Supplies" section in chapter 4.

## *Mitigation Effectiveness*

| Mitigation Identifier and Title | Authority to Require |
|---|---|
| FS-WR-01: GDEs and water well mitigation | Required – Forest Service |

We developed a robust monitoring and mitigation strategy to avoid, minimize, rectify, reduce, or compensate for resource impacts that have been identified during the process of preparing this EIS. Appendix J contains descriptions of mitigation measures that are being required by the Forest Service and mitigation measures voluntarily brought forward and committed to by Resolution Copper. Appendix J also contains descriptions of monitoring that would be needed to identify potential impacts and mitigation effectiveness.

This section contains an assessment of the effectiveness of design features associated with mitigation and monitoring measures found in appendix J that are applicable to groundwater quantity and GDEs. See appendix J for full descriptions of each measure noted below.

MITIGATION EFFECTIVENESS AND IMPACTS OF FOREST REQUIRED MITIGATION MEASURES
APPLICABLE TO GROUNDWATER QUANTITY AND GROUNDWATER-DEPENDENT ECOSYSTEMS

Appendix J contains mitigation and monitoring measures being required by the Forest Service under its
regulatory authority or because these measures are required by other regulatory processes (such as the
Biological Opinion). These measures are assumed to occur, and their effectiveness and impacts are
disclosed here. The unavoidable adverse impacts disclosed below take the effectiveness of these
mitigations into account.

**GDEs and water well mitigation (FS-WR-01).** In April 2019, the Forest Service received from
Resolution Copper a document titled "Monitoring and Mitigation Plan for Groundwater Dependent
Ecosystems and Water Wells" (Montgomery and Associates Inc. 2019b). This plan was revised and
finalized in September 2020 (Montgomery and Associates Inc. 2020b). This document outlines a
monitoring plan to assess potential impacts on each GDE, identifies triggers and associated actions to be
taken by Resolution Copper to ensure that GDEs are protected, and describes mitigation measures for
each GDE if it is shown to be impacted by future mine dewatering. Note that this plan includes actions
both for GDEs and water supply wells.

The plan focuses on the same GDEs described in this section of the EIS, as these are the GDEs that are
believed to rely on regional groundwater that could be impacted by the mine. The stated goal of the plan
is "to ensure that groundwater supported flow that is lost due to mining activity is replaced and continues
to be available to the ecosystem." The plan specifically notes that it is not intended to address water
sources associated with perched shallow groundwater in alluvium or fractures.

The specific GDEs addressed by this plan include the following:

- Bitter, Bored, Hidden, Iberri, Kane, McGinnel, McGinnel Mine, No Name, Rock Horizontal,
  and Walker Springs
- Queen Creek below Superior (reach km 17.39 to 15.55) and at Whitlow Ranch Dam
- Arnett Creek in two locations
- Telegraph Canyon in two locations
- Devil's Canyon springs (DC4.1E, DC6.1E, DC6.6W, and DC8.2W)
- Devil's Canyon surface water in two locations (reach km 9.1 to 7.5, and reach km 6.1 to 5.4)
- Mineral Creek springs (Government Springs, MC3.4W)
- Mineral Creek surface water in two locations (MC8.4C, and reach km 6.9 to 1.6)

Monitoring frequency and parameters are discussed in the plan, and include such things as groundwater
level or pressure, surface water level, presence of water or flow, extent of saturated reach, and
phreatophyte area. In general, groundwater level or pressure and surface water level would be monitored
daily (using automated equipment), while other methods would be monitored quarterly or annually.

Water supplies to be monitored are Superior (using well DHRES-16_743 as a proxy), Boyce Thompson
Arboretum (using the Gallery Well as a proxy), and Top-of-the-World (using HRES-06 as a proxy).

A variety of potential actions are identified that could be used to replace water sources if monitoring
reaches a specified trigger. Specific details (likely sources and pipeline corridor routes) are shown in the
plan. These include the following:

- Drilling new wells, applicable to both water supplies and GDEs. The intent of installing a well for
  a GDE is to pump supplemental groundwater that can be used to augment flow. The exact

location and construction of the well would vary; it is assumed in many cases groundwater would be transported to GDEs via an overland pipeline to minimize ground disturbance. Wells require maintenance in perpetuity, and likely would be equipped with storage tanks and solar panels, depending on specific site needs.

- Installing spring boxes. These are structures installed into a slope at the discharge point of an existing spring, designed to capture natural flow. The natural flow is stored in a box and discharged through a pipe. Spring boxes can be deepened to maintain access to water if the water level decreases. Spring boxes require little ongoing maintenance to operate.

- Installing guzzlers. Guzzlers are systems for harvesting rainwater for wildlife consumption. Guzzlers use an impermeable apron, typically installed on a slope, to collect rainwater which is then piped to a storage tank. A drinker allows wildlife and/or livestock to access water without trampling or further degrading the spring or water feature. Guzzlers require little ongoing maintenance to operate.

- Installing surface water capture systems such as check dams, alluvial capture, recharge wells, or surface water diversions. All of these can be used to supplement diminished groundwater flow at GDEs by retaining precipitation in the form of runoff or snowmelt, making it available for ecosystem requirements.

- Providing alternative water supplies from a non-local source. This would be considered only if no other water supply is available, with Arizona Water Company or the Desert Wellfield being likely sources of water.

An important change was made to measure FS-WR-01 after the January 2021 FEIS was rescinded. Comments received by the Forest Service suggested that the triggers for mitigation be more clearly defined in the measure. The Forest Service requested revisions to the plan and received those revisions from Resolution Copper in December 2022 (Montgomery and Associates Inc. 2022). The revision simplified the triggers. Quantitative criteria are specified for each GDE that generally amount to observing 2 years of measurements below the average, coupled with decreases in water level in regional monitoring wells. Water wells are treated similarly based on groundwater level measurements.

The plan still contains a caveat that the "mitigation measure would be triggered except if data demonstrate dewatering from the Project was not the cause of the impact." However, unlike the previous version of the mitigation plan which required a positive demonstration using undetermined means that mine drawdown was responsible for GDE impacts prior to implementing mitigation, the revised version assumes that mitigation will take place if these clear quantitative triggers are met, and only would not be implemented if a defensible argument could be made otherwise.

The 2022 version of the plan (Montgomery and Associates Inc. 2022) is the version of the plan required to be implemented by the Forest Service.

**Effectiveness of Monitoring**

The monitoring as proposed has sufficient frequency and includes the necessary parameters to not only identify whether changes in GDEs are taking place, but also to inform whether the mine drawdown is responsible. For instance, conducting daily automated monitoring allows for an understanding of normal seasonal and drought-related fluctuations in water level or flow, which can be taken into consideration when evaluating the possible effects from the mine.

The plan produced by Resolution Copper that describes the actions for this measure (Montgomery and Associates Inc. 2022) does not specify a duration for monitoring. In appendix J, the Forest Service further requires that:

1. Monitoring and mitigation will be required to continue through operations, during the period of active dewatering.

2. Monitoring and mitigation will be required to continue during the closure phase as well, for at least 10 years after cessation of active dewatering.

3. At the end of this period, Resolution Copper may request from the Forest Service that individual GDEs and water wells be dropped from further monitoring and mitigation efforts, based on analysis of the observations made during the operations and closure phases.

Note that an arbitrary end date for monitoring is not included. Monitoring only can be reduced based on credible analysis and after a positive decision to do so from the Forest Service.

**Effectiveness of Mitigation**

Replacement of water sources using the techniques described (replacement wells or alternative water sources) would be highly effective for public water supplies. For GDEs, the effectiveness would depend on the specific approach. Engineered replacements like pipelines, guzzlers, or spring boxes would be effective at maintaining a water source and maintaining a riparian ecosystem, but the exact type, location, and extent of riparian vegetation could change to adapt to the new discharge location and frequency of the new water source. Changes in water quality are unlikely to be an issue, since new water sources would likely derive from the same source as natural spring flow (i.e., the Apache Leap Tuff aquifer, or stored precipitation).

While water flow, riparian ecosystems, and associated terrestrial and aquatic habitat would be maintained, there would still likely be a noticeable change in the overall environment that could affect wildlife, or the recreating public. The presence of infrastructure like wells and pipes near some natural areas could change the sense of place and nature experienced in these locations.

**Impacts from Mitigation Actions**

The mitigation actions identified would result in additional ground disturbance, though minimal. Mitigation for any given GDE would likely result in less than 1 acre of impact, assuming a well pad and pipeline installation, or installation of check dams. If all mitigations were installed as indicated in the plan, impacts could total 20 to 30 acres of additional ground disturbance.

The Forest Service received comments concerning the indirect impacts from these GDE-related mitigation actions. The general concern was that any mitigations implemented effectively take water from other uses in the watershed.

With respect to mitigations like spring boxes, guzzlers, or check dams, there is some validity to this concept. These mitigations necessarily retain water that otherwise would be flowing downstream.

However, the magnitude of the surface flow loss is minimal. For example, spring DC6.6W (the only GDE on Devil's Canyon anticipated by the NEPA analysis to be impacted, see table 3.7.1-3) is located up an unnamed tributary to Devil's Canyon. Even if a 1-acre concrete apron were installed for a guzzler, the downstream portion of Devil's Canyon has a contributing drainage area of 20 square miles (12,800 acres) and the loss of 1 acre of that area would be negligible. As a different example on a smaller scale, Kane Spring is one of the springs anticipated to be most heavily impacted (drawdown greater than 50 feet, see table 3.7.1-4). The contributing drainage area for the nearest drainage (an unnamed ephemeral wash) is 0.8 square mile (512 acres). Even at this smaller scale, the loss of area from a 1-acre concrete apron would be a fraction of 1 percent.

With respect to mitigations like well drilling and pumping groundwater to the surface, the criticism is not true. This does not represent a trade-off in uses. Under natural conditions prior to drawdown, groundwater

would have exited the aquifer at the spring naturally. Under mitigated conditions, groundwater exits the aquifer at the same location, only using mechanical means. The overall effect—exposure of groundwater at the surface—is the same.

MITIGATION EFFECTIVENESS AND IMPACTS OF RESOLUTION COMMITTED MITIGATION MEASURES APPLICABLE TO GROUNDWATER QUANTITY AND GROUNDWATER-DEPENDENT ECOSYSTEMS

Appendix J contains mitigation and monitoring measures committed by Resolution Copper in contractual, financial, or other agreements. Due to these commitments these measures are assumed to occur and their effectiveness and impacts if they were to occur are disclosed here; however, there are no committed mitigations for groundwater quantity and GDEs, which is reflected in the unavoidable adverse impacts disclosed below.

MITIGATION EFFECTIVENESS AND IMPACTS OF RESOLUTION VOLUNTARY MITIGATION MEASURES APPLICABLE TO GROUNDWATER QUANTITY AND GROUNDWATER-DEPENDENT ECOSYSTEMS

Appendix J contains mitigation and monitoring measures brought forward voluntarily by Resolution Copper and committed to in correspondence with the Forest Service. These measures are assumed to occur but are not guaranteed to occur. Their effectiveness and impacts if they were to occur are disclosed here; however, the unavoidable adverse impacts disclosed below do not take the effectiveness of these mitigations into account. No additional mitigation measures were voluntarily brought forward for groundwater quantity and GDEs.

UNAVOIDABLE ADVERSE IMPACTS

Given the effectiveness of mitigation, there would be no residual impacts on public water supplies near the mine site. All lost water supplies would be replaced.

For GDEs expected to be impacted by groundwater drawdown, the mitigation measures described would result in no net loss of riparian ecosystems or aquatic habitat on the landscape, although the exact nature and type of ecosystems would change to adapt to new water sources. However, impacts on the sense of place and nature experienced at these perennial streams and springs, rare in a desert environment, would not be mitigated by these actions.

The mitigation plan would not mitigate any GDEs lost directly to surface disturbance, depending on the tailings alternative.

Impacts on water supplies in the East Salt River valley in the form of groundwater drawdown and reduction of regional groundwater supply would not be fully mitigated when only required mitigation is considered.

### *Other Required Disclosures*

SHORT-TERM USES AND LONG-TERM PRODUCTIVITY

Groundwater pumping would last the duration of the mine life. At the mine itself, groundwater levels would slowly equilibrate over a long period (centuries). Groundwater drawdown from dewatering of the underground mine workings would constitute a permanent reduction in the productivity of groundwater resources within the long time frame expected for equilibrium. Groundwater in the vicinity of the Desert Wellfield would equilibrate more quickly, but there would still be an overall decline in the regional water table due to the Resolution Copper Project and a permanent loss of productivity of groundwater resources in the area.

specific SWPPP and best management practices. Impacts are predicted to be minor and temporary. Development of a new freeway, while linear, would create a substantial amount of new impermeable surface, which would alter drainage patterns and likely result in small amounts of oils, fuels, and other vehicle debris in the roadway to be washed onto adjacent permeable surfaces during storm events.

- The LEN Range Improvements would renew the existing grazing permit, upgrade eight existing wells, drill three new wells, and perform maintenance of roads and access to the range improvements. These new activities are expected to have minor effects on groundwater quality, as the three new wells would be permitted to ensure no impacts to the source occur. Access road improvements are expected to slightly reduce the amount of pollutant runoff during storm events by bettering function and drainage of existing roads.

- Ray Land Exchange parcels. Since no mine plans have been prepared to date, it is unknown whether there would be pollutant discharges from the activities associated with the Ray Land Exchange. The distance suggests that overlap of discharges into the same groundwater systems that could be impacted by the Resolution Copper Project is unlikely to occur, or if it does, is unlikely to be substantial. The watershed boundaries suggest that surface water quality impacts, including those from stormwater runoff, could eventually enter the Gila River. If this is the case, they would be cumulative with increased pollutant loads associated with either Alternative 5 – Peg Leg, which would enter the Gila River via tailings seepage downstream from the Ray Land Exchange parcels, or with Alternative 6 – Skunk Camp, which is located upstream from the Ray Land Exchange parcels.

- Ripsey Wash Tailings Project. The Ripsey Wash tailings storage facility would generate tailings seepage that would likely enter the Gila River as well (upstream from Alternative 5 and downstream from Alternative 6). Based on disclosures from the permitting process, anticipated tailings seepage water quality appears to meet numeric Arizona aquifer water quality standards; however, the seepage still has substantially high concentrations of sulfate (greater than 2,000 mg/L) and dissolved solids (greater than 3,200 mg/L). These would contribute to pollutant loads in the Gila River. The overall pollutant load (tons per year) cannot be estimated without better information on anticipated flow rates. The potential for cumulative impacts is greatest after closure, as during operations a pumpback system would be employed to control seepage impacts.

## Mitigation Effectiveness

| Mitigation Identifier and Title | Authority to Require |
|---|---|
| FS-SV-03: Revised reclamation and closure plans | Required – Forest Service |
| FS-PH-03: Skunk Camp pipeline protection and integrity plan | Required – Forest Service |
| RV-WR-03: Skunk Camp Water quality monitoring plan | Voluntary – Resolution Copper |

We developed a robust monitoring and mitigation strategy to avoid, minimize, rectify, reduce, or compensate for resource impacts that have been identified during the process of preparing this EIS. Appendix J contains descriptions of mitigation measures that are being required by the Forest Service and mitigation measures voluntarily brought forward and committed to by Resolution Copper. Appendix J also contains descriptions of monitoring that would be needed to identify potential impacts and mitigation effectiveness.

This section contains an assessment of the effectiveness of design features associated with mitigation and monitoring measures found in appendix J that are applicable to groundwater and surface water quality. See appendix J for full descriptions of each measure noted below.

MITIGATION EFFECTIVENESS AND IMPACTS OF FOREST REQUIRED MITIGATION MEASURES APPLICABLE TO GROUNDWATER AND SURFACE WATER QUALITY

Appendix J contains mitigation and monitoring measures being required by the Forest Service under its regulatory authority or because these measures are required by other regulatory processes (such as the Biological Opinion). These measures are assumed to occur, and their effectiveness and impacts are disclosed here. The unavoidable adverse impacts disclosed below take the effectiveness of these mitigations into account.

**Revised reclamation and closure plans (FS-SV-03).** Implementing reclamation and closure plans ensures that the post-closure landscape is successfully revegetated to the extent practicable and that the landforms are stable and safe. This measure is effective at partially replacing habitat and vegetation over the long term within the footprint of all mine components, reducing long-term effects on surface water quality from erosion, and improving long-term resilience and safety of the tailings storage facility. Proper design and installation of the closure cover would be effective at minimizing infiltration of precipitation into the facility, allowing seepage to reduce over the long term and reducing impacts to groundwater quality.

**Skunk Camp pipeline protection and integrity plan (FS-PH-03).** Implementing design and construction measures meant to mitigate specific potential failure modes ensures that the pipelines will be resilient and secure. Operational and maintenance measures ensure that problems are identified as they arise and that appropriate remedies are taken. These actions would be effective at reducing the risk of pipeline ruptures and inadvertent spills, which also reduces potential risk to groundwater and surface water quality.

MITIGATION EFFECTIVENESS AND IMPACTS OF RESOLUTION COMMITTED MITIGATION MEASURES APPLICABLE TO GROUNDWATER AND SURFACE WATER QUALITY

Appendix J contains mitigation and monitoring measures committed by Resolution Copper in contractual, financial, or other agreements. Due to these commitments these measures are assumed to occur, and their effectiveness and impacts if they were to occur are disclosed here. However, there are no committed mitigations for groundwater and surface water quality, which is reflected in the unavoidable adverse impacts disclosed below.

MITIGATION EFFECTIVENESS AND IMPACTS OF RESOLUTION VOLUNTARY MITIGATION MEASURES APPLICABLE TO GROUNDWATER AND SURFACE WATER QUALITY

Appendix J contains mitigation and monitoring measures brought forward voluntarily by Resolution Copper and committed to in correspondence with the Forest Service. These measures are assumed to occur but are not guaranteed to occur. Their effectiveness and impacts if they were to occur are disclosed here; however, the unavoidable adverse impacts disclosed below do not take the effectiveness of these mitigations into account.

**Skunk Camp water quality monitoring plan (RV-WR-03).** While voluntary at this point, it is likely that at least portions of the water quality monitoring plan for the Skunk Camp tailings storage facility would be required under the APP obtained from ADEQ. Monitoring would not be effective at preventing water quality impacts from seepage, but would be effective at identifying deviations from anticipated concentrations or potential failure or ineffectiveness of seepage control measures, which in the long term would be protective of groundwater quality.

UNAVOIDABLE ADVERSE IMPACTS

The applicant-committed environmental protection measures for stormwater control would effectively eliminate any runoff in contact with ore or tailings. There are no anticipated unavoidable adverse effects

associated with the quality of stormwater runoff under normal operating conditions, but under certain upset conditions and extreme storm events discharges from the seepage collection pond could occur, resulting in concentrations of contaminants in downstream waters above numeric water quality standards, though only for a certain distance until flows from the contributing drainage area dilute the discharge.

Seepage from the tailings storage facilities has several unavoidable adverse effects. In all cases, the tailings seepage adds a pollutant load to the downstream environment, including downstream aquifers and downstream surface waters where groundwater eventually daylights. The overall impact of this seepage varies by alternative. Alternatives 2, 3, and 4 all have anticipated impacts on water quality or have a high risk to water quality because of the extreme seepage control measures that must be implemented, and the relative inflexibility of adding more measures as needed, given the proximity to Queen Creek.

Alternatives 5 and 6 are located at the head of larger alluvial aquifers with some distance downstream before the first perennial water (the Gila River). Adverse effects are not anticipated from these alternatives. These two locations offer more flexibility for responding to potential problems using additional seepage controls if needed.

For all alternatives, some level of reduction in assimilative capacity of downstream waters (Queen Creek, Gila River) is unavoidable. For Alternatives 2, 3, and 4, discharge of additional contaminant load to designated impaired waters is also unavoidable.

### Other Required Disclosures

#### SHORT-TERM USES AND LONG-TERM PRODUCTIVITY

The use of the alternative sites for tailings storage represents a short-term use, with disposal happening over the operational life of the mine. However, the seepage from the tailings facilities would continue for much longer, with potential management anticipated being required over 100 years in some cases. While seepage persists, the long-term productivity of the downstream aquifers and surface waters could be impaired for some alternatives.

#### IRREVERSIBLE AND IRRETRIEVABLE COMMITMENT OF RESOURCES

The potential impacts on water quality from tailings seepage would cause an irretrievable commitment of water resources downstream of the tailings storage facility, lasting as long as seepage continued. Eventually the seepage amount and pollutant load would decline, and water quality conditions would return to a natural state. This may take over 100 years to achieve in some instances.

While long lived, the impacts on water quality would not be irreversible and would eventually end as the seepage and pollutant load declined.

## 3.7.3    Surface Water Quantity

### 3.7.3.1    Introduction

Perennial streams and springs are relatively rare in the area but do exist (see discussion in Section 3.7.1, Groundwater Quantity and Groundwater-Dependent Ecosystems). For the most part, surface waters in the area consist of dry washes or ephemeral channels that flow only in response to moderate- to high-intensity rainfall events. Water that flows in these washes and streams due to runoff from rainfall events reflects conditions in the upstream drainage area—the geographic area that contributes to flow in the stream—and these flows could change if the upstream drainage area changes.

The project would cause two major changes to these areas. Once the subsidence area develops at the surface, precipitation falling within this area would no longer report to the downstream stream network, potentially reducing runoff reaching both Devil's Canyon and Queen Creek.

In addition to the loss of runoff from the subsidence area, precipitation falling on or within the tailings storage facility would also be unavailable to downstream washes. All the tailings alternatives are designed to allow any runoff from upstream in the drainage area to flow around the facility and continue flowing downstream. However, for the slurry tailings facilities (Alternatives 2, 3, 5, and 6), the top of the tailings facility is managed as a pond to allow process water to be recycled. Any rain falling within the bounds of a slurry facility, including the seepage recovery ponds at the downstream toe of the tailings embankment, is retained and recycled.

Alternative 4 – Silver King is the sole filtered tailings alternative and is different from the slurry alternatives. Filtered tailings must be managed to shed, not retain, water. However, because rain that sheds off the filtered tailings has contacted tailings, it must be collected downstream and not released to the environment during operations. The overall result for the filtered tailings alternative is the same as for the slurry alternatives—less surface water reporting downstream.

This section analyzes the reduction in streamflow caused by each of the alternatives, in terms of both total volume and peak flows during flood events. This section also analyzes the impacts that would be expected on sediment yields and stream geomorphology, impacts on water quality from sediment changes, impacts on jurisdictional waters of the U.S. (related to the CWA Section 404 program), impacts on floodplains, and impacts on wetlands (related to Executive Order 11990). Some aspects of the analysis are briefly summarized in this section. Additional details not included are captured in the project record (Newell and Garrett 2018d).

### Changes from the DEIS

Overall, we received few public comments specific to the analysis of surface water quantity impacts, resulting in minimal changes. As with all resources, Alternatives 5 and 6 no longer have alternative pipeline routes to reach the tailings storage facility. Each alternative now has one pipeline route, described in chapter 2. Additionally, we revised the Alternative 6 pipeline route, primarily to address potential impacts to habitat and resources along Mineral Creek. These changes had no impact on the surface water quantity analysis, since runoff is not captured or detained by pipeline areas as it is for the subsidence area and tailings storage facility.

The analysis of potential impacts to geomorphology (erosion and sedimentation) remains the same as described in the DEIS. However, we added a refined geomorphology analysis using different methodologies that is specific to the preferred alternative (Alternative 6). We completed further work on the delineations of jurisdictional waters of the U.S., conducted to support the CWA Section 404 permit and added these details.

We also added discussion of potential impacts on downstream surface water rights. Note that analysis of potential impacts to groundwater rights are analyzed in section 3.7.1.

New mitigation measures were brought forward to directly address surface water impacts, including the direct replacement of water in Queen Creek. These are analyzed in the "Mitigation Effectiveness" discussion in this section. The cumulative effects analysis was revised for the FEIS to better quantify impacts and is described in detail in chapter 4 and summarized in this section.

SUMMARY OF APPLICANT-COMMITTED ENVIRONMENTAL PROTECTION MEASURES

A number of environmental protection measures are incorporated into the design of the project that would act to reduce potential impacts on surface water quantity. These are non-discretionary measures, and their effects are accounted for in the analysis of environmental consequences.

In the GPO, Resolution Copper has committed to various measures to reduce impacts on surface water quantity:

- To the extent practicable, stormwater flows upgradient of the facilities would be diverted around the disturbed areas and returned to the natural drainage system;

- As much water as possible would be recycled for reuse;

- Permanent diversion channels would be designed for operations and closure; and

- Runoff from roads, buildings, and other structures would be handled through best management practices, including sediment traps, settling ponds, berms, sediment filter fabric, wattles, etc.

IMPACTS ON SURFACE RUNOFF AND STREAMFLOW

The proposed block caving mining operation would result in the formation of a subsidence area at the surface. This subsidence area is estimated to cover an area of 2.7 square miles within the Queen Creek and Devil's Canyon drainage areas. Once fully formed, precipitation within the subsidence area footprint would not be expected to report as runoff to either Queen Creek or Devil's Canyon, resulting in a decrease in streamflow in both drainages. Tables 3.7.3-4 and 3.7.3-5 summarize expected changes in average monthly streamflow at two locations on Devil's Canyon and three locations on Queen Creek. These tables also show the peak instantaneous and 30-day (50 percent exceedance) stream flows for Queen Creek at Magma Avenue and for Devil's Canyon at Mineral Creek. Note that tables 3.7.3-4 and 3.7.3-5 only reflect streamflow losses from mine components common to all action alternatives, like the subsidence area and the West Plant Site. Additional losses occur under Alternatives 2, 3, and 4, shown later in this section.

reasonable to assume that reductions in storm flow could be caused by eliminating runoff of contact stormwater. Much of the combined disturbed area falls within the Gila River drainage, and cumulative reductions in surface flow would be most noticeable in that water body.

### Mitigation Effectiveness

| Mitigation Identifier and Title | Authority to Require |
|---|---|
| FS-SV-03: Revised reclamation and closure plans | Required – Forest Service |
| FS-WR-02: 404 compensatory mitigation plan | Required – U.S. Army Corps of Engineers |
| FS-WR-04: Replacement of water in Queen Creek | Required – Forest Service |

We developed a robust monitoring and mitigation strategy to avoid, minimize, rectify, reduce, or compensate for resource impacts that have been identified during the process of preparing this EIS. Appendix J contains descriptions of mitigation measures that are being required by the Forest Service and mitigation measures voluntarily brought forward and committed to by Resolution Copper. Appendix J also contains descriptions of monitoring that would be needed to identify potential impacts and mitigation effectiveness.

This section contains an assessment of the effectiveness of design features associated with mitigation and monitoring measures found in appendix J that are applicable to surface water quantity. See appendix J for full descriptions of each measure noted below.

MITIGATION EFFECTIVENESS AND IMPACTS OF FOREST REQUIRED MITIGATION MEASURES APPLICABLE TO SURFACE WATER QUANTITY

Appendix J contains mitigation and monitoring measures being required by the Forest Service under its regulatory authority or because these measures are required by other regulatory processes (such as the Biological Opinion). These measures are assumed to occur, and their effectiveness and impacts are disclosed here. The unavoidable adverse impacts disclosed below take the effectiveness of these mitigations into account.

**Revised reclamation and closure plans (FS-SV-03).** Implementing reclamation and closure plans ensures that the post-closure landscape is successfully revegetated to the extent practicable and that the landforms are stable and safe. This measure is effective at partially replacing habitat and vegetation over the long-term within the footprint of all mine components, reducing long-term effects on surface water quality from erosion, improving long-term resilience and safety of the tailings storage facility, and allowing water to return from reclaimed areas to downstream drainages.

**Clean Water Act Section 404 compensatory mitigation plan (FS-WR-02).** The compensatory mitigation parcels would offer conservation of riparian habitat, as well as overall improvement in the health and stability of riparian habitats, by minimizing invasive non-native species and returning conditions to a more natural state. This measure would be effective at replacing xeroriparian habitat lost within the project footprint. Upon approval by the USACE, this compensatory mitigation is considered to be effective at mitigating any impacts to waters of the U.S. resulting from the proposed project.

**Replacement of water in Queen Creek (FS-WR-04).** This measure would replace the storm runoff in Queen Creek that otherwise would be lost to the subsidence area. It would be highly effective at minimizing the effects felt in Queen Creek caused by reduction in the watershed area, specifically impacts to surface water quantity and riparian habitat. Note that other stormwater losses would still occur under Alternatives 2, 3, and 4.

The Forest Service received comments questioning whether this required mitigation would exist in perpetuity. The Forest Service requested clarification from Resolution Copper on this topic, which was received in November 2022 (Antone 2022a). Resolution Copper clarified that measures to divert stormwater away from the subsidence crater are intended to be permanent, with the goal of minimizing stormwater losses in the first place. The long-term need for additional placement of water in Queen Creek under FS-WR-04 is contingent on the success of maintaining stormwater flows, which will be determined by the baseline data collection to measure impacts.

MITIGATION EFFECTIVENESS AND IMPACTS OF RESOLUTION COMMITTED MITIGATION MEASURES APPLICABLE TO SURFACE WATER QUANTITY

Appendix J contains mitigation and monitoring measures committed by Resolution Copper in contractual, financial, or other agreements. Due to these commitments these measures are assumed to occur, and their effectiveness and impacts if they were to occur are disclosed here. However, there are no committed mitigations for surface water quantity, which is reflected in the unavoidable adverse impacts disclosed below.

MITIGATION EFFECTIVENESS AND IMPACTS OF RESOLUTION VOLUNTARY MITIGATION MEASURES APPLICABLE TO SURFACE WATER QUANTITY

Appendix J contains mitigation and monitoring measures brought forward voluntarily by Resolution Copper and committed to in correspondence with the Forest Service. These measures are assumed to occur but are not guaranteed to occur. Their effectiveness and impacts if they were to occur are disclosed here; however, the unavoidable adverse impacts disclosed below do not take the effectiveness of these mitigations into account. No additional mitigation measures were voluntarily brought forward for surface water quantity.

UNAVOIDABLE ADVERSE IMPACTS

The primary impact described in the analysis (in this section, as well as section 3.7.1) is the loss of surface water flow to riparian areas (including xeroriparian vegetation along ephemeral washes) and loss of surface flow to any GDEs that are associated with these drainages. The conceptual mitigation proposed under the CWA would not be effective at avoiding, minimizing, rectifying, or reducing these impacts. Rather, the proposed conceptual mitigation would be effective at offsetting impacts caused by reduced surface water flows by replacing riparian function far upstream or downstream of project impacts.

As the subsidence area is unavoidable, the loss of runoff to the watershed due to the subsidence area is also unavoidable, as are any effects on GDEs from reduced annual flows. Return of water to Queen Creek would be highly effective at eliminating impacts from this water loss, though this mitigation is voluntary and not guaranteed to occur. The loss of water to the watershed due to the tailings facility (during operations, prior to successful reclamation) is unavoidable as well, due to water management and water quality requirements. Direct impacts on wetlands, stock tanks, and ephemeral drainages from surface disturbance are also unavoidable.

## Other Required Disclosures

SHORT-TERM USES AND LONG-TERM PRODUCTIVITY

Desert washes, stock tanks, and wetland areas in the footprint of the subsidence area and tailings storage facility would be permanently impacted. In the short term, over the operational life of the mine, precipitation would be lost to the watershed. In the long term, most precipitation falling at the tailings facility would return to the downstream drainages after closure and successful reclamation. There would be a permanent reduction in the quantity of surface water entering drainages as a result of capture of runoff by the subsidence area.

## 3.10  Public Health and Safety

### 3.10.1  Tailings and Pipeline Safety

#### 3.10.1.1  Introduction

During scoping, the public expressed concern for the potential failure of a tailings embankment as well as the potential for failure of the copper concentrate and tailings pipelines. Some commenters cited recent high-profile tailings facility failures in Brazil and British Columbia as examples of the possible consequences.

Tailings storage facilities represent a long-term source of risk to public health and safety that extends well beyond the operational life of the mine. Catastrophic failures are one type of risk. In these cases, the tailings embankment can fail either because of a design or foundation flaw, a failure in construction, errors in operation, natural phenomena like earthquakes or floods, and often combinations of these factors. While the tailings themselves are solid particles, the material stored behind the embankment is a mixture of tailings

| Overview |
|---|
| Among the primary concerns expressed by the public during the scoping period for the Resolution Copper Project EIS were the potential risks posed by mine operations to public health and well-being. These included the potential for toxic air emissions, contamination of groundwater and surface water, tailings storage facility failure, increased risk of wildfire, and increased potential for accidental spills or releases of hazardous chemicals or other pollutants. This section addresses, in three parts, tailings facility and pipeline safety, fire risks, and the potential for releases or public exposure to hazardous materials. Air emissions issues are analyzed in Section 3.6, Air Quality, and the potential for mine-related contamination of water sources is assessed in Section 3.7.2, Groundwater and Surface Water Quality. |

solids and water. With a catastrophic failure of a tailings embankment, the tailings material stored in the facility behaves like a liquid. Massive amounts of tailings materials can spill from the facility and flow downstream for long distances, even hundreds of miles.[104]

A tailings embankment failure is similar to other high-consequence, low-probability events, such as catastrophic wildfires, hazardous material spills, or 1,000-year floods. The likelihood of these events happening is low and given their nature it is not possible to predict when or how they might occur. However, they do occur, and when they occur the impacts can be severe.

Bowker (2019) cataloged 254 failures of tailings facilities worldwide occurring between 1915 and 2019, with 121 categorized as serious or very serious,[105] and at least 46 events resulting in loss of life. In the recent past, since 2000, Bowker documents the occurrence of 32 serious or very serious failure events, of which 18 resulted in loss of life.[106] More than 100 of the failures between 1915 and 2019 were in the United States, with about a quarter of them serious or very serious; the last serious failure in the United States was in Kentucky in 2017, which also resulted in loss of life. Bowker also documents a number of known tailings failures in the vicinity of the project, including Pinto Valley (1997, classified as a serious failure), Ray Mine (four failures between 1972 and 2011, including one classified as serious in 1993), and Magma Mine itself (1991, classified as a minor failure).

---

[104] Note that this refers primarily to slurry tailings facilities (like Alternatives 2, 3, 5, and 6). Alternative 4 is a filtered tailings facility and would likely react differently during a failure; this difference is described in this section.

[105] The researchers based this designation on loss of life, high release volume (more than 100,000 cubic meters), or long travel distance.

[106] Concerning recent high-profile events, the dataset includes the Mount Polley (British Columbia, 2014) and Fundão (Brazil, 2015) failures, as well the much-publicized failure of the tailings facility in Brumadinho, Brazil, in January 2019.

Based on a reported 18,000 mines around the world, the failure rate of tailings storage facilities in the past 100 years is estimated at 1.2 percent. The failure rate of the traditional water storage dam is 0.01 percent (Lyu et al. 2019). On average, three of the world's 3,500 tailings dams fail every year. The likelihood of tailings dam failure is several times higher than other conventional water-retaining dams (Berghe et al. 2011).

A tailings embankment failure has immediate consequences to those in the vicinity and living downstream, including loss of life, destruction of property and infrastructure, and destruction of entire ecosystems (aquatic or terrestrial). Once the tailings stop moving downstream, long-term consequences from a catastrophic failure continue through the contamination of large geographic areas, compromised water supplies, economic disruption, and displacement of large numbers of people.

Aside from catastrophic failures, tailings storage facilities can represent other long-term risks to public health and safety, including the potential for groundwater contamination from tailings seepage, erosion of material into downstream waters, and windblown dust. While tailings facilities gradually drain over time, becoming less susceptible to failure, the potential risks can last for many decades after closure. One study identified that roughly 80 percent of tailings facility failures occur in active facilities and 20 percent occur at closed facilities (Strachan and Van 2018).

The concentrate and tailings pipelines are also potentially susceptible to failure. Failures can occur from pipe damage due to geotechnical hazards such as rockslides or ground subsidence, from hydrologic hazards such as scour or erosion, seismic hazards, human interference, or even lightning. Failures of these types of pipelines are not generally tracked, because the consequences of tailings pipeline failures are substantially less severe than a tailings embankment failure. The petroleum industry is the only source of published information on the frequency of pipeline failures. Natural gas or petroleum pipelines run at much higher pressures than those planned for the tailings and concentrate pipelines and the contents are more immediately hazardous (flammable), but they still represent a useful estimate of the type and frequency of pipeline failures.

For the petroleum industry, the frequency of failures in the United States has been estimated as 16 gas or petroleum pipeline failures per year, out of roughly 500,000 miles of pipeline (Porter et al. 2016). This can be looked at in other ways as well. The research translates to roughly 0.03 failures per year per 1,000 miles of pipeline (Porter et al. 2016); for a 30-mile tailings pipeline, the risk of failure in any given year would be about 0.1 percent. Other research has found that the failure rate is substantially lower for large-diameter pipelines and decreases with the amount of soil cover (European Gas Pipeline Incident Data Group 2015). This research also indicates that the most common failure types are pinhole leaks and holes, and the least common failure type is a complete rupture of the pipeline (European Gas Pipeline Incident Data Group 2015).

Besides the potential magnitude of a release, pipeline failures are substantially different from embankment failures. Pipelines are monitored with pressure sensors and can shut down immediately upon a rupture being detected, leading to relatively localized releases that can likely be readily cleaned up. Pipeline risk also decreases to zero after closure, unlike the tailings embankment, which can still represent a risk decades after closure.

The tailings and pipeline safety analysis in the FEIS addresses three public safety and natural resource protection commitments of the Forest Service:

1. To disclose risks and the potential magnitude and type of downstream impacts from a hypothetical tailings embankment failure;

2. To disclose risks and potential impacts associated with a failure of the tailings or copper concentrate pipelines; and

3. To ensure that the design of any tailings storage facility built on Federal land meets all expectations for safety, including a minimum requirement to adhere to National Dam Safety Program guidelines.

### Changes from the DEIS

One of the cornerstones for the design of modern tailings storage facilities is to conduct risk-based assessments of potential failures, known commonly as a failure modes and effects analysis (FMEA). We included an assessment of preliminary failure modes in the DEIS. However, the Forest Service included a requirement (mitigation measure FS-227) that a more robust and refined FMEA take place between DEIS and FEIS for the preferred alternative, in a collaborative fashion that included Resolution Copper, the Forest Service, and interested cooperating agencies. We updated this section to describe the FMEA process and outcomes. This process includes new information collected at the Skunk Camp location, and an estimate of the downstream extent of tailings in Dripping Spring Wash under a scenario reflective of many of the potential failure modes examined during the FMEA.

We also included additional information on the tailings slurry pipeline design, management, and failure risk in this section.

The DEIS described in detail the various government and industry regulatory frameworks under which tailings storage facilities are designed and managed. Additional industry guidance was developed since the DEIS and is described here. Based on this new guidance, clarification also is provided on the timing and factors involved in emergency response planning.

### Changes from the January 2021 Rescinded FEIS

No changes have been made to the tailings and pipeline safety section since January 2021 except an update to reflect the analysis of consistency with the new "Tonto National Forest Land Management Plan," implemented in December 2023.

## 3.10.1.2    Analysis Methodology, Assumptions, and Uncertain and Unknown Information

### Analysis Area

The analysis area for tailings and pipeline safety consists of all downstream areas that could be affected in the event of a partial or complete failure of the tailings embankment, as shown in figure 3.10.1-1, including human and natural environments, as well as the water bodies that could be impacted by a pipeline rupture or spill.



**Figure 3.10.1-1. Overview of tailings safety analysis areas**

### Analysis Techniques

A number of approaches are available to assess the risk of failure of a tailings storage facility, as well as the downstream effects of a failure. These techniques can be used to inform the decision process and to help analyze the potential differences between alternatives.

There are two basic steps frequently used to understand the potential size and extent of a failure:

- First, a risk-based design approach can be used to assess the inherent risks in a given design. One common tool is an FMEA. The purpose of conducting a risk-based design process is to identify potential ways an embankment could fail (modes), the type of failure (whether the tailings act as a fluid or a solid), and also to develop design and operational strategies to mitigate the risk.

- Second, in the event a failure were to occur, a breach analysis (also known as a runout analysis or inundation analysis) can be used to assess the potential downstream impacts of where the tailings would travel, how far, and how fast.

The Forest Service is using both of these steps in the NEPA process. For the FEIS, a full FMEA was conducted, making use of the current designs for each alternative. Based in part on FMEA results, the Forest Service has considered a range of possible breach scenarios. Outcomes described in this section use one end of that range, using a worst-case assumption that a full breach would occur and that the tailings would act like a fluid as they ran out, with resulting catastrophic impacts. This type of analysis does not consider controls or design features that would be employed to prevent this type of failure or limit potential damage; these features are identified and discussed in "Summary of Applicant-Committed Environmental Protection Measures" in section 3.10.1.4. For more discussion of techniques evaluated by the Forest Service, see Newell and Garrett (2018c).

FAILURE MODES AND EFFECTS ANALYSIS

When tailings facilities fail, they fail for specific reasons, or often a combination of reasons related to design (design flaws, design oversights like unknown foundation conditions, or deviation from planned design), inadequate construction methods and/or poor construction quality control, operations (improper pond management or tailings deposition practices), and environmental triggers (seismic events, extreme precipitation). In general, these are known as "failure modes." There is no such thing as a "typical" facility failure, as each situation is the result of a specific failure mode or combination of failure modes.

An industry-standard step in the design of a tailings facility is to conduct an FMEA:

> Failure modes and effects analysis (FMEA) is a technique that considers the various fault (or failure) modes of a given element and determines their effects on other components and on the global system. It is an iterative, descriptive and qualitative analytical methodology that promotes, based on the available knowledge and information, the systematic and logical reasoning as a means to improve significantly the comprehension of the risk sources and the justification for the decisions regarding the safety of complex systems, namely dams. Without requiring mathematical or statistical frameworks, it intends to assure that any plausible potential failure is considered and studied, in terms of: *what can go wrong? How and to what extent can it go wrong? What can be done to prevent or to mitigate it?* (dos Santos et al. 2012) (emphasis in original)

Resolution Copper conducted a failure modes assessment for each tailings facility design (Klohn Crippen Berger Ltd. 2019a; Pilz 2019), identifying all potential failure modes, and identifying the design feature(s) to address each risk, in line with best industry practice, international design standards, and Federal and State regulations. The Forest Service reviewed the failure modes assessment, found it appropriate for the level of alternative design, and included a discussion of the work in the DEIS. This analysis remains pertinent and is discussed in "Summary of Applicant-Committed Environmental Protection Measures" in section 3.10.1.4 of the FEIS.

When preparing the DEIS, the Forest Service recognized that the failure modes analysis conducted by Resolution Copper was based on the DEIS alternative design documents and level of information available at the time. The Forest Service recognized that with more site-specific information, a more robust and refined FMEA could be conducted. The Forest Service required that this refined FMEA be conducted for the preferred alternative (Alternative 6) between the DEIS and FEIS (mitigation measure FS-227).

During an FMEA, the tailings storage facility is considered as a complete system with a number of components, including geology, foundation, engineered structures, seepage controls, drains, containment, diversions, and spillways. Sufficient information on the design and specifications of each component is needed to understand how components would function as a system, and how they might respond to anticipated stresses on the system. Information needed to support the collaborative, refined FMEA included the results of new site investigations, borrow material analyses and specifications, and engineered drawings and specifications.

The refined FMEA took place in February 2020, as a collaborative group process that included Forest Service personnel, cooperating agency representatives, Resolution Copper and its tailings experts and contractors, and the NEPA team and its tailings experts. The process was led by an outside facilitator with experience in leading FMEA workshops. The process considered possible failure modes, the probability of their occurring, and the consequences if they did occur. The combination of probability and consequence defines the overall risk associated with that failure mode. The results are captured in a final FMEA report and are discussed in detail in this section (Gannett Fleming 2020).

BREACH ANALYSIS

A breach analysis is used to model a tailings storage facility failure, including the volume of tailings released and how far it would run downstream. Some methods require no site-specific information except for basic facility design (such as embankment height or total facility volume). These methods include the empirical, rheological, and energy balance methods. Other methods use numerical modeling with the incorporation of detailed site-specific information. See Newell and Garrett (2018c) for further information on these techniques.

For the DEIS, as well as the FEIS, the Forest Service chose the following empirical method to disclose the effects of a failure. As noted in the following text, this approach likely represents a worst case. It does not consider embankment type, design features used to specifically address failure modes, foundation conditions, operational approaches, or real-world topography.

**Rico Empirical Method**

Empirical methods use the known, available characteristics of historical tailings facility failures in order to estimate the characteristics of a failure at a hypothetical future tailings facility. Empirical methods are often based on limited data, perhaps only the basic geometry of the facility (embankment height, total volume), rather than specific embankment design details and foundation conditions. This approach was introduced by Rico et al. (2007), who relied on a database of 29 known tailings facility failures worldwide that occurred between 1965 and 2000. This empirical method was updated in 2018 by Larrauri and Lall (2018) to include additional known failures, for a total of 35 worldwide tailings facility failures between 1965 and 2015. The Larrauri and Lall dataset includes the two largest and most recent failures (at the time): Mount Polley Mine in British Columbia in 2014, and Fundão in Brazil in 2015.

These researchers developed two statistical relationships. The first relationship predicts the volume of material released during a failure based on the total facility volume. Fundamentally this approach comes down to a basic equation that shows historic releases have on average released about 33 percent of the

total facility volume. The second relationship predicts the maximum travel distance downstream based on the release volume and the embankment height.

There are substantial limitations to the empirical approach:

- The largest facility in the dataset is 74 million cubic meters,[107] compared with 1,000 million cubic meters (upon buildout) for the planned Resolution Copper facility. For this project, the extrapolation goes well beyond the bounds of the original dataset; this represents an uncertainty since larger facilities may or may not react like smaller facilities.

- Specific embankment construction methods are not factored into the empirical equations. Of the 35 facilities included in the Larrauri and Lall estimates, 24 used an upstream construction method, one used modified centerline (matching Alternatives 2 and 3), and none used centerline (matching Alternatives 5 and 6) (Bowker 2019). The empirical dataset is therefore not representative of the specific design proposed by Resolution Copper. The Resolution Copper facility would have a fundamentally different type of embankment than most of the previous failures (instead of an upstream embankment, Alternatives 2 and 3 use a modified-centerline, and Alternatives 5 and 6 use a centerline embankment).

- The dataset extends as far back as 1965 and may have been designed to lower factors of safety or higher acceptable levels of risk; the Resolution Copper facility would be designed to modern standards (described in more detail in "Relevant Laws, Regulations, Policies, and Plans" in section 3.10.1.3).

- The empirical estimates are based solely on embankment height or facility volume and take no account of operational methodologies, topography, or actual failure mode.

While recognizing these limitations, the Forest Service has selected the empirical method as the most reasonable method to inform the NEPA process and assess differences between alternatives. The level of current design and site-specific information is sufficient to use the empirical method, and the downstream effects reflect the real-world conditions experienced during other failures.

**Additional FMEA-Informed Breach Analysis**

During the FMEA workshop, participants considered the downstream consequences in the event of a tailings storage facility failure. The method used to describe downstream consequences in the DEIS, the Rico Empirical Method, represents the movement of largely saturated tailings that are subject to liquefaction, meaning they flow as a liquid during the initial outflow, thus moving a large distance downstream.

During the FMEA workshop, participants agreed that many of the potential failure modes explored would not fail in this manner. The main tailings embankment is designed as a well-drained structure composed of compacted cycloned NPAG tailings. The NPAG tailings beach would largely be drained in the upper portions unless ponded water was present. During normal operations, the recycled water pond is maintained over the PAG cells near the rear of the facility, not on the NPAG tailings beach against the tailings embankment.

During the FMEA workshop, in order to assess the severity of downstream consequences, a rough approximation was used for a "dry" failure without liquefaction. This approximation assumed that the failure would extend 4 to 8 miles downstream along Dripping Spring Wash, but would not reach the Gila River. After the FMEA workshop, this failure scenario was formalized by Resolution Copper's tailings

---

[107] The most common unit of volume used in the literature on tailings releases is cubic meters, or millions of cubic meters. For ease and consistency, these same units are being used in this section.

experts (KCB Consultants Ltd. 2020b). Together, the Rico Empirical Method and the "dry" failure scenario represent a range of possible outflow scenarios. Both scenarios are disclosed in this section.

### 3.10.1.3    Affected Environment

***Relevant Laws, Regulations, Policies, and Plans***

The regulations and policies that guide the design, construction, operation, and closure of tailings storage facilities come from a variety of sources. Some guidance is required to be met, such as the requirements of the National Dam Safety Program (on Federal land), Arizona State Mine Inspector's office, or Arizona APP program, while other guidance is followed voluntarily as part of industry best practices. What is considered acceptable in the design of a tailings storage facility is evolving as the industry and government respond to a number of recent and widely publicized catastrophic tailings failures. In this section, the Federal, State, and industry design standards are summarized, as well as recent proposals for better risk-based tailings design methods; ultimately, the design proposed by Resolution Copper is shown to meet the most stringent of these standards.

RECENT FAILURES

Post-failure investigations by independent industry experts were conducted in the Mount Polley (2014) and Fundão (2015) tailings failures. Both of these events are discussed here because they provide useful examples of the chain of events that can lead to a catastrophic failure, and because they underscore the need for stringent design requirements, regulatory oversight, and governance. In January 2019, during preparation of the Resolution Copper EIS, another tailings embankment failure in Brazil at the Córrego do Feijão facility resulted in the estimated deaths of over 300 people. Little was known about this failure at the time of publication of the DEIS, but details of the after-action investigation have been included below for the FEIS.

**Mount Polley Failure (2014)**

The Mount Polley investigative panel considered a wide range of potential failure modes that could have contributed to the failure (Mining and Mineral Resources Division 2015). Ultimately, the panel determined that the primary reason for the failure was the lack of understanding of the foundation conditions and how the increasing embankment height would change the foundation behavior. Specifically, the site characterization undertaken below a secondary embankment used to help impound the tailings prior to construction failed to identify the nature of glacial lakebeds in the subsurface, and therefore the design did not take into account the complexity of the foundation materials. As the embankment height increased, the geological unit in question changed properties and became susceptible to "undrained loading," which means that under the great load of the tailings, this geological unit compressed and developed excess pore pressure, reducing the shear strength. These were factors that are well known and studied in soil mechanics but were not understood or applied correctly in the design process.

An additional aspect of the design that contributed to the failure was the use of a steep slope on the downwards face of the embankment (1.3:1). The original design criteria for the embankment called for a 2:1 slope, but that slope had not yet been achieved due to a lack of available rock fill material until later in the life of the tailings facility. The panel concluded that the embankment likely would not have failed if the 2:1 design slope had been achieved.

Although not a cause of the failure, the primary factor in the severity of the failure was the excess amount of water stored in the facility. When the failure occurred, permitting was still underway to allow treatment and discharge of the excess stored water downstream.

In summary, the Mount Polley failure resulted from the following:

- shortcomings in site characterization,

- inadequate design resulting from the flawed site characterization,

- inadequate construction resulting from temporary deviations from the original design due to logistical issues (availability of waste rock),

- logistical delays with the discharge of excess water from the facility, which increased the severity of the consequences of failure, and

- failure of regulatory oversight for adherence to design and operational parameters.

The Mount Polley failure released 21 to 25 million cubic meters of pond water and tailings. The failure of the embankment took place suddenly without any warning signs and became uncontrollable in less than 2 hours. Polley Lake (just upstream of the breach), Hazeltine Creek, and Quesnel Lake were impacted by the debris flow, and the discharge of water from Polley Lake was blocked by the tailings plug left behind (Golder Associates Ltd. 2015; Mining and Mineral Resources Division 2015). The tailings release impacted about 5 to 6 miles of Hazeltine Creek before entering Quesnel Lake. There was no loss of human life.

At the immediate discharge location, tailings were estimated to be 11 to 12 feet thick. Along Hazeltine Creek, the debris flow scoured some areas to bedrock (estimated 1.2 million cubic meters of material lost), and tailings deposits covered other areas (estimated 1.6 million cubic meters of material deposited). Authorities estimated that Quesnel Lake received almost 19 million cubic meters of tailings, eroded material, and discharged water. The discharge completely destroyed the aquatic habitat in Hazeltine Creek. It also affected the water quality in Quesnel Lake and Polley Lake through increased turbidity and copper content. Initial assessments within the first year after the release found relatively little permanent or ongoing impact on aquatic life or terrestrial life, but studies continue (Golder Associates Ltd. 2015).

**Fundão Failure (2015)**

The Fundão investigative panel determined that a chain of decisions made during operations ultimately led to the failure of the embankment (Fundão Tailings Dam Review Panel 2016). First, damage to the original starter dam resulted in a change of design that allowed for an increase of saturation in the facility beyond the original plans. Second, a series of unplanned deviations in the facility construction resulted in deposition of fine-grained tailings at unintended locations, and the subsequent raising of the embankment above these tailings. This unintended deposition was a result of a design flaw—an inadequate concrete structure below the embankment that prevented the original design from being implemented—but also a deviation in tailings and water management over several years, in which water was allowed to encroach much closer to the crest of the embankment than originally planned.

The stresses placed on the fine-grained materials underlying the embankment caused them to shift, ultimately weakening the embankment to "a precarious state of stability" (Fundão Tailings Dam Review Panel 2016). Ninety minutes before the failure a series of small earthquakes occurred, and these seismic shocks triggered the failure. The panel was careful to note that while the seismic event was the trigger mechanism, it was not the ultimate cause of the failure.

In summary, the Fundão failure resulted from the following:

- deviations from the original design that allowed greater saturation in the facility;

- deviations in the location of planned tailings deposition caused by an unexpected problem with a foundation structure;

- deviations in the location of planned tailings deposition caused by deviations from tailings and water management criteria;

- a seismic shock that triggered the failure of the already compromised embankment; and

- failure of regulatory oversight for adherence to design and operational parameters.

The Fundão embankment failure released 32 million cubic meters of tailings. The failure of the embankment took place suddenly, within 2 hours of the triggering earthquakes. The United Nations estimated that the tailings release ultimately traveled 620 km downstream, following the Gualoxo and Doce Rivers, to reach the Atlantic Ocean. The town of Bento Rodrigues was immediately downstream of the facility; over a dozen people lost their lives, an estimated 600 families were displaced, and the drinking water supply to over 400,000 people was disrupted (GRID-Arendal 2017). The tailings destroyed an estimated 3,000 to 4,000 acres of riparian forest and destroyed substantial aquatic habitat.

### Córrego do Feijão Failure (2019)

The Feijão expert investigative panel released an assessment of the technical reasons for failure of the dam in December 2019 (Robertson et al. 2019). The failure investigation was unique in that there are a number of high-quality video scenes of the disaster unfolding. The panel found that the failure was the result of static liquefaction of materials of the embankment. The panel also found that far from being unmonitored, the embankment was extensively monitored with survey monuments, inclinometers, piezometers, and ground-based radar, as well as high-quality video from drone flights only 7 days prior to the failure. None of those methods detected significant deformation or failure. Only after analysis of satellite imagery after the failure were slow and continuous deformations observed; however, the panel noted that such deformations are consistent with long-term settlement of embankments and would not alone indicate any tendency toward failure.

The failed embankment was built as an upstream-type embankment. The causes of the failure were identified as a combination of operational and design measures that resulted in weak tailings close to the crest, interbedded layers of fine and coarse tailings within the embankment, a degree of bonding of the tailings that resulted in brittle behavior, and a lack of drainage within the embankment, including operations with water close to the embankment crest. Aside from the tailings characteristics themselves (loose, saturated, and potentially stiff and brittle due to bonding), parts of the embankment were under high loading due to the steepness of the embankment and high internal water levels. No specific trigger was identified, but the panel's findings suggest that high and intense regional wet-season rainfall contributed to triggering the failure.

These three failures (and others) involved a combination of design, construction, and operational factors, specifically the role of water, that contributed to the final outcome. Industry best practice is evolving to understand that each of these issues must be managed in an overall management plan or system that reviews the design and construction process throughout the life of the facility to prevent such future incidents.

### Evolving Industry Direction Toward an International Standard on Tailings Storage Facilities

In 2018, Dr. Norbert Morgenstern delivered a lecture to the Brazilian Geotechnical Congress on the topic of Geotechnical Risk, Regulation and Public Policy (Morgenstern 2018). Dr. Morgenstern noted that the recent high-profile failures have occurred "at locations with strong technical experience, conscientious operators and established regulatory procedures." As part of that lecture, Dr. Morgenstern proposed a system for Performance-Based Risk-Informed Safe Design (PBRISD), construction, operation, and closure of tailings storage facilities. He further urged the International Council on Mining and Metals (ICMM) to support this proposed system and to facilitate its adoption in practice. In addition, Dr. Morgenstern praised The Mining Association of Canada's (MAC's) "Guide for the Management of

Tailings Facilities" (Mining Association of Canada 2019) and noted the guide's influence on "governance protocols needed to ensure safe tailings management from the conceptual stages through to closure."

The ICMM is an international organization representing 27 signatory mining and metals companies, including Rio Tinto and BHP, partners in Resolution Copper. The ICMM also represents 36 associations, including the MAC and the National Mining Association.[108] Through these members, the ICMM delivers best practice guidelines and industry standards.

Following the 2014 tailings failure at the Mount Polley Mine in British Columbia, MAC launched a comprehensive internal and external review of their Tailings Guide. The resulting recommendations included "a risk-based ranking classification system for non-conformances and have corresponding consequences." The recommendations also asked that guidance on risk assessment methodology be included. MAC noted that the resulting third edition of the Tailings Guide "is another step in the continual improvement process for tailings management, moving toward the goal of minimizing harm: zero catastrophic failures of tailings facilities, and no significant adverse effects on the environment and human health" (Mining Association of Canada 2019). Of note, the current edition includes a risk-based approach, "managing tailings facilities in a manner commensurate with the physical and chemical risks they may pose." The revised guidance specifies: (1) regular, rigorous risk assessment; (2) application of most appropriate technology to manage risks on a site-specific basis (best available technology); (3) application of industry best practices to manage risk and achieve performance objective (best available performance); and (4) use of rigorous, transparent decision-making tools to select the most appropriate site-specific combination of best available technology and location for a tailings facility.

In February 2019, and in response to the recent Brumadinho tailings embankment failure in Brazil, the ICMM announced that it would establish an independent panel of experts to develop an international standard for tailings facilities (International Council on Mining and Metals 2019b). According to ICMM, this standard is expected "to create a step change for the industry in the safety and security of these facilities." The details of the standard are expected to include (1) a global and transparent consequence-based tailings facility classification system with appropriate requirements for each level of classification; (2) a system for credible, independent reviews of tailings facilities; and (3) requirements for emergency planning and preparedness.

In support of developing an international standard, ICMM's response to the Brumadinho failure also announced that the supporting guidance would include PBRISD, as recommended by Dr. Morgenstern, a conformance guide for ICMM's tailings governance framework, and a critical controls management framework (International Council on Mining and Metals 2019a). The fundamental principle of a PBRISD tailings management system is accountability, achieved only by multiple layers of review, recurrent risk assessment, and performance-based validation, from construction through closure (Morganstern 2018).

Further to ICMM's initial announcement, in March 2019, they announced they would co-convene the independent review along with the United Nations Environment Programme (UNEP) and the Principles for Responsible Investment (PRI) (International Council on Mining and Metals 2019c). This partnership will encourage broader acceptance of the eventual international standard, while still requiring commitment to it by ICMM's member companies.

This process had started, but was not completed, as of the publication of the DEIS. In August 2020, the Global Industry Standard on Tailings Management (Global Industry Standard, or Standard) was launched (International Council on Mining and Metals et al. 2020). The preamble to the new Global Industry Standard states,

> The Global Industry Standard on Tailings Management (herein 'the Standard') strives to achieve the ultimate goal of zero harm to people and the environment with zero tolerance for human

---

[108] The National Mining Association is an industry group located in the United States.

fatality. It requires Operators to take responsibility and prioritise the safety of tailings facilities, through all phases of a facility's lifecycle, including closure and post-closure. It also requires the disclosure of relevant information to support public accountability.

ICMM member companies will implement the Global Industry Standard as a commitment of membership. Both Rio Tinto and BHP, partners in Resolution Copper, are members of ICMM. Key aspects of the new Global Industry Standard include the following:

- Maintaining a comprehensive knowledge base, and requirements for periodic updates to facility management and design at least every 5 years, focusing on material changes in social, environmental, or local economic conditions.

- Identification of accountable parties, notably the Engineer of Record and the Accountable Executive.

- Use of an Independent Tailings Review Board (ITRB) and internal auditing.

- A focus on the mine lifecycle: operations, closure, and post-closure, extending until the facility is in a state of "safe closure." This means a closed tailings facility that does not pose ongoing material risks to people or the environment, which has been confirmed by an ITRB or senior independent technical reviewer and signed off by the Accountable Executive.

- Hazard classification based on downstream consequences, which in turn guides the selection of the seismic design standard and flood design standard. For example, for a hazard classification of "extreme", the flood design would be an annual exceedance probability of 1 in 10,000, or the Probable Maximum Flood (International Council on Mining and Metals et al. 2020). The seismic design criteria would be an annual exceedance probability of 1 in 10,000, or the Maximum Credible Earthquake (International Council on Mining and Metals et al. 2020).

- Requirements for assessing credible failure modes, developing a breach analysis, and conducting emergency planning.

- Document "as-built" construction methods and conditions.

- Use of operational surveillance with specific and measurable performance objectives, indicators, criteria, and performance parameters, and development of clear trigger action response plans.

- Commitment to public disclosure of and access to information, and transparency to support public accountability.

**Federal Requirements for Tailings Facility Design**

Regulatory jurisdiction over a tailings embankment and facility depends largely on the location. If the tailings facility is located fully or in part on Federal land administered by the BLM or Forest Service, then tailings design and safety are analyzed and approved as part of the review process for the mining plan of operations, and a bond is required for any reclamation requirements associated with the tailings embankment. Mineral regulations specifically give the Forest Service the ability to regulate tailings: "All tailings, dumpage, deleterious materials, or substances and other waste produced by operations shall be deployed, arranged, disposed of or treated as to minimize adverse impact upon the environment and forest surface resources" (36 CFR 228.8(c)).

The BLM's mining regulations require the "prevention of unnecessary or undue degradation" (43 CFR 3809), in addition to the applicable considerations for surface use and occupancy (43 CFR 3715). This gives the BLM the authority and ability to regulate tailings storage facilities on BLM-administered land. This would apply to Alternative 5 – Peg Leg.

While neither BLM nor Forest Service guidance contains prescriptive[109] requirements for how tailings embankments must be constructed, the Federal Emergency Management Agency (FEMA) has developed the National Dam Safety Program, which includes standards that are applicable to structures constructed on Federal land. This includes tailings embankments. The National Dam Safety Program provides a conceptual framework that includes requirements for site investigation and design, construction oversight, operations and maintenance, and emergency planning, as outlined in table 3.10.1-1 (Federal Emergency Management Agency 2004, 2005, 2013).

The Forest Service would require that the Resolution Copper tailings storage facility adhere to National Dam Safety Program guidelines, if built on Federal land.[110] This is included in the "Adherence to National Dam Safety Program Standards" part of the mitigation effectiveness and impacts section as a required mitigation on Federal land.

**State Requirements for Tailings Facility Design**

The APP program administered by the ADEQ contains prescriptive requirements for tailings embankments. While focused on protecting aquifer water quality, the APP program requires that tailings storage facilities be designed to meet the standards of BADCT. The BADCT guidance provides specific recommended geotechnical criteria for static stability and seismic stability of tailings embankments, including minimum design earthquake magnitude, factors of safety for various loading conditions, and maximum deformation under seismic loading (see Section 3.5 – Tailings Impoundments, in Arizona Department of Environmental Quality (2004).

The Forest Service cannot ultimately approve a plan of operations that violates an applicable law or regulation. Eventually the issuance of an APP by the ADEQ to Resolution Copper would demonstrate to the Forest Service that the project complies with applicable Arizona laws and regulations. For the purposes of the FEIS, it is therefore assumed that Resolution Copper would demonstrate compliance with APP prescriptive BADCT requirements. The overlap of the APP BADCT requirements with the National Dam Safety Program requirements is shown in table 3.10.1-1.

---

[109] For the purposes of this discussion, a "prescriptive" design requirement is one where a specific technique or value is dictated by the guidance, rather than a conceptual or qualitative objective. For example, FEMA standards for "factor of safety" are non-prescriptive: "Factors of safety should be appropriate to the probability of the loading conditions…", whereas APP standards for factor of safety are prescriptive: "Static stability analyses should indicate a factor of safety of at least 1.3."

[110] The ability to require adherence to the National Dam Safety Program or other standards may also be within the discretion of the USACE as a condition of issuing a 404 permit under 33 CFR Part 325.l(d)(6). This requirement would be at the discretion of the USACE.

**Table 3.10.1-1. Overview of key requirements of National Dam Safety Program and comparison with other guidance**

| National Dam Safety Program Process/Components | Specific FEMA Guidance | Arizona BADCT Guidance | ICMM et al. (2020) | Rio Tinto (2015) | ICMM (2016) | CDA (2014) | MAC (2017) | ANCOLD (2012) | MEM (2017) | USACE (2002, 2004) |
|---|---|---|---|---|---|---|---|---|---|---|
| Site Investigation and Design | | | | | | | | | | |
| Hazard classification | III.B.1.a (FEMA 93) FEMA 333 | | X | | | X | | X | X | |
| Selection of inflow design flood | III.B.1.b-c (FEMA 93) FEMA P-94 | E.3.2, E.3.3, E.3.4 | X | | | X | | X | X | X |
| Selection of the hydraulic capacity of embankment | III.B.1.d (FEMA 93) | 3.5.4.2; E.3.5 | X | | | X | | X | | X |
| Seismic investigations | III.B.2.a-d (FEMA 93) | 3.5.3.3; E.2.4.6 | X | | | | | X | | |
| Selection of design earthquake | III.B.2.e-f (FEMA 93) FEMA 65 | 3.5.3.3; E.2.4.3 | X | | | X | | X | X | X |
| Geotechnical aspects | | | | | | | | | | |
| Site-specific exploration | III.B.3.a-b (FEMA 93) | 3.5.3.2; E.2.3 | X | | | | | X | | X |
| Geotechnical design | III.B.3.c (FEMA 93) | 3.5.3.3 | X | | | X | | X | | X |
| Foundation treatment to ensure stability, control seepage, and minimize deformation | III.B.3.d (FEMA 93) | 3.5.4.1 | X | | | X | | X | | X |
| Embankment design parameters | | | | | | | | | | |
| Site-specific design | III.B.5.a (FEMA 93) | 3.5.3 | X | | | | | X | | X |
| Material evaluation | III.B.5.b (FEMA 93) | E.2.3 | | | | | | X | | X |
| Seismic design | III.B.5.d.1 (FEMA 93) | 3.5.4.4; E.2.4.3; E.2.4.6 | X | | | X | | X | X | X |
| Stability/factors of safety | III.B.5.d.2 (FEMA 93) | 3.5.4.4; E.2.4.3; E.2.4.5 | | | | X | | X | X | X |
| Settlement and cracking | III.B.5.d.3 (FEMA 93) | E.2.4.3 | | | | | | X | | X |
| Seepage control | III.B.5.d.4 (FEMA 93) | 3.5.4.3 | X | | | X | | X | | X |
| Zoning to ensure stability and seepage control | III.B.5.d.5 (FEMA 93) | | | | | | | | | X |
| Erosion protection | III.B.5.d.6 (FEMA 93) | | | | | | | X | | X |
| Construction management | | | | | | | | | | |
| Inspection | III.B.3.f (FEMA 93) | | X | X | X | | X | X | | X |
| Reevaluation of design | III.B.5.f (FEMA 93) III.C.2 (FEMA 93) | | X | X | | | | X | | X |

Resolution Copper Project and Land Exchange

| National Dam Safety Program Process/Components | Specific FEMA Guidance | Arizona BADCT Guidance | ICMM et al. (2020) | Rio Tinto (2015) | ICMM (2016) | CDA (2014) | MAC (2017) | ANCOLD (2012) | MEM (2017) | USACE (2002, 2004) |
|---|---|---|---|---|---|---|---|---|---|---|
| Construction quality assurance and testing | III.C.4 (FEMA 93) | | X | X | | | X | X | X | X |
| Operations and maintenance | | | | | | | | | | |
| Develop written operating and maintenance procedures | III.D.1.b-c (FEMA 93) | 3.5.4.5 | X | X | X | X | X | X | X | X |
| Periodic inspection | III.D.2.a-b (FEMA 93) | 3.5.4.6 | X | X | X | X | X | X | X | X |
| Instrumentation | III.B.3.e (FEMA 93) III.B.5.e (FEMA 93) III.D.2.c (FEMA 93) | | X | | | | | X | | X |
| Correction of deficiencies | III.D.2.d (FEMA 93) | | X | X | X | | X | X | X | X |
| Emergency Planning | III.A.1.f (FEMA 93) III.B.1.e-f (FEMA 93) III.D.3 (FEMA 93) | | | | | | | | | |
| Determine failure modes | III.D.3.b.1 (FEMA 93) | | X | | | | | | | X |
| Inundation maps or breach analysis | III.D.3.b.2-3 (FEMA 93) | | X | | | X | | X | X | |
| Response times | III.D.3.b.4 (FEMA 93) | | X | | | | | | | |
| Emergency action plan | III.D.3.c-d (FEMA 93) | | X | X | X | X | X | X | X | X |
| Other aspects | | | | | | | | | | |
| Use of outside review | III.A.6 (FEMA 93) | | X | X | X | X | X | X | X | |
| Risk-based design | III.A.1.g (FEMA 93) 2.3.6 (FEMA P-94) | | X | X | X | X | X | X | X | |
| Closure/Post-closure design | * | 3.5.5 | X | X | X | X | X | X | X | |
| Accountability | * | | X | X | X | X | X | | X | |
| Change management and documentation | * | | X | X | X | | X | | X | X |

Sources: Rio Tinto (2015); International Council on Mining and Metals (2016); CDA = Canadian Dam Association (2014); Mining Association of Canada (2017); ANCOLD = Australian National Committee on Large Dams Inc. (2012); MEM = Ministry of Energy and Mines (2017); U.S. Army Corps of Engineers (2002) and U.S. Army Corps of Engineers (2004); International Council on Mining and Metals et al. (2020)

Notes:

FEMA 93 = Federal Guidelines for Dam Safety, April 2004

FEMA 333 = Federal Guidelines for Dam Safety, Hazard Potential Classification System for Dams, April 2004

FEMA P-94 = Selecting and Accommodating Inflow Design Floods for Dams, August 2013

FEMA 65 = Federal Guidelines for Dam Safety, Earthquake Analyses and Design of Dams, May 2005

* While components of the National Dam Safety Program standards touch on these topics, they are not handled in great specificity or detail.

**Industry Best Practices**

The mining industry has adopted a number of industry standards and best practices that are equally or more restrictive than the requirements of either the National Dam Safety Program or the APP program. These are shown in comparison to the National Dam Safety Program and APP program in table 3.10.1-1 (Australian National Committee on Large Dams Inc. 2012; International Council on Mining and Metals 2016; International Council on Mining and Metals et al. 2020; Mining Association of Canada 2017; Ministry of Energy and Mines 2017; Rio Tinto 2015; U.S. Army Corps of Engineers 2002, 2004).

There are number of concepts in these documents that represent industry best practices that are not strongly represented in the National Dam Safety Program or APP program standards. These include the following:

- *Risk-based design*. Most industry best practices described above, including the Global Industry Standard on Tailings Management, incorporate risk-based design (such as conducting an FMEA). FEMA standards allow for risk-based design as an option (see for example FEMA P-94, Section 2.3.6, Risk-Informed Hydrologic Hazard Analysis), but do not require it, as these techniques were still evolving and yet to be widely used when FEMA's primary guidance was developed. APP BADCT requirements do not incorporate risk-based design.

- *Design for closure*. Most industry best practices described above, including the Global Industry Standard on Tailings Management, explicitly require design to consider closure of the tailings storage facility and post-closure conditions. FEMA standards are largely silent on the issue of closure and post-closure of tailings facilities, instead focusing primarily on the design, construction, and operation of embankments. APP BADCT requirements (section 3.5.5) include specific closure parameters be incorporated into the design, with a focus primarily on restricting discharges and ensuring stability of the facility.

- *Accountability*. Most industry best practices described above, including the Global Industry Standard on Tailings Management, require specific individuals to be identified that are responsible for ensuring safety of the facility. FEMA standards and APP BADCT requirements require qualified personnel be used, but do not specify a single individual accountable for the design, construction, or management of the tailings storage facility.

- *Change management*. FEMA and APP BADCT requirements both include various requirements for documentation; however, industry best practices include a strong focus on managing and evaluating deviations from the original design, construction, or operation plan.

- *Independent review*. One common feature in many of the industry best practices listed here is the use of independent technical review by an outside expert or panel of experts. Independent review is not an explicit requirement of either FEMA standards or APP BADCT requirements. Resolution Copper has employed an Independent Technical Review Board to review the tailings design, drawing on professionals with recognized expertise in tailings design and management[111] (Resolution Copper 2017b). The ITRB has made a number of specific comments on design considerations for liquefaction, seismic loading, design factors for seismic and flood risk, and seepage controls.

---

[111] The four members of Resolution Copper's ITRB are David Blowes, Ph.D. (University of Waterloo), David A. Carr (Registered Geologist), Richard Davidson (Professional Engineer), and Norbert Morgenstern, Ph.D. (Professional Engineer; Professor Emeritus, University of Alberta; Chair of the Mount Polley Independent Expert Engineering Investigation and Review Panel; Chair of the Fundão Tailings Dam Investigation Panel).

APPROPRIATENESS OF RESOLUTION COPPER PROPOSED DESIGN

Many of the design standards that Resolution Copper must comply with, particularly those of the National Dam Safety Program, are narrative and non-prescriptive in nature. Key design parameters that are prescriptive and readily comparable between guidance documents are shown in table 3.10.1-2. The designs developed by Resolution Copper meet the most stringent of these standards, whether required (National Dam Safety Program for Federal lands or APP program) or solely industry best practice. Specific design parameters also meet the prescriptive requirements of the recently launched Global Industry Standard on Tailings Management.

**Table 3.10.1-2. Comparison of key design criteria against requirements of National Dam Safety Program, Aquifer Protection Permit program, and industry best practices**

| | Downstream Slope | Minimum Factor of Safety (Static) | Minimum Factor of Safety (Dynamic or Seismic) | Design Earthquake | Inflow Design Flood | Independent Review | Breach Analysis and Emergency Planning |
|---|---|---|---|---|---|---|---|
| FEMA National Dam Safety Program (Required) | No specific requirement | 1.5 | 1.2 | Maximum Credible Earthquake (for high-hazard dam) | Probable Maximum Flood (for high-hazard dam) | No specific requirement | Determine failure modes; prepare inundation maps; time available for response; develop emergency action plans |
| Aquifer Protection Permit program BADCT (Required) | No specific requirement | 1.3 to 1.5 | 1.0 to 1.1 | Maximum Credible Earthquake (for risk to human life) | Probable Maximum Flood (for risk to human life) | No specific requirement | No specific requirement |
| Industry best practices | No steeper than 2H:1V (Ministry of Energy and Mines 2017) | 1.5 (Ministry of Energy and Mines 2017)<br><br>1.3 to 1.5 (Australian National Committee on Large Dams Inc. 2012) | 1.0 to 1.2 (Australian National Committee on Large Dams Inc. 2012) | 2,475-year return period (Ministry of Energy and Mines 2017)<br><br>10,000-year return period up to Maximum Credible Earthquake (Canadian Dam Association 2014)<br><br>10,000-year return period up to Maximum Credible Earthquake (Australian National Committee on Large Dams Inc. 2012)<br><br>10,000-year return period up to Maximum Credible Earthquake (International Council on Mining and Metals et al. 2020) for extreme hazard facility | 1,000-year return period up to Probable Maximum Flood (Canadian Dam Association 2014)<br><br>975-year return period, with 72-hour duration (Ministry of Energy and Mines 2017)<br><br>100,000-year return period up to Probable Maximum Flood (Australian National Committee on Large Dams Inc. 2012)<br><br>10,000-year return period up to Probable Maximum Flood (International Council on Mining and Metals et al. 2020) for extreme hazard facility | Required by most industry standards | Emergency action plans required by most industry standards; inundation maps required by Australian National Committee on Large Dams Inc. (2012), Canadian Dam Association (2014), Ministry of Energy and Mines (2017), and International Council on Mining and Metals et al. (2020) |

Resolution Copper Project and Land Exchange

| | Downstream Slope | Minimum Factor of Safety (Static) | Minimum Factor of Safety (Dynamic or Seismic) | Design Earthquake | Inflow Design Flood | Independent Review | Breach Analysis and Emergency Planning |
|---|---|---|---|---|---|---|---|
| Resolution Copper design | Alternative 2 has a 4H:1V slope, and Alternatives 3, 5, and 6 all have a 3H:1V slope | 1.5 | 1.2 | Maximum Credible Earthquake<br><br>Analysis indicates Maximum Credible Earthquake is equivalent to 10,000-year return period.<br><br>The 10,000-year design earthquake is based on a mean value; the 95th percentile of the 10,000-year event was also considered. | Probable Maximum Flood, 72-hour duration | Use of ITRB to oversee tailings design process | Not yet completed. This would be a required step for the preferred alternative based on site-specific information and design. |
| Comparison of Resolution Copper criteria to guidelines | Slope is less steep than the most stringent prescriptive standard | Static factor of safety meets the most stringent prescriptive standard | Dynamic factor of safety meets the most stringent prescriptive standard | Design earthquake meets the most stringent prescriptive standard | Design flood meets the most stringent prescriptive standard | Review by ITRB is consistent with the industry standard | Not yet met, but would be met for preferred alternative |

SER-091

### Existing Conditions and Ongoing Trends

DOWNSTREAM COMMUNITIES

The tailings alternatives are located upstream of population centers in central Arizona that could be affected in the event of a failure. Communities in the approximate flow path of a potential tailings release are shown in table 3.10.1-3, for roughly 50 miles downstream.[112] For Alternatives 2 and 3, the hypothetical flow path of a tailings release is assumed to follow Queen Creek, through Whitlow Ranch Dam, through the community of Queen Valley, through urban development in the East Salt River valley, and eventually onto the Gila River Indian Community. For Alternative 5, the hypothetical flow path is assumed to follow Donnelly Wash to the Gila River, and then downstream through Florence and eventually onto the Gila River Indian Community. For Alternative 6, the hypothetical flow path is assumed to follow Dripping Spring Wash to the Gila River toward Winkelman, Hayden, and Kearny.

**Table 3.10.1-3. Communities and populations within 50 miles downstream of proposed tailings facilities**

| | Alternatives 2 and 3 – Near West Location | Alternative 4 – Silver King Location | Alternative 5 – Peg Leg Location | Alternative 6 – Skunk Camp Location |
|---|---|---|---|---|
| Nearest downstream residence | 0.3 mile | 4.5 miles | Directly adjacent | 4 miles |
| Other points of interest | | Boyce Thompson Arboretum = 3.7 miles | | |
| Major communities | | | | |
| 1–10 miles downstream | Queen Valley CDP (654) | Queen Valley CDP (654) | | Dripping Springs CDP (165) |
| 11–20 miles downstream | San Tan Valley CDP (90,665) | | | |
| 21–30 miles downstream | Town of Queen Creek (33,298) Town of Gilbert (232,176) | | Town of Florence (26,066) Blackwater CDP (Gila River Indian Community) (1,653) | Town of Winkelman (262) Town of Hayden (483) |
| 31–40 miles downstream | City of Chandler (245,160) | | Sacaton Flats Village CDP (Gila River Indian Community) (457) | Town of Kearny (2,249) |
| 41–50 miles downstream | Lower Santan Village CDP (Gila River Indian Community) (395) Stotonic Village CDP (Gila River Indian Community) (379) Sweet Water Village CDP (Gila River Indian Community) (152) | | Sacaton CDP (Gila River Indian Community) (2,338) Upper Santan Village CDP (Gila River Indian Community) (391) Lower Santan Village CDP (Gila River Indian Community) (395) Stotonic Village CDP (Gila River Indian Community) (379) Sweet Water Village CDP (Gila River Indian Community) (152) | |
| *Estimated population within 50 miles* | *602,879* | | *31,831* | *3,159* |

Source: American Community Survey 2013–2017 5-year Estimates: Total Population (U.S. Census Bureau 2018a)

Note: CDP = Census designated place

[112] While the empirical estimates discussed in section 3.10.1.4 indicate that tailings could go farther than 50 miles in the event of a catastrophic failure, this analysis focuses on communities in the East Salt River valley and along the Gila River that would be within a distance of 50 miles downstream of the tailings storage facility alternative, which have the highest likelihood of being impacted if a catastrophic failure were to occur.

DOWNSTREAM WATER SUPPLIES

The tailings facilities are also upstream of substantial water supplies in central Arizona, including both community potable water systems and agricultural irrigation districts, as shown in table 3.10.1-4. In the event of a tailings failure, water supplies would be at risk from destruction of infrastructure and potential contamination of surface water and groundwater sources.

**Table 3.10.1-4. Water supplies in central Arizona within 50 miles downstream of proposed tailings facilities**

| Water Supply | Population/ Acreage Served | Source of Water | Downstream of Alternatives |
|---|---|---|---|
| Community Water Systems | | | |
| Queen Creek Water Company | 74,842 | Groundwater (wells within 2,000 feet of Queen Creek) | Alternatives 2 and 3 |
| Town of Gilbert | 247,600 | Surface water (SRP, CAP); Groundwater (wells directly adjacent to Queen Creek) | Alternatives 2 and 3 |
| Apache Junction (Arizona Water Company) | 57,647 | Groundwater (wells 10–11 miles from Queen Creek) | Alternatives 2 and 3 |
| Superior (Arizona Water Company) | 3,894 | Groundwater (wells 3–4 miles from Queen Creek) | Alternatives 2 and 3 |
| Central Arizona Project | ~850,000 | Delivery of surface water to over a dozen downstream contract holders, including systems serving Tucson, Florence, Marana, Coolidge, and Casa Grande | Alternatives 2, 3, 5, and 6 |
| Diversified Water Utilities | 3,868 | Groundwater (wells directly adjacent to Queen Creek) | Alternatives 2 and 3 |
| Queen Valley Domestic Water Improvement District | 1,000 | Groundwater (wells directly adjacent to Queen Creek) | Alternatives 2 and 3 |
| City of Chandler | 247,328 | Surface water (SRP, CAP); Groundwater (wells 1–2 miles from Queen Creek) | Alternatives 2 and 3 |
| Johnson Utilities | 62,158 | Groundwater (wells 1–2 miles from Queen Creek) | Alternatives 2 and 3 |
| Town of Florence | 14,880 | Groundwater (wells directly adjacent to Gila River) | Alternative 5 |
| Johnson Utilities – Anthem at Merrill Ranch | 7,028 | Groundwater (wells 1–2 miles from Gila River) | Alternative 5 |
| Gila River Indian Community – Casa Blanca/Bapchule | 2,603 | Groundwater (well locations unknown) | Alternative 5 |
| Gila River Indian Community – Sacaton | 5,307 | Groundwater (well locations unknown) | Alternative 5 |
| Winkelman (Arizona Water Company) | 468 | Groundwater (wells within 1,000 feet of Gila River) | Alternative 6 |
| ASARCO Hayden Operations | 779 | Groundwater (wells directly adjacent to Gila River) | Alternative 6 |
| Town of Hayden | 870 | Groundwater purchased from ASARCO | Alternative 6 |
| Town of Kearny | 2,070 | Groundwater (wells directly adjacent to Gila River) | Alternative 6 |
| Major Irrigation Districts | | | |
| New Magma Irrigation and Drainage District | ~27,000 acres | Groundwater; CAP | Alternatives 2 and 3 |
| Queen Creek Irrigation District | ~16,000 acres | Groundwater; CAP | Alternatives 2 and 3 |
| San Tan Irrigation District | ~3,000 acres | Groundwater; CAP | Alternatives 2 and 3 |
| San Carlos Irrigation and Drainage District | ~50,000 acres | Surface water (Gila River); CAP; Groundwater | Alternatives 5 and 6 |

DOWNSTREAM WATERS AND HIGH-VALUE RIPARIAN AREAS

**Riparian Areas Downstream of Tailings Storage Facility**

High-value riparian ecosystems exist downstream of all of the tailings alternative locations. These include the following:

- Queen Creek at Whitlow Ranch Dam (downstream of Alternatives 2, 3, and 4). Perennial flow occurs in Queen Creek at Whitlow Ranch Dam, which is the outlet for subsurface flow in the Superior Basin. Approximately 45 acres of riparian vegetation have grown up behind Whitlow Ranch Dam, supported by flowing surface water and shallow groundwater. There is a dense understory. Saltcedar dominates the woody vegetation, although other riparian tree species are also present, including cottonwood and willow. This area is important to birding and outdoor recreation. Endangered southwestern willow flycatchers have been documented in this habitat in ongoing surveys conducted by Resolution Copper; endangered western yellow-billed cuckoos have not been detected during surveys, but the habitat is appropriate for the species.

- Gila River between Dripping Spring Wash and Ashurst-Hayden Dam (downstream of Alternatives 5 and 6). This reach of the Gila River is generally perennial, though flow is regulated by releases from the San Carlos Reservoir upstream. A riparian gallery exists along substantial portions of this reach, dominated by saltcedar, with some mesquite, cottonwood, willow, and wet shrublands (Stromberg et al. 2005). This reach of the Gila River includes critical habitat for the endangered southwestern willow flycatcher and proposed critical habitat for the threatened western yellow-billed cuckoo and northern Mexican gartersnake, and is habitat for a number of native species (desert sucker, Gila longfin dace, Sonoran sucker, roundtail chub), amphibians (lowland leopard frog), reptiles (desert tortoise, box turtle), and bats (pallid bat, pale Townsend's big-eared bat, and California leaf-nosed bat). Recreational activities along this stretch of the Gila River include hiking, birding, and camping, particularly along the Arizona National Scenic Trail, which crosses the Gila River downstream of Kearny. Additionally, the abandoned town of Cochran, Arizona and the associated coke ovens are accessible from this stretch of the Gila River.

- In 1994, BLM completed a legislative EIS evaluating 20 river systems in Arizona, to identify those suitable for designation in the National Wild and Scenic Rivers System. Approximately 7.5 miles of the Gila River from Dripping Spring Wash to the town of Winkelman was determined to be suitable, with a "recreational" classification. The outstandingly remarkable values identified in the area are scenic, fish, and wildlife habitat. This river segment includes two developed recreation sites, providing access to the river for wildlife, viewing, fishing, hunting, camping, and picnicking (Bureau of Land Management 1994a). The Gila River between Dripping Spring Wash and the Ashurst Hayden Dam also is used for small-craft river floating activities (kayak, inflatable canoe, tubing), and fishing. Recreational river use is highest upstream from Winkelman, with less recreational use downstream from the town. Although this area was studied and recommended for designation under the Wild and Scenic Rivers Act, there has been no official designation for this section of the Gila River.

- A number of wetland[113] areas are associated with the Gila River (downstream of Alternative 5). A large wetland complex has developed along the Gila River Indian Community's MAR-5 managed aquifer recharge project, located near Sacaton, Arizona. The community is planning to

---

[113] In this section, a number of references are made to wetland or riparian areas. The intent is to identify physical features on the landscape with high value for habitat, recreation, aesthetics, and other uses. These references to wetlands should not be construed to mean that these are jurisdictional waters of the U.S., as regulated under Section 404 of the Clean Water Act. That designation would be made by the USACE when appropriate.

enhance this area with the development of the Gila River Interpretive Trail and Education Center (Gila River Indian Community 2016).

### Riparian Areas Crossed or Paralleled by Tailings and Concentrate Pipelines

*Copper Concentrate Pipeline and Tailings Pipelines for Alternatives 2, 3, and 4*

The copper concentrate pipeline route from the West Plant Site to the filter plant and loadout facility crosses a number of ephemeral washes that are tributary to Queen Creek: Silver King Wash, Rice Water Wash, Potts Canyon, Benson Spring Canyon, and Gonzales Pass Canyon. All contain some amount of xeroriparian habitat in linear strands along the drainage, typically mesquite, palo verde, ironwood, and desert shrubs in concentrations greater than found in the uplands. The width of xeroriparian habitat crossed by the pipeline varies, from roughly 50 feet to 500 feet wide. The copper concentrate pipeline route also parallels an ephemeral portion of Queen Creek upstream of Whitlow Ranch Dam, which has a well-developed xeroriparian community.

The tailings pipeline route to Alternatives 2 and 3 also crosses Silver King Wash, Rice Water Wash, and Potts Canyon, and the tailings pipeline route to Alternative 4 crosses Silver King Wash. Similar xeroriparian habitat exists at these crossings.

*Alternative 5 Tailings Pipeline*

The tailings pipeline route for Alternative 5 crosses several ephemeral washes, including Zellweger Wash and Walnut Canyon, both tributaries to the Gila River, with similar xeroriparian habitat as that described earlier. Walnut Canyon has a riparian reach designated as part of the White Canyon Wilderness. Important resources values in this area are outstanding scenic, wildlife, and cultural values.

The Queen Creek pipeline crossing would be constructed underground, installed using either trenching techniques or horizontal directional drilling. At this location, the stream is ephemeral and approximately 400 feet wide; however, the pipeline route nearby also crosses an unnamed tributary that receives effluent from the Superior Wastewater Treatment Plant. Thick hydroriparian vegetation is supported along this wash, and the streamflow feeds a perennial reach of Queen Creek located a few hundred feet downstream.

The pipeline route also parallels a portion of upper Arnett Creek for about 2 miles, near SR 177. Arnett Creek in this area is largely ephemeral with xeroriparian habitat, but portions of Arnett Creek downstream of this location have perennial flow.

Where the pipeline route crosses the Gila River it would be underground, installed using trenching techniques or horizontal directional drilling. At this location, the river is perennial, approximately 1,000 feet wide, and supports both aquatic habitat and hydroriparian vegetation.

*Alternative 6 Tailings Pipeline*

Since the DEIS, the Alternative 6 pipeline route was modified, in response to public comments and to avoid impacts to the endangered Arizona hedgehog cactus. The rerouted pipeline considered in the FEIS is now substantially shorter and avoids perennial water and critical habitat along Mineral Creek entirely, except for a trenchless underground crossing[114] upstream of Government Springs Ranch.

The tailings pipeline route for Alternative 6 crosses several ephemeral washes tributary to Queen Creek, including Conley Springs Wash and Yellowjack Wash. Some xeroriparian vegetation is associated with

---

[114] The trenchless crossing would likely be accomplished using horizontal directional drilling, which is a technique commonly used to place pipelines under roads and highways without causing traffic closures. A borehole would be drilled that passes completely underneath the riparian habitat and creek, and then the pipeline would be pulled through the borehole.

these washes, but sparse due to the steep and rocky terrain. Queen Creek lies about 2 miles downstream of the pipeline crossings, and is generally intermittent in this area, but with some hydroriparian vegetation adjacent to the channel (cottonwood, sycamore, ash, walnut). The pipeline route also crosses Queen Creek itself in this same area using a bridge crossing.

The pipeline route crosses Devil's Canyon upstream of where perennial flow first occurs, using an overhead span. Within a few miles downstream of the pipeline crossing, Devil's Canyon is characterized by perennial flow, flowing springs, deep pools, and a closed-canopy hydroriparian corridor (ash, sycamore, alder), with associated aquatic habitat. The pipeline route crosses Rawhide Canyon, an ephemeral wash tributary to Devil's Canyon near the corridor, with relatively sparse xeroriparian habitat.

The pipeline route now avoids perennial flow associated with both Lyons Fork and Mineral Creek, with only a single crossing that would avoid Mineral Creek habitat and flow entirely, using an underground trenchless crossing.

INFRASTRUCTURE

In addition to population centers, water supplies, and high-value riparian areas, a number of important transportation or water supply structures are downstream of the proposed tailings facilities. These include the following:

- Whitlow Ranch Dam. Whitlow Ranch Dam is a flood control structure located on Queen Creek, immediately downstream of Alternatives 2 and 3. The dam was built in 1960 to reduce the risk of flood damage to farmland and developed areas, including the communities of Chandler, Gilbert, Queen Creek, and Florence Junction, as well as the former Williams Air Force Base (now Phoenix-Mesa Gateway Airport). The USACE evaluated the structure in 2009 and rated it as inadequate (due to foundation seepage and piping), but with a low probability of failure (U.S. Army Corps of Engineers 2012b). The capacity of Whitlow Ranch is approximately 86 million cubic meters (Maricopa County Flood Control District 2018); the ability of the dam to retain or detain a tailings release from Alternatives 2 or 3 would depend on the specific size of a failure.

- East Salt River valley canals and flood control. Three major distribution canals are downstream of the flow path of a hypothetical tailings release from Alternatives 2 or 3. The Eastern and Consolidated Canals pass through the communities of Chandler and Gilbert and are part of the SRP distribution system. The Roosevelt Canal is part of the Roosevelt Conservation District and parallels a major flood control structure, the East Maricopa Floodway. This floodway is essentially an urbanized extension of Queen Creek; the ability of the floodway to retain or detain a tailings release would depend on the specific size of a failure.

- Central Arizona Project aqueduct. The CAP aqueduct transports water from the Colorado River, through Lake Pleasant north of Phoenix, and then transits the East Salt River valley. The aqueduct crosses Queen Creek near the communities of Queen Creek and San Tan Valley; flows from Queen Creek bypass the canal using a syphon system. The canal is raised and tends to block overland flow along much of its length; the ability of the canal levee to retain or detail a tailings release would depend on the specific size of a failure. The CAP canal also crosses the Gila River near Florence, but unlike the Queen Creek crossing, the flows from the canal are routed below the Gila River. The aqueduct continues through Pinal County and provides water as far south as Tucson and Green Valley.

- Arizona Water Company infrastructure. The potable water pipeline serving the town of Superior is located within the MARRCO corridor and would be downstream of a potential tailings release from Alternatives 2 or 3. This system serves approximately 4,000 people.

- Ashurst-Hayden Dam, Northside Canal, Florence Casa Grande Canal. These water diversion structures are located east of Florence and form the headworks to divert water from the Gila River for irrigation, including to the San Carlos Irrigation and Drainage District.

- U.S. Route 60. U.S. 60 crosses Queen Creek near Florence Junction. This highway forms one of only a few regional connections between the Phoenix metropolitan area and the communities of the central Arizona highlands (Globe–Miami) and the White Mountains of eastern Arizona (Show Low, Pinetop-Lakeside, Springerville).

- U.S. Route 77. U.S. 77 crosses the Gila River near Winkelman and Dripping Spring Wash near its confluence with the Gila River. This highway forms the main regional connector for the areas between Tucson and Globe, connecting to the Upper Gila valley at Safford and the White Mountains northeast of Globe.

- U.S. Route 79. U.S. 79 crosses the Gila River near Florence. This highway forms the main regional connector for the agricultural areas between Tucson and the East Salt River valley.

- Christmas, Shores, and Winkelman Campgrounds. These are improved recreational facilities located adjacent to the Gila River and important for water-based recreation activities.

### 3.10.1.4 Environmental Consequences of Implementation of the Proposed Mine Plan and Alternatives

#### *Alternative 1 – No Action*

Under the no action alternative, the tailings facility would not be constructed, pipelines would not be built, and there would be no risk to public health and safety associated with potential failure of a tailings embankment or pipelines.

#### *Impacts Common to All Action Alternatives*

EFFECTS OF THE LAND EXCHANGE

The Oak Flat Federal Parcel would leave Forest Service jurisdiction. The role of the Tonto National Forest under its primary authorities in the Organic Administration Act, Locatable Minerals Regulations (36 CFR 228, Subpart A), and Multiple Surface Use Act of 1955 (30 U.S.C. 601–615) is to ensure that mining activities minimize adverse environmental effects on NFS surface resources. The removal of the Oak Flat Federal Parcel from Forest Service jurisdiction negates the ability of the Tonto National Forest to regulate effects on these resources. However, nothing related to the tailings storage facilities is associated with the Oak Flat Federal Parcel, and the land exchange would not have an effect on public health and safety in this regard.

The offered lands parcels would enter either Forest Service or BLM jurisdiction. Section 3003, Subsection (f), of PL 113-291 specifies that any land acquired by the United States in the land exchange is withdrawn from all forms of entry, appropriation, or disposal under the public land laws, location, entry, and patent under the mining laws, and disposition under the mineral leasing, mineral materials, and geothermal leasing laws.

Specific management of mineral resources on the offered lands would be determined by the agencies, subject to the withdrawal in Subsection (f) of PL 113-291. Given these restrictions, little or no tailings-related activity would be expected to occur on the offered lands.

FOREST PLAN AMENDMENT

No components of the 2023 forest plan that directly relate to tailings or pipeline safety require amendment.

EFFECTS OF COMPENSATORY MITIGATION LANDS

No tailings would be associated with compensatory mitigation lands, and the compensatory mitigation lands would have no effect on concerns of tailings and pipeline safety.

EFFECTS OF RECREATION MITIGATION LANDS

No tailings would be associated with recreation mitigation lands, and the recreation mitigation lands would have no effect on concerns of tailings and pipeline safety.

SUMMARY OF APPLICANT-COMMITTED ENVIRONMENTAL PROTECTION MEASURES

A number of environmental protection measures are incorporated into the design of the project that would act to enhance tailings safety. These are non-discretionary measures, and their effects are accounted for in the analysis of environmental consequences.

Applicant-committed environmental protection measures for tailings and pipeline safety include those outlined in the tailings design documents (Golder Associates Inc. 2018a; Klohn Crippen Berger Ltd. 2018a, 2018b, 2018c, 2018d, 2019d), the tailings corridor pipeline management plans (AMEC Foster Wheeler Americas Limited 2019), the concentrate pipeline corridor management plan (M3 Engineering and Technology Corporation 2019), and the GPO (Resolution Copper 2016c).

Partially in response to public comments on the DEIS and further review by the Forest Service, a pipeline protection and integrity plan specific to the Skunk Camp location (Golder Associates Inc. 2020) was developed between the DEIS and FEIS. This new plan is discussed in the "Mitigation Effectiveness" section.

**Tailings Storage Facility Design and Operational Measures**

The following measures, which enhance the safety of the tailings storage facility, have been incorporated into the tailings design:

- use modified centerline (Alternatives 2 and 3) or centerline embankment (Alternatives 5 and 6) for NPAG;
- use full downstream embankment for PAG tailings (Alternatives 5 and 6);
- perform thickening of both PAG, NPAG, and NPAG overflow tailings (Alternatives 2, 3, 5, and 6), and additional ultrathickening of NPAG tailings (Alternative 3);
- segregate PAG tailings into smaller separate cells (Alternatives 5 and 6); and
- use filtered tailings (Alternative 4).

A failure modes analysis has already been completed to identify all potential failure modes and to align them with design measures appropriate to address those modes (Klohn Crippen Berger Ltd. 2019a; Pilz 2019). The design measures are aligned with international best practice and Federal and State regulations. Resolution Copper has identified both preventive measures to minimize the potential for failure, and reactive measures if problems are seen to develop. These are considered applicant-committed environmental protection measures and are summarized in table 3.10.1-5.

**Table 3.10.1-5. Applicant-committed environmental protection measures addressing key failure modes, during both design and operations**

| Failure Mode | Preventative Controls | Responsive Actions (if problems develop) |
|---|---|---|
| **Failure through foundation**. Certain types of geological materials can exhibit problematic behavior due to the stress of supporting millions of tons of material, including consolidation, liquefaction, or bedding plane weaknesses. | Removal of materials (design); use of shear keys (design); thorough site investigation (design); slope flattening (design); monitoring of pore pressure and deformations (operations). | Construct berms (operations); move water pond farther from embankment (operations). |
| **Slope failure through tailings**. These failures occur when the tailings or tailings embankment loses strength, caused by increased pore pressures that reduce strength and lead to liquefaction. Failure can be triggered by either static (i.e., a gradual increase of stress as the facility grows) or seismic means. | Use of modified-centerline or centerline embankments (design); quality assurance/control during construction to confirm density requirements (operations); monitoring of pore pressure and deformations (operations); minimize perforations (pipes) through embankments (operations). | Flatten embankment slopes (operations); maintain water pond farther from embankment (operations). |
| **Failure through internal erosion or piping.** Flow developing within the embankment or foundation can wash out fine particles, gradually leading to voids and a vicious cycle of greater flow and greater washout. Controlling movement and loss of fine particles using filter materials is a key design element. | Facility beach length and structure (design); inclusion of filter materials (design); quality assurance/control during construction to confirm proper placement of materials (operations). | Placement of filters on downstream slope (operations); movement of pond away from embankment (operations); modify spigotting or tailings deposition to reduce hydraulic gradients (operations). |
| **Failure by overtopping.** When water accumulates in the pond behind the embankment and exceeds the crest height, water flowing over the top can erode the downstream face of the embankment.* | Design for adequate freeboard (Probable Maximum Flood); pond storage and management requirements (design); armoring of downstream slope (design); monitoring of water levels and maintain sufficient beach width (operations). | Maintain adequate embankment freeboard (operations); construction of emergency spillways (operations); pumping (operations); emergency embankment raising (operations). |
| **Failure through surface erosion.** Erosion of material from the downstream embankment, not only by directly causing a breach, but also by causing the downstream slope to become steeper than designed.* | Repair of erosion channels (operations); stormwater control (design); armoring or use of riprap (design); regular maintenance of erosion controls (operations). | Emergency repairs of eroded material (operations). |

\* Portions of all alternatives involve development within floodplains of major surface drainages, mapped or unmapped, as described in section 3.7.3. Management of stormwater specifically is addressed in the prescriptive tailings standards through selection of design flood events. The potential for erosion to jeopardize the tailings embankment specifically was considered during the FMEA process.

## Pipeline Design and Operational Measures

A failure modes analysis was also completed for both the concentrate and tailings pipelines; an updated version specific to the Skunk Camp tailings pipeline was completed after the DEIS (Golder Associates Inc. 2020). The analysis informed the following design measures for both the tailings and concentrate pipelines that enhance the safety of the pipelines:

- Install pipe bridges for concentrate pipeline over Queen Creek outside the ordinary high-water mark of that drainage.

- For tailings pipelines that cross Devil's Canyon and Mineral Creek (Alternative 6), pipeline corridors would pass overhead or beneath the streams, with no disturbance to riparian habitat or waters within the ordinary high-water mark.

- Fabricate and test all pipelines in corridors for concentrate, tailings, and water in accordance with the requirements of American Society of Mechanical Engineers (ASME) standards or equivalent for quality assurance and quality control purposes. A quality assurance/quality control system

would be in place during construction (required by code and standards). A post-construction hydrostatic test would be conducted to prove the integrity of the newly installed pipeline.

- Locate pressure indicators on non-buried pipelines intermittently along water, tailings, and concentrate pipelines. Flow indicators would be placed near the tailings pumps and at the end of the line. A leak detection system would connect via fiber-optic cable to the control room at the West Plant Site and the control room at the tailings facility if a separate facility exists.

- Pipelines would be buried where feasible, given the geological setting, and where buried they would be appropriately wrapped. Field assessments would confirm the characterization of the pipeline route, including site-specific geophysical survey to approximate the extent of any suspected subsurface voids, and routing adjustments within the approved corridor would avoid unstable slopes or areas.

- Sacrificial anodes would be installed at determined intervals on the buried concentrate pipelines and select sections of tailings pipelines to mitigate corrosion of pipeline sections. Installation of sacrificial anodes would follow appropriate best practices for proper placement in order to minimize the potential for migration of metals resulting from dissolved or decayed metallic anodes.

- Shut-off valves would be located at booster pump stations.

- Double containment would be used on the concentrate pipeline at major stream crossings, and it would be routed through sleeves underneath major crossings. Tailings pipelines would be sleeved under major crossings. Expansion loops would be incorporated along the pipeline corridor.

- A minimum of 3.3 feet of horizontal and vertical separation would be used between pipelines and existing utilities or infrastructure.

- The tailings pipeline would be concrete and high-density polyethylene (HDPE) and non-pressurized for Alternatives 2 and 3, designed to flow approximately 50 percent full. The tailings pipelines to Alternatives 5 and 6 would likely be carbon steel and pressurized.

- The concentrate pipeline would be schedule 40 steel with an HDPE protective lining.

- Aboveground concentrate and tailings pipelines would be contained in a secondary containment ditch where possible and painted with an epoxy coating to prevent degradation.

In addition, a number of operational or management control measures for pipelines have been identified:

- Development of a tailings pipeline operations manual to summarize inspections and maintenance protocols (Operations, Maintenance, and Surveillance).

- Resolution Copper would have equipment available and/or contractors readily available on-site for pipeline repair. The pipeline access road would provide access to the full length of the line.

- There would be daily[115] patrols along the pipelines to look for leaks; containment spills, sediment build-up, and breaches; drainage sediment build-up, blockages, and wash-outs; access road erosion and damage; pipe bridges and over/underpass damage; landslides; third-party interference; and other potential hazards.

- The Operations, Maintenance, and Surveillance manual would be followed for immediately investigating, reporting, and implementing a response plan for suspected leaks from the tailings

---

[115] The management plans for the concentrate pipeline and tailings pipeline call for daily inspections (AMEC Foster Wheeler Americas Limited 2019; M3 Engineering and Technology Corporation 2019). This frequency was modified for the pipeline management plan specific to Alternative 6, which indicates inspections at least 26 times per year (Golder Associates Inc. 2020).

pipeline. Aberrations in flow rate, pump operation, and pressures would trigger investigations and emergency response if needed, as well as coordination with any agencies with surface management responsibility, such as the Forest Service.

- A tailings pipeline spill prevention and response plan (pipeline management plan) would be prepared as part of the comprehensive pipeline integrity program. The program would include maintenance of records, regular review of leak monitor data, regular corridor inspections, regular internal inspections using "smart-pigs,"[116] development of spill response plans, and having pre-positioned equipment and teams trained to respond to spills.

- The operating concentrate pipeline would contain pressure dissipation stations consisting of control valves, block valves, and ceramic orifice plate chokes. This control system would keep the normal pipeline operating pressure below 500 psig (pounds per square inch gauge) and would lower the pressure to an acceptable level at the filter plant and loadout facility.

OUTCOME OF FEBRUARY 2020 FMEA

FMEA participants collaborated in the analysis of 16 credible potential failure modes related to the preferred alternative (Alternative 6) tailings storage facility (Gannett Fleming 2020). FMEA participants considered an additional 23 potential failure modes but found them "to be so unlikely as to be considered non-plausible" (Gannett Fleming 2020). The 16 credible potential failure modes included the following:

- For the NPAG main tailings embankment:
  - Ten potential failure modes under normal loading conditions;
  - Three potential failure modes under seismic loading conditions; and
  - Two potential failure modes under hydrologic loading conditions.
- For the PAG cells, one potential failure mode was analyzed under normal loading conditions.

The credible potential failure modes assessed during the FMEA workshop included the following:

- **Foundation failure modes**: seven of the potential failure modes involved foundation failure (N-1 through N-5, S1, and PAG-N1)

- **Liquefaction failure modes:** each of the three seismic potential failure modes (S-1, S-2, and S-3) involved liquefaction

- **Surface erosion:** two of the potential failure modes involved surface erosion (N-10 and H-2)

- **Piping and internal erosion**: one of the potential failure modes (N-9) involved internal piping and erosion

- **Embankment failure:** four potential failure modes involved embankment failure other than the mechanisms above (N-6, N-7, and N-8, and H-1)

Each potential failure mode is rated for consequence (from low to extreme) and probability of occurring (from remote to very high). The results are plotted in a "risk matrix," as shown in figure 3.10.1-2.

---

[116] "Smart-pigs" are pieces of equipment that can be placed inside pipes that allow inspection of pipelines from the inside. These are useful to identify areas of unusual wear or weakness.



**Figure 3.10.1-2. Risk matrix resulting from the February 2020 FMEA**

Of the 16 potential failure modes developed during the FMEA workshop, no unmanageable risks were identified, and most generally fall within acceptable societal risk levels.[117] The mitigations developed to address the potential failure modes include specific data information needs (five items), surveillance and monitoring (nine items), risk reduction measures, including future design considerations (15 items), future planned activities (10 items), and contingencies that could be implemented if a potential failure mode began to develop (nine items) (Gannett Fleming 2020).

ANALYSES SUPPORTING THE FMEA

**Additional site investigation.** A number of field investigations took place at the Skunk Camp location that were concluded and reported after publication of the DEIS (Fleming, Shelley, et al. 2018; KCB Consultants Ltd. 2019; Montgomery and Associates Inc. 2019a, 2020e, 2020g; WestLand Resources Inc.

---

[117] Acceptable societal risk is a generalization but is informed by international guidance for conducting risk assessments. See Federal Energy Regulatory Commission (2016) for a summary of six different approaches for identifying societal acceptable risk. The line shown on figure 3.10.1-2 is an interpretation primarily based on U.S. Army Corps of Engineers (2014) guidance.

and Montgomery and Associates Inc. 2020; Wong et al. 2020a). Specific reports and types of investigations are detailed in section 3.2.

Overall, the on-site investigations largely confirmed the previous understanding of hydrology and geology at the site, as detailed in section 3.2. Updated results were available to FMEA participants and informed the discussions during the FMEA workshop. These included the refined understanding of groundwater depths and hydraulic conductivities, the presence, depth, and strength of underlying geological materials, and the types and quantities of materials available for construction and reclamation.

**Slumping failure**. As noted previously, during the FMEA workshop, in order to assess the severity of downstream consequences, a rough approximation was used for a "dry" failure without liquefaction, which assumed the movement of tailings 4 to 8 miles downstream. Following the FMEA workshop, this failure scenario was formalized by Resolution Copper's tailings experts (KCB Consultants Ltd. 2020b).

The "dry" failure estimate assumed a breach of the main NPAG embankment, resulting in a release of tailings from the NPAG beach. This release is considered "dry" because under normal operations the recycled water pond is maintained over the PAG cells, which are located behind separate, free-standing downstream-type embankments approximately 1.4 miles upstream of the main embankment. The NPAG beach tailings are still saturated, but at variable amounts, with the tailings nearest the embankment and shallowest (depths of less than 100 feet) being the most drained and the least saturated. Unless mixed with water from the recycled water pond, these tailings would be largely non-flowable and would slump, much like a landslide. Note that the FMEA workshop considered credible potential failure modes where water would be present in the NPAG facility. The "dry" failure slumping estimate does not apply to these potential failure modes, but only to those failure modes where water is not present. Those potential failure modes that plot toward the right in figure 3.10.1-2 are considered higher risk and reflect more fluid tailings behavior with higher runout and consequences. Together, the Rico Empirical Method and the "dry" failure scenario represent a range of possible outflow scenarios.

Estimated parameters for the "slump" modeling were based on historic case studies and estimated tailings properties based on laboratory testing. The percentage of the total tailings projected to be released was calculated as 30 percent, which corresponds well with historic tailings releases. The runout distance was modeled as 5.7 miles from the toe of the main embankment.

**Active faulting.** An additional analysis undertaken after the FMEA concerns two faults (the Ransome and Dripping Springs Faults) that fall within the footprint of the tailings storage facility, requiring evaluation for whether they would be considered active faults. ADEQ guidance for mining facilities (Arizona Department of Environmental Quality 2004) defines an active fault as one that shows evidence of movement in the past 35,000 years (Quaternary era). Tertiary-era faults (with activity between 66 million years and 2.6 million years ago) do not fall into this category but often are candidates to evaluate for Quaternary activity. Tertiary faults can be ruled out as active faults if overlying Quaternary deposits show no evidence of fault-related deformation.

Two independent studies evaluated whether the faults at this location showed evidence of Quaternary activity, focusing on fault traces identified by previous geologists (KCB Consultants Ltd. 2019; Wong et al. 2020b). Taken together, these investigations used desktop mapping, field reconnaissance, and subsurface geophysics and drilling investigations to evaluate the mapped faults. The Forest Service also independently evaluated these two studies and concurred in general that there is sufficient evidence to argue against the presence of faults that cut surficial Quaternary or Tertiary deposits in mapped faults (Zellman and Cook 2020a).

**Post-closure failure modes.** During the FMEA workshop, Forest Service personnel raised a specific concern about post-closure failure modes being adequately addressed. For most of the 16 potential failure

modes, the risk of failure decreases over time, as there will no longer be ponds on the tailings surface, the closure cover will reduce infiltration, and the entrained water will drain from the facility. However, two failure modes were identified for which the risk of failure could increase over time:

- Potential failure mode N-2 involves a slope instability through the foundation of the main embankment due to high porewater pressures. For this failure mode to occur, water behind the grout cutoff wall located just downstream of the main embankment could accumulate once shallow pumping wells are turned off. To mitigate this post-closure risk, the FMEA identified a potential need to remove the cutoff wall at the time of closure.

- Potential failure mode N-5 involves a slope instability through the foundation at the main embankment due to geochemical changes in the foundation over time. To mitigate this post-closure risk, the FMEA identified a potential need to continue to monitor water quality during the passive closure phase.

Resolution Copper prepared two reclamation and closure plans for the project (KCB Consultants Ltd. 2020c; Tetra Tech Inc. 2020); the Forest Service evaluated both of these plans (Enos and Meyer 2020; Epstein 2020; Garrett 2020h). This evaluation specifically included review of these two post-closure failure modes and found that specific mitigations were not incorporated into the plans.

Subsequent correspondence with Resolution Copper clarified aspects of these two failure modes (Resolution Copper 2020d).

- With respect to the grout curtain (potential failure mode N-2), Resolution Copper indicated that the elevation of the curtain would be low enough that accumulated water would not cause increased phreatic surface in the main embankment, but indicated that the grout curtain still would be removed after closure. Resolution Copper also clarified a concern raised by ADEQ with the Water Resources Workgroup that removal of the grout curtain would cause a "slug" of poor-quality water to migrate downgradient in the aquifer. Resolution Copper provided analysis that indicates concentrations in the aquifer would remain stable (Resolution Copper 2020d).

- With respect to long-term geochemical changes (potential failure mode N-5), Resolution Copper indicated that presently, the geochemical properties of the foundation and expected seepage water quality indicate that the foundation is very unlikely to degrade to low-strength material. However, if this were found to be a credible risk during construction, the embankment slope could be flattened. Resolution Copper also indicated that clogging of the underdrain was unlikely, but water quantity and quality monitoring to confirm the performance could be incorporated (Resolution Copper 2020d).

For both of these potential post-closure failure modes, Resolution Copper noted that the final design and closure configuration will be subject to an approved APP issued by ADEQ, and that the final tailings facility design, configuration, and closure/post-closure approach would be determined as part of that regulatory process.

DESCRIPTION OF HYPOTHETICAL TAILINGS BREACH

The Forest Service requires that the tailings storage facility design, construction, and operations adhere to National Dam Safety Program standards on Federal lands. This minimizes the risk for a catastrophic failure for Alternatives 2, 3, and 4, and likely for Alternative 5 as well (though this would be under the jurisdiction of the BLM). Adherence to the APP program BADCT standards also minimizes the risk for a catastrophic failure of the tailings storage facility for all alternatives. Adherence by Resolution Copper to the applicant-committed environmental protection measures, including industry best practices, further reduces the risk both by proactively providing robust design and containment measures, and by identifying operational steps that can be taken in reaction to a developing problem.

However, overall risk is the combination of both the probability of a failure and the consequences of that failure. While a tailings storage facility or pipeline failure is not reasonably foreseeable, the following discussion of a hypothetical tailings storage facility or pipeline failure provides a basis to compare the inherent risk in the tailings alternative locations and designs.

**Estimated Magnitude and Downstream Effect**

Table 3.10.1-6 summarizes the predicted volume released in a hypothetical tailings failure, and the downstream distance traveled, based on the empirical method (Larrauri and Lall 2018; Rico et al. 2007). The downstream distance traveled would roughly represent the downstream distance to the Colorado River, near Yuma, Arizona.

The filtered tailings (Alternative 4) would likely fail in a different manner than the slurry tailings alternatives (Alternatives 2, 3, 5, and 6). As described in table 3.10.1-6, rather than running out as a liquid, the tailings would slump in a relatively localized area.

There are a number of possible failure modes for filtered tailings. Identifying the most likely failure mode relies on whether the tailings are likely to experience liquefaction. The primary factors that would trigger liquefaction of tailings are material porosity and density, moisture content, fines content, static loading (the weight of the tailings themselves), and seismic loading (earthquakes). Generally, the dewatering requirements for practical filtered operations dictate fairly low moisture content; this is necessary for handling, transporting, and placing the tailings in the storage facility. The low moisture content necessary to handle tailings physically like this (estimated for Alternative 4 as 11 to 14 percent), represents a low potential for liquefaction. A filtered tailings facility that maintains drained conditions is expected to fail as a slump or landslide (rotational or wedge shape) with no flow of tailings downstream, regardless of whether the failure is triggered by static or seismic loading. Tailings release from a filtered tailings facility would be localized instead of flowing long distances (Witt et al. 2004).[118]

**Table 3.10.1-6. Empirical estimates of a hypothetical failure**

| Distance to: | Alternatives 2 and 3 – Near West Location* | Alternative 4 – Silver King Location (filtered)† | Alternative 5 – Peg Leg Location | Alternative 6 – Skunk Camp Location | For Comparison: Actual Mount Polley Failure‡ | For Comparison: Actual Fundão Failure‡ |
|---|---|---|---|---|---|---|
| Calculated release volume (million cubic meters) | 243 (136–436) | 220 | 243 (136–436) | 243 (136–436) | 23.6 | 45 |
| Calculated downstream distance traveled (miles) | 277 (85–901) | ~1–2.5 | 209 (65–669) | 268 (83–868) | 4.4 | 398 |

Source: Larrauri and Lall (2018). Calculations can also be run at https://columbiawater.shinyapps.io/ShinyappRicoRedo/.

Notes: Values shown reflect the median predicted result; values in parentheses indicate the range defined by the 25th and 75th percentiles.

Key parameters: Total facility volume at buildout = 1 billion cubic meters; Embankment height: Alt 2 (520 feet/158 m); Alt 3 (510 feet/155 m); Alt 5 (310 feet/94 m); Alt 6 (490 feet/148 m). Mount Polley and Fundão comparisons taken from Bowker (2019).

\* Alternative 3 modeled as Alternative 2

† Alternative 4 uses filtered tailings and the empirical method is not applicable. A 220-million-cubic-meter release was modeled using the USGS LaharZ model instead.

‡ The Mount Polley release represented 32 percent of the total facility volume; the Fundão release represented 82 percent of the total facility volume.

---

[118] The USGS Lahar flow inundation zone simulation program (referred to as LaharZ) was used to estimate the runout zone from a potential failure of the filtered tailings (Schilling 2014). A failure angle of 10 degrees was assumed based on an estimate of the residual shear strength of the tailings in the event of saturation and/or lack of buttressing; this parameter changes with saturation levels and would change, depending on the failure modes defined in a refined FMEA.

Similar to assessing the failure modes for tailings embankments for slurry tailings facilities, an FMEA could be conducted on a filtered tailings facility to assess whether undrained failure modes could occur. An undrained condition would require that a phreatic surface (i.e., water table) develop within the tailings mass itself. Under these conditions, the part of the tailings below the water table could experience liquefaction, while the part of the tailings above the water table would fail in a slump or landslide. Unlike the slurry tailings alternatives, as designed Alternative 4 would not have substantial amounts of water present and how an undrained scenario could develop is not clear. Defining a scenario under which the drainage would not occur and create a water table condition would likely require a combination of multiple factors, which could be identified during an FMEA-type of analysis.

**Estimated Chemistry of Released Liquid**

In the event of a failure, the materials potentially released downstream would include NPAG tailings (and associated water in the pore space), PAG tailings (and associated water in the pore space), and any standing water in the recycled water pond.

The potential effects of tailings on water quality are described in section 3.7.2 for stormwater and seepage. Water released during a potential failure would have similar characteristics, as shown in table 3.10.1-7. In the event of a release, concentrations above surface water quality standards would be anticipated for a number of metals, including cadmium, copper, nickel, selenium, silver, and zinc. Alternative 5 has the highest concentrations of cadmium, nickel, and notably copper.

**Table 3.10.1-7. Potential for water contamination in the event of a tailings facility or pipeline failure**

|  | Alternative 2 Released Water (mg/L)* | Alternative 3 Released Water (mg/L)* | Alternative 5 Released Water (mg/L)* | Alternative 6 Released Water (mg/L)* | Surface Water Standard for Most Restrictive Use (Gila River or Queen Creek)† | Surface Water Standard for Most Restrictive Use (Ephemeral Tributaries)† |
|---|---|---|---|---|---|---|
| Antimony | 0.0114 | 0.0118 | 0.0056 | 0.0036 | 0.030 | 0.747 |
| Arsenic | 0.00092 | 0.00141 | 0.001853 | 0.00003 | 0.030 | 0.280 |
| Barium | 0.015 | 0.015 | 0.018 | 0.019 | 98 | 98 |
| Beryllium | 0.00124 | 0.00179 | 0.004552 | 0.00003 | 0.0053 | 1.867 |
| Boron | 0.85 | 0.44 | 0.331 | 0.27 | 1 | 186.667 |
| Cadmium | 0.016 | 0.015 | 0.0082 | 0.005 | 0.0043 | 0.2175 |
| Chromium, Total | 0.092 | 0.078 | 0.0364 | 0.030 | 1 | – |
| Copper | 0.199 | 0.199 | 4.604 | 0.194 | 0.0191 | 0.0669 |
| Fluoride | 2.4 | 2.4 | 3.3 | 2.9 | 140 | 140 |
| Iron | 0.001734 | 0.001727 | 0.008108 | 0.001717 | 1 | – |
| Lead | 0.0028 | 0.0021 | 0.00174 | 0.0009 | 0.0065 | 0.015 |
| Manganese | 2.23 | 2.23 | 2.182 | 0.63 | 10 | 130.667 |
| Mercury | – | – | – | – | 0.00001 | 0.005 |
| Nickel | 0.255 | 0.272 | 0.312 | 0.066 | 0.1098 | 10.7379 |
| Nitrate | 8.4 | 8.1 | 3.8 | 2.6 | 3,733.333 | 3,733.333 |
| Nitrite | – | – | – | – | 233.333 | 233.333 |
| Selenium | 0.346 | 0.349 | 0.149 | 0.113 | 0.002 | 0.033 |
| Silver | 0.079 | 0.073 | 0.030 | 0.026 | 0.0147 | 0.0221 |
| Thallium | 0.0058 | 0.0065 | 0.0022 | 0.0018 | 0.0072 | 0.075 |

Resolution Copper Project and Land Exchange

| | Alternative 2 Released Water (mg/L)* | Alternative 3 Released Water (mg/L)* | Alternative 5 Released Water (mg/L)* | Alternative 6 Released Water (mg/L)* | Surface Water Standard for Most Restrictive Use (Gila River or Queen Creek)† | Surface Water Standard for Most Restrictive Use (Ephemeral Tributaries)† |
|---|---|---|---|---|---|---|
| Uranium | – | – | – | – | 2.8 | 2.8 |
| Zinc | 3.56 | 3.03 | 1.69 | 1.17 | 0.2477 | 2.8758 |

Notes: Dash indicates no results available for this constituent, or no standard applies to this constituent.

Shaded cells indicate the potential for concentrations to be above water standards.

\* Results shown for all alternatives are based on predicted chemistry of "lost seepage," for year 41 representing full buildout of the facility (Eary 2018a, 2018b, 2018c, 2018d, 2018e).

† See appendix N, table N-5, for more details of applicable standards.

## Estimated Chemistry of Released Solids

The solid tailings material deposited downstream once water drains away would also pose a contamination concern. As shown in table 3.10.1-8, concentrations of metals in remnant tailings materials would be above Arizona soil remediation levels for several constituents, including arsenic and copper, and require active cleanup to prevent further degradation of groundwater or surface water.

An accidental release because of a pipeline rupture would also pose similar concerns, whether a tailings pipeline or concentrate pipeline, as shown in table 3.10.1-8.

**Table 3.10.1-8. Potential for contaminated material to be left in the event of a tailings facility or pipeline failure**

| | Copper Concentrate Material (mg/kg)* | Tailings Material (mg/kg)* | Arizona Soil Remediation Levels† |
|---|---|---|---|
| Antimony | 2.2–13.3 | 0.18–0.71 | 31 |
| Arsenic | 11.4–1,180 | 2.0–20.9 | 10 |
| Barium | 20–70 | 120–360 | 15,000 |
| Beryllium | 0.05 | 1.62–3.53 | 150 |
| Boron | – | – | 16,000 |
| Cadmium | 6.56–28.1 | 0.09–0.24 | 39 |
| Chromium, Total | 28–77 | 36–68 | 120,000 |
| Copper | >10,000 | 781–3,288 | 3,100 |
| Fluoride | – | – | 3,700 |
| Iron | – | – | – |
| Lead | 39.1–161.5 | 22–258 | 400 |
| Manganese | 5 - 35 | 20–902 | 3,300 |
| Mercury | – | – | 23 |
| Nickel | 32.1–71.2 | 17.4–45.5 | 1,600 |
| Nitrate | – | – | – |
| Nitrite | – | – | – |
| Selenium | 154–205 | 6–22 | 390 |
| Silver | 29–100 | 0.41–3.12 | 390 |
| Thallium | 0.17–4.57 | 0.29–0.82 | 5.2 |
| Uranium | 1–3.7 | 1.7–3.5 | 16 |

|  | Copper Concentrate Material (mg/kg)* | Tailings Material (mg/kg)* | Arizona Soil Remediation Levels† |
|---|---|---|---|
| Zinc | 1,620–5,460 | 17–181 | 23,000 |

Notes: Dash indicates no results available for this constituent, or no standard applies to this constituent.

Shaded cells indicate the potential for concentrations to be above soil standards.

* Tailings and concentrate material values are based on whole rock analysis performed on simulated whole tailings and concentrate for four master composites (MC-1, MC-2, MC-3, MC-4) (MWH Americas Inc. 2014).

† Arizona Administrative Code R18-7-205. Values shown represent the most stringent soil standard for both residential and non-residential property uses. Chromium standard shown is for chromium III.

## Alternative 2 – Near West Proposed Action

TAILINGS STORAGE FACILITY DESIGN

### Tailings Embankment and Facility Design

The same design and safety standards apply to any tailings embankment (see table 3.10.1-2), regardless of whether the embankment has an upstream, modified-centerline, centerline, or downstream construction. However, even though the design standards are the same, there are still inherent differences between embankment types that can factor into the long-term probability of failure.

The majority of historic events that inform our understanding of when and how tailings facilities fail were constructed using the upstream method, in which the tailings themselves form part of the structure of the embankment. When designed and operated properly, these tailings facilities can be as safe as embankments constructed using modified-centerline or centerline methods.

However, based on expert investigation of historic failures, usually a failure is the result of a chain of events that might include improper characterization of the foundation and understanding of how foundation conditions potentially change with tailings (as with Mount Polley), as well as operational mistakes in which the embankment construction does not adhere to the design or is managed or operated improperly (as with Fundão). One of the main differences in embankment types is whether they are inherently resilient enough to withstand these series of unforeseen events or mistakes.

Even if embankments are designed to the same safety standards, an upstream embankment has less room for error when things do not go according to plan. A modified-centerline embankment is more resilient and has more ability to remain functional, despite any accumulated errors, and a centerline and downstream embankment have even higher resiliency.[119]

Alternative 2 would use a modified-centerline embankment, which is a design choice driven by the site geography, once the concept of an upstream embankment was abandoned (there is insufficient room at the Near West location for a full centerline embankment without expanding the footprint to another drainage). Modified-centerline embankments are inherently more resilient than upstream-type embankments, but less resilient to any accumulated missteps or unforeseen events than true centerline-type embankments.

The Alternative 2 main embankment is required to extend to three sides of the facility, is generally freestanding and not anchored to consolidated rock, and as such is the longest of the embankments proposed (10 miles). These design features are not inherently unsafe, but are potentially less resilient than a shorter, well-anchored embankment (such as Alternative 6).

---

[119] A recent study indicates that roughly 70 percent of historic tailings failures involved upstream-type embankments, with the remainder roughly split between centerline and downstream-type embankments (Strachan and Van 2018). Note that there is inherent bias in these statistics, as the bulk of tailings structures have historically been upstream-type construction.

**Foundation Materials**

The difference between foundation materials between alternatives is whether they are built primarily on consolidated rock or unconsolidated alluvium. Either type of foundation—rock or alluvium—can be appropriate for a tailings facility, provided that there is adequate site characterization to identify all geological units present, understand their properties, and incorporate necessary treatment and preparation into the embankment design.

Alternative 2 is primarily built on consolidated rock, overlain by relatively thin surface soils and alluvial material along washes. Site preparation would likely involve removal of most loose material, including any weathered bedrock, and treating any problematic or weak spots in the exposed foundation. This allows better seepage control than an alluvial foundation. However, the proximity to Queen Creek downstream also limits the flexibility in adding seepage controls that can be employed in the event of unexpected seepage loss.

**Storage of PAG Tailings**

The method of storage of PAG tailings is another difference between alternatives that could affect outcomes associated with a failure of the facility. Alternative 2 employs a separate downstream-type starter embankment to initially contain the PAG tailings. Midway through the operational life, the PAG tailings are raised above the height of the starter embankment and therefore potentially would be released in the event of a failure of the primary embankment.

A downstream embankment is one that is fully self-supporting and has no deposited tailings incorporated into the structure, though it could be composed of cyclone tailings. A downstream embankment is considered the most resilient embankment type and has more ability to remain functional, despite accumulated errors.

POTENTIAL RISK TO LIFE AND PROPERTY

The Near West location (Alternative 2) is upstream of substantial populations due to the proximity to the Phoenix metropolitan area. An estimated 600,000 people live in the communities downstream that would be affected by a hypothetical tailings storage facility failure. This location also would offer relatively little reaction time for evacuation in the event of a sudden failure, due to the close downstream presence of Queen Valley.

POTENTIAL EXPOSURE TO CONTAMINANTS

All materials released during a hypothetical tailings failure pose risk of contamination. The water present in the tailings storage facility contains concentrations of metals (cadmium, copper, nickel, selenium, silver, zinc) above Arizona surface water quality standards (see table 3.10.1-7). If released, this water would potentially impact beneficial uses of surface waters, including wildlife use, aquatic habitat, livestock use, agricultural use, and potable use. Given the highly permeable soils associated with alluvial washes like Queen Creek, released water would likely infiltrate and affect groundwater resources as well, impacting other water uses.

Similarly, the tailings material itself contains concentrations of metals (arsenic, copper) above Arizona soil remediation standards. This material would be deposited in large amounts along Queen Creek. Unless removed, the deposited tailings material would represent a long-term continuing source of contamination to groundwater and stormwater flows. The deposited tailings material could also represent a long-term hazard to public health if it became airborne during high-wind events. Wind direction is highly variable throughout the year and can include particularly intense wind events during the summer monsoon; the close proximity to the Phoenix metropolitan area would potentially expose a large population to airborne tailings.

The tailings samples have been analyzed for their long-term potential for oxidation of pyrite materials, the generation of acid, and the release of metals. While the bulk of the pyrite minerals has been segregated into the PAG tailings, both the NPAG and PAG tailings still show the potential for acid generation (see section 3.7.2). The continued oxidation of pyrite minerals in deposited tailings would represent a long-term source of impact on water quality, underlying and downstream soils, aquatic ecosystems, and the potential uses of downstream water and agricultural land.

POTENTIAL DISRUPTION OF WATER SUPPLIES AND INFRASTRUCTURE

A hypothetical tailings failure for Alternative 2 represents a substantial risk to water supplies. Eight community water systems, serving a total population of almost 700,000, were identified in the downstream flow path. Some of these water systems have robust water portfolios and draw on different water sources, including surface water that would be unimpacted by a tailings release. All of these systems, however, use groundwater in some capacity and have pumping wells located near the downstream flow path. The primary risk to these water systems is the potential for groundwater resources to be contaminated, or loss of water-related infrastructure.

In addition, substantial agricultural water use occurs downstream, including almost 20,000 acres in the Queen Creek Irrigation District and San Tan Irrigation District. Water supplies to agricultural users could also be disrupted through loss of wells, delivery infrastructure, or groundwater contamination.

In addition to the disruption of community water systems and agricultural supplies, a hypothetical tailings release could also destroy key water supply infrastructure. Damage to the SRP system (Consolidated Canal, Eastern Canal) or to the CAP aqueduct could disrupt water supplies throughout central and southern Arizona, well beyond the immediate flow path of a hypothetical tailings failure. For instance, in addition to agricultural users in Pinal County, more than a dozen CAP contract holders are located downstream, with systems serving over 850,000 people. As an example, the City of Tucson relies on CAP water (mixed with groundwater) as the primary supply for over 700,000 residents. In total, through disruption of community water systems and the CAP aqueduct, a hypothetical tailings release could affect the water supply for over 1.5 million people.

POTENTIAL DESTRUCTION OF HABITAT AND VEGETATION

The deposition of large amounts of tailings in downstream waters would have widespread effects on the ecosystem, including riparian vegetation, wildlife habitat, and aquatic habitat. The immediate effect nearest the release would be direct physical removal or burying of vegetation from the debris. This effect would reduce with distance downstream. While woody riparian vegetation (mesquite, cottonwood, willow, saltcedar) could survive the immediate arrival of the tailings, most near-stream herbaceous and wetland vegetation would be destroyed even by a few inches of tailings.

Aquatic habitat would either physically disappear—filled with tailings—or would be rendered uninhabitable for some distance downstream by high levels of suspended sediment. After the initial impact, the geomorphology of the system would also be fundamentally altered by erosion of native material and deposition of tailings material. Expected concentrations of metals in the released water are above at least some acute wildlife standards (copper, zinc), so immediate effects on fish populations not directly lost to tailings would also be expected. Until cleanup, the tailings materials could also act as a continuing source of elevated metal concentrations.

The high-quality riparian habitat at Whitlow Ranch Dam would almost certainly be lost. Downstream of Whitlow Ranch Dam, primarily xeroriparian habitat would be lost along Queen Creek.

## LARGE-SCALE SOCIETAL IMPACTS

A number of direct effects would result from a hypothetical tailings release: potential loss of life, disruptions from evacuation and relocation, destruction of property, loss of habitat, destruction or damage of infrastructure, loss or disruption of public and agricultural water supplies, disruption of regional transportation, and the long-term potential for soil, surface water, and groundwater contamination.

The large-scale societal impact of a hypothetical tailings failure is the combination of all these impacts and the fundamental disruption of a substantial portion of Arizona's economy, the lives of a substantial portion of the population, and long-term changes to the environment.

The cost of remediation of such a release would be substantial. One research study developed a dataset of seven historical tailings failures between 1994 and 2008 for which estimates of natural resource losses could be quantified (albeit with difficulty) and found that the average natural resource loss per failure was over $500 million (in 2014 dollars) (Bowker and Chambers 2015). The size of the releases in the dataset ranged from 0.1 to 5.4 million cubic meters, much smaller than the release estimated using the empirical method.

Direct cleanup costs also can be substantial. As an example, the Mount Polley failure (23.6 million cubic meters) is estimated to have cleanup costs of roughly $67 million (Hoekstra 2014); it appears most of this cost is likely to be borne by Canadian taxpayers, not the mining company (Lavoie 2017). As another example, the mining companies involved in the Fundão failure agreed to pay over $5 billion in damages to the Brazilian government, which includes funds for remediation and restoration (Boadle and Eisenhammer 2016).

## LONG-TERM IMPLICATIONS OF PRESENCE OF TAILINGS STORAGE FACILITY

The presence of a tailings storage facility on the landscape has implications for long-term potential for downstream impacts as well, even if an embankment failure never occurs. Water entrained with the NPAG tailings gradually drains from the facility over many decades. This draining is beneficial for tailings safety as it enhances stability and would continue to reduce the risk of failure. However, this seepage also causes the long-term potential for water quality impacts downstream. The long-term ramifications of seepage from tailings storage facilities is addressed in detail in Section 3.7.2, Groundwater and Surface Water Quality.

There are additional long-term impacts associated with the landform itself, including the potential for air quality impacts or windborne dust, or erosion from the tailings and subsequent sedimentation of downstream waters. The potential for windblown dust from the tailings storage facilities is addressed in detail in Section 3.6, Air Quality, but the analysis is focused largely on operations. One assumption is that over the long term, the application and revegetation of a closure cover on the tailings facility would prevent large amounts of erosion by wind or water. The potential success of revegetation and long-term stability of the ecosystem is addressed in Section 3.3, Soils, Vegetation, and Reclamation.

As noted, the risk of catastrophic failure decreases as water gradually drains from the facility due to reduced liquefaction potential of the tailings mass. The duration of active seepage management after closure for Alternative 2 has been estimated as lasting up to 100 years after closure (Klohn Crippen Berger Ltd. 2018a). This represents the time period during which sufficient seepage is still being generated to require treatment or disposal, rather than relying on passive evaporation. The risk does not decrease to zero after this time period. Other failure modes still exist. This time period is being presented here solely as a proxy for how long substantial water remains in the facility for each alternative.

POTENTIAL IMPACTS FROM PIPELINES

In the event of a potential rupture, spill, or failure of either the concentrate pipeline or the tailings pipeline, the type of effects would be similar to those of a tailings storage facility failure with respect to direct damage to vegetation and potential for contamination. However, because of the ability to monitor and shut down the pipeline immediately upon identifying a problem, the impact would be much more localized, involve much smaller volumes, and would be of a shorter duration.

All spills associated with the concentrate pipeline and the Alternative 2 tailings pipeline would occur in ephemeral drainages and would be unlikely to move far downstream if emergency cleanup were undertaken immediately. There would likely be localized impacts on xeroriparian vegetation. Potential for impact on groundwater quality would be relatively low, given limited release volumes and limited groundwater present in these ephemeral drainages.

The total length of pipeline corridors under Alternative 2 is about 27 miles (about 22 miles for the concentrate pipeline and about 5 miles for the tailings pipelines). At closure, the risk of pipeline failure falls to zero.

FINANCIAL ASSURANCE FOR LONG-TERM MONITORING AND MAINTENANCE

Alternative 2 potentially involves long time periods of post-closure maintenance and monitoring related to ensuring the continued stability of the tailings storage facility. This raises the concern for the possibility of Resolution Copper going bankrupt or otherwise abandoning the property after operations have ceased. If this were to happen, the responsibility for these long-term activities would fall to the Forest Service. The Forest Service would need to have financial assurance in place to ensure adequate funds to undertake these activities for long periods of time—for decades or even longer.

The authority and mechanisms for ensuring long-term funding are discussed in section 1.5.5. The types of activities that would likely need to be funded could include the following:

- Monitoring of the embankment movement or stability

- Long-term control of water in the facility, such as control of stormwater entering the facility, long-term drawdown of the recycled water pond, or long-term operation of pumpback facilities

- Long-term maintenance of drains to ensure embankment stability

- Monitoring of the post-closure landform for excessive erosion or instability, and performance of any armoring

- Maintenance and monitoring of post-closure stormwater control features

- Continued implementation and periodic updating of emergency notification plans and response requirements

Additional financial assurance requirements for long-term maintenance and monitoring are part of the Arizona APP program and include the following:

> [T]he applicant or permittee shall demonstrate financial responsibility to cover the estimated costs to close the facility and, if necessary, to conduct postclosure monitoring and maintenance by providing to the director for approval a financial assurance mechanism or combination of mechanisms as prescribed in rules adopted by the director or in 40 Code of Federal Regulations section 264.143 (f)(1) and (10) as of January 1, 2014. (ARS 49-243; also see Arizona Administrative Code R18-9-A203 for specific regulations and methods allowed for financial assurance)

The Arizona State Mine Inspector also has authority to require a mine reclamation plan and financial assurance for mine closure (Arizona Administrative Code Title 11, Chapter 2). The regulations for these focus primarily on surface disturbance and revegetation.

## *Alternative 3 – Near West – Ultrathickened*

TAILINGS STORAGE FACILITY DESIGN

### Tailings Embankment and Facility Design

While the modified-centerline embankment construction is similar between Alternatives 2 and 3, the use of ultrathickened deposition in Alternative 3 results in less water entrained in the tailings storage facility, making the facility inherently more resilient.

### Foundation Materials

The foundation materials are the same as those described for Alternative 2.

### Storage of PAG Tailings

After the initial raises, Alternative 3 uses a splitter berm of cyclone sand to separate PAG from NPAG tailings. While this has benefits to water quality, the splitter berm would not prevent release of PAG tailings in the event of an embankment breach. There would be little difference in release of PAG tailings between Alternatives 2 and 3.

POTENTIAL RISK TO LIFE AND PROPERTY

The potential risks are identical to those from Alternative 2.

POTENTIAL EXPOSURE TO CONTAMINANTS

The potential risks are identical to those from Alternative 2.

POTENTIAL DISRUPTION OF WATER SUPPLIES AND INFRASTRUCTURE

The potential risks are identical to those from Alternative 2.

POTENTIAL DESTRUCTION OF HABITAT AND VEGETATION

The potential risks are identical to those from Alternative 2.

LARGE-SCALE SOCIETAL IMPACTS

The potential risks are identical to those from Alternative 2.

LONG-TERM IMPLICATIONS OF PRESENCE OF TAILINGS STORAGE FACILITY

The risk of catastrophic failure decreases as water gradually drains from the facility. Because of the use of ultrathickened tailings, the duration of active seepage management after closure for Alternative 3 has been estimated as about 9 years after closure, compared with 100 years for Alternative 2 (Klohn Crippen Berger Ltd. 2018b). This represents the time period during which sufficient seepage is still being generated to require treatment or disposal, rather than relying on passive evaporation. Risk does not decrease to zero after this time period. Other failure modes still exist. This time period is being presented here solely as a proxy for how long substantial water remains in the facility for each alternative.

POTENTIAL IMPACTS FROM PIPELINES

The potential risks are identical to those from Alternative 2.

FINANCIAL ASSURANCE FOR LONG-TERM MONITORING AND MAINTENANCE

The financial assurances are identical to those from Alternative 2.

## Alternative 4 – Silver King

TAILINGS STORAGE FACILITY DESIGN

### Tailings Embankment and Facility Design

The use of filtered tailings at the Silver King location represents the least risk to public health and safety related to a catastrophic failure. Filtered tailings are fundamentally more resilient than slurry facilities due to the lack of need for an embankment. Filtered tailings are placed in a manner similar to compacted structural fill. Unlike the other alternatives, a failure of the filtered tailings would likely be more localized.

### Foundation Materials

Similar to Alternatives 2 and 3, Alternative 4 is primarily built on consolidated rock, overlain by relatively thin surface soils and alluvial material along washes. Site preparation would likely involve removal of most loose material, including any weathered bedrock, and treating any problematic or weak spots in the exposed foundation.

### Storage of PAG Tailings

For Alternative 4, PAG tailings would be stored in a separate dry-stack facility.

POTENTIAL RISK TO LIFE AND PROPERTY

The potential risk to life and property is less than the other alternatives, based on the smaller area impacted. No communities are immediately downstream of Alternative 4, within the area in which a slump or landslide failure would occur.

POTENTIAL EXPOSURE TO CONTAMINANTS

No water would be potentially released during a catastrophic failure of Alternative 4, and exposure to contaminants would be primarily related to the long-term exposure of solid material in washes, including erosion and movement downstream, and leaching of contaminants. The filtered materials are estimated to have more potential for water quality impacts, due to the chemical weathering from the ingress of oxygen into the pore space. The PAG tailings, in particular, if deposited in washes, would represent a long-term risk to water quality if not removed.

POTENTIAL DISRUPTION OF WATER SUPPLIES AND INFRASTRUCTURE

The potential disruption of water supplies and infrastructure is less than the other alternatives, based on the smaller area impacted and the specific location impacted.

POTENTIAL DESTRUCTION OF HABITAT AND VEGETATION

The potential destruction of habitat and vegetation is less than the other alternatives, based on the smaller area impacted. In addition, primarily xeroriparian habitat along ephemeral washes would be impacted, rather than perennial waters and hydroriparian and aquatic habitat.

LARGE-SCALE SOCIETAL IMPACTS

The large-scale societal impact of a failure at Alternative 4 is less than the other alternatives, based on the smaller area impacted and the specific location impacted.

LONG-TERM IMPLICATIONS OF PRESENCE OF TAILINGS STORAGE FACILITY

The risk of catastrophic failure decreases as water gradually drains from the facility. As there is relatively little seepage associated with Alternative 4, the amount of time for active seepage management after closure is only 5 years, compared with 100 years for Alternative 2 (Klohn Crippen Berger Ltd. 2018c). This represents the time period during which sufficient seepage is still being generated to require treatment or disposal, rather than relying on passive evaporation. Risk does not decrease to zero after this time period. Other failure modes still exist. This time period is being presented here solely as a proxy for how long substantial water remains in the facility for each alternative.

POTENTIAL IMPACTS FROM PIPELINES

Alternative 4 still requires concentrate and tailings pipelines; however, the overall distance is substantially less, and would represent less risk overall. The total length of pipeline corridors under Alternative 4 is less than 2 miles (there is no concentrate pipeline, and about 1.5 miles for the tailings pipelines). At closure, the risk of pipeline failure falls to zero.

FINANCIAL ASSURANCE FOR LONG-TERM MONITORING AND MAINTENANCE

The regulatory framework to require financial assurance to ensure closure and post-closure activities are conducted is the same as for Alternative 2.

## Alternative 5 – Peg Leg

TAILINGS STORAGE FACILITY DESIGN

### Tailings Embankment and Facility Design

Alternative 5 uses a centerline-type NPAG embankment, representing a more resilient design than Alternatives 2 and 3. Like Alternatives 2 and 3, the main embankment is a side hill embankment that extends on three sides of the facility and is generally freestanding and founded on alluvium versus bedrock, which is inherently less resilient than Alternative 6. The length of the embankment (7 miles) is slightly shorter than Alternatives 2 and 3. The PAG embankments use downstream construction to maintain a water cover over the PAG tailings. The PAG embankments are divided into cells to minimize seepage, reduce evaporation, and allow concurrent reclamation during operations.

### Foundation Materials

The main NPAG embankment for Alternative 5 would be primarily underlain by thick unconsolidated alluvium, with some bedrock occurring below the PAG cells. Detailed site characterization through drilling and excavation would be used to understand the specific properties of the alluvial material beneath the main embankment and develop a design to address any stability concerns. Seepage may be more difficult to control with Alternative 5, as losses to an alluvial foundation are substantial and the downstream alluvial aquifer is relatively wide.

### Storage of PAG Tailings

Unlike Alternatives 2 and 3, Alternative 5 uses an entirely separate PAG tailings facility with a downstream embankment to contain the PAG tailings throughout the life of the facility. In addition, the PAG tailings facility is divided into cells to reduce evaporation and seepage and allow concurrent reclamation. In the event of a failure of the NPAG main embankment, the double embankment of Alternative 5 means that PAG tailings would not be released unless both the NPAG and PAG embankments failed simultaneously. Alternatively, if one of the PAG cells failed, the runout could be contained within the NPAG facility.

POTENTIAL RISK TO LIFE AND PROPERTY

The Peg Leg location is upstream of populations in Pinal County and the Gila River Indian Community. An estimated 32,000 people live in the communities downstream that could be affected by a hypothetical tailings storage facility failure. This location would offer some improvement in reaction time over Alternatives 2 and 3 for evacuation in the event of a sudden failure, with no major population centers downstream for roughly 20 miles. The Peg Leg location offers the greatest risk to the town of Florence and the Gila River Indian Community.

POTENTIAL EXPOSURE TO CONTAMINANTS

As with Alternatives 2 and 3, all materials released during a hypothetical tailings failure pose risk of contamination, with metal concentrations in water and tailings material above Arizona standards. The risks to beneficial uses of surface waters, groundwater, and public health are similar, though receptors would differ.

POTENTIAL DISRUPTION OF WATER SUPPLIES AND INFRASTRUCTURE

A hypothetical tailings failure for Alternative 5 represents a substantial risk to water supplies. Four community water systems, serving a total population of almost 30,000, were identified in the downstream flow path. Unlike the community water systems downstream of Alternatives 2 and 3, which have robust water portfolios, most of these systems are highly reliant on groundwater and most have wells directly adjacent to the Gila River. The primary risk to these water systems is the potential for groundwater resources to be contaminated, or loss of water-related infrastructure. The town of Florence has one of the closest water systems, serving roughly 15,000 people and relying on groundwater wells immediately adjacent to the Gila River.

The disruption of agricultural water supplies would have a substantial effect on Pinal County and the Gila River Indian Community. The Pinal County economy relies heavily on agriculture and is one of the most important agricultural areas in the United States. Pinal County is in the top 2 percent of counties in the United States for total agricultural sales (Bickel et al. 2018) and has more than 230,000 acres under irrigation (National Agricultural Statistics Service 2014). The NMIDD and the San Carlos Irrigation and Drainage District both lie largely within Pinal County and account for about a third of agricultural acreage. A potential tailings release could affect water supplies for the roughly 77,000 acres within these districts, through destruction of infrastructure, contamination of surface supplies from the Gila River, or contamination of groundwater sources below the Gila River.

The total contribution of on-farm agriculture to Pinal County sales was an estimated $1.1 billion in 2016, supporting over 7,500 full- and part-time employees (Bickel et al. 2018). Bickel et al. (2018) also estimated the effect of a hypothetical loss of 300,000 acre-feet of irrigation water and found there would be an economic impact of up to $35 million, with up to 480 job losses. This hypothetical reduction represents about a one-third reduction in total water use of 800,000 acre-feet (Water Resources Research Center 2018).

The Gila River Indian Community is also reliant on agriculture, with about 27,000 acres irrigated (National Agricultural Statistics Service 2014), and a total market value of agricultural products sold of $38.4 million (Duval et al. 2018). Increased agriculture is the centerpiece of Gila River Indian Community economic growth, through the continued construction of the Pima-Maricopa Irrigation Project, which is meant to use water provided under the Arizona Water Settlements Act of 2004. The Community intends to increase agricultural production to over 140,000 acres of irrigable land. Water sources potentially disrupted by a hypothetical tailings release include supplies from the Gila River, groundwater, and water stored in underground recharge projects.

POTENTIAL DESTRUCTION OF HABITAT AND VEGETATION

The potential destruction of habitat and vegetation for Alternative 5 is similar to Alternative 2, except the impacts would be borne by the Gila River, which has existing aquatic habitat as well as critical habitat and proposed critical habitat. The wetlands downstream on the Gila River Indian Community could also be impacted.

The modeled water quality results in table 3.10.1-7 suggest that Alternative 5 might have substantially higher dissolved metals, particularly copper, and would represent a greater risk of acute toxicity to aquatic wildlife in downstream waters not directly inundated by tailings.

LARGE-SCALE SOCIETAL IMPACTS

The societal impacts for Alternative 5 are similar to those discussed for Alternative 2. In addition, a hypothetical release from Alternative 5 could impact the town of Florence as well as the Gila River Indian Community. The Gila River Indian Community has a greater than 40 percent poverty rate, with a median household income about one-third of the national median (U.S. Census Bureau 2018a). The population of the areas downstream of Alternative 5 (3,655) represent roughly 30 percent of the total Community population (U.S. Census Bureau 2018a). The impact of a hypothetical tailings release would be much more pronounced on the Gila River Indian Community, and the ability to recover would be much less than other communities.

LONG-TERM IMPLICATIONS OF PRESENCE OF TAILINGS STORAGE FACILITY

Alternative 5 has similar long-term implications for air quality, revegetation success, and groundwater quality, as those described for Alternative 2, with differences noted in the specific EIS sections referenced.

As noted, the risk of catastrophic failure decreases as water gradually drains from the facility. The duration of active seepage management after closure for Alternative 5 has been estimated to be up to 100 to 150 years after closure, similar to Alternative 2 (Golder Associates Inc. 2018b). This represents the time period during which sufficient seepage is still being generated to require treatment or disposal, rather than relying on passive evaporation. Risk does not decrease to zero after this time period. Other failure modes still exist. This time period is being presented here solely as a proxy for how long substantial water remains in the facility for each alternative.

POTENTIAL IMPACTS FROM PIPELINES

For the ephemeral drainages crossed by the Alternative 5 pipeline, impacts from a pipeline failure would be identical to Alternative 2. However, the Alternative 5 pipeline also crosses the Gila River, which represents a high-value riparian area that could be impacted in the event of a failure. In this case, the impacts would be similar to those described for a tailings storage facility runout reaching the Gila River, but more localized. The Alternative 5 pipeline also carries more risk for downstream habitat in Arnett Creek and Queen Creek by paralleling those water bodies for several miles and has a risk for destruction of downstream habitat associated with the White Canyon Wilderness.

The total length of pipeline corridors under Alternative 5 is about 47 miles (about 22 miles for the concentrate pipeline, and about 25 miles for the tailings pipelines). At closure, the risk of pipeline failure falls to zero.

FINANCIAL ASSURANCE FOR LONG-TERM MONITORING AND MAINTENANCE

The regulatory framework under the State of Arizona to require financial assurance for long-term closure activities is the same as described for Alternative 2. However, for the tailings facility, financial assurance requirements would be required by the BLM, not the Forest Service.

Like the Forest Service, the BLM also has regulatory authority to require financial assurance for closure activities, contained in their surface management regulations (43 CFR Subpart 3809). BLM considers that the financial assurance must cover the estimated cost as if BLM were hiring a third-party contractor to perform reclamation of an operation after the mine has been abandoned. The financial assurance must include construction and maintenance costs for any treatment facilities necessary to meet Federal and State environmental standards.

## *Alternative 6 – Skunk Camp*

TAILINGS STORAGE FACILITY DESIGN

### Tailings Embankment and Facility Design

Like Alternative 5, Alternative 6 uses a true centerline-type embankment, representing a more resilient design than Alternatives 2 and 3. The embankment design for Alternative 6 is substantially different from the other alternatives. This embankment uses a cross-valley construction, which would have a single face instead of three faces and would be tied into consolidated rock on either end. This construction results in a shorter face, only requiring 3 linear miles of embankment. As with the embankment type, all embankments would be designed to the same safety standards, but the simpler construction of the Alternative 6 embankment could be considered more resilient to accumulated missteps or unforeseen events.

### Foundation Materials

Alternative 6 is similar to Alternatives 2 and 3 and would be primarily underlain by unconsolidated alluvium within drainages and a thick sequence of Gila Conglomerate bedrock. Below the PAG facility, which is farthest away from the NPAG embankment, alluvium is less, and the primary subsurface material is Gila Conglomerate. Compared with Alternative 5, seepage is easier to control, with much of the facility underlain by bedrock rather than alluvium. In addition, the downstream alluvial aquifer is narrow and any downstream seepage controls would likely be more effective than at Alternative 5.

### Storage of PAG Tailings

Like Alternative 5, Alternative 6 uses an entirely separate PAG tailings cell with a downstream-type embankment that would contain the PAG tailings throughout the life of the facility. In addition, the PAG tailings are divided and stored in entirely separate cells. Because of this double embankment within one impoundment, with Alternative 6, PAG tailings would be less likely to be released, and individual cells would limit the amount of PAG tailings released.

POTENTIAL RISK TO LIFE AND PROPERTY

Like Alternative 5, the Skunk Camp location is upstream of populations in Pinal County. Approximately 3,000 people live in the communities downstream that would be affected by a hypothetical tailings storage facility failure. This location also would offer some improvement in reaction time over Alternatives 2 and 3 for evacuation in the event of a sudden failure, with the major towns (Hayden, Kearny, Winkelman) located over 20 miles downstream, but the nearest population center (Dripping Springs) is still within 10 miles of the facility.

Alternative 6 offers less risk to the town of Florence and Gila River Indian Community than Alternative 5, as these communities are over 50 miles distant from the tailings location.

POTENTIAL EXPOSURE TO CONTAMINANTS

As with Alternatives 2, 3, 4, and 5, all materials released during a hypothetical tailings failure pose risk of contamination, with metal concentrations in water and tailings material above Arizona standards. The risks to beneficial uses of surface waters, groundwater, and public health are similar, though receptors would differ.

POTENTIAL DISRUPTION OF WATER SUPPLIES AND INFRASTRUCTURE

A hypothetical tailings failure for Alternative 6 represents a risk to water supplies. Four community water systems are located along the Gila River above Donnelly Wash, serving approximately 3,000 people. These systems are entirely reliant on groundwater and most have wells directly adjacent to the Gila River. The primary risk to these water systems is the potential for groundwater resources to be contaminated, or loss of infrastructure.

The potential disruption of agricultural water supplies would be less than those described for Alternative 5.

POTENTIAL DESTRUCTION OF HABITAT AND VEGETATION

The potential destruction of habitat and vegetation for Alternative 6 is similar to Alternative 5, but somewhat less due to the greater distance between Alternative 6 and the Gila River, compared with Alternative 5 and the Gila River. Alternative 6 carries a risk of potential destruction of habitat and vegetation associated with the river segment identified by BLM as suitable for inclusion in the National Wild and Scenic Rivers System, between Dripping Springs Wash and Winkelman. This would include the loss of recreation opportunities along this corridor.

LARGE-SCALE SOCIETAL IMPACTS

The societal impacts for Alternative 6 are similar to those discussed for Alternative 5, but the impacts would be felt mainly in the communities of Kearny, Hayden, and Winkelman, located along the Gila River. These are small communities directly adjacent to the river, heavily dependent on the local water supply. The economic impact from property loss, business disruption, and destruction of local infrastructure would affect every aspect of these communities.

LONG-TERM IMPLICATIONS OF PRESENCE OF TAILINGS STORAGE FACILITY

Alternative 6 has similar long-term implications for air quality, revegetation success, and groundwater quality, as those described for Alternative 2, with differences noted in the specific EIS sections referenced.

As noted, the risk of catastrophic failure decreases as water gradually drains from the facility. The duration of active seepage management after closure for Alternative 6 has been estimated to be up to 20 years after closure (Klohn Crippen Berger Ltd. 2018d). This represents the time period during which sufficient seepage is still being generated to require treatment or disposal, rather than relying on passive evaporation. Risk does not decrease to zero after this time period. Other failure modes still exist. This time period is being presented here solely as a proxy for how long substantial water remains in the facility for each alternative.

POTENTIAL IMPACTS FROM PIPELINES

For the ephemeral drainages crossed by the Alternative 6 pipeline, the type of impacts from a pipeline failure would be identical to Alternative 2. However, the Alternative 6 pipeline must cross Devil's Canyon. While the pipeline would cross Devil's Canyon upstream and away from perennial flow,

a failure would have the potential to affect the water, aquatic, and riparian habitat downstream. The underground crossing of Mineral Creek has less potential risk than an overhead crossing.

The total length of pipeline corridors under Alternative 6 is about 47 miles (about 22 miles for the concentrate pipeline, and about 25 miles for the tailings pipelines). At closure, the risk of pipeline failure falls to zero.

FINANCIAL ASSURANCE FOR LONG-TERM MONITORING AND MAINTENANCE

The regulatory framework under the State of Arizona to require financial assurance for long-term closure activities is the same as described for Alternative 2. However, Alternative 6 differs from the other alternatives because the tailings facility would not be located on lands managed by the Forest Service (Alternatives 2, 3, and 4) or BLM (Alternative 5). For Alternative 6, the Federal financial assurance mechanisms would not be applicable to the tailings storage facility.

### Overall Conclusions of Potential Risk to Public Health and Safety

The Forest Service requirement for the tailings storage facility design, construction, and operation to adhere to National Dam Safety Program standards on Federal land (not applicable to Alternative 6), as well as APP BADCT standards, minimizes the risk for a catastrophic failure of the tailings storage facility. Adherence by Resolution Copper to the applicant-committed environmental protection measures, including industry best practices, further reduces the risk both by proactively providing a robust design and containment measures, and by identifying operational steps that can be taken in reaction to a developing problem.

There are some qualitative differences in alternatives that are inherent in the design and location of each alternative that affect the resilience of the facility, as shown in table 3.10.1-9. There are also differences in the downstream environment.

**Table 3.10.1-9. Differences between alternatives pertinent to tailings and pipeline safety**

|  | Alternative 2 | Alternative 3 | Alternative 4 | Alternative 5 | Alternative 6 |
|---|---|---|---|---|---|
| Embankment type | Modified centerline | Modified centerline | Filtered tailings; structural zone, but no embankment. Most resilient alternative. | True centerline. Improved resilience, compared with Alternatives 2 and 3. | True centerline Improved resilience, compared with Alternatives 2 and 3. |
| Embankment size and design | Freestanding; 10-mile length | Freestanding; 10-mile length | No embankment† | Freestanding; 7-mile length | Cross-valley construction; 3-mile length. Improved resilience, compared with Alternatives 2, 3, and 5. |
| Potential for PAG release | PAG deposition inside NPAG facility, no separate embankment (at buildout) | PAG deposition inside NPAG facility, no separate embankment (at buildout) | Separate PAG facility. Downstream risk for PAG release less, due to localized failure. | Separate PAG facility; multiple cells; separate downstream embankment. Less risk for release of PAG tailings during catastrophic failure than Alternatives 2 and 3. | Separate PAG facility; multiple cells; separate downstream embankment. Less risk for release of PAG tailings during catastrophic failure than Alternatives 2 and 3. |
| Downstream population (within 50 miles) | 600,000 | 600,000 | 700 | 32,000 | 3,200 |

Resolution Copper Project and Land Exchange

| | Alternative 2 | Alternative 3 | Alternative 4 | Alternative 5 | Alternative 6 |
|---|---|---|---|---|---|
| Nearest population | Within 10 miles | Within 10 miles | Within 10 miles | Over 20 miles | Within 10 miles |
| Pipeline risk | Ephemeral drainages; relatively low risk | Ephemeral drainages; relatively low risk | Ephemeral drainages; relatively low risk | Higher risk from crossings of Queen Creek, Gila River, and parallel of Arnett Creek | Higher risk at crossing of Devil's Canyon |
| Miles of pipeline | Concentrate = 22 Tailings = 5 | Concentrate = 22 Tailings = 5 | Concentrate = 0 Tailings = 1.5 | Concentrate = 22 Tailings = 25 | Concentrate = 22 Tailings = 25 |
| Anticipated risk period for pipelines | 41 years. LOM only. Risk ends upon closure | 41 years. LOM only. Risk ends upon closure | 41 years. LOM only. Risk ends upon closure | 41 years. LOM only. Risk ends upon closure | 41 years. LOM only. Risk ends upon closure |
| Anticipated risk period for tailings storage facilities* | 150 years (LOM, plus estimated seepage for ~100 years post-closure) | 50 years (LOM, plus estimated seepage for ~9 years post-closure) | 45–50 years (LOM, plus estimated seepage for ~5 years post-closure) | 150–200 years (LOM, plus estimated seepage or 100–150 years post-closure) | 70 years (LOM, plus estimated seepage for 20 years post-closure) |

Note: LOM = Life of mine

* The estimate shown here is the life of mine, plus the length of time active seepage management is anticipated to take after closure (see section 3.7.2). This is being presented as a proxy for risk, only to highlight differences in the period of drain-down between alternatives. A number of failure modes continue to be possible after active seepage management has been discontinued.

† The dry-stack tailings facility would not have an embankment but would have an outer structural zone. This structural zone would potentially need to meet the same design standards as a dam, depending on the applicable regulations (for example, requirements under an APP) and site-specific design.

## *Cumulative Effects*

Full details of the cumulative effects analysis can be found in chapter 4. The following represents a summary of the cumulative impacts resulting from the project-related impacts described in Section 3.10.1.4, Environmental Consequences, that are associated with tailings safety, when combined with other reasonably foreseeable future actions.

The following actions were determined through the cumulative effects analysis process to be reasonably foreseeable, and have impacts that likely overlap in space and time with impacts from the Resolution Copper Project:

- ASARCO Mine, including the Hayden Concentrator and Smelter, and Superfund Site
- Ray Land Exchange and Proposed Plan Amendment
- Ripsey Wash Tailings Project

The cumulative effects analysis area for tailings and pipeline safety would match that of surface water quantity—the watersheds within which the project is located—as the risks of other large tailings facilities would generally follow similar flow patterns in the event of a failure. The metric used to quantify cumulative impacts to tailings and pipeline safety is the number of tailings facilities located within the same watershed. Multiple tailings storage facilities within the same watershed do not affect the safety of any individual tailings storage facility, or probability of failure of any given facility. However, the more tailings storage facilities in one watershed located upstream of a given person, residence, or community, the greater the risk that an incident or failure could impact that location in the future.

It is unknown whether a tailings storage facility would be part of the Ray Land Exchange parcels, but the possibility exists. If a tailings storage facility were built on the Ray Land Exchange parcels, it would be part of the Gila River watershed. The other two reasonably foreseeable future actions represent existing or future tailings storage facilities along the main stem of the Gila River. Within the cumulative effects analysis area, the three reasonably foreseeable future actions listed could include tailings storage facilities located potentially within the same watershed (Gila River) as the Resolution Copper Project tailings.

If either Alternative 5 – Peg Leg or Alternative 6 – Skunk Camp is selected as the location for the Resolution Copper Project tailings location, the downstream communities on the Gila River would experience an overall greater risk of being impacted in the event of a partial or complete failure of a tailings storage facility.

## Mitigation Effectiveness

| Mitigation Identifier and Title | Authority to Require |
| --- | --- |
| FS-SV-03: Revised reclamation and closure plans | Required – Forest Service |
| FS-PH-01: Satellite monitoring of tailings storage facility | Required – Forest Service |
| FS-PH-02: Adherence to National Dam Safety Program Standards | Required – Forest Service |
| FS-PH-03: Skunk Camp pipeline protection and integrity plan | Required – Forest Service |
| RC-PH-05: Adhere to Global Tailings Standard | Committed – Resolution Copper |
| RV-PH-04: Maintain the existing hotline for community complaints | Voluntary – Resolution Copper |

We developed a robust monitoring and mitigation strategy to avoid, minimize, rectify, reduce, or compensate for resource impacts that have been identified during the process of preparing this EIS. Appendix J contains descriptions of mitigation measures that are being required by the Forest Service and mitigation measures voluntarily brought forward and committed to by Resolution Copper. Appendix J also contains descriptions of monitoring that would be needed to identify potential impacts and mitigation effectiveness.

This section contains an assessment of the effectiveness of design features associated with mitigation and monitoring measures found in appendix J that are applicable to tailings and pipeline safety. See appendix J for full descriptions of each measure noted below.

MITIGATION EFFECTIVENESS AND IMPACTS OF FOREST REQUIRED MITIGATION MEASURES APPLICABLE TO TAILINGS AND PIPELINE SAFETY

Appendix J contains mitigation and monitoring measures being required by the Forest Service under its regulatory authority or because these measures are required by other regulatory processes (such as the Biological Opinion). These measures are assumed to occur, and their effectiveness and impacts are disclosed here. The unavoidable adverse impacts disclosed below take the effectiveness of these mitigations into account.

**Revised reclamation and closure plans (FS-SV-03).** Implementing reclamation and closure plans ensures that the post-closure landscape is successfully revegetated to the extent practicable and that the landforms are stable and safe. This measure is effective at partially replacing habitat and vegetation over the long term within the footprint of all mine components, reducing long-term effects on surface water quality from erosion, and improving long-term resilience and safety of the tailings storage facility. Eventually, these areas could be reopened to recreational activities.

**Satellite monitoring of tailings storage facility (FS-PH-01).** High-resolution satellite imagery would be collected and processed at regular intervals. Processed output provided to the Forest Service or BLM would include beach width, tailings surface slope contours, and constructed site topography. This output could be provided for land manager verification of adherence to design criteria, as well as long-term monitoring of facility performance over time. This measure would be applicable to Alternatives 2, 3, 4, and 5 through 36 CFR 228.8 (Forest Service authority to regulate mining to minimize adverse environmental impacts on NFS surface resources) and 43 CFR 3809.2 (BLM authority to regulate mining

to prevent unnecessary or undue degradation). This measure primarily focuses on tailings safety, which in turn is protective of human life, property, and numerous downstream resources.

**Adherence to National Dam Safety Program Standards (FS-PH-02).** For a tailings storage facility built on Federal land, the Forest Service is requiring that Resolution Copper adhere, at a minimum, to the requirements of the National Dam Safety Program discussed in "Relevant Laws, Regulations, Policies, and Plans" in section 3.10.1.3. This measure focuses on tailings safety, which in turn is protective of human life, property, and numerous downstream resources.

**Skunk Camp pipeline protection and integrity plan (FS-PH-03).** Implementing design and construction measures meant to mitigate specific potential failure modes ensures that the pipelines will be resilient and secure. Operational and maintenance measures ensure that problems are identified as they arise and that appropriate remedies are taken. These actions would be effective at reducing the risk of pipeline rupture and inadvertent spills, which also reduces potential risk to groundwater and surface water quality.

MITIGATION EFFECTIVENESS AND IMPACTS OF RESOLUTION COMMITTED MITIGATION MEASURES APPLICABLE TO TAILINGS AND PIPELINE SAFETY

Appendix J contains mitigation and monitoring measures committed by Resolution Copper in contractual, financial, or other agreements. These measures are assumed to occur, and their effectiveness and impacts are disclosed here. However, the unavoidable adverse impacts disclosed below do not take the effectiveness of these mitigations into account as they are not within the authority of the Forest Service to ensure.

**Adhere to Global Tailings Standard (RC-PH-05).** The preamble to the new Global Industry Standard on Tailings Management states: "The Global Industry Standard on Tailings Management (herein 'the Standard') strives to achieve the ultimate goal of zero harm to people and the environment with zero tolerance for human fatality. It requires Operators to take responsibility and prioritise the safety of tailings facilities, through all phases of a facility's lifecycle, including closure and post-closure. It also requires the disclosure of relevant information to support public accountability." This standard represents the best international industry practices, regardless of regulatory jurisdiction or land status. Adherence to this standard cannot eliminate the risk of a tailings storage facility failure but can ensure that it is minimized to the extent practicable.

MITIGATION EFFECTIVENESS AND IMPACTS OF RESOLUTION VOLUNTARY MITIGATION MEASURES APPLICABLE TO TAILINGS AND PIPELINE SAFETY

Appendix J contains mitigation and monitoring measures brought forward voluntarily by Resolution Copper and committed to in correspondence with the Forest Service. These measures are assumed to occur but are not guaranteed to occur. Their effectiveness and impacts if they were to occur are disclosed here; however, the unavoidable adverse impacts disclosed below do not take the effectiveness of these mitigations into account.

**Maintain the existing hotline for community complaints (RVC-PH-04).** Maintaining the community hotline allows for incipient problems to be identified and remedied; these may or may not be applicable to the tailings storage facility or pipeline. Relevant notifications would help resolve issues before they resulted in off-site impacts.

UNAVOIDABLE ADVERSE IMPACTS

The mine and associated activities are expected to increase risks to public health and safety from the presence of a large tailings storage facility on the landscape, and the transport of concentrate and tailings by pipeline. These risks are unavoidable. However, risk of failure is minimized by required adherence to

National Dam Safety Program and APP program standards, applicant-committed environmental protection measures, and the mitigation measures described here.

***Other Required Disclosures***

SHORT-TERM USES AND LONG-TERM PRODUCTIVITY

Impacts from risk associated with tailings embankment safety would exist for a long time on the landscape and may result in some land uses downstream of the facility being curtailed. Over time, the reduction of risk would diminish, and productivity of downstream areas would recover.

IRREVERSIBLE AND IRRETRIEVABLE COMMITMENT OF RESOURCES

Irreversible changes with respect to tailings safety are not expected. The risk from pipeline failures ends upon closure of the mine and would be considered irretrievable but not irreversible. The risk from a tailings facility would persist for decades but would diminish as the structure drains. Impacts on public safety from tailings or tailings and concentrate pipelines would constitute an irretrievable commitment of resources.

## 3.10.2  Fuels and Fire Management

### 3.10.2.1    Introduction

This section assesses fuels and fire management both in the project area and within the larger analysis area (figure 3.10.2-1). Fuel means any vegetation, including grass, shrubs, and trees, that could sustain a wildfire. "Fuels and fire management" refers to the ability of land managers and emergency responders to maintain fuel levels and conduct other activities to prevent wildfires or control their extent or severity. Mine operations would include activities that would change fuel loads in the area or increase the possibility of accidental ignition of a wildfire, which would result in increased risk of fire and would change the severity and extent of fires that could occur. This section discusses the vegetation communities present, fire history and fire management, wildfire-urban interfaces (WUIs), and changes in wildfire risk resulting from the proposed project.

***Changes from the DEIS***

Overall, few public comments were received specific to the analysis of fuels and fire management, resulting in few changes. As with all resources, Alternatives 5 and 6 no longer have alternative pipeline routes to reach the tailings storage facility; each alternative now has a single route each as described in chapter 2. In addition, we revised the Alternative 6 pipeline route primarily to address potential impacts to habitat and resources along Mineral Creek. These changes had no major impact on the fuels and fire analysis.

Aside from changes to the project footprint, we added a discussion of the effects of future meteorological trends on fuels and fire management. We updated the discussion with the recent Woodbury, Whitlow, and Sawtooth fires, and added a discussion specific to the risks new power lines pose with respect to fire management.

The cumulative effects analysis was revised for the FEIS to better quantify impacts. It is described in detail in chapter 4 and summarized in this section. Any mitigations developed between the DEIS and FEIS are summarized in appendix J and, if applicable to fuels and fire management, are analyzed for effectiveness in this section.

# Chapter 4. Cumulative Effects

## 4.1    Introduction

A cumulative impact is one that results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions, which are those Federal or non-Federal activities not yet undertaken for which there are existing decisions, funding, or identified proposals (36 CFR 220.3). Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

Cumulative impacts are the combination of impacts from

- the proposed action or alternatives
- other past or present actions
- reasonably foreseeable future actions

Past and present actions contribute to the existing condition of the affected environment in the project area, and any impacts related to those actions are included under the "Affected Environment" heading of each resource section in chapter 3. The additional effects of the proposed action or alternatives are discussed under the "Environmental Consequences" heading in each resource section of chapter 3. To assess cumulative impacts, those effects must then be considered in conjunction with the effects of "reasonably foreseeable" future actions, as long as they overlap in both space and time.

A reasonably foreseeable future action (RFFA) is one that is likely to occur in the future and does not include actions that are speculative. We compiled a list of future actions to form the basis for the cumulative effects analysis and applied specific criteria to determine whether they were reasonably foreseeable or speculative. We then conducted screening to determine which reasonably foreseeable future actions would overlap temporally with the Resolution Copper Project, which would have impacts on individual resources, and which would overlap spatially with project-related impacts. Those reasonably foreseeable future actions that are not speculative and overlap in space and time with project effects are then analyzed for cumulative effects using specific impact metrics.

The cumulative effects analysis process and results are described in this chapter. Summaries of the impacts specific to each resource are provided in each resource section in chapter 3.

### 4.1.1    Changes from the DEIS

Our cumulative effects analysis for the DEIS included these steps:

1. Compilation of potential reasonably foreseeable future actions and screening for temporal overlap was contained in Rigg and Morey (2018).

2. Screening of reasonably foreseeable future actions for spatial overlap and impacts to individual resources was contained in SWCA Environmental Consultants (2018a).

3. Analysis of cumulative effects was included in each resource section in chapter 3, primarily in a narrative and qualitative format.

We received public comments that generally criticized two aspects of this process: lack of documentation in the DEIS itself (though details were contained in the project record), and lack of quantitative analysis of cumulative effects.

A specific loss of water sources for specific grazing allotments is not known for any of the RFFAs.

# 4.3.4    Further Discussion of Key Topics

The following discussions concern several topics that have cumulative impacts that are not adequately captured in the cumulative effects analysis undertaken in sections 4.3.1 through 4.3.3. In some cases this is because many of the reasonably foreseeable actions have been screened out for lack of sufficient detail, but are still likely to happen in some unspecified fashion, such as increasing competition for water supplies. In other cases, such as future meteorological trends, the effects are not tied to a single reasonably foreseeable future action but have ramifications on many aspects of the analysis.

## 4.3.4.1    Cumulative Effects on Regional Water Supplies

We received many comments expressing concern with regional water supplies, current and future stresses on water supplies from drought and future meteorological trends, and the ramifications of Resolution Copper's use of water in the face of competing water uses.

We considered a number of specific projects or actions related to water supplies during the cumulative effects analysis process, including the following:

- Arizona's Drought Contingency Plan
- Resolution Copper's Potential Allocation of CAP Water
- Town of Florence Development Projects
- Population Change
- Recent Modeling Reports Projecting Water Shortages in Pinal County
- Assured Water Supplies in the East Salt River Valley
- Future Superstition Vistas Development Area on Arizona State Trust Land

Some of these normally would not be analyzed as cumulative effects because they do not meet the appropriate screening criteria to be considered reasonably foreseeable future actions (Debauche 2023; Newell et al. 2020; SWCA Environmental Consultants 2020b). For example, the provisions of the drought contingency plan expire in 2026 and would not overlap in time with the Resolution Copper Project's operational pumping. Similarly, water shortages in Pinal County are outside the spatial area impacted by Resolution Copper Project's pumping, and the effects of groundwater drawdown would not overlap. The Superstition Vistas development area would likely overlap in both space and time with the Resolution Copper Project's operational pumping. However, the development plans are conceptual and lack adequate detail to allow substantial analysis of resource effects and thus normally would be considered speculative, not reasonably foreseeable.

Regardless of the screening outcomes, due to the great interest expressed by the public and cooperating agencies in water-related issues, we have added this section to the cumulative effects analysis to discuss these regional water supply issues in the context of the Resolution Copper Project's use of water.

### Regulatory Framework and Appropriateness of Resolution Copper's Water Use

Many comments express a value judgment that use of water for the Resolution Copper Project is an inappropriate use of Arizona's limited water resources, especially in the context of current drought and future meteorological trends.

The use of water in Arizona—from whatever source—takes place under a complex regulatory framework designed to prioritize and manage limited water resources. There is no single author of this framework; rather, it represents the combined outcome of four decades of intensive water management in Arizona and in the Colorado River basin. Two major components of this framework that are pertinent to the Resolution Copper Project are the following:

- The authorities and restrictions put in place by the State of Arizona with the 1980 Groundwater Management Act and furthered by subsequent legislation. These laws are administered by the ADWR and govern the use of groundwater within AMAs.

- The body of laws, treaties, and agreements known generally as the Law of the River. This governs the contracting and use of Colorado River water delivered through CAP, which is administered by the Central Arizona Water Conservation District and the Bureau of Reclamation.

These laws and regulations were enacted to codify the value and priorities that the State of Arizona, the Colorado River basin states, the U.S. Government (via Congress), and society in general place on the use of a limited water supply. While many individuals expressed their personal value judgments about the appropriateness of Resolution Copper using groundwater for mining, these laws and regulations reflect the overall value that society places on competing uses for water.

Every aspect of the water supply used by the Resolution Copper Project must adhere to this legal and regulatory framework, whether direct use of CAP water, dewatering at the mine site (which lies within the Phoenix AMA), pumping from the Desert Wellfield (also within the Phoenix AMA), or acquisition and use of long-term storage credits. By definition, the legally permitted use of water by Resolution Copper adheres to the norms and values placed on water by the State of Arizona.

### Drought Contingency Plan and Central Arizona Project Resources

With respect to water supplies from the Colorado River, the State of Arizona is currently operating under a drought contingency plan. The drought contingency plan was signed in May 2019 by of all seven Colorado River basin states, the U.S. Department of the Interior, and the Bureau of Reclamation. The provisions of the plan expire in 2026. This plan imposes additional restrictions on the delivery of Colorado River water; these restrictions are in addition to interim guidelines previously agreed to by the seven Colorado River upper and lower basin states.

The Colorado River Compact of 1922 is the foundation of the "Law of the River," which governs Colorado River water management. State apportionments were established in agreements approved subsequent to the Colorado River Compact, and other laws and court decisions have further added to the Law of the River. The drought contingency plan is designed to reduce the risks of Lake Mead declining to critical elevations by requiring Arizona, California, and Nevada to contribute additional water to Lake Mead storage at predetermined elevations and creating additional flexibility to incentivize additional voluntary conservation of water to be stored in the lake. These new contributions of water by each lower basin state are an overlay and are in addition to the shortage volumes outlined in the Colorado River Interim Guidelines for Lower Basin Shortages and the Coordinated Operations for Lake Powell and Lake Mead (known as the 2007 Guidelines, which were further supplemented in May 2024) (Bureau of Reclamation 2007, 2024b). Like the shortage elements of the 2007 guidelines, new contributions would increase as Lake Mead's elevation declines, providing protection against Lake Mead's declining to critically low elevations. The drought contingency plan also provides for the potential recovery of contributions later, should Lake Mead conditions improve significantly.

Every year in August, the Bureau of Reclamation makes a 24-month projection of anticipated reservoir levels, which in turn determines the level of restrictions that will be in place for the coming year. In 2020 and 2021, projections indicated that Lake Mead reservoir water levels would remain between 1,075 and

1,090 feet amsl; at these levels, the reservoir is operated under "Intentional Created Surplus" conditions (also known as "Tier 0"). At Tier 0 conditions, Arizona already forgoes 192,000 acre-feet of allocated Colorado River water. But in August 2021, the Bureau of Reclamation projections showed Tier 1 conditions expected for 2022 (corresponding to Lake Mead reservoir levels between 1,050 and 1,075 feet amsl), and beginning on January 1, 2022, Arizona has forgone 512,000 acre-feet of allocated Colorado River water, with the new reductions primarily affecting agricultural users (Ramirez 2021).

In August 2022, the Bureau of Reclamation's projections indicated that Lake Mead's water level would be below 1,050 feet amsl in January 2023, corresponding to a Tier 2a shortage. This means, beginning January 1, 2023, Arizona has forgone an additional 80,000 acre-feet to achieve the total 592,000 acre-foot Tier 2a reduction in water consumption. These cuts will primarily come from the CAP allocations to the Gila River Indian Community, Tohono O'odham Nation, and some cities, including Phoenix (Duda 2022; Nilsen and Ramirez 2022; U.S. Department of the Interior 2022).

In August 2023 and August 2024, the Bureau of Reclamation's projections indicated that Lake Mead's water level would be between 1,050 and 1,075 feet amsl. This recovery in water levels moved the reservoir back to Tier 1 conditions from Tier 2A conditions, as of January 2023.

The Bureau of Reclamation also makes probability projections about likely outcomes under various hydrologic conditions (including "stress test" conditions). As of August 2024, these projections suggest that for Lake Mead:

- In 2025, there is a 100 percent probability that shortage conditions will persist (Tier 1 or Tier 2).

- In 2026, there is a 0 percent probability of surplus conditions, a 7 percent probability that Tier 0 (normal year) conditions could return, and a 93 percent probability of remaining in a Tier 1 condition.

- In 2027, there is a 0 percent probability of return to surplus conditions, a 17 percent probability that Tier 0 (normal year) conditions could return, and an 83 percent probability of remaining in a Tier 1 condition (Bureau of Reclamation 2024a).

Upstream, Lake Powell projections indicate that water level conditions may improve. Water levels in Lake Powell as of August 2024 were in the Mid-Elevation Release Tier (> 3,525 feet amsl) and have a 57 percent probability of improving to a higher elevation tier in 2026 and a 70 percent probability of improving to a higher elevation tier in 2027 (Bureau of Reclamation 2024a). The drought contingency plan guidelines extend only to 2026; it was not considered for analysis as an RFFA because it will expire before Resolution Copper begins pumping groundwater from the Desert Wellfield. Given long-term climate conditions, presumably the drought contingency plan will be replaced with a different framework. ADWR and CAP have convened the Arizona Reconsultation Committee. This committee will develop an Arizona perspective on the reconsultation of the 2007 Guidelines. Regardless of the specifics, it is reasonable to anticipate that some level of similar restrictions would be in place on the Colorado River, and the projections suggest that such restrictions are likely to worsen over time rather than improve.

However, these restrictions do not mean a complete absence of Colorado River water for Arizona. Arizona's allocation from the Colorado River is 2.8 million acre-feet, of which one-half is allocated to main-stem users, and the other one-half is accessed by users via the CAP aqueduct. Most of the 192,000 acre-feet of forbearance under Tier 0 shortages has come from the excess CAP water pool, which reduces water available for groundwater replenishment activities but avoids drastic effects on contracted users. In 2022, under Tier 1 shortages and the drought contingency plan provisions, the reductions have spread more widely, primarily impacting agricultural users with allocations from the Agriculture Excess pool (Ag pool). In 2023, under Tier 2 shortages and the drought contingency plan provisions, reductions expanded to include reductions in CAP water availability, primary affecting cities in the Phoenix area and

Tribes that receive water from the Non-Indian Agricultural (NIA) pool (Person 2021; Whitehill 2019). Though internal to Arizona, the drought contingency plan also provides for mitigation measures (including wet water replacement and financial compensation) that are meant to reduce impacts on end users.

One provision of the drought contingency plan is to allow irrigation districts in central Arizona to pump an additional 70,000 acre-feet of groundwater per year, which would only replace part of the Colorado River water that Pinal County farmers will have to relinquish under Tier 2 restrictions (James 2020). Some amount of CAP water has also been banked annually for future use as groundwater since 1996, but between 1996 and 2016, only 9 million total acre-feet of water was banked. This is the equivalent of about 1 year of total water usage for the state, or 9 years of total water usage for the Phoenix and Tucson AMAs (Hirt et al. 2017). With Tier 2 restrictions (as occurred in 2023), banking of CAP water for future use is likely to be further reduced, increasing the net reduction in available groundwater. There already is a demand/supply gap with respect to groundwater in Arizona, resulting in long-term depletion of aquifers (Eden et al. 2015). If water use restrictions continue or increase and the amount of groundwater recharge continues to decrease, this would only increase the rate at which groundwater supplies are depleting.

### Ramifications of Future Colorado River Shortages on the Resolution Copper Project

In June 2020, the U.S. Department of the Interior published a proposed decision for the reallocation of NIA priority CAP water (U.S. Department of the Interior 2020). The reallocation decision originated with the 2004 Arizona Water Settlements Act, which led to an ADWR recommendation in January 2014 to reallocate a pool of CAP water to a number of entities, including Resolution Copper. ADWR recommended that Resolution Copper receive 2,238 acre-feet of CAP water annually. The Bureau of Reclamation undertook a NEPA analysis for the potential reallocation, which culminated in the completion of a Final Environmental Assessment and Finding of No Significant Impact in November 2019. On September 20, 2021, Resolution Copper entered into a subcontract with the United States and the Central Arizona Water Conservation District for the approved annual allocation of 2,238 acre-feet of NIA CAP water (Antone 2022b). In 2022, Resolution's NIA CAP allocation was delivered to New Magma Irrigation and Drainage District's Groundwater Savings Facility. Availability of the Resolution Copper NIA CAP water in future years will be subject to both physical availability and the terms of the drought contingency plan.

The DEIS disclosed the potential for Resolution Copper to use CAP water directly as one possible water source, along with pumping groundwater from the Desert Wellfield. However, because Resolution Copper did not have an approved CAP allotment, for the purposes of impact analysis, all makeup water for the mine was assumed to be physically pumped from the Desert Wellfield. This choice was made to ensure that impacts caused by groundwater drawdown in the East Salt River valley are not underestimated. The FEIS continues to assume that all makeup water for the mine is physically pumped from the Desert Wellfield.

Now that Resolution Copper has received the CAP allocation, it could potentially be used to offset about 100,000 acre-feet of groundwater pumping over the operational life of the mine. This could be accomplished by direct use of CAP water but more likely would be accomplished by using the allotment to acquire additional long-term storage credits, as was done in 2022. If this occurs, the impacts to regional groundwater would be less than those disclosed in section 3.7.1 of the January 2021 Rescinded FEIS.

Under Tier 1 and 2 shortages on the Colorado River, or similar shortages required by future iterations of management plans once the drought contingency plan expires, Resolution Copper's CAP allocation may not be fully available. In this case, the disclosures of impacts to regional groundwater in the FEIS would remain appropriate.

There are other ramifications to shortages on the Colorado River. To date, Resolution Copper has obtained long-term storage credits to offset pumping from the Desert Wellfield. In some cases, these long-term storage credits were generated by recharging or using excess CAP water. The current shortages reduce the available pool of excess CAP water significantly, rendering future acquisition of long-term storage credits more difficult. However, these long-term storage credits have no bearing on the impact analysis conducted for the EIS; the entire amount of makeup water needed for the mine was assumed to be physically pumped from the Desert Wellfield. Again, this choice was made to ensure that impacts caused by groundwater drawdown in the East Salt River valley are not underestimated.

### *Assured Water Supplies, Future Development, and Competing Uses for Groundwater*

With the passage of the 1980 Groundwater Management Act, Arizona enacted one of the most progressive and expansive regulatory systems in the western United States governing the use of groundwater. Over the past 40 years, this regulatory system has helped transition water users in Arizona's most populous areas away from the use of groundwater and toward the use of renewable sources.

The Groundwater Management Act established special management areas called Active Management Areas (AMAs) and Irrigation Non-expansion Areas (INAs). Within AMAs, which encompass much of the urban population of the state and several agricultural centers, groundwater use is subject to a system of groundwater rights. By contrast, many rural parts of the state, outside any AMAs, have no restrictions on groundwater pumping except for the legal requirement that it be put to beneficial use.

MANAGEMENT OF THE PHOENIX ACTIVE MANAGEMENT AREA

Both the Desert Wellfield and the dewatering pumping at the mine site take place within the boundaries of the Phoenix AMA. The management strategy of water resources within the AMA is laid out in the AMA management plan. The most recent (and by statute, the final) management plan for the Phoenix AMA is the fifth management plan (2020–2025) (Arizona Department of Water Resources 2022). The Director of the Arizona Department of Water Resources entered an order adopting the fifth management plan on September 9, 2022, with conservation measures to go into effect January 1, 2025. As the fifth management plan is the final plan envisioned in the original Arizona Groundwater Management Act, the conservation measures will remain in effect "until the legislature determines otherwise" (ARS 45-568(C)).

The management plans for each AMA serve as a tool to assist ADWR in achieving the groundwater goals of each AMA. The statutory management goal of the Phoenix AMA is safe-yield by the year 2025 (ARS 45-562(A)). Safe-yield is defined as "a groundwater management goal which attempts to achieve and thereafter maintain a long-term balance between the annual amount of groundwater withdrawn in an active management area and the annual amount of natural and artificial recharge in the active management area" (ARS 45-561(2)). Groundwater withdrawals in excess of natural and artificial recharge lead to groundwater overdraft.

The fifth management plan summarizes the water management challenges facing the Phoenix AMA. This includes groundwater pumping by industrial users like Resolution Copper:

> The risks associated with the overuse of groundwater have been long recognized in Arizona. There were multiple efforts prior to the GMA [Groundwater Management Act] to regulate groundwater, and the risks of overdraft were well-accepted enough that they were written into the "Declaration of Policy" in the Groundwater Code: "(overdraft) is threatening to do substantial injury to the general economy and welfare of this state and its citizens. . . " (A.R.S. § 45-401(A)). To address this threat, the [Groundwater Management Act] set forth what was then seen as a comprehensive and proactive set of regulations with the goal to shift water users to alternate supplies and preserve groundwater.

The regulations and goals laid out in the [Groundwater Management Act] have proven to be insufficient though: despite significant conservation efforts and imported water supplies added to the [Phoenix AMA] since 1980, the AMA has not reached, and is not expected to reach, its goal of safe-yield by 2025. Continued overdraft has resulted in growing pressure on groundwater supplies: physical availability challenges in the AWS [Assured Water Supply] program which have already been observed in the Pinal AMA are expected eventually to also occur in the [Phoenix AMA], and there are additional concerns about the physical impacts (subsidence, fissures, water quality degradation, etc.) associated with continued groundwater mining. (Arizona Department of Water Resources 2022:8-11)

PINAL ACTIVE MANAGEMENT AREA MODELING

ADWR has a long history of assessing groundwater conditions in the Pinal AMA and projecting groundwater use into the future, starting in 1989 with the first Pinal AMA groundwater flow model (Wickham and Corkhill 1989). The results of ADWR's most recent modeling effort for the Pinal AMA was published in 2019, generally raising concerns about future groundwater supplies in the Pinal AMA (Arizona Department of Water Resources 2019). This modeling effort projected groundwater conditions through the year 2115, and incorporated all known groundwater demands including groundwater supplies already committed and approved for Assured Water Supplies and the recovery of long-term storage credits. Municipal and industrial demands were maintained at 2015 levels, and agricultural demands were projected based on a number of factors. Overall, the combined projections show that annual rates of groundwater pumping decrease somewhat over the next century, but not substantially so.

The modeling report focused on whether committed or projected water supplies could physically be obtained from the aquifer. The modeling found that of the roughly 80 million acre-feet projected to be required by the year 2115, only 72 million acre-feet were physically available, suggesting the Pinal AMA may experience a long-term shortfall of 8.1 million acre-feet, or about 10 percent of cumulative total projected 100-year demand (Arizona Department of Water Resources 2019).

The modeled shortfalls noted are for the Pinal AMA as a whole, and it is important to recognize that because the model is based on physical availability, the specific location of the pumping determines whether a shortfall is anticipated. Most of the critical shortfalls are predicted to occur south of Eloy, roughly 30 to 40 miles from the Desert Wellfield. Based on the modeling, groundwater supplies are likely to remain physically available in the northern part of the Pinal AMA nearest the Desert Wellfield, with substantial remaining saturated thickness in the aquifer.

However, the model also predicts that water levels will be reduced by 201 to 300 feet, to between 501 and 800 feet below ground surface in the East Salt River Valley near the boundary with the Phoenix AMA over the next 100 years (see figure 16 in Arizona Department of Water Resources (2019)). This drawdown at the Phoenix AMA boundary will be cumulative with drawdown resulting from the project in the Desert Wellfield. At the boundary of the Phoenix AMA/Pinal AMA, the anticipated drawdown due to Desert Wellfield pumping is estimated to be 40 to 50 feet at the end of Resolution Copper's pumping, eventually recovering to 20 to 30 feet (see figure 3.7.1-2). The total cumulative drawdown at the Phoenix AMA/Pinal AMA boundary is therefore estimated to range from 220 to 350 feet over the next 100 years. Resolution Copper's pumping from the Desert Wellfield would contribute to anticipated drawdown in the northern part of the Pinal AMA, but would likely represent roughly 10 to 15 percent of the total drawdown experienced there. While the cumulative water level reductions anticipated near the Phoenix AMA/Pinal AMA boundary (220 to 350 feet over the next 100 years) will have ramifications on water availability and cost of pumping similar to those described in section 3.7.1, the aquifer in this area is by no means depleted. The Pinal AMA model considers any groundwater at depths greater than 1,100 feet below ground surface to be unavailable for use. Despite the anticipated drawdown, after 100 years the

regional aquifer still retains 300 to 500 feet of saturated thickness (above the 1,100 foot cutoff) (see figures 17 and 21 in Arizona Department of Water Resources (2019)).

As noted above, the drought contingency plan will drive additional groundwater pumping by farmers in the Pinal AMA. The agricultural demands in the Pinal AMA are roughly 400,000 to 500,000 acre-feet per year (Arizona Department of Water Resources 2019). The potential increase resulting from the drought contingency plan (70,000 acre-feet per year) represents a 14 to 17 percent increase in agricultural pumping on an annual basis. This increase would exacerbate the anticipated groundwater conditions modeled by ADWR for the Pinal AMA.

One specific nearby project in the Pinal AMA that has been raised by commenters is the Florence Copper in-situ mining project, located approximately 10 miles south of the Desert Wellfield. This project was screened as a RFFA and identified for analysis for geology and mineral resources, and socioeconomics (SWCA Environmental Consultants 2020b). Ultimately this project only fell within the cumulative effects analysis area for socioeconomics (see section 4.3.3). The Florence Copper project was not analyzed with respect to groundwater resources for two reasons. First, there are no groundwater impacts (such as drawdown or a cone of depression) associated with the Florence Copper project that would overlap with Desert Wellfield pumping impacts. By design, the Florence Copper project maintains a stable water level through control of injection and pumping wells. Second, the Florence Copper project falls outside the cumulative effects analysis area for groundwater resources.

The Florence Copper project is in an area where substantial aquifer drawdown is anticipated unrelated to the Resolution Copper project, as noted above (200 to 300 feet). Additional drawdown may occur that is attributable to the Desert Wellfield, as described above, but would not substantially change the outcome of the Florence Copper project.

RESOLUTION COPPER GROUNDWATER RIGHTS

Resolution Copper is currently pumping groundwater near Superior to dewater the mine infrastructure and would continue to do so throughout the mine life (roughly 1,700 acre-feet per year, or 87,000 acre-feet over the mine life). In addition, Resolution Copper would pump makeup water from the Desert Wellfield, located in the East Salt River valley (this varies by alternative, with the maximum estimate for Alternative 2 at 14,300 acre-feet per year, or 590,000 acre-feet over the mine life). Both activities take place within the Phoenix AMA. As such, Resolution Copper must have appropriately issued groundwater rights or permits to conduct this pumping. Resolution Copper currently holds a dewatering permit for the pumping at the mine site (59-524492); this permit extends through 2029. It is reasonable to assume that this permit would be reissued as needed by ADWR to prevent flooding of an operational mine.

Resolution Copper has not yet obtained the groundwater rights needed to pump from the Desert Wellfield, although they do have some Type 2 Non-Irrigation Grandfathered Rights that would allow pumping (1,800 acre-feet per year, which would equate to 74,000 acre-feet over the mine life), and have also obtained a substantial amount of long-term storage credits (see below). After appropriate permitting, these long-term storage credits could be recovered from the Desert Wellfield without acquisition of further groundwater rights or permits.

In December 2022, Resolution Copper clarified agreements that are currently in place for obtaining additional long-term storage credits. Resolution Copper indicated that delivery of its Colorado River allotment was anticipated to result in additional long-term storage credits, estimated through 2024 as 5,596 acre-feet but also subject to potential drought reductions (Antone 2022b). Resolution Copper has also entered into an agreement with EPCOR to recharge effluent over the life of the mine and accrue 56,780 acre-feet of long-term storage credits in the Phoenix AMA. These long-term storage credits will be exchanged to Resolution Copper in return for long-term storage credits held in Pinal AMA. With these

agreements, Resolution Copper would have roughly 318,000 acre-feet of long-term storage credits, which accounts for roughly 60 percent of the water needs for the preferred alternative.

It is foreseeable that ADWR would make the remainder of the necessary groundwater available to Resolution Copper. Resolution Copper would likely receive a Permit to Withdraw Groundwater for Mineral Extraction and Metallurgical Processing. Under State law, this is a non-discretionary permit, provided that certain conditions are met (ARS 45-514).

OTHER FUTURE WATER USERS IN THE EAST SALT RIVER VALLEY

One of the primary mechanisms by which groundwater is managed in the AMAs is the Assured Water Supply program. Under this program, the act of subdividing land for development requires proof that enough water is physically and legally available to supply those homes for 100 years. As the intent of this program is to foster use of renewable sources of water, there are restrictions on how much groundwater can be used to make this demonstration. There is a total of roughly 24,000 acre-feet of annual future committed demand through approved Assured Water Supplies in the East Salt River valley (Barter et al. 2020). This is above and beyond the amount of agricultural, industrial, and municipal pumping already taking place in this part of the basin.

Superstition Vistas is a 275-square mile area of Arizona State Trust land in the East Salt River valley. Conceptually, this area has been identified for residential and commercial development, with a number of different scenarios considered (Morrison Institute for Public Policy 2006); however, at the time of this January 2021 Rescinded FEIS, the ASLD had taken no concrete steps for auction of this land. This has since changed, but only for a small portion of the Superstition Vistas area, described in the "Analysis of Cumulative Effects in the East Salt River Valley" section below. While the lack of detailed water use plans prevents specific analysis of most of the Superstition Vistas development, some estimates indicate that a population of 900,000 could live in this area. Throughout the Resolution Copper Project NEPA process, the ASLD has raised concerns about the potential future water supply to support the Superstition Vistas development. The cumulative effects modeling described below was undertaken in part to investigate the potential impacts to the Superstition Vistas water supply.

LONG-TERM STORAGE CREDITS IN EAST SALT RIVER VALLEY

Aside from the long-term storage credit portfolio acquired by Resolution Copper, a substantial amount of groundwater in the East Salt River valley is already "spoken for" because it represents banked water or long-term storage credits acquired through physical recharge of water to the aquifer or "in-lieu" recharge of water to the aquifer (foregoing otherwise legal groundwater pumping by providing alternative water supplies, like excess CAP water). The amount of stored water is substantial. Approximately 7 million acre-feet of long-term storage credits were stored in the entire Phoenix AMA at the end of 2017 (Barter et al. 2020).

ANALYSIS OF CUMULATIVE EFFECTS IN THE EAST SALT RIVER VALLEY

The analysis of impacts to the East Salt River valley aquifer as a result of the Desert Wellfield pumping was conducted for the EIS using a groundwater flow model. This groundwater flow model was built from an existing, calibrated, regulatory model prepared by ADWR. In some form, this model has been used widely for basin-wide planning purposes since the 1990s, as well as to estimate project-specific water supply impact. The appropriateness of using this model to predict impacts from the Desert Wellfield was further assessed by the NEPA team and found to be reasonable (Walser 2020a).

An additional set of model runs was conducted through the year 2118 to simulate cumulative effects from the water users described above: existing pumping, permitted Assured Water Supplies, recovery of long-term storage credits, and pumping from the Desert Wellfield (Barter et al. 2020). The following represent

the approximate stresses applied in the model (for the entire Phoenix AMA, not just the East Salt River valley):

- Non-recovery agricultural pumping: 530,000 acre-feet/year

- Non-recovery non-agricultural pumping: 200,000 acre-feet/year

- Recovery of storage credits accrued through 2017 (including Resolution Copper credits): 112,000 acre-feet/year

- Recovery of additional storage credits accrued after 2017: 14,300 acre-feet/year

- Permitted Assured Water Supply groundwater demands: 105,000 acre-feet/year

- Non-recovery Desert Wellfield pumping: 6,700 acre-feet per year

Results indicate that by 2118, groundwater levels in the East Salt River valley would experience drawdown up to roughly 450 feet below current water levels, with or without Desert Wellfield pumping. As shown in figure 4.3.4-1, Resolution Copper's pumping increases drawdown as would be anticipated, primarily in the immediate vicinity of the Desert Wellfield.



**Figure 4.3.4-1. Projected drawdown in the East Salt River valley in 2118 caused by cumulative water use, with (right) and without (left) Resolution Copper pumping**

In the center of the Desert Wellfield, without Resolution Copper pumping, water levels would decline roughly 75 feet from current levels by 2118. With Resolution Copper pumping, water levels would decline roughly 100 feet by 2118. Note that operational pumping has ceased, and groundwater levels have

partially recovered by 2118. Maximum drawdown in the center of the Desert Wellfield of just over 200 feet would occur at the peak of operational pumping (around 2060).

A depth-to-water of 1,000 feet below land surface is often used as a limit of physically available groundwater in the Phoenix AMA. Maximum depth-to-water in 2118 with all cumulative groundwaters uses ranges up to 850 feet as shown in figure 4.3.4-2, with a large cone of depression forming near Apache Junction. In addition, some model cells near Apache Junction and at the periphery of the basin show drying by 2118, indicating that groundwater would not be available in these areas. The depth-to-water in the center of the Desert Wellfield in 2118 is 550 feet below ground surface without Resolution Copper pumping, and 575 feet below ground surface with Resolution Copper pumping.



**Figure 4.3.4-2. Projected depth-to-water in the East Salt River valley in 2118 caused by cumulative water use, with (right) and without (left) Resolution Copper pumping**

### Sufficiency of Regional Water Supplies

Groundwater modeling, using the best available estimates of all regional groundwater users over the next 100 years, indicates that regional groundwater supplies generally are sufficient to satisfy committed demands. Full drying of the aquifer is limited to peripheral areas, and depth-to-groundwater generally does not exceed limits of physical availability (1,000 feet). However, there likely would be certain areas that experience lack of well capacity and groundwater shortages, particularly around the edges of the basin.

Further, the cost and energy required for pumping increases as groundwater deepens, and infrastructure costs would increase as wells and pumps need to be lowered or replaced. According to one estimate, an additional 1.02 to 2.56 kilowatt-hours of energy, depending on pump efficiency, are required to lift an

acre-foot of water an additional foot (Peacock n.d. [1996]). The above quantitative modeling analysis includes known population increases through the incorporation of permitted Assured Water Supplies. At the time of the January 2021 FEIS, no portion of Superstition Vistas had been concretely planned for development. This has now changed. The first Superstition Vistas parcels (2,783 acres) were auctioned by the ASLD in 2020, purchased by DR Horton. Prior to subdivision, this parcel will require demonstration of a 100-year water supply under the Assured Water Supply program. There are generally two ways a developer can demonstrate this 100-year water supply: either by obtaining a separate, independent Assured Water Supply for the parcel from the ADWR, or relying on a designation of Assured Water Supply already obtained by a water provider from the ADWR. In this case, the auctioned Superstition Vista parcels are relying on previous designation obtained by the Apache Junction Water Department. Sufficient water has not been demonstrated to develop the entire Superstition Vistas area, but Apache Junction Water Department has demonstrated enough water rights to begin development on the auctioned properties (Hilgartwilson LLC 2021). Importantly, those committed Assured Water Supplies were included in the Desert Wellfield modeling report described above (Barter et al. 2020).

In summary, the portion of Superstition Vistas that has a demonstrated source of water has been quantified and included in the regional cumulative effects groundwater model. Other portions of Superstition Vistas without demonstrated water supplies are speculative and not explicitly modeled.

Resolution Copper and ASLD have discussed potential wellfield layouts for Superstition Vistas, informed by these modeling results, but no firm water supply planning has been undertaken. Conceptual water use estimates for the entirety of Superstition Vistas range anywhere from 100,000 to 190,000 acre-feet/year, depending on the progressiveness of water conservation (Morrison Institute for Public Policy 2006).

While adequate groundwater exists for committed regional demands, including Resolution Copper's Desert Wellfield, as demonstrated by the cumulative effects model presented above, those demands are met in part by mining of non-renewable groundwater and result in an overall lowering of groundwater levels over the next 100 years. While the next 100 years are demonstrated through this modeling to be manageable without exhausting groundwater supplies in the East Salt River valley, ultimately, the long-term use of groundwater may become unsustainable, even without considering Superstition Vistas' growth. The potential new future residential demand from Superstition Vistas represents between seven and 13 times the annual groundwater pumping by Resolution Copper over the operational life of the mine. More importantly, these residential water demands are in perpetuity, rather than for a limited time frame (four decades in the case of Resolution Copper). While the cumulative effects modeling does not preclude the future Superstitions Vistas' development and the population growth it portends, the cumulative effects modeling suggests that regional water supplies would become more limited and would need to be carefully assessed for sufficiency based on actual development plans for the area. This assessment would take place at a basin-wide planning level by ASLD before auctioning of the land, as well as through the existing regulatory framework, which requires Assured Water Supply permitting before approving each subdivided parcel.

In its comments on the DEIS, ASLD indicated that the water use of the Desert Wellfield would preclude the development of 3,440 acres of otherwise developable State Trust land and calculated a potential loss in revenue. This comment fundamentally suggests that the Desert Wellfield and full and complete development of Superstition Vistas are mutually exclusive, based on the assumption that groundwater supplies would not be sufficient for all development. The cumulative effects modeling cannot fully answer this question. The recent auctioned land described above is an example of some Superstition Vistas parcels whose water use is already effectively included in the cumulative effects modeling. The outcome of the cumulative effects modeling indicates there is still groundwater available for use after 100 years, even after all committed demands are accounted for. Whether these water supplies would be sufficient for full development of Superstition Vistas depends on the details of that development, which

do not yet exist. However, as noted above, the overall concern that regional supplies would become more limited in the future is certainly consistent with the outcome of the cumulative effects modeling.

### *2023 ADWR Salt River Valley Model Update*

For over 30 years, ADWR has developed, updated, and used a comprehensive groundwater flow model for the Salt River valley, including the Phoenix AMA (known as the Salt River valley (SRV) model). The Desert Wellfield cumulative effects modeling described above was conducted by updating a version of this calibrated regulatory model.

In June 2023, ADWR released the results of a new predictive model run using the SRV model for the period 2022 through 2121 (ADWR 2023a, 2023b, 2023c). The release of the new model results triggered substantial public concern and news coverage, as it was accompanied by an announced moratorium on approving new Assured Water Supplies for development within the Phoenix AMA.

The 2023 SRV model results in the East Salt River valley are substantially different from the Desert Wellfield modeling used for the cumulative effects analysis:

- As noted above, the cumulative effects analysis shows that depth to water in the center of the Desert Wellfield in 2118 is 550 feet below ground surface without Resolution Copper pumping and 575 feet below ground surface with Resolution Copper pumping.

- The 2023 SRV modeling results show that depth to water in 2121 is 750 to 1,000 feet below ground surface without Resolution Copper pumping.

A review was undertaken to identify the differences between the cumulative effects modeling (Barter, Bates, and Bayley 2020) and the 2023 SRV model (ADWR 2023a, 2023b, 2023c). The review found that the difference in modeling results stems from the fact that the 2023 SRV model simulates approximately twice as much net groundwater withdrawals in the East Salt River valley than the cumulative effects modeling (Barter and Bayley 2023). Over 80 percent of this net groundwater withdrawal increase is attributable to resumed agricultural pumping within NMIDD, which ADWR simulated at 76,000 acre-feet per year for 100 years. This step was taken because ADWR assumed that as a result of curtailment of Colorado River supplies, the cessation of CAP-sourced water currently irrigating NMIDD crops would lead to full resumption of historic groundwater pumping for agriculture irrigation.

By contrast, the cumulative effects modeling for the Desert Wellfield assumes that NMIDD agricultural land will be converted to residential housing by 2030. The 2023 SRV model also assumes this conversion and includes groundwater use for residential development. However, the review found that the 2023 SRV model does not correspondingly reduce the NMIDD agricultural pumping, but rather restores it to historic levels. The review found that the 2023 SRV model is essentially double-counting the water use for NMIDD lands, including pumping for both agriculture and residential development.

The FEIS reviewers interviewed NMIDD representatives to determine whether the cumulative effects analysis used improper assumptions. NMIDD representatives confirmed the approach used in the cumulative effects modeling and estimated that future irrigation pumping will not exceed 8,000 acre-feet per year and will cease completely by 2050 due to residential development of NMIDD land (Barter and Bayley 2023).

The difference is substantial between the two models when comparing the cumulative water budget for the 100-year period for the East Salt River valley:

- Cumulative effects modeling (Barter, Bates, and Bayley 2020):
    - Inflows: 3.3 million acre-feet

- o Outflows: 5.3 million acre-feet
- o Total deficit: 1.9 million acre-feet
- 2023 SRV modeling (ADWR 2023a, 2023b, 2023c):
  - o Inflows: 5.1 million acre-feet
  - o Outflows: 15.7 million acre-feet
  - o Total deficit: 10.6 million acre-feet

Both models indicate that a groundwater deficit will occur in the East Salt River valley over the next 100 years, with pumping exceeding recharge. This occurs with or without Desert Wellfield pumping, though the Desert Wellfield withdrawals will physically add to the deficit (i.e., not taking into account any long-term storage credits). Cumulative effects analysis should be based on reasonably foreseeable actions. The conversion of NMIDD lands to residential development with reductions in agricultural pumping is the most likely and reasonably foreseeable scenario for these lands. This scenario is appropriately modeled in the cumulative effects modeling used for the EIS but was not appropriately modeled in the 2023 SRV modeling.

Overall, the new analysis and subsequent policy changes in Arizona water management and the Phoenix AMA that occurred in 2023 highlight the continued deficit pumping of groundwater resources but did not result in any change to the cumulative effects assessment in this FEIS. While the next 100 years are demonstrated through the cumulative effects modeling to be manageable without exhausting groundwater supplies in the East Salt River valley, ultimately, long-term use of groundwater may become unsustainable, even without considering the growth of the Superstition Vistas development.

## 4.3.4.2    Future Meteorological Trends

For the DEIS, we did not handle future meteorological trends as a cumulative effect. Rather, in the face of changing guidance on how this topic should be handled during NEPA analysis, as we evaluated the issues to analyze gathered from project scoping, we chose the following approach:

- Conduct a quantitative assessment of greenhouse gas emissions of $CO_2$, methane, and nitrous oxide (see appendix E, Issue 8-3)
- Conduct an assessment using best available science of long-term trends in precipitation and temperature that may affect resources (see appendix E, Issue 8-8)

The quantitative assessment of greenhouse gas emissions is found in section 3.6 of the FEIS.

### Future Meteorological Scenario Used for NEPA Analysis

To address the effects of long-term trends in precipitation and temperature on individual resources, we started by compiling a consistent meteorological trend scenario for all resource specialists to use, making use of the best available literature and analyses for the anticipated effects of future meteorological trends (Dugan 2018). In the FEIS, these long-term trends are analyzed in the following places:

- Section 3.3, Soils, Vegetation, and Reclamation. This analysis focuses on the anticipated effect that long-term meteorological trends would have on the success of revegetation efforts after closure.
- Section 3.6, Air Quality. This analysis focuses on the basic trends anticipated and greenhouse gas emissions.

- Section 3.7.1, Groundwater Quantity and Groundwater-Dependent Ecosystems. This analysis focuses on the effect ongoing meteorological trends would have on the hydrologic water balance in the area, particularly changes to groundwater recharge.

- Section 3.7.3, Surface Water Quantity. This analysis focuses on the effect ongoing meteorological trends would have on the hydrologic water balance in the area, particularly changes in the amount and timing of surface water runoff.

- Section 3.10.2, Fuels and Fire Management. This analysis focuses on the changes in wildfire risk that result from changes in fuel load from vegetation changes, and the higher risk of damage in the aftermath of fires from more intense storms.

The long-term meteorological trends in temperature, precipitation amount, and precipitation timing and intensity would tend to exacerbate the resource impacts from the project. In a similar way, these trends would tend to exacerbate the cumulative impacts from reasonably foreseeable future actions that are described in this chapter.

The consistent outlook is that the American Southwest would see warmer and drier conditions. There is greater certainty with temperature changes. Average temperatures in Arizona have increased about 2°F in the past century (U.S. Environmental Protection Agency 2016). In the Lower Colorado River basin, the annual mean and minimum temperature have increased by 1.8°F to 3.6°F for the time period 1900–2002. Data suggest that spring minimum temperatures for the same time period have increased by 3.6°F to 7.2°F (Dugan 2018). Annual average temperatures are projected to rise by 5.5°F to 9.5°F by 2070–2099, with continued growth in global emissions (Melillo et al. 2014).

Anticipated impacts on precipitation are less certain, with some models suggesting more precipitation, and others suggesting less. There is general agreement that the timing and intensity of precipitation events (and drought) would change. Increased temperatures are expected to diminish the accumulation of snow and the availability of snowmelt, with the most substantial decreases in accumulation occurring in lower-elevation portions of the Colorado River basin, where cool-season temperatures are most sensitive to warming (Dugan 2018).

The common effect of these changes is that vegetation would become drier and more susceptible to drought and fire, and that water sources would experience greater stress. This in turn affects the terrestrial habitat and the hydrologic systems that support aquatic and riparian habitat. The increased risk of fire, and the detrimental and cascading effects of wildfires, can lead to further negative effects, which, while infrequent, can often be catastrophic. The long-term changes also make recovery from these incidents, as well as revegetation and reclamation efforts to be undertaken for the mine, less effective with a higher risk of failure.

Note that ongoing drought and long-term meteorological trends also have effects on water supplies; these effects are discussed elsewhere in chapter 4.

### Recent Research on Future Meteorological Trends

Research and predictions about future meteorological trends have continued to evolve since the NEPA analysis for the Resolution Copper Project was conducted. Building on the information already presented above and in other sections of the EIS, this section summarizes key conclusions from the most recent meteorological data and projections included in the FEIS.

GENERAL PROGNOSIS FOR SOUTHWEST WATER

Recent reports note with medium to high confidence that droughts and earlier snowmelt runoff will increase water scarcity during the summer peak water demand period especially in regions with extensive

irrigated agriculture, leading to economic losses and increased pressures on limited groundwater as a substitute for diminished surface water supplies. These reports also highlight with high confidence that heavy exploitation of limited water supplies and deteriorating freshwater management infrastructure in the Southwest will compound the effects of meteorological trends and increase the risk of negative impacts in the region.

## RISING TEMPERATURES

A 2022 summary of the latest meteorological data and projections for Arizona from the National Oceanic and Atmospheric Administration's National Centers for Environmental Information (Frankson and Kunkel 2022) shows temperatures in Arizona have increased by 2.5°F since 1900, with average temperatures and frequency of extreme heat expected to continue increasing throughout the twenty-first century. Current projections also confirm that the region will experience serious ongoing threats from extended drought, while summer monsoon rainfall will remain highly variable and difficult to predict. Current assessments confirm that communities that rely on snowpack to supply their water may be especially vulnerable, as late-season snowpack accumulation declines due to increasing winter temperatures.

## CONTINUED UNPREDICTABLE MONSOON RAINFALL

In southern Arizona, monsoon rains are highly unpredictable and can have negative impacts at either extreme. For example, "on September 8, 2014, extremely heavy monsoon rain associated with a decaying eastern Pacific hurricane caused significant damage and flooding around the Phoenix area. The record for single-day rainfall was broken, with several stations reporting more than 4 inches" (p. 4 in Frankson and Kunkel (2022)). At the other extreme, "the 2020 monsoon season was the driest on record, with only 1.5 inches of precipitation, well below the previous record low of 2.8 inches in 2009" (p. 4 in Frankson and Kunkel (2022)).

## UNCHANGED FREQUENCY AND INTENSITY OF RAINFALL EVENTS

While many areas of the United States have already begun experiencing an increase in the frequency of extreme rainfall events, this trend has not been observed in Arizona and other southwestern states. The number of 1-inch extreme precipitation events in Arizona continues to be variable and has been near to below normal, since the 1990s, with the exception of the 2010–2014 period (Frankson and Kunkel 2022).

## INCREASING SEASONAL AND LONG-TERM WATER SHORTAGES

Arizona is on the northern fringe of an area of projected decreases in spring precipitation over Mexico and Central America, indicating a risk of reduced spring precipitation. However, overall annual precipitation trends remain uncertain for Arizona (Frankson and Kunkel 2022).

Higher spring temperatures are expected to raise the snow line and make precipitation more likely to fall as rain rather than snow. The resulting reduced snowpack and earlier melting of snowpack is expected to reduce water resources available for irrigation during the summer. These impacts will be particularly pronounced at lower elevations in the mountains where snowpack is already unreliable (Frankson and Kunkel 2022).

Whether or not overall annual precipitation decreases, droughts are expected to become more intense during the cool season due to increasing temperatures resulting in increased evaporation. Increased temperature and evaporation will further reduce streamflow, soil moisture, and water supplies. Increasingly frequent droughts will result in more frequent dust storms and risk of very large wildfires (Frankson and Kunkel 2022).

### Assessment of Future Meteorological Trends in Groundwater Models

There are limited studies that provide quantitative assessment of the linkages between future meteorological projections and estimated groundwater recharge, particularly at the regional level. A review of aquifer studies across the West showed average declines of 10 to 20 percent in total recharge across the southern aquifers (Meixner et al. 2016).

Groundwater recharge can be understood in four general categories: "diffuse" recharge that results when precipitation infiltrates over a large area; "focused" recharge, from streams and runoff; "mountain system" recharge from mountains and mountain streams; and "irrigation" recharge resulting from irrigation-based agriculture (Bolin et al. 2010). Meteorological trends are especially likely to reduce mountain system recharge due to decreased snowpack and mountain streamflow, particularly at lower elevations. For desert systems like the Desert Wellfield pumping in the East Salt River valley, this is likely not a large change in the overall groundwater system dynamics. For example, the Salt River valley model developed by the ADWR estimates roughly 2 percent of all recharge to the aquifer comes from mountain system recharge, with most recharge coming from agricultural recharge (Freihoefer et al. 2009). In contrast, for the mine site groundwater model, it is possible that all recharge components could be affected in some way by future meteorological trends.

The effect of future meteorological trends on the groundwater model was a topic discussed by the Groundwater Modeling Workgroup during the NEPA analysis (Morey 2018e). The primary impact of these trends to the groundwater model would be through a decrease in precipitation recharging the aquifer, or an increase in loss of water through evaporation or transpiration from higher temperatures.

In the mine site groundwater model, gain of water to the aquifer by recharge of precipitation generally occurs along stream channels, as does loss of water to the aquifer by evapotranspiration from riparian vegetation. These two influences are both combined into a single recharge input to the groundwater model. In order to understand the effects of future meteorological trends on the mine site groundwater model outcomes, the Forest Service (through the forum of the Groundwater Modeling Workgroup) requested a sensitivity analysis that adjusted recharge in the model by ±50 percent.

The purpose of this sensitivity analysis was to understand how important meteorological changes are to the outcomes of the model. Results were provided in the form of maps showing the areal extent of the 10-foot drawdown contour under each scenario and hydrographs for each groundwater-dependent ecosystem analyzed in the EIS (Meza-Cuadra et al. 2018c). Results of the recharge (±50 percent recharge) sensitivity analyses are shown in table 4.3.4-1, comparing the base case results to the sensitivity modeling run results.

**Table 4.3.4-1. Results of assessment of future meteorological trends for mine site groundwater model**

| GDE | Base Case Drawdown (No Action) (feet) | Base Case Drawdown (Proposed Action) (feet) | Additional Drawdown at 50% Less Recharge at High Elevations (Sensitivity Run #85) (feet) | Additional Drawdown at 50% Less Recharge at Low Elevations (Sensitivity Run #87) (feet) | Change in Conclusions Resulting from Future Meteorological Trends (see EIS table 3.7.1-3 for base case conclusions) |
|---|---|---|---|---|---|
| **Queen Creek and tributaries** | | | | | |
| Queen Creek – Flowing reach from km 17.39 to 15.55 | 0.8 | 6.3 | 0.1 | 1.2 | Remains <10 feet of drawdown. Future meteorological trend scenario reaches same conclusions as base case. |

992

| GDE | Base Case Drawdown (No Action) (feet) | Base Case Drawdown (Proposed Action) (feet) | Additional Drawdown at 50% Less Recharge at High Elevations (Sensitivity Run #85) (feet) | Additional Drawdown at 50% Less Recharge at Low Elevations (Sensitivity Run #87) (feet) | Change in Conclusions Resulting from Future Meteorological Trends (see EIS table 3.7.1-3 for base case conclusions) |
|---|---|---|---|---|---|
| Arnett Creek (from Blue Spring to confluence with Queen Creek) AC 12.49 AC 4.54 | 1.1 0.1 | 2.3 0.2 | 0.0 0.0 | 1.0 0.6 | Remains <10 feet of drawdown. Future meteorological trend scenario reaches same conclusions as base case. |
| Telegraph Canyon (near confluence with Arnett Creek) | 1.1 | 2.7 | 0.4 | 1.2 | Remains <10 feet of drawdown. Future meteorological trend scenario reaches same conclusions as base case. |
| **Devil's Canyon and springs along channel** | | | | | |
| Middle Devil's Canyon (from km 9.3 to km 6.1, including springs DC8.2W, DC6.6W, and DC6.1E) DC6.1E DC6.6W DC8.2W DC8.8W DC8.1C | 0.1 1.0 −0.2 −0.1 −0.1 | 2.8 10.8 4.3 3.1 3.2 | 0.3 0.8 0.0 1.5 0.2 | 0.0 0.0 0.0 0.0 0.0 | With the exception of DC6.6W, remains <10 feet of drawdown. Future meteorological trend scenario reaches same conclusions as base case. For DC6.6W, conclusion for base case was: "Additional drawdown due to block caving is anticipated in spring DC-6.6W with the base case model and most sensitivity modeling runs." Future meteorological trend scenario increases drawdown from 10.8 to 11.6, but reaches same conclusions as base case. |
| Lower Devil's Canyon (from km 6.1 to confluence with Mineral Creek, including spring DC4.1E) 5.5C 4.1E | −0.3 −0.1 | 2.8 0.5 | 0.3 −0.1 | 0.0 0.0 | Remains <10 feet of drawdown. Future meteorological trend scenario reaches same conclusions as base case. |
| **Mineral Creek and springs along channel** | | | | | |
| Mineral Creek (from Government Spring (km 8.7) to confluence with Devil's Canyon, including springs MC8.4C and MC3.4W (Wet Leg Spring)) MC6.9 Lower Mineral | −0.1 0.0 | 1.3 0.4 | 0.8 0.2 | 0.0 0.0 | Remains <10 feet of drawdown. Future meteorological trend scenario reaches same conclusions as base case. |
| **Queen Creek Basin springs** | | | | | |
| Bitter Spring | 2.0 | 28.5 | 1.1 | 0.3 | Remains 10–30 feet of drawdown. Future meteorological trend scenario reaches same conclusions as base case. |
| Bored Spring | 105.0 | 180.9 | 2.3 | 6.2 | Remains >50 feet of drawdown. Future meteorological trend scenario reaches same conclusions as base case. |
| Hidden Spring | 90.7 | 90.7 | 1.3 | 4.9 | Remains >50 feet of drawdown. Future meteorological trend scenario reaches same conclusions as base case |

| GDE | Base Case Drawdown (No Action) (feet) | Base Case Drawdown (Proposed Action) (feet) | Additional Drawdown at 50% Less Recharge at High Elevations (Sensitivity Run #85) (feet) | Additional Drawdown at 50% Less Recharge at Low Elevations (Sensitivity Run #87) (feet) | Change in Conclusions Resulting from Future Meteorological Trends (see EIS table 3.7.1-3 for base case conclusions) |
|---|---|---|---|---|---|
| Iberri Spring | 0.1 | 0.2 | 0.0 | 0.0 | Remains <10 feet of drawdown. Future meteorological trend scenario reaches same conclusions as base case. |
| Kanes Spring | 7.7 | 56.6 | 5.9 | 14.5 | Remains >50 feet of drawdown. Future meteorological trend scenario reaches same conclusions as base case |
| McGinnel Mine Spring | 18.0 | 22.7 | −0.2 | -3.4 | Remains 10–30 feet of drawdown. Future meteorological trend scenario reaches same conclusions as base case. |
| McGinnel Spring | 24.0 | 28.3 | −0.3 | 0.6 | Remains 10–30 feet of drawdown. Future meteorological trend scenario reaches same conclusions as base case. |
| No Name Spring | 0.1 | 0.2 | 0.0 | 1.5 | Remains <10 feet of drawdown. Future meteorological trend scenario reaches same conclusions as base case. |
| Rock Horizontal Spring | 1.3 | 2.0 | 0.0 | 0.0 | Remains <10 feet of drawdown. Future meteorological trend scenario reaches same conclusions as base case. |
| Walker Spring | 27.1 | 40.9 | 0.5 | 4.2 | Remains 30–50 feet of drawdown. Future meteorological trend scenario reaches same conclusions as base case. |
| **Water supply wells** | | | | | |
| DHRES-16-753 | 3.6 | 21.7 | 0.4 | 1.6 | Remains 10–30 feet of drawdown. Future meteorological trend scenario reaches same conclusions as base case. |
| Gallery Well | 0 | 0.1 | 0.2 | 0.3 | Remains <10 feet of drawdown. Future meteorological trend scenario reaches same conclusions as base case. |
| HRES-06 | -0.7 | 9.7 | 5.0 | 0.1 | Results change from <10 feet of drawdown under base case scenario to 10–30 feet of drawdown under Future meteorological trend scenario. However, because of the presence of sensitivity runs, the conclusions in table 3.7.1-3 already assumed impacts: "Additional drawdown due to block caving is anticipated for water supply wells in this area, except for those completed solely in alluvium or shallow fracture systems. Impacts could include loss of well capacity, the need to deepen wells, the need to modify pump equipment, or increased pumping costs. Applicant-committed remedy if impacts occur." Future meteorological trend scenario reaches same conclusions as base case. |

The anticipated impacts on precipitation, recharge, and evapotranspiration from continuing meteorological trends are described in section 3.7.1 and further detailed in Dugan (2018), but largely are not quantifiable. Though unquantifiable, the Groundwater Modeling Workgroup found that a ±50 change in recharge was sufficient to account for the effects of future meteorological trends on precipitation. Even under this substantial change, not a single conclusion changed for any GDEs or water supply wells.

The fundamental reason for this lack of change in conclusions is that precipitation/evapotranspiration are small components of the water budget, compared with the mine dewatering that will occur.

Future meteorological trends are anticipated to have profound impacts on the hydrologic cycle in Arizona. However, the impacts described in the groundwater model are largely influenced by groundwater withdrawals and the fundamental change in geologic structure caused by the block-caving. Changes driven by long-term meteorological trends that affect recharge and evapotranspiration have an effect, as shown in table 4.3.4-1, and exacerbate impacts caused by mine dewatering. However, these effects do not drive the model and therefore result in little change to the conclusions in the FEIS that are based on the results of the groundwater model.

### Future Meteorological Trends and Ramifications for Potential Tailings Failure

Concerns have also been raised as to whether future meteorological trends has been adequately assessed in the design of the tailings storage facility. Future meteorological trends are anticipated to lead to more extreme precipitation and flooding events, as well as changes in watershed conditions.

These type of extreme events are already encompassed in the assumptions and design parameters used for the tailings storage facility. With respect to water, many design parameters are based on "return periods." These are probabilities of a given storm event or flood event occurring. These probabilities are derived from the historic record of actual precipitation events and flood events. For example, a return period of 100 years (a 100-year storm event), has a 1 percent probability of occurring for any given storm event.

The current meteorological trend research does not predict exactly how much bigger storm or flood events could become. It is not possible to predict now exactly what a 100-year storm event might look like 50 years in the future given the ongoing meteorological trends. In lieu of this understanding of how storms could perform in the future, we can look instead at more extreme events under current conditions, such as the 1,000-year event. A 1,000-year event has a 0.1 percent (one-tenth of 1 percent) probability of occurring, given the historic record.

The design of the tailings storage facility under all action alternatives already incorporates events even more extreme than the 1,000-year event (Patterson 2022). Each impoundment is designed to safely store, at a minimum, the 72-hour probable maximum flood. The probable maximum flood is defined as the flood that may be expected from the most severe combination of critical meteorological and hydrologic conditions that are reasonably possible in any particular drainage. The probable maximum flood has a probability even less than that of a 10,000-year event, which has a 0.01 percent (one-hundredth of 1 percent) probability of occurring.

Since the probabilities of given floods are based on the historic record, they reflect the historic conditions of the watershed when the flood occurred. However, future meteorological trends can alter these conditions. For example, higher temperatures and lower precipitation are anticipated to lead to more frequent, and more severe, wildfire. Fire can fundamentally change how precipitation runs off a watershed by removing vegetation and even causing hydrophobic (water-repelling) soil conditions. With respect to the tailings storage facilities, the storage calculations assume that the upstream contributing area has a runoff coefficient of 1.0. This means that every drop of water falling on this area during a storm event will leave the watershed as runoff, with no infiltration to soil or groundwater. This replicates the worst conditions that could occur on a watershed due to fire. It also replicates less catastrophic situations,

such as when an area has received substantial previous rainfall and soil is already saturated, leading to greater runoff.

Each tailings storage facility also has stormwater control structures designed to route upstream flow around the facility. These structures are designed for a 24-hour, 100-year storm. This relatively small-magnitude design event suggests these diversion structures may be undersized for future extreme events. The tailings storage facility designs take this into account. As an additional safety factor built into the design, the tailings storage designs assume that these diversion structures would fail during the extreme design flood event (72-hour probable maximum flood), resulting in all upstream flow instead entering the tailings storage facility. The design of the tailings storage facility can safely store all the water resulting from this scenario.

# Chapter 5. Consulted Parties

## 5.1    Introduction

This chapter provides an overview of the consultation and coordination conducted to date between the Forest Service and Federal, State, and local agencies, Tribes, and the public. We expanded this chapter to include consultation, agency permitting activities, and additional comments and outreach activities conducted after publication of the DEIS, including cooperating agency review, Tribal consultation, the EIS public review, comment analysis, and agency response processes.

## 5.2    Notice of Intent and Scoping

An NOI announcing the Tonto National Forest's intent to prepare an EIS was published in the Federal Register on March 18, 2016. The notice announced the preparation of this EIS as well as opportunities for public involvement, including scoping meetings. Five public scoping meetings subsequently were held at the locations and on the dates shown in table 1.6.1-1 in chapter 1. The official scoping and public commenting period lasted 120 days, from March 18 to July 18, 2016.

Members of the public were afforded several methods for providing comments during the scoping period. These included multiple comment stations with comment forms or providing oral comments to a court reporter at the scoping meetings, or the opportunity to send emails to comments@resolutionmineeis.us. Additionally, interested parties could submit letters via U.S. mail to the Tonto National Forest, or drop off written comments in person at the Tonto National Forest Supervisor's Office located at 2324 East McDowell Road, Phoenix, Arizona 85006, during normal business hours. We received 133,653 comments during the project scoping period.

A comprehensive scoping report summarizing the public meeting and comment process and providing a detailed synopsis of the scoping comments received was released in March 2017. The scoping report (U.S. Forest Service 2017i) is available on the project website: www.ResolutionMineEIS.us. This website was created to provide access to the project schedule, updates, project and alternative information, and baseline data and reports. The website has been active since 2016.

## 5.3    Notice of Availability and DEIS Comment Period

A Notice of Availability (NOA) announcing the release of the Resolution Copper Project and Land Exchange DEIS was published in the Federal Register on August 9, 2019. The NOA disclosed the online location to download the DEIS, along with opportunities for public involvement, including public comment meetings. Other outreach and means of notification included 15,200+ postal mail and 23,000+ emails to individuals on the project mailing list, social media posts, news releases, website announcements, 16 newspaper notices (in English and Spanish), and posters physically displayed at 37 various local bulletin boards and areas within the project vicinity. Six public meetings were held at the locations and on the dates shown in table 5.3-1. The meeting format allowed for an open house with posters and handouts. Staff were on hand to answer questions, and a court reporter and comment table were available for receipt of verbal or written comments. Meetings also included a recorded presentation and a facilitated hearing for those wishing to provide verbal testimony.

**Table 5.3-1. DEIS public meeting locations, dates, and attendance numbers**

| Meeting Location | Date | Number of People Who Signed In |
| --- | --- | --- |
| Superior, Arizona – Superior High School | September 10, 2019 | 107 |

| Meeting Location | Date | Number of People Who Signed In |
|---|---|---|
| San Tan, Arizona – Central Arizona College | September 12, 2019 | 41 |
| Kearny, Arizona – Ray Elementary School | September 17, 2019 | 29 |
| Globe, Arizona – High Desert Middle School | September 19, 2019 | 60 |
| Queen Valley, Arizona – Recreation Center | October 8, 2019 | 118 |
| Tempe, Arizona – Hotel Tempe, Phoenix Airport Inn | October 10, 2019 | 156 |

Comments were received via U.S. mail, hand delivery to a public meeting or Forest Service office, verbal testimony recorded at a public meeting, email, or webform. The 90-day public comment period ended on November 7, 2019. We extended the comment period for Tribes to 135 days, which ended on December 22, 2019. A seventh meeting, with the San Carlos Apache Tribe, took place on November 22, 2019. Over 29,000 submittals were received, analyzed, and responded to by the Tonto National Forest on the DEIS. Comments were reviewed and categorized by topic. Responses to comments are shown in appendix R. The FEIS was revised based on comments received.

Revisions and updates since the DEIS and since the January 2021 Rescinded FEIS are summarized in section 1.1.2, and in each resource section of chapter 3.

## 5.4   Project Mailing List

Early in the project NEPA process, an initial mailing list identifying individuals (as points of contact) in organizations, agencies, and interest groups was compiled from Tonto National Forest records of interested parties and from organizations and individuals who submitted comments related to the "Final Environmental Assessment: Resolution Copper Mining Baseline Hydrological and Geotechnical Data Gathering Activities Plan of Operations" (U.S. Forest Service 2016a). Those interested or who had commented on the "Apache Leap Special Management Area Management Plan Environmental Assessment" (U.S. Forest Service 2017b) are also included in this mailing list. After alternatives were developed for detailed analysis, the mailing list was once again updated to include those landowners or stakeholders who would be adjacent to the alternative tailings locations or associated corridors.

The goal of the mailing list is to enable broad distribution of information to local and regional businesses, organizations, and interested individuals about public meetings, comment period deadlines, and other key project milestones.

A mailing list was maintained throughout the project and includes interested parties, adjacent landowners, and those who have commented upon the project. At the San Tan Valley public meeting, local residents expressed concern they were not aware of the project. This led us to expand our outreach and notification efforts to include landowners beyond those immediately adjacent to the project. Previous efforts included adjacent landowners up to 1 mile from the project; after the San Tan Valley public meeting, we added landowners in the San Tan Valley up to 10 miles from the proposed project.

## 5.5   Tribal Consultation (Government-to-Government)

Federal agencies are required to consult with American Indian Tribes as part of the ACHP regulations, Protection of Historic Properties (36 CFR 800), implementing Section 106 of the NHPA. Accordingly, the NHPA outlines when Federal agencies must consult with Tribes and the issues and other factors this consultation must address. Pursuant to Executive Order 13175, executive departments and agencies are charged with engaging in regular and meaningful consultation and collaboration with Tribal officials in the development of Federal policies that have Tribal implications and are responsible for strengthening the government-to-government relationship between the United States and Indian Tribes. In addition, PL

113-291 requires consultation with affected Indian Tribes concerning issues of concern related to the land exchange.

The Tonto National Forest has been conducting Tribal consultation related to various Resolution Copper projects, the land exchange, and the Apache Leap SMA environmental assessment. This consultation has included formal and informal meetings, correspondence, sharing information, site visits, and documentation of Tribal comments and concerns by the Forest Service. Consultations are ongoing and will continue through the end of the project. The following Tribes are involved in the consultation process:

- Fort McDowell Yavapai Nation

- Gila River Indian Community

- Hopi Tribe

- Mescalero Apache Tribe

- Pueblo of Zuni

- Salt River Pima-Maricopa Indian Community

- San Carlos Apache Tribe

- Tonto Apache Tribe

- White Mountain Apache Tribe

- Yavapai-Apache Nation

- Yavapai-Prescott Indian Tribe

Additional Tribes were included in consultation with the introduction of the Peg Leg alternative location. These Tribes, included at the BLM's request, are as follows:

- Ak-Chin Indian Community

- Fort Sill Apache Tribe

- Pascua Yaqui Tribe

- Tohono O'odham Nation

Consultation records include formal and informal communications between the Tonto National Forest and the Tribes. A listing of communications occurring from project initiation through FEIS publication is documented in appendix S.

As noted above, one reason for the March 2021 withdrawal of the NOA and rescinding of the January 2021 FEIS was to allow the Forest Service to re-engage with consulting Tribes to fully understand their concerns. On September 20, 2021, the Forest Service notified Tribes that the Forest Service would reinitiate Tribal consultation. This was followed by a Tribal listening session on October 19, 2021, and subsequent consultation and staff meetings thereafter. The reinitiated Tribal consultation has informed the republished FEIS.

## 5.6    Section 106 Consultation

Section 106 of the NHPA requires Federal agencies to take into account the effects of their undertakings on historic properties. Section 106 consultation involves multiple parties including the SHPO, affected

Tribes, and in some cases the direct participation of the ACHP. The ACHP began participating in the Resolution Copper Section 106 consultation process in December 2017.

The ultimate outcome of consultation is often a Memorandum of Agreement or Programmatic Agreement (depending on the complexity of the project). The agreement outlines the roles and responsibilities of parties, the procedure for identification and evaluation of historic properties, assessment for effects, and each party's responsibilities for resolving adverse effects from the project. The execution of the agreement evidences the agency official's compliance with Section 106. The agency official then must ensure that the undertaking is carried out in accordance with the agreement.

A PA was pursued and drafted during the Section 106 consultation process. The Rescinded FEIS included that PA (appendix O). All signatories, other than the ACHP, had signed the PA as of January 15, 2021. On February 11, 2021, ACHP notified the Forest Service that "ACHP believes that further consultation in this case would be unproductive and therefore, we are hereby terminating consultation pursuant to 36 CFR § 800.7(a)(4)." In accordance with 36 CFR 800.7(c)(4), the Secretary of Agriculture delivered a written response to the ACHP on April 17, 2025, and that response concluded the Section 106 process for this undertaking.

Since ACHP did not sign the PA, the PA was never executed. Therefore, mitigation measures identified in the PA and any others identified subsequently will now be implemented through the final ROD and special use permit for use of Forest Service lands, and through enforcement by other State and Federal agencies as well as third parties in separate agreements. Changes in enforcement of the measures described in the draft PA are further described in appendix J.

## 5.7    Section 7 – Endangered Species Consultation

The Forest Service requested formal consultation with the FWS under Section 7 of the Endangered Species Act with submittal of a Biological Assessment on June 26, 2020 (SWCA Environmental Consultants 2020a). The FWS accepted the Biological Assessment on July 9, 2020 (U.S. Fish and Wildlife Service 2020c), and initiated the consultation process. Consultation included the endangered Arizona hedgehog cactus (*Echinocereus triglochidiatus* var. *arizonicus*), the endangered Gila chub (*Gila intermedia*) and designated critical habitat, the endangered southwestern willow flycatcher (*Empidonax traillii extimus*) and designated critical habitat, the threatened northern Mexican gartersnake (*Thamnophis eques megalops*), and the threatened yellow-billed cuckoo (*Coccyzus americanus*) and proposed critical habitat. The FWS completed consultation with the issuance of a Biological Opinion. The Biological Opinion is included in appendix P of the FEIS.

Since January 2021, some changed conditions have occurred in the project area, such as the Telegraph Fire. The Biological Opinion (included as appendix P of the FEIS) includes specific triggers to be evaluated to determine whether reinitiation of Section 7 consultation is necessary. The Forest Service considered these changed conditions and determined that none of the triggers specified in the Biological Opinion have been met as of April 2025.

## 5.8    Tonto National Forest Tribal Monitor Cultural Resources Program and Emory Oak Restoration Studies

### 5.8.1    Tribal Monitor Program

As a result of input received during ongoing consultation between the Tonto National Forest and participating Tribes, the Tonto National Forest agreed to initiate, and Resolution Copper agreed to fund, a unique program that would employ Tribal members as auxiliary specialists to assist cultural resources

# Introduction

This mitigation and monitoring strategy was developed by the Tonto National Forest using information from a number of sources in support of the draft environmental impact statement (DEIS) published in August 2019 and has been revised based on considerable input from public and agency comments for inclusion in the final environmental impact statement (FEIS). This mitigation and monitoring strategy is designed to clearly disclose which mitigation and monitoring items are within the authority of the U.S. Forest Service (Forest Service) or other regulatory permitting agency (e.g., U.S. Army Corps of Engineers (USACE), Bureau of Land Management (BLM), Arizona Department of Environmental Quality (ADEQ), or Arizona Department of Water Resources).

This appendix discusses the following items:

- Design features and applicant-committed environmental protection measures
- Mitigation and monitoring measures considered in chapter 3 impacts analysis, including measures required by the Forest Service, measures required under Resolution Copper Mining LLC (Resolution Copper) agreements, and voluntary measures by Resolution Copper

# Design Features and Applicant-Committed Environmental Protection Measures

The environmental analysis considered for this FEIS includes the implementation of applicant-committed environmental protection measures. These measures are listed in each resource section of chapter 3 in a section titled "Summary of Applicant-Committed Environmental Protection Measures." Applicant-committed environmental protection measures are features incorporated into the design of the project by Resolution Copper to reduce potential impacts on resources. These measures would be non-discretionary as they are included in the project design, and their effects are accounted for in the analysis of environmental consequences disclosed in each resource section of chapter 3.

Many of these features are either specified in the General Plan of Operations (GPO) or were developed as part of the action alternatives. Resolution Copper has created the following plans to detail the protection measures it will employ under the action alternatives:

- Subsidence management plan. This plan originally was included as an appendix to the GPO. Partially in response to public comments on the DEIS, the Forest Service collaborated with Resolution Copper to produce a revised subsidence monitoring plan (Davies 2020a). After review of the revised plan, the Forest Service also developed additional stipulations that would be required as part of the subsidence monitoring. These additional stipulations are described in the mitigation section below.

- Road use plan. This plan originally was included as an appendix to the GPO. Partially in response to public comments on the DEIS and further review by the Forest Service, Resolution Copper submitted a revised road use plan (Resolution Copper 2020b). A number of specific mitigation measures were developed to respond to impacts disclosed during the National Environmental Policy Act (NEPA) process. These new mitigation measures were incorporated into the revised plan; those new requirements of the plan are discussed in the mitigation section below.

- Environmental emergency and response and contingency plan (appendix to GPO)

- Fire prevention and response plan (appendix to GPO)

- Preliminary spill prevention control and countermeasures plan (SPCC) (appendix to GPO)

- Explosives management plan (appendix to GPO)

- Acid rock drainage management plan (appendix to GPO)

- Hydrocarbon management plan (appendix to GPO)

- Environmental materials management plan (appendix to GPO)

- Preliminary stormwater pollution prevention plan (SWPPP) (appendix to GPO)

- Wildlife management plan. This plan originally was included as an appendix to the GPO. After collaborative discussions with Arizona Game and Fish Department (AGFD), Resolution Copper submitted a revised wildlife management plan (Resolution Copper 2020i). A number of specific mitigation measures were developed in consultation with the AGFD, in order to respond to impacts disclosed during the NEPA process. These new mitigation measures were incorporated into the revised plan; these new requirements of the plan are discussed in the mitigation section below.

- Noxious weed and invasive species plan (created May 2019 in response to EIS analysis (Resolution Copper 2019))

- Tailings pipeline management plan (AMEC Foster Wheeler Americas Limited 2019)

- Concentrate pipeline management plan (M3 Engineering and Technology Corporation 2019)

The implementation and effectiveness of applicant-committed environmental protection measures are considered integral to the analysis considered in this FEIS. These design features would be a requirement of the record of decision (ROD) and final mining plan of operations.

Only those measures that were developed directly in response to impacts disclosed during the NEPA process are included in this appendix. These include the additional stipulations on the subsidence monitoring plan, new mitigations in the road use plan, and new mitigations in the wildlife management plan.

# Mitigation and Monitoring Measures Considered in Chapter 3 Impacts Analysis

## *Mitigation and Monitoring Required by Forest Service*

The role of the Tonto National Forest under its primary authorities in the Organic Administration Act, subsequent statutes, and Locatable Regulations (36 Code of Federal Regulations (CFR) 228 Subpart A), is to ensure that mining activities minimize adverse environmental effects on National Forest System (NFS) surface resources. The Forest Service authority related to mitigation is limited to protection of surface resources of NFS lands (see 30 United States Code (U.S.C.) 612, 5 U.S.C. 551, and 36 CFR 228.1). The role of the Forest Service under special use authorizations (36 CFR 251 Subpart B) would include terms and conditions to minimize damage to the environment, protect the public interest, and require compliance with water and air quality standards.

For the Forest Service to require implementation of mitigation, the mitigation must have a direct connection to avoiding, mitigating, or minimizing effects on NFS surface resources. The Forest Service has no authority, obligation, or expertise to determine or enforce compliance with other agencies' laws or regulations. However, it is the operator's responsibility to ensure that its actions comply with applicable laws. The Forest Service will only approve a final plan of operations once all other necessary permits are approved.

Mitigation and monitoring items under this heading are within the authority of the Forest Service or the U.S. Fish and Wildlife Service (FWS) through the Biological Opinion resulting from consultation under Section 7 of the Endangered Species Act. These measures would be specified as a requirement of the ROD and incorporated into the final mining plan of operations or special use permit. The Forest Service is responsible for determining whether the implementation of mitigation and the results of monitoring in this category are in compliance with the decision that will be documented in the ROD and final mining plan of operations or special use permit, and it has a legal obligation to ensure that the requirements of the Biological Opinion are implemented. Resolution Copper would submit reports to the Tonto National Forest for review of work done in the previous year and would be subject to routine inspections to verify mitigation and monitoring effectiveness.

Section 3003 of Public Law (PL) 113-291 directs the Secretary of Agriculture to engage in government-to-government consultation with affected Indian Tribes regarding issues of concern to the affected Tribes related to the land exchange and, following such consultation, consult with Resolution Copper and seek to find mutually acceptable measures to address affected Tribes' concerns and "minimize the adverse effects on the affected Indian Tribes resulting from mining and related activities on the Federal land conveyed to Resolution Copper" (see 16 U.S.C. 539p(c)(3)). Measures developed through this process would be specified as a requirement of the ROD and incorporated into the final mining plan of operations or special use permit.

## Mitigation and Monitoring Agreed to by Resolution Copper Mining LLC or Required by Other Local, State, or Federal Agencies

Resolution Copper has publicly agreed to implement the mitigation and monitoring items under this heading. These are separated into two categories. The first category includes measures that Resolution Copper has committed to in contractual, financial, and other agreements over which the Forest Service and other regulatory agencies have no jurisdiction. The second category includes measures that Resolution Copper has voluntarily committed to but that are not part of any contractual, financial, or other agreement. For both of these categories, the Forest Service and regulatory agencies have no authority, obligation, or expertise to determine or enforce compliance of the measures included in this category. They are presented here to facilitate disclosure of currently known mitigation and monitoring and their consideration in impacts analyses.

These measures differ from the applicant-committed environmental protection measures in that they were not proposed as part of the project or alternatives and in many cases were developed directly in response to the EIS analysis or public comments in order to reduce resource impacts. Since the Forest Service and regulatory permitting agencies cannot require implementation of the mitigation and monitoring measures in this category, their implementation is not assured. The effectiveness of these mitigation measures is included in chapter 3 of the FEIS. As part of the NEPA process, it is recognized that these are measures that may occur, as opposed to measures that would occur.

## Measures Identified in the Draft Programmatic Agreement

Section 106 of the National Historic Preservation Act requires Federal agencies to take into account the effects of their undertakings on historic properties. Section 106 consultation involves multiple parties, including the State Historic Preservation Office, affected Tribes, and in some cases the direct participation of the Advisory Council on Historic Preservation (ACHP). The ACHP began participating in the Resolution Copper Project Section 106 consultation process in December 2017.

The ultimate outcome of consultation is often a Memorandum of Agreement or Programmatic Agreement (depending on the complexity of the project). The agreement outlines the roles and responsibilities of parties, the procedure for identification and evaluation of historic properties, assessment for effects, and

each party's responsibilities for resolving adverse effects from the project. The execution of the agreement evidences the agency official's compliance with Section 106. The agency official then must ensure that the undertaking is carried out in accordance with the agreement.

A Programmatic Agreement was pursued and drafted during the Section 106 consultation process. All signatories, other than the ACHP, had signed the Programmatic Agreement as of January 15, 2021. The January 2021 Rescinded FEIS included that Programmatic Agreement (appendix O), and therefore in appendix J all measures included in the Programmatic Agreement were deemed to be Forest Service–required. On February 11, 2021, the ACHP notified the Forest Service that "ACHP believes that further consultation in this case would be unproductive and therefore, we are hereby terminating consultation pursuant to 36 CFR § 800.7(a)(4)." In accordance with 36 CFR 800.7(c)(4), the Secretary of Agriculture delivered a written response to the ACHP on April 17, 2025, and that response concluded the Section 106 process for this undertaking.

Since the ACHP did not sign the Programmatic Agreement, the Programmatic Agreement was never executed. Therefore, mitigation measures identified in the Programmatic Agreement and any others identified subsequently will now be implemented through the final ROD and special use permit for use of NFS lands, and through enforcement by other State and Federal agencies as well as third parties in separate agreements.

All of the measures that appeared in the draft Programmatic Agreement and the January 2021 Rescinded FEIS remain in appendix J. However, while some of these measures remain Forest Service–required, others have become Resolution Copper–voluntary or required under other local, State, or Federal agencies or under separate third-party agreements. Table J-1 summarizes these changes.

**Table J-1. Changes in authority for measures included in the draft Programmatic Agreement**

| Mitigation Measure in January 2021 Rescinded FEIS | Mitigation Measure in This FEIS | Change in Authority to Require |
|---|---|---|
| FS-CR-01: Implementation of Oak Flat HPTP | No change in categorization | This measure remains a Forest Service–required measure, as it was developed under the authority provided in Section 3003 of PL 113-291. |
| FS-CR-02: GPO research design | No change in categorization | This measure remains a Forest Service–required measure, as it was developed under the authority provided in Section 3003 of PL 113-291. |
| FS-CR-03: Visual, atmospheric, auditory, socioeconomic, and cumulative effects mitigation plan | No change in categorization | This measure remains a Forest Service–required measure, as it was developed under the authority provided in Section 3003 of PL 113-291. This measure has already been completed. |
| FS-SV-01: Resource salvage (inventory, then salvage) | No change in categorization | This measure remains a Forest Service–required measure; however, this authority only exists for NFS lands. Other implementation, including on Oak Flat, would remain a commitment in the Resolution Copper cultural heritage management plan and co-management of heritage on private lands developed in consultation and coordination with consulting Tribes. |
| FS-RC-02: Access to Oak Flat campground | No change in categorization | This measure remains a Forest Service–required measure, as it was developed under the authority provided in Section 3003 of PL 113-291. |
| FS-CR-05: Emory Oak Collaborative Tribal Restoration Initiative | No change in categorization | This measure remains a Forest Service–required measure, as it was developed under the authority provided in Section 3003 of PL 113-291. |
| FS-SO-02: Establish foundations for long-term funding, including the Tribal Monitor Program | No change in categorization | This measure remains a Forest Service–required measure, as it was developed under the authority provided in Section 3003 of PL 113-291. |
| FS-CR-06: Tribal cultural heritage fund | No change in categorization | This measure remains a Forest Service–required measure, as it was developed under the authority provided in Section 3003 of PL 113-291. |

| Mitigation Measure in January 2021 Rescinded FEIS | Mitigation Measure in This FEIS | Change in Authority to Require |
|---|---|---|
| FS-CR-07: Archaeological database funds | RC-CR-07: Archaeological database funds | This Forest Service no longer has the authority to require this measure. However, this measure is enforceable through Letter Agreements dated January 12, 2021, and March 10, 2025, with the State Historic Preservation Office. |
| FS-CR-08: Tribal education fund | No change in categorization | This measure remains a Forest Service–required measure, as it was developed under the authority provided in Section 3003 of PL 113-291. |
| FS-SO-01: Community development fund | RC-SO-01: Community Development Fund | This Forest Service no longer has the authority to require this measure. However, this measure is enforceable under an agreement with the Town of Superior dated January 14, 2021, and through Letter Agreements dated January 12, 2021, and March 10, 2025, with the State Historic Preservation Office. |
| FS-RC-04: Establish an alternative campground site (Castleberry) to mitigate the loss of Oak Flat campground | RC-RC-04: Establish an alternative campground site (Castleberry) to mitigate the loss of Oak Flat campground | The Forest Service has no authority over management of lands that will be private after the land exchange. However, this measure is enforceable under third-party agreements dated January 14, 2021, between Resolution Copper and the Town of Superior. |

## Reporting and Evaluation

Monitoring would be evaluated annually after reports are reviewed by the appropriate land management agency to determine whether the level of monitoring and/or reporting is appropriate for the current conditions. This review may result in a change in the monitoring requirements. Please refer to section 2.3 of the FEIS for a discussion of mitigation-related monitoring and evaluation.

## Detail of Mitigation and Monitoring Measures Analyzed in Chapter 3 Impacts Analysis

Mitigation and monitoring measures are detailed below and include the following descriptors:

- Unique identification number

- Title of mitigation/monitoring measure

- A list of other identifiers for the measure, to assist with cross-referencing between DEIS and project record materials

- Description/overview of measure

- Source of measure

- Resource affected/impacts being mitigated

- Alternatives to which the measure is applicable

- Authority under which the measure is being required

- Funding sources

- Any additional ground disturbance that would be required to implement the measure

## Naming Convention

Internal documentation makes use of several naming conventions to track mitigation, including those used in appendix J of the DEIS and those used to evaluate mitigation measures between the DEIS and FEIS (Garrett 2020g).

For clarity, a single naming convention is used in appendix J of the FEIS, using the format "XX-YY-##." For example, mitigation measure "FS-GS-01: New stipulations on subsidence monitoring plan." Previous identifiers for each measure may be included as notes. This naming convention conveys three specific pieces of information:

- The first two letters ("FS-GS-01") convey the authority under which this mitigation measure would take place.

  - Those mitigation measures designated "FS" are under the authority of the Forest Service to require, either due to impacts on Forest Service surface resources, inclusion in the Biological Opinion, or inclusion in the Clean Water Act Section 404 permitting process.

  - Those mitigation measures designated "RC" are measures brought forward and undertaken by Resolution Copper that are outside the authority of the Forest Service to require but that Resolution Copper has committed to under some contractual, financial, or other agreement. These mitigation measures are assumed to be implemented, though they are not under the authority of the Forest Service to require.

  - Those mitigation measures designated "RV" are voluntary measures brought forward and undertaken by Resolution Copper that are outside the authority of the Forest Service to require and for which no other contractual, financial, or other agreements have been executed. Resolution Copper has publicly committed to these mitigation measures, which may ultimately be included as stipulations or requirements in regulatory permits; however, until that occurs, there is no guarantee these mitigation measures would be implemented. It should be noted that many of the "FS" required mitigation measures were originally brought forward voluntarily by Resolution Copper and then selected for inclusion by the Forest Service. Some of these mitigation measures may be required under the authority of other local, State, or Federal agencies.

- The second two letters ("FS-GS-01") convey the resource being addressed by the mitigation measure: geology, minerals, and subsidence (GS); soils, vegetation, and reclamation (SV); noise and vibration (NV); transportation and access (TA); air quality (AQ); water resources (WR); wildlife (WI); recreation (RC); public health and safety (PH); scenic resources (SR); cultural resources or Tribal concerns (CR); socioeconomics (SO); and livestock and grazing (LG).

- The third number ("FS-GS-01") provides a unique identifier for each mitigation measure.

The order in which the mitigation measures appear below is not alphabetical, but rather organized in the same order in which the resources appear in chapter 3 of the FEIS. Several mitigation measures were included in appendix J of the DEIS that were intended to be conducted between the DEIS and FEIS. These have been completed and are listed below, but they no longer appear as mitigation measures. Some mitigation measures included in appendix J of the DEIS have been superseded or are no longer applicable; these also remain below, and it is clearly noted that they are no longer being considered.

## Summary List of Mitigation Measures Included

The following required mitigation measures are included in this appendix (appendix J) of the FEIS:

- FS-GS-01: New stipulations on subsidence monitoring plan

- FS-SV-01: Resource salvage

- FS-SV-02: JI Ranch

- FS-SV-03: Revised reclamation and closure plans

- FS-TA-01: New mitigation aspects of revised road use plan

- FS-WR-01: Groundwater-dependent ecosystems (GDEs) and water well mitigation

- FS-WR-02: 404 compensatory mitigation plan

- FS-WR-04: Replacement of water in Queen Creek

- FS-WI-01: New mitigation aspects of revised wildlife management plan

- FS-WI-02: Reptile and Sonoran desert tortoise (ESA-CCA) plan

- FS-WI-03: Mitigation of loss of abandoned mine or cave habitat for bats

- FS-WI-04: Maintain or replace access to stock tanks and AGFD wildlife waters

- FS-RC-01: Relocation of Arizona National Scenic Trail

- FS-RC-02: Access to Oak Flat campground

- FS-RC-03: Mitigation for adverse impacts to recreational trails (Tonto National Forest multi use trail plan)

- FS-PH-01: Satellite monitoring of tailings storage facility

- FS-PH-02: Adherence to National Dam Safety Program Standards

- FS-PH-03: Skunk Camp pipeline protection and integrity plan

- FS-SR-01: Minimize visual impacts from transmission lines

- FS-CR-01: Implementation of Oak Flat HPTP

- FS-CR-02: GPO research design

- FS-CR-03: Visual, atmospheric, auditory, socioeconomic, and cumulative effects mitigation plan

- FS-CR-05: Emory Oak Collaborative Tribal Restoration Initiative

- FS-CR-06: Tribal cultural heritage fund

- FS-CR-08: Tribal education fund

- FS-SO-02: Establish foundations for long-term funding, including the Tribal Monitor Program

The following Resolution Copper mitigation measures that have been committed to under a contractual, financial, or other agreement are included in this appendix (appendix J) of the FEIS:

- RC-SV-04: Interim management of 7B Ranch

- RC-AQ-01: Salt River Project solar participation agreement

- RC-RC-04: Establish an alternative campground site (Castleberry) to mitigate the loss of Oak Flat campground

- RC-RC-05: Mitigation for impacts on climbing resources

- RC-CR-04: Increase size of Apache Leap Special Management Area

- RC-CR-07: Archaeological database funds
- RC-PH-05: Adhere to Global Tailings Standard
- RC-SO-01: Community development fund
- RC-SO-03: Establish a regional economic development entity for Copper Triangle communities
- RC-SO-05: Continue funding Community Working Group
- RC-SO-06: Agreement with Town of Superior to cover direct costs

The following Resolution Copper voluntary mitigation measures are included in this appendix (appendix J) of the FEIS:

- RV-NV-01: Dripping Springs Road mitigations
- RV-WR-03: Skunk Camp water quality monitoring plan
- RV-RC-06: Mitigation for public access to JI Ranch through AGFD cooperative agreement
- RV-PH-04: Maintain the existing hotline for community complaints
- RV-SO-04: Resolution Copper social investment program
- RV-LG-01: Mitigation for impacts to ranching and grazing leases

The following mitigation measures were required in the DEIS and have been completed:

- Conduct soil surveys within the area to be disturbed by the preferred alternative tailings storage facility footprint (DEIS mitigation measure FS-223; KCB Consultants Ltd. (2020c))
- Conduct appropriate testing of soil materials within the preferred alternative tailings storage facility footprint (DEIS mitigation measure FS-224; KCB Consultants Ltd. (2020c))
- Conduct vegetation surveys within the preferred alternative tailings storage facility footprint (DEIS mitigation measure FS-225; WestLand Resources Inc. (2020l))
- Preparation of detailed reclamation plans for the preferred alternative (DEIS mitigation measure FS-226; KCB Consultants Ltd. (2020c))
- Conduct refined failure modes and effects analysis (FMEA) before FEIS for the preferred alternative (DEIS mitigation measure FS-227; Gannett Fleming (2020))

The following mitigation measures were included in the DEIS but have been replaced, have been consolidated into other mitigation measures, or are no longer applicable:

- Alternate road access to Skunk Camp tailings storage facility (DEIS mitigation measure RC-218) [superseded by RV-NV-01]
- Follow AGFD and FWS guidance for mitigation of impacts on wildlife (DEIS mitigation measure GP-125) [consolidated into FEIS mitigation measure FS-WI-01]
- Implement a wildlife management plan for stormwater ponds, including wildlife exclusion fencing (DEIS mitigation measure GP-131) [consolidated into FEIS mitigation measure FS-WI-01]
- Use of best management practices during pipeline construction and operations (DEIS mitigation measure CA-176) [consolidated into FEIS mitigation measures FS-WI-01 and FS-PH-04]

- Reduce impacts on golden eagles (DEIS mitigation measure CA-185) [consolidated into FEIS mitigation measure FS-WI-01]

- Reduce impacts on peregrine falcon (DEIS mitigation measure CA-186) [consolidated into FEIS mitigation measure FS-WI-01]

- Reduce impacts on migratory and breeding birds (DEIS mitigation measure CA-187) [consolidated into FEIS mitigation measure FS-WI-01]

- Implement impact avoidance and minimization measures for special status species (DEIS mitigation measure GP-122) [consolidated into FEIS mitigation measure FS-WI-01]

- Mitigate loss of bouldering at Oak Flat by establishing access to "Inconceivables" (DEIS mitigation measure RC-213) [superseded by FEIS mitigation measure RC-RC-05]

- Implement recreation user group and superior trail network plan (DEIS mitigation measure RC-214) [superseded by FEIS mitigation measure FS-RC-03]

- Provide replacement campground (DEIS mitigation measure RC-215) [consolidated into FEIS mitigation measure RC RC-04]

- Develop access to Oak Flat Campground (DEIS mitigation measure RC-216) [consolidated into FEIS mitigation measure FS-RC-02]

- Improve resiliency of tailings storage facility (DEIS mitigation measure GP-26) [already incorporated into overall project design and alternatives development]

- Development of an emergency action plan for the tailings storage facility for the preferred alternative (DEIS mitigation measure FS-229) [consolidated into FEIS mitigation measure FS-PH-02]

- Establish procedures for reporting noise complaints (DEIS mitigation measure GP-133) [consolidated into FEIS mitigation measure RC-PH-03]

- Develop noise limits and a monetary fine structure for noise violations (DEIS mitigation measure GP-134) [already incorporated into overall project operations]

- Maintain equipment regularly to reduce noise from heavy machinery operations (DEIS mitigation measure GP-132) [already incorporated into overall project operations]

- Reevaluate GPO dust abatement strategy (DEIS mitigation measure GP-110) [already incorporated into overall project operations, and will be governed by air permit]

- Identify monitoring thresholds for fugitive dust pollution (DEIS mitigation measure GP-111) [already incorporated into overall project operations and will be governed by air permit]

- Implement enforcement strategies for air quality mitigation (DEIS mitigation measure GP-112) [already incorporated into overall project operations and will be governed by air permit]

- Test stormwater runoff through running washes (DEIS mitigation measure GP-76) [will be governed by Arizona Pollutant Discharge Elimination System (AZPDES) permit]

- Disclose results of water monitoring (DEIS measure GP-79) [consolidated into FEIS mitigation measure PF-WR-01 (Garrett 2025)]

- Detail methodology for monitoring and mitigation of discharge water (DEIS measure GP-92) [already incorporated into overall project operations and will be governed by Aquifer Protection Permit (APP)]

- Streams and riparian ecosystem mitigation of impacts (DEIS mitigation measure CA-168) [consolidated into FEIS mitigation measure FS-WR-02]

- Surveys of riparian and aquatic species (DEIS mitigation measure CA-189) [consolidated into FEIS mitigation measure FS-WI-01]

- Special species surveys prior to construction and site-specific plans (DEIS mitigation measure CA-177) [consolidated into FEIS mitigation measure FS-WI-01]

- Arizona National Scenic Trail construction considerations (DEIS mitigation measure GP-230) [consolidated into FEIS mitigation measure FS-TA-01]

- Provide personal protective equipment (PPE) to employees (DEIS mitigation measure GP-113) [already incorporated into overall project operations and governed by Mine Safety and Health Administration regulations]

- Install additional deep monitoring wells (DEIS mitigation measure GP-37) [consolidated into FEIS mitigation measure RV-WR-03]

- Wells up- and down-gradient of site (DEIS mitigation measure CA-206) [consolidated into FEIS mitigation measure RV-WR-03]

- Implement a long-term monitoring and mitigation plan for releases (DEIS mitigation measure FS-151) [consolidated into FEIS mitigation measure RV-WR-03]

- Clarify "interim shutdown" (DEIS mitigation measure GP-91) [consolidated into FEIS mitigation measure FS-SV-04]

- Require adequate bond amount (DEIS mitigation measure GP-102) [consolidated into FEIS mitigation measure FS-SV-04]

- BLM offered lands preservation/improvement (DEIS mitigation measure CA-166) [consolidated into FEIS mitigation measure RC-SV-03]

## Required and Voluntary Measures for Geology, Minerals, Subsidence (1 measure)

| FS-GS-01: New stipulations on subsidence monitoring plan |
|---|
| Other names: FS-222 (DEIS appendix J); M-PH11 |
| **Description/overview:**<br>Resolution Copper proposed the subsidence monitoring plan as part of the original mine plan of operations, and therefore it has been included in the FEIS as an applicant-committed environmental protection measure. However, the Forest Service has identified additional requirements related to the subsidence monitoring plan, which are included here. |
| **Source of measure:**<br>The revised subsidence monitoring plan (Davies 2020a) is the source of this measure. This version of the plan was collaboratively developed after receipt of comments on the DEIS, as part of the Geology and Subsidence Workgroup.<br><br>In addition, the Forest Service has identified two actions that were not included in the revised subsidence monitoring plan. The Forest Service views these additional requirements as necessary components to ensure that monitoring is implemented appropriately and with proper oversight. The Forest Service will require these additional actions as part of the subsidence monitoring plan:<br><br>1. Given the highly technical nature of the monitoring, the Forest Service foresees the need for independent outside experts to assist in the review of monitoring results, through the duration of the operations phase. Annual and quarterly monitoring reports, as well as any updated modeling reports, shall be submitted to the Forest Service and reviewed by an independent third-party subsidence expert who will work on behalf of the Forest Service. The third-party subsidence expert shall be selected by the Forest Service and funded by Resolution Copper.<br><br>2. The Forest Service shall require notification within 24 hours of Resolution Copper completing internal data validation whenever project conditions reach Trigger Level 2 or 3. Upon notification that Trigger Level 2 or 3 have been encountered, the Forest Service will initiate a technical workgroup meeting to discuss these results. Participants in the technical workgroup meeting would include: Resolution Copper Mine management and appropriate subsidence experts, Forest Service personnel, and an independent third-party subsidence expert to work on behalf of the Forest Service, to be funded by Resolution Copper. |
| **Resource affected/impacts being mitigated:**<br>This measure seeks to mitigate impacts of subsidence on Forest Service surface resources, including the Apache Leap Special Management Area. |
| **Applicable alternatives:**<br>All |
| **Authority to require:**<br>As subsidence would impact Forest Service surface resources, notably the Apache Leap Special Management Area, authority exists under 36 CFR 251.56 (terms and conditions on special use permits) and 36 CFR 228.8 (mine plan requirements for environmental protection). |
| **Funded by:**<br>Resolution Copper |
| **Additional ground disturbance:**<br>No additional ground disturbance anticipated. |

## *Required and Voluntary Measures for Soils, Vegetation, and Reclamation (4 measures)*

| **FS-SV-01: Resource salvage within the tailings storage facility footprint, tailings pipeline/power line corridor, and Oak Flat Federal Parcel** |
|---|
| Other names: RC-208 (DEIS appendix J); PA Measure #B4 |
| **Description/overview:**<br>Resolution Copper would allow natural resource salvage within the Oak Flat Federal Parcel, the tailings storage facility footprint, and the tailings pipeline/power line corridor. This measure would facilitate the salvage of resources (e.g., culturally important plants and mineral resources) to address the loss of access to traditional collection areas and a loss of access to the *Chí'chil Bildagoteel* Historic District within the Oak Flat Federal Parcel (selected lands). To the extent practicable and in collaboration and partnership with Tribes, an inventory will be conducted to identify the natural resources within the Oak Flat Federal Parcel area, pipeline corridor, and tailings storage facility footprint. When the inventory is complete, the resources will be "salvaged" (collected) and the material gathered will be distributed amongst the Tribes for traditional and cultural use. |
| **Source of measure:**<br>Resolution Copper; draft Programmatic Agreement |
| **Resource affected/impacts being mitigated:**<br>This measure seeks to mitigate impacts on vegetation by directly salvaging individual plants, but also through improving reclamation success and recovery of habitat after closure. This measure also seeks to mitigate impacts on Tribes by providing for resource salvage prior to loss of access. |
| **Applicable alternatives:**<br>All |
| **Authority to require:**<br>The Forest Service has the authority to require resource salvage on the NFS lands approved under the mining plan of operations or special use permit.<br>Other implementation, including on Oak Flat, would remain a commitment in the Resolution Copper cultural heritage management plan and co-management of heritage on private lands developed in consultation and coordination with consulting Tribes. |
| **Funded by:**<br>Resolution Copper |
| **Additional ground disturbance:**<br>While resource salvage would require ground disturbance, it would be within the existing area of analysis of the project fence line, in areas that eventually would be fully disturbed by project activities. |

---

**FS-SV-02: Conservation of Arizona hedgehog cactus at JI Ranch**

Other names: None

**Description/overview:**

Resolution Copper will record a conservation easement on portions of the JI Ranch, or a comparable location with suitable Arizona hedgehog cactus habitat, after the publication of a ROD (by both the Forest Service and the USACE) and receipt of all requisite permits and approvals from the USACE (under Clean Water Act Section 404) and Forest Service; and before construction of pipeline and power line infrastructure for the final selected alternative (WestLand Resources Inc. 2020j). The conservation easement's purpose shall be for the protection of the Arizona hedgehog cactus and will be at least 100 acres, comprising one or multiple parcels, excluding roads and trails for the life of the project.

**Source of measure:**

Resolution Copper; Biological Opinion

**Resource affected/impacts being mitigated:**

Arizona hedgehog cactus lost habitat due to project activities

**Applicable alternatives:**

All

**Authority to require:**

As this measure is included as a conservation measure in the Biological Opinion, implementation is required to take place.

**Funded by:**

Resolution Copper

**Additional ground disturbance:**

None anticipated.

---

**FS-SV-03: Revised reclamation and closure plans**

Other names: GP-91 (DEIS appendix J); GP-102 (DEIS appendix J); M-PH10; M-V3

**Description/overview:**

The reclamation and closure plan assessed in the DEIS was largely conceptual in nature. Resolution Copper has completed revised reclamation and closure plans, for the preferred alternative tailings storage facility (KCB Consultants Ltd. 2021) as part of the overall mine plan of operations (Tetra Tech Inc. 2020), and for the tailings pipeline (Tetra Tech Inc. 2022). Aspects of these reclamation and closure plans speak to several specific mitigation suggestions raised in public comments:

- Public comments suggested that the subsidence area boundary should be fenced off to prevent cattle from entering the area if there is a safety hazard to the mine or the livestock. Access prevention measures to limit public access (including cattle) have been incorporated into the closure and reclamation plan, including a combination of fencing, locked gates, cattle guards, security patrols, and steep topography.

- Public comments suggested that comprehensive revegetation plans should be required for the subsidence area, the tailings slurry pipeline corridor, and the tailings facility as part of scenic resources mitigation. Comprehensive reclamation actions have been developed and incorporated into the revised reclamation and closure plans. The reclamation plans cover all mine plan components, including the mine area, subsidence area, tailings corridor, and the tailings storage

facility. The reclamation plans include detailed revegetation plans for construction (reclaim and revegetate temporary construction footprints), operations (progressive reclamation of the tailings storage facility), and end of mine (closure) revegetation for all disturbance footprints. The revegetation plans incorporate the use of native seed mixes and site preparation, vegetation, monitoring, erosion monitoring, and vegetation reestablishment metrics of success. It is not practical to revegetate the eventual subsidence area because reclamation equipment and personnel to perform the work will not be able to safely access the area.

- Clarifies activities to be undertaken and conditions for interim shutdown of operations.
- Clarifies procedures to be undertaken to calculate financial assurance requirements.

**Source of measure:**

Public comments; Resolution Copper

**Resource affected/impacts being mitigated:**

Loss of habitat; surface water quantity and quality

**Applicable alternatives:**

All

**Authority to require:**

For those portions of the project area that would impact Forest Service surface resources, authority exists under 36 CFR 251.56 (terms and conditions on special use permits) and 36 CFR 228.8 (mine plan requirements for environmental protection). Other authorities exist with ADEQ under the APP program and the AZPDES program, with the Arizona State Land Department for rights-of-way across State Trust land, and with the Arizona State Mine Inspector.

**Funded by:**

Resolution Copper

**Additional ground disturbance:**

Revegetated and reclaimed areas are already disturbed, as analyzed in the EIS

**RC-SV-04: Voluntary cooperative management of 7B Ranch until BLM management plan is implemented**

Other names: CA-166 (DEIS appendix J); M-L7; M-L9; M-L11; M-L15

**Description/overview:**

As a voluntary measure, Resolution Copper will work with the current caretaker of 7B Ranch, The Nature Conservancy, for management of the 7B Ranch to cover a transition period until the BLM has developed and implemented a management plan consistent with the Section 3003 of Public Law (PL) 113-291, which specifically requires that not later than 2 years after the date on which the land is acquired, the Secretary of the Interior shall update the management plan for the San Pedro National Conservation Area to reflect the management requirements of the acquired land. Resolution Copper would fund the transition period, and fence repair/replacement and protection measures for cultural resources may be implemented in collaboration with The Nature Conservancy and the BLM under the transition arrangement. This includes undertaking limited bosque restoration activities as well. All other aspects of parcel cleanup or structure removal have already been implemented, after consultation with BLM.

**Source of measure:**

Public comments; Resolution Copper

**Resource affected/impacts being mitigated:**

Loss of riparian and upland habitat

**Applicable alternatives:**

All

**Authority to require:**

Resolution Copper has an agreement in place with the AGFD to manage 7B Ranch prior to execution of the land exchange, and an agreement in place with the BLM to manage 7B Ranch after the execution of the land exchange.

**Funded by:**

Resolution Copper

**Additional ground disturbance:**

Negligible, associated with bosque restoration and fence repair/replacement

## *Required and Voluntary Measures for Noise and Vibration (1 measure)*

| RV-NV-01: Mitigate noise and vibration impacts along Dripping Springs Road |
|---|
| Other names: M-N2; M-N4; M-T3 |
| **Description/overview:**<br><br>Applicant-committed measures to address noise and vibration near the tailings facility specific to the presence of residential areas in Section 29, Township 3 South, Range 15 East, include the following prior to ground-disturbing activities: paving Dripping Springs Road, setting the speed limit to 15 miles per hour (mph), and requiring the deliveries of equipment and materials to occur during the daytime.<br><br>Resolution Copper has already purchased properties in the footprint and vicinity of the tailings storage facility.<br><br>Resolution Copper has an established hotline for community complaints (including noise and vibration) via email (community-complaint@resolutioncopper.com) and telephone ([520] 689-3955). These are described on the Resolution Copper website (www.resolutioncopper.com). |
| **Source of measure:**<br><br>Resolution Copper; public comments |
| **Resource affected/impacts being mitigated:**<br><br>Noise and vibration experienced along Dripping Springs Road |
| **Applicable alternatives:**<br><br>All |
| **Authority to require:**<br><br>As an applicant-proposed mitigation measure, implementation is not assured; however, if included as a stipulation or requirement in a permit it may become required.<br><br>Gila County has legal authority to maintain the Dripping Springs Road. As such, Resolution Copper will need to work with Gila County to implement the measures, including reduced speeds and selective paving. |
| **Funded by:**<br><br>Resolution Copper |
| **Additional ground disturbance:**<br><br>None anticipated. |

## Required and Voluntary Measures for Transportation and Access (1 measure)

| FS-TA-01: New mitigation aspects of revised road use plan |
|---|
| Other names: GP-230 (DEIS appendix J) |
| **Description/overview:**<br>Resolution Copper included a road use plan as an appendix to its original mine plan of operations. After publication of the DEIS, Resolution Copper revised the road use plan in consultation with the Forest Service in response to comments submitted on the DEIS. Several revised aspects of the road use plan (Resolution Copper 2020b) respond directly to issues raised during comments.<br>Specific new measures in the revised road use plan include:<br><br>• updates to incorporate the preferred alternative;<br>• additional details of road and pipeline crossings;<br>• additional details of the access east of Oak Flat, which was a specific issue raised in public comments;<br>• additional details of management of construction with respect to the Arizona National Scenic Trail;<br>• specific details about how access would be maintained to the extent possible for recreational activities, including hiking, camping, and hunting; and<br>• a change in the location of employee access to the West Plant Site, to reduce impacts within the Town of Superior surface streets. |
| **Source of measure:**<br>Resolution Copper; public comments |
| **Resource affected/impacts being mitigated:**<br>Recreation and access |
| **Applicable alternatives:**<br>All |
| **Authority to require:**<br>Since the road use plan is an integral part of the mine plan of operations as submitted to the Forest Service, these measures are considered to be non-discretionary for implementation. This measure is listed here as a mitigation measure because aspects of the revised road use plan were developed directly in response to the impacts disclosed in the EIS analysis.<br><br>Additionally, the routes impacted are Forest Service surface resources for Alternatives 2, 3, and 4, and authority exists under 36 CFR 251.56 (terms and conditions on special use permits) and 36 CFR 228.8 (mine plan requirements for environmental protection). For Alternative 5, 43 CFR 3809.2 provides similar authority to the BLM to regulate mining to prevent unnecessary or undue degradation.<br>For Alternative 6, the Forest Service would not have jurisdiction over the tailings storage facility, but would have authority over the pipeline corridor crossing NFS lands. |
| **Funded by:**<br>Resolution Copper |
| **Additional ground disturbance:**<br>None. |

## *Required and Voluntary Measures for Air Quality (1 measure)*

| **RC-AQ-01: SRP solar participation agreement** |
|---|
| Other names: M-AQ1 |
| **Description/overview:**<br>Rio Tinto has plans to invest significantly over the next 5 years to support delivery of its emissions targets. In line with this objective, in November 2019, Resolution Copper entered into a Solar Participation Agreement with the Salt River Project Agricultural Improvement and Power District to obtain solar power from a 100-megawatt solar photovoltaic generating facility expected to go online in January 2022. In furthering its commitment to increase its reliance on renewable energy, Resolution Copper subscribed to 4.6 percent of the generating facility's solar power. Accordingly, by entering into the agreement, Resolution Copper has sourced renewable energy credits constituting approximately 25 percent of Resolution Copper's estimated baseload in 2022. Resolution Copper will continue to explore other opportunities to obtain renewable energy credits as the project moves forward. Note that Resolution Copper anticipates similar agreements in the future to meet net-zero carbon commitments by 2050. As these commitments cannot be enforced by the Forest Service, this remains a Resolution Copper–voluntary measure. |
| **Source of measure:**<br>Resolution Copper; public comment |
| **Resource affected/impacts being mitigated:**<br>Air quality and increased greenhouse gas emissions. |
| **Applicable alternatives:**<br>All |
| **Authority to require:**<br>Resolution Copper has committed to this measure through the November 2019 Solar Participation Agreement. |
| **Funded by:**<br>Resolution Copper |
| **Additional ground disturbance:**<br>None. |

## *Required and Voluntary Measures for Water Resources (4 measures)*

| FS-WR-01: Monitoring and mitigation plan for GDEs and water wells |
|---|
| Other names: RC-211 (DEIS appendix J); M-W28 |
| **Description/overview:**<br><br>In April 2019, Resolution Copper provided the Forest Service with a document titled "Monitoring and Mitigation Plan for Groundwater Dependent Ecosystems and Water Wells" (Montgomery and Associates Inc. 2019b). This plan was revised and finalized in September 2020 (Montgomery and Associates Inc. 2020b). This document outlines a monitoring plan to assess potential impacts on each GDE, identifies triggers and associated actions to be taken by Resolution Copper to ensure that GDEs are preserved, and suggests mitigation measures for each GDE if it is shown to be impacted by future mine dewatering. Note that this plan includes actions both for GDEs and water supply wells.<br><br>The plan focuses on the same GDEs described in section 3.7.1 of the FEIS, as these are the GDEs that are believed to rely on regional groundwater that could be impacted by the mine. The stated goal of the plan is "to ensure that groundwater supported flow that is lost due to mining activity is replaced and continues to be available to the ecosystem." The plan specifically notes that it is not intended to address water sources associated with perched shallow groundwater in alluvium or fractures.<br><br>The specific GDEs addressed by this plan include the following:<br><br>• Bitter, Bored, Hidden, Iberri, Kane, McGinnel, McGinnel Mine, No Name, Rock Horizontal, and Walker Springs;<br>• Queen Creek below Superior (reach km 17.39 to 15.55) and at Whitlow Ranch Dam;<br>• Arnett Creek in two locations;<br>• Telegraph Canyon in two locations;<br>• Devil's Canyon springs (DC4.1E, DC6.1E, DC6.6W, and DC8.2W);<br>• Devil's Canyon surface water in two locations (reach kilometer (km) 9.1 to 7.5, and reach km 6.1 to 5.4);<br>• Mineral Creek springs (Government Springs, MC3.4W); and<br>• Mineral Creek surface water in two locations (MC8.4C, and reach km 6.9 to 1.6).<br><br>Monitoring frequency and parameters are discussed in the plan and include such things as groundwater level or pressure, surface water level, presence of water or flow, extent of saturated reach, and phreatophyte area. In general, groundwater level or pressure and surface water level would be monitored daily (using automated equipment), while other methods would be monitored quarterly or annually.<br><br>Water supplies to be monitored are Superior (using well DHRES-16_743 as a proxy), Boyce Thompson Arboretum (using the Gallery Well as a proxy), and Top-of-the-World (using HRES-06 as a proxy).<br><br>A variety of potential actions are identified that could be used to replace water sources if monitoring reaches a specified trigger. Specific details (likely sources and pipeline corridor routes) are shown in the plan. These include the following:<br><br>• Drilling new wells, applicable to both water supplies and GDEs. The intent of installing a well for a GDE is to pump supplemental groundwater that can be used to augment flow. The exact location and construction of the well would vary; it is assumed in many cases groundwater would be transported to GDEs via an overland pipeline to minimize ground disturbance. Wells require maintenance in perpetuity, and likely would be equipped with storage tanks and solar panels, depending on specific site needs.<br>• Installing spring boxes. These are structures installed into a slope at the discharge point of an existing spring, designed to capture natural flow. The natural flow is stored in a box and |

discharged through a pipe. Spring boxes can be deepened to maintain access to water if the water level decreases. Spring boxes require little ongoing maintenance to operate.

- Installing guzzlers. Guzzlers are systems for harvesting rainwater for wildlife consumption. Guzzlers use an impermeable apron, typically installed on a slope, to collect rainwater which is then piped to a storage tank. A drinker allows wildlife and/or livestock to access water without trampling or further degrading the spring or water feature. Guzzlers require little ongoing maintenance to operate.

- Installing surface water capture systems such as check dams, alluvial capture, recharge wells, or surface water diversions. All of these can be used to supplement diminished groundwater flow at GDEs by retaining precipitation in the form of runoff or snowmelt, making it available for ecosystem requirements.

- Providing alternative water supplies from a non-local source. This would be considered only if no other water supply is available, with the Arizona Water Company or the Desert Wellfield being likely sources of water.

The September 2020 plan (Montgomery and Associates Inc. 2020b) is silent on the duration of this monitoring and mitigation measure. The Forest Service will require the following as part of the monitoring and mitigation plan for GDEs and water wells, due to the expectation that pumping effects could take many years or decades to be observed:

1. Monitoring and mitigation will be required to continue through operations, during the period of active dewatering.

2. Monitoring and mitigation will be required to continue during the closure phase as well, for at least 10 years after cessation of active dewatering.

3. At the end of this period, Resolution Copper may request from the Forest Service that individual GDEs and water wells be dropped from further monitoring and mitigation efforts, based on analysis of the observations made during the operations and closure phases.

An important change was made to this measure after the January 2021 FEIS was rescinded. Some comments requested that triggers for mitigation be more clearly defined in the measure. The Forest Service requested revisions to the plan and received those revisions from Resolution Copper in December 2022 (Montgomery and Associates Inc. 2022). The revision simplified the triggers. Quantitative criteria are specified for each GDE that generally amount to observing 2 years of measurements below the average, coupled with decreases in water level in regional monitoring wells. Water wells are treated similarly based on groundwater level measurements.

The plan still contains a caveat that the "mitigation measure would be triggered except if data demonstrate dewatering from the Project was not the cause of the impact." However, unlike the previous version of the mitigation plan which required a positive demonstration using undetermined means that mine drawdown was responsible for GDE impacts prior to implementing mitigation, the revised version assumes that mitigation will take place if these clear quantitative triggers are met and only would not be implemented if a defensible argument could be made otherwise.

The 2022 version of the plan (Montgomery and Associates Inc. 2022) is the version of the plan required by the Forest Service to be implemented by Resolution Copper.

| **Source of measure:** |
| --- |
| Resolution Copper |

| **Resource affected/impacts being mitigated:** |
| --- |
| Water resources, riparian habitat, water supplies |

| **Applicable alternatives:** |
| --- |
| All |

| Authority to require: |
|---|
| As some GDEs impacted are considered Forest Service surface resources, authority exists under 36 CFR 251.56 (terms and conditions on special use permits) and 36 CFR 228.8 (mine plan requirements for environmental protection). |

| Funded by: |
|---|
| Resolution Copper |

| Additional ground disturbance: |
|---|
| Yes, quantified in the plan in the event replacement water is needed |

| FS-WR-02: Clean Water Act Section 404 compensatory mitigation plan |
|---|
| Other names: RC-217 (DEIS appendix J); CA-168 (DEIS appendix J); M-L1; M-L4; M-L12; M-R18; M-W2 |

**Description/overview:**

Resolution Copper has proposed a package of compensatory mitigation as part of the Clean Water Act Section 404 permitting process; this package is included in appendix D of the FEIS and has been approved by the USACE. The three compensatory mitigation parcels approved under the Section 404 permitting process are:

1. MAR-5 Wetland/Olberg Road. The conceptual mitigation strategy consists of exotic tree species (principally tamarisk) removal and control, combined with native plant species reseeding, to allow for the establishment and maintenance of a riparian habitat dominated by native tree species. The MAR-5 Wetland site was established in 2015. Proposed continuing mitigation activities for the MAR-5 site include continued scheduled Central Arizona Project water discharges, limited tamarisk removal and control, and seeding of native plant species. The Olberg Road site would represent new mitigation activities and is located adjacent to the existing MAR-5 Wetland site. Mitigation activities at the Olberg Road site consist of tamarisk removal and control within the entire 23-acre site, followed by seeding of native plant species. The entire Mar-5/Olberg Road area encompasses 146 acres of lands; only the 23-acre Olberg Road mitigation parcel is part of the compensatory mitigation package.

2. Queen Creek. This site is located downstream of the town of Superior, along Queen Creek. Resolution Copper would establish a conservation easement covering approximately 79 acres along 1.8 miles of Queen Creek to restrict future development of the site and provide protected riparian and wildlife habitat. Within a 33-acre area being considered as part of the compensatory mitigation package, conceptual mitigation elements include the removal of tamarisk to allow riparian vegetation to return to its historic composition and structure and promote more natural stream functions.

3. H&E Farm. The H&E Farm is a 500-acre property owned by The Nature Conservancy. Mitigation activities proposed include earthwork to reconnect historic tributaries. The earthwork is proposed to reestablish the San Pedro River's access to its floodplain and terrace and enhance the wetland features present in the area. The soils across the site on the terraces are compacted and causing earth fissures and sinkholes on the parcel, which will continue if no intervention occurs. Grading in some areas would reestablish the natural alluvial fan and floodplain terrace structure. Planting and seeding native species is planned to restore a more native vegetation community along the bank of the river. It is intended to mirror previous mitigation strategies implemented by The Nature Conservancy as well as ongoing mitigation at the AGFD Lower San Pedro Wildlife Area that is contiguous to the

| |
|---|
| western and northern boundaries of the H&E Farm parcel. The terrace area to be reestablished encompasses 300 acres, and the wetland area to be reestablished encompasses 15 acres. The remainder of the property would be conserved in the current condition. |

**Source of measure:**

Clean Water Act Section 404 permit

**Resource affected/impacts being mitigated:**

Mitigations impacts to waters of the U.S. and associated riparian habitat

**Applicable alternatives:**

Compensatory mitigation plans are specific to Alternative 6 only; Alternative 5 would also require permitting, although this has not been pursued to date. Alternatives 2, 3, and 4 would not require Section 404 permitting or any associated compensatory mitigation.

**Authority to require:**

Authority exists to require this under Section 404 of the Clean Water Act, administered by the USACE.

**Funded by:**

Resolution Copper

**Additional ground disturbance:**

As described in FEIS Appendix D, Clean Water Act Section 404 Compensatory Mitigation Plan

---

**FS-WR-04: Replacement of water in Queen Creek**

Other names: M-W16

**Description/overview:**

Resolution Copper will replace stormwater flow to Queen Creek that has been diverted as a direct result of subsidence. Resolution Copper plans to do so by placing water into Queen Creek above the Magma Bridge and potentially other locations. Queen Creek is a surface resource on portions of the Mesa and Globe Ranger Districts.

Precise timing of actual subsidence impacts will depend on timing and sequencing of underground mining. Mitigations for stormwater flow loss to Queen Creek resulting from future subsidence impacts will be incrementally implemented in advance of and concurrent with future subsidence impacts in collaboration with the Town of Superior and other downstream stakeholders with a presence along Queen Creek, in order to offset the actual impacts of future activities. Thus, this mitigation will be supported by a process of baseline data collection to measure impacts. All mitigations involving discharge of replacement water are contingent on successful permitting, including the receipt of an AZPDES permit from ADEQ.

Some comments asked whether this required mitigation would exist in perpetuity. The Forest Service requested clarification from Resolution Copper on this topic, which was received in November 2022 (Antone 2022a). Resolution Copper noted that the site-wide reclamation plan indicates, "Diversion channels surrounding the EPS will be retained and to the extent practicable may be implemented at closure to divert stormwater from entering the crater" (Tetra Tech Inc. 2020). Resolution Copper then further noted, "Based on the statements in the GPO, FEIS, and Closure Plan, it is the intent of Resolution Copper for the stormwater diversion around the subsidence area to be constructed prior to subsidence beginning, and to be permanent. The permanence is implied in the GPO (and FEIS analysis). The USFS might consider updating the PF-WR-02 mitigation measure to indicate that the diversion will be permanent as needed."

| Mitigation measure PF-WR-02 (Garrett 2025) is a voluntary measure on the future private land that would be exchanged to Resolution Copper, indicating that stormwater will be diverted around the subsidence crater as practicable. Activities implemented in mitigation measure PF-WR-02 would be permanent. The intent of PF-WR-02 is to maintain as much natural flow as possible in Queen Creek. Whether water needs to be replaced in Queen Creek under mitigation measure FS-WR-04 will depend on the actual measured loss of flow. This will be determined by baseline data collection that will measure impacts to stormflow. |
|---|
| **Source of measure:**<br>Resolution Copper |
| **Resource affected/impacts being mitigated:**<br>Adverse impacts to surface water quantity |
| **Applicable alternatives:**<br>All |
| **Authority to require:**<br>For those project activities that would impact Forest Service surface resources, authority exists under 36 CFR 251.56 (terms and conditions on special use permits) or 36 CFR 228.8 (mine plan requirements for environmental protection).<br><br>Mitigation measure PF-WR-02 (Garrett 2025) is also a committed measure under an agreement with the Town of Superior dated January 14, 2021, and letter of intent with the Town of Superior dated August 23, 2024, to develop a formal agreement. |
| **Funded by:**<br>Resolution Copper |
| **Additional ground disturbance:**<br>No additional ground disturbance is anticipated; most wells are existing or within the footprint of the facility. |

| **RV-WR-03: Skunk Camp water quality monitoring plan** |
|---|
| Other names: GP-37 (DEIS appendix J); CA-206 (DEIS appendix J); FS-151 (DEIS appendix J); M-W10 |
| **Description/overview:**<br><br>Dripping Spring Wash is ephemeral between the proposed Skunk Camp tailings storage facility and the Gila River. Resolution Copper will need an AZPDES permit issued by the ADEQ, which will require monitoring of any discharges from the tailings storage facility, if any such discharges occur, which will identify the quality of any such discharges.<br><br>Resolution Copper will also need an APP issued by ADEQ. APPs include groundwater monitoring at specified point of compliance (POC) wells located near the facility. Monitoring at these wells is required to demonstrate that discharges from the facility will not cause exceedance of aquifer water quality standards (set equal to Federal primary drinking water maximum contaminant levels) at the POC(s), or cause further degradation of water quality if an aquifer water quality standard is already exceeded at the POC(s) at the time of permit issuance. APPs also typically include alert levels, generally set lower than corresponding aquifer quality limits and monitored at the POCs. APPs include specific contingency measures to be followed if specified conditions occur, including (but not limited to) exceedance of alert levels or aquifer quality limits. Finally, APPs require reporting of all monitoring results to ADEQ, as well as prompt reporting of permit violations or alert level exceedances.<br><br>Resolution Copper has provided a robust water quality monitoring program around the proposed tailings storage facility (Skunk Camp water quality monitoring plan (Montgomery and Associates Inc. 2020f)), which exceeds the likely monitoring requirements to be implemented under the APP or AZPDES permit. The Skunk Camp water quality monitoring plan includes monitoring of numerous wells and springs along or adjacent to Dripping Spring Wash and in the Gila River just downstream of its confluence of Dripping Spring Wash. |
| **Source of measure:**<br>Resolution Copper |
| **Resource affected/impacts being mitigated:**<br>Adverse impacts to groundwater and surface water quality |
| **Applicable alternatives:**<br>Alternative 6 |
| **Authority to require:**<br>Authority for these measures will ultimately reside with ADEQ under the APP and AZPDES programs; however, it is anticipated that much of the sampling detailed in the plan will remain voluntary by Resolution Copper. |
| **Funded by:**<br>Resolution Copper |
| **Additional ground disturbance:**<br>No additional ground disturbance anticipated; most wells are existing or within the footprint of the facility. |

## *Required and Voluntary Measures for Wildlife (4 measures)*

| **FS-WI-01: Revised wildlife management plan** |
|---|
| Other names: GP-125 (DEIS appendix J); GP-131 (DEIS appendix J); CA-176 (DEIS appendix J); CA-177 (DEIS appendix J); CA-185 (DEIS appendix J); CA-186 (DEIS appendix J); CA-187 (DEIS appendix J); CA-189 (DEIS appendix J); GP-122 (DEIS appendix J); M-WL1; M-WL3; M-WL4; M-WL11; M-WL14; M-WL23; M-WL25; M-WL28; M-WL32; M-WL36; M-WL42; M-WL45; M-WL49 |
| **Description/overview:**<br><br>Resolution Copper included a wildlife management plan as an appendix to its original mine plan of operations. After publication of the DEIS, Resolution Copper consulted with the AGFD to revise the wildlife management plan in response to comments submitted by the AGFD on the DEIS. Several revised aspects of the wildlife management plan (Resolution Copper 2020i) respond directly to issues raised in the comments or supersede more generic measures contained in the DEIS.<br><br>Specific measures that this measure consolidates and supersedes are as follows:<br><br>• Follow AGFD and FWS guidance for mitigation of impacts on wildlife (DEIS mitigation measure GP-125). Resolution Copper will be following appropriate guidance from the AGFD and the FWS, relying on the revised wildlife management plan completed in response to the AGFD comments and the Biological Opinion issued by the FWS.<br><br>• Implement a wildlife management plan for stormwater ponds, including wildlife exclusion fencing (DEIS mitigation measure GP-131). These aspects are explicitly incorporated into the revised wildlife management plan.<br><br>• Use best management practices during pipeline construction and operations (DEIS mitigation measure CA-176). These aspects are explicitly incorporated into the revised wildlife management plan.<br><br>• Reduce impacts on golden eagles (DEIS mitigation measure CA-185). These aspects are explicitly incorporated into the revised wildlife management plan.<br><br>• Reduce impacts on peregrine falcon (DEIS mitigation measure CA-186). These aspects are explicitly incorporated into the revised wildlife management plan.<br><br>• Reduce impacts on migratory and breeding birds (DEIS mitigation measure CA-187). These aspects are explicitly incorporated into the revised wildlife management plan.<br><br>• Implement impact avoidance and minimization measures for special status species (GP-122). Resolution Copper will be following appropriate guidance for special status species, relying on the revised wildlife management plan completed in response to AGFD comments and the Biological Opinion issued by the FWS.<br><br>Specific new measures in the revised wildlife management plan include the following:<br><br>• The project lighting plan would reduce impacts to wildlife from lights.<br><br>• May–September seasonal restrictions that were detailed in the Biological Assessment with respect to avian species would be implemented in riparian habitat (SWCA Environmental Consultants 2020a).<br><br>• Hazing, non-lethal deterrents, exclusion fencing, and other measures to minimize wildlife conflicts would be implemented.<br><br>• Flight diverters would be used on power lines over riparian habitat in Devil's Canyon, Queen Creek, and Mineral Creek.<br><br>• Preconstruction surveys and nest location for golden eagles, peregrine falcon, and migratory or breeding birds, with mitigation if occurrences are found.<br><br>• Mitigations for kit fox. |

| **Source of measure:** |
|---|
| Resolution Copper; public comments |

| **Resource affected/impacts being mitigated:** |
|---|
| Adverse effects on wildlife |

| **Applicable alternatives:** |
|---|
| All |

| **Authority to require:** |
|---|
| Since the wildlife management plan is an integral part of the mine plan of operations as submitted to the Forest Service, these measures are considered to be non-discretionary for implementation. This measure is listed here as a mitigation measure because aspects of the revised wildlife management plan were developed directly in response to the impacts disclosed in the EIS analysis. |
| Additionally, the habitats impacted are Forest Service surface resources for Alternatives 2, 3, and 4, and authority exists under 36 CFR 251.56 (terms and conditions on special use permits) and 36 CFR 228.8 (mine plan requirements for environmental protection). For Alternative 5, 43 CFR 3809.2 provides similar authority to the BLM to regulate mining to prevent unnecessary or undue degradation. For Alternative 6, the Forest Service would not have jurisdiction over the tailings storage facility but would have authority over the pipeline corridors crossing NFS lands. |

| **Funded by:** |
|---|
| Resolution Copper |

| **Additional ground disturbance:** |
|---|
| No additional ground disturbance anticipated. |

| **FS-WI-02: Reptile and Sonoran desert tortoise (ESA-CCA) plan** |
|---|
| Other names: CA-191 (DEIS appendix J); M-WL34 |

| **Description/overview:** Implement conservation actions detailed in the Candidate Conservation Agreement (CCA). The CCA would be a formal agreement between the FWS and Resolution Copper to address the conservation needs of proposed or candidate species, or species likely to become candidates for listing, before they become listed as endangered or threatened. Resolution Copper would voluntarily commit to conservation actions that would help stabilize or restore the species with the goal that listing would become unnecessary. |
|---|
| This measure was included in the DEIS and has since been incorporated into the revised wildlife management plan (FEIS mitigation measure FS-WI-01). Resolution Copper has committed to this measure. |

| **Source of measure:** |
|---|
| AGFD |

| **Resource affected/impacts being mitigated:** |
|---|
| Wildlife |

| **Applicable alternatives:** |
|---|
| All |

**Authority to require:**

Because of its inclusion in the revised wildlife management plan, this measure is considered to be non-discretionary for implementation.

Additionally, the habitats impacted are Forest Service surface resources for Alternatives 2, 3, and 4, and authority exists under 36 CFR 251.56 (terms and conditions on special use permits) and 36 CFR 228.8 (mine plan requirements for environmental protection). For Alternative 5, 43 CFR 3809.2 provides similar authority to BLM to regulate mining to prevent unnecessary or undue degradation. For Alternative 6, the Forest Service would not have jurisdiction over the tailings storage facility but would have authority over the pipeline corridors crossing NFS lands.

**Funded by:**

Resolution Copper

**Additional ground disturbance:**

No additional ground disturbance anticipated.

---

**FS-WI-03: Mitigation of loss of abandoned mine or cave habitat for bats**

Other names: CA-172 (DEIS appendix J)

**Description/overview:**

Mitigate impacts on bat habitat by conducting pre-closure surveys over multiple years and multiple visits per year, to document species presence/absence and develop appropriate closure methods in coordination with AGFD, Bat Conservation International, and Forest Service biologists; implement wildlife exclusion measures pre-closure to minimize wildlife entrapment and mortality during closure; consider seasonal timing of closure on any sites with suitable maternity roosts; and identify mines, adits, and/or shafts with known bat roosting areas. If activities are adjacent to bat roosting/maternity sites, develop best management practices to reduce human encroachment.

This measure was included in the DEIS and has since been incorporated into the revised wildlife management plan (FEIS mitigation measure FS-WI-01). Resolution Copper has committed to this measure.

**Source of measure:**

AGFD

**Resource affected/impacts being mitigated:**

These actions seek to mitigate potential adverse effects on wildlife habitat.

**Applicable alternatives:**

All

**Authority to require:**

Because of inclusion in the revised wildlife management plan, this measure is considered to be non-discretionary for implementation.

Additionally, the habitats impacted are Forest Service surface resources for Alternatives 2, 3, and 4, and authority exists under 36 CFR 251.56 (terms and conditions on special use permits) and 36 CFR 228.8 (mine plan requirements for environmental protection). For Alternative 5, 43 CFR 3809.2 provides similar authority to the BLM to regulate mining to prevent unnecessary or undue degradation. For Alternative 6, the Forest Service would not have jurisdiction over the tailings storage facility but would have authority over the pipeline corridors crossing NFS lands.

| |
|---|
| **Funded by:** |
| Resolution Copper |
| **Additional ground disturbance:** |
| No additional ground disturbance anticipated. |

| |
|---|
| **FS-WI-04: Maintain or replace access to stock tanks and AGFD wildlife waters** |
| Other names: CA-175 (DEIS appendix J) |
| **Description/overview:** Resolution Copper would maintain or replace access to stock tanks and AGFD wildlife waters impacted by the project. Stock tanks are used to provide drinking water for livestock. The AGFD constructs wildlife water developments to support a variety of wildlife, including game species. The benefits of AGFD wildlife water developments include a long lifespan; year-round, acceptable water quality for wildlife use; require no supplemental water hauling, except in rare or exceptional circumstances; minimal visual impacts and blend in with the surrounding landscape; are accessible to and used by target species and exclude undesirable/feral species to the greatest extent possible; and minimized risk of animal entrapment and mortality. |
| This measure was included in the DEIS and maintaining access in general has since been incorporated into the revised road use plan (FEIS mitigation measure FS-TA-01) and committed to by Resolution Copper. |
| **Source of measure:** |
| AGFD |
| **Resource affected/impacts being mitigated:** |
| These actions seek to mitigate potential adverse effects on livestock grazing, recreation, and wildlife habitat. |
| **Applicable alternatives:** |
| All |
| **Authority to require:** |
| Because of inclusion in the revised road use plan, this measure is considered to be non-discretionary for implementation. |
| Additionally, the areas impacted are Forest Service surface resources for Alternatives 2, 3, and 4, and authority exists under 36 CFR 251.56 (terms and conditions on special use permits) and 36 CFR 228.8 (mine plan requirements for environmental protection). For Alternative 5, 43 CFR 3809.2 provides similar authority to BLM to regulate mining to prevent unnecessary or undue degradation.<br>For Alternative 6, the Forest Service would not have jurisdiction over the tailings storage facility but would have authority over the pipeline corridors crossing NFS lands. |
| **Funded by:** |
| Resolution Copper |
| **Additional ground disturbance:** |
| No additional ground disturbance anticipated. |

### Required and Voluntary Measures for Recreation (6 measures)

| FS-RC-01: Relocation of Arizona National Scenic Trail |
|---|
| Other names: RC-212 (DEIS appendix J) |
| **Description/overview:**<br>Resolution Copper has proposed to fund the relocation of a segment of the Arizona National Scenic Trail as well as the construction of new trailheads. Approximately 9 miles of new trail would need to be built between U.S. Route 60 and NFS Road 650 near Whitford Canyon. This measure was proposed by Resolution Copper and seeks to mitigate impacts on recreational opportunities on the trail. This measure is only applicable to Alternatives 2, 3, and 4. Relocating the trail and constructing new trailheads would require additional ground disturbance, but the exact area of new disturbance has yet to be determined. It is assumed the new trail would be about 2 to 3 feet wide and have approximately 3 acres of total surface area. |
| **Source of measure:**<br>Resolution Copper |
| **Resource affected/impacts being mitigated:**<br>These actions seek to mitigate potential adverse effects on recreation. |
| **Applicable alternatives:**<br>Alternative 2, 3, and 4 |
| **Authority to require:**<br>The segments of the trail impacted are Forest Service surface resources for Alternatives 2, 3, and 4, and authority exists under 36 CFR 251.56 (terms and conditions on special use permits) and 36 CFR 228.8 (mine plan requirements for environmental protection). |
| **Funded by:**<br>Resolution Copper |
| **Additional ground disturbance:**<br>Yes, to be determined, but it is roughly estimated that a new trail bed would be 2 to 3 feet wide and would account for approximately 3 acres of additional ground disturbance. |

| FS-RC-02: Access to Oak Flat Campground |
|---|
| Other names: RC-216 (DEIS appendix J); PA Measure #B5 |
| **Description/overview:**<br>Resolution Copper will ensure access to the Oak Flat campground to members of the public and Tribes as long as safety allows. Resolution Copper will develop an Oak Flat campground management plan prior to completion of the land exchange. The management approach is consistent with the current Forest Service management of the campground but would also incorporate additional measures requested by Tribes, including closure of the campground to the public periodically or upon request by Indian Tribes for traditional and ceremonial purposes. |
| **Source of measure:**<br>Resolution Copper; draft Programmatic Agreement |
| **Resource affected/impacts being mitigated:** |

| These actions seek to mitigate potential adverse effects on recreation and Tribal values. |
|---|
| **Applicable alternatives:** <br> All |
| **Authority to require:** <br> As this measure was developed under the authority of Section 3003 of PL 113-291, implementation is required to take place. |
| **Funded by:** <br> Resolution Copper |
| **Additional ground disturbance:** <br> No additional ground disturbance anticipated. |

| **FS-RC-03: Mitigation for adverse impacts to recreational trails (Tonto National Forest multi-use trail plan)** |
|---|
| Other names: RC-214 (DEIS appendix J); M-R14; M-R17; M-R19; M-R20; M-R23; M-R35 |
| **Description/overview:** <br> In the DEIS, Resolution Copper had agreed to support the recreation user group (RUG) and the Superior Trail network plan to offset loss of public roads at Oak Flat. The RUG had proposed a conceptual plan for a trail system on the Tonto National Forest, located southwest of the town of Superior, that would meet the needs and interests of different stakeholders (WestLand Resources Inc. 2019). <br><br> In 2020, land managers and resource specialists from the Tonto National Forest evaluated the proposed measures intended to mitigate recreation impacts on the Tonto National Forest resulting from actions associated with the proposed project. This review resulted in a set of measures found to be legitimate, practicable, and effective, and inclusion in the FEIS was recommended (Rausch and Rasmussen 2020). <br><br> The recommendations include 9.3 miles of motorized trail and 11.5 miles of non-motorized trail that would be located on and managed by Tonto National Forest. Resolution Copper has committed to funding the construction and maintenance of the new multi-use trail network on the Tonto National Forest, with the further intent that investment funding can be supported by additional grants and funds from recreational groups and other organizations to further expand recreational opportunities. |
| **Source of measure:** <br> Tonto National Forest |
| **Resource affected/impacts being mitigated:** <br> These actions seek to mitigate potential adverse effects on recreation. |
| **Applicable alternatives:** <br> All |
| **Authority to require:** <br> As project impacts would impact Forest Service surface resources, including recreation opportunities involving motorized and non-motorized routes, authority exists under 36 CFR 251.56 (terms and conditions on special use permits) and 36 CFR 228.8 (mine plan requirements for environmental protection). |
| **Funded by:** <br> Resolution Copper |

| **Additional ground disturbance:** |
| Implementation of the full plan would involve 42 acres, which has been incorporated into the FEIS analysis. |

| **RC-RC-04: Establish an alternative campground site (Castleberry) to mitigate the loss of Oak Flat campground** |
| Other names: RC-215 (DEIS appendix J); M-R1; M-R2; M-R14; PA Measure #C7 |
| **Description/overview:** |
| Resolution Copper will establish an alternative campground site, known as Castleberry, within 18 months of the issuance of the final ROD, to mitigate the loss of Oak Flat campground, which is a historic property (Graham 2020). |
| The new Castleberry campground will be located primarily on private property owned by Resolution Copper near the town of Superior that contains numerous prehistoric and historic-era historic properties. Resolution Copper has indicated that efforts will be made to avoid effects on these properties when developing the campground facilities and to potentially install interpretive signs at several historic properties. |
| **Source of measure:** |
| Resolution Copper |
| **Resource affected/impacts being mitigated:** |
| These actions seek to mitigate potential adverse effects on recreation. |
| **Applicable alternatives:** |
| All |
| **Authority to require:** |
| Resolution Copper has noted that this measure is enforceable under third-party agreements dated January 14, 2021, between Resolution Copper and the Town of Superior. |
| Of the 50-acre proposed campground, 48 acres are private, and 2 acres are managed by the Tonto National Forest. The Tonto National Forest has the ability to manage surface uses on those 2 acres but does not have authority or jurisdiction over the remaining portions of the campground. |
| **Funded by:** |
| Resolution Copper |
| **Additional ground disturbance:** |
| Additional disturbance on the Castleberry property and access to property could include up to 50 acres, which has been incorporated into the FEIS analysis. |

**RC-RC-05: Mitigation for impacts on climbing resources**

Other names: RC-213 (DEIS appendix J); M-R8; M-R9; M-R23; M-R33; M-R34; M-R37

**Description/overview:**

As described in the Queen Creek "Climbing and Mitigation Access Plan" (Oliver 2020), impacts to climbing resources near Oak Flat and Euro Dog Valley could be offset by new access to bouldering and climbing resources known as "The Inconceivables and Chill Hill Boulders." These climbing resources are roughly accessed from Arizona State Route (SR) 177, located approximately 5 miles south of Superior, in Pinal County, Arizona, in portions of Sections 26, 27, 34, and 35, Township 2 South, Range 12 East.

Initial engineering designs for improved road access and parking on NFS lands have been drafted and Resolution Copper has agreed to fund the improvements. Details are provided in the "Inconceivables Access Plan" (WestLand Resources Inc. 2020a).

Additionally, Resolution Copper has agreed to mitigation efforts in the combined "Queen Creek Climbing Area," which includes 10 discrete climbing areas: The Pond, Atlantis, Oak Flat, Euro Dog Valley, The Mine Area, Apache Leap, Northern Devil's Canyon, Upper Devil's Canyon, and Lower Devil's Canyon, and Hackberry Creek/The Refuge. Some of these areas will be impacted, and Resolution Copper has proposed the following mitigation:

- Oak Creek and Euro Dog Valley: May eventually be impacted by subsidence. Funds for a new access road (crossing NFS lands) to the Inconceivables and Chill Hill boulders.

- The Mine Area: Mining impacts will likely include closure of the current access route via Magma Mine Road and closure of some of the climbing area. Resolution Copper will work with local climbing groups and climbers to evaluate the feasibility of an alternate access route (trail) on private lands.

- Apache Leap: Access via Magma Mine Road and NFS Road 315 will be closed due to mining impacts. Resolution Copper will work with local climbing groups and climbers to evaluate the feasibility of an alternate access route (trail) across private lands. Although access from NFS Road 2440 via the Cross Canyon Road would not be impacted by mining activities, there may be possible restrictions for climbing as a result of the climbing management plan for Apache Leap Special Management Area.

- Upper Devil's Canyon: Access from NFS Road 2438 and/or 2439 via NFS Road 469 (Magma Mine Road) will most likely remain. However, in the event that parts of NFS Road 2438 are closed due to subsidence, Resolution Copper will work with local climbing groups and climbers to evaluate the feasibility of an alternate access route.

- Lower Devil's Canyon, Hackberry Creek/The Refuge: Access will remain from the south from NFS Road 315 via SR 177, but access from Magma Mine Road will be closed.

Resolution Copper has also agreed to fund an endowment to support the continuing use of the Queen Creek Climbing Area for climbing and bouldering. The Queen Creek Climbing Coalition has agreed to support the use of the fund for the development of climbing access and areas outside the area impacted by the mine.

**Source of measure:**

Resolution Copper

**Resource affected/impacts being mitigated:**

These actions seek to mitigate potential adverse effects on recreation.

| **Applicable alternatives:** |
| All |

| **Authority to require:** |
| Portions of this measure are committed to by Resolution Copper under an agreement with the Queen Creek Coalition dated July 12, 2012. |

| **Funded by:** |
| Resolution Copper |

| **Additional ground disturbance:** |
| Total new ground disturbance for the Inconceivables Access Road has been incorporated into the FEIS analysis. Other ground disturbance from recreation use would be negligible and consistent with current uses. |

| **RV-RC-06: Mitigation for public access to JI Ranch through AGFD cooperative agreement** |
| Other names: M-S20 |

| **Description/overview:** |
| Resolution Copper will open Signal Mountain Road on the JI Ranch for public access to the Tonto National Forest for wildlife-related recreation through an agreement with the AGFD. |

| **Source of measure:** |
| Public comment |

| **Resource affected/impacts being mitigated:** |
| Recreation and public access |

| **Applicable alternatives:** |
| All |

| **Authority to require:** |
| As an applicant-proposed mitigation measure, implementation is not assured; however, if included as a stipulation or requirement in a permit it may become required. |

| **Funded by:** |
| Resolution Copper |

| **Additional ground disturbance:** |
| None. |

## Required and Voluntary Measures for Public Health and Safety (5 measures)

| FS-PH-01: Satellite monitoring of tailings storage facility |
|---|
| Other names: FS-01 (DEIS appendix J) |
| **Description/overview:** <br> High-resolution satellite imagery would be collected and processed at regular intervals. Processed output provided to the Forest Service or BLM would include beach width, tailings surface slope contours, and constructed site topography. This output could be provided for land manager verification of adherence to design criteria, as well as long-term monitoring of facility performance over time. |
| **Source of measure:** <br> Tonto National Forest interdisciplinary team |
| **Resource affected/impacts being mitigated:** <br> Public health and safety |
| **Applicable alternatives:** <br> Alternatives 2, 3, 4, and 5 |
| **Authority to require:** <br> Alternatives 2, 3, and 4: authority exists under 36 CFR 251.56 (terms and conditions on special use permits) and 36 CFR 228.8 (mine plan requirements for environmental protection). <br> Alternative 5: 43 CFR 3809.2 (BLM authority to regulate mining to prevent unnecessary or undue degradation). <br> Alternative 6: As facility would ultimately be located on private land, the Forest Service would not have authority to require long-term monitoring of the tailings storage facility. |
| **Funded by:** <br> Resolution Copper |
| **Additional ground disturbance:** <br> No additional ground disturbance anticipated. |

| FS-PH-02: Adherence to National Dam Safety Program Standards |
|---|
| Other names: FS-228 (DEIS appendix J); FS-229 (DEIS appendix J) |
| **Description/overview:** <br> For a tailings storage facility built on Federal land, the Forest Service is requiring that Resolution Copper adhere, at a minimum, to the requirements of the National Dam Safety Program discussed in "Relevant Laws, Regulations, Policies, and Plans" in section 3.10.1.3. <br> This measure also incorporates the development of an emergency action plan for the tailings storage facility. The failure modes and effects analysis (FMEA) that was conducted provides key information to this process, including the breach analysis performed as a result (KCB Consultants Ltd. 2020b). Emergency action planning would include evaluation of emergency potential, inundation mapping and classification of downstream inundated areas, response times, notification plans, evacuation plans, and plans for actions upon discovery of a potentially unsafe condition. This measure originally was anticipated to be conducted between the DEIS and FEIS (DEIS mitigation measure FS-229), and several fundamental steps were conducted (risk assessment and preparing the breach analysis). However, full |

emergency planning is premature, given that those efforts are specific to the downstream residents and community, and the facility would not begin operation—at best—for at least a decade. This remains a requirement for any facility built on Federal land, and while this would not include Alternative 6, emergency planning also is a specific requirement of the recently adopted Global Industry Standard on Tailings Management and would be conducted under that framework, regardless of site ownership (International Council on Mining and Metals et al. 2020).

**Source of measure:**

Tonto National Forest interdisciplinary team

**Resource affected/impacts being mitigated:**

Public health and safety

**Applicable alternatives:**

Alternatives 2, 3, 4, and 5

**Authority to require:**

Alternatives 2, 3, and 4: authority exists under 36 CFR 251.56 (terms and conditions on special use permits) and 36 CFR 228.8 (mine plan requirements for environmental protection).

Alternative 5: 43 CFR 3809.2 (BLM authority to regulate mining to prevent unnecessary or undue degradation).

Alternative 6: As facility would ultimately be located on private land, the Forest Service would not have authority to require these specific design standards.

**Funded by:**

Resolution Copper

**Additional ground disturbance:**

No additional ground disturbance anticipated.

---

**FS-PH-03: Skunk Camp pipeline protection and integrity plan**

Other names: CA-176 (DEIS appendix J); M-PH6; M-W30

**Description/overview:**

Resolution Copper has prepared a plan for assuring the protection of resources and integrity of the Skunk Camp tailings pipelines during both construction and operations (Golder Associates Inc. 2020). This plan includes additional details of the crossings of drainages such as Devil's Canyon and Mineral Creek. The plan includes details of the materials and techniques to be used in construction, including appropriate industry codes and guidance, an assessment of potential failure modes for the pipeline and design remedies to ensure integrity, operational controls, and spill response plans.

**Source of measure:**

Resolution Copper, public comments

**Resource affected/impacts being mitigated:**

Public health and safety; surface and groundwater quality

**Applicable alternatives:**

Alternative 6

| Authority to require: |
| --- |
| As much of the pipeline route occurs across NFS lands, authority exists under 36 CFR 251.56 (terms and conditions on special use permits) and 36 CFR 228.8 (mine plan requirements for environmental protection). |

| Funded by: |
| --- |
| Resolution Copper |

| Additional ground disturbance: |
| --- |
| None. |

| RC-PH-05: Adhere to Global Tailings Standard |
| --- |
| Other names: M-PH7 |

| Description/overview: |
| --- |
| Prior to the publication of the DEIS, in March 2019, the International Council on Mining and Metals (ICMM) announced it would co-convene an independent review of global tailings standards along with the United Nations Environment Programme (UNEP) and the Principles for Responsible Investment (PRI).<br><br>In August 2020, the Global Industry Standard on Tailings Management was launched (International Council on Mining and Metals et al. 2020). The preamble to the new Standard states, "The Global Industry Standard on Tailings Management (herein 'the Standard') strives to achieve the ultimate goal of zero harm to people and the environment with zero tolerance for human fatality. It requires Operators to take responsibility and prioritise the safety of tailings facilities, through all phases of a facility's lifecycle, including closure and post-closure. It also requires the disclosure of relevant information to support public accountability."<br><br>ICMM member companies would implement the Standard as a commitment of membership. Both Rio Tinto and BHP, partners in Resolution Copper, are members of ICMM.<br><br>Key aspects of the new Standard include the following:<br><br><ul><li>Maintaining a comprehensive knowledge base, and requirements for periodic updates to facility management and design at least every 5 years, focusing on material changes in social, environmental, or local economic conditions.</li><li>Identification of accountable parties, notably the Engineer of Record and the Accountable Executive.</li><li>Use of an independent tailings review board (ITRB) and internal auditing.</li><li>A focus on the mine lifecycle: operations, closure, and post-closure, extending until the facility is in a state of "safe closure." This means a closed tailings facility that does not pose ongoing material risks to people or the environment, which has been confirmed by an ITRB or senior independent technical reviewer and signed off by the Accountable Executive.</li><li>Hazard classification based on downstream consequences, which in turn guides the selection of the seismic design standard and flood design standard. For example, for a hazard classification of "extreme," the flood design would be an annual exceedance probability of 1 in 10,000, or the Probable Maximum Flood (International Council on Mining and Metals et al. 2020), and the seismic design criteria would be an annual exceedance probability of 1 in 10,000, or the Maximum Credible Earthquake (International Council on Mining and Metals et al. 2020).</li></ul> |

- Requirements for assessing credible failure modes, developing a breach analysis, and conducting emergency planning.
- Document "as-built" construction methods and conditions.
- Use of operational surveillance with specific and measurable performance objectives, indicators, criteria, and performance parameters; and development of clear trigger action response plans.
- Commitment to public disclosure of and access to information and transparency.

**Source of measure:**
Resolution Copper; public comments

**Resource affected/impacts being mitigated:**
Public health and safety

**Applicable alternatives:**
All

**Authority to require:**
ICMM member companies are required to implement the Standard as a commitment of membership. Both Rio Tinto and BHP, partners in Resolution Copper, are members of ICMM.

**Funded by:**
Resolution Copper

**Additional ground disturbance:**
None.

---

**RV-PH-04: Maintain the existing hotline for community complaints**

Other names: GP-133 (DEIS appendix J); M-G2

**Description/overview:**
Resolution Copper will maintain the existing hotline set up for community complaints via email and telephone, described on the Resolution Copper website (www.resolutioncopper.com).
Email: community-complaint@resolutioncopper.com. Telephone: (520) 689-3955.

**Source of measure:**
Public comments

**Resource affected/impacts being mitigated:**
General public use, health and safety, or other public nuisance issues that could occur as a result of project activities.

**Applicable alternatives:**
All

**Authority to require:**
As an applicant-proposed mitigation measure, implementation is not assured. However, note that this measure is required by Rio Tinto Corporate Community Standards.

**Funded by:**
Resolution Copper

| Additional ground disturbance: |
|---|
| None. |

### *Required and Voluntary Measures for Scenic Resources (1 measure)*

| FS-SR-01: Minimize visual impacts from transmission lines |
|---|
| Other names: FS-03 (DEIS appendix J) |
| **Description/overview:** Best management practices or other guidelines (on NFS lands) that would minimize visual impacts from transmissions lines could include the following:<br><br>• use non-specular transmission lines, transformers, and towers;<br><br>• avoid use of monopole transmission structures;<br><br>• avoid "skylining" of transmission/communication towers and other structures; consider topography when siting transmission structures to avoid "skylining" of structures on high ridges in the landscape; and<br><br>• use air transport capability to mobilize equipment and materials for clearing, grading, and erecting transmission towers in areas of the highest visual sensitivity with difficult access. |
| **Source of measure:**<br>Internal NEPA team scoping |
| **Resource affected/impacts being mitigated:**<br>These measures seek to reduce and minimize the scenery impacts and project contrast of mining operations in the surrounding landscape and impacts upon sensitive viewers. All recommendations would be effective in reducing the form, line, and color contrasts presented by the project elements. |
| **Applicable alternatives:**<br>All |
| **Authority to require:**<br>Power line corridors occur mainly on Tonto National Forest–managed lands, and mitigation can be required, regardless of alternative, under 36 CFR 251.56 (terms and conditions on special use permits) and 36 CFR 228.8 (mine plan requirements for environmental protection). |
| **Funded by:**<br>Resolution Copper |
| **Additional ground disturbance:**<br>No additional ground disturbance anticipated. |

## Required and Voluntary Measures for Cultural/Historical Resources and Tribal Values (7 measures)

| **FS-CR-01: Implementation of Oak Flat HPTP** |
| --- |
| Other names: RC-209 (DEIS appendix J); PA Measure #B1 |
| **Description/overview:**<br><br>The "Resolution Copper Oak Flat Land Exchange Treatment Plan" (Oak Flat historic properties treatment plan (HPTP)) (Deaver and O'Mack 2019) sets out a plan for treatments to resolve the adverse effects on 42 historic properties that have been identified within the Oak Flat Federal Parcel. In accordance with the plan, Resolution Copper would conduct archaeological data recovery on sites eligible under Criterion D that would be adversely affected. Project materials and archaeological collections would be curated in accordance with 36 CFR 79 (Curation of Federally-Owned and Administered Archaeological Collections). All materials recovered and the associated reports will be curated at the Huhugam Heritage Center or other approved repository. |
| **Source of measure:**<br><br>Discussions pursuant to Section 3003 of PL 113-291; draft Programmatic Agreement |
| **Resource affected/impacts being mitigated:**<br><br>Adverse impacts to historic properties and Tribal values and cultural heritage |
| **Applicable alternatives:**<br><br>All |
| **Authority to require:**<br><br>As this measure was developed under the authority of Section 3003 of PL 113-291, implementation is required to take place. |
| **Funded by:**<br><br>Resolution Copper |
| **Additional ground disturbance:**<br><br>Yes, but data recovery activities would take place within the area already assumed to be disturbed in the FEIS. |

| **FS-CR-02: GPO research design** |
| --- |
| Other names: RC-210 (DEIS appendix J); PA Measure #B2 |
| **Description/overview:**<br><br>The GPO research design and data recovery plans detail treatments to resolve adverse effects on historic properties within the GPO project area, with the exception of those in the Oak Flat Federal Parcel. Data recovery would be conducted on archaeological sites eligible for the National Register of Historic Places under Criterion D within the GPO project area. Project materials and archaeological collections would be curated in accordance with 36 CFR 79 (Curation of Federally-Owned and Administered Archaeological Collections). All materials recovered from State Trust and private lands and the associated reports will be curated at the Arizona State Museum, Huhugam Heritage Center, or other approved repository.<br><br>This measure has two components. The first component is the GPO research design document, which describes the approach for preparing future data recovery plans. In November 2020, the GPO research |

design was completed and approved by the Forest Service, State Historic Preservation Office (SHPO), and concurring parties (Arizona State Land Department, USACE), and some Tribes.

The second component of this measure is the preparation of individual data recovery plans for various portions of the project. As the Programmatic Agreement was never executed, the authority over cultural resource mitigation varies across the project. As a result there may be separate data recovery plans for portions of the project on NFS lands, Arizona State Trust lands, and lands associated with the Section 404 permit. Resolution Copper has committed to preparing these plans and conducting the data recovery or treatment of historical properties. It is conceivable that some areas of the project may not fall under the jurisdiction of any agency, in which case preparing and executing the data recovery plans may remain solely a voluntary commitment by Resolution Copper. However, Resolution Copper has coordinated with SHPO for approval to work on or with historic cultural resources, even on private lands.

For any data recovery plan associated with NFS lands, implementation of that plan would be a requirement of the final mine plan of operations or the special use permit.

| |
|---|
| **Source of measure:** |
| Discussions pursuant to Section 3003 of PL 113-291; draft Programmatic Agreement |
| **Resource affected/impacts being mitigated:** |
| Adverse impacts to historic properties and Tribal values and cultural heritage |
| **Applicable alternatives:** |
| All |
| **Authority to require:** |
| The Forest Service has the authority to require implementation of this measure on the NFS lands approved under the mining plan of operations or special use permit. |
| Additional authority may exist as a requirement of the Clean Water Act Section 404 permit, under the jurisdiction of the USACE; this is not under the authority of the Forest Service to require. |
| Additional authority may also exist on Arizona State Trust lands or as a requirement for the acquisition of State Trust lands; this is not under the authority of the Forest Service to require. |
| For areas not under the above authorities, this would remain a voluntary commitment by Resolution Copper. |
| **Funded by:** |
| Resolution Copper |
| **Additional ground disturbance:** |
| Yes, but data recovery activities would take place within the area already assumed to be disturbed in the FEIS. |

**FS-CR-03: Visual, atmospheric, auditory, socioeconomic, and cumulative effects mitigation plan**

Other names: PA Measure #B3

**Description/overview:**

The Forest Service will ensure that additional mitigation plan(s) are prepared after the publication of the FEIS that describe mitigation measures to address visual, atmospheric, auditory, and cumulative effects on historic properties. This plan has already been completed.

**Source of measure:**

Discussions pursuant to Section 3003 of PL 113-291; draft Programmatic Agreement

**Resource affected/impacts being mitigated:**

Adverse impacts to Tribal values and cultural heritage

**Applicable alternatives:**

All

**Authority to require:**

As this measure was developed under the authority of Section 3003 of PL 113-291, implementation is required to take place.

**Funded by:**

Resolution Copper

**Additional ground disturbance:**

Yes, but data recovery activities would take place within the area already assumed to be disturbed in the FEIS.

---

**FS-CR-05: Emory Oak Collaborative Tribal Restoration Initiative**

Other names: M-C5; PA Measure #C1

**Description/overview:**

In partnership with the Tonto National Forest, Resolution Copper will fund the Emory Oak Collaborative Tribal Restoration Initiative, a multi-year restorative fieldwork program for Emory oak groves located on the Tonto National Forest and the Coconino National Forest. The Tonto National Forest will direct the identification and restoration work of the Emory oak groves and fieldwork in consultation with Tribal elders from the Yavapai-Apache Nation, White Mountain Apache Tribe, San Carlos Apache Tribe, and Tonto Apache Tribe and with Northern Arizona University. Program treatments under consideration for Emory oak groves include installation of select fencing to exclude cattle and large herbivores, invasive species control, shrub canopy thinning, prescribed burns, hand-thinning, mastication, and reseeding through seed transplantation to increase recruitment of juvenile oaks. The program is designed to restore and protect Emory oak groves that are accessed by Apache communities for traditional subsistence gathering and ensure their sustainability for future generations.

**Source of measure:**

Discussions pursuant to Section 3003 of PL 113-291; draft Programmatic Agreement

**Resource affected/impacts being mitigated:**

Emory oak groves, particularly those that will be lost at Oak Flat; adverse impacts to Tribal values and cultural heritage

| Applicable alternatives: |
| --- |
| All |
| **Authority to require:** |
| As this measure was developed under the authority of Section 3003 of PL 113-291, implementation is required to take place. |
| **Funded by:** |
| Resolution Copper |
| **Additional ground disturbance:** |
| Treatments under consideration for Emory oak groves include installation of select fencing to exclude cattle and large herbivores, invasive species control, shrub canopy thinning, prescribed burns, mastication, and reseeding through seed transplantation to increase recruitment of juvenile oaks. Total ground disturbance is to be determined. |

| **FS-CR-06: Tribal cultural heritage fund** |
| --- |
| Other names: PA Measure #C3 |
| **Description/overview:** |
| Resolution Copper shall establish a cultural fund, through an endowment managed by an organization recognized as exempt under Internal Revenue Code section 501(c)(3), to partially address the physical and visual effects on the *Chí'chil Bildagoteel* Historic District and other historic properties significant to Tribes. The concept of this fund was developed through government-to-government consultation, and its purpose is to provide a fund from which Tribes could request financial support for activities that do not fit under the other Tribal-related funding programs. Examples of Tribal requests include but are not limited to direct funding to assist with new and existing Tribal projects and programs. Monies from the cultural fund will be available to the following Tribes for completion of cultural preservation projects: the Fort McDowell Yavapai Nation, Gila River Indian Community, Hopi Tribe, Mescalero Apache Tribe, Pueblo of Zuni, Salt River Pima-Maricopa Indian Community, San Carlos Apache Tribe, Tonto Apache Tribe, White Mountain Apache Tribe, Yavapai-Apache Nation, and Yavapai-Prescott Indian Tribe. |
| **Source of measure:** |
| Discussions pursuant to Section 3003 of PL 113-291; draft Programmatic Agreement |
| **Resource affected/impacts being mitigated:** |
| Adverse impacts to Tribal values and cultural heritage |
| **Applicable alternatives:** |
| All |
| **Authority to require:** |
| As this measure was developed under the authority of Section 3003 of PL 113-291, implementation is required to take place. |
| **Funded by:** |
| Resolution Copper |
| **Additional ground disturbance:** |
| No additional ground disturbance would take place. |

| FS-CR-08: Tribal education fund |
|---|
| Other names: PA Measure #C4 |
| **Description/overview:**<br>To partially address effects on the *Chí'chil Biłdagoteel* Historic District and other historic properties significant to Tribes, Resolution Copper shall establish a fund, through an endowment to be managed by an organization recognized as exempt under Internal Revenue Code section 501(c)(3), dedicated to funding scholarships for Tribal members pursuing post–high school education at a college, university, vocational school, or accredited 2-year program. Scholarships will be awarded based upon a committee's review of applicants. |
| **Source of measure:**<br>Discussions pursuant to Section 3003 of PL 113-291; draft Programmatic Agreement |
| **Resource affected/impacts being mitigated:**<br>Adverse impacts to historic properties and Tribal values and cultural heritage |
| **Applicable alternatives:**<br>All |
| **Authority to require:**<br>As this measure was developed under the authority of Section 3003 of PL 113-291, implementation is required to take place. |
| **Funded by:**<br>Resolution Copper |
| **Additional ground disturbance:**<br>No additional ground disturbance would take place. |

| RC-CR-04: Increase size of Apache Leap Special Management Area |
|---|
| Other names: None |
| **Description/overview:**<br>Resolution Copper will donate 32 acres of privately owned land within the Apache Leap South End Parcel, in addition to 807 acres of land required by Section 3003 of PL 113-291. With this additional land, the Apache Leap Special Management Area (SMA), a sacred landscape for the Apache and Yavapai, will be 839 acres. The Apache Leap SMA is named after its signature feature, an escarpment of sheer cliff faces and hoodoos, and preserves the natural character of Apache Leap, allows for traditional uses of the area by Native Americans, and protects and conserves the cultural and archaeological resources of the area. Upon completion of the land exchange outlined in Section 3003 of PL 113-291, the additional 32 acres will be transferred into Federal ownership, and the entire Apache Leap SMA will include only Federal lands. This measure would mitigate impacts on cultural and Tribal values and would require no additional ground disturbance. |
| **Source of measure:**<br>Resolution Copper |
| **Resource affected/impacts being mitigated:**<br>Adverse impacts to Tribal values and cultural heritage |

| **Applicable alternatives:** |
|---|
| All |

| **Authority to require:** |
|---|
| Although this was an applicant voluntary mitigation measure, it is included as a requirement in the Apache Leap Special management plan and associated decision notice issued by the Forest Service. |

| **Funded by:** |
|---|
| Resolution Copper |

| **Additional ground disturbance:** |
|---|
| No additional ground disturbance would take place. |

| **RC-CR-07: Archaeological database funds** |
|---|
| Other names: PA Measure #C6 |

| **Description/overview:** |
|---|
| In recognition of the substantial loss of cultural resources and historic properties on State Trust lands occurring through development of the preferred alternative, Resolution Copper shall fund the creation and/or enhancement of existing electronic archaeological databases to assist the State of Arizona with management of these assets. The funding shall be deposited into a restricted fund for the State's use in two installments. The first installment shall be deposited within 6 months of either (1) issuance of the final ROD, or (2) State funding of the electronic database project, whichever is later; as long as the first installment has been funded, the second installment shall be funded within 60 days of notice to proceed. If the first installment has not been made at the time of notice to proceed, both first and second installments shall be made when the State funds the electronic database project. |

| **Source of measure:** |
|---|
| Resolution Copper; draft Programmatic Agreement |

| **Resource affected/impacts being mitigated:** |
|---|
| Adverse impacts to historic properties, Tribal values, and cultural heritage |

| **Applicable alternatives:** |
|---|
| All |

| **Authority to require:** |
|---|
| This measure is enforceable through Letter Agreements dated January 12, 2021, and March 10, 2025, with the SHPO. |

| **Funded by:** |
|---|
| Resolution Copper |

| **Additional ground disturbance:** |
|---|
| No additional ground disturbance would take place. |

## *Required and Voluntary Measures for Socioeconomics (6 measures)*

| **FS-SO-02: Establish foundations for long-term funding, including the Tribal Monitor Program** |
|---|
| Other names: M-C4; PA Measure #C2 |
| **Description/overview:** |
| Resolution Copper worked with the Forest Service to fund training and facilitate the employment of Tribal members from the consulting Tribes to work on the project. More than 50 Tribal members have been trained, and 30 Tribal members from seven Native American Tribes are employed as Tribal monitors, all funded by Resolution Copper. The program has been in place for over 2 years, with approximately $1.8 million paid to Tribal members in wages and benefits in 2018 and 2019. Tribal monitors will be employed for the implementation of the Oak Flat HPTP and the GPO HPTPs. |
| Resolution Copper will establish a foundation or foundations for funding the continuation of the Tribal Monitor Program, long-term maintenance and monitoring of the Emory Oak Collaborative Tribal Restoration Initiative, and development of a Tribal Youth Program in partnership with the Forest Service and consulting Tribes. All three programs will be available to the following Tribes: the Fort McDowell Yavapai Nation, Gila River Indian Community, Hopi Tribe, Mescalero Apache Tribe, Pueblo of Zuni, Salt River Pima-Maricopa Indian Community, San Carlos Apache Tribe, Tonto Apache Tribe, White Mountain Apache Tribe, Yavapai-Apache Nation, and Yavapai-Prescott Indian Tribe. |
| **Source of measure:** |
| Discussions pursuant to Section 3003 of PL 113-291; draft Programmatic Agreement. With respect to the Tribal Monitor Program, during formal consultation between the Forest Service and Native American Tribes, Tribes requested the opportunity to have members of their own communities survey the land and prepare reports in their own words to have Tribal "eyes and ears" on the project. |
| **Resource affected/impacts being mitigated:** |
| Adverse impacts to Tribal heritage and values |
| **Applicable alternatives:** |
| All |
| **Authority to require:** |
| As this measure was developed under the authority of Section 3003 of PL 113-291, implementation is required to take place. |
| **Funded by:** |
| Resolution Copper |
| **Additional ground disturbance:** |
| None. |

| RC-SO-01: Community development fund |
|---|
| Other names: M-C1; PA Measure #C5 |
| **Description/overview:** |
| Resolution Copper shall establish a fund, through an endowment to be held by an organization recognized as exempt under Internal Revenue Code Section 501(c)(3), to be focused on the built environment located within the visual/atmospheric/socioeconomic and cumulative effects area of potential effects. The primary purpose of the fund is to address effects from the project on historic properties and other community infrastructure within the communities of Superior, Miami, Globe, Kearny, Hayden, and Winkelman. The monies in the fund will financially support a revolving loan program that will be administered by an organization that has experience in managing, investing, distributing, and reporting funds held for 501(c)(3) purposes and will be overseen by an appropriate governance structure that will be developed and will permit the implementation of the funding described in this stipulation. Applications for use of monies from the Community Development Fund shall be reviewed by a committee consisting of representatives from the SHPO, the applicable administrating organization, and the affected communities. All funded projects must comply with the Secretary of the Interior's Standards for the Treatment of Historic Properties and compliance with these standards will be determined by the SHPO. The endowment will be funded within 60 days of notice to proceed. Specific parameters for the Community Development Fund shall be defined through consultation between Resolution Copper, the applicable administering organization, and the SHPO and must include <br><br> • availability to municipalities, Counties, non-profit organizations, private citizens, and private organizations; <br><br> • preference for projects participating in other historic preservation incentive programs; <br><br> • preference for projects agreeing to repay funds within 5 years of award, with extensions possible. <br><br> Purchase or rehabilitation of the Harding building in Superior (a specific suggestion made in public comments) is a project that may be covered by this fund. |
| **Source of measure:** |
| Resolution Copper; draft Programmatic Agreement |
| **Resource affected/impacts being mitigated:** |
| Adverse impacts to historic properties |
| **Applicable alternatives:** |
| All |
| **Authority to require:** |
| This measure is enforceable under an agreement with the Town of Superior dated January 14, 2021, and through Letter Agreements dated January 12, 2021, and March 10, 2025, with the SHPO. |
| **Funded by:** |
| Resolution Copper |
| **Additional ground disturbance:** |
| None. |

| **RC-SO-03: Establish a regional economic development entity for Copper Triangle communities** |
|---|
| Other names: M-S1; M-S13; M-S22; M-S27 |
| **Description/overview:** |
| Through investment of an initial endowment, Resolution Copper will develop a sustainable regional economic development entity (or entities) to provide programming and investment in the Copper Triangle communities (Superior, Hayden, Winkelman, and Kearney). This new community-based entity will partner with external organizations, local municipalities, and stakeholders. Specifically, partnerships will be sought with organizations having certain expertise and tools to support and enhance the quality of life in the region, such as strategic planning for economic reinvestment and workforce development. |
| **Source of measure:** |
| Resolution Copper; public comments |
| **Resource affected/impacts being mitigated:** |
| Adverse socioeconomic impacts within the Copper Triangle |
| **Applicable alternatives:** |
| All |
| **Authority to require:** |
| This measure is enforceable under an agreement with the Town of Superior dated January 14, 2021. |
| **Funded by:** |
| Resolution Copper |
| **Additional ground disturbance:** |
| None. |

| **RC-SO-05: Continue funding Community Working Group** |
|---|
| Other names: M-S17; M-W7 |
| **Description/overview:** |
| In May 2024, Resolution Copper entered into a Good Neighbor Agreement with a number of entities, including the Town of Superior, Arizona Trail Association, Boyce Thompson Arboretum, Cobre Valley Medical Center, Copper Community Alliance, Queen Valley, Queen Valley Fire Department, Queen Valley Golf Association, Queen Valley Historic Society, Rebuild Superior, Inc., Superior Chamber of Commerce, Superior Optimist Club, Superior Unified School District, Top of the World, Town of Miami, Town of Kearney, Town of Winkelman, Gila County, Pinal County, and the City of Globe. The Good Neighbor Agreement provides for the continued funding of the Community Working Group. |
| Working with the Community Working Group, and combined with Rio Tinto corporate requirements for health, safety, and environmental protection, Resolution Copper will ensure that all possible measures are taken to identify and mitigate public health, safety, and environmental issues before they occur, with transparency with local communities. Additionally, Resolution Copper will comply with the Rio Tinto Community and Social Performance Standard, which requires comprehensive engagement throughout the life of the project. The standard specifically requires effective engagements with communities on social, environmental, and other issues, disclosure of project-related information, and consultation with communities on matters that directly affect them, throughout the life of the project. This involvement includes continuing the Community Monitoring Program. |

Appendix J

| **Source of measure:** |
| Resolution Copper; public comments |

| **Resource affected/impacts being mitigated:** |
| Public safety and community engagement |

| **Applicable alternatives:** |
| All |

| **Authority to require:** |
| This measure is enforceable under the May 2024 Good Neighbor Agreement. |

| **Funded by:** |
| Resolution Copper |

| **Additional ground disturbance:** |
| None. |

| **RC-SO-06: Agreement with Town of Superior to cover direct costs** |
| Other names: M-S11 |
| **Description/overview:** |
| Projected tax increases are a factor of Resolution Copper's business impacts on the Town of Superior, driven mainly through increased sales taxes from Resolution Copper employees and contractors within the town, and to a lesser extent property and sales tax increases benefiting the Town through Pinal County and State apportionments. Resolution Copper has historically paid the Town for more public safety coverage than a standard level of service requires at a mine site. Resolution Copper is committed to public safety and will continue to work with the Town to agree annually on projected net direct costs that will be Resolution Copper's responsibility. |
| **Source of measure:** |
| Resolution Copper; Town of Superior; public comments |
| **Resource affected/impacts being mitigated:** |
| Public safety and infrastructure |
| **Applicable alternatives:** |
| All |
| **Authority to require:** |
| This is a Resolution Copper commitment under the agreement with the Town of Superior dated January 14, 2021. |
| **Funded by:** |
| Resolution Copper |
| **Additional ground disturbance:** |
| None. |

| RV-SO-04: Resolution Copper social investment program |
|---|
| Other names: M-R14 |
| **Description/overview:** |
| The Resolution Copper social investment program and corporate giving program have been established to support economic development and enhance quality of life. This includes programs that help create a diverse local business community and programs that help build a healthier and safer community, including parks/pool facilities and schools. Through these programs Resolution Copper has worked with cities, towns, governments, and school districts to fund existing projects, including pool repair and upgrades as well as school programs. These requests are defined and based on the needs of those local municipalities and school districts. |
| **Source of measure:** |
| Resolution Copper; public comments |
| **Resource affected/impacts being mitigated:** |
| Adverse socioeconomic impacts within the Copper Triangle |
| **Applicable alternatives:** |
| All |
| **Authority to require:** |
| As an applicant-proposed mitigation measure, implementation is not assured. However, note that this measure is required by Rio Tinto Corporate Community Standards. |
| **Funded by:** |
| Resolution Copper |
| **Additional ground disturbance:** |
| None. |

## *Required and Voluntary Measures for Livestock and Grazing (1 measure)*

| RV-LG-01: Mitigation for impacts to ranching and grazing leases |
|---|
| **Other** names: M-S28 |
| **Description/overview:** |
| Resolution Copper has and will continue to work collaboratively with ranchers who hold private property and/or grazing leases/rights within the vicinity of the proposed project footprint. To minimize ranching impacts, the corridor pipeline/power line has been designed consistent with feedback from ranchers to have minimal impact on ranching land uses and day-to-day activities. In the event that other ranching and range improvements may be impacted in the future, Resolution Copper would replace those improvements as a result of the construction of the pipeline corridor. Range fencing will be opened during pipeline construction with temporary fencing installed at the end of each workday to prevent livestock migration. Permanent repairs will be made to the fencing, including a gate to permit right-of-way access for inspection and maintenance activities along the pipeline corridor. |
| **Source of measure:** |
| Resolution Copper; public comments |

| Resource affected/impacts being mitigated: |
| Livestock grazing and socioeconomics |

| Applicable alternatives: |
| All |

| Authority to require: |
| As an applicant-proposed mitigation measure, implementation is not assured. However, all grazing leases within the footprint are under Resolution Copper management and require implementation of management practices covering maintenance, including fencing, and stock ponds. |

| Funded by: |
| Resolution Copper |

| Additional ground disturbance: |
| None. |

# Mitigation and Monitoring that Could Be Required by Other Regulatory and Permitting Agencies

Potential mitigation and monitoring measures associated with the permits listed below are within the authority of other regulatory permitting agencies and could be required, including ADEQ and Arizona Department of Water Resources. These measures were not considered in the chapter 3 impacts analysis. The Forest Service has no authority, obligation, or expertise to determine or enforce compliance for the measures associated with the permits listed in this section, as they have not yet been required by other agencies, nor have they been agreed to by Resolution Copper. The mitigation and monitoring measures in this section include permit requirements and stipulations from legally binding permits and authorizations such as the air quality permit, APP, and groundwater withdrawal permit.

Many of these permits have not yet been issued but are anticipated to be issued prior to approval of the final mining plan of operations or special use permit. Those permits received prior to the issuance of the final ROD may need to be modified to reflect the alternative selected by the deciding official. These regulatory and permitting agencies would share monitoring results and any instances of noncompliance with the Forest Service. The Forest Service would use the information provided by the regulatory and permitting agencies to determine compliance with the decision that would be documented in the ROD and compliance with the final mining plan of operations or special use permit. Some of the other permits, licenses, and authorizations (see FEIS table 1.5.4-1 in chapter 1) that are anticipated to be required for the mine to be operational (and may involve additional mitigations beyond those noted here) include the following:

- Aquifer Protection Permit (APP)

- Arizona Pollutant Discharge Elimination System (AZPDES) Permit

- Clean Water Act Section 401 Certification

- Special Use Permits

- Project-Specific Section 404 Clean Water Act Permit

- Air Quality Control Permit



February 11, 2021

Tom Torres
Acting Supervisor
U.S. Forest Service
Tonto National Forest
2324 E. McDowell Road
Phoenix, AZ 85006

Ref:   *Resolution Copper Mining Project and Land Exchange*
       *Tonto National Forest, Pinal County, Arizona*
       *ACHP Project Number: 012344*

Dear Mr. Torres:

On January 26, 2021, the U.S. Forest Service (USFS), Tonto National Forest (TNF) forwarded the final Programmatic Agreement (PA) for the referenced undertaking for the Advisory Council on Historic Preservation's (ACHP) signature. All the other Signatories (USFS, Arizona State Historic Preservation Officer) and Invited Signatories (Bureau of Land Management, US Army Corps of Engineers, Resolution Copper, Salt River Project, Arizona State Land Department, and Arizona State Museum) have already signed the agreement. If the ACHP were to sign the PA, the agreement would be executed. Execution and implementation of the PA would document the USFS' compliance with Section 106 of the National Historic Preservation Act (NHPA) and its implementing regulations, "Protection of Historic Properties" (36 CFR Part 800) for the proposed Resolution Copper Mining Project and Southeast Arizona Land Exchange.

The ACHP has participated in the Section 106 consultation to seek ways to avoid, minimize, or mitigate adverse effects to historic properties that would result from this undertaking since December 21, 2017. On multiple occasions, in writing and in person, the ACHP provided its recommendations to the TNF that the consultation process should include those parties with an interest in the effects of the land exchange and mining on historic properties, specifically properties of traditional religious and cultural significance to Indian tribes, and that those parties be provided with sufficient information to participate meaningfully in the consultation.

We appreciate USFS's attention to these and other recommendations we have provided, and the steps it has taken to improve its consultation with Indian tribes and others. However, it is clear that the proposed undertaking would destroy significant historic properties, including the highly significant Oak Flat, and the measures in the PA are not sufficient to adequately resolve those adverse effects. The ACHP believes that further consultation in this case would be unproductive and therefore, we are hereby terminating consultation pursuant to 36 CFR § 800.7(a)(4).

In accordance with section 800.7(c), the ACHP will develop and transmit its final comments to the Secretary of Agriculture. Recognizing that the USFS' issuance of the Final Environmental Impact Statement on January 15, 2021 initiated a 60-day clock for transferring the Oak Flat parcel out of federal

ADVISORY COUNCIL ON HISTORIC PRESERVATION

401 F Street NW, Suite 308 • Washington, DC 20001-2637
Phone: 202-517-0200 • Fax: 202-517-6381 • achp@achp.gov • www.achp.gov

SER-200

ownership (as required by the Southeast Arizona Land Exchange and Conservation Act, 16 U.S.C. § 539p), the ACHP will endeavor to provide its comments by March 5, 2021, short of the 45 day time line afforded to us by the regulations. With this notice of termination, we are also requesting that USDA, TNF, and all consulting parties provide any views on this undertaking and proposed resolution of adverse effects to us as soon as possible. This accelerated timeline will enable the Secretary an opportunity to receive our comments and respond to them prior reaching a final decision on the undertaking, as required by section 800.7(c)(4).

The ACHP remains committed to supporting the USFS in meeting its Section 106 compliance responsibilities. If you or your staff have any questions or require further clarification, please contact Mr. Christopher Daniel, Program Analyst, at 202-517-0223 or via e-mail at cdaniel@achp.gov.

Sincerely,

John M. Fowler
Executive Director

1

2  Roger Flynn (CO Bar # 21078) *(Pro Hac Vice)*
   Jeffrey C. Parsons (CO Bar #30210) (*Pro Hac Vice*)
3  WESTERN MINING ACTION PROJECT
   P.O. Box 349; 440 Main Street, #2
4  Lyons, CO 80540
   (303) 823-5738
5  wmap@igc.org

6
   Susan B. Montgomery (AZ Bar # 020595)
7  Robyn L. Interpreter (AZ Bar # 020864)
   MONTGOMERY & INTERPRETER, PLC
8  3301 E. Thunderbird Rd.
   Phoenix, AZ 85032
9  (480) 513-6825
10 smontgomery@milawaz.com
   rinterpreter@milawaz.com
11

12 *Additional Plaintiffs' Counsel Listed in Signature Block Below*

13                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF ARIZONA
14                        PHOENIX DIVISION

15

16 Arizona Mining Reform Coalition; Inter Tribal    )    Case No. 2:21-CV-00122-DWL
   Association of Arizona, Inc.; Earthworks;        )
17 Center for Biological Diversity; Access Fund;    )    FIRST AMENDED
   and Grand Canyon Chapter of the Sierra Club,     )    COMPLAINT FOR VACATUR,
18                                                   )    DECLARATORY AND
                     Plaintiffs                      )    INJUNCTIVE RELIEF
19                                                   )
              vs.                                    )
20                                                   )
   Brooke L. Rollins, United States Secretary of    )
21 Agriculture; United States Forest Service, an    )
   agency in the U.S. Department of Agriculture;    )
22 and Neil Bosworth, Supervisor of the Tonto       )
   National Forest,                                  )
23                                                   )
24                   Defendants,                     )
                                                     )
25 and                                               )
                                                     )
26 Resolution Copper Mining,                         )
                                                     )
27                   Defendant-Intervenor.           )
   _____          )
28

                                                                                    1

37.     The requested relief would redress Plaintiffs' actual, concrete injuries caused by the Forest Service's failure to comply with duties mandated by the NDAA, NEPA, the other federal laws noted herein, and their implementing regulations and policies.

38.     The challenged agency actions are subject to judicial review and authority pursuant to 5 U.S.C. §§702, 704, & 706.

## PARTIES

39.     Plaintiff Arizona Mining Reform Coalition ("AMRC") works in Arizona to improve state and federal laws, rules, and regulations governing hard rock mining to protect communities and the environment.  AMRC works to hold government agencies and mining operations to the highest environmental and social standards to provide for the long term environmental, cultural, and economic health of Arizona.

40.     Plaintiff Inter Tribal Association of Arizona, Inc. ("ITAA"), is an intertribal, non-profit organization composed of 21 federally recognized Tribes with lands located primarily in Arizona, as well as in California, New Mexico, and Nevada.  The ITAA's Member Tribes have worked together since 1952 to provide a united voice for Tribes on matters of common concern.  ITAA's Member Tribes have stood in united opposition to the Resolution Copper Mine and Land Exchange Project for nearly 20 years.  The representatives of ITAA are the highest elected tribal officials from each of the Member Tribes, including tribal chairpersons, presidents, and governors.  ITAA's Member Tribes are the Ak-Chin Indian Community, the Cocopah Tribe, the Colorado River Indian Tribes, the Fort McDowell Yavapai Nation, the Fort Mojave Indian Tribe, the Gila River Indian Community, the Havasupai Tribe, the Hopi Tribe, the Hualapai Indian Tribe, the Kaibab Band of Paiute Indians, the Pascua Yaqui Tribe, the Quechan Tribe, the Salt River Pima-Maricopa Indian Community, the San Carlos Apache Tribe, the San Juan Southern Paiute Tribe, the Tohono O'odham Nation, the Tonto Apache Tribe, the White Mountain Apache Tribe, the Yavapai-Apache Nation, the Yavapai-Prescott Indian Tribe, and the Zuni Tribe.

41.     Plaintiff Access Fund is the national advocacy organization that works to keep U.S. climbing areas open and conserves the climbing environment.  Founded in 1990,

13

the Access Fund works with more than 145 affiliated local climbing organizations around the country in supporting and representing more than 8 million climbers nationwide in all forms of climbing: rock, ice, mountaineering, and bouldering.

42.     Plaintiff Center for Biological Diversity ("Center") is a non-profit public interest organization with headquarters located in Tucson, Arizona, representing more than 90,000 members dedicated to the conservation and recovery of threatened and endangered species and their habitats.  The Center works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction.  The Center has long-standing interest in projects of ecological significance undertaken in the National Forests of the Southwest, including proposed mining projects.

43.     Plaintiff Earthworks is a nonprofit organization dedicated to protecting communities and the environment from the adverse impacts of mineral and energy development while promoting sustainable solutions.  Earthworks stands for clean air, water and land, healthy communities, and corporate accountability.  Earthworks supports solutions that protect both the Earth's resources and our communities.

44.     Plaintiff Sierra Club is one of the nation's oldest and most influential grassroots organizations whose mission is "to explore, enjoy, and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; and to educate and enlist humanity to protect and restore the quality of the natural and human environments."  Sierra Club has more than 2.4 million members and supporters with 35,000 in Arizona as part of the Grand Canyon (Arizona) Chapter.  Its members have long been committed to protecting and enjoying the Tonto National Forest.

45.     Plaintiffs have long-standing interests in the proper and lawful management of the National Forests, especially the Tonto National Forest near and adjacent to the town of Superior, including the lands within the Project and Exchange area.  Plaintiffs also have long-standing interests in the proper implementation of NEPA and federal public land management laws.  Members, officers, staff, and supporters of Plaintiffs participate in a wide range of aesthetic, scientific research, recreational, commercial, and traditional,

14

religious and cultural activities on the Tonto National Forest and within and adjacent to the lands proposed to be impacted by the Exchange and Project activities reviewed in the FEIS.

46.     Plaintiffs' members, officers, staff, and supporters hike, rock climb, guide commercial clients, picnic, conduct cultural and religious ceremonies, appreciate scenery, solitude, and quiet, engage in scientific research projects, and view and value wildlife, in the lands at the site of the Exchange, Project operations, and related infrastructure, including waters adversely affected by the Exchange and Project (such as Ga'an Canyon, Queen Creek, Mineral Creek, and springs and seeps that will suffer severe loss or elimination of flows).  Plaintiffs' members, officers, staff, and supporters have concrete plans to continue pursuing these activities on the specific lands and transportation and infrastructure routes impacted by the Exchange and Project operations.  These uses will be immediately and irreparably diminished or eliminated altogether by the Exchange and Project operations.  Many of Plaintiffs' members live in the town of Superior and in Queen Valley near the Project area that will be adversely affected by the Exchange and the Project, while the Mine and all of its infrastructure would exist within the ancestral lands of ITAA's Member Tribes.

47.     Plaintiffs' members use of, and access to, the currently public lands that would be exchanged would be eliminated, and Plaintiffs are entitled to enforce the NDAA's "equal value," appraisal, and other requirements.

48.     Plaintiffs fully participated in the Agency's public review process and submitted detailed comments during the Forest Service review of the Exchange and Project, including hundreds of pages of comments, with exhibits, on the Draft EIS in 2019. Plaintiffs submitted additional comments, information, and exhibits to the Forest Service in 2020, prior to the issuance of the 2021 FEIS.  In addition, on April 11, 2025, Plaintiffs submitted additional significant new information to the Forest Service and U.S. Army Corps of Engineers, including: 28 documents pertaining to water shortages, drought, and other water resource implications; two documents pertaining to subsidence features developing in the area due to groundwater pumping; eight documents pertaining to ongoing

15

residential development and water implications; one document pertaining to the existence of an endangered species at the bridge that will be impacted by mine traffic on US-60 East; and three documents pertaining to the mine's production timeline, current exportation of all copper mined in the U.S. and reasonably foreseeable copper mining in the vicinity of the project area. The agency failed to meaningfully analyze or consider nearly all of this relevant information in preparing the FEIS.

49.   The Forest Service's failure to properly and fully involve the public during the FEIS and Exchange and Project review process has violated Plaintiffs' and their members' procedural rights under NEPA, NFMA, FLPMA, the APA, Section 3003 of the NDAA, and related laws and regulations.

50.   The interests of Plaintiffs and their members, officers, staff, and supporters in this matter are substantial and are adversely affected by Defendants' failure to comply with NEPA, Section 3003 of the NDAA, NFMA, FLPMA, the 1897 Organic Act, the APA, and by the Exchange and Project activities. The requested relief will redress the injuries of the Plaintiffs, and their members, officers, staff, and supporters.

51.   The failure of the Federal Defendants to comply with the public and agency review requirements of NEPA, Section 3003 of the NDAA, Forest Service regulations, the NFMA, FLPMA, Organic Act, and their implementing regulations also adversely affects and injures Plaintiffs and their members' ability to fully participate in the agency's decision-making as mandated by these laws.

52.   Brooke L. Rollins is the U.S. Secretary of Agriculture, and is sued in her official capacity. Defendant, United States Forest Service, is a federal agency within the U.S. Department of Agriculture, which are responsible for the management of the National Forests, including the Tonto National Forest. As part of its management responsibility, the Forest Service must ensure that activities it reviews and authorizes on the Tonto National Forest comply with NEPA, FLPMA, Forest Service regulations, NFMA, the Organic Act, the APA, and the other federal laws noted herein. According to Defendants, the Secretary of Agriculture has accepted and approved the appraisals for the Exchange. On June 20,

16

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **GOUYEN BROWN LOPEZ,**<br>9340 East Sleepy Hollow Road<br>Mesa, AZ 85207 | |
| **SINETTA LOPEZ, on behalf of herself and her minor child L.B.,**<br>9340 East Sleepy Hollow Road<br>Mesa, AZ 85207 | Civil Action No. 1:25-cv-02408 |
| **NOMIE BROWN,**<br>175 Roja Drive<br>Globe, AZ 85501 | **COMPLAINT**<br>(Jury Requested) |
| **ANGELA KINSEY, on behalf of herself and her minor children V.K. and M.K.,**<br>8734 North Ninth Avenue<br>Phoenix, AZ 85021 | |
| *Plaintiffs*, | |
| v. | |
| **UNITED STATES OF AMERICA**,<br>U.S. Attorney's Office for the District of Columbia<br>601 D Street NW<br>Washington, D.C. 20530 | |
| **UNITED STATES DEPARTMENT OF AGRICULTURE,**<br>U.S. Department of Agriculture<br>1400 Independence Ave., SW<br>Washington, D.C. 20250-0003 | |
| **UNITED STATES FOREST SERVICE,**<br>U.S. Department of Agriculture<br>1400 Independence Ave., SW<br>Washington, D.C. 20250-0003 | |
| **BROOKE ROLLINS,**<br>U.S. Department of Agriculture<br>1400 Independence Ave, SW<br>Washington, D.C. 20250-0003 | |

37.   The federal government actively suppressed the Holy Ground movement by forbidding Silas John's dances and jailing him. *Id.* at 259. Nevertheless, some families still held Holy Ground ceremonies at Oak Flat in the late 1940s or early 1950s. *Id.* And they continue to do so today.

38.   The Sunrise Ceremony requires months of planning, takes several days to celebrate, and is often attended by hundreds of tribal members. To prepare, the girl gathers plants from Oak Flat and speaks to the spirit of Oak Flat, expressing gratitude for its resources. Her godmother dresses her in the essential tools of womanhood, and tribal members surround her with singing, dancing, and prayer. In the night, the Ga'an enter Apache men called crown dancers. The Ga'an bless the girl, who joins their dance.

39.   On the final day, one of the Ga'an dancers paints the girl with white clay taken from the ground at Oak Flat, molding her into the woman she is going to be. When her godmother wipes the clay from her eyes, she is a new woman forever imprinted with the spirit of Oak Flat.

40.   Oak Flat is also the site of several natural springs, which are rare in this arid region, and which are sources of spiritual power for Apaches.

41.   One example is *Tú Nahikaadi* (Dripping Spring), a cave with a dripping spring, which has a unique role in Apache oral tradition.

42.   According to Apache tradition, a great flood scoured the world, and the matriarch of the Apache people, Changing Woman, survived the flood and took refuge in a cave with a dripping spring. Wenger at 250–51. She emerged alone into this world, and her children, conceived with the Sun, received guidance from the Ga'an on how to live in this land. *Id.*

43.   Western Apaches continue to visit Dripping Spring for religious rituals, and the Apache girl in a Sunrise Dance embodies Changing Woman as she dances her way to womanhood.

44.   Oak Flat is also the site of *Tséyaa Gogeschin* (translated as Written or Painted under the Rocks), a large rock overhang with ancient pictographs and petroglyphs—rock art that holds special meaning for Apache medicine people and provides a tangible, irreplaceable connection to Apache ancestors. The Chairman of the San Carlos Apache Tribe has described this artwork as "the footprints and the very spirit of our ancestors," akin to "the Western Wall in Jerusalem, St.

8

Peter's Basilica in Vatican City, or Angor [sic] Wat in Cambodia. This is why I call Oak Flat the
Sistine Chapel of Apache religion." 6-EIS-U-9.

*Plaintiffs' religious practices*

45.  The Plaintiffs in this case include Apache women and girls whose religious practices
center on Oak Flat and who would be unable to continue their religious practices if Oak Flat is
destroyed.

46.  Plaintiff Gouyen Brown had her Sunrise Ceremony at Oak Flat. During that ceremony,
she experienced a profound spiritual connection with the Creator, with the Ga'an, with Mother
Earth, and with her ancestors. It is where she became a new woman. She continues to return to
Oak Flat to pray, gather medicine, and participate in religious ceremonies. She hopes and intends
that her own children will be able to connect with the Creator at Oak Flat, and that her daughters
will be able to have their Sunrise Ceremonies at Oak Flat. If Oak Flat is destroyed, she would be
devastated. She would be unable to continue core religious practices and unable to bring up her
children in the Apache religious ways.

47.  Plaintiff Sinetta Lopez is an Apache woman and Gouyen's mother. She grew up coming
to Oak Flat with her mother and grandmother, collecting acorns, praying, and participating in
sacred ceremonies there. Oak Flat is central to her religious practices. As a single mother, Oak Flat
is central to how she brings up her daughters in the Apache way.

48.  Sinetta also has a minor daughter, L.B., who is named after an Apache warrior and
prophet who escaped from imprisonment on the San Carlos Reservation and fought alongside
Geronimo. Sinetta's minor daughter has grown up at Oak Flat and has had dreams and encounters
with spirits at Oak Flat. She plans to have her Sunrise Ceremony there and remain connected with
the Creator and with her ancestors through sacred ceremonies at Oak Flat.

49.  Plaintiff Nomie Brown is an Apache woman who had her coming-of-age Sunrise
Ceremony at Oak Flat. That ceremony fundamentally changed her life, and she continues to return
to Oak Flat to engage in prayer and religious ceremonies there. Oak Flat is essential to her ongoing
religious exercise and her identity as an Apache woman.

9

50.   Plaintiff Angela Kinsey is an Apache woman and mother who engages in religious practices at Oak Flat. She grew up coming to Oak Flat with her grandmother and has participated in many religious ceremonies at Oak Flat, including serving as a godmother in a Sunrise Ceremony. She has two minor daughters whom she continues to take to Oak Flat to show them where they came from and to pass on Apache traditions and religious ways. Oak Flat is the place where she is uniquely able to connect with the Creator.

51.   Angela's older minor daughter, V.K., had her coming-of-age ceremony at Oak Flat. She has attended many ceremonies at Oak Flat, and attending and participating in those ceremonies is an essential part of her religious practices and identity as an Apache woman.

52.   Angela's younger minor daughter, M.K., is four years old. Angela hopes and intends that M.K. will be able to have her coming-of-age ceremony at Oak Flat.

53.   For Plaintiffs, Oak Flat in its entirety is a sacred and holy site. Oak Flat's protection is essential for the continued practice of Apache religious and cultural ways, and they oppose the plan to violate the integrity of Oak Flat through mining.

### *The government takes Oak Flat*

54.   Oak Flat was Apache land before the United States existed.

55.   Beginning in the 1500s, other nations made claims on the area, including Spain and, later, Mexico.

56.   The United States first gained an interest in the area in 1848, after the Mexican-American War, when Mexico ceded its claim to the area in the Treaty of Guadalupe Hidalgo.

57.   In 1852, to secure peace with the Apaches, the United States entered the Treaty of Santa Fe with several Apache chiefs. In it, the United States promised to settle the Apaches' territorial boundaries and pass and execute laws conducive to their prosperity and happiness.

58.   Although the government failed to carry out its obligation to settle territorial boundaries formally, the earliest map of the area, prepared by the Smithsonian Institution in 1899, shows Oak Flat as Apache territory, not belonging to the United States.

to—(i) address the concerns of the affected Indian tribes; and (ii) minimize the adverse effects on the affected Indian tribes resulting from mining and related activities on the Federal land conveyed to Resolution Copper under this section." § 3003(c)(3)(B), *id.*, at 3733.

82.   Once the Secretary publishes the EIS, Section 3003 provides that "the Secretary shall convey all right, title, and interest of the United States" in Oak Flat "to Resolution Copper" within "60 days." § 3003(c)(10), *id.*, at 3736.

### *Resolution Copper's mine will destroy Oak Flat*

83.   The government initially published an EIS on January 15, 2021, but withdrew it a few weeks later, stating that it needed additional "time" to "fully understand concerns raised by Tribes." USDA, Resolution Copper Project & Land Exchange Environmental Impact Statement: Project Update (Feb. 21, 2023), https://www.resolutionmineeis.us/.

84.   Before publishing the EIS, the government failed to coordinate with the ACHP in the production of a plan to mitigate harm to Oak Flat's historical features.

85.   Due to this failure, the ACHP submitted comments in March 2021 that included suggestions to which the agencies were required to respond.

86.   The government declined to adopt the ACHP's suggestions in a letter issued in April 2025.

87.   The government republished the EIS on June 20, 2025.

88.   The EIS confirms that the mine will destroy Oak Flat.

89.   The copper is located between 4,500 and 7,000 feet below Oak Flat's surface. To mine it, Resolution will use a technique called panel caving, which involves tunneling beneath the ore, fracturing it with explosives, and removing it from below.

90.   This method is cheaper than other feasible mining techniques but far more destructive of Oak Flat's surface.

91.   Once the ore is removed, approximately 1.37 billion tons of toxic waste ("tailings") will need to be stored forever. This will permanently bury or otherwise destroy many prehistoric and

historic cultural artifacts, including human burials. Oak Flat itself will collapse ("subside") into a crater almost 2 miles across and 800 to 1,110 feet deep.

92.    The EIS admits that the impacts of the mine will be "immediate, permanent, and large in scale"; that all "public access" to the site will be "lost"; and that nothing can "replace or replicate the Tribal resources and [traditional cultural properties] that would be destroyed." 1-EIS-153; 3-EIS-892.

93.    Among other things, the mine will destroy the places used for Sunrise, Holy Grounds, and other sacred ceremonies; old-growth oak groves and sacred medicinal plants; sacred springs, including Dripping Spring; burial grounds; and ancient religious and cultural artifacts, including the centuries-old petroglyphs of *Tséyaa Gogeschin*.

94.    The destruction of Oak Flat will terminate the Apaches' access to the site, destroy the foods, medicines, springs, artifacts and locations that are essential to their religious practices, and make it physically impossible for the Apaches to ever engage in their core religious practices again.

### *Impacted groups challenged the 2021 EIS*

95.    When the government initially published an EIS in 2021 (before withdrawing it a few weeks later), three lawsuits were filed challenging the adequacy of the EIS and the legality of the land transfer. *Apache Stronghold v. United States*, No. 2:21-cv-50 (D. Ariz. Jan. 12, 2021); *San Carlos Apache Tribe v. U.S. Forest Serv.*, No. 2:21-cv-68 (D. Ariz. Jan. 14, 2021); *Ariz. Mining Reform Coal. v. U.S. Forest Serv.*, No. 2:21-cv-122 (D. Ariz. Jan. 22, 2021).

96.    Two of those lawsuits focused on the adequacy of the 2021 EIS and were stayed when the EIS was withdrawn on March 1, 2021. Order, *San Carlos Apache Tribe*, No. 2:21-cv-68 (D. Ariz. Mar. 23, 2021), ECF No. 47; Order, *Ariz. Mining Reform Coal.*, No. 2:21-cv-122 (D. Ariz. Mar. 16, 2021), ECF No. 35.

97.    One of the lawsuits challenged the legality of the land transfer under the Religious Freedom Restoration Act and First Amendment and sought an emergency injunction. The district court declined to enjoin the land transfer. *Apache Stronghold*, No. 2:21-cv-50, 2021 WL 689906 (D. Ariz. Feb. 22, 2021). The en banc Ninth Circuit affirmed by a sharply divided, 6-5 vote. *Apache*

*Stronghold*, 101 F.4th 1036. The Supreme Court declined to grant certiorari on May 27, 2025, over a dissenting opinion from Justice Gorsuch, joined by Justice Thomas, *Apache Stronghold*, 145 S. Ct. 1480, and is currently considering a petition for rehearing asking it to reconsider the denial of certiorari, *Apache Stronghold v. United States*, No. 24-291 (U.S. petition for rehearing filed June 23, 2025).

### *The government issued a new EIS and sped ahead with the land transfer*

98.   On March 20, 2025, President Trump issued Executive Order 14241, titled *Immediate Measures to Increase American Mineral Production*. Exec. Order No. 14241, 90 Fed. Reg. 13,673 (Mar. 20, 2025). Executive Order 14241 states that the United States must "take immediate action to facilitate domestic mineral production to the maximum possible extent" and orders agencies to "identify priority projects that can be immediately approved or for which permits can be immediately issued." *Id.* §§ 1, 3.

99.   On June 20, 2025, the Forest Service published a new final EIS.

100.  After publication of the EIS, the government must convey Oak Flat to Resolution within 60 days, which the government has represented that it intends to do on August 19, 2025.

## CLAIMS

## COUNT I

### Violation of the Religious Freedom Restoration Act
### 42 U.S.C. § 2000bb *et seq.*

101.  Plaintiffs incorporate by reference all preceding paragraphs.

102.  Under RFRA, "Government shall not substantially burden a person's exercise of religion" unless it satisfies strict scrutiny. 42 U.S.C. § 2000bb-1(a)-(b).

103.  Strict scrutiny requires that the government "demonstrates that application of the burden to the person–(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b); *Singh v. Berger*, 56 F.4th 88, 92 (D.C. Cir. 2022).

16

104. RFRA broadly defines the "exercise of religion" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000bb-2(4) (citing 42 U.S.C. § 2000cc-5).

105. RFRA also defines the "exercise of religion" to include "[t]he use ... of real property" for religious exercise. *Id.* §§ 2000bb-2(4), 2000cc-5(7)(B).

106. A compelling interest includes "only those interests of the highest order." *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972). And the least-restrictive-means standard is "exceptionally demanding." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014). To pass the least-restrictive-means test, the government must show "that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion" by the religious objector. *Id.*

107. Plaintiffs exercise their religion by visiting, praying, and participating in sacred ceremonies that are uniquely tied to Oak Flat and cannot be replicated elsewhere. Plaintiffs intend to continue in their religious exercise at Oak Flat through their ongoing, imminent, active participation in ceremonies and religious observances at Oak Flat.

108. The transfer and destruction of Oak Flat substantially burdens Plaintiffs' exercise of religion.

109. Denying Plaintiffs access to Oak Flat substantially burdens Plaintiffs' religious exercise.

110. Physically destroying Plaintiffs' sacred site substantially burdens Plaintiffs' religious exercise.

111. Interfering with Plaintiffs' religious ceremonies at Oak Flat substantially burdens Plaintiffs' religious exercise.

112. Completely preventing Plaintiffs' exercise of religion at Oak Flat substantially burdens Plaintiffs' religious exercise.

113. Defendants cannot satisfy strict scrutiny.

## COUNT II

### Violation of the First Amendment to the U.S. Constitution
### Free Exercise Clause
### Prohibition of Free Exercise

114. Plaintiffs incorporate by reference all preceding paragraphs.

115. The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I.

116. Under the Free Exercise Clause, government action burdening religion is protected from strict scrutiny only if it constitutes a valid and neutral law of general applicability.

117. Failing either the neutrality or general applicability test is sufficient to trigger strict scrutiny.

118. The government's action here burdens Plaintiffs' religious exercise.

119. The government's action here is neither neutral nor generally applicable.

120. The government's action is neither neutral nor generally applicable because it disproportionately affects the religious exercise of Native Americans and almost no others, and because it was enacted with hostility toward Plaintiffs' religious exercise.

121. The government's action is neither neutral nor generally applicable because it involves a calculated, discretionary, and individualized decision about a single piece of land, and it intentionally favors the secular use of copper mining over religious use by Apaches.

122. The government's action cannot satisfy strict scrutiny.

## COUNT III

### Violation of the First Amendment to the U.S. Constitution
### Free Exercise Clause
### Burden on the Right to Direct the Religious Upbringing of Children

123. Plaintiffs incorporate by reference all preceding paragraphs.

124. The government's actions are subject to strict scrutiny under the Free Exercise Clause when they "substantially interfer[e] with the religious development" of children. *Mahmoud*, 145 S. Ct. at 2356 (quoting *Yoder*, 406 U.S. at 218).

125. When the government's actions impose an "objective danger," or a "very real threat of undermining" parents' religious exercise, they impose a burden on religious exercise. *Id.* at 2349, 2355.

126. The relevant religious exercise here is the plaintiff parents' ability to raise their children in accordance with their Apache religious beliefs, which includes worship, prayer, gathering medicine, and holding religious ceremonies at Oak Flat.

127. By transferring and destroying Oak Flat, the government is cutting off Apache parents from ever engaging in core religious practices that are essential to their children's religious development. This not only poses an "objective danger" or "very real threat of undermining" Plaintiffs' religious exercise, but also renders it altogether physically impossible.

128. The government's actions cannot satisfy strict scrutiny.

## COUNT IV

### Violation of the National Environmental Policy Act

129. Plaintiffs incorporate by reference all preceding paragraphs.

130. The National Environmental Policy Act, 42 U.S.C. §§ 4321–4370, is designed to ensure that the government's actions are consistent with the "broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989).

131. NEPA realizes its "sweeping policy goals" "through a set of 'action-forcing' procedures that require that agencies take a 'hard look at environmental consequences'" before engaging in certain projects. *Id.* at 350 (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)).

132. The land-transfer statute instructs the government to "carry out the land exchange in accordance with the requirements of the National Environmental Policy Act" in "a single environmental impact statement." § 3003(c)(9)(A)–(B), 128 Stat. 3735.

133. By expressly incorporating NEPA, Congress indicated that the government must take a hard look at the land transfer's environmental consequences and then show its work in a

19