**Nos. 25-5185, 25-5189, 25-5197**

---

# In The United States Court of Appeals for the Ninth Circuit

---

ARIZONA MINING REFORM COALITION; et al.,

*Plaintiffs-Appellants,*

v.

BROOKE L. ROLLINS, U.S. Secretary of Agriculture, et al.,

*Defendants-Appellees,*

and

RESOLUTION COPPER MINING LLC,

*Intervenor-Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Arizona
No. 2:21-cv-00122-PHX-DWL
Hon. Dominic W. Lanza

---

**COMBINED ANSWERING BRIEF OF INTERVENOR-DEFENDANT-APPELLEE
RESOLUTION COPPER MINING LLC**

<table>
<tr>
<td valign="top">

Christopher D. Thomas
Andrea J. Driggs
Janet M. Howe
Benjamin A. Longbottom
HOLLAND & HART LLP
2398 E. Camelback Rd, Suite 650
Phoenix, AZ 85016
(602) 507-9704
CDThomas@hollandhart.com

</td>
<td valign="top">

Michael R. Huston
  *Counsel of Record*
Diane M. Johnsen
Nicholas S. Crown
Samantha J. Burke
Addison W. Bennett
PERKINS COIE LLP
2525 E Camelback Rd, Suite 500
Phoenix, AZ 85016
(602) 351-8000
MHuston@perkinscoie.com

</td>
</tr>
</table>

*Counsel for Resolution Copper Mining LLC*

SAN CARLOS APACHE TRIBE, a federally recognized Tribe,

*Plaintiff-Appellant,*

v.

UNITED STATES FOREST SERVICE,
an agency of the U.S. Department of Agriculture, et al.,

*Defendants-Appellees,*

and

RESOLUTION COPPER MINING LLC,

*Intervenor-Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Arizona
No. 2:21-cv-0068-PHX-DWL
Hon. Dominic W. Lanza

GOUYEN BROWN LOPEZ, et al.,

*Plaintiffs-Appellants,*

v.

UNITED STATES OF AMERICA, et al.,

*Defendants-Appellees,*

and

RESOLUTION COPPER MINING LLC,

*Intervenor-Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Arizona
No. 2:25-cv-2758-PHX-DWL
Hon. Dominic W. Lanza

## Fed. R. App. P. 26.1 Disclosure Statement

Resolution Copper Mining LLC is a Delaware limited liability company that is 55% owned by Resolution Copper Company, an indirect, wholly owned subsidiary of Rio Tinto plc, and 45% owned by BHP Copper Inc., an indirect, wholly owned subsidiary of BHP Group Limited. Rio Tinto plc and BHP Group Limited are publicly traded companies. Upon information and belief, no publicly held company owns 10% or more of either company's stock. No other publicly traded company owns 10% or more of the stock in Resolution Copper Mining LLC.

Date: September 29, 2025

*s/ Michael R. Huston*

Michael R. Huston

PERKINS COIE LLP

## TABLE OF CONTENTS

**Page**

Introduction .................................................................................... 1

Jurisdictional Statement .................................................................. 4

Statutory and Regulatory Authorities .............................................. 4

Statement of the Issues .................................................................. 5

Legal Background ........................................................................... 5

    A.    The Exchange Act ........................................................... 5

    B.    The Administrative Procedure Act ..................................... 7

    C.    NEPA and *Seven County* ................................................ 8

    D.    NHPA ............................................................................. 9

    E.    RFRA ............................................................................. 10

Statement of the Case .................................................................... 10

    A.    Factual Background ......................................................... 11

    B.    Procedural History .......................................................... 14

        1.    *Apache Stronghold* ............................................. 14

        2.    The present cases .................................................. 15

            a.    *San Carlos* and *AMRC* ......................... 15

            b.    *Lopez* ..................................................... 16

Summary of Argument .................................................................... 18

Standard of Review ........................................................................ 21

Argument ...................................................................................... 22

I.    The district court correctly determined that Plaintiffs cannot succeed on the merits ................................................................ 22

    A.    Plaintiffs lack Article III standing .................................... 23

       1.      Plaintiffs fail to show Article III injury on any claim ............................................................................... 24

       2.      Plaintiffs fail to show traceability or redressability on their procedural claims .................... 25

B.     Plaintiffs' requested remedy—vacatur of the FEIS—is not permissible here ......................................................... 28

C.     Plaintiffs' NEPA claims lack merit ..................................... 29

       1.      The FEIS is not final agency action ............................ 30

       2.      Even if the FEIS were final agency action, it would be entitled to substantial deference ................. 33

       3.      The FEIS reflects years of exhaustive analysis .......... 35

       4.      No Plaintiff has identified any flaw in the FEIS ........ 37

            a.     AMRC's arguments fail ...................................... 37

            b.     The Tribe's arguments are refuted by the record ............................................................... 42

            c.     Lopez's NEPA arguments likewise lack merit ................................................................ 46

D.     The extensive consultation process was more than sufficient .............................................................................. 51

       1.      The Forest Service's 434 consultations with the Tribe satisfy the NHPA and the Exchange Act ........... 52

       2.      The Forest Service adequately consulted ACHP ........ 56

E.     The district court correctly rejected AMRC's "absurd" appraisal claim .................................................................. 58

       1.      AMRC has no cognizable claim to challenge the appraisal ................................................................... 59

       2.      The appraisal correctly applied the General Mining Law of 1872 .................................................. 60

3. AMRC cannot show anything arbitrary and capricious in the appraisal ............................ 62

F. Lopez's religious-practice claims are untimely and foreclosed by precedent ..................................... 66

1. Lopez's religious-practice claims are severely untimely ............................................................. 67

2. This Court's precedent squarely rejects Lopez's arguments ............................................................ 71

3. Even if strict scrutiny applied, the Exchange Act satisfies it ............................................................. 77

II. The remaining *Winter* factors do not tip sharply in Plaintiffs' favor ............................................................................ 81

A. Plaintiffs will not suffer irreparable harm if the land exchange occurs before judicial review of their claims is complete ........................................................................ 82

B. The equities decisively support denying an injunction ........ 84

Conclusion ............................................................................................ 89

Certificate of Compliance ................................................................ 90

Statutory and Regulatory Addendum

TABLE OF AUTHORITIES

Page(s)

CASES

*Action Apartment Ass'n, Inc.* v. *Santa Monica Rent Control Bd.*,
509 F.3d 1020 (9th Cir. 2007)............................................................68

*Akiak Native Cmty.* v. *EPA*,
625 F.3d 1162 (9th Cir. 2010)............................................................50

*Alliance for the Wild Rockies* v. *Petrick*,
68 F.4th 475 (9th Cir. 2023) .............................................................22

*Apache Stronghold* v. *United States*,
101 F.4th 1036 (2024),
*cert. denied*, 145 S.Ct. 1480 (2025) ..............3, 10-11, 14-15, 17, 19-20,
26, 66, 69, 71, 73,76-77, 83-84

*Apache Stronghold* v. *United States*,
38 F.4th 742 (9th Cir. 2022),
*superseded by* 101 F.4th 1036 (2023) ................................................83

*Arizona Libertarian Party* v. *Reagan*,
189 F.Supp.3d 920 (D. Ariz. 2016) ...................................................70

*Arizona Mining Reform Coalition* v. *United States Forest Service et al.*,
No. 21-cv-122 (D. Ariz. Jan. 22, 2022)........................................15, 47

*Assurance Wireless USA, L.P.* v. *Reynolds*,
100 F.4th 1024 (9th Cir. 2024) ....................................................23, 81

*Audubon Soc'y of Portland* v. *Haaland*,
40 F.4th 967 (9th Cir. 2022) .......................................21, 41, 45, 47-48

*Bennett* v. *Spear*,
520 U.S. 154 (1997)...........................................................7, 30, 32, 51

*Biden* v. *Texas*,
597 U.S. 785 (2022)...........................................................................23

*Bostock* v. *Clayton County*,
590 U.S. 644 (2020)...........................................................................33

TABLE OF AUTHORITIES
(CONTINUED)

Page(s)

*Bowen* v. *Roy*,
476 U.S. 693 (1986)...............................................................72-73, 76

*Burwell* v. *Hobby Lobby*,
573 U.S. 682 (2014).....................................................................79

*California Cmtys. Against Toxics* v. *EPA*,
688 F.3d 989 (9th Cir. 2012).........................................................29

*California* v. *Azar*,
911 F.3d 558 (9th Cir. 2018)..........................................................22

*Cascadia Wildlands* v. *BLM*,
No. 24-4542, --- F.4th ---, 2025 WL 2460946
(9th Cir. Aug. 27, 2025) ..........................................................35, 47, 65

*Center for Biological Diversity* v. *BLM*,
141 F.4th 976 (9th Cir. 2025) ....................................................9, 29, 48

*Center for Biological Diversity* v. *U.S. Fish
and Wildlife Serv.*,
33 F.4th 1202 (9th Cir. 2022) .........................................................61

*Clapper* v. *Amnesty Int'l USA*,
568 U.S. 398 (2013)........................................................................27

*Concerned Citizens & Retired Miners Coal.* v. *USFS*,
279 F.Supp.3d 898 (D. Ariz. 2017) ...................................................55

*Concerned Citizens Alliance, Inc.* v. *Slater*,
176 F.3d 686 (3d Cir. 1999) .............................................................56

*Connecticut General Life Ins. Co.* v. *New Images of Beverly Hills*,
321 F.3d 878 (9th Cir. 2003)...................................................34, 46, 58

*Department of Transp.* v. *Public Citizen*,
541 U.S. 752 (2004)..........................................................7, 33, 41, 58

*Desert Citizens Against Pollution* v. *Bisson*,
231 F.3d 1172 (9th Cir. 2000)......................................................59, 64

TABLE OF AUTHORITIES
(CONTINUED)

Page(s)

*Earth Island Inst.* v. *Carlton*,
626 F.3d 462 (9th Cir. 2010) ....................................... 21, 42, 52, 84-85

*Eberle* v. *City of Anaheim*,
901 F.2d 814 (9th Cir. 1990) ............................................................. 56

*Employment Division* v. *Smith*,
494 U.S. 872 (1990) .......................................................................... 75

*Epic Sys. Corp.* v. *Lewis*,
584 U.S. 497 (2018) .......................................................................... 65

*Flynt* v. *Shimazu*,
940 F.3d 457 (9th Cir. 2019) ............................................................. 67

*FTC* v. *Consumer Def., LLC*,
926 F.3d 1208 (9th Cir. 2019) ........................................................... 71

*Fulton* v. *City of Philadelphia*,
593 U.S. 522 (2021) .......................................................................... 79

*Garcia* v. *Google, Inc.*,
786 F.3d 733 (9th Cir. 2015) ............................................................. 82

*Jarrow Formulas, Inc.* v. *Nutrition Now, Inc.*,
304 F.3d 829 (9th Cir. 2002) ........................................................ 68-70

*Jones* v. *Hendrix*,
599 U.S. 465 (2023) .......................................................................... 86

*Juliana* v. *United States*,
947 F.3d 1159 (9th Cir. 2020) ........................................................... 28

*Kansas* v. *Colorado*,
514 U.S. 673 (1995) .......................................................................... 68

*Kleppe* v. *Sierra Club*,
427 U.S. 390 (1976) .......................................................................... 33

*Kunkes* v. *United States*,
78 F.3d 1549 (Fed. Cir. 1996) ........................................................... 61

# TABLE OF AUTHORITIES
## (CONTINUED)

Page(s)

*Lackey* v. *Stinnie,*
  604 U.S. 192 (2025) .............................................................. 23

*Lance* v. *Coffman,*
  549 U.S. 437 (2007) .............................................................. 59

*Lands Council* v. *McNair,*
  629 F.3d 1070 (9th Cir. 2010) ................................. 34, 42, 46

*Lands Council* v. *Powell,*
  395 F.3d 1019 (9th Cir. 2004) .............................................. 42

*League of Wilderness Defs.* v. *Connaughton,*
  752 F.3d 755 (9th Cir. 2014) ................................................ 21

*Lopez* v. *United States,*
  No. 25-cv-2408 (D.D.C. Jul. 24, 2025) .......................... 16-17

*Lujan* v. *Defenders of Wildlife,*
  504 U.S. 555 (1992) ........................................................ 23-24, 59

*Lyng* v. *Northwest Indian Cemetery Protective Association,*
  485 U.S. 439 (1988) ........................... 14, 19, 71-73, 75, 77

*Mahmoud* v. *Taylor,*
  145 S.Ct. 2332 (2025) ............................... 3, 15, 20, 71-77

*Marsh* v. *Oregon Nat. Res. Council,*
  490 U.S. 360 (1989) ......................................................... 8, 33

*Massachusetts* v. *EPA,*
  549 U.S. 497 (2007) .............................................................. 26

*Miccosukee Tribe of Indians of Fla.* v. *U.S. Army Corps of Eng'rs,*
  619 F.3d 1289 (11th Cir. 2010) .............................................. 7

*Miller* v. *Gammie,*
  335 F.3d 889 (9th Cir. 2003) (en banc) ........................ 23, 71

*Miller* v. *Glenn Miller Prods., Inc.,*
  454 F.3d 975 (9th Cir. 2006) ............................................... 70

# TABLE OF AUTHORITIES
## (CONTINUED)

Page(s)

*Montana Wildlife Fed'n* v. *Haaland*,
127 F.4th 1 (9th Cir. 2025) ................................................ 29

*Morongo Band of Mission Indians* v. *FAA*,
161 F.3d 569 (9th Cir. 1998).............................................. 51

*Muckleshoot Indian Tribe* v. *USFS*,
177 F.3d 800 (9th Cir. 1999)........................................ 54, 56

*Murthy* v. *Missouri*,
603 U.S. 43 (2024)............................................................ 24

*National Family Farm Coal.* v. *EPA*,
966 F.3d 893 (9th Cir. 2020)....................................... 26, 29

*National Parks & Conservation Association* v. *BLM*,
606 F.3d 1172 (9th Cir. 2010)........................................... 64

*North Cascades Conservation Council* v. *USFS*,
136 F.4th 816 (9th Cir. 2025) ........................................... 47

*Northwest Ecosystem Alliance* v. *U.S. Fish
& Wildlife Serv.*,
475 F.3d 1136 (9th Cir. 2007)........................................... 62

*Pacific Coast Fed'n of Fishermen's Ass'ns* v. *Blank*,
693 F.3d 1084 (9th Cir. 2012)........................................... 35

*Perry Educ. Ass'n* v. *Perry Loc. Educators' Ass'n*,
460 U.S. 37 (1983)............................................................ 76

*Petrella* v. *Metro-Goldwyn-Mayer, Inc.*,
572 U.S. 663 (2014).......................................................... 68

*Pouncil* v. *Tilton*,
704 F.3d 568 (9th Cir. 2012).............................................. 67

*Pro Football, Inc.* v. *Harjo*,
565 F.3d 880 (D.C. Cir. 2009) .......................................... 69

# TABLE OF AUTHORITIES
## (CONTINUED)

Page(s)

*Respect Maine PAC* v. *McKee*,
562 U.S. 996 (2010) ................................................................ 85

*RK Ventures, Inc.* v. *City of Seattle*,
307 F.3d 1045 (9th Cir. 2002) ................................................. 68

*Robertson* v. *Methow Valley Citizens Council*,
490 U.S. 332 (1989) ........................................................... 34, 49

*Salmon Spawning & Recovery All.* v. *Gutierrez*,
545 F.3d 1220 (9th Cir. 2008) ................................................. 28

*San Carlos Apache Tribe* v. *United States*,
417 F.3d 1091 (9th Cir. 2005) ...................................... 9-10, 52

*San Carlos Apache Tribe* v. *United States Forest Serv.*,
No. 21-cv-68 (D. Ariz. Jan. 14, 2022) .............................. 15, 17

*San Luis & Delta-Mendota Water Auth.* v. *Locke*,
776 F.3d 971 (9th Cir. 2014) ..................................... 35, 43, 62

*Save the Peaks Coal.* v. *USFS*,
669 F.3d 1025 (9th Cir. 2012) ............................................ 69-70

*Seven County Infrastructure Coalition* v. *Eagle County*,
145 S.Ct. 1497 (2025) ...................................... 3, 8-9, 16, 28-29, 32-35,
38, 41, 45-46, 49, 51, 58, 85

*Shoshone-Bannock Tribes of the Fort Hall Reservation* v.
*Department of the Interior*,
No. 23-35543, --- F.4th ---, 2025 WL 2424422
(9th Cir. Aug. 22, 2025) ......................................................... 63

*Standing Rock Sioux Tribe* v. *U.S. Army Corps of Eng'rs*,
239 F.Supp.3d 77 (D.D.C. 2017) ........................................... 68

*Starbucks Corp.* v. *McKinney*,
602 U.S. 339 (2024) ................................................................ 23

TABLE OF AUTHORITIES
(CONTINUED)

Page(s)

*Steel Co.* v. *Citizens for a Better Env't*,
  523 U.S. 83 (1998) ............................................................... 27

*Summers* v. *Earth Island Inst.*,
  555 U.S. 488 (2009) ..................................................... 25, 50

*Tanzin* v. *Tanvir*,
  592 U.S. 43 (2020) ............................................................. 75

*Te-Moak Tribe of W. Shoshone of Nevada* v. *Department of Interior*,
  608 F.3d 592 (9th Cir. 2010) ............................................ 54

*Tohono O'odham Nation* v. *Department of the Interior*,
  138 F.4th 1189 (9th Cir. 2025) ........................................ 32

*Trinity Lutheran Church of Columbia, Inc.* v. *Comer*,
  582 U.S. 449 (2017) .......................................................... 73

*Trump* v. *CASA, Inc.*,
  606 U.S. 831 (2025) .......................................................... 84

*United States* v. *Locke*,
  471 U.S. 84 (1985) ............................................................. 61

*United States* v. *Oakland Cannabis Buyers' Co-op.*,
  532 U.S. 483 (2001) ............................................... 4, 20, 85

*United States* v. *Shumway*,
  199 F.3d 1093 (9th Cir. 1999) ................................... 61, 63

*United States* v. *Sineneng-Smith*,
  590 U.S. 371 (2020) .......................................................... 84

*Valley Forge Christian College* v. *Americans United For Separation of Church and State, Inc.*,
  454 U.S. 464 (1982) .......................................................... 59

*Vermont Yankee Nuclear Power Corp.* v. *NRDC*,
  435 U.S. 519 (1978) ............................................................. 8

# TABLE OF AUTHORITIES
## (CONTINUED)

Page(s)

*Western Watershed Project* v. *Grimm*,
  921 F.3d 1141 (9th Cir. 2019)............................................................ 26

*Whitewater Draw Nat. Res. Conservation Dist.* v. *Mayorkas*,
  5 F.4th 997 (9th Cir. 2021) ....................................................25-27, 59

*WildEarth Guardians* v. *USFS*,
  70 F.4th 1212 (9th Cir. 2023) ........................................................25-27

*Winter* v. *NRDC, Inc.*,
  555 U.S. 7 (2008)...............................................................21-23, 81

*Wisconsin* v. *Yoder*,
  406 U.S. 205 (1972).............................................................. 72, 74

## U.S. CONSTITUTION

Art. IV, § 3, cl. 2.......................................................................... 1

Amend.I .......................................................................... 17, 76, 81
  Free Exercise Clause ........................................... 14, 17, 21, 68, 72, 75

## STATUTES

Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ............................7
  5 U.S.C. § 702 ......................................................................7
  5 U.S.C. § 704 .....................................................................30
  5 U.S.C. § 706(2)...................................................................7
  5 U.S.C. § 706(2)(A)...............................................................21

Southeast Arizona Land Exchange and Conservation Act,
  16 U.S.C. § 539p.................................................................... 1
  16 U.S.C. § 539p(a)................................................... 6, 32, 85, 89
  16 U.S.C. § 539p(a)(b)(2) ............................................................5
  16 U.S.C. § 539p(b)(2) ......................................................... 11, 78
  16 U.S.C. § 539p(c) ................................................................78

## TABLE OF AUTHORITIES
### (CONTINUED)

**Page(s)**

16 U.S.C. § 539p(c)(1) .................................................................. 29

16 U.S.C. § 539p(c)(2) .................................................................. 85

16 U.S.C. § 539p(c)(3)(A) ............................................................. 79

16 U.S.C. § 539p(c)(3)(B) ....................................................... 52, 79

16 U.S.C. § 539p(c)(4) .................................................................... 7

16 U.S.C. § 539p(c)(4)(A) ............................................................. 60

16 U.S.C. § 539p(c)(4)(B)(i) ......................................................... 60

16 U.S.C. § 539p(c)(4)(B)(iv) ....................................................... 61

16 U.S.C. § 539p(c)(5) .................................................................... 7

16 U.S.C. § 539p(c)(5)(A) ............................................................. 60

16 U.S.C. § 539p(c)(5)(B)(i) ......................................................... 60

16 U.S.C. § 539p(c)(7) .................................................................. 85

16 U.S.C. § 539p(c)(8) .................................................................... 5

16 U.S.C. § 539p(c)(9)(A) ............................................................... 6

16 U.S.C. § 539p(c)(9)(B) ........................................ 6, 29-30, 32, 47

16 U.S.C. § 539p(c)(9)(C) ......................................................... 7, 50

16 U.S.C. § 539p(c)(10) ..................................... 6, 13, 29, 85

16 U.S.C. § 539p(d) ..................................................................... 87

16 U.S.C. § 539p(d)(1) .................................................................... 5

16 U.S.C. § 539p(e)(2) .................................................................. 65

16 U.S.C. § 539p(f) .......................................................................... 6

16 U.S.C. § 539p(g) ................................................................. 6, 79

16 U.S.C. § 539p(g)(3) ........................................................... 11, 85

16 U.S.C. § 539p(i)(3) ........................................ 11, 24, 79, 82, 86

16 U.S.C. § 539p(i)(1)(C) ............................................................. 65

28 U.S.C. § 1292(a)(1) .................................................................... 4

28 U.S.C. § 1331 ............................................................................. 4

28 U.S.C. § 1362 ............................................................................. 4

28 U.S.C. § 1658 ........................................................................... 67

TABLE OF AUTHORITIES
(CONTINUED)

Page(s)

General Mining Law of 1872,
30 U.S.C. § 26....................................................................... 11, 58, 60, 63

National Environmental Policy Act (NEPA),
42 U.S.C. § 4321 *et seq*. ................................................................. 3, 49

National Historic Preservation Act (NHPA),
54 U.S.C. § 300101 *et seq*. ........................................................... 3, 9, 56

Religious Freedom Restoration Act (RFRA),
42 U.S.C. § 2000bb *et seq*. .............................................. 10, 75, 77, 81

REGULATIONS

36 C.F.R. § 218.1 ......................................................................... 7

36 C.F.R. § 254.9(b)(1)(ii) ...................................................... 63

36 C.F.R. § 254.9(b)(iv)............................................................ 64

36 C.F.R. § 254.9(c)(4) .........................................................62-63

36 C.F.R. § 800.2(c)(2)(ii)........................................................ 9

36 C.F.R. § 800.2(c)(2)(ii)(A).................................................. 52

36 C.F.R. § 800.6(a)(1) ............................................................ 56

36 C.F.R. § 800.6(b)(2) ............................................................ 56

36 C.F.R. § 800.7(a) .................................................................. 56

36 C.F.R. § 800.7(a)(4) ............................................................. 56

36 C.F.R. § 800.7(c)(2) ............................................................. 56

36 C.F.R. § 800.7(c)(4) ............................................................. 56

36 C.F.R. § 800.16(f) ................................................................ 52

40 C.F.R. § 1502.14(a) ............................................................. 47

TABLE OF AUTHORITIES
(CONTINUED)

Page(s)

OTHER AUTHORITIES

88 Fed. Reg. 51,792 (Aug. 4, 2023).........................................78

90 Fed. Reg. 29,632 (July 3, 2025) ........................................50

90 Fed. Reg. 41,591 (Aug. 26, 2025)......................................78

Cathles & Simon, *Copper Mining and Vehicle Electrification*,
    Int'l Energy Forum (May 2024),
        https://tinyurl.com/4tc346eu .......................................78

Exec. Order No. 14,220, § 1,
    90 Fed. Reg. 11,001 (Feb. 25, 2025)..............................78, 86

Henry M. Parker, Letter Regarding 2016 Geological and
    Mineral Resource Model,
        https://www.resolutionmineeis.us/sites/
        default/files/references/parker-2017.pdf........................66

H.R.2618, 109th Cong. (2005),
        https://tinyurl.com/y532aent.....................................78

Proclamation No. 10,962, § 6, 90 Fed. Reg. 37,727
    (July 30, 2025)....................................................80

Resolution Copper: Hearing Before the Subcomm.
    on Nat. Res., 112th Cong. 3 (2012),
        https://tinyurl.com/4uwswczh ..................................11-12

Rick Gonzalez, Vice Chairman of ACHP,
    Letter to Hon. Tom Vilsack (Mar. 29, 2021),
        https://www.achp.gov/sites/default/files/
        2021-03/VilsackResolutionCopperLTR
        20210329.pdf ..................................................57

Rio Tinto 2024 Annual Report,
        https://www.riotinto.com/en/invest/reports .................87-88

TABLE OF AUTHORITIES

(CONTINUED)

**Page(s)**

Rio Tinto, Comments to U.S. Department of Commerce,
https://www.regulations.gov/comment/BIS-2025-0010-0076 ........ 88

S.1122, 109th Cong. (2005),
https://tinyurl.com/jtam4zc8 ......................................................... 78

S.3157 § 3(2), 110th Cong. (2008) ........................................................ 11

Ted Eary, Enchemica, *Technical Memorandum: Block Cave
Geochemical Model* (June 26, 2018),
https://www.resolutionmineeis.us/sites/default/files/refe
rences/eary-enchemica-block-cave-geochemical-model-
2018.pdf ...................................................................................... 45

U.S. Department of Agriculture,
*Documents Cited – Final EIS* (2025),
https://www.resolutionmineeis.us/documents/
final-eis/documents-cited ............................................................ 35

U.S. Department of Agriculture,
*Draft Resolution Copper Project and Land Exchange
Environmental Impact Statement* (2019),
https://tinyurl.com/4tphhbsf ........................................................ 37

U.S. Department of Agriculture,
*Resolution Copper Project and Land Exchange
Environmental Impact Statement* (2021),
http://web.archive.org/web/20250530231518/
https://www.resolutionmineeis.us/documents
/final-eis .................................................................................... 12

White House, *Trump Administration Advances First Wave of
Critical Mineral Production Projects* (Apr. 18, 2025),
https://tinyurl.com/35vru2fy ........................................................ 86

## INTRODUCTION

The Constitution assigns to Congress the power to manage federal lands for the benefit of the Nation. U.S. Const., art. IV, § 3, cl. 2. At issue in these appeals is whether to enjoin the operation of a statute passed by the people's elected representatives more than a decade ago: the Southeast Arizona Land Exchange and Conservation Act, 16 U.S.C. § 539p.

