# Nos. 25-5185, 25-5189, 25-5197

# In The United States Court of Appeals for the Ninth Circuit

ARIZONA MINING REFORM COALITION; et al.,

*Plaintiffs-Appellants,*

v.

BROOKE L. ROLLINS, U.S. Secretary of Agriculture, et al.,

*Defendants-Appellees,*

and

RESOLUTION COPPER MINING LLC,

*Intervenor-Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Arizona
No. 2:21-cv-00122-PHX-DWL
Hon. Dominic W. Lanza

## SUPPLEMENTAL EXCERPTS OF RECORD OF INTERVENOR-DEFENDANT-APPELLEE RESOLUTION COPPER MINING LLC

### VOLUME 7 OF 12 (SER 1721–1976)

Christopher D. Thomas
Andrea J. Driggs
Janet M. Howe
Benjamin A. Longbottom
HOLLAND & HART LLP
2398 E. Camelback Rd, Suite
650 Phoenix, AZ 85016
(602) 507-9704
CDThomas@hollandhart.com

Michael R. Huston
  *Counsel of Record*
Diane M. Johnsen
Nicholas S. Crown
Samantha J. Burke
Addison W. Bennett
PERKINS COIE LLP
2525 E Camelback Rd, Suite 500
Phoenix, AZ 85016
(602) 351-8000
MHuston@perkinscoie.com

*Counsel for Resolution Copper Mining LLC*

---

SAN CARLOS APACHE TRIBE, a federally recognized Tribe,

*Plaintiff-Appellant,*

v.

UNITED STATES FOREST SERVICE,
an agency of the U.S. Department of Agriculture, et al.,

*Defendants-Appellees,*

and

RESOLUTION COPPER MINING LLC,

*Intervenor-Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Arizona
No. 2:21-cv-0068-PHX-DWL
Hon. Dominic W. Lanza

---

GOUYEN BROWN LOPEZ, et al.,

*Plaintiffs-Appellants,*

v.

UNITED STATES OF AMERICA, et al.,

*Defendants-Appellees,*

and

RESOLUTION COPPER MINING LLC,

*Intervenor-Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Arizona
No. 2:25-cv-2758-PHX-DWL
Hon. Dominic W. Lanza

---

Appendix A

(3) PUBLIC ACCESS IN AND AROUND OAK FLAT CAMPGROUND. – As a condition of conveyance of the Federal land, Resolution Copper shall agree to provide access to the surface of the Oak Flat Campground to members of the public, including Indian tribes, to the maximum extent practicable, consistent with health and safety requirements, until such time as the operation of the mine precludes continued public access for safety reasons, as determined by Resolution Copper.

7-RCMSER-1721

# Appendix B. Existing Conditions of Offered Lands

Appendix B

# Existing Conditions of Offered Lands

## *Overview of Land Exchange*

Section 3003 of the Carl Levin and Howard P. 'Buck' McKeon National Defense Authorization Act for Fiscal Year 2015 (Public Law (PL) 113-291) directs the conveyance of 2,422 acres of specified National Forest System (NFS) lands to Resolution Copper Mining LLC (Resolution Copper) if Resolution Copper offers to convey 5,460[134] acres of private lands to the United States, which Resolution Copper has done. Table B-1 provides a brief summary of the land exchange parcels. A detailed description of the land exchange can be found in section 2.2.2.1 of the final environmental impact statement (FEIS). The complete Section 3003 of PL 113-291 is provided in appendix A of the FEIS.

**Table B-1. Summary of land exchange parcels**

| Parcel Landownership | Description of Parcels to Be Exchanged |
|---|---|
| Parcels transferred from the United States to Resolution Copper | • 2,422 acres near Superior in Pinal County, Arizona, known as the <u>Oak Flat Federal Parcel</u>, to become private lands |
| Parcels transferred from Resolution Copper to the United States, to be included in the NFS | • 140 acres* near Superior in Pinal County, Arizona, known as the <u>Apache Leap South End Parcel</u>, to be administered by the Tonto National Forest<br>• 148 acres in Yavapai County, Arizona, known as the <u>Tangle Creek Parcel</u>, to be administered by the Tonto National Forest<br>• 147 acres in Gila County, Arizona, known as the <u>Turkey Creek Parcel</u>, to be administered by the Tonto National Forest<br>• 149 acres near Cave Creek in Maricopa County, Arizona, known as the <u>Cave Creek Parcel</u>, to be administered by the Tonto National Forest<br>• 640 acres north of Payson in Coconino County, Arizona, known as the <u>East Clear Creek Parcel</u>, to be administered by the Coconino National Forest |
| Parcels transferred from Resolution Copper to the U.S. Department of the Interior | • 3,120 acres† near Mammoth in Pinal County, Arizona, known as the <u>Lower San Pedro River Parcel</u>, to be administered by the U.S. Department of the Interior Bureau of Land Management (BLM) as part of the San Pedro Riparian National Conservation Area<br>• 956 acres‡ south of Elgin in Santa Cruz County, Arizona, known as the <u>Appleton Ranch Parcel</u>, to be administered by the BLM as part of the Las Cienegas National Conservation Area<br>• 160 acres near Kearny in Gila and Pinal Counties, Arizona, known as the <u>Dripping Springs Parcel</u>, to be administered by the BLM |
| If requested by the Town of Superior, Arizona, land would be transferred from the United States to the Town of Superior | • 30 acres associated with the Fairview Cemetery<br>• 250 acres associated with parcels contiguous to the Superior Airport<br>• 265 acres of Federal reversionary interest associated with the Superior Airport |

* Using updated survey information and increase in 32 additional private acres provided by Resolution Copper, the U.S. Forest Service revised the Apache Leap South End Parcel from 110 acres (as presented in Section 3003 of PL 113-291) to 140 acres.

† Final cadastral surveys were completed by BLM on the Lower San Pedro River Parcel, resulting in additional 70 private acres being transferred to Federal ownership.

‡ Final cadastral surveys were completed by BLM on the Appleton Ranch Parcel, resulting in additional 16 private acres being transferred to Federal ownership.

---

[134] Section 3003 disclosed the anticipated acres exchanged from private to Federal management as approximately 5,376 acres. After Bureau of Land Management (BLM) cadastral surveys were completed, the final acres to be conveyed will be 5,460 acres. These acreages reflect those offered by Resolution Copper to the Federal Government, after completion of surveys. Ultimately, the Federal Government may not accept all portions of these lands. The exact parcels and acreage would be assessed in the appraisal process.

7-RCMSER-1724

Appendix B

## Offered Lands – Forest Service

Details of the eight private parcels that would be transferred to the United States with management by the U.S. Department of Agriculture Forest Service (Forest Service) are in the following text. Additional details regarding the special status species present on the offered lands being transferred to the Tonto National Forest, Coconino National Forest, and BLM are summarized in tables B-2, B-3, and B-4, respectively, at the end of this appendix.

## APACHE LEAP SOUTH END PARCELS

As noted later in this section, the Apache Leap South End Parcels would become part of the Apache Leap Special Management Area (SMA), administered by the Tonto National Forest, Globe Ranger District. The NDAA required completion of a management plan for the Apache Leap SMA. Preparation of the management plan was conducted through a separate National Environmental Policy Act (NEPA) process, which resulted in an environmental assessment (August 2017) and the final management plan (December 2017). Substantial information about the Apache Leap South End Parcels can be found in that environmental assessment (see "Key Documents Describing Apache Leap South End Parcels" later in this section). The Apache Leap management plan would exclude future grazing leases and limit construction and motorized vehicles to protect the natural character of the area.

### Parcel Description

The Apache Leap South End Parcels consist of three parcels that total 140 acres, located near the eastern edge of the town of Superior in Pinal County, Arizona (figures B-1 and B-2). The Apache Leap South End Parcels are surrounded by NFS lands and would become part of the Apache Leap SMA, administered by the Tonto National Forest, Globe Ranger District. Upon completion of the land exchange, Resolution Copper would surrender all mining claims and interests to the parcels. Portions of the parcels are accessible by unimproved roads and trails from below Apache Leap via Ray Road/Apache Leap Road from Arizona State Route (SR) 177, or from above Apache Leap via NFS Road 315 via Magma Mine Road.



**Figure B-1. Photograph of Apache Leap South parcels**

7-RCMSER-1725

Appendix B

The parcels include lands located above and below Apache Leap, an escarpment of sheer cliff faces, hoodoos, and buttresses that forms the scenic backdrop to the town of Superior. Current land uses on the parcels include livestock grazing and informal recreation such as hiking, rock climbing, nature viewing, and hunting. Additionally, there are multiple historical mining features and remnants of old mining-related roads located throughout the parcels, including small open cuts, shafts, tunnels, raises, crosscuts, and more extensive underground workings. The major underground mines in this area were principally known as the Grand Pacific and Belmont Mines. Entrances to these mines are found on portions of the parcels and appear to date to the early 1900s, with evidence of having been explored historically for the presence of economic minerals. In a few instances, this exploration led to mineral development and exploitation.

## Geological Setting

This area lies in a transitional zone on the northeastern edge of the Basin and Range physiographic province. The western edge of this area is generally very steep, with the cliffs of the Apache Leap escarpment rising abruptly above the town of Superior. There is roughly up to 1,970 feet of vertical displacement along the escarpment and Superior is in a down-dropped fault basin. The Tertiary-aged Apache Leap Tuff, the youngest consolidated formation in the area, forms the Apache Leap escarpment, and the underlying Paleozoic sedimentary rocks and Precambrian sedimentary rocks are exposed at the foot of the escarpment. Tertiary-aged Whitetail Conglomerate is present, with limited exposure at the toe of the slope on the west side of Apache Leap. A Quaternary alluvial deposit overlies the Apache Leap Tuff in a small area in the southwestern portion of the parcels.

## Biological and Water Resources

Major biotic communities within the Apache Leap South Parcels include the Arizona Upland subdivision -- Sonoran Desertscrub vegetation community in lower elevations and Interior Chaparral along the top of the Apache Leap escarpment (Brown 1994). Interior Chaparral species also occur on north-facing slopes in lower elevations west of the Apache Leap escarpment.

Vegetation found in the Arizona Upland subdivision typically consists of shrubs, cacti, and leguminous trees such as foothill paloverde, saguaro, and velvet mesquite. Additional species common to this area include goldenflower century plant, Mormon tea, fairyduster, barrel cactus, catclaw mimosa, jojoba, catclaw acacia, wolfberry, brittlebush, teddybear cholla, buckhorn cholla, cactus apple, Engelmann's hedgehog, shrubby buckwheat, flattop buckwheat, Louisiana sagewort, desert marigold, Coues' cassia, desert globemallow, and purple three-awn.

The Interior Chaparral vegetation type is characterized by dense stands of woody evergreens and shrubs. A common (diagnostic) species of Interior Chaparral in central Arizona is scrub live oak. In the Apache Leap SMA, this community is best represented by scrub live oak, pointleaf manzanita, red barberry, alderleaf mountain mahogany, deerbrush, and sugar sumac. Other common species include crucifixion thorn, hopbush, Wright's silktassel, and broom snakeweed.

Three special status plant species have the potential to occur within the parcels: Arizona hedgehog cactus, Pima Indian mallow, mapleleaf false snapdragon, and Gila rockdaisy. All may occur but are not known to occur. There is suitable habitat for Arizona hedgehog cactus in the northern portion of the parcels, and the parcels are near known populations of the species. However, the species' presence was not confirmed during site visits or during informal surveys specifically searching for the species by Forest Service biologists over the past several years.

Drainages within the project area do not contain permanent surface water features and do not support riparian vegetation. Instead, the drainages generally contain greater densities of the same species that are

Appendix B

present in the adjacent uplands. Additionally, no known springs occur within the Apache Leap South End Parcels.



Figure B-2. Apache Leap Special Management Area and land exchange parcel

Appendix B

## Hazardous Materials

A Phase I environmental site assessment was completed for the property in May 2025 that identified no recognized environmental conditions (RECs) on the property. Historic-era mine features were noted during the work. However, while there is potential for the historic mine features to impact groundwater or produce acid mine drainage, no discoloration or distressed vegetation was noted around the existing features. In addition, potential for impacts on surface or groundwater by contact with mineralized rock is not considered likely. Most adits are closed for human safety while allowing continued bat use.

## Cultural Resources

The parcels are generally characterized as undeveloped open space with no evidence of human occupation. A Class III cultural resources inventory was performed in 2016 that found three archaeological sites, two of which were new discoveries. Of these, one site was considered eligible for the National Register of Historic Places (NRHP). Additionally, numerous cultural resources inventories have identified sites representing precontact, ethnohistoric, and historic-era Native American occupations and activities spanning several thousand years in the areas surrounding the parcels. Historic-era Euro-American activities have also been identified, including ranching, transportation, and utilities in combination with mining operations; these date to the late nineteenth century through the middle twentieth century.

## Key Documents Describing Apache Leap South End Parcels

- WestLand Resources Inc. 2025. "Phase I Environmental Site Assessment, Apache Leap South End, Pinal County, Arizona." May 15, 2025 (WestLand Resources Inc. 2025a)
- WestLand Resources Inc. 2020. "Phase I Environmental Site Assessment Apache Leap South End [Phase I Environmental Assessment Non-Federal Parcel Apache Leap South End Gila County, Arizona]." September 4, 2020 (WestLand Resources Inc. 2020c)
- SWCA Environmental Consultants. 2017. "Apache Leap Special Management Area Management Plan: Heritage Resources Report." August 1, 2017 (Tremblay 2017)
- SWCA Environmental Consultants. 2017. "Apache Leap Special Management Area Wildlife and Vegetation Specialist Report." August 1, 2017 (Dugan 2017)
- SWCA Environmental Consultants. 2017. "Apache Leap Special Management Area Biological Evaluation." August 1, 2017 (Campbell and Dugan 2017)
- U.S. Forest Service. 2017. "Apache Leap Special Management Area Management Plan: Environmental Assessment and Finding of No Significant Impact." August 1, 2017 (U.S. Forest Service 2017b)
- U.S. Forest Service. 2017. "Apache Leap Special Management Area: Management Plan." December 1, 2017 (U.S. Forest Service 2017d)
- U.S. Forest Service. 2017. "Apache Leap Special Management Area Management Plan: Errata to Final Environmental Assessment." December 1, 2017 (U.S. Forest Service 2017c)
- WestLand Resources Inc. 2015. "Phase I Environmental Site Assessment Apache Leap South End [Phase I Environmental Assessment Non-Federal Parcel Apache Leap South End Gila County, Arizona]." August 13, 2015 (WestLand Resources Inc. 2015b)
- WestLand Resources Inc. 2016. "A Cultural Resources Inventory of 106 Acres Along the South End of Apache Leap for Resolution Copper Mining, LLC, Pinal County, Arizona." June 23, 2016 (Daughtrey 2016)

7-RCMSER-1728

Appendix B

- U.S. Forest Service. 2014. Tonto National Forest's Nomination of *Chí'chil Bildagoteel*, commonly known as Oak Flat and Apache Leap, to the National Register of Historic Places as an Apache Traditional Cultural Property. October 31, 2014 (Nez 2014)

## TANGLE CREEK PARCEL

### Parcel Description

Located in Yavapai County, Arizona, approximately 35 miles north of the towns of Cave Creek and Carefree, the Tangle Creek Parcel is a 148-acre private inholding within the Tonto National Forest (figures B-3 and B-4). The parcel would be administered by the Tonto National Forest, Cave Creek Ranger District. The Tangle Creek parcel lies within the Central Highlands physiographic province, a transition zone between the Basin and Range and the Colorado River provinces.



Figure B-3. Photograph of Tangle Creek parcel

The Tangle Creek Parcel is located near the center of a broad valley known as Bloody Basin, a rugged, scenic basin in central Arizona with abundant hiking, camping, and hunting opportunities. The parcel was homesteaded in the 1890s by the Babbitt family and used for livestock grazing and farming through the 1990s. Developed features within the parcel were limited; the only remaining associated improvements include an overgrown dirt road, remnants of a concrete dam/revetment structure, and a small concrete foundation. The historically cultivated farm fields are in the process of reverting to open woodlands and thickets of hackberry, mesquite, and catclaw acacia. Resolution Copper does not use the parcel for any specific purpose. Several unimproved roads provide public access to the area and are likely used for recreational, grazing, and agricultural purposes. The parcel is within a grazing allotment that includes surrounding lands in all directions. The parcel also contains a power line transmission corridor. No active mining claims exist within the parcel.

The parcel can be accessed from the west via Bloody Basin Road (NFS Road 269) from Interstate (1-) 17 or by traveling north from Carefree along Cave Creek Road (NFS Road 24).

Appendix B



**Figure B-4. Tangle Creek land exchange parcel**

7-RCMSER-1730

## Geological Setting

This parcel is located along Tangle Creek in Bloody Basin, which is in the Central Highlands physiographic province, a transitional zone between the Basin and Range and the Colorado Plateau. The Bloody Basin area is a graben, bounded to the west by Cooks Mesa and to the east by the Mazatzal Mountains. It is mapped as Tertiary-aged deposits.

## Biological and Water Resources

Upland vegetation of the parcel is mapped as Great Basin Conifer Woodland; however, vegetation characteristic of the Arizona Upland Subdivision of the Sonoran Desertscrub, the Semi-Desert Grassland, and Sonoran Deciduous Riparian Forest biotic communities were also observed during field reconnaissance. Common plant species include one-seed juniper, oats grama, saguaro, sycamores, ash, and desert willow.

Features of the Tangle Creek Parcel include Tangle Creek, a spatially intermittent to perennial stream that bisects the parcel and acts as a substantial tributary to the Verde River (located approximately 10 miles downstream) and associated riparian habitat, as well as mature netleaf hackberry, mesquite, ash, and sycamore trees, which provide habitat for migratory birds and nesting songbirds. No aquatic biology surveys have been conducted. One spring, LX Spring, exists outside the parcel, and water from this spring was conveyed to the parcel by pipeline. The water right for LX Spring water use at the Tangle Creek parcel is no longer active. The pipeline and site have been reclaimed, and cleanup is complete.

No critical habitats exist within the parcel. The 2004 ecological overview identified three special status species (under the Endangered Species Act (ESA)) with some potential to occur within the property: Arizona agave (endangered), Arizona cliffrose (endangered), and bald eagle (now delisted, but still protected under the Bald and Golden Eagle Protection Act (BGEPA)). More recent screening identified a number of other special status species with some potential to occur within the property (either under the ESA, BGEPA, or identified as a Tonto National Forest sensitive species or Species of Conservation Concern (SCC))[135]:

- ESA: western yellow-billed cuckoo (threatened); southwestern willow flycatcher (endangered); Gila chub (endangered); spikedace (endangered)

- BGEPA: golden eagle

- Tonto National Forest sensitive species or SCC: lowland leopard frog; peregrine falcon; broad-billed hummingbird; MackGillivray's warbler; elf owl; Gila longfin dace; desert sucker; headwater chub; roundtail chub; pale Townsend's big-eared bat; spotted bat; Allen's lappet-browed or big-eared bat; California leaf-nosed bat; western red bat; Sonoran desert tortoise; Parker's cylloepus riffle beetle; monarch butterfly.

## Hazardous Materials

A Phase I environmental site assessment was completed for the property in May 2025 that identified no RECs on the property. A prior Phase I environmental site assessment in 2004 had identified numerous potential environmental conditions associated with a building, but it was subsequently determined that the

---

[135] In December 2023, the revised "Tonto National Forest Land Management Plan" (forest plan) was implemented (U.S. Forest Service 2023d). The revised forest plan describes Species of Conservation Concern (SCC), which are 52 species identified that are native to and known to occur in the analysis area and for which there are substantial concerns about the species' ability to persist within the analysis area. This appendix (appendix B) has been updated to reflect analysis of consistency with the revised forest plan; additional SCC have been included in this revision to support that analysis. Forest Service Sensitive Species is no longer a valid designation under the forest plan revision. However, previous analyses of Forest Service Sensitive Species were retained in this document.

Appendix B

building was not on the parcel itself. In 2016, the only item noted was a drum that did not appear to contain more than traces of fluid and was not observed to be leaking. Resolution Copper undertook a substantial cleanup of the Tangle Creek parcel in 2018 to remove trash and other materials.

## Cultural Resources

A Class III cultural resources inventory was performed in 2016, recording 10 previously unidentified archaeological sites, seven of which were recommended eligible for inclusion in the NRHP. In addition, 22 archaeological sites had been previously discovered within the vicinity of the parcel, many of which are indicative of substantial Formative period occupation.

## Key Documents Describing Tangle Creek Parcel

- WestLand Resources Inc. 2025. "Phase I Environmental Site Assessment, Tangle Creek, Yavapai County, Arizona." May 15, 2025 (WestLand Resources Inc. 2025g)

- WestLand Resources Inc. 2020. "Phase I Environmental Assessment Non-Federal Parcel, Tangle Creek (LX Bar Ranch) Yavapai County, Arizona, Resolution Copper." September 22, 2020 (WestLand Resources Inc. 2020h)

- WestLand Resources Inc. 2016. "A Cultural Resources Inventory of the 148-Acre Tangle Creek Parcel, Yavapai County, Arizona: Resolution Copper." September 28, 2016 (Charest 2016b)

- WestLand Resources Inc. 2016. "Phase I Environmental Assessment Non-Federal Parcel, Tangle Creek (LX Bar Ranch) Yavapai County, Arizona, Resolution Copper." October 1, 2016 (WestLand Resources Inc. 2016d)

- WestLand Resources Inc. 2004. "Ecological Overview LX Bar Ranch Parcel, Yavapai County Arizona." March 8, 2004 (WestLand Resources Inc. 2004d)

## TURKEY CREEK PARCEL

## Parcel Description

The Turkey Creek Parcel is a 147-acre parcel located approximately 8 miles southeast of the community of Pleasant Valley in Gila County, Arizona (figures B-5 and B-6). Also known as JX Ranch, the Turkey Creek Parcel is a private inholding within the Tonto National Forest and would be administered by the Tonto National Forest, Pleasant Valley Ranger District. It is located within the streambed and adjacent upland areas along Turkey Creek and Rock Creek in the Sierra Ancha Mountains within the Central Highlands physiographic province, a transitional zone between the Basin and Range and the Colorado Plateau provinces.

The parcel was formerly homesteaded in the 1880s and associated with Elmer D. Boody. Development included a series of buildings and property improvements such as a house, barn, kitchen, storehouse, tool house, shop, well, and cultivated area. The parcel also includes remains of a house foundation, trail (NFS Road 701), a small apple orchard, and a scattering of historical artifacts. A dry-laid masonry well that appears to have been filled in almost entirely by sediment or possibly trash was observed on the former homestead location. The Boody homestead would eventually become known as JX Ranch. Under Resolution Copper ownership, the parcel is not used for any purpose; however, there is evidence of dispersed recreation, including hunting, nature viewing, hiking, picnicking, camping, and off-highway vehicle use. Overall, the parcel is characterized as mainly vacant open space that appears to have been used in the past for historical homesteading and grazing. Currently, there are no active mining claims within the parcel.

7-RCMSER-1732

Appendix B

The parcel can be accessed by going east and north approximately 22 miles from SR 188 along multiple NFS roads (71, 609, 416, and 2768).



**Figure B-5. Photograph of Turkey Creek parcel**

## Geological Setting

This parcel is located in the Sierra Ancha Mountains, which are in the Central Highlands physiographic province, a transitional zone between the Basin and Range and the Colorado Plateau. The parcel has middle Tertiary-aged conglomerate on the canyon's upper slopes, Precambrian-aged (middle Proterozoic) Dripping Springs Quartzite exposed in cliff faces adjacent to the stream bed, and Quaternary alluvium within the valley floor along Turkey Creek and Rock Creek.

Appendix B



**Figure B-6. Turkey Creek land exchange parcel**

7-RCMSER-1734

Appendix B

## Biological and Water Resources

Four biotic communities were observed during field reconnaissance: Petran Montane Conifer Forest, Madrean Evergreen Woodland, Interior Chaparral, and Great Basin Conifer Woodland; however, the upland vegetation on the parcel is only mapped as Great Basin Conifer Woodland biotic community. Common plants include ponderosa pine on north-facing slopes and alligator juniper, manzanita, and grasses on south-facing slopes. Riparian vegetation such as narrowleaf cottonwood, New Mexico locust, Arizona sycamore, and Gambel oak are present along Turkey Creek. Approximately one-third of the vegetation within the parcel was impacted by fires in the early 2000s, with some areas burning intensely, resulting in losses of entire stands of juniper, ponderosa pine, and manzanita. Natural vegetation is reestablishing, however. Within the parcel there is habitat for elk, mule deer, and native fish.

Additionally, the parcel is within Forest Service lands that contain Mexican spotted owl critical habitat, as well as two Mexican spotted owl protected activity centers. The 2004 ecological overview identified three special status species with some potential to occur within the property: Arizona agave (endangered), Chiricahua leopard frog (threatened), and bald eagle (now delisted, but still protected under the BGEPA). More recent screening identified a number of other special status species with some potential to occur within the property (either under the ESA, BGEPA, or identified as a Tonto National Forest sensitive species or SCC):

- ESA: western yellow-billed cuckoo (threatened); southwestern willow flycatcher (endangered); Chiricahua leopard frog (threatened); Mexican spotted owl (threatened); Gila chub (endangered); spikedace (endangered); northern Mexican gartersnake (threatened); narrow-headed gartersnake (threatened)

- BGEPA: golden eagle

- Tonto National Forest sensitive species or SCC: lowland leopard frog; peregrine falcon; northern goshawk; red-faced warbler; olive-sided flycatcher; elf owl; Pacific wren; Gila longfin dace; Sonora sucker; desert sucker; headwater chub; roundtail chub; pale Townsend's big-eared bat; spotted bat; Allen's lappet-browed or big-eared bat; western red bat; fringed myotis; monarch butterfly.

Turkey Creek is the dominant drainage feature in the parcel and has intermittent to perennial flow. Surface water features comprise ephemeral channels that are tributary to Turkey Creek in the Salt River's watershed.

Wildfires in the area over the past few years have greatly affected the surrounding lands but have not affected the property.

## Hazardous Materials

A Phase I environmental site assessment was completed for the property in May 2025 that identified no RECs on the property.

## Cultural Resources

A Class III cultural resources inventory of the parcel was performed in 2016 and found six previously undiscovered archaeological sites, with five of the sites recommended eligible for inclusion in the NRHP. Sites were dated to the Late Formative period (over a range of 1,000 years) and the Late Historic period.

## Key Documents Describing Turkey Creek Parcel

- WestLand Resources Inc. 2025. "Phase I Environmental Site Assessment, Turkey Creek, Gila County, Arizona." May 15, 2025 (WestLand Resources Inc. 2025h)

7-RCMSER-1735

Appendix B

- WestLand Resources Inc. 2020. "Phase I Environmental Site Assessment Non-Federal Parcel, Turkey Creek (JX Bar Ranch) Gila County, Arizona." September 4, 2020 (WestLand Resources Inc. 2020i)

- WestLand Resources Inc. 2016. "A Cultural Resources Inventory of the 146.78-Acre Turkey Creek Parcel, Gila County, Arizona: Resolution Copper." September 28, 2016 (Charest 2016b)

- WestLand Resources Inc. 2016. "Phase I Environmental Site Assessment Non-Federal Parcel, Turkey Creek (JX Bar Ranch) Gila County, Arizona." October 1, 2016 (WestLand Resources Inc. 2016g)

- WestLand Resources Inc. 2004. "Ecological Overview JX Ranch Parcel, Gila County, Arizona." March 31, 2004 (WestLand Resources Inc. 2004c)

## CAVE CREEK PARCEL

### Parcel Description

The Cave Creek Parcel is a 149-acre parcel located approximately 7 miles north of Cave Creek in Maricopa County, Arizona, known also as 6L Ranch (figures B-7 and B-8). The Cave Creek Parcel is a private inholding surrounded by Tonto National Forest lands. Upon completion of the land exchange, the parcel would be administered by the Tonto National Forest, Cave Creek Ranger District. The parcel lies along the canyon floor and adjacent upland areas of Cave Creek in the Central Highlands physiographic province.



**Figure B-7. Photograph of Cave Creek parcel**

The Cave Creek parcel is located north of the Spur Cross Ranch Conservation Area, used for dispersed recreation activities such as hunting, camping, nature viewing, and hiking. The parcel was initially colonized in the 1880s and used as a residence until the 1920s. Livestock grazing occurred on the parcel

Appendix B

through 2001. Several ranching features were observed through field reconnaissance and include development such as a concrete watering trough, pipes, a steel cistern, a well, a collapsed dry-laid masonry outbuilding with tin roof, a wooden cattle chute, and a corral area. The parcel is largely devoid of development, and there is no evidence of recent human occupation within the parcel. The Cave Creek parcel can be accessed via Cave Creek Road and Spur Cross road to Forest Trail 4, on which a 100-minute walk on foot is required to reach the parcel. Drivable access is limited at the Maricopa County Spur Cross Ranch Conservation Fence. No active mining claims exist within the parcel.

## Geological Setting

This parcel is located along Cave Creek, which drains the southern portion of the New River Mountains, a rugged range defining the eastern portion of the Agua Fria River valley. Notable peaks around this parcel are Skull Mesa to the east, Sugarloaf Mountain to the southwest, and Black Mesa to the west and north. The parcel lies in the Central Highlands physiographic province. The New River Mountains comprise Quaternary- and Tertiary-aged basalt-covered tablelands cut by streams through Precambrian-aged metavolcanic rocks. Most of the parcel is mapped as volcanic and sedimentary rock dating from the middle Miocene to Oligocene. Small portions of the north and south ends of the parcel are mapped as Early Proterozoic Metavolcanic rocks.

## Biological and Water Resources

Three biotic communities have been observed within the parcel: Interior Chaparral, Arizona Upland Subdivision of Sonoran Desertscrub, and Deciduous Riparian Forest along Cave Creek. Common plant species include saguaro, foothill paloverde, ironwood, barberry, buckbrush, Arizona sycamore, velvet ash, and Goodding's willow. Wildlife habitat for migratory songbirds, raptors, amphibians, javelina, mule deer, and coyotes has been identified within the parcel. No aquatic species surveys have been conducted within the parcel.

The 2004 ecological overview identified three special status species with some potential to occur within the property: bald eagle (now delisted, but still protected under the BGEPA), Gila topminnow (endangered), and cactus ferruginous pygmy-owl (now delisted).

More recent screening identified a number of other special status species with some potential to occur within the property (either under the ESA, BGEPA, or identified as a Tonto National Forest sensitive species or SCC):

- ESA: western yellow-billed cuckoo (threatened); southwestern willow flycatcher (endangered); lesser long-nosed bat (since delisted)

- BGEPA: golden eagle

- Tonto National Forest sensitive species or SCC: lowland leopard frog; peregrine falcon; gilded flicker; broad-billed hummingbird; MackGillivray's warbler; Lewis' woodpecker; elf owl; desert purple martin; Gila longfin dace; pale Townsend's big-eared bat; spotted bat; Allen's lappet-browed or big-eared bat; western red bat; western yellow bat; California leaf-nosed bat; Sonoran desert tortoise; Parker's cylloepus riffle beetle; monarch butterfly.

Surface water features include Cave Creek, which originally flowed south toward the Salt River in Phoenix. However, the flow is now intercepted by the Cave Creek Dam in the northern Phoenix metropolitan area and the canal system in Phoenix, which diverts the stream to discharge to the Agua Fria River. The Cave Creek riparian corridor runs through the center of the parcel and drains the southern portion of the New River Mountains. It is ephemeral to intermittent, with some perennial reaches in the vicinity of the parcel.

7-RCMSER-1737

Appendix B



Figure B-8. Cave Creek land exchange parcel

7-RCMSER-1738

Appendix B

## Hazardous Materials

A Phase I environmental site assessment was completed for the property in May 2025 that identified no RECs on the property.

## Cultural Resources

Since time immemorial, the parcel and area were extensively used and occupied by Indigenous people with different cultures. A Class III cultural resource inventory was performed in 2016 that identified six archaeological sites, including four that were newly identified. All six sites were recommended for inclusion in the NRHP. The sites date to the Late Archaic and Early to Middle, Middle, and Late Formative periods, as well as to the Late Historic period, and include precontact petroglyphs. Additionally, stone structures, grinding areas, and more petroglyphs have been found in areas surrounding the parcel.

## Key Documents Describing Cave Creek Parcel

- WestLand Resources Inc. 2025. "Phase I Environmental Site Assessment, Cave Creek, Maricopa County, Arizona." May 15, 2025 (WestLand Resources Inc. 2025c)

- WestLand Resources Inc. 2020. "Phase I Environmental Site Assessment Cave Creek (6L Ranch), Maricopa County, Arizona." September 4, 2020 (WestLand Resources Inc. 2020e)

- WestLand Resources Inc. 2016. "Phase I Environmental Site Assessment Non-Federal Parcel, Cave Creek (6L Ranch) Maricopa County, Arizona, Resolution Copper." September 1, 2016 (WestLand Resources Inc. 2016f)

- WestLand Resources Inc. 2016. "A Cultural Resources Inventory of the 149.18-Acre Cave Creek Parcel, Maricopa County, Arizona: Resolution Copper." September 28, 2016 (Charest and Francis 2016)

- WestLand Resources Inc. 2004. "Ecological Overview: 6L Ranch Parcel, Yavapai County, Arizona." July 19, 2004 (WestLand Resources Inc. 2004a)

## EAST CLEAR CREEK PARCEL

## Parcel Description

The East Clear Creek Parcel is a 640-acre private inholding on the Coconino National Forest, located north of Payson in Coconino County, Arizona (figures B-9 and B-10). The parcel would be administered by the Mogollon Rim Ranger District. The East Clear Creek Parcel is located along the canyon floor and adjacent upland areas of East Clear Creek in the Colorado Plateau physiographic province, a transitional zone between the upper plateau and riparian ecosystems on the Mogollon Rim.

Appendix B



Figure B-9. East Clear Creek land exchange parcel

7-RCMSER-1740

Appendix B

The only known current and historical uses of the area are recreation and logging. Designated pack trails are present on NFS land south and east of the parcel. Hiking, fishing, nature viewing, hunting, and camping are available on the public lands surrounding the parcel. The parcel is surrounded by the T Bar grazing allotment; however, Resolution Copper does not manage this grazing lease. BLM records show a record of patent for the parcel to the Santa Fe Pacific Railroad Company for the purpose of constructing a railroad and telegraph line from Missouri and Arkansas to the Pacific Coast; however, there is no evidence within the parcel or adjoining areas that the railroad was ever developed. Logging has historically been conducted in the vicinity of the parcel, with the most recent timber sale occurring in the late 1980s. There is a stock tank near the southern boundary of the parcel, suggesting livestock grazing as a potential historical land use, although not within at least the past 10 years. There is no recent development on the parcel. Dirt roads are the only developed, formal use. No active mining claims exist within the parcel.



**Figure B-10. Photograph of East Clear Creek parcel**

The parcel can be accessed from the south via SR 87 and traveling approximately 12 miles to the east and north. There is no designated access into the property from the north, but it is adjacent to the Starlight Pines subdivision.

## Geological Setting

This parcel is located in the canyon floor and adjacent uplands along East Clear Creek. The East Clear Creek parcel is in the Colorado Plateau physiographic province, which is bounded on the south by the Mogollon Rim and is characterized by nearly horizontal, stratified sedimentary rocks that have been eroded into numerous canyons, plateaus, and scarps. The canyon walls are steep adjacent to East Clear Creek and upland areas are rugged. The entire parcel is mapped as Permian-aged sedimentary rocks.

## Biological and Water Resources

The upland vegetation on the East Clear Creek parcel has one recorded biotic community: Petran Montane Conifer Forest, although field reconnaissance also documented Interior Riparian Deciduous Forest and Great Basin Conifer Woodland biotic communities. The upland vegetation is dominated by second-growth ponderosa pine with Gambel oak and New Mexico locust on north-facing slopes, while south-facing slopes are generally scrub live oak woodland with juniper and pinyon pine. Riparian habitat includes species such as boxelder, cottonwood, Arizona alder, and Bonpland willow. Riparian wildlife habitat and raptor nesting and roosting sites are present within the parcel.

The 2017 ecological overview and more recent screening identified a number of other special status species with some potential to occur within the property (either under the ESA, BGEPA, or identified as a Coconino National Forest sensitive species):

- ESA: Little Colorado spinedace (threatened); Mexican spotted owl (threatened); Chiricahua leopard frog (threatened)
- BGEPA: bald eagle; golden eagle
- Coconino National Forest sensitive species: peregrine falcon; Little Colorado sucker; northern goshawk; rock fleabane; roundtail chub; Arizona toad

The dominant surface water feature on the parcel is East Clear Creek, a substantial perennial tributary of the Little Colorado River located approximately 71 river miles downstream (northeast) of the parcel. Analytical results from water quality sampling in 1976 suggest that all chemical constituents in East Clear Creek are within acceptable water quality standards for the support of cold-water fisheries habitat. More recent data from the U.S. Environmental Protection Agency suggest that water quality in East Clear Creek is fully supportive of agricultural use; fish, shellfish, and wildlife protection and propagation; and primary-contact recreation. Other surface water features include minor tributaries that are likely ephemeral to intermittent. Active registered instream flow surface water rights in the Little Colorado watershed sourced from East Clear Creek exist in the parcel as well. In 1993, preliminary analysis was conducted to document a 25-mile portion of East Clear Creek as being eligible with a scenic designation under the Wild and Scenic Rivers Act (U.S. Forest Service 1993). The outstanding remarkable values of this segment include scenic resources and threatened and endangered fish species habitat. The East Clear Creek parcel is within the proposed eligible section. As of 2019, the segment has not been officially designated.

Wildfires in the area in 2018 have affected the property and surrounding lands.

## Hazardous Materials

A Phase I environmental site assessment was completed for the property in May 2025 that identified no RECs on the property.

## Cultural Resources

A Class III cultural resources inventory performed in 2016 identified three newly recorded archaeological sites, all of which were recommended for inclusion in the NRHP. These archaeological sites point to use by Indigenous people and to Late Historic period Euro-American uses. In addition, one historic-era feature was identified just outside the boundary of the parcel.

## Key Documents Describing East Clear Creek Parcel

- WestLand Resources Inc. 2025. "Phase I Environmental Site Assessment, East Clear Creek, Coconino County, Arizona." May 15, 2025 (WestLand Resources Inc. 2025e)

Appendix B

- WestLand Resources Inc. 2020. "Phase I Environmental Assessment Non-Federal Parcel, East Clear Creek, Coconino County, Arizona, Resolution Copper." September 4, 2020 (WestLand Resources Inc. 2020b)

- WestLand Resources Inc. 2017. "Ecological Overview for East Clear Creek Parcel, Coconino County, Arizona, Resolution Copper." January 24, 2017 (WestLand Resources Inc. 2017b)

- WestLand Resources Inc. 2016. "Phase I Environmental Assessment Non-Federal Parcel, East Clear Creek, Coconino County, Arizona, Resolution Copper." September 1, 2016 (WestLand Resources Inc. 2016c)

- WestLand Resources Inc. 2016. "A Cultural Resources Inventory of the 633.88-Acre East Clear Creek Parcel, Coconino County, Arizona." September 28, 2016 (Charest 2016d)

## *Offered Parcels – Bureau of Land Management*

Parcels to be transferred from Resolution Copper to the United States and administered by the BLM are detailed in the following text. Additional details regarding the special status species present on the offered lands being transferred to the BLM are summarized in table B-4 at the end of this appendix.

### LOWER SAN PEDRO RIVER PARCEL

### Parcel Description

The Lower San Pedro River Parcel is a 3,120-acre parcel located near Mammoth in Pinal County, Arizona (figures B-11 and B-12). It lies within the Basin and Range physiographic province, characterized by mountain ranges trending northwest-southeast, separated by broad alluvial valleys. The parcel is located within one of these valleys, with the Galiuro Mountains to the east and the Santa Catalina Mountains to the south. In November 1988, Congress designated 40 miles and 58,000 acres of the upper San Pedro corridor as the San Pedro Riparian National Conservation Area. The parcel would be administered by the BLM Gila District, Tucson Field Office. The parcel is patented private land for which Swift Land and Cattle, LLC, a subsidiary of Resolution Copper, holds active mining claims.

Appendix B



Figure B-11. Lower San Pedro River land exchange parcel

Appendix B



**Figure B-12. Photograph of Lower San Pedro River parcel**

The Lower San Pedro River Parcel is mostly undeveloped, and the parcel is surrounded by some housing, a materials quarry, the Town of Mammoth Cielo Wastewater Treatment Plant, and undeveloped land. The developed areas have been primarily used, either currently or historically, for grazing, other agricultural, former residential, or research uses, as seen from abandoned structures, corrals, and farm fields. Approximately 15 percent of the parcel has been cleared of native vegetation. Other known uses of the Lower San Pedro River Parcel are primarily recreational: off-road vehicle use, hunting, and shooting facilities. A 1.2-mile-long trail for public access is located within the parcel south of Copper Creek Road. Transfer of the Lower San Pedro River Parcel would render the area unavailable for future housing development. A shooting range, managed by the Lions Club, is not part of the current property to be transferred.

Portions of the parcel were cultivated from at least 1945 until at least the 1950s, when lead and arsenate pesticides and defoliants were historically used on certain crops in Arizona, leading to the possible presence of pesticide residuals in the formerly cultivated soils within the parcel. The parcel is currently managed as an open space by The Nature Conservancy on behalf of Resolution Copper. An on-site storage unit is used for the property manager's gear.

Current management practices by The Nature Conservancy include monitoring of hydrologic and habitat conditions, removal of grazing within the mesquite bosque, management of fuel loads, and fencing to restrict illegal firewood cutting and access; in the past, practices have included rehabilitating former agricultural areas with the goal of restoring natural hydrologic functions to the area (Nature Conservancy 2016).

Appendix B

## Geological Setting

This parcel is located within the Basin and Range physiographic province, which is characterized by elongated mountain ranges trending northwest-southeast, separated by broad alluvial valleys. The parcel is in a broad alluvial valley with the Galiuro Mountains to the east and the Santa Catalina Mountains to the south. Most of the surface geology of the parcel is Holocene-aged river alluvium. An upland area in the eastern portion of the parcel is mapped as deposits from the Pliocene to Middle Miocene, and the extreme southwestern corner of the parcel is mapped as Quaternary-aged surficial deposits.

## Biological and Water Resources

Vegetation on the Lower San Pedro River Parcel includes the Arizona Uplands Subdivision of Sonoran Desertscrub and Sonoran Deciduous Riparian Forest biotic communities. Plant species commonly occurring within the parcel include saguaro, velvet mesquite, creosote bush, several species of cholla cacti, and foothill paloverde. The riparian corridor in the parcel includes more than 800 acres of mesquite woodland that features a wetland fed by a flowing thermal artesian well. The parcel's riparian areas and woodlands provide habitat for a wide variety of wildlife, including many migratory bird species, lowland leopard frogs, and native fish. Other riparian species present include desert willow, Goodding's willow, graythorn, Fremont cottonwood, and the non-native tamarisk.

The 2003 ecological overview identified three special status species with some potential to occur within the property: cactus ferruginous pygmy-owl (now delisted); southwestern willow flycatcher (endangered); and western yellow-billed cuckoo (threatened). More recent screening identified a number of other special status species with some potential to occur within the property (either under the ESA or BGEPA, or identified as a BLM sensitive species):

- ESA: Gila chub (endangered); jaguar (endangered); ocelot (endangered)
- BGEPA: bald eagle; golden eagle
- BLM Gila District sensitive species with known or potential occurrence: peregrine falcon; lowland leopard frog; Arizona grasshopper sparrow; ferruginous hawk; gilded flicker; desert purple martin; Gila longfin dace; desert sucker; Sonora sucker; roundtail chub; monarch butterfly; pale Townsend's big-eared bat; greater western mastiff bat; Allen's lappet-browed or big-eared bat; lesser long-nosed bat; California leaf-nosed bat; cave myotis; Sonoran desert tortoise; desert ornate box turtle

Several large washes exist on the parcel, including Cooper, Mammoth, and Turtle Washes, all tributary to the San Pedro River. The San Pedro River is ephemeral to intermittent along the approximately 53,800-foot reach through the parcel; an uncapped artesian well supports a wetland adjacent to the river channel. The San Pedro River is unique as it is one of only two major rivers that flow north out of Mexico into the United States and is one of the few remaining free-flowing rivers in the Southwest. The unique qualities of the San Pedro River ecosystem have earned this riverine system The Nature Conservancy's designation as one of the "Last Great Places on Earth," and it is one of the more important riparian habitats in the Sonoran and Chihuahuan Deserts.

The parcel contains registered wells that indicate that water levels are generally shallow, at less than 60 feet below the ground surface. Two wells on-site that are monitored by The Nature Conservancy of Arizona indicate that groundwater levels are less than 35 feet below the ground surface. Active surface water rights exist for diverting water for wildlife use on the parcels.

7-RCMSER-1746

Appendix B

## Hazardous Materials

A Phase I environmental site assessment was completed for the property in May 2025 that identified several RECs on the property. These include two known fuel releases at the property boundaries (but not within the property); the Town of Mammoth wastewater treatment plant, which has permits to discharge pollutants to both the aquifer and surface water upstream of the property; a nearby dry-cleaning operation; and informal dumping. In addition, the former cultivation of the land from at least 1945 until at least the 1950s was noted, as lead and arsenate (arsenic) pesticides and defoliants were historically used on certain crops in Arizona. It is unknown whether routine agricultural application of pesticides has occurred on the property; therefore, it is possible that pesticide residuals (chlorinated pesticides, arsenic, and lead) may be present in the formerly cultivated soils on the property. RECs are not indications that contamination actually exists; these are typically noted so further investigation can take place.

Several cleanups have taken place on the property and were completed in conjunction with the BLM to identify the structures and features desired to remain after completion of the land exchange.

## Cultural Resources

A Class III cultural resources inventory performed in 2017 identified 59 archaeological sites within the parcel; 37 of these sites had not been previously identified. Forty sites are recommended eligible for inclusion in the NRHP, and one site has been determined eligible. The sites cover a wide range of periods, from precontact to historic.

### Key Documents Describing Lower San Pedro River Parcel

- WestLand Resources Inc. 2025. "Phase I Environmental Site Assessment, Lower San Pedro River, Pinal County, Arizona." May 15, 2025 (WestLand Resources Inc. 2025f)

- WestLand Resources Inc. 2020. "Phase I Environmental Site Assessment Non-Federal Parcel, Lower San Pedro River, Pinal County, Arizona, Resolution Copper." September 23, 2020 (WestLand Resources Inc. 2020g)

- WestLand Resources Inc. 2017. "A Cultural Resources Inventory of 3,125 Acres of Private Land Along the Lower San Pedro River Near Mammoth, Pinal County, Arizona, Resolution Copper." April 11, 2017 (Gruner 2017)

- WestLand Resources Inc. 2017. "Phase I Environmental Site Assessment Non-Federal Parcel, Lower San Pedro River, Pinal County, Arizona, Resolution Copper." November 1, 2017 (WestLand Resources Inc. 2017d)

- The Nature Conservancy. 2016. "7B Ranch Management Plan." October 1, 2016 (Nature Conservancy 2016)

- Tucson Audubon Society. 2010. "Avian surveys conducted by Audubon Arizona IBA Program at 7B Ranch, Lower San Pedro River, Mammoth, Arizona, 2006–2010." January 1, 2010 (Wilbor 2010)

- WestLand Resources Inc. 2003. "Ecological Overview: San Pedro River Parcel, Pinal County, Arizona." September 10, 2003 (WestLand Resources Inc. 2003)

## APPLETON RANCH PARCEL

## Parcel Description

The Appleton Ranch Parcel includes 956 acres of non-contiguous private lands south of Elgin in Santa Cruz County, Arizona (figures B-13 and B-14). The parcels are within the Appleton-Whittell Research

7-RCMSER-1747

Appendix B

Ranch and Las Cienegas National Conservation Area. The parcels are to be administered by the BLM Gila District, Tucson Field Office, as part of the Las Cienegas National Conservation Area. The Las Cienegas National Conservation Area, established in 2000, is a 45,000-acre conservation area containing cottonwood-willow riparian forests and marshlands associated with Cienega Creek, rolling grasslands, and woodlands. Established in 1969 by the Appleton family in partnership with the National Audubon Society, Forest Service, and BLM, the Appleton-Whittell Research Ranch is a sanctuary for native plants and animals and a research facility for the study of grassland ecosystems. The ranch is currently managed by the National Audubon Society.



**Figure B-13. Photograph of Appleton Ranch parcel**

The parcels that make up the Appleton Ranch Parcel consist of private land and therefore have no mining claims. Federal and State lands surrounding the area are used principally for livestock grazing as well as dispersed recreational activities, including hunting, camping, off-road vehicle use, and hiking. Grazing operations were the primary use until 1969, when the property owner ceased ranching operations to enter into agreements with the BLM, Forest Service, and Audubon Society to use the Research Ranch to study grassland ecology. Although technically not part of the Research Ranch, management on the parcels has been essentially the same: no livestock grazing or other ranching operations, limited residential use, and low-impact ecological study.

Remaining structures within the parcel include a few windmills, wells, and numerous small earthen-bermed reservoirs. These features are accessible via primitive dirt roads from the Research Ranch primitive road network. Additionally, one area was used for residential purposes from the 1980s until 2002, when it was destroyed by a fire. The fire debris was disposed of off-site, leaving only the house foundation and septic system.

7-RCMSER-1748

Appendix B



**Figure B-14. Appleton Ranch land exchange parcels**

Appendix B

## Geological Setting

These parcels are located along the streambeds and adjacent upland areas of Post, Vaughn, and O'Donnell Canyons. The upland areas drained by the three on-site streams are known as the Canelo Hills, consisting of rolling terrain that includes the parcels that make up the Appleton Ranch Parcel. The Canelo Hills are in the southern Basin and Range physiographic province and are composed of volcanic and sedimentary rocks. A veneer of soil overlies the bedrock on the upland areas, and eroded material from these uplands has accumulated as alluvium in canyon bottoms. The easternmost parcel's surface geology is mapped as surficial deposits that are predominantly from the Early Pleistocene to Late Pliocene; the western portion is mapped as deposits dating from the Pliocene to Middle Miocene; and the southeast corner is mapped as sedimentary rocks from the Middle Miocene to Oligocene. The other two parcels are mapped as deposits from the Pliocene to Middle Miocene.

## Biological and Water Resources

The ranch contains more than 90 species of native grass and 480 native plant species and is used by more than 200 species of birds for wintering, breeding, or migratory habitat.

Biotic communities within the parcels include Semi-Desert Grassland and Madrean Evergreen Oak Woodland. Grasslands are much more extensive than are the oak woodlands. The grassland varies markedly in species composition, density, and structure in the northern part of the Appleton Ranch Parcel, with short-grass grasslands found on south-facing slopes, medium-sized grass stands in swales and north-facing ridges, and tall-grass stands of sacaton in the broader floodplains along several of the washes. Woody vegetation is present in some upland areas as juniper woodlands and along watercourses as mesquite bosques with very limited stands of cottonwood and desert willow. Transfer of the parcels to public ownership would ensure seamless management of the surrounding ecological preserve and contribute to its continued protected status. Primary values of the surrounding Research Ranch that would become extended to Appleton Ranch through acquisition include the following: to provide a wildlife sanctuary that is ungrazed by cattle, conduct or promote ecological research, and provide education about sustainable land management. Large mammals such as pronghorn, deer, peccaries, and coyotes are present within the parcel and pass through often.

The 2004 ecological overview identified 13 special status species with some potential to occur within the property: Huachuca water umbel (endangered); Canelo Hills ladies' tresses (endangered); Gila chub (endangered); Gila topminnow (endangered); desert pupfish (endangered); Chiricahua leopard frog (threatened); Mexican spotted owl (threatened); bald eagle (since delisted but still protected under the BGEPA); western yellow-billed cuckoo (threatened); ocelot (endangered); jaguar (endangered); lesser long-nosed bat (since delisted); and Huachuca springsnail (candidate species, not listed). More recent screening identified a number of other special status species with some potential to occur within the property (either under the ESA or BGEPA, or identified as a BLM sensitive species):

- ESA: northern Mexican gartersnake (threatened)

- BGEPA: bald eagle; golden eagle

- BLM Gila District sensitive species with known or potential occurrence: peregrine falcon; lowland leopard frog; Arizona grasshopper sparrow; ferruginous hawk; gilded flicker; Gila longfin dace; desert sucker; Sonora sucker; roundtail chub; monarch butterfly; pale Townsend's big-eared bat; greater western mastiff bat; Allen's lappet-browed or big-eared bat; lesser long-nosed bat; California leaf-nosed bat; cave myotis; Sonoran desert tortoise; desert ornate box turtle; western burrowing owl

The parcels that make up the Appleton Ranch Parcel are located along streambeds and adjacent upland areas of Post, Vaughn, and O'Donnell Canyons, all of which flow north-northeast toward the Babocomari

7-RCMSER-1750

Appendix B

River approximately 1.5 miles north of the closest parcel boundaries. The Babocomari River is a tributary to the perennial San Pedro River and varies from ephemeral to perennial along its length. The San Pedro River flows north and northwest to join the Gila River; the Gila River eventually flows westward across Arizona to the Colorado River.

Groundwater levels on or near the property appear at relatively shallow depths (i.e., generally less than 100 feet below surface). Surface water rights exist for stock ponds and erosion-control structures on the parcels that make up the Appleton Ranch Parcel.

## Hazardous Materials

A Phase I environmental site assessment was completed for the property in May 2025 that identified no RECs on the property.

## Cultural Resources

A Class III cultural resources inventory performed in 2015 identified three archaeological sites within the parcel, related to Indigenous resource procurement and processing activities and historic-era ranching. Two sites were recommended eligible for inclusion in the NRHP.

## Key Documents Describing Appleton Ranch Parcels

- WestLand Resources Inc. 2025. "Phase I Environmental Site Assessment, Appleton Ranch, Santa Cruz County, Arizona." May 15, 2025 (WestLand Resources Inc. 2025b)

- WestLand Resources Inc. 2020. "Phase I Environmental Site Assessment Non-Federal Parcel, Appleton Ranch, Santa Cruz County, Arizona Resolution Copper." September 4, 2020 (WestLand Resources Inc. 2020d)

- WestLand Resources Inc. 2016. "Phase I Environmental Site Assessment Non-Federal Parcel, Appleton Ranch, Santa Cruz County, Arizona Resolution Copper." September 1, 2016 (WestLand Resources Inc. 2016e)

- WestLand Resources Inc. 2015. "A Cultural Resources Inventory of 940 Acres Within the Appleton-Whittell Research Ranch for Resolution Copper Mining, LLC." December 1, 2015 (Daughtrey 2015)

- Cogan, R.C., Conservation Coordinator, Appleton-Whittell Research Ranch, National Audubon Society. 2012. "Herpetofauna of the Appleton-Whittell Research Ranch." November 1, 2012 (Cogan 2012)

- WestLand Resources Inc. 2004. "Ecological Overview Appleton Ranch Parcel, Santa Cruz County, Arizona." May 26, 2004 (WestLand Resources Inc. 2004b)

- Breckenfeld, D.J., and D. Robinett, Natural Resources Conservation Service. 2001. "Soil and Range Resource Inventory of the National Audubon Society Appleton-Whittell Research Ranch, Santa Cruz County, Arizona." April 1, 2001 (Breckenfeld and Robinett 2001)

- McLaughlin, S.P., E.L. Geiger, and J.E. Bowers. 2001. "Flora of the Appleton-Whittell Research Ranch, northeastern Santa Cruz County, Arizona." January 1, 2001 (McLaughlin et al. 2001)

7-RCMSER-1751

Appendix B

# DRIPPING SPRINGS PARCEL

## Parcel Description

The Dripping Springs Parcel is a 160-acre parcel located northeast of Kearny in Gila and Pinal Counties, Arizona, in the Basin and Range physiographic province (figures B-15 and B-16). It lies within a rugged upland area northeast of the Gila River, which is the main drainage feature for the area. The parcel, situated in the Dripping Spring Mountains near Tam O'Shanter Peak and Steamboat Mountain, is almost completely surrounded by BLM-administered lands, with some adjacent ASLD-administered State Trust land. The parcel would be administered by the BLM Gila District, Tucson Field Office. The parcel consists of private land and therefore has no mining claims.

The parcel's abundant rock formations are known for offering recreational rock-climbing opportunities. Hunting is also a permitted recreational activity in the area. Historically, the areas surrounding the parcel were the focus of prospecting, mining, and settlement during the Historic period. In general, the parcel is characterized as undeveloped open space, with past land use limited to small-scale mine exploration, intermittent hunting and recreational shooting, and possibly hiking. Land use in the surrounding areas appears to be similar to the Dripping Springs Parcel but may also include livestock grazing. Vehicular access to the parcel is unavailable as no road accesses the area. Because the property is only accessible by overland hiking across rugged terrain, the parcel has been effectively isolated from human use and has not been subjected to overuse by hikers, off-road vehicle use, hunters, miners, or ranchers.

7-RCMSER-1752

Appendix B



Figure B-15. Dripping Springs land exchange parcel

7-RCMSER-1753

Appendix B



**Figure B-16. Photograph of Dripping Springs parcel**

## Geological Setting

This parcel is in the Dripping Spring Mountains northeast of Kearny, which is a rugged upland area northeast of the Gila River, the main drainage feature for the region. Notable peaks are Steamboat Mountain to the west and Tam O'Shanter Peak to the southeast. This parcel is within the Basin and Range physiographic province and the Dripping Spring Mountains have extensive and complex fault systems composed of tilted fault blocks. The surface geology of the parcel is predominantly sedimentary rocks of Precambrian age (Middle Proterozoic). A fault bisects the parcel and defines the boundary between two tilted fault blocks. The western portion of the parcel is mapped as sedimentary rocks from the Mississippian, Devonian, and Cambrian.

## Biological and Water Resources

Vegetation on the parcel encompasses two biotic communities: Arizona Upland Subdivision of the Sonoran Desertscrub and Semi-desert Grassland. The western portion of the parcel includes both biotic communities, whereas the eastern portion is entirely grasslands. Common plant species within the Dripping Springs Parcel include saguaro, paloverde, jojoba, velvet mesquite, desert hackberry, hopbush, brittlebush, cholla, and prickly pear cacti. Grassland species include desert spoon, Palmer's agave, catclaw acacia, scrub live oak, beargrass, one-seed juniper, threeawn grasses, sideoats grama grass, black grama grass, curly mesquite grass, bullgrass, and broom snakeweed. Groupings of limestone endemics

B-31

were also noted within the parcel, including sandpaper bush, Mariola, crucifixion thorn, desert zinnia, and beebush. The xeric washes on the parcel support dense velvet mesquite and catclaw mimosa.

The 2016 ecological overview and more recent screening identified a number of other special status species with some potential to occur within the property (either under the ESA or BGEPA, or identified as a BLM sensitive species):

- ESA: western yellow-billed cuckoo (threatened); ocelot (endangered); jaguar (endangered); southwestern willow flycatcher (endangered). Further comments received from BLM suggest that habitat for these species likely does not exist on the Dripping Springs Parcel.

- BGEPA: bald eagle; golden eagle

- BLM Gila District sensitive species with known or potential occurrence: peregrine falcon; gilded flicker; monarch butterfly; pale Townsend's big-eared bat; greater western mastiff bat; Allen's lappet-browed or big-eared bat; lesser long-nosed bat; California leaf-nosed bat; cave myotis; Sonoran desert tortoise; pinyon jay; desert purple martin

No surface water features appear to be present within the Dripping Springs Parcel, with the exception of very minor ephemeral headwater drainage features that are tributary to the Gila River.

## Hazardous Materials

A Phase I environmental site assessment was completed for the property in May 2025 that identified no RECs on the property. Historic-era mine features were noted during the work. However, although there is the potential for these mine features to impact groundwater or produce acid mine drainage, no discoloration or distressed vegetation was noted around the existing features. In addition, the potential for impacts on surface or groundwater by contact with mineralized rock is not considered likely.

## Cultural Resources

A Class III cultural resources inventory performed in 2016 identified four newly recorded archaeological sites, two of which were recommended for inclusion in the NRHP. These archaeological sites point to use by Indigenous people and to Late Historic period Euro-American uses.

## Key Documents Describing Dripping Springs Parcel

- WestLand Resources Inc. 2025. " Phase I Environmental Site Assessment, Dripping Springs, Gila and Pinal Counties, Arizona." May 15, 2025 (WestLand Resources Inc. 2025d)

- WestLand Resources Inc. 2020. "Phase I Site Assessment Non-Federal Parcel - Dripping Springs Gila County, Arizona." September 4, 2020 (WestLand Resources Inc. 2020f)

- WestLand Resources Inc. 2016. "A Cultural Resources Inventory of the 159.64-Acre Dripping Spring Parcel, Gila and Pinal Counties, Arizona." September 28, 2016 (Charest 2016a)

- WestLand Resources Inc. 2016. "Ecological Overview Dripping Springs Parcel Gila and Pinal Counties, Arizona: Resolution Copper." December 1, 2016 (WestLand Resources Inc. 2016b)

- WestLand Resources Inc. 2015. "Phase I Site Assessment Non-Federal Parcel - Dripping Springs Gila County, Arizona." June 1, 2015 (WestLand Resources Inc. 2015a)

Appendix B

## *Town of Superior Lands*

### PARCEL DESCRIPTION

If requested by the Town of Superior, Section 3003 additionally authorizes and directs the transfer of 545 acres of NFS lands to the Town of Superior (figure B-17). On October 15, 2021, the Town of Superior requested to purchase the Superior Airport Contiguous Parcels and the Federal reversionary interest to the 265-acre Superior Airport Parcel. On March 25, 2022, the Town updated its request to purchase to include the 30-acre parcel known as Fairview Cemetery.



**Figure B-17. Photograph of Town of Superior parcel**

The NFS lands to be conveyed to the Town of Superior include a 30-acre parcel known as Fairview Cemetery and 250 acres contained in four parcels known as the Superior Airport Contiguous Parcels. In addition, the Town of Superior lands include a Federal reversionary interest to a 265-acre Superior Airport parcel. The Superior Airport parcel was originally owned by the Federal Government, then deeded to Pinal County, and subsequently conveyed to the Town of Superior with the condition that it could only be used as an airstrip. Any other use would cause the property to revert to Federal land (the reversionary interest). As part of the land exchange, the Federal reversionary interest would be removed, after which time the parcel could be used for non-airport purposes.

## *Wildlife Species Occurrence on Offered Lands*

The following tables contain analysis of which special status species occur on lands managed by either Tonto National Forest (see table B-2), Coconino National Forest (see table B-3), or BLM (see table B-4).

Appendix B

Each of these administrative jurisdictions has a separate list of species that are considered to have special status.

## *Plant Species Occurrence on Offered Lands*

Special status plants also occur on the various parcels and are listed in table B-5. Each of these administrative jurisdictions has a separate list of species that are considered to have special status. The jurisdictions are also concerned with noxious weeds and their presence for management goals. The likelihood of occurrence of noxious and invasive weeds is shown in table B-6.

7-RCMSER-1757

(40 of 258), Page 40 of 258
Case: 25-5197, 09/29/2025, DktEntry: 61.8, Page 40 of 258
Case 2:21-cv-00068-DWL    Document 106-3    Filed 07/14/25    Page 318 of 355

Appendix B

Table B-2. Special status wildlife species for other lands under Tonto National Forest jurisdiction

| Common Name (Scientific Name) | Status | IDBG Records within 2 miles | Bisonate Data Records | Other Records (USFS, SWCA, or Forest Service. See Supp, Appendix A, Arizona) | Habitat Components (Elevation, Soils, Vegetation Association, Geographic Range) | Geographic Range in Arizona | Likelihood of Occurrence in Offered Lands Parcels |
|---|---|---|---|---|---|---|---|

B-35

Appendix B

| Common Name (Scientific Name) | Status[1] | HDMS Records within 3 miles | Baseline Data Records | Other Records (HDMS, BISON, or Forest Service or Vista, Reptiles of Arizona) | Habitat Components (Elevation, Soils, Vegetation Association, Slope, Aspect, etc.) | Geographic Range in Arizona | Likelihood of Occurrence in Offered Lands Parcels |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

B-38

Appendix B

| Common Name (Scientific Name) | Status | NMFS Records within 2 miles | Baseline Data Records | Other Records (MBTA, SWCA, or Field Survey Data; Visits, Raptors, etc. Alerts) | Habitat Comments (Elevation, Soils, Vegetation Association, Slope, Aspect, etc.) | Geographic Range in Arizona | Likelihood of Occurrence in Gilbert Lands/Parcels |
|---|---|---|---|---|---|---|---|

B-37

7-RCMSER-1760

Appendix B

| Common Name (Scientific Name) | Status | HDMS Records within 3 miles | Baseline Data Records | Other Records (BISON, BLM, CAS, or Forest Service Site Visits, Reports of Arizona) | Habitat Components (Physical, Soils, Vegetation Association, Slope, Aspect, etc.) | Geographic Range in Arizona | Likelihood of Occurrence in Offered Lands Parcels |
|---|---|---|---|---|---|---|---|
| Monarch butterfly (Danaus plexippus) | ESA: PT, TNF: SCC | Yes, Populations South | No | No | A migratory species that uses a variety of tropical, mountain, forest, and riparian areas in Arizona. Occurs in spring and fall migration. | Occurs throughout Arizona | Possible, Apache Leap South, Devils Canyon, Tangle Creek, Turkey Creek |
| Mexican spotted owl (Strix occidentalis lucida) | TNF: S, SCC | No | No | No | ... | Occurs in Gila County, Arizona | Unlikely to occur |
| Arizona hedgehog cactus (Echinocereus arizonicus) | TNF: SCC | No | No | No | Limestone rock cliffs, hillsides ... | Restricted to a single 200 sq mi area in central Arizona in the Superstition, Pinal Mountains, Tonto National Forest, Gila and Pinal counties (USFWS 1990) | Unlikely to occur |
| Verde River ... (Zea mays parviglumis) | TNF: SCC | Yes, Tangle Creek | No | No | Perennial stream ... | Occurs from the Verde and Salt River drainages ... | Unlikely to occur |
| Ford ... (Zea mays ...) | TNF: S, SCC | No | No | No | ... | Occurs in Gila and Maricopa Counties, Arizona | Unlikely to occur |
| Phoenix talussnail (Sonorella allynsmithi) | TNF: SCC | No | No | No | Occurs within talus slopes or rock crevices at the Santa ... | Occurs in Maricopa County, Arizona | Unlikely to occur |
| Apache ... (Sonorella apacheana) | TNF: SCC | Yes, Tangle Creek | No | No | Lives in small talus, rock slopes, and rock crevices in rock ... | Occurs in Maricopa and Yavapai Counties | Unlikely to occur |
| Arizona giant sedge (Carex ...) | TNF: SCC | No | No | No | ... | ... | Unlikely to occur |
| Arizona ... (Euphorbia ...) | TNF: SCC | No | No | No | Occurs in slopes and forbs and mixed conifer ... near 6000 to 7200 feet in rock forest ... | ... | Unlikely to occur |
| ... | TNF: SCC | No | No | No | ... | Occurs near Roosevelt Lake, Tonto National Forest | Unlikely to occur |
| Arizola ... (Euphorbia ...) | TNF: S[?] | No | No | No | ... | Occurs in Gila and Yavapai Counties | Unlikely to occur |

B-33

(44 of 258), Page 44 of 258

Case: 25-5197, 09/29/2025, DktEntry: 61.8, Page 44 of 258
Case 2:21-cv-00068-DWL   Document 106-3   Filed 07/14/25   Page 322 of 355

Appendix B

| Common Name (Scientific Name) | Status | USGS Records within 3 miles | Election Day Records | Other Records (HDMS, SWCA or Fossil Service Size Notes, Number of Action) | Habitat Components (Elevation, Soils, Vegetation Association, Slope, Aspect, etc.) | Geographic Range in Arizona | Likelihood of Occurrence in Offered Lands Parcels |
|---|---|---|---|---|---|---|---|

B-39

Appendix B

| Cultural Item (Scientific Name) | Status* | HSMAP Records within 2 miles | Baseline Data Records | Other Records (USFS, BMGR, or State, Federal or Arizona) | Habitat Components (Elevation, Soils, Vegetation Association, Slope, Aspect, etc.) | Geographic Range in Arizona | Likelihood of Occurrence in Offered Lands Parcels |
|---|---|---|---|---|---|---|---|

B-40

**Table B-3. Special status wildlife species for offered lands under Coconino National Forest jurisdiction**

Unless otherwise noted, range or habitat information is from the following sources: Arizona Game and Fish Department (2025); Brennan (2008); eBird (2025); NatureServe Explorer (2025); Tonto National Forest (2008); U.S. Fish and Wildlife Service (2016c); U.S. Forest Service (2017).

| Common Name (*Scientific Name*) | Status* | HDMS Records within 2 miles | Baseline Data Records | Other Records (eBird, SWCA, or Forest Service Site Visits, Reptiles of Arizona) | Habitat Components (Elevation, Soils, Vegetation Association, Slope, Aspect, etc.) | Geographic Range in Arizona | Likelihood of Occurrence in Offered Lands |
|---|---|---|---|---|---|---|---|
| **Amphibians** | | | | | | | |
| Arizona toad (*Anaxyrus microscaphus*) | CNF: S | Yes | No | Reptiles of Arizona | Species prefers rocky stream and canyons in pine-oak associations and in lower deserts. Elevation ranges from sea level to 8,000 feet above mean sea level (amsl) | Found in canyons and floodplains south of the Mogollon Rim | Known to occur: East Clear Creek |
| Chiricahua leopard frog (*Lithobates chiricahuensis*) | ESA: T (All Arizona counties except La Paz, Mohave, Pinal, Yuma) | Yes | No | No | Species is known from mid-elevation wetland communities such as tanks, lakes, reservoirs, streams, and rivers; often surrounded by an arid environment. Elevational range of 3,231–8,890 feet amsl | Species occurs along the Mogollon Rim and in mountainous areas of southeastern Arizona | Known to occur: East Clear Creek |
| Northern leopard frog (*Lithobates pipiens*) | CNF: S | Yes | No | Reptiles of Arizona | Range of habitats that includes grasslands, brush land, and forests, usually in permanent water, elevational range of 2,640–9,155 feet amsl. | Found in northern and central Arizona | Known to occur: East Clear Creek |
| Lowland leopard frog (*Lithobates yavapaiensis*) | CNF: S | No | No | No | Aquatic systems in elevations ranging from 460–6,200 feet amsl, species is found using a variety of habitats, both natural and human made. | Species occurs in central and southeastern Arizona | Unlikely to occur |
| **Birds** | | | | | | | |
| Northern goshawk (*Accipiter gentilis*) | CNF: S | Yes | Yes (WestLand Resources Inc. 2017c) | eBird | Species is found in wide variety of forest associations including deciduous, coniferous and mixed forests; prefers mature forests for breeding in elevations ranging from 4,750–9,120 feet amsl | Species is found statewide in tall, forested mountains | Known to occur: East Clear Creek |
| Clark's grebe (*Aechmophorus clarkii*) | CNF: S | No | No | No | Requires large, deep bodies of water for fishing. | Species is present on large reservoirs and along the Colorado River | Unlikely to occur |
| Golden eagle (*Aquila chrysaetos*) | EGEPA: Yes | No | No | No | Species prefers mountainous areas; nesting occurs at elevations between 4,000 and 10,000 feet amsl | Species is found throughout Arizona | May occur: East Clear Creek |
| Western burrowing owl (*Athene cunicularia hypugaea*) | CNF: S | No | No | No | Species is found in open, dry grasslands, deserts, and agricultural lands; elevation ranges from 650–6,140 feet amsl | Species is found in southern Arizona and in agricultural areas in Maricopa and Pinal Counties | Unlikely to occur |
| Ferruginous hawk (*Buteo regalis*) | CNF: S | No | No | No | Species is found in open grasslands, scrublands, and woodlands in winter; ranges in elevation from 3,500 to 6,000 feet amsl. | Species is found throughout the state in winter, breeds on Colorado Plateau | Unlikely to occur |
| Common black hawk (*Buteogallus anthracinus*) | CNF: S | Yes | No | eBird | Species only present during breeding season; riparian obligate found along streams between 1,750 and 7,050 feet amsl | Breeding range is along streams draining the Mogollon Rim, species can be found throughout the state during migration | Known to occur: East Clear Creek |
| Western yellow-billed cuckoo (DPS) (*Coccyzus americanus occidentalis*) | ESA: T (all Arizona counties) CNF: S | No | No | No | Typically found in riparian woodland vegetation—cottonwood (*Populus* spp.), willow (*Salix* spp.), or saltcedar (*Tamarix* spp.)—at elevations below 6,600 feet amsl. Dense understory foliage appears to be an important factor in nest site selection | Species occurs at its highest concentrations in Arizona are along the Agua Fria, San Pedro, upper Santa Cruz, and Verde River drainages and Cienega and Sonoita Creeks | Unlikely to occur |
| Southwestern willow flycatcher (*Empidonax traillii extimus*) | ESA: E (all Arizona counties except Navajo County) | No | No | No | Found in dense riparian habitats along streams, rivers, and other wetlands where cottonwood (*Populus* spp.), willow (*Salix* spp.), boxelder (*Acer negundo*), saltcedar (*Tamarix* spp.), Russian olive (*Elaeagnus angustifolia*), buttonbush (*Cephalanthus* spp.), and arrowweed (*Pluchea sericea*) are present. Nests are found in thickets of trees and shrubs, primarily those that are 13 to 23 feet tall, among dense, homogeneous foliage. Habitat occurs at elevations below 8,500 feet amsl | Species breeds very locally along the middle Gila, Salt, Verde, middle to lower San Pedro, and upper San Francisco Rivers; also, locally around Colorado River near the mouth of the Little Colorado River, the headwaters of the Little Colorado and locations south of Yuma; species can be found in a variety of habitat types during migration | Unlikely to occur |
| American peregrine falcon (*Falco peregrinus anatum*) | CNF: S | Yes | (WestLand Resources Inc. 2017c) | No | Species is found near cliffs overlooking habitats that support large numbers of birds, range in elevations from 400–9,000 feet amsl. | Species breeds throughout state only on cliffs near abundant prey items | Known to occur: East Clear Creek |
| California condor (*Gymnogyps californianus*) | ESA: EXE (Apache, Coconino, Mohave, Navajo and Yavapai Counties) | No | No | No | Roosts and nest in steep terrain with rock outcroppings, cliffs, and caves. High perches are necessary to create the strong updrafts the bird requires to lift into flight, and open grasslands or savannahs are essential for searching for food | Occurs mostly along the Grand Canyon and Kaibab Plateau in northern Arizona | Unlikely to occur |
| Bald eagle (*Haliaeetus leucocephalus*) | CNF: S EGEPA: Yes | Yes | (WestLand Resources Inc. 2017c) | eBird | Habitat components include large bodies of water with lots of coastline and tall perches above water to allow for hunting | Found throughout much of the central and northern parts of Arizona, near large bodies of water | Known to occur: East Clear Creek |

| Common Name (*Scientific Name*) | Status* | HDMS Records within 2 miles | Baseline Data Records | Other Records (eBird, SWCA, or Forest Service Site Visits, Reptiles of Arizona) | Habitat Components (Elevation, Soils, Vegetation Association, Slope, Aspect, etc.) | Geographic Range in Arizona | Likelihood of Occurrence in Offered Lands |
|---|---|---|---|---|---|---|---|
| Abert's towhee (*Melozone aberti*) | CNF: S | No | No | No | Habitat includes woodlands and thickets usually near water, occurs in riparian woods, exotic vegetation such as salt cedar, along agricultural fields and in suburban areas | Species is found in lower elevation areas of central, southern and western Arizona | Unlikely to occur |
| Mexican spotted owl (*Strix occidentalis lucida*) | ESA: T (All counties except La Paz and Yuma Counties) | Yes | (WestLand Resources Inc. 2017c) | No | Found in mature montane forests and woodlands and steep, shady, wooded canyons. Can also be found in mixed-conifer and pine-oak vegetation types; generally nests in older forests of mixed conifers or ponderosa pine (*Pinus ponderosa*)–Gambel oak (*Quercus gambelii*). Nests in live trees on natural platforms (e.g., dwarf mistletoe [*Arceuthobium* spp.] brooms), snags, and canyon walls at elevations between 4,100 and 9,000 feet amsl | Found throughout the state in summer in forested mountains with steep canyons; found in almost all counties of Arizona; recently species has been found wintering in lower riparian areas such as Tonto Creek and Sabino Canyon | Known to occur: East Clear Creek |
| **Fish** | | | | | | | |
| Longfin dace (*Agosia chrysogaster*) | CNF: S | No | No | No | Habitat varies from intermittent hot low-desert stream to clear, cool streams at higher elevations, prefers medium-sized to small streams with sandy/gravely bottoms and pools with some cover. Species is normally found below 4,900 feet amsl | Occurs in central, southern, and southeastern Arizona | Unlikely to occur |
| California floater (*Anodonta californiensis*) | CNF: S | Yes | No | No | Species prefers shallow areas, less than 2 meters deep in unpolluted lakes, reservoirs, and perennial streams with relatively stable water levels of low velocity flow regimes; elevational range of 4,000–8,670 feet amsl | Occurs in Apache and Greenlee Counties, found in the Black River part of the Gila River Basin System | Known to occur: East Clear Creek |
| Desert sucker (*Catostomus clarki*) | CNF: S | No | No | No | Species is found in flowing pools of streams and rivers with a gravel substrate, elevational range of 480–8,840 feet amsl | Found throughout the Gila River basin and in tributaries to the Bill Williams River | Possible to occur: East Clear Creek |
| Bluehead sucker (*Catostomus discobolus discobolus*) | CNF: S | No | No | No | Species occurs in a variety of habitats from small streams to large rivers ranging from cold clear streams to warm, turbid rivers, elevational range of 2,001–6,758 feet amsl | Occurs in the Colorado River mainstem and Grand Canyon tributaries | Unlikely to occur |
| Sonora sucker (*Catostomus insignis*) | CNF: S | No | No | No | Found in a variety of habitats from warm rivers to cool streams, prefers gravelly or rocky pools in elevations ranging from 1,210–8,730 feet amsl. | Found in the Gila and Bill Williams river basins | Possible to occur: East Clear Creek |
| Little Colorado sucker (*Catostomus* sp.) | CNF: S | Yes | (WestLand Resources Inc. 2017c) | No | Species prefers creeks, small to medium-sized rivers and impoundments most often with abundant cover, elevational range of 2,200–7,100 feet amsl | Species is endemic to the upper portion of the Little Colorado River and some of its north-flowing tributaries | Known to occur: East Clear Creek |
| Gila chub (*Gila intermedia*) | ESA: E (Cochise, Coconino, Gila, Graham, Greenlee, Pima, Pinal, Santa Cruz, and Yavapai Counties) | No | No | No | Normally found in smaller headwater streams, cienegas, and springs or marshes of the Gila River Basin at elevations below 2,720–5,420 feet amsl | Currently found in the following drainages: Santa Cruz River, Middle Gila River, San Pedro River, Agua Fria River and Verde River | Possible to occur: East Clear Creek |
| Headwater chub (*Gila nigra*) | CNF: S | No | No | No | Species is found in the middle to headwater reaches of medium-sized streams with large pools and cover; elevational range of 925–2,000 feet amsl | Current range includes streams in the Verde River basin, Tonto Creek subbasin and San Carlos River basin in Yavapai, Gila and Graham Counties | Unlikely to occur |
| Roundtail chub (*Gila robusta*) | CNF: S | No | (WestLand Resources Inc. 2017c) | No | Species prefers cool to warm water in mid-elevation streams and rivers with pools up to 6.6 feet deep near flowing water. Cover consists of boulders, tree roots, deep water and submerged vegetation. Elevational range of 1,210–7,220 feet amsl | Occurs in tributaries to the Little Colorado River, tributaries to the Bill Williams River basin, the Salt River and its tributaries, the Verde River and its tributaries, Aravaipa Creek and Eagle Creek | Known to occur: East Clear Creek |
| Little Colorado spinedace (*Lepidomeda vittata*) | ESA: T (Apache, Coconino, and Navajo Counties) | Yes | (WestLand Resources Inc. 2017c) | No | Habitat consists of medium to small streams and is characteristically found in pools with water flowing over fine gravel and silt-mud substrates, elevational range of 4,000–8,000 feet amsl. | Found in East Clear Creek and its tributaries, Chevelon and Silver Creeks, and Nutrioso Creek and the Little Colorado River | Known to occur: East Clear Creek |
| Spikedace (*Meda fulgida*) | ESA: E (Apache, Cochise, Coconino, Gila, Graham, Greenlee, Maricopa, Pinal, and Yavapai Counties) | No | No | No | Found in medium-sized to large perennial streams, where it inhabits moderate-velocity to fast waters over gravel and rubble substrates, typically at elevations below 6,000 feet amsl | In Arizona, populations are found in the middle Gila, and Verde Rivers and Aravaipa and Eagle Creeks | Unlikely to occur |
| Gila trout (*Oncorhynchus gilae gilae*) | ESA: T (Apache, Coconino, Gila, Graham, Greenlee, Navajo, and Yavapai Counties) | No | No | No | Species is found in small mountain headwater streams, which are generally narrow and shallow, and rarely exceed 70 degrees Fahrenheit. Siltation is usually low and cobble is the predominant substrate. Elevational range of 5,446–9,220 feet amsl | Historically found in Verde and Agua Fria drainages. Species has been introduced to Gap Creek and Dude Creek, but those populations are in jeopardy or have been extirpated. Species could still be present in tributaries to the Verde River such as Oak Creek and West Clear Creek | Unlikely to occur |

Appendix B

| Common Name (Scientific Name) | Status | HSRB Records within 3 miles | Baseline Data Records | Other Records (USFWS, State, AGFD, Species of Note, Reptiles of Arizona) | Habitat Components (Elevation, Soils, Vegetation Association, Slope, Aspect, etc.) | Geographic Range in Arizona | Likelihood of Occurrence in Desert Lands |
|---|---|---|---|---|---|---|---|
| Gila topminnow (Poeciliopsis occidentalis) | ESA, E (Coahuila, Gila, Green, Hassayampa, Pinal, Salt, Santa Cruz, and Verde Courses) | No | No | Occurs in small streams, springs, and cienegas at elevations below 4,500 feet and primarily in habitat areas with aquatic vegetation and debris for cover | | In Arizona, occurs at a few scattered populations are known in the Santa Cruz River system | Unlikely to occur |
| Gila trout? (Oncorhynchus gilae) | | No | No | | | | Unlikely to occur |
| Loach minnow (Tiaroga cobitis) | ESA, E (Apache, Gila, Graham, Greenlee, Pinal, and Yavapai Counties) | No | No | Found in large perennial streams and rivers, typically in shallow, swift water over cobble and gravel in riffles and runs, below 8,000 feet | Largely in Arizona is limited to reaches in the East Fork of the Gila River, and other populations have been historically distributed throughout River drainages | Unlikely to occur |
| Razorback sucker (Xyrauchen texanus) | ESA, E (Cochise, Gila, Graham, Greenlee, La Paz, Maricopa, Mohave, Pinal, Yavapai and Yuma Counties) | No | No | Found in slow-moving flood pools of backwaters of river reaches below 6,000 feet and shoreline | In Arizona, populations are restricted to Lake Mohave and the Lower Colorado River, with some populations are found in the Verde and Salt rivers and Roosevelt Lake. Found in the Gila and Salt River Basins was occupied by the Black River in 1996 | Unlikely to occur |
| **Invertebrates** | | | | | | | |
| A mayfly (Fallceon eatoni) | CNF: S | No | No | | | Occurs in Cochise and Pima Counties | May occur  East Clear Creek |
| Ferruginous tiger beetle (Cicindela nigrocoerulea) | CNF: S | No | No | | | | May occur  East Clear Creek |
| Page tiger beetle (Cicindela columbica) | CNF: S | No | No | | | | May occur  East Clear Creek |
| Fossil springsnail (Pyrgulopsis simplex) | CNF: S | No | No | | | | Unlikely to occur |
| Kanab ambersnail (Oxyloma haydeni kanabensis) | CNF: S | No | No | | | Occurs in Gila and Yavapai Counties, Arizona | Unlikely to occur |
| **Mammals** | | | | | | | |
| White-bellied (?) (Eptesicus fuscus) | CNF: S | No | No | Vegetation may vary but site-disturbed areas | Occurs in Apache and Graham Counties, particularly in pine and oak woodlands and riparian areas known from Pima and Santa Cruz Counties in southern Arizona | Unlikely to occur |
| Pale Townsend's big-eared bat (Corynorhinus townsendii pallescens) | CNF: S | No | No | | | Whispers Occurs in the principal counties | May occur  East Clear Creek |
| Spotted bat (Euderma maculatum) | CNF: S | No | No | | | Widespread occurrence in Arizona | May occur  East Clear Creek |
| Greater western mastiff bat (Eumops perotis californicus) | CNF: S | No | No | | | The record species is reported in Arizona | May occur  East Clear Creek |

B-43

Appendix B

| Common Name (Scientific Name) | Status | IDFG Records within Range | Burden Data Records | Other Records (BLM, DWCA, or Forest Service Database, Reptile Records) | Habitat/components (Structure, Soils, Vegetation Association, Slope, Aspect, etc.) | Geographic Range in Arizona | Likelihood of Occurrence in Other Lands |
|---|---|---|---|---|---|---|---|

B-44

Appendix B

**Table B.4 Special status wildlife species for offsed lands under BLM jurisdiction**

| Common Name (Scientific Name) | Status | IGBA Records within 2 miles | Breeding Bird Records | Other Occurrence Records (eBird, etc.) | Habitat Components (Elevation, Soils, Vegetation, Association, Slope, Aspect, etc.) | Geographic Range in Arizona | Likelihood of Occurrence in BLM Offsed Lands |
|---|---|---|---|---|---|---|---|
| **Amphibians** | | | | | | | |
| | | | | | | | |

7-RCMSER-1768

Appendix B

| Common Name (Scientific Name) | Status* | HDMS Records Within 2 Miles | BisonFox Data Records | Other Occurrence Records | Habitat Components (Elevation, Soil, Vegetation Association, Slope, Aspect, etc.) | Geographic Range in Arizona | Likelihood of Occurrence in BLM Administered Lands |
|---|---|---|---|---|---|---|---|

B-46

Appendix B

| Common Name (Scientific Name) | Status | HDMS Records within 2 miles | Biotics EOA Records | Other Documents Records (RHA, TNC, Audubon Association, Sage, Apache, etc.) | Geographic Range in Arizona | Likelihood of Occurrence in BLM Referral Lands |
|---|---|---|---|---|---|---|
| | | | | | | |

B-47

7-RCMSER-1770

Appendix B

| Common Name (Scientific Name) | Status | IDMA Records within 2 miles | Breeding Data Records | Other Occurrence Records (AGFD, SPCA or BLM Survey Association, Steps, Aspect, etc.) | Habitat Components (Elevation, Soils, Aspect, etc.) | Geographic Range in Arizona | Likelihood of Occurrence in BLM Offered Lands |
|---|---|---|---|---|---|---|---|

7-RCMSER-1771

Appendix B

| Common Name (Scientific Name) | Status | HDMS Records within 2 Miles | Baseline DMA Records | Other Documents Records in HDMS, DMA, or BLM, USFWS, Reptiles of Arizona | | Geographic Range in Arizona | Likelihood of Occurrence in BLM/Other Lands |
|---|---|---|---|---|---|---|---|

B-49

7-RCMSER-1772

Appendix B

| Common Name (Scientific Name) | Status[a] | HDMS Records within 2 miles | Bam/Ino Data Records | Other Occurrence Records (JTHA, SPCA or BLM SDA, NWR, Pipeline VT Arizona) | Habitat Components (Elevation, Soils, Vegetation Association, Slope, Aspect, etc.) | Geographic Range in Arizona | Likelihood of Occurrence in BLM Overall Level |
|---|---|---|---|---|---|---|---|

7-RCMSER-1773

Appendix B

Table B-5. Special status plant species analyzed for the alternatives panels

| Common Name (Scientific Name) | Status* | HDMS Records within 2 Miles | Baseline Data Records | Other Occurrence Records (HDMS, AGFD, Heritage) | Habitat Components (Elevation, Soils, Physiographic Association, Slope) | Occupied Range in Arizona | Likelihood of Occurrence in Official Land Analysis Area |
|---|---|---|---|---|---|---|---|

B-51

Appendix B

| Common Name (Scientific Name) | Status | NHDES Records within 2 units | Baseline Data Records | Other Occurrence Record (EBHM, NatureServe) | Habitat Components (Elevation, Soils, Vegetation Association, Slope, Aspect, Etc.) | Geographic Range in Alaska | Lakebed of Occurrence in Other Lands Analysis Area |
|---|---|---|---|---|---|---|---|

B-52

Appendix B

| Common Name (Scientific Name) | Status | HDMS Records within 2 miles | Baseline Data Records | Other Documented Records (USFWS, Reports, Aspect, etc.) | Habitat Components (Elevation, Soils, Vegetation Association, Slope, Aspect, etc.) | Geographic Range in Arizona | Likelihood of Occurrence in Offered Lands/Analysis Area |
|---|---|---|---|---|---|---|---|

B-53

Appendix B

| Common Name (Scientific Name) | Status[a] | HDMS Records within 2 miles | Baseline Data Records | Other Occurrence Records (SEINet, NatureServe) | Habitat Components (Elevation, Soils, Vegetation Association, Slope, Aspect, etc.) | Geographic Range in Arizona | Likelihood of Occurrence in Offered Lands Analysis Area |
|---|---|---|---|---|---|---|---|
| Nichol's Turk's head cactus (Echinocactus horizonthalonius var. nicholi) | ESA: E (Maricopa, Pima, and Pinal Counties) BLM: S | No | No | No | Found on limestone substrates along dissected alluvial fans, inclined terraces and saddles, bajadas, and debris flow. It grows in open areas and partially to shaded areas underneath the canopy of shrubs and trees, or sheltered next to rocks on steep slopes and with limestone outcrops. Occurs within the Upland Division of Sonoran desertscrub on 0% to 30% slopes with north, west, and south-facing exposure. Elevation 2,400–4,600 feet amsl. | Endemic to the Sonoran Desert and occurs on isolated mountain ranges within south-central Arizona in Pima and Pinal Counties. | Unlikely to occur |
| Page Springs agave (Agave yavapaiensis) | CNF: S | No | No | No | Rocky, clayey/loamy igneous derived soils, less frequently on limestone soils in semi-arid desert grassland to pinyon juniper woodland. | Known only from 10 populations occurring near habitation and agricultural and archeological sites associated with pre-Columbian cultures. | Unlikely to occur |
| Peebles Navajo cactus (Pediocactus peeblesianus var. peeblesianus) | ESA: E (Navajo County) BLM: S | No | No | No | Weakly alkaline, gravelly soils where the host gravel can occur on a variety of substrates. Elevation between 5,400 and 5,500 feet amsl | Central Navajo County, near Holbrook, Arizona | Unlikely to occur |
| Parish's Indian mallow (Abutilon parishii) | TNF: S[1] BLM: S | No | No | No | Mountain slopes and desert scrublands. Elevation 3,200 feet amsl | Found in Maricopa, Gila, Graham, Pima, Pinal, and Yavapai Counties | May occur; Apache Leap South, Dripping Springs |
| Pima pineapple cactus (Coryphantha scheeri var. robustispina) | BLM: S | No | No | No | Alluvial valleys, mesas, and hillsides in desert, desert grassland, or southwestern oak woodlands. Soils range from shallow to deep, and silty to rocky, with a preference for silty to gravelly deep alluvial soils. Elevation 2,300–4,500 feet amsl | Pima and Santa Cruz Counties | Unlikely to occur |
| Pinaleno Mountain rubberweed (Hymenoxys ambigens var. ambigens) | TNF: BCC[1] | No | No | No | Occurs in stony soils at elevations from 5,905–7,000 feet amsl. | Maricopa, Graham, and Gila Counties | Unlikely to occur |
| Ripley's wild buckwheat (Eriogonum ripleyi) | CNF: S TNF: S, SCC | No | No | No | Sandy clay flats and slopes on edges of sandstone outcrops, oak juniper woodlands. Elevation 3,200–6,235 feet amsl | Known only from two areas in Arizona: one near Fraziers Well in Coconino County, and a second in the Verde Valley area of southeastern Yavapai and extreme northwestern Maricopa County | Unlikely to occur |
| Rock fleabane (Erigeron saxatilis) | CNF: S | No | No | Yes | Shaded canyon walls, moist north-facing slopes, and steep rock outcrops and boulders in the stream beds of shady canyons. Elevation 4,360–6,890 feet amsl | Coconino, Gila, and Yavapai Counties | Known to occur; East Clear Creek |
| Round dunebroom (Errazurizia rotundata) | BLM: S | No | No | No | Sandy areas or in crevices of rock on rocky hilltops and ledges | Coconino and Navajo Counties | Unlikely to occur |
| Rusby's milkvetch (Astragalus rusbyi) | CNF: S | No | No | No | Meadows in yellow pine forest or edge of thickets and aspen groves, in dry or frequently moist basaltic soils; elevational range of 6,400–8,000 feet amsl | Occurs in the Flagstaff area and the lower slopes of the San Francisco Peaks descending into Oak Creek Canyon, in Coconino County | Unlikely to occur |
| Rusby's milkvetch (Hylophila rusbyi) | CNF: S TNF: S, SCC | No | No | No | Desert grasslands and juniper woodlands. Elevation 3,000–5,000 feet amsl | Maricopa, Mohave, and Yavapai Counties | Unlikely to occur |
| Salt River rock daisy (Perityle gilensis var. salensis) | TNF: S, SCC | No | No | No | Crevices on cliff faces, ledges and rock outcrops in habitats that are occurred between oak-juniper and oak-juniper woodland and mountain mahogany (Cercocarpus)-oak scrub. Elevation between 3,000–3,900 feet amsl | Only two known sites, located along the Salt River Canyon | Unlikely to occur |
| San Francisco Peaks groundsel (Packera franciscana) | ESA: T (Coconino County) | No | No | No | Talus slopes, rock crevices, above timberline. Elevation 10,500–12,470 feet amsl | Known only from above timberline in the San Francisco Peaks | Unlikely to occur |
| San Pedro River wild buckwheat (Eriogonum terrenatum) | BLM: S | No | No | No | Clayey slopes and flat, creosote bush communities. Elevation 3,200–3,940 feet amsl | Pima and Cochise Counties | Unlikely to occur |
| Sierra Ancha fleabane (Erigeron anchana) | TNF: S, SCC | No | No | No | Rock crevices and ledges on boulders or on vertical cliff faces, usually in canyons. Granite cliff faces, chaparral through pine forests | Found in Gila County in the Sierra Ancha, Mazatzal, and Mescal Mountains as well as Pine Creek | Unlikely to occur |
| Sunset Crater beardtongue (Penstemon clutei) | CNF: S | No | No | No | Volcanic cinder cones, either in open areas or under ponderosa pines in spots without leaf litter. Elevation 6,965 feet amsl | Near Sunset Crater in Coconino County | Unlikely to occur |
| Texas purple spike (Piloblephis texensis) | BLM: S | No | No | No | Shaded slopes and dry, rocky creek beds in canyons, in leaf mold in oak-juniper-pinyon pine woodlands. Elevation 4,965–5,595 feet amsl | Found in Cochise County | Unlikely to occur |

B-54

Appendix B

| Common Name (Scientific Name) | Status | IUCN Recovery within 2 Sites | Electrical Data Records | Other Documents Recall (EISAs, Reports/Books) | Habitat Components (Elevation, Soils, Vegetation Association, Slope, Aspect, etc.) | Geographic Range in Arizona | Dr. Minckje and Tiarga Counties | Life Period of Occurrence in District Levels Analysis Area |
|---|---|---|---|---|---|---|---|---|
| Tecla Basin agave (Agave delamater) | CdF-S TNF-S, BCC | No | No | No | | | | Maricopa Turkey Creek |
| Toumey's pincushion cactus (Pediocactus paradine... bisnaga) | TNF-S, BCC | No | No | No | | | | Unlikely to occur |
| Gierisch mallow (Sphaeralcea gierischii) | BLM-S | No | No | No | | | | Unlikely to occur |
| Welsh's milkweed (Asclepias welshii) | TNF, BCC* | No | No | No | | | | Unlikely to occur |
| Welsh's milkweed (Astragalus welshii) | CdF-S | No | No | No | | | | Unlikely to occur |

7-RCMSER-1778

(61 of 258), Page 61 of 258
Case: 25-5197, 09/29/2025, DktEntry: 61.8, Page 61 of 258
Case 2:21-cv-00068-DWL   Document 106-3   Filed 07/14/25   Page 339 of 355

Appendix B

Table B-6. Noxious and invasive weed species analyzed for the offered lands project

| Common Name | Scientific Name | Status | Habitat Components (Elevation, Soils, Veg Association, Slope, Aspect, etc.) | Geographic Range in Arizona | Likelihood of Occurrence |
|---|---|---|---|---|---|

7-RCMSER-1779

Appendix B

| Common Name | Scientific Name | Status | Habitat Components (Elevation, Soils, Veg Associations, Slope, Aspect, etc.) | Geographic Range in Arizona | Likelihood of Occurrence |
|---|---|---|---|---|---|

7-RCMSER-1780

Appendix B

| Common Name | Scientific Name | Status | Habitat Components (Elevation, Soils, Veg Association, Slope, Aspect, etc.) | Geographic Range in Arizona | Likelihood of Occurrence |
|---|---|---|---|---|---|

7-RCMSER-1781

Appendix B

| Common Name | Scientific Name | Status | Habitat Components (Elevation, Soils, Veg Association, Slope, Aspect, etc.) | Geographic Range in Arizona | Likelihood of Occurrence |
|---|---|---|---|---|---|

7-RCMSER-1782

Appendix B

| Common Name | Scientific Name | Status | Habitat/Component (Elevation, Soils, Veg Association, Slope Aspect, etc.) | Geographic Range in Arizona | Likelihood of Occurrence |
|---|---|---|---|---|---|

7-RCMSER-1783

(66 of 258), Page 66 of 258
Case: 25-5197, 09/29/2025, DktEntry: 61.8, Page 66 of 258
Case 2:21-cv-00068-DWL   Document 106-3   Filed 07/14/25   Page 344 of 355

Appendix B

| Common Name | Scientific Name | Status | Habitat Components, Elevation, Soils, Vegetation, Slope, Aspect, etc.) | Geographic Range in Arizona | Likelihood of Occurrence |
|---|---|---|---|---|---|

B-61

7-RCMSER-1784

Appendix B

| Common Name | Scientific Name | Status | Habitat Components (Elevation, Soils, Veg. Association, Slope, Aspect, etc.) | Geographic Range in Arizona | Likelihood of Occurrence |
|---|---|---|---|---|---|

B-62

(68 of 258), Page 68 of 258

Case: 25-5197, 09/29/2025, DktEntry: 61.8, Page 68 of 258
Case 2:21-cv-00068-DWL   Document 106-3   Filed 07/14/25   Page 346 of 355

Appendix B

| Common Name | Scientific Name | Status | Habitat Component (Elevation, Soils, Veg Association, Slope, Aspect, etc.) | Geographic Range in Arizona | Likelihood of Occurrence |
|---|---|---|---|---|---|

7-RCMSER-1786

Appendix B

| Common Name | Scientific Name | Status | Habitat Components (Elevation, Soils, Veg Association, Slope, Aspect, etc.) | Geographic Range in Arizona | Likelihood of Occurrence |
|---|---|---|---|---|---|

*(Table content illegible at available resolution)*

B-61

Appendix B

| Common Name | Scientific Name | Status | Habitat Component (Elevation, Soil, Key Association, Slope, Aspect, etc.) | Oregon/Washington Status in Analysis Area | Likelihood of Occurrence |
|---|---|---|---|---|---|

B-65

Case: 25-5197, 09/29/2025, DktEntry: 61.8, Page 71 of 258
Case 2:21-cv-00068-DWL   Document 106-3   Filed 07/14/25   Page 349 of 355

Appendix B

| Common Name | Scientific Name | Status | Habitat Components (Elevation, Soils, Veg Association, Slope, Aspect, etc.) | Geographic Range in Arizona | Likelihood of Occurrence |
|---|---|---|---|---|---|
| Paiute | Vauquelinia | THF | | Has occurrence records in Coconino, Cochise, Maricopa, Pima, Santa Cruz, and Yavapai counties. Occurs on Tonto National Forest in scattered populations. | Unlikely to occur (p0). No Tonto National Forest suitable habitat is present. Any occurrences would likely be at elevations and aspects too cold for these low occurrences. |

*(The remainder of this appendix table is a multi-row listing of plant species with their scientific names, status codes (THF/ADA), habitat component descriptions, geographic ranges in Arizona, and likelihood of occurrence. The text is rotated and at a resolution too low to transcribe each cell reliably.)*

B-66

Appendix B

| Common Name | Scientific Name | Status | Habitat/Geographic Range (Elevation, Soils, Vegetation Association, Slope, Aspect, etc.) | Geographic Range in Montana | Likelihood of Occurrence |
|---|---|---|---|---|---|

B-47

Appendix B

| Common Name | Scientific Name | Status | Habitat Components (Elevation, Soils, Veg Association, Slope, Aspect, etc.) | Geographic Range in Arizona | Likelihood of Occurrence |
|---|---|---|---|---|---|

B-65

7-RCMSER-1791

Appendix B

| Common Name | Scientific Name | Status | Habitat/Comments (Elevation, Soils, Vegetation, Slope, Aspect, etc.) | Geographic Range in Arizona | Likelihood of Occurrence |
|---|---|---|---|---|---|

B-49

Appendix B

| Common Name | Scientific Name | Status | Habitat/Components (Elevation, Soils, Veg Association, Slope Aspect, etc.) | Geographic Range in Arizona | Likelihood of Occurrence |
|---|---|---|---|---|---|

B-10

Appendix B

| Common Name | Scientific Name | Status | Habitat Components (Elevation, Soils, Veg Association, Slope, Aspect, etc.) | Geographic Range in Arizona | Likelihood of Occurrence |
|---|---|---|---|---|---|

B-71

Appendix B

*This page intentionally left blank.*

B-72

Exhibit 26


2025 FEIS Volume 4


San Carlos Apache Tribe's Motion for Preliminary Injunction to Enjoin
Conveyance of Oak Flat

 

**Forest Service**
U.S. DEPARTMENT OF AGRICULTURE

Tonto National Forest | MB-R3-12-10 | June 2025

# FINAL Environmental Impact Statement
## Resolution Copper Project and Land Exchange

Coconino, Gila, Maricopa, Pinal, Santa Cruz, and Yavapai Counties, Arizona



In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at How to File a Program Discrimination Complaint and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov.

USDA is an equal opportunity provider, employer, and lender.

**Front Cover photo captions:**

*Top:* Map of the Preferred Alternative Project location and the Tonto National Forest

*Bottom Left:* Oak Flat Federal Parcel

# Table of Contents

## Volume 1

Executive Summary

Chapter 1. Purpose of and Need for Action

Chapter 2. Alternatives, Including the Proposed Action

Chapter 3. Affected Environment and Environmental Consequences, Sections 3.1 through 3.6

## Volume 2

Chapter 3. Affected Environment and Environmental Consequences, Sections 3.7 through 3.12

## Volume 3

Chapter 3. Affected Environment and Environmental Consequences, Sections 3.13 through 3.17

## Volume 4

Appendix C. Clean Water Act 404(B)(1) Alternatives Analysis – Resolution Copper

Appendix D. Clean Water Act Section 404 Conceptual Mitigation Plan – Resolution Copper Project

Appendix E. Alternatives Impact Summary

Appendix F. Alternatives Considered but Dismissed from Detailed Analysis

Appendix G. Further Details of East Plant Site, West Plant Site, MARRCO Corridor, and Filter Plant and Loadout Facility Infrastructure

Appendix H. Further Details of Mine Water Balance and Use

Appendix I. Summary of Effects of the Land Exchange

Appendix J. Mitigation and Monitoring Strategy

Appendix K. Summary of Content of Resource Analysis Process Memoranda

## Volume 5

Appendix L. Detailed Hydrographs Describing Impacts on Groundwater-Dependent Ecosystems

Appendix M. Water Quality Modeling Results for Constituents of Concern

Appendix N. Summary of Existing Groundwater and Surface Water Quality

Appendix O. *This appendix has been removed from the FEIS*

Appendix P. Final Biological Opinion Completing Consultation under Section 7 of the Endangered Species Act

Appendix Q. Special Use Permit Applications

i

Resolution Copper Project and Land Exchange

# Volume 6

**Appendix R. Response to Comments Received on the DEIS**

**Appendix S.  Consultation History**

**Appendix T.  Proposed Forest Plan Amendment and NFMA Compliance Determination for Preferred Alternative**

**Appendix U. Supplemental Information for Section 3.14, Tribal Values and Concerns**

7-RCMSER-1800

# Appendix C. Clean Water Act 404(B)(1) Alternatives Analysis – Resolution Copper

# CLEAN WATER ACT 404(B)(1)
# ALTERNATIVES ANALYSIS
## Resolution Copper

Prepared for:



United States Army Corps of Engineers

On Behalf of:



102 Magma Heights – Superior, Arizona 85173

Project Number: 807.175 05 02

September 10, 2020



## WestLand Resources

WestLand Resources, Inc. • 4001 E. Paradise Falls Drive • Tucson, Arizona 85712 • 520•206•9585

CWA 404(B)(1) Alternatives Analysis                                    Resolution Copper

# TABLE OF CONTENTS

1.  INTRODUCTION .................................................................................................................. 1
2.  PROJECT DESCRIPTION AND PURPOSE .................................................................... 2
    2.1.  Mine Development Background ................................................................................. 2
    2.2.  Project Description ...................................................................................................... 3
    2.3.  Purpose and Need for the Project ............................................................................ 3
3.  FORMULATION OF PROJECT ALTERNATIVES ........................................................ 4
    3.1.  Geographic Scope for TSF Alternatives .................................................................. 5
        3.1.1.  Brownfield Sites .............................................................................................. 5
        3.1.2.  Multiple TSF Locations ................................................................................. 8
    3.2.  Tailings Impoundment Design, Construction, and Operation ............................. 9
        3.2.1.  Tailings Embankment .................................................................................... 10
        3.2.2.  Tailings Processing and Placement Technologies ................................... 11
4.  ANALYSIS OF PROJECT ALTERNATIVES .................................................................. 13
    4.1.  TSF Locations Dismissed from Consideration Due to Lack of Availability ...... 14
        4.1.1.  ASLD Lands Associated with the BGC A and Far West Alternatives ...... 14
        4.1.2.  Lands Associated with the BOR Mineral Withdrawal ............................. 14
        4.1.3.  Lands Associated with the Superstition Wilderness .............................. 17
        4.1.4.  Wild and Scenic River Candidate Reaches .............................................. 17
    4.2.  TSF Locations Dismissed from Consideration Due to Impracticability ............ 17
    4.3.  Preliminary Environmental Effects Screening Analysis ...................................... 18
        4.3.1.  BGC B .............................................................................................................. 18
        4.3.2.  Peg Leg ........................................................................................................... 19
        4.3.3.  Mineral Creek ................................................................................................ 21
    4.4.  Skunk Camp Filtered Tailings ('Dry-Stack') Design ............................................ 21
    4.5.  Screening and Analysis Summary ............................................................................ 22
    4.6.  Alternatives Considered in Detail ............................................................................ 22
5.  TSF ALTERNATIVES DESCRIPTION AND PRACTICABILITY DETERMINATION ........ 23
    5.1.  Project-Specific Practicability Criteria ................................................................... 23
    5.2.  Detailed Evaluation of Alternatives ........................................................................ 25
        5.2.1.  Near West 'Wet' TSF Alternative ............................................................... 25
        5.2.2.  Near West 'Dry' TSF Alternative ................................................................ 27
        5.2.3.  Silver King TSF Alternative ......................................................................... 29
        5.2.4.  Skunk Camp TSF Alternative ...................................................................... 31
6.  ENVIRONMENTAL EFFECTS OF THE SKUNK CAMP ALTERNATIVE ............... 36
    6.1.  Impacts to the Aquatic Ecosystem/Surface Water Features .............................. 37
    6.2.  Other Adverse Environmental Consequences ...................................................... 37
    6.3.  Cumulative Impacts to the Aquatic Ecosystem .................................................... 40
    6.4.  Compliance with the Guidelines .............................................................................. 40
7.  SUMMARY AND CONCLUSIONS ................................................................................. 42
8.  REFERENCES ...................................................................................................................... 43

## TABLES

Table 1. Brownfields Sites Investigated for Potential Tailings Storage (adapted from SWCA 2017 [revised]) ............................................................................................................................................6
Table 2. Alternative TSF Locations Dismissed from Consideration (adapted from USFS 2019b, Appendix B [revised]).................................................................................................................15
Table 3. TSF Alternative Practicability Analysis Results Summary.......................................................35

## FIGURES

Figure 1.       Overview of Proposed Mining Operation
Figure 2.       Brownfield Tailings Storage Facility Locations
Figure 3.       TSF Alternatives Dismissed from Further Consideration
Figure 4.       Superstition Vistas ASLD Lands
Figure 5.       BOR Mineral Withdrawal Lands
Figure 6.       Superstition Wilderness Lands
Figure 7.       OHWM Delineation of BGC B TSF Alternative
Figure 8.       OHWM Delineation of Peg Leg TSF Alternative
Figure 9.       Mineral Creek TSF Alternative
Figure 10.      Overview of TSF Alternatives Locations Considered in Detail
Figure 11.      Near West TSF 'Dry' Alternative Detail
Figure 12.      Skunk Camp Pipeline Alternative Impacts to Aquatic Ecosystems
Figure 13.      Skunk Camp TSF Alternative Impacts to Aquatic Ecosystems

## APPENDICES

Appendix A. *Resolution Copper Mining, LLC – Mine Plan of Operations and Land Exchange – USFS Alternatives Data Request #3-F, Information on Potential Tailings Alternatives*
Appendix B. ASLD Letter *Response to July 5, 2017 Letter Regarding "Potential to Locate a Resolution Copper Mine Tailings Storage Facility on Arizona State Trust Lands"* (August 2, 2017)
Appendix C. WestLand Resources, Inc. *Resolution Copper Project Revised Alternatives Discussion* (January 21, 2020)
Appendix D. Air Sciences Inc. *Air Quality Regulatory Constraints Associated with the Hewitt Canyon and Whitford Canyon Tailings Alternatives* (September 13, 2019)
Appendix E. WestLand Resources, Inc. *Resolution Copper Project BGC B Tailings Storage Facility Revised Alternatives Discussion* (April 13, 2020)
Appendix F. KCB Consultants Ltd. *Resolution Copper Project Skunk Camp Tailings Storage Facility Filtered Tailings Analysis, Conceptual Filtered Tailings Impoundment Layout and Staging* (January 17, 2020)
Appendix G. Tables 3.1 – 3.7 Adapted from KCB Consultants Ltd. *Summary of DEIS Tailings Alternatives Seepage Control Levels* (February 22, 2019)

## 1.  INTRODUCTION

Resolution Copper Mining, LLC (Resolution, or the Applicant) proposes to develop and operate an underground copper and molybdenum mine near Superior, Arizona. As proposed, the construction of the tailings storage facility (TSF), associated pipelines, and appurtenant infrastructure requires the discharge of fill to surface water features that the U.S. Army Corps of Engineers (Corps) has determined (Corps File No. SPL-2016-00547) to be potentially jurisdictional waters of the United States (waters of the U.S.) pursuant to a preliminary jurisdictional determination (PJD). As these potentially jurisdictional waters of the U.S. will be impacted by discharges of dredged or fill material resulting from portions of Resolution's planned mine development, Resolution has made application for a Clean Water Act (CWA) Section 404 permit for these discharges.

Because portions of Resolution's planned mine development occur on lands managed by the U.S. Forest Service (USFS) Tonto National Forest (TNF), Resolution submitted a General Plan of Operations (GPO) to the TNF in 2013 and subsequently amended it (Resolution 2016) to account for the USFS plan completeness review and the Southeast Arizona Land Exchange (land exchange) authorized in the National Defense Authorization Act (NDAA) for Fiscal Year 2015. The TNF deemed the GPO to be complete for the purpose of initiating review under the National Environmental Policy Act (NEPA) and subsequently published an Environmental Impact Statement (EIS) for the planned mine development and land exchange. Section 3003 of the NDAA authorized the exchange of lands between the federal government and Resolution and directed the USFS to prepare a single EIS as the basis for all decisions under federal law related to Resolution's proposed mine development and any related major federal action significantly affecting the quality of the human environment. The NEPA analysis will ultimately lead to the issuance of a Record of Decision (ROD) by the USFS for Resolution's planned mining-related activities on National Forest System lands. The Corps is acting as a cooperating agency in the EIS process to meet its NEPA obligation for issuance of a CWA Section 404 permit.

Independent of the requirement to develop the EIS pursuant to NEPA and Section 3003 of the NDAA, an analysis of alternatives is required as part of Section 404 permitting in order to demonstrate compliance with guidelines established under CWA Section 404(b)(1) (40 CFR Part 230; the Guidelines) for avoidance, minimization, and mitigation of impacts to waters of the U.S. A demonstration of compliance with the Guidelines is required before a Section 404 permit may be issued. The 404(b)(1) alternatives analysis is intended to ensure that no discharge be permitted "if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences" (40 CFR Part 230.10(a)).

As discussed above, the Final EIS (FEIS) analyzes Resolution's planned mine development activities, as well as the congressionally authorized land exchange. Because only certain elements of Resolution's overall mine development activities involve a discharge of dredged or fill material into potential waters

20200910_ResolAtion_404b1_final

7-RCMSER-1806

of the U.S. (i.e., the construction of the TSF, associated pipelines, and auxiliary infrastructure), only those activities are required to be analyzed by the Corps under the Guidelines. This 404(b)(1) alternatives analysis has been developed to support compliance with the Guidelines, identify the basic and overall project purpose, describe the alternatives selected for detailed analysis, evaluate the practicability of each selected alternative, and discuss the environmental effects of practicable alternatives to ultimately inform the determination of which alternative is the Least Environmentally Damaging Practicable Alternative (LEDPA) under the Guidelines. Information contained in this analysis of alternatives builds on the descriptions contained in the Practicability Analysis (WestLand 2019) included with the Draft EIS (DEIS; USFS 2019b), comments received on the DEIS, and information developed through a series of workgroup meetings with the Corps, USFS, and Environmental Protection Agency (EPA) following publication of the DEIS. This 404(b)(1) alternatives analysis will be used in the Corps permitting decision-making process.

## 2. PROJECT DESCRIPTION AND PURPOSE

### 2.1. MINE DEVELOPMENT BACKGROUND

Resolution's planned mine development is located near Superior in Pinal County, Arizona (**Figure 1**) in an area commonly referred to as the Copper Triangle and specifically within the Pioneer Mining District. Mine exploration and operations have been conducted in the area since the early 1860's, when the discovery of silver led to the development of the Silver King Mine. Magma Copper Company (Magma) took over the Silver King Mine and operated it as the Magma Mine from 1912 until the concentrator was finally shut down in 1996. After Magma's shutdown, the Resolution ore deposit was discovered 1.2 miles south of the existing Magma Mine and 7,000 feet below the ground surface.

Resolution was formed as a limited liability company in 2004 by Rio Tinto and BHP Billiton. Since 2004, Resolution has steadily worked to investigate and delineate the Resolution ore body, develop a mine design, prepare environmental and engineering studies to support the mine permitting and approvals effort, and conduct multiple community outreach efforts and public meetings to inform and involve the public as plans were developed. These efforts led to the submittal of the GPO to the USFS in November 2013.

Resolution proposes the development of the Resolution ore body using panel caving, a type of cave mining. The copper and molybdenum ore will be mined, undergo primary crushing underground, and then be sent to a concentrator facility to be constructed at the existing West Plant Site north of Superior. Concentrate produced at the West Plant Site will be transported offsite for additional processing, while the resulting tailings will be transported via a pipeline to the proposed TSF location. Under the current proposed operating conditions and Life of Mine (LOM) planning parameters, the Resolution ore body is sufficient to support the concentrator operations for approximately 41 years. As currently configured, operations are anticipated to result in the mining of approximately 1.4 billion tons of copper and molybdenum ore and the production of approximately 1.37 billion tons of tailings.

7-RCMSER-1807

## 2.2.  PROJECT DESCRIPTION

Although the mining process in general, and the planned locations of the ore and processing facilities in particular, are described in the GPO, locations for the TSF, pipelines, and auxiliary infrastructure are the primary subject of the alternatives analysis in the EIS and the sole focus of this 404(b)(1) alternatives analysis document. As configured, only the development of the TSF, pipelines, and auxiliary infrastructure (collectively, the "Project" for purposes of this 404(b)(1) alternatives analysis document) require a discharge of dredged or fill material into potential waters of the U.S. Discharge of fill for the development of these features, particularly the TSF, consists mostly of the levelling of existing topography through cut and fill of the natural ground surface. Materials to be discharged to potential waters of the U.S. during this process would consist primarily of native soil and rock taken from the footprint of the constructed features during the grading process.

Processing of the copper and molybdenum ore from the Resolution ore body will result in the production of two physically, mineralogically and geochemically distinct types of tailings: 1) the scavenger or non-potentially acid generating (NPAG) tailings, and 2) the pyrite or potentially acid generating (PAG) tailings. Scavenger tailings contain less than 0.1 percent of pyrite by weight (Duke HydroChem 2016) and will account for approximately 84 percent, or approximately 1.15 billion tons, of the tailings produced during the LOM. In contrast, pyrite tailings contain a much higher amount of pyrite (>20% by weight) and will account for 16 percent, or approximately 0.22 billion tons, of the tailings produced during the LOM (KCB 2018a). These two very distinct types of tailings, and the management requirements for each (especially the pyrite tailings) informed the design and operation of the proposed TSF alternatives evaluated in both the FEIS and this document.

## 2.3.  PURPOSE AND NEED FOR THE PROJECT

The Applicant's overall project purpose and need is to construct and operate a TSF and associated infrastructure capable of storing approximately 1.37 billion tons of tailings produced through milling copper and molybdenum ore from the Resolution ore body (plus approximately 12 million cubic yards of on-site borrow material used to construct the starter embankments), along with the pipelines and associated infrastructure needed to transport tailings to the TSF and recycled water from the TSF back to the concentrator facility. Capacity to deposit approximately 1.37 billion tons of tailings is required to allow for utilization of the Resolution ore body to the extent described in the GPO (mining of approximately 1.4 billion tons of ore). The Applicant's basic project purpose is mine tailings storage, which is not water-dependent. However, the proposed discharge will not affect a special aquatic site, so the rebuttable presumption in 40 C.F.R. § 230.10(a)(3) is not triggered.

7-RCMSER-1808

## 3.  FORMULATION OF PROJECT ALTERNATIVES

The USFS and cooperating agencies (including the Corps)[1] have analyzed a number of alternative TSF designs and locations for detailed analysis in the EIS. This evaluation is contained in the EIS and other documents cited herein but will be summarized in the balance of this document to explain the selection of the alternatives analyzed in detail for compliance with the Guidelines. This 404(b)(1) alternatives analysis document relies on the detailed analysis of TSF alternatives contained in the EIS and supporting documents. Most of these alternatives, and the methodology for identifying them, are discussed in detail in the *Resolution Copper Project and Land Exchange Environmental Impact Statement DRAFT Alternatives Evaluation Report, November 2017* (SWCA 2017) and *Appendix F: Alternatives Considered but Dismissed from Detailed Analysis* of the DEIS (USFS 2019b). The Skunk Camp TSF alternative was also identified for detailed analysis in the DEIS and FEIS. This 404(b)(1) alternatives analysis was designed to be consistent with, and relies on, the detailed analysis of TSF alternatives contained in these documents to support the analysis of the alternatives for compliance with the Guidelines.

The USFS utilized information gathered from public scoping, government-to-government consultation with Native American groups, and alternatives workshops to identify public values and develop screening criteria for reviewing alternative TSF development scenarios. Some of the key public issues raised during this scoping analysis were public health and safety, proximity to existing communities, and protection of aquatic and wildlife habitat (SWCA 2017). With these issues in mind, the USFS began evaluating the regional landscape to identify TSF locations as potential alternatives to that TSF location proposed in the GPO. The USFS systematically evaluated dozens of potential tailings locations and technologies for both the full volume and partial volumes (split volume storage) of tailings. The identification and evaluation of alternatives, in addition to varying the proposed location of the TSF, also included a process that prioritized alternatives through the following: the potential for use of previously disturbed, or 'brownfield', sites for TSF development, the use of multiple sites for the placement of tailings, and finally differing the types of tailings embankments and tailings processing/placement technologies, including filtered or 'dry stack' tailings, at proposed TSF locations. The discussion of these screened alternatives in this 404b1 alternatives analysis include sixteen brownfield locations (**Section 3.1.1**), the potential use of multiple sites (**Section 3.1.2**), fifteen alternative combinations of TSF locations and tailings processing/placement technologies (**Sections 4.1** and **4.2**), three alternatives evaluated using a preliminary environmental effects screening analysis (**Section 4.3**), a potential filtered TSF at the Skunk Camp location (**Section 4.4**), and four TSF alternatives considered in detail (**Section 5**). The next sections of this document maintain this process and structure in reviewing the resulting alternatives from the USFS alternatives screening process within the added context of the Guidelines.

---

[1] Henceforth in this document, references to the USFS in the context of development of the FEIS should be understood to include the agencies cooperating in the development of that document, including (but not limited to) the Corps.

## 3.1.  GEOGRAPHIC SCOPE FOR TSF ALTERNATIVES

Transport distance for tailings is a significant factor in determining the economic and technological practicability of recovering the copper and molybdenum ore from the Resolution ore body, and the placement of tailings is not functionally independent of the fixed locus of that ore body. The USFS evaluated a broad landscape up to 200 miles from the East and West Plant sites to identify initial potential alternative locations for the TSF. Factors considered in this evaluation included existing mines or 'brownfield' areas, locations within a reasonable proximity to the Resolution mine site, favorable topography, sufficient storage capacity, and a configuration suitable for tailings impoundment construction as described in the GPO. Potential use of brownfield sites for TSF development was prioritized in this evaluation.

### 3.1.1.  Brownfield Sites

The USFS evaluated brownfield sites associated with other current and previous mining operations not under the ownership of Resolution in locations up to 200 miles from the Resolution ore deposit. This evaluation includes 15 brownfield sites not under Rio Tinto or Resolution Copper ownership, as well as the future subsidence zone anticipated from mining the Resolution ore deposit itself, as potential areas for the storage of tailings that might be available and practicable as alternatives to the development of a new TSF in a previously undisturbed location (SWCA 2017). These brownfield sites are shown in **Figure 2.** The evaluation considered whether the brownfield site had ongoing or publicly stated planned future mining operations, had other ongoing site activities, and had the capacity to contain a necessary volume of tailings (factors relating to the availability of the site under the Guidelines as well as its ability to meet the project purpose). Included in the evaluation of capacity for tailings storage was an investigation of the use of multiple brownfield sites so site capacity was evaluated for both storage of the total volume of tailings and storage of only the total volume of pyrite tailings. If sites were available and practicable under these initial screening factors, they would be further evaluated to determine if they were within a practicable distance for the transportation of tailings. The evaluated sites are listed in **Table 1**.

Based on the brownfield site evaluation, it was ultimately determined that none of the brownfield sites are available, feasible, or reasonable alternatives for TSF locations, and the use of these brownfield sites are dismissed from detailed analysis. Eight of the sites are currently in operation or have proposed future operations that would make them unavailable for the storage of tailings from the Resolution ore body. These sites are therefore determined to be impracticable due to lack of availability and are dismissed from further analysis. The availability assessment reflected in **Table 1** does not consider such other salient factors as whether the owner of the sites in question would be willing to sell the land to Resolution or otherwise allow the deposition of tailings to be generated by the planned Resolution operation, whether the deposition of the Resolution tailings (or a portion thereof) would be consistent with approved site closure/reclamation strategies, or the feasibility of transporting tailings to the sites. A location identified as being "available" in **Table 1** simply means that there are

20200910_Resolution_404b1_final

7-RCMSER-1810

CWA 404(B)(1) Alternatives Analysis                                                                Resolution Copper

Table 1. Brownfields Sites Investigated for Potential Tailings Storage (adapted from SWCA 2017 [revised])

| Site Name | Ownership | Mining Activity Status | Approximate Distance (miles)[2] | Available | Capacity for Both Tailings Types | Capacity for Pyrite Tailings Only | Other Factors | Alternative Dismissed |
|---|---|---|---|---|---|---|---|---|
| Ajo | Freeport-McMoRan | Copper mine, potential for future operation | 120 | No | No | No | N/A | Yes |
| Carlota | KGHM International Ltd. | Copper mine, current operation | 10 | No | No | No | N/A | Yes |
| Casa Grande | ASARCO LLC | Copper mine, closed operation | 49 | Yes | No | No | N/A | Yes |
| Copper Queen | Freeport-McMoRan | Copper mine, closed operation, tourism | 145 | No | No | No | N/A | Yes |
| Copperstone | Kerr Mines Incorporated | Gold mine, closed operation | 190 | Yes | No | No | N/A | Yes |
| Sierrita | Freeport-McMoRan | Copper mine, current operation | 100 | No | No | No | N/A | Yes |
| Johnson Camp | Excelsior Mining Corp. | Copper mine, potential for future operation | 100 | No | No | No | N/A | Yes |
| Miami and Inspiration | Freeport-McMoRan | Copper mine, closing | 15 | Yes | No | Yes | WQARF Site | Yes |
| Miami Unit and Copper Cities | BHP Copper Inc. | Copper mine, closing | 15 | Yes | No | Yes | WQARF Site | Yes |
| Pinto Valley Mine | Pinto Valley Mining Corp. | Copper mine, current operation | 11 | No | Yes | Yes | N/A | Yes |
| Ray Mine | ASARCO | Copper mine, current operation | 11 | No | Yes | Yes | N/A | Yes |
| Resolution Copper Subsidence Zone | Resolution Copper | Copper mine, potential for future operation | 3 | Yes | No | Yes | Safety | Yes |

[2] Distances measured in aerial miles between the Resolution ore body and the brownfield facilities. The total length to construct appropriate infrastructure (pipelines, etc.) would be considerably longer.

WestLand Resources, Inc.                                                                                              6

2020.0110_Resolution_404b1_final

7-RCMSER-1811

CWA 404(B)(1) Alternatives Analysis                                                  Resolution Copper

| Site Name | Ownership | Mining Activity Status | Approximate Distance (miles)² | Available | Capacity for Both Tailings Types | Capacity for Pyrite Tailings Only | Other Factors | Alternative Dismissed |
|-----------|-----------|------------------------|-------------------------------|-----------|----------------------------------|-----------------------------------|---------------|-----------------------|
| San Manuel | BHP Copper Inc. | Copper mine, closed operation | 45 | Yes | No | Yes | Proximity to San Pedro River | Yes |
| Cyprus Tohono | Freeport-McMoRan | Copper mine, potential for future operation | 70 | No | No | No | N/A | Yes |
| Twin Buttes | Freeport-McMoRan | Copper mine, potential for future operation | 95 | No | No | No | N/A | Yes |
| United Verde | Phelps Dodge Corporation | Copper mine, closed operation | 115 | Yes | No | No | N/A | Yes |

WestLand Resources, Inc.                                                                        7
2020.0910_Resolution_404.1_final

no current operations occurring on the site and no indications of planned future mining operations. An additional site, the Copper Queen site in Bisbee, Arizona is currently used for tourism and was considered unavailable as a potential tailings storage site. Use of this site would also require an extensive pipeline traversing over 145 straight-line miles and crossing multiple divisions of federal, state, tribal, and private lands such as to be technologically and logistically impracticable.

All but two of the alternatives lack sufficient capacity to accommodate the total volume of tailings from the Resolution ore body and, therefore, do not meet the purpose and need for this project. The closed operations at Casa Grande, Copperstone, and United Verde lack the capacity to completely contain even the pyrite portion of the anticipated tailings and would require the operation of multiple TSFs solely for the pyrite tailings (SWCA 2017). These operations also do not meet the project purpose and need and were therefore dropped from further consideration and analysis.

The Miami and Inspiration site, the Miami Unit and Copper Cities sites, and the San Manuel site are dismissed from further analysis due to environmental considerations related to potential ground and surface water quality impacts associated with the storage of the pyrite tailings (SWCA 2017). The Miami and Inspiration site and the Miami Unit and Copper Cities sites are located within the Pinal Creek Water Quality Assurance Revolving Fund (WQARF) site and are currently undergoing closure and remediation activities for impacts to groundwater. Similarly, storage of the pyrite tailings in the San Manuel pit was determined to have the potential to deliver poor quality groundwater to the San Pedro River, given the characteristics of the pyrite material and the pit's proximity to the river (SWCA 2017). As such, none of these three alternatives are considered logistically and/or technologically practicable alternatives for a TSF.

Use of the final brownfield site, the future subsidence zone anticipated from mining the Resolution ore deposit itself, was assessed as a potential TSF location. The usage scenario at this site entailed placement of either conventional or dry stack tailings on the land above the mining panels which would gradually become the subsidence pit. The subsidence pit would continue to be filled with tailings as mining continued and the subsidence expanded over time. Safety concerns to operations and personnel both aboveground and belowground from the deposition of tailings above the active panel caving operations (SWCA 2017) make this alternative impracticable and it is therefore removed from further consideration.

### 3.1.2. Multiple TSF Locations

The potential for use of multiple sites for the storage for tailings was investigated by the USFS as part of the evaluation of brownfield TSF locations (SWCA 2017; USFS 2019b, 2020) and was also considered in the development of the alternatives evaluated in this 404(b)(1) alternatives analysis. In general, the use of multiple smaller sites for the storage of tailings is problematic from an operations, maintenance, and environmental perspective given the need to duplicate infrastructure at multiple smaller TSFs when compared to a single TSF site. Splitting the footprint of a TSF designed for a given

7-RCMSER-1813

capacity into multiple smaller TSFs designed to store that same capacity often results in a greater overall footprint, given the need to duplicate infrastructure.

Impoundment embankments, pipelines, seepage controls, and other auxiliary infrastructure (e.g., roads, power, pumping stations, buildings, vehicle storage/maintenance, and various environmental-management measures such as stormwater ponds, run-off collection, and run-on diversion structures) are required for the operation of a TSF of any size. All these structural components and appurtenant features would need to be constructed and operated at each of the smaller TSFs in a multiple TSF scenario. Starter dam, embankment, and capping materials would be required for each of the multiple TSF locations. Separate tailings delivery and recycle water return pipelines would also be necessary for each TSF, further increasing the disturbance footprint. As described in **Section 3.2.2**, the transport of the two types of tailings, scavenger (NPAG) and pyrite (PAG), will be through separate pipelines, further increasing the infrastructure needs associated with multiple TSFs. The duplicative infrastructure required for multiple TSF sites as compared to use of a single site would be expected to result in a larger combined footprint of impact for the multiple TSF over a single TSF of the same storage capacity.

In addition to the consideration of the physical footprint of a single TSF facility in one location versus multiple TSF footprints dispersed over a larger area, the use of multiple TSFs also spreads the potential for environmental effects to additional locations. Effects such as impacts to the aquatic ecosystem, visual impacts, land use compatibility, ground and surface water quality, and air quality would occur at multiple locations, rather than a single location. These effects would be spread over a much larger area when considering the separate facilities, as would the potential for impacts from process upsets, pipeline failures, or seepage. Operating multiple TSF sites when a single site with the necessary capacity exists increases both the operations and maintenance requirements and potential environmental impacts from process upsets.

Given the extensive infrastructure requirements for multiple TSFs and the potential spread of environmental effects to multiple locations, the use of multiple TSFs compared to a single TSF was not carried forward in this analysis.

## 3.2.    TAILINGS IMPOUNDMENT DESIGN, CONSTRUCTION, AND OPERATION

Numerous aspects of TSF design, construction, and operation such as embankment type (e.g., upstream, centerline, modified centerline, and downstream embankments), foundation treatment and lining options, management of pyrite tailings, and deposition methods (e.g., conventional thickened, high-density thickened/thin lift, and filtered, or 'dry-stack') were assessed in the formulation of TSF alternatives, as described in the DEIS (USFS 2019b). Pertinent aspects of tailings impoundment design, construction, and operation considered in this analysis are discussed below in the context of the Guidelines. Additional detail is available in the DEIS (USFS 2019b).

7-RCMSER-1814

### 3.2.1. Tailings Embankment

There are four main embankment types for constructing a raised TSF, which are known as upstream, centerline, modified centerline, and downstream. The names of the types refer to the direction of movement of the TSF embankment's centerline in relation to the starter dam initially constructed at the toe of the TSF impoundment. Filtered tailings stacks also require an outer structural zone to meet stability requirements. The differences in embankment design for each of the TSF alternatives are included in the TSF descriptions in **Section 5**.

#### Upstream Raised Embankment

For a TSF using an upstream raised embankment, the starter dam is constructed at the ultimate TSF toe and successive embankments, or 'lifts,' are constructed with the crest of each berm offset towards the interior of the TSF or 'upstream' of the starter dam. This form of embankment is constructed of the tailings themselves and is generally considered the least robust and resilient embankment type as it relies on a well-drained shell and the strength of the tailings themselves for stability. The upstream method of embankment construction, which had been proposed in the GPO, was formally dismissed as part of the USFS alternatives analysis for the FEIS.

#### Downstream Raised Embankment

For a TSF using a downstream raised embankment, the starter dam is constructed within the ultimate impoundment and successive berms, or 'lifts,' are constructed with the crest of each berm offset towards the exterior of the TSF or 'downstream' of the starter dam. This form of embankment is typically constructed for containment of water for reservoirs or flood control. This can be a very robust and resilient embankment type because the embankment stability is not reliant on the strength of the tailings but it generally requires the largest volume of material to construct. Due to the large volume required for this embankment type, it can present a challenge for three-sided embankments and areas where topography and land ownership constrains the TSF footprint. This embankment type is proposed for the secondary pyrite tailings storage embankment within the larger Peg Leg and Skunk Camp TSF alternatives.

#### Centerline Raised Embankment

For a TSF with a centerline raised embankment, the starter dam is constructed within the ultimate impoundment and successive berms, or 'lifts', are constructed with the crest of each berm directly above the starter dam and previous lift, the embankment crest not moving either towards or away from the TSF interior. As with the downstream embankment, this embankment type requires a relatively large volume of materials for construction and is a very robust and resilient embankment type. This embankment type is proposed for storage of the scavenger tailings embankments for the Peg Leg and Skunk Camp TSF alternatives.

*Modified Centerline Embankment*

Some of the TSF alternatives considered in detail in the FEIS and in this 404(b)(1) alternatives analysis document utilize what are known as 'modified centerline' embankments. As described in Chapter 2 of the FEIS (USFS 2020), modified centerline embankments do move 'upstream' of the starter dam over time and involve some construction of embankments over tailings, but contain a more substantial structural zone as compared to an 'upstream' embankment design. The Near West 'Wet' and Near West 'Dry' TSF alternatives propose use of this embankment method.

### 3.2.2.  Tailings Processing and Placement Technologies

The processing and placement method used for the deposition of tailings can be a determining factor in the design of the TSF and generally has a great effect on the delivery of tailings from the concentrator facility to the TSF for storage. Where differences in tailings placement methods are pertinent to the analysis of alternatives, this information is included in the TSF descriptions in **Section 5**. All TSF alternatives described in Chapter 2 of the FEIS (USFS 2020) consist of separation and thickening of the scavenger and pyrite tailings at the concentrator facility. Thickening tailings involves the mechanical process of removing some water from the tailings while still maintaining a concentration of water that allows the tailings to be transported via pipeline. The two types of tailings, scavenger and pyrite, are transported to the TSF facility though separate pipelines within the same corridor. Brief descriptions of tailings placement technologies evaluated are provided below.

*Sub-aqueous Deposition of Pyrite Tailings*

In this method of tailings placement, pyrite tailings are thickened at the concentrator to 50 to 55 percent solids and then transported to the TSF via pipeline. Sub-aqueous deposition of pyrite tailings (i.e., deposition in a manner that keeps the pyrite tailings submerged below water) is a Best Management Practice (BMP) method used to prevent and minimize acid rock drainage (ARD) by preventing the tailings from being exposed to oxygen in the air that would interact with the sulfides in the pyrite tailings. For all alternatives except Silver King (Filtered), the pyrite tailings are discharged sub-aqueously into the reclaim pond from a barge in a separate area to the scavenger tailings deposition area. Near West 'Wet' includes the reclaim pond and pyrite tailings area within the scavenger beach (not in a separate cell).

Near West 'Dry', Peg Leg and Skunk Camp alternatives all store pyrite tailings in physically separate cells, although there are differences in these cells across the TSF alternatives. The Peg Leg and Skunk Camp pyrite cells are contained by independent downstream embankments. The Near West "Dry" pyrite cell is physically isolated with a splitter berm and therefore not structurally stable without the abutting scavenger tailings. The Peg Leg pyrite cells are separate from the scavenger impoundment, whereas, the Near West 'Dry' and Skunk Camp pyrite cells would ultimately be encapsulated by the scavenger impoundment. As a result, the reclaim water pond would only overlie the pyrite tailings, reduced in size from that typically needed for Near West 'Wet'. Limited and small low spots that

accumulate water either released from the tailings or stormwater on the scavenger surface would also be directed to the pyrite tailings cell.

### Tailings Placement via Conventional Thickened Deposition

In this method of tailings placement, scavenger tailings are thickened at the concentrator facility to 50 to 60 percent solids by weight and transported to the TSF via pipeline. At the TSF, the scavenger tailings are processed through hydrocyclones to produce a coarse particle tailings stream used to construct the embankment, and the finer particle tailings stream is deposited into the interior of the impoundment. Hydrocyclones require the input tailings stream to be between 30 to 40 percent solids by weight. The underflow from the hydrocyclones, used for construction material, typically has higher solids content by weight, often greater than 60 percent. The overflow, a finer particle tailings stream, therefore a higher water content. Typically, the finer particle tailings stream is directly discharged into the facility with the high water content. For the Near West 'Wet' TSF alternative, the finer particle tailings stream is assumed to be thickened and discharged at 50 to 55 percent solids by weight.

### Tailings Placement via High-Density Thickened/Thin Lift Deposition

Similar to conventional thickened deposition, tailings are transported to the TSF via pipeline after thickening at the concentrator facility. Additional thickeners located at the TSF facility remove and recycle water to further thicken the tailings prior to deposition. These tailings are deposited at between 60 to 70 percent solids by weight. Like conventional thickened tailings, the scavenger tailings are processed through hydrocyclones to produce a coarse particle tailings stream (the underflow) used to construct the embankment, and a finer particle tailings stream (the overflow) that is deposited into the interior of the impoundment. The high-density thickened deposition also involves additional thickening of the overflow to between 62 to 65 percent solids by weight to remove water prior to deposition, with placement of those tailings in thin layers, called "thin-lift," to further reduce entrained water through evaporation and thus reduce seepage. Alternatives that incorporate this type of tailings placement technology include the Near West 'Dry', Peg Leg, and Skunk Camp TSF alternatives.

### Filtered Tailings ('Dry-Stack')

In this method of tailings placement, tailings are transported to the TSF via pipeline where they are filtered to reduce the moisture content to approximately 85 percent solids by weight. This process reduces the moisture content to the point where transportation and placement via pipeline is no longer possible and placement of the dewatered tailings in the TSF must be accomplished via mechanical means, such as by truck or conveyor and spreading/compacting equipment. Filtered tailings impoundments can be constructed in horizontal lifts using a structural outer shell that supports the non-structural zone upstream.

Key considerations when assessing the reasonableness, practicality, and benefits of a tailings management strategy are the precedents and lessons learned from case histories. Most dry-stack

tailings facilities operate with throughput capacity between 2,000 and 10,000 tons per day (tpd) with dam heights of less than 200 feet. The current demonstrated industry maximum throughput capacity for operating dry-stack facilities at other mines is approximately 20,000 tpd to more recently approximately 30,000 tpd. Operation at that rate, however, essentially requires two TSFs to allow for conventional thickened tailings deposition during upset conditions where filtered tailings cannot be produced properly. The proposed concentrator facility for the Resolution Copper Project will have a throughput of approximately 132,000 tpd and a dam height of approximately 1000 feet for the Silver King Filtered TSF alternative. To date, the maximum slope height of filtered tailings stack achieved is approximately 200 feet (further detail can be found in **Appendix A**: *Resolution Copper Mining, LLC – Mine Plan of Operations and Land Exchange – USFS Alternatives Data Request #3-F, Information on Potential Tailings Alternatives*). Although the dry-stack technology needed to meet the overall project purpose is unproven, this method was carried forward for further analysis in the Silver King TSF alternative in the EIS (USFS 2019b, 2020) and this document for the sake of completeness.

## 4.  ANALYSIS OF PROJECT ALTERNATIVES

After dismissal of the brownfield alternatives, fifteen alternative TSF locations (**Figure 3**), including the GPO location, were further evaluated by USFS and screened using criteria developed from the public and agency scoping processes (SWCA 2017; USFS 2019b) and the design criteria described above. Although these fifteen alternatives were ultimately dismissed from further consideration, they ultimately gave rise to the four alternatives considered in detail in this 404(b)(1) alternatives analysis (**Section 5**). The general evaluation criteria included locations that are within approximately 20 miles of the West Plant Site, sites that avoid landscape barriers such as mountains or rivers, sites outside rugged terrain too steep for TSF development, and sites potentially near existing or historic mining operations. The alternatives have also been independently analyzed by the Corps as part of this 404(b)(1) alternatives analysis. The screening process entailed an assessment of whether or not each location was available, logistically practicable, or technologically practicable for use as a TSF site in the context of the Guidelines. As outlined in **Table 2**, all fifteen TSF alternatives were dismissed from further consideration due to availability and/or practicability issues. An alternative is "practicable" under the Guidelines if it is available and capable of being implemented after taking into consideration cost, existing technology, and logistics in light of overall project purposes (40 C.F.R. § 230.3(l) & 230.10(a)(2)). The rationale for dismissal of each site is explained in further detail below.

Three additional potential TSF locations, BGC B, Peg Leg, and Mineral Creek (**Figure 3**) were identified and carried through to a preliminary environmental effects screening, wherein it was determined that development of a TSF at these proposed locations would have obvious adverse environmental consequences precluding their selection as the LEDPA. A final preliminary environmental effects screening was conducted for the proposed TSF at the Skunk Camp location to assess whether a filtered tailings TSF was feasible and could potentially reduce the footprint of the TSF as compared to a conventional thickened tailings TSF. The evaluation found that the filtered

7-RCMSER-1818

tailings TSF at Skunk Camp would instead have a similar or larger footprint than the conventional slurry TSF. Based on this information, the Skunk Camp Filtered Tailings TSF design alternative was also dropped from further analysis.

## 4.1. TSF LOCATIONS DISMISSED FROM CONSIDERATION DUE TO LACK OF AVAILABILITY

Most of the TSF alternatives screened in **Table 2** were dismissed from further consideration due to lack of availability. The availability issues and rationale for dismissal of each of the sites is provided below.

### 4.1.1. ASLD Lands Associated with the BGC A and Far West Alternatives

The BGC A and Far West TSF alternatives are located approximately 14 miles southwest of Superior Arizona (**Figure 3**) and located primarily on Arizona State Trust Lands managed by the Arizona State Land Department (ASLD). The ASLD land underlying both alternatives has been proposed as the location for a future 175,000-acre residential and commercial development known as Superstition Vistas (Superstition Vistas 2013; **Figure 4**). Placing a TSF within this planned area development would decrease the amount of land available and reduce property values within the viewshed of the TSF. ASLD has stated (**Appendix B**) that it will not sell land in the Superstition Vistas to Resolution for the development of a TSF and both alternatives were dropped from further consideration (WestLand 2020a; **Appendix C**).

### 4.1.2. Lands Associated with the BOR Mineral Withdrawal

The BGC C, BGC D, SWCA 1, and SWCA 2 TSF alternatives are located along the Gila River west of Kearny and east of Florence (**Figure 3**). The Lower East TSF alternative is located along Queen Creek west of Superior (**Figure 3**). Lands underlying portions of all five of these TSF alternatives have been withdrawn from mineral entry by the Bureau of Reclamation (BOR; **Figure 5**) and Resolution has no mining claims located at these sites that predate the withdrawal. The BOR withdrawal is related to use of these lands by the Salt River Project (SRP) and the San Carlos Irrigation Project (SCIP) for water storage and diversion and/or power generation, transmission, and distribution (WestLand 2020a; **Appendix C**). Information provided to the USFS and Corps indicates that these withdrawals have no expiration, or 'sunset date,' and remain in force as long as the purpose for withdrawal still exists. BOR has provided information to the USFS indicating these lands remain unavailable for TSF development (USFS 2020). These 5 TSF alternatives were therefore dropped from further consideration.

Table 2. Alternative TSF Locations Dismissed from Consideration (adapted from USFS 2019b, Appendix B [revised])

| Alternative Location | Available | Logistically Practicable | Technologically Practicable | Dismissed |
|---|---|---|---|---|
| BGC A | No – includes ASLD lands not available for purchase. | N/A | N/A | Yes – not available. |
| BGC C | No – includes lands withdrawn from mineral entry by BOR. | N/A | N/A | Yes – not available. A reconfiguration of BGC C became DEIS Alternative 5 (Peg Leg) |
| BGC D | No – includes lands withdrawn from mineral entry by BOR. | N/A | No – proximity to the Gila River presents impracticable technological challenges related to seepage. | Yes – not available and not technologically practicable. |
| Dry-Stack at GPO | Yes | No – water management issues (fully unsaturated pyrite would exceed WQ standards and result in long-term WQ issues) and pipeline corridor make this logistically impracticable. | No – dry-stack technology not proven at scale and impoundment is ~1,000 feet high, an unprecedented height for TSF embankments in North America or for a dry stack embankment anywhere in the world (highest currently are ~200 feet). | Yes – neither logistically nor technologically practicable. Reconfigurations based on conventional and high-density thickened tailings became DEIS Alternatives 2 and 3 (Near West 'Wet' and 'Dry'). |
| Far West | No – includes ASLD lands not available for purchase. | N/A | N/A | Yes – not available |
| Hewitt Canyon | No – location in proximity to Superstition Wilderness Class I airshed would prevent air permit compliance. | No – location in proximity to Superstition Wilderness Class I airshed would prevent air permit compliance. | N/A | Yes – not available or logistically practicable. |
| Lower East | No – includes lands withdrawn from mineral entry by BOR. | N/A | N/A | Yes – not available. |

CWA 404(B)(1) Alternatives Analysis                                                    Resolution Copper

| Alternative Location | Available | Logistically Practicable | Technologically Practicable | Dismissed |
|---|---|---|---|---|
| Silver King | No – conventional tailings deposition design at this location was not available because of historic cemetery, private lands, and adverse mineral estate. | N/A | No – presence of historic mine workings. | Yes – not available or logistically practicable. Reconfiguration of methodology and footprint became DEIS Alternative 4 (Silver King Dry-Stack). |
| SWCA 1 | No – appurtenant features (seepage collection, etc.) on lands withdrawn from mineral entry by BOR. | Yes | No – proximity to the Gila River and terrain present challenges for seepage and stormwater management. | Yes – not available and not technologically practicable. |
| SWCA 2 | No – includes lands withdrawn from mineral entry by BOR. | Yes | No – proximity to the Gila River and terrain present challenges for seepage and stormwater management. | Yes – not available and not technologically practicable. |
| SWCA 3 | Yes | No – rugged topography makes it unlikely to have available capacity for all tailings volume and presents substantial difficulties for infrastructure, structures, and equipment. | No – location is on steep ridge crest and occupies portions of both the Queen Creek and Gila River watersheds, requiring substantial engineering controls to minimize seepage from multiple locations. | Yes – neither logistically nor technologically practicable |
| SWCA 4 | No – partially located on Superstition Wilderness and therefore not available. | N/A | N/A | Yes – not available. |
| Telegraph Canyon | No – tributary to creek reach listed as candidate for Scenic River Area designation. | N/A | N/A | Yes – not available. |
| Upper Arnett | No – tributary to creek reach listed as candidate for Scenic River Area designation. | N/A | N/A | Yes – not available. |
| Whitford Canyon | No – location in proximity to Superstition Wilderness Class I airshed would prevent air permit compliance. | No – location in proximity to Superstition Wilderness Class I airshed would prevent air permit compliance. | N/A | Yes – not available or logistically practicable. |

WestLand Resources, Inc.                                                                                    16
3\O\9103_Resolution_404b1_Gad

### 4.1.3.  Lands Associated with the Superstition Wilderness

The Hewitt Canyon and Whitford Canyon TSF alternatives are located in proximity to the Superstition Wilderness, and SWCA 4 is located within the wilderness boundary (**Figure 6**). Air Sciences Inc. (ASI) prepared a technical memorandum (ASI 2019) describing the regulatory constraints associated with the Class I airshed of the wilderness. The USFS determined that even if the TSFs were operated and controlled to industry standards, they are so close to the wilderness boundary as to be incompatible with the protection of the Class I airshed (ASI 2019; **Appendix D**). Further, no emissions offsets are available to mitigate potential air quality impacts (ASI 2019). These TSF alternatives are not available or logistically practicable and were therefore dropped from further consideration.

Related to the above, the location of the SWCA 4 TSF alternative partially within the Superstition Wilderness boundary precludes its availability for development of a TSF. This alternative was also dropped from further consideration.

### 4.1.4.  Wild and Scenic River Candidate Reaches

The Telegraph Canyon and Upper Arnett TSF locations (**Figure 3**) were dismissed from further consideration because, in addition to other unique natural resource values, these two creeks are tributaries to reaches previously listed as candidates for designation as Scenic River Areas (USFS 1993) under the National Wild and Scenic River System (16 U.S.C. 1271 et seq.). This system allows for the preservation of certain rivers with outstanding natural, cultural, and recreational values in a free-flowing condition for the enjoyment of present and future generations. Both Arnett and Telegraph creeks contain reaches which have outstandingly remarkable scenery and fisheries resource values that are protected under a restrictive land use and resource management framework (USFS 2017, 2019a). Because of the anticipated impacts to these sensitive resources, both of these TSF alternatives were dropped from further consideration (WestLand 2020a; **Appendix C**).

## 4.2.  TSF LOCATIONS DISMISSED FROM CONSIDERATION DUE TO IMPRACTICABILITY

The Dry-Stack at GPO and SWCA 3 (**Figure 3**) TSF alternatives were dismissed from further detailed consideration based on practicability issues. The Dry-Stack at GPO TSF was determined to be both logistically and technologically impracticable. Water management issues related to fully unsaturated pyrite tailings in the Dry-Stack at the GPO TSF would result in exceedances of water quality standards and long-term water quality issues. Additionally, the dry-stack technology proposed for use in this TSF is not proven or commercially available at the scale proposed for the Resolution project and the resulting impoundment is ~1,000 feet high, an unprecedented height for TSF embankments in North America or for a dry stack embankment anywhere in the world (the highest of which is ~200 feet in height). For these reasons, this alternative was dropped from further consideration (WestLand 2020a; **Appendix C**).

7-RCMSER-1822

The SWCA 3 TSF was also determined to be both logistically and technologically impracticable. The rugged topography of the location makes the proposed TSF unlikely to have available capacity for the proposed tailings volume and makes impossible the safe and effective construction and operation of the embankment and associated infrastructure (USFS 2019b). The location of this TSF on a steep ridge crest puts it in portions of both the Queen Creek and Gila River watersheds and would require substantial engineering controls to minimize seepage from multiple locations. This alternative was therefore dropped from further consideration (WestLand 2020a; **Appendix C**).

## 4.3. PRELIMINARY ENVIRONMENTAL EFFECTS SCREENING ANALYSIS

Three additional potential TSF locations, BGC B, Peg Leg, and Mineral Creek (**Figure 3**) were identified and carried through to a preliminary environmental effects screening, wherein it was determined that development of a TSF at these proposed locations would have adverse environmental consequences precluding their selection as the LEDPA, and these sites were therefore dismissed from further analysis. The preliminary environmental effects screening for the BGC B, Peg Leg, and Mineral Creek locations, including the rationale for dismissal from further analysis, is provided below.

### 4.3.1. BGC B

The BGC B TSF alternative is located east of Florence in Pinal County on lands administered by the Bureau of Land Management (BLM) and ASLD (**Figure 3**), and the proposed BGC B footprint includes an approximately 3-mile stretch of the Florence Kelvin Highway (**Figure 7**). BGC B is situated approximately 6 miles west of the Peg Leg TSF alternative and 20 miles directly southwest of the West Plant Site, which is described in the DEIS as the location from which the tailings will ultimately be transferred to the TSF (USFS 2019b). Notable landscape features between BGC B and the West Plant Site include the Gila River, which occurs approximately 3.8 miles north of BGC B. This TSF alternative is located at the furthest distance from the West Plant Site and, due to both terrain and distance, the overall tailings pipeline length would be much longer than 20 miles and longer than the Peg Leg TSF alternative pipelines.

WestLand Resources, Inc. (WestLand) conducted a desktop evaluation of the BGC B site and identified approximately 124 acres of drainage features exhibiting a potential Ordinary High Water Mark (OHWM) within the BGC B TSF footprint (**Figure 7**). The linework depicted in **Figure 7** reflects only the BGC B footprint and does not include associated pipelines and other appurtenant TSF infrastructure, which would have additional impacts to OHWM. Additionally, the Florence-Kelvin Highway, which bisects the southern portion of the BGC B footprint (**Figure 7**) would require a substantial reroute, which would add considerably more impacts.

Development of the Skunk Camp TSF alternative, including the appurtenant infrastructure and pipeline, would result in approximately 129 acres of direct impacts to potential waters of the U.S. The BGC B TSF footprint alone contains approximately 124 acres of potential waters of the U.S.

7-RCMSER-1823

(**Figure 7**) that would be directly impacted without the addition of the appurtenant features (e.g., roads, power, pumping stations, buildings, vehicle storage/maintenance, and various environmental-management measures such as stormwater ponds, run-off collection, and run-on diversion structures) required to construct and operate the TSF. These appurtenant features would also be anticipated to have direct and indirect impacts on OHWM. A tailings pipeline between BGC B and the West Plant site would also require several more miles of tailings pipeline beyond that required for the Peg Leg and Skunk Camp TSF alternatives, and the BGC B pipeline would necessarily cross the Gila River. Development of a tailings pipeline across the Gila River would potentially impact species listed as threatened or endangered by the U.S. Fish and Wildlife Service (USFWS) under the Endangered Species Act (ESA), including southwestern willow flycatcher (*Empidonax traillii extimus*) and yellow-billed cuckoo (*Coccyzus americanus*), which utilize the Gila River between Kearny and Florence for breeding and/or a migration travel corridor (WestLand 2016a, 2016b, 2019a, b).

The higher acreage of impacts to OHWM compared to Skunk Camp and the potential environmental consequences of constructing and operating a tailings pipeline across the Gila River preclude BGC B from consideration as the LEDPA. The BGC B alternative is therefore dropped from further analysis (WestLand 2020b; **Appendix E**).

### 4.3.2.  Peg Leg

The Peg Leg TSF alternative The Peg Leg TSF Alternative is located in Pinal County, Arizona (**Figure 8**), and proposes the construction of two separate impoundments with a dual-embankment approach, a centerline embankment for containment of approximately 1.15 billion tons of scavenger tailings and a downstream embankment for containment of approximately 0.22 billion tons of pyrite tailings (pyrite tailings are managed separately due to their potential for acid generation). These impoundments would be located on a mix of public lands managed by the BLM and State Trust lands (**Figure 3**) that would need to be purchased from the ASLD prior to construction and operation of the TSF. The transportation corridor for the pipelines, roads, and powerline between West Plant and the TSF would be located on a combination of lands owned by the USFS, BLM, BOR, Department of Defense, ASLD, and Resolution. Similar to the Near West 'Dry' Alternative, pyrite tailings would be discharged sub-aqueously into a separate impoundment, a BMP for pyrite tailings. However, with the Peg Leg TSF Alternative, the pyrite facility would be contained behind a separate downstream embankment and separated into smaller operating cells to reduce pond size, seepage, and water required during the life of mine (LOM). These two impoundments would total approximately 10,782 acres in size with the ultimate height of the scavenger and pyrite impoundments reaching 310 and 200 feet in height, respectively.

WestLand conducted a desktop evaluation of OHWM at the Peg Leg TSF Alternative site and identified approximately 182.5 acres of drainage features exhibiting a potential OHWM within the TSF footprint (**Figure 8**). An additional 27.8 acres of OHWM would be directly impacted by the TSF design infrastructure (**Figure 8**) evaluated in the DEIS (USFS 2019b). Important to note is that the

OHWM impact linework depicted in **Figure 8** reflects only the direct impacts from the Peg Leg footprint and this TSF infrastructure, but does not include: (1) indirect impacts from 'dewatering' of downgradient reaches through upgradient fills; (2) direct impacts from construction in the power and pipeline corridor, or (3) direct impacts from the complete suite of infrastructure that would be required to operate this TSF (e.g., stormwater ponds, run-off collection, run-on diversion structures, onsite roads, buildings, and vehicle storage/maintenance). As noted above, the 27.8 acres of direct impact associated with TSF infrastructure reflects impacts from only the limited infrastructure evaluated in the DEIS.

Development of the Skunk Camp TSF alternative, including all of the appurtenant infrastructure and pipelines, would result in approximately is 188.3 acres of direct and indirect impacts to potential waters of the U.S., of which 172.6 are permanent direct and indirect impacts from construction of the TSF and appurtenant infrastructure. The remaining approximately 15.7 acres of impacts are associated with construction in the power and pipeline corridor. Of these approximately 172.6 acres of impacts associated with the construction of the TSF and associated infrastructure, approximately 43.4 acres represent indirect impacts associated with dewatering of downstream features identified as potential waters of the U.S. in the PJD. Direct impacts to potential waters of the U.S. associated with the construction of the TSF and associated infrastructure at the Skunk Camp site are approximately 129.2 acres.

The Peg Leg TSF design as evaluated in the DEIS (USFS 2019b) contains approximately 210.3 acres of potential waters of the U.S. (**Figure 8**) that would be directly impacted by the construction of the TSF and a limited amount of associated infrastructure. This represents a nearly 63% increase in direct impacts to potential waters of the U.S. from TSF and associated infrastructure construction as compared to the Skunk Camp alternative. The relative difference is likely even greater because the full infrastructure of the Peg Leg TSF has not been designed (i.e., impacts to potential waters of the U.S. from construction of necessary on-site features such as roads, pumping stations, buildings, and stormwater control features have not been estimated)[3].

In addition, pipelines running between Peg Leg and the West Plant site would necessarily cross the Gila River. Development of a tailings pipeline across the Gila River would potentially impact species listed as threatened or endangered by the USFWS under the ESA, including southwestern willow flycatcher and yellow-billed cuckoo, which utilize the Gila River between Kearny and Florence for breeding and/or a migration travel corridor (WestLand 2016a, 2016b, 2019a, b).

The significantly higher acreage of impacts to potential waters of the U.S. associated with the construction of a TSF and some associated infrastructure at the Peg Leg site, as compared to the

---

[3] Like the Skunk Camp alternative, the Peg Leg alternative would also have direct impacts to potential waters of the U.S. associated with construction in the power and pipeline corridor, as well as indirect impacts to potential waters of the U.S. downstream of the TSF as a result of dewatering. These impacts cannot be quantitatively estimated at this time, but there is no reason to believe they would be appreciably lower than comparable impacts associated with the Skunk Camp TSF.

Skunk Camp site (at least 81.1 acres, or a 63% increase), along with the potential adverse environmental consequences of constructing and operating a tailings pipeline across a portion of the Gila River known to be utilized by listed endangered species clearly preclude the selection of the Peg Leg TSF as the LEDPA if there are any other practicable alternatives. The Peg Leg TSF alternative, therefore, will not be analyzed in detail in the 404(b)(1) alternatives analysis.

### 4.3.3.  Mineral Creek

The Mineral Creek TSF alternative (**Figure 3**) was developed after the initial TSF evaluation and screening analysis was completed and was therefore carried through to a preliminary environmental effects screening. The Mineral Creek TSF alternative location appears to be available and both logistically and technologically practicable for the development of a TSF. However, before detailed design and engineering documentation for a TSF at this location were prepared, other significant adverse environmental consequences were identified and deemed sufficient to preclude this location from being selected as the LEDPA.

Mineral Creek, located within the HUC-10 Mineral Creek – Gila River watershed (HUC 1505010002), is a north to south trending drainage originating in the foothills of the Pinal mountains, joining the Gila River just south of Kelvin, Arizona (**Figure 9**). The drainage is spatially intermittent with an approximately 4-mile-long reach (**Figure 9**) considered continuously saturated (Montgomery and WestLand 2017). Vegetation composition along the continuously saturated reaches of Mineral Creek consists of mixed stands of Arizona sycamore (*Platanus wrightii*), velvet mesquite (*Prosopis velutina*), and gray thorn (*Ziziphus obtusifolia*), with a few Goodding's willow (*Salix gooddingii*). Intermittent patches of seepwillow (*Baccharis salicifolia*) and singlewhorl burrobrush (*Ambrosia monogyra*) occur along the terraces. Approximately nine miles of Mineral Creek in this area has been designated by the USFWS as critical habitat (**Figure 9**) for the native and endangered Gila chub (*Gila intermedia*). Of this 9-mile-long reach, approximately 5.16 miles would be permanently lost within the footprint of this TSF. Approximately seven miles of Mineral Creek in this area has been proposed by the USFWS as critical habitat (**Figure 9**) for the western distinct population segment of the yellow-billed cuckoo. Of this 7-mile-long reach, approximately four miles of proposed this proposed critical habitat would be permanently lost within the footprint of the TSF. Based on this impact, this alternative has been dropped from further consideration (WestLand 2020a; **Appendix C**).

### 4.4.  Skunk Camp Filtered Tailings ('Dry-Stack') Design

In an agency workgroup meeting following publication of the Draft EIS, the EPA requested that the filtered, or 'dry-stack,' technology also be evaluated for the proposed TSF at the Skunk Camp location to assess whether the filtered tailings TSF was feasible and could potentially reduce the footprint of the TSF as compared to a conventional thickened tailings TSF. KCB Consultants Ltd. (KCB) prepared a conceptual Filtered Tailings Impoundment Layout and Staging memorandum (KCB 2020a; **Appendix F**) to evaluate the likely footprint of a Skunk Camp filtered tailings TSF. This memorandum

7-RCMSER-1826

was developed based on the assumption that the filtered tailings technology would be feasible and commercially available at the scale of the Resolution project in time for production. Regardless, the KCB evaluation found that the filtered tailings TSF at Skunk Camp would instead have a larger footprint than the conventional slurry TSF and would require additional back-up storage area (KCB 2020a). Based on this information, the Skunk Camp Filtered Tailings TSF design alternative was dropped from further analysis.

## 4.5.  SCREENING AND ANALYSIS SUMMARY

As none of the alternatives discussed above met the general screening criteria defined herein and the criteria for practicability under the Guidelines, they were dismissed from further consideration in the FEIS (SWCA 2017, USFS 2020) and this 404(b)(1) alternatives analysis. Due to concerns about tailings embankment safety and the potential for adverse environmental consequences from TSF failure, the upstream method of tailings embankment construction was dismissed from further analysis, as well. This screening analysis did, however, identify three new TSF alternatives at two of the previously investigated locations. The Near West 'Wet' and 'Dry' Alternatives resulted from the screening and analysis performed for the Dry-Stack at GPO Alternative. The Silver King location was identified for analysis as a potential dry-stack TSF. These three alternatives are described and considered in detail in both the FEIS and this 404(b)(1) alternatives analysis document.

A fourth alternative site, initially named Upper Dripping Springs Wash, was also brought forward for consideration during the scoping period. The initial screening of this alternative, later renamed the Skunk Camp Alternative, did not identify any high-level availability or practicability issues with this alternative location. The alternative footprint includes only ephemeral drainages, does not contain any potential wetlands, and avoids seeps and springs in the area. The Skunk Camp Alternative proposes tailings placement via High-Density Thickened/Thin Lift Deposition (KCB 2020b) and was carried forward for detailed review in both the FEIS and this practicability analysis document.

## 4.6.  ALTERNATIVES CONSIDERED IN DETAIL

Five TSF alternatives are considered for detailed analysis in the FEIS (USFS 2020), including the Peg Leg TSF alternative. As the Peg Leg TSF alternative could not be selected as the LEDPA (**Section 4.3.2**), this alternative will not be analyzed in detail in this 404(b)(1) alternatives analysis document. The four TSF alternatives considered in detail in this document occur in a variety of locations and utilize several different embankment types and tailings deposition and placement technologies. The alternative site names and corresponding tailings processing and deposition information are as follows:

- Near West 'Wet' TSF (conventional thickened tailings)
- Near West 'Dry' TSF (high-density thickened/thin lift tailings)
- Silver King TSF (dry-stack tailings)
- Skunk Camp TSF (high-density thickened/thin lift tailings)

7-RCMSER-1827

These final TSF alternatives are fully analyzed in the FEIS to disclose impacts to the natural and social environment. Per the Guidelines, the evaluation of these alternatives provided herein will focus on practicability, impacts to the aquatic ecosystem, and other significant adverse environmental consequences.

# 5. TSF ALTERNATIVES DESCRIPTION AND PRACTICABILITY DETERMINATION

This section describes the four TSF alternatives identified for detailed analysis (**Figure 10**) by the Corps and provides descriptions for each, including the acreages of impacted undisturbed land reported to the nearest acre. An alternative is to be deemed practicable, "if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes" (40 CFR Part 230.3(l) & 230.10(a)). The alternatives considered in this analysis have been evaluated for these elements of practicability. Details of each alternative are followed by a determination of the alternative's practicability based on the criteria defined in the Guidelines at 40 CFR Part 230.10(a)). Project-specific practicability criteria applied to this analysis of TSF alternatives is discussed in **Section 5.1**.

## 5.1. PROJECT-SPECIFIC PRACTICABILITY CRITERIA

A critical element in determining the logistical and technological practicability of a TSF alternative is the ability (or lack thereof) to capture and control seepage from the TSF in a manner that reliably allows the facility to meet all applicable standards and obtain and operate in compliance with required environmental permits. Numerical models were developed for each TSF to predict the amount of uncollected seepage for each TSF alternative (M&A 2019a, 2019b). These seepage models were developed based on the hydrogeological setting of each TSF site and represent steady-state conditions assuming operational conditions at full TSF build-out. Levels of engineering seepage controls were also developed for implementation at each TSF site and are described in detail in the FEIS (USFS 2020).

The levels of engineering control and estimated efficiency are based on Best Available Demonstrated Control Technology (BADCT) for seepage controls as defined by the Arizona Department of Environmental Quality (ADEQ), as well as other discharge control technologies considered by the Applicant. Engineering controls to reduce seepage are characterized in the models by level, or efficiency, of control. These levels are specific to each alternative and location. Descriptions of each TSF alternative's levels are described in **Section 5.2** and tables taken from the *Resolution Copper Project Summary of DEIS Tailings Alternatives Seepage Control Levels* (KCB 2019) are included as **Appendix G** of this document. It should be noted that the seepage engineering controls included within each defined level are slightly different for each TSF alternative due to site-specific conditions. However, the greater the number of controls required in each level, and the presence of higher level controls, denote an increased degree of complexity in terms of those engineered controls, which in turn corresponds to a greater difficulty in reliably controlling seepage at the location.

7-RCMSER-1828

The numerical models, described above and explained in detail in the DEIS, were used to estimate the uncaptured seepage in acre-feet per year (AF/yr). GoldSim models taking into account these engineered controls were then used to predict potential transport of any uncollected seepage through the aquifer to surface water receptors. In order to operate a TSF, Resolution must obtain an Aquifer Protection Permit (APP) from ADEQ, which will require it to demonstrate that discharges from APP-regulated facilities will not cause or contribute to an exceedance of Aquifer Water Quality Standards (AWQS) at the Point of Compliance (POC), or, if the AWQS for a pollutant has been exceeded at the POC at the time of permit issuance, that the discharge will not further degrade aquifer water quality for that pollutant at the POC [A.R.S. § 49-243(B)(2)-(3); A.A.C. R18-9-A202(A)(8)(a)]. Seepage must also not cause or contribute to the exceedance of any ADEQ surface water quality standards where groundwater may emerge and contribute to surface flow [A.A.C. R18-11-405(b)].

The concentrations of regulated constituents in the seepage were modeled both with and without the background water quality. An analysis of the total predicted concentrations (modeled plus background) of pollutants was used to calculate the preliminary allowable seepage rate in AF/yr that would allow each TSF to operate over the LOM and post-closure (245 years) periods without exceeding water quality standards. The total predicted concentrations are compared to the ADEQ groundwater and surface water quality standards at the POCs downgradient of each TSF footprint (750 ft downgradient for groundwater, consistent with A.R.S. § 49-244(2)(b)(iii); site-specific locations for surface water). In terms of analysis of potential effect of seepage on downstream surface waters, POCs were established for various alternatives at the location where groundwater that may have been impacted by the seepage is likely to emerge and potentially impact the quality of a surface water. The surface water POC for Near West 'Wet,' 'Dry,' and Silver King alternatives is in the last groundwater model cell nearest to Whitlow Ranch Dam, which provides the majority of surface flow at the dam. The surface water POC for Peg Leg and Skunk Camp alternatives is located in groundwater just before the confluence of Gila River at Donnelly Wash and Dripping Spring Wash, respectively. The background water quality, surface water flow rate, and distance to the POC are critical in determining the potential seepage impacts to downstream surface water quality.

For each alternative, a maximum uncollected seepage rate was modeled that would allow compliance with aquifer water quality standards at the groundwater POCs and surface water quality standards at the surface water POCs noted above, as is necessary in order to secure an APP. If exhaustive and multiple seepage controls are installed and the TSF cannot meet standards and secure an APP, then it was determined that the TSF is technologically impracticable for the purposes of this assessment.

7-RCMSER-1829

## 5.2.  DETAILED EVALUATION OF ALTERNATIVES

A description and discussion on the practicability of each TSF alternative selected for analysis in detail is provided in the following sub-sections. The alternatives evaluated are as follows:

- Near West 'Wet' TSF
- Near West 'Dry' TSF
- Silver King TSF
- Skunk Camp TSF

### 5.2.1.  Near West 'Wet' TSF Alternative

#### 5.2.1.1.  Description

The Near West 'Wet' TSF Alternative (Alternative 2 in the DEIS) proposes the construction of a modified centerline embankment on USFS lands (**Figure 10**) with approximately 1.37 billion tons of tailings storage capacity using conventional thickened tailings deposition. The associated tailings transportation corridor would also be located on USFS and private lands owned by Resolution. This TSF alternative would be approximately 4,909 acres in size with an ultimate embankment crest reaching 520 feet in height.

The location of the Near West 'Wet' TSF is underlain by a mix of different age bedrock incised with narrow channels infilled with alluvial, colluvial and undifferentiated sediments (KCB 2018a). Gila Conglomerate makes up 55 percent of the Near West 'Wet' TSF overall foundation, while a mixture of limestones, sandstones and quartzites are located along the footprint of the scavenger starter dam, the TSF embankment, and the northern portion of the TSF. The conglomerate, limestone, and sandstone sediments all possess a potential for reduced foundation strength, especially if exposed to long-term saturation, and have potential to allow seepage into adjacent canyons (KCB 2018a).

The proposed Near West 'Wet' TSF is located near the center of Superior Basin, which drains ultimately into Queen Creek. Stormwater diversion channels would be required for this TSF alternative to redirect flow from the 4.91-square-mile upper watershed of Bear Tank Canyon to adjacent watershed of Roblas Canyon and Potts Canyon (SWCA 2018).

The Queen Creek aquifer in the vicinity of the Near West TSF location is relatively small with groundwater levels approximately 50 feet below ground surface and in relatively close proximity to the TSF footprint. As such, extensive seepage controls would be required for this alternative, including the following (KCB 2018a, 2019):

**Level 0**
- Underdrain system comprising a drainage blanket and finger drains beneath the entirety of the embankment to drain to seepage collection ponds

7-RCMSER-1830

**Level 0-1**
- Extension of embankment underdrains beneath the entirety of the starter dam and into the impoundment under the entire scavenger tailings beach area
- In each drainage channel surrounding the TSF there would be a primary seepage collection system including lined seepage collection ponds, cutoff walls and pump back wells to return and recycle the collected seepage
  - A total of 12 cutoff walls would be excavated through alluvium, filled with compacted granular fill and grouted to competent bedrock

**Level 1**
- Further extension of the underdrain system an additional 200 feet into the impoundment beyond the beach area
- Lined channels downgradient of the embankment to direct captured seepage to the primary seepage collection system
- Foundation treatments and/or selective engineered low permeability layers in areas of the foundation where Gila Conglomerate not present
- Placement of an engineered low permeability layer for the pyrite tailings starter facility
- Encapsulation of pyrite into the low permeability scavenger tailings fines and sealing of the scavenger foundation with fines
- Addition of grout curtains extending to 100 feet below ground paired with each cutoff wall as part of the primary seepage collection system

**Level 2**
- Further extensions and deepening of the grout curtains described in Level 1 to target higher permeability zones and potential seepage pathways

**Level 3**
- Auxiliary seepage collection system downgradient of the primary seepage collection system in drainages surrounding the TSF facility comprising additional cutoff walls, seepage collection ponds, and wells to pump the collected and recycle water back to the TSF

**Level 4**
- Low permeability liners in areas of the foundation where Gila Conglomerate not present
- Engineered low permeability liner for the entire pyrite cell
- Addition of an auxiliary grout curtain extending to 100 feet below ground paired with cutoff walls as part of the auxiliary seepage collection system; total of 7.5 miles in length
- Up to 21 pump back wells between the auxiliary seepage collection system and Queen Creek

Seepage modeling studies indicate that by using Levels 0 through 4 (KCB 2018a, 2019) of the engineered seepage controls detailed above, this facility would have uncollected seepage rates of 20.7 AF/yr and that the concentration of selenium will ultimately exceed state-established surface water

7-RCMSER-1831

quality standards at the surface water POC described above. Montgomery & Associates (2019b) modeled a preliminary allowable maximum uncollected seepage rate of 3 AF/yr for compliance with surface water quality standards, well below the 20.7 AF/yr estimate. This allowable rate of uncollected seepage was based on the constituent (selenium) that resulted in the lowest seepage rate prior to exceeding the regulatory threshold.

### 5.2.1.2.    Practicability of Alternative

The Near West 'Wet' TSF Alternative is determined to be not technologically practicable. Although this alternative would meet the overall project purpose, the allowable seepage rate needed for this TSF alternative to avoid exceeding the Aquatic and Wildlife warm water quality standard for selenium is unachievable, even with the extensive engineering seepage controls described above. Under these circumstances, it is unlikely that Resolution could secure the and comply required APP from ADEQ. Therefore, this alternative is not technologically practicable and is therefore not carried forward for further analysis.

It should be noted also that seepage from this tailings facility would result in increased dissolved copper loading of Queen Creek, which has been determined to be impaired for copper by ADEQ. This alternative would increase the copper loading in Queen Creek by 7 to 22 percent, potentially interfering with the state's efforts to reduce the loading in this impaired feature. Even if seepage could be controlled to the point where this alternative were technologically practicable, it is likely these controls would need to be located in the lands withdrawn from mineral entry by the BOR, which are not available for this purpose.

## 5.2.2.    Near West 'Dry' TSF Alternative

### 5.2.2.1.    Description

The Near West 'Dry' TSF Alternative also proposes the construction of a modified centerline embankment on USFS lands (**Figure 10**) with approximately 1.37 billion tons of tailings storage capacity. The approximate TSF footprint is 4,909 acres in size with an ultimate embankment crest 510 feet in height. The tailings transportation corridor would also be located on USFS and private lands owned by Resolution (KCB 2018b). Compared to the 'Wet' Alternative, the Near West 'Dry' Alternative physically separates the pyrite and scavenger tailings with a splitter berm (a physical, rather than structural barrier) and proposes high-density thickening/thin lift deposition of scavenger tailings. By isolating pyrite tailings and high-density thickening the scavenger tailings, drier conditions are maintained, resulting in reduced seepage into the foundation.

The proposed Near West 'Dry' TSF Alternative has a very similar footprint to the Near West 'Wet' TSF Alternative and, therefore, possesses similar geologic and hydrologic conditions. This alternative would require upstream stormwater diversions and all of the same Levels 0 through 4 of extensive engineered seepage controls as the Near West 'Wet' TSF Alternative described above. However, this

7-RCMSER-1832

configuration allows the interior finger drain system to function more effectively for greater seepage capture. This more effective seepage capture, in combination with the Levels 0 through 4 seepage controls (KCB 2018a, 2019), the physical separation of pyrite and scavenger tailings, and high-density thickening the scavenger tailings, is modeled to result in 2.7 AF/yr of uncollected seepage, which is essentially equal to the modeled allowable maximum seepage of 3 AF/yr (Montgomery 2019b) needed to meet surface water quality standards at the POC identified for this alternative. At this rate, no chemical constituents are anticipated in concentrations above established surface and groundwater quality standards.

### 5.2.2.2.   *Practicability of Alternative*

The Near West 'Dry' TSF Alternative is not practicable. Although this alternative has the capacity to meet the overall project project purpose and is technologically practicable, the site is not available. Although Near West 'Dry' is technologically practicable, the extensive seepage control system required for this alternative necessitates the placement of seepage controls within the lands withdrawn from mineral entry by the BOR. As described above, the BOR withdrawal is related to use of these lands by SRP and SCIP for water storage and diversion and/or power generation, transmission, and distribution. BOR has provided information to the USFS indicating these lands remain unavailable for TSF development and that the placement of seepage controls within these lands would be incompatible with the withdrawal and their intended future use. Based on this information, the Near West 'Dry' TSF alternative is unavailable and was therefore dismissed from further detailed analysis.

With regard to technological practicability, the Near West 'Dry' TSF Alternative would require implementation of a degree of engineering control beyond what is typical of large-scale copper porphyry tailings facilities. Individually, the seepage control measures have been implemented at small, medium and large-scale projects, but the engineering controls described for this alternative combine a multitude of the available seepage controls and would be implemented on a larger scale than typical. Like the Near West 'Wet' TSF Alternative, this alternative would still require an extreme and extensive seepage control system, in comparison to the other TSF designs, in order to maintain ADEQ water quality standards. However, more extensive finger drains and thickening of tailings reduces overall seepage, allowing the engineered controls to capture enough seepage to meet water quality standards and potentially secure and comply with an APP from ADEQ. Based on the predicted uncollected seepage rates being so close to the allowable maximum rates to achieve compliance with water quality standards, this TSF alternative would need to consistently capture 99.5 percent of seepage. As noted in the FEIS (USFS 2020), "the high capture efficiency required of the engineered seepage controls could make meeting water quality standards under this alternative challenging. The number and types of engineered seepage controls represent significant economic and engineering challenges." Uncaptured seepage from this tailings facility would result in dissolved copper loading of Queen Creek, an impaired water. This alternative would increase the copper loading in Queen Creek by 1 to 2 percent, potentially impeding the state's efforts to reduce the loading in this impaired feature.

7-RCMSER-1833

### 5.2.3. Silver King TSF Alternative

#### 5.2.3.1. Description

The Silver King TSF Alternative (**Figure 10**) proposes the construction of two separate impoundments using the dry-stack method, one with approximately 1.15 billion tons of scavenger tailing capacity and one with 0.22 billion tons of pyrite tailing capacity. In contrast to the other TSF alternatives, the dry-stack TSF would not require an embankment, but rather the compacted zone of tailings around the perimeter of the dry-stack facility provides structural support (USFS 2019b). Both the TSF and pipeline corridor would be located on USFS lands. Due to topography and land constraints, scavenger and pyrite tailings would need to be placed in separate impoundments. Given the nature of dry stack tailings, the pyrite tailings would be placed and maintained unsaturated, as opposed to sub-aqueous deposition, and therefore would be exposed to continual wetting and drying cycles associated with natural precipitation (average of 18 inches per year). This TSF alternative would be approximately 5,661 acres in size, and the ultimate embankment crests for scavenger and pyrite would reach 1,040 feet and 750 feet in height, respectively.

The location of the Silver King TSF sits across the Concentrator, Main, and Conley Springs faults. It is predominantly underlain by Quaternary deposits overlaying Pinal Schist bedrock. A complex geologic sequence of Pinal Schist, Tertiary Gila Conglomerate, Mescal Limestone, Apache Group, Bolsa Quartzite, Dripping Spring Quartzite, and Tertiary Tuff occur along the southwestern portion of the TSF with Quartz Diorite occurring along the northeastern corner, all of which is covered by Quaternary deposits and incised with alluvial filled channels. Additionally, the Pinal Schist unit is known to have reduced strength along foliations, which appear at the southeastern portion of the TSF (KCB 2018c).

The proposed Silver King TSF is situated at the northeast edge of the Superior Basin, which drains into Queen Creek and Potts Canyon and ultimately to the Whitlow Ranch Dam. Due to the topography, land constraints, and large volume of tailings, large diversion dams, underground tunnels, and pipelines would be required to reroute surface water from large upstream drainage basins, particularly from Comstock Wash and Whitford Canyon, around the TSF.

The Queen Creek aquifer in this area is relatively small with groundwater levels approximately 100 to 300 feet below the surface of the TSF. The three faults beneath the TSF are likely leaky barriers to groundwater flow, causing higher groundwater levels to the northeast of the faults (KCB 2018c). Seepage controls proposed for this alternative include the following (KCB 2018a, 2019):

**Level 0**
- Dewatering of tailings to 85-percent solids prior to placement in a dry-stack
- Underdrain system comprising a drainage blanket beneath the entirety of the compacted structural zone of the dry-stacked tailings

**Level 1**

7-RCMSER-1834

- Lined channels downgradient of the tailings facility to direct captured seepage to the primary seepage collection system
- Primary seepage collection system in drainages surrounding the TSF comprising multiple lined seepage collection ponds, cutoff walls and pump-back wells to return the collected seepage
  - Cutoff walls will be excavated through the small amount of alluvium present, filled with compacted granular fill and grouted to competent bedrock

**Level 2**
- Targeted grouting of fractures in the foundation
- Pump back wells down gradient of the primary seepage collection cutoff walls

Seepage modeling studies determined that Levels 0 to 2 controls (KCB 2018a, 2019) would only reach 90 percent efficiency, leading to uncollected seepage rates of 9 AF/yr with Level 2 controls, which exceeds the preliminary modeled maximum allowable seepage of 6 AF/yr (Montgomery 2019a) needed to meet surface water quality standards at the POC identified for this alternative. As such, selenium is modeled to exceed surface water quality standards beginning in model year 59 (USFS 2020).

### 5.2.3.2. *Practicability of Alternative*

The Silver King TSF Alternative is not logistically or technologically practicable. Although the land for this alternative is available, the dry-stack technology is not proven at this scale and seepage quantities are modeled to result in exceedances of surface water quality standards in downstream surface waters.

The current proven maximum throughput capacity for operating dry-stack facilities is approximately 30,000 tpd (at the La Coipa mine in Chile), or approximately 23 percent of the Resolution Copper Project's anticipated initial operating capacity of approximately 132,000 tpd. Most filtered tailings capacities in operation are less than 10,000 tpd. Furthermore, with land constraints and capacity requirements, the Silver King TSF would reach heights of 750 (pyrite tailings) and 1,040 feet (scavenger tailings), both unprecedented heights for existing TSFs, and for which structural stability is unknown. For comparison, the embankment heights for the other proposed TSF alternatives for the project range between 200 and 520 feet in height.

As noted above, development of this alternative would result in concentrations of selenium in Queen Creek above state-established surface water quality standards. In addition, seepage from this tailings facility would result in dissolved copper loading of Queen Creek, which has been determined to be impaired for copper by ADEQ. This alternative would increase the copper loading in Queen Creek by 11 to 21 percent, potentially interfering with the state's efforts to reduce the loading in this impaired feature.

7-RCMSER-1835

Additionally, the filtered tailings are placed partially saturated and exposed to the natural elements, an approach that is inconsistent with current BMPs for pyrite tailings that are highly pyritic and acid generating. Such designs are more prone to wetting and drying cycles than typical TSF systems, resulting in low pH and an increase in Total Dissolved Solids (TDS), as well as elevated metals in seepage during the LOM. Only the dry-stack design is as affected by the cyclical wetting and drying that leads to oxidation.

Given the lack of demonstrated dry-stack technology at the scale contemplated by the project, as well as projected exceedance of state surface water quality standards as a result of seepage, this alternative would not be considered logistically or technologically practicable. This alternative is not carried forward for further analysis.

### 5.2.4. Skunk Camp TSF Alternative

#### 5.2.4.1. Description

The Skunk Camp TSF Alternative design proposes a dual embankment approach incorporating a robust centerline embankment for the scavenger tailings and a downstream embankment for the pyrite tailings. The Skunk Camp TSF alternative is located on a mix of private and ASLD-managed State Trust lands (**Figure 10**) that would have to be purchased prior to construction and operation of the TSF. If it is otherwise a practicable alternative, an area not presently owned by the Applicant which could reasonably be obtained, utilized, expanded or managed in order to fulfill the basic purpose of the proposed activity may be considered (40 CFR Part 230.10(a)(2)).

Two potential pipeline corridors were analyzed for this TSF alternative in the DEIS: 1) the North Pipeline Corridor, and 2) the South Pipeline Corridor. Both corridors would be located on USFS, private, and State Trust lands. The North Pipeline Corridor (**Figure 12**) is the preferred corridor due to a smaller disturbance footprint, shorter length, lower required operating pressure, and lower pumping requirements. This pipeline corridor was subsequently updated (USFS 2020) due to public and agency comments on the DEIS and now results in less impacts to potential waters of the U.S. that are almost exclusively temporary in nature (WestLand 2020c). Impacts to surface water features including potential waters of the U.S. associated with the pipeline construction are anticipated to be largely temporary impacts.

The cross-valley design of the Skunk Camp TSF requires far less material to construct the embankment compared to three-sided ring-impoundment TSF design needed at Near West, thus reducing construction and operational complexity (KCB 2018d). Much like the Near West 'Dry' TSF alternative, the pyrite tailings are physically isolated from the scavenger and are sub-aqueously placed into separate smaller operating cells located at the northern end of the scavenger tailings to reduce pond size, seepage, evaporative losses, and water required to maintain a water cover over the pyrite tailings. The ultimate footprint would be approximately 4,140 acres in size with the ultimate height of the embankment crest reaching 475 feet in height.

7-RCMSER-1836

The Skunk Camp TSF is situated along a north-trending normal fault and is underlain by a tertiary age Gila Conglomerate that is partially covered by Quaternary deposits, including alluvium in the base of the major valleys (KCB 2018d). There is some potential for relatively shallow Gila Conglomerate thickness west of the normal fault and greater depths along the eastern edge (Montgomery 2019a). Alluvial channels located throughout the site are considered pathways for groundwater flow and are noted to be less than 150 feet thick. Recent measurement of depth to groundwater taken within the alluvium and Gila Conglomerate suggests that groundwater levels are approximately 70 feet below the ground surface in some locations (KCB 2018d). This TSF alternative is located within the Dripping Spring Wash basin, which flows 13 miles to the southeast and discharges into the Gila River. Several named and unnamed drainages report to Dripping Spring Wash. Stormwater diversion channels and dams are proposed on either side of the TSF, diverting surface runoff around the TSF and back into Dripping Spring Wash.

In response to public and agency comment on the discussion of this alternative in the DEIS, the USFS directed that additional geologic, geotechnical, and hydrological data be collected (KCB 2019b; M&A 2020a). The Skunk Camp site investigation resulted in further foundation characterization and hydrogeologic data gathering to supplement existing baseline information. The additional information collected support the design approach and philosophy of the original design in the DEIS (USFS 2020) and did not require any major design modifications (KCB 2020d) in the FEIS (USFS 2020).

The data collected also confirms that the anticipated geology, geologic units, and geotechnical conditions, including the hydrogeologic units and setting, are as described in the DEIS (USFS 2020). Additionally, the data collected was used to refine seepage control measures and confirm that the post-closure drainage reporting the Dripping Spring Wash (KCB 2020) will meet groundwater and surface water quality standards at the POCs (M&A 2020b).

The site's geology and hydrology coupled with the overall design of the TSF allow for a less complex and more reliable seepage collection system compared to the Near West 'Wet' and Near West 'Dry' TSF alternatives. The topography and geologic configuration of the site generally funnels seepage to one location, as compared to the topography and geologic configuration at Near West, which would allow seepage to move in multiple directions and thus require far more extensive engineering controls. This alternative would include one grout curtain of far less length and fewer alluvial pump-back wells between the embankment of the TSF and the grout curtain and seepage collection pond. For the Skunk Camp TSF, the seepage management plan in the DEIS (USFS 2019b) included levels of seepage controls with variations on the depth of the grout curtain and alluvial pump-back wells, rather than additional engineered controls (KCB 2018d, 2019). The seepage management plan developed for the FEIS (USFS 2020) is largely the same but has been refined (KCB 2020b) for this TSF as follows:

(120 of 258), Page 120 of 258
Case 2:21-cv-00068-DWL    Document 107-2    Filed 07/14/25    Page 43 of 127
Case: 25-5197, 09/29/2025, DktEntry: 61.8, Page 120 of 258

**Level 0-1**

- Operational Upstream Diversion Channels will divert non-contact water as much as practical to reduce water reporting to the TSF, thus this water would be unavailable for seepage into the foundation.
- Cycloned sand embankments will be well-drained such that a phreatic surface will not develop in the embankments long-term (reducing head on the foundation). To limit infiltration, the cycloned sand embankments will be progressively reclaimed, where possible, throughout operations.
- The cycloned sand embankments will include a finger drain network that will extend into Zone 2 – Near Dam Scavenger Beach to capture seepage from tailings deposition and embankment construction.
- Tailings deposited in the scavenger beach (scavenger total tailings and scavenger overflow) will be thickened to a 60 percent solids content slurry by mass to maximize water recovery and deposited in thin lifts over a large area to maximize evaporation losses and minimize water available to infiltrate through the tailings and into the foundation. The scavenger beach will also be managed as dry as possible (i.e., no to minimal ponded water), with runoff or bleed water that collects in the low points pumped to the active pyrite cell.
- A lined seepage collection pond downstream of the TSF for short-term management of seepage and construction water prior to returning to the active pyrite cell.
- Shallow alluvial pumpback wells downstream of the TSF to capture seepage that enters into the shallow foundation.

**Level 2**

- Pyrite tailings will be deposited in two segregated, low permeability cells to reduce seepage flows from the reclaim pond during operations and limit seepage from the pyrite tailings draindown during post-closure.
- A series of lined Contact Water Collection Ditches that convey captured seepage from the Main Embankment finger drains and convey to the seepage collection pond.
- A grout curtain and shallow pumpback well downstream of the seepage collection pond to capture stormwater flow in the alluvium or leakage from the seepage collection pond.

Seepage modeling studies prepared for and described in the DEIS (USFS 2019b) concluded that by using the described engineering seepage controls (KCB 2018d, 2019) this facility would be expected to comply with ADEQ groundwater quality standards at the POCs and the surface water quality standards (Aquatic and Wildlife warm) established for the Gila River. The modeling did not result in concentrations of any constituent above established water quality standards (Montgomery 2019a). In response to public and agency comments on the DEIS, the seepage controls were refined (KCB 2020b) and subject to additional analysis. The analysis also incorporated additional baseline data that was collected in response to public comments on the DEIS and CWA Section 404 Public Notice. The seepage controls and management approach described in KCB 2020 and the additional baseline data

7-RCMSER-1838

were incorporated into a regional model (M&A 2020b). The regional model output confirmed analysis presented in the DEIS, demonstrating compliance with groundwater standards at the POCs. The model also confirms compliance with surface water standards for groundwater that would become surface flows within the downgradient Gila River for a duration of approximately 400 years.

### 5.2.4.2. Practicability

The Skunk Camp TSF Alternative is practicable. This alternative is available and both technically and logistically practicable. The ASLD has indicated that it is willing to sell this land to Resolution for the development of a TSF. The seepage collection system is simpler in design with a higher degree of effectiveness than the other TSF alternatives. The design of the TSF under this alternative has the capacity to meet the overall project purpose.

7-RCMSER-1839

**Table 3. TSF Alternative Practicability Analysis Results Summary**

| TSF Alternative | Tailings Placement Method | Key Geologic and Hydrogeologic Characteristics | Available | Logistically/Technologically Practicable | Practicability Determination |
|---|---|---|---|---|---|
| Near West 'Wet' | Conventional thickened; modified centerline embankment. | Distance to Queen Creek is ~0.25 miles. | No – Extensive seepage control system may require seepage controls within lands withdrawn from mineral entry by the BOR which is incompatible with the withdrawal and their intended future use. | No – Significantly exceeds uncollected seepage maximums even with Level 4 controls. | Not Practicable (technology and logistics) |
| Near West 'Dry' | High-density thickened/thin lift scavenger; modified centerline embankment for scavenger; physically separated pyrite cell using splitter berm. | Distance to Queen Creek is ~0.25 miles. | No – Extensive seepage control system necessitates seepage controls within lands withdrawn from mineral entry by the BOR which is incompatible with the withdrawal and their intended future use. | Yes – However, this TSF requires Level 4 seepage controls consistently operating at 99.5 percent efficiency. No known TSFs that use this degree of extensive seepage control technology to date. | Not Practicable (not available) |
| Silver King | Filtered scavenger and pyrite; structural outer shell | Mix of diverse and complex geology with higher potential for weathering and fracturing. Requires extensive surface water diversion tunnels, dams, and channels. | Yes | No – Technology for dry-stack methodology at the scale needed to meet the project purpose has not been demonstrated, is at an unprecedented height, and lacks ability to meet water quality standards and secure an APP. | Not Practicable (technology and logistics) |
| Skunk Camp | High-density thickened/thin lift scavenger; robust and resilient double embankment approach (full centerline for scavenger and downstream for pyrite). | Geology is composed of Gila Conglomerate with thin alluvial cover. Distance to Gila River ~13 miles. | Yes | Yes | Practicable |

2429.9/H10_Resolution_404b1_final

## 6.  ENVIRONMENTAL EFFECTS OF THE SKUNK CAMP ALTERNATIVE

This section provides an analysis of the environmental impacts of the Skunk Camp alternative, which is the only alternative determined to be practicable. This analysis includes a discussion of impacts to the aquatic ecosystem and other anticipated adverse environmental consequences. Identification of these other adverse environmental consequences is based on information contained in the baseline resource reports and FEIS prepared for Resolution's proposed mine development. Analyses of these other adverse environmental consequences are necessary to ensure that the Corps may identify the LEDPA, as required by the Guidelines (40 CFR Part 230.10(a)).

The 404(b)(1) alternatives analysis is intended to ensure that no discharge be permitted "if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences" (40 CFR Part 230.10(a)). The aquatic ecosystem, in turn, is defined as waters of the U.S., including wetlands, that serve as habitat for interrelated and interacting communities and populations of plants and animals (40 C.F.R. Part 230.3(c)). In evaluating practicable alternatives, the Guidelines' preliminary focus is thus on assessing effects on waters of the U.S., but the analysis can extend to other adverse environmental consequences occurring outside of waters of the U.S.

The definition of "waters of the U.S." has been a source of considerable confusion for many years, particularly since the United States Supreme Court's 2006 decisions in *Rapanos v. United States and Carabell v. United States.* Following those decisions, the EPA and the Corps issued interpretive guidance, last modified in December 2008. In this 2008 CWA guidance document, entitled *Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in Rapanos v. United States and Carabell v. United States* (the Guidebook), non-navigable tributaries that are not relatively permanent (which represent the majority of features present at all of the TSF alternatives) can be found jurisdictional only if they have a significant nexus with a Traditional Navigable Water (TNW). This represented a significant departure from the prior agency interpretation, which categorically regulated all tributaries, even ephemeral tributaries.

On June 22, 2020, the Navigable Waters Protection Rule (NWPR) promulgated by Corps and EPA went into effect, redefining the extent of federally regulated jurisdictional waters of the U.S. Multiple challenges to the NWPR have been filed in multiple courts, including one in Arizona. The fate of the NWPR remains unclear while this litigation is pending. Corps policy allows for issuance of a permit based on a PJD that predates the NWPR's effective date, as is the case for the Skunk Camp PJD. The environmental attributes of the surface water features within the Skunk Camp TSF footprint, however, are not dependent on their CWA jurisdictional status, and impacts to these features can still be considered under the Guidelines. The evaluation that follows focuses on the extent of surface water features exhibiting an OHWM in these ephemeral systems, as well as the location and extent of other aquatic features, such as seeps and springs.

In this analysis, identification of potential waters of the U.S. is based on the presence of an OHWM, as defined by the Corps' in its technical documentation including the August 2008 delineation manual *A Field Guide to the Identification of the Ordinary High Water Mark (OHWM) in the Arid West Region of the Western United States* and the July 2010 update to the same. The identification of OHWM through a desktop review of high-quality, recent aerial photographs was supplemented with field verification through collection of geolocated ground photography. The identification of seeps and springs was completed via review of U.S. Geological Survey topographic maps and other publicly available data, supplemented by full field inventory of the Skunk Camp location (Montgomery & WestLand 2017). The Corps has concurred with this delineation and determined (Corps File No.SPL-2016-00547) that features in the Skunk Camp Alternative TSF footprint and portions of the North Pipeline Corridor are potentially jurisdictional waters of the U.S. pursuant to a PJD.

## 6.1. IMPACTS TO THE AQUATIC ECOSYSTEM/SURFACE WATER FEATURES

The estimated total impacts to potential waters of the U.S. associated with the Skunk Camp Alternative (TSF footprint, pipelines, and associated facilities) is 188.3 acres. These impacts are depicted in **Figures 12 and 13**. Of these impacts, 129.2 acres are anticipated to be direct permanent impacts resulting from construction of the TSF and its appurtenant features, excluding pipelines. Impacts from the pipeline include a maximum estimated 15.7 acres of largely temporary impacts from the buried pipeline and associated access road. As the final location of the pipeline within the analyzed corridor is still being refined, this estimate of 15.7 acres conservatively assumes that all the potential waters of the U.S. within the corridor are temporarily impacted. Finally, approximately 43.4 acres of indirect permanent impacts are anticipated from the 'dewatering' of ephemeral drainages downgradient of portions of the TSF and its appurtenant features, including the seepage controls and stormwater diversions.

### Surface Water Resources

Potential waters of the U.S. identified within the site and pipeline corridor are dominated by both confined and braided ephemeral channels with functions and values typical of desert ephemeral systems. Non-ephemeral drainages within the North Pipeline Corridor, including Devil's Canyon and Mineral Creek, will not be impacted by the project. No special aquatic sites (e.g., wetlands) or seeps and springs are located within the footprint of this TSF or either potential pipeline corridor.

## 6.2. OTHER ADVERSE ENVIRONMENTAL CONSEQUENCES

As indicated in the introductory paragraph of **Section 6**, identification of the other adverse environmental consequences of the development of Skunk Camp TSF Alternative is based on information contained in the baseline resource reports and FEIS (USFS 2020) prepared for the proposed project. Adverse direct effects include the loss of those resources within the Skunk Camp alternative footprint as described in the FEIS. Construction of the TSF and associated infrastructure

(including pipelines) under this alternative will directly affect approximately 4,140 acres of previously undisturbed private and state lands.

## Seepage

Implementing the engineered seepage control measures at Skunk Camp (KCB 2020b) would be relatively straightforward due to Skunk Camp's geological setting on Gila Conglomerate overlain with alluvial sediments and favorable topography, allowing for seepage collection to a single location downgradient of the TSF. Seepage control measures incorporated into the initial design and in groundwater modeling studies described in the DEIS (USFS 2019b) indicate that the seepage would be below the ADEQ groundwater standards at the POCs and the surface water standards set for the Gila River. The seepage controls were refined (KCB 2020b) after collection of additional baseline data in response to public comments on the DEIS and CWA Section 404 Public Notice. The seepage controls and management approach described in KCB 2020b and the additional baseline data were incorporated into a regional model (M&A 2020b). The regional model output analysis presented in the DEIS demonstrates compliance with groundwater standards at the POCs. The model also confirms compliance with surface water standards for groundwater that would become surface flows within the downgradient Gila River for a duration of approximately 400 years.

## Tailings Safety (Risk and Consequences of Failure)

The Skunk Camp TSF will consist of two pyrite cells upstream of the scavenger beach contained by a cross-valley embankment (the Main Embankment). The pyrite cells and scavenger beach have the capacity to store more than the 72-hour Probable Maximum Flood (PMF) and are designed for the 1-in-10,000-year earthquake, assuming all potentially liquefiable tailings will liquefy. This design criteria and design approach (i.e., assuming all potentially liquefiable tailings will liquefy) are considered high standards in the industry resulting in a robust design.

The pyrite tailings will be deposited subaqueously in low permeability pyrite cells contained by independent, downstream, raised and compacted, cycloned sand embankments, which are then buttressed by the scavenger beach. The Main Embankment will be constructed of compacted cyclone underflow, the coarser underflow scavenger tailings produced during cycloning, using a centerline embankment. Compacted cycloned sand tailings are a robust and resilient embankment construction method.

Cyclone overflow, the finer scavenger tailings produced during cycloning, and uncycloned scavenger tailings will be deposited upstream of the Main Embankment forming the tailings beach. Entrained water within the scavenger beach will be minimized by thickening prior to deposition in the TSF and adopting "thin-lift" deposition, allowing time for water to evaporate resulting in a relatively 'dry' tailings beach (KCB 2018). Water that may pool in low spots on the scavenger beach will be pumped to the pyrite cell, thus limiting the standing water within the scavenger beach.

7-RCMSER-1843

A risk assessment workshop was completed between February 5th and 7th of 2020 to review the potential failure modes of the proposed Skunk Camp TSF for the DEIS. Failure Modes and Effects Analysis (FMEA) workshop participants used the results of the catastrophic failure event presented in the DEIS (USFS 2019b) as well as a more realistic slumping event based on the TSF design (KCB 2020c) to inform consequence classification of potential failure modes. During the workshop, 16 potential failure modes for the TSF were identified and developed, however, no unmitigable risks were identified. In general, the proposed Skunk Camp TSF design evaluated during the risk assessment is robust and addresses the potential failure modes through design, mitigation measures, planned operating procedures, and monitoring.

The DEIS (USFS 2019b) disclosed the potential effects of a catastrophic TSF failure event based on Rico et al. (2010), an approach informed by tailings failures associated mostly with upstream tailings embankments, which is not the design approach for the Skunk Camp TSF. Downstream communities potentially affected by the DEIS tailings dam failure extent estimate (USFS 2019b) consist of small rural communities with a total population of approximately 3,000 people. Four water supply systems serving these communities are present downstream of the proposed TSF and would potentially be affected by a dam failure. Larger downstream population centers include the towns of Winkelman, Hayden, and Kearney, which are over 20 miles away.

For some of the potential failure modes identified in the FMEA workshop in which the Skunk Camp TSF Main Embankment hypothetically fails, it was agreed that the released tailings from the 'dry' scavenger beach (i.e., no ponded water on the scavenger beach) would result in slumping failure that may not reach the Gila River. KCB (2020c) estimated the possible maximum extent of a hypothetical 'dry' slumping failure of the Skunk Camp TSF Main Embankment to be approximately 5.7 miles from the toe of the TSF down Dripping Spring Wash. Small residential areas and approximately 1.9 miles of Dripping Springs Road would become inaccessible. The post-failure slumping distance would not reach the Gila River (KCB 2020c).

## Visual Resources
The Skunk Camp alternative is not highly visible from towns, cities, or densely populated areas.

## Recreation
The Skunk Camp Alternative is in a relatively remote area and the TSF footprint would not include National Forest System lands or BOR lands. No official state or federal hiking trails (including the Arizona Trail) or recreational areas would need to be relocated due to the construction of this alternative.

## 6.3. CUMULATIVE IMPACTS TO THE AQUATIC ECOSYSTEM

Over the past 20 years, the Corps has authorized the fill of approximately 220 acres of waters of the U.S. in the Middle Gila River Watershed (HUC 15050100), resulting from issuance of about 396 general permits and 23 individual permits by the Corps. Because of changes to the Corps' database over the years, some inconsistencies resulting from the database conversions may cause impact calculations to be undercounted during the earlier part of this review period. Additionally, previous impacts to waters of the U.S. in urbanized areas and from mining projects in the HUC predate the period of Corps evaluation and permitting. This HUC includes a range of land uses including a portion of the highly urbanized Phoenix-Mesa Metropolitan area, a significant portion of the Gila River Indian Community (consisting primarily of farmland), and a portion of the Copper Triangle region. There is currently no data available that can be used to estimate the total area of waters of the U.S. present within this watershed. Changing rules regarding the Corps' geographic jurisdiction make such an estimate even more difficult.

The largest portion of previously permitted impacts to waters of the U.S. during the Corps' period of evaluation is from a large-scale tailings storage project associated with the Ray Mine in eastern Pinal County. This project included a CWA Section 404 individual permit for approximately 135 acres of permanent impacts. Approximately 173 acres of permanent acres of additional impacts to potential waters of the U.S. are proposed under the Skunk Camp TSF Alternative. No other pending or future CWA Section 404 permit applications within this watershed are known to exist at this time.

## 6.4. COMPLIANCE WITH THE GUIDELINES

The information on the range of alternatives analyzed, the availability and/or practicability of analyzed alternatives, the impacts to the aquatic system of the identified practicable alternative, and the other significant adverse environmental consequences of the identified practicable alternative described herein is intended to provide the Corps with the information necessary to make the determination of LEDPA under 40 CFR Part 230.10(a). This section is intended to demonstrate the compliance of the Skunk Camp TSF alternative with the other three independent requirements at 40 CFR Parts 230.10(b), (c), and (d) that must be met prior to the decision by the Corps to issue a permit.

The requirement at 40 CFR Part 230.10(b) prohibits discharges of dredged or fill material that will result in a violation of water quality standards or toxic effluent standards, will jeopardize a threatened or endangered species, or violate requirements imposed to protect a marine sanctuary. The Skunk Camp TSF alternative requires an APP from ADEQ to demonstrate that it will not cause or contribute to an exceedance of AWQS at the POC, or, if, AWQS for a pollutant has been exceeded in an aquifer at the time of permit issuance, that no additional degradation with respect to that pollutant will occur at the POC [A.R.S. § 49-243(B)(2)-(3); A.A.C. R18-9-A202(A)(8)(a)]. Seepage must also not contribute to the exceedance of any ADEQ surface water quality standards where

7-RCMSER-1845

groundwater may emerge and contribute to surface flow [A.A.C. R18-11-405(b)]. The seepage control measures and control efficiencies required to meet this standard for the Skunk Camp TSF alternative are described in **Section 5.2.5**. It is anticipated that seepage control using recognized technologies will be well above what is required to meet the applicable surface and groundwater quality standards. Nor will construction of the TSF and its related facilities violate any toxic effluent standard or prohibition under § 307 of the CWA.

As described in the Biological Assessment (SWCA 2020) and FEIS (USFS 2020), the Skunk Camp TSF alternative and it's appurtenant features, including pipelines, are not anticipated to jeopardize the continued existence of species listed as threatened or endangered under the ESA or result in the destruction or adverse modification of such species' designated critical habitat. The Skunk Camp TSF alternative also will not violate any requirement designed to protect a marine sanctuary.

The requirement at 40 CFR Part 230.10(c) prohibits discharges of dredged or fill material that will cause or contribute to significant degradation of waters of the U.S. The discharge of fill for the construction of the TSF will result in the loss of the structure and aquatic function of the potential waters of the U.S., comprised entirely of ephemeral drainages, within the footprint of fill. Indirect and cumulative effects from the discharge on the aquatic environment are anticipated to be minimal and will not cause significant degradation. There are not anticipated to be significantly adverse effects on human health or welfare, on life stages of aquatic life and other wildlife dependent on aquatic ecosystems, or on aquatic ecosystem diversity, productivity and stability. There will be some indirect effects on recreational, aesthetic, and economic values of the lands surrounding the TSF as disclosed in the DEIS but, for purposes of the Guidelines, the significant degradation analysis does not extend to these upland areas. The requirement at 40 CFR Part 230.10(c) requires analysis of whether significant degradation of the waters of the U.S. will occur.

The requirement at 40 CFR Part 230.10(d) prohibits discharges of dredged or fill material unless all appropriate and practicable steps have been taken to minimize potential adverse impacts of the discharge on the aquatic ecosystem. The development of the Skunk Camp TSF design included a significant effort to avoid and minimize impacts to the ephemeral drainages and potential groundwater-dependent ecosystems in the TSF vicinity. Although the areas within the TSF and appurtenant infrastructure footprint will no longer contribute runoff from precipitation to downstream drainage reaches, the TSF design minimizes impacts to downstream waters of the U.S. by diverting upstream stormwater flows around the facility. The Skunk Camp TSF has been located relatively high in the Dripping Spring Wash watershed (**Figure 13**), minimizing the size of the upgradient watershed for which stormwater must be managed. Similarly, the stormwater controls, run-on diversions, and engineering controls have been designed to maintain downstream stormwater flows while minimizing the risk of contaminant discharge to downstream surface water features to the maximum extent practicable. The pipeline design has also been continually revised to avoid non-ephemeral features, important habitats, and permanent impacts to potential waters of the U.S.

7-RCMSER-1846

## 7.  SUMMARY AND CONCLUSIONS

The Skunk Camp TSF Alternative is the only alternative that satisfies the practicability criteria of the Guidelines. Selection of the Skunk Camp Alternative as the LEDPA for the Project is not precluded by the restrictions on discharge contained in 40 CFR Part 230.10. The Skunk Camp Alternative, therefore, represents the LEDPA for the Project.

7-RCMSER-1847

# 8.  REFERENCES

Air Sciences Inc. (ASI). 2019. Air Quality Regulatory Constraints Associated with the Hewitt Canyon and Whitford Canyon Tailings Alternatives. September 13, 2019.

Duke HydroChem. 2016. Geochemical Characterization of Resolution Tailings, Update: 2014-2016. *Prepared for Resolution Copper Mining LLC.* Tucson, Arizona. June 8, 2016.

Golder Associates, Inc. 2018. Draft EIS Design Peg Leg Site Alternative 5. *Submitted to Resolution Copper Mining LLC.* Lakewood, Colorado. June 20, 2018.

Klohn Crippen Berger (KCB). 2018a. Resolution Copper Project DEIS Design for Alternative 3A Near West Modified Proposed Action (Modified Centerline Embankment - "wet") Doc. #CCC.03-26000-EX-REP-00002 - Rev. 0. Vancouver, B.C. CANADA: Klohn Crippen Berger Ltd. June 8, 2018.

_____. 2018b. Resolution Copper Project DEIS Design for Alternative 3B Near West Modified Proposed Action (High-density Thickened NPAG Scavanger and Segregated PAG Pyrite Cell) Doc. #CCC.03-26000-EX-REP-00005 - Rev. 0. Vancouver, B.C. CANADA: Klohn Crippen Berger Ltd. June 8, 2018.

_____. 2018c. Resolution Copper Project DEIS Design for Alternative 4 - Silver King Filtered Doc. #CCC.03-26000-EX-REP-00006 - Rev. 0. Vancouver, B.C. CANADA: Klohn Crippen Berger Ltd. June 4, 2018. 117 pp.

_____. 2018d. Resolution Copper Project DEIS Design for Alternative 8 - Skunk Camp Doc.#CCC.03-81600-EX-REP-00006-Rev. 0. Vancouver, B.C. CANADA: Klohn Crippen Berger Ltd. June 12, 2018.

_____. 2019. Resolution Copper Project Summary of DEIS Tailings Alternatives Seepage Control Levels. Vancouver, B.C. CANADA: Klohn Crippen Berger Ltd. February 22, 2019. 68 pp.

_____. 2019b. Resolution Copper Project Skunk Camp Proposed Unconsolidated Surficial Deposit Sampling Program Doc.#CCC.03-81600-EX-LTR-00013-Rev. 2. Vancouver, B.C. CANADA: Klohn Crippen Berger Ltd. November 12, 2019.

_____. 2020a. Resolution Copper Project Skunk Camp Tailings Storage Facility Filtered Tailings Analysis, Conceptual Filtered Tailings Impoundment Layout and Staging. Vancouver, B.C. CANADA: Klohn Crippen Berger Ltd. January 17, 2020. 10 pp.

_____. 2020b. Resolution Copper Mining LLC, Resolution Copper Project - Skunk Camp TSF Seepage Assessment. Vancouver, B.C. CANADA: Klohn Crippen Berger Ltd. June 2020.

7-RCMSER-1848

_____. 2020c. Resolution Copper Mining LLC, Resolution Copper Project - Skunk Camp Tailings Storage Facility 'Dry' Slumping Extents. Vancouver, B.C. CANADA: Klohn Crippen Berger Ltd. June 2020.

_____. 2020d. Resolution Copper Mining LLC, Resolution Copper Project - Skunk Camp TSF Stability Implications Post Site Investigation, Doc. #CCC. 03-81600-EX-LTR-00015 – Rev. 0. Vancouver, B.C. CANADA: Klohn Crippen Berger Ltd. June 2020.

Montgomery & Associates. 2019a. Results of Updated Seepage Transport Models Incorporating Additional Seepage Controls for TSF Alternative Sites. Tucson, Arizona: Montgomery & Associates. February 6, 2019. 13 pp.

_____. 2019b. Revised Near West TSF Alternatives 2 and 3 Steady-State Modeling Incorporating Additional Seepage Collection Measures. Tucson, Arizona: Montgomery & Associates. January 25, 2019. 23 pp.

_____. 2020a. Conceptual Hydrogeologic Model: Skunk Camp Tailings Storage Facility Alternative. Prepared for: Resolution Copper. Tucson, Arizona: Montgomery & Associates. June 29, 2020.

_____. 2020b. Numerical Groundwater Flow Model in Support of the Proposed Skunk Camp Tailings Storage Facility. Prepared for: Resolution Copper. Tucson, Arizona: Montgomery & Associates. July 2020.

Montgomery & Associates, and WestLand Resources, Inc. 2017. Spring and Seep Catalog Resolution Copper Project Area Upper Queen Creek and Devils Canyon Watersheds. Tucson, Arizona. October 3, 2017.

Resolution Copper Mining. 2016. General Plan of Operations, Resolution Copper Mining. Initial Submittal November 15, 2013. Revised May 9, 2016.

Rico, M., Benito, G., Diez-Herrero, A. 2010. Floods from tailings dam failures. *Journal of Hazardous Materials*. Volume 154, Issues 1–3. June 15, 2008. Pp 79-87.

SWCA Environmental Consultants. 2017. Resolution Copper Project and Land Exchange Environmental Impact Statement DRAFT Alternatives Evaluation Report. edited by Tonto National Forest U.S. Forest Service. Phoenix, Arizona: U.S. Department of Agriculture. November 2017.

_____. 2018. Resolution Copper Project EIS Hydrologic Model Results for DEIS Alternatives. Golden, Colorado. October 30, 2018.

7-RCMSER-1849

_____. 2020. Biological Assessment for the Proposed Resolution Copper Project near Superior in Pinal and Gila Counties, Arizona Consultation Codes: 02EAAZ00-2020-SLI-0104 and 02EAAZ00-2020-SLI-0553. Phoenix, Arizona: SWCA Environmental Consultants. June 2020.

U.S. Forest Service. 1993. Preliminary Analysis of Eligibility and Classification for Wild/Scenic/Recreational River Designation: National Forests of Arizona. Southwestern Region. January 1993.

_____. 2017. Tonto National Forest Draft Wild and Senic Rivers Eligibility Study. *U.S. Department of Agriculture.*

_____. 2019a. Draft Environmental Impact Statement for the Draft Land Amnagement Plan, Tonto National Forest, Volume 2: Chapter 3 (continued), Chapter 4, References and Glossary. *U.S. Department of Agriculture.*

_____. 2019b. Resolution Copper Project Draft Environmental Impact Statement. *U.S. Department of Agriculture.*

_____. 2020. Resolution Copper Project Final Environmental Impact Statement. *U.S. Department of Agriculture.*

WestLand Resources, Inc. (WestLand)  2019. Practicability Analysis in Support of Clean Water Act 404(B)(1) Alternatives Analysis, Resolution Copper. Tucson, Arizona: WestLand Resources, Inc. June 21, 2019.

_____. 2020a. Resolution Copper Project Revised Alternatives Discussion. Tucson, Arizona: WestLand Resources, Inc. January 21, 2020.

_____. 2020b. Resolution Copper Project BGC B Tailings Storage Facility Revised Alternatives Discussion. Tucson, Arizona: WestLand Resources, Inc. April 13, 2020.

_____. 2020c. Draft Skunk Camp Pipeline and Powerline Disturbance Comparison. Prepared for Resolution Copper. Tucson, Arizona: WestLand Resources, Inc. June 25, 2020.

7-RCMSER-1850

**FIGURES**



Legend

Skunk Camp TSF Alternative
GPO Mine Element

**Surface Management**

Bureau of Land Management (BLM)
Bureau of Reclamation
County
Indian Lands

Local or State Parks
Military
Other
Private Land (No Color)
State Trust Land
US Forest Service (USFS)

Pinal and Gila Counties, Arizona,
Data Source: BLM 2019, WRI Modified 2019,
ALRIS, SWCA, and USFS
Image Source: ArcGIS Online, World Topo Map

0   2.5   5   Miles
0   4   8   Kilometers

WestLand Resources

**RESOLUTION COPPER**

404(b)(1) Alternatives Analysis

OVERVIEW OF
PROPOSED MINING OPERATION

Figure 1



RESOLUTION COPPER

404(b)(1) Alternatives Analysis

BROWNFIELD TAILINGS STORAGE
FACILITY LOCATIONS

Figure 2



RESOLUTION COPPER

404(b)(1) Alternatives Analysis

TAILINGS STORAGE FACILITY ALTERNATIVES
DISMISSED FROM FURTHER CONSIDERATION

Figure 3

WestLand Resources

Image Source: ArcGIS Online World Topo Map

7-RCMSER-1855

*This page intentionally left blank.*







*This page intentionally left blank.*



Legend

BGC B Tailings Storage Facility Footprint

OHWM Delineation

T4S, R11E, Portions of Sections 32 and 33,
T5S, R10E, Portion of Section 13,
T5S, R11E, Portions of Sections 3-11, 15-22, 27, and 28,
Pinal County, Arizona
Image Source: Maxar 2018

RESOLUTION COPPER

404(b)(1) Alternatives Analysis

BGC B OHWM DELINEATION
Figure 7

WestLand Resources

7-RCMSER-1861

*This page intentionally left blank.*



T4S, R12E, Portions of Sections 25-27 and 34-36,
T4S, R13E, Portions of Sections 31 and 32,
T5S, R12E, Portions of Sections 1-3 and 10-12,
T5S, R13E, Portions of Sections 5 and 6,
Pinal County, Arizona,
Data Source: SWCA DEIS for Peg Leg Tailings Features
Image Source: Maxar 2/6/2018

**Legend**
OHWM Delineation
Peg Leg TSF Features

N
0    1,200    2,400 Feet
0    600    1,200 Meters

WestLand Resources

RESOLUTION COPPER
404(b)(1) Alternatives Analysis
OHWM DELINEATION OF
PEG LEG TSF ALTERNATIVE
Figure 8





Path: M:\Jobs\600\607.17\GENIVGWA\mxd\404b1_AltAnaysisFigures\fig10_OverviewTSF_AltsLocations.mxd
Date: 9/4/2020
User: towens

**Legend**

Near West 'Wet'
Near West 'Dry'
Silver King
Skunk Camp

**Surface Management**

Bureau of Land Management (BLM)
Bureau of Reclamation
Private Land (No Color)
State Trust Land
US Forest Service (USFS)

Portions of T1S R11 and 12E; T2S R14E; T3S R14E;
T4S R12 and 13E; and T5S R12 and 13E,
Pinal and Gila Counties, Arizona,
Image Source: ArcGIS Online, World Topo

**RESOLUTION COPPER**

404(b)(1) Alternatives Analysis

OVERVIEW OF TSF ALTERNATIVES
LOCATIONS CONSIDERED IN DETAIL

Figure 10

WestLand Resources

N

0    2    4
Miles

0    4    8
Kilometers

*This page intentionally left blank.*



7-RCMSER-1867



Skunk Camp Pipeline and TSF within
T1S, R13E, Portions of Sections 27, and 34-36,
T2S, R13E, Portions of Sections 1-4, and 12,
T2S, R14E, Portions of Sections 7, 8, 17, 18, 20, 27-29, and 32-36,
T3S, R14E, Portions of Sections 1-5, 8-17, and 21-24,
Pinal and Gila Counties, Arizona
Image Source: Maxar 2/6/2018
Surface Management: BLM 2019, WRI Modified 2019.

**Legend**

— Ancillary Facilities
□ Skunk Camp Direct OHWM Impact
--- Skunk Camp Pipeline
--- Skunk Camp TSF Alternative

Surface Management
□ Bureau of Land Management (BLM)
□ Private Land (No Color)
□ State Trust Land
□ US Forest Service (USFS)

*Note: Most OHWM impacts in the pipeline corridor
are temporary and this analysis conservatively
assumes all OHWM will be impacted.*

WestLand Resources

**RESOLUTION COPPER**
404(b)(1) Alternatives Analysis
SKUNK CAMP PIPELINE ALTERNATIVE
IMPACTS TO AQUATIC ECOSYSTEMS
Figure 12

7-RCMSER-1868



*This page intentionally left blank.*

.

# APPENDIX A

**Resolution Copper Mining, LLC Mine Plan of Operations and Land Exchange USFS Alternatives Data Request #3-F, Information on Potential Tailings Alternatives**



402 W. Main Street
Superior, Arizona
+1 (520) 689 9374

August 30, 2017

Ms. Mary Rasmussen
US Forest Service
Supervisor's Office
2324 East McDowell Road
Phoenix, AZ  85006-2496

**Subject: Resolution Copper Mining, LLC – Mine Plan of Operations and Land Exchange –
USFS Alternatives Data Request #3-F, Information on Potential Tailings
Alternatives**

Dear Ms. Rasmussen,

In a letter Resolution Copper received from the USFS dated July 19, 2017 (Alternatives Data
Request #3), the USFS requested Resolution Copper (RC) to provide information related to
tailings storage facility concepts and locations. For your review and consideration, please find
RC's response to item F of that request listed below.

***USFS Item F****: The Forest may consider tailings alternatives that would involve filtered tailings,
more commonly known as "dry-stack" tailings. The Forest requests that Resolution provide
input on technical or logistical concerns of using filtered tailings. We request that these specific
topics be considered:*

1. *What technical or logistical limitations does Resolution foresee regarding the ultimate
   height or footprint of a filtered tailings facility, or regarding the proposed disposal rate
   (tonnage per day)?*

2. *What technical or logistical limitations does Resolution foresee regarding the distance
   that filtered tailings could be reasonably conveyed? Alternatively if tailings were instead
   pumped via pipeline as a slurry to a tailings disposal facility and then filtered at that
   location prior to stacking, what is the potential acreage or infrastructure that would be
   needed for the filter equipment?*

3. *What potential concerns does Resolution foresee with respect to controlling acid rock
   drainage if scavenger and pyrite/cleaner tailings are disposed in a filtered tailings facility?*

**Resolution Copper Response to F:**

RC has studied filtered tailings as a tailings management strategy and found that filtered tailings
are not a beneficial, reasonable or practicable tailings management strategy for the Resolution

1



402 W. Main Street
Superior, Arizona
+1 (520) 689 9374

Project primarily because the scale is unprecedented and not demonstrated at an equivalent tonnage rate as well as other factors related to transportation, construction, water management and dust management challenges which are outlined herein.

RC has responded to each sub question of the Forest's item F separately below.

**Resolution Copper Response to F-1: Technical and Logistical Limitations of Filtered Tailings for the Resolution Project**

A key consideration when assessing the reasonableness, practicality and benefits of a tailings management strategy is precedents and lessons learned from case histories. A review of case histories was completed as part of the filtered tailings study, completed by RC's tailings engineer Klohn Crippen Berger, Ltd, whom have been involved with the Greens Creek filtered tailings facility for approximately 20 years and have been involved in several tailings technology reviews over recent years. An output from the review was a comparison of climate conditions to daily tailings production rate for operating mines and proposed projects, shown in Figure 1. The Resolution Project is also plotted on the figure for comparison.

**Figure 1        Summary of Review Filtered Tailings Cases**



\* Design production capacity shown. As of 2014, the Karara project has not met this design capcity (Mining Weekly 2014)

Note: Net precipitation = mean annual precipitation minus mean annual evaporation. RC is in a semi-arid climate zone with low mean annual precipitation of 18 inches and high estimated mean annual potential evapotranspiration of 72 inches, for a mean annual precipitation minus evaporation of -54 inches per year.

2



402 W. Main Street
Superior, Arizona
+1 (520) 689 9374

Based on the case history review of current and existing operations across the industry:

- Filtered tailings have never been applied at the production scale (130,000 ton per day) proposed for the Resolution Project or stored in a *dry-stack* pile of equivalent height.

  o Most filtered tailings are less than 10,000 tons per day. The La Coipa mine which is currently in care and maintenance did implement filtered tailings technology to a 20,000 tons per day operation. RC's estimated tailings production is 130,000 tons per day, 650% greater than La Copia.

  o Karara Mining Ltd. had proposed filtered tailings to manage a 40,000 ton per day operation, but returned to a conventional slurry facility after challenges with filtering and conveying limited production ramp-up.

  o To date, the maximum slope height of filtered embankments achieved is approximately 200 feet (La Coipa – from toe to crest, although maximum thickness of filtered tailings is approximately ~70 feet). A filtered tailings facility for the Resolution Project would be around 560 feet.

Given the vast differences between the tested and demonstrated limits of filtered tailings at the scale required for this project, RC will not consider this as a reasonable or practicable method for tailings management. In addition to precedents, additional key findings from RC's study of filtered tailings also are not in support of this tailings management strategy for this project, such as:

- Processing and Transportation

  o Most filtered tailings projects have reported challenges achieving target moisture contents and throughputs from filter plants on a reliable basis, especially at start-up. Conventional tailings facilities typically do not have this problem.

- Construction and Operations

  o Filtered tailings at the Near West site would be mechanically placed in rugged terrain which requires a significant construction fleet. The scale of the construction fleet for this operation would be much larger than a typical operation and be logistically challenging. See response to F-2 as well.

  o Due to potential upsets/unreliability of the filter plant and conveyor systems (i.e., mechanical break-downs, material produced at the filter plant that is too wet for transportation, flood events, wind events, etc.), multiple layers of back-up storage would be required (at the filter plant, at the filtered facility and potentially a separate back-up conventional tailings facility, like the Karara case history). At the Resolution Project's production rates, a back-up facility or stockpile would not be feasible within the current proposed disturbance footprints. Therefore, there would be significant additional disturbance on National Forest Service land.

- Water Management

  o Water management for filtered tailings for the Resolution Project would be complex. Runoff and seepage water would be managed in large external collection

3



ponds rather than within the tailings impoundment as with conventional tailings facility. Therefore, there will be additional water retaining dams around the site, larger in size than those required for conventional slurry tailings options, and increased disturbance on National Forest Service land.

- Dust Management
  - o Walking stacker conveyors for transporting and placement of filtered tailings would likely be required in a scenario for RC, a large active placement area is required, which cannot be progressively reclaimed. Therefore, there will be large areas requiring dust mitigation measures.
  - o Unsaturated filtered tailings are prone to dusting and require active dust management if they can't be progressively reclaimed; requiring regular wetting, temporary covers, or some other measures to suppress dust (such as polymer suppressants).
  - o Conventional slurry tailings facilities (as proposed in the mine plan of operations) would also have large exposed areas, but are more easily managed with multiple spigots to maintain a wet beach to reduce dust creation.
  - o Due to the lower water content of the filtered tailings, more water (or other measures) would need to be used for dust mitigation than for conventional slurry. If water sprinklers are used as the dust management methodology, the make-up water benefits from using filtered tailings in comparison to conventional slurry tailings will be lessened significantly.

**Resolution Copper Response to F-2: Transportation Logistics Considerations and Filter Plant Size**

Due to the difficulty in transporting filtered tailings in comparison to slurry, it is not practical to have the filter plant at the WPS. The filter plant would be located at the tailings site, increasing the disturbance of National Forest Service lands. For this scale of operation, a filter plant would have a footprint of approximately 10 acres based on an estimate of the number of filter presses required. Once filtered, the tailings then require transportation to the tailings site and placement. Filter tailings can be transported via trucks or conveyors.

Many projects transport filtered tailings with trucks. The highest production mine reviewed that is using trucks as the primary method of filtered tailings transportation was Cerro Lindo at 7,100 tons per day. RC would need to place 130,000 tons per day. At 20 tons per load, RCM would require 6,500 dump truck loads per day to be moved from the filter plant to the tailings facility for placement. This method of placement would not be reasonable or practicable and therefore, walking stacker conveyors would be used for transportation, plus equipment to spread and compact the tailings. The rough terrain at the Near West site and at potential alternative locations would require the use of conveyors before valleys are filled, which is exceedingly difficult because walking stacker conveyors don't walk on rough rugged steep terrain and therefore re-handling of the tailings is likely required (additional earth-moving equipment). The substantial amount of

4



402 W. Main Street
Superior, Arizona
+1 (520) 689 9374

heavy equipment would contribute significant amounts of noise and emissions above what is normal for conventional tailings facilities.

**Resolution Copper Response to F-3: Acid Rock Drainage (ARD) Management**

RC ore processing will generate two mineralogically and geochemically discrete tailings streams known as "scavenger" tailings and "cleaner" (or pyrite) tailings. Pyrite tailings are classified as Potentially Acid Generating (PAG). The management approach per the mine plan of operations for pyrite tailings involves subaqueous placement during operations (submerged beneath the reclaim pond) and then progressive covering with a thick sequence of scavenger tailings which would limit oxygen and thus minimize acid rock drainage.

If the pyrite tailings were filtered and stacked, they would be placed and kept in an unsaturated state. Thus, will oxidize under wetting and drying cycles from storm events, which would generate ARD and produce poorer water quality runoff compared to pyrite tailings stored in a saturated state (e.g. beneath a pond in a conventional facility).  In a submittal to the USFS dated March 9, 2017 Resolution Copper provided a detailed technical report evaluating the chemistry of unsaturated pyrite tailings. The report is titled "*Geochemical Reactivity of Unsaturated Pyrite Tailings Technical Memorandum*" and included in Attachment 4 of this submittal.

As described in the response to F-1 above, external water management facilities are required to manage the water that can't be stored on the tailings surface. These can be large depending on topography, operational water balance, and storm storage requirements. In the case of the proposed location in the mine plan of operations, a filtered tailings scenario would require external water management facilities containing poor quality contact storm water to be located closer to Queen Creek.

Should you have any questions or require further information please contact me.

Sincerely,

Vicky Peacey,
Senior Manager, Permitting and Approvals; Resolution Copper Company, as Manager of Resolution Copper Mining, LLC

Cc:    Ms. Mary Morissette, Senior Environmental Specialist; Resolution Copper Company
       Mr. Andrew Luke, Metallurgical Engineer; Resolution Copper Company
       Ms. Kate Patterson, P.Eng., M.Eng., PE, Associate, Tailings and Water Resources
       Engineer, Klohn Crippen Berger, Ltd

5



6

402 W. Main Street
Superior, Arizona
+1 (520) 689 9374

# APPENDIX B

**ASLD Letter Response to July 5, 2017 Letter Regarding "Potential to Locate a Resolution Copper Mine Tailings Storage Facility on Arizona State Trust Lands" (August 2, 2017)**



Douglas A. Ducey
Governor

Lisa A. Atkins
Commissioner

**Arizona State Land Department**

1616 West Adams, Phoenix, Arizona 85007
(602) 542-4631

August 2, 2017

Mr. Neil Bosworth
Forest Supervisor
U. S. Forest Service
Tonto National Forest
2324 East McDowell Road
Phoenix, Arizona  85006

Re:    **Response to July 5, 2017 Letter Regarding** *"Potential to Locate a Resolution Copper*
*Mine Tailings Storage Facility on Arizona State Trust Lands"*

Dear Mr. Bosworth:

The Arizona State Land Department (Department) has received your above-referenced letter of
July 5, 2017, regarding the alternative tailings facility locations to be considered in the
Environmental Impact Statement (EIS) for the proposed Resolution Copper Mining (RCM)
Project. Three of the alternative sites, identified as "Far West", "BGC-B" and "BGC-C" in your
July 5th letter and its accompanying map, involve State Trust land (STL) managed by the
Department to generate income on behalf of 13 beneficiaries, primarily supporting K-12 education
in Arizona.

The Far West alternative site is mostly STL except for a small portion in the southeast.  The
Department has held numerous discussion with RCM regarding the Far West site since August
2010, and has consistently and repeatedly stated its refusal to authorize the use this site for such a
purpose.  The Far West site is on the east-central portion of what is referred to as the Superstition
Vistas area which covers approximately 275 square miles of mostly STL and which the Department
considers as THE prime area for future residential and commercial development in
the Phoenix East Valley.  Again, the Department will not consider the Far West site as a potential
tailings facility.

Both alternatives BGC-B and BGC-C include what appears to be less than a section of STL each.
All of the STL in both of these alternatives have grazing leases, and most also have some Rights-
of-Way, including roads with Pinal County and an electric transmission line with Salt River
Project.  RCM would have to apply to purchase these parcels.  As part of the process to take these
parcels to auction, RCM would have to perform what the Department calls "condemnation work"
which would mainly involve RCM doing sufficient geologic work and providing sufficient detail
to demonstrate that there is no mineral value or potential on or under these parcels.  Otherwise, the
Department is statutorily unable to sell the land.  RCM would also be required to compensate any

*Serving Arizona's Schools and Public Institutions Since 1915*
www.AzLand.gov
7-RCMSER-1881

Mr. Thomas White
November 29, 2006
Page 2 of 2

of the existing lessees and permittees. There are many other steps in the process, including but not limited to paying for a surface value appraisal and legal land survey, that RCM would have to complete before these parcels could be sold. And once the parcels are taken to auction, there is no guarantee that RCM would be the successful bidder.

Thank you for giving us the opportunity to comment of these alternatives, and we look forward to continuing to work with you as a Cooperating Agency on the EIS in the coming years.

Sincerely,

Lisa A. Atkins
Commissioner

cc:     Fred Breedlove, Director, Natural Resources Division
        Max Masel, Director, Real Estate Division
        Joe Dixon, Minerals Section Manager
        Mark Edelman, Planning & Engineering Section Manager

# APPENDIX C

**WestLand
Resources, Inc.
Resolution Copper
Project Revised
Alternatives
Discussion
(January 21, 2020)**

# RESOLUTION COPPER PROJECT REVISED ALTERNATIVES DISCUSSION

| | |
|---|---|
| **Prepared for:** | U.S. Army Corps of Engineers *on behalf of* Resolution Copper |
| **Prepared by:** | WestLand Resources, Inc. |
| **Date:** | January 21, 2020 |
| **Project No.:** | 0807.175 02 02 |

## TABLE OF CONTENTS

1.  INTRODUCTION ........................................................................................................... 1
2.  FORMULATION OF PROJECT ALTERNATIVES ...................................................... 1
    2.1.  Geographic Scope for TSF Alternatives ............................................................. 2
        2.1.1.  Brownfields ............................................................................................. 2
        2.1.2.  Multiple TSF Locations ......................................................................... 5
    2.2.  Skunk Camp Filtered Tailings ('Dry-Stack') Design ......................................... 5
3.  ANALYSIS OF PROJECT ALTERNATIVES .............................................................. 6
    3.1.  TSF Locations Dismissed from Consideration Due to Availability .................... 6
        3.1.1.  ASLD Lands Associated with the BCG A and Far West Alternatives ...... 6
        3.1.2.  Lands Associated with the Florence-Kelvin Highway and BCG B .......... 10
        3.1.3.  Lands Associated with the BOR Mineral Withdrawal ............................. 10
        3.1.4.  Lands Associated with the Superstition Wilderness ............................... 10
        3.1.5.  Wild and Scenic River Candidate Reaches ............................................ 11
    3.2.  TSF Locations Dismissed from Consideration Due to Practicability ................. 11
    3.3.  Site-Level Practicability Analysis for the Mineral Creek TSF Location ............. 11
4.  CONCLUSION ............................................................................................................... 12
5.  REFERENCES ............................................................................................................... 13

## TABLES

Table 1. Brownfields Sites Investigated for Potential Tailings Storage (adapted from SWCA 2017 [revised]) .......................................................................................................................... 3
Table 2. Initial Alternative TSF Locations Dismissed from Consideration (adapted from USFS 2019, Appendix F [revised]) ........................................................................................................ 7

# FIGURES

*(follow text)*

Figure 1.      Initial Tailings Storage Facility Alternatives Dismissed from Further Consideration
Figure 2.      Superstition Vista ASLD Lands
Figure 3.      BCG B TSF
Figure 4.      BOR Mineral Withdrawal Lands
Figure 5.      Superstition Wilderness Lands
Figure 6.      Mineral Creek TSF

# ATTACHMENTS

Attachment 1.  May 23, 1925 First Form Withdrawal
Attachment 2.  April 24, 1931 Executive Order No. 5611
Attachment 3.  April 27, 1979 Tri-Party Agreement

7-RCMSER-1886

(169 of 258), Page 169 of 258 Case: 25-5197, 09/29/2025, DktEntry: 61.8, Page 169 of 258
Case 2:21-cv-00068-DWL Document 107-2 Filed 07/14/25 Page 92 of 127

## 1. INTRODUCTION

The United States Forest Service (USFS) Tonto National Forest (TNF) has published a draft of an Environmental Impact Statement (EIS) for the purpose of reviewing the Resolution Copper Mining, LLC (Resolution) revised General Plan of Operations (GPO) under the National Environmental Policy Act (NEPA). As proposed, the tailings storage facility (TSF), associated pipelines, and appurtenant TSF infrastructure for the planned mine development require the discharge of fill to surface water features that the U.S. Army Corps of Engineers (Corps) is anticipated to determine to be potentially jurisdictional waters of the United States (waters of the U.S.) pursuant to a preliminary jurisdictional determination (PJD). Resolution therefore has made application for a Clean Water Act (CWA) Section 404 permit for these discharges. The Draft EIS (DEIS), published in August 2019, included as Appendix C a draft Practicability Analysis document (WestLand 2019) containing an analysis of alternatives as required to demonstrate compliance with guidelines established under CWA Section 404(b)(1) (40 CFR § Part 230; the Guidelines) for avoidance, minimization, and mitigation of impacts to waters of the U.S. The evaluation of alternatives closely followed the format of the NEPA evaluation of alternatives in the TNF DEIS.

After review, discussion, and workgroup meetings with the TNF, the Corps, and the Environmental Protection Agency (EPA), portions of the Practicability Analysis were revised to ensure the evaluation of alternatives undertaken therein conformed to the requirements of an analysis of alternatives under the CWA Section 404(b)(1) Guidelines. The revised alternatives discussion was reviewed with the agencies and Resolution at Workgroup Meeting #2 on August 21, 2109 and at Workgroup Meeting #4 on October 16, 2019. Additional information on some of the evaluated alternatives was provided by Resolution and the agencies to support the analysis. WestLand Resources, Inc. (WestLand) has developed this technical memorandum to capture the revised information before the final CWA Section 404(b)(1) Alternatives Analysis document is published with the Final EIS.

## 2. FORMULATION OF PROJECT ALTERNATIVES

The TNF utilized information gathered from public scoping, cooperating and consulting agencies, government-to-government consultation with Native American groups, and alternatives workshops to identify public values and develop screening criteria used to evaluate the alternative TSF locations and designs in the DEIS. Most of these alternatives, and the methodology for identifying them, were discussed in detail in the *Resolution Copper Project and Land Exchange Environmental Impact Statement DRAFT Alternatives Evaluation Report, November 2017* (SWCA 2017) and *Appendix F: Alternatives Considered but Dismissed from Detailed Analysis* of the DEIS (USFS 2019). The draft Practicability Analysis document (WestLand 2019) was designed to be consistent with, and relied on, the detailed analysis of TSF alternatives contained in these documents to support the selection of the alternatives analyzed in detail for compliance with the Guidelines.

The USFS systematically evaluated dozens of potential TSF locations and technologies for both the full volume and partial volumes (split volume storage) of tailings. The identification and evaluation of alternatives, in addition to varying the proposed location of the TSF, also included a process that prioritized alternatives through the following: the potential for use of previously disturbed, or 'brownfield', sites for TSF development; the use of multiple sites for the placement of tailings; and finally differing the types of tailings embankments and tailings processing/placement technologies, including filtered or 'dry stack' tailings, at proposed TSF locations. The next sections of this document maintain this process and structure in providing the revised alternatives information.

## 2.1. GEOGRAPHIC SCOPE FOR TSF ALTERNATIVES

As described in the draft Practicability Analysis (WestLand 2019), the USFS evaluated a broad landscape surrounding the Resolution mine to identify initial potential alternative locations for the TSF described in the GPO. Factors considered in this evaluation included locations within a reasonable proximity to the Resolution mine site, favorable topography, sufficient storage capacity, and the potential for use of previously disturbed, or 'brownfield', sites for TSF development. The potential use of multiple sites for the placement of tailings, or split volume storage, was also evaluated.

### 2.1.1. Brownfields

The USFS evaluation of brownfield sites included areas not under the ownership of Resolution and associated with other current and previous mining operations in locations up to 200 miles from the Resolution ore deposit. Fifteen brownfield sites, as well as the future subsidence zone anticipated from mining the Resolution ore deposit itself, were analyzed as potential areas for the storage of tailings that might be available and practicable as alternatives to the development of a new TSF in a previously undisturbed location (SWCA 2017; WestLand 2019). It was ultimately determined that none of the brownfield sites were available, provided capacity sufficient to meet Resolution's project purpose, or were otherwise feasible and reasonable alternatives for TSF locations and the use of these brownfield sites was dismissed from detailed analysis (SWCA 2017; WestLand 2019). Minor edits were made to **Table 1** as presented in the draft Practicability Analysis document to correctly reflect the capacity for tailings storage available at the currently operating Pinto Valley Mine and Ray Mine operations. Neither of these changes was material to the practicability of the brownfield sites as TSF locations for the project. The revised **Table 1** is included below.

7-RCMSER-1888

Resolution Copper Project
Revised Alternatives Discussion

January 21, 2020
Page 3

Table 1. Brownfields Sites Investigated for Potential Tailings Storage (adapted from SWCA 2017 [revised])

| Site Name | Ownership | Mining Activity Status | Approximate Distance (miles)[1] | Available[2] | Capacity for NPAG/PAG Tailings | Capacity for PAG Tailings Only | Other Factors | Alternative Dismissed |
|---|---|---|---|---|---|---|---|---|
| Ajo | Freeport-McMoRan | Copper mine, potential for future operation | 120 | No | No | No | N/A | Yes |
| Carlota | KGHM International Ltd. | Copper mine, current operation | 10 | No | No | No | N/A | Yes |
| Casa Grande | ASARCO LLC | Copper mine, closed operation | 49 | Yes | No | No | N/A | Yes |
| Copper Queen | Freeport-McMoRan | Copper mine, closed operation, tourism | 145 | No | No | No | N/A | Yes |
| Copperstone | Kerr Mines Incorporated | Gold mine, closed operation | 190 | Yes | No | No | N/A | Yes |
| Sierrita | Freeport-McMoRan | Copper mine, current operation | 100 | No | No | No | N/A | Yes |
| Johnson Camp | Excelsior Mining Corp. | Copper mine, potential for future operation | 100 | No | No | No | N/A | Yes |
| Miami and Inspiration | Freeport-McMoRan | Copper mine, closing | 15 | Yes | No | Yes | WQARF Site | Yes |
| Miami Unit and Copper Cities | BHP Copper Inc. | Copper mine, closing | 15 | Yes | No | Yes | WQARF Site | Yes |
| Pinto Valley Mine | Pinto Valley Mining Corp. | Copper mine, current operation | 11 | No | Yes | Yes | N/A | Yes |
| Ray Mine | ASARCO | Copper mine, current operation | 11 | No | Yes | Yes | N/A | Yes |

1 Distances measured in aerial miles between Resolution ore body and brownfield facility. The total length to construct appropriate infrastructure (pipelines, etc.) would be considerably longer.

2 In this context, lack of availability generally refers to the fact that a given mine facility is currently in operation or is understood to be evaluating returning to operation and would therefore be unavailable for tailings disposal. The availability assessment reflected in Table 1 does not consider such other salient factors as whether the owner of the sites in question would be willing to sell the land to Resolution or otherwise allow the deposition of tailings to be generated by the planned Resolution operation, whether the deposition of the Resolution tailings (or a portion thereof) would be consistent with approved site closure/reclamation strategies, or the feasibility of transporting tailings to the sites.

WestLand Resources, Inc.

7-RCMSER-1889

(172 of 258), Page 172 of 258
Case: 25-5197, 09/29/2025, DktEntry: 61.8, Page 172 of 258
Case 2:21-cv-00068-DWL   Document 107-2   Filed 07/14/25   Page 95 of 127

Resolution Copper Project
Revised Alternatives Discussion

January 21, 2020
Page 4

| Site Name | Ownership | Mining Activity Status | Approximate Distance (miles)[1] | Available[2] | Capacity for NPAG/PAG Tailings | Capacity for PAG Tailings Only | Other Factors | Alternative Dismissed |
|---|---|---|---|---|---|---|---|---|
| Resolution Copper Subsidence Zone | Resolution Copper | Copper mine, potential for future operation | 3 | Yes | No | Yes | Safety | Yes |
| San Manuel | BHP Copper Inc. | Copper mine, closed operation | 45 | Yes | No | Yes | Proximity to San Pedro River | Yes |
| Tohono Cyprus | Freeport-McMoRan | Copper mine, potential for future operation | 70 | No | No | No | N/A | Yes |
| Twin Buttes | Freeport-McMoRan | Copper mine, potential for future operation | 95 | No | No | No | N/A | Yes |
| United Verde | Phelps Dodge Corporation | Copper mine, closed operation | 115 | Yes | No | No | N/A | Yes |

WestLand Resources, Inc.

### 2.1.2. Multiple TSF Locations

The use of multiple TSFs was investigated by the USFS (SWCA 2017; USFS 2019) as part of the evaluation of brownfield TSF locations and was considered in the draft Practicability Analysis (WestLand 2019). In general, the use of multiple smaller sites for the storage of tailings is problematic from an operations, maintenance, and environmental perspective given the need to duplicate infrastructure at multiple smaller TSFs. Splitting the footprint of a TSF designed for a given capacity into multiple smaller TSFs designed to store that same capacity often results in a greater overall footprint, given the need to duplicate infrastructure at each site. No revisions were made to the discussion of multiple TSFs included in the draft Practicability Analysis (WestLand 2019).

### 2.2. SKUNK CAMP FILTERED TAILINGS ('DRY-STACK') DESIGN

After dismissal of the brownfield alternatives, 16 alternative TSF locations to that location proposed in the GPO were further evaluated (SWCA 2017, USFS 2019). Numerous aspects of TSF design and construction such as embankment type (e.g., upstream, centerline, modified centerline, and downstream embankments), foundation treatment and lining options, management of pyrite or potentially acid generating (PAG) tailings (e.g., methods for complete physical separation from NPAG), and deposition methods (e.g., conventional thickened, high-density thickened, and filtered, or 'dry-stack') were assessed for use at these locations. Although the dry-stack technology needed to meet the overall project purpose is unproven and not commercially available, this method was carried forward for further analysis as part of the Silver King TSF alternative in the DEIS (USFS 2019) and draft Practicability Analysis (WestLand 2019) for the sake of completeness.

In Workgroup Meeting #3, the EPA requested that the filtered, or 'dry-stack,' technology also be evaluated for the proposed TSF at the Skunk Camp location to assess whether the filtered tailings TSF could potentially reduce the footprint of the TSF as compared to a conventional slurry TSF. KCB Consultants Ltd. (KCB) prepared a conceptual Filtered Tailings Impoundment Layout and Staging memorandum (KCB 2020) to evaluate the likely footprint of a Skunk Camp filtered tailings TSF after conventional deposition for the first 10 years of operations. This memorandum assumed that the filtered tailings technology would be feasible and commercially available at the scale of the Resolution project in time for production, a fact that is not currently true. The KCB evaluation found that the filtered tailings TSF at Skunk Camp would instead have a larger footprint than the conventional slurry TSF and may, in fact, require additional back-up storage area (KCB 2020). The discussion of the filtered tailings analysis for Skunk Camp (KCB 2020) will be added to the final CWA Section 404(b)(1) Alternatives Analysis document published as part of the Final EIS.

## 3. ANALYSIS OF PROJECT ALTERNATIVES

As part of DEIS development, the 16 potential TSF locations (**Figure 1**), including the GPO location, were screened and assessed using criteria developed from the public and agency scoping processes (SWCA 2017; USFS 2019). These general screening criteria included locations that were within a more reasonable distance of the West Plant Site, sites that avoided landscape barriers such as mountains or rivers, sites outside rugged terrain too steep for TSF development, and sites potentially near existing or historic mining operations. One additional potential TSF site, Mineral Creek, was developed after the initial screening was completed and was carried through to a site-level practicability analysis.

Section 3.3 of the draft Practicability Analysis document (WestLand 2019) analyzed these 17 alternatives as required to demonstrate compliance with the CWA Section 404(b)(1) Guidelines. Based on discussion with the agencies at Workgroup Meeting #4 and additional information received by WestLand, edits were made to **Table 2** and Section 3 as presented in the draft Practicability Analysis document (WestLand 2019) to support the additional analysis. Sixteen (16) of the TSF alternatives were dismissed from further consideration and included in **Table 2**. The final TSF alternative, Mineral Creek, was carried to a site-level practicability analysis, but was then determined to have other serious environmental consequences that would prevent it from being selected as the Least Environmentally Damaging Practicable Alternative. The Mineral Creek TSF alternative is discussed in *Section 3.3*.

### 3.1. TSF LOCATIONS DISMISSED FROM CONSIDERATION DUE TO AVAILABILITY

Fourteen (14) of the 16 TSF alternatives in **Table 2** were dismissed from further detailed consideration based on availability issues. The factors related to these availability and/or practicability issues are listed in the revised **Table 2**. Discussion of the information used to revise **Table 2** is included in the sections below.

#### 3.1.1. ASLD Lands Associated with the BCG A and Far West Alternatives

The BCG A and Far West TSF alternatives are located approximately 14 miles southwest of Superior Arizona, on Arizona State Trust Lands managed by the Arizona State Land Department (ASLD; **Figure 2**). The ASLD land underlying both alternatives has been proposed as the location for a future 175,000-acre residential and commercial development known as Superstition Vistas (Superstition Vistas 2013; **Figure 2**). Placing a TSF within this planned area development would decrease the amount of land available and reduce property values within the viewshed of the TSF. ASLD has stated that it will not sell this land to Resolution for the development of a TSF and both alternatives were dropped from further consideration.

Resolution Copper Project
Revised Alternatives Discussion

January 21, 2020
Page 7

Table 2. Initial Alternative TSF Locations Dismissed from Consideration (adapted from USFS 2019, Appendix F [revised])

| Alternative Location | Available | Logistically Practicable | Technologically Practicable | Dismissed |
|---|---|---|---|---|
| BCG A | No – includes ASLD lands not available for purchase. | N/A | N/A | Yes – not available. |
| BCG B | No – paved alignment of Florence-Kelvin Highway runs through site. | No – paved alignment of Florence-Kelvin Highway runs through site. | N/A | Yes – not available or logistically practicable. |
| BCG C | No – includes lands withdrawn from mineral entry by BOR. | N/A | N/A | Yes – not available. A reconfiguration of BCG C became DEIS Alternative 5 (Peg Leg). |
| BCG D | No – includes lands withdrawn from mineral entry by BOR. | N/A | No – proximity to the Gila River creates impracticable technological challenges related to seepage control. | Yes – not available and not technologically practicable. |
| Dry-Stack at GPO | Yes | No – water management issues with very close proximity (<0.25 mi) to Queen Creek (fully unsaturated PAG would exceed WQ standards and result in long-term WQ issues). | No – dry-stack technology not proven at scale and not commercially available. Impoundment would be over 500 feet high an unprecedented height for a dry stack TSF worldwide. | Yes – neither logistically nor technologically practicable. Reconfigurations based on modified centerline embankment with thickened and high-density thickened tailings as well as physically isolating the PAG behind a splitter berm became DEIS Alternatives 2 and 3 (Near West 'Wet' and 'Dry'). |
| Far West | No – includes ASLD lands not available for purchase. | N/A | N/A | Yes – not available. |
| Hewitt Canyon | No – location in proximity to Superstition Wilderness Class 1 airshed would prevent compliance with air quality regulations. | No – location in proximity to Superstition Wilderness Class 1 airshed would prevent compliance with air quality regulations. | N/A | Yes – not available or logistically practicable. |

WestLand Resources, Inc.

Resolution Copper Project
Revised Alternatives Discussion

January 21, 2020
Page 8

| Alternative Location | Available | Logistically Practicable | Technologically Practicable | Dismissed |
|---|---|---|---|---|
| Lower East | No – includes lands withdrawn from mineral entry by BOR. | N/A | N/A | Yes – not available. |
| Silver King | No – conventional tailings deposition design at this location was not available because of historic cemetery and adverse mineral estate. | N/A | No – presence of historic mine workings and impoundment is ~1000 feet high, an unprecedented height for a conventional TSF. | Yes – not available or technologically practicable. Reconfiguration of methodology and footprint became DEIS Alternative 4 (Silver King Dry-Stack). |
| SWCA 1 | No – appurtenant features (seepage collection, etc.) on lands withdrawn from mineral entry by BOR. | Yes | No – proximity to the Gila River and terrain also present challenges for seepage and stormwater management. | Yes – not available and not technologically practicable. |
| SWCA 2 | No – includes lands withdrawn from mineral entry by BOR. | Yes | No – proximity to the Gila River and terrain present challenges for seepage and stormwater management. | Yes – not available and not technologically practicable. |
| SWCA 3 | Yes | No – rugged topography makes it unlikely to have available capacity for all tailings volume and presents substantial difficulties for infrastructure, structures, and equipment. | No – location is on steep ridge crest and occupies portions of both the Queen Creek and Gila River watersheds, requiring substantial engineering controls to minimize seepage from multiple locations. | Yes – neither logistically nor technologically practicable. |
| SWCA 4 | No – partially located on Superstition Wilderness and therefore not available. | N/A | N/A | Yes – not available. |
| Telegraph Canyon | No – creek reach listed as candidate for Scenic River Area designation under Wild and Scenic Rivers Act. | N/A | N/A | Yes – not available. |

WestLand Resources, Inc.

| Alternative Location | Available | Logistically Practicable | Technologically Practicable | Dismissed |
|---|---|---|---|---|
| Upper Arnett | No – creek reach listed as candidate for Scenic River Area designation under Wild and Scenic Rivers Act. | N/A | N/A | Yes – not available. |
| Whitford Canyon | No – location in proximity to Superstition Wilderness Class I airshed would prevent compliance with air quality regulations. | No – location in proximity to Superstition Wilderness Class I airshed would prevent compliance with air quality regulations. | N/A | Yes – not available or logistically practicable. |

### 3.1.2. Lands Associated with the Florence-Kelvin Highway and BCG B

The BCG B TSF alternative is located east of Florence in Pinal County (**Figure 3**). The paved alignment of the existing Florence-Kelvin highway runs through the center of the site proposed for the TSF footprint. The lands underlying this portion of the highway are not available for development of a TSF, as this alignment would need to be replaced and rerouted. This TSF alternative was dropped from further consideration.

### 3.1.3. Lands Associated with the BOR Mineral Withdrawal

The BCG C, BCG D, SWCA 1, and SWCA 2 TSF alternatives are located along the Gila River west of Kearny and east of Florence (**Figure 1**). The Lower East TSF alternative is located along Queen Creek west of Superior (**Figure 1**). Lands underlying portions of all five of these TSF alternatives have been withdrawn from mineral entry by the Bureau of Reclamation (BOR; **Figure 4**) and Resolution has no mining claims located at these sites that predate the withdrawal. The BOR withdrawal is related to use of these lands by the Salt River Project (SRP) and the San Carlos Irrigation Project (SCIP) for water storage and diversion and/or power generation, transmission, and distribution. Information provided to the USFS and Corps indicates that these withdrawals have no sunset date and remain in force as long as the purpose for the withdrawal still exists. BOR has provided information to the USFS and Resolution indicating these lands remain unavailable for TSF development. This information is provided as **Attachments 1, 2,** and **3** of this document. These 5 TSF alternatives were dropped from further consideration.

### 3.1.4. Lands Associated with the Superstition Wilderness

The Hewitt Canyon and Whitford Canyon TSF alternatives are located in proximity to the Superstition Wilderness, and SWCA 4 is located within the wilderness boundary (**Figure 5**). Air Sciences Inc. (ASI) prepared a technical memorandum (ASI 2019) describing the regulatory constrains associated with the Class I airshed of the wilderness. The TNF determined that even if the TSFs were operated and controlled to industry standards, they are so close to the wilderness boundary as to be incompatible with the protection of the Class I airshed (ASI 2019). Further, no emissions offsets are available to mitigate potential air quality impacts (ASI 2019). These TSF alternatives were dropped from further consideration.

Related to the above, the location of the SWCA 4 TSF alternative partially within the Superstition Wilderness boundary precludes it availability for development of a TSF. This alternative was also dropped from further consideration.

### 3.1.5.  Wild and Scenic River Candidate Reaches

The Telegraph Canyon and Upper Arnett TSF locations (**Figure 1**) were dismissed from further consideration because, in addition to other unique natural resource values, these two creeks are tributaries to reaches previously listed as candidates for designation as Scenic River Areas (USFS 1993) under the National Wild and Scenic Rivers Act (16 U.S.C. 1271 et seq.). This system allows for the preservation of certain rivers with outstanding natural, cultural, and recreational values in a free-flowing condition for the enjoyment or present and future generations. Both Arnett and Telegraph creeks contain reaches which are free from impoundments with shorelines that are primitive and undeveloped. These TSF alternatives were dropped from further consideration.

### 3.2.  TSF LOCATIONS DISMISSED FROM CONSIDERATION DUE TO PRACTICABILITY

The two remaining TSF alternatives in **Table 2**, Dry-Stack at GPO and SWCA 3 (**Figure 1**), were dismissed from further detailed consideration based on practicability issues. The Dry-Stack at GPO TSF was determined to be both logistically and technologically impracticable. Water management issues related to fully unsaturated PAG tailings in the Dry-Stack at GPO TSF would exceed water quality standards and result in long-term water quality issues. Additionally, the dry-stack technology proposed for use in this TSF is not proven or commercially available at the scale proposed for the Resolution project and the resulting impoundment is over 500 feet high, an unprecedented height for filtered tailings. This alternative was dropped from further consideration.

The SWCA 3 TSF was determined to be both logistically and technologically impracticable. The rugged topography of the location makes the proposed TSF unlikely to have available capacity for the proposed tailings volume and makes impossible the safe and effective construction and operation of the embankment and associated infrastructure (USFS 2019). The location of this TSF on a steep ridge crest requires substantial engineering controls to minimize seepage from multiple locations and occupies portions of both the Queen Creek and Gila River watersheds. This alternative was dropped from further consideration.

### 3.3.  SITE-LEVEL PRACTICABILITY ANALYSIS FOR THE MINERAL CREEK TSF LOCATION

As described above, one additional potential TSF site, Mineral Creek (**Figure 6**), was developed after the initial TSF screening was completed and was carried through to a site-level practicability analysis. Discussion of this alternative has been included in a new section of the draft CWA Section 404(b)(1) Alternatives Analysis document preliminarily titled Section 3.4. Site-Level Practicability Analysis. The Mineral Creek TSF alternative location appears to be available and both logistically and technologically practicable for the development of a TSF. However, before detailed design and engineering documentation for a TSF at his location could be prepared, other significant adverse environmental consequences were identified that would be sufficient to keep this location from being selected as the Least Environmentally Damaging Practicable Alternative (LEDPA).

Mineral Creek, located within the HUC-10 Mineral Creek – Gila River watershed (**Figure 6**), is a northeast to southwest trending drainage originating in the foothills of the Pinal mountains, joining the Gila River just south of Kelvin, Arizona. The drainage is spatially intermittent with a very large portion considered continuously saturated (M&A and WestLand 2017). Vegetation composition along the continuously saturated reaches of Mineral Creek consists of mixed stands of Arizona sycamore (*Platanus wrightii*), velvet mesquite (*Prosopis velutina*), and gray thorn (*Ziziphus obtusifolia*), with a few Goodding's willow (*Salix gooddingii*). Intermittent patches of seepwillow (*Baccharis salicifolia*) and singlewhorl burrobrush (*Ambrosia monogyra*) occur along the terraces. Approximately nine (9) miles of Mineral Creek in this area has been designated by the U.S. Fish and Wildlife Service (USFWS) as critical habitat (**Figure 6**) for the native and endangered Gila chub (*Gila intermedia*). Of this 9-mile-long reach, approximately 5.16 miles would be permanently lost within the footprint of this TSF. Based on this impact, this alternative will not be subject to detailed consideration in the draft CWA Section 404(b)(1) Alternatives Analysis document.

## 4. CONCLUSION

The DEIS published in August 2019 by the USFS TNF included as Appendix C a draft Practicability Analysis document (WestLand 2019) containing an analysis of alternatives as required to demonstrate compliance with guidelines established under CWA Section 404(b)(1). This evaluation of alternatives closely followed the format of the NEPA evaluation of alternatives in the TNF DEIS. After review and discussion at Workgroup Meetings #2 and #4 on August 21, 2109 and October 16, 2019, respectively, portions of the Practicability Analysis were revised to ensure the evaluation of alternatives undertaken therein conformed to the requirements of an analysis of alternatives under the CWA Section 404(b)(1) Guidelines. WestLand has developed this technical memorandum to capture the revised alternatives discussion and additional information provided by Resolution and the agencies on some of the evaluated alternatives. The information presented in this memorandum will be included in the final CWA Section 404(b)(1) Alternatives Analysis document published with the Final EIS.

## 5. REFERENCES

Air Sciences Inc. (ASI). 2019. *Air Quality Regulatory Constraints Associated with the Hewitt Canyon and Whitford Canyon Tailings Alternatives.* September 2019.

KCB Consultants Ltd. (KCB). 2020. *Conceptual Filtered Tailings Impoundment Layout and Staging.* Doc. #CCC.03-81600-EX-LTR-00010. January 2020.

Montgomery & Associates and WestLand Resources, Inc. (M&A and WestLand). 2017. *Spring and Seep Catalog Resolution Copper Project Area Upper Queen Creek and Devils Canyon Watersheds.* Tucson, Arizona. October 3, 2017.

Superstition Vistas. 2013. *Superstition Vistas Information.* Avaialble at: https://www.evp-az.org/wp-content/uploads/2016/04/Superstition-Vistas.pdf. Accessed on January 17, 2020.

SWCA Environmental Consultants (SWCA). 2017. *Resolution Copper Project and Land Exchange Environmental Impact Statement DRAFT Alternatives Evaluation Report.* edited by Tonto National Forest U.S. Forest Service. Phoenix, Arizona: U.S. Department of Agriculture. November 2017.

U.S. Forest Service (USFS). 1993. *Preliminary Analysis of Eligibility and Classification for Wild/Scenic/Recreational River Designation: National Forests of Arizona.* Southwestern Region. January 1993.

_____. 2019. *Resolution Copper Project DRAFT Environmental Impact Statement.* U.S. Department of Agriculture.

WestLand Resources, Inc. (WestLand). 2019. *DRAFT Practicability Analysis in Support of Clean Water Act 404(B)(1) Anlternatives Analysis: Resolution Copper.* Prepared for the Untied States Army Corps of Engineers on behalf of Resolution Copper. June 21, 2019.

*This page intentionally left blank.*

**FIGURES**

7-RCMSER-1901



RESOLUTION COPPER

Revised Alternatives Discussion

INITIAL TAILINGS STORAGE FACILITY ALTERNATIVES
DISMISSED FROM FURTHER CONSIDERATION

Figure 1

*This page intentionally left blank.*



*This page intentionally left blank.*

(189 of 258), Page 189 of 258
Case 2:21-cv-00068-DWL    Document 107-2    Filed 07/14/25    Page 112 of 127
Case: 25-5197, 09/29/2025, DktEntry: 61.8, Page 189 of 258



T4S, R11E, Portions of Sections 32 and 33,
T5S, R10E, Portion of Section 13,
T5S, R11E, Portions of Sections 3-11, 15-22, 27, and 28,
Pinal County, Arizona
Image Source: DigitalGlobe 2018

**Legend**

☐ BGC B

RESOLUTION COPPER

Revised Alternatives Discussion

BGC B TSF
Figure 3

WestLand Resources

7-RCMSER-1907

*This page intentionally left blank.*







Legend

Spring (ALRIS)
—— Continuous Saturated Reach (Montgomery and Associates 3-16-2018)
—— Streams (ALRIS)
▭ Mineral Creek Headwaters
**USFWS Critical Habitat**
▮ Gila chub, Designated Critical Habitat, 11-02-2005
▨ Mexican spotted owl, Designated Critical Habitat, 08-31-2004

Mineral Creek
Headwaters

T1S, R14E, Portions of Sections 31-33,
T2S, R13E, Portions of Sections 1, 11-14, 23, and 24,
T2S, R14E, Portions of Sections 5-9, 16-21, and 28-30,
Gila and Pinal County, Arizona
Image Source: DigitalGlobe, 2-6-2018

N
0    0.5    1   Miles
0    1    2   Kilometers

**RESOLUTION COPPER**
Revised Alternatives Discussion

MINERAL CREEK TSF
Figure 6

WestLand Resources

*This page intentionally left blank.*

# ATTACHMENT
# 1
## May 23, 1925
## First Form
## Withdrawal

OFFICE OF THE COMMISSIONER

FIRST FORM WITHDRAWAL
ADDRESS ALL COMMUNICATIONS TO THE
COMMISSIONER

DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
WASHINGTON

May 23, 1911.

The Secretary
of the Interior.

Sir:

It is recommended that the title to the following described lands, excepting any tract the title to which has passed out of the United States, be withdrawn from public entry, under the first form of withdrawal, as provided in Sec. 3, Act of June 17, 1902 (32 Stat., 388).

Salt River Project, Arizona.

Gila and Salt River Base and Meridian.

T. 1 N., R. 8 E., (unsurveyed), all Secs. 25 and 35; W½ and SE¼ Sec. 26; N½ and E½ Sec. 36.

T. 1 S., R. 10 E., SW¼SW¼ Sec. 30; W½NW¼, N½NW¼ and SE¼NW¼ Sec. 31; NW¼NE¼ and NE¼NW¼ Sec. 34; NW¼ Sec. 35.

T. 1 S., R. 11 E., (unsurveyed) SW¼NE¼ and NE¼SW¼ Sec. 32; S½ Sec. 33; S½ Sec. 34; S½, N½SE¼, S½ Sec. 35; SW¼ Sec. 36.

T. 2 S., R. 11 E., (unsurveyed) all Sec. 1; S½ Sec. 2; N½ Sec. 3.

T. 1 S., R. 18 E., (unsurveyed) W½ and SE¼ Sec. 34; S½ and SW¼ Sec. 35.

T. 2 S., R. 18 E., NW¼, N½ Sec. 4; SW¼, N½ and NE¼ Sec. 3; S½SE¼ Sec. 5; S½ Sec. 6.

As portions of the above described lands are unsurveyed, it is requested that notation be made on the records so as to



First Farm Withdrawal.- Salt River Project.- Cont.

withdraw the lands after survey is made as well as prior thereto.

Respectfully,

Commissioner.

APPROVED:

DEPARTMENT OF THE INTERIOR

MAY 23 1925

The lands described are hereby reserved as recommended, and the Commissioner of the General Land Office will cause the records of his office and of the local land office to be noted accordingly.

(Sgd) E. C. FINNEY

First Assistant Secretary.

Copy to U.S.G.S.
" " " U.S.G.S.

## TOWNSHIP 2 SOUTH RANGE 12 EAST OF THE GILA AND SALT RIVER MERIDIAN, ARIZONA

PINAL COUNTY
LOWER SONORAN FIELD OFFICE

STATUS OF PUBLIC DOMAIN
LAND AND MINERAL TITLES

**MTP**
**SUPPL SECS 5,6,8**



### INDEX TO SEGREGATED TRACTS

| RESURVEY | | | ORIGINAL SURVEY | |
|---|---|---|---|---|
| TRACT NO | T | R | SEC | SUBDIVISION |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

FOR ORDERS AFFECTING DISPOSAL OR USE OF
UNCLASSIFIED LANDS WITHDRAWN FOR CLASSIFICATION,
MINERALS, WATER AND/OR OTHER PUBLIC PURPOSES,
REFER TO INDEX OF MISCELLANEOUS DOCUMENTS.

WDS EIG NW

| CURRENT TO | | NO 2 |
|---|---|---|
| | NW | CSR Mer |
| 2-11-2016 | ACAD | T   2 S |
| | | R   12 E |

SCALE in chains

WARNING STATEMENT

**7-RCMSER-1917**

(200 of 258), Page 200 of 258
Case: 25-5197, 09/29/2025, DktEntry: 61.8, Page 200 of 258
Case 2:21-cv-00068-DWL    Document 107-2    Filed 07/14/25    Page 123 of 127

TOWNSHIP 2 SOUTH RANGE 12 EAST OF THE GILA AND SALT RIVER MERIDIAN, ARIZONA

PINAL COUNTY
LOWER SONORAN FIELD OFFICE

STATUS OF PUBLIC DOMAIN
LAND AND MINERAL TITLES



MTP
SUPPL SECS 3,4,9

INDEX TO SEGREGATED TRACTS

| RESURVEY | | | | ORIGINAL SURVEY |
|---|---|---|---|---|
| TRACT NO | T | R | SEC | SUBDIVISION |
| | | | | |

FOR ORDERS AFFECTING DISPOSAL OR USE OF
UNIDENTIFIED LANDS WITHDRAWN FOR CLASSIFICATION,
MINERALS, WATER AND/OR OTHER PUBLIC PURPOSES,
REFER TO INDEX OF MISCELLANEOUS DOCUMENTS.

| CURRENT TO | | NW | GSR Mer |
|---|---|---|---|
| 2-11-2016 | ACAD | | T  2 S |
| | | | R  12 E |

WARNING STATEMENT
This plat is the Bureau's Record of Title, and should be used
only as a graphic display of the township survey data. Reas-
onable care has been taken in preparing this plat, however
onable harmss be assumed of the accuracy of relied upon actual
values and should be referred to the cadastral survey records
Refer to the cadastral surveys for official survey information.

7-RCMSER-1918

UNSURVEYED TOWNSHIP 1 SOUTH RANGE 11 EAST OF THE GILA AND SALT RIVER MERIDIAN, ARIZONA

7-RCMSER-1919

*This page intentionally left blank.*

# ATTACHMENT 2
## April 24, 1931
## Executive
## Order No. 5611

5611

# Executive Order

### Withdrawal of Public Lands for Use in Connection with San Carlos Indian Irrigation Project, Arizona

Under authority of the act of Congress approved June 25, 1910 (36 Stat. 847), as amended by the act of August 24, 1912 (37 Stat. 497), it is hereby ordered that the following described tracts of public lands in Arizona be, and they are hereby, withdrawn from settlement, location, sale, or entry, except as provided in said acts, for use in connection with the San Carlos Indian Irrigation Project, subject to any valid rights or claims initiated prior to March 24, 1931:

GILA AND SALT RIVER MERIDIAN

T. 4 S., R. 11 E., sec. 1, S. ½ SW. ¼ and SE. ¼;
    sec. 2, S. ½ SE. ¼;
    sec. 11, lots 1, 2, 3, 8, and 9 and NE. ¼ NE. ¼;
    sec. 12, all;
    sec. 13, N. ½ and N. ½ S. ½;
    sec. 14, NE. ¼ and N. ½ SE. ¼;
T. 4 S., R. 12 E., sec. 1, all;
    sec. 2, all;
    sec. 3, S. ½;
    sec. 4, S. ½;
    sec. 5, all;
    sec. 6, all;
    sec. 7, all;
    sec. 8, N. ½;
    sec. 9, N. ½;
    sec. 10, N. ½;
T. 4 S., R. 13 E., sec. 5, all;
    sec. 6, all;
T. 5 S., R. 15 E., sec. 12, SE. ¼;
    sec. 13, E. ½;
    sec. 24, NE. ¼;
T. 4 S., R. 16 E., sec. 28, all (N. ½ unsurveyed);
T. 5 S., R. 16 E., sec. 7, all (partly unsurveyed).

This order shall continue in full force and effect unless and until revoked by the President or by act of Congress.

HERBERT HOOVER

THE WHITE HOUSE,
    April 24, 1931.

[No. 5611]

U.S. GOVERNMENT PRINTING OFFICE, 1931

**8686**    FEDERAL REGISTER, *Thursday, June 24, 1943*

prices of another marketing agency without prior notice or hearing.[3]

On March 25, 1943, the agency filed a response to the motion of Consumers' Counsel in which it averred that the summary action requested by Consumers' Counsel was not authorized by the Rules of Practice and Procedure before the Division. Due notice and hearing, it is claimed, are indispensable prerequisites to any action by the Division, whether the motion be regarded as seeking to reopen for introduction of additional evidence or as alleging new matter in this continuing docket. The agency further maintains that the suspension of the agency's current price list would result merely in suspending a function of the agency and in confusing its members, and would not prevent any inflationary market prices.

Immediately prior to the establishment of Division minima, this agency's prices were, in different sizes, from 10 cents to 20 cents per ton lower than such minima, although considerably higher than the prices established by the agency when it began to function in January 1939. From October 1, 1940, to June 1941, agency prices were substantially the same as Division minima. Thereafter, a 20 cents per ton increase was put into effect. The agency price list current at the time of the hearing contained prices from 5 cents to 40 cents per ton above Division minima in different sizes and for shipment to different marketing areas. According to the allegations of the motion of Consumers' Counsel, the prices set forth in Price List No. 29 are substantially the same as OPA maxima, which are 15 cents to 80 cents (in one size group) per ton above the Division minima for most agency members for shipment to their home market area.[4] The record does not disclose the history of this agency's prices between the time of the hearing in September and October 1941 and the date of issuance of Price List No. 28, which was the very date on which OPA maximum price increases, governing the coals of agency members, became effective.[5]

The present motion assumes that under the provisions of section 12 of the Act, the Division may summarily suspend without hearing marketing agency price lists even when, as in this case, no specific reservation of this power has been made under the terms of the order granting provisional approval to the agency. The motion further assumes that such summary action is appropriate when it is shown only that the price list of the agency corresponds substantially to the applicable maximum prices estab-

lished by OPA. The appropriateness of the suspension procedure has been vigorously mooted in this and other proceedings involving marketing agencies. Conflicting conclusions h a v e been reached by the Examiners who have considered the problem. I do not believe it advisable to attempt to resolve this complex legal question in passing upon the present motion for interlocutory relief. It is not necessary to make any final resolution of the issue since I believe that no sufficient showing has been made to justify the suspension of the agency price list.

It may be, as Consumers' Counsel suggests, that there "is a substantial economic difference between prices when they are established as maximum on colling prices and the same prices when established as minimum or floor prices." But the difficulty of the present problem, however, is to translate what is alleged as a "substantial economic difference" into a workable basis for determining the fairness and reasonableness of the agency prices. The motion gives no help in this regard; indeed, Consumers' Counsel expressly indicates that the relief which is sought is "addressed specifically to those prices . . . which are the same as the maximum prices promulgated by the Office of Price Administration for the coals" and states that "no opinion is expressed regarding other prices contained in the Agency's Price List." Consumers' Counsel does not suggest any logical reason why prices which may be a few cents under the OPA maxima should properly be left unchanged while those identical with the OPA maxima should be suspended. Nor does the motion suggest prices which would more nearly effectuate what are contended to be the standards of Section 12.

On the basis of the general and inadequate allegations of the motion, I do not feel justified in holding that the agency's prices, which do not exceed the legal maxima established by OPA, are necessarily inimical to the public interest or prevent the public "from receiving coal at fair and reasonable prices." While it may be that the effect of concerted price-fixing action of the members of the agency has been to stabilize coal prices at or near applicable OPA maxima in the area, it does not appear that such action on the part of the agency members represented more than a response to general market conditions. There is certainly no basis in the record before me to justify an inference that the establishment of the price list in question was a substantial cause of inflationary coal prices or that the relief requested would substantially discourage sales at the present high market levels.

The problem or reconciling the interests of marketing agencies and the public calls for the highest degree of administrative statesmanship. Numerous proceedings involving marketing agencies in various parts of the country are pending before the Division for some time. After full and extensive hearings, it has become evident that the regula-

tory problems involved are extremely complex, the factors to be considered, in many instances, extremely subtle, and confident conclusions difficult to obtain. Widely varying conceptions of the aims and objectives of section 12 have been suggested. The necessity for rigorous general regulations as well as supervision of particular activities of marketing agencies has been vigorously asserted and denied. Differences in the organization of various agencies have been disclosed which may or may not affect the type of regulation necessary or appropriate. After hearing oral arguments in a number of these cases and after careful preliminary study, it is clear to me that issues of this character may not properly be resolved on a preliminary motion of the type here presented. Without deciding whether it may be appropriate for the Division, pursuant to the authority granted in section 12 of the Act, to impose maximum price restrictions on the sale of coal through marketing agencies, I believe that under present marketing conditions and in view of the present maximum price restrictions promulgated by the Office of Price Administration, it cannot be assumed that the public interest is being seriously or substantially prejudiced so as to justify drastic temporary measures of the type sought in the present motion. Before such relief would be appropriate, a more substantial showing is required.

Accordingly, the motion of the Bituminous Coal Consumers' Counsel filed March 12, 1943 should be denied.

It is so ordered.

Dated: June 21, 1943.

[SEAL]                  DAN H. WHEELER,
                                          *Director.*

[F. R. Doc. 43–10076; Filed, June 23, 1943; 10:41 a. m.]

---

General Land Office.

[Public Land Order 141]

ARIZONA

WITHDRAWAL OF PUBLIC LANDS FOR USE IN CONNECTION WITH SAN CARLOS INDIAN IRRIGATION PROJECT

By virtue of the authority vested in the President and pursuant to Executive Order No. 9337 of April 24, 1943: *It is ordered,* as follows:

Subject to valid existing rights, the following-described public lands are hereby withdrawn from all forms of appropriation under the public-land laws, including the mining and mineral-leasing laws, and reserved under the jurisdiction of the Secretary of the Interior for use in connection with the San Carlos Indian Irrigation Project:

GILA AND SALT RIVER MERIDIAN

T. 4 S., R. 11 E.,
     Sec. 13, SW¼SW¼;
     Sec. 14, S½SE¼.
T. 3 S., R. 12 E.,
     Sec. 36, S½N½, S½.
T. 4 S., R. 12 E.,
     Sec. 4, C½N½;
     Sec. 18, lot 1.

---

[3] *Matter of Application of Belleville Fuels, Inc.,* Docket No. 821–FD.

[4] The average is a fraction over 44 cents per ton higher for all size groups covered.

[5] The price list filed by the agency with the Division indicates that, as of November 1942, the agency's prices generally were the same as the applicable maximum prices established by the Office of Price Administration, save that in Size Groups 16 to 25 the agency's prices were ten to twenty cents lower than the effective maxima.

**FEDERAL REGISTER, *Thursday, June 24, 1943***　　　　　8687

T. 4 S., R. 18 E.,
Sec. 1, SW¼SW¼;
Sec. 3, S½S½;
Sec. 4, lots 1, 2, 3, 4, S½N½, NE¼SW¼, NE¼SE¼, S½S½;
Sec. 9, lots 1, 2, N½NE¼, NW¼;
Sec. 12, lot 3, NW¼NW¼.
The areas described aggregate 1,018.67 acres.

The Commissioner of the General Land Office shall continue to administer the lands for grazing purposes under section 15 of the Taylor Grazing Act (48 Stat. 1269).

This order shall take precedence over, but shall not rescind or revoke, the withdrawal for classification and other purposes made by Executive Order No. 6910 of November 26, 1934, as amended, so far as such order affects the above-described lands.

ABE FORTAS,
*Acting Secretary of the Interior.*

JUNE 16, 1943.

[F. R. Doc. 43–10009; Filed June 23, 1943; 9:24 a. m.]

NEW MEXICO

[Public Land Order 142]

WITHDRAWING PUBLIC LAND FOR USE IN CONNECTION WITH PROSECUTION OF WAR

Executive Order No. 6583 of February 3, 1934, revoked in part.

By virtue of the authority vested in the President and pursuant to Executive Order No. 9337 of April 24, 1943; *It is ordered,* As follows:

Subject to valid existing rights, the following-described public land is hereby withdrawn from all forms of appropriation under the public-land laws, including the mining and mineral-leasing laws, and reserved under the jurisdiction of the Department of the Interior for use in connection with the prosecution of the war:

NEW MEXICO PRINCIPAL MERIDIAN

T. 18 S., R. 13 W., sec. 12. NS½NE¼.
The area described contains 40 acres.

Executive Order No. 6583 of February 3, 1934, withdrawing public lands for the purpose of aiding the State of New Mexico in making exchange selections under the act of June 15, 1926, c. 590, 44 Stat. 746, is hereby revoked so far as it affects the above-described land.

ABE FORTAS,
*Acting Secretary of the Interior.*

JUNE 16, 1943.

[F. R. Doc. 43–10030; Filed June 23, 1943; 9:24 a. m.]

DEPARTMENT OF AGRICULTURE.

Farm Security Administration.

ARKANSAS

DESIGNATION OF COUNTIES FOR LOANS

In accordance with the rules and regulations promulgated by the Secretary of Agriculture on July 1, 1941, as extended by Supplement 2 of Secretary's Memorandum No. 867 issued as of July 1, 1942, loans made in the county men-

No. 123——9

tioned herein, under Title I of the Bankhead–Jones Farm Tenant Act, may be made within the localities herein described and designated. The value of the average farm unit of thirty acres and more in each of these localities has been determined in accordance with the provisions of the said rules and regulations. A description of the localities and the determination of value for each follow:

REGION VI

ARKANSAS

*Prairie County*

Locality I—Consisting of the townships of Belcher, Roc Roe, and Tyler_____ $9,110
Locality II—Consisting of the townships of Calhoun, Upper Surrounded Hill, and Lower Surrounded Hill_____ 3,445
Locality III—Consisting of the townships of Bullard, Center, Des Arc, Hazen, Hickory Plain, Union, Watensaw, and White River_____ 2,485

The purchase price limit previously established for the county above-mentioned is hereby cancelled.
Approved: June 22, 1943.
[SEAL]
C. B. BALDWIN,
*Administrator.*

[F. R. Doc. 43–10081; Filed June 23, 1943; 11:20 a. m.]

DEPARTMENT OF LABOR.

Wage and Hour Division.

LEARNER EMPLOYMENT CERTIFICATES

ISSUANCE TO VARIOUS INDUSTRIES

Notice of issuance of special certificates for the employment of learners under the Fair Labor Standards Act of 1938.

Notice is hereby given that special certificates authorizing the employment of learners at hourly wage rates lower than the minimum wage rate applicable under section 6 of the Act are issued under section 14 thereof, Part 522 of the regulations issued thereunder (August 16, 1940, 5 F.R. 2862, and as amended June 25, 1942, 7 F.R. 4725), and the determination and order or regulation listed below and published in the FEDERAL REGISTER as here stated.

Apparel Learner Regulations, September 7, 1940 (5 F.R. 0591), as amended by Administrative Order March 13, 1943 (8 F.R. 3079).
Single Pants, Shirts and Allied Garments, Women's Apparel, Sportswear, Rainwear, Robes and Leather and Sheep-Lined Garments, Divisions of the Apparel Industry, Learner Regulations, July 20, 1942 (7 F.R. 4724), as amended by Administrative Order March 13, 1943 (8 F.R. 3079).
Artificial Flowers and Feathers Learner Regulations, October 24, 1940 (5 F.R. 4203).
Glove Findings and Determination of February 20, 1940, as amended by Administrative Order September 20, 1940 (5 F.R. 3748) and as further amended by Administrative Order, March 13, 1943 (8 F.R. 3079).
Hosiery Learner Regulations, September 4, 1940 (5 F.R. 3530), as amended by Administrative Order March 13, 1943 (8 F.R. 3079).
Independent Telephone Learner Regulations, September 27, 1940 (5 F.R. 3820).
Knitted Wear Learner Regulations, October 10, 1940 (5 F.R. 3982), as amended by Ad-

ministrative Order, March 13, 1943 (8 F.R. 3079).
Millinery Learner Regulations, Custom Made and Popular Priced, August 29, 1940 (5 F.R. 3302, 3303).
Textile Learner Regulations, May 16, 1941 (6 F.R. 2446) as amended by Administrative Order March 13, 1943 (8 F.R. 3079).
Woolen Learner Regulations, October 30, 1940 (5 F.R. 4302).

Notice of amended order for the employment of learners in the Cigar Manufacturing Industry, July 20, 1941 (6 F.R. 3753).

The employment of learners under these certificates is limited to the terms and conditions therein contained and to the provisions of the applicable determination and order or regulations cited above. The applicable determination and order or regulations and the effective and expiration dates of the certificates issued to each employer is listed below. The certificates may be cancelled in the manner provided in the regulations and as indicated in the certificates. Any person aggrieved by the issuance of any of these certificates may seek a review or reconsideration thereof.

NAME AND ADDRESS OF FIRM, INDUSTRY, PRODUCT, NUMBER OF LEARNERS AND EFFECTIVE DATES

*Single pants, shirts, and allied garments, women's apparel, sportswear, rainwear, robes, and leather and sheeplined garments divisions of the apparel industry*

Hamilton Carhartt Overall Company, Irvine, Kentucky; Work clothing; 5 learners (A. T.); effective June 21, 1943, expiring February 21, 1944.
Elder Manufacturing Company, 7025 Pennsylvania Avenue, St. Louis, Missouri; Men's dress shirts; Army shirts; 10 percent (T); effective June 21, 1943, expiring June 21, 1944.
Hollywood Maxwell Company, Main Street, Arkadelphia, Arkansas; Brassieres; 10 learners (T); effective June 21, 1943, expiring June 21, 1944. (This certificate replaces the certificate effective August 10, 1942 and expiring August 10, 1943.)
Jabour Manufacturing Company, 8463½ S. Vermont, Los Angeles, California; Children's cotton garments; 6 learners (T); effective June 21, 1943, expiring June 21, 1944.
W. Kotkes & Son, Lynchburg, Virginia; Cotton and Rayon uniforms; 10 percent (T); effective June 21, 1943, expiring June 21, 1944.
Super Togs Company, Cherry Street, Slatington, Pennsylvania; Ladies' sportswear; 20 learners (A. T.); effective June 23, 1943, expiring December 23, 1943.
Willards Shirt Company, Berlin, Maryland; Cotton work shirts; 10 percent (T); effective June 22, 1943, expiring September 22, 1943.

*Glove Industry*

Berlin Glove Company, 615 Fox Alley, Berlin, Wisconsin; Leather dress gloves; 10 percent (A. T.); effective June 21, 1943, expiring December 21, 1943.

*Hosiery Industry*

Charles H. Bacon Company, Loudon, Tennessee; Seamless hosiery; 5 percent (A. T.); effective June 21, 1943, expiring October 26, 1943.
Drexel Knitting Mills Company, Inc., Drexel, North Carolina; Seamless ho-

12642

**RULES AND REGULATIONS**

Post Office Box 1449, Santa Fe, N. Mex., 87501.

HARRY R. ANDERSON,
*Assistant Secretary of the Interior.*

SEPTEMBER 27, 1965.

[F.R. Doc. 65-10479; Filed, Oct. 1, 1965; 8:45 a.m.]

---

[Public Land Order 3833]

[Nevada 051736]

## NEVADA

### Partial Revocation of Executive Order No. 7558

By virtue of the authority vested in the President by section 1 of the Act of June 25, 1910 (36 Stat. 847; 43 U.S.C. 141), and pursuant to Executive Order No. 10355 of May 26, 1952 (17 F.R. 4831), it is ordered as follows:

1. Executive Order No. 7558 of February 23, 1937, so far as it withdrew the following-described lands for use of the Soil Conservation Service for erosion control demonstrations, is hereby revoked:

MOUNT DIABLO MERIDIAN

CRYSTAL SPRINGS AREA

T. 4 S., R. 59 E.,
Sec. 36, E½;
Sec. 36, All.
T. 5 S., R. 59 E.,
Sec. 1, All;
Secs. 2 and 11, E½;
Secs. 12 and 13, All;
Sec. 14, E½;
Sec. 23, NE¼;
Sec. 24, NW¼.
T. 4 S., R. 60 E.,
Sec. 31 and 32, All;
Sec. 33, W½.
T. 5 S., R. 60 E.,
Sec. 4, W½;
Secs. 5, 6, 7, 8, All;
Sec. 9, W½;
Sec. 17, NW¼;
Sec. 18, N½, SW¼.

PANACA AREA

T. 1 S., R. 68 E.,
Sec. 36, All.
T. 2 S., R. 68 E.,
Secs. 1 and 12, All.
T. 1 S., R. 69 E.,
Sec. 31, All;
Sec. 32, S½.
T. 2 S., R. 69 E.,
Secs. 2 and 3, S½;
Secs. 4 through 12, inclusive.

Aggregating approximately 18,379.25 acres.

2. At 10 a.m. on November 2, 1965, the lands shall become subject to application, petition, location and selection generally, subject to valid existing rights, the provisions of existing withdrawals, and the requirements of applicable law. All valid applications received at or prior to 10 a.m. on November 2, 1965, shall be considered as simultaneously filed at that time. Those filed thereafter shall be considered in the order of filing.

3. The lands have been open to applications and offers under the mineral leasing laws and to location for metalliferous minerals. They will be open to location under the U.S. mining laws for non-metalliferous minerals after 10 a.m. on November 2, 1965.

Inquiries concerning the lands should be addressed to the Manager, Land Office, Bureau of Land Management, Reno, Nev.

HARRY R. ANDERSON,
*Assistant Secretary of the Interior.*

SEPTEMBER 27, 1965.

[F.R. Doc. 65-10480; Filed, Oct. 1, 1965; 8:45 a.m.]

---

[Public Land Order 3834]

[BLM 060857]

## MICHIGAN

### Adding Lands to Manistee and Hiawatha National Forests

By virtue of the authority vested in the President by section 24 of the Act of March 3, 1891 (26 Stat. 1103; 16 U.S.C. 471), and section 1 of the Act of June 4, 1897 (30 Stat. 34, 36; 16 U.S.C. 473), and pursuant to Executive Order No. 10355 of May 26, 1952 (17 F.R. 4831), it is ordered as follows:

Subject to valid existing rights, the following described public lands are hereby added to and reserved as parts of the national forest as indicated, and shall hereafter be subject to all laws and regulations applicable thereto:

MICHIGAN MERIDIAN

MANISTEE NATIONAL FOREST

T. 1 N., R. 10 W.,
Sec. 7, Islands 1, 2 and 3.
T. 39 N., R. 9 W.,
Sec. 2, lot 2.
T. 3 N., R. 8 E.,
Sec. 3, lot 7;
Sec. 10, lot 6;
Sec. 15, lots 15, 16, 17 and 18.
T. 36 N., R. 10 W.,
Sec. 2, lots 18 and 17.
T. 27 N., R. 11 W.,
Sec. 31, lot 12.
T. 7 N., R. 11 W.,
Sec. 5, lot 1.
T. 16 N., R. 16 W.,
Sec. 2, NE¼SE¼, NE¼NE¼.
T. 30 N., R. 4 W.,
Sec. 25, lot 9;
Sec. 36, lot 8.

HIAWATHA NATIONAL FOREST

T. 46 N., R. 27 W.,
Sec. 11, NE¼NE¼.

The areas described aggregate 170.98 acres.

HARRY R. ANDERSON,
*Assistant Secretary of the Interior.*

SEPTEMBER 27, 1965.

[F.R. Doc. 65-10481; Filed, Oct. 1, 1965; 8:45 a.m.]

---

[Public Land Order 3835]

[Arizona 017399]

## ARIZONA

### Withdrawal for Proposed Buttes Dam and Reservoir, Middle Gila River Project

By virtue of the authority contained in section 3 of the Act of June 17, 1902 (32 Stat. 338; 43 U.S.C. 416), as amended and supplemented, it is ordered as follows:

1. Subject to valid existing rights, the following described public lands which are under the jurisdiction of the Secretary of the Interior, are hereby withdrawn from all forms of appropriation under the public land laws, including the mining laws, but not from leasing under the mineral leasing laws, and reserved for the proposed Buttes Dam and Reservoir, Middle Gila River Project:

GILA AND SALT RIVER MERIDIAN

T. 4 S., R. 10 E.,
Sec. 10, SE¼SE¼;
Sec. 13, NW¼NW¼, S½NE¼, S½;
Sec. 14, S½NE¼, NE¼NW¼, S½NW¼, S½;
Sec. 15, NW¼, NW¼SW¼, W½SE¼, S½SE¼.
T. 4 S., R. 11 E.,
Sec. 1, SE¼, S½SW¼;
Sec. 4, S½;
Sec. 5;
Sec. 7, lots 1, 3, 4, 7, SW¼SW¼, S½SE¼;
Secs. 8, 9, 10, 11 and 12;
Sec. 13, N½, N½SE¼, SW¼SW¼, S½SE¼;
Secs. 14, 15 and 17;
Sec. 22, NE¼SE¼.
T. 3 S., R. 12 E.,
Sec. 33, S½;
Secs. 34 and 35.
T. 4 S., R. 12 E.,
Sec. 1;
Sec. 3, S½;
Secs. 4 and 5;
Sec. 6, lots 1, 2, 3, 4, 5, 6, S½NE¼;
Sec. 7, lots 3, 4, SE¼;
Secs. 8, 9, and 10;
Sec. 11, N½;
Sec. 12, N½;
Sec. 17;
Sec. 18, lots 1, 2, 3, 4, E½;
Sec. 19, lots 1, 2, 3, 4, E½;
Sec. 20;
Sec. 21, W½;
Secs. 28 and 29;
Sec. 30, lots 1, 2, 3, 4, E½;
Sec. 31, lots 1, 2, NE¼;
Sec. 33.
T. 5 S., R. 12 E.,
Sec. 4, lots 1, 2, 3, 4, S½N½;
Sec. 5, lots 1, 2, 3, 4, S½N½.
T. 3 S., R. 13 E.,
Sec. 31, lots 3, 4, E½SW¼.
T. 4 S., R. 13 E.,
Sec. 1, lots 4, 5, W½SW¼;
Sec. 2, lots 1, 2;
Sec. 3;
Sec. 4, lots 1, 2, 3, 4, S½N½, NE¼SW¼, S½SW¼, NE¼SE¼, S½SE¼;
Sec. 5 and 6;
Sec. 7, lots 1 and 2, E½NW¼, NE¼;
Sec. 8, N½;
Sec. 9, lots 1, 2, 3, 4, N½N½, S½NW¼, N½S½, S½SE¼;
Sec. 12, lots 1, 2, 4, and part of lots 3, 5, 6, 7, 8, Part S½NW¼, that are Federal lands; NW¼NW¼.
T. 4 S., R. 14 E.,
Sec. 7, lot 6;
Sec. 8, E½SW¼, SW¼SW¼;
Sec. 18, lots 1, 2, 3, 4, 9, 10, 11;
Sec. 19, W¼NE¼;
Sec. 20, SW¼NW¼, SW¼SW¼.
T. 5 S., R. 15 E.,
Sec. 7, SE¼SW¼;
Sec. 18, lot 6;
Sec. 24, lots 1 and 4, W½SE¼.
T. 5 S., R. 16 E.,
Sec. 5, lots 1 to 6, S½NE¼, N½SE¼, SW¼SE¼;
Sec. 6, lot 1, and unsurveyed portion of SE¼SE¼;
Sec. 7, lot 1, pt. lot 2, S½NE¼, N½SE¼, and unsurveyed portion of N½NW¼, NW¼NE¼;
Sec. 8, NW¼NW¼.

The areas described aggregate approximately 26,164.28 acres in Pinal County.

**Saturday, October 2, 1965**  **FEDERAL REGISTER**  12643

2. The use and administration of the lands will become subject to the provisions of the reclamation laws (Act of June 17, 1902, supra, as amended and supplemented), including the use of the lands under lease, license or permit, at such time as the Buttes Dam and Reservoir, Middle Gila River Project, is authorized by the Congress.

3. Pending authorization of the project, the withdrawal made by this order does not alter the applicability of the public land laws governing the use of the lands under lease, license, or permit, or the disposal of their mineral or vegetative resources, other than under the mining laws, subject to the condition that such use or disposition will not be inconsistent with the reclamation laws and the purposes for which the lands are withdrawn.

HARRY R. ANDERSON,
*Assistant Secretary of the Interior.*

SEPTEMBER 27, 1965.

[F.R. Doc. 65-10482; Filed, Oct. 1, 1965; 8:45 a.m.]

[Public Land Order 3886]

[BLM 048089]

## ARKANSAS

### Transferring Jurisdiction Over Oil and Gas Deposits Underlying Certain Acquired Lands at Fort Chaffee Military Reservation

Whereas, the hereinafter described lands to which title has been acquired by the United States, and which comprise a portion of the Fort Chaffee Military Reservation, are reported to be subject to drainage of their oil and gas deposits by wells on adjacent lands in private ownership; and

Whereas, it is necessary in the public interest that such protective action be taken as will prevent loss to the United States by reason of such drainage or threatened drainage; and

Whereas, in order to facilitate such action, it is considered advisable that jurisdiction over the oil and gas deposits in such acquired lands be transferred from the Department of the Army to the Department of the Interior, in which transfer the Secretary of the Army concurs.

Now, therefore, by virtue of the authority vested in the President, and pursuant to Executive Order No. 10355 of May 26, 1952 (17 F.R. 4831), it is ordered as follows:

1. The jurisdiction over the oil and gas deposits owned by the United States in the following-described lands is hereby transferred from the Department of the Army to the Department of the Interior:

FIFTH PRINCIPAL MERIDIAN

T. 6 N., R. 29 W.,
Secs. 1, 2, 7, 8 and 9;
Sec. 10, NE¼, S½NW¼ and S½;
Sec. 11;
Sec. 12, N½N½ and S½ those portions lying west of Rattlesnake Canyon Road;
Sec. 13, those portions lying west of Rattlesnake Canyon Road;
Secs. 14 and 15;

No. 191——4

Sec. 16, N½, N½S½, SW¼SW¼ and SE¼SE¼;
Secs. 17 and 18;
Sec. 20, N½N½NE¼NW¼ and N½NW¼NW¼;
Sec. 21, N½NE¼NE¼ and N½S½NE¼NE¼,
T. 6 N., R. 30 W.,
Sec. 11, S½, less 8 acres in N½NW¼NW¼ SW¼;
Secs. 12, 13 and 14;
Sec. 23, N½NE¼, SE¼NE¼ and NE¼ NW¼;
Sec. 24, N½N½ and SW¼NW¼.
T. 8 N., R. 31 W.,
Secs. 23, 24, 26, 27, 34 and 35 (less approximately 40.95 acres of county-owned lands).

The areas described aggregate 13,294.45 acres of acquired lands.

2. The Secretary of the Interior shall take such action as may be necessary to protect the United States from loss on account of the drainage or threatened drainage of oil and gas from such lands.

3. The jurisdiction of the Department of the Interior over such deposits shall be limited only by the primary jurisdiction of the Department of the Army over the lands for military purposes.

4. The jurisdiction of the Department of the Interior over such deposits of oil and gas shall continue until revocation of this Public Land Order, and no action which may be taken by the Department of the Army to relinquish jurisdiction over the described lands for military purposes or to transfer such jurisdiction out of the Department of the Army shall affect in any way the jurisdiction of the Department of the Interior over the oil and gas deposits.

5. Public Land Order No. 2248 of December 28, 1960, so far as it withdrew the following-described public lands for use of the Department of the Army for military purposes in connection with the Fort Chaffee Military Reservation, is hereby modified to the extent necessary to permit leasing of the said lands for oil and gas under the Act of February 25, 1920 (41 Stat. 437), as amended and supplemented:

FIFTH PRINCIPAL MERIDIAN

T. 8 N., R. 29 W.,
Sec. 10, N½NW¼;
Sec. 12, S½N½.

Containing approximately 240 acres.

HARRY R. ANDERSON,
*Assistant Secretary of the Interior.*

SEPTEMBER 27, 1965.

[F.R. Doc. 65-10483; Filed, Oct. 1, 1965; 8:45 a.m.]

[Public Land Order 3887]

[Oregon 016416]

## OREGON

### Withdrawal for Materials Site (Sugarloaf Mountain)

By virtue of the authority vested in the President and pursuant to Executive Order No. 10355 of May 26, 1952 (17 F.R. 4831), it is ordered as follows:

Subject to valid existing rights, the following described lands which are un-

der the jurisdiction of the Secretary of the Interior are hereby withdrawn from all forms of appropriation under the public land laws, including the mining laws (Ch. 2, Title 30 U.S.C.), but not from leasing under the mineral leasing laws, for a Department of the Interior Materials Site:

WILLAMETTE MERIDIAN

SUGARLOAF MOUNTAIN MATERIAL SITE

T. 29 S., R. 12 W.,
Sec. 23, E½ and E½SW¼;
Sec. 24, SW¼SW¼.

The areas described aggregate 440 acres of revested O&C Railroad grant lands and public domain.

HARRY R. ANDERSON,
*Assistant Secretary of the Interior.*

SEPTEMBER 27, 1965.

[F.R. Doc. 65-10484; Filed, Oct. 1, 1965; 8:45 a.m.]

# Title 50—WILDLIFE AND FISHERIES

Chapter I—Bureau of Sport Fisheries and Wildlife, Fish and Wildlife Service, Department of the Interior

## PART 32—HUNTING

### Noxubee National Wildlife Refuge, Mississippi

The following special regulation is issued and is effective on date of publication in the FEDERAL REGISTER.

§ 32.22 Special regulations; upland game; for individual wildlife refuge areas.

MISSISSIPPI

NOXUBEE NATIONAL WILDLIFE REFUGE

Public hunting of squirrels and rabbits on the Noxubee National Wildlife Refuge, Miss., is permitted only on the area designated by signs as open to hunting. This open area, comprising 42,590 acres, is delineated on a map available at the refuge headquarters, Route 1, Brooksville, Miss., and from the Regional Director, Bureau of Sport Fisheries and Wildlife, 809 Peachtree-Seventh Building, Atlanta, Ga., 30323. Hunting shall be in accordance with all applicable State regulations covering the hunting of squirrels and rabbits subject to the following conditions:

(1) The open season extends from October 15 through October 30, 1965, excluding Sundays.

(2) The use of dogs is not permitted.

The provisions of this special regulation supplement the regulations which govern hunting on wildlife refuge areas generally which are set forth in Title 50, Code of Federal Regulations, Part 32, and are effective through October 30, 1965.

W. L. TOWNS,
*Acting Regional Director, Bureau of Sport Fisheries and Wildlife.*

[F.R. Doc. 65-10478; Filed, Oct. 1, 1965; 8:45 a.m.]

RULES AND REGULATIONS

26421

pursuant to the determination of the Federal Power Commission in DA-150-Arizona, it is ordered as follows:

1. The Executive order of November 22, 1924, creating Powersite Reserve No. 759, and the Departmental Order of February 1, 1917, creating Waterpower Designation No. 4, are hereby revoked as far as they affect the following described lands:

GILA AND SALT RIVER MERIDIAN

T. 5 S., R. 29 E.,
All land within 1 mile of the San Francisco River and Gila River in sections 16, 17, and 20.
T. 5 S., R. 30 E.,
Sec. 7, NE¼NW¼;
Sec. 33, S½SW¼, SW¼SE¼.
T. 6 S., R. 8¹ E.,
Sec. 3, lot 1.
T. 6 S., R. 31 E.,
Sec. 18, lot 7.

The areas described aggregate approximately 1,535 acres of public and non-public land in Greenlee County.

Of these lands, the following described lands are public lands:

T. 5 S., R. 29 E.,
Sec. 20.
T. 6 S., R. 30 E.,
Sec. 3, lot 1.
T. 6 S., R. 31 E.,
Sec. 18, lot 7.

The land described as lot 1, sec. 3, T. 6 S., R. 30 E., is included in a withdrawal application, Arizona 030451, filed by the Corps of Engineers, Department of the Army, to which the regulations in 43 CFR 2351.3(a) are applicable.

2. At 10 a.m. on January 11, 1973, the unappropriated public land shall be open to operation of the public land laws generally, subject to valid existing rights, the provisions of existing withdrawals, and the requirements of applicable law. All valid applications received at or prior to 10 a.m. on January 11, 1973, shall be considered as simultaneously filed at that time. Those received thereafter shall be considered in the order of filing.

The unappropriated public land has been and will continue to be open to the filing of applications and offers under the mineral leasing laws, and to location and entry under the U.S. mining laws.

Inquiries concerning the public lands should be addressed to the Chief, Division of Technical Services, Bureau of Land Management, 3022 Federal Building, Phoenix, Ariz. 85025.

HARRISON LOESCH,
Assistant Secretary of the Interior.

DECEMBER 6, 1972.

[FR Doc.72-21279 Filed 12-11-72;8:46 am]

[Public Land Order 5316]

[Arizona 3535]

ARIZONA

Withdrawal for Reclamation Project

By virtue of the authority contained in section 3 of the Act of June 17, 1902, as amended and supplemented, 43 U.S.C. § 416 (1970), it is ordered as follows:

Subject to valid existing rights, the following described public lands, which are under the jurisdiction of the Secretary of the Interior, are hereby with-

drawn from all forms of appropriation under the public land laws, including the mining laws, 30 U.S.C., Ch. 2, but not from leasing under the mineral leasing laws, and reserved for the Buttes Dam and Reservoir Site of the Central Arizona Project:

GILA AND SALT RIVER MERIDIAN

T. 4 S., R. 11 E.,
Sec. 19, lots 1 to 4, incl., E½W½, E½.
T. 4 S., R. 13 E.,
Sec. 9, lot 1261-B except that portion included in Mineral Patent No. 29747.

The areas described aggregate 646.60 acres in Pinal County.

The land described in section 9, T. 4 S., R. 13 E., is also included in Powersite Classification No. 436 of November 16, 1956.

HARRISON LOESCH,
Assistant Secretary of the Interior.

DECEMBER 6, 1972.

[FR Doc.72-21280 Filed 12-11-72;8:46 am]

[Public Land Order 5317]

[Colorado 12469, 13162]

COLORADO

Correction of Public Land Order No. 5203

The description of the lands in Public Land Order 5203 of April 20, 1972, appearing in 37 F.R. 8383 of the issue of April 26, 1972, revoking certain reclamation withdrawals, is hereby corrected by changing the SW¼, sec. 20, T. 1 N., R. 86 W., to read the NW¼SW¼, sec. 20, in paragraph 1, and by changing the land described as T. 1 N., R. 37 W., to read T. 1 N., R. 37 W., in paragraph 2, of said order.

HARRISON LOESCH,
Assistant Secretary of the Interior.

DECEMBER 6, 1972.

[FR Doc.72-21281 Filed 12-11-72;8:46 am]

[Public Land Order 5318]

[Montana 20660]

MONTANA

Withdrawal for National Forest Recreation Area

By virtue of the authority vested in the President and pursuant to Executive Order No. 10355 of May 26, 1952 (17 F.R. 4831), it is ordered as follows:

1. Subject to valid existing rights, the following described national forest lands are hereby withdrawn from appropriation under the mining laws, 30 U.S.C. Ch. 2, but not from leasing under the mineral leasing laws, in aid of programs of the Department of Agriculture:

CUSTER NATIONAL FOREST

PRINCIPAL MERIDIAN

Magpie Pond Campground

T. 1 N., R. 59 E.,
Sec. 19, NE¼NE¼, E½NW¼NE¼, N½SE¼ NE¼, NE¼SW¼NE¼.

Ekalaka Park Campground

T. 1 N., R. 58 E.,
Sec. 33, SW¼NE¼NE¼, SE¼NW¼NE¼, NE¼SW¼NE¼, N½SE¼SW¼NE¼, N½ SW¼SE¼NE¼, NW¼SE¼NE¼.

The areas described aggregate 140 acres in Carter County.

2. The withdrawal made by this order does not alter the applicability of those public land laws governing the use of the national forest lands under lease, license, or permit or governing the disposal of their mineral or vegetative resources other than under the mining laws.

HARRISON LOESCH,
Assistant Secretary of the Interior.

DECEMBER 6, 1972.

[FR Doc.72-21282 Filed 12-11-72;8:46 am]

[Public Land Order 5319]

[Arizona 030111]

ARIZONA

Partial Revocation of Whipple Barracks Target Range Withdrawal

By virtue of the authority vested in the President and pursuant to Executive Order No. 10355 of May 26, 1952 (17 F.R. 4831), it is ordered as follows:

1. The Executive order of August 18, 1904, withdrawing lands for the use of the War Department as a target range for the troops at Whipple Barracks, Ariz., is hereby revoked so far as it affects the following described lands:

GILA AND SALT RIVER MERIDIAN

T. 14 N., R. 2 W.,
Sec. 2, S½SW¼;
Sec. 3, SE¼, E½SW¼;
Sec. 10, lots 1, 2, 3, NW¼NE¼, E½NW¼;
Sec. 11, N½NW¼.

The areas described aggregate 640 acres in Yavapai County.

Of the lands described, 576.53 acres have been patented under the Recreation and Public Purposes Act of June 14, 1926, 44 Stat. 471, as amended, 43 U.S.C. 869 et seq. (1964), or conveyed to the State of Arizona pursuant to sections 2275 and 2276, U.S. Revised Statutes, as amended, 43 U.S.C. 851-852 (1964).

2. The remaining lands, described as the SE¼SW¼ sec. 2, and lot 3 sec. 10, T. 14 N., R. 2 W., containing 63.47 acres, have been classified for disposal under the provisions of the Recreation and Public Purposes Act of June 14, 1926, supra, and section 7 of the Act of June 28, 1934, 48 Stat. 1272, as amended, 43 U.S.C. 315f (1964), pursuant to applications filed by the city of Prescott and Yavapai County, Ariz. These lands, therefore, will not be subject to other use or disposition under the public land laws in the absence of a modification or revocation of a modification or revocation of such classification (43 CFR 2440.4).

Inquiries concerning the lands should be addressed to the Manager, Land Office, Bureau of Land Management, 3022 Federal Building, Phoenix, Ariz. 85025.

HARRISON LOESCH,
Assistant Secretary of the Interior.

DECEMBER 6, 1972.

[FR Doc.72-21283 Filed 12-11-72;8:46 am]

DEPARTMENT OF THE INTERIOR

GEOLOGICAL SURVEY

Gila River, Arizona

POWER SITE CLASSIFICATION NO. 458

60334

Pursuant to authority vested in me by the act of
March 3, 1879 (20 Stat. 394; 43 U.S.C. 31), and by Departmental
Order No. 2333 of June 10, 1947 (43 C.F.R. 4.623; 12 F. R. 4025),
the following described land is hereby classified as power sites
insofar as title thereto remains in the United States and subject
to valid existing rights; and this classification shall have full
force and effect under the provisions of sec. 24 of the act of
June 10, 1920, as amended by sec. 211 of the act of August 26,
1935 (16 U.S.C. 818):

Gila and Salt River Meridian

T. 12 N., R. 5 E. (Unsurveyed)
Every smallest legal subdivision which when
surveyed will be adjacent to Verde River
upstream from Sycamore Creek and under an
altitude of 3,100 feet. Protraction of ex-
isting surveys indicates that the lands when
surveyed will be within secs. 1, 2, 3, 11,
and 12.

T. 13 N., R. 5 E.;
 sec. 4, S½SW¼;
 sec. 5, lots 2, 6, and SW¼NE¼;
 sec. 7, lots 8 and 11;
 sec. 9, NE¼ and S½SE¼;
 sec. 10, SE¼SW¼;
 sec. 15, lot 2, SW¼, and NW¼SE¼;
 sec. 16, N½NE¼, SW¼NE¼, W½SE¼, and SE¼SE¼;
 sec. 17, lots 2, 3, 5, 6, and 8;
 sec. 18, NE¼NE¼;
 sec. 20, SE¼NE¼ and E½SE¼;
 sec. 21, N½ and W½SW¼;
 sec. 22, E½W½ and SW¼SE¼;
 sec. 25, S½SW¼ and SE¼;
 sec. 26, SW¼;
 sec. 27, NW½NE¼, NE¼NW¼, and S½SW¼;
 sec. 28, NE¼ and W½NW¼;
 sec. 33, lots 1, 7, and 8;
 sec. 34, lots 1, 2, 3, 4, 5, 6, 7, 8, 11, and 12;
 sec. 35, S½NE¼, NW¼, and S½;
 sec. 36, NE¼, W½, and W½SE¼.

T. 14 N., R. 5 E.,
    sec. 19, NE$\frac{1}{4}$SE$\frac{1}{4}$;
    sec. 20, lots 2 and 3;
    sec. 29, lots 4, 7, and 8;
    sec. 30, lot 2;
    sec. 32, lots 2 and 8.

T. 15 N., R. 6 E.,
    sec. 31, lots 4 and 5.

T. 1 S., R. 10 E.,
    sec. 25, SE$\frac{1}{4}$SE$\frac{1}{4}$;
    sec. 36, lots 1, 2, 3, 4, NE$\frac{1}{4}$, SE$\frac{1}{4}$NW$\frac{1}{4}$, and N$\frac{1}{2}$S$\frac{1}{2}$.

T. 1 S., R. 11 E. (Unsurveyed)
    Every smallest legal subdivision any part of
    which when surveyed will be adjacent to Queen
    Creek under an altitude of 2,250 feet. Pro-
    traction of existing surveys indicates that
    the lands when surveyed will be within secs.
    20, 21, 27, 28, 29, 30, 31, 32, 33, 34, and 35.

T. 3 S., R. 11 E.,
    sec. 5, lots 3, 4, and SW$\frac{1}{4}$NW$\frac{1}{4}$;
    sec. 6.

T. 4 S., R. 11 E.,
    sec. 1, SE$\frac{1}{4}$SW$\frac{1}{4}$ and SE$\frac{1}{4}$;
    sec. 2, W$\frac{1}{2}$SE$\frac{1}{4}$ and SE$\frac{1}{4}$SE$\frac{1}{4}$;
    sec. 11;
    sec. 12, lots 1, 3, 4, 5, 6, 7, and 8, N$\frac{1}{2}$NW$\frac{1}{4}$,
        S$\frac{1}{2}$SW$\frac{1}{4}$, and SE$\frac{1}{4}$SE$\frac{1}{4}$;
    sec. 13, N$\frac{1}{2}$, N$\frac{1}{2}$SE$\frac{1}{4}$, SW$\frac{1}{4}$SW$\frac{1}{4}$, and W$\frac{1}{2}$SE$\frac{1}{4}$;
    sec. 14, NE$\frac{1}{4}$.

T. 3 S., R. 12 E.,
    sec. 34, S$\frac{1}{2}$SE$\frac{1}{4}$;
    sec. 35, SE$\frac{1}{4}$NE$\frac{1}{4}$ and S$\frac{1}{2}$;
    sec. 36, S$\frac{1}{2}$SW$\frac{1}{4}$, SW$\frac{1}{4}$SE$\frac{1}{4}$, and E$\frac{1}{2}$SE$\frac{1}{4}$.

T. 4 S., R. 12 E.,
    sec. 1, lots 1, 2, 3, 4, S$\frac{1}{2}$N$\frac{1}{2}$, and N$\frac{1}{2}$S$\frac{1}{2}$;
    sec. 2;
    sec. 3, S$\frac{1}{2}$;
    sec. 4, S$\frac{1}{2}$N$\frac{1}{2}$ and S$\frac{1}{2}$;
    sec. 5, lots 2, 3, 4, S$\frac{1}{2}$N$\frac{1}{2}$, and S$\frac{1}{2}$;
    sec. 6, lots 1, 4, 5, 6, and SE$\frac{1}{4}$NE$\frac{1}{4}$;
    sec. 7, lots 3, 4, and SE$\frac{1}{4}$;
    sec. 8, N$\frac{1}{2}$ and NW$\frac{1}{4}$SE$\frac{1}{4}$;
    sec. 9, N$\frac{1}{2}$, NE$\frac{1}{4}$SE$\frac{1}{4}$, and N$\frac{1}{2}$SE$\frac{1}{4}$;
    sec. 10, E$\frac{1}{2}$NE$\frac{1}{4}$ and NW$\frac{1}{4}$;
    sec. 18, lot 1.

2

T. 4 S., R. 13 E.,
    sec. 1, lots 3, 7, 9, and $SW\frac{1}{4}SW\frac{1}{4}$;
    sec. 3, $S\frac{1}{2}S\frac{1}{2}$;
    sec. 4, $SW\frac{1}{4}NE\frac{1}{4}$, $S\frac{1}{2}NW\frac{1}{4}$, $NE\frac{1}{4}SW\frac{1}{4}$, $S\frac{1}{2}SW\frac{1}{4}$, and $SE\frac{1}{4}$;
    sec. 5, $S\frac{1}{2}N\frac{1}{2}$, $NE\frac{1}{4}SW\frac{1}{4}$, and $SE\frac{1}{4}$;
    sec. 6, lots 3, 4, 5, 6, $S\frac{1}{2}NW\frac{1}{4}$, and $SE\frac{1}{4}NW\frac{1}{4}$;
    sec. 8, $NE\frac{1}{4}NE\frac{1}{4}$;
    sec. 9, $NE\frac{1}{4}$ and $N\frac{1}{2}NW\frac{1}{4}$;
    sec. 12, lots 1, 2, and $NW\frac{1}{4}NW\frac{1}{4}$.

T. 4 S., R. 14 E.,
    sec. 7, lots 3, 4, 7, and $SW\frac{1}{4}SE\frac{1}{4}$;
    sec. 17, $SE\frac{1}{4}SW\frac{1}{4}$.

T. 4 S., R. 15 E.,
    sec. 1, $S\frac{1}{2}N\frac{1}{2}$;
    sec. 2, $SE\frac{1}{4}NW\frac{1}{4}$ and $NE\frac{1}{4}SE\frac{1}{4}$;
    sec. 12, $NE\frac{1}{4}NW\frac{1}{4}$.

T. 4 S., R. 16 E.,
    sec. 4, $S\frac{1}{2}S\frac{1}{2}$ (Unsurveyed);
    sec. 5, $S\frac{1}{2}N\frac{1}{2}$ (Unsurveyed);
    sec. 13, $NW\frac{1}{4}NW\frac{1}{4}$ (Unsurveyed);
    sec. 18, $NE\frac{1}{4}NE\frac{1}{4}$ (Unsurveyed).

T. 7 S., R. 16 E.,
    sec. 1, $SW\frac{1}{4}$;
    sec. 2;
    sec. 3, lot 1;
    sec. 4, lot 14;
    sec. 10, lot 7 and $SE\frac{1}{4}SE\frac{1}{4}$;
    sec. 11, $S\frac{1}{2}S\frac{1}{2}$;
    sec. 12, $S\frac{1}{2}SW\frac{1}{4}$;
    sec. 13, $W\frac{1}{2}W\frac{1}{2}$;
    sec. 14;
    sec. 15, lots 10, 12, and $NE\frac{1}{4}NE\frac{1}{4}$;
    sec. 23, $E\frac{1}{2}$, $N\frac{1}{2}NW\frac{1}{4}$, and $SE\frac{1}{4}NW\frac{1}{4}$;
    sec. 24, $NW\frac{1}{4}NW\frac{1}{4}$, $S\frac{1}{2}NW\frac{1}{4}$, $N\frac{1}{2}SW\frac{1}{4}$, and $SW\frac{1}{4}SW\frac{1}{4}$;
    sec. 25, $W\frac{1}{2}$ and $SW\frac{1}{4}SE\frac{1}{4}$;
    sec. 26, $N\frac{1}{2}NE\frac{1}{4}$, $SE\frac{1}{4}NE\frac{1}{4}$, and $NE\frac{1}{4}SE\frac{1}{4}$.

T. 8 S., R. 16 E.,
    sec. 1, lot 1;
    sec. 2, lot 1 and $SE\frac{1}{4}NE\frac{1}{4}$;
    sec. 12, $E\frac{1}{2}NW\frac{1}{4}$.

T. 7 S., R. 17 E.,
    sec. 6, $W\frac{1}{2}SE\frac{1}{4}$.

T. 8 S., R. 17 E.,
    sec. 6, lot 6;
    sec. 7, $E\frac{1}{2}NW\frac{1}{4}$.

5

T. 21 S., R. 21 E.,
  sec. 9, SE¼SE¼;
  sec. 10, N½ and SE¼;
  sec. 12, lots 1, 2, S½NE¼, SE¼N¼, and NE¼;

T. 21 S., R. 22 E.,
  sec. 7, NE¼ and N½SW¼;

T. 2 S., R. 21 E.,
  Every smallest legal subdivision in unsurveyed
  secs. 17, 18, 19, 20, and 30 adjacent to Blue
  River which when surveyed will be in whole or
  in part under an altitude of 4,000 feet.

The area described is estimated to aggregate 24,608
acres, 19,408 acres of which are surveyed.

/s/ Thomas B. Nolan
Director

Date Nov 16 1956

Copy to:
RLM, Wash., D. C.
RLM, Phoenix, Arizona

# ATTACHMENT 3
## April 27, 1979
## Tri-Party
## Agreement

*1979*

"TRI-PARTY" AGREEMENT

- BETWEEN
USFS
SRP ⟶ BOR
(SRP DAMS ONLY)

- ALSO REFERRED TO AS
A "PROJECT SUPPLEMENTAL AGREEMENT"

MANAGEMENT MEMORANDUM
AMONG THE SALT RIVER PROJECT AGRICULTURAL IMPROVEMENT AND
POWER DISTRICT, UNITED STATES DEPARTMENT OF AGRICULTURE
FOREST SERVICE AND UNITED STATES BUREAU OF RECLAMATION

Purpose and Objective

It being agreed that a three-party memorandum should be utilized
to give guidance to Salt River Project Agricultural Improvement and Power
District (Salt River Project), United States Department of Agriculture
Forest Service (Forest Service) and United States Bureau of Reclamation
(Bureau) officials and personnel having responsibilities for managing
lands withdrawn for Salt River Project Reclamation purposes within Forest
Service boundaries, the purpose of this Management Memorandum is to
coordinate the program activities of the three entities to the end that
multiple uses, public recreation, aesthetic protection, enhancement of
wildlife, planning, management, environmental compatibility, public access
and use, and security of Reclamation works, will be undertaken and maintained
consistent with the responsibilities of each of the parties, the protection
of the environment and the proper enhancement of land values.

Authority

Through delegations of authority from the Secretary of the
Interior, the Bureau investigates, designs, constructs, and is responsible
for operation and maintenance of the multiple-purpose projects and facilities
on and along the Salt and Verde Rivers in Arizona for water storage and
diversion, utilization and regulation of water and land, and related

2

resources, including generation, transmission and distribution of
electric power under the Federal Reclamation Act of 1902, and Acts
amendatory thereof and supplementary thereto. Certain of these respon-
sibilities, involving the care, operation and maintenance of Reclamation
project works and the use of Reclamation withdrawn lands for Reclamation
purposes within the Tonto National Forest, have been delegated to and
assumed by the Salt River Project pursuant to a contract between the Salt
River Valley Water Users' Association and the United States, dated September 6,
1917, as amended, and as assigned to the Salt River Project.

The Forest Service is responsible for protection and development
of National Forest system lands pursuant to authorities under the Organic
Act of June 4, 1897, and the Multiple Use Sustained Yield Act of June 12,
1960, as implemented by the Memorandum of Understanding dated January 26,
1948, between the Forest Service and the Bureau. (The Salt River Project
was not a party to the 1948 Memorandum of Understanding.)

· Stipulations

The area of Reclamation withdrawn lands within the Tonto National
Forest is shown on United States Bureau of Land Management Land Status
Maps. The Salt River Project, in carrying out its responsibilities for
care, operation, maintenance and construction of water and power facilities

3

and delivery of water and electrical power and energy under the above-
mentioned contract of 1917 and all other contracts, will be guided by
this Management Memorandum as to the administration of the withdrawn lands
shown on said Land Status Maps.  The Forest Service and the Bureau, in
carrying out their respective responsibilities, will also be guided by
this Management Memorandum.

Premises

    The following are the legal and factual premises upon which this
management plan is based:

    1.  The Bureau is the Federal agency which has primary jurisdiction
over the withdrawn lands when the lands are utilized for Reclamation
purposes.  Under the terms of the 1917 contract, the Salt River Project
operates and maintains Reclamation works on the withdrawn lands.

    2.  The Forest Service is responsible for the administration of
the withdrawn lands which are not being used for Reclamation purposes.

    3.  The Salt River Project is responsible for the administration
of waters from the Salt and Verde Rivers and their tributaries pursuant
to judicial decree and applicable laws.  The Forest Service and the Bureau
cannot grant any permits or approvals for use of waters from the Salt
and Verde Rivers or their tributaries.

    4.  Except as set forth in paragraph 3 hereof, permits, licenses
or other use-rights for non-Reclamation works may be granted by the Forest

4

Service to private parties, county, state or Federal entities within withdrawal lands shown on said Land Status Maps pursuant to authorizing statutes.

     5. Consistent with applicable law, it is the Bureau's policy not to issue permits, licenses or other authorizations to third parties for non-Reclamation works within the withdrawn lands shown on said Land Status Maps.

     6. The Bureau and the Salt River Project are entitled to engage in activities related to the care, operation, maintenance and construction of Reclamation works within the withdrawn lands shown on said Land Status Maps without the prior approval of the Forest Service. As used herein, the term "Reclamation works" shall include the following where used for Reclamation purposes:

     (a) Dams and spillways, canals, headgates and pipelines, tunnels, reservoirs, and powerplants;

     (b) Employee housing, including houses used for operation and maintenance crews, and accessory buildings and structures;

     (c) Electrical transmission lines, substations, and switch-yards; electric distribution lines which serve Reclamation works;

     (d) Domestic water facilities, sewage treatment plants, refuse disposal areas, equipment and material storage facilities, and similar facilities;

5

(e)  Safety and security facilities including barriers, fences, log booms, and other safety devices, boat and barge docks (nonpublic);

(f)  Communication facilities, including microwave facilities and telephone lines;

(g)  Gauging stations and facilities to determine hydrological conditions, river and creek flows; and

(h)  Access and maintenance roads, fences, gates, bridges, and drainage facilities used in connection with Reclamation works and areas for obtaining and stockpiling road maintenance materials used for such works.

7.  The Forest Service has responsibility for enforcement and compliance with applicable laws, and rules and regulations of governmental agencies for all activities other than those related to the care, operation, maintenance and construction of Reclamation works.

Management Agreement

In implementing the rights and obligations described above, the parties will observe the following:

A.  Before acting upon applications for leasing, licensing, permitting or the like, Forest Service will furnish the Bureau a list of such applications with copy to the Salt River Project's authorized

6

designee. Applications for nonsignificant uses may, in individual cases, or in specified categories, be handled informally by telephone between the respective offices of the Forest Supervisor and the Projects Manager, Arizona Projects Office. The list will indicate the nature of the use for which the application is made. In addition, when in the opinion of the Forest Service such an application relates to a land use which may impact a present or prospective Reclamation use, Forest Service will furnish information sufficient for a tentative judgment as to such impact. If no comments with regard to a list of applications are received by Forest Service within twenty-one (21) days, it may be assumed that no interference with Reclamation use is involved; however, in those cases where further information is furnished the assumption of noninterference may be made if no response is made by the Bureau within thirty (30) days following receipt of the information.

If within the twenty-one-(21) or thirty-(30)-day periods referred to above, the Bureau desires to delay in the granting of the proposed application and/or a consultation with Forest Service concerning the same, it will notify Forest Service in writing. In any case where the Salt River Project notifies the Bureau that possible interference with a present or prospective Reclamation use is indicated, the Bureau will respond to Forest Service requesting a delay and/or consultation. The Forest Service will delay action in accordance with such a request.

7

The consulting representative of the Forest Service shall be the Supervisor, Tonto National Forest and/or his designated representatives. The consulting representative of the Bureau shall be the Projects Manager, Arizona Projects Office, and/or his designated representatives. Where the interest of the Salt River Project in the proposed application is indicated, the Salt River Project's authorized designee will be notified of the proposed consultation by the Bureau and representatives of the Salt River Project will be requested to participate. If agreement is not reached in consultation by representatives of the Supervisor, Tonto National Forest; representatives of the Projects Manager, Arizona Projects Office; and the Salt River Project's authorized designee, the matter will be referred to their principals, and failing an agreement among them, the matter will be referred to the Forest Service Regional Forester and the Bureau Regional Director.

B. Notwithstanding the provisions of paragraph 6 above relating to activities involving Reclamation works, the Bureau and the Salt River Project will consult with Forest Service before taking any major action which could materially affect or impact the activities of the Forest Service.

C. Joint consultation and cooperation with other Federal, state, and local authorities will be maintained by the parties on all phases

8

pertaining to the use of the withdrawn lands and water areas which concern such activities.

D. In recogizing the Forest Service's responsibilities for managing the resources of the National Forests in combinations that best meet the needs of the American people, the Bureau and the Salt River Project will consult with the Forest Service so that the establishment of Reclamation works, will so far as possible, be consistent with the management plans established for National Forests.

E. The Forest Service and the Bureau will cooperate in the management of off-road vehicle use of Reclamation withdrawn lands in accordance with regulations. The parties recognize the Salt River Project's need for vehicular access to certain areas in order to construct, operate, and maintain its water and power facilities.

F. Representatives of the Forest Service, the Bureau and the Salt River Project should meet at least annually to review matters of mutual interest or concern. Such representatives will also be available as required to meet at any level of administration to review problems of mutual interest or concern.

G. Channels of communication should be maintained for review of all actions by each party with regard to lands or water that could affect or impact the activities of the other parties of this Management Memorandum.

9

H.  Any major action of a party which could materially affect or impact the activities of the other party or parties within the Reclamation withdrawn lands shown on said Land Status Maps should be reviewed with representatives of the other parties prior to taking such action.  In the event a disagreement arises at the operating level, concerning the proposed action, such disagreement should be submitted for review at the next highest level of responsibility within the organization of the parties hereto.

It is agreed by the parties hereto that nothing contained in this Management Memorandum shall be used in any administrative or judicial proceeding to evidence legal rights or obligations of the United States or the Salt River Project or of any other party.

Notices in the behalf of the United States Bureau of Reclamation shall be given by or to the:

Projects Manager
Bureau of Reclamation
Arizona Projects Office
Suite 2200 Valley Center
201 North Central Avenue
Phoenix, Arizona 85073

Notices in the behalf of the United States Department of Agriculture Forest Service shall be given by or to the:

Forest Supervisor
Tonto National Forest
102 South 28th Street
P. O. Box 13705
Phoenix, Arizona 85002

10

Notices in the behalf of the Salt River Project Agricultural
Improvement and Power District shall be given by or to the:

> General Manager
> Salt River Project
> Agricultural Improvement and
>   Power District
> 1521 Project Drive
> P. O. Box 1980
> Phoenix, Arizona 85001

or his authorized designee.

The agreements and arrangements set forth above are not intended
to limit areas of cooperation and communication among the parties.  This
Management Memorandum reflects the intention of the parties to achieve
maximum cooperation and it is understood that changes in or additions to
the Management Memorandum may be made in the future to reach that goal.

Executed this 27th day of April 1979

SALT RIVER PROJECT AGRICULTURAL
IMPROVEMENT AND POWER DISTRICT

By _____
   General Manager

UNITED STATES DEPARTMENT OF AGRICULTURE
FOREST SERVICE

By _____
   Regional Forester

UNITED STATES BUREAU OF RECLAMATION

By _____
Acting.  Regional Director

7-RCMSER-1944

COPY

ADDENDUM NO. 1
TO
MANAGEMENT MEMORANDUM OF
APRIL 27, 1979

Purpose of Addendum

1.  The 1948 Memorandum of Understanding between the Commissioner of
Reclamation and the Chief of the Forest Service provides in Clause 5 that
the Forest Service will be responsible for the administration of National
Forest lands in a reclamation withdrawal which are not in actual use in
connection with reclamation works, and

2.  Clause 6 of that agreement also provides that the Bureau reserves
the right to determine the area subject to its primary jurisdiction, and

3.  Clause 9 contemplates local agreements for specific projects, and

4.  The 1979 Management Memorandum is such a local agreement, but it
did not clearly designate areas of primary jurisdiction, contemplating
instead that it would be done by a later addition to the agreement.

5.  This Addendum hereby accomplishes that purpose.

Designation of Areas of Primary Jurisdiction:

1.  Areas of primary jurisdiction are as determined by the Bureau of
Reclamation on the attached six maps dated July 1981 and titled: "Roosevelt
Dam, Horse Mesa Dam, Mormon Flat Dam, Stewart Mountain Dam, Bartlett Dam,
and Horseshoe Dam."

2.  Any areas of primary jurisdiction which may have been previously
established or inferred are hereby superseded.

3.  All appropriate regulations and procedures of the United States
Department of Interior will apply to these Bureau of Reclamation administered
areas.

4.  Any future changes in areas of primary jurisdiction will be deter-
mined by the Bureau of Reclamation by revisions to the appropriate map(s)
and by procedures similar to this Addendum.

2

Executed this _2nd_ day of _Aug._, 19_82_.

SALT RIVER PROJECT AGRICULTURAL
IMPROVEMENT & POWER DISTRICT

By _____
         General Manager

UNITED STATES DEPARTMENT OF
AGRICULTURE, FOREST SERVICE

By _____
         Regional Forester

UNITED STATES BUREAU OF RECLAMATION

        By _____
ACTING       Regional Director

7-RCMSER-1946



HORSE MESA DAM
1. Upstream Trash Boom

2. Downstream Safety Boom

3. Housing Area

4. Road to Housing Area

7-81

Case 2:21-cv-00068-DWL   Document 107-3   Filed 07/14/25   Page 26 of 334



ROOSEVELT DAM

1. Upstream Trash Boom
2. Downstream Security Boom
3. Housing Area

7-81

(231 of 258), Page 231 of 258
Case: 25-5197, 09/29/2025, DktEntry: 61.8, Page 231 of 258
Case 2:21-cv-00068-DWL    Document 107-3    Filed 02/14/25    Page 27 of 334



BARTLETT DAM

1. Upstream Security Zone
2. Wing Dam and Access Strip
3. Gates and Fence Line
4. Domestic Water Tanks and Access Road
5. Bunk House
6. Operator Housing

7-81

T-RCMSER-1949

BARTLETT
SPILLWAY  ELEVATION



HORSESHOE DAM

1. Upstream Trash Boom
2. Upstream Security Zone
3. Tailrace Security Zone
4. Housing Area

7-81



MORMON FLAT DAM

1. Upstream Trash Boom
2. Downstream Security Boom
3. Camp Housing Area
4. Entrance Gate Across Road
5. Camp TV Antenna

7-81



STEWART MOUNTAIN DAM

1. Upstream Trash Boom
2. Gate and Fence Line
3. Housing Area
4. Spillway and Maintenance Road
5. Water Tank and Maintenance Road

7-81

# APPENDIX D

**Air Sciences Inc.
Air Quality
Regulatory
Constraints
Associated with
the Hewitt Canyon
and Whitford
Canyon Tailings
Alternatives
(September 13, 2019)**



TECHNICAL MEMORANDUM

AIR SCIENCES INC.

DENVER · PORTLAND · LOS ANGELES

# AIR QUALITY REGULATORY CONSTRAINTS ASSOCIATED WITH THE HEWITT CANYON AND WHITFORD CANYON TAILINGS ALTERNATIVES

**PREPARED FOR:**   Kami Ballard & Vicky Peacey, Resolution Copper

**PREPARED BY:**   Dave Randall

**PROJECT NO.:**   262-32

**DATE:**   September 13, 2019

As part of the Section 404 of the Clean Water act practicability review , the U.S., Environmental Protection Agency (EPA) has asked for additional information pertaining to two tailings storage facility (TSF) alternatives called Hewitt Station (HC) and Whitford Canyon (WC) on Tonto National Forest adjacent to the Superstition Mountain Wilderness. This technical memorandum provides additional information on the air quality regulatory context associated with those two sites that would ultimately result in technology and/or logistical constraints rendering the facilities incapable of being built and impracticable. The following factors were key to the USDA – Forest Service, Tonto National Forest's (TNF) practicability determinations for these sites:

- The northern extent of the HC and WC footprints are essentially adjacent (less than 1 km) to the southern boundary of the Superstition Wilderness Area (SWA), a designated mandatory Class I airshed.

- The regulatory responsibilities of the TNF to preserve air quality in the SWA include stringent thresholds for pollutant impacts at the boundary of the SWA due to emissions from proposed projects.

- Due to the close proximity to a wilderness area boundary, there are no available TSF design options, construction methods, operational methods, or particulate matter control technologies available for the 1,300 million ton (approximately 4,000 acre) TSF to essentially eliminate the generation of dust due to construction, operation, and wind erosion.

## Proximity of HC and WC to the SWA

Figure 1 shows the locations of the HC and WC sites at the boundary of the SWA. The northern extent of the footprints of these sites are well within 1 km of the southern boundary of the SWA.

AIR QUALITY REGULATORY CONSTRAINTS ASSOCIATED WITH THE HEWITT CANYON AND WHITFORD
CANYON TAILINGS ALTERNATIVES



## Air Quality Protection in the SWA

The SWA is a designated mandatory Class I airshed that is managed by the TNF. The TNF's
broad responsibilities under the National Environmental Policy Act (NEPA) to address air
quality impacts from proposed projects are largely driven by the Clean Air Act (CAA) which:

1. Protects human health and welfare with National Ambient Air Quality Standards
   (NAAQS).
2. Sets a national visibility goal in mandatory Class I airsheds of no human-caused
   impairment which was further defined through the 1999 Regional Haze Rule.
3. Establishes the Prevention of Significant Deterioration (PSD) of Air Quality Related
   Values program for review of new pollution sources.

Over several decades, the USDA – FS, other federal land managers (FLMs), and EPA have
developed policy and guidance to which TNF refers to fulfill its responsibilities under these air
quality regulatory programs. The level of protection of air resources in the SWA that the above

AIR QUALITY REGULATORY CONSTRAINTS ASSOCIATED WITH THE HEWITT CANYON AND WHITFORD
CANYON TAILINGS ALTERNATIVES

mentioned regulatory programs require and pertinent policy and guidance were deciding factors in the TNF's rationale to not carry the HC and WC TSF alternatives forward for detailed analysis (USFS DEIS, August 2019) . Decisions on facility location, design, operating methods, emission controls, and best management practices have all been influenced by the project's proximity to the SWA. It remains a priority to design, develop, and operate the project so that the TNF can continue to fulfill its obligations to protect air quality in the SWA.

## Practicability Assessment of HC and WC Sites

In the practicability assessment of many candidate sites for the TSF, TNF concluded that the proximity of the HC and WC sites to the SWA and the unique air quality protection standards applicable to the SWA made these sites logistically impracticable for further consideration as locations for the TSF. The conclusion of the holistic review given the context of the Clean Air Requirements was that no level of design, construction, technology, operational methods, or air pollution controls could essentially eliminate particulate matter emissions due to material handling and wind erosion at the HC or WC TSF. TNF found that these alternative sites, even if well operated and controlled to industry standard, were so close to the SWA boundary that approving the project and fulfilling its obligations to protect air resources in the SWA would be incompatible. The HC and WC alternative TSF sites therefore failed TNF's practicability assessment and were removed from further consideration.

## Applicability of Using Emissions Offsets to Mitigate Air Quality Impacts to the SWA

EPA has requested written confirmation from Pinal County Air Quality Control that potential air quality impacts to the SWA could not be addressed using emission offsets. The bullet points below summarize the permitting rules for which emission offsets may be required. These permitting rules do not accommodate the use of emission offsets to address potential impacts to air quality in Class I airsheds. An email (August 22, 2019) from Michael Sundblom, Director Pinal County Air Quality Control, confirms this summary and is provided as an attachment to this memo.

- Emissions offsets are part of the New Source Review (NSR) permitting process. (In Pinal County's local SIP-approved NSR rules, offsets are addressed at 3-3-230.)
- The NSR emissions offsets provisions apply to new major sources or major modifications to existing sources where the area the source is located in is in nonattainment with the NAAQS.
- Offsets are emission reductions obtained from existing sources located in the vicinity of a proposed source (and within the allowable offset area, usually within the nonattainment area).

3

AIR QUALITY REGULATORY CONSTRAINTS ASSOCIATED WITH THE HEWITT CANYON AND WHITFORD
CANYON TAILINGS ALTERNATIVES

- The purpose for requiring offsetting emissions decreases is to allow an area to move toward attainment of the NAAQS while still allowing industrial growth.

In summary, unlike in non-attainment areas where proposed sources can be required to obtain pollutant offsets to mitigate permitted increases in emissions, there is no such regulatory context or authority allowing offsetting of emissions (or air quality impacts) within a Class I area.

ATTACHMENT                                          AQ Regulatory Constraints HC and WC TSF Alts

**From:** Michael Sundblom [mailto:Michael.Sundblom@pinalcountyaz.gov]
**Sent:** Thursday, August 22, 2019 8:37 AM
**To:** Ballard, Kami (RC) <Kami.Ballard@riotinto.com>
**Subject:** RE: PM10 Offsets

Kami,

It is my understanding that the "Offset" regulatory approach applies to major source air quality permitting in areas that do not attain a NAAQS.

In our local SIP approved NSR rules, offsets are addressed at *3-3-230, "Offset and net air quality benefit standards"* and apply in areas that do not attain a criteria pollutant NAAQS. In practice offsets for the nonattainment pollutant (equal to or greater than the permitted emissions) would be required by a source attempting to permit a major source. As an example, in a moderate PM10 nonattainment area a source with emissions greater than 100tpy would be subject to the offset provisions and would be required to offset all the permitted emissions of PM10.

I'm not familiar with a similar regulatory approach for emissions impacting a Class I area.

Please let me know if you would like to discuss further.

Mike

1

ATTACHMENT                                          AQ Regulatory Constraints HC and WC TSF Alts

**From:** Ballard, Kami (RC) [mailto:Kami.Ballard@riotinto.com]
**Sent:** Wednesday, August 21, 2019 2:48 PM
**To:** Michael Sundblom <Michael.Sundblom@pinalcountyaz.gov>
**Subject:** PM10 Offsets

**EXTERNAL EMAIL:** Do not click any links or open any attachments unless you tru
messages to itsecurity@pinalcountyaz.gov

Hi Mike,

Is it possible to use offsets to mitigate impacts to a Class I area or is the
offset program specific to non-attainment areas under the NSR program
of the Clean Air Act?

Thank you,

Kami Ballard
Environmental & Permitting Advisor – Resolution Copper

102 Magma Heights
Superior, AZ 85173, United States
T: +1 520.689.3418
Kami.ballard@riotinto.com www.resolutioncopper.com

2

7-RCMSER-1960

# APPENDIX E

**WestLand
Resources, Inc.
Resolution Copper
Project BGC B
Tailings Storage
Facility Revised
Alternatives
Discussion
(April 13, 2020)**

(245 of 258), Page 245 of 258
Case: 25-5197, 09/29/2025, DktEntry: 61.8, Page 245 of 258
Case 2:21-cv-00068-DWL    Document 107-3    Filed 07/14/25    Page 41 of 334

# RESOLUTION COPPER PROJECT BGC B TAILINGS STORAGE FACILITY ALTERNATIVE DISCUSSION

| | |
|---|---|
| **Prepared for:** | U.S. Army Corps of Engineers *on behalf of* Resolution Copper |
| **Prepared by:** | WestLand Resources, Inc. |
| **Date:** | April 13, 2020 |
| **Project No.:** | 0807.175 02 02 |

## TABLE OF CONTENTS

1. INTRODUCTION ........................................................................................................ 2
2. BACKGROUND ON FORMULATION OF PROJECT ALTERNATIVES ........................ 3
3. TSF ALTERNATIVE BGC B .................................................................................... 4
   3.1. Description ...................................................................................................... 4
   3.2. Dismissal From Further Analysis ................................................................. 4
4. REFERENCES ........................................................................................................... 6

## FIGURES

(follow text)

Figure 1.      Vicinity Map
Figure 2.      BGC B OHWM Delineation

Q:\Jobs\800\0807.175\ENV\02_CWA\02_8643\(H)BGC_B_Memo\20200413_Submittal\20200413_BGCB_Memo.docx          WestLand Resources, Inc.

7-RCMSER-1963

# 1. INTRODUCTION

The United States Forest Service (USFS) Tonto National Forest (TNF) has published a Draft Environmental Impact Statement (DEIS; USDA 2019) for the purpose of reviewing the Resolution Copper Mining, LLC (Resolution) revised General Plan of Operations (GPO) under the National Environmental Policy Act (NEPA). In the DEIS, the Skunk Camp tailings storage facility (TSF) was identified as the preferred TSF alternative. As proposed, the Skunk Camp TSF and its associated pipelines and appurtenant TSF infrastructure for the planned mine development requires the discharge of fill to approximately 124 acres of drainage features that the U.S. Army Corps of Engineers (Corps) is anticipated to determine to be potentially jurisdictional waters of the United States (waters of the U.S.) pursuant to a preliminary jurisdictional determination (PJD). Based on the presumption that potentially jurisdictional waters of the U.S. will be impacted by discharges of dredged or fill material resulting from these portions of Resolution's planned mine development, Resolution made an application for a Clean Water Act (CWA) Section 404 permit for these discharges. The DEIS included as Appendix C a draft Practicability Analysis document (WestLand 2019c) containing an analysis of alternative TSF sites as required to demonstrate compliance with guidelines established under CWA Section 404(b)(1) (40 CFR § Part 230; the Guidelines) for avoidance, minimization, and mitigation of impacts to waters of the U.S. Chief among the Guidelines process is the evaluation of "available and practical" alternatives, and the selection of the Least Environmentally Damaging Practicable Alternative (LEDPA). The evaluation of alternatives closely followed the format of the NEPA evaluation of alternatives in the TNF DEIS.

After review, discussion, and workgroup meetings with the TNF, the Corps, and the Environmental Protection Agency (EPA), portions of the Practicability Analysis were revised to ensure the evaluation of alternatives undertaken therein conformed to the requirements of an analysis of alternatives under the Guidelines. The revised alternatives discussion was reviewed with the agencies and Resolution at Workgroup Meeting #2 on August 21, 2019 and at Workgroup Meeting #4 on October 16, 2019. Additional information on some of the evaluated alternatives was provided by Resolution and the agencies to support the analysis, and WestLand Resources, Inc. (WestLand), captured this information in a technical memorandum (WestLand 2020). The purpose of this document is to expand upon the information provided in the previous technical memorandum regarding TSF Alternative BGC B and the decision and underlying rationale to dismiss this alternative from further analysis before the final CWA Section 404(b)(1) Alternatives Analysis document is published with the Final EIS.

Resolution Copper Project                                                    April 13, 2020
BGC B TSF Alternatives Discussion                                                   Page 3

## 2. BACKGROUND ON FORMULATION OF PROJECT ALTERNATIVES

The TNF and cooperating agencies (including the Corps)[1] utilized information gathered from public scoping, government-to-government consultation with Native American groups, and alternatives workshops to identify public values and develop screening criteria used to evaluate the alternative TSF locations and designs in the DEIS. Most of these alternatives, and the methodology for identifying them, were discussed in detail in the *Resolution Copper Project and Land Exchange Environmental Impact Statement DRAFT Alternatives Evaluation Report, November 2017* (SWCA 2017) and *Appendix F: Alternatives Considered but Dismissed from Detailed Analysis* of the DEIS (USDA 2019). The draft Practicability Analysis document (WestLand 2019c) was designed to be consistent with, and relied on, the detailed analysis of TSF alternatives contained in these documents to support the selection of the alternatives analyzed in detail for compliance with the Guidelines.

As described in the draft Practicability Analysis (WestLand 2019c), the USFS evaluated the landscape surrounding the Resolution mine to identify initial potential alternative locations for the TSF described in the GPO. Factors considered in this evaluation included locations within a reasonable proximity to the Resolution mine site, favorable topography, sufficient storage capacity, and the potential for use of previously disturbed, or 'brownfield', sites for TSF development. The potential use of multiple sites for the placement of tailings, or split volume storage, was also evaluated.

During this process, the USFS systematically evaluated dozens of potential TSF locations (**Figure 1**). The evaluation criteria included locations that were within a reasonable proximity to mine and the West Plant Site, sites that avoided landscape barriers such as mountains or rivers, sites outside rugged terrain too steep for TSF development, and sites potentially near existing or historic mining operations. Resolution Copper's feedback was informed by input from the Resolution Copper Independent Tailings Review Board (ITRB).

*Section 3.3* of the draft Practicability Analysis document (WestLand 2019c) analyzed these alternatives as required to demonstrate compliance with the Guidelines. Based on discussion with the agencies at Workgroup Meeting #4 and additional information received by WestLand, edits were made to Table 2 and *Section 3* as presented in the draft Practicability Analysis document (WestLand 2019) to support the additional analysis. Sixteen (16) TSF alternatives were dismissed from further consideration and included in Table 2. Among the alternatives dismissed was TSF alternative BGC B.

---

[1] Henceforth in this document, references to the USFS in the context of development of the DEIS should be understood to include the agencies cooperating in the development of that document, including (but not limited to) the Corps.

Q:\Jobs\1800\1807.17SJ\ENV\02_CWA\02_494J\(J)\BGC_B_Memo\3\O0413_Submittal\O0413_BGCB_Memo.docx          WestLand Resources, Inc.

7-RCMSER-1965

## 3.  TSF ALTERNATIVE BGC B

### 3.1.  DESCRIPTION

TSF Alternative BGC B (BGC B) is located in Pinal County, Arizona, on lands administered by the Bureau of Land Management (BLM) and Arizona State Land Department (ASLD) (**Figure 1**). BGC B is situated approximately 20 miles southwest of the West Plant Site, which is described in the draft EIS as the location from which the tailings will ultimately be transferred to the TSF. Notable landscape features between the West Plant Site and BGC B include U.S. Highway 60 and the Gila River (**Figure 1**). Notable landscape features that occur within the BGC B footprint include portions of the paved E Florence-Kelvin Highway and the unpaved Whitlow Ranch Road (**Figure 2**). A rural residential community is present adjacent to BGC B, near the southwest corner of the site.

WestLand conducted a desktop evaluation of the BGC B site and identified approximately 124 acres of drainage features within the BGC B footprint (**Figure 2**). Based on the characteristics of these drainages and their proximity to the Gila River, it is likely that the drainages would qualify as waters of the U.S. subject to Corps' jurisdiction. Important to note is that the linework depicted in **Figure 2** reflects only the BGC B footprint and does not include associated pipelines and other appurtenant TSF infrastructure.

### 3.2.  DISMISSAL FROM FURTHER ANALYSIS

As stated in **Section 1**, development of the Skunk Camp TSF would result in approximately 124 acres of impacts to potential waters of the U.S. The BGC B footprint alone contains approximately 124 acres of potential waters of the U.S. (**Figure 2**). The addition of pipelines and development of other appurtenant TSF infrastructure to BGC B would result in additional impacts, i.e. BGC B entails more impacts to potential waters of the U.S. than the Skunk Camp TSF. Additionally, the Florence-Kelvin Highway, which bisects the southern portion of the BGC B footprint (**Figure 2**) would require a substantial reroute which would add considerably more impacts.

The Skunk Camp TSF is located approximately 15 miles southeast of the West Plant Site, and a tailings pipeline between the two sites would not cross the Gila River. Conversely, BGC B is located 20 miles southwest of the West Plant site, and a tailings pipeline between BGC B and the West Plant site would necessarily cross the Gila River. Development of a tailings pipeline across the Gila River would likely require impacts to waters of the U.S. at that location and potentially impact species listed as threatened or endangered by the U.S. Fish and Wildlife Service under the Endangered Species Act, including southwestern willow flycatcher and yellow-billed cuckoo, which utilize the Gila River between Kearny and Florence for breeding and/or a migration travel corridor (WestLand 2016a, 2016b, 2019a, b).

Resolution Copper Project
BGC B TSF Alternatives Discussion

April 13, 2020
Page 5

The higher acreage of impacts to potential waters of the U.S. compared to Skunk Camp and the potential environmental consequences of constructing and operating a tailings pipeline across the Gila River preclude BGC B from consideration as the LEDPA. BGC B is therefore dropped from further consideration as a viable TSF site and will not be analyzed in detail in the Final Environmental Impact Statement.

# 4. REFERENCES

SWCA Environmental Consultants. 2017. Resolution Copper Project and Land Exchange Environmental Impact Statement DRAFT Alternatives Evaluation Report. Tonto National Forest U.S. Forest Service. Phoenix, Arizona: U.S. Department of Agriculture. November 2017.

U.S. Department of Agriculture. 2019. DRAFT Environmental Impact Statement Resolution Copper Project and Land Exchange. Tonto National Forest. Phoenix, Arizona: U.S. Forest Service. August 1, 2019.

WestLand Resources, Inc. 2016a. 2016 Southwestern Willow Flycatcher Survey: Middle Gila River from Upstream of the Kelvin Bridge to Downstream of Zelleweger Wash, Pinal County, Arizona. *Prepared for Asarco LLC - Ray Mine Operations.* Tucson, Arizona: WestLand Resources, Inc. October 25, 2016.

_____. 2016b. 2016 Yellow-Billed Cuckoo Survey Portions of the Middle Gila River, Pinal County, Arizona. *Prepared for Asarco LLC.* Tucson, Arizona: WestLand Resources, Inc.

_____. 2019a. 2019 Southwestern Willow Flycatcher Survey for the Resolution Copper Project. *Prepared for Resolution Copper.* Tucson, Arizona: WestLand Resources, Inc. December 10, 2019.

_____. 2019b. DRAFT 2019 Yellow-Billed Cuckoo Survey for the Resolution Copper Project. *Prepared for Resolution Copper.* Tucson, Arizona: WestLand Resources, Inc. December 12, 2019.

_____. 2019c. DRAFT Practicability Analysis in Support of Clean Water Act 404(b)(1) Alternatives Analysis. *Prepared for U.S. Army Corps of Engineers on behalf of Resolution Copper.* Tucson, Arizona: WestLand Resources, Inc. June 2019.

_____. 2020. Resolution Copper Project Revised Alternaives Discussion. *Prepared for the U.S. Army Corps of Engineers on behalf of Resolution Copper.* Tucson, Arizona: WestLand Resources, Inc. January 21, 2020.

FIGURES



RESOLUTION COPPER

BGC B Tailings Storage Facility
Alternative Discussion

VICINITY MAP
Figure 1



# APPENDIX F

**KCB
Consultants Ltd.
Resolution Copper
Project Skunk
Camp Tailings
Storage Facility
Filtered Tailings
Analysis,
Conceptual Filtered
Tailings
Impoundment
Layout and Staging
(January 17, 2020)**



January 17, 2020

Resolution Copper Mining LLC
P.O. Box 1944
Superior, Arizona
85273

**Ms. Victoria Peacey**
**Senior Manager — Permitting and Approvals**

Dear Ms. Peacey:

**Resolution Copper Project**
**Skunk Camp Tailings Storage Facility Filtered Tailings Analysis**
**Conceptual Filtered Tailings Impoundment Layout and Staging**
**Doc. # CCC.03-81600-EX-LTR-00010 — Rev. 1**

## 1   INTRODUCTION

KCB Consultants Ltd. (KCBCL) presented considerations for the application of filtered tailings for the Resolution Copper Project at the Skunk Camp site on September 3, 2019 to the Resolution 404 Workgroup during their Meeting #3. During this meeting, EPA representatives requested an action item for Resolution Copper Mining LLC (RCM) to review options to transition from a conventional slurry tailings storage facility (TSF) to a filtered tailings stack to assess whether filtered tailings disposal (if feasible) could reduce the footprint of the Skunk Camp TSF. The purpose of transitioning from a conventional facility to a filtered tailings facility is to allow adequate time for the possible successful development of this technology at the scale of the Resolution Copper Project.

A follow-up meeting was held on October 16, 2019 to review results of the assessment.

This technical letter presents two conceptual options for transitioning from conventional slurry deposition for Non-Potentially Acid Generating (NPAG) scavenger tailings (in early years) to filtered tailings (in later years) for the proposed Skunk Camp site, assuming that filtered tailings disposal has already demonstrated to be feasible at the scale of the Resolution Copper Project.

Key objectives of the conceptual options are to:

- manage the Potentially Acid Generating (PAG) pyrite tailings by depositing the tailings subaqueously in segregated lined cells and physical isolated behind a downstream embankment;
- manage the NPAG scavenger tailings by:
  - conventional slurry placement (cycloning and thickening), as included in the Draft Environmental Impact Statement (DEIS) (USFS 2019) for the first 10-15 years;

200117L-SC_Filtered-TailingsRev1.docx
UM09441A22.730

KCB Consultants Ltd.
2 North Central Avenue, 18th Floor  •  Phoenix Arizona 85004  •  USA
t  602.283.1006  •  www.kcbconsultants.com

7-RCMSER-1975

Resolution Copper Mining LLC
Resolution Copper Project
Doc. # CCC.03-81600-EX-LTR-00010 — Rev. 1

Skunk Camp Tailings Storage Facility Filtered Tailings Analysis
Conceptual Filtered Tailings Impoundment Layout and Staging

- ◆ filtered tailings stacking for the years that follow to the end of operations; and

- ▪ provide required tailings and design storm storage volumes (72-hr PMF) to meet the project's design criteria.

## 2    CONSIDERATIONS FOR FILTERED TAILINGS FOR THE RESOLUTION PROJECT

- ▪ Processing, transport and placement:

  - ◆ Filter plant and transport (e.g. conveyors) for project would be precedent setting as there are currently no filtered tailings operations in the world at tonnage rates higher than 30,000 tons per day (tpd). Most filtered tailings operate at 1,000 tpd to 10,000 tpd in flatter areas and/or where adequate backup storage is available. The management approach has only been tried and proven at these lower production rates and has not been proven or commercially available at the scale of the Resolution Copper proposed mine (> 120,000 tpd).

  - ◆ There is only one example of a filtered tailings facility that has a production above 20,000 tpd, Karara as referenced from EPA. Karara Mining Limited in Western Australia is operating a filtered stack at 30,000 metric tonnes per day in a very arid environment in flat terrain (Amoah 2019). The project still requires back-up slurry storage as well as back-up transportation methods. Given the Resolution project is an order of magnitude larger in scale and located in mountainous terrain, following the same approach as Karara, additional contingency (e.g., filter presses, slurry storage, etc.) should be incorporated into the design along with back up slurry storage.

- ▪ Storm water management for filtered piles:

  - ◆ Surface of the filtered tailings would be sloped such that storm water would not pond on the pile to maintain as dry a surface as possible and not re-wet the tailings, directing surface runoff to designated collection areas, so it can be pumped into the pyrite cell.

- ▪ Seepage management:

  - ◆ Filtered tailings would produce less seepage into the foundation than the wet tailings options. However, seepage would still need to be managed.

- ▪ Dust management:

  - ◆ Filtered tailings would be deposited "dry" in windrows from a walking stalker conveyor, spread and compacted in place. The dry filtered tailings are susceptible to dusting prior to compaction (and potentially require temporary covers), so the tailings should be compacted with a smooth drum roller as soon as possible after deposition. Due to the production or pace at which the filtered tailings are placed, the risk of dust during wind events and not meeting air quality requirements would be high and likely more frequent than at a thickened tailings facility. This would result in increased requirements for protection of the tailings surface from dust generation.

200117L-SC_Filtered-TailingsRev1.docx
UM09441A22.730

NewFields Consultants Ltd
7-RCMSER-1976

Page 2
January 2020