# Nos. 25-5185, 25-5189, 25-5197

## In The United States Court of Appeals for the Ninth Circuit

ARIZONA MINING REFORM COALITION; et al.,

*Plaintiffs-Appellants,*

v.

BROOKE L. ROLLINS, U.S. Secretary of Agriculture, et al.,

*Defendants-Appellees,*

and

RESOLUTION COPPER MINING LLC,

*Intervenor-Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Arizona
No. 2:21-cv-00122-PHX-DWL
Hon. Dominic W. Lanza

SUPPLEMENTAL EXCERPTS OF RECORD OF INTERVENOR-DEFENDANT-APPELLEE RESOLUTION COPPER MINING LLC

VOLUME 11 OF 12 (SER 2646–2943)

| | |
|---|---|
| Christopher D. Thomas | Michael R. Huston |
| Andrea J. Driggs | *Counsel of Record* |
| Janet M. Howe | Diane M. Johnsen |
| Benjamin A. Longbottom | Nicholas S. Crown |
| HOLLAND & HART LLP | Samantha J. Burke |
| 2398 E. Camelback Rd, Suite | Addison W. Bennett |
| 650 Phoenix, AZ 85016 | PERKINS COIE LLP |
| (602) 507-9704 | 2525 E Camelback Rd, Suite 500 |
| CDThomas@hollandhart.com | Phoenix, AZ 85016 |
| | (602) 351-8000 |
| | MHuston@perkinscoie.com |

*Counsel for Resolution Copper Mining LLC*

SAN CARLOS APACHE TRIBE, a federally recognized Tribe,

*Plaintiff-Appellant,*

v.

UNITED STATES FOREST SERVICE,
an agency of the U.S. Department of Agriculture, et al.,

*Defendants-Appellees,*

and

RESOLUTION COPPER MINING LLC,

*Intervenor-Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Arizona
No. 2:21-cv-0068-PHX-DWL
Hon. Dominic W. Lanza

GOUYEN BROWN LOPEZ, et al.,

*Plaintiffs-Appellants,*

v.

UNITED STATES OF AMERICA, et al.,

*Defendants-Appellees,*

and

RESOLUTION COPPER MINING LLC,

*Intervenor-Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Arizona
No. 2:25-cv-2758-PHX-DWL
Hon. Dominic W. Lanza

Exhibit 28

2025 FEIS Volume 6

San Carlos Apache Tribe's Motion for Preliminary Injunction to Enjoin
Conveyance of Oak Flat

 

**Forest Service**
U.S. DEPARTMENT OF AGRICULTURE

---

Tonto National Forest                    MB-R3-12-10                        June 2025

# FINAL Environmental Impact Statement
## Resolution Copper Project and Land Exchange

Coconino, Gila, Maricopa, Pinal, Santa Cruz, and Yavapai Counties, Arizona



In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at How to File a Program Discrimination Complaint and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov.

USDA is an equal opportunity provider, employer, and lender.

**Front Cover photo captions:**

*Top:* Map of the Preferred Alternative Project location and the Tonto National Forest

*Bottom Left:* Oak Flat Federal Parcel

# Table of Contents

## Volume 1

Executive Summary

Chapter 1. Purpose of and Need for Action

Chapter 2. Alternatives, Including the Proposed Action

Chapter 3. Affected Environment and Environmental Consequences, Sections 3.1 through 3.6

## Volume 2

Chapter 3. Affected Environment and Environmental Consequences, Sections 3.7 through 3.12

## Volume 3

Chapter 3. Affected Environment and Environmental Consequences, Sections 3.13 through 3.17

## Volume 4

Appendix C. Clean Water Act 404(B)(1) Alternatives Analysis – Resolution Copper

Appendix D. Clean Water Act Section 404 Conceptual Mitigation Plan – Resolution Copper Project

Appendix E. Alternatives Impact Summary

Appendix F. Alternatives Considered but Dismissed from Detailed Analysis

Appendix G. Further Details of East Plant Site, West Plant Site, MARRCO Corridor, and Filter Plant and Loadout Facility Infrastructure

Appendix H. Further Details of Mine Water Balance and Use

Appendix I. Summary of Effects of the Land Exchange

Appendix J. Mitigation and Monitoring Strategy

Appendix K. Summary of Content of Resource Analysis Process Memoranda

## Volume 5

Appendix L. Detailed Hydrographs Describing Impacts on Groundwater-Dependent Ecosystems

Appendix M. Water Quality Modeling Results for Constituents of Concern

Appendix N. Summary of Existing Groundwater and Surface Water Quality

Appendix O. *This appendix has been removed from the FEIS*

Appendix P. Final Biological Opinion Completing Consultation under Section 7 of the Endangered Species Act

Appendix Q. Special Use Permit Applications

Resolution Copper Project and Land Exchange

## Volume 6

**Appendix R.** **Response to Comments Received on the DEIS**

**Appendix S.** **Consultation History**

**Appendix T.** **Proposed Forest Plan Amendment and NFMA Compliance Determination for Preferred Alternative**

**Appendix U.** **Supplemental Information for Section 3.14, Tribal Values and Concerns**

11-RCMSER-2650

# Appendix R. Response to Comments Received on the DEIS

# Introduction

This document is a summary of public and agency comments received by the Tonto National Forest regarding the Resolution Copper Project and Land Exchange Draft Environmental Impact Statement (DEIS), and responses to those comments prepared by the Tonto National Forest. The comment period on the DEIS lasted from August 9, 2019, to November 7, 2019, with an extended comment period for Tribes ending on December 22, 2019.

Tonto National Forest received, analyzed, and responded to over 29,000 submittals on the DEIS, as shown in table R-1. Comments include transcripts of oral comments from formal public meetings and telephone calls, letters, form letters, and petitions. These submissions were analyzed using a process called content analysis, described below.

**Table R-1. Distribution of submittals by sender type**

| Sender Type* | Submittal Count |
|---|---|
| Individual | 29,324 |
| Non-governmental organization | 80 |
| Government | 60 |
| **Total** | **29,464** |

\* Comments from individual Tribal members are included under the "individual" category, whereas comments from Tribal governments are included under the "government" category.

# Content Analysis Process

Submissions were reviewed and parsed into individual comments. These individual comments were reviewed and categorized based on topic. We compiled 5,209 individual comments, which were then categorized. The reduction from 29,464 submittals to 5,209 comments reflects that many identical or similar form letters were received. The comments and general categories are shown in table R-2.

Content analysis is a method of eliciting meanings, ideas, and other information from written text, pictures, or audio or video messages. The goals of the content analysis process are to

- ensure that every comment is considered,
- identify the concerns raised by all respondents,
- represent the breadth and depth of the public's viewpoints and concerns as fairly as possible, and
- present those concerns in a way that facilitates the U.S. Forest Service's (Forest Service's) consideration of comments.

Through the content analysis process, the content analysis team strived to identify all relevant issues, not just those represented by the majority of respondents. The breadth, depth, and rationale of each comment are especially important. In addition to capturing relevant factual input, analysts tried to capture the relative emotion and strength of public sentiment behind particular viewpoints.

The issues identified during content analysis range in nature from the strictly procedural to the technically specific. Public comment on these issues demonstrates the interest, feelings, and concerns the public has regarding the management of National Forest System (NFS) lands, the role of mining on the Tonto National Forest, the National Environmental Policy Act (NEPA) process for this project, the land exchange, and how the public and other agencies feel the Forest Service should best analyze and address the environmental, social, and economic issues presented in the DEIS.

Appendix R

**Table R-2. General categories of comments**

| General Comment Category | Number of Comments |
|---|---|
| General document comments (not specific to an individual resource section) | 193 |
| Geology, minerals, and subsidence (section 3.2) | 39 |
| Soils and vegetation (section 3.3) | 12 |
| Noise and vibration (section 3.4) | 14 |
| Transportation and access (section 3.5) | 48 |
| Air quality (section 3.6) | 69 |
| Water resources (section 3.7) | 472 |
| Wildlife (section 3.8) | 77 |
| Recreation (section 3.9) | 96 |
| Scenic resources (section 3.11) | 31 |
| Cultural resources (section 3.12) | 57 |
| Socioeconomics (section 3.13) | 138 |
| Tribal values (section 3.14) | 135 |
| Environmental justice (section 3.15) | 24 |
| Livestock grazing (section 3.16) | 20 |
| NEPA, regulatory, and procedural comments | 514 |
| Alternatives-related comments | 275 |
| Mitigation-related comments | 358 |
| Non-substantive comments of opposition or support | 2,637 |
| **Total** | **5,209** |

# Development of Comment Responses

Once parsed, analyzed, and coded, the 5,209 individual comments were further assessed in order to develop comment responses. The development of comment responses not only is intended to provide a clear reply to the issue raised by the commenter, but also serves to identify and guide any changes, modifications, or new analysis required to prepare the final EIS (FEIS). Similarly, development of comment responses could identify additional clarification or documentation that is required for the project record.

Once grouped and consolidated, we addressed the 5,209 individual comments with 460 comment responses, as shown in table R-3. These comment responses are contained in this appendix. Note that the codes are only intended as rough groupings, and since many comments cover multiple topics, the content of the response may involve other topics as well.

**Table R-3. Grouping of comment responses**

| General Response Code and Description | Number of Responses |
|---|---|
| ALT (Alternatives) | 27 |
| AMT (Alternative mining techniques) | 17 |
| AQ (Air quality) | 25 |
| CR (Cultural resources and Tribal issues) | 23 |

Appendix R

| General Response Code and Description | Number of Responses |
|---|---|
| DOC (Specific suggestions for document edits) | 1 |
| EJ (Environmental justice) | 7 |
| GS (Geology and subsidence) | 17 |
| LG (Livestock grazing) | 6 |
| MIT (Mitigation) | 30 |
| NEPA (NEPA, regulatory, land exchange, and other general topics) | 66 |
| NO (Noise) | 5 |
| NS (Non-substantive comments) | 2 |
| SO (Socioeconomics) | 18 |
| SR (Scenery and recreation) | 32 |
| TR (Transportation) | 17 |
| TS (Tailings and tailings safety) | 31 |
| WI (Wildlife) | 24 |
| WT (Water) | 112 |
| Total | 460 |

# Organization of this Appendix

This appendix is intended to allow the public to

- directly read comments submitted by public agencies or elected officials, in their entirety and original format;
- identify letters submitted by specific individuals or entities, identify the comments coded to each letter, and identify the responses to those comments by using an index; and
- find and read the Tonto National Forest responses to their comments.

To accomplish this the following sections are included:

- Section 1. Copies of comment letters submitted by public agencies or elected officials
- Section 2. Indices of commenter names, letter IDs, and response IDs. These are divided into three tables:
  - o Table R-4. Index of responses for letters submitted by organizations, agencies, or elected officials
  - o Table R-5. Index of responses for non-form letters
  - o Table R-6. Full text of form letters submitted and index to responses
- Section 3. Responses to comments

# How to Use this Appendix

In order to find responses to comments associated with an organization, agency, or elected official:

- Step 1. Use table R-4 in section 2 of appendix R to locate the name of the organization, agency, or elected official. These are organized alphabetically. Note the "Response-to-Comment IDs Associated with this Letter."

11-RCMSER-2655

Appendix R

- Step 2. Find the appropriate Response-to-Comment IDs in section 3 of appendix R to read the Tonto National Forest response. The Response-to-Comment IDs are listed alphabetically.

Optionally, for agencies and elected officials:

- Step 1. Read the original comment letter in section 1 of appendix R and note the comments that have been marked and the "Response-to-Comment IDs" associated with those comments.

- Step 2. Find the appropriate Response-to-Comment IDs in section 3 of appendix R to read the Tonto National Forest response. The Response-to-Comment IDs are listed alphabetically.

In order to find responses to comments associated with an individual:

- Step 1. Use table R-5 in section 2 of appendix R to locate the individual's name. These are organized alphabetically by last name, using the spelling and format submitted to the Tonto National Forest. Note the "Response-to-Comment IDs Associated with this Letter."

- Step 2. Find the appropriate Response-to-Comment IDs in section 3 of appendix R to read the Tonto National Forest response. The Response-to-Comment IDs are listed alphabetically.

In order to find responses to comments associated with a form letter:

- Step 1. Use table R-6 in section 2 of appendix R to locate the full text of the form letter. Ten form letters were submitted during the public comment period. Note the "Response-to-Comment IDs Associated with this Letter."

- Step 2. Find the appropriate Response-to-Comment IDs in section 3 of appendix R to read the Tonto National Forest response. The Response-to-Comment IDs are listed alphabetically.

11-RCMSER-2656

Appendix R

# Section 1. Comment Letters from Public Agencies and Elected Officials

11-RCMSER-2657

Appendix R

*This page intentionally left blank.*

R-6

Appendix R

YAVAPAI-APACHE NATION

Executive Office

Chairwoman Jon Huey
Vice Chairwoman Tanya Lewis

2400 West Datsi Street, Camp Verde, AZ 86322

Phone (928) 567-1002     Fax (928) 567-3994

November 7, 2019

Neecha Star Lyn-kn
Tribal Relations Program Manager
Tonto National Forest, Supervisor's Office
2324 E. McDowell Rd.
Phoenix, AZ 85006

RE: USFS Consultation Comments on Southeast Arizona Land Exchange and Resolution Copper Project

Dear Ms. Star Lyn-kn:

On behalf of Yavapai-Apache Nation, I would like to thank the United States Forest Service for the consultation process on the Southeast Arizona Land Exchange and Resolution Copper Project, and ensuing inclusion of the tribal voice.

The Yavapai-Apache Nation submitted a pre-mitigation request letter in September 2019, to mitigate and offset the impacts to the environment and cultural footprint of the Project.

It is important to note that each Tribe participating in consultation, represents itself, as we are each self-governing and sovereign governments. Our Tribe does not speak in deference the position of all Tribes.

As the comment period concludes, it is important to note that the Nation is concerned about the location of the tailings. We know that ending tailings have lasting impacts on communities and environments. We do request that Tribes have the opportunity to continue to participate in the process of tailings location.

Sincerely,

[signature]

Jon Huey
Chairman

---

Deral Honna, Community Chairman
8033 West Tewe Avenue
Luccn, AZ 85331
(520) 434-4780

November 6, 2019

U.S. Department of Agriculture
Tonto National Forest

RE: Draft Environmental Impact Statement for the proposed Resolution Copper Project and Land Exchange

Dear U.S. Department of Agriculture:

The District's Community also bears a Mariposa Bottling, located on the CPA River below [...]. Community notice with a letter of support for the Arabec Stronghold as a sacred site in opposition to Oak Hill to Resolution Copper.

The protection of plantation, historical and cultural sites must be to areas developed in consideration in the State of Arizona. Our water and critical [...] to the air, water, land and primarily natural resources can never be regarded in its original state, or restore to its earning, many years. Such actions can cause permanent damage to our beautiful state of Arizona. Arizona is known for its rich natural beauty and Native American history.

The Rainbird Seven Generations agrees with, and support the Apache Stronghold position.

Sincerely,

[signature]

Deral Honna, Community Chairman
District 7, Maricopa Colony
Gila River Indian Community

---

---

APACHE STRONGHOLD

Resolution EIS Comment
P.O. Box 14668
Phoenix, AZ 85267-1668

September 19, 2019

To Supervisor Bosworth:

We appreciate your attention to the public's input on the Draft Environmental Impact Statement for the Land Exchange with Resolution Copper on the Tonto National Forest (DEIS). The DEIS is flawed and incomplete. As we describe below, it fails to address impacts to Native American religion, sacred and holy sites, the extent of environmental devastation, and impossible damage proposed by the land exchange.

In our review of the nearly 1,000 page Draft Environmental Impact Statement we have found [...] analysis of concern to the Apache as Native American. Where the Oak Flat DEIS does include the words "religious experience," the DEIS fails to achieve the respective scientific religious practice. The reference considerably cited significant harm to Native American religion, sacred and holy sites, the extent of environmental devastation, and impossible damage proposed by the land exchange.

• "Excessive among done are the expected significant impacts and loss of the Oak Flat area, historically used by Native Americans who held its land as sacred and has the area for spiritual and traditional uses. Additionally, in March 2016, the Oak Flat area was listed on the national Register of Historic Places as a traditional cultural property." (Oak Flat DEIS, pg. ES-3)

• "There is a potential for a great portion of existing yet currently unidentified prehistoric and historic artifacts and resources to be disturbed or destroyed, especially within the Oak Flat subsidence area and the footprint of the tailings storage areas. These losses could potentially include Ancestral burials within these areas" (Oak Flat DEIS, pg. ES-3)

The Tribal Values and Concerns (DEIS, 3.14) section is incomplete and demonstrates a failure of the U.S. Forest Service to take adequate consultation with affected Tribes. The proposed action would adversely, and permanently affect numerous cultural artifacts; sacred places and springs; traditional ceremonial areas; ceremonial plant habitats; burial locations; and other places of experiences of high spiritual and value to tribal members is severed. The access would have permanent loss of places with ancestral religious and spiritual. The lands of resources in the DEIS have archeological and cultural records held by the East Central Apache Tribe, Yavapai people, Anasakpa, and other Indigenous peoples of these tribal in USFS/DEIS inadequate.

Resolution Copper flooded the Tonto National Forest to let "tribal members" to the perception of the effect proposal action. The archeologists and tribal people who must have a gathered reasoned evidence of [Continued]

These 7 papers represent concerns identified individual numbers 235, 251, 280A, 285B, 280M, 280CR, 300DR, and 300D9

Letter ID: 1149
Format: Submitted by webform, 11/04/2019
Sender:
Karl Hoerig
Patron Tribe of Arizona
Contact Info:
karl.hoerig@pascua.gov
Content:
The Resolution Copper Mine project, as planned, will cause irreparable harm to the Western Apache people and the other indigenous communities with ancestral ties to the project area. In addition to the destruction of the National Register listed Oak Flat Religious and Traditional Cultural Property, the current preferred alternative including the use of the Skunk Camp site for tailings deposition will destroy more than 200 archaeological sites. These sites represent the physical expression of our ancestors. They are infused with and make up the history and heritage of these communities. They are sacred places of many ancestors. They are also key parts of our state and nation's shared heritage. This means destruction of these sacred places. If this copper deposit is to be mined, it should be mined in a manner that will protect our heritage resources.

Appendix R

R-8

Appendix R

R-9

Appendix R

Emily Newell

**From:** Donna Morey
**Sent:** Wednesday, October 2, 2019 10:44 AM
**To:** Emily Newell
**Subject:** FW: TNF.Bosworth.DEIS.Extension.091719
**Attachments:** TNF_Bosworth_DEIS_Extension_091719.pdf

**Follow Up Flag:** Follow up
**Flag Status:** Flagged

Should add as a comment received during the comment period.

D

**From:** Lyndon, Nanebah - FS <nanebah.nez.lyndon@usda.gov>
**Sent:** Wednesday, September 18, 2019 8:28 AM
**To:** Rasmussen, Mary C -FS <mary.rasmussen@usda.gov>; Hill, Kristina -FS <kristina.hill@usda.gov>; Suzanne Griset
<sgriset@swca.com>; Chris Garrett <cgarrett@swca.com>; Morgan, Esther -FS <esther.morgan@usda.gov>
**Subject:** FW: TNF.Bosworth.DEIS.Extension.091719

EXTERNAL: This email originated from outside SWCA. Please use caution when replying.

**From:** Alex Ritchie [mailto:Alex.Ritchie@scat-nsn.gov]
**Sent:** Tuesday, September 17, 2019 2:50 PM
**To:** Lyndon, Nanebah - FS <nanebah.nez.lyndon@usda.gov>
**Cc:** Justine Jimmie <justine.jimmie@scat-nsn.gov>; Roseria Astor <roseria.astor@scat-nsn.gov>
**Subject:** Fwd: TNF.Bosworth.DEIS.Extension.091719
**Importance:** High

Noni:

See below and attached. My assistant forgot to include you.

Alexander B. Ritchie
Attorney General
Department of Justice
San Carlos Apache Tribe
Post Office Box 40
16 San Carlos Avenue
San Carlos, Arizona. 85550
Tel. (928) 475-3344

1

Cel. (928) 200-5120
Fax. (928) 475-3348

This message contains confidential information and is intended only for
the individual(s) named as recipients. Please notify the sender immediately if you
have received this email by mistake and delete this email from your system.

Begin forwarded message:

**From:** Roseria Astor <roseria.astor@scat-nsn.gov>
**Subject:** FW: TNF.Bosworth.DEIS.Extension.091719
**Date:** September 17, 2019 at 2:12:31 PM MST
**To:** "Bosworth, Neil -FS" <nbosworth@fs.fed.us>
**Cc:** Kathryn Leonard <kleonard@azstateparks.gov>, "jfowler@achp.gov"
<jfowler@achp.gov>, "ASOWEB, BLM_AZ" <blm_az_asoweb@blm.gov>, Terry
Rambler <trambler@scatui.net>, Vernelda Grant <apacheven@yahoo.com>, Dee
Randall <DRandall@FORESTRY.SCAT-NSN.GOV>, Alex Ritchie <alex.ritchie@scat-
nsn.gov>

This email transmits the attachment of Chairman Rambler's letter regarding the Draft
Environmental Statement. The original letter is being mailed certified with
tracking number 7008 1300 0000 8339 2110.

Thank you,

Roseria Astor
Legal Secretary

SAN CARLOS APACHE TRIBE
Department of Justice
P.O. Box 40
San Carlos, Arizona 85550
T: (928) 475-3344/3339
F: (928) 475-3348
E: roseria.astor@scat-nsn.gov

This electronic message contains information generated by the USDA solely for the intended recipients.
Any unauthorized interception of this message or the use or disclosure of the information it contains
may violate the law and subject the violator to civil or criminal penalties. If you believe you have
received this message in error, please notify the sender and delete the message immediately.

2



**Terry Rambler**
Chairman

**SAN CARLOS APACHE TRIBE**
P.O. Box 0, San Carlos, Arizona 85550
Phone (928) 475-1600 ◆ Fax (928) 475-2567

**Tao Etpison**
Vice-Chairman

September 17, 2019

*Via E-mail and U.S. Postal Service*

Neil Bosworth
Superintendent
Tonto National Forest
2324 E. McDowell Road
Phoenix, Arizona 85006
E-Mail: nbosworth@fs.fed.us

Dear Forest Supervisor Bosworth:

On behalf of the 16,800 members of the San Carlos Apache Tribe ("Tribe") I request
that the Tonto National Forest ("TNF") issue an extension of the comment period for the Draft
Environmental Impact Statement (DEIS) for the Resolution Copper Mine project ("RCM
project") and the Southeast Arizona Land Exchange ("Land Exchange"). I further request that
TNF consult with the Tribe to arrange for at least one open meeting on the Tribe's lands in order
to encourage and optimize receipt of comments and questions from Tribal members – after all,
our Tribe's members form a significant portion of the population directly impacted by these
endeavors.

I am aware that on August 16th, Mary Rasmussen informed a group of stake holders and
extension of time to comment on the DEIS because you had already provided an additional 45
days beyond that required by law. Thank you for that. However, I am writing to you to request
that you reconsider your position due to recent developments which I believe justify a further
extension of at least another 45 days.

As you know, the Tribe has severe reservations about the Tribal Monitor Program. We
have several concerns about the Program but a major apprehension is the Program's
impingement upon tribal sovereignty and TNF's ability to ensure that the Tribe's sovereignty is

*[Comment ID: 251-I, Response: NEPA25]*

*[Continued →]*

Neil Bosworth
*Re: Request for Extension of Comment Period on the DEIS for the Proposed Resolution Project*
September 17, 2019
Page 2 of 3

*[← Continued]*

not impaired, explicitly or implicitly. I believe that developments in the last several weeks
provide TNF and the Tribe with an avenue to address this concern.

Specifically, on August 29, 2019, you wrote to me in response to my July 10, 2019
correspondence to you regarding the 5th draft for the Programmatic Agreement ("PA"). As you
know, among other matters, the Tribe was critical of the PA's description and use of a Tribal
Monitor Program for identification of important cultural resources. Your August 29th letter
provided some explanation of the Tribal Monitor Program. In your letter, you also stated I
should reach out to you with any additional requests.

I am now reaching out to you to learn more about the Tribal Monitor Program. I request
a meeting with you in your offices for a small number of my staff together with your staff to
enlarge the Tribe's leadership' understanding of this Program. Any documents you would be
willing to provide me in advance of such a meeting would be greatly appreciated.

The other recent development that I believe justifies an extension of time is connected to
the September 6, 2019 Public Notice from the U.S. Corps of Engineers ("Corps") announcing its
review of Resolution Copper's application for a permit for a tailings storage facility ("TSF") at
Skunk Camp. Attached for your convenience is the Public Notice. The Public Notice indicates
that TNF, the State Historic Preservation Officer and unspecified Native American Tribes are in
consultation regarding cultural resource impacts for this TSF project. *See* Public Notice at 3.
The notice further states that tribes have been consulted and that consultations are being led by
TNF. *Id.* Although not specifically stated, the implication is that the Corps has no intent to
conduct its own Section 106 analysis.

*[Comment ID: 251-2, Response: CR13_A]*

Given this last development, I would be remiss if I did not ask TNF to provide the Tribe
with all cultural resource information TNF has given to the Corps, all consultation materials
between TNF and any tribes and for any other information in TNF's possession regarding
cultural resources within the area of potential effects ('APE') for the Skunk Camp TSF. This
information is necessary for the Tribe's ability to provide meaningful DEIS comments regarding
the Skunk Camp TSF.

The APE for the Skunk Camp has been, and as far as the Tribe is aware, still is poised for
no trespassing and is off limits for review and inspection. For Apaches, this is not and cannot be
a "desktop" survey. We need time to visit, learn from the representatives of the clans with
traditional ties to the Dripping Spring valley, and consider traditional knowledge in relation to
the newly unveiled plans to destroy another cherished part of our homeland.

The APE is part of the traditional territories of T'iis Tseban (Pinal Band) and Tse
Binesti'e (Aravaipa Band) Apaches driven from the Dripping Springs and Pinal Mountain areas
by military-industrial campaigns from 1859 to 1874. Time is needed for the Apache aboriginal
landowners to re-familiarize themselves with the land and resources they were evicted from. We
request the opportunity, for the first time in generations to be welcomed back to the springs,

*[Continued →]*

Appendix R

Neil Bosworth
Re: Request for Extension of Comment Period on the DEIS for the Proposed Resolution Project
September 17, 2019
Page 3 of 3

**Continued**

camp areas, and plant and mineral gathering places to assess existing conditions. We need to assess and consider connections between what we see on the land today and what we have been told by our elders. I feel this obligation to visit and inspect the area personally and spiritually. Those campaigns slaughtered almost 400 Apaches and drove my direct ancestors from their homelands to San Carlos, paving the way for the industrial mining that is now culminating in the proposed Resolution Mine.

In addition to these two recent developments, there are other reasons to provide an extension for the DEIS comment period. The DEIS is extensive, complicated, technical, and unmistakably consequential. The Tribe cannot simply suspend our duties and responsibilities relating to other issues and concerns to study and prepare comments on the DEIS. It is not reasonable or useful for TNF to require a fully informed response from the Tribe within 90 days to a massive industrial proposal involving multiple alternatives.

> Comment ID: 251-3
> Response: NEPA25

Our initial review makes it clear that the DEIS fails in many ways to identify and analyze many irrevocable adverse impacts to the human and biophysical environment, including land, water, air, and cultural resources upon which San Carlos Apaches and many other Native American people and communities rely. We hope TNF will continue to fill in the many gaps in the DEIS as the proposed POO continues to evolve. We particularly request TNF issuance of a DEIS supplement or amendment to address our Tribe's well-established concerns regarding the processes proposed to complete the identification of cultural resources and sacred sites and to avoid and reduce impacts to these places, objects, and traditions.

> Comment ID: 251-4
> Response: CR5

On behalf of the San Carlos Apache Tribe, I ask you to give these requests every favorable consideration. I look forward to your response.

Sincerely,

SAN CARLOS APACHE TRIBE

Terry Rambler
Chairman

Cc Kathryn Leonard, Arizona State Historic Preservation Officer
John Fowler, Advisory Council on Historic Preservation Executive Director
Raymond Bates, USBIA Arizona State Director

San Carlos Apache Tribe
Tao Elpson, Vice-Chairman
San Carlos Council Members
Vanessa Grant, THPO
Dee Randall, Forest Manager Forest Resources
A.B. Ritchie, AG
Chrona

---

Michael Langley
Re: Resolution Copper Consultations on CWA 404
November 7, 2019
Page 2 of 4

**Continued**

Colonel Batts kindly responded to my letter explaining that TNF was the lead agency for the preparation of an environmental impact statement under the National Environmental Policy Act (NEPA) and that jurisdictionally USACE was a cooperating agency if RCC applied for a permit to discharge dredged or fill material under section 404 of the Clean Water Act (CWA) and it was determined that in fact such a permit would be necessary. Colonel Batts also explained that the Corps had recently received RCC's application for a permit for the Skunk Camp Alternative. Colonel Batts made clear that the Corps' role in the NHPA process is limited to those areas over which your agency has jurisdiction, i.e., areas for which a section 404 permit would be required such as the tailings storage facility ("TSF") and associated pipelines. We understand this is USACE view of its limited role in this and greatly appreciate Colonel Batts's clear and succinct explanation of the Corps' position, although we do not necessarily agree.

> Comment ID: 6030-2
> Response: MIT27

Regretfully, the problems pertaining to meaningful government-to-government consultation with THP on any aspect of NHPA section 106 consultation about the RCM project including the Skunk Camp Alternative, has been problematic at best. Recently, the State Historic Preservation Office ("SHPO") and the Advisory Council on Historic Preservation separately warned TNF of compliance failures. TNF's responsive actions merely reaffirmed its lack of understanding of the informal consultation compliance requirements.

> Comment ID: 6030-3
> Response: CR8

The purpose of this letter is not to document TNF's failure to engage in consultation with the Tribe and other affected Indian tribes. Rather this letter is intended to alert USACE that, at least as to the Skunk Camp Alternative, the primary responsibility for NHPA section 106 government-to-government consultation with tribes has fallen squarely in the Corps' lap.

> Comment ID: 6030-4
> Response: CR13

In his August 23, 2019 correspondence, Colonel Batts wrote, "The Corps will continue to work with TNF on developing an appropriate PA for the project, as needed for our limited role, and I encourage the San Carlos Apache Tribe to stay engaged with TNF and other consulting parties to work through the issues you have identified in your letter." By this letter, I request that the Corps, as a cooperating agency, engage in government-to-government consultation regarding the Corps' permitting of the Skunk Camp Alternative for a TSF and associated pipelines to include the area of potential effects (APEs). We would also encourage in our consultations that the Corps' jurisdiction be examined to determine the necessity for additional review of other aspects of the mine project.

> Comment ID: 6030-5
> Response: MIT27

There is no doubt that under NEPA, NHPA, the U.S. Department of Defense, American Indian and Alaska Native Policy, the USACE Tribal Policy Principles, and the various authorities cited in the letter two policies, that the Tribe has the right and the Corps has the duty to engage in government-to-government consultations. We ask that USACE engage in consultation with the Tribe in order to develop a PA which identifies, protects, and preserves the cultural, sacred, and historical assets at risk within the Corps' jurisdictional role in this project.

---



Terry Rambler
Chairman

**SAN CARLOS APACHE TRIBE**
P.O. Box 0, San Carlos, Arizona 85550
Phone (928) 475-1600 ✦ Fax (928) 475-2567

Tao Elpson
Vice-Chairman

November 7, 2019

*Via E-mail and U.S. Postal Service*

Michael Langley
Los Angeles District, Regulatory Division
U.S. Army Corps of Engineers
3636 N. Central Ave, Suite 900
Phoenix, AZ 85012-1939
E-Mail: ResolutionMine404Comments.SPL@usace.army.mil

Re: San Carlos Apache Tribe's Request for Government-to-Government Consultation and Comments on Resolution Copper Company's Application for Permit, Application Number SPL-2016-00547-MWL

Dear Mr. Langley:

On behalf of the nearly 16,800 members of the San Carlos Apache Tribe ("Tribe"), thank you for the opportunity to present the Tribe's initial comments regarding Resolution Copper Company's Application Number SPL-2016-00547-MWL. As you are certainly aware as the Senior Project Manager for the U.S. Army Corps of Engineers ("USACE" or "Corps"), the Tribe has opposed the development of the Resolution Copper Mine ("RCM") and the Southeast Arizona Land Exchange. Our opposition arises in large part from the certain destruction of sacred sites and places and culturally significant resources which will occur as a result of the mine's development and the exchange of federal lands controlled by the Tonto National Forest ("TNF").

> Comment ID: 6030-1
> Response: NS1

On July 26, 2019, I corresponded with Colonel Batts, USACE District Commander for the Los Angeles District, expressing the Tribe's increasing compliance issues with section 106 of the National Historic Preservation Act ("NHPA") and deficiencies with a draft Programmatic Agreement ("PA") under review by various agencies. Those issues persist today

**Continued**

---

Michael Langley
Re: Resolution Copper Consultations on CWA 404
November 7, 2019
Page 3 of 4

The Tribe is also concerned about other technical aspects of RCC's application, the full panoply of which remains yet unknown to the Tribe. This is an additional basis for consultation with the Corps. In August of 2016, TNF Forest Supervisor Neil Bosworth issued a record of decision ("ROD") and finding of no significant impact ("FONSI") for a Resolution Copper Mining Plan of Operations ("MPO") for Baseline Hydrological and Geotechnical Data Gathering Activities ("Baseline Plan").

> Comment ID: 6030-12
> Response: ALT22

The Final Environmental Assessment for the Baseline Plan stated the purpose and need for the Baseline Plan was to provide hydrological, geochemical and geotechnical data which would be used to support the analysis of a proposed TSF. The data was deemed important to providing data TNF would need to meet the requirements of 40 CFR §1502.23, information that is "essential to a reasoned choice among alternatives." The information was necessary, according to the final EA, for the evaluation of the TSF geotechnical stability and quality issues deemed by TNF as critical to support a reasoned choice among alternative TSF sites.

A similar baseline analysis was not performed for the Skunk Camp Alternative that leads to the question of whether the information which has been provided with RCC's application provides sufficient information to make a reasoned choice among alternatives that the Skunk Camp Alternative is an appropriate location for a TSF. After all, whatever information was derived from the Baseline Plan, it was sufficiently significant to cause RCM to abandon the site as a TSF or for TNF to reject that location.

> Comment ID: 6030-8
> Response: MIT27

The Corps issues permits for the discharge of dredged or fill material pursuant to section 404 of the CWA and subject to the Corps' and EPA's 404(b)(1) Guidelines ("Guidelines"). See 33 U.S.C. § 1344; 40 C.F.R. pt. 230. The Corps cannot authorize a discharge unless "sufficient information to make a reasonable judgment as to whether the proposed discharge will comply with [the Section 404(b)(1)] Guidelines." 40 C.F.R. § 230.12(a)(3)(iv); see 33 C.F.R. §§ 320.2(d) and 320.4(a)(1). The Corps' and EPA's 404(b)(1) Guidelines impose important limitations on the Corps' ability to issue a Section 404 permit. 40 C.F.R. pt. 230.

> Comment ID: 6030-9
> Response: MIT27

The Tribe further seeks consultation to fully explore which guidelines should be applied by the Corps including whether "all appropriate steps have been taken to minimize potential adverse impacts." 40 C.F.R. § 230.10. This would include adverse impacts to cultural resources, human health and welfare, aquatic life, other water dependent wildlife, ecosystem diversity, recreation, geological stability and any other attributes of the human condition which may be subject to significant degradation. Id. § 230.10(c)(1)(4). The Tribe submits that the Corps has not received sufficient information from RCC to make this determination possible at this time and that the applicant should be mandated to submit additional information. As an example, the Tribe submits that there is a lack of information regarding the geology and its stability for any aspect of the Skunk Camp Alternative. No seismic study of the area has been performed despite the fact that a fault runs down almost the entire length of Dripping's Spring Wash and the surrounding area is honeycombed with tailings sites. There is little or no information regarding springs and seeps that will be impacted the Skunk Camp Alternative even though TNF is fully

> Comment ID: 6030-9
> Response: ALT22

**Continued**

Appendix R

Michael Langley
*Re: Resolution Copper Consultations on CWA 404*
November 7, 2019
Page 4 of 4

aware that springs and seeps are viewed as sacred and culturally important to the Western Apache.

| | |
|---|---|
| Indeed, an examination of the Arizona Mining Reform Coalition, *et al.* comments regarding the DEIS and USACE's public notice set forth a host of reasons a 404 permit should not be issued at this time. The Tribe incorporates by reference as though fully set forth here the arguments made by the Coalition in its comments to TNF and the Corps of this date. | Comment ID: 6030-10 Response: MIT27 |
| The Tribe respectfully submits that a studied and careful inspection and analysis of the Skunk Camp Alternative is the law and is necessary for the protection of the public and the environment. The Tribe is looking forward to working with the Corps to ensure that this "Preferred" Alternative fully complies with the applicable laws and regulations. I close with an affirmation of our desire for early, direct, continuous, step-by-step and professional, government-to-government consultation with the Corps. Let us address soon how the Corps and the Tribe may engage in meaningful consultation. | Comment ID: 6030-13 Response: ALT 22 |

On behalf of the San Carlos Apache Tribe, thank you for the opportunity to offer these comments.

Sincerely,

SAN CARLOS APACHE TRIBE

Terry Rambler
Chairman

Cc: [list of recipients, largely illegible]

San Carlos Apache Tribe
Tao Elpeson Vice Chairman
San Carlos Council Members
Vernelda Grant, THPO
Dee Randall, Forest Manager, Forest Resources
A.B. Tso Sr., AG
Chente



Terry Rambler
Chairman

**SAN CARLOS APACHE TRIBE**
P.O. Box 0, San Carlos, Arizona 85550
Phone (928) 475-1600 ❖ Fax (928) 475-2567

Tao Elpeson
Vice-Chairman

COMMENT
ON
DRAFT ENVIRONMENTAL IMPACT STATEMENT FOR THE
RESOLUTION COPPER PROJECT AND LAND EXCHANGE

December 23, 2019

On behalf of the more than 16,800 members of the San Carlos Apache Tribe (Tribe) and the San Carlos Council (Council), the Tribe's governing body, thank you for the opportunity to comment on the Draft Environmental Impact Statement (DEIS) for the Resolution Copper Project and Land Exchange. Thank you also for extending the time in which the Tribe was allowed to present this comment on the DEIS.

The DEIS is required to evaluate the potential impacts associated with the Forest Service, Tonto National Forest's (Forest Service or TNF) approval of the modified General Plan of Operations (GPO) for mining of the Resolution Copper Mine (RCM) deposit and a legislatively mandated land exchange of Federal and private parcels in southeastern Arizona. In addition to analyzing the environmental impacts of the land exchange and mining operations, the Draft EIS analyzes five alternatives for a tailings storage facility (TSF), including "Alternative 6 — Skunk Camp," which is the Forest Service's preferred alternative and the site of RCM's proposed TSF.

| | |
|---|---|
| From our analysis, performed by staff and consultants that the Tribe retained for this purpose, we find that the DEIS fails to completely address the impacts or alternatives. For the following reasons, I respectfully request that the Forest Service reconsider the DEIS and work with the stakeholders in effect to either re-issue, or otherwise supplement the DEIS. | Comment ID: 30028-1 Response: NS1 |

Forest Supervisor Bosworth and Program Manager Rasmussen
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 2 of 45

The Tribe reserves the right to supplement this Comment as part of its ongoing consultation with the Forest Service.

### I. Introduction

In December 2014, Congress passed the Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015 (NDAA). Section 3003[1] of this law authorizes and directs the Secretary of Agriculture to administer an exchange which would convey 2,422 acres of Forest Service lands "in the area of the proposed mine to Resolution Copper in exchange for approximately 5,344 acres of private land on eight parcels located elsewhere in eastern Arizona."[2]

Section 3003 of the NDAA explicitly requires the Secretary of Agriculture to prepare an Environmental Impact Statement (EIS) prior to conveying the Federal land. Section 3003 also requires "[t]his EIS shall be used as the basis for all decisions under Federal law related to the proposed mine, the GPO, and any related major Federal actions, including the granting of permits, rights-of-way, or the approvals for construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities."[3]

The DEIS at issue here is the Forest Service's attempted compliance with Section 3003 and other Federal laws. The DEIS acknowledged the Forest Service's responsibility under Section 3003:

> Section 3003 of the NDAA explicitly requires the Secretary of Agriculture to prepare an EIS prior to conveying the Federal land. This EIS shall be used as the basis for all decisions under Federal law related to the proposed mine, the GPO, and any related major Federal actions, including the granting of permits, rights-of-way, or the approvals for construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities. Section 3003 of the NDAA requires this EIS to assess the effects of mining and related activities on such cultural and archaeological resources that may be located on the NFS lands conveyed to Resolution Copper, and identify measures that may be taken, to the extent practicable, to minimize potential adverse impacts on those resources, if any. The Secretary of Agriculture is further directed to engage in government-to-government consultation with affected Indian Tribes regarding issues of concern to the affected tribes related to the land exchange and, following such consultation, consult with Resolution Copper and seek to find

[1] See DEIS Appendix A.
[2] DEIS p. 3.
[3] Id

Forest Supervisor Bosworth and Program Manager Rasmussen
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 3 of 45

mutually acceptable measures to address affected tribes' concerns and "minimize the adverse effects on the affected Indian Tribes resulting from mining and related activities on the Federal land conveyed to Resolution Copper" (see 16 United States Code [U.S.C.] 539p(c)(3)).[4]

Section 3003 of the NDAA was the result of over a decade of defeats in Congress by proponents of the Land Exchange and their Congressional sponsors.[5] The successful opponents of the Land Exchange included a diverse group of Indian Tribes and organizations, environmental groups, recreational groups, academicians and religious organizations.[6] In response to these ten years of legislative defeats, the promoters of the Land Exchange added a rider, Section 3003, to the must pass 2015 NDAA appropriation bill. None of the traditional legislative safeguards, committee hearings, presentation of testimony, legislative debate and floor votes, were observed before Section 3003 was literally dropped into the NDAA. Plainly, Section 3003 had not seen the legislative light of day until it was added to the 2015 NDAA.

On March 18, 2016, Forest Service published a Notice of Intent (NOI) to prepare an EIS.[7] The Tribe filed a timely Scoping Comment with Forest Service.[8]

### II. Oak Flat And The Area Around It

The Federal land which is to be exchanged and the surrounding environs that make up the area of Resolution Copper mine and its various components lies approximately sixty miles east of Phoenix, Arizona.[9] The mine and its various components will have an estimated surface disturbance of over 6,900 acres or approximately 11 square miles.[10]

[4] DEIS p. 3.
[5] See generally Introduction, Attachment One, Land Exchange Legislative History.
[6] See generally Introduction, Attachment Two, Resolutions Opposing Land Exchange; Attachment Three, Correspondence Opposing Land Exchange.
[7] DEIS ES-3, ES-10. DEIS pp. 21, 715. Attachment Forest Service Notice of Intent to Prepare EIS.
[8] See Attachment, San Carlos Apache Tribe's Scoping Comment.
[9] DEIS ES-I-3; DEIS Figure ES-1; DEIS p. 2 Figure 1.1-1.
[10] DEIS pp. 3 & fn. 4. Visual, auditory and other disturbances, direct and indirect, extend the disturbances several thousand more acres.

Forest Supervisor Bosworth and Program Manager Rasmussen
Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange
December 23, 2019
Page 4 of 45

### A.    Tribal Stewardship

The affected tribes are the original owners and continuing stewards of the land being proposed for industrial commodification and of the great majority of the cultural resources being proposed for destruction.

> Comment ID: 30076-2
> Response: CR2

The DEIS fails to adequately describe the human environment associated with the Oak Flat Withdrawal Area and the region surrounding it. In particular, the DEIS fails to place the human environment in its cultural and historic context. The DEIS does not provide the cultural-historical framework needed by the Forest Service, other government agencies, and the public vital information necessary to understand the nature and magnitude of the impacts from the proposed mine and its various components to the affected tribes and their people.

The DEIS fails to adequately acknowledge and document the irrevocable damage posed by the RCM project to historical, cultural, spiritual, and emotional connections which the affected tribes will suffer. The DEIS fails to provide both the analyses of the proposed RCM project's impacts on affected tribes and the analyses of ways and means to mitigate the significant impacts.

> Comment ID: 30076-3
> Response: CR4

"Lip service" is the term that comes to mind when reading the DEIS's treatment of the RCM project's injuries to tribes. In section ES-1.3, the DEIS briefly acknowledges the controversy surrounding the proposed destruction of the Oak Flat sacred site and National Register Historic District. DEIS page ES-3 finds that "the expected significant environmental impacts and loss of the Oak Flat area, historically used by Native Americans who hold the land as sacred and see the area for spiritual and traditional uses."[11] The DEIS also lists some of the tribes' concerns, including "access routes, air, groundwater and surface water, plant and animal life, and landscapes, as well as less tangible attributes such as sense of place; sense of historical, spiritual, and tribal identity; opportunities for solitude; and opportunities to continue traditional cultural practices and ceremonies."[12] The DEIS recites mandates to analyze "how cumulative resource disturbance impacts tribal values and spiritual practices.... [and the] number of sacred springs or other discrete sacred sites that would be impacted, and potential effects on Native Americans from the desecration of land, springs, burials, and sacred site [and] Estimated acres of traditional resource collection areas that would be impacted."[13] But, these paltry references do not address the depth and breadth of the irreparable harms that tribes will suffer.

Even more to the point and despite NEPA's core mandate to document the human environment, the DEIS fails disclose the unassailable truth that the land and mineral wealth

> Continued →

---

[11] DEIS p. ES-3.
[12] DEIS pp. 24-25.
[13] DEIS p. 133.

> Footnotes associated with Comment ID 30076-3

---

Forest Supervisor Bosworth and Program Manager Rasmussen
Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange
December 23, 2019
Page 5 of 45

> ← Continued

proposed for transfer to RCM belonged to the affected tribes 150 years ago, and that these resources were taken by force and with the loss of many of our ancestors. The DEIS should have referenced and discussed essential facts, including at a minimum:

> Comment ID: 30076-4
> Response: CR2

- The proposed RCM impact area was under Native American control, and later claimed by Spain and Mexico until the 1848 treaty that ended the Mexican-American War (Spicer 1962).

- In the 1852 Treaty of Santa Fe[14] that followed the end of the U.S. war with Mexico, the U.S. Government formally recognized the domain of the Western and Chiricahua Apache Nations as extending from what would become central Arizona eastward to the Rio Grande. That Treaty obliged the Apaches to live exclusively under U.S. laws and jurisdiction and obligated the U.S. to "designate, settle, and adjust [the Apaches] territorial boundaries, and ... legislate and act as to secure the permanent prosperity and happiness of said Indians" (Kappler, 1904).

- Royce (1899: 922-923) on Map AZ 1, provides an authoritative depiction of the non-exclusive domain of Western and Chiricahos Apaches.[15] That map includes the RCM impact area within the Apache domain covered by the 1852 Treaty of Santa Fe.

- Despite the signed treaty and early cooperation between Apaches and the U.S. Government and the U.S. Government trust responsibilities for American Indians, various U.S. Government and Arizona Territorial Government policies and actions unlawfully abetted non-Indian encroachments onto the lands of Apaches and other Native American nations (Basso 1983; Ogle, 1970; Spicer 1962; Thrapp 1967).

- The U.S. Indian Claims Commission ("ICC") generally determined the boundaries of aboriginal lands of the affected tribes. Figure 1 below depicts the boundaries of aboriginal lands of the affected tribes.[16]

> Continued →

---

[14] See Attachment One, Tribal Stewardship.
[15] See Attachment Two, Tribal Stewardship.
[16] See Attachment Three, Tribal Stewardship.

> Footnotes associated with Comment ID 30076-4

---

Forest Supervisor Bosworth and Program Manager Rasmussen
Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange
December 23, 2019
Page 6 of 45

> ← Continued



Figure 1. Boundaries of affected Tribes' Aboriginal Territories

- Figure 2 below is a higher resolution depiction of the aboriginal lands in the vicinity of the RCM project impact area.[17] Figure 2 establishes that the DEIS proposed RCM project would have direct, indirect, and cumulative impacts on the aboriginal lands of Arizona's Apache, Yavapai, and Pima-O'odham tribes and nations.

---

[17] See Attachment Four, Tribal Stewardship.

> Continued →

---

Forest Supervisor Bosworth and Program Manager Rasmussen
Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange
December 23, 2019
Page 7 of 45

> ← Continued



Figure 2. Boundaries of affected Tribes' Aboriginal Territories overlapping with the RCM impact area

- In the early 1870s, Western Apaches relinquished millions of acres of their aboriginal lands in exchange for reduced acres on reservation lands and U.S. Government guarantees of protection and assistance (Welch, 2016, pp. 82-88). Two additional maps[18] attached to these comments depict the results of U.S. Government closures of several Apache reservations and severances of more than 2,000,000 acres from the White Mountain and San Carlos reservations from 1873-1902. These facts are specifically relevant to assessments of the human environment and tribal values and concerns for the RCM project impact area because the U.S. Government effectively donated these tracts of Apache Reservation lands to non-Apache miners, farmers, and ranchers for industrial uses. In the latter 1800s and early 1900s, and in the 2015 NDAA Section 3003, justice-driven governance was trumped by profit-driven promises by miners.

---

[18] See Attachments Five and Six, Tribal Stewardship.

> Continued →

---

Appendix R

---

**Forest Supervisor Bosworth and Program Manager Rasmussen**
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 8 of 45

Continued

- ICC Findings of Fact for Docket 22-D (Indian Claims Commission 1969) and Docket 22-E (Indian Claims Commission 1965) confirm the facts listed above and provide other court-confirmed facts directly relevant to the historical context of the human environment of the RCM impact area.

The authoritative compendium of historical and cultural facts provided by the U.S. Smithsonian Institution is directly relevant to the human environment impacted by the RCM project. (Ortiz 1983). Nevertheless, the DEIS ignored such authority. The DEIS ignored the above-cited facts. The DEIS has not meaningfully acknowledged, much less analyzed, the human environment or the impacts of this project in these essential terms.

Based on these facts and authorities, the DEIS should have provided the historical context for documenting the proposed RCM project impact area and for analyzing and assessing those impacts on cultural resources, tribal values, and tribal communities. [The DEIS should have embraced, and Forest Service remains legally obligated to embrace, the truth embedded in NDAA Section 3003, NHPA and NEPA. Namely, proponents of projects that propose to privatize and commodify public and former Indigenous lands and resources are obligated to compensate the public and tribal nations through context-sensitive recognitions, descriptions, and analyses of the people and historical dynamics that have invested the impacted area with their cultural and historical significance. The respectful recognition, description, and analysis of the Apaches' cultural resources, tribal values, tribal and tribal communities meaning and value to the human environment of the Apache and other Native American peoples.]

> Comment ID: 30078-5
> Response: CR7

**B.    Religious Significance of Chi'chil Bildagoteel**

The DEIS ignores the religious significance of Chi'chil Bildagoteel (Oak Flat) and its surrounding areas to the Tribe and Western Apaches.[18]

The Tribe has corresponded with the Forest Service and provided testimony to the U.S. Congress, regarding the preeminence of Oak Flat and its surrounding areas on our religious beliefs and values. Of all the concerns expressed by the Tribe, the impact of the proposed RCM project on the traditional religion and values of San Carlos Apache members is the most central and harmful, on a scale of cumulative effects so devastating that it cannot be completely described in English.

Despite all of the Tribe's careful, detailed documentation of the potential impacts on our people by the proposed mine project, and by extension, the Forest Service, have failed to sufficiently identify and discuss the profound religious significance of Oak Flat and

> Comment ID: 30078-5
> Response: CR4

---

[18] It is not the Tribe's intent to ignore our fellow Native Americans by not mentioning the other tribes with ties to the area impacted by the RCM project in this section. All of the tribes have important connections to this area. The San Carlos Apache, however, can only speak to our Western Apache religious values, beliefs and not to those of other tribes.

Continued

---

**Forest Supervisor Bosworth and Program Manager Rasmussen**
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 9 of 45

Continued

surrounding areas to San Carlos Apaches and our relatives within the Western Apaches. Chapters 3.12 (Cultural Resources) and 3.14 (Tribal Values and Concerns) of the DEIS, provides mere lip service to the terms "cultural" and "tribal values and concerns". The DEIS offers no serious or comprehensive explanation of the integral role that Oak Flat and its surroundings areas have on our traditional religion, now and for hundreds of years in the past. Worse, the Forest Service's approach is that the proposed mine is a *fait accompli* – that nothing can or will be done to address the immediate, irreparable and incalculable harms that will be permanently perpetrated upon the Tribe's traditional religion and values. All this without regard for federal government's statutory obligations or trust responsibility to Western Apaches and our Tribe.

Leaders of our Tribe have testified before Congress to express the religious and sacred significance of Oak Flat to our people. On November 1, 2007, former Chairman Wendsler Nosie, Sr. presented testimony on H.R. 3301, the 2007 iteration of the Land Exchange Act, before the U.S. House Natural Resources Committee, Subcommittee on National Parks, Forests and Public Lands.[19] Among other things, he described Oak Flat, Apache Leap, and Devil's Canyon as holy and sacred sites for San Carlos Apaches.

For as long as may be recalled, our [Apache] People have come together here. We gather the acorns and plants that these lands provide, which we use for ceremonies, medicinal purposes, and for other cultural reasons. We have lived throughout these lands, and the Apache People still come together at Oak Flats and Apache Leap to conduct religious ceremonies and to pray or take rest under the shade of the ancient oak trees that grow in the area. The importance of these lands has not changed. These are holy, sacred, and consecrated lands which remain central to our identity as Apache People.[20]

Our Tribe's leaders have testified before Congress on other occasions over the years always identifying the sacredness and sanctity of Oak Flat and the surrounding special places to our Western Apache People.[21] The eloquence of our Tribal Elders is poignant and is important for shedding light and understanding on the spiritual importance of places like Oak Flat.[22] The Memorandum to the Chairman, Vice-Chairman and Tribal Council on the subject of Sacred Sites in general and Oak Flat in particular signifies the singular import of sanctity and spirituality Chi'chil Bildagoteel.

---

[19]  See generally Attachment One, Religious Significance, Testimony of Former Chairman Nosie Nov. 1, 2007 pp. 1-2

[20]  *Id.*

[21]  See generally Attachment Two, Religious Significance, Testimony of Former Chairman Nosie June 17, 2009, Attachment Three, Religious Significance, Testimony of Chairman Rambler, Nov. 30, 2013.

[22]  See generally Attachment Four, Religious Significance, Elders Cultural Advisory Council's Memorandum To Chairman, Vice-Chairman, Tribal Council, December 14, 2011

Continued

---

**Forest Supervisor Bosworth and Program Manager Rasmussen**
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 10 of 45

Continued

There are many sacred and holy sites throughout our traditional lands, on and off the Reservation. These are natural places filled with power, and we go to them (or invoke them in our prayer) for a variety of reasons: for prayers and ceremonies, to get healing and ceremonial items, or for peace and personal cleansing. These places are best known by the families whose ancestors originate from the areas in which these sites are located. There are so many of these holy places that no one person knows them all. We usually best know about the sites from the area our family comes from.

*     *     *

Oak Flat is one of these sacred places. We call it Chich'il Bildagoteel. The ancestors of some of our Tribal members lived there, and passed their knowledge to their descendents who are alive today. The Oak Flat area and everything in it belongs to powerful Diyin who we respect. The people have always held dances and healing ceremonies, and gathered food, medicinal plants, and many other healing items there. To this day some of us go to some of the holy places within Oak Flat area for prayer and healing.[23]

The DEIS fails to provide any description of the traditional religious role that Oak Flat and its surrounding areas has for San Carlos Apaches in everyday life. The Forest Service is well aware of the traditional religious roles and values of Oak Flat and its surrounding areas. The DEIS should include a comprehensive, detailed description of the meaning and significance that Oak Flat represents to our Tribe and Western Apaches. This would be a simple sign of respect to our people. This is particularly vital given that this mining project will result in the Oak Flat Withdrawal Area, its environment, the plants and animals, its waters, and all the sacred places within being completely destroyed by the mine's subsidence resulting from the proposed block-cave mining method. The words "harm" and "destroyed" do not describe the sheer violence that will be perpetrated by this mine.

Most tragically, the living spiritual being of Oak Flat and its attendant Ga'an and Diyin will withhold their presence and healing services to Apaches. It will power our access to them, and remove a part of the very heart and soul of what it is to be an Apache. These are all facts to Apaches and the impacts on Apaches, our life, our culture, our soul – all remain undescribed by the DEIS. This very paragraph does not even begin to provide a description of the harm that would be perpetrated.

---

[24]  *Id.* pp. 1-2

---

**Forest Supervisor Bosworth and Program Manager Rasmussen**
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 11 of 45

Continued

**C.    Elements of Apache Traditional Religion On Ga'an and Diyin[25]**

> Comment ID: 30078-7
> Response: CR4

Apache religion is a highly ordered suite of patterned thoughts and actions grounded, like most of all religions, in precepts about the origin and development of the universe and the character and interrelations of objects and entities within it. (Basso 1983). The stark contrasts between Apache and Western metaphysical precepts help to explain the conflict over Chi'chil Bildagoteel (Oak Flat) and the proposed RCM project. Previous attempts on the part of US Federal and Arizona governments and industrial boosters to characterize Apaches as "primitive" and "savage" (see, for example, Legislature of the Territory of Arizona 1871) have been debunked as misguided racist fabrications. (see Welch 2016, 2017). In fact, despite centuries of oppression and persecution, Apaches have created and have maintained a vast and intricate mythology (Goodwin 1939), an extensive complex of elaborate and compelling prayers, chants, and rituals (Goodwin 1938; Basso 1970), a set of sophisticated theories of natural and supernatural causality (Basso 1970), and a vast and intricately named and storied landscape, one populated and animated by subtle and profound natural and supernatural entities and significances. (Basso 1996).

Traditional Apache religion makes unique and fundamental contributions to the development and sustenance of personal and collective identity and well-being. (Basso 1969, 1970, 1993). The persistent importance of traditional religious thought and practice among Apaches today and into their future as a unique Indigenous people cannot be overemphasized.

According to traditional Apache religious thought and practice, everything that exists is a manifestation of its specific form of life (*bi'th/na*). All plants, animals, minerals, waters, and the earth itself has *bi'th/na*, as do fire, wind, lightning, thunder, rainbows, and an extensive group of supernatural beings (Diyin) that are seldom seen by humans. All these forms of life are distinct and all are distinctively different from one another and from human life. All are intrinsically, though in varying degrees, "holy" or "sacred" (*godyih*). (Goodwin 1938; Basso 1970, 1983).

Because all life forms are *godyih* they possess their distinctive forms of sacred power (*diyi'*). Diyi' can be called upon via prayers and chants by religious practitioners who have received training and demonstrated respect for the natural world in general and the life forms possessing the required or desired *diyi'*. (Goodwin 1938; Basso 1970). Different powers are called upon for different reasons, for example, to afford protection from dangers, to heal specific illnesses, to facilitate success in particular endeavors, to celebrate female puberty, and for other purposes. (Goodwin 1938; Basso 1969, 1970, 1983).

The existence of *diyi'* is the fundamental rationale for Apache demonstrations of "respect" (*ikhldo'gh*). Failure to display deference and *ikhlgh* causes the *diyi'* to withhold benefits to supplicants. (Basso 1970, 1983). Respect may be shown through simple avoidance and mercy, by refraining from taking any life unless it is required to sustain oneself or one's kin, and by

---

[25]  The Source Materials for this section of the comment are in Attachment Five, Religious Significance.

Continued



Appendix R

---

**Forest Supervisor Bosworth and Program Manager Rasmussen**
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 12 of 45

◄— Continued

avoidance of causing any damage to the "home" (*goṣḥ'í*) of the *dʼyí.* For many Apaches and all practitioners of traditional Apache religion, active respect and avoidance of damage ensures stability and harmony. (Basso 1983).

Because they provide the *goṣḥ'í* (homes) of and for the *dʼyí* (sacred power) and *Diyin* (sacred beings), certain types of places – especially mountains, springs, unique landforms, and concentrations of what Westerners call biodiversity – are closely associated with holiness, sacredness. Forms of life with homes in these places are said to "belong" to that spring, mountain, or landform. Although a particular landform may itself possess great *dʼyí'*, as is certainly the case with Chʼchʼil Bildagoteel, it is the unique combination and integration of all associated *dʼyí'* and Diyin that defines its sacred significance.

Specific places have and transcendent importance in traditional Apache religion. Apaches have, on the basis of centuries of close observation, respectful uses, and spiritual exchanges with places, developed conceptions of places, place-related powers, and place-linked sacredness. Certain places are the only available host for specific ceremonies. Certain other places provide plant, animal, water, and mineral resources required for ceremonials. Other specific places command respect because of associations with important supernatural events or processes or because they are the resting places of deceased persons. (Goodwin 1938, 1939; Basso 1983). Chʼchʼil Bildagoteel is a sacred place for all of these reasons, a locality of unique and uniquely profound significance. If Oak Flat is destroyed then with it will be destroyed unique, centrally important, and irreplaceable aspects of traditional Apache religion.

Among the important implications of the facts that places are endowed with specific and often unique forms of sacred significance is that different places are not interchangeable for essential purposes in traditional Apache religion. Many spiritual and ritual observances cannot occur except in designated places. Particular plants, minerals, and animals required for specific ceremonials must be collected only at certain places. Particular sacred power must be invoked with prayers and chants that mention only the names of places that provide these *dʼyí'* and Diyin with homes. Because of these proscriptions the Apache landscape resonates with profoundly moral dimensions that sacred places symbolize and embody.

In light of the foregoing, it is understandable that damage to or destruction of sacred places, especially intentional destruction in pursuit of monetary gain or personal status enhancement, is regarded as repugnant and deeply immoral. One of Keith Basso's most knowledgeable and articulate Apache consultants, Nick Thompson, made this point in clear and compelling terms:

"If you hurt one of these holy places, it's very, very bad. You will hurt yourself and all your people if you do that. You must always show respect and take care of those holy places. Each one helps us in some way. We depend on them to help us live right, to live the way we should. So we leave them alone except when we

Continued ►

---

**Forest Supervisor Bosworth and Program Manager Rasmussen**
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 13 of 45

◄— Continued

really need them. We pray to them to help us. If we hurt them they would stop helping us – and we would only know trouble." (Basso field notes on file, White Mountain Apache Tribe Historic Preservation Office, Whiteriver, Az.)

Jacob Henry, an enrolled member of the White Mountain Apache Tribe and a Tribal Monitor employed by the Forest Service's Tribal Monitoring Program, agreed to speak to employees of the Tribe's Department of Justice (DOJ). Mr. Henry consented to provide the DOJ with an affidavit.[24] Mr. Henry described his work with the Tribal Monitoring Program.[25] Mr. Henry stated under oath that on two specific occasions at distinct locations he "had a sensation come over me, a sensation I had felt in church" and that other persons who were present also "had a very deep, personal, powerful, spiritual connection to a presence we could not see, but could feel."[26] He described feeling overwhelmed by the presence he felt.[27] Mr. Lyndon was one of the person who also had a deep, powerful, spiritual connection and was observed by Mr. Henry as weeping on the occasion.[28]

**III.  Consultation**

The Forest Service consultation processes and principles are subject to statute and regulations. Specifically, the Forest Service is required to undertake government-to-government (G2G) consultations pursuant to NEPA and its implementing regulations, under Section 3003(c)(3) NDAA, as well as by the following authorities: National Historic Preservation Act (NHPA) and its implementing regulations (36 CFR Part 800); the Forest Service Handbook 1509.13 Chapter 10, Consultation with Indian Tribes and Alaska Native Corporations; and, the U.S. Department of Agriculture's own Departmental Regulations (1340-007, Policies on American Indians and Alaska Natives, 1350-01, Tribal Consultation, and 1350-002, Tribal Consultation, Coordination and Collaboration). Furthermore, the Council on Environmental Quality (CEQ) regulations (Sections 1501.2(d)(1) and 1501.7(a)(1)) and policies require federal agencies to (1) contact Indian tribes early in the planning process and provide tribes opportunities to consult and participate in EIS preparation; (2) enable tribes to participate as cooperating agencies with federal agencies in NEPA reviews; and (3) "recognize the interrelated cultural,

[24] *See* Attachment Six, Religious Significance, Affidavit of Jacob Henry.
[25] *Id.* ¶¶ 7, 8, 12, 16 -18.
[26] *Id.* ¶¶ 20-21, 23.
[27] *Id.* ¶ 23.
[28] *Id.* ¶ 20.

Footnotes associated with Comment ID: 30078-7

---

**Forest Supervisor Bosworth and Program Manager Rasmussen**
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 14 of 45

social, occupational, historical, or economic factors that may amplify the natural and physical environmental effects of the proposed agency action."[31]

The Forest Service has failed to consult with tribes in the manner prescribed by NEPA, NHPA, and NDAA Section 3003(c)(3).[32] Contrary to the assertions made by Forest Service that a three-track approach is appropriate, the consultation process required by the NDAA § 3003(c)(3) envisions an interconnected consultation process with the affected tribes. Consultation with Tribes must comply with the NHPA and NEPA. The Forest Service is required to engage in government-to-government consultation with Indian Tribes.[33]

| | Comment ID: 30078-8 Response: CR12_B |
| --- | --- |

The Forest Service failure to consult is a matter of record, not opinion. The DEIS fails to reflect the results of previous consultations with the Tribe because it effectively has ignored virtually every concern and request conveyed in our July 2016 scoping comments. The DEIS also fails in numerous ways to support consultation efforts. The DEIS ignores the interrelations between the sociocultural and biophysical impacts of the proposed RCM. The Programmatic Agreement (PA) included in the DEIS (version 5) completely discounted and disregarded the Tribe's comments on the prior draft.

In the spring of 2016, after many months of deliberations to create a mutually acceptable memorandum of understanding between the Tribe and Forest Service to guide consultations pursuant to NDAA 3003 (c)(3) and related authorities, Forest Service eviscerated the previously agreed upon draft MOU.

The DEIS points to the Forest Service's consultation efforts made pursuant to NHPA Section 106 as a showing that it has met its burden for consultation.  Yet, this effort ignores all of the other RCM specific mandates in NDAA Section 3003(c)(3). The Forest Service has, in effect, put all its consultation "eggs" in a NHPA "basket" – an arbitrary, capricious, and poorly executed decision.

| | Comment ID: 30078-9 Response: CR8 |
| --- | --- |

The NHPA requires federal agencies to consider the effects of their undertakings on historic properties.  36 CFR § 800.16(l) defines consultation as "the process of seeking, discussing, and considering the views of other participants, and, where feasible, seeking agreement with them regarding matters arising in the Section 106 process." NHPA's Section 106 regulations (36 CFR Part 800) require agency consultations through the multiple steps in the Section 106 process with any Indian tribe that attaches religious and cultural significance to historic properties that may be affected by the agency's undertakings. However, and as noted in  Continued ►

[31] Environmental Justice Guidance Under the National Environmental Policy Act, p. 9 available at https://ceq.doe.gov/docs/ceq-regulations-and-guidance/ej/justice.pdf, last viewed December 17, 2019.
[32] The Tribe incorporates by reference the ITAA Comment Nov. 7, 2019, pp 3, 30-34 and AMRC Comment Nov. 7, 2019, pp. 105-126.
[33] 36 C.F.R. § 219.4(a)(2).

Footnotes associated with Comment ID 30078-8

---

**Forest Supervisor Bosworth and Program Manager Rasmussen**
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 15 of 45

◄— Continued

our September 30, 2019 letter to Supervisor Bosworth, Forest Service has failed to follow the guidance and steps prescribed within the Section 106 consultation process. The Forest Service failed to pursue government-to-government consultations essential to the Section 106 steps and determinations, especially the consultations required to make a "reasonable and good faith effort to carry out appropriate identification efforts" to find and document historic properties[34]; to evaluate the significance and determine the eligibility of identified historic properties[35]; to assess the adverse effects of the proposed mine and land exchange on historic properties[36]; and to resolve adverse effects.[37]

Our early efforts to forge a Memoranda of Understanding specifically addressing government-to-government consultation in compliance with NDAA Section 3003(c)(3) begins in March of 2016 and collapsed in January of 2017. My letter to the Forest Service of January 17, 2017, recites events and positions.[38] Forest Service personnel which sadly foreshadowed events which are occurring today.[39] It is perhaps because the Forest Service has maintained an attitude that the Land Exchange is a foregone conclusion regardless of the recklessness of proceeding with the RCM project that such an off-hand and casual approach has been taken toward consultation with the Tribe.

The Tribe has repeatedly corresponded with the Forest Service regarding the deficiencies in the consultation process.[40] The correspondence in Attachment Two of this section reflect only a portion of the writings between us which reflect a lack of meaningful consultation.  The most recent special Council meeting hosted by the Tribe clearly failed to qualify as meaningful consultation.[41] The Forest Service has expressly communicated to our Tribe during the special Council meeting that the Forest Service has no decision-making authority with respect to the proposed RCM mining project, meaning that the agency cannot deny the Land Exchange as an alternative under the DEIS.[42] Several questions went unanswered during the Council meeting and Forest Service did not have the personnel who could respond to questions regarding the PA.

Continued ►

| | Comment ID: 30078-10 Response: CR12 |
| --- | --- |

[34] 36 CFR § 800.4(b).
[35] 36 CFR § 800.4(c).
[36] 36 CFR § 800.5.
[37] 36 CFR § 800.6.

Footnotes associated with Comment ID 30078-9

[38] *See* Attachment One, Government-to-Government Consultation with Tribe.
[39] *See* Attachment Two, Government-to-Government Consultation with Tribe.
[40] *See* Attachment Three, Government-to-Government Consultation with Tribe.
[41] *Id.* p.7.

Footnotes associated with Comment ID: 30078-10

Appendix R

---

**Forest Supervisor Bosworth and Program Manager Rasmussen**
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 16 of 45

_____

[Continued] Cultural resource issues and concerns are explicitly recognized in the NDAA.[42] Our Tribe has clearly established that the Forest Service has failed to comply with the NHPA and Section 3003(c)(3)(A). The Tribe has a number of issues of concern listed in the Tribe's Scoping Statement and raised here which the Forest Service has failed to enter into any consultation process as mandated by Section 3003(c)(3). Even if the Forest Service were capable of PA which satisfied the NHPA and its regulations, Forest Service would not have complied with its consultation obligations with tribes under the NDAA.

**IV.   The Current DEIS Stands Deficient and To Comply With NEPA, the Forest Service Must Prepare a DEIS Which Is Meaningfully Analytical and Subject To Public Review**

**A.   Introduction**

NEPA § 102(2)(C)(iii) requires that an EIS include a "detailed statement" discussing the reasonably foreseeable environmental impact both of the proposed federal action and of any feasible alternatives. The DEIS presented here does not include a "detailed statement" of reasonably foreseeable environmental impacts. 40 C.F.R. § 1502.24 requires agencies to "insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements." The DEIS fails in several respects.

Under NEPA, an EIS is required for "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(c); *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 640 (9th Cir. 2014). "A properly prepared EIS ensures that federal agencies have sufficiently detailed information to decide whether to proceed with an action in light of potential environmental consequences, and it provides the public with information on the environmental impact of a proposed action and encourages public participation in the development of that information." *Oregon Envtl. Council v. Kunzman*, 817 F.2d 484, 492 (9th Cir. 1987).

"In assessing the adequacy of an EIS, [the court] employ[s] a 'rule of reason' test to determine whether the EIS contains a 'reasonably thorough discussion of the significant aspects of probable environmental consequences.'" *Halls Canyon Alliance v. U.S. Forest Serv.*, 227 F.3d 1170, 1177 (9th Cir. 2000). "Under this standard, [the court's] task is to ensure that the [agency] took a 'hard look' at these consequences." *Id.* "The reviewing court may not 'fly-speck' an EIS ... or 'substitute its judgment for that of the agency concerning the wisdom or prudence of a proposed action.'" *Half Moon Bay Fishermans' Ass'n v. Carlucci*, 857 F.2d 505, 508 (9th Cir. 1988), "If the agency has taken a 'hard look' at a decision's environmental consequences, the decision must not be disturbed." *Half Moon Bay*, 859 F.2d at 508 (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21 (1976)).

_____

[42] NDAA Section 3003(c)(3)(A).  [Comment ID: 30078-10]

---

**Forest Supervisor Bosworth and Program Manager Rasmussen**
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 18 of 45

_____

[Continued] RFRA's definition of "exercise of religion" was amended by the Religious Land Use and Institutionalized Persons Act (Pub. L. 106-274, 42 U.S.C. § 2000cc et seq) ("RLUIPA").[45] RLUIPA states, "[t]he term 'religious exercise' includes *any exercise of religion*, whether or not compelled by, or central to, a system of religious belief."[47] To qualify for RFRA's protection, an asserted religious belief must be sincere.[48]

The "exercise of religion" involves "not only belief and profession but the performance of (or abstention from) physical acts" that are "engaged in for religious reasons."[49] Practices that are compelled or limited by the tenets of a religious doctrine fall comfortably within RLUIPA's definition.[50] Courts have considered important writings, gathering places, and ceremonies and rituals as practices of religion for purposes of identifying the exercise of religion.[51]

With respect to important writings, "most religions embrace seminal, elemental, fundamental, or sacred writings. These writings often include creeds, tenets, precepts, parables, commandments, prayers, scriptures, catechisms, chants, rites, or mantras."[52] As to gathering places, "many religions designate particular structures or places as sacred, holy, or significant. These sites often serve as gather places for believers. They include physical structures, such as churches, mosques, temples, pyramids, synagogues, or shrines; *and natural places, such as springs, rivers, forests, plains, or mountains.*"[53] Additionally, "most religions include some form of ceremony, ritual, liturgy, sacrament, or protocol. These acts, statements, and movements are prescribed by the religion and are imbued with transcendent significance."[54]

_____

[45] *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 696, 134 S.Ct. 2751, 2761 (2014) ("Congress mandated that this concern 'be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution.'")

[47] 42 U.S.C. § 2000cc-5(7)(A) (emphasis added). Congress mandated this exercise of religion "*be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution.*" § 2000cc-3(g) (emphasis added)

[48] *Hobby Lobby*, 573 U.S. at 717.

[49] *Employment Division v. Smith*, 494 U.S. 872, 877, 110 S.Ct. 1595, 1599 (1990)

[50] *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 700, 134 S.Ct. 2751, 2762 (2014).

[51] *U.S. v. Meyers*, 95 F.3d 1475, 1483 (10th Cir. 1996) (discussing the factors that assist courts identify religion). *See also Africa v. Com. of Pa.*, 662 F.2d 1025 (3rd Cir. 1981)

[52] *Meyers*, 95 F.3d at 1483.

[53] *Id.* (emphasis added)

[54] *Id.*

[Footnotes associated with Comment ID: 30078-11]

---

**Forest Supervisor Bosworth and Program Manager Rasmussen**
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 17 of 45

_____

Here, the Forest Service has decidedly *not* taken a "hard look" at a number of empirical and scientific analyses, monitoring and mitigation measures, and cumulative impact analyses. The Tribe will not engage in unnecessary discussion of the DEIS's failures and will instead incorporate by reference the comments of ITAA and AMRC pursuant to Section 36 C.F.R. § 218.8. The Tribe hereby adopts and incorporates in full ITAA's and AMRC's Comments and Exhibits/Appendices, having submitted them by bad delivery on a separate electronic media drive. Generally, the Tribe may only add a few comments made by ITAA and AMRC, and will otherwise discuss the following deficiencies of the DEIS: namely, failure to consider the application of certain laws; water quantity and quality issues; flawed water modeling; lack of alternative mining technique analysis; and inadequate subsidence analysis by the Forest Service.

**B.   Forest Service Failed to Analyze Whether the Religious Freedom Restoration Act and the American Indian Religious Freedom Act Applied**

The Forest Service has expressly communicated to the Tribe that the agency has no decision-making authority with respect to the proposed Land Exchange, that the agency cannot deny the land exchange as an alternative under the DEIS. The Forest Service's reasoning is that location 3003 of the NDAA mandates the transfer and exchange of Oak Flat to RCM within 90 days of publication of the FEIS. However, the Forest Service is not relieved of its duty to analyze whether federal laws that protect religious liberty of all Americans, including San Carlos Apaches. The Forest Service made no such analysis in the DEIS.   [Comment ID: 30078-11 Response: CR16]

In 1993, Congress passed the Religious Freedom Restoration Act (Pub. L. No. 103-141, 107 Stat. 1488, 42 U.S.C. § 2000bb et. seq.) ("RFRA"), and confirmed that "the exercise of religion ... is an unalienable right, secured in protection in the First Amendment to the Constitution."[44] As an agency of the United States, Forest Service is obligated to carry-out the provisions of RFRA, as the RCM project will impact the religion of San Carlos Apaches.

Under RFRA, "government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person (1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of further that compelling governmental interest.[45]

_____

[43] 42 U.S.C. § 2000bb(a)(1)

[44] "The term government includes a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, or of a covered entity." 42 U.S.C. § 2000bb-2.

[45] *Id.* at § 2000bb-1(a)(1)(2).

[Footnotes associated with Comment ID: 30078-11]

---

**Forest Supervisor Bosworth and Program Manager Rasmussen**
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 19 of 45

_____

[Continued] The significance of Oak Flat and the documented cultural sites, songs, prayers, spiritual beings, and ceremonial sites confirms that Oak Flat holds significant religious meaning to San Carlos Apaches, thus illustrating the sincere and central religious principles of San Carlos Apaches. Such religious practices, as confirmed by the Ethno Study, has been well-documented as a practice of Apaches for hundreds of years. Today, Apache People will come together at Oak Flat and Apache Leap to conduct religious ceremonies and to pray, a ritual that stems from the ancestors of Apaches, which are holy and sacred, and remain central to the identity of Apache People. There are writings on the rocks at Oak Flat along with human remains and burials of materials and items of Apache Crown Dancers, the most powerful, spiritual protector of Apaches.

Young Apache girls who reach woman-hood go to Oak Flat to have their traditional Apache Sunrise Dance ceremony, a rite that entails the family of the young girl selecting a man and woman from the Apache community to serve as traditional god-parents to young Apache girl. This ritual entails the ceremony being performed for four-days, a number sacred to Apaches but also includes weeks of labor to put a traditional campsite together. This has been performed at Oak Flat since time immemorial. These young girls, as they progress in age and become wiser, always return to Oak Flat. That's the Apache way to be subject to irreparable harm that would derive, imposing severe consequences of Apache religion of Oak Flat, as a result of block-caving mining.

A government action that puts a religious practitioner to the choice of engaging in conduct that seriously violations his/her religious beliefs or facing serious consequences constitute a substantial burden for purposes of RFRA.[55] "Certain aspects of religious exercise cannot, in any way, be restricted or burdened by either federal or state legislation."[56] The freedom to hold religious beliefs and opinions is absolute.[56]

No greater burden exists than the harm that will result on Apache religion as a result of Oak Flat being destroyed due to the proposed block-cave mining method, causing Oak Flat to subside and forcing San Carlos Apaches to violate the tenets of their religion. The testimony presented by the San Carlos Apache Tribe explains the central role that Oak Flat has with the religion of San Carlos Apaches and how there is no other site that Apaches can go to practice certain ceremonies, songs, and rituals only available at Oak Flat.

When determining whether a substantial burden on the exercise of religion is in unhearance of a compelling governmental interest, the court must look beyond broadly formulated interests and scrutinize the asserted harm of granting specific exceptions to particular religious

_____

[55] *Equal Employment Opportunity Commission, B.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 587 (6th Cir. 2018).

[56] *Butts/Butts Branch*, 366 U.S. 599, 603, 81 S.Ct. 1144, 1146 (1961)

[56] *Cantwell v. State of Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 903 (1940), *Reynolds v. United States*, 98 U.S. 145, 166, 25 L.Ed. 244 (1878)

[Footnotes associated with Comment ID: 30078-11]

(26 of 300), Page 26 of 300 Case: 25-5197, 09/29/2025, DktEntry: 61.12, Page 26 of 300
Case 2:21-cv-00068-DWL Document 109-2 Filed 07/14/25 Page 24 of 565

Appendix R

Forest Supervisor Bosworth and Program Manager Rasmussen
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 20 of 45

← Continued

claimants.[58] RFRA contemplates a "more focused inquiry."[59] It "requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened.[60] This requires courts to "loo[k] beyond broadly formulated interests" and to "scrutiniz[e] the asserted harm of granting specific exemptions to particular religious claimants"— in other words, to look to the marginal interest.[61]

The Forest Service does not have a compelling government interest in developing and operating a copper mine. Rather the Forest Service is facilitating following the law it is required to perform. It would be irrational to argue that the Forest Service, a federal land management agency would be compelled to develop and operate a mine which will destroy the very land it is tasked to manage.

The least restrictive means standard is exceptionally demanding, which requires the governments to show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party.[62] "[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it."[63] This standard has no application because the Forest Service has no compelling government interest.

**C.    Forest Service Must Comply with International Legal Standards**

The Tribe reminds the Forest Service that it must comply with international standards with respect to evaluation the proposed mining project at Oak Flat. International law protects the right of Native American religious practitioners to maintain and practice their religious traditions in relation to sacred areas.[64] Among the principle sources of international law are treaties entered into by independent States. International treaties are part of federal law, inasmuch as the United States Constitution, Article VI, Section 2, provides that treaties made under the authority of the United States are the "supreme law of the land," and binding on the "Judges in every state."[65]

<span>Comment ID: 30078-12 Response: CR16</span>

<span>Continued →</span>

[58] *Burwell*, 573 U.S. at 726-27.

[59] *Id.*

[60] *Id.*, quoting *Gonzalez v. O Centro*, 546 U.S. 418, 431 (2006).

[61] *Burwell* at 722.

[62] *Id.* at 728.

[63] *United States v. Playboy Entertainn Group, Inc.*, 529 U.S. 803, 815, 120 S.Ct. 1878 (2015).

<span>Footnotes associated with Comment ID: 30078-11</span>

[64] The Tribe is required to advance the argument in this section if the Tribe should ever decide that it wishes to seek any form of relief in an international forum.

[65] U.S. CONST. art VI, § 2.

<span>Footnotes associated with Comment ID: 30078-12</span>

---

Forest Supervisor Bosworth and Program Manager Rasmussen
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 21 of 45

← Continued

Moreover, the United States Supreme Court has noted that "[i]nternational law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction."[66]

The international treaties that are particularly relevant here are the International Covenant on Civil and Political Rights[67] and the International Convention on the Elimination of All Forms of Racial Discrimination.[68] The United States ratified the Covenant in 1992[69] and the Convention two years later in 1994.

The right to practice or manifest religion or belief is protected under Article 18(1) of the International Covenant on Civil and Political Rights, which states that "[e]veryone shall have the right to freedom of thought, conscience and religion [which includes] freedom...either individually or in community with others and in public or private, to manifest his religion or belief in worship, observance, practice and teaching."[70] In addition, Article 27 of the Covenant, which is of relevance to indigenous peoples, gives special consideration to the rights of minorities whose cultural and religious traditions differ from those of the majority.[71] Article 27 states, "Persons belonging to minorities shall not be denied the right, in community with the other members of their group, to enjoy their own culture, to profess and practise their own religion."[72]

Besides the Covenant, Article 5 of the International Convention on the Elimination of All Forms of Racial Discrimination provides that State parties are to "guarantee the right of everyone...to equality before the law, notably in the enjoyment of...[t]he right to freedom of thought, conscience and religion.[73] In interpreting and applying this Convention, the Committee on the Elimination of Racial Discrimination ("the Committee"), which monitors compliance with the treaty, has observed the need to take into account the particular characteristics of diverse groups in order to achieve effective equality in enjoyment of their human rights.[74] The Committee

<span>Continued →</span>

[66] *The Paquete Habana*, 175 U.S. 677, 700 (1900).

[67] International Covenant on Civil and Political Rights, Dec. 16, 1966, S. Treaty Doc. No. 95-20, 6 I.L.M. 368 (1967) 999 U.N.T.S. 171 ("ICCPR").

[68] International Convention on the Elimination of All Forms of Racial Discrimination, Mar. 7, 1966, 660 U.N.T.S. 195 ("ICERD").

[69] Entered into force Mar. 23, 1976 and ratified by the United States Sept. 8, 1992.

[70] Article 18(1) of ICCPR.

[71] *Id.* at Article 27.

[72] *Id.*

[73] Article 5 of ICERD.

[74] CERD General Recommendation 32: Special Measures, para. 8.

<span>Footnotes associated with Comment ID: 30078-12</span>

---

Forest Supervisor Bosworth and Program Manager Rasmussen
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 22 of 45

← Continued

has noted the distinctive characteristics of indigenous peoples in particular, in light of their histories and cultures, and has called upon States to take specific measures to protect their rights, including measures to "[e]nsure that indigenous communities can exercise their rights to practise and revitalize their cultural traditions and customs."[75]

**D.    The Forest Service Wrongly Analyzed a Number of Water Resource Issues.**

**1.    Water Resources Issues**

The RCM DEIS provides an inadequate evaluation of cumulative impacts on water resources in a region already experiencing shortages. The Arizona Department of Water Resources modeled the Pinal County water supply over a 100-year period, and shows an 8.1 million acre foot ("af") deficit, one that does not include the RCM requirement of over 600,000 af over the 40-year life of the mine. That is enough water for 168,000 homes over 40 years. The Forest Service has not taken into account the effect of RCM's water demand on the region or the Tonto National Forest itself. In effect, once mining commences, the region's water supply will be immediately and irreparably compromised.

<span>Comment ID: 30078-13 Response: WF4.A</span>



Fig. 1 – RCM Pre-impacts

[73] CERD's General Recommendation, CERD C/51/Misc.13/Rev.4, para. 4(d)(e).

<span>Footnote associated with Comment ID: 30078-12</span>

---

Forest Supervisor Bosworth and Program Manager Rasmussen
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 23 of 45

← Continued

The scale of the RCM project forms the very definition of an irreparable harm. Even Resolution Copper cannot stop this process once it is begun. Once the 1.8-mile wide collapse crater forms, the Apache Leap Tuff Aquifer, which supplies the Town of Superior and the Queen Creek community, will be altered forever, irreversibly and permanently altering the region's water resources.

As stated in the DEIS, "The deep groundwater system is being and would continue to be actively dewatered, and once block-caving begins the Apache Leap Tuff would begin to dewater as well."[76]

<span>Comment ID: 30078-14 Response: WF42</span>



Fig. 2 – Impacts of RCM Operation

[76] (DEIS, at 296-299.)

Appendix R

---

**Forest Supervisor Bosworth and Program Manager Rasmussen**
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 24 of 45

The DEIS analysis of past, present and reasonably foreseeable future regional water impacts is entirely inadequate, even though the Forest Service acknowledges that "groundwater demand is substantial and growing" and "total demand on the groundwater resources in the East Salt River Valley is substantial and could be greater than the estimated amount of physically available groundwater."[77] The DEIS does not take a realistic look at the consequences of RCM's plan to pump 180 billion gallons of water from the aquifer in the East Salt River Valley.[78]

*(Intentionally Blank)*

> Comment ID: 30078-15
> Response: WT4

[77] DEIS, at 342.

[78] 550,000 af, as cited in DEIS Table 2.2-1 for Alternative 6, equals approximately 179 billion gallons, although we note that the Mining Plan of Operations and other RCM documents referenced as much as 640,000 af over the 40-year life of the mine.

> Footnotes associated with Comment ID. 30078-15

---

**Forest Supervisor Bosworth and Program Manager Rasmussen**
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 26 of 45

place the Tribe's own water resources at risk due to inexorable and unmet demand and dwindling supply.

> Comment ID: 30078-17
> Response: WT4

Colorado and other parts of the desert Southwest remain in an almost perpetual drought. The Drought Monitor map for December 2019,[80] and shows the long-term and short-term drought conditions in and around the project area and across much of the Colorado River Basin.

> Comment ID: 30078-18
> Response: WT4

A 2017 Report to Congress further noted that the Colorado River (the source of critical water supplies to Arizona via the Central Arizona Project or "CAP") has experienced generally low-or-than-normal flows for the past 16 years, with the lowest annual flows in the last 900 years.[81] The Report to Congress also noted that recent studies on the effects of climate change suggest that "a transition to a more arid average climate in the Americas West" may be under way.[82] Likely consequences of climate change include higher temperatures in the West, higher evapotranspiration, reduced precipitation, and decreased spring runoff.

The DEIS further fails to evaluate "reasonably foreseeable future" Colorado River shortages and cuts, as well as the events that will be triggered under the Drought Contingency Plan once shortages occur. It also fails to look at the project's impact on regional water resources when combined with these shortages.

Resolution Copper Mine will obviously require a vast amount of water in a region of the country that is already experiencing water shortages. Arizona water law grants exceptional leeway to mines, which are essentially unregulated water users. As such, RCM may be entitled to develop a virtually unlimited number of wells and pump an unlimited amount of water from the Desert Wellfield.

The Forest Service has incorrectly concluded that because of this water right, it is relieved of considering impacts that would arise from the exercising of this right. This approach is not sufficient under NEPA and does not satisfy the requirement under NEPA to take a "hard look" at environmental impacts:

In a cumulative impact analysis, an agency must take a "hard look" at all actions. An EA's analysis of cumulative impacts "must give a sufficiently detailed catalogue of past, present, and future projects, and provide adequate analysis about how these projects, and differences between the projects, are thought to have impacted the environment." *Lands Council*, 395 F.3d at 1028. "General

> Continued

[80] Buhle, Deborah, U.S. Drought Monitor, National Drought Mitigation Center, December 3, 2019. https://droughtmonitor.unl.edu.

[81] Congressional Research Office, November 9, 2017, Drought in the United States: Causes and Current Understanding, at 14-15.

[82] *Id.*

> Footnotes associated with Comment ID. 30078-18

---

**Forest Supervisor Bosworth and Program Manager Rasmussen**
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 25 of 45

Tens of thousands of people in Pinal County rely on groundwater for their water supply and already, private wells are drying up.[79] As shown on Figure 3, the Forest Service's own

> Comment ID: 30078-16
> Response: WT4



*Fig. 3. USDA 100-year moisture index, showing much of Arizona has a moisture deficit, even when averaged over 100 years. Source, USDA, 2012, Forest Health Monitoring: National Status, Trends and*

research shows that Arizona has experienced moisture deficits even when averaged over the last 100 years.

The Tribe has deep concerns about allowing Resolution Copper to overdraw groundwater resources in Pinal County. One of the only remaining groundwater resources accessible to users in Pinal County is in the Tribe's Cutter Basin. The United States has a long and troubled history of reallocating resources promised to tribes when demand is high and off-reservation supplies are low. The Tribe fears that allowing Resolution Copper to withdraw billions of gallons of groundwater will create a decades-long regional water imbalance. This imbalance, in turn, will

> Continued

[79] ABC15 News, Private Wells Running Dry in Pinal County, Oct. 24, 2019, available at: https://www.abc15.com/news/region-central-southern-az/private-wells-running-dry-in-pinal-county.

> Footnote associated with Comment ID. 30078-16

---

statements about 'possible effects' and 'some risk' do not constitute a 'hard look' absent a justification regarding why no more definitive information could be provided.' *Neighbors of Cuddy Mountain*, 137 F.3d at 1380. "Some quantified or detailed information is required. Without such information, neither the courts nor the public . . . can be assured that the [agency] provided the hard look that it is required to provide."

> Comment ID: 30078-19
> Response: WT4_H

*Te-Moak Tribe of Western Shoshone v. Dept. of Interior*, 608 F.3d 592, 603 (9th Cir. 2010).

Cumulative impacts are defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such actions."[83] One of the greatest contributions the Forest Service *could have made* to this process—but did not—would have been to conduct a thorough analysis on cumulative impacts of Resolution's plan to pump 180 billion gallons of water from the aquifer in the East Salt River Valley.

**2. Improper Definition of Baseline Conditions**

In order to construct the deep mine infrastructure, RCM has been dewatering the deep aquifer by pumping groundwater from the East Plant Site since 2009. Over the last five years, the average pumping rate has been approximately 639 gallons per minute,[84] which corresponds to 326 million gallons per year, or 1,000 acre-feet per year. During peak operation of the mine, pumping would increase to 3,992 acre-feet per year (DEIS, Appendix H), or between 160,000 acre-feet over 51 years to provide access to the expanded deep mine workings.[85] Resolution's total, actual water demand is unclear (see below), but the DEIS estimates a total of 621,000 acre-feet of water over the life of the mine. Changes in the aquifer due to mine dewatering (and due to unusual block caving and land subsidence) could affect seeps, springs, flowing streams and riparian areas.[86]

> Comment ID: 30078-20
> Response: NEPA19

The analysis of impacts on water supply and groundwater dependent ecosystems ("GDEs") in the DEIS is flawed because it discounts most of the impacts of mine dewatering. Since 2009, Resolution has engaged in a large dewatering project to facilitate construction of Shaft 10 and allow future development of the deep workings for this mine. This has led to a

> Continued

[83] 40 CFR §1508.7.

[84] WSP, Resolution Copper Groundwater Flow Model Report, p. 5.

> Footnote associated with Comment ID. 30078-19

[85] Westlake Resources, Resolution Copper Water Balance, Tailings Alternatives, Table 5, 2018.

[86] DEIS, at 295.

> Footnotes associated with Comment ID. 30078-20

Appendix R

**Forest Supervisor Bosworth and Program Manager Rasmussen**
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 28 of 45

← Continued

decline in water levels in the deep bedrock aquifer of more than 2,000 feet, as documented in nearby monitoring wells.[57]

Due in part to the fact that the pumping is being conducted legally (i.e., Resolution has a permit for this pumping), the Forest Service has classified this past and current dewatering as a baseline condition that is not considered in the DEIS toward environmental consequences.[58] This decision defies common sense and is improper under NEPA. The only purpose of the dewatering in question is to facilitate future mining. However, an even more egregious decision than not counting the pumping that has already taken place is the decision not to count the "baseline" pumping rate even after the mine becomes operational. During the life of the mine, all groundwater pumping that is necessary to conduct deep mining must be considered part of the project.

The decision to classify mine dewatering as a "baseline" condition is buried in the groundwater modeling technical reports. It is summarized briefly here. In support of the DEIS, two versions of the groundwater model were run. The first run was the "No-Action" alternative which is a misnomer, because this scenario inexplicably incorporates components of the mining operation. In particular, the "No Action" alternative assumes that the mine would not be developed or operated but that mine dewatering would continue anyway for 51 years – the presumed life of the non-existent mine.

The second modeling run seeks to simulate the proposed action, which incorporates some additional dewatering to maintain the expanded project infrastructure of full-scale mining as well as the hydrogeological effects of the collapse crater.[59] Impacts are defined as the difference in groundwater drawdown between these two modeling scenarios.[60] However, impacts from development of the mine only count as impacts if they are greater than the baseline impacts. In other words, impacts to water supply and groundwater dependent ecosystems (GDEs) due to the substantial current dewatering program are not considered. In addition, for every year over the entire life of the mine, the current level of dewatering is subtracted from predicted future pumping, grossly under-reporting the amount of dewatering that will actually occur. This means that under the proposed action, much of the groundwater pumping at the mine location (even during mine operation) is not considered to be part of the project.

There may be a logical rationale for excluding the pre-mine dewatering (we do not agree with this rationale, but there may be one) but surely, during the life of the mine, the pumping of

[57] DEIS, at 312.

[58] Garrett, April 11, 2018, Process Memorandum to File, Selection of Appropriate Baseline Conditions for NEPA Analysis, at 4.

[59] DEIS, at 303.

[60] Garrett, at 5; DEIS, at 66).

| Comment ID: 30078-21 Response: NEPA19 |
| --- |

| Footnotes associated with Comment ID: 30078-21 |
| --- |

---

**Forest Supervisor Bosworth and Program Manager Rasmussen**
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 29 of 45

← Continued

thousands of acre feet of water to allow mining operations (and for no other purpose) must be considered a component of the overall project.

As shown in Figure 3, after 51 years of "No-Action," up to 500 feet of drawdown is predicted under Superior and impacts of 10 feet or more of drawdown extend over an area encompassing approximately 50 square miles. This decision explains why hydrogeological impacts of the so-called "No-Action" alternative can be quite substantial. For example, under the "No-Action" alternative, the groundwater model predicts a lowering of the water table at Bored Spring (located on the west side of Apache Leap) by nearly 100 feet. The degree of impact will almost certainly dry out Bored Spring, but it does not count as a project impact because of the Forest Service's improper definition of "baseline." Such effects do not count because they accrue under the "No-Action" alternative even though virtually 100% of the cause of this drop in the water table is mine dewatering. Simply put, this is bad science because the "No-Action" analysis wrongly characterizes the facts of the current and prior dewatering.

The consequence of this decision is to under-report the impacts of the preferred alternative and over-report impacts from the "No-Action" alternative because it is improperly assigning mining impacts (dewatering) to "No-Action."

**3. Inadequate Assessment of Water Usage**

Ever since the General Plan of Operations (GPO) was submitted in 2016, there have been contradictions about how much water the Resolution Mine says it will require in order to operate. The DEIS does nothing to resolve this confusion and—in fact—is contradictory on this topic.

In Table 2-3.1 ("Tailings Storage Facility Comparisons") the DEIS states that the preferred alternative (Skunk Camp Tailings option) will require 550,000 acre-feet of water from outside sources ("pumped from Desert Wellfield"). Similarly, Table 2.2-1 states that this is less water than would be needed for the proposed action (the Near West tailings option is listed as requiring 600,000 acre-feet over the life of the mine). The reader is then directed to Appendix H for further details of mine water Balance and use.

Contrary to Table 2-2.1, Appendix H tabulates that Skunk Camp (Alternative 6) requires more water each year than Near West (Alternative 2): 25,881 acre-feet per year during peak operations for Skunk Camp vs. 22,250 acre-feet per year for Near West (p. H-3).

In conclusion, the DEIS cannot possibly evaluate the impacts of the mine's water usage if it cannot figure out just how much water Resolution plans to use.

| Comment ID: 30078-22 Response: WT3 |
| --- |

---

**Forest Supervisor Bosworth and Program Manager Rasmussen**
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 30 of 45

**4. Inadequacy and Unreliability of Groundwater Models**

40 CFR §1502.24 requires that agencies ensure scientific integrity of analyses in environmental impact statements. This means that scientific analyses must be reliable. As noted in the DEIS.

The Groundwater Modeling Workgroup recognized that a fundamental limitation of the model—of any model—is *the unreliability of predictions far in the future*, and the workgroup was tasked with determining a time frame that would be reasonable to assess.[61] (Emphasis supplied).

The Workgroup subsequently "determined that results could be reasonably assessed up to 200 years into the future." (DEIS, p. 300). This is a problem because some hydrogeological impacts not only persist, but actually get worse in timeframes beyond 200 years.

The groundwater model was actually run for 1,000 years into the future (DEIS, p. 296) although only the first 200 years are reported quantitatively in the DEIS. This long-term analysis is documented that in several areas around the mine, groundwater levels will continue to decline for many hundreds of years, thus potential impacts to GDEs will only increase beyond the 200-year cut-off for analysis. For example, the 1,000-year hydrograph produced by Resolution's modeling consultant for Hidden Spring predicts a continuing decline in groundwater levels for almost 800 years.[62] That impacts continue (and worsen) over such vast timeframes is a testament to how large and disruptive this project truly is and how environmental impacts from this project should be measured on a geologic time scale.

By limiting the period of analysis to 200 years, the Forest Service is discounting the worst impacts that are predicted to occur in later centuries. The Forest Service also acknowledges (see quotation above) that the best scientific tool available (three-dimensional groundwater modeling) is not up to the task of analyzing such impacts. The Forest Service did not meet its obligation under 40 CFR §1502.24 because it did not maintain scientific integrity in analyzing hydrogeological impacts beyond 200 years, even though such impacts are certain and significant.

The limitations and unreliability of the groundwater model see simply the most recent chapter in a long saga of Resolution falsely claiming that it understands the hydrogeology of the project area well enough to assess impacts due to mining. Indeed, Resolution has conducted substantial investigations into the hydrogeology of the project area; however, the Forest Service has failed to recognize that the knowledge base was still inadequate for the purposes of the DEIS.

The hydrogeology of the project area is extremely complex, with multiple aquifers, multiple faults and variable rock types. When combined with a proposed project of such immense

| Comment ID: 30078-23 Response: WT71 |
| --- |

[61] DEIS, p. 300.

[62] Groundwater Working Group Meeting Notes, Meeting #4 held on May 15, 2018.

Continued →

---

**Forest Supervisor Bosworth and Program Manager Rasmussen**
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 31 of 45

← Continued

scale, it is a significant challenge to conduct a groundwater impact analysis and the Forest Service has not met this challenge. Starting at least as early as 2016, Resolution's consultants assured the Forest Service scientists and others that the West Boundary Fault, Concentrator Fault and other faults would limit the western lateral extent of groundwater drawdown (under Superior and farther west) from mine dewatering at Shafts 9 and 10. Resolution's own computer model contradicted this conclusion, instead showing nearly 10 feet of drawdown as far west as the Boyce Thompson Arboretum (see Figure 5 showing substantial drawdown beyond the boundary faults surrounding the mine site). In addition, Resolution's hydrogeological studies failed to predict the inflow of 600 gallons per minute of hydrothermal groundwater (170° F) that was encountered when sinking Shaft 10.

The analysis of water resource impacts in the DEIS is a segmented environmental analysis, which is improper under NEPA. In particular, by utilizing separate computer models and non-overlapping model domains, the Forest Service incorrectly isolated its analysis of mine dewatering from its analysis of hydrogeological impacts of pumping from the Desert Wellfield. Any effects of aquifer drawdown from the Desert Wellfield are not considered in the Mine Groundwater Model and vice versa. As shown in Figure 5, drawdown from these two pumping areas almost certainly overlap, thus rendering the isolated modeling analyses incomplete and inadequate for NEPA purposes. Resolution Copper constructed the groundwater models is such a way that cumulative impacts from the two discrete pumping areas are impossible to evaluate.

In short the assessment of water impacts in the DEIS is deficient because the field investigations and computer modeling upon which this assessment is based are still inadequate to reliably and accurately predict the long-term impacts on the vast amount of pumping Resolution must conduct at the mine site as well as in the East Salt River Valley.

(Intentionally Blank)

| Comment ID: 30078-24 Response: WF69 |
| --- |

| Comment ID: 30078-25 Response: NS2 |
| --- |

Appendix R

**Forest Supervisor Bosworth and Program Manager Rasmussen**
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 32 of 45



*Figure 5. Map showing non-overlapping modeling domains (solid black lines) for Desert Wellfield groundwater model and Resolution Mine groundwater model. By separating the model domains, impacts from dewatering from the Desert Wellfield are not accounted for in the Mine model and impacts from mine dewatering are not accounted for in the Desert Wellfield model. As shown here, the zones of groundwater depression almost certainly overlap (dashed blue lines are hypothetical extensions of groundwater drawdown contours from the Desert Wellfield. These are not reported in the DEIS because the model domain did not extend far enough east.) Isolating the pumping areas into separate models under-estimates impacts and renders conclusions from both models unreliable. Sources: Base Map: DEIS, Figure ES-2; Desert Wellfield drawdown contours redrawn from DEIS, Figure 3.7.1-2 (Desert Wellfield modeling analysis area and maximum modeled pumping impacts): Mine model contours redrawn from WSP, October 31, 2018. Memo: Resolution Copper Groundwater Flow Model – Proposed Action; Figure 5 (Regional Groundwater Model Predicted Drawdown-Proposed Action Post Closure (Year 200); Faults are redrawn from WSP, February 2019, Resolution Copper Groundwater Flow Report, Figure 2.1 (Regional Geology Map).*

> Figure associated with Comment ID: 30078-23

---

**Forest Supervisor Bosworth and Program Manager Rasmussen**
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 33 of 45

### 5. Inadequate Analysis of Impacts on Groundwater-Dependent Ecosystems

In evaluating this project, the Forest Service has violated its own groundwater policy for Tonto National Forest. The DEIS acknowledges that "Between 14 and 16 GDEs, mostly sacred springs, would be anticipated to be impacted by dewatering." Use of groundwater that impacts springs and streams is contrary to Tonto National Forests groundwater policy:

> Groundwater shall be managed for the long-term protection and enhancement of the Forest's streams, springs and seeps, and associated riparian and aquatic ecosystems. Development and use of groundwater for consumptive purposes shall be permitted only if it can be demonstrated that such proposals will adequately protect Forest resources.[93]

One of the most important expectations of the groundwater modeling effort was to assist the Forest Service in evaluating future impacts to springs and perennial streams that support groundwater-dependent ecosystems (GDEs).[94] The computer model used to evaluate this issue does not quantitatively simulate groundwater-surface water interactions: "Changes in stream flow cannot be evaluated based on the groundwater model."[95] Instead, it was decided that a finding of hydrogeological "impact" would only be identified if the model predicted at least a 10-foot drop in groundwater elevation in the immediate vicinity of a GDE. As stated in the DEIS,

> … the Groundwater Modeling Workgroup determined that to properly reflect the level of uncertainty inherent in the modeling effort, results less than 10 feet should not be disclosed or relied upon, as these results are beyond the ability of the model to predict."[96]

In short, the Forest Service has acknowledged that its scientific methodology (groundwater modeling) has a limit of precision of plus or minus 10 feet. The Working Group concluded that drawdowns of less than 10 feet could still have an impact on GDEs:

> The Groundwater Modeling Workgroup recognized that while the model may not be reliable for results less than 10 feet in magnitude, changes in aquifer water [Continued]

> Comment ID: 30078-26 Response: WT19

> Comment ID: 30078-27 Response: WT61

[93] Martin and Loomis, Keeping Our Streams Flowing: Tonto National Forest Groundwater Policy, in Furniss, Clifton and Ronnenberg, eds., 2007, Advancing the Fundamental Sciences: Proceedings of the Forest Service National Earth Science Conference, October 2004, PNW-GTR-699, USDA, Forest Service, Northwest Research Station

> Footnote associated with Comment ID: 30078-26

[94] BGC Engineering, November 2018, Review of Numerical Groundwater Model Construction and Approach, Section 1.1, "Issues to be Addressed by the Groundwater Model."

[95] Id., Section 4.9.2

[96] DEIS, at 301.

> Footnotes associated with Comment ID: 30078-27

---

**Forest Supervisor Bosworth and Program Manager Rasmussen**
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 34 of 45

[Continued] level much less than 10 feet still could have meaningful effects on GDEs, even leading to complete drying."[97]

Due to the limitation of the model, in places where the model predicts drawdown greater than zero but less than 10 feet, the Forest Service assumed (without proof) that there are no impacts, "to properly reflect the level of uncertainty inherent in the modeling effort, results less than 10 feet should not be disclosed or relied upon."[98] The Forest Service did not scientifically conclude that 10 feet or more of groundwater drawdown is needed to cause an impact on GDEs, this was just an arbitrary number based on limitations of the method of analysis, not some scientific principle.

In conclusion, the Forest Service chose a methodology that is incapable of analyzing impacts of mine dewatering and the collapse crater on GDEs. As noted in BGC's review of the groundwater model, there are two principal ways to simulate groundwater-surface water interaction in the selected modeling software (MODFLOW-SURFACT): using the drains (DRN) software package or the streamflow routing (SFR) packages.[99] Resolution used the DRN approach but BGC points out that the SFR approach would have been better: "The SFR package allows for the most comprehensive modeling of groundwater-surface water interaction."[100]

In this instance, the Forest Service is not meeting its obligation under 40 CFR §1502.24, because it is relying on a scientific method (groundwater modeling) that is not capable of predicting significant hydrogeological impacts for this complex project.

### 6. Inadequate Consideration of Alternatives to Block Cave Mining as a Way to Avoid Permanent Water Resource Impacts

> Comment ID: 30078-28 Response: AMH1_B

Once the 1.8-mile wide collapse crater forms, as a result of RCM's operations, the Apache Leap Tuff Aquifer will be altered forever. As stated in the DEIS, "The deep groundwater system is being and would continue to be actively dewatered, and once block-caving begins the Apache Leap Tuff would begin to dewater as well."[101] The Apache Leap Tuff Aquifer is a critical source of water for springs and creeks, many of them sacred. This permanent impact would not occur if alternative underground mining methods were employed, but the Forest Service did not conduct an adequate analysis of alternative mining methods (as discussed elsewhere in these comments) [Continued]

[97] *Id*

[98] *Id*

[99] BGC Engineering, November 2018, Review of Numerical Groundwater Model Construction and Approach, Section 4.9.

[100] BGC Engineering, Section 4.9.2.

[101] DEIS, at 296-299.

> Footnotes associated with Comment ID: 30078-28

> Footnote associated with Comment ID: 30078-28

---

**Forest Supervisor Bosworth and Program Manager Rasmussen**
*Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 35 of 45

[Continued] largely because the Forest Service accepted Resolution's assertion that any method other than block cave mining would be too expensive.

The DEIS disclosed a number of profound impacts due to the collapse crater that cannot be mitigated, including to water resources. By failing to conduct an acceptable and competent evaluation of project alternatives that could avoid the impacts caused by the collapse zone, the Forest Service is allowing one factor (cost of mining; *i.e.*, Resolution's profitability) to outweigh all environmental and social factors combined.

### 7. Mitigation of Impacts to Groundwater Dependent Ecosystems

> Comment ID: 30078-29 Response: MIT3

The DEIS concludes that the Resolution Copper Mine project will or is likely to deplete water supplies and harm or destroy the streams, springs, seeps and other water features in Oak Flat, Ga'an Canyon (Devil's Canyon), Mineral Creek and Queen Creek: "Between 14 and 16 GDEs, mostly sacred springs, would be anticipated to be impacted by dewatering. Although mitigation would replace water, impacts would remain to the natural setting of these places."[102]

First, the estimate of 14 to 16 GDEs is almost certainly an underestimate because springs impacted by "baseline" mine dewatering (see comment 1, above) are simply not counted. Second, the proposed mitigation for GDEs is inadequate. Mitigation plans are outlined in an April 2019 report by Montgomery & Associates entitled, "Monitoring and Mitigation Plan for Groundwater Dependent Ecosystems and Water Wells." This report calls for replacing water flows in springs and creeks by pumping water from nearby wells (i.e., tapping groundwater from deeper in the aquifer), storing water in tanks and piping the water to the creek or stream or by constructing various water-collecting devices such as so-called "guzzlers," surface water capture systems or even trucking water in from alternative sources. Replacing a natural system with a manufactured facsimile of the system is not the intention of mitigation under NEPA. Just as it would not be permissible to replace the real Half Dome with a very large photograph of Half Dome, it is not permissible to replace lost GDEs with artful but artificial copies of natural systems. It was not the intention of NEPA to replace nature with Disney-like imitations of nature.

Second, the monitoring plan for GDEs is also inadequate because its discussion of triggers (i.e., occurrences or observations that would trigger mitigation activities) is vague and incomplete. The Montgomery Report (Monitoring and Mitigation Plan for Groundwater Dependent Ecosystems and Water Wells) reveals that Resolution has built in (and the Forest Service has bought into) any number of ways to avoid actually implementing mitigation measures for GDEs. In particular, the plan explains that Resolution will somehow differentiate the impacts from its dewatering from other variables such as "changes in weather and/or climate, impacts to the regional and/or local groundwater system from other human causes, landscape changes such as landslides and fires, natural succession of the GDE into a new presentation such as an increase in phreatophytic plants coincident with a reduction in spring flow rates, or other reasons not [Continued]

> Comment ID: 30078-30 Response: MIT1

[102] DEIS, at 123.

Appendix R

**Forest Supervisor Bosworth and Program Manager Rasmussen**
Re: *Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 36 of 45

←[Continues]

included in this document." Other than noting that Resolution will employ "multiple lines of evidence" there is no quantitative or qualitative discussion of how Resolution will accomplish this difficult task. Considering that all of the GDEs covered by the monitoring plan have already been identified as likely to be severely impacted by mine dewatering, this is a problematic situation and is inadequate under NEPA.

*Third*, mitigation triggers are described qualitatively as a decline in groundwater elevations or a decline in stream flow but there are no quantitative triggers. This is inadequate. The DEIS should clearly delineate quantitative triggers for each GDE (i.e., groundwater decline of greater than X feet over Y monitoring events) and the DEIS must clearly explain how Resolution intends to "confirm that observed changes are caused by mine activities" and the DEIS must confirm that these methods are scientifically reliable.

*Finally*, Appendix J of the DEIS specifies that the monitoring and mitigation plan is not intended to address water sources associated with perched shallow groundwater or alluvium or fractures, including shallow fracture flow in this statement incorrectly excludes important and probably inevitable impacts directly related to mining. Fracture flow[155] is likely the dominant groundwater flow mechanism in the Apache Leap Tuff and this groundwater unit is the source of water discharges that support riparian zones in Ga'an Canyon (Devil's Canyon), Mineral Creek and possibly Queen Creek. The groundwater system in the Apache Leap Tuff will be profoundly and irrevocably altered by the formation of the collapse crater. The DEIS is incorrect in excluding shallow fracture flow from monitoring and mitigation requirements.

| | Comment ID: 30078-31 |
| Response: MIT1 |

| | Comment ID: 30078-32 |
| Response: MIT1 |

**8. Water Quality Impacts-Acid Rock Drainage**

As noted in the DEIS, "The deposit is associated with hydrothermal alteration and includes a strong pyrite "halo" in the upper areas of the deposit, containing up to 14 percent pyrite. This mineralization has ramifications for water quality, as sulfide-bearing minerals such as pyrite have the potential to interact with oxygen and cause water quality problems (acid rock drainage). (DEIS p. 140). Much of the mineralized halo (i.e., rocks with abundant sulfide minerals but a lower grade of copper) will not be mined out, rather it will become a permanent part of the collapse zone.

The DEIS makes the incredible assumption that the mineralized, fractured rock in the collapse zone will not be in contact with oxygen, thus will not form acid rock drainage. This is a highly optimistic conclusion that defies common sense. As the collapse zone forms, the rock will become fractured (thus increasing its hydraulic conductivity many orders of magnitude) and

| | Comment ID: 30078-32 |

[155] Groundwater flow is generally thought of as flow through porous media, that is, through the pore spaces between the grains that make up sediments and sedimentary rocks. This is considered "primary porosity." Fractures are a form of secondary porosity, created due to tectonic forces or other stresses on the rock. Large fractures can increase rates of groundwater flow very substantially compared to the generally slow flow through porous media, thus can be very important in mountainous regions with significant fracturing.

| Footnote associated with Comment ID 30078-32 |

---

**Forest Supervisor Bosworth and Program Manager Rasmussen**
Re: *Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 37 of 45

←[Continues]

largely dewatered. For the purposes of groundwater modeling, Resolution assumes that the hydraulic conductivity[156] of rock in the cave zone will increase by as much as a factor of a million: "Maximum hydraulic conductivity values were altered by a multiplier of 1E+6 or to a hydraulic conductivity of 100 ft/day, whichever occurs first…The maximum hydraulic conductivity value of 100 ft/day was selected because it is much higher than the natural, un-altered bedrock, but higher values caused the model to become unstable." (WSP, February 2019, Resolution Copper Groundwater Flow Report, pp. 37-38). This statement highlights another deficiency of the groundwater model: hydraulic conductivity of rock in the collapse zone was arbitrarily limited to 100 ft/day because the model would crash if higher (i.e., more realistic) values were used.

Atmospheric air will easily penetrate the fracture zone, supplying oxygen into a subsurface environment that has probably been devoid of oxygen for thousands if not millions of years. This assumption (no oxygen thus no acid-generating reactions in in collapse zone) is likely incorrect and likely greatly understates the impacts from acid rock drainage within the mine and in ore stockpiles.

| | Comment ID: 30078-33 |
| Response: WT49 |

**9. Water Quality Impacts-Tailings Facility**

The scale of this project is hard to grasp, but the volume of tailings produced by Resolution Copper would fill the Rose Bowl to its brim, not once, but nearly 1,800 times, and over an area of 6 square miles and up to 500 feet high. Imagine lower Manhattan, from the East River to the Hudson and down to the Ferry Terminal buried under 50 stories of rubble. This vast volume of waste material will permanently disturb 16,000 acres of land of which nearly 8,000 acres is Arizona State Land.

The principal accomplishment of the DEIS seems to be to propose a new location for the mine's 1.37 billion tons of tailings, but the DEIS is inadequate in its assessment of impacts at this new location to surface water and groundwater quality due to seepage from the preferred tailings storage facility.

Water quality impacts from the tailings is one of the most profound and concerning environmental issues for a mine of this size, yet there is virtually no defensible scientific analysis of this issue in the DEIS. For this reason alone, the DEIS should be withdrawn. Indeed, except the Near West site, there is no true, data-supported, site-specific analysis of potential impacts to surface water and groundwater quality at any of the alternative tailings sites.

| | Comment ID: 30078-34 |
| Response: WT7 |

[156] Hydraulic conductivity is a measure of the ease by which groundwater flows through an aquifer. This, in turn, affects the groundwater velocity through the aquifer. Solid rock has a very low hydraulic conductivity; sandstone has a higher hydraulic conductivity and very coarse grained sediments like gravel have even higher hydraulic conductivity.

| Footnote associated with Comment ID 30078-33 |

---

**Forest Supervisor Bosworth and Program Manager Rasmussen**
Re: *Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 38 of 45

Resolution Copper has long proposed the "Near West" location for its tailings storage facility. In support of this proposal, Resolution conducted considerable geotechnical and hydrogeologic studies at Near West. As described in its August 2016 "Plan of Operations for Baseline Hydrologic & Geotechnical Data Gathering," Resolution constructed 16 drill sites to accommodate a total of 16 groundwater testing and monitoring wells; completed 38 geotechnical drill holes and piezometer installations and constructed geotechnical test trenches at 32 sites in and around the Near West Site. Resolution described this work as being needed to "collect hydrologic, geotechnical and geotechnical data in order to provide baseline information on these aspects of the environment over an area being considered for a potential tailings storage site."[158] While we do not concur that Resolution's studies at Near West were sufficiently thorough, at least they conducted site-specific studies.

No studies of this scale and scope have yet been completed at the Skunk Camp site. Instead, the DEIS acknowledges that Skunk Camp contains mere speculation and substitutes data from Near West to complete the essential hydrogeological evaluation. In the context of understanding hydrogeological impacts at Skunk Camp and comparing the alternatives tailings sites, the DEIS must provide real data for each site. At best, the current analysis provides a qualitative ranking that Skunk Camp is better than other sites because water quality impacts at Skunk Camp could be more easily controlled. This qualitative assessment is an inadequate substitute for the NEPA requirement to accurately analyze potential environmental impacts to groundwater and surface water quality.

| | Comment ID: 30078-35 |
| Response: WT7 |

**V.    Conclusion**

This mining project has long-term consequences to the groundwater resources in Arizona as a whole and the Phoenix Active Management Area, in particular, in some cases, permanent consequences. Once mining commences, the formation of a collapse crater becomes inevitable and unstoppable. The DEIS acknowledges that total demand for water in the East Salt River Valley is growing and could be greater than the available supply.[159] And yet, the DEIS does not take a realistic look at the consequences of Resolution's plan to pump some 550,000 acre feet or 180 billion gallons of groundwater from the Desert Wellfield in East Salt River Valley.

| | Comment ID: 30078-36 |
| Response: WT4 |

Considering the effects of ongoing drought conditions and likely reductions in deliveries of Colorado River water to Arizona via the CAP, it is possible that impacts from Resolution's pumping in the East Salt River Valley will be irreversible. Even more certain is the irreversibility of Resolution Copper's impacts to the Apache Leap Tuff Aquifer which will be altered forever; permanently altering the region's water resources and threatening permanent and unmitigable

[Continues]→

[158] Resolution, August 2016, General Plan of Operations, Baseline Hydrologic & Geotechnical Data Gathering Activities On Tonto National Forest, at 3.

[159] DEIS, at 342.

| Footnote associated with Comment ID. 30078-36 |

---

**Forest Supervisor Bosworth and Program Manager Rasmussen**
Re: *Draft Environmental Impact Statement Resolution Copper Project and Land Exchange*
December 23, 2019
Page 39 of 45

←[Continues]

impacts to local streams and springs, many of which are sacred to this Tribe. This is the very definition of a permanent, irreparable harm.

| | Comment ID: 30078-37 |
| Response: DOC1 |

**E.    The Forest Service Failed to Take a "Hard Look" at Alternative Mining Techniques.**

The Tribe fully adopts AMRC's Comment regarding Alternative Mining Techniques at pp. 204-211 and Dr. Chambers' Report in AMRC's Appendix A.

The Tribe would only add that Resolution Copper has limited more than just Dr. Kliche with its information regarding limited information about the tonnage of higher grade mineable ore. RCM has refused to give similar information in the appraisal context to Congress and to senior Forest Service officials. It certainly behooves RCM to low-ball the quantity and grade of ore which is mineable. And, it is a disservice to the Tribe and the public for the Forest Service to allow Oak Flat to be destroyed because the Service failed to take a "hard look" at sketchy and tenuous data relied upon by Dr. Kliche.

| | Comment ID: 30078-38 |
| Response: AM1 |

**F.    The Forest Service Failed to Adequately Analyze the Multiple Effects of Subsidence**

**1.    Surface Subsidence**

According to the DEIS, subsidence of the earth's surface will occur in two or more major locations. First, subsidence of the mountain formation overlying the ore body of the proposed mine will collapse into the cavern created through the block and cave mining process during the mining process and thereafter. (Section 3.2.3.2). Second, subsidence will occur as a result of the pumping of underground water from aquifers west and northwest of the mine site to supply water for mining activity, transportation of crushed, overburdened, and mineral-laden transportation of processed ore concentrates to the processing facility, and the application of water to mitigate surface erosion of the waste deposits by wind. The removal of groundwater from these aquifers will result in a loss of vertical hydraulic support of the valley fill material overlying these aquifers and will result in surface subsidence. (Section 3.7.1).

The mountain formation in which the ore body is located east of Superior, Arizona and those mountains related to it located east of the mine site, including the Pinal Mountain range, extend south of Miami and Globe, Arizona into the San Carlos Apache Reservation on the east.

**2.    The Effects Of Subsidence On Weather Modification**

The DEIS fails to discuss the weather patterns which will be affected during and after the mining process by a vertical collapse of the mountain formation overlying and surrounding the ore body. The draft fails to consider wind rose patterns which will be affected by the vertical

| | Comment ID: 30078-39 |
| Response: AM1 |

Appendix R

Forest Supervisor Bosworth and Program Manager Rasmussen
Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange
December 23, 2019
Page 40 of 45

Continued

collapse of the mountain unit, and the resulting alteration of the related precipitation. (3.2.2.1). The San Carlos Apache Reservation is located approximately 20 miles east of the Oak Flat site which is the site of the ore body and the central location of the collapse which will occur. That mountain formation is a weather maker for the region and a sky island within the desert. It provides a substantial influence on wind patterns and the patterns of rainfall and snowfall within the region.

Subsidence will have an effect on precipitation on the Reservation. The San Carlos Apache mineral strip and the San Carlos Cutter Basin are two locations which will be affected by any change in precipitation which will result from the collapse and subsidence of any portion of the mountain range. The San Carlos Apache mineral strip is located on the west side of the Gila River below Coolidge Dam. The Cutter Basin is located between the San Carlos River and San Carlos Apache Reservation boundary near Globe, AZ, approximately 20 miles east of the mine site. The water supply and recharge for the Cutter Basin is primarily from two sources: the first and greatest source is precipitation on the Pinal Mountains through the stowmelt and rainfall entering the mountain front recharge zone and moving to the northeast into the Cutter Basin. The other source of the recharge is the surface precipitation falling on the headwaters of Ranch Creek and Goods in Wash on the San Carlos Reservation and the infiltration of that surface flow into the Cutter Basin. The water in the Cutter Basin west of the San Carlos boundary is the water supply for the City of Globe, which has municipal wells lined up running north and south along the western boundary of the San Carlos Reservation overlying the Cutter Basin. The groundwater in the Cutter Basin is also a primary source of water presently, and in the future, for the San Carlos Apache Tribe. It is high quality compared to other sources of water for both the City of Globe and the San Carlos Apache Tribe. The rights to the groundwater in the Cutter Basin and the surface water overlying the Cutter Basin within the San Carlos Apache Reservation were adjudicated in 1999 in case number W-1, In re the General Adjudication of All Rights to Use Water in the Gila River System and Source.

Pursuant to an agreement related to that adjudication, the City of Globe may pump up to 2,500 acre-feet of water per year from the City of Globe municipal wells located on the west side of the western boundary of the San Carlos Reservation. The Tribe has the exclusive right to use both surface water and groundwater within that Reservation under the San Carlos Apache Settlement Act, Pub. L. No. 102-575, 106 Stat. 4740 (October 30, 1992) and the San Carlos Apache Tribe Water Rights Settlement Agreement dated March 30, 1999. A decrease in precipitation on that portion of the watershed which supplies the recharge of both surface and groundwater for the Cutter Basin would dramatically threaten the San Carlos Apache Tribe's vested rights to surface water and groundwater, which water rights are held in trust by the United States.[107]

Continued

[107] See Globe Equity Decree No. 59, entered June 29, 1935 and Judgment and Decree entered on December 21, 1999 in W-1-204.

| Comment ID: 30078-39 | Response: WT169 |

---

Forest Supervisor Bosworth and Program Manager Rasmussen
Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange
December 23, 2019
Page 42 of 45

Continued

Copper may be made to acquire the surface water rights to those springs under the statutory process for acquiring rights to surface water under prior appropriation pursuant to Arizona law. In addition, those springs contribute water to a number of tributaries to the Gila and Salt River Systems and the draft fails to discuss the impact or the right that the Forest Service or Resolution Copper could acquire to interfere with senior water rights of water holders to the Salt or Gila River in any matter whatsoever. The DEIS admits:

- Eight springs are anticipated to be impacted under the proposed action, because of the block-cave mining;

- Two springs would be directly disturbed by the subsidence area;

- Three perennial stream reaches in Devil's Canyon and Queen Creek would be impacted by reduced runoff from the subsidence area; and

- One perennial stream reach of the Gila River would be impacted by reduced runoff from the tailings facility.

The water from these springs generally provides a higher quality of water to the rivers in the region that is available from other tributary sources of the region and is closer to a neutral pH than most of the contributions to groundwater in the region. The reduction in groundwater supplies regionally from the loss of those springs would result in the loss of the springs' contributions to high quality recharge water for the groundwater in the region and a decline in water quality in the region.

| Comment ID: 30078-44 | Response: NEPA14 |
| Comment ID: 30078-45 | Response: WT54 |

The DEIS fails to discuss the law concerning the use of groundwater and the right to use it in Arizona. Generally, an overlying landowner may drill a well and use the water beneath the land for beneficial purposes on that land. The right to use groundwater on other than the land overlying the well is dependent upon the issuance of a permit to transfer water from wells located miles away from the point of production and is inconsistent with the general law of the State of Arizona.

No process for environmental assessment of pipelines from proposed locations of wells and the process required for permits to transfer groundwater from one location to a different location has been discussed in the DEIS.[160] The DEIS also fails to show the use of groundwater from wells which are located in the Salt River drainage and the potential impact on the subflow and water supply of the Salt River.[164] Arizona's groundwater law is limited to percolating

Continued

[160] See the General Adjudication of All Rights to Use Water in the Gila River System and Source, 198 Ariz. 330, 9 P.3d 1069 (2000) ("Gila II"); June 30, 1994 Order filed in W1-WS; Order Re: Report of the Special Master on the Gila River; Arizona Department of Water Resources' Subflow Technical Report, San Pedro River Watershed and Modified by Approval of Report dated September 28, 2005 filed in case number W1-203 ("2005 Decision").

| Comment ID: 30078-46 | Response: WT21_C |
| Comment ID: 30078-47 | Response: WT19 |

---

Forest Supervisor Bosworth and Program Manager Rasmussen
Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange
December 23, 2019
Page 41 of 45

Continued

Negative impacts to weather patterns may extend east through the Reservation into the upper Gila drainage in New Mexico. The draft fails to discuss in any matter whatsoever the potential impact on the environment, including the precipitation and wind patterns which will result from the collapse of a portion of the mountain range and its impact in all directions surrounding the collapsed mountain formation. The DEIS also fails to discuss the precipitation patterns for direct runoff to the Gila River as a result of that collapse, the precipitation available in the terms of surface water and rainfall on the mineral strip, and the effect on the adjudicated water rights under the Globe Equity Decree.

The Globe Equity Decree adjudicates rights to the mainstream of the Gila River from ten miles east of the New Mexico boundary with the State of Arizona to near the junction of the Gila and Salt Rivers on the west side of Phoenix, Arizona. The DEIS contains no analysis of the potential changes to precipitation as it contributes to the flows of the Gila River and the storage of the waters of the Gila River, including in the San Carlos Reservoir within the San Carlos Reservation, and the flows and water available to the holders of water rights under the Globe Equity Decree.

The draft fails to analyze the impact of the subsidence on the surface and groundwater contributions to the Salt and Black Rivers to the north and east of the mine site. The northern boundary of the San Carlos Apache Reservation includes the Black and Salt River, which boundary begins east of Pinal Creek and extends east to the headwaters of the Black River to 109 degrees, 30 minutes east, roughly coinciding with the alignment of Eagle Creek on the eastern side of the Reservation.

| Comment ID: 30078-40 | Response: WT30 |

The DEIS also fails to deal with the precipitation pattern and groundwater contribution to the San Carlos Black River watershed and its contribution to the water supplies of the San Carlos Apache Reservation. The San Carlos River drainage is located wholly within the San Carlos Apache Reservation and it begins on the south side of the drainage between the Black and Salt River drainage on the north and the Gila River drainage on the south. The San Carlos River drainage is dependent upon precipitation on the watershed.

| Comment ID: 30078-41 | Response: WT30 |

3.   **Impact on Regional Springs**

"There are 338 springs mapped within 5 miles of the project footprint, see figure 3.8.3-1). This includes 24 springs and several stream segments that are considered to be groundwater dependent with the potential to be impacted by the project." (Section 3.8.3.2). The DEIS fails to analyze the legal right of Resolution Copper or the Forest Service to appropriate and permanently destroy the production of the 24 springs, which the draft acknowledges will be decreased as a result of the dewatering process or subsidence. The Forest Service has failed to discuss the Forest Service's Federal Reserved water rights, and those water rights which may have been acquired by prior appropriation under state law which could be permitted by the state of Arizona under the statutory law of prior appropriation. The draft also fails to discuss any effort that Resolution

| Comment ID 30078-42 | Response: NEPA14 |
| Comment ID: 30078-43 | Response: NEPA14 |

Continued

---

Forest Supervisor Bosworth and Program Manager Rasmussen
Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange
December 23, 2019
Page 43 of 45

Continued

groundwater unconnected to surface flow or the subflow of surface water streams. The draft fails to provide a location for the wells to be used or any analysis of the impact on surface water or subflow.

A well which intercepts any portion of its water from the subflow of a stream is subject to the law of prior appropriation under state and federal law. All of the water pumped from the well which takes any portion of its water from subflow is subject to the general subject matter jurisdiction of the State water adjudication court.[163] The test for whether the cone of depression of a well would intercept the subflow of a river is whether that well, assuming pre-development conditions and steady state pumping, would cause a reduction in subflow of 1/10 of one foot. If so, the entire production of that well is included within the subject matter jurisdiction of the adjudication court adjudicating prior appropriation water rights. (See 2005 Decision).

The use of a well which acquires any of its water from a surface water right subject to prior appropriation can only be acquired after 1919 by strict compliance with the statutory process set out in the Arizona Revised Statutes.[130]

There is no indication of the specific location of the proposed production wells by Resolution Copper and no analysis of whether the production of such wells would cause a drawdown of 1/10th of one foot under pre-development conditions pumped at steady state. In fact, the DEIS's analysis of the production of pumping of wells acknowledges that the data points available for analysis for a numerical model are inadequate to provide reasonably accurate scientific results constant to a point of less than 10 vertical feet of reduction.

| Comment ID: 30078-43 | Response: WT19 |

The fact that RCM failed to provide statistical data and data points necessary to provide a modeling result which would be capable of producing a reliable scientific prediction of a level less than a drawdown of 10 feet is indefensible and a natural failure of this DEIS to properly evaluate the environmental impact of the operation of multiple wells proposed to be operated by Resolution Copper to support its mining operations, its ore processing facility, and its transportation by pipeline of processed ores and processed waste. It is also a material failure of the DEIS to properly evaluate the environmental impact of the drawdown of groundwater levels and its potential impact on water supplies and flowing streams, partially dependent upon the baseflow contribution of groundwater, which could be reduced by the operation of the production wells.

4.   **Other Effects of Subsidence**

The DEIS fails to analyze the environmental impact on the vegetation dependent upon precipitation generated by the mountains which will be subject to subsidence. The impact and a    Continued

[163] See Gila II; June 30, 1994 Order filed in W1-WS at pages 1, 62, and 63.
[130] See Ariz. Laws 1919, ch. 164, § 5 et seq.; Arizona Revised Statutes § 45-151 et seq.

| Comment ID: 30078-48 | Footnotes associated with Comment ID. |

Appendix R

---

Forest Supervisor Bosworth and Program Manager Rasmussen
Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange
December 23, 2019
Page 44 of 45

[Continued →] diminution of vegetation or alteration of the location of fallout could affect commercial timber and vegetation which supports grazing and wildlife on the San Carlos Reservation. Commercial timber, livestock grazing, wildlife, and fisheries management are substantial components of the economy of the San Carlos Apache Reservation.

> Comment ID: 30078-49
> Response: WT89

**G.    The Forest Service Failed to Analyze Impacts on Other Water Resources**

**1.    Impact On The Central Arizona Project**

The DEIS fails in total to evaluate the potential impact on the Central Arizona Project (CAP) canal reach from Granite Reef to the Tucson area, which overlays in part the potential subsidence zone caused by the pumping of various production and dewatering wells by Resolution Copper. A subsidence by a few inches in the gradient of the CAP canal can profoundly and adversely affect the integrity of the CAP delivery system to the Tucson and southern Pinal County area.

> Comment ID: 30078-50
> Response: WT10

**2.    Impact On Groundwater Storage**

The subsidence caused by groundwater pumping for production and stabilization and maintenance of waste storage sites has not been properly analyzed. The potential subsidence of those aquifers may permanently decrease the storage capacity of the groundwater aquifers and will render the potential recharge of such groundwater aquifers impossible. No analysis of those potential impacts on the future water supplies and the management of those groundwater supplies and potential recharge has been made in the DEIS.

> Comment ID: 30078-51
> Response: WT10

**H.    The Forest Service Failed to Analyze the Impacts of Radioactive Materials And Heavy Metals**

The DEIS acknowledges the existence of radioactive, toxic and hazardous materials, heavy metals and asbestos in the ore body and in overlying and surrounding geologic structures (N-3, H). It summarily deals with these radioactive, toxic and hazardous materials, heavy metals and asbestos in primarily a spreadsheet form, acknowledging the existence of a few samples in which radioactive, toxic and hazardous materials, heavy metals and asbestos were identified and reciting a degree of risk that was related to that sample concentration. (Section 3.7.1, p. 113). The spreadsheet insufficient data to quantitatively evaluate the mineralization of the ore body and the surrounding geologic structure.

> Comment ID: 30078-52
> Response: TS24

The DEIS does not describe the process by which the degree of risk was evaluated or the definition of the various categories of risk, which are employed in its spreadsheet analysis. It fails to deal with the concentration of the radioactive, toxic and hazardous materials, heavy metals and asbestos in the mining process and the location of the radioactive, toxic and hazardous materials, heavy metals and asbestos into the water system and the chemical reaction of the radioactive, [Continued →]

---

Forest Supervisor Bosworth and Program Manager Rasmussen
Re: Draft Environmental Impact Statement Resolution Copper Project and Land Exchange
December 23, 2019
Page 45 of 45

[← Continued] toxic and hazardous materials, heavy metals and asbestos with the ore, waste rock, and solution in the transport pipeline of these various components and the processed ores, the various locations and the deposition and creation of waste dump sites containing the residue of those processes. It also fails to deal with the fact that radioactive materials described in the spreadsheet are currently located in consolidated hard rock, where the transmission of radioactive materials to other locations is slow to non-existent, to a situation where the hard rock will be pulverized, which will make the radioactive material readily available for chemical reaction and transportation by the water pipeline systems for processing and transporting the ore to dump sites. It also fails to recognize that once the material has been placed in the dump sites, the radioactive, toxic and hazardous materials, heavy metals and asbestos can become airborne from the surface of the dump sites and waste sites and be transported up by local air movement into populated zones. The EIS fails to consider the change in wind rose configurations related to their construction, orientation, and altitude, compared to the natural terrain.

The evaluation of the risk from exposures to radioactive, toxic and hazardous materials, heavy metals and asbestos is limited to a summary word or two including the word "risk." The DEIS fails to describe the methodology of the summary conclusion concerning risk and any method of applying the risk analysis to public health, air, or water quality. (Section 3.7.1, p. 113).

> Comment ID: 30078-53
> Response: TS24

The DEIS also fails to recognize that radon, once freed from the hard rock ore, can become readily transportable through the ambient air, without the aid of a particle, through humidity, and in the gaseous form. It also fails to recognize that the application of water to the surface of the waste storage sites through precipitation and sprinkling of water to reduce dust from escaping the storage sites, will cause the percolation downward of radioactive, toxic and hazardous materials, heavy metals and asbestos materials including radon into the underground water system over time, which will cause a degradation of the local groundwater quality. No analysis of the potential airborne distribution of radioactive, toxic and hazardous materials, heavy metals and asbestos by the ambient air system or the transfer of the radioactive, toxic and hazardous materials, heavy metals and asbestos in solution resulting from the percolation and precipitation of water applied for stabilizing the waste systems has been made in the DEIS.

> Comment ID: 30078-54
> Response: TS24

**CONCLUSION**

The goal of NEPA is two-fold: (1) to ensure the agency will have detailed information on significant environmental impacts when it makes its decisions; and (2) to guarantee that this information will be available to a larger audience. "The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(c). The goals of NEPA are not satisfied by the DEIS, It is deficient on a score of matters. We would encourage the Forest Service to go back and get it right. Thank you for the opportunity to comment.

---



Terry Rambler
Chairman

**SAN CARLOS APACHE TRIBE**
P.O. Box 0, San Carlos, Arizona 85550
Phone (928) 475-1600 ✦ Fax (928) 475-2567

Tao Elgison
Vice-Chairman

December 23, 2019

Neil Bosworth
Supervisor
Tonto National Forest
U.S. Department of Agriculture
2324 E. McDowell Road
Phoenix, Arizona 85006
E-M: nbosworth@fs.fed.us

Dear Supervisor Bosworth:

On behalf of the over 16,800 members of the San Carlos Apache Tribe ("Tribe") and the San Carlos Council, as the governing body of the Tribe, this letter transmits the Tribe's comment to the Tonto National Forest ("Forest Service") on the proposed Resolution Copper Mine ("RCM") Project (the "Project") and Land Exchange Draft Environmental Impact Statement ("DEIS"). This comment supplements the Tribe's detailed scoping comments to the Forest Service for the Project submitted on July 18, 2016. In addition, the Tribe incorporates by reference comments submitted by the Arizona Mining Reform Coalition et al., submitted November 7, 2019 and July 18, 2016, and adopts and incorporates by reference the comments submitted by the Inter Tribal Association of Arizona, Inc. ("ITAA"), Earthworks and the Access Fund.

Oak Flat, known to Apaches as Chi'chil *Biłdagoteel* (pronounced Chi Chill Bił Dah Go Tell, or "a broad flat of Emory oak trees"), is a most precious culturally and geographically defined landscape within the Tonto National Forest whose ecological integrity is vital to the continuation of Western Apache cultural practices, particularly to many members of the San Carlos Apache Tribe.

> Comment ID: 30079-1
> Response: NS2

---

Neil Bosworth
Re: RCM DEIS
December 23, 2019
Page 2 of 5

The Southeast Arizona Land Exchange Act ("SEALECA"), a piece of federal legislation forced into the Fiscal Year 2015 National Defense Appropriations Act, as the result of back room deals subverting the will of the majority of members of Congress, transfers Oak Flat to Resolution Copper Mining, a subsidiary of BHP Billiton and Rio Tinto, foreign conglomerates.

Some may see Oak Flat a simple, but inhospitable, dry, rocky landscape. Rio Tinto and BHP Billiton see billions of dollars in profits lying beneath the surface, and others see only jobs.

Apaches see Oak Flat differently – it is a church, a place for worship and the practice of our traditional religion. It is the center of our most sincerely held, religious beliefs, where *diyí* (sacred power) can be called upon via prayers. Oak Flat is the *goiłi* (home) of our *diyí'n*, visited by our *ga'an* (spiritual beings) who provide us with healing and spiritual services. It is also a place that speaks to the very essence of tribal culture.

> Comment ID: 30079-2
> Response: CR4

Covering 4,309 acres, Oak Flat lies within the traditional territory of the *T'iis Tsebán* the "cottonwood trees gray among rocks people"), also known as the "Final Band" of Apaches, and is closely associated with the related *Tsé Binestł'é* (the "surrounded by rocks people"), also known as the Aravaipa Band. At least eight Apache clans have direct ties to this location. Tribal members continue to visit Oak Flat for prayer and a wide range of traditional needs and practices. The ethnographic and ethnohistoric study of the area surrounding Oak Flat, conducted by Anthropological Research, LLC, at the request of the Tonto National Forest, identifies 404 traditional cultural properties of at least nine tribes with traditional ties to the area.

For at least a half millennium through to the present day, members of our Tribe have utilized the Oak Flat area for traditional religious ceremonies, such as the Sunrise Dance, where we celebrate the event of a girl's maturation from puberty over four days, through dance, drumming, song and prayer, and the visitation of Crown Dancers. It is a place where Apache Holy Ground rituals occur, where we commune with and sing to our Creator God, and celebrate our holy spirits, including our mountain spirits, the Ga'an. It is a place filled with rock paintings and petroglyphs, what some may describe as the footprints and the very spirit of our ancestors, hallmarks akin to the art found in gothic cathedrals and temples, like the Western Wall in Jerusalem, St. Peter's Basilica in Vatican City, or Angor Wat in Cambodia. This is why I call Oak Flat the Sistine Chapel of Apache religion.

Oak Flat is also a burial ground, a holy cemetery. Recently, using cadaver dogs, an effort which was not done with the approval of tribes, the Forest Service found the remains of up to 100 bodies, many of whom were most likely our Apache Ancestors. The echoes of their encampments still reverberate with the outlines of wikiups, lava rock structures, metate stones for grinding foodstuffs, and other tools and artifacts.   [Continued →]

Appendix R

Neil Bosworth
*Re: RCM DEIS*
December 23, 2019
Page 3 of 5

←Continued    Oak Flat is also a place where our members still conduct traditional harvesting of plants important to our diet, such as acorns from Emory oaks, and healing plant-based medicines for a wide range of ailments.

As you have personally witnessed, it is a pristine, bucolic oasis of many varied plants and animals that depend on Oak Flat's waters. Water is very scarce in Arizona. Pinal County predicts an 8.1 million acre foot deficit in its water supply. And yet, Oak Flat is a place of water, what Apaches call tu. The water in the area plays an integral role in our traditional religion and ceremonies. Oak Flat is also full of seeps, some 46 springs, and a number of streams and ponds form an integral part of the region's weather system and the formation of ancient aquifers, like the Apache Tuff, which lies below the Town of Superior and supplies the town's municipal water system, and the Queen Creek community.

The area surrounding Superior, Arizona, as well as Oak Flat, Apache Leap and Ga'an Canyon, was also the area where mining interests and the press ignited vigilante, genocidal, militias and military campaigns between 1859 and 1874 that killed over 380 Pinal Apaches including many women and children – and resulted in the confining of survivors in a prisoner of war camp known as Old San Carlos.

For all of these reasons and factors, Oak Flat was listed in the U.S. National Register of Historic Places. Yet, if it becomes operational, the Resolution Copper Mine will swallow up and completely destroy Oak Flat in its entirety – all of the historic, cultural properties, our burial ground, our place of worship, our church, and the foundation of our traditional religious beliefs. Río Tinto, BHP Billiton and the Forest Service each admit this wholesale destruction will occur.

Ironically, the Forest Service was established in 1905 principally to protect the region's watershed. However, the SEALECA and the 1872 Mining Act eliminates these protections. The Forest Service's Draft Environmental Impact Statement ("DEIS") blindly follows the SEALECA, and ignores other controlling statutes and regulations.

Totaling some 400 pages, that methodically details the destruction of Oak Flat and its environment, the DEIS casts the Project as a *fait accompli*, despite the certain and massive environmental catastrophes that will result once the mine becomes operational. As you know, the DEIS received 6,500 pages of analytical comments in opposition from tribes and Oak Flat supporters, including the Center for Biological Diversity, the Sierra Club, and the Arizona Mining Reform Coalition. Even though these comments point to serious, critical flaws in the DEIS, we have been advised by the Forest Service that it will not reconsider or issue a supplemental DEIS; instead, the Forest Service will only provide responses to the comments received.

Neil Bosworth
*Re: RCM DEIS*
December 23, 2019
Page 5 of 5

As we say in our Apache language, A'hlyi'é (thank you) in advance for your attention to the Tribe's comments.

Sincerely,

SAN CARLOS APACHE TRIBE

Terry Rambler
Chairman

Enclosure

Comment of the San Carlos Apache Tribe on the TNF RCM DEIS

Cc   Mava Dodge, Esq., Dir., ITCA, mavadodge@azdmail.ao.com

    Matthak Lyndan   Tribal Relations Program Manager, TNF, matt.earls@af.us
    Kathryn Leonard   Arizona State Historic Preservation Officer   kleonard@azstateparks.gov
    John Fowler, Advisory Council on Historic Preservation Executive Director, jfowler@achp.gov

    Joe Carlos Apache Tribe
    Tao Rambler, Vice Chairman
    San Carlos Council Members
    Vernelda Grant, THPO
    Dee Randall, Forest Manager, Forest Resources
    A.D. Bracker, AG
    Chorro

Neil Bosworth
*Re: RCM DEIS*
December 23, 2019
Page 4 of 5

According to the DEIS, the block cave mining technique was chosen because it was the most profitable method to extract a cubic mile of copper ore body lies over 1 mile below the surface. In the process, the Oak Flat area will subside or cave-in starting in year six after the mining begins, ultimately collapsing an area approximately 2 miles in diameter of the earth's surface and swallowing and destroying Oak Flat. While the DEIS proclaims that this mining technique is the only alternative, we believe that RCM has intentionally withheld information as to the ore body's CU value, which may open up the possibility of other mining alternatives.

The mine will also consume well over 550,000 acre-feet of water, enough water to supply 168,000 homes over 40 years. This in an area already stressed by long-term drought. Worse, the water modelling employed for the DEIS's conclusions has major data gaps that do not adequately portray the impact of this mine on the region's water supply. The Forest Service does not even account for the impacts that the mine will have on the Tonto National Forest's own water supply. Nor does it take into account the Pinal County water deficit of 8.1 million acre feet 100 years from now.

| Comment ID: 30079-3 |
| Response: WT4 |

| Comment ID: 30079-4 |
| Response: WT4 |

The DEIS details how mine's waste will eventually be stockpiled over an area encompassing six square miles and 500 feet high. Imagine one-quarter of Manhattan, from Canal Street through Wall Street and down to the Staten Island Ferry buried in up to 50 stories of rubble. Just imagine the environmental disaster this stockpile of mining waste will create for the whole area, including our Reservation which stands only 14 miles away, yet the DEIS takes no issue with the stockpile and even leaves the issue for resolution at a later date.

In 40 years, when the copper will run out if RCM is allowed to mine, the quality of life, especially the elimination and pollution of scant water supplies will affect not just Apaches, but all humans that live in the surrounding areas. Once the water dries up and what remains becomes contaminated, what will prevent the people living off our Reservation to go to Congress and ask Congress for the water under the San Carlos Apache Reservation? Clearly, without question, this mine will put Apache children, grandchildren and those not born at risk. Without water, without our church, I fear for the very survival and existence of Apache life, culture and religion.

| Comment ID: 30079-5 |
| Response: CR4 |

As with the comments submitted by the ARMC and others, the Tribe's analysis of the DEIS shows that it is ill conceived, missing fundamental data, forwarding flawed analyses and methodologies, and does not meet the legal standards of other federal statutes and regulations. In addition, the Forest Service has not engaged in meaningful government-to-government consultation, as established by executive orders and statutes.

For these reasons, I respectfully request that the Forest Service reconsider the DEIS and work with the stakeholders in effort to either re-issue, or otherwise supplement the DEIS.



## YAVAPAI-APACHE NATION

**Executive Office**

Chairman Jon Huey

Vice Chairwoman Tanya Lewis

2400 West Datsi Street, Camp Verde, AZ 86322

Phone (928)567-1021                                   Fax (928)567-3994

December 13, 2019

Neil Bosworth, Supervisor
Tonto National Forest Service
2324 E. McDowell Road
Phoenix, Arizona 86006

RE:    Yavapai-Apache Nation Comments on the Resolution Copper Mine EIS

Dear Supervisor Bosworth:

On behalf of the Yavapai-Apache Nation, we share our concerns and recommendations regarding the Resolution Copper Mine.

**Consultation:**
The consultation with the Tonto National Forest Service and the Yavapai-Apache Nation has been fair and open. Your most recent effort was an inclusive event attended by concerned Tribes in late October 2019. The meeting was beneficial to discuss important issues and respond to them. The meeting was conducted with several Tribes who shared their perspectives; however the Nation prefers a government to government consultation as a face to face conversation between the Nation and the Tonto National Forest Service. We look forward to scheduling a consultation in the near future.

**THE TRIBAL MONITORING PROGRAM**
We support this effort as a step forward in the evolution of Cultural Resource Management (CRM). We have some concerns about how information gathered is being incorporated into the data set. We believe the monitoring program should be more fully integrated into the long-term CRM plan. This is a positive program and with further consultation with the Nation the concerns will sort out over time.

**LOCATION OF THE MINE SPOILS/TAILINGS**
Vincent Randall, the Nation's Apache Culture Director has been involved with the process of designating a tailing site since its inception, including visiting the proposed sites. The challenge has been to identify a location with minimal environmental and cultural heritage impact. Our preferred alternative is the Skunk Camp near Hayden.

**CONTINUITY**
Enclosed is the Nation's letter dated October 6, 2017 for your reference regarding Apache Leap and the Resolution Copper Mine. We are fully aware of the significant ongoing cultural and environmental impacts it will

generate. It is our intention, working in conjunction with the Tonto National Forest Service, to mitigate the impacts to Shii Ke Yaa (the Apache Homeland) to the extent we can.

Thank you for your attention to this matter. Additionally, the Nation appreciates the work Naeebah Nez Lyndon has done to make the consultation process professional and comprehensive. The Nation submitted an official letter in October 2019 reflecting our participation in the process, as well as a letter requesting mitigation measures that we believe offset the cultural and environmental impact of the project. It is our hope the process continues without interruption and in respect to those Tribes who have actively participated in the process.

Cordially,

Jon Huey, Chairman

CC:    Tanya Lewis, Vice Chairwoman
       Vincent Randall, YAN Apache Culture Director
       Scott Canty, YAN Attorney General
       Chris Coder, YAN Cultural Office
       Naeebah Nez Lyndon, Tonto National Forest Service

---



## City of Apache Junction

*Home of the Superstition Mountains*

October 31, 2019

Mr. Neil Bosworth
Tonto National Forest Supervisor
United States Forest Service
PO BOX 34468
Phoenix, AZ 85067-4468
(sent via email comments@resolutionmineeis.us)

RE:    Resolution Copper Draft Environmental Impact Statement

Mr. Bosworth,

Thank you for the opportunity for the city of Apache Junction to submit comments on the Draft Environmental Impact Statement, prior to finalization, for disclosure of impacts associated with the Resolution Copper Project and associated land exchange.

| Comment ID: 284-1 |
| Response: NS1 |

The city of Apache Junction is in support of this project and excited at the prospect of Resolution Copper capable of producing 20% of the world's copper through the next 50 years. The 1,000 plus jobs this project is anticipated to create is important to those rural and surrounding communities. Further, this project offers great potential for other positive economic benefits to not only those surrounding and rural communities but also to the state of Arizona.

Thank you for your consideration.

Sincerely,

Jeff Serdy
Mayor

---



October 22, 2019

Resolution Copper EIS Comments
PO Box 34468
Phoenix, AZ 85067-4468

By email: comments@resolutionmineeis.us

Re: Globe City Council Comments: Resolution Copper Draft Environmental Impact Statement

Mr. Neil Bosworth:

Thank you for the opportunity for the Globe City Council to submit comments on the Draft Environmental Impact Statement for disclosure of impacts associated with the Resolution Copper Project and associated land exchange.

The City of Globe City Council is very excited about the Resolution Copper Project in Pinal County. The City Council sees great benefits to Globe being located less than 24 miles away from the Resolution Project, that is anticipated to produce 20% of the world's copper over the next 50 years. The primary and secondary economic impacts of this project will be significant to Arizona and our region, including the creation of 1,400 direct jobs and an estimated 2,700 indirect jobs during operation.

| Comment ID: 518-1 |
| Response: NS1 |

For these reasons, the City of Globe City Council wants to express strong support for the Resolution Copper Project, and urge the U.S. Forest Service to complete, without delay, a robust Final Environmental Impact Statement and Record of Decision. The Council does submit the following comment for your consideration:

- **The City of Globe supports the relocation of the tailings facility to Skunk Camp in Gila County.** We fully support the preferred tailings alternative and urge the USFS to disclose the direct and indirect employment impacts and the associated positive fiscal impacts of this facility, as it is the only portion of the operation which would have a footprint within Gila County.

| Comment ID: 518-3 |
| Response: SO9 |

The Globe City Council would like to thank the U.S. Forest Service for giving us this opportunity to voice support and provide comments in regard to the proposed Resolution Copper Project.

| Comment ID: 518-4 |
| Response: ALT30 |

If you have any further questions, please contact our City Manager, Paul Jepson at (602) 672-6924.

Sincerely,

Al Gameros,
Mayor, City of Globe
On behalf of the Globe City Council

Appendix R





**October 15, 2019**

Mr. Neil Bosworth
Tonto National Forest Supervisor
United States Forest Service
P.O. Box 34468
Phoenix, AZ 85067-4468
Attn: Resolution DEIS Comments

Mr. Bosworth:

Thank you for the opportunity to comment during development of the Final Environmental Impact Statement for the Resolution Copper Project. I hope the United States Forest Service has the resources to quickly complete the Environmental Impact Statement for this project, which I support.

*Comment ID: 207-1 / Response: NS1*

As an elected official in a nearby community, I am was pleased to see the economic impacts the project will have on the east valley when reviewing the DEIS. This project is vital to our national security and specifically the defense industry which operates in my community.

The only outstanding question I have is related to local transportation infrastructure. Will there be traffic impacts from people living in the east valley and commuting to work at the mine? I understand there will be several thousand construction jobs and more than 1,500 permanent jobs created by the project's development.

*Comment ID: 267-2 / Response: TR8*

Thank you for your consideration of these comments and questions.

Sincerely,

Councilmember Kevin Thompson
Mesa City Council, District 6

---

**Hannah French**

| | |
|---|---|
| From: | Resolution Comments <comments@resolutionmineeis.us> |
| Sent: | Thursday, October 31, 2019 9:55 AM |
| To: | Emily Newell |
| Subject: | Fwd: DEIS Letter |
| Attachments: | Resolution Mine - Letter of Support -2019.pdf |

EXTERNAL! This email originated from outside SWCA. Please use caution when replying

---------- Forwarded message ----------
From: Karen Norris <miamiclerk@cableone.net>
Date: Wed, Oct 30, 2019 at 8:27 AM
Subject: Re: DEIS Letter
To: Bryan Sappala <Bryan.Sappala@riotinto.com>, <comments@resolutionmineeis.us>

Hi Bryan,

Here is the letter. Please let me know if you need me to mail the original anywhere. I will be out of the office the rest of the week but will be in Saturday to catch up on a few things. Thank you.

Karen Norris, C.M.C.
Town of Miami, AZ
miamiclerk@cableone.net
928-473-4403

----- Original Message -----
From: "Bryan Sappala" <Bryan.Sappala@riotinto.com>
To: "Karen Norris" <miamiclerk@cableone.net>
Sent: Tuesday, October 29, 2019 10:41:10 AM
Subject: Re: DEIS Letter

Thanks for the update!

Tell Joe hi for me.

Sent from my iPhone

> On Oct 29, 2019, at 10:36 AM, Karen Norris <miamiclerk@cableone.net> wrote:
>
> Bryan,
>
> I just talked to Joe about that this morning at our staff meeting and he said he will be working on that today. I will try and keep him on schedule to get that done today.
>

> Thank you.
>
> Karen Norris, C.M.C.
> Town of Miami, AZ
> miamiclerk@cableone.net
> 928-473-4403
>
> ----- Original Message -----
> From: "Bryan Sappala" <Bryan.Sappala@riotinto.com>
> To: "Karen Norris" <miamiclerk@cableone.net>
> Sent: Tuesday, October 29, 2019 10:21:48 AM
> Subject: DEIS Letter
>
> Hi Karen,
>
> Hope all is well, I just wanted to check and see if you had any more questions around the letter or submitting it.
>
> Thanks,
>
> Bryan
>
> Sent from my iPhone

Appendix R

R-27

11-RCMSER-2679

Appendix R



**Superior Governing Board**

Arlynn Godinez,

Nathan Duarte,

Ignacio Magallanez,

Mila Bosich,

Bruce Armitage,

Stephen Estatice,

William Duarte

Ken Major,

Pamela Duarte,

Maria Mavros,

Bertha Martinez,

Michael Beas Gonzalez,

Anthony Dumagsas

Melissa Perez

Melissad Genua

Valerie Kandis Dumagsas

## SUPERIOR UNIFIED SCHOOL DISTRICT #15
### ONCE A PANTHER, ALWAYS A PANTHER

The Superior Unified School District Governing Board has unanimously approved the following comments concerning the Draft Environmental Impact Statement for the proposed Resolution Copper Project and Land Exchange.

The Superior Unified School District is located within the District's boundaries. The DEIS states there will be an increase in revenue from property tax of the Resolution Copper Project and Land Exchange to the District. However, based on the current Arizona school funding formula, the District will not receive any additional funding. The District will require additional funding for building its infrastructure and programs due to the anticipated growth to the Town of Superior's population. The District currently has a partnership funding agreement with Resolution Copper for $1.2 million over four years. Students in Superior need increased educational opportunities that enhance the skills for the 21st Century work force, which includes those needed at the Resolution Copper Mining Project and other high-tech industries. In the long-term, this will encourage our graduates to contribute to Superior's growth, including its economy. A financial commitment from Resolution Copper is necessary for this to happen. The Governing Board will expect a new longer-term agreement or the establishment of an education foundation if the Land Exchange were approved to offset this loss of funding.

The Superior Unified School District Governing Board understands the population of the Town will increase once the mine is operational. An increase in population will require an increase for additional services such as fire, ambulance, and police. It will also call for the need for social services such as childcare, counseling, and drug rehabilitation. The Town currently is not prepared to add these additional services. Resources will be needed to provide these services in the near future.

The Superior Governing Board believes the DEIS does not address any mitigation strategies for the housing impacts. The DEIS indicates that 25% of the Resolution Copper workforce will live in Superior. This will require a substantial increase in the number of housing units. The Governing Board would like the lack of housing as well as the problems associated with it (e.g., increased crime rates and the devaluation of property) be addressed in the final EIS.

Recreation and tourism will be a major part of development in the future of Superior. The DEIS mentions that it would support the Recreational Users Group (RUG) and the surrounding trail system. It does not define what that support entails. The Superior School District would like that support to be identified and defined before the Land Exchange is approved.

| Comment ID: 322-2 | Superior Unified School District #15 | Comment ID: 322-4 | Comment ID: 322-3 |
|---|---|---|---|
| Response: 5014 | 1500 Panther Drive, Suite 101 Superior, Arizona 85173 520-689-3600 (main) 520-689-3019 (fax) Web: www.superioraz.org | Response: MT3 | Response: MT1 |

The Superior Unified School District School Board understands there will be a possible 16% decrease in the amount of water flowing through Queen Creek. The wells and springs around the community will be negatively impacted as well. The Governing Board asks that a project from the 1999 Restoration and Management Plan for Queen Creek or an updated version be funded to prevent any water loss to these areas.

There will be a significant increase in traffic due to the influx of workers and heavy trucks traveling into Superior. This will take a heavy toll on the roads in town and will affect the wear, longevity, and safety on our school buses. The Governing Board recommends mitigation around the issues due to increased traffic.

The DEIS states that the preferred tailing site is located at Skunk Camp. The Superior Governing Board believes this site should be established as the designated tailings location in the final EIS. This site would have the least environmental impact on the community.

In closing, the Superior Unified School District Governing Board supports the Resolution Copper Project and Land Exchange. Resolution Copper has partnered with the District to provide educational support to its schools and programs for over 15 years. We believe that support should continue as long as the mine is operational. Superior is a growing community and there are many opportunities to be developed in and around town. There are also many issues that will need to be addressed before the town and the school district can plan for its future. The Superior Unified School District believes that economic mitigations are necessary for its schools, its students, and the Town of Superior to prosper as a full partner under the project.

Sincerely,

| Comment ID: 322-5 | Comment ID: 322-6 | | Comment ID: 322-8 | Comment ID: 322-7 |
|---|---|---|---|---|
| Response: MT1 | Response: MT1 | | Response: MT3 | Response: ALT20 |

Superior Unified School District #15 Governing Board

Arlynn Godinez, President

Jon Nathan Duarte, Clerk

Mila Bosich, Member

Ignacio Magallanez, Member

Bruce Armitage, Member

Stephen Estatice, Superintendent

Superior Unified School District #15
1500 Panther Drive, Suite 101
Superior, Arizona 85173
520-689-3600 (main) 520-689-3019 (fax)
Web: www.superioraz.org

Letter number 261 is duplicated with letter number 924

---

**Emily Newell**

| | |
|---|---|
| From: | Resolution Comments <comments@resolutionmineeis.us> |
| Sent: | Wednesday, October 16, 2019 11:03 AM |
| To: | Emily Newell |
| Subject: | Fwd: FW: Comment Letter - Town of Superior |
| Attachments: | 10 11 19 DEIS Comment Letter.pdf |

EXTERNAL: This email originated from outside SWCA. Please use caution when replying

---------- Forwarded message ----------
From: Rasmussen, Mary C -FS <mary.rasmussen@usda.gov>
Date: Fri, Oct 11, 2019 at 11:51 AM
Subject: FW: Comment Letter - Town of Superior
To: Todd Pryor <manager@superioraz.gov>
Cc: Chris Garrett <cgarrett@swca.com>, Donna Morey <dmorey@swca.com>, comments@resolutionmineeis.us <comments@resolutionmineeis.us>, Sando, Mark -FS <mark.sando@usda.gov>, Bosworth, Neil -FS <neil.bosworth@usda.gov>, Torres, Tom -FS <tom.torres@usda.gov>, Scaggs, John - FS <john.scaggs@usda.gov>, Quintana, Devin -FS <devin.quintana@usda.gov>, michael.w.langley@usace.army.mil <michael.w.langley@usace.army.mil>

Todd,

Thanks for sharing a copy of the formal comment letter with the EIS project team.

We appreciate the specificity and clarity of the comments expressed – and look forward to discussions with you on these topics as the impact study progresses toward finalization.



Mary C. Rasmussen, Team Leader
Resolution Copper Mine EIS
Forest Service

Tonto National Forest

p: 602-225-5245
c: 480-710-7304
mary.rasmussen@usda.gov
2324 E. McDowell Rd
Phoenix, AZ 85006
www.fs.fed.us
Caring for the land and serving people

---

From: Todd Pryor [mailto:manager@superioraz.gov]
Sent: Friday, October 11, 2019 11:25 AM
To: Rasmussen, Mary C -FS <mary.rasmussen@usda.gov>
Subject: Comment Letter

Please find attached our final comment letter. I have submitted this through the official channels as well, but I wanted to get you a copy and thank you for your help throughout our review process.

Sincerely,

Todd Pryor

Town Manager

Town of Superior

(520) 689-5752

manager@superioraz.gov

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete this message immediately.

1

2

Appendix R



# TOWN OF SUPERIOR

October 18, 2019

Mr. Neil Bosworth, Supervisor
Tonto National Forest
2324 E. McDowell Rd.
Phoenix, Arizona 85006

RE:   Comments on the Draft EIS

Dear Supervisor Bosworth:

*(The following body text is arranged in multiple sideways columns and is not legibly reproducible at this resolution. Section headings visible include: Tailings, Water, Housing, Public Safety, Traffic, Recreation, Bronco Creek, Environmental Justice, Socioeconomic, Funding/Assurances, Land Exchange.)*

Sincerely,

Todd Pryor
Town Manager
Town of Superior

11-RCMSER-2681

Appendix R

**Emily Newell**

| | |
|---|---|
| **From:** | Resolution Comments <comments@resolutionmineels.us> |
| **Sent:** | Friday, September 6, 2019 11:24 AM |
| **To:** | Emily Newell |
| **Subject:** | Fwd: FW: Request for a Meeting with Town of Superior and Tonto National Forest |
| **Attachments:** | Final Budget 2019 2020.pdf |

EXTERNAL: This email originated from outside SWCA: Please use caution when replying

---------- Forwarded message ----------
From: Rasmussen, Mary C -FS <mary.rasmussen@usda.gov>
Date: Thu, Sep 5, 2019 at 6:20 PM
Subject: FW: Request for a Meeting with Town of Superior and Tonto National Forest
To: <comments@resolutionmineels.us> <comments@resolutionmineels.us>

From: Todd Pryor [mailto:manager@superioraz.gov]
Sent: Thursday, September 5, 2019 4:07 PM
To: Mila Besich <mila@superioraz.gov>; Torres, Tom -FS <tom.torres@usda.gov>
Cc: Rasmussen, Mary C -FS <mary.rasmussen@usda.gov>; Bosworth, Neil -FS <neil.bosworth@usda.gov>; Sando, Mark -
FS <mark.sando@usda.gov>; Lynne Nemeth <lynne.nemeth@btarboretum.org>; Boultinghouse, Veronica - FS
<veronica.boultinghouse@usda.gov>
Subject: RE: Request for a Meeting with Town of Superior and Tonto National Forest

I noticed a fairly substantial math error in the Socioeconomic section, and I was hoping you could clarify it before I work
on a comment.

On page 651, the report states that the cost of public safety in the Town of Superior will increase by 50% at full mine
operations, or $375,000. The correct amount of a 50% increase based on the FY 2020 budgeted expenditures is
$802,627. The $375,000 number seems to be based on the police budget alone and not police, fire, and ambulance. It
also ignores the expenses of the RCM Emergency Services Contract.

This factor alone requires a re-think on the entire section, and perhaps the public safety section as well, as the revenue
created by the current tax structure will not come anywhere near the projected expenses, and this needs to be reflected
as a significant, neigh, huge, impact of mine operations.

[Continued]

1

Thank you. We appreciate everyone's time and attention. Looking forward to this meeting.

Thank You,

Mila Besich

Mayor

Town of Superior

C: 520-827-0676

Sent from my iPhone

On Jul 18, 2019, at 11:59 AM, Torres, Tom -FS <tom.torres@usda.gov> wrote:

Hi Mila – We look forward to sitting down with you and others to discuss the various road access and
mining issues that are important to the Town of Superior.

Neil is aware of your request and sees this meeting as very important. He will be back in the office next
Monday.

Tom

<image001.png>  Tom Torres
Deputy Forest Supervisor
Forest Service

Tonto National Forest
p: 602-225-5375
c: 602-550-0692
tom.torres@usda.gov
2324 E. McDowell Rd.
Phoenix, AZ 85006
www.fs.fed.us
<image002.png><image003.png><image004.png>
Caring for the land and serving people

3

If the Town does not have sufficient revenue to increase our police force to meet this increase in call load, the public safety
of the community will suffer. The town does not have the resources to make up this shortfall in any other way.

I am working on draft comments, but this would require a re-think of many of our mitigation strategies. Can you check
on this data and let me know the nature of this error so that I may correctly respond? I have attached the town budget
for your consideration.

Thank you,

| | |
|---|---|
| Comment ID: | 250-1 |
| Response: | 8014 |

Todd Pryor

Town Manager

Town of Superior

(520) 689-5752

manager@superioraz.gov

From: Mila Besich <mila@superioraz.gov>
Sent: Thursday, July 18, 2019 12:55 PM
To: Torres, Tom -FS <tom.torres@usda.gov>
Cc: Rasmussen, Mary C -FS <mary.rasmussen@usda.gov>; Bosworth, Neil -FS <neil.bosworth@usda.gov>; Sando, Mark -
FS <mark.sando@usda.gov>; Todd Pryor <manager@superioraz.gov>; Lynne Nemeth
<lynne.nemeth@btarboretum.org>; Boultinghouse, Veronica - FS <veronica.boultinghouse@usda.gov>
Subject: Re: Request for a Meeting with Town of Superior and Tonto National Forest

Hi Tom,

2

From: Mila Besich [mailto:mila@superioraz.gov]
Sent: Wednesday, July 17, 2019 4:02 PM
To: Rasmussen, Mary C -FS <mary.rasmussen@usda.gov>; Bosworth, Neil -FS
<neil.bosworth@usda.gov>; Sando, Mark -FS <mark.sando@usda.gov>
Cc: Todd Pryor <manager@superioraz.gov>; Lynne Nemeth <lynne.nemeth@btarboretum.org>;
Boultinghouse, Veronica - FS <veronica.boultinghouse@usda.gov>; Torres, Tom -FS
<tom.torres@usda.gov>
Subject: RE: Request for a Meeting with Town of Superior and Tonto National Forest

Mary,

Thank you for reaching out. I am going to have my assistant reach out and set a meeting up for us. We
may need to look at the second week in August due to the Rural Policy Forum. We would also like for
Lynne Nemeth from the Arboretum to attend.

Thanks

P IdlЄihvlЄk

Mayor

Town of Superior

P. 520-689-5752

C. 520-827-0676

Sent from Mail for Windows 10

From: Rasmussen, Mary C -FS <mary.rasmussen@usda.gov>
Sent: Wednesday, July 17, 2019 9:44:29 AM
To: Mila Besich <mila@superioraz.gov>; Bosworth, Neil -FS <neil.bosworth@usda.gov>; Sando, Mark -FS
<mark.sando@usda.gov>
Cc: Todd Pryor <manager@superioraz.gov>; Lynne Nemeth <lynne.nemeth@btarboretum.org>;
Boultinghouse, Veronica - FS <veronica.boultinghouse@usda.gov>; Torres, Tom -FS

4

Appendix R

---

<tom.torres@usda.gov>
**Subject: RE: Request for a Meeting with Town of Superior and Tonto National Forest**

Hello Mila,

Neil is away on vacation for the second half of July.

May I suggest that you contact Neil's executive assistant to schedule a meeting in early August.

Veronica has access and arranges calendars and meeting schedules for both Neil and Tom.

Veronica's contact info:

Veronica Boultinghouse, Executive Assistant

phone: 602-225-5284

email: veronica.boultinghouse@usda.gov

---

<image001.png> **Mary C. Rasmussen, Team Leader**
**Resolution Copper Mine EIS**
**Forest Service**

**Tonto National Forest**
p: 602-225-6246
c: 480-710-7304
mary.rasmussen@usda.gov
www.fs.fed.us
<image002.png><image003.png><image004.png>
Caring for the land and serving people

5

---

**From: Mila Besich [mailto:mila@superioraz.gov]**
**Sent: Monday, July 15, 2019 3:38 PM**
**To:** Bosworth, Neil -FS <neil.bosworth@usda.gov>; Rasmussen, Mary C -FS <mary.rasmussen@usda.gov>; Sando, Mark -FS <mark.sando@usda.gov>
**Cc:** Todd Pryor <tmanager@superioraz.gov>; Lynne Nemeth <lynne.nemeth@btarboretum.org>
**Subject: RE: Request for a Meeting with Town of Superior and Tonto National Forest**
**Importance: High**

Greetings Neil, Mark and Mary,

I would like to bring your attention to three critically important matters that will have a great impact on Superior, clearly necessitating a face to face meeting with you in the very near future. Please send me your best available dates the week of July 29th. Below you will find updates and concerns that the Town of Superior has in regards to these specific projects that have the potential to adversely impact Superior and the natural areas surrounding our community. I have included Lynne Nemeth, the new Executive Director for the Arboretum as we would like to include her in our discussions with the Forest Service.

**Imerys-Forest Road 4:** The Forest Service needs to be advised that the public meeting with Imerys on Friday, July 12 did not go well. Everyone left the meeting frustrated and angry that Imerys had no real plans on how to create access to the Arnett Canyon trail or create a new connecting route to Forest Road 4. The public, along with the Town of Superior, is concerned that this re-route will not be completed before the busy winter recreation season. The Town of Superior did record the entire meeting. Imerys responded that it could take up to three years before the Forest Service will permit a new road to make the new connection for Forest Road 4, and if accurate, this is unacceptable. We all need to come up with a solution to this problem, and quickly.

The Tonto and the Town need to have a discussion before any further meetings with Imerys are held. If Forest Road Four is not fixed, it will have a negative impact on our local economy, limit recreational access for our residents and create a variety of safety issues when people realize the road is closed and do not have the resources to turn around. The road is marked but we all know there will be those who may not heed posted signs.

**Resolution Copper - Draft EIS:** As the data on the Resolution Copper Draft EIS comes out, the Town is growing increasingly concerned about the projected loss of water in the Queen Creek watershed. We have asked Resolution to share their mitigation plan with us as soon as possible, however we began requesting this information in late March. We are concerned that the Draft EIS will come out and it will only show the loss of water and not the actual mitigations that are needed. The Town has several suggestions and ideas on how to mitigate this water loss and we would like to ensure that the Forest Service and or SWCA are aware of our suggestions, as we cannot guarantee that our message will be carried forward by Resolution Copper or that our suggestions for mitigations will be their priorities.

6

---

We would like to request a meeting with either the Forest Service and/or SWCA for a briefing on the findings of the EIS as soon as it is appropriate and before further public meetings are hosted. This is important to the Town so we can appropriately communicate to our residents and also intelligently respond within the EIS Comment period.

**Bronco Creek:** This project will continue to be a lingering concern that will negatively affect Superior and the Arboretum. Recently, Town staff created a map that shows the plot lines and all of the Bronco Creek claims. The Town of Superior and the Arboretum are surrounded by their claims. We all understand that some of this is unlikely to happen but it still poses a huge threat to Superior and the Boyce Thompson Arboretum. Bronco Creek could essentially hold up any major development in Superior as the Land Exchange does not clarify that when the Town buys the Land Exchange - Airport Contiguous properties from the Federal Government that it will include the mineral rights. While the overall Bronco Creek drilling plan is separate from the Resolution Copper EIS it does affect the true benefits of the Land Exchange to Superior as well as the RUG plan which are mitigations for the loss of Oak Flats resulting from Resolution Copper's mine development and operations.

The Town understands that the Tonto National Forest is under great stress with limited resources and having to push through a tremendous amount of work in and around the Superior area. We appreciate the time and effort that you afford us. Please let Todd or me know of your best available dates and times for a meeting the week of July 29. The only day we cannot meet is July 31.

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

7

---

**Tommie C. Martin, District I**
618 E. Hwy 260, Payson, 85547
(928) 474-2029
tmartin@co.gila.az.us

**Tim R. Humphrey, District II**
(928) 402-8751
thumphrey@co.gila.az.us

**Woody Cline, District III**
(928) 402-8726
wcline@co.gila.az.us

**W. James Menlove,**
**County Manager**
(928) 402-4341
jmenlove@gilacounty.az.us

**Marian Sheppard,**
**Clerk of the Board of Supervisors**
(928) 402-8757
msheppard@gilacounty.az.us

**GILA COUNTY**
**BOARD OF SUPERVISORS**
1400 E. Ash Street
Globe, Arizona 85501

October 16, 2019

Mr. Neil Bosworth, Supervisor
Tonto National Forest
2324 E McDowell Road
Phoenix, AZ 85006

*RE: Comments on Resolution Copper Project and Land Exchange Draft Environmental Impact Statement (DEIS)*

Dear Forest Supervisor Bosworth:

The Gila County Board of Supervisors appreciates the opportunity to offer comments on the above referenced document. Although not included with the geographic boundaries of Gila County, Resolution Copper has and will continue to create an economic benefit to Gila County; however, with the late inclusion of the Skunk Camp site, Alternative 6, the project now has a direct impact on Gila County residents in the Dripping Springs area.

| | Comment ID: 26824-3 |
|---|---|
| | Response: ALT26 |

**Tailings Facility Location Chapter 2**

Gila County is aware of the applicant's proposed tailing sites included in the Draft EIS, Chapter 2 and understands that the preferred Alternative 6 site is the most remote sight and is the least objectionable tailings location; however, we recognize and respect the concerns of our citizens in Hayden and Winkelman. If Alternative 6 remains the preferred site in the Record of Decision Gila County encourages the USFS and Resolution Copper Company to take all measures possible to mitigate any impacts of concern to those communities.

| | Comment ID: 26824-1 |
|---|---|
| | Response: MIT1 |

Gila County requests that all mitigation measures for tailings facilities aimed at public health and safety are not used till Gila County agrees that these measures are critical to monitoring and remediating any unforeseen environmental contamination problems.

Socioeconomic: Estimated 4% reduction in property values for 31 properties in the vicinity of the tailings facility (DEIS page 655). Gila County requests that the USFS and Resolution Copper Company mitigate these reductions with the property owners.

Continued →

Appendix R



---

Resolution Copper Project and Land Exchange DEIS - Comments 12

[Continued] If Skunk Camp location the preferred site in the Record of Decision designed and created by the ES, Gila County requests that the ES and Res Copper assure that all mitigation measures be in place to reduce the impacts to adjacent property owners.

**Comment ID:** 32024-2
**Response:** DET1

Gila County supports any and all mitigation measures to offset the estimated $370/99 in wildlife related revenue from the loss of Oak Flat and Skunk camp (DEIS page 653)

The Gila County Board of Supervisors thanks you for the opportunity to comment and requests to be kept informed and included in the process moving forward.

Respectfully submitted,

*Woody Cline*

Woody Cline
Chairman, Gila County Board of Supervisors

---

**PINAL COUNTY**

Supervisor Pete Rios
Board of Supervisors
District 1

October 31, 2019

Mr. Neil Bosworth
Tonto National Forest - Resolution EIS Comments
PO Box 34468
Phoenix AZ 85067-4468

Dear Mr. Bosworth:

As Pinal County District 1 Supervisor and a native to the Hayden-Winkelman area, I am extremely familiar with copper mining and the Resolution Copper Project and Land Exchange. The majority of the project footprint including the mine and associated ancillary facilities are located within my district. Copper mining represents an important base industry for the economy in rural Pinal County and specifically the Copper Triangle communities. Please accept the following comments on the Draft Environmental Impact Statement (DEIS) for the Resolution Copper Project and Land Exchange.

The communication and consultation from TNF with local communities and incorporation of their feedback has improved the mine plan in important ways. This is most notable in the alternatives analysis and selection of the preferred alternative called Skunk Camp, which locates a tailings facility off public lands, behind the Ray Open Pit mine and far away from local communities and popular recreational areas. The technology incorporated into this tailings storage facility will be unlike anything that currently exists in the state of Arizona. It incorporates two separate resilient and robust embankments into one impoundment and the design is aligned with the most stringent criteria consistent with best practices internationally. The ridged design features consider long term physical stability to endure maximum floods and 10,000 year seismic events— far beyond any credible earthquake for Arizona. The approach to reclaiming the tailings at the same time as operations with vegetation types native to the local landscape is another innovative tailings management approach that has not been implemented in Arizona to date. This approach to tailings will be a demonstration of how these facilities need to be managed in the future **and I applaud the TNF for this process and outcome. However I would like to see additional groundwater monitoring down gradient of the Skunk Camp tailings storage facility and before the confluence of the Gila River incorporated into the Final EIS**

**Comment ID:** 314-1
**Response:** MIT1

The socioeconomic analysis has concluded that the overall socio-economic impact of the Resolution Copper Project would result in tens of billions tax revenues and thousands of jobs with hundreds of millions in wages. These types of revenues will be vital to Pinal County and the Copper Triangle since spending by base industries, and the associated taxes, stimulate local business and construction, business services, banks and hospitals. The revenue from this mine will result in lower taxes for residents and sustained investments that strengthen the communities through strong education. **The DEIS discloses the high and low valuation of the Superior Unified School District (SUSD), both of which would be a windfall of tens of millions in taxes annually. However, the DEIS does not disclose what this would mean for the average resident of Superior in terms of lowering of their average annual taxes – please disclose this in the Final EIS along with the high and low estimate of the tax benefit directed back to the SUSD**. Please also add a statement on the benefits to the communities of Hayden and Winkelman by relocating the tailings storage facility at Skunk Camp given that some portion of the jobs would be re-allocated to this general vicinity.

**Comment ID:** 314-4
**Response:** MIT1

**Comment ID:** 314-2
**Response:** EC14

**Comment ID:** 314-3
**Response:** SO10

BOARD OF SUPERVISORS
P.O. Box 827    Florence, AZ 85232    T 520-866-6515    F 520-866-6517
P.O. Box 201    Mammoth, AZ 85618    T 520-866-6530    T 520-487-2941    F 520-866-7056
Pete Rios@pinalcountyaz.gov

---

In recognition of the need to diversify and enhance our Copper Triangle economy, I strongly support the proposed mitigations that will bring much need day time tourism to the Town of Superior and wish to see these further committed and memorialized in the Final EIS including: RC-214 Recreational Users Group and Superior Trails Network Plan; An offset to the loss of bouldering at Oak Flat has been found called the "Inconceivables" as RC-213; A new campground to replace the Oak Flat campground called "Castleberry" (RC-215).

**Comment ID:** 314-4
**Response:** MIT3

I also strongly support the conservation of the lower San Pedro 7B parcel as described in Section 3003 of the National Defense Authorization Act for Fiscal Year 2015 (NDAA) located near the Town of Mammoth and finalization of the compensatory mitigation plan riparian conservation, restoration and preservation projects geared towards communities located closest to the project (Queen Creek – Town of Superior; Gila River – Gila River Indian Community; Lower San Pedro In-Lieu Fee – Winkleman, Hayden, Kearny). Conservation of these riparian areas will also help drive diversification and protect special places for wildlife.

**Comment ID:** 314-5
**Response:** MIT3

For these reasons, I wanted to reiterate my support for the Resolution Copper Project, and ask that the TNF complete the Final EIS in the timeliest manner to benefit rural Pinal County and local Copper Triangle Towns and Cities.

Sincerely,

*Pete Rios*

Pete Rios
Pinal County Supervisor District 1

---

**FEC's Comments on Resolution Mine Draft EIS Air Quality Section**

Submitted by Feng Mao

• Draft EIS Pg. 277 AERMOD/AERMET

The 2019 NEPA Air Quality Impacts Analyses Report indicates that Resolution used AERMOD 18081 version and AERMET 16216 version for near-field analyses. It is not clear why AERMET 16216 instead of AERMET 18081 was used. Please note that the EPA released an updated AERMOD/AERMET version (dated 19191) on August 21, 2019. It is recommended to review the recent AERMOD/AERMET updates to check whether such updates will affect the modeled results or not.

**Comment ID:** 278-1
**Response:** AQ15

• Draft EIS Pg. 277 CALPUFF

In the 2017 Appendix W Final Rule, EPA removes CALPUFF as a preferred model for long-range transport assessments. It is recommended to provide justification why the use of CALPUFF is appropriate for Class I area PSD increment and AQRV analyses.

**Comment ID:** 278-2
**Response:** AQ9

• Draft EIS Pg. 277 Years of Meteorological Data

It is recommended to delete the statement of "The dispersion models relies on 2 continuous years of meteorological data collected from the on-site monitors". While AERMOD used 2 years site-specific meteorological data, CALPUFF used 3 years of gridded data.

**Comment ID:** 278-3
**Response:** DOC1

• Draft EIS Pg. 277 Types of Emissions Sources

The statement that the emission sources were categorized into two groups (point source and area source) is incorrect. Depending on the source release characteristics, the emission sources were characterized as point source, area source, volume source as well as line source (see NEPA Air Quality Impacts Analyses Report). For example, emissions from material transfer processes were modeled as volume source and emissions from roadways were modeled as LINE source.

**Comment ID:** 278-4
**Response:** DOC1

• Draft EIS Pg. 281 Background Concentrations

The most recent 3 years of monitoring data show that the concentration levels in Year 2017 were higher than previous years. However, the NEPA Air Quality Impacts Analyses does not consider the 2017 monitoring data for the background concentrations determination. Would it be a concern?

**Comment ID:** 278-5
**Response:** AQ2

• Draft Pg. 285 Table 3.6.4-1 and Pg. 289 Table 3.6.4-2

[Continued] →

---

2

Appendix R

November 7, 2019

Mr. Neil Bosworth
Forest Supervisor
Tonto National Forest
2324 East McDowell Road
Phoenix, AZ 85006

Submitted electronically to: www.ResolutionMineEIS.us/Comment

RE:   Draft Environmental Impact Statement for the Resolution Copper Project and
      Land Exchange

Dear Mr. Bosworth:

The Arizona Game and Fish Department (Department) has reviewed the Draft Environmental Impact Statement (DEIS) for the Resolution Copper Project and Land Exchange. The Department understands Resolution Copper Mining, LLC (Resolution Copper) has proposed to develop an underground copper mine near the town of Superior in Pinal County, Arizona on unpatented mining claims on the Tonto National Forest (Forest), along with a congressionally mandated land exchange. The project would contribute to the state's economic, recreational, and natural resources values, and create associated jobs, provide mine site, and associated infrastructure, development, and utility corridors, and access routes. The Department appreciates Resolution Copper's extensive coordination efforts with the Department as a cooperating agency, the Department has provided the Forest with technical expertise, review of draft documents, and recommended mitigation measures and conservation opportunities to support the development of the DEIS.

Under Title 17 of the Arizona Revised Statutes, the Department, by and through the Arizona Game and Fish Commission (Commission), has jurisdiction and authority and public trust responsibilities for the management of state fish and wildlife resources. It is the mission of the Department to conserve Arizona's diverse fish and wildlife resources, and manage for safe, compatible outdoor recreation opportunities for current and future generations. In our state's recognizes the importance of Resolution Copper's contributions to the state's economic development. Similarly, the Department believes that through effective planning and coordination with the Department, projects such as Resolution Copper can avoid, minimize or mitigate to the extent possible, adverse impacts on the state's fish and wildlife resources and wildlife-related recreation. For these reasons, the Department has expressed interest in all land planning initiatives that may affect the management of the state fish and wildlife resources, statutory authorities, public trust responsibilities, and special expertise related to wildlife resources and recreation.

Sincerely,

Jim Goss
Assistant Director, Wildlife Management Division

Attachments:   Arizona Game and Fish Department (AGFD), 2019, MSP-0009303632 AGFD
              Comment Matrix on the Draft EIS for Resolution Copper Project

Literature Cited

Arizona Game and Fish Department (AGFD), 2018, Report on Species of Economic Importance,
   Wildlife Related Recreation and Public Access within the Resolution Copper Mine
   Project Area

AGFD, 1994, Department Operating Manual, Commission Policy A.1.9., Department Policy for
   Habitat Compensation Policy (I2.3)

Resolution Copper, 2016, General Plan of Operation

Resolution Copper, 2016, Revised Wildlife Plan

Rio Tinto, 2017, Our evolving approach to biodiversity

cc:   Clay Crowley, Habitat Branch Chief
      Ginger Ritter, Project Evaluation Program Supervisor
      Jay Cook, Regional Supervisor, Region VI Mesa
      Kelly Wolff, Habitat, Evaluation and Lands Program Manager

Appendix R



December 12, 2019

Mr. Neil Bosworth
Forest Supervisor
Tonto National Forest
2324 East McDowell Road
Phoenix, AZ 85006

Submitted electronically to: www.ResolutionMineEIS.us/Comment

RE: Amend AGFD Comments on Draft Environmental Impact Statement for the Resolution
Copper Project and Land Exchange

Dear Mr. Bosworth:

The Arizona Game and Fish Department (Department) has reviewed our comments submitted on the Draft
Environmental Impact Statement (DEIS) for the Resolution Copper Project and Land Exchange on
November 7, 2019.

The Department determined that some comments were inadvertently omitted due to multiple reviewers
when the comments were collated and prepared for submittal. Therefore, the Department requests that the
Forest consider the attached comment matrix as the Department's official comments on the DEIS;
replacing the previous comment matrix that accompanied our letter dated November 7, 2019. The attached
table has all of the Department's original comments, as well those that were inadvertently omitted
(highlighted blue).

The Department appreciates the opportunity to review and provide comments on the DEIS. Please contact
Clay Crowder (ccrowder@azgfd.gov) or 623-236-7666) directly with any questions regarding this letter.

Sincerely,

Jim deVos
Assistant Director, Wildlife Management Division

cc: Clay Crowder, Habitat Branch Chief
Ginger Ritter, Project Evaluation Program Supervisor
Jay Cook, Regional Supervisor, Region VI, Mesa
Kelly Wolff, Habitat, Evaluation and Lands Program Manager

AGFD # M19-03603432

Attachments: Arizona Game and Fish Department (AGFD) 2019 M19-03603432 AGFD Revised Comment Matrix on the
Draft EIS for Resolution Copper Project

azgfd.gov | 602.942.3000

5000 W. CAREFREE HIGHWAY, PHOENIX AZ 85086

GOVERNOR DOUGLAS A DUCEY COMMISSIONERS CHAIRMAN ERIC S SPARKS TUCSON | KURT R DAVIS PHOENIX
LELAND S "BILL" BRAKE ELGIN | JAMES E GOUGHNOUR PAYSON | JAMES L ZIELER ST JOHNS DIRECTOR TY E GRAY DEPUTY DIRECTOR JIM DEVOS

Appendix R

Ch 3 - Water Resources 3.7

| page section | issue | comment/observation | action requested | |
|---|---|---|---|---|
| 317-325 | Buried Spring | **Buried Spring** has the highest riparian value, supporting a standing pool and its 500-foot riparian string of cottonwood, willow, mesquite, saltcedar, and sumac. The Proposed Action will decrease the groundwater drawdown at this spring by 30 to 50 feet. This will lead to complete loss of the riparian habitat. | **Action:** As Arizona Game and Fish Commission Policy A2.3, 'Wildlife and Wildlife Habitat Compensation', requires compensation measures to eliminate or reduce impacts to riparian habitats. AGFD requests incorporation of the proposed mitigation listed in the comments for Appendix 4. | Comment ID: 30075-21  Response: WT62 |
| 320 | Table 3.7.1.3 | For the McGinnel Mine Spring, Table 3.7.1.3 indicates that 86 of 87 sensitivity runs show a drawdown greater than 10 feet in the Proposed Action alternative 200 years after the start of mining. However, the hydrograph form the sensitivity modeling results from the Groundwater Modeling Work Group indicate only 1 out of 67 runs show impacts greater than 10 feet for McGinnel Mine Spring in the Proposed Action alternative 200 years after the start of mining. | **Action:** The sensitivity modeling results should be verified and changed in the FEIS, if warranted. | Comment ID: 30075-02  Response: WT79 |
| | Table 3.7.1.1 Middle and Lower Devils Canyon | Table 3.7.1.3 states that Spring DC-4.6W, a spring located on the wall of Middle Devils Canyon, is predicted to experience drawdown of 10-30 feet and dry up 200 years after the start of the mine as a result of dewatering. Mine is dewatering and block-caving of Resolution Mine's dewatering and block-cave mining. | **Action:** The modeled prediction of the mine-related loss of this spring must be reconciled with any predictive statement that the Middle Devils Canyon baseflow is not expected to experience drawdown. | Comment ID: 30075-1  Response: WT63 |
| 321 | Table 3.7.1.3 Possible drawdown impacts to GDEs. | For McGinnel Spring, the table indicates that 85 of 87 sensitivity runs show a drawdown greater than 10 feet in the Proposed Action alternative 200 years after the start of mining. However, the hydrograph from the sensitivity modeling results from the Groundwater Modeling Work Group appears to indicate that none of the runs show an impact greater than 10 feet for McGinnel Spring in the Proposed Action alternative 200 years after the start of mining. | **Action:** The sensitivity modeling results should be verified and changed in the FEIS, if warranted. | Comment ID: 30075-03  Response: WT79 |

Ch 3 - Water Resources 3.7

| page section | issue | comment/observation | action requested | |
|---|---|---|---|---|
| 302 | Table 3.7.1-3 | Table 3.7.1-3 states that the predicted modeled groundwater drawdown caused by Resolution mine dewatering and the blockcave is less than 50 feet for Middle Devils Canyon. Groundwater drawdown of 50-30 feet caused by Resolution Mine blockcaving is estimated to occur along the wall of Middle Devils Canyon at spring DC-4.6W. On September 10, 2018, WGCA presented to the Groundwater Modeling Working group a Table containing a summary of predicted impacts to Groundwater-Dependent Ecosystems. This Table concludes that seven locations, including springs, in Devils Canyon will experience greater than 10 feet of groundwater drawdown caused by Resolution Mine blockcaving. In addition to Spring DC-4.6W, they are: DC-1.6D, DCN-2W, DC-6.1C, DC17.1C, DC6.4-4D, DC-6 | **Action:** The Proposed Action modeling results should be rechecked for accuracy and the Table corrected, if necessary. | Comment ID: 30075-24  Response: WT62 |
| | Middle and Lower Devils Canyon | Even after 200 years, the predicted extent of the 50-foot drawdown zone will continue to increase, as groundwater continues to flow toward the collapsed block cave zone. GDE's to the south and southeast of the East Plant Site, such as Spring DC-6.6W and Devils Canyon, will be primarily affected. Review of Numerical Groundwater Model Construction and Approach in Section 4.17.0.3 | **Action:** Describe the environmental effects of continued and complete propagation of groundwater drawdown on the aquatic resources of Middle and Lower Devils Canyon. | Comment ID: 30075-2  Response: WT76 |

Ch 3 - Water Resources 3.7

| page section | issue | comment/observation | action requested | |
|---|---|---|---|---|
| | Middle and Lower Devils Canyon | **General Comment:** Devils Canyon is the immediate and critical GDE that. The middle and lower reaches of Devils Canyon, including the confluence with Mineral Creek (5.7 miles) have perennial base flows, arising both from ground springs along its walls and from groundwater inflow from the Apache Leap Tuff aquifer. GDE's, Vol. 1 of 312, perennial base flows arising both from groundwater springs along its walls and from groundwater inflow from the Apache Leap Tuff aquifer. This groundwater originates from the Apache Leap Tuff aquifer. GDE, vol. 1 of 313, Review of Numerical Groundwater Model Construction and Approach (Mining and Subsidence Analyst (BGC Engineering, November 1, 2018). The middle and lower reaches of Devils Canyon are a Groundwater-Dependent Ecosystem (GDE), GDE, Vol. 1 of 312. This GDE consists of a 2.8 mile long, 50-acre riparian gallery and a 3.5 mile long saturated marsh with several large perennial pools. Dominant riparian species are sycamore, cottonwood, ash, alder, and willow, and wetland species at spring locations, GDE, Vol. 1 of 208. | **Action:** The effects of the Resolution Project on this important riparian area are of great importance to AGFD. AGFD requests the following comments and actions be considered for this GDE. | Comment ID: 30075-23  Response: WT6 |

Ch 3 - Water Resources 3.7

| page section | issue | comment/observation | action requested | |
|---|---|---|---|---|
| 302 | Middle and Lower Devils Canyon | Given that the perennial baseflows in Devils Canyon are dependent both from springs along its walls as well as groundwater flow along the channel bottom, what is the scientific basis for the categorical statement in vol. 1 at 322 that "[g]roundwater inflow along the main stem of Devils Canyon is not anticipated to be impacted, and the alluvium (in Table 3.7.1-3 that the groundwater inflow of Middle Devils Canyon, '[g]roundwater is possible but unlikely', and for Lower Devils Canyon, 'additional drawdown due to blockcaving is unlikely'? The MODIFLOW-SURFACT model was used to model the groundwater impacts related to Resolution Mine's panel caving and dewatering activities related to ore removal. But the model's large grid cells could not be used to accurately model excessive discharge to perennial reaches of Devils Canyon. As a result, the model cannot predict changes to Devils Canyon stream flows as a result of the Resolution Mine Project. (Review of Numerical Groundwater Model Construction and Approach (BGC Engineering, November 1, 2018). Given this fact, the conclusions in Table 3.7.1-3 that drawdown of the section stream reaches in Devils Canyon are 'unlikely' and 'not anticipated' do not appear to be supported by data or analysis. The Groundwater Modeling Work group and the forms of understand that predicting reductions in stream flows due to (Resolution Mine) groundwater drawdown 'is the most fundamental hydrology question to be answered in the EIS.' (Review of Numerical Groundwater Model Construction and Approach at Section 5.7 | **Action:** Describe in greater detail in Vol. 1, page 303, the model's limitations in providing effects to stream reaches and also that basis for the predictive statements in the DEIS that Devils Canyon stream flows will not be impacted. Analyses of impacts based on the current model modeling is required to provide reliable scientific evidence and data. NEPA 40 CFR 1500.2, 1502.1, 1502.22 | Comment ID: 30075-26  Response: WT91 |
| 330 | Table 3.7.1-5 | Possible drawdown impacts to GDEs. | **Action:** The title of this table should read 'Summary of potential impacts on groundwater-dependent ecosystems from surface flow losses due to subsidence from block-cave mining" | Comment ID: 30075-27  Response: DGGI |

Appendix R







11-RCMSER-2688

Ch 3 - Water Resources 3.7

| page section | issue | comment/observation | action requested | |
|---|---|---|---|---|
| 314 3.7.2.4 | Queen Creek | Exceedances of numeric or nontoxic surface water quality standards for Queen Creek would potentially occur if permit discharge effluent limitations are exceeded. Any exceedances would further impair Queen Creek for aquatic and wildlife use. The DEIS Vol. 2 at 363 acknowledges that The Forest Service has a responsibility to analyze and disclose to the public any potential impacts on surface water and groundwater as part of the NEPA process, separate from the State permitting process. | Action: Analyze and disclose to the public any potential impacts on surface water and groundwater as part of the NEPA process, separate from the State permitting process. | Comment ID: XX075-53 Response: WT45 |
| 364 3.7.2.2 | Surface Runoff | Modeling Details - Identifies 4 water sources for Block-cave area, including | Action: Add - the amount of surface water from sub-dence zone | Comment ID: XX1 Response: |
| 364 3.7.2.3 | Queen Creek | The DEIS states that Resolution Copper is not proposing any direct discharges to surface waters. | Action: Correct this statement in light of potential Resolution Mine discharge to Queen Creek under AZPDES Permit AZ0020508 | Comment ID: XX075-35 Response: WT44 |
| 365 3.7.2.2 | Groundwater | 1. Groundwater inflow Apache Leap, 2 Groundwater inflow deep groundwater system 3 Drawdown water from sub-dug, and 4 Excess mine service water. | Action: Block-cave sump water chemistry should be remodeled to include the oxygenated surface water. | Comment ID: XX075-36 Response: WT41 |
| 366 3.7.2.4 | Impacts on Surface Runoff and Streamflow | Question for the third paragraph on p. 354. Third paragraph. What is acceptable levels of salt seepage and how is the effectiveness of the existing controls measured. | Action: Clarify what the acceptable levels of salt seepage are and how is effectiveness of the existing controls is measured. | Comment ID: XX075-35 Response: |
| 370 3.7.2.3 | Queen Creek | The DEIS states that Queen Creek has the potential to receive additional pollutants caused by the Resolution Copper Project only from runoff or seepage from tailings in Alternatives 2, 3, and 4. | Action: Correct this statement in light of potential Resolution Mine discharge to Queen Creek under AZPDES Permit AZ0020508 | Comment ID: XX075-37 Response: Comment ID: XX075-35 Response: WT44 |

Ch 3 - Water Resources 3.7

| page section | issue | comment/observation | action requested | |
|---|---|---|---|---|
| 330 417 3.7.2.4 | Recycled Water and Seepage Ponds | The closure process for the slurry tailings facility under all Alternatives involves a phased process where the recycled water pond on the tailings facility, along with pumped back seepage, will eventually evaporate. This is estimated to take five years, but the environment of the desert southwest means that open water is an important resource for wildlife, particularly for migrating passerine and waterfowl species that seek open water for resting and drinking. Migratory birds will be attracted to open water at the Resolution Mine site. The recycled water pond can be expected to exhibit after closure. As the ponds water evaporates, metals will become increasingly concentrated. ... | Action: Resolution Mine must develop an effective bird hazing protocol to prevent avian exposure to acidified and metalliferous waters. | Comment ID: XX075-30 Response: WT1 |
| 417 2.2.4.1 table | Seepage Ponds | The Table states that closure of the tailings recycled water pond is anticipated to take up to 25 years after the end of operations. Until that time, excess seepage in seepage ponds would be pumped back to the recycled water pond, and evaporation would also place on the entrainment and tailings backfills. It could take 20 years for the ponds to gradually evaporate all existing seepage. | Action: Develop an extended monitoring protocol for the seepage ponds as a sound design plan for the prevention of large-scale avian mortalities. See above Comment. | Comment ID: XX075-40 Response: WT1 |
| 424 3.7.2.2 | Bypass Seepage Entry and Loading Models | For Bio-HA Camp, one data point is insufficient to determine background water quality. | Action: More samples should be collected and the model should be re-run since additional samples are collected to better depict background water quality conditions. | Comment ID: XX075-41 Response: WT2 |

Ch 3 - Water Resources 3.7

| page section | issue | comment/observation | action requested | |
|---|---|---|---|---|
| 400 3.7.2.2 Overall Effects of Uncertainties on the Modeled Outcomes | Water Quality | Queen Creek and Arnett Creek are already impaired for aquatic and wildlife uses from copper during scarcified conditions. | Action: Consider reworking this discussion. For Queen Creek and Arnett Creek, since they're impaired for copper during scarcified conditions. AGFD believes that many of the consequences of some stream would be attributed to mining operations and conditions, not reduced via dilution. | Comment ID: XX075-42 Response: WT44 |
| 400 3.7.2.2 - Constituents of Concern | Water Quality | Upper Queen Creek is currently listed as impaired for a constituent of concern. | Action: This text should be revised to include bald eagle as a constituent of concern. | Comment ID: XX075-43 Response: WT3 |
| 100, 400 | Devils Canyon Queen Creek | The discussion of effects to riparian vegetation and species as a result of reductions of surface water and groundwater in Devils Canyon and Queen Creek is perfunctory. | Action: Discuss potential mitigation for loss of riparian ecosystems. | Comment ID: XX075-7 Response: MT32 |
| | Devils Canyon Queen Creek | Groundwater and surface flow declines are adversely altering riparian ecosystems throughout the southwest, resulting in a decline of riparian trees (Populus, Fraxinus) (Fremont Cottonwoods) and Salix gooding) (Gooding's willow), the study of the San Pedro River, P. fremontii and S. gooding/il are dominant over T. ramosissima (tamarisk) at sites where surface flows are present more than 76% of the time, intermediate groundwater fluctuations are less than 0.5 m, and average minimum depth to ground water are less than 2.6 m. Abundance of S. gooding/i declined sharply as groundwater fluctuation exceeds 0.5 m and if demands declining as groundwater fluctuation exceeded about .8 m. Degraded water tables lead to a species composition shift to more drought tolerant tamarisk which lowers wildlife habitat quality, and leads to loss of scenic resources for recreation. Surface water and ground water is important for maintaining Populus-Salix forests (San Pedro River, Arizona U.S. Life, J.C. Stromberg (Arizona State University 2010); Cottonwood and Willow Ecology Action, Blankinson and Ingraldi, (Arizona Game and Fish Department). | Action: Discuss and disclose the potential loss of riparian ecosystems due to a drop in groundwater tables of even less than 1.6 feet in the Devils Canyon and Queen Creek watershed. | Comment ID: XX075-64 Response: WT2 |

Ch 3 - Water Resources 3.7

| page section | issue | comment/observation | action requested | |
|---|---|---|---|---|
| | Middle Devils Canyon Queen Creek Springs | The DEIS does not contain a discussion of the potential cumulative impact of climate change on the wildlife water resources. A cover letter dated November 5, 2014 from Resolution Copper to the Forest Service references an enclosure from WSP, November 2014, entitled Resolution Copper Environmental Flow Mobile "Climate Change". The Department cannot locate this technical report in the USDA Tonto NF Resolution Copper Project EIS website. | Action: Discuss the effects of climate change trends in the southwest United States to a cumulative impact on surface water resources within the Resolution Mine EIS analysis area. | Comment ID: XX075-9 Response: AG21 |
| | Middle Devils Canyon Queen Creek Springs | The cumulative concerning the extent of groundwater drawdown and its effect on riparian habitats do not induce the Forest Service of its responsibility under NEPA to discuss the mitigation of likely impacts. South Fork Sand Creek v. U.S. Department of the Interior, 588 F.3d 715 (9th Cir. 2009). | Action: Discuss potential mitigation for its loss of riparian ecosystems. | Comment ID: XX075-10 Response: MT32 |
| N5-7 3.7.3.4 | Tedie 3.7-36 Changes in Avg Monthly Flow | Since many of the actions are intended in nature, the average monthly streamflow changes may not adequately demonstrate the significant reduction in flows. Water will be present in the stream less frequently due to the reduction of runoff making it to the stream and, therefore, water will be available in smaller quantities and in shorter timeframes. This may have a bigger impact to aquatic and wildlife than the average flow volume predict. | Action: Consideration should be given to revising the text accordingly for its potential wildlife impacts due to flow reductions. | Comment ID: XX075-44 Response: IN3 |
| N5-13 3.7.3.4 | Unavoidable Adverse Effects | The section states "Alternative 5 would cause the least amount of impacts to the bred of large seepage ponds at Pinto Valley which affords gulls with some distance elsewhere to draw in from avoidable surface water features (Gila River). Alternative 6 is not anticipated from these alternatives, and in addition to have locations of the more flexibility in responding to potential problems with additional seepage control." However, on page 417 under PREDICTED REDUCTIONS IN ASSIMILATIVE CAPACITY, it says "For Alternative 6, the discharge of seepage into the Gila River uses more than 50 percent of the assimilative capacity for selenium." | Action: Clarify why this is not considered an adverse effect as AGFD believes the seepage from Alternative 6 that uses more than 50 percent of the assimilative capacity for selenium will be an adverse effect on concentrations of selenium can have adverse impacts to birds. | Comment ID: XX075-45 Response: WT5F |

Appendix R

11-RCMSER-2690

11-RCMSER-2691

Appendix R

11-RCMSER-2692

Appendix R

11-RCMSER-2693

Appendix R

R-42

Appendix R

R-43

Douglas A. Ducey
Governor

Arizona State Land Department

Lisa A. Atkins
Commissioner

November 7, 2019

Mr. Neil Bosworth
Forest Supervisor
Tonto National Forest
PO Box 34468
Phoenix, AZ 85067-4468

RE: Resolution Copper Draft Environmental Impact Statement Comments

Dear Supervisor Bosworth,

As a cooperating agency, the Arizona State Land Department (ASLD) appreciates the opportunity to submit comments for the record on the Resolution Copper Draft Environmental Impact Statement (DEIS).

## GENERAL COMMENTS

## SUBJECT-SPECIFIC DEIS COMMENTS

### WATER IMPACTS

## SKUNK CAMP TAILINGS FACILITY – PREFERRED ALTERNATIVE

## SLURRY PIPELINE ON STATE LAND

## CULTURAL RESOURCES OF SKUNK CAMP

Table 1. Cultural resources directly impacted by the different alternatives

| Tailing Storage Alternatives | Cultural Resources Directly Impacted |
| --- | --- |
| Skunk Camp (South Pipeline Alternative) | 301 |
| Skunk Camp (North Pipeline Alternative) | 253 |
| Peg Leg West Pipeline Alternative | 75 |
| Peg Leg East Pipeline Alternative) | 99 |
| Silver King | 60 |
| Near West (both Alternatives 2 and 3) | 56 |



Figure 1: Cultural Resources Directly Impacted

## LESSEE IMPACTS OF SKUNK CAMP

## CONCLUDING REMARKS

Appendix R

R-44

Appendix R

---

**Arizona House of Representatives**
Phoenix, Arizona 85007

October 24, 2019

Mr. Neil Bosworth
Tonto National Forest Supervisor
United States Forest Service
P.O. Box 34468
Phoenix, AZ 85067-4468

Attn: Resolution DEIS Comments

Supervisor Bosworth:

On August 9th, the United States Forest Service (USFS) reached an important milestone with the release of the Draft Environmental Impact Statement (DEIS) for the Resolution Copper project. I appreciate the opportunity and the process of which the USFS is allowing our comments to help shape the development of a mining project. This DEIS is a great example of how the National Environmental Policy Act process can be done in a manner that engages the community extensively and seeks feedback to shape the development of a mining project.

As an elected leader that lives near this project, I have an acute interest in the impacts this project will have in supporting Arizona's economy and the constituents I represent. With the extensive support from the county, state, and federal, cooperating agencies as well as Native American, tribes, I am proud to say our community is shaping the outcome of the mine. Specifically, the preferred tailings site is a direct result of community and tribal input after consideration of multiple alternative sites.

The Resolution Copper has shown a commitment to the local community through independent funding agreements and scholarship programs for the schools in the Copper Triangle. Additional support.

The DEIS confirms that this project alone will have the capacity to produce 25% of U.S. copper demand for 40 years. In that process of mining directly, Resolution Copper will create 1,500 permanent jobs in a region that is desperately in need of economic development.

I would like the USFS to further encourage the commitment of Resolution Copper to prove workforce development, job training, and local economic development. Developing the workforce for this side-of-the-art mining project will be a multiple-year effort that should get underway as soon as possible. The DEIS details several key factors related to local development which highlight the need for this project. The project should continue to evolve and expand its partnership and opportunities to ensure both are prepared to take full advantage of the opportunities this project will bring.

Comment ID: 3024
Response: 031

Sincerely,

DAVID L. COOK
State Representative, District 8

---

**Arizona House of Representatives**
Phoenix, Arizona 85007

October 23, 2019

Mr. Neil Bosworth
Tonto National Forest Supervisor
United States Forest Service
P.O. Box 34468
Phoenix, AZ 85067-4468

Attn: Resolution DEIS Comments

Mr. Bosworth:

I write to express my full support of the Resolution Copper project involving forward and encourage the United States Forest Service to rapidly complete the Final Environmental Impact Statement on order NEPA. Regarding the process to date, I have a few comments I would like the Forest Service to consider under NEPA.

Comment ID: 3034
Response: 031

• The approval process has been transparent and has actively sought the involvement of the community and other external stakeholders.

Comment ID: 3035
Response: 031

• The approval process was fully complete and I encourage any extensions.

• The USFS should be applauded for classifying a tailings storage facility alternative that address the majority of public concerns.

The economic impacts highlighted in the DEIS actively illustrate the critical need to have this project up and running indeed delay.

Thank you for the opportunity to comment during the development of the Final Environmental Impact Statement for the Resolution Copper Project. Completing this work is critically important for many socio, our local economies, our state, and our local workforce anxious to get started on this project.

Sincerely,

Representative Mark Finchem
District 11

---

**Arizona House of Representatives**
Phoenix, Arizona 85007

October 15, 2019

Mr. Neil Bosworth
Tonto National Forest Supervisor
United States Forest Service
P.O. Box 34468
Phoenix, AZ 85067-4468

Attn: Resolution DEIS Comments

Dear Mr. Bosworth:

As Chair of the Arizona House of Representatives Commerce Committee, I am always eager to learn about businesses in Arizona. Resolution Copper is a company that will stimulate our economy and one that I am glad is located in Arizona. Thank you for the opportunity to comment during the development of the Final Environmental Impact Statement for the Resolution Copper Project. I hope the United States Forest Service has the resources to quickly complete the Final Environmental Impact Statement for this project, which I support.

Comment ID: 3054
Response: 031

I look forward with great anticipation to this project being up and running and the economic boost it will give to rural Arizona. When I think about the future of our state finances, a project like this will be of utmost importance in providing the resources for a stable healthy economy in the United States. I understand there will be several thousand construction jobs and more than 1,500 permanent jobs created by the project's development. I am planned to see the economic impacts this project will have on Arizona.

Hopefully the review process is quick and efficient. These are the types of projects we need in Arizona.

Thank you for your consideration of these comments.

Sincerely,

JEFF WENINGER
Arizona State Representative
Legislative District 17

JW/khin

---

Mr. Neil Bosworth
October 24, 2019
Page 2

from the property tax impacts will provide a school funding stream which is vital to modernization of the Superior Unified School District.

I appreciate the time and efforts contributed by the USFS, Resolution Copper and the public through notice and meaningful participation in meetings and providing substantive comments that help shape the project. I encourage the USFS to complete the Final Environmental Impact Statement for this project as quickly as possible.

Sincerely,

DAVID L. COOK
State Representative, District 8

11-RCMSER-2697

Appendix R

R-46

**Arizona House of Representatives**
Phoenix, Arizona 85007

October 15, 2019

Mr. Neil Bosworth
Tonto National Forest Supervisor
United States Forest Service
P.O. Box 34468
Phoenix, AZ 85067-3468
Attn: Resolution DEIS Comments

Mr. Bosworth,

I strongly encourage you to complete the Final Environmental Impact Statement and Record of Decision for this project.

Sincerely,

Warren Petersen
Majority Leader
House of Representatives

---

**Arizona House of Representatives**
Phoenix, Arizona 85007

October 10, 2019

Mr. Neil Bosworth
Tonto National Forest Supervisor
United States Forest Service
P.O. Box 34468
Phoenix, AZ 85067-3468
Attn: Resolution DEIS Comments

Mr. Bosworth,

I am in full support of the Resolution Copper project moving forward and encourage the United States Forest Service to quickly complete the Final Environmental Impact Statement under NEPA.

Sincerely,

Representative District 7

---

**Arizona House of Representatives**
Phoenix, Arizona 85007

October 30, 2019

Mr. Neil Bosworth
Tonto National Forest Supervisor
United States Forest Service
P.O. Box 34468
Phoenix, AZ 85067-3468
Attn: Resolution DEIS Comments

Dear Mr. Bosworth,

Thank you for your consideration of these comments.

Sincerely,

Representative Bob Thorpe
District 72

---

**Arizona House of Representatives**
Phoenix, Arizona 85007

October 30, 2019

Mr. Neil Bosworth
Tonto National Forest Supervisor
United States Forest Service
P.O. Box 34468
Phoenix, AZ 85067-3468
Attn: Resolution DEIS Comments

Mr. Bosworth,

Thank you for your consideration of these comments.

Sincerely,

Rusty Bowers
Speaker of the House
Arizona's 25th Legislative District

Appendix R

# Arizona House of Representatives
## Phoenix, Arizona 85007

November 4, 2019

Mr. Neil Bosworth
Tonto National Forest Supervisor
United States Forest Service
P.O. Box 34468
Phoenix, AZ 85067-4468

Attn: Resolution DEIS Comments

Dear Mr. Bosworth:

Thank you for the opportunity to comment on the Resolution Copper Land Exchange Draft Environmental Impact Statement (DEIS) for renewal for studication, professionalism and due diligence with which the Tonto National Forest Service has conducted itself during this process.

As a member of the House of Federal Relations committee, I am eager for the Resolution Copper Project to move forward. This project will boost the local economy, creating growth in the area for future generations. I encourage the United States Forest Service to quickly complete the EIS for this project which has my full support.

As an advocate for economic development and education, I applaud Resolution Copper for their commitment to the community to support apprenticeship programs and secondary educational opportunities. These efforts will develop a local economy and thriving workforce. I am excited to see the local community gain the resources to participate in the development and success of this project.

I hope you will provide this final approval necessary to put this economically significant project into motion. The creation of thousands of jobs between the construction phase and the more than 1,500 positions held by the project's development is paramount to the growing the local economy.

Thank you for your consideration.

Sincerely,



Representative Shawnna Bolick
Legislative District 20

**Comment ID:** 3006
**Response:** HS1

---

# Arizona House of Representatives
## Phoenix, Arizona 85007

October 9, 2019

Mr. Neil Bosworth
Tonto National Forest Supervisor
United States Forest Service
P.O. Box 34468
Phoenix, AZ 85067-4468

Attn: Resolution DEIS Comments

Mr. Bosworth:

As a member of the House of Representatives who represent rural Arizona, I'd like to voice my full support for the Resolution Copper project. I thank you for the opportunity to comment on the development of the Final Environmental Impact Statement (EIS) for the Resolution Copper Project.

Regardless the future of our state, Arizona's, a project like this will bring important benefits to our economy and create jobs for Arizonans. I understand there will be no words discussed concerning jobs, and until the project is developed. I encourage Resolution Copper, along with the United States Forest Service, to quickly complete the Final Environmental Impact Statement so that this project, predictably can repay will all its taxes are vital to the future of our State.

Thank you for your consideration in their statements.

Sincerely,



Representative Steve Pierce
State Representative
Legislative District 1

**Comment ID:** 6007
**Response:** HS1

---

# Arizona House of Representatives
## Phoenix, Arizona 85007

November 4, 2019

Mr. Neil Bosworth
Tonto National Forest Supervisor
United States Forest Service
P.O. Box 34468
Phoenix, AZ 85067-4468

RE: Resolution DEIS Comments

Dear Mr. Bosworth:

I am in full support of the Resolution Copper project moving forward and encourage the United States Forest Service to quickly complete the Final Environmental Impact Statement under NEPA.

I have a few comments I would like the Forest Service to consider under NEPA.

The approval process has been transparent and has actively sought the involvement of the community and other external stakeholders.

I strongly encourage the USFS to maintain the planned 90-day public comment period and not consider any extension.

The USFS should be applauded for identifying a tailings storage facility alternative that addresses the majority of public concerns.

The economic impacts highlighted in the mineral illustrate the critical need to have this project up and running without delay.

Thank you for the opportunity to comment. During the development of the Environmental Impact Statement for the Resolution Copper Project. Completing the Final Environmental Impact Statement is critically important to our mining sector, our local economies, and our state as a whole.

Sincerely,

**Comment ID:** 571-1
**Response:** HS1

Representative Noel Campbell

---

# Arizona House of Representatives
## Phoenix, Arizona 85007

November 5, 2019

Mr. Neil Bosworth
Tonto National Forest Supervisor
United States Forest Service
P.O. Box 34468
Phoenix, AZ 85067-4468

Attn: Resolution DEIS Comments

Mr. Bosworth:

I would like to congratulate the United States Forest Service for completion of the Draft Environmental Impact Statement for Resolution Copper Project and Land Exchange, which I support for completion of the project. As a state representative I am aware of the need for economic development to help balance and sustain our economy. This project is an example of how modern practices can place an emphasis on responsible mineral extraction while also implementing obligation to get our natural resources. As part of your environmental review process, I understand the project has gone above and beyond the scope of a typical NEPA review in relation to public engagement and I encourage the project and DEIS to continue this process. Specifically, I am extremely supportive of the Final Environmental Impact Statement and completing the final review of the Resolution Copper Project in a timely manner. Resolution Copper is one of the most promising mining projects in our state and its project. Please ensure this process continues through completion of NEPA and fulfillment of the land exchange as mandated by Congress.

This is a direct result of the Arizona State Legislature which recognizes the need for economic development and implementing obligation to get our natural resources. Resolution Copper is an example of a project that demonstrated sound environmental and economic development. Resolution Copper has demonstrated responsible mineral extraction and jobs that would otherwise not exist without the project. The development of the Final Environmental Impact Statement is one step closer to the completion of a proposed mine life.

Sincerely,

**Comment ID:** 128-1
**Response:** HS1

**Comment ID:** 128-2
**Response:** HS1

**Comment ID:** 128-3
**Response:** HS2

**Comment ID:** 128-4
**Response:** HS1

**Comment ID:** 128-5
**Response:** HS1

Representative Alan Hernández

11-RCMSER-2699

Appendix R



KEVIN PAYNE
1700 WEST WASHINGTON, SUITE H
PHOENIX, ARIZONA 85007-2941
CAPITOL PHONE: (602) 926-3314
TOLL FREE: 1-800-352-8404
kpayne@azleg.gov

DISTRICT 21

COMMITTEES:
PUBLIC SAFETY
    Chairman
GOVERNMENT
    Vice Chairman
TRANSPORTATION

## Arizona House of Representatives
Phoenix, Arizona 85007

November 6, 2019

Mr. Neil Bosworth
Tonto National Forest Supervisor
United States Forest Service
PO Box 34468
Phoenix AZ 85067-4468

Attn: Resolution DEIS Comments

Dear Mr. Bosworth:

> As a State Representative, I am excited and eager for the Resolution Copper Project to move forward in the process. As a small business owner, I know firsthand what a project of this scale will do to support the local economy. I am writing to encourage the United States Forest Service to quickly complete the Environmental Impact Statement for this project, which has my full support.
> **Comment ID:** 1387-1 **Response:** NS1

I applaud Resolution Copper for their commitment to the community to support apprenticeship programs and secondary educational opportunities. Their efforts to develop a local Entrepreneurship and Innovation Center will ensure the local community can find pathways to participate in the development and successes of this project. Additionally, their support of the education systems to promote STEM and robotics programming will assist students in developing the interest and skills needed for the project.

I look forward with great anticipation to this project being given the final approvals necessary to realize the economic development and the proceeding economic boost it will give to rural Arizona and to our state as a whole. The jobs, which will number in the thousands through the construction phase and the more than 1,500 permanent jobs created by the project's development is of critical importance to the local economy.

I strongly encourage this review process to move as quickly and as efficiently as possible and to complete the Final Environmental Impact Statement without delay. These are the projects we need in Arizona.

Thank you for your consideration of these comments.

Thank you,

Representative Kevin Payne

---



FRANK CARROLL

DISTRICT 16

COMMITTEES:

### Arizona House of Representatives
Phoenix, Arizona 85007

November 7, 2019

Mr. Neil Bosworth
Tonto National Forest Supervisor
United States Forest Service
PO Box 34468
Phoenix AZ 85067-4468

Attn: Resolution DEIS Comments

Dear Mr. Bosworth:

> As a State Representative, I am excited and eager for the Resolution Copper Project to move forward in the process. I am willing to encourage the United States Forest Service to quickly complete the Environmental Impact Statement for this project, which has my full support.
> **Comment ID:** 1427-1 **Response:** NS1

I applaud Resolution Copper for their commitment to the community to support apprenticeship programs and secondary educational opportunities. Their efforts to develop a local Entrepreneurship and Innovation Center will ensure the local community can find pathways to participate in the development and successes of this project. Additionally, their support of the education systems to promote STEM and robotics programming will assist students in developing the interest and skills needed for the project.

I look forward with great anticipation to this project being given the final approvals necessary to realize the economic development and the proceeding economic boost it will give to rural Arizona and to our state as a whole. The jobs, which will number in the thousands through the construction phase and the more than 1,500 permanent jobs created by the project's development, are of critical importance to the local economy.

I strongly encourage this review process to move as quickly and as efficiently as possible and to complete the Final Environmental Impact Statement without delay. These are the projects we need in Arizona.

Thank you for your consideration of these comments.

Sincerely,

---

Tonto National Forest
Resolution EIS Comments
PO Box 34468
Phoenix AZ 85067-4468

Re: Resolution Copper DEIS comment

> To whom it may concern:
> **Comment ID:** 1436-1 **Response:** NS1

I would like to express my gratitude for this opportunity to provide comment on the Resolution Copper Mine and Land Exchange Draft Environmental Impact Statement. The Tonto National Forest (TNF) should be applauded for the transparent and robust manner in which you have applied NEPA throughout this process. The thorough analysis of alternatives which will decrease significantly potential environmental impacts while maintaining economic opportunities is a testament to the ability of this process to find the means to extract minerals in a responsible and sustainable manner with public interest at the forefront. Furthermore, the project and TNF should be commended for the collaborative efforts in consulting with community members, local elected officials, groups/organizations and Native American Tribes that may be potentially affected by the mine and land exchange.

As an elected State Representative, I am proud to represent a diverse district that has been impacted by mining throughout many years. I believe this project is critical to reshaping how the mining industry operates in Arizona. Resolution Copper has already invested more than $50 million dollars in reclamation of the West Plant site where they did not create the environmental liabilities, and has from the beginning of this process agreed to progressive reclamation of its future operations.

Additionally, Resolution Copper has expressed a willingness to work with labor organizations to ensure that the 3700 expected employees are provided with safe high paying jobs once the project becomes operational. Their apprenticeship program provides full-time employment and secondary education for participants and through their scholarship program they have awarded over $600,000 to local and Native American students. All of this illustrates the dedication they have to working with labor unions, and local communities to ensure their inclusion in the success of this project.

For these reasons, and many more, including the positive economic impact to our state and the local economy I want to express my support for the project and to see it proceed.

Thank you for your consideration of these comments during the development of the Final Environmental Impact Statement.

Sincerely,

Representative Daniel Hernandez, Jr

---

**Letter ID:** 30073 (Page 1 of 2)
**Format:** Submitted by webform, 11/12/2019
**Sender:**
Cesar Chavez
Arizona House of Representatives
**Contact Info:**
cchavez@azleg.gov
**Content:**

November 12, 2019

Tonto National Forest
Resolution EIS Comments
PO Box 34468
Phoenix AZ 85067-4468

Re: Resolution Copper DEIS comment

To whom it may concern:

I am thankful for the opportunity to provide comment on the Resolution Copper Mine and Land Exchange Draft Environmental Impact Statement. I commend the dedication and professionalism for which the Tonto National Forest (TNF) has conducted the NEPA process by transparently preparing a rigorous analysis of potential economic and environmental impacts as well as identifying alternatives to the original proposal. The project and TNF should be commended for the collaborative efforts in consulting with community members, local elected officials, groups/organizations and Native American Tribes that may be potentially affected by the mine and land exchange.

> As an elected State Representative, I am proud to represent many diverse economic, cultural and environmental interests across our great state. With this in mind I would like to express my support for the Resolution Copper Project and Land Exchange.
> **Comment ID:** 30073-1 **Response:** NS1

One of the largest challenges that Arizona faces is funding for public education. As a state we lag behind in both funding and performance. However, Resolution Copper has taken the initiative to work with a number of rural schools to both supplement funding needs and support enhanced performance. This commitment was further solidified earlier this year when Resolution Copper agreed to a multi-year $1.2M agreement with the Superior Unified School District which is focused on providing 21st century educational tools and opportunities for local students. I am excited to see this project continue to progress and by virtue of its operations positively impact school funding across the state through increased tax revenues, most notably the anticipated $19-$30 million dollar annual mill levy.

Appendix R

**Letter ID: 30070 (Page 2 of 2)**
Format: Submitted by webform, 11/12/2019
Sender:
Cesar Chavez
Arizona House of Representatives
Contact title:
Contact:
cchavez@azleg.gov

I would also like to voice my support of the preferred alternative tailings storage facility skunk camp. This location not only reduces the project's impact on public lands but also helps protect local communities from undue negative socioeconomic impacts that could arise from being in close proximity a significant facility such as this.

Comment ID: 30070-2
Response: ALT30

Thank you for your consideration of these comments during the development of the Final Environmental Impact Statement.

Sincerely,

Representative Cesar Chavez

Thank you for the opportunity to provide these important comments during the development of the DEIS comment period.

Sincerely,

Az State Representative
Regina E. Cobb

---

Letter 258 is a duplicate of letter 923

**Arizona House of Representatives**
Phoenix, Arizona 85007

August 8, 2019

Mr. Neil Bosworth
Tonto National Forest Supervisor
United States Forest Service
P.O. Box 34468
Phoenix, AZ 85067-4468
Attn: Resolution DEIS Comments

Mr. Bosworth,

As an elected State Representative and the Chair of the House of Representatives Appropriations Committee, I have a keen interest in the positive fiscal impacts this project will have on taxation and on Arizona's economy as a whole. The significant capital investment and job creation the Resolution Copper Mine will create will benefit generations to come.

I strongly encourage the United State Forest Service to complete the Final Environmental Impact Statement for this project, which I support, as quickly as possible.

Comment ID: 923-1
Response: NS1

A project of this size and scope will have a significant and long-term impact on Arizona and the United States. The DEIS confirms that this project alone will have the capacity to produce 25% of US copper demand for 40-45 years. In its process of mining this ore body, Resolution Copper will create 1,500 permanent jobs in this rural region that it desperately, in need of economic development.

I would like the USFS to further encourage the commitment of Resolution Copper to combine their workforce development, job training, and local economic development work in the community. Developing this workforce for this once-in-a-lifetime mining project will be a multi-year effort that should not be hindered in any way.

Comment ID: 923-2
Response: MFI

The project cannot continue, unimpeded, to evolve and expand its partnership with local communities to ensure the region and the State are prepared to take full advantage of the opportunities this project will bring.

I appreciate the thoughtfulness shown by the US Forest Service to note the impacts of this project's development on federal land. It's continued development and thriving operation is critical to the future of Arizona.

---

Letter 293 is a duplicate of letter 817

**Arizona House of Representatives**
Phoenix, Arizona 85007

August 20, 2019

Resolution EIS Comments
Tonto National Forest, United States Forest Service
P.O. Box 34468
Phoenix, AZ 85067-4468

To Whom It May Concern:

I have been following the proposed Resolution Copper Project in Superior, Arizona for many years and was pleased to see the record of draft EIS released for comment. I know this project will have a large economic impact in the district which I represent and Pinal County.

The draft EIS is a great example of how the National Environmental Policy Act process can drive how a mine or other large project can be constructed and operated to protect its surrounding environment. I have been very impressed with the community extensively and how resolute to shape a mining project. This project represents my work and it is very prepared to the Copper Corridor a support this project I intend for real.

Comment ID: 293-1
Response: NS1

The project represents an incredible opportunity for the district to which it represents and State of Arizona. I am encouraged to see that anticipated economic benefits from both verified and that all impacts of the proposed mine have been thoroughly analyzed in the draft EIS. I am especially supportive of the preferred tailings alternative and would be encouraged that principles to support to be slated in the draft camp tailings storage facility.

Comment ID: 293-2
Response: ALT30

I have engaged with the company and its employees on a regular basis and am excited to see this project move forward. As one of the Arizona House of Representatives, I hope the likelihood of projects as important in future or that state. As this process continues to move forward I encourage the Forest Service and everyone to continue working collaboratively with community stakeholders to shape this project in a mutually beneficial manner.

I appreciate you including my comments in this process. I look forward to following this process and hope it can be resolved forward expeditiously.

Sincerely,

State Representative, District 8
Speaker Pro Tempore
Vice Chairman – House Rules Committee
Member – House Education Committee
Member – Natural Resources, Energy & Water Committee

---

11-RCMSER-2701

Appendix R




Appendix R

SENATOR KAREN FANN
1700 WEST WASHINGTON, SUITE S
PHOENIX, ARIZONA 85007-2844
CAPITOL PHONE: (602) 926-5081
TOLL FREE: 1-800-352-8404
kfann@azleg.gov
District 1

COMMITTEES:
PRES
CHAIRMAN

SENATOR DAVID GOWAN
1700 WEST WASHINGTON, SUITE 309
PHOENIX, ARIZONA 85007-2844
CAPITOL PHONE: (602) 926-5154
dgowan@azleg.gov
District 14

COMMITTEES:
Appropriations
CHAIRMAN
Water & Agriculture
Natural Resources

October 4, 2019

Mr. Neil Bosworth
Tonto National Forest Supervisor
United States Forest Service
P.O. Box 34468
Phoenix, AZ 85067-4468
Attn: Resolution DEIS Comments

Mr. Bosworth,

As President of the Arizona State Senate, I want to express my support for the Resolution Copper project and for the USFS to quickly complete the Final Environmental Impact Statement and Record of Decision in favor of this project.

Comment ID: 1065-1
Response: NS1

In my duties as president of the state senate, I help oversee the state budget and care for the fiscal management of the state of Arizona. A project like this will be immensely important to the healthy financial state of Arizona. Additionally, the project remains an extraordinarily important opportunity to the State of Arizona and United States of America as it provides a long-term supply of copper and potentially a number of critical minerals.

This project will help stabilize Arizona's economy throughout lean times in future years and therefore it is one of the most important projects we have before us today. I wholeheartedly support this project and look forward to the responsible mining that Resolution Copper will preform for many years to come.
I am grateful to submit comment at this point in the NEPA process for the Resolution Copper project.

Sincerely,

*Senator Karen Fann*

President Karen Fann
District 1
Arizona Senate

Mr. Neil Bosworth
Tonto National Forest Supervisor
United States Forest Service
P.O. Box 34468
Phoenix, AZ 85067-4468
Attn: Resolution DEIS Comments

Mr. Bosworth,

I am in full support of the Resolution Copper project moving forward and encourage the United States Forest Service to quickly complete the Final Environmental Impact Statement under NEPA.

I have a few comments I would like the Forest Service to consider under NEPA.

- The approval process has been transparent and has actively sought the involvement of the community and other external stakeholders.
- I strongly encourage the USFS to maintain the planned 90-day public comment period and not consider any extensions.
- The USFS should be applauded for identifying a tailings storage facility alternative that addresses the majority of public concerns.
- The economic impacts highlighted in the material illustrate the critical need to have this project up and running without delay.

Thank you for the opportunity to comment during the development of the Environmental Impact Statement for the Resolution Copper Project. Completing the Final Environmental Impact Statement is critically important to our mining sector, our local economies and our state as a whole.

Comment ID: 1047-1
Response: NS1

Sincerely,

*David M. Gowan*

David Gowan
Arizona State Senate
Legislative District 14

---

Senator Sine Kerr
Arizona State Senate
Legislative District 13

## Arizona State Senate

Committees
Water & Agriculture Committee, Chair
Natural Resources & Energy, Vice Chair
Transportation & Technology
Joint Committee on Capital Review
Appropriations

October 16, 2019

Mr. Neil Bosworth
Tonto National Forest Supervisor
United States Forest Service
P.O. Box 34468
Phoenix, AZ 85067-4468

Attn: Resolution DEIS Comments

Mr. Bosworth,

As a member of the Arizona Senate, I am always eager to learn about businesses in Arizona and the positive impact they will have on our state. Resolution Copper is a company that will provide a huge economic boost to our economy and I am glad they are located in Arizona. I come from a dairy background and have traveled the state and understand that economic development in rural Arizona is important. This project would be very helpful and important for rural Arizona. Thank you for the opportunity to comment during development of the Final Environmental Impact Statement for the Resolution Copper Project.

Comment ID: 1018-1
Response: NS1

I look forward to the economic boost it will provide to Arizona, but particularly rural AZ. I am excited to see what the economic impact will be. When I think about the future of our state finances, a project like this will be important to provide the resources to have a stable healthy economy for years to come. These resources can then be poured back into our economy in other areas where they are desperately needed. I hope the review process is quick and efficient. These are the types of projects we need in Arizona.

I understand there will be several thousand construction jobs and more than 1,500 permanent jobs created by this project's development.

Thank you for your consideration of these comments and questions.

Sincerely,

*Sine Kerr*

Senator Sine Kerr
Senate District 13 | Chair – Water & Agriculture Committee

---

October 18, 2019

Mr. Neil Bosworth
Tonto National Forest Supervisor
United States Forest Service
P.O. Box 34468
Phoenix, AZ 85067-4468
Attn: Resolution DEIS Comments

Mr. Bosworth,

I write to express my support for the Resolution Copper mining project and for the USFS to quickly complete the Final Environmental Impact Statement and Record of Decision in favor of this project.

It is evident in the draft EIS that the USFS has done a thorough and independent analysis of the project. The project is an extraordinarily important opportunity to the State of Arizona and United States of America as it provides a long-term supply of copper and potentially a number of critical minerals.

The economic development and job creation that comes with the development of a project of this scale is critical to copper triangle, the east valley and the state as a whole cannot be overlooked or undervalued in this process. An $8 billion investment and the creation of 1,500 permanent jobs would result in significant economic development, employment, and much needed revitalization of the region. Further, I was pleased to see through this process it was determined there were no anticipated negative impacts to the water supply for communities inside and outside of the region.

Thank you for the opportunity to comment at this critical point in the NEPA process for the Resolution Copper mine project. It is project that will have a positive multi-generational impact on our state and should be approved as quickly as possible.

Comment ID: 1046-1
Response: NS1

Sincerely,

*Eddie Farnsworth*

Senator Eddie Farnsworth, President Pro Tempore LD12.

Appendix R

---

**SENATOR RICK GRAY**
Majority Leader
1700 WEST WASHINGTON, SUITE S
PHOENIX, ARIZONA 85007-2844
CAPITOL PHONE: (602) 926-5411
TOLL FREE: 1-800-352-8404
rgray@azleg.gov

DISTRICT 21

**Arizona State Senate**

**SENATE COMMITTEES**
Education
Health
& Human Services
Judiciary
Vice-Chairman
Rules
Vice Chairman

November 4, 2019

Mr. Neil Bosworth
Tonto National Forest Supervisor
United States Forest Service
P.O. Box 34468
Phoenix, AZ 85067-4468
Attn: Resolution DEIS Comments

Mr. Bosworth,

As the Arizona Senate Majority Leader, I am grateful to businesses that want to be located in Arizona. Resolution Copper is a special business that I am glad is working responsibly and diligently on their project in Superior, AZ. This is a company that will provide a huge economic boost to our economy, and it will be especially beneficial for rural Arizona.

> Comment ID: 1143-2
> Response: NS1

I look forward to the economic boost it will provide to Arizona. I am pleased to see the economic impacts the project will have on Arizona. When I think about the future of our state finances, a project like this will be important to provide the resources to have a stable healthy economy for years to come. These resources can then be poured back into our economy in other areas where they are desperately needed. I understand there will also be several thousand construction jobs and more than 1,500 permanent jobs created by the project's development.

Putting together the state budget is always an important task, but thinking about the economic success that a project like Resolution Copper would bring to Arizona makes my job a lot easier. These are the types of projects we need in Arizona. I hope the review process is quick and efficient.

Thank you for the opportunity to comment during development of the Final Environmental Impact Statement for the Resolution Copper Project.

Sincerely,

Rick Gray
Senate Majority Leader

---

**Arizona State Senate**

November 6, 2019

Resolution EIS Comments
P.O. Box 34468
Phoenix, AZ 85067-4668

To Whom It May Concern:

Thank you for the opportunity to submit written comments regarding the proposed Resolution Copper Mine in Superior, Arizona. As the State Senator for Legislative District 8 which is the district in which Resolution Copper resides I have a particular interest in seeing the project and land exchange move forward. This single project will have one of the largest economic impacts to our State in the modern era, both in the construction phase and once operational. The economic and social impact to our local economies, Pinal County and the State is a game changer. And for that reason, I am in full support of Resolution Copper mining project and land exchange.

> Comment ID: 1312-1
> Response: NS1

As part of the Final Environmental Impact Statement I would like the U.S. Forest Service to more holistically describe how tax revenue from concentrate tolling will be distributed within the Arizona educational system and how property taxes for residents within Pinal County will be impacted.

> Comment ID: 1312-2
> Response: SO14

I also understand that Resolution Copper is assisting the local government, schools, and Chambers of Commerce to prepare for a balanced economy, can you ensure that the Final Environmental Impact Statement acknowledges the opportunities which are on the brink of being realized through these efforts. These opportunities include a business incubator, increased outdoor recreation and tourism, a new hotel, and completion of a multi-generational center. Finally, it is critical that funding commitments from Resolution Copper be made clear in the Final Environmental Impact Statement such that momentum toward taking full advantage of these opportunities continues. Shared success in this project is critical to ensure the Town of Superior realizes a sustainable and vibrant economic environment.

> Comment ID: 1312-3
> Response: NS1

I appreciate your consideration of these important issues and for their inclusion in the Draft Environmental Impact Statement process. I look forward to following the progress of this important permitting process and request that the Final Environmental Impact Statement be developed without further delay.

Sincerely,

State Senator Frank Pratt

---

DAVID BRADLEY
ARIZONA STATE SENATE
1700 WEST WASHINGTON
PHOENIX, ARIZONA 85007-2844
CAPITOL PHONE: (602) 926-5262
dbradley@azleg.gov

DISTRICT 10

SENATE MINORITY LEADER

October 21, 2019

Tonto National Forest
Resolution EIS Comments
PO Box 34468
Phoenix AZ 85067-4468

Re: Resolution Copper DEIS comment

To whom it may concern:
Thank you for the opportunity to comment on the Resolution Copper land exchange Draft Environmental Impact Statement. I commend the dedication, professionalism and due diligence with which the Tonto National Forest team has conducted itself during this process.
As an Arizona State Senator and Minority Leader in the Senate, I am proud to represent many economic, cultural and environmental interests across our great state. I am grateful that the Tonto National Forest has studied all aspects of this project, including the tribal impacts. I urge the continued consideration of tribes' interests in this process.
Education issues are at the forefront of policy discussions at the Capitol and are of critical importance to the future of our state. I am very pleased to see the commitment and significant financial contributions Resolution Copper has made to the local school systems to support STEM and robotics education. Their apprenticeship program provides full-time employment and secondary education for participants as well as their scholarship program awarding over $600,000 to local and Native American students illustrates the dedication they have to working with the local community to ensure their inclusion in the success of this project.

> Comment ID: 1065-1
> Response: NS1

For these reasons, and many more, including the positive economic impact to our state I am anxious to see the process continue and have the issues discussed and addressed to meet the concerns of all the interested parties.
Thank you for your consideration of these comments during the development of the Final Environmental Impact Statement.

Dave Bradley

David Bradley

---

**Senator Sylvia Allen**
Arizona State Senate
District 6



**Arizona State Senate**

**Committees:**
Education, Chairman
Health & Human Services
Natural Resources & Energy
Water & Agriculture

October 28, 2019

Mr. Neil Bosworth
Tonto National Forest Supervisor
United States Forest Service
P.O. Box 34468
Phoenix, AZ 85067-4468

Attn: Resolution DEIS Comments

Mr. Bosworth,

Thank you for the opportunity to comment during development of the Final Environmental Impact Statement for the Resolution Copper Project. It is my hope that the United States Forest Service acts quickly to complete the Environmental Impact Statement for this project, which I support wholeheartedly.

As a State Senator living in a community immediately adjacent to the project and a lifelong advocate for the wise stewardship of our State's precious natural resources, I can say without a doubt that this project has and will continue to live up to the commitments Resolution Copper has made to the community. First, I was pleased to see items like the economic impacts of the project detailed in the Draft EIS as I reviewed the material.

This project is vital to not only our economy but to our national security. Relying on the domestic production of copper and other crucial minerals is critically important to our military for the future of our country.

Thank you for your consideration of these comments during the development of the Final Environmental Impact Statement. It is my hope that this project will continue to move along the project timeline in the most expeditious manner. Our local communities are waiting anxiously for the jobs and economic opportunities that are so critically needed in this part of our state.

> Comment ID: 318-1
> Response: NS1

Sincerely,

Sylvia Allen

Senator Sylvia Allen
Legislative District 6

1700 West Washington Street, Room 303 • Phoenix, AZ 85007 • Phone: 602-926-5409
Toll free: 1-(800) 352-8404 x65409 • E-mail: sallen@azleg.gov

Appendix R



**DEPARTMENT OF THE ARMY**
U.S. ARMY CORPS OF ENGINEERS, LOS ANGELES DISTRICT
3636 N. CENTRAL AVE, SUITE 900
PHOENIX, AZ 85012-1939

-2-

November 7, 2019

SUBJECT: Draft Environmental Impact Statement for Resolution Copper Mine (Corps file No. SPL-2016-00547

Neil Bosworth, Forest Supervisor
Tonto National Forest
2324 East McDonell Road
Phoenix, AZ 85006

Dear Mr. Bosworth:

I am writing in regard to the recently released Draft Environmental Impact Statement (DEIS) for the Resolution Copper Project and Land Exchange. As the public review period for the DEIS draws to a close, I wanted to provide a brief response to you and your team regarding the DEIS, particularly as it relates to the Clean Water Act Section 404 permitting process for this project.

The U.S. Army Corps of Engineers (Corps) is a cooperating agency for this project under the National Environmental Policy Act (NEPA) for development of the environmental impact statement (EIS) and will use this EIS as part of our decision-making process for the 404 permit. Corps staff have participated in the development of the DEIS and will continue to be a part of the NEPA process through publication of the final EIS. For this reason, we do not have any formal comments to submit on the DEIS. We will continue to remain engaged with your staff as the process progresses to share information, address issues as they come up, and refine the analysis for this project as they relate to the permitting process.

Lastly, I wanted to specifically mention my appreciation to you and your project team for the manner in which they have worked with my staff on this project. This is a very demanding and complicated project, but the process has been made less difficult by the sense of teamwork, effective communications, and offers of technical assistance conveyed by your team. We look forward to continuing our relationship with your agency.

If there is anything we can do to be of further assistance on this project, please contact me or Michael Langley, the Corps's project manager for this project.

Sincerely,

Sallie Dieboh
Chief, Arizona Branch
Regulatory Division

CC: Mary Rasmussen, TNF

11-RCMSER-2706

Appendix R

11-RCMSER-2707

Appendix R

11-RCMSER-2708

Appendix R

R-57

11-RCMSER-2709

Appendix R

11-RCMSER-2710

(68 of 300), Page 68 of 300
Case: 25-5197, 09/29/2025, DktEntry: 61.12, Page 68 of 300
Case 2:21-cv-00068-DWL   Document 109-2   Filed 07/14/25   Page 66 of 565

Appendix R

11-RCMSER-2711

11-RCMSER-2712

Appendix R



United States Department of the Interior

OFFICE OF THE SECRETARY
Office of Environmental Policy and Compliance
333 Bush Street, Suite 515
San Francisco, California, 94104

In Reply Refer To:
190314

*Filed electronically*

Neil Bosworth
Forest Supervisor
2324 East McDowell Road
Phoenix, AZ 85006

Subject: Draft Environmental Impact Statement Resolution Copper Project and
Land Exchange, dated August 2019

Dear Mr. Bosworth:

The United States Department of the Interior (Department), through the Bureau of Reclamation (Reclamation) has reviewed the *Draft Environmental Impact Statement, Resolution Copper Project and Land Exchange, dated August 2019.* The Department notes that you are proposing to construct elements of the project in or adjacent to land withdrawn for Reclamation project purposes. The withdrawn land occurs in the Queen Creek area and along the Gila River (see attached withdrawal orders). Alternatives 2-6 of the DEIS propose to construct mine infrastructure in the existing Magma Arizona Railroad Company Corridor. As proposed, this infrastructure would be constructed across Reclamation withdrawn land set aside for the Salt River Project. Additionally, Alternative 5 (East and West options) proposes a tailings transport corridor and holding facility south of the proposed mine, near the Gila River. The proposed tailings holding facility would be located directly adjacent to the southern portion of Reclamation's withdrawn land. The proposed tailings transport corridor would cross this withdrawn land along the Gila River. Please see specific comments and documentation in the attachment and enclosures.

Reclamation requests a meeting with the Forest Service to discuss the proposed action and any potential impacts to withdrawn lands. Please contact Sean Heath with Reclamation at sheath@usbr.gov or at 623-773-6250 if you have questions regarding these comments and to

Comment ID:
1121-1

Response:
NEPA49

schedule the meeting. Please contact me at janet_whitlock@ios.doi.gov or at (415) 420-0524 with all other questions.

Sincerely,

*Janet L. Whitlock*

Janet L. Whitlock
Regional Environmental Officer

Attachment
Enclosures

Cc
Sean Heath, USBR
Lisa Treichel, DOI

2

Draft Environmental Impact Statement Resolution Copper
Specific Comments from the Bureau of Reclamation, Phoenix Area Office

| Cmt # | Chapter | Page | Comment |
|---|---|---|---|
| 1. | 2 | 67 | Alternative 2 – Near West – Southern portion of the tailings disposal facility would overlap onto lands withdrawn for Reclamation for the Salt River Project. Mine infrastructure within the existing MARRCO corridor also would be constructed over Reclamation withdrawn land. |
| 2. | 2 | 75 | Alternative 3 – Near West Ultrathickened – See Comment #1 |
| 3. | 2 | 81 | Alternative 4 – Silver King – Tailings/MARRCO corridor overlaps Reclamation withdrawn land. |
| 4. | 2 | 88 | Alternative 5 – Peg Leg East/West – Tailings conveyance route (Both East and West Tailing Corridor Options) and MARRCO corridor overlaps Reclamation withdrawn land.

East and West tailings corridor option to southern tailings holding facility will cross land withdrawn for use by Reclamation for the Buttes Dam and Reservoir project. This withdrawn land was the subject of a letter sent in August 2017 from Reclamation (Phoenix Area Office) to the Forest Supervisor of Tonto National Forest. |
| 5. | 2 | 94 | Alternative 6 – Skunk Camp (Preferred Alternative) – Tailings conveyance route (Both East and West Tailing Corridor Options) and MARRCO corridor overlaps Reclamation withdrawn land. |

3

Appendix R

R-62




**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

REGION 9

75 Hawthorne Street
San Francisco, CA 94105-3901

November 1, 2019

Ms. Mary Rasmussen
United States Forest Service, Tonto National Forest
Resolution Copper Project
Post Office Box 34468
Phoenix, AZ 85067-4468

Subject: Draft Environmental Impact Statement for the Resolution Copper Project and Land Exchange, Pinal County, Arizona (EIS No. 20190039)

Dear Ms. Rasmussen:

The U.S. Environmental Protection Agency has reviewed the above-referenced document pursuant to the National Environmental Policy Act, Council on Environmental Quality regulations (40 CFR Parts 1500-1508), and our NEPA review authority under Section 309 of the Clean Air Act. The EPA provided scoping comments on July 18, 2016 and accepted the U.S. Forest Service's invitation to serve as a Cooperating Agency under NEPA on July 26, 2017. As a Cooperating Agency, the EPA has participated in several workgroups, calls, and meetings on the subject Draft EIS.

We appreciate the opportunity to review and provide recommendations on early draft analyses in support of the EIS and the Clean Water Act Section 404 Permitting process. We also appreciate the exchange of federal and private parcels in southeastern Arizona. In addition to analyzing the alternatives for a tailings storage facility (TSF), including "Alternative 6 – Skunk Camp," which is the USFS's preferred alternative and the site of the company's proposed TSF for purposes of Clean Water Act 404 permitting by the U.S. Army Corps of Engineers. The Draft EIS also evaluates developing tailings in an estimated 1.37 billion tons of tailings. According to the Draft EIS, the facility would require a dry-stacking footprint of 4,000 acres in the Dripping Spring Wash watershed and a total of 16,116 acres disturbance for the north tailings pipeline route option, including the conveyance and storage of an estimated 1.37 billion tons of tailings. According to the Draft EIS, the facility would require the diversion of jurisdictional waters to the watershed, approximately 13.1 miles upstream of the Gila River. The EPA recommends that USACE intends to adopt the EIS to support NEPA compliance for CWA Section 404 permitting, per

the legislatively mandated single environmental analysis for all federal approvals, permitting, and land exchange that are required as a part of the proposed project.[1]

**Information to Analyze Impacts from the USFS "preferred alternative"**

Additional baseline hydrogeologic and water quality information for the preferred alternative is needed to fully analyze and disclose the potential impacts of the proposed mining project and related conveyance and storage of approximately 1.37 billion tons of tailings. This information is critical for informing decisionmakers and the public about the potential environmental impacts of the proposed project. For the analysis in the Draft EIS, the USFS relies on assumptions that are informed by evaluation of other sites, but have not been verified for the preferred alternative. It is the EPA's understanding that much of the site-specific information needed for the preferred alternative is currently being gathered and would be analyzed for the Final EIS. Verification of assumptions presented in the Draft EIS are needed to confirm that estimated impacts are not substantively different, or greater, than currently disclosed in the Draft EIS. Recommendations for verifying and gathering baseline data are included in the enclosed detailed comments.

Comment ID: 524-1
Response: ALT22

**Impacts to Jurisdictional Waters of the U.S. and Mitigation**

The potential direct, indirect, and cumulative impacts to aquatic resources from mining operations, conveyance, and storage of tailings at the preferred site, "Skunk Camp," as well as plans for how those impacts will be mitigated, are not fully analyzed in the Draft EIS. While USFS has identified that Skunk Camp has the potential to avoid other significant impacts and catastrophic tailings failure risk associated with alternative sites in the Queen Creek watershed, the Skunk Camp site would involve direct fill of 120 acres of jurisdictional waters. Alternative sites in the Queen Creek watershed would not have any direct fill impacts to jurisdictional waters. The Draft EIS does not estimate indirect and cumulative impacts to jurisdictional waters and potential impacts to "special aquatic sites" (40 CFR 230 – Subpart E). A functional assessment of the value of all jurisdictional waters potentially impacted by the project, as well as for the value of mitigation, is needed to show that the mitigation could offset any unavoidable impacts. Further, accurate analysis of potential impacts to water quality, based on site-specific baseline data, is needed to support a decision on a potential CWA Section 404 Permit.

Comment ID: 524-2
Response: MIT27

**Impacts common to all action alternatives**

Regardless of action alternative selected, according to the Draft EIS, the congressionally mandated land exchange of the Oak Flat Parcel will result in permanent loss of federal protections for the National Registry of Historic Places-listed Historic District Traditional Cultural Property at Oak Flat, *Chíʼchil Biłdagoteel*, and its NRHP sites and one Traditional Cultural Property. There will also be adverse effects to sacred places, springs, and loss of access to ceremonial areas and acorn-collecting areas.

Underground mining beneath Oak Flat would result in the eventual formation of a subsidence crater approximately 800–1,115 feet deep and approximately 1.8 miles in diameter that would permanently

---

[1] According to the National Defense Authorization Act authorizing the land exchange, "[p]rior to conveying Federal land under this section, the Secretary shall prepare a single environmental impact statement under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.), which shall be used as the basis for all decisions under Federal law related to the proposed mine and the Resolution mine plan of operations and any related major Federal actions significantly affecting the quality of the human environment, including the granting of any permits, rights-of-way, or approvals for the construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities."

2

---

impact and prevent access to the NHRP District and sacred cultural areas. Significant adverse effects to these resources cannot be fully mitigated. Subsidence will also cause permanent fundamental changes to watersheds and to the underlying geology and deep groundwater regional aquifers. This will impact several groundwater-dependent ecosystems, resulting in an annual average loss of 3.5% of perennial flow at the mouth of Devil's Canyon and in Queen Creek at Whitlow Ranch Dam, as well as reductions in flow to eight springs. Combined with groundwater pumping required for mining, groundwater levels in the region are estimated to be reduced by at least 10 feet over an approximately 50 square-mile area 200 years after mining begins, with further reductions expected after that time. In the enclosed detailed comments we provide recommendations for changes to mitigation triggers in the 2019 "Monitoring and Mitigation Plan for Groundwater Dependent Ecosystems and Water Wells" to improve the effectiveness of mitigation and in maintaining groundwater-dependent ecosystems.

Specific recommendations to resolve these inadequacies of the document and other concerns or recommended clarifications for the analysis that can be addressed in a Final EIS are included in EPA's Detailed Comments attached as an enclosure. EPA remains available to work with the USFS, the USACE, and the project proponent to resolve the issues that we have identified. We note that effective October 22, 2018, the EPA no longer includes ratings in our comment letters. Information about this change and the EPA's continued roles and responsibilities in the review of federal actions can be found on our website at: https://www.epa.gov/nepa/epa-review-process-under-section-309-clean-air-act. If you have any questions, please contact me at (415) 947-4161, or Hugo Hoffman, the lead reviewer for this project, at 415-972-3929 or hoffman.hugo@epa.gov.

Sincerely,

*Connell Dunning*

Connell Dunning, Acting Manager
Environmental Review Branch

Enclosures:   EPA's Detailed Comments

cc (via email): Neil Bosworth, Forest Supervisor, Tonto National Forest
John Scaggs, Tonto National Forest
Sallie Diebolt, Army Corps of Engineers
Michael Langley, Army Corps of Engineers
Jayne Loyer, Bureau of Land Management
Jeff Humphrey, U.S. Fish and Wildlife Service
Wayne Harrison, Arizona Department of Environmental Quality, Groundwater Protection
Roni Sherrill, ADEQ, Surface Water Section
Daniel Czecholinski, ADEQ, Air Division
Michael Sundblom, Pinal County Air Quality Control District
Vineetha Kartha, Arizona Department of Water Resources
Lisa Atkins, Arizona State Land Department
Jay Cook, Arizona Game and Fish Department
William Schifferns, Arizona State Mine Inspector

3

---

**Mandated "Single Environmental Impact Statement" for NEPA, Land Exchange, and Permitting**
In December 2014, Congress authorized a land exchange pending completion of the environmental impact statement (EIS), as outlined in Section 3003 of the National Defense Authorization Act (NDAA) for fiscal year 2015. The exchange parcel to be conveyed to Resolution Copper includes not only the Oak Flat Withdrawal Area but also the National USFS lands above the copper deposit. This collective 2,422-acre tract of land is known as the "Oak Flat Federal Parcel." According to the NDAA, "[p]rior to conveying Federal land under this section, the Secretary shall prepare a single environmental impact statement under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.), which shall be used as the basis for all decisions under Federal law related to the proposed mine and the Resolution mine plan of operations and any related major Federal actions significantly affecting the quality of the human environment, including the granting of any permits, rights-of-way, or approvals for the construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities." The Draft EIS explains that "[b]ecause Congress directed that a single EIS is to support all Federal decisions related to the proposed mine, the USACE is relying on this EIS to support a decision for issuance of a Section 404 permit."

The USFS's "preferred alternative," Alternative 6, would involve direct fill of approximately 120 acres of largely undeveloped and high functioning waters of the U.S. The Draft EIS explains that "[w]hile most of the impacts considered under the USACE process are identical to those considered in this EIS, some impacts considered under the USACE process are specific only to that permitting process, which may have a different scope of analysis than the EIS. Because of these differences, the 404(b)(1) alternatives analysis is a document strongly related to the EIS, but also separate. Accordingly, the 404(b)(1) alternatives analysis is attached to the EIS as appendix C."

Although Congress directed that a single EIS is to support all Federal decisions related to the proposed mine, the document does not contain a CWA Section 404(b)(1) alternatives analysis to support a USACE's permitting decision, nor does it include an adequate analysis of the full scope of impacts to waters of the U.S., or a compensatory mitigation plan sufficiently detailed to show how impacts to waters of U.S. could be offset. Appendix C is titled a "Practicability Analysis in Support of Clean Water Act 404(b)(1) Alternatives Analysis." A practicability analysis, by itself, is an initial step in a CWA Section 404(b)(1) Alternatives Analysis and not adequate to determine a preliminary *Least Environmentally Damaging Practicable Alternative* as is needed at this stage of the federal environmental analysis for the USFS's preferred alternative.

*Recommendation:* Since a single EIS must serve as the basis for all federal decision-making on the project, confirm that the EIS includes adequate information to support a decision on a CWA Section 404 Permit, including a complete 404(b)(1) Alternatives Analysis sufficient to demonstrate compliance with EPA's *Guidelines* administered by the USACE. Please also see EPA's November 1, 2019 comments to USACE on Public Notice (PN) 2016-00547-MWL for the proposed Resolution Copper Mine Tailings Storage Facility Project, Resolution Copper Company, Superior, Arizona.

Comment ID: 524-3
Response: MIT27

1

---

**Inadequate Site Characterization and Water Quality Impact Predictions for the "Preferred Alternative"**
The Draft EIS presents predicted impacts to surface water and groundwater quality from tailings storage facility seepage based on the current level of tailings facility design and environmental baseline data; however, essential baseline hydrogeology for Alternative 6 is either substituted with data from the Near West location, inferred from desktop exercises, incomplete, or outdated. This information is needed to accurately analyze potential environmental impacts to water quality for the purposes of NEPA. The EPA understands that this baseline data is being gathered and would be used to inform reclamation and closure plans as well as to refine impact modelling for the Final EIS.

This substitution, along with missing data on potential preferential flow paths for Alternative 6, could mean that actual impacts to groundwater and surface water quality could be substantially different than currently predicted and could result in exceedances of water quality standards. Given the differences between alternatives in topography and proximity to downstream perennial waters, the USFS concludes that potential impacts to water quality from the Skunk Camp alternative could be more easily controlled; however, this simple ranking of the available alternatives cannot substitute for a full analysis and disclosure of the potential impacts from the "preferred alternative" as these impacts could still be unacceptable and, based on an accurate analysis of impacts, design changes to mitigate impacts may need to be developed, including changes that could require more direct fill of jurisdictional waters than currently estimated.

*Recommendations:* Obtain site-specific hydrogeologic characterization for the Skunk Camp alternative and update tailings seepage modelling and related predictions for impacts to surface water and groundwater. Summarize site characterization, baseline environmental conditions, and updated site-specific impact analyses and confirm that this information has been used to inform the analysis of impacts. Baseline data needed for accurate water quality impact modelling includes:

- *Hydrogeologic characterization:* major fault locations, underlying rock and soil permeability, potential preferential flowpaths (such as Dripping Spring fault, which would run roughly through the centerline of the facility and appears to extend downstream of the embankment), alluvium thickness, and verification of the assumptions about site hydrogeology in the facility design[2] and seepage estimates,[3] including the size and extent of shallow aquifer units[4] and whether groundwater at the site is connected to the Ray Mine.

- *Geologic Characterization:* lithology and mineralogy of rocks, soils, and alluvial deposits; rock unit distribution; bedrock cementation, type and degree; fracture distribution and characteristics; alteration and mineralization, including vertical and Continued →

---

[2] Klohn Crippen Berger Ltd. 2018d. *Resolution Copper Project: DEIS Design for Alternative 6 - Skunk Camp. Doc. #* CCC.03.81810.EXREP.0000x - Rev.1. Vancouver, Canada: Klohn Crippen Berger Ltd. August 9.
[3] Klohn Crippen Berger Ltd. 2019c. *Resolution Copper Project: DEIS Design for Alternative 6 Skunk Camp, Appendix IV Seepage Estimate Amendment. Doc. # CCC.03.81610.EX-REP-0006 Rev.2.* Vancouver, Canada: Klohn Crippen Berger Ltd. January 30.
[4] Gregory, C., and T. Bayley. 2018d. *TSF Alternative 6 - Skunk Camp: Life of Mine and Post Closure Seepage Transport Modeling. Project # 608.8501. Technical memorandum.* Tucson, Arizona: Montgomery and Associates Inc. September 14.

2

Appendix R

---

**Continued**

lateral changes; surface-subsurface relationships; topography and slopes; soil cover (depth and type).

- *Hydrologic characterization*: background surface water hydrology and groundwater hydrogeology in the Dripping Spring Wash watershed, Upper Mineral Creek watershed, and adjacent downstream reaches of the Gila River. Assess the condition of Dripping Springs and Seger Springs within Dripping Spring Wash, as well as their likely source.
- *Existing water quality*: baseline for surface water and groundwater in Dripping Spring Wash watershed, in surface water in the Gila River at the confluence with Dripping Spring, as well as surface water in the Upper Mineral Creek watershed and through to the confluence with Devil's Canyon. Sampling for water quality baseline conditions need to be recent and spatially representative of reaches and aquifer units that could be affected.

*Comment ID: 524-4 Response: WT7*

Additional recommendations to improve the water quality impact modelling, and suggested clarifications, are included in the section below on *Water Quality Impact Modelling*.

**Inadequate Analysis of Direct and Indirect Impacts to Waters of the U.S.**

The Draft EIS does not include a quantitative estimate of the full scope of direct, indirect, and cumulative impacts to jurisdictional waters of the U.S. for each alternative. This is critical because USFS must prepare "a single EIS under the NEPA."[5] Without analysis of the full scope of impacts to aquatic resources and jurisdictional waters, the EIS cannot support USACE decision-making on a CWA Section 404 Permit. A TSF at "Alternative 6 - Skunk Camp" would potentially impact an estimated 120 acres and approximately 395,215 linear feet of jurisdictional waters, but no estimate of indirect impacts is provided. Two tailings pipeline routes are considered for Alternative 6, a "north" and "south" option, but the potential impacts to jurisdictional waters from each option are not included in the Draft EIS.[6] The Draft EIS includes an estimate of 25.4 acres of wetlands potentially impacted along the USFS's preferred north pipeline option based National Wetlands Inventory information, but no discussion of their jurisdictional status or potential to contain "special aquatic sites" (40 CFR 230 - Subpart E). "Alternative 5 - Peg Leg" would have the potential to directly impact 182.5 acres and approximately 759,061 linear feet of jurisdictional waters. Based on the USACE's 2012 and 2013 jurisdictional determinations, Alternatives 2, 3, and 4 would not directly fall any jurisdictional waters. There are no jurisdictional determinations available for Alternatives 5 or 6.

*Recommendations:* In a Final EIS, or in a complete draft CWA Section 404(b)(1) Alternative Analysis attached as an appendix to the EIS, include the following information missing from the current analysis:

- Analyze and quantify direct, indirect, and cumulative impacts to linear feet and acreage of waters of the U.S., within each class of aquatic resources occurring within the footprint of each alternative, including the conveyance infrastructures. Include information on the type, function/condition of all aquatic resources at the alternative sites. Apply a consistent level of

---

[5] Section 3093 of the Carl Lewin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015
[6] The USACE's Public Notice for the project includes an estimate of 6 acres of direct and "temporary" fill required for what appears in the "north" pipeline option in the Draft EIS, but it is not clear how this estimate was developed, and no estimate is included for the "south" option. In addition, there is a discrepancy in the estimates of fill for the "Skunk Camp" tailings facility between the Draft EIS and the PN. The PN estimates 124 acres of fill required for the "Skunk Camp" facility itself.

3

---

**Continued**

analysis across all practicable alternatives to inform whether less environmentally damaging practicable alternatives exist.

- Describe each class of stream within the project watershed area, including information about their functional capacity for supplying, storing, and transporting water, organic matter, sediment, and nutrients. Initial guidance can be found for classification of such systems in a document titled, "Channel Classification Across Arid West Landscapes in Support of OHW Delineation," published by the USACE in Jan 2013.
- Provide a description of the current ecological condition of each class of aquatic resource present at the potential impact sites, using aerial imagery and indicator metrics like those used in the California Rapid Assessment Method (CRAM) adapted for Arizona.
- Include detailed information about "special aquatic sites", (40 CFR 230 - Subpart E) where they are present, surveys used to confirm their absence, their connection to upstream and downstream ecosystems, and their current ecological condition.
- Additional details are in our comments to the USACE on their Public Notice for the project.

*Comment ID: 524-5 Response: MT27*

**Compensatory Mitigation for Impacts to Jurisdictional Waters**

The Draft EIS includes a "Draft Resolution Copper Project Clean Water Act Section 404 Conceptual Compensatory Mitigation Plan" in Appendix B, based on the assumption that the USACE would identify the Skunk Camp TSF alternative as the *Least Environmentally Damaging Practicable Alternative* for purposes of CWA Section 404 Permitting. The draft Plan proposes several mitigation options at a collection of distinct sites referred to in the draft Plan individually as the GRIC MAR-5 Recharge Project, Lower San Pedro River Wildlife Area (ESPRWA) In-lieu Fee Project, Olberg Road Restoration Site Project, Queen Creek Project, and Arlington Wildlife Area In-lieu Fee Project. These possible projects are each in different phases of planning, pilot-testing and, in the case of In-lieu Fee (ILF) projects, review by the Inter-Agency Review Team (IRT) of which EPA is a member.

*Comment ID: 524-6 Response: MT27*

To determine compensatory mitigation requirements, and to determine the value of proposed mitigation elements in offsetting the aquatic resource functions lost due to Alternative 6, a scientifically valid functional assessment is needed for potentially impacted jurisdictional waters and proposed mitigation projects. The proposed mitigation in the "Draft Resolution Copper Project Clean Water Act Section 404 Conceptual Compensatory Mitigation Plan" does not provide detail on the values of aquatic resources in the context of a functional assessment that quantifies mitigation credits and debits for all impacts and potential mitigation projects. As currently proposed, ILFs and mitigation projects have not demonstrated that they would be scalable or could offset unavoidable impacts.

*Recommendation:* In conjunction with a complete CWA Section 404(b)(1) Alternatives Analysis identifying the *Least Environmentally Damaging Practicable Alternative*, include a revised Draft Clean Water Act Section 404 Conceptual Compensatory Mitigation Plan that demonstrates effects for unavoidable impacts that remain after all feasible avoidance and minimization strategies are used. The Mitigation Plan appreciates the commitment in the current Mitigation Plan to utilize the California Rapid Assessment Method (CRAM) to assess the functionality of ephemeral drainages based on relationships between condition and function of those streams. EPA is available to consult with the applicant and the USACE to approve final methodology and application.

4

---

**Mitigation for Impacts to Groundwater-Dependent Ecosystems**

Resolution Copper's proposed monitoring and mitigation plan for impacts to seeps and springs and other groundwater-dependent ecosystems (GDEs), titled "Monitoring and Mitigation Plan for Groundwater Dependent Ecosystems and Water Wells,"[7] is referenced in the Draft EIS's Appendix J (Draft EIS page J-8). In Section 3 of the Plan, on monitoring, the document briefly describes the intention to deconvolute regional environmental variables such as climate, "other human causes," fires, etc. from impacts due to mining-related groundwater drawdown. EPA acknowledges that there are numerous environmental variables in addition to mining that might decrease discharge at GDEs. It is important to note that these impacts are, by nature, cumulative. For example, impacts to a spring due, in part, to a period of drought cannot be easily separated from the incremental impact on the spring system due to groundwater drawdown. Deconvoluting the mining signal from the different stresses would need to be a highly nuanced analysis requiring much higher resolution monitoring data than currently exists. The proposed methodology would not be effective in identifying and mitigating only the incremental impact due to mining-related groundwater drawdown.

In Section 3.3 on "Mitigation Triggers," the plan states that mitigation thresholds would only be triggered based on multiple lines of evidence that impacts to GDEs are "caused by mine activities." (page 7). All the GDEs covered by the Plan have been selected because multiple lines of evidence already indicate that there is a high likelihood that dewatering will impact them (connection to bedrock source, within the 10-foot drawdown contour, etc.). Basing a sophisticated signal deconvolution methodology, impacts to these GDEs should be assumed to be from mining activities. EPA is concerned that without specific upfront mitigation triggers, needed mitigation may not be delivered. Furthermore, the value of "4 text if 'triggers is unclear because they appear to simply require additional monitoring and comparison with reference sites that could also be impacted since they are within the modelled 10-foot drawdown contour.

*Comment ID: 524-7 Response: MT1*

*Recommendation:* Develop quantitative trigger thresholds for mitigation actions for each GDE based on available baseline monitoring data for flow, water stage (height), and/or vegetation, as appropriate to each individual GDE. Include specific mitigation goals in reference to baseline monitored conditions and criteria by which mitigation success would be evaluated.

As explained in Appendix J, "the plan specifically notes that it is not intended to address water sources associated with perched shallow groundwater in alluvium or fractures." Conceptually, EPA agrees that it is appropriate to exclude perched shallow groundwater in alluvium; however, we do not agree that GDEs connected to fractures and supported by fracture flow should be excluded from monitoring and mitigation. Fracture flow, especially in the Apache Leap tuff and Whitetail conglomerate, may be the dominant discharge mechanism and some fracture systems may be connected over large geographic areas.

---

[7] Montgomery and Associates Inc. 2019. *Monitoring and Mitigation Plan for Groundwater Dependent Ecosystems and Water Wells.* Tucson, Arizona: Montgomery and Associates Inc. April 12 – Available at http://www.resolutionmineeis.us/sites/default/files/references/montgomery-tucson-mmp-mitigation-plan-2019.pdf

5

---

*Recommendation:* Provide additional detail about the proposed monitoring and mitigation required for the project for regularly flowing GDEs emanating from fractures.

**Water Quality Impact Modelling**

The Draft EIS explains that, on acidic, groundwater and surface water quality impact predictions are based on assumption that "fractured rock in the collapsed block-cave zone does not contact oxygen and chemical weathering does not supply any chemical load to the sump water" (Draft EIS page 350), and that actual water quality constituent concentrations in the sump could be substantially higher than predicted and summarized in the Draft EIS. To illustrate the potential magnitude of difference in water quality, Table 3.7.2-1 in the Draft EIS shows predictions of block-cave sump water quality for assumptions of less oxidation (Eary 2018[8]) and more oxidation (Hatch 2016[9]). The Hatch-predicted concentrations are lower than double Eary-predicted concentrations for magnesium, potassium, sulfate, antimony, and thallium; and orders of magnitude greater for aluminum, beryllium, cadmium, chromium, cobalt, copper, iron, lead, manganese, mercury,[10] nickel, selenium, silver, and zinc. While EPA acknowledges that this same magnitude of difference would not be seen in final surface water and groundwater concentrations affected by tailings seepage, if actual conditions result in more oxidation in the block-cave zone and in stockpiled ore than is currently assumed for the Draft EIS, water quality standard exceedances for all action alternatives would be more numerous and significant than currently estimated.

*Comment ID: 524-8 Response: WT37*

As discussed in Hatch, for the parameters evaluated (i.e. pH, sulfate, copper, and selenium) concentrations of selenium and sulfate are sensitive to oxidation and likely cannot be mitigated by lime amendments, further underscoring the need for an accurate and reasonably conservative assessment of impacts to water quality. Eary's (2018) assumptions for oxidation appear to be based on an idealized mining process schedule that could be delayed for periods over the life of the mine, resulting in greater-than-modelled oxidation. Surface water and groundwater quality impacts are likely underestimated and should be updated with a more conservative assumption about the extent of oxidation of fractured rock in the block-cave zone and in ore stockpiles at the surface.

*Recommendation:* Clarify the degree of uncertainty in assumptions about oxidation in the block-cave zone and surface ore stockpiles, including a discussion of the most reasonably conservative oxidation conditions likely to occur. Revise water quality predictions for surface water and groundwater using the more reasonably conservative oxidation assumptions for fractured block-cave rock based on Hatch (2016) or another, more realistic period of oxidation.

From a modeling perspective, the Draft EIS incorrectly evaluates flow conditions based on median flow volumes, thereby overlooking the most severe potential impacts to surface water quality as well as the **Continued**

---

[8] Eary 2018. *Block Cave Geochemical Model – 2018 Update on Calculation Approach and Results.* Technical memorandum. Loveland, Colorado: Enchemica, LLC. June 26.
[9] Hatch 2016. Appendix Q. Final Draft Report. Prediction of Block Cave Water Chemistry. In *General Plan of Operations, Resolution Copper Mining.* Scottsdale, Arizona: Hatch. January 8.
[10] Table 3.7.2-1 does not report a value for mercury concentration under Eary conditions, but it is unclear if this was not modelled or omitted for some other reason. The value for mercury under Hatch conditions is not shaded or bolded to show exceedance of the Arizona Aquifer Water Quality Standard as it should since the reported value of 0.018 mg/L is greater than the 0.002 mg/L standard

6

---

(74 of 300), Page 74 of 300
Case: 25-5197, 09/29/2025, DktEntry: 61.12, Page 74 of 300
Case 2:21-cv-00068-DWL   Document 109-2   Filed 07/14/25   Page 72 of 565

Appendix R

importance of downstream ecological resources, specifically the perennial flows of a stream found in the southern Arizona. The continued existence of perennial flow in these stream reaches is based on critical (e.g., low flow) conditions, and median peak flow conditions. While the EIS analysis cannot substantiate for Stage permitting or water quality certifications, the Draft EIS may also now be the EIS evaluate the extent of existing perennial flow conditions, it is necessary for the EIS to explain the full range of significant impacts that could result from the project.

**Recommendation:** Evaluate impacts to streams specifically the potential flows of a stream found in the southern Arizona. The continued existence of perennial flow conditions should be informed by characterization of existing hydrologic flow regimes and expected flow regimes that would occur from the project.

*Limited Geographic Scope of Surface Water Quality Impacts Analysis.*

The Draft EIS assumes that surface water quality affected by Alternative 6 would first occur at confluence of the Gila River with Dripping Spring Wash but to note other seepage flow paths in the watershed. For example, seepage from Dripping Spring Wash, the facilities and exposed and migrates via shallow aquifers, ultimately contributing to surface water flows in the Gila River. However, we note that the assumption that seepage from Whitlow Ranch would first enter the Gila River at its confluence with Dripping Spring Wash does not appear to be supported in the Draft EIS. The potential impacts of seepage on surface water flows and surface water quality standards are not analyzed in EPA approved Arizona Surface Water Quality Standards.[17] Dripping Spring Wash. Therefore, surface water quality standards for aquatic and wildlife uses found in water, fish therefore, surface water quality standards for aquatic and wildlife uses found in water, fish and other surface water flows affected by tailings seepage. Until it only has been done to determine whether the tailings seepage would violate EPA approved Arizona Surface Water Quality Standards downstream would apply.[17] If Dripping Spring proves to be ephemeral, then the standards require it to support the associated aquatic and wildlife and push habitat uses.

**Recommendation:** Evaluate the potential for surface water quality in the Queen Creek watershed to be impacted by seepage flows and surface water flows at one point location immediately upstream of Whitlow Ranch Dam. Establishing Queen Creek flow and surface water quality in the watershed. Draft its completeness will not surface water quality in the watershed above Whitlow Ranch Dam based on an assumption that flows above Whitlow Ranch would first enter the Gila River at its confluence with Dripping Spring Wash. For downstream seepage collection flows provide a comprehensive analysis should be inconsistent with other analyses presented in the Draft EIS and

processes would be helpful for assessing the reliability of modeled tailings seepage nitrate concentration.

**Recommendation:** Clarify the mass balance and fate and transport of nitrogen/nitrate from the tailings seepage impoundment to downstream locations. Accordingly, identify as a result of this clarification, update tailings seepage and water quality impact modeling.

*Combined of Tailings Closure Stormwater and Operations Diversions*

The Draft EIS does not provide a clear comparison between alternatives for stormwater management, potential differences in impacts to surface water quality implications for tailings seepage management. For example, flood events could result in large discharges of tailings precipitation exceeds the capacity of stormwater and tailings seepage management facilities. According to Neverfit and Garrett (2018b) referenced by the Draft EIS, it appears that different designs have an for capacity to manage diversions. For downstream seepage collection in particular, Alternatives 2 and 4 would be designed for the facilities closure period with stormwater seepage collection treatment will be capacity at collection drains would be designed to the 200-year, 24-hour event. For Alternative 6, it appears that all collection drains and stormwater would be designed for the peak flow of the 24-hour, 100-year event, but the basis of design for downstream facilities is not clear.

**Recommendation:** For all alternatives, clarify the design basis for capture and management facilities needed to divert or manage stormwater and avoid discharge of tailings-contacted water to the environment. Provide a comparative analysis of implications for tailings seepage management between alternatives. As compared with the most conservative design component for alternatives, identify the downstream stormwater seepage management facilities and seepage quality and quantity of tailings/tailings alternatives, as compared with the most conservative flood event and across alternatives.

*Drinking Closure Plans, Post Closure Management Requirements and Financial Assurances*

Active closure management of tailings seepage via pumpback, colonnated evaporation, or treatment are likely to be needed for decades or centuries to meet water quality standards in all alternatives. Active is extremely limited detail on closure plans and post closure management requirements, including potential impacts that could occur from implementing post closure requirements. For the preferred alternative, the Draft EIS references that for the first 20 years of resulting seepage via "collection or evaporation" (page 491). In the post closure period for each alternative, the potential for implementation would likely require deposit as solid or hazardous waste. Improper or poorly executed closure can and has led to recent and historically identical environmental issues in Arizona. Improper or poorly discussed, substantial additional detail is warranted given the importance of implementing and maintaining seepage management for protecting water quality.

**Recommendation:** Add additional discussion of the post-closure tailings seepage management periods and strategies for each alternative, including a discussion of the downstream seepage management

[17] Letter, 2018, USGS Response to Question 6 Queen Creek, Dripping Springs Wash/Mud Springs and Powers Wash, at Appendix A. Available at https://www.azdeq.gov/sites/default/files/2019-02/303d%20List%20Appendix%20A%20Section%205%20Impaired%20Waters.pdf
[18] Ibid, page R-105

potential impacts from stormwater and operating post closure management facilities. For water treatment systems, allow discussion available treatment methodologies that could be used, the issues related to evaluating subsurface reclamation and closure activities would be effective in the event of a bankruptcy or compliance issues.

We recommend at a more specific discussion of the estimated financial assurance amount and mechanisms be provided, given that long-term water management would not be required. This would provide a basis for evaluating whether the reclamation and closure activities would be effective in the event of a bankruptcy or compliance issues.

**Recommendation:** Clarify the reclamation, closure, post closure management and other mitigation requirements that would be covered for the USFS preferred alternative and confirm the probable reclamation and closure by bonding. Alternative 6 requires post closure management under USACE's authority for requiring financial assurances. Summarize all anticipated post closure activities and associated costs and include, in a draft form, a financial assurance cost estimate and mechanism that the USFS preferred financial assurance mechanism and other maintaining through financial assurance. The project proposed meets or meets financially viable following the explained execution of planned reclamation of closure operations.

*Large Area Financial Assurances*

The Draft EIS explains that the corresponding alternatives. "Resolution of Copper would be required to establish and maintain financial assurances in accordance with requirements from the USFS, ASLD, BLM, the APP program, and the Arizona Mined Land Reclamation Act. The purpose of financial assurance is to ensure that responsible agencies would be able to continue any remaining reclamation activities if the mine operator were unable to meet reclamation and closure obligations under the terms and conditions of the applicable permits and approvals" (page 63). Elsewhere, it is explained that the USMTL "requires financial assurance under Section 404 of the CWA where applicable" (page 116), and that the financial assurance for Alternative 6, the Federal financial assurance mechanisms would be to regulate "(page 205). Given that the scope of closure or post closure activities and the financial assurance for each alternative are large magnitude of closure and post closure bonds would be covered by the BLM (Alternative 6, for Alternatives 2, 3, and 4), would be assured by the appropriate financial assurance mechanism. EPA, is therefore, unable to determine whether the tailings seepage management bonds would be assured by the appropriate financial assurance mechanism. Given that the large magnitude of closure and post closure bonds would represent a long-term financial burden.

*Post Closure Plans in Mineral Creek*

The current closure plan for Alternative 6 – Shrink Crop" involves construction of a spillway through the graded reclaimed Dripping Spring Wash and Mineral Creek basins to convey flood from the tailings reclaimed surface to eventually Mineral Creek. No details are included in the Draft EIS about the source and nature of the Alternative 6 tailings closure materials, including geotechnical characteristics and solute characteristics. Given the exposure of reclaimed alternative alternatives relatively through the flows into a part of Mineral Creek that is highly functioning and, accordingly, the Draft EIS "exhibits potential flow that supports riparian galleries and aquatic habitat" (page 310), substantial additional detail on the effects to surface water quality and habitat are needed

[a] Skies discharge plan 2018, Resolution Copper Project, 2018 Survey for Alternatives 2 – Shrink Crop, Dec. 8
CC10-18 model 0006. Rev 3. Neverfit, Copeland, RCM/Ci/page/page 3.44, Rev 8.

in counter to the conceptualization of the groundwater model that Queen Creek is a perennial and dependent ecosystem.

**Recommendation:** In the Final EIS, include a summary of results from modelling surface water inputs to Queen Creek in reaches above Whitlow Ranch Dam (adversely affected tailings seepage) for Alternatives 2, 3, and 4.

Impact analysis for surface water quality in Queen Creek downstream from Whitlow Ranch Dam are also lacking in the Draft EIS, that the Draft EIS presents a lack of active or lower inputs the point at which seepage would enter the surface water system and represent the location at which surface water quality is most at risk and may impacts on surface water or aquatic habitat uses would be highest "(page 346). However, the plan is for dewatering and discharge, the tailings seepage would likely not directly analyze and also has potential surface water quality impacts related to tailings seepage, modelling should be performed as far downstream as water quality would be degraded from baseline conditions.

**Recommendation:** Model surface water quality impacts as far as the project may detectably affect water quality. Include in the Final EIS, a summary and discussion of predictions for surface water quality impacts wherever they are expected to be degraded from baseline.

*Surface water quality thresholds for chromium*

Multiple analyses in the tailings seepage and surface water quality concentrations in surface water are degrading based, including the potential affecting groundwater surface water quality. Predicted concentrations of total chromium are compared to applicable surface water quality standards (for hexavalent chromium, chromium are compared to the relevant surface water quality standards for hexavalent chromium, specialness, a conservative approach for ensuring chromium concentrations in the environment would be to assume that all hexavalent is at the most toxic form, CWVI).

**Recommendation:** Update Tables 3.7.2-5, -11, -14, -16, -18, and -20 comparing predicted stormwater runoff water quality and seepage water quality modelling results with water quality standards to include the applicable standard for hexavalent chromium, rather than the standard for total chromium. Compare then to the predictions for total chromium.

*Nuclear substances assessments*

Several analyses presented in the supporting reference, *Block Cave Geochemical Model - 2018 Update on Evaluation Approach and Results* (Enger 2018b),[a] a substantial mass of residual nitrogen (existing largely as nitrate) would be introduced to the block cave via backfilling. Assumptions that how this would be distributed throughout the block cave, and geochemical yield values are explained, but it is unclear what fate and transport mechanism water considered for the nitrate throughout the mine processes. Given the large magnitude of nitrate potentially introduced to stump water and new, greater detail on the nitrogen fate and transport of nitrogen introduced to stump

[a] The in-text discussion is included as footnotes in earlier.

| Comment ID 524-5<br>Response HEP24 |
| Comment ID 524-6<br>Response HEP25 |
| Comment ID 524-7<br>Response HEP26 |
| Comment ID 524-8<br>Response WTSH |
| Comment ID 524-9<br>Response WT25 |
| Comment ID 524-10<br>Response HEP27 |
| Comment ID 524-11<br>Response WT26 |
| Comment ID 524-12<br>Response HEP22 |
| Comment ID 524-13<br>Response HEP23 |
| Comment ID 524-14<br>Response VT46 |
| Comment ID 524-15<br>Response WTO |

Appendix R

## Air Quality and General Conformity

## Status of General Mining Act Mining Claims

## Analysis of Tailings Safety and Unacceptable Failure Risk

## Evaluation of a Filtered Tailings Technology Option at Skunk Camp

## Cumulative Effects

(76 of 300), Page 76 of 300
Case: 25-5197, 09/29/2025, DktEntry: 61.12, Page 76 of 300
Case 2:21-cv-00068-DWL   Document 109-2   Filed 07/14/25   Page 74 of 565

Appendix R

UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY
SAN FRANCISCO, CALIFORNIA 94105-3901

OFFICIAL BUSINESS
PENALTY FOR PRIVATE USE, $300

AN EQUAL OPPORTUNITY EMPLOYER

Ms. Mary Rasmussen
United States Forest Service, Tonto National Forest
Resolution EIS Comment
Post Office Box 34468
Phoenix, AZ 85067-4468

Congress of the United States
House of Representatives
Washington, DC 20515-0305

October 24, 2019

U.S. Forest Service
P.O. Box 34468
Phoenix, AZ 85067-4468

Re: Resolution Copper Draft Environmental Impact Statement Comments

11-RCMSER-2719

Appendix R

Letter 310 is a duplicate of Letter 1113

Congress of the United States
House of Representatives
Washington, DC 20515-0306

October 29, 2019

US Forest Service
P.O. Box 3468
Phoenix, AZ 85067-1468
Attn: Resolution DEIS Comments

United States Forest Service:

I am writing to provide comments on the Draft Environmental Impact Statement (DEIS) for the Resolution Copper Project and Land Exchange (Project), released on August 9, 2019. I commend the Tonto National Forest for a thorough examination of potential environmental and social impacts.

I also appreciate your efforts to work with stakeholders, Tribes and Resolution Copper. That consultation has resulted in a better proposed Project, including the preferred alternative for the tailings storage facility, and a comprehensive National Environmental Policy Act (NEPA) document.

I support a timely completion of the Land exchange, the Final Environmental Impact Statement (FEIS) and issuance of all federal approvals required for construction and operation of the Project as quickly as possible. I proudly voted for H.R. 3979, the Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015. This legislation authorized the Land Exchange for this Project in Section 3003, Southeast Arizona Land Exchange and Conservation, and I look forward to seeing its implementation.

As documented in the DEIS, the Resolution Project will provide thousands of high-paying jobs and support economic benefits to communities in the Copper Triangle, Maricopa County, Pinal County, Gila County, and State of Arizona of approximately $1 billion annually for decades. I am also encouraged by the ongoing constructive relationship between the Town of Superior and Resolution Copper stakeholders, and I look forward to seeing this continue.

As a co-sponsor of H.R. 2531, the National Strategic and Critical Minerals Production Act, I want to emphasize how important it is that the Project will provide substantial supplies of copper—up to 25% of U.S. copper demand for over 40 years. It will also supply other metals that are necessary for our national defense, economic growth and energy security.

I represent Arizona's 6th Congressional District and am pleased to provide comments on the Draft Environmental Impact Statement (DEIS) for the Resolution Copper Project and Land Exchange.

I support both the NEPA process as it has been conducted by the Forest Service and the EIS document, which provides a thorough, professional and comprehensive description of the project and the environmental and socioeconomic impacts. The Forest Service has clearly devoted considerable effort to working with the public, Tribes, state and local agencies, Resolution Copper and other stakeholders to identify issues, gather and evaluate environmental data and consider alternative configurations of the major components of the mining project. I note that a critical part of the preferred alternative for the tailings facility is diffusion of Forest System lands. There is wide public support for that alternative location and I also support that decision.

Comment ID: 14631
Response: AL30

The Resolution copper ore deposit is a world class resource. The FEIS should acknowledge that the size and scale of this deposit are important to the strategic and economic importance of the project. The Resolution copper deposit will be an important part of key economic benefits discussed in the EIS including socioeconomic, an important part of the supply of copper for our national security needs. The economic benefits disclosed in the DEIS are wide a very private investment in the state of Arizona today; thousands of jobs and tens of billions in economic benefits for over a decade. The importance of benefits from state, federal, and purchase of goods and services bring a much needed and long lasting positive economic benefit to the local Copper Triangle communities, Pinal County, Maricopa County and the state.

Comment ID: 14633
Response: ISE1

Luke Air Force base is in my district. Copper plays a critical role in the materials needed to build military aircraft to protect our nation and the men and women who serve in our armed forces. The Resolution project is important to our national security and secure supply of copper from our own resources. The Forest EIS should incorporate a discussion that describes the critical and strategic importance of this copper project in our national security.

Comment ID: 14534
Response: ISE1

During my nine years in the Arizona State Legislature, I spent time on site touring the Resolution Copper Project and visiting with employers and contractors. I was impressed with the extremely high level of professionalism and skill of the workforce and surrounding community. The commitment to environmental stewardship by the workforce was extraordinary. The Forest EIS should incorporate into the project Resolution Copper's involvement, hasn't been extraordinary. The degree of focus on bringing local and building the capacity of local contractors is impressive and directly benefits the local communities within the Copper Triangle of Arizona.

Comment ID: 14635
Response: GE8

For all questions that doesn't properly support this project and the rapid completion of the FEIS and for the Resolution Copper Project, there is a need to move to rural clearance and all other federal permits and approvals needed so that the project can move ahead.

Mine Related Demand for Public Services

The Socioeconomic text has a proven methodology for estimating accurate costs and benefits. As a result, the socioeconomic analysis in Section 3.13 is unduly negative to how Resolution addresses the following:

• The analysis assumes an increase in costs of 30% for the Town, yet the 3-acre report concludes only a 13% increase in population. There is a rational expectation that Town costs would be highly correlated with its city's growth in residents. We evidence we presented that its labor employers who do not meet the Town trend at Superior would see higher levels of maintenance. However, the Socioeconomic section already addresses costs related to expected increases in street maintenance and shows that over Town of Superior (Town) revenues will exceed these costs. Addressing street maintenance issues in three separate sections should be consistent otherwise it causes the reader to be unable to count this impact, when in fact the over has already been captured and factored through to Town benefits.

Comment ID: 11532
Response: SO14

Road Maintenance

The Transportation and Access analysis is found on an analysis of the Level of Service, which is correctly an increase in traffic. As noted, "received volumes of traffic are likely to worsen at higher levels of maintenance." However, the Socioeconomics section already addresses costs related to expected increases in street maintenance and shows that over Town of Superior (Town) revenues will exceed these costs. Addressing street maintenance issues in three separate sections should be consistent otherwise it causes the reader to be unable to count this impact, when in fact the over has already been captured and factored through to Town benefits.

Comment ID: 11533
Response: TR1

Unfortunately, it does benefit we were overshadowed in the DEIS by unsupported claims of negative impacts described in the text that don't necessarily align with the stated impacts in these sections of the DEIS. *Transportation and Access* and *Socioeconomics* [Please check these inconsistencies and work to address the following in the FEIS.

Comment ID: 11531
Response: SO14

Lastly, please incorporate into the FEIS further details on the importance of copper as a metal critical to our national defense, economic growth and energy security.

Thank you for the opportunity to provide comments on the Draft Environmental Impact Statement

Sincerely,

David Schweikert
Member of Congress

[Continued]

Appendix R

# Section 2. Commenter Index Tables

11-RCMSER-2721

Appendix R

*This page intentionally left blank.*

R-70

Appendix R

**Table R-4. Index of responses for letters submitted by organizations, agencies, or elected officials**

| Organization(s) | Letter ID | Last Name(s) | First Name(s) | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|---|
| Access Fund | 40 | Shannon | Curt | ALT22, NEPA53, NS1, WT4 |
| Access Fund | 122 | Shannon | Curt | NS1, WT24, WT4 |
| Access Fund | 1235 | Winter | Chris | ALT22, ALT8, AMT1, MIT3, MIT7, NEPA2, NEPA53, NS2, SO6, WT24, WT4, WT6 |
| Access Fund | 1454 | Shannon | Curt | ALT22, ALT8, AMT1, MIT3, MIT7, NEPA2, NEPA53, NS2, SO6, SR13, SR13_A, SR23, SR24, SR37, WT24, WT25_A, WT4_C |
| American Exploration & Mining Association | 1396 | Compton | Mark | AMT1, CR4, EJ2, MIT13, NEPA1, NS1, SO8 |
| AMIGOS | 1313 | Hay | Sydney | NS1 |
| Ana Anu Arts | 1354 | Wyssmann | Ana Anu | NS1 |
| Apache Stronghold; San Carlos Apache Tribe | 235 | Nosie; Rambler | Terry; Wendsler | CR12, CR14, CR21, CR4, MIT11, NEPA15, NEPA30, NEPA4, NS1, NS2, WT30, WT50 |
| Archaeology Southwest | 1417 | Doelle; Welch | John; William | CR17, CR22, CR6 |
| Arizona Chamber of Commerce and Industry | 201 | Taylor | Garrick | ALT30, NS1 |
| Arizona Chamber of Commerce and Industry | 928 | Hamer | Glenn | NEPA34, NS1, SO14 |
| Arizona Department of Environmental Quality – Facilities Emissions Control | 278 | Mao | Feng | AQ13, AQ15, AQ16, AQ2, AQ9, DOC1 |
| Arizona Game and Fish Department | 30075 | Ritter | Ginger | ALT30, AQ11, DOC1, MIT1, MIT3, MIT30, MIT33, MIT34, MIT38, MIT6, MIT8, NEPA32, NEPA45, NEPA54, SO3, SR25, SR26, WI15, WI20, WI22, WI3, WT16, WT17, WT44, WT48, WT49, WT57, WT61, WT62, WT7, WT79, WT8, WT82 |
| Arizona House of Representatives | 258 | Cobb | Regina | MIT1, NS1 |
| Arizona House of Representatives | 282 | Sierra | Lorenzo | NS1 |
| Arizona House of Representatives | 285 | Meza | Robert | NS1, SO10 |
| Arizona House of Representatives | 296 | Biasiucci | Leo | NS1 |
| Arizona House of Representatives | 299 | Shope | T.J. | ALT30, NS1 |
| Arizona House of Representatives | 302 | Cook | David | NS1 |
| Arizona House of Representatives | 303 | Finchem | Mark | NEPA31 |
| Arizona House of Representatives | 305 | Weninger | Jeff | NS1 |
| Arizona House of Representatives | 308 | Petersen | Warren | NS1 |
| Arizona House of Representatives | 309 | Toma | Ben | NS1 |

R-71

Appendix R

| Organization(s) | Letter ID | Last Name(s) | First Name(s) | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|---|
| Arizona House of Representatives | 312 | Lawrence | Jay | NS1 |
| Arizona House of Representatives | 315 | Bowers | Rusty | NS1 |
| Arizona House of Representatives | 316 | Block | Shawna | NS1 |
| Arizona House of Representatives | 571 | Campbell | Noel | NS1 |
| Arizona House of Representatives | 817 | Shope | T.J. | ALT30, NS1 |
| Arizona House of Representatives | 852 | Fillmore | John | NS1 |
| Arizona House of Representatives | 907 | Fillmore; Pierce | John; Steve | NS1 |
| Arizona House of Representatives | 923 | Cobb | Regina | MIT1, NS1 |
| Arizona House of Representatives | 1281 | Hernandez | Alma | NS1, NS2, SO8 |
| Arizona House of Representatives | 1387 | Payne | Kevin | NS1 |
| Arizona House of Representatives | 1427 | Carroll | Frank | NS1 |
| Arizona House of Representatives | 1494 | Hernandez | Daniel | NS1 |
| Arizona House of Representatives | 30073 | Chavez | Cesar | ALT30, NS1 |
| Arizona House of Representatives | 297 | Kavanagh | John | NS1 |
| Arizona Mining Industry Gets Our Support (AMIGOS) | 191 | Tanner | Brett | NS1 |
| Arizona Mining Reform Coalition | 24 | Featherstone | Roger | ALT22, NEPA2, NEPA35, TS2, WT1 |
| Arizona Mining Reform Coalition | 52 | Featherstone | Roger | ALT22, WT1, WT4_L |
| Arizona Mining Reform Coalition | 53 | Featherstone | Roger | ALT22, GS8, NEPA2 |
| Arizona Mining Reform Coalition | 67 | Featherstone | Roger | ALT22, TS2, TS20, WT1 |
| Arizona Mining Reform Coalition | 104 | Featherstone | Roger | GS8, NEPA2, NEPA35, NS1, NS2, SO16 |
| Arizona Mining Reform Coalition | 178 | Featherstone | Roger | NS1, TS2 |
| Arizona Mining Reform Coalition | 230 | Featherstone | Roger | NS1, TS2 |
| Arizona Mining Reform Coalition | 279 | Featherstone | Roger | NEPA25 |
| Arizona Mining Reform Coalition | 7958 | Featherstone | Roger | CR18 |

R-72

Appendix R

| Organization(s) | Letter ID | Last Name(s) | First Name(s) | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|---|
| Arizona Mining Reform Coalition et al.* | 6032 | Featherstone et al.† | Roger | ALT11, ALT21, ALT22, ALT28, ALT5, AMT1, AMT1_A, AMT1_D, AMT1_G, AMT6, AQ11, AQ17, AQ18, AQ19, AQ20, AQ21, AQ22, AQ23, AQ24, AQ25, AQ3, AQ4, AQ4_A, AQ5, AQ6, CR16, CR17, CR2, CR20, CR22, CR4, CR5, CR6, CR8, DOC1, EJ2, EJ2_A, EJ2_B, EJ3, GS1, GS11, GS11_A, GS2, GS6, GS7, GS8, LG1, MIT1, MIT15, MIT17, MIT21, MIT22, MIT24, MIT27, MIT29, MIT3, MIT33, MIT35, MIT40, MIT5, MIT7, MIT8, NEPA1, NEPA14, NEPA17, NEPA19, NEPA2, NEPA26, NEPA3, NEPA33, NEPA35, NEPA36, NEPA43, NEPA45, NEPA50, NEPA53, NEPA54, NEPA61, NEPA62, NEPA64, NEPA66, NEPA8, NEPA9, NO1, NO3, NO5, NS1, NS2, SO1, SO14, SO19, SO2, SO4, SO5, SO6, SR10, SR13, SR13_A, SR17, SR19, SR23, SR24, SR5, SR7, SR9, TR1, TR13, TR14, TR17, TR18, TR20, TR21, TR6, TR7, TR8, TR9, TS1, TS16, TS19, TS2, TS20, TS20_A, TS22, TS24, TS24_A, TS24_B, TS26, TS29, TS32, WI1, WI10, WI11, WI12, WI13, WI14, WI15, WI16, WI17, WI18, WI19, WI21, WI23, WI24, WI25, WI26, WI6, WT10, WT16, WT2, WT21, WT21_A, WT21_B, WT21_D, WT24, WT26, WT35, WT36, WT37, WT39, WT4, WT4_F, WT4_I, WT41, WT42, WT45_A, WT45_C, WT45_H, WT45_I, WT45_K, WT45_N, WT45_O, WT45_P, WT45_Q, WT45_R, WT45_S, WT45_T, WT52, WT56, WT58, WT59, WT6, WT63, WT7, WT72, WT9, WT91 |
| Arizona Mining Reform Coalition et al.* | 30140 (Letter 6032 Appendix C - Maest report) | Featherstone et al.† | Roger | WT28, WT35, WT36, WT37, WT41 |
| Arizona Mining Reform Coalition et al.* | 30141 (Letter 6032 Appendix A - Chambers report) | Featherstone et al.† | Roger | AMT1, AMT1_A, GS1, GS16, MIT21, TS1 |
| Arizona Mining Reform Coalition et al.* | 30142 (Letter 6032 Appendix B2 - Emerman report) | Featherstone et al.† | Roger | WT6 |
| Arizona Mining Reform Coalition et al.* | 30143 (Letter 6032 Appendix B3 - Emerman report) | Featherstone et al.† | Roger | WT1, WT1_A, WT24, WT6 |
| Arizona Mining Reform Coalition et al.* | 30144 (Letter 6032 Appendix B4 - Emerman report) | Featherstone et al.† | Roger | GS11, NS2 |
| Arizona Mining Reform Coalition et al.* | 30145 (Letter 6032 Appendix B5 - Emerman report) | Featherstone et al.† | Roger | TS1, TS2 |

R-73

11-RCMSER-2725

Appendix R

| Organization(s) | Letter ID | Last Name(s) | First Name(s) | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|---|
| Arizona Mining Reform Coalition et al.* | 30146 (Letter 8032 Appendix E - Prucha report) | Featherstone et al.† | Roger | WT45_A, WT45_B, WT45_C, WT45_D, WT45_E, WT45_F, WT45_G, WT45_H, WT45_I, WT45_J, WT45_K, WT45_L, WT45_M, WT45_N, WT45_O |
| Arizona Mining Reform Coalition et al.* | 30147 (Letter 8032 Appendix D - Powers report) | Featherstone et al.† | Roger | SO2, SO4, WT4, WT6 |
| Arizona Science Policy Network | 204 | Bercovici | Hannah | NS1 |
| Arizona Science Policy Network | 30122 | Bercovici | Hannah | NS1 |
| Arizona State Land Department | 562 | Atkins | Lisa | ALT30, CR5, LG3, MIT1, NEPA20, NEPA42, NS1, SO18, WT23, WT4_G |
| Arizona State Senate | 264 | Leach | Vince | NS1 |
| Arizona State Senate | 304 | Carter | Heather | NS1 |
| Arizona State Senate | 318 | Allen | Sylvia | NS1 |
| Arizona State Senate | 896 | Fann | Karen | NS1 |
| Arizona State Senate | 1017 | Gowan | David | NS1 |
| Arizona State Senate | 1018 | Kerr | Sine | NS1 |
| Arizona State Senate | 1046 | Farnsworth | Eddie | NS1 |
| Arizona State Senate | 1060 | Bradley | David | NS1 |
| Arizona State Senate | 1065 | Bradley | David | NS1 |
| Arizona State Senate | 1148 | Gray | Rick | NS1 |
| Arizona State Senate | 1312 | Pratt | Frank | NS1, SO14 |
| Arizona Trail Association | 1311 | Gaudet | Fred | ALT30, MIT1, MIT4, NS2, SR11, SR12, SR24, TR13 |
| Arizona Water Company | 555 | Haas | Andy | ALT1, ALT30, MIT1, MIT29, NEPA47, TS5, WT10, WT19, WT4, WT43, WT55, WT7, WT80 |
| Audubon Arizona | 1441 | Perillo; Supplee | Sonia; Tice | ALT22, MIT1, MIT3, MIT35, MIT8, NEPA10, NEPA65, WT1 |
| Bureau of Land Management -- Tucson Field Office | 28449 | Moore | Daniel | CR1, CR15, CR2, CR5, CR6, DOC1, EJ2, LG4, MIT1, MIT3, MIT39, MIT4, MIT7, NEPA35, NEPA43, NEPA46, NEPA52, NEPA54, NEPA60, SO10, SO3, SR13, SR16, SR24, SR30, SR31, SR32, SR33, SR34, SR36, TR11, WI7, WT32, WT33, WT4, WT7, WT81 |
| CAID Industries, Inc. | 941 | Robino | Jeff | NS1 |
| Center for Biological Diversity | 74 | Miller | Brytnee | CR4, NS1 |

R-74

Appendix R

| Organization(s) | Letter ID | Last Name(s) | First Name(s) | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|---|
| Center for Biological Diversity | 118 | Miller | Brytnee | CR4, NS1 |
| Center for Science in Public Participation | 1209 | Chambers | David | AMT1, AMT1_A, AMT1_F, MIT21, TS1 |
| City of Apache Junction | 284 | Serdy | Jeff | NS1 |
| City of Globe | 518 | Gameros | Al | ALT30, NS1, SO9 |
| Concerned Citizens and Retired Miner Coalition | 25 | Chavez | Roy | NS1 |
| Concerned Citizens and Retired Miner Coalition | 68 | Chavez | Roy | NS1 |
| Concerned Citizens and Retired Miner Coalition | 69 | Chavez | Roy | NEPA25 |
| Concerned Citizens and Retired Miner Coalition | 105 | Chavez | Roy | NS1 |
| Concerned Citizens and Retired Miner Coalition | 106 | Chavez | Roy | SO21 |
| Concerned Citizens and Retired Miner Coalition | 179 | Chavez | Roy | NS1 |
| Concerned Citizens and Retired Miner Coalition | 180 | Chavez | Roy | NEPA30, NS1 |
| Concerned Citizens and Retired Miner Coalition | 231 | Chavez | Roy | NS1, SO16 |
| County Supervisors Association of Arizona | 866 | Gallardo; McCloud; Melera; Smith; Sullivan; Whiting | Anthony; Craig; Jason; Rudy; Russell; Steve | DOC1, MIT1, MIT21, MIT3, NEPA33, NS1, NS2, SO14, SO17, TS1 |
| Department of the Interior -- Office of Environmental Policy and Compliance | 1121 | Whitlock | Janet | NEPA49 |
| Earthworks | 320 | Dronkers | Pete | ALT1, ALT13, AMT1, AMT1_G, AMT1_I |
| East Valley Back Country Horseman | 300 | McClintock | Stephen | ALT30, MIT1 |
| Gila County Board of Supervisors | 28824 | Cline | Woody | ALT26, MIT1 |
| Gila River Indian Community | 321 | Thomas | Derald | NS1 |
| Globe-Miami Chamber Regional Chamber of Commerce | 1516 | Holder | Tianna | NS1, SO9, TR1 |
| Government Springs Ranch, LLC | 30081 | Hoopes | John | ALT19, ALT27, CR19 |
| Great Old Broads for Wilderness | 568 | Switzer | Rosalind | ALT5, NS1, TS2 |
| Greater Florence Chamber of Commerce | 1152 | Biede | Roger | NS1, NS2 |
| Industrial Automation Services | 323 | Bauman | Terry | NS1, TS1 |
| Innovative Technologies Development Center | 1163 | Shatz | Robert | NEPA1, NS2 |
| Inter Tribal Association of Arizona | 246 | Lewis | Shan | NEPA25 |

R-75

11-RCMSER-2727

Appendix R

| Organization(s) | Letter ID | Last Name(s) | First Name(s) | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|---|
| Inter Tribal Association of Arizona | 8031 | Lewis | Shan | ALT8, ALT9, AMT1_E, CR10, CR12_A, CR13, CR16, CR20, CR4, CR5, LG6, MIT1, MIT15, MIT18, MIT27, MIT30, NEPA1, NEPA15, NEPA16, NEPA18, NEPA19, NEPA23, NEPA24, NEPA25, NEPA26, NEPA35, NEPA41, NEPA44, NEPA45, NEPA51, NEPA54, NEPA58, NEPA59, NS1, WI15, WI6, WT1_B, WT10, WT4, WT4_F, WT44, WT45, WT63, WT7, WT8, WT83, WT9, WT90 |
| Landmark Companies | 1465 | Barney | Jason | NS1 |
| Legends of Superior Trail and Town of Superior; Superior Community Working Group; Superior Recreation User Group | 1266 | Besich; Duerr | Debra; Mila | MIT1 |
| Legends of Superior Trails | 1429 | Schenck | James | MIT1, NS1 |
| LeSueur Investments | 1204 | LeSueur | Ty | ALT30, NS1 |
| Lower San Pedro Watershed Alliance | 1186 | Else | Peter | ALT12, ALT2, ALT22, ALT23, ALT31, AQ14, DOC1, MIT1, MIT20, MIT27, MIT3, MIT8, NEPA18, NEPA3, NEPA50, NEPA52, NEPA65, NS1, SO18 |
| M3 Engineering & Technology Corporation | 1042 | Bennett | Alberto | NS1 |
| Magma Dorada LLC; JSS International Consulting | 1286 | Schenck | James | ALT30, MIT1, MIT3, NS1, SO14 |
| Maricopa Audubon Society | 154 | Horlings | Mark | WT1 |
| Maricopa Audubon Society | 224 | Horlings | Mark | WT1 |
| ME Elecmetal | 1139 | Schick | Greg | NS1 |
| Mesa Chamber of Commerce; Greater Mesa Industry & Defense Council | 1111 | Harrison | Sally | NS1, SO8 |
| Mesa Chamber of Commerce; Greater Mesa Industry & Defense Council | 1112 | Harrison | Sally | NEPA34, NS1 |
| Mesa City Council, District 6 | 267 | Thompson | Kevin | NS1, TR8 |
| Miami Town Council | 283 | Gonzales | Sammy | ALT30, MIT1, MIT3, NS1, SO14, SR26 |
| New Energy Economy | 1151 | Nanasi | Mariel | NS1, TS12 |
| Oddonetto Construction Inc. | 1300 | Oddonetto | Kimberly; Michael | ALT30, NS1 |
| Pascua Yaqui Tribe of Arizona | 1149 | Hoerig | Karl | NS2 |
| Phoenix City Council Member | 275 | Waring | Jim | NS1 |
| Pinal County | 314 | Rios | Pete | MIT1, MIT3, SO10, SO14 |
| Pinto Valley Mine | 1072 | Wickersham | Michael | NS1 |

R-76

11-RCMSER-2728

Appendix R

| Organization(s) | Letter ID | Last Name(s) | First Name(s) | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|---|
| Public Land 4 Responsible Recreation | 778 | Hankins | Jill | NS2 |
| Queen Creek Coalition | 270 | Keedy | John | MIT1 |
| Queen Valley Golf Association | 249 | Wright | Percy | NEPA25 |
| Queen Valley Golf Association | 268 | Wright | Percy | NEPA25, WT59 |
| Saint Holdings | 1485 | Andersen | Jackob | NS1 |
| San Carlos Apache Tribe | 251 | Rambler | Terry | CR13_A, CR5, NEPA25 |
| San Carlos Apache Tribe | 8030 | Rambler | Terry | ALT22, CR13, CR8, MIT27, NS1 |
| San Carlos Apache Tribe | 30078 | Rambler | Terry | AMT1, AMT1_B, CR12_B, CR16, CR2, CR4, CR7, CR8, DOC1, MIT1, MIT3, NEPA14, NEPA19, NS1, NS2, TS24, WT10, WT19, WT21_C, WT3, WT30, WT4, WT4_A, WT4_H, WT42, WT49, WT54, WT61, WT69, WT7, WT71, WT89 |
| San Carlos Apache Tribe | 30079 | Rambler | Terry | CR4, NS2, WT4 |
| Showing Up for Racial Justice | 1236 | Cemina | Berkley | NEPA15 |
| Sierra Club | 42 | Steuter | Don | NEPA1, NEPA33, WT12 |
| Sierra Club | 124 | Steuter | Don | NEPA1, NEPA8, NS1, TS20 |
| Sierra Club – Grand Canyon Chapter | 182 | Bahr | Sandy | NS1, SO21 |
| Sierra Club – Grand Canyon Chapter | 1475 | Bahr | Sandy | NS1 |
| Signal Fire | 1256 | Pierce | Ryan | NS1 |
| Signal Fire | 1450 | Farrell-Smith | Ka'ila | CR4, NS1 |
| Southern Arizona Business Coalition | 1457 | Assenmacher | Grinnell | Bill |
| Southside Presbyterian Church | 546 | | | NS1 |
| Southside Presbyterian Church | 1205 | Lewis | Greg | NEPA39 |
| Sun City Anthem Hiking Club of Florence AZ | 1062 | WATERMAN | Greg | MIT1 |
| Superior Chamber of Commerce | 317 | Anderson | Susan | ALT30, MIT1, MIT3, NS1, SO9 |
| Superior Chamber of Commerce | 324 | Anderson | Susan | MIT1 |
| Superior Community Working Group; Superior Recreation User Group | 1389 | Duerr | Debra | DOC1, MIT1, MIT21, MIT3, MIT8, NS1, SO1, SO14, SO16, SO19, SO21, SR24, WT4 |
| Superior Retired Miners Coalition | 1140 | Munoz Sr. | Henry | NEPA46, TS24, WT4 |
| Superior Unified School District | 322 | Godinez | Arlynn | ALT30, MIT1, MIT3, SO14 |
| Superstition Area Land Trust | 319 | Goff | Charlie | ALT30, MIT1, MIT3, NS1, SR13 |

R-77

Appendix R

| Organization(s) | Letter ID | Last Name(s) | First Name(s) | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|---|
| The Nature Conservancy | 1137 | Hill | Nicole | MIT1, MIT3 |
| The Religion and Human Rights Forum for the Preservation of Native American Sacred Sites and Rights | 248 | Boyd | Stephen | NEPA25 |
| Tonto Recreation Alliance | 1317 | Smith | Richard | MIT1 |
| Town of Florence | 515 | Walter | Tara | ALT30, NS2 |
| Town of Superior | 250 | Pryor | Todd | SO14 |
| Town of Superior | 251 | Pryor | Todd | ALT1, ALT30, MIT1, NEPA12, NS1, SO14 |
| U.S. House of Representatives | 1079 | Biggs | Andy | NS1 |
| U.S. House of Representatives | 1197 | Gosar | Paul | ALT30, NEPA34, NS1, NS2, SO8 |
| U.S. House of Representatives | 1410 | Lesko | Debbie | ALT30, NS1 |
| United Steelworkers | 266 | Conway | Thomas | NS1 |
| University of Arizona, Center for Natural Resource Users | 1122 | Eisenberg | Jeff | MIT1, MIT3, NS1, SO5 |
| U.S. Army Corps of Engineers | 28455 | Dielbolt | Sallie | – |
| US Environmental Protection Agency | 524 | Dunning | Connell | ALT1, ALT22, AQ6, DOC1, MIT1, MIT17, MIT27, MIT35, NEPA2, NEPA21, TS1, TS10, W26, WT32, WT37, WT46, WT47, WT7, WT76, WT78, WT84, WT92 |
| US House of Representatives | 310 | Schweikert | David | NS1, SO14, TR1 |
| US House of Representatives | 1113 | Schweikert | David | NS1, SO14, TR1 |
| Wild By Nature, Inc | 811 | Wild | Kathryn | NS1 |
| WildEarth Guardians | 1539 | Krupp | Christopher | AMT6, MIT19, MIT3, NEPA2, NEPA55, WT25 |
| Yavapai-Apache Nation | 463 | Huey | Jon | CR12, MIT3 |
| Yavapai-Apache Nation | 30080 | Huey | Jon | ALT30, CR12, CR7 |

\* Full organization list:  Arizona Inter-Faith Power and Light; Arizona Mining Reform Coalition; Center for Biological Diversity; Community Water Coalition of Southern Arizona; Concerned Citizens and Retired Miner Coalition; Concerned Climbers of Arizona; Earthworks; Maricopa Audubon Society; Natural Allies; Oklahoma Indigenous Theatre Company; Patagonia Area Resource Alliance; Save the Scenic Santa Ritas; Save Tonto National Forest; Sierra Club – Grand Canyon Chapter; Sky Island Alliance; Tucson Audubon Society; Valley Unitarian Universalist Congregation – Green; WildEarth Guardians

† Full list of Individuals (last name): Bahr; Bland; Chavez; Dronkers; Featherstone; Grijalva; Hartmann; Hodges; Horlings; Horning; Krieg; Lutz; Misztel; Rangel; Schwartz; Serraglio; Shafer; Whitley

Appendix R

**Table R-5. Index of responses for letters submitted by individuals**

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| (Blank) | Moa Lim | 28543 | NS1 |
| | Anonymous | 1530 | NS1 |
| Abbott | Cathy | 7841 | NS1 |
| Abdalla | Abdulla | 1508 | CR4, LG5, NS1, TR4 |
| Abeling | Barbra | 1164 | NS1 |
| Ackerman | Frank | 5402 | NS1 |
| Ackerman | Judith | 30070 | NS1 |
| Acosta | Chris | 29455 | NS1 |
| Adams | Constance | 27013 | NS1 |
| Adams | Jess | 1186 | NS1 |
| Adams | Tulwen | 27733 | NS1 |
| Addison | Tom | 6494 | NS1 |
| Adkins | David | 5841 | NS1 |
| Aengst | Jennifer | 8282 | NS1 |
| Aex | Tim | 8283 | NS1 |
| Ages | Terry | 509 | ALT5, NEPA3, NS1 |
| Agins | Richard | 7766 | NS1 |
| Agneessen S | Rosemary | 7188 | NS1 |
| Aguirre | Mackailah | 1025 | NS1 |
| Aken | Richard Van | 5448 | MIT21 |
| Akers | Frederick | 27184 | NS1 |
| Alagamma I | Andrea | 7393 | NS1 |
| Albert | Iris | 1425 | NS1 |
| Albert | Shan | 27099 | NS1 |
| Albert-Black | Cecilia | 8147 | NS1 |
| Albright | Jon | 28265 | NS1 |
| Alcock | John | 1614 | NS1 |
| Alexakos | Irene | 27948 | NS1 |
| Alexander | Melody | 1218 | NS1 |
| Alexander | Sean | 971 | NS1 |
| Alexander | William | 29075 | NS1 |
| Alger | Rosie | 1299 | NS1 |
| Aljneibi | Naser | 1343 | MIT1, MIT4, SR21 |
| Allen | Heidi | 5528 | NS1 |
| Allen | Karen | 6779 | NS1 |
| Allen | Phillip | 29162 | NS1 |
| Allison | Breana | 28903 | NS1 |
| Alm | Magnus | 575 | NS1 |
| Alonzo | Luis | 7394 | NS1 |

11-RCMSER-2731

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Altherr | Forest | 6248 | NS1 |
| Altman | Andrew | 8180 | NS1 |
| Altshuler | John | 827 | NS1 |
| Alvarado | Fernando | 6403 | TS24 |
| Al-Yousef | Abdul | 1473 | MIT35, NS2, SO1 |
| Alzahrani | Rashad | 1176 | NEPA6 |
| Amrhein | Fred | 5771 | AMT1 |
| Amsden | Liz | 814 | MIT21, NS1, NS2 |
| Anaya | Zachary | 8092 | NS1 |
| Andaya | Stephanie | 6142 | NS1 |
| Andersen | Jill | 475 | NS1 |
| Andersen | Kirsten | 27121 | NS1 |
| Anderson | Alexandra | 28477 | NS1 |
| Anderson | Andrew | 1228 | NS1 |
| Anderson | Craig | 27950 | NS1 |
| Anderson | Glen | 28043 | NS1 |
| Anderson | Heather | 28108 | NS1 |
| Anderson | Ivylle | 807 | NS1 |
| Anderson | Leiann | 1229 | NS1 |
| Anderson | Mia | 28497 | WT25 |
| Anderson | Michael | 28860 | NS1 |
| Anderson | Wendi | 1332 | NS1 |
| Andersson | Rylan | 28930 | NS1, WT6_A |
| Andrew | Eidson | 960 | NS1 |
| Andrews | Jennifer | 26823 | NS1 |
| Andujo | Josh | 147 | NS1 |
| Angell | Robert | 6498 | NS1 |
| Angeloff | Linda | 6811 | NS1 |
| Anglin | Paige | 1115 | NEPA27, TS24, WI9 |
| Angus | Billy | 5461 | NS1 |
| Anonymous | Commenter1 | 35 | ALT30 |
| Anonymous | Commenter3 | 101 | NEPA35, NS1 |
| Anonymous | Commenter5 | 228 | NS1 |
| Anonymous | Anonymous | 30074 | CR4, MIT12, NS2 |
| Ansley | Celia | 6278 | NS1 |
| Anson | April | 1367 | NS1 |
| Anthony | Kendra | 28264 | NS1 |
| Apane | Irene | 28807 | NS1 |
| Apolinar | Aleena | 1038 | NS1 |
| Appel | Genevieve | 27119 | NS1 |

11-RCMSER-2732

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Aramburu | Alfredo | 387 | NS1 |
| Arbuckle | Nancy | 26824 | NS1 |
| Arenberg | Meg | 1324 | CR4, NS1 |
| Armentrout Jr | James | 550 | NS1, TS1 |
| Armitage | Bruce | 929 | ALT30, MIT1, MIT3, NEPA12 |
| Armstrong | William | 28639 | NS1 |
| Arndt | Laura | 2052 | NEPA40 |
| Arnold | Aimee | 1612 | NS1 |
| Arnold | William | 5549 | NS1 |
| Aroneo | Regina | 7419 | NS1 |
| Arrowsmith | Janet | 27749 | NS1 |
| Arsenault | Kyle | 28909 | NS1 |
| Arzabe | Miguel | 1352 | NS1 |
| Asch | Halee | 30126 | NS1 |
| Ashby | Lynn | 1501 | ALT22, TS1, TS2, WT1, WT8 |
| Ashley | Hannah | 28232 | NS1 |
| Ashouri | Aida | 6365 | NS1 |
| Ashton | Itzel | 1535 | EJ2 |
| Assanuvat | Sean | 421 | NS1 |
| Atkinson | Martha | 5475 | NS1 |
| Atwood | April | 27084 | NS1 |
| Auer | Brendan | 393 | NS1 |
| Auge | Benita | 27699 | NS1 |
| Austin | Tina | 1087 | NS1 |
| Av | Isaiah | 30103 | NS1 |
| Avila | Roman | 27783 | NS1 |
| Axt | Phyllis | 27003 | NS1 |
| Azbell | Daniel | 8145 | NS1 |
| B | Geeta | 5504 | NS1 |
| B | Jess | 1093 | CR4, NS1, TS24, WT4 |
| Bachhuber | Mary | 1606 | NEPA3, NS1 |
| Baden | Byron | 1358 | AMT1, GS15, GS3, NEPA27, NS1, WT4, WT68 |
| Baden | Eileen | 199 | AMT1, NEPA1, NEPA25 |
| Baden | Eileen | 1106 | NEPA25 |
| Baden | Eileen | 1360 | ALT1, AMT1, AQ11, CR4, GS13, MIT1, MIT3, NEPA1, NEPA24, NEPA27, NEPA28, NEPA35, NS1, SO14, SO21, SO6, WT4 |
| Baden | Eileen | 6820 | NEPA27 |
| Badinelli | Meghan | 1012 | NS1 |
| Bagley | Brandon | 8256 | NS1 |

11-RCMSER-2733

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Bahti | Yuri | 6823 | NS1 |
| Bajrami | Arlinda | 1090 | CR4, NS1, WT4 |
| Baker | Kelly | 6827 | NS1 |
| Bales | Clarice | 27222 | NS1 |
| Balfe | Carolyn | 27734 | NS1 |
| Ball | Justin | 5973 | NS1 |
| Ball | Katherine | 1241 | NS1 |
| Ballard | Brian | 192 | NS1 |
| Ballard | Brian | 1284 | AQ11, WT1 |
| Ballard | Julia | 5400 | NS1 |
| Ballard | Rebecca | 1318 | NS1, NS2, WT4 |
| Balser | Austin | 6419 | ALT22, WT4_K |
| Banks | Janice | 779 | NS1 |
| Baraka | Carmen | 29707 | NS1 |
| Baranowski | Josh | 1920 | NS1 |
| Baranowski; Dailey | Eileen; Mark | 1068 | CR4, NEPA2, NS1, SO7, WT4, WT4_A, WT6 |
| Barbee | Charles | 669 | NS1, WT4, WT6 |
| Barger | Karin | 27856 | NS1 |
| Baribeau | Robert | 28649 | NS1 |
| Barney | Dakotah | 5551 | NS1 |
| Baron | Kathryn | 1192 | NEPA13, NS1 |
| Barrett | Giulio | 30117 | NS1 |
| Barrett | Sylvia | 29 | ALT16, ALT2, ALT29, EJ4, GS3, MIT21, WT12 |
| Barrett | Sylvia | 30 | MIT3 |
| Barrett | Sylvia | 169 | CR4 |
| Barrett | Sylvia | 183 | NS1, WT25 |
| Barrett | Sylvia | 236 | GS13, NS1 |
| Barrett | Sylvia | 1493 | NEPA29 |
| Barrett | Trevor | 28505 | NS1 |
| Barringer | Thaddeus | 237 | NS1 |
| Barringer | Thaddeus | 5540 | NS1 |
| Barron | Anthony | 27415 | NS1 |
| Barrow | Olivia | 28539 | NS1 |
| Barry | Chris | 28168 | NS1 |
| Barry | Wendy | 7986 | NS1 |
| Bartelt | Jeannette | 27165 | NS1 |
| Bartlett | Heather | 29142 | NS1 |
| Barton | Jennifer | 28116 | NS1 |
| Bastias | Andreas | 29349 | NS1 |
| Bate | Jo Ellen | 27381 | NS1 |

11-RCMSER-2734

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Baucom | Frank | 6831 | NS1 |
| Bauer | Robert | 6051 | NS1 |
| Baugher | Travis | 7970 | NS1 |
| Baus | Robert | 26858 | NS1 |
| Bauserman | Christine | 1143 | NS1 |
| Baweja | Jessica | 6469 | NS1 |
| Beagle | Bryce | 1001 | NS1 |
| Bean | Jarrett | 864 | NS1 |
| Bear | Marie | 1438 | AQ1, AQ25, AQ3, AQ5, AQ8, DOC1, MIT1, MIT24, NEPA1, SO15 |
| Beard | Molly | 6300 | NS1 |
| Beck | Robin | 29712 | NS1 |
| Becker | Robert | 28044 | NS1 |
| Beckius | John | 28157 | NS1 |
| Beene | Jane | 6836 | NS1 |
| Begley | Patrick | 5637 | NS1 |
| Belgel | Lynda | 27935 | NS1 |
| Beimborn | Curtis | 30106 | NS1 |
| Bejarano | Nick | 604 | NS1 |
| Belchamber | Patricia & Frank | 259 | ALT22, NS2, TS2, WT1 |
| Bell | Jan | 6839 | NS1 |
| Bell | Janet | 5382 | NS1 |
| Bell | Janet | 26915 | NS1 |
| Bellamy | David | 27177 | NS1 |
| Belland | Tara | 27740 | NS1 |
| Bello | D | 26940 | NS1 |
| Belshin | Bryce | 8174 | NS1 |
| Bender | Angela | 561 | NS1 |
| Bengtson | Carla | 1275 | NS1 |
| Bengtson | Nancy | 6840 | NS1 |
| Benjamin | Austin | 618 | NS1 |
| Bennett | Austin | 6188 | NS1 |
| Bennett | Erin | 6008 | NS1 |
| Bennett | Jonathan | 28561 | NS1, WT4 |
| Bercaw | John | 359 | NS1 |
| Berg | Bruce | 838 | NS1 |
| Bergman | James | 925 | NS1 |
| Beringer | Steven | 6066 | NS1 |
| Berkowitz | Henry | 5429 | NS1 |
| Berry | Michael | 957 | NS1 |

11-RCMSER-2735

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Bertelsen | Tiffany | 28482 | NS1 |
| Berthoin | Paola | 27328 | NS1 |
| Berzonski | Edward | 30120 | NS1 |
| Bessler | Mike | 1997 | NS1 |
| Betancourt | Moises | 5519 | NS1 |
| Betts | Chloe | 6208 | NS1 |
| Betz | Catherine | 26965 | NS1 |
| Beyer | Alexander | 6155 | NS1 |
| Bia | Johnny | 1028 | NS1 |
| Bickford | Claire | 28184 | NS1 |
| Bicknell | Mary | 27436 | WT43 |
| Biggs | Patricia | 27142 | NS1 |
| Bighorse | Lian | 153 | NS1 |
| Bighorse | Lian | 214 | CR2, NS1 |
| Bighorse | Lian | 1460 | CR2 |
| Binder | Fred | 1272 | NS1 |
| Bingham | Brent | 1479 | NEPA17 |
| Binnie | Al | 28037 | NEPA2, NS1, NS2 |
| Birdsall | Kristin | 28139 | NS1 |
| Bishop | Carolyn and Walter | 26852 | NS1 |
| Bizjak | Julia | 5664 | NS1 |
| Black | Deborah | 28020 | NS1 |
| Black | Vania | 6845 | NS1 |
| Blackman | Jeffrey | 6847 | NS1 |
| Blackmon | Rachel | 29711 | NS1 |
| Blackwell | Thomas | 28176 | NS1 |
| Blair | Curt | 7456 | NS1 |
| Bland | Doug | 6915 | NS1 |
| Blank | Cody | 28529 | NS1 |
| Blindauer | Neil | 858 | MIT17 |
| Blindauer | Neil | 1128 | NS2, TS16, TS24, WT4, WT7 |
| Bloom | Diane | 1221 | NS1 |
| Blossom | Gretchen | 6197 | NS1 |
| Blow | Elaine | 27914 | NS1 |
| Bluhm | Erik | 27988 | NS1 |
| Blumer | Ruth | 884 | NS2 |
| Bocchicchio | Rocco | 28517 | NS1 |
| Bockelman | Kathryn | 746 | NS1 |
| Bodenhamer | Leah | 705 | NS1 |
| Bodenhamer | Leah | 826 | NS1 |

11-RCMSER-2736

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Bodmer | Kacey | 6851 | NS1 |
| Boemig | Katrina | 1364 | NS1 |
| Boggess | Laura | 5867 | NS1 |
| Bogios | Constantine | 27754 | NS1 |
| Bohanon | Kelsey | 6311 | NS1 |
| Boice | Ruth | 26844 | NS1 |
| Bolduc | Daniel | 27756 | NS1 |
| Bols | Elizabeth | 27186 | NS1 |
| Bona | James | 892 | NEPA33, NS1 |
| Boone | Harper | 675 | NS1 |
| Boone | Jim | 27895 | NS1 |
| Boonstra | Michael | 1297 | NEPA39 |
| Booth | John | 28085 | NS1 |
| Borfes | Elsa | 1240 | NS1 |
| Born | Alexandra | 28536 | NS1 |
| Bottachiari | Lia | 1033 | NS1 |
| Bouchard | Dana | 471 | NS1 |
| Boudart | Piper | 28431 | NEPA3, NS1 |
| Bouldin | Bruce | 1059 | NS1 |
| Boulger | Kelsey | 30102 | NS1 |
| Boume | Haley | 28867 | NS1 |
| Bowers | Megan | 6006 | NS1 |
| Bowman | Coral | 1181 | NS1 |
| Box | Ken | 788 | NS1 |
| Boyer | Richard | 26903 | NS1 |
| Boyer Jr. | Edward | 289 | NEPA27, NS1 |
| Boyer Jr. | Edward | 290 | NS1, WT31, WT4, WT6 |
| Boyle | Dylan | 29095 | NS1 |
| Brabazon | Holly | 28188 | NS1 |
| Bracksieck | George | 29132 | NS1 |
| Bradley | Kathy | 8312 | NS1 |
| Brady | Cindy | 76 | MIT3, NS1 |
| Brainard | Mike | 6441 | NS1 |
| Brand | Jonathan | 6644 | NS1 |
| Brandt | Benjamin | 5537 | MIT3 |
| Brannon | Elizabet H | 6852 | NS1 |
| Brask | Maria | 8181 | NS1 |
| Brazitis | Peter | 27147 | MIT21 |
| Bread | Mara | 206 | NS1 |
| Brensinger | Elizabeth | 26841 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Bressan | Steven | 6192 | NS1 |
| Brewer | Judy | 27361 | NS1 |
| Brewer | Landon | 1024 | NS1 |
| Brewer | Laura | 6859 | NS1 |
| Bridges | Caroline | 1912 | NS1 |
| Briggs | Jeff | 29387 | NS1 |
| Brigham | Laura | 551 | NS1 |
| Brill | Lesley | 27879 | NS1 |
| Brimberry | Patricia | 5437 | NS1 |
| Brink | Tom | 5456 | NS1 |
| Brinke | Cecelia | 1102 | NS1 |
| Briones | Tom | 6860 | NS1 |
| Brittain | Laura | 5967 | NS1 |
| Brock | Martha | 28075 | NEPA3 |
| Brockhaus | Matthew | 28995 | NS1 |
| Brockhoff | Jennie | 513 | NS1 |
| Brodersen | Tom | 7473 | NS1 |
| Brodsky | Leah | 2006 | NS1 |
| Broh | Jonah | 1519 | CR5, NEPA3 |
| Brown | David | 28021 | NS1 |
| Brown | Imogene | 136 | NS1 |
| Brown | Jon-Eric | 28677 | NS1 |
| Brown | Ken | 731 | NS1 |
| Brown | Kevin | 833 | NS1 |
| Brown | Kevin | 6861 | NS1 |
| Brown | Matonth | 163 | CR4 |
| Brown | Peter | 877 | NS1 |
| Brown | Roderick and Cynthia | 27166 | NS1 |
| Brown | Tim | 6060 | NS1 |
| Brown | Waya | 171 | NS1 |
| Brownell | Benjamin | 6101 | NS1 |
| Brown-Lopez | Gouyen | 135 | NS1 |
| Brugger | Julie | 674 | NS1 |
| Bruins | Scott | 1242 | NS1 |
| Bruno | Christina | 2043 | NS1 |
| Bruno | Steve | 7483 | NS1 |
| Bryant | Elizabeth | 5930 | NS1 |
| Bubala | Louis | 28033 | NS1 |
| Buccigross I | Gwen | 7484 | NS1 |
| Buchanan | Marlin | 696 | NS1 |

11-RCMSER-2738

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Buck | Barbara | 7486 | NS1 |
| Buck | Sharon | 28113 | NS1 |
| Buck | Valerie | 8279 | NS1 |
| Buckingham | Kevin | 2122 | NS1 |
| Buckner | Jordan | 1924 | CR4, NS1 |
| Budan | Wanda | 28423 | NS1 |
| Budner | Brooke | 1246 | NS1 |
| Bulla | Terry | 6322 | NS1 |
| Bulla | Terry | 29370 | NS1 |
| Bundschu | Anton | 8133 | NS1 |
| Buness | Cynthia | 6870 | NS1 |
| Burch | Allen | 739 | NS1 |
| Burdorf | Rachel | 1520 | CR1, CR12, CR4, NS1 |
| Burgess | K. H. | 6872 | NS1 |
| Burgess | Martha | 1466 | NS1 |
| Burgmann | Eric | 565 | NS1 |
| Burgmeier | Rebecca | 1908 | NS1 |
| Burk | Taylor | 694 | NS1 |
| Burks | Mary | 28034 | NS1 |
| Burnett | Arthur | 686 | NS1 |
| Burnett | Chad | 28701 | NS1 |
| Burns | Jeanne | 6875 | NS1 |
| Burton | Lynnette | 27925 | NS1 |
| Butler | Bradley | 355 | NS1 |
| Butler | Carolina and Walker | 6880 | NS1 |
| Butler | Elizabeth | 1489 | ALT30, MIT1, MIT8 |
| Butler | Jeff | 5952 | NS1 |
| Byars | Katrina | 7891 | NS1 |
| Byczynski | Michael | 8184 | NS1 |
| Byerly | Steven | 819 | NS1 |
| Cabanban | Robert | 6883 | NS1 |
| Cabico | Cailin | 1990 | NS1 |
| Cabrales | Steven | 356 | ALT22, NS1, WT4, WT6 |
| Cage | Ray | 7492 | NS1 |
| Cahall | Rebecca | 30135 | NS1 |
| Cain | Barbara | 1104 | NS1 |
| Caldwell | Mary | 27739 | NS1 |
| Calem | Tenara | 1268 | NS1 |
| Call | Anson | 5892 | NS1 |
| Callaghan- Chaffee | Martha | 7493 | NS1 |

11-RCMSER-2739

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Callaway | Jeffery | 6400 | NS1 |
| Cambero | Angel | 947 | NS1 |
| Cameron | Roderick | 27318 | NS1 |
| Camp | Sarah | 29452 | NS1 |
| Campbell | Doug | 273 | MIT1 |
| Campbell | James | 5972 | ALT22, NS1 |
| Campbell | Kay | 28062 | NS1 |
| Campbell | Thomas | 8266 | NS1 |
| Campion | Nathaniel | 2097 | NS1 |
| Campos | Juanita | 1187 | NS1 |
| Campos | Ruben | 26 | ALT30 |
| Caracciolo | Dana | 5599 | NS1 |
| Carbone | Flavia | 1050 | NS1 |
| Carey | Jacqueline | 5616 | NS1 |
| Carloti | Julia | 6884 | NS1 |
| Carleton | Susan | 7498 | NS1 |
| Carlson | Arvid "Jack" | 958 | ALT30, NS1 |
| Carlson | Skyler | 1356 | MIT1, MIT3, MIT35, NS1, SO1, WI8 |
| Carnes | Ross | 7501 | NS1 |
| Caron | Dana | 6602 | NS1 |
| Carpegna | Allegra Di | 27987 | NS1 |
| Carpenter | Garrett | 1321 | MIT1, WT16, WT36, WT4 |
| Carpenter | Grace | 5699 | ALT22 |
| Carrao | G. S. | 6865 | NS1 |
| Carroll | Brett | 578 | NS1 |
| Carroll | Linda | 27095 | NS1 |
| Carroll | Linda Louise | 5399 | NS1 |
| Carson | Mark | 873 | NEPA33, NS1 |
| Carter | David | 30131 | NS1 |
| Carter | Debbie | 1587 | MIT21, TS2 |
| Carter | John | 336 | MIT21, TS2 |
| Carter | Marian | 26904 | NS1 |
| Carter | Marian | 1615 | NS1 |
| Carter Dulin | Kathleen | 6191 | NS1 |
| Casey | Carol | 27771 | NS1 |
| Casey | Sara | 2041 | NS1 |
| Casper | Carrie | 6660 | NS1 |
| Casper | Kathlen | 337 | NS1 |
| Casper | Peter | 301 | NS1 |
| Cassadore Sr. | Johnny | 146 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Castillo | Fred | 9 | ALT30 |
| Castillo | Jocelyn | 13 | ALT30 |
| Castillo | Weston | 977 | NS1 |
| Castleberry | Renee | 989 | NS1 |
| Casto | Greg | 5747 | ALT22, NS1 |
| Castro | Elia | 29709 | CR4 |
| Castruita | Ian | 5571 | NS1 |
| Catanese | Christina | 1525 | CR4, NS1 |
| Catt | Janice | 1333 | CR4, TS7, WT2 |
| Cattau | Christopher | 28392 | NS1 |
| Cencioso | Marilyn N | 6888 | NS1 |
| Chadwick | A | 6889 | NS1 |
| Chalepah | Kyle | 917 | CR4, MIT3 |
| Chamberlin | Ryan | 232 | NS1 |
| Chao | Dorothy | 30066 | NS1, TS1, WT4 |
| Chapin | Chris | 28607 | NS1 |
| Chapin | Radka | 6527 | NS1 |
| Charles | Nicole | 27830 | NS1 |
| Chennell | Irene | 27726 | NS1 |
| Chilcoat | Rose | 27352 | NS1 |
| Chiropolos | Jim | 29005 | NS1 |
| Chisholm | Jessica | 1463 | MIT3, TS31, WT4_D |
| Choinacky | Thomas | 1366 | NS1 |
| Choppers-Wife | Sue | 836 | NS1 |
| Choran | Chasity | 615 | ALT22, NS1 |
| Christiansen | Eric | 466 | NS1, NS2 |
| Ciano | Christina | 27366 | NS1 |
| Ciosici | Stefan | 27006 | NS1 |
| Ciprian | Esther | 28095 | NS1 |
| Clagett | Rita | 27094 | NS1 |
| Clare | Mamie | 6646 | NS1 |
| Clark | Arlyn | 830 | ALT30 |
| Clark | Don | 288 | NS1 |
| Clark | Emory | 29010 | NS1 |
| Clark | Jackie | 27175 | NS1 |
| Clark | Lucy | 27210 | NS1 |
| Clark | Morgan | 5403 | NS1 |
| Clark | Sharon | 906 | WT4 |
| Clarke | Veronica | 27790 | NS1 |
| Clarkson | Jeb | 881 | ALT30 |

11-RCMSER-2741

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Clarkson | Russell | 28562 | NS1 |
| Clinton | Simon | 652 | NS1 |
| Cloud | Justin | 5912 | NS1 |
| Coady | Melis | 28801 | NS1 |
| Coates | Tim | 28327 | NS1 |
| Cobb | Maria | 1142 | NS1 |
| Cobban | Ann | 6895 | NS1 |
| Coburn | Dan | 27150 | NS1 |
| Cohan | Kathleen | 8144 | WT4 |
| Cohen | Bradley | 1249 | NS1 |
| Cohen | David | 676 | NS1 |
| Cohen | Ethan | 1008 | NEPA1, NS1 |
| Cole | Cal | 798 | NS1 |
| Cole | Jess | 6393 | NS1 |
| Cole | Ramona | 29755 | NS1 |
| Cole | Ryan | 28802 | NS1, WT25 |
| Colella | Jacob | 28316 | NS1 |
| Coleman | David | 766 | NS1 |
| Coleman | Ed | 6903 | NS1 |
| Colestock | Kailey | 409 | NS1 |
| Colter | Cindy | 478 | NS1 |
| Congdon | Sarah | 1383 | ALT22, NS1, WT4 |
| Conner | Lisa | 8167 | NS1 |
| Conner | Spencer | 8020 | NS1 |
| Conway | Katie | 931 | NS1 |
| Conway | Pamela | 832 | NS1 |
| Conway | Ryan | 253 | NS1 |
| Cook | Driz | 5493 | NS1 |
| Cook | Stephen | 1404 | ALT5, MIT1, TS24 |
| Cook | Vicki | 902 | NS1 |
| Cooper | Micah | 1032 | NS1 |
| Cooper | Paul | 27636 | NS1 |
| Coopey | Judith | 6905 | NS1 |
| Copeland | Amber | 28875 | NS1 |
| Copenagle | Lily | 5422 | NS1 |
| Copper | David | 5395 | NS1 |
| Coppinger | Josh | 6225 | NS1 |
| Corbett | Danielle | 1316 | NS1 |
| Corbin | Linda | 764 | NS1 |
| Corcoran | Tim | 1622 | NS1 |

11-RCMSER-2742

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Corcoran-Shannon | Alexandra | 1523 | NS1, SO19, SO6, SR13, SR13_A, SR14, SR23, SR24 |
| Cordoza | Marjory | 27803 | NS1 |
| Corley | John | 28145 | NS1 |
| Corliss | Nan | 27618 | NS1 |
| Corona | Ann M. | 1397 | NS1 |
| Corrigan | Joanna | 6911 | NS1 |
| Cote | Monique | 28169 | NS1 |
| Coughlin | Rev. J. | 26916 | NS1 |
| Cowan | Kathy | 27760 | NS1 |
| Cozine | Jeanne | 933 | NS1 |
| Crandall | Carol | 28014 | NS1, WT25 |
| Crawford | Marilyn | 7530 | NS1 |
| Crawford-Bizzell | Joshua | 5558 | NS1 |
| Crawley | Johnathon | 29183 | NS1 |
| Crea | Britt | 688 | NS1 |
| Crews | Eric | 29330 | NS1 |
| Cronin | Mikel | 29050 | NS1 |
| Cronkhite | Nicole | 728 | NS1 |
| Croom | Catherine | 27185 | NS1 |
| Crosby | Ann | 26820 | NEPA37 |
| Crossland | Anita | 28105 | NS1 |
| Crossman | John | 6923 | NS1 |
| Crown | Jessie | 6925 | NS1 |
| Cruz | Arturo | 8080 | NS1 |
| Cruz | Benjamin | 27634 | NS1 |
| Culberson | Clint | 256 | NS1 |
| Cullaz | Chris | 691 | NS1 |
| Cummings | Jackson | 28881 | NS1 |
| Cummings | Loretta | 27902 | NS1 |
| Cummings | Torreya | 1357 | NS1 |
| Cunningham | Tiffany | 415 | NS2 |
| Curley | Carrie | 75 | CR4 |
| Curley | Margie | 88 | NS1 |
| Curley | Selina | 109 | NS1 |
| Curtis | Margaret | 1320 | NS1 |
| Cusack | Patrick | 5910 | NS1 |
| Cuticello | Jill | 1459 | NS1 |
| Cutler | Patti | 850 | NS1 |
| Czachurski | John | 26956 | NS1 |
| Dacey | Kari | 1326 | NS1 |

11-RCMSER-2743

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Dagion | Jillian | 613 | NS1 |
| Dahlin | Camilla | 1451 | NS1 |
| Dakouzlian | Marge | 29047 | NS1 |
| Dalessio | Nicholas | 28485 | NS1 |
| Daley | Suzann | 27986 | NS1 |
| Dallari | M.Cecilia | 5457 | NS1 |
| Dallmann | Allyson | 27120 | NS1 |
| Dalpes | Bryan | 8218 | NS1 |
| Dalton-Rabago | Pamela | 1392 | ALT1, MIT1, NS1 |
| Daluz | Ze | 28074 | NS1 |
| Dancs | Kris | 668 | NS1 |
| Dantico | John | 1540 | ALT5, MIT1, MIT21, MIT27, MIT8, WT14, WT19, WT4, WT7 |
| Danz | Maria | 6436 | ALT22, NS1 |
| Dargis | Andre | 6931 | NS1 |
| Davidson | Katy | 1288 | NS1 |
| Davidson | Scott | 7957 | NS1 |
| Davies | Caroline | 935 | NS1 |
| Davies | Michael | 6438 | NS1 |
| Davis | Chandler | 27572 | NS1 |
| Davis | Jake | 1022 | NS1 |
| Davis | Jason | 8043 | NS1 |
| Davis | Karen | 5956 | NS1 |
| Davis | Keith | 714 | NS1 |
| Davis | Mark | 223 | NS1, NS2 |
| Dawood | Jonathan | 8141 | NS1 |
| Dawson | Joan | 27818 | NS1 |
| Dawud | Sumayyah | 1094 | NS1, WT1 |
| Dazey | Rachel | 1377 | NS1 |
| Deburlo | Robert | 5582 | NS1 |
| Deconcini | Dennis | 280 | NS1 |
| Dedinas | Monique | 8192 | NS1 |
| Defrain | Isaac | 28846 | NS1 |
| Delamater | Adair | 26819 | NS1 |
| Delbecq | Claire | 28645 | NS1 |
| Delgado | John | 1280 | AMT1, NS1 |
| Delo | Amy | 29241 | NS1 |
| Demaio | Teri | 26922 | NS1 |
| Demian | Dr. | 27913 | NS1 |
| Deming | Diana | 6938 | NS1 |
| Denes | Zach | 1086 | ALT5, AQ11, NS1 |

11-RCMSER-2744

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Dennis | Margaret | 27824 | NS1 |
| Denny | Rachael | 26943 | NS1 |
| Denny Ziesmer | Mary Kate | 28164 | NS1 |
| Deprez | David | 27817 | NS1 |
| Derrig | James | 6941 | NS1 |
| Deshazo | Bridget | 28175 | NS1 |
| Deshpande | Salil | 910 | AQ11, MIT17, NS1, NS2, WT1, WT24, WT26 |
| Despain | Cara | 1388 | NS1, NS2 |
| Devers | Deborah | 26909 | NS1 |
| Deweerdt | Kyle | 8212 | NS1 |
| Dewitt | Steven | 487 | NS1 |
| Deyoung | Lucas | 28471 | NS1 |
| Dial | Joe | 1212 | NS1 |
| Dianich | A. Michael | 5689 | NEPA37 |
| Dibella | Ed | 28546 | NS1 |
| Dicara | Sue | 5410 | NS1 |
| Diciccio | Sal | 307 | MIT1, NS1 |
| Diehl | Dana | 1365 | NS1 |
| Diehn | Christopher | 27181 | NS1 |
| Diller | Susan | 1202 | NS1 |
| Dillon | Joy | 27904 | NS1 |
| Dimatteo | Nick | 29148 | NS1 |
| Dischinger | Sarah | 5943 | NS1 |
| Diss | Marybeth | 27759 | NS1 |
| Dissel | Scott | 505 | NS1 |
| Distasi | Krista | 6609 | NS1 |
| Dixon | Curt | 27657 | NS1 |
| Dixon | Eva | 28439 | NS1 |
| Dixon | Marie | 27753 | NS1 |
| Dobreva | Mariyana | 27884 | NS1 |
| Dobski | Deborah | 27864 | NS1 |
| Doery | Marya | 1845 | NS1 |
| Dolan | Patricia | 27837 | NS1 |
| Dolecek | Andy | 6656 | NS1 |
| Donaghy | Howard | 2002 | NS1 |
| Donald | John | 6946 | NS1 |
| Donohoe | Colleen | 801 | NEPA30, NS1 |
| Donohoe | Colleen | 6276 | NS1 |
| Dormer | Sarah | 644 | NS1 |
| Dorn | Ryan | 8150 | NS1 |

R-93

11-RCMSER-2745

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Dotson | Breydan | 979 | NS1, NS2, WT4 |
| Doub | Eric | 5520 | NS1 |
| Downing | William | 1812 | NS1 |
| Dr | (Blank) | 6950 | NS1, WT4 |
| Drabik | Jennifer | 677 | NS1 |
| Drakos | Paul | 28660 | NS1 |
| Drescher | Anushka | 27180 | NS1 |
| Drubetskaya | Liliya | 1219 | NS1, WT8 |
| Dublinski | Jim | 209 | NS1, SO6, WT4 |
| Dublinski | Jim | 6181 | NS1, TS24_D |
| Dubois | Jan | 6139 | NS1 |
| Dubois | Jeffry | 27888 | NS1 |
| Dudley | Cory | 8302 | NS1 |
| Duff | Jon | 29406 | NS1 |
| Dunkle | Doug | 1273 | NS1 |
| Dunlap | Grace | 396 | NS1 |
| Dunlap | Lorraine | 6953 | NS1 |
| Dunn | Christy | 27011 | NS1 |
| Dunn | Keegan | 6482 | NS1 |
| Dunn | Valerie | 1264 | NS1 |
| Duplissis | Eve | 5431 | NS1 |
| Durfee | Alex | 2009 | NS1 |
| Dustin | Fw | 26971 | NS1 |
| Dutchoger | Tanner | 693 | NS1 |
| Dwyer | Anne | 685 | NS1 |
| Dyer | Richard | 6539 | NS1 |
| Dykers | Lawrence | 1200 | NS1, TS1 |
| Dynarski | Katherine | 6005 | NS1 |
| Earle | Nathan | 28335 | NS1 |
| Earls | Gail | 6956 | NS1 |
| Eason | Jennifer | 922 | ALT5, NS1 |
| Eckard | Chad | 531 | NS1 |
| Edelberg | Walter | 757 | NS1 |
| Eden | Cathy | 1910 | NS1 |
| Eden | Mary | 596 | NS1 |
| Edmondson | Teddy | 1919 | NS1, NS2, WT4 |
| Edwards | Angela | 29040 | NS1 |
| Edwards | Christian | 26988 | NS1 |
| Egger | Mark | 27808 | NS1 |
| Eichelberger | Jonathan | 28419 | NS1 |

R-94

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Elten | Zach | 648 | NS1 |
| Ela | Autumn | 1051 | NEPA36, SR2, SR35, SR36, SR4 |
| Elder | Joshua | 29158 | NS1 |
| Elkins | Scot | 8232 | NS1 |
| Ellauri | Cristian | 286 | ALT22, NEPA3, NS2, WT1, WT43 |
| Elliot | Jason | 6411 | NS1 |
| Ellis | Andrew | 736 | NS1 |
| Ellis | Andrew | 737 | NS1, WT4 |
| Ellis | Rebekah | 1329 | ALT5, MIT3, NS2, TS1, WT48 |
| Ellison | Richard | 510 | NS1 |
| England | Dennis | 5856 | NS1 |
| England | Stephen | 494 | SO1 |
| Engle | Carol | 7552 | NS1 |
| English | Amy | 7554 | NS1 |
| Engs | Bill | 27842 | NS1 |
| Enloe | Mark | 8323 | NS1 |
| Ensign | Lars | 658 | NS1 |
| Enzi | Hap | 28126 | NS1 |
| Epley | David Wilmon T | 6961 | NS1 |
| Erickson | Don | 26967 | NS1 |
| Escalet | Deborah Escalet | 27932 | NS1 |
| Espinal | Michelle | 647 | NS1 |
| Espinosa | Brittany | 5907 | NS1 |
| Eurich | Sam | 570 | NS1 |
| Evangelista | Chris | 27917 | NS1 |
| Evans | Boyd | 29060 | NS1 |
| Evans | Levi | 8239 | NS1 |
| Evans | Matthew | 28299 | NS1 |
| Evatz | Leslie | 28242 | NS1 |
| Evenson | Lynn | 27769 | NS1 |
| Eventoff | Franklin | 815 | NS1 |
| Everett | David | 1058 | MIT1 |
| Fahmy | Sam | 1841 | NS1 |
| Falcon | Jennifer | 27922 | NS1 |
| Faleq | Zakey | 29058 | NS1 |
| Fallow | David | 26958 | NS1 |
| Fancherella | Beth | 1053 | WT1 |
| Fanucchi | Joanne | 27876 | NS1 |
| Farahat | Sarah | 1222 | NS1, NS2 |
| Farrell | Courtney | 5669 | NS1 |

11-RCMSER-2747

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Faughn | Michael | 29140 | NS1 |
| Faulk | May | 27624 | NS1 |
| Faulkner | Madison | 1019 | NS1 |
| Feiller | Mary Anna | 27662 | NS1 |
| Feliciana | Selena | 407 | NS1 |
| Fellay | Helga | 1217 | NS1 |
| Fenderson | Ashley | 1537 | NS1 |
| Fernandez | Edgar | 1078 | NS1 |
| Ferrando | Elizabet H | 6967 | NS1 |
| Ferris | Bruce | 28866 | NS1 |
| Fiala | Ronald | 30124 | NS1 |
| Fiastro | Fred | 1169 | CR4, NS1, NS2 |
| Field | Edward | 5495 | NS1 |
| Fields | Theodore | 8028 | NS1 |
| Fiflis | Michael | 1110 | WT4 |
| Filippelli | Steven | 527 | NS1 |
| Filsinger | Erik | 876 | MIT1 |
| Finch | Larry | 29491 | NS1 |
| Fink | Hailey | 5757 | NS1 |
| Finnegan | Sean | 28641 | NS1 |
| Finnerty | Margar Et | 6973 | NS1 |
| Finsness | Paul | 26968 | NEPA2 |
| Fischer | Hans | 630 | NS1 |
| Fischer | Katrina | 635 | NS1 |
| Fischvogt | Ryan | 593 | NS1 |
| Fisher | Kristina | 27848 | WT1 |
| Fisher | Stephanie | 459 | NS1 |
| Fisher | Todd | 28592 | NS1 |
| Fishman | Jacob | 861 | MIT1 |
| Fister | Loreli | 27591 | NS1 |
| Fitchie | Denice | 1135 | NS1 |
| Fitzgerald | Sean | 29237 | NS1 |
| Flahart | Pat | 293 | NS1 |
| Flanagan | Sean | 28289 | NS1 |
| Flanagan | Todd | 6442 | NS1 |
| Flaten | Zachary | 7950 | NS1 |
| Fletcher | Carol | 27104 | NS1 |
| Flocken | Bruce | 6974 | NS1 |
| Flood | Jennifer | 26815 | NS1 |
| Flood | Tim | 1361 | MIT1, MIT21, MIT30, NEPA35, TS24 |

11-RCMSER-2748

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Flores | Kimberly | 8225 | NS1 |
| Flynn | Emmet | 29505 | NS2 |
| Folsom | David | 5447 | NS1 |
| Fontana | Melanie | 6406 | NS1 |
| Ford | Garrett | 28615 | NS1 |
| Ford | Marcell A | 6979 | NS1 |
| Ford | Peggy | 28032 | NS1 |
| Forde | Daniel | 1175 | NS1 |
| Forde | Meghan | 5825 | NS1 |
| Foreman | Samuel | 28588 | NS1 |
| Forest | Amanda | 6030 | NS1 |
| Fortunato | D'Anna | 26955 | NS1 |
| Foster | Andrew | 7917 | NS1 |
| Fox | Lina | 30111 | NS1 |
| France | Glenn | 777 | NS1, WT4 |
| Frank | Dave | 771 | NS1 |
| Frank | Rachel | 27971 | NS1 |
| Franklin | Constance | 28035 | NS1 |
| Franz | Derek | 6214 | NS1 |
| Fraser | David | 1328 | NS2 |
| Fraser | Kathy | 1307 | NS1 |
| Frates | Tony | 27005 | NS1 |
| Frazier | Brent | 28572 | NS1 |
| Freeman | Beth Jane | 5454 | NS1 |
| Freeman | Beth Jane | 756 | NS1 |
| Freeman | Connie | 39 | NS1 |
| Freeman | Corrine | 4 | NS1, NS2, TS24 |
| Freeman | Corrine | 121 | NS1 |
| Freeman | Deborah | 1314 | NS1 |
| Freeman | Judy | 6959 | NS1 |
| Freeman | Nancy | 22 | AQ4, MIT1, NS2 |
| Freeman | Nancy | 23 | AMT4, NEPA13, NEPA14 |
| Freeman | Nancy | 158 | ALT6, NEPA1, NEPA13 |
| Freeman | Nancy | 162 | GS9, NS2 |
| Freeman | Nancy | 885 | NEPA10, NEPA14, NEPA68 |
| Freeman | Nancy | 1201 | GS2, GS8, GS9, MIT23 |
| Freeman | Nancy | 1469 | NS1, TS28, WT60 |
| Freeman | Nancy | 1514 | NS1 |
| Freer | Elizabet H | 6984 | NS1, WT4 |
| Freer-Parsons | Christiane | 27847 | NS1 |

R-97

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Freiberg | Harry | 28059 | NS1 |
| Frejo | Morgun | 93 | CR4, NS1 |
| Frejo | Morgun | 156 | CR4, NS1, NS2 |
| Frejo | Morgun | 166 | CR4, NS1 |
| Frejo | Morgun | 227 | GS13, NS1, SR8 |
| French | David | 29253 | NS1 |
| Frey | Brenda | 28025 | NS1 |
| Fridena | Richard | 1173 | NS1 |
| Fridena | Richard | 1323 | NS1 |
| Friederich | Kurt | 1994 | NS1 |
| Fritz | Ian | 1057 | NS1 |
| Frost | Gail | 26992 | NS1 |
| Frye | Bob and Shelley | 1276 | ALT30, MIT21, NEPA4, NS1, NS2, SR20, WT43 |
| Fulmer | Kyle | 1873 | NS1 |
| Futrell | Sherrill | 27931 | NS1 |
| Gaarder | Kelsey | 5922 | NS1 |
| Gabel | Nancy | 27224 | NS1 |
| Gabel | Peter | 888 | CR4, NS1 |
| Gabrielson | Justin | 1453 | NS2 |
| Gadbois | Joseph | 28405 | NS1 |
| Gallagher | David | 1214 | NS1 |
| Gallego | Vanessa | 1497 | NS1 |
| Galvan | Martina | 1123 | NS1 |
| Ganahl | Amy | 5492 | NS1 |
| Ganmoryn | Croitiene | 790 | NS1 |
| Gapuz | Michael | 5566 | NS1 |
| Garai | Lonna | 205 | ALT1 |
| Garcia | Armando A. | 28542 | NS1 |
| Garcia | Deangelo | 1034 | NS1 |
| Garcia | Kimberly | 1436 | NS1 |
| Garcia | William | 28905 | ALT22 |
| Garnice | Cheryl | 6989 | NS1 |
| Garratt | Sharon | 27966 | NS1 |
| Garrido-Spencer | Sally | 1292 | NS1 |
| Gartner | Robert | 1234 | NS1 |
| Gastrich | Justin | 453 | NS1 |
| Gates | Tyler | 634 | NS1 |
| Gauba | Blaise | 29081 | NS1 |
| Gaura | Robin | 1619 | NS1 |
| Gebhard | Lisa | 672 | NS1 |

11-RCMSER-2750

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Gebhart | Cady | 352 | NS1 |
| Gehrels | Thomas | 28352 | NS1 |
| Geis | Tanja | 1293 | CR4, MIT35, NS2 |
| Gelczis | Lisa | 27767 | NS1 |
| Genest | Karen | 481 | NS1, WT4 |
| Gentry | Zoe | 856 | NS1 |
| George | Rusty | 6563 | NS1 |
| George | Sarah | 608 | ALT22 |
| Gerrodett E | Patricia | 6995 | NS1 |
| Gettens | Michael | 50 | NS1 |
| Gettens | Michael | 66 | ALT22, NS1, NS2, WT7 |
| Gettens | Michael | 824 | NS1, NS2 |
| Getz | Sara | 6551 | NS1 |
| Giannone | Robert | 7599 | NS1 |
| Gibbens | Paula | 812 | MIT21 |
| Gibbons | Brian | 5359 | NS1 |
| Gibbons | Connie | 7601 | NS1 |
| Gibson | George | 968 | NS1 |
| Gibson | Sara | 26999 | NS1 |
| Gibson | Zachary | 28678 | NS1 |
| Giesy | Theo | 27811 | NS1 |
| Gifford | Noah | 987 | NS1 |
| Gilbard | Alexis | 6157 | NS1 |
| Gilleran | Kari | 725 | NS1 |
| Gillespie | Fran | 891 | NS1 |
| Gillman | Andrew | 8311 | NS1 |
| Gilmore | Roland | 6546 | NS1 |
| Giordano | James | 6125 | NS1 |
| Giordano | Spencer | 557 | WT4 |
| Gist | Del | 28030 | NS1 |
| Given | Wendy | 1486 | NS1 |
| Gladieux | Stephen | 5787 | NS1 |
| Glass | Leslie | 15 | ALT22, MIT1, NS1 |
| Glass | Leslie | 64 | NEPA30, NEPA68, NS2, WT4 |
| Glass | Leslie | 65 | CR4, MIT3 |
| Glass | Leslie | 87 | CR4, NS1 |
| Glass | Leslie | 213 | NEPA30, NEPA37, NS1 |
| Glass | Leslie | 242 | CR4, NS1, NS2 |
| Glass | Leslie | 245 | NEPA30 |

11-RCMSER-2751

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Glass | Leslie | 1338 | ALT22, ALT5, CR4, EJ5, EJ6, MIT7, NEPA18, NEPA29, NS2, WT4 |
| Glass | Stephen | 8015 | NS1 |
| Glassman | Lucille | 6268 | NS1 |
| Glenn | Lisa | 1278 | NEPA35, NS1 |
| Godinez | Barbara | 1224 | NS1 |
| Goldberg | Claire | 28284 | NS1 |
| Golden | Amber | 6998 | NS1 |
| Goldenberg | Suzanne | 1487 | NS1 |
| Gomez | Belinda | 7960 | NS1 |
| Gomez | Mary | 19 | ALT25, EJ2, NS2 |
| Gomez | Mary | 211 | NS1 |
| Gomez Paz | Daniela | 1362 | NS1 |
| Gonzales | Carlos | 193 | NS1 |
| Gonzales | Joe | 27671 | NS1 |
| Gonzalez | Brisa | 1248 | TS24 |
| Gonzalez | Camille | 939 | NS1 |
| Gonzalez | Debbie | 6988 | NS1 |
| Gonzalez | Gabriel | 1428 | NS1 |
| Goodwin | Laurance | 8241 | NS1 |
| Gordian | Liana | 5644 | NS1 |
| Gordin | Lawrence | 27852 | NS1 |
| Gorman | Joseph | 633 | NS1, WT4 |
| Gorton | Henry | 1439 | CR16 |
| Goseyun | Kellieann | 157 | CR4, NS1 |
| Goss | Randy | 247 | MIT1 |
| Gottfried | Susan | 27672 | NS1 |
| Gottworth | Andrew | 6564 | NS1 |
| Govedich | Penny | 7004 | NS1 |
| Gow | Alexander | 8101 | NS1 |
| Gowie | Matt | 8264 | NS1 |
| Goyette | Roland | 27794 | NS1 |
| Grace | Ashley | 934 | NS1 |
| Graetz | Jacqueline | 7943 | NS1 |
| Graffagnino | Dr. Mary Ann and Mr. Frank | 1579 | NS1 |
| Graffagnino | Dr. Mary Ann and Mr. Frank | 1626 | NS1 |
| Graham | Karen | 27056 | NS1 |
| Graham-Gardner | Rosemary | 5373 | NS1 |
| Granata | Amelia | 1965 | NS1 |

11-RCMSER-2752

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Grant | Andrew | 29066 | NS1 |
| Grant | Dr Jennifer | 28086 | NS1 |
| Grant | Eliesha | 1049 | NS1 |
| Grant | Vernelda | 112 | CR4, NS1 |
| Grassel | Lori | 7007 | NS1 |
| Grassi | Daniel | 27617 | NS1 |
| Gray | Carolyn | 130 | NEPA13 |
| Gray | Kathleen | 27151 | NS1 |
| Gray | Thomas | 6542 | NS1 |
| Greacen | Clary | 28138 | NS1 |
| Green | Adonna | 451 | NS1 |
| Green | Amy | 353 | NS1 |
| Greenspan | Jesse | 27836 | NS1 |
| Greenway | Lumina | 6231 | NS1 |
| Greer | Russel | 28564 | NS1 |
| Gregorio | Penny | 5721 | NS1 |
| Gregory | Eric | 7012 | NS1 |
| Gresham | George | 7015 | NS1 |
| Gresham | Margo | 465 | NS1 |
| Griesser | Scott | 6036 | NS1 |
| Griffin | Sandra and Glenn | 27045 | ALT16, SO12 |
| Griffith | E Margareta | 870 | NS1 |
| Griffith | Rosemary | 1244 | NS1 |
| Grijalva | Genesis | 27823 | NS1 |
| Grimsley | Alex | 628 | NS1 |
| Grimsrud | Dee | 27602 | NS1 |
| Grinnell | Rick | 229 | NS1 |
| Grisham | Thomas | 5924 | NS1 |
| Griswold | Gene | 1172 | NS1 |
| Grman | Mark | 29032 | NS1 |
| Groslyn | Sharyn | 27325 | NS1 |
| Gross | Cheryl | 27996 | NEPA33, TS2, WT25, WT8 |
| Gross | Cheryl A | 5474 | AMT1, NS1 |
| Grout | Jeffrey | 272 | NS1 |
| Grover | Wesley | 566 | NS1 |
| Grow | Ann | 27441 | NS1 |
| Grow-Garrett | Shannon | 5391 | NS1 |
| Guerin | Gregory | 29152 | NS1 |
| Guinn | Chris | 750 | NS1 |
| Guinn | Erica | 7022 | NS1 |

11-RCMSER-2753

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Gunderman | Joan | 27417 | NS1 |
| Gunn | Ashley | 1838 | NS1 |
| Gunn | David | 5 | MIT3, NEPA36 |
| Gunn | David | 521 | NEPA25 |
| Gunn | David | 1158 | ALT1, ALT22, AMT1_C, AQ1, DOC1, GS14, MIT1, MIT12, MIT23, MIT24, MIT3, MIT4, NEPA10, NEPA25, NEPA35, NEPA36, NEPA39, NEPA45, NEPA63, SO14, TR13, WT15, WT20, WT21, WT27, WT7, WT77 |
| Gunter | Jeremy | 602 | NS1 |
| Gunter | Nic | 8245 | NS1 |
| Gurney | Hugh | 27115 | NS1 |
| Gurzi | Conor | 5658 | NS1 |
| Guthrie | Linda | 27666 | NS1 |
| Gutierres | Sara | 7627 | NS1 |
| Guy | Joel | 859 | NS1 |
| Guyett | Michell E | 7628 | NS1 |
| G-Williams | Princess | 1030 | NS1 |
| H | Diana | 1461 | TR5 |
| Haddox | David | 30133 | NS1 |
| Haff | Harry | 7630 | NS1 |
| Hafner | Nancy | 27022 | NS1 |
| Hahn | Lewis | 601 | NS1 |
| Hahn | Virginia | 1198 | NS1 |
| Haldeman | Pat | 5776 | NS1 |
| Hale | Katelyn | 1513 | CR12, NS1 |
| Hall | Jacob | 612 | WT4 |
| Hall | Josephine | 27159 | NS1 |
| Hall | Linda | 1193 | NS1 |
| Hall | Rene | 27765 | NS1 |
| Hall | Ryan | 473 | NS1 |
| Hall | Shawn | 5452 | NS1 |
| Hall | Shawn | 27111 | NS1 |
| Halladay | Jason | 6281 | NS1 |
| Halligan | Michele | 27850 | NS1 |
| Halpin | Mitchell | 964 | NS1 |
| Halsey | Bill | 27822 | NS1 |
| Ham | Kyle | 6038 | NS1 |
| Hamashima | Lawrence | 2125 | NS1 |
| Hamilton | Grant | 28653 | NS1 |
| Hamilton | James | 1907 | NS1 |
| Hammer | F | 27116 | NS1 |

11-RCMSER-2754

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Hammerle | Jim | 2117 | NS1 |
| Hamp | Charmaine | 5567 | NS1 |
| Hampton | Chance | 2129 | NS1 |
| Handwerg | Joan | 1490 | NS1 |
| Hanger | Susan | 27350 | NS1 |
| Hankins | Samantha | 6383 | NS1 |
| Hannon | Steve | 1096 | NS1 |
| Hannum | Christine | 27376 | NS1 |
| Hansen | John | 816 | ALT30 |
| Hansen | Steven | 6124 | NS1, SR22 |
| Hansis-O'Neill | Becky | 742 | ALT22, NS1 |
| Hanson | Cynthia | 28000 | NS1 |
| Harbison | Zachariah | 1015 | NS1 |
| Harders | Carl | 1081 | NS1 |
| Hardesty | Danny | 6317 | CR4 |
| Hargrove | J | 7032 | NS1 |
| Harmann | Melanie | 1442 | NS1 |
| Harmer | Jake | 6456 | NS1 |
| Harmon | Alison | 1870 | NS1, NS2 |
| Harmon | Joanna | 6152 | NS1 |
| Harmon | Lisa | 28019 | NS1 |
| Harmon | Michael | 7034 | NS1 |
| Harmon | Zachary | 851 | NEPA15, NS1 |
| Harper | Dan | 6379 | NS1 |
| Harpley | Rachel | 1335 | AQ11, TS24, WT35, WT4 |
| Harpster | Jamie | 395 | NS1 |
| Harrington | Roxy | 7036 | NS1 |
| Harris | Carolyn | 27132 | NS1 |
| Harris | Carolyn | 1500 | NS1 |
| Harris | Jerald | 1382 | NS1 |
| Harrison | David | 27995 | NEPA33, TS2, WT1, WT8 |
| Harrison | Kimberly | 30115 | NS1 |
| Harrison | Nathaniel | 641 | NS1 |
| Hart | James | 5408 | NS1 |
| Hart | Mary M | 27862 | NS1 |
| Harter | Mitchell | 360 | NS1 |
| Hartman | George | 28057 | NS1 |
| Hartman | Julia | 27156 | NS1 |
| Harts | Dwight | 28862 | NS1 |
| Hartung | Sean | 8215 | NS1 |

11-RCMSER-2755

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Hartzell | Betsy | 27667 | NS1 |
| Hartzman | Peter | 28084 | NS1 |
| Harvey | Mark Judy | 789 | NS1 |
| Harwood | Amy | 115 | NEPA30, NS1 |
| Harwood | Amy | 1480 | NS1 |
| Hassler | Andrea | 8003 | NS1 |
| Hastil | Jahn | 28340 | NS1 |
| Hastings | Logan | 29468 | NS1 |
| Hatch | Brad | 28794 | NS1 |
| Hatcher | William | 7639 | NS1 |
| Hatter | Erinn | 1341 | NS1 |
| Hatzai | Christopher | 28797 | NS1 |
| Hauck | Chad | 1000 | NS1 |
| Haughney | Sarah | 558 | NS1 |
| Havrilla | Judith | 27706 | NS1 |
| Hawes | William | 326 | NS1 |
| Hawkins | Aaliyah | 1029 | NS1 |
| Hawkins | Josh | 605 | NS1 |
| Hawley | Nicholas | 28541 | NS1 |
| Hayden | Sue | 27957 | NS1 |
| Haydon | Emily | 708 | NS1 |
| Hayenga | Beri | 8162 | NS1 |
| Hayes | Brooke | 1021 | NS1 |
| Hayes | Sara | 28120 | NS1 |
| Hayes | Tanner | 5517 | NS1 |
| Hayes | Tim | 1155 | ALT5, NEPA2, NS1 |
| Heath | Joshua | 28463 | MIT23, NEPA54 |
| Hecht | Justine | 1132 | NS1 |
| Heck | John | 997 | NS1 |
| Hedden | Chet | 27977 | NEPA33, NS1 |
| Hefton | Kris | 1144 | NS1 |
| Heirtzler | Jason | 27641 | NS1 |
| Heist | Kevin | 700 | NS1 |
| Hellauer | Tom | 28624 | NS1 |
| Heller | Carol | 1381 | TS13, WT4 |
| Heller | Carol | 1424 | AMT1, NEPA35 |
| Hemingway | Graham | 28154 | NS1 |
| Hemsoth | Jered | 6034 | NS1 |
| Henderson | Colin | 28919 | NS1 |
| Henderson | David | 1016 | NS1 |

11-RCMSER-2756

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Hendrickson | Christopher | 1875 | NS1 |
| Hendrixson | Del | 7046 | NS1 |
| Henne | Bill | 27008 | NS1 |
| Hennessey | Kaitlyn | 29035 | NS1 |
| Henning | Elisabeth | 80 | NS1, NS2 |
| Henning | Elisabeth | 1369 | TR15 |
| Hepting | Lianna | 8117 | NS1 |
| Heritage | Jason | 28964 | NS1 |
| Hernandez | Alexia | 28466 | NS1 |
| Hernandez | Rob | 28454 | NS1 |
| Hernandez De Pena | Carlos | 938 | NS1 |
| Herrera | David | 58 | NS1, WT30 |
| Herrmann | Cody | 1066 | NS1 |
| Heston | Lark | 624 | WT4 |
| Hettinger | Joseph | 376 | CR5, NS1, WT25 |
| Hickman | Sarah | 28016 | NS1 |
| Hidalgo | Gabriela | 949 | NS1 |
| High | Fred | 7895 | NS1 |
| Hilbert | Harrison | 439 | NS1 |
| Hilf | Lawrence | 28024 | NS1 |
| Hill | Colin | 990 | NS1 |
| Hill | Donald | 28315 | NS1 |
| Hill | Melissa | 567 | NS1, WT6 |
| Hill | Sandy | 28611 | NS1 |
| Hillner | Jeremy | 2058 | NS1 |
| Hilton | Charles | 27960 | NS1 |
| Hing | Michael | 155 | NS1 |
| Hinojos | Lucinda | 216 | NS1 |
| Hinton | Rebecca | 1084 | NS1, NS2, WI1, WT1, WT7 |
| Hipshire | Mark | 28433 | NS1 |
| Hiser | Katie | 431 | NS1 |
| Hittner | Hillary | 1419 | WT1 |
| Hjelmeir | Korey | 151 | ALT5, NS1, SO21, WT1, WT6 |
| Hjelmeir | Korey | 1083 | ALT5, NS1, WT4 |
| Hjelmeir | Korey | 1468 | GS12, MIT35, NS1, NS2, SO6, TS21, WT1, WT4_E, WT6 |
| Hlodnicki | Bruce | 5349 | NS1 |
| Hobbs | Joan | 27748 | NS1 |
| Hobson | Mark | 7945 | NS1 |
| Hodge | Brendan | 719 | NS1 |
| Hodgkinson | Anne | 28049 | NS1 |

11-RCMSER-2757

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Hodgson | Eleanor | 27421 | NS1 |
| Hoehne | Audrey | 27898 | NS1 |
| Hoffman | Cranston | 77 | NS1, WT30 |
| Hoffman | Jan | 7648 | NS1 |
| Hoffman | Karen | 844 | WT43 |
| Hoffman | Norman | 765 | NS1 |
| Hogan | Morris | 29394 | NS1 |
| Holiday | Shana | 28951 | NS1 |
| Holliday | Craig | 8289 | NS1 |
| Holmgren | Mark | 27896 | NS1 |
| Holmquist | Steve | 1524 | GS3, MIT1 |
| Holmstrom | Janet | 1233 | NS1 |
| Holsen | Jeffrey | 1103 | NS1 |
| Holtz | Michael | 1005 | NS1 |
| Honkonen | Jeffrey | 540 | NS1 |
| Honn | Mel | 7057 | NS1 |
| Hood | Mary | 26836 | NS1 |
| Hook | Wendslyn | 172 | NS1 |
| Hooke | Angel | 70 | CR4 |
| Hooke | Angel | 97 | CR4, NS1 |
| Hooley | Dan | 2018 | NS1 |
| Horn | Nancy | 1368 | WT43 |
| Horowitz | Ze'Ev | 532 | NS1 |
| Horton | Derek | 437 | CR4, NS1, WT4 |
| Horton | Janet | 1160 | NS1 |
| Horton | William | 5569 | NEPA3 |
| Hosea | Jeff | 6154 | NS1 |
| Hough | Kurtis | 1225 | NS1 |
| Howard | Rachel | 28421 | NS1 |
| Howe | Rebecca | 28015 | NS1 |
| Howington | John | 28844 | NS1 |
| Howitt | Shayna | 8002 | ALT22 |
| Hoyle | Alyssa | 30116 | NS1 |
| Hubbard | Chris | 5564 | NS1 |
| Hubbard | James | 27463 | NS1 |
| Hubbart | Lori | 1580 | NS1 |
| Huddleston | Jill | 28656 | NS1 |
| Hudson | Amanda | 5906 | NS1 |
| Hughes | Candace | 271 | NS1 |
| Hughes | Kristen | 6408 | NS1 |

11-RCMSER-2758

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Hughes | Michael | 27792 | NS1 |
| Hughes | Sarah | 28067 | NS1 |
| Hull | Todd | 28748 | NS1 |
| Hull-Carlson | Juanita | 7059 | NS1 |
| Hultberg | Alan | 29506 | NEPA57, NS1 |
| Humphrey | Paige | 26822 | NS1 |
| Hunter | Kendra | 5433 | NS1 |
| Hunter | Mary | 1384 | NS1 |
| Hurley | Benjamin | 28957 | NS1 |
| Hurst | David | 7061 | NS1 |
| Hyatt | Nina | 28022 | NS1 |
| Hyduke | Michael | 7661 | NS1 |
| Ialeggio | Anna | 1239 | NS1 |
| Iezzi | Jeff | 585 | NS1, NS2 |
| Iglesias | Diana | 1182 | NS1 |
| Inabinet | Sam | 28007 | NS1 |
| Inouye | David | 27978 | WT4 |
| Iranitalab | Roshanak | 30121 | NS1 |
| Irons | Ellie | 1289 | CR4 |
| Irving | Melissa | 164 | CR4, NS1 |
| J | Karen | 27947 | NS1 |
| Jackson | Carolyn | 27926 | NS1 |
| Jackson | Helen | 26957 | NS1 |
| Jackson | Sharon | 7066 | NS1 |
| Jackson | Valerie | 1259 | NS1 |
| Jacob | Aaron | 1315 | NS1 |
| Jacob | Jaime | 27741 | NS1 |
| Jacobs | Diane | 1245 | NS1 |
| Jacobs | James | 430 | NS1 |
| Jacobsen | Barbara | 7067 | NS1 |
| Jacobson | Charlott E | 7666 | NS1 |
| Jacobson | Rod | 5603 | NS1 |
| Jacoby | Jesse | 27984 | NS1 |
| Jacques | Karen | 27397 | NS1 |
| Jacques | Yan | 474 | ALT22 |
| Jaeger | David | 7667 | NS1 |
| James | Gordon | 27937 | NS1 |
| James Jr. | Johanssen | 374 | NS1 |
| Jamison | George | 7896 | NS1 |
| Jamshedji | Sheriar | 29119 | NS1 |

11-RCMSER-2759

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Janke | Susan | 794 | NS1 |
| Jankowski | Megan | 27709 | NS1 |
| Jankowski | Rob | 7069 | NS1 |
| Jans | Peter | 786 | NS1 |
| Jansen | Scott | 347 | NS1 |
| Janzen | Gayle | 27962 | NS1 |
| Jeffrey | Anna | 1 | NS1 |
| Jeffrey | Anna | 3 | NEPA19, NS1 |
| Jeffrey | Anna | 57 | NS1, NS2 |
| Jeffrey | Anna | 71 | NEPA30, NS1 |
| Jeffrey | Anna | 98 | CR4, NS1 |
| Jeffrey | Anna | 116 | NS1 |
| Jeffrey | Anna | 188 | CR4 |
| Jenkins | Jeff | 553 | NS1 |
| Jenkins | Jess | 577 | NS1 |
| Jenkins | Rose | 27414 | NS1 |
| Jensen | Debora H | 7072 | NS1 |
| Jensen | Jennifer | 1002 | NS1, NS2 |
| Jenson | Linda | 1161 | NS1, WT4 |
| Jesik | Buster | 29156 | NS1 |
| Jiang | Isaiah | 1232 | AMT1, NS1 |
| Jimerfield | Jeff | 7074 | NS1 |
| Johns | Gavin | 8320 | WT4 |
| Johnson | Adam | 8073 | NS1 |
| Johnson | Aubrey | 128 | NS1 |
| Johnson | Audrey | 2 | NS1 |
| Johnson | Brett | 30137 | NS1 |
| Johnson | Brody | 28610 | NS1 |
| Johnson | Chris | 5923 | NS1 |
| Johnson | Dr. Alan | 749 | NS1 |
| Johnson | Evan | 29171 | NS1 |
| Johnson | Iver | 27049 | NS1 |
| Johnson | Jess | 7078 | NS1 |
| Johnson | Larry | 5416 | NS1 |
| Johnson | Margaret | 26868 | NS1 |
| Johnson | Sarah | 751 | MIT1 |
| Johnson | Sydney | 573 | NS1 |
| Johnstone | Kaitlyn | 28383 | NS1 |
| Jones | Dave | 28215 | NS1 |
| Jones | Gary | 6072 | NS1 |

11-RCMSER-2760

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Jones | Kalen | 452 | ALT22, NS1, WT4, WT6 |
| Jones | Kathryn | 28646 | NS1 |
| Jones | Matt | 6504 | NS1 |
| Jones | Ola Cleon | 7081 | NS1 |
| Jones | Philip | 27762 | NS1 |
| Jones | Tristan | 823 | MIT1 |
| Jordan | Andrea | 6283 | NS1 |
| Jordan | Charlton | 29331 | NS1 |
| Jordan | Dorothy | 28063 | NS1 |
| Jordan | Ellen | 609 | NS1, WT4 |
| Jorgensen | Janette | 5455 | NS1 |
| Joseph | Michael | 1009 | NS1 |
| Jurado | Terilynn | 5919 | NS1 |
| Jurczewski | Carol | 5419 | NS1 |
| Jurgens | Denise | 880 | NS1 |
| Kaczorowski | Florence | 28029 | NS1 |
| Kadrich | Peter | 7089 | NS1 |
| Kainrath | Nicholas | 706 | NS1 |
| Kame | Jaime | 493 | MIT1, NS1 |
| Kaminski | Mikayla | 27831 | NS1 |
| Kane | Jolyne | 796 | NS1 |
| Kane | Sarah | 1216 | NS1 |
| Kang | Peter | 499 | NS1 |
| Kaplan | Maya | 926 | ALT5 |
| Kardiak | Jennifer | 791 | NS1, NS2 |
| Kasten | Sayles | 1296 | CR4 |
| Katz, M.D., J.D. | Sandra | 1230 | NS1 |
| Kearney | Kris | 722 | NS1 |
| Keedy | John | 862 | MIT1, NS2 |
| Keenan | Brynn | 30129 | NS1 |
| Keiper | Erin | 27183 | NS1 |
| Keith | Kevin | 344 | NS1 |
| Kelliher | Shannon | 649 | NS1 |
| Kelly | Barbara | 26905 | NS1 |
| Kelly | Nickie | 741 | NS1 |
| Kempke | Ryan | 974 | NS1, WT4 |
| Kennedy | James | 5911 | NS1 |
| Kennedy | Randy | 6180 | NS1 |
| Kennedy | William | 940 | NS1 |
| Keppeler | Sabine | 1986 | NS1 |

11-RCMSER-2761

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Kerins | Mary | 28114 | NS1 |
| Kerr | Tyler | 651 | NS1 |
| Kershner | Camille | 1267 | NS1 |
| Kershner | Camille | 7094 | NS1 |
| Kessler | Anne | 26962 | NS1 |
| Kester | Christopher | 464 | NS1 |
| Keys | Catherine | 26937 | NS1 |
| Kider | David | 29088 | NS1 |
| Kiesel | Matt | 8093 | NS1 |
| Kilfmeyer | Steve | 767 | NS1 |
| Kiholm | Laura | 871 | ALT22, WT1 |
| Kilgore-Brown | Thomas | 28950 | NS1 |
| Kilpatrick | Kathleen | 5901 | NS1 |
| King | Cloud | 27074 | NS1 |
| King | Cyrina | 7098 | NS1 |
| King | Dawn | 26978 | NS1 |
| King | Mason | 6229 | NS1 |
| King | Triston | 701 | NS1 |
| Kingery | Hugh | 440 | NS1 |
| Kingsford-Smith | Steve | 6199 | NS1 |
| Kippenberger | Curt | 7991 | NS1 |
| Kirk | Steve | 30134 | NS1 |
| Kirkland | Emily | 497 | ALT5, CR4, NS1 |
| Kirkland | Emily | 1088 | NS1, NS2, WT1 |
| Kirshbaum | David | 29754 | NS1 |
| Kiss | Istvan | 1301 | ALT12, ALT3, ALT4, GS11, MIT1, MIT21, MIT8, NEPA33, SO2, SO7, TS2, TS3, WT1, WT2, WT21, WT24, WT25, WT4, WT6 |
| Kist | Rosema Ry | 7100 | NS1 |
| Kitchen | Bryan | 27915 | NS1 |
| Kitcheyan | Geraldine | 81 | CR4, NS1 |
| Kitrakis | Elyse | 6297 | NS1 |
| Kitting | Sarah | 664 | NS1 |
| Kizewski | Kurt | 28565 | NS1 |
| Kjono | Greg | 5514 | NS1 |
| Klassen | Glenn | 1147 | NS1 |
| Klein | James | 5414 | NS1 |
| Klein | James | 28090 | NS1 |
| Kleissler | Liz | 6099 | NS1 |
| Klemm | Edwina | 27168 | NS1 |

11-RCMSER-2762

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Klett | Lena | 1507 | NS1 |
| Klitz | Karen | 27359 | NS1 |
| Kloeppel | S. Max | 28443 | NS1 |
| Klug | Madison | 29149 | NS1 |
| Knauer | Gregor | 7103 | NS1 |
| Knebel | Kim | 7686 | NS1 |
| Knight | David | 1041 | NS1, NS2 |
| Knight | James | 28241 | NS1 |
| Knight | Jessica | 7687 | NS1, WT2 |
| Knight-Papaioannou | Khailill | 1403 | NS1 |
| Knutson | L | 760 | NS1 |
| Kobasa | Stephen V. | 26997 | NS1 |
| Kocer | Dianne | 7108 | NS1 |
| Koeck | Diana | 799 | NEPA36, NS1 |
| Koeppe | Max | 27844 | NS1 |
| Koerner | Isaac | 2070 | NS1 |
| Koerner | Michael | 327 | NS1 |
| Kohnke | Karen | 27832 | NS1 |
| Kolodner | Ashley | 1054 | NS1, WT4 |
| Kolodner | Ashley | 1394 | NS1 |
| Kolody | Kristin | 27975 | NS1 |
| Kolvites | Kathy | 28026 | NS1 |
| Kong | Lilian | 886 | NEPA18, NEPA35, NS1 |
| Koput | Elliana | 358 | NS1 |
| Kornecki | Kasia | 398 | NS1 |
| Korte | Ashley | 7689 | NS1 |
| Kosa | Kim | 758 | NS1 |
| Kosmitis | Kim | 6159 | NS1 |
| Kosowicz | Aleks | 27886 | NS1 |
| Kosten | Dylan | 399 | NS1 |
| Kovacs | Michael | 738 | NS1 |
| Kovacs | Riczi | 993 | NS1 |
| Kowalik | Jakub | 1933 | NS1, NS2 |
| Kracen | Laurel | 7114 | NS1 |
| Kraemer | Darlene | 802 | NS1 |
| Krause | Maura | 1407 | ALT32, NS1, WT25 |
| Krause | Randy | 1174 | NS1 |
| Kreider | Tawn | 27380 | NS1 |
| Kreitzberg | Bruce | 29487 | NS1 |
| Kritzman | Ellen | 27938 | NS1 |

11-RCMSER-2763

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Krueger | Jon | 5469 | NS1 |
| Kruger | Damon | 5920 | NS1 |
| Krywult | Sebastian | 840 | NS1 |
| Kuehler | Thomas | 8149 | NS1 |
| Kuhn | Lukas | 1464 | CR4, SO16, TS28, WT4 |
| Kuhns | Randall | 27797 | NS1 |
| Kujawa | David | 367 | NS1 |
| Kulokoski | Nicholas | 5563 | NS1 |
| Kuni | Daniel | 8200 | NS1 |
| Kunitz | Isadora | 27973 | NS1 |
| Kunnecke | Mike | 781 | NS1 |
| Kunnie | Julian | 7117 | NS1 |
| Kurath | Joan | 7890 | NS1, WT7 |
| Kurick | Linda | 1238 | NS1 |
| Kurk | Katherine | 27337 | NS1 |
| Kuskey | Martha A. | 28064 | NS1 |
| Kuznetcov | Sergei | 6484 | NS1 |
| Kvaas | Robert | 27875 | NS1 |
| L. | Rebecca | 26853 | NS1 |
| Lacey | Barbara | 1223 | NS1 |
| Lacey | Jim | 325 | NS1 |
| Lacour | Nicole | 6201 | NS1 |
| Lacroix | Edward | 8272 | NS1 |
| Ladderud | Jeffrey | 657 | NS1 |
| Lagana | Jordan | 5942 | NS1, WT4 |
| Lague | Matthew | 687 | NS1 |
| Lainoff | Michael | 1476 | NS1 |
| Laitl | Jared | 27764 | NS1 |
| Lakner | Joseph | 8001 | NS1 |
| Lambert | Erik | 28745 | NS1 |
| Lambert | Justin | 29044 | NS1 |
| Lambeth | Larry | 27282 | NS1 |
| Lambrecht Se | Rudolf | 7122 | NS1 |
| Landfield | Mike | 27755 | NS1, WT8 |
| Landreth | Lucas | 999 | NS1 |
| Laney | Stephen | 6561 | NS1 |
| Lang | Robbie | 6033 | NS1 |
| Langarica | Sergio | 456 | NS1 |
| Langbeen | Maddy | 988 | NS1 |
| Lange | Karis | 834 | NS1 |

11-RCMSER-2764

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Langford | Jean | 27391 | NS1 |
| Langford | Kaia | 972 | NS1 |
| Lanskey | Marcus | 785 | NS1 |
| Lapen | Deanna | 574 | NS1 |
| Lara | Martin | 839 | CR4, NS1, WT43 |
| Lariviere | Ben | 28177 | NS1 |
| Larkin | Kevin | 1602 | CR5, TS7, WT1 |
| Larosa | Erin | 27859 | NS1 |
| Larsen | Josh | 28894 | NS1 |
| Larsen | Zachary | 857 | NS1 |
| Larsson | Kimberly | 7124 | NS1 |
| Laub | Jacob | 28506 | NS1 |
| Laufman | Harry | 27793 | NS1 |
| Lavallee | Jeff | 30139 | NS1 |
| Law | Eric | 6097 | NS1, WT6 |
| Law | Mary | 804 | NS1 |
| Law | Rimona | 492 | NS1 |
| Lawrence | Brian | 6467 | NS1 |
| Lawrence | Stephanie | 683 | NS1 |
| Lawson | Michael | 1035 | NS1 |
| Lazarus | Barbi | 28094 | NS1 |
| Lazzeri | Jon J. | 27273 | NS1 |
| Lazzeri | Patrizia | 28125 | NS1 |
| Leahy | Joyce | 27897 | NS1 |
| Leavell | Chuck | 27442 | NS1 |
| Lebrun | Tyler | 29117 | NS1 |
| Lee | Ryan | 1185 | NS1, WT25 |
| Lee | Virginia | 7127 | NS1 |
| Leech | John | 1207 | ALT30, ALT5, NEPA33, NS2 |
| Leff | Billie | 8168 | NS1 |
| Leger | Ariel | 383 | NS1 |
| Legrand | Richard | 1183 | NS1 |
| Legrande | Judith | 26939 | NS1 |
| Lehkamp | Justin | 432 | NS1 |
| Lehman | Rebecca | 579 | ALT22 |
| Leiser | Tzirel | 7133 | NS1 |
| Leland | Lora | 27855 | NS1 |
| Lemon | Ka | 27732 | NS1 |
| Lenchner | Essie | 8294 | NS1 |
| Leonard | Eric | 28549 | NS1 |

11-RCMSER-2765

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Leonard | Karson | 28545 | NS1 |
| Leonard | Shirley | 27021 | NS1 |
| Lepage | Albert | 5471 | NS1 |
| Lerch | Jean | 27515 | NS1 |
| Leslie | Darlene | 195 | NS1 |
| Lettieri | Tammy | 27118 | NS1 |
| Levi | Elena | 1370 | NS1 |
| Levine | Lisa | 49 | MIT7, WT14 |
| Levinson | Charlotte | 29708 | CR4, NS1 |
| Lewid | Mildred | 7135 | NS1 |
| Lewis | Jono | 28927 | NS1 |
| Lewis | Sherry | 28055 | NS1 |
| Lewkowitz | Micah | 28183 | NS1 |
| Lichty | Brittany | 732 | NS1 |
| Lietzke | Aryn | 1349 | AMT1, MIT9, TS1, TS1_A, WI1, WT1 |
| Lieu | Charlene | 743 | NS1 |
| Lihou | Christopher | 27014 | NS1 |
| Lincoln | Cameron | 1327 | NS1 |
| Lincoln | Jacob | 1393 | NS1 |
| Link | Kristin | 1527 | NS1 |
| Linsenberg | Richard | 7138 | NS1 |
| Lipson | Rachel | 8074 | NS1, WT4 |
| Lipstreu | David | 26970 | NS1 |
| Lisboa | Gabriela | 6222 | NS1 |
| Lish | Christopher | 1322 | ALT15, ALT22, AMT1, NEPA2, NEPA33, NS1, NS2, TS2, WT1, WT8 |
| Litchfield | Mary | 1456 | NS1 |
| Litchfield | Robert | 1462 | NS1 |
| Litwin | Iris | 6026 | NS1 |
| Livingston | Debc | 1445 | NS1 |
| Livingston | Ken and Jan | 27490 | NS1 |
| Lizama | Julia | 29299 | NS1 |
| Lloyd | David | 6587 | NS1 |
| Loba | Suntara | 29713 | NS1 |
| Loberger | Troy | 595 | WT4 |
| Lockridge | Ross | 27126 | NS1 |
| Lockwood | Victoroa | 7143 | NS1 |
| Loessberg | Casilia | 8197 | NS1 |
| Loewen | Theresa | 28659 | NS1 |
| Logan | Anthony | 72 | CR4, NS2 |

11-RCMSER-2766

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Logan | Anthony | 127 | NS1 |
| Lonergan | Darragh | 1003 | NS1, SO19, SO6 |
| Long | Richard | 27908 | NS1 |
| Longman | Beth | 1199 | NS1 |
| Looijen | Autumn | 28036 | NS1 |
| Lopez | Chris | 616 | NS1 |
| Lopez | Esteban | 133 | NS1 |
| Lopez | Esteban | 200 | NS1 |
| Lopez | Isabel | 137 | NS1 |
| Lopez | John | 911 | NS1, SR20 |
| Lopez | Lozen | 161 | CR4, NS1 |
| Lopez | Maria | 27964 | NS1 |
| Lopez | Oscar | 1495 | NS1 |
| Lopez | Sinetta | 168 | CR4, NS1 |
| Lopiccolo | Barbara | 1337 | NS1 |
| Lorentson | Harold | 29333 | NS1 |
| Lorenzetti | Ole | 28394 | NS1 |
| Loughay | Bryab | 462 | NS1 |
| Louie | Avery | 28731 | NS1 |
| Louie | Tina | 56 | NS1, NS2, WT43 |
| Loveall | Jeremiah | 1534 | AQ4, MIT17, WI5 |
| Lovelace | Kristen | 28570 | NS1 |
| Lowe | Bryan | 6399 | NS1 |
| Lowe | Latherine | 2012 | NS1 |
| Lowe | Melissa | 29025 | NS1 |
| Lowther | Carolyn | 869 | NS1 |
| Luciani | Jacob | 435 | NS1 |
| Ludden | Brett | 26897 | NS1 |
| Luke | Barbara | 30127 | NS1 |
| Lull | Mark | 5468 | NS1 |
| Luna | Greg | 1253 | NS1 |
| Lundeen | William | 28508 | NS1 |
| Lundquist | Charles | 5939 | NS1 |
| Luneau | Taylor | 29157 | WT25 |
| Lunson | Tina | 28048 | NS1 |
| Lurie | Ben | 6452 | NS1 |
| Lusk | Joanne | 1099 | NS1 |
| Lyles | Thomas | 27899 | NS1 |
| Lynch | Joshua | 528 | NS1 |
| Lyons | Jim | 28226 | NS1 |

11-RCMSER-2767

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Lyons | Mary | 27106 | NS1 |
| M | Ejay | 7147 | NS1 |
| Macarthur | William | 5678 | NS1 |
| Macdonnell | Jo Ann | 27277 | NS1 |
| Macdougall | Galen | 5966 | NS1 |
| Macias | Michael | 51 | NS1, TS14 |
| Macias | Michael | 90 | NS1, NS2, TS24 |
| Mack | Tim | 29496 | NS1 |
| Macomson | Lena | 29448 | NS1 |
| Macphail | Elizabeth | 6490 | NS1 |
| Macpherson | Alexis | 28065 | NS1 |
| Maddock | Brad | 548 | NS1, SO6 |
| Madeson | Frances | 1063 | NS1 |
| Madigan | Nathan | 29345 | NS1 |
| Madole | Gary | 27826 | NS1 |
| Magee | Chris | 28261 | NS1 |
| Maher | Mary Ann | 7151 | NS1 |
| Mahmoud | Marwa | 2016 | NS1 |
| Maiers | Joan | 27901 | NS1 |
| Maini | Rj | 6439 | NS1 |
| Maki | Tamara | 7152 | NS1 |
| Mallea | Erin | 1531 | CR12, CR4, NEPA54, NS1, NS2 |
| Mallory | Brenda | 1262 | NS1 |
| Maloney | Patrick | 26946 | NS1 |
| Malven | Tania | 5462 | NS1 |
| Malven | Tania | 27773 | NS1 |
| Malven | Tania | 7154 | NS1 |
| Maly | Suzanne | 1505 | NEPA29, NS1 |
| Mancini | Barbara | 27360 | NS1 |
| Manes | Sharin | 7156 | NS1 |
| Manning | Brandon | 28555 | NS1 |
| Manning | Paul F | 842 | NS1 |
| Manthey | Danelle | 1386 | NS1 |
| Manuel-Navarrete | David | 1350 | CR8 |
| Marco | Preston | 1047 | NS1 |
| Mare | Renelle | 27939 | NS1 |
| Mare | Renelle | 27940 | NS1 |
| Marino | Matthew | 29258 | NS1 |
| Marks | Diane | 311 | CR4, NEPA4, NS2 |
| Markus | Jesse | 1376 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Marne | Marielle | 7158 | NS1 |
| Marshall | Allysun | 715 | NS1 |
| Marshall | Brenda | 625 | NS1 |
| Martell | Angela | 28601 | NS1 |
| Martin | Aaron | 6505 | NS1 |
| Martin | Carol and Richard | 27392 | NS1 |
| Martin | James | 905 | NS1 |
| Martin | Janet | 843 | NS1 |
| Martin | Jeff | 1070 | NS1 |
| Martin | Joy | 27167 | NS1 |
| Martin | Kirsten | 588 | NS1 |
| Martin | Marilyn | 27336 | NS1 |
| Martin | Paul | 28096 | NS1 |
| Martin | Taylor | 995 | NS1 |
| Martinez | Andrew | 1006 | NS1 |
| Martinez | Joe | 27763 | NS1 |
| Martinez | Priscilla | 5434 | NS1 |
| Martinez | Susan | 1260 | NS1 |
| Mary | David | 28579 | NS1 |
| Mason | Charlotte | 29169 | NS1 |
| Massey | Linda | 5404 | NS1 |
| Masters | Bruv | 1156 | NS1 |
| Masters | Kerry | 27669 | NS1 |
| Matejcek | Patricia | 26942 | NS1 |
| Matisse | Loralei | 703 | NS1 |
| Matousek | Tomas | 448 | NS1 |
| Matson | Erin | 638 | NS1 |
| Matsuda-Dunn | Pamela | 6164 | NS1 |
| Matter | Margaret | 1203 | NS1 |
| Mattison | Priscilla | 27129 | NS1 |
| Maue | Sarah | 6550 | NS1 |
| Maul | Myoshi | 8153 | NS1 |
| Maurer | Dorothy | 27044 | NS1 |
| Maust | Gregory | 1884 | NS1 |
| Mavilia | Tom | 29290 | NS1 |
| Maxwell | Ben | 443 | NS1 |
| May | M | 780 | MIT21 |
| May | Michele | 879 | NS1 |
| Mayer | David Mayer | 27026 | NS1 |
| Mayer | Paul | 26842 | NS1 |

11-RCMSER-2769

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Mayer | Susan | 26941 | NS1 |
| Mayhew | Eric | 28498 | NS1 |
| Maynard | Ben | 38 | NEPA27, TR3, WT58 |
| Maynard | Ben | 417 | NO6, NS1, TR3, WT4 |
| Maynard | Bill | 1538 | AMT1_K, GS1, NS1, TR3, WT4 |
| Maynard | Bill | 1542 | SO7 |
| Maze | Amanda | 7962 | NS1 |
| Maze | Amanda | 28199 | NS1 |
| Mazel | Molly | 6480 | NS1 |
| Mcallister | Cheryl | 901 | NS1, NS2 |
| Mcanulty | Rick | 774 | NS1 |
| Mcatlin | Barbara | 12 | NEPA48, NS2 |
| Mcbee | Nicholas | 8081 | NS1 |
| Mcblane | Michael A | 1269 | NS1 |
| Mccaffery | Chris | 2001 | NS1 |
| Mccaffrey | Emily | 6029 | NS1 |
| Mccaleb | Mac | 29110 | NS1 |
| Mccall | Kevin | 5521 | NS1 |
| Mccallum | Hannah | 28397 | NS1 |
| Mccarthy | Keri-Lynn | 28975 | NS1 |
| Mccarthy | William | 670 | NS1 |
| Mcclatchie | Michelle | 28850 | NS1 |
| Mcclay | Samantha | 29401 | NS1 |
| Mccleester | Heather | 1857 | NS1 |
| Mcclintock | Gloria | 5446 | NS1 |
| Mccloskey | Ryan | 28943 | NS1 |
| Mccormick | Carroll | 1097 | ALT1, AMT7, GS4, MIT23, NEPA10, NEPA11, NS2, SO16, SO21, SO6, SR13, TS1, TS26 |
| Mccormick | Gene | 134 | NS1 |
| Mccracken | Bill | 6424 | NS1 |
| Mccreary | Elizabeth | 1947 | NS1 |
| Mccreary | Stephanie | 411 | CR12 |
| Mccune | Letitia | 1310 | CR4, NS1, WT4 |
| Mccurry | Gordon | 27745 | NS1 |
| Mcdermott | Ann | 872 | NS1 |
| Mcdonald | Holly | 5432 | NS1 |
| Mcdonald | Holly | 27989 | NS1 |
| Mcgowan | Don | 1363 | NS1 |
| Mcgranaghan | Allie | 1308 | ALT1, AQ11, MIT3, NS1 |
| Mcgraw | Patrick | 6224 | NS1 |

11-RCMSER-2770

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Mcguire | James | 8251 | NS1 |
| Mcguire | Timothy | 29312 | NS1 |
| Mcintosh | Mac | 6455 | NS1 |
| Mckean | Joe | 793 | NS1 |
| Mckee | Matt | 28413 | NS1 |
| Mckee | Sarah | 5423 | NEPA38 |
| Mckee | Sarah | 27356 | NS1 |
| Mcknight | Scott | 354 | NS1 |
| Mcknight | Stanley | 6315 | NS1 |
| Mclane | Karen | 1189 | WT4 |
| Mclane | Karen | 1491 | NS1 |
| Mclaughlin | Diane | 26849 | NS1 |
| Mclaughlin | Kristin | 29139 | NS1 |
| Mclaughlin | Win | 28714 | NS1 |
| Mclean | Brian | 2051 | NS1 |
| Mclean | Powell | 2105 | NS1 |
| Mcmahan | Rick | 29338 | NS1 |
| Mcmahon | Alisa | 1117 | NS1, WT4 |
| Mcmahon | Steve | 7168 | NS1 |
| Mcnair | Linda | 27161 | NS1 |
| Mcneil | Janene | 26812 | NS1 |
| Mcswain | Susan | 27743 | NS1 |
| Mcwilliams | Cynthia | 27619 | NS1 |
| Mdanat | Morgan | 631 | NS1 |
| Medina | Kelly | 501 | NS1 |
| Medina | Laura | 212 | NS1 |
| Medlin | Zach | 733 | NS1 |
| Meeks Springan | Autumn | 7748 | NS1 |
| Meersand | Kenneth | 27105 | NS1 |
| Mehall | Luke | 6202 | NS1 |
| Mehta | Naren | 610 | NS1 |
| Meier | Lorraine | 1261 | NS1 |
| Meier | Lorraine | 7174 | NS1 |
| Meikle | Barry | 7749 | NS1 |
| Meisner | Alexander | 965 | AMT1, SR27 |
| Mendez | Laura | 26977 | NS1 |
| Mentzer | Wayne & Jerri | 254 | MIT8 |
| Mentzer | Wayne & Jerri | 867 | MIT8 |
| Merendino | Caleb | 263 | NEPA2, NEPA33, NS1, NS2, TS1, TS2, WT1 |
| Merkelbach | Joseph | 27154 | NS1 |

11-RCMSER-2771

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Merritt | Joyce | 7920 | NS1 |
| Mesecher | Alyssa | 620 | NS1 |
| Metcalf | Francesca | 29273 | NS1 |
| Metzger | Dwight | 126 | NEPA33, NEPA6 |
| Metzger | Dwight | 1532 | CR4, NS1 |
| Meyer | Douglas | 5421 | NS1 |
| Meyer | John | 7178 | NS1 |
| Meza | Jordyn | 1039 | NS1 |
| Michael | Sandy | 27887 | NS1 |
| Michaels | Brenda | 30132 | NS1 |
| Michaels | Mitchell | 20 | MIT1, NS1 |
| Michaels | Mitchell | 21 | MIT1, NS1 |
| Michaels | Mitchell | 91 | MIT1, NS2 |
| Michaels | Mitchell | 92 | MIT1 |
| Michalides | Joseph | 1265 | NS2 |
| Mick | David | 28935 | NS1 |
| Mickelson | Kevin | 829 | ALT30, NS1 |
| Mickowski | Patrice | 5440 | NS1 |
| Miess | Daniel | 1449 | NS1 |
| Mignella | Anthony | 28172 | NS1 |
| Mihaly | Anna | 6218 | NS1 |
| Milich | Lenard | 27137 | NS1 |
| Miller | Aaron | 7182 | NS1 |
| Miller | Elaine | 7758 | NS1 |
| Miller | Leah | 8151 | NS1 |
| Miller | Randy | 7181 | NS1 |
| Miller | Robert | 27993 | NS1, WT1 |
| Miller | Vicky | 27928 | NS1 |
| Millier | Jennifer | 680 | NS1 |
| Mills | Damon | 26845 | NS1 |
| Mills | Donna | 1282 | NS1 |
| Mills | Linda | 7185 | NS1 |
| Millsap | Curtis | 29154 | NS1 |
| Milton | Kathy | 29231 | NS1 |
| Minto | Robert | 8305 | SO2 |
| Miramon | Federico | 8 | ALT30, MIT23 |
| Miramon | Fred | 148 | MIT23 |
| Miramon | Fred | 149 | MIT1, MIT23 |
| Miritescu | Adriana | 27802 | NS1 |
| Mirkina | Olga | 5497 | NS1 |

11-RCMSER-2772

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Misch | Margaret | 27725 | ALT22, NS1 |
| Mischke | Erica | 1976 | NS1 |
| Mitchell | Cheryl | 27280 | NS1 |
| Mitchell | David | 28288 | NS1 |
| Mitchell | Janis | 7761 | NS1 |
| Mitchell | Phillip | 1208 | NS1 |
| Mitchell | Skye | 1287 | CR4 |
| Mitchell | Vera | 7760 | NS1 |
| Mittelmei Er | Telsa | 7762 | NS1 |
| Mittelsteadt | Scott | 1342 | AMT1, NEPA33, TS1, WT12, WT36 |
| Mkrtschjan | Jason | 5589 | NS1 |
| Mo | T | 5535 | NS1 |
| Moehlman | Bruce | 7764 | NS1 |
| Mogull | Richard | 5727 | NS1, WT4 |
| Mohr-Felsen | Ariane | 7397 | NS1 |
| Mohr-Almeida | Kathy | 210 | AQ4_B, NS1 |
| Molnar | Daniela | 1295 | NEPA33, NS1 |
| Mondragon | Norma | 7398 | NS1 |
| Monks | Gerald | 748 | NS1, SO6 |
| Monroi | Joseph | 85 | TS24 |
| Monroy | Joseph | 84 | NS1 |
| Monroy | Robert | 103 | NS1, WT7 |
| Montano | Raul | 1120 | MIT1 |
| Montano | Ysidro | 1157 | WT7 |
| Montgomery | Erica | 8249 | NS1 |
| Montgomery | Hlhn | 1177 | NS1, WT10 |
| Montgomery | John | 46 | WT10 |
| Montiel | Churak | 342 | NS1 |
| Moody | Kelly | 1347 | NS1 |
| Mooney | Fjaere | 800 | NS1 |
| Moore | Chris | 534 | NS1 |
| Moore | James | 889 | AMT4 |
| Moore | Jim | 150 | AMT4 |
| Moore | Rick | 1406 | NS1, WT25 |
| Moore | Sherrie | 27923 | NS1 |
| Moran | Lauren | 1353 | CR1, CR4 |
| Moran | Mary | 1074 | NS1, WT25 |
| Moreland | Karren | 1504 | NS1, NS2, TS27 |
| Moreno | Cecilia | 837 | NS1, WT43 |
| Moreno | Paul | 6784 | NS1 |

11-RCMSER-2773

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Morgan | Gareth | 1941 | NS2 |
| Morgan | Nj | 27642 | NS1 |
| Morris | Alexis | 28112 | NS1 |
| Morrison | Michael | 28080 | NS1 |
| Morrissey | Sandra | 6786 | NS1 |
| Morta | Dan | 1048 | DOC1, MIT28, NEPA9, SR22 |
| Morton | Dennis | 27668 | NS1 |
| Moses | Annie | 6573 | NS1 |
| Moses | Kimberly | 27117 | NS1 |
| Moskowitz | Brad | 28553 | NS1 |
| Moss | Eric | 6203 | NS1 |
| Moss | Gilbert | 28605 | WT6 |
| Mott | Titus | 490 | NS1 |
| Mount | Patricia | 1166 | NS1, WT2 |
| Mousset-Jones | Pierre | 918 | AMT1_H, AQ26 |
| Mowers | Laralyn | 1885 | MIT3, NS1, NS2 |
| Moyles | Christopher | 572 | NS2 |
| Muckle | Stephen | 27205 | NS1 |
| Mueller | Inge | 418 | NS1 |
| Mugasis | Cathy | 1254 | NS1 |
| Muirhead | Fraser | 27149 | NS1 |
| Mulcahy | Laurie | 7193 | NS1 |
| Muller | Brian | 29361 | NS1 |
| Muller | Steve | 6088 | NS1 |
| Mullin | Brian | 8009 | NS1 |
| Mulvihill | Alex | 8224 | NS1 |
| Munn | Ralph | 28456 | NS1 |
| Munoz Sr. | Henry | 10 | AMT1, NEPA48 |
| Munoz Sr. | Henry | 44 | NEPA48, WT4 |
| Munoz Sr. | Henry | 59 | AMT1, NEPA48, WT4, WT4_G |
| Munoz Sr. | Henry | 82 | AMT1, GS10, NEPA48, WT4, WT43 |
| Munoz Sr. | Henry | 83 | WT4_B, WT4_G |
| Munson | K | 27804 | NS1 |
| Murillo | Eve | 7198 | NS1 |
| Murmi | Adam | 784 | NS1 |
| Murphy | Charlott E | 7200 | NS1 |
| Murphy | Darelan | 5594 | NS1 |
| Murphy | Donna | 27197 | NS1 |
| Murphy | Pat | 1165 | NS1 |
| Murray | Shayle | 29109 | NS1 |

11-RCMSER-2774

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Murrell | Susan | 1345 | NS1 |
| Musgrove | Jeanne | 5378 | NS1 |
| Mussallem | Keith | 554 | NS1 |
| Myers | David Russell | 27227 | NS1 |
| Myers | Mary | 1171 | NS1 |
| Myers | Mary | 7203 | NS1 |
| Mysak | Tara | 27658 | NS1 |
| N. | Elisabeth | 27791 | NS1 |
| Nabb | Sophia | 6275 | NS1 |
| Nagy | Karen | 27924 | NS1 |
| Nanney | Addison | 662 | NS1 |
| Naples | Jean | 5398 | NS1 |
| Naples | Jean | 28100 | NS1 |
| Necas | Al | 7206 | NS1 |
| Nedeff | Liz | 753 | NS1 |
| Nedialkov | Tzenko | 586 | NS1 |
| Neel | Margaret | 26966 | NS1 |
| Neitzke | Adam | 6478 | NS1 |
| Nelson | Adrian | 5505 | NS1 |
| Nelson | Blake | 7210 | NS1 |
| Nelson | Bryce | 5631 | NS1 |
| Nelson | Deana | 6173 | NS1 |
| Nelson | Jonathan | 996 | NS1 |
| Nelson | Margar Et | 7211 | NS1 |
| Nelson | Michael | 835 | NS1 |
| Nelson | Peter | 28961 | ALT22, NS1 |
| Nelson | Scott | 30128 | NS1 |
| Nelson | Zoey | 734 | NS1 |
| Nessel | Laurie | 1448 | AMT4, NEPA3, TS2, TS7, WT1, WT28, WT35, WT36 |
| Nevin | Ben | 6200 | NS1 |
| Newark | David | 6788 | NS1 |
| Newkirk | Staci | 1521 | CR4, NS1 |
| Nguyen | Ann | 8084 | NS1 |
| Nicholas | Ann | 26827 | NS1 |
| Nicholes | K.G.H. | 776 | AMT1 |
| Nichols | Beverly | 1226 | CR4, NEPA35, NS1 |
| Nickum | John | 6793 | NS1 |
| Nicosia | Marcella | 8022 | NS1 |
| Nieland | Thomas | 5464 | NS1 |
| Nielsen | Keeley | 569 | NS1 |

11-RCMSER-2775

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Niver | Amanda | 1503 | NS1 |
| Noble | John | 29390 | NS1 |
| Noedel | Sally | 244 | NS1 |
| Noel | Chelsey | 584 | NS1 |
| Nomann | Carmen | 5377 | NS1 |
| Norland | Diane | 26994 | NS1 |
| Norman | Jesse | 141 | NS1 |
| Norris | Josie | 6282 | NS1 |
| Nosie | Aleigha | 17 | NS1 |
| Nosie | Theresa | 184 | CR4 |
| Nosie | Theresa | 29655 | NS1 |
| Nosie | Vanessa | 111 | NS1 |
| Nosie | Vanessa | 185 | NS1 |
| Nosie | Vanessa | 218 | NS1 |
| Nosie | Vanessa | 240 | NS1 |
| Nosie | Vansler | 170 | NS1 |
| Nosie | Wendsler | 33 | CR14, NS1, TS24 |
| Nosie | Wendsler | 34 | NS1 |
| Nosie | Wendsler | 113 | NS1 |
| Nosie | Wendsler | 114 | NS1 |
| Nosie | Wendsler | 186 | CR4, NEPA30, NS1 |
| Nosie | Wendsler | 187 | NS1 |
| Nosie | Wendsler | 241 | CR4, NS1 |
| Novotny | Samantha | 822 | MIT1 |
| Nunn | Stephen | 7216 | NS1 |
| Nye | Christopher | 27788 | NS1 |
| Obrien | Ellen | 1247 | NS1 |
| O'Brien | Elizabeth | 5601 | NS1 |
| O'Connor | Jacqueline | 26918 | NS1 |
| O'Connor-Masse | Kate | 27912 | NS1 |
| Oddonetto | Kimberly | 86 | NS2 |
| Oder | Stephen | 7998 | NS1 |
| Oeleis | Jenny | 7976 | NS1 |
| Ogasian | Jason | 5574 | NS1 |
| Ohl | Jim | 60 | MIT1, MIT3, SO1, TS24 |
| Ohl | Jim | 61 | GS2 |
| Ojo | David | 1304 | NS1 |
| O'Kane | Connor | 5655 | NS1 |
| O'Keeffe | Sean | 775 | NS1 |
| O'Laughlin | Kirk | 1194 | NEPA21, NEPA22, NS1 |

11-RCMSER-2776

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Oliver | Eric | 5550 | NS2 |
| Olsen | Carly | 921 | ALT5 |
| Olsen | Rhesa | 7221 | NS1 |
| Olson | Carla | 7779 | NS1 |
| Olson | Erik | 679 | NS1 |
| Olson | Marie | 1305 | NS1 |
| O'Neil | Leslie | 28052 | NS1 |
| Opahle | Mikii | 27955 | NS1, WT8 |
| Opel | Markus | 28042 | NS1 |
| Ord | Katherine | 7223 | NS1 |
| O'Reilly | Patricia | 27097 | NS1 |
| Orlebeke | Michael | 626 | NS1 |
| Orndorff | John | 460 | NS1 |
| Ornstein | Edward | 1116 | NS1 |
| Orr | Lou | 26913 | NS1 |
| Ortega | Dutch | 849 | NS1 |
| Ortega | Shayna | 1150 | ALT5, CR16, NEPA13, NEPA67, NS2, WT4 |
| Ortinau | Nora | 8148 | NS1 |
| Ortiz | Erlina | 1484 | NS1 |
| Osheil | Jeffrey | 937 | NS1 |
| Oslund | Janet | 27936 | NS1 |
| Ostler | Joesef | 28135 | NS1 |
| Ostlie | Nancy | 27798 | NS1 |
| Ostrer | Allison | 27162 | NS1 |
| Ostrowski | Jack | 7227 | NS1 |
| Oswald | Fred | 7228 | NS1 |
| Ollowski | Steven | 27109 | NS1 |
| Overstreet | Cynthia | 959 | NS1 |
| Overton | Katherine | 8094 | NS1 |
| Owens | Christina | 1257 | NS1 |
| Page | Cali | 6520 | NS1 |
| Page | Edward | 29499 | NS1 |
| Paine | Bob | 8326 | NS1 |
| Paine | Jonthan | 436 | NS1 |
| Palma | Marina La | 27845 | NS1 |
| Palmer | Kaden | 5742 | NS1 |
| Palmer | Kirk | 5990 | SO6 |
| Palmer | Lynne | 1014 | NS1 |
| Palomino | Henry | 970 | NS1 |
| Panek | Jeanna | 28406 | NS1 |

11-RCMSER-2777

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Paney | Christiane | 6198 | NS1 |
| Pang | Selena | 30138 | NS1, WT4 |
| Panter | Rich | 5442 | NS1 |
| Paraniuk | John | 27715 | NS1 |
| Parham | Felix | 29126 | NS1 |
| Parham | Felix | 29127 | NS1 |
| Parham | Mary | 27787 | NS1 |
| Parisoe | Mary | 26839 | NS1 |
| Park | Lea | 28017 | NS1 |
| Parke-Hoffman | Will | 29309 | NS1 |
| Parker | Catharine | 1010 | NS1 |
| Parker | Greg | 5936 | NS1 |
| Parkison | Peggy | 882 | ALT30, NS1 |
| Parks | Jennifer | 29102 | NS1 |
| Parrish | Robert | 5760 | ALT22, WI25, WT1 |
| Parry | Cameron | 30123 | NS1 |
| Parsons | Alicia | 142 | NS1 |
| Parsons | Laak'Os | 144 | NS1 |
| Parsons | Orlando | 145 | NS1 |
| Parsons | Sage | 143 | NS1 |
| Pasqua | John | 5396 | NS1 |
| Patch | Joan | 30065 | CR5, NS1, WT1, WT26 |
| Patterson | Carol | 27916 | NS1, WT1 |
| Pauk | George | 1471 | CR4, NS1 |
| Paul | Joann Baker | 1544 | ALT22, ALT33, AMT1, AQ11, CR5, MIT1, MIT21, MIT9, NEPA18, NEPA41, TS29, WT12, WT24, WT26, WT4, WT8 |
| Pautman | Mike | 1957 | NS2 |
| Pavey | Steven | 217 | NS1 |
| Paxton | Harold | 287 | NS1 |
| Payne | Dustin | 8169 | NS1 |
| Payne | Jared | 6095 | NS1 |
| Peacock | Pete | 7977 | NS1 |
| Peacock | Randall | 5844 | NS1 |
| Peck | Roger | 592 | NS1 |
| Peel | Roberta | 27092 | NS1 |
| Peet | Roger | 1378 | NS1 |
| Pellerito | Elizabeth | 1124 | NS1 |
| Pemberton | Curtis | 131 | CR4, NS1 |
| Perez | Andrea | 6062 | NS1 |
| Perez | Yolanda | 7234 | NS1 |

11-RCMSER-2778

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Perini | Julie | 1355 | NS1 |
| Perlman | Janine | 27976 | NS1 |
| Perry | Lisa | 1011 | NS1 |
| Petach | Helen | 28839 | NS1 |
| Pete | Sierra | 747 | ALT22, NS1, WT4 |
| Petefish | Ashley | 854 | ALT29, NS1 |
| Peters | Loretta | 1319 | NS1 |
| Peters | Sarah | 1379 | NS1, NS2, WT4_B |
| Petersen | Katherine | 5845 | NS1 |
| Peterson | Brenda | 27383 | NS1 |
| Peterson | Elisabeth | 5445 | NS1 |
| Peterson | Katherine | 152 | NS1 |
| Peterson | Katherine | 1477 | ALT5, CR4, NEPA30, NEPA54, TR22 |
| Peterson | Katie | 260 | NEPA30 |
| Peterson | Susan | 27906 | NS1 |
| Petrowski | Michael | 410 | WT4 |
| Petterson | Carl | 684 | NS1 |
| Pfaender | Carmela | 28195 | NS1 |
| Pfaff | Paul | 954 | NS1 |
| Pharo | Patrick | 8029 | NS1 |
| Philipee | Anna | 752 | NS1 |
| Philipps-Moses | David | 384 | NS1 |
| Phillips | Elaine | 27929 | NS1 |
| Phillips | Jared | 944 | NS1 |
| Phillips | Robert | 1211 | NS1 |
| Phillips | Stan | 8304 | NS1 |
| Phillips | Weslie | 754 | NS1 |
| Picard | Jason | 28871 | NS1 |
| Picard | June | 5472 | NS1 |
| Piccolo | Scott | 28965 | NS1 |
| Piering | Amanda | 6581 | NS1 |
| Pike | Baase | 73 | CR4, NS1 |
| Pike | Baase | 117 | NS1 |
| Pike | Baase | 129 | CR4, NS1 |
| Pike | Baase | 189 | NS1 |
| Pike | Naelyn | 94 | NS1 |
| Pike | Naelyn | 29710 | NS1 |
| Pike | Nizhoni | 100 | CR4, NS1 |
| Pikula | Sam | 893 | NS1 |
| Pinckney | Kelsey | 1077 | NS1 |

11-RCMSER-2779

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Pinkelt | Jc | 28642 | NS1 |
| Pino | Manuel | 219 | CR16 |
| Pirmohamed | Nurbegum | 27208 | NS1 |
| Pitkapaasi | Daniel | 598 | NS1 |
| Pitman | Tera | 450 | NS1 |
| Planet | Captain | 1082 | NS1 |
| Platt | Christopher | 912 | NS1 |
| Pledger | Andrew | 580 | NS1 |
| Plenk | Bruce | 1565 | NEPA2, NS1, WT24_A |
| Plummer | Jared | 2022 | NS1 |
| Po Box 4338 | Laura | 847 | NS1 |
| Poel | James Vander | 28003 | NS1 |
| Pogue | Alexandra | 6195 | NS1 |
| Pohl | Ryan | 29009 | NS1 |
| Point | Thomas La | 27841 | NS1 |
| Polach | Scott | 1298 | NS1 |
| Polefka | Shiva | 27000 | NS1 |
| Ponce | Lydia | 27169 | NS1 |
| Poole | Gina | 27511 | NS1 |
| Pooler | Carole | 1258 | NS1 |
| Pope | Keenan | 29096 | NS1 |
| Porter | Christopher | 27872 | NS1 |
| Porter | Dr Rin | 1237 | CR7, NS1, WT43 |
| Porter-Solberg | Mary | 7805 | NS1 |
| Posey | Ariel | 8226 | NS1 |
| Post | Dianne | 7806 | NS1 |
| Potteiger | Gregory | 28948 | NS1 |
| Potteiger | Wyatt | 8227 | NS1 |
| Pottle | Judith | 7807 | NS1 |
| Potts | Randall | 27508 | NS1 |
| Potvin | Emilie | 26857 | NS1 |
| Powell | Edward | 6413 | NS1 |
| Powell | Robert | 7810 | NS1 |
| Power | Devin | 919 | NS1 |
| Powers | Christin A | 7238 | NS1 |
| Powers | John | 813 | NS1 |
| Powledge | Damien | 726 | NS1 |
| Praderio Lynn | Laura | 28507 | NS1 |
| Pravica | Sean | 502 | NS1 |
| Price | Chara | 6638 | NS1 |

11-RCMSER-2780

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Price | Dylan | 1975 | NS1 |
| Price | Mark | 28837 | NS1 |
| Price | Paula | 1167 | NS1 |
| Primatic | Kim | 27031 | NS1 |
| Prince | Allan | 7244 | NS1 |
| Pristelski | Jeff | 992 | NS1 |
| Proctor | Robert | 458 | NS1 |
| Proczka | John-Jozef | 8010 | NS1 |
| Pucci | Stephen | 29179 | NS1 |
| Pugsley | Debra S | 7247 | NS1 |
| Puhara | Jeff | 890 | NS1, NS2, SO21 |
| Puliselic | Christine | 1213 | NS1 |
| Punches | Vinnie | 425 | NS1 |
| Punt | Leon | 1073 | NS1 |
| Purcell | Stacey | 6350 | NS1 |
| Purdy | Jeff | 678 | NS1 |
| Pursley | Allison | 6622 | NS1 |
| Quale | Nick | 6119 | NS1 |
| Quick | Alec | 8273 | NS1 |
| Quinn | Charles and Mrs. Diana | 5370 | NS1 |
| Quinn | Neely | 787 | NS1 |
| Rafkin | Tamara | 1325 | NS1 |
| Ragan | Carolyn | 1562 | NS1 |
| Rager | Brendon | 6166 | NS1 |
| Raines | M.1. | 7251 | NS1 |
| Raitt | Jacob R. | 27422 | NS1 |
| Ralley | Phyllis | 1067 | NS1 |
| Ramaker | Julianne | 27934 | NS1 |
| Rambler | Sandra | 28 | CR12, NS1 |
| Rambler | Sandra | 54 | NS1 |
| Rambler | Sandra | 55 | CR4, CR5, NS1, NS2, TS24 |
| Rambler | Sandra | 107 | AMT1, CR4, NEPA37, NS1, NS2, WT4 |
| Rambler | Sandra | 108 | CR12, CR4, NS1, TS23 |
| Rambler | Sandra | 176 | NS1 |
| Rambler | Sandra | 181 | NS1 |
| Rambler | Sandra | 233 | CR4, CR7, WT4 |
| Ramirez | Arianna | 7964 | NS1 |
| Ramirez | Brianna | 1040 | NS1 |
| Ramirez | Steven | 1309 | AMT1, AQ4, CR4, TS24_C |
| Ramos | Miguel | 1037 | NS1 |

11-RCMSER-2781

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Randall | D. | 5476 | NS1 |
| Randall | Maryrose | 27663 | NS1 |
| Randall | Philip | 28865 | NS1 |
| Randolph | Adam | 1274 | CR4, NS1 |
| Rangel | Manuel | 220 | NS1 |
| Rangel | Manuel | 874 | NS1 |
| Rank | Robert | 1190 | NS1 |
| Ransom | Cat | 6302 | NS1 |
| Rasmussen | Linda | 713 | NS1 |
| Raster | Amanda | 27140 | NS1 |
| Reading | Toni | 5417 | NS1 |
| Reading | Toni | 5418 | NS1 |
| Reda | Clare | 29091 | NS1 |
| Redding | Ariane | 495 | CR4, SO6 |
| Redfield | Robert S. | 27571 | NS1 |
| Redmond | Eden | 1395 | NS1 |
| Redwine | Harriet | 27194 | NS1 |
| Reed | Sally | 1942 | NS1 |
| Rees | Sandra | 1470 | NS1 |
| Reese | Michele | 875 | NS1 |
| Reese | Will | 930 | NS1 |
| Regan | Marc | 5518 | NS1 |
| Reilly | Joe | 932 | NS1 |
| Reilly | Susan Barbara | 27920 | NS1 |
| Reily | Brian | 1481 | NEPA35 |
| Reina | Bradley | 6464 | NS1 |
| Reis | Ashley | 1391 | NS1 |
| Reiter | Margaret | 809 | NS1, NS2 |
| Remer | Seth | 29194 | NS1 |
| Renwick | Vanessa | 1512 | NS1 |
| Resendiz | Christian | 28221 | NS1 |
| Reveles | Roberto | 295 | NS1, TS1 |
| Reynolds | Jason Carl | 1179 | NS1 |
| Reynolds | Jon | 526 | NS1 |
| Reynolds | June | 1178 | NS1 |
| Reynolds | Rebecca | 27539 | NS1 |
| Reynolds | Waid | 27416 | NS1 |
| Rhodes | Renee | 1373 | NS1 |
| Ribble | Nathan | 8321 | NS1 |
| Rice | Adena | 27853 | NS1 |

11-RCMSER-2782

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Rice | Edward | 1420 | WT1 |
| Richards | Christopher | 27100 | NS1 |
| Richardson | Bruce | 1195 | NS1 |
| Richardson | Daniel | 292 | NS1 |
| Richardson | June | 27716 | NS1 |
| Richardson | Rebecca | 7256 | NS1 |
| Richmond | Lonna | 5465 | NS1 |
| Richt | Crystal | 7258 | NS1 |
| Rickards | Tom | 7898 | NS1 |
| Riegle | Coleman | 1952 | NS1 |
| Riffle | David | 28401 | NS1 |
| Rigney | Jane | 1220 | AMT1_G, NS1 |
| Ring | Milly | 27588 | NS1 |
| Ringgold | Bryan | 420 | NS1 |
| Ritchie | Robert | 5484 | NS1 |
| Rivera | Ryan | 994 | NS1 |
| Rivers | Karma | 853 | NS1 |
| Roach | Matthew | 7263 | NS1 |
| Roall | Richard | 7264 | NS1 |
| Roberts | Jenny | 7833 | NS1 |
| Roberts | Kathryn | 720 | NS1 |
| Roberts | Michael | 446 | NS1 |
| Roberts | Sarah | 29654 | NS1 |
| Roberts | Sarah | 30064 | ALT5, WT4 |
| Roberts | William | 762 | NS1 |
| Robertson | Annette | 27340 | NS1 |
| Robertson | Justin | 622 | NS1 |
| Robertson | Myles | 27860 | NS1 |
| Robertson | Nolan | 645 | NS1 |
| Robinett | Joseph | 7268 | NS1 |
| Robinson | Larry | 1210 | NS1, WT25 |
| Robles | Damien | 976 | NS1 |
| Rockwell | Christopher | 29475 | NS1 |
| Rodabaugh | Owen | 28963 | NS1 |
| Roder | Marc | 1401 | NS1 |
| Rodman | Emily | 6341 | NS1 |
| Rodning | Rael | 28945 | NS1 |
| Rodriguez | Danny | 29503 | NS1 |
| Rodriguez | Michael | 7270 | NS1 |
| Rodriguez | Rebeca | 28877 | NS1 |

11-RCMSER-2783

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Rodriguez | Ruthanne | 243 | NS1 |
| Rodriguez | Susan | 7269 | NS1 |
| Roeder | Dorothy | 7272 | NS1 |
| Roemer | Bert Von | 27874 | NS1 |
| Rogers | Arthur | 7846 | NS1 |
| Rogers | Jeremy | 28738 | NS1 |
| Rogers | Jim and Connie | 27278 | NS1 |
| Rogers | Renee | 7274 | NS1 |
| Rogers | Roz | 26990 | NS1 |
| Romano | Will | 6435 | NS1 |
| Romero | Duke | 43 | MIT30, NEPA37, NS2 |
| Romero | Duke | 125 | NEPA27, NS1 |
| Romero | Duke | 198 | NS1, TS24 |
| Rondon | Anna | 1134 | NS1 |
| Root | Margaret | 30114 | NS1 |
| Rosa | Yvette De La | 27919 | NS1 |
| Rose | Becky | 27705 | NS1 |
| Rose | Casarez | 1348 | NS1 |
| Rose | Kathryn | 27621 | NS1 |
| Rose | Susan | 28098 | NS1 |
| Rosen | Jerry | 26986 | NS1 |
| Rosen | Mike & Sally | 7281 | NS1 |
| Ross | Audrey | 1255 | NS1 |
| Ross | Jane | 28115 | NS1 |
| Rothenbery | Howard | 371 | ALT30, NS1 |
| Roush | Elizabeth | 952 | NS1 |
| Rowe | Carolyn | 281 | WT51 |
| Rowe; Rowe | Carolyn; Carolyn | 1231 | WT51 |
| Rowell | Patricia | 28103 | NS1 |
| Rowell | Patricia | 878 | NS1 |
| Rowen | James | 27945 | NS1 |
| Royall | Naomi | 29144 | NS1 |
| Royce | Jim | 6172 | NS1 |
| Rubenstein | Adrienne | 29188 | NS1 |
| Ruck | S | 1118 | TS1 |
| Rudisille | Mary | 7969 | NS1 |
| Ruiz | Gloria | 291 | ALT30, SO10, SO16, WT4 |
| Ruiz | Gloria | 30097 | ALT30, NS1 |
| Ruiz | Marcella | 18 | LG2, NS1 |
| Runneals | David | 538 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Ruopp | Kathy | 5450 | NS1 |
| Ruopp | Kathy | 28053 | NS1 |
| Russell | Suzette | 1390 | NS1 |
| Russo | Linda | 27681 | CR4, NS1, WT8 |
| Ryan | Anne | 30108 | NS1 |
| Ryan | Nancy | 27893 | NS1 |
| Sadowski | Alyssa | 963 | NS1 |
| Sadowski | Ryan | 961 | NS1 |
| Saint-Croix | Catharine | 29383 | NS1 |
| Salaam | Shalom | 1963 | NS1 |
| Salcido | Michael | 865 | NS1 |
| Saldana | Manuel | 221 | NS1 |
| Saldana | Manuel | 222 | NS1 |
| Salmony | Blake | 603 | NS1 |
| Sampson | Laura | 894 | NS1, NS2, WT4 |
| Sanchez | Michael | 639 | NS1, WT4 |
| Sand | Luke | 5618 | NS1 |
| Sandeen | Mimi | 27048 | NS1 |
| Sanderson | Melissa | 7839 | NS1 |
| Sandler | Michael | 6501 | NS1 |
| Sandok | Florence | 768 | NS1 |
| Sands | Preston | 1564 | NS1 |
| Santana | Kyra | 978 | NS1 |
| Santella | Janice | 7804 | NS1 |
| Savlove | John | 28107 | NS1 |
| Sawaya | Brianna | 1036 | NS1 |
| Sawyer | Bobby | 5974 | NS1 |
| Sawyer | Janis | 27428 | NS1 |
| Sayler | Becky | 1548 | NS1 |
| Scaltrito | Marietta | 27093 | NS1 |
| Scanlon | Peter | 973 | NS1 |
| Scarabin | James | 769 | NS1 |
| Schadel | Suzanne | 1263 | DOC1 |
| Schafer | Andrea | 6557 | NS1 |
| Schafer | Carol | 1095 | CR4, NS1 |
| Schafer | Lindsey | 28795 | NS1 |
| Schaffer | Gregory | 6131 | NS1 |
| Schalk | Kathleen | 27319 | NS1 |
| Scharf | Stuart | 26838 | NS1 |
| Schedler | Karen | 7283 | NS1 |

11-RCMSER-2785

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Scheel | Kurt | 7867 | NS1 |
| Schelble | Payton | 1031 | NS1 |
| Schenk | Kim | 14 | ALT1, MIT1, NS1 |
| Schepers | Danette | 1344 | ALT5, NO2, NS1, WT1 |
| Schildt | Brenda | 196 | NS1 |
| Schlossnagle | Trevor | 28942 | NS1 |
| Schmidler | Susan | 27843 | NS1 |
| Schmidt | Jacob | 28718 | NS1 |
| Schmierer | Kyle | 7869 | NS1 |
| Schmoller | Ron | 7870 | NS1 |
| Schneider | Aliza | 951 | ALT5 |
| Schneider | Carie | 1458 | CR4 |
| Schnell | Paul | 277 | NS1 |
| Schnell | Paul | 1055 | NS1 |
| Schonberg | Lisa | 1488 | NS1 |
| Schorr | Robert | 29433 | NS1 |
| Schramm | Douglas | 27007 | NS1 |
| Schroeder | Sheryl | 759 | NS1 |
| Schumacher | Mary | 30072 | NS1 |
| Schutjer | Cliff | 7285 | NS1 |
| Schwab | Mark | 549 | NS1 |
| Scott | Jonathan | 8314 | NS1 |
| Scott | Myron | 1455 | ALT5, NEPA25, NS1, NS2, WT1 |
| Scotten | Joseph | 914 | NS1 |
| Scroggins | Krisyy | 1290 | NS1 |
| Searer | Dustin | 346 | NS1 |
| Sears | Kyle | 666 | NS1 |
| Sebastian | Ted | 6068 | NS1 |
| Seeley | Megan | 29397 | NS1 |
| Segal | Adrien | 1509 | NS1 |
| Selna | Bryan | 1474 | ALT22, NS1, TS1 |
| Seltzer | Elizabeth | 797 | NS1 |
| Seubert | Joyce | 27110 | NS1 |
| Sevilla-Bazan | Todayah | 860 | NS1 |
| Shabbott | Mary | 763 | NS1 |
| Shaffer | Tria | 27427 | NS1 |
| Shaheen | William | 927 | MIT21 |
| Shane | Thomas | 28236 | NS1 |
| Shank | Ritch | 1138 | NS1 |
| Shanto | Joshua | 422 | NS1 |

11-RCMSER-2786

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Shapic | Alec | 416 | MIT3, NS2 |
| Shapiro | Dean | 820 | NS1 |
| Shapiro | Howard | 26980 | NS1 |
| Shapiro | Toblahs | 498 | NS1 |
| Shaplin | Adriano | 1302 | NS1 |
| Shaw | Benjamin | 28013 | NS1 |
| Shea | Erin | 1517 | NS2 |
| Shellenberger | Jessica | 1100 | CR4, NS1 |
| Shepard | David | 6161 | NS1 |
| Shepherd | Phil | 7290 | NS1 |
| Sherman | Mike and Kathy | 27288 | NS1 |
| Shiefman | Joe | 28891 | NS1 |
| Shields | Jedidiah | 5769 | NS1 |
| Shilko | Sandra | 5380 | NS1 |
| Shimeall | Nancy | 5882 | NS1 |
| Shimek | Carol | 27153 | NS1 |
| Shipley | Fernando | 95 | ALT30, NS2 |
| Shockey | Gwen | 1374 | WT4 |
| Shoemaker | Bradley | 29164 | NS1 |
| Sholette | Professor Gregory | 1372 | NS1 |
| Short | Brad | 30125 | ALT22 |
| Shoultz | Tim | 5818 | NS1 |
| Shouse | Antonia | 27894 | NS1 |
| Siebert | Danielle | 28320 | NS1 |
| Siegel | Nona & Michael | 6673 | NS1 |
| Siepka | Gene | 969 | NS1 |
| Sier | Rachel | 8087 | NS1 |
| Silbaugh | Kaitlin | 28532 | NS1 |
| Sillcox | James | 770 | NS1 |
| Sills-Trausch | Mike | 1091 | ALT22, ALT5, NS1 |
| Sills-Trausch | Patti | 1092 | ALT22, NS1, WT1 |
| Sills-Travich | Michael | 504 | ALT22, ALT5, NS1 |
| Silva | Jim | 1075 | ALT30, NEPA31, NS1, TS1 |
| Silver | L | 7298 | NS1 |
| Silver | Victoria | 27779 | NS1 |
| Simanski | Cliff | 29344 | NS1 |
| Simcox | Paul | 27770 | NS1 |
| Simmons | Eve | 27942 | NS1 |
| Simms | Christopher | 1056 | NS1 |
| Simon | Todd | 543 | NS1 |

11-RCMSER-2787

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Simons | Judith | 900 | ALT33, AQ11, NS1, WT4 |
| Simonton | Jonathan | 1616 | NS1 |
| Simpson | Rachel | 6186 | NS1 |
| Singer | Michael | 6675 | NS1 |
| Singh | Jaret | 542 | NS1 |
| Singler | Robert | 6676 | NS1 |
| Sirota | Joyce | 27354 | NS1 |
| Sjulstad | William | 643 | NS1 |
| Skelton | Theresa & Paul | 7301 | NS1 |
| Skidmore | Sue | 27239 | NS1 |
| Skinner | Tiffany | 29337 | NS1 |
| Skrzynski | Skz | 6680 | NS1 |
| Slay | Mark | 6102 | NS1 |
| Sloane | Gregory | 30119 | NS1 |
| Slosky | Daniel | 597 | NS1 |
| Slouka | Syd | 5863 | NS1 |
| Slovak | John | 26846 | NS1 |
| Sluski | Garrett | 1252 | NS1 |
| Sluyter | John | 868 | NS1 |
| Small | Sue | 1126 | NS1 |
| Smerlis | Judith | 1162 | NS1 |
| Smiley | Janelle | 29492 | NS1 |
| Smith | Alexandria | 665 | NS1 |
| Smith | Cameron | 512 | NS1 |
| Smith | Jaye | 28559 | NS1 |
| Smith | Joanne | 6686 | NS1 |
| Smith | John | 899 | SO1, SO3, TS1, TS24_A, WT4 |
| Smith | Kathleen | 1482 | NS1 |
| Smith | Kathy | 1536 | NS1 |
| Smith | Kira | 1227 | NS1 |
| Smith | Kurt | 6443 | NS1 |
| Smith | Kyle | 28970 | NS1 |
| Smith | Matilda | 614 | WT4 |
| Smith | Megan | 653 | NS1 |
| Smith | Patricia (Patty) | 897 | SO1, SO3, TS1, TS24, WT4 |
| Smith | Penelope | 6685 | NS1 |
| Smith | Ryan | 6535 | NS1 |
| Smith | Seth | 909 | NS1 |
| Smith | Steve | 5556 | NS1 |
| Smith | William | 667 | NS1 |

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Smith- Hansen | Mary | 7303 | NS1 |
| Smotrich | Benjamin | 1518 | CR4, NS1 |
| Smrz | Penelope | 8083 | NS1 |
| Smuts | Barbara | 27738 | NS1 |
| Sneezy | Patricia | 167 | NS1 |
| Snyder | Brad | 28097 | NS1 |
| Snyder | Charles | 472 | NS1 |
| Sodergren | Bennett | 29056 | NS1 |
| Sohocki | Dennis | 913 | NEPA1, NS1 |
| Sohocki | Dennis | 1595 | MIT35, NEPA1 |
| Sokolov | Krum | 724 | NS1 |
| Solamito | Marilyn | 1180 | NS1, NS2, WT43 |
| Solamito | Paul | 177 | NS1 |
| Solomentsev | Michael | 6586 | NS1 |
| Soltow | Sarah | 1351 | CR4, NS1 |
| Souchuns | Charles | 8040 | NS1 |
| Soukup | Jim | 29261 | NS1 |
| Sparks | Rob | 655 | NS1 |
| Speck | Jared | 7983 | NS1 |
| Spenger | Constance | 27335 | NS1 |
| Spenser | Tim | 6545 | NS1 |
| Spidle | Chris | 119 | NEPA29, NS1 |
| Spidle | Chris | 120 | NEPA29 |
| Spidle | Chris | 175 | NEPA29 |
| Spidle | Chris | 194 | NEPA29, NS1 |
| Spidle | Chris | 262 | NEPA29 |
| Spidle | Chris | 265 | NEPA29, NS1 |
| Spidle | Chris | 274 | NEPA28 |
| Spielman | Michael | 28560 | NS1 |
| Spillane | Elizabeth | 27510 | NS1 |
| Spiro | Donald | 28159 | NS1 |
| Spitzer | Max | 5777 | NS1 |
| Spiwak-Wallin | Sandra | 27866 | NS1 |
| Spung | Sandra | 27176 | NS1 |
| Spurgeon | William | 6434 | NS1 |
| St Angelo | Lynne | 1069 | NS1 |
| St. Jean | James | 28982 | NS1 |
| Stabile | Michael | 1611 | NS1 |
| Stachecki | Julie | 27292 | NS1 |
| Staehli | Richard | 5975 | CR4, NS1 |

11-RCMSER-2789

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Stanfield | Lee | 28106 | NS1, TS2, WT1, WT8 |
| Stangle | Jeanne | 27145 | NS1 |
| Stanley | Jody | 1125 | NS1 |
| Stansfield | Jack | 5460 | NS1 |
| Stansfield | Jack | 600 | NS1 |
| Starinsky | Bob | 508 | NS1 |
| Stark | Jonathon | 28200 | NS1 |
| Stasik | Daniel | 659 | NS1 |
| States | Marcia | 5401 | NS1 |
| Steadley | Ryan | 8134 | NS1 |
| Stearnes | Chase | 438 | NS1 |
| Steck | Lee | 28501 | NS1 |
| Steckman | Laura | 6696 | NS1 |
| Steele | Donna Lee | 6697 | NS1 |
| Steffen | Matthew | 6235 | NS1, NS2 |
| Stehr | Tyler | 1452 | MIT21, TS1 |
| Stein | Cletus | 27345 | NS1 |
| Stein | Janie | 138 | NS1 |
| Steitz | Jim | 28046 | CR4, NS1 |
| Steitz | Jim | 28093 | NEPA35, NEPA37, NS1, WT1, WT8 |
| Steitz | Jim | 298 | NEPA2, NEPA37, NS1, WT1 |
| Stencel | Chelsea | 8235 | NS1 |
| Stephan | Sarah | 7941 | NS2 |
| Steuter | Don | 7308 | NEPA33 |
| Steven | Erin | 28956 | NS1 |
| Stevens | Carolyn | 27661 | NS1 |
| Stevens | Dorothea | 887 | CR4, NS1 |
| Stevens | Lisa | 27078 | NS1 |
| Stevens | Raven | 27869 | CR12 |
| Stewart | Caroline | 28671 | NS1 |
| Stewart | Kathleen | 26973 | NS1 |
| Stewart | Margar Et | 6699 | NS1 |
| Stewart | Tyee | 8105 | NS1 |
| Stilt | David | 1159 | NS1, NS2 |
| Stockburger | Paul | 1170 | NS1 |
| Stocker | Andrew | 855 | NS1 |
| Stockinger | Chris | 27255 | NS1 |
| Stockwell | Douglas | 7313 | NS1 |
| Stoecker | Evan | 661 | NS1 |
| Stollings | Luke | 6387 | NS1 |

11-RCMSER-2790

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Stolp-Smith | Mike | 269 | NS1 |
| Stonas | Walter | 514 | NS1 |
| Stradiotto | Becky | 1969 | NS1 |
| Stradiotto | Ronald | 28618 | NS1 |
| Stram | Veda | 26817 | NS1 |
| Stramler | Kirstie | 27905 | NS1 |
| Strauss | Susan | 27250 | NS1 |
| Strawman | Tom | 27187 | NS1 |
| Streer Seidler | Kathryn | 1168 | NS1 |
| Stridinger | Jennifer | 26944 | NS1 |
| Strieby | Collette | 1271 | NS1 |
| Strods | Ray | 28851 | NS1 |
| Stroh | Charles | 6704 | NS1 |
| Stroud-Settles | Geoffrey | 30118 | NS1 |
| Stryker | Donald | 27131 | NS1 |
| Stuart | Todd | 366 | WT4_B |
| Stuhr | Joanne | 7300 | NS1 |
| Stumpff | Linda | 27223 | NS1 |
| Suarez | Gabriels | 915 | NS1 |
| Suen | Eric | 591 | NS1 |
| Sugden | John | 5608 | NS1 |
| Sullivan | Joan Paul and Pj | 26914 | NS1 |
| Sullivan | Mike | 29286 | NS1 |
| Sundareshan; Truebe | Brian; Priya | 1499 | NEPA3, NEPA45, NEPA6, WT4_J |
| Suorsa-Johnson | Kristina | 28675 | NS1 |
| Sussman | Max | 1089 | TS24 |
| Sutherland | Catherine | 27598 | NS1 |
| Sutinen | Matt | 5598 | NS1 |
| Sutter | Gavin | 6559 | SO6 |
| Sutton | Charles | 27192 | NS1 |
| Sutton | Russ | 6707 | NS1 |
| Svyrydenko | Vladyslav | 1250 | NS1 |
| Swain | Neal | 6022 | NS1 |
| Swain | Todd | 28590 | NS1 |
| Swartz | Deborah | 26843 | NS1 |
| Sweet | Connie | 27954 | NS1 |
| Sweet | Samuel | 26871 | NS1 |
| Switlik | Mary Margaret | 792 | NS1 |
| Szablewski | Conrad | 27387 | NS1 |
| Szumel | Leo | 6567 | NS1 |

11-RCMSER-2791

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Taber | Rebecca | 1196 | NS1, TS30, WT2 |
| Tackett | Hannah | 7997 | NS1 |
| Taenzer | Deanne | 27758 | NS1 |
| Taishoff | Lewis | 761 | NS1 |
| Takush | Kathie | 533 | NS1, WT4 |
| Talbot | Thomas | 26935 | NS1 |
| Tall | Beverly | 27878 | NS1 |
| Tallon | Marian | 916 | NS1 |
| Tanzi | Anthony | 28173 | NS1 |
| Tapiawala | Pia | 1380 | MIT24 |
| Tarango | Andrew | 96 | NS1 |
| Tarr | Ben | 27994 | NS1 |
| Tarver | Kelsie | 8247 | NS1 |
| Tate | Alan | 28946 | NS1 |
| Tatoovich | Thomas | 1130 | MIT1, NS1 |
| Taub | Audrey | 27974 | NS1 |
| Taylor | Aaron | 6496 | NS1 |
| Taylor | Dana | 348 | NS1 |
| Taylor | Gigi | 26831 | NS1 |
| Taylor | Matt | 29046 | NS1 |
| Taylor | Peter | 5897 | NS1 |
| Tchida | Celina | 1080 | NS1 |
| Tekola | Sarra | 1359 | NS1, NS2, WT4 |
| Tenijieth | Roseanna | 1131 | NS1 |
| Terry | Susan | 28101 | NS1 |
| Terwilliger | Susan | 5453 | NS1 |
| Testerman | Dolores | 1145 | NS1 |
| Tetro | Barbara | 476 | NS1 |
| Thezan | Marcie | 28111 | NS1 |
| Thias | Nancy | 99 | NS2, TS20, TS7 |
| Thomas | Jerry | 139 | NS1 |
| Thomas | Linda | 160 | CR4 |
| Thomas | Lyn | 313 | NS1, TS1 |
| Thompson | Brett | 8237 | WT7 |
| Thompson | Christen | 1995 | NS1 |
| Thompson | Hallie | 1043 | TS26, WT43 |
| Thompson | Karissa | 803 | NS1 |
| Thompson-Glaser | Nancy | 27358 | NS1 |
| Thomsen | Arina | 29125 | NS1 |
| Thomson | Barbara | 27943 | NS1 |

11-RCMSER-2792

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Thorpe | James | 1215 | NS1 |
| Thrasher | Ron | 27833 | NS1 |
| Tickle | Brian | 470 | NS1 |
| Tintle | Bob | 28002 | NEPA33, NS1 |
| Tipper | Ben | 576 | NS2 |
| Tirado | Madeline | 6056 | NS1 |
| To | Pre | 981 | NS1 |
| Tobias | Thomas | 1385 | NS1 |
| Todd | Charlene | 920 | NS1 |
| Todd | Susan | 27587 | NS1 |
| Toledo | Yovonna | 173 | NS1 |
| Toole | Thomas | 525 | NS1 |
| Tooley | Elise | 26984 | NS1 |
| Tooley | Helen | 28061 | NS1 |
| Tooley | Kristin | 27891 | NS1 |
| Torii | Tomoyuki | 5393 | NS1 |
| Torrey | Wanda | 6713 | NS1 |
| Trammell | Gail | 6003 | NS1 |
| Tran | Thanhvan | 1921 | ALT5 |
| Trappman | Suzanne | 7334 | NS1 |
| Travis | Debbie | 6718 | NS1 |
| Trent | Steven | 5885 | NS1, WT6 |
| Trezise | Megan | 255 | ALT22, NS2, TS2, WT1 |
| Triana | Richard | 7335 | NS1 |
| Trinity | Kathleen | 28066 | NS1 |
| Troll | Laura | 26862 | NS1 |
| Trump | Kathleen | 6721 | NS1 |
| Trussell | Steve | 234 | NS1 |
| Trussell | Steve | 541 | CR12, MIT33, MIT7, NS1 |
| Tsoi | Michael | 735 | NS1 |
| Tuck | Judith | 6723 | NS1 |
| Tucker | James | 6515 | NS1 |
| Tucker | William | 27675 | NS1 |
| Tuell | Cyndi | 6726 | NS1 |
| Tumbusch | Andrew | 457 | NS1 |
| Turner | Erin | 132 | CR4, NEPA37, NS1, NS2, WT4 |
| Turner | Margaret | 6728 | NS1 |
| Turner | Terry | 1045 | NS1 |
| Twyman | Matthew | 6091 | NS1 |
| Uhler | Brenda | 27209 | NS1 |

11-RCMSER-2793

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Uhls | Marshal | 991 | NS1 |
| Underwood | Asher | 1346 | NS1 |
| Underwood | Joseph | 27892 | NS1 |
| Ursitti | Kimberly | 392 | SO16, WT4 |
| Vaaler | Jim | 37 | DOC1 |
| Vaaler | Jim | 203 | SR18 |
| Valdez | Jennifer | 6733 | NS1 |
| Valdivia | Susan | 883 | ALT5, NS1, NS2 |
| Valenta | Jamison | 29444 | NS1, WT6 |
| Valentine | Jennifer | 808 | NS1 |
| Valentine | Shane | 5877 | NS1 |
| Vallieres | Jessica | 6451 | NS1 |
| Van Der Kraan | Luca | 6244 | NS1 |
| Van Dussen | Dan | 962 | NS1 |
| Van Engel | Emily | 1492 | CR4, NS1 |
| Van Exel | Les | 2124 | NS1 |
| Van Gorp | Sandra | 1107 | AMT1_J, AMT4, MIT3, NS1, NS2, TS24, WT8_A |
| Van Sciver | Hannah | 1270 | NS1 |
| Vann | Glen | 1184 | NS1 |
| Varela | Jolie | 29380 | NS1 |
| Vasquez | Luis | 16 | ALT30, AMT1_L |
| Vasvary | Kathleen | 6738 | NS1 |
| Vazquez Gomez | Patricia | 1330 | NEPA4, NS1 |
| Vela | Teri | 1013 | NS1 |
| Venezia | Justin | 28840 | NS1 |
| Ventimiglia | Nick | 6025 | NS1 |
| Vento | Jillian | 1285 | NS1 |
| Vernon | Barbara C. Holladay | 5451 | NS1 |
| Versari | Lara | 1136 | MIT3 |
| Vershay | Anton | 727 | NS1 |
| Victor Chatlin | Leopha | 159 | CR4, NS1 |
| Vierthaler | Heidi J | 27782 | NS1 |
| Villalobos | Blanca | 1331 | NS1 |
| Villegas | Joe | 62 | CR4, GS2, GS4, NS2 |
| Villegas | Joe | 63 | WT43 |
| Villodas | Abigail | 6743 | NS1 |
| Vink | Ryan | 7894 | NS1 |
| Vitols | Inesis | 6745 | NS1 |
| Voeltz | Laurie | 1283 | NS1 |
| Volz | Dale | 123 | MIT3 |

11-RCMSER-2794

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Von Ancken | Sean-Paul | 821 | NS1 |
| Von Doersten | Greg | 461 | WT4_B |
| Von Magdenko | Nadia | 29054 | NS1 |
| Votto | Nicholas | 349 | NS1 |
| Voysey | Helen | 2115 | NS1 |
| W | L | 8097 | NS1 |
| W | M | 1101 | NS1 |
| Wachtel | Jonathan | 522 | NS1 |
| Wagers | Nick | 704 | NS1 |
| Wagliardo | Nathan | 5633 | NS1 |
| Wagman | Nicole | 27838 | NS1 |
| Wagner | Betty | 190 | NS1 |
| Wagner | Norman and Dee | 27737 | NS1 |
| Wagner | Tom | 943 | MIT3, NS1, WT4 |
| Wainwright | Joel | 8082 | NS1 |
| Walbridge | John | 28583 | NS1 |
| Walden | Luke | 6519 | NS1 |
| Walker | Barbara | 1206 | CR4, NEPA33, NS1, TS30, WT25 |
| Walker | Genie | 6751 | NS1 |
| Walker | Linda | 6752 | NS1 |
| Walker | Ryan | 2044 | NS1 |
| Walker | William | 29269 | NS1 |
| Wall | Debbie | 27660 | NS1 |
| Wallace | Liz | 1064 | NS1 |
| Wallen | Rachel | 782 | NS1 |
| Walling | Robert | 6753 | NS1 |
| Walsh | Gary | 6804 | NS1 |
| Walsh | James | 202 | NEPA35 |
| Walters | Kaylin | 27164 | NS1 |
| Wang | Barb | 6807 | NS1 |
| Wang | Hannah | 469 | NS1 |
| Wannie | Evelyn | 6754 | NS1 |
| Ward | Benjamyn | 8000 | NS1, WT6 |
| Warfel | Eavan | 946 | NS1 |
| Warme | Jeanne | 28257 | NS1 |
| Warner | Benjamin | 444 | NS1 |
| Warner | Michael | 27768 | NS1 |
| Warren | Kevin | 26818 | NS1 |
| Wasker | Laura | 341 | NS1 |
| Wasp | Stephen | 506 | WT4 |

R-143

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Waters | Jerry | 11 | MIT1, TS7 |
| Waters | Osrville | 863 | GS1_A, TS17 |
| Watkins | Carol | 27101 | NS1 |
| Watkins | Tani | 27630 | NS1 |
| Watson | Ben | 1621 | MIT3 |
| Webb | Parker | 1938 | NS1 |
| Weber | Michael | 419 | NS1 |
| Webster | Betsy | 5405 | NS1 |
| Webster | Jeremy | 45 | ALT1, TS29 |
| Webster | Samuel | 956 | NS1 |
| Wehr | Rachel | 7972 | NS1 |
| Weigel | Kate | 29351 | NS1 |
| Weiner | Jeremy | 663 | NS1 |
| Weisser-Lee | Melinda | 6760 | ALT22, NS1 |
| Weisser-Lee | Melinda | 339 | ALT5, CR4 |
| Wellington | Mary | 6663 | NS1 |
| Weltner | Lucy | 26887 | MIT35 |
| Wende | Anthony | 845 | NS1 |
| Wernette | Tim | 7354 | NS1 |
| Werre | Silvia & Merlin | 294 | MIT8 |
| Wertz | Gina | 390 | NS1 |
| Wesley | Susan | 27073 | NS1 |
| West | Bret | 7356 | NS1 |
| Westerdale | John | 1279 | AMT1, GS13, TS1, TS15, TS24 |
| Wetherby | Aelwen | 30101 | NS1 |
| Whaley | James | 841 | NS1 |
| Wheatley | William | 5925 | NS1, SO6 |
| Whitaker | Gene | 27677 | NS1 |
| Whitaker | Tristan | 1004 | NS1 |
| White | Anne | 27694 | NS1 |
| White | Rich | 1243 | NS1 |
| White | Rose | 717 | NS1 |
| Whitney | Ellen | 6764 | NS1 |
| Whittington | Ashlee | 1020 | NS1 |
| Wight | Timothy | 238 | MIT1, NS1 |
| Wilburn | Andrew | 6401 | NS1 |
| Wilcox | Kenneth | 27679 | NS1 |
| Wildenhaus | James | 7948 | NS1 |
| Wildflower | Ivory Lynn | 6766 | NS1 |
| Wiley | Charles | 41 | AMT1 |

11-RCMSER-2796

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Wiley | Christopher | 560 | NS1 |
| Wiley | Dennis | 78 | AMT1 |
| Wilkin | Donovan | 27742 | NS1 |
| Willard | Mitchell | 1339 | CR4 |
| Willard | Stephanie | 1303 | NS1 |
| Williams | Karen | 28926 | NS1 |
| Williams | Kathleen | 26996 | NS1 |
| Williams | Wendy | 27921 | NS1 |
| Williamson | Alex | 29116 | ALT22 |
| Williamson | Kathleen | 27664 | NS1 |
| Williamson | Kathleen | 1108 | NS1 |
| Williamson | Kathleen | 1109 | NS1 |
| Williamson | Kelli | 6769 | NS1 |
| Willis | Fred | 773 | NS1 |
| Willliams | Ann | 27580 | NS1 |
| Wilson | Ben | 6771 | NS1 |
| Wilson | Christopher | 904 | MIT1 |
| Wilson | Darrell | 1483 | NS1 |
| Wilson | Jonny | 1820 | NS1 |
| Wilson | Julien | 276 | NS1 |
| Wilson | Robert | 7370 | NS1 |
| Wimberly | Stuart | 547 | NS1 |
| Windauer | Debora H | 7372 | NS1 |
| Windauer | Debora H | 29753 | NS2 |
| Wineman | Marian | 27204 | NS1 |
| Winner | Barbara | 28087 | NS1 |
| Winner | Thomas | 27200 | NS1 |
| Winslow | Lee | 5420 | NS1 |
| Wintz | Jason | 447 | NS1 |
| Wisniewski | Brian | 1440 | NS1 |
| Witesman | Owen | 581 | NS1 |
| Wofsy | Sheila | 27190 | NS1 |
| Wofsy | Sheila | 27191 | NS1 |
| Wolf | Ann | 828 | NS1 |
| Wolf | Miranda | 564 | NS1 |
| Wolff | Pat | 5458 | NS1 |
| Wolfswinkel | Penny | 1191 | NS1 |
| Wolterman | Jimmy | 1007 | NS1 |
| Wong | Kris | 28440 | NS1 |
| Wong | Travis | 636 | NS1 |

11-RCMSER-2797

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Wood | Jordan | 6304 | NS1 |
| Wood | Lee | 712 | NS1 |
| Woodall | Sandra | 26814 | NS1 |
| Woodbury | Michael | 1478 | NS1 |
| Woodson | Sarah | 5743 | NS1 |
| Worden | Susan | 26954 | NS1 |
| Workman | Brandon | 29155 | NS1 |
| Worthington | E.K. | 27334 | NS1 |
| Wright | Paul | 6415 | NS1 |
| Wright | Tom | 31 | NEPA25 |
| Wright | Tom | 32 | CR23, NEPA27 |
| Wright | Tom | 110 | NEPA25, NS1 |
| Wright | Tom | 239 | NS1 |
| Wright | Tom | 1422 | CR2, MIT7, NEPA3, NEPA56, NS1 |
| Wurton | Gordon | 529 | WT4 |
| Wyciskalla | Nicholas | 28391 | NS1 |
| Yahne | Ron | 454 | NS1 |
| Yancey | Robert | 772 | NS1 |
| Yankee | Michaela | 599 | NS1 |
| Yantzer | Robert | 6776 | NS1 |
| Yarbrough | Leonard | 28347 | NS1 |
| Yazzle | Chili | 30069 | NS1 |
| Yazzie | Lyle | 1502 | NS1 |
| Yensen | Roger | 7901 | NS1 |
| Yersak | Tom | 6190 | NS1 |
| Yip | Jessica | 5783 | NS1 |
| Young | Alex | 7295 | NS1 |
| Yox | Lawrence | 27972 | NS1 |
| Yubeta-Smith | Matilda | 306 | NS1 |
| Yve | Min | 226 | NS1 |
| Zache | Zach | 6777 | NS1 |
| Zadravecz | Frank | 8201 | WT4_B |
| Zak | Casey | 28131 | NS1 |
| Zamora | Julie | 744 | NS1 |
| Zampieri | Janet | 7383 | NS1 |
| Zamudio | Barbara | 671 | NS1 |
| Zane | Jeremy | 8124 | NS1 |
| Zaneski | Eddie | 29494 | NS1 |
| Zazueta | Andrew | 1027 | NS1 |
| Zeller | Thomas | 28752 | NS1 |

11-RCMSER-2798

Appendix R

| Last Name(s) | First Name(s) | Letter ID | Response-to-Comment IDs Associated with this Letter |
|---|---|---|---|
| Zeller-Av | Peyton | 6497 | NS1 |
| Zerr | Laura | 27179 | NS1 |
| Zevian | Shannin | 27807 | NS1 |
| Zhang | Wenjing | 29163 | NS1 |
| Zieber | Thomas | 1371 | AMT1 |
| Ziegler | Ann | 389 | NS1 |
| Zingg | Elizabeth | 28382 | NS1 |
| Zink | Jacqueline | 27809 | NS1 |
| Zinn | Kai | 6513 | NS1 |
| Zitzow | Kim | 1251 | NS1 |
| Zobel | Don | 6 | NS1 |
| Zobel | Don | 7 | ALT14 |
| Zobel | Don | 79 | AMT1 |
| Zobel | Don | 89 | ALT14, NS1 |
| Zobel | Don | 257 | AMT1 |
| Zsebenyi | Eric | 5937 | NS1 |
| Zurcher | Naomi | 5390 | NS1 |
| Zweig | Daniel | 28966 | NS1 |
| Zwicker | Marie Louise Morandi Long | 5428 | NS1 |

11-RCMSER-2799

Appendix R

**Table R-6. Full text of form letters submitted and index to responses**

| Form Letter ID | Full Text of Form Letter | Response-to-Comment IDs Associated with this Letter |
|---|---|---|
| F1 | I am strongly opposed to the proposed  Resolution Copper Project and Land Exchange and ask that the Forest Service not allow it to proceed as it is clearly not in the public interest. It will harm land and resources of significant spiritual and cultural value to the Apache people, severing important connections to the land and harming traditional religious practices.<br><br>In addition to the fact that this proposal would destroy these religious and spiritual values and is not in the public interest, the Draft Environmental Impact Statement (DEIS) is insufficient, incomplete, and does not reflect current conditions. The analysis of the tailings dump locations is incomplete and does not provide enough information for me to know if any of the proposed locations would be adequate for a tailings dump of such magnitude, capable of accommodating more than a billion tons of toxic waste. Several of the proposed sites were recently added and so have not had proper surveys. No cultural surveys have been completed at the Skunk Camp tailings site location, for example. Furthermore, a recent District Court ruling on the Rosemont Mine calls into question whether the Forest Service can allow tailings dumps and other facilities on public lands under the 1872 Mining Law.<br><br>It is also not clear that the proposed tailings designs in the DEIS would be legal under the U.S. Army Corps of Engineers rules. These types of tailings designs have been banned in other countries where they've failed, causing destruction and loss of life. A much more detailed and careful analysis is needed to address the disposal of billions of tons of toxic waste.<br><br>The DEIS significantly underestimates the amount of water this project would use, much less than other Arizona copper mines. It indicates it would use about 10% the amount of water other mines use, but why and how? I cannot find that information in the DEIS. Why didn't the Forest Service use a more accurate figure of 50,000-acre feet of water the mine would consume annually. The DEIS also underestimates the dewatering at Oak Flat.<br><br>The DEIS did not accurately survey, assess, and mitigate the harm to endangered and threatened species, including the Arizona hedgehog cactus, yellow-billed cuckoo, and narrow-headed garter snake.<br><br>The Forest Service must withdraw the DEIS and rewrite it to comply with the recent court decision and to provide a fuller and more accurate picture of the impacts, including the cumulative impacts.<br><br>Finally, I would like to see the Forest Service seriously consider the no action alternative, as this proposed mine is not in the public interest, will destroy a traditional cultural property and important recreational area. | ALT22, ALT5, NEPA2, NS1, TS2, WT1 |
| F2 | "I do not support this land swap and this mining operation for a multitude of reasons. Mining uses obscene amounts of water, not to mention the poisoning effect that the mining process will have on this important and sacred resource. Arizona has been experiencing a long-term drought over the last twenty-one years. More desertification brings salinization, overexploitation, and loss of biodiversity. Should we actually be dewatering the desert? Should we not be more interested in a long-term approach to land and resource management policies in an age where climate change has already modified large social patterns and mass migrations?"<br><br>"My concern lies on the destruction of the environment and the contamination of not only the groundwater and aquifers, but of the air, due to the tailings facility. It lies on the loss of biodiversity, culture, and the sacred, all of which are undeniably interconnected. It lies on providing a clean space and environment for people and distinct cultures to flourish for many more generations. We should look seven generations behind us, learn from the mistakes, and consider seven generations ahead of us, to protect the future of our relatives. This mine will be in operation for around forty years, and the future that it will leave us will be marred forever."<br><br>"Oak Flat is about water in a region of intense drought, its about contamination of land and water, its about biodiversity in a desert where populations of plant and animal life will dwindle, its about corruption, its about blatant lies, its about political subversion and coercion, its about disrespect of Indigenous people, its about a language (words and songs) that comes directly from these hills and these canyons, its about cultures who have participated in a traditional life since time immemorial, its about spirituality, its about medicine, its about origin, its about community, its about reclamation, its about conservation, its about the ephemeral as a perspective, and its about life."<br><br>"The DEIS is not complete and does not reflect current conditions. The DEIS does not include information allowing me to know if any of the alternative tailings dump locations are even acceptable for the dumping of more than a billion tons of toxic waste. Cultural surveys have not been done at the Skunk Camp tailings site location. And, a recent District Court ruling on the Rosemont mine project calls into question | ALT22, NEPA2, NS1, TS2, WT1 |

R-148

11-RCMSER-2800

Appendix R

| Form Letter ID | Full Text of Form Letter | Response-to-Comment IDs Associated with this Letter |
|---|---|---|
| | Forest Service decisions on the use of federal public land for mining facilities. Therefore, I ask you to rewrite the DEIS to correct these deficiencies and submit it for a new comment period." | |
| | "I'm concerned this project would destroy sacred land and damage public lands that are very valuable and important to all Americans. The DEIS confirms that this project would destroy the religion of Native Americans and would destroy land and waters religions depend on. This is not acceptable." | |
| | "The DEIS underestimates the amount of water this project would use. The document says that Rio Tinto would use only 10% of the water other mines in Arizona use without outlining any new methods to achieve this unrealistic goal. I would like to know why the Forest Service did not use a more accurate figure of 50,000-acre feet of water the mine would consume annually. The DEISs modeling of dewatering at Oak Flat itself is inaccurate. The DEIS fails to prevent harm to neighboring towns and landowners." | |
| | "The DEIS did not accurately survey the harm to endangered and threatened species. Arizona hedgehog cactus, yellow-billed cuckoo, and narrow-headed garter snake surveys need to be (re)done." | |
| | "All tailings dump locations listed in the DEIS are illegal in countries such as Brazil and Chile and also could not be approved by either the Arizona Department of Environmental Quality or the US Army Corps of Engineers. The DEIS needs to be withdrawn and rewritten when the US Forest Service can show that a tailings dam site could be approved under US law." | |
| F3 | We the People of the United States of America write to you today on behalf of Oak Flat, known as the sacred place Chíchʼil Biłdagoteel to the Apache people, as a site of great spiritual and ecological importance under threat from the foreign mining company Rio Tinto. The destruction of Oak Flat is a threat not only to the Apache, and to all Native people within this country, but also to the people of the United States of America as a whole. | NS1 |
| | Oak Flat is located in the Tonto National Forest in Arizona, about an hour east of Phoenix and about 45 minutes from the San Carlos Apache Reservation line. Although it used to be part of the reservation, the land was taken and put under the jurisdiction of the U.S. Forest Service during five separate reductions of the tribal land base. As part of the ancestral Apache territory, it continues to have significant religious, cultural, historical, and archaeological value to the San Carlos Apache Tribe and to other tribes in the region. | |
| | Oak Flat was traded to Resolution Copper Mining, a subsidiary of the foreign mining company Rio Tinto, through the addition of a last-minute rider to the National Defense Authorization Act in December 2014. The bill, which set the nations defense policy, was a must-pass item before the 113th session of Congress could close. Although attempts at the land exchange had been made before, using normal congressional procedures, they had been denied 13 separate times over the course of a decade. However, on page 1,103 of the approximately 1,700-page NDAA bill, Arizona state representatives added a provision exchanging over 2,400 acres of federal land, including Oak Flat, for around 5,300 acres of private land owned by Resolution Copper. The rider was revealed only minutes before midnight, in a manner that a New York Times op-ed referred to as sneakily anti-democratic even by congressional standards (Millet 2015). By being tacked onto the NDAA bill and sent to the Senate in a form that didnt allow for amending, the land exchange rider passed Congress on December 12th and was signed into law by President Obama on December 19th, 2014. This land exchange is an example of a small portion of government overriding the desires of the masses and exploiting legislative procedures to promote their own agenda. | |
| | Damage to or removal from these lands amounts to government interference in religion, an action that both violates the freedom of religion guaranteed by the First Amendment, and infringes on the American Indian Religious Freedom Act. Allowing the government to interfere with any religion sets a dangerous precedent. As Wendsler Nosie, former Chairman of the San Carlos Apache Tribe and spokesperson for Apache Stronghold, a nonprofit dedicated to the protection of sacred sites like Oak Flat, says, This is our church. They declared war on our religion. This is no different than being a Christian. How can anyone destroy a religious place that has significant meaning? | |
| | Because Oak Flat is located on U.S Forest Service land, which belongs to the American public, its transferal to a foreign corporation is not just a loss to the Apache people, but a theft from all citizens of the United States. It also disregards the will of previous Presidents, as the Tonto National Forest, including Oak Flat, was protected from mining by special order of both President Eisenhower and President Nixon, due to its cultural and environmental value. Aside from the sacred Apache ceremonies that are conducted there, Oak Flat is also a popular location for camping, rock climbing, and other recreational activities. | |

11-RCMSER-2801

Appendix R

| Form Letter ID | Full Text of Form Letter | Response-to-Comment IDs Associated with this Letter |
|---|---|---|
| | Finally, Oak Flat is as environmentally important to the human and ecological communities of Arizona as it is spiritually important to the Apache. As one of the only sites of year-round groundwater in the surrounding Sonoran Desert ecosystem, Oak Flat serves as a haven for a diverse array of species. However, the copper mine would turn this beautiful place into an industrialized mining wasteland. RCM states that it will use a method known as block cave mining to access the copper, a highly destructive and water intensive technique that involves digging underneath the ore and causing the earth to collapse under its own weight, creating a subsidence zone directly above and in the vicinity of the mine. Such a practice is projected to leave an enormous crater 2 miles wide and over 1,000 ft deep, generating up to 1.7 billion tons of waste in the process. Currently, RCM plans to dump this waste on nearby Forest Service land. The RCM General Plan of Operations states that RCM plans to put tailings behind an upstream tailings dam, the same type of dam that recently collapsed in Brazil, killing over 300 people. | |
| | Water contamination remains an issue long after copper mines have shut down. The mine would pose a threat both to water quality and to the availability of both surface and groundwater. Resolution Copper estimates that its operations would require approximately 20,000 acre-feet of water per year. Already, the amount of groundwater pumping required to drill shafts has dewatered springs in the surrounding area, springs that are vital for both local ecology and Apache ceremonies. Although RCM has promised that the economic benefits of the mine will outweigh the costs, similar promises of minings economic benefits have not been fulfilled in nearby mining towns like Superior, which has a lower median income than many of Arizonas other cities, and where nearly a fifth of the residents live in poverty. | |
| | In 2014, Carlos Apache Chairman Terry Rambler stated that Apache people have lived, prayed, and died in the Oak Flat Area since time immemorial. We are saddened that Congress, through an 11th hour rider, has ignored the will of the people. We are concerned for our children who may never see or practice their religion in their rightful place of worship. We are worried for the children of southeast Arizona who may have to find new places to live to drink clean water. And we are gravely concerned for the American voter whose voice continues to be ignored. However, the Apache people will not remain silent. We are committed to shining light on the Land Exchange and the proposed mine until we have no breath. The Save Oak Flat act has been introduced into the House of Representatives as H.R.665, and into the Senate as S.173. We ask that, regardless of partisanship or political affiliation, you take a stand on this issue and support the preservation of Oak Flat for generations yet to come. | |
| F4 | Dear Supervisor Bosworth, | ALT22, NEPA2, NS1, TS2, WT1 |
| | I am submitting comments on the Draft Environmental Impact Statement (DEIS) for the Resolution Copper Project and Land Exchange. Thank you for the opportunity to provide public comments. The DEIS is not complete and does not reflect current conditions. The DEIS does not include information allowing me to know if any of the alternative tailings dump locations are even acceptable for the dumping of more than a billion tons of toxic waste. Cultural surveys have not been done at the Skunk Camp tailings site location. And, a recent District Court ruling on the Rosemont mine project calls into question Forest Service decisions on the use of federal public land for mining facilities. Therefore, I ask you to rewrite the DEIS to correct these deficiencies and submit it for a new comment period. I'm concerned this project would destroy sacred land and damage public lands that are very valuable and important to all Americans. The DEIS confirms that this project would destroy the religion of Native Americans and would destroy land and waters religions depend on. This is not acceptable. The DEIS underestimates the amount of water this project would use. The document says that Rio Tinto would use only 10% of the water other mines in Arizona use without outlining any new methods to achieve this unrealistic goal. I would like to know why the Forest Service did not use a more accurate figure of 50,000-acre feet of water the mine would consume annually. The DEISs modeling of dewatering at Oak Flat itself is inaccurate. The DEIS fails to prevent harm to neighboring towns and landowners. The DEIS did not accurately survey the harm to endangered and threatened species. Arizona hedgehog cactus, yellow-billed cuckoo, and narrow-headed garter snake surveys need to be (re)done. All tailings dump locations listed in the DEIS are illegal in countries such as Brazil and Chile and also could not be approved by either the Arizona Department of Environmental Quality or the US Army Corps of Engineers. The DEIS needs to be withdrawn and rewritten when the US Forest Service can show that a tailings dam site could be approved under US law. Please add me to your mailing list and keep me informed about all actions regarding this action. | |
| | Sincerely, | |

11-RCMSER-2802

Appendix R

| Form Letter ID | Full Text of Form Letter | Response-to-Comment IDs Associated with this Letter |
|---|---|---|
| F5 | Under the National Environmental Policy Act, the Forest Service must analyze the impacts of a mining project and, if ultimately approved, to select the least damaging method to achieve the purpose and need of a proposed project. But in the case of the Resolution Copper Draft Environmental Impact Statement (DEIS), the Forest Service is prioritizing one of the most damaging ways to mine. The Proposed Alternative uses panel caving mining, which will destroy most of Oak Flat, hundreds of archeological sites sacred to the Apache people, and some of the best rock climbing and bouldering in Arizona. But it doesn't have to be this way. The DEIS already makes it clear that other mining methods which would preserve the surface of Oak Flat are possible. That's why the DEIS should have included an alternative that protects Oak Flat. Instead, the DEIS dismissed all other mining methods entirely, using basic analysis to suggest that any other method would be prohibitively expensive. Not only is this analysis lacking in its scope and short on details unique to Resolution Copper, but its also attempting to make a decision on whats in the best financial interest of Resolution Copper and its parent company Rio Tinto one of the largest mining companies in the world. The Forest Service should be protecting public lands to the extent possible, not making decisions consistent with the companys bottom line of maximizing profits. With a different underground mining technique that uses tailing backfilling, Oak Flat will be saved, far less water will be consumed, and the size of the tailings impoundment necessary will be a fraction of the size. All of these environmental savings and benefits can be achieved via a slightly different mining technique, yet the Forest Service has already dismissed these possibilities. Im asking you to include in the Final Environmental Impact Statement a preferred alternative that protects the surface of Oak Flat for current and future generations, reduces water consumption, and minimizes the size of the tailings impoundment needed. <br><br> Thank you, <br> Sincerely, | AMT1 |
| F6 | Thank you for the opportunity to comment on the Draft Environmental Impact Statement (DEIS) for the Resolution Copper Project and Land Exchange. I'm deeply concerned about the unacceptable damage this project would do to public lands and Apache sacred sites. I urge the Tonto National Forest to reject this proposal to destroy thousands of acres with a vast block cave mine. The proposed land exchange involves trading away a very popular recreation area that was specifically withdrawn from mining to protect the surpassing cultural and recreational value of Oak Flat. The DEIS fails to either adequately assess the value of the lands to be traded away or weigh the possibility that the proposal could facilitate severe damage to other important nearby lands, such as Apache Leap. Allowing these places to be taken out of public hands and destroyed in exchange for scattered land parcels of marginal value is a bad deal for the U.S. taxpayer. <br><br> The DEIS also fails to adequately analyze the alternatives for disposing the billions of tons of toxic waste rock that will be excavated from the mine. New alternatives have recently been added to the mix that have not been thoroughly vetted in terms of their suitability as tailings sites, impacts to cultural resources, or the related damage that will be done to public and/or state lands. Absent a more thorough analysis of this critically important aspect of the mine proposal, the issuance of the DEIS is premature and fatally flawed. Moreover, it's not clear that the proposed tailings designs would even be legal under rules administered by the U.S. Army Corps of Engineers and Arizona Department of Environmental Quality. These types of tailings designs have already been banned in other countries where they've dramatically failed, causing catastrophic destruction and loss of life. Much more careful analysis is needed to address the issue of tailings and none of the tailings alternatives should be approved as proposed. The DEIS also falls short in its analysis of water use and hydrology. Estimates of the mine's water use by the mining company are vastly understated, yet accepted as fact without independent analysis. The assertion that this mine would use only 10 percent of the water that other Arizona copper mines use simply defies belief. The company's hydrological analysis has been proven to be filled with grave errors and false assumptions to this point, which destroys the credibility of their estimates and undermines the analysis of water issues in the DEIS. <br><br> Dewatering the mine at Oak Flat is quite likely to cause undue harm to the regional aquifer and nearby Ga'an Canyon, another sacred site and a critically important resource for the area's wildlife. Water taken from other locations for use by the mine is likely to harm the regional aquifer and local communities and landowners who depend on it. More work needs to be done to assess impacts to wildlife and protected species in the area, including but not limited to the Arizona hedgehog cactus, yellow-billed cuckoo and narrow-headed garter snake. The potential dewatering of Ga'an Canyon in particular could have a devastating impact on the area's web of life. Lastly, as the recent federal district court ruling against the proposed Rosemont Mine clearly establishes, for decades the U.S. Forest Service has been "misinterpreting" the General Mining Law of 1872 and "misleading the public" about the rights it conveys upon mining interests operating | ALT22, NEPA2, NEPA33, NS1, TS2, WT1, WT8 |

R-151

11-RCMSER-2803

Appendix R

| Form Letter ID | Full Text of Form Letter | Response-to-Comment IDs Associated with this Letter |
|---|---|---|
| | on public lands. It's not e given that the Tonto National Forest has no right to reject this mine on public lands, as the Service has claimed for so many years. It's time to begin looking at such mining proposals through a new lens, which includes elevating the value end protection of public lands and sacred sites above the imperative of company profits. Thank you again for the opportunity to comment, and please add me to the Resolution Copper EIS contact list. | |
| | Thank you for the opportunity to comment on the Resolution Copper Project and Land Exchange DEIS. | |
| | I'm deeply concerned about the unacceptable damage this project would do to Apache sacred sites and public lands. I urge the Tonto NF to reject this proposal. The proposed land exchange would trade away Apache sacred sites and a very popular recreation area that have specifically withdrawn from mining to protect their surpassing cultural and recreational values. | |
| | The DEIS also fails to adequately analyze the tailings alternatives, some of which have only recently been added and not thoroughly vetted for suitability, impacts to cultural resources, or potential damage to public and/or state lands. | |
| | Much more careful analysis is needed to address the disposal of billions of tons of toxic waste  none of the tailings alternatives should be approved as proposed.  Resolution Copper's estimates of the mine's water use are likely vastly understated, yet accepted es fact without independent analysis, despite grave errors and false assumptions evident in the company's previous hydrological analysis. It defies belief that this mine would use only 10 percent of the water that other Arizona copper mines use. Dewatering the mine et Oak Flat is likely to harm the regional aquifer and nearby Ga'an Canyon, another sacred site and a critically important resource for wildlife. Water imported to the mine is likely to harm the regional aquifer and the local communities and landowners who depend on it. The Tonto NF should conduct a comprehensive, independent analysis of the mine's water use and potential hydrological impacts to ground and surface water in all affected areas. | |
| | A federal court ruled recently that the U.S. Forest Service has been "misinterpreting" tha General Mining Law of 1872 and "misleading the public" about the rights it conveys re: mining on forest lands. The Tonto NF should consider this mining proposal through a new lens, which includes elevating the value and protection of public lands end sacred sites above the imperative of company profits.  Please add me to the Resolution Copper EIS contact list. | |
| | Sincerely, | |
| F7 | Dear Supervisor Boswmth, | CR1, CR4, NS1 |
| | I am submitting comments on the Draft Environmental Impact Statement (DEIS) for the Resolution Copper Project and Land Exchange. Thank you for the opportunity to provide public comments. | |
| | The DEIS is flawed and incomplete. | |
| | The section that discusses Tribel Values and Concerns demonstrates e failure of the U.S. Forest Service to do adequate consultation with affected Tribes. The proposed mine would directly, adversely, and permanently effect numerous cultural artifacts; sacred seeps and springs; traditional ceremonial areas; resource gathering localities; burial locations; and other places and experiences of high spiritual and other value to tribal members. | |
| | The DEIS fails to address the impact to current religious practice. It fails to address the extent of the environmental devastation end the irreparable generetional harm thet will be caused to not only current but to future generations. | |
| | The mine would ceuse permanent loss of a place with enormous religious and cultural reverence. The lack of reference in the DEIS to the archeological and cultural records held by the San Carlos Apache Tribe, Yavapei people, Aravaipa, and other Indigenous peoples of these ties in the DEIS is inadequate. | |
| | Native Americans and others who hold the land as sacred end use the area for spiritual, traditional, end religious uses will be irreparably harmed and spiritually traumatized. This is not acceptable, end it is discriminatory. | |
| | I support the Tribes and congressional Leaders, Rep. Raul Grijalva, Senator Bemie Sanders and all cosponsors in requesting a hearing be held by the appropriate Congressional committees to hear this evidence of the impact to a Holy end Sacred site before the land transfer is able to move forward. | |

11-RCMSER-2804

Appendix R

| Form Letter ID | Full Text of Form Letter | Response-to-Comment IDs Associated with this Letter |
|---|---|---|
| | Sincerely, | |
| | Please add me to your mailing list and keep me informed about all actions regarding this action. | |
| F8 | Tonto National Forest, | NS1 |
| | I stand with the San Carlos Apache tribe in pledging support for Oak Flat. | |
| | Oak Flat in central Arizona is sacred land to the San Carlos Apache Tribe, but Congress traded it away to facilitate a huge copper mine for international mining giant Rio Tinto. The mine will destroy Oak Flat, leave behind a massive crater, and wipe out streams, springs, and wildlife. | |
| | What's happening at Oak Flat is part of a history of cultural and spiritual abuses against native people. It needs to end now. | |
| | I support bills introduced by Representative Raul Grijalva (H.R. 665) and Senator Bernie Sanders (S. 173) to repeal the provision that gave away Oak Flat. This land needs to be protected from mining and returned to the sacred site its bean for thousands of years. | |
| | Signed, | |
| F9 | TO WHOM IT MAY CONCERN: | NS1 |
| | This letter serves as my opposition to the Southeastern Arizona Land Exchange which allows a foreign mining company BHP-Rio Tinto-Resolution Copper Company to destroy and desecrate holy and sacred ceremonial sites at Chi'Chil'Bilda'Goteel (Oak Flat) to build a mine that will also destroy our water and cause cancerous pollution. I am a member of the San Carlos Apache Tribe. | |
| | We humbly ask that Section 3003 of the National Defense Authorization Act now P.L. 113-291 be rescinded immediately. | |
| | Respectfully, | |
| F10 | Dear Neil Bosworth, | ALT22, NS1, WT4, WT6 |
| | This mining plan calls for the largest destruction of recreational climbing resources in the history of American's public lands. It is impossible to mitigate this loss and the impacts to the local economy and health and well-being of local residents who recreate at Oak Flat. This mining plan calls for the largest destruction of recreational climbing resources in the history of American's public lands. It is impossible to mitigate this loss and the impacts to the local economy and health and well-being of local residents who recreate at Oak Flat. This proposed mine will destroy the Chi'chil Bildagoteel Historic District at Oak Flat, which was placed on the National Register of Historic Places for its cultural and religious significance to the San Carlos Apache tribe. The massive consumption of water needed to run this proposed mine will cripple local communities and agricultural businesses who are already suffering a severe drought period with more Colorado River water restrictions coming soon. The widespread dewatering this mine will cause, due to groundwater pumping in Pinal County, is unacceptable. This draft EIS is incomplete. The USFS has not conducted a geotechnical study or cultural resource survey for the tailings site that is the USFS's preferred alternative. This draft EIS is based on incorrect information. The hydrology study done by Resolution Copper was flawed, as it failed to identify the large source of 180 F water that stopped construction. The USFS should have completed an independent study in order to properly understand the hydrology in the Oak Flat area. | |
| | Thank you, | |
| | Additional comments to F10: | |
| | additionally the massive consumption of water needed to run this proposed mine will cripple local communities and agricultural businesses who are already suffering a severe drought period with more colorado river water restrictions coming soon. | |
| | additionally this draft eis is based on incorrect information. | |
| | additionally this mining plan calls for the largest destruction of recreational climbing resources in the history of americans public lands. | |
| | additionally this proposed mine will destroy the chichil bildagoteel historic district at oak flat which was placed on the national register of historic places for its cultural and religious significance to the san carlos apache tribe. | |

R-153

Appendix R

| Form Letter ID | Full Text of Form Letter | Response-to-Comment IDs Associated with this Letter |
|---|---|---|
| | also the massive consumption of water needed to run this proposed mine will cripple local communities and agricultural businesses who are already suffering a severe drought period with more colorado river water restrictions coming soon. | |
| | also this proposed mine will destroy the chichil bildagoteel historic district at oak flat which was placed on the national register of historic places for its cultural and religious significance to the san carlos apache tribe. | |
| | finally this draft eis is incomplete. | |
| | finally this mining plan calls for the largest destruction of recreational climbing resources in the history of americans public lands. | |
| | furthermore the massive consumption of water needed to run this proposed mine will cripple local communities and agricultural businesses who are already suffering a severe drought period with more colorado river water restrictions coming soon. | |
| | furthermore this draft eis is based on incorrect information. | |
| | furthermore this draft eis is incomplete. | |
| | furthermore this mining plan calls for the largest destruction of recreational climbing resources in the history of americans public lands. | |
| | furthermore this proposed mine will destroy the chichil bildagoteel historic district at oak flat which was placed on the national register of historic places for its cultural and religious significance to the san carlos apache tribe. | |
| | in addition the massive consumption of water needed to run this proposed mine will cripple local communities and agricultural businesses who are already suffering a severe drought period with more colorado river water restrictions coming soon. | |
| | in addition this proposed mine will destroy the chichil bildagoteel historic district at oak flat which was placed on the national register of historic places for its cultural and religious significance to the san carlos apache tribe. | |
| | it is impossible to mitigate this loss and the impacts to the local economy and health and wellbeing of local residents who recreate at oak flat. | |
| | please reconsider. | |
| | thank you. | |
| | thank you for your consideration. | |
| | thank you for your time. | |
| | the draft eis is incomplete. | |
| | the massive consumption of water needed to run this proposed mine will cripple local communities and agricultural businesses who are already suffering a severe drought period with more colorado river water restrictions coming soon. | |
| | the massive consumption of water needed to run this proposed mine will cripple local communities and agricultural businesses who are already suffering a severe drought period with more colorado river water restrictions coming soon. | |
| | the usfs has not conducted a geotechnical study or cultural resource survey for the tailings site that is the usfss preferred alternative. | |
| | this draft eis is incomplete and based on incorrect information. | |
| | this mining plan also calls for the largest destruction of recreational climbing resources in the history of americans public lands. | |
| | this proposed mine will also destroy the chichil bildagoteel historic district at oak flat which was placed on the national register of historic places for its cultural and religious significance to the san carlos apache tribe. | |
| | this proposed mine will destroy the chichil bildagoteel historic district at oak flat which was placed on the national register of historic places for its cultural and religious significance to the san carlos apache tribe. | |

R-154

Appendix R

# Section 3. Responses to Comments

11-RCMSER-2807

R-156

*This page intentionally left blank.*

Appendix R

Appendix R

| Comment response: ALT1 Application of filtered tailings to all alternatives; movement of filter plant | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1097-12, 1158-11, 1158-17, 1308-4, 1360-7, 1392-7, 14-2, 205-1, 261-14, 320-8, 45-2, 524-21, 555-29

These comments ask that alternative components presented for one alternative in the DEIS be applied to other alternatives as well. The comments focus primarily on including filtered tailings in the Skunk Camp alternative (or in all alternatives) and ask that the filter plant be located either near Superior or away from the San Tan Valley for the Skunk Camp alternative.

Forest Service NEPA regulations require that an EIS develop a reasonable range of alternatives that sharply define the issues and provide a clear basis for the decision-maker's choice among available options. An alternative should meet the purpose and need and address one or more significant issues related to the proposed action (36 Code of Federal Regulations (CFR) 220.5(e)). In making a decision under NEPA, the responsible official shall consider the alternatives analyzed in environmental documents; and then render a decision within the range of alternatives analyzed in the environmental documents (36 CFR 220.4(c)).

In addition to the required no action alternative, the DEIS presented five action alternatives. Alternative 2 is the proposed action and consists of the General Plan of Operations (GPO) that was submitted to the Forest Service by the proponent. Action alternative components, including use of filtered tailings (Alternative 4) and the relocated filter plant (Alternative 4), were identified to define or respond to specific issues. The reasons for developing each action alternative are described in the DEIS (p. 75, 81, 88, and 94).

In making the final decision, the Forest Service responsible official may mix and match components or elements of alternatives from the FEIS as long as the modifications are "encompassed within the range of alternatives analyzed" in the FEIS. Thus, the decision documented in the record of decision (ROD) can pick and choose between actions, activities, and facilities presented in the action alternatives in forming a Selected Action and the filtered tailings technology could be applied to alternative tailings sites.

As part of permitting under Section 404 of the Clean Water Act, the feasibility of applying filtered tailings to Alternative 6 was investigated (KCB Consultants Ltd. 2020f). Information was also developed concerning the movement of the filter plant to the West Plant Site (Peacey 2020a).

Since most of these comments focused on the Skunk Camp alternative (preferred alternative), it is important to note that, if Skunk Camp is ultimately picked to be the Selected Action, only those actions, activities, and facilities on NFS lands will be authorized by the ROD. The tailings facilities and plant site locations are on State and/or private lands. As stated in the DEIS, "Selection of this alternative by the Forest Supervisor would not automatically approve this alternative, since the other areas are not Federal land. Obtaining access to use ASLD-administered trust land and private land is the responsibility of the applicant" (DEIS, p. 94). The Forest Service ROD would authorize activities on NFS lands that are consistent with the Skunk Camp alternative as presented in the ROD, and the EIS analysis of various tailings methods would be available for consideration by the proponent and appropriate regulatory authorities in the permitting process.

Further assessment of whether the DEIS analysis would support application of filtered tailings to other alternatives is contained in Newell and Garrett (2018d), "Process Memorandum to File Water Resource Analysis: Assumptions, Methodology Used, Relevant Regulations, Laws, and Guidance, and Key Documents."

11-RCMSER-2809

Appendix R

| **Comment response: ALT2**<br>Reasons for choosing Alternative 6 – Skunk Camp | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1188-3, 29-1 | |

This comment questions why Alternative 6 – Skunk Camp was chosen as the preferred alternative. The primary purpose of the DEIS is to disclose impacts anticipated from all alternatives. Identifying a preferred alternative in the DEIS is desirable in order to give the public as much clarity as possible into the decision the Forest Service is inclined to make. However, identification of a preferred alternative in the DEIS is not required and does not represent a decision by the Forest Supervisor.

The actual decision by the Forest Supervisor is known as the selected action and will be identified in the ROD. The ROD will contain the rationale for why the selected action was chosen, with the Forest Supervisor weighing the advantages and disadvantages.

| **Comment response: ALT3**<br>Other alternatives to consider | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1301-23 | |

Alternative mining methods were fully evaluated as part of the alternatives analysis and as part of responding to comments (DEIS, p. 29, and appendix F, pp. F1–F4). See also response AMT1.

Alternatives with substantially different water use were evaluated in the DEIS, with Alternative 4 using 30 percent of the water required for Alternative 2 (DEIS, p. 31, p. 336, appendix H).

Alternative tailings locations were evaluated, with four separate physical locations considered between the different action alternatives (Near West, Silver King, Peg Leg, Skunk Camp). Development of the Peg Leg and Skunk Camp alternatives was driven, in part, by the desire to minimize the population near the tailings storage facility (DEIS, pp. 88, 94).

| **Comment response: ALT4**<br>Variations of land exchange | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1301-25 | |

This comment questions the amount of land included in the land exchange at Oak Flat (the Federal parcel) and suggests a modified acreage. The proposed land exchange, including the specific selected and offered lands, was mandated by Congress in Public Law (PL) 113-291 (the Carl Levin and Howard P. 'Buck' McKeon National Defense Authorization Act for Fiscal Year 2015, called the NDAA in the DEIS). The Forest Service is analyzing the impacts resulting from the land exchange as required in PL 113-291. However, the Forest Supervisor has no discretion or decision authority regarding the implementation of the land exchange (DEIS, pp. 13–14). Also see response NEPA35.

| **Comment response: ALT5**<br>Selection of no action alternative | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1083-2, 1086-4, 1091-4, 1150-4, 1155-3, 1207-3, 1329-2, 1329-6, 1338-1, 1344-1, 1404-1, 1455-7, 1477-5, 151-1, 1540-12, 1921-1, 30064-1, 339-1, 497-4, 504-3, 509-3, 568-2, 8032-25, 883-3, 921-1, 922-2, 926-1, 951-1, F1-10 | |

These comments question whether the no action alternative was considered in the DEIS.

The no action alternative forms a benchmark against which action alternatives are compared. The no action alternative was appropriately included throughout the DEIS. The proposed action and offered lands are described in chapter 2 (DEIS, pp. 65–66). Impacts resulting from the no action alternative are disclosed in each resource section of chapter 3.

A separate question is whether the Forest Service has the authority to select the no action alternative. The answer to this question may vary by alternative and the regulations under which mine-related actions are approved. We have added further discussion to chapter 1 of the FEIS. See response NEPA18 for more details.

11-RCMSER-2810

Appendix R

| **Comment response:** ALT6<br>Dewatering impacts | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>158-3 | |
| The impacts resulting from the dewatering required to construct and operate the mine are fully disclosed in section 3.7.1 (DEIS, pp. 295–345). | |

| **Comment response:** ALT8<br>Truncated NEPA process | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1235-1, 1454-1, 8031-3, 8031-5 | |
| These comments express concern that the NEPA process related to the land exchange is truncated by the time frames included by Congress in PL 113-291, including (1) forgoing the objection process, (2) the objection resolution process, and (3) the ROD.<br><br>PL 113-291 specifies, "Not later than 60 days after the date of publication of the final environmental impact statement, the Secretary shall convey all right, title, and interest of the United States in and to the Federal land to Resolution Copper."<br><br>The statutory language supersedes Forest Service regulations and policies with respect to the land exchange.<br><br>The Forest Service is undertaking the analysis of the impacts resulting from the land exchange as required in PL 113-291, but the Forest Supervisor has no discretion or decision authority regarding the implementation of the land exchange (DEIS, pp. 13–14). Also see response NEPA35.<br><br>Components of the ROD apart from the land exchange will processed under applicable Forest Service regulations, including a draft ROD and opportunity for objection. | |

| **Comment response:** ALT9<br>Inadequate disclosure of alternatives | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>8031-23 | |
| This comment identifies perceived inadequacies in the development and analysis of alternatives.<br><br>The comment indicates that reasons for elimination of alternatives from detailed study was not disclosed. This is an incorrect statement. Appendix F of the DEIS contains substantial information on alternatives considered but eliminated from detailed study. Further information related to the alternatives development process is found in the "Resolution Copper Project and Land Exchange Environmental Impact Statement Alternatives Evaluation Report" (Alternatives Evaluation Report) (SWCA Environmental Consultants 2017a).<br><br>The comment indicates that alternatives were not considered in detail so that reviewers may evaluate their comparative merits. This is an incorrect statement. In addition to the disclosure of impacts in each resource section in chapter 3, the comparison of all alternatives, organized by issues and sub-issues, is consolidated in appendix E of the DEIS.<br><br>The comment indicates that reasonable alternatives not within the jurisdiction of the lead agency were not considered. This is an incorrect statement. Alternatives considered within the DEIS that are not within the jurisdiction of the Forest Service include Alternative 5 (Peg Leg location, involving Bureau of Land Management (BLM) land and Arizona State Trust land), and Alternative 6 (Skunk Camp location, involving private land and Arizona State Trust land). Further alternatives not within the jurisdiction of the Forest Service that were considered but eliminated from detailed analysis include disposal of tailings in privately owned mine pits and brownfield locations, and alternative mining techniques.<br><br>The comment indicates that the no action alternative was "dismissed nearly outright in the DEIS." This is an incorrect statement. The no action was considered thoroughly for all resources. See response NEPA18.<br><br>The comment indicates that discussion of mitigation measures is inadequate. Mitigation measures were included in appendix J of the DEIS and analyzed for effectiveness under each resource in chapter 3 of the DEIS. Development of mitigation measures has continued in response to public comments and ongoing regulatory requirements. The full suite of mitigation measures is included in the FEIS (appendix J). | |

11-RCMSER-2811

Appendix R

| Comment response: ALT11 Mining at other locations | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 8032-7 | |

This comment indicates that the DEIS should have examined reopening the San Manuel mine instead of mining the Resolution ore deposit as proposed.

Forest Service NEPA regulations indicate the following: "The EIS shall document the examination of reasonable alternatives to the proposed action. An alternative should meet the purpose and need and address one or more significant issues related to the proposed action" (36 CFR 220.5(e). The purpose and need is disclosed in chapter 1 (DEIS, pp. 6–8).

The Forest Service is responding to a proposed mine plan for mining the Resolution ore deposit and to Federal legislation directing completion of a land exchange for specific lands. Mining a different deposit, in a different location, owned by a different entity, does not meet the purpose of and need for this project. We added a discussion of this alternative to appendix F of the FEIS.

| Comment response: ALT12 Backfill of old pits | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 1188-27, 1301-26 | |

This comment suggests alternatives placing tailings in old mine pits, as well as moving the tailings to unpopulated areas.

The Forest Service considered placing tailings in old mine pits as well as other brownfields sites in the alternatives analysis but eliminated this idea from detailed analysis in the DEIS (DEIS, appendix F, pp. F4–F6).

Alternative tailings locations also were evaluated, with four separate physical locations considered among the action alternatives (Near West, Silver King, Peg Leg, Skunk Camp). Development of the Peg Leg and Skunk Camp alternatives were driven in part by the desire to minimize locating the tailings storage facility near populated areas (DEIS, pp. 88, 94).

11-RCMSER-2812

Appendix R

| Comment response: ALT13<br>Backfill of old pits combined with dry-stack tailings | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>320-9 | |
| This comment suggests alternatives placing tailings in old mine pits and suggests that this possibility could be revisited with dry-stack tailings.<br><br>The Forest Service considered placing tailings in old mine pits as well as other brownfields sites in the alternatives analysis but eliminated this idea from detailed analysis in the DEIS (DEIS, appendix F, pp. F4–F6).<br><br>The Forest Service also considered dry-stack tailings in the alternatives analysis and carried this consideration forward as part of Alternative 4 – Silver King. See response ALT1 for discussion of dry-stack tailings and the potential application to other alternatives.<br><br>The suggestion to revisit mine pits or brownfields, using dry-stack tailings is valid. However, it appears that the use of dry-stack tailings would not overcome the reasons for which old mine pits were dismissed. As discussed in the Alternatives Evaluation Report (SWCA Environmental Consultants 2017a), several sites (Ajo, Green Valley) were considered unreasonable because of distance; this factor would not change considering filtered tailings. Several sites (Copper Queen, Pinto Valley, Ray, Twin Buttes, Johnson Camp) were unavailable because of ongoing operations; this factor would not change considering filtered tailings. One group of sites (Miami) was unavailable because it is part of the Pinal Creek Water Quality Assurance Revolving Fund (State Superfund); this factor would not change considering filtered tailings.<br><br>Four locations were found to have inadequate capacity (Casa Grande, Copperstone, Tohono Cyprus, and United Verde). The tonnage of tailings material—1.37 billion tons—does not change with dry-stack tailings (DEIS, p. 48). The volume would differ somewhat when transported and placed due to the change in water content (DEIS, p. 50). After placement, water partially drains from tailings with filtered and slurry tailings become more similar over time. Regardless of variations related to water content, the combined volume of all four mine pits mentioned (167 million cubic yards) represents less than 13 percent of the volume of tailings to be disposed (1.3 billion cubic yards) (SWCA Environmental Consultants 2017a). Capacity limitations would not change substantially when considering filtered tailings instead of slurry tailings.<br><br>Two locations were found to have concerns with water quality (Carlota, San Manuel). The DEIS analysis identified that filtered tailings have substantial water quality concerns (DEIS, pp. 402–403). Water quality concerns at the Carlota and San Manuel locations would not change substantially when considering filtered tailings instead of slurry tailings. |

| Comment response: ALT14<br>Backfill of subsidence crater | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>7-1, 89-1 | |
| These comments suggest the placement of tailings in the subsidence crater that will occur on Oak Flat.<br><br>This alternative was considered during the alternatives development process and dismissed, as disclosed in the DEIS (DEIS, appendix F, p. F-4). |

11-RCMSER-2813

Appendix R

| Comment response: ALT15 Alternative mining and disposal techniques | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1322-10

During scoping, many comments were received indicating that selection of an alternative mining method would prevent the subsidence crater and protect the surface of Oak Flat, as suggested by the comment. Alternative mining methods were fully evaluated as part of the alternatives analysis and as part of responding to comments (DEIS, p. 29; and appendix F, pp. F1–F4). Ultimately, these techniques were considered but dismissed from detailed analysis for multiple reasons. See also response AMT1.

Alternatives with substantially different water use also were evaluated in the DEIS, as suggested by the comment, with Alternative 4 using 30 percent of the water required for Alternative 2 (DEIS, p. 31, p. 336, appendix H).

Multiple tailings disposal techniques, facility types, and tailings disposal locations were evaluated in the DEIS, resulting in a range in the acreage of the tailings impoundment, as suggested by the comment. Alternatives 2 and 3 require only 40 percent of the acreage of Alternative 5. This is based on the acreage within the fence line and includes pipeline corridors.

| Comment response: ALT16 Lining and water treatment | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
27045-1, 29-2

These comments are related to the use of liners and water treatment for the tailings storage facilities. The concept of lining the tailings storage facility was raised during scoping and played a role throughout the alternatives development process (SWCA Environmental Consultants 2017a). During this time, the concept expanded from artificial geomembrane liners to incorporate other types of low-permeability layers that would have identical functions. For the alternatives that appear in the DEIS, a wide variety of seepage-control techniques was analyzed, including the use of artificial geomembrane liners. Details are described for each alternative in chapter 2 (DEIS, pp. 47–98) and in section 3.7.2 (DEIS, pp. 381–419). More discussion on the evolution of the liner concept is contained in Newell and Garrett (2018d).

The comment notes that Alternative 4 –Silver King should be lined. Alternative 4 – Silver King is the sole alternative that does not incorporate some manner of low-permeability layer in the design. Lining Alternative 4 was specifically considered but was not feasible (see Newell and Garrett (2018d) and Klohn Crippen Berger Ltd. (2019b)).

One comment suggests the recovery of pregnant leach solution from the tailings for a duration of 100 years. This is an incorrect concept. The seepage from the tailings storage facility is not pregnant leach solution, as might be collected from a heap leach pad.

Collection of seepage would occur as long as needed to be acceptable for release to the environment without treatment, during both operations and closure; this time frame differs by alternative, as described in section 3.7.2 (DEIS, pp. 381–419).

Appendix R

| Comment response: ALT19 Pipeline relocation | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:** 30081-10 | |

The Forest Service considered multiple tailings slurry pipeline alternatives in the DEIS for Alternatives 5 and 6. These pipeline routes have been modified in several ways between the DEIS and FEIS.

First, the Alternative 5 – West pipeline option and Alternative 6 – South pipeline option were both dropped from consideration in the FEIS. This choice was made after review of public comments and identification of which routes appeared to have greater resource impacts. A discussion of this change was added to chapter 2 of the FEIS.

Second, the Alternative 6 – North pipeline option was modified, in part based on the issues raised in this comment. The rerouted pipeline considered in the FEIS now substantially avoids perennial water and critical habitat along Mineral Creek entirely, except for a trenchless underground crossing upstream of Government Springs Ranch. The modified pipeline now crosses Devil's Canyon at a non-perennial location using an overhead span and reduces the amount of the pipeline corridor that occurs on Arizona State Trust land. A discussion of this change was added to chapter 2 of the FEIS.

| Comment response: ALT21 Power-related alternatives | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:** 8032-302, 8032-65 | |

Power for the proposed project is to be supplied by the Salt River Project (SRP). These comments, as well as comments received during scoping, suggest that alternative methods of energy production should have been considered as alternatives in the NEPA process.

The Resolution Copper Project falls within the electric service area of the SRP utility company. Under Arizona law, electric service within a service area is provided by a single entity; other service providers cannot readily enter into that area (Arizona Revised Statutes 9-516A). For this reason, the Tonto National Forest considers changes to power supply to be beyond the scope of this analysis.

However, the Tonto National Forest did assess power generation as part of the NEPA process. In response to public comments, the Tonto National Forest evaluated the overall power demands of the project to ensure proper disclosure of power demands (DEIS, p. 56; see also Garrett (2019c), "Process Memorandum to File Power Requirements"). This disclosure was updated in chapter 2 of the FEIS based on additional analysis conducted by SRP (1898 and Company 2020). See response WT24 for more detail.

As for reducing power use or using renewable energy, the Tonto National Forest pursued this as possible mitigation. An additional mitigation measure from Resolution Copper Mining LLC (Resolution Copper) committing to the use of renewable energy is discussed in appendix J of the FEIS (mitigation measure RC-AQ-01).

11-RCMSER-2815

Appendix R

| Comment response: ALT22<br>Skunk Camp information | Page 1 of 2 |
|---|---|

**Responsive to these comments:**
1091-2, 1092-1, 1158-24, 1188-2, 1235-9, 1322-3, 1338-7, 1383-2, 1441-10, 1441-4, 1441-9, 1454-15, 1474-3, 1501-2, 15-1, 1544-11, 24-1, 255-3, 259-1, 27725-3, 286-2, 28905-1, 28961-1, 29116-1, 30125-1, 356-4, 40-2, 452-3, 474-1, 504-2, 52-1, 524-1, 53-2, 5699-1, 5747-1, 5760-3, 579-1, 5972-2, 608-1, 615-2, 6419-1, 6436-1, 66-2, 67-1, 6760-2, 742-1, 747-2, 8002-1, 8030-12, 8030-13, 8030-9, 8032-11, 8032-246, 8032-247, 871-1, F10-3, F1-3, F2-2, F4-1, F6-3

Numerous comments indicate that key information was missing from the DEIS for the preferred alternative (Alternative 6 – Skunk Camp). Many comments point specifically to the lack of geotechnical information and cultural resource information.

It is incorrect that cultural resource information was not available for the preferred alternative. The DEIS notes that while written cultural resource reports were not yet completed for Alternatives 5 and 6, preliminary survey data for the completed areas were available and formed the basis for the DEIS analysis (DEIS, p. 627). Ninety-six percent of the Skunk Camp alternative area was surveyed for cultural resources (DEIS, p. 635). All remaining surveys intended to be conducted have been completed for the FEIS.

Similarly, the same level of geotechnical information was available for Alternative 6 as for Alternatives 4 and 5. Alternatives 2 and 3 are located at the Near West location, which was the subject of intense investigation by Resolution Copper under an earlier, separate GPO. Therefore, additional geotechnical information was available for these locations.

For the EIS, the approach used when dealing with incomplete or uncertain information related to a reasonably foreseeable significant adverse effect was to make clear that such information is lacking. Obtaining that information is only considered if it is essential to a reasoned choice between alternatives and it is feasible to obtain. In this case, while detailed geotechnical information is critical to the eventual building of a tailings storage facility, it is not a key factor in making a reasoned choice among alternatives. In each case, sufficient geotechnical information was available to provide an initial design for the tailings storage facility (Golder Associates Inc. 2018a; Klohn Crippen Berger Ltd. 2018a, 2018b, 2018c, 2018d). The information in hand and disclosed in the DEIS was sufficient to understand the distinctions between the facilities. The effect of this potential uncertainty on decision making is directly discussed for one of the analyses most crucial for differentiating among alternatives, the seepage modeling (DEIS, pp. 354–357).

Other comments identify the lack of information on seeps and springs for the preferred alternative. This is an incorrect statement. This information was known (see Fleming, Shelley, et al. (2018)) and referenced in section 3.7.1 (DEIS, p. 339).

Comments identify the lack of seismic information for the preferred alternative. This is an incorrect statement. Regional seismic activity was fully analyzed in the section 3.2 (DEIS, pp. 144–145). The presence of faults within the footprint of the tailings storage facility was known (see Fleming, Shelley, et al. (2018:3 and figure 3)), and was referenced in the DEIS as part of foundation considerations (DEIS, p. 144).

Appendix R

| Comment response: ALT22 | |
|---|---|
| Skunk Camp information | Page 2 of 2 |

**Responsive to these comments:**
1091-2, 1092-1, 1158-24, 1188-2, 1235-9, 1322-3, 1338-7, 1383-2, 1441-10, 1441-4, 1441-9, 1454-15, 1474-3, 1501-2, 15-1, 1544-11, 24-1, 255-3, 259-1, 27725-3, 286-2, 28905-1, 28961-1, 29116-1, 30125-1, 356-4, 40-2, 452-3, 474-1, 504-2, 52-1, 524-1, 53-2, 5699-1, 5747-1, 5760-3, 579-1, 5972-2, 608-1, 615-2, 6419-1, 6436-1, 66-2, 67-1, 6760-2, 742-1, 747-2, 8002-1, 8030-12, 8030-13, 8030-9, 8032-11, 8032-246, 8032-247, 871-1, F10-3, F1-3, F2-2, F4-1, F6-3

We identified the Skunk Camp location as the preferred alternative and required a number of mitigation measures in the DEIS to ensure that additional information was collected prior to the FEIS to inform site-specific reclamation and closure plans (required as mitigation measure FS-226, DEIS appendix J, p. J-7), and a site-specific failure modes and effects analysis (FMEA) and refined breach analysis (required as mitigation measures FS-227 and FS-229, DEIS appendix J, p. J-19). Additional studies were conducted for the Skunk Camp location and incorporated into the FEIS:

- Site-specific soil surveys and soil testing (required as mitigation measures FS-223 and FS-224, DEIS appendix J, p. J-5). This information was incorporated into section 3.3 of the FEIS.
- Site-specific vegetation surveys (required as mitigation measure FS-225, DEIS appendix J, p. J-6). This information was incorporated into section 3.3 of the FEIS.
- Updated seismic hazard analysis specific to the Skunk Camp location (Wong et al. 2020a) and specific investigations into whether the faults within the footprint of the Skunk Camp tailings storage facility are active (Hartleb 2020; KCB Consultants Ltd. 2020e; Zellman and Cook 2020a). This information was incorporated into section 3.2 of the FEIS.
- A detailed site investigation report for the Skunk Camp location, including information on field mapping, geotechnical drilling (13 boreholes), borehole geophysical logs, hydrogeologic drilling (12 boreholes/wells), hydraulic tests, geophysics, test pits (six total), and laboratory testing for geotechnical properties. Aquifer tests also were conducted on the wells (KCB Consultants Ltd. 2019; Montgomery and Associates Inc. 2019a, 2020g). This information was incorporated into several sections of the FEIS, including 3.2, 3.7.1, 3.7.2, and 3.10.1.
- An updated seep and spring inventory was compiled (WestLand Resources Inc. and Montgomery and Associates Inc. 2020). This information was incorporated into section 3.7.1 of the FEIS.
- Refined seepage and water quality modeling was also conducted to incorporate the new information collected (KCB Consultants Ltd. 2020d; Montgomery and Associates Inc. 2020a, 2020c). This refined analysis was incorporated into section 3.7.2 of the FEIS. Note that since the January 2021 publication of the Rescinded FEIS, additional water quality modeling sensitivity runs were also conducted to respond to additional comments.
- The site-specific reclamation and closure plans required under mitigation measure FS-226 (KCB Consultants Ltd. 2020e; Tetra Tech Inc. 2020). This information was incorporated into section 3.3 of the FEIS.
- The site-specific FMEA (Gannett Fleming 2020) and breach analysis (KCB Consultants Ltd. 2020b) required under mitigation measures FS-227 and FS-229. This information was incorporated into section 3.10.1 of the FEIS.

| Comment response: ALT23 | |
|---|---|
| Dismissal of Skunk Camp alternative | Page 1 of 1 |

**Responsive to these comments:**
1188-25

The comment stating that the Skunk Camp alternative was eliminated from detailed consideration and then later selected as the preferred alternative is incorrect. The Alternative 6 – Skunk Camp tailings storage facility location was added for consideration in March 2018 following a suggestion by the BLM. The alternative was further developed from that point, but at no time was it eliminated from consideration. The evolution of the Skunk Camp location is described in the project record in "Process Memorandum to File – Evolution of Range of Alternatives Considered in Detail in DEIS, after Publication of the Alternatives Evaluation Report (Nov 2017)" (Garrett 2018c).

11-RCMSER-2817

Appendix R

| **Comment response:** ALT25<br>Importance of Oak Flat | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
19-1

The cultural importance of Oak Flat, its nomination to the National Register of Historic Places (NRHP) as a traditional cultural place, and potential impacts are described in section 3.14 (DEIS, pp. 662–665). Note that section 3.14 was rewritten in the FEIS in response to public comments to better communicate the impacts to Oak Flat. See response CR4 for more details.

| **Comment response:** ALT26<br>Dripping Spring Wash residents | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
28824-3

The DEIS analyzed potential impacts to Gila County residents located along Dripping Springs Road. These included the potential for noise impacts (DEIS, pp. 233–240), traffic impacts (DEIS, pp. 266, 269), air quality impacts (DEIS, pp. 284–288; see also Newell, Garrett, et al. (2018) and Air Sciences (2019b) for tables and figures specific to Alternative 6), water quality impacts (DEIS, pp. 411–417), reductions in stormwater runoff (DEIS, pp. 443–444), recreation impacts (DEIS, pp. 507–509), and public safety impacts (DEIS, pp. 551–553).

| **Comment response:** ALT27<br>Government Springs Ranch | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
30081-1, 30081-2, 30081-3, 30081-4, 30081-5, 30081-6, 30081-7, 30081-8

These comments largely concern impacts to Government Springs Ranch, which lies on Mineral Creek along the DEIS Alternative 6 – North pipeline option.

The Tonto National Forest modified the Alternative 6 – North pipeline option based, in part, on issues raised in comments. A discussion of this change was added to chapter 2 of the FEIS. The rerouted pipeline considered in the FEIS now:

- substantially avoids perennial water and critical habitat along Mineral Creek entirely, except for a trenchless underground crossing upstream of Government Springs Ranch;
- crosses Devil's Canyon at a non-perennial location using an overhead span; and
- reduces the amount of pipeline corridor located on Arizona State Trust land.

Government Springs Ranch lies within the Government Springs grazing allotment. Impacts to this allotment are described in section 3.16 (DEIS, pp. 699–700) and include anticipated reductions in animal unit months due to acreage loss and loss of water sources.

Burial of the pipeline is not projected to impair ranch personnel, livestock movement, or runoff to water tanks. A discussion of this potential impact was added to section 3.16 of the FEIS.

Note that Resolution Copper purchased the Government Springs Ranch property in June 2021.

| **Comment response:** ALT28<br>Seismic activity at Skunk Camp | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8032-250

The DEIS fully investigated the structural geological framework and potential for seismic activity for the Skunk Camp tailings storage facility location. See response ALT22 for more detailed information.

11-RCMSER-2818

Appendix R

| Comment response: ALT29<br>Geophysical analysis of tailings sites | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>29-4, 854-1 | |

Section 3.2 (DEIS, pp. 141–144) outlines specific foundation concerns related to each of the tailings storage facility sites. Analysis of regional seismic hazard also is found in this section (DEIS, pp. 144–145). For each alternative, sufficient geotechnical information was available to provide an initial design for the tailings storage facility (Golder Associates Inc. 2018a; Klohn Crippen Berger Ltd. 2018a, 2018b, 2018c, 2018d).

See response ALT22 for more details on additional investigation undertaken for the Skunk Camp tailings storage facility location and included in the FEIS.

| Comment response: ALT30<br>Statements of support for specific alternatives | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>8-1, 9-1, 1075-3, 1197-2, 1204-2, 1207-2, 1276-7, 1286-4, 1300-2, 13-1, 1311-1, 1311-15, 1311-4, 1410-2, 1489-2, 16-1, 201-2, 26-1, 261-2, 283-1, 283-5, 291-4, 299-2, 300-1, 30073-2, 30075-11, 30080-3, 30097-2, 317-2, 319-2, 322-7, 35-1, 371-2, 515-3, 518-4, 555-12, 555-2, 555-3, 555-9, 562-3, 816-1, 817-2, 829-2, 830-1, 881-1, 882-1, 929-1, 95-1, 958-1 | |

These comments express general support for specific alternatives.

The Forest Supervisor's decision, referred to as the selected action, will be identified in the ROD. The ROD will explain why the selected action was chosen, including a weighing by the Forest Supervisor of the advantages and disadvantages.

| Comment response: ALT31<br>Elimination of Upper Dripping Spring Wash tailings alternative | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1188-5 | |

This comment notes that "BLM identified the Upper Dripping Springs Wash as a tailings disposal site that had been eliminated from consideration. However, no reason was given in the DEIS for its elimination as required by NEPA. Subsequently, the Tonto National Forest approved evaluation of this site in the DEIS and it became the preferred alternative under a new name: Skunk Camp. The only apparent difference between the Upper Dripping Springs Wash site and the Skunk Camp site is that the Skunk Camp site no longer occurs on the 69 acres of Bureau of Land Management lands." The comment states that this is arbitrary and capricious.

The DEIS describes the Upper Dripping Spring Wash site (appendix F, p. F-14). A more detailed discussion of the specific evolution of this alternative is found in Garrett (2018c), "Process Memorandum to File – Evolution of Range of Alternatives Considered in Detail in DEIS, after Publication of the Alternatives Evaluation Report (Nov 2017)." This process memorandum contains updated information on the alternatives development process that occurred after publication of the Alternatives Evaluation Report, including the Upper Dripping Spring Wash parcel.

The comment is correct that the Upper Dripping Spring Wash and Skunk Camp are in the same location. The conceptual footprint proposed by BLM was eliminated from detailed consideration. This footprint was refined and modified based on an actual tailings storage facility design and was carried forward in the DEIS. However, the location essentially remains the same, at the upper end of Dripping Spring Wash.

We have modified the language in appendix F of the FEIS to more accurately reflect that Skunk Camp is an evolution of the Upper Dripping Spring Wash alternative. We also noted that the location itself was not eliminated from detailed study, only the specific footprint proposed by BLM.

| Comment response: ALT32<br>Tailings storage locations | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1407-2 | |

The tailings storage location varies by alternative. These were described in detail in chapter 2 and can be seen all at once in figure ES-12 of the executive summary (DEIS, p. ES-11).

11-RCMSER-2819

Appendix R

| Comment response: ALT33<br>Renewable energy | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1544-16, 900-4 | |

These comments ask: "How much of the power that Resolution Copper would need would come from renewable energy sources? Is Rio Tinto planning on building any renewable energy facilities to power their project?"

Renewable energy facilities could be incorporated into the project in one of three ways:

1) As part one of the project components, described in chapter 2. No renewable energy facilities were proposed as part of the mine plan.

2) As applicant-committed environmental protection measures, described in each resource section in chapter 3. These are considered integral to the project and have a commitment from Resolution Copper. At the time of the DEIS, Resolution Copper had not brought forward or committed to any renewable energy measures.

3) As mitigation, described in each resource section of chapter 3 and compiled into one location in appendix J. Mitigation measures are developed through the NEPA process and may be required or voluntary. At the time of the DEIS, no mitigation measures related to renewable energy were developed or included in appendix J.

Appendix J in the FEIS was updated to incorporate all mitigation developed between the DEIS and FEIS. This includes voluntary measures on behalf of Resolution Copper and mitigation measures required under the jurisdiction of the Forest Service or other agency. Resolution Copper voluntarily brought forward one renewable energy mitigation measure that was added to appendix J in the FEIS (mitigation measure RC-AQ-01).

| Comment response: AMT1<br>Alternative mining techniques | Page 1 of 6 |
|---|---|
| **Responsive to these comments:**<br>10-2, 107-4, 107-6, 107-7, 1209-2, 1209-3, 1232-1, 1235-2, 1279-4, 1280-2, 1309-3, 1322-8, 1342-1, 1349-3, 1358-2, 1360-6, 1360-8, 1371-1, 1371-2, 1371-3, 1371-4, 1396-6, 1424-2, 1454-2, 1544-2, 199-1, 257-1, 30078-38, 30141-1, 30141-2, 30141-3, 320-1, 320-10, 320-3, 320-4, 320-6, 320-7, 41-1, 5474-2, 5771-1, 59-2, 776-1, 78-1, 79-1, 8032-261, 8032-6, 8032-8, 82-4, 965-2, F5-1 | |

Background on evaluation of alternative mining techniques

Numerous public comments were received that express the belief that the Forest Service should require Resolution Copper to use an alternative mining technique, other than block caving, to mine the ore deposit. As this issue was raised during scoping, it was fully evaluated during the alternatives development process. This evaluation is described in the "Alternatives Considered but Eliminated from Detailed Study" appendix of the DEIS (DEIS, appendix F, pp. F1–F4).

The premise that impacts could be avoided by different mining techniques is not incorrect. This is acknowledged in appendix F: "The proposed panel caving mining method is seen as having two major drawbacks. First, panel caving results in the creation of a subsidence area at the surface, which impacts a variety of resources. Second, because panel caving does not leave any opening or cavity belowground, there is no opportunity to backfill tailings as a potential disposal alternative. The Forest Service agreed that if an alternative mining method were found to be reasonable, it could reduce certain resource impacts, and the agency undertook an investigation into the technical and economic feasibility of using alternative mining techniques" (DEIS, appendix F, pp. F-1).

The question that we explored was not of the theoretical benefits, which were granted, but whether an alternative mining technique is at all reasonable. The most commonly cited alternative mining technique is cut-and-fill, which was used at the Magma Mine; this technique would not create surface subsidence and could allow for underground backfill of tailings.

The first evaluation of this topic was evaluated in the November 2017 Alternatives Evaluation Report (SWCA Environmental Consultants 2017a), which has similar conclusions to those in appendix F of the DEIS.

Appendix R

| Comment response: AMT1<br>Alternative mining techniques | Page 2 of 6 |
|---|---|

**Responsive to these comments:**
10-2, 107-4, 107-6, 107-7, 1209-2, 1209-3, 1232-1, 1235-2, 1279-4, 1280-2, 1309-3, 1322-8, 1342-1, 1349-3, 1358-2, 1360-6, 1360-8, 1371-1, 1371-2, 1371-3, 1371-4, 1396-6, 1424-2, 1454-2, 1544-2, 199-1, 257-1, 30078-38, 30141-1, 30141-2, 30141-3, 320-1, 320-10, 320-3, 320-4, 320-6, 320-7, 41-1, 5474-2, 5771-1, 59-2, 776-1, 78-1, 79-1, 8032-261, 8032-6, 8032-8, 82-4, 965-2, F5-1

Our evaluation found the following:

- Block caving is a standard mining technique that is often applied to ore deposits with similar characteristics as the Resolution ore deposit.
- The ore and host rock characteristics that are typically favorable for alternative techniques like cut-and-fill differ from the characteristics of the Resolution ore deposit, and it is unlikely that any of these techniques would be chosen as a reasonable technique for a similar deposit.
- Using such techniques requires higher grades of ore in order to be feasible. An increase in the cutoff grade from 1 percent to 2 percent removes an estimated 80 percent of the tonnage of the deposit from consideration for development. Accepting this level of reduction to accommodate an alternative mining technique is not economically feasible and would not be reasonable.

We reviewed additional information purporting to demonstrate that cut-and-fill mining was economically feasible, submitted to us in December 2018 (Garrett 2019a). We concluded that the submittal contained erroneous or inappropriate assumptions, and it was not considered further.

Most comments focus on profitability and incorrectly state that the Forest Service is elevating the profitability of Resolution Copper over the protection of environmental resources. Our evaluation of alternative mining techniques does not calculate Resolution Copper's profit, nor does it use profitability in the analysis. This was summarized in the project record:

> *"The analysis provided to the Forest Service attempts to answer the question: is a different mining technique financially feasible? This is fundamentally the wrong question to be asked, and the resulting answer is not pertinent to the decision space the Forest Supervisor has for the Resolution Copper project.*
>
> *The Forest Supervisor has the authority to require changes to the mine plan of operation in order to minimize effects on National Forest System surface resources, but this authority is not absolute. When assessing how far this authority can be extended to modify a plan of operation, Forest Service mineral regulations do not rely on financial criteria. Rather than dollars or profit, the bar set for the Forest Supervisor is one of reasonableness."*
> (Garrett 2019a)

The reason cut-and-fill mining is not pursued as a valid mining technique is not because Resolution Copper might make less money using that technique. The reason cut-and-fill mining is not pursued as a valid mining technique is because block caving is more appropriate to this type of ore deposit and because potentially forgoing 80 percent of the ore deposit to pursue cut-and-fill mining does not pass the test for reasonableness that the Forest Service must apply.

In light of the interest in this topic, we have included a more detailed discussion in chapter 2 of the FEIS.

Appendix R

| Comment response: AMT1<br>Alternative mining techniques | Page 3 of 6 |
|---|---|

**Responsive to these comments:**
10-2, 107-4, 107-6, 107-7, 1209-2, 1209-3, 1232-1, 1235-2, 1279-4, 1280-2, 1309-3, 1322-8, 1342-1, 1349-3, 1358-2, 1360-6, 1360-8, 1371-1, 1371-2, 1371-3, 1371-4, 1396-6, 1424-2, 1454-2, 1544-2, 199-1, 257-1, 30078-38, 30141-1, 30141-2, 30141-3, 320-1, 320-10, 320-3, 320-4, 320-6, 320-7, 41-1, 5474-2, 5771-1, 59-2, 776-1, 78-1, 79-1, 8032-261, 8032-6, 8032-8, 82-4, 965-2, F5-1

DEIS comments on alternative mining techniques

We received many comments regarding the application of alternative mining techniques. Several were generic in nature; the most detailed were submitted with comment letter #8032 in the form of a report by Dr. D. Chambers (appendix A of letter #8032).

The Chambers comments state, "Underground mining alternatives to block caving were eliminated from further consideration in the DEIS. These methods were eliminated from detailed consideration in the DEIS based largely on two factors, the cost of mining and the feasibility of large-scale tailings backfill."

This is an incorrect statement. The feasibility of large-scale tailings backfill was not a consideration in our evaluation of alternative mining techniques, nor is it listed as a reason these techniques were eliminated from detailed analysis in the November 2017 Alternatives Evaluation Report (SWCA Environmental Consultants 2017a) or in appendix F of the DEIS. The cost of mining was considered as part of the assessment of reasonableness in the form of the cutoff grade that would need to be targeted to employ a technique like cut-and-fill mining.

With respect to the cost of mining, there were three fundamental comments made about the Forest Service evaluation:

- Data were not available and were insufficient for the NEPA team to evaluate this issue.
- Inappropriate or outdated mining references were used.
- Incorrect ore grade terminology was used.

Our evaluation of these comments is documented in the project record (Garrett 2020i), and responses to each issue are summarized below.

11-RCMSER-2822

Appendix R

| Comment response: AMT1<br>Alternative mining techniques | Page 4 of 6 |
| --- | --- |

**Responsive to these comments:**
10-2, 107-4, 107-6, 107-7, 1209-2, 1209-3, 1232-1, 1235-2, 1279-4, 1280-2, 1309-3, 1322-8, 1342-1, 1349-3, 1358-2, 1360-6, 1360-8, 1371-1, 1371-2, 1371-3, 1371-4, 1396-6, 1424-2, 1454-2, 1544-2, 199-1, 257-1, 30078-38, 30141-1, 30141-2, 30141-3, 320-1, 320-10, 320-3, 320-4, 320-6, 320-7, 41-1, 5474-2, 5771-1, 59-2, 776-1, 78-1, 79-1, 8032-261, 8032-6, 8032-8, 82-4, 965-2, F5-1

Availability of Data

The Chambers comments note, "Dr Kliche had to work without any data support from Resolution Copper." This is an incorrect statement. Dr. Kliche was provided with adequate data to make a reasonable estimate of the relationship between grade and tonnage, which was the key aspect of the evaluation of reasonableness. This information, in the form of horizontal slices at 100-foot intervals from bottom to top through the Resolution Copper block model showing grade classes of the blocks, was provided when requested from Resolution Copper in March 2017 (Hart 2017). It is true that information access was not unlimited; for instance, securities regulations limit how some proprietary information can be released to the public. However, Dr. Kliche found the information provided to be sufficient for the analysis needed.

The comments also state that a specific report was unavailable ("Geologic and Mineral Resource Model – Suitability for Declaration of Mineral Resources and Support for Mine Plans to Develop a Block or Panel Cave Mine," Harry M. Parker, AMEC Foster Wheeler E&C Services Inc., March 14, 2017) (Parker 2017). This document is part of the project record, along with other supporting material for the NEPA analysis. It was not referenced in the DEIS and so was not posted to the website, but it is not proprietary and can be provided upon request. To our knowledge, these supporting materials were never requested.

Mining References

The reconvened Geology and Subsidence Workgroup compiled additional pertinent references with respect to mining techniques, in order to respond to comments that the references used by Dr. Kliche were outdated (Garrett 2020i; Garza-Cruz and Pierce 2020a). This literature review was conducted to identify classical references for mining method selection.

Itasca reviewed six classic mining references. Their conclusion is that "all of the mining method techniques arrived at similar conclusions, with block caving as the preferred mining method" (Garza-Cruz and Pierce 2020a). While block caving was identified as the clear preferred method, several other methods were identified as pertinent: top slicing, sublevel caving, and square set stoping. Top slicing and sublevel caving are both caving techniques; therefore, their use would not prevent subsidence or the impacts from subsidence.

Square set stoping is not a caving method and would allow for backfill; it therefore could offset the impacts of subsidence. Dr. Kliche evaluated this technique in the November 2017 Alternatives Evaluation Report and noted several of the downsides (SWCA Environmental Consultants 2017a):

Appendix R

| Comment response: AMT1<br>Alternative mining techniques | Page 5 of 6 |
|---|---|

**Responsive to these comments:**
10-2, 107-4, 107-6, 107-7, 1209-2, 1209-3, 1232-1, 1235-2, 1279-4, 1280-2, 1309-3, 1322-8, 1342-1, 1349-3, 1358-2, 1360-6, 1360-8, 1371-1, 1371-2, 1371-3, 1371-4, 1396-6, 1424-2, 1454-2, 1544-2, 199-1, 257-1, 30078-38, 30141-1, 30141-2, 30141-3, 320-1, 320-10, 320-3, 320-4, 320-6, 320-7, 41-1, 5474-2, 5771-1, 59-2, 776-1, 78-1, 79-1, 8032-261, 8032-6, 8032-8, 82-4, 965-2, F5-1

- Too deep may have serious ground pressure issues
- Very expensive; high-grade ore a necessity. Need a ready source of timber. Labor intensive.

In other words, this technique is similar to other cut-and-fill techniques evaluated. It requires a higher cutoff grade of ore and therefore substantially reduces the volume of the ore deposit beyond a level considered reasonable (an 80 percent reduction in ore volume, for a shift from 1 percent to 2 percent cutoff grade).

Dr. Kliche also reviewed the per-ton mining costs in light of the comments and compiled more updated information. The Alternatives Evaluation Report cited a cost of $9.10/ton for block caving, compared with $68.03/ton for cut-and-fill (SWCA Environmental Consultants 2017a:appendix C, p. 8). The updated information compiled by Dr. Kliche indicates that block caving can run from $7.99/ton to $10.68/ton, depending on production rate and adit vs. shaft entry. This is compared with cut-and-fill mining, which can run from $62.68/ton to $140.09/ton. Dr. Kliche also compiled information from 11 currently operating mines that use stoping or cut-and-fill techniques (not block caving) and found that actual per-ton costs range from $57.51/ton to $303.97/ton.

In all cases, a review of additional references only confirms the basic conclusions of the alternatives evaluation. First, it confirms that based on industry-standard literature and approaches, block caving is the most likely technique to be selected based on the characteristics of the deposit, and cut-and-fill techniques likely would not be selected. Second, it confirms that the costs of cut-and-fill are at a minimum five times the cost of block caving. This is important not for reasons of profitability but because techniques with higher operational costs require higher grade ore, or cutoff grade. As demonstrated with data specific to the Resolution ore deposit, even a 1 percent increase in cutoff grade (from 1 percent to 2 percent) results in the loss of at least 80 percent of the deposit. This fundamental tradeoff does not meet the standard for reasonableness that the Forest Service must consider.

An additional comment states that the above assumption of an increase from 1 percent to 2 percent is not substantiated because specific cutoff grades were not calculated for individual mining techniques. We acknowledge that the numbers used represent estimates of cutoff grade for different techniques, not economic calculations. These estimates are not arbitrary, however, but are informed by specific per-ton mining costs described above. The basic understanding that higher per-ton mining costs require higher cutoff grades is not in question.

11-RCMSER-2824

Appendix R

| **Comment response: AMT1**<br>Alternative mining techniques | Page 6 of 6 |
|---|---|

**Responsive to these comments:**
10-2, 107-4, 107-6, 107-7, 1209-2, 1209-3, 1232-1, 1235-2, 1279-4, 1280-2, 1309-3, 1322-8, 1342-1, 1349-3, 1358-2, 1360-6, 1360-8, 1371-1, 1371-2, 1371-3, 1371-4, 1396-6, 1424-2, 1454-2, 1544-2, 199-1, 257-1, 30078-38, 30141-1, 30141-2, 30141-3, 320-1, 320-10, 320-3, 320-4, 320-6, 320-7, 41-1, 5474-2, 5771-1, 59-2, 776-1, 78-1, 79-1, 8032-261, 8032-6, 8032-8, 82-4, 965-2, F5-1

The comments also state, "It should be the goal of DEIS to understand the ore body holistically, so that if alternative mining techniques were hypothetically mandated, it would be possible to understand the economics behind them." Indeed, this is what we endeavored to do. Per-ton mining costs and cutoff grade were only one part of the analysis. The ore deposit was also evaluated against industry-standard practices for evaluating mining techniques, regardless of cost, and block caving was clearly the mining approach that would be considered most reasonable for the specific characteristics of the Resolution ore deposit.

Ore Grade Terminology

The Chambers comments quote several statements and claim they are inconsistent with reference to the ore deposit as "high-grade" or "low-grade." This terminology is not inconsistent but rather is a matter of context.

Dr. Kliche refers to the Resolution Copper deposit as a "relatively low grade . . . resource" (SWCA Environmental Consultants 2017a:appendix C, p. 1). This is a correct statement when made in the context of porphyry copper deposits, which are considered low grade (approximately 1 percent copper), compared with a copper-sulfide vein deposit like that mined at the Magma Mine (up to 8 percent copper).

The Chambers comments note that Dr. Kliche's use of this terminology differs from Resolution Copper's reference to the Resolution Copper deposit as "high grade." In this case, the use of the term "high grade" is in the context of a comparison with other porphyry copper deposits. Most of these deposits have less than 1 percent copper, whereas the Resolution Copper deposit has 1.54 percent copper.

More importantly, the use of terminology has no bearing on the analysis itself. These terms do not affect the quantitative estimates of grade/tonnage that Dr. Kliche relied on for the analysis of reasonableness of cut-and-fill mining.

| **Comment response: AMT1_A**<br>Alternative mining techniques; with addition for specific comments 8032-260, 30141-4, 1209-4 | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1209-4, 30141-4, 8032-260

See response AMT1 for response to the general topic of alternative mining techniques.

These additional comments discuss the potential for portions of the ore body nearer to Apache Leap to be mined using underground mining techniques rather than block caving techniques.

It is correct that certain portions of the ore deposit would not be accessed under the current block caving operation. For instance, the panel caving as planned avoids the Oak Flat Withdrawal Area and does not extend as far west as it could, specifically in order to avoid impacts to Apache Leap.

It is not correct to assume that underground mining techniques could access these areas. As noted in the alternatives evaluation, cut-and-fill mining techniques require higher cutoff grades to be feasible. The portion of the deposit specifically near Apache Leap may not be of high enough grade to mine in this way.

11-RCMSER-2825

Appendix R

| Comment response: AMT1_B<br>Alternative mining techniques; with addition for specific comment 30078-28 | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
30078-28

See response AMT1 for response to the general topic of alternative mining techniques.

This comment states, "The Apache Leap Tuff Aquifer is a critical source of water for springs and creeks, many of them sacred. This permanent impact would not occur if alternative underground mining methods were employed."

This is not necessarily correct. Regardless of the mining technique used, the mine infrastructure would need to be dewatered. Without block caving, the Apache Leap Tuff would not fracture and subside, thus opening a hydraulic connection between the Apache Leap Tuff aquifer and the deep groundwater system. Access to the ore body would still need to occur, and the nature of that access could result in the need to dewater Apache Leap Tuff as well. Conversely, vertical shafts could potentially be isolated from the Apache Leap Tuff aquifer. Neither outcome can be assumed without specific mine plans.

| Comment response: AMT1_C<br>Alternative mining techniques; with addition for specific comment 1158-6 | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1158-6

See response AMT1 for response to the general topic of alternative mining techniques.

These comments question the basis for the "reasonableness" criterion used to determine the ability to use alternative mining techniques.

This discussion is provided in Garrett (2019a): "The basic standard when considering whether an alternative mining technique could be required by the Forest Service can be generally summarized as follows:

- The requirement cannot endanger or materially interfere with mining operations;
- The requirement must be reasonable;
- The requirement may not result in operations being so unreasonably circumscribed as to amount to a prohibition;
- The requirement may not impermissibly encroach on legitimate uses incident to mining."

| Comment response: AMT1_D<br>Alternative mining techniques; with addition for specific comment 8032-206 | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8032-206

See response AMT1 for response to the general topic of alternative mining techniques.

This comment raises a number of recreation impacts. These comments reiterate impacts that are disclosed in section 3.9 (DEIS, pp. 495–509).

11-RCMSER-2826

| **Comment response: AMT1_E**<br>Alternative mining techniques; with addition for specific comment 8031-38 | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8031-38

See response AMT1 for response to the general topic of alternative mining techniques.

This comment states, "The DEIS merely states in conclusory fashion with no discussion or elaboration: 'The Forest Service assessed alternative mining techniques in an effort to prevent subsidence, but alternative methods were considered unreasonable' (p. ES-3). The DEIS further admits that alternative mining techniques were not even considered in detail and were 'dismissed from detailed analysis' (DEIS, p. 29). This is not sufficient under NEPA to support the dismissal of credible alternative mining technics that have been presented to the TNF."

There is no expectation that all information available has to appear in the EIS itself. Forest Service NEPA regulations indicate, "Material may be incorporated by reference into any environmental or decision document. This material must be reasonably available to the public and its contents briefly described in the environmental or decision document" (36 CFR 220.4(h)). The full analysis of alternative mining techniques occurs elsewhere in the DEIS references (SWCA Environmental Consultants 2017a), not in the DEIS itself. However, given the interest in this topic, we have added further discussion of this topic to chapter 2 of the FEIS.

| **Comment response: AMT1_F**<br>Alternative mining techniques; with addition for specific comment 1209-1 | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1209-1

See response AMT1 for response to the general topic of alternative mining techniques.

This comment raises the issue of the land exchange and whether it changes the approach to alternative mining techniques.

The Forest Service approached the alternatives analysis as required under NEPA, with a full evaluation of alternatives, regardless of whether the land exchange would occur or not. The fact that the land exchange might occur did not factor in to the technical evaluation of alternative mining techniques.

| **Comment response: AMT1_G**<br>Alternative mining techniques; with addition for specific comment 8032-229; 320-2; 1220-5 | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1220-5, 320-2, 8032-229

See response AMT1 for response to the general topic of alternative mining techniques.

These comments state, "In all materials, Dr. Kliche and the Forest Service also acknowledge that alternative mining techniques are technically feasible."

This only partially relates what is stated in the DEIS. The full quote from the DEIS is as follows: "While several underground stoping techniques could physically and technically be applied to the deposit, the ore and host rock characteristics typically favorable for these techniques differ from the characteristics of the Resolution Copper Mine deposit. While physically feasible, it is unlikely that any of these techniques would be chosen as a reasonable technique for a similar deposit" (DEIS, appendix F, p. F3).

The distinction being drawn is that just because the physical ability to build underground mine workings to access ore exists does not mean that doing so is a method that would be used by a reasonable individual.

Appendix R

| Comment response: AMT1_H<br>Alternative mining techniques; with addition for specific comment 918-1 | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>918-1 | |

See response AMT1 for response to the general topic of alternative mining techniques.

This comment specifically mentions sublevel stoping. Sublevel stoping was one of the alternative mining techniques specifically evaluated by the Forest Service (SWCA Environmental Consultants 2017a:appendix C, p. 3). It was also specifically evaluated after receipt of public comments on the DEIS by the Geology and Subsidence Workgroup (Garza-Cruz and Pierce 2020a). This review looked at six industry-standard mining references and applied the techniques contained therein to the selection of a mining method. Sublevel stoping was not found to be appropriate by any of the six references.

| Comment response: AMT1_I<br>Alternative mining techniques; with addition for specific comment 320-5 | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>320-5 | |

See response AMT1 for response to the general topic of alternative mining techniques.

This comment questions where information on the Resolution Copper ore deposit was obtained for a specific table (table 1) in the evaluation of alternative mining techniques (SWCA Environmental Consultants 2017a:appendix C, table 1).

It is not clear what version of the document the commenter is referring to. The version of the November 2017 Alternatives Evaluation Report in the project record (SWCA Environmental Consultants 2017a), as well as the standalone version of appendix C (Kliche 2017), both contain a clear reference to footnote 6, which is present at the bottom of the page: "6 Taken from 'Resolution Copper Mining, LLC - Mine Plan of Operations and Land Exchange - Follow-up Alternatives Information;' August 14, 2017; Ms. Vicky Peacey to Ms. Mary Rasmussen. Project Record #0001734" (Resolution Copper 2017a).

| Comment response: AMT1_J<br>Alternative mining techniques; with addition for specific comment 1107-1 | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>1107-1 | |

See response AMT1 for response to the general topic of alternative mining techniques.

This comment discusses backfilling by paste tailings. This method is only feasible when underground cavities are left open after mining, as with a cut-and-fill technique. With block caving, there is no void left underground into which tailings could be placed.

| Comment response: AMT1_K<br>Alternative mining techniques; with addition for specific comment 1538-5 | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>1538-5 | |

See response AMT1 for response to the general topic of alternative mining techniques.

This comment notes that the subsidence crater would reach a depth of 1,500 feet. This is incorrect. The DEIS states, "The primary difference in results among all the sensitivity model runs is the ultimate depth of the subsidence crater. Under the base case model, an ultimate depth of about 800 feet is anticipated. Under other sensitivity runs, the depth of the subsidence crater can vary between 800 and 1,115 feet" (DEIS, p. 151).

11-RCMSER-2828

Appendix R

| Comment response: AMT1_L<br>Alternative mining techniques; with addition for specific comment 16-2 | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
16-2

See response AMT1 for response to the general topic of alternative mining techniques.

This comment references the Magma Mine and suggests that the same mining techniques (cut-and-fill) should be applied to the Resolution ore deposit. This particular statement was raised many times during scoping and public comment meetings.

The Magma Mine accessed a fundamentally different ore deposit. The Magma Mine targeted veins of material that ranged from roughly 4 to 8 percent copper. By contrast, the average grade of the Resolution ore deposit is about 1.5 percent copper.

The Magma Mine is actually a concrete example of the analysis of alternative mining techniques conducted by the Forest Service. The Forest Service concluded that alternative mining techniques like cut-and-fill could only be done at higher cutoff grades. The fact that the Magma Mine was able to use cut-and-fill with a 4 to 8 percent ore grade demonstrates this point. However, the spatial proximity of the Magma Mine to the Resolution ore deposit should not be used to conflate the properties of the ore deposits. They are fundamentally different in nature, grade, and distribution.

| Comment response: AMT4<br>In-situ leaching | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1107-6, 1448-1, 150-1, 150-2, 23-3, 889-1

These comments identify in-situ leaching as a preferable mining method for the Resolution ore deposit.

In-situ leaching was considered early in the alternatives development process and was not carried forward. Additional information was compiled by the Geology and Subsidence Workgroup after receipt of public comments (M3 Engineering and Technology Corporation 2020).

There are substantial concerns with technical feasibility of leaching at the depth of the Resolution ore deposit under the geothermal conditions encountered there. While technical challenges can potentially be overcome, this reportedly would be deeper than the deepest in-situ mining currently being done and would be precedent setting. The hydraulic properties of the deep groundwater system are not conducive to injection and recovery, though this could potentially be overcome with a massive hydraulic fracturing operation.

However, these technical concerns are not the fundamental issue that makes in-situ leaching unsuitable. The fundamental issue is that the mineralogy of the Resolution ore deposit is not suited to leaching. The Resolution deposit largely consists of chalcopyrite and bornite, not copper oxide ore, which is readily leachable. The estimated recovery of copper from the Resolution ore deposit would be 15 percent (M3 Engineering and Technology Corporation 2020).

In-situ leaching falls into a similar category as the other alternative mining techniques reviewed; the tradeoff with copper recovery simply does not meet the "reasonableness" standard.

11-RCMSER-2829

Appendix R

| Comment response: AMT6<br>Independent assessment of ore reserves | Page 1 of 1 |
|---|---|

| **Responsive to these comments:**<br>8032-231 |
|---|

This comment repeats scoping comments that indicate that the Forest Service has a responsibility to independently evaluate the ore reserves and the mining plan.

This type of assessment is not required under Forest Service mineral regulations 36 CFR 228 Subpart A. See response NEPA16 for discussion of the level of validation of claims and ore deposits that is required. Although the agency is authorized to determine claim validity at any time until a patent is issued, the agency is under no legal obligation to determine mining claim or mill site validity before approving a proposed plan of operations to explore for or develop minerals on lands open to use under the mining law.

Although the ore deposit need not be evaluated, the Forest Service does have a responsibility to independently evaluate aspects of the mining plan within the context of the NEPA process. This was done. Three key parts of the mining plan were independently assessed by the Forest Service.

The first key part of the mining plan that was independently reviewed was the evaluation of alternative mining techniques to determine whether any of these techniques could be reasonably applied and prevent impacts to Oak Flat. This evaluation was undertaken, and the Forest Service reached the conclusion that other alternative mining techniques like cut-and-fill were not appropriate for the Resolution ore deposit and that applying them would not be reasonable (DEIS, appendix F, pp. F1–F4). In response to interest on the part of commenters, we have added further discussion of the evaluation of alternative mining techniques to chapter 2 of the FEIS.

The second key part of the mining plan that was independently reviewed was the largest driver of impacts—the tailings storage facility. The Forest Service assessed a wide range of tailings storage alternatives, including different types of tailings embankments, seepage control, tailings locations, and tailings dewatering. These variations in tailings storage techniques largely drove the development of the action alternatives evaluated in the DEIS.

Changing the basic processing of the ore taking place at the West Plant Site would generally not yield any environmental benefits because regardless of processing technology, tailings would still be produced and would still require management and disposal. Even so, the Forest Service also looked at a third, lesser aspect of the processing during the alternatives development process. Resolution Copper proposes to create two separate waste streams (non-potentially acid generating (NPAG) and potentially acid generating (PAG)), concentrating the pyrite minerals in the PAG waste stream. The NEPA analysis team briefly considered whole tailings during the alternatives process but found no benefit, and the approach was not carried forward.

This comment also hypothesizes problems that might occur with the block caving operation. These concerns are speculative. However, while evaluating alternative mining techniques, the Forest Service also evaluated whether the proposed block caving operation was an appropriate choice for this specific ore body. All industry guidance reviewed indicates that block caving is the most appropriate technique. See response AMT1 for more details.

Technical issues may indeed arise during implementation of the block caving technique. These are part of any mine development. See response GS8 for more discussion of real-world problems that could occur during mining.

After publication of the January 2021 Rescinded FEIS, additional legal activity has helped refine the application of the "Rosemont ruling," which concerns the use of mining claims. These recent developments are discussed in FEIS section 3.2.

11-RCMSER-2830

Appendix R

| Comment response: AMT7 | |
|---|---|
| Use of filtered tailings to backfill the subsidence crater | Page 1 of 1 |

| Responsive to these comments: |
|---|
| 1097-13 |

This comment raises an issue specifically evaluated during alternatives development, which is the use of the subsidence crater for disposal of filtered tailings.

The rationale for dismissal of this alternative is clearly stated in appendix F of the DEIS: "The feasibility of placement of tailings in the subsidence area, either as slurry or filtered tailings, was considered during alternatives development. In this scenario, the tailings would be placed initially on undisturbed land above the mining panels in the area that would gradually become a subsidence pit. The subsidence area would then be filled with tailings as it expanded over time. This option was dismissed for safety concerns, both aboveground and belowground. In panel caving, it is paramount to control the rate of panel caving and prevent air gaps from developing above the caved zone, which can lead to potentially catastrophic air blasts. Loading of tailings above the panel cave operation could change the rock dynamics in unexpected and unknown ways. If it involves slurry, the added aspect of drainage from above further complicates mining operations. Safety hazards exist for personnel placing tailings aboveground as well, given the active subsidence and earth movement. Overall, it was determined that this option represented unreasonable safety hazards and did not conform to industry norms" (DEIS, appendix F, p. F6).

The comment characterizes this rationale as arbitrary and based on a single meeting. This is not a correct characterization. The alternatives development process took place over several years and involved professionals with experience in mining and tailings management, not just associated with Resolution Copper, but working directly for the Forest Service as part of the NEPA team. The dismissal of this alternative was made only after it was carefully considered. The documentation in the project record that specifically speaks to the issue of brownfields tailings disposal is listed in the November 2017 Alternatives Evaluation Report (SWCA Environmental Consultants 2017a:25).

Appendix R

| Comment response: AMT8 Requirement to evaluate alternatives under NEPA | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1539-2

This comment references Council on Environmental Quality (CEQ) regulations and guidance for implementing the NEPA process and indicates that alternative mining techniques should have been included as action alternatives.

The fundamental issue raised in this comment comes down to the assessment by the Forest Service of what is "reasonable." As noted in other comment responses (see response AMT1, for example), the assessment by the Forest Service of alternative mining techniques was based not on profitability but on reasonableness. The alternatives evaluation found that alternative mining techniques were not reasonable for this ore deposit. This assessment was based in part on industry standards and in part on the tradeoff between an alternative mining technique and the recovery of ore.

All of the industry-standard references reviewed identify block caving as a preferred method for an ore deposit with the characteristics of the Resolution deposit, whereas almost no alternative techniques like cut-and-fill were identified as reasonable for an ore deposit with the characteristics of the Resolution deposit. See response AMT1 for more details.

Regardless of this, the Forest Service also evaluated what it would mean if an alternative mining technique like cut-and-fill were used for the Resolution ore deposit. The result is a tradeoff in the amount of ore able to be recovered. This is because higher cost mining methods require higher grade ore to be feasible. The Forest Service estimated that targeting higher grade ore (a change from the 1 percent shell to the 2 percent shell) would reduce the volume of ore by 80 percent. The Forest Service did not consider this reasonable.

How did the Forest Service define "reasonable"? This discussion is contained in (Garrett 2019a:2):
"The basic standard when considering whether an alternative mining technique could be required by the Forest Service can be generally summarized as follows:

- The requirement cannot endanger or materially interfere with mining operations;
- The requirement must be reasonable;
- The requirement may not result in operations being so unreasonably circumscribed as to amount to a prohibition;
- The requirement may not impermissibly encroach on legitimate uses incident to mining."

The Forest Service has multiple mandates it must meet. The criteria above are extracted not just from mineral regulations but from multiple guidance and regulations under which the Forest Service must operate (see Garrett (2019a:attachment 3 for more details).

Under this definition, loss of 80 percent of the ore deposit was not considered reasonable.

| Comment response: AQ1 Air quality standards and regulatory framework | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1158-15, 1438-6

Section 3.6 describes the ambient air quality standards that are enforced in order to protect public health. The section also outlines the dispersion modeling analysis used to evaluate air quality impacts at the mine sites and the tailings storage facilities (DEIS, pp. 282–292). The modeling assessment includes the effect of controls, including (1) the enclosure of the ore stockpile at the concentrator; (2) control of fugitive dust emissions through applying stabilizers and water sprays; and (3) the control effectiveness of specific devices such as filters and baghouses (DEIS, pp. 283–284).

Comments note that the highest impacts are at receptors near the facility boundaries. The disclosed modeling results demonstrate that the alternatives all show compliance with applicable standards at all receptors outside the plant boundary or exclusion areas (DEIS, p. 285 [only Alternative 2 shown]; Newell, Garrett, et al. (2018) [all alternatives]). The DEIS only included results for Alternative 2 since all results were highly similar. However, we added results for all alternatives to section 3.6 in the FEIS.

Also see response AQ17 for details on modeling analyses and those impacts. See response TS24 regarding the effects on human health and risk assessment. Specifically, see "Potential impacts to mine employees" for how health impacts to employees was handled. We also added new discussion to section 3.6 with respect to potential health impacts.

These comments also state that the ore stockpile should be enclosed, not covered, as stated in the DEIS (p. 283). The ore stockpile will, in fact, be enclosed. Modeling analysis used an enclosed structure as part of estimating emissions. We revised the text in section 3.6 of the FEIS to clarify this.

11-RCMSER-2832

Appendix R

| Comment response: AQ2 | |
|---|---|
| Air quality modeling background concentrations | Page 1 of 1 |
| **Responsive to these comments:**<br>278-5 | |

This comment questions the effect that 2017 monitoring data would have on the air quality modeling.

In support of evaluating air quality impacts, the dispersion modeling effort used standard modeling protocols for incorporating background concentrations. Two years of on-site data were used in developing that analysis, where only 1 year of on-site representative data is required based on U.S. Environmental Protection Agency (EPA) modeling protocols. The original modeling effort was completed prior to the finalization of the 2017 air quality data. Therefore, these data were not included.

A separate detailed review of the 2017 meteorological and air quality data (Randall and Hampson 2020a), including a recalculation of background particulate matter 10 ($PM_{10}$) and particular matter 2.5 ($PM_{2.5}$) levels, demonstrated that inclusion of those data would not lead to a material difference in air quality impacts analysis. The modeling effort, if extended through 2017, would have generated impacts in compliance with the ambient air quality standards.

| Comment response: AQ3 | |
|---|---|
| Lead analysis | Page 1 of 1 |
| **Responsive to these comments:**<br>1438-3, 8032-159 | |

Lead emissions were below a screening level analysis and therefore were not included in the original analysis (DEIS, p. 277) (Newell, Garrett, et al. 2018). In response to this comment, we included a formal analysis of lead emissions and impacts, compared with the National Ambient Air Quality Standards (NAAQS), in section 3.6 of the FEIS.

To do this analysis, we used a conservative approach to estimate the ambient lead concentrations to compare with the standard (0.15 micrograms per cubic meter ($\mu g/m^3$) on a 3-month average basis), which is described in Randall (2020b). Randall (2020b) provided us with a conservative estimate for the concentration of lead and other trace metals in the ore body. Lead in the ore body is 42.72 parts per million by weight (ppmw). Using a multiple of four times the projected maximum annual impact (7 $\mu g/m^3$) and the ratio of lead content, the resulting maximum impact is 0.002 $\mu g/m^3$. When added to an estimated background concentration (0.04 $\mu g/m^3$), the calculated maximum 3-month lead concentration is 0.042 $\mu g/m^3$, which is 28 percent of the ambient standard at the highest impact receptor. Impacts at other receptors would all be less than this maximum value.

Comments also note the presence of lead in soils from previous mining activities. Resolution Copper has completed cleanup and removal of impacted soils at the West Plant Site in alignment with the Arizona Department of Quality (ADEQ) and EPA cleanup recommendations. Historic soil contamination is not expected to contribute to ambient levels of metals associated with the project.

11-RCMSER-2833

Appendix R

| Comment response: AQ4<br>Dust storms and extreme weather events | Page 1 of 1 |
|---|---|

| Responsive to these comments:<br>1309-1, 1534-1, 22-2, 8032-232 |
|---|

These comments concern the air quality analysis, wind speeds used, and potential impacts from dust.

We collected hourly wind speed along with $PM_{10}$ and $PM_{2.5}$ air quality data at three monitoring locations at the proposed site(s). We used recorded maximum wind speeds in modeling results to estimate impacts from these periods and included "paired in time" analyses for individual days with high winds and background concentrations in accordance with EPA modeling guidelines. In accordance with this guidance, the modeling excluded several days with high background concentrations as "exceptional events."

A formal dispersion modeling effort focused on $PM_{2.5}$, and it showed compliance with the $PM_{2.5}$ standards. Elevated PM levels during documented dust storms are captured in background $PM_{10}$. Higher wind conditions (associated with dust storms) are accounted for in fugitive dust emission estimates and meteorological data used to disperse the emissions in the model. The analysis incorporates carefully designed and engineered features to reduce emissions (including windblown dust) and impacts to air quality (DEIS, pp. 283–284). These emission reduction features comply with applicable State and local air district regulations. Estimated impacts to air quality due to emissions from all examined alternatives are demonstrated in the analysis to be below the applicable air quality standards (including the NAAQS) that were established to protect human health.

Also see response AQ17 for details on modeling analyses and those impacts. See response TS24 regarding effects on human health and risk assessment.

We added discussion of reclamation activities and ramifications for dust control and air quality to section 3.3 of the FEIS.

| Comment response: AQ4_A<br>Dust storms and extreme weather events; with addition for specific comment 8032-169 | Page 1 of 1 |
|---|---|

| Responsive to these comments:<br>8032-169 |
|---|

See response AQ4, which addresses the general topic of dust storms.

This comment also states that the analysis did not consider the impacts of toxic substances, the issue of aerosols, and radioactivity. See response TS24 for how impacts to human health were analyzed, including inhalation, deposition, and radioactive materials.

| Comment response: AQ4_B<br>Dust storms and extreme weather events; with addition for specific comment 210-3 | Page 1 of 1 |
|---|---|

| Responsive to these comments:<br>210-3 |
|---|

See response AQ4, which addresses the general topic of dust storms.

This comment further discusses water scarcity. See response WT4 for more discussion of this topic.

11-RCMSER-2834

Appendix R

| Comment response: AQ5<br>Monitoring and response requirements under air permit | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>1438-9, 8032-163 | |
| Resolution Copper submitted applicant-committed environmental protection measures (DEIS, pp. 283–284) that demonstrate ongoing compliance with environmental standards. These measures would be enforceable by a final ROD based on the FEIS and may be included in an air quality permit to construct the facility.<br><br>The ADEQ will issue a permit. However, the permit had not been issued prior to publication of the FEIS. Permit approval will contain assurances, through monitoring or other compliance measures, that emissions from the approved project will meet the ambient air quality standards based on agency rules and evaluations. If the approved air permit and existing regulations require a reporting of any event and corrective actions necessary to correct malfunctions or exceedances, those permit requirements must be followed as stipulated.<br><br>The FEIS properly discloses impacts based on the proposed action and the mitigation or environmental protection measures that have occurred. However, the NEPA process does not require mitigation or monitoring for all impacts. Any future permitting requirements are not pertinent for the disclosure of impacts in the FEIS. | |

11-RCMSER-2835

Appendix R

| Comment response: AQ6<br>Conformity analysis | Page 1 of 2 |
|---|---|
| **Responsive to these comments:**<br>524-20, 8032-153 | |

We concur with the comment that the conformity analysis contained in the DEIS was insufficient. We included a revised conformity analysis in section 3.6 of the FEIS.

The East Plant Site and the preferred alternative (Alternative 6) tailings storage facility are wholly located within the Hayden $PM_{10}$ Nonattainment Area. Major Federal actions that have direct and indirect emissions greater than the 100-ton/year threshold specified in 40 CFR 93 Part B 153(B)(1) require a conformity analysis. For these two sites, direct emissions include point and fugitive sources that contribute $PM_{10}$. As provided in Air Sciences (2019b:appendix A), the total $PM_{10}$ controlled emissions are 79.0 tons/year for the East Plant Site and 238 tons/year for the Alternative 6 tailings storage facility. The combined total exceeds the 100-ton/year threshold; thus, a conformity analysis is required.

Total potential $PM_{10}$ emissions from the filter plant and loadout facility are less than 100 tons/year. Thus, the West Pinal $PM_{10}$ Nonattainment Area does not require a conformity analysis.

There are two compliance options to demonstrate conformity: (1) the issuance of a permit under the Federal New Source Review Program, which is implemented by Pinal County Air Quality Control District (PCAQCD) or ADEQ and addresses the emission units in the proposed action or the preferred alternative; and (2) dispersion modeling that demonstrates that the proposed action or preferred alternative will not cause or contribute to an exceedance of the ambient air quality standard.

The cumulative dispersion modeling analysis (Hampson et al. 2020) used representative meteorological and background air quality data and demonstrated that the $PM_{10}$ impacts will comply with the ambient air quality standards at all receptors within the Hayden $PM_{10}$ Nonattainment Area. This modeling suffices to demonstrate conformity for these facilities.

For the purposes of the NEPA analysis, we have not relied on the future New Source Review Permitting requirement to demonstrate conformity. However, this permitting process will allow for a formal conformity review to be accepted at an appropriate time.

Part of the comment specifically addresses the silt content used in the modeling. Silt content has a direct effect on the emission of particulate matter from roadways and exposed surfaces that will handle ore or tailings storage. Additional work was conducted after the January 2021 Rescinded FEIS. We now use two separate screening analyses to assess the effects of silt content assumptions on the air quality modeling results used to demonstrate conformity.

The first screening analysis focused on how silt content assumptions could change the overall emissions amounts (in tons per year). A review of the silt content data showed that Randall and Hampson (2020b) provided the general silt content level, relying on a statewide factor for road silt content (3 percent) and an ore body analysis of 20 samples that led to an average silt content of 1.79 percent. Three percent was used throughout the fugitive dust calculations for both tailings storage facility and roadway surfaces. The comment questions the appropriateness of this 3 percent silt content, noting that EPA guidance indicates that site-specific silt content should be used where available and that if it is not available, a sector-specific silt content (found in table 13.2.2-1 of EPA's Emission Factors for Stationary Sources (AP-42) (U.S. Environmental Protection Agency 2006)) should be used.

The second screening analysis focused on how silt content assumptions could change modeled concentrations, compared with ambient air quality standards. This screening analysis used a 5.1 percent silt content for plant site roads and showed that the adjusted $PM_{10}$ impacts remain well below the ambient air quality standards. Based on this screening as well, the DEIS air quality modeling analysis demonstrates conformity to the air quality standards.

11-RCMSER-2836

Appendix R

| Comment response: AQ6<br>Conformity analysis | Page 2 of 2 |
|---|---|
| **Responsive to these comments:**<br>524-20, 8032-153 | |

We also conducted a conservative screening process to determine the impact that silt content values other than 3 percent would have on emissions and the modeling. We used a silt content value of 17 percent for roadways (a sector-specific silt content taken from AP-42 (U.S. Environmental Protection Agency 2006)) and a silt content of 2 percent for ore/tailings silt content (a site-specific silt content obtained directly from crushed ore samples). We estimate that the hourly emission rates for $PM_{10}$ (pound per hour (lb/hour)) would decrease from 145.2 lb/hour used for the DEIS modeling, to 116.8 lb/hour for the East Plant Site and the Alternative 6 tailings storage facility, using the revised silt content values. Based on the comparison of these emission rates, the DEIS air quality modeling analysis demonstrates conformity to the air quality standards.

| Comment response: AQ8<br>Class I Areas | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1438-4 | |

The impacts on Class I Areas within 100 kilometers (km) of the project sites were evaluated in accord with FLAG 2010 guidance regarding impacts on air quality related values, including visibility, regional haze, and deposition on soils and vegetation (U.S. Forest Service et al. 2010). Results for each Class I area are provided in the DEIS in section 3.6.4.2, including air quality (table 3.6.4-2), deposition (table 3.6.4-3), plume blight (table 3.6.4-4 and figure 3.6.4-3), and regional haze (table 3.6.4-5). All impacts are disclosed and are compared with significance thresholds or standards.

This comment references the maximum $PM_{10}$ and sulfur dioxide ($SO_2$) concentrations at the Superstition Wilderness area. This is an incorrect reference based on the impacts on Class II receptors in table 3.6.4-1. Impacts on Class I receptors are provided in table 3.6.4-2 and show, for example, that the maximum impact at the Superstition Wilderness Area is 4.26 $\mu g/m^3$, which is below the prevention of significant deterioration increment of 8 $\mu g/m^3$.

| Comment response: AQ9<br>Use of CALPUFF | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>278-2 | |

This comment questions the use of the CALPUFF model.

CALPUFF modeling evaluates impacts on air quality related values (visibility, deposition) in accordance with guidance issued by FLAG (U.S. Forest Service et al. 2010) (see response AQ8).

We evaluated impacts on air quality concentrations in Class I areas using AERMOD modeled impacts within the 50-km grid for receptors closer than 50 km; impacts were evaluated at Class I areas beyond 50 km as the highest concentration at any 50-km receptor in the direction of the Class I Area. This approach conforms to EPA guidance for assessing impacts at those receptors.

11-RCMSER-2837

Appendix R

| Comment response: AQ11<br>Future meteorological trends/greenhouse gas analysis | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
1086-2, 1284-2, 1308-5, 1335-4, 1335-5, 1360-10, 1544-4, 30075-9, 8032-308, 8032-64, 8032-66, 900-2, 910-6

These comments concern the impacts of future meteorological trends and calculations of the project contribution to greenhouse gas emissions.

"Resolution Copper Project and Land Exchange Environmental Impact Statement: Final Summary of Issues Identified Through Scoping Process" describes the approach for assessing future meteorological trends in the DEIS (SWCA Environmental Consultants 2017b):

- Issue 8, Factors for Alternative Comparison #3: "Quantitative assessment of total mine. . . . Include tabulation of greenhouse gas emissions of CO2, CH4, and N2O." These were included in section 3.6 (DEIS, p. 279).
- Issue 8, Factors for Alternative Comparison #8: "Assessment using best available science of long-term trends in precipitation and temperature that may affect resources." This assessment is contained in resource sections where it was pertinent to ongoing trends that are part of the Affected Environment. To facilitate this, we compiled a consistent climatic trend scenario for use by all resource specialists. This compilation made use of the best available literature and analyses for anticipated climate change (Dugan 2018). Specific resource discussions of climate impacts are in sections 3.6 (Air Quality, DEIS, p. 279), 3.7.1 (Groundwater Quantity, DEIS, p. 311), and 3.7.3 (Surface Water Quantity, DEIS, pp. 426–427).

We expanded the discussion of future meteorological trends and greenhouse gas emissions in the FEIS. In addition to sections 3.6, 3.7.1, and 3.7.3, we added discussion of the effects of anticipated future meteorological trends to sections 3.3 and 3.10.2. Also, we added a comprehensive discussion of future meteorological trends to chapter 4 of the FEIS to incorporate all of the different resources in one location.

We expanded the calculations of greenhouse gas emissions to incorporate project emissions, as well as three associated types of greenhouse gas emissions: shipping of concentrate, smelting, and power generation. Note that analysis of these actions is not feasible for other resources because of the specific location and type of generation or smelting and because the specific routes of travel and processing location for concentrate are unknown and speculative. Because greenhouse gas emissions are a global phenomenon, the exact locations are not pertinent to the overall greenhouse gas emissions. We made reasonable estimates of these emissions and included them in section 3.6 of the FEIS.

| Comment response: AQ13<br>Modeling approach for wind speed | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
278-8

It has been a common approach to use the Wyoming-derived data on a wide range of sites. A technical memorandum (Randall 2020a) that includes Lewis and Hampson (2015) provides documentation of other studies and original research that supports using this factor at sites where the countryside is undulating but slopes are not steep.

A 90 percent control effectiveness for fugitive emissions is commonly applied to water applications and surface stabilization. This control effectiveness is supported in general by EPA guidance (U.S. Environmental Protection Agency 2006).

Appendix R

| Comment response: AQ14 Effects of land exchange on air quality | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 1188-13 | |

See response NEPA50 for more discussion of the post–land exchange management of offered lands.

With regard to air quality, fundamental to the assessment of resource impacts in chapter 3 is the acknowledgment that specific management of the offered lands was not directed by Congress in Section 3003 of PL 113-291. The offered lands would be subject to management under whatever land and resource management plans are in place for BLM, Coconino National Forest, or Tonto National Forest.

Section 3.1 (DEIS, p. 189) states that a reasonably foreseeable action is one that is likely to occur in the future and does not include those that are speculative. The use of off-road vehicles on the Lower San Pedro Parcel is speculative and is therefore not reasonably foreseeable. Therefore, evaluation of the impacts on air quality from the Federal acquisition of the Lower San Pedro Parcel would be speculative.

For example, this comment notes specifically the use of off-road vehicles on this parcel. Management direction for the San Pedro River National Conservation Area specifically puts restrictions on off-road vehicle use. Similar restrictions could be placed on the Lower San Pedro Parcel (Bureau of Land Management 2019c). BLM would make this management decision after the land exchange.

| Comment response: AQ15 AERMOD version | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 278-1 | |

Randall (2020a) reevaluated the effect of AERMOD changes from Version 16216 vs. Version 18081 and concluded that the use of the later version had no substantive effect on the determination of maximum impacts on air quality receptors. Air Sciences also conducted a test run of AERMOD Version 19191 with AERMET Version 19191 meteorological data (19191 Test Model). The test run included all alternatives at the maximum impact locations as determined by the DEIS model run. The maximum impacts from the DEIS model and the 19191 Test Model were identical.

The NEPA modeling plan was published in June 2018. Version 18081 was released in March 2018, and the DEIS was published for public comment on August 9, 2019, all before EPA's release of the updated AERMOD/AERMET 2019 version (August 21, 2019).

| Comment response: AQ16 Calculation of background concentrations | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 278-7 | |

We concur with this comment on background carbon monoxide levels. Randall and Hampson (2020a) explored and modified this issue. We revised section 3.6 of the FEIS to incorporate this change.

Calculating the hourly nitrogen dioxide ($NO_2$) background concentration is a detailed concept/process and generally left for the reader to review in the referenced documents (Air Sciences Inc. 2018b). We added clarification to the FEIS text about the background $NO_2$ calculations.

Appendix R

| Comment response: AQ17<br>Concerns raised about AERMOD and CALPUFF application | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>8032-162 | |

CALPUFF modeling was used in accordance with the EPA guidelines to assess impacts on Air Quality Related Values in Class I areas. See response AQ9 for more discussion of CALPUFF. See response AQ22 for more discussion of ozone ($O_3$) modeling.

The associated air quality impact analysis draws on years of baseline data collected in accordance with Federal and State monitoring guidelines and a monitoring plan approved by the PCAQCD. The modeling approach is consistent with Federal and State modeling guidance and a modeling approach that was reviewed and approved by multiple agencies with expertise in this area (PCAQCD, ADEQ, and Forest Service). The modeling analyses presented in the DEIS are a statistically robust and conservative demonstration that ambient air quality standards are not expected to be exceeded due to emissions from the project. Impacts from urban area are accounted for in background concentrations that are added to estimated impacts at receptors in the modeling domain.

The modeling domain is appropriate for AERMOD and the size of study area is adequate (as impacts at the edge of modeling domain demonstrate). The analysis incorporates carefully designed and engineered features to reduce emissions (including windblown dust) and impacts to air quality. These emission reduction features comply with applicable State and local air district regulations. The analysis demonstrated that estimated impacts to air quality due to emissions from all examined alternatives were below the applicable air quality standards (including the NAAQS) established for the protection of human health. These features are included in the emission inventory and the DEIS as applicant-committed environmental protection measures (DEIS, pp. 283–284).

| Comment response: AQ18<br>Ultrafine particulate matter | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>8032-55 | |

Ultrafine particulate matter is included and directly referenced as $PM_{2.5}$. The dispersion modeling effort demonstrates compliance with ambient air quality standards, which protect human health.

We added further analysis of health risks from trace metals (as well as other pollutants) to section 3.6 of the FEIS. See response TS24 for more detail.

Appendix R

| Comment response: AQ19 | |
|---|---|
| Cumulative air analysis | Page 1 of 1 |

**Responsive to these comments:**
8032-151, 8032-152, 8032-171

With regard to air quality, the revised cumulative effects analysis is approached in a quantitative fashion. First, additional modeling was conducted to incorporate reasonably foreseeable emissions with enough detail to model. The DEIS included all direct and indirect emissions and impacts from the proposed action and preferred alternative. A formal cumulative air quality impact analysis was prepared (Hampson et al. 2020) that includes emissions and impacts from these reasonably foreseeable actions. Analysis results do not substantively change the effect on ambient air quality standards.

Second, there are still reasonably foreseeable actions, as identified by the Forest Service in the revised cumulative effects analysis, that were not part of this modeling effort. To quantify the cumulative effects from these projects, we estimated and compared emissions with the total emissions in the cumulative effects analysis area. Chapter 4 of the FEIS describes these approaches.

Some sources noted in comments already were incorporated into the baseline modeling as part of background concentrations if those emissions (including those from nearby urban areas) are ongoing. The AERMOD modeling analysis relies on meteorological data and background air quality data from on-site stations and evaluates impacts at a set of receptors that includes Superior, Queen Valley, and Superstition Wilderness Area. Meteorological data include winds from all directions and a wide variety of wind speeds. The size of the AERMOD modeling domain was determined in accordance with applicable State and Federal modeling guidance. It includes receptors in communities and extends 50 km from the project. Modeled impacts to air quality due to emissions from the project, plus representative background concentrations, are below the applicable ambient air quality standards.

| Comment response: AQ20 | |
|---|---|
| Background data from other sites | Page 1 of 1 |

**Responsive to these comments:**
8032-158

Resolution Copper conducted multiple years of baseline ambient monitoring at multiple stations across the project area. Monitoring was conducted in accordance with Quality Assurance Project Plans approved by the PCAQCD. Appropriate data quality assurance/quality control (QA/QC) procedures were applied during the monitoring program, as required in the approved Quality Assurance Project Plans. QA/QC procedures included comparison of monitored on-site data with air quality data from stations operated by other jurisdictions. PCAQCD reviewed and accepted quarterly annual reports of the baseline data. The use of other background data to represent existing conditions at distant receptors is not warranted or required under EPA guideline modeling protocols.

| Comment response: AQ21 | |
|---|---|
| Tailings pile emissions | Page 1 of 1 |

**Responsive to these comments:**
8032-164

With regard to implementation of dust control measures, section 3.6 (DEIS, pp. 283–284) identified applicant-committed environmental protection measures (including emission controls). The Forest Service ROD must ensure that the applicant-committed environmental protection measures listed in the FEIS, and used to evaluate impacts, are adequately specified as compliance requirements for activities under Forest Service jurisdiction. This will include any monitoring effort that is deemed necessary to demonstrate compliance. Additionally, during construction, operation, and closure, Resolution Copper will have an air quality permit and associated dust control plan issued by PCAQCD with compliance requirements for operations to ensure that the facility meets all applicable air quality standards.

11-RCMSER-2841

Appendix R

| Comment response: AQ22 Ozone (O₃) analysis | Page 1 of 1 |
|---|---|

Comment response: AQ22
Ozone ($O_3$) analysis — Page 1 of 1

**Responsive to these comments:**
8032-160, 8032-161

Section 3.6.4.2 (DEIS, p. 288) briefly discussed photochemical formation of $O_3$ and formation of secondary $PM_{2.5}$ in the atmosphere. Reference analysis (Air Sciences Inc. 2019b) addresses these concerns using a Tier 1 threshold analysis for significant impact levels using the EPA-approved screening techniques. Results from this screening show that the volatile organic compound (VOC), nitrous oxide ($NO_x$), and $SO_2$ emissions from the proposed project would generate impacts below the significance levels. Therefore, the analysis determined that $O_3$ and secondary $PM_{2.5}$ impacts are not significant for the proposed action, and a formal modeling of $PM_{2.5}$ and $O_3$ is not required.

These comments also note impacts on human health. See response TS24 for more discussion of this concern.

Comment response: AQ23
Impacts to Superstition Wilderness — Page 1 of 1

**Responsive to these comments:**
8032-157

Air quality impacts in the Superstition Wilderness Area, including impacts on vegetation and other air quality related values, are documented in section 3.6 (DEIS, p. 289, table 3.6.4-2 showing criteria pollutant concentrations at the Wilderness area; table 3.6.4-3 showing nitrogen and sulfur deposition at the Wilderness area; discussion on pp. 290–291 showing haze and visibility impacts at sites within the Wilderness area).

Follow-on monitoring of air quality conditions generally is unwarranted for predicted impacts that are well below the ambient standards. The modeled impacts in the Superstition Wilderness Area are well below the standards. The Forest Service and other Federal agencies provide monitoring for air quality conditions in Class I areas where warranted.

Comment response: AQ24
Modeling missing for tailings facility — Page 1 of 1

**Responsive to these comments:**
8032-170

This comment notes that modeling is missing for alternative tailings facilities. This is incorrect, though the DEIS did not specifically summarize this information.

We conducted detailed air quality analyses for all alternative tailing storage facilities. Results presented in the DEIS indicated the impacts for Alternative 2, but these impacts were representative of all sites. "Air quality impacts were modeled for each alternative, but the results are largely the same. Maximum impacts for other alternatives would be very similar to those shown in table 3.6.4-1. Detail of the results of other alternative air quality modeling are contained in Newell et al. (2018)" (DEIS, p. 284). See table 3 in the Newell, Garrett, et al. (2018) reference document. We added this table to section 3.6 of the FEIS.

With regard to the Skunk Camp location, data for the Skunk Camp were provided in Air Sciences Inc. (2019b:table 3-17); the results are slightly higher than for Alternative 2 (1 percent for 1-hour $NO_2$, and smaller percentages for other pollutants).

We prepared a cumulative impact analysis that includes reasonably foreseeable actions for all alternatives and all criteria air pollutants. The exception was for $O_3$, which was separately determined to be below significance levels (Hampson et al. 2020). We included this impact analysis in chapter 4 of the FEIS and also summarized it in section 3.6 of the FEIS.

11-RCMSER-2842

Appendix R

| Comment response: AQ25 | |
|---|---|
| Monsoon effects | Page 1 of 1 |

**Responsive to these comments:**
1438-10, 8032-63

Changes in rainfall patterns associated with future meteorological trends likely would not affect air quality conditions since this region historically has experienced wide ranges of daily and seasonal extremes of precipitation. Also see response AQ4 for discussion of extreme wind events and dust storms.

| Comment response: AQ26 | |
|---|---|
| Shaft exhaust noise and emissions | Page 1 of 1 |

**Responsive to these comments:**
918-2

This comment questions whether the impacts of the air emissions from the shafts at the East Plant Site were analyzed in terms of air quality and noise from fans.

The modeling used to disclose impacts in the DEIS did incorporate noise and air quality from these emissions.

The mine shaft ventilation exhaust emissions are formally addressed in the modeling report (Air Sciences Inc. 2019b:appendix A):appendix A. In that formulation, combined emissions of underground operations and sources are tabulated. The data shown in appendix A for "EP Underground Sub Total" refer to the potential controlled emissions from the mine shaft. The data include underground fugitive emissions, as well as process and combustion source emissions.

Noise modeling also included these sources: "The primary noise sources for the EPS include ventilation exhaust fans, transformers, condenser cooling towers, refrigeration plant, bulk air cooler, hoist houses, and batch plants" (Tetra Tech Inc. 2019:23).

We have added discussion of visual impacts from possible fog plumes caused by the emission of hot air from the ventilation shafts to section 3.11 of the FEIS (see response SR5).

| Comment response: CR1 | |
|---|---|
| Identified specific information missing from analysis | Page 1 of 1 |

**Responsive to these comments:**
1353-2, 1520-3, 28449-113, F7-2

These comments indicate that specific information was missing from the analysis of cultural resources or Tribal concerns in the DEIS. The Forest Service included all relevant data provided by the Tribes in the DEIS at the time of its writing (roughly July 2019). Since that time, we have reviewed and included additional relevant information provided by Tribes in section 3.14 of the FEIS.

In accordance with 36 CFR 800.2(c)(2), Tribal input through consultation was sought early and at every step of the NEPA and Section 106 processes. Since the DEIS was published, a plethora of new information has been provided to the Forest Service through Tribal consultation and Tribal Monitor reports. The reports the Tribal Monitors produced were shared with the Tribes as an additional source of data to consider, and Tribally designated staff were asked to determine NRHP eligibility and to designate whether any of the resources are traditional cultural places. Consultation is described fully in appendix S of the FEIS. The FEIS discusses and analyzes these data, summarizing information as appropriate in accordance with CEQ guidance. Data include additional traditional cultural places and places of religious and cultural importance to Tribes, along with modern religious use of Oak Flat. Section 3.14 of the FEIS includes further detail and discussion of the overall religious significance of the project area to Tribes. See response CR4 for more discussion of this topic.

A specific comment is that "the lack of reference in the DEIS to the archeological and cultural records held by the San Carlos Apache Tribe, Yavapai people, Aravaipa, and other Indigenous peoples of these ties in the DEIS is inadequate." The Forest Service relied upon Tribes to provide information through consultation or other means. We are unaware which specific records were not provided by Tribes.

11-RCMSER-2843

Appendix R

| Comment response: CR2 Information missing from analysis: cultural history | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1422-4, 1460-1, 214-2, 28449-100, 30078-2, 30078-4, 8032-131, 8032-132

These comments indicate that cultural history information is missing from the analysis.

There is no expectation that all information available has to appear in the EIS itself. Forest Service NEPA regulations indicate, "Material may be incorporated by reference into any environmental or decision document. This material must be reasonably available to the public and its contents briefly described in the environmental or decision document" (36 CFR 220.4(h)). We incorporated detailed background on cultural history by reference (DEIS, p. 625) and included brief summaries. We applied the same approach in the FEIS.

However, in addition to the cultural history from an academic perspective, we also received comments on the lack of a cultural history from the Tribal perspective. We have added detail about this in section 3.14 of the FEIS. See response CR4 for more discussion of this topic.

| Comment response: CR4 Personal statements and details of the Tribal importance of Oak Flat, and impacts to Tribes from the project | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
100-1, 100-2, 1068-5, 107-8, 108-3, 1090-3, 1093-4, 1095-2, 1100-2, 112-1, 1169-1, 118-1, 1206-6, 1226-2, 1274-1, 1287-1, 1289-1, 129-2, 1293-1, 1296-1, 1309-4, 1309-5, 1310-2, 1310-3, 131-2, 132-3, 1324-1, 1333-3, 1338-4, 1339-1, 1339-2, 1339-3, 1351-1, 1353-1, 1360-3, 1396-4, 1450-1, 1450-2, 1458-1, 1464-4, 1471-2, 1477-1, 1492-1, 1508-1, 1518-2, 1520-2, 1521-1, 1525-1, 1531-3, 1532-1, 1532-2, 156-3, 157-1, 157-2, 159-1, 160-1, 161-1, 163-1, 164-2, 166-1, 168-2, 169-1, 184-1, 184-2, 186-2, 188-1, 188-2, 1924-3, 233-2, 235-1, 235-11, 235-12, 235-13, 235-14, 235-19, 235-2, 235-3, 235-4, 235-5, 235-8, 235-9, 241-1, 242-1, 27681-1, 28046-1, 29708-2, 29709-1, 30074-1, 30078-3, 30078-6, 30078-7, 30079-2, 30079-5, 311-2, 339-2, 437-2, 495-1, 497-2, 55-4, 5975-2, 62-3, 6317-1, 65-2, 70-1, 72-2, 73-2, 74-1, 75-1, 8031-44, 8032-133, 8032-134, 8032-136, 8032-139, 8032-147, 8032-148, 8032-203, 81-1, 81-2, 81-3, 839-1, 87-1, 887-1, 888-1, 917-2, 93-2, 97-2, 97-3, 98-1, 98-2, F7-1, F7-3

The DEIS was written with the information available at the time. However, since its publication, the Forest Service has received important additional information about the role of the project area and proposed tailings storage locations in current-day Apache religion and culture, as well as similar information from other Tribes, through the Tribal Monitor surveys, government-to-government consultation, Tribal elders' and representatives' visits, and DEIS comments.

For the FEIS, we have revised section 3.14 to acknowledge and document the following:

- That the affected Tribes are the original inhabitants and continuing stewards of the land involved with the proposed mine and land exchange, disclosing that the land and mineral wealth proposed for transfer to Resolution Copper belonged to the affected Tribes 150 years ago and that these resources were taken by force and with the loss of many ancestors.
- A full depiction of the boundaries of aboriginal territories of the affected Tribes as determined by the U.S. Indian Claims Commission. These boundaries, when overlaid with the area of potential effects (APE) for the proposed project, clearly indicate the potential for direct, indirect, and cumulative impacts on aboriginal lands of Arizona's Apache, Yavapai, and Pima-O'odham Tribes and nations.
- That Apache Tribal leaders have testified before Congress over many years, consistently identifying the sacredness and sanctity of Oak Flat.
- A description of traditional Apache religious thought and practice.
- Inclusion of personal statements that describe the current religious significance and the value given to Oak Flat by the Apache people.

11-RCMSER-2844

Appendix R

| Comment response: CR5<br>Lack of cultural resource surveys or reports | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
1519-1, 1544-3, 1602-2, 251-4, 28449-101, 28449-106, 28449-108, 28449-109, 28449-114, 28449-116, 28449-24, 28449-6, 28449-99, 30065-2, 376-3, 55-6, 562-11, 8031-43, 8032-135

Consistent with 36 CFR 800.4, the Forest Service has taken the steps necessary to complete a reasonable and good-faith effort to identify the historic properties within the APE. Our efforts have included background research, consultations, sample field investigation, and pedestrian field surveys.

Our intent has been to complete pedestrian field surveys across all areas subject to project-related ground-disturbing activities (i.e., physical APE). To that end, the Forest Service directed the completion of pedestrian surveys to cover the portions of the physical APE that include the Oak Flat Federal Parcel, GPO project components (East Plant Site, West Plant Site, MARRCO corridor, and filter plant and loadout facility), and the proposed tailings locations for Alternatives 2, 3, 4, 5, and 6.

Most of the necessary surveys were conducted prior to the publication of the DEIS, as described in section 3.12 (DEIS, pp. 627–628), including the following:

- 96 percent of Alternatives 2 and 3 (DEIS, p. 631);
- 72 percent of Alternative 4 (DEIS, p. 632);
- 74 to 78 percent of Alternative 5 (depending on which pipeline route) had been surveyed (DEIS, p. 633); and
- 96 percent of the Alternative 6 – Skunk Camp (preferred alternative) and both pipeline routes (DEIS, p. 635).

We have updated section 3.12 of the FEIS to reflect the additional historic properties identified within the physical APE that were completed after publication of the DEIS.

| Comment response: CR6<br>Anglo, Hispanic history lacking; built environment lacking | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
28449-102, 28449-9, 8032-130, 8032-137

See response CR2 for discussion of the lack of cultural history discussion in the DEIS.

Additional work was completed on the built environment (Tremblay 2020), and we added this discussion to FEIS section 3.12.

11-RCMSER-2845

Appendix R

| Comment response: CR7 Monitoring and mitigation framework | Page 1 of 2 |
| --- | --- |

**Responsive to these comments:**
1237-2, 233-1, 30078-5, 30080-2

We developed mitigation for impacts to cultural and Tribal resources under two regulatory frameworks: PL 113-291, in which Congress authorized the Southeast Arizona land exchange; and the National Historic Preservation Act (NHPA).

The Forest Service, Resolution Copper, consulting Tribes, the Arizona State Historic Preservation Office (SHPO), and the Advisory Council on Historic Preservation (ACHP) collectively developed mitigations under both acts. The BLM, Arizona State Land Department (ASLD), and U.S. Army Corps of Engineers (USACE) provided additional input.

Regarding the land exchange, PL 113-291, Section 3003(c)(9)(C)(ii), requires the EIS to "identify measures that may be taken, to extent practicable, to minimize potential adverse impacts on [cultural and archaeological] resources."

The NHPA puts forth a process that identifies, assesses, and resolves adverse effects on cultural resources. Section 106 of the NHPA, along with Forest Service regulations at 36 CFR 800.6, requires the Forest Service to avoid, minimize, or mitigate adverse effects on historic properties for this entire project.

To identify historic properties, the Forest Service required pedestrian surveys of the project area for archaeological and built environment resources and Tribal Monitor surveys for resources important to Tribes. The reports the Tribal Monitors produced were shared with the Tribes as an additional source of data to consider, and Tribally designated staff were asked to determine NRHP eligibility and to designate whether any of the resources are traditional cultural places.

The Forest Service developed a Programmatic Agreement (PA) that outlined the procedures for resolving adverse effects on historic properties identified by the above measures and defined roles and responsibilities for those participating in the agreement. Under the PA, mitigation strategies include data recovery, archaeological monitoring, funding for the continuation of a Tribal Monitoring Program, an Emory oak tree restoration project, and the establishment of heritage funds for Tribal and local community projects. The PA set up the following strategies to resolve adverse effects:

- The SHPO and Tribes reviewed and approved a historic properties treatment plan (HPTP) for the Oak Flat Federal Parcel that details data recovery of historic properties. In accordance with Stipulation IX.B.1 of the PA, the Forest Service will initiate implementation of the Oak Flat HPTP within 1 month of the PA's execution.

11-RCMSER-2846

Appendix R

| Comment response: CR7 | |
|---|---|
| Monitoring and mitigation framework | Page 2 of 2 |

**Responsive to these comments:**
1237-2, 233-1, 30078-5, 30080-2

- In accordance with Stipulation IX.B. of the PA, we will ensure that a research design is prepared for all of the project components as described in the GPO, including the selected action. Under the umbrella of the research design, treatment plans for data recovery and other mitigations will then be prepared for each project component. Implementation of the research design and treatment plans will occur after issuance of the ROD in accordance with Stipulation IX.D of the PA.
- In accordance with Stipulation IX.C of the PA, the Forest Service shall ensure that Resolution Copper sets up multiple funding sources to fund programs for local communities and Tribes to resolve adverse effects on historic properties. These funds are set aside to partially resolve adverse effects on properties identified as being important by Tribal Monitors and Tribal representatives. The Forest Service recognizes that the Tribes assert that the adverse effects on these properties are not able to be mitigated.
- In accordance with Stipulation IX.B.3 of the PA, we will prepare and implement plans to resolve adverse visual, atmospheric, auditory, and/or cumulative effects if needed.
- In accordance with Stipulation IX.H of the PA, after we issue the ROD we will ensure that a monitoring and discovery plan is prepared and followed during construction and operation of the project.
- In accordance with Stipulation IX.I of the PA, we will develop a Native American Graves Protection and Repatriation Act plan of action for Federal lands. We also will develop an Arizona State Museum burial plan for State and private lands.

The January 2021 Rescinded FEIS included that PA (appendix O). All signatories, other than the ACHP, had signed the PA as of January 15, 2021. On February 11, 2021, the ACHP notified the Forest Service that the "ACHP believes that further consultation in this case would be unproductive and therefore, we are hereby terminating consultation pursuant to 36 CFR § 800.7(a)(4)." In accordance with 36 CFR 800.7(c)(4), the Secretary of Agriculture will deliver a written response to the ACHP, and that response will conclude the Section 106 process for this undertaking.

Since the ACHP did not sign the PA, the PA was never executed. Therefore, mitigation measures identified in the PA and any others identified subsequently will now be implemented through the final ROD and special use permit for use of NFS lands, and through enforcement by other State and Federal agencies as well as third parties in separate agreements. Changes in enforcement of the measures described in the draft PA are further described in appendix J.

In the Southeast Arizona Land Exchange and Conservation Act (PL 113-291, Section 3003(c)(3)(b)), Congress directed us to work with Resolution Copper to find mutually acceptable measures to address the concerns of affected Tribes and minimize the adverse effects on affected Tribes resulting from mining and related activities on the Federal land conveyed to Resolution Copper. We cannot fully mitigate these types of impacts through the typical activities specified in the HPTPs. Development of these separate mitigations was a collaborative effort that took place during development of the DEIS and FEIS.

Appendix J of the FEIS incorporates mitigation measures. The effectiveness of these mitigation measures in reducing impacts can be found in the "Mitigation Effectiveness" sections within FEIS sections 3.12 and 3.14. Note that we may not be privy to some private mitigation agreements developed directly between Resolution Copper and Tribes. If these agreements exist, they were not incorporated into the FEIS.

11-RCMSER-2847

Appendix R

| Comment response: CR8 | |
|---|---|
| Comments contain criticism or questions on the 106 process | Page 1 of 3 |

| Responsive to these comments: |
|---|
| 1350-1, 1417-1, 1417-4, 1417-5, 30078-9, 8030-3, 8032-123, 8032-124, 8032-125, 8032-127 |

Section 106 of the NHPA requires Federal agencies to consider the effects of an undertaking on historic properties. As defined by its implementing regulations (36 CFR 800), historic properties are any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the NRHP. An undertaking is a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including those carried out by or on behalf of a Federal agency; those carried out with Federal financial assistance; and those requiring a Federal permit, license, or approval.

Title 36 CFR 800 sets forth the procedures to be followed during the Section 106 process: initiation of the Section 106 process, identification of historic properties, assessment of adverse effects, and resolution of adverse effects. The following summarizes each step in the process and what we have done to fulfill our responsibilities as lead Federal agency for the undertaking.

During the initiation of the Section 106 process (36 CFR 800.3), the Federal agency establishes that there is an undertaking and determines that it has the potential to affect historic properties. The agency then ascertains whether other State or Federal agencies are involved, identifies the appropriate SHPO and/or Tribal Historic Preservation Office (THPO), identifies appropriate Tribes and others consulting parties, and makes a plan for involving the public in the process.

We initiated consultation with the SHPO on March 31, 2017, with the ACHP on December 7, 2017. Initial consultation began with 11 Tribes on the prefeasibility exploration plan for the Resolution Copper Project via a letter dated June 6, 2008; via a letter dated August 4, 2015, after the land exchange in 2015 was signed; and with four additional Tribes on December 3, 2018, as alternative tailings locations on BLM-managed lands were identified.

During the identification of historic properties (36 CFR 800.4), the Federal agency determines the APE in consultation with the SHPO/THPO, Tribes, and other consulting parties, identifies resources that may be historic properties within the APE to the appropriate level of effort in consultation with the SHPO/THPO, Tribes, and other consulting parties, and evaluates the historic significance of each resource through application of the NRHP criteria and determining whether a resource is eligible for the NRHP in consultation with the SHPO/THPO, Tribes, and other consulting parties.

We have continuously consulted with the SHPO, Tribes, and consulting parties regarding the APE. The APE has changed and been shaped by the input of these parties over time. The overall APE is a 6-mile buffer around the project components, except where it has been extended to the east and south up to 9 miles from the project components, as well as noncontiguous portions around the historic districts of Globe and Miami. We assert that this APE is expansive enough to account for the direct, indirect, and cumulative effects of the project.

11-RCMSER-2848

Appendix R

| Comment response: CR8<br>Comments contain criticism or questions on the 106 process | Page 2 of 3 |
| --- | --- |
| **Responsive to these comments:**<br>1350-1, 1417-1, 1417-4, 1417-5, 30078-9, 8030-3, 8032-123, 8032-124, 8032-125, 8032-127 | |

For the APE for physical effects, we directed the completion of pedestrian surveys across all portions of the physical APE where project-related ground-disturbing activities might occur. Areas surveyed include the Oak Flat Federal Parcel, GPO project components (East Plant Site, West Plant Site, MARRCO corridor, and filter plant and loadout facility), and the proposed tailings locations for Alternatives 2, 3, 4, 5, and 6. Results from these cultural resource inventories have been compiled into three reports and shared with the SHPO, relevant land managing agencies, and consulting Tribes.

For the APE for auditory effects and the APE for visual effects, a Class I records search for archaeological sites and built environment resources was conducted of the entire APE. Targeted reconnaissance and windshield surveys were conducted. We sought information on places of traditional and cultural importance to Tribes through three measures: Tribal consultations, compilation of an ethnographic and ethnohistoric report, and pedestrian surveys of the APE for physical effects by Tribal Monitors. Along with agency determinations on eligibility, survey results have been or will be shared with SHPO, land managing agencies, and consulting Tribes. Please note that some reports contain sensitive information provided by the Tribes and therefore were shared in a summarized form as part of consultation.

During the assessment of adverse effects (36 CFR 800.5), the Federal agency, in consultation with the SHPO/THPO, Tribes, and other consulting parties, applies the criteria of adverse effects on the historic properties in the APE and determines whether the undertaking will result in an adverse effect on historic properties. If no adverse effects are found, then the undertaking may be implemented and the agency's Section 106 responsibilities have been fulfilled. If adverse effects on historic properties are found, the agency must consult with SHPO, Tribes, and other consulting parties to resolve the adverse effects.

In consultation with SHPO, ACHP, Tribes, and other consulting parties, we have determined that the project will have an adverse effect on historic properties. However, because of the complexity of the project, all of the effects would not be known prior to implementation of the project.

Resolution of adverse effects (36 CFR 800.6) involved the agency consulting with SHPO, Tribes, and other consulting parties to develop strategies to avoid, minimize, or mitigate adverse effects on historic properties. This is done through the development and implementation of an agreement between the Federal agency, ACHP, SHPO, and Tribes and other consulting parties. Development also included the public.

11-RCMSER-2849

Appendix R

| Comment response: CR8 Comments contain criticism or questions on the 106 process | Page 3 of 3 |
|---|---|
| **Responsive to these comments:** 1350-1, 1417-1, 1417-4, 1417-5, 30078-9, 8030-3, 8032-123, 8032-124, 8032-125, 8032-127 | |

Considering the complexity of the project, we developed a PA to resolve adverse effects of the project in consultation with the SHPO, ACHP, Tribes, and other consulting parties. The PA outlined the roles and responsibilities of parties, the procedure for identification and evaluation of historic properties, the assessment for effects, and each party's responsibilities for resolving adverse effects from the project. Several versions of the PA were sent out for review and comment to the consulting parties, including the Tribes. Comments were received and incorporated into each new draft of the PA. In addition, the Forest Service held meetings with the Tribes to discuss the PA on October 28 and 29, 2019. The final version of the PA circulated for signature is included as appendix O of the FEIS.

We also intentionally relied on a NEPA public participation strategy to assist the Federal agencies in satisfying the public involvement requirements under Section 106, pursuant to 36 CFR 800.2(d)(3). This strategy included involving interested parties in the NEPA process, providing project information to the public, giving them opportunities to comment on the project, including Section 106 issues, through five public scoping meetings held on March 31, April 4, 5, and 6, and June 9, 2016; two alternatives workshops held on March 21 and 22, 2017; and DEIS public meetings on September 10, 12, 17, and 19 and October 8 and 10, 2019. Specific workshops to hear public comments and concerns about Section 106 compliance and the PA were held on June 13, 14, and 15, 2018. A workshop for consulting parties to discuss the PA occurred on December 11, 2019. Additionally, we received public comments through the NEPA process on the PA as presented in the DEIS.

The January 2021 Rescinded FEIS included that PA (appendix O). All signatories, other than the ACHP, had signed the PA of January 15, 2021. On February 11, 2021, the ACHP notified the Forest Service that the "ACHP believes that further consultation in this case would be unproductive and therefore, we are hereby terminating consultation pursuant to 36 CFR § 800.7(a)(4)." In accordance with 36 CFR 800.7(c)(4), the Secretary of Agriculture will deliver a written response to the ACHP, and that response will conclude the Section 106 process for this undertaking.

Since the ACHP did not sign the PA, the PA was never executed. Therefore, mitigation measures identified in the PA and any others identified subsequently will now be implemented through the final ROD and special use permit for use of NFS lands, and through enforcement by other State and Federal agencies as well as third parties in separate agreements. Changes in enforcement of the measures described in the draft PA are further described in appendix J.

11-RCMSER-2850

Appendix R

| Comment response: CR10 Failure to comply with Forest Service regulations | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 8031-47 | |

This comment states that we failed to comply with appropriate regulations concerning historic preservation, including data collection, consultation, and mitigation.

Title 36 CFR 800.8(a)(3), "Inclusion of Historic Preservation Issues," states, "Agency officials should ensure that preparation of an environmental assessment (EA) and finding of no significant impact (FONSI) or an EIS and ROD includes appropriate scoping, identification, of historic properties, assessment of effects upon them, and consultation leading to resolution of adverse effects."

As stated, we must do what is "appropriate," which does not necessarily mean a full survey. In the case of the Resolution Copper Project, we have gone beyond the normal standards for information collected to inform the NEPA analysis. Most large-scale projects requiring an EIS-level analysis only gather Class I (records search) data for all alternatives. In contrast, we have gathered full Class III pedestrian survey data for all alternatives for this project.

Title 36 CFR 800.8(c) concerns use of the NEPA process for Section 106 consultation. The section concerning inventory efforts is 36 CFR 800(c)(1)(ii), which states, "Identify historic properties and assess the effects of the undertaking on such properties in a manner consistent which the standards and criteria §§ 800.4 through 800.5, provided that the scope and timing of these steps may be phased to reflect the agency official's consideration of project alternatives in the NEPA process and the effort is commensurate with the assessment of other environmental factors."

These identification efforts do not need to be completed all at once, as they can be phased. There is no requirement that 100 percent of this information he in hand for the DEIS.

The intent is for the DEIS to contain an analysis that is complete enough to draw comparisons between alternatives. However, the DEIS is a living document, intended to garner feedback on the methodologies, supporting data, and conclusions of our analysis. We assert that all survey data sufficient to support a reasonable analysis and informed decision are available for the FEIS/draft ROD.

Title 36 CFR 800.8(c)(1)(v) states that the agency must "develop in consultation with identified consulting parties alternatives and proposed measures that might avoid, minimize or mitigate any adverse effects of the undertaking on historic properties and describe them in the EA or DEIS." The level of information specific to the DEIS consists of "proposed measures," with no expectation that these would be finalized until later in the process. The PA lays out the consultation and development of mitigation.

The January 2021 Rescinded FEIS included that PA (appendix O). All signatories, other than the ACHP, had signed the PA as of January 15, 2021. On February 11, 2021, the ACHP notified the Forest Service that the "ACHP believes that further consultation in this case would be unproductive and therefore, we are hereby terminating consultation pursuant to 36 CFR § 800.7(a)(4)." In accordance with 36 CFR 800.7(c)(4), the Secretary of Agriculture will deliver a written response to the ACHP, and that response will conclude the Section 106 process for this undertaking.

Since the ACHP did not sign the PA, the PA was never executed. Therefore, mitigation measures identified in the PA and any others identified subsequently will now be implemented through the final ROD and special use permit for use of NFS lands, and through enforcement by other State and Federal agencies as well as third parties in separate agreements. Changes in enforcement of the measures described in the draft PA are further described in appendix J.

Appendix R

| Comment response: CR12<br>Comments contain criticism or questions on the Tribal consultation process | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>108-2, 1513-1, 1520-1, 1531-1, 1531-4, 235-15, 27869-1, 28-2, 30080-1, 411-1, 463-2, 541-1 | |

We have engaged in a robust program of Tribal consultation throughout the NEPA process. Several laws, regulations, and policies mandate that we consult with Tribes on projects that may be important to them. These governing documents include NEPA and Section 106 of the NHPA, Native American Graves Protection and Repatriation Act, Archaeological Resources Protection Act (ARPA), American Indian Religious Freedom Act (AIRFA), Executive Order 13007, "Indian Sacred Sites," and Executive Order 13175, "Consultation and Coordination with Indian Tribal Governments." In addition, Section 3003(c)(3) of PL 113-291 requires that the Secretary of Agriculture, through the Forest Service, engage in government-to-government consultation with affected Tribes about their concerns of the land exchange. It also requires us to consult with Resolution Copper to find measures to address the concerns of Tribes and minimize adverse effects.

We initiated consultation with 11 Tribes on the prefeasibility exploration plan for the Resolution Copper Project via a letter dated June 6, 2008; for the land exchange in 2015 via a letter dated August 4, 2015; and with four additional Tribes on December 3, 2018 (due to the inclusion of the Peg Leg alternative). We continue to consult with Tribes, as evident by over 90 letters, 63 meetings, and 13 field visits. See the discussion of consultation history contained in chapter 5 of the FEIS and the full list of consultation process steps in appendix S.

| Comment response: CR12_A<br>Comments contain criticism or questions on the Tribal consultation process; with addition for specific comment 8031-4 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>8031-4 | |

See response CR12 for response to criticisms of the Tribal consultation process.

As noted by the comment, there are additional consultation responsibilities identified in Section 3003 of PL 113-291. The comment notes, "Whether or not the TNF has fully complied with this specific and supplemental consultation requirement is not discussed in the DEIS and there is no evidence that TNF has met this statutory requirement. To the extent that the draft Programmatic Agreement is intended to address the obligations under §3003(c)(3), ITAA does not concur that consultation obligations have been met, nor are the attempts to minimize adverse effects 'mutually acceptable' as required by law."

This comment is incorrect. Additional consultation specific to developing the mitigations required under PL 113-291 has occurred. These meetings are included in the consultation history described in chapter 5 and appendix S of the FEIS. The outcomes of these discussions include some of the remedies and mitigations included in the PA developed during consultation, but note that there are other mitigations that were developed confidentially between the Forest Service, Resolution Copper, and Tribes. These confidential discussions appropriately are not included in the FEIS.

The January 2021 Rescinded FEIS included that PA (appendix O). All signatories, other than the ACHP, had signed the PA as of January 15, 2021. On February 11, 2021, the ACHP notified the Forest Service that the "ACHP believes that further consultation in this case would be unproductive and therefore, we are hereby terminating consultation pursuant to 36 CFR § 800.7(a)(4)." In accordance with 36 CFR 800.7(c)(4), the Secretary of Agriculture will deliver a written response to the ACHP, and that response will conclude the Section 106 process for this undertaking.

Since the ACHP did not sign the PA, the PA was never executed. Therefore, mitigation measures identified in the PA and any others identified subsequently will now be implemented through the final ROD and special use permit for use of NFS lands, and through enforcement by other State and Federal agencies as well as third parties in separate agreements. Changes in enforcement of the measures described in the draft PA are further described in appendix J.

11-RCMSER-2852

Appendix R

| Comment response: CR12_B | |
|---|---|
| Comments contain criticism or questions on the Tribal consultation process; with addition for specific comment 30078-8; 30078-10 | Page 1 of 1 |

| Responsive to these comments: |
|---|
| 30078-10, 30078-8 |

See response CR12 for response to criticisms of the Tribal consultation process.

This comment indicates that the Forest Service has inappropriately intermingled three separate types of consultation: government-to-government Tribal consultation, consultation required under Section 106 of the NHPA, and consultation with Tribes required under Section 3003 of PL 113-291.

We agree that these are separate consultation tracks. While interrelated, they still need to be separate in order to comply with laws. Appendix S in the FEIS identifies the full list of specific meetings and correspondence that resulted from these three consultation tracks.

| Comment response: CR13 | |
|---|---|
| Comments contain criticism or questions on the Tribal consultation process, but specific to 404/USACE | Page 1 of 1 |

| Responsive to these comments: |
|---|
| 8030-4, 8031-12, 8031-13 |

We have engaged in a robust Tribal consultation program throughout the NEPA process. Several laws, regulations, and policies mandate that we consult with Tribes on projects that may be important to them. These governing documents include NEPA and Section 106 of the NHPA, NAGPRA, ARPA, AIRFA, Executive Order 13007, "Indian Sacred Sites," and Executive Order 13175, "Consultation and Coordination with Indian Tribal Governments." In addition, Section 3003(c)(3) of PL 113-291 requires that the Secretary of Agriculture, through the Forest Service, engage in government-to-government consultation with affected Tribes about their concerns regarding the land exchange and to consult with Resolution Copper to find measures to address Tribal concerns and minimize adverse effects.

We are the lead agency for the NEPA and NHPA processes, under PL 113-291, Section 3003(c)(9)(B). For project alternatives where a Section 404 of the Clean Water Act (CWA) permit is needed, the Forest Service is the lead Federal agency for the Section 106 process and consultation under 36 CFR 800.2(a)(2) and the Forest Service acts on behalf of other Federal agencies using the Section 106 process. This includes Section 106 Tribal consultation. We will manage Tribal consultation on the Section 404 permit, along with any compensatory mitigation areas, in conjunction with the USACE.

11-RCMSER-2853

Appendix R

| Comment response: CR13_A<br>Criticism or questions on the Tribal consultation process, but specific to the USACE and Section 404 permit; with addition for specific comment 251-2 | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>251-2 | |

See response CR13 for response to criticisms of the Tribal consultation process related to the USACE.

This comment requests "all cultural resource information TNF has given to the Corps, all consultation materials between TNF and any tribes and for any other information in TNF's possession regarding cultural resources within the area of potential effects ("APE") for the Skunk Camp TSF."

Tribes were supplied with the same information as the USACE. The Skunk Camp tailings alternative survey report was not complete when the DEIS was written, though the preliminary data were available and are referenced in section 3.12 (DEIS, pp. 635–636). When it was ready, the report was provided to the Tribes and SHPO on December 24, 2020. Any additional information provided to the USACE also was provided to the Tribes. Additionally, the reports produced by the Tribal Monitors were shared with the Tribes as an additional source of data to consider, and Tribally designated staff were asked to determine NRHP eligibility and to designate whether any of the resources are traditional cultural places.

We also provided opportunities for representatives of all affected Tribes to visit the Skunk Camp tailings alternative. Invitations for a 2-day visit on May 6 and 7, 2019, were sent via official letter on March 11, 2019, to the 11 Tribes. The May 6 and 7 meetings were attended by representatives on one or both days from the Gila River Indian Community, Mescalero Apache Tribe, Pueblo of Zuni, San Carlos Apache Tribe, Tonto Apache Tribe, White Mountain Apache Tribe, and Yavapai-Apache Tribe. We also provided opportunities for representatives of all affected Tribes to visit the Skunk Camp tailings alternative.

| Comment response: CR14<br>Criticism or questions about the Tribal Monitor Program | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>235-17, 33-2 | |

The Forest Service's Tribal Monitor Program was developed because consulting Tribes asked for Tribal members to participate in the archaeological survey effort to identify important cultural resources. Tribal Monitors are not Tribal staff and cannot conduct consultation on behalf of their Tribes. Resolution Copper agreed to fund the Tribal Monitor Program to address the concerns of Tribes in compliance with PL 113-291. The reports the Tribal Monitors produced were shared with the Tribes as an additional source of data to consider, and Tribally designated staff were asked to determine NRHP eligibility and to designate whether any of the resources are traditional cultural places.

Reports also assist the Forest Service to determine whether there are adverse effects on historic properties as mandated by Section 106, as well as adverse impacts under NEPA for resources that are not historic properties under 36 CFR 800.

| Comment response: CR15<br>Vegetation species of cultural importance | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>28449-115 | |

The DEIS disclosed that 49 types of plants are of special interest but only listed nine of the 49 in section 3.14.3. A comprehensive list, including those mentioned in the comments, was added to section 3.14 of the FEIS.

The Tribal Monitors have subsequently conducted surveys to identify plant species of special interest to Tribes and to record using GPS the locations of plants in specific areas; other plants that are plentiful in each survey area were not point-located. Any newly identified plant species have also been added to section 3.14 of the FEIS.

11-RCMSER-2854

Appendix R

| Comment response: CR16 Indigenous rights, religious freedom, and international standards | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1150-2, 1439-1, 219-1, 30078-11, 30078-12, 8031-33, 8032-146

These comments question whether or how the Forest Service has complied with a number of laws and international standards concerning Indigenous rights and religious freedoms, including AIRFA and the Religious Freedom Restoration Act.

With respect to compliance with these two specific acts, see response NEPA4.

Also see response NEPA15 with respect to comments on the United Nations Declaration on the Rights of Indigenous Peoples. Other international standards raised in these comments, such as the International Covenant on Civil and Political Rights, are similar to the issues raised in response NEPA15.

These international standards are statements of goals and objectives for signatory States and are non-binding for member States. In the United States, Federal agencies are obligated to adhere to U.S. laws, regulations, and policies that protect cultural resources and the rights of Native Americans, such as the National Historic Preservation Act of 1966 (16 United States Code (U.S.C.) 470 et seq.); Archaeological and Historic Preservation Act of 1974 (16 U.S.C. 469); American Indian Religious Freedom Act of 1978 (42 U.S.C. 1996–1996a); and Native American Graves Protection and Repatriation Act of 1990 (23 U.S.C. 3001 et seq.); as well as other applicable laws, regulations, and policies. It is through these laws, regulations, and policies that progress is made toward achieving the goals and objectives in international standards to which the United States is a signatory.

In response to concerns that the DEIS did not adequately address Tribal religious impacts, section 3.14 of the FEIS was revised to more thoroughly explore these issues. See response CR4 for further detail.

11-RCMSER-2855

Appendix R

| Comment response: CR17<br>Sufficiency of cultural resource information disclosed in DEIS | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
1417-2, 8032-122

The purpose of an EIS is to summarize and analyze information on significant issues in order to inform the public and allow agency officials to make decisions regarding a proposed project. Data are to be presented in a concise manner and in such a way that data can be easily compared across alternatives. The Forest Service approach for the EIS was that the EIS be analytic rather than encyclopedic; and that the EIS be concise and no longer than absolutely necessary to comply with NEPA and related regulations. To this end, the DEIS presented sufficient detail available at the time on the number and types of archaeological resources potentially impacted by each alternative of the proposed project for the agency official to make decisions regarding that project and for public information.

Furthermore, Section 304 of the NHPA allows Federal agencies to "withhold from disclosure to the public, information about the location, character, or ownership of a historic property if the Secretary and the Agency determine that the disclosure may –

(1) cause a significant invasion of privacy;

(2) risk harm to the historic property; or

(3) impede the use of a traditional religious site by practitioners."

Additionally, Section 9 of the ARPA (16 U.S.C. 470hh) states, "Information concerning the nature and location of any archaeological resource for which the excavation or removal requires a permit or other permission under this chapter or under any other provisions of Federal law may not be made available to the public under subchapter II of chapter 5 of title 5 or under any other provision of law unless the Federal land manager concerned determines that such disclosure would –

(1) further the purposes of this chapter or chapter 3125 of title 54, and

(2) not create a risk of harm to such resources or to the site at which such resources are located."

In general, locational information and other identifying characteristics of archaeological resources cannot be shared with the public if its release might endanger the resource. Section 9 of the ARPA applies to archaeological resources on Federal lands. If it applies, then the agency is required to withhold information if the ARPA criteria for potential harm to resources are met. Section 304 of the NHPA allows agencies to decide whether information should be withheld to protect the resource, regardless of land ownership. For the current project, the majority of the sites are on Federal land and meet the Section 9 criteria. Therefore, the law dictates that we must withhold sensitive information about those sites from the public.

In addition, many of the archaeological sites are important resources to Tribes and therefore are subject to prohibitions on disclosure, in accordance with 25 U.S.C. 3056. Graphics depicting the location of archaeological sites and detailed descriptions of sites should not be found in an EIS. These data have been shared with the staff designated by each Tribe.

In addition, agencies are limited in the amount of information they can release in a DEIS regarding the nature and characteristics of archaeological resources, which results in the use of quantified data rather than qualitative data to discuss impacts to resources.

11-RCMSER-2856

Appendix R

| Comment response: CR18 Region 3 Programmatic Agreement (PA) | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 7958-4 ||

In accordance with WHEREAS Clause 39 of the Forest Service Region 3 Programmatic Agreement (Region 3 PA), "The FS shall seek and consider the views of the public in a manner that reflects the nature and complexity of each undertaking and its potential effects on historic properties and the likely interest of the public in the effects on historic properties. The FS shall use its procedures for public involvement under the National Environmental Policy Act (NEPA) to solicit information and concerns about historic properties from members of the public. The FS will ensure that an appropriate level of public involvement is provided, in accordance with 36 CFR 800.2(d)(3)."

In following Region 3 PA guidance, we used and coordinated the NEPA public participation efforts to assist Federal agencies in satisfying public involvement requirements under Section 106 pursuant to 36 CFR 800.2(d)(3) by involving interested parties in the NEPA process, providing project information to the public, and giving them opportunities to comment on the project, including Section 106 issues, through:

- five public scoping meetings, held on March 31, April 4, 5, and 6, and June 9, 2016;
- two alternatives workshops, held on March 21 and 22, 2017;
- DEIS public meetings, held on September 10, 12, 17, and 19 and October 8 and 10, 2019;
- workshops to hear public comments and concerns about Section 106 compliance and the project PA, held on June 13, 14, and 15, 2018; and
- workshops for consulting parties to discuss the Resolution Copper Project PA, held on December 11, 2019.

Through these avenues, the Tonto National Forest received comments through the NEPA process on the Resolution Copper Project PA as presented in the DEIS.

Stipulation II. A. of the Region 3 PA states, "The FS will ensure that environmental documents include information on historic properties that will be affected by the proposed action and alternatives, consistent with Section 304 of NHPA and Section 9 of the Archaeological Resources Protection Act (ARPA)."

Stipulation II. B. of the Region 3 PA states, "The FS shall ensure public access to findings made pursuant to this Agreement, consistent with Section 304 of NHPA and Section 9 of ARPA, and will consider comments or objections by members of the public in a timely manner."

Section 304 of the NHPA and Section 9 of the ARPA address the confidentiality of information about historic properties and/or archaeological resources. Section 9 of the ARPA applies to archaeological resources on Federal lands. If it applies, the agency is required to withhold information if the ARPA criteria are met. Section 304 of the NHPA allows agencies to decide whether information should be withheld to protect the resource, regardless of land ownership. For the current project, the majority of the sites are on Federal land and meet the Section 9 criteria.

Therefore, the law dictates that we must withhold sensitive information about those sites from the public. See response CR17 for more discussion about these restrictions.

| Comment response: CR19 Cultural resources along Mineral Creek | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 30081-9 ||

These comments concern impacts to cultural resources along Mineral Creek, which, in the DEIS, would be impacted by the pipeline and power line to the Alternative 6 tailings storage facility.

The Alternative 6 – North pipeline route was modified, in part, based on the issues raised in these comments. The rerouted pipeline considered in the FEIS now substantially avoids perennial water and critical habitat along Mineral Creek (except for a trenchless underground crossing upstream of Government Springs Ranch), crosses Devil's Canyon at a non-perennial location using an overhead span, and reduces the amount of the pipeline corridor that occurs on Arizona State Trust land. A discussion of this change was added to chapter 2 of the FEIS.

This rerouted pipeline avoids the cultural resources referred to in this comment.

Appendix R

| Comment response: CR20<br>Bald and golden eagles | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>8031-45, 8031-66, 8032-186 | |

Bald and golden eagles are included in the special status species analyzed in section 3.8 (DEIS, p. 454). The status of golden eagles with respect to project components is shown in table 3.8.4-2 (DEIS, p. 466), and bald eagles are discussed on p. 468 (DEIS, p. 468). Impacts to these birds along with other migratory birds are described in section 3.8 (DEIS, pp. 461–462). Further details are included in the project record (Newell 2018j).

Impacts to these two species are identified in section 3.8 of the FEIS.

| Comment response: CR21<br>Comments contain criticism or questions on area of potential effects (APE) | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>235-20 | |

We developed the APE in consultation with the SHPO, Tribes, and other consulting parties. The APE for the undertaking consists of a 6-mile buffer around the Oak Flat Federal Parcel, the GPO project areas, and tailings alternatives, except where it has been extended outward to include Top-of-the-World, the historic districts in Globe and Miami, and any Section 404 of the CWA mitigation areas outside the 6-mile buffer.

This APE captures the direct, indirect, and cumulative effects of the project. The APE is broken up into "zones" to guide identification efforts and the evaluation of potential direct, indirect, and cumulative effects. The mine component footprints were buffered by 250 feet; generally, physical effects are expected to occur within the project areas and buffer. The APE for physical effects includes all areas likely to be affected by construction, operations, and reclamation activities. Auditory effects may occur within 2 miles of the combined project footprint and include effects from noise and vibration. Visual/atmospheric effects may occur within 6 miles of the project area or where it has been extended around Top-of-the-World and around the two noncontiguous historic districts in Globe and Miami. The 6-mile buffer plus the extension around Top-of-the-World and the areas around the two noncontiguous historic districts in Globe and Miami will also serve as the APE for cumulative effects. The cumulative APE encompasses most of what is known as the "Copper Triangle."

APE development was an ongoing process, with feedback from consultation with the SHPO, ACHP, Tribes, and other consulting parties. The APE was expanded several times to include new potential effects and new project areas. We are confident that the APE reflects the concerns of all the consulting parties, including the Tribes.

| Comment response: CR22<br>Programmatic Agreement (PA) | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1417-3, 8032-128 | |

These comments are specific to the PA included in appendix O of the DEIS.

The version of the PA in the DEIS was the latest draft at the time of publication. The PA continued to evolve through consultation with required signatories.

The January 2021 Rescinded FEIS included that final version of the PA (appendix O). All signatories, other than the ACHP, had signed the PA as of January 15, 2021. On February 11, 2021, the ACHP notified the Forest Service that the "ACHP believes that further consultation in this case would be unproductive and therefore, we are hereby terminating consultation pursuant to 36 CFR § 800.7(a)(4)." In accordance with 36 CFR 800.7(c)(4), the Secretary of Agriculture will deliver a written response to the ACHP, and that response will conclude the Section 106 process for this undertaking.

Since the ACHP did not sign the PA, the PA was never executed. Therefore, mitigation measures identified in the PA and any others identified subsequently will now be implemented through the final ROD and special use permit for use of NFS lands, and through enforcement by other State and Federal agencies as well as third parties in separate agreements. Changes in enforcement of the measures described in the draft PA are further described in appendix J.

11-RCMSER-2858

Appendix R

| Comment response: CR23 Scoping comments on Programmatic Agreement (PA) | Page 1 of 2 |
|---|---|

**Responsive to these comments:**
32-1

This comment states that the PA is insufficient and refers specifically to a number of scoping comments submitted.

The version of the PA in the DEIS was the latest draft at the time of publication. The PA continued to evolve through consultation with required signatories.

The January 2021 Rescinded FEIS included that final version of the PA (appendix O). All signatories, other than the ACHP, had signed the PA as of January 15, 2021. On February 11, 2021, the ACHP notified the Forest Service that the "ACHP believes that further consultation in this case would be unproductive and therefore, we are hereby terminating consultation pursuant to 36 CFR § 800.7(a)(4)." In accordance with 36 CFR 800.7(c)(4), the Secretary of Agriculture will deliver a written response to the ACHP, and that response will conclude the Section 106 process for this undertaking.

Since the ACHP did not sign the PA, it was never executed. Therefore, mitigation measures identified in the PA and any others identified subsequently will now be implemented through the final ROD and special use permit for use of NFS lands, and through enforcement by other State and Federal agencies as well as third parties in separate agreements. Changes in enforcement of the measures described in the draft PA are further described in appendix J.

We are aware of the specific scoping comment, in the form of 13 questions, submitted by this commenter. During the NEPA process, there is no requirement that scoping comments be addressed explicitly in the DEIS. Scoping comments generate a suite of issues that then guide the analysis in the DEIS. Those issues are contained in the report titled "Final Summary of Issues Identified Through Scoping Process, November 2017" (SWCA Environmental Consultants 2017b).

Any scoping comment is traceable to the issue statements that encompass it, through the report titled "Public Concern Statements, May 2017" (U.S. Forest Service 2017h). The scoping comment in question is #26631, and the individual comments were numbered 2626 through 2638. For example, comment 2626 from scoping comment letter #26631 was as follows: "Question 1: Once the EIS is completed, the land swap has been consummated, all the permits have been issued, and mining starts in earnest - what regulatory body or bodies will ensure that any necessary mitigation, monitoring, and other NEPA-related conditions will actually be carried out?" This was assigned to Public Concern Statement MIT-4.1 (U.S. Forest Service 2017h:A-34).

Regardless of the scoping process, the commenter's specific questions largely were answered in the DEIS. These are summarized below.

Question 1 asked what agencies would oversee mitigation and monitoring. Response: This varies by alternative, and the question is answered for each mitigation/monitoring measure in appendix J. See the "Authority to Require" section for each measure.

Question 2 asked whether any mitigation/monitoring would be charged to taxpayers. Response: No; the mine bears the financial burden for mitigation/monitoring activities. We added language to appendix J of the FEIS to make this clear to the public.

Questions 3 and 4 asked what occurs in the case of bankruptcy. Response: Chapter 2 addresses financial assurances (DEIS, p. 104).

11-RCMSER-2859

Appendix R

| Comment response: CR23 Scoping comments on Programmatic Agreement (PA) | Page 2 of 2 |
|---|---|

**Responsive to these comments:**
32-1

Question 5 asked whether a cost/benefit analysis would be conducted. Response: No; conducting a cost/benefit analysis is not a requirement under NEPA or Forest Service regulations.

Question 6 asked who will manage mined land long term. Response: This varies by alternative. Facilities on Federal land are managed long term by the appropriate Federal agency. Facilities on private land are managed by private landowners. We added language to chapter 1 of the FEIS to make the regulatory jurisdictions for each alternative and each mine component clear to the public.

Question 7 asked the range of conditions that would be analyzed in the EIS. Response: We strove to show a range of conditions, particularly with extreme events. For instance, section 3.7.3 in the FEIS looks at effects of the project on a variety of flood conditions. Section 3.7.1 in the FEIS looks at 87 different groundwater models under a range of conditions. Section 3.2 in the FEIS looks at subsidence under a range of conditions. Section 3.10.1 looks at potential tailings failures under a range of conditions, including saturated failure and unsaturated failure.

Questions 8 and 9 asked for details on how cumulative effects and "secondary" effects would be defined. Response: There is no single answer to this question, as each resource is different. The overall approach is described in chapter 3 (DEIS, pp. 127–129) and varies resource by resource. Each resource section in chapter 3 describes the analysis area considered for direct and indirect effects. The cumulative effect analysis areas were described in (SWCA Environmental Consultants 2018a) for the DEIS but now are described and shown graphically in chapter 4 of the FEIS.

Question 10 asked about boom/bust cycles. Response: Section 3.13 addresses this subject (DEIS, p. 653).

Question 11 asked where the labor pool would be derived. Response: Section 3.13 addresses this subject (DEIS, pp. 648–650).

Question 12 asked about adverse effects on tourism, recreation, and scenic resources (among other things). Response: Section 3.13 addresses effects on the "nature-based tourism economy" (DEIS, p. 653). Section 3.9 addresses effects on recreation (DEIS, pp. 495–509). Section 3.11 addresses effects on scenic resources (DEIS, pp. 594–618).

Question 13 asked, "What effects will the proposed action have on the good faith of Arizona citizens who willingly engaged in an open, federally defined process that gave them a voice and a chance, but then had the rug pulled out from under their feet?" Response: This comment was considered non-actionable during scoping. We are responsible for ensuring that the NEPA process is conducted properly, including appropriate public outreach. The public involvement effort was conducted as required and has included public meetings and comments during scoping, during alternatives development, and after release of the DEIS.

| Comment response: DOC1 Specific wording or technical edit to be considered | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1048-1, 1048-3, 1158-10, 1158-23, 1158-44, 1158-45, 1188-12, 1188-8, 1263-1, 1389-10, 1389-11, 1389-12, 1389-5, 1389-6, 1438-7, 278-3, 278-4, 278-6, 28449-103, 28449-104, 28449-107, 28449-112, 28449-118, 28449-124, 28449-125, 28449-126, 28449-127, 28449-128, 28449-129, 28449-13, 28449-130, 28449-132, 28449-133, 28449-134, 28449-135, 28449-136, 28449-137, 28449-138, 28449-139, 28449-14, 28449-140, 28449-141, 28449-142, 28449-143, 28449-144, 28449-145, 28449-146, 28449-147, 28449-148, 28449-15, 28449-151, 28449-16, 28449-18, 28449-19, 28449-21, 28449-25, 28449-26, 28449-27, 28449-3, 28449-32, 28449-34, 28449-35, 28449-36, 28449-37, 28449-38, 28449-39, 28449-4, 28449-40, 28449-41, 28449-42, 28449-43, 28449-44, 28449-45, 28449-46, 28449-47, 28449-5, 28449-50, 28449-51, 28449-53, 28449-57, 28449-59, 28449-60, 28449-61, 28449-62, 28449-63, 28449-64, 28449-65, 28449-66, 28449-68, 28449-69, 28449-7, 28449-71, 28449-72, 28449-73, 28449-78, 28449-79, 28449-82, 28449-85, 28449-87, 28449-88, 28449-89, 28449-90, 30075-100, 30075-101, 30075-130, 30075-131, 30075-132, 30075-27, 30075-28, 30075-34, 30075-37, 30075-4, 30075-51, 30075-54, 30075-55, 30075-58, 30075-59, 30075-6, 30075-60, 30075-63, 30075-64, 30075-65, 30075-67, 30075-74, 30075-79, 30075-87, 30075-90, 30078-37, 37-1, 524-25, 8032-338, 866-14

We considered all suggestions for specific edits to the EIS, including punctuation, spelling, grammar, and formatting of tables and figures, and made corrections or revisions where appropriate.

Appendix R

| Comment response: EJ2<br>Overall criticisms of environmental justice analysis | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1396-5, 1535-1, 19-5, 28449-117, 8032-140, 8032-141 | |

Section 3.15 has been removed in compliance with Executive Orders 14148 and 14173.

These comments identify the communities of Hayden, Miami, Globe, Superior, and Winkelman, as well as eight Native American communities. All of these communities were included in the analysis area disclosed in the DEIS (see figure 3.15.2-1). With respect to these and other communities identified in comments, the methodology for identifying potentially impacted communities was disclosed in DEIS Section 3.15.2.2. The assessment of impacts to these communities, which is based on the contents of the entirety of the analysis contained in chapter 3 of the DEIS, is summarized in table 3.15.4-1.

These comments identify the need to analyze impacts on area housing. This analysis can be found in FEIS Section 3.13, Socioeconomics, subsection 3.13.4.2.

These comments identify the need to assess pressures on municipal infrastructure such as roads, schools, and medical facilities. This analysis can be found in FEIS Section 3.13, Socioeconomics, subsection 3.13.4.2, specifically "Mine-Related Demands and Costs for Public Services."

| Comment response: EJ2_A<br>Overall criticisms of environmental justice analysis; with addition for specific comment 8032-145 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>8032-145 | |

Section 3.15 has been removed in compliance with Executive Orders 14148 and 14173. See response EJ2.

This comment raises issues related to Tribal consultation, Indigenous rights, and religious freedoms. See responses CR8, NEPA4, NEPA15, and CR16 for more discussion of these issues.

| Comment response: EJ2_B<br>Overall criticisms of environmental justice analysis; with addition for specific comment 8032-138 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>8032-138 | |

Section 3.15 has been removed in compliance with Executive Orders 14148 and 14173. See response EJ2.

This comment includes the following statement: "These comments on the DEIS acknowledge and incorporate by reference those comments of October 25, 2019, relating to failure of the DEIS to address EJCs submitted by Professor Steven Boyd (EJ-EX-01)."

Note that these comments were not submitted to the Forest Service. The investigation into these missing comments is described in Garrett (2020l).

Appendix R

| Comment response: EJ3<br>Overall criticisms of the environmental justice analysis specific to public health | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>8032-142, 8032-57 | |

Section 3.15 has been removed in compliance with Executive Orders 14148 and 14173. See response EJ2.

These comments identify a concern with public health. A public health analysis was conducted to assess potential health outcomes related to proposed mining facilities (see section 3.6 of the FEIS and also see response TS24). Analysis results indicate that emissions from the project and deposition of metals are not anticipated to exceed any thresholds that would indicate excessive cancer or non-cancer health risks.

Additionally, the comment notes the following specific resource impacts associated with the proposed mine facilities. See response EJ2 regarding analysis methodology and impact analyses. Supporting analyses can be found in the following DEIS and FEIS sections:

- Section 3.3 for plants and vegetation
- Section 3.5 for transportation
- Sections 3.7.1, 3.7.2, and 3.7.3 for waters
- Section 3.8 for general biology and wildlife
- Section 3.9 for recreation
- Section 3.12 for cultural resources
- Section 3.13 for economy, employment, and housing
- Section 3.14 for ancestral lands or traditional cultural places of Native American populations

| Comment response: EJ4<br>Question on pipeline impacts to Superior | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>29-3 | |

Section 3.10.1 of the DEIS analyzes the potential impacts from pipeline ruptures (pp. 546–553). This includes potential impacts resulting from ruptures of tailings slurry pipelines associated with tailings facilities (including Silver King, which is mentioned specifically), as well as concentrate pipelines that would be in the MARRCO corridor.

As stated in the DEIS (see p. 546), "In the event of a potential rupture, spill, or failure of either the concentrate pipeline or the tailings pipeline, the effects would be similar to those of a tailings storage facility failure with respect to direct damage to vegetation and potential for contamination. However, because of the ability to monitor and shut down the pipeline immediately upon detecting a problem, the impact would be much more localized, involve much smaller volumes, and would be of a shorter duration. . . . Potential for impact on groundwater quality would be relatively low, given limited release volumes and limited groundwater present in these ephemeral drainages."

| Comment response: EJ5<br>Missing and murdered women | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1338-2 | |

Section 3.15 has been removed in compliance with Executive Orders 14148 and 14173. See response EJ2.

11-RCMSER-2862

Appendix R

| **Comment response:** EJ6<br>Quality of life | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1338-3 | |

Section 3.15 has been removed in compliance with Executive Orders 14148 and 14173. See response EJ2.

This comment mentions quality of life. Impacts to quality of life indicators, including baseline descriptions of the affected environment and potential impacts associated with the construction and operation of proposed mining facilities, are described in the following sections of the DEIS and FEIS:

- Section 3.4 for noise impacts
- Section 3.5 for transportation
- Section 3.6 for air quality
- Sections 3.7.1, 3.7.2, and 3.7.3 for waters
- Section 3.9 for recreation
- Section 3.11 for scenic and dark sky
- Section 3.13 for socioeconomic and municipal services

| **Comment response:** GS1<br>Pipeline failure risks, with specific reference to seismic hazards | Page 1 of 2 |
|---|---|
| **Responsive to these comments:**<br>1538-7, 30141-7, 8032-244 | |

These comments raise concerns over the risk and consequences of pipeline failures and the seismic analysis pertinent to the pipelines.

Analysis of the potential for pipeline failures and the consequences for pipeline failures are analyzed in section 3.10.1 (DEIS, pp. 535–554).

Studies that have been completed that are pertinent to the pipeline design and protection, including seismic hazards, include the following:

- The site-specific seismic hazard analyses for the mine site and Alternative 6 tailings storage facilities (Wong 2020)
- The pipeline management plans available before the DEIS, which includes specific analysis of potential failure modes, including geohazards and storm events (AMEC Foster Wheeler Americas Limited 2019; M3 Engineering and Technology Corporation 2019)
- A pipeline protection and integrity plan prepared in response to comments, which includes specific analysis of potential failure modes, including geohazards such as slope instability, seismic hazards, scour, and geologic subsidence (Golder Associates Inc. 2020); this plan includes specific mitigation methods to respond to these geohazards

The pipeline protection and integrity plan prepared in response to comments also includes analysis of potential failure modes other than geohazards, including mechanical failure, corrosion and erosion, operational failures, and human-caused failures. This plan includes specific mitigation methods to respond to these potential failure modes.

11-RCMSER-2863

Appendix R

| Comment response: GS1<br>Pipeline failure risks, with specific reference to seismic hazards | Page 2 of 2 |
| --- | --- |
| **Responsive to these comments:**<br>1538-7, 30141-7, 8032-244 | |

Specific to seismic hazards, the pipeline protection and integrity plan looked at specific hazards such as ground movement, liquefaction, and active surface fault ruptures. No specific hazards were found to be of concern. The plan notes:

> *"Seismic events are typically not direct integrity threats to the pipelines, provided that the pipeline does not cross active faults. No records or signs of active faults have been identified along the selected pipeline alignment in the two seismic hazard evaluations completed for the area covering the pipeline and additionally, no active faults have been identified during field geotechnical investigations.*

> *If signs of active fault zones are identified during construction of the pipeline, the following mitigation measures may be implemented depending upon the site conditions:*

> - *heavy wall pipe to increase the capacity to accommodate additional stresses caused by differential movement in active fault zones*
> - *increased trench width in combination with low density fill materials to minimize the additional stresses*
> - *reduced depth of cover to minimize the additional stresses*
> - *specially designed aboveground fault crossings, if necessary."* (Golder Associates Inc. 2020:14)

| Comment response: GS1_A<br>Pipeline failure risks, with specific reference to seismic hazards; with addition for specific comment 863-1 | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>863-1 | |

See response GS1 for response to the general topic of pipeline failures due to seismic activity.

This comment notes the design earthquake for the project is the 5,000-year return period. This is incorrect. See response TS2 for more detail.

11-RCMSER-2864

Appendix R

| Comment response: GS2<br>Volcanism and seismic data sources | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1201-3, 61-1, 62-5, 8032-243 | |

These comments concern seismic activity and volcanism.

There is no credible evidence that active volcanoes or fumaroles are present at the mine site or any of the tailings storage facilities, nor is active volcanism a general concern for this area. According to the U.S. Geological Survey (USGS) Volcano Hazards Program, the nearest volcanic fields are about 140 miles away, either to the northeast (the Red Hill-Quemado volcanic field in western New Mexico) or to the northwest (the San Francisco volcanic field around Flagstaff, Arizona). This issue is therefore not analyzed as part of the NEPA process.

With respect to seismic activity, additional investigation and updated data sources have been received since the DEIS. These include the following:

- Site-specific seismic hazard assessment for the Skunk Camp location (Wong et al. 2020a) and NEPA team review of this assessment (Zellman and Cook 2020c)
- NEPA team review of three seismic reports for the mine site (Zellman and Cook 2020b)
- NEPA team review specifically of the potential for active surface faulting at the Skunk Camp tailings storage facility (Zellman and Cook 2020a)
- Specific responses to issues raised in two reports submitted with comment letter #8032, including a report by Dr. S. Emerman (Appendix B-5 to the letter) and Dr. D. Chambers (Appendix A to the letter) (KCB Consultants Ltd. 2020g)

The comments from the Chambers report questions the data sources used for the seismic analysis, noting 2014 data from the USGS that would have postdated a 2013 seismic report. As noted in the list above, the seismic hazard studies conducted for the Skunk Camp tailings storage facility all postdate the 2014 data, and the data sources are either consistent with or more updated and recent than the sources cited in the comment.

The comments from the Chambers report also note that the EIS "must disclose the location and magnitude of the maximum credible earthquake used for the design earthquake for the tailings dam." There are two basic approaches for calculating ground motions from seismic events: a probabilistic seismic hazard assessment (PSHA), and a deterministic seismic hazard assessment (DSHA). Both methods were conducted in the 2013 report that Dr. Chambers reviewed; in addition, a more recent 2020 site-specific seismic hazard assessment was conducted for the Skunk Camp tailings location. A DSHA analyzes a specific magnitude earthquake at a specific fault. A PSHA analyzes a hypothetical seismic event of a given magnitude at a given distance. In both cases, the ground motion at the location of interest (in this case the tailings storage facility) is analyzed. The PSHA approach resulted in higher ground motion than the DSHA; therefore, the PSHA was used for the design of the tailings storage facility. Regardless of the results, the faults used for the analysis are clearly disclosed in the seismic reports.

Appendix R

| Comment response: GS3<br>Safety of climbing routes; induced seismicity | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>1358-3, 1524-4, 29-8 | |

The DEIS discusses the potential for the block caving operations to induce small seismic events in section 3.2 (DEIS, pp. 145–146, 155). These comments express concern that the results are not given sufficient weight, considering climbing routes in the area and the uncertainty in the analysis.

The DEIS concludes, "While mine-induced seismicity is possible, based on 100 years of worldwide observations, events greater than magnitude 5 are rare, and events of magnitude 3 or less are more common. This is observed in the most recent mine-related earthquakes in Arizona, which ranged from magnitude 2.9 to 3.1" (DEIS, p. 155).

The general effects of earthquakes of magnitude 3 (on the Richter scale) can be put into other terms, such as the Modified Mercalli scale described in section 3.2 (DEIS, p. 145). An earthquake of magnitude 3 on the Richter scale generally corresponds to a magnitude II or III on the Modified Mercalli scale. As noted in the DEIS, the effects of a magnitude III earthquake are "weak. Many people do not recognize it as an earthquake, standing vehicles may rock slightly, and vibrations are similar to the passing of a truck" (DEIS, p. 145).

As with all climbing areas, the formations in the vicinity of the project have hazards present from balancing rocks and fractured and unstable features. Rockfalls associated with these hazards happen naturally, responding to the effects of background vibrations, wind, water, and freeze/thaw cycles. Induced seismicity triggered by block caving—if it happens—appears no more likely than these natural factors to trigger specific hazards to climbers.

We have added further discussion to section 3.2 of the FEIS to put the potential hazards of induced seismicity into context.

Another comment notes that damage could occur to buildings in Superior from induced seismicity. This was analyzed in section 3.2; "Induced mine seismicity is possible, but unlikely to be of sufficient magnitude to cause structural damage" (DEIS, p. 155).

Another comment notes the horizontal and vertical displacement associated with subsidence would increase hazards, as well. See response GS14 for more details on this issue.

11-RCMSER-2866

Appendix R

| Comment response: GS4 Uncertain information with respect to fault lines | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1097-9, 62-1

These comments raise concerns over uncertain information about the location and nature of the fault lines that exist in the area and state that the DEIS does not specifically note that the "uncertainty is much greater in the area near Apache Leap [Special Management Area]."

The document referenced in the comment (BGC Engineering USA Inc. 2018a) does note that the geological characterization is the most detailed near the ore body: "Therefore, the Workgroup concludes that geologic data outside of the mineralized zone, as well as for the Camp and Gant faults, is not as well represented as in the mineralized zone" BGC Engineering USA Inc. (2018a:54). The Gant Fault is indeed located on the west side of the ore body, near the Apache Leap Special Management Area (SMA). In this sense, the comment is correct that uncertainty is greater in the area near the Apache Leap SMA.

However, this uncertainty was not ignored in the DEIS analysis. The text continues, "However, conservative modeling assumptions and sensitivity analyses have been used to account for sparse data in these areas" (BGC Engineering USA Inc. 2018a:54). The results of the sensitivity analyses are discussed in section 3.2 of the DEIS:

*"The Geology and Subsidence Workgroup requested a number of sensitivity model runs as part of the evaluation of the subsidence model (BGC Engineering USA Inc. 2018a; Garza-Cruz and Pierce 2018). These model runs assess what would change if various input parameters or assumptions in the model were different, including rock mass strength, in-situ strength, fault strength, and bulked rock porosity. The size of the fracture limit under these different sensitivity runs does not differ substantially from the base case model, and while at least one sensitivity run brings it closer to the boundary of the Apache Leap SMA, it remains outside that boundary. Similarly, under all scenarios the first breakthrough of subsidence occurs in year 6 or 7 of mining, and subsidence ends very soon after ore extraction ends." (DEIS, p. 151)*

In other words, the NEPA team was cognizant of the potential for uncertainties related to faults to affect the outcomes of the model, particularly the potential impacts to Apache Leap, and devised an approach meant specifically to quantify those uncertainties. The outcome of this approach demonstrates that subsidence is not anticipated to impact the Apache Leap SMA, even considering uncertain model inputs.

| Comment response: GS6 Uncertain information | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8032-36

This comment states, "The DEIS Report Notes that 'There are several areas of uncertainty and some areas of sparse or low confidence data...' (Ch 3, 3.2.2.2, para. 5, bullet #4). Where are these uncertain data detailed?"

These areas of uncertain information are detailed in DEIS reference BGC Engineering USA Inc. (2018a). This memorandum documents the opinions of the Geology and Subsidence Workgroup convened by the Forest Service to assess the subsidence modeling. Much of this workgroup memorandum is devoted to identifying areas of uncertainty with the modeling. These are summarized in Section 7.0, Conclusions, and specifically in table 6, "Key input parameters impacting surface subsidence and the quality of the associated data" (BGC Engineering USA Inc. 2018a:52).

11-RCMSER-2867

Appendix R

| Comment response: GS7<br>Environmental protection measures employed for Alternative 6 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>8032-37 | |

This comment asks, "Exactly what environmental protection measures and mitigation efforts would be employed?" for Alternative 6 – Skunk Camp.

There are two categories of environmental protection measures considered in the DEIS. Within each resource section in chapter 3, specific "applicant-committed environmental protection measures" are detailed. As described in chapter 2, "Applicant-committed environmental design measures are features incorporated into the design of the project by Resolution Copper to reduce potential impacts on resources. These measures would be non-discretionary as they are included in the project design, and their effects are accounted for in the analysis of environmental consequences disclosed in each resource section of chapter 3" (DEIS, p. 103). Readers should expect that any applicant-committed environmental protection measures listed in chapter 3 would be employed as described.

The second category of environmental protection measures consists of those identified as "mitigation." Chapter 3 states, "As described in chapter 2, the Forest Service is in the process of developing a comprehensive set of mitigation measures that, where practical and technically feasible to implement, would serve to avoid, minimize, rectify, reduce, or compensate for resource impacts identified during effects analyses conducted for this EIS" (DEIS, p. 129).

Unlike applicant-committed environmental protection measures, mitigation measures are not brought forward by the applicant as an integral part of the project; rather, they emerge during the NEPA process as part of the analysis.

Because mitigation measures are not an integral part of the project, the effectiveness of proposed mitigation is analyzed separately from the environmental consequences analysis for each resource assessed in chapter 3. The usefulness of the proposed mitigation is assessed separately in the "Mitigation Effectiveness" section for each resource.

All of the mitigation measures—regardless of the resource they affect—are compiled in one location in appendix J of the DEIS. Each item in appendix J clearly identifies whether that item can be required by the Forest Service or has been agreed to be implemented voluntarily by Resolution Copper. This distinction is important, because for voluntary measures, "The Forest Service and regulatory agencies have no authority, obligation, or expertise to determine or enforce compliance of the measures included in this category. They are presented here to facilitate disclosure of currently known mitigation and monitoring and their consideration in impacts analyses" (DEIS, appendix J, p. J3).

Because different alternatives have different land jurisdictions, the authority to require mitigation differs between alternatives. The Alternative 6 tailings storage facility, as noted in the comment, occurs on private land, and therefore the Forest Service may have limited jurisdiction to require mitigation. Appendix J clearly identifies the alternatives for which each mitigation measure is applicable. For example, mitigation measure "FS-01: Satellite Monitoring of Tailings Storage Facility" is shown to be applicable only to Alternatives 2, 3, 4, and 5 because of the land jurisdiction of Alternative 6: "Alternative 6: As facility would ultimately be located on private land, Forest Service would not have authority to require long-term monitoring of the tailings storage facility" (DEIS, appendix J, p. J-17).

11-RCMSER-2868

Appendix R

| Comment response: GS8 | |
|---|---|
| Comments regarding Oyu Tolgoi mine | Page 1 of 1 |

| **Responsive to these comments:** |
|---|
| 104-3, 1201-1, 53-3, 8032-265 |

These comments discuss a mine in Mongolia: "Rio Tinto is a primary partner in Oyu Tolgoi, LLC, the operator of the Oyu Tolgoi mine being developed in southern Mongolia. Underground mine operations at Oyu Tolgoi are being planned as a block cave mine. An announcement during the first half of 2019 of 'ground instability problems' at the Oyu Tolgoi site encountered during construction of the underground mine. . . . As Resolution is proposed as a block cave mine, an analysis of the implications of the Oyu Tolgoi ground instability problem should be incorporated into a revised or supplemental DEIS and FEIS for the Resolution project."

The available facts regarding the Oyu Tolgoi mine were compiled and assessed by the NEPA team (Newell 2020). This analysis concluded the following:

> *"There are no specific parallels between the Oyu Tolgoi experience and Resolution Copper. No evidence has been found through this research that the adverse geotechnical conditions that occurred at Oyu Tolgoi would repeat themselves at Resolution Copper. Nor is there any indication that such conditions if they occurred are not already considered and incorporated into the Resolution Copper development and engineering plans. Geology and geotechnical conditions are site-specific. What was experienced geologically at Oyu Tolgoi has no bearing on what would be experienced geologically at Resolution Copper."* (Newell 2020)

In addition, geotechnical challenges encountered during development of Oyu Tolgoi underground mine are related to local rock mass condition surrounding the underground development. This has no impact on predicted subsidence on ground surface, which is a function of mainly depth and shape of the ore body and the geological structures.

The analysis continues,

> *"The applicability of Oyu Tolgoi to Resolution Copper is as an example of the challenges that can occur during mine development. There is no reason to anticipate that Resolution Copper would experience the exact same challenges, but it is indeed reasonable to anticipate that Resolution Copper could experience other unspecified challenges. These could be difficulties in material or equipment supply, unanticipated geologic conditions, difficulties with ventilation, difficulties with dewatering, or an unlimited number of other challenges. Oyu Tolgoi is an example of how unanticipated real-world challenges can be met. Meeting these challenges may result in project delays, project overruns, or both. These represent business challenges and decisions for the mining company, but they have no bearing on the Forest Service decision. No part of the Forest Service decision takes Resolution Copper's profitability into account."* (Newell 2020)

Since the publication of the January 2021 Rescinded FEIS, additional news reports about Oyu Tolgoi have appeared. These are mostly related to Rio Tinto's obtaining full control over the mine and the negotiations with the Mongolian government. None of these reports suggest similarities between Resolution Copper and Oyu Tolgoi that differ from those assessed previously (Newell 2020).

| Comment response: GS9 | |
|---|---|
| Porous nature of Apache Leap Tuff | Page 1 of 1 |

| **Responsive to these comments:** |
|---|
| 1201-2, 162-1 |

These comments refer to the porous nature of the Apache Leap Tuff. This does not represent new information. Characterization of the Apache Leap Tuff as a permeable and productive aquifer is fundamental to the analysis in the DEIS and to the long-term predictions of impacts to groundwater levels from dewatering of the aquifer once block caving begins (DEIS, pp. 139 and 305).

11-RCMSER-2869

Appendix R

| Comment response: GS10<br>Stated ore reserves | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>82-1 | |

This comment questions the amount of ore reserves stated by Resolution Copper. It is not clear whether the intent of the comment is to suggest that inadequate ore reserves exist or that the stated lifespan of the mine may be longer than anticipated.

Regardless, quantification, documentation, and disclosure of ore amounts are highly regulated, particularly under Canadian regulations. There are specific standards of evidence, specific definitions and terminology, and standards for responsible professionals with which to assess the ore body. Resolution Copper has adhered to these standards for disclosures of ore amounts.

There is no expectation that these numbers remain the same over time or that the understanding of the ore body would not evolve. Ore amounts change not just with further exploration and information gathered during operations but with improved technologies and the ability to profitably mine ore that was previously infeasible to mine.

| Comment response: GS11<br>Subsidence modeling, supporting information, and uncertainties | Page 1 of 3 |
| --- | --- |
| **Responsive to these comments:**<br>1301-18, 30144-2 (Emerman3), 30144-3 (Emerman3), 8032-262, 8032-263 | |

These comments are specific to the modeling of the subsidence resulting from the block caving operation, the supporting information for that modeling analysis, and the uncertainties from the analysis. Many of these comments are based on a report submitted with comment letter #8032, written by Dr. S. Emerman (Appendix B4 to letter #8032). Overall, these comments contain numerous incorrect statements and unsupportable analysis. Specific issues raised in the comments include the following:

- Lack of disclosure of supporting information
- Unreported faults
- Concerns with the subsidence monitoring plan
- Calculations of uncertainty of subsidence modeling analysis

Comments on lack of disclosure of supporting information

These comments state, "The actual data that were used in the subsidence modeling are not presented in any documents that have been provided by Rio Tinto."

This is an incorrect statement. The Forest Service convened a Geology and Subsidence Workgroup to review the subsidence modeling and supporting information, starting with the basic geological data collected at the Resolution Copper site, the interpretation of that data, and the incorporation of that information into a numerical subsidence model. The amount of information provided to the Forest Service by Resolution Copper is substantial and is detailed in the workgroup conclusion memorandum (BGC Engineering USA Inc. 2018a); see in particular the literature cited and appendix A). The primary underlying cause for these comments appears to be that many of these comments were written in March 2019, before the release of the DEIS and any supporting materials and before disclosure of the work done by the Geology and Subsidence Workgroup. Many of the comments appear to rely strictly on Resolution Copper's 2014 GPO. In fact, the subsidence analysis put forth in the 2014 GPO differs greatly in methodology from the analysis conducted to support the NEPA analysis, which was the analysis directed and reviewed by the Geology and Subsidence Workgroup.

In order to review public comments, the Geology and Subsidence Workgroup was reconvened in January 2020, and the results of this workgroup were updated. We have included a revised discussion in section 3.2 of the FEIS.

Comments on unreported faults

The Emerman comments identify two lineaments observable on aerial photographs and conclude that these represent faults not properly considered in the subsidence analysis. Comparison with the data used to develop the subsidence monitoring plan shows that these correspond to the West Boundary and Gant West Faults, both of which were known and properly considered in the subsidence modeling (Resolution Copper 2020c).

Appendix R

| Comment response: GS11 | |
|---|---|
| Subsidence modeling, supporting information, and uncertainties | Page 2 of 3 |

**Responsive to these comments:**
1301-18, 30144-2 (Emerman3), 30144-3 (Emerman3), 8032-262, 8032-263

Comments on subsidence monitoring plan

These comments state concerns about the subsidence monitoring plan, referring specifically to the subsidence monitoring plan contained in the 2014 GPO. These comments also appear to have been written prior to review of the DEIS, as this subsidence monitoring plan was not the plan disclosed as an applicant-committed environmental protection measure in section 3.2 (DEIS, p. 150). The more recent version contained substantially more detailed information than the GPO (Tshisens 2018a).

Despite the review of outdated information, the Forest Service shared some of the same concerns about the monitoring plan. This is reflected in mitigation measure FS-222 (DEIS, p. 159; appendix J, p. J-4), which states, "The subsidence monitoring plan proposed by Resolution Copper has been included in the EIS as an applicant-committed environmental protection measure, however, as subsidence has the potential to impact Tonto National Forest surface resources, the Forest Service will require that a final subsidence monitoring plan be completed and approved by the Forest Service prior to signing a decision."

After discussion as part of the reconvened Geology and Subsidence Workgroup, including review of the Emerman comments, a revised subsidence monitoring plan was submitted by Resolution Copper (Davies 2020b). The Forest Service provided additional comments, and a second revised subsidence monitoring plan was submitted (Davies 2020a). This subsidence monitoring plan has been included as a required mitigation measure in appendix J of the FEIS (measure FS-GS-01).

As part of the criticism of the subsidence monitoring plan, Emerman comments, "A comprehensive database of subsidence caused by block caving reported that unanticipated subsidence has occurred in 20 percent of block caving projects with most of the anomalies being related to geological faults." This information was reviewed by the Geology and Subsidence Workgroup and found that "the database compiles subsidence from underground hard rock mines in general and is not specific to block cave operations. Out of 36 subsidence cases reported in the database, there were 8 reported unexpected failures of which only 2 cases were related to sublevel caving operation and none from block cave or panel cave operations" (Karami and Henderson 2020).

11-RCMSER-2871

Appendix R

| Comment response: GS11 Subsidence modeling, supporting information, and uncertainties | Page 3 of 3 |
|---|---|
| **Responsive to these comments:** 1301-18, 30144-2 (Emerman3), 30144-3 (Emerman3), 8032-262, 8032-263 | |

The Emerman comments also refer to several case histories of chimney failure above mining areas or collapse of the overlying rock mass above the cave. A review of those cases revealed that the main causes of those failures were local ground conditions (weak rock masses), the presence of highly altered and intensely fractured faults zones (generally absent at the Resolution Copper property), and poor mining practices. The absence of a surface monitoring program to monitor ground settlement and surface cracking further exacerbated the situation at those cases (Karami and Henderson 2020). The NEPA team further evaluated examples of successful monitoring for block caving operations and noted that lateral expansion of subsidence is primarily driven by the panels being mined and that all predictive subsidence model results for the Resolution Copper Project represent the caving when it is fully expanded to the ultimate footprint. Rapid progression within that footprint may take place but would not affect the ultimate footprint.

Calculations of subsidence uncertainty

The Emerman report makes a series of calculations attempting to describe the bounds of uncertainty of the subsidence analysis. Again, this appears to have been based solely on the information in the 2014 GPO, not the actual subsidence modeling conducted for the NEPA analysis. Through a series of mathematical steps, the report concludes that "the probability that the outer limit of the subsidence zone will extend onto Apache Leap or beyond is 5.3%."

This analysis is unsupportable. Fundamentally, the analysis is based on information not relied upon for the NEPA analysis and then extrapolates this outdated analysis using a number of erroneous assumptions. Using a similar approach, but based on the actual modeling used for the NEPA analysis, both Itasca (Resolution Copper's subsidence consultant) and the Geology and Subsidence Workgroup found that the probability that the outer limit of subsidence will extend onto Apache Leap is 0.1 percent (Garza-Cruz and Pierce 2020b; Karami and Henderson 2020).

However, the more important point that is missed by the comments is that the Geology and Subsidence Workgroup explicitly addressed the issue of uncertainty and analyzed the effect through the use of sensitivity analysis. The full range of results informed the DEIS analysis and was disclosed in the DEIS.

We have added a discussion of the uncertainty of the subsidence modeling to section 3.2 of the FEIS.

| Comment response: GS11_A Subsidence modeling, supporting information, and uncertainties; with addition for specific comment 8032-264 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 8032-264 | |

See response GS11 for response to the general topic of subsidence modeling, supporting information, and uncertainties. This comment asks a number of specific questions based on the Emerman analysis:

- Why has Rio Tinto not provided the reports on subsidence modeling from their consultants? Response: All subsidence modeling and supporting information was provided to and reviewed by the Geology and Subsidence Workgroup convened by the Forest Service to support the NEPA analysis.

- Why does Rio Tinto not recognize the pronounced lineament that connects Apache Leap with the caved rock zone as a geological fault or zone of structural weakness? Response: The two lineaments identified are faults—the Gant West and West Boundary Faults. Both were identified and incorporated properly into the subsidence modeling.

- Why does Rio Tinto believe that rapid subsidence and rockbursts cannot occur, in opposition to the block caving manual that they rely upon? Response: These concepts were incorporated into the review of the subsidence monitoring plan conducted by the reconvened Geology and Subsidence Workgroup. The subsidence monitoring plan in the FEIS represents an evolution based on review by the workgroup. The question posed in this comment is based on an outdated version of the subsidence monitoring plan, and the concepts were considered. The subsidence monitoring plan makes use of a variety of continuous monitoring techniques that would note sudden movement in almost real time and includes specific triggers for action if unanticipated movement occurs.

- Why has Rio Tinto not provided any error bounds on their predictions of the lateral extent of land subsidence? Response: The uncertainties of the subsidence analysis were explicitly analyzed during the NEPA process through the use of a number of sensitivity analyses, by changing key parameters. The entire range of results informed the DEIS analysis and was disclosed in the DEIS (DEIS, p. 151).

11-RCMSER-2872

Appendix R

| **Comment response: GS12** | |
| Need for analysis of subsidence impacts | Page 1 of 1 |

| **Responsive to these comments:** |
| 1468-5 |

This comment draws comparisons between other types of ground disturbance, such as dewatering subsidence or hydraulic fracturing, and the land subsidence to be experienced above the Resolution Copper ore body.

These comparisons are not sufficient to adequately analyze the effects of subsidence associated with block caving. The best tool for assessing the potential lateral extent of subsidence displacement is a numerical model such as that developed for the NEPA analysis. This type of model can take into account the site-specific geology, including the locations and characteristics of faults and specific rock properties, in order to assess the potential subsidence effects and the effect that uncertainty has on the outcomes. The analysis contained in the DEIS used the most appropriate tools to predict subsidence outcomes (DEIS, pp. 130–160).

| **Comment response: GS13** | |
| Effectiveness of subsidence monitoring plan; impacts to nearby infrastructure | Page 1 of 1 |

| **Responsive to these comments:** |
| 1279-2, 1360-14, 227-1, 236-2 |

These comments express concern that the subsidence might affect nearby infrastructure like U.S. Route (U.S.) 60 and raise concerns about the effectiveness of the proposed subsidence monitoring to protect these areas.

We had some of the same concerns about the monitoring plan. This is reflected in mitigation measure FS-222 (DEIS, p. 159; appendix J, p. J-4), which states, "The subsidence monitoring plan proposed by Resolution Copper has been included in the EIS as an Applicant-Committed Environmental Protection Measure, however, as subsidence has the potential to impact Tonto National Forest surface resources, the Forest Service will require that a final subsidence monitoring plan be completed and approved by the Forest Service prior to signing a decision."

We reconvened the Geology and Subsidence Workgroup in January 2020 in order to address comments received on the DEIS, including a specific review and discussion of the subsidence monitoring plan. After discussion by the reconvened Geology and Subsidence Workgroup, a revised subsidence monitoring plan was submitted by Resolution Copper (Davies 2020b). We provided additional comments, and a second revised subsidence monitoring plan was submitted (Davies 2020a). This subsidence monitoring plan has been included as a required mitigation measure in appendix J of the FEIS (mitigation measure FS-GS-01).

Based on our analysis, we do not anticipate impacts to important infrastructure like U.S. 60; the monitoring is intended to ensure that real-world effects during operation match predicted outcomes. Specific attention was given to identifying triggers and tying specific actions to those triggers in order to prevent damage in the event that the NEPA analysis underestimated predicted subsidence effects.

Appendix R

| Comment response: GS14<br>Effects on Apache Leap | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>1158-26, 1158-48 | |

These comments express concern that vertical displacement at Apache Leap could cause instability to the geographic feature.

The issue of what types of movement or impact causes damage was specifically looked at by the Geology and Subsidence Workgroup and then reconsidered in light of comments received on the DEIS. Additional information was obtained to explore the most appropriate methods to identify and describe subsidence impacts (Karami and Henderson 2020; Pierce 2020).

Ground movement is generally defined by five different metrics:

- Vertical displacement
- Horizontal displacement
- Tilting
- Horizontal strain
- Angular distortion

Based on a review of literature and case studies, we identified appropriate metrics to describe potential damage to Apache Leap (and other sensitive areas). Vertical and horizontal displacement by themselves do not lead to damage of structures. Rather, it is horizontal strain (stretching) and angular distortion that can lead to cracks or fractures. Tilt is important for assessing the stability of tall structures, like the hoodoo formations associated with Apache Leap.

The criterion of how much horizontal strain and angular distortion it would take to damage a natural structure like Apache Leap is based on methods developed to assess structural damage to buildings. In reality, rock formations are not as sensitive as building structures, and small cracks in already fractured geological formations are unlikely to have any substantial effect. Clear thresholds have been established to identify the level of damage that would be associated with a given combination of horizontal strain and angular distortion. Within the zone of continuous subsidence, damage would be moderate to severe, which in buildings would translate to cracks on the order of 15 to 25 millimeters (mm) wide. By contrast, the combination of horizontal strain and angular distortion experienced at Apache Leap, on U.S. 60, or at Devil's Canyon would translate to negligible damage, which in buildings would translate to hairline cracks less than 0.1 mm wide.

The threshold for the level of tilt that might cause tall structures like hoodoos to topple is 7.5 degrees. The modeling results show that tilt at Apache Leap is expected to be less than 1 degree.

We added further discussion to section 3.2 of the FEIS to describe the metrics used to define damage resulting from subsidence.

| Comment response: GS15<br>Dewatering subsidence and block-cave subsidence | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>1358-1 | |

This comment notes that the two types of subsidence discussed in the DEIS were not evaluated cumulatively.

This is an appropriate analysis choice, and the reasons for this are described in section 3.7.1: "Two areas have the potential for land subsidence due to groundwater pumping: the area around the East Plant Site and mining panels where dewatering pumping would continue to occur, and the area around the Desert Wellfield. While small amounts of land subsidence attributable to the dewatering pumping have been observed around the East Plant Site using satellite techniques (approximately 1.5 inches, between 2011 and 2016), once mining operations begin, any land subsidence due to pumping would be subsumed by subsidence caused by the block caving (estimated to be 800 feet deep, and possibly as deep as 1,100 feet at the end of mining)" (DEIS, p. 334).

This comment also expresses concern that subsidence would not end when mining ends but would continue to occur. This question was explored by the Geology and Subsidence Workgroup before the DEIS was prepared (Morcy 2018c). Additional information was requested on this topic and can be found in (Pierce and Garza-Cruz 2018). Based on analogous mines and case studies, the Geology and Subsidence Workgroup determined that there is little likelihood of substantial residual subsidence after cessation of block caving.

11-RCMSER-2874

Appendix R

| Comment response: GS16<br>Impacts from mining technique | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
30141-5

This comment reiterates many of the impacts resulting from the block caving operation that are detailed in the DEIS, including impacts to cultural and Tribal values, groundwater resources, and recreation. The ultimate point made by the comment is that these impacts could be prevented by "conducting responsible mining instead of maximizing economic profit."

This is a reference to the concept that mining could or should be undertaken using an alternative mining technique. We fully vetted this issue, with the conclusion that the alternative mining techniques proposed by commenters (such as cut-and-fill) are not reasonable at this location. This conclusion is not based in any way on the amount of profit Resolution Copper would make; see response AMT1 for more details.

| Comment response: LG1<br>Cattle health; scope of analysis | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8032-284, 8032-285, 8032-287

These comments concern perceived shortcomings in the analysis of impacts to livestock and grazing.

The DEIS addresses several of these perceived shortcomings. Comments indicate the need to expand the spatial scope of analysis. The specific metrics used to analyze livestock grazing are "the potential for acreages of grazing allotments to change, the potential for animal unit months (AUMs) to be reduced, and the potential for loss of grazing-related facilities (e.g., stock watering sources)" (DEIS, p. 687). The spatial scope is "the entirety of all allotments that overlap spatially, in full or in part, with the primary GPO-proposed mine components (East Plant Site and subsidence area, West Plant Site, MARRCO corridor, filter plant and loadout facility, Near West tailings storage facility and pipeline corridors, and transmission lines) and each alternative tailings storage facility analyzed in this EIS" (DEIS, p. 687). This spatial analysis area is where changes in identified metrics would occur and therefore is the appropriate spatial scope.

Comments indicate the need to analyze impacts to water sources. These water sources were analyzed in section 3.16 (DEIS, pp. 694–700).

Comments indicate the need to analyze impacts to cattle health due to project emissions. An analysis of potential health effects from emissions and deposition was included in section 3.6 (DEIS, p. 279). This analysis was expanded in the FEIS (see response TS24 for more detail).

Comments indicate the need to analyze socioeconomic impacts related to changes in livestock grazing. This analysis was added to section 3.13 of the FEIS.

| Comment response: LG2<br>Impacts to livestock water supply and range | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
18-1

This comment identifies specific concerns related to ranching water supply, water quality, and loss of range. Potential impacts to water supplies near the mine site resulting from dewatering are found in section 3.7.1 (DEIS, pp. 325–326). Additionally, specific mitigation to replace these water supplies, if needed, is discussed (DEIS, pp. 343–344). The loss of livestock water sources is found in section 3.16 (DEIS, pp. 694–700). Mitigation would replace some, but not all, impacted livestock water sources.

Potential impacts to surface water quality resulting from seepage from the tailings storage facility is discussed in section 3.10.2 (DEIS, pp. 373–419). Potential water quality changes are compared with the strictest surface water quality standards, which would encompass those established for livestock use.

Range analysis appears in section 3.16 and includes the acreage and estimated AUMs that would be lost from each allotment (DEIS, pp. 694–700).

11-RCMSER-2875

Appendix R

| Comment response: LG3 Impacts to Arizona State Trust Land grazing allottees | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
562-12

This comment concerns impacts to grazing allottees on Arizona State Trust land, including economic effects and potential loss of water sources. Potential impacts to water supplies near the mine site resulting from dewatering are found in section 3.7.1 (DEIS, pp. 325–326). Additionally, note that specific mitigation to replace these water supplies, if needed, is discussed as well (DEIS, pp. 343–344). The loss of livestock water sources is discussed in section 3.16 (DEIS, pp. 694–700). Mitigation would replace some, but not all, impacted livestock water sources.

Additional analysis of socioeconomic impacts related to changes in livestock grazing was added to section 3.13 of the FEIS.

| Comment response: LG4 BLM comments specific to grazing | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
28449-119, 28449-120, 28449-121, 28449-122, 28449-123

These comments are for specific changes noted by BLM for the livestock grazing analysis. We have revised the FEIS to address all suggestions, as appropriate.

| Comment response: LG5 Impacts to vegetation | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1508-3

This comment notes a number of aspects of the grazing analysis, including water sources for livestock, impacts to vegetation from tailings, and impacts to sensitive vegetation. The DEIS addresses these aspects.

Potential impacts to water supplies near the mine site resulting from dewatering are found in section 3.7.1 (DEIS, pp. 325–326). Additionally, note also that specific mitigation to replace these water supplies, if needed, is discussed as well (DEIS, pp. 343–344). The loss of livestock water sources is discussed in section 3.16 (DEIS, pp. 694–700). Mitigation would replace some, but not all, impacted livestock water sources.

Potential impacts to surface water quality resulting from seepage from the tailings storage facility are discussed in section 3.10.2 (DEIS, pp. 373–419). Potential water quality changes are compared with the strictest surface water quality standards, which would encompass those established for livestock use.

The potential for tailings revegetation of the tailings and return to long-term suitability for grazing is discussed in section 3.3 (DEIS, pp. 186–201). This includes long-term impacts to vegetation and special status plant species. This analysis was expanded in section 3.3 of the FEIS to incorporate more details on site-specific reclamation and revegetation practices.

Additional discussion of grazing impacts on native/non-native vegetation was added to section 3.16 of the FEIS.

| Comment response: LG6 Baseline for livestock grazing, impacts to Oak Flat | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8031-40

This comment notes the current condition of Oak Flat (part of the Devil's Canyon grazing allotment) was not disclosed. Unlike for other allotments, no specific range health assessment was available for the Devil's Canyon allotment (DEIS, p. 690). However, additional documents were reviewed, and an updated assessment of the known range condition for the Devil's Canyon allotment was added to section 3.16 of the FEIS.

11-RCMSER-2876

Appendix R

| Comment response: MIT1 Mitigation concepts or suggestions | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
11-2, 1058-1, 1062-3, 1120-1, 1122-3, 1130-1, 1137-1, 1137-2, 1137-3, 1137-4, 1137-6, 1137-7, 1137-8, 1158-14, 1158-16, 1158-18, 1158-20, 1158-21, 1158-25, 1158-29, 1158-30, 1158-35, 1158-36, 1158-42, 1158-47, 1158-51, 1158-7, 1158-9, 1188-22, 1188-23, 1266-1, 1286-5, 1286-6, 1286-7, 1286-8, 1286-9, 1301-6, 1311-12, 1311-13, 1311-17, 1311-22, 1311-7, 1317-1, 1317-2, 1321-5, 1343-3, 1356-4, 1356-6, 1360-17, 1360-9, 1361-1, 1361-2, 1361-3, 1361-5, 1389-15, 1389-17, 1389-18, 1389-19, 1389-2, 1389-21, 1389-22, 1389-23, 1389-24, 1389-26, 1389-27, 1389-29, 1389-30, 1389-31, 1389-32, 1389-33, 1389-34, 1389-36, 1389-37, 1389-38, 1389-39, 1389-40, 1389-42, 1389-9, 1392-2, 1392-3, 1392-4, 1392-5, 1392-6, 1392-8, 1392-9, 1404-4, 1429-1, 1429-2, 1429-4, 14-3, 1438-5, 14-4, 1441-14, 1441-15, 1441-17, 1441-18, 1441-19, 1441-20, 1441-21, 1441-22, 1441-3, 1441-6, 1441-8, 1489-1, 1489-3, 1489-4, 149-1, 1524-1, 1524-2, 1524-3, 15-3, 1540-1, 1540-4, 1540-7, 1544-17, 20-1, 21-1, 22-1, 238-1, 247-1, 258-2, 261-10, 261-13, 261-3, 261-4, 261-6, 261-8, 261-9, 270-1, 273-1, 283-6, 28449-58, 28824-1, 28824-2, 300-2, 30075-104, 30075-111, 30075-113, 30075-114, 30075-115, 30075-117, 30075-118, 30075-119, 30075-120, 30075-123, 30075-124, 30075-125, 30075-126, 30075-127, 30075-128, 30075-133, 30075-14, 30075-39, 30075-40, 30075-46, 30075-47, 30075-49, 30075-56, 30075-70, 30075-75, 30075-77, 30075-78, 30075-80, 30075-81, 30075-82, 30075-83, 30075-84, 30075-85, 30075-86, 30075-93, 30075-98, 30075-99, 30078-30, 30078-31, 30078-32, 307-2, 314-1, 317-10, 317-11, 317-12, 317-13, 317-4, 317-5, 317-6, 317-7, 319-6, 322-1, 322-3, 322-5, 322-6, 324-1, 324-2, 324-3, 324-4, 324-5, 324-6, 324-7, 324-8, 493-1, 524-19, 524-24, 524-7, 555-22, 555-24, 555-26, 555-27, 555-6, 562-7, 562-9, 60-3, 751-1, 8031-48, 8032-144, 8032-17, 8032-18, 8032-198, 8032-204, 8032-279, 8032-283, 8032-312, 8032-317, 8032-321, 8032-322, 822-1, 823-1, 861-1, 861-2, 862-2, 866-10, 866-17, 866-8, 876-1, 904-1, 91-2, 91-3, 92-1, 923-2, 929-2, 929-3, 929-4, 929-5, 929-6, 929-7, 929-9

These comments raise specific suggestions for mitigation of impacts. The mitigation concepts contained in these comments were evaluated for implementation by the Forest Service between the DEIS and FEIS. These deliberations are documented in Garrett (2020g) and in chapter 2 and appendix J of the FEIS.

Appendix J in the FEIS summarizes all mitigations brought forward for analysis and the authority under which they would occur.

The effectiveness of the mitigation measures in reducing impacts can be found in the "Mitigation Effectiveness" section of each resource section in chapter 3.

| Comment response: MIT3 Support for mitigation already included in the DEIS | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
5-3, 1107-7, 1122-4, 1136-1, 1137-5, 1158-22, 1158-39, 1158-40, 1158-46, 1188-26, 123-1, 1235-4, 1286-3, 1308-2, 1329-5, 1356-5, 1360-16, 1389-25, 1389-41, 1441-11, 1441-12, 1441-13, 1454-4, 1463-3, 1539-6, 1621-1, 1885-3, 283-4, 28449-20, 28449-33, 30075-102, 30075-103, 30075-105, 30075-106, 30075-107, 30075-108, 30075-109, 30075-110, 30075-112, 30075-116, 30075-121, 30075-122, 30075-129, 30075-16, 30075-21, 30075-30, 30075-69, 30075-71, 30075-92, 30078-29, 30-1, 314-4, 314-5, 317-9, 319-4, 319-5, 322-4, 322-8, 416-2, 463-3, 5537-1, 60-2, 65-1, 76-2, 8032-143, 8032-16, 8032-20, 8032-22, 866-7, 917-1, 929-8, 943-3

These comments generally indicate support for a mitigation concept already included in appendix J of the DEIS. The effectiveness of these mitigation measures in reducing impacts can be found in the "Mitigation Effectiveness" section of each resource section in chapter 3.

Appendix J of the FEIS includes most of these mitigation measures, with the exception being those measures already completed between the DEIS and FEIS.

11-RCMSER-2877

Appendix R

| Comment response: MIT4<br>Support for mitigation not applicable for impacts under the preferred alternative | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1158-28, 1311-10, 1311-14, 1311-19, 1311-6, 1311-9, 1343-1, 28449-153 | |

These comments raise specific suggestions for mitigation of impacts. However, many of these impacts are associated with specific alternatives other than the preferred alternative.

Many of the mitigation concepts raised in public comments were evaluated for implementation by the Forest Service between the DEIS and FEIS. See response MIT1. However, the mitigation suggestions raised in these comments were not evaluated in the same manner, given that the impacts would not occur if the preferred alternative were selected.

The Forest Supervisor's decision will be identified in the draft ROD. If the ROD differs from the preferred alternative and any of the mitigation suggestions are applicable to the selected action and fall within the Forest Service's jurisdiction to require them, the Forest Supervisor may add them to the ROD.

| Comment response: MIT5<br>Carpooling | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>8032-320 | |

This comment is based on an incorrect premise.

Carpooling was not considered a mitigation measure in the DEIS. The lone reference to carpooling in the DEIS is tied to traffic analysis and assumes that each vehicle would carry an average of 1.7 employees (DEIS, p. 260). We base this reasonable assumption on the anticipated size of the workforce and distance to the site (DEIS, p. 246).

Appendix J includes all mitigation measures considered in the DEIS. The effectiveness of these mitigation measures in reducing impacts can be found in the "Mitigation Effectiveness" section of each resource section in chapter 3.

| Comment response: MIT6<br>Agreements with Arizona Game and Fish Department | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>30075-76 | |

Resolution Copper has worked directly with the Arizona Game and Fish Department to develop a suite of mitigation measures to offset impacts to wildlife species, habitat, and related recreation. These measures were incorporated into appendix J of the FEIS (mitigation measure FS-WI-01). The effectiveness of these mitigation measures in reducing impacts can be found in the "Mitigation Effectiveness" section of each resource section in chapter 3.

11-RCMSER-2878

Appendix R

| Comment response: MIT7 |  |
|---|---|
| Cultural and Tribal mitigations | Page 1 of 1 |

**Responsive to these comments:**
1235-10, 1338-6, 1422-5, 1454-16, 28449-105, 28449-152, 49-2, 541-3, 8032-126, 8032-129

These comments point to the lack of mitigation related to the Tribal and cultural impacts disclosed in the DEIS. Mitigation for these impacts is being developed under two regulatory frameworks: the NHPA, and Section 3003 of PL 113-291, in which Congress authorized the land exchange.

The NHPA puts forth a process by which adverse effects on cultural resources are identified, assessed, and resolved. Mitigation falls under the resolution of adverse effects for the NHPA and can include data recovery for archaeological sites and intensive recordation of historic built environment resources, as well as appropriate handling of any funerary objects or human remains encountered required by law. However, measures to resolve adverse effects will include non-research-based programs as developed in consultation with Tribes and other consulting parties. Measures to resolve adverse effects under the NHPA are stipulated in the PA, which was developed by the Forest Service in consultation with the SHPO, ACHP, Tribes, and other consulting parties. In accordance with the PA, an HPTP was developed for the lands leaving Federal ownership. A separate Research Design was developed for the rest of the project area; additional HPTPs were to be developed in accordance with the Research Design for the project area components (i.e., tailings location, West Plant Site, etc.).

The January 2021 Rescinded FEIS included that final version of the PA (appendix O). All signatories, other than the ACHP, had signed the PA as of January 15, 2021. On February 11, 2021, the ACHP notified the Forest Service that the "ACHP believes that further consultation in this case would be unproductive and therefore, we are hereby terminating consultation pursuant to 36 CFR § 800.7(a)(4)." In accordance with 36 CFR 800.7(c)(4), the Secretary of Agriculture will deliver a written response to the ACHP, and that response will conclude the Section 106 process for this undertaking.

Since the ACHP did not sign the PA, it was never executed. Therefore, mitigation measures identified in the PA and any others identified subsequently will now be implemented through the final ROD and special use permit for use of NFS lands, and through enforcement by other State and Federal agencies as well as third parties in separate agreements. Changes in enforcement of the measures described in the draft PA are further described in appendix J.

Section 3003 of PL 113-291 included special conditions for developing mitigation measures to offset impacts to Tribes and Tribal members from the loss of Oak Flat. Congress dictated that the Forest Service would work with Resolution Copper to find mutually acceptable measures to address the concerns of the affected Tribes and minimize the adverse effects on the affected Tribes resulting from mining and related activities on the Federal land conveyed to Resolution Copper. These types of impacts cannot be fully mitigated through the typical activities specified in the HPTPs. Development of these separate mitigation measures was a collaborative effort that took place during development of the DEIS and FEIS.

Mitigations under both acts were developed in conjunction between the Forest Service, Resolution Copper, consulting Tribes, the SHPO, and the ACHP, with additional input from the BLM, ASLD, and USACE.

These measures were incorporated into appendix J of the FEIS, and the effectiveness of these mitigation measures in reducing impacts can be found in the "Mitigation Effectiveness" sections in sections 3.12 and 3.14 in the FEIS.

Note that we may not be privy to some private mitigation agreements developed directly between Resolution Copper and Tribes. If these agreements exist, they have not been incorporated into the FEIS.

11-RCMSER-2879

Appendix R

| Comment response: MIT8<br>Authority for mitigations | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1188-24, 1301-22, 1389-14, 1389-16, 1441-16, 1489-5, 1540-6, 254-1, 294-1, 30075-97, 8032-15, 8032-35, 867-1 | |

These comments indicate that more clarity is needed regarding where the mitigation identified for the project would be required and under what authority they would occur.

As discussed in appendix J of the DEIS (pp. J1–J3), several different categories of mitigation measures are incorporated into the DEIS: applicant-committed environmental protection measures, mitigation and monitoring required by the Forest Service, and mitigation and monitoring agreed to by Resolution Copper.

Applicant-committed environmental protection measures are considered an integral part of the project analyzed in the EIS and are not optional. They are part of the project analyzed by the Forest Service, and the ROD will specify that they must occur as proposed. These measures are described in detail in each resource section in chapter 3.

We are authorized to require mitigation to minimize adverse environmental effects. The breadth of this authority differs, depending on the regulations under which mine-related activities are approved. Appendix J of the FEIS discusses this in more detail.

Any mitigation and monitoring that the Forest Service requires under its authority will be identified as required in the ROD. Fully detailed implementation plans typically are developed and included in approval documents (either a final GPO or a special use permit), after the final ROD. Mitigation measures that we are authorized to require include those developed under Section 7 of the Endangered Species Act (ESA) and Section 3003 of PL 113-291.

The PA previously had been noted as providing authority for the Forest Service to require mitigation measures. The January 2021 Rescinded FEIS included that final version of the PA (appendix O). All signatories, other than the ACHP, had signed the PA as of January 15, 2021. On February 11, 2021, the ACHP notified the Forest Service that the "ACHP believes that further consultation in this case would be unproductive and therefore, we are hereby terminating consultation pursuant to 36 CFR § 800.7(a)(4)." In accordance with 36 CFR 800.7(c)(4), the Secretary of Agriculture will deliver a written response to the ACHP, and that response will conclude the Section 106 process for this undertaking.

Since the ACHP did not sign the PA, it was never executed. Therefore, mitigation measures identified in the PA and any others identified subsequently will now be implemented through the final ROD and special use permit for use of NFS lands, and through enforcement by other State and Federal agencies as well as third parties in separate agreements. Changes in enforcement of the measures described in the draft PA are further described in appendix J.

The USACE also is authorized to require mitigation to minimize adverse environmental impacts, derived from its regulatory role under the CWA. Appendix J of the FEIS discusses these mitigations, but requirement of these mitigations would be part of the separate USACE ROD and Section 404 permit and not part of the Forest Service ROD and approvals. More details also appear in appendix J of the FEIS.

Additionally, appendix J of the FEIS includes and describes mitigation measures that are beyond the authority of the Forest Service to require but that have been brought forward voluntarily by Resolution Copper. However, they cannot be required in the ROD and subsequent approval documents. These remain solely voluntary actions.

Additional mitigation measures would be required of Resolution Copper under a number of State permits, including an Aquifer Protection Permit, air permit, and stormwater permit. The Forest Supervisor is responsible for ensuring that the selected action would be consistent with Federal and State laws, which is discussed in the ROD. However, the Forest Supervisor would not be responsible for overseeing State permits or ensuring that any mitigation requirements associated with these permits are met. Mitigation or monitoring related to State permits is therefore not included in the FEIS.

Note that future receipt of State permits was not relied upon in the FEIS in any way to disclose impacts. Impacts related to water quality and air quality are disclosed based on the Forest Service's own analysis, regardless of future permitting actions.

11-RCMSER-2880

Appendix R

| **Comment response:** MIT9<br>Water supply mitigation | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1349-5, 1544-8 | |

Groundwater extracted and used by Resolution Copper is subject to permitting under State of Arizona law, whether at the mine site or at the location of the Desert Wellfield in the East Salt River valley. Any pumping of water above and beyond that disclosed in the EIS would require appropriate authorization from the Arizona Department of Water Resources (ADWR).

| **Comment response:** MIT11<br>Moving Emory oak trees | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>235-16 | |

Moving Emory oak trees from Oak Flat has not been proposed as a mitigation measure. Preserving and maintaining existing oak groves separate from Oak Flat was proposed in the PA developed during consultation.

The January 2021 Rescinded FEIS included that final version of the PA (appendix O). All signatories, other than the ACHP, had signed the PA as of January 15, 2021. On February 11, 2021, the ACHP notified the Forest Service that the "ACHP believes that further consultation in this case would be unproductive and therefore, we are hereby terminating consultation pursuant to 36 CFR § 800.7(a)(4)." In accordance with 36 CFR 800.7(c)(4), the Secretary of Agriculture will deliver a written response to the ACHP, and that response will conclude the Section 106 process for this undertaking.

Since the ACHP did not sign the PA, it was never executed. Therefore, mitigation measures identified in the PA and any others identified subsequently will now be implemented through the final ROD and special use permit for use of NFS lands, and through enforcement by other State and Federal agencies as well as third parties in separate agreements. Changes in enforcement of the measures described in the draft PA are further described in appendix J.

| **Comment response:** MIT12<br>Preservation of Apache Leap | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1158-8, 30074-3 | |

In the NDAA, Congress directed that the Forest Service undertake the preservation and management of Apache Leap.

As discussed in chapter 1 (DEIS, p. 28), in December 2017, the Tonto National Forest finalized the environmental review process and the management plan for the Apache Leap SMA. The plan establishes a comprehensive framework for managing the Apache Leap SMA, with an emphasis on the preservation of the three primary purposes outlined in PL 113-291: preserve the natural character of Apache Leap; allow for traditional uses of the area by Native American people; and protect and conserve the cultural and archaeological resources of the area.

The plan includes a management objective to establish a closure order and complete the associated NEPA documentation to exclude overnight camping under 36 CFR Part 261, "Prohibitions."

The Forest Supervisor also determined that livestock grazing, timber production, and mining activities (location, entry, and patent) are uses of the land that are incompatible with the desired conditions and primary purposes for which the Apache Leap SMA is to be managed (U.S. Forest Service 2017e:7).

11-RCMSER-2881

Appendix R

| Comment response: MIT13 Disclosure of Tribal-related mitigations | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 1396-8 | |

This comment recommends that all mitigation measures related to Tribal impacts be consolidated in section 3.14 of the FEIS.

We decided not to make this change to the FEIS. It is the nature of Tribal members' relationship with the land that the impacts that affect Tribal members potentially cover all resources—loss of vegetation, loss of wildlife, loss of springs, etc. Bringing these forward to section 3.14 would substantially duplicate information already available in other resource sections in chapter 3 and consolidated in appendix J of the FEIS.

Note that section 3.14 was necessarily revised in the FEIS in response to comments. See response CR4 for more details.

| Comment response: MIT15 Insufficient analysis of mitigation | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 8031-75, 8032-12, 8032-13, 8032-9 | |

The role of the Tonto National Forest under its primary authorities in the Organic Administration Act, subsequent statutes, and Locatable Mineral Regulations (36 CFR 228 Subpart A) is to ensure that mining activities minimize adverse environmental effects on NFS surface resources. The Forest Service authority related to mitigation is limited to protection of surface resources of NFS lands (see 30 U.S.C. 612, 5 U.S.C. 551, and 36 CFR 228.1). The role of the Forest Service under special use authorizations (36 CFR 251 Subpart B) would include terms and conditions to minimize damage to the environment, protect the public interest, and require compliance with water and air quality standards. Mitigation is integral to the scope of alternatives development (36 CFR 220.5(e)).

Development and analysis of mitigation measures has been an integral part of the NEPA process. Each of the alternatives was developed in order to specifically address certain issues or resource impacts, as described in chapter 2 (DEIS, p. 75 [Alt 3], p. 81 [Alt 4], p. 88 [Alt 5], p. 99 [Alt 6]). For example, different tailings locations were considered in alternatives development to address issues of public safety, air quality, and water quality; different tailings placement or storage techniques were considered in alternatives development to address issues of water quality and tailings stability; and different seepage collection measures were considered in alternatives development to address groundwater and surface water quality impacts. In addition, specific applicant-committed environmental protection measures were evaluated and added to the proposed action in order to further reduce environmental impacts. These are discussed in each resource section of chapter 3 as an integral part of the proposed project (see the "Summary of Applicant-Committed Environmental Protection Measures" subsection).

Each resource section of chapter 3 includes a section titled "Mitigation Effectiveness" that expressly identifies mitigation measures developed to address environmental impacts for that resource and assesses the potential effectiveness of that mitigation measure. All of the mitigation measures are compiled in appendix J of the FEIS.

In addition, mitigation measures suggested in comments on the DEIS have also been evaluated. Some have been implemented as mitigation requirements by the Forest Service, and others have been included as additional applicant-committed environmental protection measures. The process of evaluating the mitigation comments is documented in the project record (Garrett 2020g).

See response MIT8 for a discussion of which documents include requirements for mitigation and the authority for requiring those mitigations. This includes requirements for mitigation in the ROD.

| Comment response: MIT17 Stormwater flood events | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 1534-3, 524-15, 8032-28, 858-1, 910-7 | |

We have added further discussion to section 3.7.2 of the FEIS to clarify the design parameters for stormwater control facilities, including the tailings storage facility, and we have also updated the analysis of potential release of stormwater under large flood events.

11-RCMSER-2882

Appendix R

| Comment response: MIT18<br>Lack of specific requirements under environmental consequences | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8031-30

This comment suggests shortcomings in disclosure. The first concern is a perceived lack of "meaningful consideration of energy requirements and conservation potential." The comment is not correct. The energy requirements of the project were analyzed (DEIS, p. 56; see also Garrett (2019c), "Process Memorandum to File Power Requirements"). There is little variation between alternatives, with most of the power use related to components common to all alternatives. Existing differences between tailings alternatives are described (DEIS, p. 56). Additional information has been added to Section 3.17, Required Disclosures, of the FEIS in response to this comment.

The second concern is a perceived lack of discussion of "natural or depletable resource requirements and conservation potential of various alternatives and mitigation measures." The comment is not correct. A number of natural or depletable resources are associated with the project. The conservation potential of each of these resources, with respect to alternatives, is shown in specific sections of chapter 3. This includes mineral resources (section 3.2), soils (section 3.3), vegetation/habitat (section 3.3), water use (section 3.7.1), and wildlife (section 3.8). Appendix E outlines the conservation potential for alternatives with respect to specific metrics associated with these resources. Appendix E summarizes impacts in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public. Additional information has been added to Section 3.17, Required Disclosures, of the FEIS in response to this comment.

The third concern is a perceived lack of discussion of "urban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential." The comment is not correct. The differences between alternatives for historic and cultural resources is the basis for section 3.12 (DEIS, pp. 629–639). Additional discussion of potential impacts to the built environment was added to section 3.12 of the FEIS in response to comments.

See response MIT15 for a discussion of how mitigation measures were analyzed.

| Comment response: MIT19<br>Lack of mitigation in the DEIS | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1539-5

This comment indicates that mitigation was not included in the DEIS and that the effectiveness of mitigation was not considered. These are incorrect statements.

Each resource section in chapter 3 includes a section titled "Mitigation Effectiveness" that expressly identifies mitigation measures developed to address environmental impacts for that resource and assesses the potential effectiveness of that mitigation measure. Appendix J of the DEIS includes all of the mitigation measures.

The lone difference between the approach in the DEIS and FEIS is that the development of mitigation measures continued, including the assessment of all mitigation suggestions brought forward as public comments on the DEIS.

11-RCMSER-2883

Appendix R

| Comment response: MIT20<br>Lack of mitigation in the DEIS; inability to require mitigation | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1188-20

This comment indicates that insufficient mitigation was included in the DEIS. Each resource section of chapter 3 includes a section titled "Mitigation Effectiveness" that expressly identifies mitigation measures developed to address environmental impacts for that resource and assesses the potential effectiveness of that mitigation measure. Appendix J of the DEIS includes all of the mitigation measures.

The lone difference between the approach in the DEIS and FEIS is that mitigation measures continued being developed after the DEIS, including an assessment of all mitigation suggestions brought forward as public comments. See response MIT1 for more details on mitigation brought forward between the DEIS and FEIS.

This comment expresses further concern that mitigation measures brought forward voluntarily by Resolution Copper cannot be required. This is true and is clearly disclosed in the DEIS (DEIS, appendix J, p. J-3). See response MIT8 for more discussion on mitigation authorities with respect to applicant-committed environmental protection measures and mitigation brought forward voluntarily by Resolution Copper.

| Comment response: MIT21<br>Financial assurances | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1209-6, 1276-5, 1301-20, 1301-21, 1361-4, 1389-20, 1452-3, 1540-3, 1544-12, 1587-2, 27147-1, 29-5, 30141-8, 336-2, 5448-1, 780-1, 8032-14, 8032-156, 8032-230, 8032-238, 8032-38, 8032-40, 812-1, 814-6, 866-18, 927-1

A discussion of financial assurances was included in chapters 1 and 2 (DEIS, pp. 15–20, 65, 104). These discussions were updated in the FEIS in response to comments.

| Comment response: MIT22<br>Satellite monitoring of tailings storage facilities | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8032-19

This comment raises concerns over satellite monitoring of tailings storage facilities, which was identified as mitigation measure FS-01 in the DEIS (DEIS, appendix J, p. J-17).

The first concern is whether satellite monitoring would be the sole monitoring technique. It would not. Satellite monitoring would supplement all other required monitoring of the tailings storage facility, including Resolution Copper's internal monitoring procedures and any monitoring procedures required under State permitting (such as the Aquifer Protection Permit). Internal tailings storage monitoring procedures are described in section 3.10.1 (DEIS, pp. 522–527 (industry best practices, including those by Rio Tinto) and pp. 536–537 (applicant-committed environmental protection measures and monitoring for specific failure modes)). Monitoring requirements under State permits would be developed as part of that permitting process but have not yet been issued.

The second concern is whether there is sufficient detail to implement this monitoring. Mitigation descriptions in the FEIS are not intended to be so detailed that they constitute full implementation plans for a given measure. Fully detailed implementation plans typically are developed and included in approval documents (either a final GPO or a special use permit), after the final ROD. Sufficient detail is developed in the FEIS to assess the effectiveness of this mitigation measure for minimizing potential impacts. This assessment is in section 3.10.1 (DEIS, pp. 556–558).

The DEIS also clearly states that this particular measure (satellite monitoring) would not be applicable to the preferred alternative (DEIS, appendix J, p. J-13).

11-RCMSER-2884

Appendix R

| **Comment response: MIT23**<br>Subsidence monitoring plan | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8-2, 1097-11, 1158-19, 1201-4, 148-1, 149-2, 28463-2

After receipt of public comments on the DEIS, the Tonto National Forest reconvened the Geology and Subsidence Workgroup in order to assess these comments regarding the proposed subsidence monitoring plan.

These internal workgroup discussions resulted in a revised version of the subsidence monitoring plan. The revision incorporated into the FEIS meets the revisions to be acceptable by the Tonto National Forest, fulfilling mitigation measure FS-222 from the DEIS (DEIS, appendix J, p. J-4). A discussion of this process was added to section 3.2 of the FEIS. See response GS13 for more details on the evolution of the subsidence monitoring plan.

As subsidence has the potential to impact national forest surface resources, such as the adjacent Apache Leap SMA, the Forest Supervisor may require additional measures related to monitoring and mitigating subsidence in the ROD, in addition to those specified in the revised subsidence monitoring plan, if warranted.

| **Comment response: MIT24**<br>Air and dust mitigations | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1158-13, 1380-1, 1438-11, 8032-154

These comments concern perceived lack of mitigation related to air quality and fugitive dust.

There are two types of measures included in the DEIS to reduce resource impacts: (1) applicant-committed environmental protection measures and (2) mitigation measures.

Applicant-committed environmental protection measures are included in each resource section of chapter 3 (for example, see air quality, DEIS, pp. 283–284). These measures are features incorporated into the design of the project by Resolution Copper to reduce potential impacts on resources. These measures would be non-discretionary, as they are included in the project design, and their effects are accounted for in the analysis of environmental consequences disclosed in DEIS in chapter 3 (DEIS, p. 103) and in appendix J (DEIS, p. J-1).

Mitigation measures are not part of the actions proposed by Resolution Copper but are developed over the course of the NEPA analysis to avoid, minimize, rectify, reduce, or compensate for remaining impacts (DEIS, p. 100). Mitigation measures are identified for each resource, and the effectiveness of that mitigation is assessed in chapter 3 (for example, see air quality, DEIS, p. 293). Appendix J includes a compilation of mitigation measures.

With respect to air quality, numerous controls were incorporated into the project as applicant-committed environmental protection measures. These controls effectively reduce emissions to the extent that they prevent any exceedance of air quality standards at the project fence line (DEIS, pp. 284–288) or at sensitive areas beyond the fence line (DEIS, pp. 288–292). There are no mitigation measures proposed for air quality because applicant-committed environmental protection measures already accomplish the reductions needed to minimize impacts.

Comments also express concern with the impacts associated with dust mitigation, such as water use. Water needs identified for the project already incorporate water use for dust control (DEIS, pp. 59–61, and DEIS appendix H; see also WestLand Resources Inc. (2018b), showing dust management requirements as part of the water balance for tailings storage facilities).

Further discussion of the closure cover and revegetation after closure (controlling dust) was added to section 3.3 of the FEIS.

11-RCMSER-2885

Appendix R

| Comment response: MIT27<br>404 Compensatory Mitigation Plan | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1188-21, 1540-2, 524-2, 524-3, 524-5, 524-6, 8030-10, 8030-2, 8030-5, 8030-8, 8031-15, 8031-16, 8031-17, 8031-18, 8031-19, 8031-20, 8031-21, 8031-58, 8032-334, 8032-335, 8032-336, 8032-337

These comments concern aspects of the CWA Section 404 permit.

Some comments identify a lack of details in the DEIS about compensatory mitigation for impacts to waters of the U.S. in the DEIS or suggest that the compensatory mitigation proposed is insufficient. The details included in the DEIS (appendix D) represent the draft conceptual compensatory mitigation package as it existed at the time of publication. The compensatory mitigation package will not be finalized until it has been approved by the USACE as part of the USACE's final permitting action. A habitat mitigation and monitoring plan (HMMP) will be developed by Resolution Copper that tiers from the plan provided in appendix D and provides a much greater level of detail with respect to refining mitigation requirements and specific mitigation actions to be taken, performance metrics for mitigation, long-term management of mitigation sites, etc. Implementation of the HMMP then becomes a requirement via special condition of the Section 404 Individual Permit that will be issued.

The 404 permit will not be issued until a ROD is completed by the USACE. This will occur after publication of the FEIS. The compensatory mitigation package included as appendix D in the FEIS represents an updated version that was determined to be sufficient and acceptable by the USACE but may still be modified prior to issuance of the 404 permit.

The extent of jurisdictional waters of the U.S. for which the mitigation package must compensate was determined by the USACE, including the evaluation of any special aquatic sites. The compensatory mitigation package was determined to be appropriate and sufficient to offset impacts from dredge and fill of jurisdictional waters, in accordance with USACE policy. The USACE also concluded, based on the updated plan, that adequate mitigation is available for offsetting the impacts of this project on waters of the U.S.

One comment notes that the EIS is intended to be sufficient for all Federal decisions related to the mine, including the 404 permit issuance by the USACE. The comment states that the document in appendix C (the Practicability Analysis) is not sufficient to satisfy requirements for alternatives analysis under Section 404(b)1. The full 404(b)1 alternatives analysis is attached to the FEIS as appendix C.

Other comments concern consultation under Section 7 of the ESA, Tribal consultation, or consultation under Section 106 of the NHPA. The Forest Service is the lead agency for Section 7 and Section 106 consultation. However, the USACE participates in both processes because the USACE's permitting action occurs within the larger project context for the Forest Service. The USACE conducts its own Tribal consultations. Also see response CR13.

Additional comments concern other aspects of the USACE process, including the need for a Section 401 water quality certification from the ADEQ, and a public interest review. These requirements must be completed prior to issuance of the 404 permit by the USACE. ADEQ issued the 401 water quality certification for the Resolution Copper Project on December 22, 2020.

| Comment response: MIT28<br>Formal wetland delineation | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1048-2

Two separate regulatory requirements for wetlands are assessed in the EIS: (1) Executive Order 11990, and (2) CWA Section 404.

Executive Order 11990 requires an assessment of impacts to wetlands and floodplains. Wetlands assessed under Executive Order 11990 are based on data from the National Wetlands Inventory. As described in section 3.7.2, these are different from wetlands as defined under Section 404 of the CWA (DEIS, p. 435). Wetlands assessed under Executive Order 11990 are described in the "Impacts on Wetlands (Related to Executive Order 11990)" subsection of section 3.7.2 (DEIS, pp. 435–444).

Certain wetlands and other waters (including ephemeral drainages) may be considered under the jurisdiction of the USACE for permitting under Section 404 of the CWA. These wetlands are typically defined during a "jurisdictional delineation" completed for the agency. Resolution Copper has obtained jurisdictional delineations from the agency for all areas within the project or alternative footprints. No jurisdictional wetlands were determined to be present. Discussion of the jurisdictional delineations obtained from the USACE was added to section 3.7.2 of the FEIS.

11-RCMSER-2886

Appendix R

| Comment response: MIT29 Seepage controls for Skunk Camp | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
555-14, 8032-34

These comments express concerns with the seepage controls associated with the Skunk Camp alternative location, particularly the potential impacts on Arizona Water Company water supplies. We have refined the analysis of seepage controls and potential water quality impacts for Alternative 6 in section 3.7.2 of the FEIS. The refined analysis indicates that no exceedances of numeric aquifer water quality standards or surface water quality standards are anticipated at the point Dripping Spring Wash enters the Gila River.

Comments also express the need for more monitoring. New monitoring wells were installed along Dripping Spring Wash by Resolution Copper and will continue to be part of the monitoring network for water quality impacts (see FEIS appendix J, mitigation measure RC-WR-03).

| Comment response: MIT30 Water monitoring and mitigation | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1361-6, 30075-10, 43-3, 8031-65

This comment indicates that inadequate monitoring and mitigation were included in the DEIS with respect to water quantity impacts.

There are two major areas where drawdown associated with project groundwater pumping would occur and have the potential to impact natural systems of water supplies: near the mine site, and near the Desert Wellfield in the East Salt River valley.

The DEIS included monitoring and mitigation for groundwater impacts near the mine site, including impacts to groundwater-dependent ecosystems (GDEs), natural systems, and water supplies. These are included in mitigation measure RC-211 (DEIS, appendix J, p. J-9), with full details contained in Montgomery and Associates (Montgomery and Associates Inc. 2019b). This mitigation measure will "ensure that groundwater supported flow that is lost due to mining activity is replaced and continues to be available to the ecosystem." Effectiveness of this mitigation measure is assessed in section 3.7.1 (DEIS, pp. 343–344). This same measure (with modifications) has been carried forward into the FEIS (appendix J, mitigation measure FS-WR-01).

The comment is correct that no specific monitoring or mitigation measures are included in the DEIS specific to the Desert Wellfield in the East Salt River valley. This groundwater pumping is subject to permitting by the ADWR. Monitoring requirements may be established during this permitting process but are not under the jurisdiction of the Forest Service and are not incorporated into either the DEIS or the FEIS. See response MIT8 for more discussion of the role of State permits in mitigation.

Note that additional water monitoring and mitigation measures were brought forward between DEIS and FEIS. These are included in appendix J and assessed in section 3.7.1.

| Comment response: MIT33 Reclamation and revegetation | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
30075-57, 541-2, 8032-235

We have added further discussion concerning reclamation and closure plans, revegetation techniques, and revegetation potential to section 3.3 of the FEIS.

11-RCMSER-2887

Appendix R

| Comment response: MIT34<br>Mitigation required for all project effects | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>30075-68 | |
| A full discussion of potential mitigation measures has been incorporated into the FEIS, appendix J. See response MIT15 for more discussion of how NEPA regulations have been addressed.<br><br>The intent of the regulations and Forest Service policy is to identify a full range of relevant and reasonable mitigation measures, which is the purpose of appendix J, as well as the mitigation development actions undertaken by the Tonto National Forest (Garrett 2020g). With respect to the specific recommended mitigations associated with this comment, see response MIT6. | |

| Comment response: MIT35<br>Section 7 consultation | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1293-3, 1356-1, 1441-7, 1468-6, 1473-2, 1595-2, 26887-1, 524-26, 8032-179 | |
| These comments concern consultation with the U.S. Fish and Wildlife Service (FWS) under Section 7 of the ESA. As consultation takes place on a single alternative, it necessarily takes place after a preferred alternative has been identified in the DEIS.<br><br>The Tonto National Forest initiated and completed Section 7 consultation on threatened and endangered species, and critical habitat, with FWS between the DEIS and FEIS. The outcome of the Section 7 consultation is a Biological Opinion, which is attached to the FEIS as appendix P. | |

| Comment response: MIT38<br>Request for specific document | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>30075-96 | |
| The requested document is the DEIS reference identified as Montgomery and Associates (Montgomery and Associates Inc. 2019b) and has been available on the project website since publication of the DEIS. | |

| Comment response: MIT39<br>Mitigation codes | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>28449-150 | |
| Clarification of the codes used in appendix J was added to the FEIS. | |

11-RCMSER-2888

Appendix R

| Comment response: MIT40 Lack of details on subsidence monitoring | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8032-333

This comment states, "The [Apache Leap Special Management Area] document mandates, (although it is unclear of the enforcement mechanism) that seismic monitoring, fencing, and other measures must be implemented to mediate the effect of Resolution Copper's proposed project. Although impacts from the proposed project on the SMA are discussed, we could not find any discussion in the DEIS of how, when, and by whom, these measures would be implemented. As the SMA is a Connected action to this project, that information should have been included in this DEIS."

This statement is incorrect. Section 3.2 of the DEIS described subsidence monitoring as an applicant-committed environmental protection measure (DEIS, pp. 149–150). Further details are included in the project record as appendix E of the GPO (Resolution Copper 2016a) and in Tshisens (2018a).

Subsidence monitoring was also the subject of a specific mitigation measure (FS-222) required by the Forest Service between the DEIS and FEIS (DEIS, p. 159; appendix J, p. J-4). See response GS13 for more details on the evolution of the subsidence monitoring plan.

| Comment response: NEPA1 Purpose and need | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1008-2, 1163-2, 124-2, 1360-5, 1396-2, 1438-12, 158-1, 1595-1, 199-2, 42-4, 8031-34, 8032-2, 913-1

These comments suggest that the Tonto National Forest should broaden the purpose and need described in chapter 1 of the DEIS and assess alternatives consistent with a broadened purpose and need.

The Forest Service has reviewed the purpose of and need for action statement and determined that it is appropriate for this project. See the discussion of purpose and need in FEIS section 1.3.

| Comment response: NEPA2 Ramifications of the Rosemont Copper Mine decision | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
104-4, 1068-6, 1155-2, 1235-8, 1322-9, 1454-14, 1539-1, 1565-2, 24-3, 263-7, 26968-1, 28037-2, 298-4, 524-27, 53-1, 8032-4, F1-4, F1-9, F2-3, F4-2, F6-7

The Forest Service has given appropriate consideration to the pending and completed litigation involving the Rosemont Copper Mine. There are many important factors that distinguish the proposed Resolution Copper Mine from the proposed Rosemont Copper Mine, most notably the provisions of PL 113-291.

At this time, several court decisions have made use of the "Rosemont ruling," and understanding of the ruling has evolved. We have added a section to the FEIS that fully discusses how the Rosemont Copper Mine case affects each action alternative.

11-RCMSER-2889

Appendix R

| Comment response: NEPA3<br>Opportunities for public comment; need for a revised DEIS | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1188-28, 1422-2, 1448-9, 1499-1, 1499-5, 1519-2, 1606-1, 28075-2, 28431-2, 286-4, 509-2, 5569-1, 8032-1, 8032-253

Federal regulations allow for several opportunities for public review and comment for EISs and specify minimum comment time frames.

- A minimum 45-day public comment period is required for a DEIS (36 CFR 218.25(a)(1)(ii)). The Resolution Copper Project DEIS was released for public comment over a 90-day period from August 10 through November 7, 2019 (U.S. Forest Service 2019a).
- A 45-day objection period follows the release of an FEIS and draft ROD. This allows the public to review and file objections that will be considered by the Regional Forester (36 CFR 218.22).

Each of these periods provides an opportunity for public review and comment on the DEIS, FEIS, and draft ROD, respectively.

The Resolution Copper DEIS and FEIS follow these requirements for all decisions we are authorized to make. For this project, Congress mandated that the land exchange occur at a specific time under specific conditions, as outlined in Section 3003 of PL 113-291. Thus, the land exchange is not a Forest Service decision.

The FEIS—not a revised or supplemental DEIS—is the appropriate document to prepare in response to public comments. As noted, the objection process provides another opportunity for public involvement.

| Comment response: NEPA4<br>American Indian Religious Freedom Act (AIRFA) | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1276-1, 1330-2, 235-24, 235-25, 235-26, 311-1

These comments focus on impacts to resources and values important to Native American Tribes, most specifically religious freedom.

The DEIS addressed Tribal concerns in the following sections: Section 3.12, Cultural Resources (DEIS, pp. 622–639); Section 3.14, Tribal Values and Concerns (DEIS, pp. 658–671); and Section 3.15, Environmental Justice (DEIS, pp. 672–686). Impacts to these resources and values clearly are described for each alternative.

The FEIS and ROD will describe the final results of consultation between the Tribes and the Forest Service. This will include mitigation and its effectiveness, as well as compliance with the AIRFA and other laws and regulations pertaining to resources and values important to Tribes.

Note that government-to-government consultation between the Forest Service and Tribes is ongoing. A full list of consultation activities as of publication of the FEIS can be found in chapter 5 and appendix S of the FEIS.

We continue to develop and evaluate measures to reduce impacts to resources and values important to the Tribes (DEIS, p. 670); those developed as of publication of the FEIS are summarized in section 3.14 and appendix J of the FEIS.

Several lawsuits were filed in January 2021, including one based on religious freedom grounds. Chapter 1 of the FEIS discusses this lawsuit and the outcomes of the lawsuit to date.

11-RCMSER-2890

Appendix R

| **Comment response: NEPA6**<br>Compensation to Tribes | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1176-1, 126-2, 1499-3 ||

There is no mechanism in Federal law or regulation that allows for provision of financial compensation for loss of Tribal, heritage, or cultural resources. Such compensation would require specific action from Congress. Rather, mitigation was developed through Section 106 consultation under the NHPA and specified in the PA and HPTP.

The January 2021 Rescinded FEIS included that final version of the PA (appendix O). All signatories, other than the ACHP, had signed the PA as of January 15, 2021. On February 11, 2021, the ACHP notified the Forest Service that the "ACHP believes that further consultation in this case would be unproductive and therefore, we are hereby terminating consultation pursuant to 36 CFR § 800.7(a)(4)." In accordance with 36 CFR 800.7(c)(4), the Secretary of Agriculture will deliver a written response to the ACHP, and that response will conclude the Section 106 process for this undertaking.

Since the ACHP did not sign the PA, it was never executed. Therefore, mitigation measures identified in the PA and any others identified subsequently will now be implemented through the final ROD and special use permit for use of NFS lands, and through enforcement by other State and Federal agencies as well as third parties in separate agreements. Changes in enforcement of the measures described in the draft PA are further described in appendix J.

Beyond NHPA requirements, Section 3003 of PL 113-291 specifies that the Secretary of Agriculture shall engage in government-to-government consultation with affected Tribes. Following consultation, the Secretary shall consult with Resolution Copper and seek to find mutually acceptable measures to address the concerns of affected Tribes; and minimize adverse effects on affected Tribes from mining and related activities on the Federal land conveyed to Resolution Copper (PL 113-291, Section 3003(c)(3)). We have engaged in efforts to identify and address specific concerns of affected Tribes since August 2015.

| **Comment response: NEPA8**<br>Use of mining regulations (36 CFR 228A) and approval of a mine plan; or use of special use regulations (36 CFR 251) and approval of a special use permit | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>124-4, 8032-226, 8032-3, 8032-5 ||

These comments state that the DEIS is deficient because it does not explicitly discuss permitting the mine under regulations at 36 CFR 251 (special use permit) instead of Forest Service mining regulations at 36 CFR 228 using a GPO.

The DEIS acknowledges that a Special Use Authorization may be required to authorize uses of NFS lands for specific features such as power lines, access roads, and other features (DEIS, pp. 9, 13, 15, 56).

We have included additional language in the FEIS explaining the criteria that must be considered to permit use and occupancy of NFS land. Any decision to authorize use and occupancy of NFS land will be made in the ROD, which will apply criteria from the regulations for the types of authorizations that will be issued.

| **Comment response: NEPA9**<br>Public interest requirement of land exchange | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1048-5, 8032-217 ||

Through PL 113-291, Congress has enacted legislation authorizing and directing this specific land exchange. The requirements that must be met are specified in Section 3003 of PL 113-291 and addressed in the DEIS (DEIS, pp. 10–11, 30–36, and 104–105 and appendix B).

11-RCMSER-2891

Appendix R

| Comment response: NEPA10 | |
|---|---|
| Ramifications of the withdrawal area on Oak Flat, if the land exchange does not occur | Page 1 of 1 |

**Responsive to these comments:**
1097-1, 1158-49, 1441-1, 885-2

The 760-acre "Oak Flat Picnic and Camp Ground" area was withdrawn on September 30, 1955 (Federal Register, October 1, 1955) by Public Land Order 1229, signed by Assistant Secretary of the Interior Fred Aandahl: "RESERVING LANDS WITHIN NATIONAL FORESTS FOR USE OF THE FOREST SERVICE AS CAMPGROUNDS, RECREATION AREAS AND FOR OTHER PUBLIC PURPOSES." The lands were "withdrawn . . . from all forms of appropriation under the public land laws, including the mining but not the mineral leasing laws, and reserved for use of the Forest Service, Department of Agriculture, as camp grounds, recreation areas, and for other public purposes, as indicated."

On September 20, 1971, Public Land Order 5132 modified the "Oak Flat Picnic and Camp Ground" withdrawal. Signed by Assistant Secretary of the Interior Harrison Loesch, the new order stated that the 1955 Public Land Order 1229 was "hereby modified to the extent necessary to open the following described lands to all forms of appropriation under the public land laws applicable to national forest lands, except under the U.S. mining laws . . . . [T]he lands described in paragraph 1 will be open to such forms of disposal as may by law be made of national forest lands except appropriation under the U.S. mining laws."

Public Land Order 5132 modified Public Land Order 1229 by making the 760-acre "Oak Flat Picnic and Camp Ground" area eligible for disposal by land exchange and other disposal authorities of the Forest Service.

Section 3003 of PL 113-291 defines the Oak Flat Withdrawal Area as follows: "OAK FLAT WITHDRAWAL AREA.— The term 'Oak Flat Withdrawal Area' means the approximately 760 acres of land depicted on the map entitled 'Southeast Arizona Land Exchange and Conservation Act of 2011–Oak Flat Withdrawal Area' and dated March 2011" (PL 113-291, Section 3003(b)(6)).

Section 3003 further directs that public land orders that withdraw Federal land from appropriation or disposal shall be revoked to permit disposal of the land (PL 113-291, Section 3003(i)(4)(1)).

As specified in the DEIS, there are two scenarios regarding the Oak Flat Withdrawal Area:

1. The land exchange occurs, in which the Oak Flat Withdrawal Area becomes the private holding of Resolution Copper. In that case, the area is no longer Federal property and the withdrawal is no longer applicable. The Oak Flat Withdrawal Area would be available for mining activity under the laws and regulations that govern mining on private property.

2. The land exchange for the Oak Flat Withdrawal Area is not completed and the parcel remains Federal property. In that situation, the withdrawal remains in place and mining cannot occur within the Oak Flat Withdrawal Area.

Note: Subsidence of land within the withdrawal area from mining on adjacent Federal land mining claims is unlikely to be allowable. The only authority to subside NFS land from adjacent placer or lode mining is under the Mining Law, and the Mining Law does not apply within withdrawn areas. Subsidence arguably falls under the definition of "processing" for purposes of locating a millsite claim, but millsites cannot be located within withdrawn areas. It is unlikely that other authorities pertaining to administration of NFS land would allow subsidence from adjacent mining in a withdrawn area.

11-RCMSER-2892

Appendix R

| Comment response: NEPA11 | |
|---|---|
| Release of the FEIS and ROD | Page 1 of 1 |

**Responsive to these comments:**
1097-2

The NEPA process for the Resolution Copper Project is unique due to legislative direction contained in Section 3003 of PL 113-291. Thus, we must meet applicable NEPA regulations as well as the legislative requirements stipulated in Section 3003.

As this comment correctly states, Section 3003(c)(10), "Title Transfer," states, "Not later than 60 days after the date of publication of the final environmental impact statement, the Secretary shall convey all right, title, and interest of the United States in and to the Federal land to Resolution Copper." Under a "normal" NEPA process, we would publish an FEIS and draft ROD, go through an objection process, issue a final ROD, and then authorize the discretionary actions specified under the final ROD.

However, PL 113-291 language stipulates that the process for Resolution Copper Project will be as follows: (1) publication of the FEIS and draft ROD, (2) overlapping objection process and conveyance of all right, title, and interest of lands to be exchanged to Resolution Copper within 60 days of FEIS publication, (3) issuance of the final ROD, and (4) project authorizations. We still are responsible for properly completing the NEPA process for discretionary actions, including the objection process. However, conveyance of land interest and title is not a discretionary action on the part of the Forest Service but a legislative requirement that we are obligated to enact.

The comment also pointed out inconsistent language in a variety of documents (such as the Dear Reader letter and the website briefing and notification materials) concerning publication of the FEIS. We have reviewed those documents and made corrections or revisions where appropriate.

| Comment response: NEPA12 | |
|---|---|
| Mineral rights on Town of Superior exchange parcels | Page 1 of 1 |

**Responsive to these comments:**
261-15, 929-11

PL 113-291 identified three parcels the United States would transfer to the Town of Superior, if requested (DEIS, p. ES-7).

These lands are currently under the administration of the Tonto National Forest as part of the NFS. Therefore, these lands are open to mineral entry under the Mining Law, and surface use and occupancy is governed by Forest Service mineral regulations (36 CFR 228A). These comments concern the effect that mining claims currently filed within these parcels will have on the ability of the Town of Superior to acquire and use these lands, as authorized by Congress.

Any surface use of the mining claims on these lands must be in accordance with Forest Service regulations. No significant disturbance of surface resources may occur without first obtaining approval of a GPO by the Tonto National Forest. Plan approval must comply with other applicable laws, including NEPA.

Mining claims do not give fee title to the land, but give the claimant the right to explore, prospect, and develop minerals. However, no property rights in the claim vest until there is a discovery of a valuable mineral deposit.

| Comment response: NEPA13 | |
|---|---|
| U.S. citizenship/foreign ownership | Page 1 of 1 |

**Responsive to these comments:**
1150-7, 1192-2, 130-1, 158-2, 23-1

Resolution Copper Mining LLC, a U.S. corporation registered in Delaware, owns the mineral claims proposed to be mined by this project. No Federal or State law precludes Resolution Copper Mining LLC from mining its deposits due to ownership or citizenship.

11-RCMSER-2893

Appendix R

| Comment response: NEPA14 Winters doctrine and water rights | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
23-2, 30078-42, 30078-43, 30078-44, 8032-340, 885-1

Section 3.7.1 of the DEIS acknowledges that potential impacts due to dewatering are anticipated for a number of springs in the project area. These impacts are anticipated at six springs under the no action alternative (DEIS, pp. 317–325) and at an additional two springs under the action alternatives (DEIS, pp. 325–334). The DEIS also acknowledges that water rights have been filed with the State of Arizona for five of these springs by the Forest Service (DEIS, pp. 332–333).

The comments suggest that impacts to such water rights, if they are necessary to fulfill the purposes for which the Tonto National Forest was reserved, are not allowable by the Forest Service.

Section 3.7.1 of the DEIS discusses the ramifications of water rights from the anticipated dewatering impacts at these springs (DEIS, p. 332) and notes that these are water rights filings only and that they have not yet been adjudicated by the State of Arizona (Superior Court) in the General Stream Adjudication of the Gila River. The DEIS concludes that while physical loss to these springs is disclosed in the DEIS, the "impact on any surface water rights from a legal or regulatory standpoint cannot yet be determined due to the ongoing adjudication."

Regardless, the DEIS clearly describes that the anticipated impacts to these water sources would not persist once mitigation is applied. The mitigation to be applied to these springs is described later in section 3.7.1 (DEIS, pp. 343–344). The five springs identified as having water rights filings by Tonto National Forest (Bitter Spring, Bored Spring, Hidden Spring, McGinnel Mine Spring, and McGinnel Spring) are specifically identified as being covered by DEIS mitigation measure RC-211. The DEIS identifies the purpose of this mitigation measure as "to ensure that groundwater supported flow that is lost due to mining activity is replaced and continues to be available to the ecosystem" (DEIS appendix J, p. J-8). The DEIS then identifies five specific techniques that could be applied to replace water in the event that the anticipated dewatering impacts are observed during monitoring.

The DEIS appropriately discloses the potential for impacts to such Tonto National Forest water rights from mining activities but also discloses Resolution Copper's commitment to prevent impacts from impinging on water uses at these springs.

| Comment response: NEPA15 United Nations Declaration on the Rights of Indigenous Peoples | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1236-1, 235-21, 8031-49, 851-4

The United Nations Declaration on the Rights of Indigenous Peoples was passed in 2007; the United States signed the declaration in 2010. The Organization of American States, including the United States, adopted an American Declaration on the Rights of Indigenous Peoples in 2016 (Organization of American States 2016).

Both the United Nations and Organization of American States declarations are statements of goals and objectives for signatory States and are non-binding on member States. In the United States, Federal agencies are required to adhere to U.S. laws, regulations, and policies that protect cultural resources and the rights of Native Americans, such as the National Historic Preservation Act of 1966 (16 U.S.C. 470 et seq.); Archaeological and Historic Preservation Act of 1974 (16 U.S.C. 469); American Indian Religious Freedom Act of 1978 (42 U.S.C. 1996–1996a); and Native American Graves Protection and Repatriation Act of 1990 (23 U.S.C. 3001 et seq.); as well as other applicable laws, regulations, and policies. These laws, regulations, and policies foster progress toward achieving the goals and objectives in the United Nations and Organization of American States Declarations on the Rights of Indigenous Peoples.

In response to concerns that the DEIS did not adequately address Tribal impacts, section 3.14 of the FEIS was modified to more thoroughly explore these issues and to incorporate specific comments and viewpoints from the Tribes. See response CR4 for further detail.

11-RCMSER-2894

Appendix R

| Comment response: NEPA16<br>Validity of Resolution Copper mining claims | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8031-36, 8031-37, 8031-7

Issues related to validity of mining claims on NFS lands largely are dependent on the specific activity proposed on NFS lands and on which regulations allow for authorization of those activities. For the Resolution Copper Project, the specific activities proposed to occur on NFS lands differ by alternative.

For the Resolution Copper Project, the activities proposed on NFS lands can be authorized under either mining regulations at 36 CFR 228A or special use regulations at 36 CFR 251, depending on the circumstances. The regulations under which the decision would be made vary, depending on the nature of the selected action that will be identified in the ROD.

Each of the action alternatives described in the DEIS has two scenarios: (1) mining and associated activities if the land exchange occurs; and (2) mining and associated activities if the land exchange does not occur.

If the land exchange occurs, mining would occur solely on private land. Whether activities on NFS lands would be authorized by mining or special use regulations would depend on what specific actions are proposed to occur on those lands, and in some instances whether the claims underlying proposed tailings are mining or mill site claims.

If the land exchange does NOT occur, the mine would be located on both private and NFS lands, and all activities would take place under the GPO filed by Resolution Copper and 36 CFR 228A mineral regulations.

At this point, the land exchange is anticipated to occur. With the DEIS preferred alternative (Alternative 6 – Skunk Camp), assuming the land exchange occurs, both mining and tailings would ultimately be on private land, and the uses on NFS lands to be authorized under the special use regulations at 36 CFR 251 would be limited to the pipeline corridor, power line corridors, and certain mitigation and monitoring activities. No actions on NFS lands would be authorized under mining regulations at 36 CFR 228A.

If the selected action identified by the Forest Supervisor in the ROD requires that the Forest Service authorize activities on NFS land under mining regulations at 36 CFR 228A, the legal requirements for considering mine claim validity are detailed in U.S. Department of the Interior Office of Solicitor Memorandum Opinions M-37012 (dated November 14, 2005) and M-37057 (dated August 17, 2020). This legal opinion concludes that although the agency is authorized to determine claim validity at any time until a patent is issued, the agency is under no legal obligation to determine mining claim or mill site validity before approving a proposed GPO to explore for or develop minerals on lands open to operations under the Mining Law. This would be the case for Resolution Copper in the event that the land exchange did not occur.

The legal opinion also concludes that when lands are withdrawn from entry under the Mining Law, the agency must verify whether the mining claims and mill sites included in a proposed GPO are valid before approving the plan. The GPO submitted by Resolution Copper to the Tonto National Forest does not include any mining within the boundaries of any withdrawal area.

At this time, several court decisions have made use of the "Rosemont ruling," which involves the type of activities that can take place on unpatented claims and the need to validate those claims, and understanding of the ruling has evolved. We added a section to the FEIS that fully discusses how the Rosemont Copper case affects each action alternative.

| Comment response: NEPA17<br>Resolution mining claims on adjacent properties | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1479-1, 8032-326

As stated in the DEIS, a potential future activity must be "reasonably foreseeable." A reasonably foreseeable action is an action that is likely to occur in the future and is not simply an activity that may or may not occur at some unknown time in the future (e.g., a speculative action) (DEIS, p. 129).

It is unknown at this time whether, when, or how potential adjacent mineral deposits that are not included in the Resolution Copper GPO would be mined. There have been no proposals to mine these deposits, so future development is speculative, and they have not been included as reasonably foreseeable actions. Should proposals to mine these deposits be made in the future, those proposals would have to comply with applicable laws and regulations, such as Federal mining laws, NEPA, and Federal and State environmental laws.

11-RCMSER-2895

Appendix R

| Comment response: NEPA18 | |
|---|---|
| No action alternative | Page 1 of 1 |

**Responsive to these comments:**
1188-1, 1338-10, 1544-1, 8031-35, 886-1

These comments question the accuracy of statements in the DEIS and related documents and claim that the Tonto Forest Supervisor cannot legally select the no action alternative.

As noted in the comments, consideration of a no action alternative is required by NEPA and its implementing regulations. We complied with this requirement by developing and analyzing a no action alternative in the DEIS.

The DEIS correctly described our authority under mining regulations at 36 CFR 228 Subpart A. The question raised by these comments is whether the proposed action and alternatives presented in the DEIS are properly authorized under Forest Service mining regulations at 36 CFR 228 Subpart A or under special use regulations at 36 CFR 251.

The authorities the Forest Service has under special use regulations differ substantially from those under the mining regulations. The alternatives presented in the DEIS differ in whether they would be permitted under the mining or special use regulations. See response NEPA8 for a more detailed discussion. We added language to chapter 1 of the FEIS to clarify the criteria that will be considered when deciding which is the appropriate permitting regulation for actions on Federal lands.

| Comment response: NEPA19 | |
|---|---|
| Appropriateness of continuing baseline pumping under the no action alternative | Page 1 of 1 |

**Responsive to these comments:**
3-1, 30078-20, 30078-21, 8031-39, 8031-41, 8031-62, 8032-23, 8032-24, 8032-69, 8032-86

These comments are concerned with the ongoing dewatering pumping being conducted by Resolution Copper, expressing the point of view that the current impacts from this dewatering should be properly analyzed in the NEPA process.

This issue was raised early in the NEPA process and thoroughly explored by the NEPA team (BGC Engineering USA Inc. 2020b; Garrett 2018d). The history of the dewatering and the impacts of that dewatering on the existing condition of the environment is explored in several places but in the most detail in chapter 3.7.1 (pp. 304–309, 312). This includes the impact this dewatering has had on groundwater levels (DEIS, p. 309) and on GDEs (DEIS, p. 312) (Garrett 2019f).

Besides describing the impact the dewatering has had on the existing environmental condition, the ongoing dewatering is evaluated in the no action alternative and the cumulative effects analysis. Among other purposes, the no action alternative acts as a baseline against which the impacts from other alternatives can be compared. A decision was required regarding whether the no action alternative should include continued dewatering or not.

None of the comments provide additional information beyond what was considered in the DEIS or suggest a basis for changing the approach. Most importantly, we believe that the approach taken ensures that no impacts have been disregarded. All future impacts resulting from the dewatering are assessed in the FEIS as part of the no action alternative and proposed action alternative, and all past impacts resulting from dewatering are assessed in the FEIS as part of the existing condition of the affected environment.

11-RCMSER-2896

Appendix R

| **Comment response:** NEPA20<br>Effects of jurisdictional delineation on Arizona State Trust lands | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>562-6 | |

Whether any waters of the U.S. are, or are not, considered jurisdictional under the CWA is a matter of law and regulation and determined under the auspices of the USACE.

Whether a jurisdictional delineation is approved or not does not change the fundamental requirements associated with that piece of property under those laws and regulations. Any development that occurs is subject to those laws and regulations.

The effects of jurisdictional delineations on the ASLD's ability to realize the highest value for those State Trust lands located downstream, if any, are speculative and would be inappropriate for analysis.

| **Comment response:** NEPA21<br>Financial assurances for preferred alternative (Alternative 6 – Skunk Camp) | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1194-2, 524-17 | |

See the response to NEPA16 concerning regulations for authorizing activities for various alternatives, scenarios, and land ownership.

Assuming that the land exchange occurs, mining for Alternative 6 – Skunk Camp (the preferred alternative) would occur solely on private land. Actions proposed for NFS lands under this alternative are limited to the pipeline corridor, power line corridors, and certain mitigation and monitoring activities that would be authorized under special use regulations at 36 CFR 251. We would not be responsible for bonding at Skunk Camp, which would be a facility located on private land. The Arizona State Mine Inspector will require a reclamation plan and financial assurance. The ADEQ will also require financial assurance as part of the Aquifer Protection Permit.

The special use permit that would authorize actions on NFS lands would require certain mitigation, which was identified and analyzed in appendix J of the FEIS. We can require a bond or other security to secure all or any of the obligations imposed by the terms of the special use permit or by any applicable law, regulation, or order (36 CFR 251.56(e)).

If the land exchange does not occur, mining for Alternative 6 – Skunk Camp would occur on both private and NFS lands. In this case, mining and associated actions on NFS lands would be authorized under Forest Service mining regulations at 36 CFR 228A. These regulations allow the Forest Service to require a bond or other financial assurance to ensure performance of payment (as necessary), reclamation, and other conditions of the contract or permit (36 CFR 228.51(a)).

| **Comment response:** NEPA22<br>Agencies and their authorities | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1194-1 | |

We clarified the discussion of authorities under which various agencies would authorize project-related actions on their lands in chapter 1 of the FEIS.

11-RCMSER-2897

Appendix R

| Comment response: NEPA23 Required components of a "single EIS" | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
8031-6

This comment focuses on the importance of the EIS addressing all Federal actions and connected actions, as required by the land exchange legislation. We acknowledged in multiple locations in the DEIS (pp. ES-4 and pp. 11, 32, and 66) that the EIS must address all Federal actions.

The comment states that the EIS must address all connected actions, specifically noting power lines and substations. The comment also asserts that "permitting decisions" are connected actions that must be analyzed in the EIS.

Infrastructure, like power lines and substations, is fully analyzed as part of the proposed project, along with all other auxiliary facilities, including pipelines, roads, and water supplies. Power lines and substations are specifically described as part of the project in chapter 2 (DEIS, pp. 56–59).

Any Federal agency making a decision related to the project is required to comply with the requirements of NEPA. The intention of the land exchange legislation at Section 3003 (c)(9)(B) is to have a single EIS provide the NEPA compliance disclosures for all Federal decisions, including the Forest Service, BLM (if needed), and USACE. The decision framework for each of these three Federal agencies is described in chapter 1 (DEIS, pp. 11–14). The NEPA process is intended to be sufficient to support these Federal decisions. We added information to chapter 1 of the FEIS to more clearly describe which components of each alternative would require Federal decisions.

The comment is incorrect when it says that State "permitting decisions" are required to be addressed in the EIS as connected actions. Rather, the purpose of the EIS is to disclose the impacts of the project on the environment. While these disclosed impacts are often the same impacts for which State permits are required, the permit decisions themselves are not part of the NEPA process.

State permitting actions are described in chapter 1 (DEIS, pp. 15–20). The relationship between these State permits and the NEPA process is described on p. 15 of the DEIS: "The EIS would not determine if a permit through another agency would be approved but would disclose impacts for resources analyzed."

With respect to other permits mentioned in the comment, the DEIS properly includes analysis of the resource impacts associated with these permits, including migratory birds (DEIS, pp. 461–462), bald eagles (DEIS, pp. 468 and 476), golden eagles (DEIS, pp. 466 and 476), threatened and endangered species (DEIS, pp. 473–476), water quality impacts (DEIS, pp. 346–422), air quality impacts (DEIS, pp. 275–294), and hazardous materials and waste (DEIS, pp. 574–584).

The comment is not correct when it says that all aspects of the project are required to be fully determined in the DEIS. This contradicts the NEPA process, during which modifications are anticipated to be made between the DEIS and FEIS in response to public comment. In addition, many of the permitting processes mentioned in the comment, including the 404 permit under the CWA, Section 7 consultation under the ESA, State of Arizona 401 water quality certification, Aquifer Protection Permit, and air permit, are specific to the alternative ultimately selected by the Forest Supervisor. Therefore, these permits may not be finalized prior to publication of the draft ROD.

| Comment response: NEPA24 The Skunk Camp alternative was not subject to scoping; need more public comment | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
1360-19, 8031-31

These comments misunderstand the purpose of and legal requirements for scoping and alternatives development.

The Skunk Camp alternative was developed to respond to the issues that were raised in scoping, including public health and safety, groundwater quality, and impacts on scenic resources and recreational opportunities, and to limit the impacts on NFS surface resources (DEIS, p. 94). Development of the alternative was part of the scoping process.

Appendix R

| Comment response: NEPA25<br>Requests for extension of comment period | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
110-1, 1106-1, 1158-1, 1455-2, 199-3, 246-1, 248-2, 249-1, 251-1, 251-3, 268-1, 279-5, 31-1, 521-1, 69-1, 8031-9

These comments generally concern aspects of the release of the DEIS to the public and specifically include requests for extensions to the public comment period.

The Forest Supervisor chose not to extend the comment period for the general public, as it already was twice as long as required by Forest Service guidance or regulation. Forest Service guidance is to "allow a minimum of 45 days for comments on a draft EIS unless a different time period is required by law or regulation" (Forest Service Handbook 1909.15, Section 24.1).

Recognizing the complexity of the Resolution Copper Project, the Forest Supervisor specified a 90-day public comment period, running from publication of the Notice of Availability in the Federal Register on August 9, 2019, through November 7, 2019.

After a specific request from the San Carlos Apache Tribe, on October 2, 2019, the Forest Supervisor extended the comment period for an additional 45 days for Tribes, through December 22, 2019 (U.S. Forest Service 2019b). With respect to comments on Tribal consultation, see response CR12.

With respect to comments on the number, format, and location of public meetings, see response NEPA30.

With respect to comments concerning the availability of the DEIS document, the document was available in electronic format on the website at the time of publication of the Notice of Availability, and hard copies were available upon request at the time of publication at various Tonto National Forest offices and the Town of Superior public library. Thumb drives containing the DEIS and all reference documents were also made available at public locations and at all public meetings. In addition, approximately 40 hard copies and thumb drives were delivered or mailed upon request in the first 2 weeks after publication of the Notice of Availability.

One comment voiced concern with the publication of the Notice of Availability in the Federal Register through the EPA weekly notice, rather than a separate Forest Service Federal Register notice. The Federal Register Notice of Availability for the Resolution Copper Project DEIS was published consistent with the "Amended Environmental Impact Statement Filing System Guidance for Implementing 40 CFR 1506.9 and 1506.10 of the Council on Environmental Quality's Regulations Implementing the National Environmental Policy Act" (Federal Register (77):51530 (2012)). Publication followed the established Forest Service process for approving Federal Register notices, which took effect in January 2017. Note that we provided details of this process to certain commenters upon request in September 2019 (Rasmussen 2019).

11-RCMSER-2899

Appendix R

| Comment response: NEPA26 Logistics of website and comment acceptance | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8031-1, 8031-10, 8032-26

We offered a variety of methods with which to submit comments on the DEIS. These methods were identified on the project website, in the Dear Reader letter published with the DEIS, in mailers sent to the entire mailing list upon publication of the Notice of Availability in the Federal Register, in news releases from the Tonto National Forest, and in materials provided at the public meetings.

Methods for submitting comments identified to the public included the following: (1) providing comments at an open house public meeting; (2) using the online form at www.ResolutionMineEIS.us/Comment (the online form stated that it accepted attachments in Microsoft Word (.doc and .docx), rich-text format (.rtf), plaintext format (.txt), or portable document format (.pdf)); and (3) mailing written comments to the Tonto National Forest through the U.S. Postal Service. Public meetings provided attendees with further opportunities to submit comments by speaking publicly during the meeting, speaking privately to a court reporter, or submitting written comments.

We chose to use the website for acceptance of comments electronically, instead of via email. The reasons for this choice included the following: (1) both email and website were perceived to require the same level of technological skill to use; (2) webforms are commonplace and are standard methods for accepting comments; (3) both email and website have similar attachment file size limitations; (4) the webform allows for direct entry of comments into a comment database, not only increasing efficiency but minimizing the potential for mishandling of comments; (5) use of the webform provides the commenter with an individualized receipt with a tracking number, providing assurance that the comment was received; (6) use of a webform avoids possible loss of email comments by spam/filtering; (7) safety at public meetings was a paramount concern, and use of a webform allowed for real-time tracking of comments, searching for key words or threats; and (8) similar key word searches in the database can identify requests that are time sensitive, such as problems noted with the website, references, or documents, or requests for extension of the public comment period.

Comments note that attachments larger than 20 MB were required to be delivered separately and could not be delivered through the website. This would have been the case with any electronic delivery system such as email. In all cases, the Tonto National Forest accepted submittal of these files via thumb drive on a schedule convenient to the commenter. We did not reject any comments for using this delivery method or reject any comments for receipt of via this delivery method after close of the comment period.

11-RCMSER-2900

Appendix R

| Comment response: NEPA27 Locations of postings, details of mailing list | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
1115-1, 125-1, 1358-5, 1360-1, 289-2, 32-2, 38-1, 6820-1

These comments raise concerns about the notification process for the DEIS and the public comment meetings.

We maintain a project mailing list of interested parties, adjacent landowners, and those who have commented upon the project.

The mailing list began when the project started and we update the list regularly. It includes people interested in previous Resolution NEPA processes, commenters from the scoping period, and commenters from the DEIS comment period. The list also includes people who contacted the Tonto National Forest through webform, comment form, or direct communication and requested to be added.

As we developed alternatives that covered different geographic areas, we used the county assessor sites to add adjacent landowners to the mailing list. We used the assessor site to expand the list to include landowners up to 1 mile from each project component and in some areas up to 10 miles from the proposed project.

We use the mailing list to contact interested stakeholders and notify them of key project activities. These activities include the Notice of Availability of the DEIS and public comment meetings, scoping meetings, and the alternatives development meetings. See response NEPA30 for details about when notices such as mailed postcards or handouts or emails were distributed for the DEIS release and public meetings.

In addition to the mailing list, we used other outreach and notification means such as a Federal Register notice, social media posts, news releases, website announcements, newspaper notices (in English and Spanish), and posters physically displayed at 37 various local bulletin boards and areas in the project vicinity. We targeted communities for notification if they expressed specific concerns, including the town of Queen Valley, Superior, and Top-of-the-World; the residences along existing roads used to access project components such as residential access off Skyline Road from Quail Run Road to the filter plant and loadout facility; and residential access from Dripping Springs Road between State Route (SR) 77 and the Skunk Camp tailings storage facility.

During the San Tan Valley public meeting on September 12, 2019, local residents expressed concern that they were not aware of the project. This led us to expand our outreach and notification efforts to include landowners located farther than 1 mile from the proposed project.

The August 2019 legal notice was published in multiple local papers to achieve widespread notification. Specific to San Tan Valley residents, this included the Arizona Republic, La Voz, and the Florence Reminder and Blade Tribune.

One comment suggested that we post information to the Oak Flat campground community board, which we will consider for future notices.

The June 2019 pre-DEIS notice was sent to 17,500+ postal mail addresses and 23,000+ email addresses. The August 2019 DEIS release was sent to 15,200+ postal mail addresses (which is smaller than the June notice, as duplicates and undeliverable addresses were removed from the mailing list) and 23,000+ email addresses. The September 2019 notice of an additional public meeting was sent to 15,400+ postal addresses and 23,000+ email addresses.

Appendix R

| Comment response: NEPA28 Accessibility of DEIS and materials | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1360-2, 274-1

The comments suggest that the documents were not available to users with disabilities or speakers of different languages.

The Section 508 amendment of the Rehabilitation Act of 1973 requires that information in Federal documents be accessible to individuals with disabilities. All NEPA documents created for this project were Section 508 compliant and posted to the public website in usable ways for people with visual disabilities. The video recording of the public meeting posted to the project website included closed captioning for those with auditory disabilities. All maps and graphics were designed with color contrast in mind to make information more easily discernible.

We are not required to produce documents in languages other than English. Public notices such as the Notice of Intent, Notice of Availability, and newspaper announcements were translated into Spanish and published in the Spanish newspaper La Voz.

Disclaimers on the project website noted that "if anyone had issues with the documents to contact John Scaggs at john.scaggs@usda.gov or (602) 225-5292 if they needed additional documents or formats." No comments or requests came to our attention to translate documents into other languages, expressed problems with Section 508 compliant documents, or asked assistance with some external documents that were not Section 508 compliant but cited by a project document.

The DEIS was available by electronic download from the public website, flash drive, or printed hard copy. References cited by the DEIS also were provided for electronic download from the public website or on flash drives.

On the inside front cover of every DEIS volume (both digital and hard copy) we included the following notice:

*"In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.*

*Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.*

*To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at http://www.ascr.usda.gov/complaint_filing_cust.html and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov.*

*USDA is an equal opportunity provider, employer and lender."*

Appendix R

| Comment response: NEPA29<br>Alleged conflict of interest | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
119-2, 119-3, 120-1, 1338-11, 1493-1, 1505-3, 175-1, 194-2, 262-1, 265-1, 265-3

These comments allege conflicts of interest with the third-party NEPA contractor (SWCA Environmental Consultants) selected by the Forest Service to prepare the EIS for the Resolution Copper Project.

The basis stated in the comments for the alleged conflicts of interest, specifically the relationship between Dr. Stephen W. Carothers and The Nature Conservancy and Dr. Carothers's position with SWCA Environmental Consultants, are incorrect. These claims were investigated, and the facts on these issues were documented for the Tonto National Forest in October 2019 after verbal receipt of these comments during a public meeting and were included in the project record (Garrett 2019e).

Conflict-of-interest management is a requirement of the third-party contract. These issues have been actively managed by the third-party NEPA contractor since award of the contract in 2015. A consolidated description of contracting and conflict-of-interest management activities was prepared for the Tonto National Forest and for the project record after receipt of these comments (Garrett 2019g).

We are aware that these allegations were raised with the U.S. Department of Agriculture Office of Inspector General (OIG), as noted in the comments. An OIG inspector contacted and interviewed the Tonto National Forest and SWCA Environmental Consultants. Both entities cooperated by providing all information requested.

| Comment response: NEPA30<br>Meeting locations | Page 1 of 2 |
|---|---|

**Responsive to these comments:**
115-1, 1477-2, 180-2, 186-1, 213-1, 235-6, 245-3, 260-1, 64-1, 71-1, 801-1

These comments suggest that the Tonto National Forest should expand the public involvement outreach and public meetings conducted on the DEIS. We held six public meetings within local communities in the vicinity of the project during the 90-day public comment period, which ended on November 7, 2019. We conducted a seventh meeting with the San Carlos Apache Tribe during a special Tribal Council meeting on November 22, 2019, within the Tribe's extended 135-day comment period, which ended on December 22, 2019.

We notified interested stakeholders of the upcoming release of the DEIS and future public meetings by first class U.S. mail postcards (June 14, 2019) and via email to the project mailing list (June 17, 2019). The Federal Register publication of Notice of Availability of the DEIS and notification of public meetings occurred on August 9, 2019. The project website simultaneously was updated with the same information on August 9, 2019, to coincide with the Federal Register Notice. We also announced availability of the DEIS and the public meeting schedule through mailers sent via U.S. first class mail (August 12, 2019), an email to the project mailing list (August 13, 2019), 16 different Arizona newspapers (beginning on August 9, 2019, and varied publication dates over the subsequent 2 weeks based on publication schedule for each paper), and physical posting of 37 Notice Posters on local bulletin boards as well as at public meetings (September 4, 2019).

Beginning on August 9, 2019, the legal notice was published in 16 newspapers, including a Spanish translation of the notice. Newspapers included statewide and local readership areas around the project and the land exchange parcels, as follows: Arizona Capitol Times, Arizona Republic, Arizona Business Gazette, Sierra Vista Herald, Arizona Silver Belt, San Carlos Apache Moccasin, Payson Roundup, Arizona Daily Star, Florence Reminder and Blade Tribune, Coolidge Examiner, San Manuel Miner, Copper Basin News, Superior Sun, La Voz, Foothills Focus, and Arizona Daily Sun.

Six public meetings were held in September and October 2019 at locations around the project area. These locations were chosen as they mirrored locations used during the scoping period. Meetings were held mid-week during the evening hours in Superior, San Tan Valley, Kearny, Globe, Queen Valley, and Tempe. We added the Tempe meeting based on public requests for a meeting closer to central Phoenix. A seventh meeting was held at a special open meeting of the San Carlos Apache Tribal Council on November 22, 2019.

11-RCMSER-2903

Appendix R

| Comment response: NEPA30 Meeting locations | Page 2 of 2 |
|---|---|
| **Responsive to these comments:** 115-1, 1477-2, 180-2, 186-1, 213-1, 235-6, 245-3, 260-1, 64-1, 71-1, 801-1 | |

We held the Superior meeting at the Superior Junior/Senior High School on September 10, 2019, as it is close to the mine headquarters and to the West and East Plant Sites. We held the San Tan Valley meeting at Central Arizona College on September 12, 2019, to provide a venue close to the filter plant and loadout facility. We held the Kearny meeting at Ray Elementary School on September 17, 2019, to provide additional outreach to communities near two additional proposed tailings storage facility locations (Alternative 5 – Peg Leg and Alternative 6 – Skunk Camp). We held the Globe meeting at High Desert Middle School on September 19, 2019, on the east side of town, closest to the San Carlos Reservation. We held the Queen Valley meeting at the Queen Valley Recreation Hall on October 8, 2019, for residents who live downstream of the Near West Tailings Storage Facility and the MARRCO corridor. We held the Tempe meeting at the Hotel Tempe/Phoenix Airport on October 10, 2019, to enable additional Phoenix residents to participate.

Feedback from scoping meetings held in 2016 informed these locations. The Gilbert meeting location from scoping was updated to Kearny, Arizona, to better consider the additional tailings facilities described in the DEIS and because the San Tan Valley meeting covered the eastern metropolitan area. The Tempe meeting was held at a location close to freeways and the Phoenix Sky Harbor Airport. Additional public notice was given to the project mailing list by both U.S. Postal Service postcards and emails (on September 25, 2019, and September 27, 2019), press release, and website banner announcement, and with notification at the Queen Valley meeting participants (October 8, 2019).

The presentation shown at each public meeting that provided input on the project and its anticipated impacts was recorded and available on the project website for those unable to attend a meeting in person (posted on the website on September 10, 2019).

Court reporters transcribed public comments at each meeting, and we placed the transcripts for others to view on the project website (November 4, 2019).

We distributed multiple news releases and generated several social media posts about the project meetings and DEIS release and comment period (media releases on September 26, 2019, and October 22, 2019).

We received requests for a meeting in Tucson, but the Forest Supervisor determined that this would not be an appropriate use of Forest Service resources, considering the other meetings, online access to information, and distance from the project and its anticipated impacts.

| Comment response: NEPA31 Request for no extensions of public comment period | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 1075-2, 303-1 | |

These comments state that the comment period for the DEIS should not be extended. The Forest Supervisor chose not to extend the comment period for the general public, as it already was twice as long as required by Forest Service guidance or regulation. Forest Service guidance is to "allow a minimum of 45 days for comments on a draft EIS unless a different time period is required by law or regulation" (Forest Service Handbook 1909.15, Section 24.1).

Recognizing the complexity of the Resolution Copper Project, the Forest Supervisor specified a 90-day public comment period running from publication of the Notice of Availability in the Federal Register on August 9, 2019, through November 7, 2019.

| Comment response: NEPA32 Missing or incorrect reference | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 30075-48 | |

The comment notes that reference Newell (2018k) was not provided on the DEIS website. This is the result of a typographical error in the Literature Cited of the DEIS (p. 753), which inadvertently repeated the information for reference Newell (2018j). After this issue was noted, we made Newell (2018k) available on the website and corrected this issue in the Literature Cited section of the FEIS.

11-RCMSER-2904

Appendix R

| Comment response: NEPA33<br>Appraisal details, including public interest and best and highest use | Page 1 of 2 |
|---|---|

**Responsive to these comments:**
1206-5, 1207-1, 126-1, 1295-1, 1301-24, 1322-2, 1342-3, 263-8, 27977-1, 27995-1, 27996-4, 28002-2, 42-3, 7308-1, 8032-216, 8032-218, 8032-219, 8032-220, 8032-221, 8032-222, 8032-223, 8032-225, 866-12, 873-2, 892-1, F6-2

These comments focus on a variety of perceived shortcomings of the land exchange appraisal process. They raise the following specific points: (1) question why the appraisal of lands to be exchanged has not been completed and disclosed in the DEIS; (2) make a number of claims about how the appraisal should be conducted, including determination of public interest, consideration of best and highest use, and inclusion of specific values (recreational use, Tribal values, value of copper deposits, water used by the mine, etc.); (3) question the method of appraisal to be used, which is specified in Section 3003 of PL 113-291; (4) state that the appraisal must be conducted in compliance with Federal Land Policy Management Act of 1976 (FLPMA) and NEPA; (5) claim a lack of meaningful public review of the appraisal; and (6) state that there is no disclosure of potential impacts from mining to Apache Leap and other nearby lands.

As stated in response NEPA9, this land exchange is a legislative exchange, and the requirements for conducting the exchange are specified in Section 3003 of PL 113-291. Requirements contained in other law, regulation, or policy that are not required by this legislation are not applicable to the exchange.

Section 3003 of PL 113-291 contains numerous requirements for appraisal of lands identified for exchange in this section. These legislative appraisal requirements include the following:

1. The appraisal of Federal and non-Federal lands is conducted in compliance with the requirements of 36 CFR 249.9;

2. The appraisal is prepared in accordance with nationally recognized appraisal standards, including the Uniform Appraisal Standards for Federal Land Acquisitions and the Uniform Standards of Professional Appraisal Practice (other than excluding the value of any improvements made by Resolution Copper);

3. Stipulations regarding reappraisal;

4. Requirement that the Secretary "make the appraisals of the land to be exchanged (or a summary thereof) available for public review."

5. A requirement that the appraisal "include a detailed income capitalization approach analysis of the market value of the Federal land which may be utilized, as appropriate, to determine the value of the Federal land, and shall be the basis for calculation of any payment;" and

6. A requirement that the value of lands to be exchanged shall be equal or equalized.

11-RCMSER-2905

Appendix R

| Comment response: NEPA33 | |
|---|---|
| Appraisal details, including public interest and best and highest use | Page 2 of 2 |

**Responsive to these comments:**
1206-5, 1207-1, 126-1, 1295-1, 1301-24, 1322-2, 1342-3, 263-8, 27977-1, 27995-1, 27996-4, 28002-2, 42-3, 7308-1, 8032-216, 8032-218, 8032-219, 8032-220, 8032-221, 8032-222, 8032-223, 8032-225, 866-12, 873-2, 892-1, F6-2

The DEIS clearly disclosed the requirements and current state of the appraisal:

> *"The appraiser was selected and began work in 2019. The completed appraisal reports will be reviewed by a Forest Service review appraiser. The review appraiser will ensure that the appraisal follows the appraisal instructions, Uniform Standards of Professional Appraisal Practice and Uniform Appraisal Standards for Federal Land Acquisitions standards, Federal regulations, and the special requirements found in the NDAA. The review appraiser will ensure that the values concluded by the appraiser are sound and well supported.*
>
> *The NDAA specifies 'a detailed income capitalization approach analysis of the market value of the Federal land which may be utilized, as appropriate, to determine the value of the Federal land.' The income capitalization approach is one of three commonly used approaches used for real property appraisals.*
>
> *The NDAA specifies that the appraisal reports (or a summary thereof) supporting the land exchange will be made available for public review prior to completion of the land exchange. The appraisal information will be made available after it is reviewed and approved by the Forest Service review appraiser."* (DEIS, pp. 35–36)

The Federal regulations for land appraisal that are required by PL 113-291 are at 36 CFR 259.9. These regulations include consideration of the best and highest uses of lands being appraised. These regulations, along with standards contained in Uniform Standards of Professional Appraisal Practice and Uniform Appraisal Standards for Federal Land Acquisitions standards, describe values and resources that are to be considered appraisal of exchange lands. As stated in both PL 113-291 and in the DEIS, the appraisal will comply with these regulations and nationally recognized appraisal standards.

The DEIS complies with NEPA requirements regarding the land exchange by describing the lands proposed for exchange and analyzing the impacts of exchanging these lands. These disclosures are contained throughout the DEIS, including in appendices B and I.

As required by PL 113-291, the final appraisal or a summary thereof will be released for public review prior to consummation of the land exchange. This release need not be part of the FEIS or draft ROD.

Impacts to nearby lands and to Apache Leap are included in the analysis of impacts throughout the sections of chapter 3 of the DEIS. There are too many instances of descriptions of potential impacts to Apache Leap and other nearby lands to identify here.

In conclusion, the land exchange appraisal will comply with a requirements stated in Section 3003 of PL 113-291 and the final report or a summary thereof will be made available for public review, as required by PL 113-291.

| Comment response: NEPA34 | |
|---|---|
| Importance of copper for defense | Page 1 of 1 |

**Responsive to these comments:**
1112-1, 1197-4, 928-2

These comments note the uses of copper and importance of copper for national strategic interests, including defense.

Uses of copper are ubiquitous and varied. Identifying specific uses of the copper to be mined by this project is speculative and beyond the scope of the analysis. The purpose and need statement in the DEIS (pp. 6–8) already notes the importance of mining to national interests, including security: "Through the Mining and Mineral Policy Act, Congress has stated that it is the continuing policy of the Federal Government, in the national interest, to foster and encourage private enterprise in the development of economically sound and stable domestic mining, minerals, and metal and mineral reclamation industries; and the orderly and economic development of domestic mineral resources, reserves, and reclamation of metals and minerals to help ensure satisfaction of industrial, security, and environmental needs."

11-RCMSER-2906

Appendix R

| Comment response: NEPA35<br>Forest Service decision space and framework | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
101-1, 104-2, 1158-4, 1226-3, 1278-2, 1360-18, 1361-8, 1424-1, 1481-1, 202-1, 24-5, 28093-2, 28449-1, 8031-69, 8031-8, 8032-227, 8032-339, 886-2

These comments raise a variety of concerns and questions regarding the Forest Service decision space, the framework in which decisions will be made, and related issues.

The decision framework for the Resolution Copper Project is described in the DEIS (DEIS, pp. 11–20). This section of the DEIS describes decisions that may be required by the Forest Service, BLM, and USACE, as well as various permits that would be required. The decisions to be made and the specific permits required will differ, depending on whether the requirements for the mandatory land exchange are met and which alternative is ultimately selected in the final ROD.

Another comment asks what parties will be responsible for ensuring that the required mitigation, monitoring, and other NEPA requirements will be carried out. The responsible party for ensuring NEPA compliance depends on which alternative is selected and the land ownership on which specific activities would occur. For alternatives with mine and mine-related facilities on Federal lands, the Federal agency that administers those lands would be responsible for bonding and ensuring compliance with NEPA and other requirements. For alternatives with mine and mine-related facilities on private or State lands, the Arizona State Mine Inspector would be responsible for bonding and ensuring compliance on those lands. Language will be added to the FEIS to clarify these roles and responsibilities. See response MIT31 for more detail on financial assurances.

Two comments ask why this project is being addressed at this time, given that Rio Tinto has other projects in the pipeline. Resolution Copper submitted a GPO to the Forest Service in 2013. The Forest Service has an obligation to process permit requests in a timely manner. In addition, through Section 3003 of PL 113-291, Congress directed the Forest Service to complete an EIS addressing this project.

Two comments assert that the DEIS is flawed and has failed to comply with NEPA, applicable laws, and PL 113-291. One claims the Forest Service cannot ensure that the project will comply with all applicable air, water, and other environmental standards. It is not unreasonable to presume for the purposes of the analysis that there will be compliance with statutory and regulatory requirements that are overseen and enforced by several Federal and State agencies.

One comment notes that the Oak Flat Recreation Area is used as a teaching site for Arizona State University's field biology courses and asks how the Forest Service justifies the loss of this educational land use value. We have added language to the FEIS noting this current use of the Oak Flat Recreation Area.

Another comment notes that, while PL 113-291 requires one EIS to be prepared to analyze the mineral extraction and associated activities and the land exchange, there is nothing to preclude using separate/supplementary compliance review and procedures in accordance with applicable laws. Another notes that while PL 113-291 does not permit the Forest Service to reject the land exchange, it does not change the agency's discretion to reject the GPO. PL 113-291 states that a single EIS will be prepared that "shall be used as the basis for all decisions under Federal law related to the proposed mine and the Resolution mine plan of operations and any related major Federal actions significantly affecting the quality of the human environment, including the granting of any permits, rights-of-way, or approvals for the construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities." If the land exchange occurs, it may be that there are no mining operations that occur on NFS land as defined under 36 CFR 228A and therefore no requirement to obtain approval of a GPO from the Forest Service.

Another comment notes that the DEIS inaccurately states that the Forest Service will no longer have jurisdiction over NFS lands impacted by the land exchange. The statement on p. 14 of the DEIS is meant to apply only to lands that will be in private ownership once the land exchange is completed. The statement is correct that the Forest Service will no longer have jurisdiction over these formerly Federal lands, which would then be in private ownership.

Lastly, one comment expressed the belief that to have this decision-making process in the hands of one person seems unwise. While there is one decision-maker for the Forest Service, there are many decisions that will be made by Federal and State agencies. Depending on which alternative is selected for implementation in the final ROD, decisions may be required by other land management or regulatory agencies (BLM, USACE, State of Arizona). The issuance of the required permits involved decisions by multiple agencies, such as ADEQ and others.

Appendix R

| Comment response: NEPA36 Legality of forest plan amendment | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
5-2, 1051-3, 1158-5, 799-1, 8032-341

These comments contend that the forest plan amendment should not occur, that the GPO should be changed to comply with the forest plan, and that the amendment would not comply with the National Forest Management Act.

The National Forest System Land Management Planning Rule (Planning Rule) (36 CFR 219) sets out the planning requirements for developing, amending, and revising land management plans (also referred to as forest plans) for units of the NFS, as required by the Forest and Rangeland Renewable Resources Planning Act of 1974, as amended by the National Forest Management Act of 1976 (16 U.S.C. 1600 et seq.).

Identifying the need for an amendment to the forest plan is consistent with Section 219.13 of the Planning Rule. On pp. 10 and 11 of the DEIS, we disclosed that a forest plan amendment was part of the project purpose and need and that the Forest Supervisor has the discretion to determine whether and how to amend the forest plan and to determine the scope and scale of any such amendment. We further disclosed that based on a project consistency review with the existing 1985 forest plan (as amended through 2017), a few narrowly focused amendments would be needed under any alternative to reconcile the visual quality objective (VQO) and recreation opportunity spectrum (ROS) management classes for Management Areas 2F and 3I. We further disclosed in DEIS table 1.4.3-1 (p. 12) specific language for the proposed plan amendment.

After considering the options available under Section 219.15(c) of the Planning Rule, the Forest Supervisor has chosen to amend the forest plan contemporaneously with the approval of the project so that the project would be consistent with the plan, as amended. This amendment will be limited to apply only to the project or activity.

We disagree with the statement in one comment that the amendment cannot go forward because it is not supported by a legally adequate EIS. Compliance with applicable laws and regulations cannot be determined at this phase of the process. When conducting an EIS, NEPA envisions a multi-step process with several opportunities for public participation. The DEIS is only one of these steps. Scoping of the proposal prior to publication of the DEIS helps to identify issues with the proposal, which, in turn, helps identify reasonable alternatives to the proposal and social and environmental aspects that must be analyzed to determine impacts. The DEIS then presents a draft of these issues, alternatives, analysis, and impacts for public review and comment. After consideration and response to public comments on the DEIS, an FEIS is prepared that includes modifications, corrections, and additions as needed to respond to DEIS comments. The FEIS is published with a draft ROD that addresses whether the alternative proposed for authorization will comply with applicable laws and regulations. The FEIS and draft ROD then go through a Forest Service objection process. Once all objections are processed and rectified, a final ROD is published, followed by agency-specific authorizations.

Note that in December 2023 the Tonto National Forest implemented a revised forest plan. We conducted a full consistency review for the new forest plan, similar to the consistency review we conducted before for the 1985 forest plan. The results of the consistency review are documented in the FEIS and the project record, and the proposed amendment to the forest plan for the preferred alternative is fully detailed in the FEIS.

11-RCMSER-2908

Appendix R

| Comment response: NEPA37 Exemption from laws | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
107-9, 132-5, 213-2, 26820-1, 28093-3, 298-2, 43-1, 5689-1

These comments express a belief that this project is exempt from a broad swath of Federal laws, either because of foreign ownership of the proponent or because the comment purports that Forest Service believes PL 113-291 trumps other Federal environmental laws.

These comments are not correct. Section 3003 of PL 113-291 legislatively directs the land exchange to take place in compliance with specific statutory provisions and other Federal laws. The specific laws mentioned are the NHPA and NEPA. As explained in the DEIS, the Tonto National Forest Supervisor has no decision authority regarding the land exchange due to the constraints imposed by PL 113-291 (DEIS, p. 13).

All other actions proposed in the DEIS are subject to all applicable laws and regulations.

Groundwater pumping and use is regulated and permitted by ADWR. Resolution Copper currently holds several groundwater rights: Type 2 Non-Irrigation Grandfathered Rights/Type II Mineral Extraction Rights, and a dewatering withdrawal permit. Similar rights or permits would be required for any dewatering that occurs during operations. Resolution Copper would be required to permit any wells associated with the Desert Wellfield, which would lie within the MARRCO corridor. Notices of Intent to Drill would be required for any well installation to ensure proper construction and documentation. Any further permits or rights required would depend on whether the water pumped was legally considered recharged or banked water or regular groundwater. This would be determined by the ADWR (DEIS, p. 18). The analysis of the impacts of dewatering at the mine site, analysis of pumping from the Desert Wellfield for the mine water supply, and anticipated effects from tailings seepage are disclosed in the DEIS in Chapter 3, Section 3.7.1, Groundwater Quantity and Groundwater-Dependent Ecosystems.

The determination of impacts to species listed under the ESA as threatened, endangered or candidate for listing is the responsibility of the FWS. The Forest Service has conducted formal consultation with the FWS to determine impacts to listed species from the Resolution Copper Project. The FWS has completed a Biological Opinion, which is attached as appendix P of the FEIS and is discussed in FEIS sections 1.6, 3.3, and 3.8.

Placing mine tailings on Federal lands is not illegal and may be authorized by the Forest Service, subject to compliance with applicable regulations. For the alternatives that propose to construct tailings storage facilities on NFS land, the impacts are described in each resource section of chapter 3 in the FEIS.

In terms of making a determination of legal compliance, the draft ROD specifically addresses whether the alternative proposed to be implemented will comply with applicable laws and regulations.

| Comment response: NEPA38 Administrative Procedures Act | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
5423-1

The aspect of the Administrative Procedures Act that typically applies to Forest Service NEPA is as follows:

> *The reviewing court shall—*
>
> (1) *compel agency action unlawfully withheld or unreasonably delayed; and*
>
> (2) *hold unlawful and set aside agency action, findings, and conclusions found to be—*
>
> (A) *arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;*
>
> (B) *contrary to constitutional right, power, privilege, or immunity;*
>
> (C) *in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;*
>
> (D) *without observance of procedure required by law;*
>
> (E) *unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or*
>
> (F) *unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.*

The Forest Service is acting in compliance with the Administrative Procedures Act and other applicable laws.

11-RCMSER-2909

Appendix R

| Comment response: NEPA39 Overturning land exchange | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:** 1158-12, 1205-1, 1297-1 | |

These comments either ask for the EIS process to be put on hold pending congressional action on repealing the land exchange specified in Section 3003 of PL 113-291, or they state that the land exchange should be reversed due to the resulting environmental and cultural impacts.

Congress passed and the President signed PL 113-291 into law. It remains binding law that the Forest Service must comply with until it is changed or repealed by Congress and the President. We cannot simply ignore the direction in PL 113-291 and wait to see whether Congress will act on an introduced bill at some unknown time in the future. If Section 3003 of PL 113-291 is modified or repealed in the future, we will follow whatever applicable stipulations and requirements the new legislation or court decision contains.

| Comment response: NEPA40 Incorrect statement about not analyzing tailings | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:** 2052-1 | |

The comment states that tailings piles were not analyzed as a connected action. This is an incorrect statement. The tailings storage facilities are analyzed in the DEIS as part of the proposed action and action alternatives. Modification of the location of the tailings storage facility and the methods of tailings deposition formed the core of the alternatives development. Tailings storage facilities are described in detail for each alternative in chapter 2, including the tailings type, conveyance, embankment, liner, disposal method, auxiliary facilities, and reclamation and closure (DEIS, pp. 67–99). Impacts resulting from the placement of the tailings are discussed in chapter 3 for each resource under each alternative.

11-RCMSER-2910

Appendix R

| Comment response: NEPA41 Analysis of power lines | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1544-15, 8031-71

The Forest Service analyzed power lines and impacts from the power lines in the DEIS. Figure 2.2.2-15 provides an overview of the existing power lines in the project area and new power lines considered under various alternatives of the project (DEIS, p. 57).

The DEIS analysis assumed that disturbance could impact all land within the analysis corridor or project component fence line. Resolution Copper and SRP have done additional design work to narrow the amount of impacts within the corridor associated with the preferred alternative. The FEIS shows a smaller impact because the corridor was reduced in some areas from 1,000 feet wide to 75 to 500 feet wide. The greatest extent of impacts is with a 1,000-foot-wide corridor, and those impacts were disclosed in the DEIS.

Rights-of-way and easements will include the power line and associated infrastructure (e.g., substation and staging areas) and temporary construction impacts. The entire analysis corridor is considered to be affected, and we disclose the impacts of the disturbed acres. Substations built specific to this project are anticipated at the West Plant Site, East Plant Site, and tailings storage facility. These are designed to be within the project disturbance disclosed in both the DEIS and FEIS.

The DEIS disclosed that the use of applicant-committed environmental protection measures would reduce impacts on soils and vegetation in the project area.

We considered reasonably foreseeable future actions (RFFAs) such as "Superior to Silver King 115-kV Relocation Project" and "APS Herbicide Use within Authorized Powerline Rights of Way on NFS lands" in the analysis, as the projects may overlap the proposed Resolution Copper Project spatially or temporally.

The air quality analysis in section 3.6 considered the estimated emissions from construction and reclamation activities, ground disturbance, and operations and maintenance trips necessary throughout the mine life.

Vegetation impacts from the project and power lines from construction, operation and maintenance, and reclamation phases are disclosed in section 3.3, listing the impact to disturbed acres. Vegetation management will be conducted under power lines and is further described in the Biological Opinion in appendix P of the FEIS.

Section 3.8 of the DEIS considered wildlife impacts from the power line corridors. The analysis and detail provided in the Biological Opinion in appendix P of the FEIS includes noise, vibration, vegetation management, and other concerns.

Section 3.11 considers impacts from the construction and heavy machinery as well as where the lines would be visible from key observation points (KOPs) such as U.S. 60. DEIS mitigation measure FS-03 is the one scenic mitigation measure to be considered (DEIS appendix J) and has been brought forward into the FEIS (measure FS-SR-01 in FEIS appendix J).

Cultural and historical resource impacts consider the impacts from the power lines with all areas within the project considered disturbed and in need of data recovery or avoidance. Class I and III surveys have occurred on the proposed power line and project areas, as noted in section 3.12.

The power lines have also been considered in other sections such as 3.5, Transportation; 3.7, Water Resources; 3.9, Recreation; and 3.10, Public Health and Safety.

DEIS appendix B included information on the existing power lines that cross land exchange parcels.

DEIS appendix G includes an additional description of the power lines, substations, and other auxiliary facilities. See the heading titled "Electrical Substations and Power Lines," which describes the route, corridor, height of tower, and operational use of the power.

11-RCMSER-2911

Appendix R

| Comment response: NEPA42<br>Clarification of Arizona State Land Department (ASLD) permitting | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
562-10

Since the DEIS, we have refined the footprint of the Alternative 6 tailings storage facility and the Alternative 6 – North pipeline/power line corridor in order to reduce potential resource impacts. This includes avoiding more Arizona State Trust land, avoiding Government Springs Ranch, and avoiding disturbance along Mineral Creek, including critical habitat for Gila chub and yellow-billed cuckoo.

We added detailed information to chapter 1 of the FEIS to more clearly describe which components of each alternative would require involvement with Federal and State agencies, including the ASLD.

Resolution Copper will be responsible for following the appropriate process for obtaining access to Arizona State Trust land for any project-related facilities.

| Comment response: NEPA43<br>Clarification of BLM role | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
28449-2, 8032-228

The DEIS identified the BLM as a decision-maker in the project. Chapter 1 of the DEIS described the decision framework for BLM (p. 14). The DEIS also describes additional process steps needed to approve Alternative 5 – Peg Leg in the event that this alternative is selected by the Forest Supervisor in the final ROD. The FEIS identifies Alternative 6 – Skunk Camp as the preferred alternative.

Since the DEIS, we have refined the footprint of the Alternative 6 tailings storage facility and the Alternative 6 – North pipeline/power line corridor in order to reduce potential resource impacts. This includes avoiding more Arizona State Trust land, avoiding Government Springs Ranch, and avoiding disturbance along Mineral Creek, including critical habitat for Gila chub and yellow-billed cuckoo. In addition, Alternative 6 now completely avoids any BLM-administered land. If Alternative 6 becomes the selected action in the final ROD, BLM would not have a decision role with respect to the mine facilities. However, they would have responsibility for management of a portion of the offered lands.

Since the DEIS, we also have dropped the western pipeline alternative for Alternative 5 – Peg Leg to reduce potential resource impacts. These include avoiding Acuña cactus habitat and impacts to the Arizona National Scenic Trail.

In addition to the clarification and modifications described above, we added more detailed information in chapter 1 of the FEIS to more clearly describe which components of each alternative would require involvement with Federal and State agencies, including BLM.

| Comment response: NEPA44<br>Clarification of 401 water quality certification | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
8031-11

This comment identifies the need to obtain a water quality certification from the State of Arizona, under Section 401 of the CWA, prior to issuance of the CWA Section 404 permit. Chapter 1 of the DEIS (p. 17) described the need for the issuance of the 401 water quality certification.

The comment is correct in stating that a Section 401 water quality certification is required for issuance of a 404 permit. The comment is incorrect in stating that the 401 application has not yet been submitted. A CWA Section 401 application, specific to the activities for which the 404 permit is being requested from the USACE, was submitted to ADEQ on February 13, 2020, and ADEQ issued the Section 401 water quality certification for the Resolution Copper Project on December 22, 2020. The USACE will follow the appropriate process to consider the issuance of the CWA Section 401 water quality certification in its CWA Section 404 permitting decision.

See response NEPA35 for more discussion of the role of State permits in the NEPA process and the disclosure contained in the EIS.

11-RCMSER-2912

Appendix R

| Comment response: NEPA45<br>Complaints related to typographic errors | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1158-31, 1499-4, 30075-17, 30075-19, 8031-25, 8032-254 | |
| These comments identify a specific typographic error that appeared in the DEIS text. As suggested in the comments, this error occurred from the accidental pasting of unrelated text into the text of the DEIS during production. This accidental pasting of text in no way conveys a flippant attitude toward the analysis. We have fixed this error in the FEIS. | |

| Comment response: NEPA46<br>Need to consult with the Town of Florence | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>28449-131 | |
| In its "Memorandum to Heads of Federal Agencies," dated January 30, 2002, the CEQ listed 12 factors for Federal agencies to consider when determining which agencies to invite as "cooperating agencies." Cooperating agencies have a responsibility to participate throughout the NEPA process by providing special expertise, providing pertinent data, participating in preparation and/or review of analyses and documents, and/or having pertinent legal jurisdiction for such things as issuing permits. We reviewed agencies and entities for cooperating agency status and extended invitations to those we felt best met the criteria and were capable of carrying out the obligations of a cooperating agency. No municipalities were identified as potential cooperating agencies.<br><br>However, the Town of Florence has had many opportunities to be involved in the NEPA process without cooperating agency status. We received a comment letter from the Town of Florence (letter 515), and those comments are being considered. In that letter, the Town noted that it has been aware of the project, was following its progress, and had been in touch with the EIS team for several years. The letter expressed a preference for the Skunk Camp alternative (preferred alternative in the DEIS) and discussed the reasons for this preference.<br><br>As a local government entity, the Town can contact us if other issues arise regarding this or other projects. | |

11-RCMSER-2913

Appendix R

| Comment response: NEPA47 Request for Arizona Water Company to participate in meetings; other specific requests of Arizona Water Company | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
555-21, 555-25

This comment asks that specific analyses and data be provided to the Arizona Water Company, and that Arizona Water Company be involved in conducting certain future analyses.

1. Arizona Water Company asks for a detailed analysis of the hydrogeological and surface water runoff data after the final site selection is complete and the impact of changes in runoff on the Queen Creek and Gila River water supplies.

   An assessment of the change in volume, frequency, and magnitude of runoff from the project area, as it affects Devil's Canyon, Queen Creek, and the Gila River, was conducted. The DEIS summarized the results (p. 114). Further details are provided in section 3.7.3.4 for each alternative (DEIS, pp. 427–447).

   The "final site selection," i.e., the selected action, has not been determined and will not be determined until the FEIS and draft ROD are published. In the meantime, Alternative 6 – Skunk Camp has been identified as our preferred alternative.

2. Arizona Water Company asks for extensive geological investigation and information, regardless of which alternative is chosen.

   The DEIS presents geological information and analysis, with a summary for all alternatives on p. 107, and more details are provided in section 3.2 (DEIS, pp. 130–160).

   Numerous supporting technical documents focused on geology and related topics are available on our project website (resolutionmineeis.us) under "Related Documents" and then "Documents Cited." The comment does not specify which specific geological information and investigation is requested. The documents on the website that relate to geology are too numerous to list here.

3. Arizona Water Company asks to have further involvement in future hydrogeology and monitoring analysis.

   Arizona Water Company is not a cooperating agency for the Resolution Copper Project (see response NEPA46 regarding cooperating agency status). The scope of its involvement is the same as the general public: it can review the DEIS, FEIS, draft and final ROD and supporting information and data. Arizona Water Company can comment during public comment periods and file objections to the FEIS and draft ROD.

4. Arizona Water Company asks that we model and determine the impact on the physically available groundwater Arizona Water Company needs for assured water supply purposes.

   The DEIS addresses availability of groundwater for all alternatives. The DEIS contains a summary of impacts (DEIS, p. 112) and a more detailed discussion of current conditions and impacts (DEIS, pp. 295–345). Impacts on public groundwater supplies are specifically addressed.

5. Arizona Water Company asks that we determine potential differences in subsidence (in the East Salt River valley) and resulting damage.

   Section 3.7.1 of the DEIS (p. 334) discussed subsidence effects due to pumping at the Desert Wellfield, along with Newell and Garrett (2018d). We added further analysis of subsidence effects to section 3.7.1 of the FEIS in response to public comments.

11-RCMSER-2914

Appendix R

| Comment response: NEPA48 USGS involvement | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 10-1, 12-5, 1140-1, 44-1, 59-1, 82-3 | |

These comments express concern that the USGS was not involved in preparing the analysis for the EIS.

The stated mission of the USGS is as follows: "The USGS serves the Nation by providing reliable scientific information to describe and understand the Earth; minimize loss of life and property from natural disasters; manage water, biological, energy, and mineral resources; and enhance and protect our quality of life." While having specialized expertise concerning analysis of technical aspects such as seismic activity, geology, and surface and groundwater hydrology and water quality, the USGS has no specific statutory role in conducting NEPA analysis. Any USGS involvement in a NEPA project is at the request of the lead agency and is discretionary on the part of the USGS.

For the Resolution Copper Project, the Forest Supervisor explored the possibility of the USGS assisting with or reviewing some aspects of the NEPA analysis (U.S. Forest Service 2017g). The USGS declined to become a cooperating agency but held open the possibility of assisting on technical issues (U.S. Geological Survey 2017a). In November 2017, the USGS identified its willingness to participate in a single task: participation in the Groundwater Modeling Workgroup, predicated on specific conditions for how USGS input could be used (U.S. Geological Survey 2017b). USGS specialists participated in four Groundwater Modeling Workgroup meetings between September 2017 and January 2018, while discussion of a full scope of work was ongoing. On January 29, 2018, we notified the USGS that we would not be requesting an interagency agreement, as the necessary time frames and costs to complete tasks identified by the USGS fell outside the scope and framework under which our EIS project team was working (Rasmussen 2018). The USGS specialists stopped their participation in the Groundwater Modeling Workgroup at that time.

| Comment response: NEPA49 Bureau of Reclamation withdrawn lands (comment from Department of the Interior) | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 1121-1 | |

These comments from the Department of the Interior identified an area within the Tonto National Forest that previously was withdrawn for use by SRP, potentially involving the MARRCO corridor and the tailings storage facility for Alternatives 2 and 3.

On December 19, 2019, we held a subsequent meeting with the Bureau of Reclamation to discuss the ramifications of the withdrawal, for the purposes of the NEPA process as well as the preparation of the 404(b)1 alternatives analysis for the USACE. Documentation of the withdrawal area was added to the project record, including a triparty agreement between the Tonto National Forest, SRP, and Bureau of Reclamation dating to 1979 that governs management of the withdrawn lands (Salt River Project Agricultural Improvement and Power District et al. 1979).

With respect to the NEPA process, the presence of the withdrawn lands does not invalidate consideration of Alternatives 2 and 3. CEQ guidance is that "an alternative that is outside the legal jurisdiction of the lead agency must still be analyzed in the EIS if it is reasonable. A potential conflict with local or Federal law does not necessarily render an alternative unreasonable, although such conflicts must be considered" (CEQ 40 Most Asked Questions #2b (U.S. Fish and Wildlife Service 2020b)). A discussion of the conflict between these alternatives and the withdrawn lands was added to chapter 1 of the FEIS.

Appendix R

| Comment response: NEPA50 Management of land exchange offered lands after completion of exchange | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 1188-10, 1188-11, 1188-14, 1188-15, 1188-16, 1188-17, 1188-18, 1188-9, 8032-199 | |

These comments raise concerns about the environmental or resource effects that would occur on the offered lands after execution of the land exchange.

The effects of the land exchange have been analyzed in the DEIS. The process for the analysis is described in chapter 2 (DEIS, pp. 66–67), and the fundamental change in regulation of the selected lands moving from Federal to private ownership is described in chapter 2 (DEIS, pp. 104–105), the resource impact sections of chapter 3, and appendix I.

There are a number of specific items that the comments indicate should be analyzed for the land exchange, primarily related to wildlife and habitat impacts. Wildlife and habitat impacts from the land exchange were discussed in sections 3.3 and 3.8 of the DEIS (pp. 183, 457). These sections have been expanded in the FEIS to more directly address the items raised in the comments.

Many of the comments are specific to post–land exchange management of the 7B Ranch parcel. As with all offered lands, management of this parcel after execution of the land exchange would be subject to the management direction of the BLM. Specific mitigation suggestions regarding the 7B Ranch were raised in public comments (Garrett 2020g). The mitigation items that are being implemented are described in appendix J of the FEIS and include continued involvement of The Nature Conservancy in management of the 7B Ranch (see measure RC-SV-04).

| Comment response: NEPA51 Failure to identify least environmentally damaging practicable alternative | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 8031-14 | |

This comment notes that the analysis presented in the DEIS and appendix C (the practicability assessment to support the Section 404 permitting process) does not identify the least environmentally damaging practicable alternative.

The identification of the least environmentally damaging practicable alternative is associated with two separate regulations.

Under 40 CFR 230.10(a), "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." In practice, this least environmentally damaging practicable alternative determination is contained in the 404(b)1 Alternatives Analysis. The complete and approved 404(b)1 Alternatives Analysis is included as appendix C of the FEIS and identifies Alternative 6 – Skunk Camp as the least environmentally damaging practicable alternative.

The Forest Service NEPA regulations contain a similar definition of the "environmentally preferable alternative" (36 CFR 220.3), but there is no requirement that the environmentally preferable alternative be selected.

| Comment response: NEPA52 Purpose of appendix I | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 1188-19, 28449-149 | |

These comments question the usefulness and appropriateness of appendix I of the DEIS. Appendix I is titled "Summary of Effects of the Land Exchange." The discussion related to appendix I can be found in chapter 2 (DEIS, pp. 67, 104–105).

The purpose of appendix I is summarized in chapter 2 (DEIS, p. 105).

We have added further discussion in the text of the FEIS (chapter 2, section 2.4) and in the introduction to appendix I to provide additional context for the discussion that follows. The comments also suggest adding a description of the laws shown (in column 3). We have added this discussion to appendix I as suggested.

We note also that additional discussion has been added to chapter 1 to clarify the laws and regulations that would be applicable to different project components and alternatives.

11-RCMSER-2916

Appendix R

| Comment response: NEPA53<br>Analysis of power lines | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1235-7, 1454-13, 40-6, 8032-294 | |
| These comments claim that power lines were not included in the DEIS analysis. This is incorrect. The power lines were clearly described in chapter 2 (DEIS, pp. 56–59; see specifically table 2.2.2-6). Also see response NEPA41. | |

| Comment response: NEPA54<br>Cumulative effects analysis | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1477-3, 1477-6, 1531-5, 28449-110, 28449-56, 28449-98, 28463-1, 30075-53, 8031-29, 8031-70, 8031-72, 8031-74, 8032-324, 8032-325 | |
| These comments contain criticisms of the cumulative effects analysis.<br><br>In response to comments, the cumulative impacts analysis has been expanded in the FEIS (see chapter 4).<br><br>Some comments refer specifically to water-related aspects of the cumulative effects analysis. See response WT4_F for specific discussion of the drought contingency plan and an expanded discussion of the cumulative effects on water resources.<br><br>Several comments question the framework for cumulative effects. The Forest Service maintains that the approach described in the DEIS (p. 129) is appropriate and that cumulative effects are a combination of the affected environment (representing the effects of past and present actions), environmental consequences (representing the effects of project-related actions), and analysis of effects of RFFAs. This approach remains the same in the FEIS as in the DEIS, though the cumulative effects analysis itself has been revised and given a separate chapter (chapter 4).<br><br>Comments variously suggest discussing the affected environment all in one location, instead of by resource section in chapter 3. The Forest Service followed common procedures in structuring the NEPA document, and the structure remains the same for the FEIS. | |

| Comment response: NEPA55<br>Improper analysis of ASARCO Ray Mine land exchange | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1539-4 | |
| The ASARCO Ray Mine land exchange was included in the DEIS as an RFFA. This comment indicates that the level of detail of analysis was insufficient.<br><br>The available details for the Ray Mine land exchange are found in SWCA Environmental Consultants (2018a). This document is a compilation of worksheets without page numbering (see p. 132 of the PDF file). Sources for the Ray Mine land exchange details are listed here as the final supplemental environmental impact statement (FSEIS) (Bureau of Land Management 2019b) and the FEIS (Bureau of Land Management 1999). The FSEIS is the data source that was requested for use by the commenter. Similar information can be found in SWCA Environmental Consultants (2020b).<br><br>The comment states, "Although no plan of operations has been approved for a Ray Mine expansion, FSEIS analysis offers sufficient information to discuss its cumulative impacts on the project area for the Resolution Copper proposal." Indeed, the FSEIS was the source used to identify impacted resources. As outlined in SWCA Environmental Consultants (2018a), all resources are shown to "contribute to cumulative effects" and therefore are pulled forward into the cumulative effects analysis in each resource section in chapter 3.<br><br>We are aware of a number of comments criticizing the methodologies used for the cumulative effects analysis and stating that the impacts analysis is too generic and qualitative.<br><br>We thoroughly documented the cumulative effects analysis. We acknowledge that further quantification of impacts analysis was needed. As a result, the FEIS contains a reworked cumulative effects analysis (chapter 4) that takes a more quantitative approach whenever possible. This includes impacts from the Ray Mine land exchange. | |

11-RCMSER-2917

Appendix R

| Comment response: NEPA56 Specific criticisms of the DEIS, on a variety of issues | Page 1 of 2 |
|---|---|

**Responsive to these comments:**
1422-3

This comment raises a number of specific issues that are characterized as having shortcomings. The DEIS adequately addresses all of them. The specific issues are as follows:

- Include a complete, accurate description of the proposed action. Response: Chapter 2 devotes 78 pages to describing the proposed action and action alternatives (DEIS, pp. 29–106), in addition to more detailed information in Appendix G, Further Details of East Plant Site, West Plant Site, MARRCO Corridor, and Filter Plant and Loadout Facility Infrastructure; and Appendix H, Further Details of Mine Water Balance and Use.

- Give due consideration to scoping comments. Response: During the NEPA process, there is no requirement that the DEIS explicitly and individually address scoping comments. Scoping comments generate a suite of issues that guide the analysis in the DEIS. Those issues are contained in the report titled "Final Summary of Issues Identified Through Scoping Process, November 2017" (SWCA Environmental Consultants 2017b). Any scoping comment is traceable to the issue statements that encompass it, through the report titled "Public Concern Statements, May 2017" (U.S. Forest Service 2017h).

- Evaluate a full range of alternatives, including "no action," as well as technologically feasible alternative mining techniques. Response: NEPA regulations require that an EIS develop a reasonable range of alternatives that sharply define the issues and provide a clear basis for choice between options by the decision-maker. An alternative should meet the purpose and need and address one or more significant issues related to the proposed action (36 CFR 220.5(e)). The DEIS presents five action alternatives and the no action alternative. Alternative 2 is the proposed action and consists of the GPO that was submitted to the Forest Service by the proponent. The remaining action alternatives were developed to meet the purpose and need and sharply define the issues. For the issue of alternative mining techniques, see response AMT1.

- Document all consultations with the affected Native American communities and include a finalized PA. Response: Consultation details are included in the FEIS in chapter 5 and appendix S.

- The January 2021 Rescinded FEIS included a final version of the PA (appendix O). All signatories, other than the ACHP, had signed the PA as of January 15, 2021. On February 11, 2021, the ACHP notified the Forest Service that the "ACHP believes that further consultation in this case would be unproductive and therefore, we are hereby terminating consultation pursuant to 36 CFR § 800.7(a)(4)." In accordance with 36 CFR 800.7(c)(4), the Secretary of Agriculture will deliver a written response to the ACHP, and that response will conclude the Section 106 process for this undertaking.

- Since the ACHP did not sign the PA, it was never executed. Therefore, mitigation measures identified in the PA and any others identified subsequently will now be implemented through the final ROD and special use permit for use of NFS lands, and through enforcement by other State and Federal agencies as well as third parties in separate agreements. Changes in enforcement of the measures described in the draft PA are further described in appendix J.

- Greatly expand the discussion of the proposed mine's impacts on water resources, given facts about future meteorological trends, drought, diminished Colorado River flows, groundwater depletion in Pinal County, ongoing and planned population growth (e.g., the proposed city-sized "Superstition Vistas" development on State lands between Apache Junction and Florence Junction), and sustainability goals in urban, rural, and agricultural settings. Response: These details were included in the DEIS and have been expanded in the FEIS (chapter 4). See response WT4 for more details.

Appendix R

| Comment response: NEPA56<br>Specific criticisms of the DEIS, on a variety of issues | Page 2 of 2 |
| --- | --- |
| **Responsive to these comments:**<br>1422-3 | |

- More fully explore the long-term socioeconomic impacts of the proposed action. Response: Additional discussion on this topic was added to section 3.13 of the FEIS.
- Discuss the post-mining requirements and costs for "in perpetuity" management of affected lands and resources. Response: These details are included in the DEIS. Section 3.7.2 discusses long-term management of water quality. Reclamation and closure plans and revegetation of disturbed areas is discussed in section 3.3 and chapter 1 (DEIS, pp. 61–65). Financial assurances are discussed in chapter 1 (DEIS, p. 65) and chapter 2 (DEIS, p. 104), as well as specifically in section 3.7.2 for each alternative with respect to water quality.
- Consider the loss of revenue and jobs from sustainable recreation, ecotourism, and heritage tourism as compared to the "boom, then bust" nature of the proposed 40-year mine. Response: Section 3.13 (DEIS, p. 653) discusses boom/bust cycles as well as impacts to nature-based tourism.
- Properly acknowledge that Oak Flat is a sacred place to the affected Native American communities and that it is still being used for religious and ceremonial activities that the spiritual leaders of the San Carlos Apache Tribe consider necessary for the survival of their culture. Response: Section 3.14 (DEIS, p. 663) explicitly acknowledges the nature of Oak Flat. See response CR4 for details on how discussion of this topic was revised in the FEIS.
- Highlight Oak Flat's historic and ongoing significance as a scenic and recreational destination, including rock-climbing competitions. Response: Section 3.9 specifically addresses recreation aspects, including climbing. Section 3.11 addresses scenic resource impacts.

| Comment response: NEPA57<br>Independent research by Forest Service | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>29506-2 | |

This comment states, "I urge the USFS to conduct further, independent research (not relying on the research submitted by Resolution Copper) into the hydrological, environmental, cultural, and recreational impact of this proposed project."

CEQ's NEPA regulations expect that an applicant will submit environmental information to the agency for purposes of the NEPA analysis and direct the agency to independently evaluate the information submitted and be responsible for its accuracy. The Forest Service has complied with those requirements.

The NEPA regulations also require that agencies ensure the professional integrity, including scientific integrity, of the discussions and analyses in the EIS. The Forest Service has employed multiple measures. Those measures are described in the text of the FEIS and in summary memoranda describing the process for obtaining, reviewing, and evaluating information for key resources.

The regulations also allow for an EIS to be prepared by a third-party contractor, subject to certain disclosures and procedures. The third-party contractor (and a number of subcontractors) worked with Forest Service resource specialists to review data, conduct specialized analysis, manage the NEPA process, maintain the project record, assist in conducting public outreach, and draft the text of the NEPA documents. The actions and communication of this third-party contractor are governed by a Memorandum of Understanding, and the third-party contractor works for the Forest Service. Resolution Copper pays for the work but does not manage the work done by the third-party contractor (Garrett 2019g).

11-RCMSER-2919

Appendix R

| Comment response: NEPA58<br>Lack of analysis on a variety of resources | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>8031-27 | |

This comment identifies a number of resources for which the comment states that direct and indirect effects were not analyzed. This is incorrect. The DEIS includes all of these analyses. Specific issues include the following:

- Raptors, eagles, and other species. See response CR20 for details.
- Effects of dewatering on local water availability. See responses WT4 and WT21 for details.
- Potential ground subsidence. See response WT10 for details.
- Tribal cultural resources and Tribal religious and traditional practices. See response CR4 for details.
- Surrounding economics of the region. Response: Section 3.13 of the DEIS analyzed a wide range of socioeconomic effects (pp. 647–656).
- Landowners and their wells. Response: Section 3.7.1 of the DEIS analyzed water supply and potential impacts on well owners (p. 333). See also response WT45, Issue #8, for why wells were not analyzed individually but by proxy wells. We also added a discussion of the financial impacts of changes to water supply to the socioeconomics section (3.13) of the FEIS.
- Long-term environmental effects. Response: DEIS analysis covered the entire mine life cycle, including construction, operation, and closure (p. 436). Postclosure conditions also were analyzed in multiple places, including long-term trends (out to 1,000 years) for groundwater impacts (DEIS section 3.7.1, pp. 317–340) and reclamation success and revegetation time frames (DEIS section 3.3, pp. 186–201). In addition, each resource section in chapter 3 included an analysis of "Short-Term Uses and Long-Term Productivity" and "Irreversible and Irretrievable Commitment of Resources." These required disclosures illuminate long-term environmental effects of the project.

| Comment response: NEPA59<br>Failure to consider conflicts with plans, policies, and controls | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>8031-28 | |

This comment states, "The DEIS failed to consider possible conflicts between the project and Federal, regional, State, and local land use plans, policies, and controls as required by 40 C.F.R. §1502.16, as evidenced in part by the failure to consider conflicts between project water usage and local, statewide, and regional drought planning measures."

The comment is not correct. These plans are identified in section 3.17.2.40 (DEIS, p. 714). Compliance with these plans is included throughout the analysis. For instance, conflicts with the "Tonto National Forest Land and Resource Management Plan" are addressed through a specific plan amendment, as described in chapter 1 (DEIS, pp. 10–11). Note that in December 2023 the Tonto National Forest implemented a revised forest plan. We conducted a full consistency review for the new forest plan, similar to the consistency review we conducted before for the 1985 forest plan. The results of the consistency review are documented in the FEIS and the project record, and the proposed amendment to the forest plan for the preferred alternative is fully detailed in the FEIS.

In response to this comment, we have added summaries to section 3.17 to consolidate any conflicts with these plans into one location.

The drought contingency plan was considered through the cumulative effects analysis; see response WT4_F for more details. Note that despite the fact that the drought contingency plan itself is not able to be analyzed (as it does not have a temporal overlap with Resolution Copper water use), the FEIS cumulative effects analysis (chapter 4) has been expanded to quantify the cumulative effects of competing water uses in the region and the ramifications of ongoing drought or future meteorological trends.

11-RCMSER-2920

Appendix R

| Comment response: NEPA60<br>Changes to issue statements | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>28449-10, 28449-11, 28449-12, 28449-8 | |

These comments all suggest changes to Section 1.7, Issues. In general, changing this section would be inappropriate. We developed issues based on scoping, and the analysis was structured around those issues. Section 1.7 describes the road map the Tonto National Forest used to develop the EIS. Retroactively changing the issues would be inappropriate.

However, since the DEIS addresses all items noted in these comments, we have made changes to the wording in FEIS section 1.7 as deemed appropriate.

| Comment response: NEPA61<br>Connected actions | Page 1 of 2 |
|---|---|
| **Responsive to these comments:**<br>8032-332 | |

This comment identifies several activities that are believed to be connected actions to the project and states that they were not analyzed. The comment is not correct. All issues raised were analyzed as part of the DEIS. Specific statements include the following:

- "Thus, the fact that some of the activities will occur on private lands does not eliminate NEPA's requirement that the Forest Service analyzed the environmental impacts of those private land activities." Response: The FEIS analyzes the environmental impacts of all activities associated with the project, regardless of land ownership or agency jurisdiction. This includes analysis of the East Plant Site and the mine site itself (which would be private land after the land exchange), the West Plant Site (private land), the MARRCO corridor (a mix of NFS and private land), the filter plant and loadout facility (private land), impacts from the Desert Wellfield (pumping from private land), and the tailings storage facility (on NFS, State, and private land, depending on the alternative).

- "We have argued as far back as our Pre-Feasibility Drilling Plan comments in April of 2009 that the dewatering of shafts #9 & #10 shafts at the East Plant are Connected to the larger mine now being discussed in this DEIS." Response: Section 3.7.1 describes the impacts that have occurred and will occur from current and future dewatering associated with the proposed action. The Forest Service does not agree that the affected environment described in the NEPA analysis should be retroactively applied to a point in time before Resolution Copper began activities at the site (dewatering began in 2009). The topic of appropriate baseline conditions for the water analysis is explicitly discussed in section 3.7.1 (DEIS, pp. 299–300). As noted there, the Forest Service has designed the analysis to ensure that even though the affected environment or baseline describes conditions at present, not in 2009, the NEPA analysis also discloses any ongoing trends caused by the dewatering (which began in 2009), including impacts to GDEs. This analysis is in section 3.7.1 (DEIS, p. 312). See response NEPA19 for more details on this issue.

- "The DEIS discusses briefly the need for an additional powerline corridor paralleling the MARRCO corridor, but defers a detailed analysis that is required under both NEPA and the NDAA. Likewise other powerlines feeding power to this project are mentioned but not discussed as is any real discussion of the actual route and design of pipeline and road access corridors." Response: This is incorrect. All power lines are included as components of the proposed action. The power lines included are clearly described in chapter 2 (DEIS, pp. 56–59; see specifically table 2.2.2-6). See response NEPA41 for more detail.

11-RCMSER-2921

Appendix R

| Comment response: NEPA61<br>Connected actions | Page 2 of 2 |
|---|---|

| Responsive to these comments:<br>8032-332 |
|---|

- "For that matter, all mitigation and monitoring plans outlined in the DEIS are connected actions with this project and should have been discussed in detail in this document no matter what the ownership of land underlying the proposed measure." Response: The Forest Service concurs, and this information is included in the DEIS. Aside from the compilation of all mitigation and monitoring measures in appendix J, the effectiveness of the mitigation, including remaining unavoidable impacts, is discussed in every resource section of chapter 3. In addition, every resource section in chapter 3 also analyzes "Impacts from Mitigation Actions" to describe how the mitigation activities themselves may adversely impact some resources while benefiting others. The distinction is drawn in appendix J regarding whether mitigation is required under the authority of the Forest Service or other agency, or is proposed by Resolution Copper and voluntary. This distinction does not change whether the mitigation measure is discussed in chapter 3; all mitigation measures are discussed for their effectiveness. The distinction is included in appendix J because there is an element of uncertainty associated with some voluntary mitigation measures, and disclosure of this uncertainty to the public is important.

| Comment response: NEPA62<br>Scoping comments | Page 1 of 1 |
|---|---|

| Responsive to these comments:<br>8032-121 |
|---|

This comment claims that scoping comments were not addressed in the DEIS.

During the NEPA process, there is no expectation that scoping comments be addressed individually in the DEIS; rather, scoping comments generate a suite of issues that then guide the analysis in the DEIS. Those issues are contained in the report "Final Summary of Issues Identified Through Scoping Process, November 2017" (SWCA Environmental Consultants 2017b) and are summarized in section 1.7 of the DEIS (pp. 24–27). A total of 14 issues and 29 sub-issues was identified based on scoping comments. A table in appendix E identifies where each sub-issue is analyzed in the DEIS.

Any given scoping comment can also be traced to the issue statements that encompass it, through the report "Public Concern Statements, May 2017" (U.S. Forest Service 2017h).

| Comment response: NEPA63<br>Molybdenum processing and transport | Page 1 of 1 |
|---|---|

| Responsive to these comments:<br>1158-3 |
|---|

This comment states that the FEIS should include an analysis of the molybdenum processing and the subsequent transportation of the final product.

The DEIS included this analysis. Chapter 2 of the DEIS included molybdenum processing as part of the proposed action (pp. 38, 47). This includes the intent to transport the molybdenum concentrate from the West Plant Site by truck (DEIS, p. 58).

These molybdenum trucks were included in the traffic analysis in section 3.5 (DEIS, p. 258; see also Southwest Traffic Engineering LLC (2017)).

| Comment response: NEPA64<br>Future meteorological trends | Page 1 of 1 |
|---|---|

| Responsive to these comments:<br>8032-196, 8032-60, 8032-61 |
|---|

These comments state that future meteorological trends have not been adequately addressed in the DEIS.

The comment is not correct. The discussion of potential impacts due to future meteorological trends is included under certain resource sections in chapter 3 and has been consolidated in FEIS chapter 4.

Appendix R

| **Comment response:** NEPA65<br>Analysis of land exchange | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1188-29, 1188-7, 1441-5 | |

These comments raise several issues regarding the analysis of the effects of the land exchange.

One concern is as follows: "This DEIS is incomplete, because it does not disclose the pre-exchange and post-exchange land management practices for the Lower San Pedro River parcel." Response: The pre-exchange conditions of the offered land parcels, including the Lower San Pedro Parcel, are summarized in chapter 2 (DEIS, p. 34) and discussed in detail in DEIS appendix B. The post-exchange management of the parcels is disclosed to the extent that it can be (DEIS, p. 14), and then in each resource section in chapter 3 (see the "Effects of the Land Exchange" subsection in each resource section). However, the specific management of the offered lands was not dictated by Congress in PL 113-291, and those lands will be subject to management under whatever land and resource management plans are in place for the BLM, Coconino National Forest, or Tonto National Forest. See response NEPA50 for further discussion of this topic, specific to the Lower San Pedro Parcel.

Another concern is as follows: "The DEIS does not provide a comprehensive analysis of the effects of the proposed land exchange." Response: The effects of the proposed land exchange are handled in multiple ways. First, as noted above, each resource section in chapter 3 includes a subsection titled "Effects of the Land Exchange," which addresses effects on a resource-by-resource basis. A larger question is how the mine itself might develop on Federal land (no land exchange occurs) instead of private land (land exchange occurs). This change in regulatory oversight is discussed in chapter 2 (DEIS, pp. 66–67, 104–105) and appendix I.

Another concern is as follows: "We do not believe the DEIS properly evaluates the second No Action alternative with no land exchange. That option would retain the Oak Flat campground and the ore body beneath it in Federal ownership and not accessible for mining. The FEIS should include this evaluation." Response: This scenario is analyzed in the DEIS. There are two aspects of this question to consider: regulatory oversight, and physical effects. The physical effects of the mine development would be the same, regardless of whether the land exchange occurs: "Physically, the panel caving proposed to take place under Oak Flat is independent of the land exchange. The deposit would be mined with fundamentally the same techniques and require fundamentally the same infrastructure, and result in the same surface subsidence, regardless of whether the surface is under Forest Service jurisdiction or is private" (DEIS, p. 105). The change in regulatory oversight caused by the land exchange (shifting from a mine on Federal land to a mine on private land) is the focus of DEIS appendix I.

| **Comment response:** NEPA66<br>Freedom of Information Act (FOIA) request | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>8032-224 | |

This comment summarizes a Freedom of Information Act (FOIA) request made to the Forest Service's Southwestern Region (Region 3) regarding the appraisal and the response received by the submitter.

We defer to the response provided by Region 3. The FOIA request has no bearing on the NEPA analysis at this time, as the appraisal was not considered in the DEIS.

| **Comment response:** NEPA67<br>Congressional approval of land exchange | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1150-5 | |

This comment states, "Congress approved a land exchange prior to the NEPA process which is not acceptable."

The Forest Service is directed by law to execute the land exchange and must follow the provisions in PL 113-291 (DEIS, p. 13).

11-RCMSER-2923

Appendix R

| Comment response: NEPA68 | |
|---|---|
| Updated forest plan | Page 1 of 1 |

| Responsive to these comments: |
|---|
| 64-3, 885-3 |

These comments concern the status of the updated forest plan. At the time of the DEIS, a revision to the 1985 "Tonto National Forest Land and Resource Management Plan" (1985 forest plan) was underway. As of the date of publication of the DEIS, the 1985 plan dictated the management direction for the Tonto National Forest, and the plan amendment considered in the DEIS is specific to the 1985 forest plan.

The revised forest plan for the Tonto National Forest was implemented in December 2023. We conducted a full consistency review of the new forest plan, similar to the consistency review we conducted before for the 1985 forest plan. The results of the consistency review are documented in the FEIS and the project record, and the proposed amendment to the forest plan for the preferred alternative is fully detailed in the FEIS.

| Comment response: NO1 | |
|---|---|
| Noise baseline for Skunk Camp location | Page 1 of 1 |

| Responsive to these comments: |
|---|
| 8032-248, 8032-277 |

This comment indicates that baseline noise measurements should be collected for the Skunk Camp location, rather than extrapolation based on baseline noise measurements at the Peg Leg location.

CEQ regulations in effect during the NEPA process (1502.22) address incomplete or unavailable information. Two pertinent aspects are cited in these regulations: (1) Is the information "relevant to reasonably foreseeable significant adverse impacts?" and (2) Is the information "essential to a reasoned choice among alternatives?" Baseline noise measurements for Alternative 6 – Skunk Camp are not necessary because that information does not meet either of these thresholds.

The comment misinterprets the purpose of collecting baseline noise measurements, suggesting they are required at every location where noise levels are predicted. This is not the case.

The noise analysis focuses on seven analysis areas "where there are existing and/or future land uses that are particularly sensitive to noise, known as 'noise sensitive areas'" (DEIS, p. 211). These areas are based on land uses (e.g., residential, recreation, conservation). Within each of these general areas, a single specific location known as a "sensitive receptor" was selected for predictive modeling, set at the location anticipated to experience the highest future noise.

Predictive future noise requires an assumption of baseline noise levels. Resolution Copper completed baseline noise monitoring at six locations. These sample locations were meant to represent the general noise sensitive areas and land uses so that they can be reasonably used for all identified sensitive receptors (DEIS, p. 213). The DEIS (p. 218) details each baseline noise monitoring location and the land uses each location represents. As shown in table 3.4.3-1 (DEIS, p. 220), the "measured" locations are then matched to the sensitive receptors based on land use and compared with "expected" levels at sensitive receptors in comparable land use(s). The Peg Leg monitoring location at the Peg Leg location also was used for Skunk Camp as well based on land use: "This location also serves as the source of background noise for Alternative 6, given the similar rural setting" (DEIS, pp. 218–219). This approach is identical to that taken for all other sensitive receptors shown in table 3.4.3-1. Having baseline noise measurements at each and every location where noise is modeled is not "essential to a reasoned choice among alternatives."

Predicted future noise at the Skunk Camp tailings storage facility also is not a "significant adverse impact" that would inform a choice among alternatives. As shown in figure 3.4.4-6 (DEIS, p. 240), the noise contours at the most stringent threshold applied in the DEIS (55 A-weighted decibels (dBA)) do not leave the facility boundaries except along Dripping Springs Road.

Residences along Dripping Springs Road are the sole location at which modeled noise impacts exceed any selected thresholds under normal conditions (DEIS, p. 242). Mitigation was included in the DEIS to prevent these impacts (see mitigation measure RC-218, p. 242). The FEIS identifies different mitigation that is effective at preventing noise levels from exceeding thresholds at the residences along Dripping Springs Road (see mitigation measure RC-NV-01 in section 3.4 and appendix J of the FEIS).

11-RCMSER-2924

Appendix R

| Comment response: NO2<br>Need for analysis of rail noise | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1344-3

This comment indicates the concern that running the rail cars at night to avoid traffic (see DEIS, p. 261) would instead increase noise levels. The DEIS already discloses these impacts.

Noise levels associated with the rail cars were incorporated into the noise modeling: "The Filter Plant and Loadout Facility also incorporates a railway system that will tie into the existing railway located along the MARRCO corridor. The facility will be able load a maximum of two trains per day with 100 cars. This railway was entered as a railway source in the noise model and was evaluated from the Filter Plant to Magma Junction" (Tetra Tech Inc. 2019:30).

Modeling results are shown in figure 3.4.4-3 (DEIS, p. 230), as well as in Tetra Tech Inc. (2019:figure 12a, p. 43). Noise levels at four sensitive receptors were modeled in the immediate vicinity of the rail line (see DEIS figure 3.4.3-1, p. 217). The noise levels do not exceed the most stringent noise level applied in the DEIS (55 dBA).

Rail noise levels were not explicitly modeled in the DEIS for Alternative 4 – Silver King, which envisions the possibility of moving the filter plant to Superior, thus requiring rail cars to transport concentrate from Superior to Magma Junction. We have added an analysis to section 3.4 of the FEIS to discuss these impacts.

| Comment response: NO3<br>Basis for background noise measurements | Page 1 of 2 |
|---|---|

**Responsive to these comments:**
8032-273, 8032-274, 8032-276, 8032-278, 8032-39

This set of comments expresses general concerns over the collection and use of background noise measurements.

One comment references statements from the GPO that indicate that noise monitoring would be done during the NEPA process. This monitoring was indeed conducted and formed the basis for the DEIS analysis (see "Background Noise Measurements," DEIS, p. 213).

Other comments raise two concerns: the representativeness of the selected baseline monitoring time frames, and the potential skewing of data due to ongoing activities or other disturbances (aircraft noise is mentioned specifically). These concerns are raised because they could potentially skew the baseline data higher, therefore potentially minimizing the noise impacts caused by the mine.

The methodology used for the DEIS addresses these two concerns.

Daily/weekly variation is accounted for by the duration of monitoring: "Background noise levels are monitored for several days or weeks in order to account for variation between day and night, and weekends and weekdays" (DEIS, p. 213).

Seasonal variation also was reflected in the methodology: "Ambient sound and vibration measurements were performed from June 7 through July 2016 to represent the existing environment for the spring and summer periods when there are fewer residents and less outdoor recreation. Additional sound and vibration measurements were conducted from November 14, 2017 through January 18, 2018, to represent the existing environment for the fall and winter conditions, when there are more residents and more outdoor recreation" (Tetra Tech Inc. 2019:9). Specifically, the recreational use areas around Alternatives 2/3 – Near West were monitored during both the summer and winter periods; the results are comparable, with the summer measurements being slightly higher. The higher measurements were selected for use in the DEIS (DEIS table 3.4.3-1, p. 220).

As part of the methodology, the data were reviewed for anomalous high measurements, and these were removed: "The background noise data are then reviewed to identify any anomalies, such as fireworks, thunder, rainfall, high wind, or very close activity (like a nearby off-road vehicle). While these types of noises do occur in the analysis area, they happen infrequently or may affect the monitoring equipment more than they would a human listener. The goal of background noise measurements is to obtain a 'typical' background level, while acknowledging that occasional louder noises would also occur" (DEIS, p. 213).

11-RCMSER-2925

Appendix R

| Comment response: NO3 Basis for background noise measurements | Page 2 of 2 |
|---|---|
| **Responsive to these comments:** 8032-273, 8032-274, 8032-276, 8032-278, 8032-39 | |

As a cross-check, baseline noise measurements were also assessed vs. expected background noise levels for different land uses and found to be similar (Tetra Tech Inc. 2019:table 11, pp. 20-21) (DEIS, pp. 213, 219–220).

Regardless of how background noise measurements are determined, the approach used to assess noise impacts in the DEIS effectively prevents background measurements from skewing modeled results. The results are assessed not only for the total modeled noise (background noise plus predicted mine noise), but also for the incremental increase over background levels. A threshold of a 15-dBA noise increase was used in the DEIS to define adverse impacts.

| Comment response: NO5 Noise/vibration caused by block caving | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 8032-282 | |

We have added further analysis to section 3.4 of the FEIS to evaluate the potential for noise or vibration caused by block caving activities.

| Comment response: NO6 Impacts from concentrator/dryer | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 417-3 | |

This comment questions whether the impacts of noise, light, and air emissions from the concentrator/dryer were assessed. From context, we believe the term "concentrator/dryer" refers to the filter plant and loadout.

Noise, air quality, and light impacts from these emissions already were incorporated into the modeling used to disclose impacts in the DEIS.

With regard to air quality, all sources of emissions associated with the filter plant and loadout were included. The exact sources of emissions are detailed in Air Sciences Inc. (2019b:appendix A, pp. 45-53). Note specifically the reference to "Copper Concentrate Loadout" on p. 51.

These sources also were included in noise modeling: "The primary noise sources for the Filter Plant and Loadout Facility include conveyors, concentrator filter plant, substation and mobile equipment" (Tetra Tech Inc. 2019:28).

Lighting effects from the filter plant also were included in the dark skies modeling. See the Dark Sky Partners LLC (2018:table 3, p. 12) reference to "Concentrate Loadout." We added more details on the impacts of lighting sources and dark skies to section 3.11 of the FEIS.

11-RCMSER-2926

Appendix R

| Comment response: NS1<br>General response for non-substantive comments | Page 1 of 6 |
| --- | --- |

**Responsive to these comments:**

1-1, 2-1, 3-2, 4-1, 6-1, 1000-1, 1001-1, 1002-1, 100-3, 1003-3, 1004-1, 1005-1, 1006-1, 1007-1, 1008-1, 1009-1, 1010-1, 1011-1, 101-2, 1012-1, 1013-1, 1014-1, 1015-1, 1016-1, 1017-1, 1018-1, 1019-1, 1020-1, 1021-1, 1022-1, 1024-1, 1025-1, 1027-1, 1028-1, 1029-1, 1030-1, 103-1, 1031-1, 1032-1, 1033-1, 1034-1, 1035-1, 1036-1, 1037-1, 1038-1, 1039-1, 1040-1, 1041-1, 1042-1, 1045-1, 104-6, 1046-1, 1047-1, 1049-1, 1050-1, 105-1, 1054-2, 1055-1, 1056-1, 1057-1, 1059-1, 1060-1, 1063-1, 1064-1, 1065-1, 1066-1, 1067-1, 1068-7, 1069-1, 1070-1, 1072-1, 1073-1, 1074-2, 107-5, 1075-1, 1077-1, 1078-1, 1079-1, 1080-1, 1081-1, 1082-1, 1083-1, 1084-1, 108-5, 1086-1, 1086-3, 1087-1, 1088-3, 1090-1, 1090-4, 109-1, 1091-1, 1092-4, 1093-1, 1094-3, 1095-1, 1096-1, 1099-1, 1100-1, 1101-1, 110-2, 1102-1, 1103-4, 1104-1, 1107-2, 1107-8, 1108-1, 1109-1, 111-1, 1111-1, 1112-2, 1113-3, 1116-1, 1117-3, 112-2, 1122-1, 112-3, 1123-1, 1124-1, 1125-1, 1125-2, 1126-1, 1130-2, 113-1, 1131-1, 1132-1, 1134-1, 1135-1, 1138-1, 1139-1, 114-1, 1142-1, 1143-1, 1144-1, 1145-1, 1147-1, 1148-2, 1151-2, 115-2, 1152-2, 1155-1, 1156-1, 1159-1, 1159-5, 1160-1, 116-1, 1161-1, 1162-1, 1164-2, 1165-1, 1166-1, 1167-1, 1168-1, 1169-3, 1170-1, 117-1, 1171-1, 1172-1, 1173-1, 1174-1, 1175-1, 1177-1, 1178-1, 1179-1, 1180-1, 1180-2, 1181-1, 118-2, 1182-1, 1183-1, 1184-1, 1185-2, 1186-1, 1187-1, 1188-6, 1190-1, 119-1, 1191-1, 1192-1, 1193-1, 1194-3, 1195-1, 1196-3, 1197-1, 1198-1, 1199-1, 1200-1, 1202-1, 1203-1, 1203-2, 1204-1, 1206-1, 1208-1, 1210-1, 121-1, 1211-1, 1212-1, 1213-1, 1214-1, 1215-1, 1216-1, 1217-1, 1218-1, 1219-1, 1220-1, 122-1, 1221-1, 1222-1, 1223-1, 1224-1, 1225-1, 1226-1, 1227-1, 1228-1, 1229-1, 1230-1, 1232-2, 1233-1, 1234-1, 1237-1, 1237-4, 1238-1, 1239-1, 1240-1, 124-1, 1241-2, 1242-1, 1243-1, 1244-1, 1245-1, 1246-1, 1247-1, 1249-1, 1250-1, 1251-1, 125-2, 1252-1, 1253-1, 1254-1, 1255-1, 1256-1, 1257-1, 1258-1, 1259-1, 1260-1, 1261-1, 1262-1, 1262-2, 1264-1, 1267-1, 1268-1, 1269-1, 1270-1, 127-1, 1271-1, 1272-1, 1273-1, 1273-2, 1273-3, 1274-2, 1275-1, 1276-2, 1278-1, 1280-1, 128-1, 1281-1, 1281-5, 1282-1, 1283-1, 1285-1, 1286-1, 1288-1, 1290-1, 129-1, 1292-1, 1295-2, 1298-1, 1299-1, 1300-1, 1302-1, 1303-1, 1304-1, 1305-1, 1307-1, 1308-3, 1310-4, 1310-5, 131-1, 1312-1, 1312-2, 1313-1, 1314-1, 1315-1, 1316-1, 1316-2, 1318-5, 1318-6, 1319-1, 1320-1, 132-2, 1322-1, 1323-1, 1324-2, 1325-1, 1326-1, 1327-1, 1330-1, 133-1, 1331-1, 1332-1, 1337-1, 134-1, 1341-1, 1344-2, 1345-1, 1346-1, 1347-1, 1348-1, 135-1, 1351-2, 1352-1, 1354-1, 1355-1, 1356-7, 1357-1, 1358-6, 1359-5, 1360-4, 136-1, 1362-1, 1363-1, 1364-1, 1365-1, 1366-1, 1367-1, 1370-2, 137-1, 1372-1, 1373-1, 1376-1, 1377-1, 1378-1, 1379-2, 138-1, 1382-1, 1383-3, 1383-4, 1384-1, 1385-1, 1386-1, 1387-1, 1388-2, 1389-43, 1390-1, 139-1, 1391-1, 1392-1, 1393-1, 1394-1, 1395-1, 1396-1, 1397-1, 1401-1, 1403-1, 1406-2, 1407-3, 14-1, 1410-1, 1410-3, 141-1, 142-1, 1422-1, 1422-6, 1425-1, 1427-1, 1428-1, 1429-3, 143-1, 1436-1, 1440-1, 144-1, 1442-1, 1445-1, 1449-1, 1450-4, 145-1, 1451-1, 1455-3, 1456-2, 1457-1, 1459-1, 146-1, 1462-1, 1465-1, 1466-1, 1468-1, 1468-11, 1468-7, 1469-3, 1470-2, 147-1, 1471-1, 1471-3, 1474-1, 1475-1, 1476-1, 1478-1, 1480-1, 1482-1, 1483-1, 1484-1, 1485-1, 1486-1, 1487-1, 1488-1, 1490-1, 1490-2, 1490-3, 1491-1, 1492-2, 1494-1, 1495-1, 1497-1, 1500-1, 1502-1, 1503-1, 1504-4, 1505-1, 1507-1, 1508-4, 1509-1, 1512-1, 1513-2, 1514-1, 151-5, 1516-1, 1518-1, 15-2, 1520-4, 152-1, 1521-2, 1523-1, 1525-2, 1527-1, 1530-1, 153-1, 1531-6, 1532-3, 1536-1, 1537-1, 1538-1, 1538-6, 1548-1, 155-1, 156-1, 1562-1, 1564-1, 1565-1, 157-3, 1579-1, 1580-1, 159-2, 1606-2, 1611-1, 161-2, 1612-1, 1614-1, 1615-1, 1616-1, 1619-1, 1622-1, 1626-1, 164-1, 166-2, 167-1, 168-1, 170-2, 17-1, 171-1, 172-1, 173-1, 176-1,

11-RCMSER-2927

Appendix R

| Comment response: NS1<br>General response for non-substantive comments | Page 2 of 6 |
| --- | --- |

**Responsive to these comments:**

177-1, 178-1, 179-1, 180-3, 181-1, 1812-1, 18-2, 1820-1, 182-1, 183-2, 1838-1, 1841-1, 1845-1, 185-1, 1857-1, 186-3, 1870-2, 187-1, 1873-1, 1875-1, 1884-1, 1884-2, 1884-3, 1885-4, 189-1, 190-1, 1907-1, 1908-1, 1910-1, 191-1, 1912-1, 1919-4, 1920-1, 192-1, 1924-1, 1924-2, 193-1, 1933-3, 1938-1, 194-1, 1942-1, 1947-1, 195-1, 1952-1, 196-1, 1963-1, 1965-1, 1969-1, 1975-1, 1976-1, 198-1, 1986-1, 1990-1, 1994-1, 1995-1, 1997-1, 200-1, 2001-1, 2001-2, 2002-1, 2006-1, 2006-2, 2009-1, 201-1, 2012-1, 2016-1, 2018-1, 20-2, 2022-1, 2041-1, 204-2, 2043-1, 2044-1, 2051-1, 2058-1, 206-1, 2070-1, 209-2, 209-4, 2097-1, 210-2, 2105-1, 211-1, 2115-1, 2117-1, 21-2, 212-1, 2122-1, 2124-1, 2125-1, 2129-1, 213-3, 214-1, 216-1, 217-1, 218-1, 220-1, 221-1, 222-1, 223-1, 226-1, 227-3, 228-1, 229-1, 229-2, 229-3, 230-1, 231-1, 232-1, 234-1, 235-1, 236-3, 237-1, 238-2, 239-1, 240-1, 241-2, 242-2, 243-1, 244-1, 25-1, 253-1, 256-1, 258-1, 261-1, 263-4, 264-1, 265-2, 266-1, 267-1, 26812-1, 26814-1, 26815-1, 26817-1, 26818-1, 26819-1, 26822-1, 26823-1, 26824-1, 26827-1, 26831-1, 26836-1, 26838-1, 26839-1, 26841-1, 26842-1, 26843-1, 26844-1, 26845-1, 26846-1, 26849-1, 26852-1, 26853-1, 26857-1, 26858-1, 26862-1, 26868-1, 26871-1, 26897-1, 26903-1, 26904-1, 26905-1, 26909-1, 269-1, 26913-1, 26914-1, 26915-1, 26916-1, 26918-1, 26922-1, 26935-1, 26937-1, 26939-1, 26940-1, 26941-1, 26942-1, 26943-1, 26944-1, 26946-1, 26954-1, 26955-1, 26956-1, 26957-1, 26958-1, 26962-1, 26965-1, 26966-1, 26967-1, 26970-1, 26971-1, 26973-1, 26977-1, 26978-1, 26980-1, 26984-1, 26986-1, 26988-1, 26990-1, 26992-1, 26994-1, 26996-1, 26997-1, 26999-1, 27000-1, 27003-1, 27005-1, 27006-1, 27007-1, 27008-1, 27011-1, 27013-1, 27014-1, 27021-1, 27022-1, 27026-1, 27031-1, 27044-1, 27048-1, 27049-1, 27056-1, 27073-1, 27074-1, 27078-1, 27084-1, 27092-1, 27093-1, 27094-1, 27095-1, 27097-1, 27099-1, 27100-1, 27101-1, 27104-1, 27105-1, 27106-1, 27109-1, 271-1, 27110-1, 27111-1, 27115-1, 27116-1, 27117-1, 27118-1, 27119-1, 27120-1, 27121-1, 27126-1, 27129-1, 27131-1, 27132-1, 27137-1, 27140-1, 27142-1, 27145-1, 27149-1, 27150-1, 27151-1, 27153-1, 27154-1, 27156-1, 27159-1, 27161-1, 27162-1, 27164-1, 27165-1, 27166-1, 27167-1, 27168-1, 27169-1, 27175-1, 27176-1, 27177-1, 27179-1, 27180-1, 27181-1, 27183-1, 27184-1, 27185-1, 27186-1, 27187-1, 27190-1, 27191-1, 27192-1, 27194-1, 27197-1, 27200-1, 27204-1, 27205-1, 27208-1, 27209-1, 272-1, 27210-1, 27222-1, 27223-1, 27224-1, 27227-1, 27239-1, 27250-1, 27255-1, 27273-1, 27277-1, 27278-1, 27278-2, 27280-1, 27282-1, 27288-1, 27292-1, 27318-1, 27319-1, 27325-1, 27328-1, 27334-1, 27335-1, 27336-1, 27337-1, 27340-1, 27345-1, 27350-1, 27352-1, 27354-1, 27356-1, 27358-1, 27359-1, 27360-1, 27361-1, 27366-1, 27376-1, 27380-1, 27381-1, 27383-1, 27387-1, 27391-1, 27392-1, 27397-1, 27414-1, 27415-1, 27416-1, 27417-1, 27421-1, 27422-1, 27427-1, 27428-1, 27441-1, 27442-1, 27463-1, 27490-1, 27508-1, 275-1, 27510-1, 27511-1, 27515-1, 27539-1, 27571-1, 27572-1, 27580-1, 27587-1, 27588-1, 27591-1, 27598-1, 27602-1, 276-1, 27617-1, 27618-1, 27619-1, 27621-1, 27624-1, 27630-1, 27634-1, 27636-1, 27641-1, 27642-1, 27657-1, 27658-1, 27660-1, 27661-1, 27662-1, 27663-1, 27664-1, 27666-1, 27667-1, 27668-1, 27669-1, 27671-1, 27672-1, 27675-1, 27679-1, 27681-2, 27694-1, 27699-1, 27705-1, 27706-1, 27709-1, 277-1, 27715-1, 27716-1, 27725-1, 27725-2, 27726-1, 27732-1, 27733-1, 27734-1, 27737-1, 27738-1, 27739-1, 27740-1, 27740-2, 27741-1, 27742-1, 27743-1, 27745-1,

11-RCMSER-2928

Appendix R

| Comment response: NS1<br>General response for non-substantive comments | Page 3 of 6 |
|---|---|

**Responsive to these comments:**
27748-1, 27749-1, 27753-1, 27754-1, 27755-1, 27755-4, 27756-1, 27758-1, 27759-1, 27760-1, 27762-1, 27763-3, 27764-1, 27765-1, 27767-1, 27768-1, 27769-1, 27770-1, 27771-1, 27773-1, 27779-1, 27782-1, 27783-1, 27787-1, 27788-1, 27790-1, 27791-1, 27792-1, 27793-1, 27794-1, 27795-1, 27797-1, 27798-1, 27802-1, 27803-1, 27804-1, 27807-1, 27808-1, 27809-1, 27811-1, 27817-1, 27818-1, 27822-1, 27823-1, 27826-1, 27830-1, 27831-1, 27832-1, 27833-1, 27836-1, 27837-1, 27838-1, 27841-1, 27842-1, 27843-1, 27844-1, 27845-1, 27847-1, 27850-1, 27852-1, 27853-1, 27855-1, 27856-1, 27859-1, 27860-1, 27862-1, 27864-1, 27866-1, 27872-1, 27874-1, 27875-1, 27876-1, 27878-1, 27879-1, 27884-1, 27886-1, 27887-1, 27888-1, 27891-1, 27892-1, 27893-1, 27894-1, 27895-1, 27896-1, 27897-1, 27898-1, 27899-1, 27901-1, 27902-1, 27904-1, 27905-1, 27906-1, 27908-1, 27912-1, 27913-1, 27914-1, 27915-1, 27916-1, 27916-3, 27917-1, 27919-1, 27920-1, 27921-1, 27922-1, 27923-1, 27924-1, 27925-1, 27926-1, 27928-1, 27929-1, 27931-1, 27932-1, 27934-1, 27935-1, 27936-1, 27937-1, 27938-1, 27939-1, 27940-1, 27942-1, 27943-1, 27945-1, 27947-1, 27948-1, 27950-1, 27954-1, 27955-1, 27955-2, 27957-1, 27957-3, 27960-1, 27962-1, 27964-1, 27966-1, 27971-1, 27972-1, 27973-1, 27974-1, 27975-1, 27976-1, 27977-3, 27984-1, 27986-1, 27987-1, 27988-1, 27989-1, 27993-2, 27994-1, 28000-1, 28002-1, 28002-3, 28003-1, 28007-1, 280-1, 28013-1, 28014-2, 28014-3, 28015-1, 28016-1, 28017-2, 28019-1, 28020-1, 28021-1, 28022-1, 28024-1, 28025-1, 28026-1, 28029-1, 28030-1, 28032-1, 28033-1, 28034-1, 28035-1, 28036-1, 28037-1, 28042-1, 28043-1, 28044-1, 28046-2, 28048-1, 28049-1, 28052-1, 28053-1, 28055-1, 28057-1, 28059-1, 28061-1, 28062-1, 28063-1, 28064-1, 28065-1, 28066-1, 28067-1, 28074-1, 28080-1, 28084-1, 28085-1, 28086-1, 28087-1, 28090-1, 28093-1, 28093-7, 28094-1, 28095-1, 28096-1, 28097-1, 28098-1, 28-1, 28100-1, 28101-1, 28103-1, 28105-1, 28106-1, 28106-5, 28107-1, 28108-1, 28111-1, 28112-1, 28113-1, 28114-1, 28115-1, 28116-1, 28120-1, 28125-1, 28126-1, 28131-1, 28135-1, 28138-1, 28139-1, 28145-1, 28154-1, 28157-1, 28159-1, 28164-1, 28168-1, 28172-1, 28173-1, 28175-1, 28176-1, 28177-1, 28183-1, 28184-1, 28188-1, 28195-1, 28199-1, 28200-1, 282-1, 28215-1, 28221-1, 28226-1, 28232-1, 28236-1, 28241-1, 28242-1, 28257-1, 28261-1, 28264-1, 28265-1, 28284-1, 28288-1, 28289-1, 28299-1, 28315-1, 28316-1, 28320-1, 28327-1, 28335-1, 28340-1, 28347-1, 28352-1, 283-7, 28382-1, 28383-1, 28391-1, 28392-1, 28394-1, 28397-1, 28401-1, 28405-1, 28406-1, 284-1, 28413-1, 28419-1, 28421-1, 28423-1, 28431-1, 28433-1, 28439-1, 28440-1, 28443-1, 28454-1, 28456-1, 28456-2, 28466-1, 28471-1, 28477-1, 28482-1, 28485-1, 28498-1, 28501-1, 28505-1, 28506-1, 28507-1, 28508-1, 285-1, 28517-1, 28529-1, 28532-1, 28536-1, 28539-1, 28541-1, 28542-1, 28543-1, 28545-1, 28546-1, 28549-1, 28553-1, 28555-1, 28559-1, 28560-1, 28561-1, 28562-1, 28564-1, 28565-1, 28570-1, 28572-1, 28579-1, 28583-1, 28588-1, 28590-1, 28592-1, 28601-1, 28607-1, 28610-1, 28611-1, 28615-1, 28618-1, 28624-1, 28639-1, 28641-1, 28642-1, 28645-1, 28646-1, 28649-1, 28653-1, 28656-1, 28659-1, 28660-1, 28671-1, 28675-1, 28677-1, 28678-1, 28701-1, 287-1, 28714-1, 28718-1, 28731-1, 28738-1, 28745-1, 28748-1, 28752-1, 28794-1, 28795-1, 28797-1, 28801-1, 28802-1, 28802-3, 28807-1, 288-1, 288-2, 28837-1, 28839-1, 28840-1, 28844-1, 28846-1, 28850-1, 28851-1, 28860-1, 28862-1, 28865-1, 28866-1, 28867-1, 28871-1, 28875-1, 28877-1, 28881-1, 28891-1, 28894-1, 28903-1, 28909-1, 289-1, 28919-1, 28926-1, 28927-1, 28930-1, 28935-1, 28942-1, 28943-1, 28945-1, 28946-1, 28948-1, 28950-1,

11-RCMSER-2929

Appendix R

| Comment response: NS1<br>General response for non-substantive comments | Page 4 of 6 |
|---|---|

**Responsive to these comments:**
28951-1, 28956-1, 28957-1, 28961-2, 28963-1, 28964-1, 28965-1, 28966-1, 28970-1, 28975-1, 28982-1, 28995-1, 29005-1, 29009-1, 29010-1, 29025-1, 29032-1, 29035-1, 290-4, 29040-1, 29044-1, 29046-1, 29047-1, 29050-1, 29054-1, 29056-1, 29058-1, 29060-1, 29066-1, 29075-1, 29081-1, 29088-1, 29091-1, 29095-1, 29096-1, 29102-1, 29109-1, 29110-1, 29117-1, 29119-1, 29125-1, 29126-1, 29127-1, 29132-1, 29139-1, 29140-1, 29142-1, 29144-1, 29148-1, 29149-1, 29152-1, 29154-1, 29155-1, 29156-1, 29158-1, 29162-1, 29163-1, 29164-1, 29164-2, 29169-1, 29171-1, 29179-1, 29183-1, 29188-1, 29194-1, 292-1, 29231-1, 29237-1, 29241-1, 29253-1, 29258-1, 29261-1, 29269-1, 29273-1, 29286-1, 29290-1, 29299-1, 29309-1, 293-1, 29312-1, 29330-1, 29331-1, 29333-1, 29337-1, 29338-1, 29344-1, 29345-1, 29349-1, 29351-1, 29361-1, 29370-1, 29380-1, 29383-1, 29387-1, 29390-1, 29394-1, 29397-1, 29401-1, 29406-1, 29433-2, 29444-1, 29444-3, 29448-1, 29452-1, 29455-1, 29468-1, 29475-1, 29487-1, 29491-1, 29492-1, 29494-1, 29496-1, 29499-1, 29503-1, 29506-1, 295-1, 296-1, 29654-1, 29655-1, 29707-1, 29708-1, 29708-3, 297-1, 29710-1, 29711-1, 29712-1, 29713-1, 29754-1, 29755-1, 298-3, 299-1, 30065-1, 30066-1, 30069-1, 30070-1, 30072-1, 30073-1, 30078-1, 30097-1, 30101-1, 30102-1, 30103-1, 30106-1, 30108-1, 301-1, 30111-1, 30114-1, 30115-1, 30116-1, 30117-1, 30118-1, 30119-1, 30120-1, 30121-1, 30122-1, 30123-1, 30124-1, 30126-1, 30127-1, 30128-1, 30129-1, 30131-1, 30132-1, 30133-1, 30134-1, 30135-2, 30137-1, 30138-2, 30139-1, 302-1, 304-1, 305-1, 306-1, 307-1, 308-1, 309-1, 310-1, 312-1, 313-1, 315-1, 316-1, 317-1, 317-3, 318-1, 319-1, 321-2, 323-2, 325-1, 326-1, 327-1, 33-1, 337-1, 34-1, 341-1, 342-1, 344-1, 346-1, 347-1, 348-1, 349-1, 352-1, 353-1, 354-1, 355-1, 356-1, 358-1, 359-1, 360-1, 367-1, 371-1, 374-1, 376-1, 383-1, 384-1, 387-1, 389-1, 390-1, 39-1, 393-1, 395-1, 396-1, 398-1, 399-1, 40-4, 407-1, 409-1, 409-2, 417-4, 418-1, 418-2, 419-1, 420-1, 421-2, 422-1, 425-2, 430-1, 431-1, 432-1, 435-1, 435-2, 436-1, 437-1, 438-1, 439-1, 440-1, 443-1, 444-1, 446-1, 447-1, 448-1, 450-1, 450-2, 451-1, 452-1, 453-1, 454-1, 456-1, 457-1, 458-1, 459-1, 460-1, 462-1, 464-1, 465-1, 465-2, 466-2, 469-1, 470-1, 471-1, 472-1, 473-1, 475-1, 475-2, 476-1, 478-1, 481-1, 481-3, 487-1, 490-1, 492-1, 493-2, 497-1, 497-3, 498-1, 499-1, 50-1, 501-1, 502-1, 504-1, 505-1, 508-1, 509-1, 510-1, 51-1, 512-1, 51-3, 513-1, 51-4, 514-1, 518-1, 522-1, 522-2, 525-1, 526-1, 527-1, 528-1, 531-1, 532-1, 533-1, 534-1, 5349-1, 5359-1, 5370-1, 5373-1, 5377-1, 5378-1, 5380-1, 538-1, 5382-1, 5390-1, 5391-1, 5393-1, 5395-1, 5396-1, 5398-1, 5399-1, 5400-1, 540-1, 5401-1, 5402-1, 5403-1, 5404-1, 5405-1, 5408-1, 5410-1, 541-4, 5414-1, 5416-1, 5417-1, 5418-1, 5419-1, 5420-1, 542-1, 5421-1, 542-2, 5422-1, 5428-1, 5429-1, 543-1, 5431-1, 5432-1, 5433-1, 5434-1, 5437-1, 54-4, 5440-1, 5442-1, 5445-1, 5446-1, 5447-1, 5450-1, 5451-1, 5452-1, 5452-2, 5453-1, 5454-1, 5455-1, 5456-1, 5457-1, 5458-1, 5460-1, 546-1, 5461-1, 5462-1, 5464-1, 5465-1, 5468-1, 5469-1, 547-1, 5471-1, 5472-1, 5474-1, 5475-1, 5476-1, 548-1, 5484-1, 549-1, 5492-1, 5493-1, 5495-1, 5497-1, 550-1, 5504-1, 5505-1, 55-1, 551-1, 5514-1, 5517-1, 5518-1, 5519-1, 5520-1, 5521-1, 5528-1, 553-1, 5535-1, 5540-1, 554-1, 5549-1, 5551-1, 5556-1, 5558-1, 5563-1, 5564-1, 5566-1, 5566-2, 5567-1, 5571-1, 5574-1, 558-1, 5582-1, 5589-1, 5594-1, 5598-1, 5599-1, 560-1, 5601-1, 5603-1, 5608-1, 561-1, 5616-1, 5618-1, 562-1, 562-2, 56-3, 5631-1, 5633-1, 5633-2, 5637-1, 564-1, 5644-1, 565-1, 5655-1, 5658-1, 566-1, 5664-1, 5669-1, 567-1, 5678-1, 568-1, 569-1, 570-1, 57-1, 571-1, 5721-1, 5727-1, 5727-3, 573-2, 574-1, 5742-1, 5743-1, 5747-2, 575-1, 5757-1, 5769-1, 577-1, 5776-1, 5777-1, 578-1, 578-2, 5783-1, 5787-1, 580-1, 581-1,

11-RCMSER-2930

Appendix R

| Comment response: NS1 | Page 5 of 6 |
|---|---|
| General response for non-substantive comments | |

**Responsive to these comments:**
5818-1, 58-2, 5825-1, 584-1, 5841-1, 5844-1, 5845-1, 585-1, 5856-1, 586-1, 5863-1, 5867-1, 5877-1, 588-1, 5882-1, 5882-2, 5885-1, 5892-1, 5897-1, 5901-1, 5906-1, 5907-1, 5910-1, 591-1, 5911-1, 5912-1, 5919-1, 5920-1, 592-1, 5922-1, 5923-1, 5924-1, 5925-1, 5925-2, 5930-1, 593-1, 5936-1, 5937-1, 5939-1, 5942-1, 5942-3, 5943-1, 5943-2, 5952-1, 5952-2, 5956-1, 596-1, 5966-1, 5967-1, 597-1, 5972-1, 5973-1, 5974-1, 5975-1, 598-1, 599-1, 600-1, 600-2, 6003-1, 6005-1, 6006-1, 6008-1, 601-1, 601-2, 602-1, 6022-1, 6025-1, 6026-1, 6029-1, 6030-1, 603-1, 6033-1, 6034-1, 6036-1, 6038-1, 604-1, 605-1, 6051-1, 6056-1, 6060-1, 6062-1, 6066-1, 6068-1, 6072-1, 6088-1, 609-1, 6091-1, 6095-1, 6097-2, 6099-1, 610-1, 6101-1, 6102-1, 6119-1, 6124-2, 6125-1, 613-1, 6131-1, 6139-1, 6142-1, 615-1, 6152-1, 6154-1, 6155-1, 6157-1, 6159-1, 616-1, 6161-1, 6164-1, 6166-1, 6172-1, 6173-1, 6180-1, 618-1, 6181-1, 6186-1, 6188-1, 6190-1, 6191-1, 6192-1, 6195-1, 6197-1, 6198-1, 6199-1, 6200-1, 620-1, 6201-1, 6202-1, 6203-1, 6208-1, 6214-1, 6218-1, 622-1, 6222-1, 6224-1, 6225-1, 6229-1, 6231-1, 6235-2, 6244-1, 6248-1, 625-1, 626-1, 6268-1, 6275-1, 6275-2, 6275-3, 6275-4, 6276-1, 6278-1, 628-1, 6281-1, 6282-1, 6282-2, 6283-1, 6297-1, 6300-1, 630-1, 6302-1, 6304-1, 631-1, 6311-1, 6315-1, 6315-2, 6322-1, 633-1, 634-1, 6341-1, 634-2, 6350-1, 635-1, 636-1, 636-2, 6365-1, 6379-1, 638-1, 6383-1, 6387-1, 639-2, 6393-1, 6399-1, 6400-1, 6401-1, 6406-1, 6408-1, 641-1, 6411-1, 6413-1, 6415-1, 6415-2, 6424-1, 6424-2, 643-1, 6434-1, 6435-1, 6436-2, 6438-1, 6439-1, 644-1, 6441-1, 6442-1, 6443-1, 645-1, 6451-1, 6452-1, 6455-1, 6456-1, 6464-1, 6467-1, 6469-1, 647-1, 647-2, 6478-1, 6480-1, 648-1, 6482-1, 6484-1, 6490-1, 649-1, 6494-1, 6496-1, 6497-1, 6498-1, 6498-2, 6501-1, 6504-1, 6505-1, 651-1, 6513-1, 6515-1, 6519-1, 6520-1, 652-1, 6527-1, 653-1, 6535-1, 6539-1, 6542-1, 6545-1, 6545-2, 6546-1, 6550-1, 6550-2, 655-1, 6551-1, 6557-1, 6561-1, 6563-1, 6564-1, 6567-1, 657-1, 6573-1, 658-1, 6581-1, 6586-1, 6587-1, 6587-2, 659-1, 659-2, 6602-1, 6602-2, 6609-1, 66-1, 661-1, 662-1, 6622-1, 663-1, 6638-1, 664-1, 6644-1, 6646-1, 6646-2, 66-5, 665-1, 6656-1, 6660-1, 666-1, 6663-1, 667-1, 6673-1, 6675-1, 6676-1, 6680-1, 668-1, 6685-1, 6686-1, 669-1, 6696-1, 6697-1, 6699-1, 670-1, 6704-1, 6707-1, 671-1, 6713-1, 6718-1, 672-1, 6721-1, 6723-1, 6726-1, 6728-1, 6733-1, 6738-1, 674-1, 6743-1, 6745-1, 675-1, 6751-1, 6752-1, 6753-1, 6754-1, 6760-1, 676-1, 6764-1, 6766-1, 6769-1, 677-1, 6771-1, 6776-1, 6777-1, 6779-1, 678-1, 6784-1, 6786-1, 6788-1, 679-1, 6793-1, 680-1, 6804-1, 6807-1, 68-1, 6811-1, 6823-1, 6827-1, 683-1, 6831-1, 6836-1, 6839-1, 6840-1, 684-1, 6845-1, 6847-1, 685-1, 6851-1, 6852-1, 6859-1, 6860-1, 686-1, 6861-1, 6865-1, 6870-1, 687-1, 6872-1, 6875-1, 6880-1, 688-1, 6883-1, 6884-1, 6888-1, 6889-1, 6895-1, 6903-1, 6905-1, 691-1, 6911-1, 6915-1, 6923-1, 6925-2, 693-1, 6931-1, 6938-1, 694-1, 6941-1, 6946-1, 6950-2, 6953-1, 6956-1, 6959-1, 696-1, 6961-1, 6967-1, 6973-1, 6974-1, 6979-1, 6984-1, 6988-1, 6989-1, 6995-1, 6998-1, 700-1, 7004-1, 7007-1, 701-1, 7012-1, 7015-1, 7022-1, 703-1, 7032-1, 7034-1, 7036-1, 704-1, 7046-1, 705-1, 7057-1, 7059-1, 706-1, 7061-1, 7066-1, 7067-1, 7069-1, 7072-1, 7074-1, 7078-1, 708-1, 7081-1, 7089-1, 7094-1, 7098-1, 7100-1, 7103-1, 7108-1, 7114-1, 7117-1, 71-2, 712-1, 7122-1, 7124-1, 7127-1, 713-1, 7133-1, 7135-1, 7138-1, 714-1, 7143-1, 7147-1, 715-1, 7151-1, 7152-1, 7154-1, 7156-1, 7158-1, 7168-1, 717-1, 7174-1, 7178-1, 7181-1, 7182-1, 7185-1, 7188-1, 719-1, 7193-1, 7198-1, 7200-1, 720-1, 7203-1, 7206-1, 7210-1, 7211-1, 7216-1, 722-1, 7221-1, 7223-1, 7227-1, 7228-1, 7234-1, 7238-1, 724-1, 7244-1, 7247-1, 725-1, 7251-1, 7256-1,

Appendix R

| Comment response: NS1<br>General response for non-substantive comments | Page 6 of 6 |
| --- | --- |

**Responsive to these comments:**

7258-1, 726-1, 7263-1, 7264-1, 7268-1, 7269-1, 7270-1, 727-1, 7272-1, 7274-1, 728-1, 7281-1, 7283-1, 7285-1, 7290-1, 7295-1, 7298-1, 7300-1, 7301-1, 7303-1, 73-1, 731-1, 7313-1, 732-1, 733-1, 7334-1, 7335-1, 734-1, 735-1, 7354-1, 7356-1, 736-1, 736-2, 7370-1, 737-2, 7372-1, 738-1, 7383-1, 739-1, 7393-1, 7394-1, 7397-1, 7398-1, 741-1, 7419-1, 74-2, 742-2, 743-1, 744-1, 7456-1, 746-1, 747-3, 7473-1, 748-1, 7483-1, 7484-1, 7486-1, 749-1, 7492-1, 7493-1, 7498-1, 750-1, 7501-1, 752-1, 7530-1, 753-1, 754-1, 7552-1, 7554-1, 756-1, 757-1, 758-1, 759-1, 7599-1, 760-1, 7601-1, 76-1, 761-1, 762-1, 7627-1, 7628-1, 7630-1, 763-1, 7639-1, 764-1, 7648-1, 765-1, 766-1, 7661-1, 7666-1, 7667-1, 767-1, 768-1, 7686-1, 7687-1, 7689-1, 7690-1, 769-1, 770-1, 77-1, 771-1, 772-1, 773-1, 774-1, 7748-1, 7749-1, 775-1, 7758-1, 7760-1, 7761-1, 7762-1, 7764-1, 7766-1, 777-2, 7779-1, 779-1, 7804-1, 7805-1, 7806-1, 7807-1, 7810-1, 781-1, 782-1, 7833-1, 7839-1, 784-1, 7841-1, 7846-1, 785-1, 786-1, 7867-1, 7869-1, 7870-1, 787-1, 788-1, 789-1, 7891-1, 7894-1, 7895-1, 7896-1, 7898-1, 790-1, 7901-1, 791-1, 7917-1, 7920-1, 792-1, 793-1, 794-1, 7943-1, 7945-1, 7948-1, 7950-1, 7957-1, 7960-1, 796-1, 7962-1, 7964-1, 7969-1, 7970-1, 797-1, 7972-1, 7976-1, 7977-1, 798-1, 7983-1, 7986-1, 7991-1, 799-3, 799-4, 7997-1, 7998-1, 8000-1, 800-1, 8001-1, 8003-1, 8009-1, 80-1, 8010-1, 801-2, 801-3, 8015-1, 8020-1, 802-1, 8022-1, 8028-1, 8029-1, 8030-1, 8031-2, 8031-26, 8031-32, 803-2, 8032-241, 8040-1, 804-1, 8043-1, 807-1, 8073-1, 8074-2, 8080-1, 808-1, 8081-1, 8082-1, 8083-1, 8084-1, 8087-1, 809-1, 8092-1, 8093-1, 8094-1, 8097-1, 8101-1, 8105-1, 811-1, 8117-1, 8124-1, 813-1, 8133-1, 8134-1, 81-4, 814-1, 8141-1, 8145-1, 8147-1, 8148-1, 8149-1, 8150-1, 815-1, 8151-1, 8153-1, 8162-1, 8167-1, 8168-1, 8169-1, 817-1, 8174-1, 8180-1, 8181-1, 8184-1, 819-1, 8192-1, 8197-1, 8200-1, 820-1, 821-1, 8212-1, 8215-1, 8218-1, 8224-1, 8225-1, 8226-1, 8227-1, 8232-1, 8235-1, 8239-1, 8241-1, 824-2, 8245-1, 8247-1, 8249-1, 8251-1, 8256-1, 826-2, 8264-1, 8266-1, 827-1, 8272-1, 8273-1, 8279-1, 828-1, 8282-1, 8283-1, 8289-1, 829-1, 8294-1, 8302-1, 8304-1, 8311-1, 8312-1, 8314-1, 832-1, 832-1, 8323-1, 8326-1, 833-1, 834-1, 835-1, 836-1, 837-2, 838-1, 839-3, 840-1, 84-1, 841-1, 842-1, 842-3, 843-1, 845-1, 847-1, 849-1, 850-1, 851-3, 852-1, 853-1, 854-2, 855-1, 856-1, 857-1, 859-1, 860-1, 864-1, 865-1, 866-2, 868-1, 869-1, 870-1, 87-2, 872-1, 873-1, 874-7, 875-1, 877-1, 878-2, 879-1, 879-3, 879-4, 880-1, 88-1, 882-2, 883-1, 886-3, 887-2, 888-2, 890-3, 891-7, 89-2, 892-2, 893-1, 894-3, 896-1, 900-1, 901-1, 901-2, 90-2, 902-1, 905-1, 907-1, 909-1, 910-1, 911-2, 912-1, 913-2, 914-1, 915-1, 916-1, 919-1, 920-1, 922-1, 923-1, 925-1, 928-1, 930-1, 93-1, 931-1, 932-1, 933-1, 934-1, 935-1, 937-1, 938-1, 939-1, 940-1, 94-1, 941-1, 94-2, 943-1, 944-1, 946-1, 947-1, 947-2, 949-1, 952-1, 954-1, 956-1, 957-1, 958-2, 959-1, 960-1, 96-1, 961-1, 961-2, 962-1, 963-1, 964-1, 968-1, 969-6, 969-7, 970-1, 97-1, 971-2, 972-1, 973-1, 974-1, 976-1, 977-1, 978-1, 979-1, 981-1, 98-3, 987-1, 988-1, 989-1, 990-1, 991-1, 992-1, 993-1, 994-1, 995-1, 996-1, 997-1, 997-2, 999-1, F10-1, F1-2. F1-8, F2-1, F2-4, F2-7, F3-1, F4-3, F4-5, F6-1, F7-4, F8-1, F9-1

Upon careful review, we concluded that this comment is non-substantive for one of the following reasons:

- Contains general comments, opinions, or position statements that express support or opposition to the project;
- Reiterates impacts or actions already described in the DEIS;
- Lacks specific changes or actions for consideration;
- Falls outside the scope or is irrelevant to the proposed action and decision; or
- Lists concerns already decided by law, regulation, or policy.

11-RCMSER-2932

Appendix R

| Comment response: NS2<br>Non-substantive comments related to a specific resource or impact topic | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
4-2, 12-1, 12-3, 1002-2, 104-1, 1041-2, 107-10, 107-3, 1084-6, 1088-1, 1097-3, 1107-3, 1128-8, 1149-1, 1150-3, 1150-6, 1150-9, 1152-1, 1152-3, 1159-2, 1159-4, 1163-1, 1169-2, 1180-3, 1197-3, 1207-4, 1222-2, 1235-3, 1265-1, 1276-4, 1281-2, 1281-3, 1293-2, 1311-16, 1311-2, 1311-21, 1318-3, 1318-4, 132-1, 1322-7, 1328-1, 1329-1, 1338-5, 1338-8, 1359-3, 1379-1, 1388-1, 1453-1, 1454-3, 1455-1, 1455-6, 1468-8, 1473-3, 1504-1, 1517-1, 1531-2, 156-2, 162-2, 1870-1, 1885-1, 1885-2, 1919-2, 1919-3, 19-3, 1933-1, 1933-2, 1941-1, 1957-1, 22-3, 223-2, 235-10, 242-3, 255-5, 259-3, 263-6, 28037-3, 286-6, 286-7, 29505-1, 29753-1, 30074-2, 30078-26, 30079-1, 30144-1 (Emerman3), 311-3, 415-1, 416-1, 43-2, 466-1, 515-4, 55-2, 5550-1, 56-2, 57-2, 572-1, 572-2, 576-2, 585-2, 62-2, 6235-1, 62-4, 64-2, 66-4, 72-1, 778-1, 791-2, 7941-1, 80-2, 8032-173, 8032-209, 8032-27, 8032-303, 8032-44, 8032-45, 809-2, 814-5, 824-1, 86-1, 862-1, 866-13, 866-5, 883-2, 884-1, 884-2, 884-3, 890-1, 894-2, 90-1, 901-3, 90-4, 90-5, 910-4, 91-1, 95-2, 979-2, 99-1

Upon careful review, we concluded that this comment is non-substantive relative to the specific resource or impact topic described for one of the following reasons:

- Contains general comments, opinions, or position statements that express support or opposition to the project;
- Reiterates impacts or actions already described in the DEIS;
- Lacks specific changes or actions for consideration;
- Falls outside the scope or is irrelevant to the proposed action and decision; or
- Lists concerns already decided by law, regulation, or policy.

| Comment response: SO1<br>Property values will decline near tailings or nearby facilities from water quality changes, noise, traffic | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1356-3, 1389-7, 1473-1, 494-1, 60-1, 8032-249, 897-1, 897-2, 897-4, 897-9, 899-1, 899-2, 899-4, 899-9

These comments concern the potential reduction in nearby property values that could be caused by mine-related impacts. Section 3.13 of the DEIS disclosed potential reductions in property value due to the tailings facility (pp. 655–656). As analyzed in the DEIS, the proximity of properties to the tailings facility would be the primary reason for the reduction in property values. We expanded this discussion in section 3.13 of the FEIS to more completely describe the basis for this analysis of the reduction in property values from proximity to tailings.

The DEIS disclosed other potential impacts mentioned in these comments but not explicitly tied back to potential reductions in property value. These include the following: noise (DEIS, pp. 223–241); traffic (DEIS, pp. 258–269); impacts to groundwater quality downstream of tailings storage facilities (DEIS, pp. 381–419); impacts to water supplies from drawdown near the mine site (DEIS, pp. 317–345); and impacts from drawdown near the Desert Wellfield (DEIS, pp. 317–345). We added further discussion to section 3.13 of the FEIS to assess potential reductions in property values due to impacts to private water supplies.

We have not explicitly analyzed reductions in property values resulting from traffic or noise. Noise analysis found that "under most conditions, predicted noise and vibration during construction and operations, for both blasting and non-blasting activities, at sensitive receptors are below thresholds of concern; rural character would not change due to noise" (DEIS, p. ES-22). One exception was along Dripping Springs Road. However, additional mitigation was brought forward between the DEIS and FEIS to address this impact (see FEIS appendix J, mitigation measure RC-NV-01). We added discussion of the effectiveness of this mitigation to section 3.4 of the FEIS. The traffic analysis found that most traffic impacts, as measured by changes in level of service (LOS), remain within acceptable levels and are similar to those caused by natural growth (DEIS, pp. 262–263, 266). Unacceptable LOSs caused by project-related traffic occur at Silver King Mine Road/U.S. 60 (construction and operations), Main Street/U.S. 60 (construction and operations), SR 177/U.S. 60 (construction), and Magma Mine Road/U.S. 60 (operations). Section 3.13 of the FEIS acknowledges that increased traffic and industrial development have an effect on the overall quality of life in an area. However, tying reductions in property value to LOS at specific intersections along a major highway is not feasible or appropriate.

Appendix R

| Comment response: SO2 | |
|---|---|
| Economic impacts of water use | Page 1 of 1 |

| Responsive to these comments: |
|---|
| 1301-9, 30147-5 (Powers), 8032-291, 8305-1 |

These comments tie the use of water by the Resolution Copper Mine to economic effects on the State of Arizona and other water users, based on a variety of studies.

The issue of competing water uses, water scarcity, and regional water supplies is one that has been raised in many public comments, and we added necessary additional discussion of this topic to the FEIS in response to comments. See response WT4 for additional discussion.

The use of water by the mine—from whatever source—takes place under a complex regulatory framework for management of limited water resources. This includes the following: the authorities and restrictions put in place by the 1980 Groundwater Management Act, administered by the ADWR, for use of groundwater within Active Management Areas; and the contracting and use of Central Arizona Project (CAP) water, which is administered by the Central Arizona Water Conservation District and Bureau of Reclamation.

Particularly in Arizona, every water source has competing users. Laws and regulations were enacted to codify the value and priorities that the State of Arizona and society in general place on the use of a limited water supply. Any water used by Resolution Copper must adhere to this framework, whether direct use of CAP water, dewatering at the mine site (which lies within the Phoenix Active Management Area), pumping from the Desert Wellfield (also within the Phoenix Active Management Area), or acquisition and use of long-term storage credits.

By definition, the legally permitted use of water by Resolution Copper adheres to the norms and values placed on water by the State of Arizona. Analysis of the economic value of the water used by Resolution Copper, analysis of other beneficial uses for that water, or extrapolation of economic harm to other entities due to the legally permitted use of water by Resolution Copper is outside the scope of analysis of this EIS.

On a local scale, there are potential indirect economic impacts to individual well owners from the Resolution Copper water supply. Section 3.13 of the FEIS analyzes these impacts.

There also are potential risks to regional water supplies in the event of a tailings storage facility failure. We do not anticipate this to occur, based on the demonstration in section 3.10.1 of how Resolution Copper design standards meet or exceed State, Federal, international, and industry-standard guidelines (DEIS, pp. 520–527). The importance of tailings safety resulted in the disclosure of potential impacts to regional water supplies if a failure were to occur (DEIS, pp. 535–554). We expanded this discussion in the FEIS to incorporate additional work conducted on tailings safety between the DEIS and FEIS, specifically the FMEA conducted for the preferred alternative.

| Comment response: SO3 | |
|---|---|
| Dripping Spring Wash road mitigations | Page 1 of 1 |

| Responsive to these comments: |
|---|
| 28449-83, 30075-95, 897-7, 899-7 |

These comments are concerned with the potential impacts to Dripping Springs Road due to its use as access to the Alternative 6 tailings storage facility.

The DEIS proposed a potential reroute of access to the Alternative 6 tailings storage facility in order to resolve noise issues (mitigation measure RC-218, p. 242, and appendix J, p. J-7). This potential mitigation was dropped between the DEIS and FEIS due to the greater impacts that would result from constructing it, compared with the relatively minor noise issues it would mitigate. Instead, different mitigation was proposed along Dripping Springs Road that would reduce the noise impact. We described the effectiveness of this new mitigation in section 3.4 of the FEIS and summarized the details in appendix J of the FEIS (mitigation measure RC-NV-01).

We added details on road maintenance for Dripping Springs Road to section 3.4 of the FEIS.

11-RCMSER-2934

Appendix R

| Comment response: SO4<br>Powers report comments | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
30147-1 (Powers), 30147-10 (Powers), 30147-11 (Powers), 30147-2 (Powers), 30147-3 (Powers), 30147-4 (Powers), 30147-7 (Powers), 30147-8 (Powers), 8032-288, 8032-290, 8032-292

These comments provide specific criticisms of the economic analysis conducted for the DEIS and summarized in section 3.13. (herein called the Power report). These comments address four specific issues:

- Boom-bust analysis in the DEIS
- Quantification of negative economic impacts on nature-based tourism and amenities
- Exaggeration of local positive impacts
- Lack of analysis of societal impacts

Boom-bust analysis

Section 3.13 of the DEIS analyzed and disclosed the vulnerability of the Resolution Copper Mine to the boom/bust cycles that are common in the industry (p. 653). The full boom-bust analysis contained in the project record (BBC Research and Consulting 2018) addressed many of the issues raised in the Power report.

We expanded our discussion in section 3.13 of the FEIS to more clearly describe the methodologies used for this analysis and the uncertainties involved in some of the inputs. More importantly, the Power report raises a number of social concerns that are not specifically economic in nature and that have to do with the workforce and communities that are subject to boom-bust cycles. We added new discussion to section 3.13 of the FEIS to directly address these types of societal impacts.

Quantification of negative economic impacts

Several comments see inconsistencies in the treatment of the economic "benefits" of the proposed mine with the "negative impacts" on recreation and "amenity-supported economic vitality." The Power report argues that the "benefits" and "negative impacts" were not treated equally in the DEIS and primarily focuses on the points that natural amenities and the visitor-based economy are vital to Arizona and to the area near the proposed mine in particular. These points are largely made by citing information provided in the DEIS, and we agree with them, which is why an analysis of these impacts was included in section 3.13 (DEIS, pp. 653–655).

A main concern is that there is more quantification of the potential "benefits" associated with the proposed mine than of the "negative impacts" on the amenity and recreation-based economy. We acknowledge this is the case. However, the Power report does not provide new data or analysis to support further quantification of "negative impacts." Therefore, the narrative or qualitative approach used in the DEIS also was used in the FEIS.

Exaggeration of positive benefits to Town of Superior

These comments indicate that the DEIS exaggerated the "positive impacts" of the project. This assertion is based on the argument that most of the proposed mine's benefits will occur outside the town of Superior. Exploration of where these benefits would occur is a fundamental part of the analysis contained in the project record (BBC Research and Consulting 2018) and is summarized in the DEIS (pp. 650–651). We revised this analysis based, in part, on comments and on direct discussions with the Town of Superior. The revised analysis in section 3.13 of the FEIS accurately depicts where the positive economic benefits of the project would occur.

Societal impacts

These comments indicate that the non-economic societal impacts have not been adequately discussed. We added a new discussion to section 3.13 of the FEIS to address these impacts.

Appendix R

| Comment response: SO5 Economic losses from livestock changes, including multiplier effect | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1122-2, 8032-286

We added an analysis of the economic impact from reductions in livestock grazing capacity to section 3.13 of the FEIS.

Comments raised concerns that the pipeline corridor could inhibit movement of cattle and operation of a grazing allotment. Note that the pipelines would be buried in most locations and are not anticipated to restrict access for livestock or personnel.

Comments also raised concerns that water sources used by livestock would be lost. We anticipate that some water sources would be impacted due to dewatering at the mine site. A monitoring and mitigation plan is required that would restore water to any impacted spring or stream. The only lost water sources that would remain unmitigated would be those lost within the subsidence area or within the footprint of a tailings storage facility. Grazing would not take place within these areas.

| Comment response: SO6 Costs associated with loss of recreation and tourism | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1003-2, 1097-6, 1235-11, 1360-13, 1454-17, 1468-9, 1523-4, 209-1, 495-2, 548-2, 5925-3, 5990-1, 6559-1, 748-2, 8032-207, 8032-289, 8032-328

Many of these comments focus on the economic costs associated with the loss of recreation opportunities and tourism that would be caused by the loss of areas. These impacts were specifically analyzed for the DEIS (BBC Research and Consulting 2018) and are included in section 3.13 (DEIS, pp. 653–655).

We developed a mitigation package related to recreational opportunities between the DEIS and FEIS. We assessed the effectiveness of this suite of mitigations to replace recreation opportunities in sections 3.9 and 3.13 of the FEIS.

Other comments point to the long-term effects on recreation and property values, even after closure of the facility. We added discussion to section 3.13 of the FEIS to address this issue.

| Comment response: SO7 Competition for electricity and water | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1068-2, 1301-3, 1542-1

These comments pertain to the potential economic impacts of the use of power by the mine. Note that many comments are based on an estimation of power use that is not supportable; see response WT24 for more detail.

Since publication of the DEIS, SRP has conducted an independent load study for the project and has concluded the following: "The total maximum combined load proposed by RC is 273 to 315 MW, which represents 3.7 to 4.3 percent of SRP's 2019 peak demand. SRP is well suited to provide the needed power just as it has done with other large power users across the state. SRP does not see any limitations to serving this load to the Project at the aforementioned sites, presuming the recommended system upgrades are implemented. With these system upgrades, there will be no impact on the neighboring customers as the Project site increase loads as per the estimated load levels" (1898 and Company 2020). Also note that information received since January 2021 using a different estimation technique has modified the anticipated power use; this updated disclosure has been incorporated into chapter 2 of the FEIS.

Some comments also note the impacts of competition for water. See response SO2 for more discussion of this topic.

11-RCMSER-2936

Appendix R

| Comment response: SO8<br>Statements of positive economic benefits | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1111-2, 1197-5, 1281-4, 1396-3, 1396-7 | |
| These comments note the positive economic benefits that would occur from the mine. The analysis contained in section 3.13 of the FEIS accurately assessed the positive and negative socioeconomic effects that would occur from the mine, and this analysis remains in the FEIS. | |

| Comment response: SO9<br>Employment effects of specific facilities, such as filter plant being placed in Superior, or tailings storage facility in Gila County | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1516-3, 317-8, 518-3 | |
| These comments express the economic benefits of placement of the tailings storage facility at the Skunk Camp location or express support for the movement of the filter plant to be within the boundaries of the town of Superior.<br>We added analysis for these changes in alternatives to section 3.13 of the FEIS. | |

| Comment response: SO10<br>Socioeconomic effects on other communities (Kearny, Florence, San Tan Valley, Queen Creek, Apache Junction, and Gold Canyon, Winkelman, Hayden) | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>28449-111, 285-2, 291-1, 314-3 | |
| These comments question the economic effects that would be felt by specific individual communities within the analysis area.<br>Existing analysis encompasses these communities. We added discussion regarding each of these communities to section 3.13 of the FEIS to better clarify the pertinent effects. | |

| Comment response: SO12<br>Gila River impacts from water supply | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>27045-2 | |
| This comment states, "Freeport Copper in New Mexico is pushing to dam the Gila River to provide our water to this proposed mine."<br>This is an incorrect statement. Freeport McMoRan is not associated with the Resolution Copper Project. No water sources proposed for the Resolution Copper Project originate with or are associated with the Gila River. | |

| Comment response: SO14<br>Comments related to Town of Superior impacts analysis | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1113-2, 1158-50, 1286-2, 1312-3, 1360-12, 1389-1, 1389-35, 250-1, 261-5, 261-7, 283-3, 310-3, 314-2, 322-2, 8032-306, 866-1, 866-15, 866-16, 928-3 | |
| These comments indicate that analysis of potential economic impacts to the Town of Superior is flawed, including the calculation of costs to the Town of Superior, tax revenue, impacts to the school system, impacts to emergency services, and housing stock.<br>We revised the socioeconomic analysis to address many of these issues; changes were based in part on discussions between the Forest Service and the Town of Superior following publication of the DEIS (BBC Research and Consulting 2020). We changed the analysis appropriately in section 3.13 of the FEIS to address these concerns. | |

Appendix R

| Comment response: SO15 | |
|---|---|
| Emissions will inhibit other development | Page 1 of 1 |

**Responsive to these comments:**
1438-8

This comment indicates that the development of the Resolution Copper Project, by emitting nitrogen oxides, would reduce the amount of this criteria pollutant that could be emitted by other developments or projects, thereby inhibiting growth within the area.

Mine emissions must meet regulations and conform to State plans for implementation of the Clean Air Act. Section 3.6 of the FEIS demonstrates that this is the case.

The emission of criteria pollutants by competing sources takes place under a complex regulatory framework for management of regional air quality. This includes the authorities and restrictions put in place by the Clean Air Act, which ultimately are enacted through permitting administered by PCAQCD or the ADEQ.

Every emission of a criteria pollutant reduces the ability of the airshed to receive other emissions without violating air quality regulations and guidelines. For instance, the air quality analysis conducted for the Resolution Copper Project had to incorporate the existing background air quality, which encompasses all sources that preceded the Resolution Copper Project in the airshed. These laws and regulations were enacted to codify the value and priorities that the State of Arizona and society in general place on the emission of pollutants. Any emission by the Resolution Copper Project must adhere to this framework. By definition, the legally permitted emissions by the Resolution Copper Project adhere to the norms and values placed on air quality by the State of Arizona. The decision whether it is more appropriate for the mine, or for some other development, to use this "capacity" for emitting pollutants is outside the scope of analysis of this EIS.

| Comment response: SO16 | |
|---|---|
| Labor force details | Page 1 of 1 |

**Responsive to these comments:**
104-5, 1097-4, 1389-8, 1464-5, 231-2, 291-3, 392-2

These comments concern the labor force assumptions used in the DEIS. We updated the economic analysis and labor force analysis using the most recent numbers available from Resolution Copper (BBC Research and Consulting 2020). The updated analysis contained in section 3.13 of the FEIS accurately assesses the anticipated labor force and associated impacts using the best sources of information and taking into account uncertainty about future predictions.

| Comment response: SO17 | |
|---|---|
| Offsets for payments in lieu of taxes (PILT) | Page 1 of 1 |

**Responsive to these comments:**
866-11

This comment asks that a comparison be made for the revenues generated by the Resolution Copper Project to the amount currently paid by the Federal Government in lieu of taxes.

The revenues generated by the Resolution Copper Project and to which jurisdiction they would accrue is complex and the focus of the analysis in the project record (BBC Research and Consulting 2018) and in section 3.13 (DEIS, pp. 648–651). We updated this analysis in section 3.13 of the FEIS to incorporate the most recent data and assumptions available.

11-RCMSER-2938

Appendix R

| Comment response: SO18<br>Impacts to State Trust land | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1188-4, 562-13, 562-5 | |

These comments concern the potential impact to Arizona State Trust land, specifically the future Superstition Vistas development area in the East Salt River valley.

Many public comments raised the issue of competing water uses, water scarcity, and regional water supplies. We added discussion of this topic to the FEIS. This includes the Superstitions Vistas development. See response WT4 for additional discussion.

The DEIS contains analysis of the impact to adjacent property values caused by proximity to a tailings facility (DEIS, pp. 655–656). Section 3.13 of the FEIS clarifies that these reductions in value would apply to any adjacent lands—whether private land or State Trust land.

| Comment response: SO19<br>Social effects of mine | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1003-1, 1389-3, 1523-9, 8032-293 | |

These comments indicate that non-economic societal impacts were not adequately discussed. We added a new discussion to section 3.13 of the FEIS to address these impacts.

| Comment response: SO21<br>Boom-bust impacts; financial viability | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>106-3, 1097-5, 1360-11, 1389-4, 151-4, 182-2, 890-2 | |

Section 3.13 of the DEIS analyzed and disclosed the vulnerability of the Resolution Copper Mine to the boom-bust cycles that are common in the mining industry (DEIS, p. 653). Many of the issues raised in the Power report are directly addressed in the full boom-bust analysis contained in the project record (BBC Research and Consulting 2018).

We expanded our discussion in section 3.13 of the FEIS to more clearly describe the methodologies used for this analysis and the uncertainties involved in some of the inputs. More importantly, the Power report raises a number of social concerns that are not specifically economic in nature, that have to do with the workforce and communities that are subject to boom-bust cycles. We added new discussion to section 3.13 of the FEIS to directly address these types of societal impacts.

These comments also question the financial viability of the mine. We are not required to assess the financial viability of the mine proposal. Resolution Copper holds mining claims that confer a statutory right to enter upon public lands to prospect, explore, develop, mine, and process mineral resources. Demonstrating the financial ability to do so is not a requirement under Federal mining laws.

We do have a responsibility to ensure that long-term environmental liabilities on NFS lands will not occur, which is accomplished through appropriate bonding and financial assurance as discussed in chapter 1 and elsewhere (DEIS, pp. 15–20, 65, 104, 391–417).

Comments also raise the question of demand for copper and the international copper market. This also is a financial decision the mining company must make as it assesses the financial viability of the project. Assessing financial viability and international copper markets is outside the scope of analysis for this EIS.

The analysis of alternative mining techniques (see response AMT1 for more detail) incorporates economics only on a per-ton basis, with the goal of assessing not profitability but instead whether requiring alternative mining techniques would be reasonable.

11-RCMSER-2939

Appendix R

| Comment response: SR2 | |
|---|---|
| Comments related to BLM visual management framework | Page 1 of 1 |
| **Responsive to these comments:** 1051-1 | |
| We added discussion to FEIS section 3.11 that updates the scenery resource impact analysis methodology to describe the rationale for using the BLM Visual Resource Management (VRM) system for analyzing impacts to scenery and how that system relates to and is similar to the Forest Service Visual Management System. | |

| Comment response: SR4 | |
|---|---|
| Clarification of rationale for analysis distances | Page 1 of 1 |
| **Responsive to these comments:** 1051-5 | |
| The impact distance zones and project analysis area described in the DEIS section 3.11 are based on landscape topography in the project area, general visibility distances of project features, and location of sensitive viewpoints. Collectively, these represent the geographic scope of expected impacts to scenery from the proposed project. | |
| The 6-mile buffer around the tailings facilities represents the visibility within the landscape from the sensitive viewpoints that were identified through review of the locations where people gather, travel, recreate, or live in the vicinity of the proposed project. | |
| Although the viewshed analyses for the tailings facilities presented in Newell, Grams, et al. (2018) illustrate modeled visibility beyond 6 miles, this model does not incorporate landscape features such as vegetation and structures or a distance factor that shows reduced visibility by distance. At a distance beyond 6 miles, it is not anticipated that the tailings facilities would be visible to the casual observer. | |

| Comment response: SR5 | |
|---|---|
| Visual impact of fog plume | Page 1 of 1 |
| **Responsive to these comments:** 8032-233, 8032-267, 8032-270 | |
| We have included additional analysis for fog plume impacts in section 3.11 of the FEIS, and simulations for fog plume effects are included in appendix D of Newell, Grams, et al. (2018). | |
| The DEIS included analysis of impacts to visual resources for the subsidence area and all tailings facility alternatives. In addition, it included analysis of visual impacts to KOPs at Picket Post Mountain and Boyce Thompson Arboretum, and it further included parts of the Superstition Wilderness and White Canyon Wilderness areas in the viewshed analyses in Newell, Grams, et al. (2018). | |

| Comment response: SR7 | |
|---|---|
| Comment about areas denuded of vegetation | Page 1 of 1 |
| **Responsive to these comments:** 8032-269 | |
| We have updated section 3.11 of the FEIS to further explain the visual simulation development process and the use of revegetation success at the West Plant Site legacy mining sites as a reference for simulation development. | |
| The FEIS contains an additional simulation package and analysis for the preferred alternative, Skunk Camp (see FEIS section 3.11 and appendix D of Newell, Grams, et al. (2018)), which presents the approximate view of the tailings facility at 15-, 20-, and 30-year intervals. These simulations illustrate the scenery impact over time and account for concurrent reclamation activities beginning at approximately year 10. | |

11-RCMSER-2940

Appendix R

| **Comment response: SR8**<br>Question on visual haze effects | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>227-2 | |
| The analysis of visual haze effects includes multiple analysis points and is included in section 3.6 (DEIS, pp. 288–292). The effects from air quality on people nearby (whether local residents or visitors) are also analyzed in section 3.6. See response TS24 for more details about the new analysis included in the FEIS. | |

| **Comment response: SR9**<br>Subsidence area visual analysis | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>8032-268, 8032-272 | |
| Representative KOPs were identified through a selection process with the Forest Service. Based on potential recreation locations, access, and topography, a KOP location was selected to represent potential views of the subsidence area. This KOP is located east of the subsidence area on NFS Road 2466; based on this KOP, it is anticipated that the subsidence area would not be visible due to intervening landforms. We have updated section 3.11 of the FEIS to describe the KOP selection process. | |

| **Comment response: SR10**<br>Dark sky impacts | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>8032-275 | |
| We included additional analysis for impacts to regional dark skies from mining operations in FEIS section 3.11, including anticipated lighting from each of the mine plan locations (West Plant Site, East Plant Site, tailings facility, pump stations, and filter plan and loadout facility) and anticipated impacts to the town of Superior, Oak Flat campground, Boyce Thompson Arboretum, and Queen Valley.<br><br>Lighting impacts to wildlife are disclosed in section 3.8 of the DEIS and FEIS. | |

| **Comment response: SR11**<br>Visual impacts related to pipelines | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1311-11 | |
| We revised the FEIS to remove the Alternative 5 – West pipeline option and the Alternative 6 – South pipeline option. The scenery impact analyses for the remaining Alternative 5 – East pipeline option and Alternative 6 – North pipeline option were updated and are included in section 3.11 of the FEIS. | |

| **Comment response: SR12**<br>Visual impacts to Arizona National Scenic Trail | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1311-5 | |
| The impact analysis for the Arizona National Scenic Trail is presented in the DEIS throughout section 3.11 and includes much of the analysis presented in the comment (DEIS, pp. 594–618), specifically with regard to the impacts to the Barnett Camp area of the Arizona National Scenic Trail through analysis of KOP 5. A visual simulation for KOP 5 that illustrates the pipeline bridge at Barnett Camp is presented in Newell, Grams, et al. (2018).<br><br>A discussion of the impacts of the borrow area on the Arizona National Scenic Trail was added to FEIS section 3.11 for Alternatives 2 and 3. | |

11-RCMSER-2941

Appendix R

| Comment response: SR13 Greater impact anticipated for non-motorized users vs. motorized users; impacts from displacement of recreation | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1097-7, 1454-6, 1523-3, 28449-22, 28449-86, 319-3, 8032-210, 8032-211, 8032-213, 8032-214, 8032-215

The analysis of a reduction in non-motorized uses under all alternatives is provided in section 3.9 (DEIS, pp. 495–509). Impacts to motorized uses are also provided in section 3.9. The approach for these analyses has not changed between the DEIS and FEIS.

The commenters express many of the direct impacts that this EIS has disclosed, where recreation opportunity would be lost, and noise, air quality, and visual impacts are anticipated to impact non-motorized recreation experiences. However, to assert that this same level of direct impact be universally applied to all surrounding public lands is beyond the scope of this analysis.

We included a discussion of public land recreation displacement in FEIS section 3.9 under "Loss of Federal Land Base." This information discloses the potential impact of shifting recreational use to other public lands in the area and describes the unique recreation setting and opportunity at Oak Flat.

Some of the issues put forth by commenters that are wholly outside the scope of this analysis include the request for the proponent to construct recreation facilities in Superior, Arizona, and to develop extensive, yet-to-be-surveyed motorized trails. However, specific mitigation to offset recreational opportunity impacts was developed after the DEIS; this mitigation was included in appendix J of the FEIS and assessed for effectiveness in section 3.9 (FEIS appendix J, mitigation measure FS-RC-03). This was an evolution of mitigation measure RC-214, included in the DEIS (appendix J, p. J-15).

| Comment response: SR13_A Greater impact anticipated for non-motorized users vs. motorized users; impacts from displacement of recreation; with addition for specific comments 8032-327, 1523-2, 1454-5 | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1454-5, 1523-2, 8032-327

See response SR13 for response to comments on motorized users and loss of Federal land base for recreation.

The indirect impacts of mining to surrounding lands (such as Upper and Lower Devil's Canyons, as the commenter suggests) such as dewatering, noise, dust, view degradation, subsidence, and other mine impacts are discussed under the analysis for each resource in the FEIS. The discussion in the FEIS at section 3.9 provides in-depth analysis of the potential shifting/displacement of recreational users to surrounding private and public lands.

| Comment response: SR14 Recreational value of Oak Flat | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1523-7

Oak Flat has been used by locals and visitors alike for decades, and its history and importance as a recreation site include traditional recreation like camping, hiking, and nature viewing. It also contains unique recreation settings and opportunities as it relates to rock climbing. It also has a strong link to cultural and heritage resources.

We added information on the historic recreational use of Oak Flat in FEIS section 3.9 under "Loss of Federal Land Base." This information discloses the unique recreation setting of Oak Flat and the loss of recreation opportunity that would occur once Oak Flat is closed to the public.

Appendix R

| Comment response: SR16 | |
|---|---|
| Definition of recreation opportunity spectrum (ROS) (or equivalent) for BLM lands around Peg Leg; request to conduct inventory | Page 1 of 1 |

| **Responsive to these comments:** |
|---|
| 28449-67, 28449-74, 28449-75, 28449-76 |

The BLM's Tucson Field Office Planning Area is guided by the 1989 Phoenix resource management plan, and the recreation management prescriptions therein did not specify ROS acreages. Section 201(a) of FLPMA specifies the Secretary must prepare and maintain on a continuing basis an inventory of all lands (including for recreation purposes). This inventory is conducted by the BLM during the land use planning process. While the BLM does use ROS or ROS-like management frameworks for recreation, in this portion of the Tucson Field Office, there are no lands designated for ROS. Therefore, a quantitative recreation opportunity inventory was not conducted for the DEIS, and it remains inappropriate to do so in the FEIS.

Section 3.9.3.2 was updated in the FEIS to provide a discussion of the differences between the Forest Service's recreation categorization and the BLM's recreation categorization.

| Comment response: SR17 | |
|---|---|
| Lack of "Recreation Specialist Report" | Page 1 of 1 |

| **Responsive to these comments:** |
|---|
| 8032-208 |

While a standalone Recreation Technical Report was not created for this EIS, the analysis and project record are supported by baseline data acquisition, review, verification, and compilation processes, including tiering to applicable NEPA analysis like the Apache Leap EA or Baseline EA, numerous project-specific recreation-related process memoranda, geographic information system (GIS) and spatial data and calculations, administrative draft and DEIS working documents, specialist-to-specialist communication and meetings, subject matter expert/agency specialist input, engagement with local community groups like the Recreation User Group, and forest plan consistency reviews. All the information gathered as part of the baseline data acquisition culminates in the recreation section of the EIS. We note that neither NEPA nor the Forest Service requires Specialist Reports for EISs, and a Recreation Specialist Report was not produced for the FEIS.

We included new analysis on the very real potential for recreation opportunity displacement, in FEIS section 3.9 under "Loss of Federal Land Base."

| Comment response: SR18 | |
|---|---|
| White Canyon Area of Critical Environmental Concern (ACEC) | Page 1 of 1 |

| **Responsive to these comments:** |
|---|
| 203-1 |

Incorrect labels for White Canyon Wilderness were corrected on all figures in the FEIS. The description of the purposes for designation of the wilderness was also included in section 3.9 of the FEIS.

| Comment response: SR19 | |
|---|---|
| Power line noise | Page 1 of 1 |

| **Responsive to these comments:** |
|---|
| 8032-280 |

This comment states that the effect of power line noise on recreation should be assessed.

We added an analysis of anticipated noise impacts on recreationists from power lines to sections 3.4 and 3.9 of the FEIS.

The approximate levels of noise in close proximity to power lines are estimated as 40 to 50 dBA, which is below the most stringent noise thresholds selected in the DEIS.