## Nos. 25-5185, 25-5189, 25-5197

# In The United States Court of Appeals for the Ninth Circuit

ARIZONA MINING REFORM COALITION; et al.,

*Plaintiffs-Appellants,*

v.

BROOKE L. ROLLINS, U.S. Secretary of Agriculture, et al.,

*Defendants-Appellees,*

and

RESOLUTION COPPER MINING LLC,

*Intervenor-Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Arizona
No. 2:21-cv-00122-PHX-DWL
Hon. Dominic W. Lanza

SUPPLEMENTAL EXCERPTS OF RECORD OF INTERVENOR-DEFENDANT-APPELLEE RESOLUTION COPPER MINING LLC

VOLUME 12 OF 12 (SER 2946–3242)

Christopher D. Thomas
Andrea J. Driggs
Janet M. Howe
Benjamin A. Longbottom
HOLLAND & HART LLP
2398 E. Camelback Rd, Suite
650 Phoenix, AZ 85016
(602) 507-9704
CDThomas@hollandhart.com

Michael R. Huston
  *Counsel of Record*
Diane M. Johnsen
Nicholas S. Crown
Samantha J. Burke
Addison W. Bennett
PERKINS COIE LLP
2525 E Camelback Rd, Suite 500
Phoenix, AZ 85016
(602) 351-8000
MHuston@perkinscoie.com

*Counsel for Resolution Copper Mining LLC*

---

SAN CARLOS APACHE TRIBE, a federally recognized Tribe,

*Plaintiff-Appellant,*

v.

UNITED STATES FOREST SERVICE,
an agency of the U.S. Department of Agriculture, et al.,

*Defendants-Appellees,*

and

RESOLUTION COPPER MINING LLC,

*Intervenor-Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Arizona
No. 2:21-cv-0068-PHX-DWL
Hon. Dominic W. Lanza

---

GOUYEN BROWN LOPEZ, et al.,

*Plaintiffs-Appellants,*

v.

UNITED STATES OF AMERICA, et al.,

*Defendants-Appellees,*

and

RESOLUTION COPPER MINING LLC,

*Intervenor-Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Arizona
No. 2:25-cv-2758-PHX-DWL
Hon. Dominic W. Lanza

---

Appendix R

| Comment response: SR20<br>Motorized recreation | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1276-6, 911-1 | |

Much of the motorized recreation experience within the Near West tailings storage facility footprint includes a loop experience, which is a different opportunity from an out-and-back experience. Additional discussion has been added to section 3.9 of the FEIS to describe the impact to loop-route opportunities more clearly. Additional mitigation for motorized recreation was included in FEIS appendix J, with a focus on recreation experiences like motorized loops (see FEIS appendix J, mitigation measure FS-RC-03).

| Comment response: SR21<br>Inconceivables mitigation | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1343-2 | |

We developed additional details regarding the Inconceivables climbing area mitigation proposal (see FEIS appendix J, mitigation measure RC-RC-05). We determined the route and design features of the mitigation proposal using information from cultural and natural resources surveys and from consistency reviews of existing and pending Forest Service management decisions. We documented our recreation mitigation evaluation findings in a process memorandum (Rausch and Rasmussen 2020) to support the disclosures in FEIS section 3.9 and in appendix J.

| Comment response: SR22<br>Request for data collection for rock-climbing impacts | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1048-4, 6124-1 | |

The FEIS (section 3.9) includes the best available information for climbing resources in the analysis area, and this threshold of reasonableness is consistent with guidance contained in the Forest Service's NEPA requirements. As some public comments correctly contend, comprehensive climbing guides for this area are not easily found. Classic Queen Creek and surrounding area guides, including Karabin Jr. (1996), informed the analysis, and a comprehensive review of climbing resources was included in the DEIS (Oliver 2017).

Additional information on climbing data is not necessary for this analysis; the FEIS identifies this impact as major and long term.

| Comment response: SR23<br>Adjacent rock-climbing areas | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1454-10, 1454-8, 1523-5, 1523-6, 8032-329, 8032-331 | |

These comments identify the Pond and Atlantis climbing areas as not being analyzed in the DEIS and state that any mitigation proposal related to them is inappropriate.

These are incorrect statements. These two climbing resources were correctly included in the analysis in section 3.9 (DEIS, pp. 493–494). No mitigation related to these two climbing resources was proposed in the DEIS, nor has any been proposed in the FEIS.

There may be other access agreements related to these two climbing areas that have been executed outside the Forest Service NEPA process. Agreements between Resolution Copper and climbing groups as they relate to access to these areas would be similar to any private partnership, which is subject to termination.

12-RCMSER-2946

Appendix R

| Comment response: SR24<br>Arizona National Scenic Trail analysis; Arizona National Scenic Trail Comprehensive Plan | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>1311-3, 1311-8, 1389-28, 1454-9, 1523-8, 28449-70, 28449-84, 8032-330 | |

Reference to the Arizona National Scenic Trail comprehensive plan is included in the FEIS. While not available for public review at the time of this FEIS publication, much of the information that will feed into the comprehensive plan (nature and purpose development documents) is now referenced in this analysis. As the commenter correctly points out, the Forest Service manages the area, allowing motorized and other uses.

The nature and purpose of the Arizona National Scenic Trail was re-reviewed, and additional text was added to the FEIS to better specify potential impacts, particularly for Passage 18.

| Comment response: SR25<br>Birding | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>30075-94 | |

Section 3.9 of the FEIS now includes discussion of birding as a recreation opportunity and describes the recreation setting as it relates to prime birding areas (e.g., riparian areas, canyons).

| Comment response: SR26<br>Hunting | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>283-2, 30075-88, 30075-89, 30075-91 | |

Section 3.9 of the DEIS included basic information regarding the hunting opportunities in the analysis area, such as the Game Management Units affected and the common species hunted, and indicated that the analysis area was subject to application of basic hunting regulations (DEIS, p. 489).

The FEIS includes more detailed information about the hunting opportunities (species and hunts) in the analysis area, and missing information regarding lawful discharge of firearms was corrected. The hunting setting of the proposed tailings storage facility is more specifically described as the commenter requested, including the link between dispersed camping opportunities and hunting opportunities.

| Comment response: SR27<br>Impacts to climbing | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>965-1 | |

A comprehensive climbing inventory of the Oak Flat area was provided in section 3.9.3.2 of the DEIS; this is the only inventory in existence for the analysis area, apart from local and national climbing guidebooks and publicly available information on the Internet. Additional climbing areas in the analysis area, both known and unknown, will not be inventoried for the FEIS.

Appendix R

| Comment response: SR30 Comments related to Peg Leg Visual Resource Management (VRM) Class Objectives | Page 1 of 1 |
|---|---|
| **Responsive to these comments**: 28449-80, 28449-97 | |

Table 3.11.4-11 in the DEIS identifies acres where the proposed project components intersect Federal lands, not all lands in the analysis area. Section 3.11 of the FEIS was revised to include information regarding meeting Class III objectives for Alternative 5 – Peg Leg. The DEIS analysis states that the Peg Leg tailings storage facility alternative would likely not meet VRM Class III objectives. If the Arizona National Scenic Trail and Gila River pipeline crossing area is designated Interim VRM Class II, the proposed alternative would also not meet these objectives. These data are not available to make this determination. A representative KOP for the West Pipeline crossing of the Arizona National Scenic Trail and Gila River corridors was not identified as part of the analysis to determine degree of contrast, and it is assumed, based on project components and descriptions, that the pipeline crossing would not meet interim VRM Class II objectives without further mitigation measures.

The West Pipeline has been removed from further consideration, thus eliminating any potential visual impacts to the Reymert Townsite.

| Comment response: SR31 Comments related to BLM Visual Resource Management (VRM) framework | Page 1 of 1 |
|---|---|
| **Responsive to these comments**: 28449-91 | |

We have added the text provided related to further defining BLM directives to the FEIS.

| Comment response: SR32 Changes to visual analysis driven by comments related to viewshed quantification | Page 1 of 1 |
|---|---|
| **Responsive to these comments**: 28449-94 | |

We have included additional analysis in the FEIS for each alternative to quantify the number of acres visible for each tailings storage facility option within the foreground, middle ground, and background distance zone area as defined in the DEIS.

| Comment response: SR33 Changes to visual analysis driven by comments, including additional travel routes | Page 1 of 1 |
|---|---|
| **Responsive to these comments**: 28449-48, 28449-92, 28449-93, 28449-95 | |

We have included the additional routes identified by the commenter in the FEIS as part of the effects analysis for Alternative 5, as applicable.

The majority of routes identified below by the commenter are near the West Pipeline Corridor, which is no longer under consideration:

- Box Canyon Road
- North Sandman
- Cottonwood Canyon
- Mineral Mountain
- Reymert Road
- Whitlow Ranch Road

Battle Axe Road, which has been identified by the commenter, intersects the East Pipeline Corridor, and the FEIS has been updated accordingly. Rincon Road was not located, and a specific location was not provided by the commenter.

12-RCMSER-2948

Appendix R

| Comment response: SR34 Changes to visual analysis findings driven by comments | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
28449-154, 28449-96

We have updated conclusions associated with the degree of contrast and description of contrast as indicated by the commenter.

Additionally, as part of the analysis, the tailings storage facilities were evaluated as structures, rather than as landform modifications. There would be no change in determination of contrast and/or conformance with VRM objectives as a result of this methodology.

| Comment response: SR35 Visibility analysis and associated figure information | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1051-4

Further clarification related to the methodology associated with the development of the viewshed analyses is provided in Newell, Grams, et al. (2018). We have updated section 3.11 of the FEIS to include additional information regarding KOP selection.

| Comment response: SR36 Changes to visual analysis driven by comments, including a new metric of viewshed quantification and additional travel routes | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1051-2, 28449-23

Additional information on concurrent reclamation (a design feature that reduces impacts to scenery, also known as progressive reclamation) for the tailings facilities is included in section 3.3 of the FEIS.

Additional information on scale and vegetative pattern is included in table 3.11.4-1 of the FEIS.

An additional simulation package and analysis for the preferred alternative (Alternative 6 – Skunk Camp) is presented in the FEIS and in appendix D of Newell, Grams, et al. (2018) to illustrate the approximate view of the tailings facility at 15-, 20-, and 30-year intervals. This illustrates the scenery impact over time and accounts for concurrent reclamation beginning at approximately year 10.

The FEIS contains additional analysis illustrating the anticipated length of time the tailings facilities would potentially be visible to travelers on the area's scenic byway (U.S. 60) and the Arizona National Scenic Trail.

The Florence-Kelvin highway simulation for KOP 27 in the DEIS illustrates the top of the tailings facility, which is not vegetated at the simulated mine-life year. The top of the facility, which is visible in the simulation, is not "painted to match the sky" as understood by the commenter, but actually shows the water covering.

| Comment response: SR37 Recreational values of Oak Flat | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1454-7

We disclosed the impacts to the nature-based tourism economy, including the recreation uses listed in the comment in section 3.13 (DEIS, p. 653). More specific analysis of impacts to recreation resources was included in section 3.9 (DEIS, pp. 495–509).

12-RCMSER-2949

Appendix R

| Comment response: TR1 Street wear and maintenance | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 1113-1, 1516-2, 310-2, 8032-310 | |

These comments indicate that street wear and maintenance should have been analyzed, in addition to traffic and access.

The primary roadways used by the project (U.S. 60, SR 177, SR 79) are designed and maintained by the Arizona Department of Transportation (ADOT) to accommodate typical passenger cars and trucks. Roadways are designed to incorporate growth in background traffic volumes as part of the design life of the pavement structure. Increases in traffic (passenger cars and standard load trucks) are already included in the existing roadway design and do not require separate mitigation.

When necessary, overweight/oversized vehicles will need to obtain permits from ADOT. These permits outline specific criteria for use of such transports to ensure that damage to State highways does not occur.

A different concern for road degradation and maintenance needs would be the use of roads within the town of Superior. ADOT did not design or maintain these roads. The original road use plan analyzed in the DEIS used Magma Avenue. In response to comments on the DEIS and concerns from the Town of Superior, the revised road use plan uses the existing entrance at the intersection of Main Street/North Smeltertown Road during construction and operations. Most vehicles traveling to/from the mine entrance at North Smeltertown Road likely would use the intersection of U.S. 60/Main Street. This is the fastest and most direct route to the West Plant Site. Trips into the town of Superior using Main Street (north of North Smeltertown Road) and/or Magma Avenue are expected to be limited and consist of employees visiting restaurants and other amenities in town.

Vehicle use of a small section of road from U.S. 60 along Main Street to the Lone Tree/Smelter Town Gate would increase. Resolution Copper introduced mitigation to cover increased maintenance costs for road degradation within the town of Superior caused by mine traffic (see FEIS appendix J, mitigation measure RC-SO-06).

We added discussion of the revised Road Use Plan, potential for pavement degradation, and new mitigation measures to section 3.5 of the FEIS.

Other comments are concerned with the double-accounting of costs associated with road maintenance. The socioeconomic analysis was revised after consultation with the Town of Superior and Resolution Copper. The analysis more closely reflects the costs and benefits of the mine for the Town of Superior. Resolution Copper introduced mitigation to reflect these increased costs (see FEIS appendix J, mitigation measure RC-SO-06).

| Comment response: TR3 Impacts to roads near filter plant/loadout facility | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 1538-3, 38-3, 417-2 | |

These comments largely are concerned with impacts to local roads near the filter plant/loadout facility, specifically Skyline Drive.

Section 3.5 (DEIS, pp. 249–252) described the access route for the filter plant. The existing condition of these roads also is described (DEIS, p. 249), as are the existing traffic volumes and LOS (DEIS, pp. 255–257). Baseline traffic data were collected for four intersections along this access route.

Filter plant/loadout facility-related traffic is relatively small, compared with the other mine facilities, with peak-hour construction trips of 60 employee and 18 material trips, and peak-hour operations trips of 18 employees (DEIS, p. 260). Three of these intersections were analyzed for LOS; two are disclosed in section 3.5 (DEIS, pp. 258–261). Mine-related traffic causes no changes in LOS. We anticipate the Combs Road/Schnepf Road intersection would experience unacceptable LOSs in the future, regardless of the mine-related traffic. Other intersections along Skyline Drive would experience no degradation in LOS due to mine-related traffic.

One comment indicates that Skyline Drive is closed to through traffic at Laine Road. We believe this corresponds to a transition from private to Arizona State Trust land. Access restrictions on this road will adhere to Arizona State Trust land requirements. We added a discussion to section 3.9 of the FEIS regarding the possible impacts of opening access to lands because of mine infrastructure.

12-RCMSER-2950

Appendix R

| Comment response: TR4 | |
|---|---|
| Back roads | Page 1 of 1 |

**Responsive to these comments:**
1508-2

An inventory of all "back roads" was not conducted for the DEIS, but all NFS roads currently open to public use were listed (see table 3.9.4-2 of the DEIS). An assessment to determine "orphaned roads" is described in section 3.5 and, as they relate to the recreation setting, in section 3.9.

| Comment response: TR5 | |
|---|---|
| Mitigation for unacceptable level of service (LOS) | Page 1 of 1 |

**Responsive to these comments:**
1461-1

These comments note intersections in the analysis that will experience unacceptable LOSs as a result of mine traffic.

These impacts are disclosed in section 3.5 (DEIS, pp. 262–263) and include Silver King Mine Road/U.S. 60 (change in LOS to "E" during construction and "F" during operations), Main Street/U.S. 60 (change in LOS to "F" during construction and operations), SR 177/U.S. 60 (change to LOS "E" during construction), and Magma Mine Road/U.S. 60 (change to LOS "F") during construction.

The original road use plan analyzed in the DEIS used Magma Avenue. In response to comments on the DEIS and concerns from the Town of Superior, the revised road use plan uses the existing entrance at the intersection of Main Street/North Smeltertown Road during construction and operations. We expect that most vehicles traveling to/from the mine entrance at North Smeltertown Road would use the intersection of U.S. 60/Main Street. This is the fastest and most direct route to the West Plant Site. We revised the transportation analysis to incorporate these changes, and we updated the results in section 3.5 of the FEIS to reflect the changes. Note that Smeltertown Road and Lonetree Road refer to the same location.

These changes still result in unacceptable LOSs. SR 177/U.S. 60 was not reanalyzed, and those results have not changed between the DEIS and FEIS. The Silver King Road/U.S. 60 intersection was reanalyzed and improved, though it still has an unacceptable LOS (change to LOS of "E" during operations). Main Street/U.S. 60 was reanalyzed and remains at an unacceptable LOS (change to LOS of "F" during construction and operations).

The Main Street/Smeltertown Road intersection was reanalyzed and maintains adequate LOS. The Main Street/Magma Avenue would no longer be used by mine-related traffic.

No mitigations were developed for traffic impacts in the DEIS, though a number of applicant-committed environmental protection measures were identified. These included (DEIS, p. 258) the following: (1) installation of new stop signs at minor approaches to intersections as needed, subject to ADOT approval; (2) having flaggers or officers to assist with turning movements at major project intersections during peak construction, subject to ADOT approval; and (3) using construction traffic or similar advanced warning signs as needed during peak construction, subject to ADOT approval.

No new applicant-committed environmental protection measures or mitigation measures related to these intersections were brought forward for the FEIS. We are not authorized to require implementation of mitigation measures for traffic impacts at these intersections. However, a handful of mitigation measures were recommended based on the NEPA team's analysis. We describe these in the project record (see mitigation measure PF-TA-02) (Garrett 2025).

| Comment response: TR6 | |
|---|---|
| Oversized loads | Page 1 of 1 |

**Responsive to these comments:**
8032-305

This comment expresses concern that oversized loads are not documented in the EIS.

Specific information on oversized loads is not known at this time. When necessary, overweight/oversized vehicles will obtain permits from ADOT. These permits outline specific criteria for the use of such transports to ensure that damage to State highways does not occur and that traffic impacts are understood and mitigated to the extent possible (typically by timing the loads).

Appendix R

| Comment response: TR7 | |
|---|---|
| Analysis of movement of molybdenum and copper concentrates | Page 1 of 1 |

| Responsive to these comments: |
|---|
| 8032-307 |

This comment states that the DEIS did not analyze the transportation of molybdenum and copper concentrates. This is incorrect.

The DEIS included this analysis. Chapter 2 included molybdenum processing as part of the proposed action (pp. 38, 47). The analysis includes the intent to transport the molybdenum concentrate from the West Plant Site by truck (DEIS, p. 58).

The molybdenum trucks were included in the traffic analysis in section 3.5 (DEIS, p. 258; see also Southwest Traffic Engineering LLC (2017)).

Chapter 2 of the DEIS included the movement of copper concentrate from the filter plant/loadout facility to the railhead (DEIS, pp. 9, 38, 51).

Impacts along the rail to the filter plant/loadout facility are analyzed for noise in section 3.4 (DEIS, pp. 214, 227–230) and for traffic impacts in section 3.5 (DEIS, p. 261).

We added further discussion of rail impacts to section 3.5 of the FEIS to better describe existing and future conditions. All crossings on the MARRCO corridor are signalized and currently operate two trains or fewer per night, based on current Federal Railroad Administration (FRA) information. During peak production years, an average 0.8 train sets per day is expected to enter and exit the facilities, with a typical train set being 100 cars. The typical covered hopper rail car is upward of 65 feet long, with an estimated 75 feet for each engine required for pulling the 11,000-ton load. This places the total train length at approximately 7,000 feet. Assuming an estimated travel speed between 5 and 10 miles per hour (in accordance with FRA documentation from 2011) and that no gate-down time associated with switching will be required, the estimated increase in gate-down time is 8 to 15 minutes each day. According to FRA data, no trains cross these locations between 6 a.m. and 6 p.m.

As noted in chapter 1, the smelter location is unknown at this time (DEIS, pp. 38, 58). Analysis of concentrate movement beyond the railhead is speculative.

| Comment response: TR8 | |
|---|---|
| Analysis of impacts to U.S. 60, SR 77, and SR 177 | Page 1 of 1 |

| Responsive to these comments: |
|---|
| 267-2, 8032-309, 8032-313 |

These comments indicate that additional analysis is needed for U.S. 60, SR 77, and SR 177.

Mine-related traffic impacts to these highways, beyond the intersections analyzed in the DEIS, are well within the design capacity, even when considering population increase. Specific analysis of traffic impacts on these routes is not warranted.

We added discussion to section 3.5 of the FEIS to clarify this point.

12-RCMSER-2952

Appendix R

| Comment response: TR9 Traffic accidents and fatalities | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8032-315, 8032-47

These comments concern the lack of analysis for traffic accidents and fatalities.

Extrapolation of accidents based on traffic volumes is not an appropriate analysis technique. However, examination of crash data is reasonable. We added this analysis to section 3.5 of the FEIS.

Crash data on U.S. 60 at Silver King Mine Road and Main Street were obtained from ADOT's Traffic Records Section and reviewed as a part of this traffic analysis to determine whether there are any observable trends. Records for the most recent 5-year period were reviewed and reported (Southwest Traffic Engineering LLC 2020b).

Available crash data do not reveal any crash patterns or trends at the study intersections that require mitigation by the project. A single left-turn collision was reported in 2015 at the West Main Street/U.S. 60 intersection. Analysis shows there would be an added 611 eastbound left-turn mine trips at this intersection during construction and 133 eastbound left-turn mine trips during normal operations (Southwest Traffic Engineering LLC 2020b). This does not yet warrant mitigation but will require monitoring for potential safety mitigation if turning left becomes a concern.

No new applicant-committed environmental protection measures or mitigation measures related to these intersections were brought forward for the FEIS. We are not authorized to require implementation of mitigation for traffic impacts at these intersections. However, a handful of mitigation measures were recommended based on the NEPA team's analysis and are described in the project record (Garrett 2025). One of these recommendations concerns the use of a temporary traffic signal during construction at Main Street/U.S. 60.

| Comment response: TR11 Road impacts from pipeline | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
28449-17, 28449-77, 28449-81

The FEIS includes additional details regarding the potential impacts to motorized recreation opportunities that may result from pipeline construction and operation. Specific common route names such as Battle Axe Road and Mineral Mountain Road are now noted in the analysis.

The FEIS is not evaluating the West and South pipeline routes, as they have been dropped from consideration.

| Comment response: TR13 Rail transportation impacts | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1158-2, 1158-27, 1311-18, 8032-318, 8032-319, 8032-48

These comments raise a number of concerns with the analysis of impacts related to rail transportation of copper concentrate.

Chapter 2 of the DEIS included the movement of copper concentrate from the filter plant/loadout facility to the railhead (DEIS, pp. 9, 38, 51), including the movement of the filter plant to the West Plant Site (DEIS, pp. 81–84).

Impacts along the rail between the filter plant/loadout facility are analyzed for noise in section 3.4 (DEIS, pp. 214, 227–230) and for traffic impacts in section 3.5 (DEIS, p. 261). See response NO2 for additional discussion of the revised analysis of rail noise in the FEIS. See response TR7 for additional discussion of rail impacts on traffic in the FEIS.

These comments note the potential impact of releasing hazardous materials during rail transport. We added discussion of this possibility to section 3.10.3 of the FEIS.

These comments also note potential impacts to the Arizona National Scenic Trail from the use of the railroad to transport concentrate between the West Plant Site and the railhead in Alternative 4. We acknowledged this in chapter 2:
"The MARRCO corridor track would require upgrades along the entire length, bridge replacement at Queen Creek Bridge, and significant upgrades for crossings at Queen Creek, US 60, SR 79, the Arizona National Scenic Trail, Hewitt Canyon Road, and other NFS roads" (DEIS, p. 84). Such upgrades have not been designed at this time but are considered part of the actions proposed under Alternative 4.

Appendix R

| **Comment response: TR14** Concerns with traffic analysis | Page 1 of 2 |
| --- | --- |
| **Responsive to these comments:** 8032-304 | |

These comments contain a number of specific concerns with the traffic analysis. These include the following:

1) Incorrect methodology was used to generate the traffic impact reports. Two-way, two-lane highway segment methodology was used when the roadway conditions mandate the directional methodology must be used.

2) There is also evidence of incomplete LOS worksheets.

3) No input data are documented; there is incorrect site information, and incorrect lane width and shoulder width used to determine adjusting values.

4) The DEIS incorrectly bases its traffic counts on only two studies on a Friday in 2015 (between 7 am and 10 pm) and presumably also on a Friday during the same hours of the day in November of 2018 (this was supposed to cover winter visitor traffic). No explanation was given as to why the sample is so small or why only those days were used. To begin with summer traffic begins well before 7 am and winter visitors have not all yet arrived in November.

5) Why were these studies done 3-4 years ago? It is unclear if the DEIS's multiplier rate for traffic increase of 2% per year was added to make those old studies more relevant. Also, since the Skunk Camp tailings alternative was not made public until 2017 at the earliest, does the Resolution Copper study claim to have surveyed the intersection of Highway 777 and Dripping Springs Road in 2015?

6) Why does the DEIS assume that construction would begin in 2022 when Resolution Copper publicly maintains that construction would begin much later as would presumably production?

Two-way, two-lane highway segment methodology

We maintain that the intersections are the key analysis points where conflicts occur. We maintained this approach between the DEIS and FEIS. Mine-related traffic impacts on the highway segments between intersections are well within the design capacity, even when considering population increase. Specific analysis of traffic impacts on these routes is not warranted. See also response TR8. We added discussion to section 3.5 of the FEIS to clarify this point.

Incomplete worksheets

This comment refers to worksheets in the original traffic analysis report (Southwest Traffic Engineering LLC 2017). These worksheets were updated for key intersections (Southwest Traffic Engineering LLC 2020b). The worksheets reflect percent heavy vehicles and peak hour factors based on traffic counts.

Lane width and shoulder width

Shoulder widths do not impact the calculations required for intersection analyses. In accordance with ADOT procedures and their typical lane width design/construction, 12-foot lanes are used in capacity calculations unless more narrow lanes are noted during the field review. The field review did not note such lanes. We added discussion to section 3.5 of the FEIS to clarify this point.

12-RCMSER-2954

Appendix R

| Comment response: TR14 Concerns with traffic analysis | Page 2 of 2 |
|---|---|

**Responsive to these comments:**
8032-304

### Baseline traffic counts

Background (baseline) traffic counts were purposefully taken to capture peak traffic (i.e., peak day of week and season). According to discussions with ADOT (Southwest Traffic Engineering LLC 2020c), traffic counts were taken on Friday (the day of the week with historically highest traffic volumes due to users traveling for the weekend in the region). Also, to ensure that the most conservative case scenario was analyzed, traffic counts were taken seasonally in August 2015 and November 2016, with the most conservative winter (November) counts used for the analysis.

The period from 7 a.m. to 10 p.m. provides a typical daily count that captures most a.m. and p.m. peak hours. Traffic count data shown in the appendix of the original traffic analysis (Southwest Traffic Engineering LLC 2017) indicated that U.S. 60 only encounters one peak (p.m.), with traffic steadily increasing between a.m. and p.m. hours.

Note that the revised analysis (Southwest Traffic Engineering LLC 2020b) analyzes both a.m. and p.m. peak hours, with no change in the conclusions.

### Timing of Baseline Studies

Baseline studies were conducted during the NEPA analysis (2015–2016), with modeling conducted shortly thereafter (2017). The data used in the modeling were reasonable, recent, and pertinent to the affected environment captured in the DEIS. Note that publication of the DEIS occurred in August 2019, but most analysis was completed in 2017–2018, with 2019 primarily dedicated to finishing the administrative draft, receiving cooperating agency review of the administrative draft, and producing the revised DEIS for publication.

ADOT's road-aggregated annual growth rates are below the 2 percent annual growth used in the analysis. The analysis used a growth rate of 2 percent as a conservative estimate to account for uncertainty in the development plan (i.e., shifting study years). For example, ADOT data estimated that growth at U.S. 60/SR 79 would be 1.6 percent per year and that growth at U.S. 60/SR 177 would be 1.6 percent per year.

The comments ask, "Why does the Resolution Copper study claim to have surveyed the intersection of Highway 77 and Dripping Springs Road in 2015?" We assume that this refers to the traffic assessment conducted specifically for the tailings storage alternatives (Southwest Traffic Engineering LLC 2018). This document clearly states that the baseline studies at SR 77 and Dripping Springs Road were conducted in March 2018 (Southwest Traffic Engineering LLC 2018:14).

### Start of Construction in 2022

The DEIS explained that traffic modeling necessitates picking specific dates (DEIS, pp. 244–246) and notes the steps taken to ensure that conservative traffic values were used. When the FEIS was originally published in January 2021, the assumption that 2022 is an unreasonable time frame for construction was not warranted. At that time, 2022 remained a reasonable start time for construction. Conceivably, it would have allowed time for publication of the FEIS and draft ROD, completion of the pre-decisional objection process, and publication of the final ROD.

With the republication of the FEIS, this is no longer the case, and a start date in 2022 clearly did not occur.

However, in the January 2021 Rescinded FEIS we recognized that process delays could occur. Our analysis of growth rates suggests that, based on the difference between the growth rate used in the analysis and ADOT's estimated growth rate, the published analysis would remain valid until at least 2025. We added further discussion of this issue to section 3.5 of the FEIS. We believe this conclusion remains valid for the republished FEIS, as well.

Appendix R

| Comment response: TR15 | |
|---|---|
| Effects on U.S. 60 | Page 1 of 1 |

**Responsive to these comments:**
1369-1

The potential effects on U.S. 60 were an integral part of the subsidence analysis conducted for the project. The analysis concluded that no impacts are anticipated at U.S. 60 (DEIS, p. 154). In addition, specific monitoring and mitigation is in place to ensure that potential impacts are observed and mitigated if they occur (DEIS, pp. 149–150). See responses GS13 and GS14 for more details.

| Comment response: TR17 | |
|---|---|
| Safety of bicyclists | Page 1 of 1 |

**Responsive to these comments:**
8032-314

This comment notes that the safety of bicyclists considering mine truck traffic was not analyzed, noting specifically SR 77 and SR 177.

We analyzed these State routes in section 3.5 in the DEIS. The SR 177 typical section provides a 4-foot shoulder in each direction of travel. However, there are sections of the highway where the shoulder is less than the desired 4 feet or does not exist at all. Current daily truck traffic on SR 177 is approximately 200 trucks per day. The added truck traffic on SR 177 represents a 2 percent increase in total trucks. Given this existing condition, there has been one recorded pedestrian collision on SR 177 (2009–2018). There have been no recorded bicycle collisions on either SR 177 or SR 77 between Winkelman and U.S. 60 (2009–2018). Available crash data do not reveal any crash patterns or trends along the study corridors that require mitigation by the project.

We added analysis of these data to section 3.5 of the FEIS.

| Comment response: TR18 | |
|---|---|
| School bus safety | Page 1 of 1 |

**Responsive to these comments:**
8032-323

This comment concerns analysis of school bus safety.

The analysis in the DEIS covers a wide variety of potential impacts to vehicular traffic. School buses represent one type of vehicular traffic. Therefore, impacts are encompassed in the traffic analysis in section 3.5 of the FEIS.

We added further analysis to section 3.5 of the FEIS to analyze available crash data. See response TR9 for more discussion. None of the factors identified as potential safety issues suggest a propensity for school buses to be more at risk than other vehicular traffic.

| Comment response: TR20 | |
|---|---|
| Role of ADOT | Page 1 of 1 |

**Responsive to these comments:**
8032-316

This comment states that the role of ADOT was overlooked in the DEIS description of decisions that must be made in the transportation arena.

This is incorrect. ADOT guidance pertinent to the analysis of impacts is stated in section 3.5 (DEIS, p. 246). The need for a Right-of-Way Encroachment Permit is stated in chapter 1 (DEIS, p. 18).

Further, traffic analysis was based on publicly available ADOT data sources and guided by conversations with ADOT staff regarding data collection methodology (Southwest Traffic Engineering LLC 2020b).

12-RCMSER-2956

Appendix R

| Comment response: TR21 Conflicts with off-highway-vehicle (OHV) users | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 8032-212, 8032-311 | |
| Additional analysis and qualitative discussion about user displacement are included in section 3.9 of the FEIS. Understanding the conflicts that may arise from user displacement, including the potential noise and the impacts it may have to non-motorized recreation settings, the Forest Service has included additional analysis on non-motorized user conflicts with OHV users. | |

| Comment response: TR22 Impacts from traffic | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 1477-4 | |
| This comment notes a number of impacts related to traffic, including quality of life, transportation, air quality, road maintenance, and cumulative effects. | |
| These aspects were analyzed in the DEIS, with some additional discussion added in the FEIS. | |
| With regard to quality of life, see response EJ6 for more detail. | |
| Transportation and access was analyzed in section 3.5 (DEIS, pp. 244–274) using a variety of methodologies. | |
| Air quality was analyzed in section 3.6 (DEIS, pp. 275–294) using a variety of methodologies; the analysis incorporated emissions from employee and delivery traffic. | |
| With regard to road maintenance, see response TR1 for more detail. | |
| With regard to cumulative effects, see response NEPA54 for more detail. | |

Appendix R

| **Comment response: TS1** | |
|---|---|
| FMEA, breach analysis, seismic analysis, and emergency planning | Page 1 of 2 |

**Responsive to these comments:**
1075-4, 1097-8, 1118-1, 1200-2, 1209-5, 1279-1, 1329-3, 1342-4, 1349-2, 1452-1, 1452-2, 1474-2, 1501-6, 263-2, 295-2, 30066-3, 30141-6, 30145-5 (Emerman4), 30145-6 (Emerman4), 30145-7 (Emerman4), 30145-8 (Emerman4), 313-2, 323-1, 524-23, 550-2, 8032-10, 8032-21, 8032-240, 8032-245, 8032-43, 866-9, 897-6, 899-6

These comments concern the potential for a tailings embankment failure and the analysis that was presented in the DEIS.

In response to comment, the Forest Service has included additional analysis of tailings safety issues in the FEIS, particularly with regard to the preferred alternative (Alternative 6) tailings storage facility. This effort was driven by mitigation measures required by the Tonto National Forest and included in the DEIS. These include the following:

- Conducting a refined FMEA before the FEIS (DEIS, p. 557; appendix J, p. J-19, mitigation measure FS-227).
- Development of an emergency action plan for the tailings storage facility, and specifically a refined breach analysis before the FEIS based on the outcome of the FMEA (DEIS, p. 557; appendix J, p. J-20, mitigation measure FS-229).

Additional hydrologic and geotechnical fieldwork and data collection were also conducted for the preferred alternative to support the measure required by the Forest Service. See response ALT22 for a listing of the specific information developed between DEIS and FEIS for the preferred alternative.

A discussion of the FMEA process undertaken is provided in FEIS chapter 3, section 3.10.1.

Some comments request that "3rd party risk analysis be undertaken." This is essentially the purpose and scope of the FMEA (see FEIS chapter 3, section 3.10.1).

Several comments specifically mention seismic hazards associated with the tailings storage facility. These hazards were specifically considered during the FMEA process. In addition, site-specific seismic hazard evaluations have been prepared for the Alternative 6 tailings storage facility location, and specific investigations were undertaken to ascertain whether certain faults that underlie the tailings storage facility are active. The results of these analyses are summarized in FEIS sections 3.2 and 3.10.1.

Many comments also mistakenly identify the 5,000-year earthquake as the design basis for the tailings storage facility. This is an incorrect assumption. The design basis for the tailings storage facility is the Maximum Credible Earthquake (DEIS, p. 529). See response TS2 for more details.

Appendix R

| Comment response: TS1<br>FMEA, breach analysis, seismic analysis, and emergency planning | Page 2 of 2 |
|---|---|

**Responsive to these comments:**
1075-4, 1097-8, 1118-1, 1200-2, 1209-5, 1279-1, 1329-3, 1342-4, 1349-2, 1452-1, 1452-2, 1474-2, 1501-6, 263-2, 295-2, 30066-3, 30141-6, 30145-5 (Emerman4), 30145-6 (Emerman4), 30145-7 (Emerman4), 30145-8 (Emerman4), 313-2, 323-1, 524-23, 550-2, 8032-10, 8032-21, 8032-240, 8032-245, 8032-43, 866-9, 897-6, 899-6

A breach analysis was conducted in section 3.10.1 of the DEIS (pp. 538–540). This breach analysis represents a scenario in which the tailings are saturated at the time of failure and flow extensively downstream. The analysis was based solely on a statistical assessment of historic tailings failures, with no consideration for site-specific conditions. As required in mitigation measure FS-229 in the DEIS, the Tonto National Forest anticipated that a breach analysis using details of the actual tailings design and location would be one of the outcomes of the FMEA. This breach analysis was conducted and consists of largely non-saturated failure of the embankment and NPAG tailings. This breach analysis, in conjunction with the approach used in the DEIS, forms the bounds of anticipated failures. The anticipated failures form the basis for future emergency planning by Resolution Copper. We have included a description of the refined breach analysis in section 3.10.1 of the FEIS, and it can be found in (KCB Consultants Ltd. 2020h).

Some comments request that the breach analysis be based on "actual design and environmental factors." This is essentially what has been done, informed by the FMEA process.

Many comments indicate that downstream impacts from a potential tailings storage facility failure have not been analyzed. This is incorrect. Section 3.10.1 of the DEIS analyzes the effects from a failure of saturated tailings that travel far downstream. The impacts assessed from this runout include the following:

- Estimated chemistry of released liquids and released solids (DEIS, p. 540)
- Potential risk to life and property (DEIS, p. 544 [Alt 2], p. 547 [Alt 3], p. 548 [Alt 4], p. 549 [Alt 5], p. 552 [Alt 6])
- Potential exposure to contaminants (DEIS, p. 544 [Alt 2], p. 547 [Alt 3], p. 548 [Alt 4], p. 549 [Alt 5], p. 552 [Alt 6])
- Potential disruption of water supplies and infrastructure (DEIS, p. 544 [Alt 2], p. 547 [Alt 3], p. 548 [Alt 4], p. 550 [Alt 5], p. 552 [Alt 6])
- Potential destruction of habitat and vegetation (DEIS, p. 545 [Alt 2], p. 547 [Alt 3], p. 548 [Alt 4], p. 550 [Alt 5], p. 552 [Alt 6])
- Large-scale societal impacts (DEIS, p. 545 [Alt 2], p. 547 [Alt 3], p. 548 [Alt 4], pp. 550–551 [Alt 5], p. 553 [Alt 6])

Many comments also cite high-profile catastrophic failures. Indeed, we noted several of these in the DEIS itself (Mt. Polley [pp. 520–521], Fundão [pp. 521–522], and Brumadinho [p. 515]), and the historic tailings upon which the breach analysis was based incorporated the majority of known catastrophic tailings breaches (DEIS, pp. 519–520). This experience has informed the NEPA analysis, including the FMEA for the preferred alternative.

Other comments request the evaluation of the risks associated with different types of tailings embankments and pipelines. These analyses were included in section 3.10.1. Embankment types included modified-centerline embankments (Alternatives 2 and 3), filtered tailings (Alternative 4), centerline embankments (Alternatives 5 and 6), and downstream embankments (PAG cells for Alternatives 5 and 6).

Appendix R

| Comment response: TS1_A<br>FMEA, breach analysis, seismic analysis, and emergency planning; with addition for specific comment 1349-1 | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1349-1

See response TS1 to the general topic of tailings failure, the FMEA, seismic analysis, and emergency planning.

This comment asks specifically about the studies conducted for the tailings pipeline. Studies include the following:

- The site-specific seismic hazard analyses for the mine site and Alternative 6 tailings storage facilities (Wong et al. 2020a).
- The pipeline management plan available before the DEIS, which includes specific analysis of potential failure modes, including geohazards and storm events (AMEC Foster Wheeler Americas Limited 2019).
- A pipeline protection and integrity plan prepared in response to comments, which includes specific analysis of potential failure modes, including geohazards such as slope instability, seismic hazards, scour, and geological subsidence (Golder Associates Inc. 2020). This plan includes specific mitigation methods to respond to these geohazards.

| Comment response: TS2<br>Insufficiency of tailings design; design earthquake; embankment type | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1301-17, 1322-4, 1448-6, 1501-1. 1587-1, 178-2, 230-2, 24-4, 255-6, 259-5, 263-5, 27995-2, 27996-1, 28106-2, 30145-1 (Emerman4), 30145-2 (Emerman4), 30145-3 (Emerman4), 30145-4 (Emerman4), 336-1, 568-3, 67-2, 8032-256, 8032-258, F1-5, F2-6, F4-6, F6-4

These comments variously state that the tailings facility design would be illegal in other countries, with Brazil and Chile noted specifically, or would not meet the standards of either the USACE or the ADEQ.

These are incorrect statements. While many of these comments do not identify specific factors, we believe they likely are based on two fundamental misunderstandings. The first misunderstanding is that the tailings storage facility is designed only to a 5,000-year earthquake event, which is the specific topic of a report submitted with comment letter #8032 by Dr. S. Emerman. This is an incorrect assumption. The design basis for the tailings storage facility is the Maximum Credible Earthquake (DEIS, p. 529). The second misunderstanding is that the tailings storage facility proposed to use an upstream-type embankment, which is rapidly becoming unacceptable for the mining industry. While Resolution Copper's original proposal used an upstream embankment, this was changed during alternatives development to a modified-centerline embankment (DEIS, p. 67). No upstream embankments are proposed for any of the alternatives.

The requirements of these different regulatory programs with respect to tailings facilities is disclosed in section 3.10.1, table 3.10.1-1 (DEIS, pp. 524–525). Table 3.10.1-2 in section 3.10.1 outlined the comparison of the Resolution Copper tailings design parameters specifically with ADEQ and National Dam Safety Program requirements (DEIS, pp. 528–529).

Section 3.10.1 included a comparison of the Resolution Copper Project design with local, national, and international regulations and industry best practices (DEIS, pp. 522–527). The DEIS concludes, "The designs developed by Resolution Copper meet the most stringent of these standards, whether required (National Dam Safety Program or Aquifer Protection Permit program) or solely industry best practice" (DEIS, p. 527).

12-RCMSER-2960

Appendix R

| Comment response: TS3<br>Specific questions on tailings storage facility design parameters | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1301-19 | |

This comment asks several specific questions about the tailings storage design parameters:

- Potential for liquefaction, specifically due to monsoon storms
- Handling of water during tropical storms
- Presence of 100-year floodplains

With respect to liquefaction, the presence of water in the facility is not a consideration because the tailings design assumes that liquefaction will occur regardless of conditions. This is described in section 3.10.1 (DEIS, p. 515) and in the design documents. For example, from the design document for the preferred alternative, "For stability analysis, all potentially liquefiable contractive tailings are assumed to liquefy regardless of the triggering mechanism" (Klohn Crippen Berger Ltd. 2018d:22).

The handling of stormwater and stormwater controls is described in section 3.7.2 (DEIS, pp. 379–380), with more details in Newell and Garrett (2018d). Stormwater controls at the tailings storage facility are designed for complete capture and control of stormwater during operations:

> "Generally speaking, during operations any precipitation or runoff that comes into contact with tailings, ore, hazardous material storage areas, or processing areas is considered "contact water." During operations contact water would be captured, contained in basins, pumped out after storm events, and recycled back into the process water stream. This type of containment would be required by both the stormwater and aquifer protection permits that would be issued for the project. Contact water would not be released to the environment at any time during operations. . . . The tailings storage facility generally follows the same strategy during operations. For all alternatives, runoff from upstream of the facility would be diverted around the facility to prevent any contact with tailings. For Alternatives 2, 3, 5, and 6, any precipitation falling within the facility would run into the recycled water pond, and any runoff from the external embankments would be routed to the downstream seepage collection ponds, then pumped back and recycled into the process water stream." (DEIS, p. 379)

The stormwater analysis was revised for the FEIS. See response WT35 for more discussion. As part of this analysis, the design storm events used for the facility are described in detail in the FEIS:

- All dams and diversion channels would be designed to handle the 100-year, 24-hour storm event.
- The tailings storage facility itself is designed for greater than the 72-hour Probable Maximum Flood, including the conservative assumption that diversions fail and stormwater enters the facility as well. The Probable Maximum Flood is defined as the flood that may result from the most severe combination of critical meteorological and hydrologic conditions. This Probable Maximum Flood encompasses precipitation outcomes from all types of precipitation patterns, including monsoon, winter frontal, and tropical storms.
- Downstream of the embankment, the seepage collection pond is sized to hold an operating pond, a week's worth of inflows without outflow (i.e., an upset condition where pumps fail), and the 200-year 24-hour storm volume.

With respect to floodplains, these are disclosed in DEIS section 3.7.3 (pp. 435–444), with further details included in Newell and Garrett (2018d). Some of the tailings storage facilities do partially lie within the 100-year floodplains (Alternatives 5 and 6), whereas other areas have not been fully mapped for floodplains (Alternatives 2 and 3).

Regardless, design specifications exist to specifically address the location of tailings storage facilities within floodplains. For instance, the ADEQ Best Available Demonstrated Control Technology (BADCT) requires that if they are within the 100-year floodplain, drainage structures must be designed to protect them from the 100-year peak stream flows (Klohn Crippen Berger Ltd. 2018d:8).

12-RCMSER-2961

Appendix R

| Comment response: TS5 Height of tailings embankment | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 555-8 | |

This comment says, "The EIS states that the dam created by facility would be approximately 1,000 feet tall. This is not feasible and needs to be reconsidered in order to maintain structural stability of the facility."

This is an incorrect statement. The tailings storage facility embankment height varies by alternative: 521 feet [Alt 2, DEIS p. 73], 510 feet [Alt 3, DEIS p. 80], 310 feet [Alt 5, DEIS p. 93], and 490 feet [Alt 6, DEIS p. 99].

This comment may mistakenly refer to the height of the filtered tailings facility for Alternative 4, which is 1,040 feet for the NPAG tailings (DEIS, p. 87). This is not a dam or embankment; filtered tailings are freestanding with a structural shell but do not require any sort of embankment or dam.

| Comment response: TS7 Liner for PAG tailings; seepage controls | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 11-1, 1333-2, 1448-2, 1602-3, 99-3 | |

These comments raise questions or concerns regarding the use of liners, particularly for the PAG tailings, and question the impact of seepage.

The concept of a "liner" evolved during alternatives development (see Newell and Garrett (2018d)), and discussion in the DEIS is more expansive than just a geomembrane. The term used in the DEIS is "engineered low-permeability layer," which could consist of one or more of the following: an engineered low-permeability liner, compacted fine tailings, asphalt, slurry bentonite, cemented paste tailings, etc.

Most alternatives incorporate a low-permeability layer. Alternative 2 incorporates it in the PAG cell starter facility (DEIS, pp. 69, 73). Alternative 3 incorporates it in the entire PAG cell (DEIS, pp. 78, 80). Alternative 5 incorporates it in the entire PAG cell and the starter NPAG cell (DEIS, pp. 90, 93). Alternative 6 incorporates it in the entire PAG cell (DEIS, pp. 97, 99). The NEPA team specifically assessed the longevity of liners and seepage through liners (Newell and Garrett 2018d).

In all cases, we assume seepage would occur, regardless of the type of low-permeability layer or liner incorporated. This would be true even for a facility lined with a full geomembrane liner (see Newell and Garrett (2018d)). The water quality analysis contained in section 3.7.2 of the DEIS assumes that this seepage would occur and estimates the potential impacts in groundwater and surface water downstream.

While not relied upon for any aspect of the NEPA analysis, Resolution Copper would also be obtaining an Aquifer Protection Permit for the tailings storage facility (DEIS, pp. 16, 363–364). This permit would have specific requirements for seepage control, water quality monitoring, and water quality standards.

| Comment response: TS10 Inconsistent references to most resilient alternative | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 524-22 | |

This comment noted internal inconsistencies regarding which alternative represents the most resilient facility. We have clarified this language in the Executive Summary and in section 3.10.1 of the FEIS.

12-RCMSER-2962

Appendix R

| **Comment response: TS12**<br>Varied water-related criticisms | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1151-1 | |
| This comment raises four criticisms:<br>• With respect to the design earthquake, see response TS2 for more detail.<br>• With respect to the power consumption by the project, see response WT24 for more detail.<br>• With respect to geothermal water, see response WT6 for more detail.<br>• With respect to overall water use for the project, see response WT1. | |

| **Comment response: TS13**<br>Varied tailings-related criticisms | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1381-2 | |
| This comment raises four criticisms:<br>• With respect to the design earthquake, see response TS2 for more detail.<br>• With respect to seepage from the tailing storage facility, see response TS7 for more detail.<br>• With respect to emergency planning and warnings to residents downstream of a tailings storage facility, and specifically development of an emergency action plan, this is a requirement of all the national and international regulations and industry best practices reviewed in section 3.10.1 (DEIS, p. 525). It is not a requirement of Arizona regulations under the Aquifer Protection Permit program. We added mitigation measure FS-229 between the DEIS and FEIS to develop the breach analysis based on site-specific designs to inform emergency planning efforts. See response TS1 for more details. In addition, section 3.10.1 of the FEIS now discusses the Global Industry Standard on Tailings Management (standard), launched on August 5, 2020. Both of Resolution Copper's parent companies (Rio Tinto and BHP) are signatory to the International Council on Mining and Metals (ICMM) and through that membership have committed to implementing the new standard. Principal 13 of the standard requires emergency response planning.<br>• Potential impacts from leakage from slurry pipelines are addressed in section 3.10.1 (DEIS, pp. 540–554). | |

| **Comment response: TS14**<br>Alternative 4 Silver King stormwater controls | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>51-2 | |
| Stormwater controls for Alternative 4 – Silver King are described in detail in Newell and Garrett (2018d) and summarized in section 3.7.2 (DEIS, pp. 379–380). | |

12-RCMSER-2963

Appendix R

| Comment response: TS15 Varied questions on tailings alternatives | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1279-5

This comment raises several concerns and questions regarding tailings alternatives.

Impacts to scenery and recreation from Alternatives 2, 3, and 4 are disclosed in section 3.9 (DEIS, pp. 502–505) and section 3.11 (DEIS, pp. 603–609). Disclosures include impacts to the Arizona National Scenic Trail users. Impacts to scenery and recreation from Alternative 6 are also disclosed in these same sections (DEIS, pp. 507–509, 615–616).

The NEPA team specifically reviewed placing tailings at previously disturbed sites, including mine pits, during alternatives analysis but found it to be impractical for a variety of reasons (DEIS, appendix F, pp. F-4 through F-6). Ray Mine was specifically analyzed (DEIS, appendix F, p. F-5). Full details of the evaluation are contained in the Alternatives Evaluation Report (SWCA Environmental Consultants 2017a).

The ramifications of a breach at Alternatives 2, 3, 4, and 5 were analyzed in section 3.10.1 (DEIS, pp. 535–554). This included potential impacts to groundwater and water supplies for the San Tan Valley, Queen Creek, and Florence.

| Comment response: TS16 Concerns with stormwater controls for tailings storage facilities | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1128-12, 1128-13, 8032-33

The handling of stormwater and stormwater controls was described in section 3.7.2 (DEIS, pp. 379–380), with more detail in Newell and Garrett (2018d). Stormwater controls at the tailings storage facility are designed for complete capture and control of stormwater during operations:

> *"Generally speaking, during operations any precipitation or runoff that comes into contact with tailings, ore, hazardous material storage areas, or processing areas is considered 'contact water.' During operations contact water would be captured, contained in basins, pumped out after storm events, and recycled back into the process water stream. This type of containment would be required by the stormwater and aquifer protection permits issued for the project. Contact water would not be released to the environment at any time during operations. The tailings storage facility generally follows the same strategy during operations. For all alternatives, runoff from upstream of the facility would be diverted around the facility to prevent any contact with tailings. For Alternatives 2, 3, 5, and 6, any precipitation falling within the facility would run into the recycled water pond, and any runoff from the external embankments would be routed to the downstream seepage collection ponds, then pumped back and recycled into the process water stream." (DEIS, p. 379)*

The stormwater analysis was revised in the FEIS; see response WT35 for more discussion. As part of this analysis, the design storm events used for the facility are described in detail in the FEIS:

- All dams and diversion channels would be designed to handle the 100-year, 24-hour storm event.
- The tailings storage facility itself is designed for greater than the 72-hour Probable Maximum Flood, including the conservative assumption that diversions fail and enter the facility as well. The Probable Maximum Flood is defined as the flood that may result from the most severe combination of critical meteorological and hydrologic conditions. This Probable Maximum Flood encompasses precipitation outcomes from all types of precipitation patterns, including monsoon, winter frontal, and tropical storms.
- Downstream from the embankment, the seepage collection pond is sized to hold an operating pond, a week's worth of inflows without outflow (i.e., an upset condition where pumps fail), and the 200-year 24-hour storm volume.

With respect to floodplains, these are disclosed in section 3.7.3 (pp. 435–444), with further detail included in Newell and Garrett (2018d). Some of the tailings storage facilities do partially lie within the 100-year floodplains (Alternatives 5 and 6), whereas other areas have not been fully mapped for floodplains (Alternatives 2 and 3).

Regardless, design specifications exist to specifically address the location of tailings storage facilities within floodplains. For instance, ADEQ BADCT requires that if they are within the 100-year floodplain, drainage structures must be designed to protect them from the 100-year peak stream flows Klohn Crippen Berger Ltd. (2018d:8).

12-RCMSER-2964

Appendix R

| Comment response: TS17 Varied criticisms related to tailings storage facilities | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
863-2

This comment raises several concerns and questions regarding tailings storage facilities.

With respect to tailings safety, see responses TS1 and TS2 for more discussion. A comparison of the Resolution Copper Project design with local, national, and international regulations, and industry best practices is included in section 3.10.1 (DEIS, pp. 522–527). The DEIS concludes, "The designs developed by Resolution Copper meet the most stringent of these standards, whether required (National Dam Safety Program or Aquifer Protection Permit program) or solely industry best practice" (DEIS, p. 527).

The potential for acid generation is fundamental to the water quality analysis in section 3.7.2 (DEIS, pp. 370–373). Additional comments were raised regarding operational segregation of PAG and NPAG tailings. We have added further discussion on this topic to section 3.7.2 of the FEIS.

The NEPA team specifically reviewed placement of tailings in previous mine excavations during alternatives analysis but found it to be impractical for a variety of reasons (DEIS, appendix F, pp. F-4 through F-6). Putting tailings back into the Resolution crater is specifically analyzed (DEIS, appendix F, p. F-6). Full details of the evaluation are contained in the Alternatives Evaluation Report (SWCA Environmental Consultants 2017a), as well as in appendix F of the DEIS.

| Comment response: TS19 Regulation at Skunk Camp | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8032-42

This comment requests clarification of the framework under which a tailings storage facility at the Skunk Camp location (Alternative 6) would be regulated.

We described this issue in several places within the DEIS. Federal financial assurance mechanisms are not applicable to this location (DEIS, p. 553): "However, Alternative 6 differs from the other alternatives because the tailings facility would not be located on lands managed by the Forest Service (Alternatives 2, 3, and 4) or BLM (Alternative 5). For Alternative 6, the Federal financial assurance mechanisms would not be applicable." Section 3.7.2 of the DEIS specifically discussed this with respect to water quality and potential long-term contamination (p. 417).

Similarly, adherence to National Dam Safety Standards would not apply to this location (DEIS, appendix J, p. J-20): "Alternative 6: As facility would ultimately be located on private land, Forest Service would not have authority to require these specific design standards."

However, note that the specific State and industry guidance discussed in section 3.10.1 remains pertinent to Skunk Camp (DEIS, pp. 523–526), as does the new Global Industry Standard on Tailings Management, launched on August 5, 2020 (standard). Both of Resolution Copper's parent companies (Rio Tinto and BHP) are signatory to the ICMM and through that membership have committed to implementing the new standard. We now discuss this new standard in section 3.10.1.

We added further discussion to chapter 1 of the FEIS to clarify which components of the project would be regulated by various agencies.

Appendix R

| Comment response: TS20 Response times in event of failure | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 124-3, 67-3, 8032-242, 8032-255, 8032-41, 99-2 | |

These comments all reference the potential response times that would be experienced by residents downstream of a tailings storage facility in the event of a failure.

Many of these reference specific time frames it would take for tailings to reach downstream communities. The methods used to develop these estimates are not clearly articulated by the comments. We investigated a number of methods for conducting breach analyses (see Newell and Garrett (2018c)). The chosen method (Rico empirical method) does not estimate travel times. Such travel times were not disclosed in the DEIS, nor are they disclosed in the FEIS.

With respect to emergency planning and warnings for residents downstream from a tailings storage facility, and specifically development of an emergency action plan, this is a requirement of all national and international regulations and industry best practices reviewed in section 3.10.1 (DEIS, p. 525). It is not a requirement of Arizona regulations under the Aquifer Protection Permit program. We required mitigation measure FS-229 between the DEIS and FEIS to develop the breach analysis based on site-specific designs to inform emergency planning efforts. See response TS1 for more details.

Development of a full emergency action plan is premature, given that the tailings storage facility would likely not be constructed for at least a decade and on-the-ground details of downstream infrastructure, communities, and residents likely will change in that time. We believe that the disclosures of a liquefied breach analysis (Rico method), as included in the DEIS; a site-specific unsaturated embankment failure analysis, as included in section 3.10.1 of the FEIS; and the analysis of the downstream consequences of these failures adequately disclose the environmental effects required under NEPA.

Development of emergency plans is required by the Global Industry Standard on Tailings Management, launched on August 5, 2020 (standard). Both of Resolution Copper's parent companies (Rio Tinto and BHP) are signatory to the ICMM and through that membership have committed to implementing the new standard. Principal 13 of the standard requires emergency response planning. Requirement 13.1 requires the preparation and implementation of a site-specific tailings facility emergency preparedness and response plan based on credible flow failure scenarios and the assessment of potential consequences. Requirement 13.2 requires engaging with public-sector agencies, first responders, local authorities, and institutions to assess the capability of emergency response services to address the hazards in the emergency preparedness and response plan. Requirement 13.3 requires all reasonable steps to maintain a shared state of readiness.

| Comment response: TS20_A Response times in event of failure; with addition for specific comment 8032-257 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 8032-257 | |

See response TS20 for discussion of the general topic of response times in the event of a tailings storage facility failure.

This comment also mentions the incorrect assumption that the design earthquake for the tailings storage facility is 5,000 years. See response TS2 for more discussion about this incorrect assumption.

| Comment response: TS21 Specific concerns over long-term liability | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 1468-10 | |

This comment raises a number of concerns regarding long-term liability.

Regarding the potential health effects from tailings fugitive dust, see response TS24 for more details.

With respect to bankruptcy, chapters 1 and 2 of the DEIS included a discussion of financial assurances (pp. 15–20, 65, and 104). We updated these discussions in the FEIS. Section 3.7.2 of the DEIS specifically discussed financial assurances with respect to water quality and potential long-term contamination (DEIS, pp. 381–417).

12-RCMSER-2966

Appendix R

| Comment response: TS22 Consultation with irrigation districts | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 8032-259 | |

The analysis of tailings safety in section 3.10.1 of the DEIS considered potential impacts to the San Carlos Irrigation and Drainage District, including potential disruption of infrastructure and contamination of water supplies (pp. 531, 534, and 550). Section 3.10.1 also addressed the "financial and societal hardships" resulting from a catastrophic failure of the tailings storage facility (DEIS, pp. 540–554; see "Large Scale Societal Impact" subsections for each alternative).

In its "Memorandum to Heads of Federal Agencies," dated January 30, 2002, CEQ listed 12 factors for Federal agencies to consider when determining which agencies to invite as "cooperating agencies." Cooperating agencies have a responsibility to participate throughout the NEPA process by providing special expertise and pertinent data, participating in preparation and/or review of analyses and documents, or having pertinent legal jurisdiction for such things as issuing permits. We reviewed agencies and entities for cooperating agency status and extended invitations to those we felt best met the criteria and were capable of carrying out the obligations of a cooperating agency. No irrigation districts were identified as potential cooperating agencies.

However, the San Carlos Irrigation and Drainage District and other irrigation districts have many opportunities to be involved in the NEPA process without cooperating agency status. As a local government entity, these districts can contact us if issues arise regarding this or other projects.

| Comment response: TS23 Use of Pinto Valley Mine | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 108-1 | |

This comment states, "They say they will dump these poisons at BHP's nearby Pinto Creek mine."

We believe this refers to the Pinto Valley Mine. During the alternatives development process, the Pinto Valley Mine was considered as a tailings storage location but eventually was dismissed from detailed consideration. The potential for placing tailings at previously disturbed sites, including mine pits, was specifically reviewed by the NEPA team but found to be impractical for a variety of reasons (DEIS, appendix F, pp. F-4 through F-6). The Pinto Valley Mine was specifically analyzed (DEIS, appendix F, p. F-5). The Alternatives Evaluation Report includes full details of this evaluation (SWCA Environmental Consultants 2017a).

12-RCMSER-2967

Appendix R

| Comment response: TS24 Analysis of potential health concerns | Page 1 of 5 |
|---|---|

**Responsive to these comments:**
4-3, 1089-1, 1093-3, 1107-4, 1115-3, 1128-1, 1128-10, 1140-3, 1248-1, 1279-3, 1335-2, 1361-7, 1404-2, 1404-3, 198-2, 30078-52, 30078-53, 30078-54, 33-4, 55-3, 60-4, 6403-1, 8032-150, 8032-155, 8032-165, 8032-167, 8032-168, 8032-49, 8032-50, 8032-51, 8032-52, 8032-53, 8032-54, 8032-56, 8032-58, 8032-59, 85-1, 897-5, 90-3

These comments contain numerous concerns about health impacts and the analysis of potential health impacts from the mine project. These comments include the following:

- Health impacts from deposition of heavy metals in dust from the tailings storage facility, including ingestion through game, livestock, or plants
- Health impacts like asthma and heart disease caused generally by emissions of particulate matter and ultrafine particles
- Health impacts from valley fever or other fungal diseases spread by dust from the tailings storage facility
- Already vulnerable populations due to existing cancer clusters in the vicinity of the mine site or due to existing elevated levels of contaminants like arsenic
- Potential impacts to mine employees
- Health impacts from water quality degradation
- Health impacts from the excavation and processing of radioactive materials
- Health impacts from the excavation and processing of asbestiform materials
- Concentration of processing chemicals in the tailings storage facility

Potential health impacts from air emissions and dust deposition

The rationale and approach used in the DEIS to assess the potential impact to health from elevated concentrations of contaminants in water is described in SWCA Environmental Consultants (2018b), "Overview of Potential Mining Impacts on Public Health and Safety and Rationale for Analysis Approach" (pp. 6–14). It is summarized as follows:

> *"Federal law has established specific air quality standards that are considered to be protective of human health and the environment. The intent of promulgating these standards is explicitly spelled out in the Clean Air Act. . . . For the purposes of the National Environmental Policy Act (NEPA) analysis, the ability to meet these standards is considered protective of public health; therefore, a separate health-based analysis is not necessary in order to disclose impacts on human health."*

This approach had changed slightly by the time the DEIS was published, and an additional health risk assessment was conducted (DEIS, p. 279):

12-RCMSER-2968

Appendix R

| Comment response: TS24<br>Analysis of potential health concerns | Page 2 of 5 |
| --- | --- |

**Responsive to these comments:**
4-3, 1089-1, 1093-3, 1107-4, 1115-3, 1128-1, 1128-10, 1140-3, 1248-1, 1279-3, 1335-2, 1361-7, 1404-2, 1404-3, 198-2, 30078-52, 30078-53, 30078-54, 33-4, 55-3, 60-4, 6403-1, 8032-150, 8032-155, 8032-165, 8032-167, 8032-168, 8032-49, 8032-50, 8032-51, 8032-52, 8032-53, 8032-54, 8032-56, 8032-58, 8032-59, 85-1, 897-5, 90-3

*"For the purposes of the NEPA analysis, the ability to meet air quality standards is considered protective of public health; therefore, a separate health-based analysis of individual constituents, particularly those associated with particulate emissions, is not necessary in order to disclose impacts on human health. . . . However, the levels of metals deposition associated with particulate emissions were estimated and compared with Regional Screening Levels for which the EPA has derived carcinogenic and/or non-carcinogenic chronic health effects. Where the cancer risk health quotient is less than 1, excess cancer risk is less than $1 \times 10^{-6}$, and where the non-carcinogenic chronic health effects health quotient is less than 1, the health index for non-carcinogenic chronic health effects is less than 1. For all alternatives, the estimated human health risk associated with the maximum air concentrations of inorganic metals is less than $1 \times 10^{-6}$ cancer risk (representing a risk below 1.0 for cancer) and below 1.0 for non-carcinogenic chronic health effects. Further background about these estimations can be found in Newell et al. (2018)."*

We took this same approach in section 3.6 of the FEIS, but analysis was expanded with additional analysis (Randall 2020b). An important aspect of the health risk assessment included in the FEIS is that the risk factors take into account multiple exposure pathways. This includes inhalation and ingestion through a variety of methods, including drinking of water, inhalation of emissions, and dermal contact or ingestion of soils.

Potential health impacts from airborne fungal diseases

Comments raised the concern that certain fungal diseases, like coccidioidomycosis (valley fever), could be transmitted due to ground disturbance from the project. Valley fever is a human fungal infection caused by inhaling fungi spores in certain geographic areas in Arizona. This infection is endemic to Arizona and can occur as a result of many activities (e.g., construction activities, gardening, farming, windy weather, dirt biking, driving all-terrain vehicles).

The project will include ground-disturbing activities, like any other form of development. Numerous controls will be used and required to reduce fugitive dust (DEIS, pp. 283–284). Emissions of particulate matter at the facility boundaries do not exceed Federal standards established to prevent adverse health effects. The Resolution Copper Project is no more likely to contribute to the spread of valley fever than any other form of disturbance.

Appendix R

| Comment response: TS24<br>Analysis of potential health concerns | Page 3 of 5 |
| --- | --- |

**Responsive to these comments:**
4-3, 1089-1, 1093-3, 1107-4, 1115-3, 1128-1, 1128-10, 1140-3, 1248-1, 1279-3, 1335-2, 1361-7, 1404-2, 1404-3, 198-2, 30078-52, 30078-53, 30078-54, 33-4, 55-3, 60-4, 6403-1, 8032-150, 8032-155, 8032-165, 8032-167, 8032-168, 8032-49, 8032-50, 8032-51, 8032-52, 8032-53, 8032-54, 8032-56, 8032-58, 8032-59, 85-1, 897-5, 90-3

Presence of existing cancer clusters

During scoping meetings and the public comment period for the DEIS, the concern was raised that the existing populations of the town of Superior and nearby communities are at higher risk for health effects, due to existing high rates of cancer.

The NEPA team evaluated this issue after scoping. Results were included in "Overview of Potential Mining Impacts on Public Health and Safety and Rationale for Analysis Approach" (SWCA Environmental Consultants 2018b:30-31). This analysis concluded, "Given the public concern and interest, the documentation described above will be disclosed. However, at this time there does not appear to be any compelling evidence that a cancer cluster exists, and as such it is not expected to be incorporated into any assessment of health effects."

Public comments received on the DEIS do not contain any specific, additional information on this issue. We included an additional discussion about this topic in section 3.6 of the FEIS.

Potential impacts to mine employees

The air quality analysis demonstrates that Federal air quality standards (NAAQS) are met at the facility fence line, thus being protective of the health of the public at large. The potential impact of air emissions to mine employees within the boundaries of the facility was considered to be beyond the scope of the NEPA analysis. The rationale for this was described in "Overview of Potential Mining Impacts on Public Health and Safety and Rationale for Analysis Approach" (SWCA Environmental Consultants 2018b:13):

> "The above analysis components will focus solely on exposure to the general public. While acknowledging that mine workers within the boundaries of the mine facilities have a greater potential for exposure, the Mine Safety and Health Administration (MSHA) enforces specific health and safety standards, as well as monitoring. Resolution Copper will directly address worker health and safety regulations in compliance with MSHA rules. For the purposes of the NEPA analysis this oversight is considered to be protective of mine worker health and safety. Worker health and safety regulations are not evaluated further under NEPA requirements."

Potential health impacts from water contamination

The rationale and approach used in the DEIS to assess the potential impact to health from elevated concentrations of contaminants in water was described in "Overview of Potential Mining Impacts on Public Health and Safety and Rationale for Analysis Approach" (SWCA Environmental Consultants 2018b:14-19). It is summarized as follows:

12-RCMSER-2970

Appendix R

| Comment response: TS24<br>Analysis of potential health concerns | Page 4 of 5 |
|---|---|

**Responsive to these comments:**
4-3, 1089-1, 1093-3, 1107-4, 1115-3, 1128-1, 1128-10, 1140-3, 1248-1, 1279-3, 1335-2, 1361-7, 1404-2, 1404-3, 198-2, 30078-52, 30078-53, 30078-54, 33-4, 55-3, 60-4, 6403-1, 8032-150, 8032-155, 8032-165, 8032-167, 8032-168, 8032-49, 8032-50, 8032-51, 8032-52, 8032-53, 8032-54, 8032-56, 8032-58, 8032-59, 85-1, 897-5, 90-3

> *"For the purposes of the NEPA analysis, the ability to meet these standards is considered protective of public health; therefore, separate health-based analysis of individual constituents is not necessary in order to disclose impacts on human health.*
>
> *1) Predictions will be made of potential water quality impacts to groundwater from exposure to materials either in situ or at the surface, and from seepage or other discharge of process water. Groundwater quality changes due to the project will be compared to numeric Arizona Aquifer Water Quality Standards. Compliance with narrative Arizona Aquifer Water Quality Standards will be assessed in a qualitative manner.*
>
> *2) Predictions will be made of potential surface water quality changes from stormwater runoff from the project areas and will be compared with numeric Arizona Surface Water Quality Standards. Compliance with narrative Arizona Surface Water Quality Standards will be assessed in a qualitative manner."*

Predictions of groundwater and surface water quality impacts, with a comparison with the appropriate standards, are contained in section 3.7.2 (DEIS, pp. 373–419). The results of the analysis are summarized as follows (DEIS, p. ES-24):

> *"After closure, the reflooded block-cave zone could have poor water quality; however, a lake in the subsidence crater is not anticipated, and no other exposure pathways exist for this water.*
>
> *Stormwater runoff could have poor water quality, but no stormwater contacting tailings or facilities would be released during operations or post-closure until reclamation is successful.*
>
> *All of the tailings facilities would lose seepage with poor water quality to the environment, and all are dependent on a suite of engineered seepage controls to reduce this lost seepage. Modeling indicates that seepage from Alternatives 2 and 4 would result in water quality problems in Queen Creek; Alternative 3 would not, but requires highly efficient seepage control to achieve this (99.5 percent capture). Seepage from Alternatives 5 and 6 does not result in any anticipated water quality problems; these alternatives also have substantial opportunity for additional seepage controls if needed."*

The approach taken in the FEIS is identical to that taken in the DEIS, although some tools used to predict water quality impacts for Alternative 6 were refined. See response WT7 for more discussion.

12-RCMSER-2971

Appendix R

| Comment response: TS24 | |
|---|---|
| Analysis of potential health concerns | Page 5 of 5 |

**Responsive to these comments:**
4-3, 1089-1, 1093-3, 1107-4, 1115-3, 1128-1, 1128-10, 1140-3, 1248-1, 1279-3, 1335-2, 1361-7, 1404-2, 1404-3, 198-2, 30078-52, 30078-53, 30078-54, 33-4, 55-3, 60-4, 6403-1, 8032-150, 8032-155, 8032-165, 8032-167, 8032-168, 8032-49, 8032-50, 8032-51, 8032-52, 8032-53, 8032-54, 8032-56, 8032-58, 8032-59, 85-1, 897-5, 90-3

<u>Potential health impacts from radioactive materials</u>

Section 3.7.2 (DEIS, pp. 418–419) summarized analysis of the presence of radioactive materials in the ore and the potential concentration of those materials during processing (technologically enhanced naturally occurring radioactive materials). The full detailed analysis is contained in Newell and Garrett (2018d). The analysis concluded,

> *"When compared with common background levels, review of existing information at the site does not suggest the strong presence of naturally occurring radioactive materials above typical concentrations, although a small percentage (2 to 6 percent) of samples have exhibited concentrations above thresholds of concern.*

> *The processes that historically have been documented with problems would not occur as part of this project. . . . With respect to the processing (flotation) that would be used during the Resolution Copper Project, site-specific locked cycle testing has simulated the effect of processing to potentially concentrate radioactive materials, and no concentrations are above any thresholds of concern for uranium, radium, and gross alpha activity."*

Additional investigation was undertaken after receipt of DEIS comments (Randall 2020b), with similar conclusions. The public comments received on the DEIS contain general discussions of the issue and theoretical sources and exposure mechanisms but do not contain additional information relevant for analysis. This analysis remains unchanged in section 3.7.2 of the FEIS.

<u>Potential health impacts from asbestiform materials</u>

Section 3.7.2 (DEIS, p. 419) summarized analysis of the presence of asbestiform materials in the ore and the potential release of these materials during processing, based on analysis contained in Duke (2019a). The analysis concluded,

> *"Asbestos is present in trace to minor amounts in the Resolution ore and development rock as fibrous forms of the amphibole minerals tremolite and actinolite, primarily tremolite. The general threshold for asbestos-containing material is more than 1 percent asbestos as determined by polarized light microscopy (40 CFR 61.141).*

> *These analyses indicate that asbestiform minerals are present in the ore deposit, but on average the percentage is below the threshold for concern. However, the block caving is not conducted on the ore deposit as a whole, but panel by panel. When viewed on a panel-by-panel basis, overall asbestiform minerals are not anticipated to exceed 0.1 percent by weight."*

Additional investigation was undertaken after receipt of DEIS comments (Randall 2020b), with similar conclusions. The public comments received on the DEIS contain general discussions of the issue and theoretical sources and exposure mechanisms but do not contain additional information that informs this analysis. This analysis remains the same in section 3.7.2 of the FEIS.

<u>Concentration of processing chemicals in tailings seepage</u>

Analysis of the potential for processing chemicals used during the flotation process to be concentrated, carried into the tailings storage facility, and released in seepage was analyzed in section 3.7.2 (DEIS, pp. 417–418). The analysis concluded that for six specific reagents analyzed, three have no theoretical pathway to be released, two degrade at rates high enough to be unlikely to persist in tailings seepage, and one (a binder and flocculant) is unlikely to be mobile. This analysis remains the same in section 3.7.2 of the FEIS.

Appendix R

| Comment response: TS24_A<br>Analysis of potential health concerns; with addition for specific comments 8032-149; 899-5 | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
8032-149, 899-5

See response TS24 for the general topic of analysis of health impacts.

This comment contains mention of a number of issues: "The dust related to mining activities can contain a variety of toxic materials, and can cause exceedances of health-based air quality standards, as well as provisions that protect Class I airsheds such as the Superstition Wilderness. The Forest Service has underestimated the impacts of the air pollution that would be generated by this mine on the health of both employees and area residents, region-wide visual impact on scenery and view sheds, and the impact on plant and animal life. Consideration of the impacts on recreational values and property values was also not adequately considered."

Section 3.6 (DEIS, pp. 282–288) contained an analysis of health-based air quality standards (NAAQS). The project meets all NAAQS at the facility boundaries.

Section 3.6 (DEIS, pp. 288–292) contained an analysis of impacts to sensitive areas, including five Class I areas and two Class II areas, including the Superstition Wilderness. This analysis includes impacts from criteria pollutants, haze and visibility, and deposition of nitrogen and sulfur.

Section 3.11 (DEIS, pp. 594–618) contained an analysis of impacts to scenery and viewsheds.

The analysis of impacts on plants is contained in section 3.3 (DEIS, pp. 183–205), and the analysis of impacts on wildlife is contained in section 3.8 (DEIS, pp. 457–476). See specifically pp. 161 and 448 of the DEIS for descriptions of how the analysis areas for plants and wildlife incorporate air quality.

Section 3.9 (DEIS, pp. 495–509) contained an analysis of impacts on recreation. Also see section 3.13 (DEIS, p. 653) for air quality impacts related to nature-based tourism.

Section 3.13 (DEIS, pp. 647–656) contained an analysis of impacts on property values.

| Comment response: TS24_B<br>Analysis of potential health concerns; with addition for specific comment 8032-166 | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
8032-166

See response TS24 for the general topic of analysis of health impacts.

This comment lists a number of specific contaminants. All of these, with the exception of fluoride (which was not identified in the tailings samples), were included in the health assessment.

| Comment response: TS24_C<br>Analysis of potential health concerns; with addition for specific comment 1309-2 | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
1309-2

See response TS24 for the general topic of analysis of health impacts.

This comment notes concerns with the use of chemicals for dust control. Treatment with chemicals or polymer dust suppressants is one of the applicant-committed environmental protection measures for controlling dust emissions described in section 3.6 (DEIS, p. 283). These materials would be used in accordance with manufacturer recommendations and all applicable laws and regulations. In general, because of the stormwater controls that prevent any water contacting tailings from being released, exposure pathways even in the event of improper use of these materials at the tailings storage facility are limited.

12-RCMSER-2973

Appendix R

| Comment response: TS24_D<br>Analysis of potential health concerns; with addition for specific comment 6181-2 | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
6181-2

See response TS24 for response to the general topic of analysis of health impacts.

This comment notes several additional concerns. Section 3.10.1 (DEIS, pp. 535–554) contained the analysis of potential tailings storage facility failure. Section 3.10.3 (DEIS, pp. 577–582) contained an analysis of risk associated with hazardous waste transport.

| Comment response: TS26<br>Potential for air blast | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
1043-2, 1097-10, 8032-234, 8032-46

These comments concern the potential for an air blast to occur within the block-cave zone during active mining.

We agree that block caving air blasts are a mine operational safety concern. The potential impact of an air blast on mine employees within the boundaries of the facility is beyond the scope of the NEPA analysis. The rationale is similar to that described in "Overview of Potential Mining Impacts on Public Health and Safety and Rationale for Analysis Approach" (SWCA Environmental Consultants 2018b:13) with respect to worker exposure to air contaminants:

> *The above analysis components will focus solely on exposure to the general public. While acknowledging that mine workers within the boundaries of the mine facilities have a greater potential for exposure, the Mine Safety and Health Administration (MSHA) enforces specific health and safety standards, as well as monitoring. Resolution Copper will directly address worker health and safety regulations in compliance with MSHA rules. For the purposes of the NEPA analysis this oversight is considered to be protective of mine worker health and safety. Worker health and safety regulations are not evaluated further under NEPA requirements."*

| Comment response: TS27<br>Impacts of traffic on medical care | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
1504-3

This comment raises concerns with traffic affecting medical transport and care.

Section 3.5 of the DEIS contained an analysis of transportation impacts (pp. 254–269). It focused primarily on intersections, which is where most traffic conflicts occur. We added further analysis to section 3.5 of the FEIS to discuss impacts specific to highway segments, including impacts to Phoenix as noted in the comment. See response TR1 for more discussion.

| Comment response: TS28<br>Impacts to vegetation and habitat | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
1464-3, 1469-2

These comments raise concerns with impacts to vegetation and habitat.

The analysis of impacts to vegetation is contained in section 3.3 (DEIS, pp. 183–205), including the types and acreage of vegetation lost to project disturbance. Biodiversity is analyzed in sections 3.3 and 3.8 (DEIS, pp. 197 and 463).

The impact of that habitat loss on wildlife species is analyzed in section 3.8 (DEIS, pp. 457–476). Potential impacts on surface waters due to this loss of vegetation and disturbance are also analyzed in section 3.7.3 (DEIS, pp. 427–444). Edge effects, artificial night lighting, noise, vibration, and associated disturbance on species is discussed in section 3.8 (DEIS, pp. 459–462).

We added further details about the analysis regarding edge effects, artificial night lighting, noise, vibration, and the associated disturbance to section 3.8 of the FEIS. We also added further details about biodiversity to section 3.8 of the FEIS.

Appendix R

| Comment response: TS29<br>Pipeline failure | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1544-13, 45-1, 8032-236, 8032-237 | |

These comments raise concerns over the risk and consequences of pipeline failures.

Section 3.10.1 of the DEIS analyzed the potential for pipeline failures and their consequences (DEIS, pp. 535–554).

We evaluated a pipeline protection and integrity plan in response to comments. The plan incorporates specific analysis of potential failure modes, including geohazards such as slope instability, seismic hazards, scour, and geological subsidence, mechanical failure, corrosion and erosion, operational failures, and human-caused failures (Golder Associates Inc. 2020). It also includes specific mitigation methods to respond to these potential failure modes.

One comment notes that lubricant is used in the slurry pipeline. This is an incorrect statement. The slurry (tailings and water) and concentrate (concentrate and water) pipelines do not need lubricant to facilitate flow in the pipes.

Also see response GS1 for more discussion of seismic risk to pipelines.

| Comment response: TS30<br>Locations of tailings storage | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1196-2, 1206-3 | |

These comments question where the tailings would be stored.

We analyzed five tailings storage facility alternatives at four separate locations. These are described in detail in chapter 2 (DEIS, pp. 29–100).

| Comment response: TS31<br>Choice of tailings type for preferred alternative | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1463-2 | |

This comment questions the determination of tailings type for the preferred alternative, though referencing only the Executive Summary.

A variety of tailings types was analyzed in the DEIS, as described in chapter 2 (DEIS, p. 50), each with varying water and solids content. The use of thickened tailings (50–70 percent solids) is considered for three of the alternatives (Alternatives 2, 5, and 6), with ultrathickened tailings considered for one alternative (Alternative 3) and filtered tailings considered for one alternative (Alternative 4).

The analysis of multiple tailings types allows for a comparison of impacts in the NEPA analysis.

As the responsible official, the Forest Supervisor for the Tonto National Forest can modify an alternative in the ROD as long as the modification is "encompassed within the range of alternatives analyzed" in the EIS. Thus, the decision documented in the ROD can pick and choose between actions, activities, and facilities presented in the action alternatives to form a selected action. This could include changing the tailings type, if such a decision is within the scope of the ROD. See response ALT1 for more discussion on this topic.

| Comment response: TS32<br>Pipeline safety protocols | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>8032-30 | |

Section 3.10.1 of the DEIS discusses pipeline safety. The section includes the potential for failures and spills (DEIS, pp. 535–554) as well as the applicant-committed environmental protection measures, including safety protocols that will be followed (DEIS, pp. 536–538).

Appendix R

| Comment response: W11 Specific species, species groups, and available survey data | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
1084-4, 1349-6, 8032-185, 8032-192, 8032-195

These comments identify specific species or groups of species that are perceived to have been insufficiently analyzed. In some cases this information was already sufficiently analyzed in the DEIS; in other cases, we have expanded the analysis in the FEIS.

We have added more discussion describing potential impacts on species protected under the Migratory Bird Treaty Act to section 3.8 of the FEIS.

We addressed lowland leopard frog in section 3.8 (DEIS, p. 466, table 3.8.4-2) using as a metric the acres of modeled suitable habitat for all alternatives. We also mentioned the species in light of a potential failure of the tailings storage facility (DEIS, p. 532). Minimization measures that would reduce or avoid potential impacts on the species are discussed in section 3.8 (DEIS, p. 458). We added text to section 3.8 of the FEIS to further discuss the potential for the species to occur in the project area.

We addressed potential impacts to fish, reptiles, and amphibians from habitat loss and changes to water quality in section 3.8 (DEIS, pp. 458–461, for general project impacts; DEIS, pp. 461–463, for "Additional Impacts Specific to Wildlife Groups" broken out by mammals, birds, amphibians, reptiles, and invertebrates).

We addressed springs, seeps, and water holes in the affected area in sections 3.7.1 and 3.8 (DEIS, pp. 452 and 460, figure 3.8.3-1 on p. 453, and table 3.7.1-2 on p. 314). We have added further details to section 3.8 regarding potential dewatering of springs and riparian areas.

We analyzed habitat loss, degradation, and fragmentation in section 3.8 (DEIS, pp. 459–461). We analyzed habitat use (selection) and changes to foraging/hunting and breeding behavior and success in section 3.8 (DEIS, pp. 459–462).

We addressed edge effects, artificial night lighting, noise, vibration, and disturbance to species in section 3.8 (DEIS, pp. 459–462). We have added further detail to the analysis regarding edge effects, artificial night lighting, noise, vibration, and associated disturbance to section 3.8 of the FEIS.

Some comments raise concerns that inadequate surveys were conducted. The ability to collect additional information needs to be addressed when the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives. We used the best available data to determine the potential presence or absence of species, including migratory birds, wildlife, vegetation, and special status species in the project area. Surveys for species in the project and action area have been occurring, with oversight from the Tonto National Forest. These surveys and data provide sufficient information to make a reasoned choice between alternatives.

Potential impacts on the Arizona hedgehog cactus are addressed in the DEIS and also are subject to Section 7 consultation with the FWS. The species is addressed in section 3.3 (DEIS, pp. 178, 179, 195, 197, and 203). The final Biological Opinion issued by the FWS is attached to the FEIS as appendix P.

Since January 2021, the Telegraph Fire burned portions of the project area. We analyzed the potential impacts of the fire on threatened or endangered species and determined that reconsultation on Section 7 was not warranted (Gladding 2025).

| Comment response: W13 Impacts from flow reductions | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
30075-44

We addressed potential impacts to wildlife from reductions in surface flows in sections 3.7.3 and 3.8 (DEIS, pp. 447, 462, 463, 472, and 473).

We have added further details to the analysis in section 3.8 of the FEIS regarding how changes in surface flow impact wildlife.

12-RCMSER-2976

Appendix R

| **Comment response: WI5**<br>Concerns over insufficient survey data and analysis of game species | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1534-2

These comments identify potential shortcomings in survey data and concerns regarding game species and hunting.

With respect to survey data or research, the ability to collect additional information needs to be addressed when the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives. We used the best available data to determine potential presence or absence of species, including migratory birds, wildlife, vegetation, and special status species in the project area. Surveys for species in the project and action area have been occurring with oversight from the Tonto National Forest. These surveys and data provide sufficient information to make a reasoned choice between alternatives.

We addressed potential impacts to hunting in section 3.9 (DEIS, pp. 489, 498–500). Mitigation related to wildlife is given in section 3.8 (DEIS, pp. 479–480). No specific hunting mitigation was proposed or included in the DEIS.

We have added further detail about potential impacts to game species to section 3.8 of the FEIS and impacts to hunting in section 3.9 of the FEIS. Additional mitigation has also been brought forward related to hunting and wildlife species and is included in section 3.8 and appendix J of the FEIS (see mitigation measures FS-TA-01 and FS-WI-01).

| **Comment response: WI6**<br>Sonoran desert tortoise, Gila monster | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8031-67, 8032-190, 8032-191

These comments raise concerns about the analysis of Sonoran desert tortoise and Gila monster and insufficiency of survey data.

We addressed impacts to vegetation and wildlife in sections 3.3 and 3.8 of the DEIS, respectively, as well as in the "Unavoidable Impacts" sections (3.3.4.8 and 3.8.4.4). Cumulative impacts were also addressed in sections 3.3.4.8 and 3.8.4.4 of the DEIS. We have expanded the cumulative impacts analysis in the FEIS (chapter 4).

In section 3.8, we addressed potential impacts to predator/prey relationships from power lines, including predation on Sonoran desert tortoise by ravens (DEIS, p. 462).

Mitigation for wildlife species, including Sonoran desert tortoise and Gila monster, is given in section 3.8 (DEIS, pp. 457–458). We analyzed the potential impacts on wildlife and special status species using the best available information. Uncertain and unknown information is discussed, as well (DEIS, p. 450). Potential mitigation for Sonoran desert tortoise includes preconstruction surveys, biological monitoring, crew orientation, and creation of tortoise crossings for the pipeline corridors in suitable habitat.

With respect to survey data, the ability to collect additional information needs to be addressed when the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives. We used the best available data to determine potential presence or absence of species, including migratory birds, wildlife, vegetation, and special status species in the project area. Surveys for species in the project and action area have been occurring with oversight from the Tonto National Forest. These surveys and data provide sufficient information for the Forest Supervisor to make a reasoned choice between alternatives.

We have added further details to section 3.8 of the FEIS regarding edge effects impacting Sonoran desert tortoise habitat use and selection.

| **Comment response: WI7**<br>Analysis of wind erosion and fugitive dust | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
28449-28, 28449-29, 28449-30, 28449-31

These comments are concerned with fugitive dust and wind erosion.

We analyzed fugitive dust as part of the air quality analysis in section 3.6 by assessing criteria pollutants $PM_{10}$ and $PM_{2.5}$ (DEIS, pp. 282–292). Based on our modeling results, these pollutants are estimated to meet applicable air quality standards at the fence line of each facility.

The susceptibility of soils to water and wind erosion is disclosed in section 3.3 (DEIS, pp. 192–193).

Appendix R

| Comment response: WI8<br>Time frame for regeneration of land | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1356-2 | |

This comment concerns the long time frame for regeneration of disturbed land, as well as the importance of vegetation resources for Tribal members.

The time frame for reestablishing native vegetation and specifically the potential for these lands to meet their future desired condition is disclosed in section 3.3 (DEIS, pp. 197–201). The difficulties are fully disclosed: "Revegetation success in these desert ecosystems is demonstrated. However, impacts to soil health and productivity may last centuries to millennia, and the ecosystem may not meet desired future conditions. The habitat may be suitable for generalist wildlife and plant species, but rare plants and wildlife with specific habitat requirements are unlikely to return" (DEIS, p. ES-22).

For further discussion of the overall importance of the land to Tribal members, see response CR4. For further discussion of the species of Tribal importance, see response CR15.

| Comment response: WI9<br>Impact of mine processes on soil | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1115-2 | |

This comment raises concerns with long-term effects of potential contamination of soil due to exposure to chemicals or mine tailings.

These effects are analyzed in several places in the DEIS.

We disclosed the potential for release of tailings or concentrate (from a tailings storage facility or pipeline rupture) and the resulting long-term contamination that would result in section 3.10.1 (DEIS, pp. 540–542, 544–546).

We analyzed the interaction of water with tailings material and the subsequent release into the environment through tailings seepage in section 3.7.2 (DEIS, pp. 373–419).

We also discussed the potential for stormwater to interact with tailings material in section 3.7.2 (DEIS, pp. 379–381). See response WT35 for a discussion of how this analysis has been refined for the FEIS.

We analyzed the potential for impacts to human health from air emissions of chemicals or particulate matter in section 3.6 (DEIS, pp. 282–292). This includes a specific impact to human health. See response TS24 for a discussion of how this analysis has been refined for the FEIS, including potential exposure to asbestiform materials, radioactive materials, heavy metals, and processing chemicals.

12-RCMSER-2978

Appendix R

| Comment response: WI10 Vegetation analysis and Arizona hedgehog cactus | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8032-197

These comments identify a number of specific issues related to Arizona hedgehog cactus and general vegetation analysis.

The ability to collect additional information needs to be addressed when the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives. We used the best available data to determine the potential presence or absence of species, including migratory birds, wildlife, vegetation, and special status species in the project area. Surveys for species in the project and action area have been occurring with oversight from the Tonto National Forest. These surveys and data provide sufficient information to make a reasoned choice between alternatives.

An analysis of the potential impacts to Arizona hedgehog cactus was disclosed in the DEIS (pp. 178–179, 195, 197, and 203). Arizona hedgehog cactus are subject to Section 7 consultation with the FWS. We added discussion of the outcome of this process to section 3.3 of the FEIS, and the final Biological Opinion issued by the FWS is attached to the FEIS as appendix P.

Since January 2021, the Telegraph Fire burned portions of the project area. We analyzed the potential impact of the fire on threatened or endangered species, particularly Arizona hedgehog cactus, and determined that re-consultation on Section 7 was not warranted (Gladding 2025).

We addressed potential impacts to vegetation communities from other items mentioned in the comments in sections 3.3, 3.7.1, and 3.8 of the DEIS, including the removal of vegetation by mining activity (DEIS, p. 202), air pollution (DEIS, pp. 161–163, noting the analysis area for vegetation defined to encompass deposition impacts), dewatering (DEIS, pp. 178 and 317–340), invasive species (DEIS, pp. 197–201), and fire (DEIS, pp. 190–201).

| Comment response: WI11 Avian analysis | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8032-178

These comments concern impacts to avian species and available information to support the avian analysis.

We have added further discussion of species protected under the Migratory Bird Treaty Act in section 3.8 of the FEIS.

The ability to collect additional information needs to be addressed when the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives. We used the best available data to determine potential presence or absence of species, including migratory birds, wildlife, vegetation, and special status species in the project area. Surveys for species in the project and action area have been occurring with oversight from the Tonto National Forest. These surveys and data provide sufficient information to make a reasoned choice between alternatives.

12-RCMSER-2979

Appendix R

| Comment response: WI12<br>Mammal analysis | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8032-189

These comments concern impacts to wildlife and mammal species and available information to support the analysis.

We addressed wildlife and mammals in section 3.8 (DEIS, pp. 457–461). Mitigation for these species was also discussed in section 3.8 (DEIS, pp. 479–480).

The ability to collect additional information needs to be addressed when the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives. We used the best available data to determine the potential presence or absence of species, including migratory birds, wildlife, vegetation, and special status species in the project area. Surveys for species in the project and action area have been occurring with oversight from the Tonto National Forest. These surveys and data provide sufficient information to make a reasoned choice between alternatives and therefore a population density analysis would not be required.

We have added further information and analysis regarding the issues raised in this comment to section 3.8 of the FEIS.

| Comment response: WI13<br>Improvements on bird analysis; Migratory Bird Treaty Act | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8032-177, 8032-180, 8032-181, 8032-182, 8032-183, 8032-184

We have added text describing potential impacts on species protected under the Migratory Bird Treaty Act in section 3.8 of the FEIS.

| Comment response: WI14<br>Wildlife camera data | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8032-205

We have used the wildlife camera data submitted with this comment and included those data in the baseline data for section 3.8.

| Comment response: WI15<br>Wildlife connectivity | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
30075-61, 30075-62, 8031-68, 8032-201

These comments concern habitat blocks and habitat connectivity across the larger landscape.

Habitat connectivity is addressed in section 3.8 (DEIS, pp. 452–456, 463–465). We have added further information to section 3.8 of the FEIS regarding habitat connectivity, including defining habitat category 1 and 2 blocks, the ability of species to move between habitat blocks, linkages, and potential impacts to individual wildlife and species groups related to potential impacts to springs.

12-RCMSER-2980

Appendix R

| Comment response: WI16 | |
| --- | --- |
| General wildlife analysis; uncertain information | Page 1 of 1 |

| Responsive to these comments: |
| --- |
| 8032-172 |

This comment raises a number of issues regarding general analysis of wildlife and biological resources, including analysis at alternative locations, cumulative impacts, mitigation, threatened and endangered species, and uncertainties in the analysis.

With respect to the analysis of impacts to wildlife and biological resources, direct and indirect effects are analyzed in section 3.8 (DEIS, pp. 457–476). This analysis includes impacts to special status species, such as threatened and endangered species. Cumulative effects are analyzed as well (DEIS, pp. 476–479); note that we have reworked the cumulative effects analysis for the FEIS (chapter 4), with the intent of using more quantitative metrics than those used in the DEIS. Migratory birds are also addressed as special status wildlife species, but note that we have added further detail to the analysis impacts to species protected by the Migratory Bird Treaty Act in section 3.8 of the FEIS.

Potential impacts on threatened and endangered species are addressed in the DEIS and also are subject to Section 7 consultation with the FWS. These species are addressed in section 3.3 (DEIS, pp. 473–476). The final Biological Opinion issued by the FWS is attached to the FEIS as appendix P.

With respect to alternative locations, impacts to wildlife species are assessed separately for each of the alternatives in section 3.8 (DEIS, pp. 463–472).

Mitigation for wildlife species was also discussed in section 3.8 (DEIS, pp. 479–480) and was summarized in appendix J. Additional mitigation measures related to wildlife have been developed since the DEIS, and we have added these to section 3.8 and appendix J of the FEIS.

A number of these comments indicate a lack of awareness of the substantial background information, either in the project record or cited as DEIS references, that contribute to the analysis statements contained in the DEIS. There is no expectation that all information available has to appear in the EIS itself. Forest Service NEPA regulations indicate, "Material may be incorporated by reference into any environmental or decision document. This material must be reasonably available to the public and its contents briefly described in the environmental or decision document" (36 CFR 220.4(h)).

The comment states, "The DEIS cites the problem of 'uncertainties and unknown information' and 'assumptions,' including 'limitations in the use of GIS data,' 'lack of current scientific data,' and 'reliance on other resource analyses' that further this problem (Ch. 3, p. 450)."

It is incorrect to characterize these statements as problems. They are disclosures of uncertainties in the analysis, but they do not preclude an adequate assessment of impacts. The ability to collect additional information needs to be addressed when the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives. We used the best available data to determine the potential presence or absence of species, including migratory birds, wildlife, vegetation, and special status species in the project area. Surveys for species in the project and action area have been occurring with oversight from the Tonto National Forest. These surveys and data provide sufficient information to make a reasoned choice between alternatives.

Appendix R

| Comment response: WI17 Management indicator species (MIS) | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 8032-175 | |

This comment indicates that the analysis of management indicator species (MIS) is insufficient, as it is based solely on habitat acreage lost.

We address MIS species in section 3.8 (DEIS, pp. 454–457, 472) and in the background documentation (see Newell (2018j)). Analysis of MIS has a specific purpose that is applicable on a forest-wide basis. MIS are plant and animal species, communities, or special habitats that are selected for emphasis in planning and monitored during forest plan implementation in order to assess the effects of management activities on their populations and the populations of other species with similar habitat needs, which they may represent. In order to determine the level of impact that each of these MIS may incur on a forest-wide level, analysis was completed to determine the percentage of each species' occupied habitat across the Tonto National Forest that may be impacted (lost or altered) by implementation of any of the action alternatives. Calculation of acres of disturbance to MIS habitat is an appropriate technique to meet these purposes.

Note that in December 2023 the Tonto National Forest implemented a revised forest plan, and the MIS concept is no longer used in the forest plan as a management tool. For consistency and completeness, the analysis of MIS remains in the FEIS.

| Comment response: WI18 Wildlife impacts from tailings failure or seepage | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 8032-174, 8032-29 | |

These comments indicate that exposure of wildlife to seepage affected by tailings or a tailings release was not included in the DEIS. We addressed wildlife exposure during a major tailings release in section 3.10.1 (DEIS, p. 544). We addressed wildlife exposure to seepage ponds in section 3.8 (DEIS, p. 460). We have added a revised analysis to section 3.7.2 of the FEIS that specifically analyzes water quality from a release of stormwater during operations; we have also added further discussion to section 3.8 to more clearly describe the effects that water in seepage ponds, seepage, or stormwater could have on wildlife.

12-RCMSER-2982

Appendix R

| Comment response: W119 Noise/vibration/light impacts on species | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8032-281

This comment indicates that the EIS needs to disclose impacts of noise, vibration, and artificial light on plants and animals that normally inhabit the surrounding areas.

Disclosure of these impacts is already incorporated into the DEIS, as described below.

Wildlife impacts focus primarily on two aspects: acreage of habitat that could be affected by the project, and the typical impacts experienced in these areas by various species.

The buffer areas that define the wildlife habitat impacts were based specifically on noise and light impacts. The buffer area selected was 1 mile, and the rationale for this distance to represent noise and light impacts is included in Newell (2018j), as well as the DEIS:

> *"The noise modeling shows that for all action alternatives, noise levels at 1 mile would be at or below the level of normal human conversation; as such, the 1-mile buffer is sufficient to address potential impacts from noise-producing activities. We also expect light associated with project construction and facilities to increase night-sky brightness from 1 to 9 percent (Dark Sky Partners LLC 2018). Light impacts would occur across the landscape but available research suggests any substantial impacts would occur within the 1-mile buffer (Newell 2018j)."* (DEIS, pp. 448–450)

Specific impacts to individuals caused by noise and light are described in Section 3.8, Wildlife and Special Status Wildlife Species. In the DEIS, see specifically pp. 458–459 (general construction noise/vibration impacts: change in use patterns, competition, stress levels, decreased immune response, hearing damage, diminished intraspecific communication, increased predation risk, reduced reproductive success); pp. 460–461 (general operations lighting impacts: changes in foraging, changes in migration/dispersal); p. 461 (mammal-specific impacts); p. 462 (bird-specific impacts); p. 462 (reptile-specific impacts); p. 462 (invertebrate-specific impacts); and p. 463 (amphibian-specific impacts).

| Comment response: W120 Species of Economic and Recreational Importance | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
30075-73

We addressed Species of Economic and Recreational Importance (SERI) in section 3.8 (DEIS, pp. 451–452). Additional analysis of species that are game species is included in Section 3.9, Recreation, with respect to hunting (DEIS, pp. 489, 500), and Section 3.13, Socioeconomics (DEIS, pp. 653–655).

We have added further analysis of SERI in sections 3.8 and 3.9 of the FEIS.

12-RCMSER-2983

Appendix R

| Comment response: W121 Bat species | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:** 8032-188 | |

These comments concern analysis of bat species, and bat inventories.

We addressed existing conditions and potential impacts to bats in section 3.8, including from artificial light, impacts to prey species, roost impacts, and habitat impacts (DEIS, pp. 452, 460, and 461). Acres of impacts to habitat for special status bat species are given in table 3.8.4-2 (DEIS, p. 470). Mitigation is described, as well (DEIS, pp. 479–480). We added further details to section 3.8 of the FEIS regarding potential impacts to bat species.

As lesser long-nosed bat is no longer listed as threatened or endangered, Section 7 consultation with the FWS for the species would not occur. We give the acres of modeled habitat for the species that would be potentially impacted under each action alternative in table 3.8.4-2 (DEIS, p. 470).

With respect to survey data or bat inventories, the ability to collect additional information needs to be addressed when the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives. We used the best available data to determine potential presence or absence of species, including migratory birds, wildlife, vegetation, and special status species in the project area. Surveys for species in the project and action area have been occurring with oversight from the Tonto National Forest. These surveys and data provide sufficient information for the Forest Supervisor to make a reasoned choice between alternatives.

| Comment response: W122 Missing species | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:** 30075-66 | |

This comment indicates that additional source data are needed for wildlife species and that some species may be missing, compared with reports generated by Arizona Game and Fish Department.

We have added the source to table 3.8.4-2 and other tables, and we have updated the data for the FEIS. Note that not all species appear in the DEIS; some may be screened out. This additional information is included in the background documentation (see Newell (2018j)).

We addressed SERI in section 3.8 (DEIS, pp. 451–452). Additional analysis of species that are game species is included in Section 3.9, Recreation, with respect to hunting (DEIS, pp. 489, 500), and Section 3.13, Socioeconomics (DEIS, pp. 653–655). We have added further analysis of SERI in sections 3.8 and 3.9 of the FEIS.

We addressed ecologically important areas in "Special Habitat Areas" and "Wildlife Connectivity" in section 3.8 of the DEIS. We added further details and analysis to the FEIS for "Special Habitat Areas" and "Wildlife Connectivity."

| Comment response: W123 Impacts to Gila chub in Mineral Creek | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:** 8032-193 | |

We have addressed potential impacts to Gila longfin dace and Gila chub in section 3.8 (DEIS, pp. 462 and 469, for Gila longfin dace; and pp. 469 and 475–476, for Gila chub). Potential impacts on threatened and endangered species are also subject to Section 7 consultation with the FWS. The final Biological Opinion issued by the FWS is attached to the FEIS as appendix P. Note that for the Section 7 consultation, Mineral Creek was assumed to be occupied habitat for Gila chub.

We added further details to section 3.8 of the FEIS regarding the potential impacts to Gila longfin dace and Gila chub.

12-RCMSER-2984

Appendix R

| Comment response: WI24 | |
|---|---|
| Ocelot | Page 1 of 1 |

**Responsive to these comments:**
8032-187

We addressed the potential for the ocelot to occur in the project area in the wildlife resources process memorandum (Newell 2018j). The species was determined to be unlikely to occur based on guidance from species' experts at FWS and because the project alternatives occur outside the area where the species is known to occur, with only one known record. Also, camera trap data from the project vicinity have not shown any ocelots.

FWS agreed in its Biological Opinion that the species was unlikely to occur in the project and action areas.

| Comment response: WI25 | |
|---|---|
| Impacts to Mineral Creek | Page 1 of 1 |

**Responsive to these comments:**
5760-2, 8032-194

This comment states, "The DEIS then describes potential damage to nearby critical habitat in Mineral Creek above the confluence with Ga'an Canyon, including 'reduction of perennial pools and a conversion of vegetation toward xeroriparian species', but concludes that "groundwater modeling for the action alternatives does not indicate that impacts from groundwater drawdown would significantly impact Mineral Creek in the area of designated critical habitat' (Ch. 3, p. 476)."

To be clear, the statement of potential impacts (DEIS, p. 476) does not tie the impacts to Mineral Creek, and as noted in the comment, the DEIS explicitly states that groundwater drawdown is not anticipated to impact Mineral Creek.

We addressed potential impacts to Mineral Creek and critical habitat from changes in surface and groundwater hydrology. The drawdown analysis is contained in section 3.7.1 (DEIS, p. 320), and the surface hydrology analysis is contained in section 3.7.3 (since no stormwater is lost within the Mineral Creek watershed, it is not analyzed specifically; see the analysis area on p. 423).

We addressed potential impacts from water contamination in section 3.7.2, and water quality would meet all wildlife standards for acute and chronic exposure. We have added further analysis of water quality impacts to wildlife in section 3.8 of the FEIS.

We consulted with FWS regarding the potential impacts on Gila chub and designated critical habitat, and FWS concurred that the project may affect but is not likely to adversely affect the species or designated critical habitat. The final Biological Opinion issued by FWS is attached to the FEIS as appendix P.

These comments also note impacts to Gila longfin dace. We addressed Gila longfin dace in section 3.8 (DEIS, pp. 462, 469). We have added further detail to section 3.8 of the FEIS regarding potential impacts to Gila chub.

Appendix R

| Comment response: W126 | |
|---|---|
| Clarifications of aspects of reclamation | Page 1 of 1 |

**Responsive to these comments:**
524-16, 8032-239, 8032-32

These comments raise several issues related to reclamation details.

One comment questions how the remaining material in the seepage ponds, where solids have been concentrated through evaporation, would be removed and disposed of. As noted in the DEIS (p. 391), these solids would be handled as solid or hazardous waste. Solids physically would be removed, along with the liner for the seepage pond, and disposed in an appropriate facility off-site. We added more detail  this aspect to section 3.7.2 of the FEIS.

Several comments ask for cost details for reclamation. We calculate costs for reclamation activities during the bond approval process. This takes place after the NEPA analysis, after a ROD, and during the approval stage of the operating plan, whether in the form of a special use permit or a GPO. It is not our policy to include bonding financial estimates in the EIS documents.

Another comment notes, "Although options for post-closure seepage management are briefly discussed, substantial additional detail is warranted given the importance of implementing and maintaining seepage management for protecting water quality. . . . Add a detailed discussion of the post-closure tailings seepage management periods and strategies for each alternative, including a discussion of the infrastructure required and potential impacts from constructing and operating post-closure management facilities. For water treatment options, discuss available treatment technologies that could be used, the water quality that could be achieved, as well as likely AZPDES permit requirements and whether they could be met."

We added further discussion of post-closure water quality management to section 3.7.2 of the FEIS.

Appendix R

| Comment response: WT1 Disclosed water use is incorrect and unrealistic | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1053-1, 1084-3, 1088-2, 1092-2, 1094-1, 1284-1, 1301-13, 1301-14, 1322-5, 1344-4, 1349-4, 1419-1, 1420-1, 1441-2, 1448-4, 1455-4, 1468-2, 1501-4, 151-2, 154-1, 1602-1, 224-1, 24-2, 255-1, 259-2, 263-3, 27848-3, 27916-2, 27993-1, 27995-3, 28093-5, 28106-3, 286-5, 298-1, 30065-4, 30143-6 (Emerman2), 30143-7 (Emerman2), 52-2, 5760-1, 67-4, 871-2, 910-3, F1-7, F2-5, F4-4, F6-5

The information presented in these comments is not factually accurate. Detailed comments related to this topic were submitted with comment letter #8032 in the form of a report from Dr. S. Emerman titled "Projected Consumption of Electricity and Water by the Proposed Resolution Copper Mine, Arizona." Based on estimates of per-ton water use by mines both globally and in Arizona, Dr. Emerman calculates that "predicted water consumption of the Resolution Copper Mine is 50,000 acre-feet per year."

The water balance of the mine is complex, and the DEIS discloses the water use of the mine in multiple places, including in chapter 2 (see "Water Use," DEIS, pp. 52–54); chapter 3, section 3.7.1 (see "Changes in Desert Wellfield Pumping"); and Appendix H, Further Details of Mine Water Balance and Use (appendix H of the DEIS).

There is no single water balance component that equals "predicted water consumption." We interpret the term "predicted water consumption" in the comment to mean water that is lost from evaporation, seepage, or shipping with concentrate and therefore cannot be captured and recycled. Similarly, "predicted water consumption" also equals the various sources of water supply that continually make up for this lost water, and this can be readily quantified. The "predicted water consumption" of the mine consists of three components:

1) By far the largest of these components is makeup water pumped from the Desert Wellfield in the East Salt River valley (for the preferred alternative, this water use ranges from 5,578 to 17,948 acre-feet per year (af/yr), depending on the project phase, and averages 13,289 acre-feet (af) over the 41-year period of active pumping; see DEIS, appendix H, p. H-8).

2) For consumptive use it would be reasonable to also add the dewatering from the East Plant Site (ranges from 1,298 to 2,118 af/yr, with an average of 1,715 af/yr; see DEIS, appendix H, p. H-2); and

3) The capture of precipitation at the tailings storage facility (for the preferred alternative, ranges from 1,110 to 1,865 af/yr, with an average of 1,678 af/yr; see DEIS, appendix H, p. H-4).

Thus, the "predicted water consumption" of the mine as disclosed in the DEIS averages 16,682 af/yr (13,289 af + 1,715 af + 1,678 af = 16,682 af/yr).

The point made by these public comments is that this disclosed water use (16,682 af/yr) is less than that predicted by Dr. Emerman from literature estimates (50,000 af/yr). The Emerman analysis was thoroughly examined and considered, and the results are included in the project record (see Garrett (2020c)). It should be noted that Emerman did not base his calculations on any of the information described above that is contained in the DEIS, but rather on the GPO (Resolution Copper 2016c).

A review of the same literature sources used by Dr. Emerman confirms the point made: Resolution Copper water use as disclosed is less than would be anticipated, based on other mines. However, Emerman fails to examine why this difference exists, but instead assumes it means the disclosure is flawed. As discussed in the review of the Emerman report (Garrett 2020c), the data sources used by Dr. Emerman fail to account for the type of tailings. Specifically, the Resolution Copper Project is using thickened tailings ranging from 50 to 65 percent solids, compared with 20 to 50 percent solids in a conventional tailings slurry (see DEIS, p. 50). The review of the Emerman report demonstrates that the water difference identified by Dr. Emerman is due to use of this technology (Garrett 2020c).

In other words, the Resolution Copper Project uses less water than other mines because the proponent has incorporated enhanced technology (thickening) in order to reduce water use.

Appendix R

| **Comment response: WT1_A**<br>Disclosed water use is incorrect and unrealistic; with addition for specific comment 30143-8 | Page 1 of 1 |
|---|---|

| **Responsive to these comments:**<br>30143-8 (Emerman2) |
|---|

See response WT1 for response to the estimates of water use contained in the Emerman report. In addition, see response WT24 for the response to the estimates of power use by the project in the Emerman report.

This comment is a summary of the points made by Dr. Emerman and poses a number of questions. The answers to these questions are as follows:

- Does Rio Tinto have a guarantee from SRP that they will supply power to the Resolution Copper Mine? Response: The power requirements estimated by Dr. Emerman are erroneous, as discussed in response WT24. In addition, as discussed in response WT24, SRP has conducted an independent load study for the project and concluded the following: "The total maximum combined load proposed by RC is 273 to 315 MW, which represents 3.7 to 4.3 percent of SRP's 2019 peak demand. SRP is well suited to provide the needed power just as it has done with other large power users across the state. SRP does not see any limitations to serving this load to the Project at the aforementioned sites, presuming the recommended system upgrades are implemented. With these system upgrades, there will be no impact on the neighboring customers as the Project site increase loads as per the estimated load levels" (1898 and Company 2020). Also note that information received since January 2021 using a different estimation technique has modified the anticipated power use, and this updated disclosure has been incorporated into chapter 2 of the FEIS.

- Why does Rio Tinto believe that the water consumption for the Resolution Copper Mine will be 10.2 percent of the average for copper mines in Arizona? Response: As discussed in response WT1, water use calculated for the Resolution Copper Mine is based on a thickened tailings slurry that differs from sources in the literature referenced by Dr. Emerman. Resolution Copper is investing in thickening technology specifically in order to reduce water use.

- Why does Rio Tinto believe that water consumption for the Resolution Copper Mine will be only 15,700 af/yr when the water exported with the tailings alone will be 25,600 af of water per year, according to the GPO? Response: This information is out of date. The disclosure and the analysis in the DEIS are based on updated information developed during the NEPA analysis, not the GPO from 2016. The actual amount of water exported with the tailings differs by alternative. For instance, for Alternative 2 this ranges from 5,820 af/yr to 20,810 af/yr (DEIS, appendix H, p. H-2). Dr. Emerman also disregards the amount of water that is reclaimed back to the process from the tailings storage facility. For instance, for Alternative 2 this ranges from 434 to 2,989 af/yr (DEIS, appendix H, p. H-4).

- What alternatives does Rio Tinto have for water supply if Rio Tinto cannot meet its promise to consume only 15,700 af of water per year? Even if Rio Tinto can fulfill its promise to consume only 15,700 af of water per year, how will Rio Tinto secure the shortfall of 35 percent of necessary water supply, as stated in the GPO? Response: Resolution Copper's water supply from the Desert Wellfield must be permitted through the ADWR; the Desert Wellfield is located within the Phoenix Active Management Area and is therefore subject to the requirement to obtain valid groundwater rights. This is true regardless of the amount of water Resolution Copper pumps from the Desert Wellfield.

Appendix R

| Comment response: WT1_B Disclosed water use is incorrect and unrealistic; with addition for specific comment 8031-50 | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8031-50

See response WT1 for response to the estimates of water use contained in the Emerman report.

This comment also refers back to the water use figures provided in the GPO (Resolution Copper 2016e) and indicates that the DEIS numbers differ. This is correct; the DEIS estimates of water use are based on actual tailings alternatives and do differ in a number of ways from the general estimates in the GPO. The comments also indicates that the DEIS "simply concludes with no analysis or support that for the life of the mine, '87,000 acre-feet of water would be pumped from the mine, and between 180,000 and 590,000 acre-feet of makeup water would be pumped from the Desert Wellfield in the East Salt River Valley.'"

It is incorrect to state that this conclusion is not supported. The quote from the comment is taken solely from the Executive Summary, with no reference to the rest of the analysis in the DEIS itself. The water balance for the mine is complex, and the DEIS, DEIS references, and the project record contain extensive analysis of the mine water balance. For instance, the DEIS discloses the water use of the mine in chapter 2 (see "Water Use," DEIS, pp. 52–54); chapter 3, section 3.7.1 (see "Changes in Desert Wellfield Pumping"); and Appendix H, Further Details of Mine Water Balance and Use (DEIS appendix H). These are based in turn on reference documents such as WestLand Resources Inc. (2018b).

| Comment response: WT2 Questions about total amount of water use | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1166-2, 1196-1, 1301-16, 1333-1, 7687-2, 8032-67

There is no single water balance component that equals "predicted water consumption." We interpret the term "predicted water consumption" used in the comment to mean water that is lost from evaporation, seepage, or shipping with concentrate and that cannot be captured and recycled. Similarly, "predicted water consumption" also equals the various sources of water supply that continually make up for this lost water, and this can be readily quantified. The "predicted water consumption" of the mine consists of three components:

(1) By far the largest of these components is makeup water pumped from the Desert Wellfield in the East Salt River valley (for the preferred alternative, this water use ranges from 5,578 to 17,948 af/yr, depending on the project phase, and averages 13,289 af over the 41-year period of active pumping; see DEIS, appendix H, p. H-8).

(2) For consumptive use it would be reasonable to add the dewatering from the East Plant Site (ranges from 1,298 to 2,118 af/yr, with an average of 1,715 af/yr; see DEIS, appendix H, p. H-2).

(3) The capture of precipitation at the tailings storage facility (for the preferred alternative, ranges from 1,110 to 1,865 af/yr, with an average of 1,678 af/yr; see DEIS, appendix H, p. H-4).

Thus, the "predicted water consumption" of the mine as disclosed in the DEIS averages 16,682 af/yr (13,289 af + 1,715 af + 1,678 af = 16,682 af/yr).

Appendix R

| Comment response: WT3 | |
|---|---|
| Amount of water use shown in Appendix H | Page 1 of 1 |

| Responsive to these comments: |
|---|
| 30078-22 |

The comment correctly restates and interprets the data shown in table 2.2-1 of the DEIS but does not correctly interpret the data in appendix H.

The numbers cited in the comment from appendix H, p. H-3, for Alternatives 2 and 6 are specifically for the combined inflow to the West Plant Site, which in turn consists of process makeup water (a combination of groundwater pumped from the Desert Wellfield and return flow from the filter plant) and tailings recycled water.

The numbers shown in table 2.2-1 only reflect the Desert Wellfield pumping. Both the process makeup water and Desert Wellfield pumping values shown in appendix H are consistent with table 2.2-1. For process makeup water, Alternative 2 (peak year = 13,757 af [p. H-2]) uses more than Alternative 6 (peak year = 11,779 af [p. H-3]). For Desert Wellfield pumping, Alternative 2 (peak year = 19,926 af [p. H-7]) uses more than Alternative 6 (peak year = 17,948 af [p. H-8]).

| Comment response: WT4 | |
|---|---|
| Water scarcity and competing water uses | Page 1 of 1 |

| Responsive to these comments: |
|---|
| 1054-1, 1068-3, 107-1, 107-2, 1083-4, 1090-2, 1093-2, 1110-2, 1117-1, 1128-11, 1140-2, 1150-8, 1161-2, 1189-1, 1189-2, 122-7, 1235-6, 1301-10, 1301-11, 1301-4, 1301-5, 1301-7, 1310-1, 1318-2, 1321-1, 1321-2, 132-4, 1335-3, 1338-9, 1358-4, 1359-4, 1360-15, 1374-1, 1381-1, 1383-1, 1389-13, 1464-1, 1464-2, 1538-2, 1540-10, 1540-8, 1544-7, 1919-1, 209-3, 233-3, 27978-1, 28449-54, 28561-2, 290-3, 291-2. 30064-2, 30066-2, 30078-15, 30078-16, 30078-17, 30078-18, 30078-36, 30079-3, 30079-4, 30138-1, 30147-6 (Powers), 356-2, 356-3, 392-1, 40-3, 410-1, 417-1, 437-3, 44-2, 452-2, 481-2, 506-1, 529-1, 533-2, 555-16, 555-17, 555-18, 557-1, 5727-2, 59-3, 5942-2, 595-1, 609-2, 612-1, 614-1, 624-1, 633-2, 639-1, 64-4, 669-3, 6950-1, 6984-2, 737-1, 747-1, 777-1, 8031-42, 8031-51, 8031-56, 8031-73, 8032-101, 8032-106, 8032-107, 8032-62, 8074-1, 8144-1, 82-5, 8320-1, 894-1, 897-3, 897-8, 899-3, 899-8, 900-3, 906-1, 943-2, 974-2, 979-3, F10-2 |

Groundwater use by the mine is regulated by the State of Arizona, not the Forest Service. The Arizona legal framework has been promulgated in order to balance competing uses of a finite resource, under a comprehensive framework of water rights and water use permits. The responsibility of the Forest Service under NEPA is to analyze and disclose the water use of the mine and disclose the anticipated effects on the environment caused by extraction and use of that water.

Numerous public comments raise the issue of water shortages due to overallocation, drought, and future meteorological trends. The DEIS addresses these issues in several sections, including the following: "Ongoing Climatic Trends Affecting Water Balance" (DEIS, p. 311); "Cumulative Effects – East Salt River Valley Water Supplies" (DEIS, p. 341); "Cumulative Effects – Recharge and Recovery Credits" (DEIS, p. 341); and "Cumulative Effects – Regional Water Supplies" (DEIS, p. 342). The DEIS concludes, "Cumulatively, the total demand on the groundwater resources in the East Salt River valley is substantial and could be greater than the estimated amount of physically available groundwater" (DEIS, p. 342).

The FEIS reaches similar conclusions; however, the cumulative effects analysis has been expanded in chapter 4 of the FEIS to quantify the cumulative effects of competing water uses in the region and the ramifications of ongoing drought or future meteorological trends.

12-RCMSER-2990

Appendix R

| Comment response: WT4_A Water scarcity and competing water uses; with addition for specific comment 1068-1; 30078-13 | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
1068-1, 30078-13

See response WT4 for the response to the general topic of water scarcity and competing water uses.

This comment also raises the issue of the use of long-term storage credits. With respect to the makeup water supply for the project, the intent of the analysis contained in the DEIS is to consider the maximum physical impacts that could be caused by the pumping. For this reason, the analysis models the physical extraction of all water from the Desert Wellfield, regardless of legal status: "The impacts from the Desert Wellfield that are described in this section are based on the physical removal of water from the aquifer as it exists today and are not a reflection of the legal availability of that groundwater" (DEIS, p. 342). Resolution Copper has obtained long-term storage credits equal to more than one-half of the planned water supply over the life of the mine (DEIS, p. 342). These long-term storage credits represent water that otherwise would have already been pumped from the aquifer; thus, from a regulatory viewpoint, ADWR does not consider pumping that recovers these credits to be "new" groundwater extraction. In the DEIS, the pumping of the full amount of groundwater was modeled without the regulatory context in order to ensure that physical impacts to the aquifer were not underrepresented.

With respect to the FEIS, (1) the pumping analysis continues to assume that all water is removed directly from the Desert Wellfield, without reduction from direct delivery, in order to not underestimate physical impacts to the aquifer; and (2) the cumulative effects analysis in chapter 4 of the FEIS has been expanded to quantify the cumulative effects of competing water uses in the region and the ramifications of ongoing drought or future meteorological trends.

Also note that these comments mention recent modeling of projected shortfalls in the Pinal Active Management Area conducted by the ADWR; the area for which this modeling was conducted does not extend as far north as the Desert Wellfield. However, because there is a hydrologic connection between the Pinal and Phoenix Active Management Areas, further analysis has been added to describe this connection and the potential overlap for drawdown predicted in each area.

| Comment response: WT4_B Water scarcity and competing water uses; with addition for specific comment 1379-3; 83-2; 8201-2; 461-2; 366-1 | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
1379-3, 366-1, 461-2, 8201-2, 83-2

See response WT4 for the response to the general topic of water scarcity and competing water uses.

Several comments claim that the amount of water use was not disclosed or cite incorrect water usage numbers.

With respect to the disclosure of water use, the water balance of the mine is complex, and the DEIS discloses the water use of the mine in multiple places, including in chapter 2 (see "Water Use," DEIS, pp. 52–54); chapter 3, section 3.7.1 (see "Changes in Desert Wellfield Pumping"); and Appendix H, Further Details of Mine Water Balance and Use (DEIS appendix H). There is no single water balance component that equals "predicted water consumption." We interpret the term "predicted water consumption" used in the comment to mean water that is lost from evaporation, seepage, or shipping with concentrate and that cannot be captured and recycled. Similarly, "predicted water consumption" also equals the various sources of water supply that continually make up for this lost water, and this can be readily quantified. The "predicted water consumption" of the mine consists of three components:

(1) By far the largest of these components is makeup water pumped from the Desert Wellfield in the East Salt River valley (for the preferred alternative, this water use ranges from 5,578 to 17,948 af/yr, depending on the project phase, and averages 13,289 af over the 41-year period of active pumping; see DEIS, appendix H, p. H-8).

(2) For consumptive use it would be reasonable to add the dewatering from the East Plant Site (ranges from 1,298 to 2,118 af/yr, with an average of 1,715 af/yr; see DEIS, appendix H, p. H-2), and

(3) The capture of precipitation at the tailings storage facility (for the preferred alternative, ranges from 1,110 to 1,865 af/yr, with an average of 1,678 af/yr; see DEIS, appendix H, p. H-4).

Thus, the "predicted water consumption" of the mine as disclosed in the DEIS averages 16,682 af/yr (13,289 af + 1,715 af + 1,678 af = 16,682 af/yr).

See also response WT1 for more discussion about incorrect estimates for mine water use.

Appendix R

| Comment response: WT4_C<br>Water scarcity and competing water uses; with addition for specific comment 1454-12 and 6419-21 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1454-12 | |

See response WT4 for the response to the general topic of water scarcity and competing water uses.

These comments incorrectly assert that no analysis of the impact on the local area from the pumping was contained in the DEIS. The analysis of groundwater drawdown in the vicinity of the Desert Wellfield is provided in section 3.7.1 of the DEIS (see specifically figure 3.7.1-2, and pp. 335–340 (changes in the Desert Wellfield by alternative)). The analysis of groundwater drawdown in the vicinity of the mine site is also contained in section 3.7.1 of the DEIS (see specifically figure 3.7.1-3 and all of section 3.7.1.4, which looks at impacts to GDEs and water supplies from groundwater drawdown).

| Comment response: WT4_D<br>Water scarcity and competing water uses; with addition for specific comment 1463-1 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1463-1 | |

See response WT4 for the response to the general topic of water scarcity and competing water uses.

The comment states, "I think it would be valuable to the public if there was more of a discussion on the potential impact there may be at these sites." This appears to refer to riparian areas where mitigation would be applied.

Discussion of the impacts to these areas is found in the DEIS in the following places: table 3.7.1-3 (see specifically the footnote for types of riparian impacts anticipated: "reduction or loss of spring/stream flow, increased mortality or reduction in extent or health of riparian vegetation, and reduction in the quality or quantity of aquatic habitat from loss of flowing water, adjacent vegetation, or standing pools"); p. 329 (anticipated impacts on Devil's Canyon); p. 329 (anticipated impacts on springs); pp. 329–332 (anticipated impacts on Queen Creek); and pp. 333–334 (longer term anticipated impacts on springs, Queen Creek, Devil's Canyon, Telegraph Canyon, and Arnett Creek).

Also see response WT8 for more details about riparian impacts contained in the DEIS.

| Comment response: WT4_E<br>Water scarcity and competing water uses; with addition for specific comment 1468-4 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1468-4 | |

See response WT4 for the response to the general topic of water scarcity and competing water uses.

The comment asks, "Has the impact of the reduction in the water table on the ability of the surrounding areas to provide adequate water for development been factored into the financial impact of this project?" We have added a discussion of the financial impacts of changes to the water supply to the socioeconomics section of the FEIS (section 3.13).

Appendix R

| Comment response: WT4_F<br>Water scarcity and competing water uses; with addition for specific comment 8031-55; 8031-57; 8032-108 | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8031-55, 8031-57, 8032-108

See response WT4 for the response to the general topic of water scarcity and competing water uses.

These comments criticize the lack of inclusion of the drought contingency plan in the cumulative effects analysis. This criticism is based on an incorrect assumption.

We evaluated the drought contingency plan as a potential RFFA. Our cumulative effects analysis in the DEIS consisted of three documented steps:

- First, a list of any and all potential RFFAs was compiled from available sources, including public scoping, internal scoping, news media, and the Forest Service Schedule of Proposed Actions. These potential RFFAs were screened for temporal overlap and to ensure that sufficient detail existed to allow for analysis. The results of this screening are detailed in "Process Memorandum to File – Determination of Reasonably Foreseeable Actions Considered in Cumulative Effects Analysis" (Rigg and Morey 2018).
- Second, for those RFFAs that passed the initial screening and for other key RFFAs raised specifically after the initial screening, a more complete resource-by-resource assessment of spatial overlap was conducted. The results of this screening are provided in "Process Memorandum to File – Cumulative Effects Analysis" (SWCA Environmental Consultants 2018a).
- Third, the analysis of cumulative effects for all RFFAs that passed both screenings was provided in chapter 3 of the FEIS, in each of the appropriate resource sections.

The assessment of the drought contingency plan can be found in SWCA Environmental Consultants (2018a). (Note that this process memorandum is a compilation of worksheets and does not have useful page numbering; the drought contingency plan can be found on p. 68 of the PDF file). The drought contingency plan was not analyzed because there is no temporal overlap with the Resolution Copper Project: "Although an important reasonably foreseeable future action, the DCP is statutorily set to expire in December 2026. A new water management plan for the seven Colorado River basin states and Mexico will replace it, but work on this new plan has not yet begun. . . . Overall conclusion: It is unlikely that any of the provisions of the DCP will be in effect when (or if) the Resolution Mine becomes operational, which is not likely to occur before 2026-2027. No information exists as to what any new water management plan that will replace it will entail. This analysis therefore presumes no cumulative effects can be established between the Resolution Mine project and the DCP."

Despite the fact that the drought contingency plan itself could not be analyzed, we expanded the FEIS cumulative effects analysis (chapter 4 of the FEIS) to quantify the cumulative effects of competing water uses in the region and the ramifications of ongoing drought or future meteorological trends.

Appendix R

| Comment response: WT4_G<br>Water scarcity and competing water uses; with addition for specific comment 83-1, 59-4, 562-4 | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
562-4, 59-4, 83-1

See response WT4 for the response to the general topic of water scarcity and competing water uses.

These comments specifically mention the planned Superstition Vistas development area in the East Salt River valley. We evaluated these developments as a potential RFFA. See response WT4_F for more details about the steps of the cumulative effects analysis.

The assessment of Superstition Vistas can be found in (SWCA Environmental Consultants 2018a). (Note that this process memorandum is a compilation of worksheets and does not have useful page numbering; Superstition Vistas can be found on p. 33 of the PDF file.) Superstition Vistas was not analyzed as a standalone RFFA because insufficient detail exists: "Development of any or all of these projects depends on numerous factors, including public demand for new housing and commercial facilities in the area as well as necessary roads, bridges, and water and electrical and other infrastructure and services; favorable market conditions; municipal government approval of planning and individual development designs; and innumerable other factors. It is considered too speculative to estimate if, when, or to what extent development may occur in these areas."

However, we still incorporated the future growth in the Superstition Vistas planning area conceptually. One RFFA carried into the cumulative effects analysis was "Future Assured Water Supplies" (SWCA Environmental Consultants 2018a:76). This RFFA includes more general impacts, as well: "Note that this RFFA is combined with the overall use of water resources and development in the East Salt River valley, which are assessed together for cumulative effects." The resulting analysis is disclosed in section 3.7.1 (DEIS, pp. 341–342).

Note that we expanded the FEIS cumulative effects analysis (chapter 4) to quantify the cumulative effects of competing water uses in the region and the ramifications of ongoing drought or future meteorological trends. This includes the Superstition Vistas development.

Since January 2021, a portion of the Superstition Vistas development area has been auctioned off, and a specific development is planned. This change is discussed in chapter 4.

| Comment response: WT4_H<br>Water scarcity and competing water uses; with addition for specific comment 30078-19 | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
30078-19

See response WT4 for the response to the general topic of water scarcity and competing water uses.

This comment indicates that the level of analysis conducted for cumulative effects is not sufficient under NEPA.

In response to comment, the cumulative effects analysis has been expanded and reformatted in the FEIS. The FEIS contains a reworked cumulative effects analysis (chapter 4) that takes a more quantitative approach whenever possible. This includes the cumulative impacts in the East Salt River valley. After consultation with the ADWR, additional modeling has been conducted to quantify the combined impact of future regional water use with the Resolution Copper Project Desert Wellfield pumping, including approved assured water supplies and extraction of all accumulated long-term storage credits. The quantitative results of this model are included in section 3.7.1 and chapter 4 of the FEIS.

12-RCMSER-2994

Appendix R

| Comment response: WT4_I<br>Water scarcity and competing water uses; with addition for specific comment 8032-100 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>8032-100 | |

See response WT4 for the response to the general topic of water scarcity and competing water uses.

This comment states, "The DEIS (p. 335) states that 'the amount of groundwater in storage in the East Salt River valley subbasin (above a depth of 1,000 feet) is estimated to be about 8.1 million acre-feet.' The amount of water in storage (meaning in water storage facilities) is NOT the same thing as the amount of water which actually exists in the subbasin."

This is an incorrect reading of the DEIS. The value of 8.1 million af refers to the amount of groundwater physically existing in the basin above a depth of 1,000 feet. It does not refer to the amount of water stored in permitted water storage facilities.

| Comment response: WT4_J<br>Water scarcity and competing water uses; with addition for specific comment 1499-2 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1499-2 | |

See response WT4 for the response to the general topic of water scarcity and competing water uses.

This comment states, "Resolution Copper essentially gave up on modeling the impacts on groundwater resources from the Desert Wellfield withdrawals claiming it is too difficult to foresee."

The comment is not correct. We evaluated the modeling results from the Desert Wellfield impacts analysis as the basis for our disclosure of impacts in the DEIS. The analysis of groundwater drawdown in the vicinity of the Desert Wellfield is contained in section 3.7.1 of the DEIS (see specifically figure 3.7.1-2 and pp. 335–340 (changes in the Desert Wellfield by alternative)).

| Comment response: WT4_K<br>Water scarcity and competing water uses; with addition for specific comment 6419-2 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>6419-2 | |

See response WT4 for the response to the general topic of water scarcity and competing water uses.

This comment states, "Dewatering the pit may also have unintended consequences on local groundwater as the analysis conducted by Resolution Copper failed to determine the source of water that would have to be removed and managed."

This is an incorrect statement. The proposed mine is not an open-pit mine.

Assuming the comment may be referring to the underground mine infrastructure in the block-cave zone, this is still an incorrect statement. Analysis of groundwater drawdown in the vicinity of the mine site is also contained in section 3.7.1 of the DEIS (see specifically figure 3.7.1-3 and all of section 3.7.1.4, which looks at impacts to GDEs and water supplies from groundwater drawdown).

| Comment response: WT4_L<br>Water scarcity and competing water uses; with addition for specific comment 52-3 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>52-3 | |

See response WT4 for the response to the general topic of water scarcity and competing water uses.

This comment states, "The DEIS says that this would cause the ground to collapse as much as 10 feet."

This is an incorrect statement. The DEIS acknowledges the potential for ground subsidence but makes no specific predictions. See response WT10 for more details about subsidence impacts.

12-RCMSER-2995

Appendix R

| Comment response: WT6<br>Ramifications of geothermal water | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
1068-4, 1235-5, 1301-1, 1468-3, 151-3, 28605-1, 290-2, 29444-2, 30142-1 (Emerman1), 30142-2 (Emerman1), 30142-3 (Emerman1), 30142-4 (Emerman1), 30142-5 (Emerman1), 30142-6 (Emerman1), 30142-7 (Emerman1), 30143-1 (Emerman2), 30147-9 (Powers), 356-5, 452-4, 567-2, 5885-2, 6097-1, 669-2, 8000-2, 8032-299, 8032-300, 8032-88, F10-4

These comments suggest that Resolution Copper is underestimating the amount of groundwater required to be removed in order to dewater the mine infrastructure. These same comments also focus on the temperature of the water, suggesting that the cooling requirements have not been properly taken into account by the design. These comments have been made by multiple commenters but are handled in the most detail in two technical reports (attached to comment letter #8032 as B2 and B3) authored by Dr. S. Emerman.

The Forest Service explored the issues raised in these two reports and documented the review (Garrett 2020c). This review found that the information compiled by Dr. Emerman is quoted correctly from sources and is factual as applied to the specific location and experience of constructing Shaft 10.

However, Dr. Emerman has then extrapolated these facts to the project as a whole, based primarily on review of the GPO (Resolution Copper 2016c), rather than on the documents used in the NEPA analysis. When taken in the context of the entire project and all other available information, the conclusions drawn by Dr. Emerman are not valid. Four specific considerations that led to this conclusion are discussed in detail in Garrett (2020c).

The Forest Service also determined that the temperature data were not unexpected or unanticipated and that the high temperatures have been assumed in the support documents and incorporated into both the design and the analysis (Garrett 2020c).

| Comment response: WT6_A<br>Ramifications of geothermal water; with addition for specific comment 28930-2 | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
28930-2

See response WT6 for the response to the general topic of geothermal water.

The comment states that there has not been a geotechnical study or a cultural resource study conducted for the preferred alternative (Alternative 6 – Skunk Camp).

With respect to cultural resources, this is not factually correct. As noted on p. 635 of the DEIS, almost all the land in this alternative was surveyed before the DEIS was prepared: "Please note that portions of the proposed pipeline corridors for the Skunk Camp alternative have not been completely surveyed. At this time, 16,049 acres (96 percent) of the alternative has been surveyed for Alternative 6 and the north pipeline route option, and 16,559 acres (96 percent) has been surveyed for Alternative 6 and the south pipeline route option." These surveys are now fully complete and have been consulted on with the Arizona SHPO, as required under Section 106 of the NHPA.

With respect to the geotechnical study, the comment is correct that this had not been completed as of the time of publication of the DEIS. The Forest Service obtained the results in late 2019 from Resolution Copper. These results are reflected in the FEIS (see section 3.2 for an overview) and in fact formed a key part of the collaborative review of tailings safety that occurred in February 2020 (the FMEA, described in section 3.10.1 of the FEIS).

Appendix R

| **Comment response: WT7**<br>Refined analysis for water quality for the preferred alternative (Alternative 6 – Skunk Camp) | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
103-2, 1084-5, 1128-9, 1157-1, 1158-32, 1158-33, 1158-41, 1540-11, 28449-52, 30075-41, 30078-34, 30078-35, 524-4, 555-11, 555-13, 555-15, 555-23, 66-3, 7690-2, 8031-64, 8032-251, 8032-252, 8032-84, 8237-1

These comments express concerns for water quality in general. Potential surface water and groundwater quality impacts have been fully analyzed and disclosed in the DEIS. See response WT48 for more details.

Many of these comments are specifically concerned with the preferred alternative (Alternative 6 – Skunk Camp) and the potential downstream water quality impacts to residents along Dripping Spring Wash or water supplies farther downstream, such as Winkelman or Hayden.

The analysis of potential impacts to surface water and groundwater quality associated with the preferred alternative was refined and is presented in section 3.7.2 of the FEIS. The updated analysis is supported by additional baseline hydrologic investigations, aquifer testing, and additional groundwater and surface water quality samples. The results disclosed in the FEIS are similar to those in the DEIS. The concentrations of contaminants due to the seepage from the Alternative 6 tailings storage facility are not anticipated to exceed numeric water quality standards.

| **Comment response: WT8**<br>Riparian analysis and mitigation | Page 1 of 2 |
|---|---|

**Responsive to these comments:**
1219-2, 1322-6, 1501-5, 1544-10, 27681-3, 27755-2, 27955-3, 27995-4, 27996-3, 28093-4, 28093-6, 28106-4, 30075-25, 30075-3, 30075-5, 30075-50, 30075-52, 30075-7, 30075-8, 8031-46, F6-6

These comments generally indicate that riparian habitats have not been adequately analyzed in the DEIS.

We consider the analysis of impacts to riparian habitats to be thorough and complete. A number of these comments indicate a lack of awareness of the substantial background information, either in the project record or cited as DEIS references, that contributed to the analysis statements contained in the DEIS.

There is no expectation that all information available has to appear in the EIS itself. Forest Service NEPA regulations indicate, "Material may be incorporated by reference into any environmental or decision document. This material must be reasonably available to the public and its contents briefly described in the environmental or decision document" (36 CFR 220.4(h)).

The analysis of riparian areas and potential impacts appears in the following places in the DEIS:

- Section 3.3, amount of riparian vegetation and xeric riparian vegetation removed by each alternative (DEIS, pp. 176–178)
- Section 3.3, desired future conditions from the Tonto National Forest for riparian and xeric riparian areas, the potential to meet these conditions after reclamation, and the amount of time needed to meet these conditions (DEIS, pp. 186, 188–190, and 200)
- Section 3.3, anticipated impacts to riparian vegetation extent and health due to water quantity and quality impacts (DEIS, p. 196)
- Section 3.7.1, descriptions of GDEs, including riparian areas (DEIS, pp. 312–317)
- Section 3.7.1, impacts to GDEs, including riparian areas, due to dewatering from the project (DEIS, pp. 317–340)
- Section 3.7.1, cumulative impacts to GDEs, including riparian area (DEIS, pp. 340–342)
- Section 3.7.1, mitigation, mitigation effectiveness, and unavoidable adverse effects on GDEs (DEIS, pp. 342–345)
- Section 3.7.3, amount of wetlands (defined under the National Wetlands Inventory) impacted (DEIS, pp. 435–444)
- Section 3.7.3, amount of jurisdictional wetlands (defined under Section 404 of the CWA) impacted (DEIS, pp. 435–444)
- Section 3.7.3, impact of changes in geomorphology on GDEs, including riparian vegetation (DEIS, pp. 433–434)

Appendix R

| Comment response: WT8 | |
|---|---|
| Riparian analysis and mitigation | Page 2 of 2 |

**Responsive to these comments:**
1219-2, 1322-6, 1501-5, 1544-10, 27681-3, 27755-2, 27955-3, 27995-4, 27996-3, 28093-4, 28093-6, 28106-4, 30075-25, 30075-3, 30075-5, 30075-50, 30075-52, 30075-7, 30075-8, 8031-46, F6-6

- Section 3.7.3, impact of reductions in storm flow on surface water systems supporting vegetation (DEIS, pp. 435–444)
- Section 3.8, impact on special habitat areas supporting wildlife, including riparian (DEIS, pp. 452 and 459–461)
- Section 3.8, impact to specific species groups, including impacts of low-elevation riparian loss on MIS (DEIS, pp. 461–463 and 472)
- Section 3.8, impact to threatened and endangered species from riparian zone impacts (DEIS, pp. 473–476)
- Section 3.10.1, potential to impact riparian areas from tailings storage facility or pipeline failures (DEIS, pp. 527–534 and 540–543)

In addition to these, there are a number of reference documents that contain more detail on these riparian areas. Key documents include the following (all of which were available for public review of the website at the time of release of the DEIS):

- DEIS reference "Summary and Analysis of Groundwater-Dependent Ecosystems" (Garrett 2018e)
- DEIS reference "Spring and Seep Catalog Resolution Copper Project Area Upper Queen Creek and Devils Canyon Watersheds, Version 2.0" (WestLand Resources Inc. and Montgomery and Associates Inc. 2018)
- DEIS reference "Surface Water Baseline Addendum: Upper Queen Creek, Devils Canyon, and Mineral Creek Watersheds" (Montgomery and Associates Inc. 2017d)
- DEIS reference "2017 Oak Flat Surface Water Monitoring Program" (Montgomery and Associates Inc. 2017a)

Note: we added further description of riparian impacts to the FEIS, including potential impacts to landowners from drawdown (section 3.13), the results of Section 7 consultation on threatened and endangered species (section 3.8), and further descriptions of the types of riparian impacts that could occur (section 3.7.1).

| Comment response: WT8_A | |
|---|---|
| Riparian analysis and mitigation; with addition for specific comment 1107-5 | Page 1 of 1 |

**Responsive to these comments:**
1107-5

See response WT8 for the response to the topic of inadequate riparian analysis in the DEIS.

Potential impacts to water rights are described in section 3.7.1 (DEIS, pp. 332–333). Also see response NEPA14 for more discussion of water rights impacts.

12-RCMSER-2998

Appendix R

| **Comment response: WT9**<br>Pumping from MARRCO corridor | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8031-52, 8032-102

This comment indicates that "impacts of activities in the desert wellfield (MARRCO corridor) including water pumping have not been fully considered . . . . Future activity in the MARRCO corridor includes at least the drilling of several dozen wells, construction of major power line infrastructure, new pump stations, grading and sloping, access roads, and an additional 50-foot easement (DEIS, appendix G, p. G-10), all of which are major connected actions as defined in 40 C.F.R. § 1508.25, and which should have been fully analyzed in this DEIS."

All impacts within the MARRCO corridor were included in the DEIS:

- With respect to ground disturbance, the entire footprint of the MARRCO corridor was incorporated into all analysis in the DEIS with an assumption of 100 percent disturbance, as described in chapter 2 (DEIS, p. 38). This ground disturbance incorporates many impacts found in the analysis of soils (section 3.3), vegetation (3.3), and wildlife habitat (section 3.8).
- Noise impacts along the MARRCO corridor are in section 3.4 (DEIS, pp. 227–232).
- Transportation impacts related to activities along the MARRCO corridor are in section 3.5 (DEIS, pp. 254–269).
- Air quality impacts related to activities along the MARRCO corridor are in section 3.6 (DEIS, pp. 284–291). Note also that more detailed impacts are found in the DEIS references for air quality, such as Air Sciences Inc. (2019b).
- Impacts from the pumping of the Desert Wellfield are specifically analyzed in section 3.7.1 (DEIS, pp. 325–340).
- Recreation impacts related to the MARRCO corridor, particularly the crossing of the Arizona National Scenic Trail, are analyzed in section 3.9 (DEIS, pp. 498–509).
- Potential impacts caused by rupture of a concentrate pipeline along the MARRCO corridor are analyzed in section 3.10.1 (DEIS, pp. 538–554).

| **Comment response: WT10**<br>Subsidence analysis | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1177-2, 30078-50, 30078-51, 46-1, 555-20, 8031-53, 8032-103, 8032-79

These comments concern the analysis of potential land subsidence in the East Salt River valley caused by pumping from the Desert Wellfield. The analysis of land subsidence is found in section 3.7.1 (DEIS, p. 334). Note that this short summary is not the sole analysis of land subsidence. Further description can be found in Newell and Garrett (2018d), and further references are provided in the project record.

There is no expectation that all information available has to appear in the EIS itself. Forest Service NEPA regulations indicate, "Material may be incorporated by reference into any environmental or decision document. This material must be reasonably available to the public and its contents briefly described in the environmental or decision document" (36 CFR 220.4(h)).

Based on comments on the DEIS, we have included additional analysis of land subsidence in section 3.7.1 of the FEIS. We also have included a new discussion of the regional water supply and competing water uses in a new cumulative effects chapter in the FEIS (chapter 4).

Several of these comments note the lack of mitigation proposed for pumping impacts from the Desert Wellfield. This is a correct statement. Mitigation is not a regulatory requirement for pumping impacts properly permitted by the ADWR, nor is it within the jurisdiction of the Forest Service to require it for pumping impacts off of NFS lands. Further, Resolution Copper has not brought forth voluntary mitigation for impacts to nearby well owners or property owners.

A specific comment was made that MODFLOW could be used to quantitatively estimate the contribution of the Desert Wellfield to subsidence. This specific issue was brought forward to the Water Resources Workgroup (reconvened in January 2020 to assist the Forest Service in reviewing and addressing comments on the DEIS) and explored by the NEPA team. We found that the ADWR Salt River valley model, which is based on MODFLOW, is a sufficient tool to estimate the contribution of the Desert Wellfield to subsidence in the East Salt River valley, when considered alongside historic data (Walser 2020b).

Appendix R

| **Comment response: WT12**<br>Analysis of impacts in the San Tan area | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1342-5, 1544-9, 29-6, 42-1 | |

These comments indicate that analysis of dewatering impacts—either at the mine site or in the East Salt River valley near the Desert Wellfield—is missing from the FEIS. This is not a correct statement.

The analysis of dewatering impacts from the mine site is found in section 3.7.1, including the analysis of potential impacts on springs and seeps, perennial waters, riparian areas, and water supplies (DEIS, pp. 317–340). This includes the analysis of mitigation meant to offset these impacts (DEIS, pp. 342–344).

The analysis of dewatering impacts in the San Tan area (East Salt River valley) from pumping at the Desert Wellfield is also found in section 3.7.1 (DEIS, pp. 317–340). No mitigation is pertinent to this pumping, but substantial discussion of the cumulative impacts on the regional water supplies in this area is also found in section 3.7.1 (DEIS, pp. 340–342).

Based on comments on the DEIS, we have included a necessary new discussion of the regional water supply and competing water uses in a new cumulative effects chapter in the FEIS (chapter 4).

| **Comment response: WT14**<br>Long-term storage credits | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1540-9, 49-1 | |

The use of long-term storage credits by Resolution Copper is discussed in chapter 2 (DEIS, p. 59), in section 3.7.1 as part of "Applicant-Committed Environmental Protection Measures" (DEIS, pp. 327–328), and in section 3.7.1 as part of the cumulative effects analysis (DEIS, pp. 340–342). Based on comments on the DEIS, we have expanded the discussion of the regional water supply and competing water uses in the reformatted cumulative effects chapter in the FEIS (chapter 4). This refined cumulative effects analysis includes the cumulative impact caused by the removal of all currently held long-term storage credits in the East Salt River valley, in addition to the removal of water by Resolution Copper for the mine. See also response WT4_A for more discussion of the analysis of long-term storage credits.

One comment notes the lack of mitigation proposed for pumping impacts from the Desert Wellfield. This is a correct statement. Mitigation is not a regulatory requirement for pumping impacts properly permitted by the ADWR, nor is it within the jurisdiction of the Forest Service to require it for pumping impacts off of NFS lands. Further, Resolution Copper has not brought forth voluntary mitigation for impacts to nearby well owners or property owners.

| **Comment response: WT15**<br>Pumping impacts | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1158-38 | |

This comment notes, "The DEIS states, 'Drawdown from 10 to 30 feet is anticipated in wells in the Superior area.' It assumed that this estimate is an addition to the drawdown that has occurred already as a result of dewatering in the #9 and #10 shafts at Oak Flat."

To clarify, the quote from the DEIS that is referenced in the comment represents the impact anticipated from the no action alternative. These anticipated drawdowns are indeed in addition to any drawdown that has occurred in the past due to Resolution Copper dewatering pumping. The amount of drawdown that has already occurred near Superior is also disclosed in section 3.7.1 (DEIS, p. 309; see wells DHRES-03, -04, -05, and -16).

12-RCMSER-3000

Appendix R

| **Comment response: WT16**<br>Long-term trends beyond 200 years | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1321-4, 30075-2, 8032-90

These comments indicate that the use of the 200-year threshold for assessing impacts is inappropriate. These comments misconstrue the analysis contained in the DEIS.

The choice to restrict the groundwater modeling analysis to 200 years was arrived at after discussions with the Groundwater Modeling Workgroup (DEIS, p. 300). This time frame is applicable only to quantitative impacts. As noted in the DEIS, "Even if quantitative results are unreliable at long time frames, the general trends in modeled groundwater levels can indicate whether the drawdown or impact reported at 200 years represents a maximum impact, or whether conditions might still worsen at that location. These trends are qualitatively explored, regardless of time frame" (DEIS, p. 300).

This qualitative exploration of long-term trends beyond 200 years is also contained in section 3.7.1 (DEIS, p. 325, no action alternative; and pp. 333–334, action alternatives).

Long-term trends were also quantitatively used in the analysis of whether a lake would develop in the subsidence crater (DEIS, pp. 375–379). See response WT36 for details about how the subsidence lake analysis has been modified in response to comments.

| **Comment response: WT17**<br>Insufficient analysis of water quantity impacts in Queen Creek | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
30075-29

This comment notes that "full discussion and disclosure of the environmental effects on Queen Creek caused by the Propose Action requires an analysis of all combined stressors (mine dewatering; the block cave zone; loss of runoff in the subsidence area)," along with the effects of future meteorological trends.

All of these impacts have been analyzed in the DEIS for Queen Creek. Mine dewatering and block-cave zone impacts are analyzed in section 3.7.1 (DEIS, pp. 317–340). Loss of runoff to Queen Creek from the subsidence zone is analyzed in section 3.7.3 (DEIS, pp. 427–444).

The comment indicates that any drawdown impacts should be looked at in tandem with impacts to surface runoff. This indeed was done in the DEIS for those GDEs experiencing both impacts. For instance, see analysis of Devil's Canyon in section 3.7.1 (DEIS, p. 329), which concludes, "Percent reductions in average annual flow due to the subsidence area range from 5.6 percent in middle Devil's Canyon to 3.5 percent at the confluence with Mineral Creek; percent reductions during the critical low-flow months of May and June are approximately the same. Combined with loss from spring DC-6.6W due to groundwater drawdown, total estimated flow reductions along the main stem of lower Devil's Canyon caused by the proposed project could range from 5 to 10 percent."

Queen Creek does not experience effects from both drawdown and runoff like Devil's Canyon. As described in the DEIS, only impacts from surface runoff are likely (DEIS, pp. 329–332).

The effects of future meteorological trends have been considered in both the groundwater and surface water analysis, as discussed in the section titled "Ongoing Meteorological Trends Affecting Water Balance" in section 3.7.1 (DEIS, p. 311) and in the section titled "Climate Conditions" in section 3.7.3 (DEIS, pp. 426–427). For groundwater drawdown, effects of future meteorological trends were incorporated into the groundwater modeling itself as one of the sensitivity analyses modifying the amount of recharge to the system (see September 2018 groundwater workgroup notes (Morey 2018e), Action Item 89, and Meza-Cuadra et al. (2018c)).

The impact of future meteorological trends on surface runoff is not readily predicted in ephemeral systems or perennial systems without reliance on snowmelt: "While future projected temperature increases are anticipated to change mean annual precipitation to a small degree, the majority of changes to annual flow in the Lower Colorado River basin are related to changes in runoff timing. Increased temperatures are expected to diminish the accumulation of snow and the availability of snowmelt, with the most substantial decreases in accumulation occurring in lower elevation portions of the basin where cool season temperatures are most sensitive to warming (Dugan 2018)" (DEIS, p. 427).

We have added a comprehensive discussion of future meteorological trends to chapter 4 of the FEIS to incorporate all of the different resources in one location.

12-RCMSER-3001

Appendix R

| Comment response: WT19 Water rights | Page 1 of 1 |
|---|---|
| Responsive to these comments: 1540-5, 30078-26, 30078-47, 30078-48, 555-19 | |

The comments purport that project activities may result in impacts to surface water rights. Comments involving the Winters doctrine and Federal reserved water rights are also discussed in response NEPA14.

Several comments indicate that groundwater pumping by wells in the Desert Wellfield in the Salt River valley has not been considered for surface water impacts under the General Stream Adjudication of the Gila River. As noted in section 3.7.1, drawing firm conclusions about impingement on surface water right holders is problematic: "Goals of the adjudication include clarifying the validity and priority of surface water rights and providing a clear legal framework for when groundwater withdrawals would impinge on surface water rights. The adjudication has been underway for several decades, and while progress has been made, many issues remain unresolved, including any prioritization or validation of water rights in the analysis area" (DEIS, p. 332). The DEIS then concludes that while physical loss to these springs is disclosed, "impact on any surface water rights from a legal or regulatory standpoint cannot yet be determined due to the ongoing adjudication" (DEIS, p. 332).

However, for the case of the Desert Wellfield, these same difficulties are not present. As noted in the DEIS, "Current depths to groundwater in the vicinity of the Desert Wellfield range from 400 to 600 feet below ground surface" (DEIS, p. 310). While it is correct that groundwater pumping can in some cases be legally considered surface water under the General Stream Adjudication, usually these wells are located quite close to surface waters, pull water from the same aquifer as the surface water (usually young alluvium), and have relatively shallow groundwater levels because of this. The Desert Wellfield is located roughly 4 miles from Queen Creek (typically ephemeral at this location), 10 miles from the Gila River (typically ephemeral at this location), and 25 miles from the Salt River, with groundwater levels hundreds of feet below the ground surface. There is no reasonable expectation that any of the groundwater pumping wells would impact surface water rights.

There are also pumping wells associated with the seepage collection ponds at the tailings storage facilities. These are similarly unlikely to impact surface water rights. Even the closest alternative tailings storage facility locations (Alternatives 2 and 3) are located several miles from the nearest flowing surface waters, and these wells are intended to capture and control seepage, which represents water being added to the aquifer. These wells are not intended to substantially dewater the aquifer from its current state.

As noted in section 3.7.3 of the DEIS, surface water flows will also be reduced, due to either the subsidence crater (a permanent reduction) or the tailings storage facility stormwater control (reduction only during operations).

With respect to subsidence crater impacts, through mitigation these flows would be returned to Queen Creek. This new mitigation is described in section 3.7.1 and appendix J (see mitigation measure FS-WR-04) of the FEIS.

With respect to the tailings stormwater controls, typically, sequestration and control of stormwater from development in upland areas are not considered under the General Stream Adjudication, with exceptions for diversions in active channels such as stock tanks. For Alternatives 5 and 6, there would be temporary, operational, reductions in stormwater delivered to the Gila River (DEIS, pp. 437–444). As with impacts to springs, while physical impacts to surface flow can be disclosed, impacts to any surface water rights from a legal or regulatory standpoint cannot be determined unless stormwater controls are considered to be appropriate for consideration under the General Stream Adjudication or other water rights proceedings. This includes any impacts to downstream water rights holders on the Gila River, including the San Carlos Irrigation and Drainage District, which lies beyond the groundwater and surface water analysis area but diverts surface water from the Gila River near Florence.

Additional discussion was added to section 3.7.3 of the FEIS on surface water rights.

One comment also discusses the inconsistency of spring loss from the project with Forest Service groundwater policy. The Forest Service has multiple mandates expressed by Congress through a number of laws. The appropriate execution of these mandates is further detailed in regulation and in policy documents (like Forest Service Handbook issuances). Where conflicts occur, the Forest Service must balance these mandates when arriving at a decision.

Appendix R

| Comment response: WT20 Potential inconsistency | Page 1 of 1 |
| --- | --- |

**Responsive to these comments:**
1158-34

This comment identifies a potential inconsistency in reported drops in water levels near Superior.

The first mention of a drop of "50 feet since 2009" is found on p. 306 of the DEIS, as noted in the comment. This reference is specific to the values shown in table 3.7.1-1, which looks at four specific wells that are representative of water levels in the deep groundwater system outside the Resolution Graben.

The second mention of a drop of "20 to 90 feet since 2009" is found on p. 312 of the DEIS, as noted in the comment. This reference is meant to be a more encompassing statement—not specific to the four specific wells in table 3.7.1-1, but representative of all water levels monitored around Superior.

| Comment response: WT21 Water sources analyzed; inadequate analysis of water drawdown impacts | Page 1 of 2 |
| --- | --- |

**Responsive to these comments:**
1158-52, 1301-15, 8032-297, 8032-97, 8032-98

This comment notes perceived inadequacies in the analysis of water sources and impacts.

The first comment is regarding water sources for the mine. There is some potential for renewable water sources to be brought to bear, to reduce groundwater pumping, as described in chapter 2. "Resolution Copper proposes to use water either directly from the CAP canal or through wells along the MARRCO corridor in the East Salt River Valley" (DEIS, p. 59). This also includes credits for water already recharged to the aquifer: "Currently, Resolution Copper has acquired approximately 313,000 acre-feet of renewable long-term storage credits within the Phoenix and Pinal Active Management Areas (AMAs)" (DEIS, p. 59).

However, the DEIS acknowledges that the renewable supplies from the CAP may or may not be available: "Resolution Copper has also applied for an additional 2,238 acre-feet per year allocation of CAP Non-Indian Agricultural water from the U.S. Department of the Interior Bureau of Reclamation; this application is not yet approved" (DEIS, p. 59).

The Central Arizona Project Non-Indian Agricultural (CAP-NIA) reallocation has been appropriately analyzed under NEPA by the Bureau of Reclamation, a process that began with scoping in November 2015 and that concluded with a signed FONSI on November 8, 2019. As of the publication of the January 2021 FEIS, the reallocation had not yet taken place; however, on September 20, 2021, Resolution Copper entered into a subcontract with the United States and the Central Arizona Water Conservation District for an annual allocation of 2,238 af of CAP-NIA water. In 2022, this allocation was delivered to New Magma Irrigation and Drainage District. Future use of the Resolution Copper CAP allotment remains as disclosed in the DEIS and FEIS: potentially used directly, or recovery of long-term storage credits by pumping from the Desert Wellfield.

Our consistent goal with the EIS analysis has been to avoid underestimating impacts. With respect to uncertainty about water sources, we undertook a conservative approach to ensure that impacts caused by the mine water supply were not underestimated. That approach was to model the physical removal of necessary makeup water from the Desert Wellfield in the East Salt River valley with no offsets from either CAP water or long-term storage credits. The pumping impacts shown in the DEIS from pumping at the Desert Wellfield are found in section 3.7.1 (DEIS, pp. 317–340).

We added more discussion to chapter 2 of the FEIS to clarify the sources of water assessed.

Similarly, some comments note that permitting by the ADWR is not completed yet. This is correct. However, all groundwater that is anticipated to be physically removed from the aquifer, regardless of how ADWR chooses to permit it, has been modeled, and the impacts are disclosed in the DEIS.

12-RCMSER-3003

Appendix R

| Comment response: WT21<br>Water sources analyzed; inadequate analysis of water drawdown impacts | Page 2 of 2 |
|---|---|
| **Responsive to these comments:**<br>1158-52, 1301-15, 8032-297, 8032-97, 8032-98 | |

These comments point to insufficiency in the cumulative effects analysis for water resources, including the issue of water shortages due to overallocation, drought, and future meteorological trends. The DEIS addresses these issues in several sections, including "Ongoing Climatic Trends Affecting Water Balance" (DEIS, p. 311); "Cumulative Effects – East Salt River Valley Water Supplies" (DEIS, p. 341); "Cumulative Effects – Recharge and Recovery Credits" (DEIS, p. 341); and "Cumulative Effects – Regional Water Supplies" (DEIS, p. 342). We concluded, "Cumulatively, the total demand on the groundwater resources in the East Salt River valley is substantial and could be greater than the estimated amount of physically available groundwater" (DEIS, p. 342). We reached similar conclusions in the FEIS; however, the cumulative effects analysis (chapter 4 of the FEIS) was expanded to quantify the cumulative effects of competing water uses in the region and the ramifications of ongoing drought or future meteorological trends.

One comment notes that impacts to GDEs were not analyzed for the Desert Wellfield. This is a correct statement. As noted in the DEIS, "Current depths to groundwater in the vicinity of the Desert Wellfield range from 400 to 600 feet below ground surface" (DEIS, p. 310). Unlike for the mine site, there are no GDEs that access water this deep.

| Comment response: WT21_A<br>Water sources analyzed; inadequate analysis of water drawdown impacts; with addition for specific comment 8032-99 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>8032-99 | |

See response WT21 for the response to the topic of water sources analyzed in the DEIS.

This comment specifically notes the Phoenix Active Management Area goals. Discussion of these goals was added to the FEIS in the expanded cumulative effects analysis to quantify the cumulative effects of competing water uses in the region and the ramifications of ongoing drought or future meteorological trends.

| Comment response: WT21_B<br>Water sources analyzed; inadequate analysis of water drawdown impacts; with addition for specific comment 8032-298 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>8032-298 | |

See response WT21 for the response to the topic of water sources analyzed in the DEIS.

This comment specifically requests that the CAP-NIA water reallocation for Resolution Copper be included as a connected action in the EIS.

The CAP-NIA reallocation has been appropriately analyzed under NEPA by the Bureau of Reclamation, a process that began with scoping in November 2015 and that concluded with a signed FONSI on November 8, 2019. As of the publication of the January 2021 rescinded FEIS, the reallocation had not yet taken place; however, on September 20, 2021, Resolution Copper entered into a subcontract with the United States and the Central Arizona Water Conservation District for an annual allocation of 2,238 af of CAP-NIA water. In 2022, this allocation was delivered to New Magma Irrigation and Drainage District. Future use of the Resolution Copper CAP allotment remains as disclosed in the DEIS and FEIS: potentially used directly, or recovery of long-term storage credits by pumping from the Desert Wellfield.

In the DEIS, we acknowledged that CAP water may be a future water source but did not assume it would be available and did not incorporate it into the impacts analysis. All necessary makeup water is assumed to be physically removed from the East Salt River valley aquifer in order to avoid underestimating impacts.

We updated this discussion in the FEIS to reflect the advancement of the Bureau of Reclamation process. However, the approach remains the same. Because there are clear concerns over the physical availability of CAP water, regardless of the legal availability to Resolution Copper, we did not assume that this source was physically available. As with the DEIS, all necessary makeup water is assumed to be physically removed from the East Salt River valley aquifer in order to avoid underestimating impacts.

12-RCMSER-3004

Appendix R

| Comment response: WT21_C<br>Water sources analyzed; inadequate analysis of water drawdown impacts; with addition for specific comment 30078-46 | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
30078-46

See response WT21 for the response to the topic of water sources analyzed in the DEIS.

This comment indicates that "the right to use groundwater on other than the land overlying the well is dependent upon the issuance of a permit to transfer water from wells located miles away from the point of production and is inconsistent with the general law of the State of Arizona." This is an incorrect statement.

The Desert Wellfield is located within the Phoenix Active Management Area. As such, the water supply must be appropriately permitted by the ADWR prior to pumping (DEIS, p. 18), and ultimately some form of groundwater right must be obtained before pumping.

The ultimate type of groundwater right includes several options for which use away from the point of extraction is allowable, including Type 2 Non-Irrigation Grandfathered Rights or Type 2 Mineral Extraction Rights.

| Comment response: WT21_D<br>Water sources analyzed; inadequate analysis of water drawdown impacts; with addition for specific comment 8032-105 | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8032-105

See response WT21 for the response to the topic of water sources analyzed in the DEIS.

This comment indicates that "Resolution Copper's water recharge and storage credits, which are 'not required under Arizona water law' and a 'voluntary measure' (DEIS p. 341) are not a requirement by definition and should not be relied upon at all in any part of the DEIS."

This is indeed the approach we disclosed in the DEIS and continue to use in the FEIS. All necessary makeup water for the mine is assumed to be physically removed from the East Salt River valley aquifer in order to avoid underestimating impacts, with no offsets for any storage or recharge credits. By acquiring these credits, Resolution Copper has theoretically already offset some impacts in the aquifer either by directly recharging water or by preventing groundwater pumping that otherwise would have occurred. Regardless, none of these potential offsets were considered in the DEIS to reduce impacts.

| Comment response: WT23<br>Reduction of water content in tailings | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
562-8

See response ALT1 for more discussion of the application of filtered tailings to alternatives other than Alternative 4 – Silver King.

One of the key differences between alternatives in the DEIS is the application of different amounts of water removal from the tailings slurry (DEIS, p. 50). All action alternatives use as a basis "thickened tailings" (50 to 70 percent solids), which contain less water than conventional slurry tailings (20 to 50 percent solids). Alternatives 3 and 4 use techniques that reduce water content even further. Alternative 4 uses filtered tailings, which generally represent the least water content possible with the tailings material (85 percent solids).

12-RCMSER-3005

Appendix R

| Comment response: WT24<br>Power use by project | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
122-4, 1235-12, 1301-12, 1301-2, 1454-18, 1544-14, 30143-2 (Emerman2), 30143-3 (Emerman2), 30143-4 (Emerman2), 30143-5 (Emerman2), 8032-295, 8032-296, 8032-301, 910-2

These comments question the power use estimates for the mine. This concern is handled in the most detail in two technical reports (attached to comment letter #8032 as B2 and B3), authored by Dr. S. Emerman.

In general, the comments suggest that the amount and temperature of geothermal water that would be encountered during mining is underestimated or undisclosed by Resolution Copper and therefore that the power requirements to pump the water and cool the mine have been underestimated. See response WT6 for discussion of the geothermal water amount and temperature. As noted there, when taken in the context of the entire project and all available information, the conclusions drawn by Emerman are not valid; neither the groundwater amounts nor the temperatures were unexpected or unanticipated in the design and analysis. The extrapolations of power use based on these erroneous estimates are equally invalid (Garrett 2020c).

Partially in response to these comments, SRP conducted an independent load study for the project and concluded the following: "The total maximum combined load proposed by RC is 273 to 315 MW, which represents 3.7 to 4.3 percent of SRP's 2019 peak demand. SRP is well suited to provide the needed power just as it has done with other large power users across the state. SRP does not see any limitations to serving this load to the Project at the aforementioned sites, presuming the recommended system upgrades are implemented. With these system upgrades, there will be no impact on the neighboring customers as the Project site increases loads as per the estimated load levels" (1898 and Company 2020). Also note that information received since January 2021 using a different estimation technique has modified the anticipated power use, and this updated disclosure has been incorporated into chapter 2 of the FEIS.

| Comment response: WT24_A<br>Power use by project; with addition for specific comment 1565-3 | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1565-3

See response WT24 for the response to the topic of power use for the project.

This comment further asserts that the project "uses a tailings plan illegal in many other countries." This appears to be based on an erroneous assumption; see response TS2 for more discussion.

Appendix R

| Comment response: WT25<br>Independent hydrology study | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1074-1, 1185-1, 1206-2, 1210-2, 1301-8, 1406-1, 1407-1, 1539-3, 183-1, 27996-2, 28014-1, 28497-1, 28802-2, 29157-1, 376-2

These comments generally indicate that an independent hydrologic study needs to be conducted in order to analyze impacts from the project.

The professional conclusions and analysis contained in the DEIS and FEIS have been conducted by the independent third-party contractor working for the Forest Service. Conflict-of-interest management is a requirement of the third-party contract, and these issues have been actively managed by the third-party NEPA contractor since the awarding of the contract in 2015. A consolidated description of contracting and conflict-of-interest management activities is contained in the project record (Garrett 2019g).

See also response NEPA29 for specific conflict-of-interest allegations and investigation results.

With respect to hydrologic analysis, in order to inform the analysis being conducted by the independent third-party professionals, the Tonto National Forest also convened a Groundwater Modeling Workgroup (meeting roughly between September 2017 and November 2018) to assess and discuss the mine-site groundwater model prior to the DEIS. Then, the Tonto National Forest convened an expanded Water Resources Workgroup (meeting roughly between January 2020 and July 2020) to discuss comments received on the DEIS and additional analysis for the FEIS. These workgroups are described in detail in several memoranda in the project record (BGC Engineering USA Inc. 2020b; Garrett 2020j).

These workgroups were designed to include many professional viewpoints, including Forest Service specialists, the third-party NEPA specialists, agency specialists (including representatives from the EPA, ADEQ, ADWR, Arizona Game and Fish Department, USACE, and ASLD), Resolution Copper and its contractors, and the San Carlos Apache Tribe. Several meetings included participants from the USGS; see response NEPA48 for more discussion about this relationship.

In all cases, the goal of the workgroup was to review the analysis being conducted and have open discussion about technical methodologies, results, and documentation; raise concerns and questions; request clarifications or additional data; and discuss the use and portrayal of analyses in the EIS documents. The group was not intended to reach consensus on all issues. Where professional disagreements remained, the Tonto National Forest committed to documenting these and explaining the agency's decision (BGC Engineering USA Inc. 2020b).

| Comment response: WT25_A<br>Independent hydrologic study; with addition for specific comment 1454-11 | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1454-11

See response WT25 for response to the topic of independent hydrologic studies.

This comment states, "No conclusive hydrological study has been conducted for the Oak Flat/Superior, AZ area." This comment is not correct. The analysis disclosed in the DEIS is based on a groundwater model specific to the mine-site area, which in turn is based on extensive geological investigations (see BGC Engineering USA Inc. (2018a) and extensive hydrologic investigations and monitoring (in some cases since 2002). See Newell and Garrett (2018d) for lists of key background documents.

This comment also states that "no geotechnical and hydrological study was done on the Skunk Camp site prior to publication of the DEIS." This comment is not correct. The specific investigations available for the DEIS are discussed in section 3.7.2 (DEIS, pp. 356–357), as are the ramifications of any uncertain or unknown information (DEIS, pp. 350–363). Additional investigations were conducted for the FEIS that are responsive to this comment; see responses WT7 and ALT22 for more details.

Appendix R

| **Comment response: WT26**<br>Notification of residents in East Salt River valley; incorrect statements about subsidence | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1544-5, 30065-3, 910-5 | |

These comments ask whether water users in the East Salt River valley have been notified of the water use by the mine. See responses NEPA27 and NEPA30 for more detail on the specific outreach used for the East Salt River valley.

These comments also contain incorrect statements regarding the amount of subsidence. The DEIS acknowledges the potential for ground subsidence but makes no specific predictions. See response WT10 for more details about the subsidence impacts.


| **Comment response: WT27**<br>Well identity | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1158-37 | |

This comment states, "The DEIS reports that 'Well DHRES-16 743 is used as a proxy for potential impacts on water supplies and individual wells in the area.' In a search of the ADWR well registry, this well number is not valid."

The name "DHRES-16 743" is a project-specific name assigned by Resolution Copper, not an ADWR well registry identification. The ADWR well registry number for this well is 55-917232 (see Shelley et al. (2016)).

12-RCMSER-3008

Appendix R

| Comment response: WT28<br>NPAG/PAG subaqueous deposition | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1448-3, 30140-1 (Maest), 30140-10 (Maest), 30140-2 (Maest), 30140-3 (Maest), 30140-4 (Maest), 8032-114, 8032-115, 8032-116

These comments concern the effectiveness of subaqueous deposition, particularly of the PAG tailings, to control acid generation.

The comments indicate that subaqueous deposition is the "lone proposed mitigation measure for PAG tailings." This is incorrect. The DEIS notes numerous control measures for PAG tailings, which vary by alternative. These include full lining of the PAG cells (Alternatives 2, 3, 5, and 6), full downstream embankments for the PAG cells (Alternatives 5 and 6), and extensive seepage collection systems (all alternatives) (DEIS, pp. 381–417).

The comments state that no testing was conducted on the efficacy of submerging PAG tailings to prevent acid generation. This is incorrect. Column tests were conducted by Resolution Copper that measured the rate of oxygen consumption by tailings. Tests were run with variable percentages of the pyritic tailings submerged in water, up to full saturation, and the results clearly demonstrate the expected: as greater amounts of pyritic tailings are submerged, the rate of oxygen consumption—and therefore sulfide mineral oxidation—decreases (Duke HydroChem LLC 2016).

The question of the efficacy of using subaqueous deposition to control the acid generation of PAG tailings was brought forward to the Water Resources Workgroup (reconvened in January 2020) to assist the Forest Service in reviewing and addressing comments on the DEIS. Upon our request, additional information was submitted by Resolution Copper for consideration. The analyses from the NEPA project team on the efficacy of the PAG subaqueous deposition in an arid environment, based in part on this additional information, are found in the project record (Enos 2020; Williamson 2020), and discussion of this issue has been expanded in section 3.7.2 of the FEIS.

The comments also indicate concern that NPAG tailings, which despite predictions may have the potential for acid generation, would not be handled in a similar manner to prevent acid generation. We explored this issue through the Water Resources Workgroup and requested more information from Resolution Copper. The first part of the investigation clarified that while the design of the tailings storage facility is governed by the anticipated split between NPAG and PAG tailings, during operations, geochemical testing would also take place that would verify the actual acid generation potential of the different tailings streams. This includes routine sampling (likely no less than monthly) for whole NPAG tailings, NPAG cyclone overflow and underflow, and PAG tailings. Sampling of the NPAG underflow cells occurs specifically to confirm that they are geochemically suitable for the outermost surface layer of tailings on the embankment slope. If they are not, amendments may be needed (i.e., limestone) prior to concurrent reclamation (Wickham 2020).

The second part of the investigation clarified that the tailings storage facility design incorporated sufficient flexibility to accommodate future changes in the percentage of NPAG/PAG if the reality—as verified through operational sampling—varies from the predictions (KCB Consultants Ltd. 2020a). We added further discussion of this issue to section 3.7.2 of the FEIS.

Appendix R

| Comment response: WT30<br>Hydrologic connection to San Carlos Apache Reservation | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>235-18, 30078-40, 30078-41, 58-1, 77-2 | |

These comments contain incorrect statements or assumptions regarding the hydrology of the project area.

Comments identify the Salt and Black Rivers and their watersheds as not being analyzed. None of the project surface water or groundwater impacts extend into any of these drainages.

We disclosed that all potential surface water impacts associated with the East Plant Site, West Plant Site, tailings storage facility for Alternatives 2, 3, and 4, and subsidence area are to stormflows in Queen Creek, which ultimately joins the Gila River downstream. Similarly, all potential surface water impacts associated with the tailings storage facility for Alternatives 5 and 6 are to stormflows to the Gila River, well downstream of the San Carlos Apache Tribal boundary. We provided a figure showing the surface water quantity analysis area and potentially impacted surface watersheds in section 3.7.3 (DEIS, p. 423).

Groundwater drawdown from the mine similarly does not impact tributaries to the Salt River, such as Pinto Creek. The groundwater quantity analysis area is shown in section 3.7.1 (DEIS, p. 297) and does not extend across the groundwater basin boundary to Pinto Creek; the anticipated drawdown similarly is shown in section 3.7.1 (DEIS, p. 302) and does not reach to Pinto Creek.

Groundwater impacts would not be anticipated to extend to the San Carlos Apache Tribal lands or to the town of Miami, as indicated in comments. Aside from the distance from any anticipated drawdown impacts (DEIS, p. 302), there are substantial hydrologic barriers separating project components from these areas, including the Pinal Mountains and Mescal Mountains.

After the January 2021 publication of the Rescinded FEIS, we received further insights into the concerns raised by the San Carlos Apache Tribe with respect to water impacts. We understand that the concern is not of direct drawdown impacts but of the potential for cascading regional effects to cause greater groundwater use near Tribal lands. An analysis of this potential has now been added to section 3.7.1 of the FEIS.

12-RCMSER-3010

Appendix R

| Comment response: WT31 Baseline trends | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
290-1

This comment identifies changes in hydrologic conditions for GDEs that are not adequately captured in the affected environment description in the DEIS, specifically, the reported reductions in flow and drying of water sources.

These potential effects were specifically analyzed for the DEIS. The ongoing pumping operations by Resolution Copper to dewater mine infrastructure began in 2009 (DEIS, p. 312). The concern that this pumping might already be affecting water sources, and thus changing the baseline conditions, was brought forward during scoping and analyzed in section 3.7.1. The analysis in section 3.7.1 concludes, "Most hydrologic indicators show no significant change over time in Devil's Canyon (Garrett 2019f). A number of other water sources have been monitored on Oak Flat and show seasonal drying, but these locations have been demonstrated to be disconnected from the Apache Leap Tuff aquifer, relying instead on localized precipitation (Garrett 2018e; Montgomery and Associates Inc. 2017a)" (DEIS, p. 312).

We statistically analyzed any available hydrologic time series data to identify downward trends (see Garrett (2019f)). This included baseflow calculations at four locations in Devil's Canyon (time period from roughly 2003 to 2015); manual flow measurements collected at four springs in Devil's Canyon (time period from roughly 2003 to 2017); and saturated length measurements collected in Devil's Canyon (time period from 2002 to 2013). The memo concludes (using a $P$ value of 0.05 for statistical significance), "Of the thirteen data sets analyzed, none show a statistically significant trend either upward or downward. The saturated length of Devil's Canyon would be significant if the threshold were adjusted slightly higher (p-value of 0.10), in which case it shows an upward trend, not a downward trend. Overall, none of the direct field measurements taken between roughly 2003 and 2017 of hydrologic parameters along Devil's Canyon suggest that dewatering pumping is having a negative effect on natural stream or spring flow" (Garrett 2019f:5).

In the same process memorandum (Garrett 2019f), we reviewed monitoring of 14 sites on Oak Flat, observed over three seasons between March and September 2017. From these data we concluded, "While the results were useful for determining the hydrology and seasonal dynamics of these sites, the period of monitoring is insufficient to detect any long-term trends that may be associated with ongoing pumping. The most that can be said is that pumping (which re-started in 2009) has not resulted in complete drying of the 14 locations monitored, and that the reliance on storage of precipitation in near surface alluvial veneers suggests that pumping would not affect these locations" (Garrett 2019f:5).

| Comment response: WT32 Mounding below tailings storage facility and exposure at surface | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
28449-49, 524-11

Several comments raised the possibility of seepage from the tailings storage facility causing a rise in groundwater levels that would potentially create a new surface water exposure where only ephemeral channels exist now, in Queen Creek (Alternatives 2, 3, and 4), Donnelly Wash (Alternative 5), or Dripping Spring Wash (Alternative 6).

This possibility was explored during the April 2020 meeting of the Water Resources Workgroup (reconvened in January 2020 to assist the Forest Service in reviewing and addressing comments on the DEIS). The same question had been raised by a cooperating agency prior to the release of the DEIS, and a white paper documenting the estimates of anticipated mounding was provided to the workgroup for consideration (Morey 2020c). This analysis indicates that the groundwater levels are not anticipated to rise to the point of creating new surface exposure of tailings seepage.

With respect to the preferred alternative, the suggestion was made in the Water Resources Workgroup to confirm this analysis using the refined groundwater flow model being conducted for the preferred alternative (see also response WT7 for more details on the refined Skunk Camp water quality analysis). The results of the refined water quality analysis were submitted in July 2020 and confirm that groundwater levels are not anticipated to approach ground surface downstream of the preferred alternative tailings storage facility (Montgomery and Associates Inc. 2020c).

We added further discussion of this issue to section 3.7.2 of the FEIS.

12-RCMSER-3011

Appendix R

| Comment response: WT33<br>Specific suggested technique for estimating changes in geomorphology | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
28449-55

DEIS section 3.7.3 contains an analysis of the potential changes in storm flows caused by the project isolating portions of the watershed, as well as the potential changes in stream geomorphology or sediment movement caused by these changes in storm flows (DEIS, pp. 433–434). This comment suggests employing an alternative or supporting technique that could be used to bolster the analysis of geomorphology.

The possibility of using this technique was explored during the April 2020 meeting of the Water Resources Workgroup (reconvened in January 2020 to assist the Forest Service in reviewing and addressing comments on the DEIS). After discussion with the workgroup, we further explored the issue (Garrett 2020a), including review of a new analysis conducted by Resolution Copper using the proposed technique, specifically for the preferred alternative (JE Fuller 2020). This new analysis concluded that the reduction in mean annual discharge caused by the proposed tailings storage facility would not adversely impact the overall channel pattern downstream of the facility. We agreed with this conclusion. We added further discussion of this issue to section 3.7.3 of the FEIS.

| Comment response: WT35<br>Revised stormwater quality analysis | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1335-1, 1448-5, 30140-13 (Maest), 30140-14 (Maest), 30140-7 (Maest), 8032-113, 8032-119

We included analysis of surface water quality impacts in DEIS section 3.7.2, which can be caused by runoff contacting facilities, including tailings, or by seepage from the tailings storage facility entering downstream surface waters. The DEIS primarily focused on water quality impacts caused by seepage from the tailings storage facility. With respect to water quality of stormwater runoff, we analyzed the stormwater controls during construction, operations, and closure (DEIS, pp. 379–380); estimated the potential stormwater quality (DEIS, p. 381); and assessed the potential for discharge of stormwater (DEIS, pp. 379–380). We concluded, "At no point during construction, operation, closure, or post-closure would stormwater coming into contact with tailings, ore, or processing areas be allowed to discharge downstream. After closure, precipitation falling on the tailings facilities would interact with the soil cover, not tailings" (DEIS, p. 380).

These comments express concern that the assumption that stormwater would never be released is not realistic and that stormwater in contact with tailings could be anticipated to be released under some extreme conditions or failure of controls. We explored this question with the Water Resources Workgroup (reconvened in January 2020 to assist the Forest Service in reviewing and addressing comments on the DEIS). An initial discussion of the workgroup in February 2020 determined that indeed there are some scenarios during operations under which the tailings storage facility would allow discharge of stormwater that had contacted tailings (Johnson 2020). We requested that Resolution Copper conduct an analysis of the conditions under which this would occur and the potential quality of that released stormwater. The analysis was conducted and further discussed with the workgroup in June 2020 (Morey 2020e) and subsequently submitted to and reviewed by the NEPA project team (Resolution Copper 2020f).

We modified section 3.7.2 of the FEIS to include analysis of the conditions under which stormwater would be released during operations, the estimated quality of that stormwater, and the potential impacts resulting from the stormwater release.

12-RCMSER-3012

Appendix R

| Comment response: WT36<br>Subsidence lake analysis | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1321-3, 1342-2, 1448-8, 30140-6 (Maest), 8032-112, 8032-117, 8032-176, 8032-92, 8032-93

We analyzed the potential for a lake to develop in the subsidence crater, after closure of the mine (DEIS, pp. 375–379). We acknowledged in the DEIS that several conditions exist that suggest a lake could form, including the presence of a subsidence crater estimated to be 800 to 1,100 feet deep, recovering groundwater levels in the deep groundwater system after dewatering ends, and a block-cave zone that would hydraulically connect the deep groundwater system to the surface. In the DEIS we compared the elevations of the subsidence crater with the modeled elevations of groundwater during recovery and found that even after a period of 1,000 years they did not intersect. The DEIS concludes, "Ultimately the Forest Service determined that the presence of a subsidence lake was speculative and not reasonably foreseeable, and as such it would therefore be inappropriate to analyze in the EIS" (DEIS, p. 376).

These comments disagree with this conclusion, indicating that creation of the subsidence lake is inevitable.

This issue was discussed with the Water Resources Workgroup (reconvened in January 2020 to assist the Forest Service in reviewing and addressing comments on the DEIS). The discussion took place during the January 2020 meeting (Morey 2020a), and the general conclusions reached during that meeting were recapped for the Workgroup in February 2020 as follows: "We need to modify the language we use to describe the potential for a crater lake ('remote and speculative'); however, the analysis of the impacts of a subsidence lake >1000 years in the future remains inappropriate" (Johnson 2020).

The suggested change in language was based on an acknowledgment that there are trends present that if they persisted over a long period of time (greater than 1,000 years), they could indeed form a subsidence lake. In this sense, such a lake could be considered "reasonably foreseeable." The terms "remote and speculative" were determined to be more descriptive of the situation, which would take place at a point so far in the future that it prevents a viable analysis. We modified the discussion in section 3.7.2 to reflect this language.

One comment raised the argument that the groundwater levels were likely to return to pre-mining levels, and this would create a subsidence lake. The workgroup explored this issue, along with many other groundwater modeling issues, in June and July 2020 (Morey 2020d, 2020e). We concluded that this assumption is fundamentally incorrect. The changes wrought to the aquifer by the block caving fundamentally change the hydrologic and geological framework of the system. A return to pre-mining hydrologic conditions is not anticipated, and a return to pre-mining groundwater levels is not inevitable.

Similar comments also raised the issue of groundwater modeling uncertainty, noting that while a range of values was given for the ultimate depth of the subsidence crater, a similar range of values was not given for the ultimate modeled groundwater levels, and noting that doing so would better reflect the uncertainty inherent in the modeling analysis. We requested this output from Resolution Copper and incorporated it into the analysis.

We revised the subsidence lake analysis in section 3.7.2 of the FEIS to incorporate the uncertainty inherent in the groundwater model. The conclusions remain similar to those stated in the DEIS.

12-RCMSER-3013

Appendix R

| Comment response: WT37 | |
|---|---|
| Comments concerning water quality predictions for the block-cave zone | Page 1 of 2 |

| Responsive to these comments: |
|---|
| 30140-11 (Maest), 30140-12 (Maest), 30140-15 (Maest), 30140-5 (Maest), 30140-8 (Maest), 524-8, 8032-111, 8032-118 |

These comments raise concerns over the predictions in the DEIS for potentially poor water quality in the block-cave zone after closure.

We presented two different modeling approaches for estimating potential water quality in the block-cave zone (DEIS, pp. 349–352). The comments received on these modeling approaches were brought forward to the Water Resources Workgroup (reconvened in January 2020 to assist the Forest Service in reviewing and addressing comments on the DEIS). Discussion in March 2020 (Loomis 2020) clarified the use of these two models and whether they are appropriate for estimating post-closure water quality in the block-cave zone. It became clear that the two models shown in the DEIS (table 3.7.2-1, p. 349) were misconstrued by the NEPA team. These two models were both created for a specific purpose: to estimate the load of pollutants entering the West Plant Site from the East Plant Site. These models largely calculate the same chemical load, but differ in how that load is delivered to the West Plant Site. The earlier "Eary" model assumed that all oxidation products associated with the fractured ore were rinsed into the sump water. The later "Hatch" model assumed that all oxidation products associated with the fractured ore remain with the ore and do not report to the sump, but are instead retained in ore moisture. In both cases, the mass of oxidation products is consistent and enters the West Plant Site, ultimately becoming one source contributing to elevated metals in the tailings seepage.

Neither of these models is a proper analog for the physical and chemical actions that take place when the block-cave zone is reflooded after closure. Discussion of these models was removed from section 3.7.2 of the FEIS.

We replaced these inappropriate estimates with different and more appropriate methods of estimating post-closure block-cave water quality impacts in the FEIS (Williamson 2020). Physically, oxygen is anticipated to be present in the unsaturated block-cave zone, but in limited quantities. Some oxygen arrives in groundwater that must travel through overlying caved ore, either from the surrounding aquifer or percolating from the subsidence crater at the surface. At the end of mining, oxygen would also be present within the fractured mineralized ore around the draw points, where ventilation actively replenishes oxygen to the extent air flow can reach into the fractured ore body (estimated to be from tens to hundreds of feet, but overall not known with any certainty).

Conceptually, what happens to water quality upon closure is described succinctly in Borden (2014) (also appendix R of the GPO): "The first flush of water which accumulates in the underground workings will release any residual sulfide oxidation products into solution. The first water which accumulates at the production level is thus likely to have the poorest quality within the caved zone. Subsequent reflood waters which accumulate above this in the mineralized rock zone will have progressively better water quality as saturation progresses upward."

Appendix R

| Comment response: WT37<br>Comments concerning water quality predictions for the block-cave zone | Page 2 of 2 |
|---|---|

**Responsive to these comments:**
30140-11 (Maest), 30140-12 (Maest), 30140-15 (Maest), 30140-5 (Maest), 30140-8 (Maest), 524-8, 8032-111, 8032-118

At closure, both ventilation and pumping systems are turned off. As the groundwater level recovers and rises, it submerges ore and effectively halts oxidation. This is the same process by which acid generation will be controlled in the PAG tailings cell, by maintaining saturation and a water cap (see response WT28).

The above description, based on the anticipated physical and chemical effects, indicates that oxidation would not persist in the block-cave zone after reflooding, but does not provide any reliable estimate of post-closure water quality. To that end, Resolution Copper also conducted a number of geochemical tests intended to specifically address the potential flooding of the block-cave zone.

Resolution Copper conducted a number of humidity cell tests to characterize the geochemistry and acid generation potential of mined rock. These are known as "kinetic" tests, as they track the changes over time in the quality of water in contact with ore or rock samples. Humidity cell tests are typically run for at least 20 weeks, and many are run longer.

Resolution Copper converted 14 of the humidity cell tests into saturated column tests upon completion, in order to analyze how reflooding might affect water quality. The saturated column tests were run for 12 weeks (MWH Americas Inc. 2013). The results for all 14 saturated column tests support the conceptual description that the initial reflooding removes most of the oxidation products from oxygenated fractured ore (primarily around the draw points), and then gradually water quality improves. The concentrations from the first week of the saturated column test (initial reflooding) are substantially greater than the last week of the humidity cell test, and then concentrations substantially decline by the final week of the saturated column test. Using sulfate as an example, the median sulfate concentration at the end of the humidity cell tests is 360 mg/L. Immediately after reflooding, the median sulfate concentration increases to 1,024 mg/L. By completion of the saturated column test after 12 weeks, the median sulfate concentration has fallen to 42 mg/L. Concentrations of all of the constituents of concern followed a similar pattern. Furthermore, the final concentrations from the saturated column tests are less than Arizona numeric aquifer water quality standards, suggesting that long-term water quality in the block-cave zone after closure may not represent an environmental concern, though uncertainty still exists. A discussion of the anticipated physical and chemical effects of reflooding of the block-cave zone after closure, along with the results of the saturated column tests, was added to section 3.7.2 of the FEIS.

The comments also focus on the uncertainty of these estimates. The primary uncertainty lies with the amount of oxygen that can infiltrate the block-cave zone, both during active ventilation and afterward. Regardless of the uncertainty, we also explored whether there are any foreseeable points at which this potentially poor-quality water would be exposed to the environment (DEIS, pp. 375–379). Neither development of a subsidence crater nor exposure through other pathways is anticipated.

In March 2020, the Water Resources Workgroup also further explored the potential for exposure of poor-quality water within the block cave. We requested additional information from Resolution Copper (Meza-Cuadra and Pantano 2020), which confirmed that hydraulic gradients will persist for centuries that prevent movement of any potentially poor-quality water—which may not exist based on the saturated column tests—out of the block-cave zone. Further effort was also put into assessing the potential for subsidence lake development (see response WT36). The discussion of potential exposure pathways, including subsidence lake development, mine workings or natural caves, and lateral movement of groundwater, was updated in section 3.7.2 of the FEIS.

12-RCMSER-3015

Appendix R

| **Comment response: WT39**<br>Request for revised DEIS, based on geochemistry analysis concerns | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>8032-120 | |

This comment points to perceived uncertainty with respect to many of the geochemical analyses, including the efficacy of managing PAG tailings using subaqueous deposition, the quality of water in the block-cave zone, the formation of a subsidence lake, and water use, and requests that a revised DEIS be completed.

Other detailed comments were received concerning all of the items listed above. In each case, we undertook additional investigation and analysis in order to consider the comment, much of it under the auspices of the Water Resources Workgroup (reconvened in January 2020 to assist the Forest Service in reviewing and addressing comments on the DEIS): for efficacy of PAG tailings management, see response WT28; for block-cave water quality, see response WT37; for formation of the subsidence lake, see response WT36; for water use, see response WT1.

For many of these points, the additional analysis conducted has led to refined presentations and discussions in the FEIS. However, none of the items mentioned have led us to fundamentally change our conclusions contained in the DEIS and FEIS.

The comment is not correct that refined analysis in response to comments should result in a revised DEIS rather than an FEIS. This contradicts the NEPA process; modifications are anticipated to be made between the DEIS and FEIS in response to public comments.

| **Comment response: WT41**<br>Criticism of analysis method | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>30140-9 (Maest), 8032-110 | |

This comment raises concerns about the specific tests used to estimate stormwater quality disclosed in the DEIS.

One specific concern is the use of an older version of the Sobek method. We investigated this concern and determined that "the use of the original or modified Sobek method does not functionally affect the outcome of characterization to any meaningful extent" (Williamson 2020:2).

Another concern raised was about the use of the synthetic precipitation leaching procedure tests to estimate stormwater quality. Synthetic precipitation leaching procedure results are shown as one of three methods for estimating potential stormwater quality (DEIS, pp. 381–383). However, as described in the text, we assumed that no stormwater was anticipated to be released and that none of these tests were pertinent to the DEIS analysis. We revised our approach to disclosing potential stormwater releases in section 3.7.2 of the FEIS; see response WT35 for more details.

12-RCMSER-3016

Appendix R

| Comment response: WT42 Draining of Apache Leap Tuff | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
30078-14, 8032-266

These comments suggest that as a result of the block cave, "all groundwater in the [Apache Leap Tuff], and underlying geologic structure affected by block cave mine subsidence and fracturing will permanently drain to the mine."

The general concept and mechanisms in the comments are correct, as described in section 3.7.1:

> "The block-caving conducted to remove the ore body would unavoidably result in fracturing and subsidence of overlying rocks. These effects would propagate upward until reaching the ground surface approximately 6 years after block-caving begins (Garza-Cruz and Pierce 2017). It is estimated that the subsidence area that would develop at the surface would be approximately 800 to 1,100 feet deep (see Section 3.2, Geology, Minerals, and Subsidence). Fracturing and subsidence of rock units would extend from the ore body to the surface. This includes fracturing of the Whitetail Conglomerate that forms a barrier between the deep groundwater system and the Apache Leap Tuff aquifer. When the Whitetail Conglomerate fractures and subsides, a hydraulic connection is created between all aquifers. Effects of dewatering from the deep groundwater system would extend to the Apache Leap Tuff aquifer at this time." (DEIS, p. 328)

While the mechanism as stated in the comments is generally correct, it does not mean that "all" groundwater in the Apache Leap Tuff aquifer drains into the mine. The statement in the comments is an overly simplistic representation of a complex system. Identifying how much groundwater would drain from the Apache Leap Tuff, how fast it would drain, and how long it would take to recover after cessation of pumping requires sophisticated tools to model the complex hydrologic properties of the groundwater system. A specific example of such complexity is the effect of the faults that bound the Resolution Graben; these faults have demonstrably prevented propagation of dewatering impacts of the deep groundwater system (DEIS, pp. 304–309). We determined that the numeric groundwater model was the appropriate tool with which to assess this system based on several specific factors listed in section 3.7.1 (DEIS, p. 295). The results of the groundwater model show that the Apache Leap Tuff aquifer does not completely drain, that drawdown varies over time and space (see DEIS, pp. 317–334 and appendix H), and that recovery eventually also happens (DEIS, pp. 333, 375–378).

12-RCMSER-3017

Appendix R

| Comment response: WT43 Generic concerns about water quality | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1043-1, 1180-4, 1237-3, 1276-3, 1368-1, 27436-1, 286-1, 555-1, 555-10, 555-28, 555-4, 56-1, 63-1, 82-2, 837-1, 839-2, 844-1

These comments express concerns about potential changes to water quality as a result of the mine.

In the DEIS, we disclosed whether there would be potential impacts to water quality in three areas: (1) oxidation and subsequent acid drainage of mineralized ore in the block-cave zone after closure; (2) seepage from the tailings storage facility that enters groundwater and eventually perennial surface water; and (3) the potential for stormwater runoff to contact tailings or processing facilities.

The analysis of block-cave water quality, including potential exposure routes, can be found in section 3.7.2 (DEIS, pp. 375–379). See also response WT37 regarding changes to this analysis in the FEIS in response to public comments.

The analysis of stormwater quality can be found in section 3.7.2 (DEIS, pp. 379–381). See also response WT35 regarding changes to this analysis in the FEIS in response to public comments.

The analysis of the potential for seepage from the tailings storage facility to enter groundwater and surface water can be found in section 3.7.2 (DEIS, pp. 381–419). This section includes analysis of the potential water quality of seepage, the design and efficacy of seepage controls, predictions of changes in groundwater quality resulting from seepage, and predictions of changes in surface water quality in downstream perennial waters resulting from seepage.

Comments also are concerned with the potential impacts of water quality on wildlife species. This analysis can be found in section 3.8 (DEIS, pp. 460–463).

Specific comments were made on the potential to impact community water supplies, including Queen Valley, and Arizona Water Company wells serving Apache Junction, Superior, Winkelman, and Pinal Valley.

The issue of the hydrologic connection of Queen Valley with Queen Creek and the potential for impacts from tailings seepage associated with Alternatives 2, 3, and 4 was discussed as part of the Water Resources Workgroup (reconvened in January 2020 to assist the Forest Service in reviewing and addressing comments on the DEIS). Analysis was added to section 3.7.2 of the FEIS to further evaluate potential impacts on water resources in Queen Valley. See response WT59 for more detailed discussion of this issue.

Analysis was also added to section 3.7.2 of the FEIS to further discuss the potential impacts to community water systems, including the water systems of Apache Junction, Superior, Winkelman, and Pinal Valley. The Arizona Water Company supply wells for Superior, Pinal Valley, and Apache Junction are located in the East Salt River valley. No water quality changes are anticipated to result from the mine in these areas.

The DEIS disclosed the effects of a potential tailings facility failure in section 3.10.1. This included potential impacts to public water supplies, which vary by alternative but do include these service areas (DEIS, pp. 531, 544, 547, 548, 550, 552). While these impacts were disclosed in the DEIS and have high consequences, the probability of their occurring is low and minimized by required adherence to Federal and Arizona design standards and by applicant-committed environmental protection measures. See response TS1 for more details on the process undertaken to minimize risks in the tailings facility design.

The Arizona Water Company Winkelman system is located on the Gila River downstream from Alternative 6 – Skunk Camp. Seepage from the tailings storage facility is anticipated to enter the aquifer along Dripping Spring Wash and eventually to enter the Gila River. The analysis of impacts to water quality in the Gila River is found in section 3.7.2 (DEIS, pp. 411–417). This analysis was refined in the FEIS. For both the DEIS and FEIS, we disclose that no numeric surface water quality standards would be exceeded in the Gila River, and increases of constituents without numeric standards (total dissolved solids, sulfate) would be negligible.

Appendix R

| Comment response: WT44 Impaired waters analysis, including Arizona Pollutant Discharge Elimination System (AZPDES) discharge permit | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
30075-32, 30075-35, 30075-38, 30075-42, 30075-43, 8031-60, 8031-61

These comments contain criticisms of perceived errors in the analysis of where discharges from the project may impact waters listed as impaired by the State of Arizona. Many of these comments are based on an incorrect assessment of where discharges would occur from the project.

Discharges associated with the project as analyzed in the DEIS were restricted to seepage from the tailings storage facility entering groundwater and then entering surface water some distance downstream. The impaired waters selected and described in section 3.7.2 (DEIS, pp. 369–370) were appropriately chosen as those waters downstream of the various tailings storage facility alternative locations: Queen Creek from the Superior Wastewater Treatment Plant to Whitlow Ranch Dam, impaired for copper, which would be potentially impacted by Alternative 2 (DEIS, p. 392), Alternative 3 (DEIS, p. 398), and Alternative 4 (DEIS, pp. 404–405); and the Gila River from the San Pedro River to Mineral Creek, impaired for suspended sediment, which would be potentially impacted by Alternative 6 (DEIS, p. 417). Comments identified upper Queen Creek and Arnett Creek as appropriate for analysis; however, these do not have the potential to receive potential discharge from tailings storage facilities.

Comments also identify an existing Arizona Pollutant Discharge Elimination System (AZPDES) discharge permit that Resolution Copper holds for the West Plant Site, which involves two outfalls that could indeed affect the upper Queen Creek reach. These are permitted for stormwater discharges over the 100-year, 24-hour storm and for discharge of treated effluent from the water treatment plant. These discharges do not occur regularly. They have not occurred at the site since Resolution Copper began operating at the West Plant Site in 2004, nor are these discharges proposed as part of the project. Rather, all treated water is anticipated to be required for use in processing. Further discussion of the status and use of the AZPDES permits has been added to section 3.7.2; however, the analysis of discharges under these permits and their impact on impaired waters remains inappropriate and was not included in the FEIS.

Note that since the January 2021 Rescinded FEIS was published, Resolution Copper sought and received renewal of that AZPDES permit. However, in November 2022, a decision was issued in an ongoing appeal, and the court found that the ADEQ could not renew the permit because Resolution Copper's dewatering discharge from Shaft 10 represented a new source. Further, the court noted that ADEQ would need to finalize standards on Queen Creek before a similar AZPDES permit could be issued. Permitting of any current or future discharges at these locations under the AZPDES program remains unresolved at this time. As noted above, however, these discharges are not anticipated as part of the proposed project, as all water is anticipated to be required for use in processing.

Discharge of stormwater was not anticipated or analyzed in the DEIS, as described in section 3.7.2 (DEIS, pp. 379–381). This analysis was revised in section 3.7.2 of the FEIS, including the potential impacts on impaired waters; see response WT35 for more details.

Appendix R

| Comment response: WT45 | |
|---|---|
| Overall response to report by Dr. B. Prucha regarding groundwater modeling | Page 1 of 7 |

| Responsive to these comments: |
|---|
| 8031-59 |

These comments are specific to the groundwater model completed for the mine site. Detailed comments related to this topic were submitted with comment letter #8032 in the form of a report from Dr. B. Prucha titled "Review of Hydrologic Impacts In the Draft Environmental Impact Statement Resolution Copper Project and Land Exchange August 2019."

With respect to the hydrologic analysis and the groundwater model, in order to inform the analysis being conducted by the independent third-party professionals, we convened a Groundwater Modeling Workgroup (meeting roughly between September 2017 and November 2018) to assess and discuss the mine-site groundwater model prior to the DEIS. This was followed by an expanded Water Resources Workgroup (meeting roughly between January 2020 and July 2020) to discuss comments received on the DEIS and additional analysis for the FEIS. These workgroups are described in detail in several memoranda in the project record (BGC Engineering USA Inc. 2020b; Garrett 2020j).

These workgroups were designed to include many professional viewpoints, including Forest Service specialists, the third-party NEPA specialists, cooperating agency specialists (including representatives from the EPA, ADEQ, ADWR, Arizona Game and Fish Department, USACE, and ASLD), Resolution Copper and its contractors, and specialists representing other stakeholders such as the San Carlos Apache Tribe.

The general goal of the workgroup was to review the modeling analysis being conducted and have open discussion about technical methodologies, results, and documentation; raise concerns and questions; request clarifications or additional data from the modeling contractors; and discuss the use and portrayal of the model in the EIS documents. The group was not convened for the purpose of reaching consensus on all topics considered. We did commit to documenting any professional disagreement and the Forest Service course of action, along with a clear rationale for why a different course was taken (BGC Engineering USA Inc. 2020b).

The detailed modeling comments by Dr. Prucha were brought forward and reviewed by the Water Resources Workgroup between January 2020 and July 2020. Specific input in response to these comments was obtained from the NEPA third-party groundwater modelers and Resolution Copper's modeling contractors. This included requests for additional output and analyses (see Garrett (2020j)). The full details of the discussion and conclusions specific to the groundwater modeling comments are contained in the project record (Garrett 2020e).

12-RCMSER-3020

Appendix R

| Comment response: WT45<br>Overall response to report by Dr. B. Prucha regarding groundwater modeling | Page 2 of 7 |
|---|---|

**Responsive to these comments:**
8031-59

Ultimately, Dr. Prucha's report was considered as 15 separate issues:

1. Modeling process, characterization, conceptualization
2. Model code selection
3. Groundwater-dependent ecosystems (GDEs)
4. Baseline conditions
5. Decisions about use of model output (200 years, 10 feet)
6. Skunk Camp modeling
7. Surface water/groundwater
8. Choice of calibration wells and targets
9. Calibration
10. Uncertainty analysis
11. Geothermal effects
12. Subsidence crater lake analysis
13. Subsidence effects in the model
14. Desert Wellfield model
15. Inappropriate modeling choices for faults, recharge, evapotranspiration (ET), and boundary conditions

A summary of the comments and discretionary actions that we made is provided below; see Garrett (2020e) for more details.

<u>1. Modeling process, characterization, conceptualization</u>

These comments raised concerns that the overall modeling process did not follow industry standards, including in the characterization and conceptualization of the groundwater system. The NEPA team determined the following: (1) industry-standard processes were followed and are clearly documented in the project record (BGC Engineering USA Inc. 2018d:appendix A); (2) specific questions/issues were appropriately considered and documented prior to modeling; (3) the conceptualization of the groundwater system incorporated substantial data collection, the field efforts included feedback loops to identify and fill data gaps, and, ultimately, these efforts resulted in an adequate basis for modeling; (4) alternative conceptual models had been appropriately considered and incorporated into the modeling analysis; and (5) the aquifer test data set was substantial and adequate for supporting the model characterization. The NEPA team identified some project record material that required updating, but no changes to the modeling approach or FEIS text were warranted based on these comments.

Appendix R

| | |
|---|---|
| **Comment response: WT45**<br>Overall response to report by Dr. B. Prucha regarding groundwater modeling | Page 3 of 7 |
| **Responsive to these comments:**<br>8031-59 | |

### 2. Model code selection

These comments raised concerns that the model code selection was not fully vetted or that the wrong model code was used. The NEPA team determined the following: (1) the code was selected for specific reasons; (2) the model code selection was appropriate (MODFLOW-SURFACT), and the appropriateness was a specific topic of discussion in the Groundwater Modeling Workgroup; (3) the rationale for selection was appropriately documented; and (4) the specific alternative model codes identified in the comments do not override the specific reasons why MODFLOW-SURFACT was selected and approved in the first place. The NEPA team recognized that additional text was needed to augment the description of the model code selection and criteria; this text was added to section 3.7.1 of the FEIS.

### 3. Groundwater-dependent ecosystems

As part of the Groundwater Modeling Workgroup, any springs, streams, or other potential GDEs were evaluated for the most likely source of water; the intent of this evaluation was to identify those GDEs connected to the regional aquifers that would be impacted by mine-related drawdown. These comments express disagreement with the conclusions reached, characterizing several of the GDE determinations used in the DEIS as "unconvincing." The NEPA team determined that these comments contain errors and contain little specificity for why the GDE determinations were said to be lacking in light of the substantial lines of evidence brought forward by the NEPA team to evaluate the GDEs. The GDE evaluations used for the DEIS (Garrett 2018e) were based on multiple lines of evidence, with a clear methodology and framework identified for how each line of evidence would be evaluated. Given the lack of specificity in these comments, the NEPA team did not identify any changes that were necessary to the approach, the project record, or the FEIS.

### 4. Baseline conditions

These comments criticize the choice of baseline conditions used for the model and NEPA analysis, particularly in light of the mine pumping that is currently ongoing. The decision regarding which baseline conditions were appropriate for both the groundwater model and the NEPA analysis was the subject of specific and lengthy discussions prior to the preparation of the DEIS, including Groundwater Modeling Workgroup discussions. Full consensus was not reached. The rationale for our ultimate decision on the appropriate baseline conditions has been clearly articulated in the EIS (DEIS, pp. 299–300) and in the project record (see Garrett (2018d)); dissenting opinions have been fully articulated and considered, as well (see BGC Engineering USA Inc. (2018d:section 5.1)). From these comments, we recognized that additional information was needed in the EIS and project record to fully describe the baseline information incorporated into the model; this text was added to section 3.7.1 of the FEIS.

12-RCMSER-3022

Appendix R

| Comment response: WT45<br>Overall response to report by Dr. B. Prucha regarding groundwater modeling | Page 4 of 7 |
| --- | --- |

**Responsive to these comments:**
8031-59

### 5. Decisions on the use of model output, including limiting quantification to 200 years and 10 feet

Two key decisions that resulted from discussions in the Groundwater Modeling Workgroup were to limit quantification of modeled drawdown to 200 years and 10 feet. These comments describe these decisions as arbitrary and uninformed. As with baseline conditions, the consideration of the limitations of quantified model output and the decision to limit quantification of drawdown to 200 years and 10 feet were the subject of specific and lengthy discussions in the Groundwater Modeling Workgroup prior to the preparation of the DEIS. Full consensus was not reached. The rationale for choosing the model limitations for our analysis approach was clearly articulated in the EIS (DEIS, pp. 300–301). A dissenting opinion from a workgroup member was fully articulated and considered, as well (see BGC Engineering USA Inc. (2018d:section 5.1)). Additionally, the comments incorrectly characterize the analysis contained in the DEIS in three ways. First, the characterization that GDEs were excluded from monitoring because of the 10-foot drawdown threshold is incorrect. As a specific remedy to the uncertainties inherent in modeling, the proposed mitigation and monitoring program includes all GDEs identified with a connection to the regional aquifers, regardless of their anticipated impacts as predicted by the groundwater modeling (DEIS, pp. 301–303, 343–344). Second, impacts beyond 200 years were not ignored. The EIS does include qualitative descriptions of long-term trends beyond 200 years (DEIS, pp. 333–334). Third, impacts less than 10 feet were also not ignored. The EIS graphically shows impacts less than 10 feet (DEIS, appendix L). We determined from these comments that some clarification in the text was required to better explain that these analyses exist; such clarification was added to section 3.7.1 of the FEIS.

### 6. Skunk Camp modeling

These comments state that a conceptual model was not provided for the Alternative 6 water analysis and that the hydrogeologic characterization associated with Alternative 6 is missing. Neither of these assertions is correct: the conceptual model of Alternative 6 was clearly documented in the project record, and the level of hydrogeologic characterization and the effect it has on modeling uncertainty and comparison between alternatives were specifically described in section 3.7.2 (DEIS, pp. 357–361). Between the DEIS and FEIS, we reviewed further field investigations for Alternative 6 that are responsive to these comments. See responses ALT22 and WT7 for further discussion. Text was added to section 3.7.2 to reflect the new information collected.

Appendix R

| Comment response: WT45 Overall response to report by Dr. B. Prucha regarding groundwater modeling | Page 5 of 7 |
|---|---|
| **Responsive to these comments:** 8031-59 | |

### 7. Modeling of surface water/groundwater interaction

These comments state that the model code selection was inappropriate and that a fully coupled surface water/groundwater model would have been more appropriate; alternatively, they state that the wrong techniques or packages within the existing model were used to model surface water/groundwater interaction. We determined that the choice of modeling techniques to simulate the physical processes of recharge or discharge in stream channels is fundamentally a professional choice, not an error. As with baseline conditions and use of model output, consideration of the appropriate methods with which to model surface water and groundwater interaction was the subject of specific and lengthy discussions in the Groundwater Modeling Workgroup prior to the preparation of the DEIS. Full consensus was not reached. The rationale and dissenting opinions have been documented in the project record (see BGC Engineering USA Inc. (2018d:section 5.1)). Further, the combined impacts of surface water changes and groundwater drawdown were indeed analyzed together in the DEIS, as requested in the comment, for the one location where both types of impacts occur—Devil's Canyon (DEIS, p. 329). No impacts were ignored as a result of the techniques chosen, even if there were other methods available that could have been used to analyze them. Given the lack of specificity in these comments, the NEPA team did not identify any changes that were necessary to the approach, the project record, or the FEIS.

### 8. Choice of calibration wells and targets

These comments criticize the choice not to analyze impacts at individual wells but instead to rely on representative wells for key locations where private wells provide water supplies (Top-of-the-World, Superior, Boyce Thompson Arboretum). The rationale for the choice not to analyze individual wells was clearly articulated, with several specific reasons noted (Newell and Garrett 2018d). The alternative choice expressed in these comments would in no way overcome the obstacles that drove the choice made by the NEPA team. Further, the fundamental type of analysis desired in the comment—the ability to analyze the potential impacts at any point in the aquifer—already exists in the DEIS analysis through the drawdown figures (DEIS, pp. 298, 302, 323). Based on these comments, the NEPA team determined that some clarification was necessary to explain how impacts can be assessed using the existing analysis; this clarification was added to section 3.7.1 of the FEIS.

12-RCMSER-3024

Appendix R

| Comment response: WT45<br>Overall response to report by Dr. B. Prucha regarding groundwater modeling | Page 6 of 7 |
| --- | --- |
| **Responsive to these comments:**<br>8031-59 | |

9. Calibration

These comments indicate that the groundwater model calibration process was flawed and inappropriate. We determined the following: (1) the calibration data set covered an appropriate area; (2) the calibrated hydraulic conductivity matches the substantial real-world data collected in the field; (3) the claim made in the comments that water levels represented the sole calibration target was incorrect; (4) the concentration of head targets near the mine site is acknowledged and unavoidable but also is not inappropriate, as this represents the area that would experience the greatest stresses and that has highly sensitive GDEs (Devil's Canyon); and (5) generic references to other data sets are inappropriate, as no other specific data set exists that would have improved upon those used. In this case, we did identify additional model output that was needed in response to these comments; this output was requested, received, and incorporated into the FEIS analysis (Garrett 2020j).

10. Uncertainty Analysis

These comments criticize the approach taken to assess uncertainty in the modeling and suggest that such an approach contradicts industry standards. In fact, we concluded that this is a difference of professional opinion that actually is explicitly discussed in modeling guidance, with the approach identified in the comments being suggested in some guidance but expressly disagreed with in other guidance. The comments also criticize the disclosure of the uncertainty analysis that was conducted. We assert that the full suite of model runs (87 in all) was properly disclosed. As a more general concern, the comments suggest that risk and uncertainty were not adequately assessed in the decision-making process or analysis. We found this also to be unsupported, as the uncertainty of the model is explicitly addressed in numerous places in the documentation and clearly was a fundamental part of our Forest Service decision making (see, for instance, "Key Decision on Use of Model Results – Strategies to Address Uncertainty" (DEIS, p. 301)). In response to these comments, we did not identify any changes to be made to our analysis approach or to text in the EIS, but we did identify some additional discussion needed in project record material.

11. Geothermal Effects

These comments indicate that geothermal effects were not included in the model, as would be appropriate. In this case, we found that the comments had merit. There is a reasonable rationale for not including geothermal effects, but none of the DEIS or Groundwater Modeling Workgroup documentation captured this rationale. We determined that additional documentation was necessary in response to this comment, though the overall modeling approach remains appropriate and has not been changed.

Appendix R

| Comment response: WT45<br>Overall response to report by Dr. B. Prucha regarding groundwater modeling | Page 7 of 7 |
|---|---|

**Responsive to these comments:**
8031-59

### 12. Subsidence crater lake analysis

One fundamental outcome of our DEIS analysis is that a subsidence crater lake is not likely to develop and therefore would be inappropriate to attempt to analyze. These comments criticize that decision, indicating that development of a subsidence crater lake is reasonably foreseeable and that the methodology we used to determine otherwise was flawed. This topic is discussed in greater detail in response WT36. In response to these comments, we revised the methodology approach used in the DEIS and requested additional model output data in order to execute that revised approach (Garrett 2020j). However, our conclusions in the FEIS based on the revised approach remain the same: the creation of a lake in the subsidence crater is remote and speculative and would be inappropriate to analyze.

### 13. Subsidence effects in the model

These comments indicate that subsidence effects were not explicitly incorporated into the groundwater flow model and that the model was inappropriate for subsidence effects. We found that this to be a correct interpretation; however, the modeling of a change in elevation of land surface above the regional aquifer has no bearing on the outcome of the groundwater model. We also found that the approaches used to assign hydraulic conductivity in the block-cave zone were appropriate and would not lead to any substantial change in model outcomes. Based on these comments, we determined that additional explanation in the project record was necessary to capture how the block-cave zone is modeled.

### 14. Desert Wellfield model

These comments indicate that the separate groundwater model used to predict impacts from the Desert Wellfield was not scrutinized or vetted by the NEPA team, unlike the mine-site groundwater model, which was scrutinized. This is a correct statement. Because the model used for the Desert Wellfield is a standard regulatory model prepared and used by the ADWR, the same level of evaluation was not deemed necessary. These comments were discussed with the Water Resources Workgroup, and ultimately there was consensus that the comments were valid and that some level of vetting of the Desert Wellfield model would be appropriate. This analysis was completed (Walser 2020a), included in the project record, and disclosed in section 3.7.1 of the FEIS.

### 15. Inappropriate modeling choices for faults, recharge, evapotranspiration, and boundary conditions

These comments are extensive and detailed, but in general they criticize various modeling choices made with respect to modeling faults, recharge, evapotranspiration, and setting boundary conditions. We noted that there are many modeling tools and techniques available, and modelers have to make choices about which tools and techniques to use. There are always other tools that could have been used—that the comments raise other possible approaches is a moot point. The appropriate threshold for concern is whether the comments make a valid argument that the existing method is actually in error or that the rationale for using the existing method is incorrect.

The NEPA team reviewed each individual criticism and determined in all cases that adequate information and rationale exist to justify the choices made and that in many cases alternative methods were in fact investigated to determine the potential effect on the model (such as changing fault properties, changing recharge, or changing boundary conditions). In every case, the existing approaches not only are valid options, they have been demonstrated in various ways to accurately predict real-world conditions. Where uncertainty exists, it was determined that the uncertainty had been properly incorporated into the uncertainty analysis and disclosed in the DEIS. We identified some additional output data needed on one topic (springs) and recognized that some additional explanation in the FEIS was needed, but no overall change in modeling approach is warranted.

| Comment response: WT45_A<br>Overall response to report by Dr. B. Prucha regarding groundwater modeling; with addition for specific comment 30145-1; 8032-70; 8032-68 | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
30146-1 (Prucha), 8032-68, 8032-70

For full response, see response WT45. The concerns raised in this comment are addressed specifically by issue #3 in WT45.

Appendix R

| Comment response: WT45_B<br>Overall response to report by Dr. B. Prucha regarding groundwater modeling; with addition for specific comment 30146-2 | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>30146-2 (Prucha) | |
| For full response, see response WT45. The concerns raised in this comment are addressed specifically by issue #12 in WT45. | |

| Comment response: WT45_C<br>Overall response to report by Dr. B. Prucha regarding groundwater modeling; with addition for specific comment 30146-3; 8032-75 | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>30146-3 (Prucha), 8032-75 | |
| For full response, see response WT45. The concerns raised in this comment are addressed specifically by issues #7 and #9 in WT45. | |

| Comment response: WT45_D<br>Overall response to report by Dr. B. Prucha regarding groundwater modeling; with addition for specific comment 30146-4 | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>30146-4 (Prucha) | |
| For full response, see response WT45. The concerns raised in this comment are addressed specifically by issues #3, #4, #5, and #7 in WT45. | |

| Comment response: WT45_E<br>Overall response to report by Dr. B. Prucha regarding groundwater modeling; with addition for specific comment 30146-5 | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>30146-5 (Prucha) | |
| For full response, see response WT45. The concerns raised in this comment are addressed specifically by issues #1, #7, and #10 in WT45. | |

| Comment response: WT45_F<br>Overall response to report by Dr. B. Prucha regarding groundwater modeling; with addition for specific comment 30146-6 | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>30146-6 (Prucha) | |
| For full response, see response WT45. The concerns raised in this comment are addressed specifically by issues #1, #6, #11, and #15 in WT45. | |

| Comment response: WT45_G<br>Overall response to report by Dr. B. Prucha regarding groundwater modeling; with addition for specific comment 30146-7 | Page 1 of 1 |
| --- | --- |
| **Responsive to these comments:**<br>30146-7 (Prucha) | |
| For full response, see response WT45. The concerns raised in this comment are addressed specifically by issues #2, #11, and #15 in WT45. | |

12-RCMSER-3027

Appendix R

| Comment response: WT45_H Overall response to report by Dr. B. Prucha regarding groundwater modeling; with addition for specific comment 30146-8; 8032-73 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 30146-8 (Prucha), 8032-73 | |
| For full response, see response WT45. The concerns raised in this comment are addressed specifically by issue #6 in WT45. | |

| Comment response: WT45_I Overall response to report by Dr. B. Prucha regarding groundwater modeling; with addition for specific comment 30146-9; 8032-74 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 30146-9 (Prucha), 8032-74 | |
| For full response, see response WT45. The concerns raised in this comment are addressed specifically by issues #5, #7, #8, #12, and #15 in WT45. | |

| Comment response: WT45_J Overall response to report by Dr. B. Prucha regarding groundwater modeling; with addition for specific comment 30146-10 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 30146-10 (Prucha) | |
| For full response, see response WT45. The concerns raised in this comment are addressed specifically by issues #4, #7, and #9 in WT45. | |

| Comment response: WT45_K Overall response to report by Dr. B. Prucha regarding groundwater modeling; with addition for specific comment 30146-11; 8032-81; 8032-82; 8032-83; 8032-85 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 30146-11 (Prucha), 8032-81, 8032-82, 8032-83, 8032-85 | |
| For full response, see response WT45. The concerns raised in this comment are addressed specifically by issue #9 in WT45. | |

| Comment response: WT45_L Overall response to report by Dr. B. Prucha regarding groundwater modeling; with addition for specific comment 30146-12 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 30146-12 (Prucha) | |
| For full response, see response WT45. The concerns raised in this comment are addressed specifically by issues #1, #4, #6, and #9 in WT45. | |

12-RCMSER-3028

Appendix R

| Comment response: WT45_M<br>Overall response to report by Dr. B. Prucha regarding groundwater modeling; with addition for specific comment 30146-13 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>30146-13 (Prucha) | |
| For full response, see response WT45. The concerns raised in this comment are addressed specifically by issues #5, #11, and #13 in WT45. | |

| Comment response: WT45_N<br>Overall response to report by Dr. B. Prucha regarding groundwater modeling; with addition for specific comment 30146-14; 8032-91 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>30146-14 (Prucha), 8032-91 | |
| For full response, see response WT45. The concerns raised in this comment are addressed specifically by issues #5, #10, #12, and #13 in WT45. | |

| Comment response: WT45_O<br>Overall response to report by Dr. B. Prucha regarding groundwater modeling; with addition for specific comment 30146-15; 8032-95 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>30146-15 (Prucha), 8032-95 | |
| For full response, see response WT45. This concerns raised in this comment are addressed specifically by issues #5, #9, #10, and #14 in WT45. | |

| Comment response: WT45_P<br>Overall response to report by Dr. B. Prucha regarding groundwater modeling; with addition for specific comment 8032-72 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>8032-72 | |
| For full response, see response WT45. The concerns raised in this comment are addressed specifically by issues #2, #7, #11, and #15 in WT45. | |

| Comment response: WT45_Q<br>Overall response to report by Dr. B. Prucha regarding groundwater modeling; with addition for specific comment 8032-78 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>8032-78 | |
| For full response, see response WT45. The concerns raised in this comment are addressed specifically by issue #10 in WT45. | |

Appendix R

| Comment response: WT45_R<br>Overall response to report by Dr. B. Prucha regarding groundwater modeling; with addition for specific comment 8032-71 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>8032-71 | |
| For full response, see response WT45. The concerns raised in this comment are addressed specifically by issues #1, #2, #7, and #10 in WT45. | |

| Comment response: WT45_S<br>Overall response to report by Dr. B. Prucha regarding groundwater modeling; with addition for specific comment 8032-87 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>8032-87 | |
| For full response, see response WT45. The concerns raised in this comment are addressed specifically by issue #13 in WT45. | |

| Comment response: WT45_T<br>Overall response to report by Dr. B. Prucha regarding groundwater modeling; with addition for specific comment 8032-76; 8032-77 | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>8032-76, 8032-77 | |
| For full response, see response WT45. The concerns raised in this comment are addressed specifically by issues #9 and #15 in WT45. | |

| Comment response: WT46<br>Nitrogen analysis | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>524-14 | |
| We added further discussion of the assumptions and calculations used for nitrogen loading in the block-cave zone due to blasting in section 3.7.2 of the FEIS. | |

| Comment response: WT47<br>Chromium analysis | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>524-13 | |
| This comment concerns the appropriate speciation of chromium to include in the water quality analysis. Based on this comment, we modified the approach used in section 3.7.2 of the FEIS to incorporate standards for chromium III and VI where appropriate. | |

12-RCMSER-3030

Appendix R

| Comment response: WT48 Need for water quality analysis | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1329-4, 30075-33

Potential impacts on surface water and groundwater, as requested in the comment, are disclosed in section 3.7.2, as follows:

- potential stormwater quality (DEIS, pp. 379–383),
- potential impacts of tailings seepage to surface water and groundwater quality (DEIS, pp. 387–390 [Alt 2], pp. 395–397 [Alt 3], pp. 401–404 [Alt 4], pp. 408–410 [Alt 5], pp. 414–416 [Alt 6])
- post-closure ramifications on water quality (DEIS, p. 391 [Alt 2], p. 398 [Alt 3], p. 404 [Alt 4], p. 411 [Alt 5], p. 417 [Alt 6])
- potential impacts on impaired waters (DEIS, p. 392 [Alt 2], p. 398 [Alt 3], pp. 404–405 [Alt 4], p. 411 [Alt 5], p. 417 [Alt 6])
- potential impacts on assimilative capacity (DEIS, p. 392 [Alt 2], p. 398 [Alt 3], p. 405 [Alt 4], p. 411 [Alt 5], p. 417 [Alt 6])
- potential for processing chemicals to persist in tailings seepage (DEIS, pp. 417–418)
- potential for technologically enhanced naturally occurring radioactive materials (DEIS, pp. 418–419)
- potential for asbestiform materials (DEIS, pp. 419–420)
- cumulative impacts (DEIS, pp. 419–420)

In addition to the impacts disclosed in section 3.7.2, the potential impacts to water quality from a catastrophic failure of the tailings storage facility or the failure of a slurry or concentrate pipeline are analyzed in section 3.10.1 (DEIS, pp. 535–558).

| Comment response: WT49 Issue of oxygenation from stormwater infiltrating the subsidence crater | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
30075-31, 30075-36, 30078-33

The analysis of potential block-cave water quality was revised in the FEIS; see response WT37 for more details.

These comments raise the question of oxygenation within the block-cave zone and the impact this would have on water quality. Oxygenation has been incorporated into the operational analysis of water quality, and the oxygenation products associated with mineralized rock are appropriately carried through into the processing plant and ultimately the tailings seepage, as further described in section 3.7.2.

During closure, we determined that the models used in the DEIS were inappropriate (see response WT37). A more appropriate approach was used in section 3.7.2 in the FEIS, based on saturated column testing conducted by Resolution Copper, specifically intended to estimate the water quality associated with submerged mineralized rock. While oxygenated precipitation would enter the subsidence crater and likely would indeed infiltrate and contribute to aquifer recharge, the remnants of the mineralized ore body are located thousands of feet below ground and would be the first material submerged upon closure once dewatering has ceased. Some level of dissolved oxygen is associated with any source of groundwater submerging the mineralized ore, whether recharged precipitation or groundwater flowing into the block-cave zone from the surrounding aquifer. The potential for any oxidation of mineralized rock due to the presence of any dissolved oxygen available within the submerged block-cave zone is replicated by the saturated column tests we use in the FEIS to assess post-closure block-cave water quality.

12-RCMSER-3031

Appendix R

| Comment response: WT50 | |
|---|---|
| Community water supplies | Page 1 of 1 |

**Responsive to these comments:**
235-23

This comment indicates that the "DEIS fails to address the loss and contamination of water in communities surrounding the proposed project area including Globe, Superior, Miami, San Carlos, Kearny, Florence, Queen Valley and other surrounding areas." This is an incorrect statement.

The potential for groundwater drawdown to impact water supplies is addressed in section 3.7.1, specifically for water supplies around the mine site (DEIS, p. 333) and around the Desert Wellfield (DEIS, pp. 335–340; varies by alternative).

At the mine site, the analysis of water loss includes potential impacts to wells that are representative of impacted community water supplies corresponding to Superior, Top-of-the-World, and Boyce Thompson Arboretum (DEIS, p. 326). As shown in figure 3.7.1-3 (DEIS, p. 302), Globe, Miami, San Carlos, Kearny, Florence, and Queen Valley are beyond the limits of anticipated impact caused by drawdown at the mine site.

Similarly, as shown in figure 3.7.1-2 (DEIS, p. 298), Globe, Miami, San Carlos, Kearny, and Queen Valley are beyond the limits of anticipated impact caused by drawdown from the Desert Wellfield. Florence is located just outside the analysis area shown in figure 3.7.1-2, and some drawdown might indeed reach the town of Florence and other communities in the East Salt River valley not mentioned specifically in the comment. See response WT4 for more discussion of how regional water supplies and competing water uses have been analyzed, with additional discussion in the FEIS.

Potential water contamination from seepage entering downstream surface waters is described in section 3.7.2. As shown in figure 3.7.2-1 (DEIS, p. 347), Globe, Miami, San Carlos, and Florence are outside the area of analysis in which water impacts would occur.

Kearny is located along the Gila River, downstream of where seepage from the tailings storage facility at the Skunk Camp location (Alternative 6) could affect the Gila River. As described in section 3.7.2, all numeric surface water quality standards are anticipated to be met in the Gila River; thus, impacts to water supplies are unlikely downstream at Kearny. Additional analysis was added to the FEIS with respect to seepage impacts from Alternative 6; see response WT7 for more details.

Queen Valley is located downstream of Whitlow Ranch Dam, where seepage from the tailings storage facilities for Alternatives 2, 3, and 4 would enter surface water. The hydrologic connection between Queen Valley and Queen Creek and the potential for impact from tailings seepage associated with Alternatives 2, 3, and 4 were discussed as part of the Water Resources Workgroup (reconvened in January 2020 to assist the Forest Service in reviewing and addressing comments on the DEIS). Analysis was added to section 3.7.2 of the FEIS to further evaluate potential impacts on water resources in Queen Valley. See response WT59 for more detailed discussion of this issue.

| Comment response: WT51 | |
|---|---|
| Sodium selenite | Page 1 of 1 |

**Responsive to these comments:**
1231-1, 281-1

This comment refers to sodium selenite specifically and water quality impacts in general. Sodium selenite is one of many compounds that can contribute to dissolved selenium concentrations in water. The analysis and disclosure in the EIS are applicable to any impacts specific to sodium selenite.

Selenium is a specific constituent of concern identified for the water quality analysis (DEIS, p. 365). Predicted concentrations of selenium in groundwater and surface water as a result of tailings seepage are compared with Arizona numeric water quality standards as a threshold of concern (DEIS, pp. 387–390 [Alt 2], pp. 395–397 [Alt 3], pp. 401–404 [Alt 4], pp. 408–410 [Alt 5], pp. 414–416 [Alt 6]). Predicted concentrations of selenium in stormwater are similarly compared with Arizona numeric water quality standards (DEIS, pp. 379–383). Arizona numeric water quality standards compared for selenium include for aquifers, body contact, agricultural use, and chronic wildlife exposure (DEIS, appendix N, table N-5).

12-RCMSER-3032

Appendix R

| Comment response: WT52<br>Water quality related comments by Dr. Maest | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8032-109

This comment references a number of specific water quality comments that were submitted in a report titled "Review of Geochemical Issues of Resolution Copper's Draft Environmental Impact Statement, August 2019," authored by Dr. A. Maest. The following responses are applicable to this report:

- Response WT28, regarding concerns with subaqueous deposition of potentially acid generating tailings
- Response WT35, regarding analysis of stormwater quality
- Response WT36, regarding the potential for the development of a lake in the subsidence crater
- Response WT37, regarding anticipated water quality within the block-cave zone
- Response WT41, regarding the use of specific analytical techniques

| Comment response: WT54<br>Contribution to regional water quality from impacted springs | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
30078-45

The springs and perennial streams potentially impacted by dewatering represent discharge points from the regional aquifers, either the deeper groundwater system or the Apache Leap Tuff aquifer. These springs and streams do not represent recharge points for these aquifers but discharge points.

Once exposed at the surface, in some cases these high-quality waters contribute to stream runoff and ultimately may form a small component of recharge to the larger region. An example is spring DC-6.6W, which is anticipated to be impacted by drawdown and forms 0 to 5 percent of flow in Devil's Canyon (DEIS, p. 329). In most cases, however, the springs in question do not flow far enough to contribute to surface runoff and are likely to be consumed locally through evaporation or transpiration by riparian plants.

The baseflow of perennial streams in the area (Devil's Canyon and Mineral Creek) is not anticipated to be impacted by drawdown; contribution to regional recharge from these sources would remain unchanged.

| Comment response: WT55<br>Impacts to water quality from copper | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
555-5

The comment correctly states that concentrations of copper in stormwater—at least for stormwater contacting the filtered tailings on Alternative 4—are predicted to be 3.294 milligrams per liter (mg/L) (DEIS, p. 382). The comment compares this with the maximum contaminant level for copper, which is 1.3 mg/L. This number is correct, but maximum contaminant levels are regulations specific to drinking water. The EIS disclosure uses different thresholds for analysis.

Copper is a specific constituent of concern identified for the water quality analysis (DEIS, p. 365). Predicted concentrations of copper in groundwater and surface water as a result of tailings seepage are compared with Arizona numeric water quality standards as a threshold of concern (DEIS, pp. 387–390 [Alt 2], pp. 395–397 [Alt 3], pp. 401–404 [Alt 4], pp. 408–410 [Alt 5], pp. 414–416 [Alt 6]). Predicted concentrations of copper in stormwater are similarly compared with Arizona numeric water quality standards (DEIS, pp. 379–383). Arizona numeric water quality standards compared for copper include those for aquifers, body contact, agricultural use, and wildlife exposure (DEIS, appendix N, table N-5).

The maximum contaminant level of 1.3 mg/L referenced in the comment is the least restrictive of the standards used as impact thresholds in the EIS. The most restrictive is 0.0191 mg/L (DEIS, appendix N, table N-5).

The potential concentrations in stormwater identified by the comment (DEIS, p. 365) would not be released to the environment, as discussed in section 3.7.2 (DEIS, pp. 379–381). However, we revised the stormwater analysis in section 3.7.2 of the FEIS to reflect possible release scenarios; see response WT35 for more details.

Appendix R

| Comment response: WT56 Additional spring sources not analyzed | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 8032-200, 8032-202 | |

These comments raise the issue of potential springs either on Oak Flat or within the footprints of the tailings storage facilities that were not analyzed in the DEIS. Four appendices to comment letter #8032 provide specific information.

Appendix M-1 provides a map of purported spring locations. A similar exercise was conducted by the NEPA team early in the analysis process, compiling potential spring locations from all available sources (Rietz 2017). The vast majority of the springs identified in Appendix M-1 do not exist in perennial form on the landscape. They may be artifacts of historic water conditions, they may be mismapped, or they may be seasonal or ephemeral seeps or springs. The types of water sources that stand to be impacted by mine drawdown are those that have persistent water on the landscape and are connected to the regional aquifer. The term we used in the NEPA analysis is "groundwater-dependent ecosystems" (GDEs). Spring inventories based on historic maps and available databases are not sufficient to define springs in this way.

However, field surveys are sufficient to define those springs likely to be impacted by mine drawdown, and these surveys were conducted over the entire mine footprint, including the Federal parcel (Oak Flat) and each of the tailings storage facility locations. Perennial springs have been identified and monitored, in some cases extending back to 2002 (Montgomery and Associates Inc. and WestLand Resources Inc. 2017; WestLand Resources Inc. and Montgomery and Associates Inc. 2018, 2020). The map provided with the comment (appendix M-1) is not sufficient to determine true GDEs.

The springs identified and monitored in these surveys were then assessed against multiple lines of evidence to determine the likely source of water (local sources or regional sources that could be impacted by mine drawdown) (DEIS, pp. 312–317) (Garrett 2018e). The springs fed by regional sources are those that the NEPA team analyzed for potential impacts, using the predictions of the groundwater model or the disturbance footprint of the project (DEIS, pp. 317–340; see especially p. 324). These are the same springs for which monitoring would be undertaken during operations and mitigation applied to any water reductions, regardless of anticipated impacts disclosed in the DEIS (DEIS, pp. 342–344).

Appendix M-2 to comment letter #8032 contains images and details of "an unnamed cave seep." Based on the coordinates provided, this is actually the GDE analyzed in the DEIS as "The Grotto" (WestLand Resources Inc. and Montgomery and Associates Inc. 2020). This water feature is anticipated to be lost to the subsidence crater (DEIS, p. 324).

Appendix M-3 to comment letter #8032 contains images and details of "an unnamed Cienega." Based on the coordinates provided, this is actually the feature identified and monitored as "Anxiety Fault Pond" (Montgomery and Associates Inc. 2017a). The project record documentation describes this feature as follows: "Anxiety Fault Pond is an anthropogenic, earthen pond off of Magma Mine Road, approximately 1.5 miles from the Highway 60 turnoff (Figure 1). The pond is in a naturally flat lying area, south of the Number 9 wash drainage (Photo 11). The source of water in the pond is runoff from rain events and seepage from the jointed and fractured Tal topography above the pond." This pond is one of four persistent surface water features identified on Oak Flat that likely derive water from local sources and therefore would not be impacted by groundwater drawdown resulting from mine dewatering. However, these features still would be lost, as they lie within the footprint of the projected subsidence crater. These features were not included in the DEIS in section 3.7.1 but were added to section 3.7.1 of the FEIS as impacted features.

Appendix M-4 to comment letter #8032 contains images and details of a "Swimming Hole Spring unnamed unmapped." Based on the coordinates provided and comparison of the photographs provided, this is actually the GDE analyzed in the DEIS as "Rancho Rio Spring" (WestLand Resources Inc. and Montgomery and Associates Inc. 2020). This water feature is anticipated to be lost to the subsidence crater (DEIS, p. 324).

12-RCMSER-3034

Appendix R

| **Comment response:** WT57<br>Adverse impact of assimilative capacity change | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>30075-45 | |
| We revised the "Unavoidable Adverse Effects" section of the water quality analysis (added to section 3.7.2) in the FEIS to reflect that a reduction in assimilative capacity is an adverse effect. | |

| **Comment response:** WT58<br>Impacts to individual wells | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>38-2, 8032-80 | |
| Note that this topic is also covered in response WT45. The concerns raised in these comments are addressed specifically in issue #8 in response WT45.<br><br>These comments raise the concern that "the evaluation of future drawdown at the surrounding wells was not conducted." This is an incorrect statement. The analysis of impacts on surrounding water supply wells from drawdown was analyzed in the DEIS.<br><br>Our approach in the DEIS was to use three proxy locations for representative water supplies that could be impacted by drawdown resulting from mine dewatering. The specific reasons for which proxies were used instead of individual wells is articulated in the project record (Newell and Garrett (2018d).<br><br>The larger question is whether the DEIS lacks disclosure of important drawdown impacts that are not shown by the proxies. In fact, the DEIS contains the information necessary for anybody to understand the drawdown at their individual well. If the proxy wells (one for Superior, one for Top-of-the-World, one for Boyce Thompson) are deemed insufficient for this purpose, perhaps because a reader owns a well farther afield, the full spatial distribution across the landscape is still shown in the DEIS: figure 3.7.1-2 for drawdown near the Desert Wellfield (DEIS, p. 298), figure 3.7.1-3 for drawdown at the mine site under the proposed action (DEIS, p. 302), and figure 3.7.1-8 for drawdown at the mine site under the no action alternative (DEIS, p. 323). Also note that figure 3.7.1-3 does show the full range of drawdown from all the uncertainty analysis as well, not just the single best-calibrated run. Other specific representations of drawdown are shown in DEIS appendix L, with the specific location shown in figure 3.7.1-7 (DEIS, p. 315). Any of these locations are indicative of drawdown in the regional aquifer, which could impact individual wells.<br><br>We added further discussion to section 3.7.1 of the FEIS to further describe where results specific to individual well owners can be found. We have also included the overall number of individual wells anticipated to be impacted to disclose a sense of the magnitude of the issue. | |

| **Comment response:** WT59<br>Queen Valley water rights | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>268-2, 8032-96 | |
| These comments state that the DEIS "does not recognize or discuss the existing ground and surface water rights granted and purchased by the Queen Valley Golf Course and the Queen Valley Community."<br><br>See response WT19 for a full discussion of water rights issues.<br><br>As with other surface water rights, the Queen Valley water rights are similar to other potential water rights discussed in the DEIS, such as springs. In the DEIS we conclude that while physical loss to these sources can be disclosed, "impact on any surface water rights from a legal or regulatory standpoint cannot yet be determined due to the ongoing adjudication" (DEIS, p. 332).<br><br>The physical connection between Queen Valley and the Queen Creek system (and therefore the potential for impact from project activities) was not explicitly assessed in the DEIS. This description has been added to section 3.7.2 of the FEIS. Further discussion of the potential to impact water rights in Queen Valley has been added to section 3.7.3, and further discussion of the potential for contamination to impact Queen Valley has been added to section 3.7.2. | |

12-RCMSER-3035

Appendix R

| Comment response: WT60<br>Destruction of trees/Winters doctrine | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>1469-1 | |

See response NEPA14 for discussion of the Winters doctrine with respect to federally reserved water rights.

Response NEPA14 is primarily about potential loss of springs and the Federal water rights associated with those springs. This comment expands the issue more generally to include water potentially needed to sustain vegetation. Analysis of vegetation that may lose water due to the mine is focused on water sources and associated vegetation that have a connection to the regional aquifer (GDEs). This is the primary focus of section 3.7.1 of the DEIS (pp. 317–344). Potential Federal water rights associated with these areas are disclosed, as well (DEIS, pp. 332–333).

A separate question raised by this comment is the "number of trees that will be destroyed by the mining operation." From context, it would appear that this is specifically referring to the loss of water as described above, not the physical destruction of trees. While a specific number of trees is not enumerated in the DEIS, the physical destruction of vegetation and habitat is described in several places in the DEIS, including the following:

- Section 3.3 for the amount of vegetation removed by each alternative (DEIS, pp. 176–178);
- Section 3.3, desired future vegetation conditions from the Tonto National Forest for riparian and xeric riparian areas, the potential to meet these conditions after reclamation, and the amount of time needed to meet these conditions (DEIS, pp. 186, 188–190, 200);
- Section 3.3, anticipated impacts to riparian vegetation extent of health due to water quantity and quality impacts (DEIS, p. 196);
- Section 3.7.1, descriptions of GDEs, including riparian areas (DEIS, pp. 312–317);
- Section 3.7.1, impacts to GDEs, including riparian areas, due to dewatering from the project (DEIS, pp. 317–340);
- Section 3.7.1, cumulative impacts to GDEs, including riparian areas (DEIS, pp. 340–342);
- Section 3.7.1, mitigation, mitigation effectiveness, and unavoidable adverse effects on GDEs (DEIS, pp. 342–345);
- Section 3.7.3, impacts of changes in geomorphology on GDEs, including riparian vegetation (DEIS, pp. 433–434); and
- Section 3.7.3, impacts of reductions in storm flow to surface water systems that support vegetation (DEIS, pp. 435–444).
- Section 3.8, impacts to special habitat areas supporting wildlife, including riparian (DEIS, pp. 452, 459–461)
- Section 3.8, impacts to specific species groups (DEIS, pp. 461–463, 472)
- Section 3.10.1, potential to impact riparian areas from tailings storage facility or pipeline failures (DEIS, pp. 527–534, 540–543)

12-RCMSER-3036

Appendix R

| Comment response: WT61 | |
|---|---|
| Prediction of streamflow impact | Page 1 of 1 |

**Responsive to these comments:**
30075-26, 30078-27

This comment questions the ability of the groundwater model to predict impacts to streamflow in Devil's Canyon specifically and questions the basis for the conclusions regarding impacts in the DEIS.

The limitations of the groundwater model with respect to predicting impacts were the subject of extensive discussions in the Groundwater Modeling Workgroup and are described in the DEIS (pp. 299–301).

Informed by these discussions, we made a reasoned decision regarding the quantitative use of the model output: "Based on combined professional judgment, the Groundwater Modeling Workgroup determined that to properly reflect the level of uncertainty inherent in the modeling effort, results less than 10 feet should not be disclosed or relied upon, as these results are beyond the ability of the model to predict" (DEIS, p. 301).

The DEIS also clearly notes that impacts less than 10 feet are not negligible: "The Groundwater Modeling Workgroup recognized that while the model may not be reliable for results less than 10 feet in magnitude, changes in aquifer water level much less than 10 feet still could have meaningful effects on GDEs, even leading to complete drying" (DEIS, p. 301). Although we understand that these types of impacts could occur, that does not mean that the tools available can reasonably predict them. The decision regarding how to use model output was not based on the fact that such impacts would be negligible but on the fact that the best available tools were insufficient to predict those impacts.

We clearly recognized the ramifications of not having the tools to accurately predict impacts at fractions of a foot, hundreds of years in the future, despite applying the best available science in the form of the groundwater model, and took steps to respond to this uncertainty:

> "The Groundwater Modeling Workgroup explored a number of other modeling techniques, including explicitly modeling the interaction between groundwater and surface water to predict small changes in streamflow, but found that these techniques had similar limitations. To address this problem, monitoring of GDEs would be implemented during mine operations, closure, and potentially beyond. . . . If monitoring identifies real-world impacts that were not predicted by the modeling, mitigation would be implemented. Mitigation is not restricted to unanticipated impacts; mitigation may also be undertaken for those GDEs where impacts are expected to occur." (DEIS, pp. 301–303)

The comment notes specifically that "the conclusions in Table 3.7.1-3 that drawdown of the wetted stream reaches in Devil's Canyon are 'unlikely' and 'not anticipated' do not appear to be supported by data or analysis." These statements are fully supported by the groundwater modeling analysis, which includes the limitations of that modeling. Specifically, the results in table 3.7.1-3 are based on 87 separate modeling runs, examining a variety of scenarios. The main stream segments of middle Devil's Canyon (DC-8.8C, DC-8.1C) show anticipated drawdown (above the 10-foot threshold) in only 1 of 87 model runs. Spring DC-6.1E shows anticipated drawdown in 0 of 87 model runs. Spring DC-6.6W shows anticipated drawdown in 76 of 87 model runs; the ramifications of spring DC-6.6W's losing flow due to drawdown are described, combined with the anticipated stormwater reductions resulting from the subsidence crater (DEIS, p. 329). These specific model runs are the data and analysis that support the conclusions in table 3.7.1-3.

The wetted stream reaches in Devil's Canyon are not anticipated to be impacted based on our analysis. However, these areas will be monitored, and if flow reductions are observed resulting from the mine—even if unanticipated now—mitigation would be applied to replace flows (DEIS, pp. 342–344).

12-RCMSER-3037

Appendix R

| Comment response: WT62 Potential error in reported results | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
30075-24

This comment references a table circulated at a Groundwater Modeling Workgroup meeting on September 12, 2018, and notes: "SWCA presented to the Groundwater Modeling Workgroup a Table containing a summary of Potential Impacts to Groundwater-Dependent Ecosystems. This Table concludes that seven locations, including springs, in Devil's Canyon will experience greater than 10 feet of groundwater drawdown caused by Resolution Mine block-caving. In addition to Spring DC-6.6W, they are: DC8.8C; DC8.2W, DC8.1C; DC7.1C, DC6.14C; DC6. 1E."

The notes from the September 12, 2018, Groundwater Modeling Workgroup meeting do include a table titled "Table X. Summary of Potential Impacts to Groundwater-Dependent Ecosystems." All of the specific locations noted in the comment are on this table. However, for each, the prediction is "<10," not greater than 10 feet. The basis for this comment appears to be a misreading of that table. Additionally, this table has been superseded by tables in the DEIS; the table that appears in the DEIS (table 3.7.1-3, pp. 318–322) is not the same. When preparing the DEIS in 2019, after the conclusion of the Groundwater Modeling Workgroup's efforts, the NEPA team decided to simplify the reporting of model results. The impacts from the proposed action in the table from September 2018 are based on the concept of an impact calculation, rather than raw drawdown as output from the model. In the September 2018 table, the impact is defined as the drawdown under the no action alternative (raw output from the model) subtracted from the drawdown under the proposed action (raw output from the model).

This approach—while justifiable—led to numerous points of confusion, which were pointed out by cooperating agencies when reviewing the administrative draft of the DEIS. In response, a simpler approach was taken to report the raw output from the model for both the no action and proposed action alternatives, with no other calculations. This was felt to be more understandable and more importantly would not lead to any "masking" of potential impacts. This was particularly evident for spring DC-6.6W. Under the old approach (shown on the September 2018 table), this spring would not be anticipated to be impacted. Under the revised approach that appears in the DEIS, spring DC-6.6W is anticipated to be impacted by drawdown in the range of 10 to 30 feet (DEIS, pp. 319 and 329).

This change of approach, the rationale for the change, and a quantification of the ramifications of the change for every GDE is described in Newell and Garrett (2018d). Importantly, we think this revised approach avoided underestimating impacts to GDEs in our analysis.

12-RCMSER-3038

Appendix R

| Comment response: WT63<br>East Salt River valley model sufficiency | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8031-54, 8032-104

These comments question the use of the groundwater modeling for the East Salt River valley and state that "the DEIS makes no attempt whatsoever to model or estimate groundwater resources and thus, makes no attempt to study the cumulative impacts."

This is an incorrect statement. The analysis of potential impacts from pumping in the East Salt River valley at the Desert Wellfield is based on modeling and is discussed in section 3.7.1. Disclosure of impacts includes quantifications of drawdown and water use that varies by alternative (DEIS, pp. 317–344). Cumulative impacts to water resources are analyzed in section 3.7.1, as well (DEIS, pp. 340–342), including in specific sections titled "East Salt River Valley Water Supplies" and "Regional Water Supplies."

Additional information was added to the FEIS related to these topics. While the cumulative effects analysis was thorough and documented, we acknowledge that certain aspects of the impacts analysis could have been better quantified. The FEIS contains a reworked cumulative effects analysis (chapter 4) that takes a more quantitative approach whenever possible. This includes the cumulative impacts in the East Salt River valley. After consultation with the ADWR, additional modeling was conducted to quantify the combined impact of future regional water use with the Resolution Copper project Desert Wellfield pumping, including approved assured water supplies and extraction of all accumulated long-term storage credits. The quantitative results of this model are included in chapter 4 and have been added to section 3.7.1 of the FEIS.

In addition, further work has been conducted regarding vetting of the regulatory model used to predict impacts for the Desert Wellfield; this discussion has been included in the project record (Walser 2020a) and in section 3.7.1 of the FEIS. See also response WT45, issue #14.

We consider the analysis of drawdown impacts to be thorough and complete. Some of these comments ignore or indicate a lack of awareness of the substantial background information, either in the project record or cited as DEIS references, that contributed to the analysis statements contained in the DEIS.

There is no expectation that all information available has to appear in the EIS itself. Forest Service NEPA regulations indicate, "Material may be incorporated by reference into any environmental or decision document. This material must be reasonably available to the public and its contents briefly described in the environmental or decision document" (36 CFR 220.4(h)).

| Comment response: WT68<br>Request for inclusion of surface water losses in groundwater depletion | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1358-7

This comment focuses on the long-term impact to the Phoenix area water supply, including reductions in surface flow.

Cumulative impacts to water resources are analyzed in section 3.7.1 (DEIS, pp. 340–342), including specific sections on "East Salt River Valley Water Supplies" and "Regional Water Supplies."

While the cumulative effects analysis was thorough and documented, we acknowledge that certain aspects of the impacts analysis could have been better quantified. The FEIS contains a reworked cumulative effects analysis (chapter 4) that takes a more quantitative approach whenever possible. This includes the cumulative impacts in the East Salt River valley. After consultation with the ADWR, additional modeling was conducted to quantify the combined impact of future regional water use and the Resolution Copper Project Desert Wellfield pumping, including approved assured water supplies and extraction of all accumulated long-term storage credits. The quantitative results of this model are included in chapter 4 and have been added to section 3.7.1 of the FEIS.

12-RCMSER-3039

Appendix R

| Comment response: WT69 Combination of modeling effects | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 30078-24 | |

This comment suggests that it was inappropriate to consider modeling impacts using separate models, pointing specifically to the mine site model and the Desert Wellfield model.

This comment was raised for discussion in the Water Resources Workgroup (reconvened in January 2020 to assist the Forest Service in reviewing and addressing comments on the DEIS) (Morey 2020a). The two separate models are justifiable because there is no reasonable hydrologic connection between the two domains (Queen Creek flows for approximately 4 miles through rock-dominated areas between the Superior basin and the East Salt River valley basin), nor do drawdown impacts from either model extend far enough to act in combination (DEIS, p. 298 for Desert Wellfield drawdown impacts, p. 302 for mine site drawdown impacts). The edge of the East Salt River valley model domain is shown in figure 3.7.1-2 (DEIS, p. 298).

| Comment response: WT71 Concerns with the use of the 200-year time frame | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 30078-23 | |

This comment raises three issues: concerns with the use of the 200-year time frame, concerns with model domains, and statements regarding past Resolution Copper efforts.

With respect to the 200-year time frame, the comment misinterprets the use of this time frame in the DEIS. Results beyond 200 years were discussed in the DEIS, just not quantitatively. See response WT16 for more discussion, as well as response WT45, issue #5.

With respect to model domains, see response WT69.

With respect to past Resolution Copper statements or efforts, these are immaterial to the analysis at hand. See response WT25 for more discussion about the independent hydrologic analysis.

| Comment response: WT72 Subsidence in modeling | Page 1 of 1 |
|---|---|
| **Responsive to these comments:** 8032-89, 8032-94 | |

These comments are primarily addressed by response WT45, issue #13. However, several auxiliary issues are also raised.

These comments indicate that Magma Mine workings were not presented or reviewed. This is an incorrect statement. The Magma Mine workings were explicitly incorporated into the groundwater model for the mine site. This information is provided in (WSP USA 2019).

These comments also indicate that "the DEIS should have also assessed impacts within the following watersheds: North of Queen Creek, including Haunted Canyon, Upper Pinto Creek, and West Fork watersheds.; Walnut Canyon to the south, which drains into the Gila River via Donnelly Wash."

This conclusion is drawn by arbitrarily expanding the impact contours shown in the groundwater modeling results. As shown in figure 3.7.1-3 (DEIS, p. 302), the drawdown from the mine dewatering does not reach far enough to cross the groundwater basin boundary where it would affect Haunted Canyon, Upper Pinto Creek, and West Fork, nor would any surface water impacts due to reductions in stormwater occur in these areas (DEIS, p. 423).

Similarly, Walnut Canyon, which drains into the Gila River, is not located within any areas of groundwater drawdown from the mine dewatering (DEIS, p. 302), nor would any surface water impacts due to reductions in stormwater occur in these areas (DEIS, p. 423). Note that the comment is incorrect that Walnut Canyon drains into the Gila River via Donnelly Wash; rather, Walnut Canyon is within the Donnelly Wash subwatershed but does not actually flow into Donnelly Wash.

Neither of these areas would be reasonable to include in the analysis for groundwater or for surface water impacts.

Appendix R

| Comment response: WT76 Use of median flow volumes | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
524-9

This comment indicates that when predicting potential impacts to surface water due to tailings seepage, the appropriate flow values are low-flow conditions instead of median flow conditions.

The use of median flow values was intentional in the DEIS, as it is a common method for assessing baseflow conditions instead of conditions dominated by storm runoff. Using base flow is a conservative approach in that it prevents the dilution of seepage by large storm events, which would lead to lower predicted concentrations in surface water and potentially underestimate impacts (see footnote 46, DEIS, p. 365).

Use of low-flow values is an even more conservative approach. We added further disclosure to section 3.7.2 of the FEIS to evaluate the potential impacts if low-flow values are used in lieu of baseflow conditions (see "Further Assessment with Low-Flow Conditions" under each alternative in section 3.7.2 of the FEIS).

| Comment response: WT77 Incorrect statements about watershed areas | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
1158-43

This comment points to various watershed areas noted in the DEIS and states that they are inconsistent.

The first mention of an area in the comment is the total watershed area of Queen Creek, identified as 143 square miles (DEIS, p. 425). This number is correct and specifically refers to the contributing watershed for Queen Creek, as measured at Whitlow Ranch Dam.

The second mention of an area in the comment is that 1.76 square miles of the watershed would be lost to subsidence (DEIS, p. 429). This number is correct.

The third mention of an area in the comment is a quote from section 3.7.1: "Runoff from over 20 percent of the Queen Creek watershed above Magma Avenue Bridge would be lost to the subsidence area" (DEIS, p. 316). This sentence is indeed incorrect. It should read that 20 percent of the average flow is lost from the watershed above Magma Avenue Bridge, not that the lost area represents 20 percent of the Queen Creek watershed. We corrected this in the FEIS.

| Comment response: WT78 Scope of analysis for water quality curtailed at nearest perennial water | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
524-12

This comment concerns the analysis of water quality only at the nearest downstream perennial water. The rationale for this choice is described in the "Analysis Area" discussion of section 3.7.2 (DEIS, p. 346).

The issue of the hydrologic connection between Queen Valley and Queen Creek and the potential for impacts from tailings seepage associated with Alternatives 2, 3, and 4 below Whitlow Ranch Dam was discussed as part of the Water Resources Workgroup (reconvened in January 2020 to assist the Tonto National Forest in reviewing and addressing comments on the DEIS). We added analysis to section 3.7.2 of the FEIS to further evaluate potential impacts on water resources in Queen Valley. See response WT59 for more detailed discussion of this issue.

Appendix R

| Comment response: WT79 Questions about inconsistencies regarding impacts to groundwater-dependent ecosystems (GDEs) | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
30075-18, 30075-20, 30075-22, 30075-23

These comments identify perceived inconsistencies in the DEIS disclosure of model impacts, compared with results previously reviewed by the Groundwater Modeling Workgroup.

It is important to note that the results reviewed at various points during the Groundwater Modeling Workgroup are not identical to the results displayed in the DEIS.

When preparing the DEIS in 2019, after the conclusion of the Groundwater Modeling Workgroup's efforts we deemed it necessary and prudent to simplify the reporting of model results. The impacts from the proposed action reviewed by the Groundwater Modeling Workgroup (see the September 2018 meeting notes in particular (Morey 2018e)) were based on the concept of an impact calculation, rather than raw drawdown as output from the model. With this approach, impact is defined as the drawdown under the no action alternative (raw output from the model) subtracted from the drawdown under the proposed action (raw output from the model).

This approach—while justifiable—led to numerous points of confusion, which were pointed out by cooperating agencies when reviewing the administrative draft of the DEIS. In response, a simpler approach was taken to report the raw output from the model for both the no action and proposed action alternatives, with no other calculations. We felt this would be more understandable and more importantly would not lead to any "masking" of potential impacts. This was particularly evident for spring DC-6.6W, as a key example. Under the old approach (shown on the September 2018 table), this spring would not be anticipated to be impacted. Under the revised approach that appeared in the DEIS, spring DC-6.6W is anticipated to be impacted by drawdown in the range of 10 to 30 feet (DEIS, pp. 319, 329).

Our change in approach, the rationale for the change, and a quantification of the ramifications of the change for every GDE are described in Newell and Garrett (2018d). Importantly, we assert that this revised approach avoided underestimating impacts to GDEs in the NEPA analysis.

| Comment response: WT80 Request for water quality analysis document | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
555-7

The requested document is the DEIS reference identified as Gregory and Bayley (2018b) and has been available on the project website since publication of the DEIS.

12-RCMSER-3042

Appendix R

| Comment response: WT81<br>Specific questions about the Alternative 5 – Peg Leg water quality analysis | Page 1 of 3 |
| --- | --- |

**Responsive to these comments:**
28449-155

This comment includes a number of questions about the Alternative 5 – Peg Leg water quality modeling report (Gregory and Bayley 2018c).

The first question concerns the calculation of the hydraulic conductivity value (K) for the site. As noted in the report, "Hydraulic conductivity is estimated to be 2.11 feet/day (ft/d) based on total basin size, estimated recharge, and hydraulic gradient" (Gregory and Bayley 2018c). Hydraulic conductivity is a parameter that is difficult to observe in the field, except through some manner of pumping test. By contrast, the hydraulic gradient can be observed directly from measured water levels, and recharge in the arid Southwest can be estimated based on elevation and basin size from previous literature studies. With these parameters, the K value can be back-calculated.

The comment notes that a K value of 2.11 feet/day falls outside the normal range for alluvium. The full reference for Anderson et al. (1992) is not provided, but we believe this represents USGS Professional Paper 1406-B, "Geohydrology and Water Resources of Alluvial Basins in South-Central Arizona and Parts of Adjacent State." This is correct, but the K value of 2.11 feet/day falls well within the range for upper and lower basin fill (Anderson et al. 1992:B16), which forms part of the basin. The use of the term "alluvium" in Gregory and Bayley (2018c) should not be construed to exclude basin-fill materials. Regardless of literature values, in the comment, we have aquifer test data, as well, that can inform the K value. At the time of the DEIS, the Near West field study included some aquifer test data, and at this time we also have the Skunk Camp field study on Dripping Spring Wash. We believe Dripping Spring Wash is likely a better analog for Donnelly Wash (Peg Leg location). Seven constant-rate pumping tests, two injection tests, and 11 slug tests were conducted in 2019 (Montgomery and Associates Inc. 2019a). An additional five constant-rate pumping tests and six injection tests were conducted in 2020 (Montgomery and Associates Inc. 2020g). Hydraulic conductivity values from this data set of 28 field tests range from 0.002 foot/day to 24 feet/day, with a median of 3.4 feet/day, a mean of 5.4 feet day, and a geometric mean of 2.2 feet/day. The value used for the Alternative 5 – Peg Leg water quality modeling is near the middle of this range.

The second question concerns the choice of recharge parameters, particularly the split of 75 percent "focused" recharge and 25 percent "diffuse" recharge, and the lack of consistency with values published for the nearby San Pedro Basin in (Meixner et al. 2016). The terms "diffuse" and "focused" recharge are defined in Meixner et al. (2016:126): "In this analysis, diffuse recharge is operationally defined as being sourced from precipitation and occurs as direct infiltration of precipitation followed by percolation to the water table. Focused recharge from ephemeral or perennial surface-water expressions occurs via concentration of precipitation and shallow interflow at the Earth's surface through runoff processes and subsequent infiltration, percolation, and recharge of runoff at specific locations on the landscape (e.g., ephemeral streams and playas)." This publication provides estimates for the division of diffuse, focused, mountain system, and irrigation recharge in 11 basins throughout the western United States.

Appendix R

| Comment response: WT81<br>Specific questions about the Alternative 5 – Peg Leg water quality analysis | Page 2 of 3 |
|---|---|
| **Responsive to these comments:**<br>28449-155 | |

As noted in the comment, the San Pedro Basin is one of these, and an estimate of 0 percent diffuse recharge is given. The range of diffuse recharge across the western United States varies from 0 to 98 percent.

In this case, there is a difference in terms between Meixner et al. (2016) and Gregory and Bayley (2018c). Gregory and Bayley (2018c:6) note, "Diffuse recharge [is] classified as groundwater underflow in the model." Meixner et al. (2016:126), by contrast, define diffuse recharge only as "direct infiltration of precipitation followed by percolation to the water table" and include a separate term, "mountain system recharge" (abbreviated MSR in the following quote), to incorporate other aspects of recharge flowing into the basin in the subsurface: "MSR includes recharge from stream loss at mountain fronts (MFR) (also a form a focused recharge, but herein grouped with MSR), along with subsurface transfer of groundwater from the mountain block to the adjacent alluvial aquifer (mountain-block recharge, or MBR)." In other words, the "diffuse" recharge of Gregory and Bayley does not strictly match the usage by Meixner et al. and is a term that incorporates any recharge mechanisms other than focused recharge.

The comment notes that siting the tailings storage facility near the margins of the alluvium may reduce total system recharge. This capture of precipitation, preventing it from reaching ephemeral channels where focused recharge can occur, is correct, at least during operations when stormwater is not allowed to be released. The reduction in this flow has been disclosed in section 3.7.3 (DEIS, pp. 437–441). Roughly 21 percent of storm flow and potential recharge would be sequestered by the tailings storage facility. The inability for this water to recharge the aquifer was added to section 3.7.3 in the FEIS.

The comment notes that the Gregory and Bayley model report mentions two samples in the Donnelly Wash subbasin, while the DEIS only lists one (DEIS, pp. 408–409). This is a misunderstanding about what the actual modeling results use for baseline water quality. The report indeed notes that only two groundwater quality samples exist (Gregory and Bayley 2018c:9). However, only the Tea Cup Well sample was used to define baseline water quality, as it is located immediately below the tailings storage facility footprint. This is not clear from the Gregory and Bayley report itself but is clear from the backup spreadsheets provided to the Forest Service. These files are described in Garrett (2019d).

Appendix R

| Comment response: WT81 | |
|---|---|
| Specific questions about the Alternative 5 – Peg Leg water quality analysis | Page 3 of 3 |

**Responsive to these comments:**
28449-155

The comment notes that exploration wells should be used to confirm the depth of the geophysical surveys. The ability to collect additional information needs to be addressed when the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives. In this case, while detailed geotechnical information is indeed critical to the eventual building of a tailings storage facility, it is not a key factor in making a reasoned choice between alternatives. In each case, sufficient geotechnical information was available to provide an initial design for the tailings storage facility (Golder Associates Inc. 2018a; Klohn Crippen Berger Ltd. 2018a, 2018b, 2018c, 2018d). The information in hand and disclosed in the DEIS was sufficient to understand the distinctions between the facilities. The effect of this potential uncertainty on decision making is directly discussed for one of the analyses most crucial for differentiating between alternatives, the seepage modeling (DEIS, pp. 354–357).

The comment notes that the mixing cells used for the water quality model expand into the Gila Conglomerate instead of being confined to the alluvium. This choice was made in order to ensure that all of the embankment—and more importantly the seepage measures below the embankment-like finger drains—are incorporated into the model.
The comment also notes that the mixing cells do not match the Donnelly Wash alluvium. This mismatch is only evident when comparing the surface expression of the alluvium; the mixing cells are intended to represent an idealized flow through the aquifer, with a representative thickness of alluvium. The modeling approach (a simple mixing model) does not allow for matching the complex real-world geometries of the aquifer, nor is this matching necessary to obtain a reasonable estimate of water quality.

The comment also notes that the model is deterministic (giving one outcome) and not probabilistic (giving multiple outcomes). This fundamental choice of modeling was discussed in the Groundwater Modeling Workgroup in 2017. Overall, the choice was made by the Tonto National Forest to use deterministic modeling but to also incorporate discussion of uncertainties and sensitivities where appropriate. The various uncertainties for the Alternative 5 – Peg Leg water quality model are discussed specifically in section 3.7.2 (DEIS, pp. 353–363, with a summary shown graphically on p. 362). Importantly, this discussion concludes with a rationale for why the models are considered reasonable in light of these uncertainties (DEIS, p. 363).

12-RCMSER-3045

Appendix R

| Comment response: WT82<br>Inconsistencies in Devil's Canyon | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>30075-1 | |

This comment states, "Spring DC-6.6W, a spring located on the wall of Middle Devil's Canyon, is predicted to experience drawdown of 10-30 feet and dry up 200 years after the start of the mine as a result of Resolution Mine's dewatering and block-cave mining. Action: The modeled prediction of the mine-related loss of this spring must be reconciled with any predictive statement that the Middle Devil's Canyon baseflow is not expected to experience drawdown."

There is no inconsistency in the results. The base flow in Middle Devil's Canyon is represented by monitoring points DC-8.8 and DC8.1 (see Newell and Garrett (2018d) for a full compilation of groundwater modeling results, which are summarized in the DEIS, table 3.7.1-3, p. 319). Simply put, the drawdown contours predicted by the groundwater model reach spring DC-6.6W on the west side of the canyon (11 feet of drawdown) but do not reach the main stem of the canyon at the thresholds the model is capable of predicting (<10 feet).

Discharge from spring DC-6.6W flows into Devil's Canyon, however, and contributes to base flow in that way. Analysis of this impact is contained in section 3.7.1 (DEIS, p. 329), in combination with the anticipated stormflow reductions in Devil's Canyon.

| Comment response: WT83<br>Various criticisms of the water resource analysis | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>8031-24, 8031-63 | |

This comment expresses concerns that information was not available in the DEIS or in supporting documents.

We consider the analysis of impacts to water resources to be thorough and complete. Some of these comments indicate a lack of awareness of the substantial background information, either in the project record or cited as DEIS references, that contributed to the analysis statements contained in the DEIS.

There is no expectation that all information available has to appear in the EIS itself. Forest Service NEPA regulations indicate, "Material may be incorporated by reference into any environmental or decision document. This material must be reasonably available to the public and its contents briefly described in the environmental or decision document" (36 CFR 220.4(h)).

One specific criticism is the inability to find reference Newell and Garrett (2018d). This reference is correctly cited throughout the DEIS and correctly included in the Literature Cited section (DEIS, p. 753). It was available on the project website when the DEIS was released in August 2019. However, it does appear that the citation on the website was labeled 2018c, though the title was correctly stated. This was remedied when brought to our attention.

With respect to other information, not all details of a complex project can or should be included in the DEIS itself. The substantial volume of baseline data reports, analysis reports, and modeling reports cited in the DEIS contain much of the details requested and were available for review of the website when the DEIS was released in August 2019.

| Comment response: WT84<br>Specific questions about the Alternative 6 – Skunk Camp water quality modeling | Page 1 of 1 |
|---|---|
| **Responsive to these comments:**<br>524-10 | |

See response WT32 for more detail on how the possibility of exposure of seepage in surface water was investigated, both on Dripping Spring Wash and Queen Creek.

In addition, subsequent field investigations have verified the statement in the DEIS that Dripping Spring Wash is ephemeral, with groundwater levels deep enough to prevent surface water exposure (KCB Consultants Ltd. 2019; Montgomery and Associates Inc. 2020a; WestLand Resources Inc. and Montgomery and Associates Inc. 2020).

12-RCMSER-3046

Appendix R

| Comment response: WT89 | |
|---|---|
| Reduction in precipitation from subsidence | Page 1 of 1 |

| Responsive to these comments: |
|---|
| 30078-39, 30078-49 |

This comment states that "the draft fails to consider wind rose patterns which will be affected by the vertical collapse of the mountain unit, and the resulting alteration of the related precipitation."

We do not anticipate that the subsidence crater would have any noticeable effect on weather patterns or climate, except at a localized scale immediately around the subsidence crater.

Geography and elevation indeed have an influence on precipitation. Orographic precipitation is rain, snow, or other precipitation produced when moist air is lifted as it moves over a mountain range. Similarly, changes in elevation are associated with changes in air pressure and temperature.

However, while the fundamental mechanisms are valid, it is not reasonable to expect that these effects would occur at the same scale as the subsidence crater. These effects occur on the scale of large swaths of the landscape. For instance, summer precipitation in Arizona largely differs between the lower desert areas (approximately 1,000 feet in elevation) and the high mountain areas (approximately 5,000–7,000 feet in elevation).

Numerous analogous situations exist in Arizona. The Ray mine is located nearby and is well over 1,000 feet deep. The Lavender pit in Bisbee is 900 feet deep. We have not discovered any reports that either pit has affected local weather patterns. In Phoenix, South Mountain park and Piestewa Peak both feature elevation changes of over 1,000 feet, across miles of landscape, yet these features do not fundamentally alter the desert climate of Phoenix in the way that traveling up 1,000 feet in elevation toward the mountains might. As an example, Black Canyon City (2,000 feet above mean sea level) has an annual precipitation of 14 inches, compared with Phoenix (1,080 feet above mean sea level), which has an annual precipitation of 9 inches.

| Comment response: WT90 | |
|---|---|
| Section 404 regulatory changes | Page 1 of 1 |

| Responsive to these comments: |
|---|
| 8031-22 |

This comment indicates that the USACE "should have conducted a full analysis of the potential impacts of Arizona's proposed assumption of the CWA 404 Permit Program and potential changes to the WOTUS Rule."

Regulation of waters of the U.S. under the CWA is subject to specific laws and regulations. At times, these regulations are revised or the interpretation of existing regulations must change due to court decisions. The permit issued by the USACE must comply with these regulations. Predicting future changes in regulations is speculative and not required under NEPA or CWA permitting.

As a concrete example, the State of Arizona was considering assumption of the 404 permit program but since the publication of the DEIS has decided to discontinue this pursuit. Such decisions are not predictable.

Regarding changes in jurisdiction, Resolution Copper received an Approved Jurisdictional Determination (AJD) for aquatic features in the Queen Creek watershed (U.S. Army Corps of Engineers 2020a) and a Preliminary Jurisdictional Determination (PJD) for potential waters of the U.S. in the Dripping Spring Wash watershed (U.S. Army Corps of Engineers 2020b). Permit processing is underway, based on these jurisdictional determinations, which were performed consistent with Rapanos guidance that was in effect at the time at which the determinations were made. It would be speculative to consider future changes in jurisdiction, and this is not required under NEPA or CWA permitting.

12-RCMSER-3047

Appendix R

| Comment response: WT91 Control of seepage | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
8032-31

This comment notes that using the wrong materials to prevent seepage would have adverse consequences.

This was considered in the DEIS. Scoping comments and initial alternatives development focused on the concept of a "liner," envisioning an artificial geomembrane as a primary means of seepage control. This vision evolved to encompass a number of materials, depending on which would be the most effective at a specific location ("Evolution of the Fully Lined Alternative" (Newell and Garrett 2018d)).

As noted in section 3.7.2, "The foundation would be treated during construction to reduce seepage and encourage flow into the drain system. Foundation treatment can include a variety of techniques such as dental concrete, cut-offs, grouting, or engineered low-permeability layers such as compacted fine tailings, engineered low permeability liners, asphalt, slurry bentonite, and/or cemented paste tailings. Specific treatments would be designed based on real-world conditions encountered during site preparation" (DEIS, p. 384).

| Comment response: WT92 Closure plans for Alternative 6 – Skunk Camp | Page 1 of 1 |
|---|---|

**Responsive to these comments:**
524-18

This comment raises two general concerns with the closure plans for Alternative 6 – Skunk Camp. First, the comment expresses concerns about the plan to allow post-closure drainage to cross the watershed divide and discharge to Mineral Creek. This aspect of the closure plan was dropped and is no longer being contemplated.

Second, the comment requests disclosure of Skunk Camp closure plans in detail. The following plans were received and contain more details about likely reclamation activities (KCB Consultants Ltd. 2020c; Tetra Tech Inc. 2020). We added a discussion of the specific reclamation and closure plans from these documents in section 3.3 of the FEIS. Note that since the January 2021 publication of the Rescinded FEIS, several additional reclamation plans have been received and are cited in and incorporated into the FEIS.

12-RCMSER-3048

# Appendix S. Consultation History

Case 2:21-cv-00068-DWL   Document 109-2   Filed 07/14/25   Page 403 of 565

# Introduction

As noted in chapter 5, the Forest Supervisor, Tonto National Forest, has been conducting Tribal consultation related to various Resolution Copper projects, the land exchange, and management of the Apache Leap Special Management Area (SMA). These consultation activities have been guided by the laws, regulations, and executive orders identified below.

**Advisory Council on Historic Preservation (ACHP) regulations for the Protection of Historic Properties (36 Code of Federal Regulations 800):** These regulations outline when Federal agencies must consult with Tribes regarding a Federal undertaking, and the issues and other factors this consultation must address to be compliant with Section 106 of the National Historic Preservation Act.

**Executive Order 13175:** This executive order directs executive departments and agencies to establish regular and meaningful consultation and collaboration with Tribal officials in the development of Federal policies that have Tribal implications. It calls attention to the importance of strengthening the government-to-government relationship between the United States and Indian Tribes based on three fundamental principles:

- The Federal Government has enacted numerous statutes and promulgated numerous regulations that establish and define a trust relationship with Indian Tribes.

- The United States continues to work with Indian Tribes on a government-to-government basis to address issues concerning Indian Tribal self-government, Tribal trust resources, and Indian Tribal treaty and other rights.

- The United States recognizes the right of Indian Tribes to self-government and supports Tribal sovereignty and self-determination.

**Section 3003 of Public Law (PL) 113-291:** Section 3003(c)(3) of this law directs the Secretary of Agriculture to consult with affected Indian Tribes concerning issues of concern related to the Southeast Arizona Land Exchange and any adverse effects resulting from mining and related activities on those lands.

Consultation for the Resolution Copper Project and Land Exchange has included formal and informal meetings, correspondence, sharing information, site visits, and documentation of Tribal comments and concerns by the U.S. Forest Service (Forest Service). Consultation is ongoing and will continue for the life of the project. As sovereign nations, federally recognized Tribes determine their own standards for formal and informal consultation. The Forest Service (2016b:chapter 10, subsection 11.3) directs the Forest Service through "Principals of mutual concurrence" to reach agreement on when and how formal consultation is occurring.

Table S-1, contained in this appendix, lists the consultation records between the Tonto National Forest and the Tribes, including formal and informal communications. Table S-2 continues the list of consultation records from the time of reinitiation of consultation.

Appendix S

**Table S-1. Tonto National Forest Tribal consultation and communication record for the Resolution Copper Project (2003–Present)**

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 11/09/03 | Discussion at Western Apache Coalition | Apache | San Carlo Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation | Payson, AZ | TNF staff discussed proposed land exchange and requested Apache assistance in reviewing a CR survey (cited in 7/16/09 memo) |
| 1/27/04 | Official Letter from TNF Supervisor to Tribal Chairs | Apache | San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation | N/A | TNF met 11/10/03 with Resolution Copper Mining LLC (Resolution Copper) regarding proposed land exchange and archaeological survey of area; Apache sites recorded; will send report once received; requested assistance in ethnohistoric research of area |
| 11/10/05 | Official form letter from TNF Supervisor to Tribal Mailing List | All Tribes (10) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | n/a | Provided copy of archaeological survey of proposed land exchange area; discussed RCM plan to conduct ethnohistorical archival research; and TNF invited Tribes to conduct interview-based study |
| 1/23/06 | Official Letter from Hopi CPO to TNF Supervisor | Puebloan | Hopi Tribe | N/A | Request 2 CR reports on Land Exchange Area and site visit as part of consultation |
| 2/23/06 | Official Letter from Hopi CPO to Desert Archaeology | Puebloan | Hopi Tribe | N/A | Comments on Desert's research design for Oak Flat (cited in PR 571) |
| 5/15/06 | Informal meeting with cultural staff | Yavapai | Yavapai Prescott Indian Tribe | Prescott, AZ | Review of Oak Flat archaeological survey report in preparation for proposed Treatment Plan |
| 5/22/06 | Informal meeting with cultural staff | Yavapai | Fort McDowell Yavapai Nation | Fountain Hills, AZ | Review of Oak Flat archaeological survey report in preparation for proposed Treatment Plan |
| 6/19/06 | Informal meeting with cultural staff | Puebloan | Hopi Tribe CPO | Kykotsmovi, AZ | Review of Oak Flat archaeological survey report in preparation for proposed Treatment Plan |
| 6/21/06 | Informal meeting with cultural staff | O'odham | Four Southern Tribes meeting | Sells, AZ | Review of Oak Flat archaeological survey report in preparation for proposed Treatment Plan |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-2

12-RCMSER-3052

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 6/20/07 | Official Letter from San Carlos Chair to President Bush on behalf of Tribal Coalition | Apache Hopi Hualapai | Camp Verde Yavapai Apache Hopi Tribe Hualapai Tribe San Carlos Apache Tribe Tonto Apache Tribe White Mountain Apache Tribe | n/e | Tribal Coalition opposition to RCM mine |
| 1/25/08 | Formal meeting TNF Cultural Staff with Four Southern Tribes | O'odham | Ak-Chin Indian Community Gila River Indian Community Salt River Pima-Maricopa Indian Community Tohono O'odham Nation | Maricopa AZ | Recorded in 7/16/09 internal summary of tribal consultation re RCM |
| 2/27/08 | Formal meeting TNF Cultural Staff with San Carlos cultural staff | Apache | San Carlos Apache Tribe | Peridot, AZ | Recorded in 7/16/09 internal summary of tribal consultation re RCM |
| 5/16/08 | Official Letter from Congressman Grijalva to U.S. Department of the Interior (USDOI) and U.S. Department of Agriculture (USDA) | n/a | n/a | n/a | Complaint on lack of G2G consultation by agencies at highest levels with Tribes regarding mining projects |
| 5/10/08 | Emails between TNF Archaeologist and YAN Archaeologist | Yavapai Apache | Yavapai Apache Nation | N/A | Emails regarding meeting to discuss Resolution Copper Project proposed exploratory drilling |
| 6/06/08 | Official Letter from TNF Supervisor to Chairs and cultural staff | All Tribes (10) | Fort McDowell Yavapai Nation Gila River Indian Community Hopi Tribe Pueblo of Zuni Salt River Pima-Maricopa Indian Community San Carlos Apache Tribe Tonto Apache Tribe White Mountain Apache Tribe Yavapai-Apache Nation (representatives of both) Yavapai-Prescott Indian Tribe | N/A | Conveyed Plan of Operations for Resolution Copper Project Pre-feasibility Mining Studies; requested tribal input on sensitive areas |
| 6/23/08 | Informal Meeting with Western Apache Coalition cultural staff | Apache | San Carlos Apache Tribe Tonto Apache Tribe White Mountain Apache Tribe Yavapai-Apache Nation | Payson, AZ | Resolution Copper Project Pre-feasibility Studies NEPA Consultation Recorded in 7/16/09 internal summary of tribal consultation re RCM |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-3

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 6/27/08 | Official Letter from TNF Mesa Ranger District | All Tribes (10) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | N/A | Requesting input on proposed Resolution Copper Project water pipeline |
| 7/07/08 | Official Letter from Hopi CPO to TNF Supervisor | Puebloan | Hopi Tribe | N/A | Response to TNF 6/06/08 letter; request 2 CR reports and information about water pipeline |
| 7/07/08 | Official Letter from Hopi CPO to TNF Mesa Ranger District | Puebloan | Hopi Tribe | N/A | Request information on any cultural resources and how this relates to Resolution Copper Project |
| 9/11/08 | Official Letter from TNF Supervisor to Chairs and cultural staff | All Tribes (10) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Conveyed CR report for pre-feasibility study and requested information on sensitive areas |
| 9/29/08 | Official Letter from Hopi CPO to TNF Supervisor | Puebloan | Hopi Tribe | N/A | Request for site visit and for an ethnographic study of the project area |
| 11/03/08 | Official Letter from Hopi CPO to TNF Supervisor | Pueblo | Hopi Tribe | n/a | Intend to invite TNF to meet to discuss RCM pre-feasibility studies, water line, and concerns regarding proposed land exchange |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

12-RCMSER-3054

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 4/01/09 | Official Letter from TNF Supervisor to Leaders and cultural staff | All Tribes (10) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Conveyed Resolution Copper Project Pre-feasibility Plan of Operations EA and requested comments |
| 4/13/09 | Official Letter from Hopi CPO to TNF Supervisor | Puebloan | Hopi Tribe | N/A | Comments on Pre-feasibility Study |
| 4/29/09 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Comments on Pre-feasibility Study |
| 4/30/09 | Letter from Sparks Law Firm on behalf of San Carlos and Tonto Apache | Apache | San Carlos Apache Tribe<br>Tonto Apache Tribe | N/A | Requesting 180-day extension of comment period on Pre-feasibility Study |
| 5/05/09 | Letter (partial) from TNF to Sparks Law Firm | Apache | San Carlos Apache Tribe<br>Tonto Apache Tribe | N/A | Denying requested 180-day comment extension and requesting proof of representation for San Carlos and Tonto Apache tribes |
| 5/11/09 | Official Letter from TNF Supervisor to Leaders | All Tribes (10) | Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Invitation to attend information sharing meeting |

\* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-5

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 5/15/09 | Official Letter from TNF Supervisor to Leaders and cultural staff | All Tribes (10) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Conveyed final version of Pre-feasibility CR Inventory Report |
| 5/29/09 | Formal Meeting* with tribal cultural staff | Apache Puebloan | Hopi Tribe<br>San Carlos Apache Tribe<br>White Mountain Apache Tribe | TNF S.O Phoenix, AZ | Prefeasibility study, CR Inventory, status of Land Exchange, tribal concerns |
| 6/10/09 | Official Letter from TNF Supervisor to Chairman | Apache | White Mountain Apache Tribe | N/A | Thanking for attending 5/29 meeting |
| 6/11/09 | Official Letter from TNF Supervisor to Chairman | Yavapai | Fort McDowell Yavapai Nation | N/A | Thanking for attending 5/29 meeting |
| 6/15/09 | Official Letter from TNF Supervisor to Leaders and cultural staff | Apache Puebloan | Hopi Tribe<br>San Carlos Apache Tribe<br>White Mountain Apache Tribe | N/A | Thanking for attending on 5/29 meeting |
| 6/16/09 | Official Letter from TNF Supervisor to Leaders and cultural staff | Apache O'odham Yavapai | Gila River Indian Community<br>Pueblo of Zuni<br>Tonto Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai Prescott Indian Tribe | N/A | Reporting on 5/29/09 meeting |
| 6/30/09 | Official Letter from Hopi CPO to TNF Supervisor | Puebloan | Hopi Tribe | N/A | Oppose the finding of No Adverse Effect for Pre-feasibility Study |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

12-RCMSER-3056

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 6/30/09 | TNF Consultation Tracker | All Tribes (10) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Documents Consultation on Resolution, 1/27/04 –6/30/09 |
| 7/06/09 | Official Letter from San Carlos Chairman to Secretary Dept of Agriculture | Apache | San Carlos Apache Tribe | N/A | San Carlos has not been consulted on the Land Exchange |
| 7/13/09 | Official Letter from Yavapai Prescott to TNF Supervisor | Yavapai | Yavapai Prescott Indian Tribe | N/A | Defer to Fort McDowell, but wish to be kept informed on project |
| 7/16/09 | Internal U.S. Forest Service (USFS) email | | | n/a | Provides chronology of TNF tribal consultation regarding RCM between 1/27/04 and 7/16/09 |
| 3/16/10 | Official Letter from TNF Supervisor to Tribal leaders and staff | All Tribes (10) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Requested comment on Pre-Feasibility report for connected state and private lands |
| 3/29/10 | Official Letter from Hopi CPO to TNF Supervisor | Puebloan | Hopi Tribe | N/A | Comments on Prefeasibility Study EA |
| 10/20/10 | Official Letter from TNF Supervisor to San Carlos Chairman | Apache | San Carlos Tribe | N/A | Requested meeting to discuss upcoming forest projects and best way to consult |

* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-7

12-RCMSER-3057

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 2/08/11 | Official Letter from San Carlos Chairman to Secretary, USDA | | | n/a | Referred to in 6/27/11 letter from Secretary of Agriculture |
| 6/27/11 | Official Letter from Secretary of Agriculture to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Discusses proposed land exchange; requirements for FS consultation |
| 7/28/11 | Copy of Official Letter from Hopi to U.S. Congressmen | Puebloan | Hopi Tribe Chairman | N/A | Opposition to Land Exchange |
| 9/06/11 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Request meeting on all projects impacting Oak Flat region |
| 10/17/11 | Official Letter from TNF Globe District Ranger to Leaders and cultural staff | All Tribes (10) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Conveyed Resolution Copper Project Plan of Operations for a Magnetotelluric Geophysical (mT) Survey, and Cultural Resources Monitoring Plan |
| 10/24/11 | Official Letter from Hopi CPO Response to Globe District Ranger | Puebloan | Hopi Tribe CPO | N/A | Response to 10/17/11 letter: Consultation request and request for monitoring report – Resolution Copper mT Survey |
| 10/25/11 | Official Letter from Gila River THPO to TNF Supervisor | O'odham | Gila River Indian Community | N/A | Opposes mining; requested monitors during geophysical testing |
| 12/16/11 | Formal Meeting* with Tribal Leaders | Apache | San Carlos Apache Tribal Council | San Carlos, AZ | Resolution Copper Pre-feasibility Plan of Operations for mT Survey |
| 12/19/11 | Official Letter from TNF Supervisor to Chairman, A.G., cultural staff | Apache | San Carlos Apache Tribe | N/A | Thanks for meeting on 12/16/11 |
| 12/28/11 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Thanks for meeting and re-emphasized TNF's trust responsibilities to tribes |
| 1/09/12 | Internal memo from TNF Archaeologist to TNF Supervisor | n/a | | n/a | RCM Pre-feasibility tribal consultation timeline |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 1/17/12 | Email from TNF Archaeologist to San Carlos THPO | Apache | San Carlos Apache Tribe | n/a | Items to discuss regarding documentation and evaluation of traditional cultural places (TCPs) for Oak Flat |
| 2/06/12 | Email from TNF Archaeologist to Hopi CPO | Pueblo | Hopi Tribe | n/a | Inviting Hopi to participate in the development of the TCP Nomination |
| 2/06/12 | Email from TNF Archaeologist to Yavapai-Prescott Archaeologist | Yavapai | Yavapai-Prescott Indian Tribe | n/a | Follow up of earlier discussion regarding TCP nomination and evidence of Yavapai in TNF archaeological record |
| 2/07/12 | Official Letter from Hopi CPO to U.S. Senate Energy and Natural Resources Committee | Puebloan | Hopi Tribe | N/A | Opposing proposed Land Exchange |
| 4/26/12 | Email from TNF Archaeologist to San Carlos THPO | Apache | San Carlos Apache Tribe | n/a | Asked if map is ready for inclusion in TCP Nomination or should they meet to discuss further |
| 5/11/12 | Exchange of letters between TNF and San Carlos | Apache | San Carlos Apache Tribe | Oak Flat, AZ | Re: San Carlos obtaining a non-commercial use permit for ceremony at Oak Flat |
| 0/25/12 | Email from TNF Tribal Relations Program Manager to San Carlos THPO | Apache | San Carlos Apache Tribe | N/A | Conveyed draft list of culturally sensitive plants requested by San Carlos Council; asked for comment |
| 9/21/12 | Official Letter from TNF Globe District Ranger to Leaders and cultural staff | All Tribes (10) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Plan of Operations for Resolution Copper's mT Survey<br><br>(mT = Magnetotellurics is an electromagnetic geophysical method for inferring the earth's subsurface electrical conductivity from measurements of natural geomagnetic and geoelectric field variation at the Earth's surface.) |
| 9/25/12 | Official Letter from White Mountain Apache Tribe THPO to TNF District Ranger | Apache | White Mountain Apache Tribe | N/A | White Mountain Apache Tribe recommends an ethnohistoric study to inform the mT Survey |
| 10/02/12 | Official Letter from Hopi Tribe CPO to TNF District Ranger | Puebloan | Hopi Tribe | N/A | Reply to TNF 9/21/12 letter; want to consult and request copy of monitoring report, Resolution Copper mT Survey |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-9

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|--------------------|----------------------|----------|----------------------|
| 10/08/12 | Official Letter from Gila River Indian Community to TNF District Ranger | O'odham | Gila River Indian Community | N/A | Reply to TNF 9/21/12 letter; request copies of mT survey area archaeological reports for review (provided) |
| 10/26/12 | Official Letter from San Carlos Apache Tribe Chairman to TNF District Ranger | Apache | San Carlos Apache Tribe | N/A | mT Survey Decision Memo; environmental assessment insufficient; project merits EIS |
| 11/23/12 | Official Letter from San Carlos Apache Tribe A.G. to District Ranger | Apache | San Carlos Apache Tribe | N/A | Objection to Categorical Exclusion: cumulative impacts merit EIS |
| 3/13/13 | Official Letter from TNF Supervisor to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Comments in 10/26/12 letter referred to EIS; 9/21/12 letter asked for comments on mT proposal; copy enclosed; Apache plant list provided again; still seek comment; contact if want to meet |
| 3/27/13 | Official Letter from TNF Supervisor to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Invitation to participate in Superior Area Ethnographic Study |
| 4/08/13 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Accept Invitation to Participate in Ethnographic Study |
| 4/17/13 | Copy of San Carlos Apache Tribe Executive Memo | Apache | San Carlos Apache Tribe | N/A | Designate San Carlos Apache Tribe staff to work on the Superior Area Ethnographic Study |
| 4/17/13 | Letter from San Carlos THPO to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Invitation to attend sunrise ceremony in Oak Flat to educate Forest staff on a place that is sacred |
| 4/18/13 | Formal Meeting* with Tribal Staff | Pueblo | Hopi Tribe CPO | Kykotsmovi, AZ | Superior Area Ethnographic Study |
| 4/26/13 | Official Letter from San Carlos Chairman to Secretary of Agriculture and TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Request to consult on land exchange and to receive associated documents |
| 6/06/13 | Memorandum of Understanding (MOU) | Apache | Tonto Apache Tribe | n/a | [5/1/15 letter mentions MOU sections that require TNF to "incorporate TEK into land and resource management decisions to promote sustainable ecosystems and protect traditional cultural properties and resources"] |
| 6/26/13 | Official Letter from TNF Supervisor to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Designating project leads for Superior Area Ethnographic Study and provide copy of Oak Flat archaeological report |
| 7/31/13 | Official Letter from TNF Supervisor to Gila River THPO | O'odham | Gila River Indian Community | N/A | Comments received; archaeological monitor will be present during mT survey |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-10

12-RCMSER-3060

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 7/31/13 | Official Letter from TNF Supervisor to Hopi CPO | Puebloan | Hopi Tribe | N/A | Comments received; archaeological monitor will be present during mT survey |
| 7/31/13 | Official Letter from TNF Supervisor to WMAT THPO | Apache | White Mountain Apache Tribe | N/A | Comments received; archaeological monitor will be present during mT survey |
| 6/20/13 (final signature 8/16/13) | Executed MOU between TNF and San Carlos | Apache | San Carlos Apache Tribe | N/A | Protocols for San Carlos participation in Ethnohistoric/Ethnographic Study |
| 11/15/13 | GPO submitted to TNF by Resolution Copper | N/A | N/A | N/A | Resolution Copper submits GPO for Resolution Copper Mine |
| 11/15/13 | FOIA request by San Carlos | Apache | San Carlos Apache Tribe | N/A | [Letter not located, but is mentioned in TNF 12/06/13 letter and 1/29/14 FOIA response] |
| 11/15/13 | FOIA request by San Carlos | Apache | San Carlos Apache Tribe | n/a | FOIA request (see 12/29/13) |
| 11/15/13 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Requested copy of Resolution Copper Project Mining Plan of Operations and TNF's analyses [Response 1/29/14 suggests the 11/15/13 letter was a FOIA request, but this letter makes no mention of FOIA] |
| 12/6/13 | Official Letter from TNF Supervisor to San Carlos Chairman | Apache | San Carlos Apache | N/A | Acknowledged receipt of FOIA request in 11/15/13 letter [letter not located]; stated Forest Service/TNF cannot consult on Congressional action (SE AZ Land Exchange) but is available to consult on Resolution Copper Project proposed mine plan |
| 1/29/14 | Official Letter from TNF Supervisor to San Carlos Chairman | Apache | San Carlos Apache | N/A | Cover letter with response to 11/15/13 FOIA request with enclosed CD |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-11

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 5/13/14 | Official Letter from TNF Supervisor | All Tribes (10) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Request meeting to consult on Resolution Copper's Baseline Hydrologic and Geotechnical Data Gathering Activities Project, and Superior Area Ethnographic Study |
| 5/27/14 | Official Letter from Hopi CPO to TNF Supervisor | Puebloan | Hopi Tribe | N/A | Response to 5/14/14 TNF letter; support EIS for the proposed data gathering and request consultation meeting |
| 5/28/14 | Official Letter from TNF Supervisor to Chairman | Yavapai | Ft. McDowell Yavapai Nation | N/A | Request meeting to confer on TNF NEPA Proposed Activities, including Resolution Copper Project Baseline request |
| 5/28/14 | Official Letter from TNF Supervisor to Chairman | Yavapai | Yavapai-Prescott Indian Tribe | N/A | Request meeting to confer on TNF NEPA Proposed Activities, including Resolution Copper Project Baseline request |
| 5/30/14 | Official Letter from GRIC THPO to TNF Supervisor | O'odham | Gila River Indian Community | N/A | Reviewed mT archaeological report and considers adequate; remain opposed to project |
| 6/16/14 | Official Letter from YPIT Cultural Research Director to TNF Supervisor | Yavapai | Yavapai-Prescott Indian Tribe | N/A | Response to TNF 5/13/14 letter re: Baseline testing CR report; support avoidance of historic properties |
| 6/20/14 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Request extension of deadline for comments on Baseline testing report |
| 6/23/14 | Official Letter from Fort McDowell President to TNF Supervisor | Yavapai | Fort Mc Dowell Yavapai Nation | N/A | Regarding Baseline Hydrological and Geotechnical Data Gathering and clarifying proper consultation procedure for Fort McDowell |
| 6/23/14 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Comments on Resolution Copper Project Baseline study |
| 7/01/14 | Email from TNF Tribal Relations Program Manager to Fort McDowell Director of Governmental Relations | Yavapai | Fort McDowell Yavapai Nation | N/A | Response to 6/23/14 letter forthcoming; attempting to set up meeting |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-12

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 7/23/14 | Formal Meeting* of TNF Leaders and CPO Staff | Puebloan | Hopi Tribe CPO | N/A | Comments on Resolution Copper Project Baseline study and Land Exchange |
| 8/04/14 | Emails between Fort McDowell Director of Government Relations and TNF Tribal Relations Program Manager | Yavapai | Fort McDowell Yavapai Nation | N/A | Communication protocol and attempt to set meeting |
| 8/21/14 | Official Letter from TNF Supervisor to Fort McDowell President | Yavapai | Fort McDowell Yavapai Nation | N/A | Response to Fort McDowell 6/23/14 letter with comments on Baseline |
| 8/21/14 | Official Letter from TNF Supervisor to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Receipt of 6/20 and 6/23 letters re: Baseline Plan; some comments pertain to General Plan; response to Baseline comments |
| 8/21/14 | Official Letter from TNF Supervisor to Hopi CPO | Puebloan | Hopi Tribe | N/A | Conveyed draft MOU for government-to-government consultation [missing attachment] |
| 10/31/14 | TNF Internal Brief, Oak Flat National Register of Historic Places (NRHP) Nomination | Apache | | n/a | Reviews steps and timeline for nominating Oak Flat as a TCP |
| 2014-2015 | Ethnographic/ Ethnohistoric Study fieldwork and report | All Tribes (10) invited | Gila River Indian Community<br>Hopi Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | Superior, AZ | Cultural Landscapes and Traditional Cultural Places within the Resolution Copper project area |
| 2/17/15 | AZ Mining Reform to Forest Service | Apache | San Carlos Apache Tribe | N/A | Provided copy of letter and statement from San Carlos and AZ Mining Reform re: Oak Flat |
| 2/18/15 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache | N/A | Request TNF obtain return of TCP form released by SHPO to Resolution Copper |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

12-RCMSER-3063

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 3/12/15 | Official Letter from TNF Supervisor to Tribal leaders and cultural staff | All Tribes (10) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Requested comments on Baseline EA |
| 3/30/15 | Official Letter from Hopi CPO to TNF Supervisor | Puebloan | Hopi Tribe | N/A | Comments on Resolution Baseline EA |
| 3/31/15 | Official Letter from TNF Supervisor to Apache Stronghold | Apache | San Carlos Apache Tribal Council | N/A | Thanking for 2/17/15 Joint Statement and TNF will not remove crosses |
| 3/31/15 | Official Letter from Yavapai-Apache Nation Chairman and cultural staff to TNF Supervisor | Yavapai | Yavapai-Apache Nation | N/A | Comments on Resolution Baseline Plan EA |
| 4/13/15 | Official Letter from Fort McDowell Yavapai Nation Governmental Relations Director to TNF Supervisor | Yavapai | Fort McDowell Yavapai Nation | N/A | Comments on Resolution Baseline Plan EA |
| 4/13/15 | Official Letter from San Carlos Apache Tribe A.G. to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Response to TNF 3/12/15 letter requesting comments on Resolution Baseline EA; requests TNF send letters to Chair and provide POCs for consultation |
| 4/22/15 | Formal Meeting* of TNF and Tribal Staffs | Apache | Tonto Apache Tribe<br>White Mountain Apache Tribe | TNF S.O., Phoenix, AZ | Forest projects update, including Resolution |
| 4/23/15 | Official Email from Region 3 Tribal Relations to TNF and San Carlos | Apache | San Carlos Apache Tribe | N/A | Correspondence re: MOU process |
| 4/27/15 | Formal Meeting* with Tribal Leaders | Apache | San Carlos Apache Tribe | San Carlos, AZ | Deputy Undersecretary Blazer and Bosworth met with San Carlos Apache Tribe Vice Chair and A.G. re: Land Exchange |
| 4/30/15 | Official Letter from TNF Supervisor to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Invited to meet re: Baseline EA; Second invitation issued 06/29/15 |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-14

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 6/01/15 | Official Letter from Tonto Apache Tribe Vice Chairman to TNF Supervisor | Apache | Tonto Apache Tribe | N/A | Comments on Baseline Plan -- there are TCPs in the project area |
| 6/09/15 | Official Letter from TNF Supervisor to San Carlos Chairman | Apache | San Carlos Apache Tribe | n/a | Special Use Permit for Oak Flat continued encampment |
| 6/11/15 | Official Letter from TNF Supervisor to San Carlos A.G. | Apache | San Carlos Apache Tribe | N/A | Response to 4/2/15 FOIA request |
| 6/19/15 | Official Letter from San Carlos Chairman to U.S. Secretary of Agriculture | Apache | San Carlos Apache Tribe | N/A | Request for government-to-government consultation on NDAA |
| 6/19/15 | TNF Tribal Liaison | Apache | San Carlos Apache Tribe | N/A | Telephone log documenting attempts to set meeting with San Carlos (see also 8/24/15) |
| 6/24/15 | Official Letter from Gila River THPO to TNF Supervisor | O'odham | Gila River Indian Community | N/A | Comments on Baseline EA |
| 6/29/15 | Telephone log documenting TNF staff attempts to set meeting with San Carlos | Apache | San Carlos Apache Tribe | n/a | Multiple attempts to call Attorney General, Chairman, and acting Chairman to set up G2G meeting (see also 8/24/15) |
| 7/09/15 | Official Letter from TNF Supervisor to Tonto Chairman | Apache | Tonto Apache Tribe | N/A | Response to Tonto 6/01/15 comments on Baseline Plan |
| 7/15/15 | Official Letter from TNF Supervisor to GRIC Governor | O'odham | Gila River Indian Community | N/A | Invitation to Gila River Indian Community Governor to consult on the TCP nomination |
| 7/30/15 | Official Letter from National Park Service | N/A | N/A | N/A | Notified TNF of technical errors in TCP nomination |
| 7/31/15 | Official Letter from TNF Supervisor to Leaders and cultural staff | All Tribes (10) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Invitation to consult about the TCP nomination and Oak Flat |

* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-15

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|--------------------|----------------------|----------|----------------------|
| 8/04/15 | Official Letter from TNF Supervisor to Leaders and cultural staff | All Tribes (10) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Invitation to consult about the NDAA Land Exchange |
| 8/14/15 | Formal Meeting* with Tribal staffs | Apache | Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation | Payson, AZ | Notes: Land Exchange, Resolution Copper's Baseline Plan |
| 8/17/15 | Official Letter from Hopi CPO to TNF Supervisor | Puebloan | Hopi Tribe | N/A | Response to invitation to consult re: SE AZ Land Exchange |
| 8/24/15 | Phone Log and Email from TNF Tribal Liaison to San Carlos A.G. | Apache | San Carlos Apache Tribe | N/A | Attempting to set up meeting |
| 8/24/15 | Email from TNF Archaeologist to San Carlos Attorney General | Apache | San Carlos Apache Tribe | n/a | Written follow up on voicemail left on Attorney General's phone inquiring if Chairman wants to meet with TNF regarding RCM Baseline |
| 9/14/15 | Report (*Ethnographic and Ethnohistoric Study of the Superior Area, Arizona*) undertaken for RCM project, submitted to TNF for distribution to Tribes | All Tribes (10) | Gila River Indian Community<br>Hopi Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | Superior, Arizona area | Identifies sites of importance to Tribes representing Western Apache, Yavapai, O'odham, and Hopi/Zuni Pueblo cultural groups; copies provided to Tribes for review<br>CONFIDENTIAL |
| 9/18/15 | Official Letter from TNF Supervisor to Fort McDowell Government Relations | Yavapai | Fort McDowell Yavapai Nation | N/A | Response to 4/13/15 comments from Fort McDowell Government Relations |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 9/18/15 | Official Letter from TNF Supervisor to YAN Chairman and cultural staff | Apache Yavapai | Yavapai-Apache Nation | N/A | Response to YAN's 3/31/15 comments on Baseline Plan |
| 9/22/15 | Formal Meeting* with Hopi CPO staff | Puebloan | Hopi Tribe | Kykotsmovi, AZ | Update on Forest projects, including Resolution |
| 9/24/15 | Formal Meeting* with Tribal staffs | Apache | Mescalero Apache Tribe<br>San Carlos Apache Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (Apache representative) | Payson, AZ | Resolution Copper Baseline Plan, TCP Mitigation Plan, Avoidance of Springs |
| 9/28/15 | TNF Tribal Liaison attempts to contact THPO | Apache | San Carlos Apache Tribe | N/A | – |
| 9/30/15 | Official Email from TNF Supervisor to Leaders and cultural staff | All Tribes (10) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | N/A | Provided Superior Area Ethnographic Study and thanked for their participation |
| 10/02/15 | Formal Meeting* with Zuni Leaders | Pueblo | Pueblo of Zuni | Zuni, NM | Update on Forest projects, including Resolution Copper EIS and Land Exchange |
| 10/15/15 | Formal Meeting* with Tribal staffs | O'odham | Gila River Indian Community<br>Salt River Pima-Maricopa Indian Community | TNF S.O., Phoenix, AZ | Notes: Land Exchange, Baseline Plan of Operations, Oak Flat Traditional Cultural Places |
| 10/21/15 | Formal Meeting* with Tribal staffs | Apache | Mescalero Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation | Payson, AZ | Notes: Baseline Plan, Traditional Cultural Places Mitigation Plan, Avoidance of Springs |
| 10/21/15 | TCP Mitigation Plan for Baseline Hydrological and Geotechnical Data Gathering Activities Plan of Operations | | | n/a | Specifics of springs avoidance plan with map showing buffers, and stipulating archaeological monitoring during project<br>CONFIDENTIAL (Site Locations) |

* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-17

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|--------------------|----------------------|----------|----------------------|
| 10/22/15 | Email from TNF Tribal Liaison to San Carlos A.G. | Apache | San Carlos Apache Tribe | N/A | Provided redacted copy of Ethnography as example of FOIA response, and unredacted copy |
| 10/22/15 | TNF Tribal Liaison to San Carlos THPO | Apache | San Carlos Apache Tribe | N/A | Telephone log of attempts to set meeting |
| 10/27/15 | Official Letter from San Carlos A.G. to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Decline consulting on Resolution Copper Mine as unaware that TNF has been delegated the responsibility |
| 11/02/15 | Email from TNF Tribal Liaison to GRIC THPO | O'odham | Gila River Indian Community | N/A | Provided information prior to 11/6/15 meeting |
| 11/04/15 | Official Letter from USDA Secretary to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Response to 6/19/15 San Carlos letter re: consultation about Land Exchange |
| 11/06/15 | Formal Meeting* with Tribal staff | O'odham | Gila River Indian Community Salt River Pima-Maricopa Indian Community | TNF S.O., Phoenix, AZ | Baseline Plan and proposed mitigations for TCPs |
| 11/16/15 | Formal Meeting* with Tribal staff | Yavapai | Fort McDowell Yavapai Nation | Fountain Hills, AZ | Land Exchange, Baseline EA |
| 11/30/15 | Formal Meeting* with Tribal staffs | Yavapai | Fort McDowell Yavapai Nation Yavapai-Apache Nation Yavapai-Prescott Indian Tribe | Prescott, AZ | Resolution Copper Baseline Plan, Land Exchange, Apache Leap SMA |
| 12/18/15 | Formal Meeting* with Tribal staffs | O'odham | Gila River Indian Community Salt River Pima-Maricopa Indian Community | Sacaton, AZ | Notes: Land Exchange, Superior Area Ethnographic Study, Resolution Copper's Baseline Plan – Traditional Cultural Places Mitigations, Oak Flat Traditional Cultural Place |
| 1/13/16 | Formal Meeting* with Tribal staffs | Apache | Mescalero Apache Tribe San Carlos Apache Tribe Tonto Apache Tribe White Mountain Apache Tribe Yavapai-Apache Nation | Payson, AZ | Notes: Baseline EA draft decision notice |
| 1/15/16 | Official Letter from TNF Supervisor to Leaders and cultural staff | Apache Pueblo Yavapai | Hopi Tribe San Carlos Apache Tribe White Mountain Apache Yavapai-Prescott Indian Tribe | N/A | Regarding EA on Hydro/geo baseline study |
| 2/29/16 | Official Letter from San Carlos Chairman to Regional Forester | Apache | San Carlos Apache Tribe | N/A | Objections to Baseline Hydrological and Geotechnical Data Gathering FONSI |
| 3/01/16 | TNF Tribal Liaison and San Carlos A.G. | Apache | San Carlos Apache Tribe | N/A | Telephone log re: attempts to set meeting to discuss objections to Baseline EA |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-18

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|--------------------|---------------------|----------|---------------------|
| 3/04/16 | NRHP Listing | All Tribes (10) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | Superior area | Oak Flat Traditional Cultural Place, Superior Area Ethnographic Study |
| 3/07/16 | Internal TNF Table summarizing consultation to date regarding RCM Baseline | All Tribes (10) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | n/a | RCM Baseline |
| 3/08/16 | Officiel Letter from Region 3 Forester to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Acknowledge receipt of objections to Baseline EA |
| 3/16/16 | Email from Ft McDowell Governmental Relations to TNF Supervisor | Yavapai | Fort McDowell Yavapai Nation | N/A | Five questions regarding TCP, ALSMA mgmt. plan, mtg notes, timelines, next mtg |

* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 3/16/16 | Official email from TNF Supervisor to Leaders and cultural staff | All Tribes (10) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | N/A | Official start of environmental review for Resolution Copper Project and land exchange |
| 3/17/16 | Email from TNF Tribal Liaison to Salt River Chairman | O'odham | Salt River Pima-Maricopa Indian Community | N/A | Resent 3/16/16 email that bounced |
| 3/18/16 | Email from San Carlos Attorney General to TNF Archaeologist | Apache | San Carlos Apache Tribe | n/a | Confirms G2G meeting for 4/06–4/07/16 on RCM Baseline and MOU with USDA regarding Land Exchange; MOU will be transmitted to Vilsack and Bosworth on 3/21/16 |
| 3/21/16 | Official Letter from San Carlos Chairmen to USDA Secretary and TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Conveyed draft proposed Land Exchange Memorandum of Understanding (MOU) |
| 4/01/16 | Official Letter from TNF Supervisor to Leaders and cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Requesting comment on scope of EIS |
| 4/01/16 | Email from TNF Deputy Supervisor to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Regarding the MOU |
| 4/01/16 | Email from TNF Tribal Liaison to San Carlos A.G. | Apache | San Carlos Apache Tribe | N/A | Draft MOU revisions |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-20

12-RCMSER-3070

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 4/04/16 | Email from TNF Archaeologist to San Carlos Chairman and Attorney General | Apache | San Carlos Apache Tribe | n/a | Provided draft agenda for 4/06/16 meeting and digital copy of scoping letter (PR 2957) |
| 4/06/16 | Official Letter from Hopi CPO to TNF Supervisor | Puebloan | Hopi Tribe | N/A | Response on scope of the EIS |
| 4/06/16 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Resolution Copper's Baseline Finding of No Significant Impact |
| 4/06/16 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Initiate government-to-government consultation and MOU |
| 4/06/16 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Request for extension to scoping period |
| 4/06/16 | Formal Meeting* with Tribal Leaders | Apache | San Carlos Apache Tribe | TNF S.O., Phoenix, AZ | Update on Forest projects, including Resolution Copper EIS, Baseline Study, and Land Exchange |
| 4/12/16 | Formal Meeting* with Tribal Leaders | Puebloan | Pueblo of Zuni | Zuni, NM | Discussed Resolution Copper Project, requested video of elders visiting project area |
| 4/19/16 | Email from San Carlos A.G. | Apache | San Carlos Apache Tribe | N/A | Additional requests for information |
| 4/22/16 | Official Letter from TNF Supervisor to Hopi CPO | Puebloan | Hopi Tribe | N/A | Responding to 4/6/16 Hopi letter re: the EIS process |
| 4/26/16 | Presentation by TNF Staff | O'odham | Ak-Chin Indian Community<br>Gila River Indian Community<br>Salt River Pima-Maricopa Indian Community | Scottsdale, AZ | Update on Forest projects including Resolution Copper Project EIS and Land Exchange, for Four Southern Tribes Cultural Group |
| 4/26/16 | Official Letter from Acting Regional Administrative Review Coordinator to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | [mentioned in 4/29/16 San Carlos letter] |
| 4/29/16 | Official Letter from San Carlos Chairman to Acting Regional Administrative Review Coordinator | Apache | San Carlos Apache Tribe | N/A | Oppose Baseline activities plan |
| 5/04/16 | Official Letter from TNF Supervisor to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Comments received on Baseline Plan |
| 5/04/16 | Official Letter from TNF Supervisor to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Extension of Scoping period; other issues to be discussed at 5/18/16 meeting in San Carlos |
| 5/04/16 | Official Letter from TNF Supervisor to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Confirmed action items from 4/06/16 meeting regarding the NDAA MOU and the meeting set for 5/18/16 |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-21

12-RCMSER-3071

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 5/06/16 | Email from TNF Supervisor to San Carlos Chairman | Apache | San Carlos Apache Tribe | n/a | Provided alternate times/dates for telephona conference with Regional Forester regarding objections to Baseline FONSI |
| 5/13/16 | Official Letter from San Carlos Chairman to Regional Forester | Apache | San Carlos Apache Tribe | N/A | San Carlos objections to Baseline Plan Finding of No Significant Impact |
| 5/16/16 | Official Letter from Regional Forester to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Analysis of San Carlos objections; approval of Baseline Plan |
| 5/17/16 | Emails between San Carlos and TNF | Apache | San Carlos Apache Tribe | N/A | Cancelled 5/18/16 meeting |
| 6/17/16 | Official Letter from TNF Supervisor to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Provided TNF Points of Contact for Land Exchange MOU and invitation to tour |
| 6/21/16 | Email from TNF Tribal Liaison to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Provided TNF Points of Contact for Land Exchange MOU |
| 6/30/16 | Email from TNF Tribal Liaison to San Carlos Chairman and Attorney General | Apache | San Carlos Apache Tribe | n/a | Follow up to 6/17/16 invitation to tour and discuss groundwater issues on 7/12–13; Attorney General responded that Dr. Wells will attend on behalf of Attorney General |
| 7/14/16 | Official Letter from White Mountain Apache THPO to TNF Mine Specialist | Apache | White Mountain Apache Tribe | N/A | White Mountain Apache Tribe provided comments on Resolution public scoping |
| 7/18/16 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | San Carlos Apache Tribe provided comments on Resolution public scoping |
| 8/25/16 | Official Letter from TNF Supervisor to Leaders and cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Decision Notice: Finding of No Significant Impact for Baseline Plan of Operations |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-22

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 9/29/16 | Official Letter from TNF Supervisor to Leaders and cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Requesting consultation re: Apache Leap SMA Management Plan |
| 10/31/16 | Email from San Carlos A.G. to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Conveyed draft MOU |
| 11/02/16 | Email from TNF Tribal Liaison to San Carlos A.G. | Apache | San Carlos Apache Tribe | N/A | Acknowledge receipt of draft MOU |
| 11/03/16 | Formal Meeting* USDA and San Carlos Chairman | Apache | San Carlos Apache Tribe | Washington, DC | Notes from San Carlos/USDA Meeting (author unknown) |
| 11/07/16 | Emails San Carlos Attorney General and TNF Tribal Liaison | Apache | San Carlos Apache Tribe | n/a | Attempts to set meeting to discuss MOU |
| 11/16/16 | TNF leaders and staff met with Fort McDowell representative | Yavapai | Fort McDowell Yavapai Nation | Unknown | TNF Tribal consultation form documented RCM Baseline Plan discussion |
| 11/23/16 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Will meet 12/14/16 to discuss MOU and other Land Exchange issues |
| 11/29/16 | Formal Meeting* with Tribal cultural staff | Yavapai | Fort McDowell Yavapai Nelion Yavapai-Apache Nation Yavapai-Prescott Indian Tribe | TNF S.O., Phoenix, AZ | Land Exchange, Resolution Copper Project (EIS), Apache Leap SMA |
| 12/01/16 | Email from TNF Tribal Liaison to San Carlos Chairman and A.G. | Apache | San Carlos Apache Tribe | N/A | Provided agenda for Apache Cultural meeting 12/09/16 |
| 12/08/16 | Email from San Carlos Attorney General to TNF Tribal Liaison | Apache | San Carlos Apache Tribe | n/a | Questions about topics for meeting |
| 12/09/16 | Formal Meeting* with Tribal cultural staff | Apache | Mescalero Apache Tribe San Carlos Apache Tribe Tonto Apache Tribe | Payson, AZ | Land Exchange, EIS, Apache Leap SMA |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|--------------------|---------------------|----------|---------------------|
| 12/12/16 | Email from TNF Supervisor to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Conveyed Land Exchange MOU with proposed edits |
| 12/13/16 | Formal Meeting* with Tribal Leaders | Pueblo | Pueblo of Zuni | Zuni, NM | Land Exchange, EIS, Apache Leap SMA |
| 12/14/16 | Formal Meeting* with Tribal Leader and staff | Apache | San Carlos Apache Tribe | TNF S.O., Phoenix, AZ | Land Exchange, EIS, Apache Leap SMA, MOU re: government-to-government consultation |
| 12/20/16 | Formal Meeting* with Tribal cultural staff | Yavapai | Fort McDowell Yavapai Nation | TNF S.O., Phoenix, AZ | Land Exchange, EIS, Apache Leap SMA |
| 12/30/16 | Formal Meeting* with Tribal cultural staff | O'odham | Salt River Pima-Maricopa Indian Community  Gila River Indian Community | TNF S.O., Phoenix, AZ | Land Exchange, EIS, Apache Leap SMA |
| 1/10/17 | Field Trip | O'odham | Salt River Pima-Maricopa Indian Community  Gila River Indian Community | Superior, AZ | Land Exchange and Proposed Tailings Location |
| 1/11/17 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | MOU re: government-to-government consultation |
| 2/16/17 | Official Letter from TNF Supervisor to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | MOU re: government-to-government consultation |
| 2/16/17 | Informal Meeting TNF Tribal Relations Program Manager and Tribal staff | Apache | Yavapai-Apache Nation  (Apache Cultural representatives) | Camp Verde, AZ | Apache Leap SMA and Resolution EIS |
| 3/07/17 | Formal Meeting* with Tribal leaders and staff | Apache | Mescalero Apache Tribe | Mescalero, NM | Update on Forest projects, including Apache Leap SMA and Resolution EIS |
| 3/20/17 | Email from TNF Supervisor to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Invitation to meetings on 4/27 and 4/28 |

* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-24

12-RCMSER-3074

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 3/20/17 | Email from TNF Tribal Relations Program Manager to cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Invitation to meetings and tour, 4/27 and 4/28 |
| 3/29/17 | Formal Meeting* with Hopi CPO | Puebloan | Hopi Tribe | Kykotsmovi, AZ | Land Exchange, EIS, Apache Leap SMA |
| 4/07/17 | Email from TNF Tribal Relations Program Manager to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Apache Leap SMA brochure and draft agenda for April 27 meeting and field visits |
| 4/27/17 | Formal Meeting* and field tour with Tribal Leaders and cultural staff | All Tribes (11) invited | Ak-Chin Indian Community<br>Gila River Indian Community<br>Mescalero Apache Tribe<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (Apache and Yavapai representatives) | Superior, AZ | Meeting: EIS and addressing adverse effects Tour: JI Ranch as possible mitigation |
| 4/27/17 | Comment Form | Apache | San Carlos Apache Tribe | Superior, AZ | Chairman Rambler provided written comments at All Tribes meeting |

* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

12-RCMSER-3075

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 4/28/17 | Field Trip | All Tribes (11) invited | Ak-Chin Indian Community<br>Gila River Indian Community<br>Mescalero Apache Tribe<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (Yavapai representatives) | Superior area | Tour of Mine and Proposed Facilities areas |
| 5/01/17 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Comments on Apache Leap SMA plan and EA |
| 5/15/17 and 5/16/17 | Field Trips | All Tribes invited (11) | Ak-Chin Indian Community Mescalero Apache Tribe | Superior, AZ | Hike to top of Apache Leap and tour of Resolution Mine shaft |
| 5/18/17 | Official Email from TNF Supervisor to Leaders and staff | All Tribes (11) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Conveyed minutes from 4/27 and 4/28 all tribes mtg, provided link to Apache Leap draft management plan, asked for comments by June 16 |
| 6/30/17 | Official Letter from TNF ALSMA Project Manager to San Carlos A.G. | Apache | San Carlos Apache Tribe | N/A | Requested comments on ALSMA management plan |
| 7/05/17 | Formal Meeting* with Tribal Leader and Staff | Apache | Yavapai Apache Nation (Apache cultural representatives) | Camp Verde, AZ | Tailings Alternatives |
| 7/07/17 | Email from TNF Deputy Supervisor to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Re: Apache Leap Special Management Area Management Plan |

* = Forest Service line officer present

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

12-RCMSER-3076

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 7/10/17 | Email from TNF Tribal Relations Program Manager to YAN Chairman and staff | Apache Yavapai | Yavapai-Apache Nation | N/A | Provided items requested in 7/05/17 meeting |
| 7/13/17 | Formal Meeting* of TNF and SHPO | | Arizona State Historic Preservation Officer | TNF S.O., Phoenix, AZ | Section 106 process, PA, tribal consultation |
| 7/20/17 | Official Letter from TNF Supervisor to Tribal Leaders and cultural staff | All Tribes invited | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | TBD | Invitation to All Tribes meeting October 5, 2017 |
| 7/26/17 | Email from TNF Tribal Relations Program Manager to Ak-Chin Cultural Staff | O'odham | Ak-Chin Indian Community | n/a | Invitation to All Tribes meeting 10/05/17 |
| 7/31/17 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Comments on modified Apache Leap SMA Management Plan |
| 8/02/17 | Official Letter from TNF Supervisor to San Carlos Apache Tribal Council | Apache | San Carlos Apache Tribe | N/A | Request to engage in formal government-to-government meeting with tribal council re: Apache Leap SMA |
| 8/09/17 | Email from TNF RCM Project Lead to San Carlos Water Consultant | Apache | San Carlos Apache Tribe | n/a | Invitation to join groundwater modeling analysis group meeting on 9/17/17 |
| 8/16/17 | Email from TNF Tribal Relations Program Manager to Zuni THPO | Pueblo | Pueblo of Zuni | n/a | Requested Zuni review of ALSMA Management Plan, setting up elders visit to ALSMA and fall Council meeting |

* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 9/07/17 | Official Letter from TNF Supervisor to Tribal Leader and Cultural Staff | All Tribes (12) invited | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | n/a | Invitation to second All Tribes meeting on 10/05/17 |
| 10/05/17 | Formal Meeting* with Tribal Leaders and Staffs | All Tribes (11) invited | Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | Payson, AZ | Apache Leap SMA, EIS, Tailings Alternatives, SHPO Consultation |
| 10/06/17 | Field Trip | All Tribes (11) invited | Mescalero Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (Yavapai)<br>Yavapai Prescott Indian Tribe<br>Pueblo of Zuni | Superior area | Field Trip to Peg Leg Tailings Alternative |
| 10/10/17 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Letter to Regional Forester Objecting to Final Apache Leap EA |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal Issues.

12-RCMSER-3078

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 10/23/17 | Official Letter from TNF Supervisor to Leaders and cultural staff | All Tribes Invited | Ak-Chin Indian Community<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Requesting Tribal Input on Tailings Alternatives |
| 10/25/17 | Email from SWCA to White Mountain elder | Apache | White Mountain Apache Tribe | n/a | Provided information on water associated with Apache Leap/Oak Flat as requested at All Tribes meeting |
| 11/01/17 | Email from TNF RCM Project Lead to San Carlos Attorney General | Apache | San Carlos Apache | n/a | Provided links to requested information |
| 11/02/17 | Email from TNF Tribal Relations Program Manager to Tribes | All Tribes (11) | Ak-Chin Indian Community<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | n/a | Provided link to Tailings Alternatives report |
| 11/29/17 and 11/30/17 | Field Trips | Apache | Mescalero Apache Tribe<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (Apache representatives) | Superior area | Field Trip to Peg Leg Tailings Alternative and Mine Tour |
| 12/06/17 | Official Letter from White Mountain THPO to TNF Supervisor | Apache | White Mountain Apache Tribe | N/A | Comment on their preferred Tailings Alternatives; restate opposition to project |
| 12/06/17 | Official Letter from Tonto Apache Chairwoman and cultural staff to TNF Supervisor | Apache | Tonto Apache Tribe | N/A | Comment on their preferred Tailings Alternatives; restate opposition to project |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 12/06/17 | Official Letter from Yavapai-Apache Nation Chairwoman and cultural staff to TNF Supervisor | Apache | Yavapai-Apache Nation (Apache representatives) | N/A | Comment on their preferred Tailings Alternatives; restate opposition to project |
| 12/08/17 | Official Letter from Mescalero Apache Present and THPO to TNF Supervisor | Apache | Mescalero Apache Tribe | N/A | Comment on their preferred Tailings Alternatives; restate opposition to project |
| 1/08/18 | Official Letter from Hopi CPO | Puebloan | Hopi Tribe | N/A | Note: Letter written but never mailed by Hopi (confirmed by Hopi CPO) |
| 1/09/18 | Formal Meeting* of TNF Supervisor with San Carlos Chairman and Staff | Apache | San Carlos Apache Tribe | San Carlos, AZ | Tailings Alternatives/Mining Technique |
| 1/23/18 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Support for Peg Leg and request for additional data |
| 1/25/18–2/02/18 | Tribal Monitor Training | All Tribes invited | Ak-Chin Indian Community<br>Gila River Indian Community<br>Hope Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>San Carlos Apache Tribe<br>Salt River Pima-Maricopa Indian Community<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation | Chandler and Globe, AZ | First training of Tribal Monitors |
| 2/09/18 | Email from TNF Supervisor to San Carlos Chairman (and email from Lyndon w/corrected attachment) | Apache | San Carlos Apache Tribe | N/A | Asked if TNF had any outstanding items from mtg, sent mtg notes, and asked for San Carlos' promised mine deposit characterization |
| 2/12/18 | Email from SWCA to San Carlos Chairman with link to requested data | Apache | San Carlos Apache Tribe | N/A | Provided additional data requested at Jan 10, 2018, meeting |
| 3/13/18 | Email from TNF Tribal Relations Program Manager to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Provided digital copy of mailed invitation to May 2 meeting |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 3/14/18 | Official Letter from TNF Supervisor to Tribal Leaders and Staff | All Tribes (11) invited | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Invitation to 3rd All Tribes meeting on Resolution Copper Mine, May 2 |
| 3/14/18 | Emails TNF Tribal Relations Program Manager and San Carlos THPO | Apache | San Carlos Apache Tribe | N/A | Regarding 5/03/18 Apache meeting |
| 3/21/18 | Official Letter from San Carlos Chairman to TNF Supervisor' | Apache | San Carlos Apache | N/A | Will attend 5/02/18 All Tribes; requested agenda materials 2 weeks prior to meeting; thanked for materials sent by SWCA |
| 4/09/18 | Email from TNF Tribal Relations Program Manager to Tribal Leaders and cultural staff | All Tribes (11) and TNF leaders | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Sent draft agenda for 5/02/18 All Tribes meeting and invitation to participate in development of PA (version 3); attachments included Section 106 Status Report; Resurvey/TCP of Oak Flat outline; and Oak Flat HPTP outline; and SharePoint link to file containing inventory reports |
| 4/27/18 | Formal Meeting* with Tribal Staffs | O'odham | Ak-Chin Indian Community<br>Gila River Indian Community<br>Salt River Pima-Maricopa Indian Community | TNF S.O., Phoenix, AZ | Update on Forest projects and Resolution EIS; provided PA outline |

\* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-31

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|--------------------|----------------------|----------|----------------------|
| 5/01/18 | Formal Meeting* with Tribal Staffs | Apache | Mescalero Apache Tribe<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>Yavapai-Apache Nation (Apache representatives)<br>White Mountain Apache Tribe | Flagstaff, AZ | Update on Forest projects and Resolution EIS; provided PA outline |
| 5/02/18 | Formal Meeting* with Tribal Leaders and Staffs | All Tribes invited | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | Flagstaff, AZ | Update on Resolution Copper Project; discuss Oak Flat treatment; provided PA outline |
| 5/03/18 | Formal Meeting* with Tribal Staffs | Puebloan | Hopi Tribe Pueblo of Zuni | Flagstaff, AZ | Update on Forest projects and Resolution EIS |
| 5/04/18 | Email from TNF RCM Project Manager to San Carlos Attorney General Office | | San Carlos Apache Tribe | n/a | Provided maps of alternative tailings locations, requested at 5/2/18 All Tribes meeting |
| 5/10/18 | SWCA provided maps requested by THPOs at All Tribes meeting | Apache | Mescalero Apache San Carlos Apache | N/A | Large format map of Oak Flat archaeology sites sent to both tribes; pdf of Alternatives map, Springs map, and Alt 8 map to San Carlos |
| 5/23/18 | Formal Meeting of Agencies, | N/A | TNF BLM SHPO | TNF S.O., Phoenix, AZ | TNF's Aprill 2018 Section 106 report; PA |
| 5/24/18 | Internal TNF Project Summary | | | | Tribal consultation regarding RCM tailings alternatives |

\* = Forest Service line officer present

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

12-RCMSER-3082

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 5/29/18 and 5/30/18 | Field Tour and Discussions with Elders | All Tribes (11) invited | Gila River Indian Community<br>Hopi Tribe<br>Pueblo of Zuni<br>San Carlos Apache Tribe<br>White Mountain Apache Tribe | Peg Leg Tailings Alternative | Tour and Discussion of TCPs recorded by Tribal Monitors |
| 6/05/18 | Email from TNF Tribal Relations Program Manager to Tribal cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Announced second Tribal Monitor Training and requested nominations |
| 6/07/18 | Formal Meeting* with Tribal Staffs | Yavapai | Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | TNF S.O., Phoenix, AZ | Update on Forest projects and Resolution EIS |
| 6/13/18 | Programmatic Agreement (PA) Public Workshop | All Tribes | Tohono O'odham Nation | Tucson, AZ | PA Contents |
| 6/14/18 | Formal Meeting* with Tribal Council Executive Committee and Staff | Apache | Mescalero Apache Tribe | Mescalero, NM | Discussion on Resolution Copper Mine |
| 9/04/18 | Formal Meeting* with Tribal Council | Puebloan | Pueblo of Zuni | Zuni, NM | Discussion on Resolution Copper Mine |
| 9/18/18 | Emory Oak meeting | Apache | San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Tribe | Camp Verde, AZ | Kickoff meeting to set objectives and identify potential groves for restoration |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-33

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|---------------------|----------|---------------------|
| 9/28/18 | Official Letter from TNF Supervisor to Tribal Leaders and cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Request for comment on draft HPTP and PA version 3 (provided on share drive 4/9/18); due Nov 9 |
| 10/1/18–10/10/18 | Tribal Monitor Training | All Tribes (11) invited | Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>San Carlos Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation | San Carlos, AZ | Second Tribal Monitor Training |
| 10/15/18 | Email from TNF Tribal Relations Program Manager to cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Request for comment on Peg Leg Tailings Alternative Tribal Perspectives Report, due Nov. 9, 2018<br><br>CONFIDENTIAL [report not included in PR] |

* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

12-RCMSER-3084

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 10/25/18 | Emails between Zuni Governor and TNF Tribal Relations Program Manager | Puebloan | Pueblo of Zuni | N/A | Requested extension of deadline for identifying NDAA mitigation measures |
| 11/13/18 | Official Letter from Hopi CPO | Puebloan | Hopi Tribe | N/A | Comment on Peg Leg Tailings TM Report |
| 11/7 /18 | Email from TNF Tribal Relations Program Manager to BLM Cultural Resources Specialist | Cooperating Agency | | | Conveyed Hopi comment on Peg Leg TM report |
| 11/14/18 and 11/15/18 | Field Tours and Discussions with Elders | All Tribes (11) invited | Gila River Indian Community Hopi Tribe Pueblo of Zuni | Near West and Silver King areas | Tour and Discussion of TCPs recorded by Tribal Monitors |
| 11/19/18 | Email from TNF Tribal Relations Program Manager | All Tribes (11) invited | Fort McDowell Yavapai Nation Gila River Indian Community Hopi Tribe Mescalero Apache Tribe Pueblo of Zuni Salt River Pima-Maricopa Indian Community San Carlos Apache Tribe Tonto Apache Tribe White Mountain Apache Tribe Yavapai-Apache Nation (representatives of both) Yavapai-Prescott Indian Tribe | N/A | Invitation to attend 11/26/18 meeting to discuss draft PA |
| 11/26/18 | Formal Meeting* with Cooperating Agencies and Consulting Tribes | All Tribes (11) invited | Gila River Indian Community Salt River Pima-Maricopa Indian Community ACHP, BLM, AZ SHPO, ASLD | TNF S.O., Phoenix, AZ | Discussion of proposed changes to draft PA version 3 |
| 11/28/18 | Emory Oak Field Trip | Apache | San Carlos Apache Tribe Yavapai-Apache Nation (Apache representatives) | Camp Verde area | Examined potential groves |
| 12/03/18 | Official Letter Signed by TNF and BLM | Apache O'odham Yoeme | Ak-Chin Indian Community Fort Sill Apache Tribe Pascua Yaqui Tribe Tohono O'odham Nation | N/A | Invitation to 4 additional tribes BLM consults, to consult regarding the Peg Leg Alternative area |

\* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-35

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 2/05/19 | Emory Oak Field Trip | Apache | Tonto Apache Tribe | Payson, AZ | Examined potential groves |
| 2/13/19 | Official Email from TNF Tribal Relations Program Manager | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Conveyed PA version 4, asking for comments by March 15, 2019, and informing of meeting to discuss on March 27 or 28, 2019 |
| 2/21/19 | Email from Gila River Native American Graves Protection and Repatriation Act (NAGPRA) Staff to TNF Tribal Relations Program Manager | O'odham | Gila River Indian Community | n/a | Provided comments on draft Oak Flat Burial Plan and referred TNF to Gila River CR Management Program Director for cost of treatment of human remains |
| 2/28/19 | Official Letter from TNF Supervisor to Chairs and cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Invitation to Discuss Draft PA on 3/28 and to Attend All Tribes Consultation Meeting on 3/29; conveyed PA version 4 |
| 3/08/19 | Email from Hopi Tribe to TNF Tribal Relations Program Manager | Puebloan | Hopi Cultural Preservation Office Program Manager | N/A | Comments on PA version 4 |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|--------------------|----------------------|----------|----------------------|
| 3/11/19 | Formal Meeting* of TNF Supervisor with Mescalero Leaders, staff, and elders | Apache | Mescalero Apache Tribe | Superior, AZ | Annual consultation meeting; and update on Resolution Copper Project EIS; PA version 4 with comments due 3/28/19; viewed Oak Flat from Mine East Plant |
| 3/15/19 | Official Letter from San Carlos | Apache | San Carlos Apache Tribe | N/A | Comments on PA draft version 4 and request for informal staff meeting and formal presentation to Council |
| 3/25/19 | Email from San Carlos THPO to TNF | Apache | San Carlos Apache Tribe | N/A | Requested large format maps on paper [provided by SWCA via mail] |
| 3/25/19 | Emory Oak - Red Rock IDT Meeting | Apache | Tonto Apache Tribe Yavapai-Apache Nation (Apache representatives) | Red Rock Ranger Station | Discussed objectives, potential treatments, and NEPA status of groves examined in Red Rock District of Coconino NF |
| 3/28/19 | Formal Meeting* with Cooperating Agencies and Consulting Tribes | All Tribes (11) invited | Hopi Tribe Mescalero Apache Tribe Pueblo of Zuni San Carlos Apache Tribe Tonto Apache Tribe White Mountain Apache Tribe | Phoenix, AZ | Discussion of PA Version 4 |
| 3/28/19 | Tour of Huhugam Curation Facility | All Tribes (11) invited | Hopi Tribe Mescalero Apache Tribe Pueblo of Zuni San Carlos Apache Tribe Tonto Apache Tribe White Mountain Apache Tribe | Wild Horse Pass | Tour of proposed curation facility for project archaeological collections |
| 3/29/19 | Formal Meeting* with All Tribes | All Tribes (11) invited | Hopi Tribe Mescalero Apache Tribe Pueblo of Zuni San Carlos Apache Tribe Tonto Apache Tribe White Mountain Apache Tribe | Phoenix, AZ | Update on status of Resolution Copper EIS, PA, HPTPs, and discussion |
| 3/29/19 | Email from SWCA to Hopi Archaeologist | Pueblo | Hopi Tribe | n/a | Provided requested copy of PowerPoint from 3/29/19 meeting |

\* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 4/02/19 | Email from TNF Tribal Relations Program Manager to All Tribes | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Thanked for attending All Tribes mtg and advised of Skunk Camp Elders Tour May 6 and 7 and TM Training Aug/Sep |
| 4/03/19 | Official Email from TNF Tribal Relations Program Manager | Puebloan | Hopi Tribe CPO | N/A | Response to Hopi comments on draft PA |
| 4/04/19 | Formal Meeting* with Tribal Staffs | O'odham | Gila River Indian Community<br>Salt River Indian Community | TNF S.O., Phoenix, AZ | Annual consultation; focus on Resolution Copper Mine |
| 4/10/19 | Emory Oak – FS planning meeting | N/A | None | Tele meeting | Forest staff planning for NEPA and NHPA requirements for groves identified on Coconino National Forest |
| 4/12/19 | Official Letter from TNF Supervisor to Chairs and cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Invitation to Chair and Staff to attend Elders Tour of Skunk Camp Tailings Alternative |
| 4/12/19 | Email from TNF Tribal Relations Program Leader to San Carlos Chair, A.G., and cultural staff | Apache | San Carlos Apache Tribe | N/A | Provided digital copy of TNF Supervisor's 4/12/19 invitation to tour Skunk Camp |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-38

12-RCMSER-3088

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|--------------------|----------------------|----------|----------------------|
| 4/15/19 | Formal Meeting* with Tribal Leaders and Staff | Apache Yavapai | Yavapai-Apache Nation | Camp Verde, AZ | Annual consultation and discussion of mitigation for Resolution Copper Project |
| 4/18/19 | Emory Oak Field Trip | Apache | Yavapai-Apache Nation | Fossil Creek, AZ | Examined potential groves identified by YAN-Apache elders near Fossil Creek |
| 4/24/19 | Formal Meeting* with Tribal Leaders and Staff | Puebloan | Pueblo of Zuni | Zuni | Annual consultation and discussion of mitigation for Resolution Copper Project |
| 4/25/19 | Official Letter from TNF Supervisor to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Response to SC letter of 3/15/19 re: PA |
| 4/25/19 and 5/02/19 | Emails between TNF Tribal Relations Program Manager and San Carlos THPO | Apache | San Carlos Apache Tribe | N/A | Response to request for TM assistance in San Carlos archaeology training; thank you from San Carlos THPO for TM good job speaking with trainees |
| 4/30/19 | Email from TNF Tribal Relations Program Manager to Chairs and cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Provided agenda for May 6 and 7 tour of Skunk Camp |
| 5/02/19 | Email from TNF Tribal Relations Program Manager to Zuni Governor | Puebloan | Pueblo of Zuni | N/A | Conveyed 4/24/19 meeting notes |
| 5/06/19 and 5/07/19 | Field Trip with Tribal Leaders, Staff, and Elders | All Tribes (11) invited | Gila River Indian Community<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache<br>Yavapai-Apache Nation (Apache) | Skunk Camp area | Tour and discussion of Skunk Camp Tailings Alternative led by Tribal Monitors |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

12-RCMSER-3089

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 5/14/19 | Formal Meeting* with Tribal Leader and Staff | Apache | San Carlos Apache Tribe | San Carlos, AZ | Discussion of PA, mining technique, and water analyses |
| 5/16/19 | Email from TNF Tribal Relations Program Manager to San Carlos THPO Office | Apache | San Carlos Apache Tribe | N/A | Provided status of TM plant guide |
| 5/17/19 | Email from San Carlos A.G. to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Requested information regarding EIS analyses |
| 5/30/19 | Formal Meeting* with Tribal Staff | Puebloan | Hopi Tribe | Flagstaff, AZ | Annual consultation update and PA version 4.9 |
| 6/05/19 | Emory Oak Elders Advisory Meeting and Field Trip | Apache | San Carlos Apache Tribe White Mountain Apache Tribe | Globe Ranger District | Discussed project approaches, examined potential groves in Globe Ranger District, and discussed potential groves on WMAT and SCAT |
| 6/11/19 | Email from TNF Tribal Relations Program Manager to cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation Gila River Indian Community Hopi Tribe Mescalero Apache Tribe Pueblo of Zuni Salt River Pima-Maricopa Indian Community San Carlos Apache Tribe Tonto Apache Tribe White Mountain Apache Tribe Yavapai-Apache Nation (representatives of both) Yavapai-Prescott Indian Tribe | N/A | Provided PA version 5 (no appendices) as attachment; hardcopies to follow; requested comments by 6/21/19; notified of PA signatories teleconference on 6/25/19; tribes contact Tribal Relations Program Manager if want to attend |

* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 6/12/19 (letter dated 5/20/19, not mailed until 6/12 due to closure of TNF S.O. Bldg) | Official Letter from TNF Supervisor to Leaders and cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Provided flash drive with: PA version 5 and appendices (requested comments by June 19, 2019), Oak Flat HPTP with Burial Plan of Action (requested comments by June 28, 2019) |
| 6/14/19–6/15/19 | Emails between TNF Tribal Relations Program Manager and San Carlos A.G. | Apache | San Carlos Apache Tribe | N/A | Regarding information requested by San Carlos and providing PA version 5 Appendices requested in 6/14/19 email from A.G. |
| 6/17/19 | Email from TNF Tribal Relations Program Manager to San Carlos A.G. | Apache | San Carlos Apache Tribe | N/A | Provided Items 1 and 3 requested 5/17/19 after 5/14/19 meeting between TNF and San Carlos; Items 2 and 4 anticipated in July |
| 6/18/19 | Emory Oak – Red Rock District IOT Meeting | Apache | Yavapai-Apache Nation | Red Rock Ranger District | Discussed NEPA status of identified groves |
| 6/25/19 | Teleconference regarding PA | All Tribes (11) invited | No tribe attended; only PA signatories | N/A | Discussed PA version 5 |
| 7/09/19–7/09/19 | Emory Oak Elders Advisory Council Meeting and Field Trip | Apache | San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation | Payson/ Young | Discussed project objectives and approaches; examined potential groves |
| 7/10/19 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Comments on PA version 5 |
| 7/25/19 | Email from TNF Tribal Relations Program Manager to Apache cultural staff | Apache | San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation | N/A | Coordinating August 2 tour of newly discovered Apache Rockshelter at Oak Flat |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribas, but still involved specific Section 106 or Tribal issues.

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|--------------------|---------------------|----------|---------------------|
| 7/26/19 | Emails between TNF Tribal Relations Program Manager and Zuni THPO | Puebloan | Pueblo of Zuni | N/A | Provided PA version 5 for review; discussed project history via telephone |
| 7/26/19 | Copy of letter from San Carlos Chairman to AZ Tribes, NCAI, and PA Signatories | All SW Tribes | Ak-Chin Indian Community<br>Cocopah Indian Tribe<br>Colorado River Indian Tribe<br>Fort McDowell Yavapai Nation<br>Fort Mojave Indian Tribe<br>Fort Sill Apache Tribe<br>Fort Yuma Quechan Tribe<br>Gila River Indian Community<br>Havasupai Tribe<br>Hopi Tribe Hualapai Tribe<br>Kaibab Paiute Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Juan Paiute Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | N/A | Criticized TNF PA Consultation |
| 8/02/19 | Field visit by Apache Tribes to Oak Flat | Apache | San Carlos Apache | Oak Flat, AZ | All Apache tribes cultural staff were invited; only San Carlos THPO staff and their family members attended |
| 8/05/19 and 8/06/19 | Email from TNF Tribal Relations Program Manager to Zuni THPO | Puebloan | Pueblo of Zuni | N/A | Discussed project background on phone 8/05/19 and sent requested Superior Area Ethnography in 8/06/19 email |

\* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 8/09/19 | Official Letter from TNF Supervisor to Chairs and cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Announcing publication of DEIS, invitation to public meetings, and to consult |
| 8/12/19 | Email from TNF Tribal Relations Program Manager to San Carlos A.G. | Apache | San Carlos Apache Tribe | N/A | Conveyed items 2 and 4 of 5/17/19 request; release of DEIS and comment period; and imminent release of PA version 6 |
| 8/18/19 | Official Email from TNF Tribal Relations Program Manager to Tribes cultural staff | All Tribes (11) (except San Carlos) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Conveyed PA version 6 and requested comments by 9/13/19 |
| 8/16/19 | Email from TNF Tribal Relations Program Manager to San Carlos leaders and staff | Apache | San Carlos Apache | N/A | Conveyed PA version 6 and clarified comments due 9/13/19 |
| 8/16/19 | San Carlos THPO to TNF Tribal Relations Program Manager | Apache | San Carlos Apache | N/A | Provided Tribal Consultation Response form re: DEIS comments; deferred to San Carlos A.G. |
| 8/16/19 | Email from TNF Heritage Program Manager to PA Signatories | N/A | N/A | N/A | Conveyed PA version 6, appendices, and comments crosswalk |

* = Forest Service line officer present
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-43

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 8/19/19 | Email from TNF Tribal Relations Program Manager to White Mountain Chair | Apache | White Mountain Apache Tribe | N/A | Seeking protocol for obtaining approval for EOCTRI program on WMAT reservation |
| 8/20/19 | Email from San Carlos THPO Office to TNF Tribal Relations Program Manager | Apache | San Carlos Apache Tribe | N/A | San Carlos consultation form requesting face-to-face mtg re: DEIS |
| 8/20/19 | Email reply from TNF Tribal Relations Program Manager to San Carlos THPO Office | Apache | San Carlos Apache Tribe | N/A | Offer to work with San Carlos THPO to set up meeting |
| 8/23/19 | Emory Oak Meeting and Field Trip | Apache | White Mountain Apache Tribe | Cibecua, AZ | Examined groves and discussed steps to restore on tribal land |
| 8/26/19 | Email from San Carlos A.G. to TNF Tribal Relations Program Manager and response | Apache | San Carlos Apache Tribe | N/A | Questions about EOCTRI program answered by TNF |
| 8/29/19 | Official Letter from TNF Supervisor to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Response to 7/26/19 San Carlos letter about PA process |
| 8/29/19 | Email from TNF Tribal Relations Program Manager to Chairman | Apache | San Carlos Apache Tribe | N/A | Conveyed Bosworth 6/12/19 letter with PA version 6 |
| 8/29/19 | Email from TNF Tribal Relations Program Manager to Chairman | Apache | San Carlos Apache Tribe | N/A | Sent attachment missing from earlier 8/29/19 email |
| 8/29/19 | Formal Meeting TNF/SHPO | N/A | N/A | SHPO, Phoenix, AZ | Discussed consultation and PA |
| 9/04/19 | Official Letter from Chairman to TNF Supervisor | Yoeme | Pascua Yaqui Tribe | N/A | Comments on consultation process, tribal monitor program, and PA in present form |
| 9/09/19–9/16/19 | Tribal Monitor Training | All Tribes | Gila River Indian Community Hopi Tribe Mescalero Apache Tribe Pueblo of Zuni White Mountain Apache Tribe Yevapai-Apache Nation (representatives of both) | | Third Tribal Monitor Training |
| 9/17/19 | Email from TNF Tribal Relations Program Manager | PA Signatories | N/A | N/A | Provided TNF's 8/29/19 response to San Carlos' 7/10/19 letter |
| 9/17/19 | Email from TNF Tribal Relations Program Manager to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Requested meeting with Tribal Council |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-44

12-RCMSER-3094

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 9/17/19 | Phone call from TNF Tribal Relations Program Manager to Pascua Yaqui THPO | Yoeme | Pascua Yaqui Tribe | N/A | Requested meeting with Tribal Council |
| 9/17/19 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Requested extension of comment period on DEIS; SO mtg re: Tribal Monitor Program; and field visit to Skunk Camp |
| 9/18/19 | Email from TNF Tribal Relations Program Manager to PA Signatories | N/A | N/A | N/A | Provided copy of 6/12/19 Bosworth Letter conveying PA version 6 to tribes |
| 9/18/19 | Email from TNF Tribal Relations Program Manager to Tohono O'odham THPO | O'odham | Tohono O'odham Nation | N/A | Follow-up on telephone call to inquire if TO want to consult on Resolution Copper Mine |
| 9/23/19 | Email from TNF Tribal Relations Program Manager to All Tribes chairs and cultural staff | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Save the date for next All Tribes meeting October 28, 2019 |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-45

12-RCMSER-3095

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|--------------------|---------------------|----------|---------------------|
| 9/25/19 | Official Letter from TNF Supervisor to All Tribes chairs and cultural staff | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Conveyed flash drive with GPO SIR Vol I: Summary of Findings and Vol II: Site Descriptions and reports dated 2003–2017 |
| 9/27/19 | Email from TNF Heritage Program Manager to ACHP | N/A | N/A | N/A | Provided copy of 9/25/19 TNF Official Letter to tribes |
| 9/30/19 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Comments on PA Ver 6; cc to SHPO, USACE, ACHP, BLM and all Arizona tribes |
| 10/01/19 | Email from TNF Tribal Relations Program Manager to San Carlos A.G. Office | Apache | San Carlos Apache Tribe | N/A | Conveyed copy of Rambler's 9/30/19 letter |
| 10/01/19 | Email from TNF Tribal Relations Program Manager to San Carlos A.G. Office | Apache | San Carlos Apache Tribe | N/A | Requested meeting for Bosworth with Chairman and invited to October 28–29 meetings |
| 10/02/19 | Email from TNF Tribal Relations Program Manager to WMAT Tribal Council Administration | Apache | White Mountain Apache Tribe | N/A | Requested time to present information about TM Program to Tribal Council |
| 10/02/19 | Email from TNF Tribal Relations Program Manager to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Reply to 9/17/19 request for extension on DEIS comments, public mtg at SC, TM Program discussion, CR data, Skunk Camp tour |
| 10/02/19 | Email from San Carlos A.G. to TNF Supervisor and TNF Tribal Relations Program Manager | Apache | San Carlos Apache Tribe | N/A | Inquired whether TNF would provide formal response on SC's 9/30/19 PA comments |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 10/02/19 | Email from TNF Tribal Relations Program Manager to San Carlos A.G. | Apache | San Carlos Apache Tribe | N/A | Bosworth travelling this week; will respond to SC 9/30/19 letter upon return |
| 10/03/19 | Email from TNF Tribal Relations Program Manager to San Carlos Chairman's Office and A.G. | Apache | San Carlos Apache Tribe | N/A | Conveyed cultural documents sent to USACE |
| 10/04/19 | Email from TNF Tribal Relations Program Manager to All Tribes chairs and cultural staff | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache Tribe<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Sent draft agenda and RSVP form for 10/28 All Tribes and 10/29 PA meetings |
| 10/04/19 | Email from San Carlos A.G. to TNF Tribal Relations Program Manager | Apache | San Carlos Apache Tribe | N/A | Could not open attachment in 10/03/19 Tribal Relations Program Manager email replying to San Carlos' 9/17/19 letter |
| 10/07/19 | Email from TNF Tribal Relations Program Manager to San Carlos A.G. | Apache | San Carlos Apache Tribe | N/A | Sent zipped version of 2018 Section 106 report that was provided to USACE (and attached to 10/04/19 Tribal Relations Program Manager email) |
| 10/07/19 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Thanked TNF for DEIS comments extension and invited to Council meeting 10/21/19 |
| 10/07/19 | Official Letter from Hopi CPO to TNF Supervisor | Puebloan | Hopi Tribe Cultural Preservation Office | N/A | NDAA mitigation request |

\* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-47

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|-------------------|---------------------|----------|---------------------|
| 10/09/19 (letter dated 10/8/19) | Official Letter from TNF Supervisor to chairs and cultural staff | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache Tribe<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Invitation to All Tribes and PA meetings, 10/28/19 and 10/29/19<br><br>(GRIC letter returned – incorrect PO Box; resent) |
| 10/10/19 | Email from TNF Tribal Relations Program Manager | Apache | Mescalero Apache Tribe | N/A | Asking new President if November 5 meeting is still on [no response] |
| 10/15/19 | Official Letter from TNF Supervisor to Chairman | Apache | San Carlos Apache Tribe | N/A | Response to San Carlos letter dated 9/17/19; DEIS comment extension, public meeting in San Carlos, meet in Phoenix to discuss TM Program, info shared with USACE, visits to Dripping Springs |
| 10/15/19 | Email from TNF Tribal Relations Program Manager | Apache | San Carlos Apache Tribe | N/A | Conveyed electronic version of TNF Supervisor 10/15/19 letter and available dates to meet |
| 10/22/19 | Emails between TNF Tribal Relations Program Manager and San Carlos Attorney General | Apache | San Carlos Apache | n/a | Discussing dates for special Council meeting suggested by San Carlos |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 10/23/19 | Official Email from TNF Tribal Relations Program Manager to tribal cultural staff | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache Tribe<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Extension of DEIS comment deadline to 12/22/19 for all tribes |
| 10/24/19 | Email from TNF Tribal Relations Program Manager to BLM Cultural Resources Specialist | N/A | Kim Ryan | N/A | Provided electronic copy of Revised Peg Leg TM Report |
| 10/25/19 | Official Letter from ACHP to TNF Supervisor | N/A | N/A | N/A | Commented on PA, Tribal consultation, and resolution of adverse effects |

\* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-49

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 10/27/19 | Official Email from TNF Tribal Relations Program Manager | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache Tribe<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Conveyed electronic version of Tribal Consultation Summary and Plan (PR 3479) |
| 10/28 and 10/29/19 | Formal Meeting* | All Tribes (15) invited | Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation | Phoenix, AZ | Discussed consultation plan, status of historic properties inventories and Oak Flat HPTPs, Tribal Monitor Program and Signatories Listening Session Morning of Day 2 |
| 10/29/19 | Formal Meeting* of PA Signatories (tribes invited to attend) | All Tribes (15) invited | Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>White Mountain Apache Tribe | Phoenix, AZ | Discussed PA version 6 |
| 11/06/19 | Emory Oak Elders Advisory Council Meeting | Apache | White Mountain Apache Tribe<br>Yavapai-Apache Nation | Payson, AZ | Update on grove status; TM cultural surveys |
| 11/06/19 | Official Letter from White Mtn Apache Vice Chair | Apache | White Mountain Apache Tribe | N/A | Will continue to consult on Resolution Copper Mine |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-50

12-RCMSER-3100

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 11/07/19 | Email from TNF Tribal Relations Program Manager to THPO | O'odham | Salt River Pima-Maricopa Indian Community | N/A | Follow-up regarding tribal resolution mentioned by Angela Garcia-Lewis at 10/28/19 meeting |
| 11/07/19 | Copy of Official Letter from San Carlos Chairman to USACE | Apache | San Carlos Apache Tribe | N/A | Requests USACE lead PA for Skunk Camp and not issue 404 Permit |
| 11/07/19 | Official Letter from YAN Chairman to TNF Tribal Relations Program Manager | Apache Yavapai | Yavapai-Apache Nation | N/A | Thanked TNF for consulting; wants to continue consulting on failings |
| 11/08/19 | Official Email from White Mountain Apache Vice Chairman to TNF Tribal Relations Program Manager | Apache | White Mountain Apache Tribe | N/A | NDAA Mitigation requests for SE AZ Land Exchange CONFIDENTIAL |
| 11/12/19 | Email from TNF Tribal Relations Program Manager to WMAT Legislative Advisor | Apache | White Mountain Apache Tribe | N/A | Asked for POC for mitigation discussions |
| 11/12/19 | Email from TNF Tribal Relations Program Manager to WMAT Legislative Advisor | Apache | White Mountain Apache Tribe | N/A | Thanked for comments on consultation |
| 11/13/19 | Email from BLM Cultural Resources Specialist to TNF Tribal Relations Program Manager | | | N/A | Provided comments on draft Consultation Summary and Plan |
| 11/15/19 | Formal Meeting*, TNF and YAN Tribal Council | Apache Yavapai | Yavapai-Apache Nation | Camp Verde, AZ | Discussion of Resolution Copper Project and mitigations |

* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

12-RCMSER-3101

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 11/19/19 | Email from TNF Tribal Relations Program Manager to PA Signatories and Tribes | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Reminder to provide comments on attached Consultation Plan by Nov 29, 2019 |
| 11/22/19 | Formal Meeting* TNF and San Carlos Tribal Council | Apache | San Carlos Apache Tribal Council | San Carlos, AZ | Updated status of EIS process, answered questions; presentation by San Carlos water consultant |

\* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-52

12-RCMSER-3102

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 12/03/19 | Email from TNF Tribal Relations Program Manager | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Forwarded invitation to PA workshop and provided PA version 7 |
| 12/03/19 | Emails between Zuni THPO and TNF Tribal Relations Program Manager | Puebloan | Pueblo of Zuni | N/A | Tribal Relations Program Manager response to 3 questions from Dongoske re: TM Program; treatments for sites NRHP eligible under Criteria A,B,C; and need to address tribal spiritual impacts; provided TM protocols |
| 12/03/19 and 12/04/19 | Email from San Carlos A.G. to TNF Tribal Relations Program Manager and reply | Apache | San Carlos Apache Tribe | N/A | A.G. provided list of items requested by San Carlos; Tribal Relations Program Manager responded that TNF will provide them shortly |
| 12/03/19 and 12/04/19 | Email from San Carlos A.G. to Buckles, WestLand Resources | Apache | San Carlos Apache Tribe | N/A | Requested copies of WRI 10/28/19 meeting power point presentations; WRI provided by email 12/4/19 |
| 12/04/19 | Presentation to White Mountain Tribal Council | Apache | White Mountain Apache Tribe | Whiteriver, AZ | TNF's Tribal Relations Program Manager and WMAT's THPO Altaha presented on Tribal Monitor Program and EOCTRI project proposed for Cibecue |
| 12/05/19 | Official letter from Hopi THPO to TNF Supervisor | Pueblo | Hopi Tribe | n/a | Comments on the draft Tribal Consultation Plan |
| 12/05/19 | Official Letter from TNF Supervisor to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Response to San Carlos 9/30/19 letter re: PA version 6; also provided Oak Flat HPTP Addendum |

* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-53

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 12/05/19 | Email from TNF Tribal Relations Program Manager to San Carlos Chair and staff | Apache | San Carlos Apache Tribe | N/A | Provided digital version of TNF 12/5/19 letter and attachments |
| 12/05/19 | Email from TNF Tribal Relations Program Manager to San Carlos THPO | Apache | San Carlos Apache Tribe | N/A | Provided GPS locations of 5 SIs visited in May 2019 Tribal Monitors' Tour of Skunk Camp |
| 12/07/19 | Email from WMAT THPO to TNF Tribal Relations Program Manager | Apache | White Mountain Apache Tribe | N/A | Provided comments on PA version 7 |
| 12/09/19 | Email from TNF Tribal Relations Program Manager to PA Signatories | | ACHP ASLD BLM Resolution Copper SHPO USACE USFS Region 3 | N/A | Provided copy of TNF 12/05/19 response to San Carlos 9/30/19 letter |
| 12/09/19 | Email from TNF Tribal Relations Program Manager to WMAT Vice Chairman | Apache | White Mountain Apache Tribe | N/A | Invitation to PA Workshops; provided PA version 7 |
| 12/09/19 | Email from TNF Tribal Relations Program Manager to WMAT Legis. Advisor | Apache | White Mountain Apache Tribe | N/A | Invitation to PA Workshops; provided PA version 7 |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

12-RCMSER-3104

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 12/10/19 | Official Email from TNF Tribal Relations Program Manager to Signatories and Tribes | All Tribes (15) and Signatories (ACHP, ASLD, BLM, Resolution Copper, SHPO, USACE, Forest Service Reg 3) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Provided revised Consultation Plan |
| 12/10/19 | Official Letter from TNF Supervisor to PYT Chair | Yoeme | Pascua Yaqui Tribe | N/A | Response to PYT comments on PA version 6 |
| 12/10/19 | Email from TNF Tribal Relations Program Manager to PYT Chairman | Yoeme | Pascua Yaqui Tribe | N/A | Provided digital copy of 12/10/19 Letter from Bosworth with response to PA Comments |
| 12/10/19 | Official Letter from TNF Supervisor to Zuni Governor | Puebloan | Pueblo of Zuni | N/A | Response to Zuni Comments on PA version 6 |
| 12/10/19 | Email from TNF Tribal Relations Program Manager to Zuni THPO | Puebloan | Pueblo of Zuni | N/A | Conveyed digital copy of TNF Supervisor 12/10/19 letter to Zuni |
| 12/10/19 | Official Letter from TNF Supervisor to WMAT Vice Chairman | Apache | White Mountain Apache Tribe | N/A | Thanked for 11/6/19 commitment to consult, 11/8/19 mitigation request, and hosting TNF staff 12/4/19 presentation to Council |
| 12/10/19 | Email from TNF Tribal Relations Program Manager to WMAT Legislative Advisor | Apache | White Mountain Apache Tribe | N/A | Conveyed digital copy of 12/10/19 letter from TNF Supervisor to Vice Chairman |

\* = Forest Service line officer present

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 12/10/19 | Email from TNF Tribal Relations Program Manager to PA Signatories | | ACHP<br>Arizona State Land Department BLM<br>Resolution Copper SHPO<br>USACE<br>Forest Service Region 3 | N/A | Provided email copy of 12/10/19 response letter to Zuni |
| 12/11/19 | TNF Public Meeting | All Tribes (15) invited | San Carlos Apache Tribe<br>White Mountain Apache Tribe | Phoenix Airport Hotel | Public discussion on PA version 7; Staff from 2 tribes attended |
| 12/12/19 | Formal Meeting* of TNF and PA Signatories (tribes invited) | All Tribes (15) invited | San Carlos Apache Tribe<br>White Mountain Apache Tribe | SWCA Office, Phoenix, AZ | PA version 7 |
| 12/13/19 | Official Letter from Chairman to TNF Supervisor | Apache Yavapai | Yavapai-Apache Nation | N/A | Comments on Resolution Copper Project EIS, TM program, and process |
| 12/15/19 and 12/16/19 | Emails between San Carlos A.G. and TNF Tribal Relations Program Manager | Apache | San Carlos Apache Tribe | N/A | Clarifying due date and format for DEIS comments; TNF responded. Dec 23 and flash drive are acceptable; S.O. staffing hours on Dec 23 |
| 12/16/19 | Official Letter from TNF Supervisor to YAN Chairman | Apache Yavapai | Yavapai-Apache Nation | N/A | Thanking for mitigation requests and continuing government-to-government consultation on Resolution Copper Project |
| 12/16/19 | Emails between TNF Tribal Relations Program Manager and San Carlos A.G. | Apache | San Carlos Apache Tribe | N/A | Re: items outstanding from 12/3/19 request |
| 12/16/19 | Emails between TNF Tribal Relations Program Manager and San Carlos A.G. | Apache | San Carlos Apache Tribe | N/A | Re: items outstanding from 5/17/19 request |
| 12/16/19 | Email from TNF Resolution Copper Project Lead to San Carlos A.G. | Apache | San Carlos Apache Tribe | N/A | Clarifying 12/23/19 due date for DEIS comments and S.O. hours of operation |
| 12/16/19 | Email from San Carlos Asst. A.G. to TNF Tribal Relations Program Manager | Apache | San Carlos Apache Tribe | N/A | Requested copies of sign-in sheets and notes for 12/11/19 and 12/12/19 PA meetings (see 1/23/20) |
| 12/19/19 | Email from TNF Tribal Relations Program Manager to PA Signatories | | N/A | N/A | Provided YAN 's 12/13/19 comments on Resolution Copper Project consultation process |
| 12/23/19 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Conveyed comments on DEIS (letter via webform; comments via flash drive delivered to TNF SO) |

* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|--------------------|----------------------|----------|----------------------|
| 12/30/19 | Annual Report | Apache | San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation | N/A | Provided copy of EOCTRI 2019 Annual Report |
| 1/07/20 | Formal Meeting TNF and Pascua Yaqui Council | Yoeme | Pascua Yaqui Tribe | Tucson, AZ | TNF and BLM met with Tribal Council to discuss consultation going forward |
| 1/09/20 | Official Letter from TNF Supervisor to leaders and cultural staff | All Tribes (15) | Ak Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Conveyed hard copy of Peg Leg TM Report and Review Form<br>CONFIDENTIAL |

\* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

12-RCMSER-3107

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 1/10/20 | Email from TNF Tribal Relations Program Manager to tribal cultural staff | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Provided pdf of Peg Leg TM Report Final Draft and Review Form<br>CONFIDENTIAL |
| 1/13/20<br>(letter dated 1/07/20) | Official Letter from TNF Supervisor to Leaders and cultural staff | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Conveyed GPO Research Design on flash drive |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

12-RCMSER-3108

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 1/13/20 | Email from Hopi CPO to TNF, tribal leaders, and cultural staff | Puebloan | Hopi Tribe | N/A | Kudos on TM Program |
| 1/14/20 | Email from YAN Archaeologist to TNF, tribal leaders, and cultural staff | Apache Yavapai | Yavapai-Apache Nation | N/A | Kudos on TM Program |
| 1/14/20 | Email from Zuni Cultural Resources Advisory Team to TNF, tribal Leaders, and cultural staff | Puebloan | Pueblo of Zuni | N/A | Kudos on TM Program |
| 1/14/20 | Official Letter from TNF Supervisor to BLM | | BLM state and field office staff | N/A | Conveyed Peg Leg TM Report and copies of letters to tribes CONFIDENTIAL |
| 1/15/20 | Email TNF Tribal Relations Program Manager to SRPMIC cultural representatives | O'odham | Salt River Pima-Maricopa Indian Community | N/A | Conveyed requested PDF of PA version 7 and comment matrix |
| 1/16/20 | Emory Oak Elders Advisory Council Meeting | Apache | White Mountain Apache Yavapai-Apache Nation | Payson Ranger District | Discussed findings of CR/TM surveys of Payson groves, and steps to treat groves on WMAT |
| 1/21/20 | Tribal Consultation Response Form from San Carlos | Apache | San Carlos Apache Tribe | N/A | Defer to A.G. for comments on GPO Research Design |
| 1/22/20 | Email from White Mountain Apache THPO to TNF Tribal Relations Program Manager | Apache | White Mountain Apache Tribe | N/A | Provided comments on Tribal Evaluation Form for Peg Leg Tribal Monitor Report CONFIDENTIAL |
| 1/23/20 | Official Letter from TNF Supervisor to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Provided materials requested after meeting with Tribal Council and itemized in Ritchie 12/3/19 email; questions answered in letter and additional materials provided on flash drive |
| 1/23/20 | Email from TNF Tribal Relations Program Manager to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Conveyed digital copy of 1/23/20 letter and notice of hard copy in mail |
| 1/23/20 | Email from TNF Tribal Relations Program Manager to BLM and TNF Heritage Resources Program Manager | Apache | White Mountain Apache Tribe | N/A | Provided WMAT comments on Peg Leg TM Report confirming TCPs CONFIDENTIAL |
| 1/27/20 | Copy of Official Letter from San Carlos to USACE (sent via email from Chairman's office) | Apache | San Carlos Apache Tribe | N/A | Requested consultation re: Skunk Camp and groundwater modeling |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

12-RCMSER-3109

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 1/29/20 | Copy of Official Letter from San Carlos to BLM (sent via email from Chairman's office) | Apache | San Carlos Apache Tribe | N/A | Requested clarification of BLM's responsibilities and commencement of consultation |
| 1/29/20 | Correspondence Form from San Carlos THPO | Apache | San Carlos Apache Tribe | N/A | Thanked for response to A.G.'s questions from 11/22/19 and 12/3/19 meetings |
| 1/31/20 | Emails (2) from Morey, SWCA to attendees of PA meetings | Apache O'odham | Signatories Salt River Pima-Maricopa Indian Community San Carlos Apache Tribe White Mountain Apache Tribe | N/A | Provided copies of 12/11/19 meeting notes; and 12/12/19 meeting notes |
| 2/04/20 | Email from Grisel, SWCA to cultural reps on behalf of TNF ID Team Leader | All Tribes (15) | Ak-Chin Indian Community Fort McDowell Yavapai Nation Fort Sill Apache Gila River Indian Community Hopi Tribe Mescalero Apache Tribe Pascua Yaqui Tribe Pueblo of Zuni Salt River Pima-Maricopa Indian Community San Carlos Apache Tribe Tohono O'odham Nation Tonto Apache Tribe White Mountain Apache Tribe Yavapai-Apache Nation (representatives of both) Yavapai-Prescott Indian Tribe | N/A | Reminder to submit comments on GPO Research Design and Peg Leg TM Report by 2/14/20 |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|--------------------|----------------------|----------|----------------------|
| 2/04/20 | Official Email from TNF Tribal Relations Program Manager to tribal cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Provided list of potential natural resources in Oak Flat and Request Form; requested response by 3/6/20 |
| 2/05/20 | Email from YAN Archaeologist to TNF Tribal Relations Program Manager | Apache Yavapai | Yavapai Apache Nation | N/A | Comments on Peg Leg TM Report and Resolution Copper Project GPO Research Design<br>CONFIDENTIAL (TM Report) |
| 2/05/20 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Rumored cutting of Oak Trees in Oak Flat |
| 2/06/20 | Comment Form from San Carlos THPO | Apache | San Carlos Apache Tribe | N/A | Acknowledged receipt of info requested at 11/22/19 meeting |
| 2/11/20–2/13/20 | Emory Oak project interviews for video | Apache | San Carlos Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation | Camp Verde, Payson, and Cibecue | Interviewed elders, tribal council members, Forest staff participating in project |
| 2/18/20 | Official Letter from TNF Supervisor to Pascua Yaqui Chairman | Yoeme | Pascua Yaqui Tribe | N/A | Thanked for meeting and provided requested data |

\* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

12-RCMSER-3111

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 2/20/20 | Official Email from TNF Tribal Relations Program Manager to Tribal Leaders and cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation Gila River Indian Community Hopi Tribe Mescalero Apache Tribe Pueblo of Zuni Salt River Pima-Maricopa Indian Community San Carlos Apache Tribe Tonto Apache Tribe White Mountain Apache Tribe Yevapai-Apache Nation (representatives of both) Yavapai-Prescott Indian Tribe | N/A | Provided memo on HHRD survey at Oak Flat |
| 2/20/20 | Official Letter from TNF Supervisor to San Carlos Chairman | Apache | San Carlos Apache | N/A | Responded to San Carlos 2/5/20 letter regarding trees in Oak Flat |
| 2/21/20 | Email from TNF Project Lead to San Carlos | Apache | San Carlos Apache | N/A | Conveyed electronic copy of Bosworth's 2/20/20 letter |
| 2/25/20 | Official Emails from White Mountain THPO to TNF Tribal Relations Program Manager | Apache | White Mountain Apache Tribe | N/A | Concerns about HPTP and Research Design |
| 3/03/20 | Email from Tribal Relations Program Manager to Hopi CPO | Puebloan | Hopi Tribe | N/A | Set next meeting date to consult re: Resolution Copper Mine |
| 3/04/20 | Formal Meeting* with Zuni cultural staff | Puebloan | Pueblo of Zuni | N/A | NDAA Mitigations |
| 3/04/20 and 3/18/20 | Emails between WMAT THPO and TNF Tribal Relations Program Manager | Apache | White Mountain Apache | N/A | PA provision for Tribal Intellectual Property Rights |
| 3/05/20 | Formal Meeting* with Leaders | Apache Yavapai | Yavapai-Apache Nation | Camp Verde, AZ | Opportunity to gather natural resources from Oak Flat area |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

12-RCMSER-3112

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 3/20/20 | Official Email from TNF Tribal Relations Program Manager | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | N/A | Provided upcoming schedule of Tribal Monitor projects, and reminder to request O.F. natural resources |
| 3/30/20 | Official Email from TNF Tribal Relations Program Manager to tribes to Tribal Leaders and cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Conveyed Oak Flat HPTP Addendum and asked for input on consultation |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-63

12-RCMSER-3113

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 3/31/20 | Official Email from TNF Tribal Relations Program Manager to Tribal Leaders and cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Conveyed Near West Tribal Monitor survey report and requested TCP identification (mailed hard copies to GRIC and YAN)<br>CONFIDENTIAL |
| 4/08/20 | Official Email from TNF Tribal Relations Program Manager to tribes | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Conveyed link to Silver King TM Report and eligibility form<br>CONFIDENTIAL |
| 4/16/20 | Official Letter from USACE Colonel to San Carlos chairman | Apache | San Carlos Apache Tribe | N/A | Response to San Carlos 11/07/19 letter requesting to consult; documents attempts to meet; requests to teleconference |
| 5/01/20 | Email from TNF Resolution Copper Project Archaeologist summarizing 4/31/20 telephone conversation with WMAT THPO | Apache | White Mountain Apache Tribe | N/A | Concerned about sensitive ethnographic information in Research Design; agreed to inclusion of cautionary statement |
| 5/07/20 | Emory Oak Elders Advisory Council meeting | Apache | White Mountain Apache Tribe<br>Yavapai-Apache Nation | Tele-meeting | Discussed status of CR surveys and NEPA for Payson and Coconino groves, EO video, and youth activity changes due to COVID-19 |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-64

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 5/21/20 | Email from TNF Tribal Relations Program Manager to Leaders and cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Save the Date for 6/9/20 meeting to discuss NDAA mitigations |
| 6/01/20– 6/05/20 | Tribal Monitor Refresher Training | All Tribes (11) invited | Monitors from:<br>Ak-Chin Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Yavapai-Apache Nation | Tele-meeting | Additional skills and techniques for current TMs |
| 6/02/20 | Email from TNF Tribal Relations Program Manager to Chair and Vice Chair | Apache Yavapai | Yavapai-Apache Nation | N/A | Invitation to attend June 9 meeting on mitigations |
| 6/02/20 | Email from TNF Tribal Relations Program Manager to Leaders and cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Provided agenda for June 9 online meeting on mitigations |

* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

12-RCMSER-3115

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 6/09/20 | Formal Meeting* with Tribes, Resolution Copper, NFF | All Tribes (11) invited | Gila River Indian Community<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation | Tele-meeting | Discussed potential mitigations for the NDAA and requested input |
| 6/10/20 | Email from TNF Tribal Relations Program Manager to 6/9/20 meeting attendees | All Tribes (11) TNF Staff Resolution Copper NFF | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | N/A | Provided two PowerPoint presentations from 6/9/20 All Tribes meeting |
| 6/11/20 | Email from YPIT CR Dept Director to TNF Tribal Relations Program Manager | Yavapai | Yavapai-Prescott Indian Tribe | N/A | Submitted TCP form for Perlite Spring in Near West Tailings Alternative<br>CONFIDENTIAL |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 6/16/20 | Official Email from TNF Tribal Relations Program Manager | All Tribes (11) TNF Staff Resolution Copper NFF | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Provided notes from 6/9/20 meeting and request for Advisory Board volunteers |
| 6/16/20 | Official Letter from San Carlos Chair to TNF Supervisor and Tribal Relations Program Manager | Apache | San Carlos Apache Tribe | N/A | Requested digital copy of 6/9/20 teleconference, a government-to-government meeting, and ceasing work on DEIS |
| 6/18/20 | Email from TNF Tribal Relations Program Manager to San Carlos leaders | Apache | San Carlos Apache Tribe | N/A | Provided video of 6/9/20 teleconference |
| 6/26/20 | Official Email from TNF Tribal Relations Program Manager to YAN Archaeologist | Apache | Yavapai-Apache Nation | N/A | Respondad to YAN comments on Peg Leg TM report and Research Design |
| 6/29/20 | Email from TNF Tribal Relations Program Manager to WMAT Tribal Administrator | Apache | White Mountain Apache Tribe | N/A | Request to meet with Tribal Council |
| 6/29/20 | Email from TNF Tribal Relations Program Manager to San Carlos A.G. | Apache | San Carlos Apache Tribe | N/A | Request to meet with Tribal Council |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

12-RCMSER-3117

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 7/02/20 (letter mailed 7/06/20) | Official Letter from TNF Supervisor to Leaders and cultural staff | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Conveyed flash drive with SIR Vol III: Tailings Alternatives and Oak Flat, and additional smaller reports; requested comments by 9/7/20<br>[GRIC letter to Chair refused for missing postage; THPO letter shredded in post office due to flash drive; resent to both 8/10/20 along with the 7/27/20 letter and PA version 8] |
| 7/09/20 | Official Letter from San Carlos Chairman to ACHP President | Apache | San Carlos Apache Tribe | N/A | Request for final PA and for review of Section 106 compliance by Forest Service |
| 7/16/20 | Email from TNF Tribal Relations Program Manager to Cultural Staff | O'odham | Ak-Chin Indian Community<br>Gila River Indian Community<br>Salt River Pima-Maricopa Indian Community<br>Tohono O'odham Nation | N/A | Informed that would be presenting on Resolution Copper Project at next day's 4 Southern Tribes meeting and provided TNF Schedule of Proposed Activities (SOPA) |
| 7/17/20 | Presentation to Four Southern Tribes by TNF Tribal Relations Program Manager | O'odham | Ak-Chin Indian Community<br>Gila River Indian Community<br>Salt River Pima-Maricopa Indian Community<br>Tohono O'odham Nation | N/A | PowerPoint presentation on Resolution Copper Project status, and SOPA |
| 7/21/20 | Official Letter from ACHP to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Response to San Carlos 7/9/20 letter; PA is imminent; will request that OFAP review TNF Section 106 process |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

12-RCMSER-3118

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|--------------------|----------------------|----------|----------------------|
| 7/24/20 | Official Letter from TNF Supervisor (signed by Torres) to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Response to San Carlos 6/16/20 letter; lists items sent already; mentions Resolution Copper Project mitigations; offers to meet virtually; cannot cease work on DEIS; will be sending PA and Oak Flat NAGPRA POA next week |
| 7/24/20 | Email from TNF Tribal Relations Program Manager to San Carlos Chairman, A.G., and cultural staff | Apache | San Carlos Apache Tribe | N/A | Conveyed digital copy of 7/24/20 letter from Bosworth |
| 7/27/20 (mailed 7/29/20) | Official Letter from TNF Supervisor to Tribal Leaders and cultural staff | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Conveyed PA version 8 draft final and appendices, on flash drive with a blank comment form; requested comments by September 4, 2020<br><br>[Also mailed to non-tribal consulting parties and emailed by M. Hangan to Resolution Copper, BLM, SHPO, ITCA, Region 3, Doug Stephens WO, and WRI]<br><br>[GRIC Chair and THPO received another copy to replace the first that was lost in mail; added to the replacement 7/2/20 flash drive that was mailed 8/10/20] |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 7/28/20 | Official Email from TNF Tribal Relations Program Manager to cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Conveyed digital copy of Oak Flat TM Report CONFIDENTIAL |
| 7/29/20 | Email from TNF Tribal Relations Program Manager to Chair and Vice Chair | Apache Yavapai | Yavapai-Apache Nation | N/A | Conveyed digital copy of Oak Flat TM Report CONFIDENTIAL |
| 7/29/20 | Official Email from TNF Tribal Relations Program Manager to cultural staff and all San Carlos POCs | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Conveyed Oak Flat POA (dated 7/27/20) and notice that Oak Flat data recovery set to start week of October 12; invited to visit before, during or after field work; suggested field tours later in October or November |
| 7/29/20 | Email from SWCA Donna Morey to WMAT PA meeting attendees | WMAT ITCA | Brannen Parrish Shan Lewis Merla Dedgar | N/A | Conveyed PA draft version 8 |
| 8/12/20 | Emory Oak Elders Advisors Quarterly Meeting | Apache | San Carlos Apache Tribe<br>Yavapai-Apache Nation | Tele-meeting | Update on status of identified groves; discussion of EO blueprint for continuing program as part of Resolution Copper Mine mitigation |
| 8/19/20 | Emory Oak – Cibecue planning meeting | Apache | White Mountain Apache Tribe | Tele-meeting | Planning meeting for cultural resource surveys of three groves in Cibecue District of WMAT |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-70

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 8/21/20 | Email from TNF Tribal Relations Program Manager to San Carlos | Apache | San Carlos Apache Tribe | N/A | Follow up to 7/24/20 letter from Bosworth requesting consultation on the Resolution Copper Project |
| 8/25/20 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Request clarification on NDAA mitigation process and NAGPRA Plan of Action |
| 8/28/20 (mailed 8/31/20) | Official Letter from TNF Supervisor to Leaders and cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Introducing ACF who will craft blueprint for Education and Cultural Preservation Funds.<br>[Tonto certified letter rejected by PO; digital copy provided 8/31/20; mailed hard copy w/o certified, 9/2/20] |
| 8/31/20 | Email from TNF Tribal Relations Program Manager to Leaders and cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Conveyed digital copy of 8/28/20 letters from Bosworth |
| 8/31/20 | Emails between San Carlos A.G. and TNF Tribal Relations Program Manager | Apache | San Carlos Apache Tribe | N/A | Invited TNF to safe-distanced meeting at Apache Gold on 9/9/20; also stated their comments on PA version 8 will be submitted by September 4 |
| 8/31/20 | Email from WMAT THPO to TNF Tribal Relations Program Manager | Apache | White Mountain Apache | N/A | Questions regarding Oak Flat HPTP and tribal site visits |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-71

12-RCMSER-3121

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 9/02/20 | Email from TNF Tribal Relations Program Manager to Hopi THPO | Puebloan | Hopi Tribe CPO | N/A | Apologized for incorrect address, sent revised 8/28/20 letter regarding ACF role in planning mitigation funding and asked for Chair email |
| 9/02/20 | Email from TNF Tribal Relations Program Manager to Hopi Chairman | Puebloan | Hopi Tribe | N/A | Provided digital copy of revised 8/28/20 letter with apology for erroneous last name used in letter mailed 8/31/20 |
| 9/03/20 | Official Letter from San Carlos Chair to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Objections to proposed mitigations; need for Supplemental EIS; notice that PA version 8 comments coming separately |
| 9/03/20 [received by TNF 9/30/20 via ACHP] | Official Letter from San Carlos Chair to TNF Supervisor | Apache | San Carlos Apache Tribe | N/A | Provided comments on PA version 8. [attached to 9/08/20 letter to ACHP conveying 9/03/20 letter to Bosworth and the PA comments] |
| 9/04/20 | Official Email from WMAT THPO to TNF Tribal Relations Program Manager | Apache | White Mountain Apache Tribe | N/A | Provided comments on PA version 8 |
| 9/08/20 | Official Letter from San Carlos Chair to ACHP Executive Director | Apache | San Carlos Apache Tribe | N/A | Provided copy of 9/03/20 letter to TNF with comments on PA version 8 |
| 9/08/20 | Email from San Carlos A.G. to TNF Tribal Relations Program Manager and TNF staff | Apache | San Carlos Apache Tribe | N/A | Canceled meeting scheduled for 9/9/20 |
| 9/08/20 (mailed 9/10/20) | Official Letter from TNF Supervisor to Leaders and cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Provided blueprints for Tribal Monitor, Emory Oak, and Youth mitigation programs; requested comment by October 9, 2020 |
| 9/08/20 | Official Letter from Fort McDowell President to TNF Supervisor | Yavapai | Fort McDowell Yavapai Nation | N/A | Echoes San Carlos request to defer FEIS |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-72

12-RCMSER-3122

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 9/09/20 | Email from TNF Tribal Relations Program Manager to Leaders and cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Provided digital copy of 9/8/20 letter |
| 9/11/20 | Letter from WMAT Cultural Resource Director to AZ Tribal Leaders | All Arizona Tribes (22) | | N/A | Urged all tribes to oppose Resolution Copper Project and not work with TNF |
| 9/15/20 | Official Letter from ACHP to TNF re: Sec 106 | All Tribes (15)<br>FS Region 3<br>Other Interested Parties | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Provided comments on PA version 8; requested updates on consultation process |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 9/15/20 [received 9/30/20 by TNF from ACHP] | Email from San Carlos A.G. Secretary to ACHP Executive Director | Apache | San Carlos Apache Tribe | N/A | Provided to ACHP a copy of San Carlos' 9/03/20 letter to TNF Supervisor with comments on PA version 8 [it was missing from their 9/09/20 letter to ACHP] |
| 9/17/20 | Official Letter from YAN to TNF Tribal Relations Program Director | Apache Yavapai | Yavapai-Apache Nation | N/A | Urged TNF not to delay process due to request from single tribe |
| 9/24/20 | Official Letter from TNF Supervisor to Fort McDowell President | Yavapai | Fort McDowell Yavapai Nation | N/A | Response to 9/09/20 letter comments on PA and Tribal Monitor program |
| 9/24/20 | Email from TNF Tribal Relations Program Manager to Fort McDowell President | Yavapai | Fort McDowell Yavapai Nation | N/A | Conveyed digital copy of TNF 9/24/20 Letter from TNF Supervisor |
| 9/24/20 | Emails between San Carlos A.G. and TNF Tribal Relations Program Manager | Apache | San Carlos Apache Tribe | N/A | Informed TNF that Chairman Rambler available to meet on 10/08/20, Lyndon replied that new tribal program manager would be in touch to make COVID-safe arrangements |
| 9/25/20 (mailed 9/28/20) | Official Letter from TNF Supervisor to Tribal Leaders and Staff | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation (representatives of both)<br>Yavapai-Prescott Indian Tribe | N/A | Provided flash drive with revised GPO Research Design and comments matrix for January 2020 version; 9 survey reports, and technical memo on built environment; requested comments by 10/23/20 |
| 9/28/20 | Email from TNF Tribal Relations Program Manager to San Carlos A.G. | Apache | San Carlos Apache Tribe | N/A | Accepted proposed meeting date/time and asked if teleconferencing would be provided |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-74

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|--------------------|---------------------|----------|----------------------|
| 9/30/20 [received via email from ACHP] | Official Letter dated 9/08/30 from San Carlos to ACHP | Apache | San Carlos Apache Tribe | N/A | Included copy of San Carlos 9/3/20 letter to TNF Supervisor and comments on PA version 8 (which were not received directly by TNF) |
| 9/28/20– 10/5/20 | Emails between TNF Tribal Relations Program Manager and San Carlos A.G. | Apache | San Carlos Apache Tribe | N/A | Discussions regarding arrangements for 10/08/20 meeting and requesting agenda from tribe |
| 9/30/20 | Official Letter from TNF Acting Supervisor to YAN Chair | Apache Yavapai | Yavapai-Apache Nation | N/A | Thanked for 9/17/20 letter and informed of Tribal Relations staffing change |
| 10/01/20 | Email from TNF Tribal Relations Program Manager to YAN Chair | Apache Yavapai | Yavapai-Apache Nation | N/A | Conveyed digital copy of 9/30/20 letter from TNF Acting Supervisor responding to YAN 9/17/20 letter |
| 10/01/20– 10/05/20 | Email from TNF Tribal Relations Program Manager to San Carlos THPO | Apache | San Carlos Apache Tribe | N/A | Regarding proposed sunrise ceremony at Oak Flat |
| 10/05/20 | Emails between TNF Tribal Relations Program Manager and San Carlos A.G. | Apache | San Carlos Apache Tribe | N/A | Regarding topics for 10/08/20 meeting; request for Adkins' vitae; requested that A.G. be cc'd on any correspondence to San Carlos Chair and THPO |
| 10/07/20 | Official Letter from TNF Supervisor to San Carlos Chair and staff | Apache | San Carlos Apache Tribe | N/A | Response to 8/25/20 letter regarding NDAA mitigations and process |
| 10/07/20 | Email from TNF Tribal Relations Program Manager to Chairman and Staff | Apache | San Carlos Apache Tribe | N/A | Conveyed digital copy of response to 8/26/20 letter re: NDAA |
| 10/07/20 | Official Letter from TNF Supervisor to San Carlos Chair and staff | Apache | San Carlos Apache Tribe | N/A | Response to 9/0320 letter requesting a Supplemental EIS |
| 10/07/20 | Email from TNF Tribal Relations Program Manager to Chairman and Staff | Apache | San Carlos Apache Tribe | N/A | Conveyed digital copy of response to 9/03/20 letter #1 re: Supplemental EIS |
| 10/07/20 | Official Letter from TNF Supervisor to San Carlos Chair and staff | Apache | San Carlos Apache Tribe | N/A | Response to 9/03/20 letter (received 9/30/20) with comments on PA version 8 |
| 10/07/20 | Email from TNF Tribal Relations Program Manager to Chairman and Staff | Apache | San Carlos Apache Tribe | N/A | Conveyed digital copy of response to 9/03/20 letter re: PA 8 |
| 10/08/20 | Formal Meeting of TNF Acting Supervisor and staff with San Carlos Vice Chairman and staff | Apache | San Carlos Apache Tribe | San Carlos, AZ | Meeting requested initially by TNF 7/24/20, (canceled twice because of COVID-19); discussed PA |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-75

12-RCMSER-3125

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 10/13/20 | Email from TNF Tribal Relations Program Manager to Chair and Staff | Apache | San Carlos Apache Tribe | N/A | Thanked for hosting government-to-government consultation meeting |
| 10/13/20 | Email from TNF Tribal Relations Program Manager to San Carlos Chairman and Staff | Apache | San Carlos Apache Tribe | n/a | Thanked for hosting government-to-government consultation meeting |
| 10/21/20 | Official Program Manager to Tribal cultural staff and all San Carlos contacts | All Tribes (11) | Fort McDowell Yavapai Nation Gila River Indian Community Hopi Tribe Mescalero Apache Tribe Pueblo of Zuni Salt River Pima-Maricopa Indian Community San Carlos Apache Tribe Tonto Apache Tribe White Mountain Apache Tribe Yavapai-Apache Nation (representatives of both) Yavapai-Prescott Indian Tribe | N/A | Asked tribes to request Oak Flat site visits and to conduct blessing before data recovery begins November 30, 2020 |
| 10/22/20 | Official Letter from AZ SHPO to San Carlos Chairman | Apache | San Carlos Apache Tribe | N/A | Reply to San Carlos 9/14/20 letter to SHPO re: TNF PA version 8 comments |
| 10/29/20 (mailed 11/3/20) | Official Letter from TNF Supervisor to San Carlos Chairman and other staff | Apache | San Carlos Apache Tribe | N/A | Reply to San Carlos's 9/03/20 comments on PA version 8 [cc: to SHPO and ACHP] |
| 11/02/20 | Email from Tribal Relations Program Manager to San Carlos contacts | Apache | San Carlos Apache Tribe | N/A | Conveyed digital copy of 10/29/20 letter to Chairman Rambler; A.G. acknowledged receipt [cc: to SHPO and ACHP] |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

12-RCMSER-3126

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 11/03/20 | Official Email from Tribal Relations Program Manager to Tribal cultural staff | All Tribes (11) | Fort McDowell Yavapai Nation<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | N/A | Conveyed digital copy of Preliminary Report of Oak Flat Natural Resources Survey and reiterated invitation to collect resources |
| 11/05/20 | Emails from Tribal Relations staff to Cultural staff | O'odham Pueblo | Gila River Indian Community<br>Pueblo of Zuni | N/A | Inquiring whether they wish to do a blessing at Oak Flat |
| 11/06/20 | Email from WRIT to TNF Tribal Relations Program Manager | O'odham | Gila River Indian Community | N/A | GRIC THPO office will conduct a blessing of Oak Flat prior to 11/30/20 |
| 11/09/20 | Statement from White Mountain Apache Tribe Cultural Resource Director | Apache | White Mountain Apache Tribe | N/A | Statement opposing Resolution Copper Mine; sent to U.S. Federal Government Trustees and Tribal leaders [list not provided] |
| 11/12/20 | Emory Oak Advisory Council Quarterly Meeting | Apache | San Carlos Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation | telemeeting | Update on groves; contract signed for mastication of Crackerjack grove; discussed Advisory Board description |
| 11/13/20 | Letter from Apache Stronghold to ACHP | N/A | Interested party | N/A | Comments on Forest Service consultation; attached 9/11/20 and 11/9/20 letters from Ramon Riley, WMAT Culture Resource Director |
| 11/18/20 | Official Letter from TNF Acting Supervisor to Archaeology Southwest | N/A | Interested party | N/A | Response to comments on PA version 8 regarding SRP, Tribal Consultation, and Public Involvement |
| 11/25/30 and 11/30/20 | Emails between TNF Tribal Relations and White Mountain Cultural Resources Director | Apache | White Mountain Apache Tribe | N/A | Questions regarding the EOCTRI program |
| 12/09/20 | Email from TNF Tribal Relations Program Manager to Hopi THPO | Pueblo | Hopi Tribe | n/a | Question about identification and determination of rock art feature (no response as of July 2021) |

\* = Forest Service line officer present
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-77

12-RCMSER-3127

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|--------------------|----------------------|----------|----------------------|
| 12/14/20 | Email from TNF Mitigation Tribal Liaison to WMAT Repatriation Specialist | Apache | White Mountain Apache Tribe | N/A | Response to Ramon Riley's questions about the EOCTRI program and proposed mitigation fund; cc: to THPO and Cibecue |
| 12/15/20 | Official Letter from ACHP to TNF | N/A | Programmatic Agreement Signatory | N/A | Results of 36 CFR 800.9(a) compliance review |
| 12/21/20 | Official Letter from TNF Acting Supervisor to Tribal leaders and cultural staff | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | N/A | Conveyed digital copies of Skunk Camp and Peg Leg Corridors cultural resource survey reports |
| 12/22/20 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | n/a | Notice of additional information on water resources analysis and request for SEIS; information to follow in mail |
| 12/23/20 | Email from TNF Acting Supervisor to San Carlos Chair | Apache | San Carlos Apache Tribe | n/a | Thanked for 12/22/20 letter sent via email; TNF will respond once information is received |
| 12/23/20 | Official Letter from San Carlos THPO to TNF Acting Supervisor | Apache O'odham Yavapai | Fort McDowell Yavapai Apache<br>Gila River Indian Community<br>Salt River Indian Community<br>San Carlos Apache<br>Tohono O'odham Nation | n/a | Advised TNF that members of Apache Stronghold and listed tribes will tour Skunk Camp 12/31/20 to offer prayers |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-78

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 12/23/20 (mailed and emailed notice 12/24/20) | Official Letter from Acting TNF Supervisor to Tribal leaders and cultural staff | All Tribes (15) | Ak-Chin Indian Community Fort McDowell Yavapai Nation Fort Sill Apache Gila River Indian Community Hopi Tribe Mescalero Apache Tribe Pascua Yaqui Tribe Pueblo of Zuni Salt River Pima-Maricopa Indian Community San Carlos Apache Tribe Tohono O'odham Nation Tonto Apache Tribe White Mountain Apache Tribe Yavapai-Apache Nation Yavapai-Prescott Indian Tribe | n/a | Conveyed digital copies of Skunk Camp and Peg Leg Corridors cultural resource survey reports; requested comment by February 24, 2021 |
| 12/23/20 (mailed 12/28/20) | Official Letter from Acting TNF Supervisor to Tribal leaders and cultural staff | All Tribes (15) | Ak-Chin Indian Community Fort McDowell Yavapai Nation Fort Sill Apache Gila River Indian Community Hopi Tribe Mescalero Apache Tribe Pascua Yaqui Tribe Pueblo of Zuni Salt River Pima-Maricopa Indian Community San Carlos Apache Tribe Tohono O'odham Nation Tonto Apache Tribe White Mountain Apache Tribe Yavapai-Apache Nation Yavapai-Prescott Indian Tribe | n/a | Conveyed Final PA, comment matrix, and concurring party signatory page; offer to meet |
| 12/24/20 | Email from Pascua Yaqui President to SWCA | Yoeme | Pascua Yaqui Tribe | n/a | Acknowledged receipt of Peg Leg and Skunk Camp cultural reports and intent to review |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-79

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 12/30/20 | Email from Gila River Indian Community THPO to SWCA | O'odham | Gila River Indian Community | n/a | Acknowledged receipt of Peg Leg and Skunk Camp cultural reports |
| 1/05/21 (mailed 1/06/21; emailed digital version by SWCA 1/07/21) | Official Letter from TNF Acting Forest Supervisor to Tribal Leaders and cultural staff | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache Tribe<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | n/a | Provided copy of Oak Flat Campground Management Plan and requested comments by 2/05/21 |
| 1/05/21 | Email from San Carlos Chairman to TNF Acting Forest Supervisor (copy to USACE) | Apache | San Carlos Apache Tribe | n/a | Asks why TNF has not responded to his 12/22/20 demand for a SEIS based on water studies conducted by San Carlos, and why no courtesy call regarding the planned 1/15/21 publication of the FEIS |
| 1/07/21 | Official Letter from San Carlos Chairman to ACHP Director | Apache | San Carlos Apache Tribe | n/a | Requests continued ACHP review of 5 themes identified in letter regarding Section 106 process; requests ACHP not sign the PA at this time |
| 1/08/21 | Official Letter from ACHP Director to USFS Region 3 Acting Regional Forester and TNF Acting Forest Supervisor | | | n/a | Provides recommendations for completing NHPA and NEPA compliance, and publication of FEIS |
| 1/08/21 | Email from Office of Federal Agency Programs to TNF Supervisor (copies to Tribal cultural staff, TNF staff, agencies, and interested public) | | | n/a | Provided copy of ACHP's 1/08/21 letter to USFS Region 3 and TNF, and copy of 1/07/21 San Carlos letter to ACHP |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-80

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 1/08/21 | ACHP Statement | | | n/a | Published statement on NDAA and request for clarification from TNF on the PA |
| 1/08/21 | Email from TNF Tribal Relations Program Manager to San Carlos Chairman | Apache | San Carlos Apache Tribe | n/a | Request for G2G consultation meeting on PA, comment matrix |
| 1/08/21 | Email from Pascua Yaqui THPO to TNF Tribal Relations Program Manager | Yoeme | Pascua Yaqui Tribe | n/a | Expressed concerns about timing of announced FEIS publication date and date for comments on the Skunk Camp CR report |
| 1/10/21 (by email; mailed 1/11/21) | Official Letter from TNF Acting Forest Supervisor to San Carlos Chairman | Apache | San Carlos Apache Tribe | n/a | Response to San Carlos 12/22/20 letter regarding water analyses |
| 1/11/21 | Official Letter from TNF Acting Forest Supervisor to Tribal Leaders and cultural staff | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache Tribe<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | n/a | Announced publication of FEIS will be 1/15/21 |
| 1/12/21 | Official Letter from San Carlos Chairman to TNF Acting Forest Supervisor | Apache | San Carlos Apache Tribe | n/e | Criticized water modeling and reiterated need for SEIS |
| 1/13/21 | Email TNF Tribal Relations Program Manager to Tohono O'odham THPO | O'odham | Tohono O'odham Nation | n/a | Response to phone message on Adkins' voicemail; copy of PA will be mailed to THPO; request to set up phone discussion about PA signatory status [PA mailed 1/13/21] |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-81

12-RCMSER-3131

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 1/13/21 | Telephone Log, TNF Tribal Relations with Tohono O'odham THPO | O'odham | Tohono O'odham Nation | n/a | THPO called to acknowledge receipt of PA; their attorneys will review, and he will be in touch with TNF |
| 1/13/21 | Email from Pascua Yaqui THPO to TNF Acting Forest Supervisor | Yoeme | Pascua Yaqui Tribe | n/a | Requests deferral of FEIS until all environmental and cultural studies are completed |
| 1/13/21 | Email TNF Tribal Relations Program Manager to Pascua Yaqui THPO | Yoeme | Pascua Yaqui Tribe | n/a | Provided response to THPO's 1/08/21 and 1/13/21 emails regarding comments on Skunk Camp and publication of FEIS |
| 1/14/21 | Telephone Log of call from San Carlos Chairman and Staff to TNF Tribal Relations Program Manager | Apache | San Carlos Apache Tribe | n/a | San Carlos notified it has filed a lawsuit and a request for injunction against TNF Land Exchange; Adkins discussed with TNF Acting Forest Supervisor |
| 1/15/21 | Emails with copy of 1/11/21 Letter from TNF Supervisor to Tribal Leaders and staff | All Tribes (15) | Ak-Chin Indian Community  Fort McDowell Yavapai Nation  Fort Sill Apache Tribe  Gila River Indian Community  Hopi Tribe  Mescalero Apache Tribe  Pascua Yaqui Tribe  Pueblo of Zuni  Salt River Pima-Maricopa Indian Community  San Carlos Apache Tribe  Tohono O'odham Nation  Tonto Apache Tribe  White Mountain Apache Tribe  Yavapai-Apache Nation  Yavapai-Prescott Indian Tribe | n/a | SWCA sent email to each Tribe with copies of 1/11/21 letters to Tribal leader and staff, announcing publication of FEIS |
| 1/26/21 | Telephone Log of call from Tohono O'odham THPO to TNF Tribal Relations | O'odham | Tohono O'odham Nation | n/a | Inquired about signatory status for Tohono O'odham and status of Land Exchange |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

12-RCMSER-3132

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 1/28/21 | Email from TNF RCM Project Heritage Resources Lead to Tribes and Interested Parties | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache Tribe<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | n/a | Provided response to ACHP 1/8/21 letter (enclosed: TNF 12/22/20 letter to USFS Region 3; and USFS Region 3's 1/14/21 response to TNF)<br><br>[also sent to PA signatories, USFS Region 3, and interested parties] |
| 2/25/21 | Emory Oak Advisory Council Quarterly Meeting | Apache | San Carlos Apache Tribe<br>Yavapai-Apache Nation | telemeeting | Update on groves and research; and discussed Advisory Board description |
| 2/18/21 | Telephone Log of call from San Carlos THPO to TNF Tribal Relations Program Manager | Apache | San Carlos Apache Tribe/Apache Stronghold | n/a | THPO called to request closure of Oak Flat campground for Sunrise Ceremony, same weekend as Mrs. Wilson's request for 3/08/21–3/15/21 closure |
| 2/17/21 | Telephone Log of call from TNF Tribal Relations Program Manager to San Carlos member Mrs. Wilson | Apache | San Carlos Apache Tribe | n/a | Discussed the double booking of Oak Flat for sunrise ceremonies; referred her to San Carlos THPO to discuss arrangements and asked her to inform TNF of the outcome |
| 2/18/21 | Telephone Log of call between TNF Tribal Relations Program Manager and San Carlos THPO Office | Apache | San Carlos Apache Tribe | n/a | Continued discussion of Oak Flat closure for sunrise ceremony(ies) |
| 2/18/21 | Official Letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | n/a | Delegation of authority to THPO for San Carlos sunrise ceremonies |
| 2/24/21 | Telephone Log of call between TNF Tribal Relations Program Manager and Salt River THPO | O'odham | Salt River Pima-Maricopa Indian Community | n/a | Discussed status of Oak Flat and pending lawsuits |

\* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-83

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|--------------------|----------------------|----------|----------------------|
| 2/25/21 | Emory Oak Advisory Council Quarterly Meeting | Apache | San Carlos Apache Tribe<br>Yavapai-Apache Nation | telemeeting | Update on groves and research; and discussed Advisory Board description |
| 3/01/21 | Memo from USDA to USFS to rescind FEIS | | | n/a | Instructed to re-initiate consultation and keep USDA informed of progress |
| 3/01/21 | Email from USDA Acting Forest Supervisor to all Tribes | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache Tribe<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | n/a | Conveyed USDA decision to rescind FEIS; invited questions to be addressed to Torres or Adkins |
| 3/11/21 | Official Letter from U.S. Environmental Protection Agency regarding water findings | Apache<br>O'odham | Gila River Indian Community<br>San Carlos Apache Tribe | n/a | Advises Tribes of finding of potential effects from water discharge from Skunk Camp tailings, in contradiction of USACE findings |
| 3/18/21 | Arizona Republic 3/07/21 article sent from Hopi Tribe to TNF Supervisor | Pueblo | Hopi Tribe | n/a | Article dated 3/03/21 by E.J. Montini cut from newspaper and sent to S.O. in tribal envelope without comment |
| 3/18/21 (emailed 3/19/21) | San Carlos Tribal Consultation Response Form | Apache | San Carlos Apache Tribe | n/a | Response on TNF proposed Access and Management Plan Oak Flat Campground; cited adverse effects and directed consultation via Attorney General's Office |
| 3/23/21 | Email from TNF Tribal Relations program Manager to San Carlos THPO Office | Apache | San Carlos Apache Tribe | n/a | Thanked for consultation response form (PR 4988) and will reach out to THPO to discuss cited adverse effects of management plan; conveyed copy of email to San Carlos Attorney General |
| 5/06/21 and 5/07/21 | Zuni Field Trip to Oak Flat to Collect Natural Resources | Pueblo | Pueblo of Zuni | Superior/Oak Flat, Arizona | Members of Zuni CR Advisory Team collected plants and minerals |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-84

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 6/7/2021 | Emory Oak Advisory Council Quarterly Meeting | Apache | Yavapai-Apache Nation | telemeeting | Update on groves; potential field trip to examine canker affecting EO in southern Arizona; upcoming harvest trips; finalized roles of Advisory Board; EOCTRI video |
| 8/12 and 8/13/21 | Emory Oak Advisory Council Quarterly Meeting & Field Trip | Apache | White Mountain Apache Tribe Yavapai-Apache Nation | Camp Verde | Field trip examined Needle Rock grove post FS backfire, then Dry Creek and Long Canyon groves to discuss treatment strategy with elders. Meeting next day continued discussions |

**Table S-2. Reinitiation of Tribal consultation by USDA**

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 9/03/21 | Decision Memo from Deputy Under Secretary, USDA | | | | Designating NFS Associate Deputy Chief Barnie Gyant to re-initiate tribal consultation |
| 9/08/21 | Email from TNF Tribal Relations Program Manager on behalf of TNF Supervisor to San Carlos Chairman | Apache | San Carlos Apache Tribe | n/a | Invited Tribe to listening session on 10/19/21; time to be determined once date is selected |
| 9/10/21– 9/30/21 | Emails between USDA Office of the Secretary (OSEC) and USDOI | | | | Series of emails to identify independent mining expert to review mining technique proposed by RCM |
| 9/10/21 | Email from TNF Acting Supervisor to Arizona SHPO | | | n/a | Advised SHPO that TNF is reinitiating tribal consultation |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

12-RCMSER-3135

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|--------------------|----------------------|----------|----------------------|
| 9/10/21 | Email from TNF Tribal Relations Program Manager with letter from NFS Associate Deputy Chief to Tribal Leaders and Cultural Staff | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache Tribe<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | n/a | Invitation to attend USFS tribal listening session 10/19/21, 10:00 a.m. Arizona time |
| 9/28/21 | Email from TNF Tribal Relations Program Manager to Tribal Leaders and Cultural Staff | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache Tribe<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | n/a | Provided draft agenda for 10/19/21 with a late morning end early afternoon session, asked for list of non-tribal entities that Tribes want invited to listen, informed that transcript will be available |
| 9/28/21 (see also 10/19/21) | Email from Mapetsi Policy Group on behalf of San Carlos Apache Tribe to OSEC | Apache | San Carlos Apache Tribe | n/a | Provided copy of San Carlos's contracted water resources analysis by James Wells |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-86

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 10/14/21 | Email from San Carlos Chairman's office to USDA, USFS, TNF | Apache | San Carlos Apache Tribe | n/a | Conveyed copy of 10/14/21 letter sent by San Carlos to President Biden and Secretary of Agriculture Vilsack regarding consultation process |
| 10/14/21 | Email from San Carlos Chairman's Office to TNF Tribal Relations Program Manager | Apache | San Carlos Apache Tribe | n/a | Conveyed copy of 10/14/21 letter sent by San Carlos to NFS Associate Deputy Chief Barnie Gyant regarding consultation process and request to reschedule 10/19/21 listening session |
| 10/14/21 | Official Letter from White Mountain Chairwoman to NFS Associate Deputy Chief | Apache | White Mountain Apache Tribe | n/a | Posed 8 questions about the withdrawal of the FEIS and continuing consultations |
| 10/15/21 | Email from TNF Tribal Relations Program Manager to Tribal Leaders and Cultural Staff | All Tribes (15) | Ak-Chin Indian Community | n/a | Provided meeting connection information and agenda |
| | | | Fort McDowell Yavapai Nation | | |
| | | | Fort Sill Apache Tribe | | |
| | | | Gila River Indian Community | | |
| | | | Hopi Tribe | | |
| | | | Mescalero Apache Tribe | | |
| | | | Pascua Yaqui Tribe | | |
| | | | Pueblo of Zuni | | |
| | | | Salt River Pima-Maricopa Indian Community | | |
| | | | San Carlos Apache Tribe | | |
| | | | Tohono O'odham Nation | | |
| | | | Tonto Apache Tribe | | |
| | | | White Mountain Apache Tribe | | |
| | | | Yavapai-Apache Nation | | |
| | | | Yavapai-Prescott Indian Tribe | | |
| 10/15/21 | Email from Hopi THPO to TNF Tribal Relations Program Manager | Pueblo | Hopi Tribe | n/a | Acknowledged telephone discussion and conveyed written statement to be read into 10/19/21 listening session meeting record. |
| 10/18/21 | Telephone Log of call between TNF Tribal Relations Program Manager and White Mountain NAGPRA Representative | Apache | White Mountain Apache Tribe | n/a | Adkins spoke to Ramon Riley per the Chairwoman's request, and answered the 8 questions posed in White Mountain 10/14/21 letter |

\* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 10/19/21 | Tribal listening session | All Tribes (15) | Fort McDowell Yavapai Nation<br>Fort Sill Apache Tribe<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Triba<br>Pascua Yaqui Tribe<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>White Mountain Apache Tribe | Telemeeting | Tribal listening session to re-initiate consultation on RCM |
| 10/20/21–10/27/21 | Emails between TNF Tribal Relations Program Manager and USDA OTR Program Analyst | | | n/a | Discussion of Salt River request for independent review of EIS water quality and mining methods analyses |
| 10/21/21 | Email from Salt River THPO to TNF Tribal Relations Program Manager | O'odham | Salt River Pima-Maricopa Indian Community | n/a | Requested water quality study |
| 10/27/21 | Email from TNF Tribal Relations Program Manager to Salt River THPO | O'odham | Salt River Pima-Maricopa Indian Community | n/a | Acknowledged receipt of request for water quality study and will respond esap |
| 11/04/21–11/05/21 | Official Letter dated 11/04/21 from TNF Supervisor to Tribal Leaders and Cultural Staff, conveyed in 11/05/21 email from Tribal Relations Program Manager | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache Tribe<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | n/a | Provided copy of Bosworth 11/04/21 letter with audio file and transcript of 10/19/21 meeting, and Powerpoint from meeting, and encouraged Tribes to fill out doodle poll regarding next meeting(s) |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 11/11/21 | Official Letter from NFS Associate Deputy Chief to White Mountain Chairwoman | Apache | White Mountain Apache Tribe | n/e | Provided responses to 8 questions in White Mountain Apache Tribe 10/14/21 letter |
| 11/17/21–12/08/21 | Emails between Mapetsi Policy Group, TNF, OSEC, and OTR requesting virtual meeting | Apache | San Carlos Apache Tribe | n/a | Request from Mapetsi Policy Group on behalf of San Carlos to TNF for virtual meeting to discuss fulfilling the Joint Secretarial Order regarding co-management; OSEC and OTR also part of the discussion |
| 11/19/21 | Emory Oak Advisory Council Quarterly Meeting | Apache | White Mountain Apache Tribe  Yavapai-Apache Nation | telemeeting | Update on groves and research. |
| 11/22/21 | Email from NFS Associate Deputy Chief to San Carlos Chairman | Apache | San Carlos Apache Tribe | n/a | Requested that their staff set up a meeting to discuss San Carlos concerns |
| 11/30/21 | Email from TNF Tribal Relations Program Manager to Tribal Leaders and Staff | All Tribes (15) | Ak-Chin Indian Community  Fort McDowell Yavapai Nation  Fort Sill Apache Tribe  Gila River Indian Community  Hopi Tribe  Mescalero Apache Tribe  Pascua Yaqui Tribe  Pueblo of Zuni  Salt River Pima-Maricopa Indian Community  San Carlos Apache Tribe  Tohono O'odham Nation  Tonto Apache Tribe  White Mountain Apache Tribe  Yavapai-Apache Nation  Yavapai-Prescott Indian Tribe | n/e | Request for Tribes to complete doodle poll regarding re-initiation of consultation |
| 11/30/21 | Email from NFS Associate Deputy Chief to San Carlos Chairman | Apache | San Carlos Apache Tribe | n/a | Requesting call from Rambler to discuss RCM |
| 11/30/21 | Email from San Carlos Chairman to NFS Associate Deputy Chief | Apache | San Carlos Apache Tribe | n/a | Chairman Rambler authorized his admin to set a telephone meeting with Gyant |
| 11/30/21 | Email from NFS Associate Deputy Chief to White Mountain Chairwoman | Apache | White Mountain Apache Tribe | n/a | Requesting call from Chairwoman Lee-Gatewood to discuss RCM |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-89

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 12/07/21 | Email from TNF Tribal Relations Program Manager to Salt River THPO | O'odham | Salt River Pima-Maricopa Indian Community | n/a | Provided 11/05/21 Water Quality Information Roadmap |
| 12/07/21 | Email from Salt River THPO to TNF Tribal Relations Program Manager | O'odham | Salt River Pima-Maricopa Indian Community | n/a | Thanked for water quality information and will get back with dates for meeting |
| 12/07/21 | Email from TNF Tribal Relations Program Manager to Salt River THPO | O'odham | Salt River Pima-Maricopa Indian Community | n/a | Asked if Salt River THPO is the designated consultation staff, asked for agenda items and to pick date/time for next meeting |
| 12/08/21 | Emails between TNF Tribal Relations Program Manager and Gila River Indian Community Cultural Staff | O'odham | Gila River Indian Community | n/a | Asked Gila River Indian Community to select date and time for meeting and provide topics they would like to discuss; subsequent emails set time |
| 12/08/21 | Email from TNF Tribal Relations Program Manager to San Carlos Deputy Attorney General | Apache | San Carlos Apache Tribe | n/a | Asked San Carlos Tribe to select date and time for meeting and provide topics they would like to discuss |
| 12/08/21 | Email from TNF Tribal Relations Program Manager to White Mountain THPO | Pueblo | White Mountain Apache Tribe | n/a | Asked White Mountain Tribe to select date and time for meeting, and provide topics they would like to discuss |
| 12/08/21 | Email from TNF Tribal Relations Program Manager to Hopi Tribe THPO | Pueblo | Hopi Tribe | n/a | Asked Hopi Tribe to select date and time for meeting and provide topics they would like to discuss |
| 12/08/21 | Emails between TNF Tribal Relations Program Manager and Gila River Indian Community THPO | O'odham | Gila River Indian Community | n/a | Selected date and time for meeting and will set up an agenda of topics to discuss |
| 12/08/21 | Email from TNF Tribal Relations Program Manager to Mescalero Apache Tribe THPO | Apache | Mescalero Apache Tribe | n/a | Asked Mescalero Apache Tribe to select date and time for meeting and provide topics they would like to discuss |
| 12/17/21 | Official meeting of NFS Associate Deputy Chief and San Carlos Leaders and Council | Apache | San Carlos Apache Tribe | telemeeting | Adkins' email summary dated 1/6/22: it was decided that the NFS Associate Deputy Chief will meet in person with Chairman and Council at Oak Flat on 1/18/22 |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-90

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|--------------------|----------------------|----------|----------------------|
| 1/03/22 | Email from TNF Tribal Relations Program Manager to Tribal Leaders and Cultural Staff | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache Tribe<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | n/a | Conveyed 4 water quality documents |
| 1/05/22 & 1/07/22 | Emails between TNF Tribal Relations Program Manager to White Mountain THPO | Apache | White Mountain Apache Tribe | n/a | Various emails attempting to set meeting between TNF and White Mountain Apache Tribe |
| 1/10/22 | Email from TNF Tribal Relations Program Manager to Salt River THPO | O'odham | Salt River Pima-Maricopa Indian Community | n/a | Asked Salt River THPO to select date and time for meeting and provide topics they would like to discuss; set meeting for 1/19/22 |
| 1/18/22 | Official meeting of NFS Associate Deputy Chief with Hopi CPO staff | Pueblo | Hopi Tribe | Telemeeting | Consultation meeting |
| 1/19/22 | Official meeting of NFS Associate Deputy Chief with O'odham THPOs | O'odham | Gila River Indian Community<br>Salt River Pima-Maricopa Indian Community | Telemeeting | Consultation meeting |
| 1/20/22 | Email from TNF Tribal Relations Program Manager to O'odham THPOs | O'odham | Gila River Indian Community<br>Salt River Pima-Maricopa Indian Community | n/a | Provided information on leaching method, requested in 1/19/22 meeting |
| 1/24/22 | Email from SWCA to Hopi Tribe consultation meeting attendees | Pueblo | Hopi Tribe | n/a | Provided 1/18/22 meeting notes and transcript |
| 1/25/22 | Chi' chil Advisory Board Quarterly Meeting | Apache | San Carlos Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation | telemeeting | Revised Emory Oak partnership statement; changed name to Chi 'chil Advisory Board |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-91

12-RCMSER-3141

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 1/26/22 | Email from SWCA to O'odham consultation meeting attendees | O'odham | Gila River Indian Community<br>Salt River Pima-Maricopa Indian Community | n/a | Provided 1/19/22 meeting notes SG and transcript |
| 2/03/22 | Emails from TNF Tribal Relations Program Manager to Tribal leaders and Cultural Staff | Apache<br>Yoeme | Fort Sill Apache Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe | n/a | Inquired if Tribe wishes to engage in G2G consultation about RCM with NFS Associate Deputy Chief Gyant |
| 2/08/22 | Emails between TNF Tribal Relations Program Manager and San Carlos Attorney General | Apache | San Carlos Apache Tribe | n/a | Response to 2/8/22 email concerning 3 incidents at Oak Flat (refers also to telephone conversation earlier in day on same subject) |
| 2/10/22 | Official public meeting of NFS Deputy Chief, TNF Leaders, and San Carlos at Oak Flat | Apache | San Carlos Apache Tribe | Oak Flat, Arizona | Summary notes of meeting highpoints CONFIDENTIAL |
| 2/11/22 | Official meeting NFS Associate Deputy Chief, TNF, and San Carlos Chairman and Attorney General | Apache | San Carlos Apache Tribe | Peridot, Arizona | Meeting between NFS (Gyant), TNF (Bosworth, Torres, Robertson, and Adkins), and San Carlos (Rambler, Ritchie, Jimmie); discussed San Carlos' concerns about the project and the FEIS CONFIDENTIAL |
| 2/18/22 | Email from TNF Tribal Relations Program Manager to Tribal leaders and Cultural Staff | Apache<br>O'odham<br>Pueblo<br>Yavapai<br>Yoeme<br>(11 Tribes) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | n/a | Invitation on behalf of NFS Associate Deputy Chief to engage in G2G consultation regarding RCM |
| 2/22/22 | Emails between TNF Tribal Relations Program Manager and Hopi THPO | Pueblo | Hopi Tribe | n/a | Addressed questions raised by Hopi Tribe concerning consultation about the RCM project; will arrange a meeting between NFS Associate Deputy Chief Gyant and Hopi Tribe |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 3/02/22 | Email from TNF Tribal Relations Program Manager to Tribal Leaders and Cultural Staff | Apache O'odham Pueblo Yavapai Yoeme | Ak-Chin Indian Community Fort McDowell Yavapai Nation Fort Sill Apache Tribe Mescalero Apache Tribe Pascua Yaqui Tribe Pueblo of Zuni Tohono O'odham Nation Tonto Apache Tribe White Mountain Apache Tribe Yavapai-Apache Nation Yavapai-Prescott Indian Tribe | n/a | Follow up to 2/18/22 email inviting G2G consultation |
| 3/02/22 | Email from TNF Tribal Relations Program Manager to Salt River THPO | O'odham | Salt River Pima-Maricopa Indian Community | n/a | Follow up on Water Quality study issues |
| 3/02/22 | Emails between TNF Tribal Relations Program Manager and Pascua Yaqui THPO | Yoeme | Pascua Yaqui Tribe | n/a | Pascua Yaqui Tribe request to consult and TNF follow up inquiring what meeting format is requested |
| 3/02/22 | Emails between TNF Tribal Relations Program Manager and Mescalero THPO | Apache | Mescalero Apache Tribe | n/a | Mescalero Apache Tribe requested in-person meeting and site visit. |
| 3/03/22 | Emails between TNF Tribal Relations Program Manager and White Mountain THPO | Apache | White Mountain Apache Tribe | n/a | White Mountain THPO suggested TNF contact White Mountain Tribe Legal Department prior to arranging meeting with Tribal Council |
| 3/07/22 | Emails between TNF Tribal Relations Program Manager and Tribal Leaders | Apache Yoeme | Mescalero Apache Tribe Pascua Yaqui Tribe | n/a | Requested dates for meeting with NFS Associate Deputy Chief Gyant during week of 3/21/22 |
| 3/07/22– 3/10/22 | Emails between TNF Tribal Relations Program Manager and Pascua Yaqui THPO | Yoeme | Pascua Yaqui Tribe | n/a | Pascua Yaqui suggested 2 dates for NFS Associate Deputy Chief Gyant to meet with the Tribal Council |
| 3/11/22 | Email confirming telephone conversation between TNF Tribal Relations Program Manager and Mescalero Apache Tribe THPO | Apache | Mescalero Apache Tribe | n/a | Email confirming telephone request to meet with NFS Associate Deputy Chief Gyant on 4/07 or 4/08 at Oak Flat; TNF will check with the NFS Associate Deputy Chief |
| 3/11/22 | Email from TNF Tribal Relations Program Manager to NFS Associate Deputy Chief's Office | Apache | Mescalero Apache Tribe | n/a | Asked if Gyant can attend either date proposed by Mescalero for tour of Oak Flat |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-93

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 3/16/22 | Emails between White Mountain THPO and TNF Tribal Relations Program Manager | Apache | White Mountain Apache Tribe | n/a | Altaha asked if TNF is involved in the renewal of RCM's Arizona Department of Environmental Quality water permit; Adkins clarified that the permit was analyzed in FEIS, but TNF is not the deciding agency for the permit |
| 3/17/22 | Email from TNF Tribal Relations Program Manager to Mescalero THPO | Apache | Mescalero Apache Tribe | n/a | Regarding arrangements for 4/07/22 meeting at Oak Flat with NFS Associate Deputy Chief Gyant |
| 3/19/22 | Email from TNF Tribal Relations Program Manager to Pascua Yaqui THPO | Yoeme | Pascua Yaqui Tribe | n/a | NFS Associate Deputy Chief Gyant will attend 3/30/22 Pascua Yaqui Tribal Council meeting virtually |
| 3/29/22 | Official letter from NFS Deputy Gyant to San Carlos Chairman | Apache | San Carlos Apache Tribe | n/a | Response to 10/14/21 letter; comments heard during 10/19/21 listening session; legal issues; Oak Flat field visit; direct contact information |
| 3/29/22 | Email from TNF Tribal Relations Program Manager to SRP-MIC | O'odham | Salt River Pima-Maricopa Indian Community | n/a | Inquiring about Tribe's review of Water Quality Information provided on 1/06/21 |
| 3/30/22 | Official meeting of NFS Associate Deputy Chief, TNF Leaders, and Pascua Yaqui Tribal Council | Yoeme | Pascua Yaqui Tribe | Telemeeting | Discussed Pascua Yaqui's opposition to the mine end the destruction of cultural sites, plants, animals, and water resources |
| 4/06/22 | Emails between Salt River THPO and TNF Tribal Relations Program Manager | O'odham | Salt River Pima-Maricopa Indian Community | n/a | Salt River listed parameters for requested additional water analyses |
| 4/07/22 | Meeting of NFS Associate Deputy Chief, TNF Leaders, and Mescalero Council Members and Cultural Staff | Apache | Mescalero Apache Tribe | Superior and Dripping Springs, Arizona | Meeting and field trip to view Oak Flat mining area and Skunk Camp proposed tailings' location |
| 4/12/22 | Email from TNF Tribal Relations Program Manager to White Mountain Chairwoman and Cultural Staff | Apache | White Mountain Apache Tribe | n/a | Requested meeting of NFS Associate Deputy Chief Barnie Gyant end White Mountain Tribal Council |
| 4/12/22 & 4/13/22 | Emails between White Mountain THPO and TNF Tribal Relations Program Manager | Apache | White Mountain Apache Tribe | n/a | Advised that new administration will take office 5/06/22 and will want to re-engage on RCM consultation |
| 4/13/22 | Emails between TNF Tribal Relations Program Manager and Salt River THPO | O'odham | Salt River Pima-Maricopa Indian Community | n/a | Setting up meeting to discuss water issues raised by Salt River |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-94

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 4/15/22 & 4/19/22 | Emails between TNF Tribal Relations Program Manager and Salt River THPO | O'odham | Salt River Pima-Maricopa Indian Community | n/a | Relayed NFS Associate Deputy Chief Gyant's question whether Salt River would accept BLM Hydrologist as third-party reviewer of water data; Anton replied that request is for new third-party study, not a review of the existing; stressed that he can consult with Mr. Gyant about the topics, but Salt River is not the only Tribe that made the request |
| 4/22/22– 4/25/22 | Emails between TNF Tribal Relations Program Manager and Salt River THPO | O'odham | Salt River Pima-Maricopa Indian Community | n/a | Discussed meeting topics and asked Anton if Chris Garrett, SWCA hydrologist, should attend 4/26 meeting to discuss water issues; replied in affirmative |
| 4/26/22 | Meeting of NFS Associate Deputy Chief, TNF Leaders, and Salt River THPO | O'odham | Salt River Pima-Maricopa Indian Community | Telemeeting | Anton provided input on tribal concerns about EIS water analysis deficiencies |
| 4/22/22 to 4/27/22 | Emails between BLM hydrologist and NFS Associate Deputy Chief | n/a | n/a | n/a | BLM review of RCM EIS water analyses will be provided by 5/24/22 |
| 5/02/22 | Emails between Mescalero Councilman Brusuelas and TNF Tribal Relations Program Manager | Apache | Mescalero Apache Tribe | n/a | Requested materials as follow-up to field tour; USFS provided 4/07/22 meeting notes; and summary of 5 mitigation funds discussed in October 2020 |
| 5/04/22 | *Chi' chil* Advisory Board Quarterly Meeting | Apache | San Carlos Apache Tribe White Mountain Apache Tribe Yavapai-Apache Nation | Camp Verde | Update on groves and research; 2 groves added; distributed revised partnership statement |
| 5/27/22 | *Chi' chil* Advisory Board Quarterly Meeting | Apache | White Mountain Apache Tribe Yavapai-Apache Nation | Hondah | Provided project background for WMAT Tribal leaders; updates on groves and research |
| 6/17/22 | Emory Oak Field Trip | Apache | White Mountain Apache Tribe Yavapai-Apache Nation | Cibecue | Examined grove and discussed preparation of a cost proposal to treat 3 groves at Cibecue |

\* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

12-RCMSER-3145

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 6/30/22 | Official letter from NFS Associate Deputy Chief to Tribal Leaders and Staff | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache Tribe<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | n/a | Gyant informed Tribes of his retirement and provided name of contact pending new designee |
| 8/12/22 | Emory Oak Field Trip | Apache | Yavapai-Apache Nation | Payson | Scouted Cherry Creek grove near Camp Verde |
| 8/15/22 | Official letter from San Carlos Chairman to USDA Secretary, USDOI Secretary, Domestic Policy Council Director | Apache | San Carlos Apache Tribe | n/a | Describes impacts of proposed mine and EIS failures (did not include Indigenous Traditional Ecological Knowledge in analyses, devaluation of impacts to Oak Flat, water analyses and impacts, valuation of exchange lands); seeks to include USDOI in consultations on RCM |
| 8/24/22 | Emory Oak picking trip | Apache | Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation | Payson | Scouted for acorns in first grove treated by EOCTRI |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-96

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 8/26/22 | Official letter from TNF Supervisor to Tribal Leaders and Cultural Staff | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache Tribe<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | n/a | Conveyed BLM's 8/13/22 review of hydrology aspects of the RCM EIS; TNF will pursue identified topics; and invited Tribes to pursue further with TNF |
| 8/29/22 | Email from TNF Tribal Relations Program Manager conveying 8/26/22 Official Letter from TNF Supervisor to Tribal Leaders and Cultural Staff | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache Tribe<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | n/a | See 8/26/22 letter |
| 8/30/22 | Email from Pascua Yaqui THPO to TNF Tribal Relations Program Manager | Yoeme | Pascua Yaqui Tribe | n/a | Encourages TNF to re-evaluate water and tailings analyses |

* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 8/30/22 | Email from TNF Tribal Relations Program Manager to Pascua Yaqui THPO | Yoeme | Pascua Yaqui Tribe | n/a | Thanked for comments, and will share with leadership; asked if Pascua Yaqui Tribe wants to meet to discuss further |
| 9/06/22 | Telephone Log of conversation between TNF Tribal Relations Program Manager and Salt River THPO | O'odham | Salt River Pima-Maricopa Indian Community | n/a | Salt River THPO requested copies of the data provided to BLM and any additional water analyses; Richard will direct SWCA to provide to Salt River THPO |
| 9/06/22 | Email from TNF Tribal Relations Program Manager to Salt River THPO | O'odham | Salt River Pima-Maricopa Indian Community | n/a | Provided link to FEIS and supporting documents and suggested Shane reach out to SWCA for any additional supporting documents on water analyses |
| 9/09/22 | Official letter from San Carlos Chairman to USDA Secretary, USDOI Secretary, and Domestic Policy Council Director | Apache | San Carlos Apache Tribe | n/a | Second request to meet to discuss the BLM Analysis of Water Data in the FEIS and additional issues San Carlos feels were inadequately addressed |
| 9/12 and 9/13/22 | Chi' chil Advisory Board Quarterly Meeting | Apache | Tonto Apache Tribe White Mountain Apache Tribe Yavapai-Apache Nation | Flagstaff | Apache Countermap presentation; updates on groves and biological/cultural surveys. EOCTRI panel at Biennial Conference on 9/13/22 |
| 9/13/22 | Official letter from San Carlos Chairman to TNF Supervisor | Apache | San Carlos Apache Tribe | n/a | Requests new EIS by new consultant to address points raised in BLM review of hydrology analyses, as well as other issues such as Skunk Camp tailings alternative |
| 9/13/22 | Email from San Carlos Chairman's Office to TNF Supervisor | Apache | San Carlos Apache Tribe | n/a | Conveyed digital copy of 9/13/22 letter; hard copy in mail |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-98

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|-----|--------------------|----------|---------------------|
| 10/21/22 | Official Decision Memorandum from USDA Under Secretary for Natural Resources and Environment | All Tribes | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache Tribe<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | n/a | Delegating NFS Associate Deputy Chief Troy Heithecker es the USDA Consulting Official for G2G consultation with Tribal Nations regarding RCM |
| 11/28/22 | Official Meeting NFS Associate Deputy Chief, OTR, San Carlos Chairman and Attorney General, and Mapetsi Policy Group | Apache | San Carlos Apache Tribe | Washington, DC | Meeting to discuss San Carlos opposition to Resolution Copper Mine |
| 12/11/22 | Emails between USFS OTR and Mapetsi Policy Group | Apache | San Carlos Apache Tribe | n/a | Mapetsi Policy Group provided transcript of NFS Associate Deputy Chief Gyant's 2/11/22 meeting with San Carlos, as part of follow up from 11/28/22 meeting |
| 12/15/22 | Chi' chil Advisory Board Quarterly Meeting | Apache | Yavapai-Apache Nation | telemeeting | Updates on groves and potential groves; presentation on Kaibeb NF pinyon jay project that may intersect |
| 1/18/23 | Official letter from Ak-Chin Indian Community Chairman to NFS Associate Deputy Chief | O'odham | Ak-Chin Indian Community | n/a | Support the Apache Nation closest to the project in their venture to address their use of Oak Flat sacred site |
| 2/28/23–3/16/23 | Emails between Mapetsi Policy Group and NFS regarding arrangements for visit to San Carlos | Apache | San Carlos Apache Tribe | n/a | Coordinated trip schedule and provided draft agendas for 3/28/23 meeting with Tribal Council and 3/29/29 Oak Flat tour |

* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 3/22/23 | Email from TNF Tribal Relations Program Manager conveying 3/22/23 Official letter from NFS Associate Deputy Chief to Tribal Leaders and Cultural Staff (letter also mailed) | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache Tribe<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | n/a | Heithecker summarized issues raised by Tribes since re-initiation of consultation in September 2021; extended invitation to listening session on 4/25/23 |
| 3/28/23 | Official meeting USDA Under Secretary Wilkes, NFS, and TNF with San Carlos Apache Tribal Council | Apache | San Carlos Apache Tribe | San Carlos, Arizona | Meeting to discuss status of consultation and the revision of the EIS; followed by tour of projects for which the Tribe is seeking federal funding |
| 3/29/23 | Presentations and tour of Oak Flat for USDA Under Secretary Wilkes and NFS staff | Apache | San Carlos Apache Tribe | Oak Flat, Arizona | Presentations by proponents for saving Oak Flat and tour to familiarize Washington staff with the area |
| 3/29/23<br>3/30/23<br>4/01/23<br>4/18/23 | Emails NFS Associate Deputy Chief and San Carlos Chairman | Apache | San Carlos Apache Tribe | n/a | Heithecker thank you for meeting 3/28/23 and tour 3/29/23, and request to continue formal G2G consultation; 3/30 Rambler will reply after discusses with team; 4/1 Heithecker requested meeting transcript and list of San Carlos issues; 4/18 Heithecker follow up to set G2G meeting |
| 4/04/23 | Email from TNF Tribal Relations Program Manager to San Carlos Attorney General | Apache | San Carlos Apache Tribe | n/a | Requested copy of sign-in sheet for Oak Flat Tour on 3/29/23 |
| 4/06/23 | Emails between TNF Tribal Relations Program Manager and San Carlos Attorney General | Apache | San Carlos Apache Tribe | n/a | Adkins response to Ritchie's protest about SWCA involvement in Tribal listening session slated for 4/25/23 |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 4/06/23 | *Chi' chil Advisory Board Quarterly Meeting* | Apache | White Mountain Apache Tribe<br>Yavapai-Apache Nation | telemeeting | Updates on groves, initial analysis of Crackerjack post treatment; prepping for Red Rock groves treatments |
| 4/07/23 | Email from TNF Tribal Relations Program Manager to NFS Associate Deputy Chief | Apache | Regarding San Carlos Apache Tribe | n/a | Suggested Heilhecker reach out to Rambler to confirm listening session will occur on 4/25/23 |
| 4/25/23 | Emails between TNF Tribal Relations Program Manager and San Carlos Attorney General | Apache | San Carlos Apache Tribe | n/a | Asked if anyone from San Carlos would be attending the tribal listening session on 4/25/23 |
| 4/25/23 | USFS Tribal Listening Session | All Tribes (15) invited | Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>White Mountain Apache Tribe | Telemeeting | Discussed issues identified by Tribes and the status of the EIS |
| 5/10/23 | Email from TNF Tribal Relations Program Manager to Tribal Leaders and Cultural Staff | All Tribes (15) | Ak-Chin Indian Community<br>Fort McDowell Yavapai Nation<br>Fort Sill Apache Tribe<br>Gila River Indian Community<br>Hopi Tribe<br>Mescalero Apache Tribe<br>Pascua Yaqui Tribe<br>Pueblo of Zuni<br>Salt River Pima-Maricopa Indian Community<br>San Carlos Apache Tribe<br>Tohono O'odham Nation<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation<br>Yavapai-Prescott Indian Tribe | n/a | Provided transcript and notes for 4/25/23 listening session |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-101

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 6/27/23 | Emory Oak Field Trip | Apache | San Carlos Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation | Camp Verde | Examined Hartwell grove treated with hand-lopping |
| 7/28/23 | Emory Oak scouting trip | Apache | Tonto Apache Tribe<br>Yavapai-Apache Nation | Payson | Searched for acorn at Payson Ranger District, Dude Fire scar, and Crackerjack |
| 8/10/23 | Emory Oak picking trip | Apache | Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation | Payson | Picked acorns at Ranger Station and Rumsey Park in Payson |
| 8/18/23 | Official Letter from San Carlos Apache Chairman to USFS Deputy Chief | Apache | San Carlos Apache Tribe | n/a | Proposes a MOU, a working group, and 6 topics to be discussed by the working group for RCM tribal consultation |
| 8/22/23 | Email from San Carlos Legal Secretary to TNF Supervisor and Tribal Relations Program Manager | Apache | San Carlos Apache Tribe | n/a | Conveyed copy of 8/18/23 letter from Rambler to Heithecker |
| 8/22/23 | Email from TNF Tribal Relations Program Manager to San Carlos Legal Secretary | Apache | San Carlos Apache | n/a | Informed San Carlos that 8/18 and 8/22/23 emails had incorrect email address for Heithecker; Adkins forwarded latter via correct email |
| 9/01/23 | Official Letter from NFS Associate Deputy Chief to San Carlos Chairman | Apache | San Carlos Apache Tribe | n/a | Replied to 8/18/23 letter saying USFS would like to delay September meeting so it can draft MOU for discussion |
| 9/01/23 | Email from San Carlos Chairman to NFS Associate Deputy Chief | Apache | San Carlos Apache Tribe | n/a | Agreed to delay meeting with USFS to discuss draft MOU |
| 9/06/23 | Emails from TNF Tribal Relations Program Manager to Salt River THPO | O'odham | Salt River Pima-Maricopa Indian Community | n/a | Confirmed that water data had been provided to SWCA ethnographer and provided link to the online FEIS update |
| 11/06/23 | Email from NFS Associate Deputy Chief to San Carlos Chairman | Apache | San Carlos Apache Tribe | n/a | Informed Rambler that MOU is nearly ready to share and hopes some dates can be offered to reschedule consultation later in November or December |
| 12/07/23 | Email NFS Associate Deputy Chief to San Carlos Chairman | Apache | San Carlos Apache Tribe | n/a | Provided for discussion with San Carlos, the USFS Draft MOU for G2G consultation on RCM, incorporating issues identified by Tribe |
| 1/16/24 | Email NFS Associate Deputy Chief to San Carlos Chairman | Apache | San Carlos Apache Tribe | n/a | Following up to set meeting date to discuss the draft MOU |

⁺ = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-102

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|--------------------|--------------------|----------------------|----------|----------------------|
| 1/29/24 | *Chi' chil* Advisory Board Quarterly Meeting | Apache | San Carlos Apache Tribe<br>White mountain Apache Tribe<br>Yavapai-Apache Nation | telemeeting | Marked Vincent Randall's passing and Chi' Chil Advisory Board support for continuing project; updates on groves; field and research objectives for 2024 |
| 2/05/24 | Email from San Carlos Attorney General to NFS Associate Deputy Chief | Apache | San Carlos Apache Tribe | n/a | Responding to 1/18/24 email and noting that San Carlos review of draft MOU will be complete mid-February |
| 2/05/24 | Email from TNF Tribal Relations Program Manager to San Carlos Attorney General | Apache | San Carlos Apache Tribe | n/a | Informing Mr. Ritchie that Heilhecker is not available in March, but would be available in April and seeking to set a meeting date |
| 2/12/24 | Email from San Carlos Attorney General to NFS Associate Deputy Chief | Apache | San Carlos Apache Tribe | n/a | Suggesting second or third week of April for meeting; revised draft should be sent to Heilhecker by next week or following week |
| 2/13/24 | Email reply from NFS Associate Deputy to San Carlos Attorney General | Apache | San Carlos Apache Tribe | n/a | Heilhecker available third or fourth week of April |
| 3/04/24 | Emory Oak Field Trip | Apache | Yavapai-Apache Nation | Fossil Creek<br>Needle Rock | Assessed potential post-fire treatments to discuss with Chi' Chil Advisory Board |
| 3/14/24 | Email from TNF Tribal Relations Program Manager to San Carlos Chairman | Apache | San Carlos Apache Tribe | n/a | Follow-up to 2/13/24 email from Heilhecker to Rambler seeking to set meeting date |
| 3/15/24 | Emails between San Carlos Chairman and TNF Tribal Relations Program Manager | Apache | San Carlos Apache Tribe | n/a | Set 5/15/24 mtg in San Carlos Council chambers |
| 3/19/24 | Email from TNF Tribal Relations Program Manager to San Carlos Chairman | Apache | San Carlos Apache Tribe | n/a | Requested San Carlos comments on draft MOU sent 12/7/23 by TNF, prior to meeting |
| 3/19/24 | Telephone Log of conversation between San Carlos Attorney General and TNF Tribal Relations Program Manager | Apache | San Carlos Apache Tribe | n/a | Ritchie spoke with Adkins about the status of the draft MOU |
| 3/27/24 | Telephone Log of conversation between San Carlos Attorney General and TNF Tribal Relations Program Manager | Apache | San Carlos Apache Tribe | n/a | Ritchie concerned he could not provide MOU revisions before April meeting due to lawsuits requiring his attention; Adkins confirmed San Carlos chairman moved meeting to 5/15/24. Ritchie will try to provide MOU comments by 4/02/24 |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-103

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 3/27/24 | Email from TNF Tribal Relations Program Manager to NFS Associate Deputy Chief | Apache | | n/a | Adkins forwarded his telephone log (originally misdated) to Heilhecker and also requested discussion of next steps with 14 other consulting Tribes [misstated date of San Carlos meeting as 4/15/24] |
| 4/15/24 | Email from TNF Tribal Relations Program Manager to NFS Associate Deputy Chief | Apache | | n/a | Adkins relayed telephone conversation with San Carlos Attorney General re: MOU comments coming on 4/17/24 |
| 4/19/24 | Email from TNF Tribal Relations Program Manager to NFS Associate Deputy Chief | Apache | San Carlos Apache Tribe | n/a | Regarding telephone conversation between Richard Adkins, TNF, and Alex Ritchie, San Carlos, re: delivery of comments on MOU today and inquiring about the people being copied on conversations |
| 4/19/24 | Official letter from San Carlos Chairman to NFS Associate Deputy Chief | Apache | San Carlos Apache Tribe | n/e | Letter conveying San Carlos proposed changes to draft MOU; emailed copy with hard copy via US mail |
| 4/22/24 | Email from NFS Associate Deputy Chief to San Carlos Chairman's Office | Apache | San Carlos Apache Tribe | n/a | Email acknowledging receipt of emailed 4/19/24 letter and draft MOU from San Carlos Chairman's office |
| 4/25/24 | *Chi' chil* Advisory Board Quarterly Meeting | Apache | San Carlos Apache Tribe / White Mountain Apache Tribe / Yavapai-Apache Nation | Hon Dah | Memorialized Vincent Randall's passing; updates on groves, research, potential youth activities, and elders guidance on these |
| 5/10/24 | Email from NFS Associate Deputy Chief to San Carlos Chairman's Office | Apache | San Carlos Apache Tribe | n/a | Sent final proposed agenda for 5/15/24 meeting |
| 5/15/24 | Official meeting of NFS Associate Deputy Chief and TNF Leaders with San Carlos Tribal Council | Apache | San Carlos Apache Tribe | San Carlos, Arizona | Discussed EIS and proposed consultation MOU |
| 5/17/24 | Email from NFS Associate Deputy Chief to San Carlos Chairman | Apache | San Carlos Apache Tribe | n/a | Thank you for the meeting and follow up on creating working groups to address, ACHP response letter and consultation MOU |
| 5/17/24 | Email from TNF Tribal Relations Program Manager to San Carlos Attorney General | Apache | San Carlos Apache Tribe | n/a | Requested copy of court reporter's transcript of 5/15/24 meeting at San Carlos |
| 5/20/24 | Email from San Carlos Attorney General to TNF Tribal Relations Program Manager | Apache | San Carlos Apache Tribe | n/a | San Carlos will send transcript upon receipt from court reporter |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-104

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 5/20/24 | Email from San Carlos Attorney General to NFS Associate Deputy Chief | Apache | San Carlos Apache Tribe | n/a | Suggested Fridays for meetings to finalize MOU between USFS and San Carlos |
| 5/20/24 | Email from NFS Associate Deputy Chief to San Carlos Attorney General | Apache | San Carlos Apache Tribe | n/a | Is available any of the next 3 Friday mornings |
| 5/23/24 | Email from TNF Tribal Relations Program Manager to San Carlos Attorney General | Apache | San Carlos Apache Tribe | n/a | Suggested three dates in June for meeting |
| 5/28/24 | Official letter from NFS Associate Deputy Chief to Tribal Leaders | All Tribes (15) Apache O'odham Pueblo Yavapai Yoeme | Ak-Chin Indian Community Fort McDowell Yavapai Nation Fort Sill Apache Tribe Gila River Indian Community Hopi Tribe Mescalero Apache Tribe Pascua Yaqui Tribe Pueblo of Zuni Salt River Pima-Maricopa Indian Community San Carlos Apache Tribe Tohono O'odham Nation Tonto Apache Tribe White Mountain Apache Tribe Yavapai-Apache Nation Yavapai-Prescott Indian Tribe | n/a | Provided review of consultation activities since withdrawal of FEIS and invitation to discuss further, and enclosed his 3/23/23 offer to consult (PR 6026-6042) |
| 5/29/24 | Email from San Carlos Attorney General to TNF Tribal Relations Program Manager | Apache | San Carlos Apache Tribe | n/a | 6/07/24 and Microsoft Teams format is good for the meeting; requested USFS marked-up version of MOU prior to meeting |
| 5/30/24 | Email from TNF Tribal Relations Program Manager to San Carlos Attorney General | Apache | San Carlos Apache Tribe | n/a | Adkins will send Teams invitation and anticipates marked-up version of MOU will be available early next week |
| 6/04/24 | Email from TNF Tribal Relations Program Manager to San Carlos Attorney General | Apache | San Carlos Apache Tribe | n/a | Conveyed USFS's marked up Draft MOU |

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-105

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|------|---------------------|-------------------|----------------------|----------|----------------------|
| 6/04/24 | Email from San Carlos Attorney General to TNF Tribal Relations Program Manager | Apache | San Carlos Apache Tribe | n/a | Asked for V. Grant and V. Nosie to be added to email chain; advised he will not be available for 6/08/24 meeting, but San Carlos Attorney General office attorneys will attend |
| 6/05/24 | Email TNF Tribal Relations Program Manager to San Carlos Attorney General | Apache | San Carlos Apache Tribe | n/a | Acknowledged Ritchie meeting conflict and will add Grant and Nosie to email |
| 6/05/24 | Emails between TNF Tribal Relations Program Manager and San Carlos Attorney General office | Apache | San Carlos Apache Tribe | n/a | Velasquez will attend 6/07/24 MOU discussion for San Carlos Attorney General office |
| 6/05/24 | Email from TNF Tribal Relations Program Manager to San Carlos THPO Office | Apache | San Carlos Apache Tribe | n/a | Provided marked up MOU and will send invite to 6/07/24 meeting |
| 6/06/24 | Email from TNF Tribal Relations Program Manager to San Carlos Chairman and staff | Apache | San Carlos Apache Tribe | n/a | Provided draft agenda for meeting on 6/07/24 |
| 6/07/24 | Official meeting of NFS Associate Deputy Chief and TNF Leaders with San Carlos Tribal Council* | Apache | San Carlos Apache Tribe | n/a | Discussed draft MOU for consultation on the RCM EIS |
| 6/07/24 | Emails between TNF Tribal Relations and San Carlos Attorney General office | Apache | San Carlos Apache Tribe | n/a | Provided transcript, attendance file, and agenda from meeting |
| 7/22/24 | Email from NFS Associate Deputy Chief to San Carlos Chairman | Apache | San Carlos Apache Tribe | n/a | Provided USFS Draft MOU for review by San Carlos and requested meeting date to discuss |
| 7/25/24 | *Chi' chil* Advisory Board Quarterly Meeting | Apache | San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation | Payson | Updates on groves and research; need for Cibecue prescriptions; discussion of problems picking in public places; need to involve youth |
| 7/31/24 | Emory Oak picking trip | Apache | San Carlos Apache Tribe<br>Tonto Apache Tribe<br>White Mountain Apache Tribe<br>Yavapai-Apache Nation | Payson | Collected fallen acorns in Payson Ranger District parking lot; Payson Roundup reporter interviewed elders about importance of acorn; moved to City Park to continue collecting. |
| 8/05/24 | Email from TNF Tribal Relations Program Manager to San Carlos Chairman | Apache | San Carlos Apache Tribe | n/a | Follow up regarding meeting date to discuss draft MOU sent on 7/22/24 |

* = Forest Service line officer present.
Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-106

12-RCMSER-3156

Appendix S

| Date | Type of Interaction | Cultural Group(s) | Tribes Participating | Location | Subject(s) Discussed |
|---|---|---|---|---|---|
| 8/05/24 | Email from San Carlos Attorney General to TNF Tribal Relations Program Manager | Apache | San Carlos Apache Tribe | n/a | MOU received, will review and reply |
| 8/09/24 | *Chi' chil* Advisory Board Quarterly Meeting | Apache | San Carlos Apache Tribe White Mountain Apache Tribe Yavapai-Apache Nation | telemeeting | Elders discussion of proposed treatments for Needle Rock and Fossil Creek groves |
| 10/23 – 10/24/24 | *Chi' chil* Advisory Board Quarterly Meeting | Apache | White Mountain Apache Tribe Yavapai-Apache Nation | Camp Verde | Tour of results of Dry creek hand lopping; Meeting discussed youth director position, additional groves, forest and research updates, recruitment of members |
| 2/18/25 | *Chi' chil* Advisory Board Quarterly Meeting | Apache | Tonto Apache Tribe White Mountain Apache Tribe Yavapai-Apache Nation | Payson | Discussed positive reaction to newspaper article on Apache acorn picking; updates on groves and research; RCM video request; and Youth Director tasks |
| 4/22/25 | Copy of letter dated 04/18/25 from USDA Secretary to ACHP Executive Director | All Tribes (15) | Ak-Chin Indian Community Fort McDowell Yavapai Nation Fort Sill Apache Tribe Gila River Indian Community Hopi Tribe Mescalero Apache Tribe Pascua Yaqui Tribe Pueblo of Zuni Salt River Pima-Maricopa Indian Community San Carlos Apache Tribe Tohono O'odham Nation Tonto Apache Tribe White Mountain Apache Tribe Yavapai-Apache Nation Yavapai-Prescott Indian Tribe | n/a | Conveyed USDA decision to publish the FEIS and draft Record of Decision, and conclude NHPA Section 106 process as of 4/17/25 |

* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

S-107

Appendix S

*This page intentionally left blank.*

\* = Forest Service line officer present.

Note: Shaded cells denote meetings between Tonto National Forest and other agencies that did not involve Tribes, but still involved specific Section 106 or Tribal issues.

12-RCMSER-3158

Appendix S

| Consulting Tribes | Official Name |
| --- | --- |
| Ak-Chin | Ak-Chin Indian Community |
| Fort McDowell | Fort McDowell Yavapai Nation |
| Fort Sill | Fort Sill Apache Tribe |
| Gila River | Gila River Indian Community |
| Hopi | Hopi Tribe |
| Mescalero | Mescalero Apache Tribe |
| Pascua Yaqui | Pascua Yaqui Tribe |
| Salt River | Salt River Pima-Maricopa Indian Community |
| San Carlos | San Carlos Apache Tribe |
| Tohono O'odham | Tohono O'odham Nation |
| Tonto | Tonto Apache Tribe |
| White Mountain | White Mountain Apache Tribe |
| Yavapai-Apache | Yavapai-Apache Nation |
| Yavapai-Prescott | Yavapai-Prescott Indian Tribe |
| Zuni | Pueblo of Zuni |

# Acronyms

| | |
| --- | --- |
| ACHP | Advisory Council on Historic Preservation |
| ALSMA | Apache Leap Special Management Area |
| ASLD | Arizona State Land Department |
| ASM | Arizona State Museum |
| BLM | Bureau of Land Management (a branch of the USDOI) |
| CPO | Cultural Preservation Office |
| CR | cultural resources |
| DEIS | draft environmental impact statement |
| EA | environmental assessment |
| EIS | environmental impact statement |
| EOCTRI | Emory Oak Collaborative Tribal Restoration Initiative |
| FEIS | final environmental impact statement |
| FOIA | Freedom of Information Act |
| FONSI | finding of no significant impact |
| G2G | Government-to-Government |
| GPO | General Plan of Operations |
| HPTP | Historic Properties Treatment Plan |

12-RCMSER-3159

Appendix S

| | |
|---|---|
| HR | House of Representatives |
| IDT | Inter Disciplinary Team |
| MOU | memorandum of understanding |
| mT | magnetotelluric geophysical |
| NAGPRA | Native American Graves Protection and Repatriation Act |
| NDAA | National Defense Authorization Act of 2015 |
| NEPA | National Environmental Policy Act |
| NFF | National Forest Foundation |
| NFS | National Forest System |
| NHPA | National Historic Preservation Act |
| NRHP | National Register of Historic Places |
| OSEC | USDA Office of the Secretary |
| OTR | USDA Office of Tribal Relations |
| PA | Programmatic Agreement |
| POC | point-of-contact |
| RC | Resolution Copper Mining LLC |
| RCM | Resolution Copper Mine |
| S.O. | Forest Supervisor's Office |
| SEIS | supplemental environmental impact statement |
| SHPO | Arizona State Historic Preservation Office |
| SRP | Salt River Project |
| SWCA | SWCA Environmental Consultants |
| TCP | traditional cultural place |
| THPO | Tribal Historic Preservation Office |
| TM | Tribal Monitor |
| TNF | Tonto National Forest |
| USACE | U.S. Army Corps of Engineers |
| USDA | U.S. Department of Agriculture |
| USDOI | U.S. Department of the Interior |
| USFS | U.S. Forest Service (a branch of the USDA) |
| WRI | WestLand Engineering and Environmental Services (formerly WestLand Resources Inc.) |

12-RCMSER-3160

# Appendix T. Proposed Forest Plan Amendment and NFMA Compliance Determination for Preferred Alternative

# Introduction

## *Tonto National Forest Land Management Plan*

The "Tonto National Forest Land Management Plan" (forest plan) was revised and implemented in December 2023 (U.S. Forest Service 2023d) under the 2012 Planning Rule (36 Code of Federal Regulations (CFR) § 219). The forest plan contains over 600 plan components consisting of desired conditions, guidelines, standards, and objectives.

Forest-wide plan direction is broken into 23 major categories, with further sub-categories in some instances (e.g., recreation is a major category that also includes forest-wide direction for developed recreation, dispersed recreation, motorized recreation, non-motorized recreation, water-based recreation, recreational shooting, and wildlife related recreation). The forest plan also includes Management Area Plan Direction for 12 discrete management areas.

The Resolution Copper Project preferred alternative (Alternative 6 – Skunk Camp) proposes a multi-component forest plan amendment that would except the Resolution Copper Project from nine guidelines and seven desired conditions. No standards or objectives would be excepted. Other than the proposed exceptions, no other changes to the forest plan would occur with the proposed amendment.

While the 2025 Resolution Copper Project final environmental impact statement (FEIS) addresses forest plan compliance for all six action alternatives, this appendix (appendix T) focuses only on the preferred alternative.

In appendix (appendix T), the Resolution Copper Project FEIS is cited as follows: citations listed as 2021 Resolution Copper Project FEIS refer to language or sections from the initial FEIS issued in January 2021; citations listed as 2025 Resolution Copper Project FEIS refer to language or sections from the FEIS issued in 2025 of which this appendix (appendix T) is a part; and citations listed as Resolution Copper Project FEIS refer to sections or language that are consistent in both versions of the FEIS (2021 and 2025).

## *Forest Plan Amendment Process and Compliance with 2012 Planning Rule*

This provides an overview of the process used to amend a forest plan for a specific project. It includes a section discussing how the proposed amendment meets the 2012 Planning Rule requirements.

The Forest and Rangeland Renewable Resources Planning Act of 1974, as amended by the National Forest Management Act of 1976 (NFMA), requires national forests to be managed under the land and resource management plan (land management plan or forest plan). The NFMA requires proposed projects, such as the Resolution Copper Project, to be consistent with a land management plan of the national forest where the project occurs (Forest Service Handbook (FSH) 1909.12 (U.S. Forest Service 2015b:chapter 20, section 21.33)). When a proposed project is not consistent with applicable plan components contained within the land management plan,[182] the U.S. Forest Service (Forest Service) has the following options: (1) modify the proposed project to make it consistent with the applicable plan; (2) reject the proposal; (3) amend the plan so that the project would be consistent with the plan as amended; or (4) amend the plan contemporaneously with the approval of the project so the project would be consistent with the plan, as amended. The fourth option may be limited to only the project.

---

[182] Title 36 Code of Federal Regulations (CFR) 219.15(c) (U.S. Forest Service 2023d:22).

---

A review of the Resolution Copper Project FEIS in relation to the December 2023 "Tonto National Forest Land Management Plan" indicated that the preferred alternative, as proposed, cannot adhere to nine forest plan guidelines and seven forest plan desired conditions that are intended to protect soil productivity, scenic resources, national scenic trails, recreation resources, wildlife habitat, and cultural resources.

This appendix (appendix T) describes how the Forest Service proposes to implement the fourth option described above and amend the forest plan contemporaneously with the approval of the project so that the project would be consistent with the plan as amended." The proposed amendment would be limited to apply only to this project.

Land management plans are like municipal zoning plans, which take a geographic area, for example a city or county, and partition it into zones to promote various objectives such as economic development, traffic flow, etc. To achieve those objectives, the zoning plan provides codes that limit or promote certain activities within a zone. In a municipal zoning plan, alterations to zoning codes, often called variances or modifications, are allowed to provide exceptions to a code restriction for a developer or property owner.

Similar to partitioning a city under a municipal zoning plan, a land management plan partitions a national forest into areas called management areas or where specific forest plan components apply. A land management plan defines the intentions through forest-wide guidelines, objectives, standards, and desired conditions. Each resource area or management area has an emphasis that is articulated in desired conditions and objectives, which are achieved through limiting or promoting certain activities through standards and guidelines. The 2012 Planning Rule (36 CFR Part 219) requires the following plan components: desired conditions, objectives, standards, guidelines, and suitability of lands. Like a municipal zoning plan, a land management plan allows for variances or modifications through the plan amendment process. "Project specific amendments give a way to deal with exceptions. An exception is similar to a variance to a county zoning ordinance" (77 Federal Register (FR) 21239).

Land management plan revisions are comprehensive changes to a plan, whereas plan amendments are more limited changes to a plan to accommodate specific projects and/or activities, or to adapt to changing conditions. In December 2016, the U.S. Department of Agriculture issued a final rule that amended the 2012 Planning Rule and clarified the U.S. Department of Agriculture's direction for amending land management plans. The 2016 final rule stated, "No individual amendment is required to do the work of a revision" (81 FR 90725). "The process requirements for plan amendments . . . are simpler than those for new plan development or plan revisions in order to . . . keep plans current and adapt to new information or changed conditions" (77 FR 21237).

A plan amendment is the adding, removing, or modification of one or more plan components or the changing of how or where one or more plan components apply to the plan area (36 CFR § 219.12(a)). As stated above, plan components include desired conditions, objectives, standards, guidelines, and suitability of uses. There are two types of plan amendments: programmatic amendments and project-specific amendments. Programmatic amendments are performed independently of any specific project or activity, although they may have been prompted by a specific proposal that is not consistent with a land management plan. Programmatic amendments result in a permanent change to the land management plan and apply to all future projects. On the other hand, project-specific amendments are applicable to only a single project, amending the land management plan solely for the life of the project or activity. A project-specific amendment is crafted in conjunction with a project proposal and is approved within a project's decision document.

"The point of a project-specific amendment is to allow a project that would otherwise not be consistent with the plan to be authorized" (77 FR 21239). The Forest Service is proposing a project-specific amendment with multiple components for the Resolution Copper Project.

12-RCMSER-3164

Appendix T

Plan amendments are guided by Federal regulations at 36 CFR § 219 (NFMA implementing regulations, 2012 Planning Rule, or Planning Rule). The plan amendment process consists of three primary steps:

- Determine which plan components must be modified to allow the project to be consistent with the amended plan (36 CFR § 219.13(a)).

- Determine which of the substantive requirement(s) within §§ 219.8 through 219.11 are directly related to the proposed amendment based on the purpose for and the effects of the amendment (36 CFR § 219.13(b)(5)).

- Apply[183] those directly related substantive requirements to the amended plan within the scope and scale of the proposed amendment (36 CFR § 219.13(b)(5)).

## Scope and Scale of the Amendment

The 2012 Planning Rule gives the responsible official the discretion, within the framework of the rule's requirements, to tailor the scope and scale of an amendment to reflect the need to change the plan (81 FR 90725). The 2012 Planning Rule, at 36 CFR § 219.13(a), states, "A plan may be amended at any time. Plan amendments may be broad or narrow, depending on the need for change, and should be used to keep plans current and help units adapt to new information or changing conditions. The responsible official has the discretion to determine whether and how to amend the plan and to determine the scope and scale of any amendment. Except as provided by paragraph (c) of this section, a plan amendment is required to add, modify, or remove one or more plan components, or to change how or where one or more plan components apply to all or part of the plan area (including management areas or geographic areas)." Title 36 CFR § 219.13(b)(1) states, "When a plan amendment is made together with, and only applies to, a project or activity decision, the analysis prepared for the project or activity may serve as the documentation for the preliminary identification of the need to change the plan."

Title 36 CFR § 219.13(b)(5) states:

> [d]etermine which specific substantive requirement(s) within §219.8 through §219.11 are directly related to the plan direction being added, modified, or removed by the amendment and apply such requirement(s) within the scope and scale of the amendment.
>
> (ii) When basing the determination on adverse effects:
>
>> (A) The responsible official must determine that a specific substantive requirement is directly related to the amendment when scoping or NEPA effects analysis for the proposed amendment reveals substantial adverse effects associated with that requirement, or when the proposed amendment would substantially lessen protections for a specific resource or use.

The scope of an amendment is generally considered to be the extent of the changes to the land management plan. The scope of this proposed project-specific amendment is the exception of nine forest plan guidelines and seven forest plan desired conditions for the Resolution Copper Project for the duration of the project.

The scale of a project-specific amendment is generally considered to be the extent of the direct impacts to a resource related to a substantive requirement and varies for each resource. For example, for the Resolution Copper Project preferred alternative, the scope of the amendment differs by resource, but at its greatest extent represents about 2,500 acres of National Forest System (NFS) land on the Tonto National Forest that will be disturbed by the preferred alternative. This is composed of 2,458 acres of mine

---

[183] The 2012 Planning Rule regulations do not explicitly state what is intended by "apply." The FR notice from December 16, 2016, demonstrates that "apply" can mean determine that the plan needs additional components in order to provide for the identified directly related substantive requirement.

infrastructure and 44 acres of NFS land where recreation mitigation is required, for a total of 2,502 acres. This area is referred to as the "preferred alternative area of disturbance." This is the area in which construction of electrical transmission lines, pipelines, and associated infrastructure would be located.

## Applying the Directly Related Substantive Requirements

In December 2016, the U.S. Department of Agriculture issued a final rule that amended the 2012 Planning Rule (81 FR 90723) clarifying that the responsible official is not required to apply every substantive requirement (36 CFR §§ 219.8 through 219.11) to every acre of land within the planning unit. The December 2016 final rule amending the 2012 Planning Rule clarifies that any evaluation of effects of amending the plan needs to remain focused on the amendment itself—its purpose, scope, and scale. "No individual amendment is required to do the work of a revision. While the 2012 rule sets forth a series of substantive requirements for management plans within §§219.8 through 219.11, not every section or requirement within those sections will be directly related to the scope and scale of a given amendment. Although the Department recognizes that resources and uses are connected, the Department does not expect an individual plan amendment to do the work of a revision to bring an underlying plan into compliance with all the substantive requirements identified in §§219.8 through 219.11" (81 FR 90725).

Appropriate application of the directly related substantive requirements, within the scope and scale of the amendment, makes certain that the amended land management plan has the components necessary to ensure that meeting those requirements within the plan area will not be compromised by any single project. If a directly related substantive requirement is not meeting the Planning Rule intent through existing land management plan direction due to the amendment, then additional plan components need to be included as part of the amendment in order to satisfy the substantive requirement in question.

This understanding further supports that the purpose of the amendment is not to ensure compliance of the entire land management plan with all the substantive requirements of the 2012 Planning Rule, but rather to apply only those substantive requirements that are directly related to the amendment and the area affected by the amendment.

## Purpose of the Amendment

The NFMA requires proposed projects, including proposals from non-Federal entities subject to permits, to be consistent with the applicable forest plan (16 United States Code § 1604(i)). The December 2023 "Tonto National Forest Revised Land Management Plan" (forest plan) states on page 22, "All projects and activities authorized by the Forest Service must be consistent with the land management plan (16 USC 1604(i) and 36 CFR 219.15(b-c))."

As mentioned, the Resolution Copper Project preferred alternative, as proposed, cannot adhere to nine forest plan guidelines and seven forest plan desired conditions. Therefore, the purpose of the proposed amendment is to except specific plan desired conditions and guidelines to allow the project to be consistent with the forest plan. All other desired conditions, objectives, standards, and guidelines would remain unexcepted and applicable to all other activities across the planning unit (Tonto National Forest), including the preferred alternative. The Resolution Copper Project preferred alternative would be excepted from the desired conditions and guidelines, but they would continue to apply to the remainder of the planning unit.

# Step 1: Determine the Plan Components to Be Excepted

After reviewing the forest plan, the responsible official determined the Resolution Copper Project preferred alternative, as proposed, would be inconsistent with nine guidelines and seven desired conditions in the forest plan. The Forest Service proposes a project-specific amendment to except the

Appendix T

Resolution Copper Project from the nine guidelines and seven desired conditions to meet the requirement that the Resolution Copper Project be consistent with the forest plan. The proposed amendment would except the Resolution Copper Project from complying with the nine guidelines and seven desired conditions, which would apply to 2,502 acres of NFS land that would be disturbed by the preferred alternative (preferred alternative area of disturbance).

The following desired conditions and guidelines are proposed to be excepted. They are presented in the order in which they appear in the 2023 forest plan. The Resolution Copper Project preferred alternative would be excepted from each of these desired conditions and guidelines.

- **Recreation Guideline 10 (REC-G-10) - All project-level decisions, implementation activities, and management activities should be consistent with or move the area toward the appropriate recreation opportunity spectrum (ROS), or current protocol over the long term (forest plan, p. 31).** The pipeline, electrical transmission line, and associated infrastructure that would be authorized with the preferred alternative would not meet current ROS criteria.

- **Wildlife Related Recreation Guideline 03 (REC-WR-G-03) - Wildlife connectivity for economically important and other species should be maintained and/or enhanced (forest plan, p. 44).** The analysis of wildlife connectivity concludes there would be a loss of long-term movement habitat along pipeline corridors with the preferred alternative, therefore wildlife connectivity would not be maintained or enhanced.

- **Cultural and Historic Resources Desired Condition 01 (CUH-DC-01) - Historic properties, including traditional cultural properties, retain all of the characteristics that qualify the property for listing in the National Register of Historic Places and convey its historical significance, including any aspects of the property's integrity (e.g., location, design, setting, materials, workmanship, feeling, or association) that have been identified as supporting its eligibility (forest plan p. 55).** Although the preferred alternative includes mitigation measures designed to avoid, minimize, rectify, reduce, or compensate for resource impacts, impacts to historic properties cannot be avoided or fully mitigated. It is not feasible to retain all characteristics that qualify impacted properties for listing.

- **Cultural and Historic Resources Desired Condition 02 (CUH-DC-02) - Historic properties are not threatened by human disturbances (forest plan, p. 55).** The pipeline, electrical transmission, lines and associated infrastructure constructed and operated with the preferred alternative would impact historic properties.

- **Cultural and Historic Resources Desired Condition 07 (CUH-DC-07) - Cultural resources (including artifacts) are preserved in place (forest plan, p. 55).** The preferred alternative would disturb cultural resources, including artifacts, and data recovery and curation would be conducted on these sites.

- **Scenery Desired Condition 03 (SC-DC-03) - High quality scenery dominates the landscape in areas valued by the public (e.g., state designated scenic routes, major roads, developed recreation sites, wilderness, national scenic trails, and wild and scenic rivers) (forest plan, p. 67).** Infrastructure constructed with the preferred alternative would not meet criteria for existing Scenic Integrity Objectives (SIOs) and would degrade views from U.S. Route (U.S.) 60, a State designated scenic route.

- **Scenery Guideline 01 (SC-G-01) - Management activities and newly constructed features (e.g., facilities and infrastructure) should minimize visual disturbances and be consistent with or move the area towards achieving scenic integrity objectives (as defined in the Scenery Management System, or similar protocol) (forest plan, p. 67).** Infrastructure

12-RCMSER-3167

constructed with the preferred alternative, including transmission lines and pipelines, would not be consistent with or move the area toward achieving SIOs.

- **Scenery Guideline 03 (SC-G-03) - Management activities that result in short-term impacts inconsistent with the scenic integrity objectives, as defined in the scenery management system or similar protocol, should achieve, or move the project towards, the scenic integrity objectives over the long-term (forest plan, p. 67).** It is not currently known whether the electrical transmission line constructed with the preferred alternative would remain in place after reclamation has occurred. Therefore, the preferred alternative may not achieve or move toward achieving SIOs in the long term.

- **Fish, Wildlife and Plants Guideline 06 (WFP-G-06) - Landscape and vegetation alterations that significantly contribute to uncharacteristic habitat fragmentation should be avoided. Project design should provide for movement and dispersal of species between treated and untreated areas (forest plan, p. 142).** The analysis of wildlife connectivity concludes that there would be a loss of long-term movement habitat along pipeline corridors by the preferred alternative; therefore, dispersal and movement of species would be adversely affected.

- **Fish, Wildlife and Plants Guideline 07 (WFP-G-07) - New infrastructure or constructed features (e.g., fences, roads, recreation sites, facilities, drinkers, and culverts) should be designed and maintained to minimize negative impacts to the movement and dispersal of wildlife, fish, and rare plants. Infrastructure and constructed features already present that negatively impact movement and dispersal should be modified or removed when no longer in use in order to improve connectivity. Barriers may be used to protect native species or prevent movement of nonnative species (forest plan, p. 142).** The analysis of wildlife connectivity concludes that there would be a loss of long-term movement habitat along pipeline corridors with the preferred alternative; therefore, dispersal and movement of wildlife would be adversely affected.

- **Soils Guideline 02 (SL-G-02) - Where biological soil crusts exist, ground disturbing activities should identify areas for protection and minimize disturbance (forest plan, p. 147).** The preferred alternative would disturb and impact soils on NFS land. Biological crust soils (referred to as biotic soils and desert pavement in the FEIS) are present in some of these areas and cannot be completely avoided.

- **National Trails Management Area Desired Condition 03 (NTMA-DC-03) - Visitor access, use, and management activities are consistent with the recreational, scenic, ecological, cultural, traditional, wildlife resources, and the nature and purpose for which the trail is designated (forest plan, p. 182).** New pipelines constructed within the Magma Arizona Railroad Company (MARRCO) corridor[184] would cross the Arizona National Scenic Trail. Any new development intersecting the Arizona National Scenic Trail corridor would interfere with the nature and purpose of the Arizona National Scenic Trail.

- **National Trails Management Area Desired Condition 06 (NTMA-DC-06) - The Arizona National Scenic Trail and corridor are well-defined and provide high-quality, primitive hiking, mountain biking, equestrian opportunities, and other compatible nonmotorized trail activities. The significant scenic, natural, historic, and cultural resources within the trail's corridor are conserved. The trail provides visitors with expansive views of the natural-appearing landscapes (forest plan, p. 182).** New pipelines constructed within the MARRCO corridor would cross the Arizona National Scenic Trail. The preferred alternative would not meet

---

[184] The MARRCO corridor is an existing utility corridor containing Arizona Water Company facilities, water lines, a Qwest fiber-optic line, an El Paso Natural Gas pipeline, a power line, and a telephone line in its right-of-way. The preferred alternative would construct additional pipelines and an access road within this existing corridor.

the criteria to provide visitors with expansive views of a naturally appearing landscape along all segments of the Arizona National Scenic Trail, or conserve scenic resources within the Trail corridor.

- **National Trails Management Area Desired Condition 07 (NTMA-DC-07) - Scenery viewed from the Arizona National Scenic Trail is consistent with high or very high scenic integrity objectives. The foreground of the trail is natural-appearing (forest plan, p. 182).** New pipelines constructed within the MARRCO corridor would cross the Arizona National Scenic Trail. The preferred alternative would not be consistent with or move the area toward high or very high SIOs.

- **National Trails Management Area Guideline 01 (NTMA-G-01) - National trails should be consistent with management direction in the trail establishment reports as well as the maintenance standards for trail class and use (forest plan, p. 182).** New pipelines and access road constructed within the MARRCO corridor would cross the Arizona National Scenic Trail. Any new development intersecting the Arizona National Scenic Trail corridor would interfere with the nature and purposes of the Arizona National Scenic Trail.

- **National Trails Management Area Guideline 08 (NTMA-G-08) - If management activities result in short-term impacts to the scenic character of the Arizona National Scenic Trail, design elements should be included (e.g., screening, feathering, and other scenery management techniques) at the project level (forest plan, p. 183).** The preferred alternative would result in impacts to the scenic character of the Arizona National Scenic Trail that cannot be fully mitigated through design elements.

# Step 2: Determine Directly Related Substantive Requirements

The purpose of Step 2 is to identify which 2012 Planning Rule substantive requirement(s) within 36 CFR §§ 219.8 through 219.11 are directly related to the amendment. Whether a substantive requirement is directly related to an amendment is determined by either the purpose or effects—beneficial or adverse—of the amendment (36 CFR § 219.13(b)(5)(i)). When basing the determination on adverse effects, a substantive requirement is directly related if the adverse effects are substantial or when the amendment would substantially lessen plan protections of a specific resource (36 CFR § 219.13(b)(5)(ii)(A)). Therefore, a substantive requirement is directly related to an amendment through one of the following: the amendment, or a substantial lessening of plan protections by the amendment (36 CFR § 219.13(b)(5)).

The scope of this proposed project-specific amendment is defined as the nine guidelines and seven desired conditions that would not be met if the Resolution Copper Project preferred alternative were implemented and the exception of the Resolution Copper Project from those nine guidelines and seven desired conditions. The scale for the proposed project-specific amendment varies by resource as described in Step 3.

The determination of the directly related substantive requirements is organized by resource group.

## Soil Productivity

One forest plan guideline associated with soil productivity is proposed to be excepted in this amendment (SL-G-02). This one guideline cannot be met using standard industry construction methods like those proposed with the Resolution Copper Project.

- SL-G-02 requires that areas of biological crust soil be protected and disturbance minimized. Biological crust soils exist within the 2,502 acres of disturbance that will occur with this project, and disturbance cannot be fully avoided.

Appendix T

It is not practical to modify the Resolution Copper Project construction methods in a manner that would achieve consistency with this one guideline. Therefore, the Forest Service proposes to except this one guideline for the Resolution Copper Project.

**Purpose** - The purpose of excepting guideline SL-G-02 is to allow the Resolution Copper Project to exceed one of 12 forest-wide guidelines for soil protection.[185] The exception of this guideline is directly related to § 219.8(a)(2)(ii) – soils and soil productivity.

**Effects** - The effect of the exception of the one guideline includes minor adverse effects of vegetation removal, erosion and sedimentation, soil compaction, runoff potential, soil fertility, revegetation potential, and soil carbon budget (2021 Resolution Copper FEIS,[186] p. 238). The reduction of soil protection measures constitutes an adverse impact, but effects are not expected to be substantial. The greatest impact to soils would be during the construction period.

Guideline SL-G-02 is focused on maintaining soil productivity. The FEIS analysis of impacts on soil productivity concludes that the preferred alternative would impact soils through compaction, erosion, excavation, etc. However, the analysis of impacts along the pipeline and power line corridor, where all activities authorized by this alternative would occur, states, "Soil loss from construction and operations in the pipeline and power line corridor is expected to be minimal after compliance with applicant-committed environmental protection measures (SWPPPs and erosion and sediment controls), and post-closure after reclamation when the surface has stabilized from revegetation" (FEIS, section 3.3.4.7).

The effects noted would occur on 2,500 acres or less of NFS land (less than 0.09 percent of the total NFS land on the Tonto National Forest[187]); therefore, the one guideline would not hinder the Forest Service's ability to implement the forest plan to maintain or restore soils.

Required mitigation measures designed to minimize soil effects include (2021 Resolution Copper Project FEIS, section 3.3.4.9):

- **Revised reclamation and closure plans (FS-SV-03).** Implementing the reclamation and closure plans ensures that the post-closure landscape is successfully revegetated to the extent practicable and that the landforms are stable and safe. This measure is effective at partially replacing habitat and vegetation over the long term, reducing long-term effects on surface water quality from erosion.

- **Design feature:** Two different tailings corridor options were considered for the preferred alternative (north and south). The south corridor was eliminated from consideration due to impacts along Arnett Creek that otherwise would remain undisturbed and had greater surface disturbance. The north pipeline corridor was further revised to include the co-location of the

---

[185] The 2023 forest plan components associated with soil protection consist of the following: Desired Conditions – REC-DIS-DC-04, REC-DIS-MO-DC-03, GRZ-DC-03, FP-DC-05, RD-DC-04, FC-DC-02, ERU-DC-13, ERU-DES-DC-05, ERU-DES-DC-09, ERU-IC-DC-07, ERU-PPE-PG-DC-08, ERU-PPE-SS-DC-04, ERU-PPF-DC-05, ERU-MCD-DC-05, ERU-MCW-DC-06, ERU-MCW-DC-14, RERU-DC-06, RERU-DC-07, RERU-DC-11, RERU-DC-14, ERU-MEWMPO-DC-05, WAT-DC-04, WAT-DC-05, WAT-DC-07, RMZ-DC-02, RMZ-DC-05, SL-DC-01, SL-DC-02, SL-DC-03, SL-DC-04, SL-DC-05, SL-DC-06, RNBAMA-DC-03, SWBMA-DC-02, SRHMA-DC-03; Guidelines - REC-G-03, REC-DIS-G-02, ERU-G-02, ERU-G-04, ERU-SDG-G-01, RMZ-G-03, INS-G-07, SL-G-01, SL-G-02, SL-G-03, SL-G-04, LRMA-G-04; Standards – FP-S-01, FP-S-06, WAT-S-01; and Objectives – WAT-O-03.

[186] The Resolution Copper Project FEIS is cited as follows: citations listed as 2021 Resolution Copper Project FEIS refer to language or sections from the initial FEIS issued in January 2021; citations listed as 2025 Resolution Copper Project FEIS refer to language or sections from the FEIS issued in 2025 of which this appendix (appendix T) is a part; and citations listed as Resolution Copper Project FEIS refer to sections or language that are consistent in both versions of the FEIS (2021 and 2025).

[187] The Tonto National Forest totals 2,965,716 acres (U.S. Forest Service 2023b:1).

12-RCMSER-3170

power line and pipeline within the same corridors. In addition, several aspects were changed to reduce impacts to sensitive drainages, including a span over Devil's Canyon and Queen Creek Canyon and directional drilling to avoid trenching through Mineral Creek. Overall, this reroute measurably reduced surface disturbance.

Environmental protection measures that are incorporated into the design of the project would act to reduce potential impacts on soils. The non-discretionary applicant-committed environmental protection measures related to soils include the following (Resolution Copper FEIS, section 3.3.4.2):

- Road embankment slopes will be graded and stabilized with vegetation or rock as practicable to prevent erosion;

- During construction and operations, diversions will be constructed around the affected areas to minimize erosion. A number of best management practices, including check dams, dispersion terraces, and filter fences, also will be used during construction and operations;

- Off-road vehicle travel across Tonto National Forest will generally be avoided;

- Newly reclaimed areas on Tonto National Forest will be monitored for weeds and invasive plants for the first 5 years after reclamation. Infestations of invasive species will be treated as soon as they are identified, or as soon as weather conditions are appropriate for treatment; and

- On NFS lands, seed mixes used in reclamation will be certified free of seeds listed on the Forest Service's noxious weed list and will contain only species native to the project area. Seed mixes will be developed from a native species seed list approved by the Forest Service.

Most impacts would occur during the construction phase of project, which would be considered minor and temporary adverse effects when considered on a forest-wide basis. Although impacts on soils and vegetation could take hundreds of years to fully recover, these impacts would affect less than 0.09 percent of the plan area (Tonto National Forest).

Because there would be no substantial environmental effects from the proposed exception of the one guideline, the proposed amendment is not directly related to any substantive requirements based on adverse or beneficial effects.

Guideline SL-G-02 would continue to apply to that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the preferred alternative. The one excepted guideline would only apply to the 2,502 acres of NFS land where construction of electric transmission lines, pipelines, and associated infrastructure would disturb soils and vegetation, which would not constitute a substantial lessening of plan protections. Therefore, the proposed amendment is not directly related to any substantive requirement based on substantial lessening of plan protections.

The 2023 forest plan contains the following soil protection components: 35 desired conditions, 12 guidelines, three standards, and one objective. This amendment would except the Resolution Copper Project from one guideline. The remaining 35 desired conditions, 11 guidelines, three standards, and one objective would remain applicable to the entire Tonto National Forest, including the Resolution Copper Project preferred alternative area of disturbance. The one excepted guideline would continue to apply to that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the preferred alternative.

In conclusion, the proposed exception of the one guideline related to soils (SL-G-02) is directly related to substantive requirement and § 219.8(a)(2)(ii) – soils and soil productivity. These two substantive requirements are directly related to the proposed amendment through the purpose of the amendment. None of the substantive requirements are directly related through beneficial effects, substantial adverse effects, or substantial lessening of plan protections.

## Scenic Resources—Scenic Integrity Objectives

A number of forest plan desired conditions and guidelines require all new projects to meet or move toward meeting specific scenery conditions. Three forest plan desired conditions and three forest plan guidelines associated with scenic resources are proposed to be excepted in this amendment (SC-DC-03, SC-G-01, SC-G-03, NTMA-DC-06, NTMA-DC-07, and NTMA-G-08).

- SC-DC-03 requires that high quality scenery dominates the landscape in areas valued by the public, including state designated scenic routes and national scenic trails. The facilities constructed under the Resolution Copper Project preferred alternative would be visible from U.S. 60, a State designated scenic route. SIOs would also be reduced along segments of the Arizona National Scenic Trail.

- SC-G-01 requires that management activities and newly constructed features minimize visual disturbance and be consistent with or move the area toward achieving SIOs. Under the Resolution Copper Project preferred alternative, electric transmission lines, pipelines, and associated infrastructure would be constructed that would not be consistent with or move the area toward achieving SIOs.

- SC-G-03 requires that management activities that result in short-term impacts inconsistent with the SIOs achieve, or move the project toward, the SIOs over the long term. It is not currently known whether the electrical transmission line constructed with the preferred alternative would remain in place after reclamation has occurred. Therefore, the preferred alternative may not achieve or move toward achieving SIOs in the long-term.

- NTMA-DC-06 requires that the Arizona National Scenic Trail provide visitors with expansive views of the natural appearing landscape. Under the Resolution Copper Project preferred alternative, electric transmission lines, pipelines, and associated infrastructure would be constructed that would be visible from some trail segments and would not be compatible with a natural appearing landscape.

- NTMA-DC-07 requires that scenery viewed from the Arizona National Scenic Trail be consistent with high or very high SIOs and that the foreground of the trail be natural appearing. The preferred alternative would lower existing SIOs, and segments of the trail would not be consistent with high or very high SIOs. Pipelines and associated infrastructure would also cross the Arizona National Scenic Trail in the MARRCO corridor, and the foreground of the trail would not be natural appearing.

- NTMA-G-08 requires that management activities that result in short-term impacts to scenic conditions include design elements to mitigate the impacts. As stated above, feasible measures to mitigate adverse impacts on scenic conditions have not been identified.

The Resolution Copper Project preferred alternative would occur in areas with high and moderate existing SIOs. Scenery analysis in the Resolution Copper Project FEIS concludes that the facilities constructed under the preferred alternative would not meet high and moderate SIOs. High SIO areas should appear unaltered to the casual observer, whereas moderate SIO areas may appear slightly altered but should borrow from elements of form, line, color, texture, and scale found in the characteristic landscape. The clearing of the transmission/pipeline corridor would highlight the linear nature of the pipelines and electric transmission lines and would not be consistent with the natural form, lines, and scales in the adjacent landscape. This alteration of the landscape would be obvious to the casual observer. It is not practical to modify the Resolution Copper Project construction methods and achieve consistency with high and moderate SIOs due to the linear nature of pipelines and the need to remove the vegetation along the corridor, which creates an unnatural form on the landscape. Therefore, the Forest Service proposes to

except the Resolution Copper Project from SC-DC-03, SC-G-01, SC-G-03, NTMA-DC-06, NTMA-DC-07, and NTMA-G-08.

**Purpose** - The purpose of excepting desired conditions SC-DC-03, NTMA-DC-06, and NTMA-DC-07 and guidelines SC-G-01, SC-G-03, and NTMA-G-08 is to allow the Resolution Copper Project to exceed three of the 12 forest-wide desired conditions for scenery; and three of the 17 forest-wide guidelines for scenery.[188] Therefore, due to the purpose of the amendment, the exception of these desired conditions and guidelines is directly related to § 219.10(b)(1)(i) – sustainable recreation, including recreation setting, opportunities, access; and scenic character.

**Effects** - The effect of the exception of desired conditions SC-DC-03, NTMA-DC-06, and NTMA-DC-07 and guidelines SC-G-01, SC-G-03, and NTMA-G-08 would be a reduction in SIOs inconsistent with these forest plan components. Although this is an adverse impact to scenery, it is not a substantial adverse impact due to the limited extent to the scenery resource of the project on the Tonto National Forest and the implementation of mitigation measures.

Implementation of the Resolution Copper Project preferred alternative would reduce 516 acres of high SIO to the low category; and reduce 345 acres of moderate SIO to the low category (2025 Resolution Copper Project FEIS, table 3.11.4-2). These numbers include impacts to scenic resources in the Arizona National Scenic Trail corridor, which would reduce 20 acres of high SIO to low SIO (2025 Resolution Copper Project FEIS, table 3.11.4-3). There is a total of 1,706,521 acres of high SIO on the Tonto National Forest (see table 64, Alternative B, in the FEIS for the 2023 forest plan (U.S. Forest Service 2023b)). A reduction of 516 acres constitutes a change to 0.03 percent of the amount of high SIO across the forest. There is a total of 597,020 acres of moderate SIO on the Tonto National Forest (see table 64, Alternative B, in the FEIS for the 2023 forest plan (U.S. Forest Service 2023b)). A reduction of 345 acres constitutes a change to 0.06 percent of the amount of moderate SIO across the forest.

Required mitigation measures to reduce impacts on scenic resources include the following (Resolution Copper Project FEIS, section 3.11.4.9):

- **Revised reclamation and closure plans (FS-SV-03).** This measure would have long-term beneficial effects on scenic resources, reducing the contrast with the natural landscape.

- **GDEs and water well mitigation (FS-WR-01).** This measure would be effective at preserving riparian vegetation and aquatic habitats, which are of scenic value.

- **Clean Water Act Section 404 compensatory mitigation plan (FS-WR-02).** This measure would be effective at replacing xeroriparian habitat lost within the project footprint. Overall, these would be beneficial to scenic resources, though not necessarily in the vicinity of the impact area.

- **Replacement of water in Queen Creek (FS-WR-04).** This measure would be effective at minimizing impacts to scenic resources along this riparian corridor.

- **Minimize visual impacts from transmission lines (FS-SR-01).** Resolution Copper would use best management practices or other guidelines (when on NFS lands) that would minimize visual impacts from transmission lines. Measures could include using non-specular transmission lines, transformers, and towers; avoiding use of monopole transmission structures; avoiding "skylining"

---

[188] December 2023 forest plan components associated with scenic resources consist of the following: Desired Conditions – REC-DEV-DC-05, SC-DC-01, SC-DC-02, SC-DC-03, SC-DC-04, SC-DC-05, MMAM-DC-01, IRAMA-DC-04, NTMA-DC-03, NTMA-DC-06, NTMA-DC-07, NTMA-DC-10; Guidelines – REC-G-02, REC-G-03, REC-DIS-NMO-G-04, SU-G-07, EG-G-02, EG-G-06, TRB-G-04, SC-G-01, SC-G-02, SC-G-03, FC-G-04, RWMA-G-10, IRAMA-G-02, NTMA-G-02, NTMA-G-06, NTMA-G-08, NTMA-G-012; and Standards – FP-S-07.

12-RCMSER-3173

Appendix T

transmission and communication towers and other structures (i.e., considering topography when siting transmission structures to avoid "skylining" structures on high ridges in the landscape); and using air transport capability to mobilize equipment and materials for clearing, grading, and erecting transmission towers in areas with the highest visual sensitivity with difficult access. These measures would be effective at reducing and minimize the scenery impacts and project contrast of mining operations in the surrounding landscape and impacts on sensitive viewers.

Environmental protection measures are incorporated into the design of the project that would act to reduce potential impacts on scenic resources. The non-discretionary applicant-committed environmental protection measures related to scenic resources include the following (Resolution Copper FEIS, section 3.11.4.2):

- Implement an outdoor lighting plan that would reduce potential impacts from artificial night lighting;

- Reduce illumination levels where appropriate while still providing safe working conditions;

- Adhere to the Pinal County Outdoor Lighting Code;

- Use control systems that can turn off lights at particular times of night or that are activated by detecting motion while still providing safe working conditions;

- Use non-reflective earth-tone paints on buildings and structures to the extent practicable;

- Bury pipelines to the extent practicable;

- Build rust-colored towers or use wooden poles on transmission lines;

- Use a reclamation seed mix of weed-free native species consistent with surrounding vegetation; and

- Use colors that blend in with the desert environment.

Excepting desired conditions SC-DC-03, NTMA-DC-06, and NTMA-DC-07 and guidelines SC-G-01, SC-G-03, and NTMA-G-08 through the proposed amendment would not cause a substantial lessening of plan protections.

These excepted desired conditions and guidelines would continue to apply across the forest. The Resolution Copper Project preferred alternative would affect only 516 acres of 1,706,521 acres of high SIO forest-wide and 345 acres 597,020 of moderate SIO forest-wide. Because excepting the Resolution Copper Project from desired conditions SC-DC-03, NTMA-DC-06, and NTMA-DC-07 and guidelines SC-G-01, SC-G-03, and NTMA-G-08 would not constitute a substantial lessening of plan protections, in part due to the implementation of required mitigation, the proposed excepted desired conditions and guidelines are not directly related to any substantive requirements based on substantial lessening of plan protections.

The 2023 forest plan contains the following scenery protection components: 12 desired conditions, 17 guidelines, and one standard. This amendment would except three desired conditions and three guidelines. The remaining nine desired conditions, 14 guidelines, and one standard would remain applicable to the entire Tonto National Forest, including the Resolution Copper Project preferred alternative area of disturbance. The three excepted desired conditions and three excepted guidelines would continue to apply to that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the preferred alternative.

In conclusion, the proposed exception of desired conditions SC-DC-03, NTMA-DC-06, and NTMA-DC-07 and guidelines SC-G-01, SC-G-03, and NTMA-G-08 is directly related to substantive requirement

12-RCMSER-3174

§ 219.10(b)(1)(i) – sustainable recreation, including recreation setting, opportunities, access; and scenic character. This substantive requirement is only directly related to the proposed amendment through the purpose of the amendment. None of the substantive requirements are directly related through beneficial effects, substantial adverse effects, or substantial lessening of plan protections.

## National Scenic Trails

The direction in the forest plan considered here applies to the National Scenic Trails Management Area and not to the entire forest. Specifically, the area addressed here is the Arizona National Scenic Trail corridor on the Tonto National Forest.[189]

The 2023 forest plan contains a number of desired conditions and guidelines that focus on protection of user experience on the Arizona National Scenic Trail. Several of those desired conditions and guidelines are addressed under the Scenic Resources—Scenic Integrity Objectives section earlier in this document. The Resolution Copper Project preferred alternative would not be consistent with two other Arizona National Scenic Trail components: desired condition NTMA-DC-03 and guideline NTMA-G-01.

- NTMA-DC-03 requires visitor access, use, and management activities to be consistent with the recreational, scenic, ecological, traditional, and wildlife resources and the nature of and purpose for which the trail is designated. The preferred alternative would construct pipelines and an access road across the Arizona National Scenic Trail within the MARRCO corridor. Any new development intersecting the Arizona National Scenic Trail corridor would interfere with the nature and purpose of the Arizona National Scenic Trail (2021 Resolution Copper Project FEIS, p. 626).

- NTMA-G-01 requires national trails to be consistent with management direction in the trail establishment report. As previously stated, the preferred alternative would construct pipelines and an access road across the Arizona National Scenic Trail within the MARRCO corridor. Any new development intersecting the Arizona National Scenic Trail corridor would interfere with the nature and purpose of the Arizona National Scenic Trail (2021 Resolution Copper Project FEIS, p. 626).

The proposed amendment of desired condition NTMA-DC-03 and guideline NTMA-G-01 would allow for pipelines and an access road to cross the Arizona National Scenic Trail within the MARRCO corridor, a location where other major effects already exist.

**Purpose** - The purpose of excepting desired condition NTMA-DC-03 and guideline NTMA-G-01 is to allow the Resolution Copper Project to exceed one out of 10 forest plan desired conditions for the Arizona National Scenic Trail corridor and exceed one out of 13 forest plan guidelines for the Arizona National Scenic Trail corridor. Therefore, the exception of desired condition NTMA-DC-03 and guideline NTMA-G-01 is directly related by the purpose of the amendment to § 219.10(a)(3) – appropriate placement and sustainable management of infrastructure, such as recreational facilities and transportation and utility corridors, and to § 219.10(b)(1)(i) – sustainable recreation.

**Effects** - The effect of the exception of the desired condition NTMA-DC-03 and guideline NTMA-G-01 would be the allowance of a new pipeline and access road to cross the Arizona National Scenic Trail at a location where major effects already exist. As disclosed in the following paragraph, although this is an adverse impact to Arizona National Scenic Trail, it is not a substantial adverse impact because effects would primarily be limited to the construction period.

---

[189] The Arizona National Scenic Trail corridor is defined as approximately 0.5 mile from the centerline of the trail (U.S. Forest Service 2023d:181).

12-RCMSER-3175

The Resolution Copper Project preferred alternative would construct pipelines and an associated access road within the MARRCO corridor. The pipelines would move concentrate to the filter plant near the train and move recovered water and newly pumped water from the Desert Wellfield back to the West Plant Site. The pipelines and access road would cross Passage 18 of the Arizona National Scenic Trail in the MARRCO corridor. Any new development intersecting the Arizona National Scenic Trail corridor would interfere with the nature and purpose of the Arizona National Scenic Trail. There would be short-term impacts on trail users during construction activities when disturbance precludes use for safety reasons (e.g., active grading, transport of heavy equipment, active construction).

The scale of the Arizona National Scenic Trail component of the project-specific amendment encompasses the immediate location in the MARRCO Corridor where the pipeline and access road cross the Arizona National Scenic Trail. New pipelines constructed within the MARRCO corridor would cross Passage 18 of the Arizona National Scenic Trail (2021 Resolution Copper Project FEIS, p. 626.). In the Passage 18 segment, 0.07 mile of the proposed tailings pipeline corridor would intersect the Arizona National Scenic Trail. The Arizona National Scenic Trail corridor extends 0.5 mile on either side of the Arizona National Scenic Trail; the proposed tailings pipeline corridor would affect approximately 45 acres of the Arizona National Scenic Trail corridor (2021 Resolution Copper Project FEIS, p. 630).

As stated above, the Arizona National Scenic Trail corridor is defined as approximately 0.5 mile from the centerline of the trail. The Tonto National Forest manages about 200 miles of the Arizona National Scenic Trail (forest plan, p. 181). The Arizona National Scenic Trail corridor totals about 128,000 acres,[190] and the area impacted by the Resolution Copper Project preferred alternative would be less than 0.04 percent of the Arizona National Scenic Trail corridor. The area impacted by Resolution Copper Project is a minor portion of the Arizona National Scenic Trail on the Tonto National Forest.

Disruption to Arizona National Scenic Trail users would occur during the activity, and when conditions are safe for hikers, cyclists, and equestrian users, the disruption would cease. Contractors would provide necessary detours or signage for Arizona National Scenic Trail user awareness during these activities. Existing disturbances in this area include a railroad corridor, trailhead parking, and Hewitt Station Road.

Required mitigation measures to reduce impacts on the Arizona National Scenic Trail include the following (Resolution Copper Project FEIS, section 3.11.4.9):

- **New mitigation aspects of revised road use plan (FS-TA-01).** Implementing the revised road use plan would help reduce the conflicts with existing traffic and recreational road users that would occur during construction and operations. New mitigation measures incorporated in response to disclosed impacts include additional mitigation that would be effective at reducing the impacts of road and pipeline crossings, especially with the Arizona National Scenic Trail.

Environmental protection measures are incorporated into the design of the project that would act to reduce potential impacts on the Arizona National Scenic Trail. The non-discretionary applicant-committed environmental protection measures related to national scenic trails include the following (Resolution Copper Project FEIS, section 3.9.4.2):

- Developing a concentrate pipeline corridor management plan to reestablish crossing on the Arizona National Scenic Trail after construction.

As stated above, the area of impact is a small fraction of the Arizona National Scenic Trail on the Tonto National Forest. Mitigation measures would further reduce impacts. Therefore, no substantive requirements are directly related due to beneficial effects or substantial adverse effects.

---

[190] 200 miles long × 1 mile wide = 200 square miles × 640 acres per square mile.

12-RCMSER-3176

Excepting desired condition NTMA-DC-03 and guideline NTMA-G-01 would not cause a substantial lessening of plan protections. Desired condition NTMA-DC-03 and guideline NTMA-G-01 would continue to apply to the remaining 199+ miles of the Arizona National Scenic Trail corridor on the Tonto National Forest, and nine other desired conditions and 12 other guidelines focused on protecting user experience on the Arizona National Scenic Trail would be unaffected by the proposed amendment. Because allowing the pipeline to go over the Arizona National Scenic Trail would not constitute a substantial lessening of plan protections, the proposed amendment is not directly related to any substantive requirement based on substantial lessening of plan protections.

The forest plan contains the following National Scenic Trail protection components: 10 desired conditions, 13 guidelines, and three standards. This amendment would except one desired condition and one guideline. The remaining nine desired conditions, 12 guidelines, and three standards would remain applicable to the entire Tonto National Forest, including the Resolution Copper Project preferred alternative area of disturbance. The one excepted desired condition and one excepted guideline would continue to apply to that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the preferred alternative.

In conclusion, the proposed exception of desired condition NTMA-DC-03 and guideline NTMA-G-01 is directly related to substantive requirements § 219.10(a)(3) – appropriate placement and sustainable management of infrastructure, such as recreational facilities and transportation and utility corridors, and to § 219.10(b)(1)(i) – sustainable recreation, including recreation setting, opportunities, access; and scenic character. These two substantive requirements are only directly related to the proposed amendment through the purpose of the amendment. None of the substantive requirements are directly related through beneficial effects, substantial adverse effects, or substantial lessening of plan protections.

## *Recreation Resources—Recreation Opportunity Spectrum*

The Resolution Copper Project preferred alternative would not be consistent with one guideline related to the ROS: REC-G-10.

- REC-G-10 requires all decisions and activities to be consistent with or move the area toward the appropriate ROS. The preferred alternative would reduce nonmotorized ROS to motorized ROS in some areas; therefore, it is not consistent with this guideline.

**Purpose** - The purpose of excepting guideline REC-G-10 is to allow the Resolution Copper Project to exceed one out of 52 forest plan guidelines for recreation.[191] The exception of guideline REC-G-10 is

---

[191] December 2023 forest plan components associated with recreation and ROS consist of the following: Desired Conditions – PV-DC-01, PV-DC-02, REC-DC-01, REC-DC-02, REC-DC-03, REC-DC-04, REC-DC-05, REC-DC-06, REC-DC-07, REC-DC-08, REC-DC-09, REC-DC-10, REC-DEV-DC-01, REC-DEV-DC-02, REC-DEV-DC-03, REC-DEV-DC-04, REC-DEV-DC-05, REC-DIS-DC-01, REC-DIS-DC-02, REC-DIS-DC-04, REC-DIS-DC-05, REC-DIS-DC-06, REC-DIS-MO-DC-01, REC-DIS-MO-DC-02, REC-DIS-MO-DC-03, REC-DIS-MO-DC-04, REC-DIS-MO-DC-05, REC-DIS-NMO-DC-01, REC-DIS-NMO-DC-02, REC-DIS-NMO-DC-03, REC-DIS-NMO-DC-04, REC-DIS-WB-DC-01, REC-DIS-WB-DC-02, REC-DIS-WB-DC-03, REC-DIS-WB-DC-04, REC-DIS-RS-DC-01, REC-DIS-RS-DC-02, REC-DIS-RS-DC-03, REC-DIS-RS-DC-04, REC-DIS-RS-DC-05, REC-WR-DC-01, REC-WR-DC-02, REC-WR-DC-03, SC-DC-03, SC-DC-04, RD-DC-03, FC-DC-07, FC-DC-08, LA-DC-02, FF-DC-01, WAT-DC-01, WAT-DC-08, AQ-DC-01, DWMA-DC-01, DWMA-DC-02, DWMA-DC-03, DWMA-DC-04, DWMA-DC-05, DWMA-DC-06, DWMA-DC-07, DWMA-DC-08, DWMA-DC-09, DWMA-DC-10, DWMA-DC-11, RWMA-DC-02, RWMA-DC-03, RWMA-DC-05, RWMA-DC-06, RWMA-DC-07, IRAMA-DC-04, NTMA-DC-01, NTMA-DC-02, NTMA-DC-03, NTMA-DC-06, NTMA-DC-10, LRMA-DC-01, LRMA-DC-02, LRMA-DC-04, LRMA-DC-05; Guidelines - REC-G-01, REC-G-02, REC-G-03, REC-G-04, REC-G-05, REC-G-06, REC-G-07, REC-G-08, REC-G-09, REC-G-10, REC-DEV-G-01, REC-DIS-G-01, REC-DIS-G-02, REC-DIS-G-03, REC-DIS-G-04, REC-DIS-MO-G-01, REC-DIS-MO-G-02, REC-DIS-MO-G-03, REC-DIS-MO-G-04, REC-DIS-NMO-G-01, REC-DIS-NMO-G-02, REC-DIS-NMO-G-03, REC-DIS-NMO-G-04, REC-DIS-NMO-G-05, REC-DIS-NMO-G-06, REC-DIS-WB-G-01, REC-DIS-RS-G-01, REC-DIS-RS-G-02, REC-WR-G-01, REC-WR-G-02, REC-WR-G-03, RD-G-01, RD-G-02, INS-G-05, AQ-G-01, DWMA-G-10, RWMA-G-09, EWSRMA-G-03, IRAMA-G-01, NTMA-G-01, NTMA-G-02, NTMA-G-03, NTMA-G-04, NTMA-G-06, NTMA-G-08, NTMA-G-10, NTMA-G-11, NTMA-G-13, LRMA-G-03, ALSMA-G-02; Standards – REC-S-01, REC-DEV-S-01, REC-DEV-S-02, REC-DIS-S-01, REC-DIS-MO-S-01, REC-DIS-MO-S-02, REC-DIS-MO-S-03, REC-DIS-RS-S-01, FP-S-01, FP-S-06, DWMA-S-01, DWMA-S-02, NTMA-S-01, NTMA-S-02, NTMA-S-03; and Objectives – REC-O-01, REC-O-02, REC-O-03, REC-O-04, REC-O-05, REC-O-06, REC-DEV-O-01, REC-DIS-RS-O-01, WAT-O-05.

---

directly related by the purpose of the amendment to § 219.10(b)(1)(i) – sustainable recreation, including recreation setting, opportunities, access; and scenic character.

**Effects -** The effect of the exception of the guideline REC-G-10 would be to allow construction, operation, and maintenance of new pipelines, electrical transmission lines, and associated infrastructure that would result in a reduction of 166 acres from semiprimitive nonmotorized ROS to semiprimitive motorized ROS (2025 Resolution Copper Project FEIS, table 3.9.4-2). Implementation of the Resolution Copper Project preferred alternative would reduce the amount of semiprimitive nonmotorized ROS on the forest from 715,024[192] acres to 714,858 acres, a reduction of 0.02 percent forest-wide. Semiprimitive motorized recreation would increase from 1,072,671 acres to 1,072,837 acres, an increase of less than 0.02 percent forest-wide. Although this has an adverse impact on nonmotorized recreation, it is not a substantial adverse impact due to the relatively small amount of effects across the Tonto National Forest.

Required mitigation measures to reduce impacts on recreation resources include the following (Resolution Copper Project FEIS, section 3.9.4.9):

- **Revised reclamation and closure plans (FS-SV-03).** Implementing reclamation and closure plans ensures that the post-closure landscape is successfully revegetated to the extent practicable. Eventually these areas could be reopened to recreational activities.

- **New mitigation aspects of revised road use plan (FS-TA-01).** Implementing the revised road use plan would help reduce the conflicts with existing traffic and recreational road users that would occur during construction and operations. This mitigation would be effective at reducing impacts of road and pipeline crossings.

- **GDEs and water well mitigation (FS-WR-01).** This measure would be effective at preserving riparian vegetation and aquatic habitats, which are of importance to recreational users of the Tonto National Forest.

- **Clean Water Act Section 404 compensatory mitigation plan (FS-WR-02).** The Queen Creek parcel would likely be effective at improving recreational opportunities in the immediate vicinity of Superior, when considered in combination with implementing the Tonto National Forest multi-use trail plan (FS-RC-03) and replacement of water in Queen Creek (FS-WR-04).

- **Replacement of water in Queen Creek (FS-WR-04).** This measure would be effective at minimizing impacts to recreational users and birdwatchers drawn to riparian habitat in this area.

- **Access to Oak Flat campground (FS-RC-02).** Maintaining access to Oak Flat campground, to the extent practicable with respect to safety, would be effective at reducing impacts caused by the loss of the Oak Flat area to subsidence.

- **Mitigation for adverse impacts to recreational trails (forest multi-use trail plan) (FS-RC-03).** This plan would replace over 20 miles of motorized routes and nonmotorized trail on the Tonto National Forest around Superior. It would be effective at expanding the motorized and nonmotorized travel routes and recreational opportunities.

Environmental protection measures are incorporated into the design of the project that would act to reduce potential impacts on recreation. The non-discretionary applicant-committed environmental protection measures related to recreation include the following (Resolution Copper FEIS, section 3.9.4.2):

- Developing traditional and sport climbing open to the public on Resolution Copper property outside the mining footprint through agreement with Queen Creek Coalition.

---

[192] See table 15 in the FEIS for the 2023 forest plan (U.S. Forest Service 2023b) for total acres by ROS on the forest.

Appendix T

The amount of reduction in semiprimitive ROS is a small fraction of the available semiprimitive ROS on the Tonto National Forest (0.02 percent). Mitigation measures and design features would further reduce impacts to recreation. Therefore, no substantive requirements are directly related due to beneficial effects or substantial adverse effects.

Excepting guideline REC-G-10 would not cause a substantial lessening of plan protections. Guideline REC-G-10 would continue to apply to the remaining 714,858 acres of semiprimitive nonmotorized ROS and 1,072,837 acres of semiprimitive motorized ROS on the Tonto National Forest.

The minor scale of the change in ROS would not constitute a substantial lessening of plan protections. The proposed amendment is not directly related to any substantive requirement based on substantial lessening of plan protections.

The 2023 forest plan contains the following components focused on managing and providing recreation opportunities: 80 desired conditions; 52 guidelines; 15 standards; and nine objectives. This amendment would except one guideline. The remaining 51 guidelines, 80 desired conditions, 15 standards, and nine objectives would remain applicable to the entire Tonto National Forest, including the Resolution Copper Project preferred alternative area of disturbance. The one excepted guideline would continue to apply to that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the preferred alternative.

In conclusion, the proposed exception of guideline REC-G-10 is directly related to substantive requirements § 219.10(b)(1)(i) – sustainable recreation, including recreation setting, opportunities, access; and scenic character. This substantive requirement is only directly related to the proposed amendment through the purpose of the amendment. None of the substantive requirements are directly related through beneficial effects, substantial adverse effects, or substantial lessening of plan protections.

## Wildlife Habitat—Connectivity and Movement

The forest plan contains guidelines that focus on maintenance of habitat connectivity and wildlife movement. The Resolution Copper Project preferred alternative would not be consistent with three habitat connectivity and wildlife movement guidelines: REC-WR-G-03, WFP-G-06, and WFP-G-07.

- REC-WR-G-03 requires that wildlife connectivity for economically important and other species be maintained or enhanced. The reduction in movement habitat with the preferred alternative would not maintain or enhance wildlife connectivity.

- WFP-G-06 requires that landscape and vegetation alterations that significantly contribute to uncharacteristic habitat fragmentation be avoided and that project design provide for movement and dispersal of species. The preferred alternative would not provide for movement and dispersal of species.

- WFP-G-07 requires that new infrastructure or constructed features be designed and maintained to minimize negative impacts to movement and dispersal of wildlife. Impacts to wildlife movement and dispersal would not be maintained or minimized with the preferred alternative.

**Purpose** - The purpose of excepting guidelines REC-WR-G-03, WFP-G-06, and WFP-G-07 is to allow Resolution Copper Project to exceed three out of seven forest plan guidelines related to wildlife movement and habitat connectivity.[193] Therefore, the exception of guidelines REC-WR-G-03, WFP-G-06, and WFP-G-07 is directly related by the purpose of the amendment to §219.8(a)(1)(i) – ecosystem

---

[193] December 2023 forest plan components associated with wildlife habitat—connectivity and movement consist of the following: Desired Conditions – FP-DC-01, FP-DC-05, MMAM-DC-01, LA-DC-01, DWMA-DC-02, RWMA-DC-02, SRHMA-DC-03, WAT-DC-08, RMZ-DC-07, ERU-DC-11 and WFP-DC-05; Guidelines – MMAM-G-06, LA-G-01(c), REC-WR-G-03, RD-G-04, WFP-G-06, WFP-G-07, and REC-WR-G-03; and Standard – FP-S-07.

12-RCMSER-3179

integrity, interdependence of terrestrial and aquatic ecosystems in the plan area; and to §219.9(a)(2)(i) – ecosystem diversity, key characteristics associated with terrestrial and aquatic ecosystem types.

**Effects -** The effect of excepting guidelines REC-WR-G-03, WFP-G-06, and WFP-G-07 would be to allow construction, operation, and maintenance of new pipelines, electrical transmission lines, and associated infrastructure that would result in 1,417 acres of habitat disturbance in the tailings corridor, transmission line corridor, and access roads (2025 Resolution Copper Project FEIS, table 3.8.4-1). This would result in a loss of long-term movement habitat along pipeline corridors since vegetation would be expected to eventually reestablish in the disturbed areas but would be unlikely to return to preconstruction conditions (2021 Resolution Copper Project FEIS, p. 581). The total acres of intact habitat connectivity on the Tonto National Forest is not known. However, the 1,417 acres of habitat connectivity that would be affected by the Resolution Copper Project preferred alternative is a minor component of the habitat available across the 2,965,716 acres of the Tonto National Forest. Potential impacts to biodiversity would likely be limited to impacts at the local level for most species and would not be significant at the population level (2021 Resolution Copper Project FEIS, p. 581).

Excepting guidelines REC-WR-G-03, WFP-G-06, and WFP-G-07 would not cause a substantial lessening of plan protections. Guideline REC-WR-G-03, WFP-G-06, and WFP-G-07 would continue to apply to that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the preferred alternative.

Required mitigation measures to reduce impacts on wildlife habitat include the following (Resolution Copper Project FEIS, section 3.8.4.4):

- **Revised reclamation and closure plans (FS-SV-03).** This measure would be effective at partially replacing habitat and vegetation for wildlife over the long term.

- **GDEs and water well mitigation (FS-WR-01).** This measure would be effective at preserving riparian vegetation and aquatic habitats available for wildlife.

- **Replacement of water in Queen Creek (FS-WR-04).** This measure would be highly effective at minimizing impacts to surface water quantity and riparian habitat, which would prevent impacts to wildlife using this habitat.

- **New mitigation aspects of revised wildlife management plan (FS-WI-01).** Adherence to the revised wildlife management plan would reduce effects on habitat and to individuals of species.

- **Maintain or replace access to stock tanks and AGFD wildlife waters (FS-WI-04).** This measure would ensure that these water sources are available for wildlife, preventing additional impacts to species from disruption of available water.

Environmental protection measures are incorporated into the design of the project that would act to reduce potential impacts on wildlife habitat. The non-discretionary applicant-committed environmental protection measures related to wildlife habitat include the following (Resolution Copper FEIS, section 3.8.4.2):

- In order to minimize the potential risk for bird collisions with transmission lines, the lines and structures would be designed in accordance with "Reducing Avian Collision with Power Lines" (Avian Power Line Interaction Committee 2012).

- Resolution Copper prepared a noxious weed and invasive species management plan for NFS lands (Resolution Copper 2019). Resolution Copper further agreed to prepare reports 2 years after construction begins and every 5 years during operations.

Appendix T

- Developing a site-specific wildlife mitigation plan in coordination with the AGFD, FWS, and Forest Service biologists to address construction-related actions. Intent is to avoid, minimize, and mitigate impacts on special status species.

- Ensuring that all ground-disturbing activities associated with pipeline and power line work near Mineral Creek and Gila chub designated critical habitat are performed outside the ordinary high-water mark and designated critical habitat.

- Using trenchless/non-surface impact methods (such as horizontal drilling or micro-tunneling) in areas where project facilities intersect Mineral Creek to avoid surface disturbance within the ordinary high-water mark and designated critical habitat.

- Clearly defining the perimeter of the construction footprint with flagging or other appropriate markers to restrict heavy equipment use and other surface-disturbing activities to areas within the construction footprint. The biological monitor will be present at all times during construction and will help ensure that construction activities and equipment remain within designated limits.

- Conducting annual yellow-billed cuckoo surveys in Devil's Canyon and Mineral Creek immediately upstream and downstream of disturbance areas and crossings. Annual surveys will begin 2 years prior to surface-disturbing activities. Surveys will continue until pipeline construction has been completed, including reclamation of temporary construction disturbance.

- In areas where surveys have detected the presence of yellow-billed cuckoo, avoiding vegetation clearing and ground-disturbing activities associated with pipeline construction within 500 feet of the ordinary high-water mark of Mineral Creek from May 1 through September 30, to remain outside the breeding season.

- Avoiding when possible large trees (greater than 12 inches in diameter), including Fremont cottonwood (*Populus fremontii*) and willow species (*Salix* spp.), as well as dense stands of vegetation.

- Cutting riparian trees to ground level when they are removed. When possible, root masses will be left intact to help stabilize soils and provide opportunities for regrowth through adventitious shoots (e.g., in the case of willows).

The minor scale of the change in wildlife habitat connectivity would not constitute a substantial lessening of plan protections. The proposed amendment is not directly related to any substantive requirement based on substantial lessening of plan protections.

The forest plan contains the following habitat connectivity wildlife movement protection components: 11 desired conditions, seven guidelines, and one standard. This amendment would except three guidelines. The remaining 11 desired conditions, four guidelines, and one standard would remain applicable to the entire Tonto National Forest, including the Resolution Copper Project preferred alternative area of disturbance. The three excepted guidelines would continue to apply to that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the preferred alternative.

In conclusion, the proposed exception of guidelines REC-WR-G-03, WFP-G-06, and WFP-G-07 is directly related to substantive requirements §219.8(a)(1)(i) – ecosystem integrity, interdependence of terrestrial and aquatic ecosystems in the plan area; and to §219.9(a)(2)(i) – ecosystem diversity, key characteristics associated with terrestrial and aquatic ecosystem types. These substantive requirements are only directly related to the proposed amendment through the purpose of the amendment. None of the substantive requirements are directly related through beneficial effects, substantial adverse effects, or substantial lessening of plan protections.

12-RCMSER-3181

## *Cultural Resources*

Three forest plan desired conditions associated with protection of cultural resources are proposed to be excepted in this amendment: CUH-DC-01, CUH-DC-02, and CUH-DC-07. These three desired conditions cannot be met using standard industry construction methods like those proposed with the Resolution Copper Project.

- CUH-DC-01 requires that historic properties retain all of the characteristics that qualify the property for listing in the National Register of Historic Places (NRHP). Impacts to historic properties cannot be avoided or fully mitigated, and it is not feasible to retain all the characteristics that qualify impacted properties for listing.

- CUH-DC-02 requires that historic properties not be threatened by human disturbance. As previously stated, it is not feasible to avoid all impacts to historic properties.

- CUH-DC-07 requires that cultural resources, including artifacts, be preserved in place. Ground disturbance associated with the Resolution Copper Project preferred alternative would disturb hundreds of archaeological sites. Mitigation would include data recovery and curation of artifacts.

It is not practical to modify the Resolution Copper Project location or construction methods in a manner that would achieve consistency with these three desired conditions. Therefore, the Forest Service proposes to except the Resolution Copper Project from these three desired conditions.

**Purpose** - The purpose of excepting desired conditions CUH-DC-01, CUH-DC-02, and CUH-DC-07 is to allow the Resolution Copper Project to exceed three of the 18 forest-wide desired conditions for cultural resource protection.[194] The modification of these desired conditions are directly related to § 219.8(a)(b) – social and economic sustainability – cultural and historic resources and uses; to § 219.10(a)(1) – integrated resource management for multiple use – cultural and heritage resources; and to § 219.10(b)(1)(ii) – protection of cultural and historic resources.

**Effects** - The effect of the exception of desired conditions CUH-DC-01, CUH-DC-02, and CUH-DC-07 includes minor adverse effects on historic and archaeological resources. The reduction in cultural resource protection measures constitutes an adverse impact, but effects are not expected to be substantial. The greatest impacts to cultural resources would be during the construction period.

The cultural resources analysis in the Resolution Copper Project FEIS lists hundreds of historic and archaeological sites likely to be directly by the preferred alternative (2021 Resolution Copper Project FEIS, pp. 785-786). However, that analysis includes areas where the forest plan does not apply, such as private land and land administered by the State of Arizona and Bureau of Land Management. The Forest Service decision to implement the Resolution Copper Project preferred alternative would not authorize any activities on land that are not administered by the Forest Service. A review of impacted sites by landownership concludes that eight of these sites are located on NFS land associated with the preferred alternative area of disturbance (Newell 2018a). While it is not possible to know the total number of cultural resource sites on the Tonto National Forest, eight cultural sites represents a small amount of the number of sites on the forest.

---

[194] December 2023 forest plan components associated with cultural resources consist of the following: Desired Conditions – CUH-DC-01, CUH-DC-02, CUH-DC-03, CUH-DC-04, CUH-DC-05, CUH-DC-06, CUH-DC-07, CUH-DC-08, TRB-DC-01, TRB-DC-02, TRB-DC-03, TRB-DC-04, TRB-DC-05, LA-DC-01, REC-DIS-RS-DC-04, NTMA-DC-06, ALSMA-DC-01, CVK-DC-01; Guidelines – SU-G-04, EG-G-04, EG-G-06(b), CUH-G-01, CUH-G-02, CUH-G-03, CUH-G-04, CUH-G-05, TRB-G-01, TRB-G-02, TRB-G-03, TRB-G-04, TRB-G-05, MMAM-G-06, LA-G-01(e), FF-G-03, FF-G-04, CVK-G-03, ALSMA-G-01; and Standards – CUH-S-01, CUH-S-02, TRB-S-01, TRB-S-02, TRB-S-03, TRB-S-04, FF-S-04, SU-S-01.

Any direct ground disturbance runs the risk of disturbing cultural resources. Implementation of the Resolution Copper Project preferred alternative would result in construction, use, and maintenance of electrical transmission lines, pipelines, and associated infrastructure that would disturb 2,502 acres of NFS lands and not affect that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the preferred alternative. This is a minor amount of impact when considered on a forest-wide basis.

The direct effects noted would occur on 2,502 acres or less of NFS land (less than 0.09 percent of the total NFS land on the Tonto National Forest); the three excepted desired conditions would not hinder the Forest Service's ability to implement the forest plan to protect cultural resources across that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the preferred alternative.

Required mitigation measures designed to minimize impacts on cultural resources include the following (Resolution Copper Project FEIS, section 3.12.4.9):

- **Implementation of Oak Flat HPTP (FS-CR-01).** The Oak Flat historic properties treatment plan (HPTP) sets out a plan for treatments to resolve the adverse effects on 42 historic properties that have been identified within the Oak Flat Federal Parcel.

- **GPO research design (FS-CR-02).** The GPO research design and data recovery plans will detail treatments to resolve adverse effects on historic properties within the GPO project area, with the exception of those in the Oak Flat Federal Parcel. Data recovery would be conducted on archaeological sites eligible for the NRHP under Criterion D within the GPO project area. Project materials and archaeological collections would be curated in accordance with 36 CFR 79 (Curation of Federally-Owned and Administered Archaeological Collections) with the Gila River Indian Community, Salt River Pima-Maricopa Indian Community, and Arizona State Museum.

- **Visual, atmospheric, auditory, socioeconomic, and cumulative effects mitigation plan (FS-CR 03).** The Forest Service will ensure that additional mitigation plan(s) are prepared after the publication of the FEIS that describe mitigation measures to address effects on historic properties.

- **Design criteria:** Two different tailings corridor options were considered for the preferred alternative (north and south), and the south corridor was eliminated from consideration due to impacts along Arnett Creek that otherwise would remain undisturbed and had greater surface disturbance. The north pipeline corridor was further revised based in part on public comments. Key changes include the co-location of the power line and pipeline within the same corridors, moving the corridor away from paralleling perennial reaches of lower Mineral Creek, and relocating it around Government Springs Ranch.

Environmental protection measures are incorporated into the design of the project that would act to reduce potential impacts on cultural resources. Specifically, Resolution Copper has committed to following the Section 106 process for the resolution of adverse effects on historic properties and will design the footprint of the project to avoid resources to the maximum extent possible (Resolution Copper FEIS, section 3.12.4.2).

Most impacts would occur during the construction phase of project, which would be considered minor adverse effects when considered on a forest-wide basis. These impacts would affect only eight cultural resource sites located on less than 0.09 percent of the forest plan area (Tonto National Forest).

Because there would be no substantial environmental effects from the proposed exception of these desired conditions and guidelines, the proposed amendment is not directly related to any substantive requirements based on adverse or beneficial effects.

Desired conditions CUH-DC-01, CUH-DC-02, and CUH-DC-07 would continue to apply to that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the preferred alternative. The

12-RCMSER-3183

Appendix T

excepted three desired conditions would only apply to the 2,502 acres of NFS land where construction of electric transmission lines, pipelines, and associated infrastructure would occur and would not constitute a substantial lessening of plan protections. Therefore, the proposed amendment is not directly related to any substantive requirement based on substantial lessening of plan protections.

The forest plan contains the following cultural resource protection components: 18 desired conditions, 19 guidelines, and eight standards. This amendment would except three desired conditions. The remaining 15 desired conditions, 19 guidelines, and eight standards would remain applicable to the entire Tonto National Forest, including the Resolution Copper Project preferred alternative area of disturbance. The three excepted desired conditions would continue to apply to that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the preferred alternative.

In conclusion, the proposed exception of the three desired conditions related to cultural resource areas (CUH-DC-01, CUH-DC-02, and CUH-DC-07) are directly related to substantive requirements § 219.8(a)(b) – social and economic sustainability – cultural and historic resources and uses; § 219.10(a)(1) – integrated resource management for multiple use – cultural and heritage resources; and § 219.10(b)(1)(ii) – protection of cultural and historic resources. These substantive requirements are directly related to the proposed amendment through the purpose of the amendment. None of the substantive requirements are directly related through beneficial effects, substantial adverse effects, or substantial lessening of plan protections.

## Directly Related Substantive Requirements

Based on the criteria and analyses described above, the substantive requirements that are directly related include:

- § 219.8(a)(2)(ii) – Soils and soil productivity due to the exception of guideline SL-G-02.

- § 219.10(b)(1)(i) – Sustainable recreation due to the exception of desired conditions SC-DC-03, NTMA-DC-06, and NTMA-DC-07 and guidelines SC-G-01, SC-G-03, NTMA-G-01, and NTMA-G-08 (Scenic Integrity Objectives); desired condition NTMA-DC-03 and guideline NTMA-G-01 (Arizona National Scenic Trail); and guideline REC-G-10 (Recreational Opportunity Spectrum).

- § 219.8(a)(1)(i) – Ecosystem integrity, interdependence of terrestrial and aquatic ecosystems in the plan area due to exception of guidelines REC-WR-G-03, WFP-G-06, and WFP-G-07.

- § 219.9(a)(2)(i) – ecosystem diversity, key characteristics associated with terrestrial and aquatic ecosystem types due to exception of guidelines REC-WR-G-03, WFP-G-06, and WFP-G-07.

- § 219.8(a)(b) – social and economic sustainability – cultural and historic resources and uses due to the exception of desired conditions CUH-DC-01, CUH-DC-02, and CUH-DC-07.

- § 219.10(a)(1) – Integrated resource management for multiple use – cultural and heritage resources due to the exception of desired conditions CUH-DC-01, CUH-DC-02, and CUH-DC-07.

- § 219.10(a)(3) – Appropriate placement and sustainable management of infrastructure, such as recreational facilities and transportation and utility corridors, due to the exception of desired conditions and guidelines NTMA-DC-03 and NTMA-G-01.

- § 219.10(b)(1)(ii) – protection of cultural and historic resources due to the exception of desired conditions CUH-DC-01, CUH-DC-02, and CUH-DC-07.

# Step 3: Apply the Directly Related Substantive Requirement

The purpose of Step 3 is to take the directly related substantive requirements (identified above in Step 2) and apply them within the scope and scale of the proposed amendment. In applying those requirements, the Forest Service must ensure that the forest plan, as amended, contains plan components that meet the 2012 Planning Rule substantive requirements across the planning unit within the scope and scale of the proposed amendment. A plan amendment is not expected to bear the burden of a plan revision and bring the entire plan into consistency with the 2012 Planning Rule. Rather, the plan amendment shall only apply the directly related substantive requirements and only in a manner commensurate with the scope and scale of the amendment.

In applying the directly related substantive requirements to those components related through "purpose" or "beneficial effect," the responsible official may determine that additional plan components are necessary to ensure compliance with the 2012 Planning Rule.[195] When a directly related substantive requirement is determined to be related by "adverse effect" in Step 2, the responsible official is required to either modify the proposal or review the amended plan to determine the need or benefit of additional plan components.

Based on the Step 2 analysis, the forest plan, as amended, must contain plan components that maintain or restore[196] ecosystem integrity and diversity of plant and animal communities (36 CFR §§ 219.8 and 219.9) and provide for multiple uses (36 CFR § 219.10). Each of these substantive requirements contains direction regarding their application to the plan. For some substantive requirements like ecosystem integrity and diversity (36 CFR §§ 219.8 and 219.9), the plan's components must strive to "maintain or restore."

When applying directly related substantive requirements, the scope of the proposed project-specific forest plan amendment is the exception of the following out of more than 600 forest plan components (see the Introduction section above):

- One of 35 forest-wide desired conditions for soil protection.
- Three of 12 forest-wide desired conditions and three of 17 forest-wide guidelines for scenery.
- One of 10 forest-wide desired conditions and one of 13 forest-wide guidelines for the Arizona National Scenic Trail corridor.
- One of 52 forest-wide guidelines for recreation.
- Three of seven forest-wide guidelines related to wildlife movement and habitat connectivity.
- Three of 18 forest-wide desired conditions for cultural resource protection.

Therefore, the proposed amendment leaves the following forest plan components related to the proposed amendment <u>unchanged</u>:

- Soil Productivity – 34 desired conditions, 12 guidelines, three standards, and one objective;

---

[195] When a directly related substantive requirement is determined to be related by "substantial adverse effect" in Step 2, the responsible official is required to either modify the proposal to avoid the "substantial adverse effect determination" or verify whether the existing plan provides sufficient plan components for the directly related substantive requirement. If the plan does not, the responsible official must add additional plan components to make certain the Planning Rule requirements are met.

[196] The Planning Rule defines restore as "[t]o renew by the process of restoration (see restoration)." It defines restoration as "[t]he process of assisting the recovery of an ecosystem that has been degraded, damaged, or destroyed. Ecological restoration focuses on reestablishing the composition, structure, pattern, and ecological processes necessary to facilitate terrestrial and aquatic ecosystem sustainability, resilience, and health under current and future conditions" (36 CFR § 219.19).

12-RCMSER-3185

Appendix T

- Scenic Resources (SIO) – nine desired conditions, 14 guidelines, and one standard;

- National Scenic Trails – nine desired conditions, 12 guidelines, and three standards;

- Recreation Resources (ROS) – 80 desired conditions, 51 guidelines, 15 standards, and nine objectives;

- Wildlife Habitat (Connectivity and Movement) – 11 desired conditions, four guidelines, and one standard; and

- Cultural Resources – 15 desired conditions, 19 guidelines, and eight standards.

Through actions that require adherence to State standards and practices, actions that avoid or mitigate erosion, and practices that require restoration, these unexcepted desired conditions, guidelines, objectives, and standards would continue to maintain or restore terrestrial ecological integrity, soils and soil productivity, scenery, riparian areas, recreation, wildlife habitat, cultural resources, and ecosystem diversity.

The following analysis of the application of the directly related substantive requirements considers the extent of the proposed amendment (scope) and area of the forest affected by the proposed amendment (scale), evaluates the desired future conditions contained in the forest plan, and uses best available science data such as monitoring reports and other scientific information. The direction required by each substantive requirement is included in the analysis below.

## Section 219.8(a)(2)(ii) – Soils and Soil Productivity

Substantive requirement § 219.8(a)(2)(ii) – soils and soil productivity is directly related to the proposed amendment through the purpose of excepting guideline SL-G-02. The overarching goal of the substantive requirements found in § 219.8 is for the plan to provide for social, economic, and ecological sustainability within Forest Service authority and the inherent capability of the plan area. The substantive requirement specific to soils and soil productivity is to include plan components to maintain or restore soils and soil productivity, including guidance to reduce soil erosion and sedimentation. To "maintain" a resource is defined by the Planning Rule as "to keep in existence or continuance of the desired ecological condition in terms of desired composition, structure, and processes" (36 CFR § 219.19) and to "restore" means bring back to a baseline condition. This does not infer that there must be *no net loss* to the resource in question across the plan area. However, it does mean that over time, the trend for the resource in question should be moving toward the desired condition or is constant (sideways trend). Like any trend line, there can be peaks and troughs within the trendline; as long as over time the primary trend is toward the desired condition or is constant, then maintenance of the resource is being achieved.

Scope

The scope of this component of the project-specific amendment is the exception of one out of 12 soil productivity guidelines as they are applied to the 2,502 acres of NFS land where construction of electric transmission lines, pipelines, and associated infrastructure would occur with the Resolution Copper Project preferred alternative (area of disturbance). The proposed amendment would only apply to the Resolution Copper Project and not except any other projects.

Scale

The scale of the project-specific amendment for this resource is the preferred alternative area of disturbance (2,502 acres), which is less than 0.09 percent of the 2,965,716-acre Tonto National Forest. The project-specific amendment would be limited to the area of disturbance for the life of the pipelines and electrical transmission lines.

12-RCMSER-3186

Appendix T

**Application**

Excepting the Resolution Copper Project from adhering to this soil productivity guideline would have an adverse impact on the soil resource within the 2,502-acre preferred alternative area of disturbance. However, as discussed below, excepting the Resolution Copper Project from the soil productivity guideline would not detract from the Forest Service's ability to implement the forest plan to provide for the ecological integrity of the forest-wide soil resource, and the mandates of the 2012 Planning Rule would be met. As previously described, implementation of the preferred alternative would include mandatory measures to minimize impacts to soil and soil productivity from the Resolution Copper Project and thus would minimize impacts to ecosystem integrity as it relates to soil resources.

Soil loss from construction and operations in the pipeline and power line corridor (preferred alternative area of disturbance) is expected to be minimal after compliance with applicant-committed environmental protection measures (stormwater pollutant prevention plans and erosion and sediment controls) and after reclamation when the surface has stabilized from revegetation (2021 Resolution Copper Project FEIS, p. 255). Over the long term, with implementation of reclamation measures and mitigation, soil productivity would improve in the preferred alternative area of disturbance (2021 Resolution Copper Project FEIS, pp. 247–248).

Multiple unexcepted forest-wide plan components to maintain or restore soils and soil productivity would remain in place throughout the entire Tonto National Forest, including the Resolution Copper Project preferred alternative area of disturbance. These include 35 unexcepted desired conditions, 11 unexcepted guidelines, three unexcepted standards, and one unexcepted objective that would remain in place throughout that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the preferred alternative. In addition, the original requirements of guideline SL-G-02 continue to apply to 99.9 percent of the Tonto National Forest. As such, the scope and scale of the proposed amendment is negligible in context of the forest-wide soil resource. Considering the scale of the plan amendment, the unaffected plan components maintain or restore soil resources, and the measures imposed on the Resolution Copper Project for construction and the forest plan direction for the Tonto National Forest, including the project-specific amendment, are sufficient to maintain the soil resource.

In conclusion, the substantive requirement § 219.8(a)(2)(ii) – soils and soil productivity would be sufficiently applied within the scope and scale of the project-specific amendment to maintain or restore soils/soil productivity across the planning unit (i.e., the plan area) because of

- the limited scale of the proposed exception to the soil productivity guideline;

- the limited soil loss and displacement from the construction, operation, and maintenance of the pipeline due to implementation of the design criteria and mitigation measures;

- the limited scope of the proposed amendment to soil guideline (one of 12 forest-wide soil productivity guidelines) and continued application of the unexcepted desired conditions, guidelines, standards, and objectives across the entire Tonto National Forest, including the Resolution Copper Project preferred alternative area of disturbance.

## Section 219.10(b)(1)(i) – Sustainable Recreation, Including Recreation Setting, Opportunities, Access; and Scenic Character

Substantive requirement § 219.10(b)(1)(i) – sustainable recreation, including recreation setting, opportunities, access; and scenic character is directly related to the proposed amendment through the purpose of excepting the following: desired conditions SC-DC-03, NTMA-DC-06, and NTMA-DC-07 and guidelines SC-G-01, SC-G-03, NTMA-G-01, and NTMA-G-08 (Scenic Integrity Objectives); desired condition NTMA-DC-03 and guideline NTMA-G-01 (Arizona National Scenic Trail); and guideline

12-RCMSER-3187

Appendix T

REC-G-10 (Recreational Opportunity Spectrum). The overarching goal of the substantive requirements found in § 219.10 is to provide for ecosystem services and multiple uses within Forest Service authority and the inherent capability of the plan area. The substantive requirement specific to recreation settings, opportunities, access; and scenic character is to include plan components to provide for sustainable conditions for these resources.

This section is organized based on major resource categories pertinent to this substantive requirement.

## SCENIC RESOURCES—SCENIC INTEGRITY OBJECTIVES

### Scope

The scope of this component of the project-specific amendment is the exception of the following: desired conditions SC-DC-03, NTMA-DC-06, and NTMA-DC-07 and guidelines SC-G-01, SC-G-03, and NTMA-G-08 as they are applied to the Resolution Copper Project preferred alternative area of disturbance. The proposed amendment would only apply to the Resolution Copper Project and not except any other projects.

### Scale

The scale of the scenic component of the project-specific amendment encompasses areas of high SIO (516 acres), moderate SIO (345 acres), and low SIO, representing approximately 0.03 percent of the amount of high SIO across the forest and 0.06 percent of the amount of moderate SIO across the forest.

### Application

Excepting Resolution Copper Project from adhering to these three desired conditions and three guidelines would have an adverse impact on the scenery resource. However, as discussed below, excepting Resolution Copper Project from these desired conditions and guidelines would not detract from the Forest Service's ability to implement the forest plan to provide for sustainable scenery resources, and the mandates of the 2012 Planning Rule would be met.

Resolution Copper would use best management practices or other guidelines (when on NFS lands) that would minimize visual impacts from transmission lines. Other required mitigation measures to reduce impacts on scenic resources include measures to reduce the contrast with the natural landscape; preserve riparian vegetation and aquatic habitats, which are of scenic value; replace xeroriparian habitat, which would be beneficial to scenic resources; and replace water in Queen Creek, which would minimize impacts to scenic resources along this riparian corridor. These measures would be effective at reducing and minimizing the scenery impacts and the project contrast of mining operations in the surrounding landscape and impacts upon sensitive viewers.

Users of the Arizona National Scenic Trail would encounter the pipeline at the location where the pipeline crosses the trail and in an area where there are already pipelines and utilities crossing the trail (MARRCO Corridor). There is a total of 55 miles of the Arizona National Scenic Trail in the scenery analysis area (2025 Resolution Copper Project FEIS, section 3.11.3-2). Within the trail corridor, there is currently a total of 42,209 acres of high SIO. Implementation of the Resolution Copper Project preferred alternative would impact 20 acres of high SIO, which would then meet the criteria for low SIO (2025 Resolution Copper Project FEIS, table 3.11.4-3). Less than 0.05 percent of the high SIO in the analysis area would be affected by the Resolution Copper Project preferred alternative.

The forest plan includes numerous forest-wide desired conditions, guidelines, standards, and objectives for scenery that would not be subject to exception from this proposed amendment, including nine desired conditions, 14 guidelines, and one standard. The three excepted desired conditions and three excepted

12-RCMSER-3188

Appendix T

guidelines would continue to apply to 99.9 percent of the Tonto National Forest. The amended forest plan direction would provide for sustainable scenic character for the Tonto National Forest.

As stated previously, only 516 acres of high SIO and 345 acres of moderate SIO would not meet the assigned SIO. This would be minor in the context of scenic conditions across the plan unit. Forest-wide the Tonto National Forest would remain predominantly natural appearing and natural evolving. In addition, the main plan component for managing for sustainable scenic character, the assigned SIO map for the Tonto National Forest, would remain in place and unaffected by the proposed amendment.

The substantive requirement § 219.10(b)(1)(i) – sustainable recreation, including recreation setting, opportunities, access; and scenic character would be sufficiently applied within the scope and scale of the project-specific amendment, and the mitigation measures would provide for sustainable scenic character because

- required mitigation would reduce scenic impacts;
- the limited scope of this component of the proposed amendment and the fact that the proposed exceptions would only apply to three out of 12 forest-wide scenery desired conditions and three of 17 forest-wide guidelines in the forest plan;
- forest-wide, the scenery resources would continue toward meeting the desired conditions;
- the limited area the proposed exceptions to scenic desired conditions and guideline would be applied to: 516 acres of high SIO and 345 acres of moderate SIO; and
- the application of scenery desired conditions and guidelines would continue across the remaining plan area.

## NATIONAL SCENIC TRAILS[197]

### Scope

The scope of this component of the project-specific amendment is the exception of desired condition NTMA-DC-03 and guideline NTMA-G-01 as they are applied to the Resolution Copper Project preferred alternative. The proposed amendment would only apply to the Resolution Copper project and not except any other projects.

### Scale

The scale of the national scenic trails component of the project-specific amendment encompasses the immediate location in the MARRCO Corridor where new pipelines and an access road would cross the Arizona National Scenic Trail. New pipelines constructed within the MARRCO corridor would cross Passage 18 of the Arizona National Scenic Trail (2021 Resolution Copper Project FEIS, p. 626.). In the Passage 18 segment, 0.07 mile of the proposed tailings pipeline corridor would intersect the Arizona National Scenic Trail. The Arizona National Scenic Trail management corridor extends 0.5 mile on either side of the Arizona National Scenic Trail; the proposed tailings pipeline corridor would affect approximately 45 acres of the Arizona National Scenic Trail corridor (2021 Resolution Copper Project FEIS. p. 630). The Tonto National Forest manages about 200 miles of the Arizona National Scenic Trail (forest plan, p. 181). The Arizona National Scenic Trail corridor totals about 128,000 acres, and the area

---

[197] The forest plan contains a number of desired conditions and guidelines that focus on protection of visitor experience on the Arizona National Scenic Trail. Several of those desired conditions and guidelines for scenic conditions are addressed under scenic resources earlier in this document.

12-RCMSER-3189

Appendix T

impacted by the Resolution Copper Project preferred alternative would be less than 0.04 percent of the Arizona National Scenic Trail corridor.

**Application**

Excepting Resolution Copper Project from adhering to this one desired condition and one guideline would have an adverse impact on the Arizona National Scenic Trail. However, as discussed previously, excepting the Resolution Copper Project from these desired conditions and guidelines would not detract from the Forest Service's ability to implement the forest plan to provide for sustainable scenery resources, and the mandates of the 2012 Planning Rule would be met.

There would be short-term impacts on trail users during construction of pipelines and an access road when disturbance precludes use for safety reasons (e.g., active grading, transport of heavy equipment, active construction). These impacts would occur during construction, and when conditions are safe for hikers, cyclists, and equestrian users, the impact would cease. Contractors would provide necessary detours or signage for Arizona National Scenic Trail user awareness during these activities. Existing disturbances in this area include a railroad corridor, trailhead parking, and Hewitt Station Road.

As mentioned, the area impacted by Resolution Copper Project is a minor portion of the Arizona National Scenic Trail on the Tonto National Forest, affecting only 45 acres of the 128,000-acre Arizona National Scenic Trail corridor on the Tonto National Forest.

Required mitigation to reduce impacts on the Arizona National Scenic Trail include a measure that would reduce impacts of road and pipeline crossings, especially with the Arizona National Scenic Trail.

As stated, the area of impact is a small fraction of the Arizona National Scenic Trail on the Tonto National Forest. Mitigation measures and design features would further reduce impacts. Therefore, no substantive requirements are directly related due to beneficial effects or substantial adverse effects.

Excepting desired condition NTMA-DC-03 and guideline NTMA-G-01 would not cause a substantial lessening of plan protections. Desired condition NTMA-DC-03 and guideline NTMA-G-01 would continue to apply to the remaining 199+ miles of the Arizona National Scenic Trail corridor on the Tonto National Forest, and nine other desired conditions, 12 other guidelines, and three standards focused on protecting user experience on the Arizona National Scenic Trail would be unaffected by the proposed amendment. Because allowing the pipelines to go over the Arizona National Scenic Trail would not constitute a substantial lessening of plan protections, the proposed amendment is not directly related to any substantive requirement based on substantial lessening of plan protections.

The substantive requirement § 219.10(b)(1)(i) – sustainable recreation, including recreation setting, opportunities, access; and scenic character would be sufficiently applied within the scope and scale of the project-specific amendment, and mitigation measures would provide for sustainable scenic character because

- required mitigation would limit impacts to Arizona National Scenic Trail users to brief periods only during construction activities;

- the limited scope of this component of the proposed amendment and the fact that the proposed exceptions would only apply to one of 10 forest-wide scenery desired conditions and one of 13 forest-wide guidelines in the forest plan;

- forest-wide, management of the Arizona National Scenic Trail would continue toward meeting desired conditions;

12-RCMSER-3190

- the limited area to which the proposed exceptions to scenic desired conditions and guideline would be applied: 45 acres of the 128,000-acre Arizona National Scenic Trail corridor on the Tonto National Forest; and

- the application of scenery desired conditions, guidelines, and standard would continue across the remaining plan area.

## RECREATION RESOURCES—RECREATION OPPORTUNITY SPECTRUM

### Scope

The scope of this component of the project-specific amendment is the exception of guideline REC-G-10 as it applies to the Resolution Copper Project preferred alternative area of disturbance. The proposed amendment would only apply to the Resolution Copper Project and not except any other projects.

### Scale

The scale of the recreational opportunity spectrum component of the project-specific amendment encompasses the area of the Resolution Copper Project preferred alternative 2,502-acre area of disturbance, where construction of electrical transmission lines, pipelines, and associated infrastructure would impact existing ROS designations.

### Application

Excepting Resolution Copper Project from adhering to this one guideline would have an adverse impact on the existing ROS designation in the preferred alternative area of disturbance. However, as discussed previously, excepting Resolution Copper Project from this guideline would not detract from the Forest Service's ability to implement the forest plan to provide for sustainable scenery resources, and the mandates of the 2012 Planning Rule would be met.

There would be short-term impacts on trail users during construction of pipelines and an access road; and during construction, operation, and maintenance of new pipelines, electrical transmission lines, and associated infrastructure that would result in a reduction of 166 acres from semiprimitive nonmotorized ROS to semiprimitive motorized ROS (2025 Resolution Copper Project FEIS, table 3.9.4-2). Implementation of the Resolution Copper Project preferred alternative would reduce the amount of semiprimitive nonmotorized ROS on the forest from 715,024[198] acres to 714,858 acres, a reduction of 0.02 percent forest-wide. Semiprimitive motorized recreation would increase from 1,072,671 acres to 1,072,837 acres, an increase of less than 0.02 percent forest-wide. Although this has an adverse impact on nonmotorized recreation, it is not a substantial adverse impact due to the relatively small amount of effects across the Tonto National Forest.

Excepting guideline REC-G-10 would not cause a substantial lessening of plan protections. Guideline REC-G-10 would continue to apply to the remaining 714,858 acres of semiprimitive nonmotorized ROS, and 1,072,837 acres of semiprimitive motorized ROS on the Tonto National Forest and 51 other recreation-focused guidelines on the Tonto National Forest would be unaffected by the proposed amendment.

The minor scale of the change in ROS would not constitute a substantial lessening of plan protections. The proposed amendment is not directly related to any substantive requirement based on substantial lessening of plan protections.

---

[198] See table 15 in the FEIS for the 2023 forest plan (U.S. Forest Service 2023b) for total acres by ROS on the forest.

The application of the proposed Resolution Copper Project–specific amendment demonstrates that the amendment is consistent with the 2012 Planning Rule and that no additional provisions are needed to ensure the forest plan's consistency with the 2012 Planning Rule. Furthermore, the remainder of the forest plan is unaffected by the Resolution Copper Project–specific amendment and is adequately protecting and maintaining recreation and scenic resources. The substantive requirement § 219.10(b)(1)(i) – sustainable recreation, including recreation setting, opportunities, access; and scenic character would be sufficiently applied within the scope and scale of the project-specific amendment because

- required mitigation and design features would reduce impacts to scenic resources and the Arizona National Scenic Trail;

- the limited scope of this component of the proposed amendment and the fact that the proposed exceptions would only apply to one of 52 forest-wide recreation guidelines;

- forest-wide, scenery resources management of the Arizona National Scenic Trail and recreation opportunity spectrum would continue toward meeting the desired conditions;

- the limited area of the proposed exceptions to scenic resources, the Arizona National Scenic Trail corridor, and recreation opportunity spectrum in the plan area; and

- the application of scenery, Arizona National Scenic Trail, and recreation opportunity spectrum desired conditions and guidelines would continue across the remaining plan area.

## Section 219.8(a)(1)(i) – Ecosystem Integrity, Interdependence of Terrestrial and Aquatic Ecosystems in the Plan Area; and Section 219.9(a)(2)(i) – Ecosystem Diversity, Key Characteristics Associated with Terrestrial and Aquatic Ecosystem Types

Substantive requirements §219.8(a)(1)(i) – ecosystem integrity, interdependence of terrestrial and aquatic ecosystems in the plan area; and § 219.9(a)(2)(i) – ecosystem diversity, key characteristics associated with terrestrial and aquatic ecosystem types are directly related to the proposed amendment through the purpose of excepting guidelines REC-WR-G-03, WFP-G-06, and WFP-G-07. The overarching goal of the substantive requirements found in § 219.8 is to provide for social, economic, and ecological sustainability within Forest Service authority and the inherent capability of the plan area. The substantive requirement for ecosystem integrity is to include plan components to maintain or restore the ecological integrity of terrestrial and aquatic ecosystems and watersheds in the plan area. The substantive requirement specific to riparian areas is to include plan components to maintain or restore the ecological integrity of riparian areas in the plan area. To "maintain" a resource is defined by the Planning Rule as "to keep in existence or continuance of the desired ecological condition in terms of desired composition, structure, and processes" (36 CFR § 219.19), and to "restore" means bring back to a baseline condition. This does not infer that there must be *no net loss* to the resource in question across the plan area. However, it does mean that over time, the trend for the resource in question should be moving toward the desired condition or is constant (sideways trend). Like any trend line, there can be peaks and troughs within the trendline. As long as over time the primary trend is toward the desired condition or is constant, then maintenance of the resource is being achieved.

**Scope**

The scope of this component of the project-specific amendment is the exception of the following: three out of seven forest plan guidelines—REC-WR-G-03, WFP-G-06 and WFP-G-07—related to wildlife movement and habitat connectivity, as it applies to the Resolution Copper Project preferred alternative area of disturbance. The proposed amendment would only apply to the Resolution Copper Project and not except any other projects.

Appendix T

**Scale**

The scale of the amendment in the context of the substantive requirements § 219.8(a)(1) – ecosystem integrity and § 219.9(a)(2)(i) – ecosystem diversity, key characteristics associated with terrestrial and aquatic ecosystem types is 1,417 acres of habitat disturbance in the tailings corridor, transmission line corridor, and access roads (FEIS, table 3.8.4-1) out of the 2,965,716 acres of the Tonto National Forest, or less than 0.05 percent of the Tonto National Forest.

**Application**

Excepting the Resolution Copper Project from adhering to the three guidelines would have an adverse impact to wildlife movement habitat in the preferred alternative area of disturbance. However, as discussed previously, excepting Resolution Copper Project from these desired conditions and guidelines would not detract from the Forest Service's ability to implement the forest plan to provide for the ecological integrity of terrestrial and aquatic ecosystems, and the mandates of the 2012 Planning Rule would be met.

The Resolution Copper Project preferred alternative includes measures to minimize impacts to wildlife movement habitat from the Resolution Copper Project and thus would minimize impacts to ecosystem integrity as it relates to wildlife habitat. These include measures that would improve wildlife connectivity by protecting habitat blocks, partially replace habitat and vegetation for wildlife over the long term, preserve riparian vegetation and aquatic habitats available for wildlife, prevent impacts to wildlife using habitat along Queen Creek, and reduce effects on habitat and on individuals of species.

There are 11 area desired conditions, four guidelines, and one standard to protect habitat connectivity and wildlife movement in the forest plan that are not subject to exception as part of this proposed amendment; those forest plan components continue to apply throughout the Tonto National Forest, including in the project area. The total acreage of intact habitat connectivity on the Tonto National Forest is unknown. However, the 1,417 acres of habitat connectivity that would be impacted by the Resolution Copper Project preferred alternative is a minor component of the habitat available across the 2,965,716 acres of the Tonto National Forest. Potential impacts to biodiversity would likely be limited to impacts at the local level for most species and would not be significant at the population level (2021 Resolution Copper Project FEIS, p. 581).

The proposed amendment would not affect the vast majority of wildlife habitat connectivity across the forest. Although there would be an adverse impact through removal of wildlife movement habitat, it would be limited to 1,417 acres and would not be significant enough to affect forest-wide trends toward desired conditions. This would not impede the Forest Service's ability to implement the forest plan to move toward the desired condition over the majority of the forest.

The remainder of the forest plan is unaffected by the project-specific amendment. The substantive requirements § 219.8(a)(1) – ecosystem integrity and § 219.9(a)(2)(i) – ecosystem diversity, key characteristics associated with terrestrial and aquatic ecosystem types would be sufficiently applied within the scope and scale of the project-specific amendment that ecological integrity of wildlife connectivity across the plan area would be maintained or restored because

- required mitigation and design features would reduce impacts to habitat connectivity and wildlife movement habitat;
- the limited scope of this component of the proposed amendment and the fact that the proposed exceptions would only apply to three of seven forest-wide guidelines;

12-RCMSER-3193

- forest-wide, habitat connectivity and wildlife movement habitat would continue toward meeting the desired conditions;

- the limited area of the proposed exception to habitat connectivity and wildlife movement habitat in the plan area; and

- the application of habitat connectivity and wildlife movement habitat desired conditions and guidelines would continue across the remaining plan area.

## Section 219.8(a)(b) – Social and Economic Sustainability – Cultural and Historic Resources and Uses, Section 219.10(a)(1) – Integrated Resource Management for Multiple Use – Cultural and Heritage Resources, and Section 219.10(b)(1)(ii) – Protection of Cultural and Historic Resources

Substantive requirements § 219.8(a)(b) – Social and economic sustainability – cultural and historic resources and uses, § 219.10(a)(1) – Integrated resource management for multiple use – cultural and heritage resources, and § 219.10(b)(1)(ii) – Protection of cultural and historic resources are directly related to the proposed amendment based on the purpose of excepting desired conditions CUH-DC-01, CUH-DC-02, and CUH-DC-07 as they apply to the Resolution Copper Project preferred alternative area of disturbance. The proposed amendment would only apply to the Resolution Copper Project and would not except any other future projects.

**Scope**

The scope of this component of the project-specific amendment is the exception of three forest plan components—desired conditions CUH-DC-01, CUH-DC-02, and CUH-DC-07—as they apply to the Resolution Copper Project preferred alternative area of disturbance. The proposed amendment would only apply to the Resolution Copper Project and would not except any other projects.

**Scale**

The scale of the amendment in the context of the substantive requirements § 219.8(a)(b) – Social and economic sustainability – cultural and historic resources and uses, § 219.10(a)(1) – Integrated resource management for multiple use – cultural and heritage resources, and § 219.10(b)(1)(ii) – Protection of cultural and historic resources is disturbance of 2,502 acres of NFS lands out of the 2,965,716 acres of the Tonto National Forest, or less than 0.09 percent of the Tonto National Forest.

**Application**

Excepting the Resolution Copper Project from adhering to the three desired conditions would have an adverse impact on cultural resources in the preferred alternative area of disturbance. However, as discussed previously, excepting the Resolution Copper Project from these desired conditions would not detract from the Forest Service's ability to implement the forest plan to provide for the protection of cultural and historic resources, and the mandates of the 2012 Planning Rule would be met.

The Resolution Copper Project preferred alternative includes measures to minimize impacts to cultural resources from the Resolution Copper Project, although it is recognized that mitigation is primarily effective off-site and of benefit from a forest-wide perspective. These include measures that would require mitigating the loss of Oak Flat campground (which has cultural significance), resolving adverse effects on 41 historic properties that have been identified within the Oak Flat Federal Parcel, conducting data recovery on archaeological sites eligible for the NRHP with curated project materials and

Appendix T

---

archaeological collections, and preparing additional mitigation plan(s) that describe mitigation measures to address effects on historic properties. A design feature to select a tailings corridor location with fewer impacts is built into the preferred alternative.

There are 15 desired conditions, 19 guidelines, and eight standards to protect cultural resources in the forest plan that are not subject to exception as part of this proposed amendment; those forest plan components continue to apply throughout the Tonto National Forest, including in the project area.

The implementation of the Resolution Copper Project preferred alternative would result in construction, use, and maintenance of electrical transmission lines, pipelines, and associated infrastructure that would disturb 2,502 acres of NFS lands and not affect that portion of the 2,965,716 acres of the Tonto National Forest not impacted by the preferred alternative. This is less than 0.09 percent of the Tonto National Forest, which is a minor amount of impact when considered on a forest-wide basis.

The proposed amendment would not affect the majority of cultural resources across the forest. Although there would be an adverse impact through direct impacts to eight cultural sites (Newell 2018a), within the 2,502-acre preferred alternative area of disturbance of NFS lands, it would be limited and would not be significant enough to affect forest-wide trends toward desired conditions. This would not impede the forest plan's movement toward the desired condition over the majority of the forest.

The remainder of the forest plan is unaffected by the project-specific amendment. The substantive requirements § 219.8(a)(b) – Social and economic sustainability – cultural and historic resources and uses, § 219.10(a)(1) – Integrated resource management for multiple use – cultural and heritage resources, and § 219.10(b)(1)(ii) – Protection of cultural and historic resources would be sufficiently applied within the scope and scale of the project-specific amendment that ecological integrity of wildlife connectivity across the plan area are maintained or restored because

- required mitigation and design features would compensate for impacts to cultural resources in the preferred alternative area of disturbance;

- the limited scope of this component of the proposed amendment and the fact that the proposed exceptions would only apply to three out of 18 forest-wide desired conditions;

- forest-wide, cultural resource management would continue toward meeting the desired conditions;

- the limited area of the proposed exception to cultural resources in the plan area; and

- the application of cultural resource desired conditions and guidelines would continue across the remaining plan area.

## Section 219.10(a)(3) – Appropriate Placement and Sustainable Management of Infrastructure, such as Recreational Facilities and Transportation and Utility Corridors

Substantive requirement § 219.10(a)(3) – Appropriate placement and sustainable management of infrastructure, such as recreational facilities and transportation and utility corridors, is directly related to the proposed amendment through the purpose of excepting desired condition NTMA-DC-03 and guideline NTMA-G-01. The overarching goal of the substantive requirements found in § 219.10 is to provide for ecosystem services and multiple uses within Forest Service authority and the inherent capability of the plan area. The substantive requirement specific to utility corridors is consideration of appropriate placement and sustainable management of infrastructure, including utility corridors.

---

12-RCMSER-3195

**Scope**

The scope of this component of the project-specific amendment is the exception of desired condition NTMA-DC-03 and guideline NTMA-G-01 as they apply to the Resolution Copper Project preferred alternative area of disturbance. The proposed amendment would only apply to the Resolution Copper Project and not except any other projects.

**Scale**

The scale of the amendment is the 2,502 acres of land in the Resolution Copper Project preferred alternative area of disturbance. These acreages correlate to less than 0.09 percent of the total Tonto National Forest.

**Application**

The forest plan includes forest-wide desired conditions, guidelines, standards, and objectives for lands, special uses, and energy production and distribution, which include utility corridors, electrical transmission lines, and pipelines. The forest plan also includes forest-wide desired conditions, guidelines, standards, and objectives for recreational facilities, including recreation, developed recreation, facilities, cultural resources, and roads. The amended forest plan direction provides sufficient direction for future placement of infrastructure, including utility corridors, as well as recreational facilities.

The application of the proposed Resolution Copper Project–specific amendment demonstrates that the amendment is consistent with the 2012 Planning Rule. Furthermore, the remainder of the forest plan is unaffected by the Resolution Copper Project–specific amendment and is adequately protecting and maintaining the riparian resources. The substantive requirement § 219.10(a)(3) – Appropriate placement and sustainable management of infrastructure, such as recreational facilities and transportation and utility corridors, would be sufficiently applied within the scope and scale of the project-specific amendment, and no additional plan components are needed to ensure appropriate placement and sustainable management of infrastructure, including utility corridors and recreational facilities because

- the limited footprint of the impact to the Arizona National Scenic Trail from the Resolution Copper Project preferred alternative would be 45 acres of the 128,000 acres of Arizona National Scenic Trail corridor on the Tonto National Forest; and

- forest plan direction for recreational facilities and transportation and utility corridors would continue to apply across the forest, along with other forest plan direction, which does not foreclose future placement of infrastructure.

# Compliance with the Planning Rule Regulations

This section provides the agency's view of why the updated proposed amendment is consistent with the 2012 Planning Rule, specifically 36 CFR § 219.13, the section outlining the requirements for forest plan amendments.

The NFMA regulation at **36 CFR § 219.13(a)** states:

> A plan may be amended at any time. Plan amendments may be broad or narrow, depending on the need for change, and should be used to keep plans current and help units adapt to new information or changing conditions. The responsible official has the discretion to determine whether and how to amend the plan and to determine the scope and scale of any amendment. Except as provided by paragraph (c) of this section, a plan amendment is required to add, modify, or remove one or more plan components, or to change how or where one or more plan

components apply to all or part of the plan area (including management areas or geographic areas).

The responsible official used his discretion to propose an amendment to allow the Resolution Copper Project to move forward. The proposed amendment is narrow and is limited to the Resolution Copper Project. The amendment excepts the Resolution Copper Project from nine guidelines and seven desired conditions. The exception only applies to the Resolution Copper Project preferred alternative. The preferred alternative would issue a special use authorization to construct, operate, and maintain electrical transmission lines, pipelines, and associated infrastructure. The FEIS analysis indicates that 2,502 acres of land would be disturbed. The proposed amendment is consistent with the direction at 36 CFR § 219.13(a).

The NFMA regulation at **36 CFR § 219.13(b)(1)** states:

> Base an amendment on a preliminary identification of the need to change the plan. The preliminary identification of the need to change the plan may be based on a new assessment; a monitoring report; or other documentation of new information, changed conditions, or changed circumstances. When a plan amendment is made together with, and only applies to, a project or activity decision, the analysis prepared for the Project or activity may serve as the documentation for the preliminary identification of the need to change the plan.

The proposed amendment is a project-specific amendment, and the 2025 Resolution Copper Project FEIS serves as the documentation for the need to change the plan. This is consistent with the direction at 36 CFR § 219.13(b)(1).

The NFMA regulation at **36 CFR § 219.13(b)(2)** states:

> Provide opportunities for public participation as required in § 219.4 and public notification as required in § 219.16. The responsible official may combine processes and associated public notifications where appropriate, considering the scope and scale of the need to change the plan. The responsible official must include information in the initial notice for the amendment (§ 219.16(a)(1)) about which substantive requirements of §§ 219.8 through 219.11 are likely to be directly related to the amendment (§ 219.13(b)(5)).

Opportunities for public participation have been extensive for this project. The 2021 Resolution Copper Project FEIS section 1.6 (pp. 34 to 39) describes the public involvement process used to develop the 2021 Resolution Copper Project FEIS. The 2025 Resolution Copper Project FEIS section 1.6 describes the public involvement process used to develop the 2025 Resolution Copper Project FEIS and resulting 2025 Forest Service draft record of decision. The Forest Service used a wide variety of tools to engage the public, including mailings, public meetings, legal notices in local newspapers and the Federal Register, distribution of information on the Internet, and intake of comments electronically and in writing. Federal agencies have conducted outreach to affected landowners, public and private organizations, individuals, State and local governments, and Tribes. The Forest Service consulted on a government-to-government basis with federally recognized Native American Tribes having traditional interests in and/or ties to the lands potentially affected by a proposed action and alternatives. The public participation process, which began in March 2016 and continues today, is consistent with 36 CFR § 219.4.

This proposed amendment is a project-specific amendment; therefore, the notification requirements of 36 CFR Part 218 were followed, in accordance with direction at 36 CFR § 219.16(b). The notice of availability for this FEIS serves as the required Federal Register notice for inviting comments on the proposed amendment (36 CFR § 219.16(c)(3)). The public notification process is consistent with 36 CFR § 219.16.

The initial notice for this proposed amendment was the notice of intent for this FEIS, and it included information on which substantive requirements are likely to be directly related to the amendment. The

Appendix T

public participation effort undertaken for this proposed amendment is consistent with 36 CFR § 219.13(b)(2).

The NFMA regulation at **36 CFR § 219.13(b)(3)** states:

> Amend the plan consistent with Forest Service NEPA procedures. The appropriate NEPA documentation for an amendment may be an environmental impact statement, an environmental assessment, or a categorical exclusion, depending upon the scope and scale of the amendment and its likely effects. Except for an amendment that applies only to one project or activity, a proposed amendment that may create a significant environmental effect and thus requires preparation of an environmental impact statement is considered a significant change in the plan for the purposes of the NFMA and therefore requires a 90-day comment period for the proposed plan and draft environmental impact statement (§ 219.16(a)(2)), in addition to meeting the requirements of this section.

This amendment applies only to the Resolution Copper Project; therefore, the amendment is not considered a significant change in the plan for the purposes of the NFMA. A 90-day comment period is not required. This comment period for this proposed amendment is consistent with 36 CFR § 219.13(b)(3).

The NFMA regulation at **36 CFR § 219.13(b)(4)** states:

> Follow the applicable format for plan components set out at § 219.7(e) for the plan direction added or modified by the amendment, except that where an amendment to a plan developed or revised under a prior planning regulation would simply modify the area to which existing direction applies, the responsible official may retain the existing formatting for that direction.

This proposed amendment excepts nine guidelines and seven desired conditions by describing where the desired conditions and guidelines would not apply, which is consistent with 36 CFR § 219.7(e). The Resolution Copper Project–specific amendment is only applicable to the Resolution Copper Project, which is consistent with 36 CFR § 219.7(e). Therefore, the proposed amendment is consistent with 36 CFR § 219.13(b)(4).

The NFMA regulation at **36 CFR § 219.13(b)(5)** states:

> Determine which specific substantive requirement(s) within §§ 219.8 through 219.11 are directly related to the plan direction being added, modified, or removed by the amendment and apply such requirement(s) within the scope and scale of the amendment. The responsible official is not required to apply any substantive requirements within §§ 219.8 through 219.11 that are not directly related to the amendment.

The "Step 2" section in this document describes which specific substantive requirements are directly related to the proposed amendment. Each desired condition and guideline proposed to be excepted were reviewed for purpose and effect of the amendment. Excepted desired conditions and guidelines that would result in an adverse effect require further review to determine whether the adverse effects were substantial, would substantially lessen plan protections, or would be beneficial. Ten substantive requirements were found to be directly related due to purpose of the amendment. No substantive requirements were found to be directly related due to adverse effects, and no substantive requirements were found to be directly related due to beneficial effects. The determination of directly related substantive requirements is consistent with 36 CFR § 219.13(b)(5).

The "Step 3" section in this document applies to the directly related substantive requirements. The Forest Service must ensure that the forest plan will contain components that meet the directly related substantive requirements even after the Resolution Copper Project–specific amendment takes effect. Specifically, the

12-RCMSER-3198

Appendix T

amended plan must contain plan components that maintain or restore[199] ecosystem integrity and diversity (36 CFR § 219.8 and 219.9), guide the plan area's contribution to social and economic sustainability (36 CFR § 219.10), and guide timber management within the plan area (36 CFR § 219.11). To "maintain" a resource is defined by the rule as "to keep in existence or continuance of the desired ecological condition in terms of desired composition, structure, and processes" (36 CFR § 219.19). This does not infer that there must be *no net loss* to the resource in question across the plan area.

---

[199] The process of assisting the recovery of an ecosystem that has been degraded, damaged, or destroyed. Ecological restoration focuses on reestablishing the composition, structure, pattern, and ecological processes necessary to facilitate terrestrial and aquatic ecosystem sustainability, resilience, and health under current and future conditions (36 CFR § 219.19).

12-RCMSER-3199

Appendix T

*This page intentionally left blank.*

# Appendix U. Supplemental Information for Section 3.14, Tribal Values and Concerns

'

# Introduction

The following information is referenced in Section 3.14, Tribal Values and Concerns, of the environmental impact statement (EIS). This appendix contains the testimony of Tribal members describing the spiritual significance of Oak Flat and what its loss would mean to their culture, especially Apache culture, in their own words. The first section contains portions of the congressional testimony by members of the San Carlos Apache Tribe; the second section is a selection of representative comments on the draft EIS, which emphasize the cultural importance of Oak Flat to Native peoples.

# Congressional Testimony

## Wendsler Nosie Sr. Congressional Testimony

Wendsler Nosie Sr., Chairman of the San Carlos Apache Tribe from 2006 to 2010, gave testimony before Congress several times beginning in 2007. Mr. Nosie testified to the importance of Oak Flat and Apache Leap to the Apache peoples, stating, "These lands are holy and sacred places." He reiterated the sacredness of these places each time he testified to Congress. The following excerpts are illustrative of the statements made during these hearings.

November 1, 2007, U.S. House Natural Resources Committee, National Parks, Forests, and Public Lands Subcommittee:

> Well before Oak Flat, Apache Leap, and Devil's Canyon were appreciated for their unique habitat and features by hikers, bird watchers, off-road enthusiasts, and rock climbers, these Lands were home to the Apache People. In our native language Oak Flat is called *Chí'chil Bildagoteel*, and it lies in the heart of T'is Tseban country. The Oak Flat area is bounded in the east by Gan Bikoh or Crown Dancers Canyon, and in the north by Gan Diszin or Crowndancer Standing. These canyons are called "Devil's Canyon" and "Queen Creek Canyon" by non-Indians.

> For as long as may be recalled, our People have come together here. We gather the acorns and plants that these lands provide, which we use for ceremonies, medicinal purposes, and for other cultural reasons. We have lived throughout these lands, and the Apache People still come together at Oak Flats and Apache Leap to conduct religious ceremonies and to pray or take rest under the shade of the ancient oak trees that grow in the area. The importance of these lands has not changed. These are holy, sacred, and consecrated lands which remain central to our identity as Apache People.

> In the nearby area called Devil's Canyon, we have placed marks, which are symbols of life on Earth, on the steep ledges and canyon walls that rise high above the stream that has carved deep into the Canyon, and we buried our ancestors in the Canyon's heart. The escarpment of Apache Leap, which towers above nearby Superior, is also sacred and consecrated ground for our People for a number of reasons, many of which are not appropriate to discuss here. You should know, however, that at least seventy-five of our People sacrificed their lives at Apache Leap during the winter of 1870 to protect their land, their principles, and their freedom when faced with overwhelming military force from the U.S. Calvary which would have required them to surrender as prisoners of war. (Nosie Sr. 2007)

June 17, 2009, U.S. Senate Energy and Natural Resource Committee, Public Lands and Forests Subcommittee:

> Apache spiritual beings, our Gaan, exist within the three sacred sites of Oak Flat, Gaan Canyon and Apache Leap affected by S. 409. These sites become RCM property and subject to its proposed mine. Yet, to Apache, the Gaan live and breathe in those sites. The Gaan are the very

Appendix U

foundation of our religion; they are our creators, our saints, our saviors, our holy spirits. Imagine if this same type of mine as proposed by RCM lay 7,000 feet beneath the National Cathedral here in Washington, D.C. Imagine further that the mine was affected by a major subsidence, one that shook and swallowed the National Cathedral. Everyone would be outraged. Every person of every faith would fight to their last breath to prevent that mine from happening. Every American understands that the desecration of any one religion affects all religions, and that such an act even threatens the free exercise protections afforded under the First Amendment of the Constitution. (Nosie Sr. 2009)

March 12, 2020, House Committee on Natural Resources, Indigenous Peoples of the United States Subcommittee (regarding the DEIS):

The analysis of the Tribal Values and Concerns focuses the impacts of the proposed Land Exchange and Resolution Copper Mine on the past without recognizing the current presence of religious and cultural practices that have endured at Oak Flat for centuries. This erasure of Native Americans in contemporary terms perpetuates the genocidal history of America. What was once gunpowder and disease is now replaced with bureaucratic negligence and a mythologized past that treats us Native people as something invisible or gone. We are not.

We are still a vibrant and vital part of our Nation's fabric despite repeated attempts to relegate our cultures as artifacts in museums or blubs in history books. However, the permanent damage that will be caused by the Resolution Copper Mine is something that will contribute to this genocidal narrative continuing now and well into the future. It is disappointing that the cumulative effects analyzed in the Oak Flat DEIS do not look at the present or future of impacted Native peoples.

*Chi'chil Bildagoteel* (also known as Oak Flat) is a Holy and Sacred site for our Apache people and many other Native Americans. It is a place where we pray, collect water and medicinal plants for ceremonies, gather acorns and other foods, and honor those that are buried here. It is important to understand that we have never lost our relationship to *Chi'chil Bildagoteel*. Despite the violent history of the U.S. Government's exile, forced march and imprisonment of Native people on reservations, and the efforts by the U.S. Government to discourage, impede, or fully disallow us from coming to this holy area, we have our own legacy of persistence and never letting go of this place. *Chi'chil Bildagoteel*'s religious value to our prayers, our ceremonies, and in our family histories cannot be overstated. Native religion was the first religion practiced in this area. And for over five years now, we have established an encampment to protect the Holy Ground at *Chi'chil Bildagoteel* with its four crosses, which represent the entire surrounding Holy and Sacred area, including its water, animals, oak trees, and other plants central to our tribal identity. It is important to note that *Chi'chil Bildagoteel* is listed on the National Park Service's National Register of Historical Places ("NRHP") as a Historic District and Traditional Cultural Property ("TCP"). Emory oak groves at Oak Flat used by tribal members for acorn collecting are among the many living resources that will be lost along with more than a dozen other traditional plant medicine and food sources. Other unspecified mineral and plant collecting locations and culturally important landscapes will also be affected. Development of the Resolution Copper Mine would directly and permanently damage *Chi'chil Bildagoteel*, the designated TCP that is vital to us, which is why we strongly oppose this operation.

The impacts that will occur to Oak Flat will undeniably prohibit the Apache people from practicing our ceremonies at our Holy site. Construction of the mine would temporarily cut off access and once the mine has been completed, the ongoing safety concerns of subsidence will create a permanent barrier preventing Apache ceremonies from taking place. Our connections to the Oak Flat area are central to who we are as Apache people. Numerous people speak of buried family members. Most of them include childhood memories. Everyone speaks to the deep spiritual and religious connection that Apaches have to the land, water, plants and animals that

12-RCMSER-3204

would be permanently destroyed by this proposed action. The destruction to our lands and our sacred sites has occurred consistently over the past century in direct violation of treaty promises and the trust obligation owed to Indian tribes. Tribes ceded or had taken hundreds of millions of acres of our homelands to help build this Nation. In return, the United States incurred obligations to protect our lands from harm, and to respect our religion and way of life. Despite these obligations, the U.S. Government has consistently failed to uphold these promises or too often fails to act to protect our rights associated with such places like *Chí'chil Bildagoteel*. (Nosie Sr. 2020)

## *Terry Rambler Congressional Testimony*

Terry Rambler, Chairman of the San Carlos Apache Tribe from 2010 to the present, also gave testimony before Congress about the impacts on Apache culture and spirituality by the proposed project.

February 9, 2012, U.S. Senate Committee on Energy and Natural Resources, prepared statement excerpt:

Throughout our history, Oak Flat continues as a vital part of the Apache religion, traditions, and culture. In Apache, our word for the area of Oak Flat is *Chí'chil Bildagoteel* (a "Flat with Acorn Trees"). Oak Flat is a holy and sacred site, and a traditional cultural property with deep religious, cultural, archaeological, historical and environmental significance to Apaches, Yavapais, and other tribes. At least eight Apache Clans and two Western Apache Bands have documented history in the area. Apache clans originated from this area and Apaches on the Reservation have ancestors who came from the Oak Flat area before they were forced to Old San Carlos. Tribal members' ancestors passed their knowledge about Oak Flat to their descendants who are alive today.

A number of Apache religious ceremonies will be held at Oak Flat this Spring, just as similar ceremonies and other religions and traditional practices have been held for a long as long as Apaches can recall. We do so because Oak Flat is a place filled with power, a place Apaches go: for prayer and ceremony, for healing and ceremonial items, or for peace and personal cleansing. The Oak Flat area and everything in it belongs to powerful Diyin (Medicine Men) who we respect, and the home of a particular kind of Gaan—powerful Mountain Spirits and Holy Beings on whom Apaches depend for our well-being.

The Oak Flat area is bounded on the west by portions of the large escarpment known as Dibecho Nadil (Apache Leap), to the east by Gaan Bikoh (Crown Dancer's, Mountain Spirit's, or Gaan Canyon, and known as Devil's Canyon), and is intersected to the north by Gaan Daszin (Crown Dancer's or Mountain Spirits Standing, and known as Queen Creek Canyon).

In the Oak Flat area, there are hundreds of traditional Apache species of plants, birds, insects, and many other living things in the Oak Flat area that are crucial to Apache religion and culture. Some of these species are among the holiest of medicines—medicines that are only known and harvested by gifted Apache spiritual or healing practitioners. Only the species within the Oak Flat area are imbued with the unique power of this area. The ancient oak groves provide an abundant source of acorns that for many centuries and today serve as an important traditional food source for the Apache people.

Any mining on Oak Flat will adversely impact the integrity of the area as a whole—both as a holy and religious place and as a place of continues traditional and cultural importance to Apaches and other tribal people. There are no human actions or steps that can ever make this place whole again or restore to the Apache what will be lost. Mining on Oak Flat will desecrate our Gaan's home and could greatly diminish the power of this place, as well as our ability to most effectively conduct our ceremonies. The destruction of Oak Flat will add to the many problems and

sufferings that our community already faces. We will become vulnerable to a wide variety of illness, and our Apache spiritual existence will be threatened. (Rambler 2012)

March 21, 2013, U.S. House Committee on Natural Resources, Energy and Mineral Resources Subcommittee:

The San Carlos Apache Reservation is bordered on the west by the Tonto National Forest. The Oak Flat area is 15 miles from our Reservation. The Forest and the Oak Flat area are part of our and other Western Apaches' aboriginal lands and it has always played an essential role in the Apache religion, traditions, and culture. In the late 1800s, the U.S. Army forcibly removed Apaches from our lands, including the Oak Flat area, to the San Carlos Apache Reservation. We were made prisoners of war there until the early 1900s. Our people lived, prayed, and died in the Oak Flat area. At least eight Apache Clans and two Western Apache Bands document their history in the area. Since time immemorial, Apache religious ceremonies and traditional practices have been held at Oak Flat. Article 11 of the Apache Treaty of 1852, requires the United States to "so legislate and act to secure the permanent prosperity and happiness" of the Apache people. Clearly, H.R. 687 fails to live up to this promise. The Oak Flat area, as well as other nearby locations, are eligible for inclusion in, and protection under, the National Historic Preservation Act of 1966, as well as many other laws, executive orders and policies.

Today, the Oak Flat area continues to play a vital role in Apache ceremonies, religion, tradition, and culture. In Apache, the Oak Flat area is *Chi'chil Bildagoteel* (a "Flat with Acorn Trees"). The Oak Flat area is a place filled with power—a place where Apaches today go for prayer, to conduct ceremonial dances such as the sunrise dance that celebrates a young woman's coming of age, to gather medicines and ceremonial items, and to seek and obtain peace and personal cleansing. The Oak Flat area and everything in it belongs to powerful Diyin, or Medicine Men, and is the home of a particular kind of Gaan, which are mighty Mountain Spirits and Holy Beings on whom we Apaches depend for our well-being.

Apache Elders tell us that mining on the Oak Flat area will adversely impact the integrity of the area as a holy and religious place. Mining the Oak Flat area will desecrate the Gaan's home and would diminish the power of the place. Without the power of Gaan, the Apache people cannot conduct our ceremonies. We become vulnerable to a variety of illnesses and our spiritual existence is threatened. There are no human actions or steps that could make this place whole again or restore it once lost. (Rambler 2013a)

November 20, 2013, U.S. Senate Committee on Energy and Natural Resources, Public Lands, Forests, and Mining Subcommittee:

At least eight Apache Clans and two Western Apache Bands have documented history in the area. Apache clans originated from this area and Apaches on the Reservation have ancestors who came from the Oak Flat area before being forced to Old San Carlos. Tribal members' ancestors passed their knowledge to their descendants who are alive today. Our people lived, prayed, and died in the Oak Flat area for decades and centuries before this mining project was conceived.

For centuries, Apache religious ceremonies and traditional practices have been held at Oak Flat. Article 11 of the Apache Treaty of 1852 requires the United States to "so legislate and act to secure the permanent prosperity and happiness" of the Apache people. S. 339 would directly abrogate this promise. The Oak Flat area, as well as other nearby locations, is eligible for inclusion in and protection under the National Historic Preservation Act of 1966 and under other laws, executive orders and policies.

Today, the Oak Flat area continues to play a vital role in Apache religion, tradition, and culture. The ceremonies conducted at Oak Flat are part of a centuries-old continuum of ceremony and

everyday life. The Oak Flat area is a place filled with power—a place where Apaches today go for prayer, to conduct ceremonies such as Holy Ground and the Sunrise Dance that celebrates a young woman's coming of age, to gather medicines and ceremonial items, and to seek and obtain peace and personal cleansing. The Oak Flat area and everything in it belongs to powerful Diyin, or Holy Beings, and is the home of a particular kind of Gaan, which are mighty Mountain Spirits and Holy Beings on whom we Apaches depend for our well-being.

Apache traditions and practices mean that we are responsible to respect and to take care of our relatives, which in our culture includes all living things. On my mother's side, I am Túgain, (Whitewater Clan). I am related to the eagles and hawks, yellow corn, and a plant called iya'aiyé (wild tarragon). On my father's side, I am Nadots'osn (Slender Peak Clan) and related to the roadrunner, side-oats grama grass, and black corn. These animals and plants thrive at Oak flat and elsewhere. Our lives are closely intertwined with these living things as the power of the Holy Beings provide the plants, corn and animals to sustain life and for use in our ceremonies and prayers. The Apache way of life is to take care of these relatives and their habitats. The Tonto National Forest's own website states that it works closely with tribes in the area to ensure that we can continue to practice our religious and traditional activities there and to protect tribal archeological, historical, and cultural areas. (Rambler 2013b)

## Naelyn Pike Congressional Testimony

Naelyn Pike, a member of the San Carlos Apache Tribe, testified before the U.S. House Natural Resources Committee Indigenous Peoples of the United States Subcommittee, on March 12, 2020, about her experiences at Oak Flat during her Sunrise Dance.

Oak Flat is one of the sacred areas where Apaches hold the coming of age Sunrise Ceremony for girls to mark their entrance into womanhood. The ceremony begins when a girl goes to the sacred land and builds a wikkiup, which becomes their new home for the journey ahead.

On the first day of my ceremony, I made the four Apache breads for the medicine man and my godparents. My godmother helped me dress in my traditional clothing and stayed with me throughout the ceremony. On the second day of the ceremony, I woke up when the sun started to rise. I danced and prayed with my godmother, godfather, and my partner by my side. I danced to the sun, the Creator. I hit the ground hard with my cane in time with the drumbeat to wake up the sacred mountain, the spirits, and the Gaans, also known as Angels, bringing them back to life.

Without the power of the Gaans, the Apache people cannot conduct our ceremonies. I awoke the Gaans and danced beside them, tears streaming down my face. On the third day, my partner and I danced underneath the four sacred poles. This day is when I became the white-painted woman. My godfather and the Gaans painted me with the Glesh. In our creation story, the white-painted woman came out of the earth, covered with white ash from the earth's surface. Being painted with the Glesh represents the white-painted woman and her entrance into a new life. The paint molds and glues the prayers and blessings from the ceremony onto me. With my face completely covered, my godmother wiped my eyes with a handkerchief. Once my eyes opened, I looked upon the world not as a little girl, but as a changed woman. At the end of my dance, my family and friends congratulated me. We all cried because I was no longer a girl; I was now a woman. On the last day of my ceremony, my grandmother undressed me and took me to the stream so I could bathe. While she washed my hair, a small green hummingbird flew right in front of us and hovered about before it flew toward the sky. I knew this was a great blessing. I dressed in my everyday clothes, and we went back to the camp.

I had become a woman and followed in the footsteps of Apache girls that have come before me. My ceremony is just one part of an Apache way of life. It is our religious right to be able to

practice these ceremonies in these sacred places. How can we practice our ceremonies at Oak Flat when it is destroyed? How will the future Apache girls and boys know what it is to be Apache, to know our home when it is gone? (Pike 2020)

Ms. Pike also described her family's visits to Oak Flat to gather acorns and other plants:

Through my entire existence, I was consistently brought back to Oak Flat. My family would come together for prayer and ceremony. When the red berries and the acorn were in season, I was taken to Oak Flat to gather our traditional foods. With the food we collected, we were able to feed our families. Through this practice, I was able to learn my role as an Apache girl and to live our culture. The acorn, berries, and medicinal plants can never be replaced. Nor can they ever be relocated to a different area. Usen has planted these plants and herbs there for a reason. To me, Oak Flat is home, and it will always be home. (Pike 2020)

## Personal Statements from DEIS Comments

Many Apache people provided personal statements about the importance of Oak Flat to their culture and religion. The following statements attest to the role Oak Flat has in Apache religious belief, ceremonial practice, and resource gathering:

Chí'chil Bildagoteel (also known as Oak Flat) is a Holy and Sacred site for our Apache people and many other Native Americans. It is a place where we pray, collect water and medicinal plants for ceremonies, gather acorns and other foods, and honor those that are buried here. We have never lost our relationship to Chí'chil Bildagoteel. Despite the violent history of the U.S. Government's exile, forced march and imprisonment of Native people on our reservations and the efforts by the U.S. Government to discourage, impede, or fully disallow us from coming to this holy area, we have our own legacy of persistence and never letting go of its religious value in our prayers, in our ceremonies, and in our family memories. – Terry Rambler and Wendsler Nosie on behalf of Apache Stronghold

The Gaan people (Crown Dancers) are angels, Apache spiritual beings. Our Gaan exist within the three sacred sites of Chí'chil Bildagoteel (Oak Flat), Gaan Canyon and Apache Leap. The Gaan live and breathe in these sites. The Gaan are the very foundation of our religion. They are our Creator, our Saints, our Saviors, and our Holy Spirits. This mine endangers our Holy Spirits and this was not considered in the impacts. – Terry Rambler and Wendsler Nosie on behalf of Apache Stronghold

We have lived throughout these lands since time immemorial. For as long as may be recalled, our people have come together here. The Apache People continue to come together at Oak Flats and Apache Leap to conduct religious ceremonies and to pray or take rest under the shade of the ancient oak trees that grow in the area. These are holy, sacred, and consecrated lands which remain central to our identity as Apache People. Cultural significance is displayed largely in the historic social practices of a group. The Religious value of a current ongoing connection to the area is not addressed. – Terry Rambler and Wendsler Nosie on behalf of Apache Stronghold

In the nearby area called Devil's Canyon, the marks (petroglyphs) that exist are symbols of life on earth. They exist on the steep ledge and canyon walls that rise high above the stream that has carved deep into the Canyon. This loss of our written history is not considered in the impacts. . . . We buried our ancestors in the Canyon's heart. The loss of our Sacred Burial Ground is mentioned in passing. – Terry Rambler and Wendsler Nosie on behalf of Apache Stronghold

The escarpment of Apache Leap, which towers above nearby Superior, is also sacred and consecrated ground for our People for a number of reasons, many of which are not appropriate to discuss here. As you know, however, that at least seventy-five of our People sacrificed their lives

Appendix U

at Apache Leap during the winter of 1870 to protect their land, their principles, and their freedom when faced with overwhelming military force from the U.S. Calvary which would have required them to surrender as prisoners of war. The escarpment of Apache Leap, which towers above nearby Superior, is also Sacred and consecrated ground for our People.
– Terry Rambler and Wendsler Nosie on behalf of Apache Stronghold

Although the DEIS has set aside Apache Leap as a Special Management Area, it does not discuss the spiritual and religious connection the desecration of *Chi'chil Biłdagoteel* will have on Apache Leap. They are of the same body and connected in every way. Creating the Apache Leap Special Management Area does not protect the Holy, Sacred, spiritual and religious nature of this consecrated ground. The protection of Apache Leap from subsidence is not conclusive. The impacts of the loss of this land form to Apache people has not been addressed.
– Terry Rambler and Wendsler Nosie on behalf of Apache Stronghold

My children have been going to Oak Flat since they were born. I have three children and they are all directly connected to the land and the environment. My nine year old daughter dreams about having her Apache Sunrise dance ceremony at Oak Flat. The Apaches see Oak Flat differently— it is a church, a place for worship and the practice of our traditional religion. It is the center of our most sincerely held, religious beliefs, where diyi' (sacred power) can be called upon via prayers. Oak Flat is the goiff' (home) of our diyi'n, visited by our ga 'an (spiritual beings) who provide us with healing and spiritual services. It is also a place that speaks to the very essence of tribal culture. Covering 4,309 acres, Oak Flat lies within the traditional territory of the T'iis Tseban (the "cottonwood trees gray among rocks people"), also known as the "Pinal Band" of Apaches, and is closely associated with the related Tse Binesti 'e (the "surrounded by rocks people"), also known as the Aravaipa Band. At least eight Apache clans have direct ties to this location. Tribal members continue to visit Oak Flat for prayer and a wide range of traditional needs and practices.
– Terry Rambler

Apache Sunrise dance is a womanhood ceremony for a young girl and we hope she will have the opportunity to choose to have her ceremony there on our traditional homelands. My seven year old son has five different forts at Oak Flat and every time we go to Oak Flat he runs to check on all his forts. He says I have to make sure they have not destroyed my forts yet. This is a disheartening statement for a mother to hear, because my son knows Resolution Cooper is trying to destroy our holy place. I pray my son will have the opportunity to sweat at Oak Flat for the first time, when he becomes a young man. We have gone to many Apache spiritual ceremonies (Sunrise dances and Holy ground ceremonies) at Oak Flat and we know the land personally.
– Lian Bighorse

The memories I have there when visiting there is praying, picking acorn, visiting the spring, going hiking, playing tag, participating with my cousin sunrise dance ceremony, having my massage ceremony at Oak Flat. Oak Flat means so much because of the memories but also because it where my ancestor use to live and rom free. It's where our sacred Red Guan came from another holy place to go to Oak Flat. I believe Oak Flat is sacred. I believe it because when you are there you can feel it, it's in the wind, the rocks, the dirt, the spring, it's just all around you.
– Baase Pike

I've been to the holy grounds and puberty ceremonies at Oak Flat. I do healing ceremonies for people who are needing prayer there. . . . When I was younger, we would go through Oak Flat on the way to Casa Grande. It was part of different tribes competing. At the time, those rocks caught my eye. It brings be back to my ancestors who walked the canyon. You can hear their prayers and songs. As a kid, I remember the stories. You can feel it, something special about that place. . . . You can still see the human figures. Before the turn off to the campground there is a shape of a skill like a Gaan dancer. You can still see that. – Jerry Thomas

12-RCMSER-3209

Appendix U

Even to my people (Un'k Akimel O'odham) Oak Flat is a sacred holy place. It is mentioned in our traditional songs that my ancestors would meet and pray there because of the direct connection to the holy spirit Juhwertamahkai (earth doctor). – Esteban Lopez

I went to Oak Flats when I was a kid with my parents. We used to always go out there to pick acorn, herbs, spices. And just to get away from home at a place where we could go to picnics. Learning my history about Oak Flats, I have family that is buried there. So it became a memorial place where me and my family can go pay our respects to the people who have died there. I have family that are buried there. It's been basically a big part of my life growing up. Introducing my kids the place and to the environment, I did what my parents did for me. Take them out there and enjoy what I enjoyed as a kid. To teach them at a young age, learning how to gather and hunt was a big issue when I was growing up to teach the younger generation, which I tend to do all the time. I got involved in running. It's been a journey, going every year. I'm trying to show my siblings, my sons and daughters, how important it is to me why I go up there. It's important to me to get them involved, knowing that it's a place where we go to gather acorns. It's also a place for me to teach them about our bloodlines and where they're buried there. – Andrew Victor Tarango

Comments regarding the Sunrise Dance:

My family, my ancestors come from Oak Flat. I grew up there, praying, picking the medicine, picking the acorn, going to the springs, gaining the teachings of my role as an Apache woman so I can pass it down to my daughters. Those teachings through the songs and prayers still exist, and I and many others have passed it on to our children. I have 3 daughters which my two younger daughters had their coming of age Ceremony for our girls who become women there at Oak Flat. My daughter, Nizhoni, held her Ceremony at Oak Flat in October 2014. As a Mother and as a family, we prepare our daughters from the day they take their first breath onto this world until the day their ceremony starts. All the elements of the wind, fire, water, and land go into the Ceremony for my daughter. Everything Usen (Creator, God) has created has a significant role in the Ceremony got the 4 days that she prays, dances, connects with all the elements, connected to our ancestors, connected to the Holy Spirit. On the 3rd day of the Ceremony she is painted white with the white clay that is provided from Mother Earth, and that paint blesses all living beings, followed by the next day, the last day of the ceremony, she has to wash the paint off and give it back to the earth. . . . The exact springs she went to wash her paint off is being affected by Resolution Copper Mine already by dewatering the springs. You are already tampering with her life. My daughter, Nizhoni was reborn from a young girl into a beautiful strong Apache woman at Oak Flat. Her feet touched the ground as the beat of the drum is the heart beat of Mother Earth. Her tears hit the ground having Mother Earth feel her love for the land, the water, and all creations. She prayed to our Holy people and entered the spirit world to pray for all people in this world and all that is created for she/we believe that everything is alive. – Vanessa Nosie

Our granddaughter, Nizhoni had her sunrise dance there at Oak Flat. . . . When someone has there dance, they have to be ready. They have to know as they're growing up the different things they need to know as a women. She would have to pick what she wanted to be on her buckskin, what would be her representation. And those things that she loves about Oak Flat were the butterflies and the hummingbird and so in her emblems on her buckskin, those were where those representations of nature were on her own dress. After her dance was over, she would have to be washed of all the ashes. So, we took her to the spring there and as we took her to the spring, all the butterflies came to meet her. We were going up toward the spring and there were groups of butterflies, black monarchs and yellow ones. The followed us all the way there. It was very special. And during her dance, there were times when hummingbirds actually came to the ceremony to where she was. Those things are very important to her and to me as a grandmother. Coming of age there is always going to hold reverence in her life and her kid's lives and her

12-RCMSER-3210

grandchildren's lives, the same it does with me. There are is connected to her and is connected to me through life, through practices, through ceremony, through prayers. – Theresa Nosie

The Sunrise ceremony places Apache women's bodies into the ground where the ceremony exists. They build their homes, physically and spiritually, where they are called to have their ceremony. As several people who gave testimonial, the location of a Sunrise ceremony is one that each girl must arrive to herself and in their own understanding of a spiritual connection.
– Terry Rambler and Wendsler Nosie on behalf of Apache Stronghold

This is about our Apache way of life and concern for Oak Flat, which is a holy place for me. I witness ceremonies like Sunrise Dances, and a Holy Ground Song, I hear, Chanting Songs, and bells from Ga'an in dances, such as bull-roaring. So it means a lot to any Apache who stops there hears things and feelings. – Linda Thomas

For at least a half millennium through to the present day, members of our Tribe have utilized the Oak Flat area for traditional religious ceremonies, such as the Sunrise Dance, where we celebrate the event of a girl's maturation from puberty over four days, through dance, drumming, song and prayer, and the visitation of Crown Dancers. It is a place where Apache Holy Ground rituals occur, where we commune with and sing to our Creator God, and celebrate our holy spirits, including our mountain spirits, the Ga'an. It is a place filled with rock paintings and petroglyphs, what some may describe as the footprints and the very spirit of our ancestors, hallmarks akin to the art found in gothic cathedrals and temples, like the Western Wall in Jerusalem, St. Peter's Basilica in Vatican City, or Angor Wat in Cambodia. This is why I call Oak Flat the Sistine Chapel of Apache religion. – Terry Rambler

I have a cousin who had her coming of age ceremony at Oak Flat. It was a time where she became a woman. The amazing thing about the ceremony is that it brought together family and we did what we do as Apache people. At this time I was a young girl. We came together and I wanted to someday have my ceremony just like her. To think that a mine would come and destroy the area of where my cousin had her ceremony breaks my heart. – Kellieann Goseyun

My daughter runs to Oak Flat. She wanted to have her Sunrise Ceremony at Oak Flat. We got all of the materials for the ceremony from Oak Flat, the plants the yucca sticks, and branches for the Ga'an Dancers. A week before the dance it snowed. When I went to check the dance grounds, everything was covered in snow. It worried me, but kept on doing what we were doing to prepare for the dance. When we got there the dance grounds were clear of snow and dry. Everything was ready for the ceremony. That was very spiritual to us that the grounds were ready. To me Oak Flat is very spiritual. Her house is still up at Oak Flat. That was in March, and it is still up today, She goes and checks on it every chance she gets. – Matonth Brown

Oak Flat is a special place to my family and the Apache people. Our ancestors prayed and dance there. Our medicine, water and food comes from there. When you are in the presents of Oak Flat you can feel the strength, struggle and resistance of our ancestors. This is where my daughter and nieces made their journey to womanhood through the coming of age ceremony. The houses they built with their own two hands still stands strong in Oak Flat a place they call home where they can revisit and still feel the power of the songs and prayers. – Sinetta Lopez

I just recently had my coming of age ceremony at Oak Flat and being there meant a lot to me to have my ceremony in a place where all my ancestors used to be. If the Resolution Copper mine continues with destroying Oak Flat, then I will never have a sacred place to come back to or to show my kids where our ancestors gathered. I have many memories of Oak Flat of our family when we would sing our traditional songs. Our elders would tell us the history of Oak Flat.
– Gouyen Brown-Lopez

Appendix U

The reason why Oak Flat is so important to me is because I have a very strong connection with the land. Oak Flat gives me connection with my family and my past ancestors. A place for me to dance with people that I love including my closest cousin and my sister who had their Sunrise Dances there which I was able to be a big part of. Because of all the dances I have done there it became my home. Whenever I am there the nature around me makes me feel free and I am able to rethink past mistakes and also the land makes me think of the future and how I can make my life better. With all the dances I was able to learn more about my culture and things I am supposed to do as a person and when I get older I know what I can pass on to the next generation.
-- Waya Brown

Comments about acorn and resource gathering at Oak Flat:

Oak Flat is also a place where our members still conduct traditional harvesting of plants important to our diet, such as acorns from Emory oaks, and healing plant-based medicines for a wide range of ailments. – Terry Rambler

We gather the acorns and plants that these lands provide for ceremonial and medicinal purposes and for other cultural reasons. The numerous natural elements, that come from these Holy Sites, are used as tools to conduct Religious Ceremonies, spiritual sweats, and Sunrise Ceremonies. The loss of these natural elements, fundamental to our religion, was not considered in the impacts. – Terry Rambler and Wendsler Nosie on behalf of Apache Stronghold

We pick acorn. I forgot what that plant medicine is called. My families pick the plant medicine to heal themselves, like wild tea. It is a sacred and spiritual place for me and my family the ones that are traditional and they don't want anything to be built there. We would like to keep it to be sacred. – Melissa Irving

We pick them up in acorn, and then we grind it, and we put it into a soup. We make dumpling, squash, corn, mixed together, and then we just— we do a lot of things with it. We eat, mostly— the elderlies love to pick acorn, and I am the one that love to pick acorn. And I have spent four days doing this, and it takes a lot of hard work, but if it's—if you guys do something about it and destroy it, there will be nothing. There will be nothing. So I just want you to know that it's very, very important. – Geraldine Kitcheyan

We have concerns about Oak Flat. There shouldn't be a mine there, because it's our acorns, squaw berries and we use squaw berries stem to make burden basket and it is our Apache Kool-Aid. Acorn we have been picking for our food and the acorn is Apache food when Geronimo was here in San Carlos that is his favorite food. And there's 3 ways of acorn soup that we do. I'm 67 years old and that's where I find my acorn and squash berries. Our families (Victor) have been picking acorn there and for us to have lunch there too. – Leopha Victor Chatlin

He used to go up over the mountain with my mom and she would collect acorn. And we were always stopping by over there [Oak Flat]. There are so many acorn trees. My Aunt Marie, she would go there and pick acorns. Out there she would smash hem on the rocks and put them in a blanket. She'd shake it and then blow the hard ones away. She would grind it on a wheel and then we'd take it home and make acorn soup. My mom used to pick the berries—in Indian it's called, everyone called it Kool Aid. At that time everybody talked Apache. So that's what I know to call those berries. She would make that for us at home. I don't see people make that as much anymore. But Oak Flat is where she used to get it. – Imogene Brown

My great grandmother Dott Crockett, born in 1882 and passed away in 1981 at the age of 99 years old. . . . She told me stories of camping at the Oak Flats and praying while there, how they collected medicinal plants, also acorn which was the staple back then. She talked about the Red Berries they would pick and use as Koolaid to drink, she also talked about 'noos.' I never found its original name. – Brenda Schildt

# EXHIBIT F



| United States | Forest | Washington Office | 1400 Independence Avenue, SW |
| Department of | Service | | Washington, D.C. 20250 |
| Agriculture | | | |

**File Code:** 1560; 2800
**Date:** May 28, 2024

Terry Rambler
Chairman
San Carlos Apache Tribe
P.O. Box "0"
#3 San Carlos Ave.
San Carlos, AZ 85550

Dear Chairman Rambler,

As part of the consultation process for the proposed Resolution Copper Mine (RCM) pursuant to the Southeast Arizona Land Exchange Act, 16 U.S.C 539p (SALECA), I am again reporting to all consulting Tribes on the status of the proposed project and our current activities that are a result of the feedback we have received through previous listening sessions, meetings, and correspondence. As I reported to you in the enclosed correspondence dated March 22, 2023, issues raised through consultation have been considered and carefully analyzed. In some instances, we have been able to resolve issues raised; for other issues we have ongoing dialogue.

As you recall, on January 15, 2021, the Tonto National Forest released the Final Environmental Impact Statement (FEIS) and draft Record of Decision (ROD) for the RCM and SALECA, concluding the Tribal consultation for the land exchange.

On March 1, 2021, the U.S. Department of Agriculture (USDA) directed the Forest Service to withdraw the Notice of Availability and rescind the FEIS and draft ROD. The USDA sought to fully understand concerns raised by Tribes and the public about the impact of the project. The USDA also wanted to review the environmental, cultural, and archaeological analyses required by SALECA and other applicable laws.

On September 3, 2021, USDA Secretary Thomas Vilsack delegated lead consultation authority to National Forest System Associate Deputy Chief (ADC) Barnie Gyant to reinitiate formal consultation with Tribes. On September 10, 2021, the reinitiation of consultation began with a listening session for 15 consulting Tribes. That listening session was followed by formal consultation meetings with those Tribes choosing to participate. Requests from consulting Tribes received during ADC Gyant's tenure were considered and, where appropriate, acted upon and implemented. Please refer to correspondence dated March 22, 2023.

On October 21, 2022, USDA's Natural Resources and Environment Under Secretary Homer Wilkes appointed me as lead consultation official to continue the work started by former ADC Gyant. I want to take this opportunity to address the issues and concerns raised with me to again invite you to meet with me at a date and time convenient for you and your council.

**Update on issues raised to date and status:**



Printed on Recycled Paper



2

1. One consulting Tribe requested that the Forest Service execute a consultation Memorandum of Understanding (MOU) specific to the SALECA land exchange during a meeting with me and Under Secretary Homer Wilkes on March 28, 2023.  The Forest Service provided the Tribe with a draft MOU in December 2023.  The Tribe returned comments to the Forest Service on April 15, 2024.  The Forest Service is reviewing the revised draft and will continue to engage the Tribe.

2. During reinitiation of consultation, the Forest Service received requests for "technical support" to assist Tribes with issues related to the proposed project.  To date, no follow-up requests providing specific technical needs have been received from any consulting Tribe.

3. Requests have been made to completely restart the Environmental Impact Statement process, citing the need for new data and additional analysis on several resource areas.

   Based on the information obtained through our consultation efforts and reviews of the withdrawn FEIS, the Forest Service is not aware of any information that would require a complete reinitiation of the process.  The Agency is incorporating additional information and discussion to address issues identified during consultation efforts and our review of the FEIS.

   Examples of information we continue to incorporate into the FEIS include:

   - the effects of the Telegraph Fire that burned in the area in summer 2021;

   - analysis of consistency with the new Tonto National Forest Land and Resource Management Plan published in December 2023; and

   - updates to the analysis of cumulative effects from reasonably foreseeable future actions.

4. Tribes have elaborated on areas of the FEIS that they feel require additional research, review, analysis, and reporting.  For example, during ADC Gyant's tenure as consultation official a Tribe requested a third-party review of water data.  The Forest Service engaged a Bureau of Land Management (BLM) hydrological review team to review the water analysis section of the FEIS to thoroughly understand the potential impacts.  In response to that analysis, the Forest Service continues to incorporate changes into the FEIS where appropriate.  For example, the Forest Service included additional analysis of potential indirect impacts to groundwater in the area known as the Cutter Basin due to the use of groundwater near the proposed mine.  In addition, the Agency is assessing reports of future groundwater shortages in the metro Phoenix area, including the East Salt River Valley where the RCM Desert Wellfield is located.

   In review of the BLM Water Report, the Forest Service decided to clarify the language of the original research, analysis, and findings within the FEIS to more clearly address issues brought forth by the BLM report.  However, no issues were identified that would require additional data collection.

12-RCMSER-3215

3

5.  Throughout the consultation process, requests have been made to stop the land exchange. In December 2014, the SALECA was enacted to "authorize, direct, facilitate and expedite the exchange of land between Resolution Copper and the United States." Moreover, the SALECA requires that "[n]ot later than 60 days after the date of publication of the final environmental impact statement, the Secretary shall convey all right, title, and interest of the United States in and to the Federal land to Resolution Copper." The statute does not provide the Forest Service with the authority to choose whether or not to complete the land exchange under the SALECA.

6.  During consultation, Tribes continue to assert there is no way to mitigate the loss of Oak Flat. After consultation with Tribes, the SALECA directs the Secretary to "…consult with Resolution Copper and seek to find mutually acceptable measures to (i) address the concerns of the affected Indian tribes; and (ii) minimize the adverse effects on the affected Indian tribes resulting from mining and related activities on the Federal land conveyed to Resolution Copper under this section." Our commitment on that front has not changed, and we will continue to communicate with our Tribal partners on these issues moving forward.

While we have determined that further discussion on some issues is complete, we recognize that compliance with Congress's mandate to complete the SALECA land exchange cannot be reconciled with Tribal concerns and understand there are still issues that allow for further engagement. I am committed to continued collaborative dialogue. Therefore, I am inviting you to reach out directly to me to engage on this proposed project in formal consultation at a time and place convenient for you and your leadership. I encourage additional dialogue and engagement to assist the Forest Service in understanding where consulting Tribes see opportunities to work together in this process as we move forward.

Sincerely,

Recoverable Signature

X  _Troy Heithecker_____

Signed by: TROY HEITHECKER

TROY HEITHECKER
Associate Deputy Chief, National Forest System

Enclosure

**EXHIBIT C**

**DECLARATION OF VICTORIA PEACEY**

1   Christopher D. Thomas (#010482)
    Matthew L Rojas (#025030)
2   Andrea J. Driggs (#023633)
    PERKINS COIE LLP
3   2901 North Central Avenue, Suite 2000
    Phoenix, Arizona 85012-2788
4   Telephone:    602.351.8000
    Facsimile:    602.648.7000
5   cthomas@perkinscoie.com
    mlrojas@perkinscoie.com
6   adriggs@perkinscoie.com
    docketPHX@perkinscoie.com
7
    *Attorneys for Defendant-Intervenor*
8   *Resolution Copper Mining, LLC*

9                  UNITED STATES DISTRICT COURT

10                       DISTRICT OF ARIZONA

11

12   San Carlos Apache Tribe, a federally          No. CV-21-0068-PHX-DWL
     recognized Tribe,
13
                        Plaintiff,                 **DECLARATION OF VICTORIA
14                                                 PEACEY**
             v.
15
     United States Forest Service, an agency in the
16   U.S. Department of Agriculture; Neil
     Bosworth, Supervisor of the Tonto National
17   Forest; Tom Torres, Acting Forest Supervisor
     of the Tonto National Forest,
18
                        Defendants.
19
     Resolution Copper Mining, LLC,
20
                        Defendant-Intervenor.
21

22

23

24

25

26

27

28

DocuSign Envelope ID: ...

I, Victoria Peacey, declare as follows:

1. I am over the age of 18 and am competent to make this declaration. I could and would testify to the following facts, which are within my personal knowledge and based on my review of relevant documents, if called as a witness to do so.

2. I joined Resolution Copper Mining LLC ("Resolution") in September 2010. I am the Senior Business Partner - Community and Social Performance ("CSP"), Copper – America and Joint Ventures. In this role, I lead the CSP teams at various Rio Tinto operations, including at Resolution, while also continuing to lead the federal permitting activities at Resolution. Previously, I was the Senior Manager of Permitting and Approvals for Resolution. In that position, I managed the permitting processes at the federal, state, and local levels for Resolution.

3. Before joining Resolution, I spent approximately ten years managing environmental affairs and permitting at several Rio Tinto facilities, including America's only primary nickel mine and one of the world's largest open-pit copper mines.

4. From March 2008 to September 2010, I served as manager of environmental affairs and permitting for the Rio Tinto project at the Eagle Mine, located in Michigan's Upper Peninsula. The Eagle Mine is an underground, high-grade nickel and copper mine that required significant investment in the mine and related facilities. It is the only primary nickel mine located in the United States. In 2007, the Eagle Mine was the first mine permitted by the State of Michigan under its Non-Ferrous Metallic Mining Law. In 2013, the mine was sold by Rio Tinto to Lundin Mining. The mine began production in September 2014.

5. From 2002 until 2008, I worked on environmental compliance and permitting issues at the Kennecott Bingham Canyon copper mine, located about 25 miles south of Salt Lake City, Utah. Bingham Canyon is one of the world's largest sources of copper. Rio Tinto acquired the mine in 1989, more than 100 years after the mine was established. Rio Tinto has invested significant sums of money in environmental upgrades and reclamation.

12-RCMSER-3219

During 2006-2008, I helped the facility obtain necessary permits and approvals for an expansion, supervised the collection of environmental data, managed permit compliance, and assisted with reclamation of areas impacted by Rio Tinto's predecessors. I also worked on reclamation of the Barney's Canyon gold mine, which stopped operating in 2001 and is now recognized as elk and deer habitat.

6.      I hold two degrees from the University of Western Ontario: a Bachelor of Science degree in applied geosciences and a Master of Science degree in civil and environmental engineering.

**Resolution Copper: Overview of the Project**

7.      Resolution is a limited liability company owned by subsidiaries of the Rio Tinto Group and BHP.

8.      In 2004, Resolution acquired property and equipment associated with the historic Magma Copper Mine near Superior, Arizona, in an area that forms part of the Copper Triangle. Mining in the Superior area reportedly began in the late 1880s and the Magma Copper mine operated from 1911-1996, when operations were suspended.

9.      Resolution's work on the project began in 2005. At that time, Resolution started reclamation work at the former Magma West Plant. That work has lasted about 15 years and cost approximately $75 million. As a result of our reclamation efforts, an area impacted by mining operations has been restored and reclaimed per state regulatory requirements.

10.      The proposed Resolution mine would be underground rather than open-pit. Block cave mining has been used in Arizona for decades and would result in a smaller footprint than an open pit mine. The San Manuel and the inspiration complex were both block cave operations. Rio Tinto has successfully operated three block cave operations in Australia and South Africa, and this will be a modern, leading-edge operation utilizing the most sophisticated technology available.

11.      Once in operation, the Resolution Copper mine could supply up to one-

2

DocuSign Envelope ID: ...

quarter of the nation's copper demand. Copper is an essential component in mobile devices, medical equipment and clean energy technologies, and demand is growing worldwide.

12.     After the mine is closed, Resolution Copper—not taxpayers—must cover all costs associated with closing the mine and all post-closure monitoring.

**Location of Resolution's Claims and Chi'chil Bildagoteel**

13.     Resolution holds approximately 185 unpatented mining claims in the vicinity of Oak Flat, Pinal County, Arizona (the "Claims"). The Claims are located on lands, the surface of which is administered by the Tonto National Forest. The Claims were located by Resolution or a predecessor in interest between 1903 and 2011. The Claims are adjacent to the Oak Flat Withdrawal Area ("Withdrawal Area"). The area around the Claims and the Withdrawal Area is commonly known as "Oak Flat" or "Oak Flats."

14.     In 2013, Resolution Copper submitted a proposed Mine Plan of Operations ("MPO") to the Tonto National Forest pursuant to 36 CFR Part 228 seeking authorization to conduct mining operations on the Claims. The Tonto National Forest declared the application complete in 2014, and initiated the necessary administrative and environmental review, which is still in process.

15.     In December 2014, Congress passed the Southeast Arizona Land Exchange and Conservation Act, 16 USC § 539p (the "Act"), as part of a lands package that was included in the National Defense Authorization Act. The Act provides that the Federal land, as defined by the Act, shall be exchanged for non-Federal lands held by Resolution Copper. Both the Withdrawal Area, as well as a portion of the Tonto National forest lands where Resolution Copper's Claims are located, constitute the Federal land for purposes of the Act. A graphic depicting the Claims relative to the boundaries of the Federal land is attached as Exhibit A.

16.     In December 2015, the US Forest Service submitted an application to have part of Oak Flat listed on the National Register of Historic Places as a traditional cultural property ("TCP") known as Chi'chil Bildagoteel.

3

17.     On March 4, 2016, the National Park Service announced that Chi'chil Bildagoteel was listed on the National Register of Historic Places as a TCP. A graphic depicting the Claims relative to the approximate boundaries of the Chi'chil Bildagoteel TCP is attached as Exhibit B.

**Apache Leap Special Management Area**

18.     In 2017, the Forest Service established the Apache Leap Special Management Area ("ALSMA"), as required by the Act.

19.     Pursuant to the Act, Resolution set aside 697 acres of mining claims and provided approximately 140 acres of privately-held land to permanently protect Apache Leap as part of the ALSMA. *See* 16 U.S.C. § 539p (f), (g). Specific measures were taken within the ALSMA to accommodate tribal concerns regarding public access, grazing, and other protections for locations of cultural importance.

20.     Including Apache Leap in this special management area will (A) preserve the natural character of Apache Leap; (B) allow for traditional uses of the area by Native American people; and (C) protect and conserve the cultural and archeological resources of the area.

21.     Apache Leap will be monitored to ensure that future mining-related activity does not impact the feature and this monitoring will continue throughout construction, operation, closure and reclamation of the mine.

**The Environmental Impact Statement Process**

22.     Because the federal permitting process for the MPO was already underway at the time that the land exchange became law, the legislation specifies that the US Forest Service must produce a single environmental impact statement as the basis for all decisions under federal law related to the proposed mine, the MPO and any related major federal actions. *See* 16 U.S.C. § 539p(c)(9)(b).

23.     While the Forest Service began its official independent review of the proposed project required under the National Environmental Policy Act ("NEPA"),

4

DocuSign Envelope ID: ...

Resolution began deepening an existing shaft, sinking a new shaft, performing extensive ore body exploration drilling, and conducting reclamation of historical mining activity.

24.    In 2016, the Forest Service initiated public scoping with a notice of intent to prepare an Environmental Impact Statement ("EIS") for the Resolution Copper MPO and land exchange.

25.    In the project schedule, initially set by the USFS during the Obama Administration, the target date for Final EIS publication was July 2020.

26.    In August 2019, the Forest Service published a Draft EIS. After consideration of all the public comments, the Final EIS was published on January 15, 2021. Under the Act, exchange of title to the lands is to occur within 60 days of publication of the Final EIS.

27.    I understand that approximately 130,000 comments were received during public scoping and close to 30,000 public comments were received on the Draft EIS and subsequently reviewed and addressed through the NEPA process.

**The Final Environmental Impact Statement**

28.    Because this is a congressionally mandated land exchange, it differs in many respects from an administrative land exchange.

29.    Because the Act is a legislative land exchange, "the Tonto National Forest Supervisor has no decision authority due to the constraints imposed by PL 113-291 [the Act]."[1]

30.    As described in chapter 2 of the Final EIS, Alternative 6 – Skunk Camp was identified as the preferred alternative. This alternative is unique because the tailings storage facility would be located on private lands (after eventual acquisition of Arizona State Trust land). This means that, if the land exchange occurs, the mine, all processing facilities, and the tailings storage facility would be located off National Forest System lands.[2]

---

[1] Final EIS at 62. https://www.resolutionmineeis.us/documents/final-eis
[2] See *id.*

31.     The remaining portions of the project on National Forest System land would be roads, pipelines, and utilities, which are considered special uses and regulated under 36 CFR 251.50.

32.     Notably, the "ROD for this project does not include any decision related to the land exchange—it only includes decisions related to authorizing roads, pipelines and utilities located on Forest Service land. The land exchange itself was mandated by Congress and is not subject to the objection process, objection resolution process, or the ROD."[3]

**Resolution's Plans for Management of Oak Flat After the Exchange**

33.     After the land exchange, Resolution will ensure ongoing public access to the Oak Flat Campground, recreational trails and climbing.

34.     Resolution published a detailed management plan on its website, showing how it will continue to operate the campground in keeping with current Tonto National Forest practices. The plan was submitted to the Forest Service and they distributed to consulting Native American tribes for input.

35.     Input from community groups and Native American tribal representatives will continue to guide how the area is protected and managed, even after the land exchange.

36.     Resolution Copper intends to contract with 4 Winds, a local small business part-owned by members of the San Carlos Apache Tribe, to maintain the campground areas, infrastructure, and access to recreation.

37.     Consistent with Forest Management, Resolution will permit grazing to continue on the Devil's Canyon Grazing Allotment, as it has for the last 17 years.

38.     With respect to the Western Apaches annual fall harvesting of Emory oak acorns, Resolution Copper will continue to permit harvesting of the Emory oak groves by individuals, or commercially through an authorization, and will administer the

---

[3] *See* Final EIS at 19.

authorization process in a manner similar to the TNF.

39.     In coordination with the TNF Tribal Liaison, the tribes requested that a complete natural resources survey of the Oak Flat Parcel be conducted by the TNF Tribal Monitors using their Traditional Ecological Knowledge. Surveys were conducted between May and September 2020 and resulted in approximately 6,906 salvage locations within the Oak Flat Parcel, which includes: 6,871 plant salvage locations, 9 animal salvage locations (animal carcasses and remains), and 26 mineral salvage locations. Resolution Copper will continue to manage culturally significant natural resources on the Oak Flat Parcel by removing any cultural resources using the salvage operations set forth in the FEIS.

40.     Cultural resources on the Oak Flat Parcel will be managed as provided in the approved Historic Preservation Treatment Plan (HPTP), the Archaeological Resources Protection Act (ARPA) permit issued by the USFS, the Native American Graves Protection and Repatriation Act (NAGPRA) Plan of Action and/or Arizona State Museum-issued Burial Agreement, and the curation agreement with the Gila River Indian Community (GRIC) Huhugam Heritage Center, and the associated Resolution Copper Cultural Heritage Management Plan.

41.     Any Euromerican and Non-Apache Native American historic properties identified on the parcel will undergo full data recovery per the approved HPTP. Data recovery includes the collection of surface artifacts, excavation and sampling of cultural features, archival research, and identification and respectful excavation of artifacts and or burials if present. All of the resources collected will be curated at the GRIC curation facility.

42.     As requested by the Apache Tribes, Apache historic properties will only involve surface recovery and repatriation to the GRIC curation facility. No excavation will occur on these sites.

43.     Resolution Copper will continue to permit climbing and bouldering on the Oak Flat Parcel. The Oak Flat Parcel and a number of climbing areas outside the Parcel

7

DocuSign Envelope ID: 1A50CFB48-B4F...

on TNF, State Trust and other land owned by Resolution Copper, contains several climbing and bouldering resources, in what is collectively known as the Queen Creek Climbing Area. This area extends from Queen Creek Canyon, south along Apache Leap and east across the Property to Devils Canyon. A portion of this climbing area falls within the Oak Flat Parcel.   Resolution Copper has an agreement in place with a local climber organization, Queen Creek Coalition, to manage climbing on Resolution Copper owned property.

44.   The Oak Flat Parcel is frequently utilized by off-highway vehicles (OHV), and will continue to be used for such after Resolution takes ownership. Existing approved roads for OHV users include FRs 315, 469, 2432, 2435, 2438, 2439 and 3153.

45.   The Oak Flat Parcel is within Arizona Game and Fish Department's Game Management Unit 24A. To ensure the safety of Resolution Copper employees and all members of the public using the property, as well as to prevent potential wildfires, hunting and shooting will be banned on the property. However, hunters will be allowed to travel through the property to get to other hunting areas off the property.

46.   Resolution will provide access to the surface of the Oak Flat Campground to members of the public and Tribes, to the maximum extent practicable and consistent with health and safety requirements, until the operation of the mine precludes public access for safety reasons. Resolution has developed an Oak Flat Campground Management Plan consistent with the current Forest Service management of the campground, and will also incorporate additional measures to accommodate requests to periodically close the campground to the public for traditional and ceremonial purposes.

47.   Further permitting will be progressed with other authorities and a detailed feasibility study completed over several years to inform investment considerations on the project. When an investment decision is made, Resolution Copper is expected to take around 10 years to build infrastructure to prepare for mining.

DocuSign Envelope ID: 7F8BCF55-B883-4FA4-8D44-BE4F32C95E3C

48.    If we proceed with developing the project, the Oak Flat Campground will remain open for as long as it is safe, which is expected to be at least for the next few decades.

49.    Resolution Copper does not expect to see subsidence at the site for at least ten years.

**Resolution's Conservation Lands**

50.    Resolution's parcels to be conveyed to the US Forest Service and BLM include high-priority conservation lands that will be added to National Forests in Arizona, as well as lands that will be added to the San Pedro Riparian and Las Cienegas national conservation areas, managed by the Bureau of Land Management.[4]

51.    The conservation value of the lands being conveyed to the United States has been analyzed during the NEPA process. Each parcel was evaluated by Westland Resources for evidence of special species, habitats, or cultural or historical significance. Westland's reports were in turn included in the EIS administrative record.

52.    The Conservation Lands provide a range of benefits, as follows:

53.    *Apache Leap South End Parcel.* This land includes cultural, recreational, and scenic resources that are important to Superior, Native American tribes, and the general public. It is located above and below Apache Leap, an area of sheer cliff faces, hoodoos, and buttresses that frames the town of Superior and provides opportunities for hiking, rock climbing, and nature viewing. Additionally, numerous cultural resource inventories have identified sites representing Prehistoric, Protohistoric, and Historic Native American occupations and activities spanning several thousand years in the area within the parcel and the surrounding Apache Leap Special Management Area. This land has already undergone a separate NEPA process, which resulted in a final Environmental Assessment in August

---

[4] Resolution's conservation lands are described in the FEIS. ES-8 of the FEIS and page 13 provide thumbnail descriptions and detail the acreage. More detailed descriptions are provided on pages 51-53 of the FEIS.

DocuSign Envelope ID: ...

2017 and a final Decision Notice in December 2017. The Apache Leap Special Management plan excludes future grazing leases and limits construction and motorized vehicles in order to protect the area. Apache Leap South End Parcels are surrounded by NFS lands and would become part of the Apache Leap Special Management Area, administered by the Tonto National Forest. Upon title exchange, Resolution will also surrender all mining claims and interests to the parcels.

54.     *Tangle Creek Parcel.* The Tangle Creek parcel is located in the heart of Bloody Basin, long known for its rugged, scenic terrain and abundant hiking, camping, and hunting opportunities. The parcel is adjacent to the Seven Springs Recreation Area, Cave Creek Campground and Trailhead, and the Civilian Conservation Corps Campground. It is bisected by Tangle Creek and features a variety of trees and shrubs, including netleaf hackberry, mesquite, ash, and sycamore trees, many of which are believed to be over 100 years old. The netleaf hackberry groves provide exceptional habitat for migratory and nesting songbirds. The Tangle Creek parcel also has both pre-historic and historic value: it is believed that the property was farmed by Native Americans and homesteaded by the Babbitt family in the 1890s. Two of the previously cultivated farm fields are reverting to open woodlands or thickets of hackberry, mesquite, and cat-claw acacia. Reestablishment of these native plants will increase wildlife connectivity within the Bloody Basin by transforming the area into a migratory corridor with ideal habitat for various bird and mammal species.

55.     *Turkey Creek Parcel.* The Turkey Creek parcel is an inholding within the Tonto National Forest about eight miles southeast of Pleasant Valley and is the site of a historic homestead dating back to the 1880s. Turkey Creek flows through the property and supports abundant and diverse wildlife, including elk, mule deer, bear, and three species of native fish. It also provides potential habitat for bald eagles and the Chiricahua leopard frog, a threatened species. Additionally, Turkey Creek is within the proposed critical habitat for the Mexican spotted owl; the parcel has two Protected Activity Centers for this

10

(286 of 299), Page 286 of 299
Case: 25-5197, 09/29/2025, DktEntry: 61.13, Page 286 of 299
Case 2:21-cv-00068-DWL    Document 37-3    Filed 03/04/21    Page 13 of 26

DocuSign Envelope ID: 7E96E7B3-F58B-482B-A7A1-A0C57982B65F

threatened species. Public acquisition of this parcel presents a significant opportunity to preserve alluvial surface (rare in the area) by reestablishing native cottonwood and sycamore trees. Preservation of historical resources from the homestead era, including the cabin site, hand-dug well, and fruit trees, is also a significant opportunity offered by the parcel.

56.   *Cave Creek Parcel.* Totally surrounded by the Tonto National Forest, the property includes the lush Cave Creek riparian corridor. Wildlife present in the area include Neotropical migratory songbirds, raptors, amphibians, javelinas, mule deer, and coyotes. The Cave Creek parcel is also home to numerous archaeological sites, including petroglyphs, structure ruins, and grinding sites. This land would help protect Cave Creek and its riparian area; protect the prehistoric ruins, petroglyphs, and agricultural sites scattered throughout the parcel; provide for the enhancement and expansion of the Forest Service's trail network and other recreational opportunities in the area; and help consolidate Tonto National Forest lands.

57.   *East Clear Creek Parcel.* East Clear Creek, which extends more than two miles through the property, contains riparian and aquatic ecosystems which have long been recognized for their scarcity and overall contribution to wildlife diversity in the Coconino National Forest. The land has also been featured in *Arizona Highways* magazine. In 1993, a preliminary analysis was conducted to document a 25-mile portion of East Clear Creek (including the parcel) as being eligible for a scenic designation under the Wild and Scenic Rivers Act. Acquisition of this parcel will help protect the Mogollon Rim area of the Coconino National Forest, which is known for its outstanding natural beauty and unique landscape. The parcel provides habitat for a variety of resident big game, such as Rocky Mountain elk, mule deer, turkey, black bear, and Coues white-tailed deer. It also supports a variety of smaller resident mammals, such as beavers, raccoons, and ringtails, as well as diverse amphibian, reptile, and bird species. East Clear Creek has become a notable fishery with sustained populations of both rainbow and brown trout. The upper ridges provide

12-RCMSER-3229

DocuSign Envelope ID: ...

habitat for a variety of big game and are home to native fish species occurring within the East Clear Creek system, including bluehead suckers, Little Colorado suckers, speckled dace, roundtail chub, and the Colorado spinedace. The segment of East Clear Creek flowing through the property is a designated critical habitat for these species. The property provides suitable habitat for other federally-threatened, endangered, proposed, and sensitive species, including the southwestern willow flycatcher, bald eagle, Mexican spotted owl, Chiricahua leopard frog, peregrine falcon, northern goshawk, northern leopard frog, Arizona southwestern toad, and the narrow-headed garter snake.

58.      *Lower San Pedro River Parcel.* The San Pedro River is unique, as it is one of only two major rivers that flow north out of Mexico into the United States and is one of the few remaining free-flowing rivers in the Southwest. These qualities of the San Pedro River ecosystem have earned it The Nature Conservancy's designation as one of the "Last Great Places on Earth." Deep in the bosque that forms part of this parcel (believed to be one of the largest remaining in the Southwest), a free-flowing artesian spring creates a rare wetland populated by lowland leopard frogs and nesting birds. This area has also been recognized by the Tucson Audubon Society and BirdLife International as an "Important Bird Area." It contains habitat for various threatened, endangered, proposed, and candidate species, including the cactus ferruginous pygmy owl, the southwestern willow flycatcher, the yellow-billed cuckoo, and the Gila topminnow. The San Pedro corridor is one of the most important riparian habitats in the Sonoran and Chihuahuan deserts, with more than 390 species of birds and a highly diversified mammal population. It also has a rich cultural history: a cultural resources inventory report performed by WestLand Resources in 2017 identified 59 archaeological sites within the parcel.

59.      *Appleton Ranch Parcel.* This property offers protection to land within the boundaries of the Appleton Whittell Research Ranch. The land acquired from the Appletons will eliminate non-federal lands that are intermingled with and adjacent to the Las Cienegas National Conservation Area established by Congress in December 2000. The

12-RCMSER-3230

mission of the Research Ranch is to formulate, test, and demonstrate methods to restore and safeguard the bioregion, and to assist citizens and policy makers in the protection and stewardship of our native ecosystems, natural resources, and quality of life. In 1980, The National Audubon Society assumed management of the Research Ranch, which is now a cooperative partnership among the National Audubon Society, Forest Service, Bureau of Land Management, and the Research Ranch Foundation. The dozens of ongoing projects at the Ranch have a common goal of working toward preservation of the grassland ecosystems in the Southwest. More than 90 species of native grass and 480 native plant species create a biologically rich plant community. Over 200 species of birds use the Ranch for wintering, breeding, or as a migratory habitat and more than 60 species of mammals have been found on the Ranch, including pronghorn. The land is also suitable habitat for threatened, endangered, proposed, and sensitive species, including the Huachuca water umbel, Canelo Hills ladies' tresses, Gila chub, Gila topminnow, desert pupfish, Chiricahua leopard frog, Mexican spotted owl, bald eagle, western yellow-billed cuckoo, ocelot, jaguar, lesser long-nosed bat, Huachuca springsnail, northern Mexican gartersnake, and golden eagle.

60. *Dripping Springs Parcel.* This land is situated in the Dripping Springs Mountains near Tam O'Shanter Peak in Gila County. It is almost completely surrounded by BLM-administered lands, with some adjacent ASLD-administered State Trust land. The Dripping Springs parcel includes rock formations with excellent climbing opportunities. National and local rock climbers also indicate that this is a significant rock-climbing resource.

### Protecting Arizona's Cultural Heritage: Some Highlights

61. As the lead agency overseeing the multi-year federal review of the project, the Forest Service has participated in hundreds of consultations with communities and

DocuSign Envelope ID: ...

DocuSign Envelope ID: ...

tribal nations since 2008.[5]

62.     Resolution conducted a multi-year ethnographic and ethnohistoric study in partnership with consulting tribes and the Forest Service to identify places, areas, artifacts, and natural features of importance.[6]

63.     Over the past 15 years more than 150 cultural baseline studies and reports, including a variety of tribal perspectives, have been conducted and prepared to inform consultation with Native American tribes.

64.     In 2018, Resolution funded a new Tribal Monitor program, hosted by the Forest Service. This innovative program ensures tribal members are a part of the informed decision-making process to identify areas, resources, and sites of importance. More than 30 members from seven Native American tribes have been trained and employed to work alongside archaeologists and biologists to gather baseline information and tribal perspectives within the footprint of the Resolution Copper Project. In June 2020, the Arizona Preservation Foundation and State Historic Preservation Office recognized the program at the Governor's Heritage Preservation Honor Awards. To date, Tribal Monitor crews have performed approximately 61,000 acres of pedestrian surveys.

65.     Apache elders have made it clear during consultation that Emory oaks are culturally significant trees that produce acorns that are traditionally harvested and used as a food source for the Western Apache. Grazing and other practices are preventing the new growth of younger trees. In recognition of the cultural importance of this species, the Forest Service, consulting Western Apache tribes, Northern Arizona University, and Resolution are partnering through a multi-year program to study, protect, and conserve Emory oak groves across Arizona.

---

[5] *See* Appendix S of the Final EIS, which lists the consultation records between the Tonto National Forest and the Tribes.
https://www.resolutionmineeis.us/sites/default/files/feis/resolution-final-eis-vol-6.pdf
[6] Hopkins, M.P., C. Colwell, T.J. Ferguson, and S.L. Hedquist. 2015. *Ethnographic and Ethnohistoric Study of the Superior Area, Arizona.* Prepared for Tonto National Forest and Resolution. Tucson, Arizona: Anthropological Research LLC.

12-RCMSER-3232

DocuSign Envelope ID: ...

**Measures to Address Tribal Concerns**

66.     The Act directs the Forest Service to "consult with Resolution and seek to
find mutually acceptable measures to—(i) address the concerns of the affected Indian
tribes; and (ii) minimize the adverse effects on the affected Indian tribes resulting from
mining and related activities on the Federal land conveyed to Resolution under this
section."[7]  16 USC § 539p (c)(3)(B).

67.     For over 11 years, Tribes have been consulted meaningfully and consistently
on the proposed project. They have had considerable influence on various activities,
including protecting traditional cultural properties; avoiding medicinal plants, springs, and
ancestral sites for activities related to the project; completing a comprehensive
ethnographic report; nominating the Oak Flat Traditional Cultural Property to the National
Register of Historic Places; implementing a tribal monitoring program; and creating a
program to protect and restore Emory oak groves. The compensatory funds described
below were developed in response to the tribal consultation efforts.

68.     Mutually acceptable measures identified through consultation have already
been initiated, implemented, or completed, including, but not limited to:

69.     *Funding and Completion of Ethnographic and Ethnohistory Study of the
Superior Area.* In response to tribal requests, and working collaboratively with Tribes,
Resolution funded, and the Forest Service managed, completion of an ethnographic and
ethnohistoric study. Information from the study provided the basis for environmental and
cultural analysis and the development of additional mitigation measures.

70.     *Implementation of a Tribal Monitor Program.* At the request of various

---

[7] The tribes with traditional territory claims to the general area in which the 2,422
acres known as the Oak Flat Federal Parcel are located—the Fort McDowell Yavapai
Nation, the Gila River Indian Community, the Hopi Tribe, the Mescalero Apache Tribe,
the Pueblo of Zuni, the Salt River Pima-Maricopa Indian Community, the San Carlos
Apache Tribe, the Tonto Apache Tribe, the White Mountain Apache Tribe, the Yavapai-
Apache Nation, and the Yavapai-Prescott Indian Tribe—are described as a Tribe or
Tribes.

tribes, Resolution funded, and the Forest Service implemented, a Tribal Monitor Program, including both training and employment, to gather baseline cultural and natural resource information and tribal perspectives for use during environmental and cultural resource analysis and to support development of additional mitigation measures. To date, more than 50 tribal members have been trained, and 30 tribal members from seven Tribes employed, with approximately $1.8 million paid to tribal members in wages and benefits in 2018 and 2019.

71. *Initiation of Emory Oak Collaborative Tribal Restoration Initiative.* In partnership with the Forest Service, Resolution has funded Northern Arizona University and Tribal Monitors to gather biological and cultural field data to define treatments that would form a multi-year restorative field work program. The identification of the Emory Oak groves and field work is directed by the Forest Service in consultation with tribal elders from the Yavapai Apache, White Mountain Apache, San Carlos Apache and Tonto Apache. Data gathering, analysis, and treatments have already begun.

- The program is intended to restore and protect Emory oak groves that are accessed by Apache communities for traditional subsistence gathering and ensure their sustainability for future generations.
- This Tribal Restoration Initiative is designed to partially address the adverse effects on the loss of the oak groves within the Chi'chil Bildagoteel Historic District, which is within the Oak Flat Federal Parcel.

72. *Design features for the Resolution Copper Project.* In response to public and agency comments, as well as tribal consultation, components of the Resolution Copper Project have been modified or relocated as follows:

- The proposed tailings storage facility has been relocated from National Forest lands to Arizona State and private lands, avoiding disturbance of Forest resources, including seeps and springs identified by Tribes as having cultural importance.

12-RCMSER-3234

- The Oak Flat Access and Management Plan has been developed and adopted to ensure that current management continues and assuring Tribal access for traditional, cultural, and ceremonial purposes.

- Power and pipeline infrastructure has been routed to avoid physical impacts Devil's Canyon and Queen Creek. The proposed tailings conveyance pipeline and associated power lines have been located to avoid resources identified as culturally important during tribal consultation, including Devil's Canyon and Queen Creek.

- *Subsidence Monitoring and Management Plan.* The subsidence monitoring plan was developed to help avoid impacts to cultural resources, including Devil's Canyon and the Apache Leap Special Management Area, and will be used to manage continued access to Oak Flat and the Oak Flat Campground.

- *Monitoring and Mitigation Plan for Groundwater Dependent Ecosystems.* In response to expressed concerns over potential impacts to groundwater dependent ecosystems from Tribes and others, Resolution has developed and the Forest Service has approved a monitoring and mitigation plan which will mitigate potential impacts associated with the mining project.

- In collaboration with consulting Tribes, Resolution has agreed to salvage select natural resources with cultural significance from the footprint of the Land Exchange area, tailings pipeline corridor, and tailings storage facility.

73.     Further, in order to partially address effects on the Chi'chil Bildagoteel Historic District and other historic properties significant to Tribes, Resolution is committing $15 million, in installments at various project milestones, to fund three programs:

- *Tribal Monitor Program.* This program, discussed above, coordinates and administers the continued use of tribal monitors to work on NHPA Section 106 and 110 projects on public lands, including providing for the training of

17

monitors and payment of a tribal monitor salary for select public projects.

- *Emory Oak Collaborative Tribal Restoration Initiative.* This initiative will commence at the conclusion of the Emory Oak Collaborative Tribal Restoration Initiative funded by Resolution and will fund oak grove treatments, monitoring and research, cultural research or activities, and educational activities.

- *Tribal Youth Program.* This program will fund the development of a Tribal Youth Program in partnership with the Forest Service and consulting Tribes to provide cultural and educational opportunities to tribal youth.

74.    *Endowment for Tribal Cultural Heritage Fund.* In order to partially address the physical and visual effects on the Chi'chil Bildagoteel Historic District and other historic properties significant to Tribes, Resolution will deposit, in installments at various project milestones, a total of $20 million into an endowment fund from which the Tribes may receive direct financial support for activities that further the receiving Tribe's preservation, protection, recognition, or development of its culture or heritage. The concept of this fund was developed through government-to-government consultation and its purpose is to provide a fund from which Tribes could request financial support for activities that do not fit under the other tribal-related funding programs.

75.    *Tribal Education Fund.* To partially address effects on the Chi'chil Bildagoteel Historic District and other historic properties significant to Tribes, Resolution will deposit a total of $6.5 million, in installments at various project milestones, into an endowment fund to fund scholarships for tribal members pursuing two-year and four-year courses of post-secondary education at an accredited college, university, vocational school, or community college.

### Additional Mitigation Efforts Associated with the Land Exchange

76.    *Oak Flat Historic Properties Treatment Plan ("HPTP").* The Forest Service has completed preparation of an archaeological HPTP for the Oak Flat Federal Parcel to

resolve adverse effects on historic properties eligible for the National Register of Historic Places.

77. *General Plan of Operations Research Design and Treatment Plans.* The Forest Service has prepared an archaeological Research Design (GPO Research Design) in consultation with the State Historic Preservation Office, Tribes, and appropriate managing agencies to guide the development of treatment plans to address adverse effects on historic properties within the GPO project areas and the Section 404 permit compensatory mitigation parcels (i.e., West Plant Site, Magma Arizona Railroad Company ("MARRCO") corridor, tailings facility, etc.).

78. *Copper Triangle Community Development Fund.* Resolution has agreed that at various project milestones it will place a total of $5 million into a designated fund that will focus on the built environment located within the visual/atmospheric/socioeconomic and cumulative effects of the Area of Potential Effects. The primary purpose of the fund is to address effects on historic properties and other community infrastructure within the communities of Superior, Miami, Globe, Kearny, Hayden, and Winkelman. The monies in the fund will financially support a revolving loan program. Applications for use of monies from the Community Development Fund will be reviewed by a committee consisting of representatives from the State Historic Preservation Office, the applicable administering organization, and the affected communities. Specific parameters for the Community Development Fund will be defined through consultation between Resolution Copper, applicable administering organization(s), and the State Historic Preservation Office and will be:

- available to municipalities, counties, non-profits, private citizens, and private organizations;
- prefer projects participating in other historic preservation incentive programs; and
- prefer projects agreeing to repay funds within 5 years of award, with

extensions possible.

79. *Archaeological Database Funds.* Resolution has agreed that it will deposit $2 million, in installments, into a restricted fund for use by the State of Arizona for the creation and/or enhancement and/or management of existing electronic archaeological databases.

80. *Castleberry Campground.* Resolution has agreed to establish an alternative campground site known as Castleberry to mitigate the loss of Oak Flat Campground. The new Castleberry Campground will be located on private property owned by Resolution near the town of Superior that contains numerous prehistoric and historic-era historic properties. All efforts will be made to avoid effects on these properties when developing the campground facilities. If effects on any of the identified historic properties from construction of the Castleberry Campground cannot be avoided, a Historic Properties Treatment Plan will be developed to address the effects and implemented prior to the campground being constructed. A plan will be developed in consultation with the Tribes to install interpretive signs at a few historic properties located near the Castleberry Campground.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. This Declaration was executed on February 26, 2021.

*Vicky Peacey*
_____
Victoria Peacey

12-RCMSER-3238

# Exhibit A

**Legend**

- Apache Leas Special Managment Area
- Oak Flat Withrawal Boundary
- Oak Flat LEX Boundary
- Resolution Holdings

**Resolution Claims**
- Unpatented
- Patented

**Surface Management (BLM 2012)**
- Private Land (No Color)
- State Trust Land
- US Forest Service (USFS)

RESOLUTION
C O P P E R

Resolution Copper Claims Within
the ALSMA and Oak Flat LEX Parcel

June 10, 2019
Prepared By: Mary Morissette

Exhibit A

# Exhibit B

**Legend**

- TCP Boundary (approximate)
- Oak Flat Withdrawal Boundary (approximate)
- Resolution Copper Unpatented Claims
- Resolution Copper Patented Claims
- Resolution Holdings

Surface Management (BLM 2012)

- Private Land (No Color)
- State Trust Land
- US Forest Service (USFS)

TCP Boundary and Oak Flat Withdrawal Boundary as depicted in an undated map titled "Map A" contained in the National Register of Historic Places Registration Form dated 2/26/2015 signed by David M. Johnson, Federal Preservation Officer, USDA Forest Service, Southwestern Region.

Pinal County, Arizona,
Superior and Teapot Mountain
USGS 7.5' Quadrangles

0    1,000    2,000
Feet
500

N

**RESOLUTION COPPER**
Traditional Cultural Property
Nomination for
*Chi' chil Bildagoteel*

*Chi' chil Bildagoteel / Oak Flat*
July 14, 2015

12-RCMSER-3242