## Nos. 25-5185, 25-5189, 25-5197

---

# In The United States Court of Appeals
# for the Ninth Circuit

---

ARIZONA MINING REFORM COALITION; et al.,

*Plaintiffs-Appellants,*

v.

BROOKE L. ROLLINS, U.S. Secretary of Agriculture, et al.,

*Defendants-Appellees,*

and

RESOLUTION COPPER MINING LLC,

*Intervenor-Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Arizona
No. 2:21-cv-00122-PHX-DWL
Hon. Dominic W. Lanza

---

### MOTION OF RESOLUTION COPPER MINING LLC
### TO LIFT THE TEMPORARY ADMINISTRATIVE INJUNCTION

Christopher D. Thomas
Andrea J. Driggs
Janet M. Howe
Benjamin A. Longbottom
HOLLAND & HART LLP
2398 E. Camelback Rd, Suite 650
Phoenix, AZ 85016
(602) 507-9704
CDThomas@hollandhart.com

Michael R. Huston
 *Counsel of Record*
Diane M. Johnsen
Nicholas S. Crown
Samantha J. Burke
Addison W. Bennett
PERKINS COIE LLP
2525 E Camelback Rd, Suite 500
Phoenix, AZ 85016
(602) 351-8000
MHuston@perkinscoie.com

*Counsel for Resolution Copper Mining LLC*

SAN CARLOS APACHE TRIBE, a federally recognized Tribe,

*Plaintiff-Appellant,*

v.

UNITED STATES FOREST SERVICE,
an agency of the U.S. Department of Agriculture, et al.,

*Defendants-Appellees,*

and

RESOLUTION COPPER MINING LLC,

*Intervenor-Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Arizona
No. 2:21-cv-0068-PHX-DWL
Hon. Dominic W. Lanza

GOUYEN BROWN LOPEZ, et al.,

*Plaintiffs-Appellants,*

v.

UNITED STATES OF AMERICA, et al.,

*Defendants-Appellees,*

and

RESOLUTION COPPER MINING LLC,

*Intervenor-Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Arizona
No. 2:25-cv-2758-PHX-DWL
Hon. Dominic W. Lanza

# Table of Contents

INTRODUCTION ................................................................ 1

BACKGROUND ................................................................. 4

ARGUMENT .................................................................... 6

    A.    Plaintiffs' still-pending motions do not make a remotely
        sufficient showing for extraordinary emergency relief. ......... 7

    B.    The temporary administrative injunction has far
        exceeded an appropriate duration. ........................................ 9

    C.    Resolution faces increasing irreparable harm under the
        administrative injunction. ................................................... 12

CONCLUSION ................................................................ 20

CERTIFICATE OF COMPLIANCE .......................................... 22

# Table of Authorities

**CASES**

*Al Otro Lado* v. *Wolf,*
　945 F.3d 1223 (9th Cir. 2019)..............................................................10

*Doe #1* v. *Trump,*
　944 F.3d 1222 (9th Cir. 2019)..........................................................2, 11

*Doe* v. *San Diego Unified Sch. Dist.,*
　19 F.4th 1173 (9th Cir. 2021) ..........................................................7, 11

*Earth Island Inst.* v. *Carlton,*
　626 F.3d 462 (9th Cir. 2010)..............................................................8, 9

*June Med. Servs., L.L.C.* v. *Gee,*
　139 S. Ct. 661 (2019) (Alito, J., in chambers) ....................................10

*Lackey* v. *Stinnie,*
　604 U.S. 192 (2025)..........................................................................3, 11

*Mi Familia Vota* v. *Fontes,*
　111 F.4th 976 (9th Cir. 2024) ...............................................................13

*National Urban League* v. *Ross,*
　977 F.3d 698 (9th Cir. 2020)............................................2, 6, 10, 11, 12

*Nken* v. *Holder,*
　556 U.S. 418 (2009) ..............................................................................10

*Seven County Infrastructure Coal.* v. *Eagle Cnty.,*
　145 S.Ct. 1497 (2025)..............................................................................8

*Starbucks Corp.* v. *McKinney,*
　602 U.S. 339 (2024) ..............................................................................11

*United States* v. *Texas,*
　144 S. Ct. 797 (2024)..................................................................6, 10, 11

