## DECLARATION OF VICTORIA PEACEY

I, Victoria Peacey, declare as follows:

1. I am over the age of 18 and am competent to make this declaration. If called as a witness, I could and would testify to the following facts, which are within my personal knowledge and based on my review of relevant documents.

2. I joined Resolution Copper Mining LLC (Resolution) in September 2010. Since March 14, 2023, I have been the President and General Manager, responsible for overseeing all aspects of planning, development, and operations of the project. Prior to my appointment, I served as Acting Director since August 2022, where I took on the same job responsibilities.

3. Previously, I was the Chief of Staff to the Chief Operating Officer for Rio Tinto Copper from July 2021 to July 2022, where I was accountable for implementing the strategic direction for copper, including operations, projects, and growth across the globe. Before that I worked as the Senior Business Partner – Community and Social Performance (CSP), Copper – America and Joint Ventures from February 2021 to July 2021. In that role, I lead the CSP teams at various Rio Tinto operations, including at Resolution, while also continuing to lead the federal permitting activities at Resolution.

4. From 2012-2021, I worked as the acting Vice President of External Affairs (July 2012-December 2012), the Senior Manager of Environment and Communities (January 2013-December 2015) and Senior Manager of Permitting and Approvals (January 2016-January 2021), in which I managed permitting processes at the federal, state, and local levels for Resolution.

5. Before joining Resolution, I spent approximately ten years managing environmental affairs and permitting at several Rio Tinto facilities, including America's only primary nickel mine and one of the world's largest open-pit copper mines.

6. I hold two degrees from the University of Western Ontario: a Bachelor of Science degree in applied geosciences and a Master of Science degree in civil and environmental engineering. My professional experience and educational background are set forth more fully in my earlier declarations, filed on May 23, 2025 as Exhibit A to Resolution's opposition to the San Carlos Apache Tribe's motion for preliminary injunction in the district court (Doc. 86 in No. 2:21-cv-00068) (D. Ariz.) and as Exhibit 1 to the motion for preliminary injunction filed by the Arizona Mining Reform Coalition in the district court (Doc. 72 in No. 2:21-cv-00068) (D. Ariz.). I believe those declarations to be accurate.

7. I offer this declaration in support of Resolution's motion to dissolve the Ninth Circuit motions panel's temporary administrative injunction in *Arizona Mining Reform Coalition et al.* v. *United States Forest Service et al.*, No. 25-5185, and the consolidated cases. That temporary administrative injunction has been pending since August 18, 2025. As discussed further below, the injunction has caused significant, ongoing harm to Resolution's business.

**The Significant Benefits of Closing the Land Exchange.**

8. Both before and after the district court's denial of a preliminary injunction in the consolidated cases, Resolution made substantial preparations to complete the land exchange mandated by the Southeast Arizona Land Exchange Act, 16 U.S.C. § 539p. That exchange will include Resolution's conveyance of 5,460 acres of private land to the federal government for conservation purposes in exchange for Resolution's taking title to 2,422 acres known as the Oak Flat Parcel. Those efforts involved months of preparatory work, including new role descriptions for dozens of jobs to be posted, recruitment and filling of select new geology roles, competitive bids with a wide range of underground mining, surface construction and exploration drilling contractors with final award of contracts. Those efforts were halted when the Ninth Circuit motions panel issued a temporary administrative injunction pending review of the Plaintiffs' emergency motions for an injunction pending appeal.

9. If no injunction were in place, Resolution would promptly move to close the land exchange with the United States, as required by statute and permitted by the district court's refusal to issue an injunction.

10. Following the exchange, Resolution plans to begin the next phases of exploration from existing drill pads, and underground development accessed from existing underground workings and associated surface construction on private land necessary to work toward the completion of Resolution's planned copper mine.

11. Lifting the administrative injunction and permitting Resolution and the United States to complete the land exchange would permit Resolution to significantly ramp up underground development, surface construction on private land and exploration from existing drill pads, which would lead to a substantial increase in hiring. Specifically, closing the land exchange would permit Resolution to hire approximately 25 new roles to support its planned drilling activities from existing drill pads in and around the Oak Flat Parcel. Resolution also plans to employ approximately 150 contractors to support underground development from existing underground mine workings and associated surface construction on private land. Construction of surface support facilities needed to facilitate underground development will use contractors that are overwhelmingly professional tradespeople in fields like electrical, pipefitting, plumbing, or heating, ventilation, and air conditioning (HVAC). Resolution is party to a PLA with the Arizona Building and Construction Trades Council and the affiliated unions, meaning that the additional hiring following the exchange will lead to the generation of jobs for these workers.

