Nos. 25-5185, 25-5189, 25-5197

# United States Court of Appeals
# for the Ninth Circuit

ARIZONA MINING REFORM COALITION, et al.,
*Plaintiffs-Appellants*,

v.

BROOKE L. ROLLINS, U.S. Secretary of Agriculture, et al.,
*Defendants-Appellees*,

and RESOLUTION COPPER MINING LLC,
*Intervenor-Defendant-Appellee*.

On Appeal from the United States District Court
for the District of Arizona
No. 2:21-cv-00122-PHX-DWL
Hon. Dominic W. Lanza

## BRIEF OF *AMICUS CURIAE* WILLIAM P. BARR
## IN SUPPORT OF DEFENDANTS-APPELLEES

Christopher G. Michel
Michael J. Sebring
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
1300 I Street, NW, Suite 900
Washington, DC 20005
(202) 538-8000
christophermichel@quinnemanuel.com
michaelsebring@quinnemanuel.com

*Counsel for Amicus Curiae*

---

SAN CARLOS APACHE TRIBE, a federally recognized Tribe,
*Plaintiff-Appellant*,

v.

UNITED STATES FOREST SERVICE,
an agency of the U.S. Department of Agriculture, et al.,
*Defendants-Appellees*,

and

RESOLUTION COPPER MINING LLC,
*Intervenor-Defendant-Appellee*.

On Appeal from the United States District Court
for the District of Arizona
No. 2:21-cv-0068-PHX-DWL
Hon. Dominic W. Lanz

---

GOUYEN BROWN LOPEZ, et al.,
*Plaintiffs-Appellants*,

v.

UNITED STATES OF AMERICA, et al.,
*Defendants-Appellees*,

and

RESOLUTION COPPER MINING LLC,
*Intervenor-Defendant-Appellee*.

On Appeal from the United States District Court for
the District of Arizona
No. 2:25-cv-2758-PHX-DWL
Hon. Dominic W. Lanz

---

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

IDENTITY AND INTEREST OF AMICUS CURIAE ................................. 1

SUMMARY OF THE ARGUMENT ...................................................... 2

ARGUMENT ................................................................................... 4

I.   The Land Transfer Does Not Impose A "Substantial Burden" On Religion Because It Neither Coerces Nor Discriminates Against Appellants. .......................................................................... 4

II.  Appellants' Alternative Approach Lacks A Limiting Principle And Would Threaten To Paralyze Governmental Functions. ..................... 10

    A.   The Free Exercise Clause And RFRA Provide No Right To Control Public Lands ................................................................ 10

    B.   Lopez's Proposed Standard Leads To Untenable Results And Is Judicially Unworkable. ............................................... 12

CONCLUSION .............................................................................. 18

CERTIFICATE OF COMPLIANCE ................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

## <u>Cases</u>

*Apache Stronghold v. United States*,
101 F.4th 1036 (9th Cir. 2024) (en banc)..................................8, 10, 11, 12, 16

*Bowen v. Roy*,
476 U.S. 693 (1986)..................................................................................12, 17

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014)....................................................................................6, 17

*Cantwell v. Connecticut*,
310 U.S. 296 (1940)...........................................................................................5

*Carson v. Makin*,
596 U.S. 767 (2022)...........................................................................................5

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993)...........................................................................................5

*Employment Division v. Smith*,
494 U.S. 872 (1990)...........................................................................................6

*Espinoza v. Mont. Dep't of Revenue*,
591 U.S. 464 (2020).....................................................................................1, 11

*Fulton v. City of Philadelphia*,
593 U.S. 522 (2021)...........................................................................................5

*Gonzales v. O Centro Espirita Beneficenta Uniao do Vegetal*,
546 U.S. 418 (2006)....................................................................................6, 15

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
565 U.S. 171 (2012)...........................................................................................5

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022)......................................................................................5, 6

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
591 U.S. 657 (2020).................................................................1

*Lyng v. Nw. Indian Cemetery Protective Ass'n*,
485 U.S. 439 (1988)............................................8, 9, 10, 11, 12

*Mahmoud v. Taylor*,
145 S. Ct. 2332 (2025)..........................................................6

*Navajo Nation v. U.S. Forest Serv.*,
535 F.3d 1058 (9th Cir. 2008) .............................................15

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
591 U.S. 732 (2020)..............................................................1

*Seven Cnty. Infrastructure Coal. v. Eagle County*,
145 S. Ct. 1497 (2025)....................................................14, 15

