Nos. 25-5185, 25-5189, 25-5197

# In The United States Court of Appeals for the Ninth Circuit

ARIZONA MINING REFORM COALITION; et al.,
*Plaintiffs-Appellants,*

v.

BROOKE L. ROLLINS, U.S. Secretary of Agriculture, et al.,
*Defendants-Appellees,*

and

RESOLUTION COPPER MINING LLC,
*Intervenor-Defendant-Appellee.*
(caption continued on following page)

On Appeal from the United States District Court
for the District of Arizona
No. 2:21-cv-00122-PHX-DWL
Hon. Dominic W. Lanza

**BRIEF OF *AMICI CURIAE* NATIONAL MINING ASSOCIATION, AMERICAN EXPLORATION & MINING ASSOCIATION, ARIZONA MINING ASSOCIATION, ALASKA MINERS ASSOCIATION, COLORADO MINING ASSOCIATION, IDAHO MINING ASSOCIATION, MININGMINNESOTA, MONTANTA MINING ASSOCIATION, NEVADA MINING ASSOCIATION, TEXAS MINING AND RECLAMATION ASSOCIATION, UTAH MINING ASSOCIATION, WYOMING MINING ASSOCIATION, AND NATIONAL TRIBAL ENERGY ASSOCIATION IN SUPPORT OF DEFENDANTS-APPELLEES**

James M. Auslander
 *Counsel of Record*
Beveridge & Diamond, P.C.
1900 N St., N.W., Suite 100
Washington, DC 20036
(202) 789-6009
jauslander@bdlaw.com
*Counsel for Amici Curiae NMA et al.*

Tawny Bridgeford
National Mining Association
101 Constitution Avenue, NW
Suite 500 East
Washington, DC 20001
(202) 463-2600
*Counsel for Amicus Curiae NMA*

i

SAN CARLOS APACHE TRIBE, a federally recognized Tribe,

*Plaintiff-Appellant,*

v.

UNITED STATES FOREST SERVICE,
an agency of the U.S. Department of Agriculture, et al.,
*Defendants-Appellees,*

and

RESOLUTION COPPER MINING LLC,
*Intervenor-Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Arizona
No. 2:21-cv-0068-PHX-DWL
Hon. Dominic W. Lanza

GOUYEN BROWN LOPEZ, et al.,
*Plaintiffs-Appellants,*

v.

UNITED STATES OF AMERICA, et al.,
*Defendants-Appellees,*

and

RESOLUTION COPPER MINING LLC,
*Intervenor-Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Arizona
No. 2:25-cv-2758-PHX-DWL
Hon. Dominic W. Lanza

ii

## CORPORATE DISCLOSURE STATEMENT

Per Fed. R. App. P. 26.1, the undersigned *amici curiae* (collectively, "*Amici*") represent that they are national or state trade associations, they have no parent corporations, and no publicly-held corporation holds a 10 percent or greater ownership interest in them.

Dated: October 6, 2025

/s/ *James M. Auslander*
James M. Auslander
BEVERIDGE & DIAMOND, P.C.
*Counsel for Amici Curiae NMA et al.*

## TABLE OF CONTENTS

INTRODUCTION AND INTEREST OF *AMICI CURIAE* ....................................1

ARGUMENT ...........................................................................................9

I.  Granting Preliminary Relief Here Would Revive Misuse of NEPA to Impede Important Mining Projects. ..................................................9

II.  The Supreme Court's *Seven County* NEPA Decision Controls This Court and These Cases. ........................................................................14

III.  Plaintiffs' NEPA Claims Are Meritless. ...............................................18

IV.  The District Court Rightly Rejected Plaintiffs' "Absurd" Attempt to Erase Existing Mining Rights. .......................................................23

CONCLUSION ........................................................................................25

iv

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Camp v. Pitts,*
411 U.S. 138 (1973).............................................................................17

*Cascadia Wildlands* v. *U.S. Bureau of Land Mgmt.,*
No. 24-4542, --- F.4th ---, 2025 WL 2460946 (9th Cir. Aug. 27, 2025) ..........17

*Dep't of Commerce v. New York,*
139 S. Ct. 2551 (2019).........................................................................17

*Dep't of Transp. v. Pub. Citizen,*
541 U.S. 752 (2004)...................................................................... 19, 20

*Earthworks v. U.S. Dep't of Interior,*
105 F.4th 449 (2024) ...........................................................................24

*Earthworks v. U.S. Dep't of Interior,*
496 F. Supp. 3d 472 (D.D.C. 2020)....................................................24

*Found. on Econ. Trends v. Lyng,*
817 F.2d 882 (D.C. Cir. 1987)............................................................19

*Grunewald v. Jarvis,*
776 F.3d 893 (D.C. Cir. 2015)............................................................19

*Juliana* v. *United States,*
947 F.3d 1159 (9th Cir. 2020) ............................................................20

*Martin v. Occupational Safety & Health Rev. Comm'n,*
499 U.S. 144 (1991)............................................................................17

*Miller* v. *Gammie,*
335 F.3d 889 (9th Cir. 2003) ..............................................................16

*Montana Wildlife Fed'n v. Haaland,*
127 F.4th 1 (9th Cir. 2025).................................................................23

