**Nos. 25-5185, 25-5189, and 25-5197**

# In the United States Court of Appeals for the Ninth Circuit

GOUYEN BROWN LOPEZ, ET AL.,

Plaintiffs-Appellants,

v.

UNITED STATES OF AMERICA, ET AL.,

Defendants-Appellees

and

RESOLUTION COPPER MINING LLC,

Intervenor-Defendant-Appellee

Appeal from the United States District Court
for the District of Arizona
Honorable Dominic W. Lanza
(2:25-cv-2758-PHX-DWL)

## PLAINTIFFS-APPELLANTS' PETITION FOR REHEARING EN BANC

Madeline C. Bergstrom
NELSON MULLINS RILEY &
   SCARBOROUGH LLP
101 Constitution Ave. NW,
   Suite 900
Washington, DC 20001
(202) 689-2807
madeline.bergstrom@nelsonmul-
lins.com

Miles E. Coleman
NELSON MULLINS RILEY &
   SCARBOROUGH LLP
2 W. Washington St., Suite 400
Greenville, SC 29601
(864) 373-2352
miles.coleman@nelsonmullins.com

Jeffrey A. Wald
NELSON MULLINS RILEY &
   SCARBOROUGH LLP
380 Knollwood Street, Suite 530
Winston-Salem, NC 27103
(336) 774-3335
jeffrey.wald@nelsonmullins.com

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................iii

STATEMENT ...................................................................................... 1

BACKGROUND ................................................................................. 3

  A. Oak Flat and the Apaches.................................................. 3

  B. Oak Flat's Protection and Planned Destruction............................. 4

  C. Proceedings in *Apache Stronghold*..................................... 5

  D. Proceedings Below ........................................................ 7

  E. Proceedings on Appeal .................................................... 8

ARGUMENT ..................................................................................... 9

  I. *Apache Stronghold* conflicts with RFRA's text, Supreme Court precedent, and decisions of other circuits. ......................................... 9

  II. The conflict is exceptionally important, and the case for en banc review is exceptionally strong. ............................................... 18

CONCLUSION .................................................................................. 20

CERTIFICATE OF COMPLIANCE........................................................ 21

CERTIFICATE OF SERVICE............................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apache Stronghold v. United States,*
101 F.4th 1036 (9th Cir. 2024) ................................................. *passim*

*Apache Stronghold v. United States,*
145 S. Ct. 1480 (2025) ..................................................... *passim*

*Apache Stronghold v. United States,*
38 F.4th 742 (9th Cir. 2022) ............................................. 6, 11, 12, 14

*Apache Stronghold v. United States,*
No. 21-15295, 2021 WL 12295173
(9th Cir. Mar. 5, 2021) ................................................. 6, 9, 10-11, 19

*Bethel World Outreach Ministries v. Montgomery Cnty.*
*Council,*
706 F.3d 548 (4th Cir. 2013) ............................................... 15

*Bostock v. Clayton County,*
590 U.S. 644 (2020) ........................................................ 9

*Burwell v. Hobby Lobby Stores, Inc.,*
573 U.S. 682 (2014) ........................................................ 12

*Desert Citizens Against Pollution v. Bisson,*
231 F.3d 1172 (9th Cir. 2000) ............................................. 19

*Employment Division v. Smith,*
494 U.S. 872 (1990) ........................................................ 13

*Fulton v. City of Philadelphia,*
593 U.S. 522 (2021) ........................................................ 13

*Haight v. Thompson,*
763 F.3d 554 (6th Cir. 2014) .............................................. 15

*Holt v. Hobbs,*
  574 U.S. 352 (2015)........................................................................ 12

*Lopez v. United States,*
  No. 1:25-cv-2408 (D.D.C. July 24, 2025) ............................................ 7

*Lopez v. United States,*
  No. 25A1008 (U.S. Mar. 19, 2016)..................................................... 9

*Lyng v. Northwest Indian Cemetery Protective Ass'n,*
  485 U.S. 439 (1988)............................................................... 11, 13, 14

*Mahmoud v. McKnight,*
  102 F.4th 191 (4th Cir. 2024) ........................................................ 16

*Mahmoud v. Taylor,*
  606 U.S. 522 (2025)........................................................... 2, 14, 16, 17

*Mirabelli v. Bonta,*
  146 S. Ct. 797 (2026)................................................................ 2, 16-18

*Porter v. Lee,*
  328 U.S. 246 (1946)........................................................................ 19

*Sherbert v. Verner,*
  374 U.S. 398 (1963)........................................................................ 12

*Thai Meditation Ass'n of Ala. v. Mobile,*
  980 F.3d 821 (11th Cir. 2020)......................................................... 15

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
  582 U.S. 449 (2017)........................................................................ 13

*West v. Radke,*
  48 F.4th 836 (7th Cir. 2022) .......................................................... 15

*Wisconsin v. Yoder,*
  406 U.S. 205 (1972)........................................................................ 12

*Yellowbear v. Lampert,*
  741 F.3d 48 (10th Cir. 2014).......................................................... 15

iv

*In re Young,*
  82 F.3d 1407 (8th Cir. 1996) ............................................................. 15

## Statutes

16 U.S.C. § 539p ..................................................................................... 4

42 U.S.C. § 2000 ............................................................................ *passim*

## Other Authorities

Stephanie Hall Barclay & Matthew Krauter, *The Untold Story of the Proto-*Smith *Era,*
  174 U. Pa. L. Rev. 435 (2026) .................................................... 13, 14

## STATEMENT

Some decisions split with other circuits or Supreme Court precedent. Very few decisions do both while also perpetuating the nation's worst injustices against long-repressed minorities. But such is the panel decision here and the Circuit precedent it followed, *Apache Stronghold,* where this Court, splintering 6-5, held that obliterating a Native American sacred site and eradicating core religious practices forever somehow doesn't "substantially burden" those practices.

To reach this absurd result, the Court admittedly rejected the "ordinary meaning" of the Religious Freedom Restoration Act in just one type of case: those involving "government real property." But of course, only one class of people typically brings such cases: Native Americans. That's because only Native Americans have been systematically divested of the "real property" essential to their religious exercise—and *cannot exercise their religion* without accessing sites now controlled by the government.

The result is that one class of people and religion the government has tragically repressed is now the *only* class of people and religion denied the protection of RFRA's ordinary meaning. And the government now has carte blanche—in this Circuit alone—to destroy Native American sacred sites and terminate religious practices for any reason or no reason at all.

Such a tragic result might be understandable if it had a modicum of legal grounding. But *Apache Stronghold* is woefully, embarrassingly rootless. As Justices Gorsuch and Thomas observed, it is supported by

"[e]xactly nothing" in "RFRA's text," constitutes an "outlier" among circuits, and rests on reasoning the Supreme Court has "emphatically rejected" as "absurd." *Apache Stronghold v. United States*, 145 S. Ct. 1480, 1486–88 (2025) (Gorsuch, J., dissenting from denial of certiorari).

Defendants will say the Court shouldn't grant rehearing again, two years after *Apache Stronghold*. But when the Court makes a "grievous mistake," it should fix it sooner rather than later, particularly when the mistake has "consequences that threaten to reverberate for generations." *Id.* at 1481, 1489. Here, the consequences are unfathomable—for Apaches, who face the "end [of their] religious existence as we know it," and for over a million Native Americans Circuit-wide. *Id.* at 1488.

Moreover, in the last two years, the case for rehearing has only grown stronger. The Supreme Court has *twice* rejected *Apache Stronghold*'s core rationale: that religious exercise on government property is not burdened absent "coercion." *Mahmoud v. Taylor*, 606 U.S. 522 (2025); *Mirabelli v. Bonta*, 146 S. Ct. 797 (2026). Indeed, if Christian and Muslim families in *Mahmoud* suffer a religious burden when children merely hear LGBTQ+-inclusive storybooks in public schools, then surely Apache families here suffer a religious burden when the government blasts their sacred site to oblivion and ends their religious practices forever.

The Court should grant rehearing to end the discriminatory exclusion of Native Americans from RFRA's protection and realign its jurisprudence with that of the Supreme Court and other circuits.

## BACKGROUND

### A. Oak Flat and the Apaches

For centuries, Apaches have practiced their religion at *Chi'chil Bitda-goteel* or "Oak Flat." Oak Flat is the birthplace of the Apache religion and the site of essential religious ceremonies that cannot be replicated elsewhere. Br.7–13. Oak Flat also features an unmatched concentration of Apache archeological sites, showing it "has been persistently utilized and occupied for the past 1,500 years." Br.7–8 (quoting ER-237–39). One example is *Tséyaa Gogeschin*, a large rock overhang with ancient pictographs and petroglyphs, which tribal leaders have described as "the Sistine Chapel of Apache religion." Br.13 (quoting 6-EIS-U-9). The area containing critical ceremonial sites is shown here (ER-207–08):



3

### B. Oak Flat's Protection and Planned Destruction

Recognizing Oak Flat's significance, the federal government long protected it from mining and added it to the National Register of Historic Places. Br.19.

But when copper was discovered beneath Oak Flat, two of the world's largest mining companies formed a joint venture, Resolution Copper, and began lobbying Congress to transfer the land. Br.19–20. Twelve standalone bills failed. *Id.* The transfer was then included as a last-minute rider in a 696-page, must-pass defense spending bill. Br.20–21. The rider ends federal protection for Oak Flat and directs the Secretary of Agriculture, after publishing an Environmental Impact Statement (EIS), to convey Oak Flat to Resolution Copper and make it available for mining. 16 U.S.C. § 539p(a), (c)(8), (c)(10), (i)(1)(A).

The EIS confirms the mine will destroy Oak Flat. *E.g.*, 1-EIS-ES-28–29. The impacts of the mine will be "immediate, permanent, and large in scale." 3-EIS-892. Once the ore is extracted, Oak Flat will be swallowed in a crater almost 2 miles across and 800-to-1,115 feet deep. 1-EIS-ES-1. All "public access" to the site will be "lost," 1-EIS-327, and it will be physically impossible for the Apaches to perform their religious practices at Oak Flat ever again. 3-EIS-892; 1-EIS-327.

The following map shows the location of the crater in relation to the ceremonial sites (*cf.* 1-EIS-65):



The EIS admits there are feasible alternative mining methods that would preserve Oak Flat's surface while still allowing billions of pounds of copper to be profitably mined. 4-EIS-F-3–F-5. But the government rejected any detailed consideration of these alternatives because they "would result in higher per-ton mining costs," reducing Resolution's profits. 1-EIS-50–51.

## C. Proceedings in *Apache Stronghold*

When the EIS was first published in 2021, plaintiffs in *Apache Stronghold* sought to preliminarily enjoin the land transfer under RFRA—which provides that the government shall not "substantially burden" a person's exercise of religion unless it satisfies strict scrutiny. 42 U.S.C. § 2000bb-1(a)–(b).

5

After the district court declined to enjoin the transfer, this Court thrice divided. First, a split motions panel denied an emergency injunction because the government withdrew the EIS and voluntarily halted the land transfer; Judge Bumatay, however, addressed the merits, concluding that the transfer and destruction of Oak Flat was an "obvious substantial burden." *Apache Stronghold v. United States*, No. 21-15295, 2021 WL 12295173, at \*2 (9th Cir. Mar. 5, 2021) (Bumatay, J., dissenting).

Next, a 2-1 merits panel also denied an injunction, over a dissent by Judge Berzon, who agreed with Judge Bumatay and called the majority's no-substantial-burden ruling "flawed," "illogical," "incoheren[t]," "disingenuous," and "absurd." *Apache Stronghold v. United States*, 38 F.4th 742, 776, 782 (9th Cir. 2022) (Berzon, J., dissenting).

Finally, the en banc Court fractured into two separate 6-5 majorities, issuing seven opinions. *Apache Stronghold v. United States*, 101 F.4th 1036 (9th Cir. 2024) (en banc). One majority concluded that the plain meaning of "substantial burden" includes government actions "preventing access to religious exercise"—which all agreed the mine would do here. *Id.* at 1043.

But another majority held that RFRA's plain meaning doesn't apply to "a disposition of government real property." *Id.* at 1044. In such cases alone, religious claimants must show that the disposition of property tends to "coerce," "discriminate," "penalize" or "deny" them "equal … rights." *Id.* at 1055. Chief Judge Murguia, joined by Judges

6

Gould, Berzon, Mendoza, and Lee, dissented, explaining that the majority "tragically err[ed]" in conflict with "RFRA's plain text," the decisions of "[s]everal other circuits," and Supreme Court precedent. *Id.* at 1144 n.13, 1157.

The Supreme Court declined to grant certiorari or rehearing. Justices Gorsuch and Thomas dissented from denial of certiorari, explaining that the decision below was supported by "[e]xactly nothing" in "RFRA's text," "implicates a circuit split," and rests on reasoning that the Supreme Court has "emphatically rejected" as "absurd." 145 S. Ct. at 1486–88.

### D. Proceedings Below

The government published a new EIS in 2025, restarting the transfer process. Immediately thereafter, seven Apache women and girls filed this lawsuit, seeking a preliminary injunction and arguing that the government's actions violated, among other things, RFRA and the Free Exercise Clause. *Lopez v. United States*, No. 1:25-cv-2408 (D.D.C. July 24, 2025).

After the case was transferred to the District of Arizona, the district court denied Plaintiffs' motions for a preliminary injunction and for injunction pending appeal, ER-4–23—as it had done two days earlier in two other cases challenging the transfer on other grounds, *San Carlos Apache Tribe v. United States Forest Service* and *Arizona Mining Reform Coalition v. United States Forest Service.* Br.27; ER-117.

The court agreed that "Plaintiffs will suffer irreparable harm in the absence of a preliminary injunction." ER-22. However, it held Plaintiffs'

7

RFRA and First Amendment claims were foreclosed by *Apache Strong-hold*. ER-11.

