Nos. 25-5185, 25-5189, 25-5197

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

ARIZONA MINING REFORM COALITION, et al.,
*Plaintiffs–Appellants*,

v.

UNITED STATES FOREST SERVICE, et al.
*Defendants–Appellees*.

and

RESOLUTION COPPER MINING, LLC,
*Intervenor-Defendant–Appellee*

(caption continued on following page)

Appeal from the United States District Court for the
District of Arizona
Nos. 2:21-cv-68, 2:21-cv-122, 2:25-cv-2758 (Hon. Dominic W. Lanza)

## FEDERAL APPELLEES' BRIEF IN OPPOSITION TO REHEARING EN BANC

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*

THEKLA HANSEN-YOUNG
ERIKA NORMAN
ANGELA ELLIS
*Attorneys*
Environment & Natural Resources Div.
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 598-7942
angela.ellis@usdoj.gov

(caption continued from previous page)

---

SAN CARLOS APACHE TRIBE, et al.,
*Plaintiffs–Appellants,*

v.

UNITED STATES FOREST SERVICE, et al.
*Defendants–Appellees.*

and

RESOLUTION COPPER MINING, LLC,
*Intervenor-Defendant–Appellee*

---

GOUYEN BROWN LOPEZ, et al.,
*Plaintiffs–Appellants,*

v.

UNITED STATES OF AMERICA, et al.
*Defendants–Appellees.*

and

RESOLUTION COPPER MINING, LLC,
*Intervenor-Defendant–Appellee*

---

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................iii

INTRODUCTION ........................................................................... 1

BACKGROUND...............................................................................2

    A.    The Southeast Arizona Land Exchange and Conservation Act ...............................................................2

    B.    Prior litigation.........................................................4

    C.    The present litigation .............................................5

ARGUMENT....................................................................................7

I.    AMRC's appraisal claim does not warrant en banc review.........................................................................7

    A.    The panel correctly concluded there was no error in the appraisal. ................................................ 7

    B.    The panel's decision does not conflict with any decision of this Court or the Supreme Court. ...................... 10

        1.    The panel's decision is consistent with the Mining Law and binding precedent. ...........................11

        2.    The dissent erred in concluding that transfer would extinguish Resolution's mining rights. ................................................................... 14

        3.    The panel correctly upheld the appraisal's highest and best use assessment. ...............................20

II.    The Tribe's NEPA and consultation claims do not warrant en banc review. ...........................................23

i

A. The panel correctly rejected the Tribe's NEPA claims. ................................................................ 23

B. The panel correctly rejected the Tribe's consultation claim. ............................................... 25

C. The Tribe does not present any question of exceptional importance. ...................................... 28

III. Lopez's request for a re-do of *Apache Stronghold* should be denied. ............................................................... 29

A. *Apache Stronghold* was correctly decided. ........................... 29

B. *Apache Stronghold* does not conflict with any decision of the Supreme Court or other appellate court. ................................................................. 36

1. Apache Stronghold does not conflict with any Supreme Court decision. ................................. 36

2. Apache Stronghold does not conflict with any decision of any other appellate court. ......................... 39

C. Lopez's claims would fail even if RFRA forbids the Land Exchange. ................................................. 41

CONCLUSION ........................................................... 43

CERTIFICATE OF COMPLIANCE

ii

# TABLE OF AUTHORITIES

## Cases

*Alaska Miners v. Andrus,*
662 F.2d 577 (9th Cir. 1981)..................................................12, 16, 17

*Apache Stronghold v. United States,*
38 F.4th 742 (9th Cir. 2022) ...............................................................4

*Apache Stronghold v. United States,*
56 F.4th 636 (9th Cir. 2022) ...............................................................4

*Apache Stronghold v. United States,*
101 F.4th 1036 (9th Cir. 2024) ...............................................................
1, 4, 6, 29, 33, 34, 35, 36, 37, 39, 40, 41, 42

*Apache Stronghold v. United States,*
145 S. Ct. 1480 (2025)..............................................................4, 29, 36

*Apache Stronghold v. United States,*
146 S. Ct. 285 (2025).........................................................4, 29, 36, 39

*Assiniboine & Sioux Tribes v. Nordwick,*
378 F.2d 426 (9th Cir. 1967)............................................14, 15, 16, 17

*Bethel World Outreach Ministries v. Montgomery Cnty. Council,*
706 F.3d 548 (4th Cir. 2013)..............................................................40

*Bowen v. Roy,*
476 U.S. 693 (1986).........................................................................30

*Burwell* v. *Hobby Lobby Stores, Inc.*,
 573 U.S. 682 (2014) .................................................................... 30, 37, 41

*Cameron v. United States*,
 252 U.S. 450 (1920) .............................................................................. 17

*Center for Biological Diversity v. U.S. Department of the Interior*,
 623 F.3d 633 (9th Cir. 2010) ............................................................... 22

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
 33 F.4th 1202 (9th Cir. 2022) ....................................................... 9, 13, 19

*Desert Citizens Against Pollution v. Bisson*,
 231 F.3d 1172 (9th Cir. 2000) ......................................................... 20, 21

*Dorsey v. United States*,
 567 U.S. 260 (2012) .............................................................................. 42

*Employment Division* v. *Smith*,
 494 U.S. 872 (1990) .............................................................................. 31

*Gonzales* v. *O Centro Espirita Beneficente Uniao do Vegetal*,
 546 U.S. 418 (2006) .................................................................... 32, 41, 42

*Haight v. Thompson*,
 763 F.3d 554 (6th Cir. 2014) ............................................................... 40

*Holt v. Hobbs*,
 574 U.S. 352 (2015) .............................................................................. 37

*Kipp v. Davis,*
   986 F.3d 1281 (9th Cir. 2021).................................................................28

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
   591 U.S. 657 (2020) ...............................................................................42

*Lockhart v. United States,*
   546 U.S. 142 (2005) ...............................................................................42

*Lopez v. United States,*
   No. 25A1008 (U.S. Mar. 19, 2026).........................................................6

*Lyng v. Nw. Indian Cemetery Protective Ass'n,*
   485 U.S. 439 (1988)................................................. 30, 31, 33, 34, 35, 40

*Mahmoud v. Taylor,*
   606 U.S. 522 (2025)...................................................................... 4, 38, 39

*Mirabelli v. Bonta,*
   607 U.S. 492 (2026)...........................................................................38, 39

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife,*
   551 U.S. 644 (2007) ...............................................................................42

*Posadas v. National City Bank,*
   296 U.S. 497 (1936)................................................................................42

*Seven County Infrastructure Coalition v. Eagle County,*
   605 U.S. 168 (2025)......................................................................5, 24, 25

*Sherbert* v. *Verner*,
374 U.S. 398 (1963) ........................................................................ 30

*Shoshone-Bannock Tribes of Fort Hall Reservation v. U.S. Dep't of the Interior*,
153 F.4th 748 (9th Cir. 2025) ........................................................ 22

*Tanzin* v. *Tanvir*,
592 U.S. 43 (2020) .......................................................................... 32

*Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of the Interior*,
608 F.3d 592 (9th Cir. 2010) .......................................................... 27

*Thai Meditation Ass'n of Ala., Inc. v. City of Mobile*,
980 F.3d 821 (11th Cir. 2020) ........................................................ 40

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
582 U.S. 449 (2017) ................................................................. 34, 35

*United States v. Locke*,
471 U.S. 84 (1985) ............................................................ 8, 9, 11, 12

*United States v. Shumway*,
199 F.3d 1093 (9th Cir. 1999) ....................................... 9, 10, 12, 19, 20

*West v. Radtke*,
48 F.4th 836 (7th Cir. 2022) .......................................................... 40

*Wisconsin* v. *Yoder*,
406 U.S. 205 (1972) ........................................................................ 30

*Yellowbear v. Lampert,*
  741 F.3d 48 (10th Cir. 2014) ................................................................ 40

**Statutes**

16 U.S.C. § 539p ................................................................................... 3

16 U.S.C. § 539p(a) ............................................................................... 3

16 U.S.C. § 539p(b) ............................................................................... 3

16 U.S.C. § 539p(c) ............................................................. 3, 7, 13, 23, 43

16 U.S.C. § 539p(e)(2) ..................................................................... 12, 13

16 U.S.C. § 539p(g) ........................................................................ 3, 43

16 U.S.C. § 539p(i)(1) .................................................................. 7, 17, 18, 19

30 U.S.C. § 26 ....................................................................................... 9

30 U.S.C. § 612 ..................................................................................... 9

42 U.S.C. § 2000bb ......................................................................... 32, 33

42 U.S.C. § 2000bb-1 ...................................................................... 32, 41

42 U.S.C. § 2000bb-3 ............................................................................ 42

54 U.S.C. § 306108.............................................................................23

Act of May 30, 1908, 35 Stat. 558 (1908)...........................................14, 15