The purpose of the Exchange Act, enacted by a bipartisan Congress and signed into law by President Obama, is to "authorize, direct, facilitate, and expedite" an exchange of federal lands in a part of Arizona that has been mined for more than a century. The land exchange will enable Resolution Copper Mining LLC to repurpose and expand existing infrastructure from a historic underground mine to extract enormous supplies of copper—a mineral indispensable to American life and national security. Copper is essential for everything from cell phones to fighter jets, and America's need for it is expanding rapidly. The government predicts that the Resolution mine will supply up to 25% of the Nation's copper for the next half-century. The Exchange Act provides that, in exchange for that federal land, the United States will receive from Resolution significantly larger acreage of valuable conservation and historical properties—including one of the most culturally important sites for Western Apache people—to be preserved in perpetuity.

Congress did not grant the Executive Branch any discretion about whether to carry out this land exchange. It "directed" the conveyance to

occur "no later than" 60 days following the U.S. Forest Service's publication of a final environmental impact statement (FEIS). The Act makes clear that the purpose of the FEIS is *not* to determine whether to transfer the land or to authorize construction of the mine on private land; it is instead to inform and facilitate various *post-exchange* permitting decisions in connection with the project. The Forest Service published the FEIS on June 20, 2025, along with a draft Record of Decision (ROD) for some initial proposed permitting decisions. But those decisions have not been finalized.

Plaintiffs Arizona Mining Reform Coalition et al. (AMRC) and the San Carlos Apache Tribe (the Tribe) sued in the District of Arizona to enjoin the Forest Service from complying with Congress's mandate to complete the land exchange. In late July 2025—over ten years after the Exchange Act became law and just weeks before the transfer deadline—Plaintiffs Gouyen Brown Lopez et al. (Lopez) challenged the Act in the District of Columbia. The D.C. court recognized Lopez's forum-shopping and transferred that case to the District of Arizona. Lopez-ER-9.

The District of Arizona (Hon. Dominic Lanza), in two orders totaling approximately 115 pages of thorough analysis, determined that Plaintiffs are not entitled to a preliminary injunction for multiple independent reasons. 1-AMRCER-2–95; Lopez-ER-4–23.

First, none of Plaintiffs' legal claims raises even a serious question on the merits: The substantial administrative record refutes Plaintiffs'

asserted process grievances and arbitrary-and-capricious challenges under the Exchange Act, the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, and the National Historic Preservation Act (NHPA), 54 U.S.C. § 300101 *et seq.* For some claims, Plaintiffs failed even to identify final agency action. Plaintiffs therefore cannot get close to overcoming the deferential standard of review that the Supreme Court recently reaffirmed in *Seven County Infrastructure Coalition* v. *Eagle County*, 145 S.Ct. 1497, 1510 (2025). 1-AMRCER-36–56; Lopez-ER-12–22. The district court further explained why AMRC's lead contention—that the appraisal of certain federal land should have disregarded existing encumbrances—is "absurd." 1-AMRCER-24. And Lopez's religious-exercise challenge is foreclosed by this Court's en banc precedent in *Apache Stronghold* v. *United States*, 101 F.4th 1036 (2024), *cert. denied*, 145 S.Ct. 1480 (2025), which was entirely unaffected by *Mahmoud* v. *Taylor*, 145 S.Ct. 2332 (2025). Lopez-ER-10–12.

The record not only decisively defeats Plaintiffs' claims on the merits, it also demonstrates that Plaintiffs lack Article III standing to obtain a preliminary injunction. Plaintiffs' asserted injuries—their purported inability to access Oak Flat—are far from imminent: Resolution's President has submitted a declaration, under penalty of perjury, swearing that the public will not lose access to the currently federal land for *at least a decade* following the exchange. And any asserted injuries from the land's

transfer are traceable to *Congress*; Plaintiffs' procedural challenges to the Forest Service's FEIS cannot redress that result.

The district court further held that Plaintiffs are not entitled to an injunction because the balance of equities and public interest do not tip sharply in favor of halting the statutory land exchange. 1-AMRCER-86–89; Lopez-ER-12–13, 22. As the court observed: "a court sitting in equity cannot 'ignore the judgment of Congress, deliberately expressed in legislation.'" *United States* v. *Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001). Resolution would incur catastrophic and irreparable harm from a lengthy injunction. And as just described, the record refutes Plaintiffs' claims of imminent irreparable harm. Plaintiffs' policy disagreement with Congress's constitutional judgment about the best use for this public land is no basis to enjoin a federal statute.

This Court should affirm.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331 and (for the Tribe's action) 28 U.S.C. § 1362. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATUTORY AND REGULATORY AUTHORITIES

Pertinent statutes and regulations appear in the Addendum to this Brief.

## STATEMENT OF THE ISSUES

1.      Whether the district court abused its discretion in determining that Plaintiffs are not likely to succeed on the merits and have presented no serious question on any claim.

2.      Whether the district court abused its discretion in determining that the balance of equities does not tip sharply in Plaintiffs' favor given Congress's statutory finding that this land exchange serves vital national interests.

## LEGAL BACKGROUND

### A.    The Exchange Act

The Exchange Act's purpose is to "authorize, direct, facilitate, and expedite" the transfer of 2,422 acres of Tonto National Forest land in Arizona, called "Oak Flat." 16 U.S.C. § 539p(a)(b)(2). After the exchange, that land "shall be available" to Resolution "for mining and related activities subject to and in accordance with applicable Federal, State, and local laws pertaining to mining and related activities on land in private ownership." 16 U.S.C. § 539p(c)(8). In exchange, the United States will acquire from Resolution 5,460 acres of valuable conservation lands, including rivers, creeks, rare wetlands, proposed critical habitat for threatened and endangered species, one of the Southwest's largest mesquite bogs and rare dense woodlands, important migratory bird flyways, rock climbing areas, and Native American cultural sites. 16 U.S.C. § 539p(d)(1);

- 5 -

12-RCMSER-3230–3231. The government will also gain full ownership of Apache Leap—one of the most important religious and cultural sites for many Western Apache people. 16 U.S.C. § 539p(f)-(g).

The Exchange Act establishes a unique and "expedite[d]" process. 16 U.S.C. § 539p(a). It directs the Secretary of Agriculture (through the Forest Service) to "carry out the land exchange in accordance with the requirements of [NEPA]," "[e]xcept as otherwise provided in this section." *Id.* § 539p(c)(9)(A). Before conveying title, the Forest Service must "prepare a single [FEIS]." *Id.* § 539p(c)(9)(B). Publishing the FEIS triggers the prompt mandatory transfer of title: The Secretary "shall convey all right, title, and interest of the United States in and to the Federal land to Resolution" "not later than 60 days after the date of publication." *Id.* § 539p(c)(10). The purpose of the FEIS is not to authorize the land exchange but to serve "as the basis for all decisions under Federal law related to" the development and operation of Resolution's proposed mine "and any related major Federal actions significantly affecting the quality of the human environment." *Id.* § 539p(c)(9)(B). Subsequent "decisions under Federal law" that will be informed by the FEIS may include "the granting of any permits, rights-of-way, or approvals for the construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities." *Id.* § 539p(c)(9)(B).

Resolution has applied for a permit to construct a pipeline across some land that will remain in federal ownership after the exchange, and

the Salt River Project has requested approval for a power line crossing the National Forest. 9-RCMSER-2440. The Forest Service issued a draft ROD on those permits and is currently reviewing objections—including from some Plaintiffs. 2-AMRCER-268; *see* 36 C.F.R. § 218.1. The Exchange Act also directs the FEIS to "identify measures that may be taken, to the extent practicable, to minimize potential adverse impacts on" "cultural and archeological resources that may be located on the Federal land." 16 U.S.C. § 539p(c)(9)(C). And the Act contains "appraisal" and "equal value" provisions requiring Resolution to convey additional land or "make a cash payment" if the appraised value of the federal land exceeds that of the non-federal land to be exchanged. *Id.* § 539p(c)(4)-(5).

## B.    The Administrative Procedure Act

The APA provides a cause of action to persons aggrieved by final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 702, 706(2). The APA applies only to agency actions—not Acts of Congress—that are both discretionary and final. *Bennett* v. *Spear*, 520 U.S. 154, 177-178 (1997). "Procedural statutes" like the APA "do not apply when an agency has no discretion to act or not to act on a given matter." *Miccosukee Tribe of Indians of Fla.* v. *U.S. Army Corps of Eng'rs*, 619 F.3d 1289, 1302 (11th Cir. 2010) (citing, *e.g.*, *Department of Transp.* v. *Public Citizen*, 541 U.S. 752, 770 (2004)).

C.    **NEPA and** *Seven County*

"For certain [federal] infrastructure projects," NEPA "requires federal agencies to prepare an environmental impact statement, or EIS, identifying significant environmental effects." *Seven County*, 145 S.Ct. at 1510. The Supreme Court has long held that courts hearing NEPA challenges must "defer to the informed discretion" of the agency performing the environmental analysis. *Marsh* v. *Oregon Nat. Res. Council*, 490 U.S. 360, 377 (1989); *accord Vermont Yankee Nuclear Power Corp.* v. *NRDC*, 435 U.S. 519, 557-558 (1978).

Lower courts have not always applied the deference that NEPA requires, prompting the Supreme Court recently to announce a major "course correction." *Seven County*, 145 S.Ct. at 1511-1512, 1514. *Seven County* abrogated lower-court decisions that had "assumed an aggressive role in policing agency compliance with NEPA," "slowed down or blocked many projects and, in turn, caused litigation-averse agencies to take ever more time and to prepare ever longer EISs." *Id.* at 1511, 1513.

*Seven County* reaffirmed that NEPA is "purely procedural," "does not mandate particular results," and does not "require the agency to weigh environmental consequences in any particular way." 145 S.Ct. at 1507. "The ultimate question is not whether an EIS … itself is inadequate, but whether the agency's final decision was reasonable and reasonably explained." *Id.* at 1514. "The bedrock principle of judicial review in NEPA cases" is "[d]eference" to the agency, *id.* at 1515, which is "better

equipped" than a court to assess what "need[s] to be included" in an EIS and "what facts are relevant to the agency's own decision," *id.* at 1512. And "[b]lack-letter administrative law instructs that when an agency" decides "what qualifies as significant or feasible or the like, a reviewing court must be at its 'most deferential.'" *Id.*

"Even if an EIS falls short in some respects," an injunction halting a project is generally inappropriate if the agency would not likely change the outcome. *Seven County*, 145 S.Ct. at 1514. A "deficiency" in an EIS "may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more to the EIS." *Id.* at 1514; *see Center for Biological Diversity* v. *BLM*, 141 F.4th 976, 1015-1016 (9th Cir. 2025) (remanding without vacatur in NEPA case).

## D.   NHPA

NHPA Section 106 requires federal agencies to "take into account the effect of [an] undertaking on any historic property," and to give the Advisory Council on Historic Preservation (ACHP) "a reasonable opportunity to comment with regard to the undertaking." 54 U.S.C. § 306108. If the undertaking may affect historic property with religious significance to a tribe, the agency must consult the tribe before proceeding. 36 C.F.R. § 800.2(c)(2)(ii). NHPA is "a close statutory analog" to NEPA and similarly "chiefly procedural in nature." *San Carlos Apache Tribe* v. *United States*, 417 F.3d 1091, 1097 (9th Cir. 2005) (citation omitted). It is

"designed to insure that the agency 'stop, look, and listen' before moving ahead." *Id.*

E.    RFRA

The Religious Freedom Restoration Act "establishes the general rule that '[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability.'" *Apache Stronghold*, 101 F.4th at 1058 (quoting 42 U.S.C. § 2000bb-1(a)). But Supreme Court precedent dictates that the Exchange Act's "disposition of government real property" is not a substantial burden "subject to strict scrutiny" under RFRA. *Id.* at 1055-1056.

## STATEMENT OF THE CASE

As the district court observed, Congress "weighed considerable tradeoffs" in passing the Exchange Act. 1-AMRCER-3. Congress determined that privatizing the federal land for mining would result in "significant economic benefits" and promote "America's national security interests, by ensuring domestic access" to copper—a critical mineral. *Id.* Resolution and the federal government have for decades engaged with the Tribe, other tribes with ancestral ties to Oak Flat, and other stakeholders to ensure that Resolution's use of this land will carefully attend to cultural and environmental concerns. That engagement resulted in significant amendments to the mine plan far beyond what any law requires. This record of intensive evaluation and consultation is reflected

in the 2500+ page FEIS and accompanying documents that the Forest Service issued in June 2025. 3-RCMSER-539.[1]

## A.    Factual Background

**Congress's findings.** The Exchange Act reflects a decade of debate, including six hearings and twelve draft bills. *Apache Stronghold*, 101 F.4th at 1045 & n.1 (collecting statutory history); Resolution Copper: Hearing Before the Subcomm. on Nat. Res., 112th Cong. 3 (2012) (Resolution Hr'g.) (statement of Sen. McCain).[2] Congress invited the Tribe and other tribal leaders to share their views. Resolution Hr'g. 68-69. After weighing tribal and environmental concerns, Congress significantly reduced the amount of federal land that Resolution would receive. *Compare* S.3157 § 3(2), 110th Cong. (2008), *with* 16 U.S.C. § 539p(b)(2). Congress also required that Resolution "surrender to the United States, without compensation … all rights" to culturally significant land known as Apache Leap so that it can be permanently preserved. 16 U.S.C. § 539p(g)(3). And Congress required that public access to the Oak Flat Campground be maintained for as long as safely possible. *Id.* § 539p(i)(3).

---

[1] The Tribe asserts without evidence (Br.8) that "Resolution's predecessors unlawfully explored beneath Oak Flat in the mid-1990s," purportedly "[i]n violation of" Executive Orders withdrawing Oak Flat from "mining activity." That is false. "The portion of the Resolution Copper Mine deposit explored to date is located primarily on the Tonto National Forest and *open to mineral entry* under the General Mining Law of 1872." 3-RCMSER-542 (emphasis added).

[2] https://tinyurl.com/4uswczh.

Congress found that the exchange is vital to the national interest because it will facilitate domestic production of one of the world's largest deposits of copper—a critical resource for American life and a national-security priority. Resolution Hr'g. 11 (Sen. Kyl). As the district court observed, the Exchange Act reflects Congress's judgment that the mine's benefits—including adding "about $1.2 billion" in estimated economic annual "value" in Arizona and "ensuring domestic access to a mineral that is essential to energy distribution, generation, and storage" nationwide, 1-AMRCER-25—justified the land exchange despite the objections of a "vocal minority" of affected parties, Resolution Hr'g. 8 (Sen. McCain).

**The 2021 EIS.** In January 2021, the Forest Service released an EIS containing six volumes, 19 appendices, and over 750 supporting documents.[3] That EIS detailed the lengthy evaluation process and described potential environmental impacts of the land exchange, mine, and related facilities. The agency held extensive meetings with the public. 1-RCMSER-16, 2-RCMSER-287. It undertook extensive environmental analyses; considered nearly 30,000 public comments; and consulted agencies, groups, and stakeholders, including 15 separate tribes, 11 of which have expressed historical ties to Oak Flat. The Forest Service conducted hundreds of consultations with the San Carlos Apache Tribe spe-

---

[3] http://web.archive.org/web/20250530231518/https://www.resolutionmineeis.us/documents/final-eis.

cifically. 11-RCMSER-2651–12-RCMSER-3048 (comment responses); 12-RCMSER-3052–3157 (consultation history since 2003).

In March 2021, the Forest Service withdrew the EIS for additional "review based on significant input received from collaborators, partners, and the public," including "to fully understand concerns raised by Tribes and the public and the project's impacts to these important resources and ensure the agency's compliance with federal law." 6-AMRCER-1027. Contrary to the Tribe's repeated misstatements (*e.g.*, Br.5-6), the agency did not state that its prior tribal consultations had been "inadequate."

**Further evaluation and the 2025 FEIS**. Between September 2021 and April 2025, the government conducted hundreds of additional consultations, many including the Tribe. 12-RCMSER-3135–3157. The Forest Service provided "corrections, modifications, and additional analysis" in response to public comments, and revisions "in response to events and changes since" 2021. 3-RCMSER-544.

On April 17, 2025, the Forest Service gave notice that its additional work was nearly complete. 8-TribeER-1850. The agency published the operative FEIS on June 20, 1-AMRCER-6, triggering a statutory deadline of August 19 to complete the land exchange. 16 U.S.C. § 539p(c)(10).

The 2025 FEIS comprises 2,500-plus pages, six volumes, and 19 appendices. It includes a five-chapter scoping report, hundreds of supporting documents, and a draft ROD on pending permit applications. 1-RCMSER-15; 2-AMRCER-268. The final record of tribal consultation

contains "434 documented consultations" with the Tribe and hundreds more with other tribes. 1-AMRCER-68 (cleaned up).

**Resolution's ongoing preparations**. Resolution has invested $2.7 billion into the mining project. 1-RCMSER-7. It costs Resolution approximately $130 million annually to maintain its facilities while awaiting the land exchange. 1-RCMSER-13. Every month of delay equals roughly $11 million in expenses. *Id.*

## B. Procedural History

Four cases are relevant here: this Court's 2024 *en banc* decision in *Apache Stronghold*, which conclusively rejected the religious-exercise arguments Lopez reprises—and the three lawsuits presently on appeal.

### 1. *Apache Stronghold*

After the 2021 EIS was released, a group named Apache Stronghold sued claiming the land exchange would violate the Free Exercise Clause, RFRA, and the Tribe's treaty rights. *Apache Stronghold*, 101 F.4th at 1049, 1056, 1063. The district court found those claims unlikely to succeed, and an *en banc* panel of this Court affirmed. *Id.* at 1044. This Court explained why *Lyng* v. *Northwest Indian Cemetery Protective Association*, 485 U.S. 439 (1988), foreclosed the plaintiff's claims. 101 F.4th at 1049 (Free Exercise), 1056 (RFRA). The Court also held that the "statutory obligation to transfer Oak Flat under [the Exchange Act] clearly abrogates any contrary treaty obligation." *Id.* at 1064.

The Supreme Court denied review. 145 S.Ct. 1480. The plaintiffs have sought rehearing from the Supreme Court based on *Mahmoud*, but the Court has not requested a response to that rehearing petition.

### 2. The present cases

Plaintiffs in these consolidated appeals moved to preliminarily enjoin the government from fulfilling its statutory duty to complete the land exchange. The district court denied those motions.

#### a. *San Carlos* and *AMRC*

The Tribe and ARMC filed suit in the District of Arizona in January 2021. No. 21-cv-68 (Tribe); No. 21-cv-122 (AMRC). Resolution intervened in both actions, which were stayed after the Forest Service withdrew the 2021 EIS.

Following the FEIS's publication in June 2025, the Tribe and AMRC amended their complaints and renewed their motions to preliminarily enjoin the land exchange. Lopez-ER-7. After a six-hour oral argument, 6-AMRCER-1050, the district court issued a 94-page order denying preliminary relief, 1-AMRCER-2–95. It held that Plaintiffs could not show likely success, *or even a serious question*, on any claims:

**Plaintiffs' NEPA Claims.** The district court held that Plaintiffs' claims likely fail at the outset because Plaintiffs have not shown that the FEIS is final agency action. 1-AMRCER-35–37. And in any event, none of Plaintiffs' challenges to the FEIS is likely to succeed or presents seri-

ous questions—especially under the deferential standard that *Seven County* and its progeny require. 1-AMRCER-41–56, 95.

**The Tribe's Consultation Claim.** The "434 documented consultations" between the government and the Tribe between 2003 and 2025, 1-AMRCER-68–74, and the Forest Service's consultations with ACHP, 1-AMRCER-73–82, were likely sufficient. The Tribe's consultation claims reflect merely its "vehement … opposition to the very concept of the land exchange," but that policy disagreement does not raise even "serious questions" about the consultations' legal sufficiency. 1-AMRCER-82–83.

**AMRC's Appraisal Claim**. The appraisal properly valued the federal land to be exchanged. 1-AMRCER-22–27. AMRC "failed to identify any appraisal standard" supporting its novel argument that the Forest Service misinterpreted its regulations when it refused to disregard existing encumbrances on the federal property. 1-AMRCER-27.

Regarding the equities, the district court found that, despite Plaintiffs' asserted harm and the "profound tradeoffs" involved, 1-AMRCER-92–94, the remaining preliminary-injunction factors do not support an injunction. The court explained that the exchange "represents a considered choice by the political branches" in service of a paramount public interest in increasing domestic copper supply. 1-AMRCER-91–93.

### b. *Lopez*

More than ten years after the Exchange Act became law, and just weeks before the land-exchange deadline, the *Lopez* plaintiffs filed an

eleventh-hour action in the District of Columbia. No. 25-cv-2408 (D.D.C. Jul. 24, 2025). Like the plaintiff in *Apache Stronghold*, Lopez claimed that the Exchange Act's mandate to transfer Oak Flat violated RFRA and the Free Exercise Clause. Lopez-ER-5–6. Lopez admitted to filing in D.C. to evade this Court's en banc precedent. No. 25-cv-2408, Dkt. 20 at 16. Lopez also asserted violations of NEPA, the NHPA, and the APA, and sought a preliminary injunction. Lopez-ER-4, 8.

Resolution intervened, and the D.C. district court transferred venue to the District of Arizona because Lopez's complaint "raises the specter of forum-shopping" to avoid *Apache Stronghold*, which "would appear to doom many of their First Amendment and RFRA claims." Lopez-ER-9.

Following transfer, Judge Lanza denied a preliminary injunction. Because the issues "overlap significantly" with those in *San Carlos* and *AMRC*, the court "incorporate[d], by reference" substantial portions of its *San Carlos/AMRC* order. Lopez-ER-10. The court held that *Apache Stronghold* barred Lopez's religious-exercise claims. Lopez-ER-11–12. It also rejected Lopez's arguments that the FEIS (1) exceeded a purported "page limit" in NEPA, Lopez-ER-12–17, (2) insufficiently addressed alternative mining methods, Lopez-ER-17–21, and (3) reflected inadequate consultation with ACHP, Lopez-ER-21–22. Independently, the district court found that the equitable factors did not justify an injunction. Lopez-ER-22.

## SUMMARY OF ARGUMENT

This Court should affirm.

**I.**     The district court correctly determined that no Plaintiff has raised even a serious question on the merits—much less demonstrated likely success.

**A.**     Plaintiffs' claims for an injunction are foreclosed by multiple threshold defects. *First*, Plaintiffs lack standing to obtain such extraordinary relief. None of their asserted injuries is imminent; they would not occur for years. And Plaintiffs' procedural claims targeting the FEIS, consultation process, and appraisal are neither traceable to the Forest Service's actions nor redressable by judicial order: Congress, not an agency, decided to transfer the land. *Second*, vacatur of the FEIS is not available to remedy Plaintiffs' procedural claims because Congress *mandated* the land exchange. The Forest Service has no authority to approve or disapprove the land transfer, and no amount of NEPA analysis, consultations, or reappraisals could prevent it.

**B.**     Plaintiffs' NEPA claims fail. The FEIS is not final agency action because it does not reflect the consummation of any agency "decisionmaking process"—the land exchange was mandated by Congress, and the Forest Service had no decision to make about completing it. Plaintiffs' claims are just policy disagreements with the Forest Service's analysis, especially its technical choices regarding the amount of examination to include in the FEIS. The Supreme Court has made clear that

the agency enjoys substantial deference on those issues, and its exhaustive review soars over NEPA's standards.

**C.** The Tribe's and Lopez's consultation claims similarly lack merit. Plaintiffs cannot establish that the Forest Service shirked its statutory obligations to consult; the record reveals 434 separate consultations with the Tribe between 2003 and 2025. Nor did the agency act arbitrarily and capriciously when it declined to adopt ACHP's recommendations—particularly because ACHP's principal recommendation was simply that Congress amend the Exchange Act.

**D.** As the district court observed, AMRC's challenge relies on an "absurd" misreading of the federal appraisal standards. Appraisals of federal property must account for existing encumbrances—such as the mineral rights to a portion of the federal property that Resolution already owns. The agency followed that well-established mandate.

**E.** Lopez's RFRA and Free Exercise claims fail on several independent grounds. The RFRA claim is untimely, and Lopez's request for injunctive relief is barred by laches. Lopez's claims accrued in 2014 (when Congress codified its decision to transfer Oak Flat), and Lopez's inexcusable delay has caused significant prejudice to Resolution, the government, and the judicial system.

In addition, Lopez's claims are foreclosed by *Apache Stronghold*, which explained why the Supreme Court's decision in *Lyng* rejects materially identical religious-exercise claims. 101 F.4th at 1049-1056. Lopez

insists that the Supreme Court impliedly repudiated *Apache Stronghold* in *Mahmoud.* But *Mahmoud* involved entirely different circumstances: a challenge to a mandatory public-school curriculum. 145 S.Ct. at 2341-2342. And it *reaffirmed* rather than abandoned *Lyng*'s rule that the government's use of its own property does not constitute an actionable burden on religious exercise. *Id.* at 2356-2357. Even if strict scrutiny applied, moreover, the Exchange Act reflects the least restrictive means of vindicating the Nation's paramount national-security and economic interests.

II. The district court also correctly held that the balance of equities and public interest do not support a preliminary injunction—a fact-specific determination reviewed only for clear error. Plaintiffs cannot show that the land exchange will cause them irreparable harm. By contrast, the harms to Resolution, the government, and the public caused by enjoining this Act of Congress are immense. And an injunction would be particularly inappropriate because a court sitting in equity cannot wield "the third and fourth [preliminary-injunction] factors" to "second-guess the political branches' wisdom in deciding how to balance those considerations." 1-AMRCER-92 (citing *Oakland*, 532 U.S. at 497).