*Western Watersheds Project* v. *Salazar,*
　692 F.3d 921 (9th Cir. 2012)...................................................................9

*Winter* v. *NRDC, Inc.*,
    555 U.S. 7 (2008) .................................................... 3, 4, 5, 6, 7, 10, 11

*Wisconsin Right to Life, Inc.* v. *FEC*,
    542 U.S. 1305 (2004) ................................................................ 6, 7, 9

## STATUTES

16 U.S.C. § 539p ............................................................................ 1

16 U.S.C. § 539p(a) ............................................................... 4, 7, 16

16 U.S.C. § 539p(c)(8) ................................................................... 4

16 U.S.C. § 539p(c)(10) ............................................................ 2, 5

16 U.S.C. § 539p(g) ...................................................................... 4

28 U.S.C. § 1292(a)(1) .................................................................. 1

## RULES

9th Cir. R. § 34-3 .......................................................................... 5

Fed. R. App. P. § 8 ....................................................................... 1

Fed. R. App. P. § 27 ..................................................................... 1

Fed. R. Civ. P. § 65(b)(2) ............................................................. 6

## OTHER AUTHORITIES

Felicity Barringer, *Thirsty for power and water, AI-crunching data
    centers sprout across the West*, & The West (Apr. 8, 2025) ................ 19

## INTRODUCTION

Pursuant to Federal Rules of Appellate Procedure 8 and 27, Appellee Resolution Copper Mining LLC respectfully moves to dissolve the "temporary administrative injunction" entered by a motions panel of this Court 43 days ago on August 18. Dkt. 19. Plaintiffs-Appellants have not shown any likelihood of success on their claims that could justify the extraordinary remedy of this injunction *against an Act of Congress*. And the injunction is causing increasingly significant and irreparable harm to Resolution.

These appeals arise from the district court's denials of motions for a preliminary injunction to block execution of the Southeast Arizona Land Exchange and Conservation Act, 16 U.S.C. § 539p. The district court found that none of Plaintiffs' claims raises even a serious question on the merits, and independently that the equities do not weigh in Plaintiffs' favor because Congress has already balanced them. The district court also denied Plaintiffs' motions for an injunction pending appeal, because they have no realistic possibility of success on their claims.

Plaintiffs appealed to this Court under 28 U.S.C. § 1292(a)(1). They also submitted emergency motions to enjoin the government from complying with the Exchange Act during the appeal. Those motions remain undecided: A motions panel of this Court expressly took "no position on the merits" of Plaintiffs' emergency motions and instead referred them to

the merits panel. The motions panel also significantly "expedite[d]" the briefing and oral argument schedule.

The motions panel issued a "temporary administrative injunction" against the Exchange Act "to preserve the status quo" until the merits panel can consider the emergency motions. That administrative injunction has now remained in effect for more than six weeks. The government has thus been blocked from complying with an unambiguous congressional deadline. *See* 16 U.S.C. § 539p(c)(10). And Plaintiffs have received the extraordinary remedy of an injunction against a federal statute without *any judge* having found that they are likely to succeed on their claims or that the balance of equities supports injunctive relief.

Respectfully, controlling precedent on equitable remedies establishes that the administrative injunction cannot persist, and a prompt ruling on Plaintiffs' emergency motions is legally required. *See, e.g.*, *Doe #1* v. *Trump*, 944 F.3d 1222, 1223 (9th Cir. 2019) (an administrative order merely "preserve[s] the status quo until the substantive motion … can be considered on the merits"); *National Urban League* v. *Ross*, 977 F.3d 698, 700-701 (9th Cir. 2020) (same). Such prompt action is also critically necessary to mitigate the ongoing and growing irreparable harm that Resolution suffers while the administrative injunction remains in place. As explained below, the current injunction has forced Resolution into a difficult financial situation that is increasingly causing significant injury to its business and workforce. The injunction is therefore a real

threat to progress on Congress's national-security objectives, and to the success of Resolution's surrounding community and the many tribes that support the project. It is deeply inequitable for Resolution, its employees (many of whom are San Carlos Apache Tribe members), and its neighbors to face these threats from an administrative injunction. And Supreme Court precedent makes this injunction especially unsustainable where the district court correctly determined that none of Plaintiffs' challenges is likely to succeed. *See Lackey* v. *Stinnie*, 604 U.S. 192, 198 (2025) ("[A] finding of *likely* success on the merits is a prerequisite to preliminary injunctive relief." (citing *Winter* v. *NRDC, Inc.*, 555 U.S. 7, 20 (2008)).