12. Resolution's hiring plans following the completion of the exchange will specifically and directly benefit the local community, including the San Carlos Apache Tribe. Resolution's extensive record of engagement with local communities is described in part on Resolution's website.[1] For example, Resolution has contracted with a business named 4-Winds Contracting to manage the Oak Flat campground following the exchange.

---

[1] https://resolutioncopper.com/supporting-our-community/.

4-Winds is 100% owned, operated, and staffed by San Carlos Apache Tribe members. Completion of the exchange is essential to its business.

13. As Resolution increases hiring in these fields and others, I anticipate that Resolution will continue to adhere to its current hiring practices and employ many additional members of the San Carlos Apache Tribe and others from Superior, Miami, Globe, Winkleman, Hayden and Kearny—the local communities comprising the Copper Triangle. Many of Resolution's metrics for hiring from the local community are published on a quarterly "Scorecard," which is available on Resolution's website.[2] Our 2025 Q1 Scorecard reflected our continued strong record of local hiring: out of 341 total employees, 258 came from the local community (within 40 miles of the project), 71 from areas of Arizona more than 40 miles away from the project, and 12 came from outside Arizona. I expect that future hiring following the land exchange will continue to advance Resolution's commitment to hiring from within the local area known as the "Copper Triangle," including the San Carlos Apache Tribe and tribal areas and other local communities with areas with historically high unemployment.

14. In addition to hiring, Resolution would be able to very quickly spend hundreds of millions of dollars after closing, making a massive investment in the local community. Specifically, following the close of the exchange, spending on procurement for the drilling program—including for large drill rigs, fuel, salaries and benefits for drillers and drill helpers, road maintenance equipment, water trucks for dust control, drill bits, drill casing, housing, spend on local restaurants and safety equipment —is budgeted for around $100 million. Additionally, procurement spending for the initial phase of underground development and surface construction on private land is budgeted for and anticipated to be around $250 million. Consistent with Resolution's past practice, much of this spending will be directed toward local businesses and contractors. I anticipate that Resolution will spend all of these budgeted funds within approximately 3 years after the close of the land exchange.

---

[2] https://resolutioncopper.com/wp-content/uploads/2025/07/RC-Scorecard-2025-Q1.pdf.

15. Closing the exchange will also permit Resolution to release funds marked for substantial educational, employment, economic development, recreational, riparian and cultural endowments that were the result of years of consultations between Resolution, the federal government, and various affected tribes and communities. As one example, it will permit Resolution to begin making payments into a $53.5 million trust established for the benefit of 11 tribes (San Carlos and ten others). The trust agreement has been executed and is enforceable by the Trustee. Under the agreement, Resolution must pay the first $12 million into the trust within 60 days after the land exchange. The company must pay another $41.5 million into the trust within six months after issuance of the Forest Service's final record of decision, which the Forest Service has stated will follow the land exchange.

16. Resolution also must wait for the land exchange to distribute certain funds to make agreed-upon recreational enhancements to the Town of Superior, which supports Resolution's plans to construct a mine. Resolution has invested more than $8.9 million into projects in the Copper Triangle that drive the area's long term economic growth, as well as supporting its recreational and cultural advancements. Resolution has, for example, invested $4.7 million to help regrow Superior's local workforce, as well as hundreds of thousands of dollars in revitalization projects to bring new life to historic spaces and create opportunities for new businesses in Globe, Miami, Gila County, and Kearney, Arizona. Resolution has also made substantial contributions to local school districts.[3]

17. After consummation of the exchange, Resolution has committed to pay over $20,000,000 to benefit local communities and the environment, including water for a local community, support to the climbing organization Queen Creek Coalition to enhance local climbing opportunities, a distribution to a local tribe for riparian preservation, support for a water conservation fund, a contribution to the Emory Oak Restoration Project (a joint conservation project with the U.S. Forest Service to preserve sacred trees), and a payment to the Arizona Archaeological Database Fund to modernize their recording system.