*Sherbert v. Verner*,
374 U.S. 398 (1963).......................................................5, 10, 11

*Snoqualmie Indian Tribe v. FERC*,
545 F.3d 1207 (9th Cir. 2008) .............................................14

*Soka Gakkal Int'l-USA v. U.S. Army Corps of Eng'rs*,
2025 WL 2269858 (S.D. Fla. July 29, 2025) .......................15

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
239 F. Supp. 3d 77 (D.D.C. 2017) ...................................14, 15

*W. Va. State Bd. of Educ. v. Barnette*,
319 U.S. 62 (1943) ...............................................................5

*Wisconsin v. Yoder*,
406 U.S. 205 (1972)...............................................................5

*Yellowbear v. Lampert*,
741 F.3d 48 (10th Cir. 2014) ..............................................18

iv

## <u>Constitution</u>

U.S. Const. amend. I ...................................................................4

## <u>Statutes</u>

42 U.S.C. § 2000bb-1.............................................................6

42 U.S.C. § 2000bb-1(a) ...............................................11, 15

42 U.S.C. § 2000bb-1(b).........................................6, 15, 16

Pub. L. No. 113-291, § 3003, 128 Stat. 3292 (2014) ...........7

## <u>Rules</u>

Fed. R. App. P. 29(a)(2)..........................................................1

Fed. R. App. P. 29(a)(4)(E) ...................................................1

## <u>Other Authorities</u>

James Madison, *A Memorial and Remonstrance Against Religious Assessments* (1785)...........................................4

Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1456 (1989) ...................................................4

## IDENTITY AND INTEREST OF AMICUS CURIAE[1]

Amicus curiae William P. Barr served as the 77th Attorney General of the United States from 1991 to 1993 and the 85th Attorney General from 2019 to 2020. In that role, he was responsible for defending the laws and actions of the United States and ensuring the effective administration of justice. During his tenure, the Department of Justice filed numerous amicus briefs before the Supreme Court and other courts in support of religious-liberty claims, defending (*inter alia*) the right of religious schools to receive general scholarship funds, the right of religious employers to select the teachers of their faith without government interference, and the right of religious entities to receive exemptions from contraceptive-coverage mandates.[2]

Mr. Barr has also been an ardent advocate of religious liberty outside of litigation and beyond his government service. In 2019, he delivered a widely publicized speech on religious liberty at Notre Dame Law School; in 2020, he

---

[1] No party's counsel authored this brief in whole or in part, no party or party's counsel contributed money to fund its preparation or submission, and no person other than the amicus curiae or its counsel contributed money to fund its preparation or submission. Fed. R. App. P. 29(a)(4)(E). All parties consent to the filing of this brief. *See* Fed. R. App. P. 29(a)(2).

[2] *See, e.g., Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464 (2020); *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732 (2020); *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657 (2020).

received the Christifideles Laici Award from the National Catholic Prayer Breakfast; and in 2021, he was awarded the Edwin Meese III Award for Originalism and Religious Liberty by the Alliance Defending Freedom.

Amicus has a profound and enduring interest in ensuring that the First Amendment and the Religious Freedom Restoration Act are interpreted in a manner that provides robust protection for religious exercise without creating an unworkable standard that could paralyze essential government functions. His experience provides a unique, practical perspective on the widespread governmental and judicial burdens that would result from abandoning the established, objective standard for what constitutes a "substantial burden" on an individual's exercise of religion.

## SUMMARY OF THE ARGUMENT

Amicus yields to no one in his vigorous defense of the religious liberties protected by the Constitution and federal statutes. The free exercise of religion is a cornerstone right in the American legal system, having inspired the birth of our country and enabled its flourishing as a pluralistic society. A principled defense of religious liberty, however, requires a clear understanding of the rights the law protects. As developed through decades of Supreme Court jurisprudence, the Free Exercise Clause of the First Amendment

2

applies when the government coerces, punishes, or discriminates against religious adherents. The enhanced protections of the Religious Freedom Restoration Act (RFRA) are triggered by the same kinds of burdens. But neither provision applies to claims of the kind advanced here, where Congress has simply decided to dispose of government resources in a way that a religious entity opposes.

Allowing such claims to proceed would create a rule with no foundation in the text of the First Amendment or RFRA, as declining to allocate a public resource in the manner a religious group prefers is not properly regarded as burdening that group's religious exercise. Such a position would also have no logical stopping point. Religious believers may profoundly object to a wide variety of uses of government resources—to wage war, facilitate abortion, or inflict the death penalty, among countless examples. But even the most sincere objections do not entitle believers to effectively veto the government's use of its own property in the absence of religious coercion or discrimination. The mechanism for voicing such objections is through the democratic process, not by allowing religious groups to impose a de facto easement on government land. The decision below should accordingly be affirmed.