*San Luis & Delta-Mendota Water Auth. v. Locke,*
776 F.3d 971 (9th Cir. 2014) ..............................................................18

*Seven County Infrastructure Coal. v. Eagle County, Colo.,*
    605 U.S. ----, 145 S. Ct. 1497 (2025) ........................................................ passim

**STATUTES**

5 U.S.C. § 706 .................................................................................................17

16 U.S.C. § 539p ............................................................................................19

16 U.S.C. § 539p(a) ........................................................................................20

16 U.S.C. § 539p(c)(9) ...................................................................................21

16 U.S.C. § 539p(c)(9)(B) ..............................................................................22

16 U.S.C. § 539p(i)(C) ...................................................................................23

16 U.S.C. § 539p(9)(D)(ii) .............................................................................22

23 U.S.C. § 139(g)(1)(B)(iii) .........................................................................20

23 U.S.C. § 139(n) .........................................................................................20

30 U.S.C. § 1606(a)(2) ...................................................................................12

30 U.S.C. § 1606(a)(3) ...................................................................................12

30 U.S.C. § 1606(c)(4) ...................................................................................12

30 U.S.C. § 1606(g)(1) ...................................................................................12

42 U.S.C. § 4332(2)(C) ..................................................................................17

42 U.S.C. § 4332(C) .......................................................................................17

42 U.S.C. §§ 4370m-4(b)(5) ..........................................................................21

**RULES**

Fed. R. App. P. 29(a)(2) ...................................................................................1

**OTHER AUTHORITIES**

Dep't of Energy, Notice of Final Determination on 2023 DOE Critical Materials List,
    88 Fed. Reg. 51792 (Aug. 4, 2023) ....................................................12

U.S. Geological Survey, Dep't of the Interior, 2022 Final List of Critical Minerals,
    87 Fed. Reg. 10381 (Feb. 24, 2022) ..................................................12

Presidential Determination Pursuant to Section 303 of the Defense Production Act of 1950, as Amended,
    87 Fed. Reg. 19775 (Mar. 31, 2022)..................................................12

## INTRODUCTION AND INTEREST OF *AMICI CURIAE*[1]

Given the decisive rejection of Plaintiffs' claims and preliminary injunction motions by the district court, now is the time to effectuate the non-discretionary land exchange that Congress directed more than a decade ago for a critical mining project. *Amici* national and state mining industry trade associations write to underscore the importance, in this case and more broadly, of promptly affirming the district court and upholding the Supreme Court's directive for substantial deference to agencies under the National Environmental Policy Act ("NEPA"). *See Seven County Infrastructure Coal. v. Eagle County, Colo.,* 605 U.S. ----, 145 S. Ct. 1497 (2025).

The National Mining Association ("NMA") represents the interests of the mining industry, including the producers of most of America's metals (including copper), coal, and industrial and agricultural minerals, and the hundreds of thousands of workers it employs before Congress, the federal agencies, the judiciary, and media. NMA advocates for public policies that will help America fully and responsibly utilize its vast natural resources. NMA has more than 250

---

[1] *Amici* affirm that the parties in these consolidated appeals consented to the filing of this brief, and thus leave of Court is unnecessary per Fed. R. App. P. 29(a)(2). *Amici* also affirm that no party or its counsel authored this brief in whole or in part, no party or its counsel contributed money that was intended to fund preparing or submitting this brief, and no person other than *Amici*, their members, or their counsel contributed money that was intended to fund preparing or submitting this brief.

members, including companies and organizations involved in every aspect of U.S. mining. America's mining industry supplies the essential materials necessary for nearly every sector of our economy.

The American Exploration & Mining Association ("AEMA") is a 130-year-old, 1,800-member national trade association representing the mineral development and mining industry, with members residing in 46 states. Its members range from the largest independent, global mine owners to small exploration companies. AEMA is the recognized national representative for the exploration sector, the junior mining sector, and mineral developers interested in maintaining access to federal and state lands. More than 80 percent of AEMA members are small businesses or individuals who work for small businesses.

The Arizona Mining Association ("AZMA") is a non-profit corporation comprised of entities engaged in mining and mineral processing in Arizona. In 2024, AZMA member companies produced approximately 74 percent of the nation's newly-mined copper, along with significant amounts of associated valuable co-products (e.g., gold, silver, selenium, tellurium, and molybdenum). Arizona's hard rock mining industry employs approximately 14,580 people directly, which supported an additional 44,339 indirectly and has an estimated direct and indirect impact on the Arizona economy of nearly $21.1 billion. AZMA is the unified voice of responsible, sustainable and safe mining in

Arizona. Through its advocacy, AZMA helps Arizona continue to be a premier location for mining investment in the U.S.

The Alaska Miners Association ("AMA") is a professional membership trade organization established in 1939 to represent the mining industry in Alaska. AMA's more than 1,400 members come from eight statewide branches: Anchorage, Denali, Fairbanks, Haines, Juneau, Kenai, Ketchikan/Prince of Wales, and Nome. Alaska's miners are individual prospectors, geologists, engineers, suction dredge miners, small family mines, junior mining companies, major mining companies, Alaska Native Corporations, and the contracting sector that supports Alaska's mining industry.