### E. Proceedings on Appeal

Plaintiffs appealed, as did the *San Carlos* and *Arizona Mining* plain-tiffs. ER-281. This Court consolidated the appeals and issued a tempo-rary stay enjoining the government from conveying Oak Flat to Resolu-tion while the appeal was pending. Order, *San Carlos Apache Tribe v. United States*, No. 25-5189 (9th Cir. Aug. 18, 2025), Dkt. 17.

On March 13, 2026, the panel affirmed. Op.10. It held that Plaintiffs' RFRA and Free Exercise claims were controlled by *Apache Stronghold* and that *Apache Stronghold* was not "clearly irreconcilable" with the Su-preme Court's recent decision in *Mahmoud*. Op.37–39. The panel also dissolved the temporary stay that had halted the land transfer. Op.40.

Minutes after the panel issued its decision at 7:34 p.m. ET on Friday evening, Plaintiffs notified the government of their intent to seek emer-gency relief from the Supreme Court and requested that the government confirm by 10:00 a.m. Saturday morning whether it would agree to briefly stay the land transfer during Supreme Court emergency proceedings. The government and Resolution then rushed the transfer through late Friday night or Saturday morning and didn't inform Plaintiffs' counsel until Saturday afternoon. Plaintiffs filed their Supreme Court emergency application that day; it was denied March 19. *Lopez v. United States*, No. 25A1008 (U.S. Mar. 19, 2016).

## ARGUMENT

### I. *Apache Stronghold* conflicts with RFRA's text, Supreme Court precedent, and decisions of other circuits.

RFRA is a "super statute" designed to "displac[e] the normal operation of other federal laws." *Bostock v. Clayton County*, 590 U.S. 644, 682 (2020). It applies "to all Federal law, and the implementation of that law, whether statutory or otherwise," 42 U.S.C. § 2000bb-3(a), and provides that "Government shall not substantially burden a person's exercise of religion" unless it satisfies strict scrutiny, *id.* § 2000bb-1(a)–(b).

The only question here is whether the complete destruction of a Native American sacred site—which renders continued religious exercise at the site physically impossible—"substantially burdens" religious exercise.

Strikingly, *Apache Stronghold* didn't dispute that destroying Oak Flat would substantially burden the plaintiffs' religious exercise under RFRA's ordinary meaning. Nor could it. "As a matter of ordinary meaning, after all, an action that prevents a religious exercise does not just burden that exercise substantially, it burdens it completely." *Apache Stronghold*, 145 S. Ct. at 1486 (Gorsuch, J., dissenting); *see also Apache Stronghold*, 101 F.4th at 1156 (Murguia, C.J., dissenting); *Apache Stronghold*, 2021 WL 12295173, at *2 (Bumatay, J., dissenting) ("obvious substantial burden").

9

Instead, *Apache Stronghold* held that RFRA's ordinary meaning doesn't apply in one—and only one—context: the "disposition of government real property." 101 F.4th at 1055. In that context alone, the court concluded, "the destruction of a sacred site cannot be described as a substantial burden no matter how devastating the impact on religious exercise," *id.* at 1128 (Murguia, C.J., dissenting), unless the government "coerces people into defying their religious beliefs or discriminates between religions," *Apache Stronghold*, 145 S. Ct. at 1485 (Gorsuch, J., dissenting). The panel here deemed itself bound by that decision and found no substantial burden. Op.37–38.

But this Court should revisit *Apache Stronghold*—not only because it conflicts with decisions of the Supreme Court and other circuits, but also because it rips an unprincipled and atextual hole in RFRA, relegating Native Americans to second-class status. And the case for en banc review has only grown stronger in the last two years, with two recent Supreme Court decisions rejecting *Apache Stronghold*'s key premise.

**a.** Start with RFRA's text. RFRA's ordinary meaning produces an obvious result: destroying a unique sacred site necessary for specific religious ceremonies "substantially burdens" religious exercise. It "burdens" religious exercise by "restrict[ing]" it; and it does so "substantially" by restricting it not just by a "considerable amount" but completely. *Apache Stronghold*, 101 F.4th at 1136 (Murguia, C.J., dissenting) (quoting dic-

tionaries); *see also Apache Stronghold*, 2021 WL 12295173, at *3 (Bumatay, J., dissenting) ("burden is substantial when it is 'considerable in quantity or significantly great'").

Contrary to this Court's decision in *Apache Stronghold*, "nothing in the phrase 'substantial burden'—or anything else in RFRA's text—hints that a different and more demanding standard applies when (and only when) the 'disposition' of the government's property is at issue." *Apache Stronghold*, 145 S. Ct. at 1486 (Gorsuch, J., dissenting). Rather, RFRA expressly defines the "exercise of religion" to include "[t]he use … of real property for the purpose of religious exercise." 42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7)(B). And it expressly applies to "all Federal law, and the implementation of that law, whether statutory or otherwise"—with no carveout for laws regarding property. *Id.* § 2000bb-3(a). Thus, under RFRA's plain meaning, there is simply "no exception for federal laws relating to federal land or access to sacred sites." *Apache Stronghold*, 38 F.4th at 783 (Berzon, J., dissenting).

**b.** *Apache Stronghold* also contradicts Supreme Court precedent. The majority purported to locate its special "property" rule in the Supreme Court's pre-RFRA decision in *Lyng v. Northwest Indian Cemetery Protective Ass'n*, which upheld the paving of a road near a sacred site. 485 U.S. 439 (1988). The majority said *Lyng* was "subsume[d]" by RFRA. *Apache Stronghold*, 101 F.4th at 1043–44 (per curiam). But as Justices Gorsuch

11

and Thomas observed, this conclusion conflicts with Supreme Court precedent in several ways.

First, the Supreme Court has "emphatically rejected" the notion that RFRA "should be construed to 'subsume'" its pre-RFRA jurisprudence. *Apache Stronghold*, 145 S. Ct. at 1486 (Gorsuch, J., dissenting) (cleaned up). The Court first rejected this notion in *Hobby Lobby*, where it said it was "absurd" to claim that "RFRA merely restored this Court's pre-[RFRA] decisions in ossified form." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 714–16 (2014); *see also Apache Stronghold*, 101 F.4th at 1141 (Murguia, C.J., dissenting) (discussing *Hobby Lobby*); *Apache Stronghold*, 38 F.4th at 777 (Berzon, J., dissenting) (same). It did so again in *Holt v. Hobbs*, criticizing the lower court's narrow definition of "substantial burden" for "improperly import[ing] a strand of reasoning" from pre-RFRA decisions "into a distinct statutory setting that guarantees 'greater protection'" for religious freedom. *Apache Stronghold*, 145 S. Ct. at 1486–87 (Gorsuch, J., dissenting) (quoting *Holt v. Hobbs*, 574 U.S. 352, 361 (2015)). Indeed, it is particularly counter-textual to interpret RFRA to subsume *Lyng* when RFRA expressly "restore[s]" two *other* pre-RFRA decisions by name—"*Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972)"—without ever mentioning *Lyng*. 42 U.S.C. § 2000bb(1).

Second, *Lyng* doesn't set forth any "substantial burden" test at all, much less "a special test for determining when a government's 'disposition' of land represents a 'substantial burden' on religion." *Apache Stronghold*, 145 S. Ct. at 1487 (Gorsuch, J., dissenting). The phrase "substantial burden" appears nowhere in *Lyng. See, e.g., Apache Stronghold*, 101 F.4th at 1146 (Murguia, C.J., dissenting) ("*Lyng* did not analyze whether there was a substantial burden"). To the contrary, *Lyng* "reiterat[ed]" that the government's plan there did not "discriminate against religions" and emphasized that "a law prohibiting [Native Americans] from visiting [a] sacred area would raise a different set of constitutional questions." *Id.* at 1148 (cleaned up) (quoting *Lyng*, 485 U.S. at 453). *Lyng* is thus an "example" of a case that "rejected [a] free exercise challenge[]" where "the law[] in question [was] neutral and generally applicable." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 460 (2017). That's the same test adopted in *Employment Division v. Smith*, 494 U.S. 872 (1990), and rejected by RFRA.

Indeed, *Smith* relied on *Lyng* to support its rule that the government doesn't violate the Free Exercise Clause when its actions are "neutral" and "generally applicable." 494 U.S. at 881, 883 (citing *Lyng*); *see also Fulton v. City of Philadelphia*, 593 U.S. 522, 536 (2021) (*Smith* "drew support for the neutral and generally applicable standard from … *Lyng*"); Stephanie Hall Barclay & Matthew Krauter, *The Untold Story of the Proto-*Smith *Era*, 174 U. Pa. L. Rev. 435, 440–41, 532–36 (2026) ("*Lyng*

is part of the proto-*Smith* era that RFRA was meant to replace."). That's the very rule RFRA rejects. 42 U.S.C. §§ 2000bb(a)(4), 2000bb-1(a).

Third, *Lyng* is factually distinct because, unlike here, it didn't involve destruction of a religious site. *Apache Stronghold*, 101 F.4th at 1146–47 (Murguia, C.J., dissenting) ("[n]o sites" in *Lyng* were "disturbed"); *see also Apache Stronghold*, 38 F.4th at 781 (Berzon, J., dissenting) (government "did not deny access to or directly damage the [sacred] sites"). Instead, it involved a plan to pave a road that was "removed as far as possible from [religious] sites," ensuring that "[n]o sites where specific rituals take place were to be disturbed." *Lyng*, 485 U.S. at 443, 454. Thus, the *Lyng* plaintiffs' substantial-burden argument rested solely on "subjective spiritual harm," which civil courts cannot weigh, *Apache Stronghold*, 101 F.4th at 1147 (Murguia, C.J., dissenting)—not on any "objective" impediment to acts constituting religious exercise. *See Mahmoud*, 606 U.S. at 546 (2025) (burden is "objective" inquiry). The *Apache Stronghold* majority simply ignored these distinguishing facts. *See Apache Stronghold*, 101 F.4th at 1146 (Murguia, C.J., dissenting) ("In its retelling of *Lyng*, the majority omits crucial facts."); Barclay & Krauter, *supra*, at 441–42, 500–03 (Justices' private papers noted *Lyng* would be a "different" case had the project "prevent[ed]" religious exercise).

c. *Apache Stronghold* is also an "outlier" that creates "a circuit split." *Apache Stronghold*, 145 S. Ct. at 1487–88 (Gorsuch, J., dissenting); *see also Apache Stronghold*, 101 F.4th at 1140 (Murguia, C.J., dissenting)

14

(majority's decision splits with "at least seven other circuits"). Indeed, "[n]ot a single other Court of Appeals has suggested that the 'substantial burden' test in RFRA or its sister statute RLUIPA contains anything like the Ninth Circuit's special rule for the 'disposition' of government property." *Apache Stronghold*, 145 S. Ct. at 1488 (Gorsuch, J., dissenting).

"To the contrary," at least six circuits have "held that preventing a religious exercise is, necessarily, a 'substantial burden' on that religious exercise." *Id.* (citing *Haight v. Thompson*, 763 F.3d 554, 565 (6th Cir. 2014) ("barring access to the practice" "necessarily place[s] a substantial burden on it"); *Yellowbear v. Lampert*, 741 F.3d 48, 56 (10th Cir. 2014) (preventing access to prison sweat lodge "easily" meets substantial-burden test); *Bethel World Outreach Ministries v. Montgomery Cnty. Council*, 706 F.3d 548, 555–56 (4th Cir. 2013) ("preventing a religious organization from building a church" can be a substantial burden even if it doesn't "force the organization to violate its religious beliefs"); *West v. Radke*, 48 F.4th 836, 845 & n.3 (7th Cir. 2022) (substantial burden "when a prison declines to provide an inmate access to something that will allow him to exercise his religion"); *In re Young*, 82 F.3d 1407, 1418 (8th Cir. 1996) (recovering tithing monies from debtors' church was a substantial burden because it "would effectively prevent the debtors from tithing"); *Thai Meditation Ass'n of Ala. v. Mobile*, 980 F.3d 821, 830–31 (11th Cir. 2020) (land-use regulation that "completely prevents" religious exercise "clearly satisfies the substantial-burden standard").

**d.** Lastly, the Supreme Court's recent decisions in *Mahmoud* and *Mirabelli*—both post-dating *Apache Stronghold*—further conflict with *Apache Stronghold*'s reasoning.

In *Mahmoud*, the Supreme Court considered whether a public school district "burden[ed]" parents' religious exercise when it included "'LGBTQ+-inclusive' storybooks" in the curriculum without letting parents opt their children out of the readings. 606 U.S. at 528–30. Like the *Apache Stronghold* majority, *see* 101 F.4th at 1051, the Fourth Circuit in *Mahmoud* held that in cases involving the government's "internal affairs," the government imposes a religious "burden" only if it "coerces" religious practitioners to act "contrary to their religious views," *Mahmoud v. McKnight*, 102 F.4th 191, 208–214 (4th Cir. 2024). But the Supreme Court rejected this narrow, coercion-based interpretation of a religious "burden" as "chilling," "alarmingly narrow," and contrary to "the fundamental values of the American people." 606 U.S. at 558–59. Instead, it held courts must ask if the government's actions pose an "objective danger" or "very real threat of undermining" religious practices. *Id.* at 553–55.

Similarly, in *Mirabelli*, a California policy allowed public schools to notify parents about their child's gender transition at school only with the child's consent. 146 S. Ct. at 800–01. Relying on *Mahmoud*, religious parents challenged the policy as a violation of their right to guide the religious development of their children. The government argued

16

*Mahmoud* was "'a narrow decision focused on uniquely coercive "curricular requirements"'"; but the Supreme Court rejected that argument, holding that the "intrusion on parents' free exercise rights here"—unconsented facilitation of a child's gender transition—was even "greater than the introduction of LGBTQ storybooks" in *Mahmoud. Id.* at 802.