Act of March 3, 1927, 44 Stat. 1401 (1927) ................................14, 15, 16

**Rules**

Fed. R. App. P. 40(b)(2) ................................................................7, 11, 28

Fed. R. App. P. 40(c) ....................................................................7, 11, 28

**Regulations**

36 C.F.R. § 254.9(b)(1)(i) ........................................................................7

36 C.F.R. § 254.9(c)(4) ............................................................................8

**Other Authorities**

139 Cong. Rec. 26,193 (1993) ................................................................32

9 Richard R. Powell et al., Powell on Real Property § 63.06[2] (Michael
    Allan Wolf ed., 2017).........................................................................9

H.R. Rep. No. 88, 103d Cong., 1st Sess. 6-7 (1993)................................32

Legislative Hearing on 112 H.R. 1904 et al., H. Comm. on Natural
    Resources, Subcommittee on National Parks, Forests and Public
    Lands,
    112th Congress 68 (2011) ..................................................................2

Oversight Hearing before the Subcommittee for Indigenous Peoples of the United States of the Committee on Natural Resources, U.S. House of Representatives, 116th Cong. 129-30 (Mar. 12, 2020) .......................................................... 3

S. Rep. No. 111, 103d Cong., 1st Sess. 8 (1993) ...................................... 32

Uniform Appraisal Standards for Federal Land Acquisitions § 1.4.5 .................................................. 20

Uniform Appraisal Standards for Federal Land Acquisitions § 1.12 .................................................... 8

Uniform Appraisal Standards for Federal Land Acquisitions § 4.6.5.2 ........................................... 8, 10

Uniform Appraisal Standards for Federal Land Acquisitions § 4.10 ................................................. 21

## INTRODUCTION

Plaintiffs' petitions for rehearing en banc should be denied. The panel correctly determined that Plaintiffs were not entitled to a preliminary injunction because they failed to establish a likelihood of success—or even serious questions—on the merits of their claims. No aspect of that decision warrants en banc review.

Arizona Mining Reform Coalition (AMRC) seeks review of a real-estate appraisal based on arguments that "flow from a misunderstanding of how unpatented mining claims work." Op. 22. The San Carlos Apache Tribe presses NEPA and consultation claims that the panel rightly rejected under blackletter principles of administrative law. And Lopez urges this Court to revisit the en banc decision it issued two years ago in *Apache Stronghold v. United States*, 101 F.4th 1036 (9th Cir. 2024).

Individually, none of the petitions meets the standard for en banc review. Together, Plaintiffs raise claims that have been rejected by two district court judges, two Ninth Circuit panels, the Ninth Circuit en banc, and the Supreme Court in denying certiorari, rehearing, and emergency relief. The panel's holding reflects what multiple courts have consistently recognized: Plaintiffs' claims fail on the merits. The petitions should be denied.

## BACKGROUND

### A. The Southeast Arizona Land Exchange and Conservation Act

In 1995, the world's third-largest copper orebody was discovered beneath lands in the Tonto National Forest. Resolution Copper, a mining company, held unpatented mining claims on much of the deposit. To promote development in an economically depressed area, members of Arizona's Congressional delegation introduced bills over successive Congresses to convey the federal lands to Resolution in exchange for conservation lands of equal value.

The federal lands at issue include a site known in English as Apache Leap and an Apache ceremonial ground known as Oak Flat. In debates over the bills, Congress heard testimony from several members of the San Carlos Apache Tribe for and against the exchange. Those voicing support included a former San Carlos Apache Tribal Chairman who testified in 2011 the exchange and resulting development would improve the Tribe's staggering unemployment rate and status as "one of the poorest Indian tribes in the Nation." *Legislative Hearing on 112 H.R. 1904 et al., H. Comm. on Natural Resources, Subcommittee on National Parks, Forests and Public Lands*, 112th Congress 68 (2011). Other tribal members, including the Tribe's first historian, also expressed support.[1]

---

[1] *See* Dale Miles, *Oak Flat is a sacred site? It never was before*, https://www.azcentral.com/story/opinion/oped/2015/07/23/oak-flat-

2

This led to a compromise. In 2014, Congress passed and President Obama signed the Southeast Arizona Land Exchange and Conservation Act (the Land Exchange Act). 16 U.S.C. § 539p. The Act's purpose is to "authorize, direct, facilitate, and expedite the exchange of land between Resolution Copper and the United States." *Id.* § 539p(a). It directs the Forest Service to convey 2,422 acres of land—including Oak Flat—in exchange for at least 5,344 acres of land owned by Resolution. *Id.* § 539p(b)(2), (4). Resolution would also surrender its rights to mine under Apache Leap, and Apache Leap's natural character would be preserved for traditional Tribal uses, and to protect and conserve cultural and archaeological resources. *Id.* § 539p(g).

The Land Exchange Act establishes several procedural requirements. The Forest Service must "engage in government-to-government consultation with affected Indian tribes." *Id.* § 539p(c)(3)(A). It must prepare appraisals to ensure that the value of the federal and non-federal land to be exchanged are equal or can be equalized. *Id.* § 539p(c)(4)–(5). And the Forest Service must prepare an environmental impact statement (EIS) before conveying federal land. § 539p(c)(9)(B).

---

sacred/30587803/ (July 23, 2015); Oversight Hearing before the Subcommittee for Indigenous Peoples of the United States of the Committee on Natural Resources, U.S. House of Representatives, 116th Cong. 129-30 (Mar. 12, 2020).

3

## B.    Prior litigation

The Forest Service first published an EIS in 2021. AMRC and the San Carlos Apache Tribe challenged it. Another group of plaintiffs—Apache Stronghold—challenged the land exchange under the Religious Freedom Restoration Act (RFRA) and the Free Exercise Clause, arguing it substantially burdened Apache religion. *Apache Stronghold v. United States*, No. 21-cv-50-PHX-SPL, 2021 WL 689906 (D. Ariz. Feb. 22, 2021).

In March 2021, the Forest Service withdrew the EIS and reinitiated consultation. 6-AMRCER-1027. Because AMRC and the Tribe's suits focused on the adequacy of the EIS, those cases were stayed.

But *Apache Stronghold* continued. A panel of this Court affirmed the district court's denial of a preliminary injunction. The Court granted rehearing en banc. *See Apache Stronghold v. United States*, 38 F.4th 742 (9th Cir. 2022), *vacated, Apache Stronghold v. United States*, 56 F.4th 636 (9th Cir. 2022). The en banc panel also affirmed the district court's denial of a preliminary injunction. *Apache Stronghold*, 101 F.4th at 1044.

Apache Stronghold petitioned for certiorari. The Supreme Court denied the petition in May 2025 over the dissent of Justices Gorsuch and Thomas. *Apache Stronghold v. United States*, 145 S. Ct. 1480, 1480–89 (2025). Apache Stronghold asked the Court to reconsider its denial of certiorari considering its decision in *Mahmoud v. Taylor*, 606 U.S. 522 (2025). The Supreme Court denied that petition as well, *Apache Stronghold v. United States*, 146 S. Ct. 285 (2025).

### C. The present litigation

In April 2025, the Forest Service provided notice that it planned to publish the Final EIS. AMRC and the Tribe moved for preliminary injunctions. While those cases proceeded in the District of Arizona, Lopez sued in the District for the District of Columbia. The D.C. district court granted the government's motion to transfer venue to Arizona. Lopez moved for a preliminary injunction.

The district court denied the preliminary injunctions. 1-AMRCER-93–94; LopezER-23. All three Plaintiff groups appealed.

This Court affirmed. The panel majority held that Plaintiffs had not established they were likely to succeed on the merits, or raised serious questions regarding any of their claims. Op. 20. The panel rejected AMRC's appraisal challenge, concluding "there was no error," and that "AMRC's criticisms all flow from a misunderstanding of how unpatented mining claims work." Op. 22. The panel then considered each of Plaintiffs' NEPA claims, and found none were likely to succeed under the deferential standard of review the Supreme Court mandated in *Seven County Infrastructure Coalition v. Eagle County*, 605 U.S. 168 (2025). Turning to the consultation claims, the panel concluded that "the record evinces a thorough consultation process" and that "the Government adequately fulfilled its consultation obligations." Op. 35, 36. Finally, the panel held that Lopez's religious liberty claims are foreclosed by the en

banc Court's decision in *Apache Stronghold*, 101 F.4th at 1044, 1051-52, 1063. Op .37.