## STANDARD OF REVIEW

A preliminary injunction is an "extraordinary remedy." *Winter* v. *NRDC, Inc.*, 555 U.S. 7, 20, 22 (2008). It "may only be awarded upon a clear showing" by the plaintiff "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Id.* This Court reviews the denial of a preliminary injunction for "abuse of discretion." *League of Wilderness Defs.* v. *Connaughton*, 752 F.3d 755, 759-760 (9th Cir. 2014). That review is "'limited and deferential.'" *Earth Island Inst.* v. *Carlton*, 626 F.3d 462, 468 (9th Cir. 2010) (citation omitted). This Court will not reverse "simply because [it] would have arrived at a different result if it had applied the law to the facts of the case." *Id.* (cleaned up).

Plaintiffs' procedural claims must overcome an additional layer of deference: As Plaintiffs concede (Tribe.Br.33; AMRC.Br.16; Lopez.Br.57), their procedural challenges are governed by the APA, under which final agency action may be overturned only when it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Audubon Soc'y of Portland* v. *Haaland*, 40 F.4th 967, 978-979 (9th Cir. 2022) (APA review is "deferential and narrow").[4]

---

[4] Lopez's RFRA and Free Exercise claims are the only claims not subject to the APA.

ARGUMENT

I.    **The district court correctly determined that Plaintiffs cannot succeed on the merits.**

The district court thoroughly explained why Plaintiffs cannot satisfy the first *Winter* factor. This Court can affirm on that basis alone because "[l]ikelihood of success on the merits is the most important factor; if a movant fails to meet this threshold inquiry," the Court "need not consider the other factors." *California* v. *Azar*, 911 F.3d 558, 575 (9th Cir. 2018) (cleaned up). Indeed, the Court need not even reach the substance of Plaintiffs' claims: Multiple independent obstacles bar their requests for a preliminary injunction. *See* 1-AMRCER-95 (district court describing "jurisdictional and threshold" issues presenting "complexities" and "difficult[ies]"). Those threshold barriers counsel against granting the extraordinary relief that Plaintiffs demand.

Regardless, none of Plaintiffs' claims has any merit. The district court explained why, even assuming Plaintiffs need show only "serious questions" at this stage, no Plaintiff has made even that "lesser showing." 1-AMRCER-8–9. But Plaintiffs' actual burden is heavier because the "serious questions" standard is inapplicable here. Although this Court has occasionally stated that "serious questions going to the merits" can support a likelihood of success, it recently clarified that the lower standard refers to *factual* questions that might "become clearer with at least some discovery or a further hearing." *Alliance for the Wild Rockies* v. *Petrick*,

68 F.4th 475, 490-491, 497 (9th Cir. 2023); *see Assurance Wireless USA, L.P.* v. *Reynolds*, 100 F.4th 1024, 1031 (9th Cir. 2024) ("parties do not show serious questions when they raise a 'merely plausible claim'"). Here, judicial review is necessarily "limited to" "the administrative record" that will not change. *Biden* v. *Texas*, 597 U.S. 785, 811 (2022).

More fundamentally, the Supreme Court has recently and repeatedly explained that a likelihood of success is mandatory: "[A] finding of *likely* success on the merits is a *prerequisite* to preliminary injunctive relief." *Lackey* v. *Stinnie*, 604 U.S. 192, 198 (2025) (emphasis added); *see, e.g.*, *Starbucks Corp.* v. *McKinney*, 602 U.S. 339, 349 (2024) (movant "must" make "a clear showing that it 'is likely to succeed on the merits'" (quoting *Winter*, 555 U.S. at 20)). Plaintiffs' reliance on a mere "serious questions" test—which they cannot satisfy in any event—is incompatible with Supreme Court law. Insofar as some of this Court's precedents are irreconcilable with those recent clarifications of the *Winter* test, the Supreme Court's holdings control. *Miller* v. *Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc).

## A.  Plaintiffs lack Article III standing.

To demonstrate standing, Plaintiffs must show (1) "'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized and (b) 'actual or imminent'"; that is (2) "'fairly traceable to the challenged action of the defendant'"; and (3) "likely" to be "redressed by a favorable decision." *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560-

561 (1992) (cleaned up). Because this case is "[a]t the preliminary injunction stage," each Plaintiff "must make a 'clear showing' that she is 'likely' to establish each element of standing." *Murthy* v. *Missouri*, 603 U.S. 43, 58 (2024) (citation omitted).

Although the district court concluded that Plaintiffs had carried their burden under circuit law, a close review of their asserted harms and Supreme Court precedent shows that Plaintiffs lack standing to obtain a preliminary injunction.

### 1. Plaintiffs fail to show Article III injury on any claim.

All Plaintiffs' claims fail for lack of an "actual or imminent" injury that will occur with "a high degree of immediacy." *Lujan*, 504 U.S. at 560, 564 n.2 (citation omitted). Plaintiffs' central contention is that, once the land exchange occurs, they will face an "immediate loss of access" to the federal land. AMRC.Br.20; *see* Tribe.Br.55; Lopez.Br.31. But that is false: Resolution's President has committed under oath to maintaining public access to that land for the next *ten years*. 1-RCMSER-10, 13. The district court "accept[ed] and ha[d] no reason to question the sincerity" of Resolution's commitment. 1-AMRCER-90. And under the Exchange Act, Resolution must permit access to Oak Flat Campground for as long as safely possible, 16 U.S.C. § 539p(i)(3), which may be decades, 1-RCMSER-12. Plaintiffs have "allege[d] only" a "'some day'" injury "at some indefinite future time." *Lujan*, 504 U.S. at 564 n.2. That does not suffice. *Murthy*, 603 U.S. at 58.

Nor can Plaintiffs rely (*contra* AMRC.Br.44) on asserted procedural rights untethered from their claimed right to access the land. The "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers* v. *Earth Island Inst.*, 555 U.S. 488, 496-497 (2009); *see Whitewater Draw Nat. Res. Conservation Dist.* v. *Mayorkas*, 5 F.4th 997, 1013 (9th Cir. 2021) ("environmental plaintiffs must make some showing of how the agency's failure to account for environmental consequences affects them").

### 2. Plaintiffs fail to show traceability or redressability on their procedural claims.

Even if Plaintiffs could establish Article III injury, they would still lack standing to raise their NEPA, consultation, and appraisal claims because their asserted harms are neither traceable to the agency "actions" they challenge nor redressable by a judicial order.

"Federal courts may 'act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court.'" *WildEarth Guardians* v. *USFS*, 70 F.4th 1212, 1216 (9th Cir. 2023) (citation omitted). Where, as here, "'the plaintiff is not himself the object of the government action or inaction he challenges,'" standing "is ordinarily 'substantially more difficult' to establish," *id.*, "even for proce-

dural claims" like those brought under NEPA, *id.* at 1217. *See White-water*, 5 F.4th at 1013.

Plaintiffs' alleged harms are not traceable to the agency actions they challenge. Their "claimed injury arises from" *Congress's* decision to transfer the federal land—not from any NEPA analysis, consultation, or appraisal performed by the Forest Service. *WildEarth*, 70 F.4th at 1216.

For similar reasons, Plaintiffs' asserted injuries are not redressable. They cannot show any "possibility that the requested relief will prompt" the Forest Service to "reconsider the decision that allegedly harmed" them. *Massachusetts* v. *EPA*, 549 U.S. 497, 518 (2007); *see National Family Farm Coal.* v. *EPA*, 966 F.3d 893, 910 (9th Cir. 2020) (redressability requires "'that the relief requested … may influence the agency's ultimate decision of whether to take or refrain from taking a certain action'"); *cf. Western Watershed Project* v. *Grimm*, 921 F.3d 1141, 1148 (9th Cir. 2019) (claim was redressable where "additional NEPA analysis could change [the agency's] activities in the long term"). The Exchange Act does not authorize the Forest Service to "decide" whether to complete the land exchange; Congress *mandated* it. "Nowhere in [the Act] does Congress confer on the Government discretion to halt the transfer." *Apache Stronghold*, 101 F.4th at 1047.

Only AMRC attempts to directly defend its standing, but its arguments are faulty. AMRC repeats (Br.40) the district court's "hypothe[sis]" that a judicial order to re-appraise the land might cause Resolution to

"decline" to complete the land exchange if Resolution had to pay a significant amount to equalize the "value between the federal and non-federal parcels." 1-AMRCER-13 (citation omitted). That argument cannot establish standing because it relies on a "highly attenuated" "chain of contingencies" "amount[ing] to mere speculation." *Clapper* v. *Amnesty Int'l USA*, 568 U.S. 398, 410-411 (2013). That thin thread also "depends on the unfettered choices made by independent actors" like Resolution, "'whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict.'" *WildEarth*, 70 F.4th at 1218.

AMRC next contends that its procedural claims might be redressable if a court vacated the FEIS because "that remedy would, at least temporarily, prevent the land exchange from occurring." Br.44 (cleaned up). But that theory—that plaintiffs have standing to pursue a *temporary* remedy that could never be made permanent—flips Article III on its head. "Relief that does not remedy the injury suffered" at the end of the case "cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Steel Co.* v. *Citizens for a Better Env't*, 523 U.S. 83, 107 (1998).

Last, AMRC invokes (Br.44) a supposedly "'relaxed'" redressability standard for claimed "procedural injury under NEPA." But even "environmental plaintiff[s] … must be able to show that if the agency agreed that environmental harms flowed from its decision, that the agency was capable of redressing those harms." *Whitewater*, 5 F.4th at 1013; *Wild-*

*Earth*, 70 F.4th at 1216-1217 (similar). Plaintiffs cannot do so: Even "if a court were to give the [Plaintiffs] the remedy that they seek"—an order "that [the Forest Service] follow the proper procedures" in another NEPA review, appraisal, or consultation—the "ultimate agency decision of whether to" convey this land "could never be influenced." *Salmon Spawning & Recovery All.* v. *Gutierrez*, 545 F.3d 1220, 1227 (9th Cir. 2008). In every event, "the Forest Service would still be required" to complete the land exchange "at the conclusion of" those processes. 1-AMRCER-13.

In short: Plaintiffs' asserted injuries from the land exchange trace to Congress and can be redressed only through the political process. *See Juliana* v. *United States*, 947 F.3d 1159, 1175 (9th Cir. 2020) (claims not redressable where "plaintiffs' case must be made to the political branches or to the electorate").

## B.  Plaintiffs' requested remedy—vacatur of the FEIS—is not permissible here.

Even if Plaintiffs could prove their procedural claims, the only proper remedy would be to remand to the agency *without* vacating the FEIS or appraisal.

Lopez asserts (Br. 56) that vacatur is the "'presumptive'" remedy, but *Seven County* undercuts that notion. A "deficien[t]" EIS "may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more to the EIS." 145 S.Ct. at 1514. Vacatur is not

automatic; it is an equitable remedy requiring courts to "consider whether 'on remand, a different result may be reached.'" *Montana Wildlife Fed'n* v. *Haaland*, 127 F.4th 1, 51 (9th Cir. 2025); *see National Family*, 966 F.3d at 929; *BLM*, 141 F.4th at 1015-1016. Even a "flawed" agency decision "need not be vacated," particularly when vacatur might "thwart[] 'the operation'" of a federal statute. *California Cmtys. Against Toxics* v. *EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (per curiam).

Those considerations foreclose vacatur here. If the Forest Service reevaluated Plaintiffs' procedural issues, there would be no "reason to believe that [it] might disapprove the project"; it has no power to do so. *Seven County*, 145 S.Ct. at 1514. The Exchange Act specifies that the FEIS be used to evaluate *post*-conveyance agency decisions—not the agency's mandatory and ministerial duty to convey title. 16 U.S.C. § 539p(c)(9)(B). No matter whether the Forest Service adds more to the EIS, engages in additional consultation, or undertakes a reappraisal, Congress has "directed" that title to the federal land "shall" convey, *Id.* § 539p(c)(1), (10), and the Forest Service lacks authority to decide otherwise. Vacatur would unjustifiably thwart Congress's mandate that the land exchange occur by August 2025. *Id.*

## C. Plaintiffs' NEPA claims lack merit.

As the district court recognized, Plaintiffs have not shown that the FEIS likely constitutes "final agency action." Regardless, the voluminous

record confirms that the FEIS amply satisfies the highly deferential standard of review.

### 1. The FEIS is not final agency action.

Plaintiffs concede (AMRC.Br.16; Tribe.Br.25; Lopez.Br.57) that the APA governs their NEPA claims. But the APA limits judicial review to "final agency action." 5 U.S.C. § 704. To satisfy that finality requirement, an action must (1) "mark the consummation of the agency's decision-making process" and (2) determine "rights or obligations" or "legal consequences." *Bennett* v. *Spear*, 520 U.S. 154, 177-178 (1997) (cleaned up).

The district court rightly found that Plaintiffs failed to establish that their NEPA challenges are "likely to satisfy the 'final agency action' requirement." Lopez-ER-12, *see* 1-ARMCER-35–37, 38, 64, 83. The FEIS does not mark the consummation of the Forest Service's "decisionmaking process" because it is not "a 'decision' in and of itself." 1-AMRCER-37. As discussed, the FEIS informs decisions the agency will make in the *future* "regarding pipelines, permits, and the like." 1-AMRCER-37 (citation omitted); *see* 16 U.S.C. § 539p(c)(9)(B). It will be the *final ROD*, not the EIS, that consummates the Forest Service's decisionmaking regarding any permits, rights-of-way, or approvals. 1-AMRCER-37–39. Because no final ROD has issued, "[t]he Forest Service hasn't 'rendered its last word' on any of the discretionary decisions it will be making in relation to the land exchange." 1-AMRCER-38.

Plaintiffs have no persuasive response to the district court's straightforward conclusions. They *undercut* their position by observing (Tribe.Br.25) that the Exchange Act is "unique" or that this FEIS differs from typical NEPA cases. That is precisely the point: Congress did not authorize the Forest Service to decide whether to approve the land exchange or to allow a mine on private land. Although Congress required the FEIS before the conveyance takes place, "the FEIS does not inform the decision to transfer the land." 1-AMRCER-38. Congress made that decision itself. As the district court correctly emphasized, the Exchange Act "contemplates that the land exchange will occur within 60 days of, *and regardless of the analysis set forth in*, the FEIS." 1-AMRCER-30.

Plaintiffs contend that publishing the FEIS was "final action" because it "trigger[ed]" the land exchange and "complet[ed] the object of" the Exchange Act. Tribe.Br.27; *see* AMRC.Br.43-46; Lopez.Br.54 n.3. That argument fails for three reasons.

First, Plaintiffs conflate the two prongs of the APA's finality requirement. Even if triggering the 60-day clock could be considered a "legal consequence" of the FEIS—which is doubtful—starting a timer is not "decisionmaking" of the type required for APA review. Had Congress set the 60-day clock to run from the agency's publication of a report on copper prices, for example, no one would consider that report to consummate a decisionmaking process regarding whether to exchange the land. The same is true here.

- 31 -

Second, Plaintiffs misunderstand the Exchange Act's structure. The Act provides that the FEIS's purpose is to inform *future* agency decisions about permits and rights-of-way *after* completion of the land exchange—which Congress sought to "expedite." 16 U.S.C. § 539p(a), (c)(9)(B). The substance of the FEIS cannot change Congress's decision to require the land exchange, so the FEIS does not reflect any agency "decision[]" about whether to convey the land. *Bennett*, 520 U.S. at 177-178.

Third, the Tribe's argument is irreconcilable with *Seven County*. "[R]eview of an agency's EIS is not the same thing as review of the agency's final decision concerning the project." 145 S.Ct. at 1514. Courts measure an EIS by its "usefulness … to the decisionmaking process," because "[t]he ultimate question is not whether an EIS in and of itself is inadequate, but whether the agency's final decision was reasonable and reasonably explained," *id.* at 1513-1514. Again, Congress—not the Forest Service—decided to transfer this land.

The Tribe's reliance (Br.29-30) on *Tohono O'odham Nation* v. *Department of the Interior*, 138 F.4th 1189 (9th Cir. 2025), confirms the errors in Plaintiffs' argument. There, the Court concluded that two limited notices to proceed issued by the Bureau of Land Management (BLM) were final agency actions. *Id.* at 1200-1201. But those notices "expressly" authorized construction to begin and thus "mark[ed] the consummation of the agency's decisionmaking process" whether to permit that work. *Id.* at 1200 (citation omitted). Here, by contrast, the FEIS neither marks the

consummation of any agency decisionmaking respecting the land exchange (because Congress did not delegate any such decision to the agency), nor does it authorize construction to begin.

The district court correctly determined that the NEPA claims would likely be dismissed for lack of final agency action.[5]

### 2. Even if the FEIS were final agency action, it would be entitled to substantial deference.

"[T]he central principle of judicial review in NEPA cases is [substantial] deference" to the agency. *Seven County*, 145 S.Ct. at 1511. Because "Congress did not design NEPA for judges to hamstring new infrastructure and construction projects," *id.* at 1514, NEPA requires only that the agency take a "'hard look'" at potential environmental impacts. *Kleppe* v. *Sierra Club*, 427 U.S. 390, 410 n.21 (1976).

For decades, the Supreme Court has repeatedly held that courts of appeals reviewing NEPA challenges must defer to agencies' determinations about the proper scope of an EIS. *See, e.g.*, *Public Citizen*, 541 U.S. at 766-768) (Ninth Circuit wrongly required agency to prepare an EIS); *Marsh*, 490 U.S. at 369-370, 385 (Ninth Circuit should have deferred to agency's determination concerning extent of environmental analysis);

---

[5] AMRC suggests (Br.45-46) that legislative history gave the Forest Service "discretion" over the land exchange. That argument is incorrect because, among other things, it contradicts the Exchange Act's text. *See Bostock* v. *Clayton County*, 590 U.S. 644, 674 (2020) ("[W]hen the meaning of the statute's terms is plain, our job is at an end.").

*Robertson* v. *Methow Valley Citizens Council*, 490 U.S. 332, 353-354 (1989) (Ninth Circuit erroneously deemed EIS inadequate). *Seven County* reaffirmed the long-standing principle that an agency has discretion to choose the "depth and breadth of its inquiry" and "the length, content, and level of detail of the resulting EIS." 145 S.Ct. at 1507, 1513. Courts should be at their "most deferential when reviewing scientific judgments and technical analyses within the agency's expertise." *Lands Council* v. *McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010) (cleaned up).

The Tribe asserts (Br.39) that *Seven County*'s required deference applies only to the agency's analysis of *indirect* environmental effects of a project. The Tribe forfeited that argument by failing to raise it below. *Connecticut General Life Ins. Co.* v. *New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003). Regardless, it is wrong. *Seven County* did not limit deference to so-called indirect effects. While that case happened to involve an agency's analysis of a project's indirect impacts, the Court spoke unequivocally: "when determining whether an agency's EIS complied with NEPA, a court should afford substantial deference to the agency." 145 S.Ct. at 1511-1512. Thus, "[s]o long as the EIS addresses environmental effects from the project at issue, courts should defer to agencies' decisions about where to draw the line." *Id.* at 1513. That deference "*include[s]*," but is not limited to, "how far to go in considering indirect environmental effects." *Id.*

This Court has already held that the "teachings" of *Seven County* are "fully applicable" to NEPA cases, regardless of the particulars of the plaintiff's challenge. *Cascadia Wildlands* v. *BLM*, No. 24-4542, --- F.4th ---, 2025 WL 2460946, at *23 (9th Cir. Aug. 27, 2025) (detailing breadth of deference that NEPA requires). The Tribe's own cited authority (Br.35-37) confirms this Court's repeated acknowledgement that the arbitrary-and-capricious standard is "highly deferential," and agency actions should be upheld "if a reasonable basis exists for" them. *Pacific Coast Fed'n of Fishermen's Ass'ns* v. *Blank*, 693 F.3d 1084, 1091 (9th Cir. 2012); *see San Luis & Delta-Mendota Water Auth.* v. *Locke*, 776 F.3d 971, 994 (9th Cir. 2014) (standard of review is "narrow"). The Tribe's brief seeks to revive the very forms of aggressive judicial review that the Supreme Court and this Court have consistently (and recently) rejected.

### 3. The FEIS reflects years of exhaustive analysis.

Plaintiffs did not include in their Excerpts of Record the full FEIS, perhaps because it proves that the Forest Service exhaustively conducted its NEPA process over nine years. The FEIS includes three narrative volumes totaling 1,083 pages (plus a 31-page Executive Summary), and three volumes of appendices adding another 1,400 pages. 3-RCMSER-539–12-RCMSER-3212. The agency's website contains hundreds of studies and other project documents, 848 of which the FEIS references.[6]

---

[6] https://www.resolutionmineeis.us/documents/final-eis/documents-cited.

Twelve cooperating and consulting federal, state, and county agencies with environmental, cultural, and natural-resource expertise contributed to the FEIS. 3-RCMSER-546, 625–626. Thirty-seven Forest Service employees and 73 contractors—most with advanced degrees and with 2,353 combined years of professional experience in a wide range of fields—also contributed. 6-RCMSER-1616–1619.

Many Plaintiffs were fully engaged throughout the process. The Forest Service began consultations with the San Carlos Apache Tribe in 2003, 12-RCMSER-3052, and it initiated government-to-government consultations per the Exchange Act with the Tribe and nine other tribes in August 2015. 12-RCMSER-3066. In early 2016, the agency interviewed 28 stakeholders, including the directors of multiple Plaintiff-groups. 1-RCMSER-28, 210–211. In March 2016, the Forest Service opened a formal scoping period lasting 120 days—nearly three times the typical period. 1-RCMSER-27–28, 42. The agency held five scoping meetings; reviewed 133,653 comments (including many submitted by Plaintiffs), 1,237 of which were unique and given particular scrutiny; and identified dozens of issues for evaluation, including tribal concerns, cultural issues, and water. 1-RCMSER-42, 65–67, 182; 2-AMRCER-317.

Going beyond what was required, the Forest Service conducted public stakeholder workshops to analyze various aspects of the proposed project in 2017. 2-AMRCER-318. After a draft EIS was released in August

2019, *id.*, another extended public comment period followed.[7] The Forest Service held six public meetings, received 29,000 written submissions, and gave individual attention to the 5,200 unique comments. 2-ARMC-ER-318.

The Forest Service's responses to public comments on the draft EIS totaled 394 pages. 11-RCMSER-2653–12-RCMSERR-3048. The agency responded to submissions by AMRC, the Tribe (and its later-appointed experts), and those Lopez Plaintiffs who commented. 11-RCMSER-2662–2676, 2724–2726.

**4. No Plaintiff has identified any flaw in the FEIS.**

In 29 pages of detailed analysis, the district court properly held that none of Plaintiffs' NEPA claims is likely to succeed—or even raises a serious question on the merits. Plaintiffs come nowhere close to showing that the FEIS is so deficient as to be arbitrary and capricious.

**a. AMRC's arguments fail.**

**i. The Forest Service adequately analyzed the mine's impact on groundwater.**

AMRC argues (Br.46-52) that the Forest Service "refused to consider" the cumulative impacts of (1) the mine's groundwater pumping in the Desert Wellfield and (2) water usage within a development project called "Superstition Vistas." Those arguments fail for two reasons.

---

[7] https://tinyurl.com/4tphhbsf.

First, AMRC's assertion is "factually inaccurate." 1-AMRCER-45. The FEIS explains that, even though cumulative effects would not "normally" be studied "because they do not meet appropriate screening criteria to be considered reasonably foreseeable future actions," the Forest Service *did* analyze that issue "due to the great interest expressed by the public and cooperating agencies in water-related issues." 1-AMRCER-45–46 (quoting 6-RCMSER-1586); *see* 6-RCMSER-1596 (discussing "water use estimates for the entirety of Superstition Vistas"); 12-RCMSER-2994 (noting the agency "incorporated the future growth in the Superstition Vistas planning area conceptually").

Second, AMRC errs in contending (Br.50-51) that the agency should have quantitatively modeled potential water usage by the entire proposed Superstition Vistas development, even though some of its subdivisions may never be built and the timing and volumes of groundwater they might pump is speculative. As the district court properly recognized, 1-AMRCER-45, Supreme Court precedent requires "courts [to] defer to agencies' decisions about where to draw the line" in evaluating a project's effects. *E.g.*, *Seven County*, 145 S.Ct. at 1513. The Forest Service rationally decided not to model water use by the entire proposed development, given uncertainties about how much of it will actually be built and what demands on groundwater it will actually cause. Instead, the agency reasonably modeled water demands for subdivisions that have obtained state approval to pump groundwater. 6-RCMSER-1593, 1596. And even

for undeveloped portions of Superstition Vistas, the agency performed qualitative analysis of potential regional groundwater impacts. *Id.* Those discretionary choices easily pass muster, particularly because the agency's bottom-line determination—that water supplies are limited— would have remained the same.[8]

### ii. The Forest Service adequately considered and responded to comments from cooperating agencies.

AMRC renews its argument (Br.52-53) that the Forest Service did not "meaningfully address" BLM's 2022 memorandum concerning water issues associated with the mine. Here again, AMRC "rests on an inaccurate factual premise." 1-AMRCER-48.

The FEIS "directly acknowledge[d] and addresse[d]" BLM's concerns. 1-AMRCER-48. "In response to [BLM's] analysis," the Forest Service assessed additional potential indirect impacts to groundwater in the Cutter Basin, including reports of possible future groundwater shortages in the East Salt River Valley. 12-RCMSER-3214–3215; *see* 4-RCMSER-993–995, 6-RCMSER-1586–1596. The FEIS addressed BLM's other

---

[8] AMRC's insistence (Br.55) that the "technical water demands" have been calculated for the whole Superstition Vistas development is misleading. The table AMRC invokes (3-AMRCER-436) merely shows the water district's standard "design criteria" for development of project infrastructure. Those criteria relate to the project's "overall water portfolio," including recharge credits, effluent reuse, and the like, and do not establish the project's expected groundwater demand. 3-AMRCER-403. In any event, the numbers will be "reevaluated and amended" if and as development progresses.

concerns too. *Compare* 2-AMRCER-161 (BLM comments concerning state water law, well analysis, model boundaries, tailings, and climate change), *with* 4-RCMSER-993, 4-RCMSER-982, 4-RCMSER-1040–1044, 8-RCMSER-2154–2155 *and* 6-RCMSER-1601–1605.

Equally mistaken is AMRC's assertion (Br.53) that the Forest Service failed to address BLM's concerns regarding Superstition Vistas. As discussed (pp. 38-39), the Forest Service further studied Superstition Vistas *in response* to BLM's memo. 6-RCMSER-1586 (adding "section to the cumulative effects analysis" due to "great interest expressed by … cooperating agencies in water-related issues"); *see* 6-RCMSER-1593–1597.