Resolution therefore respectfully requests that this Court immediately dissolve the temporary administrative injunction. When the Court takes up the pending emergency motions for an injunction pending appeal, it should deny them for the reasons stated in the district court's well-reasoned orders, as well as in Defendants' motion papers and merits briefs to this Court. In brief: Plaintiffs' claims are plainly meritless, and the equities weigh strongly against countermanding Congress's national-security judgment with an injunction.

The federal appellees support this motion. Appellants the San Carlos Apache Tribe ("Tribe"), Arizona Mining Reform Coalition et al. ("AMRC"), and Gouyen Brown Lopez et al. ("Lopez") oppose it.

- 3 -

BACKGROUND

1.     These appeals arise from the district court's denial of three requests for a preliminary injunction halting the Exchange Act. The Act requires the Secretary of Agriculture to convey to Resolution a parcel of federal land in Southeast Arizona known as Oak Flat—located in Arizona's "Copper Triangle," where copper has been mined for more than a century. The land exchange will enable Resolution to re-purpose and expand existing mining infrastructure to extract enormous supplies of copper—a mineral indispensable to American life and national security. 16 U.S.C. § 539p(c)(8). In exchange, Resolution will convey to the United States a much larger swath of land, including the culturally significant "Apache Leap" site, for permanent conservation. *Id*. § 539p(g). Congress directed that the land exchange be "expedite[d]," *id*. § 539p(a), in light of the urgent national-security need for copper.

In two orders totaling approximately 115 pages of analysis, the district court comprehensively explained that no Plaintiff is entitled to the "extraordinary remedy" of an injunction preventing the statutorily mandated exchange of title. *Winter*, 555 U.S. at 20, 22; *see* 1-AMRCER-2–95; Lopez-ER-4–23. The district court concluded that none of Plaintiffs claims raises even a "serious question" on the merits. 1-AMRCER-7; Lopez-ER-22. It further held that, even independent of the merits, it "would still decline to issue injunctive relief" in balancing the equities. *Id.* The court explained that Plaintiffs' arguments properly lie with "the

- 4 -

political branches," and that the judiciary cannot override Congress's decision to exchange the land at issue. *Id.*

Crucially, the district court also correctly observed that Congress set a specific deadline for the land exchange: the Secretary "shall convey" the federal land to Resolution "[n]ot later than 60 days after the publication" by the U.S. Forest Service of a "final environmental impact statement" (FEIS). 16 U.S.C. § 539p(c)(10). That deadline was August 19, 2025. 1-AMRCER-2. Recognizing the importance of Congress's chosen deadline, the district court expedited its review—ordering briefing to occur over just a few weeks in July, holding a six-hour oral argument on August 5, and issuing its decisions fewer than two weeks later.

In rejecting Plaintiffs' challenges, the district court also denied Plaintiffs' request for an injunction pending appeal, reiterating that such relief was inappropriate because "the *merits* of Plaintiffs' claims do not … present close or serious questions." 1-AMRCER-95.

2.    Plaintiffs appealed, and the case was placed on the Court's accelerated "preliminary injunction schedule." Dkt. 2; *see* 9th Cir. R. 34-3 (defining "applications for temporary … injunctions" as "entitled to priority in hearing"). Plaintiffs also filed three separate emergency requests for injunctions pending appeal. Dkt. 12 (AMRC); Dkt. 12, No. 25-5189 (Tribe); Dkt. 5, No. 25-5197 (Lopez).

The motions panel responded by "expedit[ing]" the briefing schedule and ordering that the case be set for oral argument on "the next avail-

able calendar." Dkt. 19 at 2. The motions panel declined to rule on and took "no position on the merits" of the emergency motions, referring them instead to the merits panel. *Id*. But the motions granted a "temporary administrative injunction," blocking the land exchange "while the motions are pending." *Id*.