---

[3] https://resolutioncopper.com/8-9-million-strong-investing-in-the-copper-triangles-future/.

18. Resolution has committed to additional payments after the Forest Service publishes the final record of decision, That includes a contribution to climbing and bouldering infrastructure to support local recreation and tourism estimated at $1,500,000, an estimated $2,600,000 investment in the Castleberry Campground, a $5,000,000 donation to the Copper Corridor Cultural Heritage Fund, an approximately $1,000,000 contribution to develop the multi-use trails project developed by the Community Working Group, and a further $1,000,000 contribution to the Arizona Archaeological Database Fund.

19. The United States also stands to gain through the land exchange significant swaths of land, currently owned by Resolution, for conservation purposes. Resolution will convey 5,460 acres of valuable conservation lands, including additions to the Apache Leap Special Management Area, the San Pedro Conservation Riparian Area, and the Las Cienegas National Conservation Area. These areas include rivers, creeks, rare wetlands, proposed critical habitat for threatened and endangered species, one of the Southwest's largest mesquite bogs and rare dense woodlands, important migratory bird flyways, rock climbing areas, and Native American cultural sites.

20. In short, Resolution stands to make massive investments in its project, employees, contractors, local-government partners, and its tribal neighbors shortly after the land exchange closes. The hundreds of millions of dollars that stand to be disbursed—and the downstream positive effects on the region's economy, culture, educational opportunities and recreational facilities—are enormous.

**The disastrous consequences of an injunction.**

21. By sharp contrast, if the injunction presently in place were maintained until the Court reaches a decision on the merits in the appeal, delivery of all the benefits discussed above would at least be delayed and Resolution's ability to construct the mine would be significantly affected.

22. In the near future, if the exchange remains enjoined, Resolution faces an imminent risk of immediate ramp-down in current employment, including layoffs of potentially 10 to 20% of currently employed on-site staff and a substantial amount of

Resolution's workforce will be left with nothing to do. That dynamic substantially increases Resolution's holding costs to keep the team and equipment in a ready state. The company incurs $11 million every month to keep the mine in an operational state while awaiting the land exchange. That expense includes the cost of maintaining thousands of feet of underground mining infrastructure and employing some 400 workers. This is the cost Resolution incurs to maintain the status quo as it waits to begin tunneling and data collection of the copper resource thousands of feet below the Oak Flat parcel. Among other significant expenses necessary during any delay in completing the exchange is the cost of collecting, pumping and treating groundwater to keeping the mine in a maintained and operation-ready state. The network of deep underground workings, some of which are nearly 7,000 feet below ground, require regular maintenance and replacement of components as though the mine were in production. These costs add up. Between January 2021 and June 2025, Resolution spent $545 million in an operation-ready holding pattern due to withdrawal of the FEIS and litigation delays between 2021 and 2025. These costs are irreparable because they are merely holding costs while Resolution awaits the Court's ruling on the injunction. They have no relation to the future profitability of the mine.

23.     In the very near future, therefore, Resolution faces the imminent decision of reducing costs and headcount while Resolution waits for the exchange to close.

24.     Many of the employees and contractors who stand to be affected by headcount reductions that are the result of the injunction are highly skilled professionals with experience and education in essential technical and scientific fields. They cannot easily be replaced. For example, the technical team employs dozens of metallurgists, geologists, scientists, geotechnical engineers, mining engineers, geophysicists, and hydrogeologists. Many of these professionals have advanced professional degrees from mining and engineering schools. Although Resolution finds their service invaluable, absent an effectuated land exchange that permits their work to continue, Resolution imminently will need to reduce its headcount in at least some of these areas. Additionally, I am aware that many of these professionals, having been given no work to do for an extensive period, are considering voluntarily leaving Resolution in the near term in search of productive,

mining related work. For example, Resolution's principal ventilation design engineer just recently resigned to take a role in Texas due to lack of meaningful work and career stagnation.

25. Committing to work on a mining project like Resolution is a multi-year, sometimes multi-decade decision, often requiring a relocation for the professional and his or her family and causing a significant personal upheaval.