## ARGUMENT

**I.   The Land Transfer Does Not Impose A "Substantial Burden" On Religion Because It Neither Coerces Nor Discriminates Against Appellants.**

Every American has the right to practice religion freely.  That right is enshrined in the First Amendment's command that "Congress shall make no law . . . prohibiting the free exercise" of religion.  U.S. Const. amend. I.  As understood since the Founding, this guarantee recognizes the unalienable right to worship and practice religion without interference by the state.  *See* Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1456 (1989).  Under our system of government, "[t]he Religion . . . of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate."  James Madison, *A Memorial and Remonstrance Against Religious Assessments* (1785), *in* 2 The Writings of James Madison (1783–1787) 183, 184 (Gaillard Hunt ed. 1901).

In light of these guarantees, the Supreme Court has rightly invoked the Free Exercise Clause to protect religious exercise from two forms of government-imposed burdens: discrimination and coercion.  The Clause has shielded religious ministers from criminal convictions for proclaiming their

faith, *Cantwell v. Connecticut*, 310 U.S. 296 (1940); protected students from expulsion for refusing to salute the American flag, *West Virginia State Board of Education v. Barnette*, 319 U.S. 62 (1943); prohibited states from conditioning receipt of public benefits on abandoning religious convictions, *Sherbert v. Verner*, 374 U.S. 398 (1963); prevented states from compelling parents to send their children to public school when doing so violated their sincere religious beliefs, *Wisconsin v. Yoder*, 406 U.S. 205 (1972); vacated laws targeting religious minorities for performing ritual sacrifices, *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993); and safeguarded religious organizations from state interference in the selection of their ministers, *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. 171 (2012).

More recently, the Supreme Court has emphasized that the Free Exercise Clause does not permit government officials to treat religious entities differently than secular ones. *See Fulton v. City of Philadelphia*, 593 U.S. 522, 542 (2021) (city could not refuse to accommodate religious foster agency's beliefs about marriage while offering accommodations to others); *Carson v. Makin*, 596 U.S. 767, 780 (2022) (state cannot deny tuition assistance payment to schools solely because they are religious); *Kennedy v. Bremerton*

5

*Sch. Dist.*, 597 U.S. 507, 543–44 (2022) (school district could not prevent personal prayer while allowing comparable secular activities). And it has affirmed that the government cannot burden religious exercise as a condition of receiving public benefits. *Mahmoud v. Taylor*, 145 S. Ct. 2332, 2363–64 (2025) (schools could not force parents to allow significant interference with religious instruction of their child as a condition of receiving a public education).

RFRA operates in a similar way. *See* 42 U.S.C. § 2000bb-1(b). Enacted after the Supreme Court's decision in *Employment Division v. Smith*, 494 U.S. 872 (1990), RFRA prohibits the federal government from "substantially burden[ing] a person's exercise of religion" unless the burden furthers "a compelling governmental interest" and "is the least restrictive means" of doing so. 42 U.S.C. § 2000bb-1. The Supreme Court has held that RFRA protects sacramental uses of certain drugs against criminal prosecution, *Gonzales v. O Centro Espirita Beneficenta Uniao do Vegetal*, 546 U.S. 418 (2006), and that it requires exemptions for closely held religious corporations from providing coverage for certain contraceptives, *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014).

While both RFRA and the Free Exercise Clause provide broad protection, that protection is not unlimited. As noted above, both provisions require the government to impose a substantial burden—to discriminate against individuals on account of their religion or to coerce them to act inconsistent with their faith—before they apply. In this case, Congress's decision to transfer federally owned property to a third party does not impose such a burden. In 2014, Congress approved the sale of over 2,000 acres of federal land to a private mining company—an action consistently defended by the Trump, Obama, and Biden administrations. *See* Pub. L. No. 113-291, § 3003, 128 Stat. 3292, 3732 (2014). Underneath the land is the second largest untapped copper deposit in the world, and Congress authorized the transfer to allow "mining and related activities" to secure this critical mineral. *Id.* § 3003(c)(8). If used to extract copper, the transfer will likely prevent the Lopez Appellants ("Lopez")[3] from using the land for religious ceremonies. But the transfer does not discriminate against Lopez: it does not single Lopez out for adverse treatment or penalize on account of faith. Nor does the transfer coerce Lopez: the government is not forcing Lopez—through promised

---

[3] In this consolidated appeal, only the Lopez Appellants bring Free Exercise and RFRA claims.

benefits or threats of penalties—to act in a way contrary to Lopez's beliefs. Congress simply authorized a transfer of its own property to a third party to use for development of a critical mineral. That decision does not wield the state's power to "prohibit" religious exercise; it just fails to allocate the state's resources to promote it. As a result, the Lopez's First Amendment and RFRA claims cannot succeed.