The Colorado Mining Association ("CMA"), established in 1876, is the oldest professional mining industry trade association in the United States. CMA represents companies that are engaged in the exploration, production, and refining of mineral resources, as well as mining companies with national and global headquarters in Colorado, equipment manufacturers, law firms, engineering and consulting organizations, and financial institutions serving the mining industry.

The Idaho Mining Association ("IMA") is a non-profit, non-partisan, state-wide trade association that has, since 1903, represented miners and mining companies engaged in mineral exploration, mineral developments, and land reclamation throughout the state of Idaho. IMA is the recognized voice in support

3

of exploration and mining in the state of Idaho. IMA's work includes engaging with federal and state agencies as they craft policies for land use and natural resource planning, and IMA advocates for a sustainable mining industry that benefits state and local communities, while advancing the mineral resource and mining related interests of our members. IMA and its members are committed to the protection of human health, the natural environment, and a prosperous mining industry that employs responsible and sustainable mineral withdrawal practices in Idaho. IMA's members continue to utilize and explore more innovative and science-based methods to extract minerals needed for everyday life while protecting and preserving the environment in Idaho for future generations.

MiningMinnesota is a coalition of community, labor, and industry leaders who advocate for safe and responsible mineral production in Minnesota. Its mission is to benefit communities and the nation by building a sustainable future through mining, processing, and domestic supply chain utilization of our mineral resources.

The Montana Mining Association ("MMA") is an industry organization representing the mining community throughout the state of Montana. The ranks of its 170-plus members include metals, minerals and coal producers; companies exploring for such metals and minerals; goods and service providers to the industry; and advocates, researchers, educators and collaborative partners of

the mining industry in Montana and beyond. MMA's mission is "to protect and promote responsible mining in Montana," for the benefits and security of America's current and future generations.

The Nevada Mining Association ("NVMA"), established in 1913, consists of more than 400 companies that comprise Nevada's mining industry and rely, in whole or in part, on this state's foundational industry. These member companies are engaged across the broad spectrum of the industry in Nevada, from exploration and discovery to development and construction, to operation and production, to closure and reclamation. NVMA provides a voice for Nevada's mining industry in federal, state, and local policy matters, community engagement, public education, and workforce development.

The Texas Mining and Reclamation Association ("TMRA"), established in 1976, is a state trade organization representing owner/operator companies and support members (vendors) involved in various surface mining operations in Texas. These operations encompass the coal, industrial minerals, and uranium mining industries. The association educates the public, regulators, educators, policymakers, and the media on the importance of mining and its value to the Texas economy and lifestyle. TMRA is a unified voice for mining in the state of Texas, demonstrating integrity, clarity, and vision in its efforts to strike a balance

between mineral production, environmental protection, economic strength, and public welfare.

The Utah Mining Association ("UMA") is a professional trade association that has represented Utah's mining industry since its founding in 1915. UMA advocates for Utah's hardrock, industrial mineral, and coal mine operators and the diverse service companies that support them. UMA advocates for public policies that support all phases of mineral development including exploration, project planning and financing, mineral extraction, mineral processing, smelting, and refining, early-stage manufacturing, and energy production. UMA works to educate policymakers and regulators at the federal, state, and local levels on the necessity of a healthy domestic mining industry for economic and national security.

The Wyoming Mining Association is a is a statewide trade organization in Wyoming that represents and advocates for 34 mining company members producing bentonite, coal, trona (natural soda ash), uranium, and lignite, as well as companies developing gold, copper, lithium and rare earths deposits. WMA also represents over 100 associate member companies, one electricity co-op, and two advanced nuclear power companies. WMA promotes the mining industry by communicating with elected officials, regulators, educators, and the public in a

credible way that encourages trust and confidence and earns respect as a reliable and credible source of information on issues pertinent to the industry.

The mission of the National Tribal Energy Association ("NTEA") is to support the safe, efficient, practical, sustainable, and environmentally sound management and monetization of its Tribal Nations' energy and mineral wealth. NTEA supports Tribal goals of stewardship of this wealth by balancing social, environmental, commercial, and financial considerations. NTEA utilizes the tools of social, environmental, and commercial responsibility in the realm of policy and sound and practical regulations that match the unique aspects of Tribal governments, their people, their sovereignty, and self determination. Its members including the Navajo Nation, the Crow Nation, the Southern Ute Tribe, and the MHA Nation, not only produce over ninety percent of the energy produced in Indian Country, but also are leading in the development of minerals including the critical minerals needed for our national and energy security. Between 68 and 97 percent of the top four minerals, cobalt, lithium, copper, and nickel, lie on or within 35 miles of an Indian Reservation. NTEA supports the responsible development of these critical and important mineral resources.

Because hardrock, coal, and other mining operations routinely require federal authorizations triggering NEPA review, *Amici's* members spend tens of millions of dollars annually on environmental analyses, paying NEPA third-party

contractors and subcontractors, and reimbursing agencies for their costs in implementing NEPA. The Court's treatment of Plaintiffs' NEPA claims is highly important to *Amici* and their members, to the mining industry, to workers and businesses across the United States, and to the Nation's economy.