*Mahmoud* and *Mirabelli* both reject *Apache Stronghold*'s reasoning. First, both decisions reject the idea, crucial to *Apache Stronghold*, that showing a burden under the Free Exercise Clause requires "compulsion or coercion to renounce or abandon one's religion." *Mahmoud*, 606 U.S. at 558–59; *accord Mirabelli*, 146 S. Ct. at 802. *Contra* Op.39 (wrongly distinguishing *Mahmoud* as limited to policies that "compel behavior at odds with individual religious beliefs or practices").

Second, both decisions found that a religious burden existed when the government's actions posed an "objective danger" or "'very real threat of undermining' the religious beliefs and practices that the parents wish to instill in their children." *Mahmoud*, 606 U.S. at 552–55 ("subtle" LGBTQ+ message of storybooks); *accord Mirabelli*, 146 S. Ct. at 802 (facilitation of gender transition). Here, the government's actions don't merely pose an "objective danger" or "threat" of undermining religious practices; its actions will literally swallow the irreplaceable site of those practices in a crater and eradicate them forever. Thus, the "intrusion" on religious exercise is even "greater than the introduction of LGBTQ storybooks" in *Mahmoud. Mirabelli*, 146 S. Ct. at 802.

17

Finally, the Apaches here are suing under RFRA, which "goes far beyond what is constitutionally required under the Free Exercise Clause." *Apache Stronghold*, 101 F.4th at 1134 (Murguia, C.J., dissenting) (cleaned up). Thus, if the mere reading of objectionable storybooks is a burden under the narrower protections of the Free Exercise Clause, then the permanent, physical eradication of religious practices is an *a fortiori* burden under the broader protections of RFRA.

## II. The conflict is exceptionally important, and the case for en banc review is exceptionally strong.

*Apache Stronghold* doesn't just defy RFRA's plain text and conflict with the Supreme Court and other circuits. It also poses an existential threat to Native Americans throughout this Circuit.

For Apaches, the obliteration of Oak Flat will "reverberate for generations," "effectively 'end[ing] Apache religious existence as we know it.'" *Apache Stronghold*, 145 S. Ct. at 1488–89 (Gorsuch, J., dissenting). But the decision also harms *innumerable* Native Americans, whose "religions are typically land-based" and whose "traditional ... religious sites are" often "located exclusively on federal land." *Apache Stronghold*, 101 F.4th at 1155 (Murguia, C.J., dissenting). The government now has carte blanche to destroy those sacred sites with impunity. And subjecting Native American religious practices to a discriminatory double standard is especially troubling in this Circuit, which encompasses far more Native Americans and far more federal land than any other.

18

That may be partly why this Court granted en banc review in *Apache Stronghold* previously. But there is strong reason to believe those fractured en banc opinions don't accurately reflect the full Court's views. Indeed, the twelve judges of this Court who considered the substantial-burden question split 6-6. *Apache Stronghold*, 101 F.4th at 1156 (Murguia, C.J., dissenting); *Apache Stronghold*, 2021 WL 12295173, at *2 (Bumatay, J., dissenting). And that was *before* the Supreme Court twice rejected a "coercion" requirement for proving a "burden" on religious exercise in a government-controlled setting, *supra* Part I.d—making *Apache Stronghold*'s coercion carveout for Native Americans even more indefensible.

The government's late-night scramble to effectuate the land transfer, *supra* p.8, only confirms the importance of the en banc Court's intervention. When plaintiffs challenge a land transfer from the government to a private party, and both parties to the transfer have notice (as they indisputably did here), those parties "act[] at their peril in transferring the land," "subject to the power of the court" to determine "the legality of the transfer[]" and "restore the status" of the land prior to the transfer. *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1187 (9th Cir. 2000); *see also Porter v. Lee*, 328 U.S. 246, 251 (1946) ("court may by mandatory injunction restore the status quo" where "defendant with notice in an injunction proceeding" attempts to change the "status quo" by "complet[ing] the acts sought to be enjoined"). Here, if the en banc court con-

19

cludes that destroying Oak Flat would likely qualify as a substantial burden, it is well within the district court's equitable discretion to fashion appropriate injunctive relief on remand.

## CONCLUSION

The Court should grant rehearing en banc.

Respectfully submitted,

/s/ *Miles E. Coleman*
Miles E. Coleman
NELSON MULLINS RILEY & SCARBOROUGH LLP
2 W. Washington St., Suite 400
Greenville, SC 29601
(864) 373-2352
miles.coleman@nelsonmullins.com

Jeffrey A. Wald
NELSON MULLINS RILEY & SCARBOROUGH LLP
380 Knollwood Street, Suite 530
Winston-Salem, NC 27103
(336) 774-3335
jeffrey.wald@nelsonmullins.com

Madeline C. Bergstrom
NELSON MULLINS RILEY & SCARBOROUGH LLP
101 Constitution Ave. NW, Suite 900
Washington, DC 20001
(202) 689-2807
madeline.bergstrom@nelsonmullins.com

*Counsel for Plaintiffs-Appellants*

20

## CERTIFICATE OF COMPLIANCE

I certify that this petition for rehearing en banc complies with Circuit Rule 40-1 because it contains 4,179 words, excluding the parts exempted by Fed. R. App. P. 32(f), as determined by the word counting feature of Microsoft Office 365.

/s/ Miles E. Coleman
Miles E. Coleman

## CERTIFICATE OF SERVICE

I hereby certify that on April 27, 2026, I electronically filed the foregoing petition for rehearing en banc with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

/s/ Miles E. Coleman
Miles E. Coleman

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ARIZONA MINING REFORM
COALITION; INTER TRIBAL
ASSOCIATION OF ARIZONA,
INC.; EARTHWORKS; CENTER
FOR BIOLOGICAL DIVERSITY;
ACCESS FUND; GRAND
CANYON CHAPTER OF THE
SIERRA CLUB,

     *Plaintiffs - Appellants*,

  v.

UNITED STATES FOREST
SERVICE, an agency in the U.S.
Department of Agriculture; NEIL
BOSWORTH, Supervisor of the
Tonto National Forest; BROOKE
ROLLINS, US Secretary of
Agriculture,

     *Defendants - Appellees*,

RESOLUTION COPPER MINING,
LLC,

No. 25-5185

D.C. No.
2:21-cv-00122-
DWL

AMENDED
OPINION

2        AZ MINING REFORM COAL. v. U.S. FOREST SERV.

*Intervenor-Defendant - Appellee.*

---

SAN CARLOS APACHE TRIBE, a federally recognized Tribe,

       *Plaintiff - Appellant,*

  v.

UNITED STATES FOREST SERVICE, an agency in the U.S. Department of Agriculture; NEIL BOSWORTH, Supervisor of the Tonto National Forest; BROOKE ROLLINS,

       *Defendants - Appellees,*

RESOLUTION COPPER MINING, LLC,

       *Intervenor-Defendant - Appellee.*

No. 25-5189

D.C. No.
2:21-cv-00068-DWL

---

GOUYEN BROWN LOPEZ; SINETTA LOPEZ, on behalf of herself and her minor child L.B.; NOMIE BROWN; ANGELA KINSEY, on behalf of herself and her minor children V.K. and M.K.,

No. 25-5197

D.C. No.
2:25-cv-02758-DWL

*Plaintiffs - Appellants*,

v.

UNITED STATES OF AMERICA; UNITED STATES FOREST SERVICE; BROOKE ROLLINS; UNITED STATES DEPARTMENT OF AGRICULTURE; TOM SCHULTZ,

*Defendants - Appellees*,

RESOLUTION COPPER MINING, LLC,

*Intervenor-Defendant - Appellee*.

Appeal from the United States District Court
for the District of Arizona
Dominic Lanza, District Judge, Presiding

Argued and Submitted January 7, 2026
Phoenix, Arizona

Filed March 13, 2026
Amended April 8, 2026

Before: JOHNNIE B. RAWLINSON, MILAN D. SMITH, JR., AND DANIEL A. BRESS, Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.;
Partial Dissent by Judge Rawlinson

## SUMMARY[*]

### Southeast Arizona Land Exchange and Conservation Act

The panel affirmed the district court's denial of plaintiffs' request for a preliminary injunction seeking to block a land exchange, mandated by the Southeast Arizona Land Exchange and Conservation Act (the Land Exchange Act), that targets a large copper deposit in Southeast Arizona located in the Tonto National Forest.

The Land Exchange Act directs the United States Forest Service to transfer nearly 2,500 acres of National Forest land, including Oak Flat—an Apache ceremonial religious ground—and a deposit containing almost two billion metric tons of copper to a private mining company, Resolution Copper Mining LLC (Resolution Copper). In exchange, Resolution Copper must provide over 5,000 acres of equally appraised land to the federal government.

Three groups of plaintiffs—the Arizona Mining Reform Coalition (AMRC), the San Carlos Apache Tribe (the Tribe), and a separate set of Apache plaintiffs (the Lopez Plaintiffs)—brought suit under the Land Exchange Act, the National Environmental Policy Act (NEPA), the National

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Historic Preservation Act (NHPA), the Religious Freedom Restoration Act (RFRA), and the Free Exercise Clause of the United States Constitution.

Addressing threshold justiciability issues, the panel held that Plaintiffs had Article III standing because (1) they demonstrated actual or imminent injury flowing from the land exchange where the final environmental impact statement (FEIS) under NEPA showed that physical and visual impacts on traditional cultural places, special interest areas, and plant and mineral resources caused by construction of the mine would be immediate, permanent, and large in scale; and (2) their injuries are redressable by a favorable judicial decision. The panel also held that AMRC had prudential standing to bring its claims challenging the land exchange appraisal. Finally, the panel held that Plaintiffs established that their NEPA claims are justiciable because the FEIS is reviewable as "final agency action."

Turning to the merits, the panel held that Plaintiffs have not established a likelihood of success on the merits of their claims. First, AMRC is not likely to succeed on the merits of its claims challenging the appraisal under the Land Exchange Act. Second, Plaintiffs are not likely to succeed on the merits of their claims that the FEIS fails to comply with NEPA. Third, the Tribe and the Lopez Plaintiffs are not likely to succeed on the merits of their claims that the Government failed to satisfy its consultation obligations under the Land Exchange Act and the NHPA. Finally, the Lopez Plaintiffs' claim that the land exchange would violate their religious liberty, as protected by RFRA and the Free Exercise Clause, is foreclosed by precedent.

Because Plaintiffs failed to show a likelihood of success on, or even serious questions regarding, any of their claims,

the panel did not reach any of the other preliminary injunction factors and affirmed the district court's denial of Plaintiffs' request for a preliminary injunction against the land exchange.

Judge Rawlinson partially dissented. She agreed with the majority that Plaintiffs' claims were mostly foreclosed by this court's precedent and recent Supreme Court rulings. She dissented from that portion of the majority opinion concerning the appraisal report prepared by the U.S. Forest Service because the appraisal did not conform to the requirements of the authorizing statute or this court's precedent. Because the nonconforming appraisal flouted the provisions of the legislation authorizing the land exchange, she would reverse the district court decision allowing the land exchange to proceed.

## COUNSEL

Roger Flynn (argued) and Jeffrey C. Parsons, Western Mining Action Project, Lyons, Colorado; Marc D. Fink, Center for Biological Diversity, Duluth, Minnesota; Allison N. Henderson, Center for Biological Diversity, Crested Butte, Colorado; Susan B. Montgomery, Montgomery & Interpreter PLC, Phoenix, Arizona; Miles E. Coleman (argued), Nelson Mullins Riley & Scarborough LLP, Greenville, South Carolina; Jeffrey A. Wald, Nelson Mullins Riley & Scarborough LLP, Winston-Salem, North Carolina; Madeline C. Bergstrom, Nelson Mullins Riley & Scarborough LLP, Washington, D.C.; Bernardo M. Velasco (argued), Alexander B. Ritchie, Jana L. Sutton, Justine Jimmie, and Laurel Herrmann, San Carlos Apache Tribe Department of Justice, San Carlos, Arizona; Joe P. Sparks, The Sparks Law Firm PC, Scottsdale, Arizona; Colin C. Hampson, Sonosky Chambers Sachse Endreson & Perry LLP, Bonita, California; Frank S. Holleman IV, Sonosky Chambers Sachse Endreson & Perry LLP, Washington, D.C.; Steve Titla, Titla & Parsi PLLC, Globe, Arizona; for Plaintiffs-Appellants.

Robert N. Stander (argued), Deputy Assistant Attorney General; Erika D. Norman, Ezekiel A. Peterson, Thekla Hansen-Young and Angela Ellis, Attorneys, Environment and Natural Resources Division; Adam R. F. Gustafson, Acting Assistant Attorney General; United States Department of Justice, Washington, D.C.; for Defendants-Appellees.

Michael R. Huston (argued), Diane M. Johnsen, Samantha J. Burke, Addison W. Bennett, and Nicholas S. Crown, Perkins Coie LLP, Phoenix, Arizona; Christopher D. Thomas, Andrea J. Driggs, Janet M. Howe, and Benjamin A.

Longbottom, Holland & Hart LLP, Phoenix, Arizona; for Intervenor-Defendant-Appellee.

Heather D. Whiteman Runs Him and Dana L. Chavis, Tribal Justice Clinic, Rogers College of Law, University of Arizona, Tucson, Arizona; Gerald Torres, Yale Law School, New Haven, Connecticut; for Amici Curiae National Native American Law Students Association, Yale Native American Law Students Association, University of Arizona Native and Indigenous Students Association, and Others.