Judge Rawlinson dissented in part, solely as to AMRC's appraisal claim. In her view, the appraisals failed to comply with the Land Exchange Act because they did not appraise the value of the underlying mineral estate over which Resolution held preexisting unpatented mining claims. Op. 54. In Judge Rawlinson's view, the appraisal should have proceeded as if the United States owned the mining rights and was conveying them to Resolution through the land exchange. This is true even though Resolution already owned the mining rights. According to Judge Rawlinson, the government should have appraised the value of the mineral estate as if owned entirely by the United States, then required Resolution to pay the full value of the mineral estate during the exchange, and then paid Resolution back as compensation for a taking of Resolution's property. Op. 43-44.

For its part, the majority concluded that this head-spinning theory was based on "a misunderstanding of how unpatented mining claims work." Op. 22, 23 n.3.

Following the panel's decision, Lopez sought an emergency injunction from the Supreme Court, which Justice Kagan denied. *Lopez v. United States*, No. 25A1008 (U.S. Mar. 19, 2026). The land exchange has now closed.

6

## ARGUMENT

### I. AMRC's appraisal claim does not warrant en banc review.

The panel correctly concluded that AMRC is unlikely to succeed on the merits of its appraisal claim. Resolution already possessed the right to extract the minerals on much of the federal land. Congress expressly preserved Resolution's rights in the Land Exchange Act. 16 U.S.C. § 539p(i)(1)(C). So any transfer of that land would be subject to Resolution's exclusive right to extract the copper (and to the copper once extracted). The appraiser thus excluded the value of the copper encumbered by Resolution's mining claims. The panel correctly determined "there was no error" in that straightforward approach. That holding adheres to Supreme Court and Ninth Circuit precedent, the plain text of the Land Exchange Act, and common sense.

AMRC's arguments, by contrast, rest on a misunderstanding of the mining claims. Op. 22. The dissent erred in holding otherwise. AMRC's petition should be denied. *See* Fed. R. App. P. 40(b)(2) & (c).

### A. The panel correctly concluded there was no error in the appraisal.

The Land Exchange Act requires appraisals of the exchanged lands, 16 U.S.C. § 539p(c)(4), to ensure that value of the exchanged land is equal (or equalized), *id.* § 539p(c)(5)(A). The appraisals must "be conducted in accordance with nationally recognized appraisal standards." *Id.* As the

7

panel concluded, the appraisals are consistent with the Land Exchange Act, the Uniform Appraisal Standards, and the Mining Law.

The purpose of an appraisal is to assess the value of the property that the seller owns and is conveying by sale or exchange. Thus, appraisals must account for any encumbrances that reduce the scope of the subject property. Uniform Appraisal Standards for Federal Land Acquisitions (UAS) § 4.6.5.2. ("[I]t is improper to disregard preexisting encumbrances and their impact on the property."); *id.* (for "property encumbered by a preexisting easement, the measure of compensation is the market value of the property as encumbered."); 36 C.F.R. § 254.9(c)(4) (appraisal must include "a statement of all encumbrances").

As for the seller's property, the appraisal must "value … the appraised land to reflect 'the highest and best use of the property' 'as if in private ownership and available for sale in the open market,' 36 C.F.R. § 254.9(b)(1)(i), meaning 'the most probable and legal use of [the] property.'" Op. 20; UAS § 1.12.

Here, the property the government owned was encumbered by Resolution's ownership of the mineral rights. Before the land exchange, Resolution held unpatented mining claims on a portion of the federal land that gave it the exclusive possessory right to access the property and mine the copper. Op. 20-21 (citing *United States v. Locke*, 471 U.S. 84, 86 (1985)). Under the General Mining Law of 1872, a party that discovers a valuable mineral deposit on lands open to mining obtains a property right

8

to extract those minerals, and to reasonable use of the land for those purposes. 30 U.S.C. §§ 26, 612. "Patenting . . . is not required, and an unpatented mining claim remains a fully recognized possessory interest." *Locke,* 471 U.S. at 86. An unpatented mining claim "is a property interest, which is itself real property in every sense, and not merely an assertion of a right to property." *United States v. Shumway*, 199 F.3d 1093, 1099-1100 (9th Cir. 1999) (citation omitted). "[T]he government cannot reserve its own land from an unpatented mining claim without paying the owner the value of the claim, because an unpatented mining claim is property." *Id.* In other words, the government did not own the mining rights.

To account for that encumbrance, as the appraisal standards require, the Forest Service prepared two appraisal reports for the federal land. One summarized the value of the federal land encumbered by Resolution's mining claims (the "Mining Claim Zone," or "MCZ"). The other summarized the value of the federal land unencumbered by any mining claim (the "Mineral Withdrawal Area" or "MWA").

The Mineral Withdrawal Area appraisal identified development of a mine as the highest and best use for the federal land unencumbered by Resolution's claims. Op. 21. It assessed the value at $22 million, which included approximately $17.5 million for the copper ore owned by the United States. *Id.* The Mining Claim Zone appraisal accounted for the encumbrance of Resolution's exclusive right to mine the copper, identifying the highest and best use as "surface land use in support of a

9

mining operation." *Id.* Thus, although the Mining Claim Zone contains substantially more copper ore than the Mineral Withdrawal Area, the appraisal assessed the Mining Claim Zone at $2 million. *Id.*

The panel correctly concluded "[t]here was no error in this appraisal." *Id.* at 22. In exchanges that transfer federal land subject to mining claims, the Forest Service correctly excludes the value of the encumbered minerals from its appraisal. Consistent with that approach, the Mining Claim Zone appraisal recognized Resolution's mining claims as an encumbrance that runs with the land. *See* 9 Richard R. Powell et al., Powell on Real Property § 63.06[2] (Michael Allan Wolf ed., 2017) ("A grant or reservation of minerals effects a horizontal severance of the rights in the land and creates two separate estates—one in the minerals and one in the surface."). Although the United States held title to the land, *Shumway*, 199 F.3d 1093, the United States could neither mine the minerals nor transfer the right to do so without paying just compensation for a taking (a fact even the dissent admits). *See Shumway*, 199 F.3d at 100; Op. 46 ("Undoubtedly, Resolution would receive just compensation for its unpatented mining claims."). The appraisal properly accounted for that encumbrance by excluding the value of the minerals. UAS § 4.6.5.2.

## B. The panel's decision does not conflict with any decision of this Court or the Supreme Court.

AMRC claims the panel's decision committed three "fundamental errors." AMRC Pet. 1. It is wrong about each and its claims do not satisfy

10

the criteria for en banc review. *See* Fed. R. App. P. 40(b)(2) & (c) (rehearing "ordinarily" allowed only if panel decision conflicts with Supreme Court or Ninth Circuit precedent, creates a circuit split, or involves a question "of exceptional importance").

### 1. The panel's decision is consistent with the Mining Law and binding precedent.

The panel did not, as AMRC claims (AMRC Pet. 5-7), mistakenly hold that Resolution owned title to the mineral estate before the land exchange. In attempting to show otherwise, AMRC plucks an isolated clause from a single sentence in the majority opinion stating that the minerals in the Mining Claim Zone were "not part of the estate owned by the United States." *Id.* at 5 (quoting Op. 21). AMRC claims that statement contradicts the Supreme Court's decision in *Locke*, 471 U.S. at 104. AMRC Pet. 5.

That is wrong. The majority accurately described Resolution's rights, explaining that "Resolution Copper owns the right to mine the minerals in the MCZ and the minerals themselves, *once mined.*" Op. 22 (emphasis added); *id.* at 24 ("[T]he Government owns the underlying mineral estate"). And it correctly applied *Locke*, which recognized that "an unpatented mining claim remains a fully recognized possessory interest" that "gives an individual the right of exclusive possession of the land for mining purposes." 471 U.S. at 86. Indeed, "[a] miner need never acquire a title in order to work his claim and protect his rights against

11

third persons." *Alaska Miners v. Andrus*, 662 F.2d 577, 579 (9th Cir. 1981) (citation omitted).

Certainly "[t]he United States, as owner of the underlying fee title to the public domain, maintains broad powers over the terms and conditions upon which public lands can be used, leased, and acquired." *Locke*, 471 U.S. at 104. But an unpatented mining claim is a "vested" right, and the fact that "an applicant has yet to receive, or even apply for, a patent does not mean that the government has plenary power over the [property]." *Shumway*, 199 F.3d at 1103. As the panel explained, "[w]hile it is true that the Government owns the underlying mineral estate, that interest has no practical value because the Government does not own the right to mine those minerals." Op. 24. AMRC points to nothing in *Locke*—or any decision of any court—that supports its assertion that the appraisal should have assessed the value of minerals only Resolution could extract merely because the United States held title.

AMRC is also incorrect in asserting (AMRC Pet. 8) that the appraisal contradicted the "equal value" provision in subsection (e) of the Land Exchange Act. That provision requires Resolution to make a "value adjustment payment" to the government if the "cumulative production of valuable locatable minerals produced in commercial quantities" from the conveyed Federal land "exceeds the quantity of production of locatable minerals from Federal land used in the income capitalization approach analysis prepared under (c)(4)(C)." 16 U.S.C. § 539p(e)(2). Section

12

539p(c)(4)(C) requires that the "appraisal prepared under this paragraph shall include a detailed income capitalization approach analysis of the market value of the Federal land which may be utilized, as appropriate, to determine the value of the Federal land, and shall be the basis" for any subsection (e) equalization payment.