AMRC next contends (Br.54-55) that the Forest Service did not consider "socioeconomic concerns" raised by the Arizona State Land Department (ASLD) regarding the mine's groundwater pumping. Again, the FEIS includes an entire section on cumulative impacts concerning Superstition Vistas to address concerns raised by "cooperating agencies." And AMRC ignores the district court's detailed explanation that the agency "specifically indicated, in various portions of the FEIS, that it had revised its analysis in response to concerns identified by ASLD." 1-AMRCER-50–51 (citing 11-RCMSER-2695–2696, 11-RCMSER-2726, 11-RCMSER-2939, 12-RCMSER-2995).

Nor can AMRC prevail by arguing that the Forest Service should have *further* considered the above issues. "Particularly in a project of this magnitude, it will always be possible to identify some argument, raised

by some stakeholder, that could have been analyzed in more detail in the FEIS." 1-AMRCER-49. That is why agencies enjoy substantial deference in deciding where to "draw the line." *Seven County*, 145 S.Ct. at 1513-1514; *see Audubon Society*, 40 F.4th at 984.

### iii. The Forest Service extensively considered water-related mitigation measures.

AMRC argues (Br.55-56) that the Forest Service failed to analyze potential mitigation measures to address regional groundwater declines. That argument "require[s] little additional discussion." 1-AMRCER-51. "The FEIS includes hundreds of pages of detailed analysis regarding water usage, including analysis regarding mitigation measures." *Id.* The FEIS extensively discussed groundwater mitigation measures in both the narrative section and in Appendix J, devoted entirely to mitigation and monitoring strategy. *E.g.*, 3-RCMSER-718–726 (mitigation framework and authority); 4-RCMSER-1046–1049 (groundwater and well-mitigation efforts); 8-RCMSER-2225–2229 (additional groundwater mitigation efforts). And as the Forest Service explained, it lacks authority to implement some of the mitigation measures that commenters proposed. *E.g.*, 11-RCSER-2875–2876, 2884. "[A]gencies are not required to analyze the effects of projects over which they do not exercise regulatory authority." *Seven County*, 145 S.Ct. at 1516; *see also Public Citizen*, 541 U.S. at 770.

### b. The Tribe's arguments are refuted by the record.

#### i. The Tribe misapprehends the decision below and misstates the legal standard for extra-record evidence.

The Tribe presses a lengthy and inapposite argument (Br.33-42) that the district court should have considered the declarations of the Tribe's two experts, Dr. Emerman and Dr. Wells. The court *did* consider those declarations. 1-AMRCER-52, 59. It then found "on the merits" that the Tribe did not "establish a likelihood that the Forest Service acted arbitrarily and capriciously." 1-AMRCER-54, 59.

The Tribe next complains (Br.20, 38) that, under *Lands Council* v. *Powell*, 395 F.3d 1019 (9th Cir. 2004), the district court did not "consider whether the EIS evaluated the factors that Dr. Emerman identified." The court's decision—which meticulously and properly applied *Lands Council*'s standards—refutes that charge. 1-AMRCREC-52–56. The court discussed the "factors" raised by the Tribe's experts, and identified precisely where the FEIS considered each. *Id.* In doing so, the court properly gave deference to the Forest Service's analysis and conclusions. *Id.* In any event, NEPA does not "require[] the Forest Service to affirmatively present every uncertainty in its EIS …, given that experts in every scientific field routinely disagree." *Earth Island*, 626 F.3d at 473; *see Lands Council*, 629 F.3d at 1074.

For similar reasons, the Tribe is wrong (Br.38) that a court must "wrestl[e] … to the ground" and resolve every issue raised by experts

which differs in some way from how the agency addressed the issue. Courts are "never permitted" to use "admitted extra-record evidence 'to determine the correctness or wisdom of the agency's decision.'" *San Luis*, 776 F.3d at 993. Indeed, "deference to the agency is at its highest where a court is reviewing an agency action that required a high level of technical expertise." *Id.*

### ii. The FEIS addressed all the Tribe's concerns.

The Tribe claims (Br.42-48) that the Forest Service arbitrarily failed to consider various factors that the its experts raised. The district court dispelled that argument by diligently pinpointing the FEIS's discussion of each issue. Rather than identify any error, the Tribe simply recounts its experts' declarations. Those arguments fail.

**Tailings issues.** The Tribe repeats (Br.42-45) its expert's opinion that the Forest Service did not adequately assess the mine's tailings operations. But as the district court explained, the FEIS "devotes an entire 51-page section to tailings and pipeline safety that addresses all of [those] concerns." 1-AMRCER-55; *see* 5-RCMSER-1284–1335. "The agency undertook an exhaustive and collaborative process to assess the inherent risks in the tailings designs and a range of breach scenarios." 1-AMRCER-55. That assessment included a failures-modes-and-effects analysis, 5-RCMSER-1310, an "industry-standard" practice that "assure[s] that any plausible potential failure is considered and studied," 5-RCMSER-1288. For each tailings failure mode, Resolution employs a

mitigation design feature consistent with the highest applicable international, federal, or state standard or regulation. 5-RCMSER-1288.

The FEIS also includes an 80-page pipeline-protection-and-integrity plan with specific mitigation and design measures to address each potential failure mode, 10-RCMSER-2474–2554, and a 40-page analysis on potential locations for the tailings facility, 1-RCMSER-119–161. The selected location—known as Skunk Camp—was chosen in response to AMRC's scoping comments and is "the most remote location," "offers the best ability to control seepage and protect water quality, has the least visibility, and is located in an area with relatively little recreation use." 2-AMRCER-312. Skunk Camp is also on state land, where additional state dam-safety permitting and federal water-quality permitting processes will apply. *Id.* The Forest Service also responded to comments by the Tribe's expert (among others) regarding the concerns the Tribe reiterates here. *E.g.*, 12-RCMSER-2958–2960 (tailings failure-mode-and-effects analysis, breach analysis, emergency planning, tailings-facility design); 12-RCMSER-2987–2989, 2996 (water use and pipelines). "[T]he Forest Service was aware of [Dr. Emerman's] criticisms and provided extensive, reasoned analysis to justify its conclusions." 1-AMRCER-56.

The Tribe complains (Br.45) that the Forest Service's use of the term "non-potentially acid-generating" (or "NPAG") is confusing. But its expert concedes that the FEIS explains exactly what it meant by that term. 5-TribeER-1044. The Tribe reiterates (Br. 45-46) its expert's view

that the presence of NPAG tailings (as the agency defines them) would cause issues in tailings-storage design. But the agency specifically addressed those concerns, too. 12-RCMSER-3009.

The Tribe's NEPA arguments distill to complaints that the Forest Service and its experts disagreed with the Tribe's experts. But "[b]lack letter administrative law" prevents courts from second-guessing, *Seven County*, 145 S.Ct. at 1512, or "'fly-speck[ing]'" the agency's analysis, *Audubon Society*, 40 F.4th at 984; *accord* 1-AMRCER-56. Reviewing courts "must be at [their] 'most deferential'" "when an agency makes those kinds of speculative assessments or predictive or scientific judgments." *Seven County*, 145 S.Ct. at 1512.

**Acid rock drainage.** The Tribe briefly quibbles (Br.48) with the Forest Service's evaluation of oxidation and acid rock drainage in the block-cave. But the agency's geochemical model extensively evaluated that issue both for the period while the mine operates and for after mining ceases.[9] *See* 4-RCMSER-1059; 4-RCMSER-1084–1085. And, as the district court found, not only did the agency thoroughly "analyze[] the likelihood that oxygen would penetrate the tailings, causing a risk of acid rock drainage," the FEIS also "disclosed uncertainties in [that] modeling" and "assessed the reasonableness of various assumptions." 1-AMRCER-59; *see* 4-RCMSER-1058–1059. Those are precisely the sort of "specula-

---

[9] *See* https://www.resolutionmineeis.us/sites/default/files/references/eary-enchemica-block-cave-geochemical-model-2018.pdf.

tive assessments or predictive or scientific judgments" that warrant the highest deference from reviewing courts. *Seven County*, 145 S.Ct. at 1512.

**Hydrological concerns.** Last, the Tribe criticizes the Forest Service's groundwater modeling. The Tribe claims (Br.48-49) that the agency should have used a different "margin of error"—the margin recommended by the Tribe's expert—for drops in the water table when evaluating the mine's environmental impacts. But the Tribe forfeited that argument by failing to raise it below. *Connecticut General*, 321 F.3d at 882.

Regardless, the Tribe's assertion improperly asks this Court to supplant the agency's scientific judgment. *Contra*, *e.g.*, *Lands Council*, 629 F.3d at 1074. The Forest Service amply considered the Tribe's argument: It convened two working groups—which included Dr. Wells—to examine the groundwater model and respond to comments, 2-RCMSER-0351–0352, and ultimately selected a groundwater model with a cell size of 200x200 feet. 2-RCMSER-0533–0534. The agency did so over Dr. Wells' highly technical "dissenting opinion" that the cell size should have been less than 200 feet in one dimension. *Id.*; 6-TribeER-1097. As discussed, that scientific debate does not support a NEPA claim.

### c. Lopez's NEPA arguments likewise lack merit.

#### i. The Forest Service adequately considered alternative mining methods.

Lopez argues (Br.53-56) that the FEIS failed to evaluate alternative mining techniques. Not so.

Lopez misunderstands the agency's regulatory authority. Other than the "granting of ... permits, rights-of-way, or approvals for the construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities," the *Forest Service* has no warrant to regulate mining operations that will occur on *private* land after the transfer. 16 U.S.C. § 539p(c)(9)(B). The FEIS accordingly did not approve the mine plan of operations—it simply assessed the mine's anticipated environmental impacts, as directed by the Exchange Act.

Nonetheless, the Forest Service fully considered a range of alternative mining methods. And it reasonably explained why it decided to evaluate the environmental impacts only of Resolution's selected method—a process called "block caving," which it determined was the *only* practical way to accomplish the Exchange Act's purpose: to extract most of the copper resource. Lopez-ER-18–21; 8-RCMSER-2150–2151. An agency need evaluate only "reasonable" or "feasible" alternatives, not those "that do not advance the project's purpose." *North Cascades Conservation Council* v. *USFS*, 136 F.4th 816, 826-827 (9th Cir. 2025). And when an agency eliminates an alternative "from detailed study," NEPA requires only that it "briefly discuss" its reasons. *Audubon Society*, 40 F.4th at 980 (quoting 40 C.F.R. § 1502.14(a)). Courts, in turn, must "defer[] to the agency regarding ... what alternatives are feasible." *Cascadia Wildlands*, 2025 WL 2460946, at *23. Indeed, judicial "review of an agency's alter-

natives analysis must be at its 'most deferential.'" *BLM*, 141 F.4th at 994 (citations omitted).

Lopez is simply incorrect (Br.55) that the agency "refus[ed]" to consider alternative mining methods. As the district court observed, "it is evident" from the record "that the Forest Service took [a] 'hard look' at alternative mining methods." Lopez-ER-20. Specifically, Appendix F of the FEIS, titled "Alternatives Considered but Dismissed from Detailed Analysis," explains that "*[a]ll comments* received … that provided suggestions for alternative methods for achieving the purpose and need were considered for analysis." 8-RCMSER-2147 (emphasis added). The Forest Service "assessed" a "spectrum of underground mining techniques," including Lopez's preferred technique, and explained that the eliminated methods could not feasibly recover the copper as Congress directed. 8-RCMSER-2147; *see* 3-RCMSER-547 (FEIS's "Purpose and Need" section describing the government policy of "development of domestic mineral resources").

The Forest Service cited several feasibility studies to further explain that "[a]lmost all industry mining guidance indicates alternative mining techniques are not appropriate for a[n ore] deposit like" this one. 3-RCMSER-633–634. Indeed, any method besides block caving would require abandoning at least *80%* of the ore deposit. 8-RCMSER-2151. That explanation more than satisfies the agency's burden to "'briefly discuss'" why it eliminated alternatives. *Audubon Society*, 40 F.4th at 980;

Lopez-ER-19. The agency also extensively addressed and rebutted comments critiquing the block caving method. 11-RCMSER-2820–2821.

Lopez contends that the Forest Service could have supported *any* mining method that "made [the site] 'available' for 'mining.'" Br.55. But as just explained, the Forest Service is not responsible for approving Resolution's selected mining method on private land, and *Seven County* forbids second-guessing the agency's reasonable decision about which methods to analyze. 145 S.Ct. at 1512-1513. Nor is it true that the agency concerned itself with Resolution's profits. *Contra* Lopez.Br.1, 54-55. The FEIS is explicit: The Forest Service "did *not* factor profitability into the [alternatives] analysis." 8-RCMSER-2151 (emphasis added).[10]

### ii. Lopez's page-limit argument is meritless.

Lopez briefly asserts (Br.56-57) that the FEIS violates page limits established by recent amendments to NEPA, 42 U.S.C. § 4336a(e)(1)(A), enacted years after the environmental analysis underlying the FEIS had begun. The district court correctly rejected that theory.

"It is unclear whether" the new page count even applies here. Lopez-ER-13. The FEIS process began in 2016. When the amendments

---

[10] Regardless, the Forest Service could have reasonably considered costs and productivity. Lopez-ER-20 (citation omitted). An agency is free to decide that "other values outweigh the environmental costs" of a project. *Robertson*, 490 U.S. at 351 (Forest Service permissibly determined that "benefits to be derived from downhill skiing" justified "even 100 percent loss of a deer herd").

took effect in 2023, the Forest Service had already published an initial EIS exceeding 2,000 pages. 3-RCMSER-544. Lopez offers no reason why the agency should have discarded that work and begun anew. Nor do the applicable regulations support such an illogical and wasteful outcome: They instruct that the page limits apply only to *new* projects or ones in early stages of development. 90 Fed. Reg. 29,632, 29,644 (July 3, 2025). Lopez disregards those regulations.

Moreover, the Exchange Act required an FEIS covering "topics beyond the topics ordinarily addressed in a FEIS." Lopez-ER-14; *see* 16 U.S.C. § 539p(c)(9)(C). As "the more specific statute," the Exchange Act controls. *Akiak Native Cmty.* v. *EPA*, 625 F.3d 1162, 1173 (9th Cir. 2010).

Lopez's only argument (Br.57) is that the FEIS's length "impedes th[e] goal" of "fostering the public's ability to understand an EIS's contents," and supposedly "prejudiced" Plaintiffs by providing *more* information than they were entitled to. But Lopez identifies no issue for which more time to study was needed. And as the district court held, the FEIS's 32-page executive summary encapsulates the entire study. Lopez-ER-16 n.5. Lopez thus asserts a mere "procedural right *in vacuo*" that is "insufficient" to support relief—especially the extraordinary remedy requested here. *Summers*, 555 U.S. at 496.

**D.    The extensive consultation process was more than sufficient.**

The Tribe contends (Br.50) that the Forest Service failed to conduct adequate "government to government" tribal consultations. Lopez similarly argues (Br.57) that consultations with ACHP were inadequate.

Both Plaintiffs lack a cause of action to raise those claims because the consultation record in the FEIS is not final agency action. For reasons similar to those discussed above regarding Plaintiffs' NEPA claims (at 30-33), the FEIS's consultation record is not an actionable "decision" of the agency, and the consultation record standing alone does not finally determine any rights or obligations. *Bennett*, 520 U.S. at 177-178. Only the final *ROD* will qualify for review through the APA, after the agency gives its "ultimate approval" to the matters committed to its discretion. *Seven County*, 145 S.Ct. at 1514.

In any case, the record decisively refutes Plaintiffs' challenges. The Forest Service conducted "434 documented consultations" specifically with the San Carlos Tribe between 2003 and 2025. 1-AMRCER-68. And "ACHP was involved in the Forest Service's consultation efforts" and expressed its concerns to the Secretary of Agriculture, who "provided detailed, reasoned responses" even after ACHP terminated consultations because it disagreed with Congress's decision to authorize the mine. 1-AMRCER-82. Plaintiffs have not come close to showing that the Forest Service's consultation efforts were "arbitrary and capricious." *Morongo Band of Mission Indians* v. *FAA*, 161 F.3d 569, 573 (9th Cir. 1998).

1. **The Forest Service's 434 consultations with the Tribe satisfy the NHPA and the Exchange Act.**

Neither the NHPA nor the Exchange Act requires the government to grant a tribe's demands for specific *outcomes* that "avoid, minimize, and mitigate" concerns. *Contra* Tribe.Br.51. Rather, the NHPA, like NEPA, is "chiefly procedural in nature" and "designed to insure that the agency 'stop, look, and listen' before moving ahead." *San Carlos*, 417 F.3d at 1097. The NHPA's implementing regulations thus require only that the Forest Service "seek[], discuss[], and consider[] the views" of the Tribe and, "where feasible, seek[] agreement," 36 C.F.R. § 800.16(f), giving the Tribe "a reasonable opportunity to identify its concerns" and "articulate its views," *id.* § 800.2(c)(2)(ii)(A). The Exchange Act similarly tasks the Secretary with *consulting* the Tribe and "*seek[ing]* to find *mutually acceptable measures*" with "Resolution Copper." 16 U.S.C. § 539p(c)(3)(B) (emphasis added). Neither statute grants the Tribe a veto over the land exchange.

The Tribe baldly asserts (Br.17) that "Defendants made no substantial effort to comply" with their consultation obligations. But it fails to mention Appendices S and J to the FEIS, which disprove that assertion. The extensive record of consultation, catalogued in detail in the 110-page Appendix S, 12-RCMSER-3049–3160, easily satisfies the arbitrary-and-capricious standard and this Court's "limited and deferential" review, *Earth Island*, 626 F.3d at 468. The district court thoroughly recounted

the two decades' worth of governmental efforts to understand the Tribe's concerns and seek reasonable, mutually acceptable mitigation measures. 1-AMRCER-68–80.

The Forest Service first engaged the Tribe's government about a potential land exchange in 2003. 12-RCMSER-3052. Throughout the next two decades, the agency consulted extensively with the Tribe and 14 other tribes. Those discussions addressed the proposed mine, the land exchange, tailings locations, archeological and cultural resources, ethnographic studies, protection of Apache Leap, and other issues of tribal concern. 12-RCMSER-3051–3157. These consultations included "formal meeting[s]" with tribal staff and representatives, informal listening sessions, site tours, and correspondence. *Id.*; *see* 1-AMRCER-68–80.

Through those extensive consultations, the Forest Service identified, and Resolution agreed to, a host of mitigation measures described in the 50-page Appendix J. 8-RCMSER-2195. These measures will, among other things, reduce the project's impact on historic properties, allow tribes to recover cultural resources, and ensure replacement water for any sacred springs should they be impacted by the project. *See* 6-RCMSER-1499. Resolution also agreed to fund an endowment for cultural heritage, tribal education, and a tribal monitor program. 6-RCMSER-1499; 1-RCMSER-8. And Resolution has made significant changes to the mining project in response to tribal concerns. 1-RCMSER-8–9.

- 53 -

The Tribe erroneously and repeatedly contends (*e.g.*, Br.5-6, 51-52) that most of that consultation history is irrelevant because the government supposedly admitted in March 2021 that its consultations to that point had been "inadequate." That is false: The government withdrew the initial EIS so it could "review" and "fully understand" tribal concerns and complete its "environmental, cultural, and archaeological analyses." 6-AMRCER-1027. That the government sought to *better* understand the Tribe's concerns does not remotely suggest it needed to restart consultation from scratch.

Moreover, this Court's precedents reject the Tribe's view that only post-2021 consultations count. *E.g.*, *Te-Moak Tribe of W. Shoshone of Nevada* v. *Department of Interior*, 608 F.3d 592, 609 (9th Cir. 2010) (court appropriately considered "historic background" of consultations, including "past efforts" predating the project). The key inquiry is whether the government gave the Tribe an opportunity to provide all relevant "information." *Te-Moak Tribe*, 608 F.3d at 609-610; *see Muckleshoot Indian Tribe* v. *USFS*, 177 F.3d 800, 807 (9th Cir. 1999) (consultation adequate where "the Tribe had many opportunities to reveal more information to the Forest Service").

The Tribe plainly had such an opportunity both before and after 2021. As the district court observed (1-AMRCER-71–72), the government conducted substantial additional consultations with the Tribe between 2021 and 2025. 12-RCMSER-3135–3157. Indeed, those consultations

- 54 -

prompted changes to the FEIS. 4-RCMSER-1033 (discussing amended groundwater analysis following "re-initiation of Tribal consultation"); 1-AMRCER-78.

The Tribe also protests (Br.51-53) that the government supposedly failed to "substantively" consult when the Tribe insisted in May 2024 that the agency execute a memorandum of understanding and provide specific "written responses." The record contradicts that claim too. The Tribe's declaration confirms that its substantive concerns were addressed in a May 2024 meeting, including (1) views that the "EIS is deeply flawed," (2) "[w]hether the Forest Service would fully assess" "water needs" and "viability of potential water sources," and (3) "[w]hether the Forest Service would provide thorough written responses to BLM's concerns." 1-AMRCER-76; *see* 3-TribeER-473–477.

In any event, the Forest Service was not required to accept the Tribe's unilateral demands that consultation follow a particular process. As another court explained in rejecting the same Tribe's prior assertions of inadequate consultation under the Exchange Act, "[c]onsultation is a two-way street"; the Tribe cannot ignore "numerous and substantial efforts to consult" and then block an agency's "undertaking by refusing to cooperate." *Concerned Citizens & Retired Miners Coal.* v. *USFS*, 279 F.Supp.3d 898, 942 (D. Ariz. 2017). The Tribe plainly had reasonable "*op-*

Case: 25-5197, 09/29/2025, DktEntry: 59.1, Page 74 of 126

*portunities* to reveal more information," which is sufficient. *Muckleshoot*, 177 F.3d at 807 (emphasis added).[11]

### 2. The Forest Service adequately consulted ACHP.

Lopez claims (Br. 57) that the Forest Service failed to consult ACHP as required by NHPA Section 106, 54 U.S.C. § 306108. The district court explained why that's wrong. Lopez-ER-21–22. NHPA requires only that the agency "take into account" ACHP's views. 54 U.S.C. § 306108. An agency does so by "invit[ing] [ACHP] to participate in the consultation" "to seek ways to avoid, minimize or mitigate … adverse effects." 36 C.F.R. § 800.6(a)(1), (b)(2). ACHP may "terminate consultation" if further engagement would "not be productive." *Id.* § 800.7(a). If that occurs, ACHP transmits its comments to the agency. *Id.* § 800.7(a)(4), (c)(2). The agency must "take into account" those comments "in reaching a final decision," *id.* § 800.7(c)(4), but it "is not obligated to give the ACHP's opinion so much weight that it is foreclosed from making its own decision," *Concerned Citizens Alliance, Inc.* v. *Slater*, 176 F.3d 686, 696 (3d Cir. 1999).

Lopez's own description of the record (Br.58-59) proves that the Forest Service complied with the statute and regulations. ACHP, not the

---

[11] The Tribe's assertion (Br.51) that consultations were not "government to government" meetings repackages a contention unveiled in a reply brief below: that only formal consultations with the Tribal Council qualify. No. 21-cv-68, Dkt. 119 at 17. The Tribe forfeited that argument. *Eberle* v. *City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990). Regardless, tribal leaders were involved in consultations. *See* 3-TribeER-473–477; 1-AMRCER-70.

Forest Service, terminated consultation because it irrevocably opposed the land exchange and wanted the Secretary to advocate for the Exchange Act's repeal—not because it was dissatisfied with the consultation process. Lopez-ER-197–198.[12] The NHPA therefore required the Secretary of Agriculture to respond to ACHP's comments, and her April 2025 letter did so. Lopez-ER-191–196. "[T]he Secretary acknowledged ACHP's concerns and recommendations and provided detailed, reasoned responses to them," 1-AMRCER-82, including by observing that it could not lobby Congress and was bound to follow the statute, Lopez-ER-193.

Lopez nevertheless argues (Br.59-60) that the Secretary's letter "ignored" ACHP's "recommendations to assess alternative mining techniques." But "[r]ead in proper context," the letter *did* address that concern. Lopez-ER-21. In response to ACHP's comment about "alternatives" and "modifications," the Secretary wrote "four lengthy, single-spaced paragraphs" noting that the agency will have limited authority to regulate mining once Oak Flat becomes "private land." *Id.* (citing Lopez-ER-193–194). The Secretary addressed a comment about "alternatives" and "modifications" and reasonably declined to exceed her authority by attempting to "compel" a "particular mining method." Lopez-ER-21.

Lopez now claims (Br.60) that the Secretary ignored requests to "incentivize" alternative mining techniques on private land. That argu-

---

[12] *See also* https://www.achp.gov/sites/default/files/2021-03/VilsackResolutionCopperLTR20210329.pdf.

ment is forfeited because Lopez did not raise it below. *Connecticut General*, 321 F.3d at 882; Lopez Dkt. 15-1 at 30-31. The argument also lacks a basis in fact or law. Again, the Secretary's response to ACHP addressed "alternative mining techniques." Lopez-ER-21. And an agency operating under a procedural statute "may decline to evaluate" matters beyond its authority. *Seven County*, 145 S.Ct. at 1518; *accord Public Citizen*, 541 U.S. at 770.

## E.   The district court correctly rejected AMRC's "absurd" appraisal claim.

AMRC contends (Br.21-39) that the Forest Service acted arbitrarily by approving an appraisal of a portion of the federal land (the Mining Claim Zone, or MCZ) that is encumbered by unpatented mining claims long held by Resolution and its predecessors. AMRC lacks standing to raise this claim because it alleges no cognizable injury. Beyond that, AMRC's claim fails on the merits. Federal appraisal standards require that any encumbrance—whether an easement, covenant, or mining claim—*must* be considered because it indisputably affects the parcel's value. AMRC's contrary theory would require the agency to appraise a proverbial bundle of sticks without regard for which sticks are present. That theory flouts fundamental property principles. It would also "nullify the [General Mining Law of 1872] and 150 years of Supreme Court precedent" and effect a taking of Resolution's property. 1-AMRCER-24. The district court rightly rejected AMRC's theory as "absurd." *Id.*

- 58 -

### 1. AMRC has no cognizable claim to challenge the appraisal.

Initially, AMRC lacks standing to challenge the appraisal. There is no "Article III case or controversy" where, as here, "a plaintiff assert[s] a procedural harm raising only a generally available grievance about government" and "seek[s] relief that no more directly and tangibly benefits him than it does the public at large." *Whitewater*, 5 F.4th at 1014 (cleaned up) (quoting *Lujan*, 504 U.S. at 573-574).