## ARGUMENT

The Court should promptly dissolve the temporary administrative injunction issued 43 days ago. Plaintiffs' emergency motions do not come close to demonstrating entitlement to the "extraordinary remedy" of an "injunction pending appeal barring the enforcement of an Act of Congress." *Wisconsin Right to Life, Inc*. v. *FEC*, 542 U.S. 1305, 1305-1306 (2004) (cleaned up). That temporary injunction has now exceeded any legally permissible duration—a brief period lasting only as needed to allow "the substantive motion" to be "considered on the merits." *National Urban League*, 977 F.3d at 700-701. As Justice Barrett recently explained regarding a closely analogous equitable remedy: "[a]n administrative stay should last no longer than necessary to make an intelligent decision on the motion for a stay pending appeal." *United States* v. *Texas*, 144 S. Ct. 797, 798-799 (2024) (Barrett, J., concurring); *cf*. Fed. R. Civ. P. 65(b)(2) (temporary restraining orders generally are "not to exceed 14 days"). The current injunction is unsupported by any judicial finding on the *Winter* factors: no judge has found that Plaintiffs are likely to succeed on the merits, or that the equities and public interest can justify halting

- 6 -

an Act of Congress. And the injunction is causing serious and ever-increasing irreparable harm to Resolution and its employees, contractors, local government partners, tribal members, neighboring communities, and other stakeholders in the critical-mineral mining project that Congress "direct[ed]" and "expedite[d]" a decade ago. 16 U.S.C. § 539p(a).

### A. Plaintiffs' still-pending motions do not make a remotely sufficient showing for extraordinary emergency relief.

As Resolution explained in opposing the emergency applications for injunction pending appeal, Dkt. 14.1, no Plaintiff has demonstrated the requisite "most critical and exigent circumstances" that would be needed to justify an "injunction pending appeal" against an "Act of Congress." *Wisconsin Right to Life*, 542 U.S. at 1305-1306 (citation omitted). Plaintiffs' request for an injunction pending appeal is governed by the four-factor "test for preliminary injunctions." *Doe* v. *San Diego Unified Sch. Dist.*, 19 F.4th 1173, 1176-1177 (9th Cir. 2021); *see Winter*, 555 U.S. at 20. But as shown in Defendants' motion papers, Plaintiffs' motions failed to make the required showing at every step.

This Court now has the benefit of all parties' principal briefs, which make the multiple fatal deficiencies in Plaintiffs' case even more apparent than in the emergency briefing. In short, the district court was correct—and certainly did not abuse its discretion—in denying Plaintiffs' requested injunctions. Plaintiffs are especially unlikely to succeed on appeal given this Court's "limited and deferential" standard appellate of

review. *Earth Island Inst.* v. *Carlton*, 626 F.3d 462, 468 (9th Cir. 2010); Dkt. 80 ("Resolution Br.") 21.

Plaintiffs' claims suffer from a host of threshold deficiencies. They lack Article III standing because their asserted harms arise not from the land exchange that they seek to enjoin, but from a far-off alleged loss of access to Oak Flat that will not occur for at least another *ten years*. Resolution Br. 24–25. Their claims are not redressable: it was Congress that mandated the land exchange and provided no discretion for any federal agency to override that decision. Resolution Br. 25–28. And for similar reasons, Plaintiffs' requested remedy—vacatur of the FEIS—is unavailable because no amount of additional agency process could change Congress's decision to complete this land exchange. Resolution Br. 28–29.

The district court correctly held that Plaintiffs' attempts to nitpick the FEIS's environmental analysis under NEPA are unsupported by the record—especially given the Supreme Court's recent admonitions that "the central principle of judicial review in NEPA cases is deference" to the agency. *Seven County Infrastructure Coal.* v. *Eagle Cnty.*, 145 S.Ct. 1497, 1511 (2025); Resolution Br. 33–51. Plaintiffs also lack a cause of action for those claims under the Administrative Procedure Act because the FEIS is not final agency action. Resolution Br. 29–33. Plaintiffs' failure-to-consult claims are belied by the record, which demonstrates *hundreds* of consultation meetings with the San Carlos Apache Tribe and the Forest Service's rigorous adherence to the National Historic Preservation

- 8 -

Act. Resolution Br. 52–58. Plaintiffs also cannot overcome the district court's conclusion that their challenges to the Forest Service's appraisals are "absurd" because they defy federal law and would require Resolution to pay for mineral-mining rights that it already owns. Resolution Br. 59–66. And Plaintiffs' religious-practice claims are both untimely and foreclosed by Supreme Court precedents, as well as this Court's en banc decision declining to enjoin the Exchange Act on constitutional grounds. Resolution Br. 66–81; *see Wisconsin Right to Life*, 542 U.S. at 1305-1306 (injunction pending appeal is "particularly" "extraordinary" when the Court has found the statute at issue "facially constitutional").