26. The loss of these highly skilled professionals will be a particularly acute blow to Resolution because it will represent a significant loss of institutional knowledge. Many scientists and professionals who I believe will soon be let go or voluntarily seek other work have been working for Resolution for over 10 years. They have specific knowledge over such details as copper porphyry geology, copper metallurgy and geometallurgy, underground mine design and planning, underground hardrock hydrogeology, low temperature geochemistry, and shaft engineering. Even if the headcount could theoretically be replaced, the loss of these particular employees caused by the injunction will deal a significant hardship.

27. Accentuating the problem of losing headcount as a result of the injunction, the mining industry is facing a significant labor shortage.[4] A productive mine capable of generating long-term, well-paid employment to a scientific or engineering professional will be a more attractive employer than an unproductive mine subject to a lengthy injunction against making substantial progress. This labor shortage both exacerbates Resolution's acute risk of losing its highly skilled professionals during the injunction and its future inability to find replacement professionals and advisors. I have personally witnessed this labor shortage affect Resolution, as it can be very difficult to hire professionals for open positions. I believe that a consequence of the injunction could therefore be an even greater loss of much-needed professionals, scientists, engineers, and other essential staff. Some may even choose to leave the profession altogether.

---

[4] https://projects.gbreports.com/western-usa-mining-2024/labor-shortage.

28. As stated above, if Resolution is unable to continue making substantial progress toward constructing the mine, and accordingly must reduce headcount, the many advances described above in improving employment and economic outcomes in the Copper Triangle and Arizona will be at risk of backsliding.

29. The injunction also threatens Resolution's continued ability to make many of the substantial social investments discussed above. As discussed above (¶¶ 15, 16), at least $20 million dollars in Resolution's commitments can be released only after the land exchange closes—with tens of millions of additional dollars to follow upon the release of the draft record of decision. These massive investments in tribal initiatives, local recreation and tourism, and water conservation remain frozen under the injunction.

30. Moreover, the tens of millions of dollars Resolution will pay into the $53.5 million trust for the benefit of 11 tribes (¶ 15, *supra*) also become due upon completion of the land exchange—the first $12 million within 60 days of the exchange, and the remainder within 6 months of the final record of decision. A further delay of this land exchange disrupts that trust.

31. Moreover, the hundreds of millions in spend that is set to be released upon the completion of the exchange of title will remain unspent for the duration of the injunction. Because a substantial majority of this spend is geared towards local and Arizona communities, this would have negative downstream consequences on the entire local and regional economy.

32. Another way that an ongoing injunction harms Resolution and the mine project is power. A failure to promptly complete the land exchange threatens to *significantly* delay Resolution's access to power facilities that Salt River Project (SRP) will need to construct—such as transformers and power lines—as demand from other sources that need significant amounts of power surges. A massive, recent increase in construction of AI data centers and other similar facilities that draw significant power have led to massive projected surges in power demand in Arizona. That surge stands to increase strain on Arizona utilities' ability to timely deliver those necessary facilities to Resolution. This dynamic places Resolution at the end of the line to receive power—perhaps by many years.

Given surges in demand for power in a rapidly evolving market, Resolution's access to power facilities is a constantly changing situation, and the uncertainty about completing the exchange only raises the cost of delay.

33. Although Plaintiffs in these cases have at times asserted that Resolution's production will only benefit foreign markets or that Resolution is controlled by China, that is wrong. Resolution is 55% owned by Rio Tinto plc and 45% owned by BHP Copper Inc., both publicly traded companies. Twenty-five percent of Rio Tinto is owned by American shareholders—a larger share than is owned by shareholders from any other country. Rio Tinto has operated in the United States and has provided America with domestically mined copper for 120 years and maintains extensive business operations across nearly a dozen states. One of those operations is a copper smelter in Utah— only one of two operational copper smelters that remain in the country—that has the capacity to take on more domestic mined copper inputs.

34. The longer the Resolution project is frozen by the injunction, the higher the chance that the company may feel compelled to reassess its annual spend on the Resolution project. This result would be deeply unfortunate given Resolution's investment of $2.7 billion dollars in the project—including tens of millions on community partnerships and improvements—in reliance on Congress's determination in the Exchange Act to "authorize, direct, facilitate, and expedite the exchange of land between Resolution Copper and the United States." 16 U.S.C. § 539p.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. This Declaration was executed on September 30, 2025.

DocuSigned by:

*Victoria Peacey*

Victoria Peacey

11