This Court, sitting *en banc*, has already correctly resolved these issues. Under this Court's decision, "a disposition of government real property does not impose a substantial burden on religious exercise when it has no tendency to coerce individuals into acting contrary to their religious beliefs, does not discriminate against religious adherents, does not penalize them, and does not deny them an equal share of the rights, benefits, and privileges enjoyed by other citizens." *Apache Stronghold v. United States*, 101 F.4th 1036, 1044 (9th Cir. 2024) (en banc) (per curiam). While the members of the *en banc* court did not agree on every detail, there was wide agreement on this basic point. *See id.*; *id.* at 1051–52 (majority opinion of Collins, J.); *id.* at 1090–91 (Bea, J., concurring in part and dissenting in part); *id.* at 1109–10 (Nelson, J., concurring); *id.* at 1114, 1119 (VanDyke, J., concurring).

8

As a matter of precedent and practical operation of the government, the result could hardly be otherwise. In *Lyng v. Northwest Indian Cemetery Protective Association*, 485 U.S. 439 (1988), the Supreme Court considered the U.S. Forest Service's decision to build a six-mile road through a portion of federal land that had "historically been used for religious purposes" by various Native American tribes. *Id.* at 442. According to a draft environmental report, construction of the road "would cause serious and irreparable damage to the sacred areas." *Id.* Despite recognizing the "severe adverse effects on the practice of [the tribes'] religion," the Court held that road development did not substantially burden the appellants' religious exercise. *Id.* at 447, 450–51. While the road development "may make it more difficult to practice certain religions," it had "no tendency to coerce individuals into acting contrary to their religious beliefs," *id.* at 450, nor did it "penalize religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens," *id.* at 449. And absent those coercive or discriminatory effects, the government maintained "its right to use what is, after all, *its* land." *Id.* at 453.

Lopez's claims require the same conclusion. Congress's decision has not pegged receipt of a public benefit on the abandonment of Lopez's faith; it has

not threatened imposition of criminal or civil penalties for any belief or method of worshiping; and it has not discriminated against Lopez or denied any benefits afforded to others on account of religion. The land transfer thus does not impose a substantial burden on religious exercise within the meaning of the First Amendment or RFRA, and Lopez's claims cannot succeed.

## II.  Appellants' Alternative Approach Lacks A Limiting Principle And Would Threaten To Paralyze Governmental Functions.

### A.  The Free Exercise Clause And RFRA Provide No Right To Control Public Lands.

The Free Exercise Clause and RFRA protect individuals and religious organizations from government interference with their beliefs, worship, and other acts. But neither provision grants religious believers the power to require the government to expend federal resources purely to benefit their religious exercise. And they do not impute onto public lands private religious easements. *See Lyng*, 485 U.S. at 452.

"The crucial word in the constitutional text is 'prohibit.'" *Id.* at 451. The government may not interfere with the rights of citizens to exercise their religion, absent compelling justifications. And while the Free Exercise Clause can require exemptions from laws that impose a substantial burden on religious exercise, it does not require the government to subsidize religious

worship because it is religious. "For the Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the government." *Id.* (quoting *Sherbert*, 374 U.S. at 412 (Douglas, J., concurring)).

RFRA's text imposes a similar requirement. It restricts the federal government from "substantially burden[ing] a person's exercise of religion." 42 U.S.C. § 2000bb-1(a). It does not, by contrast, impose affirmative obligations on the government to *subsidize* or fund a person's religious exercise. *See Apache Stronghold*, 101 F.4th at 1051–52.