The mining project at issue in this case undisputedly will provide a crucial source of copper—approximately 1.8 billion tons, from the third-largest known deposit worldwide, poised to supply up to a quarter of the Nation's copper needs over the next five decades. Copper is an essential metal for construction, transportation, electrical and electronic products, industrial machinery, defense applications, and energy production. This project comes just as the world prepares for a global shortage of copper because of surging demand to meet these needs. The project is also expected to co-produce other critical minerals including rhenium, tellurium, indium, arsenic, and bismuth. These minerals will play a crucial role in shoring up the national security of the U.S. These reasons are why this project has been endorsed as a bipartisan priority, both by Congress and the Executive Branch. And this project is emblematic of the similar importance of prompt realization of other mining projects across the country.

Collectively, *Amici* support and incorporate by reference arguments of all Defendants-Appellees for this Court to affirm the denial of any preliminary injunction and enable the antecedent land transfer to conclude expeditiously as the

elected branches intended. *Amici* herein chiefly focus on assisting the Court's consideration of the meritless NEPA claims underlying Plaintiffs-Appellants' three consolidated appeals (if the Court deems it necessary to reach their merits despite the threshold hurdles flagged by Defendants), which the district court thoroughly refuted. *Amici* also succinctly address the misguided claim in one appeal challenging land appraisals and collaterally attempting to divest existing mining claims, which the district court rightly rejected as "absurd." 1-AMRCER-24.

## ARGUMENT

## I. GRANTING PRELIMINARY RELIEF HERE WOULD REVIVE MISUSE OF NEPA TO IMPEDE IMPORTANT MINING PROJECTS.

Prompt affirmance by this Court has vital real-world implications here and beyond. In line with *Seven County* (*see infra* Section II), the aim of NEPA reviews should return to informing specific agency decisions rather just surviving litigation. But that goal is futile if flimsy and scattershot NEPA claims like Plaintiffs raise here can derail even a clear Congressional directive to expedite a land exchange for mining.

*Amici*'s members produce the minerals that are at the front end of the supply chain for nearly every sector of our economy—from technology and healthcare to energy, transportation, infrastructure, and national security. Delays in mining projects reverberate throughout the economy, threatening America's national and economic security. Nevertheless, delays associated with the threat of NEPA

9

litigation have been a primary contributor to the lengthy and unpredictable permitting process that discourages the capital investments required for mineral exploration and mine development. Indeed, NEPA is "one of the most frequently litigated federal environmental statutes."[2] *Amici* and their members have extensive experience with protracted NEPA delays and escalating costs associated with NEPA compliance. This trend necessitated the Supreme Court stepping in for a "course correction" on NEPA implementation and judicial review, and this Court should follow suit here. *Seven County*, 145 S. Ct. at 1514.

The Nation, and the world, urgently need more copper and other key minerals and materials that new and expanded mines could help provide. A recent report calculated that, to meet economic changes and growing electricity demands, the world will need to produce more copper in the next 12 years than it has in the previous 120 years.[3] Another 2024 study, by the world's largest international organization of energy ministers, found that the United States is able to meet only about half of its copper demand through domestic sources, and absent a course correction, that gap will grow. Int'l Energy Forum, *Copper Mining and Vehicle*

---

[2] Congressional Rsch. Serv., *National Environmental Policy Act: Judicial Reviews and Remedies* (June 26, 2025), https://www.congress.gov/crs-product/IF11932.

[3] S & P Global, *Mine development times: The U.S. in Perspective*, at 9 (June 2024), https://cdn.ihs-markit.com/www/pdf/0724/SPGlobal_NMA_DevelopmentTimesUSinPerspective_June_2024.pdf.

*Electrification* (May 2024) ("Just to meet business-as-usual trends, 115% more copper must be mined in the next 30 years than has been mined historically until now.").[4] Apart from copper, U.S. consumption of so-called "battery minerals" (lithium, cobalt, and nickel) could reach 20 percent to 30 percent compound growth rates by 2035. *Id.* Similarly, the International Energy Agency estimated that demand for some minerals could grow by more than 40 times by 2040.[5] At the same time, global competition for these minerals is only increasing.[6] Simply going without such minerals is not a feasible option, as they touch on nearly every aspect of our lives. *See, e.g.*, Nat'l Research Council, Minerals, Critical Minerals, and the U.S. Economy, at 1 (2008) ("Minerals are . . . fundamental inputs to the domestic economy and daily life at scales ranging from the individual consumer to entire manufacturing and engineering sectors.").[7]

Increasing mining and processing capacity is the only way to guarantee supply to address the massive copper shortfall of which analysts, industry leaders, and international organizations now routinely warn. *See, e.g.*, Yusuf Khan, Copper Shortage Threatens Green Transition, Wall St. J. Pro (Apr. 18, 2023) ("[A]nalysts

---

[4] https://www.ief.org/focus/ief-reports/copper-mining-and-vehicle-electrification.
[5] *See* Rich Nolan, NMA President & CEO, Testimony before the U.S. House of Representatives Committee on Natural Resources, at 2 (Feb. 28, 2023), https://naturalresources.house.gov/uploadedfiles/testimony_nolan.pdf.
[6] *See id.*
[7] https://nap.nationalacademies.org/download/12034.