Eric N. Kniffin and Rachel N. Morrison, Ethics & Public Policy Center, Washington, D.C.; Ian Speir, Covenant Law PLLC, Colorado Springs, Colorado; for Amici Curiae Religious Freedom Institute and Ethics and Public Policy Center.

Jack W. Fiander, Sacred Ground Legal Services, Yakima, Washington, for Amicus Curiae Sacred Ground Legal Services.

Steven T. Collis and John Greil, Law & Religion Clinic, University of Texas School of Law, Austin, Texas, for Amicus Curiae Lipan Native American Church.

Wesley J. Furlong, Native American Rights Fund, Anchorage, Alaska; Geoffrey C. Blackwell, National Congress of American Indians, Washington D.C.; for Amici Curiae National Congress of American Indians and National Association of Tribal Historic Preservation Officers.

Jennifer H. Weddle, Greenberg Traurig PA, Denver, Colorado, for Amicus Curiae Coalition of Large Tribes.

Jay C. Johnson and Megan Barbero, Venable LLP, Washington, D.C.; Erica Klenicki and Caroline McAuliffe, National Association of Manufacturers, Washington, D.C.;

Stephanie Maloney, U.S. Chamber Litigation Center, Washington, D.C.; for Amici Curiae National Association of Manufacturers and Chamber of Commerce of the United States of America.

Christopher G. Michel, Quinn Emanuel Urquhart & Sullivan LLP, Washington, D.C., for Amicus Curiae William P. Barr.

Svend A. Brandt-Erichsen, Nossaman LLP, Seattle, Washington; Michelle Burton, Nossaman LLP, Phoenix, Arizona; for Amici Curiae Greater Phoenix Chamber of Commerce.

Thomas J. Basile and Kory Langhofer, Statecraft PLLC, Phoenix, Arizona, for Amici Curiae Arizona Chamber of Commerce & Industry, Greater Phoenix Leadership, Arizona State Building and Construction Trades Council, and Arizona Plumbers and Pipefitters Local Union 469.

Ivan L. London and Grady J. Block, Mountain States Legal Foundation, Lakewood, Colorado, for Amici Curiae the Towns of Superior, Kearny, and Miami, Arizona, and Mayor Dean Hetrick of Hayden, Arizona.

James M. Auslander, Beveridge & Diamond PC, Washington, D.C.; Tawny Bridgeford, National Mining Association, Washington, D.C.; for Amici Curiae National Mining Association, American Exploration & Mining Association, Arizona Mining Association, Alaska Miners Association, MiningMinnesota, Montana Mining Association, Nevada Mining Association, Texas Mining and Reclamation Association, Utah Mining Association, Wyoming Mining Association, and National Tribal Energy Association.

## OPINION

M. SMITH, Circuit Judge:

These consolidated cases concern a land exchange, mandated by the Southeast Arizona Land Exchange and Conservation Act (the Land Exchange Act), 16 U.S.C. § 539p, that targets a large copper deposit in Southeast Arizona located in the Tonto National Forest. Plaintiffs bring a variety of claims under the Land Exchange Act, the National Environmental Policy Act (NEPA), the National Historic Preservation Act (NHPA), the Religious Freedom Restoration Act (RFRA), and the Free Exercise Clause of the United States Constitution. Because Plaintiffs' claims are unlikely to succeed on the merits, we affirm the district court's denial of Plaintiffs' request for a preliminary injunction against the land exchange.

## FACTUAL BACKGROUND

### I.  Statutory History

In 2014, Congress passed the Land Exchange Act as part of the National Defense Authorization Act for Fiscal Year 2015. Pub. L. No. 113-291, § 3003, 128 Stat. 3292, 3732–41 (2014) (codified at 16 U.S.C. § 539p). The land exchange had, for many years, been hotly contested in Congress and in public debate. The Land Exchange Act directs the United States Forest Service to transfer nearly 2,500 acres of National Forest land, including Oak Flat—an Apache ceremonial religious ground—and a deposit containing almost two billion metric tons of copper, in addition to other minerals, to a private mining company, Resolution Copper Mining LLC (Resolution Copper). In exchange, Resolution Copper must provide over 5,000 acres of equally appraised

land to the federal government. 16 U.S.C. §§ 539p(b)(2), (4); (d)(1).

The Land Exchange Act includes a variety of procedural requirements. For instance, the Secretary of Agriculture must consult with Native American tribes regarding their concerns related to the land exchange, *id.* § 539p(c)(3)(A), and then "seek to find mutually acceptable measures" to address those concerns and "minimize the adverse effects on the affected" tribes. *Id.* § 539p(c)(3)(B). The Land Exchange Act also mandates appraisals of the land to ensure an exchange of equal value, "conducted in accordance with nationally recognized appraisal standards." *Id.* §§ 539p(c)(4), (5). Furthermore, the Land Exchange Act requires the Government to "prepare a single environmental impact statement [(EIS)] under the National Environmental Policy Act of 1969" prior to conveying the land. *Id.* § 539p(c)(9)(B). That EIS, per the Land Exchange Act, "shall be used as the basis for all decisions under Federal law related to the proposed mine and the Resolution mine plan of operations and any related major Federal actions significantly affecting the quality of the human environment, including the granting of any permits, rights-of-way, or approvals for the construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities." *Id.* Conveyance of the land must occur within 60 days of EIS publication. *See id.* § 539p(c)(10).

## II. Procedural History

### a. Original Litigation

Following issuance of the original EIS on January 15, 2021, three plaintiff groups filed suit seeking to enjoin the conveyance. Two of the groups, also Plaintiffs here—the

Arizona Mining Reform Coalition (AMRC)[1] and the San Carlos Apache Tribe (the Tribe)—challenged the EIS's sufficiency and raised similar claims as Plaintiffs in this litigation. The third plaintiff group, Apache Stronghold (not involved in the instant litigation) raised religious freedom claims under the Free Exercise Clause and the Religious Freedom Restoration Act (RFRA) in a separate case. *See Apache Stronghold v. United States*, No. 21-CV-00050 (D. Ariz.).

While the *Apache Stronghold* litigation was pending, the Forest Service withdrew the EIS in March 2021 to engage in further consultation with tribal groups. However, the *Apache Stronghold* case proceeded as to the plaintiffs' RFRA and Free Exercise claims. The district court in that case eventually denied the request for a preliminary injunction, and a panel of this court affirmed; the full court then granted en banc rehearing. *See Apache Stronghold v. United States*, 519 F. Supp. 3d 591 (D. Ariz. 2021), *aff'd*, 38 F.4th 742 (9th Cir. 2022), *reh'g en banc granted, opinion vacated*, 56 F.4th 636 (9th Cir. 2022). The en banc panel reached the same result as the merits panel, ruling that the land exchange did not burden the plaintiffs' religious exercise. *See Apache Stronghold v. United States*, 101 F.4th 1036, 1044, 1051–53, 1063 (9th Cir. 2024). The Supreme Court denied review over a dissent from Justice Gorsuch, joined by Justice Thomas. *See Apache Stronghold v. United States*, 145 S. Ct. 1480, 1480–89 (2025) (Gorsuch, J., dissenting from the denial of certiorari). Apache Stronghold filed a petition for rehearing in light of the Court's subsequent decision in

---

[1] AMRC refers to Plaintiffs-Appellants Arizona Mining Reform Coalition, Inter Tribal Association of Arizona, Inc., Center for Biological Diversity, Earthworks, the Access Fund, and the Sierra Club.

*Mahmoud v. Taylor*, 606 U.S. 522 (2025), which the Court denied. *Apache Stronghold v. United States*, 146 S. Ct. 285 (2025) (mem.). Justice Gorsuch again noted he would have granted the petition. *See id.*

### b. Current Litigation

The Forest Service issued the revised Final EIS (FEIS) on June 20, 2025, restarting the Land Exchange Act's 60-day clock for conveyance of the land. The Forest Service also conducted the required appraisal process pursuant to the Land Exchange Act. This included one appraisal report detailing the area of federal land over which Resolution Copper holds unpatented mining claims, known as the "Mining Claim Zone," and another regarding the "Mineral Withdrawal Area," the federal land over which Resolution Copper holds no mining claims.

AMRC and the Tribe filed motions for a preliminary injunction in early 2025 in anticipation of the Forest Service's filing of the revised Final EIS, which the district court denied on June 6, 2025. However, with the Government's consent, the court entered a temporary stay until August 19, 2025, to allow for a second round of preliminary injunction briefing; the court denied that injunction request on August 15, 2025. The district court found that the plaintiffs had not "established a likelihood of success or even serious questions going to the merits of any of their" appraisal, NEPA, consultation, or National Forest Management Act (NFMA) claims.

Simultaneously, a separate set of Apache plaintiffs (the Lopez Plaintiffs) filed their own suit in the District Court for the District of Columbia on July 24, 2025, which was transferred to the District of Arizona upon the Government's motion. *See Lopez v. United States*, 2025 WL 2193001

(D.D.C. Aug. 1, 2025). The Lopez Plaintiffs raised RFRA, Free Exercise, NHPA, and NEPA claims, which the district court rejected on August 17, 2025, when denying their motion for a preliminary injunction. Under *Apache Stronghold*, the district court ruled, the Lopez Plaintiffs' religious liberty claims were foreclosed, and nothing in *Mahmoud* changed that.

All three Plaintiff groups appealed to this court and simultaneously filed for injunctions pending appeal, seeking to block the land transfer. A motions panel of this court entered an administrative stay on August 18, 2025, referring the motions for injunction pending appeal to the merits panel.

## STANDARD OF REVIEW

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). We have "adopted a sliding-scale approach to the *Winter* factors," where "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Bennett v. Isagenix Int'l LLC*, 118 F.4th 1120, 1126 (9th Cir. 2024) (cleaned up).

We review a district court's decision to deny a motion for a preliminary injunction for abuse of discretion. *See Betschart v. Oregon*, 103 F.4th 607, 616 (9th Cir. 2024). The district court abuses its discretion "when it fails to identify 'the correct legal rule to apply to the relief requested' or applies the correct rule in a way that is illogical, implausible,

or unsupported by the facts." *Shayler v. 1310 PCH, LLC*, 51 F.4th 1015, 1020 (9th Cir. 2022) (quoting *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc)). In evaluating agency action, the court must determine if the agency decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This "deferential standard simply ensures that the agency has acted within a zone of reasonableness." *League of California Cities v. FCC*, 118 F.4th 995, 1014 (9th Cir. 2024) (internal quotation marks omitted).

## ANALYSIS

### I.   Threshold Justiciability Issues

Plaintiffs must establish Article III standing as to each of their claims. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) ("[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III."); *Davis v. FEC*, 554 U.S. 724, 734 (2008) ("Standing is not dispensed in gross. Rather, a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." (cleaned up)). To establish standing, Plaintiffs must show: (1) they have suffered an injury in fact that is "concrete and particularized" and "actual or imminent"; (2) that the injury they show is traceable to the challenged action; and (3) that it is likely that a favorable decision would redress their injury. *Lujan*, 504 U.S. at 560–61.

Absent a specific private right of action, plaintiffs must assert their administrative claims via the Administrative Procedure Act's (APA) judicial review provisions. *See* 5 U.S.C. §§ 701–706. "[A] person suing under the APA must satisfy not only Article III's standing requirements," but

16          AZ MINING REFORM COAL. v. U.S. FOREST SERV.

also, "[t]he interest he asserts must be 'arguably within the zone of interests to be protected or regulated by the statute' that he says was violated." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (quoting *Ass'n of Data Processing Serv. Orgs. v. Camp,* 397 U.S. 150, 153 (1970)). "[I]n the APA context . . . the test is not especially demanding," and "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014) (cleaned up).

Finally, under the APA, only "final agency action" is reviewable. 5 U.S.C. § 704. Agency action is "final" if it "both (1) 'mark[s] the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature,' and (2) is 'one by which rights or obligations have been determined, or from which legal consequences will flow.'" *Ctr. for Biological Diversity v. Haaland*, 58 F.4th 412, 417 (9th Cir. 2023) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). This inquiry is meant to consider the "practical and legal effects of the agency action" and should be "pragmatic and flexible." *Id.* (citing *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006)).

Plaintiffs have established that all of their claims are reviewable.

### a. Article III Standing

Defendants challenge Plaintiffs' Article III standing on two grounds: first, that they have not demonstrated actual or imminent injury flowing from the land exchange, and

second, that their injuries would not be redressed by a favorable judicial decision. We disagree on both counts.

As for actual or imminent injury, under this court's precedents, "plaintiffs may satisfy standing by showing that they face a future injury that is 'imminent,' or 'certainly impending.'" *Int'l Partners for Ethical Care Inc v. Ferguson*, 146 F.4th 841, 851 (9th Cir. 2025) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561, 564 n.2 (1992)) (emphasis omitted). Here, the FEIS points out that "[p]hysical and visual impacts on [traditional cultural places], special interest areas, and plant and mineral resources caused by construction of the mine would be *immediate*, *permanent*, and *large in scale*." That is enough to show imminent injury.

To demonstrate redressability, "a federal plaintiff must show only that a favorable decision is likely to redress his injury, not that a favorable decision will inevitably redress his injury." *Desert Citizens*, 231 F.3d at 1178 (quoting *Beno v. Shalala,* 30 F.3d 1057, 1065 (9th Cir. 1994)). "Plaintiffs have standing if 'there is some possibility that the requested relief will prompt the injury-causing party to reconsider' its actions." *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007). As for Plaintiffs' appraisal claims, we have held before that injuries flowing from a flawed land exchange appraisal are redressable. *See Desert Citizens*, 231 F.3d at 1178. As we noted, if an agency is required to redo a flawed appraisal, "the particular exchange would not go through" and plaintiffs can continue to use the public land. *Id.* That is the case here.