AMRC contends that Section 539p(e)(2) requires the appraisal to include the value of the copper on all the federal land, including in the Mining Claim Zone where Resolution already owns the right to extract the copper. AMRC Br. 32. But AMRC misses the point of subsection (e). That subsection instructs Resolution to equalize the value if the minerals from the federal land exceed the appraised value. This subsection only makes sense when it comes to the Mineral Withdrawal Area, where Resolution did not already own the right to extract copper. Applying it to the Mining Claim Zone would require Resolution to pay the United States for minerals it already had the right to extract "free of charge" under the Mining Law—a result Congress surely did not intend. *See Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 1202, 1209 (9th Cir. 2022).

AMRC's references to legislative history (AMRC Pet. 8-9) fare no better. As the panel explained, "those references most naturally apply to the Mineral Withdrawal Area, over which Resolution holds no mining rights." Op. 24.

13

The panel's analysis is consistent with the decisions of the Supreme Court and this Court, and the panel rightly upheld the appraisal's approach. AMRC fails to identify any contrary authority.

### 2. The dissent erred in concluding that transfer would extinguish Resolution's mining rights.

A cornerstone of the dissent's analysis was its conclusion that "an unpatented claim on public land is extinguished when the government disposes of those lands." Op. 45. That conclusion is incorrect and unsupported by the sole authority the dissent relies on—*Assiniboine & Sioux Tribes v. Nordwick*, 378 F.2d 426, 428 (9th Cir. 1967). Op. 44, 45. The panel correctly rejected it. Op. 23 n.3.

*Assiniboine* did not address the transfer of federal land subject to unpatented mining claims. It involved the disposition of land that once comprised the Fort Peck Reservation. In the Act of May 30, 1908, 35 Stat. 558 (1908 Act), Congress provided that "part of the land composing the Fort Peck Reservation was to be allotted among members of the Assiniboine and Sioux Tribes, and the remainder sold for their benefit." *Assiniboine & Sioux Tribes,* 378 F.2d at 428. The unallotted lands were then opened to settlement and homestead entry. *Id.* In 1927, Congress amended the 1908 Act to "reserve[e] to the Indians having tribal rights on said reservation the oil and gas in the tribal lands *undisposed of on the date of the approval of this Act.*" *Id.* (citing Act of March 3, 1927, 44 Stat. 1401 ("1927 Act) (emphasis added)). The question in *Assiniboine*

14

was whether the 1927 Act reserved oil and gas rights on property subject to an unperfected homestead entry when the statute was enacted. *Id.* In other words, whether "undisposed of" land under the 1927 Act included property encumbered by unperfected homestead entries.

This Court held that it did, "conclud[ing] that withholding provisions of the 1927 Act did not apply to lands subject to pending but unperfected homestead entries under the 1908 Act." *Id.* at 432. In reaching that conclusion, the Court observed that the 1927 Act lacked any savings clause or other text "expressly preserving outstanding but unperfected rights." *Id.* at 429. Thus, the Court considered the meaning of "disposal" and "undisposed of" in the 1908 Act and other legislation addressing the Fort Peck Reservation, administrative guidance and practice, and the Indian canon of construction. *Id.* at 429-30. The Court was ultimately persuaded by the consistent administrative practice of issuing patents on homestead applications that predated the 1927 Act, which reflected a "contemporaneous interpretation of the 1927 Act by persons familiar with its background and purpose." *Id.* at 432. *Assinibone* thus involves very different circumstances than those present here.

Implicitly acknowledging that *Assiniboine* never speaks directly to the question here, the dissent asserts "[t]he important takeaway" is that the Court's "thorough and detailed analysis would not have been necessary if, as the majority argues, the unperfected patent ran with the land." Op. 52. Even that overreads *Assiniboine*. The Court did closely

15

analyze statutory text and administrative practice to determine the meaning of the 1927 Act. 378 F.2d at 429-30. But tellingly, nothing in that "detailed analysis" (Op. 52) states that unperfected claims are automatically extinguished upon transfer unless Congress says otherwise. If anything, as the panel found, Op. 23 n.3, *Assiniboine* supports the opposite conclusion because it held that an unperfected homestead claim *survived* Congress's subsequent reservation of oil and gas rights. And unlike the homestead entry at issue in *Assiniboine*, the unpatented mining claims here did not need to be patented to be fully vested property rights. *See Alaska Miners*, 662 F.2d at 579 (contrasting unpatented mining claims with homestead entries because "[a] miner need never acquire a title in order to work his claim and protect his rights against third persons").[2] *Assiniboine* does not support the dissent's blanket assertion that unpatented claims are uniformly extinguished upon title transfer.

The same is true of the other cases the dissent cites. Op. 43, 50. *Alaska Miners*, like *Assiniboine*, affirms the general proposition that "the

---

[2] The dissent also errs in reading *Assiniboine* to mean that "[i]n a transaction involving the government transferring the [MCZ] parcel to a third party, that third party would obtain the entire estate unless portions were reserved by the United States." Op. 44. *Assiniboine* merely held that an unperfected homestead claim survived Congress's later decision to reserve oil and gas rights to benefit tribes. 378 F.2d at 432. There was no question in *Assiniboine* that property disposed of *before* the 1927 Act would transfer "the entire estate." *Assiniboine* did not address the effect of title transfer on an existing unpatented mining claim.

16

government may withdraw or convey title to land *subject to valid, unpatented claims.*" 662 F.2d at 580 (emphasis added). The dissent emphasizes the word "may" and *Alaska Miners'* observations that claims can be forfeited for failure to fulfill necessary conditions and that "the land remains subject to the disposing power of Congress" until a claimant obtains a patent. Op. 50 (citing *Alaska Miners*, 662 F.2d at 579-80). But here "there are no conditions for maintaining the mining claims that Resolution failed to fulfill." Op. 23 n.3. Thus, Resolution held *valid* mining claims that could not be extinguished without just compensation—a fact the dissent concedes. *See infra.* And the Supreme Court's observations in *Cameron v. United States*, 252 U.S. 450, 460 (1920), about *invalid* mining claims are inapposite.

Even if the dissent were correct (Op. 50) that Congress's preservation of mining claims is permissive, there can be no doubt that Congress manifested its intent to preserve Resolution's mining claims here. The Land Exchange Act states that "[n]othing in this section shall interfere with, limit, or otherwise impair, the unpatented mining claims or rights currently held by Resolution Copper on the Federal land." 16 U.S.C. § 539p(i)(1)(C). Thus, unlike the 1927 Act, which lacked any savings clause "expressly preserving outstanding but unperfected rights," the Land Exchange Act explicitly requires Resolution's unpatented mining claims be preserved. *Id.*; *contra* Op. 52 (acknowledging Section 539p(i)(1)(C) but wrongly stating it is undisputed

17

that the Land Exchange Act "contains no language 'expressly preserving outstanding but unperfected rights.'") (quoting *Assiniboine*, 378 F.2d at 429). Whatever else Congress *could* have required, the statutory text confirms that "Congress *expressly chose* to preserve Resolution's mining claims in the Land Exchange Act." Op. 23 (emphasis added).

AMRC attempts to brush aside that clear statutory command by asserting that it "only dealt with the situation if Resolution decided not to accept the exchange." AMRC Pet. 11. But the text of Section 539p(i)(1)(C) is unqualified and says nothing about Resolution refusing the exchange. 16 U.S.C. § 539p(i)(1)(C). In fact, none of the three provisions in subsection (i)(1) is limited to a scenario where Resolution decides not to proceed with the land exchange.

The dissent takes a different approach, stating that "an accurate appraisal will not impermissibly 'interfere with, limit, or otherwise impair, the unpatented mining claims.'" Op. 53. But in the dissent's view, an "accurate appraisal" assumes Resolution's mining claims would be "extinguished" upon transfer, *id.* at 45—a result in direct conflict with subsection 539p(i)(1)(C). The dissent errs in faulting the appraisal (Op. 44) for failing to consider a scenario the Land Exchange Act expressly forbids.

The dissent's theory is also at odds with its ready admission that extinguishing Resolution's mining claims would effect a taking. *See* Op. 46 ("Undoubtedly, Resolution would receive just compensation for its

18

unpatented mining claims."). By recognizing that Resolution would be entitled to just compensation, the dissent tacitly confirms that the mining claims are valid, vested property rights, *Shumway*, 199 F.3d at 1103. But the dissent never harmonizes that admission with its conclusion that the claims are automatically extinguished when transferred.