AMRC's claim is materially indistinguishable from the claim rejected in *Valley Forge Christian College* v. *Americans United For Separation of Church and State, Inc.*, 454 U.S. 464 (1982), in which the Supreme Court found no Article III injury from an agency's "transfer [of] a parcel" that allegedly had been incorrectly appraised. *Id.* at 479; *see id.* at 468-469, 480-487 (rejecting theories of taxpayer and citizen standing). AMRC similarly "fail[s] to identify any personal injury" it has suffered due to the MCZ appraisal. *Id.* at 485. "The only injury" it alleges "is that the law … has not been followed," which is "precisely the kind of undifferentiated, generalized grievance about the conduct of government that [federal courts] have refused to countenance." *Lance* v. *Coffman*, 549 U.S. 437, 442 (2007); *see Whitewater*, 5 F.4th at 1013-1014.

The district court found that AMRC had "likely" alleged Article III injury under *Desert Citizens Against Pollution* v. *Bisson*, 231 F.3d 1172 (9th Cir. 2000). 1-AMRCER-15. But *Desert Citizens* is irreconcilable with the Supreme Court's and this Court's cases holding that generalized

grievances—including challenges to the government's transfer of funds or property at allegedly below-market value—do not support standing.

### 2. The appraisal correctly applied the General Mining Law of 1872.

The Exchange Act requires that "[t]he value of the Federal land and non-Federal land to be exchanged … shall be equal or shall be equalized." 16 U.S.C. § 539p(c)(5)(A). The Act mandates appraisals "in accordance with nationally recognized" standards, including the Uniform Appraisal Standards for Federal Land Acquisitions (UAS). *Id.* § 539p(c)(4)(A), (B)(i). If the appraisals show that the value of the government's land exceeds Resolution's, then Resolution must either convey additional property or make a cash payment to equalize the exchange. *Id.* § 539p(c)(5)(B)(i).

Under the General Mining Law of 1872, 30 U.S.C. § 26, the MCZ is encumbered by 148 unpatented mining claims that give Resolution—not the United States—the exclusive right to extract the minerals beneath the MCZ. Because those mining claims encumber the government's mineral estate, the MCZ appraisal did not include in the federal estate the value of the copper subject to those claims. 1-AMRCER-21. By contrast, the other federal parcel, the Mining Withdrawal Area (MWA) is not subject to mining claims, so the appraisal of that parcel did include the value of its copper. 1-AMRCER-25–26.

The MCZ appraisal is fully consistent with federal law and foundational property principles. Under the General Mining Law, "the finder of valuable minerals on government land is entitled to exclusive possession

- 60 -

of the land for purposes of mining and to all the minerals he extracts." *United States* v. *Shumway*, 199 F.3d 1093, 1098-1099 (9th Cir. 1999); *see Center for Biological Diversity* v. *U.S. Fish and Wildlife Serv.*, 33 F.4th 1202, 1209 (9th Cir. 2022) ("A valid unpatented claim gives the miner the right to 'occupy' the claim and to mine the minerals free of charge."); *United States* v. *Locke*, 471 U.S. 84, 86 (1985) (mining-claim owner may "extract and sell minerals from the claim without paying any royalty").

As the district court recognized, 1-AMRCER-22–23, a mining claim "is a [real] property interest" distinguishable from other property rights in the land. *Shumway*, 199 F.3d at 1100. Mining claims thus constitute "encumbrance[s] on public land[]." *Kunkes* v. *United States*, 78 F.3d 1549, 1556 (Fed. Cir. 1996). The MCZ appraisal properly excluded Resolution's pre-existing mining rights from the valuation because they "are not part of the estate owned by the United States," 4-AMRCER-540, and thus not part of the "exchange," 16 U.S.C. § 539p(c)(4)(B)(iv).

Under AMRC's view, Resolution should "pay the federal government for the copper it effectively already owns the exclusive right to mine." 1-AMRCER-24. AMRC's position "flow[s] from a misunderstanding of how unpatented mining claims work." 1-AMRCER-22. And contrary to AMRC's contention (Br.23), the MCZ appraisal does not "assume[] that the value of the copper is zero." It simply recognizes the indisputable legal fact that Resolution, not the United States, currently owns the rights to mine that copper.

AMRC has "never directly addresse[d] the absurd consequences that would flow from adopting its position." 1-AMRCER-24. Nor can AMRC square its illogical approach with the "highly deferential" standard of review that applies to the Forest Service's approval of the appraisal. 1-AMRCER-26 (citing *Northwest Ecosystem Alliance* v. *U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007)). "The APA gives an agency substantial discretion to rely on the reasonable opinions of its own qualified experts." *San Luis,* 776 F.3d at 992 (cleaned up). And AMRC still cannot "identify any appraisal standard" or "any judicial decision" requiring "minerals that are the subject of unpatented mining claims to be included" when appraising the government's interest in a parcel of land. 1-AMRCER-27. To Resolution's knowledge, no court or agency has ever endorsed or adopted such a bizarre position.

### 3. AMRC cannot show anything arbitrary and capricious in the appraisal.

AMRC cannot establish arbitrary and capricious agency action because its appraisal arguments share the same defect described above—a fundamental misunderstanding of applicable law.

AMRC erroneously argues (Br.23) that federal regulations required the appraisal to treat the MCZ as if it were unencumbered by mining claims. In fact the regulations state the opposite: Appraisals must account for "all encumbrances." 36 C.F.R. § 254.9(c)(4); *see* UAS § 4.6.5.2

(5-AMRCER-909) ("it is improper to disregard preexisting encumbrances and their impact on the property").

AMRC's reliance (Br.24) on 36 C.F.R. § 254.9(b)(1)(ii) is similarly misplaced. That Section requires appraisals to treat "lands and interests as if in private ownership and available for sale in the open market." 36 C.F.R. § 254.9(b)(1)(ii). That's exactly what this appraisal did. 4-AMRCER-540. If a private party acquired the MCZ from the government and then listed it for sale on the open market, Resolution's mining claims would remain and the next buyer would acquire the property subject to that encumbrance. 36 C.F.R. § 254.9(c)(4); *see Shumway*, 199 F.3d at 1100 ("government cannot reserve its own land from an unpatented mining claim without paying the owner the value of the claim"). The appraisal explained that the hypothetical private-sale condition "does not alter the fact[] that [] the Federal Property is encumbered by mining claims held by [Resolution] … in accordance with the [General] Mining Law." 4-AMRCER-540. AMRC's theory rests on the "false premise" that Resolution's "exclusive right to mine the minerals would somehow cease to exist" in an open-market sale. 1-AMRCER-24.[13]

---

[13] AMRC cites (Br.24-25) the dissent in *Shoshone-Bannock Tribes of the Fort Hall Reservation* v. *Department of the Interior*, No. 23-35543, --- F.4th ---, 2025 WL 2424422 (9th Cir. August 22, 2025), for the proposition that land must be appraised as if for sale in the open market. But that does not require an appraisal to disregard encumbrances on property.

AMRC repeats the same errors in asserting (Br.28) that the appraisal arbitrarily identified the "highest and best use" of the MCZ not as mining but as "surface land use in support of a mining operation." The appraisal correctly recognized that the government does not possess the right to mine the copper beneath the MCZ, which would constrain a hypothetical prospective purchaser's uses for the property. *E.g.*, 5-AMRCER-917 ("highest and best use" must be "legally permissible"); *accord* UAS at 73.[14]

AMRC also fails to advance its case (Br.31) by invoking 36 C.F.R. § 254.9(b)(iv). That provision requires appraisers to "consider the contributory value of any interest in land such as … minerals … to the extent they are consistent with the highest and best use of the property." Once again, AMRC cites no precedent supporting its assertion that the copper beneath the MCZ "contributes" to the value of that government-owned parcel given that Resolution holds exclusive mining rights. 1-AMRCER-24 (observing same error). AMRC cites (Br.32) the Exchange Act's provision for a "value adjustment" if mineral production exceeds the appraisal estimates, but that provision accounts for mineral production *from the*

---

[14] AMRC argues (Br.29) that the MWA appraisal is based on comparable sales whose values include mining rights. But those comparables are inapt because the MWA, unlike the MCZ, is not encumbered by any mining claims. AMRC's citations—*Desert Citizens*, 231 F.3d 1172, and *National Parks & Conservation Association* v. *BLM*, 606 F.3d 1172 (9th Cir. 2010)—do not suggest otherwise. Neither case involved land encumbered by mining claims.

*MWA*, where Resolution does not already own the mineral rights. 16 U.S.C. § 539p(e)(2).

AMRC falls back to legislative history, arguing (Br.32-33) that comments on a draft land-exchange bill suggested the federal land should be appraised as if it included mineral rights. But "once [Congress] enacts a statute we do not inquire what the legislature meant; we ask only what the statute means." *Epic Sys. Corp.* v. *Lewis*, 584 U.S. 497, 523 (2018) (cleaned up). Anyway, once again, the appraisal of the MWA (unencumbered by mining claims) did "include[] the value of those copper deposits." 1-AMRCER-26. And the Exchange Act "contains a clear textual indication that Congress was aware of Resolution Copper's unpatented mining claims and intended to preserve them." 1-AMRCER-26. It provides that "[n]othing in this section shall interfere with, limit, or otherwise impair, the unpatented mining claims … currently held by Resolution Copper on the Federal land, nor in any way change, diminish, qualify, or otherwise impact" Resolution's rights on those claims. 16 U.S.C. § 539p(i)(1)(C).

Last, AMRC questions (Br.37-39) the validity of Resolution's unpatented mining claims. AMRC forfeited that challenge by failing to "properly raise[]" it in the district court. 1-AMRCER-24–25 & n.8; *see Cascadia Wildlands*, 2025 WL 2460946, at *22. AMRC asserted that argument for the first time in a reply brief, improperly depriving Resolution of the opportunity to develop the record plainly demonstrating the validity of its claims.

In any event, AMRC's attack on Resolution's mining claims is frivolous. According to AMRC, Resolution's mining claims are speculative because it has not shown that the copper beneath the MCZ can be "extracted, removed and marketed at a profit." Br.37. But as the district court pointed out, it was "logical—and certainly not arbitrary and capricious" for the agency to assume "that the copper deposits underlying the MCZ parcel are valuable enough to validate Resolution Copper's mining claims." 1-AMRCER-24–25 & n.8. The entire premise of the Exchange Act is the existence of an enormous copper deposit beneath the federal land—a fact well-documented in the record. Lopez-ER-143-162.[15] The Act thus reasonably "reflect[s] a congressional determination that Resolution Copper's mining claims are valid and that the contemplated mine will be financially valid." *Id.*

AMRC has failed to demonstrate a likelihood of success, or even serious questions, on its challenges to the MCZ appraisal.

## F. Lopez's religious-practice claims are untimely and foreclosed by precedent.

Lopez's eleventh-hour RFRA and Free-Exercise claims reprise arguments that this Court already rejected in *Apache Stronghold*. Those claims are both out-of-time and meritless.

---

[15] *See, e.g.*, https://www.resolutionmineeis.us/sites/default/files/references/parker-2017.pdf.

**1. Lopez's religious-practice claims are severely untimely.**

The statute of limitations ran on Lopez's RFRA claims over five years ago, and the doctrine of laches bars Lopez's request for equitable relief. While the district court had no need to address those obstacles given the other defects in Lopez's claims, Lopez-ER-12, they reinforce that Lopez is unlikely to prevail.

**a.** Lopez's RFRA claim is time-barred. RFRA actions are subject to a four-year limitations period, 28 U.S.C. § 1658, which "accrues when a party knows or has reason to know of the injury which is the basis of the cause of action," *Pouncil* v. *Tilton*, 704 F.3d 568, 574 (9th Cir. 2012) (cleaned up). Lopez's claim accrued when the Exchange Act became law on December 19, 2014. The limitations period thus expired in December 2018—more than five years before Lopez filed suit.

Lopez argued below that her RFRA claim accrued when the Forest Service published the FEIS in June 2025. But Lopez's Complaint alleges that it was "the government's decision to transfer" Oak Flat that imposed a "'substantial burden'" on her religious exercise. Lopez.Dkt.1 ¶¶ 8-9. *Congress*, not the agency, made that "decision"—ten years ago.

Lopez argued below that the Exchange Act constitutes a "continuing or repeated harm." *Flynt* v. *Shimazu*, 940 F.3d 457, 462 (9th Cir. 2019). But Lopez identifies no "series" of acts causing "new" injury, *id.*; she simply challenges a congressional decision enacted a decade ago. And for claim-accrual purposes, "the question is when the operative decision

was made, not when the decision is carried out." *RK Ventures, Inc.* v. *City of Seattle*, 307 F.3d 1045, 1059 (9th Cir. 2002). Because Congress's decision to transfer the land "has been in effect continuously since [2014] and was not substantively altered" since then, Lopez's RFRA claim is untimely. *Action Apartment Ass'n, Inc.* v. *Santa Monica Rent Control Bd.*, 509 F.3d 1020, 1027 (9th Cir. 2007) (challenge to ordinance time-barred).

**b.** The doctrine of laches separately bars Lopez's requests for equitable relief on her religious-practice claims.

"'Laches is an equitable time limitation on a party's right to bring suit,' resting on the maxim that 'one who seeks the help of a court of equity must not sleep on his rights.'" *Jarrow Formulas, Inc.* v. *Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002). The doctrine applies where there is a (1) "lack of diligence" by the plaintiff and (2) "prejudice" to the defendant. *Kansas* v. *Colorado*, 514 U.S. 673, 687 (1995).[16]

**Lack of diligence.** Lopez has been on notice for over 10 years that Oak Flat would be transferred to Resolution Copper for mining purposes,

---

[16] While Lopez's RFRA action is subject to a statutory limitations period, the equitable doctrine of laches may properly "bar at the very threshold" Lopez's request for "equitable relief" on that claim. *Petrella* v. *Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 667-668 (2014); *see Standing Rock Sioux Tribe* v. *U.S. Army Corps of Eng'rs*, 239 F.Supp.3d 77, 87-88 (D.D.C. 2017) (laches barred relief under RFRA). And while Lopez's Free Exercise claim does not have a statutory limitations period, "the presumptive applicability of laches turns on whether the limitations period for the analogous action at law has expired." *Jarrow*, 304 F.3d at 837. At minimum, Lopez's Free Exercise claim presumptively expired when her RFRA claim lapsed.

and that the transfer would occur within 60 days of FEIS publication. Yet Lopez unjustifiably waited until just 26 days before the statutory transfer deadline to file suit and seek emergency injunctive relief—years after the *Apache Stronghold* plaintiff challenged the same statute on materially identical grounds.

Strikingly, some of the Lopez Plaintiffs appear to be close family of Wendsler Nosie—the leader of the plaintiff organization in *Apache Stronghold*. Lopez waited to deploy this lawsuit—in Washington, D.C.— until it became clear that her claims would finally fail under binding Ninth Circuit law. This Court has decried as "egregious" such "strategic gamesmanship in litigation to hinder development and impose costs unnecessarily." *Save the Peaks Coal.* v. *USFS*, 669 F.3d 1025, 1032 (9th Cir. 2012).

**Prejudice to Resolution and the government.** Lopez's tardy suit imposes an "unfair" burden "of having to defend against claims that should have been made in the [*Apache Stronghold*] litigation." *Save the Peaks*, 669 F.3d at 1034. Since the Exchange Act's passage nearly 11 years ago— and in reliance on the statutory timeline and *Apache Stronghold*— Resolution has invested billions of dollars in mine development and preparation and entered numerous contracts and commitments. *See Jarrow*, 304 F.3d at 839 (finding prejudice where defendant "invested enormous resources"); *Pro Football, Inc.* v. *Harjo*, 565 F.3d 880, 884 (D.C. Cir. 2009) (recognizing "evidence of continued investment" as "proof of prejudice").

Since January 2021 alone, Resolution has invested over $545 million in the project; it has also incurred about $11 million per month in carrying costs to maintain the mine in operational readiness. 1-RCMSER-7, 13. The government, meanwhile, has invested substantial time and resources in conducting environmental reviews and consultations, preparing the FEIS, and coordinating with federal and state agencies to address timely-raised religious concerns.[17]

Lopez's suit also prejudices the administration of justice. In taking a wait-and-see approach—and then engaging in forum-shopping—Lopez has demanded that courts in two Circuits "steamroll through delicate legal issues" ahead of the statutory land-exchange deadline. *Arizona Libertarian Party* v. *Reagan*, 189 F.Supp.3d 920, 923 (D. Ariz. 2016) (cleaned up). Allowing Lopez to obtain through eleventh-hour litigation what she could not through the legislative process or timely judicial challenges would reward dilatory conduct.

---

[17] Below, Lopez erroneously argued that Resolution's investments during Lopez's delay are irrelevant to laches. But the case Lopez cited, *Save the Peaks*, distinguished between consequential economic losses (which are irrelevant to showing prejudice) from actual "money spent on a project," which *is* "relevant." 669 F.3d at 1033 (citation omitted). And any limitation on considering economic losses applies only to laches concerning *environmental* claims. *Id.* Outside that context, economic losses caused by a plaintiff's delay can support a prejudice finding. *See, e.g.*, *Jarrow*, 304 F.3d at 839-840; *Miller* v. *Glenn Miller Prods., Inc.*, 454 F.3d 975, 999-1000 (9th Cir. 2006).

Case: 25-5197, 09/29/2025, DktEntry: 59.1, Page 89 of 126

### 2. This Court's precedent squarely rejects Lopez's arguments.

**a.** This Court has already rejected Lopez's religious-practice theories. *Apache Stronghold*, 101 F.4th at 1051. Plaintiffs effectively acknowledge as much by repeatedly referencing (Br.2-3, 34-39, 50-51) a two-Justice dissent from denial of certiorari in that case. 145 S.Ct. 1480. But this Court's opinion was sound. Lopez's claims fail under *Lyng*, 485 U.S. 439, which held that the government's "disposition of government real property" "does not impose a substantial burden on religious exercise" triggering strict scrutiny. *Apache Stronghold*, 101 F.4th at 1044. Lopez cannot succeed—or even show serious questions—on the merits.[18]

**b.** Lopez seeks (Br.31-42, 46-51) to relitigate *Apache Stronghold* by insisting that the Supreme Court impliedly repudiated that decision in *Mahmoud*, 145 S.Ct. 2332. But Lopez comes nowhere close to satisfying the "'high standard'" required to jettison en banc precedent, *FTC* v. *Consumer Def., LLC*, 926 F.3d 1208, 1213 (9th Cir. 2019), which would require her to show that the decisions are "clearly irreconcilable," *Miller*, 335 F.3d at 900.

The district court correctly held that Lopez "does not satisfy this demanding 'clearly irreconcilable' standard for a host of reasons." Lopez-ER-12 (citation omitted). *Mahmoud*, far from undermining this Court's

---

[18] Several of Plaintiffs' amici tacitly concede that Lopez's argument lacks merit by calling for *Apache Stronghold* to be overruled, or by declining to engage with *Lyng* or the en banc majority's analysis.

- 71 -

holding, in fact *reaffirms* that *Lyng*'s holding controls here—and thus confirms that Lopez lacks a viable claim. 145 S.Ct. at 2356-2357.

In *Mahmoud*, the parents of public-school children challenged a "mandatory" curriculum that was "designed to 'disrupt' children's thinking about sexuality and gender" and prohibited "opt outs." *Id.* at 2341-2342, 2363. The Supreme Court held that such a compulsory policy triggers strict scrutiny because it "burdens the religious exercise of parents" by "requir[ing] them to submit their children to instruction that poses 'a very real threat of undermining' the religious beliefs and practices that the parents wish to instill," and because "a government cannot condition the benefit of free public education on parents' acceptance of such instruction." *Id.* at 2342 (quoting *Wisconsin* v. *Yoder*, 406 U.S. 205, 218 (1972)).

In reaching those conclusions, *Mahmoud* made clear that claims like Lopez's—which challenge the government's disposition of its own land—are governed and rejected by *Lyng*. The Supreme Court reiterated that "[t]he Free Exercise Clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens." *Mahmoud*, 145 S.Ct. at 2356 (alteration in original) (quoting *Bowen* v. *Roy*, 476 U.S. 693, 699 (1986) (plurality op.)). And, *quoting Lyng*, the Court explained that this principle applies to alleged burdens arising from "the conduct of such internal affairs [that] might result in 'incidental interference with an individual's spiritual activities.'" *Id.* at 2356-2357 (quoting 485 U.S. at

450). The Court specifically identified "construction" on "federal land" as one such "internal affair[]" that does not constitute an actionable burden on religious exercise. *Id.*

Contrary to Lopez's suggestion (Br.40-41), *Mahmoud*'s distinction of federal land management is no outlier. In *Trinity Lutheran Church of Columbia, Inc.* v. *Comer*, 582 U.S. 449 (2017), for example, the Court explained that the government's disposition of its land does not trigger strict scrutiny, even if it would "obstruct" or "'interfere significantly with'" the "religious practice of several Native American Tribes that held certain sites on the tract to be sacred." *Id.* at 460 (quoting *Lyng*, 485 U.S. at 449). Those well-established principles defeat Lopez's claims.

**c.** Lopez fundamentally misapprehends *Mahmoud* in suggesting (Br.47-48) that it granted parents a veto over the government's use of federal property whenever it might impede their ability to instill religious beliefs in their children. That boundless theory would subject nearly *all* government functions to free-exercise scrutiny. *Apache Stronghold*, 101 F.4th at 1083 n.18 (Bea, J., concurring in part) (some believe all of "Washington and Oregon" are sacred, and "[n]ew sacred areas are continuously being recognized" (citations omitted)). And there is no sound reason to think that *Lyng* itself would have come out differently had the plaintiffs simply emphasized the right to direct their children's religious upbringing. *See Roy*, 476 U.S. at 696, 699-700 (rejecting similar theory).

*Mahmoud* itself dispenses with Lopez's sweeping argument. *Mahmoud* expressly departed from typical religious-exercise analysis because it involved a State's "'compulsory education'" laws, which implicate "direct, coercive interactions between the State and its young residents." 145 S.Ct. at 2357, 2361. Citing *Yoder*—which involved religious-based challenges to a public school's "compulsory-attendance requirement"— the Court explained that mandatory public education triggers a "special" burden and an "exception to the general rule." *Id.* at 2361. In that unique circumstance, courts must "proceed differently." *Id. Mahmoud* applied the same "exception" as *Yoder* because the parents' asserted burden— mandatory compliance with a public-school curriculum that "forb[ade] opt outs"—shared "the exact same character as the burden in *Yoder.*" *Id.* at 2353, 2361. It was that "compulsory" education requirement, not the parents' sincere desire to teach religion to their children, that triggered strict scrutiny. *Id.* at 2355; *see id.* at 2353 ("As our decision in *Yoder* reflects, the question whether a law 'substantially interfer[es] with the religious development' of a child will … depend on the specific religious beliefs and practices asserted, *as well as the specific nature of the educational requirement or curricular feature* at issue." (emphasis added)).

Even when the narrow mandatory-education exception applies, a plaintiff's remedy is far more limited than the veto Lopez seeks to wield here. "It must be emphasized," *Mahmoud* explained, that the plaintiffs there were not "seek[ing] … the right to micromanage the public school

curriculum, but rather to have their children *opt out* of a particular educational requirement" otherwise taught to willing participants. *Id.* at 2363 (emphasis added). Lopez thus seeks precisely what *Mahmoud* prohibits: to sidestep *Lyng* and impose a "religious servitude" over the government's use of its own land. *Contra Lyng*, 485 U.S. at 452.

Lopez further errs in suggesting (Br.40-41) that *Mahmoud* deemed *Lyng* categorically inapplicable to RFRA cases. The Supreme Court said no such thing—as the district court rightly recognized. Lopez-ER-12. Nor does Lopez support her argument by declaring *Lyng* inapplicable to her RFRA claim because it was a "Free Exercise Clause" case. Br.40 (cleaned up). *Mahmoud* was too, so by Lopez's logic *Mahmoud* cannot rescue her RFRA claim either: RFRA did not *expand* the concept of an actionable free-exercise burden by inserting the qualifier "substantially." Regardless, RFRA "restore[d]" "the compelling interest test as set forth in prior [pre *Employment Division* v. *Smith*, 494 U.S. 872 (1990)] Federal court rulings" in the Free Exercise context, 42 U.S.C. § 2000bb(a)(5), (b)(1)—a body of precedent that *includes Lyng*. That decision formed the "legal 'backdrop against which Congress enacted' RFRA." *Tanzin* v. *Tanvir*, 592 U.S. 43, 48 (2020) (citation omitted).

Similarly unavailing are Lopez's efforts (Br.40-41, 49-51) to distinguish this case from the "internal affairs" doctrine that bars her religious-practice claims. Lopez maintains (Br.40) that Congress's decision to convey federal land is not an internal affair because it supposedly resembles

the "direct, coercive interactions between the State and its young residents" that arise in compulsory public school, and because garden-variety "trespass[]" laws might apply to children who enter private property without permission. But the government's transfer of its own land to Resolution—unlike a compulsory-education law—does not "coerce" Lopez or her children to do anything, let alone to "trespass" on private property. Indeed, the hypothetical application of *state* trespass law has no bearing on this *federal* statute. Nor is there merit to Lopez's suggestion that the First Amendment grants anyone an unqualified right to access to land (federal or private): "[T]he 'First Amendment does not guarantee access to property simply because it is owned or controlled by the government,'" or was previously "opened for use by the public." *Perry Educ. Ass'n* v. *Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45-46 (1983). And just as the government's operation and enforcement of the massive Social Security program is an "internal affair," so too is Congress's determination to transfer the government's own land to someone else. *See Roy*, 476 U.S. at 699-700.