Plaintiffs' requests for an injunction pending appeal also fail independently of the merits: The district court correctly concluded that the equitable factors do not support relief. Because "[t]he assignment of weight to particular harms is a matter for district courts to decide," *Earth Island*, 626 F.3d at 475, Plaintiffs must identify "clear factual error" in the court's equitable balancing, *Western Watersheds Project* v. *Salazar*, 692 F.3d 921, 923 (9th Cir. 2012). They come nowhere close to carrying that heavy burden. Resolution Br. 81–89.

## B. The temporary administrative injunction has far exceeded an appropriate duration.

The motions panel's temporary administrative injunction was entered to supply a *brief* period to allow the "the substantive motion" to be "considered on the merits." *National Urban League*, 977 F.3d at 700-701

(citation omitted); *accord Texas*, 144 S. Ct. at 798-799 (Barrett, J., concurring). But no legal rule or case law permits a temporary "administrative" injunction to last 43 days and counting. On September 2, when the injunction had been effective for just over two weeks, the United States submitted a letter to the Court explaining why "it is imperative for the pending motions to be resolved promptly." Dkt. 36 at 2. Since then, an additional 28 days have passed.

That result is untenable as a matter of law. An injunction pending appeal is never permissible absent a "clear showing" that the Plaintiff can satisfy the applicable four-factor test. *Winter*, 555 U.S. at 20. Because an *administrative* injunction "does not reflect any view regarding the merits," it can be warranted only for a short time as necessary to provide the Court "time to review th[e] filings." *June Med. Servs., L.L.C.* v. *Gee*, 139 S. Ct. 661 (2019) (Alito, J., in chambers); *see Al Otro Lado* v. *Wolf*, 945 F.3d 1223, 1224 (9th Cir. 2019) (administrative stay was "not in any respect on the merits of the dispute"). Thus, the "real problem" with administrative injunctions, and "the one lurking in this case[,] is the risk that a court will avoid" consideration of the four-factor test "for too long." *Texas*, 144 S. Ct. at 799 (Barrett, J., concurring) (citing *Nken* v. *Holder*, 556 U.S. 418 (2009)). Put simply, "[o]nce the court is equipped to rule, its obligation to apply the [injunction] factors is triggered." *Id.*[1]

---

[1] Justice Barrett's *Texas* concurrence favorably cites two opinions authored by Judges of this Court making the same point. *See id.*; *Doe #1*,

That problem has arisen here—to Resolution's irreparable preju-
dice. Plaintiffs sought an emergency injunction pending appeal, which
required them to carry an extraordinarily heavy burden to demonstrate,
among other things, "a clear showing that [they] '[are] likely to succeed
on the merits.'" *Starbucks Corp.* v. *McKinney*, 602 U.S. 339, 349 (2024)
(quoting *Winter*, 555 U.S. at 20); *see Lackey*, 604 U.S. at 198; *Doe*, 19
F.4th at 1176-1177. Whatever justification existed on August 18 for issu-
ing a brief pause to evaluate Plaintiffs' request, it is unsustainable for
Plaintiffs to continue benefitting from "the undesired effect of allowing a
demonstrably incorrect injunction to remain in place without justifica-
tion." *Doe #1*, 944 F.3d at 1226 (Bress, J., dissenting). Plaintiffs have suc-
cessfully blocked a mandatory congressional deadline for six weeks even
though no judge has found that they are entitled to such exceptional relief
under *Winter*—and despite the district court's analysis forcefully demon-
strating the opposite. It therefore remains imperative that the administra-
tive injunction be lifted by a merits panel as soon as it can review the
"substantive motion." *National Urban League*, 977 F.3d at 700-701.