When it comes to federal property, the government has authority to maintain, use, or dispose of it to promote the public interest. To be sure, the government cannot use that land to discriminate, *e.g.*, by allowing hikers to access Oak Flat but not Western Apaches seeking to worship and perform sacred rituals. And the government cannot threaten to convey that land to force Lopez or anyone else to change their religious beliefs or practices. *See Lyng*, 485 U.S. at 453; *Apache Stronghold*, 101 F.4th at 1112–13 (VanDyke, J., concurring). But the government is not required to open public lands—or hold onto them—to *benefit* a religious exercise. Otherwise, the First Amendment would mandate "religious servitude[s]" on public lands. *Lyng*, 485 U.S. at 452;

11

*cf. Espinoza v. Montana Dep't of Revenue*, 591 U.S. 464, 487 (2020) ("A State need not subsidize private education. But once a State decides to do so, it cannot disqualify some private schools solely because they are religious."). "The Free Exercise Clause simply cannot be understood to *require* the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens." *Bowen v. Roy*, 476 U.S. 693, 699 (1986) (emphasis added).

Congress has decided to transfer its own land for mining because it believes that will further the public interest. And "there is no textual, historical, or precedential support for the notion that a government's refusal to use its own property to enable or subsidize religious practice is a cognizable burden under either the Free Exercise Clause or RFRA." *Apache Stronghold*, 101 F.4th at 1110 (VanDyke, J., concurring). Neither the Free Exercise Clause nor RFRA require the government to maintain the land for one specific use as opposed to all others. Lopez's arguments otherwise are not sustainable.

## B. Lopez's Proposed Standard Leads To Untenable Results And Is Judicially Unworkable.

*Lyng* held that "incidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs," do not

12

"require government to bring forward a compelling justification for its otherwise lawful actions." 485 U.S. at 450–51. Lopez asks this Court to abandon *Lyng* for its RFRA claim and adopt the minority reasoning from the *en banc* dissent in *Apache Stronghold*, which would have held that anytime "the government prevents a person from engaging in religious exercise, the government has substantially burdened the exercise of religion." 101 F.4th at 1145 (Murguia, C.J., dissenting).

That theory would take religious liberty law on an untenable course. It would dramatically expand the universe of claims subject to strict scrutiny, empowering any individual with an asserted spiritual connection to land to challenge government action disposing of that land in a manner inconsistent with the persons' religious beliefs. This expansion would force courts to abandon the clear, objective standard of coercion and discrimination for a subjective test that requires judges to perform an impossible task: weighing personal spiritual value of a religious practice against public benefits of government projects and land use decisions.

Lopez's proposed standard would trigger strict scrutiny over a vast range of government actions, fundamentally alter challenges to federal land usage, and lead to untenable results. It would mean that any person claiming

13

a spiritual connection to a particular threatened parcel, anyone who venerates a cross placed on a bluff set to be used for wind power generation, or anyone who meditates or prays at a site that will be mined for critical minerals could force the government to justify its actions under the most demanding legal standard. It would trigger strict scrutiny over government actions that courts have correctly concluded do not substantially burden religious exercise within the meaning of the relevant protections, such as the grant of an easement for a pipeline to "run under the lakebed but not through the water itself" that was subject to objections by religious adherents who "believe that the mere existence of a crude oil pipeline under the waters of [the lake] will desecrate those waters and render them unsuitable for use in their religious sacraments." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 239 F. Supp. 3d 77, 81, 82, 91 (D.D.C. 2017); see *Snoqualmie Indian Tribe v. FERC*, 545 F.3d 1207, 1213 (9th Cir. 2008) (declining to apply strict scrutiny to FERC's approval of a hydroelectric project at a waterfall when a religious group claimed that the project "alters the ancient sacred cycle of water flowing over the Falls").

While RFRA provides vital protections for religious liberty, the test Lopez proposes would have the practical effect of enabling environmental

obstructionism of the kind the Supreme Court recently curtailed. In *Seven County Infrastructure Coalition v. Eagle County*, 145 S. Ct. 1497 (2025), the Court decried that the National Environmental Policy Act (NEPA) "has transformed from a modest procedural requirement into a blunt and haphazard tool employed by project opponents . . . to try to stop or at least slow down new infrastructure and construction projects." *Id.* at 1513. *Seven County* constrains environmental opponents' ability to interfere with public works projects, and the Court should not allow RFRA to play a substitute role—a tactic already attempted in cases where RFRA and NEPA claims are brought in tandem.[4]

RFRA is not a proper vehicle for project opponents to pursue environmental-protection interests. For starters, the focus of RFRA's textual guarantee is individualized protection of "*a person's* exercise of religion," 42 U.S.C. § 2000bb-1(a) (emphasis added); *cf. Gonzales*, 546 U.S. at 430–31 ("RFRA requires the Government to demonstrate that the compelling interest