say a lack of new mined resources is the main hurdle.").[8]  Production at home in turn yields enormous benefits domestically through economic strength and stability.  In 2024, "minerals remained fundamental to the U.S. economy" by "creating an estimated value of $4.08 trillion."[9]  Further, the "incredible derivative value of strategic and critical materials" to other sectors creates jobs for many Americans far beyond the mines themselves.[10]

Regardless of political party, Congress and the Executive Branch have recognized the threat to national security posed by dependence on foreign minerals—especially given weaknesses in the global supply chain and the efforts of hostile foreign governments to corner key supplies.  Accordingly, they have designated copper and other minerals and materials as "critical" and prioritized their prompt production.[11]  And of course, the Southeast Arizona Land Exchange and Conservation Act ("Act") facilitates the specific mining project here.

---

[8] https://www.wsj.com/articles/copper-shortage-threatens-green-transition-620df1e5.

[9] U.S. Geological Survey, Mineral Commodity Summaries 2025, at 6 (Mar. 2025), https://pubs.usgs.gov/publication/mcs2025.

[10] U.S. Dep't of Defense, Securing Defense-Critical Supply Chains, at 43 (Feb. 2022), https://media.defense.gov/2022/Feb/24/2002944158/-1/-1/1/DOD-EO-14017-REPORT- SECURING-DEFENSE-CRITICAL-SUPPLYCHAINS.PDF.

[11] 30 U.S.C. §§ 1606(a)(2), (a)(3), (c)(4), (g)(1); U.S. Geological Survey, Dep't of the Interior, 87 Fed. Reg. 10381-01 (Feb. 24, 2022); Dep't of Energy, 88 Fed. Reg. 51792-01 (Aug. 4, 2023) (adding copper as a critical mineral); Presidential Determination, 87 Fed. Reg. 19775 (Mar. 31, 2022); *see* Resolution Br. 77-78, 86.

Yet, permitting uncertainty and litigation risk generated by misapplication of NEPA have for decades bedeviled major infrastructure projects, including mining. NEPA triggers are common for mining projects. Almost half of the "11 mineral-rich western states—and over 60% of Alaska" are comprised of federal lands.[12] Many mining projects also need at least one form of federal approval. It requires an average of 29 years for U.S mines to go from discovery to production—longer than any country included in a study other than Zambia.[13] Per that study, since 2002, only three mines have come online in the U.S., and none are on federal land.[14] These projects cannot be switched on and off like a light. Rather, a reasonable and reliable regulatory process is essential to American business, which requires transparent and predictable permitting processes that result in durable decisions to enable informed investments.[15]

Unchecked NEPA-based challenges drive the opposite result. They encourage agencies preemptively to prepare expansive, lengthier, and duplicative analyses in attempts to insulate NEPA reviews from future litigation risk. That in turn forces project applicants and agencies to factor unmitigable litigation risks

---

[12] S & P Global, *supra* note 3, at 26.

[13] *Id.* at 6.

[14] *Id.* at 7.

[15] *See, e.g.*, Nat'l Academy of Eng'g, Time Horizons and Technology Investments, at 60 (1992) ("too much uncertainty is the natural enemy of long-term investment"), https://nap.nationalacademies.org/download/1943#.

into permitting and business plans. The resulting permitting delays impose an enormous burden on *Amici*'s members and the economy. These appeals prove the point—even USFS going above and beyond in its Final Environmental Impact Statement ("FEIS") for Resolution's project (encompassing thousands of pages and many years, and expanding analysis to alternative mining techniques and potential future nearby residential development in response to comments) was still not enough for Plaintiffs. But any order for further analysis would not serve NEPA's purpose of informed decisionmaking, especially where Congress mandated the land exchange Plaintiffs oppose.

Post-*Seven County*, it is now up to courts and agencies to eschew the NEPA landscape of years-long, unfettered reviews followed by extended litigation risk that deprives the American public of needed projects and infrastructure. This litigation affords another such opportunity. Enjoining, even temporarily, the Act's express directive would broadly invite more challenges to needed mining projects without specific enabling legislation. The Court should not elicit that outcome.

## II. THE SUPREME COURT'S *SEVEN COUNTY* NEPA DECISION CONTROLS THIS COURT AND THESE CASES.

"The bedrock principle of judicial review in NEPA cases can be stated in a word: Deference." *Seven County*, 145 S. Ct. at 1515. Defendants and the district court aptly explain the holdings and import of this seminal Supreme Court NEPA decision. Yet Plaintiffs here invite the very flyspecking and second-guessing by

14

courts that the Supreme Court has prohibited. Like the district court, this Court should decline that invitation.