Plaintiffs' appraisal, consultation, and NEPA claims are also redressable by favorable judicial action, as we have held that even a temporary cessation of agency action can redress

connected injuries. *See W. Watersheds Project v. Grimm*, 921 F.3d 1141, 1148 (9th Cir. 2019). As the district court correctly noted, "every day that Oak Flat remains intact is another day that members of the Tribe can use the land in its current, unspoiled form for religious purposes and ceremonies. Thus, even a temporary delay may, for example, allow another Sunrise Ceremony to take place."

Therefore, Plaintiffs have demonstrated that they have Article III standing.[2]

### b. Prudential Standing

The Government and Resolution Copper next argue that AMRC has no prudential standing to bring its appraisal claim under the APA. In their view, there is no injury to AMRC from an incorrect appraisal (to the degree the appraisal was incorrect). The district court rejected those arguments below, holding that this court's decision in *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172 (9th Cir. 2000), permits standing for appraisal claims in land exchange cases like this one. The Defendants attempt to distinguish *Desert Citizens* on the grounds that it involved a discretionary land exchange under the Federal Land Policy and Management Act (FLPMA). In their view, AMRC's appraisal claims do not fall within the zone of interests of the Land Exchange Act's appraisal provisions, and *Desert Citizens* is inapposite because the Land Exchange Act,

---

[2] Though the parties do not contest Plaintiffs' standing for their religious liberty claims, we must nonetheless ensure Plaintiffs have standing for those claims. *See United States v. Hays*, 515 U.S. 737, 742 (1995). Here, the Lopez Plaintiffs face an imminent inability to practice their religion at Oak Flat, an injury traceable to the Government's decision to transfer the land to Resolution and redressable by a decision barring that transfer. That suffices to establish standing.

unlike the FLPMA, does not contain a judicial review provision.

Though the FLPMA and Land Exchange Act are different in some respects, the flexible zone-of-interests test supports prudential standing here. We have held that we "may look beyond the section sued under to the statute or act as a whole 'to understand Congress' overall purposes.'" *Nat'l Wildlife Fed'n v. Burford*, 871 F.2d 849, 852 (9th Cir. 1989) (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 401 (1987)), and here, the Land Exchange Act contains statutory provisions that seek to protect the public and Native groups' interests in the land. *See* 16 U.S.C. §§ 539p(c)(3), (9); (d)(2); (g); (i)(3). There is also a "public review" sub-provision in the Land Exchange Act's appraisal section. *See id.* § 539p(c)(4)(B)(iv). Taking these provisions together, and given the "lenient approach" to the zone-of-interests test in the APA context, *Lexmark*, 572 U.S. at 130, AMRC has established standing for its appraisal claim.

### c. Final Agency Action

Finally, the FEIS is reviewable as "final agency action" because publication triggers the 60-day time limit for the land exchange, and no further agency action or decision-making process is needed for that deadline to run. *See Ctr. for Biological Diversity*, 58 F.4th at 417 ("An agency action is 'final' only if it both (1) 'mark[s] the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature,' and (2) is 'one by which rights or obligations have been determined, or from which legal consequences will flow.'" (quoting *Bennett*, 520 U.S. at 177–78)); *Oregon Nat. Desert Ass'n*, 465 F.3d at 982 ("In determining whether an agency's action is final, we look

to whether the action amounts to a definitive statement of the agency's position or has a direct and immediate effect on the day-to-day operations of the subject party, or if immediate compliance with the terms is expected." (cleaned up)); *id.* at 984 ("[W]e look to see whether the agency has rendered its last word on the matter to determine whether an action is final and is ripe for judicial review." (internal quotation marks omitted)).   Accordingly, Plaintiffs have established that their NEPA claims are justiciable.

## II. Plaintiffs have not established a likelihood of succeeding on the merits, nor raised serious questions regarding, any of their claims.

### a. AMRC is not likely to succeed on, nor has it raised serious questions regarding, its appraisal claims.

The Land Exchange Act sets out a set of appraisal requirements governing the land at issue.  *See* 16 U.S.C. §§ 539p(c)(4), (5).  These include the requirements that the appraisals be prepared "in accordance with nationally recognized appraisal standards" and that the land then be exchanged for non-Federal land of equal value.  *Id.* § 539p(c)(4)(b)(i).  Among other things, national appraisal standards require the value of the appraised land to reflect "the highest and best use of the property" "as if in private ownership and available for sale in the open market," 36 C.F.R. § 254.9(b)(1)(i), meaning "the most probable and legal use of [the] property." *Id.* § 254.2.

These appraisals also reflect the general mining laws, pursuant to which "'[d]iscovery' of a mineral deposit, followed by the minimal procedures required to formally 'locate' the deposit, gives an individual the right of exclusive possession of the land for mining purposes." *United States*

*v. Locke*, 471 U.S. 84, 86 (1985) (quoting 30 U.S.C. § 26); *see also United States v. Shumway*, 199 F.3d 1093, 1098–99 (9th Cir. 1999) ("[T]he finder of valuable minerals on government land is entitled to exclusive possession of the land for purposes of mining and to all the minerals he extracts."). "[A]n unpatented mining claim remains a fully recognized possessory interest." *Locke*, 471 U.S. at 86.

The Forest Service prepared one appraisal report detailing the area of federal land over which Resolution Copper holds unpatented mining claims, known as the "Mining Claim Zone" (MCZ), and another regarding the "Mineral Withdrawal Area" (MWA), the federal land over which Resolution Copper holds no mining claims. There are two main differences between these two parcels. First, the MCZ contains approximately 35 billion pounds of copper ore, while the MWA contains approximately 5 billion. Second, the MCZ is "encumbered by 148 unpatented mining claims that give Resolution . . . the exclusive right to extract the minerals beneath the MCZ," while Resolution has no such claims against the MWA.

In its appraisal for the MWA, the Forest Service concluded that the parcel was worth $22 million after factoring in the value of the underlying copper ore (valued at approximately $17.5 million). It determined that the highest and best use of the land was "exploration and development of a mineral resource," as no party had mining claims to the underlying minerals. However, for the MCZ, the agency noted that because Resolution had unpatented mining claims to the minerals, the mineral rights were "not part of the estate owned by the United States." Therefore, the highest and best use was "surface land use in support of a mining operation," and the land was only worth about $2 million.

There was no error in this appraisal.  As the district court correctly explained, "AMRC's criticisms all flow from a misunderstanding of how unpatented mining claims work." The United States has a "finders keepers" regime for mining claims.  In other words, whoever finds minerals on federal land gains an exclusive possessory interest in the land "for purposes of mining and to all the minerals he extracts" from that land. *Shumway*, 199 F.3d at 1098–99.  Here, Resolution Copper owns the right to mine the minerals in the MCZ and the minerals themselves, once mined.  As the district court determined, if the appraisal had included the value of the MCZ minerals in what the federal government owned, that "would force Resolution Copper, as part of the land exchange, to pay the federal government for the copper it effectively already owns the exclusive right to mine." Indeed, the Land Exchange Act itself indicates that Congress did not contemplate that the appraisal would include the value of the minerals in the MCZ.  The statute emphasizes that "[n]othing in this section shall interfere with, limit, or otherwise impair, the unpatented mining claims or rights currently held by Resolution Copper on the Federal land." 16 U.S.C. § 539p(i)(1)(C).  Effectively wiping out the value of Resolution Copper's mining claims and forcing it to pay twice for its existing rights would undeniably "interfere with" and "impair" those claims.  *Id.*

AMRC's arguments to the contrary are unavailing. AMRC first argues that the appraisal improperly "based its 'highest and best use' valuation on the current status of the federal lands, instead of its value on the future open market after the lands are private."  To reach this conclusion, AMRC seems to assume that "as if in private ownership" means as if owned by Resolution or some other private party in fee simple after the land exchange has concluded.  But this is an

erroneous reading of the regulations.  The better interpretation of the term "as if in private ownership" is that the appraiser needs to determine the present value of the federal lands as if they are exploited for profit by a hypothetical private party.  AMRC has failed to highlight any authority suggesting that Congress's decision to transfer this land to Resolution somehow defeats Resolution's already-existing mining claim over that land.[3]

AMRC's remaining arguments fare no better.  For instance, AMRC points to regulations that require appraisers to "consider the contributory value of any interest in land such as water rights, minerals, or timber, to the extent they

---

[3] The dissent claims that our precedent allows for the government to dispose of federal land and extinguish unpatented mining claims.  But the dissent's own cases emphasize that unpatented mining claims survive transfer absent congressional direction to the contrary.  *See, e.g.*, *Alaska Miners v. Andrus*, 662 F.2d 577, 580 (9th Cir. 1981) ("[T]he government may withdraw or convey the title to land *subject to valid, unpatented claims.*") (emphasis added); *Assiniboine & Sioux Tribes v. Nordwick*, 378 F.2d 426, 432 (9th Cir. 1967) ("Accordingly, we conclude that withholding provisions of the 1927 Act did not apply to lands subject to pending but unperfected homestead entries under the 1908 Act.").  And here, the dissent ignores the fact that Congress expressly chose to preserve Resolution's mining claims in the Land Exchange Act, which states that "[n]othing in this section shall interfere with, limit, or otherwise impair, the unpatented mining claims or rights currently held by Resolution Copper on the Federal land."  16 U.S.C. § 539p(i)(1)(C).  The transfer of the land at issue here to any hypothetical third party, therefore, would still be subject to Resolution's mining claims.  *See Shumway*, 199 F.3d at 1098–99.  Contrary to the dissent, there are no conditions for maintaining the mining claims that Resolution failed to fulfill.  And the "highest and best use" of the property by any private party cannot legally include mining the mineral deposit over which Resolution holds its claims.  *See* Uniform Appraisal Standards for Federal Land Acquisitions § 1.4.5 (the highest and best use must be "legally permissible").

are consistent with the highest and best use of the property." 36 C.F.R. §254.9(b)(1)(iv). That is what the appraiser did here. While it is true that the Government owns the underlying mineral estate, that interest has no practical value because the Government does not own the right to mine those minerals. AMRC ignores language in the regulations that requires appraisers to account for "all encumbrances" on the property. *Id.* § 254.9(c)(4). Indeed, § 4.6.5.2 of the Uniform Appraisal Standards for Federal Land Acquisitions (which apply "to the extent appropriate" under § 254.9) emphasizes that it is "improper to disregard preexisting encumbrances and their impact on the property," and when encumbered property is totally acquired, "the measure of compensation is the market value of the property as encumbered."

Finally, AMRC also points to various statements in the legislative history suggesting that the appraisals must include a valuation of relevant mineral rights. But as the district court aptly explained, those references most naturally apply to the Mineral Withdrawal Area, over which Resolution Copper holds no mining rights.

AMRC's appraisal arguments are really a challenge to the general mining laws. But "[d]espite much contemporary hostility to the Mining Law of 1872 and high level political pressure by influential individuals and organizations for its repeal, all repeal efforts have failed, and it remains the law." *Shumway*, 199 F.3d at 1098. Accordingly, we reject AMRC's appraisal claims.

> **b. Plaintiffs are not likely to succeed on, nor have they raised serious questions regarding, their NEPA claims.**

"NEPA imposes no substantive environmental obligations," but instead "is a purely procedural statute that . . . simply requires an agency to prepare an EIS." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 173 (2025). "Importantly, NEPA does not require the agency to weigh environmental consequences in any particular way. Rather, an agency may weigh environmental consequences as the agency reasonably sees fit under its governing statute." *Id.* Arbitrary and capricious review of NEPA compliance involves only "confirm[ing] that the agency has addressed environmental consequences and feasible alternatives as to the relevant project." *Id.* at 180. This review "should afford substantial deference to the agency" and "should not micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Id.* at 180, 183.

Plaintiffs argue that the FEIS here fails to comply with NEPA in six ways: (1) it fails to properly analyze the land exchange's impacts on water; (2) it fails to consider comments from other agencies; (3) it fails to consider sufficient mitigation measures; (4) it fails to consider certain expert evidence; (5) it fails to consider reasonable alternatives; and (6) it violates NEPA's length requirement. Under the deferential review the Supreme Court mandated in *Seven County*, these arguments are unlikely to succeed.

### i. Cumulative Water Impacts

AMRC first argues that the Government failed to consider "the Mine's cumulative pumping impacts on the aquifer or existing wells alongside the groundwater impacts

of the 275-square mile 'Superstition Vistas' mega development." AMRC asserts that the Government only analyzed a portion of the impact and dismissed the rest as "speculative." In AMRC's view, this "conceptual" discussion of the development's water demands is insufficient to comply with NEPA. Where there are "plain facts before" an agency, AMRC suggests, it cannot choose "to ignore [that] existing and readily available technical information."

Under the circumscribed NEPA review standard the Supreme Court set out in *Seven County*, however, the Government's water analysis as to the Superstition Vistas development suffices. First, the Court in *Seven County* expressly denied that the Government has an obligation under NEPA to consider the impact of "a housing development that might someday be built" near the operative project, even if the "effects from [that] separate project may be factually foreseeable." 605 U.S. at 187; *see also id.* at 190 (distinguishing separate, future projects from ones "interrelated and close in time and place to the project at hand," such as a "residential development next door to and built at the same time as a ski resort"). This is especially true because AMRC has made no argument nor provided any evidence suggesting that the Forest Service has regulatory authority over the Superstition Vistas development. *See id.* at 188 (discussing limited agency obligation to consider "separate projects" over which it "possesses no regulatory authority").

Second, the Government's decision to draw a line between modeling and analyzing the cumulative water impact from "the portion of Superstition Vistas that has a demonstrated source of water," and not "[o]ther portions of Superstition Vistas without demonstrated water supplies," is

the type of discretionary decision about "how far to go in considering indirect environmental effects" that we must defer to pursuant to *Seven County*. *Id.* at 182. This is particularly true given the agency *did* analyze the impact of the Superstition Vistas development on water supplies. While it did so qualitatively, rather than quantitatively, as Plaintiffs would prefer, the government's chosen method of analysis is entitled to substantial deference. AMRC's cumulative water NEPA claim is therefore unlikely to succeed on the merits.