If the dissent were correct, Resolution would have to pay the United States for the value of exclusive mining rights Resolution already possessed, only to turn around and recoup that payment from the United States as just compensation. That is not a sensible way to read the statute. Such a circular process would needlessly interfere with Resolution's mining claims without yielding any benefit to the public. After all, any additional value provided by Resolution in exchange for higher-appraised federal land would ultimately be returned to Resolution as just compensation. Nothing in the Land Exchange Act suggests Congress intended such an illogical result. In fact, the Act expressly prohibits it. 16 U.S.C. § 539p(i)(1)(C).

AMRC is also incorrect that the panel allows Resolution to "receiv[e] billions of pounds of copper ore for free." AMRC Pet. 12. As a holder of unpatented mining claims, Resolution *already* had the right under the Mining Law "to 'occupy' the claim and to mine the minerals *free of charge.*" *Ctr. for Biological Diversity*, 33 F.4th at 1209 (emphasis added). Thus it was the Mining Law—not the appraisal or the land

19

exchange—that gave Resolution the right to extract and profit from the copper.

AMRC and the dissent may disagree with the policy underlying the Mining Law. But despite "much contemporary hostility" to the law "and high level political pressure by influential individuals and organizations for its repeal," "all repeal efforts have failed, and it remains the law." Op. 24 (quoting *Shumway*, 199 F.3d at 1098). The Forest Service was not free to disregard the Mining Law when preparing the appraisals. *See* UAS § 1.4.5 (the highest and best use must be "legally permissible").

### 3. The panel correctly upheld the appraisal's highest and best use assessment.

In assessing the highest and best use of the Mining Claim Zone, the appraisal correctly excluded mining because Resolution already held the right to mine the copper. Thus, any hypothetical private party in the open market would receive title to the property subject to Resolution's mining claim. That was correct, as the panel explained, because "the 'highest and best use' of the property by any private party cannot legally include mining the mineral deposit over which Resolution holds its claims." Op. 23 n.3 (citing UAS § 1.4.5).

This Court's decision in *Desert Citizens Against Pollution v. Bisson* is not to the contrary. 231 F.3d 1172 (9th Cir. 2000). There, the Court considered an appraisal where the federal land to be transferred was to be used for a landfill. *Id.* at 1174. The Court rejected the appraisal for

failing to consider a landfill among the highest and best uses despite evidence of a "general market for landfill development" and knowledge of its planned use. *Id.* at 1181, 1186. *Desert Citizens* did not involve land encumbered by mining claims. And the decision did not address AMRC's argument here, that the appraisal should have considered a use precluded by a valid encumbrance. *Desert Citizens* simply held that, "[b]ecause landfill use was reasonably probable," the appraisal should have considered it in the highest and best use analysis. *Id.* at 1181. The panel's decision is consistent with that holding.

The dissent also errs in reading *Desert Citizens* to mean that "at a minimum the land should be appraised for the use contemplated by the transferee." Op. 46 (citing *Desert Citizens*, 231 F.3d at 1183 n.14). *Desert Citizens* emphasized not just the intended use but also the general market for that use. 231 F.3d at 1181. That makes sense, because "neither an existing federal use nor a nonfederal party's proposed use can be considered unless there is competitive demand for that use in the private market." UAS § 4.10.[3] Here, although there may be competitive

---

[3] Amici Legal Scholars emphasize the possibility that unpatented mining claims can be voided by various circumstances, resulting in "a significant fragility" in Resolution's mining claims. Dkt. No. 207.2 at 15-16. But they cite no authority for the argument that an appraisal should have valued the speculative possibility that Resolution's claims would someday be invalidated by, for example, government-initiated "contest proceedings." *Id.* at 16. To the contrary, "uses that are merely speculative or conjectural need not be considered." *Desert Citizens*, 231 F.3d at 1181.

demand for mining generally, the appraisal correctly concluded that mining was not a probable use of the Mining Claim Zone. Appraisals must analyze property "as if in private ownership," meaning "the appraiser needs to determine the present value of the federal lands as if they are exploited for profit by a *hypothetical* private party." Op. 23 (emphasis added). That means the appraisal needed to consider that Resolution already possessed the exclusive right to mine the copper, but not that Resolution was the nonfederal party to the land exchange.

Rather than rebutting that point, AMRC's citation (AMRC Pet. 15) to Judge Bumatay's dissent in *Shoshone-Bannock Tribes of Fort Hall Reservation v. U.S. Dep't of the Interior*, 153 F.4th 748 (9th Cir. 2025), underscores it. As Judge Bumatay observed, "[m]arket value refers to the lands' value in a competitive and open market," not "the special value of property to the owner arising from its adaptability to his particular use." 153 F.4th 748, 780 (9th Cir. 2025) (cleaned up). The appraisal is consistent with that principle.

AMRC's reliance (AMRC Pet. 14) on *Center for Biological Diversity v. U.S. Department of the Interior*, 623 F.3d 633 (9th Cir. 2010), is also misplaced. That case did not involve any appraisal claim. The question there involved an agency's analysis of the effects of a land exchange under NEPA; it has no applicability here.

Finally, AMRC overstates the likely reach of the panel's decision to other cases involving federal land exchanges. AMRC Pet. 16-18. Far from

"fundamentally alter[ing] the legal regime," *id.* at 17, the panel decided the appraisal claim based on settled principles of mining law and the specific facts of the Land Exchange Act in this unique case. AMRC's argument to the contrary depends on mischaracterizations of the panel's decision that do not withstand scrutiny.

* * * *

AMRC's appraisal claim is really a disagreement with the Mining Law itself, not any application of that law here. Op. 25. The panel rightly rejected it, and its decision does not warrant en banc review.

## II. The Tribe's NEPA and consultation claims do not warrant en banc review.

The panel properly and unanimously determined that the Tribe's NEPA claims "fail on the merits" under longstanding, blackletter law. Opp. 30. The panel also correctly concluded that the government's extensive, two-decade long consultation satisfied the Land Exchange Act, 16 U.S.C. § 539p(c)(3)(A), and National Historic Preservation Act (NHPA), 54 U.S.C. § 306108. *Id.* at 36. Those holdings do not conflict with any decision of this Court, the Supreme Court, or another appellate court. The Tribe offers no serious argument to the contrary.

### A. The panel correctly rejected the Tribe's NEPA claims.

The Tribe's NEPA claims consist of two extra-record declarations that disagree with the scientific and technical conclusions the Forest

23

Service reached and accuse the agency of failing to consider topics the Final EIS addresses. "[A]ssuming, without holding," that an exception to the rule barring extra-record evidence applied, Op. 30, the panel considered the declarations and concluded the Tribe's claims fail on the merits.

As the panel explained, "[t]he FEIS addressed each of the topics the Tribe highlights from the declarations, including tailings and pipeline safety, acid rock drainage, and hydrological concerns." *Id.* The Tribe's NEPA claims were thus merely "a disagreement with the FEIS's scientific conclusions." *Id.* The panel applied "[b]lack-letter administrative law," which "instructs that when an agency makes those kinds of speculative assessments or predictive or scientific judgments, and decides what qualifies as significant or feasible or the like, a reviewing court must be at its 'most deferential.'" *Seven Cnty.*, 605 U.S. at 182.

The Tribe mischaracterizes the panel's decision, asserting it held that courts do not need to "'confirm that the agency has addressed the environmental consequences' of the relevant project" if a plaintiff challenges an agency's scientific conclusions. Tribe Pet. 9 (quoting *Seven County*, 605 U.S. at 180). That is wrong. The panel *did* confirm that the Forest Service addressed the topics of the Tribe's concern. Op. 30. In fact, the Forest Service not only addressed those topics, but also "directly responded to comments by [the Tribe's] experts regarding the same

24

concerns." *Id.* The panel thus did not, as the Tribe asserts, confuse any "distinction between *how* an agency considers relevant factors and *whether* the agency considered all the relevant factors." Tribe Pet. 8. To the contrary, the panel applied settled principles of arbitrary-and-capricious review and rightly concluded that "the Tribe's arguments fail on the merits." Op. 30.

That conclusion merely reaffirmed the longstanding NEPA principle the Supreme Court "doubly-underscore[d]" in *Seven County*: in assessing environmental effects under NEPA, an agency must "make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry," and courts "should not micromanage those agency choices so long as they fall within a broad zone of reasonableness." 605 U.S. at 183-84. The panel followed that directive here.