Finally, Lopez attempts (Br.38-39, 50-51) to manufacture a conflict with *Apache Stronghold* by arguing that *Mahmoud* "declined to adopt any line between 'cognizable' and 'non-cognizable' burdens." That is obviously wrong, otherwise *every* burden would give rise to Article III standing and a religious-practice claim. Instead, the Supreme Court declined to adopt a rule confining actionable burdens strictly to "compulsion or

coercion to renounce or abandon one's religion." 145 S.Ct. at 2357-2358. *Apache Stronghold* did the same: This Court "overrule[d]" Circuit precedent that had recognized substantial burdens "*only* when individuals are … coerced to act contrary to their religious beliefs." 101 F.4th at 1043 (citation omitted). Then, applying Supreme Court law, the en banc Court held that the Exchange Act imposed no actionable burden because it "has 'no tendency to coerce individuals into acting contrary to their religious beliefs,' does not 'discriminate' against religious adherents, does not 'penalize' them, *and* does not deny them 'an equal share of the rights, benefits, and privileges enjoyed by other citizens.'" *Id.* at 1044 (quoting *Lyng*, 485 U.S. at 449-450).

### 3. Even if strict scrutiny applied, the Exchange Act satisfies it.

In all events, the Exchange Act employs the least restrictive means to further a compelling government interest. *See Mahmoud*, 145 S.Ct. at 2361; 42 U.S.C. § 2000bb-1(b).[19]

**a.** First, the United States has a paramount interest in facilitating copper mining on the land at issue. Copper is "essential to electricity

---

[19] The district court had no occasion to address strict scrutiny because it correctly held that *Apache Stronghold* bars Lopez's claims. Lopez-ER-12. Lopez now argues (Br.41-42) that only the government (not Resolution) may show that the Exchange Act satisfies strict scrutiny. But it is Lopez who bears the heavy burden to show entitlement to a preliminary injunction, and the record proves that her claims would fail at the strict-scrutiny stage. If this Court reaches that question, it should affirm on the current record. Were the Court to remand, Resolution would present still more evidence showing that strict scrutiny is satisfied.

generation, distribution, and storage," making it "the mineral most fundamental to the human future." Cathles & Simon, *Copper Mining and Vehicle Electrification*, Int'l Energy Forum (May 2024).[20] The government has designated copper a "critical material[] for energy." 88 Fed. Reg. 51,792, 51,792 (Aug. 4, 2023); *accord* 90 Fed. Reg. 41,591, 41,592 (Aug. 26, 2025). Copper and its derivatives "play a vital role in defense applications, infrastructure, and emerging technologies, including clean energy, electric vehicles, and advanced electronics." Exec. Order No. 14,220, § 1, 90 Fed. Reg. 11,001 (Feb. 25, 2025).

Second, Congress focused intently on vindicating the nation's critical mineral interests while limiting potential impacts on religious believers as much as practicable. Whereas earlier bills proposed transferring 3,025 acres to Resolution, *see* S.1122, 109th Cong. (2005);[21] H.R.2618, 109th Cong. (2005),[22] the enacted version conveys only 2,422 acres and still protects 24 of 25 cultural sites in the area, 16 U.S.C. § 539p(b)(2). Those changes reflect Congress's deliberate efforts to minimize impacts on religious exercise.

Moreover, the Exchange Act itself *requires* the least restrictive means. The Act targets parcels necessary to enable mining of the copper deposit. 16 U.S.C. § 539p(b)(2), (c). It directs the Secretary to consult

---

[20] https://tinyurl.com/4tc346eu.

[21] https://tinyurl.com/jtam4zc8.

[22] https://tinyurl.com/y532aent.

affected tribes "concerning issues of concern" and to seek to "minimize the adverse effects on the affected Indian tribes." *Id.* § 539p(c)(3)(A)-(B). Resolution must provide public access to the Oak Flat Campground "to the maximum extent practicable" and for as long as safely possible. *Id.* § 539p(i)(3). And the Act obligates Resolution to transfer Apache Leap to the government for preservation. *Id.* § 539p(g). The Act thus ensures that "government can achieve its interests in a manner that does not burden religion" any more than necessary. *Fulton* v. *City of Philadelphia*, 593 U.S. 522, 541 (2021). While Lopez invokes (Br.46) the Supreme Court's statement in *Burwell* v. *Hobby Lobby*, 573 U.S. 682 (2014), that RFRA "may in some circumstances require the Government to expend additional funds to accommodate citizens' religious beliefs," *id.* at 730, the Exchange Act did just that by requiring extensive consultation and environmental-review processes.

Resolution, for its part, tailored the mine plan by forgoing over *half a billion tons* of copper ore to avoid disrupting sites important to Native American tribes, including Apache Leap and Devil's Canyon. 3-RCM-SER-542, 544. Resolution will not build an open-pit mine, which would have eliminated Oak Flat and parts of Devil's Canyon. Resolution instead intends to use the "standard mining method" of block-caving, employing existing infrastructure from a pre-existing underground mine. 3-RCM-SER-633. Resolution will collect and repatriate any artifacts found. *Id.* And consistent with the Exchange Act's support for mutually agreeable

solutions, Resolution has worked for years to minimize any impact on cultural and environmental resources—as detailed at length above (at 51-53). Resolution also worked with the government to commission an ethnographic study of traditional cultural properties that included literature reviews, oral interviews, and field visits. 6-RCMSER-1480.

**b.** Lopez does not seriously contest the government's compelling interests or the Exchange Act's narrow tailoring. Lopez observes (Br.42-45) that the U.S. currently imports about half of the copper it needs. But the country's reliance on foreign copper only reinforces the compelling interests here: "[D]ependency on foreign sources of copper is a national security vulnerability" that "weakens [the Nation's] industrial resilience, exposes the American people to supply chain disruptions, economic instability, and strategic vulnerabilities, and jeopardizes the United States defense industrial base." Proclamation No. 10,962, § 6, 90 Fed. Reg. 37,727 (July 30, 2025). And the availability of *other* domestic copper sources, *cf.* Lopez.Br.44, does not diminish the government's vital and ever-increasing interests in maximizing domestic production of such an essential resource.[23]

Equally misguided are Lopez's claims (Br.44-45) that alternative mining methods might be "'physically feasible.'" For one thing, whether

---

[23] Lopez speculates (Br.42-45) whether Resolution will refine the mined copper domestically. Such guesswork cannot satisfy Lopez's burden to show likelihood of success, and in any event the argument is meritless. *See* pp. 87-88, *infra*.

"*Resolution's* preferred mining method" is the least restrictive means is beside the point: The First Amendment and RFRA apply only to *state* action, *e.g.*, 42 U.S.C. § 2000bb-1(a), and the government is neither approving nor disapproving particular mining methods through the land exchange. *See* pp. 28-31, 47-49, *supra*.

Anyway, Lopez does not advance her claims by asserting (Br.46) that the Forest Service's "analysis" fails the "least-restrictive means requirement." Those arguments—which recycle Plaintiffs' attacks on the FEIS—fail for the reasons discussed above (at 35-49): Resolution's selected mining method is the *only* practical way to extract most of the copper resource. Moreover, the FEIS is irrelevant to Lopez's religious-exercise claims: It is the Exchange Act, not the FEIS, that mandates the land transfer allegedly causing Lopez harm. The relevant question would be whether the Exchange Act itself is narrowly tailored, but Lopez ignores altogether the statute's narrowly tailored provisions.

## II. The remaining *Winter* factors do not tip sharply in Plaintiffs' favor.

Because Plaintiffs have not "established a likelihood of success or even serious questions going to the merits of any of their claims," 1-AMRCER-93, this Court can affirm the judgments without addressing Plaintiffs' alleged harms, *see Assurance Wireless,* 100 F.4th at 1031.

If this Court considers the remaining *Winter* factors, it should conclude that the district court did not abuse its discretion in deciding that

the balance weighs in favor of permitting the Forest Service to comply with Congress's direction to execute the land exchange.

## A. Plaintiffs will not suffer irreparable harm if the land exchange occurs before judicial review of their claims is complete.

Plaintiffs contend that once the Forest Service conveys the federal parcel to Resolution, they will lose access to that land, causing irreparable harm. Tribe.Br.55; AMRC.Br.57; Lopez.Br.61-63. That argument simply attacks the Exchange Act itself; the injunction Plaintiffs seek would violate Congress's express direction that the federal land must be conveyed to Resolution. Without a viable direct challenge to the Act, Plaintiffs are left only with procedural claims, but not even a remand to the Forest Service for further analysis would prevent the statutorily mandated land exchange. For that reason, the fundamental "mismatch between" Plaintiffs' claims and "the dangers [Plaintiffs] hope[] to remedy through an injunction" is reason enough to deny relief. *Garcia* v. *Google, Inc.*, 786 F.3d 733, 744 (9th Cir. 2015).

In addition, Plaintiffs' arguments that they will lose access to the federal parcel (AMRC.Br.20; Tribe.Br.55; Lopez.Br.31) are belied by the record. Even after the land exchange, Plaintiffs will maintain access to the federal land for *years*. *See* p. 24, *supra*; 1-RCSMSER-10–12; 16 U.S.C. § 539p(i)(3). Similarly false is Plaintiffs' accusation (Lopez.Br.62-63) that Resolution will imminently and irrevocably alter the landscape. Most near-term construction will occur on land that Resolution already owns.

1-RCMSER-8–11 ¶¶10-11, 16. And the small amount of federal land that Plaintiffs mention is already traversed by longstanding mine-exploration roads and drill pads. *Id*. ¶¶14-15. At any rate, initial surface disturbance will impact only approximately 3.76 acres, or 0.155% of the 2,422-acre federal parcel, merely with five new soil clearings and two new dirt-and-gravel access roads. *Id*. ¶15. That work will not disturb any area known to host tribal ceremonies. *Id*.

Nor have Plaintiffs shown that they will suffer irreparable harm while the district court completes its review of any religious-exercise claims. This Court has already held that the land exchange "does not impose a substantial burden on religious exercise." *Apache Stronghold*, 101 F.4th at 1044. And the proceedings in *Apache Stronghold* refute the notion that the land exchange will "end" "Apache religious and cultural practices." Tribe Br.56; Lopez.Br.61, because the religious ceremonies they cite routinely occur "elsewhere in Arizona," *Apache Stronghold* v. *United States*, 38 F.4th 742, 749 (9th Cir. 2022) (noting infrequency of Apache Sunrise Ceremony at Oak Flat), *superseded* by 101 F.4th 1036.

Finally, this Court should disregard the Tribe's attempt (Br.56) to invoke purported Treaty rights and trust obligations, including water rights, for the first time on appeal. The Tribe failed to build a record to pursue such claims. Indeed, the Tribe *waived* those arguments below by stating that it "d[id] not seek preliminary relief" under the "Apache Treaty of 1852, Indian title, [or] State and Federal water rights."

6-TribeER-1328, n.16.[24] The Tribe concedes that "Congress certainly has the power to modify Tribes' rights." Br.56 (quotation omitted). And this Court has already held that the Act "plainly abrogates any tribal treaty rights." *Apache Stronghold*, 101 F.4th at 1065.

## B. The equities decisively support denying an injunction.

This Court will not reverse a district court's weighing of the public-interest factors for a preliminary injunction absent "clear[] err[or]." *Earth Island*, 626 F.3d at 475. Here, the district court's analysis was not remotely clearly erroneous. The court carefully considered Plaintiffs' asserted harms, 1-AMRCER-89–91, and ultimately observed that there are "weighty equities and public-interest considerations on the other side of the ledger" that foreclose injunctive relief, 1-AMRCER-92.

"Any time" the government is "enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Trump* v. *CASA, Inc.*, 606 U.S. 831, 861 (2025) (cleaned up). As the district court recognized, Plaintiffs' requested injunction would irreparably harm the critical national security and economic interests that prompted Congress and President Obama to enact the Exchange Act for the benefit of the Nation. *See* 1-AMRCER-92-93. Courts sitting in equity cannot "second-guess the political branches' wisdom in

---

[24] The Tribe's explicit waiver forecloses various amici's attempts to revive that argument on appeal. *See United States* v. *Sineneng-Smith*, 590 U.S. 371, 375 (2020) (courts must follow the "principle of party presentation").

deciding how to balance those considerations." 1-AMRCER-92 (citing *Oakland*, 532 U.S. at 497). The "political process, and not NEPA, provides the appropriate forum in which to air policy disagreements." *Seven County*, 145 S.Ct. at 1518.

Plaintiffs' extended focus on the district court's weighing of the equities confirms that they are unlikely to prevail: "The assignment of weight to particular harms is a matter for district courts to decide." *Earth Island*, 626 F.3d at 475. Nor do Plaintiffs even attempt to satisfy their burden to show a "significantly higher justification" for an injunction of a congressionally enacted statute, especially after "judicial intervention … has been withheld" below. *Respect Maine PAC* v. *McKee*, 562 U.S. 996, 996 (2010) (citations omitted).

Nothing in the Exchange Act conditions the land transfer on completion of judicial review over any NEPA analysis, appraisal, or consultation. Congress instead codified its "purpose" to "*expedite* the exchange of land." 16 U.S.C. § 539p(a) (emphasis added). And it mandated that the Forest Service "shall convey" the parcel "[n]ot later than 60 days after the [FEIS's] date of publication." *Id.* § 539p(c)(10). That express statutory deadline is incompatible with Plaintiffs' assertions that the land exchange should wait for litigation over their procedural claims. Congress deliberately and sparingly used explicit language when it imposed conditions on the land exchange. 16 U.S.C. § 539p(c)(2) ("Conditions on acceptance"); *id.* § 539p(c)(7), (g)(3) ("condition of the land

exchange"); *id.* § 539p(i)(3) ("condition of conveyance"). But Congress did not condition the land exchange on completion of judicial review. *See Jones* v. *Hendrix*, 599 U.S. 465, 478 (2023) ("The expression of one thing implies the exclusion of others." (cleaned up)).

The land exchange that Congress wanted to expedite is the product of "a considered choice by the political branches to prioritize the significant potential benefits that Resolution Copper's mining activity is expected to generate," including the "promoting [of] critical national security interests." 1-AMRCER-92–93. Multiple administrations have recognized the urgent need for domestic investment in copper. *See* 90 Fed. Reg. at 11,001 (domestic copper supplies are "essential to the national security, economic strength, and industrial resilience"). And Resolution is among ten "critical mineral production projects" necessary "to facilitate domestic production of America's vast mineral resources to create jobs, fuel prosperity, and significantly reduce our reliance on foreign nations." White House, *Trump Administration Advances First Wave of Critical Mineral Production Projects* (Apr. 18, 2025).[25]

The proposed mine will also have significant immediate and long-term benefits for Arizona. The project will "boost[] Arizona's economy to the tune of over $1 billion per year." 1-AMRCER-92. At its peak, it will directly employ 1,500 people (and 2,200 indirectly), generating up to $61 billion in economic value for Arizona. 1-AMRCER-3; 1-RCMSER-0007.

---

[25] https://tinyurl.com/35vru2fy.

And the land exchange also will add valuable conservation lands to the public trust. 16 U.S.C. § 539p(d).

Plaintiffs' requested injunction would undercut those profound goals. It would exacerbate America's shortage of domestic copper. 1-AMRCER-93. It would postpone job creation and other "significant economic benefits." 1-AMRCER-3, 93. And it would impose tens of millions of dollars in unrecoverable economic harm—not just "temporary" injury—on Resolution. The company already has spent many millions of dollars to stay operation-ready during the long delay in completing the land exchange. 1-RCMSER-13. Further delay would make it virtually impossible for Resolution to maintain the current level of employment or to sustain its investment in the surrounding communities. 1-RCMSER-13. And Resolution will incur yet-more costs if forced to cancel contracts that depend on the timely, mandated completion of the land exchange.

Plaintiffs assert (Tribe.Br.24, 25; Lopez.Br.43-44) that the mine will benefit only "China" because some unknown amount of the copper may be sent there for refining. That's misleading at best. Resolution is 55% owned by Rio Tinto plc and 45% owned by BHP Copper Inc., both publicly traded companies. Although Lopez asserts (Br.20, 43) that one of the Resolution partners, Rio Tinto, is "controlled" by China, the Chinese company Lopez references holds just 14.1% of Rio Tinto shares. Rio Tinto 2024 Annual Report 326.[26] Rio Tinto has operated in the United

---

[26] https://www.riotinto.com/en/invest/reports.

States for 120 years and maintains extensive business operations across nearly a dozen states.[27] That domestic investment supports Congress's judgment that Resolution is best positioned to extract this enormously important copper resource for the benefit of the American people.

Plaintiffs' speculation that Resolution will ship its copper ore abroad for processing also overlooks that Rio Tinto owns a copper smelter in Utah that now operates far below capacity. *Compare* Rio Tinto 2024 Annual Report 318 (smelting-refining capacity of 335,000 tons per year), *with id.* at 275 (2024 production of 193,000 tons).[28] Rio Tinto recently invested over $700 million to maintain and improve that smelter.[29] Given the political branches' determination that it is 'imperative for our national security that the United States take immediate action to facilitate domestic mineral production to the maximum possible extent," the district court properly rejected Plaintiffs' speculative "attempts to downplay the national security" interests militating against an injunction. 1-AMRCER-92, n.29.

Equally unavailing is Plaintiffs' contention that any temporary delay they seek would not cause harm to national interests. Lopez.Br.64. As the district court recognized, that argument countermands Congress's

---

[27]  Rio Tinto Comments to U.S. Department of Commerce 1, https://www.regulations.gov/comment/BIS-2025-0010-0076.

[28]  https://www.riotinto.com/en/invest/reports.

[29]  Rio Tinto Comments to U.S. Department of Commerce 3, https://www.regulations.gov/comment/BIS-2025-0010-0076.

explicit direction "to authorize, direct, facilitate, and *expedite* the [land] exchange." 16 U.S.C. § 539p(a) (emphasis added). That provision reflects the strong "public interest in allowing the land exchange to proceed on the expedited timetable Congress contemplated." 1-AMRCER-83.

*

The district court correctly assessed that the equities and public interest weigh conclusively against enjoining Congress's directive to complete the land exchange mandated in the Exchange Act.

## CONCLUSION

The Court should affirm the district court's orders denying a preliminary injunction.

September 29, 2025

Respectfully submitted,

*/s/ Michael R. Huston*
  *Counsel of Record*

| | |
|---|---|
| Christopher D. Thomas | Diane M. Johnsen |
| Andrea J. Driggs | Nicholas S. Crown |
| Janet M. Howe | Samantha J. Burke |
| Benjamin A. Longbottom | Addison W. Bennett |
| HOLLAND & HART LLP | PERKINS COIE LLP |
| 2398 E. Camelback Road, Suite 650 | 2525 E Camelback Rd, Suite 500 |
| Phoenix, AZ 85016 | Phoenix, AZ 85016 |
| (602) 507-9704 | (602) 351-8000 |
| CDThomas@hollandhart.com | MHuston@perkinscoie.com |

*Counsel for Intervenor-Defendant-Appellee*
*Resolution Copper Mining LLC*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**

      I am the attorney or self-represented party.

      **This brief contains _____ words,** including _____ words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

      I certify that this brief *(select only one)*:

☐ complies with the word limit of Cir. R. 32-1.

☐ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

☐ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

☐ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

☐ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
      ☐ it is a joint brief submitted by separately represented parties.
      ☐ a party or parties are filing a single brief in response to multiple briefs.
      ☐ a party or parties are filing a single brief in response to a longer joint brief.

☐ complies with the length limit designated by court order dated          .

☐ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**                                             **Date**
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                              *Rev. 12/01/22*

-90-

# ADDENDUM

## ADDENDUM

Page

16 U.S.C. § 539p ........................................................................ Add. 1

42 U.S.C. § 4331 ....................................................................... Add. 8

42 U.S.C. § 4332 ....................................................................... Add. 8

54 U.S.C. § 306108 ................................................................... Add. 10

36 C.F.R. § 800.2 ...................................................................... Add. 13

36 C.F.R. § 800.6 ...................................................................... Add. 14

36 C.F.R. § 800.7 ...................................................................... Add. 16

and to ensure the survival of the Pines for the purposes of public enjoyment and scientific study, the approximately 31,700 acres of public land in the State, as generally depicted on the map entitled ''Ancient Bristlecone Pine Forest—Proposed'' and dated July 16, 2008, is designated as the ''Ancient Bristlecone Pine Forest''.

### (b) Map and legal description

#### (1) In general

As soon as practicable, but not later than 3 years after March 30, 2009, the Secretary shall file a map and legal description of the Forest with—

(A) the Committee on Natural Resources of the House of Representatives; and

(B) the Committee on Energy and Natural Resources of the Senate.

#### (2) Force of law

The map and legal description filed under paragraph (1) shall have the same force and effect as if included in this subtitle, except that the Secretary may correct any errors in the map and legal description.

#### (3) Public availability

The map and legal description filed under paragraph (1) shall be on file and available for public inspection in the appropriate offices of the Forest Service.

### (c) Management

#### (1) In general

The Secretary shall administer the Forest—
(A) in a manner that—

(i) protect[1] the resources and values of the area in accordance with the purposes for which the Forest is established, as described in subsection (a); and

(ii) promotes the objectives of the applicable management plan (as in effect on March 30, 2009), including objectives relating to—

(I) the protection of bristlecone pines for public enjoyment and scientific study;

(II) the recognition of the botanical, scenic, and historical values of the area; and

(III) the maintenance of near-natural conditions by ensuring that all activities are subordinate to the needs of protecting and preserving bristlecone pines and wood remnants; and

(B) in accordance with the National Forest Management Act of 1976 (16 U.S.C. 1600 et seq.), this section, and any other applicable laws.

#### (2) Uses

##### (A) In general

The Secretary shall allow only such uses of the Forest as the Secretary determines would further the purposes for which the Forest is established, as described in subsection (a).

##### (B) Scientific research

Scientific research shall be allowed in the Forest in accordance with the Inyo National Forest Land and Resource Management Plan (as in effect on March 30, 2009).

#### (3) Withdrawal

Subject to valid existing rights, all Federal land within the Forest is withdrawn from—

(A) all forms of entry, appropriation or disposal under the public land laws;

(B) location, entry, and patent under the mining laws; and

(C) disposition under all laws relating to mineral and geothermal leasing or mineral materials.

(Pub. L. 111–11, title I, §1808, Mar. 30, 2009, 123 Stat. 1060.)

REFERENCES IN TEXT

This subtitle, referred to in subsec. (b)(2), is subtitle K (§§1801–1808) of title I of Pub. L. 111–11, Mar. 30, 2009, 123 Stat. 1052, which enacted this section and subchapter CXXXIII of chapter 1 of this title, amended section 1274 of this title, enacted provisions set out as notes under sections 460vvv and 1274 of this title, and enacted and amended provisions listed in a table of Wilderness Areas set out under section 1132 of this title. For complete classification of subtitle K to the Code, see Tables.

The National Forest Management Act of 1976, referred to in subsec. (c)(1)(B), is Pub. L. 94–588, Oct. 22, 1976, 90 Stat. 2949, which enacted sections 472a, 521b, 1600, and 1611 to 1614 of this title, amended sections 500, 515, 516, 518, 576b, and 1601 to 1610 of this title, repealed sections 476, 513, and 514 of this title, and enacted provisions set out as notes under sections 476, 513, 528, 594–2, and 1600 of this title. For complete classification of this Act to the Code, see Short Title of 1976 Amendment note set out under section 1600 of this title and Tables.

DEFINITIONS

For definitions of terms used in this section, see section 1801 of Pub. L. 111–11, set out as a note under section 460vvv of this title.

### § 539p. Southeast Arizona land exchange and conservation

#### (a) Purpose

The purpose of this section is to authorize, direct, facilitate, and expedite the exchange of land between Resolution Copper and the United States.

#### (b) Definitions

In this section:

##### (1) Apache Leap

The term ''Apache Leap'' means the approximately 807 acres of land depicted on the map entitled ''Southeast Arizona Land Exchange and Conservation Act of 2011–Apache Leap'' and dated March 2011.

##### (2) Federal land

The term ''Federal land'' means the approximately 2,422 acres of land located in Pinal County, Arizona, depicted on the map entitled ''Southeast Arizona Land Exchange and Conservation Act of 2011–Federal Parcel–Oak Flat'' and dated March 2011.

##### (3) Indian tribe

The term ''Indian tribe'' has the meaning given the term in section 5304 of title 25.

##### (4) Non-Federal land

The term ''non-Federal land'' means the parcels of land owned by Resolution Copper that are described in subsection (d)(1) and, if necessary to equalize the land exchange under subsection (c), subsection (c)(5)(B)(i)(I).

---

[1] So in original. Probably should be ''protects''.

**(5) Oak Flat Campground**

The term ''Oak Flat Campground'' means the approximately 50 acres of land comprising approximately 16 developed campsites depicted on the map entitled ''Southeast Arizona Land Exchange and Conservation Act of 2011–Oak Flat Campground'' and dated March 2011.

**(6) Oak Flat Withdrawal Area**

The term ''Oak Flat Withdrawal Area'' means the approximately 760 acres of land depicted on the map entitled ''Southeast Arizona Land Exchange and Conservation Act of 2011–Oak Flat Withdrawal Area'' and dated March 2011.

**(7) Resolution Copper**

The term ''Resolution Copper'' means Resolution Copper Mining, LLC, a Delaware limited liability company, including any successor, assign, affiliate, member, or joint venturer of Resolution Copper Mining, LLC.

**(8) Secretary**

The term ''Secretary'' means the Secretary of Agriculture.

**(9) State**

The term ''State'' means the State of Arizona.

**(10) Town**

The term ''Town'' means the incorporated town of Superior, Arizona.

**(11) Resolution mine plan of operations**

The term ''Resolution mine plan of operations'' means the mine plan of operations submitted to the Secretary by Resolution Copper in November, 2013, including any amendments or supplements.

**(c) Land exchange**

**(1) In general**

Subject to the provisions of this section, if Resolution Copper offers to convey to the United States all right, title, and interest of Resolution Copper in and to the non-Federal land, the Secretary is authorized and directed to convey to Resolution Copper, all right, title, and interest of the United States in and to the Federal land.

**(2) Conditions on acceptance**

Title to any non-Federal land conveyed by Resolution Copper to the United States under this section shall be in a form that—

(A) is acceptable to the Secretary, for land to be administered by the Forest Service and the Secretary of the Interior, for land to be administered by the Bureau of Land Management; and

(B) conforms to the title approval standards of the Attorney General of the United States applicable to land acquisitions by the Federal Government.

**(3) Consultation with Indian tribes**

**(A) In general**

The Secretary shall engage in government-to-government consultation with affected Indian tribes concerning issues of concern to the affected Indian tribes related to the land exchange.

**(B) Implementation**

Following the consultations under paragraph (A), the Secretary shall consult with Resolution Copper and seek to find mutually acceptable measures to—

(i) address the concerns of the affected Indian tribes; and

(ii) minimize the adverse effects on the affected Indian tribes resulting from mining and related activities on the Federal land conveyed to Resolution Copper under this section.