---

944 F.3d at 1226 (Bress, J., dissenting) ("We have had more than enough
time to consider the merits, and under the circumstances, not considering
the likelihood of success has the undesired effect of allowing a demon-
strably incorrect injunction to remain in place without justification.");
*National Urban League*, 977 F.3d at 705 n.5 (Bumatay, J., dissenting)
("We can't simply ignore the fact that the government is likely to prevail
on the merits here.").

To be clear: responsibility for the current delay does not rest with the Court or its staff. When the motions panel issued the temporary injunction and expedited the briefing schedule, it ordered that oral argument be scheduled "on the next available calendar." Dkt. 19 (citing Gen. Order 3.3(f) ("Such a case shall be assigned … to the next available panel … where the panels sitting for that calendar have not yet been assigned their cases.")). The Court then issued a notice that the case was being considered for argument in December 2025. Dkt. 39. But Plaintiffs AMRC and the Tribe then stated that they had collectively *zero* days of availability during *any* of the Court's December sittings. *See* Dkt. 45.1, 46.1. As Resolution and the United States explained, Dkt. 49.1, Plaintiffs' responses were insufficient: Neither attorney explained why their numerous co-counsels were not capable of delivering oral argument. *Id.* Under these circumstances, the time taken for this case to reach a merits panel has caused Resolution significant prejudice. Having sought and secured an injunction against Congress's deadline in the Exchange Act, Plaintiffs failed to make themselves available for the "next available calendar." Dkt. 19; s*ee* Gen. Order 3.2.

## C. Resolution faces increasing irreparable harm under the administrative injunction.

While the administrative injunction must be dissolved due to its duration, the injunction also should be dissolved for the independent reason that it is presently causing substantial irreparable harm to Resolu-

tion—and those harms grow worse every day. *Cf. Mi Familia Vota* v. *Fontes*, 111 F.4th 976, 984 (9th Cir. 2024) (vacating motions panel's "stay pending appeal" in light of "manifest injustice" caused by the "practical effect of the stay"). As discussed below and explained in further detail in the attached declaration of Resolution's President and General Manager Victoria Peacey (Exhibit A), the injunction is causing ever-increasing irreparable harm that poses significant risks to Resolution and a wide variety of stakeholders. These harms highlight the imperative need to lift the administrative injunction, and they also demonstrate that no injunction pending appeal is warranted.

Ms. Peacey's declaration explains how hundreds of millions of dollars, hundreds of jobs, tens of millions of dollars in investments in cultural, economic, employment, and educational initiatives, and Resolution's long-term business forecasts all hang in the balance while Resolution waits for the government to implement Congress's directive.

Specifically, Ms. Peacey explains that soon after Resolution and the United States complete the land exchange, Resolution plans to ramp up underground development, surface construction on private land that Resolution currently owns, and exploration of the surface and ore body from existing drill pads in preparation for the mine. Those operations would lead to a substantial increase in hiring, contractor engagement, and community and tribal investment. Peacey Decl. ¶¶ 11–18. Resolution will establish approximately 25 new positions to support its planned drilling

activities, and employ approximately 150 contractors in planned underground development and associated surface construction on private land. *Id*. ¶ 11. Consistent with Resolution's local-hire commitments reflected in the composition of its current workforce, Resolution's hiring will draw predominantly from neighboring local communities—including members of the San Carlos Apache Tribe—populations with historically high unemployment in the area known as the "Copper Triangle." *Id*. ¶ 13.

Shortly after the land exchange, Resolution would be able to spend hundreds of millions of dollars in procurement, making a massive investment in the local and regional community. *Id*. ¶ 14. Spending on procurement for the drilling program is budgeted for and anticipated to be around $100 million. And procurement spending for underground development and associated surface construction on private land is budgeted for and anticipated to be around $250 million. Consistent with Resolution's past practice, much of this spending will be directed toward local and Arizona-based businesses and contractors. *Id*.

Closing the exchange will also allow Resolution to release tens of millions of dollars marked for substantial educational, employment, economic, and cultural investments in partnership with its neighboring municipalities, tribes, and business partners. *Id*. ¶ 15. The exchange will trigger the release, for example, of $12 million into a trust established for the benefit of 11 tribes (including the San Carlos Apache Tribe) within 60 days after the land exchange. *Id*. The remainder of that trust—$41.5

million—will be released within six months after issuance of the Forest Service's final record of decision. *Id*.