---

[4] *See, e.g., Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1062 (9th Cir. 2008) (challenging the use of artificial snow for skiing on a portion of a public mountain sacred in their religion under NEPA and RFRA); *Soka Gakkal Int'l-USA v. U.S. Army Corps of Eng'rs*, 2025 WL 2269858, at *2 (S.D. Fla. July 29, 2025) (challenging Everglades preservation project under NEPA and RFRA); *Standing Rock Sioux Tribe*, 239 F. Supp. 3d at 81–82 (challenging Dakota Access Pipeline easement under NEPA and RFRA).

test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." (quoting 42 U.S.C. § 2000bb–1(b))). There is no basis in the text for converting protections for personal religious exercises into permanent easements on the physical land owned by the government, including to protect specific environments, sites, or particular places of worship. Second, RFRA is a poor vehicle for resolution of competing land uses, as RFRA would inevitably tip the scales in favor of one particular land use policy—environmental preservation—over other legitimate uses that the public may desire, including for the amelioration of critical mineral shortages.

Finally, Lopez's proposed test is unworkable. The current standard provides an objective and administrable framework by focusing on the government's conduct—a burden is substantial if it coerces or discriminates against religious exercise. In contrast, Lopez's test for a substantial burden would require that courts determine substantiality by measuring the effects of the government's action and the degree of their impact on an individual's religious belief. Weighing religious impact also introduces risks of preference, favor, or discrimination. Long-established religious practices could receive more deference than newer traditions. *See Apache Stronghold*, 101 F.4th at

1120 (VanDyke, J., concurring). Animistic beliefs systems that venerate sacred physical or environmental features may be given outsized privilege compared to other more abstract religions. *See id.* at 1121–22. Moreover, Lopez's standard lacks any limiting principle that would confine it to property or land use. Under Lopez's theory, individuals could claim a substantial burden from any government policy they find religiously objectionable and wish to challenge—such as military action, the death penalty, or social security numbers. *See, e.g., Bowen*, 476 U.S. at 695. The proposed test offers courts no principled way to avoid subjecting the government to strict scrutiny over virtually any government function.

That unworkability would be compounded under the subsequent strict scrutiny analysis. Even under RFRA, an individual's personal religious interest in public land does not operate as a veto over all other competing uses. Rather, a finding of a substantial burden subjects the government action to strict scrutiny: a values-based comparison of the government interest and the liberty interest. *See, e.g., Burwell*, 573 U.S. at 726–27. If a substantial burden could be defined based on subjective measures of spiritual harm, the approach would require comparison of competing values without any administrable standard. Here, it creates an impossible choice between subjective spiritual

17

beliefs and the expressed will of the democratic branches on matters of national importance. On one side of the scale, the Court is asked to measure the spiritual gravity of, *inter alia*, the "Holy Ground Ceremony," a "blessing ceremony conducted by a medicine man for protection from sickness and perils," performed at this specific site. Lopez Op. Br. 8. On the other side, the Court must weigh the expressed democratic will and considered judgment of both Congress and the President to develop the copper mine to limit our nation's dependency on foreign copper, a critical national security vulnerability that weakens our industrial base, risks economic instability, and jeopardizes our defense. Resolution Copper Mining Ans. Br. 77–81. Courts are readily positioned to step in to prevent coercion of or discrimination against a person's individual religious beliefs, but they are not adequate arbiters of competing land use values. *See, e.g.*, *Yellowbear v. Lampert*, 741 F.3d 48, 54 (10th Cir. 2014) (Gorsuch, J.) ("[W]e also lack any license to decide the relative value of a particular exercise to a religion.").

This Court should reject Lopez's unworkable standard. The established coercion and discrimination-based test provides a clear and administrable framework that protects religious liberty without paralyzing essential government functions.

## CONCLUSION

For the foregoing reasons, the Court should affirm the judgment below.

October 6, 2025

Respectfully submitted,

/s/ Christopher G. Michel
Christopher G. Michel
Michael J. Sebring
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
1300 I Street, NW, Suite 900
Washington, DC 20005
(202) 538-8000
christophermichel@quinnemanuel.com
michaelsebring@quinnemanuel.com

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

**9th Cir. Case Number(s)** <u>Nos. 25-5185, 25-5189, 25-5197</u>

I am the attorney or self-represented party.

**This brief contains <u>3855</u> words,** including <u>0</u> words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[  ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[✓] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [  ] it is a joint brief submitted by separately represented parties.
    [  ] a party or parties are filing a single brief in response to multiple briefs.
    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** <u>/s/ Christopher Michel</u>       **Date** <u>October 6, 2025</u>