As reflected in its grant of certiorari, the Supreme Court's NEPA course correction was aimed in part at the Ninth Circuit along with the D.C. Circuit (whose decision was directly at issue in *Seven County*). *See Seven County* Supreme Court Docket, Questions Presented ("Five circuits read *Public Citizen* to mean that an agency's environmental review can stop where its regulatory authority stops. Two circuits [Ninth and D.C.] disagree and require review of any impact that can be called reasonably foreseeable.").[16] As the Circuit with the historically heaviest NEPA caseload, it is critical now for this Court to take this precedent to heart and not construe NEPA as requiring more than it actually does. *See* Nat'l Ass'n of Env't Prof'ls, 2022 Annual NEPA Report, at 26 (July 2022) (Ninth Circuit decided *half* of all NEPA appellate cases from 2006 to 2022; next highest was D.C. Circuit at 15 percent).[17]

This Court should disabuse any perception of Ninth Circuit courts as forum-shopping destinations for opportunistic plaintiffs looking to stop projects they dislike under the guise of manufactured NEPA obligations. Claims like Plaintiffs' here seek to transform NEPA from an informational tool into a roadblock. But

---

[16] https://www.supremecourt.gov/docket/docketfiles/html/public/23-975.html.
[17] https://naep.memberclicks.net/assets/annual-report/NEPA_Annual_Report_2022.pdf.

15

"[t]he goal of the law is to inform agency decisionmaking, not to paralyze it."
*Seven County*, 145 S. Ct. at 1507; *see also id.* at 1513 ("The upshot: NEPA has
transformed from a modest procedural requirement into a blunt and haphazard tool
employed by project opponents (who may not always be entirely motivated by
concern for the environment) to try to stop or at least slow down new infrastructure
and construction projects."). Plaintiffs' continued citations of pre-*Seven County*
cases and now-rescinded NEPA regulations (e.g., AMRC Br. 52, Lopez Br. 56),
are inapposite to their motions here and underscore the problem of project
opponents seeking to prolong NEPA's misapplication. *Miller* v. *Gammie*, 335
F.3d 889, 900 (9th Cir. 2003) (en banc) (perpetuation of Circuit law "must not be
pursued at the expense of creating an inconsistency between our circuit decisions
and the reasoning of state or federal authority embodied in a decision of a court of
last resort").

Plaintiffs have no meaningful response to *Seven County*'s applicable NEPA
standard entailing heavy deference to agencies' environmental reviews. Tellingly,
the Lopez Plaintiffs ("Lopez") barely mention it. The Arizona Mining Reform
Coalition Plaintiffs ("AMRC") concede *Seven County* supports a "rule of reason."
AMRC Br. 43. And Plaintiff San Carlos Apache Tribe ("Tribe") on appeal
proffers a waived and illusory argument to limit *Seven County* to "indirect effects."
Tribe Br. 2, 18-19 38-40. Neither NEPA nor the Supreme Court created such a

distinction; to be sure, the statute does not even utilize the term. *See* 42 U.S.C. § 4332(2)(C) ("reasonably foreseeable environmental *effects*") (emphasis added). Even the Tribe's own arguments exceed indirect effects. Tribe Br. 47 (arguing about "cumulative and synergistic" impacts analysis, which also is nowhere required by NEPA, including their citation to "42 U.S.C. § 4332(C)"). Rather, *Seven County* applies to *any* NEPA claim. *See, e.g.*, *Cascadia Wildlands* v. *U.S. Bureau of Land Mgmt.*, No. 24-4542, --- F.4th ---, 2025 WL 2460946, at *23 (9th Cir. Aug. 27, 2025) (following *Seven County* with no mention of indirect effects).

Nor does *Seven County* (or any other authority) invite evidentiary fact-finding or expert testimony in NEPA cases as the Tribe suggests. *See* Tribe Br. 33-50. NEPA claims are brought under the Administrative Procedure Act ("APA") and consequently are decided based on the administrative record. 5 U.S.C. § 706. Courts typically may not look beyond the record that was before the agency at the time it made the challenged decision. *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2559 (2019); *Camp v. Pitts,* 411 U.S. 138, 142 (1973) (APA review is based on "the administrative record already in existence, not some new record made initially in the reviewing court"). In NEPA cases, the *agency* is the salient expert and its analysis and findings deserve deference. *Seven County*, 145 S. Ct. at 1512 ("The agency is better equipped to assess what facts are relevant to the agency's own decision than a court is."); *Martin v. Occupational Safety & Health Rev.*

*Comm'n*, 499 U.S. 144, 151 (1991) (agencies have "unique expertise" including in "complex or changing circumstances").

Thus, the Tribe is simply wrong in averring that "it is common for a plaintiff to supplement the administrative record with expert evidence" Tribe Br. 33. The Tribe's two cited cases for this proposition do not even involve NEPA. *Id.* at 33-34. In fact, in one of those cases, this Court confirmed that use of "extra-record evidence" to "determine the correctness or wisdom of the agency's decision"—as the Tribe seeks to do here—is "*never* permitted." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 993 (9th Cir. 2014) (emphasis added). Likewise, the Tribe's bald assertion "that courts must not reduce plaintiffs' claims to disagreements among experts without wrestling the issues to the ground" is baseless. Tribe Br. 38. Moreover, the Tribe's cited dictionary definitions of "arbitrary" or "capricious" are immaterial and cannot manufacture a new standard of review given the APA's text and wealth of caselaw, including *Seven County*. *See id.* at 34. In any event, the district court *did* admit and discuss at length the Tribe's litigation declarations, which revealed only technical disagreement—not a NEPA violation. 1-AMRCER-52–60.