### ii.   Other Agencies' Comments

In determining whether the Government has complied with NEPA, the court must generally defer to "the agency regarding what level of detail is required." *Cascadia Wildlands v. United States Bureau of Land Mgmt.*, 153 F.4th 869, 903 (9th Cir. 2025). "Courts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Id.* (quoting *Seven Cnty.*, 605 U.S. at 183). Under this deferential standard of review, AMRC's arguments regarding comments from other agencies are unlikely to succeed.

AMRC argues that the "the Forest Service failed to consider the full scope of criticisms raised by the Bureau of Land Management ('BLM') and the Arizona State Land Department ('ASLD') about the FEIS." It contends that the FEIS does not acknowledge the BLM Report at all, ignoring that agency's water-related concerns. AMRC also asserts that the FEIS fails to sufficiently address the ASLD's "actual and specific concerns related to the Mine's direct, indirect, and cumulative socioeconomic impacts on" Arizona's State Land Trust.

As the district court explained, "it will always be possible to identify some argument, raised by some stakeholder, that could have been analyzed in more detail in the FEIS."  But the Supreme Court has made clear that "the question of whether a particular report is detailed enough in a particular case itself requires the exercise of agency discretion—which should not be excessively second-guessed by a court."  *Seven Cnty.*, 605 U.S. at 181.  Here, Chapter 4 of the FEIS contains an analysis of regional groundwater, including qualitative and quantitative analyses of water sufficiency.  The Government therefore did not ignore the agencies' comments, and arguments about the relative detail it afforded particular comments must fail. AMRC's claims regarding the FEIS's treatment of the BLM and ASLD's comments are unlikely to succeed.

### iii.  Mitigation Measures

AMRC's final argument fares no better.   AMRC contends that the FEIS "failed to fully analyze potential mitigation measures, especially regarding the groundwater pumping and transport of water via the proposed pipelines." But as the district court correctly concluded, the Forest Service considered mitigation measures across "hundreds of pages" in the FEIS.  The FEIS explicitly discusses various commenters' concerns about groundwater impacts and notes the limits of the Forest Service's regulatory authority. AMRC's argument is just another example of it taking issue with the depth of treatment the Forest Service afforded certain issues in the FEIS.   But as with AMRC's other arguments, the Supreme Court has made clear that it is largely within the agency's discretion to determine the detail afforded to particular issues in an EIS, especially those issues over which it lacks regulatory authority.  *See Seven Cnty.*, 605 U.S. at 181, 188.  AMRC's claim regarding the

FEIS's treatment of possible mitigation measures is therefore also unlikely to succeed on the merits.

### iv.  Extra-Record Evidence

The Tribe's NEPA claim centers around two extra-record declarations submitted in the district court.  The Tribe argues that we should consider those declarations even though they were not part of the administrative record, and that on the merits, the FEIS fails to address concerns raised by the declarations regarding tailings storage and transport, acid rock damage, and hydrological concerns.

Judicial review of agency decision-making should be focused on the administrative record.  *See Ctr. for Biological Diversity v. United States Fish & Wildlife Serv.*, 450 F.3d 930, 943 (9th Cir. 2006).  However, there are

> four exceptions to this rule, allowing extra-record materials (1) if necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) when the agency has relied on documents not in the record, (3) when supplementing the record is necessary to explain technical terms or complex subject matter, or (4) when plaintiffs make a showing of agency bad faith.

*Id.* (cleaned up).    These exceptions are "narrowly construed," and the party invoking them has a "heavy burden to show that the additional materials sought are necessary to adequately review" the agency decision.  *Fence Creek Cattle Co. v. United States Forest Serv.*, 602 F.3d 1125, 1131 (9th Cir. 2010).

Even assuming, without holding, that an exception applies here, the Tribe's arguments fail on the merits. The FEIS addressed each of the topics the Tribe highlights from the declarations, including tailings and pipeline safety, acid rock drainage, and hydrological concerns. Indeed, the Forest Service directly responded to comments by Plaintiffs' experts regarding the same concerns. The Tribe's arguments amount to a disagreement with the FEIS's scientific conclusions as to each of these topics. Judicial review, however, must be at its most deferential "when an agency makes . . . predictive or scientific judgments." *Seven Cnty.*, 605 U.S. at 182; *see also Earth Island Inst. v. United States Forest Serv.*, 351 F.3d 1291, 1301 (9th Cir. 2003) ("[A]n agency is entitled to wide discretion in assessing the scientific evidence, so long as it takes a hard look at the issues and responds to reasonable opposing viewpoints."). Accordingly, the Tribe's NEPA claim is unlikely to succeed.

### v.  Alternative Mining Techniques

The Lopez Plaintiffs argue that the FEIS is "deficient" because it does not analyze alternative mining methods that might preserve Oak Flat. They draw on case law explaining that the "heart" of an EIS is its effort to "study, develop, and describe appropriate alternatives to the proposed agency action, thus informing policymakers and the public of options that would avoid or minimize adverse effects on the environment." *Ctr. for Biological Diversity v. United States Bureau of Land Mgmt.*, 141 F.4th 976, 990 (9th Cir. 2025) (cleaned up).

In determining whether an EIS has appropriately considered alternatives, we have set out a two-step process. First, we must determine "whether or not the EIS's Purpose and Need Statement was reasonable." *Id.* at 995 (cleaned

up). Second, we "employ a rule of reason analysis to determine whether the agency considered an adequate range of alternatives to the proposed action." *Id.* (internal quotation marks omitted). However, "an agency need not consider an infinite range of alternatives, only reasonable or feasible ones. Nor does NEPA require a discussion of alternatives that are unlikely to be implemented or that are inconsistent with the agency's basic policy objectives." *Id.* (cleaned up). If an alternative is eliminated from detailed consideration, all the agency is required to do is to "briefly discuss the reasons for [its] elimination." 40 C.F.R. § 1502.14(a).

The Lopez Plaintiffs challenge only the adequacy of the range of alternatives the FEIS considered. They argue that the Government should have analyzed "techniques like cut-and-fill or sublevel stoping." Ultimately, as with the Tribe's NEPA claim, the heart of this claim is a disagreement with the Government's scientific conclusions as to the feasibility and appropriateness of potential alternative mining approaches. Even if the Forest Service's lack of regulatory authority over the eventual mine was not itself a bar to the Lopez Plaintiffs' argument, *see Seven Cnty.*, 605 U.S. at 188, the agency's approach to analyzing the alternatives is entitled to substantial deference. *See id.* at 181–82 ("[A] reviewing court must be at its most deferential" when considering an agency's "predictive and scientific judgments in assessing . . . alternatives." (internal quotation marks omitted)). The record shows that the agency adequately considered possible alternatives and reasonably rejected them due to technical and economic infeasibility. As the agency noted, if alternative techniques were used on the Oak Flat deposit, an estimated 80 percent of the copper tonnage would have to be abandoned, as it would be uneconomical

to mine.  This explanation is sufficient under NEPA, and under the highly deferential scheme the Supreme Court set out in *Seven County*, we must afford the agency's reasonableness determinations significant deference. Therefore, the Lopez Plaintiffs' NEPA claim based on potential mining technique alternatives is unlikely to succeed.

### vi.  Page Limits

Finally, the Lopez Plaintiffs argue that the FEIS exceeds the page limit requirements established by recent amendments to NEPA under the BUILDER Act.  42 U.S.C. § 4336a(e)(1).  In their view, this impeded NEPA's goals by "forcing them to digest thousands of pages of material and litigate their claims in a matter of days, without an easily comprehensible administrative record."

We assume, without holding, that these page limits— enacted seven years after the FEIS process began—apply here.  Regardless, the Lopez Plaintiffs' claims are unlikely to succeed.  Even if the Government violated the new page limit requirement, that violation did not "materially impede[] NEPA's goals" and was therefore harmless error.  *Friends of the Inyo v. United States Forest Serv.*, 103 F.4th 543, 557 (9th Cir. 2024) (internal quotation marks omitted).  Though the FEIS's length may have made it more difficult for affected parties and the public at large to digest, it was the result of a decades-long process involving countless stakeholders, comments, and analyses.  As evidenced by the various other NEPA claims Plaintiffs collectively raise in the instant case, not even at its current length does the FEIS satisfy all those parties.  Where NEPA's goal is ultimately "to inform agency decisionmaking," *Seven Cnty.*, 605 U.S. at 173, a too-thorough analysis of a highly controversial, complicated

project can hardly be said to conflict with that goal. The agency here made a reasonable judgment about the level of detail to include, balancing the need to manage the FEIS's length with the need to adequately address the various issues. That decision is afforded "substantial deference," and courts "should not micromanage those agency choices." *Id.* at 183. The Lopez Plaintiffs' page limit requirement argument is therefore unlikely to succeed on the merits.

### c. The Tribe and Lopez Plaintiffs are not likely to succeed on, nor have they raised serious questions regarding, their consultation claims.

The Tribe and Lopez Plaintiffs argue that the Government has failed to satisfy its consultation obligations under the Land Exchange Act and the NHPA. They are not likely to succeed on either point.

The Land Exchange Act sets out general requirements for the Government's consultation with impacted Native groups. Specifically, the Government must "engage in government-to-government consultation with affected Indian tribes concerning issues of concern to the affected Indian tribes related to the land exchange." 16 U.S.C. § 539p(c)(3)(A). Then the Government must "consult with Resolution Copper and seek to find mutually acceptable measures to" both "address the concerns of the affected Indian tribes" and "minimize the adverse effects on the affected Indian tribes resulting from mining and related activities on the Federal land conveyed to Resolution Copper." *Id.* § 539p(C)(3)(B).

Section 106 of the NHPA, a more general consultation statute, similarly requires the federal government to "take into account the effect of" any government "undertaking on

any historic property" and "afford the [Advisory Council on Historic Preservation (ACHP)] a reasonable opportunity to comment." 54 U.S.C. § 306108.  Pursuant to the Section 106 process, the federal government "must make *a reasonable and good faith effort* to identify historic properties . . . assess the effects of the undertaking on any eligible historic properties found; determine whether the effect will be adverse; and avoid or mitigate any adverse effects." *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999) (emphasis added) (citations omitted); *see id.* (describing Section 106 as a "stop, look, and listen" provision).

The Tribe argues that when the Government withdrew the original 2021 EIS to undertake further consultation with impacted Native groups, that was "an admission that, through March 2021, Federal Defendants had not satisfied" their consultation obligations under the Land Exchange Act. And in their view, the Government has done nothing to remedy that failure in the interim; the Tribe requested, but has not received, written responses to various documents and a draft memorandum of understanding (MOU) was never finalized.  To the Tribe, any pre-2021 consultation efforts by the parties are not relevant in determining whether the Government has today satisfied its consultation obligations. Nor, the Tribe argues, do letters and emails sent while "the Forest Service, at the very same time, was negotiating a MOU to govern a future consultation" satisfy the Government's consultation obligations.

The Lopez Plaintiffs similarly argue that the Government failed to satisfy its Section 106 obligations by failing to negotiate a "programmatic agreement" with the ACHP to mitigate adverse impacts on the historic properties at issue here.  When the ACHP instead terminated the consultation

process, they assert, the Government was required to respond in writing to the ACHP's final recommendations. The Government's written response, in the Lopez Plaintiffs' view, was inadequate under Section 106 because it failed to give "genuine attention" to those recommendations. *See Concerned Citizens All., Inc. v. Slater*, 176 F.3d 686, 696 (3d Cir. 1999.

We find neither argument compelling. At bottom, both the Land Exchange Act's consultation provisions and Section 106 are procedural statutes like NEPA—in other words, they do not mandate any particular substantive outcome from the consultation process. *See Muckleshoot*, 177 F.3d at 805. Therefore, the Tribe and Lopez Plaintiffs cannot use these provisions to attack the ultimate outcome of the consultation process here.

What remains, then, is whether the Government's actions were "arbitrary and capricious" under the Land Exchange Act and Section 106. As the district court correctly explained, they were not. Over the course of two decades, the Government engaged in thorough consultation with the Tribe, both electronically and in person. The Tribe's attempt to discount the pre-2021 consultation efforts fails because it fails to explain how that earlier portion of the consultation process was at all deficient or irrelevant. This includes failing to cite any case law standing for the idea that re-opening a consultation process negates all pre-reopening consultation efforts. The Tribe's arguments amount to a disagreement with how the Government engaged in consultation, including a belief that the consultation was not sufficiently substantive. But the record evinces a thorough consultation process that ultimately resulted in a conclusion contrary to the Tribe's hopes. That is not enough to render the consultation process "arbitrary and capricious."

The same holds true for the Section 106 consultation requirements. The Lopez Plaintiffs argue that the Government ignored the ACHP's recommendation "to assess alternative mining techniques" or "incentivize the consideration of those alternatives." But the Government's response letter explained that "[the Land Exchange Act] limits the authority the USDA will have over most elements of the proposed Resolution Copper Mine (RCM) because once the land is exchanged, the project will be almost entirely on private land." And it further elaborated in the FEIS that "[m]ining operations within the area conveyed by the Forest Service in the exchange are not subject to regulation by the Forest Service, since Forest Service regulation of mining operations pertains only to mining operations conducted on NFS land under the jurisdiction of the Secretary of Agriculture." The FEIS also analyzed the these proposed alternative mining techniques and dismissed them as "not appropriate for a deposit like the Resolution Copper deposit." These written materials, taken together, evince the agency's good faith effort to address possible mitigation and "demonstrate that it has read and considered" the ACHP's recommendations. *Concerned Citizens All., Inc. v. Slater*, 176 F.3d 686, 696 (3d Cir. 1999).