**B. The panel correctly rejected the Tribe's consultation claim.**

The panel was also right to conclude "the Government adequately fulfilled its consultation obligations." Op. 36. The Tribal consultation was extensive. It began in 2003, before Congress enacted the Land Exchange Act. 1-AMRCER-68. It included "at least eight different versions of the [programmatic agreement], with the Forest Service soliciting comments and input from the Tribe . . . concerning the successive drafts." 1-AMRCER-70. It included an ethnographic and ethnohistoric study with

25

a literature review, oral interviews, and field visits with Tribal members to collect oral history and knowledge. 1-AMRCER-69. And it included "434 documented consultations with the San Carlos Apache Tribe," with both formal meetings with the Tribal Council and with individual members. 1-AMRCER-67–72. That exhaustive consultation more than satisfied the agency's obligations under the Land Exchange Act and NHPA.

The Tribe attempts to show otherwise by focusing solely on the period between 2021, when the Forest Service reinitiated consultation, and 2025, when it issued the Final EIS. Tribe Pet. 12-13. According to the Tribe, the Forest Service's decision to reinitiate consultation means the pre-2021 consultation was inadequate. Tribe Pet. 11-12. But the Tribe "fail[ed] to cite any case law standing for the idea that re-opening a consultation process negates all pre-reopening consultation efforts." Op. 35. Instead, it relies on the unconvincing argument that the agency's decision to reinitiate consultation was tantamount to an admission that all prior consultation was invalid, and that the United States must "justify" its supposed "change in position." Tribe Pet. 13-14.

The panel rightly rejected that argument. The Forest Service never said its pre-2021 consultation was invalid; it simply agreed that further consultation was appropriate. SER-148. Thus, the panel correctly considered the "thorough consultation" that occurred *over the course of two decades*," before and after 2021. Op. 35; *see also Te-Moak Tribe of W.*

26

*Shoshone of Nevada v. U.S. Dep't of the Interior*, 608 F.3d 592, 609 (9th Cir. 2010) (finding consultation sufficient based on both project-specific consultation and "previous efforts" to consult).

But even if the panel had looked solely to post-2021 efforts, the record still would demonstrate adequate consultation. After reinitiating consultation, the Forest Service held Tribal listening sessions and formal and informal consultation meetings with affected tribes. SER-148. It held a listening session in October 2021 with eight tribes, including the Plaintiff Tribe. 1-AMRCER-71. Between 2021 and 2023, the Forest Service engaged directly with Plaintiff's Tribal Council. 1-AMRCER-71–72. That process continued through 2024, including two formal meetings with the Tribe and efforts to develop a memorandum of understanding. 1-AMRCER-72. The consultation was more than sufficient.

That is true even though it did not result in an executed memorandum of understanding. The Land Exchange Act does not require any memorandum of understanding, nor mandate any one format for consultation. There simply is no support in the statute for the Tribe's assertion that the parties' failed efforts to develop a memorandum of understanding mean that "no actual [Land Exchange Act] consultations took place." Tribe Pet. 13.

"[T]he record evinces a thorough consultation process that ultimately resulted in a conclusion contrary to the Tribe's hopes." Op. 35.

But "[t]hat is not enough to render the consultation process 'arbitrary and capricious.'" *Id.*[4]

### C.  The Tribe does not present any question of exceptional importance.

The Tribe also asserts that en banc review is warranted because the case is of "fundamental" importance to the Tribe. Tribe Pet. 14. But that is not the standard in Federal Rule of Appellate Procedure 40(c). As the Rule explains, rehearing ordinarily is only appropriate if the decision conflicts with Supreme Court or Ninth Circuit precedent, creates a circuit split, or involves a question "of exceptional importance." Fed. R. App. P. 40(b)(2) & (c).

The Tribe's petition satisfies none of those criteria. In enacting the Land Exchange Act, Congress struck a legislative compromise with exceptionally important *policy* implications for the Tribe and for the national security of the United States. But the Tribe's petition presents no *legal* issue of exceptional importance. To the contrary, the Tribe seeks to relitigate NEPA and consultation claims that merely "involve[] the application of settled legal standards to a set of facts." *Kipp v. Davis*, 986

---

[4] Because the panel correctly held that the Tribe's claims fail on the merits, the Court can deny the petition without deciding whether execution of the land exchange mooted this appeal and without ruling on the scope of its remedial authority to unwind the exchange. Those questions make this case a poor vehicle for en banc review. Plaintiffs may continue to pursue their claims in district court. If the Court ultimately finds the transfer unlawful and concludes it has remedial power to unwind the exchange, it can rule accordingly at that time.

F.3d 1281, 1284 (9th Cir. 2021) (Paez, J., concurring in denial of rehearing en banc). The Tribe presents no exceptionally important legal question that warrants en banc review.

### III. Lopez's request for a re-do of *Apache Stronghold* should be denied.

Two years ago, this Court granted en banc review and resolved the same issue, on the same facts, that Lopez presents. In *Apache Stronghold*, this Court correctly held that the land exchange does not violate RFRA or the Free Exercise Clause. 101 F.4th at 1063. As the panel unanimously recognized, that decision forecloses Lopez's religious exercise claims.

Lopez urges the Court to revisit *Apache Stronghold*. But it does not meet the standard for rehearing en banc. No intervening decision of the Supreme Court or any appellate court conflicts with *Apache Stronghold*. To the contrary, the Supreme Court denied certiorari, 145 S. Ct. 1480, and a request for rehearing based on *Mahmoud*—the same case Lopez relies on here, 146 S. Ct. 285. Lopez's petition should be denied.

#### A. *Apache Stronghold* was correctly decided.

*Apache Stronghold* correctly recognized that, under controlling Supreme Court precedent, the government does not impose a cognizable burden on religious exercise when it uses or disposes of its own property—even when members of the public seek to use that property for religious purposes. 101 F.4th at 1051-52 (citing *Lyng v. Nw. Indian*

*Cemetery Protective Ass'n*, 485 U.S. 439, 452-53 (1988)). RFRA did not upset that settled understanding. To the contrary, RFRA is best read to "subsume[], rather than override[]," *Lyng*'s holding. *Id.* at 1061. And "[t]he project challenged here is indistinguishable from that in *Lyng*." *Id.* at 1051.

For several decades, in a line of cases including *Sherbert* v. *Verner*, 374 U.S. 398 (1963), and *Wisconsin* v. *Yoder*, 406 U.S. 205 (1972), the Supreme Court permitted religious adherents to seek exemptions from neutral, generally applicable laws under the Free Exercise Clause. "[T]hose decisions used a balancing test that took into account whether the challenged action imposed a substantial burden on the practice of religion, and if it did, whether it was needed to serve a compelling government interest." *Burwell* v. *Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014).

But the Supreme Court's decisions applying the *Sherbert-Yoder* test rejected claims that the government's management of its own programs or property could substantially burden religious exercise. *See Bowen v. Roy*, 476 U.S. 693, 700 (1986) (religious objection to Social Security numbers was not a cognizable burden because the Free Exercise Clause "does not afford an individual a right to dictate the conduct of the Government's internal procedures."); *Lyng*, 485 U.S. at 453.

*Lyng* rejected a Free Exercise challenge in the specific context presented here—the government's management of federal lands. There,

30

the Court considered a challenge to government plans to permit timber harvesting and road construction through part of a national forest traditionally used for religious practice by three tribes. 485 U.S. at 442-43. The plaintiffs asserted the area was an "indispensable part of Indian religious conceptualization and practice," and that the project would irreparably damage "the sacred areas which are an integral and necessary part of the[ir] belief systems and lifeway." *Id.* at 442 (citations omitted).

The Court acknowledged the project would have "devastating effects on traditional Indian religious practices." *Id.* at 451. But it held that those harms were not cognizable under the Free Exercise Clause because, as in *Roy*, the affected persons would not "be coerced by the Government's action into violating their religious beliefs; nor would [the] governmental action penalize religious activity." *Id.* at 449. As the Court explained, the "government simply could not operate if it were required to satisfy every citizen's religious needs and desires" in matters like the administration of public lands. *Id.* at 452. The Court declined to adopt an rule that would grant religious adherents "*de facto* beneficial ownership" of federal lands. *Id.* at 453.

The Supreme Court later rejected the *Sherbert-Yoder* approach as a matter of constitutional law in *Employment Division* v. *Smith*, 494 U.S. 872 (1990). *Smith* held that the Free Exercise Clause does not require

31

religious exemptions to neutral laws of general applicability, even if those laws substantially burden religious exercise. *Id.* at 876-90.

Congress responded by enacting RFRA, which "adopts a statutory rule comparable to the constitutional rule rejected in *Smith*." *Gonzales* v. *O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 424 (2006). Under RFRA, the government may not "substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless "application of the burden to the person" is "the least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. § 2000bb-1(a) and (b).