**(4) Appraisals**

**(A) In general**

As soon as practicable after December 19, 2014, the Secretary and Resolution Copper shall select an appraiser to conduct appraisals of the Federal land and non-Federal land in compliance with the requirements of section 254.9 of title 36, Code of Federal Regulations.

**(B) Requirements**

**(i) In general**

Except as provided in clause (ii), an appraisal prepared under this paragraph shall be conducted in accordance with nationally recognized appraisal standards, including—

(I) the Uniform Appraisal Standards for Federal Land Acquisitions; and

(II) the Uniform Standards of Professional Appraisal Practice.

**(ii) Final appraised value**

After the final appraised values of the Federal land and non-Federal land are determined and approved by the Secretary, the Secretary shall not be required to reappraise or update the final appraised value—

(I) for a period of 3 years beginning on the date of the approval by the Secretary of the final appraised value; or

(II) at all, in accordance with section 254.14 of title 36, Code of Federal Regulations (or a successor regulation), after an exchange agreement is entered into by Resolution Copper and the Secretary.

**(iii) Improvements**

Any improvements made by Resolution Copper prior to entering into an exchange agreement shall not be included in the appraised value of the Federal land.

**(iv) Public review**

Before consummating the land exchange under this section, the Secretary shall make the appraisals of the land to be exchanged (or a summary thereof) available for public review.

**(C) Appraisal information**

The appraisal prepared under this paragraph shall include a detailed income capitalization approach analysis of the market value of the Federal land which may be utilized, as appropriate, to determine the value of the Federal land, and shall be the basis for calculation of any payment under subsection (e).

**(5) Equal value land exchange**

**(A) In general**

The value of the Federal land and non-Federal land to be exchanged under this section shall be equal or shall be equalized in accordance with this paragraph.

**(B) Surplus of Federal land value**

**(i) In general**

If the final appraised value of the Federal land exceeds the value of the non-Federal land, Resolution Copper shall—

(I) convey additional non-Federal land in the State to the Secretary or the Secretary of the Interior, consistent with the requirements of this section and subject to the approval of the applicable Secretary;

(II) make a cash payment to the United States; or

(III) use a combination of the methods described in subclauses (I) and (II), as agreed to by Resolution Copper, the Secretary, and the Secretary of the Interior.

**(ii) Amount of payment**

The Secretary may accept a payment in excess of 25 percent of the total value of the land or interests conveyed, notwithstanding section 206(b) of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1716(b)).

**(iii) Disposition and use of proceeds**

Any amounts received by the United States under this subparagraph shall be deposited in the fund established under section 484a of this title and shall be made available to the Secretary for the acquisition of land or interests in land in Region 3 of the Forest Service.

**(C) Surplus of non-Federal land**

If the final appraised value of the non-Federal land exceeds the value of the Federal land—

(i) the United States shall not make a payment to Resolution Copper to equalize the value; and

(ii) except as provided in subsection (h), the surplus value of the non-Federal land shall be considered to be a donation by Resolution Copper to the United States.

**(6) Oak Flat Withdrawal Area**

**(A) Permits**

Subject to the provisions of this paragraph and notwithstanding any withdrawal of the Oak Flat Withdrawal Area from the mining, mineral leasing, or public land laws, the Secretary, upon enactment of this Act, shall issue to Resolution Copper—

(i) if so requested by Resolution Copper, within 30 days of such request, a special use permit to carry out mineral exploration activities under the Oak Flat Withdrawal Area from existing drill pads located outside the Area, if the activities would not disturb the surface of the Area; and

(ii) if so requested by Resolution Copper, within 90 days of such request, a special use permit to carry out mineral exploration activities within the Oak Flat Withdrawal Area

(but not within the Oak Flat Campground), if the activities are conducted from a single exploratory drill pad which is located to reasonably minimize visual and noise impacts on the Campground.

**(B) Conditions**

Any activities undertaken in accordance with this paragraph shall be subject to such reasonable terms and conditions as the Secretary may require.

**(C) Termination**

The authorization for Resolution Copper to undertake mineral exploration activities under this paragraph shall remain in effect until the Oak Flat Withdrawal Area land is conveyed to Resolution Copper in accordance with this section.

**(7) Costs**

As a condition of the land exchange under this section, Resolution Copper shall agree to pay, without compensation, all costs that are—

(A) associated with the land exchange and any environmental review document under paragraph (9); and

(B) agreed to by the Secretary.

**(8) Use of Federal land**

The Federal land to be conveyed to Resolution Copper under this section shall be available to Resolution Copper for mining and related activities subject to and in accordance with applicable Federal, State, and local laws pertaining to mining and related activities on land in private ownership.

**(9) Environmental compliance**

**(A) In general**

Except as otherwise provided in this section, the Secretary shall carry out the land exchange in accordance with the requirements of the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.).

**(B) Environmental analysis**

Prior to conveying Federal land under this section, the Secretary shall prepare a single environmental impact statement under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.), which shall be used as the basis for all decisions under Federal law related to the proposed mine and the Resolution mine plan of operations and any related major Federal actions significantly affecting the quality of the human environment, including the granting of any permits, rights-of-way, or approvals for the construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities.

**(C) Impacts on cultural and archeological resources**

The environmental impact statement prepared under subparagraph (B) shall—

(i) assess the effects of the mining and related activities on the Federal land conveyed to Resolution Copper under this section on the cultural and archeological resources that may be located on the Federal land; and

(ii) identify measures that may be taken, to the extent practicable, to minimize potential adverse impacts on those resources, if any.

**(D) Effect**

Nothing in this paragraph precludes the Secretary from using separate environmental review documents prepared in accordance with the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) or other applicable laws for exploration or other activities not involving—

(i) the land exchange; or

(ii) the extraction of minerals in commercial quantities by Resolution Copper on or under the Federal land.

**(10) Title transfer**

Not later than 60 days after the date of publication of the final environmental impact statement, the Secretary shall convey all right, title, and interest of the United States in and to the Federal land to Resolution Copper.

**(d) Conveyance and management of non-Federal land**

**(1) Conveyance**

On receipt of title to the Federal land, Resolution Copper shall simultaneously convey—

(A) to the Secretary, all right, title, and interest that the Secretary determines to be acceptable in and to—

(i) the approximately 147 acres of land located in Gila County, Arizona, depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011–Non-Federal Parcel–Turkey Creek" and dated March 2011;

(ii) the approximately 148 acres of land located in Yavapai County, Arizona, depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011–Non-Federal Parcel–Tangle Creek" and dated March 2011;

(iii) the approximately 149 acres of land located in Maricopa County, Arizona, depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011–Non-Federal Parcel–Cave Creek" and dated March 2011;

(iv) the approximately 640 acres of land located in Coconino County, Arizona, depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011–Non-Federal Parcel–East Clear Creek" and dated March 2011; and

(v) the approximately 110 acres of land located in Pinal County, Arizona, depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011–Non-Federal Parcel–Apache Leap South End" and dated March 2011; and

(B) to the Secretary of the Interior, all right, title, and interest that the Secretary of the Interior determines to be acceptable in and to—

(i) the approximately 3,050 acres of land located in Pinal County, Arizona, identified as "Lands to DOI" as generally depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011–Non-

Federal Parcel–Lower San Pedro River" and dated July 6, 2011;

(ii) the approximately 160 acres of land located in Gila and Pinal Counties, Arizona, identified as "Lands to DOI" as generally depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011–Non-Federal Parcel–Dripping Springs" and dated July 6, 2011; and

(iii) the approximately 940 acres of land located in Santa Cruz County, Arizona, identified as "Lands to DOI" as generally depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011–Non-Federal Parcel–Appleton Ranch" and dated July 6, 2011.

**(2) Management of acquired land**

**(A) Land acquired by the Secretary**

**(i) In general**

Land acquired by the Secretary under this section shall—

(I) become part of the national forest in which the land is located; and

(II) be administered in accordance with the laws applicable to the National Forest System.

**(ii) Boundary revision**

On the acquisition of land by the Secretary under this section, the boundaries of the national forest shall be modified to reflect the inclusion of the acquired land.

**(iii) Land and Water Conservation Fund**

For purposes of sections 100506(c) and 200306 of title 54, the boundaries of a national forest in which land acquired by the Secretary is located shall be deemed to be the boundaries of that forest as in existence on January 1, 1965.

**(B) Land acquired by the Secretary of the Interior**

**(i) San Pedro National [1] Conservation Area**

**(I) In general**

The land acquired by the Secretary of the Interior under paragraph (1)(B)(i) shall be added to, and administered as part of, the San Pedro National [1] Conservation Area in accordance with the laws (including regulations) applicable to the Conservation Area.

**(II) Management plan**

Not later than 2 years after the date on which the land is acquired, the Secretary of the Interior shall update the management plan for the San Pedro National [1] Conservation Area to reflect the management requirements of the acquired land.

**(ii) Dripping springs**

Land acquired by the Secretary of the Interior under paragraph (1)(B)(ii) shall be managed in accordance with the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1701 et seq.) and applicable land use plans.

---

[1] So in original. The word "Riparian" probably should precede "National".

### (iii) Las Cienegas National Conservation Area

Land acquired by the Secretary of the Interior under paragraph (1)(B)(iii) shall be added to, and administered as part of, the Las Cienegas National Conservation Area in accordance with the laws (including regulations) applicable to the Conservation Area.

## (e) Value adjustment payment to United States

### (1) Annual production reporting

#### (A) Report required

As a condition of the land exchange under this section, Resolution Copper shall submit to the Secretary of the Interior an annual report indicating the quantity of locatable minerals produced during the preceding calendar year in commercial quantities from the Federal land conveyed to Resolution Copper under subsection (c). The first report is required to be submitted not later than February 15 of the first calendar year beginning after the date of commencement of production of valuable locatable minerals in commercial quantities from such Federal land. The reports shall be submitted February 15 of each calendar year thereafter.

#### (B) Sharing reports with State

The Secretary shall make each report received under subparagraph (A) available to the State.

#### (C) Report contents

The reports under subparagraph (A) shall comply with any recordkeeping and reporting requirements prescribed by the Secretary or required by applicable Federal laws in effect at the time of production.

### (2) Payment on production

If the cumulative production of valuable locatable minerals produced in commercial quantities from the Federal land conveyed to Resolution Copper under subsection (c) exceeds the quantity of production of locatable minerals from the Federal land used in the income capitalization approach analysis prepared under subsection (c)(4)(C), Resolution Copper shall pay to the United States, by not later than March 15 of each applicable calendar year, a value adjustment payment for the quantity of excess production at the same rate assumed for the income capitalization approach analysis prepared under subsection (c)(4)(C).

### (3) State law unaffected

Nothing in this subsection modifies, expands, diminishes, amends, or otherwise affects any State law relating to the imposition, application, timing, or collection of a State excise or severance tax.

### (4) Use of funds

#### (A) Separate fund

All funds paid to the United States under this subsection shall be deposited in a special fund established in the Treasury and shall be available, in such amounts as are provided in advance in appropriation Acts, to the Secretary and the Secretary of the Interior only

for the purposes authorized by subparagraph (B).

#### (B) Authorized use

Amounts in the special fund established pursuant to subparagraph (A) shall be used for maintenance, repair, and rehabilitation projects for Forest Service and Bureau of Land Management assets.

## (f) Withdrawal

Subject to valid existing rights, Apache Leap and any land acquired by the United States under this section are withdrawn from all forms of—

(1) entry, appropriation, or disposal under the public land laws;

(2) location, entry, and patent under the mining laws; and

(3) disposition under the mineral leasing, mineral materials, and geothermal leasing laws.

## (g) Apache Leap Special Management Area

### (1) Designation

To further the purpose of this section, the Secretary shall establish a special management area consisting of Apache Leap, which shall be known as the ''Apache Leap Special Management Area'' (referred to in this subsection as the ''special management area'').

### (2) Purpose

The purposes of the special management area are—

(A) to preserve the natural character of Apache Leap;

(B) to allow for traditional uses of the area by Native American people; and

(C) to protect and conserve the cultural and archeological resources of the area.

### (3) Surrender of mining and extraction rights

As a condition of the land exchange under subsection (c), Resolution Copper shall surrender to the United States, without compensation, all rights held under the mining laws and any other law to commercially extract minerals under Apache Leap.

### (4) Management

#### (A) In general

The Secretary shall manage the special management area in a manner that furthers the purposes described in paragraph (2).

#### (B) Authorized activities

The activities that are authorized in the special management area are—

(i) installation of seismic monitoring equipment on the surface and subsurface to protect the resources located within the special management area;

(ii) installation of fences, signs, or other measures necessary to protect the health and safety of the public; and

(iii) operation of an underground tunnel and associated workings, as described in the Resolution mine plan of operations, subject to any terms and conditions the Secretary may reasonably require.

**(5) Plan**

**(A) In general**

Not later than 3 years after December 19, 2014, the Secretary, in consultation with affected Indian tribes, the Town, Resolution Copper, and other interested members of the public, shall prepare a management plan for the Apache Leap Special Management Area.

**(B) Considerations**

In preparing the plan under subparagraph (A), the Secretary shall consider whether additional measures are necessary to—

(i) protect the cultural, archaeological, or historical resources of Apache Leap, including permanent or seasonal closures of all or a portion of Apache Leap; and

(ii) provide access for recreation.

**(6) Mining activities**

The provisions of this subsection shall not impose additional restrictions on mining activities carried out by Resolution Copper adjacent to, or outside of, the Apache Leap area beyond those otherwise applicable to mining activities on privately owned land under Federal, State, and local laws, rules and regulations.

**(h) Conveyances to Town of Superior, Arizona**

**(1) Conveyances**

On request from the Town and subject to the provisions of this subsection, the Secretary shall convey to the Town the following:

(A) Approximately 30 acres of land as depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011–Federal Parcel–Fairview Cemetery" and dated March 2011.

(B) The reversionary interest and any reserved mineral interest of the United States in the approximately 265 acres of land located in Pinal County, Arizona, as depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011–Federal Reversionary Interest–Superior Airport" and dated March 2011.

(C) The approximately 250 acres of land located in Pinal County, Arizona, as depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011–Federal Parcel–Superior Airport Contiguous Parcels" and dated March 2011.

**(2) Payment**

The Town shall pay to the Secretary the market value for each parcel of land or interest in land acquired under this subsection, as determined by appraisals conducted in accordance with subsection (c)(4).

**(3) Sisk Act**

Any payment received by the Secretary from the Town under this subsection shall be deposited in the fund established under section 484a of this title and shall be made available to the Secretary for the acquisition of land or interests in land in Region 3 of the Forest Service.

**(4) Terms and conditions**

The conveyances under this subsection shall be subject to such terms and conditions as the Secretary may require.

**(i) Miscellaneous provisions**

**(1) Revocation of orders; withdrawal**

**(A) Revocation of orders**

Any public land order that withdraws the Federal land from appropriation or disposal under a public land law shall be revoked to the extent necessary to permit disposal of the land.

**(B) Withdrawal**

On December 19, 2014, if the Federal land or any Federal interest in the non-Federal land to be exchanged under subsection (c) is not withdrawn or segregated from entry and appropriation under a public land law (including mining and mineral leasing laws and the Geothermal Steam Act of 1970 (30 U.S.C. 1001 et seq.)), the land or interest shall be withdrawn, without further action required by the Secretary concerned, from entry and appropriation. The withdrawal shall be terminated—

(i) on the date of consummation of the land exchange; or

(ii) if Resolution Copper notifies the Secretary in writing that it has elected to withdraw from the land exchange pursuant to section 206(d) of the Federal Land Policy and Management Act of 1976, as amended (43 U.S.C. 1716(d)).

**(C) Rights of Resolution Copper**

Nothing in this section shall interfere with, limit, or otherwise impair, the unpatented mining claims or rights currently held by Resolution Copper on the Federal land, nor in any way change, diminish, qualify, or otherwise impact Resolution Copper's rights and ability to conduct activities on the Federal land under such unpatented mining claims and the general mining laws of the United States, including the permitting or authorization of such activities.

**(2) Maps, estimates, and descriptions**

**(A) Minor errors**

The Secretary concerned and Resolution Copper may correct, by mutual agreement, any minor errors in any map, acreage estimate, or description of any land conveyed or exchanged under this section.

**(B) Conflict**

If there is a conflict between a map, an acreage estimate, or a description of land in this section, the map shall control unless the Secretary concerned and Resolution Copper mutually agree otherwise.

**(C) Availability**

On December 19, 2014, the Secretary shall file and make available for public inspection in the Office of the Supervisor, Tonto National Forest, each map referred to in this section.

**(3) Public access in and around Oak Flat Campground**

As a condition of conveyance of the Federal land, Resolution Copper shall agree to provide access to the surface of the Oak Flat Campground to members of the public, including Indian tribes, to the maximum extent practica-

ble, consistent with health and safety requirements, until such time as the operation of the mine precludes continued public access for safety reasons, as determined by Resolution Copper.

(Pub. L. 113–291, div. B, title XXX, § 3003, Dec. 19, 2014, 128 Stat. 3732.)

### REFERENCES IN TEXT

Enactment of this Act, referred to in subsec. (c)(6)(A), means the enactment of Pub. L. 113–291, which was approved Dec. 19, 2014.

The National Environmental Policy Act of 1969, referred to in subsec. (c)(9), is Pub. L. 91–190, Jan. 1, 1970, 83 Stat. 852, which is classified generally to chapter 55 (§ 4321 et seq.) of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 4321 of Title 42 and Tables.

The Federal Land Policy and Management Act of 1976, referred to in subsec. (d)(2)(B)(ii), is Pub. L. 94–579, Oct. 21, 1976, 90 Stat. 2743, which is classified principally to chapter 35 (§ 1701 et seq.) of Title 43, Public Lands. For complete classification of this Act to the Code, see Short Title note set out under section 1701 of Title 43 and Tables.

The Geothermal Steam Act of 1970, referred to in subsec. (i)(1)(B), is Pub. L. 91–581, Dec. 24, 1970, 84 Stat. 1566, which is classified principally to chapter 23 (§ 1001 et seq.) of Title 30, Mineral Lands and Mining. For complete classification of this Act to the Code, see Short Title note set out under section 1001 of Title 30 and Tables.

### CODIFICATION

In subsec. (d)(2)(A)(iii), "sections 100506(c) and 200306 of title 54" substituted for "section 7 of the Land and Water Conservation Fund Act of 1965 (16 U.S.C. 4601–9) [sic]" on authority of Pub. L. 113–287, § 6(e), Dec. 19, 2014, 128 Stat. 3272, which Act enacted Title 54, National Park Service and Related Programs.

## § 539q. Hermosa Creek watershed protection

### (a) Definitions

In this section:

**(1) City**

The term "City" means the city of Durango, Colorado.

**(2) County**

The term "County" means La Plata County, Colorado.

**(3) Secretary**

The term "Secretary" means the Secretary of Agriculture.

**(4) Special Management Area**

The term "Special Management Area" means the Hermosa Creek Special Management Area designated by subsection (b)(1).

**(5) State**

The term "State" means the State of Colorado.

### (b) Designation of Hermosa Creek Special Management Area

**(1) Designation**

Subject to valid existing rights, certain Federal land in the San Juan National Forest comprising approximately 70,650 acres, as generally depicted on the map entitled "Proposed Hermosa Creek Special Management Area and Proposed Hermosa Creek Wilderness Area" and dated November 12, 2014, is designated as the "Hermosa Creek Special Management Area".

**(2) Purpose**

The purpose of the Special Management Area is to conserve and protect for the benefit of present and future generations the watershed, geological, cultural, natural, scientific, recreational, wildlife, riparian, historical, educational, and scenic resources of the Special Management Area.

**(3) Administration**

**(A) In general**

The Secretary shall administer the Special Management Area—

  (i) in a manner that conserves, protects, and manages the resources of the Special Management Area described in paragraph (2); and

  (ii) in accordance with—

    (I) the National Forest Management Act of 1976 (16 U.S.C. 1600 et seq.);

    (II) this Act; and

    (III) any other applicable laws.

**(B) Uses**

**(i) In general**

The Secretary shall allow only such uses of the Special Management Area as the Secretary determines would further the purposes[1] described in paragraph (2).

**(ii) Motorized and mechanized vehicles**

**(I) In general**

Except as provided in subclause (II) and as needed for administrative purposes or to respond to an emergency, the use of motorized or mechanized vehicles in the Special Management Area shall be permitted only on roads and trails designated by the Secretary for use by those vehicles.

**(II) Oversnow vehicles**

The Secretary shall authorize the use of snowmobiles and other oversnow vehicles within the Special Management Area—

  (aa) when there exists adequate snow coverage; and

  (bb) subject to such terms and conditions as the Secretary may require.

**(iii) Grazing**

The Secretary shall permit grazing within the Special Management Area, if established before December 19, 2014, subject to all applicable laws (including regulations) and Executive orders.

**(iv) Prohibited activities**

Within the area of the Special Management Area identified as "East Hermosa Area" on the map entitled "Proposed Hermosa Creek Special Management Area and Proposed Hermosa Creek Wilderness Area" and dated November 12, 2014, the following activities shall be prohibited:

  (I) New permanent or temporary road construction or the renovation of existing nonsystem roads, except as allowed under the final rule entitled "Special Areas; Roa-

---

[1] So in original. Probably should be "purpose".

emption of an agency activity, and related personnel, resources, and facilities, from this order.

SEC. 11. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of OMB relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented in a manner consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP.

SUBCHAPTER I—POLICIES AND GOALS

§ 4331. Congressional declaration of national environmental policy

(a) The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

(b) In order to carry out the policy set forth in this chapter, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—

(1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

(2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;

(3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

(4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;

(5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

(6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

(c) The Congress recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment.

(Pub. L. 91–190, title I, § 101, Jan. 1, 1970, 83 Stat. 852.)

COMMISSION ON POPULATION GROWTH AND THE AMERICAN FUTURE

Pub. L. 91–213, §§ 1–9, Mar. 16, 1970, 84 Stat. 67–69, established the Commission on Population Growth and the American Future to conduct and sponsor such studies and research and make such recommendations as might be necessary to provide information and education to all levels of government in the United States, and to our people regarding a broad range of problems associated with population growth and their implications for America's future; prescribed the composition of the Commission; provided for the appointment of its members, and the designation of a Chairman and Vice Chairman; required a majority of the members of the Commission to constitute a quorum, but allowed a lesser number to conduct hearings; prescribed the compensation of members of the Commission; required the Commission to conduct an inquiry into certain prescribed aspects of population growth in the United States and its foreseeable social consequences; provided for the appointment of an Executive Director and other personnel and prescribed their compensation; authorized the Commission to enter into contracts with public agencies, private firms, institutions, and individuals for the conduct of research and surveys, the preparation of reports, and other activities necessary to the discharge of its duties, and to request from any Federal department or agency any information and assistance it deems necessary to carry out its functions; required the General Services Administration to provide administrative services for the Commission on a reimbursable basis; required the Commission to submit an interim report to the President and the Congress one year after it was established and to submit its final report two years after Mar. 16, 1970; terminated the Commission sixty days after the date of the submission of its final report; and authorized to be appropriated, out of any money in the Treasury not otherwise appropriated, such amounts as might be necessary to carry out the provisions of Pub. L. 91–213.

EXECUTIVE ORDER NO. 11507

Ex. Ord. No. 11507, eff. Feb. 4, 1970, 35 F.R. 2573, which related to prevention, control, and abatement of air and water pollution at federal facilities was superseded by Ex. Ord. No. 11752, eff. Dec. 17, 1973, 38 F.R. 34793, formerly set out below.

EXECUTIVE ORDER NO. 11752

Ex. Ord. No. 11752, Dec. 17, 1973, 38 F.R. 34793, which related to the prevention, control, and abatement of environmental pollution at Federal facilities, was revoked by Ex. Ord. No. 12088, Oct. 13, 1978, 43 F.R. 47707, set out as a note under section 4321 of this title.

§ 4332. Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decision-making which may have an impact on man's environment;

(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

   (i) the environmental impact of the proposed action,

   (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

   (iii) alternatives to the proposed action,

   (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

   (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of title 5, and shall accompany the proposal through the existing agency review processes;

(D) Any detailed statement required under subparagraph (C) after January 1, 1970, for any major Federal action funded under a program of grants to States shall not be deemed to be legally insufficient solely by reason of having been prepared by a State agency or official, if:

   (i) the State agency or official has statewide jurisdiction and has the responsibility for such action,

   (ii) the responsible Federal official furnishes guidance and participates in such preparation,

   (iii) the responsible Federal official independently evaluates such statement prior to its approval and adoption, and

   (iv) after January 1, 1976, the responsible Federal official provides early notification to, and solicits the views of, any other State or any Federal land management entity of any action or any alternative thereto which may have significant impacts upon such State or affected Federal land management entity and, if there is any disagreement on such impacts, prepares a written assessment of such impacts and views for incorporation into such detailed statement.

The procedures in this subparagraph shall not relieve the Federal official of his responsibilities for the scope, objectivity, and content of the entire statement or of any other responsibility under this chapter; and further, this subparagraph does not affect the legal sufficiency of statements prepared by State agencies with less than statewide jurisdiction.[1]

(E) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

(F) recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

(G) make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

(H) initiate and utilize ecological information in the planning and development of resource-oriented projects; and

(I) assist the Council on Environmental Quality established by subchapter II of this chapter.

(Pub. L. 91–190, title I, § 102, Jan. 1, 1970, 83 Stat. 853; Pub. L. 94–83, Aug. 9, 1975, 89 Stat. 424.)

### AMENDMENTS

1975—Subpars. (D) to (I). Pub. L. 94–83 added subpar. (D) and redesignated former subpars. (D) to (H) as (E) to (I), respectively.

### CERTAIN COMMERCIAL SPACE LAUNCH ACTIVITIES

Pub. L. 104–88, title IV, § 401, Dec. 29, 1995, 109 Stat. 955, provided that: "The licensing of a launch vehicle or launch site operator (including any amendment, extension, or renewal of the license) under [former] chapter 701 of title 49, United States Code [now chapter 509 (§ 50901 et seq.) of Title 51, National and Commercial Space Programs], shall not be considered a major Federal action for purposes of section 102(C) of the National Environmental Policy Act of 1969 (42 U.S.C. 4332(C)) if—

   "(1) the Department of the Army has issued a permit for the activity; and

   "(2) the Army Corps of Engineers has found that the activity has no significant impact."