Resolution will also distribute over $20 million in various ear-marked funds for recreational and riparian investments after the land exchange. *Id*. ¶ 17. It will, for example, make a water-rights purchase, a disbursement to the Water Conservation Fund, and an investment to the Emory Oak Restoration Project—a joint venture with the Forest Service to preserve sacred trees. *Id*. These and other projects explained in Ms. Peacey's declaration depend on the land exchange. *Id*. Many more millions of dollars will be distributed upon the final record of decision, which is anticipated to follow the land exchange. *Id*. ¶¶ 17, 18, 20.

All of those immense benefits are set to occur if the administrative injunction is lifted. In stark contrast, as Ms. Peacey explains, the hundreds of millions of dollars that stand to be disbursed—and the downstream positive effects on the region's economy, culture, educational opportunities, and environment—will be frozen if the land exchange cannot close in short order. *Id*. ¶ 20. It is not merely that certain disbursements will be delayed; as Ms. Peacey explains, the longer that the delay has stretched on, the more difficult it has become for Resolution to retain key staff and make economic commitments. *Id*. ¶ 21. Further delay would strike a serious blow to the timetable for the essential national-security interests that prompted Congress to "direct" and "expedite" the land exchange. A persistent injunction also threatens the multi-billion-dollar

investments that Resolution has made in reasonable reliance on that express statutory mandate. 16 U.S.C. § 539p(a); Peacey Decl. ¶ 22.

The irreparable and serious consequences of a lasting injunction, explained in detail in Ms. Peacey's declaration, include the following: Given Resolution's ongoing inability to begin tunneling and data collection of the copper resource thousands of feet below the Oak Flat parcel, Resolution faces a significant risk of having to reduce its on-site operations headcount by potentially ten to twenty percent. Peacey Decl. ¶ 22. These anticipated layoffs are the direct result of the injunction because, if the injunction were lifted and land exchange could close, Resolution would be able to activate those operations, providing a source of meaningful work to staff who are currently under-utilized. *Id.* At present, under the injunction, Resolution incurs significant expense maintaining thousands of feet of underground mining infrastructure, while retaining hundreds of workers to keep the mine in a production-ready state, despite being unable to proceed with this crucial data collection. *Id.* These anticipated layoffs will likely occur in the near future if the injunction is not lifted soon. *Id.* ¶ 23.

To keep the current facilities in a ready state—especially bringing breathable air into the mine and keeping water out—Resolution must spend approximately $11 million a month. *Id.* ¶ 22. These costs have taken a significant toll. Between 2021 and 2025, Resolution spent roughly $545 million in holding costs. *Id.* These ongoing holding costs are

necessary to preserve the current ready state while Resolution awaits the Court's ruling on the injunction requests, but these massive expenditures have no relation to the future profitability of the mine, making them irreparable.

Layoffs are not the only staffing problem that Resolution faces. Because many of its highly skilled professional workforce are currently employed with little to do, Ms. Peacey states that significant portions of the skilled technical staff are considering voluntarily departing Resolution. *Id.* ¶ 24. When these highly educated professionals depart a mining project, they almost invariably depart forever. *Id.* ¶¶24, 25. As Ms. Peacey explains, committing to work on a mining project like Resolution is a multi-year, sometimes multi-decade decision, often requiring a relocation for the professional and his or her family. *Id.* Departing one project for another means the professional (and his or her family) would make a similarly momentous commitment elsewhere, making their return even after litigation subsides highly unlikely.

The loss of these highly skilled professionals would be a particularly acute blow to Resolution because it will represent a significant and irreversible loss of institutional knowledge—including highly specific technical knowledge in the areas of underground mine design and planning, geotechnical engineering, underground hardrock hydrogeology, geometallurgy, metallurgical engineering, construction engineering, and copper prophyry geology. *Id.* ¶ 26. Due to the decline in the U.S. mining industry

over time, professionals with these technical talents are retiring and making it increasingly difficult to find replacements. *Id.* ¶ 27.

Moreover, as discussed above (at p.14–15), the land exchange is a crucial triggering event for tens of millions of dollars in educational, cultural, employment, economic, and recreational investment in Resolution's partner communities, including a $53.5 million trust established for the benefit of the local tribes. If the injunction remains in place, Resolution will be unable to make those significant disbursements that are specifically triggered by the closing of the exchange. *Id.* ¶¶ 28–30.