## III. PLAINTIFFS' NEPA CLAIMS ARE MERITLESS.

Plaintiffs' NEPA claims amount to policy arguments about the wisdom of the land exchange and technical disagreements about the extent of environmental

and cultural impacts from Resolution's expanded copper mine project. However, these claims are not tantamount to NEPA violations. *Found. on Econ. Trends v. Lyng*, 817 F.2d 882, 886 (D.C. Cir. 1987) (finding "NEPA was not intended to resolve fundamental policy disputes" and thus declining to "extend NEPA as far as [appellant would take] it"); *Grunewald v. Jarvis,* 776 F.3d 893, 903 (D.C. Cir. 2015) ("NEPA is 'not a suitable vehicle' for airing grievances about the substantive policies adopted by any agency, as 'NEPA was not intended to resolve fundamental policy disputes.'"); *Seven County*, 145 S. Ct. at 1512 (courts must be at their "most deferential" regarding agency "speculative assessments or predictive or scientific judgments" as to "what qualifies as significant or feasible or the like"). Here, all that matters is that the U.S. Forest Service's ("USFS") multi-volume, multi-year FEIS and administrative record satisfied NEPA's mere rule of reason to inform federal agency decisionmaking. *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004). As Defendants and the district court demonstrate, and *Amici* briefly supplement here, to the extent that these appeals even properly present that question for judicial review, USFS readily cleared that bar in these appeals.

As a threshold matter, Defendants are correct that the land exchange decision is statutorily mandated and cannot change. 16 U.S.C. § 539p (Southeast Arizona Land Exchange and Conservation Act). All that Plaintiffs "prove" is that *they* think it can change. *See* Tribe Br. 41. To adopt that view would be to negate

the Act's *sole* "purpose" to "authorize, direct, facilitate, and expedite the exchange of land between Resolution Copper and the United States." 16 U.S.C. § 539p(a).[18] This critical context provides the necessary lens for assessing any NEPA claim as it pertains to the land exchange at issue here, as opposed to any discretionary agency actions that may occur later. That is because the FEIS's proper "extent" of analysis is "based on the usefulness of any new potential information to the decisionmaking process," and Congress already made the land exchange decision. *Pub. Citizen*, 541 U.S. at 767.

Relatedly, as another threshold matter, Defendants are correct that any challenges to the FEIS are not yet ripe absent final agency action. Plaintiffs' concerns about other agency decisions such as "pipelines" across separate federal lands similarly are not ripe. *See* Tribe Br. 46, 50. A Record of Decision ("ROD"), not the FEIS, concludes and operationalizes a NEPA process and is subject to judicial review. *See*, *e.g.*, 23 U.S.C. §§ 139(g)(1)(B)(iii) (measuring "environmental review process" from EIS "notice of intent" until "record of decision"); *id.* § 139(n) (calling for "single document" combining FEIS and ROD

---

[18] The Tribe's offhand suggestion that the Act is entitled to less deference based on how it originated is unsupported and wrong. Tribe Br. 58-59. The Act's plain provisions were enacted by Congress and signed by President Obama; neither Plaintiffs nor courts may substitute their own views after the fact. *See Juliana* v. *United States*, 947 F.3d 1159, 1175 (9th Cir. 2020).

as practicable); 42 U.S.C. §§ 4370m-4(b)(5) (ROD required after an adopted or supplemental EIS). Here, it is undisputed that USFS has not yet issued any final ROD. Plaintiffs' view would broadly open inchoate agency actions to premature judicial review, whereas even completed NEPA reviews often do not ever yield discretionary agency action.

Furthermore, the proper scope of the FEIS mirrors the scope of federal agency authority. *Seven County*, 145 S. Ct. at 1516 ("[A]gencies are not required to analyze the effects of projects over which they do not exercise regulatory authority."); *see also id.* at 1523 n.3 (Sotomayor, J., concurring) ("The greater an agency's authority to consider and prevent environmental impacts in its decisionmaking process, the greater its duty under NEPA to consider those impacts, and vice versa."). As Defendants explain, that principle applies twice over: USFS lacks authority either to deny the land exchange or to prescribe mining techniques on the land transferred to private ownership. Thus, the Tribe is wrong in asserting that the Act's specified FEIS must entail "comprehensive" analysis of all facets of the ultimate mining project "regardless of whether any agency will decide anything related to these components." Tribe Br. 16. The Tribe's citation of the Act says no such thing, and pertains only to "decisions under Federal law." *See id.*; 16 U.S.C. § 539p(c)(9). And regardless, the FEIS's scope *was* comprehensive, including in response to comments received. 1-AMRCER-41-61.