Because the Government adequately fulfilled its consultation obligations under the Land Exchange Act, Plaintiffs have failed to demonstrate a likelihood of success on the merits for their consultation claims.

> **d. The Lopez Plaintiffs are not likely to succeed on, nor have they raised serious questions regarding, their religious liberty claims because they are foreclosed by precedent.**

The Lopez Plaintiffs argue that the land exchange here would violate their religious liberty, as protected by RFRA and the Free Exercise Clause. RFRA bars the federal government from "substantially burden[ing] a person's exercise of religion" unless that burden satisfies strict scrutiny. 42 U.S.C. § 2000bb-1(a)–(b). And the Free Exercise Clause protects parental rights surrounding their children's religious upbringing, and more generally requires "any government action that burdens religion" to "survive strict scrutiny unless it qualifies as a 'neutral law of general applicability.'" *Emp. Div. v. Smith*, 494 U.S. 872, 879 (1990).

But this court foreclosed these arguments in *Apache Stronghold v. United States*. *See* 101 F.4th at 1044, 1051–52, 1063. The en banc court explained that pursuant to the Supreme Court's decision in *Lyng v. Northwest Indian Cemetery Protective Association*, 485 U.S. 439 (1988):

> [A] disposition of government real property is not subject to strict scrutiny when it has "no tendency to coerce individuals into acting contrary to their religious beliefs," does not "discriminate" against religious adherents, does not "penalize" them, and does not deny

> them "an equal share of the rights, benefits,
> and privileges enjoyed by other citizens."

*Apache Stronghold*, 101 F.4th at 1055 (quoting *Lyng*, 485 U.S. at 449–50, 453). The *Apache Stronghold* court held that the land transfer under the Land Exchange Act here was "indistinguishable from that in *Lyng*," and therefore was not subject to strict scrutiny under either the Free Exercise Clause or RFRA. *Id.* at 1051–52, 1056. Though the Lopez Plaintiffs detail their disagreement with the en banc court, we remain bound by the en banc court's decision. *See McBurnie v. RAC Acceptance E., LLC*, 95 F.4th 1188, 1193 (9th Cir. 2024).

Recognizing this, the Lopez Plaintiffs seek refuge in the limited exception to that rule, where en banc review is not required if "intervening Supreme Court authority is clearly irreconcilable with our prior circuit authority." *Id.* (internal quotation marks omitted). They argue that the Supreme Court's decision in *Mahmoud v. Taylor*, 606 U.S. 522 (2025), abrogated *Apache Stronghold* by clarifying the meaning of a "religious burden." In their view, *Mahmoud* stands for the proposition that the court must determine if "looking to 'the specific religious beliefs and practices asserted,' the challenged government actions pose an 'objective danger,' or 'very real threat' to the claimant's religious exercise, thus 'substantially interfer[ing]' with it." *See Mahmoud*, 606 U.S. at 549–50, 553 (internal quotation marks omitted). By contrast, the Lopez Plaintiffs argue, the *Apache Stronghold* majority rejected an inquiry into the relative objective or subjective nature of an asserted interference with religious practice in favor of an inquiry focused on coercion.

But this view of *Mahmoud* does not survive scrutiny. As an initial matter, the Supreme Court itself declined to rehear

its denial of certiorari in *Apache Stronghold* in light of *Mahmoud*. *See Apache Stronghold v. United States*, 2025 WL 2824572 (U.S. Oct. 6, 2025). Regardless, the Lopez Plaintiffs misrepresent the thrust of *Mahmoud* by selectively quoting from it. Their focus on the "objective danger" language ignores that *Mahmoud* centers on (1) the education context and (2) policies that directly coerce or indirectly compel behavior at odds with individual religious beliefs or practices, not involving the disposition of government property. *Mahmoud*, 606 U.S. at 546–50.

*Mahmoud* highlights the risk of "impos[ing] upon children a set of values and beliefs that are 'hostile' to their parents' religious beliefs." *Id.* at 553–54 (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 211 (1972)). But risks of these kinds, the Court explained, are different in nature for Free Exercise purposes than those in *Lyng*, which involved "incidental interference with an individual's spiritual activities," as opposed to coercion. *Id.* at 557 (quoting *Lyng*, 485 U.S. at 450). Because *Apache Stronghold* involved neither education nor an attempt by the government to affirmatively coerce or indirectly compel behavior at odds with the plaintiffs' religious beliefs, it is not "clearly irreconcilable" with *Mahmoud*. *Apache Stronghold* therefore bars the Lopez Plaintiffs' identical claims here.[4]

### III. Other Injunction Factors

Because Plaintiffs have failed to show a likelihood of success on, or even serious questions regarding, any of their claims, we need not reach the other injunction factors. We

---

[4] Perhaps understanding this, the Lopez Plaintiffs also offer a version of their religious liberty arguments cast in parental-rights language. But there is no "coercive interaction[]" here "between the State and its young residents." *Mahmoud*, 606 U.S. at 557.

nonetheless recognize that this land transfer will fundamentally alter the nature of the land, including destruction of those sites sacred to the Tribe, the Lopez Plaintiffs, and similarly situated Native individuals. Despite those grave harms to Native religious practice, Congress has chosen to transfer this land, and Plaintiffs have not raised any viable challenges to that decision.

## CONCLUSION

Because Plaintiffs' claims are unlikely to succeed on the merits, we **AFFIRM** the district court's denial of Plaintiffs' request for a preliminary injunction against the land exchange and **DENY AS MOOT** their request for an injunction pending appeal, Dkt. 12. The administrative stay currently in effect, Dkt. 19, is **DISSOLVED**.[5]

---

Rawlinson, Circuit Judge, dissenting in part:

I agree with my colleagues in the majority that the Plaintiffs' claims are mostly foreclosed by our precedent and recent Supreme Court rulings. But before we stamp our imprimatur on a decision that will completely annihilate sacred Native lands, we must be certain that every i was dotted and every t was crossed. And that simply is not the case for the appraisal report prepared by the United States Forest Service (USFS) in this case. I respectfully dissent from that portion of the majority opinion because the

---

[5] The motion for leave to file an amicus brief, Dkt. 44, is **GRANTED**. The motions to file oversized briefs, Dkts. 6, 9, 17, 136, & 139, are **GRANTED**. The motions to dissolve the administrative stay, Dkts. 83 & 84; motions for an extension of time, Dkts. 90 & 91; and motions to expedite, Dkts. 164 & 166, are **DENIED AS MOOT.**

appraisal did not conform to the requirements of the authorizing statute or our precedent.

The Southeast Arizona Land Exchange and Conservation Act (The Act) requires an independent appraisal of both the private and government lands involved in the exchange. *See* 16 U.S.C. § 539p(c)(4). The Act also provides that the appraisal must be prepared "in accordance with nationally recognized appraisal standards." *Id.*

The original sin of the appraisal report, which permeates the majority opinion as well, is that it treated Resolution Copper Mining's (Resolution) unpatented mining claims as if those claims were equivalent to ownership of the mineral estate. But an unpatented mining claim is simply a possessory property right to enter public land and extract valuable resources; it is not ownership of the underlying fee estate. *See United States v. Locke*, 471 U.S. 84, 86 (1985). An unpatented mining claim is a "unique form of property," *id.* at 104 (citation omitted), that "partake[s] more of the character of use rights." *Kunkes v. United States*, 78 F.3d 1549, 1554 (Fed. Cir. 1996). "Title to the land remains with the United States, and the unpatented mining claim holder has the right to use the Government's fee simple estate [only] for mining purposes." *Id.*

An unpatented mining claim is a tenuous form of property created by the government and subject to its regulation. "The United States, as owner of the underlying fee title to the public domain, maintains broad powers over the terms and conditions upon which the public lands can be used, leased, and acquired." *Locke*, 471 U.S. at 104 (citation omitted). "Claimants thus must take their mineral interests with the knowledge that the Government retains substantial regulatory power over those interests." *Id.* at 105 (citation

omitted).   "The United States, which holds legal title to the lands, plainly can prescribe the procedure which any claimant must follow to acquire rights in the public sector." *Best v. Humboldt Placer Min. Co.*, 371 U.S. 334, 339 (1963).

Courts have consistently acknowledged that failure to adhere to government-imposed conditions may lead to forfeiture of an unpatented mining claim.   *See, e.g., Cameron v. United States*, 252 U.S. 450, 460 (1920) (upholding authority of the government to investigate the validity of an unpatented mining claim and "declare it null and void if . . . found invalid"); *see also Locke*, 471 U.S. at 89-91 (allowing the government to deem an unpatented claim abandoned and void for failing to meet annual filing requirements); *Kunkes*, 78 F.3d at 1554, 1556  (permitting the government to declare an unpatented claim abandoned for failure to pay $100 annual fee even though the failure was due to lack of funds and not neglect).

A holder of an unpatented mining claim "may go through an additional process to obtain a patent," to convert "the right to extract all minerals from the claim without paying royalties to the United States," into "fee-simple title to both the surface estate and the mineral deposits." *McMaster v. United States*, 731 F.3d 881, 885 (9th Cir. 2013) (citations omitted).   However, legislation has decreased the rights available through patenting. *See id.* at 886 (noting that after passage of the Wilderness Act, "subject to valid existing rights, patents that issued after the effective date of the Wilderness Act, would convey title only to the mineral deposits, with the surface estate being reserved to the United States") (citation, alteration and internal quotation marks omitted).

In *McMaster*, we affirmed the district court's dismissal of the mining claim owner's quiet title action seeking title to the surface estate on the basis that his interest in a fee simple patent was not a "valid existing right" to fee simple title because he had not fulfilled the requirements for obtaining a patent until years after the Wilderness Act had taken effect. *Id.* at 896-97. Our decision in *McMaster* confirms that an unpatented claim is not an ownership interest in the mineral estate.

Importantly, an unpatented claim does not foreclose the government from disposing of public lands and superseding the unpatented claim. *See Assiniboine & Sioux Tribes v. Nordwick*, 378 F.2d 426, 428 (9th Cir. 1967) ("Land remains subject to the disposing power of Congress until a homestead or pre-emption entryman satisfies the conditions imposed by law for issuance of a patent. . . .") (citations omitted); *see also Cameron*, 252 U.S. at 460 ("A mining location which has not gone to patent is of no higher quality and no more immune from attack and investigation than are unpatented claims under the homestead and kindred laws. . . ."). Under this reasoning, land the United States conveyed to Alaska Native corporations and villages was not encumbered by unpatented mining claims if the miners failed to obtain a patent within the statutory grace period. *See Alaska Miners v. Andrus*, 662 F.2d 577, 579-80 (9th Cir. 1981) ("[T]he interest of a claimant in a mining claim, prior to the payment of any money for the granting of the patent for the land, is nothing more than a right to the exclusive possession of the land based upon conditions subsequent, a failure to fulfill which forfeits the locator's interest in the claim[,]" so "the government may withdraw or convey the title to land subject to valid, unpatented claims.").

Thus, Resolution's existing unpatented mining claims did not convey ownership over the mineral estate, and the underlying premise of the appraisal, treating the parcel as a "split estate" and assessing the highest and best use for only the surface estate is fatally flawed.  In a transaction involving the government transferring the mineral claim zone (MCZ) parcel to a third party, that third party would obtain the entire estate unless portions were reserved by the United States, and Resolution's unpatented claims would be extinguished. *See Assiniboine & Sioux Tribes*, 378 F.2d at 428.  Resolution would only be entitled to just compensation for the taking of its property interest in the unpatented mining claim through a separate condemnation process.  *See United States v. Shumway*, 199 F.3d 1093, 1105 (9th Cir. 1999).

The appraisal simply did not consider this scenario. Because the mineral estate is an integral part of the transaction, the appraisal deviated from accepted appraisal standards in determining that the highest and best use of the land was "surface land use in support of a mining operation," rather than mining.   The appraiser was required to "[e]stimate the value of the lands and interests as if in private ownership and available for sale in the open market," and to "[c]onsider the contributory value of any interest in land such as . . . minerals . . . to the extent they are consistent with the highest and best use of the property."   36 C.F.R. §§ 254.9(b)(1)(ii),  (iv);  *see  also*  Uniform  Appraisal Standards  for  Federal  Land  Acquisitions  (Uniform Standards), § 1.4.5 (2016).

The majority interprets the term "as if in private ownership" as requiring the appraiser "to determine the present value of the federal lands as if they are exploited for profit by a hypothetical private party." *Majority Opinion*, p. 23.  But the majority offers no citation for this definition

which conflicts with the Uniform Standards and our precedent.

As an initial matter, the plain language meaning of "as if in private ownership" precludes an interpretation that assumes federal ownership. Indeed, the Uniform Standards interpret this direction as "an assignment condition that . . . creates a hypothetical condition." Uniform Standards § 1.12. And that hypothetical condition by definition also precludes considering federal ownership. *See id.* Indeed, in *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1183 n.14 (9th Cir. 2000), we chastised the government for undervaluing land in a manner no private seller would do, knowing the value of the land to the proposed buyer. *See id.* (observing that "[a] private seller would, at the very least, want his property appraised for use as a landfill [the intended exchange use] before selling it"). The same is true in this case. "A private seller would at the very least want his property appraised for use as [mining] before selling." *Id.*

The only reason the appraisal did not evaluate the MCZ parcel for the highest and best use of copper mining is because it assumed the minerals were "not part of the estate owned by the United States." But, as explained above, an unpatented claim on public land is extinguished when the government disposes of those lands. *See Assiniboine & Sioux Tribes*, 378 F.2d at 428. And a private owner would not be encumbered by the unpatented mining claim, which is "valid [only] against the United States." *Best*, 371 U.S. at 336; *see also* 30 U.S.C. § 22 (providing that "mineral deposits in lands *belonging to the United States* . . . shall be free and open to exploration and purchase") (emphasis added).