RFRA is intended to "restore the compelling interest test as set forth in [*Sherbert*] and [*Yoder*]." *Id.* § 2000bb(b)(1). Congress did not define "substantial burden" in RFRA. But RFRA's legislative history confirms that Members of Congress intended courts to "look to free exercise cases decided prior to *Smith* for guidance in determining whether the exercise of religion has been substantially burdened." S. Rep. No. 111, 103d Cong., 1st Sess. 8 (1993) (Senate Report); see H.R. Rep. No. 88, 103d Cong., 1st Sess. 6-7 (1993) (same). Those decisions formed the "legal 'backdrop against which Congress enacted' RFRA," *Tanzin* v. *Tanvir*, 592 U.S. 43, 48 (2020) (citation omitted), as the statutory text reflects, *see* 42 U.S.C. § 2000bb(a)(5) (referring to the "compelling interest test as set forth in prior Federal court rulings"). And legislators recognized that "pre-*Smith* case law makes it clear that strict scrutiny

32

does not apply to government actions involving only management of internal Government affairs or the use of the Government's own property or resources." Senate Report 9; see, *e.g.*, 139 Cong. Rec. 26,193 (1993) (Sen. Hatch) (reaffirming "RFRA does not affect *Lyng*"); *id.* at 26,415-26,416 (Sen. Grassley) (same).

*Apache Stronghold* properly looked to *Lyng* to inform "what counts as a *cognizable* substantial burden" under RFRA in the federal lands context. *Apache Stronghold*, 101 F.4th at 1061. And it correctly held that the principle adopted in *Lyng* and carried forward by Congress in RFRA is "controlling" and forecloses the religious exercise claims here. 101 F.4th at 1049.

As in *Lyng*, Lopez challenges a government action that will effectively preclude use of certain federal land for religious exercise, but that does not "coerce[]," "penalize," or otherwise prohibit Lopez's religious practices. *Lyng*, 485 U.S. at 449. Lopez seeks the same "religious servitude," *id.* at 452, that would prevent the transfer of Oak Flat.

If Lopez were right, similar RFRA claims could burden vast swaths of federal lands. *Id.* at 453. That concern is not merely theoretical: "One religious adherent has testified that the 'entire state of Washington and Oregon' is 'very sacred' to him," and another "has claimed as sacred" an area spanning "some 40,000 square miles" around the Colorado River. *Apache Stronghold*, 101 F.4th at 1083 n.18 (Bea, J., concurring in part). The right to free exercise "simply does not provide a principle that could

33

justify upholding" such a claim to control public land. *Lyng*, 485 U.S. at 452.

To be sure, *Lyng* did not use the phrase "substantial burden." Lopez Pet. 13. But *Lyng* described the plaintiffs' claim as contending "that the burden on their religious practices is heavy enough to violate the Free Exercise Clause unless the Government can demonstrate a compelling need." *Lyng*, 485 U.S. at 447. The Court "disagree[d]," holding that burdens on religious exercise from the government's management of its own land are not cognizable under the Free Exercise Clause. *See id.* at 452-53; *see also id.* at 458-59 (Brennan, J., dissenting) (acknowledging "the Court's determination that federal land-use decisions that render the practice of a given religion impossible do not burden that religion in a manner cognizable under the Free Exercise Clause").

Lopez mischaracterizes *Lyng* as "an example of a *Smith*-style case that rejected a free exercise challenge where 'the law in question was neutral and generally applicable.'" Lopez Pet. 13 (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 460 (2017)) (cleaned up). In Lopez's view, *Lyng* relied on "the same test adopted in [*Smith*] and rejected by RFRA." *Id.* But this Court rightly rejected that reading of *Lyng* as "patently incorrect." 101 F.4th at 1062. That is because "[t]he law at issue in *Lyng* was manifestly *not* generally applicable"; instead, "the relevant provisions of the statute at issue in *Lyng* likewise involved legislative action directed at 'one 'particular

34

property.'"" *Id.* at 1053; *see also id.* at 1069 at n.4 (Bea, J., concurring in part) ("[A]n Act of Congress that deals with a specific stretch of road in Northern California is not, by definition, a 'neutral law of general application.'"). *Lyng* did not adopt, "rest[] upon, or endorse[], the broad rule later adopted in *Smith*."[5]

Lopez also contends that *Lyng* "didn't involve destruction of a religious site," and "rested solely on 'subjective spiritual harm.'" (Lopez Pet. 14). But *Apache Stronghold* correctly rejected that argument as at odds with *Lyng* itself. 101 F.4th at 1052. As the Court explained, the action challenged in *Lyng* would "'*physically destroy* the environmental conditions and the privacy without which the religious practices cannot be conducted.'" *Id.* (quoting *Lyng*, 485 U.S. at 449). Indeed, *Lyng* squarely rejected any "subjective/physical distinction," *id.*, explaining that courts have no principled basis to "say that one form of incidental interference with an individual's spiritual activities should be subjected to a different constitutional analysis than the other," *Lyng*, 485 U.S. at 450. That principle likewise forecloses Lopez's distinction between "'subjective

---

[5] As the Court explained, *Trinity Lutheran* "at most" "suggested in dicta that *Lyng* fits a pattern of cases in which the Court upheld laws that were 'neutral and generally applicable without regard to religion' in the sense that they did not 'penalize religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens.'" 101 F.4th at 1054 (citing *Trinity Lutheran*, 582 U.S. at 460). But *Trinity Lutheran* did not consider whether the statute in *Lyng* "could be properly deemed to qualify as 'neutral and generally applicable' under the details of *Smith's* framework." *Id.* at 1054-55.

35

spiritual harm'" and "'objective' impediment to acts constituting religious exercise." Lopez Pet. 14.

> **B.** ***Apache Stronghold* does not conflict with any decision of the Supreme Court or other appellate court.**

Lopez also asserts that *Apache Stronghold* conflicts with Supreme Court precedent and decisions of other circuits. Not so. Lopez cites no Supreme Court or appellate court decision holding—or even suggesting—the government's disposition of its own land can impose a substantial burden cognizable under RFRA.

> **1.  Apache Stronghold does not conflict with any Supreme Court decision.**

As this Court explained, *Apache Stronghold's* holding followed directly from *Lyng*, which was "controlling." 101 F.4th at 1049-52. In attempting to show otherwise, Lopez overreads statements in the Supreme Court's post-RFRA decisions addressing very different issues. But Lopez merely resurrects the same arguments Apache Stronghold advanced in its unsuccessful motions for certiorari and for reconsideration based on *Mahmoud*, both of which the Supreme Court denied. *Apache Stronghold*, 145 S. Ct. 1480 (denial of certiorari); 146 S. Ct. 285 (denial of rehearing).

Lopez first asserts (Lopez Pet 12) that *Apache Stronghold* is inconsistent with the Supreme Court's statement in *Hobby Lobby* that "the results would be absurd if RFRA . . . merely restored this Court's

pre-*Smith* decisions in ossified form." 573 U.S. at 715. But *Hobby Lobby* was addressing whether for-profit corporations are "person[s]" who can exercise religion within the meaning of RFRA. *Id.* at 705. *Hobby Lobby's* conclusion that for-profit corporations can assert RFRA claims, even absent pre-*Smith* case law on point, "does not stand for the quite different—and erroneous—proposition that RFRA is somehow exempt from the settled rule that 'Congress legislates against the backdrop of existing law.'" *Apache Stronghold*, 101 F.4th at 1063.

Lopez likewise errs (Lopez Pet. 12) in relying on *Holt v. Hobbs*, where the Supreme Court held a lower court considering a prisoner's claim under the Religious Land Use and Institutionalized Persons Act ("RLUIPA") had "improperly imported a strand of reasoning" from pre-RLUIPA precedents. 574 U.S. 352, 361 (2015). The lower court erred in *Holt* by considering whether a prisoner had "alternative means of practicing [his] religion"—a question relevant before RFRA and RLUIPA, but that Congress foreclosed by adopting the substantial-burden test. *Id.* Here, in contrast, this Court relied on a pre-*Smith* requirement—a cognizable "burden" on religious exercise—that Congress explicitly incorporated into RFRA's text.

*Hobby Lobby* and *Holt* underscore that RFRA and RLUIPA can obligate the government to provide religious accommodations even where the Free Exercise Clause would not. But neither supports Lopez's view that Congress repudiated *Lyng*—an assertion that would have come as a

37

shock to RFRA's key supporters, who gave express assurances that the statute would do no such thing. *See supra.*

Finally, Lopez is also incorrect that *Apache Stronghold* conflicts with the Supreme Court's decisions in *Mahmoud* and *Mirabelli v. Bonta*, 607 U.S. 492 (2026). Lopez Pet. 16-17. *Mahmoud* addressed a school district's decision rescinding a policy permitting parents to excuse their elementary-age children from instruction related to LBTQ+ inclusive storybooks that conflicted with the parents' religious beliefs. 606 U.S. at 528-30. *Mahmoud* held that "[a] government burdens the religious exercise of parents when it requires them to submit their children to instruction that poses 'a very real threat of undermining' their religious beliefs and practices." *Id.* at 530.