### EX. ORD. NO. 13352. FACILITATION OF COOPERATIVE CONSERVATION

Ex. Ord. No. 13352, Aug. 26, 2004, 69 F.R. 52989, provided:

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

SECTION 1. *Purpose.* The purpose of this order is to ensure that the Departments of the Interior, Agriculture, Commerce, and Defense and the Environmental Protection Agency implement laws relating to the environment and natural resources in a manner that promotes cooperative conservation, with an emphasis on appropriate inclusion of local participation in Federal decisionmaking, in accordance with their respective agency missions, policies, and regulations.

SEC. 2. *Definition.* As used in this order, the term "cooperative conservation" means actions that relate to use, enhancement, and enjoyment of natural resources, protection of the environment, or both, and that involve collaborative activity among Federal, State, local, and tribal governments, private for-profit and nonprofit institutions, other nongovernmental entities and individuals.

---

[1] So in original. The period probably should be a semicolon.

on the National Register and the development and implementation of agreements, in consultation with State Historic Preservation Officers, local governments, Indian tribes, Native Hawaiian organizations, and the interested public, as appropriate, regarding the means by which adverse effects on historic property will be considered; and

    (C) provide for the disposition of Native American cultural items from Federal or tribal land in a manner consistent with section 3(c) of the Native American Graves Protection and Repatriation Act (25 U.S.C. 3002(c)).

(Pub. L. 113–287, § 3, Dec. 19, 2014, 128 Stat. 3225.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 306102 ....... | 16 U.S.C. 470h–2(a)(2). | Pub. L. 89–665, title I, § 110(a)(2), as added Pub. L. 96–515, title II, § 206, Dec. 12, 1980, 94 Stat. 2996; Pub. L. 102–575, title XL, § 4012(2), Oct. 30, 1992, 106 Stat. 4760. |

In subsection (a), the words "except for programs and undertakings exempted" are substituted for "unless exempted" for clarity.

In subsection (b)(2), the words "as are listed in or may be eligible for the National Register" are omitted as unnecessary because of the definition of "historic property" in section 300308 of the new title.

### § 306103. Recordation of historic property prior to alteration or demolition

Each Federal agency shall initiate measures to ensure that where, as a result of Federal action or assistance carried out by the agency, a historic property is to be substantially altered or demolished—

    (1) timely steps are taken to make or have made appropriate records; and

    (2) the records are deposited, in accordance with section 302107 of this title, in the Library of Congress or with such other appropriate agency as the Secretary may designate, for future use and reference.

(Pub. L. 113–287, § 3, Dec. 19, 2014, 128 Stat. 3226.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 306103 ....... | 16 U.S.C. 470h–2(b). | Pub. L. 89–665, title I, § 110(b), as added Pub. L. 96–515, title II, § 206, Dec. 12, 1980, 94 Stat. 2996. |

### § 306104. Agency Preservation Officer

The head of each Federal agency (except an agency that is exempted under section 304108(c) of this title) shall designate a qualified official as the agency's Preservation Officer who shall be responsible for coordinating the agency's activities under this division. Each Preservation Officer may, to be considered qualified, satisfactorily complete an appropriate training program established by the Secretary under section 306101(c) of this title.

(Pub. L. 113–287, § 3, Dec. 19, 2014, 128 Stat. 3226.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 306104 ....... | 16 U.S.C. 470h–2(c). | Pub. L. 89–665, title I, § 110(c), as added Pub. L. 96–515, title II, § 206, Dec. 12, 1980, 94 Stat. 2996; Pub. L. 102–575, title XL, § 4006(b), Oct. 30, 1992, 106 Stat. 4757. |

### § 306105. Agency programs and projects

Consistent with the agency's missions and mandates, each Federal agency shall carry out agency programs and projects (including those under which any Federal assistance is provided or any Federal license, permit, or other approval is required) in accordance with the purposes of this division and give consideration to programs and projects that will further the purposes of this division.

(Pub. L. 113–287, § 3, Dec. 19, 2014, 128 Stat. 3226.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 306105 ....... | 16 U.S.C. 470h–2(d). | Pub. L. 89–665, title I, § 110(d), as added Pub. L. 96–515, title II, § 206, Dec. 12, 1980, 94 Stat. 2996. |

### § 306106. Review of plans of transferees of surplus federally owned historic property

The Secretary shall review and approve the plans of transferees of surplus federally owned historic property not later than 90 days after receipt of the plans to ensure that the prehistorical, historical, architectural, or culturally significant values will be preserved or enhanced.

(Pub. L. 113–287, § 3, Dec. 19, 2014, 128 Stat. 3226.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 306106 ....... | 16 U.S.C. 470h–2(e). | Pub. L. 89–665, title I, § 110(e), as added Pub. L. 96–515, title II, § 206, Dec. 12, 1980, 94 Stat. 2996. |

### § 306107. Planning and actions to minimize harm to National Historic Landmarks

Prior to the approval of any Federal undertaking that may directly and adversely affect any National Historic Landmark, the head of the responsible Federal agency shall to the maximum extent possible undertake such planning and actions as may be necessary to minimize harm to the landmark. The head of the Federal agency shall afford the Council a reasonable opportunity to comment with regard to the undertaking.

(Pub. L. 113–287, § 3, Dec. 19, 2014, 128 Stat. 3226.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 306107 ....... | 16 U.S.C. 470h–2(f). | Pub. L. 89–665, title I, § 110(f), as added Pub. L. 96–515, title II, § 206, Dec. 12, 1980, 94 Stat. 2996. |

### § 306108. Effect of undertaking on historic property

The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or

federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, shall take into account the effect of the undertaking on any historic property. The head of the Federal agency shall afford the Council a reasonable opportunity to comment with regard to the undertaking.

(Pub. L. 113–287, § 3, Dec. 19, 2014, 128 Stat. 3227.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 306108 ....... | 16 U.S.C. 470f. | Pub. L. 89–665, title I, § 106, Oct. 15, 1966, 80 Stat. 917; Pub. L. 94–422, title II, § 201(3), Sept. 28, 1976, 90 Stat. 1320. |

The words "historic property" are substituted for "district, site, building, structure, or object that is included in or eligible for inclusion in the National Register" because of the definition of "historic property" in section 300308 of the new title.

## § 306109. Costs of preservation as eligible project costs

A Federal agency may include the costs of preservation activities of the agency under this division as eligible project costs in all undertakings of the agency or assisted by the agency. The eligible project costs may include amounts paid by a Federal agency to a State to be used in carrying out the preservation responsibilities of the Federal agency under this division, and reasonable costs may be charged to Federal licensees and permittees as a condition to the issuance of the license or permit.

(Pub. L. 113–287, § 3, Dec. 19, 2014, 128 Stat. 3227.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 306109 ....... | 16 U.S.C. 470h–2(g). | Pub. L. 89–665, title I, § 110(g), as added Pub. L. 96–515, title II, § 206, Dec. 12, 1980, 94 Stat. 2996. |

## § 306110. Annual preservation awards program

The Secretary shall establish an annual preservation awards program under which the Secretary may make monetary awards in amounts of not to exceed $1,000 and provide citations for special achievement to officers and employees of Federal, State, and certified local governments in recognition of their outstanding contributions to the preservation of historic property. The program may include the issuance of annual awards by the President to any citizen of the United States recommended for the award by the Secretary.

(Pub. L. 113–287, § 3, Dec. 19, 2014, 128 Stat. 3227.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 306110 ....... | 16 U.S.C. 470h–2(h). | Pub. L. 89–665, title I, § 110(h), as added Pub. L. 96–515, title II, § 206, Dec. 12, 1980, 94 Stat. 2997. |

The words "historic property" are substituted for "historic resources" for consistency because the defined term in the new division is "historic property".

## § 306111. Environmental impact statement

Nothing in this division shall be construed to—
(1) require the preparation of an environmental impact statement where the statement would not otherwise be required under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.); or
(2) provide any exemption from any requirement respecting the preparation of an environmental impact statement under that Act.

(Pub. L. 113–287, § 3, Dec. 19, 2014, 128 Stat. 3227.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 306111 ....... | 16 U.S.C. 470h–2(l). | Pub. L. 89–665, title I, § 110(l), as added Pub. L. 96–515, title II, § 206, Dec. 12, 1980, 94 Stat. 2997. |

REFERENCES IN TEXT

The National Environmental Policy Act of 1969, referred to in text, is Pub. L. 91–190, Jan. 1, 1970, 83 Stat. 852, which is classified generally to chapter 55 (§ 4321 et seq.) of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 4321 of Title 42 and Tables.

## § 306112. Waiver of provisions in event of natural disaster or imminent threat to national security

The Secretary shall promulgate regulations under which the requirements of this subchapter (except section 306108) may be waived in whole or in part in the event of a major natural disaster or an imminent threat to national security.

(Pub. L. 113–287, § 3, Dec. 19, 2014, 128 Stat. 3227.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 306112 ....... | 16 U.S.C. 470h–2(j). | Pub. L. 89–665, title I, § 110(j), as added Pub. L. 96–515, title II, § 206, Dec. 12, 1980, 94 Stat. 2997. |

## § 306113. Anticipatory demolition

Each Federal agency shall ensure that the agency will not grant a loan, loan guarantee, permit, license, or other assistance to an applicant that, with intent to avoid the requirements of section 306108 of this title, has intentionally significantly adversely affected a historic property to which the grant would relate, or having legal power to prevent it, has allowed the significant adverse effect to occur, unless the agency, after consultation with the Council, determines that circumstances justify granting the assistance despite the adverse effect created or permitted by the applicant.

(Pub. L. 113–287, § 3, Dec. 19, 2014, 128 Stat. 3227.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 306113 ....... | 16 U.S.C. 470h–2(k). | Pub. L. 89–665, title I, § 110(k), as added Pub. L. 102–575, title XL, § 4012(3), Oct. 30, 1992, 106 Stat. 4760. |

## § 306114. Documentation of decisions respecting undertakings

With respect to any undertaking subject to section 306108 of this title that adversely affects any

# CHAPTER VIII—ADVISORY COUNCIL ON HISTORIC PRESERVATION [1]

Part
800    Procedures for the protection of historic and cultural properties.

**PART 800—PROCEDURES FOR THE PROTECTION OF HISTORIC AND CULTURAL PROPERTIES**

Sec.
800.1   Purpose and authorities.
800.2   Coordination with agency requirements under the National Environmental Policy Act.
800.3   Definitions.
800.4   Agency procedures.
800.5   Consultation process.
800.6   Council procedures.
800.7   Other powers of the Council.
800.8   Criteria of effect.
800.9   Criteria of adverse effect.
800.10  National Register criteria.

AUTHORITY: Pub. L. 89–665, 80 Stat. 915, (16 U.S.C. 470); E.O. 11593, 3 CFR 1971 Comp., p. 154.

SOURCE: 39 FR 3366, Jan. 25, 1974, unless otherwise noted.

## § 800.1   Purpose and authorities.

(a) The National Historic Preservation Act of 1966 created the Advisory Council on Historic Preservation, an independent agency of the Executive branch of the Federal Government, to advise the President and Congress on matters involving historic preservation. Its members are the Secretary of the Interior, the Secretary of Housing and Urban Development, the Secretary of the Treasury, the Secretary of Commerce, the Attorney General, the Secretary of Transportation, the Secretary of Agriculture, the Administrator of the General Services Administration, the Secretary of the Smithsonian Institution, the Chairman of the National Trust for Historic Preservation, and 10 citizen members appointed by the President on the basis of their outstanding service in the field of historic preservation.

(b) The Council reviews Federal, federally assisted, and federally licensed undertakings affecting cultural properties as defined herein in accordance with the following authorities:

(1) *Section 106 of the National Historic Preservation Act.* Section 106 requires that Federal, federally assisted, and federally licensed undertakings affecting properties included in the National Register of Historic Places be submitted to the Council for review and comment prior to the approval of any such undertaking by the Federal agency.

(2) *Section 1(3) of Executive Order 11593, May 13, 1971, "Protection and Enhancement of the Cultural Environment."* Section 1(3) requires that Federal agencies, in consultation with the Council, establish procedures regarding the preservation and enhancement of non-federally owned historic and cultural properties in the execution of their plans and programs. After soliciting consultation with the Federal agencies, the Advisory Council has adopted procedures, set forth in §§ 800.3 through 800.10, to achieve this objective and Federal agencies should fulfill their responsibilities under section 1(3) by following these procedures. The Council further recommends that Federal agencies use these procedures as a guide in the development, in consultation with the Council, of their required internal procedures.

(3) *Section 2(b) of Executive Order 11593, May 13, 1971, "Protection and Enhancement of the Cultural Environment."* Federal agencies are required by

[1] 39 FR 3366, Jan. 25, 1974.

Add. 012

§ 800.2                Title 36—Parks, Forests, and Public Property

section 2(a) of the Executive Order, to locate, inventory, and nominate properties under their jurisdiction or control to the National Register. Until such processes are complete, Federal agencies must submit proposals for the transfer, sale, demolition, or substantial alteration of federally owned properties eligible for inclusion in the National Register to the Council for review and comment. Federal agencies must continue to comply with section 2(b) review requirements, even after the initial inventory is complete, when they obtain jurisdiction or control over additional properties that are eligible for inclusion in the National Register or when properties under their jurisdiction or control are found to be eligible for inclusion in the National Register subsequent to the initial inventory.

§ 800.2  Coordination with agency requirements under the National Environmental Policy Act.

Section 101(b)(4) of the National Environment Policy Act (NEPA) declares that one objective of the national environmental policy is to "preserve important historic, cultural, and natural aspects of our national heritage and maintain, wherever possible, an environment which supports diversity and variety of individual choice." In order to meet this objective, the Advisory Council instructs Federal agencies to coordinate NEPA compliance with the separate responsibilities of the National Historic Preservation Act and Executive Order 11593 to ensure that historic and cultural resources are given proper consideration in the preparation of environmental impact statements. Agency obligations pursuant to the National Historic Preservation Act and Executive Order 11593 are independent from NEPA and must be complied with even when an environmental impact statement is not required. However, where both NEPA and the National Historic Preservation Act or Executive Order 11593 are applicable, the Council on Environmental Quality, in its *Guidelines for the Preparation of Environmental Impact Statements* (40 CFR Part 1500), directs that compliance with section 102(2)(C) of NEPA should, to the extent possible, be combined with other statutory obligations—such as the National Historic Preservation Act and Executive Order 11593—to yield a single document which meets all applicable requirements. To achieve this objective,

Federal agencies should undertake, to the fullest extent possible, compliance with the procedures set forth below whenever properties included in or eligible for inclusion in the National Register are involved in a project to ensure that obligations under the National Historic Preservation Act and Executive Order 11593 are fulfilled during the preparation of a draft environmental impact statement required under section 102(2)(C) of NEPA. The Advisory Council recommends that compliance with these procedures be undertaken at the earliest stages of the environmental impact statement process to expedite review of the statement. Statements on projects affecting properties included in or eligible for inclusion in the National Register should be sent directly to the Advisory Council for review. All statements involving historic, architectural, archeological, or cultural resources, whether or not included in or eligible for inclusion in the National Register, should be submitted to the Department of Interior for review.

§ 800.3  Definitions.

As used in these procedures:

(a) "National Historic Preservation Act" means Public Law 89–665, approved October 15, 1966, an "Act to establish a program for the preservation of additional historic properties throughout the Nation and for other purposes," 80 Stat. 915, 16 U.S.C. 470, as amended, 84 Stat. 204 (1970) and 87 Stat. 139 (1973) hereinafter referred to as "the Act."

(b) "Executive Order" means Executive Order 11593, May 13, 1971, "Protection and Enhancement of the Cultural Environment," 36 FR 8921, 16 U.S.C. 470.

(c) "Undertaking" means any Federal action, activity, or program, or the approval, sanction, assistance, or support of any other action, activity or program, including but not limited to:

(1) Recommendations or favorable reports relating to legislation, including requests for appropriations. The requirement for following these procedures applies to both: Agency recommendations on their own proposals for legislation and agency reports on legislation initiated elsewhere. In the latter case only the agency which has primary responsibility for the subject matter involved will comply with these procedures.

(2) New and continuing projects and program activities: directly undertaken

352.

Add. 013

finding and unanimously agreeing to such an alternative, they shall execute a Memorandum of Agreement acknowledging satisfactory mitigation of adverse effect. This document shall be forwarded to the Chairman for review pursuant to § 800.6(a).

(g) *Memorandum of Agreement.* It shall be the responsibility of the Executive Director to prepare each Memorandum of Agreement required under these procedures. In preparation of such a document the Executive Director may request the Agency Official to prepare a proposal for inclusion in the Memorandum, detailing actions to be taken to avoid or mitigate the adverse effect.

(h) *Failure to avoid or mitigate adverse effect.* Upon the failure of consulting parties to find and unanimously agree upon a feasible and prudent alternative to avoid or satisfactorily mitigate the adverse effect, the Executive Director shall request the Chairman to schedule the undertaking for consideration at the next Council meeting and notify the Agency Official of the request. Upon notification of the request, the Agency Official shall delay further processing of the undertaking until the Council has transmitted its comments or the Chairman has given notice that the undertaking will not be considered at a Council meeting.

§ 800.6    Council procedures.

(a) *Review of Memorandum of Agreement.* Upon receipt of a Memorandum of Agreement acknowledging avoidance of adverse effect or satisfactory mitigation of adverse effect, the Chairman shall institute a 30-day review period. Unless the Chairman shall notify the Agency Official that the matter has been placed on the agenda for consideration at a Council meeting, the memorandum shall become final: (1) Upon the expiration of the 30-day review period with no action taken; or (2) when signed by the Chairman. Memoranda duly executed in accordance with these procedures shall constitute the comments of the Advisory Council. Notice of executed Memoranda of Agreement shall be published in the FEDERAL REGISTER monthly.

(b) *Response to request for consideration at Council meeting.* Upon receipt of a request from the Executive Director for consideration of the proposed undertaking at a Council meeting, the Chairman shall determine whether or not the undertaking will be considered and notify the Agency Official of his decision. To assist the Chairman in this determination, the Agency Official and the State Historic Preservation Officer shall provide such reports and information as may be required. If the Chairman decides against consideration at a Council meeting, he will submit a written summary of the undertaking and his decision to each member of the Council. If any member of the Council notes an objection to the decision within 15 days of the Chairman's decision, the undertaking will be scheduled for consideration at a Council meeting. If the Council members have no objection, the Chairman shall notify the Agency Official at the end of the 15-day period that the undertaking may proceed.

(c) *Decision to consider the undertaking.* Upon determination that the Council will consider an undertaking, the Chairman shall: (1) Schedule the matter for consideration at a regular meeting no less than 60 days from the date the request was received, or in exceptional cases, schedule the matter for consideration in an unassembled or special meeting; (2) notify the Agency Official and the State Historic Preservation Officer of the date on which comments will be considered; and (3) authorize the Executive Director to prepare a case report.

(d) *Content of the case report.* For purposes of arriving at comments, the Advisory Council prescribes that certain reports be made available to it and accepts reports and statements from other interested parties. Specific informational requirements are enumerated below. Generally, the requirements represent an explication of elaboration of principles contained in the Criteria of Effect and in the Criteria of Adverse Effect. The Council notes, however, that the Act recognizes historical and cultural resources should be preserved "as a living part of our community life and development." Consequently, in arriving at final comments, the Council considers those elements in an undertaking that have relevance beyond historical and cultural concerns. To assist it in weighing the public interest, the Council welcomes information not only bearing upon physical, sensory, or esthetic effects but also information concerning economic, social, and other benefits or detriments that will result from the undertaking.

(e) *Elements of the case report.* The report on which the Council relies for comment shall consist of:

(1) A report from the Executive Di-

Add. 014

§ 800.6                Title 36—Parks, Forests, and Public Property

rector to include a verification of the legal and historical status of the property; an assessment of the historical, architectural, archeological, or cultural significance of the property; a statement indicating the special value of features to be most affected by the undertaking; an evaluation of the total effect of the undertaking upon the property; a critical review of any known feasible and prudent alternatives and recommendations to remove or mitigate the adverse effect;

(2) A report from the Agency Official requesting comment to include a general discussion and chronology of the proposed undertaking; when appropriate, an account of the steps taken to comply with section 102(2)(A) of the National Environmental Policy Act of 1969 (83 Stat. 852, 42 U.S.C. 4321): an evaluation of the effect of the undertaking upon the property, with particular reference to the impact on the historic, architectural, archeological and cultural values; steps taken or proposed by the agency to take into account, avoid, or mitigate adverse effects of the undertaking; a thorough discussion of alternate courses of action; and, if applicable and available, a copy of the draft environmental statement prepared in compliance with section 102 (2)(C) of the National Environmental Policy Act of 1969;

(3) A report from any other Federal agency having under consideration an undertaking that will concurrently or ultimately affect the property, including a general description and chronology of that undertaking and discussion of the relation between that undertaking and the undertaking being considered by the Council;

(4) A report from the State Historic Preservation Officer to include an assessment of the significance of the property; an identification of features of special value; an evaluation of the effect of the undertaking upon the property and its specific components; an evaluation of known alternate courses of action; a discussion of present or proposed participation of State and local agencies or organizations in preserving or assisting in preserving the property; an indication of the support or opposition of units of government and public and private agencies and organizations within the State; and the recommendations of his office;

(5) A report by any applicant or potential recipient when the Council considers comments upon an application for a contract, grant, subsidy, loan, or other form of funding assistance, or an application for a Federal lease, permit, license, certificate, or other entitlement for use. Arrangements for the submission and presentation of reports by applicants or potential recipients shall be made through the Agency Official having jurisdiction in the matter; and

(6) Other pertinent reports, statements, correspondence, transcripts, minutes, and documents received by the Council from any and all parties, public or private. Reports submitted pursuant to this section should be received by the Council at least two weeks prior to a Council meeting.

(f) *Coordination of case reports and statements.* In considerations involving more than one Federal department, either directly or indirectly, the Agency Official requesting comment shall act as a coordinator in arranging for a full assessment and discussion of all interdepartmental facets of the problem and prepare a record of such coordination to be made available to the Council. At the request of the Council, the State Historic Preservation Officer shall notify appropriate governmental units and public and private organizations within the State of the pending consideration of the undertaking by the Council, and coordinate the presentation of written statements to the Council.

(g) *Council meetings.* The Council does not hold formal hearings to consider comments under these procedures. Two weeks notice shall be given, by publication in the FEDERAL REGISTER, of all meetings involving Council review of Federal undertakings in accordance with these procedures. Reports and statements will be presented to the Council in open session in accordance with a prearranged agenda. Regular meetings of the Council generally occur on the first Wednesday and Thursday of February, May, August and November.

(h) *Oral statements to the Council.* A schedule shall provide for oral statements from the Executive Director; the referring Agency Official presently or potentially involved; the applicant or potential recipient, when appropriate; the State Historic Preservation Officer; and representatives of national, State, or local units of government and public and private organizations. Parties wishing to make oral remarks shall submit written statements of position in advance to the Executive Director.

356

Add. 015

(i) *Comments by the Council.* The comments of the Council, issued after consideration of an undertaking at a Council meeting, shall take the form of a three-part statement, including an introduction, findings, and a conclusion. The statement shall include notice to the Agency Official of the report required under § 800.6(j) of these procedures. Comments shall be made to the head of the Federal Agency requesting comment or having responsibility for the undertaking. Immediately thereafter, the comments of the Council will be forwarded to the President and the Congress as a special report under authority of section 202(b) of the Act and published as soon as possible in the FEDERAL REGISTER. Comment shall be available to the public upon receipt of the comments by the head of the Federal agency.

(j) *Report of agency action in response to Council comments.* When a final decision on the undertaking is reached by the Federal Agency, the Agency Official shall submit a written report to the Council containing a description of actions taken by the Federal Agency subsequent to the Council's comments; a description of actions taken by other parties pursuant to the actions of the Federal Agency; and the ultimate effect of such actions on the property involved. The Council may request supplementary reports if the nature of the undertaking requires them.

(k) *Records of the Council.* The records of the Council shall consist of a record of the proceedings at each meeting, the case report prepared by the Executive Director, and all other reports, statements, transcripts, correspondence, and documents received.

(l) *Continuing review jurisdiction.* When the Council has commented upon an undertaking pursuant to Section 800.6 such as a comprehensive or area-wide plan that by its nature requires subsequent action by the Federal Agency, the Council will consider its comments or approval to extend only to the undertaking as reviewed. The Agency Official shall ensure that subsequent action related to the undertaking is submitted to the Council for review in accordance with § 800.4(e) of these procedures when that action is found to have an adverse effect on a property included in or eligible for inclusion in the National Register.

§ 800.7    Other powers of the Council.

(a) *Comment or report upon non-Federal undertaking.* The Council will ex-ercise the broader advisory powers, vested by section 202(a)(1) of the Act, to recommend measures concerning a non-Federal undertaking that will adversely affect a property included in or eligible for inclusion in the National Register: (1) upon request from the President of the United States, the President of the U.S. Senate, or the Speaker of the House of Representatives, or (2) when agreed upon by a majority vote of the members of the Council.

(b) *Comment or report upon Federal undertaking in special circumstances.* The Council will exercise its authority to comment to Federal agencies in certain special situations even though written notice that an undertaking will have an effect has not been received. For example, the Council may choose to comment in situations where an objection is made to a Federal agency finding of "no effect."

§ 800.8    Criteria of effect.

A Federal, federally assisted, or federally licensed undertaking shall be considered to have an effect on a National Register property or property eligible for inclusion in the National Register (districts, sites, buildings, structures, and objects, including their settings) when any condition of the undertaking causes or may cause any change, beneficial or adverse, in the quality of the historical, architectural, archeological, or cultural character that qualifies the property under the National Register Criteria.

§ 800.9    Criteria of adverse effect.

Generally, adverse effects occur under conditions which include but are not limited to:

(a) Destruction or alteration of all or part of a property;

(b) Isolation from or alteration of its surrounding environment;

(c) Introduction of visual, audible, or atmospheric elements that are out of character with the property or alter its setting;

(d) Transfer or sale of a federally owned property without adequate conditions or restrictions regarding preservation, maintenance, or use; and

(e) Neglect of a property resulting in its deterioration or destruction.

§ 800.10    National Register criteria.

(a) "National Register Criteria" means the following criteria established by the Secretary of the Interior for use in evaluating and determining the eligi-

357