During the last six weeks, the administrative injunction has frozen roughly $350 million in anticipated procurement spending that depends on successful completion of the exchange. *Id.* ¶ 31. As Ms. Peacey explains, because a substantial majority of those contracts are with local and Arizona-based vendors, Resolution's inability to make these payments portends significant consequences on the entire local and regional economy. *Id.*

Additionally, the failure to promptly complete the land exchange stands to significantly delay the ability of Salt River Project (SRP), a provider of power utilities in Arizona, to deliver critical electrical infrastructure like transformers and power lines. *Id.* ¶ 32. This is because demand has surged from other Arizona sources that need significant amounts of

power—including AI data centers and other similar facilities.[2] *Id.* As Ms. Peacey explains, those projected surges in power demand in Arizona increase strain on Arizona utilities' ability to timely deliver necessary facilities to Resolution. The longer Resolution waits for the land exchange, the longer Resolution must await a record of decision on these power facilities, which keeps Resolution at the "end of the line" to engage SRP to construct the facilities. *Id.* Ms. Peacey estimates that significant delays in engaging SRP due to an injunction could lead to much longer overall project delays of many years. *Id.* That lost time is also an irreparable harm to Resolution—to say nothing of the Nation's national-security and economic interests reflected in the Exchange Act itself.

As Ms. Peacey explains, these delays caused by the injunction have presented a significant business risk to the Resolution Copper project and the communities it will support. The longer the injunction remains in place, the more likely that Resolution's controlling owners may ultimately reduce their annual spend in favor of other projects—risking a loss, impacting the local and regional economy, further constraining the domestic supply of copper, and increasing global copper prices. *Id.* ¶ 33.

---

[2] *See* Felicity Barringer, *Thirsty for power and water, AI-crunching data centers sprout across the West*, & The West (Apr. 8, 2025) (describing massive increase in SRP's demand from Arizona-based data centers), https://andthewest.stanford.edu/2025/thirsty-for-power-and-water-ai-crunching-data-centers-sprout-across-the-west/.

In short, the administrative injunction is not merely preserving the status quo without imposing any harm. Quite the contrary. Every day the injunction lasts, Resolution is precluded from quickly bringing substantial benefits to the Copper Triangle and from releasing hundreds of millions of dollars in increased hiring, procurement, community investment, and endowments and trusts established for the benefit of local communities and tribes. And while that injunction persists, it causes severe, ongoing, and irreparable harm to Resolution.

The merits panel can and should mitigate those harms by promptly lifting the administrative injunction. When the panel turns to Plaintiffs' emergency motions for an injunction pending appeal, it should deny them—both for lack of any substantial merit and because the equities do not support enjoining Congress's constitutional judgment about the best use of this federal land for the benefit of the Nation.

## CONCLUSION

Resolution respectfully requests that this Court promptly dissolve the administrative injunction and deny Plaintiffs' requests for an emergency injunction pending appeal.

Respectfully submitted,

*/s/ Michael R. Huston*

Michael R. Huston
  *Counsel of Record*
Diane M. Johnsen
Nicholas S. Crown
Samantha J. Burke
Addison W. Bennett
PERKINS COIE LLP
2525 E Camelback Rd., Suite 500
Phoenix, AZ 85016
(602) 351-8000
MHuston@perkinscoie.com

Christopher D. Thomas
Andrea J. Driggs
Janet M. Howe
Benjamin A. Longbottom
HOLLAND & HART LLP
2398 E. Camelback Rd., Suite 650
Phoenix, AZ 85016
(602) 316-9334
CDThomas@hollandhart.com

*Counsel for Intervenor-Defendant-Appellee*
*Resolution Copper Mining LLC*

September 30, 2025

## CERTIFICATE OF COMPLIANCE

This document complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 4,520 words excluding the parts exempted by Rule 27(a)(2)(B); and (2) the typeface and type style requirements of Rule 27(d)(1)(E) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word (the same program used for the word count)..

*s/ Michael R. Huston*
**PERKINS COIE LLP**

*Counsel for Intervenor-Defendant-Appellee Resolution Copper Mining LLC*