21

The Court also should reject Plaintiffs' seeming attempts to use NEPA to force substantive outcomes. It is blackletter law that "NEPA is a purely procedural statute" and "NEPA imposes no substantive environmental obligations or restrictions." *Seven County*, 145 S. Ct. at 1507. Here, the Secretary of Agriculture, and by delegation USFS, was the agency that Congress assigned to prepare the "single [EIS]." 16 U.S.C. § 539p(c)(9)(B). USFS duly considered cooperating agency and public comments, yet was not bound by them. Nothing in the Act or NEPA imposes substantive mitigation requirements or conditions on the land exchange. USFS also reasonably found that its voluntary consideration of alternative mining techniques on post-exchange private land should not endorse leaving four-fifths of the copper deposit in the ground, inconsistent with the Act's provision for mining in "commercial quantities." *E.g.*, *id.* § 539p(9)(D)(ii). Plaintiffs' attacks on a future mine also ignore the incorporation of extensive measures to protect environmental and cultural resources, which is a routine practice for mining projects. *See* U.S. SER-150–99 (EIS Appendix J).

Finally, even if a NEPA violation existed, the land exchange should proceed now. As the Supreme Court recently reiterated, "[e]ven a deficient EIS does not necessarily require vacating an agency's project approval, absent reason to believe that the agency might disapprove the project if it added more to the EIS." *Seven County*, 145 S. Ct. at 1514. That is consistent with the remedy of remand without

22

vacatur, depending on "how serious the agency's errors are and the disruptive consequences of an interim change that may itself be changed." *Montana Wildlife Fed'n v. Haaland*, 127 F.4th 1, 50 (9th Cir. 2025) (cleaned up, citations omitted). Plaintiffs' briefing does not justify a remedy, particularly on an emergency basis, that enjoins or vacates the FEIS or otherwise delays USFS's non-discretionary action to effectuate the land exchange.

## IV. THE DISTRICT COURT RIGHTLY REJECTED PLAINTIFFS' "ABSURD" ATTEMPT TO ERASE EXISTING MINING RIGHTS.

As Defendants fully explain, AMRC's appraisal claim likewise fails. Tellingly, no other Plaintiff joins that claim. AMRC also waived any challenge to the validity of mining claims by not timely raising it below. 1-AMRCER-23–24 n.8. In any event, AMRC's claim seeks to turn both basic mining law and property appraisal standards on their head. The district court thus had little trouble dispensing with this claim. 1-AMRCER-21–28. This Court should affirm and thereby preserve the integrity of unpatented mining claims here and elsewhere.

In short, USFS's appraisals for the land exchange properly valued what each party will convey—no more, no less. Congress knew Resolution held mining claims to certain subject lands and the appurtenant exclusive right to mine that copper. 16 U.S.C. § 539p(i)(C). It thus is no mystery to whom or for what purpose the Act directed USFS to convey those and surrounding federal lands. Like Defendants, *Amici* are unaware of any court or agency that has adopted or

23

endorsed Plaintiffs' urged approach to land appraisals that would pretend such existing rights do not exist and can be rescinded without paid just compensation.

Moreover, nothing governing the appraisals under the Act requires a validity determination, and the appraisals were based on complete data. AMRC seeks to relitigate a prior failed collateral attack by AMRC's same counsel (then representing Earthworks) on unpatented mining claims under the General Mining Law of 1872. *Amici* NMA and AEMA both were intervenor-defendants in that case. There, the plaintiffs similarly argued that claimants under the Mining Law had no rights under the Mining Law absent a determination that their claims were valid. *Earthworks v. U.S. Dep't of Interior*, 496 F. Supp. 3d 472, 490 (D.D.C. 2020). That court rejected the argument, instead finding that (1) "the Mining Law, its implementing regulations, and related case law have never required Interior or BLM to verify the validity of a claim by independently confirming discovery;" and (2) the plaintiffs' interpretation would "have quietly upended the current claim system under the Mining Law." *Id.* at 492. The plaintiffs did not appeal this ruling, and the D.C. Circuit otherwise affirmed the ruling against the plaintiffs (including on their NEPA claim). *Earthworks v. U.S. Dep't of Interior*, 105 F.4th 449 (2024). The same is true here.

## CONCLUSION

For the reasons above and in Defendants-Appellees' briefs, this Court should affirm the district court's denials of Plaintiffs' preliminary injunction motions.

Dated: October 6, 2025    Respectfully submitted,

/s/ *James M. Auslander*
James M. Auslander
 *Counsel of Record*
BEVERIDGE & DIAMOND, P.C.
1900 N St., N.W., Suite 100
Washington, DC 20036
Phone: (202) 789-6043
jauslander@bdlaw.com
*Counsel for Amici Curiae NMA et al.*

Tawny Bridgeford
National Mining Association
101 Constitution Avenue, NW
Suite 500 East
Washington, DC 20001
(202) 463-2600
*Counsel for Amicus Curiae NMA*

## **CERTIFICATE OF COMPLIANCE**

Undersigned counsel certifies that this brief complies with the length limitations in Federal Rules of Appellate Procedure 27(d)(2)(A) and 29(a)(5) because the brief contains 5,427 words as calculated by Microsoft Word, excluding exempted by the Federal Rule of Appellate Procedure 32(f).

Undersigned counsel certifies that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionately spaced 14-point Times New Roman font.

Dated: October 6, 2025                    */s/ James M. Auslander*
                                          James M. Auslander
                                          BEVERIDGE & DIAMOND, P.C.
                                          *Counsel for Amici Curiae NMA et al.*