If the government had sold the land to any other mining company, that hypothetical company would take ownership of the entire estate and Resolution's unpatented mining claims would be extinguished. *See Best*, 371 U.S. at 336. Undoubtedly, Resolution would receive just compensation for its unpatented mining claims, *see Shumway*, 199 F.3d at 1105, but the acquiring company would not be excused from paying full value for the land it just acquired. And the highest and best use of that land would have to consider its use for mining rather than just surface support for mining. *See* 36 C.F.R. § 254.9(b)(iv); *see also Desert Citizens*, 231 F.3d at 1183 n.14. As we held in *Desert Citizens*, at a minimum the land should be appraised for the use contemplated by the transferee. *See id.*

As for the argument made by the district court and the majority that Resolution would be forced to pay twice for its existing rights, the fact is that Resolution never paid the government in the first instance. The Mining Law is essentially a government giveaway to anyone who discovers valuable minerals on lands belonging to the United States. *See Ctr. for Biological Diversity v. U.S. Fish and Wildlife Serv.*, 33 F.4th 1202, 1208 (9th Cir. 2022) ("The Mining Law of 1872 . . . gives to United States citizens free of charge . . . mining rights . . .). Once perfected "[a] mining claim . . . may be bought, sold, and conveyed." *Belk v. Meagher*, 104 U.S. 279, 283 (1881). Resolution acquired its unpatented claims from a predecessor mining company, and presumably paid some consideration in that deal. However, because an unpatented claim is merely a possessory right to extract minerals from land owned by the United States (and subject to substantial oversight by the United States), what Resolution purchased was far less than the entire,

unregulated mineral estate that it now stands to acquire from United States taxpayers.

Under the governing regulations, prior to a land exchange, an appraiser must determine "the highest and best use of the property." 36 C.F.R. § 254.9(b)(1)(i). "Highest and best use means an appraiser's supported opinion of the most probable and legal use of a property, based on market evidence, as of the date of valuation." *Id.* § 254.2. The appraiser must "[e]stimate the value of the lands and interests *as if in private ownership* and available for sale in the open market," and "[c]onsider the contributory value of any interest in land such as . . . minerals . . . *to the extent they are consistent with the highest and best use of the property*." *Id.* §§ 254.9(b)(1)(ii), (iv) (emphasis added). Under the Uniform Standards, the "highest and best use . . . must be: (1) physically possible; (2) legally permissible; (3) financially feasible; and (4) *must result in the highest value*." Uniform Standards § 1.4.5 (emphasis added); *see also National Parks & Conserv. Assn. v. BLM (NPCA)*, 606 F.3d 1058, 1067 (9th Cir. 2010) *as amended.*

We addressed this issue in depth in *Desert Citizens*. In that case, Plaintiffs challenged the BLM's appraisal of a land exchange that was to become part of a landfill. *See* 231 F.3d at 1175. The appraisal evaluated the highest and best use of the federal land as "either open space or wildlife habitat, or mine support," because the land transferee was the only party that would reasonably desire to use the land as a landfill. *Id.* at 1180. The district court concluded that the BIA's reliance on the apprisal "was proper as there was no general market for use of the land as a landfill." *Id.* (internal quotation marks omitted).

We determined that this appraisal was inadequate because it failed to consider potential landfill use for the exchanged property. We reasoned that "[w]hile uses that are merely speculative or conjectural need not be considered, uses that are 'reasonably probable' must be analyzed as a necessary part of the highest and best use determination." *Id.* at 1181. We remarked that the transferee's "proposed use of a parcel of property is certainly relevant to showing a market demand for that use." *Id.* at 1183. We set aside the land exchange until a proper appraisal could be put in place, emphasizing that "[t]he government must not wear blinders when it participates in a real estate transaction, particularly if the result, as here, is the transfer of a flagrantly undervalued parcel of federal land to a private party." *Id.* at 1187. We explained that "[w]hether [the land transferee] and BLM would negotiate a new exchange after a proper appraisal and BLM valuation had been made, and what that new exchange would be is sheer speculation at this stage of the proceedings. *If the current exchange is not based on a proper valuation, it must be set aside.* What the parties do after that is up to them." *Id.* at 1179; *see also NPCA*, 606 F.3d at 1067-69 (upholding a district court order setting aside a land transfer under "virtually identical" facts).

Here, the appraisal for the MCZ parcel treated the property as a "split estate since the unpatented mining claims confer all rights to locatable minerals." Because it considered only the surface estate for the best "legally permissible, physically possible, and financially feasible use," the appraisal determined that "the highest value is of surface land use in support of a mining operation." As a result, the MCZ parcel was priced by comparing other land that was essentially empty desert purchased to support mining or mineral processing, valued at only $1,200 per

acre, with a total value of $1.9 million. In contrast, the mineral withdrawal area (MWA) parcel included the value of the mineral estate and properly considered mining as the highest and best use. That appraisal also accounted for the value of the unmined minerals, valuing the parcel at $22 million.

As previously discussed, Resolution possesses a present interest in extracting copper in the MCZ parcel, and that interest is subject to substantial government oversight. *See Locke*, 471 U.S. at 104. Thus, the value of Resolution's present unpatented mining claim, for which it must receive government approval to conduct mining operations, is substantially less than the unrestricted ability to mine copper that it would obtain in the land transfer. *See United States v. 191.07 Acres of Land*, 482 F.3d 1132, 1137-38 (9th Cir. 2007) ("[A] highest and best use determination is subject to pre-existing restrictions on land use on the date of valuation.") (citation omitted). The FEIS also states that "*[o]nce the land exchange is completed*, Forest Service management regulations would no longer apply on 2,422 acres of the Oak Flat Federal Parcel transferred to Resolution Copper" (emphasis added). The land exchange thus transforms Resolution's property interest in the copper beneath the MCZ from a limited interest to an unlimited one, an eventuality that was totally elided in the appraisal.

Fundamentally, the appraisal failed to analyze the market value as if the land were in private ownership and available for sale in the open market. *See NPCA*, 606 F.3d at 1066. The "unique form of property" that is an unpatented mining claim applies only to "lands belonging to the United States." *Locke*, 471 U.S. at 104; *see also* 30 U.S.C. § 22. A hypothetical private owner would not be subject to this claim. If the United States were to transfer the MCZ to a

third party on the open market, the third party would obtain the complete estate including the mineral rights. *See Assisibone & Sioux Tribes*, 378 F.2d at 428.

My colleagues in the majority essentially accuse me of misrepresenting the holdings of our court. *See Majority Amended Opinion*, p. 23 n.3. To support this accusation, the amended opinion cites language from *Alaska Miners*, 662 F.2d at 580 ("[T]he government may withdraw or convey the title to land *subject to valid, unpatented claims*.") (alteration and emphasis in amended opinion). However, the amended opinion did not emphasize use of the word "*may,*" an indication of permissiveness rather than a mandate. *See Patterson v. Wagner*, 785 F.3d 1277, 1281 (9th Cir. 2015). More importantly, the amended opinion completely ignores the text preceding and following the quoted language. *See Alaska Miners*, 662 F.2d at 579 ("[T]he interest of a claimant in a mining claim, prior to the payment of any money for the granting of the patent for the land, is nothing more than a right to the exclusive possession of the land based upon conditions subsequent, *a failure to fulfill which forfeits the* locator's interest in the claim. . . ."); *id.* at 580 ("*[T]he land remains subject to the disposing power of the Congress until [the unpatented holder] satisfies the conditions imposed by law for the issuance of a patent*. . . .") (emphasis added). I stand by my accurate characterization of our precedent.

The same is true for the majority's reliance on our decision in *Assiniboine & Sioux Tribes*, 378 F.2d at 432. *See Majority Amended Opinion*, p. 23 n.3. *However*, it is the majority that misreads this case. In *Assiniboine & Sioux Tribes*, the issue addressed was whether oil and gas deposits on land allotted to the Tribes was reserved to the Tribes in the Act of 1927 or passed to a homesteader. *See* 378 F.3d at 428.

In 1908, Congress passed an act to allot a portion of the land comprising the Fort Peck Reservation to members of the Tribes. *See id.* The balance of the land was to be sold for the benefit of the Tribes. *See id.* The unallotted land was made available for homestead at prices "fixed by appraisal." *Id.* Homesteaders were given five years to pay the purchase price and seven years to finalize their patents. *See id.* The Act of 1927 amended the 1908 Act by "specifically reserving to the Indians having tribal rights on said reservation the oil and gas in the tribal lands undisposed of" as of the date the 1927 Act was approved. *Id.*

In 1925, R.E. Nordwick (the homesteader) filed a homestead application under the 1908 Act. *See id.* When the 1927 Act was passed, the homesteader had not paid the purchase price in full or satisfied the requirements to finalize his patent. *See id.* With these facts, the issue before us was "whether the oil and gas rights were reserved to the Tribes by the 1927 Act, or passed to [the homesteader]." *Id.* It was within that context that we cited the established rule that "[l]and remains subject to the disposing power of Congress until a [homesteader] satisfies the conditions imposed by law for issuance of a patent." *Id.* We said nothing to disturb that rule. Rather, we reiterated that "Congress . . . had power to amend the 1908 Act to reserve oil and gas deposits in land subject to an unperfected homestead." *Id.* at 428-29. The question then was "whether Congress intended to do so." *Id.* at 429. This language proves the point that an unpatented claim can be voided by the government at any time before it is perfected.

In deciding whether Congress intended to reserve the oil and gas deposits to the Tribes in the land subject to the unperfected homestead claim, we interpreted the language of the 1927 Act: "specifically reserving to the Indians having

tribal rights on said reservation the oil and gas in the tribal lands undisposed of on the date of the approval of this Act." *Id.* at 428. We noted that "statutes withdrawing tribal lands from further alienation commonly include provisions expressly preserving outstanding but unperfected rights." *Id.* at 429 (footnote reference omitted). We acknowledged that the "omission of such a savings clause from the 1927 Act [could] be taken as deliberate," *id.*, thereby reserving to the Tribes the unpatented oil and gas reserves claimed by the homesteader. We ultimately were persuaded that "the virtually unbroken administrative practice of issuing patents on pre-1927 homestead applications after passage of the 1927 Act without reserving oil and gas rights . . . seemingly reflects a uniform contemporaneous interpretation of the 1927 Act by persons presumably familiar with its background and purpose." *Id.* at 432. Accordingly, we held that the "withholding provisions of the 1927 Act did not apply to lands subject to pending but unperfected homestead entries under the 1908 Act." *Id.* The important takeaway is that our thorough and detailed analysis would not have been necessary if, as the majority argues, the unperfected patent ran with the land.

Turning to the case before us, it is undisputed that the Land Exchange Act contains no language "expressly preserving outstanding but unperfected rights." *Id.* at 429. Instead, the majority relies on language in the Act stating that "[n]othing in this section shall interfere with, limit, or otherwise impair, the unpatented mining claims or rights currently held by Resolution Copper on the Federal land." *Majority Amended Opinion*, p. 23 n.3 (quoting 16 U.S.C. § 539p(i)(1)(C) (alteration in majority amended opinion). But this language does not and cannot preempt the requirement that the appraisal be conducted in conformity

with "nationally recognized appraisal standards" 16 U.S.C. § 539p(c)(4)(B)(i). Because, of course we must give effect to *every* provision of a statute. *See Saldana v. Bronitsky (In re Saldana)*, 122 F.4th 333, 342 (9th Cir. 2024). And adherence to "nationally recognized appraisal standards" requires the appraiser to "[e]stimate the value of the lands and interests *as if in private [not government] ownership*." 16 U.S.C. § 539P(c)(4)(B)(i); 36 C.F.R. § 254.9(b)(1)(ii) (emphasis added). In any event, an accurate appraisal will not impermissibly "interfere with, limit, or otherwise impair, the unpatented mining claims." 16 U.S.C. § 539p(i)(1)(C). As we explained in *Desert Citizens*, "[w]hether [Resolution] and [the government] would negotiate a new exchange after a proper appraisal and [government] valuation had been made, and what that new exchange would be is sheer speculation at this stage of the proceedings. *If the current exchange is not based on a proper valuation, it must be set aside. What the parties do after that is up to them*." 231 F.3d at 1179; *see also NPCA*, 606 F.3d at 1067-69.[1] Under our decision in *Desert Citizens*, we simply cannot pretend that this appraisal, which would result in "the transfer of a flagrantly undervalued parcel of federal land to a private party," complies with our precedent. 231 F.3d at 1187.

In sum, the district court abused its discretion when it determined that the Arizona Mining Reform Coalition failed to show that it was likely to succeed, or at least raised serious questions, on the merits of its appraisal challenge. There are at least serious questions as to whether it was arbitrary and capricious for the USFS to proceed with a land exchange based on an appraisal that did not include the value of the

---

[1] The majority amended opinion completely ignores this precedential direction.

mineral rights, and accordingly valued the land under a less valuable highest and best use determination.  *See Desert Citizens*, 231 F.3d at 1183, 1187; *see also NPCA*, 606 F.3d at 1066-69.  Because this nonconforming appraisal flouted the provisions of the legislation authorizing the land exchange, I would reverse the district court decision allowing the land exchange to proceed.  *See* 16 U.S.C. § 539p(c)(4) (requiring an independent appraisal of the land to be exchanged in accordance with nationally recognized appraisal standards); *see also Desert Citizens*, 231 F.3d at 1188 (reversing the district court's denial of a preliminary injunction and remanding "for entry of a preliminary injunction setting aside [the] land exchange").

I respectfully dissent from the majority amended opinion allowing this non-compliant land exchange to proceed.