In *Mirabelli*, the Supreme Court vacated in part a Ninth Circuit stay of a district court's injunction barring a California school district from implementing its policy preventing school officials from notifying parents of a student's gender transition without the child's consent. 607 U.S. at 493, 498. Like *Mahmoud*, *Mirabelli* involved government interference with parents' rights to "guide the religious development of their children." *Id.* at 496 (quoting *Mahmoud*, 606 U.S. at 559). The Court concluded the *Mirabelli* plaintiffs were likely to succeed in demonstrating that the district's policies violated the Free Exercise Clause and their Fourteenth Amendment substantive due process rights. *Id.* at 496-98.

38

Both *Mahmoud* and *Mirabelli* involved parental rights in the context of public education. The holdings of those cases have no bearing on the question here (and answered in *Lyng*) whether the government's disposition of its own land can impose a cognizable burden on religious exercise. Indeed, *Mahmoud* expressly distinguished *Lyng* as having "no application." 606 U.S. at 557. And the Supreme Court declined to rehear its denial of certiorari in *Apache Stronghold* in light of *Mahmoud*. 146 S. Ct. 285. The panel therefore correctly determined that *Apache Stronghold* was not clearly irreconcilable with *Mahmoud*. Op. 38-39. Nothing in *Mirabelli* calls that conclusion into question or even suggests it warrants further review.

### 2. Apache Stronghold does not conflict with any decision of any other appellate court.

Lopez is also incorrect that *Apache Stronghold* conflicts with the decisions of other appellate courts. Lopez Pet. 15. Lopez identifies decisions it characterizes as holding "that preventing a religious exercise is, necessarily, a 'substantial burden' on that exercise." *Id.*

But in *Apache Stronghold*, a majority *agreed* that "preventing access to religious exercise is an example of substantial burden." 101 F.4th at 1043. The Court rejected Apache Stronghold's claim on the narrower ground that, under *Lyng*, "a disposition of government real property does not impose a substantial burden on religious exercise" because it does not "coerce individuals into acting contrary to their

39

religious beliefs," "'discriminate' against religious beliefs," "'penalize' them," or "deny them 'an equal share of the rights, benefits, and privileges enjoyed by other citizens.'" *Id.* at 1044 (quoting *Lyng*, 485 U.S. at 449-50, 453).

Lopez does not identify any decision by any appellate court that conflicts with that holding concerning RFRA's application to the government's disposition of its own land. By contrast, the decisions Lopez invokes largely addressed RLUIPA claims arising in far different circumstances. Lopez Pet. 15. *See Thai Meditation Ass'n of Ala., Inc. v. City of Mobile*, 980 F.3d 821, 825 (11th Cir. 2020) (RLUIPA challenge to zoning); *Bethel World Outreach Ministries v. Montgomery Cnty. Council*, 706 F.3d 548, 552 (4th Cir. 2013) (same); *West v. Radtke*, 48 F.4th 836, 840 (7th Cir. 2022) (RLUIPA challenge to prison policies); *Haight v. Thompson*, 763 F.3d 554, 558-559 (6th Cir. 2014) (same); *Yellowbear v. Lampert*, 741 F.3d 48, 51-52 (10th Cir. 2014) (Gorsuch, J.) (same).

The RLUIPA land-use cases are inapposite because RLUIPA is limited to circumstances where the claimant has an ownership interest in the lands at issue. RLUIPA does not support any claim to control how someone else's property is used, let along the government's property. And the cases involving prisons are different because they "inherently involve coercive restrictions" and thus "do *not* raise a similar *Lyng*-type issue about the bounds of what counts as 'prohibiting' religious exercise." *Apache Stronghold*, 101 F.4th at 1062.

40

### C. Lopez's claims would fail even if RFRA forbids the Land Exchange.

Even if this Court were inclined to reconsider (again) how RFRA applies to federal land more broadly, this case would be a poor vehicle for doing so because Lopez's RFRA claim is atypical. In the paradigmatic RFRA case, the claimant seeks a religious exemption "from a rule of general applicability." 42 U.S.C. § 2000bb-1(a); *see, e.g., Hobby Lobby*, 573 U.S. at 726-727 (religious exemption from mandate to provide contraceptive coverage); *O Centro*, 546 U.S. at 434-437 (religious exemption from federal drug laws for religious use of controlled substance). But here, Lopez does not seek a religious exemption. She seeks to prevent the very land exchange Congress mandated. The RFRA question is therefore academic to the proper resolution of the case. As Judge Bea explained in *Apache Stronghold*, "the plain text of the Land Exchange Act requires that the land exchange, including the exchange of Oak Flat, *must* occur if the preconditions are met." 101 F.4th at 1090 (Bea, J., concurring in part and dissenting in part). Thus, even if Lopez were correct that RFRA forbids the land exchange (she is not), the result would be an "irreconcilable" conflict between RFRA and the Land Exchange Act—one statute prohibiting what the other specifically commands. *Id.* And in the event of such a conflict, the later and more specific statute must be given effect. *See, e.g., Nat'l Ass'n of Home*

41

*Builders v. Defenders of Wildlife*, 551 U.S. 644, 662-63 (2007); *Posadas v. National City Bank*, 296 U.S. 497, 503 (1936).

The Land Exchange Act would control over RFRA notwithstanding the rule of construction in 42 U.S.C. § 2000bb-3. 101 F.4th at 1087-90 (Bea, J., concurring in part and dissenting in part). That provision states that RFRA applies to any federal law enacted after RFRA "unless such law explicitly excludes such application by reference to this chapter." 42 U.S.C. § 2000bb-3(b). But such express-statement requirements are "ineffective." *Lockhart v. United States*, 546 U.S. 142, 147-50 (2005) (Scalia, J., concurring) (citing Section 2000bb-3(b) as an example). "That is because statutes enacted by one Congress cannot bind a later Congress, which remains free to repeal the earlier statute, to exempt the current statute from the earlier statute, to modify the earlier statute, or to apply the earlier statute but as modified." *Dorsey v. United States*, 567 U.S. 260, 274 (2012). And a future Congress "remains free to express" its intention to amend or partially repeal prior law "expressly or by implication as it chooses." *Id.*

In the mine run of RFRA cases, no irreconcilable conflict will arise between RFRA and any later-enacted statute because the government can generally carry both into effect by granting a religious exemption while continuing to apply the later-enacted statute to others. Providing exemptions or accommodations is generally "how [RFRA] works." *O Centro*, 546 U.S. at 434; *see Little Sisters of the Poor Saints Peter & Paul*

42

*Home v. Pennsylvania*, 591 U.S. 657, 681 (2020). But this case is anomalous because Lopez does not seek an exemption from a law that would continue to operate as to others but rather invokes RFRA to block a land transfer that Congress specifically required.

Congress mandated the land exchange with full awareness that some Native Americans consider the area to be sacred. Indeed, the Land Exchange Act reflects a legislative compromise: Congress did not transfer Apache Leap, which had also been identified as sacred in committee hearings. 16 U.S.C. § 539p(g)(2)(B). Congress already determined that the land exchange "shall" occur despite sincerely held religious objections. 16 U.S.C. § 539p(c)(10). RFRA's general prohibition cannot thwart that unambiguous directive from a later Congress. Lopez's petition should be denied.

## CONCLUSION

For these reasons, rehearing en banc should be denied.

43

Respectfully submitted,

/s/ *Angela N. Ellis*

Of Counsel:                                     ADAM R.F. GUSTAFSON
                                                *Acting Assistant Attorney General*
ANDREW MOORE                                     ROBERT N. STANDER
ANDREW SIMEK                                     *Deputy Assistant Attorney General*
NICHOLAS PINO                                    THEKLA HANSEN-YOUNG
*Attorney*                                       ERIKA NORMAN
Office of the General Counsel                    ANGELA ELLIS
U.S. Department of Agriculture                   *Attorneys*
                                                 Environment & Natural Resources Div.
                                                 U.S. Department of Justice
                                                 Post Office Box 7415
                                                 Washington, D.C. 20044
                                                 (202) 598-7942
                                                 angela.ellis@usdoj.gov

July 3, 2026
90-1-4-16263
90-2-4-16252
90-1-4-16516

44

## Form 11.  Certificate of Compliance for Petitions for Rehearing/Responses

**9th Cir. Case Number(s)** 25-5185, 25-5189, 25-5197

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 40-1, the attached petition for panel rehearing/petition for rehearing en banc/response to petition is *(select one)*:

[ X ]  Prepared in a format, typeface, and type style that complies with Fed. R. App. P. 32(a)(4)-(6) and contains the following number of words: 10,000

**OR**

[  ] In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.


**Signature**     /s/ *Angela N. Ellis*

**Date**          July 3, 2025

45